they were fixing the balance sheet and, in effect, complying with GAAP."[143]

    iii.    With respect to the CRA entry, "my best recollection is that there was a liability on the balance sheet for PIP, if you will, or CRAs. I mean, I'm not sure exactly that classification that the account was sitting under under [sic] the client's cost rate adjustment section of their trial balance, and that they were reclassifying what I call contractual over to the re – reclassifying it over to bad debt reserve, if you will, for the Delaware Valley Obligated Group report."[144]

    iv.    The HUH receivable related to "receivables that Hahnemann had coming to it from the government for some Graduate Medical Education programs ... I believe the amount that Hahnemann was entitled to receive was much greater than 3.6 million. So this 3.6 is a subset of that, and I can't give you the specifics on how those amounts were segregated."[145]

  v.  Mr. Buettner's statement that items, discussed in paragraph (u.i) and (u.ii) above, are immaterial is incorrect for the following reasons:

    i.    Although GAAP does not require prior year adjustments for immaterial items, the assessment of materiality should have been performed both individually and in aggregate for all known prior year items.

    ii.    PwC should have included prior year items on its SUD in a manner that segregated those items from proposed current year adjustments.

    iii.    Prior year items should not have been commingled with current year items.

    iv.    As is evident from the deposition testimony of members of the Board of Trustees[146] and from the transcriptions of the meeting of the audit committee, the results of operations for the AHERF

---

[143] Ibid, page 267 line 17 through page 268 line 6
[144] William Buettner 6/23/04 deposition, page 286 lines 13 to 23
[145] Ibid, page 287 line 3 through page 289 line 5
[146] For example, J. David Barnes 07/08/03 deposition, page 49 line 10 through page 53 line 13

Prepared in connection with litigation

entities was an important area for those users of the financial statements.[147]

w.  As discussed in paragraph B.4.b.iii above, to the extent that there is an impact on a significant financial statement item, this netting of entries by AHERF was not appropriate. In addition, the use of excess reserves, or cushions, that were inappropriately set up in prior years to offset current year adjustments represented earnings management by AHERF and was not in compliance with GAAP.

x.  PwC failed to obtain sufficient competent evidential matter to provide reasonable assurance that the reserve for uncollectible accounts was reasonable in the circumstances. In fact, given the increased risk assessment of accounts receivable including: collectibility issues, billing process issues, deteriorating aged receivables and inadequate reserve methodologies and percentages, PwC should have concluded that the 1996 reserve for uncollectible accounts as stated in the combined financial statements was not reasonable and was materially misstated.

y.  PwC issued a management letter dated September 23, 1996,[148] which included its observations on AHERF's accounts receivable. This letter was addressed to the Board of Trustees of AHERF and contained the following observation:

"As a result of our procedures, we have concluded that the controls over the establishment and monitoring of accounts receivable reserves are designed appropriately and are operating effectively so as to properly adjust accounts receivable balances to their estimated net realizable value."

z.  This observation is surprising given PwC's recognition that the methodologies used by the DVOG Hospitals to develop the estimate for uncollectible accounts were inconsistent and inadequate, as discussed above.

aa. In contrast to the observation that PwC included in its management letter, PwC should have informed the Board of Trustees of the deficiencies it had noted with respect to management's methodology for developing the estimate for uncollectible accounts and the control weaknesses in AHERF's accounting for receivables.

---

[147] GOR 0000025 – 37 and Exhibit 1648, GOR0000194 – 202
[148] Exhibit 168, AHERF Audit Committee package, DBR-DKS 020201

Prepared in connection with litigation

bb. In addition, the October 15, 1996 audit committee transcription noted that Mr. Buettner stated the following:

"you are taking a very realistic and conservative approach ...

We did perform additional work in the receivables area from a control perspective and from an individual billing review perspective. Findings outlined in comment letter. We are comfortable with the process management is following to establish reserves."[149]

This statement was not consistent with PwC's findings.

### 4    Utilizing "Cushions" to Decrease the Reported Net Loss

a    In periods prior to fiscal year 1996, AHERF had a practice of recording excess expenses or not recording income. This practice helped AHERF to establish "cushions" to be used in future years to "manage" net income. The creation and use by management of such cushions enabled management to manipulate its reported income. AHERF used worksheets called "Analysis of Reserves"[150] (also referred to by some as "X-files"[151]) to keep track of available cushions. AHERF's practices in this regard have been the subject of extensive testimony by many individuals in AHERF's accounting department, including Messrs. Spargo, Cancelmi, Adamczak, Scharf, Lisman and Ellsworth.

b    This practice of earnings management was pervasive throughout AHERF. As a result of the poor financial performance of DVOG, most of the cushions available on DVOG's books were used in fiscal year 1996 to mask this poor performance, and resulted in a material misstatement of the results of operations of DVOG.

c    The FASB has made it clear that general or unspecified business risks do not meet the conditions for accrual, and should not be included in the financial statements.

i.    "Some enterprises have in the past accrued so-called 'reserves for general contingencies.' General or unspecified business risks do not meet the conditions for accrual", and "no accrual for loss shall be made." [FAS 5, par. 14]

---

[149] Exhibit 1648, GOR0000198 – 199
[150] See for example Exhibit 1341
[151] Charles Lisman 05/22/04 deposition, page 203 line 14 through page 206 line 13

Prepared in connection with litigation

d   During its 1995 audit, PwC was aware, or should have been aware, of a number of these cushions in AHERF's financial statements. AHERF had recorded these cushions as liabilities in, among other accounts, third party settlement accounts, non-current liabilities, and corporate service accruals, and also had unrecorded income from various sources. PwC also knew, or should have known, that these excess reserves were used to inflate income and or reduce expenses in fiscal year 1996. In 1996, AHERF's net loss would have been materially increased had it not used its cushions to misstate its income.

    i.    For example, HUH's books and records included an unusually high liability accrual in its 1994 CRA account for Medicare. In June 30, 1995 the amount of the accrual was $13.6 million.[152] Contemporaneous "Analysis of Reserves" worksheets showed a large "Prior Year CRA" cushion at HUH.[153]

    ii.    When auditing CRA reserves for tentative settlements and final settlements, Duane Girol, PwC CRA specialist, testified:

"I would need specific quantifiable reasons. And if those reasons don't exist, you know, then I would consider, you know, a general cushion or a reserve that's somewhat excess in nature ...

