- Impact of Graduate Reserve"[223]

viii.   Moreover, individuals from AHERF's accounting department, including Messrs. Cancelmi, Adamczak and Spargo, have testified that they discussed the concept of creating $50 million of reserves on the books of the Graduate Hospitals in order to transfer those reserves to the DVOG Hospitals' reserves for uncollectible accounts with PwC personnel during or prior to the preliminary fieldwork stage of the 1997 audit.[224]   In fact, it is Mr. Spargo's recollection that he first learned of the idea at an early April 1997 meeting with Mr. Buettner and Mr. McConnell and that he believed that the idea originated from Mr. Buettner.[225]

f.   PwC knew that the $50 million transfer violated GAAP.

i.   Mr. Buettner testified that when Ms. Frazier told him about the $50 million transfer that he "basically told her that they couldn't do that" and "told her to talk to Dan [Cancelmi] about it and tell her – tell him that we wouldn't accept the reserves over the Delaware Valley."[226]   He also acknowledged that he believed "that the transfers in and of themselves were a departure from GAAP."[227]

ii.   Amy Frazier testified that the $50 million reserve transfers were not consistent with GAAP.[228]

iii.   Mr. Kirstein also acknowledged that the "bookkeeping" transfer of the $50 million was not in compliance with GAAP.  He testified:

"I don't think the actual bookkeeping sounds like it's GAAP. You know, I would think if you increase the reserve you would increase in expense.  That's pretty traditional accounting."[229]

---

[223] Exhibit 1069, PwC 0036838

[224] Dan Cancelmi 1/23/03 deposition, page 202 line 11 through page 205 line 22; page 222 line 15 through page 223 line 14; Dan Cancelmi 11/25/03 deposition, page 1732 line 25 through page 1733 line 23; Al Adamczak 6/19/03 deposition, page 246 line 22 through 251 line 16; and Steve Spargo 7/18/03 deposition, page 369 line 23 through page 380 line 22

[225] Steve Spargo 7/18/03 deposition, page 369 line 23 through 380 line 22

[226] William Buettner 6/24/04 deposition, page 616 line 18 through page 617 line 1

[227] Ibid, page 618 lines 12 to 14

[228] Amy Frazier 6/10/04 deposition, page 582 line 18 through page 583 line 22

[229] Mark Kirstein 5/13/04 deposition, page 687 line 24 through page 688 line 3

Prepared in connection with litigation

g.  Ms. Frazier has testified that she requested that Mr. Cancelmi reverse the $50 million transaction. She did not recall Cancelmi's response to this request.[230]

h.  The transfers were not reversed by AHERF and Mr. Buettner has testified that he did not recall discussing the transfers with anyone at AHERF.[231]

i.  PwC failed to communicate the $50 million reserve transfers to AHERF's audit committee. These transfers had no basis in GAAP and were material to the consolidated financial statements. Rather than eliminating Graduate's unneeded acquisition reserves via a transfer to DVOG, AHERF should have eliminated these unneeded reserves and reduced the goodwill that had been increased as a consequence of Graduate's recording of these unneeded reserves.

   i.  Mr. Buettner testified that he did not communicate to the audit committee that AHERF management had recorded this transfer in violation of GAAP.[232]

   ii.  Despite Mr. Buettner's testimony that this $50 million transfer was a departure from GAAP with which he disagreed, Mr. Buettner "concluded that the transfers were not material and did not warrant disclosure to the audit committee."[233]

   iii.  He further testified as follows:

   "When you go through this process of providing the board with specific information within the context of required communications with the audit committee, the items that you made reference to, significant audit adjustments and disagreements with management, relate to items that we would deem to be significant or material.

   The 50 million dollar transfer, as I testified to a little earlier today, in my opinion was not material. It had no impact on the consolidated financial statements of AHERF, and this letter refers to our audit of the consolidated statements of AHERF. No impact on key parameters or measurements within the AHERF system

---

[230] Amy Frazier 6/10/04 deposition, page 583 line 4 through page 586 line 20
[231] William Buettner 6/24/04 deposition, page 619 lines 7 through 13
[232] Ibid, page 619 line 22 through page 620 line 8
[233] Ibid, page 620 lines 6 through 8

Prepared in connection with litigation

when you measure materiality. No impact on net unrestricted assets. No impact on working capital. No impact on total assets.

I viewed the transfer as nothing more than a related party transaction that eliminated in consolidation."[234]

j.   In concluding that the $50 million transfer did not result in a material misstatement, Mr. Buettner has testified, among other things, that he evaluated whether a collection of entities referred to as "Old AHERF" (AHERF as it existed as of June 30, 1996) needed the $50 million of reserves transferred from Graduate.

   i.   At his deposition Mr. Buettner described two pages of handwritten notes within Exhibit 4473[235] as summarizing this assessment.

      "management had made this – taken this position of transferring, as we had discussed earlier, this 50 million dollars, from one entity to the other with the intended purpose of using the 50 million dollars to, if you will, support or enhance the reserve, bad debt reserve, if you will, for some old AHERF entities.

