accordance with the agreement.  It appears that, once again, PwC did not adequately review important terms of the Morgan Agreement.

e.  PwC failed to disclose the unrestricted fund balance covenant violation in AHERF's consolidated financial statements for the year ended June 30, 1997.

f.  Furthermore, in a separate report dated January 8, 1998[310], PwC improperly reported to the Board of Trustees that AHERF was in compliance with the debt covenants.

g.  I have prepared Exhibit G to calculate the unrestricted fund balance as of June 30, 1997 in accordance with the agreement.  As shown in this exhibit, AGH violated the unrestricted fund balance covenant as of June 30, 1997.

**8    Failure to Classify the Graduate Hosptials' Long-Term Debt as Current Liabilities**

a.  Contained within the Master Trust Indenture, applicable to Bonds issued by certain of the Graduate Hospitals was a financial covenant that required the Obligated Issuers to achieve a Historical Debt Service Coverage Ratio of at least 1.1 (hereinafter referred to as "Rate Covenant").[311]

i.  If the Obligated Issuers did not achieve such ratios, "the Master Trustee shall require the Obligated Issuers at their expense to retain a consultant to make recommendations with respect to the rates, fees and charges of Obligated Group …"

ii.  Section 6.3 of the Master Trust Indenture also stated: "So long as the Obligated Issuer shall retain a Consultant and shall follow such Consultant's recommendations to the extent feasible, no Event of Default shall be deemed to have occurred hereunder provided only that Total Income Available For Debt Service for each such Fiscal Year is at least equal to 100% of the Maximum Annual Debt Service for such Fiscal Year."[312]

---

[310] Exhibit 4004, CL 043885
[311] Exhibit 334, section 6.3
[312] Ibid

Prepared in connection with litigation

b. On or around November 1, 1996, certain of the Graduate Hospitals became part of the Allegheny Hospitals – Centennial (AHC) Obligated Group.[313] For fiscal year 1997, AHC failed to achieve compliance with the rate covenant. As calculated by AHERF, AHC had a Maximum Annual Debt Service Coverage Ratio of negative 1.62 to 1.0.[314]

c. In a memorandum dated August 15, 1997, Dan Cancelmi indicated that AHC would likely be in violation of the rate covenant, and further stated: "In order for C&L [PwC] to issue a 'clean' opinion on the consolidated AHERF financial statements, we will need to obtain a written waiver of the violations from the Graduate debt holders. If we do not receive a waiver, we would have to classify Graudate's debt as a current liability instead of as a non-current liability."[315]

d. In a letter dated September 19, 1997, AHC through AHERF Vice President of Treasury, Mike Martin, informed First Union, the Master Trustee of the Bonds, that the calculated Maximum Annual Debt Service Coverage Ratio was negative 1.62 to 1.0[316] and that AHC would retain AHERF as its consultant in an attempt to remedy the violation.

   i. Mr. Martin also asked First Union to assert, "that the remedial actions that have been and are being taken are sufficient for First Union, as Master Trustee, to assert that this is not an Event of Default."[317]

   ii. Prior to sending this letter, AHERF received comments on this letter from Mr. Kirstein of PwC. Among those comments was a suggestion that Mr. Martin's letter request that First Union acknowledge that there has been no event of default and that, "accordingly the remedies available to you as they relate to events of default for violation of the Maximum Annual Debt Service Coverage ratio will not be exercised through July 1, 1998."[318]

e. On November 3, 1997, Mr. Martin and Susan Gilbert of AHERF's Treasury department received a memorandum from Bond Counsel, Foley and Lardner, indicating that AHC's retention of AHERF as a

---

[313] Exhibit 381, PR-DLC-BRM-01-00149
[314] Exhibit 377
[315] Exhibit 782, JD-MM-0001711
[316] Exhibit 377
[317] Ibid, PR-BINDER-01-00781
[318] Exhibit 783, DBR-SG 03475

Prepared in connection with litigation

Consultant precluded "... the default from becoming an Event of Default."[319]

f. On November 10, 1997, First Union indicated, through a letter from Dave Leondi to Mr. Martin of AHERF, that it was not First Union's practice to "waive any requirements under the Master Indenture."[320]

g. On November 19, 1997, AHERF Chief Financial Officer David McConnell sent First Union a letter that stated, among other things: "As long as Centennial is taking these actions, no Event of Default is deemed to occur under the Master Indenture."[321]

h. On November 21, 1997, First Union, through Vice President Lynn Hines sent a letter to Mr. McConnell and stated, among other things: "I wish to call your attention to section 6.3 of the Master Trust Indenture which basically indicates that failure to maintain Total Income Available for Debt Service of at least 100% of the Maximum Annual Debt Service for such fiscal year is an Event of Default."[322] This letter also concluded that:

"You have asked that the Master Trustee acknowledge the adequacy of Centennial's remedial efforts in order to facilitate the release of AHERF's audited consolidated financials statements. The Master Trust Indenture does not provide for this type of action by the Master Trustee."

i. On November 26, 1997, Mr. McConnell sent a reply to Ms. Hines that stated, among other things: "Finally, you say in the third paragraph of your letter of November 21, 1997 that AHC's failure to satisfy the coverage ratio is an 'Event of Default' under the Master Indenture. AHERF and AHC respectfully disagree."[323] Mr. McConnell's disagreement was based upon AHC's retention of AHERF as a Consultant as defined under the Master Indenture.

j. Robert Zimmerman and Becki Brueckel, the Foley and Larder lawyers who were consulted by AHERF on this issue, have testified that the believe First Union's position was a reasonable one, and that there was more than one reasonable interpretation regarding the ramifications of

