registrant and its auditor should evaluate misstatements in light of quantitative and qualitative factors and consider whether, in relation to individual line item amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole. This requires consideration of the significance of an item to a particular entity (for example, inventories to a manufacturing company), the pervasiveness of the misstatement (such as whether it affects the presentation of numerous financial statement items), and the effect of the misstatement on the financial statements taken as a whole ....

Registrants and their **auditors first should consider whether each misstatement is material, irrespective of its effect when combined with other misstatements. The literature notes that the analysis should consider whether the misstatement of 'individual amounts' causes a material misstatement of the financial statements taken as a whole**. As with materiality generally, this analysis requires consideration of both quantitative and qualitative factors." {Emphasis added}

### G.    Tort Settlements

1.    Mr. Tillett acknowledges in his report that AHERF management told the PwC auditors that "only more senior team members like Mr. Buettner or Mr. Kirstein could review" the tort settlement agreements.[50]

2.    This was a clear indication to PwC that these agreements were of a sensitive nature.

3.    Mr. Tillett proceeds to opine that for Mr. Buettner to have had a conversation with another member of AHERF's management "to understand the nature and terms" of the agreements, rather than to review the underlying documents, was reasonable.  According to Mr. Tillett, by doing so Mr. Buettner "confirmed previous management representations about the nature of the agreements with an independent source in management."

4.    GAAS specifically states that while management representations are part of the evidential matter the independent auditor obtains, they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit.

5.    Inquiry of another member of the client management is not corroboration through "an independent source" of representations made by other members of management.

---

[50] Ibid, Page 153

6.    Not looking at the underlying documents when the sensitive nature of the information has been highlighted by management limiting access to senior members of the audit team was not adequate or reasonable in the circumstances.

**H.    $50 Million Reserve Transfer**

1.    In footnote 271 to the Tillet Report, Mr. Tillett makes reference to the PwC audit team having utilized the concurring partner on the AHERF audit, Jeffrey Hoover, to discuss the effect of the $50 million reserve transfer from the Graduate Hospitals to DVOG on the consolidated financial statements.  Mr. Tillett then states that this "represents both an example of independence in mental attitude and a representation of due professional care exercised by the audit team."[51]

2.    The significance and extent of this consultation with Mr. Hoover may be reflected in the fact that it is only referred to by Mr. Tillett in this footnote.

3.    In fact, when Mr. Hoover was deposed in the SEC investigation in June 2000, he had no recollection of this matter being discussed with him by the audit team.[52]

4.    When Mr. Hoover was deposed in this matter in February 2004, he testified that, based on documents in his personal file, he believed that he would have been aware of the reserve transfer but could not recall any discussions that he had with members of the audit team with respect to the transfer.[53]

5.    Mr. Tillett's comments continue to ignore PwC's knowledge, acquired during its audits of AHERF's 1997 financial statements, that at least $50 million in reserves were established at Graduate in order for those reserves to be improperly used to avoid recording bad debt expenses at DVOG during its fiscal year ended June 30, 1997.  This type of financial manipulation is not GAAP and PwC's acceptance of it is not GAAS.[54]

Executed in San Francisco, California on January 11, 2005

D. Paul Regan, CPA, CFE

---

[51] Ibid, Page 89
[52] Deposition of K. Jeffrey Hoover, June 21, 2000, Page 162, Line 9 through Page 179, Line 24
[53] Deposition of K. Jeffrey Hoover, February 3, 2004, Page 235, Line 22 through Page 242, Line 25
[54] See for example, Exhibit 1064

IN THE MATTER OF
THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
AND RESEARCH FOUNDATION,
PLAINTIFFS,


v.


PRICEWATERHOUSECOOPERS, LLP,
DEFENDANT.



SUPPLEMENTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

I.    **Introduction**

By report, dated September 2, 2004 ("the September Report"), I have previously submitted expert opinions with respect to certain issues in this case. I stated in that report that amendments or additions to the September Report might be required as a result of developments prior to trial, including, but not limited to, the discovery of new evidence.

