# Allegheny Health Education and Research Foundation

# Delaware Valley Obligated Group

# Turnaround Evaluation
# As Of September 30, 1996

**Submitted:  August 2004**

**Thomas W. Singleton, President and CEO**
**Cambio Health Solutions, LLC**
**100 Westwood Place**
**Suite 350**
**Brentwood, TN  37027**

1

**Thomas W. Singleton – Experience and Qualifications**

My name is Thomas W. Singleton.  I am President and CEO of Cambio Health Solutions, LLC (Cambio), a nationally-recognized hospital turnaround management and consulting company.

I have over twenty-five years of experience in the healthcare industry.  Upon receiving an MBA from the University of Chicago, my healthcare career began as a systems and financial analyst.  I then became a Chief Financial Officer of a hospital and was ultimately promoted to a corporate finance position with responsibility for the financial management of several hospitals.  Subsequently I served as the Chief Financial Officer and Treasurer of a large hospital management company.  In 1989, I founded Cambio's predecessor enterprise, The Intensive Resource Division of Hospital Management Professionals, Inc.  In addition, I have also served as the president and CEO of a publicly-traded hospital company.

As President and CEO of Cambio, I have had ultimate responsibility for over 100 consultative and management engagements. These projects have included turning around various hospitals ranging from a 100 bed suburban hospital to a 700 bed teaching hospital.

I have been involved in bringing hospitals out of bankruptcy, keeping hospitals out of bankruptcy and improving the performance of financially stable hospitals concerned about deterioration in financial performance.

I have also negotiated a substantial number of hospital sales and debt restructurings. MBIA, a significant creditor of the Allegheny Health Education and Research Foundation (AHERF) engaged me in July of 1998 to serve as advisor/consultant for MBIA in the 1998 bankruptcy filing of AHERF.  In connection with the 1998 filing, I began my assignment as an advisor to MBIA as to valuation and the identification of

2

potential purchasers of AHERF assets, and eventually I oversaw the development of a
plan focused on the turnaround of certain Eastern AHERF enterprises.

In performing my analysis, I have utilized a team of persons employed by Cambio who
worked under my direction and control.

For additional information on my qualifications and background, please refer to Exhibit I
attached to this report for a copy of my Curriculum Vitae and Exhibit II for a list of
national speaking engagements.

## SUMMARY

I have been asked by the Official Committee of Unsecured Creditors of AHERF (the
Committee) to evaluate whether AHERF, in the restated financial condition articulated
by the Committee's forensic accountants for fiscal year-end 1996, and with appropriate
intervention around September of 1996, could remain financially viable and therefore
avoid the creditor loss occasioned when it resorted to Chapter 11 protection some two
years later. Based upon both my review of the financial data and other information in
connection with this engagement and on my previous work performed for MBIA, I
believe that the answer to that question focuses upon whether those entities that
formed the so-called Delaware Valley Obligated Group (DVOG), as influenced by
operations at Allegheny Integrated Health Group (AIHG), could be restored to financial
stability on a go-forward basis. It is my opinion that DVOG could have been restored to
a position of financial viability upon a timely intervention by AHERF's Board or others
around the end of September, 1996. For purposes of this analysis, and by "financial
stability", I mean that the DVOG entities could, within three to four years, have been
restored to a position of positive earnings before interest, taxes, depreciation and
amortization (EBITDA), sufficient to allow AHERF's Board to sell the entities without
creditor loss. In the late 1990's, hospitals of similar kind to the DVOG entities' sold at
multiples of between five and eight times EBITDA. This does not suggest that a sale of
any or all of the DVOG hospitals was or was not necessary. Rather, in analyzing for
present purposes the ability to avoid a creditor loss through an intervention and

3

turnaround, a finite measure of success is the ability to sell the troubled entities free of loss to debt holders.

The Committee's accounting experts have developed various adjustments to the audited financial statements for fiscal 1996. The financial statements of DVOG, when properly stated, provide evidence of financial distress and accounting and financial practices sufficient to compel intervention in the financial management of DVOG. In my experience, when a board of trustees of a hospital organization is provided with accurate information regarding the operations and potential financial peril of the kind portrayed here, board action is swift. Board action is also inevitable when creditor pressure, precipitated by flagging financial performance or the organization's potential or actual inability to comply with debt covenants, is brought to bear. In my opinion, both of these results were probable, if not assured, had AHERF's independent public accounting firm reported upon statements with operating losses for the system consistent with those shown by the Committee's restated financial statements.

Often in such situations an independent firm such as Cambio is contracted to develop and implement an EBITDA improvement plan, commonly referred to as a "turnaround" plan, such as the one discussed herein. In reviewing the data, it became apparent that a major drain on AHERF's financial performance was the loss for the acquisition and subsidy of physician practices at AIHG, an AHERF entity not part of the DVOG obligated group. I therefore looked at potential EBITDA improvement at the DVOG entities as well as the AIHG physician practices.

As noted in the following table labeled "Summary of EBITDA Improvement," there were significant opportunities for both financial improvement and cost avoidance in the months and years following fiscal 1996. Principal among the latter would have been placing a hold on further development of AHERF's Integrated Delivery System model (IDS), specifically the further acquisition of hospitals and physician practices, and the assumption of additional capitated contract risk beyond that which existed at September of 1996. I have developed turn around initiatives that, when fully implemented in fiscal 1999, yield $123.7 million in EBITDA improvement for the DVOG

4

entities and limit further EBITDA deterioration at AIHG to $8.8 million.  Consistent with my experience, I have conservatively assumed that 30% of the EBITDA improvements, reduced to account for nine months of improvement in year one, could have been achieved in fiscal 1997, 70% in 1998, with full realization in fiscal 1999.  Cessation of further physician practice acquisition and risk contracting at or around September 30, 1996 would have produced an immediate impact on AIHG EBITDA deterioration.

| SUMMARY OF EBITDA IMPROVEMENT | | | | |
|---|---|---|---|---|
| | | EBITDA Improvement Phase In | | |
| | Delaware Valley Obligated Group and AIHG Total EBITDA for Fiscal Year Ending 6/30/1996 Calculated From Creditors Committee Accounting Expert's Adjustments | Fiscal Year Ending 6/30/1997 | Fiscal Year Ending 6/30/1998 | Fiscal Year Ending 6/30/1999 |
| **Delaware Valley Obligated Group** | | | | |
| Restated Base Year EBITDA | 38,129 | 38,129 | 38,129 | 38,129 |
| EBITDA Improvements (Cambio Findings) | | | | |
| Supply Chain Management | | 4,107 | 12,778 | 18,254 |
| Productivity | | 14,148 | 44.015 | 62,878 |
| Case Management | | 573 | 1,782 | 2,546 |
| Revenue Cycle | | 7,274 | 22,632 | 32,331 |
| Discretionary Spending | | 1,720 | 5,350 | 7,642 |
| Total EBITDA Improvements | | 27,882 | 86,556 | 123,651 |
| **Allegheny Integrated Health Group** | | | | |
| EBITDA as restated by the Creditors committee Accounting Experts adjusted for Improvements | (36,659) | (45,459) | (45,459) | (45,459) |
| **Combined DVOG and AIHG** | | | | |
| Combined Restated EBITDA Adjusted for Improvement | 1,470 | 20,492 | 79,226 | 116,321 |
| Note:  The Delaware Valley Obligated Group is comprised of the following entities: Allegheny Center City Hospital Allegheny East Falls Hospital Allegheny Bucks County Hospital Allegheny Elkins Park Hospital St. Christophers Hospital Allegheny University - (a medical school entity) Management Support Services - (an entity providing system resources such as Human Resources, Legal, etc.) Note:  The Allegheny Integrated Health Group is an entity charged with management and financial reporting of employed physicians and risk contracting for all of AHERF. **Our analysis rendered a conclusion that improvements to EBITDA were sufficient to effect a turnaround.  The improvements are sufficient to allow the AHERF Board of Trustees to sell the entities after turnaround without creditor loss.** | | | | |

