**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH EDUCATION & RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br><br>Defendant. | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

**INDEX TO
APPENDIX TO PWC's MEMORANDUM IN OPPOSITION TO THE COMMITTEE'S
MOTION TO EXCLUDE CERTAIN TESTIMONY FROM PWC's EXPERTS**

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, Pa 15219
(412) 232-0200


Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH SWAINE & MOORE, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000


Attorneys for Defendant
PricewaterhouseCoopers, LLP

**APPENDIX TO PWC's MEMORANDUM IN OPPOSITION TO THE COMMITTEE'S
MOTION TO EXCLUDE CERTAIN TESTIMONY FROM PWC'S EXPERTS**

1.    Expert Report of James E. Orlikoff

2.    Expert Report of David E. Covintree

3.    Expert Report of Professor Christopher M. James

4.    Expert Report of Lawton R. Burns, Ph.D., MBA

5.    Expert Report of Robert A. Dickinson

6.    Deposition Excerpts of Richard H. Daniel

7.    Deposition Excerpts of Alfred W. Martinelli

8.    Settlement Agreement – Exhibit No. 2760

9.    Articles from "*CIO Connection*", FHA "*In Action*" and Ontario Hospital Association
      "*Executive Report 16/8*"

10.   Deposition Excerpts of Lawton R. Burns, Ph.D.

11.   Deposition Excerpts of Roger D. Feldman, Ph.D.

12.   Deposition Excerpts of David E. Covintree

13.   Deposition Excerpts of Christopher M. James

14.   Article: "The Fall of the House of AHERF: The Allegheny System"

15.   News Abstracts

16.   Declaration of Robert A. Dickinson

17.   Deposition Excerpts of Robert A. Dickinson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| ALLEGHENY HEALTH, EDUCATION | ) | Civil Action No. 00-684 |
| AND RESEARCH FOUNDATION, | ) | Judge David Stewart Cercone |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRICEWATERHOUSECOOPERS LLP | ) | |
| | ) | |
| Defendant. | ) | |

RULE 26(A)(2)(B) DISCLOSURE OF
JAMES E. ORLIKOFF

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

        A.      Summary of Credentials and Experience ......................................... 1

        B.      Subject Matter of My Testimony ....................................................... 2

        C.      Summary of My Opinions .................................................................. 3

II.     BACKGROUND ................................................................................................ 4

        A.      A Brief Background on Healthcare Governance ............................. 4

        B.      Background of the AHERF Board Members .................................... 6

III.    THE TRUSTEES UNDERSTOOD, AGREED WITH, AND APPROVED
        MANAGEMENT IDS BUSINESS STRATEGY ............................................ 6

        A.      The Theory of Integration and Description of the Integrated
                Delivery System .................................................................................. 7

        B.      The AHERF Board Approved the IDS Strategy .............................. 8

        C.      The AHERF Board Knew or Should Have Known the Risks of the
                IDS Strategy. ...................................................................................... 8

        D.      There Is No Reason To Believe The Board Would Not Have Pursued
                The IDS Strategy  Under More Challenging Financial Circumstances .................... 10

IV.     THE BOARD APPROVED EACH OF AHERF'S MAJOR
        ACQUISITIONS DESPITE KNOWING THE ACQUIRED
        ENTITY WAS FINANCIALLY WEAK .......................................................... 10

        A.      United Hospitals, 1991 ..................................................................... 11

        B.      Hahnemann University 1993-1994 ................................................... 11

        C.      Graduate Health System 1996-1997 ................................................ 12

V.      THE BOARD APPROVED THE PHYSICIAN PRACTICE ACQUISITION
        STRATEGY DESPITE THE COSTS AND RISKS ....................................... 14

VI.    TRUSTEES KNEW OF MAJOR FINANCIAL DETERIORATION
       AT AHERF ........................................................................................................16

       A.    By the Fall of 1996, the Board Had Received Information Indicating
             that AHERF was in Financial Difficulty .................................................16

       B.    Many of the Trustees had Been on the Boards of Financially
             Distressed Entities Prior to their Acquisition by AHERF.......................17

       C.    In April, 1997, the AHERF Board was Informed of Declining Market
             Projections for the Next Three Years.....................................................18

       D.    By the Fall of 1997, the Audit Committee and Board had Received
             Information Indicating that AHERF was in Serious Financial Distress.................20

       E.    AIHG Financial Results Continued to Deteriorate....................................21

       F.    AHERF Financial Results Continued to Deteriorate..................................22

VII.   DESPITE KNOWLEDGE OF FINANCIAL AND BUSINESS
       PROBLEMS AT AHERF, THE BOARD FAILED TO INITIATE
       MEANINGFUL ACTION ..................................................................................23

VIII.  AT ALL TIMES THE BOARD SUPPORTED MANAGEMENT,
       INCLUDING MR. ABDELHAK..........................................................................24

       A.    Prior to June 1998, Mr. Abdelhak was Never Terminated. ......................24

       B.    Mr. McConnnell Also Was Not Terminated, Despite
             Concerns About His Credibility...............................................................25

       C.    Mr. Abdelhak's Termination Was Not Initiated by the Board of Trustees...............26

IX.    AHERF'S GOVERNANCE STRUCTURE WAS DYSFUNCTIONAL ..............................27

    A.    The Board Was Dominated by Mr. Abdelhak.................................................27

    B.    The Board's Governance Structure Was Broken so the Board Was
        Significantly Inhibited From Taking Action .......................................30

    C.    AHERF Suffered From Representational Governance................................33

    D.    The Large Size of the AHERF Board Significantly Hindered Effective
        Governance ............................................................................35

    E.    The Duration of AHERF Board Meetings was Typically Too Short to
        Facilitate Effective  Governance...................................................40

    F.    These Combined Structural Problems Precluded Effective AHERF
        Governance During  Board Meetings .............................................41

    G.    AHERF Board Committees Also Suffered From Structural Problems...................43

    H.    These Structural Problems in AHERF Governance Were Recognized by the
        Board.......................................................................................43

    I.    The AHERF Board had a Culture of Conformity.......................................43

    J.    Physicians and Faculty Members Who Were Also Board Members
        Felt Powerless Within the Board Structure  .........................................50

    K.    Faculty Board Members Felt Particularly Threatened by Mr. Abdelhak .................51

    L.    Many Trustees had Recent Examples of More Robust Governance Structure
        and Process, But Did Not Act On This Knowledge ..... ...........................51

    M.    These Dysfunctional Governance Characteristics Support My Opinion...................52

X.    GIVEN THE BOARD'S ACTUAL INACTION THERE IS NO REASON
    TO BELIEVE THAT ADDITIONAL INFORMATION FROM COOPERS
    WOULD HAVE CAUSED THE BOARD TO INITIATE MEANINGFUL
    ACTION....................................................................................52

    A.    The Board Understood and Repeatedly Approved the IDS Strategy .....................53

    B.    Trustees Knew that AHERF was in Serious Financial Distress ........................53

C.    The Vast Majority of Trustees Never Lost Confidence in Mr. Abdelhak ................ 53

D.    There is No Reason to Believe That the Additional Information About AHERF's Financial Condition That Plaintiff Alleges Coopers Should Have Provided to the Board Would Have Caused the Board to Initiate Meaningful Action ........................................................................... 54

E.    There is No Reason to Believe that Coopers' Discovery of "AHERF Senior Officials' Financial Manipulations" Would Have Caused the Board to Initiate Any Meaningful Action. ........................................................... 54

XI.    NO TRUSTEE HAS IDENTIFIED ANY SPECIFIC ALTERNATIVE ACTION THE BOARD WOULD HAVE INITIATED IN PLAINTIFF'S HYPOTHETICAL WORLD ........................................................... 57

iv

# I. INTRODUCTION

A.      Summary of Credentials and Experience

My name is James E. Orlikoff and I am the president of Orlikoff & Associates, Inc., a Chicago-based consulting firm specializing in health care governance and leadership, strategy, quality, and organizational development. I have owned and continuously operated this consulting business since August, 1989. In addition, I am the Executive Director of the American Governance and Leadership Group, LLC, an organization that provides governance and leadership education, publications, and services to the boards, executive management, and physician leadership of hospitals, health systems, physician groups, and other healthcare-related organizations. I am also the National Advisor on Governance and Leadership to the American Hospital Association and Health Forum.

I am the author of numerous books and articles on the topics of health care governance and leadership. I am co-author of the book Board Work: Governing Health Care Organizations, which won the American College of Healthcare Executives James A. Hamilton Book of the Year award for 2000, and I am the primary author of The Future of Health Care Governance: Redesigning Boards for a New Era, published in 1996.

My consulting work for healthcare boards includes conducting governance improvement projects, facilitating board self-evaluations, conducting governance restructuring projects, and facilitating board retreats on issues of governance and strategy, among other topics. In addition, I am a frequent keynote and plenary speaker on the topics of governance and leadership at national and state healthcare conferences, educational programs, and conventions.

I have attached my resume as Exhibit 1. It includes a list of my publications for the past ten years which, to the best of my recollection, is complete.

I have been retained by Cravath, Swaine & Moore LLP as an expert witness in the case of Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers LLP, to assist the defendant in assessing plaintiff's claims

1

regarding the governance of AHERF. For this work, I am being compensated at the rate of $625.00 per hour for office work and $8,500.00 per day plus travel expenses for travel time. This is my usual and customary fee schedule.

B.     Subject Matter of My Testimony

Plaintiff asserts that the audited financial statements failed to "expose AHERF's deteriorating financial condition, violations of various debt covenants, deficient financial controls, and AHERF senior officials' financial manipulations to the innocent, unaware, and misinformed trustees of AHERF and its affiliates," and that the "innocent Trustees, who were not parties to the aforesaid wrongdoing, could and would have taken affirmative action to bring the wrongdoing to an end, remove the wrongdoers and halt the decline of AHERF and its affiliates had they been informed by Coopers of the true state of AHERF's financial condition." (Amended Complaint, ¶ 30.)

I have been asked by counsel to PricewaterhouseCoopers LLP to provide an opinion, based on my expertise in healthcare governance and leadership and based upon the materials related to AHERF that I have considered, as to whether it is likely that any of the additional information that plaintiff asserts that the audited financial statements should have disclosed to the board would have caused the board to act differently than it did and to initiate meaningful action.[1] This report, and my expected testimony, is also intended to respond to those portions of plaintiff's expert opinions that relate to activities of the AHERF boards and committees. I attach a list of materials that I have considered as Exhibit 2.

