"shared patterns of meaning," where the same event, process, or situation has the same meaning to the members of the same board and executive management. A layman's definition of governance culture is "the way our board does things."

Governance culture includes such issues as: the way a board makes decisions; the way it deals with conflict; the way it handles dissent and disagreement among its members and between the board and the CEO; the way it builds and maintains a positive, cohesive group dynamic; the way it integrates the expertise of its individual members into the function of the board as a whole; and the way it recognizes how its past function and behavior influences its present function and behavior. (Orlikoff and Totten, April 2003.)

The AHERF board had a culture of conformity which severely constrained the development and expression of opinions and dissent of trustees making it almost impossible for trustees to change the course of AHERF or to initiate any meaningful action. Further, the AHERF board had a very negative governance culture which: did not facilitate a positive, inclusive decision-making process; did not have any clear or positive process to address conflict between board members or between board members and the CEO; did not in any way build and maintain a positive, cohesive group dynamic; did not leverage and integrate the skills and experience of the board members into board function; and, did not recognize or respond to past inefficiencies and functional problems in governance and correct them.

The fact that there is not a single incident of dissent recorded in the minutes of any of the hundreds of meetings of the AHERF board or any of its committees is clear evidence of the AHERF board culture of conformity. This voting history and pattern is unique and in and of itself strongly suggests severe governance dysfunction. That the AHERF board had such an overpowering culture of censorious conformity that dissent was so deeply discouraged that there was never a dissenting vote during board or committee meetings emphasizes the inability of the board or its members to initiate any meaningful action. The AHERF board not only had a culture of conformity, it had a culture of unanimity. Indeed, those who asked too many questions were

44

removed or resigned in frustration. (Daniel Dep. p. 144-145; Miller Dep. p. 39.)

One of the reasons for this culture of conformity and the remarkable result of an unbroken history of no dissenting votes is that the AHERF board meetings closely followed management's agenda. The board meetings have been described by trustees as having "followed a script" (Victor Dep. p. 21) and being "staged" (Victor Dep. p. 71). As a result, the board never discussed alternatives to management's proposals as even marginally effective boards do, because it was not able to. Dr. Black testified: "These board meetings were almost like window dressing in terms of general summaries of activities and not meetings where they would specifically thrash out a financial issue." (Black Dep. p. 43-44.) He also said "I must admit I would have expected more of the board members to be more vocal at the board meetings." (Black Dep. p. 47.) Dr. Victor testified: "You typically didn't say very much at board meetings. They were more - sort of followed a script and they weren't very encouraging of spontaneous dialogue." (Victor Dep. p. 21). He added that the meetings were "not necessarily the forum for personal opinion or conceptual leaps." (Victor Dep. p. 22).

This culture of conformity, of group think and unanimity, was so extensive it was on at least one instance conspicuously recorded in the minutes. Specifically, at the special meeting of the AHERF Executive Committee on April 29, 1996, Mr. Abdelhak "requested approval from the Executive Committee to extend an invitation to Forbes Health system to consolidate with AHERF consistent with the structure Mr. Abdelhak outlined to the Committee." (AHERF Executive Committee Meeting Minutes of April 29, 1996). The minutes further state that after a summary of financial information and comparison data was presented to the committee: "Following a thorough discussion of the advantages of extending such an invitation to Forbes Health System, upon motion duly made and seconded, the Executive Committee approved the following resolution: . . . ." Then, the Executive Committee considered the consolidation of Allegheny Valley Hospital and Affiliates, again the minutes stated: "Following a thorough discussion of the advantages of extending such an invitation to Allegheny Valley Hospital, upon motion duly made and seconded, the Executive

45

Committee approved the following resolution: . . . ." The Executive Committee then turned its attention to the proposed consolidation of Shadyside Hospital, and again the following language was used: "Following a thorough discussion of the advantages of extending such an invitation to Shadyside, upon motion duly made and seconded, the Executive Committee approved the following resolution: . . . ."

The most significant statement from the April 29, 1996 minutes of the AHERF Executive Committee is the following, which was repeated three times (pages 2, 8, and 14), one for each consolidation vote: "Following thorough discussion **of the advantages** of extending such an invitation . . . ." (emphasis mine). Thus, by their own admission in their own minutes, the Executive Committee did not bother to discuss actual or possible **disadvantages** of the proposed consolidations/acquisitions (in fact, it would have been impossible to discuss potential disadvantages in the one hour long executive committee meeting). A board is not functioning at a competent level if it only considers the advantages of substantial proposals made by executive management. The acceptance of or insistence upon a presentation by management, and a following board or committee discussion with questioning of management, of the disadvantages of such proposals, along with alternative proposals and potential or probable outcomes for each, is what would be expected not only of a "best-practices" board or executive committee, but of a merely adequate one.

Some board members were indeed concerned about the lack of questioning of management at board meetings, yet as always, they did nothing about it. For example, Dr. Black testified, "certainly at the time of the board meeting I thought [the trustees] could have been more vocal and more questioning." (Black Dep. p. 103.) He also testified: "Actually, if there was anything that I do have concern about was the fact that the board was not challenging [Abdelhak] as much as I think they should have been." (Black Dep. p. 81-82.)

As discussed previously, there were so many non-trustee members of management present at the AHERF board meetings that it was not conducive to, and in all probability significantly

46

inhibited, meaningful board discussion.[34]  When there are many non-trustees present during board meetings, effective and honest and free-flowing board discussion is inhibited.  This occurs for several reasons:  lay trustees who are not experts in healthcare will usually be uncomfortable asking questions which may reveal their lack of understanding of complex issues which they assume are well known by the management staff; board members may not wish to ask questions which may be interpreted as casting management staff in a negative light; board members who do not understand a technical, financial, strategic or clinical term will not ask for it to be defined for fear of seeming unintelligent or uninformed in front of management staff; and, the larger the number of people in the room, the less free board members feel to speak up due to concerns of time constraints and perceived pressure to stay on track with the agenda.

As discussed previously, the board and committee meetings were too short for meaningful discussion.[35]

Many other trustees complained in their trustee evaluations that the board's business was consumed by "legalistic" approvals and left little or no time for discussion.  Many trustees complained at the time that the meetings were too short.  Such complaints are found for example in the trustee evaluations of:  Mr. Henry Allyn, Ms. Dorothy Mckenna Brown, Mr. Douglas Danforth, Ms. Judith Eaton, Mr. Ira Gumberg, Mr. Paul Neuwirth, and Mr. Robert Palmer.

Effective governance requires that information is routinely provided to the board sufficient to support the board's development and approval of strategy, deliberations and decision making, policy setting, and monitoring of organizational and management performance.  Effective

---

[34]For example, at the December 12, 1996 AHERF board meeting where the Graduate acquisition was approved, there were 13 management people and 22 trustees present.  At the October 30, 1997 meeting there were 20 management present relative to 25 trustees.

[35]For example, at the April 29, 1996, AHERF Executive Committee meeting discussed above, the committee irrevocably on behalf of the full board approved the acquisitions of Forbes and Allegheny Valley Hospitals as well as the proposed acquisition of Shady Side Hospital and other matters in a telephonic meeting that lasted approximately one hour.

governance information includes materials regularly provided to a board that contain appropriate content, are provided in useful and understandable formats, and are tailored to established board priorities and organizational strategy. Effective governance information is also defined in terms of its timeliness, meaning how soon it is provided to trustees prior to board and board committee meetings. Trustees testified that they received board materials so close to the meetings that they often did not have time to review them sufficiently. Several trustees complained about this state of affairs, but apparently nothing was done to fix the problem. Similarly, several trustees complained that the board materials were so voluminous that they were of limited use. More prudent trustees would have insisted on a more precise presentation focusing on the major problems or issues.

Again as evidence of the dysfunctional board culture of conformity, while on the board, Dr. Spielvogel felt Mr. Abdelhak and Mr. McConnell "gave the board a lot of information in rapid fire fashion and that it was perhaps a part of a strategy not to have the board too involved." (Spielvogel Dep. p. 94.) That this approach by management could be considered intentional by one or more of the trustees, and yet these trustees did not challenge management about this approach, is further indicative of the culture of conformity, of the go-along-to-get-along group-think governance dynamic. This dynamic was so strong that it prevented the board or the trustees from initiating any meaningful action.

Some of the trustees, including the AHERF board chairman, had been on the board for much longer than what is recommended for good governance practices. For example, Mr. Ebert was asked in his 1995 trustee evaluation whether he wanted to be reappointed to the board and he checked "no," writing "25 years is probably long enough." As he testified in his deposition, his wife had just passed away. He told Mr. Abdelhak he wanted to resign. But Mr. Abdelhak told him: "Oh, don't do that. Don't do that. Just try your best. Come when you can." Then, in 1996, Mr. Ebert's daughter passed away. He remained on the board through January 1998, attending sporadically. Mr. Ebert now says "I read about it now and I thought, geez, I really missed things." (Ebert Dep. p. 24-26.)

As a result of AHERF's broken governance system, the trustees largely failed in their role of overseeing management and how the CEO was running the system. For example, there is no systematic pattern of the board or the Executive Committee closely or critically questioning in any sophisticated fashion the CEO's vision or strategy for the system. Nor is there even any pattern of the board questioning management when the financial position of the system was sharply negative and/or significantly different from management's projections. An example of this can be seen in the board's reaction to Mr. Abdelhak's proposal to sell certain Eastern hospitals to Vanguard. Mr. Abdelhak presented this proposal to the board as a response to the clear and shared understanding among the trustees that the system's financial condition was significantly and precipitously deteriorating. The response of the trustees was to accept Mr. Abdelhak's assurances that the Vanguard deal would close.[36] According to one trustee's notes, Mr. Abdelhak said he was comfortable that the deal would close "but . . . there is a backup plan (doesn't want to share)." (Ex. 2524.) There is no evidence that any trustee pushed Mr. Abdelhak to share his backup plan in the event that the sale to Vanguard did not close. This is despite the perceived importance of the deal, and despite the fact that, as Mr. Brenner testified, "no deal is a deal until it's signed." (Brenner Dep. p. 88.) This indicates significant problems in governance from two perspectives. First, given how important the trustees believed the Vanguard sale was to the future viability of the system, that they did not critically question Mr. Abdelhak as to the nature, scope, and feasibility of his apparently secret "back-up plan" was a general and serious lapse in governance.

