to continue in the future". (Ex. 1879) It is my experience that this reliance was unfounded as AHERF had no legal obligations in this underwriting. As David Stevens testified, "if you don't have a legal obligation, then you have nothing." (Stevens Dep. Tr. at 102) I agree with the views expressed by Mr. Stevens and Pat Mathis after the AHERF bankruptcy that, "despite assurances to the contrary, the resources of a hospital system may not be available for a struggling obligated group. Put another way, "'moral obligation' is a concept best restricted to states and other entities with tax collection powers and the inability to sell, liquidate, or bankrupt their enterprises." (Ex. 2205)

The MBIA underwriting committee report also indicates that the analyst places great emphasis on the "well qualified management staff with experience in turnaround situations and in operating systems". (Ex. 1880) As the current management team will not be in place over the 20 to 30 year period of the bond, I believe that reliance on the skills of a particular management team to justify disregarding the usual underwriting financial standards was not reasonable.

VII.    FINANCIAL AND LEGAL COVENANTS.

**Opinion: MBIA agreed to a set of weak financial and legal covenants for the DVOG bonds that severely limited MBIA's ability to either protect itself from further credit deterioration or to enforce meaningful remediation efforts.**

A.    MBIA required no liquidity covenant.

MBIA's credit analysis revealed that DVOG was highly leveraged and short of cash. (Ex. 1880) Yet MBIA required no liquidity covenant in the Supplemental Master Trust Indenture with DVOG. (Ex. 331) The link between liquidity and the ability to meet current debt payment obligations is obvious, and covenants relating to liquidity are an available safeguard. Notably, PNC required liquidity covenants in connection with the

13

letters of credit it extended to DVOG. (Exs. 2790, 2791) Yet MBIA did not request a liquidity covenant in connection with its insurance of the DVOG bonds, nor did MBIA require a cross-default provision to the PNC-guaranteed bonds that were part of the same offering that MBIA insured. As a result, when DVOG violated the liquidity covenant on the PNC letters of credit in fiscal year 1998, MBIA had no ability to declare an event of default. (Reilly Dep. Tr. at 137-141) In my opinion, given the financial position at the time of underwriting of the DVOG a liquidity covenant would have been prudent. Likewise after the AHERF bankruptcy Mr. Stevens and Mr. Mathis recommended that MBIA obtain "well-crafted covenants like liquidity tests, ideally measured on a quarterly basis with meaningful cure provisions." (Ex. 2205 at 2)

B.     <u>MBIA was aware that DVOG's strategy contemplated large transfers of assets to cover physician practice acquisitions, yet permitted such transfers at a brisk rate, and included a covenant restriction on asset transfers that was looser than their usual restrictions</u>

The DVOG Offering Statement and AHERF management's revised financial projections disclosed that DVOG intended to pursue an aggressive integrated delivery system strategy that would require very large cash commitments going forward, particularly for physician practice and ambulatory care center acquisitions. (Exs. 408, 1118) While these acquisitions would be pursued and managed by AIHG, not a member of the obligated group, MBIA was aware that AHERF management projected that DVOG would transfer approximately $158 million over three years to AIHG to fund acquisitions. (Ex. 1118) Given DVOG's leverage and known cash shortage, planned cash outflows of this magnitude should have been very troubling to MBIA.

MBIA's standard asset transfer covenant at the time prohibited transfer of more than 10% of Plant, Property and Equipment per year, a rule still permitting the transfer of

14

a large portion of the obligor's assets within just a few years. (Ex. 2149) However, in Section 3.22 of the DVOG First Supplemental Master Trust Indenture, MBIA actually agreed to a significantly looser annual limit on asset transfers out of the DVOG of 8% of all assets per year. (Ex. 331) The result of this was to increase the permitted level of transfers for FY 1996 from $42 million to $76 million, and indeed DVOG transferred $74 million to AIHG in FY 1996, as was disclosed in the AHERF 1996 audited financials. (Heberton Dep. Tr. at 91-92. See also Ex. 1888) Ms. Karleen Strayer, the manager of the Healthcare Group in the Surveillance Department, testified that she "would have wished for a tighter test" on transfers. (Strayer Dep. Tr. at 310) In my opinion the more conservative asset transfer test was more appropriate. The fact that MBIA relaxed its existing covenant to permit these substantially larger transfers in the face of the challenges which it knew DVOG was facing is difficult to understand apart from a desire by MBIA to cultivate a good relationship with AHERF as a whole without regard to the factual creditworthiness of DVOG.

C.    <u>MBIA was aware that DVOG had adopted an accounting change governing transfers to AIHG that would impact its income from operations, yet did not take that into account in its legal review.</u>

While not as direct as an explicit limitation on transfers, a debt service coverage ratio covenant can also serve as a check on transfers that undermine the obligor's ability to meet its obligation, so long as such transfers are accounted for as expenses of the obligor. However, the DVOG offering statement disclosed that DVOG was adopting an accounting change such that large portions of its payments to AIHG would be classified as "net asset transfers" rather than an expense at DVOG. (Ex. 408) This would have the predictable effect of increasing DVOG's reported operating performance without actually

15

reflecting any improvement in its cash position or ability to meet its debt repayment

obligations. As Richard Heberton noted, if all of such payments to AIHG had been

treated as an expense in 1996, "the group would have recorded a loss of over 24MM

instead of a 27MM profit." (See Heberton Dep. Tr. at 75-76, referring to Ex. 1887.)

MBIA was well aware of a means of neutralizing any such potential evasion of debt

service coverage covenants: MBIA had a provision in its 1991 contract with AGH,

another AHERF affiliate, prohibiting such transfers if a pro forma long term debt service

coverage ratio, calculated with the amount of asset transfers deducted from income, fell

below 1.75. (Ex. 1865 at D-18) Yet MBIA neither requested nor obtained any such

requirement in its Supplemental MTI covenants with DVOG in 1996.

> D.  MBIA agreed to a toothless "consultant" requirement in the event of default.

Municipal bond insurance contracts commonly provide that, in the event of a

financial covenant violation, the insurer may not declare an event of default and

accelerate the debt if the obligor retains a consultant and works to implement the

recommendations of the consultant.[1] The consultant mechanism is often of limited value

to the insurer. First, I agree with Ms. Strayer's evaluation that "consultant call-ins are

never effective without the cooperation of management". (See MBIA-REP-0150)

Second, in the case of a complex organization such as AHERF, it would be at best a

lengthy process for a consultant to analyze the hospital system, make recommendations,

---

[1] I have seen that Mr. Kite is of the opinion that if the DVOG debt service coverage ratio fell below 1.0x, there was an event of default that could not be cured. I have also read the expert report Robert P. Mitchell, dated November 9th, 2004, who states that the failure to maintain even a debt service coverage ratio of 1.0x would not, in his opinion, have constituted an incurable event of default. (Mitchell Report at 3)

persuade management and the board to authorize a radical change of strategy and direction, and then implement such changes. Indeed, because change can take years even if pursued with vigor, the "consultant" mechanism can actually block the insurer from declaring an event of default or taking other remedial actions it sees as more appropriate.

The general recognition that the consultant mechanism is a slow one is illustrated by the fact that the DVOG Supplemental MTI states that, if the obligors still remained under a debt service coverage of 1.1 three years after retaining a consultant, then they had to retain a new consultant and get a new consultant's report. (Ex. 331, Section 3.21) Further, the DVOG consultant provision was more lax than many in the industry. The MTI specifies that the consultant may be appointed by any member of the obligated group. (Ex. 330, definition of "Consultant") The approval of MBIA is not required, nor is there any requirement that the consultant be from a nationally recognized firm. As Mr. Reilly testified, MBIA commonly imposed a consultant provision under which "either we can nominate or they can nominate and we approve". (Reilly Dep. Tr. 153) In my experience, both of those requirements have been incorporated in other similar circumstances. In the case of the DVOG, MBIA had no control at all over the selection of the consultant. So it could do little to prevent the hiring of a consultant from being used as a means to block a declaration of an event of default.

17

VIII.    SURVEILLANCE AND REMEDIATION

**Opinion: MBIA's surveillance of DVOG was perfunctory, and MBIA demonstrated that it was unwilling or unable to take meaningful remedial action.**

A.    MBIA reacted to a progression of very bad news about DVOG without initiating intensive investigation, or demanding remedial action.

As early as February 1997, within a year of the DVOG underwriting, MBIA downgraded the DVOG credit within its internal rating system from a "4" to a "6", based on review of the 1996 audited financials. (Ex. 1887)  Based on my experience, I would consider this to be an extraordinary and deeply troubling development causing grave concern about the credit and the associated underwriting, particularly given that the underwriting had occurred so recently.  As Mr. Weill, then President of MBIA, put it, this was an "out of pattern" event.  (Weill Dep. Tr. at 71)

Indeed, MBIA's first surveillance report, written by Richard Heberton and dated March 11, 1997, made clear the magnitude and tone of the financial difficulties facing DVOG.  Mr. Heberton detailed that cash on hand had dropped to 27 days, that the debt to capitalization ratio had jumped to 77%, that DVOG had transferred $74 million to affiliates in 1996 and $17 million in the first quarter of fiscal 1997, and that apart from a change in the accounting treatment for the asset transfers discussed above, DVOG would have shown a loss rather than a profit for fiscal 1996.  (Ex. 2193)

In the face of all this, MBIA took no meaningful action to initiate remedial action at DVOG or AHERF.  As mentioned, the DVOG credit was downgraded to a "6" internally, but it was also rated "B", or "stable", although there was no sign that its performance had in fact stabilized.  At a level "6" the frequency of review was increased to only semi-annual.  (Heberton Dep. Tr. at 149)  Without regard to covenants, MBIA could have exercised informal pressure, for example by approaching the board to express

18

its concern and demand specific remedial action. In fact, Mr. Weill testified that "in the real world when we become concerned about a credit and we understand what the problems are even if there hasn't been a covenant breach or if the covenants [are not written] perfectly, we found that just getting involved is pretty darn persuasive." (Weill Dep. Tr. at 161-162) Yet, MBIA made no serious effort to exert whatever influence they may have had. In fact, Mr. Heberton and Ms. Strayer testified that they did fly to Pittsburgh at some time in 1997 to meet with Sherif Abdelhak to raise concerns, only to be told upon arrival that he could not meet with them. (Strayer Dep. Tr. at 261-262, Heberton Dep. Tr. at 118-119) In fact, Charles Reilly testified that MBIA got "excuses" in terms of why Mr. Abdelhak would not meet with them and Mr. Reilly was frustrated. (Reilly Dep. Tr. at 83-84) Such a direct rebuff from management was in my opinion a grave warning sign itself, yet as Mr. Reilly testified, MBIA did not meet with any board members until April 29, 1998. (Reilly Dep. Tr. at 81-85) I find this degree of passivity to be comprehensible only on the theory that MBIA did not take seriously the thought that it could and should make a difference through a remediation process.

