covenant violations, as well as the deposition testimony in this case and my experience in the commercial banking industry, I conclude that it is unlikely that, in response to the covenant violations alleged by the Plaintiff's experts, the lenders would have taken a course substantially different from what they actually followed.

*Debt Covenant Background*

81.    Debt covenants protect lenders by enabling them to act to safeguard their investment should the borrower's financial condition begin to deteriorate. Negative debt covenants prohibit behaviors and events and/or indicate financial limitations; positive debt covenants present provisions to which the borrower must adhere.[107] Covenants also can provide a bank with the right to receive additional or more frequent information should the borrower's financial condition deteriorate.[108] Carefully designed covenants act like a good warning system, providing lenders with a mechanism to detect a borrower's worsening financial condition at a very early stage.

82.    When a borrower violates one or more debt covenants but has made all required principal and interest payments, the borrower is in technical default on the debt. With a well-designed set of debt covenants, technical default alerts the lender to an increased risk of payment default: that the buyer, in the future, may become unable to make scheduled interest or principal payments.[109] Therefore, when a covenant is violated and the borrower is in technical (but not payment) default, the lender should carefully assess the situation and evaluate its many options for the appropriate response. While technical default acts as a warning, payment default is far more serious and indicates severe financial distress, at which point "...closing down and liquidating may be the best or only remaining options."[110]

---

[107] Koch, T. and S. MacDonald. *Bank Management.* Fifth Edition, Thomson South-Western, 2003, p. 570.
[108] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation. *Commercial Bank Examination Manual,* Section 2040.1, p. 4.
[109] Revsine, L., D. Collins, and W. Johnson. *Financial Reporting and Analysis.* New Jersey, Prentice Hall, 1999, p. 288.
[110] McKinley, J. et al. *Problem Loan Strategies: A Decision Process for Commercial Bankers.* The Risk Management Association, Philadelphia, 1998, p. 25. "...the bank may be one of the last parties to be

Possible responses to a technical default include: waiving the violation, imposing additional constraints, increasing the interest rate or collateral, requesting outside assistance, restructuring the debt, or even forcing bankruptcy. According to Edgar M. Morsman Jr.'s *The Art of Commercial Lending*, published by the Risk Management Association, lenders should react reasonably to a covenant violation:

> "When covenant violations do occur, experienced lenders react reasonably and rationally, balancing both the interests of shareholders and their customers. In practice, covenant violations usually lead to several instances of restructuring before a borrower is asked to leave. Transferring the customer to workout status is a last resort and frequently means you did not react fast enough or the borrower incurred a sudden and unexpected reversal."[111]

*Academic Studies*

83.    In a recent academic study Ilia Dichev and Douglas Skinner use *Dealscan*, a database of private lending agreements, to provide evidence on the frequency of violation of accounting-based debt covenants.[112] The authors examine all covenant violations, even those that were waived.[113] Dichev and Skinner find that covenants in private lending agreements are set tightly and that violations are common. In fact, their research suggests that violations occur in approximately 30% of loans. This result suggests "...that private lenders use covenants as 'trip wires' which provide them with an option to step in and take action when

---

directly affected by the company's problems. Overdrafts and past-dues usually do not occur until other creditors have suffered and other emergency steps have been taken....[P]ast-dues and overdrafts are, in fact, late warning signs and...quick corrective action depends on recognizing symptoms in the earliest stages."
[111] Morsman, Jr., E. *The Art of Commercial Lending*. The Risk Management Association, 1997, p. 87.
[112] Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) p. 1091 – 1123.
[113] SEC Regulation S-X 17CFR §210.4-08 dictates that the only covenant violations that must be disclosed publicly are those resulting in an "Event of Default." Covenant violations that are waived typically do not require public disclosure and are therefore absent from many academic studies. Dichev and Skinner note that evidence from studies relying on this technical default data "...only sheds light on what later prove to be unsuccessful attempts to avoid covenant violations." Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) p. 1092. In addition, they note "[a]lthough we find that violations are associated with a decline in financial position and profitability, firms that violate debt covenants in our samples are not in the dire financial straits evident in previous studies of debt covenant violations." Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) p. 1121.

circumstances warrant, and that violations do not necessarily indicate that borrowers are in serious financial difficulty."[114] The authors argue that it behooves the lender to not "'pull the trigger' and call a loan too early" as the imposition of unwarranted costs on borrowers results in the loss of business due to the highly competitive nature of the banking industry.[115]

84.    Moreover, academic literature suggests that after a covenant violation, both borrowers and lenders expect the probability of waiver to be high and the probability of immediate termination of the loan to be low.  V. Gopalakrishnan and Mohinder Parkash surveyed CFOs of Fortune 500 firms, chief credit officers of banks and private placement department heads of insurance companies, and found that, "[m]ore than 95% of both borrowers and lenders indicate a medium or high probability of a waiver of violation."[116]  In addition,

> "[b]oth borrowers and lenders give lowest ranking to termination of the lending agreement and immediate repayment of the loan.  More than 76 percent of the borrowers and more than 90 percent of the lenders indicate a zero or low probability of these events occurring.  For both private and public debt, there is thus a very low probability of termination or immediate repayment due to violation of an accounting-based debt covenant."[117]

The survey results indicate that waiver of a violation is the most likely response to a covenant violation.  This result is consistent with my own experience as both a consultant and a member of the Board of Directors of a commercial bank.

*Lender Liability*

85.    The Kite Report asserts that had the lenders been aware of the alleged covenant violations, they would have been able to "in certain circumstances, persuade or

---

[114] Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) p. 1093.
[115] Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) p. 1096-7.
[116] Gopalakrishnan, V. and M. Parkash. "Borrower and Lender Perceptions of Accounting Information in Corporate Lending Agreements", *Accounting Horizons* 9 (1995) p. 20.
[117] Gopalakrishnan, V. and M. Parkash. "Borrower and Lender Perceptions of Accounting Information in Corporate Lending Agreements", *Accounting Horizons* 9 (1995) p. 20.

influence the debtor to alter its business operations or adjust a strategic plan".[118]
In reality, in the event a covenant is violated and the lenders decide to take action,
bankers are typically cautious of becoming too involved in the planning and
operational decisions of a company due to the existence of lender liability laws.

> "A lender should be wary of becoming too involved in
> a borrower's business affairs, even if the borrower
> willingly solicits help. Advising a borrower in trouble
> on how to turn the business around is tempting. While
> general advice may be warranted at times, the lender
> who meddles with the day-to-day operational aspects of
> a borrower's business may be deemed as having *de
> facto* control over the conduct of the borrower's
> business."[119]

If a lender is deemed as having *de facto* control over a business, the lender may be
deemed to be acting as a principal of the business and thereby could become
liable for the debts of the borrower.  As a result, workout officers and other
lenders typically avoid becoming too intimately involved in the control of the
business, precluding behavior such as requiring the borrower to take specific steps
at their express direction.[120]

### Assertions in the Reports of Steven Kite and Bruce Den Uyl

86.    The Kite Report asserts that the banks would have responded in some manner to
the hypothetical covenant violations, but does not provide a careful and detailed
analysis of what the banks would have actually done.  Rather than thoroughly
outlining the steps the banks would have taken in the event of the Plaintiff's
hypothetical covenant violations, the Kite Report merely speculates that these
actions would have been financially beneficial for the banks.

---

[118] Report of Steven B. Kite, p. 8.
[119] Ruth, G. *Commercial Lending*. Third Edition, American Bankers Association, 1995, p. 303.
[120] Clarke, R. *The Workout Manual*. Robert Morris Associates, Philadelphia, 1993, p. 30.  In addition,
Jeffrey Dickson, PNC's AHERF RM in 1998, has the following exchange in his deposition testimony: Q:
"So your understanding was that PNC had no right to tell AHERF management how to run the business of
AHERF?"  A: "I wouldn't limit it specifically to AHERF.  Banks simply cannot.  I mean, there are legal
penalties for doing such." Deposition of Jeffrey R. Dickson, p. 96.

87.     It is not surprising that the Kite Report does not provide specific actions the banks would have taken, as the wide variety of options available to a banker following notice of covenant non-compliance makes it difficult to speculate on the lender's response to a hypothetical covenant violation. This magnifies the importance of reviewing the lender's responses to actual covenant violations in determining the likely response to a hypothetical covenant violation. Despite the importance of such an analysis, the Kite Report fails to review the response of the banks to the actual covenant violations that occurred in the AHERF-related credits.

