operating costs these factors would cause. Based on my corrected analysis and consideration of the impact of external market events, it is my opinion that the DVOG hospitals could not have been restored to a position of financial stability in fiscal years 1997, 1998, or 1999 based on the initiatives proposed by Mr. Singleton.

The Singleton Report proposes five turnaround initiatives at the DVOG hospitals that he estimates would collectively improve DVOG performance by greater than $120 million in FY1999. Based on my analysis, which corrects for calculation errors and flawed assumptions, I have determined that the contribution of these initiatives would not achieve anything close to this amount of improvement and would not be sufficient to achieve financial stability. Additionally, when a full and complete accounting is made for the impact of external market changes on DVOG hospital financial performance and the cost of implementing the turnaround initiatives is taken into consideration--which are not included in plaintiff's expert report--the combined DVOG / AIHG organization would have generated negative earnings before interest, taxes, depreciation, and amortization ("EBITDA") through at least fiscal year 1999, effectively leaving the organization without a source of cash from operations to pay for required capital spending and debt service. See Exhibit 4 for a summary comparison of Mr. Singleton's turnaround opportunity and the corrected opportunity analysis that I have conducted.

Based on my estimates of negative DVOG and AIHG operating earnings, anticipated capital spending, and considering the available cash reserves, I have also concluded that operating cash flows would be insufficient to meet debt service requirements, leaving the organization in a position of insolvency.

The Singleton Report uses benchmark analysis as the primary basis for the determination of a turnaround result. Based on my experience, benchmark analysis serves as a reference point against which performance can be measured. It is not a reliable predictor of what can be realized, but rather an indication of what is theoretically possible based on what is being achieved by other organizations. To achieve success, the extension from what is theoretically possible to what can actually be achieved needs to be based on the feasibility of specific actions to be taken. The Singleton Report does not completely address the specific actions that will be taken to achieve the benchmark goal.

In my experience, the use of benchmark analysis is an essential tool of hospital managers and consultants as a starting point in the development of achievable goals. Benchmark analysis will inform the magnitude and prioritization of potential interventions to achieve a turnaround. However, the benchmark analysis only establishes the prioritization of opportunities and the targeting of goals. The determination of what is achievable can typically be determined only after developing and testing the improvement opportunity against action plans and implementation factors. Based on my professional experience, an effective benchmarking analysis should include consideration of four essential factors: (1) the criteria for developing an appropriate peer group for comparison, (2) the sufficient time period for the development of the turnaround analysis, validation and buy-in from Board and

management of what is an achievable result, (3) the appropriate standard for the determination of what performance quartile constitutes an achievable goal, and (4) careful attention to the definition of benchmark statistics to ensure that the statistics of the target hospital under review can be compared appropriately to the benchmark data. I have applied these four factors in my review of the benchmark findings in the Singleton Report.

Exhibit 4 quantifies my findings that an achievable turnaround of the DVOG hospitals would have been limited to an EBITDA improvement opportunity of $23.1 million by fiscal year 1999. This turnaround improvement opportunity would have been offset by external market impacts and implementation costs of $32 million by fiscal year 1999, for a combined negative DVOG hospital cash flow of $16.2 million by fiscal year 1999.

### 1. _External Market Impacts Unaccounted For_

The Singleton Report relies on the assumption that internal operations are of greater relevance than external market factors.[3] It is my opinion that internal operations cannot ignore and are not immune to changes in payment and cost-related events external to the AHERF organization.

The Singleton Report completely and explicitly discounts the impact of external market factors in influencing DVOG's performance.[4] In fact, Mr. Singleton's proposed interventions and savings, and their resulting projected cash flow improvements, are based on constant revenue and cost structure projections based on FY1996 results. In reality, between FY1997 and FY1999, external forces entirely out of the control of AHERF management, were dramatically changing the system's revenue and cost picture. Most hospitals, including those in DVOG, are dependent on government sources (e.g., Medicare and Medicaid) for a substantial proportion of their revenue. Government reimbursement rates and the terms of payment are set by the Congress, federal and state agencies, and are completely outside of the control of management. Regulatory changes, new health insurance products, and consumer preferences had a significant impact on hospital performance in Philadelphia in the 1990s.

In estimating the future EBITDA performance of the DVOG hospitals in fiscal years 1997, 1998, and 1999 from a starting point in FY1996, the Singleton Report assumes no adjustment to EBITDA from external market events. I have quantified the impact from three external market events on DVOG hospitals in the FY1997 to FY1999 time period: Medicare BBA / BBRA, Medicaid Welfare Report, and Malpractice Insurance Surcharges. Based on my experience and well-documented evidence of the negative impact these external events had, I have estimated that DVOG hospital EBITDA would have been negatively impacted by greater than $30 million in FY1999. In addition to the quantified impact from three external market events, I have also identified an additional four, non-quantified external market events that in my opinion had a negative impact on DVOG hospital operations: excess hospital supply, new hospital competition,

---

[3] Singleton Report, Ibid., at p. 8.
[4] Singleton Report, Ibid., at pp. 8-9.

increasing managed care penetration, and increased hospital strategy implementation costs.

### a) *Medicare BBA / BBRA*

On August 4, 1997, the Balanced Budget Act of 1997 (Public Law 105-33) ("BBA") was enacted. This Act made major changes to the Medicare hospital payment systems, rates, and policies effective October 1, 1997. The introduction of BBA payment reform was the government's first real response to the failure of healthcare reform initiatives proposed under the Clinton administration, and they were designed with the intent of reversing the perceived run-away escalation in government spending on healthcare costs. The impact of BBA was to reduce payments for most hospital-based services provided to Medicare patients. The impact on hospitals was immediate and disproportionate, with urban teaching hospitals particularly hard hit, as reimbursements provided by Medicare to cover the cost of teaching and provision of indigent care were also reduced. The payment reductions proposed under BBA were to be phased in over a multi-year period.

In response to the severe payment reductions caused by BBA, follow-on legislation was enacted on November 29, 1999 in the form of the Balanced Budget Refinement Act of 1999 (Public Law 106-113) ("BBRA"). BBRA provided partial relief to the BBA payment reductions effective with government fiscal year 2000. The American Hospital Association ("AHA") issued a report on the effect of BBA and BBRA on America's hospitals to quantify the phase-in impact to hospitals, including detailed analysis by geographic region and hospital teaching status. The AHA report prepared by The Lewin Group provides a detailed study of the impact of this change in the law.[5] Among their key findings was that BBA reduced total Medicare payments to hospitals by $76.7 billion from 1998 to 2002, with additional reductions of $42.2 billion through 2004. BBRA was projected to restore $8.4 billion of BBA reductions by 2004; however, even after BBRA relief, payment reductions to hospitals were still estimated to amount to $110.5 billion between 1998 and 2004 for all hospitals.[6]

In estimating the impact of BBA, and accounting for the relief provided by BBRA on DVOG hospitals, I relied on the detailed impact projection schedules as published in the AHA report. Based on my analysis, I have determined that the combined BBA / BBRA legislation reduced payments to the DVOG hospitals on the order of $20 million in FY1999. My analysis of the impact of BBA / BBRA on DVOG is highly comparable with the adjustments Tenet made to the purchase price analysis they developed in support of their internal consideration of the fair purchase value of the AHERF hospital assets they ultimately purchased in November, 1998 and an industry impact study prepared by HCIA.[7] Based on my review of Tenet's purchase price analysis, it is my opinion that hospital managers expected that the payment reductions implemented through BBA,

---

[5] "The Impact of the Medicare Balanced Budget Refinement Act on Medicare Payments to Hospitals", American Hospital Association, February 1, 2000 (i.e., Lewin Report).
[6] Lewin Report, Ibid., at p. 3.
[7] Exhibit 1504, TENET-DA00003 at row 65; "The BBA and a Guide to Hospital Performance", HCIA, 1999.

even though modified somewhat by BBRA, would be lasting payment reductions that would not be completely reversed in the foreseeable future. The details of my analysis are presented in Exhibit 5.

b) *Medicaid Welfare Reform*

Pennsylvania signed into law on May 16, 1996, Act No. 1996-35 ("Act-35"). Act-35 was an amendment to the Pennsylvania Public Welfare Code that, among other things, established new and revised eligibility criteria for General Assistance Related Medical Assistance. This had the effect of reducing access by the General Assistance population to Medicaid benefits.[8] The proposed Pennsylvania state budget for fiscal year 1997 included the assumption of eliminating General Assistance medical benefit costs (e.g., Medicaid reimbursement to hospitals) for nearly 150,000 Pennsylvania state residents as a result of the proposed implementation of Act-35.[9]

At the same time that Medicare reimbursement reductions were impacting AHERF, AHERF facilities were also experiencing revenue reductions from the implementation of the Pennsylvania HealthChoices Program. This program was a mandated managed care program for Medicaid beneficiaries in Pennsylvania and resulted in 80% of Philadelphia's 550,000 Medicaid population being enrolled in capitated plans.[10] Again, both the reduction in the payment rates for services rendered to those Medicaid beneficiaries and the shift of enrollment to less-costly facilities had a dramatic impact on the operating performance of AHERF facilities.

In March 1996, external sources estimated the impact of Medicaid reform on DVOG to be between $14 million and $17 million in the first year of implementation.[11] A follow-up study of Pennsylvania residents in 2000 quantified the extent to which welfare policy changes actually caused a loss of Medicaid benefits.[12] In my analysis of the impact of Welfare Reform on the DVOG hospitals, I have conservatively adjusted my analysis to account for the Medicaid recipients who were impacted by Welfare Reform but did not lose Medicaid coverage, recipients who lost Medicaid coverage but were subsequently covered by private insurance, and additionally for changes in healthcare utilization among affected Medicaid recipients. The conclusion of my analysis is that the DVOG hospitals realized a significant loss in EBITDA from reductions in Medicaid payments. The detail of my analysis is presented in Exhibit 6.

---

[8] Medical Assistance Bulletin, Commonwealth of Pennsylvania, Department of Public Welfare, No. 99-96-05, June 14, 1996; "A Report on Welfare Reform in Pennsylvania at the One Year Mark March 3, 1998", Philadelphia Unemployment Project, Executive Summary.

[9] Memorandum from Stephen H. Spargo, Senior Vice President, Corporate Support Services for AHERF to Sherif Abdelhak and David W. McConnell, March 19, 1996.

[10] *"The Fall of the House of AHERF: The Allegheny Bankruptcy"* written by Lawton R. Burns, John Cacciamani, James Clement, and Welman Aquino in the January/February edition of Health Affairs, vol. 19, no.1 p. 19.

[11] Memorandum from Stephen H. Spargo, Ibid.

[12] "Health Care after Welfare: An Update of Findings from State-Level Leaver Studies", Jocelyn Guyer, Center on Budget and Policy Priorities, August 16, 2000, pp. 13, 21 and 29.

### c) Malpractice Insurance

Starting in 1996, AHERF and other Pennsylvania hospitals and physicians were significantly impacted by increases in the premium cost for physician malpractice insurance coverage obtained from the Pennsylvania state-run Catastrophic Loss ("CAT") Fund. In December 1995, the CAT Fund imposed an emergency premium surcharge, followed by an annual surcharge in 1996 of 164% over prior year rates.[13] Additional premium escalation occurred in FY1997 that caused premium costs in that year and in FY1998 to be significantly greater than the prevailing FY1996 rates. The CAT Fund provided mandatory excess liability insurance coverage and mandatory premium costs that the DVOG hospitals were unable to avoid. Supporting analysis is presented in Exhibit 7.

### d) Excess Hospital Supply

Many of the largest Delaware Valley health systems were actively pursing hospital consolidation growth strategies; however, bed supply remained distributed across five large health systems, and hospital occupancy levels were flat or declining between 1994 and 1998.[14] The bargaining power of hospitals relative to commercial health plans was greatly reduced by the combined effect of the abundant supply of hospital beds, increasing penetration of managed care products, and growing consolidation of the healthcare insurance market into two dominant commercial plans. The combined market environment of excess hospital supply and consolidated health plan control reduced the bargaining power of the DVOG hospitals to negotiate higher reimbursement.

### e) New Hospital Competition

The expiration of Pennsylvania's certificate of need ("CON") law on December 18, 1996 ushered in an era of increased competition to DVOG hospitals from community hospitals in the Delaware Valley. The previously existing CON statute required facilities that proposed to operate certain reviewable health services to first establish a community need for such services through an often lengthy and adversarial need review process.[15] Specialized services such as cardiac catheterization, heart surgery, and organ transplantation that were provided by MCP and Hahnemann and other academic medical centers in Philadelphia came under increased competition with the sunset of CON.

