1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

2

3

4    THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALLEGHENY HEALTH,

5    EDUCATION & RESEARCH FOUNDATION,

6        Plaintiff,

7    vs.                          No. 00-684

8    PRICEWATERHOUSECOOPERS, L.L.P.,

9        Defendant.

10

11

12

13      VIDEOTAPED DEPOSITION OF RICHARD H. DANIEL

14        Taken on behalf of the Defendant

15             October 10, 2003

16

17                 - - -

18

19      BE IT REMEMBERED THAT, pursuant to the Federal Rules

20    of Civil Procedure, the deposition of RICHARD H. DANIEL

21    was taken before Tim Bellisario, a Certified Court

22    Reporter and a Notary Public for the State of Washington,

23    on October 10, 2003, commencing at the hour of 9:13 a.m.,

24    the proceedings being reported at 601 Union Street, Suite

25    1624, Seattle, Washington.

Richard Daniel

138

1 funds came from your attendance at the AHERF audit committee
2 meeting?
3   A.  Probably.
4   Q.  So you don't recall specifically, but you
5 definitely recall that you were aware of the use of
6 AGH-funded depreciations to pay for --
7   A.  I think this is the first time I heard about it.
8   Q.  Do you believe you would have heard about it in
9 the context of being a member of either the AGH resource
10 management committee or the AHERF audit committee?
11   A.  Not necessarily.
12   Q.  In what other context could you have envisioned
13 learning of this, Mr. Daniel?
14   A.  Only if someone else told me.  I don't know how
15 I would have none.  Sooner or later it was going to come
16 out.  I mean, it was too important a transaction to lie
17 there and not have somebody be made aware of it.  This was
18 being made aware of.
19   Q.  Do you have any reason to believe that this
20 information was only imparted to you to the exclusion of any
21 other members of the AHERF audit committee, the AHERF parent
22 board or the AGH resource management committee?
23       MR. UNICE:  Objection, lack of
24 foundation.
25   A.  No.

139

1   Q.  So it's your understanding that the other members
2 of the audit committee and the AGM resource management
3 committee were aware of this transfer as well?
4   A.  Yes.
5       MR. UNICE:  Do you mean is that what
6 the minutes say, was that your question, Avi?
7       MR. LUFT:  I think he answered my
8 question.
9       THE WITNESS:  If I knew it, they knew
10 it.
11   Q.  Did you ever have any personal conversations with
12 Mr. Abdelhak?
13   A.  Yes.
14   Q.  About how many times do you believe you just
15 spoke to Mr. Abdelhak, just the two of you?
16   A.  Two or three times.
17   Q.  Were those before the acquisition of Forbes or
18 after the acquisition of Forbes, or a combination?
19   A.  I don't remember.
20   Q.  Do you recall if you had a view of Mr. Abdelhak's
21 capabilities as a CEO when you were a member of the AHERF
22 audit committee?
23   A.  I was developing one, yes.
24   Q.  And what view were you developing of Mr. Abdelhak?
25   A.  That he was a very controlling CEO.

140

1   Q.  Do you recall if that manifested itself in how he
2 acted?
3   A.  Yes.
4   Q.  How so?
5   A.  He dominated virtually every meeting he was at.
6   Q.  Including the audit committee meetings you
7 attended?
8   A.  Yes.
9   Q.  Do you recall if Mr. Abdelhak was responsive to
10 other people's ideas?
11   A.  I would have no way of knowing.
12   Q.  Do you recall ever being in a situation where
13 people raised suggestions other than what Mr. Abdelhak was
14 advocating?
15   A.  No.
16   Q.  Do you recall ever hearing any members of the
17 Board of Trustees or one of the committees of the Board of
18 Trustees ever criticize Mr. Abdelhak in public?
19       THE WITNESS:  In public?
20       MR. LUFT:  Yes.
21   A.  No.
22   Q.  Do you recall ever hearing one of the members of
23 the audit committee or a member of the Board of Trustees
24 ever raising questions in public about how Mr. Abdelhak was
25 handling a matter relevant to AHERF?

