**College of Healthcare Information Management Executives**

# HIPAA Progress Status for COMPARE Level Four

Many healthcare organizations report insufficient progress when compared to the HIPAA privacy and transaction and code set deadlines, as detailed in our COMpliance Progress And Readiness methodology.



**SUMMARY**

**Key Issue**
How will changes in the regulatory, societal or technological arenas alter the importance or position of healthcare IT and the IS department?

### Background

In February 2003, Gartner completed its seventh U.S. Health Insurance Portability and Accountability Act (HIPAA) survey since November 2000. The COMpliance Progress And Readiness (COMPARE) methodology, described in "HIPAA COMPARE Methodology and Panel for February 2003," divides progress indicators into five levels:

- Level 1: Orientation and project organization
- Level 2: Assessment
- Level 3: Analysis and planning
- Level 4: Development
- Level 5: Implementation and ongoing development

Although this data is three months old, Gartner's ongoing conversations with clients and discussions at the May 2003 Workgroup on Electronic Data Interchange (WEDI) Summit indicate that it is still very relevant.

### COMPARE Level 4

Figure 1 shows the percentages of healthcare providers and healthcare payer organizations (payers) that had completed Level 4 activities when surveyed in August 2002, those that reported having completed the steps in February 2003 and those that reported they are currently engaged in the activity.

On average, 92 percent of payers and 85 percent of providers have completed or at least begun work on Level 4 items; however, only 35 percent and 28 percent, respectively, reported completion.

**Privacy.** Remarkably, the question on reassigning need-to-know classifications showed the least progress (see Note 1). Although the privacy deadline was only two months away when we asked these questions, 13 percent of payers and 38 percent of providers had not begun the task. More than half of those that had not begun the task answered "don't know," and most of the rest indicated that they were planning to work on the task during the next 12 months. These results are consistent with our conclusions drawn from examining the data from other COMPARE levels. A significant minority of all HCOs reached the 14 April 2003 privacy deadline with skeletal compliance programs in place.

**Transaction and Code Sets.** Virtually all respondents were still working on system modifications for transaction and code sets (TCS). The transaction deadlines were further away than privacy (eight months away when we started this survey). Nonetheless, these numbers are definitely a source of concern. It is also a concern that 23 percent of providers had not even begun to upgrade their systems or implement other system modifications.

At first glance, the low completion numbers seem to be an anomaly. In our Level 5 responses, a higher percentage of the same respondents indicated that they were ready to test at least the claim and remittance advice transactions with external trading partners. It is likely that respondents with multiple systems are in test with some systems and some transactions, even as they continue development for other transactions and other systems.

Providers are not forced to use electronic transactions. Because of this, health plans that are behind might try to find comfort in the small amount of progress reported by providers. This is not valid for claims, however, because many claims are already being sent electronically in non-HIPAA formats. The worst-case scenario is that many providers won't be ready and payers

**Figure 1**
**COMPARE Level 4 Indicators for August 2002 and February 2003**



Source: Gartner Research (May 2003)

> **NOTE 1**
>
> **Other Privacy Activities**
>
> Many of the activities involved with privacy are the development and implementation of policies and procedures. Our COMPARE scale deals with development in Level 3 and implementation in Level 5.

won't accept nonconformant electronic claims. In this scenario, the providers would create a flood of paper claims, greatly increasing payer backlogs. This scenario is addressed in "Contingency Planning for a Possible HIPAA Claims Crisis."

**Bottom Line:** The COMpliance Progress And Readiness Level 4 privacy indicators show that a many payer organizations and providers have rolled out approaches to privacy compliance that are less than thorough. This approach will pay off, but only if covered entities continue to work on privacy coverage after the deadline. The numbers for transaction and code sets remediation indicate a last-minute scramble to reach compliance. The risks are higher for TCS, because the measure of compliance is very objective – transactions either succeed or fail.

> **ACRONYM KEY**
>
> COMPARE   COMpliance Progress And REadiness
> HIPAA     U.S. Health Insurance Portability and Accountability Act
> TCS       transactions and code sets
> WEDI      Workgroup on Electronic Data Interchange

*Gartner Healthcare Executive and Management Strategies Research Note M-19-7033, W. Rishel, 9 June 2003.*

# HIPAA COMPARE Level Five: A Worst-Case Scenario Ahead

Widespread unreadiness for the HIPAA transaction and code set deadline creates the possibility of a crisis if many providers switch from electronic to paper claims, according to our latest COMpliance Progress And Readiness survey.

