# OHA — ONTARIO HOSPITAL ASSOCIATION

# Executive Report 16/8

Volume 16, Issue 8

Thursday, February 26, 2004

## FOCUS OHA

**Ontario Government Moves to Meet Hospital Funding Election Commitments**

On February 24, 2004, The Honourable George Smitherman, Minister of Health and Long-Term Care, delivered a special address at The Economic Club of Toronto entitled "Transforming Ontario's Health Care System." Highlights of the Minister's speech and funding announcement include:

- A commitment of increased funding for hospitals of $385 million to address operating funding pressures for 2003/04 equivalent to a 3.6% increase in funding;

- The Ministry of Health and Long-Term Care's (MOHLTC) three key priorities to be measured are: reducing wait times for important procedures, improving access to family physicians and other members of the primary health care team, and making Ontarians healthier – measured by rates of physical activity, smoking and obesity;

- The Minister outlined the government's four "change strategies" for health care: a sustainable financial footing for hospitals, a culture of accountability and results, creating strong community health care services, and a new emphasis on preventing illness and promoting healthy living, including reducing smoking and increasing rates of physical activity;

- Acknowledgement that hospitals are also sitting on $721 million of cash pressures, accumulated over the past few years;

- This is the last time that this government will pay for deficits; and

- The government will enter into performance agreements with each institution to: ensure targets are set for service delivery and volumes, achieve key government priorities, and outline penalties for failure.

"During the election the government promised 'immediate relief' for hospitals," said Ontario Hospital Association (OHA) President and CEO Hilary Short. "Today's announcement honours this key promise to the people of Ontario and is particularly important because it comes with just five weeks left in the fiscal year." The OHA also reinforced its ongoing leadership role in improving accountability in the hospital sector and its commitment to implementing meaningful performance agreements that are negotiated in partnership with, rather than imposed by, the government.

A bulletin on this announcement, including OHA's key messages, was sent to members on February 24, 2004. The OHA will continue to keep members informed as events unfold and will provide an updated analysis of hospital funding as soon as the detailed funding is available. Copies of the Minister's speech and media release are available online at www.health.gov.on.ca, and copies of OHA's media release are available at www.oha.com - News - Media Releases.

## OHA Presentation to Ontario Standing Committee on Justice and Social Policy

On February 23, 2004, Tony Dagnone, Chair of the Board of the OHA and President and CEO of London Health Sciences Centre; Ruthe Anne Conyngham, OHA Board member and Board Chair of St. Joseph's Health Care, London; and Hilary Short, OHA President and CEO made a presentation to the

Ontario Standing Committee on Justice and Social Policy.

Mr. Dagnone, Ms. Conyngham and Ms. Short indicated that Ontario hospitals strongly support the intent behind The Commitment to the Future of Medicare Act, 2003, but warned that key sections of Bill 8 undermine local hospital boards and weaken accountability instead of strengthening it. They indicated that since the introduction of Bill 8, the OHA has worked closely with Minister Smitherman, senior staff from the MOHLTC and our hospital members on proposals for amendments. Significant progress has been made in refining the Bill, but several key issues remain unresolved. They also stressed that the OHA and hospitals will continue to work with the government to improve it.

OHA's speaking notes, slide presentation, proposed amendments and news release can be found at www.oha.com under News – Media Releases. For questions about the Bill 8 presentation, contact Steve Orsini at 416-205-1339 or sorsini@oha.com

## Call for Participants for the PIA Working Group

The OHA is creating a working group to oversee the privacy impact assessment (PIA) of the Patient Satisfaction Program. The working group will provide input to the process and recommend areas of focus for the consultants that are performing the assessment. Based on the final PIA report, the working group will make recommendations to the OHA for improvement of the program. Please notify Jenny Lineker of your interest in participating at 416-205-1439 or jlineker@oha.com

## Call for Information on Telehealth Initiatives Occurring in Your Hospital or Community

The Ontario Hospital eHealth Council was established jointly by the MOHLTC and OHA as a vehicle to provide leadership and strategic direction on eHealth for Ontario hospitals and to support the implementation of eHealth solutions. Home telehealth (HTH) strategies and applications are an emerging priority. As a result, the eHealth Council will soon be releasing a White Paper with an over-arching goal to present high-level policy, technical and implementation perspectives that arise with HTH.

The Home Telehealth Working Group (HTHWG) is in its formative stage and will be working towards the identification of pilot projects in Ontario, and the development and enhancement of policy and processes related to Home Telehealth. The Working Group would be extremely interested in learning about current telehealth projects occurring within your hospital facility and community. This information would provide the WG with an excellent foundation of "real life" telehealth initiatives in Ontario.

Please contact Carol McFarlane at 416-205-1438 or cmcfarlane@oha.com by March 4, 2004 if you wish to share information. We invite you to visit the eHealth Council web site at http://www.oha.com/ehealth/wehealth.nsf

## FOCUS Queen's Park
### Funding for Hamilton Area Health Care

On February 23, 2004, Minister of Health and Long-Term Care George Smitherman announced a total of more than $36 million in funding to retain and recruit physicians, to modernize hospital facilities and to improve services for critically ill patients in Hamilton. The announcement includes:

- The redevelopment of the Henderson site resulting in a larger emergency department, upgraded operating rooms and intensive care and coronary care units, expanded rehabilitation services and an increase in laboratory capacity.

- A new funding agreement to help retention and recruitment of physicians and specialists. The agreement is intended to allow physicians to better integrate their roles in patient care, facilitate the training of future physicians and improve research capacity for new medical innovations.

> Strengthening of the CritiCall Ontario program. CritiCall maintains a database with available specialists, hospital beds and critical care resources to ensure critically ill patients receive the best and most timely care. CritiCall's office will now be consolidated at Hamilton Health Sciences Centre (HHSC).

The Minister also announced a grant for health and safety upgrades at HHSC's McMaster site, to make the site safer for patients and health care workers. The projects include installation of new fire alarms, building automation and fire sprinkler systems.

## FOCUS Health Sector
### National Report Card on Antibiotic Resistance Encouraging
Canada continues to be a world leader in the fight against antibiotic resistance, according to new data presented on February 17, 2004 by the National Information Program on Antibiotics (NIPA). NIPA is a coalition of eight leading Canadian physician, pharmacist and patient organizations created in 1996 to inform Canadians about the appropriate use of antibiotics. The data, compiled by the Canadian Bacterial Surveillance Network (CBSN), show that while the rates of high-level resistance have remained stable, the rate of penicillin-resistant Streptococcus pneumoniae (PRSP) was slightly lower in 2003 than in 2002 (13.3% vs. 15.0%). S. pneumoniae is the leading infectious cause of morbidity and mortality worldwide, and is the most common bacterial cause of community-acquired infections.

Researchers say that we are heading in the right direction, but we must remain vigilant. Through the appropriate use of and respect for antibiotics, Canadians can play a vital role in making sure that these medications continue to be effective. Rates of PRSP are significantly lower in Canada than in other parts of the world, where they range from more than 30% in parts of South America to as high as 80% in Hong Kong and South Africa. In the United States, the latest figures show resistance rates between 30-35%. The national report card on antibiotic resistance was released as part of NIPA's fifth annual Antibiotic Awareness Week (February 16-20).

### New Leaders Announced for Cambridge Memorial Hospital
Dr. Kevin Smith, Provincial Supervisor of Cambridge Memorial Hospital (CMH), is pleased to announce the appointment of a new Board of Governors and a new CEO for CMH. Mr. John K. Bell is the new Chair of the new CMH Board of Governors, and Mrs. Heather Ferber is the new Vice Chair. Ms. Julia Dumanian is the new President and CEO. Ms. Dumanian, chosen following a five-month national search, is a certified governance consultant with Masters degrees in Public Policy and Public Administration. She was most recently the Provincial Supervisor of the Hamilton and Niagara Community Care Access Centres; an executive with St. Peter's Health System in Hamilton; and a former CEO for United Way of Oakville, among other organizations. The new board members will undergo an extensive hospital orientation program before holding their first public meeting in March. Dr. Smith will retain authority over the governance and operations of CMH until the Minister of Health and Long-Term Care revokes his Order in Council. The CEO begins her duties simultaneous to the new Board assuming governance control.

### New Appointment at William Osler Health Centre
The Board of Directors of William Osler Health Centre are pleased to announce the appointment of Dr. Ian Smith to the position of Chief of Staff. Dr. Smith joined William Osler Health Centre in August 2002 as Chief of Surgery. He came from St. John's, Newfoundland where he was an active staff member of the Division of General Surgery at General Hospital, Health Sciences Centre and held a variety of roles at the Newfoundland and Labrador Medical Association. Dr. Smith is a graduate of the University of Toronto and has spent time as a teaching surgeon at Memorial University in Newfoundland.

**Rehabilitation Nursing Receives Specialty Status**

Recognizing the unique knowledge and skills required to work with patients who need rehabilitation, the Canadian Nurses Association (CNA) has elevated rehabilitation nursing to the level of specialty, joining 13 other areas of specialization such as critical care, oncology and emergency nursing. Starting in 2005-2006, nurses can write a national exam to earn a specialty certification in rehabilitation nursing. In January 2004, Toronto Rehabilitation Institute welcomed 12 nursing students to the country's first university-based rehabilitation nursing course, a joint effort of the hospital and the University of Toronto. A part of the undergraduate nursing program, the course includes clinical education for the students at Toronto Rehab.

**North Bay Fundraising Campaign Surpasses Benchmark**

The Caring for Generations fundraising campaign for the new North Bay Regional Health Centre has surpassed its $15 million benchmark and has reached $18.2 million. The additional funds raised will go towards a Magnetic Resonance Imaging (MRI) machine and other advanced medical equipment needed for the new health centre. The North Bay General Hospital and the Northeast Mental Health Centre are creating a partnership, co-locating the facilities side-by-side to form the North Bay Regional Health Centre. Plans are also underway to build a Children's Treatment Centre on the same site.

**FOCUS Parliament Hill**
**Contributions for Health Professionals in French-Speaking Communities**

On February 23, 2004, the Government of Canada announced that it will be allocating more than $25 million over the next five years to three Ottawa organizations to support the training and retention of health professionals in French-speaking minority communities. The University of Ottawa will receive more than $17.5 million, which will enable the training of more students in medicine and other health-related disciplines. Cité collégiale will receive more than $4.1 million to strengthen and increase the capacity of its current programs, with a view to expanding them to other regions. And the Consortium national de formation en santé will receive a contribution of more than $3.3 million, which will help the institution increase its recruitment efforts, create and promote training research partnerships, and establish research projects. Funding was provided for in the 2003 Federal Budget and is therefore built into the existing fiscal framework.

**Health Canada Releases Canadian Pandemic Influenza Plan**

Recently, Health Canada released the joint federal, provincial and territorial governments' Canadian Pandemic Influenza Plan. The plan, developed collaboratively with the provinces and territories, maps out how Canada would prepare for and respond to a pandemic influenza outbreak. The plan creates a framework that would guide the actions of all levels of government in the event of an influenza pandemic. It covers the following activities:

Prevention activities, such as annual immunization programs and the establishment of an infrastructure for manufacturing sufficient vaccines to protect all Canadians at the time of a pandemic;

Preparedness activities include the preparation of actual plans for a pandemic. The preparedness section addresses key activity areas such as vaccine programs, surveillance and public health measures in terms of their current status and future requirements; and

Response/Implementation (including communications activities) for controlling the pandemic and any social disruption it causes. Implementation also involves tracking activities and outcomes in order to make changes swiftly if the situation warrants.

The plan will continue to evolve based on the best and most recent knowledge available. The plan is

available on Health Canada's web site at http://www.hc-sc.gc.ca/pphb-dgspsp/cpip-pclcpi/

**EDUCATIONAL Services**
**OHA Hosts "Health Care Governance" Conference - March 29, 2004**
Today's health care organizations are inventing the future and transforming themselves from the inside out. At the helm of this transformation are the board members and senior administrators. Successfully guiding their organizations through the challenges of change will require health care trustees to meet a high standard of performance and accountability.

This one-day governance conference will feature James E. Orlikoff, who is one of the most experienced and highly regarded governance consultants in North America, and has written definitive guides for health care boards that want to maximize their performance and help their organizations reach full potential. The head of his own consulting firm, Orlikoff will offer board members and executives of health care organizations advice on how to improve their governance practice.

The conference is chaired by Jackie Thoms, OHA Board Member and Chair of the OHA Governance Committee. A Governance panel will include OHA Board Members Ruthe Anne Conyngham, Board Chair, St. Joseph's Health Care, London; Dr. Christina Fiedorowicz, Board of Directors, Arnprior and District Memorial Hospital; Teddene Long, Board of Directors, York Central Hospital; and Virginia McLaughlin, Board Chair, Sunnybrook & Women's College Health Sciences Centre. For additional information, contact Eva Bell at 416-205-1342 or ebell@oha.com

**OHA This Week**
Educational Services
Educational Highlights - February 26, 2004

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION
         Plaintiff,
    vs.                        Civil Action
PRICEWATERHOUSECOOPERS,      No. 00-684
LLP,
         Defendant.

- - - - -

Videotaped Deposition of LAWTON R.
BURNS, Ph.D., called for examination under the
Applicable Rules of Federal Civil Procedure,
taken before me, Michele E. Eddy, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to notice and
stipulations of counsel, at the offices of
Cravath, Swaine & Moore, 825 Eighth Street,
Worldwide Plaza, New York, New York, on Friday,
the 4th day of March, 2005, at 9:00 a.m.

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Lawton Burns, Ph.D.

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION
                Plaintiff,
        vs.              Civil Action
PRICEWATERHOUSECOOPERS,          No. 00-684
LLP,
        Defendant.


- - - - -

        Videotaped Deposition of LAWTON R.
BURNS, Ph.D., called for examination under the
Applicable Rules of Federal Civil Procedure,
taken before me, Michele E. Eddy, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to notice and
stipulations of counsel, at the offices of
Cravath, Swaine & Moore, 825 Eighth Street,
Worldwide Plaza, New York, New York, on Friday,
the 4th day of March, 2005, at 9:00 a.m.

        - - - - -

**Page 2**

1   APPEARANCES:
2
3       On behalf of the Plaintiff:
4           Jones, Day, by
5           JESSE A. WITTEN, ESQ.
6           51 Louisiana Avenue, NW
7           Washington, D.C.  20001
8           202.879.3939
9
10      On behalf of the Defendant:
11          Cravath, Swaine & Moore, LLP, by
12          ANTONY L. RYAN, ESQ.
13          825 Eighth Avenue
14          Worldwide Plaza
15          New York, New York  10019
16          212.474.1296
17
18
19
20
21
22
23
24
25

**Page 3**

1   APPEARANCES, Continued:
2
3       Manion, McDonough & Lucas, PC, by
4       JOSEPH F. MCDONOUGH, ESQ.
5       600 Grant Street
6       USX Tower, Suite 1414
7       Pittsburgh, PA  15219
8       412.232.0200
9           ----
10
11  ALSO PRESENT:
12      Nick Rennillo, Videographer
13          ----
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1           I N D E X
2
3   EXAMINATION OF           5      21
4   LAWTON R. BURNS, Ph.D.
5   BY MR. WITTEN
6
7   Exhibit 6100 was marked   57     2
8   Exhibit 6101 was marked   64     22
9   Exhibit 6102 was marked   77     24
10  Exhibit 6103 was marked   87     21
11  Exhibit 6104 was marked   173    18
12  Exhibit 6105 was marked   185    3
13
14  AFTERNOON SESSION         185    1
15
16  object          116     17
17  object          130     22
18  object          145     1
19  object          149     21
20  object          151     21
21  object          153     10
22  object          159     18
23  object          160     7
24  object          162     1
25  object          165     19

Lawton Burns, Ph.D.

Page 5

1  THE VIDEOGRAPHER: Today's date is
2  March 4th, 2005, coming on the record at 8:49
3  a.m. We're located at 825 Eighth Avenue, the
4  offices of Cravath, Swaine & Moore. We're here
5  for the deposition of Mr. Burns in the case        08:49:48
6  captioned Official Committee of AHERF,
7  Allegheny Health, Education, Research
8  Foundation V PricewaterhouseCoopers, LLP.
9       Could counsel please voice identify
10  themselves for the record?                         08:50:02
11       MR. WITTEN: Jesse Witten from
12  Jones Day for the plaintiff, the Official
13  Committee of Unsecured Creditors of Allegheny
14  Health, Education, and Research Foundation.
15       MR. McDONOUGH: And Joseph             08:50:10
16  McDonough for PricewaterhouseCoopers.
17       LAWTON R. BURNS, Ph.D., of lawful
18  age, called for examination, provided by the
19  statute, being first duly sworn, as hereinafter
20  certified, said as follows:
21  EXAMINATION OF LAWTON R. BURNS, Ph.D.
22  BY MR. WITTEN:
23       Q.  Good morning.
24       A.  Good morning.
25       Q.  Can you please state your full name 08:50:24

Page 6

1  for the record?
2       A.  Lawton Robert Burns.
3       Q.  Do you go by Rob Burns?
4       A.  Yes, or Robert.
5       Q.  Or Robert. Do you use your middle   08:50:30
6  name more than your first name?
7       A.  Except professionally.
8       Q.  Well, we -- I introduced myself
9  earlier, but my name is Jesse Witten. I'm one
10  of the attorneys for the Unsecured Creditors    08:50:44
11  Committee.
12       Have you ever had your deposition
13  taken before?
14       A.  Once in the -- a long time ago.
15       Q.  What kind of a case was that?        08:50:56
16       A.  It involved workmen who were
17  working on a roof of a condominium building
18  where I owned one of the condominiums and they
19  had secured lines to the roof, the parapet, and
20  it gave way and they felt that the homeowners   08:51:15
21  may have known ahead of time that there was
22  something structurally wrong with the roof.
23       Q.  You were testifying as a condo
24  owner, you said?
25       A.  Yes.                                 08:51:26

Page 7

1       Q.  Were you an expert witness in that
2  case?
3       A.  No.
4       Q.  A fact witness?
5       A.  I'm not sure what a fact witness     08:51:30
6  is.
7       Q.  That's fine. That's fine.
8       MR. WITTEN: I promise I won't talk
9  over him again.
10       Q.  If I don't ask a clear question,    08:51:37
11  like just then, please ask me to rephrase it
12  and I'll do my best to ask a question that you
13  can understand.
14       A.  Okay.
15       Q.  Are you under the influence of any  08:51:49
16  kind of medicine or any other substance that
17  could impair your ability to think clearly
18  today?
19       A.  No.
20       Q.  Is there any substance or medicine  08:51:59
21  that could impair your ability to give accurate
22  testimony today?
23       A.  No, there's no substance.
24       Q.  I understand that you have a Ph.D.,
25  is that right?                                 08:52:17

Page 8

1       A.  Correct.
2       Q.  What field is that Ph.D. in?
3       A.  Sociology.
4       Q.  That was earned from the University
5  of Chicago in 1981?                            08:52:24
6       A.  Yes.
7       Q.  I know that you have -- do you have
8  a copy of your own expert report that you
9  prepared here?
10       A.  Right over here.                     08:52:30
11       MR. WITTEN: Do you need a copy,
12  too, Joe? I've got plenty.
13       MR. McDONOUGH: Why don't I give
14  him that one and you can hand me one, please.
15       Q.  I'm just going to ask you some      08:52:39
16  questions about your background. I know your
17  CV is in here. This is not a memory test, so
18  if you need to check your CV, that's fine.
19       A.  Okay.
20       Q.  In addition to your Ph.D, do you    08:52:49
21  have any other degrees after college?
22       A.  I have two Master's degrees.
23       Q.  What are those Master's degrees in?
24       A.  One's a Master's in Sociology; the
25  other is a Master's in Business Administration. 08:53:05

2 (Pages 5 to 8)

Lawton Burns, Ph.D.

