what the other lacked. MCP enjoyed a good academic reputation, while Hahnemann enjoyed a wide range of clinical programs, a large volume of open-heart surgeries, and a large endowment. Such synergies were difficult to achieve, however, in a market dominated by larger AMCs such as the University of Pennsylvania Health System (UPHS) and the Jefferson Health System with greater market share, more desirable hospitals, and larger research portfolios. Former AHERF executives admit it was not clear what the system would do with two medical schools. MCP was acquired first, but Hahnemann was considered to be more like AGH. The acquisition was rationalized internally by economies of scale via program consolidation. Such consolidation never extended beyond some basic science departments and the clinical laboratories of AHERF's Philadelphia hospitals; clinical faculty from the two schools were never integrated. Most importantly, Hahnemann brought with it $123 million in debt, while its hospital had small operating margins (roughly 1 -3 percent during 1991 -1995).

AHERF's 1996 -1997 takeover of GHS brought in six more hospitals. GHS had followed a strategy of acquiring small osteopathic hospitals in the wider community and unsuccessfully attempted to feed the downtown flagship hospital (Graduate) while making the referring hospitals more efficient. Several GHS hospitals had negative margins and a cumulative deficit of $40 million by 1996, which AHERF had to assume. Moreover, the acquisition ultimately included GHS's bond and related debt, totaling $174 million. Graduate Hospital referred to itself as the premier hospital in the city for providing comprehensive treatment to persons with human immunodeficiency virus (HIV). It achieved a roughly 3.5 percent return during the 1990s -not enough to subsidize the losses at the other facilities. Moreover, much of its balance-sheet strength lay in accounts receivable that were unlikely to be collected.

The final hospital acquisitions occurred in the Pittsburgh market during 1997, when AHERF assumed control of Forbes, Allegheny Valley, and Canonsburg. Forbes was a relatively healthy facility, sporting a 4-5 percent return to net operating revenue in the mid-1990s. The acquisition of the three hospitals added another $121 million in bond debt to AHERF, however.

In the push for vertical integration, AHERF acquired lots of physicians at high prices. The acquisition of 310 PCPs in Philadelphia during 1991 -1997, and an additional 136 PCPs and seventy-five other specialists in Pittsburgh, reportedly cost AHERF $100 million. The high cost was in part the result of a bidding war with other systems in Philadelphia (UPHS, GHS, and Temple) that believed in the IDS mythology. The bidding war, along with the perceived need to expand the physician network (Allegheny University Medical Practices, or AUMP) in tandem with the hospital network, led to a reported lack of due diligence and prudence in AHERF's practice purchases. AUMP's COO was given a mandate by Abdelhak to put the physician network together quickly. He allegedly received a $15, 000 commission for each contract executed -a strong incentive to cut deals rapidly and to overpay for practices.[15] AHERF paid less money for the assets than it did for those of UPHS but offered much higher salaries and more years guaranteed. Two purchase agreements filed in Common Pleas Court showed that PCPs received $70, 000 -$150, 000 for their assets, an average annual salary of $220, 000 -$250, 000 for five years, and 60 percent of the revenues above $470, 000 -$570, 000. This compensation exceeded the salary of UPMC's CEO.

Every hired physician was contracted through the Allegheny University of the Health Sciences (AUHS), making it impossible to unilaterally alter their contracts. Prior to bankruptcy, AHERF officials estimated it would cost $135 million to dismantle the PCP network, given the executory contracts. Moreover, these contracts included no means to monitor practice productivity, which might decline up to 20 -25 percent postacquisition. AHERF may not have been able to capture a major portion of its PCPs 'referrals because the practices were acquired without proximity to AHERF

Case 2:00-cv-00684-DSC    Document 171-2    Filed 07/12/2005    Page 2 of 50
The Fall of the House of AHERF: The Allegheny System Debacle

Page 6 of 27

hospitals in mind. The rich compensation and benefits also attracted an older PCP network (average age reported to be nearly fifty-six) eager to sell and less eager to continue working hard.

AHERF also tried to centrally manage all physician billing operations out of Pittsburgh. Physicians 'offices collected no cash but rather billed patients by mail for their copayments. Moreover, the hospital computer system was much less sensitive to small physician claims and typically could not determine how much a physician was owed. Only an estimated 20 percent of physicians 'billings were collected. Also, physicians lost control and oversight of billing and revenue collection, which further reduced the incentive to produce.

These decisions spelled financial disaster for AUMP: It lost $41 million in 1996 and $61 million in 1997. These losses required substantial cash infusions from AHERF and its Pittsburgh hospitals. Such losses proved difficult not only to control but also to forecast. Projected losses at AUMP for the first eleven months of FY 1998 were estimated at $32 million; the final figures were $52 million.

## Debt Accumulation and Debt Financing

During the mid-1980s AGH was considered the "Fort Knox of hospitals." It had only $67 million in debt and enjoyed a 15 percent margin. During the late 1980s it earned $30 -$38 million in excess revenues over expenses annually and was one of only forty hospitals nationwide with a bond rating of Aa.[16] Its financial strength served as the initial source of financing for the MCP subsidy. In the year following the MCP acquisition (1988) AGHissued $60 million in bonds. MCPitself issued $79 million in bonds between 1989 and 1991. After the 1991 purchase of United, AGH issued another $60 million in bonds. The United purchase was not announced until after the bonds were sold. The acquisition of Hahnemann and its debt in 1993 was followed by another issue of $100 million in bonds by AGH in 1995. The next year an AHERF subsidiary was formed for the MCP, Hahnemann, and United hospitals, known as the Delaware Valley Obligated Group (DVOG). DVOG issued $360 million in bonds and $52 million in notes as new and replacement debt. AHERF's acquisitions and bond financings led to a staggering growth in debt, from $67 million in 1986 to nearly $1.2 billion in 1998.

Why did AHERF issue so many bonds and assume so much debt? There are four acknowledged reasons and several speculated motives. First, the bond debt at AGH often constituted reimbursement for capital expenditures incurred over the prior two to three years. Second, the bond debt refinanced older debt at better interest rates. Third, AHERF assumed that its takeover of distressed systems such as GHS would lead to the latter's bonds 'being given a higher credit rating, thus lowering its interest expenses and improving access to capital.[17] Fourth, AHERF believed that it could assume the debt of the fiscally distressed hospitals it acquired, retire that debt, and reissue it under one of its five obligated groups of hospitals.[18] In this manner, AHERF refinanced debt of hospitals with lower debt ratings by pooling themwith hospitals that had better balance sheets and/or higher debt ratings, to obtain better interest rates for the former.

There is speculation that AHERF issued the new debt for two other reasons. First, AGHreportedly used the proceeds from its own bond sales to free up cash flow and reserves for other purposes, such as propping up the weakened operations in the east. The system was reportedly starved for cash as early as mid-1997. AHERF appears to have deflected attention from all of its accumulated debt by organizing it into different obligated groups. Debt-rating agencies such as Moody's Investors Service had a difficult time grading each group, since it was hard to know how the fiscal and operational health of one group affected the others. Moreover, AHERF may have contravened its bond covenants

Case 2:00-cv-00684-DSC    Document 171-2    Filed 07/12/2005    Page 3 of 50
The Fall of the House of AHERF: The Allegheny System Debacle
Page 7 of 27

by making cash transfers between its obligated groups. For example, the Centennial group made a $111 million payment to DVOG, which was subsequently canceled without any consideration paid to Centennial. Second, AHERF may have issued debt because it was in a hurry to develop a statewide system. AHERF faced competition from other systems for at least some of the hospitals it wished to acquire, had no access to the equity market, had already begun to tap AGH's surplus, and had purchased hospitals with little or no positive cash flow. There also were plans to acquire hospitals in southern New Jersey and even in France![19]

AHERF engaged in other forms of debt financing. In 1997 AHERF and affiliates began to lease rather than buy equipment, due to cashflow problems. AHERF ultimately recorded $430 -$500 million in noncancelable operating leases on its books for equipment, offices, and garages. Leases permitted AHERF to obtain capital at better rates than bank loans and constituted off-balance sheet financing that benefited cash-flow figures. However, they entailed future expenses with no ability to depreciate the value of the property.

In sum, AHERF's expansion during the 1980s and 1990s was accompanied by the assumption of debt among its acquisitions and by large amounts of new and refinanced debt floated in the tax-exempt hospital bond market. AHERF hospitals managed to service their debt and even generate some cash in excess of their debt. However, the tiny margins achieved (0 -3 percent) during the early and mid-1990s paled in comparison with the margins earned at competing hospitals (6 -12 percent), placing AHERF at a competitive disadvantage in Philadelphia in terms of capital improvements. By the late 1990s debt-service coverage by hospitals nationwide began to worsen as a result of slower growth in cash flow.[20] Coupled with AHERF's higher debt, its hospitals were particularly disadvantaged. The size of the debt, the marginal profitability of many of the hospitals acquired, and the competing needs for what little cash was generated proved to be too great a strain for the system.

### Acquisition of Clinicians and Researchers

At the same time that AHERF was purchasing PCP practices, it also was recruiting clinical and research faculty. AHERF aimed to enhance its AMC stature and compete with UPMC. Expanded programs in basic and clinical sciences would attract National Institutes of Health (NIH) funding and high-price research talent and would make cuttingedge treatments available at AHERF facilities. These would, in turn, attract paying patients, clinical trials, and new revenue sources. AHERF's enhanced clinical status, finally, would attract more medical students and low-cost physician trainees, provide a reliable supply of residents, and preserve AHERF's residency programs.

Unlike the PCP practices, the faculty practices often generated a lot of revenue. On the clinical side, AHERF recruited a cardiologist in 1996 who helped MCP to nearly quadruple its number of openheart surgeries in two years. The cardiologist earned $850, 000 before bonuses and close to $1 million in total compensation. AHERF also recruited three orthopedists in 1997, who collectively performed 4, 000 procedures annually and generated $40 million in business. They received guaranteed salaries of $3.9 million per year; their patients got free valet parking.

On the research side, recruitment efforts helped to augment research funding (see Exhibit 1). AHERF recruited prominent researchers to head its Institute for Cellular Genetics and Center for Genomic Sciences, Center for Gene Therapy, Cancer Clinical Trials Research Center, and Institute for Human Oncology in Philadelphia. It ultimately sought designation from the National Cancer Institute as a comprehensive cancer center, a status enjoyed by UPMC in Pittsburgh and by two other AMCs in Philadelphia.

Clinicians and researchers thus were recruited not only by the lure of large salaries but also by promises of new buildings; large lab space; and paid staff in billing, support, and research. More importantly, they were lured by the promise of participating in a new growth environment. Several explained to the press that they were mesmerized by Abdelhak's ambitious promises and plans, and the opportunity to be part of an enterprise that might dwarf other AMCs in the state. They also were taken with Abdelhak's dream of building a "better institution for tomorrow" based on research and education, a higher caliber of physicians, and higher quality of care.

It is not clear how much these high-price faculty knew about the system's growing financial problems prior to 1998. Some AHERF physicians claimed that nothing was known until March 1998, but there were signs of trouble before then. Promised compensation was often not paid after the first year of the contract. Promised new buildings and renovations took longer than expected, anticipated new staff were not hired, and equipment was leased rather than purchased starting in 1997. Some researchers found that their grant funds had been diverted. Research budgets were cut, and bridge support dwindled. Intramural research grants to encourage new investigators were eliminated in 1997. Yet there is no record of any public protests by prominent faculty. Some AHERF physicians stated that "colleagues didn't really care as long as their paychecks [from guaranteed contracts] got cashed." Newspaper reports of the bankruptcy suggest that Abdelhak intimidated both administrative and medical staff. He ended his first speech to the joint MCP-Hahnemann medical faculty by telling a stunned audience, "Don 't cross me or you will live to regret it." He also reportedly felt that he had paid his staff so well and promised them so much that he deserved their unquestioning obedience.

## Competitive Market Context

Although they are the paramount reasons, AHERF's bankruptcy cannot be explained alone by high debt, questionable assumptions, poor decisions, and excessive spending. These actions took place in a Philadelphia market that quickly became totally unforgiving of such mistakes. This market was very different from the market AHERF was familiar with.

Pittsburgh, AHERF's and AGH's home base, had a fee-for-service, bigger-is-better mentality. In 1994 the metropolitan statistical area "AHERF's bankruptcy cannot be explained alone by high debt, questionable assumptions, poor decisions, and excessive spending." (MSA) had only five health plans. The local Blue Cross plan, Highmark/Keystone, had the largest share, followed closely by Coventry's HealthAmerica. Although these two commanded 80 percent of the HMO market, total HMO penetration in Pittsburgh was only 15 percent, slightly below the national MSA average of 16 percent.[21] The dominant provider network was UPMC, an AMC affiliated with twelve other hospitals, with 4, 500 total hospital beds and $1.65 billion in revenues in 1999. AHERF's western operations encompassed only six hospitals, 2, 200 beds, and $0.93 billion revenues. The Pittsburgh market was in essence one large AMC and a fragmented HMO community largely paying discounted fee-for-service.

Abdelhak tried to transplant this strategy of AMC-centered expansion into a Philadelphia market with a very different HMO and provider market structure. Philadelphia had double the HMO penetration (30 percent in 1994) and double the number of HMO plans (eleven in 1994). Moreover, two plans -U. S. Healthcare and Keystone/ Blue Cross -dominated the HMO market with 74 percent share. They wielded enormous influence over providers, who suffered from high utilization and excess capacity. According to one report, Philadelphia was overbedded (3.6 beds per 1, 000 population versus 3.0 nationally), overdoctored (296 physicians per 100, 000 population versus 184

nationally), overstaffed (7.15 full-time equivalents per 100 case-mix-adjusted admissions), and overutilized (550 commercial inpatient days per 1, 000 population versus 456 nationally; 3, 170 Medicare days per 1, 000 population versus 2, 669 nationally).[22] Both large HMOs became more active in managing costs via discounts than in managing care. Both also contracted with most providers using open-access plans, avoiding any exclusive contracting.

