... **BURNS LR,** 2000, V19, P7, HEALTH AFFAIR

4/7,K/21      (Item 21 from file: 7)
DIALOG(R)File   7:Social SciSearch(R)
(c) 2005 Inst for Sci Info. All rts. reserv.

03545215    Genuine Article#: 373PH    Number of References: 72
  **Title: Are patients a scarce resource for academic clinical research?**
Author(s): Rettig RA (REPRINT)
Corporate Source: RAND CORP,/ARLINGTON//VA/ (REPRINT)
Journal: HEALTH AFFAIRS, 2000, V19, N6 (NOV-DEC), P195-205
Publisher: PROJECT HOPE, 7500 OLD GEORGETOWN RD, STE 600, BETHESDA, MD
    20814-6133
Language: English   Document Type: Article

Abstract: Managed care has affected clinical research at academic
medical
    centers (AMCs) in various ways. It has reduced revenues for both
    faculty practice plans and major teaching hospitals, thus
constraining
    the internal funds available for the cross-subsidy of research. it
has
    increased the amount of patient care required of academic
clinicians to
    meet target incomes, thus reducing the time for research. Has
managed
    care also reduced the availability of patients for academic
clinical
    research, either indirectly by diverting patients to community
    hospitals or directly by constraining access to such research,
    including clinical trials? Consistent with other studies and based
on
    extensive interviews at nine AMCs, this research found little
evidence
    that patients were a scarce resource for academic clinical
research.

Cited References:
    ... **BURNS LR**, 2000, P7, HLTH AFFAIRS      JAN



One Market
Steuart Street Tower, 12ᵗʰ Floor
San Francisco, CA 94105
415-247-1000 Tel
415-247-1099 Fax

<u>VIA FED EX DELIVERY</u>

July 8, 2005

Joseph F. McDonough, Esq.
Manion McDonough & Lucas, P.C.
600 Grant Street, Suite 1414
Pittsburgh, PA 15219-2702

RE:  *UNSECURED CREDITORS OF AHERF v. PWC*
*CIVIL ACTION NO. 00-684*

Dear Joe:

In preparation for your filing on Monday, July 11, 2005, enclosed please find my signed
Declaration in support of PricewaterhouseCoopers LLP's ("PwC") Memorandum in Opposition
to the Committee's Motion to Exclude Certain Testimony From PwC's Experts.

If you should have any questions, please contact me directly at (415) 247-1013.

Sincerely,
BDC Advisors, LLC

Robert A. Dickinson
Managing Director

RAD/ks

Enclosure

San Francisco  •  Boston  •  Washington, D.C.  •  Chicago

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION AND RESEARCH
FOUNDATION,

                                                    Plaintiff,

            -against-

PRICEWATERHOUSECOOPERS LLP,

                                                    Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

## DECLARATION OF ROBERT A. DICKINSON

I, Robert A. Dickinson, declare under penalty of perjury:

1.      I have been retained by PricewaterhouseCoopers LLP ("PwC") as an expert witness in the above-captioned action.  I submit this declaration in support of PwC's Memorandum in Opposition to the Committee's Motion to Exclude Certain Testimony From PwC's Experts.

2.      I submitted an expert report in this case, signed on November 9, 2004.  On March 10, 2005, I was deposed in this case by counsel for the Committee.

3.      I am the Managing Director of BDC Advisors, LLC ("BDC"), a healthcare consulting firm.  I have been involved in providing a wide range of services for health plans, physician organizations, hospitals, hospital systems and academic medical centers across the country.  A summary of my qualifications and experience, partial list of clients and bibliography were attached to my report as Exhibits 1, 2 and 3.

4.    In my work for BDC, I have often directed turnaround projects for hospitals and hospital systems.  For example, I was the project manager for BDC's work with Catholic Healthcare West, which was a system involving 47 hospitals in three states when we successfully conducted a turnaround.

5.    I also regularly provide advice and professional services to clients concerning the sale or potential sale of hospitals or hospital assets.

6.    I have directed or performed valuations of hospitals or hospital-related assets in 14 client engagements.  Many of these have been in the context of evaluating whether and when to sell hospitals.

7.    I have frequently provided advice to BDC clients on whether and when to sell particular hospital assets.  Many of my turnaround projects require me to address such issues, as the sale of some or all of a client's assets is an option to be considered as part of turning around a system's performance.

