**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH
FOUNDATION,

                                    Plaintiff,

            v.

PRICEWATERHOUSECOOPERS LLP,

                                    Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

**REPLY MEMORANDUM IN SUPPORT OF**
**PRICEWATERHOUSECOOPERS LLP'S**
**MOTION FOR SUMMARY JUDGMENT**

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

August 19, 2005

**TABLE OF CONTENTS**

Page

Preliminary Statement......................................................................................1

Argument ..........................................................................................................1

I.   THE COMMITTEE'S CLAIMS ARE BARRED BY IMPUTATION
     OF AHERF MANAGEMENT'S WRONGDOING.....................................1

     A.   AHERF Management's Wrongdoing Must Be Imputed to
          AHERF Because There Is No Evidence That AHERF
          Management Acted Exclusively for Their Own Benefit. ...............2

     B.   The Board Was Dominated by AHERF Management, and
          Therefore the Presence of Independent Trustees Cannot Defeat
          Imputation................................................................................5

     C.   Imputation of AHERF Management's Wrongdoing Mandates
          Application of the *In Pari Delicto* Doctrine. ...............................6

II.  AHERF'S INTERFERENCE WITH C&L'S AUDITS BARS
     RECOVERY AGAINST PWC FOR NEGLIGENCE AS A MATTER
     OF LAW. ................................................................................................7

     A.   The Committee Misstates the Law on Contributory Negligence. ....7

     B.   AHERF's Undisputed Omissions and Misleading Statements
          Were a Substantial Factor in the Alleged Audit Failings. ............10

III. THE COMMITTEE'S CLAIMS FAIL BECAUSE THE COMMITTEE
     CANNOT MEET ITS BURDEN OF SHOWING CAUSATION. ...............14

     A.   The Committee's Own Evidence Establishes That the
          Committee Cannot Meet Its Burden of Showing Causation in
          Fact...........................................................................................14

     B.   The Committee Makes No Attempt to Meet Its Burden of
          Showing Proximate Causation. ...................................................19

IV.  THE COMMITTEE'S CLAIMS ON BEHALF OF THE
     CENTENNIAL ESTATE FAIL .............................................................19

     A.   C&L Owed No Relevant Duty to Centennial. ..............................20

     B.   There Is No Evidence That C&L Caused Any Loss to
          Centennial..................................................................................22

Page

C.   The Post-Bankruptcy Consolidation of the Debtors' Estates
     Does Not Create Liability for C&L Where None Existed Before. ............23

V.   THE BREACH OF CONTRACT CLAIM MUST BE DISMISSED AS
     DUPLICATIVE OF THE PROFESSIONAL NEGLIGENCE CLAIM ................25

VI.  THE CLAIM FOR AIDING AND ABETTING A BREACH OF
     FIDUCIARY DUTY IS NOT A RECOGNIZED CAUSE OF ACTION
     UNDER PENNSYLVANIA LAW AND MUST BE DISMISSED. ........................27

Conclusion ...............................................................................................................29

# TABLE OF AUTHORITIES

Page

**Cases**

*Bailey v. Tucker*, 553 Pa. 237, 621 A.2d 108 (1993) ................................................... 26

*Berman v. Radner Rolls, Inc.*, 374 Pa. Super. 118, 542 A.2d 525 (1988) .......................... 8

*Board of Trustees of Community College v. Coopers & Lybrand*,
775 N.E.2d 55 (Ill. App. Ct. 2002), *aff'd in part & rev'd in part*,
803 N.E.2d 460 (Ill. 2003) ............................................................................................. 18

*Burnside v. Abbott Labs.*, 351 Pa. Super. 264, 505 A.2d 973 (1985) ................................ 28

*City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002) ...................... 28

*Comeau v. Rupp*, 810 F. Supp. 1172 (D. Kan. 1992) ........................................................ 9

*Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. Lexis 27238
(D.N.J. Aug. 25, 2004) .................................................................................................. 18

*Daniel Boone Area Sch. Dist. v. Lehman Bros.*, 187 F. Supp. 2d 400
(W.D. Pa. 2002) ............................................................................................................. 28

*Devaney v. Chester*, No. 83 Civ. 8455 (JFK), 1989 WL 52375 (S.D.N.Y.
May 10, 1989) ................................................................................................................ 18

*Drabkin v. Alexander Grant & Co.*, 905 F.2d 453 (D.C. Cir. 1990) ................................ 14

*Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 2002 PA Super 10,
811 A.2d 10 (2002) ........................................................................................................ 28

*Flood v. Makowski*, Civ. A. No. 3:CV-03-1803, 2004 WL 1908221
(M.D. Pa. Aug. 24, 2004) .............................................................................................. 28

*Galullo v. Federal Express Corp.*, 937 F. Supp. 392 (E.D. Pa. 1996) .............................. 19

*Geibel v. United States*, 667 F. Supp. 215 (W.D. Pa. 1987), *aff'd mem.*,
845 F.2d 1011 (3d Cir. 1988) ........................................................................................ 26

*GFN Corp. v. KPMG Peat Marwick*, 820 So. 2d 944 (Fla. Dist. Ct. App.
2002), *review denied*, 842 So. 2d 843 (Fla. 2003) ...................................................... 21

*Gorski v. Smith*, 2002 PA Super 334, 812 A.2d 683 (2002), *appeal denied*,
856 A.2d 834 (Pa. 2004) ............................................................................................... 9

iii

Page

*Greenstein, Logan & Co. v. Burgess Marketing*, 744 S.W.2d 170
   (Tex. Ct. App. 1987) ................................................................ 18

*Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983) ............................... 20

*Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162 (3d Cir. 1982) ............... 26

*Heck v. Beryllium Corp.*, 424 Pa. 140, 226 A.2d 87 (1966) ....................... 25

*In re AAPC, Inc.*, 277 B.R. 785 (Bankr. D. Utah 2002) ............................ 24

*In re AHERF*, 253 B.R. 157 (Bankr. W.D. Pa. 2000) ............................... 22

*In re Augi/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988) ..................... 23

*In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001), *cert. denied*,
   535 U.S. 929 (2002) ......................................................... 3, 4

*In re Cendant Corp. Securities Litigation*, 139 F. Supp. 2d 585
   (D.N.J. 2001) ................................................................. 9

*In re Jack Greenberg, Inc.*, 240 B.R. 486 (Bankr. E.D. Pa. 1999) ................. 6

*In re Murray Industries, Inc.*, 125 B.R. 314 (Bankr. M.D. Fla. 1991) ............ 24

*In re New Center Hosp.*, 187 B.R. 560 (E.D. Mich. 1995) ......................... 25

*In re Optical Technologies, Inc.*, 252 B.R. 531 (M.D. Fla. 2000) ................ 24

*In re Owens Corning*, __ F.3d __, No. 04-4080, 2005 WL 1939796
   (3d Cir. Aug. 15, 2005) ..................................................... 23

*In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676
   (W.D. Pa. 1995) ............................................................. 21

*In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. 784
   (W.D. Pa. 1995) ........................................................... 2, 3

*In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ................. 4

*In re Stewart*, 62 Fed. Appx. 610, 614 (6th Cir. 2003) .......................... 25

*In re Walnut Leasing Co.*, No. 99-526, 1999 WL 729267 (E.D. Pa.
   Sept. 8, 1999), *aff'd sub nom. Official Comm. of Unsecured Creditors
   v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ........................ 2

iv

Page

*Jewelcor Jewelers & Distribs., Inc. v. Corr*, 373 Pa. Super. 536, 542 A.2d
72 (1988), *appeal denied*, 542 Pa. 608, 569 A.2d 1367 (1989) ............................ 8, 9, 12

