UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF ) <br> UNSECURED CREDITORS OF ) <br> ALLEGHENY HEALTH, EDUCATION ) <br> AND RESEARCH FOUNDATION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PRICEWATERHOUSECOOPERS, LLP, ) <br> ) <br> Defendant. ) | Civil Action No. 00-684 <br><br> Judge David Stewart Cercone |

**THE COMMITTEE'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE
CERTAIN TESTIMONY FROM PRICEWATERHOUSECOOPERS' EXPERTS**

**INTRODUCTION**

PwC argues that if one of its experts is qualified to opine on a given subject, then that expert may opine on other subjects as well. PwC also contends that if one of its experts has done work in a given area, then that expert has a free pass to testify in other areas. Neither contention is correct.

First, PwC argues that because its experts have acquired expertise in certain fields and have reviewed much of the factual record in this case, they can opine about how AHERF's trustees and creditors would have acted if provided different (and much worse) audited financial statements. However, no identified expertise and no amount of work will permit an expert to testify about how other specified people would have acted under different circumstances. PwC has found no legal authority to support the extraordinary and jury-usurping role it plans at trial for its experts.

Similarly, PwC argues that because Lawton Burns has studied and purportedly identified the factors that caused AHERF's bankruptcy (what he calls a combination of "internal" and "external" factors), he is also qualified to opine that there is nothing AHERF could have done to avoid that bankruptcy. But PwC admits that Dr. Burns was not retained to analyze, and did not analyze, whether AHERF could have avoided bankruptcy by reversing its acquisition strategy and cutting costs (by eliminating the "internal" factors that he claims caused the bankruptcy). Identifying the causes of bankruptcy is not the same as analyzing the inevitability of a bankruptcy if certain of the causes were rectified.

Finally, PwC argues that because Robert Dickinson has business experience in the health care field, he is also qualified to opine about the supposed mismanagement of AHERF's sale of its Philadelphia hospitals. But, as Mr. Dickinson testified, for all his other experience, he has never worked on the actual sale of a hospital. As he testified, the closest he has come is to give advice on whether to sell a hospital. Moreover, Mr. Dickinson's "opinion" is in reality a lengthy, lawyer-like summarization of facts. He also has not employed sufficient analytic techniques to justify allowing his testimony in the form of an expert opinion.

## ARGUMENT

**I.    PwC's Experts Cannot Opine About What AHERF's Trustees And Creditors Would Have Done If Provided Different Audited Financial Statements.**

The Committee moved to bar four PwC experts (Orlikoff, Burns, James and Covintree) from opining about how AHERF's creditors and trustees would have reacted if they had been provided audited financial statements revealing that AHERF's financial performance and condition were actually far worse than what was presented to them.

Under *Daubert*, such behavior-predicting opinion testimony is not permitted. PwC has not cited a single case allowing experts to opine about how others would have acted

under different circumstances. Instead, PwC responds first with a digression, arguing that AHERF's trustees and creditors should not be allowed to testify about the actions that they would have taken to save AHERF if they had been provided accurate audited financial statements. *See* PwC Br. at 1-2, 6-7. PwC is wrong, however. Trustees and creditors may tell the jury what they would have done had they not been misinformed.

In view of the trustee and creditor testimony, PwC pleads that it "must be permitted to defend itself through its causation experts." *Id*. at 2. PwC, however, may defend only with admissible evidence; its experts can testify only as to matters allowed by the Federal Rules of Evidence and by *Daubert*. The fact that the Committee has admissible evidence to support its case does not mean that the rules may be bent to aid PwC.

Moreover, PwC's plea to bend the rules is misplaced because expert testimony is not needed to "permit" PwC to challenge the trustee and creditor testimony. PwC has already outlined its closing argument regarding why the jury supposedly should not believe the trustees and creditors:

> As events actually unfolded, in the face of substantial and cumulative negative financial information, AHERF's Board and creditors took <u>no</u> action, and AHERF went bankrupt. The Committee now claims that, in its hypothetical circumstances, radically <u>different</u> actions would have been taken. . . . [I]t is unlikely that AHERF's Board and creditors would suddenly have acted as they never had acted before in the real world (where they took *no substantial action* in response to a number of strong warnings of financial trouble).

PwC Br. at 10 (underlining in original; italics supplied). PwC's lawyers are also prepared to argue that the jury should disbelieve the trustee and creditor testimony as "self-serving speculation, with the benefit of hindsight." *See id*. at 7.

