# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH
FOUNDATION,

Plaintiff,

v.

PRICEWATERHOUSECOOPERS LLP,

Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

## REPLY STATEMENT OF UNDISPUTED AND MATERIAL FACTS PURSUANT TO RULE 56.1(D) IN SUPPORT OF PRICEWATERHOUSECOOPERS LLP'S MOTION FOR SUMMARY JUDGMENT

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

August 19, 2005

## Table of Contents

Replies Concerning PwC's Statement
of Undisputed and Material Facts ..................................................................................1

I.      Background ..................................................................................................................1

II.     Imputation ...................................................................................................................2

III.    Audit Interference .......................................................................................................9

IV.     Causation ...................................................................................................................33

V.      Centennial ..................................................................................................................42

VI.     Breach of Contract ....................................................................................................46

PwC's Responses to the Committee's Statement
of Additional Material Facts .......................................................................................49

I.      Imputation .................................................................................................................49

II.     Audit Interference .....................................................................................................63

III.    Causation ...................................................................................................................78

IV.     Centennial ................................................................................................................102

Pursuant to Rule 56.1(D) of the Local Rules of the United States District Court for the Western District of Pennsylvania, defendant PricewaterhouseCoopers LLP ("PwC") contends that there is no genuine issue to be tried with respect to the following material facts.

In this Reply Statement of Undisputed and Material Facts, PwC responds to the Committee's Statement of Additional Material Facts in ¶¶ 226-411. PwC also submits replies to certain of the Committee's responses to PwC's Statement of Undisputed and Material Facts in ¶¶ 1-225, where the Committee included additional assertions as part of its responses to PwC's facts, and PwC believes a reply would be of assistance to the Court in showing that there is no genuine dispute as to PwC's original undisputed and material facts.[1]

### Replies Concerning PwC's Statement of Undisputed and Material Facts

## I. BACKGROUND

18. The Committee admits the substance of this paragraph. PwC denies the Committee's legal characterization of the nature and effect of Judge McCullough's December 14, 2000 Order Confirming Debtors' Second Amended Consolidated Liquidating Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. (McCullough Order Dec. 14, 2000, PwC Supp. tab 171) (*see infra*, ¶¶ 409-411.)

---

[1] PwC has not submitted replies for those responses in ¶¶ 1-225 that the Committee admitted, or for which PwC believes it is readily apparent that there is no genuine dispute as to the stated facts in PwC's original Statement of Material and Undisputed Facts.

## II. IMPUTATION

33. The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC denies the Committee's additional assertions. The testimony the Committee cites is inadmissible hearsay and lacks a proper foundation. (*See infra* ¶136.) PwC denies that the Committee's assertions are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

34. The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC admits that the Committee accurately quotes Mr. Spargo's testimony but otherwise denies the Committee's additional assertions. The testimony that the Committee quotes is unfounded speculation and hearsay; as such it is inadmissible. PwC specifically denies that C&L had an obligation to independently assess the reasonableness of AHERF's bad debt reserves; this is only one of three approaches identified by the GAAS standard set forth in the Committee's paragraph 263. PwC denies that the Committee's assertions are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

35. Although the Committee purports to deny this paragraph it does not provide any factual basis for disputing either that Mr. McConnell directed the improper accounting entries, or that Mr. Abdelhak knew of them. Accordingly there is no genuine dispute as to this paragraph. PwC denies that the Committee's assertions about Mr. McConnell and Mr. Abdelhak are material to imputation because the Committee does not dispute that Mr. Spargo, Mr. Abdelhak and Mr. Cancelmi were responsible for

2

the alleged improper accounting entries (PwC SOF ¶¶ 29-34), and the acts of these

executives should equally be imputed to AHERF.

       37. PwC disputes the additional assertions in the Committee's response.

None of the three witnesses whose testimony the Committee cites testified that he

believed that Mr. Abdelhak or Mr. McConnell acted entirely out of self-interest. (*See*

*infra* ¶¶ 38, 226-240.) The Committee mischaracterizes Mr. Sanzo's testimony regarding

Mr. Abdelhak by quoting his deposition testimony out of context. Mr. Sanzo testified:

> "Q.    . . . [W]hat was your opinion, your personal opinion, of
> Mr. Abdelhak's skills as a manager—I'm going to ask you three
> questions—skills as a manager, number one; number two,
> dedication to the progress of AHERF; and, number three, loyalty to
> the AHERF organization and its constituent parts. . . .

> "* * *

> "A.    He was definitely dedicated to all of AHERF. I think what hurt
> especially Old Alleghenians—I was not a member. I joined Old
> Allegheny in 1986, but especially the Old Allegheny alums,
> medical staff, members of the board, his dedication to the greater
> AHERF, all of AHERF and all of its constituent parts, hurt those
> who believed that they were the fountainhead, or the organization
> from which they hailed was the fountainhead of the AHERF
> organization, but he was definitely dedicated.

> "I mean, even when he was wrong, he made decisions based on
> what he thought was going to be in the best interest of AHERF."

> "* * *

> "Q.    And then the last element of this, Mr. Sanzo, is loyalty, by which I
> intend to convey the question of was this a guy who was making
> deals for himself or creating financial incentives for himself as
> proposed to a loyalty to the organization for which he was
> working, from your observations?

> "A.    I think he was motivated first by his loyalty to the organization, but
> he was definitely motivated by what his accomplishments may
> mean financially to him. I don't think he was superhuman in that
> way."

3

(Sanzo Dep. Tr. (PwC Supp. tab 16) at 356-57, 358-59, emphasis added.) The
Committee also mischaracterizes the testimony of Messrs. McNair (McNair Dep. Tr.
(PwC Supp. tab 172) at 307-08) and Moyer (Moyer Dep. Tr. (PwC Supp. tab 173) at 202-
04). PwC denies that the Committee's assertions are material because they do not
suggest that AHERF management acted entirely in their own interest.

      38. PwC admits the Committee's additional assertions in its first
paragraph, except PwC denies the Committee's characterization that "[s]enior
management at AHERF utilized assets for personal purposes". PwC denies that the
Committee's assertions in the first paragraph are material because they do not suggest
that AHERF management acted entirely in its own interest, nor that avoidance of the
threatened litigation was not in the interest of AHERF.

      PwC denies the assertions in the Committee's second paragraph, which
are not supported by the documents and testimony cited by the Committee. Further, on
the advice of counsel, the Compensation Committee of AHERF's Board in July 1998
authorized withdrawals from the KESOP funds to repay loans on which AHERF was
jointly liable with the executives in question—Mr. Abdelhak, Mr. McConnell,
Mr. Kasperbauer, Ms. Wynstra, Mr. Sanzo and Dr. Kaye. (Comm. tab 6 at DC 2587-88.)
PwC denies that the Committee's assertions in the second paragraph are material because
the acts of AHERF management were known to and approved by the Board.

      PwC admits that the trips and expenditures recited in the Committee's
third and fourth paragraph occurred, but denies that all of these were entirely without
business purpose, as the testimony cited by the Committee does not support that
assertion. (*See, e.g.*, McNair Dep. Tr. (Comm. tab 172) at 131.) The business trips were

for meetings of AHERF's offshore insurance claims committee, of which many trustees were members. Numerous Board members knew of, and participated in, the business trips, trips on AHERF corporate jets, and other perquisites referred to by the Committee. (*See, e.g.*, Little Dep. Tr. (PwC Supp. tab 174) at 133-35; Brenner Dep. Tr. (PwC Supp. tab 175) at 132-33; Barnes Dep. Tr. (PwC Supp. tab 176) at 294-95; Spielvogel Dep. Tr. (PwC Supp. tab 177) at 55-60; Victor Dep. Tr. (PwC Supp. tab 178) at 60-62; Kennedy Dep. Tr. (PwC Supp. tab 179) at 231-32.) PwC denies that these assertions are material because the acts of AHERF management were known to and approved by the Board. Further, AHERF managers who used the AHERF corporate jets for personal travel reimbursed AHERF for that use. (Schrecengost Dep. Tr. (PwC Supp. tab 180) at 181-82.)

PwC admits that "in both fiscal years 1996 and 1997, AHERF managers directed accounting entries" but otherwise denies the Committee's conclusory and unsupported assertions in the Committee's fifth paragraph. (*See infra* ¶¶ 226-236.)

PwC admits the facts asserted in the Committee's sixth paragraph, except PwC denies that the funds in question were "from AHERF". Mr. Abdelhak was charged with misusing restricted endowment funds to make a $50,000 donation to Quaker Valley High School. (Opinion of Robert E. Dauer, Sr. J. (5/10/01); Grand Jury Indictment (3/15/00) (Comm. tab 8); PwC SOF ¶¶ 41-43.) Furthermore, Judge Novak specifically found that Mr. Abdelhak was motivated by AHERF's interest, not his own. (*Id.* ¶ 42.) PwC denies that the Committee's assertions are material because Judge Novak has already found that AHERF management did not act entirely in their own interest.

39. Although the Committee purports to deny this paragraph, the Committee does not present any admissible evidence that would show that personal compensation motivated the accounting misstatements at issue. (*See supra* ¶ 38, *infra* ¶ 226-40.)

