Mr. McConnell was approved by the Compensation Committee. (PwC SOF ¶ 40.) PwC specifically denies the statement that "much of these bonuses were directly tied to net income". (*See supra* ¶¶ 226-229.) PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

237. Denied, except PwC admits that the Committee accurately quotes from the documents it cites. PwC further states that AHERF's Board knew, or should have known, of AHERF's financial distress. Mr. Barnes believed at the time that AHERF's earnings for fiscal year 1996 were "unimpressive" and, at the very December 2, 1996 Finance Committee meeting from which the Committee quotes, stated that "last year was [the] toughest year in this corporation since World War II from bottom line". (Barnes Dep. Tr. (PwC Supp. tab 176) at 124-26; Ex. 1650 (Comm. App.) at GOR0000203.) Referring to the fall of 1997, Mr. Barnes testified, "Well, the first thing was an absolutely massive storm warning signal which went up on October 30 when we saw the first quarter results were, you know, just disastrous . . . ." (Barnes Dep. Tr. (PwC Supp. tab 176) at 169.) Mr. Brenner testified that AHERF was at a "scramble stage" in the fall of 1997 due to concerns over AHERF's known financial distress. (Brenner Dep. Tr. (PwC Supp. tab 175) at 109.) PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

238. Denied, except PwC admits that during fiscal years 1996 and 1997, AGH liquidated certain investments and made an intercompany advance of those funds to DVOG. All of such inter-company advances outstanding as of June 30, 1996, was

reflected in the 1996 audited financial statements of AGH as "due from affiliates"; PwC denies that any such advances were reclassified as funded depreciation. (*See* AGH audited financial statements, Ex. 237 (PwC Supp. tab 214) at PR-BINDER-12-00691, PR-BINDER-12-00711; Adamczak Dep. Tr. (PwC Supp. tab 204) at 829.) A portion of the inter-company advance outstanding as of June 30, 1997, was reflected as "assets limited or restricted as to use" in the consolidating information for AGH attached to the 1997 audited financial statements of AHERF. Mr. Abdelhak explained this classification to the Audit Committee at the meeting held on October 15, 1997, when the draft 1997 audited financial statements were presented to the Audit Committee. (Ex. 58 (PwC tab 94) at TN CBC43B 00921; Ex. 2019 (PwC Supp. tab 215) at GOV 55814; Ex. 1659 (PwC Supp. tab 216) at page 7 of 13; Ex. 732 (PwC Supp. tab 217) at DS 01787; Gumberg Dep. Tr. (PwC Supp. tab 218) at 243-44, 248-49; Daniel Dep. Tr. (PwC Supp. tab 219) at 138.) Accordingly, PwC specifically denies that the audited financial statements "left the Board in the dark". The testimony of Mr. Adamczak and Ms. Gilbert, quoted by the Committee, is inadmissible for lack of foundation. PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

239. PwC admits the facts stated in the first sentence and that the Committee has accurately quoted from Mr. Adamczak's deposition testimony, but otherwise denies this paragraph. Mr. Adamczak's testimony is inadmissible as it is speculative hearsay and lacks a proper foundation. PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

240.  Denied, except that PwC admits that on April 27, 1998, AHERF repaid $89,457,722.18 outstanding on a line of credit with a consortium of banks that included Mellon Bank (MM2945 (PwC Supp. tab 220)), and that Abdelhak directed McConnell to "liquidate sufficient funds . . . to pay the loan in full". (Ex. 1930 (PwC Supp. tab 221)). PwC admits that the quotation discussed in the third sentence was taken from an e-mail Mr. Martin received from Carol Gordon (RMcK-022 (Comm. Tab 17)). PwC denies the fourth sentence; the Committee has mischaracterized the resolution. (*See* GOV 29560-69 (PwC Supp. tab 222) at GOV 29565-66.) PwC denies that the Committee's assertions are material because they do not suggest that AHERF management acted entirely in their own interest.

241.  PwC admits the Committee has accurately quoted from C&L's workpapers, but denies any implication that this accurately reflects the operation of the AHERF Board or Audit Committee. C&L was poorly placed to evaluate the independence of the Board. C&L did not interact with the AHERF Board. C&L generally met with the Audit Committee twice a year to discuss the audit. (*See* PwC SOF ¶ 309.) The Committee's assertions do not create a genuine issue of material fact because the undisputed testimony of the Board members with direct knowledge establishes that AHERF's Board was dominated and controlled by AHERF management. (*See* PwC SOF ¶¶ 44-62.)

242.  PwC admits that the cited Bates range within Exhibit 4403 was a "Client Services Approach" meeting document produced from Mr. Kirstein's files that includes the language quoted by the Committee. PwC denies that the Committee's selective quotations from this document accurately represent its substance, as the

document speaks for itself. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

243. PwC admits the first sentence of this paragraph. PwC denies the second sentence of this paragraph, which is not supported here, in any other portion of the Committee's SOF, or in the record as a whole. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

244. PwC admits that the Committee has accurately quoted the deposition testimony of Mr. Spargo, but otherwise denies that this paragraph is undisputed. Mr. Buettner denied that he had such a conversation with Mr. McConnell or Mr. Spargo. (Buettner Dep. Tr. (PwC Supp. tab 192) at 622, 631-33.) Mr. Buettner further testified that when he found out about the transfer, he told Amy Frazier to tell Mr. Cancelmi that he would not accept the transfer because he felt the transfer "was a departure from GAAP". (Buettner Dep. Tr. (PwC Supp. tab 192) at 618-19.) Mr. Spargo's testimony is inadmissible hearsay and speculation that lacks foundation. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

245. Denied. Mr. Kirstein and Mr. Cancelmi have both testified that the topic of transferring $50 million in Graduate reserves to the DVOG books was not discussed at this lunch meeting. (Cancelmi SEC Tr. (PwC Supp. tab 223) at 23-24; Kirstein SEC Tr. (PwC Supp. tab 224) at 13-16.) PwC denies that the Committee's

assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

246. Denied. The testimony of Mr. Cancelmi cited by the Committee is inadmissible because it is vague and self-serving, and is hearsay as to supposed conversations of others. Further, C&L did not approve of the transfer referred to in this paragraph, and made its disapproval known to AHERF. (Buettner Dep. Tr. (PwC Supp. tab 192) at 618-619.) Ms. Frazier told Mr. Cancelmi that the appropriate solution was to "reverse the 50 million dollar entry". (Frazier Dep. Tr. (PwC Supp. tab 193) at 152; *see also supra* ¶ 243.) PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

247. Denied, except that PwC admits that Mr. Kirstein took handwritten notes dated April 18, 1997 (Ex. 4436 (PwC Supp. tab 225) at PWCK2 45), that the Committee accurately quotes Mr. Kirstein's reading of those notes at his deposition, and that Mr. Kirstein was not able to recall the subject of those notes at his deposition. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

248. Denied, except PwC admits that Mr. Kirstein took handwritten notes dated June 10, 1997 (Ex. 4403 (PwC Supp. tab 226) at PWCK2 37), that the Committee accurately quotes Mr. Kirstein's reading of those notes at his deposition, and that Mr. Kirstein was not able to recall the subject of those notes at his deposition. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

249. PwC admits that the description of the "CLASS" system and that the quotation from the preliminary review note referenced in paragraph 249 is accurate, but disputes the inference the Committee seeks to draw relating this preliminary review note to the $50 million reserve transfer. (*See* Frazier Dep. Tr. (PwC Supp. tab 193) at 615-16, 618.) PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

250. Denied, except PwC admits that on or about June 9, 1997, Ms. Heinlein, a C&L staff auditor, created a draft "Issue" document in the CLASS database entitled "$50 Million Reserve Entry", and that the Committee accurately quotes from the "Issue Description" field of that document (Ex. 4297 (PwC Supp. tab 227)). PwC states that Ms. Heinlein designated documents containing her notes on matters to address later as "Issue" documents simply as a convenient way to control and view them later. (Heinlein Dep. Tr. (PwC Supp. tab 228) at 141-42.) PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

251. Denied. When Ms. Heinlein was first interviewed by the Securities and Exchange Commission (SEC) on March 1, 2000, she testified that she recalled that she first learned of the transfer of $50 million of reserves from the Graduate books to the DVOG books from Ms. Frazier during the "year-end" phase of the audit. (Heinlein 3/1/00 SEC Dep. Tr. (PwC Supp. tab 229) at 88, 91.) At a later interview before the SEC, on September 15, 2000, she testified that she had reviewed additional documents since her first interview with the SEC, and that she "realized that I knew about the

$50 million before August. So my chronology was incorrect [in her first interview]." (Heinlein 9/15/00 SEC Dep. Tr. (PwC Supp. tab 229) at 10.) When she was deposed in this case on February 24, 2004, Ms. Heinlein testified that she did not recall who first told her about the $50 million reserve transfer. (Heinlein Dep. Tr. (PwC Supp. tab 228) at 115.) PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

252. Denied, except PwC admits that on or about September 15, 1997, following C&L's resolution of the $50 million reserve transfer, Ms. Heinlein moved the content of her draft "Issue" document into an ordinary workpaper, which is contained in the final CLASS database. The Committee cites no evidence of any effort to "eliminate" workpapers or to "alter" workpapers other than revisions made in the ordinary course of the audit. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

253. Denied, except PwC admits that a workpaper in the CLASS database can be deleted in one of two ways, either by marking the item for deletion, or by "hard deletion". PwC further states that it is immaterial that the draft "Issue" document was "hard deleted" because, as the Committee admits (*see* Comm. SOF ¶¶ 252-253), the content of the draft "Issue" document is contained in the final CLASS database as an ordinary workpaper. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

254. PwC admits the facts stated in this paragraph, but denies any characterizations or inferences the Committee draws from those facts. AHERF management transferred the $50 million of Graduate reserves for a perceived need at the DVOG hospitals, C&L considered that transfer to be inappropriate, and evaluated the need for the reserves at Graduate. (Ex. 4444 (PwC Supp. tab 230) at CL 25987; Frazier Dep. Tr. (PwC Supp. tab 193) at 680-84.) The revisions to the workpapers referred to in this paragraph were made in the ordinary course of the audit. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

255. PwC admits the facts stated in this paragraph, but denies any characterizations or inferences the Committee draws from those facts. PwC denies that the Committee's assertions are material because the defendant's knowledge of wrongdoing imputed to the corporation is irrelevant to the *in pari delicto* defense.

