# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH
FOUNDATION,

                          Plaintiff,

              v.

PRICEWATERHOUSECOOPERS LLP,

                          Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

---

### SUPPLEMENTAL APPENDIX TO STATEMENT OF UNDISPUTED AND
### MATERIAL FACTS PURSUANT TO RULE 56.1(D) IN FURTHER
### SUPPORT OF PRICEWATERHOUSECOOPERS LLP'S
### MOTION FOR SUMMARY JUDGMENT

### VOLUME I

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

August 19, 2005

TAB 171

†8485
Mc|q|o

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:                                    :
                                          :    Case Nos. 98-25773 MBM through
ALLEGHENY HEALTH, EDUCATION               :    98-25777 MBM inclusive
AND RESEARCH FOUNDATION,                  :
ALLEGHENY UNIVERSITY OF THE               :    Chapter 11
HEALTH SCIENCES, ALLEGHENY                :
UNIVERSITY MEDICAL PRACTICES              :
ALLEGHENY HOSPITALS                       :    Consolidated for
CENTENNIAL AND ALLEGHENY                  :    Administration at 98-25773 MBM
UNIVERSITY HOSPITALS-EAST,                :
                                          :
            Debtors.                      :

## ORDER CONFIRMING DEBTORS' SECOND AMENDED
## CONSOLIDATED LIQUIDATING PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Allegheny Health, Education and Research Foundation, Allegheny University

Medical Practices, Allegheny Hospitals, Centennial, Allegheny University of the Health Sciences

and Allegheny University Hospitals-East (collectively, the "Debtors") having filed with this

Court their respective voluntary petitions for relief under Chapter 11 of Title 11, United States

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on July 21, 1998 (the "Petition Date");

and William J. Scharffenberger having been appointed the Chapter 11 Trustee of the Debtors;

and the Chapter 11 Trustee having filed the (1) Debtors' Second Amended Consolidated

Liquidating Plan of Reorganization dated December 5, 2000 (the "Plan") and the Amended

Disclosure statement dated August 15, 2000 (the "Disclosure Statement");[1] and the Disclosure

Statement having been approved as containing adequate information, as such term is defined in

Section 1125 of the Bankruptcy Code, by Order of the Court dated August 15, 2000 (the

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to such
terms in the Plan or the Disclosure Statement, as the case may be.

"Disclosure Statement Approval Order"); and the Disclosure Statement Approval Order having,

inter alia, (1) authorized the Chapter 11 Trustee to solicit acceptances or rejections of the Plan,

(2) approved the form of ballots (the "Ballots") to be transmitted with the Plan and Disclosure

Statement for voting purposes, (3) fixed October 18, 2000, at 5:00 p.m. (Pittsburgh time) as the

deadline for (a) Ballots accepting or rejecting the Plan to be received (the "Voting Deadline") and

(b) objections to confirmation of the Plan to be filed and served (the "Objection Deadline") and

(4) approved the form and manner of notice of the hearing on confirmation of the Plan and of the

Voting Deadline and Objection Deadline; and this Court having subsequently scheduled a

hearing pursuant to Section 1128 of the Bankruptcy Code for December 14, 2000 at 9:00 a.m., or

as soon thereafter as counsel can be heard (the "Confirmation Hearing"); and the Chapter 11

Trustee having solicited votes on the Plan by transmitting copies of the Plan, the Disclosure

Statement, the Disclosure Statement Approval Order, notice of the Confirmation Hearing (the

"Confirmation Hearing Notice") and a Ballot and/or Master Ballot to all impaired creditors and

banks or brokers holding the Centennial Bonds for the beneficial ownership of other entities or

individuals entitled to vote on the Plan; and the Court having considered the Declaration of

Carole G. Donlin Certifying the Ballots Accepting or Rejecting the Plan sworn to on December

4, 2000 (the "Ballot Declaration"); and it appearing that due notice of the Voting Deadline, the

Confirmation Hearing and the Objection Deadline having been given by the Chapter 11 Trustee

to creditors and other parties-in-interest in accordance with the Disclosure Statement Approval

Order, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") as evidenced by the affidavits of mailing and of publication filed with this Court; and the

Chapter 11 Trustee having filed with this Court a Memorandum of Law, dated December 5,

2000, and an Affidavit of Charles P. Morrison in support of confirmation, sworn to on December

4, 2000; and objections to confirmation of the Plan having been filed by (1) the AHERF Lenders[2] (the "AHERF Lenders' Objection") (2) Sarah Lohwater, (3) Bell Atlantic, (4) Comprehensive Safety Compliance, Inc., (5) the Pension Benefit Guaranty Corporation, (6) InPhyNet Contracting Services, Inc., (7) certain breast implant litigants, (8) the Attorney General of Pennsylvania, and (9) the United States Government, Department of Health and Human Services (together with the AHERF Lenders' Objection, collectively, the "Objections"); and upon all the documents and the evidence of record adduced at the Confirmation Hearing and the statements of the parties appearing at such hearing; and upon all the pleadings and proceedings heretofore had in these Chapter 11 Cases; and after due deliberation and consideration; and sufficient cause appearing therefor; and

## IT HAVING BEEN FOUND AND DETERMINED by this Court that:

A.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, and the subject matter of the Confirmation Hearing, and all issues raised by the Objections, pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Plan is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(L) and this Court has jurisdiction to enter a Final Order with respect thereto.  Venue of the Chapter 11 Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are entities eligible for relief under Section 109 of the Bankruptcy Code.

---

2    The AHERF Lenders include Mellon Bank, N.A., Toronto Dominion (New York), Inc., Bank One, National Association as successor in interest to Bank One, Akron, N.A., and Bank One, National Association formerly known as the First National Bank of Chicago.

3

B.    Notice.  In accordance with the Disclosure Statement Approval Order, the Chapter 11 Trustee timely (1) mailed notice of the Voting Deadline, of the date, time and place for the Confirmation Hearing and of the deadline and procedures respecting the Objection Deadline upon the parties set forth in the Disclosure Statement Approval Order and (2) published such notice in the publications set forth in the Disclosure Statement Approval Order.  Adequate and sufficient notice of the Confirmation Hearing, the Voting Deadline and the Objection Deadline, the proposed substantive consolidation of the Estates pursuant to Article 2 of the Plan and other requirements, deadlines, hearings and matters described in the Disclosure Statement Approval Order was provided in compliance with the Disclosure Statement Approval Order and the Bankruptcy Rules, and no other and further notice is required.  All parties-in-interest had the opportunity to appear and be heard at the Confirmation Hearing.

C.    Reasonable Classification of Claims (Section 1122(a)).  The classification of Claims in Article 4 of the Plan is reasonable and necessary, and places Claims in a particular Class where such Claims are substantially similar to the other Claims of such Class, and therefore the Plan satisfies the requirements of Section 1122(a) of the Bankruptcy Code.

D.    Designation of Classes (Section 1123(a)(1)).  Article 4 of the Plan properly designates all Classes of Claims, and therefore the Plan satisfies the requirements of Section 1123(a)(1) of the Bankruptcy Code.

E.    Specification of Unimpaired Classes (Section 1123(a)(2)).  Article 4 of the Plan specifies the Classes of Claims which are unimpaired or impaired, and therefore the Plan satisfies the requirements of Section 1123(a)(2) of the Bankruptcy Code.

4

F.   Specification of Treatment of Impaired Classes (Section 1123(a)(3)).

Article 5 of the Plan specifies the treatment of each impaired Class of Claims, and therefore the

Plan satisfies the requirements of Section 1123(a)(3) of the Bankruptcy Code.

G.   No Discrimination (Section 1123(a)(4)). The Plan provides the same

treatment for each Claim in a particular Class, and therefore the Plan satisfies the requirements of

Section 1123(a)(4) of the Bankruptcy Code.

H.   Implementation of the Plan (Section 1123(a)(5)). Articles 6 and 7 and the

other provisions of the Plan provide adequate means for the Plan's implementation, and therefore

the Plan satisfies the requirements of Section 1123(a)(5) of the Bankruptcy Code.

I.   Equity Securities (Section 1123(a)(6)). The requirements of

Section 1123(a)(6) of the Bankruptcy Code are inapplicable because the Plan contemplates the

liquidation of the Estates and it does not provide for the issuance of any securities.

J.   Selection of Officers and Directors (Section 1123(a)(7)). The Plan

provides for the management and governance of Liquidating AHERF in a manner that is

consistent with the interests of creditors and with public policy with respect to the manner of

selection of any officer, director or trustee under the Plan, and any successor to such officer,

director or trustee, and therefore the Plan satisfies the requirements of Section 1123(a)(7) of the

Bankruptcy Code.

K.    Impairment or Unimpairment of Claims (Section 1123(b)(1)).  The Plan impairs or leaves unimpaired, as the case may be, each Class of Claims, and therefore complies with Section 1123(b)(1) of the Bankruptcy Code.

L.    Assumption or Rejection of Executory Contracts and Unexpired Leases (Section 1123(b)(2)).  Article 9 of the Plan provides for the rejection on the Confirmation Date of any executory contracts or unexpired leases (other than Insurance Policies) which (a) have not expired by their own terms on or prior to the Confirmation Date, (b) have not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (c) are not the subject of a motion to assume or reject the same which is pending at the time of the Confirmation Date, and therefore the Plan complies with Section 1123(b)(2) of the Bankruptcy Code.

M.    Settlement and Compromise (Section 1123(b)(3)).  The Plan complies with Section 1123(b)(3)(A) of the Bankruptcy Code because any settlement and compromise incorporated in the Plan including, without limitation, the settlements with (a) MBIA Insurance Corporation and PNC Bank, N.A. regarding the treatment of the Secured and Unsecured Claims of holders of MBIA/PNC Claims and (b) Bank of New York, as indenture trustee acting for and on behalf of bondholders holding claims against Allegheny Hospital, Centennial regarding the treatment of the Secured and Unsecured Claims of holders of Centennial Bondholder Claims whereby, among other things, holders of Allowed Centennial Unsecured Claims receive a payment in Cash equal to 1.5% of such Allowed Claim and an Unsecured Claim Liquidation Participation equal to the 30% of such Allowed Claim, (1) reflects a reasonable balance of the risks and expenses of litigation against the benefits and early resolution of the disputes in a

context that permits confirmation of the Plan, (2) falls within the range of reasonableness for the resolution of complex litigation or litigable issues and claims and (3) is fair and equitable and in the best interests of the Debtors, their Estates and all holders of Claims.

N.     Plan Compliance With Provisions of the Bankruptcy Code (Section 1129(a)(1)). The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, Sections 1122 and 1123 and, as required pursuant to Bankruptcy Rule 3016(b), is dated and identifies the Chapter 11 Trustee as the proponent of the Plan, and therefore the Plan satisfies the requirements of Section 1129(a)(1) of the Bankruptcy Code.

O.     Proponent Compliance With Provisions of the Bankruptcy Code (Section 1129(a)(2)). The Chapter 11 Trustee, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code including, without limitation, Sections 1125 and 1126, and therefore the Chapter 11 Trustee has satisfied the requirements of Section 1129(a)(2) of the Bankruptcy Code.

P:     Plan Proposed in Good Faith (Section 1129(a)(3)). The Plan has been proposed in good faith, for the valid business purposes of liquidating and distributing the Estate Assets and resolving and administering claims, and resolving other disputes, and has not been proposed by any means forbidden by law, and therefore the Plan satisfies the requirements of Section 1129(a)(3) of the Bankruptcy Code.

Q.     Payment of Costs and Expenses (Section 1129(a)(4)). Any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been

7

approved by, or will be subject to the approval of, this Court as reasonable, and therefore the

Plan satisfies the requirements of Section 1129(a)(4) of the Bankruptcy Code.

R.    Disclosure of Identities of Officers, Directors and Insiders (Section

1129(a)(5)).  The Chapter 11 Trustee has disclosed the identity and other relevant information of

all individuals, including insiders, proposed to serve, after confirmation of the Plan, as a

Bankruptcy Officer of Liquidating AHERF pursuant to a Designation of Bankruptcy Officers

dated October 11, 2000 (the "Designation of Bankruptcy Officers") which was filed with this

Court, and the appointment to, or continuance in such office of each such individual, subject to

the provisions of the Plan and the Liquidating AHERF Bylaws, is consistent with the interests of

creditors and with public policy, and therefore the Plan satisfies the requirements of Section

1129(a)(5) of the Bankruptcy Code.

S.    No Rate Change (Section 1129(a)(6)).  Section 1129(a)(6) is inapplicable

to the Plan because there are no rate changes provided for in the Plan for which a governmental

regulatory commission will have jurisdiction over the Debtors after confirmation of the Plan.

T.    Best Interest of Creditors (Section 1129(a)(7)).  With respect to each

impaired Class of Claims, each holder of a Claim of such Class entitled to vote on the Plan has

accepted the Plan, or will receive or retain under the Plan on account of such Claim (including,

without limitation, holders of Allowed Centennial Unsecured Claims), property of a value, as of

the Effective Date of the Plan, that is not less than the amount that such holder would so receive

or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

Therefore, the Plan satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code.

U.    Plan Acceptance (Section 1129(a)(8)). Each Class, except Class 7, has

accepted the Plan, or is not impaired under the Plan and thus is conclusively presumed to have

accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and therefore the Plan

satisfies the requirements of Section 1129(a)(8) of the Bankruptcy Code. The Plan provides for

no distribution to holders of Insurance Claims (Class 7) and, therefore, pursuant to Section

1126(g), Class 7 is deemed to reject the Plan. The Plan does not discriminate unfairly against,

and is fair and equitable with respect to, holders of Insurance Claims and, therefore, the Plan

satisfies the requirements of Section 1129(b) of the Bankruptcy Code.

V.    Plan Treatment of Administrative Expense Claims, Priority Claims and

Tax Claims (Section 1129(a)(9)). The Plan satisfies the requirements of Section 1129(a)(9) of

the Bankruptcy Code because, except to the extent that the holder of a particular Claim has

agreed to a different treatment of such Claim, the Plan provides that Administrative Expense

Claims pursuant to Section 507(a)(1) of the Bankruptcy Code, Priority Claims pursuant to

Sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code and Priority Tax Claims pursuant

to Section 507(a)(8) of the Bankruptcy Code shall be treated in accordance with the provisions of

Section 1129(a)(9) of the Bankruptcy Code.

W.    Acceptance by at Least One Impaired Class (Section 1129(a)(10)). At

least one Class of Claims that is impaired under the Plan has accepted the Plan, determined

without including any acceptance of the Plan by any insider holding a Claim in such Class, and

therefore the Plan satisfies the requirements of Section 1129(a)(10) of the Bankruptcy Code.

X.    Feasibility (Section 1129(a)(11)).  The Plan satisfies the requirements of Section 1129(a)(11) of the Bankruptcy Code because the Debtors will have sufficient Cash to meet all payment and funding obligations under Articles 3 and 5 and Section 6.9 of the Plan for distribution to secured and unsecured creditors upon the occurrence of the Effective Date. Therefore, the Plan satisfies the requirements of Section 1129(a)(11) of the Bankruptcy Code.

Y.    Payment of Fees (Section 1129(a)(12)).  Pursuant to Section 14.13 of the Plan, Liquidating AHERF shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C § 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered, and therefore the Plan satisfies the requirements of Section 1129(a)(12) of the Bankruptcy Code.

Z.    Retiree Benefits (Section 1129(a)(13)).  To the extent applicable to the Debtors, Section 9.4 of the Plan provides that payment of any retiree benefits shall be continued solely to the extent, if any, and for the duration of the period the Debtors are contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtors under applicable law, and therefore the Plan complies with Section 1129(a)(13) of the Bankruptcy Code.

AA.    Cramdown (Section 1129(b)).  With respect to holders of Insurance Claims (Class 7) who are deemed to reject the Plan, the Plan does not discriminate unfairly against such holders and is fair and equitable and, therefore, the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code.