On a final settled you need specific reasoning to have a reason on it. On a tentative settled cost report, you need to have some quantification as well. You know, I'm just not going to accept that we have a $2 million dollar payable booked because in prior years there have been audit adjustments, so on and so forth. I need to have it quantified for me to consider it an acceptable reserve."[154]

- In the 1995 audit working papers, PwC did not include any explanations or supporting documents relating to a $13.6 million credit balance in the 1994 Medicare CRA account.[155]

- Mr. Girol admitted that this $13.6 million credit balance in the 1994 Medicare CRA account could be a cushion.[156]

---

[152] Exhibit 4048, CL 049729
[153] Exhibit 1341 shows $19.5 million of Prior year CRA as of 6/30/95 and Exhibit 1343 shows $13.0 million
[154] Duane Girol 10/22/03 deposition, page 118 line 3 to line 20
[155] Ibid, page 184 line 14 through 186 line 10, page 188 line 16 to 23, and Exhibit 4048, CL 049729
[156] Duane Girol 10/22/03 deposition, page 201 line 5 through page 202 line 1

Page 57 of 114

Prepared in connection with litigation

- In the 1996 audit working papers, the 1994 Medicare CRA account was shown to have decreased from $13.6 million to $124,000.[157] Of this decrease, $4 million was the result of the settlement for 1993 Medicare CRA being recorded in this account. The remaining $9.5 million was used to inflate fiscal year 1996 income, primarily to cover patient revenue adjustments.

- An issue topic within PwC's audit working papers, headed Non-recurring Income in the Current Year, indicates that PwC was aware that $12 million of "other CRA reserves" was included in fiscal year 1996 income.[158]

iii. According to their 1995 audit working papers, PwC knew that a $7.4 million final settlement should have been reflected as income rather than as a CRA reserve.[159]

- Amy Frazier testified that she wrote, "This Δ [change] has resulted in additional reimbursements. HUH has reflected $7.4M of this (which has been received) as a CRA reserve. C&L proposed an adjustment to record this amount in income. Note, the $7.4M is related to final settled years. HUH has not recorded a receivable for the remaining open yrs (i.e., FY 92, 93, & 94). C&L also proposes an adjustment to record the remaining years. Total amount recognized to income $13.4M."[160]

- A PwC 1995 audit working paper noted: "M/C GME Settlement of $7,400,000. Have we reserved for this entire amount?  received 7,400,000 & cushioned for entire amount."[161]

- PwC's audit working papers also noted: "Other noncurrent [sic] liabilities consists primarily of a CRA reserve received for payment of outstanding GME audit adjustments that were received during fiscal year 1995. The $7.4 million was not properly recognized into income during the current year. See

---

[157] Exhibit 4056, CL 008803-804
[158] Exhibit 1340, CL 000350
[159] Exhibit 1335, CL 049738
[160] Exhibit 4048, CL 049738 and Amy Frazier 06/08/04 Deposition, page 76 line 7 through page 79 line 12
[161] Exhibit 4047, CL 051593

Page 58 of 114

Prepared in connection with litigation

CRA w/p's and the SUD for adjustment to reflect the amount in current year net patient service revenue."[162]

- For financial statement purposes, at June 30, 1995, DVOG reclassified $4.0 million of the $7.4 million unnecessary CRA reserves to reserves for uncollectible accounts. However, this reclassification was never recorded in the underlying books and records, thus causing the balance of the unnecessary CRA reserves as of July 1, 1995 to remain at $7.4 million.

- In 1996, PwC knew this $7.4 million cushion was used to inflate income as indicated by the issue topic "Non-recurring Income in the Current Year" referred to above.[163]

iv.  As of June 30, 1995 AHERF carried a $6.5 million cushion in its Corporate Service Accrual account. PwC knew this cushion existed.

- In a 1995 audit working paper, PwC noted "per Jack Lydon, [Manager of Accounting & Financial Reporting], that this account is a cushion for potential future CRA adjustments"[164] referring to a $6.5 million corporate service accrual. This cushion was also listed in a PwC "A/P scoresheet"[165] working paper, but was not included on PwC's SUD.

- In 1996, PwC knew that $5.9 million of this cushion was used to inflate income. PwC noted "AHERF has reduced it's [sic] 'cushion' for accruals during the course of the year. C&L does not take exception and waives futher [sic] review."[166]

v.  DVOG did not record equity investment income from Health Partners of $3,563,000 and $1,264,000 for MCP and SCHC, respectively.[167] These balances, which totaled $4.8 million, were cushions and were included on AHERF's cushion analysis ("X-files").[168]

---

[162] Exhibit 1338, CL 053899
[163] Exhibit 1340, CL 000350
[164] Exhibit 4055, CL 056871
[165] Exhibit 4054, CL 056854
[166] Exhibit 4334, CL 002889
[167] Exhibit 11, Attachment A (Same as CL 057326) and also included in PwC's SUD, Exhibit 1339, CL 057339 and 341
[168] Exhibit 1341

Prepared in connection with litigation

- In the 1995 audit working papers, PwC listed the $4.8 million Health Partners audit adjustments on the SUD.