      Obviously a question we had at the time we learned of the transfer is the 50 million needed at what I called old AHERF. So I went through this assessment to determine in my own mind if the 50 million dollars was needed."[236]

   ii.  Mr. Buettner has testified that his handwritten notes in Exhibit 4473 reflected his attempt to calculate the amount of reserves for uncollectible accounts the Old AHERF entities had on their books and records as of June 30, 1997. Instead of looking to PwC's working papers for this information, however, Mr. Buettner testified that he attempted to derive the amount of such reserves by performing a rollforward that took the reserves at the beginning of the fiscal year, increased that amount by the bad debt expense recorded for the year, and then reduced the resulting sum by the amount of write-offs during the year. In doing so, he testified that he concluded the Old AHERF entities had $35.2 million of reserves for uncollectible accounts as of June 30, 1997.[237]

---

[234] Ibid, page 639 line 18 to 640 line 13
[235] Exhibit 4473, CL 036438-39
[236] William Buettner 6/24/04 deposition, page 684 lines 9 to 22
[237] Ibid, page 693 line 20 through 699 line 17

Prepared in connection with litigation

    iii.   He testified that part of his approach in these calculations was to identify other reserves that could have been used instead of the $50 million transferred from Graduate to augment the reserve for uncollectible accounts. PwC purportedly identified the following reserves within Old AHERF as being available for such use.[238]

- Excess CRA reserves - $10 million
- Excess C/A [contractual allowances] - $9.8 million
- Legal reserves - $1.7 million
- SCHC collections - $1 million

    iv.   Another element of his approach, he has testified, was to modify AHERF's calculation of Old AHERF's required reserves. Specifically, he has testified that his approach substantially lowered the reserve requirements on older Blue Cross and HMO receivables to account for purported delays in the collection of those receivables.[239] He has also testified that he considered balances in unapplied cash accounts to reduce AHERF's reserve requirements.[240]

    v.   Mr. Buettner testified that he believed the sum of the $35.2 million and the "other reserves" of $22.5 million (total of $57.7 million) was sufficiently close to his modified calculation of Old AHERF's required reserve of $66.2 million, taking into consideration the possibility of $3 to $4 million of bad debt recoveries.[241]

k.   Mr. Buettner also testified that his handwritten notes in Exhibit 4473 and other PwC working papers reflect his conclusions that the $50 million of acquisition reserves did not result in material misstatement of the AHERF consolidated balance sheet. He stated that the $50 million of acquisition reserves were needed for identified exposures at the acquired entities, principally at the Graduate Hospitals, that were not adequately reserved. They included:

    i.   Graduate QualMed Deferred Revenue - $14 million
    ii.   Graduate Police / Fire – PFMA (Police and Fire Medical Association) Contract - $14 million
    iii.   Graduate Prudent Buyer - $5.1 million

---

[238] Exhibit 4473, CL 036439
[239] William Buettner 6/24/04 deposition, page 726 line 21 through 730 line 2
[240] Ibid, page 730 lines 6 through 21
[241] Ibid, page 734 line 7 through 736 line 13

Prepared in connection with litigation

iv.    Corporate Compliance Issues[242]

l.  Mr. Buettner's approach in assessing whether the $50 million Graduate
    transfer caused a material misstatement of the AHERF consolidated
    financial statements contained numerous errors.

    i.    The reserve of $63.8 million used in the analysis failed to include
    the $17.5 million late adjustments made to increase DVOG's
    reserve for uncollectible accounts. The reserve for uncollectible
    accounts recorded on the Old AHERF's books and records was
    $81.3 million ($63.8 million and $17.5 million).

    ii.    In calculating the available reserves for uncollectible accounts for
    Old AHERF, Mr. Buettner's analysis included an add-back of
    $66.4 million of consolidated AHERF bad debt expenses. Since
    the analysis was only Old AHERF, this add-back incorrectly
    included $6.9 million of bad debt expenses from the acquired
    entities. Therefore, the actual add-back for bad debt expenses for
    Old AHERF should be $59.5 million.[243]

    iii.    The $95.0 million of charge-offs, $80.4 million for DVOG and
    $14.6 million for what appears to be "West" (which could be
    referring to AGH), did not appear to include $10.6 million of
    write-offs for AU. Mr. Buettner should have included this write-
    off, which would decrease the reserves by $10.6 million, in his Old
    AHERF reserve analysis.

    iv.    In addition to the write-offs for AU, Mr. Buettner failed to deduct
    the full amount of write-offs and other accounting entries that
    serve to reduce the DVOG Hospitals' reserves for uncollectible
    accounts. Mr. Buettner should have included these uses of bad
    debt reserve in his Old AHERF reserve analysis.

    v.    As part of the $22.5 million of Other Reserves, $10 million was
    considered by PwC to be excess CRA. Many of these CRA
    balances, for example $1.8 million for HUH, were tentative
    settlements, which were not excess reserves according to Joe
    Scharf, Senior Director of Corporate Reimbursements.[244]
    Furthermore, most of the AGH "excess" CRA reserve of $4.3

---

[242] Ibid, page 758 line 23 through page 763 line 4
[243] Exhibit 60, TN-C13A 00425
[244] Joseph Scharf 3/25/03 deposition, page 173 line 9 through page 174 line 2

Prepared in connection with litigation

million[245] was created in fiscal year 1996 when AGH capitalized $6.5 million of prior year interest, which was a violation of GAAP as discussed in paragraph C.5d.i above. Therefore, much of the $10 million "excess" CRA should not have been considered in Mr. Buettner's analysis.

vi.    In her testimony, Ms Frazier could not recall the details of the $9.8 million of purported excess contractual allowances. In fact, the $9 million of contractual allowances identified for DVOG can be reconciled to specific reserves manually accrued by AHERF's accounting department for specific reasons.[246]

vii.   In addition, it is unlikely that DVOG would have had an excess in its contractual allowances since PwC had concluded that an additional $5.2 million was needed for contractual adjustments (out of period adjustments – Inpatient).[247]

viii.  In regards to the $14 million Qualmed deferred revenue, Mr. Buettner's analysis and the SUD appear to indicate that the revenue should be deferred. However, Ms. Frazier has testified to the contrary, stating the following:

"It wasn't that we didn't agree that the deferred revenue should be eliminated. Our position was that at minimum the prudent buyer clause [referring to the Qualmed issue] had been eliminated as of January 31, 1997. Therefore, that would be revenue in the period in which it was with SDN. It would not be revenue in the two month period that it came to AHERF."[248]

Based on Ms. Frazier's conclusion on the Qualmed deferred revenue, a reserve was not needed on the books of the Graduate Hospitals, and therefore, Mr. Buettner should not have included this reserve in his assessment of the $50 million Graduate Transfer.