---

[319] Exhibit 378, PR-BINDER-01-00599
[320] Exhibit 380, PR-PRIV-111-00464
[321] Exhibit 381, PR-DLC-BRM-01-00149
[322] Exhibit 784, CL027109
[323] Exhibit 385, PR-DLC-BRM-01-00162

Prepared in connection with litigation

AHC's failure to achieve at least a 1.0 to 1.0 ratio.[324] Mr. Zimmerman also testified that a failure to achieve a Debt Service coverage ratio is not a type of non-compliance that can be cured.[325]

k.  GAAP states that long-term obligations should be classified as current liabilities when long-term obligations that are or will be callable by the creditor either because the debtor's violation of a provision of the debt agreement at the balance sheet date makes the obligation callable or because the violation, if not cured within a specified grace period, will make the obligation callable. Accordingly, such callable obligations shall be classified as current liabilities unless one of the following conditions is met:

i.  The creditor has waived or subsequently lost the right to demand repayment for more than one year from the balance sheet date.

ii.  For long-term obligations containing a grace period within which the debtor may cure the violation, it is probable that the violation will be cured within that period, thus preventing the obligation from becoming callable. If an obligation is classified as a long-term liability, the circumstances shall be disclosed. [FAS 78 paragraph 5]

l.  One of PwC's audit steps in the long-term debt section was to determine "If provisions or covenants of debt agreements are unclear, the auditor should ask the client to requires lenders to provide a written interpretation of the item or items in question."

m.  In its Subsequent Event working papers, PwC retained a copy of Ms. Hines November 21, 1997 letter as discussed above in paragraph h.[326] The letter stated that the violation of the rate covenant was an Event of Default.

n.  There was no evidence in the PwC audit working papers that indicated that First Union changed its position that the failure to achieve at least a 1.0 to 1.0 ratio with respect to the rate covenant constituted an Event of Default prior to the issuance of AHERF's audit consolidated financial statements.

---

[324] Robert Zimmerman 4/1/03 deposition, page 224 lines 1 through 9 and Becki Brueckel 1/8/03 deposition, page 339 lines 1 through 7
[325] Ibid, page 252 line 5 through 253 line 8
[326] Exhibit 784, CL 027109 - 10

Page 107 of 114

Prepared in connection with litigation

o. AHERF's fiscal year June 30, 1997 audited consolidated financial
statements disclosed AHC's long-term debt to be $160.5 million (less its
current portion). These financial statements failed to disclose that First
Union had conveyed to AHERF its position that AHC's "failure to
maintain Total Income Available for Debt Service of at least 100% of
the Maximum Annual Debt Service for such fiscal year is an Event of
Default." As a consequence, the related long-term debt should have
been presented as current.[327]

p. PwC failed to comply with GAAS in its consideration of the above-
noted circumstances for the following reasons:

   i.   PwC was aware that the Annual Debt Service Coverage Ratio was
        below 1.0, and was, in fact, a negative 1.62 as of June 30, 1997[328];

   ii.  PwC was aware of the letter from First Union noted in paragraph h
        above that indicated an Annual Debt Service Coverage Ratio of
        less than 1.0 was an Event of Default and that First Union was
        unable to provide a waiver for that provision;

   iii. As noted in paragraph n above, there were no evidence in PwC's
        audit working papers that First Union had modified its position as
        stated in its November 21, 1997 letter;

   iv.  PwC was aware that GAAP requires that long-term obligations
        which are callable because of the debtor's violation of a provision
        of the debt agreement shall be classified as current liabilities as
        noted in paragraph k above;

   v.   PwC was aware that the long-term obligations that would be
        required to be classified as current liabilities due to the above-
        noted circumstances are material to the financial statements of
        AHERF[329];

   vi.  Despite having knowledge of the facts noted herein, PwC
        permitted AHERF to discuss its violation of debt covenants in its
        financial statements without disclosing that First Union had
        identified the violation as an Event of Default and without
        reclassifying the long-term obligations as current liabilities.[330]

---

[327] Exhibit 58
[328] See Exhibit 382, CL216926
[329] Exhibit 58
[330] Ibid

Page 108 of 114

Prepared in connection with litigation

Since the lack of appropriate disclosure and failure to reclassify obligations is a material departure from GAAP, PwC failed to comply with the first standard of reporting, which states that the auditor's report must state whether the financial statements are presented in accordance with GAAP.[331] In other words, PwC failed to comply with GAAS because their report did not note the material departure from GAAP of which they were aware.

## 9   PwC's Failure to Comply with its Responsibilities for Communications with AHERF's Audit Committee

a.  As discussed in sections B.3.c and B.3.d above, GAAS requires an auditor to communicate certain matters to a client entity's audit committee. PwC failed to comply with these requirements in connection with at least the items discussed below.

b.  These required communications were of particular importance in light of the qualitative factors impacting their materiality. For instance, senior management's intentional misapplication of accounting principles to inflate reported net income and misstate balance sheet accounts ($50 million Graduate transfer, additional Graduate transfers to DVOG, AHERF Irrevocable Trusts, depreciation recapture, Qualmed deferred revenue, and establishment of unneeded "cushions" in connection with acquisitions), particularly in light of the compensation structure of senior management,[332] should have been reported to the audit committee. These intentional misstatements raised doubts about the integrity of AHERF's senior management.

c.  The $50 million transfer of Graduate acquisition reserves to DVOG's reserve for uncollectible accounts was not recorded in accordance with GAAP. This material transfer should have been communicated to the audit committee, as well as the related excess goodwill established as a result of excess acquisition reserves.

d.  Had PwC appropriately performed audit procedures on the "Shortfall Adjustments" in the DVOG reserve for uncollectible accounts rollforward schedule, it should have been aware that these material adjustments were improperly transferred from Graduate. The extent and nature of these impacts would have required communication to the audit committee.