By report, dated January 11, 2005 ("the Rebuttal Report"), I submitted certain rebuttal opinions with respect to the opinions expressed in the expert report of the Defendant's accounting expert, Mr. J. W. Tillett, Jr. (the "Tillett Report"), dated November 12, 2004. I stated in the Rebuttal Report that I intended to submit this Supplemental Report upon completion of my analysis of the audit working papers relating to the auditing of accounts receivable for other healthcare entities in Pennsylvania audited by Coopers & Lybrand, a predecessor to Defendant PricewaterhouseCoopers LLP (hereinafter collectively referred to as "PwC") for fiscal years 1994 through 1997. This supplemental report addresses the results of my analysis.

I have not changed any of the opinions included in the September Report or the Rebuttal Report, and I have not attempted to restate all of the opinions, and the bases for those opinions, included in those reports that are relevant to the opinions expressed by Mr. Tillett. I disagree with substantially all of the opinions expressed in the Tillett Report even if not specifically addressed in this report. The focus of this supplemental report is on those issues where additional information, contained in the working papers relating to the auditing of accounts receivable discussed in the above paragraph, not mentioned in the September Report or the Rebuttal Report, bear upon the opinions of Mr. Tillett and my opinions as to whether PwC's audits of AHERF complied with GAAS.

II.    **Supplemental Opinions**

    A.    **Background**

        1.    Subsequent to the date of the September Report, the Defendants produced certain audit working papers relating to the auditing of accounts receivable of other healthcare entities by PwC for fiscal years 1994 through 1997.

        2.    The most recent production of these working papers was by letter dated December 31, 2004, whereby counsel for PwC produced approximately 2,400 pages of additional working papers.

        3.    Given the timing and volume of this production, it was not possible to complete my review of those working papers prior to the submittal of the Rebuttal Report.

        4.    I have now had the opportunity to review these audit working papers and the results of my analysis of them, and those audit working papers previously produced, are set forth below.

**B.**    **Discussion of Opinions**

<u>The Relevance of the Audit Working Papers Relating to the Auditing by</u>
<u>PwC of Accounts Receivable for Other Pennsylvania Healthcare Entities</u>

1.    The requirements under GAAS with respect to the auditing of accounting estimates, such as the allowance for uncollectible accounts, are contained in Statement on Auditing Standards No. 57 ("SAS 57").

2.    With respect to the evaluation of the reasonableness of accounting estimates, SAS 57 states in part as follows:

"In evaluating the reasonableness of an estimate, the auditor normally concentrates on key factors and assumptions that are –

a.    Significant to the accounting estimate.

b.    Sensitive to variations.

c.    Deviations from historical patterns.

d.    Subjective and susceptible to misstatement and bias.

The auditor normally should consider the historical experience of the entity in making past estimates, as well as the auditor's experience in the industry. However, changes in facts, circumstances, or entity's procedures may cause factors different from those considered in the past to become significant to the accounting estimate[1]."

3.    In addition to considering the auditor's experience in the industry, SAS 57 provides guidance on the testing the auditor can perform to evaluate the reasonableness of an estimate. This testing includes:

a.    "Identify[ing] whether there are controls over the preparation of accounting estimates and supporting data that may be useful in the evaluation …

b.    Evaluat[ing] whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data …

c.    Analyz[ing] historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit, and consider[ing] whether such data is sufficiently reliable for the purpose …

d.    Consider[ing] whether changes in the business or industry may cause other factors to become significant to the assumptions.[2]"

---

[1] AU Section 342.09
[2] AU Section 342.11

4.    As stated in the September Report, in evaluating the DVOG
      Hospitals' reserve for uncollectible accounts, PwC either did not
      perform these audit tests or the results of such testing did not
      support the reserve levels established by management.

5.    The key members of PwC's audit engagement team for the
      AHERF audits (Mr. Buettner, Mr. Kirstein and Ms. Frazier), have
      all testified in this matter that they relied on their industry
      experience in their assessment of the adequacy of AHERF's bad
      debt reserves and that this experience supported their audit
      conclusions[3].

6.    SAS 57 called for the auditors to consider their experience in the
      industry.  The audit working papers for these other healthcare
      audits, as evidence of that experience, therefore bear on whether
      the PwC auditors complied with SAS 57 in the AHERF audits.

7.    I have analyzed these other audit working papers in order to
      determine whether or not the information contained therein
      comports with the testimony of the PwC auditors, and to determine
      whether or not the experience gained from those other audits, or
      the prior experience reflected in the working papers of those other
      audits, was supportive of the assessments made by the PwC
      auditors in connection with the AHERF audits.