The anticipated EBITDA improvements are not immediately realized in full, necessitating access to working capital during the turnaround process.  The following simplified cash flow illustrates the need for access to funds in excess of EBITDA for fiscal 1997 and 1998.

| SIMPLIFIED CASH FLOW | | | |
|---|---|---|---|
| | Fiscal 1997 | Fiscal 1998 | Fiscal 1999 |
| EBITDA estimate including AIHG | 20,492 | 79,226 | 116,321 |
| Less: | | | |
| Debt Service | 25,412 | 36,488 | 35,457 |
| Capital Requirements | 48,631 | 46,462 | 45,092 |
| Cash Required | 74,043 | 82,950 | 80,549 |
| | | | |
| Excess / (Deficit) Cash | (53,551) | (3,724) | 35,772 |
| Beginning Cash | 27,762 | (25,789) | (29,513) |
| Ending Cash | (25,789) | (29,513) | 6,259 |

AHERF, in fact, had sufficient working capital to undertake a feasible DVOG turnaround. AHERF and DVOG held investments in accounts titled "assets limited or restricted as to use." Amounts available for use are limited to the unrestricted portion of these asset accounts. We noted amounts in the unrestricted accounts (net of amounts designated for self-insurance reserves or encumbered as a debt service fund) of $48.8 million at DVOG alone as of June 30, 1996. In the context of a rational turnaround plan, AHERF had access to additional working capital through assets held by non-DVOG AHERF entities, current lenders or other sources.

The impact of a cessation of further IDS development, specifically acquisitions of hospitals, physician practices and entry into additional risk contracting agreements for AHERF as a whole is significant. Based on a review of data relating to capital acquisition and operating costs, if no additional physician practices had been purchased after September 30, 1996, AIHG would have conserved $38.7 million in cash. A total of $31.6 million in physician-acquisition costs were identified from the AHERF consolidating cash flow statement as of June 30, 1997. Additionally, AIHG incurred $7.1 million in derived EBITDA losses associated with practices that it acquired subsequent to September 30, 1996 during fiscal 1997.[1]

Based on a review of financial and statistical data, depositions of key individuals from the AHERF senior management team and others, various court filings and exhibits, and

based upon my experience in the hospital and health system turnaround and process improvement business, it is my opinion that, had I or another competent healthcare turnaround consultant been retained in late September or early October of 1996 to provide turnaround services, the financial performance and operational decisions made would have been very different. In my opinion, if I had been retained, the DVOG entities could have been successfully redirected -- turned around -- and restored to profitability, without loss to creditors. It is also my opinion, based on my experience with other health system boards, that immediately following the Board's learning of the system's precarious financial position and accounting irregularities, AHERF's Board of Trustees and/or its major creditors would have reached out for such expert assistance.

My opinions are based upon my education, training, experience and documents on the attached list of Information Considered by Thomas W. Singleton. My opinions may change based upon review of additional information. Accordingly, I reserve the right to supplement, update or otherwise modify this report.

## MARKET OVERVIEW

It is relevant to understand the environment in which DVOG operated in 1994 through 1998. The marketplace for hospitals in Philadelphia and other metropolitan areas was challenging, but not untenable: witness the turnaround of the University of Pennsylvania Health System, AHERF's primary market rival. The Penn System posted net operating losses of $105 million, $104 million, and $198 million in fiscal years 1997, 1998, and 1999 respectively. For fiscal 2000 this deteriorating trend was reversed and the system reduced its operating loss to approximately $30 million[2]. This dramatic success story, coupled with the ongoing viability of other organizations in that market, support my opinion that distressed entities must focus on core internal operations.

Clearly AHERF's primary competitors in the DVOG service area have succeeded in withstanding market pressures. No other Philadelphia healthcare system filed for bankruptcy or closed hospitals during the late 1990's even though Tenet, an aggressive "for profit," entered the market.

7

## INTERNAL OPERATIONS ARE OF GREATER RELEVANCE THAN EXTERNAL MARKET FACTORS

The vast majority of hospital and health system failures are based on controllable factors. Cambio contributed to a <u>Health Care Advisory Board</u> publication titled, "Avoiding Financial Flashpoints – Foreseeing (and Preventing) Dramatic Decline in Hospital and Health System Fortunes."   This study is illustrative of my belief that strategic and organizational factors, both deemed controllable, are primarily responsible for financial flashpoints.  In fact, this study found (at page 34) that fully 87% of the root causes of distress in the sample population studied were in fact controllable and by extension reversible.

Many troubled healthcare organizations suffer because attention is diverted from core operations.  For DVOG, restoration of the core mission of providing access to acute hospital care, would have been the focus of my turnaround initiatives.  A system-wide strategy change that I would have instituted would have been to strengthen existing hospitals, rather than compromise the system with further acquisition of poor-performing facilities.

In general, I would have proceeded with five initiatives that would have reversed the financial decline experienced by DVOG:

1) Stop acquisitions of additional hospitals and physician practices;
2) Restructure physician employment agreements to include productivity related compensation parameters and in-system referral mandates;
3) Improve operational efficiencies of existing hospitals and owned physician practices;
4) Rationalize existing hospitals and services; and
5) Stop entering into risk contracts.

With respect to item 1) above, I would have strongly advised against the acquisition of the Graduate Health System, Inc.'s troubled hospitals. While the poor financial condition portrayed by the Graduate system hospitals' audited financial statements would have, alone, resolved the issue, three principal factors would have contributed to my recommendation:

A. AHERF management's failure to successfully assimilate the previously acquired Philadelphia facilities;

B. Financial weakness of the target facilities; and

C. The associated managerial diversion that this weakness would precipitate as management attempted to address operations at these troubled facilities.

The Graduate Hospitals demonstrated very poor and deteriorating operating results in the fiscal years ending 1995 and 1996 and each had a highly leveraged balance sheet.

With respect to item 3) above, I would have focused on those areas with the greatest opportunity for EBITDA improvement. A hospital or health system's fiscal fate is almost invariably in its own hands. Internal operational and fiscal discipline can restore a system irrespective of external environmental matters. Stated another way, no matter what the environment, hospitals and health systems must "manage to it."

## HOSPITAL OPERATIONAL IMPROVEMENTS

### Productivity

As labor and associated benefits often comprise half of total operating expenses, they constitute the single largest expense reduction item available to an organization. Patient care services are extremely dynamic and require constant vigilance to maintain appropriate staffing levels. Troubled hospitals and health systems often lack adequate monitoring systems to ensure that the labor hours incurred are appropriate.

To control salary and benefits costs, productivity must be monitored at the department level.[3] The root cause of an overage in a given department can then be determined. In

9

my experience, one generally finds that excessive costs are the result of a series of issues, such as management failures, staff training and competency deficits, poorly designed or broken systems, and inappropriate allocation of skill sets.