---

[1]For purposes of my analysis, I assume that the AHERF Fiscal Year 1996 and Fiscal Year 1997 audited financial statements should have been "corrected," as reflected in Appendices I and II of the Expert Report of Robert W. Berliner.

2

C.    <u>Summary of My Opinions</u>

It is my opinion that there is no reason to believe that any of the additional information plaintiff says the audited financial statements should have disclosed to the board would have caused the board to act differently. Numerous facts and reasons, described later in this report, support this opinion. Briefly, they include, but are not limited to, the following:

1.    The board agreed with AHERF's business plan, knowing it was a response to projected financial difficulties, and supported AHERF's management.

2.    Trustees knew of increasingly major financial problems at AHERF.

3.    The board failed to change course or initiate meaningful different action despite knowledge of these major financial problems. Instead, the board believed management was already doing all it could to deal with the problems.

4.    The board never initiated and was generally incapable of initiating meaningful action. That is because, among other things, the AHERF governance structure was cumbersome and dysfunctional, and significantly inhibited the possibility of any initiative on the part of the AHERF board; the AHERF Chief Executive Officer ("CEO") dominated and controlled the board which contributed to a dominant governance culture of board acquiescence and "rubber-stamp" decision making; many of the AHERF trustees had divided loyalties and represented interests other than those of AHERF; no trustee has identified any specific alternative action the board would have initiated in the plaintiff's hypothetical situation.

I reserve the right to supplement or revise this report based upon review of additional information.

3

## II. BACKGROUND

A.    A Brief Background on Healthcare Governance

The governing board is the ultimate authority of the hospital or healthcare system, and bears the final fiduciary responsibility, authority, and accountability for the organization or system that it governs. The board provides oversight and direction for the planning, operation, and evaluation of all programs, services, and activities of the organization, and hires/fires and monitors the performance of the CEO.

The board bears the final responsibility for everything the organization is, does, and becomes. Not-for-profit hospital and healthcare organization governance includes the responsible stewardship and allocation of health resources to produce a sustained benefit to the community. As fiduciaries, boards are the financial overseer of the healthcare organization, and must act accordingly and prudently.

The board has the fundamental leadership responsibility but must employ negotiation and delegation to share its leadership responsibility with executive management and the medical staff or physician leadership. There are several categories of the functions of the healthcare governing board, including: mission development, evaluation, and stewardship; strategic planning oversight; financial oversight; organizational oversight, monitoring, and evaluation; governance effectiveness, including direct oversight and control of board development, governance structure and function, information flow, self-evaluation, and continuous governance improvement; management oversight, relations, and performance evaluation; quality oversight; and, medical staff oversight and physician relations.

One of the key characteristics of an effective board is that it is dynamic, evolving in function and form. Since the 1980's, hospitals and other healthcare organizations have existed in an increasingly changing, challenging, and turbulent environment. Because of this, it is almost universally recognized that the board and the way it functions influences the function and viability of the organization it governs.

4

If the function of the board indeed affects the hospital or system, then the board can affect the organization in one of two broad ways: the board can be an asset to the organization, or the board can be a liability to the organization. This is in marked contrast to earlier days when boards were not expected to be as active or effective and the impact of boards on their hospitals was largely benign.

The roles and relationships of the board are complicated and challenging when considered in the context of a single healthcare organization with one board. The role and challenges of governance become even more complicated with the evolution of multi-hospital systems and integrated delivery systems. These new healthcare organizations and systems have all affected the structure and function of governance. Frequently, one result of these changes is the emergence of multiple boards within a healthcare system with different but related responsibilities and authority.

Multiple boards within a healthcare organization create issues that must be addressed to assure effective governance and success of the system or organization. These issues include: the effective integration of multiple levels of governance; the clarification of the distinction of the relative roles, authorities and responsibilities of the different boards; achieving strategic alignment among the different boards; facilitation of effective oversight of management; and many others. The less clear these distinctions in authority, role, and relationships are, the more ineffective will be the governance of the system or organization.

Effective governance is critical for a successful healthcare system. The board must provide consistent direction and critical oversight for the system; keep a focus on the mission; and, oversee and manage the incredibly complex and interdependent relationships that form the complicated organisms that are integrated delivery systems and other healthcare organizations.

An ineffective board actively contributes to declining organizational function, measured in terms such as financial instability, regulatory compliance problems, deteriorating relationships with the medical staff, poor relations with the community, and so on.

5

B.     Background of the AHERF Board Members

A major characteristic that directly impacts the quality of governance of any board is its composition. The AHERF board was composed of many accomplished, highly-educated, and distinguished individuals.[2] These included many high-ranking, financially sophisticated corporate executives; entrepreneurs—some in healthcare-related businesses; accomplished physicians; experts in accounting and auditing; academic leaders; and others. Many trustees also had knowledge of governance gained through their extensive service on many other boards, both not-for-profit and for-profit.

These individuals had the skills, experience, and education to effectively and efficiently govern and direct AHERF, and not function simply as caretakers. That the AHERF board failed to do these things effectively is not due to any failure of Coopers & Lybrand ("Coopers") to "expose AHERF's deteriorating financial condition . . . to the innocent, unaware, and misinformed trustees of AHERF and its affiliates." (Amended Complaint, ¶ 30.) Rather, it is due to a variety of factors that were, or should have been, under the control of the AHERF board and within its range of competence, responsibility and authority.

### III. THE TRUSTEES UNDERSTOOD, AGREED WITH, AND APPROVED MANAGEMENT'S IDS BUSINESS STRATEGY

In the early to mid 1990's, the AHERF board was fully aware of the trends in the healthcare market that were projected to negatively impact AHERF. The board was presented with information that emphasized the national healthcare trend toward managed care, and the highly competitive Philadelphia market; the board knew of these trends from written material provided to them (e.g., Ex. 724) and they discussed them at board meetings. Some trustees knew of these trends from other sources also.

---

[2] A chart listing each board member, including the board(s) and committee(s) upon which each served, is attached as Exhibit 3.

6

The board agreed with management that these trends needed to be addressed by an AHERF business strategy or AHERF would face major difficulties. The board understood and agreed with management that an integrated delivery system strategy was the way to address these trends.

A.    The Theory of Integration and Description of
       the Integrated Delivery System

Integrated delivery systems ("IDS") formed in the United States in the 1990's in response to financial pressures from both government and private purchasers of healthcare. Through reductions in payments to healthcare providers and different payment systems, the market was forcing healthcare providers to become more efficient and provide less expensive care, and to attempt to provide better value for the healthcare dollar. In response, many hospitals and hospital systems began to integrate their many and diverse clinical and operational functions, and to acquire other organizations, services, and functions to become more uniformly robust across the growing spectrum of integrated services. This often included the integration of hospitals, physicians, clinical services, information systems, inpatient and outpatient access points, governance, quality improvement, and other parts of the healthcare continuum. For some, it also included the development, acquisition, or affiliation with health insurance entities and managed care companies such as HMO's (Health Maintenance Organizations).

The theory behind integration held at this time that as health resources became more scarce and more tightly controlled, hospitals would have to integrate their services with those of other healthcare providers to use those resources more efficiently. The demand of the healthcare market for efficiency combined with the prevailing theory of the day—that integration was the best way to deal with market pressures—and resulted in hospitals and other healthcare providers around the country creating, evolving into, or affiliating with integrated delivery systems.

7

B.     The AHERF Board Approved the IDS Strategy

The board approved the adoption of the AHERF IDS strategy at the latest by 1994, during a process referred to as the Delaware Valley Planning Initiative.

Many trustees expressed understanding of both the increasingly challenging market conditions and how the IDS strategy was intended urgently to address those conditions.  For example, Mr. Robert Hernandez testified that the IDS strategy was meant "to combat all of the trends in the healthcare field which were headed towards reducing revenues, whether it be this [managed care] or, you know, lower Medicare reimbursements."  (Hernandez Dep. p. 40-41.) Similarly, Mr. Robert Palmer described the situation as "your back [is] against the wall and you are reaching out and you are trying."  Accordingly, AHERF developed the IDS strategy "trying desperately" to "combat the forces."  (Palmer Dep. p. 64-65.)  Also, Mr. Ira Gumberg testified that the consolidation effort, particularly in eastern Pennsylvania, was part of the strategic effort to be one of the survivors in the market.  (Gumberg Dep. p. 54.)  Mr. Randall Russell, Ph.D. testified "that consolidating, merging of hospitals was going on in the environment was going on all over the country, and the general theory of cost reduction through consolidation and merger of varieties of functions, from purchasing, finance, overhead, management, all of those things would help to reduce costs would certainly help to sustain the delivery of healthcare."  (Russell Dep. p. 41-42.) He further testified that the goal was to make AHERF "Integrated," meaning "you would have the hospitals, the physicians, the testing, all of the various components of healthcare integrated under one umbrella."  (Russell Dep. p. 43.)

C.     The AHERF Board Knew or Should Have Known the
       Risks of the IDS Strategy

While other health care organizations around the country were implementing IDS strategies, and while integration was the dominant paradigm of the time, the AHERF board knew or should have known that IDS was a strategy with significant risks with short term costs for anticipated long term benefits, and that it had not been proven successful in practice.  Indeed, several trustees

identified such risk at their depositions. For example, Mr. Hernandez acknowledged that there was a risk that the strategy might not work, which is the nature of business, especially where the market is changing. (Hernandez Dep. p. 48-49.) Mr. Sculley testified "to say that there were no risks I think would be not correct." (Sculley Dep. p. 46.) Moreover, some trustees knew by no later than 1995 or 1996 that IDS was not working for other healthcare systems. For example, Dr. Spielvogel testified that, for him, the "glow and the exhilaration" of IDS wore off in late 1995. Further, he knew by 1996, from attending think tank sessions in Washington D.C., that the cost savings from the IDS concept were not materializing. (Spielvogel Dep. p. 43-45.)

The AHERF IDS strategy had a particularly novel and risky aspect to it which was the combination of two Academic Medical Centers ("AMC") and medical schools. This was particularly risky for several reasons. First, AMC's were regarded as being expensive providers of hospital care due to the inherently inefficient aspects of teaching medicine, and to the combination of the unique and byzantine politics of academic medicine with those of hospital-based medical systems and practices. Second, the AHERF CEO had no academic experience, and leading an AMC was generally regarded as requiring many skill sets different from those required for leading community hospitals, regardless of their size. Third, the Philadelphia market was generally regarded as being "top heavy" with AMC's. Indeed, some trustees were concerned about the aspect of the AHERF strategy relating to the acquisition and combination of two medical schools.[3]

---

[3]For example, Dr. Donna M. Murasko, an AHERF board member since the early 1990's, stated "As a faculty member, we could not understand why there was a need to have another medical school, so it was always a mystery." (Murasko Dep. p. 50.) She further stated: "There was a subgroup of the faculty that could not understand the need to join the two medical schools" (Murasko Dep. p.51), and was concerned that there were "Numerous issues regarding faculty governance and how departments were going to be merged and the positive aspects of doing this." (Murasko Dep. p.52.)