Second, it would be reasonable to expect that the board would vigorously exercise oversight in this precarious situation. That Mr. Abdelhak, in the middle of a financial crisis due to a flawed management strategy or failed management execution of that strategy, told board members that he

---

[36]For example, Robert Palmer testified that "in my wisdom and in my stupidity, I concluded that that management team had a dialogue going with the Vanguard group which could truly produce a uniquely beneficial transaction." (Palmer Dep. p. 177.) Mr. Brenner testified that the board was "optimistic" about the Vanguard deal closing. He "was hopeful that it could be accomplished because at that point in time it was obvious we needed a savior." (Brenner Dep. p. 88.)

"did not want to share" his back-up plan with them is evidence of the fact that the board did not have a history of systematically or meaningfully engaging in the oversight of management. Had the board had such a history, Mr. Abdelhak either would have been much more forthcoming about the back-up plan in anticipation of critical questioning from the board, or would have experienced demands from the trustees that the back-up plan be revealed to them. That the board did not challenge Mr. Abdelhak on this point and demand a full review of the back-up plan, but instead simply accepted his assurance that there was one, indicates that this board did not perform effective management, or system oversight.

The board did not focus on the effective oversight of management. In the face of mounting and significant evidence of problems with management performance, the AHERF board was remarkably ineffective in the discharge of management oversight. When "it was obvious that we needed a savior" (Brenner Dep. p. 88), the board's reaction was not to initiate action, but to rely optimistically on management's ability to find that savior. In light of these circumstances, it is very unlikely that the board ever would have initiated action (the initiation of action **not** having been seen as a function of the board by many trustees) in response to additional information from Coopers.

J.    Physicians and Faculty Members Who Were Also Board Members
      Felt Powerless Within the Board Structure

The physician and faculty trustees saw an important distinction between themselves and the other trustees. As one physician trustee (a medical staff president) put it, the two groups were "like night and day": the physicians were like "invited guests" as opposed to the "big movers and shakers and people worth fortunes." (Victor Dep. p. 29.) Similarly, another testified: "We didn't move in their circle - we the physicians who represented the hospitals didn't really mix with the trustees." (Black Dep. p. 93-94.) Some physician trustees testified that they were not entitled to vote. There is no indication that this was technically true, but the fact that they had this impression is

50

remarkable evidence of their sense of impotence, and of the purely cursory nature of quote "voting" at board meetings.

**K.    Faculty Board Members Felt Particularly Threatened by Mr. Abdelhak**

As Dr. Spielvogel testified, for any faculty member, "if you were to protest the actions of the system or the senior management in a public way, either to the newspapers or too vociferously in a management meeting or board meeting" there was an "implied threat." He identified cuts in pay and elimination of practice groups as potential punishments. He thought this as far back as 1995, at that time he knew that Mr. Abdelhak did not want doctors to become a "power base." (Spielvogel Dep. p.157-158.)

**L.    Many Trustees had Recent Examples of More Robust Governance Structure and Process, But Did Not Act On This Knowledge**

Many trustees joined AHERF from the boards of other healthcare organizations, as a result of AHERF's acquisitions of Hahnemann, Forbes, and others. These trustees had experienced a working governance culture that contrasted with AHERF's. These trustees, as well as those with the extensive governance experience in both for-profit and not-for-profit boards discussed earlier, knew or should have known that AHERF's governance structure, process, and culture was dysfunctional.[37]

**M.    These Dysfunctional Governance Characteristics Support My Opinion**

All of these many negative structural, cultural, process, and personality characteristics of this board combined with this board's lack of actual action when confronted with AHERF's

---

[37]For example, Mr. Fletcher from Forbes testified that the AHERF board did not have a "reasonable degree of participation" because it was so large. (Fletcher Dep p. 125-127.) Ms. Miller also said she had concerns while an MCP board member, prior to the acquisition, that AHERF had a board "in name only." (Miller Dep. p. 14-20.) Again nothing was done.

51

deteriorating financial condition support my opinion that there is no reason to believe this board would have initiated meaningful action if provided additional information by Coopers. Indeed, the board's bylaws provided that a majority of trustees present (if a quorum) were required for action. Since not a single trustee ever tried to take meaningful action, plaintiff's speculation that, given additional information, a **majority** of trustees would have suddenly taken initiative to force radical change is entirely unrealistic.

I note that the ineffectiveness of the AHERF board has been used in governance publications and conferences as a case study in poor governance. (For example, L. Walker "Governing Board Know Thyself" <u>Trustee</u> Sept 1, 1999.)

I also note that the board itself has apparently concluded that the board used poor judgement. One trustee, Mr. Sunstein, took notes of a meeting in late July 1998 around the time of the bankruptcy. A potential lawsuit against the trustees was discussed at that meeting. Another trustee, Mr. Palmer, discussed at the meeting what can and cannot be proved against the board. According to Mr. Sunstein's notes, Mr. Palmer concluded "poor judgement, yes." (Ex. 2565; Sunstein Dep. p. 92-96.)


### X. GIVEN THE BOARD'S ACTUAL INACTION THERE IS NO REASON TO BELIEVE THAT ADDITIONAL INFORMATION FROM COOPERS WOULD HAVE CAUSED THE BOARD TO INITIATE MEANINGFUL ACTION

In light of the board's inaction in the face of actual knowledge of AHERF's seriously deteriorating financial condition, there is no reason to believe that additional information about that condition would have stirred them into initiating meaningful action. That is especially true given the shared understanding among most of the AHERF trustees that the board's role was not to create strategy, and given AHERF's broken governance structure.


A.    <u>The Board Understood and Repeatedly Approved the IDS Strategy</u>

As summarized above, in the early to mid 1990's the board understood and repeatedly

52

approved management's IDS strategy as a response to market factors that were threatening AHERF's financial health. The board approved each of the major acquisitions and the physician practice acquisition program as part of that strategy. When market and financial projections became more dire in April 1997 the trustees reaffirmed the IDS strategy rather than initiating any action themselves. Further, the board did not question or challenge management, did not question or challenge the strategy or ask that it be modified in any way, or require Mr. Abdelhak to develop any contingency plans.

The board knew that the IDS strategy had risks and was not guaranteed to succeed but the trustees had total confidence in Mr. Abdelhak's ability to develop, define, and implement the strategy. Even the newspaper in October 1997 quoted Mr. Abdelhak as saying that the future was "scary" but that he did not expect to change strategic direction. No trustee disagreed.

B.    Trustees Knew that AHERF was in Serious Financial Distress

As summarized above, by October 1997 trustees knew that AHERF was in serious financial distress. Again, the board never initiated any action, or critically questioned Mr. Abdelhak. Instead, it agreed with management's continuation of the IDS strategy and supported management's restructuring efforts including the layoffs. The board was confident in Mr. Abdelhak's abilities to "right the ship" even in the face of staggering losses. The board thought management was doing all it could to improve the situation.

C.    The Vast Majority of Trustees Never Lost Confidence in Mr. Abdelhak

The vast majority of trustees never lost confidence in Mr. Abdelhak's ability to lead AHERF, nor disagreed with his vision even in the face of this significant and accelerating financial deterioration.

Equally telling, some trustees testified that they did lose at least some confidence in Mr. Abdelhak. However, in response to this loss of confidence these trustees never initiated any action.

53

They did not raise the issue at board meetings. They did not request an executive session to discuss their concerns with the board without Mr. Abdelhak being present. They did not challenge, or even question, Mr. Abdelhak in private or during board or committee meetings. Each of these would be a normal, expected, and appropriate action for concerned trustees who claim a loss of confidence in the CEO of a healthcare system that was in a dire and declining financial situation. Yet, these trustees did not initiate any such normal and appropriate actions. Thus, there is no reason to believe that had AHERF's financial condition been disclosed to the board (either in the Fall of 1996 or 1997) through plaintiff's alleged "corrected" financial statements, the board would have acted any differently.

D.    There is No Reason to Believe That the Additional Information
      About AHERF's Financial Condition That Plaintiff Alleges Coopers
      Should Have Provided to the Board Would Have Caused the
      Board to Initiate Meaningful Action

In my opinion, based on my experience with health care boards and considering the evidence regarding what the AHERF board actually did in the face of AHERF's mounting losses, there is no reason to believe that the additional information about AHERF's financial condition that plaintiff alleges Coopers should have provided to the board would have caused the board to initiate meaningful action, for example changing the IDS business plan or terminating management.

Since, in the Fall of 1997, the board already thought that the "drastic" restructuring efforts were going to correct the problems, there is no reason to believe that, if given additional information about AHERF's financial condition, the board would not have merely approved similar ineffective restructuring efforts.

E.    There is No Reason to Believe that Coopers' Discovery of
      "AHERF Senior Officials' Financial Manipulations" Would Have
      Caused the Board to Initiate Any Meaningful Action

Plaintiff hypothesizes that the board would have initiated meaningful action to change the

54

course of AHERF's business plan if Coopers had told the board of "AHERF senior officials' financial manipulations." This hypothetical is not realistic for either 1996 or 1997, for at least two reasons.

First, even if Coopers discovered such "manipulations," I would not expect such discovery to result in either Coopers or the Audit Committee telling the board that they believed management had engaged in fraud, with management simultaneously contending it did not. Such confrontations are exceptionally unusual. In my opinion, the much more likely scenario is that Coopers would have discussed the issue with management first, and the decision would be taken as to whether to make an adjustment. The likely outcome is that an adjustment would be made, though the initial discrepancy may have been reported to the audit committee. In light of all of the AHERF board and audit committee's inaction, as described elsewhere in this report, it is unlikely that such a report would have stirred the committee into action. More likely, it would have accepted whatever adjustment had been made. Thus, the likely outcome is that even a discovery of intentional misstatement would have only revealed to the board AHERF's alleged "true financial condition," i.e., the same additional information about AHERF's financial condition that I have concluded would not have stirred the board into initiating meaningful action.

Second, even if such a confrontation did reach the board, i.e., the board had been told of senior management's fraudulent conduct, or that the audited financials had been intentionally misstated, or materially misstated (and either adjustments had been made or not), there is no reason to believe the board would have changed the course of AHERF's business plan.

Indeed, some trustees actually did question Mr. Abdelhak's integrity and did nothing about it. Further, as Philadelphia trustee, Ms. Leslie Anne Miller, testified it would have been a "totally unrealistic prospect" to terminate Mr. Abdelhak because the leadership of the board was in Pittsburgh and they "seemed to be continuously supportive of Sherif and his actions and decisions." (Miller Dep. p. 40.)

While it is speculation on their part, some trustees testified that they would want a full

investigation if told by Coopers that there were allegations of fraud on the part of AHERF financial management. Even assuming that such an investigation were conducted and assuming that as a result some management personnel were terminated, and assuming Mr. Abdelhak were one of those persons terminated there is no reason to believe that the course of AHERF's business plan would change. There are several reasons for this.