MBIA's inaction is in part also explained by the fact that MBIA unjustifiably continued to rely on the overall creditworthiness of AHERF and all its component parts, rather than that of the DVOG obligor. Mr. Heberton testified that he considered the possibility of downgrading the DVOG credit all the way to 7B in February 1997, but the overall amount of cash at the parent entity and at other AHERF entities played a role in the decision not to. (Heberton Dep. Tr. at 103-104) Eventually, in December 1997, MBIA did downgrade DVOG to a 7B. (Ex. 1890) And indeed, only on February 3, 1998, shortly after Moody's had downgraded Graduate Hospital to B2, Zurbrugg to a

Ba3, and AGH to an A3 (all AHERF entities), did MBIA downgrade its internal credit rating of DVOG to an 8—the lowest level above an actual default, while inexplicably retaining the "B" or "stable" rating. (Ex. 2201)  A few days later MBIA received AHERF's audited financial statements which disclosed a potential violation of the DVOG rate covenant for fiscal year 1998. (Ex. 1893)  Yet even after these alarming developments, MBIA made no attempt to exercise any influence to prompt remedial action such as the hiring of a consultant.

B.    MBIA became concerned about a lack of integrity on the part of the AHERF CFO, but neither intensified surveillance nor demanded remedial action.

MBIA not only became aware of financial warning signs, but also became concerned about the integrity of AHERF management.  In April 1997, MBIA representatives met with David McConnell, CFO of AHERF, and came away with the belief that Mr. McConnell was willing to "move funds surreptitiously" in a way that could "weaken our credit". (Ex. 2194, Stevens Dep. Tr. at 121-122, Reilly Dep. Tr. at 74-75)  Charles Reilly came away from this meeting being "uncomfortable with the financial integrity being held at the highest level at AHERF." (Reilly Dep. Tr. at 75)  Yet again, MBIA made no effort to exert influence to prevent such "weakening" of its credit. In my opinion, these concerns should have been raised to the CEO and board.

C.    Apparently, MBIA was improperly treating the DVOG credit deterioration no differently than general obligation credits.

Corporate bonds and municipal general obligation bonds have historically presented very different risk profiles.  With corporate bonds an insurer faces the risk that the issuer may be unable to increase revenues to cover obligations, or may even go out of

20

business—resulting in a major or complete write-off. Municipalities, by contrast, do not go away, and generally have monopoly power enabling them to raise taxes or fees (e.g., for sewer services) to any level necessary to pay off related bonds. There is a risk of a delay of payment, but almost no risk of actual non-payment. By the mid 1990s, as a result of rapid changes in the health care market, health care bonds, even if issued by municipal authorities, had more in common with corporate credits. In particular, revenues were earned in highly competitive markets, and the insurer faced a real risk of bankruptcy and write-off. (Ex. 2205) For this very reason, by 1995 FGIC stopped insuring health care bonds. Yet it appears to me that in 1996 and 1997, MBIA was aggressively continuing to consider health care credits including DVOG, as though their quality was no different than their municipal debt, with no real risk of non-payment default. This may in part explain MBIA's passivity in the face of the obvious and severe risk factors associated with DVOG. Only after the bankruptcy did MBIA begin to reduce its exposure to healthcare. In 1997 the percentage of health care of the total public finance portfolio was 16%. (1997 MBIA Annual Report) By 2003 this percentage had declined to 10%. (Moody's Investors Service Annual Report for MBIA Insurance Corporation, dated August 2004)

     **D.**   <u>MBIA's senior management was generally reluctant to assert its legal rights against obligors.</u>

MBIA's persistent passivity in the case of DVOG is also more understandable in light of the fact that, at the highest levels MBIA was generally disinclined to enforce its legal rights against obligors. Mr. Stevens testified that MBIA had a general attitude of not "supporting any kind of legal action against trustees, hospitals, or other entities that issued bonds or who were involved with the investment banking community who were

21

the main clients of MBIA" (Stevens Dep. Tr. at 181-82), and that MBIA was concerned about losing future business if MBIA took legal action against the AHERF board of trustees. (Stevens Dep. at 182)  In fact Mr. Stevens testified that when he suggested legal actions against DVOG, Mr. Weill responded that they were "not going to pursue those kinds of strategies". (Stevens Dep. Tr. at 182)

As detailed above, however, despite Mr. Heberton alerting MBIA to many alarming aspects of the DVOG credit in March 1997, MBIA did nothing. (Ex. 2193) MBIA also apparently believed that vigorously enforcing its legal rights was not a genuine option. As Mr. Stevens put it, the right to declare an event of default and acceleration was "a nuclear cure of little attraction" (Stevens Dep. Tr. at 285, referring to Ex. 2205, p. 3), and in my judgment there is considerable truth to this. That is, exercising legal rights against an uncooperative obligor is likely to frighten other creditors and damage the business of the obligor, to the injury of all creditors including the insurer. For an institution with poor liquidity, such as DVOG,  acceleration of the bonds will typically lead to bankruptcy. As MBIA recognized, "hospital bankruptcies are particularly injurious to a health care enterprise" and "once bankruptcy is declared, a turnaround is virtually impossible." (Ex. 2205, p. 1)

E.    MBIA demonstrated a pattern of waiving rather than enforcing covenant violations.

Consistent with its attitude towards enforcing covenants and its passive response to grave warning signs of financial trouble and lack of management integrity at DVOG, MBIA demonstrated more than once in actual practice that it was not interested in declaring events of default and invoking legal rights. Backing up to 1994, when Hahnemann, then separately insured by MBIA, violated debt service coverage ratio

22

covenants and requested a waiver, MBIA granted that waiver without requiring appointment of a consultant or requiring a pledge of a security interest and lien on gross revenues. They simply required quarterly financials and the funding of the reserve funds for the 1989 and 1991 bonds. (Ex. 338) In my experience, monthly reports can be and are requested of troubled credits. Then, when in 1997 AHERF breached a covenant (Ex. 331, Section 3.25) by delivering its audited financials more than five months after the end of the fiscal year, MBIA again did not send in a notice of default. (Ex. 1893)

In sum, there is no indication that at any time MBIA was looking for an opportunity to declare an event of default at DVOG, nor that it would have done so had an opportunity presented itself. MBIA was unwilling, when faced with the opportunity, to cross over from performing surveillance functions to taking remedial actions to try to correct DVOG's financial deterioration.

IX.    CONCLUSION

I am aware that Mr. Kite has opined that had the financial statements for DVOG been as Mr. Berliner has written in his report,[2] MBIA "would have been in a position in the fall of 1996 to pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system." (Kite Report at 6) And Mr. Den Uyl quotes Mr. Weill of MBIA to the effect that he is sure that had MBIA had known of

_____

[2] Steven Kite, in his Report, lists the financial covenant violations that he believes would have been occurred. I understand that PwC disagrees. For purposes of this opinion regarding what actions MBIA likely would have taken in the event of covenant non-compliance, I have assumed that Mr. Kite is correct about what violations would have occurred.

23

AHERF's true financial condition sooner, MBIA would have advocated steps, including the hiring of a consultant, discontinuing physician practice acquisitions, cutting costs, and hiring professionals to assist with AHERF's accounts receivable. (Den Uyl Report at 21-22) So far as I can tell from their resumes, neither Mr. Kite nor Mr. Den Uyl have any experience on the business side of bond insurance, and Mr. Weill's testimony of course is from the perspective of 20-20 hindsight.

Such speculation is not justified by my experience in the bond insurance industry and MBIA's record in particular. I agree with the statement in the 2003 MBIA Annual Report: "To understand what is happening today or what will happen in the future, I look back." In light of the actual historical facts reviewed above, it is my opinion that it is very unlikely that MBIA would have acted in the way assumed in the plaintiff's scenario. MBIA would have been far more likely when receiving the negative 1996 financials to have moved in its normal fashion slowly and deliberately have avoided any formal legal action for an extended period of time, and—if and when it tried to make any serious moves—would have found that the covenants in its Supplemental Master Trust Indenture with DVOG gave MBIA very little ability to control the course of events at DVOG.


Dated:  November 12, 2004

David E. Covintree

Name:     David E. Covintree

Personal:     Birth Date 6/24/50
              Summit, New Jersey

Education:

| | | |
|---|---|---|
| 1968-1972 | Denison University, Ohio | B.A. Economic and Biology |
| 1974-1976 | Columbia University, NY | B.S. Nursing |
| 1977-1979 | New York University, NY | M.B.A. Economics |

Experience:

1976-1977     University of Michigan Hospital, Ann Arbor, Michigan
              Registered Nurse, Psychiatric Unit

1980-1981     New Jersey Department of Health, Trenton, NJ
              Analyst – Certificate of Need Unit

1981-1983     Moody's Investors Service – NY, NY
              Assistant Vice President – Municipal Finance, Health Care Group

1984-1997     Financial Guaranty Insurance Company (FGIC), NY, NY
1984-1989     Director of Health Care
1990-1995     Deputy Director of Public Finance
1996-1997     Director of Quality and Acting Director of Public Finance
              Surveillance

Professional Licenses:     Registered Nurse, New York State

EXHIBIT

1

ALL-STATE LEGAL®

**Documents Considered for the Expert Report of David Covintree**

| CASE DOCUMENTS |
|---|
| First Amended Complaint |
| Answer to First Amended Complaint |
| Plaintiff's Response to Defendant's Second Set of Interrogatories |
| MBIA's Written Responses to Defendant's Rule 30(b)(6) Subpoena |

| PLAINTIFF'S EXPERT REPORTS |
|---|
| Expert Report of Steven B. Kite (September 1, 2004) |
| Expert Report of Robert W. Berliner (September 3, 2004) |
| Supplemental Expert Report of Robert W. Berliner (September 3, 2004) |
| Expert Report of R. Bruce Den Uyl (September 3, 2004) |

| DEFENDANT'S EXPERT REPORTS |
|---|
| Expert Report of Robert P. Mitchell, Esq. (November 9, 2004) |

| DEPOSITION EXHIBITS & TRANSCRIPTS |
|---|
| Transcript and Exhibits from the deposition of Hollis Anzani December 23, 2003 |
| Transcript and Exhibits from the deposition of Richard Heberton January 15, 2004 |
| Transcript and Exhibits from the deposition of Charles Reilly November 21, 2003 |
| Transcripts and Exhibits from the deposition of Emmeline Rocha-Sinha August 5-6, 2003 & June 18, 2004 |
| Transcript and Exhibits from the deposition of Thomas Saccardi September 17, 2003 |
| Transcripts and Exhibits from the deposition of David Stevens February 10, 2004 |
| Transcripts and Exhibits from the deposition of Karleen Strayer October 8-9, 2003 |
| Transcripts and Exhibits from the deposition of Carolyn Tain August 7-8, 2003 & June 18, 2004 |
| Transcripts and Exhibits from the deposition of Richard Weill June 15, 2004 & July 7, 2004 |