88.     The deposition testimony in this case confirms that it is impossible to predict with assurance a response to a specific covenant violation. For example, in his deposition testimony, Thomas McCool, a Senior Vice President in PNC's workout group, stated:

> Q: "Do you personally know of what steps, if any, any creditors of AHERF or its affiliates would, in fact, have taken if they had had additional information about the financial condition of AHERF or its affiliates at an earlier point in time?"
>
> A: "I think as I've testified not only here but in my prior deposition, it's impossible to predict what may have occurred."[121]

Numerous other deponents confirm this opinion: that the range of potential responses to a covenant violation must be evaluated in the context of the banking relationship, the seriousness of the violation, and the financial situation of the company, and that it is speculative to presume what actions would have been taken and the effect of these actions.[122]

89.     In contrast to the deposition testimony, the Report of Bruce Den Uyl states that representatives from PNC have testified that, "had they known about AHERF's

---

[121] Deposition of Thomas McCool, October 28, 2003, p. 259. Mr. McCool, the manager of PNC's workout group since 1988, also noted that he could not recall any instances in which he was involved in the acceleration of a Letter of Credit where the credit was above $100 million or any instances where he decided to accelerate a Letter of Credit that involved a healthcare system in Pennsylvania. Deposition of Thomas McCool, p. 116-117. It is my understanding that this is consistent with PNC's conduct with respect to other credits.
[122] See for example, Deposition of Ralph S. Michael, p. 210; Deposition of George Brikis, p. 162-163; Deposition of Richard Arrington, p. 108; Deposition of Susan Flanagan, p. 66.

deteriorating financial situation sooner, steps would have been taken to address the situation."[123] The only PNC witness he cites is Ralph "Mike" Michael, the CEO of PNC's corporate bank. Read in its entirety, Mr. Michael's deposition testimony does not indicate that PNC would have halted AHERF's financial demise. Rather, Mr. Michael testified that there were no established practices or procedures at PNC regarding how to respond to covenant non-compliance in connection with debt obligations.[124] He did not say exactly what PNC would have done, but he indicated that they would have worked with the borrower to improve operations and cash flows.[125] He also states that he does not know what the outcome of any such steps would have been.[126] Thus, the Den Uyl Report does not provide any additional insight into the steps that the Plaintiff's would have taken in the event of a hypothetical covenant violation.[127]

90.     The Kite and Den Uyl Reports do not specify what specific actions the banks would have taken in response to the hypothetical covenant violations. They merely speculate that the banks would have taken actions, but do not outline the specific steps the banks would have taken. Given the wide range of potential responses to covenant non-compliance, it is essential to analyze the response of the lenders to actual covenant violations to determine the likely response to a hypothetical covenant violation. It is unlikely that the banks would have taken a course substantially different from what they actually followed when certain covenant violations were detected.

---

[123] Report of Bruce Den Uyl, p. 21.
[124] Deposition of Ralph S. Michael, p. 151.
[125] Deposition of Ralph S. Michael, p. 166.
[126] Deposition of Ralph S. Michael, p. 168. "Q: And do you know what in fact would have been the outcome of any such steps in this instance with respect to AHERF?" "A: I don't know because again we didn't have the opportunity to do that."
[127] One of the possible steps that Mr. Michael identifies is the introduction of a crisis manager, but he repeatedly says that Tom McCool, the head of PNC's workout group, was in charge of that decision. However, Mr. McCool was asked in his deposition "Q: Do you know personally what steps, if any, any creditor of AHERF or it's affiliates would, in fact, have taken if an event of default had been declared on any of the letters of credit or any other?" Mr. McCool responded, "No." Deposition of Thomas McCool, p. 267-268. He was also asked if he knew what steps, if any, would be taken regarding GAAP violations or material misstatements or if Coopers & Lybrand had issued a qualified opinion. Again, he answered "No." Deposition of Thomas McCool, p. 267. Thus it is pure speculation that a crisis manager would have been brought into the AHERF situation by PNC.

## VIII.  Bank Actions When Covenants Were Violated

### PNC Bank

91.    Based on the Berliner Report, the Kite Report asserts that the DVOG debt service coverage covenant would have been breached at fiscal year-end 1996 and 1997.[128] Mr. Kite argues that had this breach been known, PNC would have been in a position to "pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system."[129]  Mr. Kite further asserts that the actions taken by PNC "could have either avoided bankruptcy or mitigated its effects."[130]  Based on my review of PNC's actual response to covenant violations by AHERF and its affiliates, and my experience in the commercial banking industry, it is unlikely that, in response to the covenant violations alleged by the Plaintiff's experts, PNC would have taken a course substantially different from the one actually followed.

92.    On December 23, 1997, DVOG informed PNC that it was out of compliance with its liquidity ratio covenant requirement of 2.00 to 1.00 for the 1996 DVOG Letter of Credit.  Further, DVOG indicated that it did not anticipate meeting this requirement for the balance of fiscal year 1998.[131]  As discussed in Section VII, the occurrence of a covenant violation created a wealth of possible responses from PNC ranging from granting DVOG a waiver to declaring an Event of Default. PNC's inaction in responding to this actual DVOG covenant violation is informative in regards to how PNC may have responded to the Plaintiff's alleged covenant violation at fiscal year-end 1996.

93.    Following its receipt of the notice of the covenant violation, PNC had to decide whether to renew the 1993 AGH Letter of Credit that expired in approximately

---

[128] I have been advised that there is a legal issue regarding whether there would have been an incurable "Event of Default" under the DVOG Master Indenture or First Supplement thereto if DVOG had failed to maintain an annual debt service coverage ratio of 1.00.  I understand that Robert P. Mitchell opines in his expert report that there would not have been.
[129] Report of Steven B. Kite, p. 6.
[130] Report of Steven B. Kite, p. 5.
[131] Exhibit 1788.

one month on January 28, 1998. The timing of this renewal provided PNC with considerable leverage to exact concessions from AHERF. In the Credit Information Sheet that was prepared in support of the renewal of the credit, PNC notes the numerous operating and liquidity problems at DVOG. Specifically, DVOG was experiencing considerable losses, its physician practices would potentially take years to turn around and its liquidity was constrained. In short, PNC was aware that DVOG's financial condition and outlook were poor. Despite this negative outlook, the Credit Information Sheet indicated that PNC intended to pursue additional business with AHERF and its affiliates, including treasury management, capital markets and asset management business.[132]

94.     PNC was also aware that AHERF had historically transferred funds from its stronger Obligated Groups to support the operations of the weaker ones and to fund AHERF's physician acquisition strategy. As one of AHERF's stronger Obligated Groups, AGHOG had helped fund AHERF's expansion plans. Given the weakness of DVOG and AHERF's historical penchant of transferring funds among its Obligated Groups, PNC should have been aware that the DVOG's weakness could have a direct impact on AGH.

95.     Despite the knowledge of DVOG's financial condition and covenant violation, PNC renewed the 1993 AGH Letter of Credit with only one modification to the existing terms: an increase in pricing from 35 basis points to 55 basis points due to a Moody's downgrade of AGH's bond rating.[133] Despite the DVOG covenant violation, the renewed 1993 AGH Letter of Credit contained no additional substantive amendments.

96.     Following PNC's decision to renew the 1993 AGH Letter of Credit in January 1998, PNC continued to take limited action with respect to the DVOG covenant violation. On February 26, 1998, more than two months after receiving notice from AHERF, PNC was still uncertain of how to respond. In her quarterly credit summary, the acting PNC RM, Paula Mammarella, indicated that "[s]ignificant

---

[132] Exhibit 1785.

[133] The renewal included a revised fee of 55 basis points with a provision to increase the fee to 65 basis points or 75 basis points in the event of further declines in AGH's credit rating.

analysis is currently being undertaken to analyze and assess the company's financial picture."[134]  Despite the covenant violation and DVOG's rapid financial decline, on the same day, Paula Mammarella prepared a memo that discussed the potential for PNC to add incremental AHERF business, including capital markets, and expanded treasury management and trust business.[135]

97.    A month later, on March 25, 1998, PNC received internal approval to waive DVOG's violation of its liquidity covenant for the quarter ended December 31, 1997.  This approval proposed an extension of the waiver to the covenant violation until June 30, 1998 in return for certain DVOG concessions, including higher fees and a "Springing Guarantee" from AHERF that would be activated given certain circumstances.[136]  It is important to note that, in the banking industry, creditors often use covenant violations as leverage to negotiate certain guarantees or additional security in return for the granting a of waiver.  These guarantees, much like the one negotiated by PNC, are intended to benefit the specific creditor, and not necessarily benefit the borrower or the borrower's other creditors.  The intent of the guarantee from the creditor's perspective is to cover its potential losses with the available assets of the borrower.

98.    At the same time, Paula Mammarella and Jeffrey Dickson prepared a memo requesting bank approval to increase the amount of its guidance line of credit to AHERF from $3.5 million to $7.5 million.  These loans enabled AHERF senior managers to borrow up to the equivalent of their annual compensation.  The memo indicates "the increase in the Guidance Line allows PNC Private Bank to retain existing relationships with AHERF executives and to associate with additional executives are [sic] referred by AHERF."[137]  Despite the financial problems facing AHERF and its affiliates, as well as the continued DVOG covenant violation, PNC's RMs still filed this expanded credit request with the credit committee.

---

[134] Exhibit 2239.
[135] Exhibit 1748.
[136] Exhibit 1749.
[137] Exhibit 1806.

99.    A memo dated April 20, 1998 from Frank Taucher, PNC Senior Vice President and Paula Mammarella, Senior Financial Analyst to David Cook, Manager of the PNC Healthcare and Public Finance Group, updated the status of the negotiations between PNC and DVOG regarding the violation of the liquidity covenant. The memo discusses the substantial relationship between PNC and AHERF, which contributed $1.4 million in revenue and an SVA[138] of approximately 12.7% in 1997. The memo also outlines AHERF's credit issues, including its decline in liquidity, the options AHERF is considering to improve liquidity, and AHERF's significant number of creditors. Most importantly, the memo outlines PNC's current options. These include: a) resigning as trustee on all AHERF/affiliate bond issues, b) granting a waiver through June 30, 1998 in exchange for several concessions, and c) declaring a default.[139]

100.    On April 24, 1998, PNC prepared a Credit Information Sheet to modify the approval received on March 25, 1998 to waive DVOG's violation of its liquidity covenant. This request would extend the waiver until August 31, 1998, or the closing of the sale of certain Eastern Pennsylvania hospitals to Vanguard or the termination or modification of the sale without the prior written consent of PNC.[140] Negotiations of how to resolve the covenant violation continued into May 1998 – five months after PNC received notice of DVOG non-compliance with its liquidity ratio covenant – without reaching a resolution. Finally, in July 1998, PNC and MBIA jointly proffered a term sheet to inject liquidity into the AHERF system. In return, they mandated that AHERF pledge the relatively healthy Western Pennsylvania assets to support the troubled Eastern Pennsylvania assets. AHERF's Board flatly rejected this proposal, refusing to tie the Eastern Pennsylvania assets with those in the Western half of the state, and shortly thereafter, the majority of AHERF's Eastern Pennsylvania assets filed for bankruptcy protection. Notably, following the covenant violation until the bankruptcy filing – a period of seven months – PNC never invoked any of its remedies under the 1996 DVOG Letter of Credit.