### f) Increasing Managed Care Penetration

A major reduction of revenue available to AHERF came from providing services to the commercial population. All across the nation, commercial HMOs were competing with traditional health plans for market share by offering healthcare coverage for employers

---

[13] "History of Mandatory Coverage & Medical Liability Reform in the 1990s", Pennsylvania Medical Society.
[14] "Market Environment and AHERF-E Impact", BDC Advisors, LLC, November 2004.
[15] "PA's Certificate of Need Sunset", Physician's News Digest, February 1997.

at lower premiums than traditional health plans. As commercial HMOs represented a larger and larger share of commercial enrollment, they were successful in extracting bigger discounts from providers to offset falling premiums. This was particularly true for markets with substantial hospital bed overcapacity such as Philadelphia. In Philadelphia, the two largest HMOs (U.S. Healthcare and Keystone / Independence Blue Cross) were very successful in moving market share away from indemnity health plans. In 1997, commercial HMO market penetration in the Philadelphia had achieved a high of 53%.[16] Accordingly, HMO enrollment dramatically increased from 1994 to 1997 for both HMOs resulting in a 10% decline in weighted average payments for the AHERF system.[17] The revenue reductions were so dramatic that by the fall of 1997, AHERF had reached a financial crisis in which its Philadelphia operations anticipated a reduction of $63 million in revenue for the same patient volume, and an increase in charitable care expenses by $14 million.[18]

### g) Increased Hospital Strategy Implementation Costs

Other hospital systems in the Delaware Valley such as the University of Pennsylvania ("UPenn") and Jefferson Health System were pursuing an IDS strategy similar to AHERF's, including the acquisition of physician practices.[19] AHERF and UPenn in particular competed head-to-head in the acquisition of physician practices. This pursuit of overlapping strategy execution would likely have driven up the prices paid by AIHG for the acquisition of physician practices. Mr. Singleton asserts that he would have put an immediate stop to AHERF's physician practice acquisition strategy. As I discussed in section B. 2. of this report, I do not believe the Board would have changed the physician acquisition strategy so quickly.

* * * * *

The external market events that can be quantified, including Medicare reimbursement from BBA / BBRA, reduction in Medicaid payments from Welfare Report, and increases in malpractice insurance premium cost, were beyond the control of AHERF management. They had a significant and increasingly negative impact on AHERF operating performance and EBITDA starting in FY1997. It is my conclusion that on a combined basis, quantifiable market events reduced DVOG EBITDA by greater than $30 million in FY1999. It is also my opinion that additional external market factors, including excess hospital supply, new hospital competition, increasing managed care penetration, and increased hospital strategy implementation costs, would have had a further negative impact on the DVOG hospitals which I have not quantified.

---

[16] *"The Fall of the House of AHERF: The Allegheny Bankruptcy"*, <u>Ibid.</u>, at p. 19.

[17] *"The Fall of the House of AHERF: The Allegheny Bankruptcy"*, <u>Ibid.</u>, at p. 19.

[18] Paper published at the 1999 Annual Meeting of the American Health Lawyers by Howard A. Burde, Esq., Deputy General Counsel of the Governor's Office of General Counsel.

[19] "UPMC Prepared to Spend $300M for Hospitals", Pittsburgh Business Time, March 18, 1996; "Local Hospital Mergers with University of Penn System", Medical Industry Today, November 8, 1996; "Bids Accelerate for the Regions Physician Practices", Philadelphia Business Journal, June 14, 1996; "How Fast Can Things Change? Just Look at Philadelphia", Medical Economics, January 27, 1997.

## 2. *Extension of Market Impact Analysis to Centennial Hospitals*

I have been asked by counsel for the Defendant to extend my external market impact analysis from Medicare BBA / BBRA changes, Welfare Reform, and malpractice insurance surcharges to quantify the impact of these events on the Centennial hospitals. It is my understanding that this analysis will be used by another expert related to the damages analysis. My analysis of the external market impacts on the Centennial hospitals is detailed in Exhibits 16.1 to 16.5.

## 3. *DVOG Hospital Turnaround Initiatives*

The Singleton Report proposes five areas of intervention for achieving a turnaround, including supply chain management, labor cost savings through full-time equivalent ("FTE") reductions, cost savings from Medicare patient length of stay reductions, revenue cycle improvements, and reductions in discretionary spending. When adjusted for calculation errors and flawed assumptions, it is my opinion that the combined improvement opportunity within DVOG is limited to less than $25 million in FY1999, which is more than $90 million lower than the Singleton Report estimates.

In my analysis of the phase-in time required to implement and realize the financial benefit from improvement initiatives, I assumed the same intervention assumptions as the Singleton Report. In my professional experience with turnaround initiatives, it is likely that the true implementation timeline for the DVOG hospitals to achieve these turnaround results is much longer. However, solely for the purpose of comparison to the Singleton Report, I have assumed the implementation timing presented in the Singleton Report. Starting on October 1, 1996, and adjusting for the remaining nine months of FY 1997, I have assumed that 30% of the opportunity could be achieved in FY1997, 70% in FY1998, and 100% in FY1999. Although it is my opinion that a longer implementation timeline would be more realistic, adopting the implementation timeline suggested by Mr. Singleton is a conservative assumption in my analysis.

### a) *Supply Management*

The Singleton Report overstates potential supply expense savings based on the flawed application of a benchmark statistic. Mr. Singleton uses a benchmark of 15% of revenue based on HCA's and Tenet's system-wide supply expense experience in 1996. A system-level benchmark is appropriate as it assumes that all hospitals in a system benefit from shared purchasing and other joint efficiency programs. Mr. Singleton incorrectly applies this system level benchmark to only two of the AHERF hospitals: Allegheny East Falls ("MCP") and Allegheny Center City Hospital ("Hahnemann"), when it should have been applied to all five DVOG hospitals. The rationale for applying a system-wide benchmark is based on the assumption that system supply costs can be reduced based on participation in shared purchasing programs and other efficiency-based programs, and reflects a system-wide average. It does not imply that all hospitals within a system can achieve this level. Had the proposed benchmark been

applied to the combined DVOG hospitals, as suggested by comparability with HCA and Tenet performance, the calculated savings would have been lower.

The supply benchmark used in the Singleton Report also represents a flawed assumption because it is inappropriately calculated as a percent of operating revenue, rather than as a percent of cost. The Singleton Report cites HCA and Tenet Corporation SEC 10-K report disclosures of historical 1996 system supply costs, presented on a percent of revenue basis. The development of a supply cost benchmark as a percent of operating revenue introduces variability in revenue performance based on differences in case mix, service line mix, and variation in negotiated commercial contracts that cannot be corrected for in the benchmark statistic. By constructing the supply cost benchmark relative to total cost, the introduction of unnecessary and uncorrected variability can be partially avoided.

The supply benchmark in the Singleton Report is also insufficient because it fails to account for differences among the AHERF hospitals based on bed-size, teaching status, and specialty children's hospital status. I have applied two alternative benchmark standards that correct for the deficiencies in the Singleton Report supply benchmark. The first benchmark is drawn from the benchmark standard published by the Premier Group, a national hospital group purchasing vendor. I used in my corrected benchmark analysis the Premier Group benchmark for supply cost as a percent of total expenses, by hospital bed-size.[20] Although a benchmark statistic was not available for 1996, the 2000 benchmark statistic did account for different standards by hospital bed-size. Based on the Premier Group benchmark, I have concluded that supply cost improvements would not have been achievable for the DVOG hospitals in FY1996. To further validate if an alternative 1996 benchmark standard would have been different than the Premier Group 2000 benchmark, I undertook an examination of the actual HCA and Tenet system-wide supply costs as a percent of expense, rather than revenue, in the 1996 to 2000 time period. Using the 10-K reports, I found that at no time during the period 1996 through 2000 were the supply costs as a percent of expenses for HCA or Tenet less than the actual FY1996 average for the DVOG hospitals of 15.3%. Based on these findings, I have concluded that no supply cost savings were achievable, and the Singleton Report significantly overstates the savings opportunity in FY1999. Additional detailed analysis to this finding is presented in Exhibit 8.

b) *Productivity Improvement through FTE Reduction*

The Singleton Report estimates that greater than $60 million in annual productivity improvement through FTE reduction could have been achieved in FY1999. Based on my review of the productivity improvement initiatives presented in the Singleton Report, I have concluded that calculation errors and flawed assumptions significantly overstate the achievable improvement opportunity.

Mr. Singleton calculates a productivity measure for the DVOG hospital inconsistent with the benchmark definition. In his calculation of DVOG's historical FTEs per 100 adjusted

---

[20] "Benchmarking Program Guides Cost, FTE Levels", Healthcare Purchasing News, by Todd Shields, June 2001.

discharges case mix ("CMI") adjusted, Mr. Singleton incorrectly uses the all patient CMI for the 'case mix adjusted' calculation input. This CMI input is in error because the Solucient benchmark is calculated using the Medicare CMI[21]. I calculated the benchmark productivity measure for comparison to the DVOG hospitals performance using Medicare CMI. Since Medicare CMI can be 15% to 30% higher than the all-patient CMI, this error produces a significant overstatement of the productivity improvement opportunity.

In the calculation of AHERF's 1996 FTEs per 100 adjusted discharges, the Singleton Report mistakenly includes nursery department FTEs, but excludes nursery discharges from the calculation. This inconsistency results in an overstatement of the improvement opportunity.

In the calculation of the Hahnemann and MCP historical hospital FTEs, the Singleton Report mistakenly includes psychiatric department FTEs, but excludes psychiatric cases from the calculation of adjusted discharges. Based on my analysis, less than one-third of U.S. hospitals offer inpatient psychiatric services of the kind offered by Hahnemann and MCP. In keeping with the make-up of the benchmark data for the purpose of ensuring comparability, psychiatric FTEs should be excluded from the DVOG FTE calculation. The inconsistent treatment of including psychiatric FTEs but excluding psychiatric cases results in an overstatement of the improvement opportunity.

The Singleton Report purports to select benchmarks based on the highest quartile performance standard within performance categories (e.g., teaching hospital, bed size). When multiple performance categories are available, Mr. Singleton purports to use the most conservative (i.e., highest) FTE standard among categories considered. However, Mr. Singleton incorrectly applies this category selection approach to Elkins Park and Buck Hospitals.

The Singleton Report incorrectly assigns Hahnemann to a benchmark category of '250-399 Bed Size' when the correct benchmark category is actually the '400 and Over Bed Size'. The DVOG hospitals are also incorrectly compared to the 'S&P A Bond Rating' category, when the actual bond rating, before credit enhancement, was BBB in FY1996.

I agree with the assertions in the Singleton Report that to control salary and benefit costs, productivity must be monitored at the department level.[22] It is my opinion that the only effective way to support a conclusion of achievable productivity improvement is to complete a productivity diagnostic at the hospital department level. Since hospitals, even within a similar peer group such as teaching hospitals, have many unique programs and services, only at a department level review can a conclusion be reached that staffing reductions will reduce costs without negatively impacting patient quality and safety. Mr. Singleton did not conduct a department level analysis as the basis for his conclusion of a savings improvement opportunity. For this reason, I am of the opinion

---

[21] The Comparative Performance of U.S. Hospitals, The Sourcebook, 2003, Solucient.
[22] Singleton Report, Ibid., at p. 9.

that the conclusions reached in the Singleton Report are based on an insufficient level of analysis to draw a meaningful conclusion.

This finding notwithstanding, I have conducted a further assessment of the productivity improvement assumptions to determine if the remaining productivity improvement opportunity, after adjusted for calculation errors, represents an achievable result. Based on my review of the productivity improvement assumptions in the Singleton Report, I have concluded that the assumption flaws significantly overstate the achievable savings opportunity, over-and-above the overstated opportunity based on the calculation errors identified above.

Inappropriate Benchmark Time Period. The Singleton Report relies on an inappropriate time period of benchmark performance, fiscal year 1999, in reaching a conclusion for the achievable productivity performance standard, when complete benchmark data is available for 1996 to construct a complete analysis. The Singleton Report concludes that the 1999 Solucient benchmark is suitable because,

> *"While this data [1999], is of course, dated years after the period of inquiry, the more complete data is useable here since relevant labor productivity measures did not materially change in the interim."* [23]

This finding is factually in error. A review of Solucient 1996 benchmark statistics compared to the 1999 benchmark used in the Singleton Report shows that staffing productivity has trended to a higher efficiency standard than that which prevailed in 1996. The impact on costs savings of using a 1999 benchmark statistic, as opposed to the more appropriate 1996 benchmark statistic, is to significantly overstate the opportunity improvement. Additionally, since the 1999 data would not have been available to AHERF, other managers, or advisers in 1996 for determining the productivity reduction standard for goal setting and implementation of cost savings targets, the use of the 1999 benchmark is inappropriate.

Inappropriate Characterization of Benchmark Data. I also disagree with the assertion in the Singleton Report that:

> *"The 1999 Solucient data allows us to overcome data lapses that would exist in the application of the 1996 CHIPS data, principally a stratification of statistics between inpatient and outpatient."* [24]

The CHIPS report does not have a data lapse in the reporting of inpatient and outpatient performance measures for productivity analysis since it provides for a discrete and separate analysis of inpatient labor productivity and outpatient labor productivity. Both reports provide a reliable methodology and basis for using benchmark data to determine an achievable turnaround improvement. While I think a benchmark analysis--both one done in 1996 and one done today to assess what could have been an achievable result

---

[23] Singleton Report, Ibid., at p. 11.
[24] Ibid.

in 1996--could use benchmark data provided by either Solucient or CHIPS, I have elected to use Solucient data to make my analysis more comparable to Mr. Singleton's analysis.