141

1   A.  No.
2   Q.  Do you recall if you ever found that odd, that no
3 one was ever raising any questions about any of the
4 decisions that Mr. Abdelhak was making?
5       MR. UNICE:  Objection, mischaracterized
6 his prior testimony.
7   A.  I didn't find it odd.
8   Q.  Why not?
9   A.  He wouldn't allow it.
10   Q.  What do you mean, "he wouldn't allow it"?
11   A.  People would not do it in public.  You said
12 "public" in each one of these questions.
13   Q.  Yes.
14   A.  And people working for Mr. Abdelhak, I figured
15 out, would not criticize him in public.
16   Q.  When you say people working for him, you're
17 referring to AHERF management?
18   A.  Yes.
19   Q.  They wouldn't question him in public?
20   A.  Yes.
21   Q.  How about members of the audit committee, would
22 they be willing to question Mr. Abdelhak in public?
23       MR. UNICE:  Objection, lack of
24 foundation.
25       THE WITNESS:  In public?

36 (Pages 138 to 141)

### Page 142

1   MR. LUFT: Yes.
2   A. Not to my knowledge.
3   Q. Do you know of any reason why independent members
4   of the audit committee wouldn't want to -- would feel that
5   they couldn't question Mr. Abdelhak in public?
    A. It's not the role of a committee member.
    Q. You don't believe it to be the role of a
committee member if they have a different opinion than the
CEO, to question the CEO?
    A. They do it in the context of the corporation, not
in public.
    Q. And by "public," I mean public meetings.
    A. So do I.
    Q. So it is your opinion that it is not the role of
a member of a committee of a board to raise disagreements
they have with the CEO at meetings of that committee?
    A. Oh. I've been referring to AHERF. The answer to
that question is yes.
    Q. Okay. So in general you believe it's the role,
but at AHERF, there wasn't the role of the committee
members.
    A. That's correct.
    Q. Now, in your opinion --
    A. From what I saw.
    Q. Obviously. I'm only asking about your opinion and

### Page 143

your understanding.
    A. Okay.
    Q. And from your perspective, what accounted for that
difference between what you would expect to be right at
other corporations, and what in fact was happening at AHERF?
    A. A term I used before. Abdelhak was a dominant
CEO, to the extreme.
    Q. So he was dominating the Board?
         MR. UNICE: Objection, lack of
foundation.
    A. He was dominating every meeting that I was
involved in.
    Q. Do you recall ever talking to any other members
of the AHERF Board of Trustees or the AHERF audit committee
about Mr. Abdelhak's dominating personality and domination of
meetings he attended?
    A. Yes.
    Q. Who did you speak to about this?
    A. Ira.
    Q. That would be Ira Gumberg?
    A. That would be.
    Q. Do you recall what Mr. Gumberg said in response?
    A. Yes.
    Q. What did Mr. Gumberg say?
    A. He shared my concern.

### Page 144

1   Q. He also feared that Mr. Abdelhak was dominating
2   the meetings he attended?
3   A. That's correct.
4   Q. Do you know if Mr. Gumberg indicated to you that
5   he had ever spoken to anyone else about his concern about
6   Mr. Abdelhak's domination?
7   A. I don't recall that he did.
8   Q. Do you recall if Mr. Gumberg ever took any action
9   in response to his belief that Mr. Abdelhak was dominating
10  the meeting that he was in attendance at?
11  A. No.
12  Q. Did you ever take any action in response to Mr.
13  Abdelhak's domination of meetings?
14  A. No.
15  Q. Was that partially because you were off the audit
16  committee before you had ever had an opportunity to take any
17  action?
18      MR. UNICE: Object to form.
19      THE WITNESS: Well, you're asking the
20  question now at a time in which I'm no longer affiliated
21  with AHERF.
22      MR. LUFT: What I'm asking is: Do you
23  believe that if you had not been excused from your duties
24  on the audit committee so quickly, you may have chosen to
25  take action in the future against this problem that you