It is often said of IS projects that design and programming takes 90 percent of the schedule and "testing takes the other 90 percent." The sardonic observation seems to describe the progress that Gartner has found in its most recent U.S. Health Insurance Portability and Accountability Act (HIPAA) COMpliance Progress And REadiness (COMPARE) survey.

The survey, conducted in February and early March 2003, was the seventh iteration of Gartner's periodic surveys of HIPAA compliance. There were 166 participants in this iteration, comprising integrated delivery systems, stand-alone hospitals with at least 250 beds, physician groups of at least 30 physicians, health maintenance organizations with more than 10,000 members, large national preferred provider organizations, private health insurers and enterprises that operate as hybrids for HIPAA Administrative Simplification (AS). Gartner's provider and payer data are statistically valid to a margin of error of plus or minus 10 percent.

COMPARE Level 5 consists of implementation and ongoing development. That includes implementing policies and procedures and other compliance measures, testing and implementing software tools and applications, and establishing a formal process to address evolving requirements and improve the level of compliance. Here, we focus on a specific Level 5 concern, implementing the transactions. This implementation process requires testing with trading partners.

As shown in Figure 1, only 62 percent of health plans and 26 percent of healthcare providers had begun any external testing of the HIPAA claim transaction; 37 percent of health plans and 20 percent of providers had begun testing on the remittance advice. These figures represent the best case within a healthcare organization (HCO). A respondent could answer yes if only one of its several core applications had begun testing.

To further gauge testing progress, we asked what our respondents had heard



**Figure 1**
**Testing of Specific HIPAA Transactions as of February 2003**

Percentages of Respondents (0–100)
- 837 Claim
- 835 Remittance Advice
- 270/271 Eligibility
- 277/276 Claim Status
- 278 Referrals
- 820 Premium Payment
- 834 Enrollment/Disenrollment

February 2003
- Payers Internal
- Payers External
- Providers Internal
- Providers External

Source: Gartner Research (May 2003)

College of Healthcare Information Management Executives

from their trading partners. Almost half of all respondents indicated that fewer that 10 percent of their trading partners were ready to test. At least 9 percent of the respondents indicated that none of their trading partners had contacted them to arrange testing (see Figure 2). For relatively small providers (under $1 billion in annual revenue), the lack of progress was more notable – 24 percent reported no contact on testing. The Gartner survey does not poll practices with fewer than 30 physicians, but anecdotal information for that category is grim. We hear that many of them are not aware that they need an upgrade to their software, and many more believe incorrectly that they do not need to change their data collection practices to achieve compliance.

An optimist might argue that this "glass is half full," given that the survey was conducted eight months before the 16 October 2003 transaction deadline. The leading health plans and providers are clearly beginning to test. We have since discussed these results with health plans, clearinghouses and certification firms. These enterprises indicate that there is gradual progress, but no breakthrough will create a sudden leap toward on-time completion. Therefore, Gartner takes the alternative to the "half-full" position and concludes that the glass is broken.

Our concern is based on an examination of the steps that have to happen for full national compliance:

- Based on the experience of early testing, the health plans and vendors of provider systems have to adjust their programming, and the early-adopter providers have to adjust how the vendor systems are implemented for their sites.
- The provider vendor modifications have to be rolled out to other providers.
- The vendors must provide assistance to the other providers in configuring the application for their practices and collecting additional data elements.
- Health plans must re-enroll providers for the new electronic data interchange (EDI) relationship, a significant work effort.
- End-to-end testing is required for all major trading partners.

Given the common experience that it takes three to six weeks to complete testing for a single transaction, as well as bandwidth limitations on how health plans can support enrollment and testing, it is clear that it is already too late to achieve HIPAA claims compliance for a large percentage of the industry.

### Use of Clearinghouses vs. End-to-End Testing

Many providers believe that their clearinghouses can fully handle the conversion to the new HIPAA format. As Gartner and others have been saying for more than two years, this is not the case. The clearinghouses cannot create the few extra data elements that are required for compliance. That requires installing and properly configuring software updates from their billing system vendors.