Page 9

1    Q.   Did you get your Master's in
2   Sociology before you got the Ph.D.?
3    A.   Yes.
4    Q.   And what institution gave you those
5   sociology degrees?          08:53:16
6    A.   University of Chicago.
7    Q.   You also say you have an MBA?
8    A.   Yes.
9    Q.   Where did you earn that MBA?
10    A.   University of Chicago.      08:53:24
11    Q.   Do you --
12        MR. McDONOUGH:  You were there, so
13   you just kept going to the same school because
14   you were already there, right, you knew where
15   the student union was.        08:53:35
16    A.   I grew up next to the University of
17   Chicago.
18    Q.   Oh, did you, Hyde Park?
19    A.   Yes.
20    Q.   Did you go right from the Ph.D. to    08:53:40
21   get the MBA, or did you take some time off in
22   between?
23    A.   It's -- let me try the explain the
24   sequence.  Let me just get the dates, if you
25   don't mind, if I could just look at my --    08:54:00

Page 10

1    Q.   No.
2    A.   If you want the exact years, then I
3   just need to consult this because things sort
4   of overlap.
5        I finished -- while I was working    08:54:09
6   on my dissertation, I began as a lecturer in
7   hospital administration in the business school
8   at the University of Chicago.
9        While I was being a lecturer, then
10   I finished -- I think I finished my      08:54:44
11   dissertation, then I had a one year post
12   doctoral fellowship in the graduate school of
13   business.  After completing that, then I spent
14   two years in the MBA program, all the time
15   being a lecturer.            08:54:59
16    Q.   The dissertation you're describing
17   was a requirement to earn a Ph.D.?
18    A.   Yes.
19    Q.   Can you please describe for me what
20   the field of sociology is?        08:55:10
21    A.   Not anymore.
22    Q.   Why not?
23    A.   Well, I graduated in 1981, that's
24   25 years ago, and I've never taught in a
25   sociology department.          08:55:22

Page 11

1    Q.   So how about -- you mean you have
2   forgotten what sociology is or the field has
3   changed since 1981?
4    A.   Both.
5    Q.   In 1981, did you know what the    08:55:36
6   field of sociology was?
7    A.   A portion of it.
8    Q.   What portion did you know in 1981?
9    A.   The portion I knew in 1981 were two
10   sections.  One was medical sociology and the    08:55:50
11   other was what we call formal organizations.
12    Q.   What in 1981 was the field of
13   medical sociology?
14    A.   Boy, I'd be hard pressed to
15   encapsulate that for you.  There are textbooks    08:56:07
16   that have been published in medical sociology
17   which summarize a portion of what medical
18   sociology is, but it's sort of an amorphous
19   field that includes lots of different things.
20    Q.   What was your piece of medical    08:56:19
21   sociology in 1981?
22    A.   I was studying doctors in
23   hospitals.
24    Q.   What about doctors in hospitals?
25    A.   About doctors, I would study how    08:56:28

Page 12

1   doctors were trained, how doctors -- what was
2   sort of the makeup of people who went to
3   medical school.  I'd study how they're
4   socialized in medical school.
5        Then I would study the medical    08:56:51
6   profession, how the medical profession tried to
7   control their own behavior.  It's a classic
8   field in sociology.
9    Q.   What do you mean by how -- excuse
10   me. I'm interrupting.  Why don't you finish.    08:57:10
11    A.   It's hard to go back and try to
12   remember everything that I studied back then.
13    Q.   Sure.
14        One of the topics you studied you
15   said was how the medical profession controlled    08:57:21
16   their own behavior?
17    A.   Yes.
18    Q.   What -- how does -- how did the
19   medical profession control its own behavior?
20    A.   Well, the medical profession was    08:57:32
21   supposed to regulate itself.  They were a
22   self-regulating organization with, at that
23   time, very little external, you know,
24   oversight, scrutiny of how doctors practiced,
25   unlike today.              08:57:47

3 (Pages 9 to 12)

Lawton Burns, Ph.D.

Page 13

1    Q.   So the trade associations would lay
2  out standards, is that the kind of thing that
3  you would look into?
4    A.   Well, one of the things you would
5  look into is the AMA and its various bodies      08:57:55
6  that accredit -- not accredit -- but license
7  physicians that oversee and sort of regulate
8  residency programs and board certification and
9  things like that and how doctors are supposed
10 to monitor one another's behavior, things like   08:58:11
11 that.
12   Q.   What was the other branch you said
13 or piece of sociology that you were studying in
14 1981, medical sociology and the sociology of
15 organizations?                                    08:58:26
16   A.   Yes, it's called formal
17 organizations.
18   Q.   And what -- can you please describe
19 that piece of sociology?
20   A.   Yes, I can try. The existing         08:58:33
21 analysis back then was looking at organizations
22 as bureaucracies, what does it mean to be a
23 bureaucracy, how do bureaucracies grow and
24 develop, what is life like within a
25 bureaucracy, things like that.                    08:58:52

Page 14

1    Q.   You went then, after receiving your
2  Ph.D, you proceeded to get an MBA. Your resume
3  here -- your CV says you have a specialization
4  in hospital administration and marketing as
5  part of that MBA, is that right?                  08:59:07
6    A.   Yes.
7    Q.   At the time, did the Graduate
8  School of Business at the University of Chicago
9  have a special program for hospital
10 administration and marketing?                     08:59:18
11   A.   Not quite like that. They had a
12 special program in hospital administration,
13 which I majored in, and I minored in marketing.
14   Q.   I see.
15   A.   They're not a joint degree.          08:59:29
16   Q.   So does your diploma, does your MBA
17 diploma actually signify a specialization in
18 hospital administration?
19   A.   It's hanging up in my office. I
20 believe it does say hospital administration.     08:59:46
21   Q.   Does the University of Chicago
22 still have that specialty in their business
23 school?
24   A.   No.
25   Q.   When did it cease having that       08:59:51

Page 15

1  specialization, do you know?
2    A.   I don't know the exact year. I
3  would guess that sometime during the early
4  1990s, I'm guessing here, I don't recall the
5  exact date, that the business school decided     09:00:09
6  not to sponsor that program, and the program
7  was subsequently relocated over to two or three
8  other schools at the University of Chicago.
9    Q.   I see.
10        You said that the field of           09:00:24
11 sociology has changed since you got your Ph.D.
12 in 1981 such that you can't no longer define
13 for me what the field of sociology is, is that
14 right?
15   A.   That's correct.                      09:00:41
16   Q.   Does that include the branch of
17 medical sociology as well?
18   A.   What has changed since then is that
19 some of the domains of sociology that existed
20 back when I was getting my degrees have since    09:00:59
21 migrated to other disciplines. So sociology no
22 longer has sort of ownership of these domains.
23 And what has been left in medical sociology I'm
24 not quite sure.
25   Q.   I see.                               09:01:17

Page 16

1        Are you a migrator? Are you one of
2  those who migrated with the field -- with some
3  of the fields of sociology?
4    A.   No, I'm not a -- I wouldn't call
5  myself a migrator. What happened is in the       09:01:30
6  late 1970s, my father, who was a faculty member
7  at the University of Chicago in the business
8  school, counseled me, as he would want to do,
9  and suggested I might want to apply my studies
10 in organization and management to the            09:01:46
11 healthcare industry.
12        I took his advice. I wrote my
13 dissertation on management of hospitals and I
14 made a career switch in the late 1970s going
15 from sociology to business.                       09:02:02
16   Q.   I see.
17   A.   That was the only, if you want to
18 call migration, I guess it's migration. I call
19 it more of going to where the future is going
20 to be.                                            09:02:12
21   Q.   So I don't mean to put words in
22 your mouth, but did you then just tell me that
23 you've moved from the field of sociology to the
24 field of business?
25   A.   Well, I teach in a school of        09:02:21

4 (Pages 13 to 16)

Lawton Burns, Ph.D.

Page 17

1   business. I don't know if I would characterize
2   it as I have moved to a school -- moved to
3   business. But I teach in a school of business.
4       Q.   You're being put toward in this
5   case as an expert witness. You know that?    09:02:38
6       A.   Yes.
7       Q.   In what field, in what discipline
8   do you have expertise?
9       A.   Well, I think my CV lists fields of
10  interest. I'm looking at --                  09:02:51
11      Q.   Right, it does.
12      A.   -- page two. I would include those
13  as some of my areas of competence. I have
14  listed them here as major fields of interest.
15  There are probably other areas that I have   09:03:03
16  developed competencies in that aren't listed
17  here.
18      Q.   Let's talk about the major fields
19  of interest that you've listed here. The first
20  is healthcare management. What is -- what do  09:03:15
21  you mean by healthcare management?
22      A.   That would be applying the field of
23  discipline of management, which is a business
24  school of discipline, to the healthcare
25  industry.                                    09:03:30

Page 18

1       Q.   Can you please describe for me that
2   discipline, the business field -- I think you
3   said the business school of discipline of
4   management?
5       A.   Well, every business school has a   09:03:40
6   department of management. What those
7   departments and their faculties study spans a
8   whole lot of things. So it's hard to pin down
9   what is the school of management. And so
10  people who are in the field of management can 09:03:57
11  study any of a number of topics.
12      All I was describing is that I have
13  training in management, having studied formal
14  organizations. And I've applied all of my
15  disciplinary training in management to the    09:04:12
16  empirical field of healthcare.
17      Healthcare is not a discipline.
18  Management is a discipline.
19      Q.   Management is a discipline.
20      A.   Yes.                                 09:04:21
21      Q.   Healthcare is not a discipline.
22      A.   No.
23      Q.   It's an enterprise.
24      A.   Well, in academia, healthcare is a
25  field of application. It's an industry.       09:04:28

Page 19

1       Q.   You said that -- I think you said
2   that the discipline of management has a lot of
3   parts to it. What are some of the parts to
4   that discipline?
5       A.   I think some of the basic           09:04:39
6   classifications are what we call macro
7   organizational theory, what we used to call
8   formal organizations.
9       Another one could be micro
10  organizational behavior, looking at the       09:04:55
11  behaviors of individuals, groups.
12      Those are probably the two biggest
13  groups.
14      If I think about the Academy of
15  Management, which is one of the professional   09:05:11
16  associations I belong to, they probably have 15
17  or 20 different divisions within that academy
18  that are now considered to be part of the field
19  of management. I'd be hard pressed to
20  enumerate those. That's how diverse it is.    09:05:31
21      Q.   You said you have competence in
22  management. Is that right?
23      A.   Yes.
24      Q.   Do you consider yourself an expert
25  in management?                               09:05:37

Page 20

1       A.   An expert in the practice of
2   management or an expert in the discipline of --
3   academic discipline in management? I'm not
4   sure what you're asking.
5       Q.   Thank you for asking for a          09:05:53
6   clarification.
7       An expert in the academic
8   discipline of management.
9       A.   Portions of it.
10      Q.   Which portions of the academic      09:05:59
11  discipline of management are you an expert in?
12      A.   Well, here again, I'd be -- I'd
13  have to think about all the different interest
14  areas and subject areas within the field of
15  management. But some of them would include    09:06:14
16  study of formal organizations, you know,
17  bureaucracies, organizational analysis. Micro
18  organizational behavior, study of individuals,
19  groups, study of organizational change. Those
20  are some of the areas. There are probably     09:06:34
21  others.
22      Q.   Can you break down for me the study
23  of bureaucracies? What aspects of bureaucracy
24  get studied in this discipline of management?
25      A.   Gosh, it's -- each of these areas,  09:06:52

5 (Pages 17 to 20)

Lawton Burns, Ph.D.

Page 53

1  then we kind of wrote up a summary report. So
2  that would be one.
3      Q.   What aspect of the conversion was
4  being studied?
5      A.   They changed ownership from          09:42:58
6  for-profit to nonprofit, nonprofit to
7  for-profit, public to nonprofit, nonprofit to
8  public, public to for -- you can imagine all
9  the permutation.
10     Q.   Same question, any other consulting  09:43:10
11 arrangements?
12     A.   You know, there may be others, but
13 I, to be honest, I can't think of them here.
14 Those are clearly some of the main ones.
15     Q.   Right.                               09:43:23
16          We've made reference to the fact
17 that you speak to hospitals and other groups as
18 well, I suppose, is that right?
19     A.   That's correct.
20     Q.   Do you ever use the phrase blocking  09:43:37
21 and tackling?
22     A.   Probably.
23     Q.   Why do you say probably instead of
24 a yes or no?
25     A.   It's a football analogy, and, so, I  09:43:46

Page 54

1  mean, I commonly use those kinds of analogies.
2      Q.   Do you have an understanding of
3  what the -- in the context of hospital
4  management, what that football analogy of
5  blocking and tackling would refer to?          09:44:00
6      A.   I could probably tell you what I
7  understand it to be, but I don't know what
8  other people would understand it to be.
9      Q.   Tell me what you understand it to
10 be.                                            09:44:09
11     A.   I would take it to be the basic --
12 just performing the basic tasks of running a
13 hospital.
14     Q.   Such as what? What basic tasks?
15     A.   Well, here you get into all the      09:44:20
16 different processes that hospitals have to do.
17 They have to order supplies. They have to
18 manage how those supplies are utilized. They
19 have to, you know, hire people. They have to
20 monitor how people perform. They have to find  09:44:33
21 executives and compensate those executives.
22 You have to recruit a medical staff and find
23 the right -- all these things.
24     Q.   You have to register patients?
25     A.   You admit patients, sure.            09:44:45

Page 55

1      Q.   And you have to maintain your
2  information systems?
3      A.   That would be included.
4      Q.   So in your understanding of the
5  term blocking and tackling in the hospital     09:44:53
6  management context, it's sort of all the --
7  putting words in your mouth here, but I want to
8  see if you agree -- it's sort of all the basic
9  business functions of the hospital?
10     A.   It would include basic business      09:45:06
11 functions. It would include basic work
12 processes. I think that would be just as
13 important, how work gets performed. Who
14 performs it. How work gets handed off. Where
15 do you get staff, where do you get patients,    09:45:18
16 where do you get supplies, where do you get
17 money.
18     Q.   Day-to-day operations?
19     A.   Yes.
20     Q.   My mouth is dry. Can we take a       09:45:26
21 break?
22     A.   Sure.
23          MR. McDONOUGH:  Sure.
24          THE VIDEOGRAPHER:  Off the record,
25 9:45.                                           09:45:33

Page 56

1      (Recess had.)
2          THE VIDEOGRAPHER:  Going back on
3  the record, 9:55.
4      Q.   Do you know how you came to the
5  attention of PricewaterhouseCoopers?           09:55:05
6          MR. McDONOUGH:  You mean in this
7  case or --
8      Q.   I mean in this case.
9      A.   Not exactly.
10     Q.   Do you have any understanding?       09:55:19
11     A.   It could have been they saw my
12 article on the AHERF bankruptcy.
13     Q.   This is the article on Healthfares
14 magazine?
15     A.   Health Affairs journal.              09:55:37
16          MR. McDONOUGH:  He's not asking you
17 to guess.
18     A.   I don't know exactly.
19     Q.   Did the first contact by PwC or one
20 of its representatives occur after your Health  09:55:42
21 Affairs journal article was published?
22     A.   Yes.
23     Q.   Let's take a look at the Health
24 Affairs journal article. I have copies of it.
25     A.   Okay.                                 09:56:07

14 (Pages 53 to 56)

Lawton Burns, Ph.D.

Page 57

1          - - - - -
2        (Thereupon, Deposition Exhibit 6100
3        was marked for purposes of
4        identification.)
5          - - - - -          09:56:21
6        Q.  Do you have before you what's been
7    marked as Exhibit 6100?
8        A.  Yes.  Sorry.
9        Q.  This is a print-out that we made of
10    your article entitled the Fall of the House of    09:56:34
11    AHERF, the Allegheny Bankruptcy from the
12    Journal of Health Affairs.
13        What questions were you trying to
14    answer in this -- let me back up.
15        Why did you write this article in    09:56:51
16    the first instance?
17        A.  I think what originally prompted me
18    was the Association of Professors of Medicine
19    is a national body of academic professors of
20    medicine asked me to give a presentation to    09:57:12
21    their, it may have been one of their national
22    meetings, on what happened in Philadelphia.  I
23    think that's how it started.
24        Q.  Did you give that presentation?
25        A.  Yes, I did.          09:57:26

Page 58

1        Q.  The research that you did to
2    prepare you for that presentation then led you
3    to continue your work to make the article?
4        A.  Yes.
5        Q.  So why did you write the article?    09:57:42
6        A.  Well, that's what professors do.
7    That's our business model.
8        Q.  Were you paid by the Association of
9    Professors of Medicine to give the
10    presentation?          09:58:02
11        A.  Yes.
12        Q.  Did they -- after you gave that
13    presentation, were your duties to that
14    association over or was writing this article
15    part of what they had contracted with you to    09:58:12
16    do?
17        A.  I was compensated just to present
18    at their meeting.  That was it.
19        Q.  Did you get any additional
20    compensation from anybody to write this    09:58:20
21    article, which is Exhibit 6100?
22        A.  I did not receive compensation from
23    anyone to write this article.
24        Q.  As you were writing the article,
25    did you know in advance that it would be    09:58:40

Page 59

1    published in the Health Affairs journal?
2        A.  No.
3        Q.  You submitted it for publication
4    and then they selected -- they elected to
5    publish it?          09:58:53
6        A.  Yes.
7        Q.  When you submitted it to -- what --
8    tell me about the Health Affairs journal.  Is
9    this a widely read journal?
10        A.  Yes.          09:59:01
11        Q.  Who is it read -- do you have an
12    understanding as to who reads the journal?
13        A.  Well, Health Affairs likes to think
14    of itself as the number one health policy
15    journal.  So one constituent in its readership    09:59:15
16    are policy makers.  But another set of their
17    constituents are the people who do health
18    services research.
19        Q.  Is it a prominent journal for those
20    two constituencies?          09:59:33
21        A.  Very much so.
22        Q.  So you had an understanding that
23    this article would be widely read when it was
24    being published by those constituencies?
25        A.  You know, I never thought of it    09:59:50

Page 60

1    that way, but I guess that's a logical
2    conclusion.
3        Q.  Aside from this Health Affairs
4    article, have you written any other article
5    that centers around AHERF?  I don't mean a    10:00:11
6    reference here or there to AHERF, but that
7    centers on AHERF.
8        A.  Let me just take -- so I'm precise,
9    let me just take a look just because that was
10    published in 2000.  Let me just scroll forward    10:00:35
11    and see.  I'm missing a page from my resume
12    here in this one.
13        MR. McDONOUGH:  Here, we have
14    another copy.
15        A.  There was a page missing when I    10:01:03
16    think this one was --
17        MR. WITTEN:  Let me give you
18    another one, Joe.
19        MR. McDONOUGH:  You're looking to
20    lighten the load, are you, Jack?    10:01:13
21        MR. WITTEN:  Big time.
22        MR. McDONOUGH:  Thank you, I
23    appreciate it.
24        A.  Your question, did I write
25    anything -- any other article that centers on    10:01:21

15 (Pages 57 to 60)

Lawton Burns, Ph.D.

Page 61

1    AHERF?
2        Q.    Let me rephrase.  Article or book
3    chapter may move this along a little bit.
4        A.    Yes, I've recently completed a
5    chapter on what does the -- What Do Hospital        10:01:35
6    Failures Like AHERF Mean For Policy Makers.
7        Q.    I think we're on the same page,
8    although you've just closed your page, but the
9    page that had been formerly been missing from
10   your CV.                                             10:01:49
11       A.    Yes.
12       Q.    Are you referring now to the book
13   that you wrote with Alexandra -- excuse me, the
14   chapter written with Alexandra Burns here,
15   Policy Implications and Hospital System
16   Failures, the Allegheny Bankruptcy?
17       A.    Yes.
18             MR. McDONOUGH:  Let me just make it
19   clear that it was a page that was missing from
20   the copy that he was looking at, not from the        10:02:04
21   copy that was produced in this case.
22             MR. WITTEN:  It was actually
23   missing from ours, too.
24             MR. McDONOUGH:  It was?
25             MR. WITTEN:  I talked to Antony,          10:02:12

Page 62

1    and it was replaced.
2             MR. McDONOUGH:  It was replaced.
3             MR. WITTEN:  We did a switcharoo.
4    We're all fine with that switcharoo.
5             MR. McDONOUGH:  Okay, good.             10:02:19
6        Q.    Who's Alexandra Burns, by the way?
7        A.    My wife.
8        Q.    Is she -- what does she do
9    professionally?
10       A.    She's a housewife professionally,    10:02:27
11   but she's trained as an attorney.
12       Q.    As an attorney?
13       A.    Yes.
14       Q.    How long has she been working in
15   the home?                                            10:02:38
16       A.    Boy, I think she stopped working
17   around '88 or '89 to go to law school and she
18   got out of law school, then we came to
19   Philadelphia and then we were trying to get
20   pregnant and --                                      10:02:57
21       Q.    Has she ever worked as an attorney?
22       A.    No.  She's been a paralegal.
23       Q.    So after law school she's been
24   home?
25       A.    That's right.                          10:03:06

Page 63

1        Q.    This chapter is going to be in the
2    book by Stevens, Rosenberg and Burns called
3    History and Health Policy in the United States,
4    is that right?
5        A.    That's correct.                        10:03:19
6        Q.    I tried to get a copy of that book
7    but was unable to, is it in publication yet?
8        A.    No.
9        Q.    Do you know when it will be coming
10   out in publication?                                 10:03:28
11       A.    No, I don't.  Hopefully this
12   summer.
13       Q.    I'll buy a copy.
14       A.    I don't know the time line for the
15   publication of the book.  I'm not the lead       10:03:38
16   author.
17       Q.    Now how about passing references to
18   AHERF, can you think of any articles that
19   you've written that might have a reference to
20   AHERF?                                             10:03:53
21       A.    Boy, you know, it's probably in
22   lots of my work, but I'd be hard pressed to
23   state which papers it's in.  I know that it's
24   in the paper I wrote in 2002 with Mark Pauly,
25   Integrated Delivery Networks, a Detour on the     10:04:15

Page 64

1    Road to Integrated Healthcare.  I know it's in
2    that one.  Whether or not it shows up in the
3    others, boy, I'd be hard pressed to state with
4    any specificity.
5        Q.    That's fine.  Of course we can read   10:04:28
6    that.
7        A.    Yes.
8        Q.    How -- how is it that you recall
9    that the 2002 article that you did with
10   Mr. Pauly includes a reference to AHERF?          10:04:38
11       A.    Oh, because I remember there was a
12   -- one of the lessons I concluded from the
13   Integrated Delivery Network Trend in the 1990s
14   with -- was Leading With Speed, and that was in
15   my opinion one of the characteristics of        10:04:57
16   Allegheny.
17       Q.    I want to mark another exhibit.
18   This will be Exhibit 6101.
19       A.    Can I just put these up here?
20       Q.    You can put them aside.               10:05:13
21             - - - - -
22             (Thereupon, Deposition Exhibit 6101
23             was marked for purposes of
24             identification.)
25             - - - - -                               10:05:14

16 (Pages 61 to 64)

Lawton Burns, Ph.D.