On the provider side, Philadelphia had five major AMCs vying for market share, reputation, and research funding. They also produced their own medical graduates, who, if they remained in the area as community practitioners, might favor their alma mater in referral networks over their rivals. They also were surrounded in the collar counties by large teaching hospitals (such as Crozer-Chester Medical Center and Lankenau Hospital) that attracted wealthy suburban patients. As a result, Philadelphia had a large number of tertiary facilities that lacked clear differentiation in patient services or the unique attributes they offered the area's two large payers. AHERF's decision to purchase two struggling medical schools and their city hospitals thus did not bestow any competitive advantage.

Unfortunately for providers, the Philadelphia market deteriorated rapidly and substantially. First, Philadelphia hospitals were hit by reductions in the rates paid by their three major payers: commercial insurers, Medicare, and Medicaid. On the commercial side, the two largest HMOs (U. S. Healthcare and Keystone) began to move their members from indemnity to HMO plans. U. S. Healthcare's total HMO enrollment in the MSA skyrocketed from 640, 000 in 1994 to 817, 000 in 1996; Keystone/Blue Cross's enrollment jumped from 564, 000 to 666, 000. According to Abdelhak, these enrollment shifts led to a 10 percent decline in the weighted average payment per case.[23] Managed care penetration jumped from 30 percent to 53 percent in AHERF's eastern operations between 1993 and 1997, and from 15 percent to 48 percent in its western operations.[24]

Nationally, commercial HMOs were competing for market share and seeking to rapidly grow enrollment by lowering their premiums. Larger enrollments motivated providers to want to contract with them; however, HMOs extracted bigger discounts from providers to offset the falling premiums. When these insurers passed on capitated risk to providers, the situation was often exacerbated. For example, AHERF signed a full-risk contract with Aetna/U. S. Healthcare at 79 percent of the premium but reportedly failed to stipulate a premium floor. When Aetna lowered its premium, AHERF received 79 percent of a smaller figure and experienced higher-than-expected losses. AHERF signed a similar agreement with HealthAmerica in Pittsburgh for 80 percent of premium. At the time of AHERF's bankruptcy, HealthAmerica claimed that AHERF owed it $108 million to pay for medical care that was supposed to have been paid for under the fixed-price contract. In signing these contracts, AHERF assumed risk for up to half a million enrollees statewide with little managed care infrastructure in place. The book of capitated risk business led to the single biggest losses at AHERF and other AMCs signing such contracts.[25]

On the Medicare side, hospitals were hit by changes in reimbursement from the Balanced Budget Act (BBA) of 1997, including cuts in inpatient, outpatient, and home health care services. Also, Medicare HMO enrollment in Philadelphia skyrocketed from 9 percent in 1994 to 30 percent by 1997. This growth spelled lower per capita insurance premiums and thus lower hospital payment rates for their Medicare patients. Medicare case rates for coronary artery bypass graft changed from $40, 000 for traditional Medicare patients to $20, 000 for Medicare HMO patients.[26] These enrollment changes also motivated Medicare HMOs to pull patients away from AMCs and seek lower-cost facilities.

On the Medicaid side, hospitals in southeast Pennsylvania witnessed the implementation of

HealthChoices, a mandated managed care program, in February 1997. More than 80 percent of the area's 550, 000 Medicaid recipients were quickly moved to capitated plans. The program has been criticized for giving the plans capitated rates that were too low.[27] The plans in turn gave providers rates that were too low. As one CFO at a Philadelphia AMC described it, "The state takes 10 percent off the top and gives it to the HMOs; the HMOs take another 15 percent off the top and give it to the hospitals." The four Philadelphia HMOs with HealthChoices contracts lost $50 million during the first year of operation. Two AHERF institutions were part owners of one of these four plans and took risk at the hospital level. AHERF was particularly vulnerable to these reimbursement changes since Medicaid accounted for up to 20 percent of revenues at some AHERF hospitals and 10 percent systemwide.

As HealthChoices was being implemented, the Pennsylvania State Legislature (Act 35) cut Medicaid coverage for previously eligible adults. The result was an increase in the number of uninsured persons using hospitals they had used before, a $75 million cut in Medicaid payments per year to those hospitals, and a 2.7 percent reduction in net patient revenues for AHERF's Philadelphia hospitals.[28]

After these three sudden drops in reimbursement, AHERF's spokesman said that the system had hit the "trifecta." [29] They affected all area hospitals and, with the possible exception of Medicaid, would not have disproportionately hurt AHERF's finances. However, AHERF's rapid expansion and cash-flow problems made it vulnerable to any sudden revenue declines. By contrast, the vice-president and controller at the University of Pittsburgh stated that the medical center had planned for cuts in Medicare and Medicaid by eliminating 3, 000 -4, 000 jobs and consolidating services over the preceding few years. No similar steps were taken at AHERF.

A second market shift that hurt AHERF was the repeal of some protective regulation. Several community hospitals around Philadelphia successfully lobbied the state legislature to allow the state's certificate-of-need (CON) law to sunset at the end of 1996. Two hospitals -Abington and Frankford - then started open-heart surgery programs. Frankford Hospital spent $6.5 million on renovations and equipment to create a cardiac services program that was expected to perform 1, 000 cardiac catheterizations and 250 surgeries the first year, and 1, 500 cardiac catheterizations and 450 surgeries the third year.[30] Most of this new volume came at the expense of AHERF's Hahnemann and GHS hospitals.

The Philadelphia market thus proved inhospitable to AHERF's strategy. Powerful managed care market forces in the 1990s brought the system's eleven-year expansion to a complete halt and forced a complete unbundling within a year and a half.

## Failure of External Oversight Mechanisms

### Problems with governance

While the growing managed care market succeeded in holding AHERF accountable for its managerial decisions, other oversight mechanisms did not. AHERF suffered from a weak governance structure. It had an enormous parent board whose membership varied between twenty-five and thirty-five persons, rather than the optimal thirteen to seventeen persons recommended by governance consultants.[31] Second, it had a network of ten different boards responsible for its various operations (fifty-five different corporate entities), which had little overlap in their membership. Consequently, directors on one board reportedly were never sure what was happening elsewhere in the AHERF

empire, thus making effective oversight impossible. Again, this is contrary to the recommendations of governance consultants.

AHERF also suffered from weak board composition. Many board members were Pittsburgh's captains of industry, but there were several inherent conflicts of interest. In April 1998, three months prior to filing for bankruptcy, AHERF's CEO ordered the repayment of an $89 million loan to a bank consortium including Mellon Bank without board discussion or approval. Five board members were current/former directors or executives with Mellon, including its former chairman (who was AHERF's chairman). The bankruptcy trustee charged in a September 1999 lawsuit that Mellon officials used their influence as AHERF directors to pressure AHERF to repay the obligation, even though the lenders had made no formal notice of default. For its part, Mellon may have been pressured by the other banks in the consortium.

The Official Committee of Unsecured Creditors also claims that there was substantial overlap between AHERF's officers and the officers of both the debtor hospitals (eastern operations) and the nondebtor hospitals (western operations). This overlap created conflicts of interest between their fiduciary duties to the creditors of the debtor estates and their duties to the nondebtor hospitals.[32]

Perhaps the greatest reported problem was Abdelhak's domination of all board decisions and his protection by AGH Chairman Snyder. Board meetings were described as scripted affairs, intentionally staged to limit oversight and participation by other board members. For example, board members (many of whom were busy executives) might receive as many as 1, 000 pages of paper to be discussed at board meetings that might last only a short time. As one former member explained, "Half of the people didn't even open the book. They didn't have the time." As a result, board members relied on Abdelhak's and Snyder's judgment. Moreover, the elderly Snyder may have relied on Abdelhak, who reportedly made Snyder feel he was involved in managing AGH, even though he could not keep pace.

Snyder also protected Abdelhak. The two men discouraged board members from asking tough questions. When Vincent Sarni, CEO of PPG Industries and AHERF board chairman in the late 1980s, questioned AHERF's expansion into Philadelphia, Snyder and Abdelhak lobbied (and mildly pressured) other board members to remove him as chair. Sarni reportedly found himself subject to a new "three-year term limit" that had just expired. Snyder also sat on the board's compensation committee, which developed rich compensation and benefit packages for AHERF's top management. Board members did not want to be seen as "anti-team players." Many shared Abdelhak's and Snyder's vision of AGH as a prestigious AMC. As in other nonprofit entities, membership on AHERF's board may also have been more a social activity or community service than a fiduciary duty.

This atmosphere might help to explain how many critical strategic decisions could be made by Abdelhak and his senior management without formal board approval. Board members had little effective oversight of management and none in board meetings. Several key decisions were relayed to the board after they were made or were never relayed at all. These included the acquisition of GHS, the assumption of existing debt at United Hospitals and GHS, the restatement of financial losses at AGH in the mid-1990s, and the controversial decision made by the compensation committee shortly before bankruptcy to grant top executives $8 million in bank loans (on favorable terms with AHERF jointly liable) and allow them to cash out their deferred compensation plans.

Moreover, the information that the board needed to govern was held by a small group. Former

AHERF executives have chided the board for failing to ask the tough questions at critical times, such as AHERF's entrance into full-risk contracts with payers. They also claim that Abdelhak actively presented himself as the key decisionmaker and thus shielded the board from its responsibility. During the negotiations with Vanguard for the purchase of the eastern hospitals, Abdelhak negotiated directly with Vanguard's CEO, who was surprised by his lack of access to AHERF's board. Abdelhak reportedly told him, "When you are talking to me, you are talking to the board. I have the authority to make this happen."

At the same time, AHERF took steps to shield the board from the financial risk of lax oversight by taking out a $50 million liability policy for directors and officers. In March 1998 (three months prior to bankruptcy) that policy was doubled to $100 million; in June it was doubled again. These premiums were paid while provider malpractice premiums went unpaid.

Finally, there were serious problems with AHERF's corporate bylaws and enforcement. The bylaws allowed AHERF to move cash around in a two-step process: from one operating unit (donor) to AHERF, and from AHERF to another operating unit (recipient). As in other corporations, this permitted some flexibility to redistribute funds to units that needed cash. However, AHERF's retained powers did not require the consent of the donor unit. Moreover, these cash transfers could be made by AHERF management without knowledge of the board and without explicit rationales. The lack of board oversight and control led to top management's transfer of funds from AGH to subsidize the eastern operations. The board discovered this in late 1997 as Abdelhak clarified the 1997 financial statements, and responded by instituting a board-level loan committee to review and approve any such future transfers. Abdelhak reportedly repeated the offense in April 1998 by using funded depreciation accounts from the Forbes and Allegheny Valley Hospitals to help repay the Mellon obligation. This time the board fired him.

In sum, AHERF's board failed to act as a countervailing force against the overly ambitious plans of its senior management. As a nonprofit corporation, there was also no countervailing force of shareholders to hold managers accountable. In partial recognition of its ineffective oversight, AHERF's board has been subjected to legal action. On 22 June 1999 the Committee of Unsecured Creditors sued ten AHERF officers and directors for $1 billion in damages on three counts of breech of fiduciary duty, gross negligence and management, and corporate waste.[33] Attorneys for the creditors state that their liability may be as high as $1.5 billion.

## Oversight by Accountants and Auditors

While the community at large depends on a board to oversee a nonprofit corporation, board members tend to rely (to some degree) on a corporation's accountants and external auditors for oversight. Such reliance presumes ethical financial reporting and no negligence. Just like management, however, these parties have an incentive to state results in a positive light. Such reports please executives, to whom the accountants report and on whom the auditors rely for the business account. They also please stockholders and Wall Street analysts, who are looking for growth in earnings. Unfortunately, there has been a reported increase in "managed earnings" (cooking the books) by accountants to impress investors and keep stock prices up.[34]

In the case of AHERF, there is some question about the CFO's integrity. The CFO worked closely with Abdelhak in most of the major acquisitions and financial decisions; according to AHERF executives, they were the two key decisionmakers. According to Patrick Hurst, the "chief forensic accountant" hired by creditors to sift through AHERF's finances, financial management was

deliberately "placed in boxes" so that each person or entity within AHERF could see only one piece of the overall financial position. In fact, AHERF did not compile a consolidated financial report for all of its subsidiaries until 1998. When these figures were compiled, it led to a restatement of prior years 'results that produced a $15 million reduction in operating results for 1996 and elimination of a line item for operating income that would have reflected losses of $40 million. Moreover, the revenues and endowment funds from AHERF's scattered operations were commingled in a "Byzantine structure" that reportedly permitted the two top executives to transfer funds between units as needed and manipulate final results to make units look as favorable as possible. In acquiring GHS, for example, the board was promised that GHS would be taken through an intermediate step, sanitized, and improved so it would not have a deleterious effect on AHERF finances. This step was a shell corporation formed by the CEO, CFO, and corporate counsel. The CFO told the board that it could take advantage of the Medicare depreciation recapture, which would result in the influx of $100 million in needed cash. Only part of these monies were realized.[35]

As for the external auditors, AHERF used Coopers and Lybrand, AGH's auditor for a century. It gave AHERF a clean bill of health in its last audit (June 1997), which the AHERF board accepted and relied on. Included in this audit was a large, improperly recorded loan and financial statements that were later retracted, precipitating an investigation by the Securities and Exchange Commission (SEC). The firm's positive report may have reflected the incompleteness of the information AHERF supplied to them. AHERF dropped the auditor shortly before filing for bankruptcy. An AHERF attorney told the bankruptcy judge that it needed to change accountants because "there are some concerns about the [firm's ]audit procedures." Others have expressed similar concerns, as Coopers has been involved as auditor in several prior scandals. The Pittsburgh office of Coopers and Lybrand was found guilty by a federal jury in 1996 of negligence in the fraud and embezzlement scheme at Phar-Mor, a regional, discount drugstore chain.