8.    In addition, I have been asked by clients on a number of occasions to evaluate, identify and contact potential buyers for hospitals, and to perform extensive due diligence of buyers.

9.    In one engagement, for example, I was asked in 2004 to evaluate and oversee the solicitation of potential bidders and partners for the Floating Hospital For Children, a hospital that is part of the Tufts-New England Medical Center.  In connection with that engagement, I identified and evaluated two potential buyers or partners for that hospital.  I developed and oversaw the distribution of formal requests for proposals to them, and conducted due diligence of them.

2

10.    I performed another engagement of this type on behalf of Stanford University Hospital and Clinics in 2000 and 2001. In this engagement, I identified and evaluated four potential buyers for the client, and evaluated alternative options (including the sale, lease or transfer of clinic assets to the School of Medicine) for bringing financial stability to the client's operations.

11.    In the Tufts-New England Medical Center and Stanford University engagements discussed above, and others, I provided my clients with many of the same types of services that are the subject of my evaluation of the AHERF sale process in this case.

12.    I have also performed research on sales of hospitals in bankruptcy. Prior to AHERF, it is my understanding that only a few hospitals had ever been sold out of bankruptcy. To my knowledge, no academic medical center had ever been sold out of bankruptcy before AHERF.

13.    While the bankruptcy filing had a negative effect on the DVOG sale, it did nothing to ease or address the many other problems with that sale that I identified in my report. I addressed the effect of the bankruptcy (Report, pp. 32-33), based on a number of sources, including the testimony of witnesses in this case who were involved in the AHERF bankruptcy, scholarly articles concerning the effects of bankruptcy filings on asset sales in other industries, and my own experience in asset sales and understanding of the factors that affect such sales (Report, p. 33).

14.    At my deposition, I was asked, "Have you ever given what is called a fairness opinion in the business to or for purchasers or regulators regarding the sale of a hospital or set of hospitals?" (Deposition p. 265.) I answered, "Our firm has. I

3

have not." (Deposition p. 265.) Because I was asked if I had "given" a fairness opinion, I understood the question to be addressed to whether or not I had signed such an opinion, and I answered it on the basis of that understanding. I had the same understanding of the subsequent question when I was asked if I had "done a fairness opinion" (Deposition p. 265), and answered on the basis of that understanding that I had not.

15.    While I have not signed a fairness opinion, I have frequently worked with my colleagues at BDC on fairness opinions.

16.    It is the policy of BDC Advisors that only the Managing Director of the firm can sign a fairness opinion. I became Managing Director of BDC in late 2003. Prior to that time, Richard Wesslund (the founder of BDC) was the Managing Director, and he signed fairness opinions given by the firm until I succeeded him.

17.    In my report (on pages 29-32), I expressed my opinion that AHERF and its financial advisors made a serious mistake by entering into "sole source" negotiations with Vanguard Health Systems, Inc. during the process that led to the sale of the assets of DVOG. In forming that opinion, I relied on my experience in seeking buyers for hospital assets. In light of my experience in assisting clients with the sale of hospitals, I believe it is customary to involve multiple buyers, rather than to select only one buyer and conduct sole source negotiations. Sole source negotiations are seldom used, and based on my experience are generally an inadvisable practice for the prospective seller. Accordingly, in both of the examples identified above (in paragraphs 9 and 10) in which I identified and evaluated potential buyers for a client's hospitals, multiple potential buyers were involved. I conclude that AHERF's decision to proceed

4

with only Vanguard as its sole bidder was a mistake in light of my experience advising clients on identifying and working with bidders.

18.    In my report (on pages 34-35), I also expressed my opinion that AHERF and its financial advisors did a poor job in their preparation for the sale process and the manner in which they dealt with Vanguard and other potential bidders. Here again, I relied on my experience in assisting clients with preparation and organization for the sale of hospitals. I concluded that AHERF did a poor job of preparing for the sale of DVOG, and of dealing with potential bidders for DVOG, by applying the same skills and experience that I use when advising clients in such matters.

19.    In addition, (as I discussed in my deposition at pages 267-270), I have done research on conversions of non-profit academic medical centers to for-profit status through sales to or joint ventures with for-profit companies. Only a very small number of such transactions took place prior to AHERF. In particular, I reviewed publicly-available information about the academic medical centers at St. Louis University, George Washington University, Tulane University, the University of Southern California, St. Joseph's Hospital (Creighton University Medical Center), Emory University and the University of Chicago, each of which was sold to or formed a joint venture with a for-profit company.