*Kline v. Ball*, 306 Pa. Super. 284, 452 A.2d 727 (1982) ......................................... 28

*Klingler v. Yamaha Motor Corp.*, 738 F. Supp. 898 (E.D. Pa. 1990) ................................ 19

*Landell v. Lybrand*, 264 Pa. 406, 107 A. 783 (1919) ................................................. 20

*McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657 (3d Cir. 1980) ....................................... 26

*Messenger v. Bucyrus-Erie Co.*, 507 F. Supp. 41 (W.D. Pa. 1980), *aff'd
mem.*, 672 F.2d 903 (3d Cir. 1981), *cert. denied*, 455 U.S. 944 (1982) ...................... 17

*Murphy v. Aesthetic & Reconstructive Surgery*, 2 Pa. D. & C.4th 273
(Ct. Com. Pl., Erie County 1989) ........................................................................ 26

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
267 F.3d 340 (3d Cir. 2001) ......................................................................... 5, 6, 24

*Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378 (3d Cir. 1999) .................................. 17

*Peterman v. Geisinger Med. Ctr.*, 8 Pa. D. & C.3d 432 (Ct. Com. Pl.,
Montour County 1978) ..................................................................................... 26

*Reynolds v. Central R.R. Co.*, 448 Pa. 415, 292 A.2d 924 (1972) ................................... 8, 9

*Shaffer v. Commonwealth*, 842 A.2d 989 (Pa. Commw. Ct. 2004) ................................... 25

*Skipworth v. Lead Indus.*, 547 Pa. 224, 690 A.2d 169 (1997) ...................................... 28

*Staymates v. ITT Holub Indus.*, 364 Pa. Super. 37, 527 A.2d 140 (1987) ................. 20, 21

*Thompson v. Monetary Management Corp.*, 44 Pa. D. & C.4th 401
(Ct. Com. Pl., Delaware County ), *aff'd mem.*, 769 A.2d 1218
(Pa. Super. Ct. 2000) ...................................................................................... 2, 4

*Yeager v. Cendant Corp.*, 109 F. Supp. 2d 225 (D.N.J. 2000) ........................................ 3

## Statute

11 U.S.C. § 541 .................................................................................................. 24

Page

**Other**

Fed. R. Evid. 701 .......................................................................................................... 17

Restatement (Second) of Agency § 282.............................................................................. 2

Restatement (Second) of Torts § 457.................................................................................. 25

Restatement (Second) of Torts § 461.................................................................................. 25

Restatement (Second) of Torts § 487.................................................................................. 27

PricewaterhouseCoopers LLP ("PwC") submits this reply memorandum in further support of its motion for summary judgment.

### Preliminary Statement

The Committee, standing in the shoes of AHERF in bringing this action, seeks to hold Coopers & Lybrand ("C&L") responsible for the collapse of AHERF. But AHERF has only itself to blame for its bankruptcy, as its Board of Trustees approved the expansion strategy that resulted in AHERF's huge losses. C&L played no part in those business decisions. The Committee itself admits that AHERF "management deliberately misstated AHERF's financial statements" (Comm. SOF ¶ 256), and AHERF managers acknowledge that they knowingly made false representations to C&L and withheld information that would have been material to C&L's audit. Board members describe a dysfunctional system of governance, in which CEO Sherif Abdelhak "dominated" the Board, and there is no evidence that AHERF's Board or creditors either would or could have taken the complicated series of purely hypothetical actions that the Committee's experts posit would have prevented loss to AHERF.

PwC's summary judgment motion is based on a distinct set of undisputed facts and issues that can be decided as a matter of law. The Committee's voluminous submission of other facts—most of which are disputed—is legally irrelevant to this motion.

### Argument

### I.    THE COMMITTEE'S CLAIMS ARE BARRED BY IMPUTATION OF AHERF MANAGEMENT'S WRONGDOING.

The *in pari delicto* defense bars the Committee's claims because the wrongdoing of AHERF management must be imputed to AHERF for two distinct

reasons, each based on undisputed facts: (1) the Committee has produced no evidence

that management totally abandoned AHERF's interests and acted entirely out of adverse

interests, and (2) the AHERF Board, although nominally independent, was dominated by

the CEO, Sherif Abdelhak.[1]  The Committee does not dispute any of the material facts in

support of PwC's motion, but instead argues for a legal standard contrary to governing

Third Circuit law.

> A.   AHERF Management Did Not Act Entirely for Their Own Benefit.

Contrary to the Committee's contention that Pennsylvania law does not

require that management acted "entirely" in their own interest (Br. at 13), it is "well

established" that the "adverse interest" exception applies only when "the agent secretly is

acting adversely to the [corporation] and <u>entirely</u> for his own or another's purpose".

*Thompson v. Monetary Management Corp.*, 44 Pa. D. & C.4th 401, 406 (Ct. Com. Pl.,

Delaware County) (emphasis added), *aff'd mem.*, 769 A.2d 1218 (Pa. Super. Ct. 2000).[2]

---

[1] Contrary to the Committee's assertion that *in pari delicto* is a defense only to some of the financial misstatements (Br. at 12), it is undisputed that all of the misstatements at issue in the case were made by AHERF management in the course of their employment (*see* PwC SOF ¶¶ 29-35); hence, they must be imputed to AHERF.  The Committee fails to identify any misstatements not so made by AHERF management.  While the Committee does dispute that AHERF's CFO, David McConnell, directed each and every one of the accounting entries at issue in the case (*see* Comm. Br. at 12; Comm. SOF ¶ 35), that is irrelevant to the imputation question.  The acts of Mr. McConnell's direct reports, Stephen Spargo and Albert Adamczak, must equally be imputed to AHERF. (PwC Br. at 7; PwC SOF ¶¶ 29-32.)  In any event, the Committee's argument is academic since it fails to identify a single accounting entry not authorized by Mr. McConnell.

[2] *Accord In re Walnut Leasing Co.*, No. 99-526, 1999 WL 729267, at *4 (E.D. Pa. Sept. 8, 1999) ("the agent has totally abandoned the principal's interest"), *aff'd sub nom. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 240 (3d Cir. 2001); *Phar-Mor*, 900 F. Supp. at 786 ("the agent secretly is acting adversely to the [corporation] and entirely for his own or another's purposes"); Restatement (Second) of Agency § 282(1) (1957) (same).

2

The very evidence on which the Committee relies demonstrates that AHERF management did not act entirely out of self-interest. The Committee quotes (at 16) an excerpt of testimony from Anthony Sanzo, who worked closely with Sherif Abdelhak and succeeded him as AHERF's CEO. But Mr. Sanzo testified in full: "I think [Mr. Abdelhak] was motivated <u>first by his loyalty to the organization</u>, but he was definitely motivated by what his accomplishments may mean financially to him. I don't think he was superhuman in that way." (PwC Reply SOF ¶ 37.) Mr. Sanzo further testified: "[E]ven when [Mr. Abdelhak] was wrong, he made decisions based on what he thought was going to be in the best interest of AHERF." (*Id.*)

The type of "self-interest" the Committee identifies is inadequate as a matter of law to defeat imputation. Relying on *In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. 784 (W.D. Pa. 1995), the Committee contends that imputation is inappropriate where the jury could infer that management "'acted to preserve their own 'employment, salaries, emoluments and reputations, as well as their liberty'". (Comm. Br. at 14 (quoting *Phar-Mor*, 900 F. Supp. at 787).) But that aspect of *Phar-Mor* was rejected by the Third Circuit four years ago.