In fact, PwC is wrong in asserting that AHERF's trustees and creditors took "no action" (in the quoted passage, even PwC revised "no action" to "no substantial action"). Rather,

- 3 -

the trustees and creditors acted too late because they did not learn in time of the need to act. Moreover, the supposed "self-serving" testimony is hardly counter-intuitive. The trustees and creditors would predictably have acted to save AHERF since doing so would have been in their respective best interests. In any event, whether the trustees and creditors would have acted, how they would have acted, and when they would have acted are jury questions. The jury can answer these questions based on evidence adduced at trial. No expert testimony is needed.

While experts may be permitted to opine on the options available to AHERF's trustees and creditors, or on how a reasonable trustee or creditor would have acted, no expert may opine on how specified trustees and creditors would have acted if provided different (and more dire) audited financial statements.

### A. Trustee And Creditor Testimony About What They Would Have Done Is Admissible.

As noted, PwC argues that the testimony of trustees and creditors about the actions they would have taken is not admissible. This argument is irrelevant. It has no bearing on whether the challenged expert testimony satisfies *Daubert*. That said, and as the Committee has explained in earlier briefing, the testimony of AHERF's trustees and creditors is admissible.[1] In numerous accounting malpractice cases, courts have rejected PwC's argument.

A thorough analysis is provided in *Comeau v. Rupp*, 810 F. Supp. 1127 (D. Kan. 1992). In *Comeau*, the FDIC as receiver for a failed savings and loan sued the S&L's auditors for not disclosing the high-risk nature of certain loans. The Court denied the auditors' motion for summary judgment, relying in part on testimony of two directors that "they would have taken corrective action if they had been informed of the serious problems with [the S&L's] lending practices." *Id*. at 1143-44. The Court rejected the auditors' argument that "what I would have

---

[1] *See* The Committee's Brief In Opposition To PwC's Motion For Summary Judgment at 32-34.

- 4 -

done" testimony is inadmissible; it recognized that audit malpractice cases "necessarily pose[] the causation question of what 'would have' happened if the Accountants had adequately fulfilled their duties." *Id*. at 1144 n.8. Testimony by the directors, which the auditors in that case "deride[d] as 'self-serving' and 'speculative,'" was held admissible. *Id*.

Likewise, testimony by board members about what they would have done was admitted at trial in *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand, L.L.P.*, 775 N.E.2d 55 (Ill. App. Ct. 2002), *aff'd in part, rev'd in part on other grounds*, 803 N.E.2d 460 (Ill. 2003). There, City Colleges of Chicago sued Coopers & Lybrand because Coopers' audit failed to disclose that management had invested City Colleges' funds in violation of its investment policy, resulting in a substantial financial loss. At trial, to prove that the audit failure caused injury, City Colleges introduced testimony from three of its six board members. One board member testified that if he had been informed of the investment policy violation, "he would have made whatever changes Coopers recommended." 775 N.E.2d at 61-62. A second testified that "the Board would not have tolerated it and that it would have 'cleared up' the situation," and a third testified that "he would have pursued any information that indicated improper investment" practices. *Id.* at 62. On appeal, the Court found the causation evidence sufficient to support a verdict in favor of City Colleges. *Id*. at 63.[2]

Other courts have similarly allowed testimony from witnesses about what they would have done if provided different information by a company's auditors. *See Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. LEXIS 27238, at *23, 26-28 (D.N.J. Aug. 25, 2004) (denying auditors' motion for summary judgment on the strength of testimony of two employees of Vermont Insurance Commissioner about the actions they would have taken if

---

[2] The Illinois Supreme Court affirmed in all material respects. *See* 803 N.E.2d 460, 473 (Ill. 2003).

provided different financial information about a Vermont insurance company; rejecting PwC's contention that the evidence was "speculative and requires pure conjecture"); *Seafirst Corp. v. Jenkins*, 644 F. Supp. 1152, 1156 (W.D. Wash. 1986) (denying auditors' motion for summary judgment based on declarations of two board members regarding what they would have done if the auditors had provided different information); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 188, 190 (Tex. Ct. App. 1987) (affirming jury verdict against auditors where company's owner testified about different business decisions "he would have made if he had been given accurate financial statements").