40. Although the Committee purports to deny this paragraph, the Committee does not present any admissible evidence that would show that any compensation paid to AHERF management was not properly authorized. PwC admits that Mr. Kasperbauer testified that certain bonus payments were made without his prior knowledge, but denies that would establish that the payments were not properly authorized. The bonuses referred to in the deposition testimony cited by the Committee were awarded under the direction of Mr. Snyder, chair of the Compensation Committee of the AHERF Board of Trustees. (*See, e.g.*, Exhibit 2488 (PwC Supp. tab 181) at AMS6 000230-31.) Accordingly there is no genuine dispute as to this paragraph. PwC denies that the Committee's assertions are material because the acts of AHERF management were approved by the Board. Further, PwC denies the Committee's unfounded speculation about what the basis for the Compensation Committee's approval of management compensation. There is no factual dispute because the Committee offers no evidence that the Compensation Committee would have approved different management compensation if the financial statements had been more negative.

44. The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC denies that the additional assertions in the Committee's response are undisputed, except PwC admits the Committee accurately quotes Mr. Turtz's testimony. Mr. Turtz was not a member of the

AHERF Board and did not regularly attend AHERF Board meetings. There is no competent, admissible evidence that would show that AHERF's Board or Audit Committee "would have taken corrective action" based on different information about AHERF's finances. Mr. Turtz's testimony is inadmissible as speculation and for lack of foundation. (*See infra* ¶¶ 147, 150-152, 326-343.)

PwC admits the assertions in the Committee's second paragraph.

46. PwC denies that "AHERF Board members testified [that] Mr. Abdelhak was receptive to others' suggestions". The Committee mischaracterizes the testimony it cites. (Davenport Dep. Tr. (PwC Supp. tab 182) at 89; Fletcher Dep. Tr. (PwC Supp. tab 183) at 123-24; Murasko Dep. Tr. (PwC Supp. tab 184) at 167-68.)

48. Although the Committee purports to deny this paragraph, the deposition testimony cited by the Committee does not support the Committee's denial that "many trustees perceived that Mr. Abdelhak dominated the Board." In addition, the Committee does not accurately describe Ms. Miller's testimony. Ms. Miller testified that she recalled Mr. Abdelhak chastising her after a particular board meeting because he was "very unhappy with [her] challenging him". (Miller Dep. Tr. (PwC tab 33) at 29.) Ms. Miller also recognized that many of the other board members "didn't enjoy the independence" that she did. (*Id.* at 30; *see also* PwC SOF ¶ 51.) Ultimately Ms. Miller quit the AHERF Board because "the board meetings especially . . . were a colossal waste of time or exercises in frustration". (Miller Dep. Tr. (PwC tab 33) at 40.) Accordingly, there is no genuine dispute as to this paragraph.

49. The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC denies that the

Committee's speculation that there may have been dissent expressed at Board meetings is relevant, because as a matter of law any trustee whose dissent is not recorded in the minutes is deemed to have consented. (15 Pa. C.S.A. § 5714 (1995).) PwC denies the additional assertions in the Committee's response. There is no competent, admissible evidence that would indicate that "AHERF Board members would have acted to remedy a disclosure by Coopers of financial misstatements or fraud". PwC denies that the Committee's assertion is material because the AHERF Board was under the domination and control of Mr. Abdelhak.

52. PwC admits that Jules Blake was not a member of the AHERF Board, but states that Mr. Blake was a member of the board of the debtor AUHS (and its predecessors) from 1992 to 1998. (PR-BO-063-02710 - 25 (PwC Supp. tab 185).)

53. The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC denies the additional assertions in the Committee's response. There is no competent, admissible evidence that would show that AHERF's Board "would have taken the steps necessary to remedy misstatements in AHERF's financial reporting". (*See infra* ¶¶ 147, 150-152, 326-343 )

56. Although the Committee purports to deny this paragraph, the Committee cites no evidence showing that the Board was informed of the Graduate transaction before it was publicly announced. The fact that the transaction was publicly announced before the effective date of the merger is irrelevant to the fact that AHERF committed publicly to the transaction without informing the Board. PwC admits that Ms. Gargalli was not a member of the AHERF Board in 1996; at that time she was a member of the boards of the debtors AUH East and AUHS. (PR-BO-040-01830-41

(PwC Supp. tab 186);  PR-BO-089-01231-48 (PwC Supp. tab 187).)  The remainder of the Committee's response is unresponsive and immaterial.

57.  The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial.  PwC denies the additional assertions in the Committee's response.  The Committee mischaracterizes the testimony it cites.  (Brown Dep. Tr. (Comm. tab 188) at 39, 176-79.)

58.  The Committee admits the substance of this paragraph; the remainder of the Committee's response is unresponsive and immaterial.  The Committee has no basis in the record for denying that AHERF Board members "perceived" the Graduate transaction in the manner to which they testified.

59.  Although the Committee purports to deny this paragraph, the Committee cites no evidence that is contrary to PwC's statement that "[t]he Board approved the Graduate transaction even though a number of trustees had concerns about the transaction that they did not express at Board meetings".  PwC admits the factual assertion in the Committee's last sentence; the citation in PwC's original SOF ¶ 59 should have been to Kaye Dep. Tr. (PwC Supp. tab 189) at 380-81.

## III. AUDIT INTERFERENCE

63.  The Committee admits the substance of this paragraph.  PwC admits that C&L was required to (and did) conduct its audits in accordance with GAAS and professional standards.

64.  The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial.  PwC admits that AHERF and C&L agreed that C&L would not separately audit the consolidating and combining schedules to AHERF's 1997

consolidated financial statements (PwC SOF ¶ 64; Ex. 1591 (PwC tab 52)), and further replies that those schedules were properly assessed for materiality in relation to AHERF's 1997 consolidated financial statements taken as a whole (Berliner Dep. Tr. (PwC Supp. tab 190) at 153-55.)

65. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's additional assertions. Mr. Regan admitted that he did not examine whether AHERF management committed fraud, intentionally misstated its financial statements, or withheld documents or information from C&L. (Regan Dep. Tr. (PwC Supp. tab 191) at 171-72, 191-92.)

66. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's additional assertions. The Committee admits that Messrs. Spargo and Adamczak signed the management representation letters knowing that representations contained therein were false, and knowing that C&L relied in part upon management's representations in those letters. Accordingly, there is no genuine dispute as to this paragraph.

68. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's additional assertions. The Committee admits that members of AHERF management who were CPAs breached their professional obligations to disclose material information to C&L. There is no competent evidentiary support for the Committee's unsubstantiated conclusion that those breaches were not a substantial factor contributing to the alleged audit failures.

74. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits that one set of Mr. Berliner's estimates of doubtful accounts at the DVOG hospitals was based on an approach utilized for AGH as modified by Mr. Berliner. PwC also admits that Mr. Berliner has claimed his modification of the AGH methodology was designed to more conservatively estimate reserves for certain older accounts. PwC denies the remainder of the Committee's assertions. These additional assertions are not material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

75. Although the Committee purports to deny this paragraph, the testimony cited in the paragraphs cross-referenced by the Committee is not competent testimony (in the case of Mr. Adamczak), or does not make the point stated by the Committee (in the case of Mr. Spargo). Accordingly, there is no genuine dispute of material fact as to this paragraph. AHERF accountants (including Mr. Spargo) expressed concerns about the functioning of Mr. Snow's billing and collections department and the need to conduct additional audit work concerning collections, but not about the financial accounting department's methods of setting reserves. (*See infra* ¶¶ 270-271.) Whether other witnesses would have expressed concerns if asked is irrelevant; the Committee admits that they did not. (*See infra* ¶¶ 76, 272.) PwC denies that the Committee's additional assertions are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

76. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits the Committee elicited the additional testimony from Mr. Snow that the Committee quotes. Mr. Snow's testimony

11

concerning what he would have told C&L if asked is inadmissible self-serving speculation. Mr. Snow admitted that he possessed information material to C&L's audits, and did not share that information with C&L because he feared he would be fired if he did so. (PwC SOF ¶¶ 76-77.) PwC denies that the additional testimony cited by the Committee is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

78. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's unsubstantiated conclusion that the conduct by AHERF that the Committee admits in response to this paragraph did not interfere with C&L's audits. AHERF management's failure to inform C&L that it had determined, in September 1996, that it would write off rather than collect $80 million in accounts receivable (*see* PwC SOF ¶ 78), is a material fact because it was a substantial factor contributing to C&L's alleged failure to adequately assess the reasonableness of DVOG's bad debt reserves.

80. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. The Committee admits that neither Mr. Spargo nor Mr. Cancelmi recalled ever providing C&L with a copy of Mr. Cancelmi's September 24, 1996 memorandum or discussing with C&L AHERF's determination that it would write off, rather than attempt to collect, $80 million in accounts receivable. Mr. Cancelmi's testimony that, although he did not inform C&L about management's determination, it "may have been brought to Bill[] [Buettner's] attention" by someone else (who is not named), is inadmissible hearsay and vague. The Committee does not deny, and therefore admits, that Mr. Spargo testified he knew C&L

12

relied upon his representations. Mr. Spargo's unsubstantiated belief that C&L was aware of uncollectible reserves is inadmissible speculation without foundation. PwC denies the Committee's unsubstantiated conclusion that the undisputed facts about conduct by AHERF asserted in this paragraph did not interfere with C&L's audits. AHERF's failure to inform C&L that it would write off, rather than attempt to collect, $80 million in accounts receivable was a substantial factor in causing C&L's alleged failure to appropriately assess the reasonableness of AHERF's accounts receivable reserves.

81. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations in the 1996 management representation letter did not interfere with C&L's audits.

82. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations in the 1996 management representation letter did not interfere with C&L's audits. PwC denies that C&L had a duty to independently assess the reasonableness of AHERF's accounts receivable reserves; that is only one of three approaches allowed by GAAS. (See Comm. SOF ¶ 263.)

83. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. Whether or not Mr. Spargo's other representations were also false cannot affect the undisputed fact that his representation with respect to accounts receivable being appropriately reduced to their estimated net realizable value was false.