## II. AUDIT INTERFERENCE

256. Denied, except PwC admits that the Committee's retained accounting and auditing experts prepared lengthy reports that catalogue purported violations of GAAP by AHERF and GAAS by C&L. The Committee misstates the record regarding the opinions of Messrs. Berliner and Regan. Mr. Berliner did not opine that C&L was reckless (a legal concept), and Mr. Regan did not conclude that AHERF deliberately misstated its financial statements, and therefore cannot have a basis to opine that C&L knew or recklessly disregarded that AHERF did so. (Regan Dep. Tr. (PwC Supp. tab 191) at 191-92.)

PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

257. Denied, except that PwC admits Messrs. Berliner and Regan submitted reports, each of which speaks for itself. Each of these retained experts conceded that AHERF management was responsible for preparation of AHERF's financial statements. (Berliner Dep. Tr. (PwC Supp. tab 190) at 237-38, 241-42; Regan Dep. Tr. (PwC Supp. tab 191) at 165, 214; PwC SOF ¶¶ 71-73.) PwC admits that, for not-for-profit entities, net assets and unrestricted net assets (also known as "fund balance") is a primary measure of the financial health of the organization.

258. PwC admits that the facts stated in this paragraph are not disputed for purposes of this motion. PwC further admits that Ms. Robinson's letter dated October 30, 1996 (Ex. 20 (PwC tab 103)), is evidence for the assertion in the Committee's first sentence. AHERF failed to disclose Ms. Robinson's October 30, 1996 letter to C&L until calendar year 1998. (*See* PwC SOF ¶¶ 130-131.)

259. PwC admits that the Committee's retained experts Messrs. Berliner and Regan have given the opinions cited. PwC denies that this paragraph is material because AHERF's contributory negligence was a substantial factor in causing the alleged audit failings, even if it did not entirely "prevent" their detection ("prevention" is not the legal standard).

260. Admitted. PwC further states that C&L's audits complied with the third standard of fieldwork.

261. PwC admits that the quoted material in this paragraph appears in the cited documents, but denies that this paragraph is material because C&L's alleged

negligence is irrelevant to the contributory negligence defense. PwC further responds that: (1) classification of accounts receivable as an area of "higher risk" is an audit planning categorization relative to other balance sheet accounts and reflects a judgment by C&L about the extent to which its audit can rely on the company's internal controls to reduce the extent of substantive testing; and (2) C&L conducted additional reviews of the billing process at AHERF as a result of classifying accounts receivable as an area of "higher risk". (Buettner Dep. Tr. (PwC Supp. tab 192) at 49-50, 52-54, 88-90; Kirstein Dep. Tr. (PwC Supp. tab 197) at 211.)

262. Admitted. The bad debt reserves carried by AHERF hospitals, like all bad debt reserves, were accounting estimates created by management and for which management was responsible. (PwC SOF ¶¶ 70-71.) PwC further denies that the responsibility discussed in this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

263. Admitted, except that PwC denies that the standards set forth in this paragraph are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

264. Admitted, except that PwC denies that those procedures that might be performed to assess the reasonableness of management's estimates as outlined in this paragraph are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

265. Denied, except PwC admits that Mr. Adamczak was interviewed by Mr. Cepielik, a legacy Price Waterhouse manager, in October 1998, and that Mr. Cepielik's notes contain the material quoted by the Committee. Mr. Adamczak

testified that he was not responsible for the DVOG accounts receivable reserves in 1996, that he did not pay attention to discussions about those reserves, that he did not recall specific discussions about them in any detail, and that he was not present for the meeting to which his statement to Mr. Cepielik refers. (Adamczak Dep. Tr. (PwC Supp. tab 204) at 59-60, 85, 101, 123, 142-43, 164-65.) In addition, Mr. Adamczak's statements to Mr. Cepielik are inadmissible hearsay and speculation without foundation. PwC further denies that the notes or Mr. Adamczak's statements are material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

266. Denied. Mr. Adamczak testified that he did not recall the discussions in 1996 about DVOG bad debt reserves in any detail, that he did not pay attention to those discussions because that was not his area of responsibility, and that he was not present or involved in discussions that allegedly yielded the conclusions referred to in this paragraph. (*See supra* ¶ 265.) Mr. Adamczak's testimony on this subject is also inadmissible hearsay and unfounded speculation. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

267. Denied, except PwC admits that the Committee accurately summarizes the cited opinions of Messrs. Berliner and Regan. The record does not support the Committee's characterization of Mr. Spargo's testimony. Mr. Spargo testified that he did not recall specific details from 1996 "closing" meetings, including whether there was any agreement about a purported $30 million "shortfall" in DVOG accounts receivable reserves, but did recall "everyone acknowledging a deficiency that needed to be rectified quickly". (Spargo Dep. Tr. (PwC Supp. tab 200) at 204.) Counsel

for the Committee was unable to "refresh" Mr. Spargo's recollection with Mr. Cepielek's notes from an October 1998 interview with Mr. Adamczak. (Spargo Dep. Tr. (PwC Supp. tab 200) at 207-08.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

268. Admitted, except PwC further states that Ms. Schaffer coordinated AHERF's response to C&L's audit requests in the accounts receivable area (Schaffer Dep. Tr. (PwC Supp. tab 198) at 89), and that for the audit of AHERF's 1996 financial statements, Mr. Kirstein was the manager assigned to that area. (Kirstein Dep. Tr. (PwC Supp. tab 197) at 168-69.)

269. PwC admits that the Committee has correctly quoted the excerpted passages from Ms. Schaffer's testimony, but otherwise disputes this paragraph. Ms. Schaffer's testimony about what C&L would have known from the schedules is vague and inadmissible speculation without foundation. The Committee misstates Ms. Schaffer's testimony. Ms. Schaffer testified that she did not discuss with C&L that there were accounts that should be written off (or reserved at 100%), and that she was not aware of any such accounts during C&L's fiscal year 1996 audit. (Schaffer Dep. Tr. (PwC Supp. tab 198) at 158-59.) PwC denies the Committee's characterization of Ms. Schaffer's testimony about "candid" discussions with Ms. Frazier. PwC denies that the quoted testimony is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

270. PwC admits that Mr. Cancelmi testified as quoted, but disputes the remainder of this paragraph. The Committee mischaracterizes Mr. Cancelmi's testimony. PwC admits that Mr. Cancelmi testified to disagreements between his department and the

billing operation run by Mr. Snow, but denies that Mr. Cancelmi testified that he urged

C&L to conduct extensive auditing in the accounts receivable area. Statements by

Mr. Cancelmi about the extent of C&L's alleged awareness are inadmissible speculation

without foundation. PwC denies that this paragraph is material because C&L's alleged

negligence is irrelevant to the contributory negligence defense.

271. Denied. The Committee mischaracterizes Mr. Spargo's testimony

and quotes it out of context. Mr. Spargo did not testify that he requested that C&L

address any perceived problem in the <u>financial accounting</u> department or its valuation of

receivables, but testified that he had little faith in Mr. Snow's <u>collections</u> department,

including both the "numbers" being reported by the collections department to the

financial accounting department and what Mr. Spargo perceived to be a poor job on

collections. (Spargo Dep. Tr. (PwC Supp. tab 200) at 99-100.) Mr. Spargo also testified

that he had an "impression" that his opinion on Mr. Snow's department was taken less

seriously by Mr. Buettner (*id.* at 103) but that impression was not based on direct

conversations that Mr. Spargo had with C&L, and is inadmissible hearsay without

foundation. PwC denies that this paragraph is material because C&L's alleged

negligence is irrelevant to the contributory negligence defense.