10

BB.  <u>No Other Plan (Section 1129(c))</u>.  No other plan of reorganization has

been filed with respect to the Debtors' Chapter 11 Cases.

CC.  <u>Avoidance of Taxes or Application of Securities Laws (Section 1129(d))</u>.

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the

application of Section 5 of the Securities Act of 1933.  In addition, no party-in-interest that is a

governmental unit has requested that the Plan not be confirmed on such grounds.  The Plan,

therefore, satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

DD.  <u>Discharge and Injunction</u>.  The discharge and injunction provisions set

forth in Article 10 of the Plan and the exculpation provision set forth in Section 14.2 of the Plan

(1) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), (b) and (d), (2) are each

an essential means of implementing the Plan pursuant to Section 1123(a)(5) of the Bankruptcy

Code, (3) are integral elements of the settlements and compromises incorporated in the Plan, (4)

confer material benefits on, and thus are in the best interests of, the Debtors' Estates and (5) are,

in the facts and circumstances of these Chapter 11 Cases, consistent with and permitted pursuant

to Sections 105, 524, 1123, 1129 and all other applicable provisions of the Bankruptcy Code.

EE.  <u>Substantive Consolidation and Related Issues</u>.  The testimony proffered

and the facts adduced at the Confirmation Hearing establish that the substantive consolidation of

the Debtors' Estates is warranted for all purposes as set forth in Article 2 of the Plan in the

Chapter 11 Cases pursuant to Section 105 of the Bankruptcy Code.  The Debtors share a

substantial identity in part because AHERF is the sole member of the other Debtors, AHERF

served as the general and administrative service provider for all of the Debtors, assets and

11

business functions of all of the Debtors are commingled, and it would be extremely difficult, if

not impossible, to segregate and ascertain individual assets and liabilities of the Debtors.  The

burden and costs of disentangling the Estates heavily outweigh the benefit to creditors.  The

affairs of the Debtors are so entangled that substantive consolidation of the Estates will benefit

all creditors.  Unwinding the Debtors' assets and liabilities will substantially and materially delay

the distribution of funds to creditors, will deplete the assets of the Debtors' Estates substantially

to pay the resultant administrative expenses, will involve innumerable speculative assumptions

that will be contested by creditors of the individual Estates, and, ultimately, is not likely to be

feasible.  Creditors of the Estates will also benefit from substantive consolidation due to the

elimination of the substantial inter-Debtor claims, which would otherwise be General Unsecured

Claims against the Estates.  Liquidating plans for each of the Estates cannot be confirmed unless

and until complicated and substantial inter-Debtor claims and inter-creditor disputes could be

resolved because they constitute substantial liabilities against various of the individual Debtors

and would constitute the most significant liabilities of certain Debtors, including AHERF.  The

evidence establishes that an accurate and expeditious determination of inter-company claims and

inter-creditor disputes cannot be made.  Creditors extended trade and/or bank credit to the

Debtors as a single economic unit and did not rely on the separate identities of the many affiliates

of AHERF.  Creditors are not prejudiced by the substantive consolidation of the Debtors' Estates

as contemplated in the Plan.

    FF.   Solicitation and Tabulation of Acceptances.  As evidenced by the Ballot

Declaration, the solicitation and tabulation of acceptances and rejections of the Plan was

accomplished in a proper, fair and lawful manner in accordance with the Disclosure Statement

Approval Order and/or all applicable Bankruptcy Rules.  The Plan has been duly accepted by the holders of Claims whose acceptance is required in accordance with the provisions of Section 1126(b) of the Bankruptcy Code.

GG.    Plan Transfers.  All transfers and issuances by the Debtors are transfers under the Plan free from the imposition of taxes of the kind specified in Section 1146(c) of the Bankruptcy Code and are subject to the exemptions of Section 1145 of the Bankruptcy Code.

HH.    Chapter 11 Trustee's Duties.  The Chapter 11 Trustee has completed and fulfilled all of his obligations and duties with respect to the Debtors' Estates through the Confirmation Date pursuant to Section 1106 of the Bankruptcy Code.

II.    Modification of the Plan.  Any modifications of the Plan provided for and approved by this Order are non-material and do not adversely change the treatment of the holder of any Claim against the Debtors under the Plan.  In accordance with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan are hereby deemed to have accepted the Plan, as amended in accordance with any modifications.  No holder of a Claim who has voted to accept the Plan shall be permitted to change its acceptance to a rejection as a consequence of such modifications.  Disclosure of any modifications on the record of the Confirmation Hearing constitutes due and sufficient notice thereof.

13

**IT IS NOW HEREBY ORDERED THAT:**

1.    <u>Confirmation</u>.  The Plan shall be, and hereby is, confirmed, having met the requirements of Section 1129 of the Bankruptcy Code.  The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.

2.    <u>Objections Overruled</u>.  The Objections to confirmation of the Plan that have not been withdrawn prior to entry of this Confirmation Order or are not cured by the relief granted herein shall be, and they hereby are, overruled in their entirety, and all withdrawn Objections shall be, and they hereby are, deemed withdrawn with prejudice and without costs.

3.    <u>Record Date</u>.  Pursuant to the Plan, and in accordance with Bankruptcy Rule 3021, the Distribution Record Date for the purposes of determining those holders of Claims entitled to receive distributions under the Plan shall be the Business Day after the Confirmation Date.

4.    <u>Confirmation Hearing</u>.  The record of this Confirmation Hearing shall be, and hereby is, closed.

5.    <u>Modifications</u>.  Any modifications to the Plan shall be, and hereby are, approved and are incorporated into and made part of the Plan.

6.    <u>Allowance of Claims</u>.  (a)  Pursuant to Section 5.3 of the Plan, the holders of Centennial Bondholders Claims shall be, and they hereby are, granted (i) an Allowed Secured Claim in the aggregate amount of $33 million and (ii) an Allowed Centennial Unsecured Claim

14

in the aggregate amount of $105.6 million, which shall be subject to reductions, to the extent necessary, pursuant to Section 5.3(e) of the Plan.

      (b)    Pursuant to Section 5.4 of the Plan, the holders of MBIA/PNC Claims shall be, and they hereby are, granted an Allowed Secured Claim in the aggregate amount of $50 million and an Allowed Unsecured Claim in the aggregate amount of $340.3 million, each of such Claims shall be treated as provided in Section 5.4(c) of the Plan and, to the extent, if necessary, pursuant to Section 5.4(d) of the Plan.

      7.    <u>Implementation of the Plan</u>.  In accordance with Section 1142 of the Bankruptcy Code, the implementation and consummation of the Plan in accordance with its terms shall be, and hereby is, authorized and approved, and the Chapter 11 Trustee, the Creditors' Committee or any other Person designated pursuant to the Plan shall be, and they hereby are, authorized, empowered and directed to issue, execute, deliver, file and record any document, whether or not any such document is specifically referred to in the Plan, the Disclosure Statement or any exhibit thereto, and to take any action necessary or appropriate to consummate the Plan in accordance with its terms.  Without in any manner limiting the foregoing, the execution and delivery, performance, filing or recordation by the Chapter 11 Trustee, the Creditor's Committee or any other entity or Person designated pursuant to the Plan, of each of the documents, instruments and agreements contemplated by or necessary in connection with consummation of the Plan, are hereby authorized and approved.

      8.    <u>Binding Effect</u>.  In accordance with Section 1141(a) of the Bankruptcy Code, the Plan and all of its provisions shall be, and hereby are, binding upon the Debtors,

Liquidating AHERF, any Person acquiring or receiving property or a distribution under the Plan, any lessor or lessee of property to or from the Debtors, any creditor of the Debtors and any holder of a Claim against the Debtors, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder (a) has filed, or is deemed to have filed, a proof of Claim, (b) has accepted or rejected the Plan or (c) will or will not receive a distribution under the Plan.

        9.    Substantive Consolidation.  On the Effective Date: (i) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of AHERF, (ii) no distributions shall be made under the Plan on account of inter-company Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, and (iv) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors; provided, however, that (a) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Debtors shall be treated as separate entities so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the Debtors may not be set-off against the debts of any of the other Debtors, (b) for purposes of determining the plaintiff of, and the availability of defenses to, Recovery Actions, the Debtors may, at the option of the Chapter 11 Trustee upon the direction of the Creditors' Committee, be treated as separate entities and (c) holders of Centennial Unsecured Claims shall be afforded the

16

treatment set forth in Section 5.6 of the Plan for all purposes and shall not be deemed General

Unsecured Creditors for purposes of distributing under or voting for the Plan as a result of giving

effect to this Article 2.  To the extent that a creditor, including, but not limited to, the Pension

Benefit Guaranty Corporation, is holding an Allowed Unsecured Claim against more than one of

the Debtors' Estates arising out of the joint and several obligations of the Debtors, such creditor

shall be treated as a holder of an Allowed General Unsecured Claim under Class 5(A) of the

Plan.

          10.    Section 1146(c) Exemption.  In accordance with Section 1146(c) of the

Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the

making or delivery of any instrument of transfer pursuant to, in implementation of, or as

contemplated by the Plan, including any merger agreements or agreements of consolidation,

deeds, bills of sale or assignments executed in connection with any of the transactions

contemplated under the Plan, or the revesting, transfer or sale of any real or personal property of

the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making,

delivery, creation, assignment, amendment or recording of any note or other obligation for the

payment of money or any mortgage, deed of trust or other security interest under, in furtherance

of, or in connection with the Plan, the issuance, renewal, modification or securing of

indebtedness by such means and (c) the making, delivery or recording of any deed or other

instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without

limitation, this Confirmation Order, shall not be subject to any document recording tax, stamp

tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage

recording tax or other similar tax or governmental assessment.  Consistent with the foregoing,

17

each recorder of deeds or similar official for any county, city or governmental unit in which any

instrument hereunder is to be recorded shall be, and hereby is, directed to accept such instrument,

without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer

tax, intangible tax or similar tax.

      11.   Exemption From Securities Laws.  The exemption from the requirements

of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and any state or local law requiring

registration for the offer or sale of a security, provided for in Section 1145 of the Bankruptcy

Code, shall apply to the Series A Bondholder Secured Liquidation Participations, the Series B

Bondholder Secured Liquidation Participations, the Series C Bondholder Secured Liquidation

Participations and the Unsecured Claim Liquidation Participations to be granted to creditors

pursuant to the Plan.

      12.   Binding Effect of Prior Bankruptcy Court Orders.  Subject to the terms of

the Plan and this Confirmation Order, all prior orders of this Court entered in the Chapter 11

Cases, all documents and agreements executed by the Chapter 11 Trustee or the Debtors as

authorized and directed thereunder, and all motions or requests for relief by the Debtors pending

before the Court as of the Effective Date shall be, and hereby are, binding upon, and shall inure

to the benefit of the successors and assigns of such Persons.

      13.   Corporate Authority to Implement Plan.  Except as may otherwise be

required pursuant to the Plan or any documents or agreements implemented in connection

therewith, all terms of the Plan, and all documents which are contemplated to be executed in

connection with the Plan, may be put into effect and carried out, without further action by the

trustees of Liquidating AHERF, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated therein, including, without limitation, (a) the adoption of the Liquidating AHERF Bylaws and (b) the initial selection of directors and officers of the Bankruptcy officers.

14.    <u>Authority to Grant Releases</u>.  Without limiting the generality of Section 6.3(b) of the Plan, in connection with the compromise and settlement of any Recovery Actions, the Creditors' Committee and the Chapter 11 Trustee (with prior consent of the Creditors' Committee), are authorized to release and discharge, to the fullest extent permitted by law, the non-Debtor parties to the Recovery Actions from all Claims and Causes of Action that the Debtors, the Creditors' Committee or the Chapter 11 Trustee has or may have whether known or unknown against such Persons.  Any settlement effectuated prior to the Confirmation Date, upon notice thereof to the Bankruptcy Court, shall be deemed incorporated into the Plan and this Order by this reference thereto, and the terms and provisions thereof shall be deemed a settlement pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code.

15.    <u>Attorney Client Privilege</u>.  In the event that the Chapter 11 Trustee (with the prior consent of the Creditors' Committee) or the Creditors' Committee determine to waive any aspect of their, the Debtors' Estates', or Liquidating AHERF's attorney-client privilege (including any other applicable privileges or other immunities from disclosure) in connection with requests for documentation and information heretofore sought or to be sought by governmental agencies or other third parties investigating and litigating matters related to the Debtors, such determination shall be, and hereby is, deemed as (i) a reasonable exercise of the

19

Creditors' Committee's and the Chapter 11 Trustee's business judgment, as the case may be, and

(ii) in the best interest of the Beneficiaries.

16.  <u>Disbursing Agent</u>.  The Chapter 11 Trustee (or a disbursing agent

designated by the Chapter 11 Trustee and the Creditors' Committee) shall be, and hereby is,

authorized and directed to serve as disbursing agent to make all distributions required under the

Plan (a) to the holders of Allowed Claims and (b) thereafter, to the extent Disputed Claims

become Allowed, to the holders of such Allowed Claims.  All distributions including any

proceeds from the Recovery Actions shall be made pursuant to, and in accordance with, the

provisions of Articles 5 and 6 of the Plan.  Any payment of Cash made by Liquidating AHERF

(by the Chapter 11 Trustee or his disbursing agent) pursuant to the Plan shall be made by wire

transfer or check drawn on a domestic bank; <u>provided, however,</u> that until no later than

December 21, 2000 at 5:00 p.m. (Pittsburgh time), holders of Allowed Claims in excess of $15

million in the aggregate may provide to the Chapter 11 Trustee or his disbursing agent written

instructions for the receipt by wire transfer of distributions required to be made from the Estates

upon the occurrence of and after the Effective Date.  Any payments made by the AHERF Lenders

pursuant to that certain order (the "Settlement Order") approving the Stipulation of Settlement

and Order dated December 6, 2000 (the "Stipulation") among the Chapter 11 Trustee, the

AHERF Lenders and the Creditors' Committee directly to parties designated by the Chapter 11

Trustee as provided in the Settlement Order shall be deemed to be distributions made in

accordance with Section 6.6(b) of the Plan.  All other distributions under the Plan required to be

made to holders of Allowed Claims upon the occurrence of the Effective Date shall be deemed in

accordance with the Plan if made by the Chapter 11 Trustee or his disbursing agent as soon as practicable after the occurrence of the Effective Date.

      17.   <u>Discharge</u>. Subject to, and upon the occurrence of, the Effective Date, and except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors of any debt that arose before the Effective Date, and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of Claim based on such debt, obligation or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim has accepted the Plan; <u>provided</u>, <u>however</u>, that the foregoing discharge shall not apply to rights of holders of Insurance Claims to name the Debtors as nominal defendants in any litigation solely to obtain a right of recovery against any applicable Insurance Policy (but not to enforce a judgment against any property of the Debtors or Liquidating AHERF).

      18.   <u>Injunctions</u>. As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against the Debtors, their Estates, the Chapter 11 Trustee or Liquidating AHERF, on account of or respecting any Claims, debts, rights, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

21

19.   Exculpation. Neither the Debtors, the Chapter 11 Trustee, the Creditors' Committee (including its individual members), the Bankruptcy Officers or their advisors, agents or Professionals shall have or incur any liability to any holder of a Claim or any fiduciary for such holder for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Chapter 11 Trustee, or Creditors' Committee and each of their respective members, officers, directors, employees, advisors, agents and Professionals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that nothing in the Plan shall, or shall be deemed to, release or exculpate such parties with respect to their respective obligations or covenants arising pursuant to this Plan. Notwithstanding the foregoing, and except as provided in the PBGC Settlement Agreement, nothing in this Plan shall constitute or be construed as a release or exculpation from liability for claims against non-Debtors brought by the Pension Benefit Guaranty Corporation under the Employee Retirement Income Security Act or other applicable laws that relate to fiduciary obligations to or administration of the Allegheny Health, Education and Research Foundation Retirement Account Plan, the Graduate Hospital Pension Plan, the Graduate Hospital Teamsters Plan and the Zurbrugg Memorial Hospital Retirement Income Plan.