- In 1996, PwC noted in an issue topic "in the current year AHERF recorded the Health Partners Investment on the financial statements and recognized in FY 96 approximately $5.2 million of income relating to 1994 and 1995 equity investments."[169] PwC knew that DVOG improperly inflated income by recording $4.8 million of prior year Health Partner equity investment income in the current year.

vi. In the 1995 audit working papers, PwC identified, on an "AHERF PP+E Scoresheet" working paper, certain excess reserves in DVOG's accumulated depreciation accounts.[170] Some of these excess reserves, as PwC knew, were identified as excess in its property plant and equipment working papers.[171] Some of the excess accumulated depreciation reserves were also identified in contemporaneous X-files.[172]

- In 1996, PwC knew, or should have known, that much of the prior year excess accumulated depreciation ($1,133,000 for SCHC, $999,438 for Bucks, and $597,000 for Elkins Park) was reclassified to reserves for uncollectible accounts in March 1996. This reclassification of $2.7 million increased income by not charging the corresponding increase to bad debt expenses.[173]

- As part of the $17.5 million reserves for uncollectible accounts adjustments recorded in September 1996 as of June 30, 1996, AHERF transferred an additional $6 million of excess accumulated depreciation to reserves for uncollectible accounts, as discussed in section i above. $5 million of the $6 million related to prior year excess depreciation.[174]

---

[169] Exhibit 1340, CL 000350. Exhibit 287 corroborates with PwC's working paper regarding the $5.2 million of equity investment income.

[170] Exhibit 4380, CL 056131

[171] CL 056131 (PP&E Scoresheet), CL 056265 – 266 (SCHC PP&E rollforward), CL 056290 – 292 (Bucks PP&E rollforward), CL 056302 – 303 (Elkins Park PP&E rollforward), CL 056329 – 332 (HUH PP&E worksheets), CL 56313 – 315 (MCP PP&E worksheets)

[172] Exhibit 1341

[173] SCHC $1,133,000 in CL 010574 agrees with Exhibit 114, CL 001357. Bucks $1,493,000 in CL 010572, of which, $999,000 was transferred to bad debt reserve as indicated at Exhibit 108, CL 001016. Elkins Park $597,170 in CL 010571 appears to have increased bad debt reserve as indicated in Exhibit 112, CL 001281.

[174] PwC 1996 audit working papers, CL 002495

Prepared in connection with litigation

    e   The use by AHERF of these cushions to manage the earnings reported in its financial statements was not in accordance with GAAP. PwC should have communicated the inappropriate use of these cushions to AHERF's audit committee.

## 5   Improperly Recognized a Gain of $6.7 million on the IBM "Sale Leaseback" Transaction

    a.  In fiscal year 1996, AGH "sold" its IBM Building and leased back a significant portion of the building. AGH recorded a $6.7 million gain on this "sale."[175]

    b.  GAAP stated "A sale of property that is accompanied by a leaseback of all or any part of the property for all or part of its remaining economic life shall be accounted for by the seller-lessee in accordance with the provisions of [FAS 28, paragraph 3]." [FAS 28, par. 2]

        i.   For an operating lease, any profit or loss on the sale shall be deferred and amortized over the lease term. [FAS 28, par 3]

    c.  The recognition of all of the gain by AGH was in violation of GAAP.

    d.  Mr. Buettner testified that he recalled the issue of AHERF's treatment of the IBM sale and leaseback coming up in the 1996 audit and that he took exception to AHERF's treatment.[176]AGH should have deferred and amortized the $6.7 million gain over the term of the lease. PwC performed an analysis during the course of its audit of AGH and also concluded that recognition of the gain was improper.[177] It posted the proposed reversal of the $6.7 million gain to its SUD.[178]

        i.   The reversal of this $6.7 million gain on the SUD was largely offset by PwC with a $7.1 million entry relating to capitalized interest.[179] As $6.5 million related to prior year's capitalized interest, using that portion as an offset to increase current year income on the SUD was improper. Rather, PwC should have accumulated the $6.5 million along with other prior year items on its SUD, in order to assess the impact, both individually and in the

---

[175] PwC 1996 audit working papers, CL 000170 to 172
[176] William Buettner 6/23/04 deposition, page 531 line 19 through page 532 line 4
[177] Exhibit 4399, CL 000379
[178] Exhibit 1351, CL 000327
[179] PwC 1996 audit working papers, CL 007539

Prepared in connection with litigation

aggregate, of all those items in determining whether there was a need for a prior year adjustment.

    e. GAAS called for PwC to inform the audit committee about adjustments arising from the audit that could have a significant effect on the entity's financial reporting process.  [AU 380.09]

    f. GAAS also called for PwC to discuss with the audit committee any disagreements with management about matters that could be significant to the entity's financial statements or the auditor's report.  [AU 380.11]

    g. PwC disagreed with management's treatment of the $6.7 million gain and proposed a deferral of the gain.  PwC prepared an issue topic with a detailed discussion of the accounting treatment of this sale.[180]

    h. There is no evidence to indicate that this material adjustment proposed by PwC and/or the disagreement with management was communicated to the audit committee.