ix.    Relating to the $14.1 million of PFMA reserves, although PwC noted in its working papers that it disagreed with the removal of this reserve by AHERF[249], there is no evidence that PwC obtained supporting documents that the reserve was required. PwC's

---

[245] Exhibit 4043, X23987 (AGH, $9,765,448 less $5,500,000 ≈ $4,265,448)
[246] Amy Frazier 6/10/04 deposition, page 749 line 7 through page 763 line 23
[247] Exhibit 4039, CL 015527
[248] Amy Frazier SEC 3/11/99, page 695 lines 6 through 11
[249] Exhibit 4444, X25991

Page 84 of 114

Prepared in connection with litigation

conclusion also contradicts a legal memo that Mr. Cancelmi recalls providing to Ms. Frazier.[250]  The memo stated: "Based on the written and executed documents we have in hand, my initial conclusion is that SDN (and therefore AHERF) does not have any obligation to repay PFMA Losses, whether arising before or after November 1 1996, to HSI."[251]  Had PwC adequately performed audit procedures on this reserve, PwC would have determined that this reserve was improperly transferred to DVOG.  The removal of this reserve should have had a corresponding decrease in goodwill on the books of the Graduate Hospitals.  Given that this reserve was no longer required, Mr. Buettner should not have included it in his assessment of the $50 million Graduate Transfer.

x.   The PwC audit working papers indicated that Graduate hospital and Mt. Sinai hospital accrued for approximately $7.4 million of prudent buyer.[252]  There is no evidence in its audit working papers that PwC concluded that the Graduate Hospitals needed additional prudent buyer reserves.  An accrual for prudent buyer already existed on the books of the Graduate Hospitals; therefore, Mr. Buettner should not have included the $5.1 million prudent buyer reserve in his assessment of the $50 million Graduate Transfer.

m.  With respect to the matters identified in paragraphs i through k above, it is important to note the following:

i.   With the exception of a $14 million entry relative to the QualMed deferred revenue, PwC had not included any entries on its 1997 SUD to propose adjustments for these matters.  Each of these matters would have represented a disagreement between PwC and AHERF, many that were individually material.  Moreover, with the exception of a "15 second" conversation regarding Qualmed[253], there is no evidence that Mr. Buettner discussed purported disagreements with management in order to support his apparent conclusions.  In fact, in many cases the PwC audit working papers contain information inconsistent with Mr. Buettner's assessment.

ii.   To the extent that there were such excess reserves, or failures to accrue liabilities, they represented violations of GAAP.

---

[250] Dan Cancelmi 01/24/03 deposition, page 573 line 13 through page 574 line 21
[251] Exhibit 1080, AHW DC 10293
[252] Exhibit 4120 (3rd and 4th page of the exhibit)
[253] William Buettner 6/24/04 deposition, page 710 lines 14 through 21

Page 85 of 114

Prepared in connection with litigation

iii.   If these reserves were in fact cushions and were set up by AHERF in prior years, the use of such cushions to avoid recording additional bad debt expenses in fiscal year 1997 would have been a violation of GAAP. Such a use of these cushions would have been yet another example of earnings management on the part of AHERF.

iv.   If these reserves were in fact cushions and were set up by AHERF during fiscal year 1997, PwC should have included entries to reverse those cushions on its SUD and included the impact of those entries in its evaluation of the potential misstatements in the financial statements.

n.   For the reasons stated in paragraph 1 above, rather than identifying a legitimate alternative to AHERF's use of the $50 million transfer to augment its reserve for uncollectible accounts, Mr. Buettner's assessment actually highlighted his, and PwC's, knowledge of other misstatements within AHERF's financial statements.

o.   In applying GAAS to supplementary consolidating and combining financial information accompanying consolidated financial statements, AU 551 provides for the following:

"When reporting in this manner [an auditor's report on information accompanying the basic financial statements in an auditor submitted document], the measurement of materiality is the same as that used in forming an opinion on the basic financial statements taken as a whole. Accordingly, the auditor need not apply procedures as extensive as would be necessary to express an opinion on the information taken by itself." [AU 551.08]

"If the auditor concludes, on the basis of facts known to him, that any accompanying information is materially misstated in relation to the basic financial statements taken as a whole, he should discuss the matter with the client and propose appropriate revision of the accompanying information. If the client will not agree to revision of the accompanying information, the auditor should either modify his report on the accompanying information and describe the misstatement or refuse to include the information in the document." [AU 551.09]

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

Prepared in connection with litigation

CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY

q.  Mr. Buettner testified that this was because "my audit opinion is based
    on the materiality level for consolidated AHERF."[255]

r.  These comments ignore the qualitative aspects of materiality,
    particularly in the context of the management of earnings.  In this
    particular instance, AHERF management was clearly attempting to take
    advantage of the opportunity to set up acquisition reserves to avoid
    recording bad debt expenses on the books of the DVOG Hospitals
    through a clearly suspect transaction.  This also had the impact of
    overstating recorded goodwill by $50 million on the books of the
    Graduate Hospitals.  Even if, in Mr. Buettner's opinion the $50 million
    transfer was not quantitatively material to the consolidated financial
    statements, this qualitative aspect to the transaction certainly made it
    material.

s.  PwC's report on the accompanying financial information should have
    been modified to reflect the material departures from GAAP in the
    DVOG balance sheet and income statement included in that
    accompanying information.

t.  Given the evidence of PwC's upfront knowledge regarding the
    establishment and use of excess acquisition reserve in order to avoid

---

[254] Exhibit 4404, CL 221165, PwC audit manual Section 440.6
[255] William Buettner 6/24/04 deposition, page 592 lines 2 through 4

Page 87 of 114

Prepared in connection with litigation

recording $50 million in bad debt expenses at DVOG, the failure to either require AHERF to make appropriate adjustments or qualify its opinion on the financial statements represented a reckless disregard[256] of professional standards by PwC.