---

[331] AU Section 150.02
[332] SEC Exhibit 209, PwC 003351

Prepared in connection with litigation

e. Had PwC appropriately performed audit procedures on Graduate's acquisition reserves, it should have been aware of the transfer of $28.3 million of these reserves to DVOG contractual allowances. The material impact and the improper nature of these transfers would have required communication to the audit committee.

f. Had PwC appropriately tested the classification of the AHERF Irrevocable Trusts, it should have been aware of the improper nature of the classifications made by AHERF's management. The impact of these misclassifications was material to both the consolidated balance sheet and the consolidated statement of operations. The extent and nature of these impacts would have required communication to the audit committee.

g. PwC's disagreement as to the treatment of the $7.1 million depreciation recapture transaction should have been communicated to the audit committee.

h. PwC concluded that $10.5 million of unnecessary reserves related to the Forbes acquisition had no supporting evidence. The nature and the impact of these reserves would have required communication to the audit committee.

i. As discussed above, PwC failed to appropriately test the calculation of the Morgan Agreement debt covenants and erroneously reported to the Board of Trustees that AGHOG was in compliance with those covenants. Had PwC appropriately tested these calculations, it would have been required to report that AGHOG was not in compliance with those covenants.

## 10  Summary of GAAS Violations for PwC's 1997 Audit

a. PwC issued unqualified opinions in its audit reports on the consolidated financial statements and the consolidating and combining information of AHERF for the year ended June 30, 1997. As these financial statements were not presented fairly, in all material respects in conformity with GAAP, PwC's unqualified opinions violated GAAS Standard of Reporting No. 1. The following is a summary of the material GAAP misstatements contained in those financial statements.

i. Graduate Transfer of $50 million to DVOG Reserves for Uncollectible Accounts - AHERF avoided recording bad debt expenses for DVOG, which reduced expenses and inflated goodwill by $50 million.

Page 110 of 114

Prepared in connection with litigation

ii.    Graduate Transfer of $21.3 million to DVOG Reserves for Uncollectible Accounts - AHERF again reduced expenses and inflated goodwill by $21.3 million.

iii. ·  Graduate Transfer of $28.3 million to DVOG Contractual Allowances - This transfer inflated net patient services revenue and goodwill by $28.3 million.

iv.    AHERF Irrevocable Trusts - AHERF overstated investment income by $54.7 million, improperly classified $12.1 million of permanently restricted net assets as temporarily restricted net assets, and overstated unrestricted net assets by $85.6 million.

v.    Depreciation Recapture – Forbes and AVH overstated net income by a total of $7.1 million by recognizing contingent gains.

vi.    Forbes Acquisition Reserves recorded as "Cushions" – Forbes overstated goodwill and acquisition reserves by $10.5 million.

b.  PwC failed to conduct its audits of the consolidated financial statements and the accompanying consolidating and combining information of AHERF for the year ended June 30, 1997 in accordance with GAAS. PwC knew, or should have known, that the aforementioned financial statements contained material departures from GAAP and should not have issued unqualified audit opinions on those financial statements. PwC's failure to comply with GAAS included, at least, the following:

i.    PwC failed to maintain the independence in mental attitude required by General Standard No. 2. PwC failed to:

- question the validity of the "Shortfall Adjustments" by assuming that these adjustments were recorded appropriately,

- require AHERF to reverse the non GAAP $50 million Graduate transfer and perhaps being involved with this transfer,

- challenge the recording of cushions by AHERF, and

- evaluate the qualitative aspects of the trend of earnings management engaged in by AHERF management.

ii.    PwC failed to exercise due professional care in the performance of its audits and the preparation of its audit reports as required by General Standard No. 3. PwC failed to:

Page 111 of 114

Prepared in connection with litigation

- ensure that the GAAP violations described above were either corrected by AHERF in its financial statements or by qualifying their opinions on those financial statements,

- challenge the inappropriate use and establishment of unnecessary acquisition reserves of the books of Graduate,

- adjust its audit risk assessment and perform additional audit procedures in light of its discovery of AHERF management's intentional misapplication of GAAP in connection with the improper transfer of the $50 million from Graduate to DVOG,

- perform additional audit work to ensure that there were no other material inter-company transfers recorded in violation of GAAP after the discovery of the improper transfer of $50 million from Graduate to DVOG,

- conclude that Graduate's goodwill was overstated after the discovery of the improper transfer of $50 million from Graduate to DVOG,

- investigate unusual "Shortfall Adjustments" that increased DVOG reserves for uncollectible accounts and conclude that the increases were improperly transferred from Graduate,

- perform adequate audit work on Graduate's acquisition reserves and conclude that the decreases were the result of improper transfers to DVOG,

- appropriately test the classification of the AHERF Irrevocable Trusts endowments and conclude that these trust amounts should have been recorded as permanently restricted funds,

- appropriately include a total of $7.1 million of income booked by Forbes and AVH in connection with Medicare depreciation recapture in its evaluation of the materiality of unadjusted audit differences,

- conclude that the $10.5 million of Forbes unnecessary acquisition reserves were not recorded in accordance with GAAP and consider the impact of these reserves in its evaluation of the materiality of the unadjusted audit differences on the financial statements, and

Page 112 of 114

Prepared in connection with litigation

- calculate the unrestricted fund balance debt covenant in accordance with the AGH Morgan Agreement, which would have led PwC to conclude that AGH had violated the debt covenant.

iii.  PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for its opinion as was required by Standard of Field Work No.3. PwC failed to:

- obtain supporting evidence for the "Shortfall Adjustments" that were transferred to DVOG from Graduate,

- perform adequate audit work as a result of the establishment and use of acquisition reserves to ensure that these charges were recorded in accordance with GAAP, and

- challenge the cushions recorded by AHERF.