8.    I have also analyzed PwC working papers from other Pennsylvania
      healthcare audits, to determine the extent to which Mr. Tillett's
      comparison of the allowance percentage for the DVOG entities to
      the average percentages derived from his Pennsylvania Data is
      valid or instructive.

The Cumulative Experience of the PwC Audit Team

9.    As stated above, the key members of the PwC audit team for the
      AHERF audits have testified that they relied on their cumulative
      experience in the healthcare industry in assessing the
      reasonableness of AHERF's reserve for uncollectible accounts and
      that this experience supported their audit conclusions.

10.   Mr. Tillett also cites, in numerous places in his report, the
      accumulated level of healthcare experience of Mr. Buettner and the
      other PwC auditors[4].  He further suggests that they brought all of
      this experience to bear in their audit of the AHERF entities and
      that this experience supported their audit conclusions.

---

[3] See for example:  Deposition of William Buettner, June 22, 2004, Page 161, Line 17 through Page 162,
Line 5; Deposition of William Buettner, June 22, 2004, Page 262, Line 2 through Page 263, Line 10;
Deposition of Mark Kirstein, May 12, 2004, Page 332, Lines 10 through 22; Deposition of Mark Kirstein,
May 12, 2004, Page 392, Line 20 through Page 394, Line 1; Deposition of Amy Frazier, June 10, 2004,
Page 805, Line 18 through Page 806, Line 8
[4] See for example, Tillett Report Pages 49 and 55

Supplemental Report of D. Paul Regan, CPA, CFE                          Page 3

11.     Included within the additional audit working papers recently produced are selected working papers from eight other audits, involving five other healthcare entities, covering fiscal years 1995 through 1997, for which Mr. Buettner was the audit partner.

12.     Of these eight audits, two are for fiscal year 1996: Children's Hospital of Pittsburgh ("CHP") and Meadville Medical Center ("MMC").

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

17.     PwC noted that this decrease in the allowance percentage was expected and acceptable due to the write-off of a significant amount of older receivables.  This suggests that it was Mr. Buettner's experience that older accounts receivable should be more highly reserved or written off, even in (indeed, particularly in) situations where there has been a consolidation of billing operations, systems conversions, billing delays, and the like.

18.     In addition, this acknowledgement of the relationship between the age of the receivables and the required allowance percentage demonstrates the fallacy, limitations, and simplicity of Mr. Tillett's Pennsylvania Data comparison, discussed below, which ignores this relationship.

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

21.    In comparison, 54.8% of the DVOG Hospitals' 1996 receivables were in aging categories of more than 90 days old and, after the $17.5 million increase in the allowance for uncollectible accounts, its allowance percentage was only 21%.

22.    Mr. Buettner also served as the engagement partner for the audits of Armstrong County Memorial ("ACM") and Jeanette District Memorial ("JDM") for fiscal year 1997.

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

28.    In contrast, 47.9% of the DVOG Hospitals' 1996 receivables were in aging categories of more than 120 days old and, after the $17.5 million increase in the allowance for uncollectible accounts, its allowance percentage was only 21%.

**CONFIDENTIAL
INFORMATION REDACTED
FOR PURPOSES OF THIS
FILING ONLY**

30.  This is in stark contrast to Mr. Buettner's testimony in this case, where he has asserted that he had other clients that only assessed credit risk "on self-pay and would not go through the exercise of evaluating Blue Cross, Medicare, Medical Assistance, Medicaid, whatever you want to call it, the commercial insurers, because the credit risk is rather low[6]."

31.  Clearly, in the 1997 NMC audit, Mr. Buettner was questioning the appropriateness of such an approach.

32.  These audits illustrate the impact that a deterioration in the aging of a healthcare entity's receivables can have on the level of the reserve for uncollectible accounts and support the reasonableness of the level of estimated allowance percentages that I set forward in the September Report.

33.  In addition, the audit working papers for healthcare entity audits other than AHERF, which audits involved Mr. Buettner, indicate that the level of old accounts carried by the DVOG entities was relatively high and that the level of bad debt reserves recorded for those old accounts was relatively low, even after the additional $17.5 million in reserves was recorded.

<u>Summary</u>

34.  The "auditor's experience in the industry," reflected in the other working papers produced by PwC for audits involving Mr. Buettner as the engagement partner, do not support, and in fact contradict, the conclusions rendered by Mr. Buettner in connection with PwC's audits of accounts receivable at AHERF.