Once identified, detailed plans of correction for these productivity problems are drafted and implemented. Together with department level managers, shift-specific staffing plans are established, consistent with established benchmark guidelines. The staffing standards for any given department may be adjusted for numerous factors such as staff tenure (knowledge of the job), geography/layout of the department (and the impact it has on efficiency), or transportation issues (such as the existence of pneumatic tubes for drug distribution or dumb waiters for specimen routing). Some departments may be assigned standards at the upper end of a benchmark range, while others are determined capable of running at the lower or more efficient end of the range.

These departmental targets then "roll" to a facility measure that is compared with desired aggregate productivity levels. These are measured in Full Time Equivalents (FTE's) per Adjusted Occupied Bed. An FTE equates to 2,080 paid hours. Adjusted Occupied Beds represent the average daily census of a facility inflated for outpatient activity. This "inflation factor" is arrived at by dividing total gross patient charges by inpatient charges.

We evaluated the potential for productivity improvement in the DVOG hospitals by comparing actual DVOG labor costs for 1996 against benchmarks selected from, *The Comparative Performance of U.S. Hospitals – The Sourcebook 2003,* published by Solucient. We utilized benchmarks from the 1999 data. This is a nationally recognized and utilized source of aggregate hospital data and benchmarks. A review of this publication's predecessor, *The 1997-98 Almanac of Hospital Financial & Operating Indicators*[4], authored by The Center for Healthcare Industry Performance Studies (CHIPS) was made, as it contained 1996 data. I opted to utilize the Solucient 1999 data, in preference to the 1996 CHIPS data, because I regarded the Solucient methodology for adjusting volume, and therefore volume-related statistics, to be much sounder. The 1999 data contained in *The  Sourcebook* is "adjusted" using a formula

10

which divides total gross charges by inpatient gross charges to arrive at an adjustment factor, which when applied to inpatient statistics, inflates that volume to compensate for the outpatient volume of the hospital. The 1999 Solucient data allows us to overcome data lapses that would exist in the application of the 1996 CHIPS data, principally a stratification of statistics between inpatient and outpatient.

While this data, is of course, dated years after the period of inquiry, the more complete data is useable here since relevant labor productivity measures did not materially change in the interim.

The most reliable source for DVOG FTE data was the Medicare Cost Reports, which, in their detailed schedules, provide not only an aggregate count but also a breakout of resident FTE's. Residents are extracted from productive FTE's when performing productivity studies, as the number of residents is often unrelated to patient service volume. The benchmarks we selected are set forth in Exhibit III. I utilized benchmarks for the most efficient performance quartile, while conservatively selecting the most generous benchmarks in the various data slices within that quartile for hospital size, teaching status, managed care penetration levels, bond rating and more.

I determined that the Solucient statistic "Full Time Equivalent Personnel per 100 Adjusted Discharges – Case Mix Adjusted" yielded the most rational result as it was appropriately weighted for case mix and is less subject to distortion caused by length of stay variance. In addition to the FTE costs, DVOG incurred an additional $16,230,000 of salary and benefit expense in "management support". I believe that achieving the FTE goal should eliminate the "management support" charges. I have however reduced the $16,230,000 "management expense" by $4.6 million, which represents positive variances in FTE's attributable to Allegheny Elkins Park and Allegheny Bucks County Hospitals of $3,703,179 and $942,394, respectively.

11

| PRODUCTIVITY EBITDA IMPROVEMENT SUMMARY | | | |
|---|---|---|---|
| COMPANY NUMBER | FACILITY | EBITDA IMPACT | TOTAL |
| 210 | Allegheny East Falls Hospital | 17,294,785 | |
| 230 | Allegheny Center City Hospital | 32,115,003 | |
| 220 | St. Christopher's Hospital | 1,883,468 | |
| Sub Total | | | 51,293,256 |
| Add: Management Support | | 16,230,000 | |
| Less: Positive Variance (Elkins and Bucks) | | (4,645,573) | |
| Sub Total | | | 11,584,427 |
| Grand Total | | | 62,877,683 |

Further detail is provided in Exhibit III.

A second metric, salary and benefit expense as a percentage of total operating expense was also reviewed. The DVOG percentage as calculated from the Committee's revised combining statement of operations was 60.3%, well in excess of the most generous 1997 median benchmark provided by Solucient of 49.85% (pages 126 -127). The Solucient benchmark percentage when applied to DVOG yields an EBITDA improvement opportunity of $206.6 million. A third metric, salary and benefit cost as a percentage of restated net revenue yielded an EBITDA opportunity of $80.7 million when calculated using a Cambio targeted range of 45%.

My calculated EBITDA improvement opportunity is certainly conservative given the results of this analysis.

I would also note that the EBITDA improvement in the above table compares with a plan developed by management in Fiscal Year 1997 to reduce salary and benefits by

$57 million on an annualized basis for the DVOG facilities. This plan by management was described on page 41 of the Fiscal Year 1997 Secondary Market Disclosure Report (Bates GOV 20252). It is also reasonable to believe that additional salary dollars as well as a limited amount of other direct costs could be reduced through enhanced utilization management as discussed in the next section.

**Utilization Review/ Case Management**

Utilization review (UR) and case management (CM) initiatives seek to improve the quality, efficiency and environment for delivery of health care. In analyzing this area, Cambio utilizes physicians who specialize in the identification of physician practice patterns that vary from accepted best practice. Authoritative literature such as articles from, The Joint Commission Journal on Quality Improvement , "A Framework for the Continual Improvement of Health Care: Building and Applying Professional and Improvement Knowledge to Test Changes in Daily Work", Volume 19 Number 10 October 1993, and The American Journal of Medical Quality, "Insight Into Successful Change Management, Empirically Supported Techniques for Improving Medical Practice Patterns", Volume 18, Number 5, September/October 2003, suggests that increases in practice pattern deviation positively correlate to negative outcomes. Negative outcomes are commonly quantified in categories such as mortality, readmission, and complication rates. Consistent with that, the experience of Cambio's physician practitioners indicates an inverse relationship between cost and quality. Simply stated, a physician's ability to quickly diagnose and treat a patient using appropriate therapies consistently results in improved outcomes and lower costs. An inability to diagnose and employ the appropriate treatments in a timely manner generates excessive length of stay and cost per case as direct care hours mount. Extended length of stay and abnormal resource utilization exposes patients to additional stress and risks such as secondary infections and falls.

Medicare was the predominant payor for healthcare services in DVOG. Medicare pays for inpatient care on an admission basis. Each admission is assigned to a Diagnosis

Related Group (DRG) which defines the intensity of services required. Essentially Medicare pays a flat rate per admission, regardless of the length of stay or intensity of services based on the DRG assigned to the admission. It therefore behooves every provider to treat Medicare inpatients as efficiently and in as short a period of time as possible, because each day of care increases the cost against a fixed reimbursement. Thus, the longer a patient remains in the hospital the lower the margin on the patient.

Moving patients through the healthcare system is a complex and challenging endeavor, yet it is absolutely essential that it be done in an efficient and effective manner. Without exception this is a hallmark of successful hospitals. These facilities retool their case management process by supporting specially trained nurses and social workers. The successful providers put in place systems which for each patient compare expected length of stay with actual length of stay. There are industry benchmarks for length of stay for each DRG. In evaluating a hospital's opportunity for case management improvement, I utilize these as well as other industry benchmarks such as those provided by Solucient, which aggregate hospital data, considering size, geographical location, managed care penetration levels, and other relevant factors.