9

D.    <u>There Is No Reason To Believe The Board Would Not<br>Have Pursued the IDS Strategy Under More<br>Challenging Financial Circumstances</u>

To the extent that trustees had concerns about the IDS strategy, the trustees did not voice such concerns.[4] Either because they saw no alternative,[5] or because of board dysfunction, no trustee voiced any objection to the IDS strategy. Even after knowing that AHERF's financial problems got worse (as described below), the board, at the April 1997 Board Retreat, reaffirmed the IDS strategy as the way to address AHERF's difficulties.

Since the trustees believed that it was precisely the present and anticipated financial threats that created the need to aggressively pursue the IDS strategy, there is no reason to believe that if the board believed that AHERF was in even worse shape financially it would not still have pursued the IDS strategy. Indeed, the reaffirmation of the IDS strategy in the face of projected further problems in April 1997 as described below indicates they may have pursued the IDS strategy even more aggressively.

## IV. THE BOARD APPROVED EACH OF AHERF'S MAJOR ACQUISITIONS DESPITE KNOWING THE ACQUIRED ENTITY WAS FINANCIALLY WEAK

The acquisitions approved by the board show that the board saw that IDS strategy as the way to deal with financially failing hospitals—not a luxury to be pursued as long as finances were healthy.

---

[4] For example, Dr. Spielvogel thought there were several risks to the IDS strategy and testified "I actually thought that I would have had a lot to say had anybody been interested in listening to it." (Spielvogel Dep. p. 70.) Nevertheless, he jumped on the IDS "bandwagon" (Spielvogel Dep. p. 38-39.)

[5] While the board knew that there was no guarantee that the IDS strategy would work, the board was committed to the strategy and was aware of no contingency plans or exit strategies in the event that the IDS strategy failed. This did not bother most of the trustees; the board had full confidence in Mr. Abdelhak's ability to make the IDS strategy work.

10

A.      United Hospitals, 1991

AHERF management told the board that without the acquisition, United would go bankrupt.
As one trustee, Mr. Henry Allyn, testified, "everybody at the table understood" that the United
Hospitals were in poor financial condition and that absent the acquisition, they would be declaring
bankruptcy in the very near future. (Allyn Dep. p. 51.) United board members were "desperate" for
an acquisition to save their institution. (Brenner Dep. p. 17.) The AHERF trustees said that they
wanted St. Christopher's Hospital for Children (a pediatric hospital) even though they knew that the
other United hospitals, the community hospitals, were in bad shape financially. Many children's
hospitals did not make money from operations, and typically relied on philanthropy and investment
return to cover operating shortfalls.[6] The AHERF trustees knew or should have known that.

Despite this, the board approved the acquisition. Reasons given for this were that it was a
prestigious children's hospital; that it provided high-quality care; that such a children's hospital fit
well into the AHERF IDS strategy of having a full continuum of care ("soup to nuts"); and, that it
would be a good place to train residents.


B.      Hahnemann University, 1993-1994

In the face of the growing market pressures described above, compounded by difficulties
associated with AMC's, the Hahnemann board concluded that Hahnemann could not survive on its
own. The AHERF board approved the acquisition of Hahnemann and its merger into the Medical
College of Pennsylvania ("MCP"). As AHERF trustee Ronald Davenport testified, "It was thought
that Hahnemann was having difficulties and that the merger of the two would be helpful."
(Davenport Dep. p. 53.) He accepted management's representations that the acquisition "will
strengthen [AHERF's] position in the Philadelphia market and strengthen the medical school."
(Davenport Dep. p. 54.)

_____

[6]Dr. Iain Black, who was Chairman of the Department of Pediatrics at St. Christopher's (and
later an AHERF board member, according to board minutes), explained at his deposition why
pediatrics "is not a high-revenue discipline in medicine." (Black Dep. p. 20-22.)

11

The faculty and administration of MCP were very concerned about how to integrate two medical schools, as it had never been done before. Many of the faculty from both MCP and Hahnemann were against it. MCP faculty thought that Hahnemann was a "lower quality" hospital (Cohen Dep. p. 58), and it was thought that "no one would go there by choice." (Miller Dep. p. 28.) Nevertheless, the AHERF board approved the acquisition.

C.    Graduate Health System, 1996-1997

The poor financial condition of Graduate Health System ("GHS"), in the form of large debt and operating losses, was known to AHERF trustees before the December 12, 1996 meeting where they approved the incorporation of GHS into AHERF. Many trustees testified that they knew of GHS's poor financial condition and discussed it with management. On August 11, 1996, the Philadelphia Inquirer reported GHS's poor financial condition in an article on the front page of the business section headlined "ABSORBING GRADUATE HEALTH ENTAILS RISK." (Ex. 579.) The article began by stating "local health care analysts" say AHERF "is about to take on a high risk case." Many trustees acknowledge that they had read this article.

The GHS financial information was sent to AHERF trustees with an August 8, 1996 letter from Mr. Abdelhak, and with a September 16, 1996 board book. (Exs. 2385, 1988.) The trustees agreed with the rationale for the GHS acquisition: that AHERF needed to grow in Philadelphia for its IDS strategy to work.

The rationale for the GHS acquisition was not that AHERF could "afford" an acquisition it did not need because AHERF was financially strong. Thus there is no reason to believe that, if the trustees thought that AHERF's financial condition was actually worse than they thought it was, they would not have approved the GHS acquisition.

The board acquiescence was so complete that even those trustees who were upset about not being consulted earlier voted for the GHS acquisition. For example, some trustees said they found out about the acquisition for the first time from the newspaper article, or otherwise were not

12

consulted and were angry about it, but later approved the acquisition when it was brought to the board.[7]

Also, some trustees who thought the GHS acquisition was a bad idea voted for it. For example, Dr. Spielvogel was "incredulous" about the acquisition and "amazed that they would take on something like this." (Spielvogel Dep. p. 82.) He said "nothing that they had so far seemed to be working correctly . . . how could they take on so much more until they had some of that fixed?" (Spielvogel Dep. p. 85.) He did not say anything at the meeting, and voted for the acquisition. And, during his testimony, Dr. Victor gave numerous reasons why he had been opposed to the GHS acquisition. He also admitted he was at the meeting where it was approved, and said nothing.[8]

There is no reason to believe that the behavior of the trustees would have been any different if they had thought that AHERF's finances in the Fall of 1996 were worse than they thought they were. In any event, by the time the AHERF board was asked to approve the GHS transaction, it had already largely taken place. AHERF had already committed publicly to the acquisition of GHS, GHS had already been acquired by a subsidiary of AHERF (SDN), and members of AHERF management had already taken over management of GHS. The board was asked only to formally authorize management to transfer GHS from SDN to AHERF. Thus, several trustees testified that by the time management informed the board of the GHS transaction, it was already a "fait accompli." (E.g., Martinelli Dep. p. 88-89; Fletcher Dep. p. 80-84; Palmer Dep. p. 103-126.) In fact, one testified that at the time he did not believe that the board could have stopped the acquisition even if it had wanted to. (Fletcher Dep. p. 84.)

---

[7]One trustee, Ms. Dorothy Brown, called Mr. Abdelhak to voice her anger at finding out about the deal in the newspaper. She said to him, "I don't know why you have a board if you are going to operate like this," and he hung up on her. (Brown Dep. p. 43.) She never thought of resigning or of firing him and later voted to approve the acquisition. (Brown Dep. p. 49.)

[8]Ms. Miller recalled that when the GHS acquisition was discussed in 1996, there was a "very high frustration level in the room" because it was "very hard to know what was going on" as a result of insufficient information. (Miller Dep. p. 51-53.) She resigned before the December 1996 vote.

13

## V. THE BOARD APPROVED THE PHYSICIAN PRACTICE ACQUISITION STRATEGY DESPITE THE COSTS AND RISKS

The acquisition of physician practices was seen by the trustees as being consistent with and in furtherance of the AHERF IDS strategy which was necessary to combat the projected market forces. The program began in late 1994 when AHERF established a separate entity, the Allegheny Integrated Health Group ("AIHG") to acquire physician practices. At that time, the AHERF board was informed that AHERF was to allocate $125 million over five years to enable AIHG to build the physician network. (Ex. 1630.)[9] The trustees further understood that it was expected that the practice acquisitions would generate short-term operating losses but long-term gains. The trustees knew that physicians could not be forced to refer patients within the system but "hoped" that they would. The program was well underway by the Fall of 1996, the earliest time which plaintiff asserts that, in its hypothetical world, additional information would have been available.

Mr. William Snyder testified that he recalled the following about the AHERF plan to develop an expansive network of providers: "Well, I recall that it was to make sure that the beds were filled in the various hospitals. It was needed to have some kind of a system whereby there'd be more ways to feed into the hospitals, and it was developed, such as buying doctors' practices and things of that nature . . . ." (W. Snyder Dep. p. 24.) One trustee, Mr. J. David Barnes, testified to the reasons AHERF was acquiring physician practices: "There were two reasons: Number one had to do with their mission as they perceive it to deliver quality medical service, and, of course, it was very much the fashion at that time to acquire these things as a technique and a vehicle to deliver

---

[9] AIHG established numerical targets for this operation. Moreover, one member of the AHERF board testified that the individual who was in charge of purchasing the physician practices was incentivized to pay more for the practices, in other words, the more that they paid the higher their commissions were. (Martinelli Dep. p. 118-119.)

14

medical service. The Pittsburgh -- University of Pittsburgh Medical Center was doing it. PAN was doing it in Philadelphia. So it was very much the very commonly accepted way to both improve your medical service delivery and, secondly, to provide patients to fill your -- provide patients for your hospitals. You know I almost used the word fad earlier, but that's inappropriate. It's still being done. It's not a thing that came and went. It's a thing that sort of came and stayed." (Barnes Dep. p. 34-35.) Mr. Barnes further testified that physician practice acquisition "was a very common business strategy." (Barnes Dep. p. 35.) Thus, the trustees recognized that their competitors were doing it also, and believed that therefore physician practice acquisition was a strategic competitive imperative. As Dr. Cohen, the Chancellor of MCP/Hahnemann, put it, there was a "race" between AHERF and University of Pennsylvania to acquire physician practices, and that it was part of the IDS strategy. (Cohen Dep. p. 104.)