First. The disclosure would have revealed AHERF's alleged "true financial condition," i.e. the same additional information about AHERF's financial condition that I have concluded would not have stirred the board into initiating meaningful action. There is no reason to believe that adding allegations of fraud or terminating management would have made the board change business course rather than simply putting in new management to execute existing strategy. Again, that is especially true given the trustee's understanding that it is not the board's role to create strategy.

Second. There is no reason to believe that the course of AHERF's business plan would have changed had Mr. Abdelhak been replaced by someone else from within AHERF because, as trustees have testified, there was not a single person within AHERF who stands out as not sharing Mr. Abdelhak's IDS vision. Indeed, one trustee, Mr. Fletcher, testified that when Mr. Abdelhak actually was replaced by Anthony Sanzo, he had no view about whether Mr. Sanzo thought the organization should be run differently going forward from the way Mr. Abdelhak had run it. (Fletcher Dep. p. 125.)

Third. In my experience, a notable characteristic of the vast majority of healthcare systems and hospitals is institutional inertia. This institutional inertia makes it extremely difficult for most health systems and hospitals to: significantly change established strategy; meaningfully alter the execution of that strategy; or, bring about timely change in the culture or structure of the organization, the management, or the board. As discussed throughout this report, this institutional inertia was clearly, significantly, and pervasively present both at AHERF and at the AHERF board, and would have made it extremely difficult to change AHERF's course regardless of any

56

information which may have motivated a desire for such a change of course.

Fourth. Had the board fired Mr. Abdelhak and other members of the executive management, it would have taken at least 6 to 12 months to find an external candidate to replace Mr. Abdelhak and to find candidates to replace the other executives. It then would have taken a substantial period of time (6 to 12 months) for even the most adept new CEO and executives to understand the complex organization that AHERF had become, the markets in which it operated, its finances, its governance structure and political dynamics, its physician relationships and the politics attendant to them, and to develop a new strategy. Further, the recruitment of qualified external candidates for the CEO and other executive positions would have been made very difficult due to probable and understandable concern that such candidates would have about the financial situation of AHERF, and its prospects for survival. Thus, if the disclosure had been made in the Fall of 1997, the new CEO and strategy (if any) likely would not have been in place until Spring or Summer of 1998—the time when Mr. Sanzo, in fact, replaced Mr. Abdelhak.

## XI. NO TRUSTEE HAS IDENTIFIED ANY SPECIFIC ALTERNATIVE ACTION THE BOARD WOULD HAVE INITIATED IN PLAINTIFF'S HYPOTHETICAL WORLD

To me as a health care governance expert the clear historical pattern of this board's inaction combined with AHERF's broken governance structure is a reliable predictor of the board's behavior if faced with additional information: it would have approved whatever management put before it.

I understand that counsel for plaintiff has asked the trustees at depositions various speculative and hypothetical questions about plaintiff's alleged hypothetical situation: a situation where Coopers had provided the board with additional information regarding AHERF's financial condition or with allegations that AHERF management had intentionally misstated or materially misstated financial statements presented for audit, or had committed fraud.

The vast majority of trustees do not say what they would in fact do in any of these

57

situations.[38]  Some say they would conduct an investigation.  When told a list of possible options by

counsel for plaintiff, most trustees agree that those options would be available for them and that

they would follow a "prudent" course, but they do not say what they would do, if anything.[39]  The

options include hiring a consultant and terminating management.[40]

     The trustees had never hired a consultant before.  In addition, there is no reason to believe

that such a consultant would not have been dominated by AHERF management.  Indeed, one

trustee, Dr. Atkinson, testified that a consultant "certainly could not have worked with Sherif

Abdelhak" because "he didn't listen to other people"; she said "he could not have a consultant group

---

[38]Mr. Gumberg was asked what he would have done if Coopers had issued an adverse
opinion because the financial statements presented for audit for Fiscal Years 1996 or 1997 were
materially misstated, and he replied ". . . I believe we would have brought in consultants to help
advise us.  We may have even asked Coopers under an engagement with the audit committee to
delve deeper and report back to us their additional findings" and that is was possible that "we
may have put the brakes on everything that was going on until we get our hands around it."  If the
conclusions of Coopers, the board, or consultants had drawn into question the competence and
integrity of management, his options were "none other than terminate them."  (Gumberg Dep. p.
349-356.)

[39]For example, plaintiff's expert, Mr. Den Uyl refers to the deposition of Mr. Brenner.
(Den Uyl Report p. 16.)  Mr. Brenner testified that if Coopers had indicated that management had
made intentional misstatements, he would have asked management to conduct an investigation,
and then he would have had various options as to what course of action to take, including "no
action."  He would have followed "whatever prudent course" he thought the investigation led to.
But he never indicated what that course would have been in plaintiff's hypothetical world.
(Brenner Dep. p. 170-173.)  Mr. Den Uyl also refers to Mr. Palmer's testimony.  (Den Uyl Report
p. 16.)  Mr. Palmer testified that materially worse financial performance in 1996 or 1997 likely
would have caused "in-depth examination" of the steps of the IDS strategy.  But he also testified,
"I can't say that it would have stopped."  He noted that auditors "are no excuse whatsoever for
you not doing your business right to begin with.  You shouldn't sit around and wait for your
auditor to tell you you got a problem, whether it's in the numbers or the context."  (Palmer Dep.
p. 236-239.)  When Mr. Palmer was asked whether he would have acted on a report from the
auditors that they had questions about Mr. Abdelhak's or Mr. McConnell's integrity, he replied
that he could not speculate what he would have done:  "It could have led to, but I can't
hypothesize.  I don't know what it was, so I don't know how you react."  (Palmer Dep. p. 246.)

[40]Mr. Barnes testified that, when faced with the hypothetical situations posed by plaintiff,
various questions would be raised, including about changing management and the possible need
for a consultant; however, he never said what he would, in fact, do, and stated "how they all get
answered, I'm not sure."  (Barnes Dep. p. 183-184, 333-336.)

working with him or for him, he ran the system" thus it is very unlikely indeed that the board would have, over the objection of Mr. Abdelhak, hired a consultant to make any meaningful recommendations. (Atkinson Dep. p. 150.)

Even if the board were to have, either in the Fall of 1996 or the Fall of 1997, terminated Mr. Abdelhak (unlikely for all the reasons I set forth above) and hired a consultant, there is no reason to believe that such a consultant would not have agreed with the strategic actions that AHERF management was already taking, especially given the general popularity of IDS strategies at the time. In addition, even if the consultant had made such a recommendation there is no reason to believe that the board would have countenanced the abandonment of strategies all had agreed with for so long. All else is rankest speculation.

That is especially so given the huge number of management people as opposed to trustees present at board meetings, as discussed previously. For example, at the October 30 1997 AHERF board meeting there were 20 management to 25 trustees; at the June 20, 1997 AHERF board meeting there were 21 of each; and at the April 5, 1997 AHERF meeting there were 37 management and only 22 trustees. This was at a so-called board retreat.

I have been a consultant to health care boards where I have recommended that these boards immediately adopt significant changes in their strategy, and/or their governance structure and process. More often than not these boards either reject my proposals, or they acknowledge the appropriateness of them, accept them and then never implement them. My general experience as a consultant who has worked with numerous organizations in serious financial and strategic difficulty is that in order to implement actions necessary to achieve an effective turnaround there first needs to be a significant "sea change" in governance. Such a "sea change" was clearly not present in AHERF governance, and it would have been very difficult and time consuming to bring one about.[41]

---

[41] I note that David Campbell, who was CEO of Allegheny Health Services, Inc. (AHERF's predecessor), brought in consultants from Ernst & Whinney in 1985. Those consultants made a number of recommendations (including relating to governance) which were ignored. (Ex. 1203.)

59

Hospitals and healthcare systems are generally regarded as being very resistant to change. In my experience as a governance consultant, this is particularly true for hospital and health system boards. The quote from John Maynard Keynes comes to mind: "The hardest thing is not to get people to accept new ideas, it is to get them to forget old ones."

Many boards when presented with a call for change by consultants and compelling information to do so will not respond due to:

-- Their reactive nature—many boards do not lead, they follow. This was true of the AHERF board.

-- The stultifying nature of their meetings and agendas—even if boards are stirred by consultant admonitions for change at retreats or in reports, their resolve to change often is snuffed out by the restrictive routine of their meetings, agenda, information, and structures. This would have been highly likely with the AHERF board for the numerous reasons discussed previously.

-- Board composition. Many boards are composed of individuals who are unwilling to ask difficult questions or push for (or support calls for) change. This is often due to a "go along to get along" "group think" board culture. It is also due to the fact that many board members are unwilling to risk placing themselves at risk of economic loss or social ostracism if they are seen as "trouble makers" on the board. Again, these dynamics were all present at the AHERF board.

-- The "paralysis of analysis". Many boards take no action because they spend all of their time gathering information and analyzing it in the hope that the "right answer" will clearly emerge.

-- Lack of accountability. Most boards do not hold individual board members accountable for their performance, so there is no incentive for them to challenge organizational direction or inertia. This was true of the AHERF board.

60

-- Ineffective board chairs. Many board chairs are unsure of their roles and responsibilities, many are invested in maintaining the status quo. Weak board chairs often fail to advance a board's agenda or develop the board as a cohesive team. Conversely, dominant board chairs often run roughshod over board process and crush meaningful debate and dissent. As discussed previously, AHERF did not have an effective board chair or process for facilitating effective board leadership on an ongoing basis.

Further, if a consultant had been retained, there is no way to know what the consultant would have proposed or whether the board would have approved such proposals. There is no way to know how long it would have taken the consultant to study the situation and make recommendations. In my experience this process takes several months at a minimum.

Finally, it is not true that all boards with accurate facts and information act well and save the day. There are numerous examples of healthcare (and other boards) that have received financial, strategic, quality/patient safety, market or other information that, to any reasonable person, would have called for significant change in organizational operations, management, or strategy; yet the boards took no action in response to this information.

It is important to stress that information in and of itself, no matter how new or compelling, does not make decisions; boards do. An ineffective board is far more likely to not act in response to being provided with any such compelling information than is an effective board. As has been previously shown, the AHERF board was remarkable in the depth and range of its governance ineffectiveness.


Dated:  November 8, 2004




James E. Orlikoff

61

# REFERENCES

American Hospital Association and Ernst & Young, LLP, <u>1997 Hospital and Health System Governance Survey: Shining Light on Your Board's Passage to the Future - Revised Edition.</u> Chicago:  AHA Center for Health Care Leadership and Ernst & Young LLP 1997.