**EXHIBIT**

ALL-STATE LEGAL®

2

| ADDITIONAL DEPOSITION EXHIBITS |
| --- |
| PNC Letters of Credit 2790, 2791 |

| ADDITIONAL DOCUMENTS |
| --- |
| Allegheny County Hospital Development Authority Hospital Revenue Bond for Series 1993 (Magee-Womens Hospital) |
| 1996-2004 MBIA Annual Report |
| 1996-2004  Moody's MBIA Insurance Report |
| The Bond Buyer |

| BATES STAMPED DOCUMENTS |
| --- |
| MBIA-REP-0001 – MBIA-REP-0212 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> PRICEWATERHOUSECOOPERS LLP <br><br> Defendant. | Civil Action No. 00-684 <br> Judge David Stewart Cercone |

# EXPERT REPORT OF
# PROFESSOR CHRISTOPHER M. JAMES

November 12, 2004

## I.     Introduction

1.      I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at
        the University of Florida.  Prior to joining the faculty of the University of Florida,
        I taught at the University of Oregon and the University of Michigan.  I have also
        held positions at the Federal Reserve Bank of San Francisco, the Federal Deposit
        Insurance Corporation and the Treasury Department.  Over the past ten years I
        have served as a consultant to a number of financial institutions and corporations
        on matters concerning commercial bank lending practices, corporate financial
        policy, mergers and acquisitions and corporate strategy.  My academic research
        has been in the area of bank management, security pricing, corporate finance and
        financial institutions.  I have published numerous articles on bank lending
        practices and the role of banks in the corporate capital acquisition process.  I
        currently serve on the Advisory Board of SunTrust Bank and formerly served on
        the Board of Directors of SunTrust Bank of North Central Florida.  I served on the
        academic advisory board to the Turnaround Management Association for ten
        years from 1992 through 2002.  I also serve on the editorial boards of four
        scholarly journals including the *Journal of Financial Economics*.  I served as an
        associate editor of the *Journal of Finance* and as editor of the *Journal of
        Financial Intermediation* from 1988 through 1999.  I have taught courses in
        commercial lending and loan management at banking schools and executive
        training programs at major commercial banks.  A copy of my curriculum vitae is
        attached as Exhibit 1.  A list of my deposition and trial testimony over the past
        four years is included in Exhibit 2.

2.      I was retained by counsel for PricewaterhouseCoopers LLP ("PwC") to provide
        expert opinions with respect to the credit relationships between Allegheny Health,
        Education and Research Foundation ("AHERF"), its affiliated entities, and
        several commercial banks, and to evaluate the assertions made by Plaintiff's
        experts Steven Kite and Bruce Den Uyl relating to the actions that they allege
        would have been taken by the banks in the event that the alleged covenant
        violations outlined by Mr. Kite had occurred.

3.    As part of my analysis, I have reviewed documents produced in this litigation as
      well as information from a number of additional sources. I have also reviewed
      the First Amended Complaint and the Answer to First Amended Complaint in this
      matter. A complete list of documents considered is included in Exhibit 3.

4.    I am being compensated for my time and services on an hourly basis. I am
      charging my regular hourly rate of $600.


## II.    AHERF Background

5.    AHERF was a Pennsylvania nonprofit corporation with affiliates that owned and
      operated numerous hospitals, physician practices and other healthcare-related
      entities in the Pittsburgh and Philadelphia regions. The AHERF organization was
      divided into a series of "Obligated Groups" based primarily on geography. At
      fiscal year-end 1996, AHERF's two primary Obligated Groups were the Delaware
      Valley Obligated Group ("DVOG") consisting of the following Philadelphia-area
      entities: Allegheny University of the Health Sciences, the Allegheny University
      Hospitals (MCP Hospital, Hahnemann Hospital, Bucks County Hospital, Elkins
      Park Hospital), St. Christopher's Hospital for Children and Horizon Medical
      Corporation; and the Allegheny General Hospital Obligated Group ("AGHOG")
      consisting of the following Pittsburgh-area entities: Allegheny General Hospital
      ("AGH") and Allegheny-Singer Research Institute ("ASRI").[1] At fiscal year-end
      1997, AHERF's other Obligated Groups included Allegheny University Medical
      Centers Obligated Group; Allegheny Hospitals, Centennial Obligated Group,
      formerly Graduate Hospitals ("Centennial"); and Allegheny Hospitals, New
      Jersey.[2] Below, I outline the credit obligations of AHERF that will be referenced
      in this report.

6.    In April 1995, Morgan Guaranty Trust ("MGT") issued a Standby Letter of Credit
      backing a $50 million AGHOG bond issuance (the "1995 AGHOG Letter of

---

[1] ASRI withdrew from AGHOG as of January 1, 1997.
[2] See Exhibits 4a and 4b for an overview of AHERF's organization chart as of November 30, 1996 and November 30, 1997.

Credit"), for the purposes of financing the cost of construction and new capital improvements, and financing a portion of the cost of new acquisitions. A concurrent AGHOG bond issuance was insured by MBIA.

7.   In June 1996, AHERF's Philadelphia-area affiliated entities, collectively referred to as DVOG, issued bonds and commercial paper totaling more than $400 million. This offering refinanced $336 million in existing credit, provided additional working capital, and consolidated AHERF's existing Philadelphia-area debt, which previously had been spread among several Obligated Groups. In connection with this offering, PNC Bank ("PNC") issued two Standby Letters of Credit: the first supported $50 million in variable rate bonds and the second supported approximately $54 million in commercial paper (collectively, the "1996 DVOG Letter of Credit"). The three-year 1996 DVOG Letter of Credit had an annual fee of 35 basis points. PNC syndicated $20 million of its $104 million in credit exposure to Sumitomo Bank.

8.   In February 1997, PNC renewed a Standby Letter of Credit supporting a 1988 AGH bond issuance of approximately $49 million (the "1988 AGH Letter of Credit"). This renewal included an increase in the annual fee from 35 basis points to 55 basis points.[3] The existing syndicate members, Bank of Tokyo-Mitsubishi and ABN-Amro, declined to renew their participations, which had previously totaled approximately $39 million. Following the renewal, PNC syndicated $15 million of the 1988 AGH Letter of Credit to Toronto Dominion Bank ("TD").

9.   In March 1997, AHERF obtained a $100 million Revolving Line of Credit (the "1997 AHERF Line of Credit") from Mellon Bank ("Mellon") and a group of banks (the "Mellon Bank Group") consisting of TD, BankOne, and First Chicago Bank. The 1997 AHERF Line of Credit replaced $57 million of existing Lines of Credit associated with various AHERF affiliates, primarily those that became part of DVOG.[4] According to the agreement, AHERF could lend all borrowed funds

---

[3] The renewal included a revised annual fee of 55 basis points with a provision to increase the fee to 65 basis points or 75 basis points in the event of further declines in AGH's credit rating.
[4] The total amount available under these Lines of Credit was $58 million; of this amount, $57 million was drawn down.

from the 1997 AHERF Line of Credit to cover the working capital needs of its affiliates.[5]

10.  In January 1998, PNC renewed a Standby Letter of Credit supporting a 1993 AGH bond issuance of approximately $27 million (the "1993 AGH Letter of Credit"). The renewal included an increase in the annual fee from 35 basis points to 55 basis points.[6] The only existing syndicate member, Sanwa Bank, renewed its commitment of approximately $13 million.

### III. Overview of Plaintiff's Assertions of Covenant Non-Compliance

11.  Steven Kite, in his Report, (the "Kite Report") lists the financial covenant violations that he believes "would have been disclosed had the 1996 and 1997 audited financials statements of AHERF, DVOG and AGHOG been properly prepared and audited."[7] The violations in the Kite Report are based on restated financial statements presented in Robert Berliner's Report (the "Berliner Report"). Although I am advised that PwC strongly disagrees with the opinions in the Kite and Berliner Reports, for purposes of this report, I am assuming for argument's sake that Mr. Berliner's proposed changes to AHERF's financial statements are appropriate and that Mr. Kite's conclusions concerning which covenants would have been violated by such changes are correct. According to Mr. Kite, the following covenants would have been violated:

- DVOG's debt service coverage covenant contained in the Master Trust Indenture and the First Supplemental Master Trust Indenture in 1996 and 1997.

- AGHOG's consolidated unrestricted fund balance covenant contained in the Reimbursement and Security Agreement with MGT in 1996 and 1997.

---

[5] At the time of the Credit Agreement, inter-company loans could only be made to AGHOG and DVOG, with a provision allowing for the eventual inclusion of other AHERF affiliates.
[6] The renewal included a revised annual fee of 55 basis points with a provision to increase the fee to 65 basis points or 75 basis points in the event of further declines in AGH's credit rating.
[7] Report of Steven B. Kite, p. 3-6.

- AGHOG's liquidity covenants contained in various financing documents in 1997.

- AHERF's parent-level liquidity ratio covenant contained in its Credit Agreement with the Mellon Bank Group. This covenant was allegedly violated at the time the Credit Agreement became effective (March 7, 1997) and as of fiscal year-end 1997.

- AHERF's covenants that DVOG and AGHOG were in compliance with their respective Master Trust Indentures as required by the above Credit Agreement.

- Centennial's debt service coverage ratio covenant contained in its Master Trust Indenture as of fiscal year-end 1997.

- The obligation of DVOG, AGHOG and AHERF to provide properly audited financial statements for fiscal year-end 1996 and 1997.[8]

## IV.    Summary of Opinions

12.    My review of the documentary evidence combined with my expertise and experience in banking leads to the following opinions.

13.    PNC had a broad, longstanding and profitable banking relationship with AHERF and its affiliates. In an attempt to expand its fee-based business with AHERF, PNC took on more than $100 million in credit exposure to AHERF and its affiliates. Further, PNC's desire to expand its relationship with AHERF provided an incentive for PNC not to oppose AHERF's aggressive growth strategy.

14.    PNC either knew the risks inherent in the 1996 DVOG Letter of Credit or should have recognized the risks of this credit. If PNC had followed sound banking

---

[8] I have been advised that there is a legal issue regarding whether the DVOG Master Trustee would have had the legal ability to declare an "Event of Default" under the DVOG Master Indenture if it became aware that the audited financial statements delivered under the DVOG Master Indenture were not prepared in accordance with GAAP. I understand that Robert P. Mitchell opines in his expert report that it would not have such legal ability.

practices it either would not have issued the Letter of Credit or would have done so at a higher price. In particular, PNC did the following:

- Either overlooked or failed to adequately consider an extensive list of risk factors.

- Contrary to safe and sound banking practices, failed to obtain a guarantee from AHERF in support of the DVOG credit.

- Significantly underpriced the 1996 DVOG Letter of Credit relative to the risks inherent to the credit.