---

[138] Shareholder Value Added, a measure of profitability.
[139] Exhibit 1810.
[140] Exhibit 1817.

101.    Further, the remedies PNC had available in 1998 in response to a covenant
violation would have harmed PNC itself.  If PNC had declared a default under its
agreement with AHERF regarding the 1996 DVOG Letter of Credit, the outcome
would have been a draw by the holders of AHERF debt on the 1996 DVOG Letter
of Credit.  The result, therefore, would have been to make matters worse for
AHERF by causing holders of its bonds or commercial paper to demand payment
from PNC itself under the 1996 DVOG Letter of Credit if AHERF were unable to
make the payments.

102.    In addition to PNC's actual response to the DVOG covenant violation, I have
found several examples where PNC responded to an AHERF-related covenant
violation by waiving the covenant or granting forbearance.

103.    On September 27, 1994, in response to an Unencumbered Securities covenant
violation by Allegheny-United Hospitals, an AHERF affiliate, PNC waived the
covenant.[141]  The covenant related to a $25 million Revolving Line of Credit
initiated in 1991 between PNC and Allegheny-United.  A year later, in a letter
dated September 11, 1995, PNC again waived the Unencumbered Securities
covenant.[142]

104.    In February 1996, AHERF notified PNC of an Event of Default that occurred
under a cross-default provision in a Credit Agreement between PNC and several
AHERF affiliates.  In June 1996, AHERF requested that PNC "formalize their
willingness to forego accelerating amounts due under the Credit Agreement"
while AHERF worked on finalizing a transaction to cure the violation.[143]  PNC
recognized this request and agreed to forego accelerating amounts due under the
Credit Agreement.[144]  The forbearance was granted in writing a total of three
times.[145]

105.    In addition to waiving or forbearing actual AHERF-related covenant violations,
PNC also renewed the 1988 AGH Letter of Credit.  PNC's renewal decision was

---

[141] Exhibit 673.
[142] Exhibit 674.
[143] Exhibit 341.
[144] Exhibit 675.
[145] Exhibit 342; Exhibit 675; Exhibit 676.

not affected by AHERF's financial projections, which forecast that a covenant violation would occur within four months of the renewal date. PNC's internal Credit Information Sheet dated February 5, 1997 contains the following discussion:

> "Projections suggest the hospital will violate the minimum unrestricted fund balance covenant at FYE97 due to the elimination of ASRI from the obligated group and continue large transfers to affiliates. The covenant threshold is $200.0MM, with only $192.2MM budgeted for FYE97."

> "Given the increase in the hospital's off-balance sheet financing, it may be appropriate to consider a leverage covenant which includes operating leases. The RM intends to negotiate this type of leverage covenant if AGH violates the minimum unrestricted fund balance covenant at FYE97."[146]

This discussion indicates that PNC renewed the 1988 AGH Letter of Credit despite knowing that the covenant was likely to be violated at the end of fiscal year-end 1997. Further, rather than appearing alarmed about the potential covenant violation, PNC simply planned to use the violation as a means to negotiate a new leverage covenant.

106.    Finally, PNC either failed to notice or overlooked an easily discoverable covenant violation relating to the 1996 DVOG Letter of Credit. On December 18, 1997, DVOG signed its Officer's Certificate pursuant to Section 6.08 (b) of the Letter of Credit, Reimbursement and Security Agreement. This Officer's Certificate stated

> "Except for the recording of $23,236,000 in contractual adjustments as a direct charge against unrestricted net assets, the unaudited financial statements, which accompany this certificate, fairly present the combined financial position and the results of operations of the Delaware Valley Obligated Group for the first quarter of the current and previous fiscal years and have been

---

[146] Exhibit 1745.

prepared in accordance with generally accepted accounting principals."[147]

Despite the unambiguous statement that DVOG's financials were prepared with a noted exception to GAAP, it appears that PNC never responded to this issue. In her deposition, Paula Mammarella, the acting RM, indicates that she does not recall any specifics of PNC's response to this issue.[148]

*Mellon Bank*

107.    Based on the Berliner Report, the Kite Report asserts that AHERF's parent-level liquidity covenant was breached when the agreement came into effect on March 7, 1997 and at fiscal year-end 1997. This argument is based on the alleged misrepresentation of AHERF's liquid assets according to FASB 116 and 117, which require net assets and changes therein be classified into three categories (unrestricted, temporarily restricted and permanently restricted) based on the existence or absence of donor imposed restrictions. The Berliner Report estimates that AHERF's fiscal year-end 1996 financial statements had incorrectly categorized approximately $82 million in assets related to the Lockhart Trusts as temporarily restricted and unrestricted. The Berliner Report asserts that these assets should have been categorized as permanently restricted since the company legally could not use these assets to service its debt.[149] At this time, Mellon's Institutional Trust Group managed the Lockhart Trust assets and was aware of all restrictions that applied to them.[150] Based on my review of Mellon's due diligence and risk evaluation in connection with the 1997 AHERF Line of Credit, and my experience in the commercial banking industry, I conclude that had Mellon's Credit Group followed prudent banking practices, it would have

---

[147] Exhibit 1784.
[148] Deposition of Paula Mammarella, p. 178.
[149] The Lockhart Trusts are five related endowed irrevocable trusts, the income of which is reserved for the general purposes of Allegheny General Hospital. Per the terms of the trusts, AHERF can never access the principal, market appreciation or capital gains for any reason. The market value of the Lockhart Trusts as of fiscal year-end 1996 was approximately $87 million. Report of Robert Berliner, p. 5-4–5-7.
[150] Barbara Robinson, the manager of the Mellon Institutional Trust Group, states that she was aware of all of the restrictions that applied to the Lockhart Trusts. See, for example, Deposition of Barbara Robinson, p. 67-68.

confirmed the value of AHERF's unrestricted assets to verify AHERF's parent-level liquidity with Mellon's Institutional Trust Group prior to entering into the 1997 AHERF Line of Credit. While banks traditionally maintain a separation (a so-called "Chinese Wall") between their lending and trust departments, this does not preclude the "lending side" from getting confirmation of facts or circumstances from the "trust side."

108.    Documents and deposition testimony from members of the Mellon Bank Group suggest that AHERF's liquid assets were the primary reason that the members of the Mellon Bank Group were willing to participate in the credit. Therefore, the Mellon Bank Group structured the 1997 AHERF Line of Credit so that AHERF would be the borrower and in turn lend the borrowed funds to its affiliates. Richard Arrington, the head of the Healthcare Group at Mellon, states in his deposition testimony that Mellon thought that it would be too risky to provide credit to stand-alone AHERF affiliates without a guarantee from the parent corporation.[151] Consequently, AHERF's financial condition, and specifically its liquidity, should have been a primary concern of the Mellon Bank Group.

109.    In December 1996, Mellon Bank prepared a syndication book for the 1997 AHERF Line of Credit. In this book, Mellon outlined "Substantial Balance Sheet Liquidity" as one of the four major investment considerations.[152] The Lockhart Trust assets, held in the Mellon's Institutional Trust Group, accounted for a large portion of AHERF's liquid assets identified by Mellon. However, despite the stated importance of these assets, Mellon's Credit Group failed to verify the existence and classification of these assets. When asked by AHERF about the availability of the capital gains in the Lockhart Trusts in October 1996, Mellon's Institutional Trust Group conveyed that they were not available.[153] Mellon should

---

[151] Deposition of Richard Arrington, p. 43. Requiring a de facto AHERF guarantee was a prudent course of action and is the type of action that PNC should have taken with regard to the 1996 DVOG Letter of Credit. PNC made a similar evaluation of DVOG's risks, yet failed to require a guarantee from AHERF.
[152] Exhibit 2375. "AHERF maintains significant balance sheet liquidity, comprised of cash and other short term investments, debt instruments and marketable equity securities. This cash and investments portfolio, which as of 9/30/96 totaled approximately $196 million, net of permanently restricted assets, will be used to support any borrowings under the Revolving Credit Facility as well as other AHERF indebtedness."
[153] Exhibit 2368.

have been, at the very least, internally consistent on this important point, treating these assets as permanently restricted according to FASB 117 for purposes of this syndication book.[154]

110.  In spite of the importance of AHERF's assets as "cushion to repay our [Mellon's] debt," [155] Mellon's Credit Group did not confirm the value and the nature of the assets with its Trust Group.  Although the 1997 AHERF Line of Credit was not specifically structured as a secured loan, Mellon documents indicate that AHERF's assets were serving as a form of security.[156]  In a secured loan, the lender should always confirm the value of all assets securing its exposure.  In effect, Mellon's Credit Group had ready access to the information needed to determine whether AHERF was in compliance with the proposed liquidity covenant before the agreement became effective.

111.  In mid-February 1997, AHERF informed the Mellon Bank Group of a reduction in both its unrestricted assets by $41.2 million and its current assets by $17.8 million.[157]  These assets were housed in its captive insurance subsidiary, AHSPIC, and thus could not be considered available to support the revolving credit borrowings.  Despite the reduction in AHERF's liquidity ratio, Mellon's Credit Group did nothing to verify that the remaining AHERF assets were available to the parent entity to satisfy debt obligations.  In addition, Mellon decided to revise the proposed terms of the credit agreement rather than canceling the agreement, changing the fee structure or even requesting additional information regarding existing assets.[158]  Consequently, Mellon's Credit Group again failed to confirm the value of these AHERF assets with its Institutional Trust Group.