A second benchmark analysis completed by AHERF in FY1997 offers additional validation to my findings that labor cost savings through productivity improvements at Hahneman and MCP were limited. A CHIPS benchmarking analysis was conducted by Hahnemann in FY1997 by way of participation in a University HealthSystem Consortium benchmark survey project.[25] Based on this inpatient and outpatient productivity analysis, it was determined that Hahnemann's FTE productivity was above the 50th percentile standard among their peer group of teaching hospitals. Based on an analysis I constructed to determine how MCP would compare to the UHC survey findings, I have concluded that the CHIPS data also supports the finding that MCP FTE productivity was above the peer group teaching hospital benchmark median.[26] The findings of this second benchmark analysis support the conclusion that minimum labor savings from productivity improvement could have been achieved at the two largest DVOG hospitals, MCP and Hahnemann, in the FY1997 to FY1999 period. This finding is significant because the UHC benchmark analysis was undertaken by Hahnemann to assess their actual FY1997 productivity performance against a peer group standard of other academic medical centers. The UHC benchmark analysis is also highly relevant since it is a comparison of the two DVOG academic medical center hospitals to other academic medical center peers that make up the UHC comparison study.

Inappropriate Benchmark Performance Standard. In arriving at a determination of productivity improvement, the Singleton Report asserts that the DVOG hospitals in FY1996 could have improved their total hospital labor productivity to the highest performance quartile standard, the 25th percentile, or greater than 75 percent of all U.S. hospitals in the relevant peer group. Based on my knowledge of the historical performance of the AHERF hospitals, the market environment in Philadelphia, and the relative performance of other Philadelphia area competitors, I am of the opinion that a 50th percentile standard for the appropriate peer group is the appropriate performance standard for determining an achievable performance result for the DVOG hospitals. In the development of a performance standard for supply cost reduction and Medicare length of stay reduction, the Singleton Report assumes the achievement of a median benchmark performance standard, essentially a 50th percentile result. There is no basis for adopting a higher performance standard for labor savings than for other cost savings initiatives.

Based on the average occupancy rates of the DVOG hospitals in 1996 and 1997, it would have been unrealistic to assume a 25th percentile performance standard could be achieved. The average occupancy of the DVOG hospitals was lower than the average occupancy of the peer group hospitals. Since staffing has both a fixed and variable component, the ability to cut staffing in order to boost staffing efficiency is much more

---

[25] The Almanac of Hospital Financial and Operating Indicators, Volume 1, 1997, University HealthSystem Consortium.

[26] See Exhibit 15.

challenging for a hospital with lower average occupancy (and in the case of the DVOG hospitals, declining occupancy) than for a hospital with higher average occupancy. Indeed, in 1996 the average occupancy of the benchmark hospitals was higher than the DVOG hospital average occupancy. Fixed staff is defined as the required staffing minimums that need to be maintained regardless of whether, for example, a nursing unit has one patient or 24. As occupancy levels fall, the relative proportion of 'fixed' staff to 'variable' staff rises. Since FTE reductions to improve FTE productivity are targeted at reduction of variable staffing, falling occupancy levels exacerbate already declining staffing efficiencies as the ratio of fixed to variable staffing rises.

Inappropriate Peer Group Category Selection Process.  The Singleton Report suggests no less than seven peer group category options for comparing DVOG performance including:  State of PA, System Affiliated, S&P Bond Rating and Degree of Managed Care Penetration, Bed Size, Teaching Status, and Specialty Children's Hospital.  The methodology purported to have been adopted by Mr. Singleton was to select the 25th percentile performance standard and then select the highest-productivity measure from among the proposed peer group categories to determine the achievable benchmark standard for the DVOG hospitals.  Based on my judgment, the following peer groups are the best peer groups available for categorizing the DVOG hospitals from among the categories available in the Solucient survey.

| DVOG Hospital | Peer Group |
|---|---|
| East Falls (MCP) | Major Teaching Hospital |
| Center City (Hahnemann) | Major Teaching Hospital |
| Elkins Park | Not-for-Profit, Urban, 100-249 Beds |
| Buck | Not-for-Profit, Urban, 100-249 Beds |
| St. Christopher's | Specialty Children's Hospital |

While the benchmark category and 25th percentile performance used in the Singleton Report is sourced from the 1996 Solucient data book, no reference is made to the source for the benchmark standard for a children's hospital benchmark.  Because the Solucient data book does not provide benchmark data for specialty children's hospitals, I have relied on the CHIPS benchmark data book for the reporting of this peer group category.[27]

The assumption by Mr. Singleton that the AHERF Management Company salary costs could be completely eliminated is unsubstantiated.  The efficiency opportunity management companies bring to hospital systems is the ability to centralize functions in one location and avoid duplication at each individual hospital.  Activities that are shared across AHERF system hospitals such as purchasing, information systems, planning, and marketing, are examples of costs that would otherwise be duplicated if they were not consolidated at the management company level.  Certain costs incurred to promote clinical integration are examples of spending to support improved patient quality to improve the competitiveness of the AHERF hospitals.  Based on a review of the

---

[27] Based on the fact that the Singleton Report does not disclose the source for its St. Christopher's Hospital performance benchmark, I reserve the right to consider the impact of this analysis further based on more complete disclosure of the underlying source data relied on in the Singleton Report.

management company costs, I have identified a moderate amount of overhead cost savings opportunity. Supporting detail to my analysis can be found in Exhibit 9.

In the calculation of the adjusted productivity savings opportunity, I relied on certain calculations and representations in the Singleton Report; for example, the calculation of the 'Hour Variance' even though the basis for the calculations was not clearly expressed or disclosed.[28] As detailed in Exhibit 10, based on the more appropriate assumptions of median benchmark performance of peer group hospitals in 1996, I have estimated the cost savings in FY1999 due to productivity improvement through FTE reductions would have been less than $7M million, which is more than $55 million lower than the savings opportunity asserted in the Singleton Report.

### c) *Medicare Patient Length of Stay Reduction*

The Singleton Report estimates that cost savings from Medicare patient length of stay reduction can be achieved. The Singleton Report significantly overstates potential savings due to reduction in Medicare patient length of stay, based on both calculation errors and a failure to adjust potential savings to reflect the feasibility of actually achieving the projected savings. I agree with Mr. Singleton's findings that reductions in Medicare patient lengths of stay present a unique improvement opportunity due to the fact that much of inpatient Medicare reimbursement is on a per DRG (i.e., per case) basis. Avoided operating costs in the last days of care through length of stay reduction can achieve real savings.

However, Mr. Singleton's method for estimating Medicare length of stay savings uses a complicated, circuitous calculation that results in an overstatement of potential reduction in Medicare length of stay. A more direct and accurate benchmark approach would be to calculate the actual Medicare length of stay, CMI-adjusted for the DVOG hospitals, and compare it to an appropriate benchmark standard that accounts for teaching status and bed size. My supporting analysis is presented in Exhibit 11.

The Medicare length of stay analysis highlights the finding that the determination of an achievable benchmark standard does not automatically imply it can be achieved by AHERF, nor that any progress can be made toward this standard without incremental costs. I agree with Mr. Singleton's assertion in reference to AHERF's capitated managed care business, that AHERF " ... *lacked effective case management and utilization review functions to effectively manage its risk population*".[29] The same case management and utilization review functions are required to achieve the Medicare length of stay reductions. Even if benchmark standards indicated an opportunity for reducing Medicare length of stay, AHERF lacked the infrastructure to achieve such a goal and would have needed to incur incremental cost and invest cash flow in hiring new staff and purchasing new systems to develop this capability. As a result, the cost

---

[28] I reserve the right to adjust my calculations of productivity savings based on a more complete understanding of the calculation of productivity savings presented in the Singleton Report.
[29] Singleton Report, Ibid., at p. 32.

savings in FY1999 due to Medicare patient length of stay reduction for Medicare patients would have been lower than the savings asserted in the Singleton Report.

### d) Revenue Cycle Management

Mr. Singleton asserts that an EBITDA improvement of $32.3 million in revenue cycle management could be realized by FY1999 for the DVOG hospitals through the improvement of DVOG's bad debt expense. Consistent with my evaluation of other turnaround improvement opportunities in this report, it is my opinion that the determination of what is an achievable DVOG opportunity should be based on an evaluation of DVOG FY1996 performance to an appropriate benchmark standard. Mr. Singleton's analysis of bad debt improvement does not demonstrate a comparison of actual performance to an achievable benchmark.

For the purpose of my analysis, I have accepted without attempting to evaluate the findings of plaintiff's accounting expert, Mr. Berliner, that the FY1996 bad debt for the DVOG hospitals when adjusted is $32.3 million higher than the DVOG bad debt amount of $39.6 million reported in the FY1996 audit. This adjusted FY1996 DVOG bad debt amount is equal to 3.6% of gross patient revenue. I have compared this restated bad debt amount to 1996 benchmarks published in The Hospital Accounts Receivable Analysis ("HARA Report").[30] The HARA Reports are an appropriate benchmark standard that was used by AHERF management to evaluate FY1996 AHERF bad debt rates and other billing and collections performance.[31]

It is my understanding that AHERF had implemented a consolidation and integration of the DVOG patient financial services functions. Accordingly, I have constructed my analysis by comparing adjusted bad debt rates to 1996 benchmarks at the individual DVOG hospital level and calculated the achievable result by adding the results of the DVOG hospitals taken together. Based on a benchmark analysis, I have determined that the achievable improvement in revenue cycle management is limited to a $10.9 million improvement in DVOG bad debt by FY1999 which reduces Singleton's revenue cycle opportunity by $21.4 million. My findings represent an optimistic analysis of achievable DVOG bad debt improvement based on the fact that the 1997 HARA benchmarks show increased bad debt rates, or a deterioration of bad debt performance among the survey hospitals. My calculations can be found in Exhibit 12 to this report.

### e) Discretionary Spending Reductions

The Singleton Report finds that some discretionary spending can be eliminated simply as a matter of course. I agree that in a turnaround environment, when an organization is looking for ways to defray expenses, certain general overhead cost savings can be achieved. Cost reduction opportunities cited in the Singleton Report for dues, publications, seminars, travel, and lunch meetings can be reduced or deferred. However, in an environment of financial underperformance, physicians and patients will

---

[30] The Hospital Accounts Receivable Analysis, 2nd Quarter 1996, Volume 10, Issue 2 (HARA Report).
[31] David W. McConnell report to AHERF Board of Trustees, Exhibit 901, POB 000931.

be acutely concerned about the viability of the hospital as a safe, reliable, and fully functioning environment that will not cut corners with patient safety and quality. In such times, it is usual for hospitals to *expand and enhance* their public relations message and increase spending on special events, entertainment, and philanthropy to both attract new potential donors to the hospital and reassure physicians and patients as to the current and future course of the hospital. For this reason, I disagree with the assumption made by Mr. Singleton that a 75% reduction in 'Media Advertising' spending could be implemented without additional negative implications on physician perceptions and the potential loss of patients. Correcting for this flawed assumption reduces the cost savings due to reducing discretionary spending asserted in the Singleton Report. Details supporting these findings are presented in Exhibit 13.

### f) Unaccounted Cost to Implement Turnaround

The Singleton Report fails to consider the costs that would be incurred in implementing the turnaround initiatives. These costs would at a minimum include turnaround consulting and strategy consulting fees. I have conservatively estimated these incremental costs based on my experience as a healthcare management consultant. It is likely that AHERF would have incurred significantly more implementation fees than I have estimated and relied on in my report, including fees to provide for outplacement and counseling services related to personnel reductions and efforts to restructure the physician contracts in AIHG which would be essential for reversing the growing operating losses in this area.

The Singleton Report proposes salary and benefit cost savings that do not account for offsetting termination costs that would be incurred by AHERF to reduce staff size. Termination costs would include both severance payments and the distribution of accrued benefits. I have estimated and adjusted for the expected offsetting severance costs based on restructuring reserves AHERF set up in anticipation of severance payments to be made to settle anticipated staffing reductions in FY1997.[32]

### 4. AIHG Performance

The Singleton Report estimates that the deterioration in performance of AIHG after September 30, 1996, assuming the cessation of any new practice acquisitions, could have been limited to an incremental loss of $9 million per year. Since the disclosure and description of these assumptions is not presented by Mr. Singleton, I reserve the right to further consider my judgment on this finding until such time as additional supporting and explanatory detail is presented by Mr. Singleton.

---

[32] Memorandum from Daniel Cancelmi, Senior Director, Corporate Accounting and Financial Reporting to Al Adamezak, 12/1/97; See also Exhibit 10.