### Page 145

1   perceived?
2       MR. UNICE: Object to form.
3   A. I don't know. Probable, but I wouldn't know,
4   because that time hadn't come.
5   Q. Do you believe that your removal from the AHERF
6   audit committee was in fact partially motivated by a concern
7   that you felt that there was a problem with Mr. Abdelhak's
8   domination of the meetings he was in attendance at?
9       MR. UNICE: Object to form; lack of
10  foundation.
11  A. That's not the conclusion I came to.
12  Q. The conclusion you came to was that you were
13  asking too many questions?
14  A. That's correct.
15  Q. At the audit committee meetings at which you were
16  in attendance, would you say they were characterized by more
17  or less discussion amongst the committee members than there
18  was at the finance committee at Forbes?
19      MR. UNICE: Objection, vague.
20      THE WITNESS: I don't know what the
21  real question is.
22      MR. LUFT: Well, then, let me ask it
23  again.
24      THE WITNESS: Change it so that I can
25  understand it.

Richard Daniel

### Page 146

1  MR. LUFT: Sure.
2  Do you believe the meetings of the
3  audit committee of AHERF typically had more or less
4  discussions than the meetings of the finance committee of
5  Forbes prior? And by "the finance committee of Forbes," I'm
6  referring to prior to the acquisition by AHERF.
7  MR. UNICE: Same objection.
8  A. I've got no way of knowing that. Because (a), I
9  was not the Chairman of the audit committee, but would have
10 dealt with O'Connell. Whereas, I was Chairman of the
11 finance committee at Forbes, and I dealt with Moyer.
12 Q. How about discussion amongst the trustees at the
13 meetings?
14 A. I don't think there was -- the two I went to, I
15 don't think there was any discussion amongst the members of
16 the committee. It was basically a dialogue between the
17 staff and the committee as a whole with questions and
18 answers going back and forth to staff, not amongst the
19 committee members.
20 Q. And this is of the two AHERF audit committee
21 meetings?
22 A. That's correct.
23 Q. So if I understand you correctly, there wasn't so
24 much discussion amongst the various members of the
25 committee, as much as there was almost a question-and-answer

### Page 147

1  between the invitees, who were the AHERF management, and the
2  committee members?
3  A. That is correct.
4  Q. Was that similar to what took place on the Forbes
5  healthcare system finance committee to which you were the
6  chair?
7  A. No.
8  Q. What was it like at the Forbes finance committee?
9  A. One of the roles of the Chairman of the committee
10 was to make sure that the members of the committee
11 understand what's going on. And I felt that was my role at
12 Forbes, is to have Moyer and I lay out the facts, and then
13 how they were being dealt with, and open it up to them for
14 questions. Hence, there were times when discussions went
15 back and forth between other members of the committee. It
16 didn't happen that way in the two committees at AHERF that
17 I attended.
18 Q. Do you recall if you thought it was problematic
19 that AHERF did not have that type of internal dialogue
20 between the committee members at the meetings at which you
21 were in attendance?
22 A. Yes.
23 Q. Did you ever voice that concern to anyone?
24 A. Yes.
25 Q. To who?

### Page 148

1  A. Ira.
2  Q. Do you recall what Mr. Gumberg's response was?
3  A. He shared it.
4  Q. Do you know if Mr. Gumberg took any action in
5  response to --
6  A. You've already asked me that question.
7  Q. Well, I'm specifically asking with regard to this.
8  A. The answer is no.
9  Q. You don't know if he took any.
10    Did you ever raise it with the head of
11 the audit committee, Mr. Barnes?
12 A. I don't recall that I did. I might have, but I
13 don't recall it.
14 Q. Why did you believe it would be important, when
15 you were the Chairman of the Forbes finance committee, for
16 the committee members to have the opportunity to discuss the
17 ideas between themselves and not just have management talk
18 to the committee members and committee members have a chance
19 to ask questions of management?
20 A. That's the committee's function, is the committee
21 is supposed to discuss an issue and arrive at a conclusion,
22 a collective conclusion.
23 Q. And on the --
24 A. And you have to have a discussion in order to do
25 that.