Claredi, one of the vendors of HIPAA transaction certification services, has found this misunderstanding to be played out in practice. It reports that leading-edge clearinghouses are able to pass certification tests, as long as they generate the test data internally. If, however, the same clearinghouse submits data that was created by converting a provider's input, there is frequent failure. The specific errors represent precisely the problem discussed here. The additional input data is not present.

### The Worst-Case Scenario

Under the HIPAA-transaction regulation, any covered entity that accepts a noncompliant transaction is, itself, noncompliant, even if the covered entity is able to accept compliant transactions. If health plans follow this regulation, they must refuse to accept all noncompliant transactions. Those providers that are submitting the old format electronically, but have not completed the enrollment and testing processes, would be forced to fall back to paper. Because neither the providers nor the payers have the bandwidth to deal with the extra paper, large delays in payments to providers would be the consequence. Because most providers don't have the financial cushion to accept a delay in their payment stream, there could be considerable disruption in the delivery of healthcare.



**Figure 2**
**HCOs That Believe Their Trading Partners Are Ready to Test Transactions (February 2003)**

Source: Gartner Research (May 2003)

**What to Do**

The most-important requirement now is for frank communication between health plans and providers. Providers that look to the primary health plans in their region for guidance must receive an unambiguous picture of what they are required to do and the consequences of their not complying. In previous research Gartner discussed actions that some health plans have chosen to avoid the worst-case scenario.

**Bottom Line:** After the year 2000 "nonevent," some executives may view our concern as being unnecessarily alarmist. Indeed, some will say "there is no way that the government will let the worst-case scenario happen." This is only true, however, if the government knows the crisis exists and sees the industry take a leadership position that it can support. Health plans and providers must become vocal advocates of a definitive response if they expect to avoid a disaster.

*Gartner Healthcare Executive and Management Strategies Commentary COM-20-1974, W. Rishel, 6 June 2003.*

# Contingency Planning for a Possible HIPAA Claims Crisis

The worst-case scenario for HIPAA transactions occurs if providers fall back to paper claims. Some healthcare organizations are preparing for that possibility.

**Background**

In previous research Gartner described insufficient progress in meeting the U.S. Health Insurance Portability and Accountability Act's (HIPAA's) transaction and code sets (TCS) regulation's deadline. Based on the results of the seventh iteration of our COMpliance Progress And Readiness (COMPARE) survey of HIPAA, we describe the very real potential for a worst-case scenario in which providers drop back to paper claims in large numbers, health plans are not able to keep up with the paper flow and the resulting payment delays wreak havoc on healthcare provider organizations.

Here, we describe the actions that some health plans are taking to deal with the potential crisis. We also give advice to healthcare providers on how to take control of their HIPAA transaction implementation.

**Avoiding the Worst Case**

Allowing a significant disruption in healthcare is not good business for U.S. health plans or good politics for the Bush administration or Congress. Something must be done soon to create an orderly transition to the new standards. On 15 April 2003, the Workgroup on Electronic Data Interchange (WEDI) sent a letter to the Secretary of the U.S. Department of Health and Human Services (DHHS) recommending two contingency approaches:

- Allowing health plans that are able to accept the standard format to continue to accept the old format for a limited time
- Allowing health plans to accept the new format without the new data elements for a limited time, as long as the health plan does not need the new elements to adjudicate claims. (Many health plans will not need the new data elements.)

Allowing health plans that can comply to continue to accept the old format is consistent with the provisions of the HIPAA law. The TCS regulation is much more stringent than the law in this regard.

**DHHS Has Limited Flexibility**

Congress was explicit in the U.S. Administrative Simplification Compliance Act (ASCA). DHHS does not have the legal authority to extend the deadlines. At best, it can use an enforcement process that supports those covered entities that have taken the right steps to become compliant, but are dealing with trading partners that are not, or do not have the bandwidth to bring everyone on board in time.

In addition to the limitations of ASCA and the regulatory process, DHHS must deal with the perception of some government officials that industries always whine about new regulations.

Within these limitations, DHHS should do whatever it can to signal health plans that TCS enforcement will first emphasize health plans that are not able to accept compliant claims. This will make it easier for health plans that have successfully tested the new format with some trading partners to make their tough business decisions.