Page 65

1    Q.   Dr. Burns, do you have what we've
2  marked as Exhibit 6101?
3    A.   Yes, I do.
4    Q.   It isn't indicated here at the
5  bottom, sometimes when you pull things off the    10:05:32
6  Internet, there's a little line at the bottom.
7  But we printed this off of a page within the
8  University of Pennsylvania web page.
9         Do you recognize what this document
10  is?                    10:05:49
11    A.   Yes, I do.
12    Q.   What is it?
13    A.   The Leonard Davis Institute of
14  Health Economics is a University-wide research
15  center across the University of Pennsylvania    10:05:58
16  that does work in health policy.
17         And what they do is they issue
18  briefs summarizing research done by faculty
19  around Penn who are, I forget, they're called
20  fellows of the Leonard Davis Institute. And    10:06:20
21  that's what this brief is.
22    Q.   On the top left here, it identifies
23  you as, on the first page, as an LDI senior
24  fellow?
25    A.   That just means that you -- that    10:06:32

Page 66

1  people belong or attend Leonard Davis Institute
2  meetings and things like that, and you have a
3  -- you're appointed to this as senior fellow or
4  -- I don't know what all their gradations are.
5    Q.   Do you want to spend a minute    10:06:49
6  looking at this document or do you happen to
7  recall it?
8    A.   I remember seeing it.
9    Q.   When do you remember seeing it?
10    A.   When they issued it.    10:06:58
11    Q.   Before they issued it or after they
12  issued it?
13    A.   I saw it after they issued it.
14    Q.   Did you review it before it was
15  issued?    10:07:06
16    A.   No.
17    Q.   Did you know it was going to be
18  issued?
19    A.   Yes.
20    Q.   Maybe I wasn't clear. Did you know    10:07:11
21  it was going to be issued before it got issued?
22    A.   Yes.
23    Q.   They didn't give you a proof of it
24  to make sure they got it right?
25    A.   They may have, but I don't recall.    10:07:21

Page 67

1  The person who did all this was in the office
2  next to me, Janet Weiner, and she may or may
3  not have consulted me on it. To be honest, I
4  don't remember.
5    Q.   Did you -- you said you got a copy    10:07:34
6  of it after it was done?
7    A.   Yes.
8    Q.   After it was sent out?
9    A.   Yes.
10    Q.   Did you review it at that time?    10:07:42
11    A.   Probably not.
12    Q.   This is somebody else's, Miss
13  Weiner's, summary of your article, is that
14  right?
15    A.   That's correct.    10:07:52
16    Q.   You can set it aside.
17         You are a professor at the Wharton
18  School of Business, is that right?
19    A.   No.
20    Q.   Excuse me then. I jumped to a    10:08:10
21  conclusion. What are you -- where are you a
22  professor?
23    A.   The Wharton School of Finance.
24    Q.   I see. That's different from the
25  Wharton School of Business?    10:08:20

Page 68

1    A.   It's not called a school of
2  business. It's called a school of finance.
3    Q.   So what I've always thought of as
4  the school of business at the University of
5  Pennsylvania has called itself finance?    10:08:30
6    A.   That's the title.
7    Q.   I see.
8         So people who tell me they have
9  Wharton MBAs have gone through the Wharton
10  School of Finance?    10:08:37
11    A.   That's the official title. Yes,
12  it's a business school, but you asked --
13    Q.   I understand. No. Excuse me for
14  talking over you. I got it.
15         So you're a professor at the    10:08:53
16  Wharton School of Finance?
17    A.   Correct.
18    Q.   Have you ever taught a class where
19  you lectured about AHERF?
20    A.   Yes.    10:08:58
21    Q.   One course or was this -- was this
22  in one course or more than one course?
23    A.   I'm not sure I understand the
24  question. Are you talking about classes or
25  courses?    10:09:11

17 (Pages 65 to 68)

Lawton Burns, Ph.D.

Page 69

1   Q.  Let's talk about -- let me be
2   clear. Let's talk about courses.
3           Was there ever a course that was
4   devoted exclusively to AHERF?
5   A.  Not to my knowledge.          10:09:20
6   Q.  Was there ever a course in which
7   one of the classes during the semester or the
8   quarter, whatever it is, was devoted to AHERF?
9           MR. McDONOUGH:  Are you talking
10  about a class that he taught?          10:09:34
11          MR. WITTEN:  Yes.
12          MR. McDONOUGH:  As opposed to a
13  class. Because I'm not sure --
14  A.  That's why I said not to my
15  knowledge.          10:09:40
16  · Q.  Let me -- I'm not trying to ask a
17  trick question.
18          Did you ever teach a group of
19  students at the University of Pennsylvania
20  where in the class you lectured or led a class          10:09:51
21  discussion about AHERF?
22  A.  Yes.
23  Q.  Was this a class that was part of a
24  course? You asked me to distinguish between
25  class and course before.  I'm not trying to          10:10:05

Page 70

1   play games.
2   A.  Yes, it was a part of a class
3   session that was in a course, yes.
4   Q.  Okay.
5           Was it on -- on how many occasions          10:10:14
6   did you have class meetings where you led
7   discussions or lectured on AHERF?
8   A.  In a particular course?
9   Q.  No, in all courses.  Yes.
10          How many courses were there in          10:10:30
11  which one class was devoted in full or in part
12  to a discussion about AHERF?
13  A.  One course.
14  Q.  Is it one course that met on one
15  single quarter or was it a course that          10:10:44
16  repeated?
17  A.  We have two semesters at Wharton,
18  and I would have taught it in the course I
19  teach in the spring semester.
20  Q.  What is the name of that class?          10:10:57
21  A.  It's called Managed Care and the
22  Industrial Organization of Healthcare.
23  Q.  Did you just tell me that this is a
24  class that you teach during the spring
25  semester?          10:11:13

Page 71

1   A.  Yes.
2   Q.  In what year have you taught this
3   particular course?  What year or years?
4   A.  I have -- boy, it's not even on my
5   -- I have probably taught this course since the          10:11:25
6   late '90s. I don't remember what year I
7   started, but sometime in the late '90s.
8   Q.  Have you continued to teach it
9   until --
10  A.  That's to the best of my          10:11:39
11  recollection.  I don't remember the exact year.
12  Q.  We're now approaching spring of
13  2005.  Are we in what Wharton calls its spring
14  2005 semester?
15  A.  Correct.          10:11:50
16  Q.  Are you teaching the class Managed
17  Care in the Industrial Organization of
18  Healthcare this semester?
19  A.  Yes, I am.
20  Q.  Have you taught it continuously          10:11:55
21  since whenever it is that you started, or did
22  you take a break?
23  A.  I taught it continuously with the
24  exception of one year.
25  Q.  Do you happen to recall which          10:12:05

Page 72

1   spring of what year that was?
2   A.  Yes. I don't recall it, but I can
3   tell you what it is.  It would have been the
4   spring of 2001.  That was the one year I didn't
5   teach it.          10:12:27
6   Q.  Do you recall which spring semester
7   of which year you first included a discussion
8   of AHERF in the curriculum?
9   A.  No, I don't.
10  Q.  Was it before the spring of 2001          10:12:37
11  which is the spring that you took off?
12  A.  Well, let's see.  I probably taught
13  it -- you know, I don't -- to be honest, I
14  don't precisely remember.  I published the
15  article -- the article was published in January          10:12:55
16  of 2000.
17          MR. McDONOUGH:  That's the Health
18  Affairs article?
19          THE WITNESS:  The Health Affairs
20  article.          10:13:02
21  A.  I don't know if I taught it that
22  spring semester.  I was gone the following
23  spring.  Then I returned in 2002 and I may have
24  taught it then.  I may have started teaching it
25  then.  I don't really recall.  It's hard to          10:13:11

18 (Pages 69 to 72)

Lawton Burns, Ph.D.

Page 73

1    recall what's in each syllabus from year to
2    year.
3        Q.   Do you keep copies of the
4    syllabuses for past years?
5        A.   For the immediate past years, yes.    10:13:20
6    Because you typically revise them.
7        Q.   Suppose we would want to take a
8    look at the syllabus for the spring of 2000 for
9    this particular course, would you know how to
10   get a copy of it?                    10:13:33
11       A.   I can see if our department has a
12   copy.  They sometimes keep copies, but I don't
13   know if they keep them historically.
14       Q.   I've never been in a business
15   school.  How does -- what is the class        10:13:42
16   structure?  Do you lecture from PowerPoint
17   presentation?
18       A.   Well, it's changed over time.  It
19   used to be just, you know, lectures and
20   discussions, and then it sort of migrated into   10:13:58
21   PowerPoint.
22       Q.   So in the prePowerPoint days, did
23   you have lecture notes?
24       A.   Well, I probably would have had the
25   article or, you know, whatever I was writing at   10:14:09

Page 74

1    the time and just used that.  I don't know if I
2    would have had lecture notes because I knew the
3    topic pretty well.
4        MR. McDONOUGH:  You're talking
5    about the AHERF article.            10:14:20
6        THE WITNESS:  The AHERF article.
7        Q.   The class during which -- the
8    particular class session in which there would
9    have been a discussion of AHERF, how many
10   minutes or hours would that class have met?    10:14:29
11       A.   It would have been part of a
12   three-hour class.
13       Q.   And was it three hours in each of
14   these spring semesters in which it was taught,
15   or has that changed over time?            10:14:47
16       A.   No, that's been constant.
17       Q.   How much of the three hours,
18   approximately, would be devoted to discussion
19   of AHERF?
20       A.   Probably half.            10:14:48
21       Q.   Did there come a time when you
22   began then to use PowerPoints?
23       A.   Yes.
24       Q.   When was that, do you know?
25       A.   That I don't remember.  I'm not    10:14:57

Page 75

1    sure.  I remember when I first started out at
2    Wharton I was -- I had lagging edge technology.
3        MR. McDONOUGH:  Just to be clear,
4    are you talking about did there come a time
5    when you started using PowerPoint presentations   10:15:10
6    on the AHERF topic or just generally?
7        MR. WITTEN:  Well, I think we were
8    on the same page.
9        Q.   But to be clear, did there come a
10   time when you started generally to lecture from   10:15:18
11   PowerPoint notes?
12       A.   In general?
13       Q.   Yes.
14       A.   Yes.
15       Q.   And did you prepare then PowerPoint   10:15:25
16   -- PowerPoints for this AHERF class discussion
17   as well?
18       A.   At some point I did.
19       Q.   Do you happen to know when you
20   created the PowerPoint that was -- that was    10:15:38
21   used in your class?
22       A.   No, I couldn't recall now when I
23   did that.
24       Q.   Do you have a copy at your office
25   in Philadelphia of those PowerPoints?        10:15:47

Page 76

1        A.   I might.  I don't know.
2        Q.   You're going to be teaching it --
3    you're teaching that course this spring
4    semester you said?
5        A.   That's correct.            10:15:56
6        Q.   Have you ever done the class
7    session that will cover AHERF?
8        A.   No, I have not.
9        Q.   When that class session comes,
10   you'll either have to draft new PowerPoints or   10:16:03
11   use ones that you already have, is that right?
12       A.   Well, you know, I've learned -- I'd
13   probably base it off my expert witness report.
14       Q.   And not have PowerPoints?
15       A.   Perhaps not, just because of the    10:16:16
16   fact that litigation's going on and things like
17   that.
18       Q.   Did you destroy a past PowerPoint
19   presentation that you did for your class that
20   deals with AHERF?                    10:16:29
21       A.   No.
22       Q.   Have you -- since you first created
23   that PowerPoint presentation that deals with
24   AHERF for use in that class at Penn, have you
25   altered it?                        10:16:41

19 (Pages 73 to 76)

Lawton Burns, Ph.D.

Page 89

1  of PowerPoints for any of -- any or all of
2  these topics?
3      A.  For some.
4      Q.  Which ones do you have already
5  prepared PowerPoints?                     10:30:01
6      A.  I've given presentations on
7  physician hospital relationships, which is just
8  a subset of integrated healthcare.  So those
9  two things essentially go together.
10      I've written a whole book on supply    10:30:13
11  chain management, so the slides that are in
12  that book would be the slides in that
13  presentation.
14      Vertical integration is just
15  another part of integrated healthcare, and so   10:30:22
16  are hospital mergers.  All those topics, one,
17  two, four and five, basically go together.
18      Competitive strategy, I have a
19  handful of slides on that, but I -- that's
20  something, you know, it's more generic.        10:30:38
21      Payor provider contracting, I had
22  some grants in that area and some articles.
23  That I don't have slide shows for, but it would
24  be easy to do.
25      Managed physicians goes back to       10:30:51

Page 90

1  physician hospital relationships.
2      Hospital bankruptcy I've never
3  given a presentation on that, but based on my
4  study of Allegheny, I said I'd be happy to talk
5  my way through it.                          10:31:02
6      Group purchasing organizations goes
7  back to supply chain management.  That's just a
8  topic there.
9      And hospital of the future, I don't
10  know if I've ever given a presentation on that,   10:31:10
11  but I may have talked off-the-cuff on it.
12      Q.  Maybe in the future.
13      For these topics which you said you
14  have some slides prepared, are they -- do any
15  of them deal with AHERF?                   10:31:24
16      A.  I don't think so.  I'm just -- none
17  of the stuff on supply chain management does.
18      Physician hospital relationships,
19  that doesn't either.
20      Let me just -- the -- you know,       10:31:38
21  there might be an isolated slide in there.  You
22  know, I -- I know that when I wrote the article
23  with Mark Pauly in 2002 for Health Affairs on
24  the Lessons from Integrated Delivery Systems,
25  there was a slide show for that, and there may   10:32:03

Page 91

1  have been one slide in there on Allegheny, but
2  that's -- no, they're isolated slides.
3      Q.  Let's set this exhibit aside and
4  let's pull up your CV again.
5      A.  Okay.                              10:32:18
6      Q.  Can you turn to the page that --
7  the pages that have your industry
8  presentations?
9      A.  Yes.
10      Q.  Are you there?                     10:32:35
11      A.  Yes.
12      Q.  Do you charge for industry
13  presentations?
14      A.  Most of the time.
15      Q.  What are you referring to when     10:32:41
16  you -- by this term, industry presentation?
17      A.  Nonacademic.  Not to an academic
18  audience.
19      Q.  What is it that you do at an
20  industry presentation?                     10:32:52
21      A.  Give a speech.
22      Q.  Do the speeches vary in length?
23      A.  Of course, yes.
24      Q.  Is there something that's more
25  standard or more usual than another?         10:33:05

Page 92

1      A.  Totally variable.
2      Q.  Currently do you charge -- you told
3  me you charge, didn't you tell me that?
4      A.  Most of the time.
5      Q.  When you charge, currently, how    10:33:14
6  much do you charge for an industry
7  presentation?
8      A.  Depends on several factors.
9      Q.  What factors does it depend on?
10      A.  Do I have to travel.  How long.    10:33:23
11      Q.  How long?
12      A.  The presentation is.
13      Do I have to prepare new material.
14  And the client's ability to bear, to bear the
15  price.                                     10:33:44
16      Q.  Suppose you have to travel and
17  don't have to prepare new material, so it's
18  something you already have.  What do you
19  charge?
20      A.  Well, it would depend on how long   10:33:52
21  I'm speaking for.
22      Q.  One hour.
23      A.  Then the other variable factor is
24  how far I have to travel.
25      Q.  Do you charge by the hour?         10:34:06

23 (Pages 89 to 92)

Lawton Burns, Ph.D.

Page 93

1    A.    No.
2    Q.    By the whole engagement?
3    A.    Charge by the engagement, yes.
4    Q.    Additional amounts to reimburse you
5    for out-of-pocket expenses, or is that included    10:34:19
6    in what you charge?
7    A.    That would be additional.
8    Q.    So it's --
9    A.    Expenses.
10    Q.    What you charge plus expenses?    10:34:25
11    A.    Yes.
12    Q.    What is the range of what you have
13    charged in the past six months where you have
14    given one-hour speeches and have had to travel?
15    A.    But, as I said, it oftentimes    10:34:36
16    depends on how far I have to travel, in other
17    words, how big a dislocation it is.
18    Q.    Can you answer the question with --
19    with that caveat?
20    A.    It could be as little as 2,500 and    10:34:47
21    as much as 10,000.
22    Q.    Who have you charged $10,000 to?
23    A.    The most -- you said in the last
24    six months.
25    Q.    Yes.    10:35:07

Page 94

1    A.    Christiana Care.
2    Q.    Who are they?
3    A.    They're a hospital system in
4    Wilmington, Delaware.
5    Q.    What were the circumstances of that    10:35:13
6    speech?
7    A.    It was an all-day retreat with
8    their top management.
9    Q.    You spoke for a whole day?
10    A.    No.    10:35:22
11    Q.    How long did you speak for?
12    A.    Part of the day, and then I
13    facilitated their retreat.
14    Q.    You -- facilitating their retreat
15    involves what?    10:35:35
16    A.    Helping to lead a discussion.
17    Q.    Asking questions?
18    A.    Connecting things, yes.
19    Q.    Sure.
20        The low range, the low figure in    10:35:40
21    the range that you gave me was $2,500. Have
22    you charged less for a speech, less than 2,500
23    in the last six months?
24    A.    Sometimes I've done it for free.
25    Q.    When you've charged, have you    10:36:01

Page 95

1    charged less than $2,500?
2    A.    Well, yes, if it's executive
3    education at Wharton, that pays less.
4    Q.    How about if it's not executive
5    education at Wharton but you're going to a    10:36:14
6    hospital?
7    A.    Gosh. I may have. I don't recall.
8    I may have.
9    Q.    Delaware is not far from
10    Philadelphia, obviously.    10:36:21
11    A.    It's an hour drive.
12    Q.    So for a day at a health system --
13    was the retreat held in Delaware?
14    A.    Yes.
15    Q.    So for a day of speaking and    10:36:30
16    facilitating in Delaware for a, was it for a
17    not-for-profit health system in Delaware, the
18    charge was $10,000?
19    A.    That's right.
20    Q.    If the folks in Delaware were to    10:36:43
21    ask you to give them a one-hour presentation,
22    what would the charge be for something that you
23    already are familiar with?
24    A.    It could be 5,000.
25    Q.    Let's turn to, I think it's the    10:37:05

Page 96

1    second page of industry presentations.
2        Number five down is Meridian Health
3    System, New Jersey. That's October 1998. I
4    just picked that because it's two months after
5    the AHERF bankruptcy.    10:37:22
6        What I would like you to do, taking
7    your time, is to go down the list of industry
8    presentations for the next two pages, to
9    yourself, and when you come to one that dealt
10    primarily with AHERF, a presentation that dealt    10:37:43
11    primarily with AHERF, could you tell me which
12    they are?
13    A.    Yes, if I can remember.
14    Q.    Sure.
15    A.    You can see just by the sheer    10:37:52
16    number of them, plus I -- there's so many of
17    them, I don't even bother to list the topic I
18    speak on. So my memory could be faulty, but if
19    I spot one that looks, I'll tell you.
20    Q.    All I can ask you to do is your    10:38:06
21    best job.
22    A.    Association of Professors of
23    Medicine, Scottsdale. That's the group that
24    commissioned me to present to them what had
25    happened in Philadelphia.    10:38:23

24 (Pages 93 to 96)

Lawton Burns, Ph.D.