### Oversight by bond-rating agencies

Hospitals and other health care firms are heavily financed by long-term debt. This has become more important in the past two decades as prospective payment reduced hospital revenues and internal sources of cash, as expensive medical technology proliferated, and as managed care and competition cut margins. The year of AHERF's bankruptcy (1998) "The year of AHERF's bankruptcy (1998) marked all-time record sales of bonds by hospitals and health systems." marked all-time record sales of bonds by hospitals and health systems ($32.9 billion).[36] Hospital consolidation and the desire to take advantage of low interest rates have driven this growth. Refinancing of old debt accounted for only one-quarter of the total.

Investors who purchase health care bonds rely on rating services to evaluate the risk of their investment. Three companies rate most of the health care bonds that are issued: Moody's Investors Service, Standard and Poor's (S&P), and Fitch IBCA.[37] Health firms pay an application fee to one or more of these services to review and assess their operations. Banks and financial institutions rely on these ratings to evaluate the creditworthiness and set interest rates on the debt issues. Higher credit ratings translate into lower interest rates and thus lower interest expenses for the health care firm issuing the bonds. Lower credit ratings require a premium paid to investors. Bonds with a Moody's rating of Baa3 or better (S&P rating of BBB - or better) are considered investment grade; those with ratings below these levels are considered junk bonds.[38]

AHERF's bond debt was rated by both Moody's and S&P.[39] Moody's covered debt issued by five sets of AHERF hospitals: AGH, Forbes, GHS (later Allegheny University Hospitals -Centennial),

Zurbrugg Memorial Hospital in New Jersey, and DVOG. For some of these hospitals, Moody's publicly reported downgrades on their debt during 1996 -1998 as AHERF's financial problems mounted.[40] For example, when AHERF took over management of GHS in the spring of 1996, GHS bonds had the lowest investment grade rating by Moody's (Baa). Abdelhak mistakenly expected this rating to improve, given GHS's new affiliation with AHERF. Instead, Moody's downgraded its bonds to junk-bond status (Ba2) at the end of the year, citing GHS's weak operations, concern over the length of time required for AHERF to stabilize its operation, and the overall strength of AHERF itself.[41] Throughout 1998 GHS's bonds were repeatedly downgraded. Moody's also issued warnings about bondrating volatility and risk (June 1997) and negative forecasts about AHERF's financial health (January and May 1998).

The case of DVOG is different. Three DVOG hospitals had bonds separately rated prior to 1996 as Aaa insured (highest rating possible), Baa (barely above investment grade), and Ba (below investment grade). In June 1996 AHERF took steps that are increasingly popular among hospitals experiencing bond downgrades (and hospitals in general): They called the bonds, refinanced and reissued them under DVOG, and insured them. The underwriter they used was MBIA Insurance Corporation, the largest health care bond insurer. Some interpreted this as a signal that the insurance companies were beginning to approve AHERF's business strategy.[42] By insuring the debt, AHERF garnered an Aaa rating for DVOG's debt. This highest rating had nothing to do with an improvement in the underlying financial health of the system issuing the bonds; rather, the rating reflected the underlying health of the insurance company (MBIA's rating by Moody's) to insure that debt. The financial troubles at DVOG thus remained hidden from the public.[43]

Although Moody's conducted an internal assessment of the strength of AHERF overall and noted weak operations, the common practice at the time was not to publish the underlying ratings unless requested by the issuer. The company's policy was that if an organization had publicdebt that was rated publicly, and then that organization refunded out all of that debt with insured debt, the organization could select either Moody's underlying rating or the insured Aaa rating. AHERF obviously chose the latter.

Moody's changed this policy in January 1997. If an organization had publicly rated debt without insurance ("unenhanced debt") for which Moody's had a public underlying rating, and then the organization went to insure that debt, Moody's would maintain its underlying rating. However, the new policy did not apply to two groups: any system with no debt previously rated by Moody's that issued insured debt, and any hospital with outstanding insured bonds at the time of the policy change. Moody's would not force the underlying rating on them. Although the three DVOG hospitals had previously rated unenhanced debt, they were grandfathered in with no publication of Moody's internal evaluation of their underlying rating due to the use of insurance in 1996. So despite mounting troubles at AHERF's eastern hospital operations, DVOG debt continued to be rated as Aaa (the intended consequence of insurance). Internally, Moody's continued to monitor DVOG and downgrade its internal rating but did not publish it. It was not until the summer of 1998, just prior to the bankruptcy filing, that Moody's came under pressure from the investment community to release its underlying rating of DVOG. On 8 July debt previously rated Aaa suddenly had a publicized underlying rating below investment grade (B3). On the day of the bankruptcy (21 July), it fell even further (Caa1).

This history suggests that the companies rating health system bonds are constrained in how much financial oversight they provide the public. Insurance masks the underlying credit quality of the bonds issued by health systems. To this day, Moody's cannot publish underlying ratings where it has not previously rated the debt on systems that issue insured bonds.

To be sure, bond insurance increases investors 'confidence in the bonds and lessens fears about not getting paid interest and principal. It also augments the marketability and lowers the interest costs of the bonds for the issuer. However, insurance does not improve the underlying creditworthiness of the issuer. Moreover, systems can reduce investors'scrutiny of their underlying ratings by purchasing insurance coverage for their bonds. With the AHERF debacle, other health systems have witnessed how public these ratings can become. Finally, research shows that hospitals suffering downgrades, and thus having incentives to insure their debt, exhibit worsening cash flow and debt-service coverage (ability to pay interest on the debt).[44] Consistent with this evidence, hospitals that purchase full insurance coverage earn lower returns on their net patient revenue and net fixed assets, have lower debt-service coverage, and have a higher ratio of long-term debt to total assets.[45]

Financial oversight becomes more critical as risks in the municipal bond market increase. In 1998 Moody's downgraded more bonds (fifty-three) than they upgraded (thirty-eight).[46] The downgrades involved $11.2 billion of debt, while the upgrades involved only $1.8 billion of debt. As a result of consolidation, a small number of hospital systems with the largest outstanding debt account for a larger share of the debt affected.[47] Moreover, 7 percent of the nonprofits covered by Moody's have debt ($2 billion) rated as junk-bond status. Between January 1998 and August 1999 there was also a surge in "multinotch downgrades," where the bond ratings fell two or more notches. Many of these occurred in Philadelphia (GHS and University of Pennsylvania) and Pittsburgh (Forbes and AGH).[48]

Bond insurance became much more commonplace in the 1990s (at least until AHERF's bankruptcy), in part as a result of these increased risks and low premiums that stimulated hospital demand, as well as the increase in bond volume. According to analysts at Fitch IBCA, 54 percent of new tax-exempt bond issues now carry insurance, thus raising the public credit rating to that of the insurer.[49] This may reduce investors 'caution in purchasing tax-exempt health care bonds and scrutiny of financial statements.

This is troubling, because the municipal bond industry was largely self-regulating prior to 1995 and only loosely governed by the Municipal Securities Rulemaking Board. In 1995 the SEC adopted new rules that required hospitals and other firms issuing tax-exempt debt to make annual financial statements available to bondholders within ninety days of the close of their fiscal years. These rules also required the timely disclosure of events that could undermine the value of the bonds (such as missing interest payments).

AHERF violated both of these rules. It released its 1997 audited financial statements seven months after the fiscal year's end, blaming the delay on the decision to consolidate the financial activities of all of its subsidiaries. On 2 September 1998 AHERF officials reported that these statements contained errors and should not be used. These statements originally claimed that AHERF earned $21.9 million during the fiscal year. However, $117 million in intracompany loans to the Philadelphia operations were found to be classified as "investments" in the financial statements. Other accounting irregularities began to surface. Losses on the acquired PCPs were reportedly treated by the CFO not as hits to the income statement but rather as "asset write-downs," in which the practices were revalued each year to account for their losses. In FY 1996 AGH ceased to separate out operating results from investment and interest income, thereby hiding an operating loss of $20 million. AGH's consolidated 1996 financial statements indicated that it earned a $16.8 million profit, while its Singer Research Institute suffered a $14.2 million loss; separate statements submitted to the Internal Revenue Service (IRS) showed the opposite (a $20 million loss at AGH and a $7.8 million gain at Singer). All of this has fueled speculation that AHERF's CEO and CFO maintained different

sets of books for different external stakeholders. It also suggests that AHERF was under pressure to portray the system's fiscal health in the best light possible in order to issue bonds and obtain bank loans.

On 11 September the SEC asked three national bond-rating companies for all records relating to $605 million in bonds AHERF sold in Philadelphia and New Jersey. They announced an informal inquiry into possible violations of federal securities laws, including misleading financial statements in its bond documents and the updating of those statements to reflect changes in the health of its hospitals. There is some speculation that the SEC may make AHERF a "test case" to show its ability to enforce its new rules.

There is also the question of whether investors understand bond ratings. Rating companies assess the firm's (and its management's) ability to manage change, the firm's response to technological and market changes in the past, the quality and depth of human capital at several organizational levels, modernity of equipment, future financing requirements, and financial measures of past performance.[50] Moody's states that it "evaluates companies but does not regulate or provide accountability." Indeed, S&P is reportedly ready to ask bond issuers who want to hire it to assess the creditworthiness of their debt to agree that S&P ratings are nothing more than opinions protected under the First Amendment and that any liability is limited to the total amount of the rating fees paid to the ratings company.[51] This action, along with the AHERF bankruptcy, suggests that certain sectors of the municipal market have risks on a par with corporate debt. Indeed, Moody's developed a new risk-analysis model that puts health care in the riskiest industry category.[52]

Complicating this murky picture even further is the fact that bond insurance companies frequently reinsure a percentage of the debt to lay off some of the risk they are now assuming. Fitch IBCA analysts estimate that 18 percent of all premiums written for tax-exempt bond insurance are now backed by reinsurance.[53] Reinsurance is not used extensively by insurers because risk management is their business. It is a fundamental risk-management tool to diversify the risk assumed and allows insurers to increase their underwriting capacity (which is limited by the minimum capital requirements set by state insurance regulations and the ratings agencies). Although reinsurance does not motivate risky diversification, it does serve to partially buffer the insurer from bad underwriting decisions.[54] As competition for business increases, insurers like MBIA may grow and diversify into riskier businesses.[55] Like other for-profit firms driven by growth, MBIA has been an aggressive underwriter trying to increase the firm's book of business.

One major issue concerns MBIA's assessment of the DVOG bonds it agreed to insure in 1996. According to its SEC 10-K Form, MBIA has two internal divisions to manage its growth and risk: a Public Finance Division to handle underwriting and grow the revenue base (similar to an HMO's sales and marketing department), and a Risk Management Group to monitor and periodically review the former's underwriting decisions (similar to an HMO's actuarial department).[56] According to MBIA officials, the underwriting and surveillance sides work together with several checks and balances within and between their spheres of operation. Every deal they insure must meet a "no loss" underwriting standard. At the time of the DVOG bond insurance decision, MBIA knew the low margins at the associated hospitals and the low underlying credit rating that Moody's had assigned to DVOG. They had also insured debt at several AHERF affiliates for some time. MBIA officials are reluctant to discuss how they reached the conclusion that DVOG qualified as a "no loss" transaction. They have stated that "as a bond insurer, it is inconsequential to them if the ratings on the underlying bonds go down" (as long as they do not fall below investment grade). Moody's, on the other hand, recently stated that MBIA insured DVOG at a time in the guarantors 'history when they were under financial pressure (narrower spreads, lower profits) in their core markets (investment-grade U. S. tax-

exempt) and strayed from core fundamentals to write more business elsewhere. According to Moody's, "MBIA's large exposure on DVOG's borderline credit raises questions about the diligence in MBIA's underwriting process." Some Moody's officials also believe that MBIA may have relied on DVOG ratings developed by other rating agencies or themselves and thus felt more comfortable with DVOG. They also suspect that MBIA, like the wider investment community, had trouble evaluating the entire AHERF system of which DVOG was just a part, and felt that DVOG was a stronger organization than it was.[57]

When AHERF declared bankruptcy in July 1998, MBIA was liable for $256 million of debt outstanding on DVOG. It had initial reinsurance contracts to cover part of this risk. As a result, MBIA did not anticipate that its exposure to the insured credit would affect its ratings or earnings, or would reduce its unallocated loss reserve of $75 million. However, the two companies dominating the municipal bond reinsurance market, handling a large portion of MBIA's overall reinsurance and the initial reinsurance on DVOG's debt -Capital Reinsurance (Cap Re) and Enhance Reinsurance - incurred losses of $15 and $16 million, respectively. Moreover, one of the bondrating agencies downgraded Cap Re, the first downgrade of a triple-A-rated financial guaranty insurer, and began reviewing Enhance for a possible downgrade. Moody's stated that, like MBIA, both were diversifying into more risky business lines.

In September 1998 MBIA announced it had obtained an additional $170 million of reinsurance with different companies to cover a major portion of these losses and spread their effects into the future.[58] Why did reinsurers enter such agreements with MBIA after the bankruptcy with the full expectation that losses were likely? According to company representatives, MBIA reached "an unusual agreement" with its reinsurers in which the latter received not only a percentage of the AHERF insurance premium but also a long-term reinsurance contract. MBIA may cede more business to these reinsurers than it otherwise would and thus lower its current losses by paying those losses out on the back end (that is, by giving reinsurers a portion of its future insurance premiums).

### Oversight by Government

A final oversight mechanism is state government. In this case, the lack of oversight was due to ambiguity regarding the powers of the state attorney general (AG), state politics, an initial lack of resources, and jurisdictional issues with federal bankruptcy court. Pennsylvania law is ambiguous regarding the AG's power over transactions between nonprofits. As a result, the AG reviewed none of AHERF's acquisitions in Philadelphia. Although state law requires that charitable assets be set aside for charitable purposes in sales to for-profits, it is not clear that transactions between nonprofits involve any diversion of charitable assets.