20.    My research into these conversions of not-for-profit academic medical centers provides further support for the opinions I expressed in my report. For

5

example, the sellers in these transactions generally avoided the "sole source" negotiations that I discuss in pages 29-32 of my report, and in paragraph 17 above.


_____

Robert A. Dickinson

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

         Plaintiff,

   vs.                              Civil Action

PRICEWATERHOUSECOOPERS,                  No. 00-684

LLP,

         Defendant.


- - - - -

      Videotaped Deposition of ROBERT A.
DICKINSON, called for examination under the
Applicable Rules of Federal Civil Procedure,
taken before me, Michele E. Eddy, a Registered
Professional Reporter and Notary Public in and
for the State of Ohio, pursuant to notice and
stipulations of counsel, at the offices of
Cravath, Swaine & Moore, 825 Eighth Street,
Worldwide Plaza, New York, New York, on
Thursday, the 10th day of March, 2005, at 9:00
a.m.

- - - - -

THIS TRANSCRIPT CONTAINS
RESTRICTED/CONFIDENTIAL INFORMATION SUBJECT TO
A PROTECTIVE ORDER OF THE COURT.

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Robert Dickinson                                             Confidential Portions Included

Page 257

1  would have occurred as early as fiscal year
2  1997 and would have resulted in the insolvency
3  of the DVOG hospitals."
4          I read your conclusion accurately?
5      A.  Yes.                          16:06:11
6      Q.  As of when was the -- were the DVOG
7  hospitals insolvent if you arrived at that
8  conclusion?
9          MR. BIRKENSTOCK:  Objection.
10     A.  I don't believe I determined      16:06:22
11  specifically when.
12     Q.  Was it sometime between 1997 and
13  1999 as projected by you?
14     A.  I don't know that.  All I know is
15  an organization that's projecting the cash   16:06:44
16  flows that I've shown in Exhibit 14 is not one
17  that's going to be able to sustain itself.
18     Q.  Sir, do you know anything about the
19  practices of AHERF's management with respect to
20  the transfer of funds from western enterprises  16:07:28
21  to eastern enterprises in the time before 1996,
22  fiscal year 1996?
23     A.  No.
24     Q.  Do you know anything about those
25  practices in the year 1996 or 1997, the extent  16:07:46

Page 258

1  to which the board transferred funds or loaned
2  funds from -- not the board -- management
3  transferred funds or loaned funds from western
4  AHERF enterprises to eastern AHERF enterprises?
5      A.  I'm aware that there was some --    16:08:02
6  some transfer, but I don't know the specifics
7  of management's policy or approach.
8      Q.  And you don't know the quantum or
9  the dollar volume of those transfers or loans?
10     A.  I may have known at one point      16:08:15
11  during the course of our work.
12     Q.  Do you know today?
13     A.  No.
14     Q.  Do you know whether those sums in
15  any given fiscal year approximated at year-end  16:08:23
16  more than a hundred million dollars?
17     A.  I don't recall the specific number
18  today.
19     Q.  Your six steps for achieving a
20  successful turnaround, two of which we     16:08:40
21  discussed moments ago that are set forth on
22  page 20, where do they come from?
23     A.  They're based upon my experience
24  and the experience of our firm.
25     Q.  They're not from a written, outside  16:08:51

Page 259

1  source?
2      A.  No.
3      Q.  Are the organizational factors set
4  forth at page 21 and page 22 also from your
5  firm and not from an outside source?      16:09:10
6      A.  Yes.
7      Q.  Are the -- is the opinion expressed
8  with respect to turnaround success likelihood
9  generally for the DVOG hospitals by you, not
10  Mr. Singleton's plan, but turnaround success   16:09:45
11  generally, or the potential for it, premised
12  upon the calculations you did for the DVOG
13  hospitals as a part of your earlier work in the
14  report?
15     A.  Is your question is my -- the      16:10:02
16  second part of my first opinion, which says
17  that I don't believe that a turnaround would
18  have been successful in any form, does it rely
19  upon the analysis I did in testing the
20  Singleton report?                 16:10:16
21     Q.  I'll accept that amendment.  It may
22  be the only one I'll accept for the day, but
23  yes.
24     A.  It certainly gave me a part of the
25  perspective for arriving at that conclusion.   16:10:25