In *In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001), *cert. denied*, 535 U.S. 929 (2002), Judge Becker reviewed a District of New Jersey decision that expressly followed *Phar-Mor* and refused to impute the fraud of certain corporate officers to Cendant because "'a reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, emoluments and reputations, as well as their liberty'". *Yeager v. Cendant Corp.*, 109 F. Supp. 2d 225, 232 (D.N.J. 2000) (quoting *Phar-Mor*, 900 F. Supp. at 787). The Third

3

Circuit did "not agree", and held that the conduct of corporate officers should be imputed when (as here) they "were acting within the apparent scope of their authority and were transacting corporate business, whether or not they were feathering their own nest". *Cendant*, 264 F.3d at 238. Since *Cendant*, courts in this District have imputed fraud notwithstanding the possibility that corporate officers may have desired to keep their jobs. *See In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 522 (W.D. Pa. 2002).

The evidence put forward by the Committee (at 14-16) amounts to nothing more than what the Third Circuit rejected in *Cendant*—that AHERF management received high salaries and bonuses, and enjoyed many perquisites. Those payments and perquisites, however, were known to and approved by the Board, not "secret" (as required for imputation), *Thompson*, 44 Pa. D. & C.4th at 406, and they do not remotely support the inference that AHERF management was acting adversely to AHERF's interests. First, all of the salaries and bonuses paid to Mr. Abdelhak and Mr. McConnell listed by the Committee were approved by the Compensation Committee or the Chairman of the AHERF Board. (PwC Reply SOF ¶¶ 38, 40.) Either the Board concluded that this compensation structure was in AHERF's interest, or it was dominated by Mr. Abdelhak, or both. Second, the use of corporate jets, business trips to exotic destinations, and other perquisites were known to the Board. In fact, a number of the AHERF trustees themselves flew on the corporate jets and went along on the trips. (PwC Reply SOF ¶ 38.) Third, although the Committee makes much of the general fact that AHERF management received performance-related bonuses, the Committee points to no evidence—because there is none—that any of the alleged accounting misstatements

4

affected the amount of bonuses paid to Mr. Abdelhak, Mr. McConnell or anyone else. (PwC Reply SOF ¶¶ 39, 226-236.)[3]

        B.      The Board Was Dominated by AHERF Management.

        The misconduct of AHERF management must be imputed to AHERF for the separate reason that the Board was "dominated" by Mr. Abdelhak. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359-60 (3d Cir. 2001). The Committee does not dispute <u>any</u> of the evidence set forth in PwC's opening brief (at 12-14), including (i) the testimony of numerous Board members admitting that Mr. Abdelhak dominated the Board (PwC SOF ¶¶ 44-59); (ii) the Committee's own allegation that Board meetings were "thoroughly scripted" (PwC SOF ¶ 53); and (iii) the unrebutted opinion of a nationally recognized expert on hospital boards that Mr. Abdelhak dominated the AHERF Board (PwC SOF ¶ 60).

        The Committee also suggests that the Board demonstrated its independence by firing Mr. Abdelhak a few weeks before bankruptcy. (Comm. Br. at 19.) The Board did no such thing. It is undisputed that Dr. Richard Shannon, chairman of the department of medicine at Allegheny General Hospital (AGH), went to the Chairman of the AHERF Board, William P. Snyder III, over Memorial Day weekend of 1998, and on behalf of the doctors at AGH demanded Mr. Abdelhak's removal for reasons unrelated to the audited financial statements. (PwC Reply SOF ¶ 336.)

---

[3] The Committee's remaining evidence is truly *de minimis*, in the context of the magnitude of financial misstatements alleged in this case: a severance package provided to an AHERF executive who had threatened to sue AHERF, alleging sexual harassment by Mr. Abdelhak and Mr. McConnell, and a $50,000 contribution to the football program at Quaker Valley High School, where Mr. Abdelhak's son went to school. The Committee points to no evidence—because there is none—that the accounting misstatements at issue in this case were motivated by a desire to make either of those relatively immaterial payments.

Mr. Snyder agreed to the doctors' demand, and fired Mr. Abdelhak. (*Id*) The Board did

not meet on the subject, and most Board members did not even learn that Mr. Abdelhak

was fired until after the fact. (*Id.*) The Board's acquiescence in this decision, without

demanding a meeting and a voice in the fundamental decision of who would run AHERF,

further demonstrates the Board's supine nature.

      C.     Imputation Mandates Application of the *In Pari Delicto* Doctrine.

      Although the Committee contends (at 10-12) that the *in pari delicto*

defense involves two steps—the imputation of wrongdoing followed by a separate

weighing of "equitable factors"—*Lafferty* holds otherwise. The *Lafferty* court stated

without qualification: "Whether the *in pari delicto* doctrine applies here depends on

whether . . . [management's] conduct can be imputed.", and "If wrongdoing is imputed,

then the *in pari delicto* doctrine comes into play and bars a suit." 267 F.3d at 355. After

deciding to impute, the *Lafferty* court concluded that the *in pari delicto* doctrine barred

the claims of the creditors' committee in that case, without any separate weighing of

equitable factors. *Id.* at 360.

      Moreover, while both of the "equitable factors" put forward by the

Committee (at 20) were present in *Lafferty* itself, they did not defeat imputation as a

matter of law. The *Lafferty* court assumed that the auditors had "allegedly conspired with

[management] to render opinions replete with multiple fraudulent misstatements and

material omissions", *id.* at 345, yet imputed the wrongdoing without regard to the

auditors' knowledge of or complicity in the fraud. *Id.* at 358-60.[4] *Lafferty* also soundly

---

[4] While the Committee relies on *In re Jack Greenberg, Inc.*, 240 B.R. 486, 507 n.29 (Bankr. E.D. Pa. 1999) (Comm. Br. at 20), that case was cited to the Third Circuit and rejected in *Lafferty. See* 267 F.3d at 355.

rejected the Committee's second "equitable factor", holding that the "possible existence

of any innocent independent directors" does not bar imputation where (as here) the board

is dominated by management. *Id.* at 360.

Thus, PwC is entitled to summary judgment on its *in pari delicto* defense.

## II.    AHERF'S INTERFERENCE WITH C&L'S AUDITS BARS RECOVERY AGAINST PWC FOR NEGLIGENCE AS A MATTER OF LAW.

PwC's opening brief outlined the indisputable evidence of AHERF's

interference with C&L's audits. The Committee does not dispute those facts, but instead

proffers additional facts that are irrelevant to whether AHERF was contributorily

negligent. The Committee makes the following principal arguments:

(1) that AHERF's interference with C&L's audits should be excused because the Committee alleges C&L was itself negligent in performing the audits;

(2) that AHERF's wrongdoing was not substantial enough to warrant summary judgment because it did not prevent C&L from detecting AHERF's misstatements;

(3) that AHERF's interference with C&L's audits may have been unintentional, and not intended to deceive C&L; and

(4) that AHERF was not required to be forthcoming with C&L, but could instead leave it to C&L to try to ferret out withheld information.

Each argument is merely the Committee's incorrect statement of law masquerading as a

factual dispute.