The trustee and creditor testimony is admissible. And though it may be challenged via efforts at impeachment or contradicted by the testimony of other fact witnesses with requisite knowledge otherwise, it cannot be met with unreliable and inadmissible "expert testimony."

**B.  PwC Has Cited No Cases Supporting Its Position That Experts May Opine About How Others Would Have Acted.**

PwC has cited no case allowing an expert witness to opine about how another person or group of people "would have acted" under different circumstances. And PwC has ignored cases cited by the Committee where courts have barred experts from giving such opinions. *See Versa Prods Co. v. Bifold Co. (Mfg.), Ltd.*, 50 F.3d 189, 211 n.14 (3d Cir. 1995); *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 556-57 (S.D.N.Y. 2004).

Instead, PwC inaccurately describes *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001). In *Diet Drugs*, Judge Bechtle granted a *Daubert* motion to bar an expert [Dr. Gueriguian] from testifying about: (1) how physicians would have acted if given different warning labels; and (2) how specific FDA officials would have acted if given different information about adverse drug events. *See id*. at *18-19. The barred opinions in *Diet Drugs*

resemble the behavior-predicting opinions of PwC's experts here. PwC implies that the *Diet Drugs* court barred Dr. Gueriguian from testifying because he had not performed enough fact investigation and research. *See* PwC Br. at 10-11. That is not so. A physician, pharmacologist, endocrinologist, and former FDA employee, Dr. Gueriguian was qualified to opine on other subjects, such as what physicians generally expect to see on a warning label and actions that a reasonable FDA official in the position of Chief Medical Officer would have taken. *See Diet Drugs*, 2001 WL 454586, at *5, 18-19. But, he was not allowed to give an expert opinion regarding how other identified persons would have acted if given different information.

PwC also asserts that *Diet Drugs* supports excluding the "speculative" testimony of AHERF's trustees and creditors. *See* PwC Br. at 11. Again, that is not so. *Diet Drugs* concerned a *Daubert* challenge to experts; it did not address the testimony of fact witnesses. The AHERF trustees and creditors will testify about themselves, not opine about how others would have acted. As explained above (in Part I.A.), the AHERF trustee and creditor testimony is admissible. In every respect, *Diet Drugs* supports the Committee.

Given the unsupportive *Daubert* caselaw, PwC tries to recharacterize the challenged opinions of its experts. PwC contends that its experts are not opining about how the trustees and creditors *would have acted*. Rather, according to PwC, they are opining about how the trustees and creditors supposedly *would not have acted*. *See* PwC Br. at 8-10. According to PwC, they are merely opining that it is "unlikely" or that "there is no reason to believe" that the trustees and creditors would have taken action to change AHERF's business strategy or operations. *See id*. This hair-splitting distinction, if it is a distinction at all, has no significance. Opining about how another *would not have acted* is no different from opining about how another *would have acted*. An opinion phrased using either formulation is barred under *Daubert*.

### C. The Qualifications And Methods Of PwC's Experts Do Not Extend To Predicting The Behavior Of Others.

PwC devotes seven pages to laying out the qualifications and analytic methods of Messrs. Orlikoff, Burns, Covintree and James. *See* PwC Br. at 11-17. Whatever this discussion says about their qualifications, none of these individuals is qualified as a mind-reader or behavior-predictor. The Committee is not now seeking to exclude all the proffered opinions of PwC's experts, but only their opinions about how AHERF's trustees and creditors would (or would not) have acted if given different financial information. Just as Dr. Gueriguian was qualified to testify as to certain matters in *Diet Drugs*, but could not offer behavior-predicting opinions, PwC's experts may have suitable qualifications to offer certain opinions, but not those now challenged by the Committee.

Likewise, PwC's discussion of the methods employed by its experts is unpersuasive. PwC cites cases approving the use of methodologies that mirror those used by experts in their regular work. *See* PwC Br. at 14. But none of PwC's experts is a professional behavior-predictor in their non-AHERF capacities. The only methodology employed here was to consider evidence provided by PwC's counsel and then, for a fee, reach a conclusion about how the trustees and creditors would have acted.

### D. The Jury Will Not Be Aided By Experts Telling Them What Conclusions To Draw From The Evidence At Trial.

PwC takes issue with the Committee's remark that "jurors can reach their own conclusions about whether AHERF's trustees and creditors would have endeavored to address the enterprise's financial woes." PwC Br. at 18. According to PwC, "[t]hat is, of course, not the question." *Id.* To the contrary, that is the question and the only question pertinent to the Committee's motion.