13

The Committee's denial that the other signatories to the 1996 management representation letter knew their representation was false is inadmissible speculation. Those other signatories are all unavailable to testify. (*See* PwC SOF ¶ 142.) PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations in the 1996 management representation letter did not interfere with C&L's audits. PwC denies that C&L had a duty to independently assess the reasonableness of AHERF's accounts receivable reserves; that is only one of three approaches allowed by GAAS. (*See* Comm. SOF ¶ 263.)

85. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits the second and third sentences of the Committee's response, which do not affect the substance of this paragraph. The Committee's additional assertions do not create a genuine factual dispute. Regardless of when AHERF told C&L about the initial $50 million reserve transfer, there is no dispute that AHERF failed to tell C&L about the subsequent reserve transfers. PwC denies the Committee's additional assertion that "the idea to change the accounting" for establishment of reserves on the Graduate books was proposed by Mr. Buettner. The testimony from Mr. Adamczak cited by the Committee does not support the Committee's assertion. Mr. Cancelmi's testimony is inadmissible as hearsay and as unfounded speculation. PwC denies the Committee's characterizations of Mr. Kirstein's handwritten notes and the inferences drawn by the Committee about what those notes "indicate" or reflect.

89. The Committee purports to deny this paragraph, but admits that PwC has accurately quoted the C&L witnesses' testimony about the initial $50 million reserve

transfer from the Graduate books to the DVOG books. PwC denies the Committee's further assertion that the "evidence is otherwise", which is not supported by the record or the facts cited by the Committee. PwC disputes the Committee's further assertion, based upon the opinions of the Committee's auditing expert witnesses, that the initial $50 million transfer was material to the AHERF consolidated financial statements. (*See* PwC SOF ¶ 89.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to AHERF's contributory negligence.

a) Denied. C&L determined that these transfers, although incorrect accounting, did not render the AHERF consolidated financial statements materially misleading. (*See* PwC SOF ¶ 89.) Mr. Buettner did not discuss the initial $50 million reserve transfer with the AHERF Audit Committee in 1997 because "by then I had completed sufficient audit work and had concluded that the transfers were not material and did not warrant disclosure to the audit committee". (Buettner Dep. Tr. (PwC Supp. tab 192) at 620.) At the June 1998 meeting with members of the AHERF Finance and Audit Committee, Mr. Buettner could not answer a question about a $99 million reserve transfer because (due to AHERF's concealment of the additional reserve transfers from C&L) he "simply did not know what [Mr. Edelman] was talking about". (Buettner Dep. Tr. (PwC Supp. tab 192) at 782-83.) PwC denies that the facts asserted by the Committee in this paragraph are material because C&L's alleged negligence is irrelevant to AHERF's contributory negligence.

b) Denied, except PwC admits that Mr. Buettner's analysis of the $50 million reserve transfer is reflected in his hand-written notes. (Ex. 4473 (Comm.

App.) at CL 036437-43.) PwC specifically denies the Committee's assertions about when the notes were prepared. Mr. Buettner made these notes toward the end of the 1997 audit (Buettner Dep. Tr. (PwC Supp. tab 192) at 605-06), and they support his analysis that the $50 million reserve transfer did not have a material effect on the AHERF consolidated financial statements, in part because the $50 million was not needed at DVOG or other "old AHERF" entities (Buettner Dep. Tr. (PwC Supp. tab 192) at 682-90). Further, PwC specifically denies the Committee's assertions about excess contractual allowance. C&L reasonably concluded from its audit work that there was excess contractual allowance at DVOG and AGH (Buettner Dep. Tr. (PwC Supp. tab 192) at 705-06; Frazier Dep. Tr. (PwC Supp. tab 193) at 749-51), and the excess is reflected in C&L's 1997 contractual allowance workpapers (CL 013777, CL 013782, CL 013789, CL 013824-25, CL 013829, CL 013869-72 (all at PwC Supp. tab 194)), as well as in workpapers C&L created in 1998, after AHERF disclosed new information about the reserve transfers (Ex. 4446 (Comm. App.) at CL 138481, CL 138526-47). Further, the Committee's assertions are immaterial because C&L's alleged negligence is irrelevant to the contributory negligence defense.

c) Denied. Exhibit 4473, Mr. Buettner's analysis of "old AHERF" reserve requirements for 1997, reflects a reduction in reserve requirements due to a slowdown in payments from Oxford Health and Blue Cross. (Ex. 4473 (Comm. App.) at CL 036439; Buettner Dep. Tr. (PwC Supp. tab 192) at 727-29.) Mr. Buettner based his analysis of the slowdown in Blue Cross and Oxford

16

payments on separate discussions with Mr. McConnell and with Glenn Shively. (Buettner Dep. Tr. (PwC Supp. tab 192) at 727-29.) The Committee mischaracterizes Ms. Heinlein's testimony, which was merely that she did not recall "discussions" within C&L about the slowdown of payments. The slowdown of payments from third-party payors in the Delaware Valley region was also noted in C&L's 1997 management comment letter, dated September 22, 1997. (Ex. 576 (PwC Supp. tab 195) at CL 042209.) PwC denies that the Committee's assertions in this paragraph are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

d) PwC admits that C&L prepared a schedule called the "Summary of Unadjusted Differences", or "SUD", and that Mr. Buettner testified as quoted by the Committee. PwC further admits that Exhibit 1079 is the fiscal 1997 SUD, and that its contents speak for themselves. PwC denies the remainder of the Committee's assertions. C&L concluded that the $50 million reserve transfer did not represent an audit difference that needed to be placed on the SUD because these were balance sheet entries that eliminated in consolidation, and because the reserves were needed at the Graduate hospitals and not at the DVOG hospitals. (Frazier Dep. Tr. (PwC Supp. tab 193) at 634-44.) PwC denies that the facts in this paragraph are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

91. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. PwC denies the Committee's unsubstantiated conclusion that

17

AHERF's failure to supply Exhibit 43 to C&L or to disclose the substance of its contents did not interfere with C&L's audits. (*See* PwC SOF ¶¶ 96-104.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

93. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial.

a) The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's unsubstantiated conclusion that AHERF's failure to supply Exhibit 41 to C&L or to disclose the substance of its contents did not interfere with C&L's audits.

94. The Committee purports to deny this paragraph but its response relates only to the PFMA reserve; there is no dispute that AHERF finance department personnel did not expressly inform C&L about the numerous other reserve transfers from Graduate hospitals to DVOG that make up the $21 million and $28 million of additional transfers. PwC admits that the PFMA reserves comprised parts of the $21 million and $28 million reserve transfers, but denies the Committee's characterization of the testimony from AHERF witnesses cited in this paragraph.

The Committee mischaracterizes the testimony of Mr. Cancelmi. Mr. Cancelmi admitted that he did not recall specific conversations with C&L, or any details of supposed conversations with C&L, about the transfer of PFMA reserves from the Graduate books to the DVOG books. (Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1015-16.) Mr. Cancelmi testified that he did not recall with whom from C&L he discussed the PFMA reserves. (*Id.* at 1014.) Mr. Cancelmi testified to his speculative,

unfounded <u>impression</u> that C&L auditors were aware that the PFMA reserves had been transferred to the DVOG books; he did not testify that he <u>told</u> C&L auditors that those reserves had been transferred, nor to any conversation with C&L auditors or other personal knowledge that could have informed his impression that C&L was aware that the PFMA reserves had been transferred. (*Id.* at 1012-13.) With respect to the Hill-Burton reserves, Mr. Cancelmi testified that he did not recall any specific conversation with C&L on that subject area. (*Id.* at 1029-30.) With respect to Medicaid reserves, Mr. Cancelmi testified that he recalled only having gotten inquiries from C&L about why those reserves were no longer needed on the Graduate books, and that he may have referred such calls, if they occurred, to others within AHERF who were knowledgeable about why the reserves were not needed at the Graduate hospitals. Mr. Cancelmi did not testify that he told C&L that Medicaid reserves had been transferred to the DVOG books. (Cancelmi Tr. (PwC Supp. tab 196) at 1030-32.) The testimony on which the Committee relies is inadmissible.

The Committee misstates Ms. Schaffer's testimony as well. Ms. Schaffer did not testify that C&L auditors asked about "the whereabouts of certain Graduate reserves". Ms. Schaffer testified only that C&L auditors inquired about whether the reserves were still needed at the Graduate hospitals. As the Committee notes, Ms. Schaffer in fact testified that she <u>did not volunteer</u> that such reserves had been transferred, and that she did not tell C&L those reserves had been transferred because C&L did not ask. (PwC SOF ¶¶ 169-170.) Ms. Schaffer's "impression" that C&L was "very much aware" of the transfer of additional Graduate reserves is immaterial because

AHERF's intent is not an element of PwC's contributory negligence defense. This testimony, too, is inadmissible.

The Committee similarly misstates Mr. Adamczak's testimony. Although he claimed that "he understood [C&L] was aware of and had approved all of the transfers between Graduate and DVOG". (Comm. SOF ¶ 94.) This testimony lacks foundation and is inadmissible. Mr. Adamczak testified that he never discussed the additional transfers with C&L. (PwC SOF ¶ 94 (citing Adamczak Dep. Tr. (PwC tab 6) at 266, 787-89).) Mr. Adamczak testified that he understood Mr. McConnell had not discussed the $21 million and $28 million reserve transfers with C&L, but that Mr. McConnell predicted "they'll be ok with" additional transfers. (Adamczak Dep. Tr. (PwC tab 6) at 264-67.) PwC denies that this testimony is material, because intent is not an element of PwC's contributory negligence defense.