272. PwC admits that Mr. Laing testified as quoted by the Committee.

PwC disputes the remainder of this paragraph. Mr. Laing was employed in the billing

and collections department, not in the financial reporting area, and his analyses were not

for financial reporting purposes. (Snow Dep. Tr. (PwC Supp. tab 231) at 25-29, 205-06;

Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1435-36.) PwC denies the Committee's

assertion that Mr. Laing was "known to possess extensive experience in auditing and

estimating healthcare receivables". (Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1436-37; Spargo Dep. Tr. (PwC Supp. tab 200) at 753-57.) PwC states further that Mr. Laing met with C&L during the 1996 and 1997 audits, but failed to inform C&L of the views the Committee attributes to him. (*See also* Ex. 914 (PwC Supp. tab 232); Snow Dep. Tr. (PwC Supp. tab 231) at 117.) Additionally, Mr. Laing's testimony is inadmissible self-serving speculation without foundation. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

273. Admitted, except PwC clarifies that C&L observed that the methods employed at the DVOG hospitals for estimating bad debt reserves were not consistent with one another or with the method employed at AGH. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

274. PwC admits that the material quoted by the Committee appears in Exhibit 4090. The paragraph is incomplete and misleading because the Committee fails to include that C&L reported to the AHERF Board of Trustees in its final 1995 management comment letter that "Management should establish a system-wide methodology for calculating the reserve for bad debts using aging percentages by payor based on actual historical data." (Ex. 7 (Comm. App.) at DC 8221 page 7 of 22), and identified this area in its 1996 management comment letter as one not yet addressed by management. (Ex. 22 (PwC Supp. tab 233) at DC 8230 page 16 of 16.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

275. Denied, except PwC admits that the exhibits cited contain the figures indicated by the Committee. This paragraph is misleading because it compares only certain aging "buckets" for certain payor classes rather than comparing all aging buckets for all payor classes, and because it compares reserve percentages of net accounts receivable for some hospitals with reserve percentages of gross accounts receivable for other hospitals. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

276. Denied, except that PwC admits C&L was provided with the schedules marked as Exhibits 109-111, 113, 115, 117, and 118. PwC denies the Committee's characterization of the level at which certain receivables were reserved. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

277. PwC admits that the excerpts quoted by the Committee from Exhibits 4274 and 4201 appear in those documents. Paragraph 277 is misleading because it omits the fact that C&L addressed perceived inadequacies in DVOG reserves by proposing an increase of $15 to $20 million of accounts receivable reserves, and AHERF recorded an increase of $17.5 million. (Buettner Dep. Tr. (PwC Supp. tab 192) at 218-19; Spargo Dep. Tr. (PwC Supp. tab 200) at 813-17, 829; Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1637-38, 1793-94.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

278. Denied, except that PwC admits that (1) C&L assessed the reasonableness of AHERF management's reserve estimates for MCPH and EPPI based in part upon the methodology used at Hahnemann; and (2) the amounts of reserves

estimated by each method are as stated. The Committee's characterizations are not supported by Exhibits 1075 and 4389 or the testimony cited from Messrs. Cancelmi and Kirstein. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

279. Denied. This paragraph relies upon the Committee's mischaracterization of exhibits cited in paragraph 276. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

280. Denied. The Committee misstates the record concerning C&L's audit work. In fiscal year 1995, C&L recommended that AHERF develop a system-wide approach to setting reserves and that the AGH method be considered as a possible method. (Ex. 7 (Comm. App.) at DC 8221 page 7 of 22.) Exhibit 4386 is an agenda for an internal C&L meeting for the fiscal 1996 audit and does not "indicate" work to be performed. (Buettner Dep. Tr. (PwC Supp. tab 192) at 152-53.) During the 1996 audit, Mr. Buettner reached the conclusion that, in light of the billing difficulties at the DVOG hospitals, it would not be helpful for C&L to use the AGH reserve percentages to evaluate management's estimate of reserves needed at the DVOG hospitals. (*Id* at 150-54.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

281. Denied, except PwC admits that the quoted material appears in Exhibit 4023. C&L addressed perceived inadequacies in DVOG reserves by proposing an increase of $15 to $20 million of accounts receivable reserves and AHERF recorded an increase of $17.5 million. (*See supra* ¶ 277.) C&L believed that, in light of the billing

difficulties at the DVOG hospitals, it would not be helpful to use the AGH reserve
percentages to evaluate management's estimate of reserves at the DVOG hospitals for
fiscal 1996. (*See supra* ¶ 280). PwC denies that this paragraph is material because
C&L's alleged negligence is irrelevant to the contributory negligence defense.

        282. PwC admits that Mr. Buettner testified and concluded as indicated,
and that AHERF adjusted the DVOG bad debt reserves upward for 1996. PwC denies the
remainder of this paragraph. The Committee misstates Mr. Tillett's testimony.
Mr. Tillett testified that he would not necessarily expect the work papers to contain
documents referencing the range of Mr. Buettner's recommendation for adjustment to
increase the DVOG bad debt reserves. (Tillett Dep. Tr. (PwC Supp. tab 234) at 187-92.)
C&L did not render audit opinions on the financial statements of individual DVOG
hospitals in fiscal year 1996. (PwC SOF ¶¶ 63-64.) PwC denies that this paragraph is
material because C&L's alleged negligence is irrelevant to the contributory negligence
defense.

        283. Denied, except PwC admits that C&L's audit program called for
"subsequent receipts" testing. C&L performed the "subsequent receipts" testing called
for by its audit program. (Kirstein Dep. Tr. (PwC Supp. tab 197) at 51; Buettner Dep. Tr.
(PwC Supp. tab 192) at 119-20.) That testing showed that subsequent receipts at the
DVOG hospitals tended to be lower than at AGH, which was consistent with C&L's
expectations. (Buettner Dep. Tr. (PwC Supp. tab 192) at 130-31.) PwC denies that this
paragraph is material because C&L's alleged negligence is irrelevant to the contributory
negligence defense.

284. Denied, except that PwC admits the first two sentences of this paragraph. The Committee misrepresents Mr. Buettner's testimony, which was that the information on this workpaper suggested an increase in the reserve. (Buettner Dep. Tr. (PwC Supp. tab 192) at 244-45.) C&L proposed an increase of $15 to $20 million of accounts receivable reserves for fiscal 1996, and AHERF recorded an increase of $17.5 million. (*See supra* at 277.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

285. PwC admits that the quoted language appears in Exhibit 4025. PwC disputes the remainder of this paragraph. C&L conducted "high dollar account[]" testing to assess management's controls over whether accounts were carried at net realizable value on the patent accounting system, and appropriately considered this audit step (along with many others) in evaluating the reasonableness of management's estimate of accounts receivable reserves. (Kirstein Dep. Tr. (PwC Supp. tab 197) at 373-77.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

286. PwC admits that as part of its audit work, C&L calculated days in A/R figures for the DVOG hospitals, and that "Days in A/R" is one common benchmark among many for evaluating the adequacy of accounts receivable reserves, but denies the assertion that those figures were "considerably higher than industry averages", which is the Committee's unsupported characterization. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

287.  PwC admits that C&L identified some patient accounts not being properly adjusted for contractual allowance, and determined that AHERF management was aware of that problem and addressing it.  PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

288.  Denied.  Unlike Messrs. Abdelhak and McConnell, who have not given substantive testimony in this matter, but have instead consistently asserted their respective privileges against self-incrimination, Ms. Frazier and Messrs. Buettner and Kirstein have testified fully in this case.  Messrs. Buettner and Kirstein and Ms. Frazier were each deposed for three days, and each fully testified, without asserting a privilege against self-incrimination.  (Buettner Dep. Tr. (PwC Supp. tab 192); Frazier Dep. Tr. (PwC Supp. tab 193); Kirstein Dep. Tr. (PwC Supp. tab 197).)  PwC further denies that assertions of the Fifth Amendment privilege by Messrs. Buettner and Kirstein and Ms. Frazier in a prior proceeding outside this case would be admissible evidence.  PwC denies that this paragraph is material because AHERF's contributory negligence was a substantial factor contributing to the alleged audit failings.

289.  PwC admits that an increase to bad debt expense is generally the appropriate method for recording an increase to bad debt reserves, outside the context of a business combination accounted for as a purchase.  In fiscal year 1997, C&L evaluated the accounts receivable reserves of the "old AHERF" entities, including DVOG, and concluded that those entities were adequately reserved without the $50 million.  (Buettner Dep. Tr. (PwC Supp. tab 192) at 644, 647, 684-90; Frazier Dep. Tr. (PwC Supp. tab 193) at 589-90; Ex. 4444 (PwC Supp. tab 230).)  PwC denies the Committee's hypotheses about alternative financial statements as unsupported speculation because C&L never

74

concluded that additional reserves of $50 million were required at the DVOG. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

290. PwC admits this paragraph, except that the actual amount of restructuring reserves recorded was $49.062 million. (Ex. 58 (PwC tab 94) at TN CBC43B 00918 (note 15).)

291. PwC admits that the language quoted in this paragraph appears in the cited documents and transcripts. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

292. PwC admits that the documents cited in this paragraph contain the excerpted language. PwC denies any inferences that the Committee would draw from, or characterizations the Committee would make of, the cited documents. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

293. Denied, except PwC admits that certain portions of the $21 million and $28 million reserve transfers came from general ledger account 4205001 (sometimes known as "accrued miscellaneous") at The Graduate Hospital, Mt. Sinai Hospital and Rancocas Hospital. PwC specifically denies the Committee's description of note F (Exhibit 4127 (Comm. App.) at CL 013236), which mischaracterizes the document. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

294. Denied, except PwC admits that Exhibit 4130 noted declines in some of the accounts referred to on the cited schedules. PwC denies any inferences that the

Committee would draw from or characterizations that the Committee would make of the facts asserted in this paragraph. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

295. PwC admits that the exhibits cited by the Committee in this paragraph are fluctuation analyses, but denies the Committee's characterizations of the exhibits and C&L's audit program, which are the Committee's own and not supported by the cited exhibits or witness. C&L made inquiries of AHERF management about the reasons for declines in certain Graduate reserve accounts, and was told by AHERF management that those reserves were no longer needed. (Schaffer Dep. Tr. (PwC Supp. tab 198) at 169-70.) AHERF concealed from C&L the fact of additional reserve transfers to DVOG. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

296. Denied. AHERF had multiple general ledgers, generally one for each business unit. (Cancelmi Dep. Tr. (PwC Supp. tab 196) at 1067-68; *see also* Lisman Dep. Tr. (PwC Supp. tab 235) at 8.) Testimony from Messrs. Adamczak and Lisman about what C&L "could have tracked down" is inadmissible unfounded speculation. The Committee's statements about C&L having "access" to the general ledger are misleading, because an audit is not designed to (and C&L did not) audit journal entries, as AHERF management knew; because AHERF did not provide these journal entries to C&L; and because journal entries were often not accompanied by explanations. (Schaffer Dep. Tr. (PwC Supp. tab 198) at 517-19, 944-46; Lisman Dep. Tr. (tab 235) at 458-60.) PwC denies that journal entry binders were "made available" to C&L during its audits. AHERF management did not provide C&L with copies or make them aware of the

journal entries that comprised the "reserve transfers" the Committee discusses in this paragraph, and did not direct C&L to those entries. (Schaffer Dep. Tr. (tab 198) at 943-46.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

297. Denied. The schedule referred to by the Committee was not provided to C&L during the course of the fiscal 1997 audit. Rather, this schedule was found in the files for certain proposed agreed-upon procedures relating to "prudent buyer" obligations at the Graduate hospitals, which procedures were to be undertaken during fiscal year 1998 (after completion of the 1997 audit) but were never completed. The document the Committee cites contains only a few components of the transfers at issue, and contains no indication of any of the transfers made in June 1997. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense and because intent is not an element of PwC's contributory negligence defense.