20.   Settlements and Compromises. All settlements and compromises contained in the Plan, including, but not limited to, those referred to in paragraph M of this Order, are approved pursuant to Bankruptcy Rule 9019 as fair, prudent and reasonable

compromises of the controversies and Claims resolved by such settlements and are binding upon all entities affected thereby.

21.    Estate Assets' Reversion.  The following amounts shall become Estate Assets and shall be distributed pursuant to Section 6.6 of the Plan: (i) distributions under the Plan that are unclaimed for a period of one year after the date of such distribution and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim plus Reserve Income related thereto.

22.    Plan Documents.  The Chapter 11 Trustee is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents reasonably acceptable to the Creditors' Committee and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

23.    Rejection of Executory Contracts and Unexpired Leases.  Any executory contracts or unexpired leases (other than Insurance Policies) which (a) have not expired by their own terms on or prior to the Confirmation Date, (b) have not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, or (c) are not the subject of a motion to assume or reject the same which is pending at the time of the Confirmation Date, shall be deemed rejected on the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

23

JAN-31-2005  12:44        W D S                                    P.39

24.    <u>Rejection Damage Claims</u>.  If the rejection of an executory contract or
unexpired lease by the Debtors pursuant to Section 9.1 of the Plan results in a claim for damages
to the other party or parties to such contract or lease, any claim for such damages, if not
heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be
enforceable against the Estates, Liquidating AHERF or their respective properties or agents,
successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served
upon counsel for the Chapter 11 Trustee on or before forty-five days following the Confirmation
Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims
for which proofs of claim are timely filed will be treated as General Unsecured Claims, or
Centennial Unsecured Claims, as the case may be, subject to the provisions of the Plan.  The
Chapter 11 Trustee shall have the right to object to any rejection damage claims filed in
accordance with the preceding sentence.

25.    <u>Retention of Jurisdiction</u>.  Pursuant to Section 12.1 of the Plan, this Court
shall have exclusive jurisdiction of the following specified matters arising out of, and related to,
the Chapter 11 Cases, the Plan and Liquidating AHERF pursuant to, and for the purposes of,
Sections 105(a) and 1142 of the Bankruptcy Code (a) to hear and determine the Recovery
Actions or matters related thereunder to enable the Chapter 11 Trustee and the Creditors'
Committee to prosecute the Recovery Actions; (b) to hear and determine any and all objections
to the allowance of any Claims or any controversies as to the classification of any Claims or to
liquidate or estimate any Disputed Claim, provided that only the Chapter 11 Trustee, and the
Creditors' Committee may file objections to Claims; (c) to hear and determine any and all
applications by Professionals for compensation and reimbursement of expenses, pursuant to

24

Section 3.2(b) of the Plan; (d) to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom; (e) to enforce the provisions of the Plan subject to the terms thereof; (f) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan; (g) to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein; (h) to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and (i) to determine such other matters as may be provided for herein.

26.    Continuation of Creditors' Committee. On the Effective Date, the Creditors' Committee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which it is a party, and to fulfil its other obligations under the Plan, as a five member committee consisting of one representative of each of MBIA, PNC, the Centennial Indenture Trustee, Aetna US Healthcare, Inc. and Health America, pursuant to bylaws which the Creditors' Committee may, in its sole discretion, adopt.

27.    Continuation of Chapter 11 Trustee. On the Effective Date, the Chapter 11 Trustee shall, among other things, continue to act as plaintiff in the Recovery Actions, pursuant to Section 1123(3)(B) of the Bankruptcy Code, to which he is a party and to fulfill his other obligations under the Plan and shall be appointed as sole trustee and chief liquidating officer of Liquidating AHERF, subject in all respects to the supervision of the Creditors' Committee, the provisions of the Plan and the Liquidating AHERF Bylaws.

28.    Professional Compensation and Expense Reimbursement Claims.  All

entities, including, without limitation, the individual members of the Creditors' Committee,

seeking an award by the Bankruptcy Court of professional fees, including the fees of the Chapter

11 Trustee, or of compensation for services rendered or reimbursement of expenses incurred

through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or

503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances

of compensation for services rendered and reimbursement of expenses incurred through the

Confirmation Date (including, without limitation, for the period August 1, 2000 through and

including November 30, 2000) by no later than January 17, 2001, (b) shall appear at a hearing on

February 6, 2001 at which this Court shall  consider all of said final and interim fee applications

which heretofore have been filed but not determined by this Court, pursuant to such notice as this

Court may direct by separate order, and (c) if granted such an award by the Bankruptcy Court,

shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the

Effective Date or the date such Administrative Expense Claim becomes an Allowed

Administrative Expense Claim, or as soon thereafter as is practicable or (ii) upon such other

terms as may be mutually agreed upon between such holder of an Allowed Administrative

Expense Claim and the Chapter 11 Trustee and the Creditors' Committee.  All fees and expenses

of Professionals for services rendered in connection with the Chapter 11 Cases and the Plan after

the Confirmation Date, including, without limitation, those relating to the occurrence of the

Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of

Disputed Claims, shall be paid by the Chapter 11 Trustee from the assets of  Liquidating AHERF

in the amount of 90% of fees asserted and 100% of expenses incurred upon receipt of reasonably

detailed invoices therefor by the Chapter 11 Trustee and Creditors' Committee, for such amounts

and on such terms as may be agreed to between such Professional and the Chapter 11 Trustee, with the consent of the Creditors' Committee, with the payment of the balance of such fees to be made upon fee applications to be filed with and determined by the Bankruptcy Court on a quarterly basis, upon such notice as the Bankruptcy Court may direct. To the extent of any inconsistencies between this paragraph and Section 3.2(b) of the Plan, this paragraph shall govern.

29. Notice. Notice of entry of this Confirmation Order and of the Effective Date of the Plan, substantially in the form annexed hereto as Exhibit A (which notice is hereby approved in all respects), shall be, and hereby is, deemed sufficient (a) if served upon (i) all holders of remaining claims either listed on the Debtors' schedule of assets and liabilities or on the claims docket, (ii) all entities which are party to any litigation in which the Chapter 11 Trustee or the Creditors' Committee, as the case may be, are the plaintiff or defendant, (iii) all entities or individuals which are parties to executory contracts or unexpired leases with the Debtors, (iv) the taxing authorities in any jurisdiction where the Debtors transact business, (v) the Office of the United States Trustee, (vi) the Securities and Exchange Commission, (vii) the District Director of the Internal Revenue Service, (viii) the United States Attorney for the Western District of Pennsylvania and (ix) any individual or entity filing a notice of appearance in the Chapter 11 Cases; and (b) if published once within twenty (20) days from the Effective Date in the national editions of The New York Times and The Wall Street Journal, The Pittsburgh Post-Gazette and in The Philadelphia Inquirer-Daily News.

30.    Cancellation and Surrender of Existing Securities and Agreements. Except as may otherwise be provided in the Plan, including without limitation, as provided in Sections 5.3(f) and 5.4(e) and (f) of the Plan, on the occurrence of the Effective Date and the making of the initial distribution to the holders of Secured and Unsecured Claims, the promissory notes, share certificates, bonds and other instruments evidencing Claims, except as set forth in Section 9.3 of the Plan, against the Debtors shall be canceled without further act or action by any Person under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under any promissory notes, share certificates, bonds and other instruments evidencing any Claim shall be deemed discharged and released.

31.    Settlement with AHERF Lenders. This Order is premised upon the settlement embodied in the Stipulation. Except for the provisions of this paragraph which shall remain in full force and effect, this Order, and any provision hereof, shall not be effective or become final and enforceable, and the Effective Date shall not occur, unless and until the Settlement Order becomes a Final Order on or before December 26, 2000. In the event that the Settlement Order does not become a Final Order on or before December 26, 2000, (i) this Order, and each provision hereof, shall immediately become and be deemed null and void ab initio; (ii) the AHERF Lenders' Objection shall immediately be deemed reinstated; (iii) this Court shall schedule a hearing with respect to confirmation of the Plan, at which hearing all parties will be entitled to a full plenary hearing with respect to the AHERF Lenders' Objection, including, without limitation, their objection to substantive consolidation as provided in the Plan; and (iv) any and all evidence or proof previously presented to the Court and any and all findings of fact and conclusions of law previously determined by the Court with respect to any of the issues

28

raised by the AHERF Lenders' Objection, including, without limitation, substantive

consolidation under the Plan, shall be deemed withdrawn and shall be of no precedential or

prejudicial effect as against the AHERF Lenders, and said withdrawal shall be of no precedential

or prejudicial effect as against the Chapter 11 Trustee and the Creditors' Committee.

32.    Effect of Reference to the Plan in this Confirmation Order.  The failure to

reference or discuss any particular provision of the Plan in this Confirmation Order shall have no

effect on the validity, binding effect and enforceability of such provision, and each provision of

the Plan shall have the same validity, binding effect and enforceability as if fully set forth in this

Confirmation Order.

33.    Headings.  Headings utilized herein are for the convenience of reference

only, and shall not constitute a part of the Plan or this Confirmation Order for any other purpose.

34.    Inconsistencies.  In the event of any inconsistencies between the Plan or

other agreement, instrument or document intended to implement the provisions of the Plan, the

provisions of the Plan shall govern unless otherwise explicitly provided for in such agreements,

instruments or documents.  In the event of any inconsistency between the Plan and any

agreement, instrument or document intended to implement the Plan and this Confirmation Order,

the provisions of the Plan and any such agreement, instrument or document shall govern, unless

otherwise expressly provided in this Confirmation Order.

29

35.    <u>Integration of Confirmation Order Provisions.</u>  Except as provided in
paragraph 31 above, the provisions of this Confirmation Order are integrated with each other and
are nonseverable and mutually dependent.

Dated: Pittsburgh, Pennsylvania
       December 14, 2000


                              _____
                              The Honorable M. Bruce McCullough
                              United States Bankruptcy Court Judge


30

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Case Nos. 98-25773 MBM through |
| ALLEGHENY HEALTH, EDUCATION | : | 98-25777 MBM inclusive |
| AND RESEARCH FOUNDATION, | : | |
| Case No. 98-25773 | : | |
| | : | |
| ALLEGHENY UNIVERSITY MEDICAL | : | Chapter 11 |
| PRACTICES | : | |
| Case No. 98-25774 | : | |
| | : | |
| ALLEGHENY HOSPITALS, | : | |
| CENTENNIAL | : | |
| Case No. 98-25775 | : | Consolidated for |
| | : | Administration at 98-25773 MBM |
| ALLEGHENY UNIVERSITY | : | |
| HOSPITAL-EAST | : | |
| Case No. 98-25776 | : | |
| | : | |
| ALLEGHENY UNIVERSITY | : | |
| OF THE HEALTH SCIENCES | : | |
| Case No. 98-25777 | : | |
| | : | |
| | : | |

## NOTICE OF CONFIRMATION AND EFFECTIVENESS OF PLAN

PLEASE TAKE NOTICE, that on December __, 2000, the United States

Bankruptcy Court for the Western District of Pennsylvania entered an order (the "Confirmation

Order") confirming the Chapter 11 Trustee's Second Amended Consolidated Liquidating Plan of

Reorganization dated December 5, 2000 (the "Plan") of the above-captioned debtors

(collectively, the "Debtors").

PLEASE TAKE FURTHER NOTICE, that the Effective Date of the Plan, as

defined therein, occurred on December ___, 2000.

5742/68146-003 NYLIB2/7B3082 v1

TAB 172

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE COOPERS, LLP*

---

## *ROBERT MCNAIR*
*January 17, 2003*

---

## *MANHATTAN REPORTING CORP.*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MCNAIR, ROBERT (1/17/2003)

**Word Index included with this condensed transcript**

ROBERT M. MCNAIR, JR.

Page 58

1  Q. -- form of GHS hospitals?        10:13:27
2  A. Basically most of that organizational chart  10:13:29
3  we were looking at before would have been transferred  10:13:31
4  under SDN's control.        10:13:34
5  Q. And at some point in October of '96 or so,  10:13:35
6  the proposed transaction changed?        10:13:38
7  A. Well, I think it actually started changing in  10:13:39
8  late August, because some of the finance people at  10:13:42
9  Allegheny got the idea that they can realize a gain  10:13:45
10  on -- a loss on sale, excuse me, which was a Medicare  10:13:49
11  and other cost-based reimbursement concept, which  10:13:53
12  would actually pay for assets which had been  10:13:56
13  underdepreciated, if you will, relative to their  10:14:00
14  regular value        10:14:03
15  But the way the Medicare rules worked, you  10:14:05
16  could not realize a gain on sale unless you did either  10:14:09
17  an asset sale or you did a transaction which was, for  10:14:13
18  want of a better term, a fundamental change, like a  10:14:17
19  merger, consolidation        10:14:21
20  So the format of the arrangement changed  10:14:22
21  and became a series of mergers, which was why Horizon  10:14:24
22  had to come into the picture, because the desire was  10:14:27
23  to merge the New Jersey entities into a different  10:14:31
24  entity than the Pennsylvania entities were being  10:14:35
25  merged, because the difference in timing, and also  10:14:37

Page 59

1  because it was just desired to have New Jersey  10:14:40
2  separate from Pennsylvania.        10:14:44
3  Q. Did the difference in timing have any  10:14:44
4  implications in terms of Medicare reimbursements?  10:14:46
5  A. The difference in timing? You mean between  10:14:50
6  the Pennsylvania --        10:14:51
7  Q. Between the Pennsylvania and New Jersey  10:14:53
8  A. Not that I'm aware of.        10:14:54
9  Q. So I'm just trying to understand why Horizon  10:14:55
10  Medical Corporation was necessary, other than just  10:14:57
11  trying to keep the --        10:15:00
12  A. My best recollection is they wanted to keep  10:15:02
13  them separate, and, No. 2, we wanted to go ahead and  10:15:04
14  do the Pennsylvania ones. Mr. Abdelhak was very eager  10:15:09
15  to get those done. We couldn't do the New Jersey ones  10:15:11
16  at the same time.        10:15:13
17  But I think the real reason, if I recall  10:15:15
18  correctly, was that there was a problem with mixing  10:15:17
19  bond indebtedness or various kinds of debt between the  10:15:19
20  two entities. In other words, had you tried to merge  10:15:23
21  the New Jersey piece in with the Pennsylvania -- with  10:15:26
22  the various Graduate Pennsylvania pieces, which were  10:15:31
23  part of a collective financing arrangement, it might  10:15:32
24  have triggered defaults in those debt instruments and  10:15:35
25  so forth. So for a variety of reasons, we decided to  10:15:39

Page 60

1  put New Jersey into its own entity.        10:15:42
2  Q. Were there any other reasons that you're  10:15:45
3  aware of for the change in the proposed deal  10:15:46
4  structure?        10:15:50
5  A. Other reasons than the recognition of the  10:15:50
6  gain on sale?        10:15:55
7  Q. Yes.        10:15:55
8  A. No, because it was more complicated and it  10:15:56
9  was -- I mean, there may have been other reasons I'm  10:15:57
10  not aware of, but that was the one I was aware of.  10:16:00
11  Q. Do you recall there was some kind of a  10:16:02
12  roadblock in negotiating termination of various  10:16:03
13  management agreements that HSI had with GHS and GHS  10:16:06
14  hospitals?        10:16:10
15  A. Yes. I recall some back and forth between  10:16:10
16  Mr. Abdelhak, Mr. Korman and Dr. Hasan about -- I  10:16:12
17  can't recall the details, but there was a lot of  10:16:17
18  discussion and some posturing and, you know, calling  10:16:20
19  up and saying. This deal is dead and so forth and so  10:16:33
20  on. Ultimately that was all worked out. In fact, I  10:16:33
21  think the documents between HSI and Graduate are in  10:16:33
22  here, if I'm not mistaken        10:16:33
23  Q. Do you recall if any kind of negotiation  10:16:33
24  difficulties between HSI and Allegheny held up the  10:16:37
25  deal from August '96 and necessitated a restructuring  10:16:39

Page 61

1  of the deal?        10:16:44
2  A. No. I don't remember that as being a factor  10:16:45
3  particularly. I remember there was a lot of back and  10:16:47
4  forth, but I also remember that -- and I was not  10:16:49
5  present, but I heard that there had been some sort of  10:16:51
6  soft representations made about Allegheny taking on  10:16:55
7  certain -- QualMed had, which was in the picture here,  10:16:58
8  that's where Dr. Hasan was, had an enterprise that was  10:17:06
9  doing some kind of fancy data-related applications.  10:17:09
10  And I think Mr. Abdelhak made some commitments to them  10:17:14
11  about buying some of those applications and, in fact,  10:17:16
12  there were some papers actually entered into about  10:17:20
13  understandings in that regard.        10:17:22
14  Q. You mean like a computer program or --  10:17:24
15  A. Sort of.        10:17:25
16  Q. -- technology?        10:17:26
17  A. It was some kind of data platform that was  10:17:26
18  associated with Graduate. I never really sort of  10:17:29
19  understood the details of it. But there were some  10:17:31
20  undertakings made in connection with the HSI/Graduate  10:17:34
21  understandings that, essentially, ameliorated the  10:17:41
22  disputes between HSI and Graduate.        10:17:46
23  I actually never knew what the final terms  10:17:49
24  of settlement between HSI and Graduate were. We had  10:17:50
25  kind of a three-way closing going on, but Mr. Korman  10:17:54

16 (Pages 58 to 61)

ROBERT M. MCNAIR, JR.