**6   Tort Settlements (Understated Expenses by $4.4 million)**

    a. In fiscal year 1996, AHERF recorded the amounts paid in connection with tort settlements with two employees, Iqbal Paroo and Carol Calvert, in account 2501910 "Other Assets"[181].  These amounts were being amortized over a five-year period.

    b. GAAP states that assets represent "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." [CON 6.25]

        i. "An asset has three essential characteristics:

- it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows,
- a particular entity can obtain the benefit and control others' access to it, and
- the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred." [CON 6.26]

---

[180] Exhibit 4399, CL 000379
[181] Exhibit 4270

Prepared in connection with litigation

c.  PwC knew, or should have known, that the amounts capitalized relating to these tort settlements did not represent probable future economic benefits that could result, directly or indirectly, in future net cash inflows.

    i.  It is evident from the PwC audit working papers that "tort costs" were discussed at the preliminary status meeting for the AHERF audit held on or about May 16, 1996.[182]

    ii.  PwC was aware that the purported justification for including these costs in the Other Asset accounts "relate[d] to tort settlements with former employees to not compete."[183]

    iii.  The 1996 audit working papers do not specifically indicate whether the settlement agreements themselves were reviewed, to verify that these amounts, in fact, represented agreements not-to-compete. However, the 1997 audit working paper did indicate, "These [referring to tort settlement agreements] are confidential and were reviewed by the partner."[184] Given the materiality of the amounts, these agreements represented competent evidential matter that should have been obtained during the audit.

    iv.  The settlement agreement with Iqbal Paroo states that $3,300,000 was being paid to settle Mr. Paroo's claim for "intentional infliction of emotional distress."[185] The only mention of any non-compete provisions is in paragraph 3 of this agreement and it relates to the payment to Mr. Paroo of his benefits under the AHERF Management Long Term Incentive Plan and the flexible benefits program. There is no reference to any non-compete provision in the section of the agreement relating to the payment of the $3,300,000.[186]

    v.  Mr. Paroo confirmed in his deposition testimony that it was his understanding that the non-compete provision related only to the amounts due to him under the Executive Retirement Accounts (ERA),[187] which would be paid in the future, should Mr. Paroo comply with the provisions of the non-compete portion of the

---

[182] CL 0203370 (from Amy Frazier's computer files)
[183] Exhibit 4270
[184] Exhibit 4137, CL 014994
[185] Agreement between Iqbal Paroo and AHERF, Exhibit 1413, page 4 of 7
[186] Ibid, page 3 & 4
[187] Iqbal Paroo 4/14/03 deposition, page 250 line 18 to 253 line 14

Page 63 of 114

Prepared in connection with litigation

agreement. This is supported by the fact that a letter was sent to Mr. Paroo on November 26, 1997, stating that the non-compete provisions had been satisfied and enclosing a check for the benefits due to him. Furthermore, the duration of the non-compete period referred to in that letter was only 24 months, rather than the four or five-year periods referenced by PwC in its 1996 audit working papers.

vi.    The settlement agreement with Carol Calvert indicated that $1,600,000 was being paid to settle Ms. Calvert's claim for intentional infliction of emotional distress.[188]

vii.   The agreement mentioned a non-compete provision in two places. The first mention was in paragraph 3, which was similar to the reference in the Paroo agreement, and the second mention was in paragraph 17. The second reference refers back to the section of the agreement in which the payment of benefits under various AHERF programs is discussed. There is no reference to any non-compete provision in the section of the agreement relating to the payment of the $1,600,000, which is incremental to the benefit amounts discussed in paragraph 3 and not related to the non-compete provision.

viii.  The reference to a non-compete provision in paragraph 17 of the settlement agreement refers to a period of three years from the date of the settlement agreement. Again, this is different to the four and five-year periods referenced by PwC in its 1996 audit working papers.

d.  Contrary to the notation in PwC's 1997 audit working papers referred to above, Mr. Buettner testified that he did not review the tort settlement agreements:

"Q.    Do you know who on the engagement team, if anyone, actually reviewed the tort settlement agreements discussed here?
A.     I don't believe anyone reviewed the tort settlement agreements.
Q.     Did you review them?
A.     No, I did not.
Q.     Do you recall being – knowing that as a part of your '96 audit work, that no one had reviewed them?
A.     Yes.

---

[188] Exhibit 2172, AMS6 000155

Prepared in connection with litigation

Q.   Did that concern you?
A.   No, it did not.
Q.   Why is that?
A.   The amount was not material and I had discussions with a
     member of AHERF management, specifically Steve Spargo,
     about the items.

     We talked about the fact that the amortization period was wrong
     and I told him we could live with the difference in the write-off
     period.

     Based on my conversation with him, I was comfortable that
     there was no other audit work that needed to be done."[189]

e.  PwC knew, or would have known had it reviewed these agreements,
    that they had no future economic benefit to AHERF and that the $4.9
    million paid to settle these claims for "intentional infliction of emotion
    distress" should have been expensed when paid.

f.  Mr. Buettner's testimony that these amounts were not material is
    inconsistent with the materiality threshold for the 1996 audit.

g.  In addition, GAAS states that representations from management are not
    a substitute for the application of those audit procedures necessary to
    afford a reasonable basis for an opinion regarding the financial
    statements under audit. [AU 333.02]

h.  Had PwC performed adequate auditing procedures with respect to these
    agreements, it would have been aware that AHERF management had
    not appropriately recorded them in AHERF's financial statements. This
    fact would have required communication by PwC to AHERF's audit
    committee.

7   **Violation of Debt Covenants (AGHOG Morgan Agreement)**

a.  On April 1, 1995, AGHOG entered into a Reimbursement and Security
    agreement with Morgan Guaranty Trust of New York ("Morgan
    Agreement").[190] This agreement provided credit enhancement on $50
    million of bonds issued by AGHOG in fiscal year 1995, the "1995B
    Bonds." Included in that agreement were the following provisions:

---

[189] William Buettner 06/23/04 deposition, page 523 line 15 through page 524 line 14
[190] Exhibit 327, D0016926 to 931

Page 65 of 114

Prepared in connection with litigation

i.  Section 7(b) required that: (i) AGH's group debt not exceed 66
    2/3% of Consolidated Capitalization, (ii) AGH's Consolidated
    Unrestricted Fund Balances should be no less than $200 million at
    all times.  Excluded from this amount are "all loans to and other
    Investments in Affiliates[191] which are not Members of the
    Obligated Group[192] and all equity Investments in Persons which
    are not Subsidiaries…"[193]

ii. Documents reflecting the negotiation of the Morgan Agreement
    indicate that Morgan was defining this covenant to provide itself
    protection against outflows of funds to AHERF affiliates outside
    of AGHOG.