2    **Graduate Transfers of $21.3 million ($20.1 million to DVOG Reserves for Uncollectible Accounts and $1.2 million to DVOG Other Assets) and $28.3 million to DVOG Contractual Allowance**

a.  On or around July 3, 1997, AHERF transferred an additional $21.3 million of reserves from the Graduate Hospitals to the DVOG Hospitals, of which $20.1 million was used to increase the reserve for uncollectible accounts and $1.2 million was used to decrease other assets related to DVOG's investment in Health Partners.[257]

b.  AHERF made two further sets of transfers of reserves from the Graduate Hospitals to the DVOG Hospitals. These reserves were used to decrease DVOG's contractual allowance expenses, in contra revenue accounts, $7.0 million effective in May 1997 and an additional $21.3 million effective in June 1997.

c.  To the extent AHERF determined that the reserves transferred from the Graduate Hospitals were not needed by the Graduate Hospitals, GAAP required an adjustment to decrease the reserves with a corresponding adjustment to decrease goodwill. [FAS 38, par. 36]

    i.  GAAP also required DVOG to record reserves for uncollectible accounts by an increase to its expenses. [FAS 5, par. 8]

d.  GAAS called for PwC to obtain sufficient relevant evidential matter to support the assertions embodied in the financial statements. [Standard of Field Work No. 3] With respect to that, GAAS provided the following guidance:

    i.  "Evidential matter supporting the financial statements consists of underlying accounting data and all corroborating information available to the auditor." [AU 326.14]

---

[256] The magnitude and extent of the misstatements in the 1997 financial statements, and the lack of breath and depth of PwC's audit procedures, reflect highly unreasonable conduct representing an extreme departure from the standards of ordinary care, and presented a significant risk of misleading potential investors and other users of those financial statements.

[257] Exhibit 1547

Prepared in connection with litigation

ii.  "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and such informal memorandum records as work sheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of financial statements." [AU 326.15]

iii.  "Corroborating evidential matter includes documentary material such as checks, invoices, contracts, and minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him to reach conclusions through valid reasoning." [AU 326.16]

e.  GAAS also called for PwC to exercise professional skepticism in its audit of AHERF's financial statements.

"An audit of financial statements in accordance with generally accepted auditing standards should be planned and performed with an attitude of professional skepticism. The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. Rather, the auditor recognizes that conditions observed and evidential matter obtained, including information from prior audits, need to be objectively evaluated to determine whether the financial statements are free of material misstatements." [AU 316.16]

f.  PwC knew that, as part of the purchase accounting for the Graduate Hospitals, AHERF had recorded unnecessary acquisition reserves as "cushions" over and above the $50 million created for transfer to the DVOG Hospitals' reserve for uncollectible accounts. PwC neither reported the material cushions to the audit committee nor required management to make appropriate adjustments to reverse these cushions.

i.  AHERF established $10 million of "contingent liability reserves" on the books of the Graduate Hospitals as part of the purchase accounting entries. Relating to the reserves, PwC noted in its audit working papers: "The Contingent Liability Reserves represents an additional reserve for potential costs that may be encountered by AHERF due to the merger of the Graduate Hospitals. These costs may include legal costs, pension/payroll related costs, etc.

Page 89 of 114

Prepared in connection with litigation

**Basically, this account was set up for cushion.**"[258] [emphasis added]

    ii.    Much of these reserves were eventually transferred to the DVOG Hospitals as part of the $21.3 million and $28.3 million transfers.

g.  PwC knew, or should have known, of the $21.3 million and $28.3 million transfers to the DVOG Hospitals.

    i.    With the knowledge of the $50 million Graduate transfers prior to June 30, 1997, as discussed above, PwC should have adjusted its audit procedures to ensure that no additional reserves had been improperly transferred from the Graduate Hospitals to other AHERF entities.

    ii.    PwC's working papers contained a summary of the reserves created on the Graduate Hospitals' books, through restructuring charges, while those hospitals resided in SDN.  Had PwC appropriately performed audit procedures on these reserves as of June 30, 1997, PwC would have been aware that certain of these reserves were no longer on the Graduate Hospitals' books.[259]  PwC did not, however, take appropriate steps to determine why those balances had been reduced so substantially between May 1, 1997 and June 30, 1997.

    iii.    As in past audit years, PwC received rollforward schedules that detailed the activity in the DVOG Hospitals' reserves for uncollectible accounts. Material increases to these reserves were identified in these client prepared documents, as "shortfall adjustments" for most of the DVOG hospitals.[260] The "shortfall adjustments" were located in the "Other" column in these schedules, the same column that contained details on the $50 million transfers from the Graduate Hospitals.

        •  The term "shortfall adjustments" was vague and warranted additional investigation.  A review by PwC of the underlying journal entries would have shown that the increases in reserves

---

[258] Exhibit 4263 (5th page of the exhibit)

[259] Exhibit 1066 and 1068

[260] Exhibit 4248 (Bucks – PwC 010266.L, $1.5 million), (Elkins Park – PwC 010278.L, $2.7 million), (MCP – PwC 010294.E, $5 million of the $5.6 million shortfall adjustment related to Graduate Transfers), and (HUH – PwC 010290.M, $7.0 million of the $10.6 million shortfall adjustment related to Graduate Transfers)

Prepared in connection with litigation

for uncollectible accounts were due, in large part, to
inappropriate inter-company transfers.

- There was no proper reason to assume that the DVOG
  Hospitals recorded bad debt expenses in the amount of the
  "shortfall adjustments."." Accordingly, PwC knew, or should
  have known, that the reserves had been increased in an
  improper manner.

- There is no evidence in the reserves for uncollectible accounts
  rollforward schedules or the accounts receivable section to
  indicate that PwC obtained corroborating evidence to support
  the reasonableness of these "shortfall adjustments".