### E.  *Summary of Specific Items discussed in C and D Above:*

a.  Based upon the nature, extent and materiality of the errors discussed in C and D above, these errors were either detected by PwC or would likely have been detected by PwC had it conducted its audit in accordance with GAAS. Furthermore, it is likely that PwC should have extended its audit procedures substantially as called for by the following:

"An audit of financial statements is a cumulative process; as the auditor assesses control risk, the information obtained may cause him or her to modify the nature, timing, extent of the other planned tests of controls for assessing control risk. In addition, information may come to the auditor's attention as a result of performing substantive tests or from other sources during the audit that differs significantly from the information on which his or her planned tests of controls for assessing control risk were based. For example, the extent of misstatements that the auditor detects by performing substantive tests may alter his or her judgment about the assessed level of control risk. In such circumstances, the auditor may need to reevaluate the planned substantive procedures, based on a revised consideration of the assessed level of control risk for all or some of the financial statement assertions." [AU 319.78]

"In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved. The independent auditor should be

Page 113 of 114

Prepared in connection with litigation

thorough in his search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he should recognize the possibility that the financial statements may not be presented in conformity with generally accepted accounting principles. In developing his opinion, the auditor should give consideration to relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he must refrain from forming an opinion until he has obtained sufficient competent evidential matter to remove such substantial doubt, or he must express a qualified opinion or a disclaimer of opinion." [AU 326.23]

b. Appropriate auditing procedures in response to the matters discussed in C and D above, together with expanded procedures performed on other areas of AHERF, AGHOG, DVOG, Graduate, and AUMC are likely to have prevented the issuance of materially misstated financial statements and accompanying financial information relative to these entities.

Executed in San Francisco, California this 2nd day of September, 2004.

D. Paul Regan, CPA, CFE

Page 114 of 114

Prepared in connection with litigation

IN THE MATTER OF
THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
AND RESEARCH FOUNDATION,
PLAINTIFFS,

v.

PRICEWATERHOUSECOOPERS, LLP,
DEFENDANT.

REBUTTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

## I.   Introduction

By report, dated September 2, 2004 ("the September Report"), I have previously submitted expert opinions with respect to certain issues in this case. I stated in that report that amendments or additions to the September Report might be required as a result of developments prior to trial, including, but not limited to, expert discovery.

Since the date of my earlier report I have received copies of the following additional documents:

1.   The expert report of J. W. Tillett, Jr. (the "Tillett Report"), dated November 12, 2004.

2.   Six Volumes of supporting documents produced by Mr. Tillett.

3.   Certain audit working papers relating to the auditing of accounts receivable for other healthcare entities in Pennsylvania audited by Coopers & Lybrand, a predecessor to Defendant PricewaterhouseCoopers LLP (hereinafter collectively referred to as "PwC") for fiscal years 1994 through 1997.[1]

This rebuttal report addresses opinions expressed by Mr. Tillett in his written report. I have not changed any of the opinions included in the September Report, and I have not attempted to restate all of the opinions, and the bases for those opinions, included in the September Report that are relevant to the opinions expressed by Mr. Tillett. I disagree with substantially all of the opinions expressed in the Tillett Report even if not specifically addressed in this report. The focus of this rebuttal is on those issues where additional information, not mentioned in the September Report, bear upon the opinions of Mr. Tillett.

## II.   Rebuttal Opinions

### A.   Materiality

1.   Mr. Tillett opines in his report that "[PwC's] consideration of materiality relative to unrestricted net assets, total net assets and the impact on debt covenants was appropriate. Furthermore, I believe the opinions expressed by Mr. Berliner and Mr. Regan on materiality judgments would be relevant for for-profit healthcare systems, but are not appropriate for materiality judgments for not-for-profit healthcare systems."[2]

2.   In the September Report I cited the SEC's Staff Accounting Bulletin No. 99 on Materiality ("SAB 99").[3] Mr. Tillett opines that as this SAB

---

[1] By letter dated December 31, 2004, counsel for PwC produced approximately 2,400 additional pages of audit working papers relating to the auditing of accounts receivable for other healthcare entities. Given the timing of this production, I have not yet had the opportunity to review these additional working papers.

[2] Tillett Report, Opinion A.4, Pages 5 and 23

[3] September Report, Page 17

was not issued until December 1999 it "was clearly not applicable to the fiscal 1996 and 1997 audits."[4]

3.    Mr. Tillett fails to acknowledge that the SEC stated that SAB 99 "was not intended to change current law or guidance in the accounting or auditing literature but to discuss 'long standing' practice,"[5] and, in my opinion, SAB 99 did not change that practice.

4.    Mr. Tillett also opines that SAB 99 is not relevant "as it is guidance prescribed for companies that are registered with the SEC, all of which are for-profit organizations, owned by shareholders."[6]

5.    However, the long-standing practice referenced in SAB 99 was not specific to SEC registrants and, in fact, did not distinguish between what was applicable to SEC registrants and what was applicable to non-SEC registrants, rather it was practice that was common to all entities.