<u>The Pennsylvania Data</u>

35.  Mr. Tillett states in his report that he "also considered the Allowance Percentage of the Pennsylvania Data for 1996[7]."

---

CONFIDENTIAL INFORMATION
REDACTED FOR PURPOSES
OF THIS FILING ONLY

[6] Deposition of William Buettner, June 22, 2004, Page 166, Line 15 through Page 167, Line 12
[7] Tillett Report, Page 60

36. Mr. Tillett also makes the following statements in his report:

   a. "Based on the above [Table 9], the DVOG Allowance Percentage was near the average of the 1996 Pennsylvania Data Allowance Percentage[8]."

   b. "... [Table 11] above demonstrates clearly that the allowance for uncollectible accounts suggested by Messrs. Berliner and Regan produce Allowance Percentages that are at or outside the high end of a range calculated using the Pennsylvania Data. In my opinion, the allowances for uncollectible accounts they calculated are unreasonable in comparison to historical DVOG amounts and the market in which the hospitals were operating[9]."[10]

37. As is discussed in more detail below, Mr. Tillett's reliance on the Pennsylvania Data, with no analysis of the numerous factors that can influence that data, is too simplistic to be useful, and in fact is misleading, in evaluating the adequacy of AHERF's allowance for uncollectible accounts.

38. Included within the additional audit working papers produced by PwC are selected working papers for fifteen audits of twelve healthcare entities that are included within the 1996 Pennsylvania Data referenced by Mr. Tillett, for which sufficient detail is included for purposes of the following analysis.

39. While the average allowance percentage for these twelve entities was 17.3%, as compared to the 17% for the DVOG entities, this is not supportive of Mr. Tillett's conclusions when the aging of those entities' receivables is considered.

40. The average percentage of these entities' receivables that were included in aging categories of more than 90 days old is 29.1%. In contrast, 54.8% of the DVOG Hospitals' receivables were in aging categories of more than 90 days old.

41. For the six 1996 audits included within the data produced, the average percentage of these entities' receivables that were included in aging categories of more than 90 days old is 29.3%. For those audits the average allowance percentage was 19.4%.

42. Given a level of old receivables almost double that of these other entities, any independent expectation as to the level of reserves for uncollectible accounts for DVOG should be far in excess of the 19.4% average level for these other entities in 1996, and the 17.3% overall average level for the twelve entities from 1994 to 1997 and,

---

[8] Ibid, Page 61
[9] Ibid, Page 62
[10] It should be noted that when Mr. Tillett refers here to the average allowance percentages presented by me in the September Report being "outside the high end of a range" that it is 1% higher than the top end of his range.

indeed, the DVOG allowance percentage should be consistent with the levels set forth in my September Report.

Summary

43.    Mr. Tillett's analysis of the performance of PwC, using the Pennsylvania Data, fails to take into account, or give appropriate consideration to, the litany of problems being faced by the DVOG entities in 1996.  His simplistic comparison of the allowance percentage for the DVOG entities to the averages shown in the Pennsylvania Data, without taking into account the impact of other factors on that data, is misleading and seriously flawed.

44.    When taking into account one of the factors that can significantly impact such a comparison, the relative age of the underlying receivables, rather than support Mr. Tillett's position, the Pennsylvania Data highlights the far more significant level of old receivables being carried by the DVOG entities and the low level of reserves provided for those receivables.

Executed in San Francisco, California on January 31, 2005

D. Paul Regan, CPA, CFE

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| ALLEGHENY HEALTH, EDUCATION | ) | |
| AND RESEARCH FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 00-684 |
| | ) | |
| v. | ) | |
| | ) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAMES R. SCHWARTZ, ESQ.**

I, James R. Schwartz, Esq. hereby depose and state as follows:

1.      I am over the age of 18.  I have personal knowledge of, and am competent to testify about, the matters set forth herein.

2.      I have been retained by the Plaintiff to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter.  I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above matter.

3.      Attached hereto is a true and correct copy of the Expert Report of James R. Schwartz that I prepared in connection with my engagement.

4.      If called to testify at trial, I would testify in a manner consistent with the opinions expressed in this expert report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July _7_, 2005.