I have compared each of the DVOG hospitals' total length of stay against 1996 benchmarks for hospital length of stay - adjusted for case mix - provided by CHIPS. I selected 3.5 days as a conservative benchmark level, which is less efficient than the data suggests as median performance in many of the stratifications provided, including urban hospitals, and those hospitals with medium managed care penetration. My selected target level of 3.5 was marginally lower than the median benchmarks for the northeast region and Pennsylvania of 3.6, respectively but well below the top quartile benchmark indicators of 3.2 for both of these stratification categories, thus my selected target is conservative.

Application of the 3.5 length of stay benchmark to DVOG hospital data indicated an opportunity to reduce a significant number of excess patient days. I assumed that these days are primarily Medicare or capitated patient days, as managed care payors aggressively managed their length of stay. Lacking the ability to identify the specific

14

cases and days associated with capitated patients, I have calculated length of stay reduction opportunity for the Medicare population only adding another level of conservatism to my model. In evaluating length of stay, my experience has shown that the last days of protracted stays generally receive very little ancillary services. The costs incurred for the patient's continued stay are primarily comprised of direct care hours. Based on experience the cost of these last days is conservatively estimated to be $200.00 per day. I estimate that DVOG had over 12,700 excess days in fiscal 1996, which, if avoided, would have generated over $2.5 million in potential EBITDA improvement. A facility specific detail is provided in Exhibit IV.

The following table presents detailed average length of stay data obtained for two facilities, Bucks County Hospital and Elkins Park Hospital. A sample of DRG's was selected that are typical of services provided in most hospitals. I limited my analysis to Medicare patients. The average length of stay for each selected DRG was compared to the 1996 Geometric Mean Length of Stay (GMLOS) found in Medicare's Table 5 - "DRG Service Intensity Weights," published as a final rule in the Federal Register for 1996. The per-case variance in length of stay for each is presented in the table below. This analysis lends further support to the dollar improvement projected above.

| DRG # | DRG Description | Medicare Geometric Mean Length of Stay | Facility Average Medicare Length of Stay | Excess Length of Stay Per Case | Facility Average Medicare Length of Stay | Excess Length of Stay Per Case |
|---|---|---|---|---|---|---|
| | | SAMPLE OF VARIANCE FROM MEDICARE GEOMETRIC MEAN LENGTH OF STAY | | | | |
| | | | | Bucks County Hospital | | Elkins Park Hospital |
| 14 | SPECIFIC CEREBROVASCULAR DISORDERS EXCEPT TIA | 6.00 | 7.50 | 1.50 | 9.00 | 3.00 |
| 88 | CHRONIC OBSTRUCTIVE PULMONARY DISEASE | 5.30 | 8.50 | 3.20 | 5.40 | 0.10 |
| 127 | HEART FAILURE & SHOCK | 5.20 | 7.23 | 2.03 | 7.42 | 2.22 |
| 138 | CARDIAC ARRHYTHMIA & CONDUCTION DISORDERS W CC | 3.70 | 4.15 | 0.45 | 8.55 | 4.85 |
| 174 | GI HEMORRHAGE W CC | 4.70 | 6.26 | 1.56 | 7.90 | 3.20 |

Similar improvements are available in the area of utilization review, e.g., testing, drugs, and supplies, utilized in treating a patient. While this is a very difficult area to address without access to patient's medical records, in my experience a sample review of charts for key physicians and product lines can frequently identify aberrant utilization patterns. (Over utilization can be identified when comparisons are made between outlier cases and the underlying norm.)

With the assistance of physician specialists, Cambio reviews cases to determine the effectiveness of a physician treatment plan. Cambio often identifies opportunities for quality and cost improvement. Cambio's physician specialists can also identify opportunities for cost savings and revenue enhancements when services are provided to patients that do not relate to their reason for hospitalization. It is not uncommon to see instances of testing and therapy on inpatients that would be more appropriately performed on an outpatient basis. The Medicare payment system for inpatients is designed to reimburse hospitals for the treatment of a specific disease entity. Services performed outside of the reason for hospitalization are essentially provided without

16

compensation.  A prevalent example is routine colonoscopy performed on a patient not being treated for a gastrointestinal ailment.  Another common example is Magnetic Resonance Imaging (MRI) services, which are rarely indicated in the inpatient setting.  A review of a hospital entity's percentage of inpatient tests performed to total can quickly provide insight into a cost saving or a revenue enhancing opportunity.

In this regard, I compared Elkins Park Hospital MRI utilization data for the seven months ending June 30, 1996 to a Cambio benchmark of ten percent inpatient utilization as a percent of total.  This benchmark is common in the industry.  (Actually, in our experience, investor owned hospitals, which can be more tightly controlled, often average five percent or less.)  Elkins Park's comparable percentage was sixteen percent, far in excess of industry norms.

The EBITDA impact at this single facility perhaps is not as significant as the insight provided by this exercise.  Control over MRI utilization is not particularly difficult and is often quickly addressed by any hospital attempting to control costs through utilization and resource management.  In my opinion, this provides evidence of additional opportunity for cost savings in UR at Elkins Park Hospital.  In addition, it would be presumptively true of other DVOG hospitals since CM and resource UR in a system setting is most often standardized.

**Supply Chain Management**

AHERF had substantial buying power leverage with suppliers by virtue of its size. CAMBIO establishes a target for supply acquisition at 15% of net patient revenue.  This is a fair target as a review of corporate SEC filings of investor-owned hospital companies such as HCA and Tenet indicated a rate of 14%, for each in 1996, as noted in their SEC Form - 10K filings at pages 22 and 24 respectively.  This level of performance is certainly not limited to the investor owned segment.  In a July 2004 internet article entitled, "St. Joseph Generates Bottom Line Savings Through Top-Line Efforts" in *Healthcare Purchasing News*, St. Josephs Health System of Orange County California, a 14-hospital Integrated Delivery Network, recently published the success of

17

its efforts in reducing its supply cost as a percentage of net patient revenue from 16.0% to 14.7%.

Many variables contribute to an organization's ability to meet this benchmark. Hospitals must make timely payments on invoices to receive the most favorable discounts available. The organization must have a process for product standardization. As an example, one of our academic medical center clients opened its animal research lab for comparative testing of sutures, as a large contracted buying discount was contingent on certain combined purchase level commitments for sutures and endo-mechanical devices. Without complete commitment, the pricing would not have been nearly as advantageous. Similar disciplines must be maintained in the acquisition of orthopedic prosthetics and cardiac implants. In these instances, two important elements of standardization come into play. First, best pricing is most often achieved through sole source agreements from one vendor. Second, there is a concept known as "demand matching" in which appropriate grades of prosthetics are matched to the patient's profile, such that a cost appropriate and necessary device is utilized.

We compared supply expense data at all DVOG hospital facilities and found opportunity at two: Allegheny East Falls Hospital and Allegheny Center City Hospital. Comparing expenses to a 15% benchmark resulted in a $18.3 million supply expense reduction opportunity. Exhibit V presents a detailed schedule which identifies the accounts and amounts, by entity, which make up supply expense, as well as the EBITDA improvement opportunity calculation for each hospital and in total.

| SUPPLY CHAIN MANAGEMENT EBITDA OPPORTUNITY | | | |
|---|---|---|---|
| | Allegheny East Falls Hospital | Allegheny Center City Hospital | EBITDA Opportunity |
| Supply Cost in (000's) | 28,998 | 60,432 | |
| Supply Cost as a % of Restated Net Revenue | 16.7% | 20.1% | |
| EBITDA Improvement Opportunity with Adherence to a 15% of Net Patient Revenue Benchmark | 2,899 | 15,355 | 18,254 |

St. Christopher's Hospital has been excluded from this EBITDA opportunity table as its supply cost as a percentage of net revenue was less than the industry benchmark in part due to its specialty nature.  Elkins Park and Bucks County Hospitals have been excluded as their percentages were essentially equivalent to the benchmark utilized, thus yielding an immaterial opportunity.