Since the physician practice acquisition program (like the hospital acquisition program) was intended urgently to combat negative market trends, there is no reason to believe that additional information showing that AHERF was in worse condition than thought at the time would have caused the board to halt the program.[10]

Trustees knew that there was a risk that the plan would not work and also some trustees, particularly the physician trustees, worried that the physicians would become less productive once their practices were purchased. This was a common situation around the country at this time. When a physician's practice was acquired, that physician would often have no incentive to be as productive or work as hard as they did when they were an independent practitioner. As Dr. Cohen testified, at the time, he was worried about this issue, and it "proved to be true." (Cohen Dep. p. 59.)

---

[10]In fact, at least one trustee "realized that it [the acquisition of physician practices] wasn't helping us in late 1995." (Spielvogel Dep. p. 74-75.) He did nothing to halt the program.

15

## VI. TRUSTEES KNEW OF MAJOR
## FINANCIAL DETERIORATION AT AHERF

A.    <u>By the Fall of 1996, the Board Had
Received Information Indicating that
AHERF was in Financial Difficulty</u>

Materials provided by executive management to the AHERF board and to affiliate boards, especially the AIHG board, clearly indicated that the system was experiencing financial difficulty. For example, the Fiscal Year 1996 Audited financial statements showed a downward trend from the prior year. Many trustees testified that they were aware of and concerned about that downward financial trend in 1996 (e.g., Palmer, Hernandez, Cook, Hilton, Adam, Miller, and Spielvogel). One member of the audit committee, Mr. Cook, recalled thinking "we are going to pay the piper some time." (Cook Dep. p. 52.)

Further, at the December 2, 1996 finance committee meeting, the chairman, Mr. Barnes, said "last year [1996] was toughest year in this corporation since World War II from bottom line". Thus, Mr. Barnes and the entire AHERF finance committee were aware of the financial deterioration at AHERF.

Additionally, the AHERF board had known that accounts receivable had been a major problem for a long time.

Also, the substantial AIHG financial losses were fully disclosed in 1996. AIHG materials including the October 1996 AIHG board book showed not only large financial losses but also showed results that were much worse than projected.[11] Many AIHG trustees testified they were concerned about the losses and told Mr. Abdelhak repeatedly of these concerns. Some AIHG trustees said they were satisfied with Mr. Abdelhak's assurances that it was under control.[12]

---

[11]For example, the AIHG board book for the October 11, 1996 meeting (Ex. 1303) revealed that for the fiscal year ended June 30, 1996, there was a deficiency of revenue over expenses, non-cash items, and change in accounting principal of $40 million. There was also a net loss of $26 million.

[12]Some AIHG trustees said they had no idea whether the losses were being offset by overall AHERF gains from referrals and assumed that the AHERF board had the full financial picture. On

16

Dr. Spielvogel's testimony was particularly revealing. He was a trustee of AHERF and also the Executive Director of the clinical group practice at Allegheny University. It was his job to "attempt to coordinate the clinical activities of the full-time faculty physicians, the volunteer faculty physicians at the hospitals, and the acquired practices in the community." (Spielvogel Dep. p. 13.) He realized that the acquisition of practices "wasn't helping us" in late 1995. (Spielvogel Dep. p. 74-75.) It became obvious to him then that acquired physicians became less productive because of lack of incentives. He would go out to dinner with them and "they were working many fewer hours. Some of them were virtually joking about it"; "they'd go on semi-vacation." (Spielvogel Dep. p. 78-79.) Other trustees testified to the same effect.

Yet, despite all of these unexpected losses, and obvious indicators of the fundamental flaws in the physician practice acquisition strategy, the AIHG trustees approved the purchase of even more physician practices, and no AHERF trustee initiated any action to halt or slow down the acquisitions.

Thus, the AHERF and AIHG trustees were presented with clear and compelling financial and strategic information that identified sharply declining financial performance, results that were significantly worse than had been projected and budgeted, and fundamental flaws in the physician acquisition strategy. As a result, they had information from a variety of sources that would have stimulated a reasonably competent board to take action.

B.    Many of the Trustees had Been on the Boards of
      Financially Distressed Entities Prior to their Acquisition by AHERF

Many of the AHERF trustees had been trustees of the acquired entities prior to their acquisition. At that time, they had thought that their entity was in a weak financial position and needed a savior. They agreed to being acquired by AHERF, which they thought was that savior.

---

the other hand, at least one AHERF trustee said he relied on the AIHG board to determine whether the losses were so great that the strategy had to be reversed.

17

Following the acquisition of their organization by AHERF, they were then put on the AHERF board. Once they became members of the AHERF board, they then agreed to purchase entities that were even more financially distressed than those with which they were originally associated.

This highly questionable strategy was seen as being the way to insure AHERF's success in the face of adverse market conditions. Then, as the members of that newly-acquired, financially weak entity were put on the AHERF board, the cycle would repeat itself. By the time of the AHERF board vote for the Graduate acquisition, one-third of the trustees at the meeting were from the boards of these previously acquired entities. These trustees especially knew or should have known that this cycle of acquiring financially distressed entities by a system that was increasingly composed of financially distressed entities was creating more, not less, financial difficulty for the system.[13]

C.     In April, 1997, the AHERF Board was Informed of
         Declining Market Projections for the Next Three Years

At the Duquesne Club Board Retreat of April 1997, AHERF executive management made a presentation that included a slide show that showed projected payment rates, admission rates and other important performance and financial measures declining. Many of these visuals projected significant declines in fiscal years 1997-2000 in areas critical to hospitals and systems in general, and AHERF in particular.

In response to these trends, AHERF executive management told the AHERF trustees that continuing to push the IDS strategy would allow AHERF to grow market share in a declining market. Thus, additional physician practice acquisitions, "enhanced admissions from AIHG

---

[13]Some trustees believed that AHERF's financial condition was questionable before their entity was acquired by AHERF. For example, when the Forbes Health System board of trustees was considering affiliation with AHERF they determined, based on information also available to the AHERF board, that AHERF's financial condition was questionable. The Forbes' board's concerns were assuaged by a meeting with Mr. Abdelhak in which Coopers was not involved.

practices," the development of a Medical Services Organization, the development of "relationships" with other hospitals and medical groups, further development of the primary care network, expansion of service area through outreach efforts, and other "responses" to market projections consistent with the AHERF IDS strategy were all presented to the AHERF trustees. (Ex. 522.)

The trustees, in response, agreed with management's assessment and proposed response to continue the IDS strategy. As one trustee said it gave him a "positive feeling." (Sculley Dep. p. 39.) Many of the board members reported being reassured by this presentation.

As was shown previously in this section, the AHERF trustees had by this point in time been provided with information from multiple sources that showed significant deterioration in the financial performance and condition of AHERF. This financial deterioration occurred before the trustees were aware of the projected declines in market indicators made by management at the April 1997 retreat, and occurred in spite of the ongoing implementation of the AHERF IDS strategy. Yet, in the face of projected declining market conditions, the trustees agreed to continue the IDS strategy based on management's recommendation, even though this strategy had yet to generate positive financial results in a market environment that was identified to be significantly more favorable than the one about to emerge.

Notably, even those few trustees who developed a negative view of AHERF management as a result of AHERF's financial deterioration did not initiate corrective action. For example, Mr. Fletcher testified that he "was impressed with [Mr. Abdelhak's] credentials and his performance up until the time it appeared that things were not going according to a plan that I had not seen in detail," which he placed at "mid-'97." (Fletcher Dep. p. 122-123.) However, he never initiated corrective action of any kind.

19

D.   By the Fall of 1997, the Audit Committee and Board
     had Received Information Indicating that
     AHERF was in Serious Financial Distress

Fiscal Year 1997 draft Audited Financial Statements show significant deterioration in
AHERF's financial condition.  As one Finance Committee member, Mr. Russell said about those
statements, "no one could be happy with the results at that point in time." (Russell Dep. p. 82.)  At
the October 15, 1997 meeting at which the Audit Committee accepted the draft Fiscal Year 1997
Audited financial statements, Mr. Abdelhak informed the Audit Committee of serious business
problems.  The Audit Committee members acknowledged that there were serious business
problems.  One Audit Committee member, Mr. Bruce Thomas, was asked whether in October
1997, "were there any members of the audit committee or trustees of AHERF who did not know or
understand that AHERF was experiencing substantial and severe financial distress?"  And he
replied, "I don't believe so." (Thomas Dep. p. 95.)  Another, Mr. Cook, testified that "the numbers
were looking more and more unhealthy" at each Audit Committee meeting.  (Cook Dep. p. 110.)

Furthermore, the Fiscal Year 1997 management comment letter provided by Coopers to the
Audit Committee contains stark warnings of problems facing AHERF.   (Ex. 2102.)  It warns that
"next year will be a critical year".

It warns that the "organization must begin to realize operational efficiencies as well as
revenue enhancements from the affiliations that it has consummated in the past two years, in
addition to the extensive physician network that has been assembled".  It warns that "medical
management processes will need to be enhanced as AHERF has potentially assumed significant risk
through the full risk contracts with HealthAmerica and U.S. Healthcare."  It warns that
"enhancements must continue to be made to the revenue and billing systems to improve the
timeliness of cash collections in order for adequate amounts of cash to be available to fund
operations, capital, and debt obligations."  It warns about accounts receivable issues.

Several trustees with sophisticated business backgrounds have described this management
comment letter from Coopers as strongly worded.  Mr. Palmer, a trustee who had over 30 years

20

experience in the banking industry (including as president and CEO of Philadelphia National Bank), wrote the words "clear warning" on his copy of the letter. (Palmer Dep. p. 185.) At his deposition, he testified that the letter was "particularly strongly worded." (Palmer Dep. p. 186.)

Here was a specific example of what plaintiff asserts Coopers should have done: "expose AHERF's deteriorating financial condition . . . ." (Amended Complaint, ¶ 30.) Yet, in response to this "clear warning" from Coopers, which several trustees explicitly perceived as such, neither the Audit Committee members nor any of the other trustees initiated any corrective action. Thus, it is unreasonable to believe that the board would have initiated any action in response to additional information from Coopers, at this time or one year earlier. My opinion on this matter is further supported by the fact that at the March 11, 1998 meeting of the Audit Committee, Mr. Buettner of Coopers delivered a report containing very important warnings, telling the committee that AHERF "must" do a variety of things to improve its situation. (CL 103308-312.) Apparently, his warnings were not heeded, because he had to deliver another report with warnings at the Audit Committee meeting held on June 12, 1998. (Ex. 4481.) It is clear from the second report that the committee had taken little, if any, of his advice in the three months between the meetings.