American Hospital Association/Hospital Research and Educational Trust, <u>The Changing Character of Hospital Governance.</u> Chicago:  Hospital Research and Educational Trust 1990.

The Governance Committee, <u>The Rising Tide: Emergence of a New Competitive Standard in Health Care</u> Washington:  The Advisory Board - The Governance Committee 1996.

The Governance Institute, <u>Governance Trends and Practices in Health Systems: 1995 Panel Survey of System Boards</u> La Jolla, CA:  The Governance Institute 1995.

The Governance Institute, <u>The Governance One Hundred's 1999 Biennial Survey of Health System Boards</u> La Jolla, CA:  The Governance Institute 1999.

Orlikoff, James E. and Totten, Mary K., "How to Run Effective Board Meetings" <u>Trustee:  The Magazine for Health Care Governance</u>, April, 2001.

Orlikoff, James E. and Totten, Mary K., "Best Practices in Governance: What Makes Great Boards Great" <u>Trustee:  The Magazine for Health Care Governance</u>, April, 2003.

Walker, Larry, "Governing Board Know Thyself" <u>Trustee:  The Magazine for Health Care Governance</u>, Sept 1, 1999.

**JAMES EDWARD ORLIKOFF**
4744 S. Kimbark Avenue
Chicago, IL 60615

## EDUCATION:

1972-1974    Ripon College
                 Major: Psychology

1976         Pitzer College
                 Major:    Psychology
                 Degree:   A.B. Psychology

1978         University of Chicago
                 Social Science Division Masters Program
                 Degree:   M.A. Psychology/Social Science

## PROFESSIONAL HISTORY:

**ORLIKOFF & ASSOCIATES, INC.**
Chicago, Illinois

**August 1989 - Present**

President, Orlikoff & Associates, Inc.

--    Independent health care consulting practice specializing in
      health care organization governance, leadership, quality,
      organizational development and risk management.

--    Provided consultation, education, and facilitation of
      leadership retreats for over 1,000 hospitals and systems
      since 1989.

--    Founding editor and publisher of the **Health Governance
      Digest** newsletter, sold to Opus Communications in 1996.

--    National Advisor on Governance and Leadership to the
      American Hospital Association and Health Forum, current.

Executive Director, American Governance & Leadership Group, LLC
1999 to present.

--    Owned in partnership by the American Hospital Association,
      James Orlikoff, and Jerry Pogue, AGLG provides leadership
      education, publications, consultation and related services
      to the boards and leadership teams of hospitals, healthcare
      systems, physician groups, insurance companies, associations
      and other health-related organizations.

**AMERICAN HOSPITAL ASSOCIATION,**
Chicago, Illinois

**May 1986 - August 1989:**
Director, Division of Hospital Governance
                 and
Director, Institute on Quality of Care and Patterns of Practice



EXHIBIT

1

JAMES EDWARD ORLIKOFF P. 2

<u>PROFESSIONAL HISTORY</u>: (Continued)

of the Hospital Research and Educational Trust.

Major Responsibilities and Accomplishments:
Division of Hospital Governance

-- Directed the AHA's Hospital Governance Program which
   administered the National Congress of Hospital Governing
   Boards and was the focus of all AHA governance affairs.

-- Designed and implemented a technical assistance program to
   provide governance education and consultation to hospital
   and system governing boards.

-- Developed and controlled division budget, managed staff of
   five.

Institute on Quality of Care and Patterns of Practice:

-- Developed and implemented predictive and preventive programs
   addressing medical malpractice, professional liability and
   quality of care problems.

-- Raised grant funds for the operation of the Institute
   through commercial and hospital-formed insurance companies.

-- Directed the first projects of the Institute resulting in
   the publications <u>Managing Risks and Quality in Hospital-
   Sponsored Home Care</u>, and <u>Managing Risks and Quality in
   Hospital-Related Managed Care.</u>

-- Directed consulting staff of two.

**June 1985 - May 1986     AMERICAN HOSPITAL ASSOCIATION,**
                       Chicago, Illinois

Program Director, Trustee Communications and Allied Association
Relations.  Division of Hospital Governance.

**March 1984 - June 1985     Trader, Chicago Mercantile Exchange,**
                          Chicago, Illinois

-- Market maker on the Index and Options Market, traded own
   account in the S & P 500 Futures and the currency options
   markets.

**Dec. 1982 - Dec. 1983     SAUDI ARABIAN ARMED FORCES MEDICAL**
                       **SERVICES DEPARTMENT**
                       Riyadh, Saudi Arabia
Senior Consultant for Quality Assurance
Major Responsibilities and Accomplishments:

JAMES EDWARD ORLIKOFF P. 3

**PROFESSIONAL HISTORY:** (Continued)

-- Developed and implemented initial Quality Assurance programs in the ten Saudi Arabian Armed Forces Hospitals, and facilitated the integration and support of these activities with international hospital management companies.

-- Provided direct education and consultation to all ten hospitals on Quality Assurance theory, systems, techniques, and program organization. Supervised team of staff and outside consultants.

**Jan. 1980 - Nov. 1982    AMERICAN HOSPITAL ASSOCIATION,**
Chicago, Illinois

Senior Staff Specialist, Manager of Technical Assistance Projects. Division of Quality Control Management.

Major Responsibilities and Accomplishments:

-- Developed, marketed, and managed an on-site technical assistance project providing consultation and education to over seventy hospitals in 1981 and 1982; generated double the projected revenue. Recruited, trained and supervised outside consultants.

-- Representation and advocacy on behalf of AHA members.

-- Coordination and hosting of the International Hospital Federation Special Study Group on Quality Assurance. The group consisted of 35 participants representing 24 countries.

-- Negotiation for an international consulting project to a Saudi-Arabian hospital. Performed a series of solo consulting visits to the Riyadh-Al Kharj Hospital in Riyadh, Saudi Arabia.

**May 1978 - Dec. 1979    INTERQUAL, INC., Chicago, Illinois**

Consultant.

Major Responsibilities and Accomplishments:

-- Primary faculty for nationally conducted seminars on quality and risk management issues.

-- Development of education programs and publications. Editor of publications.

-- Directed InterQual's audio-visual media design activities.

### JAMES EDWARD ORLIKOFF P. 4

**PUBLIC SPEAKING ACCOMPLISHMENTS:**

-- Speaker at three National Association of Quality Assurance Professionals/National Association for Healthcare Quality Annual Conferences; 1981, 1990, 1992.

-- Speaker, American College of Healthcare Executives Congress on Administration, "Quality Assurance and Risk Management," February, 1981; "Improving Board Oversight of Quality," 1990, 1991, 1992; "Fostering Effective Medical Staffs and Medical Staff Relations," 1993, 1994, 1995; "Governance Restructuring and Improvement, Redesigning Boards for a New Era" 1996, 1997, 1998; "Principle-Based Governance" 1999, 2000,2001; "CEO-only Session: Building Better Relationships with Your Boards" 2002, 2003, 2004; Chicago, Illinois.

-- Speaker at three American Society for Health Care Risk Management Annual Meetings, 1985, 1987, 1991.

-- Speaker at ten consecutive Annual American Hospital Association Trustee Forums, beginning in June, 1986. Moderator of 1995 and 1996 Forums.

-- Keynote speaker, 1996 American College of Rheumatology National Scientific Meeting

-- Member core faculty for The Governance Institute, La Jolla, CA, Hospital Medical Staff and Trustee Conferences; 1989 - 1999.

-- Speaker, American Healthcare Systems Annual Leadership Conference, "The Role of the Governing Board in a System as Opposed to a Hospital," January, 1992, Phoenix, AZ. Again in 1999.

-- Faculty for the American College of Healthcare Executives "CQI: The Leadership Imperative Program," 1990-1995.

-- Plenary Speaker, Health Forum/American Hospital Association/International Hospital Federation Summit, 2003, San Francisco, CA.

-- Core faculty for American Governance & Leadership Group "Leadership Symposiums" 1999 - present.

**RELATED PROFESSIONAL ACTIVITIES:**

-- Member of the Board of Trustees, St. Catherine's Hospital, and Dominican Health Care, Inc., Kenosha, WI, June 1987 to March 1991.

-- Member of the Board of Trustees, South Suburban Hospital, Hazel Crest, IL, March 1991 - October 1999.

JAMES EDWARD ORLIKOFF P. 5

RELATED PROFESSIONAL ACTIVITIES: (Continued)

-- Member of the Board of Trustees, Pitzer College, Claremont, CA., 1999 - present.

-- Member The Governance Advisors of The Governance Institute, La Jolla, CA, 1989 - 1999.

-- Preceptor, Harvard University School of Public Health, Graduate Program in Health Policy and Management Intern Program, 1981.

-- Preceptor, Yale University School of Medicine, Department of Epidemiology and Public Health Intern Program, 1982.

-- Editorial Advisory Board, Hospital Risk Management, 1985. Hospital Peer Review, March 1992 - 1995.

-- Editorial Advisory Board, Hospital Case Management, January 1993 - 1995.

-- Editorial Advisory Boar, American Journal of Medical Quality, 2004 - present.

-- Judge, Modern Healthcare's "Trustee of the Year Award," 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000.

-- Contributing Editor, American Governance Leader, published by American Governance & Leadership Group, 1999 - present.


PUBLICATIONS: I. BOOKS

Editor, Audit Criteria Series #Eight-Obstetrics and Gyne-cology. InterQual, Inc., Chicago, IL 1979.

Orlikoff, James E., Fifer, William R. M.D., Greeley, Hugh. Malpractice Prevention and Liability Control for Hospitals. American Hospital Association, Chicago, IL 1981.

Orlikoff, James E., and Snow, Anita, J. Assessing Quality Circles in Health Care Settings: A Guide for Management. American Hospital Publishing, Inc., Chicago, IL 1984.

Orlikoff, James E., with Vanagunas, Audrone, M. Malpractice Prevention and Liability Control for Hospitals, Second Edition. American Hospital Publishing, Inc., Chicago, IL 1988.

Totten, Mary K., Orlikoff, James E., and Ewell, Charles, M. The Guide to Governance: For Hospital Trustees. Hospital Research and Educational Trust, Inc., Chicago, IL 1990.

JAMES EDWARD ORLIKOFF P. 6

PUBLICATIONS: (Continued)

Orlikoff, James E. Quality From the Top: Working with Hospital Governing Boards to Assure Quality Care. Pluribus Press, Inc., Chicago, IL 1990.

Orlikoff, James E. and Totten, Mary K. The Board's Role in Quality Care: A Practical Guide for Hospital Trustees. American Hospital Publishing, Inc., Chicago Il 1991.