15. PNC did not rely on the fiscal year-end 1996 financial statements audited by PwC in determining whether to enter into the 1996 DVOG Letter of Credit.

16. PNC failed to adequately monitor the 1996 DVOG Letter of Credit. In particular, PNC did the following:

- Failed to adjust its DVOG risk ratings in a timely fashion to adequately reflect the deterioration in the performance of DVOG.

- Renewed two AGH Letters of Credit despite the knowledge of numerous risk factors and the financial deterioration of DVOG.

17. PNC's real-world responses to numerous AHERF-related covenant violations show that it is unlikely that, in response to the alleged 1996 covenant violation, PNC would have acted as suggested by Plaintiff's allegations.

18. Mellon had a broad, longstanding and profitable banking relationship with AHERF and its affiliates; Mellon's desire to expand its relationship with AHERF provided an incentive for Mellon not to oppose AHERF's aggressive growth strategy.

19. Mellon either knew the risks inherent in the 1997 AHERF Line of Credit or should have recognized the risks of this credit. In particular, Mellon either overlooked or disregarded an extensive list of risk factors.

20. Prior to entering into the 1997 AHERF Line of Credit in March 1997, Mellon's Credit Group had access to information indicating that AHERF was out of

7

compliance with the parent-level liquidity ratio covenant. Had Mellon's Credit Group followed prudent banking practices, it would have confirmed the unrestricted asset level of AHERF prior to entering into the 1997 AHERF Line of Credit.

21.    If Mellon had not approved the 1997 AHERF Line of Credit or if DVOG had violated a covenant related to its 1996 DVOG Letter of Credit, it is my opinion that AHERF's existing lenders would likely have extended the $57 million in Lines of Credit associated with DVOG affiliates.

22.    Mellon and PNC were the two largest banks headquartered in Pittsburgh, Pennsylvania. AHERF was one of the larger borrowers and customers for other bank services in the same market. The competition for AHERF's business was a distinct disincentive for either PNC or Mellon to upset their relationship with AHERF and their actual conduct demonstrates their reluctance to do so.

23.    MGT's real-world response to the violation of the consolidated unrestricted fund balance covenant by AGHOG, as well as the minor and easily curable nature of the violation, shows that it is unlikely that MGT would have acted as suggested by Plaintiff's allegations if the alleged violation had been discovered in 1996.

24.    In a problem credit situation, a bank issuing a Letter of Credit to back up debt, as did PNC and MGT, has to consider the instability that might be created through its actions and the potential impact of this instability on the probability that the Letter of Credit will be drawn.

25.    In my experience, even in the small percentage of cases where covenant violations are not waived, lenders or issuers of Letters of Credit use the violations for leverage to assist in collecting amounts due to them alone, often to the detriment of the borrower and the borrower's other creditors. This is illustrated by AHERF itself where Mellon and PNC used covenant violations not to stabilize AHERF, but in an effort to obtain either payment (in the case of Mellon) or increased security (in the case of PNC).

26. Both academic research and bank practitioner studies indicate that a) covenant violations are frequent and b) the great majority of all covenant violations are remedied with a waiver; for example, one study suggests that more than 95 percent of both borrowers and lenders indicate a medium or high probability of a waiver of violation. This pattern is consistent with my own experience as both a consultant and a member of the Board of Directors of a commercial bank.

## V.　PNC and Mellon Sought to Expand Their Large and Profitable Relationships with AHERF and its Affiliates

*Background on Banking Relationships*

27. Commercial banks focus on developing broad relationships with their corporate customers. To facilitate these efforts, banks assign a Relationship Manager ("RM") to each customer. The role of the RM is to monitor and manage relationships with a focus on cross-selling the bank's products and services to assigned customers in a manner that maximizes the bank's profit from each customer.[9] These products and services include traditional credit products such as revolving lines of credit and letters of credit,[10] as well as fee-for-service products such as trust management and treasury management services.[11] Competition

---

[9] The 1998 PNC Annual Report highlights the importance of cross-selling. In his letter to shareholders, PNC Chairman and CEO, Thomas O'Brien, states that PNC's "[s]tate-of-the-art information technology – coupled with the quality of our products and services – should give PNC a clear advantage in capturing significant cross-selling opportunities between our businesses." Exhibit 2789.

[10] According to the *Commercial Bank Examination Manual*, "[b]anks have significantly increased their issuances of letters of credit, particularly standby letters. A contributing factor to this significant increase is that by issuing letters of credit, an institution can increase its earnings without disbursing funds and increasing total assets." Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, *Commercial Bank Examination Manual*, Section 4110.1, p. 5. PNC had approximately $4.7 billion in net Standby Letters of Credit ("SLC") outstanding in 1997 and 1998 with the largest concentration in the healthcare sector. Net healthcare-related SLCs outstanding during this period of time equaled 14% of the commercial loan portfolio. PNC 1998 10-K.

[11] The Manager of PNC's Healthcare and Public Finance Group, David Cook, notes in his deposition that "[t]he idea of trying to push noncredit services has been widely valued by the investment community in banks for the last ten to twenty years." Deposition of C. David Cook, June 30, 2004, p. 139. The increased value of fee-for-service business lines results from these products tending to have higher margins than traditional credit products. For example, Lawrence Radecki notes that "[a]lthough banks' lending activities draw the attention of supervisors, lawmakers, researchers, and the press, a very substantial and growing portion of the industry's total revenue is received in the form of fee income." Radecki, L. "Banks' Payments-Driven Revenues," *FRBNY Economic Policy Review*, July 1999, p. 53.

among banks for larger, more profitable customers is particularly acute, thus magnifying the importance of cross-selling efforts and the role of the RM.[12]

28.    Since AHERF was one of the largest non-profit healthcare entities in Pennsylvania, it was an important customer for both PNC and Mellon. In fact, deposition testimony of PNC and Mellon employees confirms that AHERF was considered a large and valuable customer for both banks.[13] This is evidenced by the wide range of products and services that each bank provided to AHERF and its affiliates, and the persistent efforts of PNC and Mellon to expand the scale and scope of their banking relationships with AHERF. Internal bank documents indicate that these relationships had been profitable for both banks for many years.[14]

*PNC Relationship*

29.    PNC acted as the primary credit bank for AHERF and its affiliates. The bank was involved in several Lines of Credit and Letters of Credit with AGH and DVOG and often carried greater than $100 million in direct credit exposure to these AHERF affiliates. PNC's primary fee-for-service relationship with AHERF was the management of the cash collection side of the treasury management business. PNC consistently sought to expand its fee-for-service business with AHERF. For example, a February 1997 AHERF summary memo prepared by Marcie Knittel, PNC's AHERF RM, and Dorothy Hunter, a PNC Portfolio Manager, indicated that PNC planned to "pursue investment management opportunities with AHERF, as well as continue to grow the treasury management business as the system's network grows."[15] To support this relationship, PNC had a standalone Healthcare Group that analyzed industry trends and provided support to the credit officers. In

---

[12] George Ruth, in his commercial lending text, notes that "[c]ross-selling other bank products and services is especially important in today's competitive environment." Ruth, G. *Commercial Lending*. Third Edition, American Bankers Association, 1995, p. 226.
[13] See, for example, Deposition of Marcella Knittel, p. 165-166, 172-174; Deposition of Paula Mammarella, p. 21-22; Deposition of Ralph S. Michael, p. 44-45, 93-94; Deposition of Marsha Wicker, p. 34-35.
[14] See, for example, Exhibit 1707; Exhibit 1711; Exhibit 1785; Exhibit 1745; Exhibit 1715; Exhibit 1748; Exhibit 2339; Exhibit 2454; Exhibit 2332.
[15] Exhibit 1745.

addition to traditional commercial banking activities, PNC Securities (a broker-dealer affiliate of PNC) was a co-manager on certain AHERF bond offerings. As of April 1998, the relationship included Public Finance Capital Markets, trustee, custody and escrow services, Blackrock Investments, private banking, treasury management and merchant services.[16]

### Mellon Relationship

30.    Mellon's primary relationship with AHERF was the management of AHERF's Institutional Trust assets, a large and highly profitable line of business. Mellon also provided AHERF with Lines of Credit, corporate trust and investment management services. Further, Mellon consistently pursued efforts to expand its relationship with AHERF. A November 5, 1996 memo prepared by Marsha Wicker, Mellon's AHERF RM, summarizes the bank's efforts to expand its more than 15-year relationship with AHERF.[17] These efforts ranged from inviting AHERF management to social events to pursuing new business opportunities in the credit and corporate trust areas. Mellon also had a Healthcare Group that analyzed industry trends and provided support to the credit officers.[18] In 1996, the relationship included credit, deposits, cash management, institutional trust, private capital, corporate trust and other services.[19]

### Impact of Banking Relationships

31.    AHERF's aggressive growth strategy presented new opportunities for PNC and Mellon to expand their relationships with AHERF. For example, PNC planned to increase its AHERF cash management revenues upon the closing of AHERF's Graduate Hospitals acquisition. PNC also planned on using this acquisition to attempt to expand its treasury management business with AHERF to include

---

[16] Exhibit 1810.
[17] Exhibit 2359. Note also that Exhibit 2332 mentions that "AHERF has been a customer of Mellon Bank for more than 15 years."
[18] Deposition of Richard Arrington, p. 24-25.
[19] Exhibit 2454. Other services included Mellon bond and network services.

disbursements, which at the time were handled by Mellon.[20]  Further, AHERF's expansion afforded both PNC and Mellon with additional credit-related business opportunities, such as the 1996 DVOG Letter of Credit and the 1997 AHERF Line of Credit.  Thus, PNC and Mellon had financial incentives not to oppose AHERF's continued acquisition and growth strategy.

32.     Apart from generating additional profitability, a broad and multi-faceted customer relationship provides banks with enhanced visibility of a customer's performance.  For example, the treasury management business line enables a bank to view the cash flow of a customer, while a credit relationship entails constant monitoring of the customer's financial performance, business strategy, and industry dynamics.  Taken as a whole, a broad relationship provides a wide array of information that enables the lender to continually evaluate a customer's performance.  This information is particularly valuable when a bank is determining whether to extend new credit to a customer or evaluating its options when a customer is facing financial difficulties.  Thus, the breadth of PNC's and Mellon's relationships with AHERF put the banks in unique positions vis-à-vis information flows and credit monitoring.

33.     While banks benefit from the profitability and visibility generated by a broad banking relationship, these relationships have potential pitfalls.  Banking practitioner manuals and academic research highlight these issues, the majority of which stem from the pressure to expand existing relationships while concurrently fighting off competition.  These factors often cause bankers to underestimate or fail to notice potential performance problems.  For example, practitioner literature notes:

> "Since their incentive compensation depends greatly on the assets under their control and the margin derived therefrom, bankers who manage portfolios wonder why they should take the chance of upsetting a relationship because they anticipate that a problem might be forthcoming. Their fear is that they could just as well be wrong in their prognostication and the borrower will

---

[20] Exhibit 1738.  See also Deposition of Marcella Knittel, p. 199-201 and 210.

react by interpreting their concern as lack of faith or respect and seek another lender, in which case both the bank and the lender have lost."[21]

Practitioner literature also notes that RMs may be "…disinclined to do much of anything about…" ensuring that their customers continue performing strongly due to their primary responsibility of growing relationships.[22] Thus, lenders must be cognizant of these potential problems caused by a comprehensive customer relationship.