---

[154] While a "Chinese Wall" existed between the Credit Group and the Institutional Trust Group, in her deposition testimony, Barbara Robinson indicates that had Mellon's Credit Group requested AHERF for permission to access information regarding AHERF's assets, the Credit Group would have had full access to all of the information regarding the Lockhart Trusts.  Deposition of Barbara Robinson, p. 37-38.
[155] Exhibit 2338.
[156] Exhibit 2338.
[157] Exhibit 2534.
[158] The revised terms lowered the parent-level liquidity ratio to 1.40 to 1.00 from 1.75 to 1.00, and created a new Obligated Group-level liquidity ratio of 1.60 to 1.00.  Exhibit 1012.

112.    Mellon was informed of a DVOG liquidity ratio covenant violation related to the 1997 AHERF Line of Credit in October 1997.[159] The obligated group liquidity ratio covenant in the Credit Agreement mandated that DVOG maintain a liquidity ratio of 1.60 to 1.00. DVOG's reported liquidity ratio was 1.31 to 1.00 as of September 30, 1997 and the group's financial performance was rapidly deteriorating.[160] In an e-mail dated October 28, 1997, Richard Arrington, head of Mellon's Healthcare Banking Group, outlined Mellon's concerns:

> "In summary, [AHERF's] consolidated net loss for the quarter is $42.5mm versus a profit in the prior year period of $3.4mm. We are concerned not only by the level of performance but also by the speed of the deterioration."[161]

Nonetheless, Mellon's Credit Group decided to waive the covenant until the end of calendar year 1997 rather than calling the loan, and did not even further investigate AHERF's liquidity levels by demanding additional financial information or reviewing readily available information.

113.    Ultimately, in late-April 1998, at the insistence of certain members of the Mellon Bank Group – specifically TD – AHERF repaid the $89 million that had been borrowed under the 1997 AHERF Line of Credit. This request by the Mellon Bank Group did not benefit the other creditors of the borrower or the borrower itself. Rather, this specific set of creditors benefited at the expense of the other parties. In addition, it is notable that TD, a lender with a limited banking relationship with AHERF pushed aggressively to call the loan, while Mellon, a lender with a broad and profitable relationship with AHERF, was reluctant to call the loan.

---

[159] Had the liquidity ratio covenant violation been reported at fiscal year-end 1997, Mellon would have likely been notified of the covenant violation in September 1997, one month prior to when Mellon was actually notified.
[160] Exhibit 2346.
[161] Exhibit 2345.

*The DVOG Lines of Credit*

114.   The Kite Report asserts that approximately $57 million in outstanding lines of credit to DVOG entities (the "DVOG Lines of Credit") "would also have been subject to renegotiation" in the event of a breach in the debt service covenant associated with the 1996 DVOG Letter of Credit or in the event that Mellon did not enter into the 1997 AHERF Line of Credit.[162] These outstanding Lines of Credit included $7.5 million between Hahnemann University Hospital and First Union Bank ("First Union Line of Credit"),[163] $33 million across two Lines of Credit between various DVOG entities and PNC ("PNC Line of Credit"), and $16.5 million across two Lines of Credit between Medical College of Pennsylvania and Hahnemann University entities and CoreStates Bank ("CoreStates Line of Credit"). In the event of a covenant violation, small participants without a strong banking relationship with AHERF may have had a desire to exit the credit; however, there is no evidence to indicate that either new or existing lenders would not have replaced them.

115.   As discussed earlier, PNC had an extensive banking relationship with AHERF and its affiliates, including its role as the primary credit bank. The credit relationship between PNC and AHERF totaled $144 million in direct exposure as of August 1996 and $140 million as of January 1998. Further, as detailed in this section, PNC's response to actual AHERF covenant violations was typically accommodative. Given PNC's longstanding and profitable relationship with AHERF, as well as its actual response to AHERF covenant violations, I conclude that it is unlikely that PNC would have altered the PNC Line of Credit in the event of a hypothetical DVOG covenant violation at fiscal year-end 1996.

116.   CoreStates had a longstanding relationship with both Hahnemann and Medical College of Pennsylvania, and it hoped to leverage its existing Lines of Credit to develop a more substantial relationship with AHERF and its affiliates.[164] In addition, CoreStates had previously extended the Hahnemann Line of Credit

---

[162] Report of Steven B. Kite, p. 18.
[163] Formerly First Fidelity Bank.
[164] See, for example, Deposition of Gary Seybold, p. 21-24.

despite the poor fiscal year 1994 financial performance of Hahnemann. When discussing this extension, Gary Seybold, the CoreStates RM at the time, stated "[t]he approval process…is not black and white, and there are a lot of factors that you take into consideration."[165] He also indicated that "…you don't make a decision just off of the financial statements."[166] In addition, the Master Note Agreements governing the CoreStates Line of Credit did not have financial covenants and therefore a hypothetical DVOG covenant violation would not have required action by CoreStates. Furthermore, Mr. Seybold testified that he had never been involved in a credit relationship "where CoreStates demanded repayment of a Line of Credit" nor was he aware of a situation where CoreStates had ever "requested collateral or otherwise restructured a deal" due to a borrower's financial performance.[167] Mr. Seybold's testimony is consistent with my experience in the banking industry that radical actions are rarely taken in situations such as the hypothetical DVOG covenant violation. Finally, CoreStates was one of four banks that bid on the 1997 AHERF Line of Credit. Given my review of responses to covenant violations and my experience in the banking industry, it is unlikely that CoreStates would have taken any radical actions in response to a hypothetical DVOG covenant violation. Further, it is my opinion that if CoreStates decided to exit its Line of Credit, it is likely that another bank would have stepped in and offered a similar Line of Credit in its stead.

117.    First Union was one of four banks to bid on the 1997 AHERF Line of Credit. Given my review of responses to covenant violations and my experience in the banking industry, it is unlikely that First Union would have taken any radical actions in response to a hypothetical DVOG covenant violation. Indeed, Thomas Woodward, the First Union Vice President responsible for managing the First Union Line of Credit, testified that he cannot say, "with any degree of certainty" how First Union would have responded in the event of a hypothetical 1996 DVOG covenant violation.[168] Further, it is my opinion that if First Union decided

---

[165] Deposition of Gary Seybold, p. 55.
[166] Deposition of Gary Seybold, p. 55-56.
[167] Deposition of Gary Seybold, p. 83-84.
[168] Deposition of Thomas C. Woodward, p. 94-96.

to exit its Line of Credit, it is likely that another bank would have stepped in and offered a similar line of credit in its stead.

*Morgan Guaranty Trust*

118.   Based on the Berliner Report, the Kite Report asserts that the AGHOG consolidated unrestricted fund balance covenant contained in the Reimbursement and Security Agreement with MGT was breached both at fiscal year-ends 1996 and 1997.[169] He argues that had this breach been discovered at fiscal year-end 1996, MGT would have been in a position to "pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system."[170] He further asserts that the actions taken by MGT, among others, "could have either avoided bankruptcy or mitigated its effects."[171] Based on my review of MGT's response to this covenant violation in early- and mid-1998, and my experience in the commercial banking industry, it is my conclusion that in response to the covenant violations alleged by Plaintiff's experts, it is unlikely that MGT would have taken a course substantially different from what it actually followed.

119.   On April 1, 1995, MGT entered into a Reimbursement and Security Agreement with AGHOG in relation to a Letter of Credit backing a $50 million bond issuance. The agreement included, among others, a covenant mandating that AGHOG should maintain a consolidated unrestricted fund balance of at least $200 million at all times. Such a covenant prevented the excessive transfer of funds from AGHOG to elsewhere in the AHERF system, as had occurred in 1993

---

[169] I understand that Robert P. Mitchell opines in his expert report that, had this covenant breach been discovered, assuming AHERF had cured the breach at or before the time it notified MGT, an "Event of Default" could not have resulted from such breach.
[170] Report of Steven B. Kite, p. 6.
[171] Report of Steven B. Kite, p. 5.

and 1994.[172] MGT wanted to ensure that its obligation would not be "weakened by net outflows to the advantage of other parts of the system."[173]

120.    At the end of fiscal year-end 1996, the consolidated unrestricted fund balance was calculated incorrectly: the reported balance was approximately $211 million, while the actual balance was approximately $185 million. MGT had explicitly negotiated this covenant into the agreement, and the calculation was relatively simple to verify, thus it is surprising that MGT did not detect the incorrect calculation.[174] Further, if the covenant had been properly calculated and AGHOG were in violation, it appears that the violation would have been easily cured via an inter-organization transfer from AHERF, as AHERF had more than sufficient liquidity to push the balance above the $200 million threshold.

121.    On January 1, 1997, AHERF transferred most of ASRI's operations out of AGHOG, resulting in a $20 million reduction in the consolidated unrestricted fund balance. In response, AHERF requested that MGT reduce the covenant level to $160 million, in exchange for the tightening of two other financial covenants.[175] In May 1997, the parties signed an amendment to the Reimbursement and Security Agreement. The consolidated unrestricted fund balance covenant was reduced to $160 million from $200 million, while the debt service covenant was increased to 1.30 to 1.00 from 1.20 to 1.00 and the debt-to-capitalization ratio was tightened to 63% from 66 2/3%.[176] MGT's willingness to renegotiate these covenants indicates that it was flexible in its management of

---

[172] Exhibit 934.

[173] Exhibit DX-2638.