5. *Change in AHERF Strategy*

The Singleton Report expresses as a core assumption that had the AHERF financial statements, as adjusted by Plaintiff's accounting expert, been available at September 1996, the AHERF Board could have been persuaded to make an immediate and irrevocable change in a corporate strategy that had been the principal AHERF strategy throughout the 1990s.[33] The integrated delivery system ("IDS") development strategy followed by AHERF was the prevailing hospital strategy in many moderately-to-highly penetrated managed care markets. It was also the prevailing hospital system strategy in eastern Pennsylvania among AHERF's primary competitors in Philadelphia, the University of Pennsylvania Health System and Jefferson Health System.[34] In my view, the Board would not have so quickly abandoned the existing strategy that AHERF had spent years and invested hundreds of millions of dollars developing. Based on my experience in advising hospital management and Boards on the development of hospital strategic plans, the process for a health system to consider an alternative strategy can take at least 3 months and commonly 12 months or more. An existing strategy would not have been abandoned unless and until a new and convincingly better strategy could be considered and adopted by the Board. Such a process would have required additional diagnostic analysis, and would have consumed additional capital spending that has not been incorporated in the Singleton Report.

6. *Assumption Flaws in Cash Flow Analysis*

Based on my findings above regarding the total achievable EBITDA performance of the DVOG hospitals in fiscal years 1997-1999 from realistic turnaround savings, the cash flow from operations as presented in the Singleton Report is not a *source* of cash, but a *use* of cash.[35] Negative operating cash flow creates a further drain on cash required for existing and ongoing capital spending projects and required debt service. I have no reason to believe, as Mr. Singleton asserts, that other AHERF operations, notably AHERF-W would have funded a turnaround of AHERF-E. The Board refused to use the assets of AHERF-W in 1998 to help support the failed operations of AHERF-E as proposed by MBIA and PNC.[36] See my analysis of the DVOG hospital cash flow attached as Exhibit 14.

Although the Singleton Report does not provide a basis for the capital spending assumptions in fiscal years 1997 through 1999, the amounts assumed in my opinion would have been insufficient for an organization going through a turnaround and changing strategic direction. In their report to the MBIA in September 1998, the

---

[33] Annual Meeting of the Board of Trustees, MCP and HUHS, 12/14/95 minutes, Health Care Delivery and Financing, Progress Report, December, 1995 Executive Summary; Special Meeting of the Board of Trustees of AHERF, 9/16/96 minutes, 10 Year Self Assessment Report – Hospital System / AIHG.

[34] Reprint of six articles published in the Pittsburgh Post-Gazette from January 17, 1999 to January 24, 1999 written by Steve Massey and Mackenzie Carpenter entitled "*Anatomy of a Bankruptcy: The Rise and Fall of Allegheny General Hospital*", Chapter 1, Anatomy of a Bankruptcy, at pp. 8-11.

[35] See Exhibit 4.

[36] Exhibit 1672, PR-PLD-005-03109 – 03116; Anthony Sanzo Deposition, pp. 398-401, July 2, 2003.

Page 19

Intensive Research Group estimated AHERF-East would need as much as $400 million in working capital in the first quarter of FY 1998 to achieve a turnaround, and $56.3 million for the first year capital spending priorities.[37]  Based on the fact that Mr. Singleton does not describe the basis for his capital cost assumptions, I reserve the right to reconsider this question at a later time when this detail is available.

Based on my analysis of Mr. Singleton's projected cash flow of the DVOG hospitals, it is my conclusion that AHERF lacked sufficient cash flow sources to meet debt service payments and offset the growing unprofitable operating EBITDA of the DVOG hospitals in FY1997 through FY1999.  The lack of sufficient cash flow would have occurred as early as FY1997, and would have resulted in the insolvency of the DVOG hospitals.

### B. *Feasibility of Any Turnaround Plan Succeeding*

I have also considered the feasibility of any efforts to turnaround the DVOG hospitals. In considering this more general question, I have assessed the impact on turnaround performance from external market events, the competitive position of the DVOG hospitals, and my experience and knowledge as a healthcare consultant in the area of hospital turnaround management.

To achieve a successful hospital turnaround, any improvement plan would need to address six elements including, (1) the development of a benchmarking analysis to compare the target hospital performance to an appropriate peer group to determine achievable goals, (2) the development of an action plan based on benchmark goals, (3) the commitment of the hospital Board and management to the action plan, (4) the implementation of the action plan by hospital management and staff, (5) monitoring and adjusting to the changes in operations that result from the implementation of the action plan, and (6) the development of follow-up action steps, as necessary, to account for unintended consequences and constituent-based issues that arise from the action plan. The turnaround plan must focus on internal, organization-based initiatives, but the success or failure of these initiatives is dependent on the external market environment and the barriers and risks they present to the timing and likelihood of achieving internally targeted goals.

### 1. *Turnaround Success Factors*

Turnaround factors fall broadly into two categories (1) organizational (internal) factors that are subject to intervention in influencing a hospital's performance (see example description of internal factors[38]), and (2) market (external) factors that can serve as enablers or constraints to intervention.  Internal factors are under the direction and control of hospital managers, but they are subject to the overall market environment. Market factors can sometimes be influenced over the long-term through the execution of

---

[37] Allegheny Business Plan Presentation to MBIA, The Intensive Resource Group, LLC, September 16, 1998, Exhibit 2206.
[38] Appendix 2.

a successful hospital strategy, but rarely in sufficient time to influence an immediate turnaround situation.

Organizational factors that typically have the potential to improve hospital performance include:

1. _Revenue management._  Renegotiating commercial health plan contracts to improve revenue, canceling poor performing contracts, improving current account balances, and monetizing fixed assets to create cash flow.

2. _Labor cost management._  Benchmarking labor productivity and census-based staffing to control labor cost.

3. _Non-labor based cost management_.  Benchmarking supply cost and introducing purchase consolidation programs to improve supply cost and provide other purchased services cost efficiencies.

4. _Service line market position_.  Adding a new service or recruiting a new physician to increase patient volumes.

5. _Physician relationships._  Focusing on issues important to efficient medical practices that reward physician behavior to control practice costs and improve physician productivity.

6. _Academic Medical Center – School of Medicine relationship._  In academic medical center settings, strengthening and aligning the incentives between the AMC and School of Medicine to advance funding for clinical research, recruitment of renowned faculty, and coordination of Graduate Medical Education programs to improve quality of care.

7. _Culture_.  Building management team strength to lead and institute change, including performance-based reward systems and rigorous planning and monitoring of performance.

External market factors impact the structure of the industry on a regional basis and evolve over time, requiring a longer-term commitment to influence change.  These factors include:

1. _Hospital market position_.  Market share, geographic coverage, and control of unique services.

2. _Hospital market structure_.  Balance between supply and demand for hospital beds and services, and the degree of oversupply vs. undersupply of hospital services.

3. *Physician market structure*.  Supply and demand by physician specialty, degree of organization of the physician labor market, and physician practice economics.

4. *Structure of the healthcare payor market.*  Number of health plans, degree of health plan consolidation, degree of managed care penetration, and payment arrangements.

5. *Population demographics*.  Age, healthcare utilization rates, and disease incidents among patient population.

6. *Local economic factors*.  Unemployment rates, the degree of organization among employers to purchase healthcare coverage, and others.

Turnaround interventions vary in terms of the length of time required to have an impact and the risk associated with the intervention.  The risk associated with organizational factors that can impede realizing a turnaround can include a lack of organizational alignment between competing strategic objectives, physician departures due to concern about the future success of the hospital, and unsustainable financial performance. AHERF struggled with competing strategic objectives in the pursuit of a managed care strategy through practice acquisitions and a care management strategy.  The focus of this strategy on population health management, patient wellness, and avoiding hospital care settings, was at times in sharp conflict with a separate strategic initiative of AHERF to pursue a focus on academic medicine designed to showcase highly specialized, 'star' physicians capable of providing the most advance care to the sickest of patients.

2. *Application of Turnaround Factors to DVOG*

a) *Organizational Factors*

I have concluded that when internal organizational factors and external market factors are applied to the DVOG hospitals, a turnaround would not have been likely to succeed. I explain below the analysis of organizational factors which are applied individually and collectively to DVOG hospitals.

In order to improve EBIDTA, both increasing revenue and decreasing expenses are major considerations.  Revenue impacts would include increasing rates on commercial managed care contracts, increasing volume among existing services by adding capacity, recruiting providers, and/or marketing, and increasing volume from the introduction of new services.  DVOG was in an unusual situation, however, regarding its ability to increase revenues.  First, DVOG was competing in a market largely on the basis of cost and attracting volume from competitors which makes having health plans or patients pay more for services challenging.  Second, DVOG was operating in a market involving a duopoly among two major health plans: U.S. Healthcare and Independence Blue Cross / Keystone.  The balance of power in contract negotiations favored health plans over hospital systems.  Finally, while an important part of any turnaround effort, revenue increases—both rate and volume—can take between 6

months to 3 years before they can have a positive impact on EBITDA. Given its financial situation, DVOG did not have the benefit of that much time.

My conclusion that DVOG had no ability to increase revenues is significantly supported by AHERF and Mr. Singleton as well. AHERF strategic planning had concluded that the revenue trend for the market and AHERF was declining.[39] It is widely understood that among the primary reasons for this decline are dominant health plan negotiating leverage and excess hospital capacity.[40] I agree with the assertion by Mr. Singleton that:

> *"Given the market clout of two payors, U.S. Healthcare (USHC) and Independence Blue Cross / Keystone Health Plan East (IBC / KHPE), and the fact that no provider had a controlling share of the market, it is unlikely that AHERF or any other provider would be bargaining from a position of strength."[41]*

and,

> *"Senior management would therefore be ill equipped to negotiate rates with payors that would positively impact its bottom line."[42]*

Considering the risky managed care contracts DVOG entered into and the well-documented exposure they faced for the potentially devastating costs for out-of-network providers, it would have been expected that losses would have continued and potentially worsened. This declining performance could be, but has not otherwise been factored into my turnaround analysis. In addition, one significant managed care contract had a nine-year cancellation notice provision. Because of the over-bedded hospital market, the health plan holding this contract (UHSC) maintained negotiating leverage over AHERF. AHERF would have been fortunate to exit this contract, and if they did, the terms would have been less favorable.

Since labor costs and supply costs represented close to three-quarters of all controllable operating expenses (excluding depreciation and interest), based on my previous analysis of cost savings from productivity improvement and other cost savings initiatives, I have concluded that cost reduction opportunities were limited and therefore a turnaround plan would likely have been unable to achieve financial stability for the DVOG hospitals.

The turnaround improvement opportunities from service line restructuring in my experience are longer-term solutions, requiring up to two to three years of significant investment to effect physician referral patterns and increase patient volumes. The type of physician restructuring that would be required in order to reduce losses in AIHG practices would require intervention to increase physician productivity and add

---

[39] AHERF Board of Trustees Retreat, 4/5/97, minutes, Market Analysis, SA1812 pp. 9-12.
[40] Gartner Group, Ibid., Management Summary; Affidavit of Patrick Hurst, November 16, para. 16. 10(d)-(e), p. 6.
[41] Singleton Report, Ibid., at p. 31.
[42] Singleton Report, Ibid., at p. 32.

incentives to control practice costs and boost patient admissions. Such interventions would require a costly contract-by-contract renegotiation that would take at least two to three years to implement and likely require additional costs or incentive arrangements not otherwise accounted for in my EBITDA analysis, or the EBITDA analysis presented by Mr. Singleton. Service line restructuring would not have been able to achieve the turnaround of the DVOG hospitals in the 1997 – 1999 fiscal year time period.

The strategic imperative AHERF was advancing in the execution of a physician acquisition strategy was to sustain a sufficient level of clinical volume that would help support (1) the ability to provide tertiary services while maintaining clinical quality, and (2) medical education training programs. It is my opinion that some of the AIHG practice losses were a result of poor contracting arrangements, and specifically a lack of physician productivity standards. Based on my understanding of the structure of the acquisition arrangements AHERF implemented, as suggested in the Singleton Report [43] the physician contracts did not include sufficient productivity goals. In my experience, it was common for many physician contracts during this time period not to have detailed productivity goals, and it was one of the reasons why practices did not fully cover operating costs.

The importance of AUHS to AHERF was the benefit of achieving a sufficient level of clinical volume to support the ability to provide tertiary services while maintaining clinical quality to support medical education training programs that resulted from the relationship with faculty and other affiliated University medical school physicians. The DVOG hospitals consisted of two urban, Academic Medical Centers, with linkages to AUHS, the University medicine school, and two suburban based community hospitals. The operating model that AHERF followed, in my opinion, was a model where the AMC hospitals focused on teaching, research, and the treatment of quaternary and tertiary care provided by highly trained and specialized clinicians, some of whom were faculty members or affiliates of the medical school. The community hospitals focused on primary and secondary care. Through their physician relationships, they were a source of quaternary and tertiary volume to the AMC hospitals. The conventional wisdom of the day was that the prestige and quality of the specialty trained physicians associated with the AMC - medical school affiliation would be a unique and distinctive quality compared to the competition. The result of this unique and distinctive market quality would be higher market share for the system as a whole. The importance of the medical school affiliation, therefore, was a means to attract and retain physicians to the affiliated community hospitals, and increase market share at all the system hospitals. The complication of this model and one that is common to many AMC arrangements is that because they focus on highly specialized cases, they often under-perform financially relative to non-AMC hospitals. The costs of AMCs engaged in teaching in the 1996 to 1999 time period were nearly double the costs of non-teaching hospitals.[44] In addition, both total and operating margins of AMC's were significantly less than non-

---

[43] Singleton Report, Ibid., at pp. 33-34.
[44] "Financial Performance of Academic Health Center Hospitals, 1994 – 2000, published by The Commonwealth Fund, September 2002, at p. 17.