### Page 149

1  Q. And on the AHERF audit committee, that wasn't
2  happening?
3  A. That's correct.
4  Q. Do you recall that prior to committee meetings you
5  would be sent a fairly sizeable set of materials that would
6  be discussed at the coming committee meetings?
7  A. I remember receiving lots of information, not
8  necessarily all of it to be discussed. Because with all
9  that information, it would have lasted all day.
10 Q. And the meetings, they were only slotted for what,
11 like two hours?
12 A. Or less.
13 Q. Or less.
14    Do you recall how far in advance of the
15 two meetings you received all that material?
16 A. No.
17 Q. Do you recall if there was a presumption that you
18 would have reviewed all that material before you showed up
19 at the meeting?
20 A. I have no idea what they presumed.
21 Q. Do you recall if you were able to review all that
22 material before you attended the meeting?
23 A. I did.
24 Q. Do you believe that all the other members of the
25 audit committee also reviewed it?

38 (Pages 146 to 149)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## ALFRED W. MARTINELLI
*May 5, 2004*

---

## LEGALINK MANHATTAN
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

MARTINELLI, ALFRED W.



LEGALINK
A WORDWAVE COMPANY

Page 49

Alfred W. Martinelli

2  A  You know, looking after their
3  interest and making sure that the whole --
4  that the entire situation was going to work
5  out the way it should. And we had some good
6  board meetings and the Allegheny Hospital was
7  really quite advanced in a lot of different
8  ways so it looked like an ideal merger. I
9  mean, after -- there was nothing that happened
10 in the following two or three years that made
11 me change my mind that this wasn't an ideal
12 situation.
13    Q  Earlier you testified about your
14 view as to the role of the Board of Trustees
15 at Hahnemann with respect to strategy. And is
16 that also your view with respect to the role
17 of the trustees on the AHERF board that you
18 served?
19         MS. MEADEN: Objection as to
20    form.
21         MR. McCLENAHAN: You can
22    answer.
23 BY MR. FRIESEN:
24    Q  That's one of those objections that
25 you might hear. I'm surprised that it's taken

Page 50

Alfred W. Martinelli

2  this long, but you can still answer the
3  questions.
4         MR. McCLENAHAN: She can make
5    up for lost time.
6         MS. MEADEN: Very quickly.
7  BY MR. FRIESEN:
8     A  I think that's the role of every
9  board. I will have to comment the boards were
10 quite large.
11    Q  The AHERF boards?
12    A  All nonprofit boards are quite large
13 and they're large because the nonprofit -- one
14 of the things they help the board to do is to
15 help with the endowment problems and to bring
16 money in one way or another. But the trouble
17 you have as a practical matter, when you have
18 a board that large, it's quite difficult to
19 kind of function the way you'd like to. Now,
20 most corporate boards are like one-tenth the
21 size of the nonprofit boards.
22    Q  Expand on what you said about the
23 need for endowments having an impact on the
24 size of the board. How does that dynamic
25 happen?

Page 51

Alfred W. Martinelli

2  A  Because the trustees are expected to
3  be helpful in either putting some money up or
4  telling the endowment people where to go to
5  get it. So it increases --
6    Q  And the more trustees means more
7  money for the endowment?
8    A  Absolutely. When you serve on a
9  board, you're intended to -- you know, you
10 don't take those jobs because of your business
11 acumen. You take the job because you can help
12 them out. And, in fact, that's what I did at
13 Hahnemann, gave them a lot of money.
14    Q  When you first met with Mr. Abdelhak
15 and I think you said Mr. Snyder was there as
16 well?
17    A  Right. They were both present at
18 all the meetings initially.
19    Q  Did either Mr. Abdelhak or
20 Mr. Snyder explain any vision that they had
21 for the AHERF system as a whole going forward?
22    A  Other than -- no, not other than the
23 merger. I mean, the merger itself was the
24 strategy. I mean, getting the two together
25 and bringing forth all the synergies that

Page 52

Alfred W. Martinelli

2  existed between the two companies, I mean,
3  that was the immediate strategy, and, as far
4  as I was concerned, the long-term strategy.
5    Q  I want to show you a document that's
6  previously been marked as Exhibit 1407. This
7  says Hahnemann University Strategic Plan Final
8  Draft, January 17, 1991. I'll give you a
9  chance to look at this, Mr. Martinelli, but my
10 first question is whether you recognize this.
11   A  I remember it, but I don't remember
12 the detail in recognizing it, you know.
13        MR. McCLENAHAN: So this would
14    have been about three years before the
15    merger?
16        MR. FRIESEN: Two or three
17    years before the merger.
18 BY MR. FRIESEN:
19    Q  You'll see that your name is listed
20 along with Mr. Paroo, Igbal Paroo, on the
21 letter.
22    A  Yes.
23    Q  That's at Pages 499 and 500. Is
24 this part and parcel of the process that you
25 described earlier?