**What Some Health Plans Are Doing**

Because there are many fewer health plans than providers, and because health plans are the source of the money, they really drive the process. Many large health plans have confided to Gartner that they will be ready for the new format, but they will unilaterally follow at least the first of the recommendations that WEDI made to DHHS. They will continue to accept old-format electronic claims after the deadline for a limited time, even if this puts them in violation of the TCS regulation. Their intent is to aggressively test with trading partners in the new standard and, when most of their trading partners are using the new format, make an economic decision to stop accepting old-format transactions from the laggards.

This approach is a difficult business decision that involves assessing legal risk. There is at least the possibility that someone will file a complaint with DHHS, and DHHS will assess civil monetary penalties. Under this unlikely scenario, they do not know what the maximum annual civil monetary penalty

would be, although it would probably be between $250,000 and $2.5 million. For a large health plan, however, the cost of having providers drop back to paper would be much higher than the penalty. It would be far easier for health plans to decide on this approach if DHHS were able to state, or at least imply, that its initial enforcement priorities will go lightly on health plans that are accepting the new format, but continue to accept the old format beyond the deadline.

These approaches will not be effective unless providers know about them. The health plans we have talked to are working to find ways to communicate their plans to their providers without giving the appearance of flaunting federal regulations.

Health plans that are not willing to follow this approach should be contracting with vendors such as Affiliated Computer Systems, Perot Systems, Computer Science Corp., IBM, Unisys or off-shore suppliers for additional optical character recognition (OCR) bandwidth to deal with paper claims. They should also be assessing the effect of payment delays on their contracts and compliance with state regulations.

**What Providers Should Be Doing**
Those providers that have upgraded their billing systems should identify the health plans with which they have large volumes and be aggressive in dealing with their vendors and the health plans to schedule testing time. They should not accept blandishments; they should get specific dates and requirements and ensure that the implementation of their vendors' products support collecting the additional data elements.

Providers that have not completed internal testing and begun testing with their high-volume health plans and trading partners must recognize that their vendors and their health plans will be flooded with providers trying to make the deadline. Most providers that are not already in external testing must assume that they will not be able to complete trading-partner testing by the deadline. Therefore, they should be talking to their high-volume health plans to understand their policies concerning the WEDI suggestions.

Providers that are not already testing and cannot get a clear picture of the approach of their high-volume health plans should make business plans for a disruption in cash flow when they revert to paper. This includes, but is not limited to, securing a line of credit. Providers should not wait to take decisive action. It will become increasingly difficult to secure the credit line as the October deadline draws near.

**What Everyone Should Be Doing**
This is a time that requires tough decisions by everyone, including the regulators in DHHS. Covered entities can support DHHS by writing Secretary Tommy Thompson and their congressional delegations to alert them of the continued need for flexibility.

**Bottom Line:** It is possible to avoid the "train wreck" of many providers dropping back to paper claims. But this can only happen if payer organizations make the tough business decision to follow one of the Workgroup on Electronic Data Interchange recommendations and communicate clearly to providers their approach and their estimates of the time frame in which they will continue to support the old formats. The U.S. Department of Health and Human Services must find a way to support such payers. Providers that take such announcements as excuses to continue to accept blandishments from their software vendors or clearinghouses will learn a hard lesson, which will come when enough of their peers have converted to the new format and payers cut them off. Implementation and testing takes time and coordination with outside entities. It cannot be put off to the last minute. ■

*Gartner Healthcare Executive and Management Strategies Commentary COM-20-2215, W. Rishel, 6 June 2003.*

# CHIME Foundation Member Features:

**Allscripts' TouchWorks Receives "5-Star" EMR Rating for Second Straight Year**
Extensive Evaluation by AC Group Assesses Over 3,400 Functional Criteria

At the 2003 TEPR Annual Conference and Exhibition in San Antonio, Texas, the AC Group announced that TouchWorks™ from Allscripts Healthcare Solutions, received a '5-Star' rating in the AC Group 2003 annual report on electronic medical record (EMR) applications. This report provides physician groups with one of the most comprehensive evaluations to date of leading EMR applications.

"Allscripts Healthcare Solutions has proven for the second straight year that TouchWorks is a '5-Star' EMR," stated Mark Anderson, the report's author. "Not only is TouchWorks a strong application, but the company continues to innovate and improve. This evaluation focused on functionality, and because we included 700 additional questions in this year's evaluation, we required companies to continue to move their applications forward in order to earn 5 stars."