Page 97

1    Q.    Where is that one?
2    A.    February 1999.  That was the first
3  presentation.
4    Q.    Right.
5    A.    There may have been one for the --    10:38:32
6  one of those symposium for governing healthcare
7  systems.  I spoke at three of these things.
8  One is in August of '99, one is in September of
9  '99, one is in January of 2000.  One of those
10  could have been on AHERF.            10:39:38
11    Q.    I see one for November '99 and
12  January 2000.
13    A.    August of '99, Annual Symposium on
14  Governing Integrated Healthcare Systems in
15  Aspen.                            10:39:51
16    Q.    Thank you.
17    A.    But there were three of those.  One
18  of them I could have spoken on AHERF.
19    Q.    There's another one, the next one.
20  Is that the same organization in March of 2000,    10:39:57
21  Annual Winter Symposium?
22    A.    Hang on.  Yes.  So there are four
23  of them.  One of those could have been on
24  AHERF.  I was sort of on their preferred list
25  of speakers at that time.            10:40:17

Page 98

1        Let me just see what else.
2        Nothing else on that page.
3    Q.    How about the one in Philadelphia
4  here in September of 2000, National Association
5  of Children's Hospitals?            10:40:30
6    A.    I know I spoke to them several
7  times.  I know that one of the times I spoke to
8  them it was about the Internet.  So that
9  probably was that meeting because I remember
10  meeting, who was it, the individual out at    10:40:45
11  Intermountain, a physician who was happening to
12  revamp their clinical delivery system.  I think
13  that's what that topic was.
14        So that's all I can remember on
15  this page.                        10:40:59
16    Q.    Sure.  Let's look at the next page.
17    A.    The Johnson & Johnson Health System
18  CEO forum.  The one, two, three, fourth one
19  down, December 2001.  I may have talked about
20  it there.                        10:41:23
21        I'm getting into supply chain
22  management here, so -- a lot of these talks are
23  on supply chain management.
24    Q.    I think you skipped one, look at
25  Johnson & Johnson.  Now look five down from    10:41:44

Page 99

1  that, College of Surgeons, Philadelphia,
2  Lessons from Allegheny Bankruptcy, April 2002.
3    A.    College of Surgeons.  I barely
4  remember that.
5    Q.    The title suggests it must have        10:41:53
6  been --
7    A.    It was an Allegheny, yeah.  I don't
8  even remember the organization --
9    Q.    That's fine.
10    A.    -- to be honest with you.  I don't    10:42:00
11  know if that's the American College of Surgeons
12  -- so you'd -- my memory of that is pretty
13  faint.  I overlooked it.  I saw college of
14  surgeons, I thought I must be talking about
15  physicians.                        10:42:18
16        Let's see, the Johnson & Johnson
17  nurse fellows program I talked on integrated
18  delivery networks, I could have mentioned it in
19  passing there, but it wouldn't have centered on
20  AHERF.                            10:42:36
21    Q.    I'm not interested in mentioned in
22  passing.  Let's do it where it was primarily on
23  the subject of AHERF.
24    A.    Fine.
25        I don't see anything else on this    10:42:47

Page 100

1  page.
2    Q.    We've got one more page,
3  fortunately only half a page.
4    A.    No.
5    Q.    Do you have -- at these occasions    10:43:43
6  where you -- at least some of these occasions
7  we, I understand, you're fairly sure you spoke
8  about AHERF, like the Association of Professors
9  of Medicine?
10    A.    Right, that for sure.        10:43:59
11    Q.    The College of Surgeons indicates
12  it on the CV.
13    A.    Yes.
14    Q.    The others are possible.
15        Do you happen to know if you have    10:44:08
16  PowerPoint slides that you presented and use at
17  those presentations?
18    A.    I wouldn't know.  That's a long
19  time ago.  I don't know.
20    Q.    Do you happen to know whether you    10:44:17
21  have lecture notes for those presentations?
22    A.    No, I don't use lecture notes.
23    Q.    So --
24    A.    I just work off the slides.
25    Q.    You never -- well, since we entered    10:44:26

25 (Pages 97 to 100)

Lawton Burns, Ph.D.

Page 101

1  the PowerPoint era?
2      A.  That's right.  I learned it was
3  hard -- it's like trying to do two different
4  things at the same time.
5          MR. McDONOUGH:  You got there          10:44:37
6  slowly, but now you're there.
7          THE WITNESS:  Now I'm there.
8      Q.  To your knowledge, is there any
9  kind of videotape recording of you speaking
10  about AHERF?                                   10:44:45
11     A.  I've only been videotaped twice,
12  and I don't think either have to do with AHERF.
13     Q.  To your knowledge, are there any
14  audiotapes of you speaking about AHERF?
15     A.  Same thing.  There could be, but,    10:45:01
16  you know, if associations tape it and -- I
17  wouldn't know.
18     Q.  The speech that you gave to the
19  Association of Professors of Medicine in
20  Scottsdale in 1999, do you happen to know     10:45:17
21  whether that was taped?
22     A.  I wouldn't know.
23     Q.  Do you happen to know whether that
24  organization typically tapes speeches presented
25  to it?                                         10:45:27

Page 102

1      A.  I doubt it.  You know, it's not
2  that big.  But, you know, I don't know.
3      Q.  The Health Affairs article, you
4  don't need to pull it up unless you feel you
5  need to to answer the question.               10:45:45
6          I see you had three other
7  authors --
8      A.  Yes.
9      Q.  -- of that article.
10     A.  Yes.                                 10:45:52
11     Q.  Were you the primary author?
12     A.  I was the sole author.
13     Q.  Why are the other three listed?
14     A.  I gave them credit for doing some
15  of the background research.  That was the quick  10:46:02
16  pro quo because I didn't pay them.
17     Q.  What kind of background research
18  did the three of them do?
19     A.  They pulled together a newspaper.
20  One person pulled together newspaper articles   10:46:18
21  from Philadelphia and went through them.  One
22  dealt with people in the bond market in New
23  York.  One person conducted interviews in
24  Philadelphia.
25     Q.  Which is the person who conducted    10:46:33

Page 103

1  the interviews in Philadelphia?
2      A.  John Cacciamani.
3      Q.  Were you present for the interviews
4  that Mr. Cacciamani did?
5      A.  Not at all.                          10:46:44
6      Q.  Pardon me?
7      A.  Not at all.
8      Q.  For none of them?
9      A.  None of them.
10     Q.  You said that another of the other   10:46:49
11  individuals dealt with folks in the bond market
12  in New York?
13     A.  Yes.
14     Q.  Which person was that?
15     A.  Jim Clement.                         10:46:54
16     Q.  What does that mean to deal with
17  the folks in the bond market?
18     A.  What I think he did is he retrieved
19  from, it was either Moody's or Standard &
20  Poor's, or both, sort of the decline in the    10:47:06
21  bond ratings of the various AHERF hospitals.
22     Q.  Did he do interviews of the people
23  in New York?
24     A.  Yes, probably -- to get the -- he
25  probably had to just to get the information.   10:47:20

Page 104

1  Sourcing the information, basically.
2      Q.  Were you present when Mr. Clement
3  spoke to the people in the bond market in New
4  York?
5      A.  No.                                  10:47:29
6      Q.  Did you do any of -- I mean, the
7  article's based largely on interviews, is that
8  right?
9      A.  No, I don't think so.
10     Q.  Did you do any interviews for that   10:47:40
11  article?
12     A.  I did at least one, but I'm trying
13  to think -- I'd have to -- you know, if you
14  want, I'll spend some time thinking about who I
15  may have talked to.                          10:47:57
16     Q.  For that article?
17     A.  Yes.
18     Q.  Why don't you spend a moment and
19  think about who you --
20     A.  Let me just -- if I could see the    10:48:02
21  article.  I probably referred to them in the --
22  so if you hang on, I'll tell you.
23     Q.  I'll get a drink while you're doing
24  that if that's okay.
25     A.  Because I think I mentioned them.    10:48:14

26 (Pages 101 to 104)

Lawton Burns, Ph.D.

Page 225

1    A.   To be honest, I don't remember.
2   This was years ago. Probably in early 2003.
3   It's hard to recall what any specific
4   individual said.
5       Q.   Dr. Catherine Clark, your          14:39:46
6   internist, what information or what did she
7   share with you about her views on the AHERF
8   failure?
9       A.   She didn't. She talked about
10  Jefferson.                              14:40:00
11      Q.   I see.
12      A.   She was part of Jefferson's primary
13  care network.
14      Q.   Since you were retained by Cravath,
15  can you think of anyone else with whom you    14:40:13
16  spoke who's not at Cravath or not Joe about the
17  AHERF failure who you haven't already named?
18      A.   Let's see. I mentioned the people
19  at Medicaid. There were people in the federal
20  government I talked to over the phone, tried to  14:40:34
21  find out the published documentation on changes
22  in the Medicare program.
23          The only individual I can remember
24  there is a guy named Stu Gutterman. Maybe you
25  know Stu. I've known Stu for a long time. I    14:40:48

Page 226

1   spoke with him. He provided me with a lot of
2   the information on the market basket and the
3   updates.
4       Q.   Stu does demonstration projects at
5   Medicare, I think.                      14:41:02
6       A.   At MedPac, I believe.
7       Q.   Let's turn to the next invoice, if
8   we could. I'm looking at the descriptive
9   invoice that accompanies your December 13th,
10  2002.                                   14:41:15
11      A.   Okay.
12      Q.   Looking at this, there are three
13  interviews referenced here. Does this jog your
14  memory in any way about additional interviews?
15      A.   I can't parse who I talked to when.  14:41:26
16  I mean, I've enumerated for you all the people
17  I can dredge up here.
18      Q.   Sure. I understand. I thought
19  sometimes --
20      A.   No. I can't associate them with a    14:41:35
21  time of year.
22      Q.   Have all of your invoices been
23  paid?
24      A.   There may be one outstanding.
25  Other than that -- maybe the January 17th one    14:41:45

Page 227

1   of this year may be outstanding.
2       Q.   Many of the cover letters are
3   addressed to someone named Matt Krusko. What
4   interactions did you have with Mr. Krusko?
5       A.   At one point Matt Krusko became my    14:42:14
6   contact person rather than Antony. And then at
7   some point Matt stopped being my contact point.
8           He was at the second meeting when I
9   came up here.
10      Q.   Did you have -- did you have          14:42:36
11  regularly scheduled conference calls with the
12  lawyers at Cravath during this engagement?
13      A.   No.
14      Q.   Did you have occasional conference
15  calls?                                  14:42:53
16      A.   I don't remember any conference
17  calls.
18      Q.   Did you have just occasional
19  telephone calls then?
20      A.   If that. I mean, the only time I      14:43:01
21  can think of -- I would -- I might prompt
22  Cravath when I wanted to buy, for example, a
23  database and I'd ask permission.
24      Q.   Did you have conference calls with
25  Mr. McDonough?                          14:43:25

Page 228

1       A.   No, I don't think I ever did.
2       Q.   Did you have telephone calls with
3   Mr. McDonough?
4       A.   Yeah, later on in the process.
5       Q.   In the report writing process?        14:43:34
6       A.   Probably, yes.
7       Q.   What input did you receive from
8   lawyers in the report writing process?
9       A.   Sort of the format, you know, and
10  the fact that you have, you know, the          14:43:59
11  structure, the expert witness background and
12  qualifications, summary of work performed,
13  executive summary. In other words, the basic
14  -- the fact that you follow sort of this format
15  and then I sort of fill in what goes underneath  14:44:12
16  each heading.
17      Q.   Did they make any suggestions that
18  you include or exclude any information?
19      A.   What they suggested was that I make
20  some editorial punctuation corrections.        14:44:24
21      Q.   What's an editorial punctuation
22  correction?
23      A.   In other words, where I've
24  mispunctuated the report.
25      Q.   You mean grammatical corrections?      14:44:34

57 (Pages 225 to 228)

Lawton Burns, Ph.D.

Page 229

1    A.  Yes.
2    Q.  Aside from grammatical corrections,
3  are there any other suggestions that you
4  received on the report from lawyers?
5    A.  What goes into the exhibits, yes.    14:44:50
6  I didn't know how they wanted stuff listed.
7    Q.  Let's take a look at pages six to
8  eight real quick.
9       Pages six to eight are your --
10  there's a heading here, Statement of Opinions.    14:45:10
11    A.  M-hm.
12    Q.  Did you get any input from a lawyer
13  on how to word your statement of opinions?
14    A.  I was asked to provide a list of
15  opinions after having written my report, so    14:45:19
16  this came at the end.
17    Q.  I see.
18       Was there any suggestion about what
19  the content ought to be?
20    A.  No, it was just more abstract what    14:45:28
21  I had written and put it up front, so it would
22  be like an executive summary.
23    Q.  Take a look at paragraph I.
24    A.  M-hm.
25    Q.  Was there any specific suggestion    14:45:38

Page 230

1  to include this paragraph?
2    A.  Not that I recall, huh-uh.
3    Q.  The reason I ask is there's not a
4  great deal in the body of the report on that
5  point.    14:45:50
6    A.  M-hm.
7    Q.  My having pointed out that there's
8  not a great deal in the body of the report
9  doesn't reflect your recollection about --
10    A.  No, it's more like a summary like    14:46:01
11  this is the end.
12    MR. WITTEN:  I might be finished.
13  Could we go off the record for a minute?
14    THE VIDEOGRAPHER:  Off the record.
15    (Discussion off the record.)    14:46:13
16    MR. WITTEN:  We can return.
17    THE VIDEOGRAPHER:  Back on the
18  record, 2:47.
19    Q.  I think I have one question on the
20  invoices still.  Take a look, first, at the    14:47:30
21  beginning, the invoice entry for October 4th,
22  2002.  This is attached to your October 7th,
23  2002 letter.
24    A.  I don't have an October 4th, 2002.
25    Q.  No, look for a letter dated October    14:48:00

Page 231

1  7th, 2002.
2    A.  Okay.
3    Q.  Then look at the time entries.  The
4  next to last one is October 4.
5    A.  Okay.    14:48:02
6    Q.  Are you there?  Are you with me?
7    A.  October 7th, 2002?
8    Q.  Yes, the cover letter is October
9  7th, 2002.  Now turn the page to the invoice.
10    A.  Okay.    14:48:11
11    Q.  Do you see the listing for 10-4?
12    A.  Yes.
13    Q.  October 4?
14    A.  M-hm.
15    Q.  We had talked about your interview    14:48:16
16  with the two Johns from Independence Blue
17  Cross.  Your entry here says, "Interview former
18  executive at major insurer at Philadelphia."
19       As I understood it, you were
20  undertaking obviously to interview Fred DiBona?    14:48:30
21    A.  DiBona.
22       This may not be that meeting.  As I
23  said, I wasn't sure.  I know one of the
24  interviews I had was with Fred DiBona down at
25  his office at Independence Blue Cross    14:48:45

Page 232

1  headquarters.  Then I got shuttled to two of
2  his other people.
3       But the other thing I was trying to
4  do was interview the former head of Aetna U.S.
5  Healthcare.  That may be what this is because    14:49:01
6  he's no longer president of Aetna U.S.
7  Healthcare.
8    Q.  Right.
9       Mr. DiBona was at this point not a
10  former executive.    14:49:06
11    A.  No, he was then CEO of Independence
12  Blue Cross.  So this may have been trying to
13  track down Len Abramson.  That's the guy's
14  name.
15    Q.  Len Abramsom?    14:49:15
16    A.  Yes.
17    Q.  An effort that was unsuccessful?
18    A.  Yes.  I was networking my way
19  around.
20    Q.  So this indicates interview former    14:49:23
21  executive of major insurer?
22    A.  Yes.
23    Q.  That's what's written.
24    A.  Unsuccessful.
25    Q.  Have you ever spoken with Sherif    14:49:31

58 (Pages 229 to 232)

Lawton Burns, Ph.D.

Page 233

1 Abdelhak?
2    A.  Never.
3    Q.  Have you ever spoken with David
4 McConnell?
5    A.  Never.                    14:49:39
6    Q.  Did you ever speak to Nancy
7 Wynstra?
8    A.  Never.
9    Q.  Have you ever spoken to William
10 Buettner?                        14:49:48
11    A.  Never.
12    Q.  Have you ever spoken to any of the
13 Coopers & Lybrand employees who were involved
14 in the AHERF audits?
15    A.  I don't know who all they are, but    14:49:59
16 not that I know of.
17    Q.  Not such that you know.
18    A.  (Shaking head no.)
19    Q.  Have you ever spoken to anyone at
20 PricewaterhouseCoopers, not their lawyers, but    14:50:10
21 anyone at PricewaterhouseCoopers about this
22 litigation?
23    A.  No, I don't think I've had any
24 direct -- no, I don't think I've had any direct
25 contact with anybody from                14:50:20

Page 234

1 PricewaterhouseCoopers, but they may have
2 consultants around the country who I know, but
3 not with regard to this.  I may have spoken to
4 them socially or professionally, but not about
5 this.                            14:50:32
6    Q.  Aside from your interview with Tony
7 Sanzo that you had for your Health Affairs
8 article, have you -- did you -- have you had
9 any other conversations with him about the
10 failure of AHERF?                    14:50:50
11    A.  No.
12    Q.  Have you ever had any conversation
13 with anyone from the Hunter Group about the
14 failure at AHERF?
15    A.  I remember I was at a conference    14:50:59
16 once where several Hunter Group executives were
17 making presentations on hospital turnarounds.
18 I remember socializing with them.  Tom Honan
19 was the guy I remember.
20    Q.  You remember socializing with    14:51:19
21 Mr. Honan?
22    A.  Yes.  So I know who they are,
23 but --
24    Q.  You knew Mr. Honan was at AHERF?
25    A.  I think he was.  He may have had    14:51:29

Page 235

1 some -- I don't know if he was at Penn or AHERF
2 because -- it was around that time.
3        MR. WITTEN:  I don't have any more
4 questions.
5        THE VIDEOGRAPHER:  Off the record,    14:51:44
6 2:51.
7
8        (Deposition concluded.)
9        - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1        CERTIFICATE
2 The State of Ohio,   )
3            SS:
4 County of Cuyahoga.  )
5
6        I, Michele Eddy, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, LAWTON R. BURNS,
10 Ph.D., was by me first duly sworn to testify
11 the truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19        I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

59 (Pages 233 to 236)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## ROGER D. FELDMAN, Ph.D.
*March 11, 2005*

---

# LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

FELDMAN, Ph.D., ROGER D. - Vol.



ROGER D. FELDMAN, Ph.D.

Page 69

1   A.   No.
2   Q.   Did you review any reports that had been
3        created for or presented to the trustees of
4        AHERF during the ten-year period covered by
5        your report?
6   A.   No.
7   Q.   Did you ask to do so?
8   A.   No.
9   Q.   Did anyone suggest it might be a good idea or
10       helpful if you did?
11  A.   No.
12            THE WITNESS:  This would be a good
13       time for a break.
14            MR. MCDONOUGH:  Okay.
15            THE VIDEOGRAPHER:  We are going off
16       the record at 10:46 a.m.
17            - - - -
18       (There was a recess in the proceedings.)
19            - - - -
20            THE VIDEOGRAPHER:  We are back on the
21       record at 10:56 a.m.
22  BY MR. MCDONOUGH:
23  Q.   Dr. Feldman, do you recall having more than one
24       conversation or telephone call with
25       Thomas Singleton?

Page 70

1   A.   I only recall one conversation.
2   Q.   Okay.  Do you recall reviewing his report?
3   A.   Yes.
4   Q.   Do you recall reviewing drafts of his report,
5        that is, something that existed prior to the
6        issuance of his report?
7   A.   No.
8   Q.   On page 7 of your report, the paragraph that
9        begins with My report is organized as follows.
10       Do you see that?
11  A.   Yes.
12  Q.   The last sentence of that paragraph, you say, I
13       conclude that external market forces would not
14       have prevented a turnaround plan, implemented
15       beginning in the fall of 1996, from rescuing
16       the hospitals in AHERF's DVOG group, correct?
17  A.   Correct.
18  Q.   What do you mean by turnaround?
19  A.   A plan that would have stopped the losses of
20       that system and put it back on sound financial
21       footing, but I am -- based on your previous
22       questions, I have not written on turnaround
23       plans.  I'm summarizing my interpretation of
24       what Mr. Singleton is doing.
25  Q.   Okay.  And in addition to not writing on them

Page 71

1        and summarizing what Mr. Singleton is doing, is
2        it also correct that you have no experience
3        working on a turnaround plan or a financial or
4        operational revamping of an organization?
5   A.   Actually, I do.
6   Q.   Okay.  And what is that?
7   A.   I'm the chair of my department at the
8        University of Minnesota, responsible for an
9        organization with a funded budget of
10       $50 million in research grants, and I've been
11       responsible for turning around some of the
12       operations of our department.
13  Q.   So you've been responsible for turning around
14       some of the operations of your academic
15       department within the University of Minnesota?
16  A.   Yes.
17  Q.   Okay.  Now, this paragraph says that you
18       conclude external market forces would not have
19       prevented a turnaround, beginning in the fall
20       of 1996, from rescuing the hospitals in AHERF's
21       DVOG group, is that correct?
22  A.   That's correct.
23  Q.   Okay.  Why the fall of 1996, Dr. Feldman?
24  A.   That is when Mr. Singleton's turnaround plan
25       begins.