Other states have passed legislation to regulate conversions, but such legislation has languished in Pennsylvania's Republican-controlled House. A bill was introduced in June 1997 by a Democrat to establish a review process for hospital ownership conversions from nonprofit to for-profit, and to require Department of Health approval. That bill had not been acted upon at the time of AHERF's bankruptcy. Following bankruptcy, legislators from both parties called for greater state oversight. The original bill's sponsor sought to expand it to include transactions between nonprofits. The Republican governor, however, took no position on legislation to enhance the AG's authority to oversee mergers of nonprofits, and the state hospital association opposed giving the AG more authority.

State law did give the AG authority to review "fundamental change transactions" involving

nonprofits to ensure that the public interest in the charitable assets is protected and make recommendations to the Orphans Court. The AG developed a procedure to review such transactions, but because there were no definite provisions, hospitals were not required to put the AG on notice. The AG also requested funding to establish an oversight unit to review the growing number of hospital mergers occurring in the market.[59] The legislature did not include the requested additional funding in the 1998 -1999 state budget but did so the following year.[60]

The bankruptcy filing allowed the sale to Vanguard (and then to Tenet) to proceed without intervention of the AG and the Orphans Court in Philadelphia, which has jurisdiction where the assets to be disposed are located. Bankruptcy law, which protects the interests of creditors, takes precedence over regulations involving charitable assets.[61] The AG was responsible for determining what portion of the bankrupt AHERF assets were charitable and was especially concerned by reports that AHERF misused endowments restricted for research, education, and patient care. The AG first sought to use the bankruptcy court to investigate AHERF's actions regarding these assets. The bankruptcy court judge, however, did not allow the AG to intervene. According to the judge, if restricted funds were misused at an earlier date, the AG should have noticed then. The AG then wanted an interim trustee appointed for AHERF's western operations through Pittsburgh's Orphans Court to protect the nonbankrupt charitable assets. The AG was opposed by the Official Committee of Unsecured Creditors, who argued that this would strip AHERF of its membership interest. The bankruptcy judge ruled in the latter's favor. The AG also asked the court to allow it to review any bids to explore all possible nonprofit buyers before AHERF's assets were sold to an investor-owned corporation. The judge refused.

## Conclusions

### Restoring Accountability And oversight

The AHERF bankruptcy suggests a lack of accountability, responsibility, and oversight exercised by AHERF's executives, trustees, and external stakeholders. The basic issue is, "Who is guarding the guards? "The community relies on the trustees and/or the state to protect the system's charitable assets. The trustees rely on auditors to verify the system's financial figures. The auditors rely on the executives for accurate information. The executives rely on the CFO and legal staff to keep within the law, and on bond investors for financing. The investors rely on bond-rating agencies to evaluate bond risks and on the SEC to oversee financial reporting by the firms issuing the bonds. Breakdowns occurred at each of these interfaces.

AHERF's board failed to act as a countervailing force. There were conflicts of interest, a ruling inside clique, a strong alliance between the board chairman and CEO, and no shareholders to hold managers accountable. Nonprofit boards also may be less adept than their for-profit counterparts are at reviewing complex financial matters and statements. This case illustrates that parties may misrepresent financial statements and accounting entries and then transmit them to an unsuspecting board and external auditor, both of whom may trust senior management for accurate information. AHERF management apparently failed to practice a well-recognized dictum in the accounting world of segregating the duties of control, authorization, and recording of transactions. AHERF's auditors failed to detect the accounting irregularities practiced by AHERF's CEO and CFO, perhaps as a result of inaccurate information provided them by these executives or the desire to maintain a favorable relationship with the system and keep its business. The AHERF experience, as well as the emerging problem of "managed earnings" in corporate America, has fostered a growing recognition of the need for board members and their audit committees to more actively engage the external auditors.

The bond-rating agencies and insurers likewise had difficulty discerning the financial health of the institution they were rating, because of AHERF's use of different obligated hospital groups and financial manipulations. Moreover, unlike the stock market, municipal debt is not traded actively and is rated at issuance. Bond ratings may be reviewed as the company's financial health changes, but such reviews are not performed continuously and may be masked by the use of debt insurance. Nevertheless, the bond insurance industry has demonstrated some resiliency following the AHERF bankruptcy, as MBIA has guaranteed its insured bondholders that they will receive all of their principal and interest payments when due. There also is a heightened awareness of risks in the municipal bond market, which may lead to tighter underwriting standards. Tighter bond covenants would permit lenders to have a preferred position in the event of a bankruptcy (ahead of the unsecured creditors). MBIA has announced that it will no longer accept Baa1 or lower-rated hospitals, has placed more stringent limits on its exposure to large single risks, and will increase its use of reinsurers. MBIA will also require additional security on higher-rated credit risks, such as a fully funded debt-service reserve fund, first mortgage loans, and a gross receipts pledge.[62] Bond insurers have begun to raise their premiums. There is now a widening spread on average bond yields (that is, a bigger gap in basis points) for bonds rated BBB +to BBB -.[63] Finally, bond insurers are beginning to pressure hospitals by demanding quarterly audited financial statements and telling hospitals to merge to pay off the bonds, to cut their costs or take other radical measures, and/or to make inspections for performance improvements.[64] Bond-rating agencies also are doing quarterly and monthly reviews to provide earlier warning signals of distress.

## General lessons

At the risk of oversimplifying an extremely complex case, we draw five lessons from the AHERF bankruptcy. First, growing the business seems to have trumped fiscal restraint and responsible investment. In its quest to quickly build a statewide system, AHERF acquired several marginally performing hospitals, which (after servicing the associated debt) could not throw off enough cash to support improvements and physician acquisitions. Moreover, there is no evidence of any master management plan for what to do with all of the acquisitions. AHERF erroneously assumed that economies of scale and other efficiencies would flow automatically from its system-building efforts. In fact, such economies typically result from the consolidation of physical capacity and the channeling of larger volumes of output at faster rates of speed through that consolidated capacity.[65] Such measures were not taken systemwide. Growth at any cost does not appear to be the answer for America's hospitals (or, perhaps, any other enterprise). Instead, hospitals may be better off forming systems at the local market level where, according to recent case evidence, they can achieve some countervailing market power over managed care and sufficient purchasing power to direct contract with large suppliers.[66]

Second, AHERF expanded using common strategies -horizontal consolidation, vertical integration, and assumption of capitated risk -with which other hospitals are having problems. More hospitals and health systems are likely to edge toward bankruptcy in the near future and certainly face greater pressures on their margins and credit ratings. This deteriorating financial condition is partly the result of market competition and managed care forces, but it is also the sad result of hospitals 'hopping on managerial bandwagons that lacked documented efficacy or any research base.

Third, changing market conditions can affect the collapse of a hospital chain. The rapid changes in managed care and competition overwhelmed the hospital strategies of consolidation and integration. The former did not provide enough money to support the latter. Developments in Philadelphia, while

sudden and concurrent, are occurring in other markets. A similar situation now faces Detroit Medical Center (with its large Medicaid patient base), UPHS, and other AMCs. Significantly, many of the multinotch bond downgrades occurred among Pennsylvania hospitals, where managed care has increasingly penetrated the market and concentrated power in a small number of large plans. Such markets may be particularly hostile climates for the provider strategies noted above.

This point suggests a fourth lesson.[67] If AHERF's troubles were simply the product of managerial decisions that initially succeeded but then failed in the face of new market forces, its bankruptcy is not necessarily an undesirable outcome. AHERF's demise might then be chalked up to a failed consolidation/integration strategy and excessive risk taking, which the market punished. If, however, AHERF's troubles were more the product of unethical behavior, a lack of due diligence, and the presence of rigid institutional forces, then bankruptcy may not be desirable. The poor performance of its integration strategies was cloaked by inaccurate, misleading financial results and certain institutional structures that limited the scrutiny and efficient response of the tax-exempt financial markets. Moreover, other institutional forces (for example, government efforts to find a buyer) may have intervened to preserve the bankrupt hospital assets in a market environment of excess capacity.

Fifth, the AHERF case suggests that the use of insurance and reinsurance vehicles allows financial and market risk to diffuse throughout the health care system and into the future. As the risk is diffused, so is the responsibility. In AHERF's case, these diffused to the point where they seemed to disappear. From a policy perspective, it becomes less clear whether actors beyond AHERF's management team and board are responsible for the collapse of the system.

## Postmortem

Who were the losers in the AHERF bankruptcy? Creditors were owed $1.3 billion at bankruptcy filing. This included $605 million in bond debt, $497 million of unsecured debt, and $200 million in loans to the eastern AHERF operations. Because of the use of insurance through MBIA, at least $256 million of the bond debt (in Philadelphia) seems to be recoverable. Some bond debt on Pittsburgh hospitals also was insured through MBIA. The Committee of Unsecured Creditors is suing the officers and directors for $1 billion to recover their losses, while the $200 million loan has been written off. The Philadelphia communities in which AHERF's hospitals resided were also losers. The hospitals were once valued at $500 -$550 million, based on various bids received from Vanguard in 1998. The final sale of AHERF's eastern facilities to Tenet for $345 million suggests, as part of the downward bidding war, a potential welfare loss of $200 million. The deputy AG for the State of Pennsylvania stated that the eight area hospitals had $206 million of charitable assets over which the state had jurisdiction. The vast majority of these assets were endowments and other restricted accounts, built up over years by gifts and tax-exemption, that now appear to have been raided. Moreover, control over these hospitals has been transferred to Tenet, an investor-owned corporation. The City of Philadelphia and the state had little say in the transaction since AHERF filed for bankruptcy in federal bankruptcy court (Pittsburgh), which oversaw the disposition of AHERF's assets.

Of the proceeds from the Tenet sale, $110 million was set aside to fund the operations of AUHS and its medical school, which now is independent. Another $100 million was used to repay the interim "debtor-in-possession financing," which allowed AHERF to continue operations to meet its payroll while strapped for cash during the bankruptcy period. An unrestricted grant of $50 million was allocated to the endowment of Drexel University to induce it to take over management of the medical school. This represented a 33 percent increase in Drexel's total endowment and 50 percent of its five-

year capital campaign. Tenet received a $40 million credit to handle the anticipated cost of "tail" insurance to cover unpaid medical malpractice insurance premiums. Other costs included the transactions fees, cure payments on executory contracts, and fees to cover the bankruptcy proceedings. Unsecured creditors thus reaped very little from the sale, with estimates ranging from $45 million (according to the lawyer for the bankruptcy trustee) to less than $40 million (according to the June 1999 lawsuit). In March 1999 the financial firm Bear Stearns sent letters to some of the 65, 000 creditors offering to buy their claims for five cents on the dollar of face value.[68]

Several ripple effects of AHERF's collapse will increase health care costs for employers and consumers in the state. First, AHERF canceled its risk contract with HealthAmerica in Pittsburgh, leaving the plan with $55 -$60 million in one-time charges to cover medical services that were supposed to have been paid for under the contract. Coventry, HealthAmerica's parent, saw its stock price fall nearly by half during July 1998. As a result, Coventry was expected to raise its prices to employers in the region. This was a bad omen to employers, which hoped that capitation would reduce costs. Second, the threat of hospital closure and the resulting loss of thousands of jobs motivated the governor of Pennsylvania and the mayor of Philadelphia to solicit a buyer for AHERF and broker a deal to persuade Drexel to manage AUHS (which Tenet did not want to do). Health care accounted for 13 percent of private employment in the area and was the primary source of new jobs from 1982 to 1995. Consequently, a lot of excess hospital capacity was left standing. Third, the sale of AHERF's Philadelphia hospitals required termination of its pension plans. However, AHERF was $40 million short in funds needed to terminate plans in its Philadelphia operations (and may be as much as $100 million short overall). The shortfall was to be made up by the Pension Benefit Guaranty Corporation (PBGC), a federal agency that rescues troubled pension plans (and is financed by healthy pension plans). AHERF's liability is one of the fifteen biggest claims since the PBGC began operating in 1975. Fourth, hospital bonds in Philadelphia have become unpopular, both new issues and the secondary market. It will now be more difficult and expensive for hospitals to upgrade their existing plant and capacity as they compete. On the other hand, the collapse permitted the first entry of an investor-owned system (Tenet) into the market. With its large revenue base and access to the equity market, Tenet may inject some new price competition with the AMCs.

Finally, AHERF's bankruptcy spelled the demise of its western hospitals in Pittsburgh, including its flagship AGH. By December 1998 AGHwas under siege to find a buyer or file for bankruptcy. The hospital had suffered as much as $80 million in operating losses over four years, draining its financial reserves down to a mere $17 million. It was financing $250 -$370 million in bond and bank debt accumulated over eleven years, along with $100 million in lease payments. Finally, it had to write off $200 million in loans to the Philadelphia operations. As an alternative to bankruptcy, AGH and the other western hospitals (AUH-West) were transferred to the West Penn system in 1999 in exchange for a $25 million payment to the creditors, who agreed to release AGH and AUH-West from liability for all claims. The smaller hospitals in AUH-West (Forbes and Canonsburg) found themselves transferred to yet another system. Ironically, they decided to link with AHERF and AGH in 1996 because they believed that smaller hospitals could not stand alone.

The hospital sysetm known as AHERF no longer exists. The legal case against AHERF's officers and directors continues. In June 1999 the unsecured creditors sued ten AHERF officers and directors for $1 billion in damages. In addition, two grand juries (one in Pittsburgh, one in Philadelphia), the SEC, the state AG, and the PBGC are investigating various charges. In September 1999 the AG filed a $78.5 million claim in Federal Bankruptcy Court, arguing that AHERF transferred funds restricted for charitable uses to a general operating account. Lawyers for the Committee of Unsecured Creditors are also soon expected to file a lawsuit against the auditor, now part of PricewaterhouseCoopers.

This research was supported by a grant from the Association of Professors of Medicine. The authors
thank Mark Pauly, Jeff Goldsmith, Tom Prince, and several anonymous reviewers for their
comments on an earlier draft.