Page 260

1      Q.  If it is based on that something
2  else, what is that something else that this
3  second opinion is based upon?
4      A.  It's based upon my understanding of
5  the organizational factors and the market   16:10:37
6  factors which I discuss on pages 22 through 26
7  of the report.
8      Q.  And those were gleaned, those
9  understandings, from the materials you viewed
10  and set forth for us on page 17 -- rather,   16:10:53
11  Exhibit 17?
12     A.  As well as my experience, my
13  understanding of what was going on in the
14  market at the time.
15     Q.  I understand that.  But to the      16:11:09
16  extent you reviewed anything, you did what I'm
17  sure that lawyers asked you to as set forth on
18  Exhibit 17?
19     A.  Yes.
20     Q.  And I know you have experience     16:11:21
21  outside of that which you reviewed for this
22  engagement.  I understand that.
23          Are there any separate set of
24  analytical work or analytics -- is there any
25  separate set of analytical work or a separate  16:11:33

65 (Pages 257 to 260)

Robert Dickinson

Confidential Portions Included

Page 261

1  set of analytics that you did for this second
2  opinion on turnaround potential?
3      A.  No.
4      Q.  You used and relied upon the
5  calculations that went with the first part of    16:11:47
6  your Singleton is wrong opinion in this second
7  opinion about turnaround potential?
8      A.  Yes, in part.
9      Q.  I understand that.  But there
10  weren't separate calculations or analytics that    16:12:01
11  you did, am I right?
12      A.  Correct.
13      Q.  What is your source for the
14  external market factors set forth at page 26 of
15  your report, as I see no footnotes.  Is it the    16:12:34
16  material reviewed in Exhibit 17 or set forth on
17  Exhibit 17?
18      A.  Material in Exhibit 17 as well as
19  some of the analysis that's contained in
20  Appendix 1.                              16:12:53
21      Q.  And Appendix 1 has its own source
22  notes, is that fair to say?
23      A.  Yes.
24      Q.  Whose term is perfect storm?  Was
25  that yours?                              16:13:08

Page 262

1      A.  To where are you referring?
2      Q.  I'm sorry.
3      A.  Second to the last paragraph on
4  page 26?
5      Q.  Yes.  You put it in quotes.  Did    16:13:15
6  you mean to be quoting the novelist or the
7  movie makers, or did you mean to be quoting
8  somebody else?
9      A.  No, it's a term I've used that
10  simply says there was a confluence of all these    16:13:25
11  factors simultaneously that would have made a
12  turnaround unlikely.
13      Q.  Did you read the term perfect storm
14  in the report of any other expert that you can
15  recall?                                  16:13:41
16      A.  I may have, but I don't believe
17  that that's something that I put in place.
18      Q.  I'm sorry, you don't believe that
19  you drew it from another report?
20      A.  I didn't draw it specifically.  I    16:14:09
21  mean, this -- there's a portion, as I said, of
22  different parts of this report that individual
23  team members developed.  It's entirely possible
24  that one of the team members in reviewing
25  documentation read that and dropped it into the    16:14:23

Page 263

1  report.  I'm telling you today I did not
2  specifically drop that in based upon something
3  I read in another report.  It's possible that
4  one of my team members did.
5      Q.  Before this engagement, were you    16:14:35
6  ever called upon to evaluate the process by
7  which a hospital or set of hospitals were sold
8  in bankruptcy?
9      A.  No.
10      Q.  Have you ever advised a prospective    16:15:05
11  purchaser of hospitals sold in bankruptcy
12  before this engagement?
13      A.  No.
14      Q.  Have you ever advised a prospective
15  seller of hospitals that were ultimately sold    16:15:29
16  in bankruptcy before this engagement?
17      A.  No.
18      Q.  Ever published in a peer review
19  journal on the process of a -- of the sale of a
20  set of hospitals that were ultimately sold in    16:15:56
21  bankruptcy?
22      A.  No.
23      Q.  Ever published in any other journal
24  on that topic?
25      A.  Relating to hospitals sold in    16:16:05

Page 264

1  bankruptcy?
2      Q.  Yes.
3      A.  No.
4      Q.  Ever testified in a Bankruptcy
5  Court on the process of the sale of a set of    16:16:19
6  hospitals ultimately sold in bankruptcy?
7      A.  No.
8      Q.  Ever testified in any other court
9  on that topic?
10      A.  No.                              16:16:31
11      Q.  Ever testified before any
12  legislative or administrative body on that
13  topic?
14      A.  No.
15      Q.  Ever submit materials to any    16:16:44
16  legislative body or regulatory authority on
17  that topic?
18      A.  No.
19      Q.  Have you ever given a fairness
20  opinion regarding hospitals sold in bankruptcy?    16:17:01
21      A.  No.
22      Q.  Have you ever given a fairness
23  opinion regarding the sale of hospitals
24  generally?
25      A.  Advising a client in terms of    16:17:15