### A.    The Committee Misstates the Law on Contributory Negligence.

First, the Committee seeks to deflect attention from AHERF's audit

interference to C&L's audits by contending (at 22) that the contributory negligence

defense is unavailable if the auditor "could have detected the accounting problems at

issue". This argument confuses two distinct questions: (1) whether C&L was negligent;

and (2) whether AHERF was contributorily negligent. The contributory negligence

7

defense presumes that the defendant could himself be found negligent. *See Jewelcor Jewelers & Distribs., Inc. v. Corr*, 373 Pa. Super. 536, 551, 542 A.2d 72, 79 (1988), *appeal denied*, 542 Pa. 608, 569 A.2d 1367 (1989). If, as the Committee seems to believe, evidence of the defendant's negligence were sufficient to defeat a contributory negligence defense, the defense would be a nullity. Thus, the Committee's assertions that C&L was negligent, while vigorously disputed, should be disregarded on this motion.

        Second, the Committee tries to avoid summary judgment by asserting, through its retained auditing experts, that "nothing that AHERF management did or did not do prevented Coopers from performing a GAAS audit and detecting the misstatements" (Comm. Br. at 23-24 (emphasis added).) But the contributory negligence defense arises not only where the client completely precludes a successful audit, but includes circumstances where the client's own negligence was a "substantial factor" in causing the alleged audit failings. The Committee implicitly admits this by describing its own causation burden as follows: "The Committee does not need to prove that Coopers' conduct was the sole cause of AHERF's harm. It is enough to show that it was a 'substantial factor in bringing about the harm'." (Comm. Br. at 30-31.) This same legal standard applies to PwC's contributory negligence defense. *See Berman v. Radner Rolls, Inc.*, 374 Pa. Super. 118, 144, 542 A.2d 525, 538 (1988).

        Third, much of the Committee's opposition brief and Statement of Facts consists of efforts to explain away AHERF's interference with C&L's audits as accidental. But PwC advances a contributory negligence (not "contributory intentional conduct") defense. It is immaterial to the defense whether AHERF acted with the intent to mislead C&L or did so negligently. *See, e.g., Reynolds v. Central R.R. Co.*, 448 Pa.

415, 292 A.2d 924 (1972) (finding contributory negligence as a matter of law where plaintiff failed to exercise "due care" but did not act intentionally).

Fourth, in obvious desperation, the Committee denies that an audit client has any obligation to be forthcoming with its auditors or to provide what the client knows is pertinent information. (Comm. Br. at 22-23.) Instead, the Committee posits a new rule, by which the audit client may keep silent and need disclose information only when the auditor asks the clairvoyant question, "What about the secret information you haven't told me about?" That is not the law in Pennsylvania. A client's failure to tell his auditor or lawyer about a known misstatement constitutes contributory negligence. *See Gorski v. Smith*, 2002 PA Super 334, ¶ 49, 812 A.2d 683, 703-04 (2002) (lawyer), *appeal denied*, 856 A.2d 834 (Pa. 2004); *Jewelcor*, 373 Pa. Super. at 551, 542 A.2d at 79-80 (auditor). The Committee does not even mention *Gorski*, and purports to distinguish *Jewelcor* on grounds that are inapplicable.[5] Instead, the Committee resorts to two inapposite district-court decisions from other states that the Committee mistakenly claims hold that an audit client need not be forthcoming with its auditor.[6] (*See* Comm. Br. at 22.) Neither case so holds, and Pennsylvania law is, in any event, to the contrary.

---

[5] The Committee's only distinction of *Jewelcor* is that the case was decided at trial rather than at summary judgment. (Comm. Br. at 22-23.) The *Jewelcor* decision makes clear what the legal standard is—that withholding information can be audit interference. Here, the undisputed facts fit squarely within the legal standard articulated in *Jewelcor* and in *Gorski*, and permit decision on summary judgment.

[6] In *In re Cendant Corp. Securities Litigation*, 139 F. Supp. 2d 585, 606-07 (D.N.J. 2001) (apparently applying Connecticut law, *see id.* at 603, 604 n.10), the court ruled that the complaint survived the auditor's motion to dismiss a breach of contract claim. This decision is irrelevant to summary judgment on contributory negligence. In *Comeau v. Rupp*, 810 F. Supp. 1172, 1183-84 (D. Kan. 1992), the court held merely that the auditors were not entitled to summary judgment on contributory negligence where the client's sloppy "bookkeeping practices" made the audit "more difficult".

B.    AHERF's Undisputed Omissions and Misleading Statements Were a
Substantial Factor in the Alleged Audit Failings.

PwC's opening brief established, through undisputed facts, that AHERF

management contributed to alleged audit failings in the three areas of the audit that the

Committee has previously told the Court are "clearly material". (12/21/01 Br. at 5.)

Interference with C&L's audits in any one of these areas, let alone in all three, would thus

indisputably be a "substantial factor" in bringing about those alleged audit failings.[7]

Accounts Receivables Reserves. The Committee concedes that AHERF

determined in September 1996 (before issuance of AHERF's fiscal 1996 financial

statements) to write off $80 million in patient accounts receivables. The Committee

concedes that AHERF did not inform C&L of this decision. (Comm. SOF ¶ 80.) Instead

of addressing these dispositive facts, the Committee alleges (at 24-25) that C&L already

knew about a smaller "bad debt reserve shortfall" from discussion at a "closing meeting"

at the end of the 1996 audit. (Comm. SOF ¶¶ 265-267.) But those very much disputed

facts are about whether C&L was negligent, and are irrelevant to the question of

AHERF's contributory negligence. AHERF's decision to write off $80 million of

accounts receivable was clearly material to any assessment of the adequacy of the

reserve. AHERF's concealment of this decision from C&L is therefore audit

interference.

---

[7] The Committee suggests that AHERF's interference in the areas identified by
PwC's motion may be insufficient to establish its defense, and PwC should catalogue
interference in every area of the audit. (Comm. Br. at 23.) The Committee cannot have it
both ways. Having told the Court that these are "three clearly material" areas of alleged
audit failure, the Committee cannot now claim that interfering in one or more of them
was not a "substantial factor" in C&L's alleged negligence.

Furthermore, the Committee does not dispute that Mr. Spargo knew that his signed representation to C&L that accounts receivable were adequately stated for 1996 was false. (Comm. SOF ¶ 83.) Although the Committee disputes that Mr. Spargo intended to mislead C&L (Comm. Br. at 25), this disputed fact is immaterial because Mr. Spargo's state of mind is irrelevant to PwC's defense.

Graduate Transfers. PwC's opening brief chronicled the (1) documents AHERF withheld from C&L (PwC SOF ¶¶ 105-108, 113-115), (2) documents AHERF altered before supplying them to C&L (*id.* ¶¶ 96-100), (3) documents in which AHERF used different language to mask additional reserve transfers (*id.* ¶¶ 101-104), and (4) AHERF's incorrect and inconsistent treatment of reserve transfers on AHERF's statement of cash flows, which even the Committee's expert concedes concealed from C&L the transfers beyond the initial $50 million (*id.* ¶¶ 109-112). In each case, the Committee admits the underlying material facts.

The Committee responds that AHERF's actions were unintentional. The Committee provides strained justifications for why AHERF stripped out tell-tale footnotes, and used obscuring language ("transfer of reserves from Graduate" for the initial $50 million, and "bad debt shortfall adjustment" for the additional $49 million). (Comm. Br. at 28.) The Committee contends that a document that Ms. Schaffer did turn over proves that she must not have meant to withhold others. (*Id.* at 29.) The Committee goes so far as to defend the statement of cash flows (which concealed the additional reserve transfers) on the ground that "AHERF's accountants have testified that they never thought about the issue". (*Id.* at 28.) But these strained excuses are of no consequence because whether the audit interference was by design or by accident does not matter.