- 8 -

PwC points out that there are additional issues in this case, and many of those issues are complex.  *See id*. at 18-19.  There is a role for experts in this case to opine on matters such as how Coopers & Lybrand violated its professional duties, how AHERF's audited financial statements were false, the remedies and options that would have been available to the creditors had they been provided accurate audited financial statements, and AHERF's ability to turn around its operations and avoid bankruptcy had timely action been taken.

That there is a role for experts as to some issues does not imply that there is a role for experts as to every issue.  PwC simply misdirects when it sets forth in bullet points "proposed topics of testimony of the experts whom the Committee challenges."  PwC Br. at 19.  What the Committee has challenged are the opinions of Orlikoff, Burns, Covintree and James regarding the actions that AHERF's trustees and creditors would (or would not) have taken.  PwC cannot obscure this point:  after hearing the evidence at trial, the jury does not need experts to tell it what to conclude about how AHERF's trustees and creditors would have acted if provided different audited financial statements.

In addition, PwC disputes that its experts are making determinations about the credibility of the trustees and creditors.  *See* PwC Br. at 20-22.  That assertion is contradicted by the written reports of the experts themselves.  As the Committee has already outlined, Mr. Orlikoff plans to tell the jury that "there is no reason to believe" that the trustees and creditors would have taken action.  Dr. Burns plans to testify that it is "implausible" that AHERF trustees or others would have changed AHERF's strategy.  Mr. Covintree expressly opined that the testimony of Richard Weill, the former President of AHERF's largest creditor (MBIA), was not credible.  Dr. James likewise plans to testify that it is "unlikely" that AHERF's creditors would take the sorts of action that the creditors themselves have testified that they would take.  *See*

Com. Opening Br. at 11-13. The point of their opinions is that the trustees and creditors should not be believed when they describe the actions that they would have taken if provided accurate audited financial statements.

PwC cites *United States v. Basroon*, 38 Fed. Appx. 772 (3d Cir. 2002), to argue that its experts are merely disagreeing with the trustees and creditors, and not opining as to their credibility. *See* PwC Br. at 20-21. That case offers no support. In *Basroon*, the expert disagreed with the defendant's explanation for the accounting basis for variations between his company's financial statements and income tax returns. *See* 38 Fed. Appx. at 777. The expert in *Basroon* was not opining that the defendant should not be believed, but was opining that the defendant's accounting rationale was "inadequate" and "didn't make any sense." *Id*. *Basroon*, thus, involved a battle between two accountants over proper accounting techniques. By contrast, PwC's experts here plan to tell the jury, rather directly, that the testimony of trustees and creditors is not to be believed.

## II. PwC Admits That Dr. Burns Did Not Investigate Whether AHERF Could Have Been Turned Around To Avoid Bankruptcy, And He Was Not Retained For That Purpose.

The Committee moved to bar Dr. Burns from opining that AHERF's "fate was sealed" as of the Fall of 1996, and that nothing could have been done to avoid the bankruptcy. The Committee demonstrated that Dr. Burns did not analyze whether AHERF could have avoided bankruptcy by changing its business strategy and slashing costs. *See* Com. Opening Br. at 17-19.

PwC admits that Dr. Burns was not asked to determine whether AHERF could have avoided bankruptcy if its strategy and operations had been changed. "Dr. Burns was not asked to analyze a 'turn-around plan.'" PwC Br. at 25. And, indeed, he did not. PwC further admits that analyzing AHERF's ability to turn its operations around is not within the "area of his

core expertise." *Id*. Since Dr. Burns was not asked to evaluate, and in fact did nothing to evaluate, whether bankruptcy could have been avoided, he cannot opine that AHERF's bankruptcy was inevitable (or, as Dr. Burns puts it, that by "Fall 1996, the fate of AHERF was sealed"). Burns Report at 7-8. PwC retained a different expert, Robert Dickinson, to dispute the Committee's evidence that AHERF could have been turned around and avoided bankruptcy. *See* PwC Br. at 25.