The Committee admits that Mr. Lisman testified that he did not recall having told C&L about those transfers, and the Committee cites no contrary evidence to suggest Mr. Lisman did tell C&L about them.

95. PwC denies the Committee's further assertions in this paragraph, except admits that the Committee accurately quoted excerpts of handwritten notes in Exhibits 72 and 4403 (although PwC denies the Committee's characterization of and inferences from those notes) and Mr. Kirstein's deposition testimony. AHERF never told Mr. Kirstein or Ms. Frazier that the PFMA reserves had been transferred to the DVOG books. (*See supra* ¶ 94.) PwC denies that this testimony is material, because intent is not an element of PwC's contributory negligence defense.

20

96. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. The Committee mischaracterizes the testimony and documents it cites. C&L utilized the "cheat sheet" schedules in performing analytical testing. (Kirstein Dep. Tr. (PwC Supp. tab 197) at 37-38.) C&L requested these schedules from Ms. Schaffer, who understood that C&L utilized them to perform analytical testing. (Schaffer Dep. Tr. (PwC Supp. tab 198) at 346-47.) Further, C&L's written schedule requests fairly called for AHERF to provide these schedules. (Ex. 1312 (PwC Supp. tab 199) at CANDEP 01348.) PwC denies that the assertions in this paragraph are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

98. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. PwC admits that the "cheat sheets" contained monthly figures, but the explanatory footnotes "stripped out" by AHERF related both to monthly figures *and* to the figures for the entire year. (Schaffer Dep. Tr. (PwC Supp. tab 198) at 346-47.)

99. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. The Committee's claim that Ms. Schaffer's "stripping out" of explanatory footnotes was done without the intent to deceive C&L is immaterial because intent is not an element of PwC's contributory negligence defense.

102. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the Committee's characterization of Ms. Schaffer's "edits", to the June 1997 bad debt roll-

21

forward schedules, which speak for themselves. The Committee's claim that Ms. Schaffer's "edits" were made without the intent to mislead C&L does not create a genuine dispute and is not material because intent is not an element of PwC's contributory negligence defense.

103. PwC admits that $1,200,000 in reserves transferred from the Graduate books as part of the additional reserve transfers went into DVOG "Health Partner Deficits" accounts (as stated in PwC SOF ¶ 91) and do not appear on the bad debt roll-forward schedules. PwC admits that, in addition to the $20,065,000 in reserves transferred from the Graduate books into DVOG bad debt reserve accounts, $5,266,000 in reserves were reclassified among accounts within the DVOG books. PwC denies the remainder of the Committee's assertions. It would have been accurate to label the $20,065,000 of reserves transferred from the Graduate accounts into DVOG bad debt reserve accounts as "transfer of reserves from Graduate". Ms. Schaffer, in explaining why she used the terminology "bad debt shortfall adjustment" rather than "transfer of reserves from Graduate", adopted the rationalization offered to her by counsel for the Committee. Ms. Schaffer's purported lack of intent to mislead C&L is not material, however, because intent is not an element of PwC's contributory negligence defense.

The Committee misstates Ms. Heinlein's testimony. Ms. Heinlein testified that she "did not know" whether the language "shortfall adjustment" was <u>intended</u> by AHERF to deceive C&L, and that she did not "feel deceived as [she sat] here today" on February 24, 2004, during her deposition testimony. PwC denies that the cited testimony is material because intent is not an element of PwC's contributory negligence defense.

22

104. PwC admits that Exhibits 290 and 291 contain the figures quoted by the Committee, that those figures appear in columns labeled "other" in each schedule, and that each of the figures is described in a footnote to the schedule as "bad debt shortfall adjustments" (rather than as "transfer of reserves from Graduate"). These facts are consistent with Ms. Schaffer's testimony that a reader of the bad debt roll-forward schedules could not tell that these adjustments reflected transfers of reserves from Graduate. (Schaffer Dep. Tr. (PwC tab 198) at 610.) The Committee's further assertions about what C&L "would have known" are unresponsive, and are inadmissible argument that lacks foundation. PwC admits that the bad debt roll-forward schedules provided to C&L contained other footnotes describing the initial $50 million reserve transfer (about which C&L knew) as "transfer of reserves from Graduate". The difference in language used in those footnotes confirms the fact (admitted by AHERF witnesses) that the terminology "bad debt shortfall adjustments" did not tell the reader that the "adjustments" were really transfers of reserves from Graduate.

107. The Committee purports to deny this paragraph, but admits that Messrs. Lisman and Cancelmi each testified that he believed Mr. Abdelhak received copies of the "X Files" schedules, and the Committee cites no evidence to the contrary. The Committee does not deny that Mr. McConnell received those schedules. Accordingly, there is no genuine dispute as to whether the "X Files" schedules were circulated to AHERF senior management, including Messrs. Abdelhak and McConnell.

108. The Committee purports to deny this paragraph, but misstates Mr. Spargo's testimony and cites no competent evidence. Mr. Spargo testified that he did not provide the "X Files" or any other schedules to C&L. (Spargo Dep. Tr. (PwC Supp.

tab 200) at 681.)  Messrs. Cancelmi and Lisman testified that they did not provide copies

of the "X Files" to C&L, nor did they provide other documents identifying excess

reserves or identifying the use of excess reserves.  Neither witness testified that he

discussed such documents or such use of excess reserves with C&L.  The cited testimony

from Messrs. Cancelmi and Lisman about what C&L may have been "aware of" is

inadmissible speculation without foundation.  PwC denies the Committee's

unsubstantiated conclusion that AHERF's creation and use of the "X Files" did not

interfere with C&L's audits.

　　　　　111.  The Committee admits the substance of this paragraph; the

remainder of its assertions are unresponsive and immaterial.  The Committee's further

assertions concern whether Mr. Cancelmi intended to deceive C&L by not making the

adjustment to the statement of cash flows that the Committee admits was required.  Intent

is not an element of PwC's contributory negligence defense.  PwC denies the

Committee's unsubstantiated conclusion that "the absence of an adjustment to the

'change in receivables' line on the AHERF statement of cash flows for additional

Graduate transfers did not interfere with" C&L's audits.  That unsubstantiated conclusion

is contrary to the undisputed facts, including testimony from the Committee's expert,

Mr. Berliner.  (*See* PwC SOF ¶ 112.)

　　　　　115.  Although the Committee purports to deny this paragraph, it cites no

competent evidence to contradict the facts stated in this paragraph.  No AHERF witness

has testified that he or she provided the AHERF internal schedules depicting two sets of

results, with and without the use of "cushions".  The Committee's summary of

Mr. Cancelmi's testimony to the effect that he "did not recall if he provided" such

schedules to C&L does not create a genuine factual dispute, nor can it be read to suggest

Mr. Cancelmi did provide those schedules to C&L. Mr. Cancelmi's further testimony

that "others may have" provided such schedules to C&L is inadmissible as speculation

without foundation. Accordingly, there is no genuine dispute as to this paragraph.

118. The Committee admits the substance of this paragraph; the

remainder of its assertions are unresponsive and immaterial. The Committee misstates

the testimony of Mr. Panucci. Mr. Panucci testified that the documents he received for

the western region (which included the documents provided by Mr. Zwirn) were not in

"one neat place", as were the documents for the Delaware Valley endowments. (Panucci

Dep. Tr. (PwC Supp. tab 201) at 128-29.) Mr. Panucci received at least one binder,

perhaps more, from Mr. Zwirn, and could not recall whether he received documents from

Mr. Zwirn all at once or over time. (*Id* at 131.)

The Committee again misstates the testimony it cites from Mr. Panucci in

the second paragraph of its response to this paragraph. Mr. Panucci testified that there

were incomplete documents for some endowments, but that AHERF management

concluded it had enough information to make its decisions about classifying the

endowments, and that PwC did not take exception to that conclusion by AHERF. (*Id* at

253-55.) PwC admits that Mr. Panucci and Ms. Frazier could not recall whether

specifically the Lockhart trusts were among the endowments for which documentation

was said to be incomplete.

PwC admits that Mr. Panucci testified he received at least one binder of

documents from Mr. Zwirn. Although Mr. Zwirn identified Exhibit 4111, and testified

that Exhibit was complete (as it existed at Mr. Zwirn's deposition), Mr. Zwirn's

testimony cannot establish what documents were in the binder provided to C&L during its audit in 1996. (*See also infra* ¶ 133.)

PwC admits that the Committee accurately quotes one provision from Exhibit 4111, but states that the Lockhart trust indentures contain other relevant provisions, which speak for themselves. PwC notes that the language quoted by the Committee is the same language highlighted by Ms. Robinson in her October 30, 1996 letter, further demonstrating the materiality of that letter as audit evidence. The Committee's final assertion about a note in C&L's "permanent files" stating that Mr. Zwirn maintained full copies of endowment fund documents, also fails to create a genuine dispute because the statement was written years before the events at issue and reflects nothing more than a representation to C&L that full copies of whatever documents AHERF had were maintained by Mr. Zwirn.

The facts asserted by the Committee in response to paragraph 118 are also immaterial because C&L's alleged negligence is irrelevant to the contributory negligence defense.

121. Although the Committee purports to deny this paragraph, the Committee admits its substance. The Committee does not dispute, and therefore admits, that AHERF classified the original principal of each of the Lockhart trusts as "permanently restricted". The Committee admits that AHERF classified the appreciation on two of the trusts as "temporarily restricted" and on the other three as "unrestricted". The Committee's further assertions are immaterial.