298. PwC admits that AHERF employees have testified as indicated, but disputes the remainder of this paragraph. There is abundant evidence that AHERF's management and employees were not forthcoming in dealing with C&L and did not provide C&L with information they knew to be important to C&L's audit work. (*See* PwC SOF ¶¶ 75-77, 79-80, 83, 94, 99-100, 102-104, 108, 113-115, 124-125, 129-131, 134-141.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense and because intent is not an element of PwC's contributory negligence defense.

77

299. PwC admits that the Committee has accurately quoted from GAAS. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

300. PwC admits that the Committee has accurately quoted from GAAS. PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

301. PwC admits that C&L prepared first drafts of management representation letters, which were circulated to AHERF management for comments and revisions. AHERF management were free to make any comment or propose any revision to the representations in the draft of the letters, and AHERF management was responsible for the content of the management representations. (*See* Ex. 1590 (PwC tab 69.) PwC denies that this paragraph is material because C&L's alleged negligence is irrelevant to the contributory negligence defense.

## III. CAUSATION

302. PwC admits that this paragraph is undisputed but denies that this paragraph is material because AHERF's Board and Audit Committee were under the domination and control of Mr. Abdelhak.

303. PwC admits that this paragraph is undisputed but denies that this paragraph is material because AHERF's Board and Audit Committee were under the domination and control of Mr. Abdelhak.

304. PwC admits that the cited documents contain the quotations given by the Committee. PwC disputes the remainder of the paragraph and denies that the paragraph is material because, as previously alleged by the Committee, members of the

78

AHERF Board and Audit Committee did not fulfill their fiduciary duties, and were under the domination and control of Mr. Abdelhak.

305. PwC admits that C&L interacted with AHERF's Audit Committee and not with AHERF's Board. PwC disputes the remainder of this paragraph. During fiscal years 1996 and 1997, the Finance Committee of the Board, not the Audit Committee, had oversight of AHERF's financial affairs. (AHERF Bylaws, 12/12/96 (PwC Supp. tab 236) at GOV 1848-49, 1850-51.) The AHERF Board and its committees were under the domination and control of Mr. Abdelhak. (*See* PwC SOF ¶¶ 44-59.)

306. PwC admits that this paragraph is undisputed but notes that the Finance and Audit Committee also assumed the responsibilities of the former Finance Committee. PwC denies that this paragraph is material because AHERF's Board and Audit Committee were under the control and domination of Mr. Abdelhak.

307. Admitted.

308. Admitted.

309. PwC admits that Mr. Buettner of C&L attended the meetings of AHERF's Audit Committee on October 16, 1995, April 8, 1996, October 15, 1996, March 14, 1997 and October 15, 1997, that Mr. Buettner and Lou Testoni of C&L attended the meeting of AHERF's Finance and Audit Committee on March 11, 1998, and part of a meeting with members of the Finance and Audit Committee on June 12, 1998, that Mr. Stalder and Mr. Korbly of PwC attended the meetings of the Finance and Audit Committee on August 27, 1998 and September 1, 1998, and that Mr. Stalder, Mr. Korbly and Mel Hope of PwC attended the meeting of the Finance and Audit Committee on October 28, 1998. PwC otherwise disputes this paragraph. PwC denies that this

79

paragraph is material because AHERF's Board and Audit Committee were under the control and domination of Mr. Abdelhak at all relevant times.

310. Admitted.

311. Admitted.

312. PwC denies the Committee's characterizations of the October 15, 1996 Audit Committee meeting. The Committee mischaracterizes the notes it cites of that meeting; it was Mr. Abdelhak who "reassured the Committee" that the reserves were "very conservative". (Ex. 1648 (Comm. App.) at GOR0000198.) PwC admits that the 1996 C&L management comment letter includes the language the Committee quotes, but denies that the Committee has characterized that letter accurately; C&L noted a "challenging environment" for accounts receivable management at AHERF. (*See* Ex. 22 (PwC Supp. tab 233) at DC 8230 page 4 of 16.)

PwC further denies the final sentence of this paragraph. The Committee does not describe Mr. Buettner's deposition testimony accurately. (*See* Buettner Dep. Tr. (PwC Supp. tab 192) at 217-18.) At C&L's suggestion, AHERF increased the bad debt reserve for DVOG by $17.5 million dollars (*id.* at 221), and on that adjusted basis C&L was "comfortable" with the bad debt reserve estimate (*id.* at 222). PwC denies that this paragraph is material because AHERF's Board and Audit Committee were under the domination and control of Abdelhak and because there is no admissible evidence that the AHERF Board would have taken any specific corrective action in response to additional or different information.

313. PwC admits that the document the Committee cites attributes the quoted language to Mr. Barnes. PwC denies that this paragraph is material because

AHERF's Board and Audit Committee were under the control and domination of
Mr. Abdelhak.

314. PwC admits that at each meeting of AHERF's Audit Committee,
both C&L and the Committee had the opportunity to meet with each other in executive
session outside the presence of AHERF's management. PwC denies that this paragraph
is material because AHERF's Board and its committees were under the domination and
control of Mr. Abdelhak.

315. PwC admits that both C&L and AHERF's Audit Committee declined
each opportunity to meet in executive session with each other. PwC denies that this
paragraph is material because AHERF's Board and its committees were under the
domination and control of Mr. Abdelhak.

316. PwC admits that C&L's 1996 and 1997 audit reports for AHERF
included the following language:

> "We have audited the accompanying consolidated balance sheet of
> Allegheny Health, Education and Research Foundation . . . . These
> consolidated financial statements are the responsibility of Allegheny
> Health, Education and Research Foundation's management. Our
> responsibility is to express an opinion on these consolidated financial
> statements based on our audit. . . .
>
> "In our opinion, the consolidated financial statements referred to above
> present fairly, in all material respects, the consolidated financial position
> of Allegheny Health, Education and Research Foundation . . . ."

(Ex. 1661 (PwC Supp. tab 237) at JB 01606; Ex. 58 (PwC tab 94) at TN CBC 43B
00895.) Audit reports including such language are commonly known as "unqualified
opinions". PwC disputes the remainder of this paragraph. The C&L audit reports speak
for themselves. PwC denies that this paragraph is material because AHERF's Board and

creditors knew or should have known of AHERF's financial difficulties. (*See supra*
¶ 237, *infra* ¶¶ 347, 353, 374.)

317. Denied. In September and October 1998, James Stalder of PwC
advised the AHERF Finance and Audit Committee and Mr. Barnes, chairman of that
committee, of evidence that fraud may exist, pursuant to SAS 82. (Ex. 1976 (PwC Supp.
tab 238); Ex. 4168 (PwC Supp. tab 239); Ex. 4455 (PwC Supp. tab 240); PR-1-001223-
27 (PwC Supp. tab 241) at PR-1-001225.) PwC denies that this paragraph is material
because AHERF's Board and creditors knew or should have known of volumes of
information that "raised questions about the competence [and] integrity of AHERF's
financial management", and because AHERF's Board and Audit Committee were under
the control and domination of Mr. Abdelhak until June 1998.

318. Denied. The Committee does not accurately describe the testimony
it cites. As Mr. O'Brien admitted, the Board was not "divorced from the realities that
certain things were losing money and there were negative trends in certain things".
(O'Brien Dep. Tr. (PwC Supp. tab 242) at 92.) PwC denies that this paragraph is
material because AHERF's Board and creditors knew or should have known that
AHERF's aggressive expansion could threaten AHERF's financial viability and that
AHERF was in financial distress. (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

319. Denied. This paragraph states legal contentions concerning the
effect and interpretation of Pennsylvania law. The deposition testimony the Committee
cites is inadmissible because it presents an opinion on a question of law.

320. Denied. The Committee does not accurately describe the testimony
it cites. Mr. Brenner had "serious questions as to the accuracy of all of the financial

dealings that were being suggested in connection with some of the transactions".
(Brenner Dep. Tr. (PwC tab 29) at 117, 119.) PwC denies that this paragraph is material
because AHERF's Board and Audit Committee knew or should have known that AHERF
was in financial distress and AHERF's Board and Audit Committee were under the
control and domination of Mr. Abdelhak.

321. Denied. The Board and its committees were at all relevant times
under the control and domination of Mr. Abdelhak. (*See* PwC SOF ¶¶ 44-59.) In
addition, PwC denies that this paragraph is material because AHERF's Board and
creditors knew or should have known that AHERF was in financial distress. (*See supra*
¶ 237, *infra* ¶¶ 347, 353, 374.)