Page 62

1  was dealing on his own with the HSI people.    10:17:57
2    Q.  Is the technology that you reference, is that  10:18:01
3  the 4G technology?    10:18:02
4    A.  Yes.  That's correct.  Which had originated  10:18:04
5  at Graduate, but which had been sold off to QualMed as 10:18:07
6  part of the deal in which Greater Atlantic was sold.  10:18:10
7    Q.  And under the revised transaction deal  10:18:14
8  structure, was essentially, the Graduate, former  10:18:19
9  Graduate hospitals, were they going to merge into SDN? 10:18:25
10    A.  That's my recollection, yes.    10:18:30
11    Q.  And then I guess the hospital entity,  10:18:30
12  Zurbrugg Memorial Hospital, was going to merge into  10:18:35
13  Horizon Medical Corporation?    10:18:38
14    A.  That's correct.  That's correct.    10:18:42
15    Q.  And was SDN also going to acquire various  10:18:42
16  other former Graduate Health System entities?  10:18:43
17    A.  Yeah.  I think it took over most, if not all, 10:18:46
18  of those entities that were reflected on that  10:18:47
19  organizational chart.  I couldn't tell you with  10:18:50
20  absolute precision that they were all there, but many 10:18:54
21  of them were.    10:18:54
22    Q.  And were those acquisitions effectuated by a  10:18:54
23  merger or were they more like a stock transaction?  10:18:55
24    A.  No.  They kind of came along because we had  10:18:59
25  taken over the entities which ultimately -- which  10:19:00

Page 63

1  owned the stock.  Over time, after the transactions  10:19:04
2  were done, we merged many of them out of existence, as 10:19:05
3  I recall, and kind of tried to clean up the  10:19:09
4  organizational chart, but that was not done at that  10:19:12
5  time.    10:19:14
6    Q.  Did you draft many of the documents in  10:19:15
7  Exhibit No. 988?    10:19:18
8    A.  I did.    10:19:19
9    Q.  And did you -- to the extent certain  10:19:20
10  documents in here were filed with governmental  10:19:24
11  agencies, were you in charge of filing them?  10:19:25
12    A.  I prepared them for filing.  They were  10:19:28
13  actually filed, as I recall, by our senior paralegal  10:19:29
14  from Pittsburgh, Kathleen Saunders, who actually flew 10:19:32
15  in to Philadelphia one day and picked up the documents 10:19:36
16  and took them to Pittsburgh and filed them.  But they 10:19:40
17  were prepared for filing by our office, yes.    10:19:40
18    Q.  I notice on certain documents that there's a  10:19:42
19  little footer that says RMM?    10:19:44
20    A.  That would be me.    10:19:47
21    Q.  Anywhere we see that footer, does that mean  10:19:50
22  that document was at least initially prepared by you? 10:19:52
23    A.  Probably.  If you want to call my attention  10:19:54
24  to specific ones.  I wouldn't be surprised if somebody 10:19:56
25  put my initials on something that I prepared, but  10:19:59

Page 64

1  let's hope not.    10:20:01
2    Q.  I'm talking about little computer-generated  10:20:04
3  footers, and let me find an example.    10:20:06
4    A.  Yeah.  You'll see the DVR footers, which  10:20:09
5  are -- identified the Delaware Valley region.  10:20:13
6    Q.  If you turn to Page PH 7386, which is behind  10:20:16
7  Tab 5, or really it's right in front of Tab 6.    10:20:21
8    A.  Okay.  Yes.    10:20:26
9    Q.  Do you see how it says RMM --  10:20:35
10    A.  Yes.  That's clearly me.  That's correct.  10:20:37
11    Q.  So anywhere we see a footer like that, that  10:20:39
12  means that you created that document?    10:20:41
13    A.  Presumptively, yeah.  I mean, if you want to  10:20:42
14  ask me about specific ones.  I would assume nobody  10:20:46
15  else would use that, but as I say, given what I've  10:20:47
16  learned since then, I wouldn't put anything past  10:20:51
17  anyone.    10:20:58
18    Q.  And at this time, were you assistant  10:21:00
19  secretary of SDN?    10:21:02
20    A.  Yes, I was    10:21:05
21    Q.  Do you recall when you first became assistant 10:21:06
22  secretary of SDN?    10:21:08
23    A.  I can't say that with great certainty.  I  10:21:11
24  will tell you that SDN was the remnant of United  10:21:14
25  hospitals.  In fact, it was the old United hospitals  10:21:26

Page 65

1  entity. which Mr. Abdelhak had not wanted to bring  10:21:26
2  into the Allegheny system, so he had sort of told me  10:21:26
3  back in the summer of '91 to. quote, make it go away, 10:21:26
4  but not make it go away in the sense of having the  10:21:30
5  corporation disappear. We just didn't want -- he  10:21:33
6  wanted it to kind of be sitting out there. which it  10:21:34
7  did.    10:21:37
8        The SDN initials obviously stand for  10:21:37
9  Sherif, David and Nancy. who were the three directors. 10:21:41
10  I cannot tell you with certainly when I became an  10:21:44
11  assistant secretary. but. as best I recall. I was  10:21:45
12    Q.  Was it before the GHS acquisition in '96?  10:21:50
13    A.  To the best of my recollection, yes    10:21:53
14    Q.  Was Donald Kaye also one of the directors of 10:21:56
15  SDN?    10:21:59
16    A.  As I recall. yes, he was.    10:22:00
17    Q.  And just to clarify. on PH 7414 --  10:22:04
18    A.  Which tab?    10:22:08
19    Q.  Which is right in front of Tab 12.  10:22:09
20    A.  Yes    10:22:18
21    Q.  Do you see there's a different kind of footer 10:22:18
22  that says RMM:SSA?  Do you know what that means?  10:22:20
23    A.  Yeah.  What this means is, this was typed by 10:22:25
24  Beth Boyer. who was Mr. Abdelhak's assistant, and it  10:22:28
25  would have been something that I gave her to type,  10:22:32

ROBERT M. MCNAIR, JR.

Page 66

1  which had been -- as I recall, this actually had gone  10:22:39
2  on in a negotiation between Mr. Abdelhak and  10:22:43
3  Mr. Korman personally. And I walked out of that  10:22:47
4  negotiation, handed her this and said, Type this,  10:22:51
5  which is why she put my initials on it.  10:22:53
6      Q.  So wherever we see the RMM footer, does that  10:23:00
7  mean that you likely had some kind of involvement with  10:23:03
8  the drafting of the document?  10:23:06
9      A.  Very probably. Again, it's obviously subject  10:23:07
10  to review of the particular document, but those are  10:23:10
11  obviously my initials, yes.  10:23:12
12      Q.  Do you recall that Allegheny had to pay money  10:23:13
13  in order to get out of the -- or to facilitate GHS  10:23:17
14  getting out of the management agreement it had with  10:23:21
15  HSI?  10:23:23
16      A.  I recall that vaguely. As I say, I remember  10:23:25
17  there were understandings between QualMed, which  10:23:27
18  basically was controlling HSI at this point, Graduate  10:23:31
19  and Allegheny. That's where the G4 conversations came  10:23:34
20  up. And as I recall, yes, there was some money that  10:23:38
21  changed hands. I couldn't tell you the precise amount  10:23:41
22  of them.  10:23:43
23      Q.  And that was money that was paid to HSI in  10:23:43
24  order to induce HSI to terminate the management  10:23:45
25  agreement?  10:23:48

Page 67

1      A.  Correct. And if I recall correctly,  10:23:49
2  Mr. Korman -- and I only overheard this, I never saw  10:23:50
3  it, but I believe Mr. Korman may have made some  10:23:54
4  payments to them too or liquidated a note or done  10:23:56
5  something that was some consideration on his part for  10:23:58
6  doing the deal as well.  10:24:02
7      Q.  Okay. Why don't we just set this document  10:24:03
8  aside. We might refer back to it later.  10:24:09
9      A.  Okay.  10:24:11
10      MR. COGAN:  Would this be a good time to  10:24:11
11  take a break. We've been going for an hour and a  10:24:12
12  half.  10:24:15
13      MR. TERUYA:  Sure. Why don't we take a  10:24:15
14  quick break.  10:24:18
15      THE WITNESS:  Not a problem.  10:24:18
16      VIDEO TECHNICIAN:  We are now going off  10:24:19
17  the videotape record. The time, 10:30  10:24:20
18      (Short recess.)  10:39:50
19      VIDEO TECHNICIAN:  Back on. The time,  10:39:54
20  10:46.  10:39:55
21  BY MR. TERUYA:
22      Q.  Just reference back to Exhibit-988, but I  10:39:59
23  don't think -- you can look at it if you need to, but  10:40:01
24  I just was going to ask, do you recall any sort of hot  10:40:03
25  issues that came up in negotiating and drafting the  10:40:07

Page 68

1  various documents that are contained in Exhibit-988?  10:40:10
2      A.  Well, as I said, there was some back and  10:40:14
3  forth between QualMed and Allegheny and HSI about  10:40:18
4  getting out of the management agreement. There were  10:40:22
5  issues in the original negotiations about assuming  10:40:22
6  obligations with respect to some of the senior  10:40:28
7  managers from Graduate, most notably Mr. Cramer and  10:40:30
8  Mr. Mathews and Mr. Huber, who, interestingly enough,  10:40:35
9  chose not to work for Allegheny. Mr. Mathews did and  10:40:40
10  Mr. Cramer got his contract paid off, as best I  10:40:42
11  recall.  10:40:45
12      Probably the biggest issue in the original  10:40:47
13  negotiations was the amount of cash that was going to  10:40:50
14  be forthcoming from Graduate to Allegheny. There was  10:40:52
15  a lot of back and forth on that.  10:40:56
16      I did not participate directly in the  10:40:57
17  business discussions between the business people.  10:40:59
18  They were basically -- I was basically sitting there  10:41:01
19  scrivening and communicating with the lawyer on the  10:41:04
20  other side. Mr. Cornblatt. And then when we got down  10:41:06
21  to the revisions in the arrangements, there were some  10:41:12
22  discussions which I think were reflected in the  10:41:21
23  letters that went back and forth between Mr. Abdelhak  10:41:22
24  and Mr. Korman, which I think related to the change in  10:41:24
25  the format of the transaction and Mr. Korman's  10:41:27

Page 69

1  concerns about what kinds of liabilities and so forth  10:41:30
2  that might expose him to. Because there were real  10:41:32
3  issues that came up, particularly with respect to the  10:41:36
4  bond financings, with doing the transaction as a  10:41:47
5  merger rather than as an assumption of membership  10:41:47
6      Q.  And do you recall if any of the liabilities  10:41:49
7  that you're mentioning with respect to bond financing  10:41:51
8  ever came to be?  10:41:54
9      A.  I don't know as a matter of personal  10:41:56
10  knowledge. Obviously the bonds went into default. I  10:41:58
11  know enough to know there was a special sort of class  10:42:03
12  of the Graduate bond holders in the general  10:42:06
13  transaction and that unlike the Allegheny bonds, which  10:42:08
14  were insured, the Graduate bonds were not insured, so  10:42:12
15  there was a tremendous amount of back and forth.  10:42:16
16      I do know, as I think I've mentioned  10:42:18
17  earlier, that there were some claims against  10:42:21
18  Mr. Korman lodged by -- I only know this from reading  10:42:23
19  the newspapers, by the way -- claiming that they had  10:42:26
20  been misled and that there had been various  10:42:30
21  guarantees, cross guarantees promised, and that monies  10:42:34
22  had been taken out, which were legitimately the bond  10:42:38
23  holders' monies.  10:42:41
24      And I know that those matters settled, and  10:42:42
25  as I recall, they settled for a payment of 4 or 5  10:42:46

18 (Pages 66 to 69)

ROBERT M. MCNAIR, JR.