    - In a fax dated March 17, 1995, Susan Flanagan, Vice President
      at Morgan Guaranty Trust Company of New York, discussed
      the intent of excluding loans to affiliates from unrestricted fund
      balances:

      "However, given the substantial volume of inter-company
      flows that have occurred and that may occur in the future, we
      seek protection, customary for this type of transaction, that our
      limited obligation will not be weakened by net outflows to the
      advantage of other parts of the System.

      We are willing to take another approach to achieve the same
      objective by requiring minimum consolidated unrestricted fund
      balances, defined to exclude 'loans to and investments in
      affiliates outside the AHG [sic] Obligated Group' and
      expressed as a percentage of Total Assets."[194]

    - In another fax dated March 21, 1995, Susan Flanagan wrote
      next to the "Sale/Transfer of Assets" item: "The
      Reimbursement Agreement will not contain the customary 10%

---

[191] Exhibit 327, D0016897, Affiliate is defined as, "…any Person controlling, controlled by, or under common control with, such Person.
For purposes of this definition, 'control' means the power to direct the management and policies of a Person through the ownership of a
majority of its voting securities…any Person having an independent board of directors which is managed by any other Person pursuant
to an arm's-length management contract shall not be deemed to be controlled by such other Person solely by virtue of the existence of
such management contract."

[192] Exhibit 327, D0016895, "Members of the Obligated Group" - the Agreement states, "Reimbursement and Security Agreement dated as
of April 1, 1995 among Allegheny General Hospital (together with its successors, 'AGH') and Allegheny-Singer Research Institute
(together with its successors, 'ASRI') (collectively, the 'Members of the Obligated Group' or the 'Obligated Group') and each
individually a 'Member of the Obligated Group')…"

[193] Exhibit 327, D0016929

[194] Exhibit 328, F&L-01-021562

Page 66 of 114

Prepared in connection with litigation

per annum limitation on Sale/Transfers of Assets, as we believe the $200 million Unrestricted Fund Balance requirement will effectively protect the asset base during the original 3 year term of the letter of credit. The Unrestricted Fund Balance, as defined in the Reimbursement Agreement, would exclude intangible assets as well as investments in and loans to (due from) affiliates, etc. outside the AGH Obligated Group."[195]

iii.    Section 7(a) required that "... (iv) simultaneously with the delivery of each set of [annual and quarterly] financial statements referred to in clauses (i) and (ii) above, a certificate of the chief financial officer or the chief accounting officer of AGH (x) setting forth in reasonable detail the calculations required to establish whether the Members of the Obligated Group were in compliance with the requirement of Sections 7(b), (c) and (e) on the date of such financial statements and (y) stating whether any Default exists on the date of such certificate and, if any Default then exists, setting forth the details thereof and the action which such Person is taking or proposes to take with respect thereto; ..."[196]

iv.    Section 8 stated, "The following events shall be Events of Default hereunder unless waived in writing by the Bank ... (c) the Members of the Obligated Group shall fail to observe or perform any of the covenants contained in Section 7(b) through (e) ..."[197]

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

---

[195] Exhibit 329
[196] Exhibit 327, D0016926-7
[197] Ibid, D0016937
[198] Exhibit 4003, CL 221086 - 93

Prepared in connection with litigation

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

c.  PwC knew, or should have known, that AGH had violated the debt
covenant requiring AGH's consolidated unrestricted fund balance to be
no less than $200 million at March 31, 1996 and June 30, 1996.

   i.   At March 31, 1996, AGH did not calculate its consolidated
unrestricted fund balance in accordance with the Morgan
Agreement.  AGH did not exclude balances due from affiliates, as
required by Section 7(b)(ii) of the agreement, from the unrestricted
fund balance as described in paragraph 7.a.i above.[202]

   ii.  At March 31, 1996, the balance due from affiliates was
$65,771,000, of which $40 million was included in "Investments
limited or restricted as to use"[203] in the summary balance sheet
used by PwC in its preliminary analytical review, and noted as
such by PwC in those working papers.

   iii. In its 1996 audit working papers, PwC documented:  "Based on
our preliminary review of debt covenant compliance, AGH
appears to be in compliance w/ their covenants through March 31,
1996.  **C&L will update at year end.**"[204] [emphasis added]

   iv.  There is no evidence in the 1996 audit working papers to indicate
that PwC tested or recalculated the unrestricted fund balance
calculation for the Morgan Agreement.

---

[199] Ibid, paragraph 5
[200] Ibid, paragraph 6
[201] For example, Exhibit 438, CL 002811 contains a portion of paragraph 5, and Exhibit 4236 contains paragraph 6.
[202] Exhibit 431
[203] Exhibit 780, CL 000201
[204] Exhibit 440, CL 002804

Page 68 of 114

Prepared in connection with litigation

   v.   PwC failed to calculate the consolidated unrestricted fund balance
        in accordance with Section 7(b) of the Morgan Agreement.
        Christa Porter, PwC auditor, testified that she worked on the debt
        section for fiscal year 1996. However, it does not appear that she
        performed the recalculation procedures on the unrestricted fund
        balance covenant.[205] Neither PwC's working paper files nor the
        permanent files included a copy of the excerpts the financial
        covenant section contained in the Morgan Agreement.