- Kristen Heinlein, the PwC auditor who reviewed these
  schedules, testified that she does not recall the "shortfall
  adjustments."[261] Christa Porter, the PwC audit responsible for
  reviewing Ms. Heinlein's audit work on accounts receivable,
  also testified that she does not recall the shortfall adjustments at
  all, but she would have inquired as to the nature of these
  adjustments if she were not already aware of the explanation for
  them.[262]

iv. Included within PwC's working papers were separate "Lead
Schedules" for trial balance accounts related to accounts receivable
and accrued liabilities.[263] The reserves transferred from the
Graduate Hospitals to the DVOG Hospitals as part of the $21.3
million and $28.3 million transfers were contained in trial balance
accounts related to accounts receivable and accounts payables.
Many of the reserves transferred were contained in trial balance
accounts listed separately on PwC's "Lead Schedules" for
accounts receivable and accrued liabilities.

- PwC prepared Lead Schedules for the accounts receivable and
  accrued liabilities audit areas as of June 30, 1997 that compared
  the balances on the trial balance accounts to the balances as of
  June 30, 1996. Both showed large fluctuations in certain
  account balances between the two dates and footnotes revealed
  large fluctuations in account balances between May 1, 1997

---

[261] Kristen Heinlein 02/24/04 deposition, page 170 line 5 through page 172 line 15

[262] Christa Porter 01/30/04 deposition, page 286 line 25 through page 290 line 17

[263] Exhibit 4248, PwC 010114 – 121, 0010152 – 158 (for accounts receivable Lead Schedules as of 3/31/97 and 6/30/97); and Exhibit
4130, CL 015188 – 202 (for accrued liabilities Lead Schedule)

Prepared in connection with litigation

(the opening balance sheet date for the Graduate Hospitals) and June 30, 1997.[264]  For accounts receivable, PwC also prepared a March 31, 1997 Lead Schedule.  A comparison of the March 31, 1997 and June 30, 1997, these Lead Schedules also would have shown large fluctuations in certain account balances between the two dates.[265]

- As set forth in PwC's audit program, auditors should investigate large fluctuations in account balances as they may signal unusual activities.  This would be particularly true with respect to the fiscal year 1997 audit, as PwC knew that AHERF had made inappropriate inter-company transfers of reserves.  For example, with respect to accounts payable accounts, PwC's audit program called for the following: "Review the balances for reasonableness, expected or unexpected fluctuations between years and obvious omissions.  Obtain explanations for any changes greater than or equal to $500,000 and 5%."[266]

- Had PwC performed adequate audit work to explain large fluctuations in these Lead Schedules, PwC would have become aware (if it was not already aware) that AHERF had transferred additional reserves.  However, PwC failed to obtain sufficient evidential matter to explain the significant decreases in many of these accounts.

v.    It appears that PwC was told that AHERF had transferred PFMA reserves on the books of the Graduate Hospitals to the DVOG Hospitals.

- On an August 22, 1997, Audit Update agenda in Ms. Frazier's files, she wrote the following note next to the "PFMA Contract" agenda item:  "Reserves recorded in SDN  legal documentation indicates that GHS obligated.  transferred reserves of the books to DV"[267]

- On Mr. Kirstein's copy of the August 21, 1997 Audit Update agenda[268], he wrote the following notes with respect to the "PFMA Contract" agenda item:  "WHERE DID IT GO?" and

---

[264] For example, Exhibit 4130, CL 015199 (refer to note B)
[265] Exhibit 4248, PwC 010114 – 121, 010152 – 158
[266] Exhibit 4132, CL 015220
[267] Exhibit 72, CL 037536
[268] CL 039228

Page 92 of 114

Prepared in connection with litigation

"NOT THRU INCOME / MOVED TO DV RESERVE FOR A/R"

- Moreover, it is Mr. Cancelmi's recollection that he informed PwC that the PFMA reserves had been transferred to DVOG.[269]

- The PFMA reserves of $14.1 million were included in the $21.3 million and $28.3 million reserve transfers.

vi. A document in PwC's 1997 working paper files alluded to transfers of reserves from the Graduate Hospitals to the DVOG Hospitals. The document, titled "Allegheny University Hospitals, Summary of Inpatient / Outpatient adjustments" contained therein the following entries:

- "Transfer from Centennial   1,000,000" (Elkins schedule[270])
- "Transfer Resv. from Centennial   1,000,000" (SCHC schedule[271])
- "Transfer reserves from Centennial   5,000,000" (HUH schedule[272])

h. PwC failed to obtain sufficient competent evidential matter to support the increases to reserves for uncollectible accounts which were noted as shortfall adjustments. PwC failed to obtain evidence to ensure that DVOG recorded a corresponding charge to income.

i. PwC failed to obtain evidence to support that the acquisition reserves set up by AHERF within Graduate were in fact required or that the use of those reserves was appropriate.

j. Despite its knowledge of the $50 million Graduate Transfers, PwC failed to adjust its risk assessments and audit procedures with respect to Graduate's goodwill and acquisition reserves.

k. Had PwC appropriately tested either the use of the acquisition reserves that had been set up by AHERF on the books of Graduate or the rollforward schedules with respect to the DVOG entities' bad debt reserves, it would likely have found that the $20.1 million increase in

---

[269] Dan Cancelmi 1/23/03 deposition, page 296 line 15 through 297 line 13; Page 299 lines 2 through 15, page 301 lines 11 through 16
[270] Exhibit 4450, CL 94016
[271] Ibid, CL 94018
[272] Ibid, CL 94019

Page 93 of 114

Prepared in connection with litigation

DVOG's bad debt reserves had been accomplished through the transfer of Graduate's acquisition reserves.

l.  As was the case with the $50 million transfer discussed in section 2 above, these transfers were not in accordance with GAAP. PwC should have required management to make appropriate adjustments to eliminate these transfers, or modified its audit report due to the noncompliance of the financial statements with GAAP.

m.  The existence of these transfers should also have been communicated to the audit committee by PwC for the same reasons as discussed above in connection with the $50 million transfer.

n.  I have prepared Exhibit F to analyze the recorded Graduate acquisition reserves and the use of those reserves. PwC knew, or should have known, that the use of a significant portion of those acquisition reserves was not related to the acquisition activities of Graduate.