6.    Interestingly, Mr. Tillett apparently does consider that some of the opinions of the SEC staff are relevant, as he himself cites the position taken by the SEC staff with respect to the Iron Curtain method for considering the effects of adjusting entries.[7]

7.    Mr. Tillett also cites as support for his position on materiality the guidance contained in the Montgomery's Auditing textbook. That guidance is as follows:

"Materiality guidelines for hospital audits <u>should be based on the specific circumstances of each hospital</u>. For not-for-profit hospitals, the excess of revenues over expenses <u>may be less important</u> as a basis for materiality judgments, because they often have access to alternative capital sources (e.g., contributions and grants) and do not provide a return to investors. Parameters frequently used by the auditor in evaluating materiality in hospital financial statements include net patient service revenue, current ratios, debt equity ratios, and debt coverage ratios; restricted or unrestricted net assets; and specific line items."[8] {emphasis added}

8.    As indicated above, this guidance does not state that the excess of revenues over expenses is not relevant. Given AHERF's particular facts and circumstances, present with respect to the 1996 and 1997 audits at issue in this matter, I believe that the opinions I expressed on materiality in the September Report are appropriate.

---

[4] Tillett Report, Page 25
[5] September Report, Page 19
[6] Tillett Report, Page 25
[7] Ibid, Page 34
[8] Montgomery's Auditing, Eleventh Edition, 1990, Page 862. Mr. Tillett actually cites to the Twelfth Edition which was published in 1998, although the language contained in that later edition is identical to that in the Eleventh Edition.

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

11. In connection with each of the AHERF audits for 1995, 1996 and 1997, Mr. Buettner disregarded entries on one or more of PwC's SUDs that had an impact on the results of operations greater than this benchmark of 5%.[10]

12. As stated in the September Report, of particular relevance to the assessment of materiality with respect to the AHERF audits at issue in this matter, is the fact that transcriptions of the audit committee meetings and testimony of members of the Board of Trustees indicated that the results of operations of AHERF and its affiliates were important considerations.[11]

13. It should also be noted that nearly all of the misstatements that I identified in the September Report were the result of actions taken that made the statement of operations look better. Therefore these misstatements served to obscure the true results of operations of AHERF and its affiliates.

14. As Mr. Tillett recognizes in his report, the ultimate test of materiality depends on what users of the financial statements would find important. Mr. Buettner's and Mr. Tillett's opinions are not consistent with what was known to be deemed important by the users of AHERF's financial statements.

15. It should also be noted that, although Mr. Tillett makes no reference to this, the magnitude of the misstatements that I identified in the September Report is such that they would be considered material under any reasonable measure utilized by the auditors.

---

[10] Exhibit 1339; Exhibit 1351; Exhibit 1079
[11] September Report, Page 24

**B.    Reliance on Management Representations and the Impact of Alleged Management Improprieties on the Conduct of PwC's Audits**

1.    Throughout his report Mr. Tillett opines that PwC was precluded from identifying audit issues due to information being withheld by members of AHERF's management.

2.    Mr. Tillett has opined that I "failed to recognize management's responsibilities to the auditor."[12]

3.    While Mr. Tillett correctly summarizes the responsibilities of members of management who are also CPAs under the AICPA's Professional Code of Conduct,[13] this does not relieve an auditor from the obligation to do an audit in accordance with generally accepted auditing standards ("GAAS").

4.    I agree with Mr. Tillett that PwC was not performing a "fraud audit."[14] Accordingly, the opinions expressed by me in the September Report relate to the types of procedures that would be appropriate in an audit performed in accordance with GAAS.

5.    The performance of an audit in accordance with GAAS requires that an auditor obtain sufficient competent evidential matter, through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. It does not presume that all relevant information will be provided to the auditor regardless of whether those procedures are performed.

6.    Mr. Tillett often notes that AHERF's senior management made written representations to PwC regarding its accounts.[15] However, the value and weight of this evidence should be considered in light of:

a.    Auditors are required by GAAS to obtain written representations from management.

b.    In my experience auditors draft the management representation letter to include all issues of concern, as well as standard language that is common to most such letters.

c.    Audit reports are not given until such written representations are signed and provided to the auditor.

The inclusion of items in the representation letter, like other representations received from management during the course of the audit, is not a substitute for the performance of necessary audit procedures. {AU 333.02}

---

[12] Tillett Report, Page 22
[13] Ibid, Page 20
[14] Ibid, Page 22
[15] See for example, Tillett Report, Page 65

7. The opinions expressed by me in the September Report address failures of PwC to comply with GAAS in its 1996 and 1997 audits of AHERF and its affiliates. The alleged failures and shortcomings of AHERF and those of its accounting systems and employees called for greater skepticism and expanded audit procedures by PwC personnel in order for its audits of AHERF to be performed in accordance with GAAS.

8. There is no evidence that AHERF management precluded PwC from conducting its audits in accordance with GAAS. AHERF management did not falsify documents, all of the entries made were included in the general ledger, PwC was provided with all of the documents that it requested for its audit, and PwC was able to ask whatever questions it deemed appropriate of AHERF personnel.

C. **The Evaluation of the Adequacy of the Allowance for Doubtful Accounts**

1. Mr. Tillett has opined that "{s}ignificant healthcare training and experience are necessary to effectively assess the reasonableness of the estimates made by management, particularly the estimates related to net patient service revenue and the net realizable value of patient accounts receivable."[16]

2. In addition, Mr. Tillett states that "an auditor should consider the historical experience of the entity in making past estimates as well as the auditor's experience in the industry when assessing an accounting estimate. Messrs. Berliner and Regan fail to do so."[17]

3. While there are some aspects of the accounts receivable that are peculiar to healthcare organizations, the basic principles that apply to the assessment of the adequacy of a healthcare entity's allowance for doubtful accounts are the same as those that apply to other organizations. The procedures that an auditor is required to apply under GAAS with respect to the evaluation of management estimates is also common to both healthcare and non-healthcare entities, and are detailed in AU 342, Auditing Accounting Estimates. The AICPA Accounting and Auditing Guide, Health Care Organizations, is consistent with the guidance contained in AU 342.