_____
James R. Schwartz

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE<br>OF UNSECURED CREDITORS<br>OF ALLEGHENY HEALTH, EDUCATION<br>AND RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 00-684<br>)<br>)<br>)<br>)<br>) |

## **EXPERT REPORT OF JAMES R. SCHWARTZ**

I, James R. Schwartz, am submitting this expert report in the above-captioned case.

## I.    **QUALIFICATIONS**

I am an attorney duly licensed to practice law before all of the courts of the State of

California; the Ninth Circuit Court of Appeals; and the United States District Courts for the

Central, Northern, and Eastern Districts of California. A current copy of my professional

resume, including a list of my publications in the last ten (10) years, is attached to this report as

Exhibit A.

I specialize in advising nonprofit organizations, and their officers, directors and senior

management, in matters of corporate governance and with respect to compliance with nonprofit

corporation and charitable trust law. A substantial emphasis in both my practice and my writing

and speaking involves the health care industry. I am experienced and knowledgeable both in the

legal requirements and constraints under which officers, directors and senior management

function in carrying out their fiduciary obligations and in the manner in which officers, directors

1

and senior management of nonprofit organizations operating in the healthcare industry should and do react to consequential matters facing their organizations.

I have previously testified as an expert witness at trial or in deposition on the subjects of proper corporate governance and the fiduciary obligations of officers and directors of nonprofit corporations and trustees of charitable trusts in the following cases:

1)  In the Matter of the Estate of Bernice P. Bishop, deceased – Circuit Court of the First Circuit, State of Hawaii, Equity No. 2048

2)  Met-Rx Foundation for Health Enhancement et. al. v. Met-Rx, Inc et. al – Superior Court of the State of California, County of Orange, Case No. 771551

3)  Pathology Medical Laboratories v. ScrippsHealth et. al. – Superior Court of the State of California, County of San Diego, case No. GIC 749962 and

4)  Marjorie H. Bright et. al v. The Bright Family Foundation et. al, Superior Court of the State of California, County of Stanislaus, Case No. 274513.

In addition, I have submitted a report as an expert on the same subject in the case of Banner Health System v. Mark W. Burnett, in his official capacity as Attorney General of South Dakota, Civil Case No. 02-5017 (USDC, So. Dakota – Western Division).

## II.    **EXPERT RETENTION**

I have been retained by the attorneys for plaintiff the Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation to provide expert testimony regarding the appropriate manner in which the members of the Board of Trustees of AHERF, and/or committees thereof, would have been expected and required to carry out their fiduciary

2

obligations with respect to overseeing the financial affairs of AHERF during the 1996-1997 time period.

I am being compensated for my services at my standard hourly rate, which is currently $615 per hour. My compensation is not contingent upon the outcome of the case or upon the nature of my opinions. A list of the materials that I have considered in reaching my opinions is attached as Exhibit B hereto.

### III.    OPINIONS

In my opinion, proper, effective corporate governance of nonprofit charitable corporations requires a "partnership" between senior management and the Board of Directors/Trustees ("board"). In this regard, management is normally responsible for developing and implementing strategic business plans and managing the day to day operations of the corporation. The board, acting as a whole and/or through the appropriate delegation of authority, exercises appropriate oversight and retains ultimate authority over the activities and affairs of the corporation.

In exercising such oversight and ultimate authority, board members are required to act in conformity with their fiduciary obligations – as set forth under applicable state and federal law. In the context of financial oversight – and with respect to matters not involving self-dealing and/or related party transactions – the board's focus is normally on the duty of care.

State law generally, and Pennsylvania law specifically (15 Pa. C.S.A. §5712), defines the duty of care and expressly authorizes Board members to rely, in carrying out their fiduciary obligations, upon financial reports, statements and opinions prepared or presented by officers or employees of the corporation, counsel, public accountants, and others whom the board members

believe to be reliable and competent in the matters presented. Moreover, state law generally, and Pennsylvania law specifically, expressly authorizes board members to rely on information, opinions, statements or reports presented by committees of the board on which a board member does not serve – provided that the committee has been delegated authority in this regard by the board. In both instances, board members' ability to so rely is predicated upon the board members acting in good faith and without knowledge that would cause such reliance to be unwarranted.