**Discretionary Spending**

A detailed review of the trial balances for each entity revealed significant amounts of what is commonly referred to as "discretionary spending," comprised of items such as advertising, special events, luncheons, travel, publications and subscriptions.  These expenses are the first to go in a troubled organization, as they are generally the least painful cuts.  Based on my review of the data, I believe that approximately $7.6 million of EBITDA improvement could have been achieved.

See Exhibit VI, a detail schedule by hospital identifying expense line totals, Cambio's reduction method, and EBITDA improvement.

**Revenue Cycle and Accounts Receivable**

**Assumed EBITDA Improvement**

I have estimated $32.331 million in improvements for the Revenue Cycle area from the restated fiscal year 1996 base year EBITDA, as discussed below.

The Committee's accounting experts have made adjustments that increase the amount of bad debt expense recorded on the books of DVOG by $36.841 million for fiscal year 1996.  This increase is primarily the result of 1) increasing the required reserve for uncollectible accounts from the $65.136 million on the books as of June 30, 1996 to $92.079 million ($15.433 million of this increase was charged to fiscal year 1996 bad debt expense) and 2) reversing certain reclassifications made by AHERF in fiscal year

19

1996 of balances in other balance sheet accounts into the reserve for uncollectible accounts. According to the report of the accounting experts, many of these reclassifications utilized excess reserves from prior years and, thus, have been treated by them as prior period adjustments. Such treatment requires increased charges to bad debt expense in fiscal year 1996 to create necessary reserves for uncollectible accounts.

In order to determine the fiscal year 1996 EBITDA impact of the $36.841 million increase to bad debt expense, it is necessary to consider the impact of reclassifications into the reserve for uncollectible accounts that were not treated by the accounting experts as prior period adjustments. Such reclassifications include a $3.4 million SUD entry from Coopers & Lybrand (accepted and incorporated into the accounting experts' restated financial statements) and proposed entries by the accounting experts of a $1.110 million increase in net patient revenue (related to current year CRA activity) and a $1 million decrease in current year depreciation expense. After considering these items, the total decrease to fiscal year 1996 net income resulting from the accounting experts' adjustments to bad debt expense is $31.331 million. The impact on restated 1996 EBITDA relating to these adjustments is $32.331 million (which adds back the $1 million non-EBITDA depreciation decrease).

The accounting experts' adjustments to increase bad debt expense in fiscal year 1996 are related to the need to significantly increase DVOG's bad debt reserve as of June 30, 1996. This need was driven by the fact that DVOG carried a large amount of very old and likely uncollectible accounts on its books as of June 30, 1996. The large amount of old and likely uncollectible accounts was caused by many factors. These factors include AHERF's failure to write-off old receivables in the ordinary course of business and deficiencies in AHERF's billing and collection processes, believed to be partially caused by the consolidation of the patient billing and collection processes to Pittsburgh. As a result of these problems, the resultant age and condition of the receivables at June 30, 1996 necessitated a one-time valuation adjustment to reduce the carrying value of accounts receivable.

I have utilized the Committee's accounting experts' restated financial statements for fiscal year 1996 as the base year of my EBITDA improvement plan. The restated financial statements attempt to reasonably allocate revenues and expenses to appropriate fiscal years, an effort necessitated by AHERF's pervasive creation and release of "cushions," particularly in the accounts receivable and patient revenue area. However, based on the factors discussed above, it is fair to conclude that the restated amount of bad debt expense for fiscal year 1996 (offset slightly as discussed above) is not indicative of the level of bad debt expense that the DVOG, even if it continued having poor billing and collecting practices, would have in subsequent fiscal years. Accordingly, I believe it is appropriate to increase future EBITDA in an amount of $32.331 million, as future earnings will not be negatively impacted by the need to properly reserve the large number of old receivables on the books at June 30, 1996.

**Improved Collection Potential**

My proposed adjustment to future years' EBITDA does not include the favorable EBITDA improvement that I believe DVOG could have achieved in collecting patient receivables. Cambio routinely assists hospitals in restoring the efficiency and effectiveness of their revenue cycle to such a level that they can regain realization of 100% of their Net Revenue prior to a revenue cycle breakdown. The revenue cycle is one of the major opportunities for EBITDA improvement in a majority of healthcare turnaround plans. Based upon our review of several depositions (principally of AHERF's PFSG staff) and documents relating to the accounts receivable area, it is clear that there were serious deficiencies in the billing and collecting of receivables at the DVOG hospitals. These deficiencies included the following:

- During May 1995, Greg Snow was hired as the Vice President of Financial Services. (G. Snow, Dep., 7/25 10:5-17). By this time, the DVOG hospitals had been purchased by AHERF and consolidation of the patient financial services functions into a centralized billing and collections office, known as the Patient Financial Services Group (PFSG), was underway. (G. Snow, 7/25, Dep., 12:23-

13:1). This consolidation of the business office functions would have initially caused many issues in the timely billing and collection of accounts.

- An order to cease writing off any account receivable balance with dates of service prior to July 1, 1995, regardless of the reason, was issued on or around September 27, 1995. (Deposition Exhibit #905 (Bates # GOV 43675). This directive resulted in a large volume of very old, uncollectible accounts in the active accounts receivable.

- The PFSG staff did not have any authority over the patient access functions of registration and verification. These areas were the responsibility of the individual facilities. (G. Snow, Dep., 45:19 – 46:6). Patient Access collects all of the initial information required to appropriately bill and collect an account. Therefore, not having control over this function often results in inaccurate information at registration, resulting in increased denials and uncollectible accounts.

- The PFSG staff also experienced significant delays in receiving medical records from the various facilities. (G. Snow, Dep., 52:3-10). This is relevant because payors often request medical records to evaluate the services provided, as well as to compare these services to the policyholder's coverage. Delays in receiving medical records may also result in increased denials and uncollectible accounts.

It appears that many of these issues had been identified by the end of fiscal 1996 and were being addressed. These issues are commonly seen by Cambio in our turnaround facilities and are corrected during the turnaround process.

Furthermore, Cambio reviewed a report, titled Allegheny Health, Education and Research Foundation Patient Financial Services (Deposition Exhibit #901, Bates # TOB 000924 – 000975 ), which documented an overall denial rate for the AUH facilities of 18% (Bates number TOB 000955) and 23% for St. Christopher's hospital (Bates #

22

TOB 000964). These figures are much higher than the Hospital Accounts Receivable Analysis benchmarks (for 3rd Quarter 1996) referenced in the report (Bates # TOB 000931), which indicated an overall denial rate of 3%. This high level analysis indicated a potential EBITDA improvement opportunity of $36.5 million. This figure was calculated by multiplying the gross revenue by the difference between the actual and benchmark denial rates, subtracting 65% for reversed denials and multiplying the result by the gross to net revenue factor. Given the degree of opportunity in this single area within the revenue cycle, as well as the other factors discussed above, I am confident that my estimate for revenue cycle EBITDA improvement is conservative and would have been achievable.