E.    AIHG Financial Results Continued to Deteriorate

The October 1997 AIHG board book shows continued losses that were significantly worse than budgeted.[14] At least one AIHG trustee, Mr. Fletcher, was not totally confident in management's ability to "improve things" when he saw the October 1997 AIHG results. (Fletcher Dep. p. 78.) Yet the trustees took no action.

---

[14]Specifically, that book (Ex. 1302) revealed for the fiscal year ended June 30, 1997 a deficiency of revenue over expenses and non-cash/extraordinary items of more than $61 million. It also showed a deficiency for the next three month period of an additional $16 million.

F.    AHERF Financial Results Continued to Deteriorate

At the October 30, 1997 meetings of the Finance Committee and of the full AHERF board (just 15 days after the Audit Committee meeting) the board learned that AHERF had lost $42 million dollars in the first quarter of Fiscal Year 1998. That loss was more than 400% ($33 million) worse than budgeted. Mr. Abdelhak also informed the full board of the serious business problems. The chairman of the AHERF board testified that these results were "very poor" and the situation was "drastic." (W. Snyder Dep. p. 134-135.) Projected over the course of an entire year, it represents a $168 million loss. Such a loss would be greater than the $108 million net loss set forth in Mr. Berliner's "corrected" Fiscal Year 1996 financial statements, or the $134 million net loss set forth in his "corrected" Fiscal Year 1997 financial statements.

Mr. Barnes, who was chairman of both the AHERF Finance Committee and Audit Committee, testified that the results were a "massive storm warning signal." (Barnes Dep. p. 205-207.) Many other financially sophisticated trustees testified similarly and said they knew aggressive action had to be taken. Trustees who could not recall seeing the First Quarter 1998 results testified that if they had seen them they would have been concerned. For example, Dr. Murasko said that just looking at them would create in her mind a serious concern as to whether AHERF could survive on its current course. Moreover, Dr. Spielvogel testified that it made sense for the trustees to focus on the First Quarter 1998 results, rather than on the Fiscal Year 1997 draft audited results (which were available at the same time) because they were the results for a more recent period.[15]

_____

[15]In addition, some trustees knew about an AHERF cash crunch through other sources. Mr. Cook, a member of the Audit Committee, was told by an owner of the company that provided both sprinklers and sprinkler maintenance for fire protection to the AHERF facilities that AHERF was behind in its payments. Mr. Cook was also aware that the credit cards issued by some AHERF facilities to their employees were being rejected. (Cook Dep. p. 304-308.) Here is a situation where a member of both the AHERF board and Audit Committee becomes aware of financial problems with the system that are so significant that they may threaten the basic life-safety capacity of the facilities of the system (fire protection), and yet no action is initiated by him, by the Audit Committee, or the board as a result.

Mr. Brenner, a trustee who was also a member of the Audit Committee at the time, called it "scramble stage" (Brenner Dep. p. 105-109.) As for Dr. Spielvogel, he testified that by mid-October 1997 he thought AHERF had "severe financial problems" and "I thought that things were going to begin to crash." (Spielvogel Dep. p.101.)

## VII. DESPITE KNOWLEDGE OF FINANCIAL AND BUSINESS PROBLEMS AT AHERF, THE BOARD FAILED TO INITIATE MEANINGFUL ACTION

As was shown in the preceding section, the AHERF trustees had received information about AHERF's financial deterioration from multiple sources. Yet, in the face of this overwhelming cascade of negative information about the finances, strategy, and overall performance of the system and of its executive management, the board did not initiate any corrective action, or even critically challenge management. This consistent pattern of board inaction is striking. There is no reason to believe that additional information from Coopers showing that AHERF's financial condition was worse than the board thought it was would have caused the board to initiate such action, either in the Fall of 1997 or in the Fall of 1996.

Significantly, the board's reaction in the Fall of 1997 to the dramatic losses incurred in the first quarter of AHERF's fiscal year 1998 was to simply agree with management's restructuring actions, particularly the layoffs of 6% of the workforce (1,200 employees). The board did not initiate any action of its own. This was true even in the face of the recognition of how drastic the restructuring was. Trustee notes and an October 1997 newspaper article refer to the layoffs as the "Columbus Day Massacre" or the "October Massacre." (Ex. 1776; Ex. 2522; Ex. 2560; Murasko Dep. p. 131-132.)

In that article, Mr. Abdelhak is quoted as saying he was forced to take drastic action by shortfalls in revenue and government cutbacks. He is also reported to have said that despite painful retrenchment he expects no change in AHERF's strategy. He is reported to have said that the future for AHERF and its competitors in Philadelphia is "scary." (Ex. 1776; Ex. 2560.) Other trustees

23

agreed that the layoffs were drastic but appropriate.[16]  Most trustees had confidence in management's ability to "right the ship."  For example, Ms. Dorothy Brown testified she thought that in light of the significant losses, aggressive action was needed and management was doing all it could do to right the ship.  She had full confidence in Mr. Abdelhak's ability to right the ship. (Brown Dep. p. 111.)  Others testified similarly.  No one initiated any action of their own, or even discussed doing so.

Some trustees did not have total confidence that the layoffs were enough to get AHERF out of deep trouble (for example, Mr. Martinelli) and yet they still did not initiate any alternative action.

### VIII. AT ALL TIMES THE BOARD SUPPORTED MANAGEMENT, INCLUDING MR. ABDELHAK

Throughout the time that the IDS strategy was implemented, despite the deteriorating financial condition, the trustees had full confidence in management, particularly Mr. Abdelhak. Many of the trustees said they thought he was a visionary.  The AHERF board itself never initiated any action against Mr. Abdelhak.

A.     Prior to June 1998, Mr. Abdelhak was Never Terminated

Before June 1998, Mr. Abdelhak was never terminated by the AHERF board or Executive committee despite, among other things:

  1.     The deteriorating financial condition described above which was well known to the trustees.

  2.     Some trustees or Audit Committee members had concerns about his honesty and integrity.[17]

---

[16]For example, W. Snyder Dep. p. 122-128; Gumberg Dep. p. 193-194; Atkinson Dep. p. 90-91, 145-146; Fletcher Dep. p. 105-106; Palmer Dep. p. 137-144.

[17]For example, Miller Dep.  p. 17; Atkinson Dep. p. 102-103; Cook Dep. p. 308-313.

24

3.    Mr. Abdelhak hung up the phone on a trustee when she said to him, "I don't know why you have a board if you are going to operate like this." (Brown Dep. p. 43).[18]

4.    Several trustees testified he was not open to other people's suggestions.[19]

5.    One trustee testified he thought as far back as 1994 and 1995 that Mr. Abdelhak and Mr. McConnell were an "unholy alliance" and that Mr. McConnell was Mr. Abdelhak's "stooge."

The fact that the AHERF board did not initiate any action in response to these events is remarkable. At a minimum, a reasonable board would have counseled such a CEO, or reprimanded him, or changed his performance objectives to emphasize the operational results and personal behavior they wanted to see, or terminated his employment. Consistent with their pattern of inaction and acquiescence, several trustees testified that while they were on the board, they thought Mr. Abdelhak would have been difficult to replace.

B.    Mr. McConnnell Also Was Not Terminated, Despite Concerns About His Credibility

Despite concerns about AHERF's CFO, Mr. McConnell, harbored by several trustees, the board never took corrective action. For example, Mr. Genge testified that while he was on the AHERF board he increasingly believed that Mr. McConnell "just did what Sherif [Abdelhak] told him to" and was Mr. Abdelhak's "henchman." (Genge Dep. p. 154-155.) He believed they were "an unholy alliance." (Genge Dep. p. 154.) In addition, Mr. Brenner testified: "I had some serious

[18]Such behavior on the part of a CEO to one of the members of the board that is his boss is highly unusual. That the trustee and the board did not take any action at all in response to this inappropriate behavior is truly remarkable.

[19]In fact, one trustee, Dr. Victor, testified that Mr. Abdelhak was "a totalitarian leader," and he and other physicians thought that Mr. Abdelhak should be fired. (Victor Dep. p. 80-81, 95-96.) Yet he did nothing about it. Similarly, Mr. Allyn testified that by 1997, he had "a very deep suspicion that Sherif ruled with an iron fist" and he "really came to feel that the organization would be better under someone else who had more humanistic relations with his subordinates." (Allyn Dep. p. 82.) And yet, he did nothing to correct the situation.

25

questions as to the accuracy of all of the financial dealings that were being suggested in connection with some of the transactions. I say that recognizing that I am not an accountant. I have already admitted to not being the guru in the area of the financial world, but I do listen and I do try and pay attention and I was somewhat mystified by some of the suggestions of how some of these transactions, particularly the latter ones, maybe Graduate as much as any, were to come into being." (Brenner Dep. p. 117.) Also, Mr. Allyn described his frustration with Mr. McConnell: "I a couple times spoke to Dave and I said, look, we want you to go over these figures and tell us the exceptions, tell us the unusual points, good or bad, whatever they are, and talk slower, and he never did. I spoke to him about it twice. Now, in my book, he did what his boss told him to do." (Allyn Dep. p. 90.) Dr. Black testified about Mr. McConnell: "something bothered me about his presentations . . . I just wasn't sure I accepted everything that was said." (Black Dep. p. 74-75.) He also said that McConnell "is a very outgoing, affable person to whom everything, everything in the garden seemed roses and its not. You know it's not." (Black Dep. p. 101.)


C.     Mr. Abdelhak's Termination Was Not Initiated
       By the Board of Trustees

When Mr. Abdelhak's employment as CEO of AHERF finally was terminated in June of 1998, the termination was carried out by the AHERF Executive Committee, not by the AHERF board. The full AHERF board, those members who were not on the Executive Committee, was not consulted. Further, the termination was not even initiated by the Executive Committee.

Mr. Abdelhak's termination came about solely because Dr. Richard Shannon and other physicians at AGH went to Mr. Synder, the chairman of the board, and demanded Mr. Abdelhak's removal. Dr. Shannon mentions the growing financial crisis in the East as a reason for his growing loss of confidence but testified that the "events of upstreaming the Forbes and Allegheny Valley moneys to pay the Mellon Note are what convinced me that Mr. Abdelhak no longer held the confidence of myself and other members of the medical staff to run it." (Shannon Dep. p. 97-98.)