Orlikoff, James E. and Totten, Mary K. The Future of Healthcare Governance: Redesigning Boards for a New Era. American Hospital Publishing, Inc., Chicago Il 1996.

Totten, Mary K. and Orlikoff, James E., The Guide to Governance: For Hospital and Health System Trustees. Hospital Research and Educational Trust, Inc., Chicago, IL 1999.

Orlikoff, James E. and Totten, Mary K. The Trustee Guide to Boardroom Basics in Health Care. AHA Press/American Hospital Publishing, Inc., Chicago Il 1998.

Orlikoff, James E. and Totten, Mary K. The Trustee Guide to Board Relations in Health Care. AHA Press/American Hospital Publishing, Inc., Chicago Il 1998.

Orlikoff, James E. and Totten, Mary K. The Trustee Guide to Board Accountability in Health Care. AHA Press/American Hospital Publishing, Inc., Chicago Il 1998.

Orlikoff, James E. and Totten, Mary K. The Trustee Guide to Strategic Planning and Information in Health Care. AHA Press/American Hospital Publishing, Inc., Chicago Il 1998.

Orlikoff, James, E. and Totten, Mary, K. The Trustee Handbook for Health Care Governance. American Hospital Publishing, Inc., Chicago Il 1998. 2nd Edition, 2002.

Pointer, Dennis D. and Orlikoff, James, E. Board Work: Governing Health Care Organizations. Jossey Bass Publishers, San Francisco CA 1999.

Pointer, Dennis D. and Orlikoff, James, E. Getting to Great: Principles of Health Care Organization Governance. Jossey Bass Publishers, San Francisco CA 2002.

Pointer, Dennis D. and Orlikoff, James, E. The High-Performance Board: Principles of Nonprofit Organization Governance. Jossey Bass Publishers, San Francisco CA 2002.

JAMES EDWARD ORLIKOFF P. 7

**PUBLICATIONS**: (Continued)

## II. BOOK CHAPTERS

"The Hospital Governing Board," Chapter 5 in Risk Management Handbook for Health Care Facilities: Second Edition. American Hospital Publishing, Inc., Chicago IL, 1997.

"Ownership and Governance," Chapter 3 in The Baxter Manual of Health Services Management. Aspen Publishers, Inc., Gaithersburg, MD, 1993.

## III. ARTICLES

Orlikoff, James E. and Lanham, Gary B. "Integrated Approach Improves Quality Assurance, Risk Management Activities," Hospitals, Sept. 1, 1980.  Vol 54, N 17.

Orlikoff, James E. and Lanham, Gary B. "Quality Assurance and Risk Management: Learning to Live Together," Journal of Quality Assurance, Fall, 1980.  Vol 2, No. 4.

Orlikoff, James E. "How to Write and Implement a Hospital-wide Quality Assurance Plan," Management Cassette Series for Hospital and Health Service Administrators, American College of Hospital Administrators, Chicago, IL, March, 1981.

Lanham, Gary B. and Orlikoff, James E. "Full Coverage of Issues Reflects Importance of Risk Management," Hospitals – Special Issue – Administrative Reviews, April 1, 1981.  Vol. 55, No. 7.

Orlikoff, James E. and Lanham, Gary B. "Why Risk Management and Quality Assurance Should Be Integrated," Hospitals – Special Issue – Quality Assurance and Risk Management, June 1, 1981.  Vol. 55, No. 11.

Orlikoff, James E. "Tips on Integrating Quality Assurance and Risk Management," Occurrence.  Chicago Hospital Risk Pooling Program, Chicago, IL, May-June 1981.  Vol. 1, #5.

Orlikoff, James E. "Use of Outside Consultants for Quality Assurance:  Why, When and How," Hospital Medical Staff, November 1981.  Vol. 10, #11.

Orlikoff, James E. "Quality Circles and Medical Staffs," The Hospital Medical Staff, September 1982. Vol. 11, #9.

Orlikoff, James E. "Quality Circles in the Hospital Setting," Topics in Health Record Management, June 1983, Vol. 3, #4.

JAMES EDWARD ORLIKOFF P. 8

PUBLICATIONS: (Continued)

Orlikoff, James E. Author of monthly column "Risk Management Strategies" in Hospital Risk Management, May-November 1985.

Peterson, Kristine E. and Orlikoff, James E. "Consumer Oriented Marketing," Medical Group Management. November/December 1985. Vol. 32, #6.

Orlikoff, James E. "Taking The Mystery Out of Board Evaluation," Trustee. January 1986, Vol. 39, #1.

Orlikoff, James E. "Good Communication Influences Patient's Decision To File Suit," Risky Business - American Academy of Pediatrics News. April 1986.

Orlikoff, James E. "Malpractice Reform: What Will It Take To Patch Up The System?" Trustee. May 1986, Vol. 39, #5.

Orlikoff, James E. "Get Reasonable About Self Evaluation: The New Requirement for Governing Boards," Kentucky Hospitals. Fall, 1986, Vol. 3 #4.

Alexander, Jeffrey A. Ph.D., and Orlikoff, James E. "Hospital Corporate Restructuring Gains Widespread Acceptance," Trustee. January 1987, Vol. 40, #1.

Orlikoff, James E. "Preventing Directors' and Officers' Liability Exposure," Trustee. June, 1987, Vol. 40 #6.

Orlikoff, James E. and Totten, Mary K. "Basic books for hospital trustees," Trustee. December, 1988, Vol. 41 #12.

Orlikoff, James E. "Do's and Don'ts for quality oversight," Trustee. March, 1989 Vol. 42 #3.

Orlikoff, James E. and Totten, Mary K. "Diagnosing and improving board-medical staff relations," Trustee. June, 1989, Vol. 42 #6.

Orlikoff, James E. "Ethics in hospital governance: A decisionmaking framework," Trustee. July, 1989 Vol. 42 #7.

Orlikoff, James E. "What trustees need to know about D & O liability," Trustee. January 1990 Vol.43 #1.

Orlikoff, James E. "Burnout in the boardroom: Recognizing and preventing a growing problem," Trustee. June 1990 Vol. 43 #6.

JAMES EDWARD ORLIKOFF P. 9

<u>PUBLICATIONS</u>: (Continued)

Totten, Mary K., Orlikoff, James E., and Ewell, Charles M. "Using criteria for medical staff reappointment," <u>Trustee</u>. September, 1990 Vol.43 #9.

Orlikoff, James E. and Totten, Mary K. "New approaches in quality:CQI," <u>Trustee</u>. May 1991 Vol 44 #5.

Orlikoff, James E. "Preventing malpractice: the board's role in risk management," <u>Trustee</u>. September, 1991 Vol.44 #9.

Orlikoff, James E. "Trustee orientation: The basic building block of board effectiveness," <u>Trustee</u>. September 1992 Vol. 45 #9.

Orlikoff, James E. and Totten, Mary K. Authors of "Trustee Workbooks" appearing four times per year in <u>Trustee: The Magazine for Health Care Governance</u>, 1995 - present:

    - Orlikoff and Totten "Developing a Community-Focused Mission" March, 1995.
    - Orlikoff and Totten "Assessing and Improving Your Community's Health" May, 1995.
    - Orlikoff and Totten "Strategic Planning by The Board" July/August 1995.
    - Orlikoff and Totten "Board Composition and Trustee Selection" October, 1995.
    - Orlikoff and Totten, "CEO Evaluation and Compensation" January, 1996.
    - Orlikoff and Totten "Board Oversight of Quality" April, 1996.
    - Orlikoff and Totten "Information and the Effective Board" July/August, 1996.
    - Orlikoff and Totten "Self-Evaluation: Mark of Good Governance" November/December, 1996.
    - Orlikoff and Totten "Board Job Descriptions" January, 1997.
    - Orlikoff and Totten "Orientation: Basic Building Blocks of an Effective Board" April, 1997.
    - Orlikoff and Totten "New Relationships with Physicians: An Overview for Trustees" July/August, 1997.
    - Orlikoff and Totten "The Board-Physician Partnership: Enhancing Leadership Potential" November/December, 1997.

JAMES EDWARD ORLIKOFF P. 10

PUBLICATIONS: (Continued)
- Orlikoff and Totten "Community Representation and
the Effective Board" January, 1998.
- Orlikoff and Totten "Governing Conversion
Foundations: A Practical Guide for Trustees"
April, 1998.
- Orlikoff and Totten "Principle-Based Governance:
An Approach for Integrated Board Leadership"
July/August, 1998.
- Orlikoff and Totten "Redesigning Governance for
Success" November/December, 1998.
- Orlikoff and Totten "Systems Thinking in
Governance" January, 1999.
- Orlikoff and Totten "Board Committees: Who's at the
Helm?" April, 1999.
- Orlikoff and Totten "Building and Maintaining Trust:
The Role of Leadership" July/August, 1999.
- Orlikoff and Totten "Leading the Leaders: The Role of
the Board Chair" November/December, 1999.
- Orlikoff and Totten "Stewardship of the Future"
January, 2000.
- Totten and Orlikoff "Trustee Development: Starting
with the Individual" April, 2000.
- Orlikoff and Totten "E-Health and the Board: The
Brave New World of Governance, Part 1" July/August,
2000.
- Orlikoff and Totten "E-Health and the Board: The
Brave New World of Governance Part 2"
November/December, 2000.
- Totten and Orlikoff "Successful Board Retreats: What
Works and Why: January, 2001.
- Orlikoff and Totten "How to Run Effective Board
Meetings" April, 2001.
- Orlikoff and Totten "Quality and Value: Overcoming
Barriers" July/August, 2001.
- Orlikoff and Totten "The Pyramid: A Model for
Effective Governance" November/December, 2001.
- Totten and Orlikoff "Evaluating Trustee Performance:
Issues, Trends, and Process" January, 2002.
- Totten and Orlikoff "Diagnosing the Health of Your
Organization: Early Warning Signs" April, 2002.
- Orlikoff and Totten "Effective Governance After Enron
and AHERF" July/August, 2002.
- Orlikoff and Totten "The Governance Audit: Assessing
and Improving the Board" November/December, 2002.
- Totten and Orlikoff "Trends in Board Accountability:
Conducting the Audit" January, 2003.
- Orlikoff and Totten "Best Practices in Governance:
What Makes Great Boards Great" April, 2003.
- Totten and Orlikoff "Best Practices in Action:
Orientation" July/August, 2003.

JAMES EDWARD ORLIKOFF P. 11

PUBLICATIONS: (Continued)

     - Totten and Orlikoff "What Boards Should Know About Turnarounds" November/December, 2003.
     - Homsy, Virginia T., Totten, Mary K., and Orlikoff, James E. "Innovation: From Theory to Practice" January, 2004.
     - Orlikoff and Totten "Conflict of Interest and Governance: New Approaches for a New Environment" April, 2004.