34.     Several banks competed aggressively for various aspects of AHERF's banking business. This competition effectively pitted the banks against each other and benefited AHERF. Mellon's AHERF account meeting minutes dated May 6, 1996 highlight this phenomenon. The meeting minutes note that W. Keith Smith, the Vice Chairman of Mellon, expressed "some disappointment over new business that we have lost," but felt that "the AHERF relationship is still solid."[23] In addition, in his deposition testimony, Oscar Hatchett, the Executive Vice President and Head of Commercial Lending at BankOne, verified that BankOne was also interested in expanding its customer relationship with AHERF. He recalled that he thought BankOne could potentially obtain trust, leasing, investment management and cash management business from AHERF. Hatchett elaborated:

> "…we typically just don't do credit facilities without any other ancillary business. And my recollection is we were told that we would be in a position to at least compete for those opportunities as a result of extending credit."[24]

Further, internal PNC documents indicate that the bank was aware that AHERF used other banks including CoreStates and MGT as credit banks and that Mellon handled AHERF's institutional trust business. Moreover, both PNC and Mellon

---

[21] Weinwurm, G. "Problem Loan Strategies for Changing Times", *Journal of Lending and Credit Risk Management* 80 (Nov 1997) p. 32.
[22] Weinwurm, G. "Problem Loan Strategies for Changing Times", *Journal of Lending and Credit Risk Management* 80 (Nov 1997) p. 32.
[23] Exhibit 2359.
[24] Deposition of Oscar C. Hatchett, p. 47.

frequently commented on AHERF business opportunities lost to competitors. For example, a 1996 PNC memo indicates that PNC was unsuccessful in its bid for a $50 million AGHOG Letter of Credit due to a lower bid from a competing bank.[25]

35.    Beyond the traditional issues surrounding commercial banking relationships, PNC and Mellon had unique customer dynamics that complicated their relationships with AHERF. Most importantly, AHERF, PNC and Mellon were all headquartered in Pittsburgh, Pennsylvania, with PNC and Mellon, the two largest banks headquartered in the city.[26] This geographic concentration appeared to impact the banks' behavior toward AHERF. For example, Richard Arrington, the head of Mellon's Healthcare Group, states in deposition testimony that:

> "I can say that we were always sensitive to political ramifications, you know, the company's standing in the community. This is a local customer, it's a large employer, provides health and welfare services, concerned about how we might be portrayed in the press as we pursue our strategy."[27]

Executives at the highest levels of PNC and Mellon were also on the Board of Trustees of AHERF and its affiliates. For example, Thomas O'Brien, Chairman and CEO of PNC, joined AHERF's Board of Trustees in 1996.[28] On the Mellon side, Frank V. Cahouet, Chairman and CEO, was Vice Chairman, and later Chairman, of the Allegheny General Hospital Board of Trustees, and was also on the AHERF Board of Trustees.[29] Moreover, J. David Barnes, the prior Chairman and CEO of Mellon, succeeded by Mr. Cahouet, was a member of AHERF's Board of Trustees and the Chairman of AHERF's audit committee.[30]

36.    PNC and Mellon had large, profitable banking relationships with AHERF and were poised to continue to benefit from AHERF's aggressive growth strategy. These broad relationships afforded PNC and Mellon access to a wide variety of

---

[25] Exhibit 1715.
[26] At December 31, 1997, PNC had consolidated total assets and deposits of $75.1 billion and $47.6 billion, respectively. 1997 PNC Bank 10-K. At December 31, 1997, Mellon had consolidated total assets and deposits of $44.9 billion and $31.3 billion, respectively. 1997 Mellon Bank 10-K.
[27] Deposition of Richard Arrington, p. 55.
[28] Exhibit 1745.
[29] Exhibit 2375. Deposition of Frank V. Cahouet, p. 14-16.
[30] Deposition of J. David Barnes, p. 6-11, 45.

information regarding AHERF's business strategy and financial performance, as well as the potential profitability of the relationships.

**VI.    The Evaluation, Pricing and Monitoring of the Credits Revealed Numerous Risk Factors**

*Background*

37.    When evaluating a loan request, commercial lenders must gather information about the borrower, its principals and its industry in order to determine the borrower's ability to repay the loan.[31]  Proper credit evaluation should be forward-looking with a view towards determining the future prospects of the borrower.  George Ruth, in his commercial lending textbook, lists "the Five C's of Credit" that should be considered when evaluating a loan:

— Character, the client's willingness and determination to repay the loan;

— Capacity, management's ability to generate and manage future cash flow;

— Capital, the amount of equity invested in the business and how it is employed;

— Conditions, external variables including industry- and economy-wide factors;

— Collateral, which provides a secondary source of repayment for the loan.[32]

38.    Of these aforementioned items, the cash flow prospects of the borrower are of primary consideration to the lender because "...cash repays loans, not accounts

---

[31] The work performed by a commercial bank to evaluate a SLC should be identical to the work required to evaluate any loan.  "A letter of credit should, though, be treated as a loan... Although, letters of credit are 'off balance sheet' in nature, banks should monitor letters of credit as diligently as loans."  Ruth, G. *Commercial Lending*.  Third Edition, American Bankers Association, 1995, p. 185.  Further, "[f]or credit-analysis purposes, SLCs are to be treated like loans and represent just one type of extension of credit relative to the overall exposure extended by the bank to the borrower."  Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, *Commercial Bank Examination Manual*, Section 2060.1, p. 6.

[32] Ruth, G.  *Commercial Lending*.  Third Edition, American Bankers Association, 1995, p. 76-77.

receivable, inventory, or some other asset of the borrower."[33]  To assess a

borrower's cash flow, as well as the rest of these criteria, it is always necessary

for commercial lenders to examine more than the company's financial statements,

as these statements alone only provide a snapshot view of the creditor's historical

performance and become outdated very quickly.[34]  As George Ruth notes in his

commercial lending text, "[e]conomic, competitive, and regulatory conditions all

influence the environment in which a business operates…The external

environment is constantly changing, which can limit the conclusions that can be

drawn by comparing statements from different periods."[35]  In addition, it is of

paramount importance that the borrower thoroughly understand the industry in

which the loan is being made.  An understanding of industry dynamics and trends

enables the borrower to identify potential industry-related risks associated with

the loan.

39.    The importance of examining more than a company's audited financials is

typified in the case of PNC.  The DVOG financial statements upon which PNC

relied during its due diligence process were not the 1996 DVOG audited financial

statements prepared by PwC (which did not exist at the time).  Rather, PNC relied

upon unaudited financials for the ten months ended April 30, 1996 and audited

financials for the fiscal year-ended June 30, 1995.[36]  Therefore, PNC did not use

the audited financial statements in question in this matter as a part of its due

diligence process.

40.    After closing a loan agreement, the bank should carefully monitor the loan for

changes in risk level that could result in a problem loan if not caught early.

Monitoring requires the loan officer to stay abreast of the performance of the

company on an ongoing basis by analyzing financial statements and projections,

---

[33] Ruth, G. *Commercial Lending*.  Third Edition, American Bankers Association, 1995, p. 162.
[34] Morsman, Jr., E. *The Art of Commercial Lending*.  The Risk Management Association, 1997, p. 26. Morsman also notes "[y]ou analyze the borrower on three different planes -- management, environment, and financial structure.  Although it is convenient to segment these components, never forget that they are interrelated."  Morsman, Jr., E. *The Art of Commercial Lending*.  The Risk Management Association, 1997, p. 55.
[35] Ruth, G. *Commercial Lending*.  Third Edition, American Bankers Association, 1995, p. 136.
[36] Exhibit 1722.

corresponding regularly with the borrower, and visiting the borrower. The loan officer should also be alert to signs of weakness identified by third parties, such as vendors or customers of the borrower. In addition, as discussed in detail in Paragraph 32, the lender should refer to information stemming from the borrower's total account relationship with the bank.[37] A bank can use information from all of its products and services in a customer relationship to gain valuable insights into the performance of the borrower, staying abreast of potential problems with the borrower.

41.    According to the Commercial Bank Examination Manual, one major source that leads to problem loans is complacency, manifested by

> "lack of adequate supervision of long-term and familiar borrowers; dependence on oral information the borrower furnished in lieu of reliable and verifiable financial data; optimistic interpretation of known credit weaknesses based on past survival of recurrent hazards and distress; [and] ignorance or disregard of warning signs about the borrower, economy, region, industry, or other related factors."[38]

Regardless of the length of the existing relationship with the borrower, a lender needs to aggressively monitor its credits to ensure that the borrower's risk profile has not changed.

*PNC Credit Evaluation*

42.    The internal PNC Credit Information Sheet regarding the 1996 DVOG Letter of Credit included a transaction summary, an overview of the affiliates within AHERF, credit risks, an overall risk rating, a customer relationship summary and a credit underwriting memo.[39] In the Credit Information Sheet, PNC discussed a wide range of DVOG-related and healthcare industry-related risks, including sections on "Industry Risk" and "Regulatory Risk." In particular, the Credit

---

[37] Ruth, G. *Commercial Lending*. Third Edition, American Bankers Association, 1995, p. 308.
[38] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation. *Commercial Bank Examination Manual*, Section 2040.1, p. 20-21.
[39] Exhibit 1722.

Information Sheet noted the increased competition in the healthcare marketplace, AHERF's evolving strategy to transform itself into an integrated delivery network and the potential vulnerability of DVOG to changes in Medicare/Medicaid reimbursement methodologies. In my opinion, PNC was clearly aware that these industry-specific and company-specific issues could affect the risk level of the 1996 DVOG Letter of Credit.[40]

43.  Along the same lines, in his deposition testimony, George Brikis, Executive Vice President of the Credit Policy Division at PNC, identified the healthcare industry as a very volatile and complex market:

> "You had to stay on top of things. You couldn't just book a loan and not worry about it. You had to really be knowledgeable about the industry because it was changing so rapidly."

> "[…] it's a whole bunch of aspects of health care, and each deal had to be understood both in terms of how it fit within that health care industry, what those risks were, and how they were addressed both by borrower and by structure of the deal."[41]

Both the Credit Information Sheet and Mr. Brikis' deposition testimony indicate that PNC was aware of the extensive risks associated with the healthcare industry at the time.