[174] The AGHOG Balance Sheet at fiscal year-end 1996 specified general net assets of approximately $228 million and receivables from affiliates of $26 million. Once the general net assets were adjusted to account for certain contractual adjustments, the fund balance was $211 million; however, this adjustment failed to subtract the receivables from affiliates of $26 million. Therefore, the actual consolidated unrestricted fund balance at fiscal year-end was approximately $185 million, below the required threshold of $200 million. The materials necessary to make this calculation were received by MGT. Further, since receivables from affiliates had to be subtracted from the general net assets in the calculation of the covenant, it should have been immediately clear to MGT that the covenant was calculated incorrectly. See Exhibits DX-2641 and DX-2642; the Deposition of Susan A. Flanagan, p. 16-18, 130; and the Deposition of Kelly Mertz, p. 296-299.

[175] Exhibit DX-2645.

[176] Exhibit 347.

covenant violations.  In this case, MGT traded the loosening of one covenant for the tightening of two others.

122.    In January 1998, Foley & Lardner ("F&L"), AHERF's counsel, discovered that AHERF was incorrectly calculating the consolidated unrestricted fund balance covenant related to the 1995 AGHOG Letter of Credit.[177]  Upon discovering this issue, F&L failed to prompt AHERF to notify Coopers, failed to cause AHERF to include the corrected calculation in the February 6, 1998 Market Disclosure Report, and failed to promptly disclose the covenant non-compliance to MGT.

123.    In March 1998, MGT was finally informed that AGHOG was in violation of the consolidated unrestricted fund balance covenant at fiscal year-end 1997, as well as at September 30, 1997 and December 31, 1997.[178]  AGHOG's consolidated unrestricted fund balance as of June 30, 1997 stood at $78 million, significantly out of compliance with the terms of the Amended Reimbursement and Security Agreement related to the 1995 AGHOG Letter of Credit.[179]  In a letter to MGT, AHERF outlined the covenant violation and requested that MGT renew the 1995 AGHOG Letter of Credit, which was set to expire on April 13, 1998.[180]

124.    The day after receiving the letter indicating that AGHOG was not in compliance with the fund balance covenant, MGT approved a one-year extension of the 1995 AGHOG Letter of Credit.[181]  This intention to extend the credit was formalized in a letter dated April 2, 1998.  Similar to the extension of the 1993 AGH Letter of Credit granted by PNC, the only significant modification to the terms of the letter of credit was an increase in the fee to 50 basis points from 27.5 basis points. MGT also requested that AGHOG provide it with monthly financial statements beginning with April 1998.  This letter also granted AGHOG a waiver of its covenant non-compliance until May 31, 1998.[182]

---

[177] Exhibit 345.
[178] Exhibit 359.
[179] Exhibit 360.
[180] Exhibit 359.
[181] Exhibit 669.
[182] Exhibit DX-2637.

125. In mid-May 1998, AGHOG informed MGT of continued covenant non-compliance and requested a second extension of the waiver. In the letter, AGHOG noted that the process of returning to compliance with the covenant would last much longer than the current deadline and that AHERF was attempting to refinance its Western Pennsylvania debt, including the 1995 AGHOG Letter of Credit.[183] In a letter dated May 29, 1998, MGT extended the waiver until September 1, 1998.[184]

126. In addition to MGT's response to the covenant violation – granting waivers and extending the 1995 AGHOG Letter of Credit – no MGT employees have testified to any remedial action that MGT would have taken. In her deposition testimony, Susan Flanagan, a VP in the Municipal Finance Department at MGT, notes that at the time "we thought that this situation [of non-compliance] could be corrected."[185] She also states "conditions of non-compliance can often be corrected..." and indicates that MGT did not consider calling the bonds.[186]

127. Further, MGT had limited major remedies available in response to a covenant violation. Specifically, under the terms of the Reimbursement and Security Agreement backing the 1995 AGHOG Letter of Credit, MGT could have accelerated the Letter of Credit. If MGT had declared default under its agreement with AGHOG regarding the 1995 AGHOG Letter of Credit, the bondholders would have had the right to immediately seek a draw from MGT. At this point, MGT would have been obligated to pay out these bondholders and seek reimbursement from AGHOG. Such an action would benefit MGT, not the borrower's other creditors or the borrower.

128. Given MGT's real-world responses to continued covenant violations, and the relatively minor technical nature of the hypothetical fiscal year-end 1996 covenant violation, if the consolidated unrestricted fund balance covenant

---

[183] Exhibit 367.
[184] Exhibit 368.
[185] Deposition of Susan A. Flanagan, p. 66-7.
[186] Deposition of Susan A. Flanagan, p. 66. Note that Ms. Flanagan also agrees that it "...would just be speculation" to testify as to what MGT "might have done had there been any other covenant violation under the 1995 letter of credit at any point in time." Deposition of Susan A. Flanagan, p. 85.

violation had been discovered in 1996 as alleged by the Plaintiff's experts, it is unlikely that MGT would have initiated a course substantially different from what it actually followed.

Christopher M. James

11/12/04

Date

**EXHIBIT 1**
<u>**VITA**</u>

| | |
|---|---|
| **NAME:** | Christopher M. James |

**CURRENT POSITION:** William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida

**ADDRESS:** Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168
E-mail: christopher.james@cba.ufl.edu

**TELEPHONE:**   Office:   352-392-3486
Home:   352-336-2765

**BIRTHDATE:** October 12, 1951

**EDUCATION:**   B.A.   Michigan State University, 1973
M.B.A.   University of Michigan (Finance), 1977
Ph.D.   University of Michigan (Economics), 1978

**RESEARCH/ TEACHING INTERESTS:** Financial Institutions and Markets, Corporate Finance, Corporate Strategy

**TEACHING/ RESEARCH EXPERIENCE:** William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Consultant, FDIC, 1988-1991

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978



EXHIBIT

1

**PAPERS AND
PUBLICATIONS:**

"The Technology of Risk and Return, Comment," <u>American Economic Review</u>, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," <u>Journal of Financial and Quantitative Analysis</u>, December, 1981.

"An Analysis of Bank Loan Rate Indexation," <u>Journal of Finance</u>, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), <u>Journal of Finance</u>, December, 1982.

"Pricing Alternatives for Loan Commitments: A Note," <u>Journal of Bank Research</u>, Winter, 1983.

"An Analysis of Intra-industry Differences in the Effect of Regulation: The Case of Deposit Rate Ceilings," <u>Journal of Monetary Economics</u>, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?") with R.O. Edmister) <u>Journal of Portfolio Management</u>, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), <u>Journal of Finance</u>, September, 1983.

"Regulation and the Determination of Bank Capital Changes: A Note," (with J.K. Dietrich), <u>Journal of Finance</u>, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency; The Case of Bank Holding Company Acquisitions," <u>Journal of Law and Economics</u>, April 1984. Abstracted in <u>Regulation</u> as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery) <u>Journal of Finance</u>, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," <u>Journal of Money, Credit and Banking</u>, (with M.J. Flannery), November 1984. Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries", (with G. Ungson and B. Spicer), <u>Academy of Management Journal</u>, 1985.

-2-

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," Journal of Finance, (with S. Koreisha and M. Partch), December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," Journal of Financial Economics, (with J. Brickley), July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier). Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier). Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogenous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

- 3 -

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?", Review of Financial Studies, Winter, 1995.

"CEO Compensation and Bank Risk: Is Compensation Structured in Banking Structured to Promote Risk-Taking?", Journal of Monetary Economics, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress", Journal of Finance, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims", (with J. Houston), Journal of Finance, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking", (with J. Houston and D. Marcus), Journal of Financial Economics, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), Journal of Banking and Finance, November, 1998.

"Where Do Merger Gains Come From? Bank Mergers From the Perspective of Insiders and Outsiders." (with J. Houston and M. Ryngaert), Journal of Financial Economics, May, 2001.

"Do Relationships Have Limits? Banking Relationships, Financial Constraints and Investment", (with J.Houston), Journal of Business, July, 2001.

"Do Banks Provide Financial Slack?" (with C.Hadlock) Journal of Finance, June, 2002.

**CURRENT RESEARCH:**

"What a Difference a Month Makes: Stock Analyst Valuations Following Initial Public Offerings" (with J. Karceski and J. Houston), under revision. (Prepared for Hong Kong Corporate Finance Conference, March, 2003)

"The Strength of Analyst Coverage Following IPO's?" (with J. Karceski), under submission.

"Smart Money or Captured Money; Differences in the Performance of Retail and Institutional Mutual Funds" (with J. Karceski), (Presented at 2001 American Finance Association Meetings) under submission.

"When Bankers Have a Voice: An Analysis of Performance Following Loan Covenant Violations" Work in Progress

-4-

"Banks and Bubbles", work in progress.

"The Effects of Leverage on Operating Performance: An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND PUBLICATIONS:**

"Are Banks Still Special?  New Evidence in the Corporate Capital-Raising Process", (with D. Smith), <u>Journal of Applied Corporate Finance</u>, Winter, 2000

"Why Are Value Enhancing Mergers In Banking So Hard to Find?  A Discussion of "Is the Bank Merger Wave of the 90's Efficient?  Lessons from Nine Case Studies"" Kaplan, S. (Ed.), <u>Mergers and Productivity</u>, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano" <u>Journal of Banking and Finance</u>, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking" (with J Houston) <u>Journal of Applied Corporate Finance</u>, Summer, 1998.

Discussion of "Financial Institutions and Regulations: The Dilemma in a Deregulated World", <u>Proceedings from Riksbank Conference: Forces for and Implications of Structural Changes in the Financial Sector</u>, June, 1997.

"Evolution of Extinction: Where are Banks Headed," <u>Journal of Applied Corporate Finance</u>, (with J. Houston), Summer, 1996.

"RAROC at Bank of America: From Theory to Practice, <u>Journal of Applied Corporate Finance</u>, Summer, 1996.