AMC hospitals in the same time period.[45]  The extra cost burden of teaching, treating complex cases, high Medicare patient mix, and bad-debt cases were some of the reasons for the financial under-performance.  The additional complication of this model for AHERF and the DVOG hospitals in particular is the lack of differentiation that resulted from this strategy because the AMC hospital system model was common to a number of other competitor hospital systems in the Philadelphia market during this time period, including UPenn and Jefferson Health System.

The benefit of the AUHS relationship and the complexity of fixing the problem of losses are well illustrated by the actions of Tenet during the final phase of the purchase of the AHERF-E assets.  Tenet held up the completion of the sale transaction until AHERF could secure an organization that would manage the University assets.[46]  The continued role of the University was important enough to Tenet that they would not precede with the acquisition unless an organization could be found to manage and assume financial responsiblity for the University assets.  In my opinion, maintaining the University was very important to Tenet because it was an important source of continued physician integration with the DVOG hospitals.  In addition, Tenet did not want to assume the financial responsibility for running the AUHS enterprise, which had a $13.4 million (restated) operating loss in 1997.  This is an operating loss that is not addressed in the Singleton Report assessment of turnaround initiatives.  In my opinion, this is an operating loss that would have been very difficult and risky to address until after the turnaround initiatives could be implemented by the DVOG hospitals, and until the going forward strategic direction of AHERF-E could have been evaluated.  The risk of downsizing the AUHS enterprise to address the anticipated future operating losses could destabilize the strategic link of physicians and patients AUHS provided to the DVOG hospitals.

One final turnaround factor impacting DVOG would have been the prevailing culture.  While I do not have an adequate basis for understanding the culture at DVOG at the time, an organization has a better chance of turning around performance if it has (1) a well-functioning Board, (2) good physician-hospital relations, (3) good employee-hospital relations, (4) good communications, (5) a performance-based culture with clear accountabilities, and (6) a willingness to change the prevailing strategy quickly when required.  In my experience, it is critical to make sure that parties understand the magnitude of the situation requiring a change in strategy or turnaround of performance, and the implications of *not* taking action.  When this is not the case, it can be difficult or impractical to change with culture and historical ways of doing business getting in the way of progress.

---

[45] Ibid., at p. ix.
[46] Cain Brothers *"The AHERF Bankruptcy and its Aftermath: Implications for Managers and Trustees, Part 1"*, Ibid., at p. 13.

b) _External Market Factors_

The market structure in Philadelphia during this time period was extremely competitive. There was a duopoly among major commercial health plans which created a balance of power favoring health plans over hospital systems. In addition, employers and patients purchased healthcare services largely on the basis of cost or price. Hospitals had excess capacity placing further pressure on hospital economics and the need to grow volume. Growth by shifting market share and volume from other hospitals, however, would have been difficult as most physicians and hospitals were participating in the vast majority of health plan products and contracts.

In part as a reaction to this market structure, there was an "arms race" for survival among the Philadelphia area hospital systems, including the University of Pennsylvania Health System, Temple University Health System, Jefferson Health System, and AHERF. The competition to survive was in my view based on the perceived need for health systems to attract volume and consolidate in response to a market characterized by excess hospital capacity and the impact that utilization and revenue reductions would have on their ability to survive.

Unfortunately, DVOG was not as well positioned as many of its competitors to compete in this arms race. DVOG hospitals did not appear to be differentiated relative to their hospital competition. It did not offer unique hospital services that could not have been accessed from a competing hospital system. In addition, there were hospital alternatives in many of the geographies that DVOG hospitals served. The timing of AHERF's strategy implementation, the relative strength of the DVOG hospital portfolio, and the system's weaker balance sheet also lagged many of its competitors. AHERF's aggressiveness may have been an attempt to counter its unfavorable market position.

To compound matters and as I have already discussed, the Philadelphia healthcare market was also experiencing a steep decline in revenue driven by several factors including : (1) the Balanced Budget Act adopted by the United States Congress, (2) Medicaid Reform measures adopted by the Pennsylvania legislature, and (3) compensation payment reductions imposed by the two strong managed care plans operating in the over-bedded Philadelphia hospital market.

Further, the combination of AHERF's aggressive acquisition strategy for hospitals and physician practices increased its costs at the very time patient care revenues in the market dropped dramatically. This combination of cost increases and revenue declines created a "perfect storm" of cash shortage from which AHERF would never recover and which led to the decision in late 1997 to sell Philadelphia assets.

Given DVOG's position relative to internal turnaround factors and external market conditions, in my opinion it is unlikely that _any_ turnaround plan could have been successful within the time frame of FY 1997 to 1999.

### C. *Opinion*

**Having reviewed data regarding the Philadelphia market environment, the position of the DVOG hospitals, the Singleton Report, and my own analysis of turnaround opportunities for DVOG, it is my opinion that a turnaround plan for DVOG executed beginning at the end of 1996 would have been unlikely to succeed. It is also my opinion that the Singleton Report does not present a feasible plan for the financial stability of the AUHS, AUH DVOG hospitals, and AIHG entities because: (1) it does not provide for sufficient improvement in operating earnings, and (2) it fails to provide adequate cash flow to achieve a position of solvency (i.e., where assets exceed liabilities).**

## V. Sale Transaction Background

In preparing my opinion regarding the impact of the sale process on the sale price of the DVOG hospitals, I conducted a detailed review of the sale process followed by AHERF management, advisors, and participants in the bankruptcy process leading up to the sale to Tenet in November 1998. The decision to sell some of the AHERF-E assets was reached in an environment of incredible strain. By the late fall of 1997, AHERF was experiencing severe financial distress. Losses in AHERF's physician practice operations accelerated and the combined impact was staggering. For the first quarter of fiscal year 1998, AHERF reported losses of $42.6 million, and by late 1997 (the second quarter in fiscal year ending 1998), it was reported that AHERF was losing nearly $1 million per day.[47]

The sale process included the involvement of numerous outside advisors. On January 14,1998, AHERF engaged Merrill Lynch & Co. ("Merrill") to serve as AHERF's exclusive financial advisor to find a buyer for the AHERF assets.[48] A period of contract negotiations resulted in a purchase agreement being executed on February 13, 1998 with Vanguard Health System, Inc. a for-profit corporation (the "2/13/98 Vanguard Agreement"). The 2/13/98 Vanguard Agreement included a purchase price of $400 million for six of the AHERF hospitals: Graduate, City Avenue, Parkview, Elkins Park, Bucks County, and Rancocas Hospital in New Jersey. Despite enormous pressure from AHERF management on AHERF's lawyers to "close" the sale transaction, on June 18, 1998, Vanguard terminated the 2/13/98 Vanguard Agreement citing "material adverse change" in financial condition of the AHERF assets and Vanguard's resulting right to withdraw from the agreement that was built into the agreement.[49]

The termination of the Vanguard Agreement was accompanied by a change in AHERF management with the termination of Mr. Abdelhak on June 5, 1998 as President and Chief Executive Officer of AHERF. This was followed on July 21, 1998, by AHERF and a number of its Philadelphia affiliates filing for relief under Chapter 11 of the federal Bankruptcy Code. This was followed by the engagement of Hunter & Associates

---

[47] Patrick Hurst Deposition, March 16, 2004, pp. 114:8 – 115:3.
[48] Lorrie Warner Declaration, November 12, 1998, para. 4, p. 6.
[49] Charles Martin deposition, Ibid., 292:11-24; 331:3-332:21.

Management Services, Inc. ("the "Hunter Group")[50] to operate the AHERF-East facilities until a successful sale could be completed, and the hiring of Lehman Brothers, Inc. ("Lehman")[51] which was engaged to work with Merrill in an attempt to achieve a timely sale of the AHERF assets.

The auction to purchase the AHERF assets was won by Tenet and the process for negotiating with Drexel for the management of the AHERF University ensued.  On November 10, 1998, Tenet closed the purchase of DVOG hospital and AIHG assets.  This purchase was conditioned on the participation of Drexel University in the operations and management of the University assets of AHERF-E.

## VI. Opinion 2.  The Mismanagement of the Sale Process Resulted in a Significant Decline in the Sale Price of the AHERF-East Assets.

By virtually all accounts, the process used for the sale of the AHERF assets was seriously compromised and resulted in a lengthy sale of the AHERF assets at a time that AHERF could least afford such a delay.  The AHERF assets that once drew a bid of $460 million[52] were ultimately sold in what has been characterized as a "fire sale" for $345 million.[53]  When deducting the $110 million paid to Drexel to become the University operator, and $40 million credit for Tenet to handle the anticipated cost of malpractice insurance premiums and the costs of the bankruptcy, the creditors were reportedly left with a small fraction of the outstanding debt recovery.[54]  A careful review of the account of the sale process from early 1998 when it was first considered to the sale in November of 1998 reveals that the sale process was seriously mismanaged by AHERF and its financial advisors.  The mismanagement of this process in the face of desperately declining financial performance at AHERF facilities, in my opinion, caused a significant decline in the sale price of the AHERF assets.  Patrick Hurst, a National Health Care Group Director at Houlihan Lokey Howard & Zukin Capital, indicates:

> "In July of 1998, Vanguard offered $460 million for Debtor's [AHERF] Philadelphia-area hospitals; when the auction closed on September 29, 1998, the purchase price Tenet paid for the hospitals was effectively $235 million.  This $225 million plummet in value over three months is perhaps the most stark illustration of the reality of Debtor's mismanagement of the sale process and the entities themselves.[55]

In addition, Mr. Hurst indicates that the sale process was pursued in a climate of "organizational chaos" with a significant "lack of information, books, and records":

---

[50] Daniel Stickler Deposition, May 9, 2003, 265:15-20.
[51] Lorrie Warner Declaration, Ibid., November 12, 1998, para. 4.
[52] Exhibit 1157; Vanguard's $502 million bid, less $42 million purchase price adjustment if sale excluded Rancocas Hospital.
[53] Patrick Hurst Affidavit, Ibid., para.13, p. 8.  (The effective price paid by Tenet to AHERF of $235 million is based on $345 million sales price, less $110 million payment to Drexel.)
[54] Cain Brothers, "The AHERF Bankruptcy and its Aftermath: Implications for Managers and Trustees, Part I", Ibid., at p. 15.
[55] Patrick Hurst Affidavit, Ibid., para. 12, p. 8.

> "*At the most fundamental level, the Debtors [AHERF] were in a state of chaos in terms of providing critical information and, as became increasingly evident, in performing basic functions essential to effectively operate their business. Certain important financial records were admitted by Debtor to be inaccurate or entirely unavailable; key financial personnel appeared unaware of vital facts concerning their operations, and even of how much information could be obtained; and there did not appear to be any organizational structure--either documentary or among management--that would enable us to efficiently ascertain the fundamental information we needed.*"[56]

Although Mr. Hurst described the climate and readiness of AHERF during the auction sale process, evidence of mismanagement of the entire sale process and strategy can be seen from its very first days.

### A.    Sole Source Negotiations with Vanguard

The single most critical mistake made by AHERF and its financial advisors in the management of the sale process was to pursue "sole source" negotiations with Vanguard. This decision to strictly limit contract negotiations for the sale of the AHERF assets exclusively to Vanguard was both unusual and unorthodox for a nonprofit hospital "conversion", and resulted in the exclusion of a fully qualified bidder (i.e., Tenet) that had invited negotiations in November 1997.[57] As David R. Mayeux, the chief negotiator for Tenet, testified:

> "*[I] think, as I mentioned in my earlier testimony, that there was just this general question in our minds as Tenet as to why Vanguard and why was Vanguard in there early and why wasn't there a bid? You know, once things kind of got opened up and we were able to demonstrate our capabilities, you know, that had much less impact on the situation.*"[58]

As would later become more evident, the decision to go it alone with Vanguard resulted in a lengthy delay in the sale process at a time in which AHERF could least afford it. This lengthy delay, the terms that Vanguard set in the 2/13/98 Vanguard Agreement, and the awareness of AHERF's worsening financial performance uncovered in the due diligence process, resulted in a dramatic and likely unnecessary decline in the sale price of the AHERF assets on the date of sale.

### 1.    Lack of Bargaining Leverage

First, it is clear that the contract negotiations in January and February with Vanguard were conducted in a climate of "desperation" by AHERF. In his deposition testimony, Robert McNair, the legal representative on the AHERF negotiation team, indicated that

---

[56] Patrick Hurst Affidavit, Ibid., para. 7, p. 3.
[57] David R. Mayeux Deposition, Ibid., 50:17-25.
[58] David R. Mayeux Deposition, Ibid., 171:23-172:4.