LEGALINK MANHATTAN (212) 557-7400

Page 53

Alfred W. Martinelli

A  Exactly, exactly. This is one of the results that we had from dealing with that.

Q  If you could go to the second -- well, let me give you a chance to read through the letter that your name is on because I'm sure it's been a while since you've seen this, but the letter on Page 499 and 500.

MR. McCLENAHAN: He wants you to read those two pages.

A  He refers to that retreat. That was where we took everybody out and discussed everything.

Q  That's the one in Maryland?

A  Right, I think that was the one.

Q  Was the retreat --

MR. McCLENAHAN: Let him finish the letter before we ask questions.

A  Okay.

Q  Was the retreat your idea or somebody else's idea?

MR. McCLENAHAN: If you remember.

A  And it's one of those things it's

Page 54

Alfred W. Martinelli

hard to say who actually thought of it. It was a practice we used at Penn Central taking the directors away. So whether I suggested it to Igbal, he suggested it to me, I can't say. It's something we both agreed would be a good idea.

Q  And management was also at this retreat?

A  I think certain people were. I'm not sure. I think it was primarily the directors. There were some key management people, but I can't recall that.

Q  If you look at the page ending in 500, the second page of the letter --

A  Yes.

Q  -- the fourth paragraph down says: "Successful organizations share one simple quality - shared vision, singleness of purpose."

I take it you still believe that that's true?

A  Uh-huh.

Q  I'm sorry. You're going to have to say --

Page 55

Alfred W. Martinelli

A  Yes.

Q  -- yes instead of uh-huh for the record. And when you arrived on the AHERF board in late 1993 or early 1994, did AHERF have a shared vision and singleness of purpose?

MS. MEADEN: Objection.

A  At that point in time, I thought they did. And what it was was to have this medical school function -- this consolidation and the medical school and to extract all of the various synergies that were present by putting this merger together. The Allegheny General Hospital was an outstanding school doing a lot of things at the cutting edge of medicine. And so those were the kinds of things that we were focused on more often and how to bring those and to share the kind of expertises that were here in Philadelphia with the ones that were in Pittsburgh and vice versa. So it was more of that type of situation.

Q  Did that -- withdraw.

What was your impression of

Page 56

Alfred W. Martinelli

Mr. Abdelhak when you first met him?

A  He was an individual that had come up through the ranks, knew with incredible detail the workings of what was going on at the hospital, was a hands-on kind of manager, someone that was uniquely qualified to do what he was doing and so got there by earning his way up.

Q  You were impressed with him?

A  Very much so.

Q  And what was your impression of Mr. Snyder when you first met him? Let me just -- was that the first time you had met --

A  Yes, yes.

Q  -- both of these gentlemen?

A  And I, you know, didn't have a view of -- I think my first impression was as chairman I thought they were probably a pretty good team, but it subsequently appeared that Bill sort of let Sherif kind of run the show. I wasn't sure how much influence he had over him.

Q  When did you first come to think that?