The AC Group report is based on 8 months of research and an evaluation that included 3,436 functional questions divided into 4 methods of operations.

The four methods included desktop capability, wireless capability, remote access capability, and PDA and mobile capability.

Anderson continued, "The current pressures in the industry for increased efficiency and better care delivery, coupled with significant advances in technology and applications, have enabled EMRs to take center stage. The challenge with EMRs is that it is very difficult for the average physician practice to effectively evaluate. This survey can serve as a valuable tool in the vendor selection process."

**College of Healthcare Information Management Executives**

The '5-Star' rating was awarded based on the fact that TouchWorks was rated above 90% in desktop, remote, and wireless functionality. 22 EMR application vendors were included in the evaluation.

For more information about AC Group's 2003 EMR evaluation, visit the AC Group Web site at www.acgroup.org.

For more information on TouchWorks from Allscripts Healthcare Solutions, visit www.allscripts.com or call 1-800-654-0889, ext. 200.

### Daou Systems, Inc.: Extending the Life of Legacy Systems

In today's economic climate, how do you accommodate your clinicians' demands for wireless and other emerging technologies to help them deliver care more efficiently and effectively? Total software migration isn't the only option, according to Daniel J. Malcolm, president and CEO of Daou Systems, Inc., a healthcare IT consulting company based in Exton, PA. "More and more hospitals are coming to us looking for alternatives that are less risky, less expensive, and take less time to implement than total systems replacement," says Malcolm. "And they're getting good results from focused infrastructure integration work that enables their legacy systems to support the new technologies."

Whether it's enterprise image management, CPOE, wireless or advanced security, healthcare CIOs face tough questions about supporting new technologies on current budgets. Malcolm said, "Our company routinely hosts executive roundtables in major cities across the country. Nearly 80 CIOs attended last year, and many of them voiced concerns over how to implement technology to support their clinicians without investing in total systems replacement. In addition, many of them showed a strong interest in innovative ways to extend the life of their existing systems – one of our company's strengths."

Daou is capable of extending the useful life of legacy systems by integrating emerging technologies with 70 percent of the functionality of the new server-based software systems, for one-third the cost, in one-third the time. "Is this message being well-received in the marketplace?" says Malcolm. "You bet. The healthcare executives we know simply don't have the money or the time to implement new systems." To help meet the new demand, Daou is partnering with companies who have "lightning rod" products in specific areas of clinical transformation. The first of these partners is Park City Solutions, whose emPOWERnet™ portal single sign-on architecture and products are installed in more than 200 U.S. hospitals.

For more information on how Daou can maximize the value of legacy systems, please contact Sandra L. Taylor, Ph.D., Vice President of Marketing at Sandra.Taylor@daou.com.

### KLAS Reports on Today's CPOE Accomplishments with the Publication of the CPOE Digest

Live "leading the way" CPOE sites speak across the board of the benefits of reducing errors and enhancing patient safety, according to a KLAS study outlining CPOE realities.

Researchers hoped to survey every North American live CPOE site. The study details a variety of care delivery organizations' CPOE experiences with eleven vendor products (Cerner, CliniComp, Eclipsys, Epic, GE, IDX, McKesson, Meditech, Per-Se, Pyxis and Siemens). "Custom" or "one-of-a-kind" site information was included to better represent CPOE accomplishments.

Participants were CPOE "live" in either inpatient or ambulatory settings. Live CPOE sites surveyed had (1) a linkage and/or a relationship between the inpatient and ambulatory environment and (2) a potential need to affect or be responsible for patient care treatment across these boundaries. Physicians at Cerner, Eclipsys, Epic, McKesson, and Siemens provided survey design and assistance. Three provider organizations also provided guidance.

Findings included:
- Inpatient and ambulatory environments are delimiters. Most vendors provide solutions for both, though none leads or has substantial penetration of CPOE use in both.
- Closed-loop medication ordering, alerting, administration and tracking use is increasing.
- The ability for physicians to enter all medication orders and be notified of alerts from decision logic at the time of the medication order is widely available. However, the physician and pharmacist may not be using the same medication ordering and alerting system. Complicating this is nearly half (48%) of all pharmacy orders are re-entered by pharmacy.