Page 72

1   Q.   Okay.  So, in choosing that date, are you
2        relying on the conclusions reached by
3        Mr. Singleton?
4   A.   No, I'm not relying on his conclusions.  I'm
5        relying upon his implementation date.
6   Q.   His implement date being the fall of 1996?
7   A.   Yes.
8   Q.   Okay.  But did you yourself independently
9        conclude that a turnaround plan implemented
10       beginning in the fall of 1996 would rescue the
11       hospitals in AHERF's DVOG group?
12  A.   No, I didn't.
13  Q.   So your conclusion here is, in effect,
14       repeating what you read in Mr. Singleton's
15       report?
16  A.   No, it's not.
17  Q.   Okay.  Well, what's the difference?
18  A.   Okay.  The difference has to do with two
19       phrases in that sentence.  One of them is
20       external market forces.  That is, would
21       external market forces have done something?
22       And then the second is what they would have
23       done, and that is preventing a turnaround plan
24       from succeeding.
25            So my conclusion here is that a

18 (Pages 69 to 72)

ROGER D. FELDMAN, Ph.D.

Page 73

1  turnaround plan would not have been doomed by
2  those external market forces.
3  Q.  Okay.  Now, would -- I'm sorry.
4      Is your conclusion that external
5  market forces would not have prevented a
6  turnaround something that relates only to a
7  plan implemented beginning in the fall of 1996?
8  A.  I can't say for sure, because I didn't analyze
9  a turnaround plan that was implemented at
10  another time.
11  Q.  Okay.  So your report then does not address
12  whether a turnaround plan executed in 1997
13  would have rescued the hospitals in AHERF's
14  DVOG group?
15  A.  Yes.  That's correct.
16  Q.  And your report does not address whether a
17  turnaround plan executed in 1998 would have
18  rescued the hospitals in AHERF's DVOG group?
19  A.  I want to be careful in answering that.
20      When you say executed, I want to make
21  sure we both mean begun.
22  Q.  And, actually, the word I should have used and
23  will use is your word which is implemented.
24  A.  Implemented.  Okay.
25  Q.  So, with that modification, your report does

Page 74

1  not address whether a turnaround plan which
2  began to be implemented in 1998 would have
3  prevented rescuing the hospitals in AHERF's
4  DVOG group?
5  A.  No.
6  Q.  Is there anything in the work that you did on
7  external market forces -- which, as I
8  understand, is the focus of your report.
9      Is there anything in that work that
10  you did that would cause you to believe, as you
11  sit here today, that something that was
12  possible in 1996 would not have been possible
13  in 1997 or 1998 because of changes in external
14  market forces?
15  A.  I haven't studied that issue.
16  Q.  Haven't studied it and didn't study it for your
17  report, correct?
18  A.  Correct.
19  Q.  Now, Mr. -- I'm sorry.  Dr. Feldman, your
20  report indicates that you were applying your
21  expertise to what others -- five other expert
22  witnesses retained by PriceWaterhouse had to
23  say, correct?
24  A.  Yes.
25  Q.  Do you consider that your training and

Page 75

1  background and experience qualifies you as an
2  expert to provide that commentary or critique?
3  A.  Yes.
4  Q.  Okay.  Do you consider that the education,
5  background, training and experience of
6  Dr. Burns qualified him to provide the opinions
7  that he provided in his report?
8  A.  I don't have an opinion about that.
9  Q.  Okay.  So you don't know whether it does or
10  doesn't?
11  A.  No.
12  Q.  Do you know Dr. Burns other than having read
13  his report in this case?
14  A.  Yes.
15  Q.  Have you worked on a professional level with
16  him?
17  A.  Yes.
18  Q.  Do you believe that he is an individual who has
19  expertise in the area of health care at
20  hospitals and integrated delivery systems?
21  A.  Yes.
22  Q.  The same question with respect to Mr. Ruback.
23  Strike that.  I'm going to ask it in a
24  different order.
25      The same question with respect to

Page 76

1  respect to Professor Dranove.  Do you know
2  Professor Dranove?
3  A.  Yes.
4  Q.  Do you consider him to have expertise in the
5  areas of health care and hospitals and
6  integrated delivery systems?
7      MR. YOUNG:  Objection.  Compound.
8  A.  I am not sure about his expertise in integrated
9  delivery systems.  I do consider him a health
10  care expert.
11  Q.  And have you worked with him?
12  A.  No, I have not.
13  Q.  How about Mr. Ruback?  In reading his report
14  and his credentials, did you have any question
15  about his expertise to address the subjects
16  that he addressed in his report?
17  A.  I am not able to make a judgment on that.  He's
18  not an economist, and I'm not sure if his
19  specialty is health care or not, but it is not
20  clear to me how to answer.
21  Q.  And, therefore, you had or formed no opinion on
22  that one way or the other?
23  A.  That's correct.
24  Q.  How about Mr. Dickinson?
25  A.  Similarly for Mr. Dickinson.

19 (Pages 73 to 76)

ROGER D. FELDMAN, Ph.D.

Page 77

1  Q.  Similarly to Mr. Ruback?
2  A.  Yes.
3  Q.  How about Professor Cleverley --
4  A.  What's the question?
5  Q.  -- or Dr. Cleverley?  That's a fair response.
6        Do you consider Dr. Cleverley to have
7  experience in the areas of health care,
8  hospitals and integrated -- or integrated
9  delivery systems?
10       MR. YOUNG:  Objection.  Compound.
11  A.  I consider that he has a lot of expertise on
12  hospitals.
13  Q.  Okay.  Do you consider him to be an expert in
14  at least the hospital area of health care?
15  A.  Yes.
16  Q.  Do you know him professionally?
17  A.  Yes.
18  Q.  Have you worked with him?
19  A.  No.
20  Q.  Now, turning to page 8 of your report, please,
21  you have a section on the Philadelphia Market
22  and AHERF's Geographic Diversification
23  Strategy, correct?
24  A.  Yes.
25  Q.  Now, in the second paragraph, you indicate,

Page 78

1  second sentence, that Philadelphia was indeed a
2  competitive hospital market compared with most
3  metropolitan areas, but then you go on to say,
4  It was by no means unique among a peer group of
5  large cities in 1990.  Do you see that?
6  A.  Yes.
7  Q.  Okay.  And that is one of the conclusions you
8  draw in your report, correct?
9  A.  That's correct.
10  Q.  Okay.  Now, Dr. Feldman, did Professor Burns,
11  in his report, based on your review and
12  recollection, ever say that Philadelphia was a
13  unique market?
14  A.  I don't recollect his use of the word unique.
15  I think he refers to it as a very bad market
16  for hospitals, a very tough market for
17  hospitals.  If I could read the report, I may
18  or may not find the word unique mentioned in
19  it.
20  Q.  Well, your conclusion here, the one I'm
21  addressing, says you agree Philadelphia was a
22  competitive hospital market, but you also
23  conclude it was by no means unique, and so what
24  I'm asking you is do you recall that
25  Professor Burns said it was unique?

Page 79

1  A.  No, I don't.
2  Q.  Do you recall that Professor Dranove said it
3  was unique?
4  A.  No.
5  Q.  Do you recall that any of the other experts
6  whose reports you critiqued indicated that the
7  Philadelphia hospital market was unique?
8  A.  Okay.  I'd like to see the Burns report,
9  please.
10  Q.  Well, I'm asking you questions here based on
11  your recollection.  Excuse me.  You used the
12  word unique.
13  A.  And I'm trying to recall.
14  Q.  And I'm simply asking you whether, when you
15  used it or now, you had any recollection that
16  any of the experts you were critiquing had said
17  Philadelphia was a unique market?
18  A.  And I'm answering that I don't recollect
19  whether this particular word was or was not
20  used in those reports.
21  Q.  Okay.  In the third -- strike that.
22        In the third paragraph -- full
23  paragraph on page 8, the one that starts with
24  starting from --
25  A.  Um-hum.  Yes.

Page 80

1  Q.  -- the second sentence, you talk about major
2  academic medical centers in Boston.  Do you see
3  that?
4  A.  Yes.
5  Q.  And you indicate here that those major academic
6  medical centers initiated several mergers in
7  order to gain market power and reduce excess
8  capacity.  Do you see that?
9  A.  Yes.
10  Q.  Now, are those major academic medical centers
11  that you reference in that sentence the ones
12  that you then go on to, later in your report,
13  deal with more closely, the Massachusetts
14  General Hospital, et cetera?
15  A.  Yes.
16  Q.  Okay.  Dr. Feldman, based on your research and
17  study, did those major academic medical
18  centers, which initiated several mergers in
19  Boston, gain market power by doing so?
20  A.  I think it was a mixed picture.
21  Q.  Meaning what?
22  A.  That the hospitals in Boston were negotiating
23  with the HMOs in Boston over rates, and during
24  the latter part of the 1990's, the negotiations
25  may have favored the hospitals more than it did

20 (Pages 77 to 80)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
          Plaintiff,
     vs.                              Civil Action
PRICEWATERHOUSECOOPERS,               No. 00-684
LLP,
          Defendant.


- - - - -

          Videotaped Deposition of DAVID E.

COVINTREE, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Cravath, Swaine & Moore, 825 Eighth Street,

Worldwide Plaza, New York, New York, on Friday,

the 11th day of March, 2005, at 9:00 a.m.

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

David Covintree

Page 45

1  number of staff members. I would say it was
2  under ten.
3      Q.   Do you remember the names of any of
4  the people in the public finance group whom you
5  supervised? I'm not talking about secretaries    09:57:35
6  or clerical. I mean professional staff.
7      A.   It's been how many years. Almost
8  eight years?
9          No, I can't -- I can't remember
10  their names.                        09:57:50
11     Q.   And this public finance group was
12  responsible for surveilling all of the types of
13  public finance transactions that you described
14  to me before, is that right?
15     A.   Yes, sir.                   09:58:01
16     Q.   That is healthcare?
17     A.   Healthcare.
18     Q.   General obligation debt?
19     A.   Yes, sir.
20     Q.   Water and sewer?              09:58:06
21     A.   Yes, sir.
22     Q.   Airport?
23     A.   Yes, sir.
24     Q.   Higher education?
25     A.   Yes, sir.                   09:58:11

Page 46

1      Q.   Utilities?
2      A.   Yes, sir.
3      Q.   And maybe some other things, but
4  you couldn't recall which?
5      A.   Yes, sir.                   09:58:19
6      Q.   Now that we're talking about your
7  function as acting director of public finance
8  surveillance, and we're on that topic, does
9  this help you recall whether what we call the
10  sale of the book of business for healthcare    09:58:34
11  occurred before or after you departed from
12  FGIC?
13     A.   I'm trying to recall because we
14  were -- I was working with the one analyst who
15  was designated in the surveillance department    09:58:55
16  for healthcare on this -- on this project. I
17  think it occurred when I was still there. But
18  I don't know the exact -- I really don't know
19  the exact date.
20     Q.   Is there something you could do to    09:59:15
21  figure out what was the time that the
22  healthcare book was sold?
23     A.   Do you mean --
24     Q.   Can you think of a document in your
25  possession or a newspaper article or something    09:59:29

Page 47

1  you could look at?
2      A.   I don't think -- I don't think
3  there would be anything that was published
4  about that.
5      Q.   No files at home would help you --    09:59:38
6      A.   I have no files at home, sir.
7      Q.   Is there a person you could talk to
8  who would help you know the date?
9      A.   Ann Stern, who was the president of
10  the company. She would -- she might recall.    09:59:51
11     Q.   Are you still in touch with Ann
12  Stern?
13     A.   No, sir.
14     Q.   A moment ago you referred to the
15  healthcare analyst on this project in your    09:59:59
16  answer. Who was that healthcare analyst that
17  you had in mind?
18     A.   I can't recall his name. I can
19  picture him. It's eight years. I mean, I -- I
20  can name hospitals, but I can't name    10:00:16
21  individuals.
22     Q.   Within the public finance group,
23  were the professionals assigned to one sector
24  or another, that is, healthcare versus airports
25  versus utilities and so on? I'm talking about    10:00:29

Page 48

1  the surveillance, public surveillance.
2      A.   In the surveillance department, we
3  had a special individual always designated for
4  healthcare, that's correct. Some of the other
5  areas we weren't as specific. They were more    10:00:47
6  generalists in some of the other areas.
7      Q.   Is this special --
8      A.   But in healthcare, we had one
9  specific individual.
10     Q.   Is this special individual the same    10:01:01
11  person you couldn't remember a moment ago? Who
12  was this special individual?
13     A.   It would have been a healthcare
14  analyst in the surveillance department.
15     Q.   A moment ago you said that there    10:01:17
16  was a healthcare analyst who was working on the
17  sale of the book of business project. Do you
18  recall that you said that?
19     A.   Yes, yes.
20     Q.   Is that the same designated    10:01:25
21  healthcare analyst that you've just been
22  testifying about?
23         MR. BROOKS: Objection. I think he
24  was testifying about a general practice over
25  time.                           10:01:37

12 (Pages 45 to 48)

David Covintree

Page 49

1  Q.  You were acting director over
2  public finance --
3  A.  There were several people -- just
4  when you're working on -- basically when I say
5  sell off the book, it's very similar to          10:01:50
6  reinsuring, you're working with several
7  departments.  So you're also working with the
8  reinsurance department.
9  So while the analyst in the
10  surveillance department was working with me     10:02:04
11  pulling all the information together to present
12  to a Capital Re or Enhance as far as how the
13  credits were performing, there was then a
14  reinsurance department that would then interact
15  with those reinsurers to actually carry off     10:02:22
16  that transaction.
17  Q.  During the approximately one year
18  that you were the acting director of public
19  finance surveillance, was there one analyst who
20  was designated to work specially on healthcare  10:02:35
21  surveillance?
22  A.  Yes, sir.
23  Q.  Was it always the same person?
24  A.  For that year that I was deputy
25  director -- director of public finance          10:02:45

Page 50

1  surveillance, yes, sir.
2  Q.  Do you recall that person's name?
3  A.  You've asked me that several times.
4  Q.  It was a man or a woman?
5  A.  It was a gentleman.          10:02:56
6  Q.  Go ahead.  Were you about to say
7  something?
8  A.  No.  I'm trying to recall his name.
9  If it comes to me and all of a sudden I pop
10  something out, it will be there.          10:03:15
11  Q.  In the general time frame of the
12  mid 1990s, let's say 1994 to '98, what other
13  companies in the United States were involved in
14  the bond insurance business?
15  A.  You say 1994 to '98?          10:03:29
16  Q.  Yes, let's pick that time frame.
17  A.  Again, the question is?
18  Q.  What other companies were involved
19  in the bond insurance business in the United
20  States?          10:03:41
21  A.  In the municipal -- in municipal
22  finance, bond insurance, there was MBIA.  There
23  was Amback.  There was FSA.  Those were the
24  primary bond insurers.
25  When I say primary, they were --          10:04:22

Page 51

1  along with FGIC, those were the four major bond
2  insurers that all carried AAA ratings.
3  There may have been some smaller
4  companies.
5  In that time frame, in the early          10:04:38
6  part of that time frame, 1994, there may have
7  been a company called Capital Guaranty.  That's
8  -- those are the major players.
9  Q.  Mr. Cunningham, who we referred to
10  earlier, he joined FSA, is that what you said,   10:05:03
11  or he joined another company?
12  A.  I stated earlier that I think he
13  went to FSA.  I don't really follow people once
14  they leave the company.
15  Q.  In this same time frame, 1994 to    10:05:18
16  1998, was Amback insuring hospital bonds?
17  A.  Amback was insuring healthcare
18  bonds, yes.
19  Q.  In the same time period, 1994 to
20  1998, was FSA insuring hospital bonds?          10:05:36
21  MR. BROOKS:  Objection, vague.  Any
22  point in that time period or the entirety of
23  the time period?
24  Q.  For the entire time period, was FSA
25  insuring hospital bonds?          10:05:49

Page 52

1  MR. BROOKS:  If you know.
2  A.  Again, through '98?
3  Q.  M-hm.
4  A.  Again, you're asking me -- after
5  '97, I really don't want to say.  I did not     10:05:58
6  follow the business after '97.
7  Q.  Okay.  So let's just do it for the
8  time period for which you followed the
9  business.  From 1994 through 1997, was FSA
10  insuring hospital bonds?          10:06:11
11  A.  Yes.
12  Q.  And of course MBIA was insuring
13  hospital bonds from 1994 through '97 when you
14  left?
15  A.  Yes.          10:06:24
16  But I would say while they were all
17  insuring bonds, I don't know what their
18  specific criteria of healthcare bonds that they
19  were insuring.
20  Again, I know FGIC was slowing down   10:06:35
21  its underwriting and insisting on A quality
22  credits.  MBIA from the documents that were --
23  that I've been presented, were insuring credits
24  less than A.
25  I don't know for sure what FSA and    10:07:07

13 (Pages 49 to 52)

David Covintree

Page 53

1   Amback were, what kind of quality of healthcare
2   issues they were insuring.
3       Q.    The documents that you were
4   provided, these are the documents described in
5   Exhibit 2?                           10:07:19
6       A.    In Exhibit 2, yes, sir.
7       Q.    Virtually all of those documents
8   deal with AHERF, is that right?
9       A.    Well, it was more than just AHERF.
10  Some of the exhibits were underwriting criteria   10:07:32
11  and their depositions.
12      Q.    Of the four companies, largest
13  companies that I think you mentioned, MBIA,
14  Amback, FSA, and FGIC, in your view, was one of
15  these four companies larger than the other?      10:07:59
16      A.    It depends really what you're
17  defining as large. In what areas are we
18  talking about large?
19      Q.    In general in bond insurance, did
20  one of these four companies have the reputation  10:08:09
21  of being the industry leader in the mid 1990s?
22      A.    Again, I think it depends, one, on
23  the sectors. It depends on if we're just
24  looking at market share. I think it depends on
25  a lot of issues. They were all -- all four of    10:08:32

Page 54

1   those major players were all rated AAA by the
2   major rating agencies.
3           I think their market shares would
4   vary from year to year. The overall market
5   share would vary and then the specific areas     10:08:51
6   where one company might dominate over another.
7           FGIC, for instance, might not be
8   the overall market share leader in bond
9   insurance, but they may have been the market
10  share leader in underwriting general obligation  10:09:08
11  debt because that's where they were focusing.
12          So when you say large, it really
13  depends.
14      Q.    I didn't say large in the last
15  question. I said that a few questions earlier.   10:09:23
16          If you look at -- if you look at
17  these four companies -- if you look at --
18  excuse me.
19          If you look at municipal bond
20  insurance in the aggregate, all municipal bond   10:09:31
21  insurance in the mid 1990s, who had the biggest
22  market share?
23      A.    I'm trying to recall. If I had a
24  bond buyer, I could -- if I had -- if I had a
25  bond buyer, I could probably be able to tell     10:09:50

Page 55

1   you right away.
2       Q.    So you don't know?
3       A.    Not -- not really. MBIA was
4   generally known as the largest market share.
5       Q.    Of the four companies, which first  10:10:02
6   got into the business of bond insurance, do you
7   know?
8       A.    Of the four, it was Amback.
9       Q.    To your knowledge, did there come a
10  time when FGIC resumed underwriting healthcare   10:10:23
11  bonds?
12      A.    I have just learned over the past
13  few -- actually probably October of 2004, I
14  learned that FGIC is now insuring healthcare
15  financings. They're under a totally new          10:10:44
16  ownership. GE Capital had sold their -- has
17  sold the business to another company and
18  they've decided to expand their sector,
19  underwritings.
20      Q.    You learned that in October of 2004  10:11:02
21  before your report that FGIC had resumed the
22  business of --
23      A.    I learned it simultaneously the
24  very same day, the day that I came into this
25  office to talk about this, Moody's Investor      10:11:16

Page 56

1   Service has an annual alumni party. And I go
2   to that every year and you see a lot of Moody's
3   alumni.
4           And at that party, there are people
5   from MBIA. There's people from Amback.           10:11:36
6   There's people from the whole industry. They
7   all know me. They were just filling me in on
8   what was going on.
9       Q.    So you learned that -- you learned
10  that FGIC resumed insuring hospital bonds        10:11:52
11  before your report was written, obviously,
12  then, is that right?
13      A.    Did I --
14      Q.    You said that you learned that FGIC
15  resumed insuring hospital bonds on the very      10:12:04
16  first day that you worked on this particular
17  report; is that right?
18      A.    Yes, sir.
19      Q.    So you knew it when the report was
20  finalized, obviously, is that right?             10:12:13
21      A.    Yes, sir. It's under a total new
22  ownership, though. It's a totally whole new
23  organization -- it's a totally whole new
24  organization.
25      Q.    You knew it when you wrote this      10:12:22

14 (Pages 53 to 56)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION

        Plaintiff,

          vs.                  Civil Action

PRICEWATERHOUSECOOPERS,       No. 00-684

LLP,

        Defendant.