## Notes

1. AHERF and its affiliates filed under Chapter 11 of the federal bankruptcy code. The affiliates
   included eight Philadelphia hospitals, organized into two divisions (Allegheny University
   Hospitals -Centennial, Allegheny University Hospitals -East); its physician practice network
   known as Allegheny University Medical Practices (AUMP); and its Allegheny University of
   the Health Sciences (AUHS), which included the combined Medical College of
   Pennsylvania/Hahnemann Medical School.
2. The bankruptcy trustee has reestimated the debt to be $1.5 billion. Creditors have challenged
   the amounts AHERF has listed as owing them.
3. According to the American Bankruptcy Institute, the 1992 filing by Charter Medical was the
   largest bankruptcy in health care.
4. The research on which this paper is based draws on interviews with AHERF executives and
   physicians in Pittsburgh and Philadelphia. Information also was gleaned from interviews with
   Moody's Investors Service; Municipal Bond Investors Assurance Corporation (MBIA); Duff
   and Phelps Credit; Pennsylvania Attorney General D. Michael Fisher; and local health care
   consultants. Virtually all of those interviewed wished to remain anonymous. The research also
   draws heavily on published stories on AHERF taken from the Pittsburgh Post-Gazette and the
   Philadelphia Inquirer. Writers at the Pittsburgh Post-Gazette include (in alphabetical order)
   Len Boselovic, Katy Buchanan, Joyce Gannon, Pamela Gaynor, Joann Loviglio, Steve Massey,
   Jim McKay, Michael Newman, Frank Reeves, Peter Shelly, Christopher Snowbeck, Byron
   Spice, and Lynda Guydon Taylor. Writers at the Philadelphia Inquirer include Andrea Gerlin,
   Josh Goldstein, Donna Shaw, Karl Stark, and Marian Uhlman. Each newspaper also released
   an excellent overall summary of the AHERF bankruptcy. We also relied on other published
   reports on AHERF in trade magazines and the Philadelphia Business Journal and on speeches
   by AHERF officials, as cited below.
5. AGH had roughly 180 residents in twelve residencies. In 1986 the University of Pittsburgh
   operated Western Psychiatric Institute and Clinic, Clinical Eye and Ear Hospital, and the
   outpatient Faulk Clinic. It was affiliated with Presbyterian University Hospital (568 beds),
   which it subsequently controlled and then complemented with Montefiore Hospital (408 beds).
   The result was a large medical enterprise with four hospitals, a medical school, a cancer center,
   and an outpatient facility.
6. John Westerman, brought in as CEO in 1982 from the University of Minnesota Hospitals,
   pursued a slow pace of change that failed to elevate AGH's stature and led to his termination
   prior to 1986.
7. S. Abdelhak, "Allegheny Health, Education, and Research Foundation: Successful Integration
   Strategies for Anticipating the Managed Care 'Wave' Before It Hits the Beach" (Speech
   delivered to the Symposium on Governing Integrated Healthcare Systems, Naples, Florida, 12
   January 1998).
8. 1998 bankruptcy court documents reveal that actual losses in FY 1998 in the eastern operations
   and the AHERF parent totaled $385 million, or more than $1 million a day.
9. Hospitals have failed to garner more than 10 percent of revenues from capitated contracts and
   have lost money on the contracts they have won. Much of this problem stems from a lack of
   managed care infrastructure. L. R. Burns and D. P. Thorpe, "Physician-Hospital Organizations:

Strategy, Structure, and Conduct," in Integrating the Practice of Medicine, ed. R. Conners (Chicago: American Hospital Publishing, 1997), 351 -371.

10. M.L. Sirower, The Synergy Trap (New York: Free Press, 1997). An examination of 300 hospital mergers and affiliations found that most have failed for a wide variety of reasons. G. Colon, A. Gupta, and P. Mango, "M&A Malpractice," McKinsey Quarterly (February 1999): 62 -77. Academic research suggests that hospital mergers typically do not result in economies of scale or lower prices, except for small hospitals and competitive markets, respectively. See E. B. Keeler, G. Melnick, and J. Zwanziger, "The Changing Effects of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," Journal of Health Economics 18, no. 1 (1999): 69 -86; and R. A. Connor et al., "Which Types of Hospital Mergers Save Consumers Money? "Health Affairs (Nov/Dec1997): 62 -74.

11. There is evidence that vertical integration into primary care through PCP acquisitions leads to losses of $50, 000 -$100, 000 per physician per year. Coopers and Lybrand, Owning Physician Practices: Challenges and Critical Success Factors (Chicago: Coopers and Lybrand, 1997).

12. Such hospitals have low returns to net operating revenues, which results in little working capital, low ability to upgrade the facility, and little ability to support other activities. T. R. Prince, Strategic Management for Health Care Entities (Chicago: American Hospital Publishing, 1998). According to Prince, investment-grade securities require a minimum return of 6 percent for several years. AHERF's hospital acquisitions in Philadelphia consistently fell below this.

13. MCP and GHS approached AHERF. AHERF initially approached United and Hahnemann, but nothing was consummated. Both of these institutions later approached AHERF when their financial condition worsened.

14. Financial data on AHERF's acquisitions come from two sources: Official Statements issued in conjunction with each of the system's bond issues, and the Merritt System, a credit analysis and database management system supporting comparative financial, operational, and bond-issue data on not-for-profit hospitals. The Merritt System is a national database containing data from more than 1, 700 hospitals and 160 health care systems. It is the product of Van Kampen American Capital Management, Inc. , and its affiliates, a division of Morgan Stanley located in Oakbrook Terrace, Illinois. Copyright 1990 by Van Kampen Merritt Investment Advisory Corp; all rights reserved.

15. Information provided anonymously by Philadelphia market informants.

16. M. Cohen, "Child of the Revolution," Philadelphia Magazine (February 1998): 78 -105.

17. When Moody's declined to upgrade GHS's debt in 1996, AHERF executives admonished Moody's, which then downgraded the GHS debt later that year.

18. The five obligated groups were DVOG, Centennial, AGH, Forbes and Allegheny Valley Hospitals, and Canonsburg Hospital. Moody's rating policies actually encouraged this use of obligated groups.

19. Some Philadelphia observers surmise that Abdelhak was seeking to amass enough hospital capacity in the market to sell the Philadelphia operations to Columbia/HCA (which was still aggressively acquiring hospitals). Former AHERF executives in Pittsburgh state that there was no such strategy.

20. The 1998 median level of maximum annual debt-service coverage dropped, reflecting a lower ability of hospital borrowers to apply their most recent historical net revenue available for the debt service to the largest future annual principal and interest payment. P. Federbusch et al. , Not-for-Profit Health Sector: 1999 Outlook and Medians (New York: Moody's, September 1999).

21. HMO data on these markets were obtained from InterStudy, courtesy of Douglas Wholey at the University of Minnesota.

22. Pennsylvania Economy League, Greater Philadelphia's Challenge: Capitalizing on Change in

the Regional Health Care Economy, Report no. 683 (Philadelphia: Pennsylvania Economy League, Eastern Division, 1996).

23. S. Abdelhak, "Our Organization's Commitment to Creating and Achieving Goals" (Presentation to the 1997 Duke Private-Sector Conference), in Beyond Managed Health Care: The Role of the Academic Health Center , ed. R. Snyderman and V. Saito (Durham, N. C. : Duke University Medical Center and Health System, 1997).

24. Abdelhak, "Allegheny Health, Education, and Research Foundation."

25. In its bankruptcy filing, AHERF listed its top three creditors as U. S. Healthcare ($19.8 million), HealthAmerica ($16 million), and Independence Blue Cross ($8.1 million). HealthAmerica disputed the amount.

26. Abdelhak, "Allegheny Health, Education, and Research Foundation."

27. R. E. Hurley et al. , "Adapting to Mandatory Medicaid Managed Care: A Painful and Unproven Pursuit of Value" (Report prepared for the Pew Charitable Trusts, January 1999).

28. Ibid.

29. S. Hensley, "System Slashes Jobs, Pay," Modern Healthcare (20 October 1997):2,8. The trifecta is a feat achieved in racetrack gambling when one picks the top three finishers (in order) in a given race.

30. J. George, "Slicing Up Cardiac Surgery Market," Philadelphia Business Journal (27 February/5 March 1998): 3, 28.

31. D.D. Pointer, "Value-Added Governance" (Presentation to Integrated Healthcare 2000 Annual Symposium on Governing Integrated Healthcare Systems, Aspen, Colorado, 30 August 1999).

32. The Official Committee of Unsecured Creditors of AHERF v AHERF, U. S. Bankruptcy Court for the Western District of Pennsylvania, Case no. 98-25773 MBM through 98-25777 MBM inclusive, 17 November 1998.

33. The Official Committee of Unsecured Creditors of AHERF v AHERF, AUHS, AUMP, Allegheny Hospitals -Centennial, and Allegheny University Hospitals -East, U. S. Bankruptcy Court for the Western District of Pennsylvania, Case no. 98-25773 MBM through 98-25777 MBM inclusive, Motion no. 99-2844, 22 June 1999.

34. C. J. Loomis, "Lies, Damned Lies, and Managed Earnings," Fortune 140, no. 3 (1999): 74 -92.

35. According to the Unsecured Creditors, the CEO and CFO redeployed the accounting entries to boost reported operating income and reduce reported operating costs, to yield one-time financial statement benefits of $100 million. The Official Committee of Unsecured Creditors of AHERF v AHERF, AUHS, AUMP, Allegheny Hospitals -Centennial, and Allegheny University Hospitals -East.

36. R. Haugh, "The Ratings Slide: Are We Headed for a Capital Crisis? "Modern Healthcare (9 August 1999): 40 -43; and K. Pallarito," 1998 Bond Sales Shatter Record, "Modern Healthcare (18 January 1999): 37, 39.

37. Prince, Strategic Management for Health Care Entities.

38. The coding system for rating bonds differs between Moody's and S&P. Moreover, these rating systems change over time, making time comparison difficult. As a quick primer, we illustrate the Moody's system. The highest rating is triple-A, denoted Aaa, followed by Aa, A, Baa, Ba, B, Caa, Ca, C, and so forth. Within each of these grades, bonds can be further differentiated by a number, such as Aa1, Aa2, and Aa3. The lowest investment-grade rating is Baa. See Prince, Strategic Management, 512, Exhibit 22-1, for more details.

39. We focus on Moody's rather than S&P in this section, because of their more frequent reports and indications of problems at AHERF and its affiliates.

40. Moody's Investors Service, "Allegheny Health, Education, and Research Foundation: Fundamental Rating History" (New York: Moody's, 1999).

41. Moody's internal rating of AHERF was "very, very low," and lower than the ratings maintained by other ratings agencies, according to Moody's officials. Yet Moody's policy did

not allow it to go public with this "underlying rating."

42. Cain Brothers, "The AHERF Bankruptcy and Its Aftermath: Implications for Managers and Trustees, Part I," Strategies in Capital Finance (Summer 1997): 1 -27.

43. Moody's bond ratings for other AHERF hospitals remained high and unchanged over time. AGH had a high credit rating of Aa during 1986 -1988, reflecting its high margins. In 1989, however, its margins began to shrink (due to an "unusual event" resulting in a $6 million write-off in the annual report). The margins dropped further in 1990 to one-quarter of the average for 1986 -1988, while its net operating revenue had increased two-thirds. As the system expanded into Philadelphia, AGH's bonds retained their Aa rating until 1995, after which they were slightly downgraded (to A1, A2, and A3) until early 1998. Why did they retain high ratings? First, AGH avoided negative cash flow by using nonoperating revenues (for example, through its research institute). Second, AGH purchased debt insurance from MBIA for roughly one-third of the $60 million in bonds issued in 1991.

44. T. Prince and R. Ramanan, "Bond Ratings, Debt Insurance, and Hospital Operating Performance," Health Care Management Review 19, no. 1 (1994): 64 -73.

45. Prince, Strategic Management.

46. K. Pallarito, "Paying for Innovation," Modern Healthcare (21 -28 December 1998): 2 -3, 12; and J. Asplund, "Uncertainties in Hospital Field Keep Pressure on Bonds," AHA News (25 January 1999): 7.

47. Federbusch et al. , Not-for-Profit Health Sector.

48. Ibid.

49. D. Aubin, "Municipal Bond Reinsurance Climbing Despite Rating Doubts," Dow Jones Newswires (9 April 1999).

50. Prince, Strategic Management.

51. C. Gasparino, "S&P's Caveat on Ratings: Don 't Blame Us," Wall Street Journal, 20 August 1999, C1, C10.

52. Cain Brothers, "The AHERF Bankruptcy and Its Aftermath." This has become evident with other recent events. See Haugh, "The Ratings Slide." AHERF's largest competitor in Philadelphia, UPHS, likewise engaged in horizontal consolidation with area hospitals and vertical integration with PCPs, and full-risk contracting. In 1998 and 1999 UPHS incurred operating deficits of $90 million and $198 million, respectively, prompting a Moody's multinotch downgrade. Because the health system represented a large share of the University of Pennsylvania parent's revenue base and borrowed $123 million from the university in 1998, Moody's downgraded the latter's debt twice in 1999.

53. Aubin, "Municipal Bond Reinsurance Climbing." MBIA reinsured 15 percent of its gross debt service as of 31 December 1998.

54. Risky diversification threatens the bond insurer's Aaa rating with Moody's and may harm the insurer's business partners (the reinsurers), who often receive a fixed percentage of all the business underwritten.

55. A June 1998 Moody's report, "The Changing Face of Healthcare May Impact Guarantors 'Exposure," documents an increase in insurers 'activity in "health care paper," which started becoming more risky in the early 1990s. Insurers ' retrenchment from this increasingly risky business (which only started after the AHERF bankruptcy) lagged behind the changing risk profile.

56. MBIA has a third division, Insured Portfolio Management, which is "responsible for monitoring outstanding issues insured by MBIA Corp. This group's first function is to detect any deterioration in credit quality or changes in the economic or political environment which could interrupt the timely payment of debt service on an insured issue" (MBIA Form 10-K, Securities and Exchange Commission, 30 March 1999).