66 (Pages 261 to 264)

Robert Dickinson

Confidential Portions Included

Page 265

1  valuation and recommendation?
2      Q.  No.  Have you ever given what is
3  called a fairness opinion in the business to or
4  for purchasers or regulators regarding the sale
5  of a hospital or set of hospitals?        16:17:35
6      A.  Our firm has.  I have not.
7      Q.  Are you an investment banker?
8      A.  No.
9      Q.  Are you a valuation professional?
10     A.  Define valuation professional.     16:17:56
11     Q.  Well, are you someone who routinely
12  as a matter of his practice values hospitals
13  for sale?
14     A.  I've done many valuations of
15  hospitals.  It's a component of what I do.  16:18:03
16     Q.  But you haven't done a fairness
17  opinion, is that fair to say?
18         MR. BIRKENSTOCK:  Objection.
19     A.  Yes.
20     Q.  When you value hospitals, you do it  16:18:09
21  for a particular client who might be interested
22  in purchasing?
23     A.  Yes.
24     Q.  Have you ever written a sale --
25  sales process review for hospitals that     16:18:31

Page 266

1  ultimately sold in bankruptcy before you wrote
2  your report in this matter?
3      A.  Define for me sales process review.
4      Q.  A report on the effectiveness of a
5  sales process like you've set forth at pages 27  16:18:48
6  through 37, I believe, of your report in this
7  case.
8      A.  No.
9      Q.  You describe a review of the sales
10  process, or I think what you call a detailed   16:19:11
11  review of the sales process.  Let me ask you a
12  few questions about what it is you did as a
13  matter of this review.
14         I understand from the footnotes
15  that you read a number of affidavits submitted  16:19:22
16  in the bankruptcy matter, is that right?
17     A.  Yes.
18     Q.  You read certain depositions of
19  some of those same individuals that were taken
20  in this case?                        16:19:32
21     A.  Yes.
22     Q.  What else did you do?
23     A.  Well, there is work or research we
24  did in addition to what might be here to inform
25  this opinion.                        16:19:51

Page 267

1      Q.  When you say here, what do you
2  mean?
3      A.  That's contained in the report.
4      Q.  There's work that you did that you
5  didn't share with us in your report?        16:19:58
6         MR. BIRKENSTOCK:  Objection.
7      A.  Well, simply information that has
8  been reviewed in the course of our work that I
9  didn't feel was necessary to include in the
10  report.                            16:20:14
11     Q.  Did you consider it, the
12  information?
13         MR. BIRKENSTOCK:  Objection.
14     A.  Yes.
15     Q.  Is it set forth on Exhibit 17?     16:20:21
16     A.  No.
17     Q.  I would ask that you share that
18  with me now.
19     A.  Well, by way of example, I looked
20  at not-for-profit conversions dating back to     16:20:35
21  1983.
22     Q.  When you say you looked at them,
23  what did you look at, public documents?
24     A.  I tried to look and see where are
25  there examples of academic medical centers that  16:20:48

Page 268

1  have in fact been sold or joint ventured to
2  understand what process they went through, why
3  they ended up going through a sale, what
4  process they followed.
5      Q.  What did you review in connection     16:21:06
6  with these hospitals, public press accounts?
7      A.  Public information.
8      Q.  Was it public press accounts?
9      A.  They're press accounts and
10  documents detailing some of the -- some of that  16:21:19
11  experience.
12     Q.  What besides public press accounts,
13  if anything?
14     A.  If you're including publicly
15  available information on the Internet about      16:21:35
16  those organizations, et cetera, if that's
17  considered press accounts, then that would be
18  included.
19     Q.  No, I think what I referred to as
20  press accounts or I think what I meant to refer  16:21:47
21  to as press accounts would be things in the
22  standard public press, newspapers, reports of
23  that kind.
24         You did Internet searches on these
25  conversions?                        16:21:58

67 (Pages 265 to 268)

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2005, a true and correct copy of the foregoing Appendix to Memorandum in Opposition to the Committee's Motion to Exclude Certain Testimony from PwC's Experts was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

### *Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219

### *Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114