11

Next, the Committee contends that C&L still should have detected the additional reserve transfers. The Committee argues that the transfers "could not have been missed", and suggests that C&L did not properly conduct its audit tests. (Comm. Br. at 27-28.) But whether C&L was negligent or not is irrelevant to PwC's contributory negligence defense. Similarly, the Committee raises a factual dispute over whether C&L should have understood that a certain Graduate reserve called the PFMA reserve had been transferred to DVOG. (*Id.* at 27.) PwC vigorously disputes the Committee's contentions about the PFMA reserve (PwC Reply SOF ¶¶ 94-95), but that dispute is immaterial to this motion because (1) it is undisputed that AHERF did not tell C&L about the full $99 million in reserve transfers, and that alone is audit interference, and (2) whether C&L was negligent with respect to the PFMA reserve is irrelevant to PwC's defense that AHERF was contributorily negligent.

Finally, the Committee acknowledges that PwC learned only after AHERF's bankruptcy that AHERF maintained secret files (the "X Files", and schedules contrasting the true financial results with those provided to C&L for audit), and that "some of these documents indicate underlying financial statement errors". (Comm. Br. at 28.) But the Committee claims that withheld documents cannot be evidence of audit interference because "[d]ocuments that Coopers auditors never saw could not have misled or misinformed them". (*Id.*) That is contrary to the law of contributory negligence in Pennsylvania, *see Jewelcor*, 373 Pa. Super. at 551, 542 A.2d at 79-80, and defies common sense. The auditors would have learned from the secret files that what AHERF was telling them was a lie. This is a classic example of audit interference.

12

Lockhart Trust Classification. The Committee admits that Barbara Robinson of Mellon Bank (the trustee for the Lockhart trusts) advised AHERF (but not C&L) that AHERF's accounting treatment was wrong. (Comm. SOF ¶¶ 124-125.) Nor does the Committee dispute that AHERF did not furnish the Mellon Bank letter to C&L, or inform C&L of its contents. (PwC Reply SOF ¶¶ 129-132.) The Committee's response consists of a number of red herrings. First, the Committee argues that the Mellon Bank letter is dated a month after C&L completed its 1996 audit work. (Comm. Br. at 29.) But the letter did not come too late for 1996 (the financial statements had not yet been approved by the Board or distributed outside AHERF), and, more important, this in no way excuses AHERF's failure to provide C&L with the letter the next year, for the 1997 audit. (PwC SOF ¶¶ 79(b)-(c), 129.) Second, the Committee argues that the Mellon Bank letter "adds nothing" because AHERF already had copies of the Lockhart trust documents that Ms. Robinson used to reach her conclusion. (Comm. Br. at 29.) This argument that the letter was immaterial strains credulity: why then did AHERF ask Mellon Bank (the trustee) for its views on the classification of the trusts, and why did Mr. Spargo write internally about the "pickle" it created, requiring "a tad bit more creativity than even we are normally accustomed to"? (PwC SOF ¶¶ 124, 127.) Finally, the Committee contends that C&L should have detected the misclassification of the trusts by independently reading the trust documents or by asking Mellon Bank for its opinion. (Comm. Br. at 29-30.) But again, that is, at most, relevant only to C&L's alleged negligence, and not to AHERF's contributory negligence.

The undisputed facts clearly establish audit interference, entitling PwC to summary judgment.

13

**III.    THE COMMITTEE'S CLAIMS FAILS BECAUSE THE COMMITTEE CANNOT MEET ITS BURDEN OF SHOWING CAUSATION.**

The Committee must separately prove both causation in fact and proximate causation. PwC is entitled to summary judgment on both grounds. The Committee fails to offer any argument whatsoever on proximate causation (*see infra* Part III.B), and the Committee's own submission of "evidence" on causation instead shows that the Committee lacks admissible evidence competent to prove what actions AHERF's Board or creditors would have taken in the Committee's hypothetical scenario.

A.    The Committee Cannot Establish Causation in Fact.

The parties' briefs make clear there is no genuine issue of material fact between them on this motion. PwC and the Committee rely on the same passages from documents and deposition testimony. The parties are in agreement that in hindsight there could have been "options available" to AHERF's Board and creditors if AHERF's 1996 financial statements had been even more negative than they were.

This motion thus presents a pure question of law: is the existence of an array of hypothetical "options available" to third parties—one or two of which, if carried out, might (hypothetically only, and with the benefit of hindsight) have avoided the damages the plaintiff suffered, while others would have made no difference or would even have worsened that harm—sufficient to meet a plaintiff's burden of proving causation in an action for negligence? As the D.C. Circuit ruled in a similar case against the auditor of a bankrupt company, *Drabkin v. Alexander Grant & Co*, 905 F.2d 453 (D.C. Cir. 1990), the purely hypothetical possibility that a plaintiff's damages could have been avoided is not sufficient to survive summary judgment.

14

1.    The Committee Has No Competent Evidence That the Trustees or Creditors Would Have Taken Any Specific Action.

The Committee's opposition brief shows that the Committee's theory of causation is even vaguer, and even more speculative, than was described in our opening brief. The Committee relies on a two-step process: (1) "options that would have been available" and (2) "steps that would have been taken by" AHERF's trustees and creditors. (Comm. Br. at 32.)

The availability of "options" proves nothing. It is common sense that there would have been an infinite universe of possible responses to even more negative financial statements. The testimony cited by the Committee does nothing more than confirm that obvious fact. And as we noted in our opening brief (at 34, 37), testimony about things that <u>could</u> have been done does not begin to meet the Committee's burden of showing what <u>would</u> have been done, or that what <u>would</u> have been done <u>would</u> have avoided AHERF's losses. The Committee admits as much: it acknowledges that it must "present evidence from which reasonable jurors could conclude that AHERF's Board or its creditors, if accurately informed, <u>would have intervened</u> to staunch AHERF's losses". (Comm. Br. at 30, emphasis added.) The self-evident existence of "options" does not satisfy even the Committee's own test.

On the second step of the Committee's causation theory, the Committee has no competent evidence of "steps that would have been taken" by trustees or creditors. The evidence in the Committee's own Statement of Undisputed and Material Facts requires summary judgment for PwC because it proves only that there were "options

15

available". With respect to the Board, the Committee cites to the following:

- Testimony by one trustee, Ira Gumberg, that it was "possible" the Board would have taken various actions, and it "would have had to have looked at everything that was happening" (Comm. SOF ¶ 152);

- Testimony by a second trustee, Ralph Brenner, that if there was a problem, "I would ask that it be looked into fully . . . and make a decision, whatever it may be" (*id.* ¶ 326);

- Testimony by a third trustee, Thomas O'Brien, that "I would demand to have a special committee look into the allegations" (*id.* ¶ 327);

- Testimony by a fourth trustee, J. David Barnes, that a report of problems "opens the door to a lot of questions. Now, how they all get answered, I'm not sure . . . . There are probably half a dozen options . . ." (*id.* ¶ 329); and

- Testimony by other trustees that they would have expected the Audit Committee to conduct an investigation, and "would have followed whatever prudent course was dictated by the results of Audit Committee's investigation" or "would not have ignored conclusions of Audit Committee regarding investigation of fraud" (*id.* ¶¶ 328, 330).

That is <u>all</u> the evidence the Committee has. It is plainly insufficient to prove the specific action that any individual trustee—let alone a majority of the Board, as required by its by-laws—would have taken in the Committee's hypothetical situation.