PwC asserts that Dr. Burns is qualified to testify as an expert about the causes of the AHERF bankruptcy. *See* PwC Br. at 22-26. The Committee did not move to bar Dr. Burns from testifying as to the causes of the AHERF bankruptcy, but only to bar him from testifying that AHERF's bankruptcy was inevitable. Even if Dr. Burns is permitted to testify as to the causes of the bankruptcy, he performed no work to support an opinion that AHERF would still have entered bankruptcy if some of the causes were eliminated. As PwC notes, Dr. Burns opines that the AHERF bankruptcy was the result of "internal" and "external" factors. *Id*. at 25; Burns Report at 5-6. The "internal" factors, according to Dr. Burns, included AHERF's strategy of aggressive growth and lack of attention to cost control. *See* Burns Report at 9-10, 12-13, 16, 19, 24, 31-34, 38, 41. As Dr. Burns put it, preoccupied with the desire to grow AHERF bigger, "AHERF's top management took its eyes off its core business." *Id*. at 33.

If the "internal" factors were eliminated in the Fall of 1996, *i.e*., if AHERF stopped its acquisitions and growth strategy, implemented cost-cutting measures and refocused on its core business, could AHERF have avoided bankruptcy? Dr. Burns did not analyze that question and, as PwC admits, he was not asked to consider it.

Identifying the causes of AHERF's failure is different from analyzing whether AHERF would still have failed if certain of the "internal factors" causing failure had been

- 11 -

reversed beginning in the Fall of the 1996. Dr. Burns purports to have done the former. It is undisputed that he has not done the latter.

Accordingly, Dr. Burns cannot opine that by "Fall 1996, the fate of AHERF was sealed" or that "AHERF would have faced the same fate even if the AHERF Board changed management or shifted strategy in or after the Fall of 1996." Burns Report at 7-8.

### III. Mr. Dickinson's Opinion Regarding Alleged Mismanagement Of The Sale Of AHERF's Philadelphia Hospitals Should Be Excluded.

#### A. Mr. Dickinson Lacks The Necessary Experience And Qualifications.

PwC has proffered Robert Dickinson to opine as an expert that AHERF mismanaged the sale of its Philadelphia hospitals. At his deposition, however, Mr. Dickinson testified that he has never been involved in the actual sale of hospitals:

> Q: Have you advised healthcare – rather, hospital systems or hospitals in selling themselves before your engagement in this matter?
>
> A: In terms of whether to or whether not to, yes, that's been a part of strategic planning.
>
> Q: Have you advised a seller that ultimately sold its assets?
>
> A: No.
>
> Q: Have you advised a purchaser of hospital assets that actually acquired assets?
>
> A: No.
>
> Q: Have you advised a seller of hospital assets that entered into a written agreement to sell assets that ultimately did not close?
>
> A: No.
>
> Q: Did you at any time advise a purchaser of hospital assets that entered into agreement – entered an agreement to purchase that ultimately did not close?
>
> A: No.

Dickinson Dep. at 292-93.

- 12 -

Advising a health system on whether or not to sell a hospital is not assisting a health system on the actual sale, or acquisition, of hospitals. Mr. Dickinson seeks to opine only on sale mechanics, not the decision to sell. Based on this testimony, Mr. Dickinson lacks professional experience necessary to allow him to opine as an expert regarding the alleged mismanagement of AHERF's sale of its Philadelphia hospitals.

With his lack of qualifications exposed, PwC has now tendered a declaration from Mr. Dickinson seeking to muddy up his clear deposition testimony. In the declaration, Mr. Dickinson states that, on behalf of a hospital system considering some sort of unspecified transaction with one of its hospitals, he "identified and evaluated two potential buyers or partners" and conducted due diligence of them. Dickinson Decl. ¶ 9. In addition, his declaration states that, on behalf of another client, he "identified and evaluated four potential buyers." *Id.* ¶ 10. This latter transaction apparently concerned "clinic assets" rather than a hospital. *Id.*

Mr. Dickinson's declaration does not demonstrate that he has the necessary experience. The two pertinent paragraphs of his declaration (paragraphs 9 and 10) do not detail his role in the proposed transactions, what the proposed transactions involved, or what came of the transactions. Significantly, his declaration does not state that the transactions ever came about or even that they got far along in the process. Mr. Dickinson's declaration contains ambiguities, omissions and nuance, raising more questions than they answer. By contrast, his answers at depositions were clear ("No," "No," "No," and "No"). Under these circumstances, the prior deposition testimony establishes that Mr. Dickinson lacks sufficient hospital sales experience to opine as an expert that AHERF mismanaged the sale of its Philadelphia hospitals. *Cf. Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) (affidavit contradicting witness's prior deposition testimony "without a satisfactory explanation" is entitled to no weight on

- 13 -

summary judgment); *Rohrbough v. Wyeth Labs, Inc.*, 916 F.2d 970, 974-76 (4th Cir. 1990) (same, as to affidavit of expert witness).