123. PwC denies the remainder of the Committee's assertions. The Committee misstates the testimony it cites from Ms. Frazier and Mr. Panucci. That

testimony does not support an inference that either one of them knew about Lockhart

trust donor restrictions on the use of capital gains. Mr. Panucci did not recall knowing

about any such restrictions. Ms. Frazier's testimony was that she understood the

classification of such gains (as "unrestricted" or "temporarily restricted") was unclear;

she did not know about donor restrictions (which would require classifications as

"permanently restricted"). (Panucci Dep. Tr. (PwC Supp. tab 201) at 241-42, 263-64;

Frazier Dep. Tr. (PwC Supp. tab 193) at 390-93.)

        124. The Committee admits this paragraph; the remainder of its assertions

are unresponsive and immaterial. PwC admits that Mr. Martin and Ms. Gilbert met with

Ms. Robinson after C&L had completed its 1996 audit field work, but that is irrelevant

because AHERF's financial statements and C&L's audit opinion had not yet been

released. (PwC SOF ¶ 79c.) The Committee's assertion that C&L had "access to all the

information it needed" is vague and non-responsive. The Committee's further assertions

that C&L did not contact Ms. Robinson, and that she would have answered C&L's

questions if it had, are immaterial because C&L's alleged negligence is irrelevant to the

contributory negligence defense. PwC denies the Committee's unsubstantiated

conclusion that AHERF's failure to disclose the substance and purpose of

Ms. Robinson's meeting with Mr. Martin and Ms. Gilbert did not interfere with C&L's

audits.

        125. The Committee admits this paragraph; the remainder of its assertions

are unresponsive and immaterial. PwC denies the remainder of the Committee's

assertions. Ms. Robinson's letter is dated at a time when AHERF's financial statements

and C&L's audit opinion for AHERF's 1996 financial statements had not yet been

released, and is dated more than a year before C&L completed its audit of AHERF's

consolidated financial statements for fiscal year 1997. (PwC SOF ¶ 79c.) PwC also

denies that the Committee's assertions in this paragraph are material because C&L's

alleged negligence is irrelevant to the contributory negligence defense. PwC denies the

Committee's unsubstantiated conclusion that AHERF's failure to disclose

Ms. Robinson's October 30, 1996 letter did not interfere with C&L's audits.

      126. The Committee admits this paragraph; the remainder of its assertions

are unresponsive and immaterial. PwC denies the remainder of the Committee's

assertions. AHERF's failure to disclose the misgivings held by Mr. Adamczak and

Ms. Gilbert about the classification of Lockhart trust assets is material because that lack

of disclosure was a substantial factor contributing to an alleged audit failing. PwC denies

the Committee's unsubstantiated conclusion that AHERF's failure to disclose the

misgivings held by Mr. Adamczak and Ms. Gilbert about the classification of Lockhart

trust assets did not interfere with C&L's audits.

      127. The Committee admits this paragraph; the remainder of its assertions

are unresponsive and immaterial. PwC denies the remainder of the Committee's

assertions. Mr. Spargo's note on Ms. Robinson's letter reflects AHERF's knowledge of

Lockhart trust donor restrictions, and AHERF's concerns about the "pickle" those

restrictions created. The Committee's further assertions about Mr. Spargo's state of mind

in writing the "pickle" note are belied by the note, which speaks for itself, and the fact

that the letter from Ms. Robinson states on its face that it responds to a request from

AHERF to advise about the accounting classification for the Lockhart trust assets, not

about "access to the funds". (Ex. 20 (PwC Supp. tab 103).) The Committee's assertions

about Mr. Spargo's state of mind in writing the "pickle" note are not material because intent is not an element of PwC's contributory negligence defense. PwC denies the Committee's unsubstantiated conclusion that the failure to provide Ms. Robinson's letter, including Mr. Spargo's "pickle" note to C&L, did not interfere with C&L's audits.

128. PwC denies the Committee's unsubstantiated conclusion that Mr. McConnell's directive not to change the accounting classifications for Lockhart trust assets, despite Ms. Robinson's October 30, 1996 letter, did not interfere with C&L's audits.

129. The Committee misstates the testimony of Mr. Buettner and Ms. Frazier, who each testified in the testimony cited in PwC's original paragraph that they did not receive a copy of Ms. Robinson's letter at any time prior to calendar year 1998. (PwC SOF ¶ 129.) The Committee points to no evidence to contradict that testimony. There is thus no genuine dispute that AHERF did not provide Ms. Robinson's letter to C&L until calendar year 1998.

130. The Committee purports to deny the facts in this paragraph, but admits that Messrs. Spargo and Adamczak each testified they did not provide a copy of Ms. Robinson's October 30, 1996 letter to C&L. Accordingly, there is no genuine dispute as to this paragraph. PwC denies the remainder of the Committee's assertions. The Committee's further assertions are not supported by the testimony it cites. Mr. Lydon's and Ms. Frazier's testimony that classification of certain Lockhart trust assets was "uncertain" refers to uncertainty over classification of the gains as "unrestricted" or "temporarily restricted" (*see supra* ¶ 123) and does not suggest that AHERF told C&L about Ms. Robinson's letter, or about concerns within AHERF that

the classification as other than "permanently restricted" was wrong. Mr. Spargo's testimony that he was not aware of any effort to hide Ms. Robinson's letter from C&L is immaterial, because intent is not an element of PwC's contributory negligence defense.

131. The Committee admits the substance of this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. The fact that AHERF first sent a copy of Ms. Robinson's letter to C&L in calendar year 1998, and continued to conceal Mr. Spargo's note that "this little pickle may require a tad bit more creativity than even we are accustomed to" before faxing a copy of Ms. Robinson's letter to C&L, are uncontroverted. There is no genuine dispute that pertinent audit evidence was not disclosed to C&L prior to release of AHERF's 1996 financial statements and C&L's opinion on those statements, and was not disclosed to C&L at any time the next year, during its audit of AHERF's consolidated financial statements for fiscal year 1997.

132. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. PwC admits that Mr. Berliner testified as quoted by the Committee in response to this paragraph, and that he has offered the opinion that C&L was negligent in its audits. Mr. Berliner's opinion is immaterial because C&L's alleged negligence is irrelevant to the contributory negligence defense.

133. The Committee purports to deny the facts in this paragraph, but adduces no contrary evidence and misstates Mr. Zwirn's testimony. Mr. Zwirn testified that the Lockhart trust documents, along with all of the other endowment fund documents for the western region, were kept in a binder with a "metal fastener" on the side.

Mr. Zwirn further described that "metal fastener" as one which could be opened so documents could be removed or inserted (consistent with either a three-ring or clamp-type binder), and he testified that the documents were not permanently fastened or bound. (Zwirn Dep. Tr. (PwC Supp. tab 202) at 74.)  Mr. Lydon also admitted that trust documents were kept in a three-ring binder from which documents could be removed and into which they could be inserted.  (Lydon Dep. Tr. (PwC Supp. tab 203) at 85.)  No witness has testified that he or she knows that the documentation provided to C&L was complete.

134.  PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations to C&L did not interfere with C&L's audits.

135.  PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations to C&L did not interfere with C&L's audits.

136.  The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial.  PwC denies the remainder of the Committee's assertions.  Mr. Adamczak had no basis to assert that C&L knew the full facts about the Graduate reserve transfers.  Mr. Adamczak testified that he never discussed those transfers with C&L (*see* Adamczak Dep. Tr. (PwC Supp. tab 204) at 266, 912-17), but based his impression that C&L knew about them on unspecified "representations" from Mr. Cancelmi and unnamed others.  Mr. Adamczak's testimony about C&L's purported knowledge about the Graduate reserve transfers is inadmissible as hearsay and as speculation without foundation.  Mr. Adamczak's alleged belief that his opinions

31

regarding certain accounting treatments were unimportant to C&L is immaterial because intent is not an element of PwC's contributory negligence defense.

137. PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations to C&L did not interfere with C&L's audits.

139. PwC denies the Committee's unsubstantiated conclusion that AHERF management's admittedly false representations to C&L did not interfere with C&L's audits.

141. Although the Committee purports to deny this paragraph, it presents no evidence that would contradict the testimony cited. In addition, neither Mr. Spargo nor Mr. Adamczak is competent to testify that C&L already knew of the falsehoods in the management representation letter that they signed, as such testimony would be inadmissible as unfounded speculation. Accordingly, there is no genuine dispute that "Mr. Spargo and Mr. Adamczak both knew that C&L was relying on the representations in the management representation letters they signed".

143. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC denies the remainder of the Committee's assertions. Mr. Berliner's additional opinions that C&L was negligent are immaterial to the question of AHERF's contributory negligence. Mr. Berliner's opinion that AHERF did not "prevent" C&L from conducting a GAAS audit is similarly immaterial because "prevention" is not the legal standard for contributory negligence.

## IV. CAUSATION

145.  Although the Committee purports to deny this paragraph, the Committee admits that it will seek to offer into evidence "Mr. Berliner's opinions and testimony regarding appropriate adjustments to the fiscal-year 1996 financial statements". Accordingly, there is no genuine dispute as to this paragraph.  The remainder of the Committee's response is unresponsive and immaterial.

146.  Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" in response to more negative 1996 financial statements.  Accordingly, there is no genuine dispute as to this paragraph.  The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response.  (*See supra* ¶ 44, *infra* ¶¶ 147, 150-152, 326-343.)

147.  Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" in response to more negative 1996 financial statements.  Accordingly, there is no genuine dispute as to this paragraph.  The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response.  The evidence the Committee cites suggests only that various options were available to (but never used by) AHERF's Board and Audit Committee; the Committee has no admissible evidence showing whether or how "the Board or Audit Committee would have acted" (emphasis added).  (*See supra* ¶ 44, *infra* ¶¶ 150-152, 326-342.)