322. Denied. The Board and its committees were at all relevant times
under the control and domination of Mr. Abdelhak. (*See* PwC SOF ¶¶ 44-59.) In
addition, PwC denies that this paragraph is material because AHERF's Board and Audit
Committee knew or should have known that AHERF was in financial distress, because
AHERF interfered with C&L's audits of AHERF's financial statements, and because the
fraud of AHERF's management is imputed to AHERF and the Committee. (*See supra*
¶ 237, *infra* ¶¶ 347, 353, 374.)

323. PwC admits that the quoted deposition testimony was given, but
otherwise disputes this paragraph. The Board was at all relevant times under the control
and domination of Mr. Abdelhak, and its members failed to exercise their fiduciary
duties. (*See* PwC SOF ¶¶ 44-59.) In addition, PwC denies that this paragraph is material
because AHERF's Board knew or should have known that AHERF was in financial
distress, because AHERF interfered with C&L's audits of AHERF's financial statements,

and because the fraud of AHERF's management is imputed to AHERF and the Committee. (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

324. PwC admits that the quoted deposition testimony was given, but otherwise disputes this paragraph. The Board and the Audit Committee were at all relevant times under the control and domination of Mr. Abdelhak, and the members of AHERF's Board and Audit Committee failed to exercise their fiduciary duties. (*See* PwC SOF ¶¶ 44-59.) In addition, PwC denies that this paragraph is material because AHERF's Board and Audit Committee knew or should have known that AHERF was in financial distress, because AHERF interfered with C&L's audits of AHERF's financial statements, and because the fraud of AHERF's management is imputed to AHERF and the Committee. (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

325. Denied. The Board and the Audit Committee were at all relevant times under the control and domination of Mr. Abdelhak, and the members of AHERF's Board and Audit Committee failed to exercise their fiduciary duties. (*See* PwC SOF ¶¶ 49-56.) C&L's duties as auditor were set by GAAS and by its engagement letters with the client. (*See* Tillett Rpt. (PwC Supp. tab 243) at 4, 9-10, 12.) In addition, PwC denies that this paragraph is material because AHERF's Board and Audit Committee knew or should have known that AHERF was in financial distress and that there were grounds to doubt the competence and integrity of AHERF's senior financial management. (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

326. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. The deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Mr. Brenner nor any other fact witness

can testify as to actions that he would have taken in reaction to events that never occurred.

327.  PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph.  The deposition testimony the Committee cites is inadmissible as self-serving speculation.  Neither Mr. O'Brien nor any other fact witness can testify as to actions that he would have taken in reaction to events that never occurred.

328.  Denied.  The Board and its committees were at all relevant times under the control and domination of Mr. Abdelhak, and the members of AHERF's Board and Audit Committee failed to exercise their fiduciary duties.  (See PwC SOF ¶¶ 49-56.) In addition, PwC denies that this paragraph is material because AHERF's Board knew or should have known that AHERF was in financial distress and that there were grounds to doubt the competence and integrity of AHERF's senior financial management, and the fraud of AHERF's management is imputed to AHERF and the Committee.  (See supra ¶ 237, infra ¶¶ 347, 353, 374.)  PwC admits that Mr. Gumberg gave the testimony quoted by the Committee, but denies that Mr. Gumberg's testimony is admissible, because it presents self-serving speculation concerning events that never happened.

329.  Denied.  The deposition testimony the Committee cites is inadmissible as the self-serving, speculative opinion of a non-expert witness.  Neither Mr. Barnes nor any other fact witness is competent to testify as to actions that he would have taken in reaction to events that never occurred.  The evidence the Committee cites suggests only that various options were available to (but never used by) AHERF's Board

and Audit Committee; the Committee has no admissible evidence showing how the Board or Audit Committee would have acted.

330. Denied. Any claim that AHERF Board members would have behaved in a particular way in reaction to hypothetical circumstances is purely speculative. Fact witnesses who purported to testify to such speculation are not competent to do so, and their testimony to that effect is inadmissible as self-serving speculation. The evidence the Committee cites suggests only that various options were available to (but never used by) AHERF's Board and Audit Committee; the Committee has no admissible evidence showing how the Board or Audit Committee would have acted.

331. Admitted, except that PwC denies that the AHERF Board approved the resolutions in question because they were recommended by the Audit Committee. The AHERF Board approved the resolutions in question because they were presented by AHERF's management, and the Board approved every resolution that was presented by management.

332. PwC admits that certain inter-company receivables from AGH to DVOG were classified as "assets limited or restricted as to use" on the consolidating and combining financial information for AGH attached to the fiscal year 1997 AHERF consolidated financial statements, that Mr. Abdelhak so informed the Audit Committee at the October 15, 1997 meeting at which those financial statements were presented for approval by the Audit Committee, and that Mr. Abdelhak so informed the Allegheny General Hospital Regional Management Committee at its October 15, 1997 meeting, but disputes the remainder of this paragraph. The Committee mischaracterizes the testimony

it cites, which does not indicate that Mr. Gumberg "required" Mr. Abdelhak to do anything. (Gumberg Dep. Tr. (PwC Supp. tab 218) at 254-55.) Furthermore, as the testimony the Committee cites indicates, the Board and its committees were at all relevant times under the control and domination of Mr. Abdelhak.

333. Denied. There is no record of any charter, bylaws or minutes of an "Internal Loan Committee". As Mr. Gumberg testified, no such committee never met. (Gumberg Dep. Tr. (PwC Supp. tab 218) at 259.) PwC denies that the paragraph is material because the Board and its committees were at all relevant times under the control and domination of Mr. Abdelhak.

334. PwC admits that a task force was formed by "Allegheny University Hospitals – Western Region" on April 18, 1998 and that the cited document includes the quotation given. PwC disputes the remainder of this paragraph. As the exhibit the Committee cites shows, this task force did little if anything more than listen to AHERF Management. (*See* Ex. 2051 (Comm. App.) at HE 1373.) In the four months of its existence prior to the AHERF bankruptcy, this task force took no meaningful action. PwC denies that the paragraph is material because AHERF's boards were under the control and domination of Mr. Abdelhak at all relevant times.

335. PwC admits that in late April 1998, AHERF retained Charles Queenan, a member of the board of Allegheny Singer Research Institute (an AHERF affiliate) and a partner in the Kirkpatrick & Lockhart law firm (longstanding counsel to AHERF) to investigate the matter referred to. Mr. Queenan's investigation produced no significant results. Mr. Barnes testified that Mr. Queenan "had done nothing that can I [sic] recollect". (Barnes Dep. Tr. (PwC Supp. tab 176) at 269.) Mr. Queenan testified

that in his investigation, which "started in late April and terminated some time, I believe, in the third week in May" (Queenan Phase II Dep. Tr. (PwC Supp. tab 244) at 79), he "didn't learn very much" (*id* at 57). PwC disputes the remainder of this paragraph.

336. Denied. On June 5, 1998, W. P. Snyder III, the Chairman of the AHERF Board, terminated Mr. Abdelhak as CEO in response to a demand that he do so from Doctors Shannon (Chief of Medicine at Allegheny General Hospital), Cohen (Chief of Urology at AGH) and McGovern (Chairman of Cardiothoracic Surgery) on behalf of many of AHERF's physicians. (W.P. Snyder Dep. Tr. (PwC Supp. Tab 246) at 146-68; Shannon Dep. Tr. (PwC Supp. tab 247) at 52-53, 59-60; Ex 1677 (PwC Supp. tab 248).) Mr. Snyder testified:

> "Q.    Who decided to replace Mr. Abdelhak as CEO?
>
> "A.    I did, with consultation with some of the senior board members. I had a meeting with three other senior doctors on a Sunday afternoon, and they said that they were going to leave and pull a lot of the doctors out of Allegheny with them if Abdelhak didn't go. It was about a three-hour meeting. Then when I got back from that meeting, I called a number of the leading trustees and asked them what they thought, and they all said we think he should go." (W.P Snyder Dep. Tr. (PwC Supp. tab 246) at 146.)

Mr. Snyder fired Mr. Abdelhak without meeting with or consulting the Board as a whole. (W. P. Snyder Dep. Tr. at 146-52.) Most Board members did not learn that Mr. Abdelhak was fired until after the fact. (Palmer Dep. Tr. (PwC Supp. tab 249) at 153; Martinelli Dep. Tr. (PwC Supp. tab 250) at 167; Atkinson Dep. Tr. (PwC Supp. tab 251) at 100.)

The Committee has pointed to no evidence that Dr. Shannon or other doctors at AGH would have demanded Mr. Abdelhak's removal in the Committee's hypothetical scenario in the fall of 1996, when AHERF's financial condition (even the

88

"true" financial condition alleged by the Committee) was much better than in the late spring of 1998. In fact, Dr. Shannon testified that he "did not see the audited financial statements of either 1996 or 1997". (Shannon Dep. Tr. (PwC Supp. tab 247) at 90.) Dr. Shannon did not become a member of the AHERF Board until June 1998, after he, along with other doctors, demanded that Mr. Abdelhak be fired. (GOV 71639-43 (PwC Supp. tab 252) at GOV 71639.)

PwC denies that this paragraph is material because AHERF's Board and its committees were under the domination and control of Mr. Abdelhak at all relevant times prior to June 1998.

337. PwC admits that this paragraph is undisputed for purposes of this motion.

338. PwC admits that Mr. McConnell was terminated on June 26, 1998 by Mr. Sanzo, who acted in consultation with the Executive Committee. (*See* AMS4 02157 (PwC Supp. tab 253).) PwC denies that this paragraph is material because AHERF's Board and its committees were under the domination and control of Mr. Abdelhak at all relevant times prior to June 1998.