Page 126

1  McConnell and Abdelhak on our side        12:06:35
2  Q  How about HSI; anyone on their behalf?  12:06:39
3  A  Again Korman. again Abdelhak. I don't think  12:06:41
4  McConnell was as heavily involved in that one  12:06:45
5  McConnell was involved in the -- at the early stages  12:06:47
6  of the Graduate transaction  When we got down to some  12:06:50
7  of the iterations in September and October when the  12:06:53
8  transaction was being sort of modified. Abdelhak took  12:06:56
9  a much more active role.        12:07:00
10  And see, I didn't. to be perfectly candid  12:07:03
11  with you. I didn't even know during the June. July  12:07:06
12  period how much Sherif was involved and how much David  12:07:08
13  was involved. I was talking to David. but it may very  12:07:11
14  well have been· that Sherif was right there on the  12:07:14
15  phone the same · as everybody else.  12:07:16
16  Q  Were there any HSI folks involved?  12:07:18
17  A  Yeah  Well, the way the --  12:07:20
18  well. no. It was not -- it would not have been HSI  12:07:25
19  HSI at this point was owned by QualMed. The head of  12:07:28
20  QualMed at that time was a fellow named Malik Hasan.  12:07:31
21  who was a physician  They were in Pueblo. Colorado.  12:07:34
22  And he was intimately involved in the discussions  I  12:07:36
23  think there were a couple of other senior executives  12:07:38
24  involved.        12:07:40
25  I dealt with a couple of their inside  12:07:41

Page 127

1  counsel, whoever their general counsel was and an  12:07:45
2  assistant GC. whose name was Mike something or other.  12:07:50
3  who was a skadnelon (ph). if I recall correctly.  I  12:07:54
4  couldn't -- I mean, if you had put their names in  12:07:57
5  front of me. I might remember them.  12:08:00
6  But there were some discussions there and  12:08:01
7  there was a little bit of posturing, as I said  12:08:03
8  earlier, and some back and forth, but that was --  12:08:05
9  those were the primary people  And there was a  12:08:08
10  certain amount going on  In fact. there was a lot  12:08:10
11  going on, I later think I determined. that was  12:08:12
12  completely beyond my purview. which was Korman's  12:08:16
13  discussions with Hasan and QualMed about the terms of  12:08:19
14  GHS's involvement in HSI and the HSI Management  12:08:24
15  contract going on        12:08:30
16  Q  Were you involved in or were you privy to  12:08:31
17  these discussions? Not just the HSI ones. but I mean  12:08:34
18  just the general discussions or negotiations relating  12:08:37
19  to the business terms        12:08:40
20  A  Some  I mean, I was there for a couple of  12:08:41
21  them when Mr. Korman and Mr. Abdelhak were talking  12:08:43
22  about very specific things  Early on I was not there.  12:08:46
23  I mean. when we were doing the deal in June and July,  12:08:52
24  I was basically sitting at the end of a telephone,  12:08:55
25  getting drafts of stuff or being told what the deal  12:08:58

Page 128

1  was, drafting things, putting them in front of people,  12:09:10
2  they'd say, No, that's not the deal, or we've changed  12:09:10
3  this, or whatever it might be  That sounds like a  12:09:10
4  peculiar way for lawyers to operate, I understand, but  12:09:10
5  the way that Allegheny did business was, they didn't  12:09:12
6  always involve the lawyers in lots of things that were  12:09:14
7  going on  I think I understand why now, and perhaps I  12:09:17
8  should have suspected why then, but --  12:09:20
9  Q  Was Foley & Lardner involved in negotiating  12:09:23
10  the business terms at all?        12:09:26
11  A  Not to the best of my knowledge  I mean, you  12:09:26
12  know, there undoubtedly were some discussions with  12:09:31
13  Bob, only because they wanted to make sure that there  12:09:34
14  was no bond problem, but, I mean, I don't think he was  12:09:36
15  actively involved in negotiating        12:09:38
16  I mean, their attitude about lawyers, just  12:09:40
17  as an aside, was, We'll make the deal and tell you  12:09:42
18  what the deal is  You know, in fact, Abdelhak told me  12:09:46
19  early in my tenure there, I don't take business advice  12:09:50
20  from my lawyers  All right  Fine.        12:09:52
21  Q  And that was even, like, from the day you set  12:09:55
22  foot at Allegheny?        12:09:58
23  A  It was early on  I can't say that it was the  12:09:59
24  day, but it was certainly within a short period of  12:10:01
25  time        12:10:04

Page 129

1  Q  So that would have been true with respect to,  12:10:06
2  what, the Hahnemann acquisition, for example, and the  12:10:08
3  United acquisition?        12:10:10
4  A  Yeah  I mean, we did them pretty much --  12:10:11
5  well. I was outside at the time --  12:10:13
6  Q  You were at DVR?        12:10:15
7  A  -- of the deal.        
8  And, in fact, there was a complication  12:10:17
9  with the United transaction because he wanted this to  12:10:19
10  be sort of ultra hush-hush. So he actually conducted  12:10:21
11  the negotiations in the United transaction in our  12:10:26
12  offices, in Drinker's offices in Philadelphia, and he  12:10:29
13  and Myles Turtz met there. And since they were there,  12:10:33
14  I was with them. Not all the negotiations. Like the  12:10:36
15  payoffs of the senior executives which went on  12:10:39
16  But this was a pretty common format. I  12:10:43
17  mean, they would go off, talk to the business guys on  12:10:46
18  the other side, come back and say, Here's the deal,  12:10:50
19  write it up. And you'd say, Well, what about this,  12:10:52
20  what about that, what about the other thing, and  12:10:52
21  they'd -- you know, you'd kind of go back and forth.  12:10:55
22  It was not a very efficient way of doing things, but,  12:10:56
23  you know, you play on the field that the client sets  12:11:00
24  for you.        12:11:04
25  Q  During negotiating these acquisitions, did  12:11:04

33 (Pages 126 to 129)

ROBERT M. MCNAIR, JR.

Page 130

1  Abdelhak consult with -- Mr. Abdelhak consult with the  12:11:07
2  Board of Directors of AHERF?        12:11:10
3      A.  I think he was consulting with individual  12:11:12
4  members of the Board.  I mean, he was relatively  12:11:14
5  punctilious about going and getting approval from at  12:11:17
6  least some group of the Board, whether it be the  12:11:19
7  executive committee or the full Board.  I mean, that's  12:11:22
8  certainly the case.        12:11:23
9          I know that, for example, in the Graduate  12:11:25
10  transaction, he represented to me -- now, whether he  12:11:26
11  did it or not, I wasn't on the phone -- that he had  12:11:28
12  talked to some of the key senior members of the Board,  12:11:31
13  like Mr. Snyder and Mr. Barnes, who was the chairman  12:11:34
14  of the finance committee, and people like that.  But,  12:11:37
15  I mean, whether he actually did or not, I can't tell  12:11:39
16  you.        12:11:41
17      Q.  Do you know when that would have been that he  12:11:42
18  was talking with them?        12:11:44
19      A.  I think he was talking with them as the  12:11:45
20  transaction approached culmination, which would have  12:11:47
21  been late, late July, you know, within -- I'd say  12:11:51
22  within a week, ten days of when we were actually  12:11:56
23  concluding the thing.  Maybe even closer in it.  12:11:59
24          I know one reason why he -- first of all.  12:12:03
25  he would never have done anything without letting Mr.  12:12:08

Page 131

1  Snyder know about it anyway.        12:12:10
2          But, second, and I recall this very  12:12:11
3  distinctly, because Wynstra was actually in Scotland  12:12:13
4  the day that the deal got done.  He was off for a  12:12:16
5  junket.  He and Mr. Snyder and -- Nancy, Mr. Snyder  12:12:21
6  and Mr. Abdelhak went off to the northern --  12:12:26
7  northwestern coast of Scotland for a week and a half  12:12:31
8  and they stayed at some castle up there that Andrew  12:12:34
9  Carnegie used to own, the name of which escapes me  12:12:37
10  And they were there purportedly in their role as the  12:12:41
11  risk retention committee of the malpractice captive.  12:12:47
12  Well, what they were doing was, they were having a  12:12:51
13  vacation, only they didn't charge themselves for it.  12:12:53
14          But the reason -- I come back to the  12:12:55
15  original question.  He wouldn't have dared to go to  12:12:56
16  Scotland with Mr. Snyder for ten days had he not  12:13:01
17  talked to him about this deal, which went down about  12:13:04
18  15 minutes before they all went over there together.  12:13:05
19          And he was very careful also, by the way,  12:13:07
20  about involving the general counsel.  I mean, she was  12:13:10
21  at the table a lot, particularly as things began to  12:13:15
22  unwind a little bit.        12:13:18
23      Q.  Other than Mr. Barnes and Mr. Snyder, are  12:13:20
24  there any other Board members that you can think of  12:13:23
25  that he may have talked with?        12:13:25

Page 132

1      A.  I think he mentioned Mr. Gumberg's name.  I'd  12:13:26
2  have to go back and look at the list.  There were  12:13:30
3  three or four key people out there who he sort of ran  12:13:33
4  things by.        12:13:37
5          I'm trying to remember who was on the  12:13:37
6  executive committee  I think Mr. Gumberg was.  I  12:13:48
7  think Mr. -- maybe Mr. Edelman, although possibly not  12:13:48
8  because he and Sherif were not big friends.  Maybe  12:13:50
9  Mr. Nimick.  Those were sort of the key people.  12:13:54
10          And I will say this:  I mean, all of the  12:14:01
11  key people he would have talked to would have been in  12:14:03
12  Pittsburgh, notwithstanding the fact this was a  12:14:05
13  Philadelphia transaction and notwithstanding the fact  12:14:10
14  that a Philadelphia trustee might have been more  12:14:12
15  conscious of some of those issues you raised earlier  12:14:14
16  about Graduate's standing in the community and  12:14:16
17  financial status.        12:14:18
18      Q.  We might return to that in a second.  12:14:22
19          And this is all taking place in July of  12:14:24
20  '96?        12:14:27
21      A.  Yes; July and very early August.  If I looked  12:14:30
22  at a calendar. I can tell you precisely -- close to  12:14:34
23  the dates        12:14:38
24          The Graduate transaction was approved on  12:14:40
25  the first Monday in August of 1996.  I remember they  12:14:43

Page 133

1  had a -- they had had a sort of informal Board meeting  12:14:47
2  the Sunday before.  And Monday afternoon of that week  12:14:52
3  we went over to the church, and their Board was  12:14:57
4  meeting there.  As I recall, it was me, Sherif, Don  12:15:03
5  Kaye and McConnell.  And we went in and they  12:15:07
6  introduced us, and they had a sort of -- they had  12:15:12
7  formally approved the transaction at this point.  And  12:15:14
8  Sherif made a little speech about what his hopes were  12:15:17
9  and introduced us and so forth.        12:15:20
10          And then we went back to Hahnemann, and  12:15:21
11  McConnell and Sherif and Wynstra had a conference  12:15:27
12  telephone call.  And that's the reason I remember why  12:15:31
13  Sherif was in Scotland, because in their capacity as  12:15:35
14  the Board of SDN to approve the other side of the  12:15:37
15  transaction        12:15:40
16      Q.  Do you remember, did any of the AHERF Board  12:15:40
17  approve the transaction at that point?        12:15:43
18      A.  I was told that the members of the executive  12:15:45
19  committee had approved the transaction, and he -- now,  12:15:48
20  whether he convened them in a group or not or whether  12:15:53
21  he just did it individually by polling them, I don't  12:15:55
22  know.        12:15:58
23          I will tell you that there was later in  12:15:59
24  the fall a bit of a dust-up about that, because he had  12:16:02
25  a Board meeting, and which I happened to be present  12:16:06

ROBERT M. MCNAIR, JR.

**Page 134**

1  at, which was not the normal style. He didn't like    12:16:09
2  the lawyers at the Board meetings, where there was    12:16:11
3  something of a controversy about the fact he had not    12:16:14
4  gone to the full Board. And he said -- and there was    12:16:16
5  truth to this. He said, Korman was leaving for Europe    12:16:20
6  for two weeks and there simply wasn't -- and he was    12:16:23
7  I mean, that was what he told Sherif anyway. And    12:16:27
8  there simply wasn't time to convene the full Board, we    12:16:29
9  had to get this done quickly. And that was what I was    12:16:32
10  told. And I was told that the executive committee had    12:16:34
11  approved it, and I had the choice of either telling    12:16:36
12  him it was a lie and leaving or taking his word for    12:16:39
13  it.    12:16:42
14    Q.  Had you, back in July and August of '96,    12:16:42
15  advised Sherif Abdelhak or anyone else that they    12:16:46
16  should be consulting with the Board of AHERF, the full    12:16:51
17  Board?    12:16:54
18    A.  They knew perfectly well they should be    12:16:54
19  consulting with the Board. We told them that any    12:16:56
20  number of times.    12:16:59
21    Q.  Were you troubled by the fact that there was    12:17:00
22  this dust-up?    12:17:02
23    A.  I would have preferred him to convene the    12:17:03
24  Board and so forth. But, I mean, he had a lot of    12:17:05
25  authority, and the executive committee had a lot of    12:17:08

**Page 135**

1  authority, and he -- and he -- yeah. I mean, it would    12:17:09
2  have been far better if the full Board had approved    12:17:18
3  it. I mean, that just goes without saying.    12:17:21
4    Q.  Did you think it was improper that he was    12:17:22
5  going to the executive committee rather than the full    12:17:23
6  Board?    12:17:26
7    A.  No, because there had been other    12:17:27
8  circumstances, and I can't remember the details, but    12:17:29
9  where he had gone to the executive committee.    12:17:31
10    I mean, these were people who had been    12:17:33
11  empowered to do certain things on behalf of the Board    12:17:35
12  of Directors. And let's remember, by the way, that    12:17:37
13  nothing had actually happened when this was brought to    12:17:39
14  the Board's attention. Had they wanted to say, No,    12:17:45
15  we're not going to do this, it would have been    12:17:47
16  perfectly within their legal capability to do that.    12:17:51
17  We're talking about how much? Almost three months    12:17:53
18  later when the transaction finally happened.    12:17:57
19    Q.  Do you have any personal knowledge about    12:18:02
20  whether the executive committee could irrevocably    12:18:04
21  approve a transaction --    12:18:07
22    A.  I had been told --    12:18:09
23    Q.  -- on its own?    12:18:09
24    A.  -- previously by the general counsel that the    12:18:11
25  executive committee had the plenary authority to act    12:18:12

**Page 136**

1  on behalf of the Board, because the question had come    12:18:15
2  up before. And I had not sat in those meetings. I    12:18:16
3  didn't know who had authorized whom to do what, but    12:18:20
4  she told me that and I pretty much was forced to take    12:18:22
5  her word for it.    12:18:24
6    Q.  Do you know if that happened with respect to    12:18:26
7  the GHS acquisition, that the executive committee    12:18:28
8  irrevocably approved the deal back in August '96?    12:18:33
9    A.  He told me that it had been approved by the    12:18:44
10  executive committee.    12:18:44
11    Q.  Do you know if it had been irrevocably    12:18:44
12  approved?    12:18:44
13    A.  I can't tell you that that word was used.    12:18:44
14    Q.  Had there been a -- you've mentioned there    12:18:44
15  was sort of a past practice of the executive committee    12:18:44
16  acting on behalf of the full Board with respect to    12:18:47
17  acquisitions in the past?    12:18:49
18    A.  No, no. Transactions. There had been other    12:18:50
19  circumstances that I was aware of, and as I say, I    12:18:53
20  can't cite them to you chapter and verse, but it had    12:18:55
21  been made clear to me by the general counsel that if    12:18:58
22  the executive committee approves something in a    12:19:01
23  circumstance where there was a legitimate reason for    12:19:03
24  having to do it quickly or because it, for whatever    12:19:06
25  reason, couldn't seek full Board approval, that that    12:19:08

**Page 137**

1  was acceptable. that was acceptable format.    12:19:11
2    Q.  Do you know any examples of acquisitions    12:19:12
3  where that had taken place?    12:19:14
4    A.  No. In fact -- well, let me go back for a    12:19:15
5  minute.    12:19:20
6    No. In point of fact -- well, I mean, the    12:19:21
7  question is at what point. I mean, in other words,    12:19:24
8  before he ever went to the Board of Directors. he    12:19:28
9  would have had the approval of the, quote. executive    12:19:34
10  committee or the members of the executive committee,    12:19:38
11  because he would want to -- he wasn't given to going    12:19:41
12  and getting himself beaten up.    12:19:43
13    My recollection of the United deal. which    12:19:45
14  I only heard about, I was not a party to, was that it    12:19:48
15  was approved by the Board. I know that the Hahnemann    12:19:52
16  transaction was approved by the Board, because they    12:20:00
17  actually sent me to Pittsburgh because they wanted    12:20:02
18  somebody out there who knew about the transaction,    12:20:04
19  because everybody else was in Philadelphia meeting    12:20:06
20  with the Hahnemann Board. So I was out there    12:20:08
21    So the answer is, no, I'm not sure it    12:20:10
22  happened previously in the context of an acquisition    12:20:14
23  transaction. But as I say, I don't remember the use    12:20:16
24  of the word "irrevocable," and I'm not aware that it    12:20:21
25  was -- I mean, let's put it this way: These were    12:20:23

35 (Pages 134 to 137)

ROBERT M. MCNAIR, JR.