   d.   I have prepared Exhibit E to calculate the unrestricted fund balance at
        March 31, 1996 and June 30, 1996 in accordance with the agreement.
        AGH violated the unrestricted fund balance covenant as of both March
        31, 1996 and June 30, 1996, without including the effect of any of the
        unrecorded adjustments discussed in this report.

   e.   Had PwC made the computation correctly, its separate report dated
        September 11, 1996, would have disclosed the covenant violation.
        Instead, PwC reported as follows:

        "In connection with our audit, nothing came to our attention that caused
        us to believe that the obligated group was not in compliance with the
        covenants (insofar as they relate to accounting or auditing matters)
        contained in Section 7 of the reimbursement and Security Agreement
        (Agreement) dated April 1, 1995 with Morgan Guaranty Trust Company
        of New York and PNC Bank (as Master Trustee)."[206]

8   **PwC's Failure to Comply with its Responsibilities for**
    **Communications with AHERF's Audit Committee**

   a.   As discussed in sections B.3.c and B.3.d above, GAAS requires an
        auditor to communicate certain matters to a client entity's audit
        committee. PwC failed to comply with these requirements in
        connection with at least the items discussed below.

   b.   These required communications were of particular importance in light
        of the qualitative factors impacting their materiality. For instance,
        senior management's intentional misapplication of accounting
        principles to inflate reported net income and unrestricted net assets
        (AHERF Irrevocable Trusts, tort settlements, earnings management,
        IBM sale leaseback, and understated bad debt reserves), particularly in

---

[205] Christa Porter 01/29/04 deposition, page 94 line 5 through page 95 line 20
[206] Exhibit 4239, CL 006236

Page 69 of 114

Prepared in connection with litigation

light of the compensation structure of senior management,[207] should have been reported to the audit committee. These intentional misstatements raised doubts about the integrity of AHERF's senior management.

c.  Had PwC appropriately tested the classification of the AHERF Irrevocable Trusts, it should have been aware of the improper nature of the classifications made by AHERF's management. The impact of these misclassifications was material to both the consolidated balance sheet and the consolidated statement of operations. The extent and nature of these impacts would also have required communication to the audit committee.

d.  In its management letter dated September 23, 1996, PwC included the following statement:

"As a result of our procedures, we have concluded that the controls over the establishment and monitoring of accounts receivable reserves are designed appropriately and are operating effectively so as to properly adjust accounts receivable balances to their estimated net realizable value."[208]

Contrary to the message conveyed by this statement, Mr. Buettner has testified that he suggested to AHERF management that the reserve for uncollectible accounts be increased by between $15 million and $20 million.[209]

GAAS requires that an auditor inform the audit committee about proposed corrections of the financial statements arising from the audit, whether or not recorded by the entity, that could have a significant effect on the entity's financial reporting process.

This proposed adjustment, and the underlying factors that gave rise to it, should have been communicated to the audit committee.

e.  The use by AHERF management of cushions in order to "manage" reported earnings should also have been communicated to the audit committee, as not only was this practice not in accordance with GAAP,

---

[207] SEC Exhibit 209, PwC 003351
[208] Exhibit 168, Audit Committee Package, DBR-DKS 020201
[209] William Buettner 6/22/04, deposition, page 218 line 22 through page 219 line 2

Prepared in connection with litigation

but AHERF's management received significant compensation based on the financial results achieved.[210]

    f.  PwC's disagreement as to the treatment of the IBM sale and leaseback transaction should have been communicated to the audit committee.

    g.  Had PwC appropriately audited the tort settlements recorded as assets by AHERF management, it would have known that there was no valid basis for treating these amounts as assets. The improper recording of these agreements would have been an item that would have required communication to the audit committee.

    h.  As discussed above, PwC failed to appropriately test the calculation of the Morgan Agreement debt covenants and erroneously reported to the Board of Trustees that AGHOG was in compliance with those covenants.[211] Had PwC appropriately tested these calculations, it would have been required to report that AGHOG was not in compliance with those covenants.

## 9   Summary of GAAS Violations for PwC's 1996 Audit

    a.  PwC issued unqualified opinions in its audit reports on the consolidated financial statements and the accompanying consolidating financial information of AHERF, the consolidated financial statements and the accompanying consolidating financial information of AGHOG, and combined financial statements and the accompanying combining financial information of DVOG for the year ended June 30, 1996. As these financial statements were not presented fairly, in all material respects in conformity with GAAP, PwC's unqualified opinions violated GAAS Standard of Reporting No. 1. The following is a summary of the material GAAP misstatements contained in those financial statements.

        i.  AHERF Irrevocable Trusts - AHERF overstated investment income by $15.4 million, improperly classified $53 million of permanently restricted net assets as temporarily restricted net assets, and overstated unrestricted net assets by $29 million.

        ii.  DVOG reserve for uncollectible accounts and its bad debt expenses were materially understated by up to $53.0 million.

---

[210] SEC Exhibit 209, PwC 003351
[211] Exhibit 4239, CL 006236

Page 71 of 114

Prepared in connection with litigation

iii.    "Cushions" – AHERF utilized "cushions" to decrease its net loss.

iv.    IBM sale-leaseback transaction - AGH recognized a gain of $6.7 million in violation of FAS 13 and 28.

v.    Tort settlement payments - AHERF inflated income by $4.4 million ($4.9 million less the related amortization expense included in the 1996 financial statements) by recording these expenses as assets.

b.  PwC failed to conduct its audits of the consolidated financial statements and the accompanying consolidating financial information of AHERF; the consolidated financial statements and the accompanying consolidating financial information of AGHOG; and the combined financial statements and the combining financial information of DVOG; for the year ended June 30, 1996 in accordance with GAAS. PwC knew, or should have known, that the aforementioned financial statements contained material departures from GAAP and should not have issued unqualified audit opinions on those financial statements. PwC's failure to comply with GAAS included, at least, the following:

i.    PwC failed to maintain the independence in mental attitude required by General Standard No. 2. PwC did not:

   •   address the numerous negative factors surrounding DVOG's deteriorating accounts receivable balances,

   •   adequately test and corroborate DVOG's representations as to the net realizable value of accounts receivable,

   •   challenge the recording of cushions by AHERF, and

   •   appropriately evaluate the qualitative aspects of the trend of earnings management engaged in by AHERF's management.

ii.    PwC failed to exercise the due professional care in the performance of its audits and the preparation of its audit reports as required by General Standard No. 3. PwC failed to:

   •   perform appropriate auditing procedures to corroborate the representations of AHERF's management, such that those made in relation to the classification of the AHERF Irrevocable Trusts and the nature of the tort settlements,

Page 72 of 114

Prepared in connection with litigation

- ensure that the GAAP violations described above were either corrected by AHERF in its financial statements or by qualifying their opinions on those financial statements,

- assess the increased risk of accounts receivable given the knowledge of billing process issues, collectibility issues, deteriorating aged receivables and inadequate reserve methodologies and percentages, which would have led PwC to conclude that DVOG's reserve for uncollectible accounts was materially understated, even after the $17.5 million in adjustments recorded in September 1996 as of June 30, 1996,

- consider the impact of the reclassification of prior year cushions to reserves for uncollectible accounts in its evaluation of the materiality of the unadjusted audit differences on the financial statements,

- properly apply GAAP and conclude that the use of the $7.4 million of GME non-current liability inappropriately inflated income,

- properly calculate the unrestricted fund balance debt covenant in accordance with the AGHOG Morgan Agreement, which would have led PwC to conclude that a debt covenant violation had occurred, and

- appropriately segregate all known adjustments according to whether they related to the current fiscal year or to prior fiscal years in its evaluation of the materiality of unadjusted audit differences on the financial statements.

iii. PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for its opinion as was required by Standard of Field Work No.3. PwC failed to:

- obtain sufficient evidence to support the net realizable value of accounts receivable because subsequent receipt testing of one month after year end did not provide sufficient evidence to support the low reserve percentages and inadequate reserve methodology used for the reserve for uncollectible accounts,

- document in its audit working papers the basis for and the adequacy of the $17.5 million adjustment to the reserve for uncollectible accounts,

Page 73 of 114

Prepared in connection with litigation

- obtain sufficient evidence to evaluate management's classification of AHERF's Irrevocable Trusts if PwC thought that they did not have sufficient evidence, and

- review the tort settlement agreements, which would have led PwC to conclude that AHERF had incorrectly recorded these transactions.

### D. PwC's 1997 Audit

**1   Graduate Transfer of $50 million to DVOG Reserve for Uncollectible Accounts**

a.   The Graduate Hospitals were merged into AHERF as of May 1, 1997.

   i.   As discussed below, prior to and in connection with the merger of the Graduate hospitals into AHERF, AHERF caused unnecessary restructuring and acquisition reserves to be recorded on the books of the Graduate Hospitals. Much of these reserves were subsequently transferred to DVOG to conceal its need to record bad debts and to increase patient revenues.

   ii.   The first of these transfers, $25 million in March and $25 million in April of 1997, which was even before the effective date of the Graduate merger, was through inter-company accounts to increase DVOG's reserves for uncollectible accounts. This transfer enabled DVOG to avoid recording bad debt expenses on DVOG's financial statements in 1997.

   iii.   This $50 million was recorded on the books of the Graduate Hospitals specifically for the improper purpose of addressing a recognized shortfall in the DVOG Hospitals' reserve for uncollectible accounts.

   iv.   An interesting result of the recording of these transfers is that the Graduate Hospitals' books and records reflected a $50 million payable to affiliates and the DVOG Hospitals' books and records reflected a $50 million receivable from affiliates. Given that at the time of these transfers the Graduate Hospitals were not yet a part of AHERF, it is inconceivable that the Graduate Hospitals had done anything to incur such an obligation or that the DVOG Hospitals had done anything to earn this "asset."

Page 74 of 114

Prepared in connection with litigation

v.    The creation of these unnecessary restructuring and acquisition reserves resulted in an equal overstatement of goodwill on the balance sheet of the Graduate Hospitals.

vi.    As discussed in section C.3 above, the DVOG Hospitals materially understated their reserves for uncollectible accounts in their financial statements as of June 30, 1996. The DVOG Hospitals wrote-off approximately $80.1 million of old accounts receivable during fiscal year 1997. This write-off was accomplished in four phases of approximately $20 million, starting in October 1996.[212] These write-offs exhausted the DVOG Hospitals' reserves for uncollectible accounts, leaving inadequate reserves for remaining uncollectible accounts. Rather than charging bad debt expense to create needed reserves, AHERF utilized the acquisition of the Graduate Hospitals to create $50 million of new reserves on the books of the DVOG Hospitals.

vii.    The use of these transferred reserves enabled the DVOG Hospitals to avoid recording bad debt expenses and resulted in an overstatement of the net income of the DVOG Hospitals by $50 million in the consolidating and combining statements of operations.

b.    With respect to acquisition reserves, GAAP states the following:

i.    "The acquiring enterprise determines the value of the consideration given to the sellers, the present value of the liabilities assumed, and the value of the assets acquired. The total value of the consideration given and the liabilities assumed is then allocated among the identifiable assets acquired based on their value; and the balance, if any, is allocated to 'goodwill'." [FAS 38, par. 34]

ii.    The FASB recognizes that completion of the allocation process may sometimes require an extended period of time. "For example, appraisals might be required to determine replacement cost of plant and equipment acquired, a discovery period may be needed to identify and value intangible assets acquired, and an actuarial determination may be required to determine the pension liability to be accrued." [FAS 38, par. 35]

iii.    "If a business combination is consummated toward the end of an acquiring enterprise's fiscal year or the acquired enterprise is very