3  **AHERF Irrevocable Trusts (Overstated Investment Income by $55 million)**

a.  As discussed in section C.2 above, the AHERF Irrevocable Trusts relate to five irrevocable trusts.

b.  GAAS called for PwC to obtain sufficient competent evidential matter with respect to the AHERF Irrevocable Trusts as part of its 1997 audit of AHERF's financial statements.

c.  As of June 30, 1997, the fair value of the AHERF Irrevocable Trusts assets was $103,232,168. Under the trust provisions, this amount (less any accrued and unpaid interest and dividends) represented the corpus of the trusts, and, under GAAP, should have been reported on AHERF's financial statements in its entirety as permanently restricted net assets as of the year then ended. Instead, the amount included in AHERF's permanently restricted net assets related to the AHERF Irrevocable Trusts assets was $5,387,071.[273]

d.  The difference between the fair value of the AHERF Irrevocable Trusts assets as of June 30, 1997 and the amount recorded in AHERF's permanently restricted net assets as of the year then ended was $97,845,097. In showing this amount as not permanently restricted,

---

[273] CL 023387

Prepared in connection with litigation

AHERF inappropriately asserted in its financial statements that such funds were, or could be, available for operating purposes. As discussed in section C.2 above, AHERF had no access to the corpus of the trusts for use in its operations.

e.  As of June 30, 1997 the $97,845,097 had been improperly transferred out of permanent restriction in AHERF's financial statements in the following manner:

  i.   $12,078,814 remained misclassified as temporarily restricted net assets,[274]

  ii.  $18,065,149 in realized gains were improperly recorded as investment revenue, which became part of unrestricted net assets,[275]

  iii. $36,663,014 was "released into income to cover the additional expenses that were not transferred out to the affiliates"[276]

  iv.  The remainder, $31,038,120, was also transferred out of permanently restricted net assets to unrestricted net assets.

  v.   A total of $54,728,163 represented improperly recognized income to AHERF for the year ended June 30, 1997 (the sum of $18,065,149 and $36,663,014 shown above).

f.  As of June 30, 1997, the total permanently restricted corpus of $103,232,168 was misstated in AHERF's financial statements within the following classifications of net assets:

- Permanently restricted net assets:      $ 5,387,071[277]
- Temporarily restricted net assets:      $12,078,814[278]
- Unrestricted net assets:                $85,766,283[279]

---

[274] Ibid

[275] CL 017167 and Exhibit 2295, JD-DC-0023945

[276] CL 012585; CL 044518-19; and Exhibit 2295, JD-DC-0023945

[277] CL 023387

[278] Ibid

[279] This amount is included in the $86,288,282 of unrestricted net assets shown on the financial statements (see CL 014670 and CL 017166). The difference of $521,999 is due to accrued interest income that PwC added to the fair value amounts shown on the Mellon Bank statements. See CL 021387 for an example.

Prepared in connection with litigation

g. PwC knew, or should have known, that the aforementioned misclassifications and improperly recognized revenues by AHERF violated the related donor-imposed restrictions and GAAP.

    i. Prior to fiscal year 1996, the book value of the AHERF Irrevocable Trusts was recorded in AHERF's financial statements as restricted endowments. The book value included accumulated realized gains and losses since the inception of the trusts.[280]

    ii. During the course of adopting FAS 117 in 1996, AHERF transferred out of permanent restriction, on its books, all but $5.4 million, the total original contribution.[281]

    iii. As shown above, AHERF continued to misclassify the majority of the corpus of the AHERF Irrevocable Trusts during fiscal year 1997, leaving the same $5,387,071 as permanently restricted.

    iv. PwC's audit working papers for 1997 indicate that PwC reviewed the underlying trust documents.

- PwC's "Permanent" file for Endowments contained a "Permanent Binder Review Sheet" which various PwC auditors initialed in connection with their review of AHERF's endowments.[282]

- The auditor's initials were required and made to "indicate that the items [e.g., AHERF Endowments] have been reviewed for pertinence to the current audit."[283]

- Under the 1997 audit year, the initials of James McIntire, appear, who performed the audit work on Investments in 1997, to signify that he reviewed the AHERF endowments during the 1997 audit.[284]

    v. Also included in the "Permanent" file was further documentation of the provisions of the AHERF Irrevocable Trusts in summary form. For each trust, the corresponding summary sheet states that principal was restricted and income was unrestricted.

---

[280] Exhibit 467, CL 002082
[281] Exhibit 185, CANDEP 02476
[282] Exhibit 4061, CL 031989 & CL 031992
[283] Exhibit 4061, CL 031992
[284] Ibid

Prepared in connection with litigation

h. As discussed in section C.2 above, PwC had at its disposal sufficient information from which to determine that the AHERF Irrevocable Trusts had not been appropriately classified in AHERF's financial statements. Had PwC appropriately tested these classifications it would have been aware of the misclassifications and the resulting inappropriate recognition of capital gains as income in AHERF's financial statements.

i. These misclassifications, and the resulting recognition of income, were material misstatements in AHERF's financial statements. PwC should have required management to make appropriate adjustments to eliminate these misstatements, or modified its audit report due to the noncompliance of the financial statements with GAAP.

j. The nature and extent of these misclassifications should also have been communicated to the audit committee by PwC.