4. Mr. Tillett's statement that I have failed to consider the historical experience of the entity in making past estimates is inaccurate. In addition, as discussed below, it is also important for the auditor to consider known information about the current status of issues impacting the realizable value of the entity's receivables and how that current status affects the entity's historical experience.

---

[16] Ibid, Page 16
[17] Ibid.

The 1996 Audit

5.    Mr. Tillett asserts that PwC considered "the claims processing issues being encountered by the billing departments of AHERF as a result of the relocation and consolidation of the billing and collection departments, systems conversions, and employee turnover"[18] in its planning for the 1996 audit.

6.    In response to these identified issues, Mr. Tillett asserts that PwC modified its audit approach in 1996 through the use of Norb Kaliszewski, a patient revenue consulting specialist, to perform additional procedures over the processing of accounts receivable in the Delaware Valley.[19]

7.    However, as noted in the September Report, Mr. Kaliszewski testified that while he reviewed the revenue and billing cycles, the collectibility of accounts receivable was not the focus of his work.[20] Mr. Tillett's characterization of this work appears to be an after-the-fact attempt to bolster the audit work relating to the valuation and collectibility of accounts receivable with work that was not done for that purpose.

8.    Mr. Tillett also asserts that "as a result of [PwC's] analyses, audit results and professional judgment, [PwC] developed an independent expectation of the allowance for uncollectible accounts and suggested to management that the allowance for uncollectible accounts be increased by approximately $15 to $20 million for the allowance to be within a reasonable range."[21]

9.    This assertion appears to have been based on the deposition testimony of Mr. Buettner, who testified that he arrived at the $15 to $20 million range as follows:

"That assessment of 15 to 20 million dollars was based on a number of factors. As I did – I didn't itemize those factors. It was based on my own assessment of reserve adequacy vis-à-vis the total receivable portfolio. It's as simple as that."[22]

10.    However, it is important to note that neither this independent expectation, nor the basis on which it was arrived at, is noted anywhere in PwC's audit working papers. Were Mr. Buettner's testimony true, in my experience, it is a virtual certainty that there would have been documentation of this in PwC's working papers.

11.    While GAAS does not require that all audit evidence be documented within the audit working papers, in my experience it is expected that there would be some documentation included in the audit working

---

[18] Ibid, Page 51
[19] Ibid.
[20] September Report, Page 43
[21] Tillett Report, Page 57
[22] Deposition of William Buettner, June 22, 2004, Page 263, Lines 1 through 6

papers relative to an issue of this significance. In fact, I would expect a substantial analysis to be included in the working papers supporting a determination of this importance.

12.   What is documented in PwC's working papers is an analysis that PwC caused AHERF to prepare as to what level of reserves would be indicated for MCP (including EPPI), one of the Delaware Valley hospitals, using the bad debt reserve methodology of HUH. That analysis showed that additional reserves of $15.2 million over those recorded would have been required for just this one hospital.[23]

13.   In addition, PwC was aware from its high-dollar testing working papers that HUH also reserved at very low levels for old accounts.[24]

14.   PwC also had other schedules in its working papers that showed that other Delaware Valley hospitals had unreasonably low reserve levels on old accounts.

15.   This information, along with other information known to PwC, should have resulted in any independent expectation developed by PwC as to the allowance for uncollectible accounts being considerably higher than the $15 to $20 million range testified to by Mr. Buettner.

$80 Million Write-Off of Uncollectible Accounts

16.   Mr. Tillett cites certain testimony of Evan Fox that Mr. Tillett appears to suggest supports his characterization of these write-offs as being unnecessary and unusual.[25]

17.   However, Mr. Fox also testified that this write-off was "no big surprise" and that, as the accounts written off had been in ARTRAC for close to a year "the only question was at what point are they going to say, that's the end of that. It was kind of coming."[26] This is very different from the manner in which the testimony of Mr. Fox is portrayed by Mr. Tillett.

18.   In addition, in opining that these write-offs were unnecessary, Mr. Tillett has ignored, or failed to consider, extensive testimony of individuals in PFSG's and AHERF's accounting departments (such as Messrs. Snow, Laing and Gedman, and Ms. Franz) that discussed in detail the substantial amount of uncollectible accounts carried on the books and the need to write those receivables off.

The Pennsylvania Data

19.   Mr. Tillett has opined that the estimates of the allowances for uncollectible accounts that I calculated in the September Report "are

---

[23] September Report, Page 45
[24] Ibid.
[25] Tillett Report, Page 80
[26] Deposition of Evan Fox, November 14, 2002, Page 129, Lines 21 through 25

unreasonable in comparison to historical DVOG amounts and the market in which the hospitals were operating."[27]

20. In addition to the historical allowance percentages of DVOG for fiscal years 1994 through 1996, Mr. Tillett also "considered the Allowance Percentage of the Pennsylvania Data for 1996."[28]

21. According to Mr. Tillett "the DVOG Allowance Percentage was near the average for the 1996 Pennsylvania Data Allowance Percentage."[29]

22. Although Mr. Tillett makes reference to them earlier in his report, in performing these simplistic comparisons he does not appear to take into account that, as PwC was aware, the DVOG Hospitals were experiencing significant processing issues as a result of the consolidation of the billing and collection departments, significant staff turnover, and systems conversions which in turn led to substantially higher than normal delays in billings, inaccurate billings and billing adjustments.