The aforementioned statutory rules are designed to inform and permit the efficient and proper management and operation of nonprofit corporations within the corporate management structure, while simultaneously providing standards through which board members can exercise appropriate oversight responsibility. Critical to board members' ability to delegate authority, and still exercise appropriate financial oversight with respect to the corporation's activities, is the need to be able to reasonably rely on the information provided by management, outside professionals and others in the board decision-making process.

I have reviewed the expert reports of Robert W. Berliner and Steven B. Kite. Key among the financial performance and condition issues raised in the expert reports of Mr. Berliner and Mr. Kite in this regard are the following:

1) Mr. Berliner's conclusions that the fiscal year 1996 consolidated financials, before extraordinary item and change in accounting principles, should have shown a net loss of approximately $90 million, instead of net income of approximately $6 million and that the fiscal year 1997 consolidated financials should have shown a net loss of approximately $134 million, instead of a net income of approximately $22 million,

4

2) Mr. Berliner's conclusion that "material misstatements...were attributable to a multitude of GAAP violations, many of which were committed for the express purpose of masking the deteriorating financial condition of AHERF and its subsidiaries and for meeting financial covenants of debt instruments" and

3) Mr. Kite's conclusion that certain financial covenants had been breached that would have enabled bond and master trustees to declare a default with respect to significant debt of AHERF.

Had the AHERF Board of Trustees and/or the appropriate committee(s) thereof (hereafter "Board"), been informed by AHERF's independent accountants that financial statements or reports prepared by AHERF management misstated the financial performance and/or condition of AHERF, and/or of key affiliates thereof (hereafter collectively "AHERF") during the relevant time period, to the extent and in the manner indicated in the expert reports of Robert W. Berliner and Steven B. Kite, the members of the Board, in complying with their fiduciary obligations, would, in my opinion, have been expected and required to take action in order to fully investigate such information and to take all appropriate action to ensure that the financial statements or reports prepared by AHERF management were, in fact, accurate and reliable and could properly be relied upon and serve as the basis for executive and Board decision-making. Such Board action should and would, in my opinion, have included, but not necessarily been limited to, the following:

1)     taking appropriate action to confirm the occurrence (or non-occurrence) of such misstatements and to determine the actual financial performance and/or condition of AHERF for the relevant time periods;

5

2)      if it were determined that the financial statements or reports of AHERF for the relevant time periods were misstated as indicated in the report of Mr. Berliner,

a)      re-evaluating those executive and Board decisions that might be materially affected by the misstated financial statements or reports in order to determine whether those decisions were, and/or remained, appropriate in light of the actual financial condition and/or performance of AHERF;

b)      determining the reasons for such misstatements, and the individual(s) responsible, in order to be able to assess whether the Board could reasonably rely on financial information provided by AHERF management on a going-forward basis and the need for any personnel actions, and

c)      if such misstatements were the result of intentional violations of GAAP and/or the intentional falsification and/or manipulation of financial information by AHERF management, appropriate corrective action would, in my opinion, have required the termination of employment of those AHERF manager(s) and/or employee(s) responsible for such intentional wrongful acts.

I have, in addition, read the report submitted by James E. Orlikoff. In his report, Mr. Orlikoff states that:

"The AHERF board was composed of many accomplished, highly-educated, and distinguished individuals. These included many high –ranking, financially sophisticated corporate executives; entrepreneurs – some in healthcare-related businesses; accomplished physicians; experts in accounting and auditing; academic leaders; and others. Many trustees also

6

had knowledge of governance gained through their extensive service on many other boards, both not-for-profit and for-profit."[1]

My own review of the depositions given in this matter by Board members confirmed these same conclusions with respect to the background, experience and capabilities of the Board members.

In his expert report, Mr. Orlikoff also states his opinion that :

a)    "There is no reason to believe that the additional information about AHERF's financial condition that plaintiff alleges Coopers should have placed before the (AHERF) Board would have caused the Board to initiate meaningful action."[2] and

b)    "There is no reason to believe that Cooper's discovery of 'AHERF senior officials' financial manipulations' would have caused the (AHERF) Board to initiate any meaningful action."[3]

In my opinion, it is not possible for Mr. Orlikoff (or me, for that matter) to state with any reasonable certainty exactly what specific actions the Board would, in the end, have taken had it been advised by AHERF's independent accountants of the circumstances as set forth above and nothing in the materials that I have reviewed to date indicates that AHERF's independent accountants ever so advised the Board.