**Cambio Assessment of DVOG Accounts Receivable Overstatement**

Cambio attempts to accurately value the accounts receivable as part of any turnaround engagement. We have been asked to estimate the value of the receivables carried by the DVOG hospitals as of June 30, 1996, using our experience in the industry. In connection with that evaluation, we have reviewed the agings of the DVOG hospitals' accounts receivable and the methodologies utilized by those hospitals to reserve for uncollectible accounts and contractual allowances. During that review, several matters came to our attention.

First, we noted that the receivables carried by the DVOG hospitals were significantly aged beyond industry norms. The Cambio standard for the aging of billed receivables is 70% under 60 days old, 25% from 61 to 180 days old and only 5% aged greater than 180 days. The aging of DVOG facility's accounts receivable were significantly worse than these standards, as discussed below:

- Elkins Park – Only 36% of billed accounts receivable were less than 60 days and 40% were greater than 180 days.

- Bucks County – Only 35% of billed accounts receivable were less than 60 days and 41% were greater than 180 days.

23

- Center City – Only 39% of billed accounts receivable were aged less than 60 days and 33% were greater than 180 days.

- Allegheny East Falls – Only 41% of billed accounts receivable were aged less than 60 days and 29% were aged greater than 180 days.

- St. Christopher's – Only 32% of billed accounts receivable were aged less than 60 days and 42% were aged greater than 180 days.

As an account receivable ages, collectibility of that account decreases. This is true for self-pay and insurance balances. No matter the age, self-pay balances are usually not collected, and the likelihood of collection decreases with age. The industry average for collection of self-pay receivables is very low.

There are several reasons why insurance balances are rejected or denied, including the following:

- Incorrect patient information, such as insurance identification numbers, patient names, and group information, is obtained at registration. While these can sometimes be corrected and the account re-billed, this process requires re-work by the collections staff, who are trying to keep up with current accounts, and such re-working often bogs down the follow-up staff. Often, these accounts are left too long before filing the appropriate appeals with the corrected information, meaning the accounts become uncollectible.

- The patient was not covered by the insurance plan billed at the date of service, or were not members of that plan at all. This denial indicates that this insurance plan will not pay for the visit at all. The patient must then be contacted to obtain updated insurance information, and often such insurance does not exist or cannot be billed based on contracted terms. Often, the patient may be responsible for the bill themselves, meaning the bill becomes a self-pay

24

receivable. Either way, the chance of collecting the account is greatly diminished.

• The services rendered were not considered medically necessary by the insurance plan. In this case, the physician can be contacted or the medical record reviewed to determine if additional information exists to support the procedures performed. This takes significant time and energy and, all too often, no additional information can be obtained. Therefore, all or some of the value of these accounts will not be paid.

As a receivable owed by a third party payor ages, it becomes increasingly likely that one or more of these factors, among many others, is present. If such factors are not present, the account is typically paid shortly after the bill is received. Medicare will pay a claim within 14 to 30 days of receipt, Medicaid 75 – 90 days, while most other payors will pay between 30 to 60 days from the receipt of a claim. (G. Snow Dep., 228:5-25).

We reviewed the methodologies and assumptions that the DVOG hospitals used in reserving for accounts receivable as of June 30, 1996, including how those hospitals reserved for uncollectible accounts and contractual allowances. Exhibit VII represents our understanding of how the DVOG hospitals reserved for uncollectible accounts and contractual allowances. We identified several inadequacies during our review of the various methodologies, including the following significant problems:

• For the Elkins Park, Bucks County and St. Christopher's hospitals, a vast majority of accounts aged greater than 180 days were on the Patcom patient accounting system. These receivables had been outsourced and were most likely not collectible. In addition, there were no employees in PFSG trained on the Patcom system, or even able, except "for cash implication purposes," to use it. (G. Snow Dep., 73: 3-15). No one from AHERF was actively working these accounts. As of June 30, 1996, collections from these accounts had diminished considerably. (Deposition Exhibit #28).

- The accounts on the Patcom system were, in our opinion, reserved at insufficient rates. For example, all three hospitals were reserving less than 2% of the gross value of significant amounts of outpatient receivables owed by Blue Cross, DPA, Medicare, Health Partners, Medical Assistance and HMOs that had aged more than 180 days. The reserve rates for the inpatient accounts owed by these payors were also too low. Oddly, these reserve assumptions were much different than the reserve assumptions contained in the bad debt reserve model developed for accounts billed on the new Invision system. In our opinion, the assumptions utilized in reserving the Patcom accounts were inadequate, resulting in the Patcom accounts being significantly under-reserved at June 30, 1996.

- Allegheny East Falls' practice of reserving only self-pay accounts and patient deductibles for bad debt potential is not consistent with our experience. For the reasons discussed below, many billings, or portions of billings, to third party payors are not collected. Therefore, a reserve model that does not reserve third party accounts at all, particularly for older receivables, or does not reclass old third party accounts as being self-pay is, in our opinion, inadequate.

- Center City hospital reserved older accounts from major payors like Medical Assistance, Medicare, and Blue Cross at low rates. In our experience, nearly all or all of the value of any account over 180 days, no matter the payor, should be reserved unless the hospital is aware of a specific reason that the payor will or should pay the receivable.

- The DVOG facilities' aging reports reflected that they aged inpatient accounts from the date of final bill and outpatient accounts were re-aged from the date of last received payment. While these aging methods did not appear to cause significant differences in the reserve amounts, the industry standard for aging is from discharge date for inpatients and date of service for outpatients.

When Cambio attempts to value receivables as part of a turnaround engagement, we typically obtain a download of the detailed demographic and transaction information from the patient accounts computer system. We use this data to perform a precise calculation of the value of accounts receivable. Reliable detailed information of this type was not available for the DVOG entities. As a result, we performed other, less specific calculations to identify an appropriate range of values for the DVOG accounts receivable. While these calculations are not as detailed as we would normally perform in a turnaround engagement, the assumptions utilized are based upon industry benchmarks and our experience with other hospital clients and the payor environment in which they operate.

As noted, we believe that the reserve rates utilized by the DVOG hospitals as of June 30, 1996 to calculate the required reserve for uncollectible accounts were, in certain respects, inadequate. We therefore devised what we believe to be more appropriate reserve percentages for the receivables carried by the DVOG hospitals, grouped by payor and age. In devising these percentages, we reviewed the change in the DVOG hospitals' accounts receivable from November, 1995 to June, 1996, as well as the cash receipts for fiscal years 1996 and 1997. We noted that the Elkins Park, Bucks County, and St. Christopher's receivables aging deteriorated significantly between November 1995 and June 1996, while the Allegheny Center City and Allegheny East Falls hospitals had less deterioration in their agings. The deterioration at the Elkins Park, Bucks County and St. Christopher's hospitals appears to be due to Patcom accounts that were not written off prior to June 30, 1996.