26

Mr. Synder understood that if Mr. Abdelhak was not terminated, Dr. Shannon and other prominent physicians would leave the system, and they would "take as many others with them as they could." (W. Snyder Dep. p. 148.) That had nothing to do with information Coopers allegedly should have provided to the board at earlier times. The decision to terminate Mr. Abdelhak was made by Mr. Synder. There is no reason to believe that any of this would have occurred earlier in the hypothetical situation the plaintiff alleges. That is well demonstrated by the fact that even given the known financial condition of AHERF in June 1998 the full board did not act to terminate Mr. Abdelhak or take any other alternative action.[20]

## IX. AHERF'S GOVERNANCE STRUCTURE WAS DYSFUNCTIONAL

In my opinion the AHERF board was generally and remarkably incapable of initiating any meaningful action at all times, which helps explain the fact that it never actually took any. There is no reason to believe that any additional information from Coopers would have caused the board to initiate meaningful action, given the severity of its negative general governance characteristics.

A.    The Board Was Dominated by Mr. Abdelhak

The board and the entire governance process was dominated by Mr. Abdelhak so the board could not and did not act. It is clear from the testimony that the trustees knew this. For example, one trustee, Dr. Victor, testified that Mr. Abdelhak was "a totalitarian leader" who was "very, very, very dictatorial and enjoyed ruling by fear" and that there "was really sort of a fascist government at the time." (Victor Dep. p. 80, 95-96.)[21] Even though he testified that he and other physicians

---

[20]There is certainly no reason to believe that Dr. Shannon would have been the catalyst for change in the hypothetical situation that plaintiff alleges: he did not join the AGH board until 1997, and was not even on the AHERF board in 1996 or 1997, and never saw the draft Fiscal Year 1997 audited financials (or the first quarter 1998 financials) before. Thus, there is certainly no reason to believe that if the Fiscal Year 1996 or draft Fiscal Year 1997 results were worse he would have done anything different.

[21]Dr. Victor further stated, "I think that Mr. Abdelhak never, ever solicited approval, enjoined

27

thought that Mr. Abdelhak should be fired, he did nothing about it. Mr. Genge testified that at the time he was on the board, he did not think that Mr. Abdelhak was really open to suggestions from members of the board or others within management. Rather, "he did his own thing." (Genge Dep. p. 158.)

Mr. Abdelhak's dominance of the board is further evidenced by the fact that the board acquiesced in Mr. Abdelhak's making major decisions with little or no prior consultation with the board. Following are examples of this dominance:

1.    The board approved the Hahnemann acquisition based on scanty materials.

2.    The board was not consulted before management embarked on the Graduate acquisition. Many of the board members read about the acquisition in the newspaper. Some thought the acquisition was a bad idea, or did not understand it. Despite this, and despite Abdelhak hanging up the phone on a trustee, the board then approved the acquisition.

3.    The board learned after the fact of the $40 million PGMA/HealthAmerica transactions (which also entailed potential future liability on the risk contracts). (JD-SA-0004069.)

4.    Another trustee, Mr. Martinelli, said that it was easily observable to him that Mr. Synder "let Sherif kind of run the show." But he was not concerned about it because he thought "a strong chief executive is a good thing because he's the one who spends his full time doing what he's supposed to be doing." (Martinelli Dep. p. 56, 59). He also said that he did not need to debate things with Mr. Abdelhak because "ultimately, the responsibility

---

[sic] conversation, sought out democratic process of governance." When asked whether Dr. Victor, a trustee, discussed these views with other trustees, he said: "You wouldn't dare speak." He explained: "And maybe I should have, but I never really saw my role truly as being a steerer of this ship. I was kind of rowing." (Victor Dep. p. 95-96.)

was his [Abdelhak's]." (Martinelli Dep. p. 128.)[22]

5.     As Ms. Miller testified, Abdelhak "had the ability I think to lull a lot of people into a false sense of security" and there were also "a certain number of sycophants" on the board.   (Miller Dep. p. 30.)  As another trustee, Dr. Victor, testified Mr. Abdelhak would  say it is "a sunny day and everybody would look outside and say its a sunny day." (Victor Dep. p. 23.)

6.     Dr. Spielvogel, a faculty board member, had a meeting with  Mr. Abdelhak in late 1995/early 1996 where he told Mr. Abdelhak that faculty members would constantly come up to him and talk about the board and ask "would I bring up this or would I do that. They had no realization that these board meetings were sort of choreographed and sort of dominated with some votes and very little opportunity, always rushed . . . and that I really didn't have any effect.  They thought they would bring their problems to me thinking that I could do something about them or have some influence to do something about them."  He asked Mr. Abdelhak if he could be on a committee, and Mr. Abdelhak said he understood and he would get back to him:  he never did.  Dr. Spielvogel never raised the issue again (Spielvogel Dep. p. 45-47, 51.)

7.     The board did nothing to assert control of AHERF, despite this failure to consult, and despite the fact that trustees believed that Abdelhak was "a dominant CEO, to the extreme" (Daniel Dep. p. 143), was "very, very, very dictatorial" (Victor Dep. p. 95) and that Mr. Abdelhak was "extraordinarily condescending" (Shannon Dep. p. 75) and not open to the suggestions of others.  (Hernandez Dep. p. 131.)  Simply put, Mr. Abdelhak

---

[22]This is a very significant statement for several reasons.  First, it is universally accepted that it is the **board** and not management that bears the ultimate responsibility for the healthcare system or hospital. Second, many trustees themselves stated that the primary function of the AHERF board was to oversee management and perform system oversight.  So, in his comment, Mr. Martinelli demonstrated the abdication of the AHERF board from its fiduciary duty and from its self-defined primary role or management oversight.

"dominated most of the meetings." (Victor Dep. p. 22). I saw this behavior myself when, as a governance and quality consultant, I conducted a retreat for the Delaware Valley Board of AHERF on March 20, 1997 in Philadelphia. I recall thinking at the conclusion of that retreat that this was the first time I had ever encountered a board that was so enthralled and intimidated by, and even afraid of, its CEO.

8.     The Compensation Committee approved lavish compensation for Mr. Abdelhak and other senior executives, even as the financial condition of AHERF deteriorated.

Nor was the Audit Committee any more dynamic. In fact, Richard Daniel testified that he was removed from that committee because he had asked too many questions. (Daniel Dep. p. 145.) Mr. Daniel had managed the problem loan department at both Security Pacific National Bank and Crocker Bank, where he "got very involved with a lot of companies that were in trouble." (Daniel Dep. p. 7-8, 18-19.) Instead of embracing Mr. Daniel's talents and expertise in turning around companies, the reaction of AHERF and the other trustees to his questioning was to remove him from the Audit Committee.


B.     The Board's Governance Structure Was Broken so the Board Was
       Significantly Inhibited From Taking Action

The AHERF governance structure was dysfunctional. Following are brief analyses of several of the structural problems with AHERF governance.

1.     The board chairman. The function of every board is dramatically affected by the quality of the chair. A superb chairperson does not guarantee good governance, but a poor one always prevents it. The chairman of the AHERF board and Executive Committee was Mr. Snyder, who inherited the position from his father and grandfather. There was no discussion of the continuation of Mr. Snyder's tenure, no term limits for the position, and no succession plan. There was no job description for the position of chairman. There was no training for the position, nor any

30

meaningful performance evaluation of Mr. Snyder during his tenure as chairman. As one trustee, Ms. Miller, said, Mr. Synder, the chairman of the board, was "totally ineffective" and Mr. Abdelhak's "puppet." This was evident to her "from the very beginning" by just looking at them. (Miller Dep. p. 60.)

　　　2.　　　New board member orientation. There was no orientation provided for new board members. A new board member orientation program is important as effective boards require effective board members. The more quickly a board brings its new members up to speed, and informs them of what is expected of them, the more effectively and efficiently it can build a cohesive and functional governance team. The best mechanism for doing this is a meaningful, systematic, and mandatory new board member orientation program. The AHERF board did not have such a program, or even a cursory one.[23] The lack of a new board orientation program, and the negative governance culture it perpetuated, significantly contributed to the inability of the AHERF board or of its members to initiate any meaningful action.

　　　3.　　　The large number of boards and committees. AHERF had a complicated, multi-tiered governance structure, with numerous affiliate boards and committees which hindered effective governance. As one trustee, Dr. Victor, succinctly put it, the number of boards was "bewildering" and there "were more boards than a house built of boards." (Victor Dep. p. 18.)

　　　The AHERF Committee on Trustees, with the apparent purpose of assessing and improving the structure and function of AHERF governance, was itself challenged in its attempts to understand, let alone control, the complexity of the AHERF governance structure. At its November 19, 1996 meeting, the Committee on Trustees requested of management that they be provided with a list of all current trustees and the Boards on which they serve. (Ex. 2416.) Thus, the committee that was putatively in charge of enhancing the effectiveness and efficiency of the

---

[23]Tellingly, when asked what he considered his role as AHERF trustee to be when he served on the board, Dr. Mark Victor said: "It was never really defined. I mean, you never had like a prep course in how to be a board member, which, you know, in retrospect, I think it would be a nice thing for organizations to teach people what they're expected to do." (Victor Dep. p. 19.)

AHERF governance system did not itself understand the basic structural components of the
AHERF governance system: how many board members there were in the AHERF system, or on
which boards they served; and it is highly probable that they also did not know how many boards or
board committees there were in the AHERF system, let alone the more critical issue of the relative
role and functions of these many governance entities.[24]

4.     The AHERF board had no strategic planning committee. It is significant that with
the excessive number of the boards and board committees in the AHERF system, there was no
AHERF board strategic planning committee even though there was a board committee for every
other core governance function (finance, audit, executive, compensation, trustees).

By comparison, in 1997 68% of system boards had a strategic planning committee, while
66% had an audit committee (American Hospital Association "1997 Hospital and Health System
Governance Survey: Shining Light on Your Board's Passage to the Future - Revised Edition," p.
38). I note that at least one of the entities AHERF acquired, Forbes Health System, had had a task
force to create a strategic financial plan (consisting of both trustees and management) prior to its
acquisition. (Fletcher Dep. p. 47-48.) The lack of a strategic planning committee meant that the
AHERF board had to oversee system strategy as a "committee of the whole," or during full board
meetings. However, as discussed in the following sections, the size of the board, the short duration
of the board meetings, the scripted nature of the meetings, all combined to make AHERF board
understanding and oversight of AHERF system strategy incomplete and ineffective. This rendered
the AHERF board incapable of initiating any meaningful action.