Orlikoff, James E. "Board Games: 10 Transitions: A Conversation with James E. Orlikoff" Trustee: The Magazine for Health Care Governance. AHPI:Vol 50, No. 6, June, 1997.

Orlikoff, James. E. "Trouble in the Boardroom: The Seven Deadly Sins of Ineffective Governance," Healthcare Forum Journal. July/August 1997 Vol. 40, # 4.

Orlikoff, James E. "From Hospital to Health System Governance: The Changing Characteristics of Boards" Healthcare Executive: The Magazine for Healthcare Leaders. ACHE: Vol. 12, No. 5, September/October 1997.

Orlikoff, James E. "Ensuring Board Effectiveness: It Could Be As Simple As Changing Your Board Structure" Healthcare Executive: The Magazine for Healthcare Leaders. ACHE: Vol. 13, No. 5, September/October 1998.

Hadelman, Jordan and Orlikoff, James. Commentary. "Get Real: Professional Governing Boards must happen if hospitals and systems are to survive." Modern Healthcare. Vol 29. No 41. October 11, 1999.

Orlikoff, James E. "Two Rivers Run Through It: An Introduction to the January Issue" Trustee: The Magazine for Health Care Governance. Health Forum:Vol 53, No. 1, January, 2000.

Orlikoff, James E. "Lessons for Health Care Leaders From the September 11 Tragedy" American Governance Leader. AGLG: Vol. 1, Issue 10, October, 2001.

Totten, Mary K. and Orlikoff, James E. "Principle-Based Governance: An Approach for Integrated Board Leadership" Chief Executive Officer. ACHE CEO Circle: Fall 2001.

Totten, Mary K. and Orlikoff, James E. "Principle-Based Governance" Healthcare Executive: The Magazine for Healthcare Leaders. ACHE: Vol. 17, No. 2, March/April 2002.

JAMES EDWARD ORLIKOFF P. 12

<u>PUBLICATIONS</u>: (Continued)

Orlikoff, James E. "Outbox – Paradigm or Paradox?," <u>Hospitals & Health Networks.</u> May 2002.

Orlikoff, James E. "Outbox – Time for a New Social Contract," <u>Hospitals & Health Networks.</u> November 2003.

Edwards, Nigel and Orlikoff, James "Where is the Hospital Going?" <u>World Hospitals and Health Services – The official Journal of the International Hospital Federation.</u> 2003 Vol. 39, No. 2.

Orlikoff, James E.  "Face Off: Board Member Compensation – Yes! In the Accountability Era, Board Members Must Be Paid" <u>Board Member: The Magazine for Nonprofit Boards and Chief Executives.</u> BoardSource: Vol. 13 No. 2, March, 2004.

Orlikoff, James E. and Totten, Mary K. "Governance Insights: Applying For-Profit Governance Reforms" <u>Healthcare Executive</u> Volume 19, No. 3 May/June 2004.

Orlikoff, James E. and Totten, Mary K. "Back to Basics. Governance in the Spotlight: What the Sarbanes-Oxley Act Means for You." <u>Trustee: The Magazine for Health Care Governance</u>. Health Forum: Vol 57, No. 8, September, 2004.

Orlikoff, James E. and Totten, Mary K. "Governance Insights: The Real Value of Governance Reform" <u>Healthcare Executive</u> Volume 19, No. 5 September/October 2004.

## MATERIALS CONSIDERED

In addition to the materials referred to in my expert report, I considered the following materials in forming my opinions:

Transcripts of depositions of AHERF and affiliate trustees, and exhibits thereto.

Trustee evaluations from 1994 and 1995.

Minutes of AHERF board and committee meetings.

Affidavits of John Brennan, Judith Eaton, Joseph Maroon, Joseph Neubauer, Robert Potamkin

Chait, Richard P. and Taylor, Barbara E., "Charting the Territory of Non Profit Boards" Harvard Business Review, January-February 1989, 54.

Chait, Richard P., Holland, Thomas P. and Taylor, Barbara E.,  The Effective Board of Trustees. New York: Macmillian Publishing and the American Council on Education 1991, 2.

Gillies, R.R., Shortell, S.M., Anderson, D.A., Mitchell, J.B., and Morgan, K.L., "Conceptualizing and measuring integration:  findings from the health systems integration study. Hospital and Health Services Administration 38(4): 467-89, Fall 1993.

Kovner, Anthony R. "Improving Hospital Board Effectiveness:  An Update," Frontiers of Health Services Management V. 6, no. 3 (1990):15.

Houle, Cyril O., Governing Boards Washington, D.C.:  National Center for Nonprofit Boards/Jossey Bass, 1989, 6.

Orlikoff James E. and Totten, Mary K., The Future of Health Care Governance: Redesigning Boards for a New Era Chicago:American Hospital Publishing, Inc. 1996.

Orlikoff, James E.,  "Trouble in the Boardroom: The Seven Deadly Sins of Ineffective Governance" Healthcare Forum Journal, July/August, 1997).

Pointer, Dennis D., "The Enron and AHERF Debacles: Failed Organizations, Impaired Governance - Diagnosis and Prescription" Presentation made at the American Governance & Leadership Group Annual Symposium on Governing and Leading Healthcare Organizations, January 28, 2003, Phoenix, AZ.

Umbdenstock, Richard J., "The Role of the Board and Its Trustees" in Health Care

EXHIBIT 2  ALL-STATE LEGAL®

Administration:Principles and Practices, eds. L.F. Wolper and J.J. Pena. Gaithersburg, MD: Aspen Publishers, 1987, 51-52.

Umbdenstock, Richard J. and Hageman, Winifred, "The Five Critical Areas for Effective Governance of Not-For-Profit Hospitals" Hospitals and Health Services Administration 35 (1990) 485-486.

# Trustees on the AHERF Board and Committees as of Fall 1996, Fall 1997 and Summer 1998

| Name | Board of Trustees | Executive Committee | Audit Committee | Finance Committee | Fin. Audit Committee | Compliance Committee | Committee on Trustees | AGH | AUHC/Comp. | AUH/CAEH. | AUHS | Centennial |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S. S. Abdelhak | X | X | | 96-97 | | | 96 | X | 96-97 | 96-97 | X | X |
| W. F. Adam | X | | | | | | | X | | | 97 | |
| H. G. Allyn, Jr. | 96-97 | | | | | | | | | | X | |
| B. F. Atkinson, M.D. | X | | 96-97 | 96-97 | 98 | | | X | X | X | X | |
| J. D. Barnes | X | X | | | | X | 96-97 | | | | | |
| I. F. S. Black, M.D. | 96-97 | | | | | | | | | | | |
| J. Brennan | | | | 96-97 | | | 96-97 | | | 98 | | |
| R. W. Brenner, Esq. | X | 96 | 96-97 | | | | | | X | 98 | X | |
| D. M. Brown, Ed.D. | X | | | | | | | | | | X | |
| F. V. Cahouet | 98 | 98 | | | | | | X | X | | X | |
| M. C. Clifford, M.D. | | | | | | | 96-97 | | | | | |
| D. W. Cohen, D.D.S. | 98 | | 96-97 | | | | | | | | | 96 |
| A. M. Cook | | | | | | | 96-97 | | | | X | |
| D. D. Danforth | X | X | 97 | | 98 | X | | | | | X | |
| R. H. Daniel | | | 97 | | | | | | | | | |
| R. R. Davenport | X | | | | | | | | | | X | |
| J. S. Eaton, Ph.D. | 96 | | | 96-97 | | | 96-97 | | 96-97 | | X | |
| L. T. Ebert | 96-97 | X | 97 | | 98 | | 96-97 | X | | X | X | |
| H. R. Edelman, III | X | X | | | | | | 98 | 97-98 | X | X | |
| R. L. Fletcher | 97-98 | 98 | | 97 | | | 97 | 98 | X | X | X | |
| C. W. Gargalli | 98 | | | | | | | 96-97 | | | X | |
| W. H. Genge | 96-97 | | | | | | | | | | | |

EXHIBIT

ALL-STATE LEGAL

3

| Name | Board of Trustees | Executive Committee | Audit Committee | Full Board Committee | Finance Committee | Foundation Committee | Committee of Trustees | AGH | CRITICAL AGHP | AGHP AUBcare | AUHS | Centennial |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I.J. Gumberg | X | | 97 | 96-97 | 98 | | 96-97 | X | | | | 97 |
| T. Heinz | 96-97 | | | | | | | | | | | |
| R.M. Hernandez | X | | 96-97 | | | | | X | | | | |
| G.K. Hilton | | | 96-97 | 96-97 | | X | | 96-97 | X | 97-98 | | 97 |
| O. Korzeniowski, M.D. | 96 | | | 96-97 | | | | | X | 96-97 | | |
| J.D. Little, Jr. | | | | | | | | 96-97 | | 96-97 | | |
| S.M. Marks, M.D. | 96 | | | | | | | X | | | X | |
| J.C. Maroon, M.D. | X | | | | | | | | | | X | |
| A.W. Martinelli | X | | | 96-97 | | | | X | | | | |
| D.W. McConnell | 96 | | | | | | | | | | | |
| L.A. Miller, Esq. | | | | | | | | | | | X | |
| D.M. Murasko, Ph.D. | X | | | | | | | | | | X | |
| J. Neubauer | X | | | | | | | | | X | X | |
| P.D. Neuwirth | | | | 96-97 | | | 96-97 | X | X | | | |
| F.B. Nimick, Jr. | X | 98 | 97 | 96-97 | | X | | | | | | |
| T.H. O'Brien | 96-97 | | 97 | | | | | | | | | |
| C. O'Reilly | 96-97 | | | 97 | | | 97 | | X | | X | 97 |
| R.B. Palmer | X | 98 | | 97 | 98 | | | | | 96-97 | X | |
| R.M. Potamkin, Esq. | 97 | | | | | | | X | | | | |
| R.L. Ray, M.D. | | | | 97 | 98 | | | | 97 | | | |
| R.L.C. Russell, Ph.D. | | | | | | | | X | X | 98 | X | |
| A.M. Sanzo | 98 | | | | | | | | | | | |
| W.A. Schenck, III | | | | | | | | | | | | |
| D.W. Sculley | X | 96 | 97 | | | | | X | | | | |
| R.P. Shannon, M.D. | 98 | | | | | | | | | | | |