44.  The healthcare industry also had numerous regulatory and legal risks that were discussed in the Credit Information Sheet. Regarding these risks, PNC noted that "[i]n addition to the regulatory risk specifically associated with Medicare/Medicaid, the revenues of the Obligated Group Hospitals may be

---

[40] In addition, the Memoranda for the DVOG Offerings indicated that DVOG had altered its accounting policies in certain areas. Specifically, in the unaudited financial information for the ten-month period ended April 30, 1996, DVOG adopted FAS 124, related to recording certain investments held by not-for-profit organizations at fair value, with unrealized investment appreciation on unrestricted funds during the current period recognized as gains on DVOG's statement of revenues and expenses. Further, the funds that DVOG provided to Allegheny Integrated Health Group ("AIHG") (its physician practice affiliate) for the acquisition of physician practices and for operating losses at those practices were reflected as a net asset transfer from DVOG to AIHG and were not shown on DVOG's statement of revenues and expenses, whereas under the previous accounting treatment the support for AIHG operating losses had been reflected as an expense on DVOG's statement of revenues and expenses. Exhibit 407.

[41] Deposition of George Brikis, p. 46-47. Also, note that PNC had a dedicated Healthcare Group that analyzed industry trends and risk factors.

impacted in the future by various types of regulatory and/or legislative actions at the federal, state and local levels."[42] The relevance of the risks surrounding legislative and regulatory events was demonstrated when the State of Pennsylvania passed a Medicaid reform bill in mid-May 1996, shortly following PNC's approval of the credit. The Offering Memorandum for the $50 million DVOG bond offering included the following:

> "On May 16, 1996, the Governor of Pennsylvania signed welfare reform legislation which will reduce the class of individuals eligible for Medicaid. It is unclear what the time frame for the implementation of this change will be and how many Delaware Valley residents will be impacted. Consequently, reasonable estimates as to the timing and size of the impact of this legislation cannot presently be made. However, the impact upon the revenues of the Obligated Group may be material."[43]

Regulatory changes, such as a Medicaid reform bill, had the potential to significantly impact DVOG's financial results and therefore were critical risks to thoroughly evaluate prior to approving the transaction.

45. The competitive environment of the hospital market in Philadelphia is another feature of the healthcare industry that added risk to this transaction. PNC noted that "Philadelphia's health care market has excess bed capacity resulting in a highly competitive market with 5 large academic medical centers and several large, community teaching hospitals."[44] In addition, PNC was concerned that "[f]or hospitals, significant pricing pressures, reduced demand for inpatient care and greater competition to fill excess bed capacity are market forces that will intensify."[45] The discussion of these concerns relating to competition in the Philadelphia market indicates that PNC was aware of the potential risks stemming from such competition.

---

[42] Exhibit 1722. The PNC Credit Information Sheet also noted that "it [DVOG] is vulnerable to changes in reimbursement methodologies related to the various services provided to Medicare/Medicaid patients." Exhibit 1722.
[43] Exhibit 407.
[44] Exhibit 1722.
[45] Exhibit 1722.

46. The Credit Information Sheet also included an overview of AHERF's strategy to transform itself into an integrated health delivery network. The acquisition of numerous physician practices was one of the centerpieces of this strategy. As noted in the Credit Information sheet, "[t]he company is currently in the process of developing a physician network and has completed the acquisition of 230 physicians to date. The network is projected to be completed over the next two years with a total of 500 physicians acquired."[46] To fund this strategy, DVOG planned on transferring significant amounts to AIHG over the course of fiscal years 1996, 1997 and 1998: a total of $158 million over the three-year period.[47] When taking into account the projected transfers to AIHG to support the physician practice acquisition strategy, DVOG's financial projections appeared to be roughly breakeven in both fiscal-year 1997 and fiscal-year 1998.[48] Despite the unproven status of this strategy and its significant anticipated costs, PNC still noted that "...AHERF should soon begin to realize the financial benefits of its physician acquisition program through increased utilization of the Delaware Valley facilities and enhanced negotiating ability with payor sources in the region."[49]

47. In addition to industry-related and strategy-related risks, DVOG had a significant accounts receivables issue. Specifically, "[a]ccounts receivable days increased from 57 days at FY94 to 184 days at 1/31/96."[50] This increase in accounts receivable is immense and such an increase is often associated with substantial operational issues. This increase prompted significant follow-up due diligence and was blamed on the consolidation of billing functions across the AHERF organization in Pittsburgh. In addition, PNC noted that "[m]anagement has hired an expert to resolve the current accounts receivable situation and expects notable improvements to occur by 6/30/96."[51]

---

[46] Exhibit 1722.
[47] Exhibit 1721.
[48] Exhibit 1721.
[49] Exhibit 1722.
[50] Exhibit 1722.
[51] Exhibit 1722.

48.    "Structural Risk" is also a risk factor included in the Credit Information Sheet. In this section, PNC notes that AHERF was not acting as a guarantor of the 1996 DVOG Letter of Credit. A guarantor contractually agrees to repay the debt if the primary borrower defaults; creditors often require a guarantor when there is significant uncertainty about the primary borrower's ability to repay the loan. In such cases, the creditor includes in its evaluation of credit quality the ability of the guarantor to repay the debt.[52] According to the Comptroller's Handbook, "[l]oans may be guaranteed by related or unrelated businesses and individuals. Guarantor strength is often a major consideration when deciding whether to grant a loan, especially to start-up businesses."[53]

49.    PNC noted in the Credit Information Sheet that, "while it is logical to think that AHERF assets will be utilized to support the Obligated Group as needed due to the importance of the Delaware Valley operations, the legal structure of the transaction does not provide for such support."[54] PNC was aware that AHERF and AGHOG had completed inter-company transfers in the past to fund DVOG's operations and AHERF's physician practice acquisition strategy. In addition, DVOG's internal three-year financial projections indicated that DVOG planned on transferring $45 million in fiscal year 1996, $51 million in fiscal year 1997 and $62 million in fiscal year 1998 in funding to AIHG to support its physician practice acquisition strategy.[55] Despite the historical need for the parent and other affiliates to support DVOG's operations and DVOG's substantial projected support for AIHG, PNC decided not to require AHERF to guarantee the loan. In her deposition testimony, Marcie Knittel, PNC's RM, remarked that PNC understood that AHERF was not acting as a loan guarantor:

> Q: "But by this point in time when the proposal was being submitted to the senior loan committee, it was understood that AHERF the parent entity was not

---

[52] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation. *Commercial Bank Examination Manual*, Section 2060.1, p. 4-5.
[53] "Rating Credit Risk," *Comptroller's Handbook*, Comptroller of the Currency, Administrator of National Banks, April 2001, p. 27.
[54] Exhibit 1722.
[55] Exhibit 1721.

> responsible for pay, supporting the Delaware Valley
> Obligated Group as well as --?"
>
> A: "It was understood that the legal structure didn't
> provide for that support."[56]

Additional PNC deposition testimony states that AHERF management had
indicated to PNC that AHERF would continue to provide financial support as
needed to its Obligated Groups. For example, Ralph "Mike" Michael, CEO of
PNC's corporate bank, notes in his deposition that "AHERF had the parent
company liquidity and the financial strength to downstream money to satisfactory
[*sic*] a cash requirement, should it occur, you know. That was -- that was
extremely important."[57]  Nevertheless, despite identifying the lack of a guarantee
from AHERF as a potentially significant risk factor, PNC went ahead with the
transaction without obtaining a guarantee from AHERF.

50.     In contrast, in a prior transaction with AHERF affiliates that later became the core
of DVOG, PNC included the requirement that AHERF act as a loan guarantor.
Specifically, AHERF was the loan guarantor in the Credit Agreement dated
January 6, 1994 for a $25 million Line of Credit (the "1994 Line of Credit")
extended by PNC to Allegheny United Hospitals, St. Christopher's Hospital for
Children and Horizon Medical Corporation.[58]

51.     Several PNC employees commented in their depositions that PNC required
AHERF to guarantee the 1994 Line of Credit due to the financial weakness of
AHERF's affiliates. For example, Emery Holloway, the PNC RM at the time of
the transaction, stated in his deposition testimony,

> Q: "Why was Allegheny's backing important to you at
> the time?"

---

[56] Deposition of Marcella Knittel, p. 317.
[57] Deposition of Ralph S. Michael, p. 208. See in addition, Deposition of Ralph S. Michael, p. 208: "Q:
Was there any guarantee that that downstreaming would continue into the future?" "A: There were no
guarantees; there were very strong implications." "Q: What were those implications based on?" "A: On
personal statements from AHERF management."
[58] Exhibit 1701.

A: "Because they were the financial -- they were the
strong guy in this group. If they weren't here, we
would not lend to these guys."[59]

In her deposition, Connie Genco confirmed that the guarantee provided added

comfort with respect to PNC's entering into the 1994 Line of Credit.[60] Despite its

request for an AHERF guarantee on an earlier credit transaction and the stated

importance of AHERF's continued funding of DVOG's operations, PNC failed to

require AHERF to guarantee the 1996 DVOG Letter of Credit.

52.     Moreover, the 1996 DVOG Letter of Credit transaction was approved

notwithstanding the existence of multiple policy exceptions. PNC's credit

underwriting protocol included a set of underwriting standards, which, if not met

by the borrower, would result in "policy exceptions." These policy exceptions

acted as "red flags" to notify PNC of potential problems with a particular credit.

The PNC Healthcare Compliance Form for the approval of the 1996 DVOG

Letter of Credit indicates that the proposed credit had one "Management Policy

Exception" and one "Underwriting Standards Exception."[61] The "Management

Policy Exception" referenced non-compliance with underwriting standards. The

"Underwriting Standards" required that DVOG meet three of five financial

criteria. However, DVOG only met one of the five required financial criteria

(therefore creating an "Underwriting Standards Exception"):[62]

| Financial Criteria | Actual Value |
|---|---|
| Cushion Ratio >= 5x | 2.0x |
| Long Term Debt/Capitalization Ratio <= 60% | 65.7% |
| Excess Margin >= 1% | 0.5% |
| Debt Service Coverage >= 1.5x | 2.62x |
| Cash + Mkt Sec + Board Des Funds/LTD >= 50% | 16.0% |

As shown in the above table, DVOG missed three of the criteria by a significant

amount (Cushion Ratio; Excess Margin; and Cash + Marketable Securities +

Board Designated Funds / Long-Term Debt). Despite DVOG's poor financial

---

[59] Deposition of Emery Holloway, p. 46.
[60] Deposition of Connie Genco, p. 77.
[61] Exhibit 1722.
[62] Exhibit 1722.

ratios, PNC proceeded with approval of the transaction. Notably, the minutes for the PNC credit committees that approved the 1996 DVOG Letter of Credit only mention the excess margin financial ratio and not the other three financial ratios that failed the threshold test.

53. Although the documentary evidence indicates that PNC was aware that the healthcare industry faced significant challenges and noted the existence of multiple policy exceptions, PNC did not require an AHERF guarantee when such a guarantee was previously deemed necessary. All of the above indicate that PNC was either aware of or should have been aware of the risks inherent in the 1996 DVOG Letter of Credit.