"Bank Equity Positions in Distressed Firms," in Anthony Saunders and Ingo Walter, <u>Universal Banking:  Financial System Design Reconsidered</u> (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One", <u>Journal of Applied Corporate Finance</u>, (with C. Smith), Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," with D. Brown and M. Mooradian, in: Edward Altman, ed., <u>Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities</u>, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), <u>Journal of Applied Corporate Finance</u>, 1994.

"Studies in Financial Institution," <u>Commercial Banks</u>, (with C. Smith), 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs - 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," presented, American Economic Association, meetings 1989.

"Are Bank Loans Different? Some Evidence From the Stock Market," Journal of Applied Corporate Finance, (with P. Wier), Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

"Discussion: The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," Proceedings of a Conference on Bank Structure and Competition, (with P. Wier), May 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," A Report prepared for the Office of the Comptroller of the Currency, February 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE
ACTIVITIES:**

Associate Editor: Journal of Banking and Finance, 1999-2001.

Associate Editor: Journal of Financial Economics, 1993 - present.

Associate Editor: Journal of Financial Services Research, 1989-present.

Associate Editor: Journal of Managerial and Decision Economics, 1988-present.

Associate Editor: Journal of Finance, 1988-2000.

Co-Editor: Journal of Financial Intermediation, 1988-1999.

Associate Editor: Journal of Financial and Quantitative Analysis, 1982-1984.

Academic Board: Turnaround Management Association: 1990- 2002

Editorial Board: Federal Reserve Bank of New York: Economic Review

Reviewer: Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics

Program Committee: Financial Management Association, Western Finance Association, American Finance Association, And European Finance Association.

**CONSULTING/EXECUTIVE
EDUCATION ACTIVITIES:**

Board of Directors/Chairman, ID$^2$, Inc.

Advisory Board, SunTrust Bank.

Board of Directors SunTrust Banks, 1989-2001.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School: Workout Lending.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness: Cases involving antitrust, portfolio management, securities valuation, bank management, valuation of closely held firms, and regulatory matters.

Consultant: Bank product pricing, and portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds

Consultant to Federal Reserve Bank of New York, 1997-2004.

Consultant to the FDIC, 1987-1990: Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member: Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.


AWARDS:                    Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

**EXHIBIT 2**
**Prior Testimony of Dr. Christopher M. James**
**In the Previous Four Years**

*Edward E. Lucente v. IBM Corporation,* No: 99 Civ. 3987 (CM) (GAY), U.S. District Court, Southern District of New York, deposition, 2000.

*Jeffrey H. Beck, as Trustee of Southeast Banking Corporation v. Deloitte & Touche and Deloitte Haskins & Sells* (U. S. District Court Southern Division of Florida, Miami Division), deposition, 2001.

*In re BankAmerica Corp. Securities Litigation,* MDL No. 1264, United States District Court, Eastern District of Missouri, deposition, 2001.

*Comac Partners, L.P., et al., v. John J. Ghaznavi, et al., and Anchor Glass Container Corporation Litigation,* No. 18417, deposition, 2002.

*Ernst & Young, LLP v. Sphinx International, Inc.,* AAA No. 30-107-00252-1, arbitration testimony, 2002.

*Dr. Ben S. Branch, Trustee of Bank of New England Corporation v. Ernst & Young U.S., et al.,* C.A. No. 93-10024-RGS, deposition, 2002.

*Duramed Pharmaceuticals, Inc. v. Wyeth-Ayerst Laboratories, Inc.,* C.A. No. C-1-00-735, deposition, 2002.

*KA Investments v. Number Nine Visual Technology Corp.,* No. 00 CV 10966 DPW, U.S. District Court, District of Massachusetts, deposition and trial testimony, 2003.

*In Re A.T. Cross Securities Litigation,* No. 00 203 ML, U.S. District Court, District of Rhode Island, deposition, 2003.

*LaSalle Talman Bank, F.S.B., v. United States of America,* No. 92-652C, United States Court of Federal Claims, deposition and trial testimony, 1998-1999, 2004.

*Smith v. Arthur Andersen et al.,* No. CIV-01-218-PHX-PGR, United States District Court for the District of Arizona, deposition, 2003.

*Land Development, Ltd. v. Arvida Managers-II, Inc.,* No. 96-0062-CA-15-N, The Circuit Court in and for the Eighteenth Judicial Circuit, Seminole County, Florida, deposition, 2003.

*PSINet Consulting Solutions Holdings, Inc., et al.,* No. 01-14916, United States Bankruptcy

Page 1

EXHIBIT

2

ALL-STATE LEGAL®

Court for the Southern District of New York, deposition, 2003, trial testimony, 2004.

*AT&T Corp. Securities Litigation*, No. 01-CV-1883, United States District Court for the District of New Jersey, deposition, 2004.

*RaboBank vs. Coopers & Lybrand*, No. 312318, Superior Court of the State of California County of San Francisco, deposition, 2004.

*Marriott International, Inc.*, No. 50-T-168-00171-2, International Centre for Dispute Resolution American Arbitration Association, trial testimony, 2004.

*Marcelli v. Bank One Trust Company*, AAA Case No. 77-148-00154-03 DEAR, trial testimony, 2004.

*Truserv Corporation v. Ernst & Young LLP*, No. 51-Y-181-01333-02, deposition, 2004.

*Texas First National bank v. Kenneth Wu*, et al,. No. H-01-2661, United States District Court for the Southern District of Texas, Houston Division, deposition, 2004.

*Hechinger Investment Company of Delaware v. Chase Manhattan Bank*, No. 00-840-RRM, United States District Court for the District of Delaware, deposition, 2004.

*American Capital Corporation and Transcapital Financial Corporation*, v. U.S., No. 95-523C, United States Court of Federal Claims, deposition, 2004.

*Wyeth Pharmaceuticals*, No. C-1-01-704, United States District Court for the Southern District of Ohio Western Division, deposition, 2004.

*WorldCom Securities Litigation*, No. 02 Civ. 3288 (DLC), United States District Court Southern District of New York, deposition, 2004.

**EXHIBIT 3**
**Documents Considered**

<u>Academic Articles, Banking Texts and Practitioner Manuals</u>

1.  Bassett, W., and E. Zakrajsek. "Recent Developments in Business Lending by Commercial Banks", *Federal Reserve Bulletin* (December 2003) pp. 477-492.

2.  Beneish, M. and E. Press. "Costs of Technical Violation of Accounting-Based Debt Covenants", *The Accounting Review* 68 (1993) 233-257.

3.  Berger, A. "The 'Big Picture' About Relationship-Based Finance" in *Business Access to Capital and Credit: A Federal Reserve System Research Conference.* (J.L. Blanton, A. Williams, and S.L. Rhine, Eds.) pp. 390-400.

4.  Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation. *Commercial Bank Examination Manual.* May, 2004.

5.  Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation. Letter SR 98-25, "Sound Credit Risk Management and the Use of Internal Credit Risk Ratings at Large Banking Organizations", September 21, 1998.

6.  Boot, A. "Relationship Banking: What Do We Know?", *Journal of Financial Intermediation,* 9 (2000) pp. 7-25.

7.  Clarke, R. *The Workout Manual.* Robert Morris Associates, 1993.

8.  Comptroller of the Currency, Administrator of National Banks. "Rating Credit Risk", *Comptroller's Handbook.* April, 2001.

9.  Cornett, M. and A. Saunders. *Fundamentals of Financial Institutions Management.* Irwin McGraw-Hill, 1999.

10. Dennis, S., D. Nandy and I. Sharpe. "The Determinants of Contract Terms in Bank Revolving Credit Agreements", *Journal of Financial and Quantitative Analysis,* 35 (2000) pp. 87-110.

11. Dichev, I. and D. Skinner. "Large-Sample Evidence on the Debt Covenant Hypothesis", *Journal of Accounting Research* 40 (2002) pp. 1091 – 1123.

12. Fischel, D. "The Economics of Lender Liability" *The Yale Law Journal* 99 (1989) pp. 131-154.

**EXHIBIT**

**3**

ALL-STATE LEGAL®

13. Gopalakrishnan, V. and M. Parkash. "Borrower and Lender Perceptions of Accounting Information in Corporate Lending Agreements", *Accounting Horizons* 9 (1995) pp. 13-26.

14. James, C. "Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress", *The Journal of Finance* 51 (1996) pp. 711-727.

15. James, C. "Some Evidence on the Uniqueness of Bank Loans", *Journal of Financial Economics* 19 (1987) pp. 217-235.

16. James, C. "The Use of Loan Sales and Standby Letters of Credit by Commercial Banks", *Journal of Monetary Economics* 22 (1988) pp. 395-422.

17. James, C. "When Do Banks Take Equity in Debt Restructurings?" *The Review of Financial Studies* 8 (1995) pp. 1209-1234.

18. Koch, T. and S. MacDonald. *Bank Management.* Fifth Edition, Thomson South-Western, 2003.

19. McKinley, J. et al. *Problem Loan Strategies: A Decision Process for Commercial Bankers.* The Risk Management Association, 1995.

20. Morsman, Jr., E. *The Art of Commercial Lending.* The Risk Management Association, 1997.

21. Radecki, L. "Banks' Payments-Driven Revenues", *FRBNY Economic Policy Review* (July, 1999) pp. 53-70.

22. Revsine, L., D. Collins, and W. Johnson. Financial Reporting and Analysis. Prentice Hall, 1999.

23. Ruth, G. *Commercial Lending.* Third Edition, American Bankers Association, 1995.

24. Securities and Exchange Commission, Regulation S-X 17CFR §210.4-08.

25. Treacy, W. and M. Carey. "Credit Risk Rating Systems at Large U.S. Banks". *Federal Reserve Bulletin,* (Nov., 1998) pp. 897-921.

26. Treacy, W. and M. Carey. "Credit Risk Rating Systems at Large US Banks". *Journal of Banking & Finance* 24 (2000) pp. 167-201.