AHERF senior management had unrealistic expectations about the closing of the transaction and made significant concessions in the 2/13/98 Vanguard Agreement to expedite the sale process. When asked if the AHERF negotiating team had sought to build protections into the agreement with Vanguard, Mr. McNair testified:

> "Yeah. Most of which were rejected out of hand. And since we were negotiating from our knees, we didn't have a lot of ability to make—I mean, we got some stuff in the margin, but it was not an altogether sales-functioning negotiation".[59]

As the negotiation proceeded and Vanguard made significant demands, more pressure was placed on the AHERF negotiation team to concede.

> "I mean, this was not a situation in which parties with co-equal bargaining power were sitting at the bargaining table. Compounded by the fact the CEO of my client was salivating on his shoes to get this deal done and the other side knew it....Well, I mean, if you've seen transactions negotiated, that's not the way to maximize your bargaining position".[60]

The course of the negotiations leading to the 2/13/98 Vanguard Agreement were so one-sided that it caused Mr. McNair to wonder if Vanguard had deliberately made a high purchase offer to gain bargaining advantage, and then negotiated hard to insure a long and complex due diligence process that would result in a bankruptcy or significantly reduced purchase price.[61]

## 2.    _Unfavorable Contract Terms_

The result of these lop-sided negotiations is that the 2/13/98 Vanguard Agreement was highly unfavorable to AHERF and left it vulnerable at a time in which its financial performance was declining rapidly. Specific features of the 2/13/98 Vanguard Agreement that were unfavorable to AHERF included: (1) representations and warranties regarding no "material adverse changes" in the financial condition of AHERF before closing, and (2) a "no shop" clause that prevented other bidders from participating in negotiations with AHERF for the purchase of the AHERF assets.[62] Many of these onerous provisions may have been avoided if AHERF had initiated a more "competitive" bidding process from the outset. In my experience, depressed sellers can seek to "even the negotiation playing field" by inviting more than one bidder into the process from the outset. This could have been accomplished easily by AHERF since Tenet, a fully-qualified bidder, had already expressed interest in pursuing negotiations for the sale of the AHERF assets.[63]

---

[59] Robert M. McNair, Jr. Deposition, January 17, 2003, 193:20-24.
[60] Robert M. McNair, Jr. Deposition, Ibid., 201:12-20.
[61] Robert M. McNair, Jr. Deposition, Ibid., 190:5-191:12.
[62] Exhibit 572, p. 18.; p. 37.
[63] Exhibit 2410.

Not only would opening up the sale negotiations to Tenet have improved AHERF's weak bargaining position, it would have been prudent to have a competitive bidding process to support any sale price of the AHERF assets as consistent with "fair market value". In my experience, it is commonplace for a non-profit health system selling assets to a for-profit hospital company to require approval or, at a minimum, scrutiny from the state Attorney General for such sale. In most states including Pennsylvania, the Attorney General is charged with responsibility to protect the public interest in the sale or "conversion" of charitable assets (owned by a 501(c)(3) nonprofit corporation) to a taxable use. In my experience, the most common method to establish that the charitable assets have been sold for "fair market value" is to use a competitive and public sale process. Such a process ensures that an "arm's length" bargaining process will be used, and a fair sale price will be achieved. Without a competitive bidding process that would assure that the sale price was both "arm's length" and market priced, AHERF was inviting scrutiny of the sale process that would most certainly have lengthened an already difficult and complex sale process. In fact, the Pennsylvania Attorney General sought to intervene in the bankruptcy proceedings to scrutinize the ultimate sale of the AHERF assets, but was prevented from doing so by the Bankruptcy Court.

### 3.    *Exhaustive Due Diligence Process*

The third major problem that AHERF created by pursuing exclusive negotiations with Vanguard, was that it left AHERF very vulnerable to an exhaustive due diligence process by Vanguard without the ability to exit from exclusivity. Indeed, using a preemptive bid, performing preferential due diligence, and buying assets of financially distressed hospitals out of bankruptcy appears to have been a part of Vanguard's strategy.[64] In its desperation to save the value of the AHERF assets, AHERF management may have fallen victim to this strategy. Vanguard's extensive due diligence activities significantly delayed the sale process and reduced AHERF's bargaining position because financial losses were accelerating over this time period. By taking advantage of the "no material adverse changes" representations and warranties in the agreement, Vanguard maintained a continuous "out" to having to close the deal. This combination of knowledge and leverage gave Vanguard an enormous edge in the sale process that carried it all the way through the auction sale. Many of the persons familiar with the details of the auction sale process confirm that Vanguard's "inside" position in the auction sale process was a major obstacle in obtaining meaningful bids from other interested parties.[65]

### 4.    *Failure to Aggressively Pursue Tenet Negotiations*

Not only did AHERF make a big mistake in pursuing exclusive negotiations with Vanguard in February 1998, it repeated the mistake in July when it chose to use the 7/31/98 Vanguard Agreement as a "stalking horse" rather than opening up sale negotiations at that point to a more competitive process. Indeed, Tenet was highly

---

[64] Charles Martin Deposition, Ibid., 61:9-16.
[65] Patrick Hurst Deposition, Ibid., pp. 191:24 – 192:16.

motivated to beat the Vanguard price and submitted a letter of intent ("LOI") in July that was highly competitive and with a higher price than Vanguard.[66] However, the LOI submitted by Tenet was never pursued by AHERF even though it did not include a "financing contingency" on the part of Tenet to complete a timely purchase of the AHERF assets. This is very significant because Tenet was aware that Vanguard as "stalking horse" could not readily get financing for the transaction and that a Tenet bid would not require lender approval to close a sale transaction.[67] Having a bidder such as Tenet that could pursue a "timely" sale transaction at a time in which AHERF was experiencing a sharp decline in operating performance could very well have permitted AHERF to sell its assets at a better sale price. This is particularly true since a timely sale of the AHERF assets was of critical importance to preserving the value of such assets. The failure to complete a timely sale had a severe impact on the sale price of the AHERF assets.[68]

### B. *Filing of Bankruptcy*

The filing of the bankruptcy petition on July 21, 1998 had a negative impact on the sale price paid for the AHERF assets for two key reasons: (1) in my experience the filing of bankruptcy itself has a negative impact on value, and (2) the bankruptcy raised serious questions of confidence in the viability of AHERF that led to a dramatic decline in patient volumes, further eroding the financial performance of AHERF.

My review of the testimony of the financial advisors working with AHERF in July 1998 indicates that the rapidly deteriorating cash position of AHERF led to the decision to file the petition for Chapter 11 bankruptcy protection.[69] While bankruptcy had been considered earlier, it was hoped that AHERF could maintain the four weeks of cash liquidity that was necessary to obtain debtor-in-possession ("DIP") financing to sustain operations during the bankruptcy process so that a sale of the AHERF assets could be achieved without a "fire sale" atmosphere.[70]

The negative impact of bankruptcy filings on the value of assets of the debtor has been well-documented in other industries. In a study examining the records of the Department of Transportation and Federal Aviation Administration from 1978-1991, the findings concluded that aircraft sold in a bankruptcy proceeding sustained a 14% discount to the average sale price for all aircraft sales during the same period.[71] Another study concluded that distressed and bankrupt airlines sell aircraft at discounts ranging from 15% to 40% compared to prices received by non-distressed sellers.[72]

---

[66] Exhibit 1159.
[67] David R. Mayeux Deposition, Ibid., 97:23-98:1.
[68] Patrick Hurst Deposition, Ibid., 42: 8-12;123:3-8.
[69] Patrick Hurst Deposition, Ibid., 114:23 – 115:15.
[70] Patrick Hurst Deposition, Ibid., 114:23 – 115:15.
[71] "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," Journal of Finance, June 1998, written by Todd C. Pulvino.
[72] "Effects of Bankruptcy Court Protection on Asset Sales," Journal of Finance and Economics, vol. 52, pp. 151, 186, Todd C. Pulvino.

In my view, the filing of the bankruptcy had a negative impact on the value of the AHERF assets as well. I am not alone. Many of the persons involved in the auction sale process concur with this conclusion, including Tenet, which believed that the purchase price of the AHERF assets would be "absolutely" cheaper in the bankruptcy process because it could designate some of the purchase price for the payment of malpractice premiums and deferred capital projects.[73] The primary reason that the filing of bankruptcy has an adverse impact on the value of assets is that there are very substantial legal and transaction costs involved in having the bankrupt estate managed during the bankruptcy and in the formal sale process supervised by the Bankruptcy Court.

Another reason that a bankruptcy has a negative impact on the value of assets is that it can erode confidence in the underlying business of the debtor. This clearly was the case with AHERF as physician referral patterns were negatively influenced immediately following the filing for bankruptcy leading to steep declining patient revenues during this period. It should be noted that patient care volumes dropped steadily during the auction process and that the decline in revenue was (1) cited by Vanguard for withdrawal of its offer and (2) watched carefully by Tenet and built into its pricing model.[74] Moreover, other players in the auction process indicated that falling patient volumes were a key factor in the decline in value of the AHERF assets.[75]

### C. *Failure to Obtain A Timely Sale of Assets*

The failure to obtain a timely sale of the AHERF assets was a direct and immediate result of the mismanagement of the sale process by AHERF and its financial advisors. At the particular time in which the sale process was pursued, it was critical that a "timely" sale be completed in order to preserve the asset value of the AHERF assets. This conclusion is supported by the fact that AHERF facilities were experiencing a rapidly deteriorating financial performance and were running out of cash. One of the key players involved in the auction sale process testified that the cash "burn rate" of AHERF during the period leading up to the auction was so severe that AHERF was compelled to close a sale quickly and efficiently or suffer a catastrophic loss in value.[76] In the face of the necessity of a quick sale, delays in the timing of the sale process further exacerbated AHERF's cash problem and compromised the sale process. Patrick Hurst indicated:

> *"Many advisors involved in the transaction shared our conclusion that Debtors were not ready for a sale, but that mismanagement was so profound and was resulting in such unbearable losses that an expedited sale was the only alternative, despite the negative effect this would have on ultimate price and creditor recoveries".*[77]

---

[73] David R. Mayeux Deposition, Ibid., 60:11-12.
[74] David R. Mayeux Deposition, Ibid., 181:13 –184:12.
[75] Anne Morse Deposition, October 22, 2003, 154:5 – 155:16; Edward Malmstrom Deposition, Ibid., 253:18-24.
[76] Patrick Hurst Deposition, Ibid., 115:4-15.
[77] Patrick Hurst Affidavit, Ibid., para. 12, p. 8.

This meant that the auction sale was conducted in a climate of rush and anxiety which increased the probability of a diminished sale price as a consequence. In fact, the timing of the auction process was so highly compressed that it did not give bidders time to perform adequate due diligence to submit a competitive offer to buy the AHERF assets. This presented an increased risk due to a lack of information that would be expected to translate into a purchase price "discount" on the part of the bidders to offset this risk. Patrick Hurst testified:

> "Debtors also failed to provide the eastern entities with information on a timely basis. In one case, for example, the Committee had the most recent available financials of the eastern entities before the acting CFO of the eastern entities. In other instances, we asked Hunter for fundamental financial information about the eastern entities that Hunter was unable to provide to us because it had not been provided to them by Debtors. In another instance, we learned that Debtors' consultants were conducting a downsizing analysis but had failed to even contact the Hunter personnel responsible for such functions for the eastern entities."[78]

### D. AHERF Poorly Prepared for Auction Sale

AHERF was poorly prepared and highly disorganized during the sale process resulting in the compromise of the auction sale process. This factor too had a negative impact on the value of the AHERF assets. As testified by each of the key financial advisors to the sale transaction, there were several significant flaws in the auction sale process that were the direct result of AHERF being poorly prepared for a sale. These include the following:

1. *Inadequate Data Room.* The "data room" organized to permit potential bidders to properly evaluate their interest in submitting a bid to purchase the assets was incomplete and poorly organized. This made it difficult for bidders to determine the exact assets they were to acquire and the liabilities they were to assume.[79] DVOG's investment bankers who were hired to assist with the hospital sale did not ensure, as would have been expected, that a functioning data room was put in place.

2. *Uncooperative AHERF Support.* The due diligence materials were not organized for bidders to review the assets and liabilities that were to be part of the sale process. AHERF managers were still "enamored" with the Vanguard proposal and did not bring a cooperative attitude into the due diligence process of other bidders.[80]

---

[78] Patrick Hurst Affidavid, Ibid., para. 35, p. 17.
[79] Patrick Hurst Deposition, Ibid., 130:11-133:3.
[80] David R. Mayeux Deposition, Ibid., 91:7 – 20.