14 (Pages 53 to 56)

**Page 57**

Alfred W. Martinelli

2  A  After several meetings, watching
3  them, having several meetings with them
4  together.
5  Q  So this would be not too long after
6  you joined the board?
7  A  I don't know, but it was clear that
8  Sherif was a very forceful and strong leader.
9  Q  And this was apparent to you just by
10 observing them at board meetings?
11 A  And being with them, the two of them
12 together, really just watching the two of them
13 operate.
14 Q  Was it your sense that the other
15 trustees at the AHERF board meetings also let
16 Mr. Abdelhak run the show?
17       MS. MEADEN:  Objection.
18       MR. McCLENAHAN:  Objection.
19 What do you mean, was it his sense?
20 BY MR. FRIESEN:
21 Q  Is that what you thought?
22       MS. MEADEN:  Same objection.
23       MR. McCLENAHAN:  Same
24 objection.
25 A  Well, again, it's hard for me to

**Page 58**

Alfred W. Martinelli

2 conclude what the other directors all thought.
3 All I can tell you is that Sherif was a strong
4 leader.  And whether the -- I can't speak for
5 everybody else on the board and what they
6 thought.
7       MR. FRIESEN:  Why don't we take
8  a quick break.
9       THE VIDEOGRAPHER:  We are now
10 going off the video record.  The time is
11 10:16.
12      (Short recess.)
13      THE VIDEOGRAPHER:  We are back
14 on the video record.  The time is 10:27
15 a.m.
16 BY MR. FRIESEN:
17 Q  Mr. Martinelli, are there any
18 specific incidents or interchanges that come
19 to mind in terms of your coming to believe
20 that Mr. Snyder let Mr. Abdelhak run the show?
21      MS. MEADEN:  Objection.
22 A  I really can't, you know, put my
23 finger on that.  It was just a general
24 impression of one man was strong and the other
25 one was silent, but that didn't mean that when

**Page 59**

Alfred W. Martinelli

2 they were together that changed.  So I don't
3 really have a sense of that.  I can't really
4 answer that truthfully.
5 Q  Did your impression that you just
6 described concern you at all?
7 A  No.  I mean, I think a strong chief
8 executive is a good thing because he's the one
9 who spends his full time doing what he's
10 supposed to be doing.
11 Q  Were you on any committees of the
12 AHERF parent board?
13 A  I may have been.  I just don't
14 recall.
15 Q  Apart from the AHERF Board of
16 Trustees, which other boards relating to the
17 AHERF entities and MCP-Hahnemann do you recall
18 being on after the merger between AHERF and
19 Hahnemann?
20 A  I think I was still involved with
21 the medical school.  That's my recollection.
22 I think I had a continuous role with the
23 medical school.
24 Q  And when, if ever, did you leave the
25 board of the medical school?

**Page 60**

Alfred W. Martinelli

2 A  When the bankruptcy -- we stayed all
3 the way through.
4 Q  After the bankruptcy filing?
5 A  Yeah.
6 Q  Can you remember being on any
7 committees of the medical school board?
8 A  I really don't.
9 Q  As a member of the AHERF parent
10 board, would you regularly be provided with
11 financial information from management?
12 A  I'm sure we were.  I don't -- it's
13 hard to remember specifically, but I'm sure
14 that material came in.  I know there were
15 dockets prepared and those kinds of things.
16 Q  And when you say "dockets," what
17 exactly are you referring to?
18 A  A board book.
19 Q  And would you find it helpful to
20 read through the board book prior to meetings?
21 A  I always did.
22 Q  Do you remember how long before an
23 AHERF board meeting board books would get to
24 you typically?
25 A  My recollection was not very --



## SETTLEMENT AGREEMENT

This Settlement Agreement (this **"Settlement Agreement"**) is made as of the 15th day of January, 2002 (the **"Execution Date"**), by and among the AHERF Benefit Plans (as that term is defined below) and the **"Settling Parties,"** which shall mean, collectively, the Settling Claimants, the AGH Affiliates, the Settling Directors and Officers, Mellon, and the Settling Insurers (as those terms are defined below).