Other selected findings:
- KLAS estimates 208 (3.4%) of U.S. hospitals (6,200+ per AHA) have some physician CPOE use, of which 125 (2%) were validated by KLAS.
- Between 0.8 and 1.3% of U.S. hospitals actively use CPOE ("active" defined as physicians entering >50% of patient orders).
- Less than 1% of U.S. hospitals actively use CPOE with a commercially available software product.
- Most live sites are teaching organizations.

Today's CPOE challenge is more theoretical than proven. The current reality and future vision gap is large. Much appears to be on the CPOE horizon from both vendors and providers.

KLAS looks forward to continually monitoring and reporting CPOE progress. For more information about KLAS, visit http://www.healthcomputing.com/site/v2/.

### SoftMed Systems, Inc.

SoftMed Systems, Inc. was founded with the vision of improving the quality of patient care through the use of innovative technology and now celebrates two decades of pioneering the electronic medical record. SoftMed has encouraged the development of electronic medical records and therefore created solutions that address the need to automate and digitize the vast amount of paperwork associated with patient care.

SoftMed's solutions for managing transcription costs combines the powerful capabilities of the ChartScript® transcription system with the innovative ChartScriptMD™ clinician document creation application – resulting in reduced costs, increased productivity and better patient care.

Through standardization of transcription production and document distribution across the organization, ChartScript helps reduce the overall costs of transcription and solves transcriptionist shortage issues. ChartScript is the viable solution to improve staff productivity, document distribution and the quality of patient care documentation. SoftMed's solution for managing transcription costs also opens up a realm of automation for hospitals, allowing them to streamline their document completion process and reduce errors. The flexibility of the tool allows efficient productivity tracking of management functions, incentive pay modules, and ad hoc reports.

ChartScriptMD is a complementary document creation tool developed for physicians that allows them to create, edit, and complete patient documentation quickly and accurately. The flexible tool offers multiple methods of documentation, including dictation, automated text selection, voice recognition, typing, and any combination of these methods. ChartScriptMD improves overall physician satisfaction and maximizes document creation efficiency, while simultaneously reducing transcription costs and patient documentation errors.

As facilities migrate to a fully automated, electronic medical record workflow environment, ChartScript and ChartScriptMD will help hospitals deliver the critical technology needed for success. The high degree of physician acceptance, time and money savings, and increased productivity has prompted many facilities to successfully implement SoftMed's solution for managing transcription costs.

For more information, visit www.softmed.com.

## Chuck Christian Appointed to CHIME Board



CHIME congratulates Chuck Christian, FCHIME, for recently being appointed to the CHIME Board. Chuck will serve through the end of 2004 to fill the vacancy created by Gary Strong's resignation.

Chuck is a charter member of CHIME and achieved Fellow status last year. He has been a valued committee member, serving on the Membership Committee for the past four years as well as serving on CIO Forum Planning Committees. Chuck has been an active participant in CHIME's educational activities, including attendance at the IME series of courses and numerous CIO Forums. He has also participated in College Live, CHIME's online educational initiative, as both an attendee and a presenter. Congratulations Chuck!

## Members on the Move

Mike Adames, formerly Director of Business/Information Services at Ramstein Air Base Clinic at Ramstein AFB, Germany, is now CIO for HQ USAFE – Office of the Command Surgeon at Ramstein AFB, Germany.

Russ Branzell, formerly Executive Director of IS at Sisters of Mercy Health System in St. Louis, MO, is now Vice President of IS and CIO at Poudre Valley Health System in Fort Collins, CO.

Chuck Chapdelaine, formerly CIO at 1st Medical Group, Langley AFB, VA, is now CIO at HQ Air Combat Command/SG, Langley AFB, VA.

Frank Clark, formerly Senior Vice President & CIO at Covenant Health in Knoxville, TN, is now CIO at the Medical University of South Carolina in Charleston, SC.

Jim Roberts, formerly Director of IS at John Peter Smith Health Network in Fort Worth, TX, is now CIO at Ancilla Health System in Hobart, IN.

Wes Wright, formerly CIO at David Grant USAF Medical Center at Travis AFB in CA, is now CIO at the Office of the Pacific Surgeon General at Hickam AFB, HI.