        Videotaped deposition of

CHRISTOPHER M. JAMES, called for examination

under the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Cravath, Swaine & Moore, 825 Eighth

Street, Worldwide Plaza, New York, New York, on

Thursday, the 3rd day of March, 2005, at 9:00

a.m.

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Christopher M. James                                                      Videotaped

| | | | Page 5 |
|---|---|---|---|
| 1 | 1742 | 241 | 9 |
| 2 | 1742 | 241 | 13 |
| 3 | Exhibit 341 | 244 | 11 |
| 4 | Exhibit 341 | 247 | 23 |
| 5 | Exhibit 1722 | 267 | 6 |
| 6 | 1722 | 268 | 9 |
| 7 | | | |
| 8 | | | |
| 9 | AFTERNOON SESSION | 147 | 1 |
| 10 | | | |
| 11 | | | |
| 12 | objection | 23 | 4 |
| 13 | objection | 35 | 2 |
| 14 | objection | 35 | 17 |
| 15 | objection | 36 | 3 |
| 16 | objection | 74 | 25 |
| 17 | objection | 104 | 5 |
| 18 | objection | 107 | 17 |
| 19 | Object | 108 | 11 |
| 20 | objection | 123 | 22 |
| 21 | objection | 158 | 19 |
| 22 | objection | 178 | 12 |
| 23 | objection | 179 | 6 |
| 24 | objection | 179 | 8 |
| 25 | objection | 194 | 8 |

| | | | Page 6 |
|---|---|---|---|
| 1 | objection | 198 | 18 |
| 2 | objection | 202 | 4 |
| 3 | objection | 207 | 18 |
| 4 | objection | 210 | 11 |
| 5 | objection | 220 | 6 |
| 6 | objection | 232 | 17 |
| 7 | objection | 242 | 25 |
| 8 | object | 255 | 5 |
| 9 | objection | 261 | 12 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

**Page 7**

1    THE VIDEOGRAPHER:  Today's date is
2  March 3rd, 2005.  The time is 9:04.  We're
3  located at 825 Eighth Avenue, the offices of
4  Cravath, Swaine here in the case captioned
5  Official Creditors Committee, Allegheny Health,    09:04:31
6  Research & Education Foundation versus
7  PricewaterhouseCoopers.
8    Would counsel please voice identify
9  themselves for the record.
10    MR. COGAN:  Good morning.  Kevin    09:04:41
11  Cogan of the law firm of Jones Day, appearing
12  on behalf of the Unsecured Creditors Committee,
13  the plaintiffs in this case.
14    MR. FRIESEN:  Jeffrey Friesen, and
15  I represent the defendant.    09:04:49
16    CHRISTOPHER M. JAMES, of lawful
17  age, called for examination, provided by the
18  statute, being first duly affirmed, as
19  hereinafter certified, said as follows:
20    EXAMINATION OF CHRISTOPHER M. JAMES
21  BY MR. COGAN:
22    Q.  Good morning, Mr. James.
23      Could you --
24    A.  Good morning.
25    Q.  -- for the record please just state    09:05:03

**Page 8**

1  your full name and tell us where you live.
2    A.  Christopher Martin James.  And I
3  reside in Gainesville, Florida.
4    Q.  How long have you lived in
5  Gainesville, Florida?    09:05:15
6    A.  Approximately 15 years.
7    Q.  Are you employed, sir?
8    A.  Yes, I am.
9    Q.  Where are you employed?
10    A.  I am employed at the University of    09:05:24
11  Florida where I hold the William H. Dial
12  SunBank Eminent Scholar's position in banking
13  and finance.
14    Q.  Are you currently teaching courses
15  at the University of Florida?    09:05:39
16    A.  I am currently teaching courses at
17  the University of Florida, yes.
18    Q.  What courses do you currently
19  teach?
20    A.  I teach a course in private    09:05:47
21  equities and a course in banking.
22    Q.  What is the course in private
23  equities that you teach?
24    A.  Do you want to know the course
25  content, is that it?    09:06:04

2 (Pages 5 to 8)

Christopher M. James                                                                                    Videotaped

Page 9

1    Q.   Yes, just generally.
2    A.   It's a course dealing with how
3  private equity transactions are structured, the
4  valuation of ventures in a private equity
5  context, be it venture capital, leverage          09:06:21
6  buyout, that type of thing.
7    Q.   When you use the term private
8  equity, that is to be compared to the use of
9  stock in a public type of transaction?
10    A.   Private equity is stock that is not   09:06:37
11  publicly traded. It's available only to
12  investors who meet certain requirements.
13    Q.   You also indicated, Mr. James, that
14  you teach a course in banking.
15    A.   That's right.                          09:06:52
16    Q.   What is the -- what is the course
17  name?
18    A.   It is called financial
19  institutions. It deals with basically
20  commercial banking, and the other side of      09:07:08
21  private equity is private debt agreements. So
22  it deals with the structuring of privately-held
23  debt, be it from commercial banks or other
24  financial institutions.
25    Q.   The courses that you are currently     09:07:27

Page 10

1  teaching in private equities and then banking,
2  are those undergraduate or graduate courses?
3    A.   Those are graduate courses.
4    Q.   Do you teach any undergraduate
5  courses?                                         09:07:40
6    A.   No.
7    Q.   Have you during your -- you've been
8  at the University of Florida for 15 years now?
9    A.   That's right.
10    Q.   During your 15 years at the           09:07:47
11  University of Florida, have you taught
12  undergraduate courses?
13    A.   Yes, I have.
14    Q.   In what subjects?
15    A.   It's been a while. It's been about    09:07:54
16  10 or 12 years. I believe the only
17  undergraduate course I've taught is in
18  commercial banking.
19    Q.   When did you become the William H.
20  Dial SunBank eminent scholar and professor in   09:08:12
21  financing at the University of Florida?
22    A.   That would have been in 1989.
23    Q.   I take it that's a chair, is that
24  correct?
25    A.   It's an endowed professorship, yes.   09:08:27

Page 11

1    Q.   As the William H. Dial SunBank
2  eminent scholar and professor of finance, do
3  you have any additional responsibilities other
4  than teaching the graduate courses that you
5  teach?                                           09:08:53
6    A.   Yes. I'm expected to and do
7  undertake research in the area of finance and
8  banking. I'm also actively engaged in teaching
9  Ph.D. students. That's principally out of the
10  classroom in kind of a mentoring context.       09:09:19
11       I have service requirements in
12  terms of both university as well as college
13  related governance. And I also am engaged in
14  executive education from time to time.
15    Q.   Are you currently consulting with     09:09:39
16  any financial institutions?
17    A.   Yes.
18    Q.   What financial institutions are you
19  consulting with or providing consulting
20  services to?                                     09:09:59
21    A.   I currently have a consulting
22  relationship with SunTrust. I serve on the
23  holding company's advisory board.
24       I also have a consulting
25  relationship with two other financial           09:10:14

Page 12

1  institutions, Chase Manhattan and Bank of
2  America.
3    Q.   I had noted from your resume, and
4  you just testified to it, that you currently
5  serve on the advisory board of the SunTrust      09:10:34
6  Bank. Is that right?
7    A.   Yes, the holding company.
8    Q.   And how long have you served on the
9  advisory board?
10    A.   The advisory board, I believe it's    09:10:42
11  been three or four years.
12    Q.   Is the advisory board on which you
13  serve a board distinct from the Board of
14  Directors for the SunTrust holding company?
15    A.   Yes, it is. It is a board that        09:11:02
16  consists principally of individuals with
17  expertise in certain functional areas. And its
18  job is to advise both the board and senior
19  management on issues of strategy and what I'd
20  characterize as big picture operational issues.  09:11:29
21    Q.   How often does the advisory board
22  meet?
23    A.   Once a month.
24    Q.   How often does the advisory board
25  meet with the Board of Directors of the          09:11:44

Christopher M. James                                                                                    Videotaped

Page 13

1   SunTrust Bank?
2       A.   That is -- there's really no set
3   schedule as part of that role.  I would say
4   that we've had meetings with various directors
5   on an irregular basis.  So several times a          09:12:08
6   year.
7       Q.   Do you have regularly scheduled
8   meetings with senior management?
9       A.   Yes.
10      Q.   How often do you meet with the            09:12:18
11  senior management of SunTrust?
12      A.   Once a month.
13      Q.   Is that meeting with the senior
14  management the same time that you have the
15  advisory board meeting?                              09:12:28
16      A.   Yes.
17      Q.   How long do those meetings
18  typically last?
19      A.   Anywhere from two hours to four,
20  five hours, depending on the nature of the          09:12:37
21  meeting and the topics to be covered.
22      Q.   Does the advisory board have any
23  committees?
24      A.   No.
25      Q.   I think I read that before joining       09:12:51

Page 14

1   the University of Florida, you had also taught
2   at the University of Oregon and the University
3   of Michigan?
4       A.   That is correct.
5       Q.   And when were you teaching at the        09:13:14
6   University of Oregon?
7       A.   On and off between 1978 and 1989.
8       Q.   Were you a professor at the
9   University of Oregon?
10      A.   I began as an assistant professor.       09:13:32
11  When I left I was a chaired professor.
12      Q.   You also indicate, and we just
13  mentioned it, that you taught at the University
14  of Michigan.  When was that?
15      A.   1985, '86.                                 09:13:48
16      Q.   Had that overlapped at the time you
17  were also teaching at the University of Oregon?
18      A.   Yes, I was on leave.  As I
19  indicated, I was at the University of Oregon on
20  and off between 1978 and 1989.                      09:14:10
21      Q.   Were you a visiting professor at
22  the University of Michigan?
23      A.   I was -- I think my title was
24  visiting professor.  I had an offer to join the
25  faculty and it was a look-see kind of situation    09:14:22

Page 15

1   where I went for a semester and half to see if
2   I wanted to join the faculty there.
3       Q.   I take it you concluded that you
4   didn't?
5       A.   I concluded that I wanted to be          09:14:37
6   back in Oregon.
7       Q.   The courses you were teaching at
8   the University of Oregon, were those
9   undergraduate or graduate courses?
10      A.   Both.                                      09:14:49
11      Q.   How about at the University of
12  Michigan?
13      A.   Only graduate courses.
14      Q.   You also indicate that, in the
15  introduction to your report, and I see you have    09:14:59
16  your report in front of you?
17      A.   Yes.
18      Q.   And obviously you should feel free
19  to make reference to that as you need to.  But
20  you indicate that you've held positions at the     09:15:09
21  Federal Reserve Bank of San Francisco, the
22  Federal Deposit Insurance Corporation and the
23  Treasury Department.  I would like to talk
24  about those.
25           What positions or position did you        09:15:16

Page 16

1   hold at the Federal Reserve Bank of San
2   Francisco?
3       A.   I was in the research and banking
4   study section conducting research on banking
5   practices for the Federal Reserve Bank of San      09:15:34
6   Francisco, principally on issues relating to
7   what I'll refer to as off-balance sheet
8   banking, such things as standby letters of
9   credit and other derivative products that banks
10  were increasingly using at the time.                09:15:52
11      Q.   When were you at the Federal
12  Reserve Bank?
13      A.   Of San Francisco?
14      Q.   Yes.
15      A.   What's listed here are the               09:16:03
16  positions that I held that were full-time.  I
17  was at the San Francisco Federal Reserve
18  full-time I believe in '87 and 1988.
19           As I recall, it was on a -- I would
20  go for a month, go back to the University of        09:16:25
21  Oregon, then go back for another month, that
22  type of thing.
23      Q.   Did you have a title while you were
24  at the Federal Reserve?
25      A.   I believe it was visiting scholar.        09:16:35

4 (Pages 13 to 16)

Christopher M. James

Videotaped

Page 17

1    Q.   Can you tell me about your
2    employment with the Federal Deposit Insurance
3    Corporation?
4    A.   I was employed at the FDIC on a
5    full-time basis in '88, '89.  And then I served    09:16:50
6    as a consultant both prior to that and after
7    that period of time.
8         I was working at the FDIC in
9    developing a system that the FDIC currently
10   uses to value the portfolios of failed or    09:17:13
11   failing banks to determine what value can be
12   achieved from either the sale or liquidation of
13   loans, other securities, real estate held by
14   troubled banks or failed banks.
15   Q.   Do you continue to provide any    09:17:35
16   consulting services to the FDIC?
17   A.   Not currently, no.
18        They continue to use the model that
19   was developed and the procedure that was
20   developed, but I currently don't have a    09:17:48
21   consulting relationship with them.
22   Q.   When was the last time you provided
23   any consulting services to the FDIC?
24   A.   It's been a number of years.  I
25   would say not within the last five years.    09:18:01

Page 18

1    Q.   What about your employment with the
2    treasury department, can you tell me about
3    that?
4    A.   Yes, I was -- served as the senior
5    economic advisor to the comptroller of the    09:18:13
6    currency.  I held that appointment, I believe,
7    in the early 1980s, '81, '82.  And I believe I
8    had a consulting relationship after that point
9    in time for a couple of years.
10   Q.   In your position as a senior    09:18:34
11   economic advisor, what were you doing?  What
12   were your responsibilities?
13   A.   Advising the comptroller of
14   currency on issues regarding banking
15   regulation, what's called off-site monitoring,    09:18:46
16   systems that the comptroller was using to
17   determine the safety and soundness of
18   commercial banks using what are called call
19   report as well as other off-site mechanisms.
20        In addition, I was involved in    09:19:07
21   evaluating examination practices that the
22   office of the comptroller was engaged in.
23   Q.   You indicated that you were at the
24   treasury department from approximately 1980 to
25   '82 and then later provided consulting    09:19:29

Page 19

1    services, correct?
2    A.   Right.
3    Q.   When was the last time you provided
4    any consulting services to the treasury
5    department?    09:19:36
6    A.   Within -- it's been within the last
7    five years.
8    Q.   What was the nature of those
9    services?
10   A.   I had been doing and continue to do    09:19:47
11   work with a number of large banks, what are
12   called risk rating systems for commercial loan
13   portfolios.
14        On a couple of occasions the
15   comptroller has asked me to come in and explain    09:20:08
16   sort of how the systems are working and really
17   the mechanics and financial economics of those
18   systems.
19   Q.   Have you written on risk rating
20   systems?    09:20:26
21   A.   Yes, I have.  I have one article
22   that was co-authored with two individuals at
23   Bank of America entitled Re:  Rock at Bank of
24   America.
25   Q.   Is that the only article that    09:20:38

Page 20

1    you've written on risk rating systems?
2    A.   Only published article that I've
3    written.  I've written as part of the
4    consulting process descriptions and internal
5    what I'll refer to as memoranda describing the    09:21:06
6    systems.
7    Q.   You have been retained in this case
8    by Cravath, Swaine & Moore, correct?
9    A.   Yes.
10   Q.   And as a result of the work that    09:21:29
11   you've done, I take it you understand at least
12   who some of the creditors in the AHERF
13   bankruptcy were, is that right?
14   A.   Yes.
15   Q.   During your career, sir, have you    09:21:42
16   ever served as a consultant to Pittsburgh
17   National Bank or its successor PNC?
18   A.   I don't believe so.
19   Q.   How about Morgan Guaranty Trust,
20   have you ever provided any consultant services    09:21:58
21   to Morgan?
22   A.   Yes.
23   Q.   When was that, sir?
24   A.   Within the last seven years.
25   Q.   What was the nature of the    09:22:11

Cleveland (216) 523-1313

www.rennillo.com

Akron (330) 374-1313

04d17651-b753-4ff4-9699-3f6ee2ccc654

Christopher M. James

Videotaped

Page 25

1 most frequent mechanism that is used, together
2 with, of course, monitoring the performance of
3 the customer relative to plan and relative to
4 historicals.
5        For more serious problems that        09:28:31
6 occur where the bank makes a determination that
7 the relationship is not one that is likely to
8 be ongoing, then sort of other techniques can
9 be used.
10       For example, under certain        09:28:43
11 circumstances, workout groups have called the
12 loan and declared it default.
13       Under those circumstances, the bank
14 is really looking at either a situation in
15 which the loan can be accelerated and repaid or   09:29:04
16 a bankruptcy and what position the bank will
17 have in bankruptcy.
18    Q.   And in that situation, in
19 connection with deciding to call the loan or to
20 not call it, has it been your experience that   09:29:19
21 one of the considerations that a workout group
22 will take into account is the amount of
23 security that is -- that exists securing the
24 loan?
25    A.   It would depend on the nature of   09:29:38

Page 26

1 the loan and the circumstances. Certainly that
2 could be potentially one of many factors that
3 the loan workout group would look at to
4 determine whether to continue on with a credit
5 or not.        09:30:01
6        Again, it would depend on the
7 nature of the credit. So, for example, if
8 you're in a situation where you have an
9 unsecured credit, then obviously the collateral
10 situation is not one that you can look to   09:30:18
11 directly for purposes of seeking repayment.
12    Q.   So perhaps one of the evaluations
13 that the workout group would engage in is
14 whether or not the ultimate recovery on the
15 loan will be greater in bankruptcy versus   09:30:33
16 trying to turn the company around?
17    A.   I think that is, you know, on a
18 high level, that is one issue that the bank
19 would look at, the extent to which it could --
20 it could have a higher recovery rate in working   09:30:55
21 with the customer versus a bankruptcy, all
22 things considered in terms of the other aspects
23 of the relationship that might be -- might be
24 jeopardized.
25        Generally the view is that        09:31:14

Page 27

1 bankruptcy is a very costly process,
2 particularly if you are an unsecured creditor
3 and, as a result, to the extent that one can
4 avoid that by not calling the loan and by
5 working with the customer, that's something   09:31:34
6 that the bank would generally want to do.
7    Q.   You indicated earlier that in
8 connection with a technical default, the most
9 frequent remedy you see the workout group
10 resorting to are waivers and restructuring of   09:31:57
11 covenants.
12       Do you recall that testimony?
13    A.   Yes.
14    Q.   When you use the term waivers, are
15 you referring to waiver of covenant violations?   09:32:05
16    A.   Yes.
17    Q.   When you use the term waiver,
18 you're referring to anything other than waiver
19 of covenant violations?
20    A.   What I had in mind when answering   09:32:17
21 that question was a waiver of the covenant
22 violation.
23    Q.   It's that covenant violation which
24 would be the technical default?
25    A.   I think you need to be careful.   09:32:34

Page 28

1 There's the difference between the event of
2 default and the default.
3        When you violate a covenant, that
4 may be an event of default in the sense that
5 absent a waiver there would be a default on the   09:32:50
6 loan agreement.
7    Q.   And in fact after an event of
8 default, there's oftentimes a requirement that
9 the borrower get notice of the default and have
10 an opportunity to cure?        09:33:01
11    A.   Depends on the nature of the
12 agreement. There's typically, in most loan
13 agreements, there is a requirement that the
14 borrower certify compliance with the covenants
15 at various points in time. And I notify the   09:33:22
16 lender in the event of noncompliance.
17    Q.   And then in addition to waiving
18 covenant violations, you said that part of the
19 most frequently used remedy is then to go on to
20 restructure the covenants, is that right?   09:33:50
21    A.   It would depend on the facts and
22 circumstances of the covenant violation.
23        I've seen lenders react to a
24 covenant violation by resetting the covenant,
25 resetting it at a looser level. I've also seen   09:34:06

7 (Pages 25 to 28)

Christopher M. James                                                    Videotaped

Page 29
1  lenders react to covenant violations by
2  resetting but raising the interest rate or fees
3  associated with the loan.
4      I've seen lenders react to covenant
5  violations through a waiver together with the      09:34:27
6  establishment of additional covenants in a
7  different fee structure.
8      Q.  Now, Mr. James, have you ever
9  during the course of your career been employed
10  as a lending officer?                          09:34:51
11      A.  No.  I have been employed and
12  received compensation as a member of the Board
13  of Directors of a commercial bank and a member
14  of what we refer to at various points in time
15  as either the executive committee or the loan   09:35:08
16  and discount committee, which are charged with
17  approving all major credit extensions, as well
18  as approving any restructurings or waivers
19  under those workout plans under our loan
20  agreements.                                     09:35:30
21      Q.  But other than your involvement as
22  a member of the board and in particular on the
23  loan and discount committee, you haven't served
24  as a lending officer?
25      A.  No.  I have simply served to review    09:35:50

Page 30
1  and approve large credits.  I have -- but I
2  haven't served as a lending officer.  I've
3  taught lending officers in a number of banking
4  schools as well as in-house programs.  But in
5  terms of being full-time -- having full-time    09:36:13
6  employment as a lending officer, that is not
7  something I have done.
8      Q.  Have you ever been employed in a
9  full-time capacity as a relationship manager?
10      A.  No, I have not.  I interact with       09:36:22
11  our relationship managers at SunTrust and at
12  other banks, but I have not been employed as a
13  relationship manager.
14      Q.  Have you ever been employed
15  full-time in a surveillant -- credit           09:36:39
16  surveillant department in a commercial banking
17  institution?
18      A.  No, other than -- by full-time
19  employment you mean other than not as a
20  consultant but as an employee of the           09:36:55
21  institution?
22      Q.  Correct.
23      A.  No.  My role has been limited to
24  devising and advising on those credit
25  monitoring systems, which are currently        09:37:11