57. "Moody's October 1999 Financial Guaranty Industry Outlook."

58. In its SEC 10-K Form, MBIA states that as of 31 December 1998, $163 million had been set aside as a "loss reserve" for a health care facility in Pennsylvania (presumably AHERF). Between 1997 and 1998 MBIA's loss ratio (losses incurred divided by premiums earned) skyrocketed from 1.2 percent to 8 percent. MBIA had previously dealt with the firms reinsuring the $170 million, but the latter's involvement in this market was more cyclical. They were multiline reinsurers that become more active in the guaranty market when their traditional markets become softer.

59. Between 1990 and 1996 the AG reviewed four mergers; in 1997 the AG reviewed twenty-one mergers. As the transactions became larger and more complex, the reviews became more time-intensive.

60. The AG's office said it took AHERF's bankruptcy to convince legislators that AG review was not governmental interference or an "intellectual" exercise.

61. The AG has challenged this point, which has not yet been absolutely determined in bankruptcy court.

62. Cain Brothers, "The AHERF Bankruptcy and Its Aftermath."

63. K. Pallarito, "Investors Aren 't Sold on Healthcare Bonds," Modern Healthcare (31 May 1999): 36 -37. Of course, the higher rates are now associated with the higher risks, reversing what some analysts refer to as the "artificial narrowing of spreads." Cain Brothers, "The AHERF Bankruptcy and Its Aftermath."

64. K. Pallarito, "Bond Insurers Put the Squeeze on Strapped Hospitals," Modern Healthcare (15 March 1999): 48 -52. Bond insurers have always had these rights and remedies at their disposal. However, they are now exercising them, as the credits they insure have deteriorated. Insurers typically have quantifiable measures of deterioration ("trigger points") for when they can step in.

65. A. D. Chandler Jr. , Scale and Scope: The Dynamics of Industrial Capitalism (Cambridge, Mass. : Belknap Press of Harvard University Press, 1990).

66. Local systems that have recently contracted with large HMOs on more of a level playing field include Allina (Twin Cities), Sutter (Bay Area), and Columbia/HCA (Florida). Hospital systems now forming their own group-purchasing organizations include Continuum Health Partners (New York City) and Lee Memorial Health System/Sarasota Memorial Hospital (Florida).

67. The authors thank Mark Pauly for his insights here.

68. New sources of funds to help repay AHERF creditors include $25 million from the sale of AUH-West. Creditors are also suing to recover the $89 million in loans repaid to the bank consortium in spring 1998 and may recover monies from the directors and officers insurance policies. Tenet is collecting up to $65 million in accounts receivable, for which it receives a 10 percent fee. Cain Brothers estimates that creditors will get thirteen to fifteen cents on the dollar.

## Table. Exhibit 1

| Organizational Growth of AHERF, 1986-1997 | | |
|---|---|---|
| Measure | 1986 | 1997 |
| Assets | $274 million | $2.20 billion |
| Revenues | $195 million | $2.05 billion |
| Medical staff/faculty | 350 | 10,115 |
| Employees | 4,000 | 31,000 |

| Admissions | 25,444 | 157,956 |
|---|---|---|
| Hospitals | 1 | 14 |
| Beds | 740 | 4,601 |
| Primary care physicians/sites | 0 | 552/304 |
| Students and residents | 170 | 4,522 |
| At-risk lives | 0 | 737,000 |
| Funded primary investigators | 55 | 383 |
| Externally funded research | $2.1 million | $80.3 million |

Source   S.Abdelhak, "Allegheny Health, Education, and Research Foundation:
         Successful Integration Strategies for Anticipating the Managed Care 'Wave'
         Before It Hits the Beach" (Speech,12 January 1998).

Note     AHERF is Allegheny Health, Education, and Research Foundation

---

Advertisement

I manage my diabetes with diet.

▌Home ▌Site Map ▌Marketplace ▌My Medscape ▌CME Center ▌Feedback ▌Help Desk

Medscape Search Options     [Articles ▼] [          ]     GO
Select a database to search, enter a search term, then click "go."    Advanced Search Forms

All material on this website is protected by copyright. Copyright © 1994-2000 by Medscape Inc. All rights reserved. This
website also contains material copyrighted by 3rd parties. CME means Continuing Medical Education credit is available.
Medscape requires 3.x browsers or better from Netscape or Microsoft.

4/7,K/22      (Item 1 from file: 34)
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

12567139   Genuine Article#: 801BJ   Number of References: 54
 Title: **The alchemists: A case study of a failed merger in academic medicine**
Author(s): Mallon WT  (REPRINT)
Corporate Source: Assoc Amer Med Coll,2450 N St NW/Washington//DC/20037
    (REPRINT); Assoc Amer Med Coll,Washington//DC/20037
Journal: ACADEMIC MEDICINE, 2003, V78, N11 (NOV), P1090-1104
ISSN: 1040-2446   Publication date: 20031100
Publisher: ASSOC AMER MEDICAL COLLEGES, 2450 N ST N W, WASHINGTON, DC
    20037-1126 USA
Language: English   Document Type: ARTICLE

Abstract: The changing environment in health care delivery and
    reimbursement in the United States in the late 1980s and 1990s
caused a
    massive overhaul in the organizational structure of health care
    institutions. Hospital mergers were commonplace. Physician
practices
    were bought and sold. Once stand-alone institutions developed
    integrated delivery systems. The academic medical community
    investigated and pursued a number of strategies to address changes
in
    the marketplace, including streamlining and reengineering business
    practices; centralizing and integrating operations and decision
making;
    creating separate clinical enterprises; creating new public
authorities
    or nonprofit corporations to govern hospitals; building networks of
    providers-, and acquiring physician practices. Perhaps the most
hyped
    strategy was consolidation. In 1997, Pennsylvania State
University's
    Hershey Medical Center and Geisinger Health System in Danville,
    Pennsylvania, announced plans to merge into one large clinical
    enterprise. The merger unwound three years later. Based on
extensive
    interviews and document analysis, this case study examines six
aspects
    of the merger and de-merger between Pennsylvania State University
and
    Geisinger: (1) the environment and historical context that preceded
the
    merger; (2) the reasons for the merger; (3) the structure of the
merged
    system; (4) the outcomes for the new organization; (5) the reasons
for
    the dissolution; and (6) the lessons teamed from this series of
events.

Cited References:
    ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

```
    4/7,K/23      (Item 2 from file: 34)
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.
```

11302126    Genuine Article#: 636CD    Number of References: 18
 **Title: The effect of a teaching hospital's financial crisis and
    reorganization on a group of residents**
Author(s): Kiely SC (REPRINT) ; Russo KS; Orav EJ; McMahon K; Shannon
RP;
    O'Donnell WJ
Corporate Source: Allegheny Gen Hosp,Dept Med,Suite 295 ST,320 East
North
    Ave/Pittsburgh//PA/15212 (REPRINT); Allegheny Gen Hosp,Dept
    Med,Pittsburgh//PA/15212; Drexel Univ,Sch
Med,Philadelphia//PA/19104;
    Harvard Univ,Sch Med, Brigham & Womens Hosp, Sect Clin
    Epidemiol,Boston//MA/; Massachusetts Gen Hosp,Pulm & Crit Care
    Unit,Boston//MA/02114
Journal: ACADEMIC MEDICINE, 2003, V78, N1 (JAN), P45-53
ISSN: 1040-2446    Publication date: 20030100
Publisher: HANLEY & BELFUS INC, 210 S 13TH ST, PHILADELPHIA, PA 19107
USA
Language: English    Document Type: ARTICLE

Abstract: Purpose. Allegheny General Hospital (AGH) in Pittsburgh,
    Pennsylvania, was part of a statewide health care system that
underwent
    a financial crisis and operational reorganization between 1998 and
    2000. This study assessed internal medicine (IM) residents'
perceptions
    of the effects of AGH's financial crisis on their residencies
        Method. A confidential, program-based questionnaire was
distributed
    to 75 IM residents at AGH in spring 2000 and included questions on
    demographic information, inpatient and outpatient medical
education,
    and the hospital's financial crisis. Residents were asked to assess
the
    effects of the financial crisis on their residencies, personal
    experiences, and attitudes toward health care systems. Outcomes
    included consideration of transfer, recommendation of the program
to a
    medical student, concerns about fellowship opportunities, opinions
    about large health care systems, and medicine as a career
    recommendation.

    Results. A total of 71 residents (95%) responded to the
    questionnaire. Fifty-five (79%) had experienced effects on their
    residencies due to the financial crisis, but perceptions differed
    widely. Eighteen (25%) considered transferring from the program,
but 44
    of 59 (75%) would have recommended the program to a medical
student.
    Because of the financial crisis, respondents reported significant
    changes in concerns about fellowship opportunities (P < .001),
opinions
    about large health care systems (p < .001), and opinions about
    recommending medicine as a career (P < .001).

Conclusion. This study highlights the fact that residents serve as
program ambassadors and their experiences may influence recruitment and
retention. Thus, programs should consider ways to assess and address
residents concerns during any system crisis or reorganization.

Cited References:
... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

**4/7,K/24      (Item 3 from file: 34)**
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

11259481   Genuine Article#: 631CQ   Number of References: 7
 **Title: Turnover among APM members since 1971**
Author(s): Pearson J; Ibrahim T
Journal: AMERICAN JOURNAL OF MEDICINE, 2002, V113, N8 (DEC 1), P706-710
ISSN: 0002-9343   Publication date: 20021201
Publisher: EXCERPTA MEDICA INC, 650 AVENUE OF THE AMERICAS, NEW YORK,
NY
    10011 USA
Language: English   Document Type: ARTICLE

Cited References:
     ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

4/7,K/25      (Item 4 from file: 34)
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

10063378   Genuine Article#: 481MT   Number of References: 8
 **Title: Integrated health systems: Success or failure?**
Author(s): Herndon JH  (REPRINT)
Corporate Source: Partners Orthopaed,55 Fruit St,GRB
624/Boston//MA/02114
    (REPRINT); Massachusetts Gen Hosp,Dept Orthopaed
Surg,Boston//MA/02114;
    Brigham & Womens Hosp,Boston//MA/02115
Journal: CLINICAL ORTHOPAEDICS AND RELATED RESEARCH, 2001, N391 (OCT),
P
    284-287
ISSN: 0009-921X   Publication date: 20011000
Publisher: LIPPINCOTT WILLIAMS & WILKINS, 530 WALNUT ST, PHILADELPHIA,
PA
    19106-3621 USA
Language: English   Document Type: ARTICLE

Abstract: There continues to be an increasing number of healthcare
delivery
    systems as a result of marketplace changes that include declining
    reimbursement and increasing costs for healthcare. However, the
    majority of these systems fail. Failures are a consequence of poor
    management, lack of a common mission and business rationale,
    individual's interests that outweigh the entity's interests, and
the
    conflict of cultures. Incremental changes will continue, but the
    healthcare environment will remain unstable for the foreseeable
future.
Cited References:
    ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

4/7,K/26     (Item 5 from file: 34)
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

09769797    Genuine Article#: 445ZR    Number of References: 7
 **Title: How DRGs hurt academic health systems**
Author(s): Taheri PA (REPRINT) ; Butz DA; Dechert R; Greenfield LJ
Corporate Source: 1C421 Univ Hosp,1500 E Med Ctr/Ann Arbor//MI/48109
     (REPRINT); Univ Michigan,Sch Business, Div Trauma Burn & Emergency
     Surg,Ann Arbor//MI/48109; Univ Michigan,Sch Business, Sect Business
     Econ,Ann Arbor//MI/48109; Univ Michigan Hlth Syst,Dept Surg,Ann
     Arbor//MI/
Journal: JOURNAL OF THE AMERICAN COLLEGE OF SURGEONS, 2001, V193, N1
(JUL)
, P1-8
ISSN: 1072-7515    Publication date: 20010700
Publisher: ELSEVIER SCIENCE INC, 655 AVENUE OF THE AMERICAS, NEW YORK,
NY
     10010 USA
Language: English    Document Type: ARTICLE

Abstract: BACKGROUND: Academic health, centers continue their mission
of
     clinical care, education, and research. This mission predisposes
them
     to accept patients regardless of their individual clinical
variation
     and financial risk. The purpose of this study is to assess the
     variation in costs and the attendant financial risk associated with
     these patients. In addition, we propose a new reimbursement
methodology
     for academic health center high-end DRGs that better aligns
financial
     risks.

     STUDY DESIGN: We reviewed clinical and financial data from the
     University of Michigan data warehouse for FY1999 (n = 39,804). The
     diagnosis-related groups were classified by volume (group 1, low
volume
     to group 4, high volume). The coefficient of variation for coral
cost
     per admission was then calculated for each. DRG classification. A
     regression analysis was also performed to assess how costs in the
first
     3 days estimated total costs. A hybrid methodology to estimate
costs
     was then determined and its accuracy benchmarked against actual
     Medicare and Blue Cross reimbursements.

     RESULTS: Low-volume DRGs (< 75 annual admissions) had the
highest
     coefficient of variation relative to each of the three other DRG
     classifications (moderate to high volume, groups 2, 3, and 4). The
     regression analysis accurately estimated costs (within 25% of
actual
     costs) in 64.7% of patients with a length of stay stay <greater
than or

equal to> 4 days (n = 16,287). This regression fared well compared with
actual FY 1999 DRG-based Medicare and Blue Cross reimbursements (n =
9,085 with length of stay greater than or equal to 4 days), which
accurately reimbursed the University of Michigan Health System in only
43.9% of cases.

CONCLUSIONS: Academic health centers receive a disproportionate number of admissions to low-volume, high-variation DRGs. This clinical
variation translates into financial risk. Traditional risk management
strategies are difficult to use in health care settings. The
application of our proposed reimbursement methodology better
distributes risk between payers and providers, and reduces adverse
selection and incentive problems ("moral hazard"). (J Am Coll Surg
2001;193: 1-11. (C) 2001 by the American College of Surgeons).