The Committee's evidence concerning AHERF's creditors is no more substantial. MBIA's president, Richard Weill, testified that MBIA "would have attempted to apply the leverage" (Comm. SOF ¶ 360), "would have had more power . . . to do all kinds of things", and would have "talk[ed] to the directors" (*id.* ¶ 361), and declares that "MBIA would have been more aggressive in pressing for change in AHERF's operations than it had been" (*id.* ¶ 368). Similarly, PNC witnesses testified that "PNC would have reviewed its agreements to see what rights and remedies PNC had available to it" (*id.* ¶ 376), "PNC would have had a number of remedial options available" (*id.* ¶ 377), and there were "a whole host of steps that might be utilized by

16

PNC" (*id.* ¶ 380). This is simply more evidence of "options available". What the Committee fatally lacks is any evidence of "steps that would have been taken".

Even if the Committee could meet the standard it sets for itself, showing that the Board and creditors "would have intervened" (Comm. Br. at 30), that would not nearly be enough. The Committee must show that the Board would have hired an independent turn-around consultant in September 1996, that the consultant would have recommended the steps that the Committee's expert presented in his report, that the Board would have given that consultant full authority over AHERF, that it would have fired Mr. Abdelhak if necessary to implement that consultant's recommendations, that the consultant's turn-around plan would have succeeded, and that a successful turn-around would have prevented the losses AHERF's creditors suffered. The Committee must prove by competent factual evidence that all of those steps would have occurred. In response to this motion, it has come forward with no evidence that would prove any of them.

        2.    The Committee's Evidence of Causation Is Inadmissible as Self-Serving Speculation.

What the Committee does proffer is inadmissible. The Committee does not dispute that to avoid summary judgment a plaintiff must present admissible evidence. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 & n.13 (3d Cir. 1999). Speculative, self-serving, after-the-fact conjecture—such as that by AHERF's trustees and creditors here—is inadmissible under Federal Rule of Evidence 701. (PwC Br. at 38-40.) The Committee offers no response to that argument. It does not even discuss Rule 701 or the cases we cited, such as *Messenger v. Bucyrus-Erie Co.*, 507 F. Supp. 41 (W.D. Pa. 1980), *aff'd mem.*, 672 F.2d 903 (3d Cir. 1981), *cert. denied*, 455 U.S. 944

17

(1982), and *Devaney v. Chester*, No. 83 Civ. 8455 (JFK), 1989 WL 52375 (S.D.N.Y. May 10, 1989), which is factually similar to this case.

The cases on which the Committee relies do nothing to ease its causation problems or to establish the admissibility of its rank speculation. Indeed, the Committee's lead case, *Board of Trustees of Community College v. Coopers & Lybrand*, 775 N.E.2d 55 (Ill. App. Ct. 2002), *aff'd in part and rev'd in part*, 803 N.E.2d 460 (Ill. 2003) (discussed in Comm. Br. at 32-33), shows why the Committee's evidence is insufficient to avoid summary judgment. In *Community College*, the plaintiff college had a pre-existing written policy that limited its investments to securities backed by the full faith and credit of the United States. The college's treasurer violated that policy, making risky investments which the auditors failed to discover. *Id.* at 62-63. It is not at all surprising that the *Community College* court found enough evidence to deny summary judgment: it required no speculation or guesswork to determine what action the college would have taken (requiring the treasurer to comply with an already existing investment policy) or what the result would have been (that the losses would have been avoided because the money would instead have been invested in government-backed securities). That straightforward theory of causation, supported by contemporaneous, non-speculative evidence, stands in stark contrast to the Committee's improbable predictions created for this litigation.[8]

---

[8] Other cases cited by the Committee illustrate the same important point. *Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. Lexis 27238, at *24-*25 (D.N.J. Aug. 25, 2004), involved a regulated insurer, and the plaintiff relied on the fact that the regulator obtained an order suspending the issuance of policies (and thereby avoiding any further liabilities) one day after an independent examination disclosed an actual insolvency. In *Greenstein, Logan & Co. v. Burgess Marketing*, 744 S.W.2d 170, 186 (Tex. Ct. App. 1987), upon disclosure management promptly implemented steps which <u>in fact</u> restored the company to profitable operation. Thus, there was no need to speculate

B.       The Committee Makes No Attempt to Establish Proximate Causation.

The Committee must also prove proximate causation. *See Galullo v.
Federal Express Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996). In our opening brief, we
showed that the Committee's theory of causation is composed of a lengthy, remote and
unprovable series of contingencies, and that Pennsylvania courts dismiss such cases on
proximate causation grounds before the question of causation of fact is put to the jury.
(PwC Br. at 42-45.) In its opposition brief, the Committee never directly discusses
proximate causation, does not refer to that portion of our brief or any of the authorities
we discussed, and makes no attempt to present a permissible theory of proximate
causation.

As we stated in our opening brief (at 43-45), the Committee's causation
case is even more attenuated than the theory rejected as a matter of law on proximate
causation grounds in *Klingler v. Yamaha Motor Corp.*, 738 F. Supp. 898 (E.D. Pa. 1990).
As the court stated in *Klingler*, it is "simply not possible to show" that all elements of
such an intricate and compound theory would have taken place. *Id.* at 908. Accordingly,
PwC is entitled to summary judgment on proximate causation grounds.

## IV.    THE COMMITTEE'S CLAIMS ON BEHALF OF THE CENTENNIAL ESTATE FAIL

PwC is entitled to summary judgment on the claims brought on behalf of
the Centennial estate for two reasons: (1) C&L owed no duty (professional or
contractual) to Centennial or its predecessors (SDN and the Graduate Hospitals), and

---

about hypothetical actions never taken in the real world, as the Committee asks the Court
to do here.

(2) there is no causation because Centennial's predecessors had already suffered the loss before any action that C&L took.

> A.    C&L Owed No Relevant Duty to Centennial.

Recognizing the need to show privity on behalf of Centennial, the Committee asserts (at 38) that C&L "had a written contract with SDN [Centennial's predecessor] and owed professional duties to SDN". But the engagement for which SDN hired C&L was different from C&L's engagement with AHERF. The Committee nowhere alleges (nor is there any evidence) that C&L did not satisfactorily perform the procedures set forth in its contract with SDN. (PwC Reply SOF ¶ 396.) The Committee seeks damages from PwC based on C&L's alleged malpractice in auditing <u>AHERF's</u> financial statements, <u>not</u> based on any defect in the limited and unrelated work C&L did for SDN. That there was a "written contract" between SDN and C&L, or that C&L owed certain duties to SDN, is irrelevant to the privity issue because this case is not about a breach of <u>that</u> contract or <u>that</u> duty.

As the Committee notes (at 37), privity exists when there is a "professional relationship" between the parties or "a specific undertaking" by the professional to the plaintiff. *Guy v Liederbach*, 501 Pa. 47, 58, 459 A.2d 744, 750 (1983). That does not mean that an unrelated relationship a plaintiff happens to have with a professional can support claims for malpractice with respect to <u>other</u> work that plaintiff did not hire the professional to perform or the professional's relationships with <u>others</u>. Rather, the claim "must arise out of some breach of duty" owed to the plaintiff. *Landell v Lybrand*, 264 Pa. 406, 408, 107 A. 783, 783 (1919). To be actionable, the breach must be of the duty owed to the plaintiff, not of a different duty owed to someone else. *See Staymates v ITT Holub Indus* , 364 Pa. Super. 37, 42, 527 A.2d 140, 142-43

20

(1987) ("Of course, recovery in tort was and is premised upon the existence of a legal duty owed by the defendant to the plaintiff, a breach of that duty and damages flowing to the plaintiff as a proximate cause thereof." (emphasis added)). Similarly, the cases in which privity has been found based on a "specific undertaking" (*see* Comm. Br. at 41) have all involved a professional undertaking a specific service for the plaintiff and negligently performing that service, not some other service.