The testimonial "do over" that Mr. Dickinson attempts through his declaration is further displayed by the effort to change his testimony that he had never "given" or "done" a fairness opinion. At deposition, asked if he had "ever given" a fairness opinion, Mr. Dickinson answered, "Our firm has. I have not." Dickinson Dep. at 265. Likewise, asked "But you haven't done a fairness opinion, is that fair to say?," he answered "yes." *Id.* By any standard, these answers indicate a lack of involvement in fairness opinions. But, Mr. Dickinson now asserts that he thought he was being asked whether he had ever *signed* a fairness opinion. *See* Dickinson Decl. ¶ 14. Trying to boost his credentials, Mr. Dickinson's declaration now asserts that he has "frequently worked with colleagues" on fairness opinions although he has never signed one. *See id.* The declaration, however, does not elaborate upon his role in these supposed fairness opinion collaborations with colleagues.

Accordingly, because of his lack of qualifications, Mr. Dickinson should not be permitted to opine as an expert concerning the supposed mismanagement of the sale of AHERF's Philadelphia hospitals.

### B. Mr. Dickinson's "Opinion" Is An Impermissible Fact Summary Lacking Expert Analysis.

In addition to his lack of qualifications, Mr. Dickinson's "opinion" on the sales process fails to satisfy *Daubert* because it is nothing but a regurgitation of selected evidence. The pertinent pages of his Report make plain that the "opinion" is just a lengthy narrative of how the hospitals were sold, a narrative that can be provided by fact witnesses and documents at trial. *See* Dickinson Report at 27-37; Com. Opening Br. at 19-20. Accordingly, his opinion does not

- 14 -

satisfy *Daubert*, as an expert opinion must be more than a disguised fact summarization. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 553-54 (D.N.J. 2004).

Responding, PwC points to two snippets in Mr. Dickinson's report that supposedly legitimate the lengthy fact regurgitation. First, PwC highlights a sentence of Mr. Dickinson stating that AHERF's "single most critical mistake" was initially to pursue "'sole-source' negotiations with Vanguard" rather than to solicit multiple bidders. *See* PwC Br. at 30 (quoting Dickinson Report at 29). PwC also contends that Mr. Dickinson has exhibited expertise by writing that "AHERF was poorly prepared and highly disorganized during the sales process." PwC Br. at 30 (quoting Dickinson Report at 34-35). Mr. Dickinson, however, applies no standards to measure the impact of negotiating solely with Vanguard, or to measure AHERF's level of preparation or organization. *See Simmons v. Ford Motor Co.*, 132 Fed. Appx. 950, 952 (3d Cir. 2005) (affirming exclusion of expert opinion that "derive[d] from subjective observations and methodologies").

In fact, these two supposed displays of expertise are just conclusory assertions. They belong, if anywhere, in the closing argument of PwC's counsel, not couched as the opinion of an "expert." *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument") (internal quotation and citation omitted).

To the extent Mr. Dickinson's two conclusory assertions might resemble opinions, they are merely mentioned in passing in a sea of fact summarization. Litigants cannot pry open the door to fact-summarizing experts by having the expert drop a few conclusory assertions in the midst of their reports. Accordingly, Mr. Dickinson should be barred from

offering an "expert opinion" concerning the supposed mismanagement of the sale of AHERF's Philadelphia hospitals.

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in the Committee's opening brief, this Court should grant the Committee's Motion To Exclude Certain Testimony From PricewaterhouseCoopers' Experts.

                Respectfully submitted,

                /s/ James M. Jones
                James M. Jones (PA # 81295)
                Laura E. Ellsworth (PA # 39555)
                Laura A. Meaden (PA # 52002)
                JONES DAY
                500 Grant Street, 31st Floor
                Pittsburgh, PA  15219

                Richard B. Whitney
                JONES DAY
                North Point
                901 Lakeside Avenue
                Cleveland, OH  44114

                Attorneys for Plaintiff The Official Committee
                of Unsecured Creditors of AHERF

Dated:  August 19, 2005