33

148. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" in response to more negative 1996 financial statements and that supposedly a "turnaround plan would have been a part of those actions". Accordingly, there is no genuine dispute as to this paragraph 148. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response. (*See supra* ¶ 147.)

149. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" in response to more negative 1996 financial statements and that supposedly "[r]etaining an outside consultant would have been a part of those actions". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response. (*See supra* ¶ 147.)

150. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "a consultant retained by the Board or Audit Committee to address AHERF's financial distress would have recommended significant modifications to AHERF's business strategies and practices". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response. The evidence the Committee cites suggests only that various options were

34

available to (but never used by) AHERF's Board and Audit Committee; the Committee has no admissible evidence showing how "the Board or Audit Committee would have acted" (emphasis added). The opinions of Mr. Singleton are inadmissible because he relies on inadmissible self-serving speculation by the Committee's witnesses and because his analysis is so riddled with serious errors as to be entirely unreliable.

151. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" and that "[t]hose actions would have included giving appropriate management authority to a retained turnaround consultant". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response. The evidence the Committee cites suggests only that various options were available to (but never used by) AHERF's Board and Audit Committee; the Committee has no admissible evidence showing how "the Board or Audit Committee would have acted" (emphasis added). (*See supra* ¶ 147.) The testimony of Mr. Singleton is inadmissible because he relies on inadmissible self-serving speculation by the Committee's witnesses and because his analysis is so riddled with serious errors as to be entirely unreliable.

152. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "the Board or Audit Committee would have acted to remedy AHERF's financial distress and any wrongdoing revealed" and that "[t]hose actions would have included putting a halt to the pursuit of AHERF's IDS strategy". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the

Committee's response is unresponsive and immaterial. PwC admits that the quoted

deposition testimony was given, and disputes the Committee's other additional assertions.

The evidence the Committee cites suggests only that various options were available to

(but never used by) AHERF's Board and Audit Committee; the Committee has no

admissible evidence showing how "the Board or Audit Committee would have acted"

(emphasis added). (*See supra* ¶ 147.) PwC denies that the quoted deposition testimony

is admissible, because it is self-interested speculation.

   153. Although the Committee purports to deny this paragraph, the

Committee admits that it contends that "[t]he turnaround plan designed by Mr. Singleton

would have restored AHERF's DVOG entities, within three to four years, 'to a position

of positive earnings before interest, taxes, depreciation and amortization (EBITDA),

sufficient to allow AHERF's Board to sell the entities without creditor loss'".

Accordingly, there is no genuine dispute as to this paragraph. The remainder of the

Committee's response is unresponsive and immaterial. PwC disputes the additional

assertions in the Committee's response. The evidence the Committee cites suggests only

that various options were available to (but never used by) AHERF's Board and Audit

Committee; the Committee has no admissible evidence showing how "the Board or Audit

Committee would have acted" (emphasis added). (*See supra* ¶ 147.) The opinions of

Mr. Singleton are inadmissible because he relies on inadmissible self-serving speculation

by the Committee's witnesses and because his analysis is so riddled with serious errors as

to be entirely unreliable.

   154. Although the Committee purports to deny this paragraph, the

Committee admits that it contends that "Mr. Singleton opines that, were he retained in

1996, his efforts would have increased DVOG's EBIDTA by more than $100 million per year". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the additional assertions in the Committee's response. The evidence the Committee cites suggests only that various options were available to (but never used by) AHERF's Board and Audit Committee; the Committee has no admissible evidence showing how "the Board or Audit Committee would have acted" (emphasis added). (*See supra* ¶ 147.) The opinions of Mr. Singleton are inadmissible because he relies on inadmissible self-serving speculation by the Committee's witnesses and because his analysis is so riddled with serious errors as to be entirely unreliable.

155. Although the Committee purports to deny this paragraph, the Committee admits that it contends that "[t]he Committee's claim for damages is premised upon the actions AHERF Board members and/or creditors would have taken had they received financial statements that accurately reported AHERF's financial condition and performance", and that it contends that such information should have been provided in September 1996 (*see supra* ¶ 145). Accordingly, there is no genuine dispute as to this paragraph.

157. The Committee admits this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC admits that Mr. Kite's report includes the quoted language, and disputes the additional assertions in the Committee's response.

158. The Committee admits that it makes the contention recited in this paragraph; to the extent that the Committee's response implies that PwC has admitted the

accuracy of that contention, PwC denies any such inference. The remainder of the
Committee's response is unresponsive and immaterial. PwC admits that the quoted
deposition testimony was given, but otherwise disputes the Committee's additional
assertions. AHERF's creditors knew or should have known that AHERF faced serious
financial difficulties. (*See infra* ¶¶ 237, 347, 353, 374.)

159. The Committee admits that it makes the contention recited in this
paragraph; to the extent that the Committee's response implies that PwC has admitted the
accuracy of that contention, PwC denies any such inference. The remainder of the
Committee's response is unresponsive and immaterial. PwC disputes the Committee's
additional assertions. The evidence the Committee cites suggests only that various
options were available to (but never used by) AHERF's creditors; the Committee has no
admissible evidence showing how the creditors would have acted. (*See infra* ¶¶ 356-358,
360-365, 368-371, 375-376, 384.)

160. Although the Committee purports to deny this paragraph, the
Committee admits that it contends that "requiring DVOG to retain an outside consultant
was one of the options available to AHERF's creditors to respond to a covenant violation
and it would have pursued that course if necessary" and that "[s]hort of a covenant
violation, creditors would have pressed for the appointment of an outside consultant".
Accordingly, there is no genuine dispute as to this paragraph. The remainder of the
Committee's response is unresponsive and immaterial. PwC disputes the Committee's
additional assertions. As shown elsewhere, there is no admissible evidence showing what
creditors would have done. (*See supra* ¶ 157, *infra* ¶¶ 161, 360-361, 379.)

161.  Although the Committee purports to deny this paragraph, the Committee admits that "AHERF's creditors did not have the right to choose a consultant for AHERF". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's remaining assertions. The only "qualifications" required of a consultant were set forth in the Master Trust Indenture:

> "'Consultant' shall mean a Person who or which is appointed by any Member of the Obligated Group for the purpose of passing on questions relating to the financial affairs, management or operations of one or more Members of the Obligated Group or the entire Obligated Group and has a favorable reputation for skill and experience in performing similar services in respect of entities engaged in reasonably comparable endeavors."

(DVOG MTI, Ex. 330 (PwC Supp. tab 205) at K + L/DAK 00011.) PwC admits that the deposition testimony quoted was given, but denies that it is admissible as it lacks foundation and purports to interpret a contract, which is a question of law.

162.  The Committee admits that it makes the contention recited in this paragraph; to the extent that the Committee's response implies that PwC has admitted the accuracy of that contention, PwC denies any such inference. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's additional assertions. The Committee's assertions about the existence of "other options" available to creditors is so vague that it is essentially meaningless.

173.  The Committee admits that Mr. Hernandez testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial because Mr. Hernandez's speculation about actions he "would have considered" are not relevant to the Committee's burden of proving that specific actions would have been taken.

39

174. The Committee admits that Mr. Weill testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's additional assertions. Mr. Weill's testimony purporting to identify action that MBIA "would have taken" is inadmissible as self-serving speculation.

175. The Committee admits that Mr. Weill testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's additional assertions. PwC admits that Mr. Weill gave the additional testimony quoted by the Committee, but denies that such testimony is admissible. Mr. Weill's testimony purporting to identify action that MBIA "would have taken" is inadmissible as self-serving speculation.

176. The Committee admits that Mr. Weill testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial. The additional testimony of Mr. Weill that the Committee cites is inadmissible for lack of foundation. (*See supra* ¶ 161.)

177. The Committee admits that Mr. Michael testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's additional assertions. Mr. Michael's testimony purporting to identify action that PNC "would have taken" is inadmissible as self-serving speculation. (*See supra* ¶¶ 386-390.)

178. The Committee's response does not meet the substance of this paragraph. PwC disputes the Committee's vague claims concerning "actions AHERF's trustees and creditor [sic] <u>could</u> have taken" (emphasis added) and denies that such unsubstantiated claims are material. PwC admits, for purposes of this motion, that

"MBIA and PNC employees" purported to testify to "actions those creditors could have taken", but disputes the Committee's remaining assertions. Testimony purporting to identify action that MBIA or PNC "would have taken sooner" is inadmissible as self-serving speculation. (*See infra* ¶¶ 356-358, 360-371, 375-384.)

179. The Committee admits that Mr. McCool testified as set forth in this paragraph. The remainder of the Committee's response is unresponsive and immaterial. Testimony purporting to identify action that PNC "would have taken sooner" is inadmissible as self-serving speculation. (*See* PwC Reply SOF ¶¶ 369-370, 383.)

183. Although the Committee purports to deny this paragraph, the Committee admits that Mr. Kite "does not opine regarding the actions AHERF's creditors would have taken but rather explains the rights and remedies available to those creditors in the event of a covenant violation or other event of default". Accordingly, there is no genuine dispute as to this paragraph. The remainder of the Committee's response is unresponsive and immaterial.

187. PwC admits that the Committee correctly identified the final version of the June 21, 1996 Bylaws, which imposes the same quorum requirement as set forth in PwC's SOF ¶ 187. (6/21/96 Bylaws (Comm. tab 9) at PR-PLD-022-00193-94.)