339. PwC admits that this paragraph is undisputed, but denies that this paragraph is material because AHERF's Board and its committees were under the domination and control of Mr. Abdelhak at all relevant times prior to June 1998, and because post-bankruptcy conduct has no bearing on the Committee's claims in this action.

340.  PwC admits that AHERF retained the Hunter Group in June 1998, and that the Hunter Group attempted, without success, to form a plan to stem losses and correct operational deficiencies.  (Stickler Dep. Tr. (PwC Supp. tab 254) at 56, 152-53.)

341.  PwC admits that Mr. Stickler gave the following testimony at his deposition:

"Q.    If you, meaning The Hunter Group, had been on the scene 18 months earlier, say in December of 1996, do you believe that you could have implemented a turnaround plan and avoided bankruptcy?

"MR. TERUYA:  Objection.

"A.    Yes, I believe we could have, yes.

"Q.    And what do you base that belief on?

"A.    I don't know that I could tie it to specifics, other than my understanding of the organization and the expense reductions that we felt we could make when we put that 30,000-foot plan together. It would have required some difficult decisions to be made, but I believe it could have been done."

(Stickler Dep. Tr. (PwC Supp. tab 254) at 375-76.)  PwC denies that Mr. Stickler's testimony is admissible, because it is self-serving speculation opinion offered without sufficient foundation.  Neither Mr. Stickler nor any other fact witness can testify as to the effects of actions that "could" have been taken in reaction to events that never occurred. PwC denies that this paragraph is material because Mr. Stickler's unsubstantiated "beliefs" do not satisfy the Committee's burden of proving causation.

342.  PwC admits that AHERF's Finance and Audit Committee recommended on August 27, 1998 that PwC be replaced as AHERF's auditors.  (Stalder Dep. Tr. (PwC Supp. tab 255) at 349-52.)  PwC denies that this paragraph is material

because post-bankruptcy conduct by AHERF has no bearing on the Committee's claims

in this action.

343. PwC admits that AHERF issued a press release on September 2,

1998, that included the following language:

> "The Finance and Audit Committee of the Board of Trustees of Allegheny
> Health, Education and Research Foundation (AHERF), together with the
> new senior management of AHERF and PriceWaterhouseCoopers [sic]
> LLP, are reviewing certain accounting and reporting issues related to the
> June 30, 1997 consolidated financial statements of AHERF and its
> affiliates, which they believe may require revision. Accordingly, pending
> completion of their review, no further reliance should be placed on the
> financial statements or the Coopers & Lybrand report thereon."

(Ex. 1289 (PwC Supp. tab 256) at DBR-SG 06009.)

344. PwC admits that by June 1996 MBIA, PNC and other of AHERF's

creditors had entered into credit relationships with AHERF and/or its affiliates, based on

financial information that the Committee does not contend was misstated. Those

relationships were formed prior to the release of AHERF's, DVOG's and AGHOG's

1996 audited financial statements (and the creditors therefore did not rely on those

financial statements in entering into those relationships). PwC denies that this paragraph

is material because the creditors knew or should have known of AHERF's, DVOG's and

AGHOG's financial condition, but took no meaningful action.

345. PwC admits that PNC, CoreStates Bank and First Union Bank

entered into credit relationships with members of DVOG prior to the release of DVOG's

1996 audited financial statements, and therefore did not rely on those financial statements

in entering into those relationships. PwC denies that this paragraph is material because

DVOG's creditors knew or should have known of DVOG's financial condition, but took

no meaningful action. (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

346.  PwC admits that Morgan Guaranty Trust Corporation of New York, PNC and MBIA had entered into credit relationships with AGHOG prior to the release of AGHOG's 1996 audited financial statements, and therefore did not rely on those financial statements in entering into those relationships.  PwC denies that this paragraph is material because AGHOG's creditors knew or should have known of AGHOG's financial condition, but took no meaningful action.  (*See supra* ¶ 237, *infra* ¶¶ 347, 353, 374.)

347.  Denied.  The fiscal year 1996 audited financial statements of AHERF and its affiliates, and the fiscal year 1997 consolidated audited financial statements of AHERF showed clear signs of future financial problems.  (*See* Cleverley Rpt. (PwC Supp. tab 257) at 28.)

348.  Denied.  This paragraph presents legal contentions concerning the effects and interpretation of the trust indenture documents.  The DVOG Master Trust Indenture (MTI) did not require DVOG's financial statements to be prepared in accordance with GAAP.  (*See* Mitchell Rpt. (PwC Supp. tab 258) at 11-12.)  There were no audited fiscal year 1997 financial statements for DVOG.  Even if the debt service coverage ratio had fallen below 1.1 to 1, as the Committee alleges, that would not have constituted an Event of Default under the MTI.  (Mitchell Rpt. (PwC Supp. tab 258) at 20-21.)

349.  Denied.  This paragraph presents legal contentions concerning the effects and interpretation of the trust indenture documents.  PwC denies that a debt service coverage ratio of less than 1.1 to 1 would have constituted an Event of Default under the DVOG MTI.  (*See supra* ¶ 348.)  To the extent that this paragraph makes

assertions of fact concerning actions that might have been taken in response to events that did not occur, it presents inadmissible speculation.

350. Denied. This paragraph presents legal contentions concerning the effects and interpretation of the loan agreement documents. To the extent that this paragraph makes assertions of fact concerning actions that might have been taken in response to events that did not occur, it is denied as speculative and unfounded. It is unlikely that any of the creditors to which the Committee refers would have taken significant action if there had been a covenant breach at DVOG at the end of fiscal year 1996. (*See* James Rpt. (PwC Supp. tab 259) at 52-55.)

351. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. AHERF's creditors knew or should have known about AHERF's financial condition. (*See infra* ¶ 353.) PNC provided irrevocable letters of credit for DVOG in June 1996, based on financial statements that the Committee does not claim to be misstated (*see* Ex. 702 (PwC Supp. tab 260) at GOV 18704-GOV 18707), and before DVOG's audited fiscal year 1996 financial statements were released. PwC denies that this paragraph is material because AHERF's creditors knew or should have known of significant financial difficulties at AHERF and its affiliates, because the fraud of AHERF's management is imputed to AHERF and the Committee and because AHERF interfered with C&L's audits of AHERF's financial statements. (*See supra* ¶¶ 237, 347 *infra* ¶¶ 353, 374.)

352. PwC admits that MBIA received DVOG's fiscal year 1996 audited financial statements by a letter dated October 31, 1996, after it had irrevocably committed itself to providing 30-year bond insurance for DVOG. Furthermore, when

MBIA analyzed the 1996 audited financial statements, it realized that DVOG was in financial difficulty (*see infra* ¶ 353), but took no meaningful action.

353. PwC admits that Exhibit 1887 includes the words the Committee quotes, but disputes the remainder of this paragraph. The Committee does not accurately describe Mr. Heberton's description of DVOG. As he wrote in Exhibit 1887, Mr. Heberton was aware, from the audited 1996 financial statements, that DVOG was "woefully undercapitalized", and "show[ed] the scars of [the] weak balance sheets" of the hospitals it had acquired. (Ex. 1887 (PwC Supp. tab 261) at MBIA 029894.) In addition, C&L audited the fiscal year 1996 financial statements of DVOG, but did not audit financial statements for individual hospitals.

354. Denied. C&L did not audit financial statements for individual DVOG hospitals.

355. Denied. MBIA was not entitled to rely on funds held by AHERF entities not liable to pay the debts of DVOG, and any such reliance was unreasonable. Further, MBIA was concerned about the financial condition of AHERF and DVOG, but took no meaningful action. (*See supra* ¶ 353.)

356. PwC admits that MBIA had frequent discussions with Mr. McConnell and Mr. Martin. Prior to April 1998, MBIA representatives also sought to meet with Mr. Abdelhak (who refused to meet with them) (*see* Strayer Dep. Tr. (PwC Supp. tab 262) at 261-62; Heberton Tr. (PwC Supp. tab 263) at 118-19); MBIA did not attempt to meet with the AHERF Board or Board members (Reilly Dep. Tr. (PwC Supp. tab 264) at 81-85).

357. PwC admits that such a meeting took place, but otherwise denies that this paragraph is undisputed. The Committee mischaracterizes Ms. Strayer's testimony. (*See* Strayer Dep. Tr. (PwC Supp. tab 262) at 216-17.) Even after failing in this attempt to persuade AHERF to retain a consultant (*id.*), MBIA took no meaningful action on a timely basis.

358. Admitted. PwC further states that the AHERF Board's refusal of MBIA's and PNC's offers of financing, which according to MBIA and PNC would have avoided AHERF's bankruptcy, is an intervening cause of AHERF's bankruptcy. PwC further states that MBIA's and PNC's financing offers, which would have improved the situation of MBIA and PNC vis-à-vis other creditors of DVOG and its western affiliates, demonstrate that MBIA and PNC acted to improve their own position as creditors, not to improve the financial condition of AHERF, DVOG and the other Debtors.

359. Denied, except PwC admits that deposition testimony was given as quoted. The Committee mischaracterizes Mr. Weill's testimony about the information that was available to him in the summer of 1998. (Weill Dep. Tr. (PwC Supp. tab 265) at 223-24.) Furthermore, at this point in time, MBIA was aware from the 1996 and 1997 audited financial statements that DVOG faced significant financial difficulties, but took no meaningful action. (*See* Ex. 1887 (PwC Supp. tab 261); Ex. 2201 (PwC Supp. tab 266).)