Page 138

1  relatively prudent people  I mean, some of them had    12:20:27
2  been in fairly responsible positions  I mean, David    12:20:30
3  Barnes had been chairman of the Board of Mellon Bank,    12:20:34
4  which is not exactly small change, although he hadn't    12:20:36
5  done a very good job of it.    12:20:41
6       Cahouet may have been on that executive    12:20:43
7  committee too, Frank Cahouet, who was Barnes'    12:20:46
8  successor as chairman of Mellon Bank.    12:20:49
9       If he had proposed to them that they,    12:20:52
10  quote, irrevocably approved something, I would think    12:20:54
11  that would have triggered some questions    12:20:58
12  Q.  But you don't know whether or not they did or    12:21:02
13  didn't irrevocably approve the transaction?    12:21:04
14  A.  No, I don't know that.    12:21:08
15  Q.  And did you think there were legitimate    12:21:09
16  reasons with respect to the GHS acquisition to go to    12:21:12
17  the executive committee rather than the full Board in    12:21:16
18  August of '96?    12:21:20
19  A.  Well, as I told you --    12:21:21
20  Q.  I know you mentioned one    12:21:22
21  A.  -- what was true -- well, that was his    12:21:24
22  presumptive reason for doing it.  He said, We've got    12:21:26
23  to get this done, Korman is leaving, we can't do it    12:21:28
24  without Korman's approval.  Korman will not move    12:21:31
25  forward unless we have some kind of indication from    12:21:35

Page 139

1  our executive committee that they're willing to commit    12:21:38
2  to this transaction.  That was the story.  Now,    12:21:42
3  whether it was a true story or not a true story, for    12:21:44
4  all I know, he may have sent Korman to Europe.    12:21:47
5       But that was the approach, and it was the    12:21:50
6  approach that he raised in front of the Board when    12:21:53
7  this controversy occurred in, I think it was,    12:21:57
8  September.  And, I mean, there certainly was the    12:22:00
9  opportunity at that point for people to say, We're not    12:22:04
10  going to do this.    12:22:06
11       Now, this was, admittedly, a subsidiary    12:22:07
12  Board.  This was not the AHERF Board.  This was the    12:22:08
13  Allegheny Hospital's eastern region, or whatever they    12:22:11
14  were calling the thing at that point, Board.    12:22:17
15       But everybody stepped to the line and the    12:22:19
16  transaction got done.    12:22:22
17  Q.  But, I mean. the executive committee you're    12:22:28
18  referring to is a subcommittee of the main AHERF    12:22:29
19  Board; is that right?    12:22:32
20  A.  Yeah, exactly.  It was comprised -- which was    12:22:34
21  not an uncommon methodology, as you're aware of.  But,    12:22:36
22  I mean, generally the reason you have an executive    12:22:38
23  committee in place is precisely to deal with sensitive    12:22:40
24  issues or time-sensitive issues or things that you    12:22:42
25  don't want -- that you either can't or don't want to    12:22:45

Page 140

1  secure approval from the full group for.  And I've    12:22:50
2  seen that in a number of different settings.  AHERF    12:22:52
3  was certainly not unique in that regard    12:22:55
4  Q.  And did you perceive there to be a legitimate    12:23:00
5  need at the time to go to the executive committee such    12:23:02
6  that it was appropriate to do so rather than going to    12:23:04
7  the full Board?    12:23:06
8  A.  He wanted to do the transaction quickly.  I    12:23:10
9  mean, that was his call.  I mean, once you accepted    12:23:12
10  that -- and this was not an uncommon methodology for    12:23:16
11  him, by the way.  I mean, we had done the United    12:23:20
12  transaction in 14 days or something back in 1990 and    12:23:22
13  '91.    12:23:31
14       If you accepted that premise, I mean, it    12:23:31
15  would not -- it literally would not have been possible    12:23:31
16  to convene that Board within less than a few weeks.  I    12:23:33
17  mean, they were pretty punctilious about their    12:23:37
18  scheduling and so forth and so on.    12:23:40
19  Q.  So at the time, you didn't see anything    12:23:42
20  inappropriate about it or --    12:23:43
21  A.  He told me the executive committee had    12:23:45
22  approved it.  I mean --    12:23:46
23  Q.  I guess I'm referring to, you didn't see    12:23:47
24  anything improper at the time about him going to the    12:23:49
25  executive committee rather than going to the full    12:23:52

Page 141

1  Board?    12:23:54
2  A.  I had been apprised that the executive    12:23:55
3  committee had the authority to act on behalf of the    12:23:57
4  Board.  The general counsel told me that.  And he was    12:23:59
5  the CEO.  If they didn't want him to go quickly, they    12:24:03
6  shouldn't have given him the approval.    12:24:08
7       But he told me he had the approval, and    12:24:10
8  I -- let's put it this way:  The general counsel was    12:24:11
9  in the middle of this transaction too.  In fact, she    12:24:14
10  was one of the three people who approved the    12:24:18
11  transaction on behalf of Allegheny, quote/unquote,    12:24:19
12  SDN  And he made the representation to her on the    12:24:24
13  phone, I can remember pretty distinctly, that the    12:24:28
14  executive committee had approved the transaction, and    12:24:31
15  I didn't hear a whimper or protest at that point from    12:24:34
16  her.    12:24:39
17       Given that circumstance and given the fact    12:24:39
18  that she was the senior legal officer, I -- I mean,    12:24:42
19  had she said at that point, Well, we can't just do    12:24:44
20  this in front of the executive committee, that's a    12:24:46
21  perfectly legitimate point of view  But it was her    12:24:49
22  call as to how the approval got done    12:24:53
23  Q.  So at that point, you didn't really have any    12:24:55
24  concerns about --    12:24:57
25  A.  It's not a matter of not having concerns.

36 (Pages 138 to 141)

ROBERT M. MCNAIR, JR.

Page 302

1    Q. So you could still get things done because of  16:11:53
2  her hands-off policy?                16:11:56
3    A. Yeah. Right. I mean. she -- there were  16:11:57
4  times when you couldn't. I mean. it really depended  16:11:58
5  on the nature of the matter. but sometimes you'd just  16:12:00
6  take things into your own hands and just go ahead and  16:12:03
7  do them, because you had to. I mean, you would go on  16:12:05
8  for weeks and months and so forth. And, I mean. she  16:12:08
9  was traveling all the time                16:12:10
10    Q. Did you raise any concerns about her travel  16:12:11
11  and failure to make certain decisions with anyone?  16:12:14
12    A. That's an interesting story. I was told. by  16:12:20
13  the way. that McConnell at one point performed an  16:12:22
14  audit of her traveling and found out how many days she  16:12:24
15  was out of the office. And I never saw it  16:12:26
16      Abdelhak was very precise about the fact  16:12:29
17  he didn't want people circumventing the command  16:12:31
18  structure. In other words. if I had a problem. I had  16:12:45
19  to go to her.                16:12:45
20      The guy who had been the Hahnemann  16:12:45
21  counsel. Bill Kennedy. egged on by Dave McConnell and  16:12:45
22  by Tony Sanzo, at the time was the CEO of Allegheny  16:12:48
23  General Hospital, actually at one point in the summer  16:12:53
24  of '97 -- summer of '97 I'm pretty sure. maybe it was  16:12:55
25  early in '97 -- actually confronted Abdelhak and said,  16:13:02

Page 303

1    Wynstra is not doing her job. She's not paying  16:13:07
2  attention. She's never here, da-da, da-da, da-da,  16:13:10
3  da-da, da-da. And Abdelhak just tore him apart and  16:13:14
4  said, How dare you come in here and do this and so  16:13:18
5  forth and so on. And of course, the end result was,  16:13:20
6  the guy left. But he left with a termination payment  16:13:23
7  before the preference period, so there's something to  16:13:26
8  be said for it. Anyway ...                16:13:29
9      No. So, I mean, I think he was conscious  16:13:31
10  of her deficiencies. I think he probably kept her in  16:13:34
11  the job because of her deficiencies. You know,  16:13:36
12  looking back, I don't think he wanted anybody who was  16:13:38
13  paying a lot of attention to what was going on  16:13:41
14    Q. Did you ever think to raise any concerns with  16:13:43
15  anyone outside of the chain of command?  16:13:46
16    A. Who was I supposed to do it with?  16:13:49
17    Q. Write a letter to a Board member or anything  16:13:51
18  like that?                16:13:53
19    A. That would have been fruitless. I mean, you  16:13:54
20  have to understand the way the organization worked. I  16:13:57
21  mean, they reposed complete confidence in Sherif  16:14:00
22  Abdelhak. And if you had done that, not only would it  16:14:04
23  have resulted in my instant dismissal, which would  16:14:08
24  have been what it was -- and, I mean, there were times  16:14:11
25  when I did things that I thought might get me fired,  16:14:13

Page 304

1  like with this business with Chuck Morrison and the  16:14:15
2  restricted funds and drafting this resolution. But it  16:14:17
3  would have gone ignored, and who knows, they might  16:14:21
4  have sued me for slander, for all I know. I mean,  16:14:24
5  they just were not having any of it.  16:14:26
6      It was a single-person-controlled  16:14:29
7  organization, and that extended to the Board as well  16:14:35
8  as to the staff. I mean, it may sound cowardly to say  16:14:37
9  it, but that's just the reality of what it was.  16:14:44
10      In a situation like that, you say to  16:14:47
11  yourself, Well, do I want to do what Kennedy did and  16:14:49
12  get tossed out of here, or do I want to keep trying to  16:14:53
13  do the job here, keep things on track, try and make  16:14:57
14  sure that things are done properly? Because I knew if  16:15:01
15  Nancy was in charge other than day to day, there  16:15:05
16  wouldn't be, and so forth.                16:15:07
17      I mean, you have conversations with  16:15:08
18  yourself about things like that a lot. It's not the  16:15:09
19  easiest thing in the world.                16:15:11
20    Q. Do you know if anyone ever tried to write a  16:15:14
21  letter to the Board or have you ever heard that anyone  16:15:15
22  did?                16:15:19
23    A. No. I'm not aware of it. I'm not aware of  16:15:19
24  it. And I'm sure everybody else's perception was the  16:15:22
25  same as mine.                16:15:25

Page 305

1      I mean, the simple reality of the matter  16:15:26
2  was that the chairman of the Board had, up until he  16:15:28
3  fired him, he had the complete unequivocal,  16:15:31
4  unconditional support of the chairman of the Board --  16:15:35
5  of that cluster of people in that senior group, that  16:15:39
6  executive committee group. And I think he devoted a  16:15:42
7  lot of time to making sure that that was the case.  16:15:45
8    Q. How about any of the Board members outside of  16:15:49
9  that cluster?                16:15:52
10    A. What's that?                16:15:53
11    Q. In other words, any of the other AHERF parent  16:15:54
12  Board members. Did anyone --                16:15:56
13    A. I have no idea.                16:15:59
14    Q. Did you ever think --                16:16:00
15    A. I mean, I -- no. Nobody -- you just have to  16:16:01
16  understand, I mean, nothing was going to happen. They  16:16:05
17  had plenty of opportunity to raise issues. By the  16:16:12
18  middle of -- early to middle of '98, there were plenty  16:16:16
19  of warning signs out there that things were not going  16:16:19
20  well. And my personal view is that they just said,  16:16:21
21  We're not going to do anything here, because if we do  16:16:27
22  anything, it will show that we knew what was going on,  16:16:29
23  and we could blame the auditors, just between you and  16:16:31
24  me. Now, I realize that's your client, but I'm  16:16:35
25  telling you what my view is. We'll hide behind the  16:16:38

MANHATTAN REPORTING CORP., A LegaLink Company

ROBERT M. MCNAIR, JR.

Page 306

1 financials and say everything was fine and so forth    16:16:40
2    Q    So in your view, the Board basically wanted    16:16:43
3 to make like an ostrich and just stick their head in    16:16:45
4 the sand?    16:16:48
5    A    That seems to me like what they were doing    16:16:48
6    MR. COGAN:    Objection    16:16:50
7    THE WITNESS:    Never mind.    Sorry    16:16:51
8 BY MR. TERUYA:
9    Q    I just got a few wrap-up questions    16:16:56
10    A    I mean, I don't know that to a moral    16:16:59
11 certainty.    I'm just saying it seems to me that    16:17:00
12 there were sufficient storm flags out there    And I    16:17:02
13 don't know what conversations were going on, because I    16:17:06
14 wasn't in meetings for a year or more before the final    16:17:08
15 thing.    16:17:12
16    I'm not sure I saw a Board member in    16:17:13
17 that -- actually, I did.    I went to a meeting in the    16:17:15
18 summer of '98 because Wynstra was in San Diego    They    16:17:17
19 related to what they were going to do about the    16:17:22
20 faculty and how they were going to cut back on    16:17:25
21 faculty, and there were some complicated issues there    16:17:28
22 about the American Association of University    16:17:41
23 Professors and tenure rules and so forth and so on.    16:17:41
24 That was a mechanical meeting more or less    And these    16:17:41
25 people were attempting to deal in good faith with what    16:17:41

Page 307

1 was going on    16:17:41
2    So there may have been efforts going on,    16:17:41
3 but you certainly didn't see it reflected in the    16:17:44
4 broader world    And it took time a long time to file.    16:17:48
5 which kind of surprised me. I mean, I wasn't entirely    16:17:52
6 sure why that happened, but .    16:17:55
7    Q    During your time at AHERF, do you personally    16:17:58
8 know of any AHERF employees who embezzled funds from    16:18:00
9 AHERF?    16:18:05
10    A    Oh, I remember we had a -- you mean AHERF    16:18:07
11 literally or any of the entities?    16:18:10
12    Q    Any of the AHERF entities.    16:18:11
13    A    We had an embezzlement case at St.    16:18:13
14 Christopher's back in the early '90s. as I recall,    16:18:17
15 right about the time I got there, somebody in the    16:18:17
16 payroll or accounting department or something    And    16:18:19
17 that got taken care of and the -- I've forgotten --    16:18:24
18 DNO policy or something paid off on it. I mean, it    16:18:29
19 was an isolated event.    16:18:31
20    Q    Other than that?    16:18:32
21    A    I'm not aware of it.    16:18:33
22    Q    Do you personally know of any AHERF employee    16:18:35
23 who ever acted solely in his or her own personal    16:18:38
24 interest while acting in his capacity as an AHERF    16:18:41
25 employee?    16:18:45

Page 308

1    MR. COGAN:    Objection    16:18:46
2    THE WITNESS:    I'm not sure I'm qualified    16:18:48
3 to saying that. People's motivations are pretty hard    16:18:49
4 to ferret out sometimes    I mean, you know, I've seen    16:18:52
5 people do a lot of selfish things in their life    I    16:18:55
6 don't know anybody who acted out -- who did that, but    16:18:57
7 I can't say for sure that there wasn't somebody.    16:18:59
8 BY MR. TERUYA:    16:19:06
9    Q    Okay.    16:19:06
10    A    I can say I didn't.    16:19:06
11    Q    Did you have any substantive discussions with    16:19:07
12 C&L employees. Coopers & Lybrand employees. during    16:19:12
13 your time at AHERF?    16:19:14
14    A    On a couple of occasions, relatively rare    16:19:16
15 occasions    I remember we had a discussion back in the    16:19:19
16 fall of '92 or sometime in '93 about a 337-B problem.    16:19:23
17 which was that McConnell wanted to do away with the    16:19:33
18 DHG, which owned the airplane. which had been    16:19:37
19 depreciated. and if he had done away with DHG. 337-B    16:19:41
20 would have required that Allegheny recognize a large    16:19:45
21 gain on disposition. because they would have had an    16:19:48
22 imputed fair market value relative to the depreciated    16:19:51
23 value    16:19:54
24    We had run across this issue when I was at    16:19:56
25 Drinker before I came in there    It came up and    16:19:58

Page 309

1 surfaced again    16:20:01
2    The Coopers people didn't seem to know too    16:20:06
3 much about it. I remember having a discussion with    16:20:07
4 somebody by telephone. I undoubtedly had some others    16:20:11
5 I'm trying to think of one other I had    16:20:15
6    Very rarely    I mean, you know, yeah,    16:20:21
7 occasionally I had had -- actually, it's interesting,    16:20:24
8 I had more interaction with the Coopers people back in    16:20:27
9 the '91, '92 time period when we were doing the United    16:20:30
10 transaction and so forth, and I was involved in a    16:20:35
11 number of discussions at that point with Bill Buettner    16:20:37
12 and various other people. We'd had some interaction    16:20:41
13 with them when they did the Levy practice    16:20:43
14 acquisitions, because Coopers had done the feasibility    16:20:45
15 on that.    16:20:47
16    There were Coopers people, Buettner was    16:20:48
17 one of them, at the due diligence meetings in the '96    16:20:51
18 transaction. I don't remember having any particular    16:20:54
19 substantive discussions with them as opposed to just    16:20:58
20 the rest of the group    16:21:00
21    No. You know, I anticipated you were    16:21:01
22 going to ask me this. And I had very little    16:21:04
23 interaction with Coopers    I mean, that was -- it was    16:21:06
24 my impression that relationship was pretty much    16:21:09
25 controlled by McConnell. He did all the talking. and    16:21:11

ROBERT M. MCNAIR, JR.