---

[212] Exhibit 4248, PwC 010173.H

Prepared in connection with litigation

large or unusually complex, the acquiring enterprise may not be able to obtain some of the data required to complete the allocation of the cost of the purchased enterprise for inclusion in its next annual financial report. In that case, a tentative allocation might be made using the values that have been determined and preliminary estimates of the values that have not yet been determined. The portions of the allocation that relate to the data that were not available subsequently are adjusted to reflect the finally determined amounts, usually by adjusting the preliminary amount **with a corresponding adjustment of goodwill**." [FAS 38, par. 36] [emphasis added]

c.   With respect to reserves for uncollectible accounts, GAAP required that AHERF and DVOG accrue for reserves for uncollectible accounts with a charge to income. [FAS 5, par. 08]

d.   GAAS required PwC to state whether the financial statements were presented in accordance with GAAP. [1st Standard of Reporting]

   i.   GAAS further stated that PwC should inform the audit committee about adjustments arising from the audit that could, in its judgment, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. [AU 380.09]

e.   PwC was aware at least as early as the time of its preliminary audit work for the 1997 audit that AHERF intended to create $50 million of reserves for uncollectible accounts for the DVOG Hospitals through its accounting for the acquisition of the Graduate Hospitals.

   i.   Mr. Kirstein kept handwritten notes of an apparent April 18, 1997, conversation involving Mr. Buettner, Ms. Frazier, Mr. Cancelmi and himself.[213] Those notes included the following:

      "$50 MM Reserves @ [at] Graduate

      - Will have $80 MM c/o [charge off] in DV by 6/30/97 (Gross #) on A/R outpatient.

Placing Reserves on Graduate entities to be used for DV A/R @ [at] Y/E [year-end]."[214]

---

[213] Mark Kirstein 5/13/04 Deposition, page 646 line 21 through page 649 line 23
[214] Exhibit 4403, PwCK2 45

Page 76 of 114

Prepared in connection with litigation

ii. Mr. Kirstein also kept notes of an apparent April 21, 1997, "Conf Call".[215] Those notes included the following:

"$50 MM add'l reserves ... write down $50 MM (put ½ against A/R)"

"view consolidated basis as acquisition."[216]

iii. A PwC working paper, dated May 1997, showed that both Ms. Frazier and Christa Porter, a PwC senior associate, had knowledge of the $50 million Graduate transfer. One of the questions noted in this working paper appears to be discussing the $50 million Graduate Transfers.

"[H]ow was the first 25 of the 50 million distributed to the entities or did this occur in April"[217]

This working paper contradicts Ms. Frazier and Ms. Porter's claim that they first became aware of the $50 million Graduate Transfer in August 1997 or during the year-end stage of the 1997 audit.[218]

iv. On June 9, 1997, in a PwC issue topic working paper, Kristen Heinlein, a PwC associate for AHERF's June 30, 1997 audit, described the $50 million reserve entry.[219] Among other things, this working paper stated:

"Per conversation with Robin Schafer [sic], C&L notes that a total of $50 million was intercompanied from the Graduate hospitals to the Delaware Valley hospitals due to the DV bad debt reserve shortfalls. A determination was made that $25 million of reserves would be recorded in the DV hospitals in the March, 1997 financials and the remaining $25 million would be recorded in April."

---

[215] Mark Kirstein 5/13/04 Deposition, page 655 line 13 to 656 line 13
[216] Exhibit 4403, PwCK2 44
[217] Exhibit 4258
[218] Amy Frazier SEC 3/9/99 deposition, page 410 line 10 through page 411 line 5 and Christa Porter 1/30/04 deposition, page 301 line 16 through page 302 line 19
[219] Exhibit 4297, CL 232335

Prepared in connection with litigation

- Ms. Heinlein has testified that she first learned of the idea to transfer $50 million of reserves from the Graduate Hospitals to the DVOG Hospitals from Ms. Frazier.[220]

v. Mr. Kirstein's notes of a June 10, 1997 update meeting with PwC personnel included the following:

"$50 MM Add'l reserve - $25MM thru March, $25MM thru April...

$80 MM write off + offset by $50 MM reserve."

- These notes, along with those of April 18 and April 21 discussed above in paragraphs e.i and e.ii, contradict Mr. Kirstein's claim that he first learned about the transfers in August 1997.[221]

vi. In an AHERF internal memo, dated June 10, 1997, Mr. Cancelmi discussed the $50 million transfer from the Graduate Hospitals to the DVOG Hospitals.

"A creative way was recently developed to record $50 million of reserves on the various Graduate entities, which were subsequently transferred to the Delaware Valley hospitals (during March and April 1997) to help reduce the bad debt reserve shortfall that had increased to $62.3 million as of March 31, 1997. Coopers & Lybrand [PwC] has accepted this proposal to transfer the $50 million of reserves from Graduate."[222]

- This memo corroborates Mr. Kirstein's notes regarding discussions of the $50 million transfer and also indicates that PwC accepted the journal entries prior to the year-end.

vii. A June 20, 1997, audit update agenda, prepared by PwC and reflecting handwritten annotations by Mr. Buettner, included the following:

"Accounts Receivable & Revenue Items

- Reserve Positions

---

[220] Kristen Heinlein 3/1/00 SEC deposition, page 88 lines 10 through 25
[221] Mark Kirstein 5/13/04 deposition, page 630 line 20 through page 632 line 2
[222] Exhibit 149, TN RC013 02475

Page 78 of 114

Prepared in connection with litigation