**4    Depreciation Recapture (Overstated Net Income by $7.1 million)**

a. In its 1997 financial statements, AHERF recognized $7.1 million of income related to Medicare depreciation recapture filings by Forbes and AVH. In connection therewith, AHERF recorded receivables on the books of Forbes and AVH.[285]

b. GAAP states, "contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization." [FAS 5, par. 17]

c. PwC knew, or should have known, that the Medicare depreciation recapture applied for by Forbes and AVH were "gain contingenc(ies) which under FAS 5 should not be recorded until received."[286]

   i. PwC knew that "the calculations *[referring to Medicare recapture]* will not be reviewed by Blue Cross of Chicago until at least the Year 2000 (BC, Chicago has taken over for Aetna in the review of Medicare cost reports and other filings.)"[287]

      • The Year 2000 timing of the review is consistent with a memo[288] from Joe Scharf, Senior Director, Corporate

---

[285] Exhibit 4058, PwC 010648 and 649
[286] Exhibit 4410, CL 218138
[287] SEC Exhibit 514, PwC 009746
[288] Exhibit 1352, AHERF Internal Memo, DBR-AA 14443

Page 97 of 114

Prepared in connection with litigation

Reimbursement, to Al Adamczak, Vice President, Financial Services. The memo stated the following:

"Attached is a summary of the depreciation recapture from the Medicare and Medical Assistance Cost Reports resulting from the acquisition of the Graduate, Forbes, and Allegheny Valley Health Systems... there is no guarantee that the monies requested constitute a 100% receivable. In addition, the purchase price allocation methodology as well as the actual loss calculations will be scrutinized by the auditors. Based upon this information, I would not anticipate receiving any cash until sometime during Fiscal Year 2000."

ii.  PwC noted that the receivables recorded in connection with the Medicare depreciation recapture were contingent gains in the CRA working papers for fiscal year 1997.[289]

iii.  Furthermore, an internal PwC email indicated that the depreciation recapture receivables should have corresponding adjustments to goodwill.[290] Therefore, even if the recording of a receivable were permissible, there should have been no income effect.

d.  At his deposition, Mr. Buettner acknowledged that he was aware that AHERF recorded these receivables, but stated that he was not aware that AHERF had recorded this $7.1 million as income:

"The booking of this receivable in my opinion was somewhat aggressive. But if structured the right way, presumably the AHERF enterprise would have collected some amount. But we weren't sure how many. So our recommendation to the client is that you really don't know how much you're going to collect. It should be booked as an adjustment to good will [sic]. Our suggestion is that you reserve for the amount until you determine exactly how much you're going to collect and that would probably take a year.

... I knew the Medicare recapture had been booked, but my understanding was that it had been booked as a part of the purchase adjustments or part of the good will [sic] computation."[291]

---

[289], Exhibit 4058, PwC 1⋯49 and Exhibit 4410, CL 218138
[290] Amy Frazier personal file, CL 037724
[291] William Buettner 06/24/04 deposition, page 768 line 21 through page 769 line 17

Prepared in connection with litigation

e.  PwC knew, or should have known that AHERF had recorded income when it recorded the Medicare recapture receivables.

    i.  Email correspondence in January 1997 indicates that Mr. Buettner, Mr. Kirstein, and Ms. Frazier were all aware that AHERF wanted to recognize a gain relative to depreciation recapture. On January 23, 1997, Mr. Buettner wrote: "THE ONLY THING I WOULD CHANGE IS I BELIEVE THAT THE CLIENT WISHES TO RECORD THE GAIN [at] THE THE [sic] TIME THE RECAPTURE CLAIM IS MADE … AND NOT AT THE TIME OF COLLECTION."[292]

This email followed an apparent January 20, 1997 meeting attended by Mr. Buettner, Mr. Kirstein, Ms. Frazier, Mr. Spargo, Mr. Adamczak and Mr. Cancelmi at which those individuals seem to have discussed, based on handwritten notes kept by Ms. Frazier,[293] whether depreciation recapture should be recorded as part of the purchase accounting or through income.

Also after this apparent meeting, Mr. Kirstein received guidance from PwC's Maribess Miller indicating that the receivables should be recorded, if at all, through the purchase accounting. Mr. Kirstein noted in a January 23, 1997 email to Mr. Buettner and Ms. Frazier that Ms. Miller's "answer does not support AHERF's intentions, however, there is no clear guidance."[294]

    ii.  Within PwC's audit working papers is a proposed SUD entry to reverse the recognition of $7.1 million of income relating to depreciation recapture receivables recorded on the books of Forbes and AVH.[295]

    iii.  On the August 22, 1997 Audit Update agenda in Ms. Frazier's files, she wrote the following note next to the "Medicare Recapture" agenda item: "through income."[296]

    iv.  There is no reference to receivables recorded in connection with depreciation recapture filings in PwC's working papers relating to

---

[292] Exhibit 4409, CL 158743
[293] Amy Frazier personal file, CL 037722 – 4
[294] Exhibit 4409, CL 158744
[295] Exhibit 4410, CL 218138
[296] Exhibit 72, CL 037536

Prepared in connection with litigation

the purchase accounting for the acquisitions of Forbes and AVH.[297]

    v.  Also, in a subsequent events working paper, PwC noted: "Relative to Medicare recapture, they are continuing to record amounts for Forbes and AVH..."[298]

f.  Although PwC disagreed with the recording of income relative to these receivables, it did not carry forward its proposed adjustment by including it on its SUD. As a result, this proposed adjustment was not included in PwC's evaluation of the materiality of unadjusted audit differences. Nor did PwC inform the audit committee of this proposed audit adjustment.

g.  GAAS called for PwC to communicate to the audit committee situations where there had been a disagreement with management about matters that could be significant to the AHERF financial statements and about proposed adjustments arising from the audit that were significant to the financial statements, whether or not those adjustments had been recorded by management. This issue clearly was within the ambit of one or both of these requirements, but PwC failed to include any discussion of this in its communications with the AHERF audit committee.