23. These conditions caused an inordinate rate of uncollectible accounts which were made exponentially greater by DVOG's reluctance to write off its uncollectible accounts. The totality of these circumstances led to a massive amount of uncollectible accounts residing in DVOG's June 30, 1996 balances. Mr. Tillett appears to ignore these draconian circumstances when comparing DVOG to other hospitals in the Pennsylvania Data.

24. In addition, as is common to any such data, the Pennsylvania Data, and its comparability to the DVOG Hospitals, is limited in at least the following respects:

   a. It does not provide information as to the aging of the various hospitals' receivables.

   b. It does not provide any information as to the payor mix of the various hospitals' receivables.

   c. It does not provide any information as to the relative policies of the various hospitals with respect to the write-off of uncollectible or old balances. For example, holding all other variables constant, if Hospital A writes off all receivables over 180 days old, its allowance for uncollectible accounts for balances over 150 days old should be less than Hospital B that has a policy of not writing off its uncollectible accounts over 180 days old.[30]

---

[27] Tillett Report, Page 62
[28] Ibid, Page 60
[29] Ibid, Page 61
[30] I am currently completing an analysis of the other audit working papers produced by PwC, including those produced on December 31, 2004, and I will supplement this rebuttal report to address my observations as a result of that analysis.

Information that AHERF Management Withheld from PwC

25. Mr. Tillett also includes in his report "examples of evidence that AHERF management withheld information or misrepresented facts to [PwC] related to accounts receivable matters during its fiscal year 1996 audit."[31]

26. In this context Mr. Tillett cites certain deposition testimony of Gregory Snow and states that he "further implied he would only provide relevant information if asked and before he provided the information he would have to get 'clearance to provide it'."[32]

27. This was not "implied" by Mr. Snow. In fact, shortly after the testimony cited by Mr. Tillett, Mr. Snow stated as follows:

"Q. In keeping with that belief, were you of the opinion that you were not to share internal information with anyone from the outside?

Mr. Torborg: Object to the form.

A. No. I – No. If information was requested, then I would provide it or attempt to get clearance to provide it, but I was not going to volunteer any information.

Q. Even if you believed that information to be relevant?

A. That's correct.

Q. Did you ever seek clearance to give information to [PwC] but were told not to?

A. I don't believe so."[33]

28. If anything is implied by this testimony, it is that Mr. Snow was not asked about the issue of uncollectible accounts by the PwC auditors. In fact, later in his deposition, Mr. Snow made it clear that the reason that he did not inform PwC of issues with respect to these receivables was because "they never asked."[34]

29. As discussed above, GAAS requires that auditors perform certain procedures and does not presume that all necessary information will simply be given to the auditors regardless of whether those procedures are performed or information is volunteered.

30. Mr. Tillett also cites portions of a June 10, 1996 memorandum from Russell Laing to Greg Snow[35] and states that "[t]his type of

---

[31] Tillett Report, Page 70
[32] Ibid.
[33] Deposition of Gregory Snow, Page 124, Lines 1 through 16
[34] Ibid, Page 407, Lines 14 through 22
[35] PR-LAING 00086-87

communication illustrates possible collusion whereby members of management scheme to possibly mislead the auditor."[36]

31.    I believe that Mr. Tillett's statement is unfounded.  In fact, in the context of the memorandum as a whole the reference to "all interested parties" in the final paragraph of this memorandum could equally be read to include the PwC auditors.  This is particularly so given that the "extended detailed audit of receivables" discussed in the memorandum largely related to the testing of billing records to be performed by Norb Kaliszewski.  There is no evidence to suggest that the problems AHERF was having in this area of its operations were not known to PwC.

SOP 00-01

32.    Mr. Tillett included the following statement in his report:

"Contrary to Mr. Berliner's opinion, estimated third party settlements are not considered loss contingencies and therefore, FAS No. 5, Accounting for Contingencies, and FIN No. 14, Reasonable Estimation of the Amount of a Loss – an Interpretation of FAS No. 5, are not applicable to their accounting.  This view was clarified by SOP 00-01, Auditing Health Care Third-Party Revenues and Related Receivables."[37]

33.    As noted, Mr. Tillet's reference for this, and numerous other citations included by him in the preceding pages of his report, is to SOP 00-01. This SOP was effective for periods ending on or after June 30, 2000,[38] and did not exist at the time of PwC's 1996 and 1997 audits of AHERF.

34.    However, SOP 00-01 did not change any of the requirements in GAAS for the auditing of accounting estimates.  It does recognize that third party settlements because of their particular characteristics are difficult to estimate, but addresses this difficulty by reference to the factors that need to be considered both by management in making the estimate and by the auditor in testing the reasonableness of management's estimate.