However, based upon my experience and expertise, I am able to opine on what courses of action an informed and sophisticated Board would have been expected and required to have

---

[1] See, Orlikoff report, page 6
[2] See, Orlikoff Report, page 54
[3] Ibid.

7

engaged in, if faced with the circumstances set forth above. Those courses of action are as described in my opinion as stated above.

Moreover, contrary to the conclusions reached by Mr. Orlikoff as to how the Board would have acted (or failed to act) had it been advised by AHERF's independent accountants of the misstatement of AHERF's financial condition and the potential effects thereof, a review of the deposition transcripts of a number of Board members (including those described by their fellow Board members as particularly active participants in Board oversight and/or particularly knowledgeable about financial affairs[4]) indicates that several such individual Board members expressed views of how they would have acted if provided with such information by AHERF's independent accountants and the actions described by them are, in my opinion, consistent with my above stated opinion as to how they would have been expected and required to act in complying with their fiduciary obligations.

Specifically, these Board members testified that in the face of information of this type being provided by AHERF's independent accountants, they would have considered specific actions as follows[5]:

        1) further investigation of the facts related to the misstatement of the financial reports, including potentially expanding the scope of the outside audit;

        2) bringing in outside consultants to advise the Board;

---

[4] Board members Gumberg, Barnes, and Danforth, Brenner have been so described. (See deposition testimony of Barbara Atkinson (pages 112-113); William Snyder (pages 207-212); D. Walter Cohen (page 92) and Donna Murasko (pages 188-189).

[5] See the deposition testimony of Ira Gumberg (pages 349-357); Douglas Danforth (pages 260-264); David Barnes (pages 333-336); Ralph Brenner (pages 166-175); Robert Hernandez (pages 187-196);and Ronald Davenport (pages 102-107)

8

3) terminating the persons responsible for such misstatements of the financial reports; and/or

4) putting "the brakes" on, or reconsidering, any further hospital and physician practice acquisitions.

Based upon my experience and expertise and upon my review of the materials listed in the Exhibit B hereto, it is my opinion that the AHERF Board, if advised by its independent accountants of the facts as described above, would have been expected and required to take those actions that I have stated above and had I had represented AHERF during the relevant time period, I would have so advised the Board. Moreover, a failure by the AHERF Board to take such action under these circumstances would, in my opinion, have exposed the individual board members to substantial risk of personal liability and I would have so advised the Board of that fact as well.

In my experience, informed and sophisticated Board members when faced with such factual circumstances would, with substantial certainty, be expected to take those corrective actions described by the AHERF Board members in their depositions and as set forth in my opinion above. Moreover, in my opinion, it would be extremely unlikely that Board members in such a factual situation would simply fail to act and, therefore, expose themselves to such personal liability.

The opinions expressed in this report are my present opinions based upon the materials I have reviewed and upon my experience. I reserve the right to revise or supplement this report based on additional information or facts which I may receive subsequent to this date.

Dated: 1/10/05

James R. Schwartz

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, )<br>)<br>)<br>)<br>) | |
| Plaintiff, ) | Civil Action No. 00-684 |
| v. )<br>) | Judge David Stewart Cercone |
| PRICEWATERHOUSECOOPERS, LLP, )<br>) | |
| Defendant. ) | |

## DECLARATION OF THOMAS W. SINGLETON

I, Thomas W. Singleton, hereby depose and state as follows:

1.      I am over the age of 18. I have personal knowledge of, and am competent to testify about, the matters set forth herein.

2.      I have been retained by the Plaintiff to serve as an expert witness, offering expert opinion testimony, in the above-captioned matter. I am submitting this Declaration in support of the Plaintiff's opposition to Defendant's Motion For Summary Judgment in the above matter.

3.      Attached hereto are true and correct copies of the expert reports that I prepared in connection with my engagement:

- Turnaround Evaluation as of September 30, 1996, dated August 2004;

- Review and Comment on the Report of Robert A. Dickinson, dated January 11, 2005;

- Corrections to Previously Submitted - Review and Comment on the Report of Robert A. Dickinson, dated February 14, 2005; and

- Corrections to Previously Submitted - Review and Comment on the Report of Robert A. Dickinson, dated February 18, 2005.

4.    If called to testify at trial, I would testify in a manner consistent with the opinions expressed in these expert reports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July __7__, 2005.

_Thomas W. Singleton_

Thomas W. Singleton

- 2 -