We devised a set of reserve percentages specifically for Elkins Park and Bucks County and a less conservative set of reserve percentages for Allegheny Center City and Allegheny East Falls hospitals. St. Christopher's required a slightly less conservative set of percentages than Elkins Park and Bucks, while a slightly more conservative set of percentages than Allegheny Center City and Allegheny East Falls. We applied these reserve percentages to the accounts receivable (net of contractual allowances) as of June 30, 1996. Our calculations are shown in Exhibit VIII. In summary, application of

the recommended reserve percentages yielded the resulting bad debt reserve requirements:

Reserve Requirements Using Cambio Percentages

| Elkins Park | Bucks County | Center City | East Falls | AUH Total | St Christopher's | DVOG Total |
|---|---|---|---|---|---|---|
| 11,816,946 | 10,241,428 | 33,663,457 | 25,384,036 | 81,105,867 | 20,317,223 | 101,423,090 |

The total reserve requirement calculated utilizing our reserve assumptions, $101,423,090 million, was significantly higher than the amount of reserves for uncollectible accounts on the books of the DVOG hospitals at June 30, 1996, $65.136 million ($4.971 million at Elkins Park; $3.836 million at Bucks County; $34.811 million at Center City; $10.396 million at East Falls; and $11.908 million at St. Christopher's). Application of our reserve rates estimates that the DVOG hospitals were under-reserved for uncollectible accounts by approximately $36 million.

We also performed calculations to value the DVOG hospitals' patient receivables utilizing a common industry benchmark, Days of Revenue in Patient Accounts Receivable, commonly referred to as "Days in A/R." These calculations attempt to value the net patient accounts receivable, rather than estimate bad debt reserve requirements. The Days in A/R metric first calculates the amount of net revenue the hospital earns per day by dividing the hospital's net revenue for the year by 365 days. This figure is then divided into the hospital's net accounts receivable balance to arrive at the Days in A/R calculation.

A low Days in A/R figure is a signal that the hospital is collecting, or "turning over," its receivables on a timely basis. Elevated Days in A/R typically indicates a hospital is not collecting its receivables as quickly or that the hospital is not writing off or reserving old accounts that have not been and likely will not be collected. By any measure, the DVOG hospitals had very high Days in A/R figures.

As an alternative approach to valuing the fair value of the accounts receivable carried by the DVOG hospitals at June 30, 1996, we applied different industry averages for the

Days in A/R metric to the DVOG hospitals. We calculated the net revenue per day for the DVOG hospitals by utilizing both the audited financial statements and the financial statements restated by the Committee's accountants. We then applied those figures to different industry averages of the Days in A/R metric. We believe this is a reasonable approach to valuating the receivables in that it utilizes industry averages. While there are differences in the collection cycles between hospitals (i.e., some hospitals collect receivables quicker than others), such differences are outweighed by the similarities inherent between hospitals, including the fact that hospitals largely work with the same payors. Given the problems in the DVOG hospitals' billing and collections processes, we performed calculations that utilized the industry Days in A/R averages for the 10% of hospitals with the highest Days in A/R figures.

Using benchmark Days in A/R data, we performed three comparative calculations to estimate the value of the patient accounts receivable. The first calculation utilized a benchmark Days in A/R figure for hospitals in the Northeast, which includes Philadelphia. The benchmark figure was 82.3 days of net revenue in accounts receivable in 1996, the reporting year of the 1997 study. The second calculation utilized a benchmark Days in A/R figure for hospitals with high managed care penetration. The benchmark figure was 87.0 days of net revenue in accounts receivable. (According to Mr. Snow's deposition, the Philadelphia facilities had very high managed-care penetration. G. Snow Dep., 113:15 – 114:9). The third calculation utilized benchmark Days in A/R figures based on the hospitals' size, as determined by net revenues.

The results of the benchmark calculations are summarized in the following chart. (Exhibit IX contains an application for each DVOG hospital.)

| | Benchmark Methodology | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Elkins Park | Bucks County | Center City | East Falls | AUH Total | St Christopher's | DVOG Total |
| Benchmark for Hospitals in Northeast (using Audited Financial Statements) | 12,393,478 | 9,868,785 | 69,472,699 | 39,209,298 | 130,944,260 | 28,839,498 | 159,783,758 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Benchmark for Hospitals with High Managed Care Penetration (using Audited Financial Statements)** | 12,754,892 | 10,156,574 | 71,498,635 | 40,352,704 | 134,762,805 | 29,680,504 | 164,443,309 |
| **Benchmark for Hospitals in Revenue Bracket (using Audited Financial Statements)** | 12,724,774 | 10,132,592 | 70,570,081 | 39,828,643 | 133,256,090 | 29,505,295 | 162,761,385 |
| **Benchmark for Hospitals in Northeast (using Restated Financial Statements)** | 10,839,474 | 8,549,504 | 64,063,898 | 36,705,124 | 120,158,000 | 26,429,574 | 146,587,574 |
| **Benchmark for Hospitals with High Managed Care Penetration (using Restated Financial Statements)** | 11,155,570 | 8,798,822 | 65,932,104 | 37,775,504 | 123,662,000 | 27,200,303 | 150,862,303 |
| **Benchmark for Hospitals in Revenue Bracket (using Restated Financial Statements** | 11,129,229 | 8,778,045 | 65,075,843 | 37,284,913 | 122,268,030 | 27,039,734 | 149,307,764 |

In summary, the calculations showed the DVOG hospitals' accounts receivable would be fairly valued in a range of $146.588 million and $164.443 million. In the fiscal year 1996 audited financial statements, the DVOG hospitals had a reported accounts receivable balance (net of reserves for uncollectible accounts) of $218.603 million. Net of CRA and PIP accounts (we used Days in A/R figures that excluded CRA and PIP accounts), the DVOG hospitals' receivables balances totaled $211 million. As can be seen, this alternative approach also shows that the DVOG hospitals' receivables were significantly overstated as of June 30, 1996.

Finally, the activity in the DVOG hospitals' bad debt reserves during fiscal year 1997 demonstrates that the hospitals were not adequately reserved for uncollectible accounts as of June 30, 1996. As of June 30, 1996, the DVOG hospitals had $65.136 million of bad debt reserves on their books. During fiscal year 1997, AHERF engaged in a "Past Statute Project" designed to write off $60 million (net of contractual reserves) from the active books and records that it considered were uncollectible. (Deposition Exhibit 138). (The DVOG hospitals wrote off additional accounts, beyond this $60 million, during fiscal year 1997.)

The write-offs occurred in four "phases" of approximately $20 million each in October and November of 1996 and March and June of 1997. AHERF personnel have testified that determinations were made that the accounts written off in fiscal-year 1997, or at least the vast majority of them, were thought to be uncollectible as of year-end 1996. (W. Gedman. Dep., 110:17 – 118:3; L. Franz, Dep., 291:13 – 293:12; G. Snow, Dep., 166: 7 -15). The $60 million would have exhausted all of the bad debt reserves, leaving little for all accounts remaining on the books.

For the above reasons I believe the DVOG hospitals' accounts receivable were overstated significantly. Based upon the alternative methodologies described above, I estimate the receivables were overvalued by at least approximately $35 million.

## MANAGED CARE

In similar situations Cambio is often able to drive additional net revenue through negotiation with managed care payors in instances where management has not been aggressive in pursuing ongoing rate updates. Based on my review of several documents including a "Managed Care Briefing" written by AHERF management, (Bates Stamp DB-CM-30-00841:00871), it would appear that AHERF actively managed its payor relations. Given the market clout of two payors, USHealthcare (USHC) and Independence Blue Cross / Keystone Health Plan East (IBC/KHPE), and the fact that no provider had a controlling share of the market, it is unlikely that AHERF or any other provider would be bargaining from a position of great strength. My belief is that there may be limited EBITDA improvement from an effort to renegotiate managed care rates in DVOG's market.

At September 30, 1996, there existed two capitated agreements, one with each of the two primary managed care payors noted above. In my opinion, the organization was ill equipped to deal with the complexities of full risk contracting.