_____

[24]In addition, some committee members were not even arguably interested in, or equipped to
perform, their nominal duties. For example, Mr. Brenner was asked to list his interests and he
listed "children" and "law." Somehow, however, he was appointed to the Audit Committee. He
only recalls attending one meeting, and that was telephonically. (Brenner Dep. p. 21-22.) Joseph
Little testified that he "didn't quite understand a lot of the financial information" at the Finance
Committee meetings and he asked several times if he could be replaced. The answer he received
back was: "I'll look into it and let you know." (Little Dep. p. 22-23.) He was, in fact, never
replaced.

32

C.     AHERF Suffered From Representational Governance

When a board, such as AHERF's, is composed of members who were explicitly or implicitly chosen, or who believe it is their role, to "represent" the interests of specific subsidiary or acquired organizations, or of various internal constituents of the system, this gives rise to representational governance.

Representational governance means that some or all of the members of a board do not consistently focus on the best interests of the system or organization as a whole, but rather focus on the best interests of the component parts or specific constituencies of the system that they believe they "represent." Representational governance is the antithesis of integration and is a significant inhibitor of effective governance. This view is shared by many observers, consultants, and academics in the field of healthcare governance. In fact, governance consultants almost uniformly counsel against representational governance.

Several AHERF trustees or committee members saw themselves as representing only interests of specific subsidiary entities.[25] Others saw themselves as representing academic or research issues. Indeed the different iterations of the AHERF bylaws required to varying degrees that the AHERF board be representationally composed from its acquired components. Thus, the AHERF board was marked by structural representational governance ("slots" on the AHERF board for members of acquired or component organizations mandated in the AHERF bylaws).

There is also evidence of functional representational governance, meaning that trustees represent the interests of outside business entities while on the AHERF board. For example, an interoffice Mellon Bank memo (Ex. 2383) that was an account plan for Mellon Bank's relationship with AHERF, listed as part of its "Relationship Team Objectives and Action Plan": "Pursue Board membership by Mellon to enhance senior management interaction." It further listed as "Status/Results": "Completed Barnes/Gumberg on AHERF Board"; "Adam, Chairman of

---

[25]For example, Brenner Dep. p. 28-29; Cook Dep. p. 12-13; Ebert Dep. p. 19-20; Sculley Dep. p. 13.

33

Allegheny-Singer, Director of AGH"; "Cahouet is on AGH board."

Mr. Thomas O'Brien joined the AHERF board when he was the CEO and Chairman of PNC Financial Services. PNC had a broad business relationship with AHERF, and Mr. O'Brien testified as to the question of whether the fact that PNC had a business relationship with AHERF entered into his mind as a factor in joining the AHERF board: "In a modest way," although he contended that this was not the primary reason for doing it. (O'Brien Dep. p.15.)

The reasons that certain individuals joined the AHERF board raise the question of their ability to be loyal as board members to AHERF. One example powerfully illustrates the issue of divided loyalties where an AHERF board member's corporation has a substantial business relationship with AHERF. In November 1995, AHERF's CFO sent a memo to board members with information about Delaware Valley Obligated Group debt restructuring. (Ex. 2397.) The memo says that the information is not public until November 15. Nevertheless, Mr. Cahouet, then President and CEO of Mellon Bank, sent a copy to the head of the capital markets department at Mellon Bank one day prior to that date as a "heads up" that there would be a refinancing, something for which Mellon could compete. (Cahouet Dep. p.127-133.) The duty of loyalty requires that individual board members must place the interest of the corporation that they help govern above all self-interest.

These representational perspectives on the part of the AHERF trustees contributed to dysfunctional AHERF governance. A system board, such as AHERF, largely selected from the representative components of its subsidiary or acquired organizations, will not necessarily function as a representational board unless its members have a mission focus, understand the strategy of the system, are trained in systems thinking, and are oriented and educated as to the role and function of the system board. Unfortunately, the AHERF board did not have a mission focus, did not have a shared view of the strategy of the system, was not trained in systems thinking, and did not participate in any meaningful or systematic new board member orientation program or ongoing, integrated governance education and board development training.

34

It is highly probable that the representational aspects of AHERF governance would have inhibited the ability of the board to initiate meaningful action, regardless of any information they would have been given. This is because the board members, even if they were considering the initiation of meaningful action, would likely first consider the implications of any proposed actions on the organizations and constituents that they believed they represented. Representational governance would have two possible effects. First, no meaningful action would be agreed upon unless it was not detrimental (and preferably was beneficial) to any of the organizations or constituencies represented on the board. Second, it would have taken an inordinate amount of time for the board to decide on what meaningful action to take and how to implement it due to the consideration given to the best interests of the organizations or constituencies that the board members believed they were representing. Many healthcare organization boards have been affected in these ways due to representational governance.

D.      The Large Size of the AHERF Board Significantly
        Hindered Effective Governance

The large size of the AHERF board was a significant structural impediment to effective governance, as were the many non-board members who regularly attended AHERF board meetings. Board size is a fundamental and critical structural characteristic that has a significant impact on all aspects of governance functioning.

According to the AHERF bylaws, in December 1991, the allowable range of the size of the AHERF board was "not less than ten (10) nor more than twenty-two (22) persons . . ." (Amended and Restated Bylaws of Allegheny Health, Education and Research Foundation, December 1991.) At its December 17, 1993 meeting, the AHERF board approved a resolution to amend the bylaws to increase the maximum number of board members to 35.[26]

_____

[26]For comparative purposes, a national survey showed that in 1997, 72% of healthcare system boards had 20 or fewer members (26% had fewer than 12 members; 21% had 12 - 14 members; 25% had 15 - 20 members), and 28% had 21 or more members). (AHA/Ernst & Young, p.38.) An

35

Boards of large size (over 20 members) are often seen as a holdover from earlier days when the primary purpose of hospital governance was philanthropy—the giving and/or raising of funds. If this was the primary purpose of a board, then a very large board was clearly desirable as more people could raise more money. Certainly by the late 1980's, the recognition was almost universal that the central obligation of hospital and system boards was effective governance, and not fundraising. With this growing recognition came a general reduction in the size of hospital and healthcare boards throughout the United States. For example, tracing changes in not-for-profit hospital board size (no national healthcare system board size data exists prior to 1997 to allow longitudinal comparisons) from national surveys reveals the following: in 1985, average hospital board size was 18.13; in 1989, it was 16.85; and by 1997, it had declined to 13.2 (American Hospital Association/HRET The Changing Character of Hospital Governance, 1990, p. 4; American Hospital Association and Ernst & Young, p. 10). However, as most not-for-profit healthcare boards around the country were reducing their size, the AHERF board was increasing its size.[27]

Large boards create several significant impediments to effective governance. For example, they are too unwieldy to be effective as they are much more cumbersome deliberative and decision-making bodies than are smaller boards. Also, very large boards, such as the AHERF board, perforce reduce the involvement of individual board members in board meeting participation and therefore in overall governance. This in turn reduces the commitment of the individual board

earlier study conducted in 1995 found that "the typical system board is composed of 13 members." (Governance Institute: Governance Trends and Practices in Health Systems: 1995 Panel Survey of System Boards, p. 2.)

[27] Apparently, at least one AHERF trustee still embraced the old fundraising-based model. Mr. Martinelli testified: "When you serve on a board, you're intended to -- you know, you don't take those jobs because of your business acumen. You take the job because you can help them out. And, in fact, that's what I did at Hahnemann, gave them a lot of money." (Martinelli Dep. p. 50-51.) He added a concern with respect to large boards: "the trouble you have as a practical matter, when you have a board that large, it's quite difficult to kind of function the way you'd like to." (Martinelli Dep. p. 50.)

member and minimizes—if not precludes—their, and the board's, ability to initiate meaningful action or to critically question management.

These impediments were clearly present in AHERF governance. As one trustee, Mr. Sunstein, wrote in a trustee evaluation form: "I find that there are so many people at the meetings it is hard to be constructive." (Ex. 2566.) Mr. Snyder, the chairman of the AHERF board, testified in response to the question did he think there were too many board members: "Too many. Too many, yes." (W. Snyder Dep. p. 163.) Mr. Snyder further testified to the impact the size of the board had on board meetings: "Well, I felt it made the board unwieldy, and we had so many people that we hardly had enough chairs, and I didn't think it was necessary to have all those people." (W. Snyder Dep. p. 163.) The fact that the **chairman** of the board would have these views and do nothing about them is striking evidence of board dysfunction.

The structural dysfunction created by the large size of the AHERF board is even more apparent when the total number of individuals present at AHERF board meetings is examined. Attached as Exhibit 4 is a listing of the numbers of people present at AHERF board meetings (for the period between December 20, 1991 and July 20, 1998), for which minutes are available. The information presented in Exhibit 4 is from an analysis of the AHERF board meeting minutes, tallying the numbers of "members present" plus "appointed officers and invited guests," and later simply "members present" and "other invitees."

The range of the total number of people present in the room during the 27 AHERF board meetings listed in Exhibit 4 is a low of 23 to a high of 59. The average number of people present during these board meetings was 33.5. Of the 28 board meetings listed, the number of management present exceeded or equaled the number of non-management board members present 7 times (exceeded 6 times, equaled 1 time), or 25% of the time.

The table can also be analyzed in terms of how many non-board members were present during board meetings and their impact on board function. The analysis begins by taking the column labeled "Appointed Officers and Invited Guests," and subtracting one from each number

37

listed there for each board meeting to count Mr. Abdelhak as a board member and to gain the number of non-board members present. The total number of these non-board members present at these 28 meetings was 402, which yields an average number of non-board members present at each board meeting of 14.35.[28]

The general rule of who should be present at board meetings is "those attending should be primarily, if not exclusively, board members." (Orlikoff and Totten "How to Run Effective Board Meetings," Trustee, April, 2001.) There are numerous problems with having many non-board members present during board meetings, as AHERF did, which significantly inhibit effective governance.[29]

In fact, measuring the rate at which AHERF board members were absent from the board meetings is instructive. Starting with the board meeting of December 17, 1993 (where the AHERF board approved a resolution to amend the bylaws to increase the maximum number of board members to 35) and extending to the board meeting of June 1, 1998 (the last meeting where Mr. Abdelhak attended), there were a total of 17 board meetings where minutes are available (the minutes of the May 12, 1998 meeting are missing). For these 17 board meetings, a total of 207 board members were absent. Thus, the average number of board members absent per meeting was 12.2. Assuming that the total number of AHERF trustees during this period was the maximum of 35 allowed by the bylaws, that means that on average 34.8% of board members were absent from

---

[28] A 1995 survey of system boards revealed that system boards have an average of 6 non-members that regularly attend their meetings, with a range of 1 to 22. (The Governance Institute, 1995 p.19.) Thus, the average number of non-board members who regularly attended AHERF board meetings (14.35) was more than twice as high as the national average of system boards in 1995 (6), and was at the high-end of the national range.