2

| Name | Board of Trustees | Executive Committee | Medical Committee | Inhouse Committee | Sub-Audit Committee | Corporation Committee | Committee of Trustees | PACH | AUHC/AUW | AUH/AUH Health | AUHS | Centennial |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J. B. Snyder | 96-97 | | | 96-97 | | | | X | | | X | |
| W. P. Snyder, III | X | X | 96-97 | 96-97 | | X | 96-97 | X | | 96-97 | X | |
| R. Spielvogel, M.D. | 96-97 | | | | | | | | X | X | X | |
| L. C. Sunstein, Jr. | 96-97 | | | | | | | 96-97 | | | | |
| W. B. Thomas | 96-97 | | 96-97 | | | | | 96-97 | | | | |
| S. Trooskin, M.D. | 97 | | | | | | 96-97 | | | 96-97 | | |
| M. Victor, M.D. | 96-97 | | | | | | | | | | | |
| W. L. Williamson | 97-98 | | | | | | | | | 96-97 | 96-97 | |
| M. G. Wood, M.D. | 96-97 | | | 96-97 | | | | | | | | |
| N. A. Wynstra, Esq. | | | | | | | | | | | | |

## ATTENDEES AT AHERF BOARD MEETINGS

| MEETING DATE | Members Present | Appointed Officers/ Invited Guests | TOTAL PRESENT |
|---|---|---|---|
| 1.  December 20, 1991 | 15 | 16 | 31 |
| 2.  March 30, 1992 | 13 | 11 | 24 |
| 3.  June 26, 1992 | 11 | 17 | 28 |
| 4.  October 5, 1992 | 14 | 13 | 27 |
| 5.  December 18, 1992 | 14 | 12 | 26 |
| 6.  March 26, 1993 | 13 | 15 | 28 |
| 7.  June 30, 1993 | 13 | 18 | 31 |
| 8.  October 25, 1993 | 14 | 9 | 23 |
| 9.  November 17, 1993 | 16 | 35 | 51 |
| 10. December 17, 1993 | 15 | 14 | 29 |
| 11. April 8, 1994 | 20 | 16 | 36 |
| 12. June 30, 1994 | 19 | 16 | 35 |
| 13. October 14, 1994 | 20 | 13 | 33 |
| 14. December 16, 1994 | 15 | 12 | 27 |
| 15. April 6, 1995 | 23 | 17 | 40 |
| 16. June 30, 1995 | 19 | 14 | 33 |
| 17. October 20, 1995 | 20 | 15 | 35 |
| 18. December 15, 1995 | 17 | 16 | 33 |
| 19. June 21, 1996 | 20 | 17 | 37 |
| 20. September 16, 1996 | 20 | 13 | 33 |
| 21. December 12, 1996 | 22 | 13 | 35 |
| 22. April 5, 1997 | 22 | 37 | 59 |
| 23. June 20, 1997 | 21 | 21 | 42 |
| 24. October 30, 1997 | 25 | 20 | 45 |
| 25. January 5, 1998 | 27 | 6 | 33 |
| 26. June 1, 1998 | 20 | 10 | 30 |
| 27. July 10, 1998 | 21 | 4 | 25 |
| 28. July 20, 1998 | 21 | 9 | 30 |

NOTE: Although in the AHERF Board Meeting Minutes Mr. Sherif Abdelhak is listed under the "Members Present" column, in the above chart he is listed under the Appointed Officers/Invited Guests column in recognition of his management status as CEO of the system.



EXHIBIT

4

ALL-STATE LEGAL®

<u>Official Committee of Unsecured Creditors</u>

<u>of Allegheny Health, Education and Research Foundation v.</u>

<u>PricewaterhouseCoopers LLP</u>

**EXPERT REPORT OF DAVID E. COVINTREE**

November 12, 2004

## EXPERT REPORT OF DAVID E. COVINTREE

I have been retained by Cravath, Swaine and Moore LLP, counsel for PricewaterhouseCoopers LLP, to provide opinions in this matter with respect to the conduct of MBIA Insurance Corp. ("MBIA") and to respond to opinions from plaintiff's experts with respect to MBIA.

I.    QUALIFICATIONS

I have experience in the municipal financial markets for seventeen (17) years. My area of expertise was concentrated in hospital credit analysis. For over 10 years, I was a hospital credit analyst first rating hospitals for Moody's Investors Service and then evaluating and approving hospital credits and negotiating bond covenants for Financial Guaranty Insurance Co. ("FGIC"), a major insurer of municipal debts for the last 20 years. As the Director of Health Care at FGIC, I was responsible for the credit analysis of every hospital credit approval as well as responsible for establishing sound underwriting guideline and procedures. Later at FGIC as the Vice President of Public Finance Underwriting, I was responsible for the underwriting of every sector in FGIC's municipal finance department. Responsibilities included not only credit approval, and revising of underwriting policies, but also pricing. I also was a key liaison with the rating agencies and reinsurers.

As Acting Director of Public Finance Surveillance, I was responsible for supervising FGIC's public finance surveillance team, and providing monthly updates to senior management. My resume appears at *Tab 1*.

II.    PRIOR SERVICE AS AN EXPERT

I have not previously provided expert testimony in any matter.

III.    COMPENSATION

I am being compensated for my time in connection with this case at the rate of

$400 per hour, plus expenses.

IV.    MATERIALS REVIEWED

I have attached a chart detailing the depositions and items reviewed at *Tab 2*.

V.    BACKGROUND

Municipal bond insurance is a form of credit enhancement for obligors on

municipal debt. For a premium paid up front, the bond insurance company—which has a

AAA rating, the highest possible—agrees to pay the bondholders both principal and

interest if the obligor defaults. The guarantee by the bond insurer is an unconditional,

irrevocable promise, and the bond insurer's potential exposure is completely locked in for

the life of the bonds (generally 20 to 30 years) from the moment that the policy is issued.

For example, MBIA's 30-year liability to stand behind the DVOG 1996 bonds in the

event of default was irrevocably locked in June 1996, before the DVOG fiscal 1996

financials were issued. No single premium will ever be sufficient to pay for a bond

default. In fact, premiums are generally low; success in this business is built on insuring

only extremely low risk issues. The demand for bond insurance has increased steadily

since the 1980s, becoming a major factor in the municipal markets.

Generally the risk of default in the municipal market is extremely low. Most

issuing entities are states, counties and towns issuing debt for essential services that are

2

supported by various taxes or fees. The municipal market is one of the safest investments in the capital market. The default rate of municipal debt is extremely low, but nonetheless, defaults do occur.

Bond insurance companies view their appetite for risk to be very conservative. Even within the highly regarded municipal market, bond insurance guides itself toward the stronger credits, generally with ratings of A or better. For example, MBIA's 2003 annual report states that in 2003, 81% of all its new business was rated A or better. 78% of the overall in-force portfolio rated A or better. (MBIA 2003 Annual Report at 4) Bond insurers customarily reduce their risk even further by "reinsuring" issues, so that in case of default the primary insurer pays only a portion of the loss.

Municipal bond insurers are, on the whole, successful in avoiding risk. For example, MBIA's 2003 annual report states that "spanning almost 30 years of public finance underwriting and 15 years of structural finance enhancements, only 66 transactions incurred any loss at all, with five transactions (two hospitals and three tax liens) causing 75% of the $460 million loss we have incurred through our history". (MBIA 2003 Annual Report at 9) Because the insurers have rarely been obliged to pay claims, the business has historically been highly profitable: according to MBIA's 2003 Annual Report at 44, net income was approximately $813 million.

Within the municipal market, there is, however, a realization that not every bond sector has the same risk profile. The spectrum of risk runs from the safest (including general obligation bonds with unlimited ability to secure the debt via taxes and water and sewage bonds that are secured by fees for essential services) to the riskiest, which are

3

specific enterprise revenue bonds (such as for hospitals), secured only from revenue generated by the facility.

The entities at the riskier side of the aforementioned spectrum tend to exhibit more characteristics of corporations. Hospitals are not monopolies and tend to have competition within their service areas—alternative services are frequently just miles away. For this reason, and because much of their income comes from reimbursement at rates set by the government, hospitals often have little or no ability to raise rates to improve their financial performance. Furthermore, the health care industry continues to change at such a rate that it is impossible to predict with any confidence the ability of a hospital system to meet debt payments 20 or 30 years in the future. As a result, while municipalities do not vanish, closures of hospitals do occur.

In 1995, FGIC decided to stop insuring health care bond issues. FGIC determined that the health care market was significantly riskier than the other public finance sectors they had been insuring and that the existing premiums did not compensate for the risk. FGIC even went to the extent to sell its existing book of health care business.

Over the years, the bond insurance companies' "product", their AAA rating, has been commoditized. As more businesses entered the lucrative market, a greater percentage of the municipal market became insured, but at a cost. The investing market saw little to no differentiation between the bond insurers. Attempts were made to distinguish themselves from one another by the size of their capital base or by the number of AAA ratings. Regardless of the marketing techniques, to the investing public, they all looked alike. As a result, to win business, bond insurers had to resort to meeting clients'

4

demands on covenants and other terms and conditions, and the insurers' influence in structuring deals diminished and covenants weakened. Premiums dropped as well.

Bond insurance companies are also effectively in competition with the rating agencies and the issuer's option to do without bond insurance. Rating agencies responsible for rating the underlying credit frequently set the standard for business covenants in that if the issuer can get an acceptable rating by means of less rigorous criteria than the insurer demanded, the issuer may choose to issue without insurance. In the 1990's, this pressure, too, weakened the covenants that insurers were able to require.

In his report Mr. Kite discusses the role of covenants. I disagree with Mr. Kite's analysis of the role of covenants. Mr. Kite states that covenants protect against precipitous deteriorations in credit quality. (Kite Report at 6-7) If this were the case, covenants would be designed differently. AA credits have very different financial performances than BBB credits. If covenants were designed to maintain the former high credit quality, a rate covenant for instance of 1.10x debt service coverage would be far from adequate. Low threshold covenants are more apt to resemble the financial profile of lower rated credits. In order to maintain high credit quality standards, you would expect covenants to be set at significantly higher levels. The standard financial covenants referred to by Mr. Kite used by bond insurers to monitor performance are just set too low to do anything more than warn of credit deterioration. The standard financial covenants are in reality minimal standards of performance expected from an operating entity.

I also disagree with Mr. Kite's assertion that covenants are an early warning of credit deterioration. (Kite Report at 7) Once again the standard array of financial tests are set at levels only slightly above "sum sufficient" coverage. Levels of 1.10x debt

service coverage are not particularly comforting. An early warning again implies a covenant would be set well above a potential problem when a credit is not immediately in need of remedial attention. In fact, the covenant violations under the "standard tests" are warnings that a significant problem already exists, as is indicated by the fact that the standard indenture then requires a consultant to be hired immediately.