*Mellon Credit Evaluation*

54. Mellon's credit review documents, as well as other background documents, indicate that the bank was aware of the industry-related and company-related risks associated with the 1997 AHERF Line of Credit transaction. For instance, Mellon had been concerned about DVOG's deteriorating performance and viability since 1995.[63] In addition, as discussed in Paragraph 32, Mellon was in a unique position to closely monitor AHERF's financial condition, as Mellon provided a wide range of banking products and services to AHERF, most notably managing a large portion of AHERF's assets in its Institutional Trust Group.

55. In its Annual Core Analysis Memorandum, dated June 30, 1995, Mellon stated its concerns related to DVOG's viability. Additionally, the document referred to industry-wide factors like the expansion of managed care that adversely affected AHERF's operations.[64] However, Mellon concurrently identified greater opportunities to pursue its strategy of selective expansion of credit exposure to AHERF by lending to affiliates located in the Delaware Valley.

---

[63] Exhibit 2332.
[64] Note that Mellon had a Healthcare Group that analyzed industry trends and risk factors.

56.    Richard Arrington, head of Mellon's Healthcare Group, indicated that he and his

colleagues at the Mellon Credit Group viewed the healthcare industry as a very

competitive one in the mid-1990s:

> Q: "Based on your work with Germantown Hospital
> and Norristown Hospital, were you of the belief that the
> Philadelphia area market was a difficult one in this time
> frame [1994] for healthcare providers?"
>
> A: "Yes."
>
> Q: "And why was that?"
>
> A: "They were all struggling from what I could see,
> financial performance, as it is in other markets as well.
> The whole industry at that time was feeling stress to
> some degree."[65]

57.    In November 1996, Mellon downgraded AHERF in its internal Customer Risk

Rating from a 4 to a 5.[66] Mellon recognized "[d]eclining operating performance

on a consolidated basis," and "[i]ncreased debt levels [...]" as the main reasons

for the downgrade. Additionally, Mellon identified "increased managed care

penetration" as the main cause of the decline in the margins of AHERF's

affiliates.[67]

58.    Nevertheless, in December 1996 Mellon prepared an Invitation to Offer attached

to a syndication book for the 1997 AHERF Line of Credit. The original materials

prepared by Mellon in this book lack almost any mention of the risk factors

previously raised by Mellon. Additionally, in contrast to its previous assertions,

Mellon's investment considerations for the 1997 AHERF Line of Credit included

an "Experienced Management Team," "Positive Industry Fundamentals" and a

"Strong Competitive Position in Major Markets."[68]

59.    Mellon ensured AHERF's involvement by extending the Revolving Credit

directly to AHERF. In turn, AHERF was permitted to subsequently lend the

---

[65] Deposition of Richard Arrington, p. 17-18.
[66] Exhibit 2339. Mellon's internal risk rating system classifies a 4 as equivalent to a bond rating between BBB and A- and a 5 as equivalent to a bond rating between BB and BBB. Exhibit 2332.
[67] Exhibit 2339.
[68] Exhibit 2375.

funds to its affiliates, specifically DVOG and AGHOG. This structure ensured that AHERF would necessarily sponsor the efforts of its Obligated Groups to repay the loans. In particular, according to Mellon's Transaction Risk Memorandum regarding the $100 million 1997 AHERF Line of Credit:

> "Although the investment assets at the AHERF level will not be pledged as collateral, the Liquidity Ratio covenant will ensure that there is additional cushion to repay our debt in the form of reasonably liquid assets."[69]

60.    Despite its concerns regarding the financial strength of AHERF's affiliates, particularly DVOG, Mellon funded the 1997 AHERF Line of Credit. Mellon overlooked the risk factors and, as discussed in detail in Section VIII, Mellon's Credit Group even failed to verify AHERF's liquidity during the due diligence process, despite its essential role as cushion for repayment.

61.    Following a review of the materials related to this matter, I conclude that the banks that evaluated the 1996 DVOG Letter of Credit and the 1997 AHERF Line of Credit (most notably PNC and Mellon) were either aware of the risks inherent in these credits or had information pointing to these risks, but failed to be guided by them. The banks should have contemplated the myriad of risks associated with the credits due to their broad, longstanding relationships with AHERF, the existence of dedicated healthcare groups tasked with analyzing industry trends and risk factors within both banks, and the additional due diligence that the banks performed prior to approving the credits. Their failure to do so can be attributed to poor banking practices and risk assessment.

### PNC Pricing and Syndication

62.    Typically, lenders syndicate participations in a letter of credit to other interested lenders. This enables the lender to reduce its exposure to a specific credit and to spread the credit risk among several banks. Syndicating credits, along with minimizing exposure to any one industry or borrower – risk diversification – are

---

[69] Exhibit 2338.

generally accepted strategies lenders use to manage their credit risk. PNC, like other lenders, had specific holding limits by geography, industry and industry sub-segment. For example, the December 1995 PNC Healthcare Policy Manual indicated that PNC's total direct hard exposure to healthcare should not exceed $1.9 billion, and only $1.125 billion of this should have been in the acute care sub-segment.[70]

63.   The 1996 DVOG Letter of Credit had a proposed PNC "hold level" of $25 million.[71] This hold level suggested that 75% of PNC's direct exposure would need to be placed with other lenders.[72] Ultimately, PNC was only able to syndicate $20 million of its approximately $104 million in exposure, thereby retaining a hold level of approximately $84 million, significantly higher than the proposed hold level.[73] Below, I outline the reasons why PNC was unable to successfully syndicate the DVOG credit.

64.   In early 1996, AHERF sent out a dozen requests for proposal to commercial banks requesting pricing and term bids on an approximate $100 million Letter of Credit supporting a DVOG bond and commercial paper issuance. Of the twelve banks solicited by AHERF, only six banks returned bids. These bids ranged from 30 basis points to 137.5 basis points.[74] PNC's bid of 30 basis points was 25 basis points below the next lowest bid, a considerable differential in the banking industry. This spread is greater than the spread associated with one rating notch.

---

[70] Exhibit 2075.

[71] Exhibit 1722.

[72] Exhibit 1722. Note that as of the date of the Credit Information Sheet, the planned size of the 1996 DVOG Letter of Credit was $100 million.

[73] PNC's approximately $84 million in direct hard exposure to the 1996 DVOG Letter of Credit accounted for 4.4% of its total allowable healthcare exposure and 7.5% of its total allowable acute care sub-segment exposure.

[74] Exhibit 2335 and Exhibit 2336. PNC's initial bid was 30 basis points over three years or 35 basis points over five years. Following a renegotiation of the pricing, the final terms were 35 basis points over three years. Exhibits 2790 and 2791. See Deposition of Marcella Knittel, p. 229-230.

65.   In commercial banking, the fee is designed to compensate the bank for the credit risk associated with the Letter of Credit.[75]  In its 1998 Annual Report, PNC defined credit risk as follows:

> "Credit risk represents the possibility that a borrower or counterparty may not perform in accordance with contractual terms.  Credit risk is inherent in the financial services business and results from extending credit to customers, purchasing securities and entering into off-balance-sheet financial derivative transactions."[76]

In this case, PNC proposed a fee of approximately $300,000 per year as compensation for the risk that the bank would not be paid back.  Simply stated, PNC's bid of 30 basis points priced the risk in the transaction approximately $250,000 lower per year than the next lowest bid.  This indicates that either PNC significantly understated the risks inherent to this transaction relative to the other eleven banks involved in the bidding process or was willing to price the risk lower than other banks based on the income or prospects for income from other aspects of its relationship with AHERF.

66.   In the period between PNC's initial bid and the closing of the 1996 DVOG Letter of Credit, PNC renegotiated the pricing of the credit due to the risks associated with the transaction.  Specifically, PNC increased the pricing to 35 basis points over three years from 30 basis points over three years.  In his deposition, David Cook, Manager of PNC's Healthcare and Public Finance Group, notes, "[t]hat change in pricing occurred because the bank determined that the risk profile, the credit risk related to the transaction had increased in our view and the collective view of the market..."[77]

---

[75] According to the Commercial Bank Examination Manual, "The institution charges a fee for the risk of default or nonperformance by the customer..."  Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, *Commercial Bank Manual*, Section 4110.1, p. 5.

[76] Exhibit 2789.  Also, David Cook, Manager of PNC's Healthcare and Public Finance Group, defines credit risk as "...a summation of the risk that relates to the extension of credit that the bank's going to make."  Deposition of C. David Cook, June 30, 2004, p. 23.

[77] Deposition of C. David Cook, June 30, 2004, p. 69.

67.     The aggressiveness of PNC's bid was mentioned in a Mellon memo dated April 15, 1996. The memo discussed Mellon's rationale for declining to participate in the transaction and also indicated that Frank Taucher from PNC acknowledged that PNC's bid was aggressive.[78] In her deposition testimony, Marsha Wicker, the Mellon RM, indicated that she "thought it was inappropriately priced for the risk."[79] Note that Mellon passed on participating in the syndication of the 1996 DVOG Letter of Credit due to these pricing concerns.[80]

68.     The low pricing of the 1996 DVOG Letter of Credit was also a topic of discussion and a clear concern in PNC's Credit Approval Committee meeting. In her deposition, Toni Hyams, a PNC employee who attended the approval meeting, recalls that, "it was priced very thin."[81] When questioned about the reasons that the committee was concerned about approving the credit, Ms. Hyams stated:

> Q: "And I take it there was concern expressed at this credit committee meeting that you're recollecting that perhaps PNC had priced this letter of credit at a low rate relative to the degree of risk --"
>
> A: "Yes..."
>
> ...
>
> Q: "And people at the credit committee meeting viewed that as a hindrance to in turn going back into the market and trying to syndicate the letter of credit."
>
> A: "Right."[82]

PNC's unsuccessful effort to fully syndicate the 1996 DVOG Letter of Credit confirmed the concerns of its Credit Committee and indicated that other banks had a greater appreciation of the risks inherent to this credit. Nevertheless, despite the aggressive pricing and the anticipated (and actual) difficulty in syndicating the letter of credit, PNC's credit committees approved the Letter of Credit.

---

[78] Exhibit 2336.
[79] Deposition of Marsha Wicker, p. 83.
[80] Exhibit 2336.
[81] Deposition of Toni Hyams, p. 106. Q: "And by 'thin' you mean low?" A: "Yes."
[82] Deposition of Toni Hyams, p. 106-107.