27. Weinwurm, G. "Problem Loan Strategies for Changing Times", *Journal of Lending and Credit Risk Management* 80 (1997) pp. 30-36.

28. Yasuda, A. "Do Bank Relationships Affect the Firm's Underwriter Choice in the Corporate-Bond Underwriting Market?" Forthcoming, *Journal of Finance*.

<u>Depositions and Deposition Exhibits</u>
Deposition and Deposition Exhibits of Richard Arrington (April 28, 2004)
Deposition of J. David Barnes (July 8, 2003)
Deposition and Deposition Exhibits of Paul Briggs (March 12, 2004)
Deposition and Deposition Exhibits of George Brikis (February 27, 2004)
Deposition of Frank V. Cahouet (March 5, 2004)
Deposition and Deposition Exhibits of Brian Camp (June 28, 2004)
Deposition and Deposition Exhibits of C. David Cook (November 24, 2003; November 25, 2003; June 30, 2004)
Deposition and Deposition Exhibits of Robert Courie (September 30, 2003)
Deposition and Deposition Exhibits of Lawrence Deihle (January 7, 2004)
Deposition and Deposition Exhibits of Fred Deramo (February 25, 2004)
Deposition and Deposition Exhibits of Jeffrey R. Dickson (August 13, 2003)
Deposition and Deposition Exhibits of Susan A. Flanagan (June 23, 2004)
Deposition and Deposition Exhibits of Pamela Flori (May 7, 2004)
Deposition and Deposition Exhibits of Connie Genco (October 21, 2003)
Deposition and Deposition Exhibits of Dorothy Hunter Gordon (August 8, 2003)
Deposition and Deposition Exhibits of Oscar C. Hatchett (March 18, 2004)
Deposition and Deposition Exhibits of Emery Holloway (August 21, 2003)
Deposition and Deposition Exhibits of Toni Hyams (March 11, 2004)
Deposition and Deposition Exhibits of Marcella Knittel (July 23, 2003; July 24, 2003; June 24, 2004)
Deposition and Deposition Exhibits of Frank Krepp (December 9, 2003)
Deposition and Deposition Exhibits of Robert Maloney (April 13, 2004)
Deposition and Deposition Exhibits of Paula Mammarella (July 28, 2003; July 29, 2003)
Deposition and Deposition Exhibits of Thomas McCool (October 28, 2003; July 1, 2004)
Deposition of Kelly Mertz (July 31, 2002; August 1, 2002)
Deposition and Deposition Exhibits of Ralph S. Michael (March 11, 2004)
Deposition and Deposition Exhibits of Kevin T. Murray (March 23, 2004)
Deposition of Thomas O'Brien (October 16, 2003)
Deposition and Deposition Exhibits of Debra W. Riefner (January 21, 2004)
Deposition and Deposition Exhibits of Barbara K. Robinson (February 24, 2004)
Deposition and Deposition Exhibits of Gary Seybold (September 24, 2004)
Deposition and Deposition Exhibits of Richard Seymour (March 30, 2004)
Deposition and Deposition Exhibits of Frank A. Taucher (October 30, 2003)
Deposition and Deposition Exhibits of Marsha Wicker (February 25, 2004)
Deposition and Deposition Exhibits of Thomas C. Woodward (July 22, 2004)

<u>Bates Numbered Documents</u>
ACE 0460-465
DB-CM 34-00602-603
GOV 20207-20268
GOV 20474-20487
MBIA 007744
MBIA 007499
MBIA 029893-896
MBIA 029907-908
MBIA 029909
MBIA 029916-917
MBIA 030074-6
MBIA 030286-7
PNC 24087
PNC 24137
PNC 30676
PNC 31389
PNC 38575
PNC 38636
PNC 38610
PNC 04-0001-442
SA0274
TN CBC43B 00893-00936
TN CBC43B 01573-01691

<u>Plaintiff's Reports</u>
Report of Robert W. Berliner (September 3, 2004)
Supplementary Report of Robert W. Berliner (September 3, 2004)
Report of Bruce Den Uyl (September 3, 2004)
Report of Steven B. Kite (September 1, 2004)

<u>Defendant's Reports</u>
Report of Robert P. Mitchell (November 9, 2004)

<u>Other Materials</u>
First Amended Complaint
Answer to First Amended Complaint
Plaintiff's Responses to Defendant's Second Set of Interrogatories
Mellon Bank 1997 10-K
Mellon Bank 1998 10-K
Mellon Bank 1999 10-K
PNC Bank 1997 10-K
PNC Bank 1998 10-K
PNC Bank 1999 10-K



**EXHIBIT 4a**
**AHERF Organization Chart**
**11/30/96**
Source: Exhibit 1745

AHERF

Delaware Valley Obligated Group

Allegheny Integrated Health Group

Allegheny Health Service Providers Insurance Co.

Allegheny University of the Health Sciences

St. Christopher's Hospital for Children

Allegheny University Hospitals

Allegheny University Hospitals, MCP

Allegheny University Hospitals, Elkins Park

Allegheny University Hospitals, Bucks County

Allegheny University Hospitals, Hahnemann

Allegheny General Hospital Obligated Group

Allegheny General Hospital

Allegheny Singer Research Institute

EXHIBIT

4

ALL-STATE LEGAL®

**EXHIBIT 4b**
**AHERF Organization Chart**
**11/30/97**

Source: Exhibit 1785



# An Analysis of the Bankruptcy of the Allegheny Health, Education, and Research Foundation (AHERF)

## Expert Witness Report

Lawton R. Burns, Ph.D., MBA
The James Joo-Jin Kim Professor
Professor of Health Care Systems and Management
Director – Wharton Center for Health Management & Economics
The Wharton School
University of Pennsylvania
3641 Locust Walk
Philadelphia, PA 19104-6218
PH:  215-898-3711
FAX: 215-573-2157
burnsL@wharton.upenn.edu

# An Analysis of the Bankruptcy of the Allegheny Health, Education, and Research Foundation (AHERF)

## Table of Contents

**Expert Witness Background and Qualifications**

**Summary of Work Performed**

**Executive Summary**

**Statement of Opinions**

**Discussion Supporting These Opinions**

1.   Integration Strategy Widely Applauded, Accepted, and Adopted

2.   AHERF's Pursuit of Questionable Strategies
     a.  Horizontal Integration Strategy
     b.  Vertical Integration Strategy
     c.  Geographic Diversification Strategy
     d.  Conglomerate Diversification Strategy
     e.  Risk Contract Diversification Strategy

3.   AHERF's Joint Pursuit of Multiple, Questionable Strategies
     a.  The Perceived Need for Speed
     b.  Strategies and Deals Act as Dominoes
     c.  Irreversible Strategies

4.   Financial Problems with AHERF's Philadelphia Hospitals
     a.  Financial Condition prior to AHERF Acquisition
     b.  Financial Performance During 1990-1998 Period
     c.  Factors Underlying AHERF's Poor Financial Performance

5.   Problems Posed by the Philadelphia Market
     a.  Demand Side Factors
     b.  Supply Side Factors
     c.  An Environment of Bankruptcy

6.   Timing Shocks in the Healthcare Industry, Commonwealth of Pennsylvania, and Philadelphia Market
     a.  Changes in Federal Medicare Program
     b.  Changes in State Medicaid Program
     c.  Changes in Private Health Insurance Market
     d.  Summary: Hitting the Reverse Trifecta

## An Analysis of the Bankruptcy of the Allegheny Health, Education, and Research Foundation (AHERF)

## EXPERT WITNESS BACKGROUND AND QUALIFICATIONS

I received my Ph.D. in organizational sociology (in 1981) and my MBA in hospital administration (in 1984), both from the University of Chicago. For the past twenty years, I have been studying the organizational combinations of physicians and hospitals, known collectively as "integrated delivery systems" (IDSs). During this period, I have conducted mail surveys of thousands of physicians in IDSs, personally interviewed hundreds of physicians and executives in IDSs, received seven grants and two research contracts to study IDSs, written or co-written five case studies of IDSs, and published over forty articles and book chapters relating to the topic of physician-hospital integration. In recognition of this effort, the American Hospital Association awarded me the Edwin Crosby Memorial Fellowship to study physician-hospital relationships in 1992-1993.

In 2000, I published an analysis of the Allegheny Health, Education and Research Foundation (AHERF) bankruptcy in a leading health policy journal, *Health Affairs*. The analysis was the longest article ever published in this journal. Most recently, I have published a summary article on the performance of IDSs in *Health Affairs*, and another article in *Medical Care Research and Review* on the ingredients for successful organizational change by hospitals and physicians.

I continue to study IDSs around the country. For the past four years, I have been working on a grant from the Robert Wood Johnson Foundation to study hospitals, physician groups, and a few IDSs that have successfully completed strategic change initiatives. In conducting this research, I have spent many days interviewing executives and physicians at several IDSs - - including Intermountain Healthcare, Hill Physicians Medical Group, and South Jersey Health System - - each of which will be prepared as a case study for a forthcoming book. I also continue to make academic presentations to hospitals and IDSs around the country. In the past few years, I have addressed

institutions in Philadelphia, Pittsburgh, the Lehigh Valley, Virginia, Boston, Dayton, and Atlanta.

Exhibit 1 contains my curriculum vitae, including a list of my publications over the last ten years. I have not testified at trial or by deposition as an expert witness in the last four years. Exhibit 2 contains my compensation arrangement for preparing this report.