3. *Information Disconnect*. AHERF managers designated to assist bidders in the auction were neither knowledgeable nor helpful to bidders.[81] The problem of incomplete information or information that was provided in a piecemeal fashion to the bidders was so severe that bidders expressed concern that the "level of disarray could reflect more than mere mismanagement, leading to concerns of deliberate concealment or obfuscation of critical financial matters."[82]

4. *No Offering Memorandum*. An offering memorandum that describes in detail the portfolio of assets that are being sold is a critical component of any auction process. The absence of an offering memorandum in the AHERF auction sale process suggested that AHERF was seriously disorganized in the sale process. Both of these factors likely had a negative impact on the sale process.[83]

5. *Inadequate Provision for University Issues*. AHERF did not put into place a viable mechanism to address the significant and complex issues presented by the University in the sale process. The University was losing millions of dollars per month and a solution to address these losses was not built into the bidder process so that interested parties could either understand or provide a solution to the problem.[84]

   E. *Poor Credibility of AHERF Leadership*

The lack of credibility of AHERF board and management in FY1998 also contributed to a "crisis in confidence" concerning the integrity of the auction sale process resulting in a negative impact on the value of the AHERF assets. Such delays were caused by the fact that AHERF and its financial advisors lacked credibility with the bidders as a capable and forthright management team. During the due diligence process leading up to the sale of the AHERF assets, there were a number of startling revelations concerning certain actions and transactions of AHERF "insiders" that raised significant concerns regarding the competence and integrity of AHERF management and board. The disclosure of many of these actions and transactions could only have had a detrimental impact on the willingness of a bidder to submit a competitive bid for the purchase of the AHERF assets. As indicated by Mr. Hurst, on several occasions both Tenet and Vanguard expressed profound concerns about "what else might be out there in light of these problems"[85] and repeatedly used these factors to justify reductions in their bids. These included the following:

1. *Malpractice Tail Insurance*. During the due diligence process, the negotiation with Tenet for malpractice tail insurance premium cost reserves resulted in a loss to creditors of $8 million.[86]

---

[81] Patrick Hurst Affidavit, <u>Ibid.</u>, paras. 7 and 8, p. 3-4.
[82] Patrick Hurst Affidavit, <u>Ibid.</u>, para. 8. p. 4.
[83] Patrick Hurst Affidavit, <u>Ibid.</u>, para. 27, pp. 13-14.
[84] Patrick Hurst Affidavit, <u>Ibid.</u>, para. 28(b), pp. 14-15.
[85] Patrick Hurst Affidavit, <u>Ibid.</u>, para. 20, pp. 11-12.
[86] Patrick Hurst Affidavit, <u>Ibid.</u>, para. 23, pp. 12-13.

2. *Preferential Repayment of Mellon Loan*. Questions also existed in the minds of the bidders concerning the depletion of AHERF cash on the eve of the filing of the bankruptcy. It was rumored that when the cash problems of AHERF were at their peak in 1998, two members of the AHERF board (who were also members of Mellon Bank) began to pressure AHERF for repayment of its loans to the health system. On April 27, 1998, AHERF management succumbed to pressure to repay the $89 million loan without board approval.[87]

3. *Raiding of Endowment Funds*. Questions about the competence and integrity of AHERF management were also raised by the lengths to which they went to find cash to meet their obligations during the last days before the filing of the bankruptcy. Indeed during the due diligence process, AHERF disclosed the improper diversion of certain endowment funds. The improper use of charitable funds is a major blow to the credibility of a nonprofit health system especially with ties to a medical school and medical research. Concerns were raised repeatedly about this issue by bidders following its disclosure.[88]

4. *Abdication of Management Responsibility*. Following the engagement of the Hunter Group, it appears that key AHERF executives sought to distance themselves from the AHERF failures in Philadelphia and retreat to Pittsburgh operations. As part of this process, AHERF failed to provide information to bidders concerning the AHERF assets on a timely basis, removed key personnel from Philadelphia making them largely inaccessible during the due diligence process, prevented contact between AHERF physicians and interested bidders, and failed to monitor and collect accounts receivable.[89]

Any one of these revelations would have been sufficient to raise credibility concerns over the competence and integrity of AHERF leaders and adversely impact the sale process and sale value of the AHERF assets. In combination with one another and in the face of dramatically declining financial performance, these AHERF actions reduced the sale proceeds from the sale of the AHERF assets.

F.  *Restated Financials Only Modestly Impact Sale Process*

A review of the testimony and exhibits of those persons participating in the sale process uniformly indicates that the disclosure by AHERF that it would restate its financial statements for FY1997 had a modest impact on the sale process. Such a conclusion is supported by several facts. First, the announcement concerning the decision of AHERF to reissue its FY1997 financial statements occurred at a time during the sale auction process in which the sale process was already chaotic and compromised. It only raised additional concerns on the reliability of the financial information that already existed from the sale process, but did not generate any new opinions on the reliability of

---

[87] Chapter 5, "Burning the House Down," Ibid., at page 18.
[88] Patrick Hurst Affidavit, Ibid., para. 19, pp. 11.
[89] Patrick Hurst Affidavit, Ibid., paras. 35-38, pp. 17-18.

AHERF management or the quality of its assets. Most significantly, it appears that by the time of the announcement, both Tenet and Vanguard had created their own respective models for valuating the AHERF assets and were using the internally generated financial statements to support their purchase price offers. In his deposition testimony, David Mayeux acknowledged explicitly that Tenet was not relying on the AHERF audited financial statements.[90] Rather, Tenet was utilizing the information provided in the on-going internal statements and its own pro-formas in preparing its bid to acquire the AHERF assets. Similar testimony was provided by Charles Martin of Vanguard who indicated that Vanguard relied upon more contemporaneous internally-generated financial statements.[91] Mr. Martin believed that internally-generated financial information were a more accurate and relevant representation of changes in financial performance for AHERF. Vanguard then updated the monthly financial information provided by AHERF and made those changes to its financial model that they thought they could make through cost savings available in Vanguard.

In short, the restatement of the FY1997 audited financial statements of AHERF did not have a direct and immediate impact on the decline in value of the AHERF assets at closing. The mismanagement of the sale process by AHERF and its agents resulted in a lower sales price paid by Tenet for the acquisition of the DVOG hospitals.

   G. *Opinion*

**It is my opinion that (1) the process for the sale of the AHERF assets was mismanaged by AHERF and its financial advisors, and (2) this mismanagement, during the period of January to November 1998, had a direct and adverse impact on the sale price paid by Tenet in November, 1998 for the AHERF assets.**

   H. *Compensation*

BDC Advisors, LLC was compensated for services under the following schedule of contract rates:

| | |
|---|---|
| Robert A. Dickinson | $5,000-$5,975 per day |
| Range for BDC Advisors, LLC Team Members | $2,100-$6,000 per day |

   I. *Prior Testimony*

In the last four years I have not testified as an expert witness in a deposition or trial.


_Bob Dickinson_ _(signature)_

/Robert A. Dickinson, Managing Director

_____
      11/9/04
      Date

---

[90] David R. Mayeux Deposition, *Ibid.*, 313:16-316:16.
[91] Charles Martin Deposition, *Ibid.*, 146:25-147:21; 162:6-163:3.

EXHIBIT

1

ALL-STATE LEGAL®

# BDC ADVISORS, LLC

**ROBERT A. DICKINSON**
*Managing Director*
*Location: San Francisco*

Mr. Dickinson is the Managing Director of BDC Advisors, LLC and has been with the firm since 1992. He possesses a broad range of senior management consulting experience developed over fifteen years in the fields of consulting and healthcare for academic medical centers, children's hospitals, healthcare delivery systems, physician organizations, and health plans. Specific areas of specialization include:

- Strategic Planning
- Revenue Enhancement / Payor Strategy
- Payor / Provider Relationships
- Physician Integration Strategy
- Organizational and Governance System Design
- Demand Forecasting / New Technology Assessment
- New Product Development
- Regional Delivery System / Network Development
- Performance Benchmarking
- Physician Compensation Systems

Mr. Dickinson has implemented strategic plans and initiatives for a broad array of healthcare payers and providers in California, Colorado, Connecticut, Florida, Hawaii, Illinois, Indiana, Massachusetts, Missouri, New Jersey, New York, Ohio, Oregon, Pennsylvania, Virginia, Washington, and Wisconsin, as well as with national health systems. Some of Mr. Dickinson's featured work includes restructuring the organization of a three-state Catholic healthcare system, successfully turning around a health plan in Michigan, and developing a strategy for a five-hospital system in the Midwest using Malcolm Baldrige quality criteria. He is currently providing litigation support for a New York law firm involving the largest bankruptcy in the history of American health care. On client engagements, he is responsible for all phases of projects, including business development, project planning, project coordination, analysis, implementation, and quality control.

Some of Mr. Dickinson's provider clients include: Advocate Health Care, Aurora Health Care, Catholic Healthcare West, Children's Hospital of Philadelphia, Lucile Packard Children's Hospital at Stanford, Mount Sinai Medical Centers and Health System, Munson Healthcare, Oregon Health Sciences University Hospital, Partners Healthcare System (Massachusetts General and Brigham and Women's Hospitals), Sacred Heart Health System, SSM Health Care, Sisters of Charity of St. Augustine Health System, Southern California Permanente Medical Group, Stanford University Hospital and Clinics, Trinity Health, Tufts-New England Medical Center and Yale-New Haven Health System. Some of his payor clients include: Aetna, Care Choices, Health Directions, Kaiser, Medi-Sun, and United Healthcare. As part of his prior consulting work, he supervised and executed the design and installation of financial information systems for Kaiser Permanente in Northern California.

Mr. Dickinson received his Master of Business Administration from the Harvard Business School where he earned honors. He received his Bachelor of Arts degree with departmental honors in Human Biology from Stanford University. Mr. Dickinson has been featured as a keynote speaker at over 20 national healthcare conferences, has published or been cited in over 24 articles in national healthcare publications, and is an expert contributor to the Health Care Advisory Board, The Leadership Institute, and The Governance Institute. He is the President of a national not-for-profit Foundation Board. He may be reached at (415) 247-1013 or BDickinson@BDCAdvisors.com.

# BDC ADVISORS, LLC





*Exhibit 2*

EXHIBIT
2

**ROBERT A. DICKINSON**
*Managing Director*
*Location: San Francisco*

## Academic Medical Centers

Baylor Healthcare System (Dallas, TX)

Howard University Hospital (Washington, D.C.)
Mount Sinai Health System (New York, NY)
Oregon Health Sciences University (Portland, OR)

Partners HealthCare System (Boston, MA)
(Mass General / Brigham & Women's Hospitals)

Stanford University Medical Center (Palo Alto, CA)

Tufts-New England Medical Center (Boston, MA)
Yale New Haven Health System (New Haven, CT)

Ambulatory Surgery Center Network Compliance (2004)
Turnaround (1990) (with APM, Incorporated)
Strategic Plan (1995-99)
Operations Restructuring (1991)
Ambulatory Care Strategy (1999)
Health Plan Receivership Strategy (2000)
Payor Pricing Strategy (2000-01)
Benchmarking (2000-01)
Tiered Network Product Strategy (2003-04)
Strategic Plan / Turnaround Management (2000-02)
Ambulatory Surgery Center Restructuring (2002)
Turnaround / Strategic Plan (2004)
Strategic Plan (1997-98)
Institute for Excellence (2003)
Performance Management (2003)

## Catholic Health Systems

Catholic Healthcare West (San Francisco, CA)
Holy Cross Health System (South Bend, IN)

Mercy Medical Center (Canton, OH)

SSM Healthcare (St. Louis, MO)

St. Vincent Charity Hospital (Cleveland, OH)
Sacred Heart Health System (Pensacola, FL)

Organization Redesign / Turnaround (2000)
Managed Care Strategy (1997)
Physician Integration Strategy (1998)
Strategic Plan (2004)
Payor Strategy and Re-Contracting (2004)
Medical Management Performance Improvement (2000-01)
Payor Strategy (2000-01)
Cardiac Network Strategy (2002)
Payor Strategy (2004)
Strategic Plan (2004)
Strategy and Network Development (1999)
Medicare and Medicaid Strategy (2000)
Physician Group Performance Improvement (2000)

## Other Health Systems

Advocate Healthcare (Chicago, IL)

Aurora Health Care (Milwaukee, WI)

Kapiolani Health Hawaii (Honolulu, HI)

Network Development (1994-97)**
Health Plan Divestiture (1999)**
Network / Contracting Compliance and Redesign (2003)
Revenue Strategy (1998)
Physician Governance Policies (2004)
Medicare Strategy (1999)

# BDC ADVISORS, LLC

*Exhibit 2*

*Robert A. Dickinson Client List*
*Page 2*

Munson Healthcare (Traverse City, MI)

Sun Health (Phoenix, AZ)

Wellspan Health (York, PA)

Strategic Plan (2001-02)
Governance / Management / Organization Redesign (2003)
Medicare PSO Implementation (1998-99)
Payor Strategy (2002)
Network Strategy and Development (1996-97)
Payor Strategy (1997)

## Children's Hospitals

Children's Hospital of Philadelphia (Philadelphia, PA)
Lucile Packard Children's Hospital (Palo Alto, CA)

Doernboecher Children's Hospital (Portland, OR)

Strategic Plan (2001)
Strategic Plan (2000)
Physician/Hospital Integration (2001)
Ambulatory Care Strategy (1999)

## Physician Organizations

Mount Sinai IPA  (New York, NY)
Physician Weblink of California (Orange County, CA)
Southern California Permanente Medical Group (Pasadena, CA)

Strategic Plan (1997, 1998, 1999)
Benchmarking (2001)
Group Practice Evaluations (2002)**

## Health Plans and Other

Aetna (San Ramon, CA)
Care Choices (Novi, MI)
Fallon Community Health Plan (Vermont)
Kaiser Permanente (Pasadena, CA)
United Health Group (Minneapolis, MN)

Benchmarking and Strategic Planning (2002)
Strategic Plan and Turnaround (2001)
Managed Care Contracting Facilitation (2004)
Medical Group Acquisition Strategy (2003)
Market Development (2000-01)
Product Design Strategy (2001)

## Fortune 500 Companies

Monsanto Health Solutions (St. Louis, MO)

Service Line Development (1998)
Product Commercialization (1999)

## Law Firms

Cravath, Swaine, & Moore (New York, NY)

Litigation Support:  AHERF Bankruptcy (2002-04)

The following are additional related clients and projects conducted by BDC Advisors, LLC:

Alexian Brothers (Chicago, IL)

Group Practice Acquisition (2000)**

San Antonio Community Hospital (Los Angeles, CA)

Strategic Planning

**BDC ADVISORS, LLC**



EXHIBIT

3

# ROBERT A. DICKINSON

# BIBLIOGRAPHY

## Publications

Cited in "Clinical Integration and Service Lines", <u>Healthcare Strategy Alert</u>, (Chicago, IL: Healthcare Strategy Institute, September, 2004).