### INTRODUCTION

As used herein,

I.  **Settling Claimants**

   A.  **Allegheny Health Education and Research Foundation and its debtor estate (collectively, "AHERF"); Allegheny University of the Health Sciences and its debtor estate (collectively, "AUHS"); Allegheny University Medical Practices and its debtor estate (collectively, "AUMP"); Allegheny Hospitals, Centennial and its debtor estate (collectively, "Centennial"); and Allegheny University Hospitals-East and its debtor estate (collectively, "AUH-E")** (AHERF, AUHS, AUMP, Centennial, and AUH-E are hereinafter collectively referred to as the **"AHERF Estates"**), and Allegheny Healthcare Services Providers Insurance Company (**"AHSPIC"**). The AHERF Estates and AHSPIC are herein collectively referred to as the **"AHERF Affiliates."** The AHERF Affiliates, together with all of their present or former parent companies, affiliates, subsidiaries, departments, divisions, predecessors, successors, assigns, agents, and representatives, in their capacities as such, but excluding the AGH Entities (as that term is defined in Paragraph II below), the AUH-W Companies (as that term is defined in Paragraph I.B below), the SDN Companies (as that term is defined in Paragraph I.C below) and any other Settling Party, shall be collectively referred to herein as the **"AHERF Companies."**

   B.  **Allegheny University Hospitals-West ("AUH-W").** AUH-W, together with all of its present or former controlled affiliates, subsidiaries, departments, divisions, predecessors, successors, assigns, agents, and representatives, in their capacities as such, which shall not be construed to include any of the AHERF Companies, the SDN Companies, the AGH Entities, and/or any other Settling Party, shall be collectively referred to herein as the **"AUH-W Companies."**

   C.  **SDN, Inc. formerly known as U/G Holding, Inc. ("SDN").**[1] SDN, together with all of its present or former controlled affiliates, subsidiaries,

---

[1]  Unless SDN subsequently becomes a signatory to this Settlement Agreement, the Settling Parties and the AHERF Benefit Plans acknowledge and agree that SDN is not and may never become a signatory to this Settlement

CO-1086785v38

Section 4 or the Additional AHERF Insured Release to the contrary, no Settling Party or Additional Releasor/Releasee shall be considered to be acting on behalf of or having the authority to act on behalf of any other individuals or organizations that are Settling Parties or Additional Releasors/Releasees in granting the releases described in this Section 4 or in the Additional AHERF Insured Release.

(iii) With the exception of Section 4.q(i), nothing in this Section 4 shall create, compromise, limit or impair the rights of: (A) persons or organizations who are not signatories to this Settlement Agreement or to an Additional AHERF Insured Release, including but not limited to (1) such nonsignatory persons or entities who were or are insureds under Ancillary Policies or to whom Ancillary Policies were issued, or (2) Committee members that sign this Settlement Agreement on behalf of the Committee; or (B) the Settling Parties or Additional Releasors/Releasees with respect to any policy or portion of a policy issued to non-signatories, or to Committee members that sign this Settlement Agreement on behalf of the Committee, that has not been released.

(iv) Except as otherwise provided in this Settlement Agreement with respect to those creditors of the AHERF Estates who are parties to this Settlement Agreement or the Additional AHERF Insured Release, acting in their capacity as such, this Settlement Agreement shall not be construed as effecting a release of any individual or organization, including but not limited to the AGH Entities or the Settling Insurers or Non-Settling Insurers, by the members of the Creditors Committee or by creditors of the AHERF Estates, respectively, in their individual capacities. For purposes of this Settlement Agreement, **"Non-Settling Insurers"** shall mean National Union Fire Insurance Company of Pittsburgh, PA, Reliance Insurance Company and Continental Casualty Company.

(v) Nothing in this Section 4 shall be construed to release or limit the Settling Insurer Companies' or, derivatively under Section 8, the Trustee's rights to assert against anyone who is not a Settling Party or an Additional Releasor/Releasee any Claim(s) or defense(s) to coverage or grounds for rescission or avoidance of coverage under the Settled Policies, including but not limited to the assertion of affirmative claims and causes of action pertaining to the procurement of any of the Settled Policies.

(vi) Nothing in this Settlement Agreement shall be construed to create coverage under any policy issued by the Settling Insurer Companies that would not otherwise exist pursuant to the policy's terms and applicable law.

(vii) Releases between and among the Settling Directors and Officers, the AHERF Affiliates, the Trustee, the Committee and the AGH Affiliates

CO-1086785v38                                60

and the <u>Spitzer</u> Class Action Plaintiffs are contained, to the extent provided, in the <u>Spitzer</u> Class Settlement Stipulation (as that term is defined in Section 12.d, below).