Page 31
1  employed at some of the major banks in the
2  country.
3      Q.  You indicated that you've sat on
4  committees that review and approve large
5  credits.  When you use the term large credit,   09:37:29
6  what are we talking about?
7      A.  With respect to the subsidiary bank
8  at SunTrust, it was -- it would be anything
9  over a million dollars.
10      Q.  When you say you serve on that        09:37:41
11  board, that is -- that service is as a member
12  of the Board of Directors of the SunTrust Bank
13  of North Central Florida?
14      A.  That's correct.
15      Q.  How long have you served on that       09:38:02
16  board?
17      A.  I served on that board.  I don't
18  currently serve on that board.  I served on
19  that board for about 13 years.
20      Q.  When did you stop serving on the       09:38:14
21  SunTrust Bank North Central Florida board?
22      A.  I don't recall specifically.
23  SunTrust went to what's called a one charter
24  system.  That was, I believe, in 2002, but I'd
25  have to go back and look at when that change    09:38:38

Page 32
1  occurred.
2      Q.  When the change occurred, that is
3  when SunTrust went to a one charter system, is
4  that when your service on the Board of
5  Directors for the SunTrust Bank of North        09:38:52
6  Central Florida ended?
7      A.  Yes, because it was no longer an
8  independently chartered institution, as a
9  result, it no longer was required to have a
10  Board of Directors.                            09:39:02
11      Q.  What was the geographic territory
12  of the SunTrust Bank of North Central Florida?
13      A.  It went from just north of Orlando
14  to the Georgia border and just west of Duval
15  County to the Gulf of Mexico.                  09:39:28
16      Q.  You indicated that while you were
17  on the SunTrust Bank of North Central Florida,
18  you served on the loan and discount committee,
19  is that right?
20      A.  It was first called the loan and       09:39:43
21  discount committee, then later the name was
22  changed to the executive committee.
23      Q.  How long did you serve on that
24  committee, that is the loan and discount
25  committee which later became the executive      09:39:56

8 (Pages 29 to 32)

Christopher M. James                                                                                Videotaped

Page 33

1  committee?
2      A.   I don't recall the length of my
3  tenure on loan and discount versus executive
4  because they're the same committee.
5      Q.   That's what I meant.  You can just          09:40:10
6  lump them together.
7      A.   Lump them together?  I would say
8  approximately half of the time that I was on
9  the Board of Directors, so that would be six
10  years or so.                                         09:40:23
11     Q.   Was your service on those
12  committees at the beginning or at the end of
13  your tenure?
14     A.   At the -- both the beginning and at
15  the end of my tenure.  So it was a rotating          09:40:34
16  committee.
17     Q.   Did you serve on any other
18  committees of the Board of Directors of the
19  SunTrust Bank of North Central Florida?
20     A.   Yes.                                          09:40:44
21     Q.   What committees were those?
22     A.   The audit committee, the trust
23  committee, and the CRA committee.
24     Q.   What was the CRA committee?
25     A.   Community reinvestment act                    09:40:59

Page 34

1  compliance committee.
2      Q.   You also indicate you served on the
3  trust committee.  What were the
4  responsibilities of the trust committee?
5      A.   SunTrust has a large trust                    09:41:10
6  department.  The trust committee would evaluate
7  investment policies, operational issues,
8  policies and procedures as it pertains to the
9  trust department.
10     Q.   Then finally what -- when did you             09:41:24
11  serve on the audit committee, if you can
12  recall?
13     A.   I don't recall specifically what
14  the dates were, but the audit committee dealt
15  with accounting and financial control issues as     09:41:32
16  it pertains to the bank.
17     Q.   Do you recall who SunTrust Bank's
18  auditors were?
19     A.   Yes.  They were, at the time,
20  Arthur Andersen until I think 2001.                  09:42:00
21     Q.   In your service as a member of the
22  audit committee, did you expect that the
23  auditors would bring to your attention if there
24  were departures from Generally Accepted
25  Accounting Principles in preparation of the          09:42:20

Page 35

1  financial statements of SunTrust Bank?
2          MR. FRIESEN:  Objection.
3      A.   No.
4      Q.   Would you meet with the auditors in
5  connection with your services on the audit           09:42:29
6  committee?
7      A.   Only with internal auditors.  Not
8  with external auditors.
9      Q.   You indicated that if there had
10  been violations of Generally Accepted                09:42:57
11  Accounting Principles in the preparation of the
12  SunTrust financial statements, you would not
13  have expected the outside auditors to bring
14  those GAAP violations to your attention.
15         Can you explain why you wouldn't              09:43:12
16  have expected that?
17         MR. FRIESEN:  Objection.
18     A.   Well, because it would have been at
19  those issues to the extent that they would
20  occur would be with respect to the audit of the     09:43:25
21  holding company and not with respect to the
22  subsidiary bank.
23     Q.   So your expectation would be that
24  if there was going to be those sorts of
25  communications, they would occur with the audit     09:43:40

Page 36

1  committee of the holding company, not the
2  SunTrust Bank of North Central Florida?
3          MR. FRIESEN:  Objection.
4      A.   My expectation would be that that
5  would be the way in which those issues would be     09:43:57
6  communicated.  Clearly if there were issues in
7  terms of, for example, on a couple of occasions
8  there were issues concerning the
9  appropriateness of our loan loss reserves, both
10  at the holding company level and at the             09:44:13
11  individual bank level, and those issues and
12  concerns were communicated through internal
13  auditors at the bank.
14     Q.   We were talking a little earlier
15  about some of the banks that had extended           09:44:52
16  credit to AHERF.  There were two others that I
17  wanted to ask if you'd ever had a consulting
18  relationship with.
19         Did you ever have a consulting
20  relationship with Sanwa Bank, S A N W A?            09:45:04
21     A.   No.
22     Q.   Finally, have you ever had a
23  consulting relationship with the Sumitomo Bank?
24     A.   No.
25     Q.   Perhaps one other, First Chicago?           09:45:16

9 (Pages 33 to 36)

04d17651-b753-4ff4-9699-3f6ee2ccc654

Christopher M. James                                                                      Videotaped

Page 37

1    A.    Yes.
2    Q.    What consulting relationship did
3  you have with First Chicago?
4    A.    I worked with them in the early
5  1990s on credit risk rating systems.          09:45:38
6    Q.    What did that -- what was that
7  credit risk rating system designed to do?
8    A.    To, like most credit risk rating
9  systems, to evaluate and to -- to evaluate the
10  risk exposure principally in terms of credit    09:46:11
11  risk associated with various credits and to
12  determine factors that influence the likelihood
13  of problems and the severity of problems if
14  they occur.
15    Q.    During the course of your career,    09:46:27
16  Mr. James, have you ever been employed in a
17  full-time capacity as a credit analyst with a
18  banking institution?
19    A.    No.  I've worked with credit
20  analysts both as a consultant and as an      09:46:55
21  instructor, but I have not been hired or been
22  employed as a full-time credit analyst.
23    Q.    During the course of your career,
24  have you ever represented any party in
25  connection with a tax exempt financing       09:47:11

Page 38

1  transaction?
2    A.    Not as a full-time employee, no.
3    Q.    Have you had experience or have you
4  had a consulting relationship where you have
5  consulted with a party in connection with a tax   09:47:27
6  exempt financing transaction?
7    A.    Yes.
8    Q.    What sort of transaction was that?
9    A.    We would be involved at both the
10  bank level and holding level at SunTrust in    09:47:42
11  issuing standby letters of credit and be
12  involved in the underwriting of certain
13  not-for-profit as well as state, municipal
14  offerings.
15    Q.    In connection with that experience   09:47:59
16  that you just described, was that during the
17  time that you were serving on the board of the
18  SunTrust Bank of North Central Florida?
19    A.    In part, yes, that's right.
20    Q.    And so that service would have been   09:48:18
21  provided in your capacity as a member of the
22  Board of Directors, is that right?
23    A.    That is correct.
24    Q.    Now, are there other instances
25  where you have been involved in consulting with  09:48:27

Page 39

1  a party in connection with a tax exempt
2  financing?
3    A.    Yes.  Not in terms of the offering
4  itself, but in terms of determining recoveries
5  in a tax exempt financing.             09:48:50
6    Q.    When you say determining recoveries
7  in a tax exempt financing, what do you mean?
8    A.    I worked with the small investor
9  owned utilities in Seattle and Oregon with
10  respect to their involvement in the Washington   09:49:13
11  Public Power supply bond offering and
12  subsequent default.
13    Q.    When you say determining
14  recoveries, was that in connection with
15  advising the small investor owned utilities as   09:49:41
16  to what they could expect as a recovery on the
17  amount that they had invested in the Washington
18  Public Power system?
19    A.    No.  It was more in terms of
20  determining what exposure they had, if any, to   09:49:57
21  -- as a result of their participation in the
22  WPPSS 4 and 5 nuclear reactors.
23    Q.    I see.  So in other words, these
24  smaller investor owned utilities were
25  borrowers, or debtors, and you were advising as  09:50:23

Page 40

1  to their potential liability --
2    A.    That's correct.
3    Q.    -- as borrowers?
4        Have you during the course of your
5  career ever had occasion to advise a healthcare   09:50:39
6  system in connection with a financing
7  transaction?
8    A.    Yes.
9    Q.    What healthcare system were you
10  advising?                        09:50:50
11    A.    Two, AvMed system located in Miami
12  and in Gainesville; and then the SHANDS
13  Healthcare System located in Jacksonville,
14  Gainesville and Lake City, Florida.
15    Q.    What type of financing transactions   09:51:08
16  were you consulting, was it AvMed?
17    A.    AvMed.
18    A.    AvMed.
19    A.    Right.  That was a lending
20  relationship.  The SHANDS was a combination of   09:51:25
21  basically both credit enhancement as well as
22  lending relationships.
23    Q.    In the case of AvMed and in the
24  case of SHANDS, you were consulting with the
25  healthcare systems, is that right?        09:51:48

10 (Pages 37 to 40)

Christopher M. James

Videotaped

Page 89

1 consulting services, is that something
2 different?
3      A.   Not necessarily.  My recollection
4 is I don't -- I did not begin drafting the
5 report until October.  And I believe the month    11:10:47
6 of October I devoted principally to reviewing
7 additional documents in the context of drafting
8 my report.
9           I also think that in November, the
10 first part of November, I was -- my    11:11:14
11 recollection is that I pretty much completed
12 the draft of the report as of the first of
13 November and that I was reviewing other
14 documents and making what I'll consider to be
15 -- what I considered to be really relatively    11:11:34
16 minor changes in the report up to the date on
17 which it was filed.
18      Q.   So when I see on the invoice dated
19 11-2, which is really for services provided in
20 essentially October?    11:11:52
21      A.   Right.
22      Q.   That's -- the month of October is
23 principally when you were drafting the report?
24      A.   Yes.  I mean, I was doing other
25 things as well.    11:12:02

Page 90

1      Q.   Sure.
2      A.   But the drafting was done
3 principally in the month of October.
4      Q.   And then the consulting services
5 that you describe on the invoice dated October    11:12:10
6 1 for services provided in September, did that
7 relate, those consulting services, relate to
8 your reviewing of depositions, exhibits and so
9 on?
10      A.   Yes.    11:12:28
11      Q.   And then as to the consulting
12 services that are depicted on the December
13 invoice for services provided in November, that
14 was just basically finalizing, proofing your
15 report and so on?    11:12:43
16      A.   No, I would say that my
17 recollection is there was that activity going
18 on.  I think I was also looking at some
19 additional documents, or the same documents,
20 but studying them further.    11:12:56
21      Q.   And all of these services were in
22 connection with the preparation of your report,
23 is that right?
24      A.   Yes.
25      Q.   Not something independent in terms    11:13:06

Page 91

1 of consulting services that you were providing
2 to Cravath?
3      A.   That is correct.
4      Q.   This would now probably be -- one
5 more question before we go off the tape.    11:13:17
6           Are you able to just estimate for
7 me how much time you have spent on the
8 engagement since the last entry of 11-10-04?
9      A.   No.  I would -- more than 50 hours.
10      Q.   That has been devoted to reviewing    11:13:36
11 the rebuttal reports of Mr. Kite and Mr. Den
12 Yul?  Would that be at least one of the things
13 you were doing?
14      A.   One of the things, yes.
15      Q.   Preparing for this deposition, I    11:13:47
16 take it?
17      A.   That would be one of the things.
18      Q.   Anything else?
19      A.   Yes.  Further review of the
20 documents in this case, as well as further    11:13:57
21 review of the accounting information that has
22 been provided in this case.
23      Q.   And why have you been reviewing
24 that information?
25      A.   Well, for example, there -- in the    11:14:12

Page 92

1 original Berliner report, there was some
2 ambiguity as to, for example, the cash flow
3 implications of some of the accounting
4 adjustments.
5           Subsequent to his report, there was    11:14:34
6 a supplemental report and then a further
7 supplement that provided, for example, the cash
8 flow implications of his accounting adjustments
9 and I think some other things.
10           MR. COGAN:  Okay, now let's take    11:14:49
11 that break.
12           THE VIDEOGRAPHER:  Off the record,
13 11:15.
14           (Recess had.)
15           THE VIDEOGRAPHER:  Going back on    11:14:56
16 the record, 11:28.
17      Q.   Mr. James, have we now discussed
18 all of the matters that you have been retained
19 to serve as a consultant or an expert by
20 Cravath, Swaine & Moore, those four matters?    11:29:14
21      A.   Right.  I'm not sure I understand
22 your question.
23      Q.   I want to make sure that I've asked
24 all of the matters that you have been retained
25 by either Cravath, Swaine & Moore or Coopers &    11:29:22

23 (Pages 89 to 92)

Christopher M. James

Videotaped

Page 93

1  Lybrand to provide consulting services in
2  connection with litigation.
3      A.  At I sit here, that's all I can --
4  I recall.  I don't know that there's anything
5  else.                              11:29:43
6      Q.  How many litigation matters are you
7  currently consulting on?
8      A.  Two.
9      Q.  Those are depicted on the list that
10 we looked at that's attached to your --   11:30:06
11     A.  One -- no.  Neither is.
12     Q.  What are the other two matters that
13 you're currently consulting on?
14     A.  This one.
15     Q.  This one?            11:30:19
16     A.  And one involving your firm, and it
17 involves a matter Colpal versus Ernst & Young,
18 I think it is.  Securities case.
19     Q.  And are you retained in that matter
20 in connection -- in providing consulting   11:30:55
21 services to Ernst & Young?
22     A.  I've been retained by your firm.  I
23 believe -- yes.
24     Q.  For Ernst & Young.
25     A.  Your firm is representing Ernst &   11:31:04

Page 94

1  Young.
2      Q.  And then those matters that are
3  depicted on Exhibit 2 to your report, to the
4  extent they are still pending and may go to
5  trial, you could be called upon to testify in   11:31:24
6  those matters as well, is that right?
7      A.  That is correct, the ones that have
8  --
9      Q.  Have not been resolved.
10     A.  Right.            11:31:33
11     Q.  Have you had occasion to actually
12 testify in court?
13     A.  Yes.
14     Q.  One matter I don't think we did
15 discuss was a matter, Beck as trustee of   11:31:47
16 Southeast Banking Corporation versus Deloitte &
17 Touche.
18     A.  M-hm.
19     Q.  And Deloitte, Haskins and Sells.
20         Is that a matter in which you   11:32:03
21 served as an expert or consultant?
22     A.  Yes.
23     Q.  You were retained by who in that
24 litigation?
25     A.  It's been several years ago.  I can   11:32:09

Page 95

1  tell you the subject matter.  I just don't
2  recall whether the retention was by the
3  accounting firm or the federal regulator.
4          It was an action involving the
5  trustee of Southeast Banking Corporation   11:32:32
6  involving an allegation that the failure of
7  Southeast was a result of two things,
8  precipitous actions by the federal regulators
9  in closing the institution and, second, the
10 acquisition by Southeast Banking Corporation of   11:33:05
11 Florida -- of Florida Savings & Loan in 1988, I
12 believe it is.  And that the savings and loan
13 that was acquired should have been acquired
14 using a pooling as opposed to a purchase
15 accounting.            11:33:38
16     Q.  You don't recall who actually
17 retained you in that, whether it was Deloitte &
18 Touche or the regulator?
19     A.  It's been a while.  And the reason
20 I'm having difficulty is my role was really to   11:33:51
21 talk about sort of failure resolution policies
22 that are pursued by the federal regulators.
23 That's my recollection of the testimony.
24     Q.  We're going to at some point
25 probably today be discussing again, as we've   11:34:15

Page 96

1  already done a little bit so far, the subject
2  of financial covenants.
3          Have you authored any books on the
4  subject of financial covenants?
5      A.  No books.            11:34:25
6      Q.  You're going to jump ahead of me.
7  I was going to then say have you published any
8  articles on the subject of financial covenants?
9      A.  Yes, a couple of articles dealing
10 with workout lending and the actions that banks   11:34:40
11 take as to whether they waive covenants, take
12 equity positions or accelerate the loan.
13         I currently have underway a study
14 that I'm doing with the Federal Reserve Bank of
15 New York looking at how covenants are set in   11:35:00
16 principally syndicated loan arrangements and
17 the relationship between covenant, what I'll
18 refer to as tightness and credit quality and
19 subsequent performance of the company.
20     Q.  That's a study you're doing with   11:35:30
21 the Federal Reserve Bank of New York?
22     A.  Right.
23     Q.  How long have you been working on
24 that study?
25     A.  I was at the bank in early   11:35:39

24 (Pages 93 to 96)

04d17651-b753-4ff4-9699-3f6ee2ccc654

Christopher M. James

Videotaped

Page 97

1  December, late November, and the -- we began it
2  prior to that. So we should have, with any
3  luck, a draft sometime in the month of March or
4  April.
5      Q.   So all of the analysis has been          11:36:04
6  completed and you're now working on the draft
7  of the report?
8      A.   No.
9      Q.   Or draft of the study?
10     A.   No, I wouldn't say the analysis is        11:36:13
11 done. The data have been assembled and
12 preliminary analyses have been conducted, but I
13 don't have final analysis.
14     Q.   Will that study then be provided to
15 the Federal Reserve Bank of New York?            11:36:27
16     A.   That's the expectation of both of
17 us.
18     Q.   And will it be published or is that
19 a document that's prepared for the bank and is
20 proprietary to the bank?                         11:36:43
21     A.   I'm not certain. I think as I sit
22 here my intention is to publish some of the
23 study. Whether I publish all of the results or
24 convey some of those results to the bank in non
25 published form, I don't know at this point in    11:37:03

Page 98

1  time.
2      Q.   Who's been assisting you in that
3  study?
4      A.   I've been doing it principally
5  myself. My contact at the Federal Reserve       11:37:15
6  board or the bank of -- Federal Reserve Bank of
7  America is a fellow by the name of Santos.
8      Q.   Santos?
9      A.   M-hm.
10     Q.   In connection with this study that       11:37:36
11 you're doing, are you studying any banks in
12 particular?
13     A.   The -- yeah. It is a study based
14 on a database of about 30 -- I'm going to say
15 30,000 plus syndicated loan facilities. And      11:37:57
16 the banks would involve virtually every large
17 regional and money center bank in the United
18 States as well as potentially foreign
19 institutions.
20     Q.   And in this study, are you            11:38:16
21 comparing the various loan covenants that
22 appear in the different financing documents?
23     A.   That's one of the things that we're
24 doing, yes.
25     Q.   What else?                              11:38:26

Page 99

1      A.   I think I described it to you.
2  Looking at the relationship between credit
3  quality and tightness of covenants and the
4  frequency with which covenants are -- there's a
5  technical violation that leads to certain        11:38:44
6  courses of action and what the financial
7  performance changes are relative to covenant
8  tightness.
9      Q.   So when you say you have a database
10 of 30,000 syndicated loan facilities, does that  11:39:03
11 database include the actual financing documents
12 and, therefore, the covenants?
13     A.   The database would have in it an
14 indication of what covenants are associated
15 with the facility, as well as for a subset what  11:39:20
16 are called tear sheets, which give more detail
17 as to both the covenant structure and the
18 details of the financing.
19         So, for example, you may see an
20 entry that has a syndicated loan facility to     11:39:39
21 Ace Hardware Store, and that facility tells you
22 what the price is, what the various covenants
23 associated with the facility are, whether
24 there's a step-up in terms of any of the
25 covenants and the frequency with which step-up   11:40:02