Cited References:
    ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

4/7,K/27      (Item 6 from file: 34)
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

09648047    Genuine Article#: 433LY    Number of References: 26
 **Title: The end of managed care**
Author(s): Robinson JC   (REPRINT)
Corporate Source: Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
    (REPRINT); Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
Journal: JAMA-JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 2001, V285,
N20
 (MAY 23), P2622-2628
ISSN: 0098-7484    Publication date: 20010523
Publisher: AMER MEDICAL ASSOC, 515 N STATE ST, CHICAGO, IL 60610 USA
Language: English    Document Type: ARTICLE

Abstract: Managed care embodies an effort by employers, the insurance
    industry, and some elements of the medical profession to establish
    priorities and decide who gets what from the health care system.
After
    a turbulent decade of trial and error, that experiment can be
    characterized as an economic success but a political failure. The
    strategy of giving with one hand while taking away with the other,
of
    offering comprehensive benefits while restricting access through
    utilization review, has infuriated everyone involved. The
protagonists
    of managed care now are in full retreat, broadening physician
panels,
    removing restrictions, and reverting to fee-for-service payment.
    Governmental entities are avoiding politically volatile initiatives
to
    balance limited resources and unlimited expectations, By default,
if
    not by design, the consumer is emerging as the locus of priority
    setting in health care. The shift to consumerism is driven by a
    widespread skepticism of governmental, corporate, and professional
    dominance; unprecedented economic prosperity that reduces social
    tolerance for interference with individual autonomy; and the
Internet
    technology revolution, which broadens access to information and
    facilitates the mass customization of insurance and delivery.

Cited References:
    ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

**4/7,K/28    (Item 7 from file: 34)**
DIALOG(R)File  34:SciSearch(R) Cited Ref Sci
(c) 2005 Inst for Sci Info. All rts. reserv.

08649110   Genuine Article#: 312LQ   Number of References: 47
 **Title: Academic internal medicine: Challenges and opportunities - Part II**
Author(s): Ibrahim T
Journal: AMERICAN JOURNAL OF MEDICINE, 2000, V108, N7 (MAY), P601-608
ISSN: 0002-9343   Publication date: 20000500
Publisher: EXCERPTA MEDICA INC, 245 WEST 17TH STREET, NEW YORK, NY 10011
Language: English   Document Type: EDITORIAL MATERIAL

Cited References:
   ... **BURNS LR,** 2000, V19, P7, HLTH AFFARIS

4/7,K/2        (Item 2 from file: 7)
DIALOG(R)File    7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

04086634    Genuine Article#: 844MB    Number of References: 46
 Title: The supply of uncompensated care in Pennsylvania hospitals:
Motives
    and financial consequences
Author(s): Rosko MD (REPRINT)
Corporate Source: Widener Univ,Grad Program Hlth & Med Serv Adm, Sch
    Business Adm,Chester//PA/19013 (REPRINT); Widener Univ,Grad Program
    Hlth & Med Serv Adm, Sch Business Adm,Chester//PA/19013(
    michael.d.rosko@widener.edu)
Journal: HEALTH CARE MANAGEMENT REVIEW, 2004, V29, N3 (JUL-SEP), P229-
239
Publisher: LIPPINCOTT WILLIAMS & WILKINS, 530 WALNUT ST, PHILADELPHIA,
PA
    19106-3621 USA
Language: English    Document Type: Article

Abstract: The need for uncompensated care has increased during a period
in
    which hospitals are confronted with public and private-sector
fiscal
    pressures. Using a panel design (1995-1998) on Pennsylvania
private,
    not-for-profit general hospitals, we found the provision of
    uncompensated care is positively associated with financial
surpluses,
    the provision of uncompensated care by neighboring hospitals, bed
    capacity, proportion of outpatient visits that are emergency, and
the
    unemployment rate (a proxy for need for uncompensated care). Other
    analysis found that the provision of uncompensated care was not
    associated with operating surplus, except in hospitals that provide
    very large amounts of uncompensated care. Provision of services to
    Medicaid patients and HMO penetration had a negative impact on
    profitability.

Cited References:
    ... BURNS LR, 2000, V19, P7, HEALTH AFFAIR

4/7,K/3      (Item 3 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03916513    Genuine Article#: 689XZ    Number of References: 35
 Title: Alternative models of hospital-physician affiliation as the United
     States moves away from tight managed care
Author(s): Casalino L (REPRINT); Robinson JC
Corporate Source: Univ Chicago,Dept Hlth Studies,Chicago//IL/60637
     (REPRINT); Univ Chicago,Dept Hlth Studies,Chicago//IL/60637; Univ Calif
     Berkeley,Berkeley//CA/94720
Journal: MILBANK QUARTERLY, 2003, V81, N2, P331-+
Publisher: BLACKWELL PUBLISHERS, 350 MAIN STREET, STE 6, MALDEN, MA 02148
     USA
Language: English    Document Type: Article

Abstract: Using concepts from organizational economics and sociology, this
     article compares the medical staff, hospital-owned physician practice,
     and hybrid models of hospital-physician coordination, as well as the
     pressures for affiliation during the premanaged care, tight managed
     care, and loose managed care eras. Case studies of two hospital systems
     in New York City and two in San Diego illustrate the-concepts. Although
     pressures for tighter hospital-physician affiliation now are weaker
     than during the era of tight managed care, they are greater than they
     were before managed care. Hospitals are not reverting to exclusive use
     of the medical staff model of affiliation but rather are maintaining a
     mix of medical staff, owned physician practice, and hybrid models.
     Hospitals probably will continue to seek tighter affiliations with
     physicians to increase coordination, enhance negotiating leverage with
     health plans, and gain admissions.

Cited References:
     ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

```
4/7,K/4      (Item 4 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.
```

03915024   Genuine Article#: 691JH   Number of References: 42
 **Title: Antecedents of hospital ownership conversions, mergers, and closures**
Author(s): Sloan FA (REPRINT); Ostermann J; Conover CJ
Corporate Source: Duke Univ,Ctr Hlth Policy Law & Management,Box 90253,125
     Old Chem Bldg/Durham//NC/27708 (REPRINT); Duke Univ,Ctr Hlth Policy Law
     & Management,Durham//NC/27708
Journal: INQUIRY-THE JOURNAL OF HEALTH CARE ORGANIZATION PROVISION AND
     FINANCING, 2003, V40, N1 (SPR), P39-56
Publisher: BLUE CROSS BLUE SHIELD ASSOC, 150 EAST MAIN ST, ROCHESTER, NY
     14647 USA
Language: English   Document Type: Article

Abstract: This study assesses the determinants of conversions in hospital
     ownership from 1986 through 1996. To place such changes in context, we
     also analyze causes of hospital mergers and closures, which are often
     alternatives to hospital ownership conversion. A consistent result from
     our analysis is that an important antecedent of ownership conversions
     is a low profit margin. Conversions from private nonprofit or
     government ownership to for-profit status are preceded by chronically
     low margins and high debt-to-asset ratios. By contrast, conversions
     from for-profit ownership occur quickly following declines in margins.
     Many mergers seem motivated by a desire to increase market power-a
     consideration not evident for conversions.

Cited References:
     ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

**4/7,K/5      (Item 5 from file: 7)**
DIALOG(R)File    7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03901179    Genuine Article#: 677WH    Number of References: 25
 **Title: Marketwatch - Hospital tiers in health insurance: Balancing consumer**
    **choice with financial incentives**
Author(s): Robinson JC (REPRINT)
Corporate Source: Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
    (REPRINT); Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
Journal: HEALTH AFFAIRS, 2003, V22, N3 (MAY-JUN), PW135-W146
Publisher: PROJECT HOPE, 7500 OLD GEORGETOWN RD, STE 600, BETHESDA, MD
    20814-6133 USA
Language: English    Document Type: Article

Abstract: Variations inefficiency and market power are generating wide
    variations in the prices charged by hospitals to health insurance
    plans. Insurers are developing new network structures that expose
the
    consumer to some of the cost differences, to encourage but not
mandate
    differential use of the more economical facilities. The three
leading
    designs include hospital "tiers" within a single broad network,
    multiple-network products, and the replacement of copayments by
    coinsurance in HMO as well as PPO products. This paper describes
the
    new network designs and evaluates the challenges they face in
    influencing consumers' behavior, incorporating information on
clinical
    quality, and supporting medical education and uncompensated care.

Cited References:
    ... **BURNS LR**, 2000, P7, HLTH AFFAIRS      JAN

**4/7,K/6      (Item 6 from file: 7)**
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03891349   Genuine Article#: 670XY   Number of References: 56
 **Title: Whatever happened to managed care?**
Author(s): Rich EC (REPRINT); Oasan A; Maio A
Corporate Source: Creighton Univ,Sch Med, Dept Med,Omaha//NE/68178
     (REPRINT); Creighton Univ,Sch Med, Dept Med,Omaha//NE/68178;
Creighton
     Univ,Ctr Practice Improvement,Omaha//NE/68178; Creighton Univ,Sch
Med,
     Div Gen Internal Med,Omaha//NE/68178
Journal: AMERICAN JOURNAL OF MEDICINE, 2003, V114, N5 (APR 1), P426-430
Publisher: EXCERPTA MEDICA INC, 650 AVENUE OF THE AMERICAS, NEW YORK,
NY
     10011 USA
Language: English   Document Type: Article

Cited References:
     ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

4/7,K/7      (Item 7 from file: 7)
DIALOG(R)File    7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03879393    Genuine Article#: 656RY    Number of References: 14
 Title: **The perils of healthcare workforce forecasting: A case study of the**
   **Philadelphia Metropolitan Area**
Author(s): Smith DB (REPRINT); Aaronson W
Corporate Source: Temple Univ,Fox Sch Businessment & Management, Dept Risk
     Insurance & Hlth Care Management,Philadelphia//PA/19122 (REPRINT);
     Temple Univ,Fox Sch Businessment & Management, Dept Risk Insurance &
     Hlth Care Management,Philadelphia//PA/19122
Journal: JOURNAL OF HEALTHCARE MANAGEMENT, 2003, V48, N2 (MAR-APR),
P99-110
Publisher: AMER COLL HEALTHCARE EXEC HEALTH ADMINISTRATION PRESS, ONE NORTH
     FRANKLIN ST SUITE 1700, CHICAGO, IL 60606 USA
Language: English    Document Type: Article

Abstract: In 1996, a widely circulated and influential forecast for the
     Philadelphia Metropolitan Area stated that a decline in hospital and
     healthcare employment in the region would occur over the next five
     years. It also suggested that this decline would exacerbate the problem
     of an oversupply of nurses seeking hospital employment. The forecast
     reflected a regional leadership and expert consensus on the impact of
     the managed care transformation on workforce needs and was supported by
     short-term statistical trends in regional utilization and employment.
     Confounding these predictions was the fact that hospital and healthcare
     employment actually grew. By the end of 2001, hospitals in the region
     were experiencing problems in recruiting sufficient numbers of nurses,
     pharmacists, and technicians. The forecast failed to anticipate the
     impact of a strong regional economy on supply and underestimated the
     resilience of underlying forces that have driven the long-term growth
     in healthcare workforce demand. More effective ongoing monitoring can
     help moderate the fluctuation of workforce shortages and surpluses.

Cited References:
     ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

4/7,K/8      (Item 8 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03859132    Genuine Article#: 636NR    Number of References: 23
 Title: **Understanding organizational designs of primary care practices**
Author(s): Tallia AF (REPRINT); Stange KC; McDaniel RR; Aita VA; Miller WL;
    Crabtree BF
Corporate Source: Univ Med & Dent New Jersey,Robert Wood Johnson Med Sch,
    Dept Family Med,New Brunswick//NJ/08903 (REPRINT); Univ Med & Dent New
    Jersey,Robert Wood Johnson Med Sch, Dept Family Med,New
    Brunswick//NJ/08903; Case Western Reserve Univ,Dept Family
    Med,Cleveland//OH/44106; Case Western Reserve Univ,Dept Epidemiol &
    Biostat,Cleveland//OH/44106; Case Western Reserve Univ,Dept
    Sociol,Cleveland//OH/44106; Univ Texas,Dept Management Sci & Informat
    Syst,Austin//TX/78712; Univ Nebraska,Med Ctr, Dept Prevent & Societal
    Med,Omaha//NE/68198; Lehigh Valley Hosp & Hlth Network,Dept Family
    Practice,Allentown//PA/
Journal: JOURNAL OF HEALTHCARE MANAGEMENT, 2003, V48, N1 (JAN-FEB),
P45-59
Publisher: AMER COLL HEALTHCARE EXEC HEALTH ADMINISTRATION PRESS, ONE NORTH
    FRANKLIN ST SUITE 1700, CHICAGO, IL 60606 USA
Language: English   Document Type: Article
Abstract: During the past decade, many hospitals experienced difficulty
    integrating primary care practices into their health systems. We
    hypothesized that this difficulty may be in part, a result of limited
    understanding of practice organizational designs. The structure and
    function of practices have not been well studied. In this article, we
    answer the following questions: Are practices all the same, or do
    variations in their organizational design exist? Do hospital designs
    predict the designs of affiliated practices? If variation exists, what
    are the management implications?

        Eighteen family practices, including nine affiliated with five
    separate hospital systems, were studied using an in-depth comparative
    case study design. A content analysis of the rich descriptive data from
    these cases indicates that a great variety exists in the organizational
    design of primary care practices, and this variety appears to be
    influenced by the initial conditions under which the practice was
    organized. Hospital system design in and of itself did not predict the
    design of affiliated practices. In fact, both affiliated and
    independent practices exhibited a range of design characteristics, some

of which did not fit traditional models. Hospital systems that allowed
greater flexibility of practice organizational designs were more
effective at integrating and managing practices. Practice response to
environmental change was greater when practice autonomy was highest.