Nor does the relationship between AHERF and SDN bring SDN into privity with C&L for the audit engagements with AHERF. It is undisputed that in 1996 SDN was separately incorporated and not owned or controlled by AHERF, which did not become the "sole member" until May 1, 1997, after SDN changed its name to Centennial. (PwC SOF ¶¶ 194-196.) But even if SDN had been a subsidiary of AHERF (which it was not), SDN and Centennial were not in privity with C&L on the audits of AHERF. In *GFN Corp. v. KPMG Peat Marwick*, 820 So. 2d 944 (Fla. Dist. Ct. App. 2002), *review denied*, 842 So. 2d 843 (Fla. 2003), a claim by a parent company (GFN) against its auditor (KPMG) for negligence in the audit of the subsidiary (ICF) was dismissed for lack of privity. Even though KPMG also provided services to GFN, "GFN has not sued KPMG for breach of any contractual duty KPMG owed GFN". *Id* at 946.[9] The same is true here.

---

[9] By contrast, in *In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676, 694-95 (W.D. Pa. 1995) (cited in Comm. Br. at 41), there were unresolved factual issues about whether C&L owed a special contractual duty to GE Delaware under C&L's audit engagement with GE Delaware's parent (Giant Eagle) "to ensure that Phar-Mor's financial statements accurately reflected its financial position". Here, the Committee does not allege—nor could it—that, in its engagement with SDN, C&L undertook to report to SDN on the accuracy of AHERF's financial statements.

21

B.    There Is No Evidence That C&L Caused Any Loss to Centennial.

The Committee's causation theory for the claims on behalf of Centennial is that the SDN/Graduate merger would have been avoided. (Comm. Br. at 42-43.) But the merger is irrelevant, as the Graduate losses predated the merger, and SDN had no separate assets or liabilities.[10]

In addition, the undisputed facts make clear that, even if the Graduate/SDN merger could be said to have caused injury in any meaningful sense, C&L's work for SDN—the work that the Committee claims creates privity between C&L and Centennial—could not possibly have been the cause. The only services C&L undertook to provide to SDN were "to assist SDN in obtaining information" regarding the Graduate Hospitals, as part of a "management review", which "was not intended to lead to the judgment of whether to consummate or not but rather to understand what SDN was going to be acquiring". (PwC Reply SOF ¶ 396.) The merger of the Graduate Hospitals into SDN was going ahead—and did go ahead—regardless of the results of C&L's work for SDN. That is proved conclusively by the timing of C&L's delivery to SDN of its report on December 13, 1996, six weeks after the Graduate/SDN merger was effective, on October 31, 1996. (Id.)

---

[10] Centennial's Chapter 11 Trustee himself alleges that the Graduate Hospitals were already insolvent before the merger (PwC SOF ¶ 193), and the Bankruptcy Court held that the liabilities of the Graduate Hospitals before the October 31, 1996 merger into SDN "are deemed to have arisen against Centennial prior to the date of the Merger". *In re AHERF*, 253 B.R. 157, 166 (Bankr. W.D. Pa. 2000). Thus, Centennial had already suffered the injury before the merger, and the merger into SDN did not cause any injury. The Committee fails to address this argument.

C.    The Post-Bankruptcy Consolidation of the Debtors' Estates Does Not
Create Liability for C&L Where None Existed Before.

The Committee attempts an end-run around the fact that it cannot bring a

claim against C&L on behalf of <u>Centennial</u> by trying to bring the same claim on behalf of

the <u>AHERF</u> estate. The Committee does not dispute that AHERF never assumed liability

for Centennial's debt (Br. at 43), but argues that the Bankruptcy Court's substantive

consolidation order operates to make any party who is liable for the losses of one

bankrupt (AHERF) liable for the losses of all of the consolidated estates. The Committee

fails to cite a single case (and we are aware of none) in which <u>any</u> court has held that

substantive consolidation expands the liability of a third party. It is easy to see why there

are none.

First, the result the Committee seeks is inconsistent with the purpose of

substantive consolidation. It is an equitable measure, not authorized by statute, and the

"sole purpose of substantive consolidation is to ensure the equitable treatment of all

creditors". *In re Augi/Restivo Baking Co* , 860 F.2d 515, 518 (2d Cir. 1988). It affects

the distribution of assets among the creditors and nothing more.

Second, the Committee's result would violate the principle that

substantive consolidation may not be used offensively. In *In re Owens Corning*, __ F.3d

__, No. 04-4080, 2005 WL 1939796, at *10 (3d Cir. Aug. 15, 2005), the Third Circuit

held that "[w]hile substantive consolidation may be used defensively to remedy the

identifiable harms caused by entangled affairs, it may not be used offensively". For the

same reasons that substantive consolidation may not be used to diminish the rights of a

group of creditors (as in *Owens Corning*), it may not be used to expand the liability of

third parties to the debtors (as the Committee seeks to do here).

23

Third, it would be a violation of due process for substantive consolidation to operate to destroy defenses or rights of a third party, without notice. Substantive consolidation should be ordered "only after affording notice and an opportunity to be heard to all those whose rights may be affected by the order". *In re AAPC, Inc.*, 277 B.R. 785, 789 (Bankr. D. Utah 2002) (emphasis added). Neither AHERF nor Centennial contended at the time that substantive consolidation would affect PwC; PwC did not receive notice that its rights might be affected; and Judge McCullough did not consider potential prejudice to PwC. (PwC Reply SOF ¶ 409.) *In re Murray Industries, Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991), is instructive. There the court rejected the argument of the debtor estates that, where the defendant had waived a defense against one estate, substantive consolidation made that waiver effective for claims by the other consolidated estates because it "would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation". *Accord In re Optical Technologies, Inc.*, 252 B.R. 531, 540 (M.D. Fla. 2000). The due process considerations are especially strong here, where the Committee was instrumental in negotiating the Plan from which it now seeks to benefit, yet never told PwC or the Bankruptcy Court that the Plan could act to expand PwC's liability in this action.

Fourth, the rights of AHERF's estate against PwC cannot be expanded more than they existed as of the date when AHERF filed for bankruptcy (July 21, 1998). A "bankruptcy estate includes 'all legal or equitable interests of the debtor in property as of the commencement' of bankruptcy". *Official Comm. of Unsecured Creditors v. R F Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001) (quoting 11 U.S.C. § 541(a)) (emphasis

in original).  Post-petition events (such as the December 14, 2000 Order approving

substantive consolidation) may <u>not</u> "be considered when evaluating a claim in

bankruptcy". *Id* at 355-56; *see also In re Stewart*, 62 Fed. Appx. 610, 614 (6th Cir.

2003) (debtor's claims are evaluated as of the bankruptcy date).  Substantive

consolidation is <u>not</u> effective retroactively to the date of the commencement of the

bankruptcy case unless specifically ordered to be effective *nunc pro tunc.  See, e.g., In re*

*New Center Hosp.*, 187 B.R. 560, 571-72 (E.D. Mich. 1995).  Here, the Bankruptcy

Court's Order provided that substantive consolidation was prospective only.  (PwC Reply

SOF ¶ 409.)  Thus, if a claim against PwC did not exist on the date of the bankruptcy

filing, it does not exist now.[11]

## V.    THE BREACH OF CONTRACT CLAIM MUST BE DISMISSED AS DUPLICATIVE OF THE PROFESSIONAL NEGLIGENCE CLAIM.

The Committee concedes by its silence that it has entirely abandoned the

breach of contract allegations (involving "agreed-upon procedures" engagements) it

made in opposition to PwC's earlier motion to dismiss, and now seeks to pursue at trial

an entirely different contract claim based on C&L's audits.  Summary judgment should

be granted against the Committee's new contract claim for two reasons.

First, the new contract claim is barred by the law of this case.  While there

is conflicting Pennsylvania authority (*see* cases cited in PwC Br. at 55 and Comm. Br. at

46), Judge Ziegler has already held in this case that "[a]llegations that a professional

---

[11] Desperate to save the Centennial claims, the Committee resorts to inapposite analogies.  Both the "eggshell skull" rule and the rule that a tortfeasor is liable for exacerbation of the injury by one rendering aid apply only to bodily injury.  *See Shaffer v. Commonwealth*, 842 A.2d 989, 993 (Pa. Commw. Ct. 2004) (citing Restatement (Second) of Torts § 457); *Heck v. Beryllium Corp.*, 424 Pa. 140, 141, 226 A.2d 87, 89 (1966) (citing Restatement § 461).  The Committee alleges only economic injury.

failed to perform her service with the requisite standard of care do not suffice to state a claim for breach of contract even if the professional expressly agreed to act in accordance with that level of care". (Jan. 28, 2002 Op. at 16 (internal citations omitted).) "[A]bsent unusual circumstances" not present here, legal issues that have "been fully considered" by a district judge should not be overruled when the case is transferred to another district judge. *Hayman Cash Register Co v Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982); *Geibel v. United States*, 667 F. Supp. 215, 218-19 (W.D. Pa. 1987), *aff'd mem.*, 845 F.2d 1011 (3d Cir. 1988).

Second, none of the cases on which the Committee relies authorizes the simultaneous pursuit at trial of entirely duplicative contract and professional negligence claims.[12] Where tort and contract claims are identical, and the "gravamen of plaintiff's action is in tort", "the contract claims are redundant and as such, should be dismissed". *Peterman v. Geisinger Med Ctr*, 8 Pa. D & C.3d 432, 437 (Ct. Com. Pl., Montour County 1978); *see also Murphy v. Aesthetic & Reconstructive Surgery*, 2 Pa. D& C.4th 273, 279 (Ct. Com. Pl., Erie County 1989) (citing the "potential for jury confusion"). Here, the Committee does not identify any respect in which its contract claim differs

---

[12] In the criminal representation context addressed by *Bailey v. Tucker*, 553 Pa. 237, 621 A.2d 108 (1993), the contract and legal malpractice claims arose from the same facts but were far from duplicative: as defined by the Supreme Court, the negligence claim allowed compensatory damages but included the difficult element of proof of actual innocence, while the contract claim did not require actual innocence but limited damages to the fees paid. *Id.* at 250-52, 621 A.2d at 115. The other cases cited by the Committee are from lower courts whose decisions are not binding on this Court applying Pennsylvania law. *See McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661-63 (3d Cir. 1980). In any event, those cases allowed claims to be pleaded in contract or in negligence, but did not address or change the rule against allowing wholly duplicative contract and negligence claims to go forward to trial.

26

from its professional negligence claim, and the breach of contract claim should accordingly not be permitted to proceed.

## VI.    THE CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY IS NOT A RECOGNIZED CAUSE OF ACTION UNDER PENNSYLVANIA LAW AND MUST BE DISMISSED.

The Committee does not dispute that C&L owed no fiduciary duty to AHERF, and instead alleges that C&L aided and abetted unnamed AHERF officers and trustees in violating <u>their</u> fiduciary duties. No such cause of action exists under Pennsylvania law. Alternatively, the Committee attempts to replead its legally deficient "aiding and abetting" claim as one for "acting in concert" under Section 876 of the Restatement (Second) of Torts. It is too late to add such a claim.

The Committee has not brought a claim of "acting in concert" to breach a fiduciary duty pursuant to Section 876. The Amended Complaint recites three counts: professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty. (Am. Compl. at 22-31.) It makes no mention of Section 876 or "acting in concert". The Committee has not sought leave to amend its complaint to include an action for "acting in concert"—nor could it. The Committee's previous attempt to amend its complaint to include a new cause of action was denied by Judge Ziegler because it was "untimely, based on previously known facts, and prejudicial to defendant". (Aug. 26, 2002 Order.) The same would be true for the addition, after the completion of fact and expert discovery, of a new claim for "acting in concert" to breach a fiduciary duty.

In any event, Pennsylvania law recognizes neither a cause of action for "acting in concert" to breach a fiduciary duty, nor for "aiding and abetting" a breach of fiduciary duty. The underlying reason is the same. A fiduciary duty arises out of a "'special relationship' . . . involving confidentiality, the repose of special trust or

27

fiduciary responsibilities". *Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 2002 PA Super 10, ¶ 37, 811 A.2d 10, 22-23 (2002). C&L owed no such duty to AHERF. A cause of action for "acting in concert" or for "aiding and abetting" a breach of fiduciary duty would improperly extend fiduciary duty liability to those who do not—as a matter of law and public policy—have this "special relationship".[13]

The cases on which the Committee relies are inapposite because they do not involve fiduciary duty. In each of the Committee's cases, the underlying tort action was based on garden-variety negligence-based duties, not a fiduciary duty or other "special relationship". *See Skipworth v. Lead Indus.*, 547 Pa. 224, 690 A.2d 169 (1997) (products liability); *Burnside v. Abbott Labs*, 351 Pa. Super. 264, 505 A.2d 973 (1985) (same); *Kline v. Ball*, 306 Pa. Super. 284, 452 A.2d 727 (1982) (personal injury).

The decision about whether to expand fiduciary liability to non-fiduciaries through theories of "acting in concert" or "aiding and abetting" is a significant policy decision better left to the Pennsylvania legislature or Supreme Court. *See City of Philadelphia v. Beretta U.S.A. Corp*, 277 F.3d 415, 421 (3d Cir. 2002). For this reason, judges in the Western and Middle Districts have recently declined to recognize an action for aiding and abetting a breach of fiduciary duty. *Daniel Boone Area Sch. Dist. v. Lehman Bros.*, 187 F. Supp. 2d 400, 414 (W.D. Pa. 2002); *Flood v. Makowski*, Civ. A. No. 3:CV-03-1803, 2004 WL 1908221, at \*36 (M.D. Pa. Aug. 24, 2004). This Court should exercise the same restraint, and dismiss Count III of the Committee's complaint.

---

[13] The Committee unsuccessfully tries to distinguish PwC's authorities by arguing that "Coopers owed professional duties to AHERF". (Comm. Br. at 49.) That ignores the distinction between fiduciary duty and ordinary negligence-based duties. C&L owed a professional duty to AHERF, but no fiduciary duty.

## Conclusion

For the reasons set forth above and in PwC's opening brief, PwC's motion for summary judgment should be granted, as follows:

- The arguments in Parts I and III support summary judgment in favor of PwC on all of the Committee's claims.

- The argument in Part II supports summary judgment on Counts I and II.

- The argument in Part V supports summary judgment on Count II.

- The argument in Part VI supports summary judgment on Count III.

- The argument in Part IV supports summary judgment on all of the Committee's claims brought on behalf of the Centennial estate.

Dated: August 19, 2005

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

by

Joseph F. McDonough

USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

CRAVATH, SWAINE & MOORE LLP

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

29

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August 2005, a true and correct copy of the foregoing Reply Memorandum in Support of Motion of PwC's Motion for Summary Judgment was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

### *Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219

### *Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114