188. The Committee admits that this paragraph is undisputed; the remainder of the Committee's response is unresponsive and immaterial. PwC admits that Mr. Kite gave the quoted deposition testimony but disputes the Committee's remaining assertions. There is no admissible evidence that would show which of the numerous potential consultants would actually have been retained by AHERF, or what the

41

recommendations of that consultant would have been. (*See supra* ¶¶ 161-162, *infra* ¶¶ 360-361.)

189. The Committee admits that this paragraph is undisputed; the remainder of the Committee's response is unresponsive and immaterial. PwC disputes the Committee's additional assertions. Dr. Atkinson lacks a proper foundation to testify about what "[v]ery often" happens to the management of a hospital system when the Hunter Group is retained.

## V. CENTENNIAL

191. The Committee does not deny, and therefore admits, the truth of paragraph 4 of the Centennial Trustee Complaint.

193. The Committee does not deny, and therefore admits, the truth of paragraph 3 of the Centennial Trustee Complaint.

194. The Committee admits the substance of this paragraph: that SDN, after the October 31, 1996 merger, "was the sole surviving corporation and became liable for the liabilities of GHS-Osteopathic, Inc., The Graduate Hospital, and The Fifth and Reed Hospital [d/b/a Mt. Sinai Hospital]". GHS-Osteopathic operated City Avenue Hospital and Parkview Hospital. (*See* Ex. 650 (PwC tab 1) at GOV 20239.) Further, the Committee does not dispute, and therefore admits, that neither AHERF nor any other Debtor (besides Centennial) assumed any liabilities of the Graduate Hospitals in connection with the SDN merger. Accordingly, there is no genuine dispute as to this paragraph.

The remainder of the Committee's response is unresponsive and immaterial. PwC admits that SDN was the predecessor in interest of the Debtor

42

Centennial, and further states that The Graduate Hospital, The Fifth and Reed Hospital and GHS Osteopathic, Inc. (collectively, the "Graduate Hospitals") were predecessors in interest of SDN, and hence of Centennial. The Committee's assertions are immaterial because there was no injury to the Graduate Hospitals/SDN/Centennial: these entities were liable for the liabilities of the Graduate Hospitals from before the October 31, 1996 merger to the date of bankruptcy.

PwC denies that the "relationship among AHERF, SDN and [C&L] was such that [C&L] owed a duty to SDN". C&L's engagement for SDN was separate from C&L's engagement for AHERF. Responding further, PwC denies that these assertions are material because SDN did not assume liabilities in reliance on any work performed for SDN by C&L. (*See infra* ¶¶ 396-398.) PwC denies the Committee's characterization of the nature and effect of Judge McCullough's December 14, 2000 Order Confirming Debtors' Second Amended Consolidated Liquidating Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. (*See infra* ¶¶ 409-411.)

195. Although the Committee purports to deny this paragraph, it does not allege that SDN was a member of AHERF or that prior approval by the AHERF Board of the merger of the Graduate Hospitals into SDN was necessary. Accordingly, there is no genuine dispute as to this paragraph. The Committee's additional assertion that the members of the SDN board were each senior AHERF officers is unresponsive and immaterial. PwC denies the third sentence of the Committee's response to this paragraph. The Executive Committee of the AHERF Board did not approve the Graduate/SDN merger: the Committee cites to no board resolutions or minutes because there are none. The Committee mischaracterizes the testimony of Messrs. McNair and

Cahouet, and the exhibit upon which it relies. (McNair Dep. Tr. (PwC Supp. tab 172) at 133-34; Cahouet Dep. Tr. (PwC Supp. tab 206) at 48-50; Ex. 2385 (PwC tab 47); *see also infra* ¶ 394.)

197. The Committee does not deny, and therefore admits that, "[f]irst SDN, and then Centennial assumed the obligations of the GHS Obligated Group with respect to the Graduate Bonds" and that neither AHERF, nor any other Debtor, assumed obligations on the Graduate Bonds. Accordingly, there is no genuine dispute as to this paragraph. PwC admits the additional allegations asserted by the Committee, and states that the SDN Obligated Group (which later became the Centennial Obligated Group) had as additional members the City Avenue and Parkview hospitals, which the "GHS Obligated Group" did not. (PwC SOF ¶ 194; Ex. 650 (PwC tab 1) at GOV 20239.)

200. The Committee does not deny, and therefore admits, that the Graduate Hospitals were not affiliated with AHERF in fiscal year 1996. The Committee does not deny, and therefore admits, that the engagement letter for C&L's fiscal year 1996 audits of AHERF and its affiliates did not include SDN (or Centennial, or any of the Graduate Hospitals). (*See infra* ¶ 201.) Accordingly, there is no genuine dispute as to this paragraph. The Committee's additional assertions are unresponsive and immaterial. PwC denies that AHERF and SDN held themselves out as affiliates, and denies the Committee's characterization of "SDN's corporate charter". (*See infra* ¶¶ 388-392.)

201. The Committee admits the substance of this paragraph. PwC denies that C&L audited Centennial's financial statements. Two months of Centennial's financial results (May and June of 1997) were included in AHERF's consolidated statement of operations, and C&L's audit procedures were directed to the audit of

AHERF's financial statements taken as a whole, not to Centennial's financial results. (PwC SOF ¶ 201.) PwC admits that GAAS required C&L to perform certain procedures for fiscal year 1997 relating to Centennial's full-year results of operations, which were included in a footnote to AHERF's audited financial statements as "unaudited pro forma financial information", but denies that such procedures constituted an audit of that financial information.

202. The Committee admits this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC admits that the Committee has accurately quoted Mr. Den Uyl's report, but otherwise disputes the Committee's additional assertions. Mr. Den Uyl's opinions are inadmissible for lack of foundation and because he relies on Mr. Singleton's speculative and unreliable turnaround plan.

203. The Committee admits this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC denies that Mr. Den Uyl's report properly calculated "the losses attributable to AHERF's acquisition of the Graduate Hospitals" and states that his opinions are inadmissible for lack of foundation.

205. The Committee admits this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC admits that Mr. Den Uyl testified as indicated, but denies that his opinions are admissible because they lacks a proper foundation and are not reliable.

206. The Committee does not deny, and therefore admits, that GHS had unsuccessfully tried to sell the Graduate Hospitals to other hospitals and hospital systems before reaching the deal with AHERF. Accordingly, there is no genuine dispute as to this paragraph. Mr. Korman's testimony about AHERF being the "successful acquirer" after

45

unsuccessful attempts to sell the Graduate Hospitals to others is consistent with his testimony that "AHERF was at the end of the line". (Korman Dep. Tr. (PwC tab 150) at 215-16.)

208. The Committee does not deny, and therefore admits, the truth of the allegations made in the Centennial Bondholder Complaint.

212. The Committee does not deny, and therefore admits, the facts contained in this paragraph. The Committee's additional assertions about the Plan are unresponsive and immaterial. The evidence cited by the Committee further supports PwC's assertion that Centennial creditors are treated differently under the Plan from creditors of the other Debtor estates. Centennial bondholders were able to seek for their own account certain recoveries against third parties outside of bankruptcy, and the Committee does not deny, and therefore admits, that non-bondholder Centennial creditors are paid out at 30% the rate of non-bondholder creditors of the other Debtor estates.

## VI. BREACH OF CONTRACT

215. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits that C&L was required to conduct its agreed-upon procedures engagements in accordance with professional standards. Professional standards for agreed-upon procedures are fundamentally different from GAAS standards for audits. (*See* PwC SOF ¶ 214.)

217. Although the Committee purports to deny this paragraph, it fails to present any evidence that C&L did not perform this agreed-upon procedure in accordance with its contractual obligations. PwC denies the additional assertions in the Committee's response. The accuracy of the 1996 financial statements is irrelevant to whether C&L

46

performed the agreed-upon procedures in accordance with its contractual obligations set forth in the engagement letter.

218. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits that C&L was required to (and did) conduct its agreed-upon procedures engagements in accordance with professional standards. Professional standards for agreed-upon procedures are fundamentally different from GAAS standards for audits. (*See* PwC SOF ¶ 214.)

219. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits that C&L was required to (and did) conduct its agreed-upon procedures engagements in accordance with professional standards. Professional standards for agreed-upon procedures are fundamentally different from GAAS standards for audits. (*See* PwC SOF ¶ 214.)

220. The Committee admits this paragraph; the remainder of its assertions are unresponsive and immaterial. PwC admits that C&L was required to (and did) conduct its agreed-upon procedures engagements in accordance with professional standards. Professional standards for agreed-upon procedures are fundamentally different from GAAS standards for audits. (*See* PwC SOF ¶ 214.)

221. The Committee admits the substance of this paragraph. The remainder of the Committee's response is unresponsive and immaterial. PwC denies the additional assertions in the Committee's response. AHERF interfered with C&L's engagement regarding inter-company account balances. (*See* Ex. 1130 (PwC Supp. tab 207); Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1241-44.)

47

222. Although the Committee purports to deny this paragraph, it fails to present any evidence that C&L did not perform this agreed-upon procedure in accordance with its contractual obligations. PwC denies the additional assertions in the Committee's response. C&L's duty pursuant to both the contract (PwC SOF ¶¶ 218, 220) and the relevant professional standards (PwC SOF ¶ 214) was to "agree", "verify" or "roll-forward" certain numbers. PwC disputes the Committee's characterization of Ms. Gordon's notes of the Finance and Audit Committee Meeting of March 1, 1998. Mr. McConnell told the Finance and Audit Committee that C&L's procedures consisted merely of "verifying". (Ex. 16 (Comm. tab 20) at GOR0000014-15; *see* PwC SOF ¶ 218.) Further, PwC denies that these allegations are material because the Committee admits that AHERF management was responsible for the sufficiency of the procedures. (*See* PwC SOF ¶¶ 214, 219.)

224. The Committee admits this paragraph; the remainder of the Committee's response is unresponsive and immaterial. PwC admits the Committee accurately quoted AU § 623.19 and Exhibit 327, but disputes the remainder of the Committee's assertions. This paragraph presents legal contentions concerning the effects and interpretation of the trust indenture documents. PwC further denies that the Morgan Guaranty Trust Agreement, to which C&L was not a party, imposed any contractual obligation on C&L.

PwC's Responses to the Committee's Statement of Additional Material Facts

## I. IMPUTATION

226.  Admitted, except that AHERF made no annual incentive plan payments for fiscal year 1997.  (Kasperbauer Dep. Tr. (PwC Supp. tab 208) at 125.)

227.  Admitted, except that PwC denies the Committee's characterization of Mr. Kasperbauer's testimony.  Mr. Kasperbauer testified that bonuses could range anywhere from "zero to 40 percent" (Kasperbauer Dep. Tr. (PwC Supp. tab 208) at 95), and that he believed the compensation and benefit packages provided to AHERF's executive management were "reasonable", "fair" and "comparable to similar organizations".  (*Id* at 184-86.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

228.  Denied.  "Operating Performance" and "Financial Viability" were two of six quantitative measures used to evaluate the performance of AHERF and its Business Units.  (*See* Exhibit 2480 (PwC Supp. tab 209) at DBR-AA 22680; Kasperbauer Dep. Tr. (PwC Supp. tab 208) at 113; Ex. 1700 (PwC Supp. tab 210) at DBR-AA 22695; Spargo Dep. Tr. (PwC Supp. tab 200) at 498.)  These measures were not "Must Goals", as the very documents cited by the Committee indicate.  (Ex 2476 (PwC Supp. tab 211) at JD-HL 0020916.)  The Compensation Committee could make annual incentive plan payments even if these measures were not met, and did so for fiscal year 1996.  (Ex. 2480 (PwC Supp. tab 209) at DBR-AA 22680.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

49

229.  Denied.  There were variances between the reported net income results for AHERF's Business Units and the Operating Performance target for fiscal year 1996.  (Ex. 1700 (PwC Supp. tab 210) at DBR-AA 22695.)  AHERF made no annual incentive plan payments for fiscal year 1997.  (Kasperbauer Tr. (PwC Supp. tab 208) at 125.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(a)  Denied, except PwC admits the Committee's assertions in the first sentence, and states that reserves not designated for any specific purpose are not appropriate under GAAP.  PwC states that the terms "cushions" or "free reserves" are vague, and reserves so denominated are not necessarily inappropriate under GAAP.  PwC further states that AHERF did not provide C&L with the "X Files".  (See PwC SOF ¶ 108.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(b)  Denied, except PwC admits that the excerpts from the documents and deposition testimony referenced in paragraph 229(b) are accurately quoted.  PwC specifically denies the Committee's characterization of this evidence as relating to the "X Files".  AHERF management testified that the fiscal year 1996 adjustments referred to in Exhibit 1122 were made for legitimate purposes.  (Cancelmi Dep. Tr. (PwC Supp. tab 196) at 165-67.)  AHERF made no annual incentive plan payments for fiscal year 1997.  (Kasperbauer Dep. Tr. (PwC Supp. tab 208) at 125.)  PwC denies that the Committee's assertions are material

50

because they do not suggest that AHERF management acted entirely in their own interest.

(c) Denied, except PwC admits that AHERF's management used so-called "cushions" to adjust the net revenues of AHERF in fiscal year 1997, and concealed those adjustments from C&L. (See PwC SOF ¶¶ 113-115; *supra* ¶ 115.) AHERF made no annual incentive plan payments for fiscal year 1997. (Kasperbauer Dep. Tr. (PwC Supp. tab 208) at 125.) PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(d) PwC admits that the Committee accurately quotes Mr. Adamczak's deposition testimony but disputes the Committee's characterization of this evidence. PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

230. Denied, except that PwC admits that the deposition testimony quoted in this paragraph was given and that the Committee quotes correctly from certain memoranda. The Committee misrepresents that evidence, which does not support its contention that "accounting decisions were driven by the bottom line, which, in turn, drove management bonuses". At most, the evidence the Committee cites in this paragraph suggests that AHERF management made certain accounting decisions based on a desire to improve AHERF's net income (or "bottom line"), not that AHERF management was motivated by the potential effect that net income at AHERF or any of its business units might have on management bonuses. (*See also supra* ¶ 228.) PwC

denies that the Committee's assertions are material because they do not show that
AHERF management acted entirely in their own interest.

(a)  PwC admits that the Committee accurately quotes Mr. Cancelmi's
April 14, 1997 memorandum, which was not provided to C&L.  (Adamczak Dep.
Tr. (PwC Supp. tab 204) at 272; Cancelmi Dep. Tr. (PwC Supp. tab 196) at 764-
67.)  PwC denies that the Committee's assertions are material because they do not
suggest that AHERF management acted entirely in their own interest.

(b)  Denied, except PwC admits that the Committee accurately quotes
Mr. Cancelmi's July 3, 1997 memorandum, which was not provided to C&L.
(Schaffer Dep. Tr. (PwC Supp. tab 198) at 555.)  The Committee mischaracterizes
Mr. Cancelmi's memorandum, by quoting it out of context.  (Ex. 164 (PwC Supp.
tab 212) at DBR-RS-0290.)  PwC denies that the Committee's assertions are
material because they do not suggest that AHERF management acted entirely in
their own interest.

(c)  Denied, except PwC admits that the Committee accurately quotes
Mr. Cancelmi's June 10, 1997 memorandum, which was not provided to C&L.
PwC denies that the Committee's assertions are material because they do not
suggest that AHERF management acted entirely in their own interest.

(d)  Denied, except PwC admits that the Committee accurately quotes
Mr. Spargo's March 13, 1997 memorandum, which was not provided to C&L.
The Committee mischaracterizes Mr. Spargo's memorandum, by quoting out of
context.  (Ex. 1533 (PwC Supp. tab 213).)  PwC denies that the Committee's

assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(e)  PwC admits that Mr. Snow testified generally as indicated, but denies that this paragraph is material because it does not suggest that AHERF management acted entirely in its own interest.

(f)  Denied, except PwC admits that the Committee accurately quotes Mr. Snow's testimony, that Mr. Snow began working at AHERF in 1995, and that in October 1995 Mr. McConnell instructed Mr. Snow to stop writing off certain older accounts.  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(g)  Denied, except PwC admits that the write-offs referenced in this paragraph occurred in four installments of roughly $20 million (gross) each (totaling roughly $60 million net of offsetting credits), and that by September 1996 AHERF management had decided to writeoff roughly $80 million (net) of accounts. (See PwC SOF ¶¶ 78-80.)  The Committee mischaracterizes the amount and the timing of the writeoffs; there is no evidence that the third and fourth installments were delayed because of the reserve transfer.  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

(h)  PwC admits the Committee accurately quoted from Mr. Spargo's deposition testimony, but denies any characterizations or inferences the Committee draws from those facts.  PwC further denies that the Committee's

assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

231.  Denied.  Only employees with satisfactory job performance evaluations in eligible Business Units received annual incentive plan payments for fiscal year 1996.  (Ex. 2476 (PwC Supp. tab 211) at JD-HL 0020917.)  AHERF already did not meet the Financial Viability measure for fiscal year 1996 based on the reported financial results, so PwC denies the Committee's implication that the Committee's proposed adjustment would have caused a failure to meet that measure.  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

232.  Admitted, except that the term "key executives" is vague and, depending on its interpretation, may mischaracterize the Long Term Incentive Plan.  (Ex. 2476 (Comm. App.) at JD-HL 0020927.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

233.  Denied as vague and overly broad, except PwC admits that the Compensation Committee approved the release of the accrued Deferred Incentive Awards for fiscal year 1994 in March of 1998, and that the resolution drafted by AHERF management and approved by the Compensation Committee stated that "organizational performance . . . was excellent and met all established goals".  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

234.  Denied, except PwC admits that the Committee accurately quotes Ms. Maher's deposition testimony.  PwC denies that Ms. Maher's testimony is admissible, as it is hearsay and lacks foundation.  The admissible evidence in the record establishes that the compensation of AHERF management was considered "fair", "reasonable" and "comparable to similar organizations".  (Kasperbauer Dep. Tr. (PwC tab 208) at 184-86.)  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

235.  Denied, except PwC admits that the Committee accurately states the total income that Mr. Abdelhak received in calendar years (not fiscal years) 1996 and 1997, and further states that the amounts of bonuses and allowances are set forth in the document the Committee cites (Ex. 2472 (Comm. App.)).  The compensation received by Mr. Abdelhak was approved by the Compensation Committee.  (PwC SOF ¶ 40.)  PwC specifically denies the statement that "much of these bonuses were directly tied to net income".  (*See supra* ¶¶ 226-229.)  PwC further admits that the hearsay newspaper article the Committee cites purports to state salary figures for the head of the University of Pittsburgh Medical Center Health System, and that the bankruptcy court filing the Committee cites lists salaries for the then-top 25 executives of AHERF.  PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

236.  Denied, except PwC admits that the Committee accurately states the total income that Mr. McConnell received in calendar years (not fiscal years) 1996 and 1997, and further states that the amounts of bonuses and allowances are set forth in the document the Committee cites (Ex. 2475 (Comm. App.)).  The compensation received by