360. PwC denies that the audited financial statements concealed covenant violations and denies that a covenant violation would have allowed MBIA to force AHERF to retain any particular consultant. PwC admits that Mr. Weill gave the deposition testimony quoted by the Committee, but denies that the quoted testimony is

95

admissible for lack of foundation and as self-serving speculation. Furthermore, the 1997 audited financial statements in fact disclosed the existence of a number of covenant violations. (*See* Ex. 58 (PwC tab 94) at TN CBC 43B 00919.)

361. Denied. The Committee quotes Mr. Weill's testimony out of context. (Weill Dep. Tr. (PwC Supp. tab 265) at 294-97.) In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Mr. Weill nor any other fact witness can testify as to actions that he would have taken in reaction to events that never occurred.

362. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. The evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Mr. Reilly nor any other fact witness can testify as to actions that he would have taken in reaction to events that never occurred.

363. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. The evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as the self-serving, speculative opinion of a non-expert witness. Neither Mr. Mathis nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

364. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. The evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Ms. Strayer nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

365. PwC admits that the deposition testimony quoted was given, but otherwise disputes this paragraph. The evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Ms. Strayer nor any other fact witness can testify as to actions that she would have taken in reaction to events that never occurred.

366. PwC admits, for purposes of this motion, that Ms. Strayer testified generally as indicated, but otherwise disputes this paragraph. The evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Ms. Strayer nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

367. PwC admits, for purposes of this motion, that Ms. Strayer and Mr. Weill testified generally as indicated, but otherwise disputes this paragraph. The

evidence the Committee cites suggests only that various options were available to (but never used by) MBIA; the Committee has no admissible evidence showing how MBIA actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. No fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

368. Denied. There is no competent evidence that "MBIA's approach would have been more aggressive". The declaration cited by the Committee is inadmissible as self-serving speculation and as hearsay.

369. PwC admits for purposes of this motion that Mr. McCool testified in general terms as indicated about an offer of financing to AHERF conditioned on a security interest in AHERF's western assets. PwC denies that this paragraph is material because it simply demonstrates the fact that the AHERF Board was unresponsive to pressures from creditors to take actions necessary to avoid bankruptcy. (*See supra* ¶ 358.)

370. PwC admits that this paragraph is undisputed for purposes of this motion, but denies that this paragraph is material because PNC knew or should have known of significant financial problems at AHERF, but took no meaningful action. (*See supra* ¶¶ 237, 347, 353, *infra* ¶ 374.)

371. PwC admits for purposes of this motion that Mr. Michael testified generally as indicated, but denies that this paragraph is material because it simply demonstrates the fact that the AHERF Board was unresponsive to pressures from creditors to take actions necessary to avoid bankruptcy. (*See supra* ¶ 358.)

372. PwC admits for purposes of this motion that Mr. McCool testified generally as indicated, but denies that this paragraph is material because PNC knew or should have known of significant financial problems at AHERF, but took no meaningful action.

373. PwC admits for purposes of this motion that Mr. Camp testified generally as indicated, but denies that this paragraph is material because PNC knew or should have known of significant financial problems at AHERF, but took no meaningful action.

374. PwC admits for purposes of this motion that Mr. Cook testified generally as indicated, but denies that this paragraph is material because PNC and other creditors knew or should have known of significant financial problems at AHERF, but took no meaningful action. In December, 1997 a violation of the PNC covenants was disclosed to PNC, yet PNC took no meaningful action. (*See* James Rpt. (PwC Supp. tab 259) at 42; Ex. 1788 (PwC Supp. tab 267).)

375. PwC admits that the Committee accurately quotes Mr. Kite's report. PwC denies the remainder of this paragraph. The Committee does not accurately describe the testimony of Mr. Camp, who testified that he did not recognize the news article that was the subject of the questions the Committee cites. (Camp Dep. Tr. (PwC Supp. tab 268) at 130-31.) Furthermore, neither Mr. Camp nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred. PwC denies that Mr. Kite's opinion on this subject is admissible for lack of proper foundation. PwC denies that this paragraph is material because AHERF's creditors knew

or should have known of significant financial problems at AHERF, but took no meaningful action

376. Denied. There is no competent evidence to show what actions "would" have been taken by PNC in the event of a covenant violation. The evidence the Committee cites suggests only that various options were available to (but never used by) PNC; the Committee has no admissible evidence showing how PNC actually would have acted. In fact, PNC did ignore a covenant violation. (*See supra,* ¶ 374.) The deposition testimony the Committee cites is also inadmissible as self-serving speculation and for lack of foundation. Neither Mr. Cook, Mr. Michael nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

377. Denied. To the extent that this paragraph purports to state that options were available in the event of a covenant breach, it asserts legal conclusions rather than facts, and Ms. Mammarella's testimony on that question of law is inadmissible. In addition, Ms. Mammarella's testimony shows at most that options were available to (but never used by) PNC; the Committee has no admissible evidence showing how PNC actually would have acted.

378. Denied. The Committee does not accurately describe the testimony of Mr. Michael, who admitted that he did not know what would have happened as a result of earlier discussions about AHERF's condition. (*See* Michael Dep. Tr. (PwC Supp. tab 269) at 155-56.) Furthermore, neither Mr. Michael nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred; his testimony on that subject is inadmissible for lack of foundation.

379. Denied. The Committee does not accurately describe the testimony of Mr. Michael, who admitted that he did not know what actions PNC would have taken in response to a covenant violation. (Michael Dep. Tr. (PwC Supp. tab 269) at 166-67, 173-74.) Furthermore, Mr. Michael's testimony only shows that various options were available to (but never used by) PNC; the Committee has no admissible evidence showing how PNC actually would have acted. Neither Mr. Michael nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred; his testimony on that subject is inadmissible for lack of foundation.

380. Denied. The Committee does not accurately describe the testimony of Mr. Michael, who admitted that he did not know what actions PNC would have taken in response to a covenant violation. (Michael Dep. Tr. (PwC Supp. tab 269) at 166-67, 173-74.) In addition, Mr. Michael's testimony only shows that various options were available to (but never used by) PNC; the Committee has no admissible evidence showing how PNC actually would have acted.

381. Denied. The Committee does not accurately describe the testimony of Mr. Michael, who admitted that he did not know what particular steps PNC would have taken in response to a lowered debt rating. (Michael Dep. Tr. (PwC Supp. tab 269) at 164-65.) Mr. Michael has no foundation to speculate regarding the actions of debt rating agencies, bondholders, credit enhancers or other creditors, and such speculation is inadmissible. Furthermore, neither Mr. Michael nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred.

382. PwC admits that Mr. Michael testified generally as indicated, but otherwise disputes this paragraph. Mr. Michael's testimony is inadmissible as unfounded

101

speculation. Mr. Michael has no foundation to speculate regarding the actions of Moody's or Standard & Poors. Further, this paragraph is irrelevant to the case because the credit ratings of DVOG, and PNC's credit approval, were based on the 1995 audited financial statements and other financial information that the Committee does not claim was misstated.

383. Denied. The Committee does not accurately describe the testimony of Mr. McCool, who admitted that even after an event of default PNC cannot force management of a borrower to take particular actions. (McCool Dep. Tr. (PwC Supp. tab 270) at 238-40.) Mr. McCool's testimony only shows that various options were available to (but never used by) PNC, and that even when PNC attempts to exercise those options, "sometimes we get what we want, sometimes we don't" (*id.* (PwC Supp. tab 270) at 240); the Committee has no admissible evidence showing how PNC actually would have acted. In addition, the deposition testimony the Committee cites is inadmissible as self-serving speculation. Neither Mr. McCool nor any other fact witness can testify as to actions that would have been taken in reaction to events that never occurred. PwC denies that this paragraph is material because PNC knew or should have known of significant financial problems at AHERF, but took no meaningful action.

384. Denied. The Committee does not accurately describe the testimony of Mr. Cook, who admitted that he did not know what steps PNC would have taken based on receiving additional information earlier. (Cook Dep. Tr. (PwC Supp. tab 271) at 573-74.) The Graduate transaction was a "fait accompli" as of August 1996, well before the audited 1996 financial statements were released. (*See* PwC SOF ¶¶ 44-59.) PNC did not have the ability to prevent AHERF from making acquisitions. Mr. Cook's testimony is

102

inadmissible speculation. As he said, neither he nor any other fact witness can "presume

to guess" as to actions that would have been taken in reaction to events that never

occurred. (Cook Dep. Tr. (PwC Supp. tab 271) at 579.)

## IV. CENTENNIAL

385. Admitted.

386. Admitted.

387. Admitted.

388. PwC admits that the Committee correctly quotes a portion of

Article III of the Amended and Restated Articles of Incorporation of United Hospitals,

Inc. (as of June 28, 1991) and that United Hospitals, Inc. subsequently changed its name

to SDN. (Comm. tab 29.) PwC denies the facts asserted in this paragraph are material

because SDN was not a subsidiary of AHERF and AHERF was not a member of SDN.

(*See* PwC SOF ¶ 194.)

389. Denied. The Committee mischaracterizes Article IX of the

Amended and Restated Articles of Incorporation of United Hospitals, Inc. which provides

for different results for distribution upon dissolution based on different circumstances.

(Comm. tab 29.) PwC denies that the facts alleged in this paragraph are material because

they address the distribution of assets not the imposition of liabilities, and because SDN

was not a subsidiary of AHERF and AHERF was not a member of SDN. (*See* PwC

SOF ¶ 194.)

390. PwC admits that the Committee correctly characterizes a portion of

SDN's bylaws as of July 1, 1991. (Comm. tab 30 at DC 3134.) PwC denies the facts

asserted in this paragraph are material because SDN was not a subsidiary of AHERF and

AHERF was not a member of SDN. (*See* PwC SOF ¶ 194.)

391. Admitted, except that "David Kaye" should be "Donald Kaye".

(McNair Dep. Tr. (PwC Supp. tab 172) at 65.)

392. PwC admits that AHERF was among the sixteen entities that SDN

listed as "related (other than by association with a statewide or nationwide organization)

through common membership, governing bodies, trustees, officers, etc." on its tax return.

(Comm. tab 13 at line 80b and statement 1.) The tax return filed in February of 1996 that

the Committee provided at tab 13 is in fact SDN's tax return for fiscal year 1995 (ending

June 30, 1995). No tax return for AHERF is included in the Committee's materials.

PwC admits that the directors of SDN were also officers at other AHERF entities. PwC

denies the facts asserted in this paragraph are material because SDN was not a subsidiary

of AHERF and AHERF was not a member of SDN. (*See* PwC SOF ¶ 194.)

393. PwC admits that SDN's fiscal year 1995 tax return (Comm. App.

tab 13) listed the AHERF tax department in Pittsburgh as its address. PwC admits that

Article II of the Amended and Restated Articles of Incorporation of United Hospitals,

Inc., dated June 28, 1991, lists an address in Cheltenham as the address of the registered

office of United Hospitals, Inc. (Comm. App. tab 29) and that the Cheltenham address

was also the address for certain administrative functions for AIHG and other AHERF

affiliates. PwC denies the facts asserted in this paragraph are material because SDN was

not a subsidiary of AHERF and AHERF was not a member of SDN. (*See* PwC SOF

¶ 194.)

394. Denied. The Committee has no competent evidentiary support for the facts asserted in this paragraph. The Executive Committee of the AHERF Board did not approve the Graduate/SDN merger: the Committee cites to no board resolutions or minutes because there are none. The Committee mischaracterizes the evidence it cites. (Ex. 2385 (PwC Supp. tab 272) at FVC 01569; McNair Dep. Tr. (PwC Supp. tab 172) at 133.)

395. Denied. The Committee mischaracterizes Mr. Snyder's deposition testimony, which does not support the Committee's assertions in this paragraph. (*See* W.P. Snyder Dep. Tr. (PwC Supp. tab 246) at 91-93.) PwC further denies that Mr. Snyder had the authority to authorize the Graduate/SDN merger because SDN was "independent of AHERF". (Ex. 2061 (PwC tab 46) at DD 00053; PwC SOF ¶ 194.)

396. Denied. The Committee mischaracterizes C&L's engagement with SDN, which was only intended to "assist SDN in obtaining information" about assets that SDN was already committed to acquire. (8/26/96 Engagement Letter (Comm. App. 31) at CL 046537.) C&L's assignment was part of what at the time was called "management review", which "was not intended to lead to the judgment of whether to consummate or not but rather to understand what SDN was going to be acquiring". (Zimmerman Phase II Dep. Tr. (PwC Supp. tab 273) at 18-19.) C&L's report on this engagement was delivered on December 13, 1996, six weeks after the effective date of the SDN merger and months after the AHERF Board considered the Graduate transaction a "fait accompli". (PR-BONDH-000298-347 (PwC Supp. tab 274); PWC SOF ¶¶ 194, 402; *supra* ¶ 58.) C&L satisfactorily performed its obligations under the engagement letter; there is no evidence to the contrary.

397. Denied, except PwC admits that the Committee accurately quotes the title used for Mr. McConnell in the August 26, 1996 engagement letter between C&L and SDN. That letter is addressed to Mr. McConnell at "SDN, Inc.", not at AHERF. (Comm. tab 31, at CL 046537.) PwC denies the facts asserted in this paragraph are material because SDN was not a subsidiary of AHERF and AHERF was not a member of SDN. (*See supra* ¶ 194.)

398. Denied. The Committee mischaracterizes the SDN-C&L engagement letter which speaks for itself. (Comm. tab 31, at CL 046540.) Steven Elek was "the partner on the Graduate due diligence". (Buettner Dep. Tr. (tab 192) at 672.) PwC denies that the paragraph is material because C&L's engagement for SDN was separate from C&L's engagement for AHERF, and because SDN was not a subsidiary of AHERF and AHERF was not a member of SDN. (*See* PwC SOF ¶ 194, *supra* ¶ 396.)

399. PwC admits that the Committee accurately quoted one sentence from the SDN-C&L engagement letter. PwC denies that this paragraph is material because the SDN-C&L engagement did not involve any of the "other services" described in that sentence. C&L was never retained (by AHERF or SDN) to perform an audit or attestation relating to a closing date balance sheet of SDN. (PwC SOF ¶ 194, *supra* ¶ 396.)

400. Admitted. PwC denies that the facts asserted in the paragraph are material because C&L's engagement for SDN was separate from C&L's engagement for AHERF. (*See supra* ¶ 396, *infra* ¶ 401.)

401. Denied. In the course of the audit of the 1997 consolidated AHERF financial statements, C&L considered matters that had come to its attention during the

course of the separate engagement pursuant to the August 26, 1996 engagement letter

with SDN, as set forth in the workpaper produced at CL 012634-49, but none of the work

done pursuant to the SDN-C&L engagement was performed for purposes of the audit.

PwC denies that the facts asserted in this paragraph are material because C&L's

engagement for SDN was separate from C&L's engagement for AHERF. (*Supra* ¶ 396.)

402. PwC admits that during a special meeting of the Board of Trustees

on September 16, 1996, "Mr. Abdelhak gave an informational update on the Graduate

Health Systems Consolidation", but disputes the remainder of this paragraph. (Ex. 829

(PwC Supp. tab 275) at PR-1-00920.) Once the Graduate transaction was publicly

announced in August of 1996, AHERF Board members considered it a "fait accompli".

(*See* PwC SOF ¶ 58.)

403. Admitted.

404. Admitted.

405. Denied, except PwC admits that Mr. Korman testified that in

September 1996, as far as he knew, SDN had no assets. (Korman Dep. Tr. (PwC Supp.

tab 276) at 119-20.) The testimony of Mr. Mathews does not support the Committee's

assertions. The GHS Board unanimously approved the transaction at a special meeting

on August 5, 1996. (Ex. 244 (PwC Supp. tab 277) at PH5101-02.) At that time, the

AHERF fiscal 1996 audited financial statements did not yet exist: they were not

approved by the Audit Committee of the AHERF Board until October 15, 1996, and were

not delivered to third parties until after that date. (PwC SOF ¶ 79a-c.)

406. PwC admits that at the AHERF Board of Trustees meeting held on

December 12, 1996, the Board adopted a resolution that authorized additional actions

relating to "the GHS-SDN Transactions [which] were concluded and became effective on November 1, 1996". (Ex. 832 (PwC Supp. tab 278) at PR-1-000745). PwC denies that the facts asserted in this paragraph are material because SDN had already assumed liability for the debts of the Graduate entities. (*See* Comm. SOF ¶ 194, *supra* ¶ 194.)

407. Admitted.

408. Denied. The Committee mischaracterizes the testimony it cites. (*See* Korman Dep. Tr. (PwC Supp. tab 276) at 213.) AHERF Board members have testified that the Graduate transaction was a "fait accompli" or a "done deal" before the formal approval by the Board. (*See* PwC SOF ¶ 58.) SDN approved the merger "irrevocably"; only GHS had the right to reverse the reorganization in the event that the GHS entities were not integrated into the AHERF system. (SDN Board Resolutions (PwC Supp. tab 279) at DC 8497 page 13 of 15.)

409. Denied. The Committee misrepresents the context and the content of Judge McCullough's December 14, 2000 Order that, at the request of the Chapter 11 Trustee, confirmed AHERF's "Liquidating Plan of Reorganization." (McCullough Dec. 14, 2000 Order (PwC Supp. tab 171).) The Order expressly states that the Plan would become effective "on the Effective Date," which was December 26, 2000. (*Id.* at 12; Notice of Confirmation and Effectiveness of Plan, MBIA 029771 (PwC Supp. tab 281).) As part of that Plan and by agreement of the parties to the Bankruptcy, the separate estates of the Debtors were substantively consolidated subject to the disparate treatment of the Centennial estate and creditors in certain respects. (*See supra* ¶ 212, *infra* ¶ 411.) PwC did not receive notice that its rights would be affected.

Judge McCullough specifically found that substantive consolidation would benefit creditors in several ways. (McCullough Dec. 14, 2000 Order (PwC Supp. tab 171) at 12.) PwC did not participate in and did not receive notice of the confirmation hearing relating to the Plan, or that the Committee would assert that substantive consolidation would affect PwC's rights.

410. Admitted, except that Judge McCullough's December , 2000 Order did not "also" confirm the Plan. That is all it did. (McCullough Dec. 14, 2000 Order (PwC Supp. tab 171).)

411. Admitted. The Plan "confirmed by Judge McCullough provided for substantive consolidation using the same language that appeared in his December 14, 2000 Order", as that Order was submitted by the Chapter 11 Trustee, and based on the language that the parties to the AHERF bankruptcy had agreed to as part of their "consensual negotiated settlement and compromise of significant issues". (Mem. of Law in Support of Confirmation of Debtors' Second Amended Consolidated Liquidating Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated Dec. 5, 2000, Bankr. Ct. Docket No. 8406 (PwC Supp. tab 280) at 7.)

Dated: August 19, 2005

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

by

Joseph F. McDonough

USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

109

CRAVATH, SWAINE & MOORE LLP

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of August 2005, a true and correct copy of the foregoing Reply Statement of Undisputed Material Facts in Support of Motion for Summary Judgment and Supplemental Appendix thereto was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

### *Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219

### *Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114