## Page 310

```
 1   all of the communications to and from Coopers pretty  16:21:14
 2   much came through his office.              16:21:17
 3       Q.  When you mentioned 337-B, that's a corporate  16:21:19
 4   tax code?                          16:21:22
 5       A.  Yes.  That's the Internal Revenue code.  It's  16:21:23
 6   a provision that —                    16:21:25
 7       Q.  Of basis?                    16:21:26
 8       A.  — mandates recognition of distributions for  16:21:26
 9   non-profits or to non-profits if taxables are wound up  16:21:29
10   or merged or whatever.  It's to prevent non-profits  16:21:36
11   from setting up taxable subsidiaries, running taxable  16:21:38
12   businesses, depreciating assets.  Then when they're  16:21:42
13   done with the business, giving the assets to the     16:21:46
14   non-profit and not having to recognize any gain,    16:21:48
15   because they've taken advantage of the loss on the  16:21:50
16   depreciation.  That's the purpose of that provision.  16:21:54
17       Q.  Do you recall any of the substance of your  16:21:56
18   discussions with Coopers & Lybrand about any of the  16:21:58
19   points you've mentioned?              16:22:01
20       A.  No.  I mean, there were — there just weren't  16:22:02
21   that many.  I mean, I'm sort of scouring my memory  16:22:06
22   banks.                             16:22:10
23       No.  I mean, I don't think I talked to        16:22:14
24   Bill for the last couple of years I was there.  If I  16:22:16
25   did, he may have been on a conference call where there  16:22:21
```

## Page 311

```
 1   were multiple parties on it.  It would not have been a  16:22:23
 2   one-on-one conversation.               16:22:24
 3       I would not have been — I mean, I don't  16:22:28
 4   think I ever talked to their auditors in the context  16:22:30
 5   of an audit.  I don't remember having — I mean.     16:22:33
 6   occasionally — the one thing I remember looking at  16:22:49
 7   their work product for was that every year, we would  16:22:49
 8   do bond disclosure stuff, which included their  16:22:49
 9   financials.  I mean, we would get to see those kind of  16:22:49
10   before they were kind of put out to the general    16:22:52
11   public, and we would look at the disclosure and just  16:22:54
12   say whether we thought it was adequate or not.     16:22:55
13       And so — but, no.  I didn't see a lot  16:22:57
14   of — five minutes — I didn't see a lot of them, and  16:23:01
15   I don't recall having had a lot of discussions with  16:23:06
16   them.  If somebody recalls having had a discussion  16:23:08
17   with me and can recite it.  I'd be happy to recall it.  16:23:10
18   but I don't remember.                 16:23:13
19       Q.  Did you recall — I mean, you said the  16:23:14
20   financial statements, the audited financial       16:23:16
21   statements of Coopers & Lybrand were — or of AHERF  16:23:17
22   that Coopers had audited were put into the bond  16:23:21
23   disclosures; is that right?           16:23:23
24       A.  That's my recollection, yeah.  I think that's  16:23:24
25   correct.                          16:23:28
```

## Page 312

```
 1       Q.  Were you in charge of reviewing those    16:23:28
 2   statements?                        16:23:30
 3       A.  No, I was not in charge.  They distributed  16:23:31
 4   them to a large number of people  I just happened to  16:23:33
 5   be one of the people who got it.          16:23:35
 6       Q.  Did you ever see anything that you thought  16:23:36
 7   was inappropriate or misstated?         16:23:37
 8       A.  No.  I might have made minor amendments to  16:23:40
 9   them, but there was nothing materially wrong with  16:23:44
10   them.  I mean, by and large, it revolved around the  16:23:45
11   financials.  I mean, the financials said what the  16:23:47
12   financials said.  I mean, I didn't consider myself  16:23:50
13   competent to flyspeck the financials.     16:23:52
14       Q.  Are you a creditor of AHERF?          16:23:56
15       A.  Yes.                        16:23:57
16       Q.  Could you explain the nature of your credit  16:23:58
17   claim?                             16:24:01
18       A.  I think I know what the nature of it is  16:24:02
19   They really didn't tell me                16:24:04
20       I was a participant in the so-called      16:24:06
21   Execuflex Plan, which was a flexible benefits plan,  16:24:13
22   non-qualified, for senior executives.  And what they  16:24:14
23   would do is, they would give you a specified sum of  16:24:16
24   money. which was a percentage of your salary or your  16:24:21
25   comp, and that would be used to pay your Social  16:24:25
```

## Page 313

```
 1   Security taxes and your FICA and a bunch of other  16:24:28
 2   things.  And then you would have optional things you  16:24:30
 3   could buy, like insurance, extra vacation, expanded  16:24:33
 4   disability coverage and some other things.          16:24:35
 5       And any amounts that weren't funded in  16:24:37
 6   that plan were supposed to be put aside into basically  16:24:41
 7   a pour-over account, which you could get within two  16:24:48
 8   years after it was put in there, provided you were  16:24:51
 9   still working there and so forth and so on.         16:24:53
10       My impression is — and I don't know this  16:24:56
11   to a certainty — my impression is that portions of  16:24:59
12   those amounts were not funded and that portions of  16:25:00
13   certain other benefits may not have been funded  16:25:03
14       All I know is that I had a claim, but I  16:25:06
15   had no idea how much it was, because I didn't know  16:25:10
16   what they'd funded and what they hadn't, in the amount  16:25:10
17   of about $105,000.  And I have to date collected  16:25:14
18   17,000 maybe, give or take.            16:25:19
19       Q.  Is Drinker Biddle & Reath a creditor of  16:25:22
20   AHERF?                             16:25:24
21       A.  Yes, they are                  16:25:25
22       Q.  Is their credit claim just based on legal  16:25:27
23   services that were rendered?           16:25:30
24       A.  Yes.  And they've received some        16:25:32
25   distributions, just as I have.  I think the total  16:25:33
```

79 (Pages 310 to 313)

TAB 173

# In The Matter Of:

## *AHERF v. PRICEWATERHOUSECOOPERS, L.L.P.*

---

### *MICHAEL W. MOYER*
### *November 15, 2002*

---

### *MANHATTAN REPORTING CORP.*
### *420 LEXINGTON AVENUE*
### *NEW YORK, NY 10170*
### *(212) 557-7400    FAX: (212) 692-9171*

*Original File 111502MM.TXT, 229 Pages*
*Min-U-Script® File ID: 2642749073*

## Word Index included with this Min-U-Script®

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

MICHAEL W. MOYER
November 15, 2002

Page 198

[1] just identify the document?

[2]    A: It's basically a request for information so
[3] that they could perform their audit for fiscal
[4] year 1997, and it wanted certain pieces of
[5] information and wanted it either in computer or
[6] otherwise.

[7]    Q: Just to be clear, this is information you
[8] received from John Lydon and Chuck Lisman at
[9] the request from them to provide information to
[10] Coopers?

[11]    A: Correct.

[12]    Q: In connection with the '97 audit, is that
[13] right?

[14]    A: That's correct.

[15]    Q: Okay. You don't recollect receiving this?

[16]    A: Truthfully, it didn't jump into my mind. I do
[17] not deny getting it, because I'm sure I did,
[18] but since it would have been a standard —
[19] nothing that jumps out that would have been odd
[20] to me.

[21]    Q: Do you have any reason to believe that you
[22] failed to provide —

[23]    A: Oh, I'm sure we provided all information that
[24] was requested of us.

[25]    Q: Okay. Was that your standard practice?

Page 199

[1]    A: Our standard practice was — and, truthfully,
[2] had we not, I'm sure one of the managers would
[3] have called me directly and said your people
[4] are not providing information, and we did not
[5] get a call. So, I'm sure when we received
[6] this, that I just turned it over to those
[7] people that would have provided the information
[8] and moved on. Because, truthfully, looking at
[9] the things that they've asked for, almost
[10] everything that they ask for was information
[11] that would have come from the accounting
[12] people. None of them worked for me at this
[13] point in time, okay, which is another reason
[14] for me not necessarily to remember, because
[15] even though I was on the distribution list, I'm
[16] not sure that any of this information was under
[17] my control any longer, and the people who did
[18] control it were also on the distribution list,
[19] so —

[20]    Q: I know you mentioned earlier that you may have
[21] had a discussion with David McConnell about
[22] recapture?

[23]    A: Correct.

[24]    Q: And I'm not sure if I understood earlier that
[25] you had told us about the entire conversation

Page 200

[1] you had with him about that, and I just wanted
[2] to give you a chance.

[3]    A: I don't remember the entire conversation. I
[4] know that it was not long. I'm sure that
[5] probably in one of our one-on-one meetings that
[6] we had occasionally, I asked him about the
[7] recapture, I mean, just the philosophy that
[8] they use since they had just done this at
[9] Graduate Hospital as well, and the philosophy
[10] that they use to come up with the numbers and
[11] how they went about it. It was not a
[12] confrontational meeting, because you did not do
[13] that with David, it was just really, gee, I'd
[14] like to understand what you did. It was
[15] probably two or three minutes long, and that
[16] was it.

[17]    Q: When is the first time that you learned that
[18] AHERF was planning on acquiring the Graduate
[19] hospitals?

[20]    A: I think that came up after we had started
[21] discussions with AHERF about our own merger, if
[22] I remember correctly, and I know it was — it
[23] was a little bit of a concern, and I'm not sure
[24] if I found out about it through the news or
[25] whether I got word of it through Barry Roth who

Page 201

[1] would have gotten word of it from Sherif
[2] himself.

[3]    Q: Why was it of concern?

[4]    A: Were they biting off more than they could chew
[5] kind of thing all at once to do the Graduate,
[6] which was not a small system, and then at the
[7] same time to be talking about Forbes and
[8] Allegheny Valley, Canonsburg. This was just a
[9] lot to do even for a huge staff that they had.

[10]    Q: You mentioned that prior to AHERF's acquisition
[11] of Forbes, you had reviewed materials about
[12] AHERF that gave no indication that there was a
[13] cash crunch I think is what you called it.
[14] What did you review that helped you arrive at
[15] that conclusion?

[16]    A: We reviewed the audited financial statements
[17] from the previous year end.

[18]    Q: Which would have been?

[19]    A: Which would have been — let's see. When did
[20] we do this? We did this in '96, right, because
[21] the merger was effective January 1, '97? So we
[22] were in '96. So we probably were using '95
[23] year end, because we were doing this before
[24] their audited financials would have been
[25] complete for '96, so it's my guess that we were

Case 2:00-cv-00684-DSC    Document 179    Filed 08/19/2005    Page 53 of 60

ICHAEL W. MOYER                                    AHERF   v.
ovember 15, 2002                        PRICEWATERHOUSECOOPERS, L.L.P.

Page 202

[1] looking at the year before, '95, and we
[1] probably — although I don't remember at the
[1] moment, but I would think that we also had some
[1] interim internal financial statements from them
[1] as well that maybe took us through half year,
[1] through January, but those would have been
[1] unaudited statements

[1] Q: Was there anything else that you would have
[1] reviewed other than those two items?

[1] A: I do not remember getting cash flow information
[1] from them, but, again, that's so long ago I
[1] know we did not get a huge amount of
[1] information from them, but we did at least have
[1] some financial statement information, and
[1] several years' worth, that we analyzed before
[1] moving ahead.

[1] Q: Why didn't you think that David McConnell was a
[1] truthful person?

[1] A: My association with Mr. McConnell goes back to
[1] 1980 when he applied to me for a job and I
[1] didn't hire him. I thought his background in
[2] accounting was weak, personal view, and the
[3] slipshod way that they ran their accounting
[4] department which became apparent after the
[5] merger. We really had no knowledge of that

Page 203

[1] prior to the merger. I just didn't find — I
[2] found it easy when you have a slipshod
[3] operation to shade the truth in the direction
[4] that you want the truth to go, and it was just
[5] my personal view that I did not think that they
[6] ran a very tight ship. I didn't think that
[7] their accounting controls were very good.
[8] Certainly, the information that they provided
[9] to their managers was not very good in
[10] comparison to what we did at Forbes, and I just
[11] did not think that he was always being
[12] truthful.

[13] Q: I guess it's one thing to have a slipshod
[14] department, but it's probably another thing to
[15] be untruthful. Is there something other than
[16] that?

[17] I don't think I'm asking a good
[18] question, but what I'm trying to understand is
[19] was there something other than the nature of
[20] the accounting department that operated at
[21] AHERF that allowed — or helped you arrive at
[22] the conclusion that McConnell was not to be
[23] trusted?

[24] A: Let's say the rumors that I heard about him and
[25] the conduct of his life did not match the way I

Page 204

[1] liked to live my life, so they were rumors, and
[2] so I tend not to like to repeat rumors too
[3] much, but I just didn't trust him.

[4] Q: When you were at Forbes and you had
[5] responsibility for creating what you've called
[6] CRA reserves —

[7] A: Yes.

[8] Q: — what was your objective when you would
[9] create those reserves?

[10] A: Okay. A little history. The year before I
[11] went to Forbes, they had a loss from
[12] operations, and one of the reasons that they
[13] had a loss from operations was they settled a
[14] prior year's cost report and they did not have
[15] it properly reserved, so they had to pay back
[16] some money that the government had paid them —
[17] or Blue Cross, I don't remember — and then
[18] they had to take that all through the current
[19] year which created a loss, which at the time
[20] was only a couple hundred thousand dollars, but
[21] for a hospital like in '78, '79, those were big
[22] dollars. The board was very upset, one of the
[23] reasons I got hired.

[24] My objective from day one at Forbes,
[25] and my personal philosophy in finance

Page 205

[1] accounting, is to be conservative. So, we at
[2] Forbes always took the conservative role. I
[3] always underbooked revenue. I would always
[4] reserve on the bad side to make sure that when
[5] it happened, I was going to have a happy
[6] surprise for the board and not a bad surprise
[7] for the board, and I think in all of my years
[8] at Forbes, we only had one bad surprise. We
[9] were very conservative in booking what we
[10] thought people owed us as settlements so we
[11] would end up with reserves that were reserves
[12] that were really, you know, going to help us at
[13] the end, because when we actually got the
[14] settlement, we would end up with more money
[15] than what we thought we said we were going to
[16] get.

[17] Q: Were you bound by any requirements to make sure
[18] that you did not — were not overly
[19] conservative?

[20] A: Yes.

[21] Q: What were those requirements?

[22] A: Well, obviously, again, the auditors are
[23] concerned that we not misstate in either
[24] direction, not overstate income or understate
[25] income to any great degree, but most auditing

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

MICHAEL W. MOYER
November 15, 2002

Page 206

[1] firms are also going — if you're going to make
[2] a mistake, they would rather you made the
[3] mistake of being more conservative rather than
[4] less conservative has been my experience over
[5] the years.

[6]   Q: Why do you think that is?

[7]   A: Well, because they would rather report that
[8] your income was less than it was and be
[9] surprised to the good in the future as well.
[10] They don't want people thinking that you are
[11] doing better than you are.

[12]   Q: People who might be relying on the financial
[13] statements?

[14]   A: Which in our case was bondholders and bankers.
[15] I mean, we had no stockholders, so those were
[16] our two constituencies that we needed to make
[17] sure that the statements were accurate for.

[18]   Q: If you were to transfer reserves, CRA reserves
[19] that had been established to another account,
[20] for instance — is there any reason why you
[21] would not transfer reserves that you had
[22] established, CRA reserves, to another account?

[23]   A: Well, we go back to the same question as
[24] earlier. I don't know why anyone would ever
[25] transfer a CRA account. It's specific to the

Page 207

[1] hospital, and it's specific to what happened at
[2] that hospital. So there may be occasion, and
[3] I'm not just seeing it being a rather
[4] short-sighted person sometimes, as to why one
[5] might want to transfer a reserve from one body
[6] to another body, but at the moment, I can't —
[7] in my own mind, I can't see why anyone would do
[8] that.

[9]   Q: Is the risk of doing that that if a reserve was
[10] properly recorded — let me step back.

[11]   If a risk — if a reserve was
[12] properly recorded for, and I'm specifically
[13] talking about a CRA reserve, would the risk be
[14] that if you transferred that reserve to another
[15] account, you have essentially underreserved a
[16] potential exposure?

[17]   A: Well, there's always the risk that we had
[18] underreserved and that we were going to then
[19] collect less than we said or that we were going
[20] to owe more than we said, whichever, both of
[21] those would be an underreserve, but I know in
[22] the case of Forbes, we did not underreserve.
[23] It was not our practice to underreserve. It
[24] was not our philosophy of the people who were
[25] determining — I personally did not determine

Page 208

[1] the reserve. That was Barb Johnson's job. She
[2] is the expert in reimbursement, one of the best
[3] in town. So that was her job to come up with
[4] the number and then convince me that it was
[5] right. It did not take a lot of convincing.
[6] She was the expert and I wasn't. But I know
[7] our philosophy over 20 years, and our
[8] philosophy was we are going to be conservative
[9] in our reserves. So I'm sure that our CRA
[10] reserve was conservative. I have no doubts in
[11] my mind that it wasn't.

[12]   Q: When did you learn that AHERF would be using a
[13] consolidated financial statement for '97 — for
[14] its '97 financial statements?

[15]   A: Probably not until late, but that was not a
[16] surprise to me. I had assumed all along that
[17] they would consolidate and use one statement.
[18] We hadn't discussed it, so I didn't know for
[19] sure until later in the process, but I just
[20] assumed that that would be the case.

[21]   Q: Did you have an opinion about the decision to
[22] move to a consolidated financial statement?

[23]   A: No, I didn't have an opinion one way or
[24] another.

[25]   MR. TAMBURRI: Let's go off the

Page 209

[1] record. I'm going to take a look at my notes,
[2] but I think I'm about there.

[3]   THE VIDEOGRAPHER: We're going off
[4] the record. The time indicated on the screen
[5] is 3:25 p.m.

[6]

[7]   (There was a recess in the proceedings.)

[8]

[9]   THE VIDEOGRAPHER: Back on the
[10] record. The time indicated is 3:31 p.m.

[11]   BY MR. TAMBURRI:

[12]   Q: Almost done, Mr. Moyer.

[13]   How many years in your career at
[14] Forbes did you spend having some interaction or
[15] responsibility for interacting with either the
[16] bond-issuing authority or bondholders of
[17] Forbes?

[18]   A: I think my interaction with the bond authority
[19] started almost immediately after I started with
[20] the organization, so, truthfully, since like
[21] 1980. Even though it was not my direct
[22] responsibility the first year or two, I
[23] attended most of the meetings with the then
[24] vice president of finance whose responsibility
[25] it was, and in some cases just went to the

TAB 174

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

## JOSEPH D. LITTLE
*September 18, 2003*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

LITTLE, JOSEPH D.



**LEGALINK**®

A WORDWAVE COMPANY

JOSEPH D. LITTLE

Page 129

1  Q. I was curious if you recall --
2  A. My guess is that, again, I will have to go
3  back to the Warminster Hospital. I spent more time
4  at Warminster Hospital than I did at all AHERF
5  meetings.
6  Q. Do you recall if in Fiscal Year 1997, what
7  type of time commitment per month you spent on your
8  Trustee responsibilities?
9  A. Not unless you have these where I filled out
10  I do not, no. I wouldn't have the faintest idea.
11  Q. In fact, I am curious, Mr. Little. Do you
12  recall filling out any Trustee Evaluations after
13  Fiscal Year 1995, or --
14  A. I don't recall any evaluations at all.
15  Q. Do you recall if -- only if you can quantify
16  it for Fiscal Year 1997 -- if the time you spent
17  per month on your Trustee responsibilities was
18  closer to the 8 to 10 hours that you indicated in
19  1994, the 20 to 25 in 1995, or any other amount
20  that you can give me a ballpark figure for?
21  A. No, sir.
22       MS. MEADEN: And I am just going to
23  object to the reference to Fiscal Year '95. There
24  is no indication on the Trustee Evaluation whether
25  it was completed in Fiscal Year or Calendar Year

Page 130

1  1995, and there may be a difference.
2       And the same is true with --
3       MR. LUFT: That's fair.
4  BY MR. LUFT:
5  Q. And I will ask.
6       If any of my questions, if your
7  answers to any of my questions change, if you
8  switch it to calendar year from fiscal year?
9  A. No, they would not.
10  Q. Mr. Little, did you believe you received
11  sufficient materials to adequately perform your
12  Trustee responsibilities?
13  A. I don't know what "sufficient materials" would
14  mean.
15       My concern was receiving materials
16  sooner, that I could digest the material and ask
17  questions.
18  Q. And because they were only provided to you at
19  the meetings?
20  A. Usually that's the case. Everything was at
21  the meetings.
22  Q. So usually you didn't feel you had enough time
23  to sufficiently digest the material?
24  A. No.
25  Q. Do you recall if at meetings of the AHERF

Page 131

1  Finance Committee, there was considerable time
2  allotted -- or, let me strike that.
3       Do you recall if at meetings of
4  AHERF Finance Committee there were specific time
5  allotted for discussion after each topic had been
6  presented?
7  A. I don't specifically recall one way or the
8  other, no.
9  Q. Mr. Little, do you recall if at meetings of
10  the AHERF Finance Committee, most of the discussion
11  was between a Trustee and a member of management,
12  as opposed to amongst the Trustees?
13       MS. MEADEN: Objection.
14  A. Specifically, no, I don't recall whether it
15  was with management or among the Trustees, or
16  committee members.
17  Q. Mr. Little, do you recall approximately how
18  many people were on the Board for the Eastern
19  hospitals?
20       MS. MEADEN: Objection. Foundation.
21  Form.
22  A. The number? Specific -- no.
23  Q. General.
24       When you attended the meetings, do
25  you roughly have a sense of how many people were

Page 132

1  there?
2       MS. MEADEN: Same objection.
3  A. A guess, 20. But that's --
4  Q. That's a guess; right?
5  A. Yes. I don't know.
6  Q. And if you don't know, you can just tell me
7  that. It would be a clearer record if you don't
8  guess.
9  A. I don't recall the numbers.
10  Q. Mr. Little, as a member of the Eastern Board,
11  do you recall that there was both an Eastern Board
12  and then a parent Board above that for AHERF, and
13  then specific Boards for the specific hospitals?
14       MS. MEADEN: Objection as to form.
15  Vague.
16  A. If I recall, the Boards had members, and then
17  there was the Allegheny Board. That's what I
18  recall. Other than committees.
19  Q. Do you recall if in this multi-layered system
20  you just identified with committees, and then a
21  parent Board, the Allegheny Board, and then Boards
22  of the hospitals, there was ever some confusion as
23  to what the responsibilities of each Board were?
24       MS. MEADEN: Objection. Form.
25  Foundation.

33 (Pages 129 to 132)

JOSEPH D. LITTLE

Page 133

1   A. No
2   Q. No, you don't recall?
3   A. I don't recall.
4       MS. MEADEN: Same objection.
5   BY MR. LUFT:
6   Q. Earlier you had identified to me that you were
7   a member of AHERF's -- a Board for AHERF's
8   insurance?
9   A. Yes, sir.
10  Q. And I had asked you if you recall if the name
11  of that company was -- well, commonly known as
12  AHSPIC?
13  A. Yes, I think that was it.
14  Q. And you mentioned to me that they met in the
15  Cayman Islands, or they were located in the Cayman
16  Islands. I can't recall what you said.
17  A. Yes, that was where the Board meetings were,
18  in the Cayman Islands.
19      As to meetings here, I don't -- I
20  don't remember.
21  Q. And AHSPIC was a captive insurer for AHERF?
22      MS. MEADEN: Objection.
23  A. Yes, I think so.
24  Q. And when I say, "captive insurer," what is
25  your understanding of what I am referring to?

Page 134

1       MS. MEADEN: Objection.
2   BY MR. LUFT:
3   Q. Or let me strike that and ask you, do you have
4   an understanding of what the term "captive insurer"
5   refers to?
6   A. Yes.
7   Q. And what is that?
8   A. My understanding is that the captives is an
9   offshore company self-insurance.
10  Q. Now, you mentioned that Board meetings were
11  held in the Cayman Islands.
12      Do you recall if you knew why
13  meetings were held in the Cayman Islands?
14  A. Yes. I questioned several times why we had to
15  go to the Cayman Islands, and was told that that's
16  where the corporation and the offshore company was,
17  and that Board meetings are required in the capital
18  of where the captive was.
19  Q. Do you recall who gave you that explanation?
20  A. Not specifically, no.
21  Q. Do you recall if any lawyer had ever confirmed
22  for you that in fact that was required by law?
23      MS. MEADEN: Objection.
24  A. Did any lawyer confirm that for me? No.
25  Q. Who would pay for the trip to the Cayman

Page 135

1   Islands?
2       MS. MEADEN: Objection.
3   A. My understanding is that Allegheny paid for
4   it.
5   Q. Mr. Little, are you on any medications today
6   which would affect your memory?
7   A. I am on insulin. Whether -- and that's never
8   had an effect on my memory, unless I was in shock.
9       I am on other medications because of
10  malignancy, but I don't think that has any effect
11  on my memory.
12      MR. LUFT: Mr. Little, thank you
13  very much for your time today. I have no further
14  questions at this time. And I really do appreciate
15  you coming down here to talk to me.
16      MS. MEADEN: Mr. Little, my
17  questioning is going to be very short in comparison
18  to Mr. Luft's questioning, but I would like to take
19  about five or ten minutes to gather my notes, and
20  then we will start up and we will get you out of
21  here in time to make your meeting this afternoon.
22      THE WITNESS: Fine.
23      MR. LUFT: We are going to take a
24  break.
25      VIDEO SPECIALIST: We are now going

Page 136

1   off the record, and the time is 1:47.
2       (Short recess.)
3       VIDEO SPECIALIST: We are now back
4   on the record, and the time is 1:54.
5   BY MS. MEADEN:
6   Q. Mr. Little, I introduced myself earlier.
7   A. Yes.
8   Q. But, as you know, my name is Laura Meaden.
9   And I will be asking you a few questions here this
10  afternoon.
11      If you don't hear a question I ask
12  or you don't understand it, please let me know, and
13  I will do my best to more clearly articulate it or
14  to rephrase the question.
15  A. Thank you.
16  Q. And, again, if you need to take a break at any
17  time, please let me know.
18      Mr. Little, I am trying to get a
19  better understanding of your years of service on
20  some of the Boards and committees that we have
21  talked about earlier today.
22      Do you recall when you started on
23  the Warminster Board, what year that would have
24  been?
25  A. No, I don't recall specifically when it was.

JOSEPH D. LITTLE

Page 137

1  It's been -- I would guess at least 15 years back.
2  Q.  Back to the late 1980s?
3  A.  That would be my guess.  I don't recall
4  specifically, no.
5  Q.  Do you recall how long you had been on the
6  Westminister Board before Westminister was
7  acquired --
8  A.  Warminster.
9  Q.  I'm sorry.  Warminster.  I apologize.
10          How long you had been on the
11  Warminster Board before it was acquired by United
12  Hospitals?
13  A.  No, not specifically dates.
14  Q.  Do you recall, when AHERF acquired Warminster
15  and the other United Hospitals, did you right at
16  the time of acquisition go onto the AHERF Finance
17  Committee, or was --
18  A.  I don't think so.  I think it was after that.
19          As to the length of time, I'm not
20  sure.  I don't recall.
21  Q.  And you don't recall when you went off the
22  Finance Committee at AHERF; correct?
23  A.  No, ma'am, I don't.
24  Q.  Mr. Luft throughout the deposition referred to
25  the Eastern hospital Boards.

Page 138

1          Did you have an understanding that
2  you were a member of an entity that was called the
3  Eastern --
4  A.  I seem to recall, yes, that -- yes.
5  Q.  Do you recall what the name of that Board in
6  particular was?
7  A.  I thought, I thought it was the Medical
8  College Hospital Board.
9  Q.  The MCPHUHS Board?
10  A.  I think so, yes.
11  Q.  And can you give me a rough estimate as to
12  when you first went onto that Board?
13  A.  No, I really can't.  I don't recall the dates.
14  Q.  Do you recall if you left service on the -- I
15  will refer to it also as the Eastern Hospital
16  Board, before or after those hospitals filed for
17  bankruptcy?
18  A.  I believe I was still on that Board when they
19  did.  I believe.
20  Q.  And I will represent to you that the
21  bankruptcy filing was in July of 1998.
22          Does that help put in context when
23  you may have gotten off the Board?
24  A.  No, not really.
25  Q.  But you were not involved in any

Page 139

1  decisionmaking involving whether the hospital
2  should go into bankruptcy or which hospital should
3  go into bankruptcy?
4  A.  I don't recall ever discussing that at a
5  meeting, no.
6  Q.  And I am going to ask you to wait just a
7  little bit until I finish my question.  It makes it
8  easier for our court reporter to get it down.
9  A.  Okay.  All right.
10  Q.  It makes the transcript cleaner.
11          Do you recall when you first went
12  onto the Board of the entity known as AIHG, the
13  group that was responsible for the physician
14  practices?
15  A.  Do I remember the date?
16  Q.  Generally speaking, the year.
17  A.  No, I don't.
18  Q.  Do you recall when you left service on that
19  Board?
20  A.  No, I don't.
21  Q.  Do you recall whether or not you were on the
22  Board at the time of bankruptcy in July of 1998?
23  And I am talking about the AIHG Board.
24  A.  No, I don't.
25  Q.  Now, you were asked a number of questions

Page 140

1  earlier by Mr. Luft about the meetings of the AIHG
2  Board.
3          And I understand from your testimony
4  that you really don't recall the specifics of any
5  meetings of that Board that you attended; correct?
6          MS. MEADEN:  Objection.
7  A.  No.
8  Q.  And you don't recall the specific discussions
9  at any of those meetings about acquiring or not
10  acquiring certain physician practices; correct?
11          MS. MEADEN:  Objection.
12  A.  No.
13  Q.  And you have no recollection of any
14  discussions that may have been -- may have occurred
15  at that Board about the strategy for deciding to
16  acquire or not acquire physician practices;
17  correct?
18          MS. MEADEN:  Objection.
19  A.  No.
20  Q.  And earlier you had talked about perhaps
21  raising some questions about the prices paid for
22  certain of the physician acquisitions.
23          But do I understand your testimony
24  to be that you don't recall specific discussions or
25  specific meetings where you may have raised those

35 (Pages 137 to 140)