**5   Other Revenue Adjustments (Overstated Net Income by $6.5 million)**

a.  As discussed above, AHERF created acquisition reserves as "cushions" on the books of the Graduate Hospitals. PwC knew that the acquisition reserves were set up on the books of the Graduate Hospitals with a corresponding increase to goodwill. Furthermore, as discussed above, PwC knew, or should have known, that these reserves were recorded in violation of GAAP. To the extent that these reserves were unnecessary, they should have been removed from the books of the Graduate Hospitals with a corresponding decrease in the amount of recorded goodwill.[299]

b.  In fiscal year 1997, Graduate Hospital and Rancocas Hospital used $4.5 million and $2.5 million, respectively, of these acquisition reserves to inflate 1997 income by decreasing contractual allowance expenses, in

---

[297] See for example Exhibit 4128
[298] CLASS working papers
[299] FAS 38, paragraph 35

Prepared in connection with litigation

contra revenue accounts. As discussed above, such use was in violation of GAAP.

   c. Had PwC appropriately tested the use of the acquisition reserves set up on the books of the Graduate hospitals, it is likely that PwC would have been aware that this $6.5 million had been used to inflate 1997 income.

      i. The reserves utilized were contained in "miscellaneous" accounts payable accounts.[300]

      ii. Like the transfers discussed in section 3 above, the removal of these reserves resulted in large fluctuations evident in PwC's Lead Schedule for accrued liabilities.[301] Had PwC performed adequate audit work to obtain explanations for these large fluctuations, PwC would have become aware that liability cushions had been inappropriately used to inflate income.

      iii. Moreover, had PwC expanded the scope of its audit, as it should have as result of its knowledge of the $50 million transfer, to identify how the other reserves set up on the books of the Graduate Hospitals had been utilized, PwC would have been aware of this improper accounting.

   d. As has been discussed above, the setting up of these unnecessary acquisition reserves and their subsequent use to inflate income represented earnings management. As such, these misstatements were qualitatively as well as quantitatively material to AHERF's financial statements. This made it all the more important that these items be communicated to the audit committee, but no such communication was made by PwC.

## 6   Forbes Acquisition Reserves Recorded as "Cushions"

   a. The pattern, discussed above in connection with Graduate, of AHERF recording unnecessary acquisition reserves ("cushions") with a corresponding increase to goodwill also occurred in connection with the Forbes acquisition. These cushions were material amounts and were not recorded in accordance with GAAP. PwC knew of the existence of these cushions but failed to either:

---

[300] Exhibit 4130, CL 015198 – 199
[301] Ibid

Prepared in connection with litigation

    i.    Require AHERF to make appropriate adjustments to eliminate these cushions; or

    ii.    Qualify its opinion on AHERF's 1997 financial statements because they contained these cushions, which were not in accordance with GAAP and were material in amount and character.

b.  PwC knew that Graduate recorded acquisition reserves as cushions as discussed above.

c.  In addition, PwC knew that Forbes recorded $10.5 million of acquisition reserves as cushions when AHERF acquired Forbes as of January 1, 1997. PwC noted the following:

    i.    "This account is additional cushion. **No support exists for this amount.** $10,469,000 of the total amount was recorded during the purchase accounting entries to allow for contingent items not previously identified."[302] [emphasis added]

    ii.    "10.4 million corp services accrual, what is it[?] **This is a general purchase accounting cushion. Per Jack, it was cleared through bill** [Bill Buettner]."[303]

d.  Although this $10.5 million acquisition reserve cushion was not used to increase income for fiscal year 1997, AHERF materially inflated both goodwill and accrued expenses.

e.  PwC failed to report the recording of these cushions by AHERF management to the audit committee.

## 7   Violation of Debt Covenant (AGH Morgan Agreement)

a.  As discussed in section C.7 above, the AGH Morgan Agreement contained a debt covenant that required AGH to maintain a Consolidated Unrestricted Fund Balance of at least $200 million, which was subsequently decreased to $160 million as of January 1, 1997.[304]

b.  The fiscal year 1997 audited financial statements did not properly disclose AGH's non-compliance with this debt covenant. AHERF's

---

[302] Ibid, CL 015202
[303] CL 217111 through 113
[304] Exhibit 4007, CL 015079

Prepared in connection with litigation

calculation showing compliance with this covenant did not appropriately exclude "all loans to and other Investments in Affiliates which are not Members of the Obligated Group and all equity Investments in Persons which are not Subsidiaries"[305], as required by the AGH Morgan Agreement. At the time of the 1997 audit, failing to exclude amounts owed to AGH by other AHERF affiliates, AHERF's treasury department incorrectly calculated the unrestricted fund balance to be $192 million.[306]

c. Mr. Buettner was aware that the $114 million in amounts due from affiliates was being reclassified by AHERF:

"he [Mr. Dionisio] called me and asked if we could accept the transfer of 114 million dollars out of due from affiliates and include it – reclass up to assets limited as to use, that there was some discussion within AHERF management as to the proper presentation of that amount since that amount represented funded depreciation that had been, in effect, transferred up to AHERF and that the draft currently – the draft report currently included the 114 down in due from affiliates and they wanted to reclassify it up to assets limited as to use.

...I told him that I could live with either presentation ..."[307]

d. PwC knew, or should have known, that in addition to the other inter-company receivable, amounts owed to AGH by other AHERF affiliates should have been excluded from the Unrestricted Fund Balance calculation in accordance with the agreement.[308] PwC failed to obtain sufficient competent evidential matter in the audit of debt, specifically the compliance with debt covenants.

i. In regards to the financial covenant calculation, Kim Fast, PwC associate performing audit work on debt compliance, described her task as "more in the nature of tying off balances from the calculations prepared by AHERF treasury."[309] This did not constitute independently calculating the financial covenants in

---

[305] Exhibit 327, D0016929

[306] Exhibit 4005, CL 020845

[307] William Buettner 6/24/04 deposition, page 806 line 13 through page 807 line 5

[308] "Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financials statements is not required in those statements. The disclosures shall include: (a) The nature of the relationship(s) involved...(d) Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement." [FAS 57 paragraph 2]

[309] Kim Fast 10/08/03 deposition, page 94 lines 2 to 11

Prepared in connection with litigation