35.    Consistent with GAAS as it existed at the time of PwC's 1996 and 1997 audits, SOP 00-01 also stated as follows:

"… if the auditor believes the estimated amount included in the financial statements is unreasonable, he or she should treat the difference between that estimate and the closest reasonable estimate in the range as a likely misstatement and aggregate it with other likely misstatements."[39]

---

[36] Tillett Report, Page 71
[37] Ibid, Page 103
[38] SOP 00-01, Paragraph .05
[39] Ibid, Paragraph .26

36.    In addition, SOP 00-01 included the following guidance with respect to contingencies:

"…As previously discussed in this SOP, the far-reaching nature of alleged fraud and abuse violations creates an uncertainty with respect to the valuation of revenues, because future allegations of illegal acts could, if proven, result in a subsequent reduction of revenues. In addition, management makes provisions in the financial statements and disclosures for any contingent liabilities associated with fines and penalties due to violations of such laws. **FASB Statement No. 5, Accounting for Contingencies, provides guidance in evaluating contingent liabilities**, such as fines and penalties under applicable laws and regulations. Estimates of potential fines and penalties are not accrued unless their payment is probable and reasonably estimable."[40] {Emphasis added}

37.    As discussed below, to the extent that PwC was aware in prior years of unjustified and/or unsupported cushions on the books of the AHERF entities in the accounts dealing with third party settlements, those cushions should have been eliminated in the prior year. If this had been done those cushions would not have been available for use by AHERF in 1996 and/or 1997 and would not have been on PwC's SUD in subsequent years.

**D.    Required Communications with the Audit Committee**

1.    Mr. Tillett has opined that PwC's communication with the Audit Committee and/or Board of Trustees was appropriate and in accordance with GAAS.[41]

2.    Mr. Tillett includes within this opinion those communications required by SAS 61[42] and those required by SAS 60.[43]

3.    Mr. Tillett also cites portions of two reports issued to the Audit Committee in 1998 and makes the following comments with respect to these reports:

a.    In the first report, presented at a March 11, 1998 Audit Committee meeting, Mr. Tillett states that Mr. Buettner "delivered significant warnings to the committee that I consider one of the most direct, hard hitting and grave warnings that I have seen in my 30 plus year career."[44]

b.    In a June 12, 1998 Audit Committee meeting Mr. Buettner delivered an update to his March 11, 1998 report. Mr. Tillett

---

[40] Ibid, Paragraph .38
[41] Tillett Report, Opinion A.6, Page 35
[42] Ibid, Page 36
[43] Ibid, Page 37
[44] Ibid, Page 46

states that "Mr. Buettner could not have been clearer, yet his warnings fell upon deaf ears."[45]

4.   It should be noted that both of these reports were extremely late in the day and were directed at what the operational difficulties that AHERF was facing and that had escalated to a far more serious nature by that time.

5.   In addition, to the extent that PwC had concerns that constituted such "hard hitting and grave warnings," PwC had an obligation to report such warnings on a timely basis as is set forth in the following sections of AU 325:

".18    Because timely communication may be important, the auditor may choose to communicate significant matters during the course of the audit rather than after the audit is concluded. The decision on whether an interim communication should be issued would be influenced by the relative significance of the matters noted and the urgency of the corrective follow-up action.

.19    The provisions of this section should not be viewed as precluding an auditor from communicating to a client a variety of observations and suggestions regarding its activities that go beyond internal control related matters. Such matters may deal with operational or administrative efficiencies, business strategies, and other items of perceived benefit to the client."

6.   There is no evidence to suggest that PwC did communicate these matters in a timely manner to the Audit Committee or the Board of Trustees. In addition, contrary to the assertion made by Mr. Tillett, PwC's duty to communicate to the Audit Committee and the Board of Trustees was not satisfied because "AHERF's deteriorating financial condition, poor performance, declining cash flows and challenges ahead were adequately disclosed to management and the Board in the consolidated financial statements."[46]

7.   In fact, the material misstatements in AHERF's 1996 and 1997 financial statements served to obscure the true gravity of AHERF's position from the Audit Committee and the Board of Trustees.

E.   **PwC's Evaluation of the Summary of Unadjusted Differences ("SUD")**

1.   Mr. Tillett has opined that PwC's evaluation of the SUD for each of the fiscal years 1995 through 1997 was reasonable and in accordance with GAAS.[47]

---

[45] Ibid, Page 48
[46] Ibid, Page 42
[47] Ibid, Opinion A.5, Page 33

2.    He also stated as follows:

"In addition, while reviewing the expert reports of the plaintiff's experts, I have noted that many items they allege as errors of GAAP were considered by [PwC] in the course of their audits and posted to the SUD. I believe their conclusion that [PwC] failed to meet GAAS since they did not require AHERF to record certain adjustments or to restate the financial statements demonstrates they did not properly evaluate the SUD using the "Iron Curtain" method. To now use the rollover method to evaluate the effect of the SUD is completely inappropriate."[48]

3.    I believe that this misstates the opinions that I expressed in the September Report.

4.    The opinions that I set forth in the September Report were that certain items, principally cushions that were identified within PwC's audit working papers, should have been adjusted for in prior years as the facts and circumstances that bear upon their misstatement were in place in those prior years. If this had been done those cushions would not have been available for use by AHERF in 1996 and/or 1997, or have been on PwC's SUD in subsequent years.

## F.    Netting of Adjusting Entries

1.    In connection with his discussion of the $17.5 million adjustment made by AHERF in fiscal year 1996, among other places, Mr. Tillett has opined that "it is common for an entity to combine the effect of several journal entries into one."[49]

2.    While I agree that it might be common for certain journal entries to be combined, this is not what happened here.

3.    In this instance, entries were made in such a way as to eliminate the income statement impact of the individual elements of the combined entry and appear to have been motivated by a desire to avoid drawing attention to that impact.

4.    This manner of making the entries, and PwC's tacit approval of it, is not "common" practice and in my opinion was inappropriate.

5.    The auditor must also be mindful that actual combined entries may result in misstatements such as those described in the September Report. This caution is further noted in SAB 99:

"In determining whether multiple misstatements cause the financial statements to be materially misstated, registrants and the **auditors of their financial statements should consider each misstatement separately and the aggregate effect of all misstatements**. A

---

[48] Ibid, Page 34
[49] Ibid, Page 68