Full risk contracting is often not a viable option for many hospital operators. Many management teams cannot put all of the systems, processes and monitoring controls in place to adequately control the risk. Fundamentally, operations in this environment are diametrically opposed to traditional business models which reward increased admission and utilization. Full risk requires a new focus on health and wellness rather than a hospital's historical provision of care at the onset of an acute episode. On a more detailed level, a hospital provider must have systems that allow it to adequately measure its costs, predict utilization patterns, and track compliance with intra-network referral channels.

A review of numerous financial documents and depositions of key AIHG executives provides no evidence that AHERF had systems which could adequately identify the existing or projected utilization patterns of the lives for which it accepted risk, or the cost of providing service for this population. Senior management would therefore be ill equipped to negotiate rates with payors that would positively impact its bottom line. The organization also lacked effective case management and utilization review functions to effectively manage its risk population.

One of AHERF's risk agreements contained a reimbursement mechanism whereby AHERF was paid a percentage of premium on a per member/per month basis. The agreement lacked a bottom limit for premiums and, as such, the significant reductions in premium which ensued resulted in reduction of reimbursement to AHERF. An omission of this nature is an indication that management did not have an adequate understanding of the full risk area.

Also significant was the fact that AHERF had no control over its covered lives. AHERF assumed all risk with no ability to control access or utilization. The payor controlled all of the data, utilization and claim adjudication. The agreement lacked any "in area" requirements or inducements. This created a potential for rampant out-of-network utilization. External utilization cannot be managed and is therefore universally inefficient and each claim paid by the administrator was an amount AHERF had to repay the plan. Payments made for services to out-of-network providers are more

costly as payment may be made based on the out-of-network provider's charges, rather than a negotiated reduced rate. It is therefore a more costly provision of services to the covered population.

Given the nine year cancellation notice provision of the most onerous agreement, my recommendation would have been to negotiate an exodus from this capitated agreement. The most effective leverage points to be utilized in such a negotiation would be the points utilized by management in 1997 and 1998. At that time, management proposed elimination of the carrier from employee health insurance open enrollment and proposed closure of physician practices to new capitated lives. The second point however was not consistent with contracted terms. Two options available to management would have been (a) elimination of physician practices with disproportionately large volumes of capitated lives, and (b) relocation of the practices which would have altered the existing utilization patterns. This alteration would have been less costly than actual closure of practices given the extended employment contract terms in place.

I would have recommended a complete halt to expansion of capitated contracting. Had AHERF followed my recommendation, the Western AHERF entities would have been spared a significant capital drain as the drive for physician acquisition in the West was fueled by a desire to activate a clause in one of its risk contracts which required the addition of 100 primary care physicians. With these strategies, I believe the capitation impact would have been marginalized and losses limited to levels experienced in 1996.

**PHYSICIAN PRACTICE OWNERSHIP**

As of August 31, 1996, AHERF owned 152 physician practices, with 263 physicians in the greater Philadelphia and Pittsburgh areas, as identified in the AIHG Summary of Practice Acquisitions to Date (Bates DBR-LI 0180989:0180990). The practices were predominately primary care, comprised of family practice physicians, as well as internal medicine practitioners. There were also employed a limited numbers of specialists, obstetricians, and pediatricians. The majority of these practices (128) and physicians

33

(221) were employed in the Philadelphia marketplace. AIHG entered into five-year employment contracts with these physicians. The Allegheny University Health System was also a party to certain of the agreements. The contracts were devoid of any stated productivity goals and simply required a set number of hours per week the physicians were obligated to practice.

I have historically advised against the ownership of physician practices. Physician practices are best run and most productive as small entrepreneurial ventures. Once the physician becomes an employee, the physician is no longer at risk for his or her pay and most often there is a reduction in productivity. To avoid or minimize this loss of productivity, there must be incentives in the employment agreement to encourage the physician to continue to produce at a high level.

As previously stated, the immediate course of action that I would have recommended would have been the cessation of further acquisitions. Given the terms of the physician employment agreements, and related complexities, it is difficult to determine the extent to which contract renegotiation efforts would have resulted in substantial savings. In my experience when faced with the potential for a complete rejection of the contract due to potential bankruptcy, physicians will agree to negotiate. That said, I have not attempted to quantify EBITDA improvement from renegotiating these physician contracts.

The one available option to promote adherence to a reasonable work load and in-system referral pattern would have been the threat of relocation. In fact, in some instances of significantly underperforming practitioners, I would have recommended closure of the physicians practice location and movement of him/her to a clinic environment where, in my opinion, patient volume and peer pressure would force an improvement in performance.

From an EBITDA and cash conservation standpoint, the single most important recommendation to be made was to halt all future acquisition activity.

34

## RATIONALIZATION OF HOSPITALS AND SERVICES

Realization of synergies associated with system development requires a detailed analysis of the role each hospital plays within the system. As part of my turnaround efforts, I would have performed a detailed analysis at a facility level to determine the public need and margin for each service within all of the DVOG hospitals. This analysis would provide information on utilization of given services, the cost to provide the service, associated revenues, capacity restraints or opportunities available to a given service, as well as capital needs required to maintain or build each service.

With this information in hand, I would review the institutions collectively to determine where duplication exists and, where possible, I would recommend consolidation of services in the facility containing the best opportunity to expand a service to meet public need and maximize margin. A prime example of this rationalization would be a review of obstetrics and gynecology services, including associated neonatal care units. Given the relatively short distances between DVOG hospitals, I would certainly review opportunities to enhance efficiency through consolidation of these services. Other typical opportunities exist with respect to sub-acute services such as psychiatric services and rehabilitation units. These are just a few examples of services that would be reviewed for opportunity to increase efficiency by consolidation of units.

A second level review would then be performed to determine if any hospital within the system was non-essential to the mission of the system. This can occur after decisions are made on service rationalization efforts. If an entity is deemed non-essential, i.e., its services are readily provided elsewhere, then its efficiency and capital needs would be examined to determine its future value to the system.

I did not have access to the detailed data required to make specific determinations, however given the geographic clustering of the facilities, I believe that service line rationalization opportunities would surely have been present and hospital rationalization opportunities were probable.

## COMPENSATION

Thomas W. Singleton                       $600.00/hr.
Range for Cambio Team Members            $250.00 - $350.00/hr.

## PRIOR TESTIMONY

I have not testified as an expert witness within the last four years.

Dated: _9/2/04_                          _Thomas W. Singleton_
                                          Thomas W. Singleton

---

[1] EBITDA was derived from the May 31, 1997 AIHG Financial Statements (Bates JD DC 0057397-0057453.

[2] Penn Health System Charts Financial Future, Physician's News Digest, December 2000, C. Guadagnino

[3] As an exception to this rule relevant to operations at AHERF, in my turnaround plan I have generally examined activity and costs incurred at the AHERF Parent entity, as well. The functions performed at this enterprise and the expenses incurred indicate that they were for administrative management and related matters. Significant portions of these costs and expenses were allocated to DVOG and therefore are addressed in the specific EBITDA-improvement analyses provided in this report. To the extent that these costs and expenses were allocated to entities other than DVOG, my experience in the healthcare industry as well as my specific experience examining the DVOG entities, indicates that these costs and expenses could also have been reduced significantly to levels consistent with the continuing solvency of the AHERF Parent without sacrificing necessary services.

[4] The Center for Healthcare Industry Performance Studies, 1997-98 Almanac of Hospital Financial and Operating Indicators.