[29] These problems include: inhibiting free discussion and deliberation; preventing the board from developing into a cohesive leadership team; making it unclear, especially to new board members, who is a board member and who is not; lessening the peer pressure on board members to fully review and understand board agenda materials prior to attending board meetings; minimizing or obviating the need to participate during board meetings; and, lessening the importance of regular attendance at board meetings.

board meetings. On two occasions, the December 6, 1994 and the December 15, 1995 AHERF board meetings, there were 17 board members absent, or 48.6% of the total number of board members.[30]

Clearly the large size of the AHERF board, combined with the large number of non-board members in attendance and the relative short duration of the meetings, contributed to such a high board meeting absentee rate. This 34.8% average absentee rate further indicates AHERF board member disenfranchisement and lack of engagement in the active governance of AHERF. In addition, in some cases trustees did not believe they were even board members.

The AHERF board, due to all of the aforementioned significant structural limitations, was incapable of initiating meaningful action regardless of the information with which it was presented. Further, the members of the AHERF board, due to all of these structural limitations, were precluded from initiating any meaningful action on their own or from stimulating the board to do so.

It is interesting to note that it was only after the AHERF bankruptcy that the board amended the AHERF bylaws to reduce the size of the AHERF board to "not less than three (3) nor more than nine (9)." (Minutes of the November 6, 1998 AHERF Board meeting.) Further, during this time the number of non-board members attending board meetings also significantly declined.

As the Compensation Committee looked to the for-profit corporate world for comparisons to justify its compensation of Mr. Abdelhak, it is interesting to note that the average size of a Fortune 500 company board in 1990 was 14, and that by 1994 it had declined to 12. (Governance Committee The Rising Tide: Emergence of a New Competitive Standard in Health Care 1996.)

The large size of the board, compounded by the large numbers of non-board members present in the room, made it virtually impossible for the AHERF board meetings to engender

---

[30]A 1995 survey of system boards revealed that on average 15% of system board members were absent from any given meeting. (The Governance Institute, 1995 p. 18.) That survey also showed that the percentage of system board members absent from system board meetings ranged from 0% to 35%. (The Governance Institute, p.18.) Thus, the 34.8% average AHERF board member absentee rate was more than twice the national average system board member absentee rate, and was at the very top of the range.

39

meaningful discussion, or in fact any real discussion at all.  Further, many of these meetings were

held by videoconference, and with board members attending "by phone" or "via telephone

conference" (AHERF Board Meeting Minutes), which further hindered effective discussion, critical

questioning by board members, and allowed for scripted, controlled meetings.[31]


E.     The Duration of AHERF Board Meetings was Typically
       Too Short to Facilitate Effective Governance

       In addition to the significant structural problems with the AHERF board meetings discussed

above, the board meetings were typically too short to accommodate effective board discussion and

oversight.[32]  There would typically be lunch, a medical speaker, and then only thirty to sixty

minutes for the business of the meeting.  As for that business, Dr. Spielvogel testified that "there

were 15 or 20 motions, most of them perfunctory, just approving things that were already done that

had to legally be approved by the board for some rule or bylaws or something like that."

(Spielvogel Dep. p. 55-56.)

       The length of Allegheny Health Services and AHERF board meetings ranged from a low of

25 minutes (November 6, 1989 meeting) to a high of 250 minutes, or 4 hours and 10 minutes (June

28, 1991 meeting).  The average length of board meetings where meeting length could be

_____

[31]Mr. Brenner testified that because of the videoconferencing, "You couldn't hear half the
time what somebody was saying."  (Brenner Dep. p. 81.)

[32]For example, following is a listing of the length of Allegheny Health Services and AHERF
board meetings: November 6, 1989 -25 minutes; June 28, 1990 - 1 hour 25   minutes (1:25 hours);
October 8, 1990 - 1:02 hours; December 18, 1990 - 1:47 hours; March 22, 1991 - 1:40 hours; June
28, 1991 - 4:10 hours; October 7, 1991 - 2:10 hours; December 20, 1991 - 1:47 hours; March 3,
1992 - 1:35 hours; June 26, 1992 - 1:05 hours; October 5, 1992 - 2:16 hours; December 18, 1992 -
2:06 hours; March 26, 1993 - 2:03 hours; June 30, 1996 - 1:46 hours; October 25, 1993 - 2:15
hours; November 17, 1993 - 1:50 hours; December 17, 2003 2:08 hours; April 8, 1994 - 2:24 hours;
June 30, 1994 - 2:34 hours; April 6, 1995 - 2:00 hours; June 30, 1995 - 2:30 hours; October 20,
1995 - 2:15 hours; December 15, 1995 - 2:15 hours; June 21, 1996 - 2:15 hours; and it was
impossible to determine board meeting length for all following meetings as either meeting start or
ending times were not noted in the board meeting minutes.

40

determined was 119 minutes, or 1 hour, 59 minutes.

For comparative purposes, according to a 1999 study of system boards, "On average, regularly scheduled system board meetings last almost three hours.", with 24% of system board meetings lasting over three hours, 57% lasting between two to three hours, and 19% lasting between one and one and one-half hours. (Governance Institute, 1999 Biennial Survey of Health System Boards, p. 29.) Thus, the average AHERF board meeting was approximately 1 hour in length less than the average system board meeting length, although the board presided over an unusually complex and troubled health system.

F.    These Combined Structural Problems Precluded Effective
      AHERF Governance During Board Meetings

The large size of the AHERF board, along with the inordinately large total number of people in the room during board meetings due to the large numbers of non-board members present, combined with the relatively short duration of board meetings, plus the fact that some meetings were held by videoconference and that there were often trustees in attendance at physical board meetings via phone, in addition to the high board member absentee rate, made it all but impossible for the AHERF board members to do anything other than passively listen at board meetings. Further, these significant weaknesses in the AHERF governance structure made it virtually impossible for the AHERF board to govern effectively during the time and at the venue when such governance is explicitly mandated to occur: the board meetings.

Numerous trustees complained about these and other governance problems in trustee self-evaluation forms and otherwise. Several of them used terms like "rubber stamp" to describe the board function and said that items were brought to the board as "fait accomplis." For example, Mr. Adam wrote in his 1995 trustee evaluation that he "would like to know whats in prospect rather than learning about events after the fact - let's have fewer things presented as fait accomplis." He added that the board meetings "should be restructured to provide for greater involvement of the

41

directors, rather than rubber-stamping a laundry list of items." (Ex. 2139.)  Similarly, Ms. Miller

wrote in her 1995 trustee evaluation that the board meetings were "little more than 'rubber stamp'

sessions.  Boards now seem to have no role in determining policy for the institutions." (Ex. 2575.)

Ms. Miller also testified, "I always felt [Abdelhak] gave us just enough information to placate us,

but never enough to fully satisfy those of us who really took our fiduciary responsibility seriously."

She felt that way until she resigned in November 1996.  She and a lot of other trustees complained

that they were getting too little information but nothing was done.  Ms. Miller thought board

meetings were "a colossal waste of time or exercises in frustration," and she resigned in part

because of increasing frustration with the limited role of the board.  (Miller Dep. p. 20-22, 36-40,

64.)

      The members of subsidiary boards also complained about AHERF's governance failures.

For example, Mr. Blake wrote in his 1994 trustee evaluation:  "As long as I'm coming to a meeting

I'd like more time for open discussion.  Its [sic] all but railroaded due to 1) size of board 2) time

constraints." (PR-PLD-020-01944.)  Similarly, Ms. Bober wrote in her 1994 trustee evaluation:

"Too often faced with <u>faits accomplis</u> without being part of decision-making process." (PR-PLD-

020-01950.)  And in her 1994 trustee evaluation, Ms. Lorraine Brown wrote the following

suggestion:  "Less rubber-stamping of decisions." (PR-PLD-020-01983.)  Further, Mr. Means

wrote in his that "having people as window dressing for the appearance of board oversight - is a

waste of time and insulting to the organization on which they serve." (PR-PLD-020-02183.)  In his

1995 trustee evaluation, Dr. Teeple wrote "I think multiple strategic options need to be presented

and discussed.  It seems at present that the decisions have been made and are just being presented

for information and/or approval." (PR-PLD-066-00587.)  This comment strikes to the heart of what

a board is supposed to do.  If, as many AHERF trustees indicated, the role of the board is not to

develop strategy, but to oversee management's development of strategy, then the board must be

presented with several strategic options.  This provides a board with a basis of comparison from

which to more effectively evaluate the strategic recommendation of management.

G.    AHERF Board Committees Also Suffered From Structural Problems

Structural problems also affected key AHERF board committees. For example, the AHERF Audit Committee suffered from problems that inhibited effective committee function. Specifically, on several occasions the Audit Committee was not able to convene a quorum of the committee for a regularly scheduled meeting of that committee (March 26, 1993; April 4, 1994; and April 8, 1996 meetings). Further, Mr. William Snyder, chairman of the AHERF board and member of the Audit Committee was frequently absent from the Audit Committee meetings, missing half (six of twelve) of the Audit Committee meetings from October 1993 to March 1997.[33]

H.    These Structural Problems in AHERF Governance
        Were Recognized by the Board

While individual trustees complained about structural problems with the boards, nothing was done until the board as a whole belatedly acknowledged some of these structural governance problems, and in the Fall of 1997 embarked on a board restructuring program. This restructuring was too little, too late. As one trustee, Mr. Brenner, said, it was "futile," it was "too late," and "only helped confuse things." (Brenner Dep. p.124-126.)

I.    The AHERF Board had a Culture of Conformity

The three broad dimensions of governance are personality, process, and culture. (Orlikoff and Totten "Best Practices in Governance: What Makes Great Boards Great" Trustee April, 2003.) Personality refers to the characteristics, skills and styles of the board members, board leaders, and executive management. Process refers to the structural components of governance discussed previously, as well as the policies and practices of a board that provide a framework for board function. Culture, the most amorphous of the three dimensions, is defined in academic terms as

---

[33]Mr. Snyder was absent from the following Audit Committee meetings: October 11, 1993; April 4, 1994; April 3, 1995; April 8, 1996; October 15, 1996; March 14; 1997.

43