Bond insurers operating under a no loss philosophy are reliant on thorough due-diligence. The large exposures of credits that bond insurers incur make sound underwriting critical in their success. Analysts are trained to review a standard set of required documentation ranging from legal documents, financial statements and obligor statistics. The analysts are also supported with internal guidelines reflecting the underwriting philosophy of the bond insurer. This all allows for consistent underwriting. In addition there is a multi-level review process giving the opportunity for numerous people from various business perspectives to review the credit prior to the bond insurer's commitment.

Another function in maintaining a successful business is surveillance. As the term of the bonds insured are generally 20 to 30 years, the bond insurer must be monitoring both specific and general events particular to the insured book of business. To accomplish this, the bond insurers have established separate surveillance departments, apart from the underwriting departments. While dependent on initial sound underwriting, the surveillance departments act independently thereafter, reviewing credits. The frequency of the review will generally reflect the risk profiles of the credits. In addition to bonds with lower credit ratings, specific bond types will be more frequently reviewed.

Hospitals, inherently more risky, usually have annual surveillance reports, whereas general obligation bonds usually do not.

The default rate in municipal finance has historically been extremely low. Indeed, it is my opinion that there have been far too few incidents of major health care defaults in bond insurance to conclude that surveillance and remediation have done much to reduce loss experience. Put another way, there is no tried and true method for bond insurers to look to that would allow one to reasonably conclude that if there was a credit deteriorating, a bond insurer would be able to successfully turnaround the credit. I agree with MBIA's statement, after the AHERF bankruptcy, that with regard to remediation efforts, "success is by no means assured -- especially in sectors like hospitals which increasingly appear to have more in common with middle market corporate credits than they do with other tax-exempt issuers providing essential public services". (Ex. 2205, p. 3)

When a bond insurer does take remedial action, one option is in the form of debt restructuring, an action that may benefit the bond insurer with no assurances of curing the root cause of the institution's problems. Consistent with this, a restructuring issues checklist prepared at MBIA lists a number of scenarios to be contemplated in the case of remediation. (Ex. 2254)

VI.    INITIAL UNDERWRITING.

**Opinion:  MBIA's agreement to insure $300 million of 30 year DVOG bonds was severely inconsistent with its no-loss underwriting standard, reflecting disregard of DVOG's riskiness.**

MBIA says it had a "no loss" underwriting philosophy at the time of the underwriting of the DVOG bonds. Emmeline Rocha-Sinha, MBIA's Managing Director

7

of Unit Finance within the Public Finance Division, testified that MBIA would not participate in a transaction if there was "even a hint that there is a possibility and a probability that [MBIA] might have to make a payment." (Rocha-Sinha Dep. Tr. at 24) For all of the reasons discussed below, it is my opinion that if MBIA had adhered to this standard they never would have underwritten the 1996 DVOG bond offering.

A.　　Given their stated "no loss" standard, MBIA should not have insured any health care bond in the Philadelphia area.

As discussed in the introduction, the health care industry was moving towards a competitive and increasingly risky "corporate model". After the AHERF bankruptcy, MBIA acknowledged that, "sectors like hospitals...increasingly appear to have more in common with middle market corporate credits than they do with other tax-exempt issuers providing essential public services." (Ex. 2205) For this very reason, in 1995, FGIC became uncomfortable with the economics of healthcare providers and FGIC's ability to predict long-term outcome of healthcare debt, and exited the business of providing bond insurance for the healthcare sector. In my opinion, MBIA's continued underwriting of health care bonds in this time period indicates that they were not paying attention to the increased risks given their long-term commitment to insure the bonds, or that they were willing to disregard their underwriting standards in order to get new business, or both. In November 1998, MBIA announced that it would no longer insure healthcare bonds rated below A. (Bond Buyer, November 13, 1998)

Beyond the risks facing the changing healthcare industry generally, the MBIA underwriting committee report accurately noted that Philadelphia in particular was a "very competitive market area". (Ex. 1880) David Penchoff, a voting member of the underwriting committee, stated in his voting sheet that the Philadelphia area market was

8

"highly competitive and managed care heavy" and acknowledged that "there will clearly be some growing pains to be endured over the next 3 to 5 year period". (Ex. 2249) Clearly, MBIA was aware that the Philadelphia area was a precarious market for health care having experienced in 1994: (1) a bankruptcy of its insured debt by Sacred Heart Hospital in a suburb of Philadelphia, and (2) the large $42 million loss at Hahnemann University Hospital that caused its debt service ratio to fall below 1.0x. These two events would suggest that there was trouble brewing in the Philadelphia market and a "hint" of future problems. MBIA's Senior VP and head of insured portfolio management, David Stevens, testified that after the Sacred Heart bankruptcy MBIA should not have involved itself in providing bond insurance on behalf of Philadelphia-area health care providers. (Stevens Dep. Tr. at 46) Surely, one would expect that if MBIA was agreeable to insuring a hospital in the Philadelphia area at all, that hospital would have had to have demonstrated extremely strong qualities. MBIA's initial rating for the DVOG bonds was a 4 (some MBIA documents state the initial rating was 4B ("B" means stable), the approval sheet states that it was voted a 4C ("C" means declining trend), Ex. 1875). It is my opinion that a credit rating of 4 (the rating MBIA gave the DVOG bonds at issuance, as discussed below) does not meet these criteria and, consequently, MBIA should not have underwritten these bonds.

**B.** **MBIA was well aware of many weaknesses in DVOG's creditworthiness specifically and, in approving the issuance, MBIA ignored many of its own health care underwriting standards and benchmarks**

MBIA was aware of numerous risks involved in underwriting DVOG. Specifically, in the initial credit analysis submitted by Carolyn Tain, she identifies many weaknesses: (1) Lack of a financial track record as a consolidated group, (2) An

9

"unproven market strategy", (3) "Weak liquidity", and (4) "Academic operations which are a drain on operation of the Obligated Group". (Ex. 1880)

Furthermore, within her own credit analysis, Carolyn Tain states that there "isn't enough information to identify trends", adding that the 1994 and 1995 financials show a "weak balance sheet". (Ex. 1880) In my experience underwriting health care credits that have a maturity date of long term, say 25 to 30 years, it would be very uncharacteristic to rely on such a short historical background. In my experience, the standard request by a bond insurer has been for five years audited financial statements. Hollis Anzani, an underwriting committee member at MBIA, likewise testified during her deposition that the underwriting committee would typically review five years of audited financials. (Anzani Dep. Tr. at 45)

MBIA's Underwriting Guidelines for Heath Care identifies particular financial ratios that a potential insured credit should exhibit prior to MBIA's commitment to insure. (Ex. 2143) While MBIA's guidelines state that Days Cash on Hand must be above 60 Days, Carolyn Tain's credit analysis reveals, and even cites as a weakness, the declining ratio at DVOG from 64 days in 1994 to just 28 days in 1995. Furthermore, while MBIA's guidelines suggest that the health care facility under review should be maintaining its accounts receivable below 70 days, DVOG's 1995 pro forma financials show a total of 81 days.

In Emmeline Rocha-Sinha's voting sheet she points out to the underwriting committee that the obligated group's financials show a stable but meager operating line, relatively high leverage and little cash, and explicitly concluded that "this financial profile is not typical for our healthcare underwriting." (Ex. 1881) During her testimony,

Ms. Rocha-Sinha further clarified what appeared in her voting sheet by stating that DVOG was "a new merger that had been unproven, we had not seen a history of financial good standing and therefore it was not typical of us to participate in these types of transactions." (Rocha-Sinha Dep. Tr. at 304)

Despite acknowledging that it was her responsibility to include past covenant violations for an existing client in a credit assessment that she was putting together for an existing client (Tain Dep. Tr. at 137), Ms. Tain failed to include the Hahnemann University covenant violation and waiver in the DVOG credit assessment. (See Exs. 1880 and 338) In my opinion, the omission of such a critically important piece of evidence from the credit assessment indicates that the underwriting process for this offering was sloppy and not being approached with appropriate seriousness.

MBIA also relied on financial projections constructed by AHERF's management team rather than requesting projections from an external third-party consultant. In my opinion, this reliance on internal reporting was a relaxation of sound underwriting practice. In her deposition, Ms. Rocha-Sinha states that it was typical for new issuers to require a feasibility study from an outside consultant, and that a large offering would ordinarily dictate that procedure. (Rocha-Sinha Dep. Tr. at 259-260) In my opinion, the DVOG offering was large. This is confirmed by Judy Radasch, MBIA's Managing Director of Investor Relations, who stated that a $300 million offering such as DVOG would be considered large. (Radasch Dep. Tr. at 48) While MBIA had prior exposure to Hahnemann University Hospital, now one member of the Obligated Group, it is my opinion that DVOG should have been treated as a new issuer as the new entity was to be significantly different from the credit that MBIA had insured in 1989 and 1991.

11

Thus, based on the information MBIA had, enforcement of MBIA's own policies and ordinary underwriting prudence would have stopped MBIA from insuring the DVOG bonds. According to Judith Radasch, Mr. Weill, then the President of MBIA, said that he looked at the file and if "the deal had come to the executive review committee he would have opposed it." (Radasch Dep. Tr. at 67) Looking back, Charles Reilly, MBIA's Head of Waiver and Consents group, echoed these sentiments by testifying that MBIA would never again provide insurance for an entity such as DVOG. (Reilly Dep. Tr. at 207) David Stevens, then head of MBIA's surveillance department, agreed that MBIA should never had provided insurance to DVOG. (Stevens Dep. Tr. at 89-90) I agree that opposing this deal would have been the prudent course of action. Instead, MBIA disregarded all the red flags and its own policies. Not only did MBIA insure the bonds, but the MBIA underwriting committee even voted to waive the capacity limit for the $300 million financing. (Ex. 1875)

C.   Despite being aware that AHERF, the parent, was not a member of the obligated group, MBIA unjustifiably relied on the strength of AHERF and its other affiliates

MBIA based its creditworthiness conclusion, at least in part, on the credit of AHERF even though AHERF was not a part of the obligated group. Dick Heberton, MBIA's Vice President of the Hospital Unit, testified that prior to the bond issuance, representations were made to MBIA by AHERF representatives that AHERF would financially support DVOG. (Heberton Dep. Tr. at 52-53, 100-102) In a memorandum to the underwriting committee, Carolyn Tain wrote that "members of the Allegheny System which are not members of the Obligated Group have provided more than $8 million in support [of MCPHU, the medical school]. Contributions of such members are expected

12