*PNC Monitoring*

69. As discussed at the beginning of this section, after issuing a loan, a lender should continually evaluate the financial and operational status of the borrower.  All banks assign each loan or Letter of Credit a credit rating based on the bank's internal credit rating system.  PNC, for example, rated credits on a scale from 1 to 10, with 1 classified as "Exceptional" and 10 classified as "Loss."  Subsequently, banks must actively monitor credits and adjust internal risk ratings as needed.  According to the Federal Reserve Board,

> "[r]isk ratings should be reviewed, if not assigned, by independent credit risk management or loan review personnel both at the inception of a transaction and periodically over the life of the loan....Among the elements of such independent review should be whether risk rating changes (and particularly downgrades) have been timely and appropriate."[83]

PNC prepared risk summaries for AHERF and its affiliates quarterly and the AHERF relationship as a whole was reviewed annually.

70. PNC's quarterly risk rating summaries attempted to track the ongoing performance of AHERF and its affiliates.  PNC rated DVOG a "3" (Strong), as of April 22, 1996.[84]  In the rating summary, PNC discussed AHERF's strategic plans, including its physician acquisition program and its overall expansion goals.  For example, the discussion noted that, "AHERF should soon begin to realize the financial benefits of its physician acquisition program through increased utilization of the Delaware Valley facilities and enhanced negotiating ability with payor sources in the region."[85]  By December 15, 1996, PNC had downgraded DVOG to a "4" (Good) rating.  The report following the downgrade discussed the

---

[83] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation Letter SR 98-25, "Sound Credit Risk Management and the Use of Internal Credit Risk Ratings at Large Banking Organizations", September 21, 1998, p. 5.
[84] Exhibit 1722.
[85] Exhibit 1722.

declines in DVOG's operating profit and unrestricted fund balance, as well as the increase in leverage.[86]

71.    Despite the increased leverage associated with additional acquisitions and the numerous DVOG-related problems that had arisen over the previous twelve months, on December 3, 1997, PNC still maintained a "4" rating for DVOG.[87] These issues included the closing of Mt. Sinai Hospital in Philadelphia and the layoff of 1,200 employees.[88] On December 22, 1997, the day before being informed of the DVOG covenant violation, PNC downgraded DVOG to a "5," (Acceptable)."[89] On February 26, 1998, more than two months following the DVOG covenant violation, PNC still rated DVOG a "5".[90] It was not until April 1, 1998 that PNC finally downgraded DVOG to a "7" (OAEM).[91] It was not until this later date that PNC also moved the DVOG credit to its workout group. Based on my experience in the commercial banking industry, it is my opinion that PNC slowly adjusted its DVOG risk ratings to reflect the deterioration in the performance of DVOG, despite the prior availability of considerable adverse information.

72.    In contrast to PNC's monitoring of DVOG and AHERF, other banks and insurers with credit exposure to AHERF and its affiliates indicated serious concerns much earlier about the quality of DVOG's credit. While PNC did not downgrade DVOG to a "7" (OAEM) rating until early-April 1998, TD sought to call the 1997 AHERF Line of Credit as early as January 1998, MBIA downgraded its internal DVOG rating much earlier and both expressed considerable concern about the viability of their credits.

73.    Once the Obligated Group-level liquidity covenant was violated, TD advocated exiting the 1997 AHERF Line of Credit. As noted in the deposition of TD's RM,

---

[86] Exhibit 1742.
[87] Exhibit 1779.
[88] These issues were prominently reported in the *Philadelphia Inquirer*, the largest daily circulation newspaper in Eastern Pennsylvania. See, for example, Exhibit 2560 and Exhibit 579.
[89] Exhibit 2239.
[90] Exhibit 2239.
[91] Exhibit 2155. OAEM stands for Other Assets Especially Mentioned. These are loans that are currently paying, but potentially weak.

Robert Maloney, once AHERF violated the covenant there was "not enough opportunity to justify this, and the risks, as we [TD] perceived them, were getting greater. So you're adding a business risk and financial risk together, and the two are dangerous content."[92]

74.    TD expressed its concern by both downgrading the debt and requesting the declaration of an event of default.    In January 1998, a Mellon Middle Market Banking Department interoffice memo indicated that TD was pushing to declare an event of default as early as January 20, 1998.[93]  By the end of the January 1998, TD had downgraded AHERF in its internal ratings and recognized AHERF's significant financial weakening.  An internal TD memo indicated that the "impetus behind the downgrade is a dramatic deterioration in the operating results from the period ending 6/30/97 to the period ending 11/30/97."[94]

75.    Following a February 3, 1998 bank meeting, TD continued to believe that the loan should be called.  As Jennifer Bergen of TD wrote to Pierre Boulanger (Senior Vice President of the Credit Risk Management Division) in a February 4, 1998 e-mail, the TD representatives left the meeting with "a ton of 'information' but nothing that said we [TD] should stay in [the facility]."[95]  Following the bank meeting, TD continued to aggressively seek avenues to exit the credit, including requesting a meeting with the Mellon Bank Group with the intent to accelerate the 1997 AHERF Line of Credit.[96]  This desire to exit the facility continued until late-April 1998 when AHERF repaid the Mellon Bank Group the $89 million outstanding under the 1997 AHERF Line of Credit.  In addition, it is not surprising that TD, a lender with a limited relationship with AHERF, pushed aggressively to call the 1997 AHERF Line of Credit, while PNC, a lender with a broad and profitable relationship with AHERF, was reluctant to call the 1996 DVOG Letter of Credit.

---

[92] Deposition of Robert Maloney, p. 179.
[93] Exhibit 2538.
[94] Exhibit 2539.
[95] Exhibit 2536.
[96] Exhibit 2544.

76.    MBIA's monitoring of DVOG was considerably more critical and attentive than that of PNC. Notably, MBIA downgraded DVOG from 4B to 6B in February 1997.[97] This downgrade was prompted by MBIA's concerns about DVOG's "...weakening balance sheet, worsened by large net transfers to affiliated physician groups in the midst of the competitive Philadelphia market."[98] Next, in early-December 1997, MBIA downgraded DVOG to 7B and added DVOG to Credit Watch List A.[99] This downgrade was prompted by "...decreasing liquidity, increasing managed care pressures on operating margins, high debt levels, labor issues and continuing losses from recently acquired physician practices."[100] In early-February 1998, due to concerns over "...recent rating downgrades for affiliated organizations, an extremely weak liquidity position and anemic operating margins in part due to managed care pressures in an over-bedded market," MBIA downgraded DVOG to 8B and placed the bonds on Credit Watch List B.[101] In March 1998, due to DVOG's "...massive losses, significant declines in liquidity and concern over continuing deterioration," MBIA further downgraded DVOG to an 8C rating.[102] On the other hand, PNC still had not determined its response to the DVOG covenant violation in late-February 1998 and did not downgrade DVOG's credit until early-April 1998. Overall, MBIA's monitoring of DVOG's financial troubles was considerably more aggressive and timely than that of PNC.

77.    Furthermore, at the time PNC renewed the 1988 and 1993 AGH Letters of Credit, PNC was aware of substantial risks relating to the performance of AHERF and its affiliates. The Credit Information Sheet for the February 1997 renewal of the 1988 AGH Letter of Credit discusses the industry-wide trends affecting the healthcare industry. The very first item listed in the "Credit Issue" section states,

---

[97] Exhibit 1887. 4B is called "Acceptable" by MBIA and is equivalent to S&P BBB+; 6B is equivalent to S&P BBB-; 7B is called "Credit Watch List A" by MBIA and is equivalent to S&P BB; 8B is called "Credit Watch List B" by MBIA and is equivalent to S&P B.
[98] Exhibit 2224.
[99] Exhibit 1890.
[100] Exhibit 1890.
[101] Exhibit 2201.
[102] Exhibit 2274.

"The potential effect of healthcare industry-wide trends on all local providers continues to be a credit concern. As managed-care and capitation continue to grow, cost-containment and consolidation pressures will increase for area hospitals. Hospitals will need to refocus operations as a result of reduced inpatient activities by increasing outpatient, primary care and illness prevention activities. In addition, hospitals will be required to thoroughly understand their cost structures in order to operate profitably in a managed care and capitated environment."[103]

Despite these concerns regarding the industry environment, the knowledge that the existing syndicate members exited the credit, and the continued fund transfers from AGHOG to elsewhere in the AHERF system, PNC still renewed the 1988 AGH Letter of Credit. The only change to the Letter of Credit was an increased fee.

78. In December 1997, amidst AHERF's worsening financial condition, PNC again was provided with an opportunity to modify the terms and covenants of an AHERF-related credit agreement when the 1993 AGH Letter of Credit came up for renewal. In the Credit Information Sheet dated December 22, 1997, PNC noted even more significant credit problems than were reported in the February 1997 Credit Information Sheet. The "Credit Issues" section listed numerous concerns including an AGHOG rating downgrade by S&P; a possible rating downgrade by Moody's; the costly, unprofitable physician practice acquisitions; over-bedding in the Philadelphia market; high percentage of Blue Cross business in the Pittsburgh market; Medicare and Medicaid reform implications; and liquidity issues caused by transfers from AGHOG to other AHERF subsidiaries.[104] Notably, given AHERF's history of transferring funds between its various affiliates, PNC should have been aware that significant weakness in one area of the AHERF organization had the potential to negatively affect the rest of the organization.

---

[103] Exhibit 1745.
[104] Exhibit 1785. The February 1997 Credit Information Sheet was prepared for the renewal of the 1988 AGH Letter of Credit.

79.     The conclusion of the December 1997 Credit Information Sheet described PNC's relationship with AHERF as "long-standing and very profitable." PNC also stated its intention to pursue additional treasury and investment management business with AHERF, as well as stressing the importance of the relationship given AHERF's continued acquisitions. In late 1997/early 1998, when the renewal was being considered, PNC's Healthcare Group still had significant AHERF-related credit exposure, totaling approximately $140 million. In addition, prior to the PNC Credit Committee meeting to discuss the renewal of the 1993 AGH Letter of Credit, DVOG notified PNC that it had violated a covenant with respect to the 1996 DVOG Letter of Credit. Despite the degree of credit exposure, the myriad of risks outlined in the Credit Information Sheet, and the knowledge of a DVOG covenant violation, PNC again did not take advantage of the opportunity to make changes in the Letter of Credit other than an increase in the fee.

## VII.    Banks Have a Wide Variety of Options in Response to a Covenant Violation

80.     The Kite Report asserts that AHERF would have breached several financial covenants at fiscal year-end 1996. Mr. Kite argues that had these breaches been known at fiscal year-end 1996, the lenders and trustees would have been in a position to "pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system."[105] He further asserts that the actions that would have been taken by the lenders and the trustees "could have either avoided bankruptcy or mitigated its effects."[106] Mr. Kite's assertions, as well as Mr. Den Uyl's assertions, consist of broad statements that provide little in the way of a careful and detailed analysis of what the bankers would have actually done. Moreover, as discussed below, in my view, the banks' position to influence and change direction is no different in the real world than in the but-for world he presents. Based on my review of academic and practitioner literature relating to

---

[105] Report of Steven B. Kite, p. 6.
[106] Report of Steven B. Kite, p. 5.