## SUMMARY OF WORK PERFORMED

In preparing this report, I have been asked to analyze the causes of the failure of the Allegheny Health, Education, and Research Foundation, known better as AHERF. These conclusions are presented below. In reaching these conclusions, I have updated my review of the academic literature on IDSs. I have also reviewed many documents associated with the case against Coopers & Lybrand (now PriceWaterhouse Coopers), including the plaintiff's amended complaint, documents generated by AHERF, its affiliate organizations, and various third parties, and deposition transcripts of AHERF board members, executives, and others. I have also conducted interviews with many government officials in the Commonwealth of Pennsylvania. The data and other information I have considered are described in Exhibit 3. Finally, I have conducted extensive empirical analyses of the healthcare market in Philadelphia over time and the performance of the AHERF hospitals within this market. My work on this matter is continuing, and I reserve the right to further expand on my opinions as more information becomes available.

## EXECUTIVE SUMMARY

The AHERF bankruptcy was occasioned by many, combined forces at work both within and outside AHERF. Looking within, the hospital system pursued too many unproven and risky strategies that did not work as intended and harmed the system's financial performance. These strategies - - horizontal integration, vertical integration, geographic diversification, conglomerate diversification, and risk contract diversification - - were pursued simultaneously. They involved lots of new businesses that AHERF entered and lots of new organizational forms that AHERF had to manage. Overall, its

4

pursuit represented a massive, large-scale, and fast-moving experiment that failed. The pursuit of these strategies was based more on faulty assumptions and fear than on evidence or careful planning.

The complexity, scale, and speed of AHERF's strategic moves represented a corporate failure to maintain financial discipline and restraint. Some acquisitions relied on supposed depreciation recapture plans to make them viable; many acquisitions relied on turning around the fiscal operations of hospitals that had gone bankrupt in the past; all acquisitions involved the belief on the part of AHERF that the negative situation could be turned around. The dogged pursuit of strategic goals overrode due diligence and warning signs. One set of strategies and deals leveraged the next, leading to a domino effect of questionable strategies building upon and compounding previous questionable strategies.

Looking outside to the environment, the Philadelphia market that AHERF chose to enter proved to be one of the worst markets to attempt its series of strategies. Competition from other hospitals was intense; contracting pressures from health insurers were even more intense; and the relative concentration of Medicare and Medicaid patients in the market made it particularly vulnerable to changes in these public payment programs. As a result, AHERF was hit by growing numbers of managed care patients in each of the three major payer programs, which then paid hospitals less money for their care.

The local market was also in decline, suffered from provider over-capacity, and exhibited high hospital operating costs. The latter two characteristics provided an ideal environment for managed care payers to wring excess costs and utilization out of the health care system, resulting in lower payments to hospitals.

Finally, the local, state, and federal-level environments experienced some dramatic and turbulent changes during the early and mid-1990s. These changes adversely affected hospital reimbursement, hospital revenues and cash flow, and the overall competitive environment.

The external turbulence and volatility in the outside market differentially affected AHERF due to the magnitude of its internal operating and financial problems. The interaction of the two sets of forces and issues - - some external, some internal - - caused

5

the AHERF system to suffer substantial financial pressures and ultimately declare
bankruptcy for part of the AHERF system.

## STATEMENT OF OPINIONS

A.    Beginning in the early 1990s and continuing until sometime around the end of the
1990s, the integrated delivery system (IDS) strategy for hospitals was widely preached,
praised, and adopted in the U.S.

B.    The IDS strategy was largely defensive in nature.  The strategy held that, due to
rising costs, falling inpatient demand, the growth of managed care, and the resulting
pressures on payment, hospitals would be subjected to financial stress and many would
fail if they failed to integrate.

C.    The prediction about financial stress was correct, but the broad pursuit of the IDS
strategy was not the solution.  If poorly performing and/or overpriced units were
combined in an IDS, the combination did not make it more sound but less sound.  The
Allegheny Health Education and Research Foundation (AHERF) did this and made its
condition worse, not better.

D.    Each component of the IDS strategy had problems.  Compounding this,
AHERF pursued them all simultaneously.

E.    AHERF was one of the most aggressive hospital organizations in the U.S. in
the adoption and pursuit of the IDS strategy.  AHERF built a system of near-
bankrupt hospitals in one of the nation's most difficult markets, at a time when
managed care was increasing and all payers were curtailing reimbursement.

F.    By Fall 1996, the fate of AHERF was sealed by virtue of how it implemented and pursued the IDS strategy:

> Acquisition of many poorly-situated and poorly-performing hospitals in Philadelphia, among the most difficult markets for hospitals in the U.S., had already been committed or completed

> Severe reductions in Medicaid and private health insurance payments had already begun and were growing in impact

> Managed care enrollments were increasing dramatically in Philadelphia and were heading upward in Pittsburgh

> AHERF had already completed acquisition of a significant number of physician practices

> AHERF had already entered a number of long-term non-cancelable risk contracts

G.    Because the IDS strategy was adopted as a defensive strategy to deal with anticipated financial pressures and stress, and because the strategy required enormous financial investments to implement the IDS strategy, bad operating results were not viewed negatively by IDS advocates but rather as short-term and reversible.

H.    Further blows to AHERF came in 1997 due to sharp reductions in Medicare reimbursement and to the accumulated impact of pre-1997 events described above.

I.    The final blow to AHERF occurred by mid-1998 when AHERF's Board refused a financial rescue effort proposed by its largest creditors and instead filed bankruptcy for its Eastern Region operations.

J.      During the late 1990s, the University of Pennsylvania Health System (UPHS) devoted several years and incurred several hundreds of millions of dollars of losses in an effort to reverse the consequences of its own implementation of the IDS strategy. AHERF's implementation of the IDS strategy, however, was far broader and burdened it with much poorer hospitals. AHERF also had less financial resources than UPHS and much less available financial resources.

K.      Given the acquisitions already made by AHERF, the continuing prevalence and popularity of the IDS strategy, and the gathering external events beyond the control of any hospital organization, it is implausible that AHERF would or could have successfully changed its strategy or performance starting in the Fall of 1996.

L.      Based on all of the facts and opinions set forth in this Report, it is my opinion that AHERF would have faced the same fate even if the AHERF Board changed management or shifted strategy in or after the Fall of 1996.

## DISCUSSION SUPPORTING THESE OPINIONS

1.    **Integration Strategy Widely Applauded, Accepted, and Adopted**

The strategy of integrated delivery systems (IDS) was widely applauded and accepted by hospitals in the U.S. during the 1990s.  Hospital conferences devoted to integration and trumpeting the stories of leading IDSs mushroomed during the decade. Consulting firms such as APM developed staged models of market evolution that highlighted the advance of integration.  This message was reinforced by other consulting firms (e.g., Advisory Board Company), shared service organizations (e.g., Voluntary Hospitals of America, or VHA), and individual consultants and academics (e.g., Russ Coile, Stephen Shortell, Ph.D.) who published widely-disseminated and widely-quoted reports heralding the arrival and benefits of integration.

All of this information and acclamation helped to spur a bandwagon movement to integrate health care.  There is clear evidence of a widespread diffusion of hospital mergers and hospital alliances with physicians.  Hospital merger activity was in steady state until about 1993, when there was a sharp upward trend in the number of mergers and number of hospitals involved in mergers, peaking in 1996.  Similarly, there was a clear upward spike in hospital alliances with physicians around 1994, peaking in 1996.

AHERF planning documents reference the conferences, reports, and individuals noted above.  AHERF followed this widespread trend and espoused the prevailing philosophy that integration would help hospitals deal with the financial pressures and strains associated with managed care and other trends.

2.  .  **AHERF's Pursuit of Questionable Strategies**

Despite being widely accepted and adopted, the IDS strategy was nevertheless questionable for many reasons.  AHERF represented an ambitious, large-scale attempt to develop an IDS.  Within a ten-year period, AHERF grew from a single tertiary care hospital in Pittsburgh (Allegheny General Hospital, or AGH) to a large IDS that included fourteen hospitals in Pennsylvania (Pittsburgh and Philadelphia metropolitan areas) and New Jersey, hundreds of primary care physicians, two medical schools, a university, and clinical researchers!  AHERF also entered into full-risk, capitated contracts with health

9

insurers in both Pittsburgh and Philadelphia for hundreds of thousands of covered lives. It is thus evident that AHERF pursued the IDS strategy along multiple fronts.

From the viewpoint of corporate strategy, AGH (and later AHERF) pursued multiple strategies of diversification. The acquisition of other hospitals constituted a strategy of horizontal integration; the acquisition of physicians represented a strategy of vertical integration; the acquisition of physicians and hospitals in different markets represented a strategy of geographic diversification; the acquisition of medical schools, universities, and clinical researchers constituted a strategy of conglomerate diversification into the related and unrelated business lines of medical education and research; and the entrance into risk contracts represented another form of conglomerate diversification into risk management. The extant base of later research evidence suggests that each of these strategies was problematic, and in combination the risk of problems was multiplied.

Horizontal Integration Strategy

There are two major types of horizontal integration strategies: hospital mergers and formation of multi-hospital systems. The evidence for both is reviewed below. Research on both types of horizontal integration reveals efforts to build hospital systems rarely improve financial performance.

A major goal of integration is to increase operational efficiency by reaping scale economies. Business historian Alfred Chandler has demonstrated historically that scale economies follow from corporate efforts to increase volume and throughput speed across reduced fixed capacity. Hospitals appear not to have learned this lesson. Bazzoli et al. studied hospital merger and restructuring activities between 1989 and 1996 and found that despite many intentions of consolidating departments and reducing service duplication, most hospitals in this period were primarily focused on reducing nurse FTEs and less on downsizing capacity and converting acquired hospitals to new service lines. Dranove concluded that scale economies may not always exist. He observed economies in mergers of small hospitals only. Other studies citing scale economies in hospital mergers have similarly focused on smaller institutions. Such findings are roughly consistent with earlier econometric studies that found hospitals with roughly 300 beds