"The Revenue Game: Optimizing the Profitability and Clinical Performance of Service Lines", <u>Service Line Leader</u>. (Centennial, CO: The Snowmass Institute, January / February, 2002).

Cited in "Focus on Brand Identity Can Improve Market Share for Healthcare Organizations", <u>HFMA Wants You to Know</u>. (Westchester, IL: Healthcare Financial Management Association, June 7, 2000).

"Reversing the Commoditization of Health Care: Advancing Your Organization Through Branding Strategies", <u>The Healthcare Strategist</u>. (Washington, D.C.: COR Research, November, 1999), with Susan Holmes.

"Rethinking Specialist Integration Strategies", <u>Healthcare Financial Management Journal</u>. (Westchester, IL: Healthcare Financial Management Association, January, 1999), with Michael S. Thomas and Bernard Naughton.

Contributions with special thanks to <u>Holding the Center: Recovering Specialty Care at America's Leading Healthcare Organizations</u>. (Washington, D.C.: The Advisory Board Company, 1998).

Contributions with special thanks to <u>Partnership at Risk: The Precarious State of Specialist-Health System Relations</u>. (Washington, D.C.: The Advisory Board Company, 1998).

Cited in "Contact Capitation: The Coming Craze for Specialists," <u>Capitation Management Report</u>. Volume 5, Number 1. (Marietta, GA: National Health Information, LLC, January 1998), pp. 1-6.

Contributions with special thanks to <u>Innovations for Eldercare</u>. (Washington, D.C.: The Advisory Board Company, 1997).

Contributions with special thanks to <u>Medicare Risk: The Race to Retail</u>. (Washington, D.C.: The Advisory Board Company, 1997).

Cited in "Mount Sinai Managed Care Network," <u>Medical Network Strategy Report</u>. Volume 6, Number 11. (Washington, D.C.: COR Research, November 1997), pp. 1-5.

Cited in "Medicare Risk Point-of-Service Plans Offer Providers Competitive Opportunities," <u>Medical Network Strategy Report</u>. Volume 5, Number 3. (Washington, D.C.: COR Research, March, 1997), pp. 1-3.

Cited in <u>Emerging from Shadow</u>. (Washington, D.C.: The Advisory Board Company, 1995).

"The Primary Care Arena", <u>National Association Medical Staff Services Journal</u>. (Knoxville, TN: NAMMS, August, 1995), pp. 14-19, with R. Curt Hatch.

Cited in "Characteristics of Capitated and Non-Capitated Markets," Fact Brief. (Washington, D.C.: The Advisory Board Company, July 26, 1995), pp. 1-10.

Cited in <u>To the Greater Good: Recovering the American Physician Enterprise</u>. (Washington, D.C.: The Advisory Board Company, Governance Committee, July, 1995).

## BDC ADVISORS, LLC

*Exhibit 3*

*Bibliography*
*Page 2*

"Group Practice Compensation Under Capitation: Managing the Transition from Productivity-Based to Prepaid Incentives," <u>American Medical Association Legal Advisor</u>. (Chicago: American Medical Association, October, 1994), pp. 5-9.

"Rewriting the Healthcare Fairy Tale: Creating Successful Integrated Delivery Systems," <u>Topics</u>. Volume 1, Issue 1. (Chicago: EHS Health Care, February, 1994), pp. 3-10.

Cited in "Jumping the Hurdles that Get in the Way of Successful Physician-Hospital Alliances," <u>Medical Staff Strategy Report</u>. Volume 3, Number 1. (Washington, D.C.: COR Research, January, 1994), pp. 1-3.

"Group Practice Compensation: Dividing the Pie," <u>Medical Staff Strategy Report</u>. Volume 2, Number 11. (Washington, D.C.: COR Research, November, 1993), pp. 6-8.

"Group Practice Governance and Management in the Capitation Era: Changing the Paradigm," <u>Medical Staff Strategy Report</u>. Volume 2, Number 6. (Washington, D.C.: COR Research, June, 1993), pp. 4-6.

## Conference and Seminar Presentations

"Clinically-Integrated Service Line Networks: Advancing Service Line Brand and Performance", <u>The Snowmass Institute</u>. (8th Annual Conference on Service Line Management, Chicago, IL October 18, 2004).

"Payor-Provider Innovation: The Next Wave", <u>The Leadership Institute</u>. (Roundtable Kickoff, Founding Group, Napa, CA March 18, 2004).

"Formalizing a Business Relationship with Physicians to Improve Clinical Quality and Patient Safety", <u>The Leadership Institute</u>. (Presentation, Millennium Group, Napa, CA February 5, 2004).

"Game-Changing Revenue Strategies", <u>The Snowmass Institute</u>. (7th Annual Conference on Service Line Management, Cincinnati, OH October 13, 2003).

"Building a Performance-Oriented Culture", <u>The Leadership Institute</u>. (Roundtable Kickoff, Millennium Group, Philadelphia, PA October 9, 2003).

"Revenue Enhancement Strategies in 2003: What's New, What's Different?", <u>The Leadership Institute</u>. (Roundtable Kickoff, Millennium Group, Dana Point, CA June 5, 2003).

"Transformational Delivery Driven by Niche Competition", <u>The Leadership Institute</u>. (Roundtable Kickoff, Millennium Group, Las Vegas, NV February 6, 2003).

"Consumerism and Consumer-Directed Initiatives: The Emperor Has No Clothes", <u>The Leadership Institute</u>. (Roundtable Kickoff, Founding Group, Charleston, SC November 14, 2002).

"The Changing Face of American Healthcare: Disruptive Technologies and Implications for Service Line Management", <u>The Snowmass Institute</u>. (6th Annual Conference on Service Line Management, Chicago, IL October 7, 2002).

"Consumerism and Health System Implications: The Emperor Has No Clothes", <u>The Leadership Institute</u>. (Roundtable Kickoff, Millennium Group, Charleston, SC October 3, 2002).

"Employer of Choice", <u>The Leadership Institute</u>. (Roundtable Kickoff, Millennium Group, Chicago, IL June 6, 2002).

"Code Blue: The Bay Area Healthcare Market on Alert", <u>Stanford Hospital and Clinics</u>. (Center for Education Conference, Palo Alto, CA April 17, 2002).

## BDC ADVISORS, LLC

*Exhibit 3*

*Bibliography*
*Page 3*

"A Call to Arms: Provider Power in a Reshaping Industry", The Leadership Institute. (Roundtable Kickoff, Millennium Group February 7, 2002).

"Pathway to Clinical Performance and Profit Improvement Through Service Line Management", The Snowmass Institute. (5th Annual Conference on Service Line Management, Denver, CO October 8, 2001).

"Designing and Implementing a Clinical Service Line", The Snowmass Institute. (5th Annual Conference on Service Line Management, Denver, CO October 8, 2001).

"Building a High Performance Care Delivery System", The Leadership Institute. (Foundtable Kickoff, Millennium Group, San Francisco, CA October 4, 2001).

"Enhancing Service Line Profitability", The Snowmass Institute. (4th Annual Conference on Service Line Management, Alexandria, VA. October 9, 2000).

"Health System Asset Portfolio Management", The Governance Institute. (National Conference, Scottsdale, AZ. March 27, 2000).

"Enhancing Service Line Profitability", The Snowmass Institute. (3rd Annual Conference on Service Line Management, Atlanta, GA. October 20, 1999).

"Health System Asset Portfolio Management", The Governance Institute. (National Conference, San Francisco, CA. September 20, 1999).

"Focused Factories," Duke Endowment. (Keynote Address for 25th Annual Health Care Conference, Charlotte, NC. May 7, 1998).

"Fundamentals of Payor Strategy: Pyramid Health Case Study," Wharton Graduate School of Business. (Health Care Systems, Course 381, Philadelphia, PA. September 18, 1997).

"Payor Strategy at Advocate HealthCare," with Charles Francis. National Managed Health Care Congress. (Executive Briefing Series, Orlando, FL. September 27, 1996).

"Fundamentals of Payor Strategy," The Snowmass Institute. (21st Annual Conference Faculty, Aspen, CO. July 31-August 3, 1996).

"Specialist Integration," The Snowmass Institute. (21st Annual Conference Faculty, Aspen, CO. July 31-August 3, 1996).

"Capitation Techniques in Managed Healthcare," University of California, Berkeley. (One-Day Workshop, Berkeley, CA. June 5, 1996).

"Case Studies in Physician/Hospital Integration," National Association of Medical Staff Services. (18th Annual Conference, Chicago, IL. October 27, 1994).

"Provider Reimbursement and Risk Sharing," Premier Health Alliance. (Keynote Address for Semi-Annual Conference, Chicago, IL. October 19, 1994).

"Basics of Capitation and Risk Sharing," Utah Medical Group Management Association. (Fall Meeting, Provo, UT. October 14, 1994).

"Mastering the Art of Physician/Hospital Partnerships," The Snowmass Institute. (19th Annual Conference Faculty, Aspen, CO. August, 1994).

"Physician / Hospital Integration Models," Snowmass Institute. (18th Annual Conference Faculty, Aspen, CO. August, 1993).

**EBITDA Improvement Opportunity**
Total Opportunity



EXHIBIT

4

| COMPARATIVE SUMMARY OF EBITDA IMPROVEMENT ($000s) | | | | |
|---|---|---|---|---|
| **DVOG** | **DVOG and AIHG Total EBITDA for FYE 6/30/96, adjusted** | **FYE 97** | **FYE 98** | **FYE 99** |
| Restated EBITDA - Singleton Report | $ 38,129 | $ 38,129 | $ 38,129 | $ 38,129 |
| Restated EBITDA Adjustments - Corrected | | | | |
| External Market Impacts | | (4,618) | (21,584) | (31,261) |
| Unaccounted Implementation Costs | | | | |
| Severance costs | | (104) | (487) | (695) |
| Consulting Turnaround fees | | (1,500) | - | |
| Restated EBITDA Adjustments - Corrected | $ 38,129 | 31,907 | 16,058 | 6,173 |
| | | | | |
| EBITDA Improvements | | | | |
| Supply Management - Singleton Report | | 4,107 | 12,778 | 18,254 |
| Supply Management - Corrected | | - | - | - |
| | | | | |
| Productivity - Singleton Report | | 14,148 | 44,015 | 62,878 |
| Productivity - Corrected | | 989 | 4,616 | 6,595 |
| | | | | |
| Case Management - Singleton Report | | 573 | 1,782 | 2,546 |
| Case Management - Corrected | | 205 | 954 | 1,363 |
| | | | | |
| Revenue Cycle - Singleton Report | | 7,274 | 22,632 | 32,331 |
| Revenue Cycle - Corrected | | 1,641 | 7,659 | 10,942 |
| | | | | |
| Discretionary Spending - Singleton Report | | 1,720 | 5,350 | 7,642 |
| Discretionary Spending - Corrected | | 631 | 2,946 | 4,209 |
| | | | | |
| Total DVOG EBITDA Improvements - Singleton Report | | 27,822 | 86,557 | 123,651 |
| Total DVOG EBITDA Improvements - Corrected | | 3,466 | 16,176 | 23,109 |
| | | | | |
| **AIHG** | | | | |
| EBITDA adjusted for improvements - Singleton Report | (36,659) | (45,459) | (45,459) | (45,459) |
| | | | | |
| **Combined EBITDA adjusted for improvements - Singleton Report** | 1,470 | 20,492 | 79,227 | 116,321 |
| **Combined EBITDA adjusted for improvements - Corrected** | 1,470 | (10,086) | (13,225) | (16,177) |