5. <u>Withdrawals and Dismissals</u>. As of the Effective Date, the Settling Parties will have respectively withdrawn and dismissed with prejudice all Claims set forth on <u>Schedule 5A</u> filed by them, including any proofs of claim filed in the bankruptcy proceeding of the AHERF Estates in connection with such Claims other than those proofs of claim described on <u>Schedule 5B</u>. Thereafter, each Settling Party respectively will seek to obtain the dismissal as to the Settling Parties of all other Claims being released by them under this Settlement Agreement and covenants and agrees never to (i) commence, prosecute, deliberately and actively assist, authorize, or (ii) voluntarily aid in any way, in each case any Claim against any individual or organization receiving a release under this Settlement Agreement or the Additional AHERF Insured Release (collectively, the **"Releasees"**) that has been released by such Settling Party in Section 4 of this Settlement Agreement or in the Additional AHERF Insured Release. However, a Settling Party is not precluded from waiving service of process requirements or appearing at trial in a matter in which that Settling Party has given deposition testimony. Each Settling Party hereby covenants and agrees to pay all reasonable expenses and fees, including, without limitation, attorneys' fees, incurred by any of the Releasees in connection with any Claim asserted by such Settling Party against such Releasee and based upon any Claim against such Releasee that is being released by such Settling Party in this Settlement Agreement.

6. <u>Participation in Other AHERF Proceedings</u>.

   a. *By Settling Directors and Officers.* As of the Effective Date and unless otherwise required by law and subject to the provisions of Section 7, each Settling Director and Officer agrees that, upon the reasonable request of the Committee, he/she will appear for a reasonable period of time and at a reasonable time and place located within one hundred miles of his/her home, provided that the same is located within the continental United States of America and, if not, then in Pittsburgh, Pennsylvania, as reasonably designated by the Committee or at such other time and/or other location as the Committee and such Settling Director or Officer may agree without compulsory process, on reasonable notice by the Committee to provide information and/or documents, sworn statements, deposition testimony and/or trial testimony, subject to his or her constitutional rights, in connection with still-pending or subsequently initiated AHERF Claims and that such participation shall be without compensation or reimbursement of any kind. Any disputes as to the obligations of a Settling Director and Officer under this Section 6 shall be expeditiously determined after hearing by an arbitrator mutually and reasonably acceptable to the Settling Parties or, if the parties cannot agree on such person within seven (7) business days of receipt of a

CO-1086785v38    61

written notice of a request for a hearing, by a person appointed by the District Court (the "**arbitor**"). The hearing on the issue shall be held in Pittsburgh, Pennsylvania as soon as practicable after written notice of the request for the same has been given to the arbitor, the subject Settling Director or Officer, and the Committee. Any parties to the proceeding may participate by telephone. The ruling of the arbitor shall be deemed to constitute an order of the District Court, and the Committee and Settling Directors and Officers consent to the entry of an order by the District Court adopting the arbitor's determination. Any party to the proceeding may compel compliance with such order in the same manner as it would compel compliance with any other order of the District Court. Nothing herein is intended to nor shall be construed to limit the right of any party to the proceeding to appeal such District Court Order, nor shall any party be deemed in breach of such District Court Order while an appeal thereof is pending.

b.  *By Mellon and Settling Insurers and AGH.* The Settling Insurers, Mellon and AGH designate the following individuals as persons whom the Committee may contact with requests for information and/or documents, sworn statements, deposition testimony and/or trial testimony in connection with still-pending or subsequently initiated proceedings, issues, disputes or claims related to the AHERF Entities or, prior to August 1, 1999, the AGH Entities and their respective operations:

For Federal Insurance Company:

Merril Hirsh, Esq.
Ross, Dixon & Bell, L.L.P.
2001 K St, N.W.
Washington, D.C. 20006

and

Directors and Officers Liability Claims
Manager Worldwide Claims
Chubb Group of Insurance Companies
15 Mountain View Road
Warren, New Jersey 07059

For Executive Risk Indemnity Inc:

Michael J. Rosen, Esq.
Peterson & Ross
200 East Randolph St., Suite 7300
Chicago, IL 60601-6969

and