Page 100

1  occurs.
2          Then that is matched with financial
3  information from other sources to provide a
4  relatively complete picture of the financial
5  characteristics of the company, both prior to   11:40:21
6  and subsequent to the loan agreement.
7      Q.   Just a couple more questions on
8  this subject. Does the database also include
9  information regarding whether there have been
10 violations of the covenants?                     11:40:36
11     A.   It will indicate in some instances
12 whether there have been restructurings.
13         The violation of the covenants has
14 to be inferred from looking at the performance
15 of the company relative to the covenants. Then  11:40:59
16 we also know whether in cases in which a
17 covenant is not waived, a violation is not
18 waived, whether the company under reporting
19 standards reports that it has a declaration of
20 default or event of default.                     11:41:24
21     Q.   Who accumulated the database?
22     A.   It comes from a couple of sources.
23 First, a facility called DealScan and LPC, Loan
24 Pricing Corporation database. DealScan, SDC,
25 Securities Database. Securities Data             11:41:40

25 (Pages 97 to 100)

Christopher M. James

Videotaped

Page 101

1 Corporation, which is a subsidiary of Thomson
2 Financial. Compustat, which is a large
3 database or large provider of financial
4 information. It was also assembled using
5 financials from Edgar and an automated search    11:42:0
6 from -- using a facility called Vateva.
7     Q.    Did you accumulate the database or
8 was it accumulated for you?
9     A.    The database that I'm using I put
10 together. And I utilized the various sources    11:42:21
11 that I've just indicated.
12     Q.    When you were explaining one of
13 your answers a couple of minutes ago, you used
14 the term of a step-up in covenants.
15     A.    M-hm.    11:42:35
16     Q.    What do you mean by that?
17     A.    Sometimes covenants are written in
18 loan agreements and standby letters of credit
19 in which you have say a tangible net worth
20 requirement.    11:42:53
21     And then the requirement says you
22 must maintain a tangible net worth of X that
23 steps up based upon the earnings of the company
24 by so much. So a 20 percent step-up would say
25 it steps up by whatever the base amount plus 20    11:43:07

Page 102

1 percent of any retained earnings or net income
2 that is earned in subsequent years up to some
3 ceiling.
4     Other step-ups are, say you have a
5 fixed charged coverage ratio that is set at    11:43:23
6 1.75 and walks up to 2.5.
7     Q.    How much of your time, Mr. James,
8 do you spend, I'm talking about your
9 professional time now, do you spend in
10 litigation consulting?    11:43:40
11     A.    It varies over time. I would say
12 sort of an average, not more than one-third.
13     Q.    Does the university impose
14 limitations or restraints on how much of your
15 time you can spend to outside consulting    11:44:00
16 activities?
17     A.    No. The only constraints or
18 requirements of the university is that I meet
19 my classes, I'm available for students, and I
20 continue to engage in the kind of scholarly    11:44:16
21 activity that the university expects of me.
22     Q.    On the subject of financial
23 covenants, do you agree, Mr. James, that it is
24 prudent for lenders to include financial
25 covenants in their financing documents?    11:44:34

Page 103

1     A.    Prudent to include?
2     Q.    Financial covenants.
3     A.    It depends on the circumstances.
4 Oftentimes -- in certain circumstances it may
5 be prudent. In other circumstances, the lack    11:44:55
6 of financial covenants may not be imprudent.
7     Q.    In connection with the financing
8 transactions that you reviewed in relation to
9 the AHERF and its affiliates, do you agree that
10 it was prudent that those financing documents    11:45:21
11 had loan -- financial covenants?
12     A.    I didn't see -- I really didn't
13 evaluate the prudence. I would say that
14 nothing that I saw indicated that they were
15 imprudent.    11:45:42
16     Q.    In fact, I take it going into this
17 engagement you would expect to see some
18 financial type covenants in the loan documents,
19 correct?
20     A.    You're talking about loan documents    11:45:55
21 now?
22     Q.    Well, I'm talking about the various
23 financing documents, the master trust
24 indenture, the letter of credit reimbursement
25 agreements and the various other documents that    11:46:05

Page 104

1 constituted the financings for AHERF, DVOG, and
2 AGHOG that I assume, as you got ready to look
3 at those documents, you expected that you would
4 see financial covenants.
5     MR. FRIESEN:  Objection.    11:46:18
6     A.    I didn't have a prior as to what
7 financial covenants I would observe prior to my
8 sort of getting into this engagement. So I
9 didn't have a strong prior as to what covenants
10 I would see as part of the arrangements.    11:46:41
11     Q.    Do you agree that covenants
12 contained in financing documents can protect
13 lenders by enabling the lenders to detect that
14 the borrower's financial condition is
15 deteriorating?    11:47:08
16     A.    It would depend on the covenant and
17 the circumstances. Certainly in the case of a
18 well-crafted covenant with respect to a bank
19 loan document, you may see a covenant that is
20 being used as sort of an early warning    11:47:27
21 mechanism or a warning mechanism as to
22 potential financial deterioration.
23     In other documents, for example,
24 bond covenants are generally written -- often
25 written very loosely, loose in the sense that    11:47:48

26 (Pages 101 to 104)

04d17651-b753-4ff4-9699-3f6ee2ccc654

Christopher M. James

Videotaped

**Page 105**

1 it would take a very significant change in the
2 financial position of the company to trigger a
3 technical violation.
4     In fact, it could be written in
5 such a way that and are often written in such a    11:48:12
6 way that by the time that there's a trigger of
7 that covenant, the company's financial position
8 may have deteriorated significantly.
9     Q.  Let me ask if I could just direct
10 your attention to page 36 of your report.    11:48:29
11     A.  Page 36?
12     Q.  Page 36, yes.
13     A.  Okay.
14     Q.  Paragraph 81.
15     A.  M-hm.    11:48:38
16     Q.  As I understand it, you write there
17 that debt covenants protect lenders by enabling
18 them to act to safeguard their investment shall
19 the borrower's financial condition begin to
20 deteriorate.    11:48:51
21     A.  Right.
22     Q.  Do you see that?
23     A.  Yes.
24     Q.  I take it you would agree with
25 that?    11:48:55

**Page 106**

1     A.  Yes.  Here what I am referring to,
2 and as you read down further in the paragraph,
3 talking about covenants providing banks and
4 private lenders with certain information,
5 really there's a -- there's a difference that    11:49:12
6 is well known between sort of covenant
7 structure as it applies to private lending
8 agreements and covenant structures as they
9 apply to bond agreements.
10     Q.  And how does this structure differ?    11:49:28
11     A.  Generally covenants in banking
12 relationships are, but not always, but
13 generally are set tighter than covenants in
14 bond relationships, or bond lending.
15     Q.  Would I understand then that you    11:49:50
16 would expect the covenants, for example, in the
17 PNC Letter of Credit Reimbursement Agreements
18 to perhaps be tighter than the covenants we
19 would find in the master trust indentures for
20 the DVOG bond financing?    11:50:12
21     A.  You're asking me what my
22 expectations would be?
23     Q.  Yes, just based on that answer that
24 the banking relationship covenants tend to be
25 tighter than the bond relationship covenants.    11:50:24

**Page 107**

1     A.  My expectation would be -- a letter
2 of credit is a little -- is a little different.
3 But I would think that under a letter of credit
4 or a lending relationship, you have the
5 potential to set covenants tighter than you    11:50:42
6 would generally set in the context of a bond
7 covenant.
8     Q.  Did you evaluate, as part of this
9 engagement, the covenants that appeared in the
10 various financing documents related to AHERF    11:50:55
11 and its affiliates?
12     A.  I'm not sure I understand what you
13 mean by evaluate.
14     Q.  Did you do any comparative analysis
15 of the covenants that appeared in the various    11:51:05
16 AHERF financing documents?
17     MR. FRIESEN:  Objection.
18     A.  I'm not sure what you mean by a
19 comparative.
20     Q.  Okay.    11:51:12
21     You understand, I'm sure, that
22 there were various financings in which AHERF
23 and its affiliates participated, is that right?
24     A.  That is correct.
25     Q.  Now, in connection with this    11:51:25

**Page 108**

1 engagement, had you ever compared the covenants
2 that appear in the DVOG master trust indenture
3 with the covenants that appear in the PNC
4 Letter of Credit Reimbursement Agreements with
5 the covenants that appear in the United master    11:51:46
6 trust indenture with the covenants that appear
7 in the Morgan Guaranty trust reimbursement
8 agreement, have you done any sort of analysis
9 on the various covenants appearing in those
10 financing documents?    11:51:59
11     MR. FRIESEN:  Object to the form of
12 the question.
13     A.  I'm aware of the different
14 covenants.  I mean, first of all, you've got
15 different borrowing and obligated groups.    11:52:06
16     Q.  I understand.  I'm just -- you've
17 used some terms earlier talking about covenants
18 being tighter or looser depending upon whether
19 it's a private lending relationship or bond
20 relationship.    11:52:22
21     A.  Right.
22     Q.  And we have both of those
23 relationships in this case, that is the AHERF
24 matter, do we not?
25     A.  Yes.    11:52:29

27 (Pages 105 to 108)

Advertisement

**I manage my diabetes with diet.**

Medscape          ▮Home ▮Site Map ▮Marketplace ▮My Medscape ▮CME Center ▮Feedback ▮Help Desk

NOTE: To view the article with Web enhancements, go to:
http://www.medscape.com/ProjHope/HA/2000/ha1901.01.burn/ha1901.01.burn-01.html.

# The Fall of the House of AHERF: The Allegheny System Debacle

Lawton R. Burns, John Cacciamani, James Clement, and Welman Aquino

[Health Affairs 19(1):7-41, 2000]

EXHIBIT
595
CW 8/20/02

## Prologue

The drama of the collapse of the Allegheny Health, Education, and Research Foundation (AHERF) ha captured the attention of industry observers from Wall Street to the ivory tower of academe. All are eager to know who ultimately held responsibility -legal, financial, and managerial -for AHERF's decline. Part of the intrigue of the story certainly stems from the fact that so many actors, both inside and outside the company, appear to have played a part. Indeed, the diffusion of responsibility itself may have contributed to the snowballing catastrophe, for as Polish poet Stanslaw Jerzy Lec observed, "No snowflake in an avalanche ever feels responsible." There are many stories still to be told about why no one was able to stop the "avalanche," and many of them will be told only as they are revealed in the courts. Meanwhile, the health policy community waits to see whether AHERF's fall has implications for other struggling academic health centers.

Robert Burns is James Joo-Jin Kim Professor of Health Care Systems and Management at the Wharton School of the University of Pennsylvania in Philadelphia. He has studied integrated delivery system for more than fifteen years. John Cacciamani is a geriatrics fellow at the University of Pennsylvania School of Medicine in Philadelphia. James Clement is a consultant at Andersen Consulting Strategic Services in Boston. He and Cacciamani are currently completing master's degrees in business administration at Wharton. Welman Aquino is a nurse manager at New York Presbyterian Hospital and Columbia-Presbyterian Medical Center in New York City.

## Abstract

The $1.3 billion bankruptcy of the Allegheny Health, Education, and Research Foundation (AHERF) in July 1998 was the nation's largest nonprofit health care failure. Many actors and factors were responsible for AHERF's demise. The system embarked on n ambitious strategy of horizontal and vertical integration just as reimbursement from major payers dramatically contracted, leaving AHERF overly exposed. Hospital and physician acquisitions increased the system's debt and competed for capital, which sapped the stronger institutions and led to massive internal cash transfers. Management failed to exercise due diligence in many of these acquisitions. Several

external oversight mechanisms, ranging from AHERF's board to its accountants and auditors to the bond market, also failed to protect these community assets.

## Introduction

On 21 july 1998 the nonprofit Allegheny Health, Education, and Research Foundation (AHERF) and several of its affiliate operations in Philadelphia filed for bankruptcy.[1] AHERF's filing papers revealed a $1.3 billion debt and 65, 000 creditors.[2] This qualified AHERF as the nation's largest nonprofit health care bankruptcy and second-largest overall.[3] In addition to the enormous debt, the bankruptcy signaled the end of the largest statewide integrated delivery system in Pennsylvania; the largest medical school in the country; and the strategy of aggressive acquisitions of physicians, researchers, and hospitals in the Philadelphia area.

The AHERF story illustrates many of the problems that have plagued horizontally and vertically integrated provider systems. However, the AHERF bankruptcy is remarkable in the low degree of fiscal responsibility and accountability throughout its operations and the other sectors of the health care system with which it dealt. At the center of the saga is AHERF's top management, especially its chief executive officer (CEO) and chief financial officer (CFO). Other corporate actors could or should have recognized the financial problems, but for a variety of reasons they did not speak out or act.

In this paper we trace the history of AHERF, then outline the actions of top management that contributed to the system's demise, the tacit support for these actions given by clinicians/researchers, and the difficult market context in which these actions were taken.[4] We conclude with a discussion of the oversight role played by the AHERF board, accountants and auditors, and the bond market.

## A Brief History of AHERF's Growth and Collapse

AHERF was established in 1983 as a nonprofit corporation and the sole member of Allegheny General Hospital (AGH), a prosperous 670-bed hospital in Pittsburgh that had a modest teaching affiliation with the much larger University of Pittsburgh Medical Center (UPMC).[5] The latter's growing reputation and prominence as a national referral center grated on both the board chairman of AGH, William Penn Snyder, and AGH physicians. The situation may have been aggravated by AGH's dependence on tertiary care for revenues and thus on UPMC to maintain its research and graduate medical programs, as well as on a failed effort by the AGHboard chairman to develop a partnership with his UPMC counterpart. For its part, UPMC felt threatened by AGH's market leadership in the twelve-county area, its large endowment, and its loyal medical staff. Seeking to protect its core competitive advantage (the medical school franchise), and perhaps to supply its own growing organization, UPMC pulled some residencies out of AGH. Snyder and the AGH board began to seek a new hospital executive and strategic thrust that would garner AGH a medical school, secure its residency programs, and transform it into a premier medical education and research institution.[6] In 1986 they hired AGH's former vice-president and chief operating officer (COO), Sherif Abdelhak, as CEO.

Under Abdelhak, AHERF's overall strategy evolved as (1) developing Pennsylvania's first statewide integrated delivery system (IDS) grounded in academic medicine, (2) building regional market share to leverage managed care payers, (3) garnering capitated contracts, (4) achieving synergies and efficiencies among the assets acquired, and (5) using community/suburban hospitals to refer private-pay patients to teaching hospitals and fill their beds. AHERF rapidly expanded into both Philadelphia

and Pittsburgh through acquisitions encompassing several hospitals, medical schools, and primary care physicians (PCPs). In 1987 Abdelhak acquired the Medical College of Pennsylvania (MCP) and its two affiliated hospitals in Philadelphia (MCP Hospital and Eastern Psychiatric Institute). In 1991 he acquired United Hospitals Inc., a system of four hospitals in Philadelphia. That same year he acquired Suburban Medical Associates outside the city as AHERF's first set of PCPs. In 1993 he acquired Hahnemann Medical College and its affiliated hospital in Philadelphia and merged the two medical schools into MCP-Hahnemann. In 1996 Abdelhak began to aggressively recruit clinicians and researchers from hospitals in Philadelphia and Pittsburgh to augment AHERF's research funding and stature. He also assumed management of the Graduate Health System (GHS) and its six hospitals that year and completed their acquisition in 1997. That year he also established a new division, the Allegheny University Medical Centers, to operate AHERF's new community hospital affiliates in the Pittsburgh area (Forbes, Allegheny Valley, and Canonsburg) that, in combination with AGH, would form the basis of AHERF's western Pennsylvania operations.

By the end of 1997 AHERF had transformed itself from a sole community hospital into Pennsylvania's largest statewide integrated delivery system. In a January 1998 speech Abdelhak depicted his system's phenomenal growth (Exhibit 1), sprawling organization, productivity improvements, growing market share in both parts of the state, and improved physician network contribution.[7] What Abdelhak did not disclose were the financing mechanisms used to fuel the growth (internal subsidies, hidden internal cash transfers, raids on hospital endowments, and the enormous debt piled up from all of the acquisitions) and the resulting fiscal deterioration of the system. This deterioration manifested itself in hospital layoffs and one hospital closure in Philadelphia in late 1997; spending of $330 million more than the system brought in during July 1997 -May 1998, mostly in the eastern operations; a series of downgrades in the bonds supporting AHERF hospitals; a failure to pay its hospital liability premiums; and attempts to uncouple the system's eastern operations from the western hospitals and sell them during 1998.[8]

The growing financial problems became known through duediligence efforts of the first potential buyer, Vanguard, which originally offered $450 million for six nonteaching hospitals in the east. Vanguard's discoveries led to a long delay in the sale and caused it to lower its offers to $280 million for the six hospitals and $460 million for nine others (including the two teaching institutions). The revelation of the financial problems and Abdelhak's use of hidden cash transfers to cope with them led to his ouster by AHERF's board in June 1998. By July AHERF was running out of cash to maintain operations and payroll. It found itself with no firm purchase offer from Vanguard, no ability to cut costs (for example, by renegotiating capitated contracts with insurers and employment contracts with physicians), and no interim financing. The system was forced to declare bankruptcy in July 1998. It then saw a 14 percent drop in clinical activity at its Philadelphia hospitals, signaling more losses and bad news for potential buyers. AHERF finally sold its entire Philadelphia operations to Tenet in late October 1998 for $345 million. Its western operations aligned with the Western Pennsylvania Health System in August 1999 as a preliminary step toward merger.

## Managerial Decisions and Accountability

### Questionable Strategy

In hindsight, all five elements of AHERF's strategy were questionable. First, Pennsylvania has few statewide payers (other than Medicaid and U. S. Healthcare) or employers (other than banks) that might wish to contract with a statewide IDS. Second, few IDSs have amassed enough market share to leverage managed care payers, especially in markets such as Philadelphia, which has high payer

concentration and excess provider capacity. Third, hospitals 'zeal to assume capitated risk and health maintenance organizations '(HMOs ') reluctance to pass it on have resulted in low capitated revenues and capitation rates as a percentage of premiums, and thus huge provider losses.[9] Fourth, synergies and economies of scale sought through mergers are difficult and depend heavily on postmerger implementation, little of which occurred at AHERF because its expansion was so rapid.[10] Fifth, academic medical centers (AMCs) in Philadelphia have had difficulty persuading wealthy suburbanites to use older teaching hospitals in the city, as well as persuading suburban hospitals not to develop revenue-generating services that attract their local patients.

As part of the IDS strategy, AHERF and other Philadelphia systems purchased PCP practices. A PCP network was deemed essential for obtaining managed care risk contracts. The PCP acquisition strategy also was consistent with the prevailing philosophy that vertical integration is necessary to obtain needed inputs such as inpatient referrals (or to at least not be locked out of the referral market). Both beliefs were incorrect. Capitated hospital risk contracts have been slow in coming from managed care payers. Because of the losses incurred, Philadelphia systems have placed a moratorium on full-risk contracting.[11] Moreover, these systems have found that they can command only 25 -30 percent of the referrals of their community-based PCPs, not 80 percent as some executives anticipated. PCP acquisitions turned into losses rather than "loss leaders."

## Questionable acquisitions

In the push for horizontal integration, AHERF acquired several financially "distressed" institutions.[12] Each major acquisition had a financial millstone attached to it. Each also was looking for a capital partner.[13] Besides bringing a medical school with a good research focus and reputation, MCP also brought fiscal distress ($3 million net operating loss in 1988), due in part to the small size of its affiliated AMC (379 total beds, 110 psychiatric); a high volume of walk-in patients; a heavy reliance on the local Veterans Affairs (VA) hospital, which was downsizing; an unfavorable location in Northwest Philadelphia (less access to physicians); and a low endowment.[14] At the time of the takeover, Abdelhak promised that 15 percent of hospital system profits (starting with AGH) in the prior year would help to support MCP, with a floor of $4 -$5 million over five years. This marked the beginning of the western operations 'legal obligation to subsidize the eastern operations, and the joke that MCP stood for "money comes from Pittsburgh." Along with the cash, AHERF infused its own management and fund-raising assistance to endow some faculty chairs. MCP's returns improved modestly, but they still remained low.

The acquisition of United Hospitals in 1991 also was viewed as synergistic. United provided more beds over which to spread MCP's fixed costs, as well as greater system size in dealing with payers. One United hospital, St. Christopher's Hospital for Children, was especially coveted to shore up MCP's weakness in pediatric specialties. However, the system was heavily in debt ($137 million in bonds with marginal investment ratings) and losing money (roughly 3 percent operating losses during 1989 -1990), largely due to a building program at St. Christopher's. AHERF executives feared a bidding war with other local systems interested in St. Christopher's and decided to preempt the competition by purchasing the entire United system. AHERF believed that referrals from United's suburban hospitals could be redirected to AHERF facilities. As with MCP, AHERF installed its own management and achieved a small fiscal turnaround (positive margins of less than 2 percent from 1992 to 1994), which was partly due to the new children's hospital facility. The other United hospitals continued to lose money.

The 1993 purchase of Hahnemann was viewed as potentially synergistic with MCP, since each had