These findings suggest that a science of practice organizational
design separate from that of hospitals is needed to help explain the
success and failure of practices within health systems and to provide
information for planning practice change.

Cited References:
    ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

4/7,K/9      (Item 9 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03815689   Genuine Article#: 596LU   Number of References: 120
 Title: Mobilizing the logic of managerialism in professional fields:
The
    case of academic health centre mergers
Author(s): Kitchener M (REPRINT)
Corporate Source: Univ Calif San Francisco,Dept Social & Behav Sci,San
    Francisco//CA/94143 (REPRINT); Univ Calif San Francisco,Dept Social
&
    Behav Sci,San Francisco//CA/94143
Journal: ORGANIZATION STUDIES, 2002, V23, N3, P391-420
Publisher: WALTER DE GRUYTER & CO, GENTHINER STRASSE 13, D-10785
BERLIN,
    GERMANY
Language: English   Document Type: Review

Abstract: This paper presents a qualitative inductive analysis of
attempts
    to re-order the bases of legitimacy in fields of professional
    organizations. Concepts from institutional theory, political
science
    and social movement theory are integrated to provide a model of the
    antecedents, processes and implications of this phenomenon.
Findings
    from a study of US academic health centre mergers illustrate each
    element of the model. They show that as part of the political
agenda to
    repress the prevailing institutional logic and structures of
    professionalism (Scott et al. 2000), executives are expected to
adopt
    certain managerial innovations to maintain organizational
legitimacy.
    Against this new basis of legitimacy, powerful agents have promoted
    merger so successfully that it has achieved mythical attributes of
    widespread and uncritical adoption (Meyer and Rowan 1977). The
paper
    explains why the intended outcomes of this innovation emerge rarely
    when it is 'sedimented' (Cooper et al. 1996) uncritically upon
enduring
    aspects of the logic and structures of professionalism.

Cited References:
    ... BURNS LR, 2000, V19, P7, HEALTH AFFAIR

**4/7,K/11      (Item 11 from file: 7)**
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03751104    Genuine Article#: 540RV    Number of References: 63
 **Title: A post-1990s assessment of strategic hospital alliances and their**
     **marketplace orientations: Time to refocus**
Author(s): Olden PC (REPRINT); Roggenkamp SD; Luke RD
Corporate Source: Univ Scranton,Grad Hlth Adm Program,Scranton//PA/18510
     (REPRINT); Univ Scranton,Grad Hlth Adm Program,Scranton//PA/18510;
     Appalachian State Univ,Dept Management,Boone//NC/28608; Virginia
     Commonwealth Univ,Dept Hlth Adm,Richmond//VA/
Journal: HEALTH CARE MANAGEMENT REVIEW, 2002, V27, N2 (SPR), P33-49
Publisher: ASPEN PUBL INC, 200 ORCHARD RIDGE DR, STE 200, GAITHERSBURG, MD
     20878 USA
Language: English   Document Type: Article
Abstract: In past years, many SHAs formed hi local urban markets to better
     compete for managed care contracts. M response to 1990s forces, these
     SHAs appear to have adapted product, production, mid selling
     orientations to their markets, aimed at large institutional purchasers
     of health care. However, health care markets have evolved differently
     than anticipated. SHAs mid their hospitals should now adopt the
     marketing orientation and focus more on patients mid enrollees.

Cited References:
     ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

**4/7,K/12    (Item 12 from file: 7)**
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03742967   Genuine Article#: 533YE   Number of References: 8
 **Title: Integrated delivery systems: What's happening?**
Author(s): Pinkerton S (REPRINT)
Corporate Source: Shands,Jacksonville//FL/ (REPRINT);
    Shands,Jacksonville//FL/
Journal: NURSING ECONOMICS, 2000, V18, N4 (JUL-AUG), P219-219
Publisher: JANNETTI PUBLICATIONS, INC, EAST HOLLY AVENUE, BOX 56,
PITMAN,
    NJ 08071-0056 USA
Language: English   Document Type: Article

Cited References:
    ... **BURNS LR,** 2000, P7, HLTH AFFAIRS      JAN

4/7,K/13      (Item 13 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03714723    Genuine Article#: 511LC    Number of References: 33
 Title: **Bond-market skepticism and stock-market exuberance in the hospital
    industry**
Author(s): Robinson JC (REPRINT)
Corporate Source: Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
    (REPRINT); Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
Journal: HEALTH AFFAIRS, 2002, V21, N1 (JAN-FEB), P104-117
Publisher: PROJECT HOPE, 7500 OLD GEORGETOWN RD, STE 600, BETHESDA, MD
    20814-6133 USA
Language: English    Document Type: Article

Abstract: The hospital industry needs funds to refurbish physical
    facilities, upgrade clinical and information technologies, and rebuild
    financial positions weakened by past external challenges and unwise
    organizational strategies. The financial markets offer a marked
    contrast in capital access, as bond 104 creditors remain skeptical
    while stock investors plunge back into the once-shunned industry.
    Ironically, high stock prices may drive the for-profit chains to repeat
    past cycles of overexpansion, while weak bond ratings may save
    non-profit systems from a comparable loss of focus on the core business
    of operating and improving inpatient facilities. This turbulence has
    implications for public payment, antitrust, and financial disclosure
    policies.

Cited References:
    ... **BURNS LR,** 2000, P7, HLTH AFFAIRS    JAN

**4/7,K/14     (Item 14 from file: 7)**
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03699015   Genuine Article#: 496GB   Number of References: 19
 **Title: The role of the capital markets in restructuring health care**
Author(s): Silvers JB (REPRINT)
Corporate Source: Case Western Reserve Univ,Weatherhead Sch
    Management,Cleveland//OH/44106 (REPRINT); Case Western Reserve
    Univ,Weatherhead Sch Management,Cleveland//OH/44106
Journal: JOURNAL OF HEALTH POLITICS POLICY AND LAW, 2001, V26, N5
(OCT), P
    1019-1030
Publisher: DUKE UNIV PRESS, 905 W MAIN ST, STE 18-B, DURHAM, NC 27701
USA
Language: English   Document Type: Article

Cited References:
    ... **BURNS L,** 2000, V19, P6, HLTH AFFAIRS

**4/7,K/15      (Item 15 from file: 7)**
DIALOG(R)File    7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03692859    Genuine Article#: 491RL    Number of References: 37
 **Title: The role of performance referents in health services
organizations**
Author(s): Ketchen DJ (REPRINT); Palmer TB; Gamm LD
Corporate Source: Florida State Univ,Coll
Business,Tallahassee//FL/32306
     (REPRINT); Florida State Univ,Coll Business,Tallahassee//FL/32306;
     Western Michigan Univ,Haworth Coll Business,Kalamazoo//MI/49008;
Texas
     A&M Univ,Hlth Sci Ctr, Sch Rural Publ Hlth,College Stn//TX/
Journal: HEALTH CARE MANAGEMENT REVIEW, 2001, V26, N4 (FAL), P19-26
Publisher: ASPEN PUBL INC, 200 ORCHARD RIDGE DR, STE 200, GAITHERSBURG,
MD
     20878 USA
Language: English    Document Type: Article
Abstract: Health care executives rely on a variety of information
sources
     to evaluate organizational performance. This is because outcomes
take
     on meaning only when compared to referents, or standards of
comparison.
     Although performance referents are widely acknowledged to be
important,
     consideration of their relevance to health services management has
been
     minimal. To address this need, we draw on organizational theories
and
     observations from health services organizations to describe the use
of
     performance referents and to provide insights about the possible
     effects of performance referent selection on strategic choices and
     performance.
Cited References:
     ... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

4/7,K/16      (Item 16 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03645079   Genuine Article#: 453PQ   Number of References: 18
 **Title: Physician organization in California: Crisis and opportunity**
Author(s): Robinson JC (REPRINT)
Corporate Source: Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
    (REPRINT); Univ Calif Berkeley,Sch Publ Hlth,Berkeley//CA/94720
Journal: HEALTH AFFAIRS, 2001, V20, N4 (JUL-AUG), P81-96
Publisher: PROJECT HOPE, 7500 OLD GEORGETOWN RD, STE 600, BETHESDA, MD
    20814-6133 USA
Language: English   Document Type: Article

Abstract: Many of the 250 physician organizations that provide care to
    California's sixteen million health maintenance organization
enrollees
    are in a state of crisis, squeezed between constrained revenues,
rising
    practice costs, and consumer sentiment that favors unconstrained
choice
    over integrated delivery. Medical groups and independent practice
    associations are retrenching to their core geographic areas,
reducing
    capitation for drug benefits and hospital services, and abandoning
    dreams of displacing health plans. Consolidation is accelerating in
    some areas, as medical groups join with hospitals to extract higher
    payment rates from insurers and employers. The conjunction of
    consumerism and premium inflation creates new opportunities for
    organizations that truly can manage health care, but the challenges
    roiling California's medical groups may preclude meaningful efforts
to
    seize the initiative.

Cited References:
    ... **BURNS LR,** 2000, P7, HLTH AFFAIRS      JAN

**4/7,K/18**      **(Item 18 from file: 7)**
DIALOG(R)File    7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03605758    Genuine Article#: 420UR    Number of References: 34
 **Title: Organizational economics and health care markets**
Author(s): Robinson JC (REPRINT)
Corporate Source: Univ Calif Berkeley,Sch Publ Hlth,418 Warren
    Hall/Berkeley//CA/94720 (REPRINT); Univ Calif Berkeley,Sch Publ
    Hlth,Berkeley//CA/94720
Journal: HEALTH SERVICES RESEARCH, 2001, V36, N1,2 (APR), P177-189
Publisher: HEALTH ADMINISTRATION PRESS, C/O FOUNDATION AMER COLL
HEALTHCARE
    EXECUTIVES ONE N FRANKLIN ST, STE 1700, CHICAGO, IL 60606-3491 USA
Language: English   Document Type: Article

Abstract: As health policy emphasizes the use of private sector
mechanisms
    to pursue public sector goals, health services research needs to
    develop stronger conceptual frameworks for the interpretation of
    empirical studies of health care markets and organizations.
    Organizational relationships should not be interpreted exclusively
in
    terms of competition among providers of similar services but also
in
    terms of relationships among providers of substitute and
complementary
    services and in terms of upstream suppliers and downstream
    distributors. This article illustrates the potential applicability
of
    transactions cost economics, agency theory, and organizational
    economics more broadly to horizontal and vertical markets in health
    care. Examples are derived from organizational integration between
    physicians and hospitals and organizational conversions from
nonprofit
    to for-profit ownership.

Cited References:
    ... **BURNS LR**, 2000, V19, P7, HEALTH AFFAIR

```
4/7,K/19      (Item 19 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.
```

03596714    Genuine Article#: 411YC    Number of References: 10
 **Title: Provider organizations at risk: A profile of major risk-bearing intermediaries, 1999**
Author(s): Gold MR; Hurley R; Lake T
Corporate Source: Virginia Commonwealth Univ,Med Coll
    Virginia,Richmond//VA/23298
Journal: HEALTH AFFAIRS, 2001, V20, N2 (MAR-APR), P175-185
Publisher: PROJECT HOPE, 7500 OLD GEORGETOWN RD, STE 600, BETHESDA, MD
    20814-6133 USA
Language: English    Document Type: Article

Abstract: Provider organizations have evolved to function as
intermediaries
    between managed care plans and individual providers. These
    organizations assume much financial risk and care management
    responsibilities. We profile the characteristics of these
organizations
    in markets across the country. The data, taken from a 1999
telephone
    survey of sixty-four entities in twenty markets and from interviews
    conducted during site visits to four markets, highlight the youth
of
    many of these organizations, the large financial risk and
functional
    responsibilities they bear, and the mixed views they hold about the
    health plans they contract with in terms of their willingness to
    delegate the authority, support, and collaboration that accompany
risk.
    Policymakers need to evaluate what this means for oversight of
managed
    care.

Cited References:
    ... **BURNS LR,** 2000, P7, HLTH AFFAIRS      JAN

4/7,K/20      (Item 20 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03587944    Genuine Article#: 405GP    Number of References: 52
 Title: The Medicare cost report and the limits of hospital
accountability:
    Improving financial accounting data
Author(s): Kane NM (REPRINT); Magnus SA
Corporate Source: Harvard Univ,Sch Publ Hlth,Boston//MA/02115
(REPRINT);
    Harvard Univ,Sch Publ Hlth,Boston//MA/02115; Univ Michigan,Sch Publ
    Hlth,Ann Arbor//MI/48109
Journal: JOURNAL OF HEALTH POLITICS POLICY AND LAW, 2001, V26, N1
(FEB), P
    81-105
Publisher: DUKE UNIV PRESS, 905 W MAIN ST, STE 18-B, DURHAM, NC 27701
USA
Language: English    Document Type: Article

Abstract: Health policy makers, legislators, providers, payers, and a
broad
    range of other players in the health care market routinely seek
    information on hospital financial performance. Yet the data at
their
    disposal are limited, especially since hospitals' audited financial
    statements-the "gold standard" in hospital financial reporting -are
not
    publicly available in many states. As a result, the Medicare Cost
    Report (MCR), filed annually by most U.S. hospitals in order to
receive
    payment for treating Medicare patients, has become the primary
public
    source of hospital financial information. However, financial
accounting
    elements in the MCR are unreliable, poorly defined, and lacking in
    critical detail. Comparative analyses of MCRs and matched, audited
    financial statements reveal long-standing problems with the MCR's
data,
    including major differences in reported profits; variations in the
    reporting of both revenues and expenses; an absence of relevant
    details, such as charity care, bad debt, operating versus
nonoperating
    income, and affiliate transactions; an inconsistent classification
of
    changes in net assets: and a failure to provide cash flow
statements.
    Because of these problems, MCR financial data give only a limited
and
    often inaccurate picture of the financial position of hospitals.
    Audited financial statements provide a more complete perspective,
    enabling analysts to address important questions left unanswered by
the
    MCR data. Regulatory action is needed to create a national database
of
    financial information based upon audited statements.

Cited References: