TAB 175

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *RALPH W. BRENNER*
*September 30, 2003*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

### BRENNER, RALPH W.



**LEGALINK**
A WORDWAVE COMPANY

Page 105

Ralph W. Brenner, Esquire

1  A.  Uh-huh.
2  Q.  The other document, 2019, the shorter one,
3  those are the minutes from this meeting, October 15,
4  1997, and the minutes do not say via video
5  conference and you are listed as a member present.
6  And I guess what I'm trying to figure out is whether
7  this is -- you think this is the meeting that you
8  attended from Florida --
9  A.  No.
10  Q.  -- or -- no?
11  A.  No.  Either one of two things, either, one,
12  they are wrong that I attended
13  Q.  Okay.
14  A.  It could be wrong.  Or looking at the date
15  again of October 1997, it was at the scramble stage,
16  this whole scenario, and it may well be because we
17  were having a variety of meetings, the board, I'm
18  sure the special committee I was telling you about,
19  were all working to try and find a way to extricate
20  AHERF from this situation and it may well be that
21  there was a video conference call and I think I
22  stated early on, unless there was some meeting
23  toward the end of this, I do not have specific
24  recollections of that because there were a number of

Page 106

Ralph W. Brenner, Esquire

1  video conferences of all kinds occurring frequently
2  to discuss proposals from the Vanguard situation, to
3  discuss other situations.
4  So I really -- I suspect they were
5  probably right in having my name there.  Maybe I was
6  there.  It was a video conference, but it was one of
7  those occasions when, you know, the last minute we
8  are going to have a video conference, which
9  happened.  They were calling, "Can you get over to
10  Hahnemann for a conference?"
11  Q.  And Hahnemann is the facility in
12  Philadelphia --
13  A.  Right.
14  Q.  -- where you would sit in a room and there
15  would be a video --
16  A.  Right.
17  Q.  -- camera?
18  A.  I'm surprised.  All of the major participants
19  on that committee are from Pittsburgh.
20  Q.  On the audit committee?
21  A.  Yeah.
22  Q.  Are there any from Philadelphia other than
23  yourself?
24  A.  I don't see any.

Page 107

Ralph W. Brenner, Esquire

1  Q.  Is Mr Cook from Philadelphia?
2  A.  I don't know.  He might be.  I'm just trying
3  to think.  Associated with any of the hospitals?  He
4  might be.  I don't remember him.
5  Q.  I guess I would like you to read through
6  these minutes and tell me if --
7  A.  The minutes?
8  Q.  The minutes.
9  -- and tell me I guess first if having
10  read through the minutes thoroughly jogs your memory
11  about the meeting itself.
12  Having read it, do you remember the
13  meeting now?
14  A.  No.  The one thing -- the one reason I don't
15  remember it is, you know, in the context of what was
16  transpiring it's not illogical that that kind of
17  meeting could go on, but I do not ever recall seeing
18  hearing or talking to Mr. William Buettner or
19  whoever  I just -- he is -- I just don't know him.
20  I don't recall seeing him and the fact that he is
21  making some sort of a presentation here does -- now,
22  it's conceivable that it was on video and it was
23  indistinguishable with eight people out there
24  talking and I just didn't pick up that he was with

Page 108

Ralph W. Brenner, Esquire

1  Coopers or whatever it was, but I have no
2  independent recollection of that meeting, although
3  it does not mean it did not occur.
4  Q.  Right.  Why don't we look at the other larger
5  document and, in particular, Page 10, looking at the
6  big numbers at the top.  At the top it says "Draft"?
7  A.  Right.
8  Q.  And it says "Consolidated Financial
9  Statements for the Year Ended June 30, 1997."
10  A.  Uh-huh.
11  Q.  And it goes on.  I'm going to point you to
12  some specific pages, but my question is going to be
13  whether you recall seeing these draft consolidated
14  financial statements for the year ended June 30,
15  1997?
16  A.  No.
17  Q.  In that same paragraph, if you turn to Page
18  68, again referring to the numbers at the top --
19  MS. LANGER:  Could you give the Bates
20  number?
21  MR. FRIESEN:  Sure.  It's CG 02027.
22  Q.  This is the beginning of a Coopers & Lybrand
23  management letter and there is a general overview on
24  Page 70 to 71 and I'd like you to read that general

Page 109

Ralph W. Brenner, Esquire

1   overview and tell me if you have ever seen this
2   before.
3
4        Do you recall reading that ever before?
5   A.  No.
6   Q.  You can put that document aside then.
7        Earlier you referred to October 15, '97,
8   that time period, as scramble stage. Just to follow
9   up, what exactly did you mean by that?
10  A.  I don't remember in what context I said that
11  Q.  I think you said -- you looked at the meeting
12  minutes and you said, oh, this was during the
13  scramble stage.
14  A.  The what stage?
15  Q.  The scramble stage?
16  A.  Yes, I said by October 15 I thought there
17  were beginning to be some signs of more meetings
18  because people were getting a little concerned about
19  some of the practices that we had been participating
20  in, the acquisitions, the practice plan.
21  Q.  Meaning that things weren't going according
22  to plan?
23       MS. MEADEN: Objection
24  A.  Well, I think like some of the others things,
25  they were not -- as we pointed out, the management

Page 110

Ralph W. Brenner, Esquire

1   plan was moving forward, but it wasn't producing as
2   quickly as had hoped, it needed tinkering and what
3   have you I suppose, but, you know, I think you can't
4   help but observe some things in the numbers that
5   were starting to show up.
6   Q.  Let me show you a document that is actually
7   going to be marked for the first time here as
8   Exhibit 2043.
9   A.  2043? God.
10       MR. FRIESEN: This has actually been
11  marked at another deposition. I don't have the
12  number handy though.
13       MS. MEADEN: I do.
14       MR. FRIESEN: You do? If you could tell
15  me the number, that would be great.
16       MS. MEADEN: I believe it was previously
17  marked as Exhibit 1953. Are we going to continue
18  with 1953, or do you want to mark it as --
19       MR. FRIESEN: Yeah, why don't we just
20  write 1953 at the top and we will get this squared
21  away with the court reporter later.
22       For the record, it's a document RB 662
23  to 663 and it is a letter from Anthony M. Cook to
24  Ralph W. Brenner dated October 24, 1997.

Page 111

Ralph W. Brenner, Esquire

1   Q.  And if you could just read through the
2   letter, Mr. Brenner.
3
4        Do you remember receiving this letter?
5   A.  I do.
6   Q.  Let me just read the first paragraph. "As
7   always, it was a pleasure to spend time with you
8   last week following the AHERF audit committee
9   meeting. Regarding AHERF, my fear and suspicion is
10  that the institution's problems go well beyond the
11  short-term cash flow problems that Sherif discussed.
12  The point was made to him at the AUHS resource
13  management meeting the following day by several of
14  us that we as trustees cannot fulfill our
15  responsibilities unless we receive timely and
16  accurate financial information on an ongoing basis
17  This is not currently happening, perhaps by design,
18  and I don't foresee any change occurring without
19  real pressure applied to him from Pittsburgh."
20       The first question is, do you remember
21  spending any time with Mr. Cook following the
22  October 15 AHERF audit committee meeting even though
23  you may or may not have actually been at that
24  meeting?
25  A.  Yeah --

Page 112

Ralph W. Brenner, Esquire

1        MS. MEADEN: I'm going to object to the
2   form because I don't know that we have definitely
3   established that it is the October 15, '97 audit
4   committee, but go ahead. You can answer
5   A.  Mr. Cook is selling his services and perhaps
6   in my usual congenial way in discussing some of his
7   thoughts I indicated to him, you know, well, tell me
8   a little bit more about your business. Maybe we can
9   do something. And so the last page and a half or
10  half is his --
11  Q.  Pitch?
12  A.  -- pitch
13       What I'm trying to recall is whether I
14  talked to him on the phone about it or I actually
15  saw him. I kind of -- I kind of think we talked on
16  the phone because -- but I cannot even picture
17  Mr. Cook right now and I don't know what his
18  capacity was. Was he a hired consultant or was he a
19  member of the committee because, as I say, I don't
20  even know who he was.
21  Q.  Well, if we go --
22  A.  He has a practice. He obviously has a
23  business that is -- deals with this kind of thing.
24  Q.  If we go back to the --

LEGALINK MANHATTAN (212) 557-7400

Page 113

Ralph W. Brenner, Esquire

1
2   A   It's just on a personal letter  Berwyn is
3   where I used to live.
4   Q   If we go back to Exhibit 2019, you will see
5   that Anthony M. Cook is a member of the audit
6   committee.
7   A   I'm asking what he does though  Is he a
8   businessman?  Is he a consultant?  I don't know what
9   he is
10  Q   There is a Cook Consultants that is referred
11  to in the second paragraph of this letter
12  A   Right.
13  Q   So
14      But focusing on the part of this letter
15  about AHERF as opposed to the part about the pitch,
16  did you share his suspicion and fear that the
17  institution's problems go well beyond the short-term
18  cash flow problems that Sherif discussed?
19  A   I don't think I shared the specifics of that
20  I think I may have spoken to him and said, you know,
21  I think there are some early signs of some concern,
22  and he, as a good salesman would, seized upon that
23  to write a letter which set forth his views
24  Because it wasn't a long conversation  It wasn't as
25  if we sat down  It was either a phone call saying I

Page 114

Ralph W. Brenner, Esquire

1
2   didn't see you at the meeting or after the meeting I
3   never did get a chance to talk to you, but here are
4   my thoughts  But the real purpose of the discussion
5   was to make the pitch  I never wrote him back or
6   talked to him again I don't think
7   Q   So did you tell him earlier that we didn't
8   receive timely and accurate financial information on
9   an ongoing basis and then he kind of put it back to
10  you?
11      MS. MEADEN:  Objection
12  A   I don't recall that.
13  Q   You don't recall?
14  A   I don't recall having said that  I can't
15  remember the man and I am troubled by what his
16  position was even on the audit committee  I don't
17  know whether he was there in some advisory sense or
18  whether he -- because I never attended the meetings,
19  I didn't get to meet all of these people, so I think
20  if I was there it was sort of after it, hi, I'm Cook
21  and there must have been some presentation and he
22  said I have some concerns and I probably said --
23  listened to him and said, yeah, there are some
24  concerns, but I didn't get into -- he was now, as I
25  see it, laying out his specific concerns, which I

Page 115

Ralph W. Brenner, Esquire

1
2   don't know whether I shared or didn't share at that
3   point in time.
4       I did, as I said before, express some
5   concern myself as to the overall situation.
6   Q   Right  Okay
7       Up until the time of Mr. Abdelhak's
8   termination, did you have confidence at all times in
9   his integrity?
10  A   Define for me the word "integrity "
11  Q   His honesty.
12  A   I had no reason to question his integrity  I
13  questioned his judgment  I questioned whether he
14  was -- I questioned his ego  I questioned whether
15  he was a man who had set a course and was unwilling
16  to deviate from it regardless of some of the
17  consequences, but I certainly don't think I had a
18  sense of distrust  Maybe I should have, but I
19  didn't  I don't think I did
20  Q   When did you first have the feeling that you
21  questioned his ego, as you described it?
22  A   It is hard to put these things together  I
23  think it was before the Graduate situation
24  Q   Do you know whether any other trustees had
25  the same kinds of concerns?

Page 116

Ralph W. Brenner, Esquire

1
2   A   Are you talking about integrity now, or are
3   you talking about judgment or -- your question was
4   integrity
5   Q   My question was integrity.
6   A   And I said I don't have any reason to believe
7   that
8   Q   Right  And then you --
9   A   I said I had questions about other aspects.
10  Q   Right  Those other aspects, ego, et
11  cetera --
12  A   I have no way of specifically knowing, but I
13  certainly had the sense that others questioned
14  certainly some of those traits  In other words, was
15  he too headstrong on some of these positions he was
16  taking and whether he was somehow as flexible as we
17  would have liked him to be.
18  Q   Do you recall any other trustees questioning
19  his integrity?
20  A   Certainly not before he was terminated  I
21  mean there may have been other people that knew
22  things that I didn't know  All I'm saying is I
23  don't recall anybody specifically saying that to me.
24  Q   Okay  I'm just here to get your
25  understanding

29 (Pages 113 to 116)

Page 117

Ralph W. Brenner, Esquire

1    Ralph W. Brenner, Esquire
2    A   Yeah
3    Q   What about Mr. McConnell; did you ever have
4  concerns about his integrity up until the time that
5  he was terminated?
6    A   Once again, I don't believe I had any
7  questions about his integrity; however, I had some
8  serious questions as to the accuracy of all of the
9  financial dealings that were being suggested in
10  connection with some of the transactions. I say
11  that recognizing that I am not an accountant. I
12  have already admitted to not being the guru in the
13  area of the financial world, but I do listen and I
14  do try and pay attention and I was somewhat
15  mystified by some of the suggestions of how some of
16  these transactions, particularly the latter ones,
17  maybe Graduate as much as any, were to come into
18  being
19    Q   Can you remember anything specifically that
20  mystified you about that?
21    A   No, no, I just knew I sat there and said, you
22  know, I'm trying, but it's too complicated to work
23  in the way that they are suggesting
24    Q   Just to finish the topic, do you know of
25  anyone else who had those same concerns on the

Page 118

1    Ralph W. Brenner, Esquire
2  board?
3    A   No
4    Q   And do you know of anyone else who voiced a
5  concern about Mr. McConnell's integrity?
6    A   No
7    Q   You mentioned that you don't recall --
8    A   I should say I can't remember specifics about
9  it, but I think there were some people who shared my
10  view not about the integrity, but about the
11  complicated mechanisms which were being suggested
12  for completing some of these transactions
13    Q   Did you have any of those questions about the
14  Forbes acquisition?
15    A   You know, I don't remember much about the
16  Forbes transaction. My only recollection was that
17  one meeting that I had and I don't remember anything
18  else about that. I don't remember seeing any papers
19  on that Forbes transaction to be honest with you
20    Q   Did you have those kinds of concerns about
21  the Hahnemann transaction?
22    A   Have any concerns about it?
23    Q   The kinds that you mentioned about the --
24    A   I don't think so
25    Q   You mentioned earlier that you don't recall

Page 119

1    Ralph W. Brenner, Esquire
2  ever speaking with Mr. Buettner at Coopers &
3  Lybrand  Do you recall speaking or hearing --
4  speaking to or listening to anyone else from Coopers
5  & Lybrand during the course of your time at AHERF?
6    A   No
7    Q   What was your view, if any, while you were on
8  the audit committee of the role of an outside
9  auditor?
10    A   I viewed them as perhaps the most important
11  facet of supporting staff that a board member,
12  trustee, could have. It is in my judgment the
13  ultimate guardian of the financial management of the
14  enterprise and, while many of the board members
15  probably are sophisticated in handling financial
16  matters, many are not and therefore they look to the
17  auditors to bring to their attention any concerns,
18  any new procedures, any new materials which they may
19  have learned about so that the board can consider it
20  and react and make intelligent decisions as to how
21  to proceed  And I relied -- I always have relied
22  heavily on them, the auditors, in every position I
23  have ever been in
24    Q   Did you understand that auditors in turn
25  relied on company management or, in this case,

Page 120

1    Ralph W. Brenner, Esquire
2  not-for-profit organization management?
3        MS. MEADEN: Objection as to foundation
4    A   I certainly understand that the auditors must
5  rely on receiving the information necessary and to
6  learn and gain the information necessary from the
7  business people so that they can appropriately
8  conclude their audits, but I also think it is up to
9  them to press hard and, if they perceive any
10  irregularities or questionable practices, that they
11  should be called to the attention not only of the
12  management, but of the board
13    Q   Are you aware at all of Mr. Abdelhak ever
14  having used any AHERF funds with respect to his
15  divorce?
16    A   No
17    Q   While you were on the AHERF board of
18  trustees, did you ever have any concerns about the
19  number of people on the board, too many or too few?
20    A   No, I thought it was an appropriate number
21  I don't remember what it was  I would be guessing
22  25? Just guessing
23    Q   Did you ever believe that sometimes the AHERF
24  board meetings didn't last long enough to get
25  through all the materials?

30 (Pages 117 to 120)

Page 121

Ralph W. Brenner, Esquire

2    MS MEADEN: Objection as to form
3    A   You have to remember that I was new on the
4  board in eighty -- '93 or 4  I can't remember  It
5  was an old established board and going to Pittsburgh
6  with the board consisting of 90 percent of
7  long-established board members, one did not question
8  the operations which presumably had been in effect
9  for some period of time  That did not mean they
10 didn't question the items that came before us, but
11 in terms of the length of the board meetings, the
12 agenda for the board meetings and things like that,
13 certainly for the first couple of years it took a
14 while -- and, as I say, you could ask me now the
15 names of all those board members and I bet I
16 couldn't give you half of them, a quarter of them,
17 simply because I would -- you would attend a
18 meeting, fly out, spend an hour and a half maybe at
19 the meeting  If you wanted to get back to the
20 office, you didn't stay for lunch, so you went back
21 to the office  And so the meetings generally
22 covered the items that were on the agenda  They
23 certainly got longer as the problems got more
24 difficult
25    Q   Let me show you a document that even though

Page 122

Ralph W. Brenner, Esquire

2  it is not written on here I believe it has been
3  previously marked as Exhibit 1990, and, for the
4  record, this is the minutes from meeting of the
5  committee of trustees of AHERF dated October 10,
6  1997
7        Mr Brenner, you are listed here as
8  attending via telephone conference. I don't think I
9  asked about this committee before  Do you remember
10 being on the committee of trustees?
11    A   No  What did we do?
12    Q   Well, let's see
13    A   Ah, yes  This is where he created what I was
14 trying to recall as the -- what is it?  The eastern
15 region -- the Allegheny University Hospital's
16 eastern region, AUH  Remember you asked me if --
17    Q   Uh-huh
18    A   It was at this point that he felt that there
19 were too many meetings I guess, too many duplication
20 of time and effort and so he was establishing some
21 new boards which I guess by the date of this, once
22 again, had very little, if any, activity  They met
23 -- I can recall just really one special meeting
24 There were other meetings when they were talking
25 about the bankruptcy

Page 123

Ralph W. Brenner, Esquire

2    Q   "They" meaning AUH Eastern Region?
3    A   Right
4    Q   And the "he" you are referring to is Mr
5  Abdelhak?
6    A   I'm sorry?
7    Q   The "he" you are referring to, the "he" did
8  this, was Mr Abdelhak?
9    A   Yes, he's the one who suggested this  Well.
10 it may have been with others  He may have consulted
11 others, I don't know, but he was the one who I
12 believe was given credit for the suggestion and I
13 can't believe this would have occurred without his
14 blessing
15    Q   If you look on the second page of this
16 document under "Proposed Corporate Restructuring" --
17    A   Where is this?
18        MS LANGER: Paragraph B
19    A   Middle paragraph?
20    Q   Right  It says, "Mr Abdelhak presented for
21 discussion a proposed governance restructuring  He
22 noted that as the AHERF system has grown, the size
23 and complexity of the governance structure has
24 increased expedientially  He further noted that
25 many trustees have complained about the amount of

Page 124

Ralph W. Brenner, Esquire

2  time required to attend the various governance
3  meetings as well as the duplication of presentations
4  and actions "
5        Were you one of those trustees who
6  complained that he is referring to, do you know?
7    A   I don't think --
8        MS. MEADEN: Objection as to foundation
9  and form
10       THE WITNESS: I'm sorry
11    A   I don't think I complained to anybody, but I
12 was aware of that  I had suffered from that myself;
13 otherwise, I would have gone to some of the audit
14 meetings or I would have gone out to the Pittsburgh
15 board meetings, which I didn't attend  It was just
16 too much to do  And, once again, once you get into
17 this late '97 period, things are starting to stir up
18 a little bit and I think one of his reasons for
19 trying to distill this down was to try to reduce the
20 number of some of those meetings for a variety --
21 not only the trustees but his own management
22    Q   And why do you think that he would want to do
23 that?
24    A   I would hope he would want to do it to try to
25 help the trustees and management or maybe he felt by

Page 125

1	Ralph W. Brenner, Esquire
2	the multitude of meetings he was not getting the
3	benefit of the help of the trustees who could not
4	participate in all of those events.
5	Q. Did the changes in -- first of all, did these
6	changes actually take effect?
7	A. Some of them he tried to take effect. As I
8	say, in my mind it is one of those sort of futile
9	let's try and do something. One of the -- you will
10	note here a question was raised as to whether the
11	women's hospital like St. Christopher's should have
12	a separate board and at the same time he wanted to
13	change the name of St. Christopher's to Allegheny
14	St. Christopher's. Every other hospital here was
15	Allegheny Graduate, Allegheny Hahnemann, Allegheny
16	-- everybody Allegheny, and I threatened to resign
17	from the board. I said it has to be St.
18	Christopher's. St. Christopher's is the name it is
19	known by. St. Christopher's has the reputation, and
20	if you are going to change that name, you are in
21	effect changing what I believe to be one of the
22	assets of this, and he backed off. But it was
23	during this period that he was making a variety of
24	changes like this.
25	Q. In your view did these changes, the ones that

Page 126

1	Ralph W. Brenner, Esquire
2	were put into effect, did they for you solve the
3	issues of the board meetings that you had?
4	MS. MEADEN: Objection to form.
5	A. What happened here? What he was trying to do
6	here?
7	Q. Right.
8	A. In my mind it was too late. I mean it only
9	helped confuse things. I didn't really any longer
10	sort of know what board I was on and there were so
11	many special meetings starting to occur that it
12	really -- it really did not, I think, accomplish
13	what he had hoped it would accomplish.
14	Q. You can put that document to the side.
15	MR. FRIESEN: This one I know is new,
16	Exhibit 2043, which is Mr. Brenner's trustees'
17	evaluation.
18	THE WITNESS: My own? Did I evaluate
19	myself?
20	MS. MEADEN: Jeff, would this be a good
21	time to take about a five-minute break, or do you
22	want to wait? If he is going to review the document
23	-- it's up to you.
24	MR. FRIESEN: I'm actually not going to
25	spend much time on this document.

Page 127

1	Ralph W. Brenner, Esquire
2	VIDEO TECHNICIAN: There's 15 minutes
3	left of the tape.
4	MS. MEADEN: Oh, okay.
5	MR. FRIESEN: I'm going to spend not
6	much time on this document, if it's okay with you.
7	MS. MEADEN: Sure.
8	BY MR. FRIESEN:
9	Q. I will represent to you that this came from a
10	file of 1994 trustees' evaluation even though it
11	doesn't have the year on it.
12	A. Do we know who fills these out?
13	Q. Pardon me?
14	A. Do we know who fills these out?
15	Q. Well, I was going to ask you.
16	MR. FRIESEN: For the record, it is
17	Bates-numbered PR-PLD-020-01968 through 973.
18	(Exhibit 2043 was marked for
19	identification.)
20	A. This is me. I did it.
21	Q. This is your handwriting on here?
22	A. Yes.
23	Q. And your signature on the last page?
24	A. Uh-huh. Now, you have to remember this is
25	probably a year after I got on the board.

Page 128

1	Ralph W. Brenner, Esquire
2	Q. Right. I just want to ask you questions
3	about --
4	A. Oh, no. Go ahead.
5	Q. -- one of the entries here on Page -- the
6	number at the bottom ends in 1971. And it says No.
7	3, "Do you feel that your time as a trustee is being
8	effectively used by the organization?" and you wrote
9	"Not always." Do you see that?
10	A. Uh-huh.
11	Q. Do you remember what you meant when you wrote
12	that?
13	A. I think I was probably referring to my skills
14	as a lawyer. I think I was the only lawyer on the
15	board, I may have been, a practicing lawyer, and
16	that there would be, I think, some occasions when I
17	felt they could utilize my thoughts in connection
18	with some of the things they were doing. Again,
19	this is the early stages and it would be
20	presumptuous of me to suggest that to many people,
21	but I think I was writing it with the hope that
22	maybe they would come back to me and say, you know,
23	what did you mean by that and that I would have an
24	opportunity to give them my thoughts.
25	Q. Were there any particular legal-related

32 (Pages 125 to 128)

Page 129

Ralph W. Brenner, Esquire

1  issues that you thought you could --
2  A. One was that I did get to, which was a
3  revision which I was able to accomplish with Nancy
4  Wynstra of the whole process by which risk
5  management was handled because claims against the
6  hospitals was becoming egregious and I felt -- I was
7  wondering why and so when we started looking into it
8  a little bit more, we found out that there was just
9  no process for having the lawyers who represent the
10  hospital access to materials which were being
11  created by the physicians in the hospital which were
12  damaging to the cases. And discovery would be
13  forthcoming and these documents would show up and
14  everybody acted surprised and they were
15  overwhelmingly dangerous, so we did revise that
16  program and I spent time over it with Nancy Wynstra
17  and our legal staff over here at Hahnemann. This is
18  years later. This is a couple years later.
19  Q. Any other specific issues as of 1994 that you
20  recall --
21  A. No, I don't think so.
22  Q. -- having thought that you should have had
23  some input legally?
24  MR. FRIESEN: Okay. Why don't we take

Page 130

Ralph W. Brenner, Esquire

1  our break.
2  VIDEO TECHNICIAN: This marks the end of
3  Tape No. 2 in the videotape deposition of Ralph W.
4  Brenner. We are going off the record. The time is
5  2:21.
6  (Short recess.)
7  VIDEO TECHNICIAN: This marks the
8  beginning of Tape No. 3 in the videotape deposition
9  of Ralph Brenner. We are going on the record. The
10  time is 2:34.
11  BY MR. FRIESEN:
12  Q. Mr. Brenner, do you recall a visit to AHERF
13  in Philadelphia in November of 1996 by some doctors
14  or consultants from an organization called Care
15  Group which is affiliated with the Harvard Medical
16  School?
17  A. No
18  Q. I'm going to show you a number of documents
19  that have been previously marked as Exhibits 2012,
20  2013, 2014, 2015 and 2016. Basically these are some
21  of the audit committee meetings that you did not
22  attend and I just wanted for the record to nail down
23  the dates of these meetings.
24  The first one, 2012, is an audit

Page 131

Ralph W. Brenner, Esquire

1  committee meeting dated April 4, 1994 and you are
2  listed there as not attending. Do you see that?
3  A. I do see it. I'm looking for something.
4  Okay.
5  Q. And is that consistent with your memory that
6  you did not --
7  A. No --
8  Q. -- attend this meeting?
9  A. -- I did not
10  Q. And the next one, Exhibit 2013, is audit
11  committee meeting October 10, 1994 and again you are
12  listed as not attending this one and all of the same
13  questions, whether you -- whether this is consistent
14  with your memory, that you weren't there?
15  A. I'm just looking for that if it was a phone
16  call, but I don't see anything. I was not there
17  Q. And the next one, Exhibit 2014, is an audit
18  committee meeting dated April 3, 1995 and you are
19  listed as not at this one. Is that consistent with
20  your memory?
21  A. It is.
22  Q. The next one, Exhibit 2015, is an audit
23  committee meeting dated October 16, 1995 and you are
24  listed as not being there. Is that also consistent

Page 132

Ralph W. Brenner, Esquire

1  with your memory?
2  A. That is correct.
3  Q. And the last one in this bunch is Exhibit
4  2016 dated April 8, 1996, audit committee meeting,
5  and you are listed in this one as not being at the
6  meeting. Is that consistent with your memory?
7  A. It is.
8  Q. Were you on the board of an entity called the
9  Allegheny Health Service Providers Insurance Company
10  or AHSPIC?
11  A. Not to my knowledge.
12  Q. Do you remember ever going to any
13  AHERF-related meetings in the Cayman Islands?
14  A. Yes
15  Q. And do you know what was in the Cayman
16  Islands that brought you there?
17  A. Come on.
18  MS. MEADEN: Objection.
19  Q. Apart from the fun and sun?
20  A. This was in connection with an offshore
21  insurance company and there they had to have their
22  meetings outside of the United States and they did
23  so several times a year. It was also an
24  opportunity, I believe, for AHERF to provide an

LEGALINK MANHATTAN  (212) 557-7400

Page 133

Ralph W. Brenner, Esquire

1    opportunity for a gathering of executives and some
2    trustees in a nice setting. I should tell you I
3    went four or five times. I would go down in the
4    morning without my wife and come back as soon as I
5    could leave the next day. I have been to the Cayman
6    Islands a number of times with my wife and I found
7    it much more enjoyable than being there with the
8    AHERF people. I was there principally --
9    Q. Don't worry. I won't show her this
10    transcript.
11    A. That's all right.
12         I was there principally in connection
13    with the problem with the risk management. The risk
14    management was a big part of the sessions, business
15    sessions, and a portion of almost the whole day was
16    taken up with that, and what they would do is they
17    would bring in the insurance carrier's
18    representatives to tell us how much coverage we had,
19    how much -- what our exposures were and things like
20    that.
21    Q. Do you recall AHERF entering into something
22    called risk contracts?
23    A. How do you spell that?
24    Q. Risk, R-I-S-K. And this would be in

Page 134

Ralph W. Brenner, Esquire

1    connection with that --
2    A. With that? Was that with an insurance
3    carrier?
4    Q. The idea that I'm getting at is that AHERF
5    would be responsible for the healthcare for a
6    certain defined number of people.
7    A. I saw that written in here somewhere, but I
8    don't recall.
9    Q. You don't recall that?
10    A. No.
11    Q. Did you meet with anyone from Jones Day prior
12    to the deposition here --
13    A. Yesterday.
14    Q. -- in preparation for the deposition?
15    A. But you were offered the same opportunity I
16    understand through my counsel.
17    Q. Right. And you and I have never met before
18    today?
19    A. No.
20    Q. And you have never met with anybody
21    representing PWC in preparation for this deposition?
22    A. No.
23    Q. How long did you -- did you meet with Miss
24    Meaden or somebody else?

Page 135

Ralph W. Brenner, Esquire

1    A. With who?
2    Q. Miss Meaden --
3    A. No --
4    Q. -- who is sitting here with us
5    A. -- just by her little self.
6    Q. And how long was that meeting?
7    A. Hour.
8    Q. And did she show you any documents?
9    A. I don't recall that I saw any documents. She
10    warned me that you might be showing me a pile.
11         MS. MEADEN: I told him to bring his
12    reading glasses.
13         MR. FRIESEN: I don't have any further
14    questions right now. I might have some when Miss
15    Meaden concludes, but thank you very much for coming
16    in today. I know that it is not comfortable. I
17    appreciate it.
18         THE WITNESS: I appreciate your being
19    very civil and understanding of that and permitting
20    me to get up and walk around a little bit. I did
21    not mean to impede your opportunity to question me.
22         MR. FRIESEN: Not at all.
23         MS. MEADEN: And if I could take ten
24    minutes and gather my notes and my documents --

Page 136

Ralph W. Brenner, Esquire

1    THE WITNESS: Sure.
2         MS. MEADEN: -- I would appreciate that,
3    and we will get back on the record and we will try
4    to get you out of here as quickly as possible
5         THE WITNESS: That's great. Wonderful.
6         VIDEO TECHNICIAN: We are going off the
7    record. The time is 2:42.
8         (Short recess.)
9         VIDEO TECHNICIAN: We are going on the
10    record. The time is 2:58.
11    BY MS. MEADEN:
12    Q. Mr. Brenner, as you know, my name is Laura
13    Meaden, and I represent the plaintiff in this
14    action, the Official Committee of Unsecured
15    Creditors of AHERF, and I will have considerably
16    fewer questions for you this afternoon than
17    Mr. Friesen had today, but I would like to again go
18    over some of the ground rules with you.
19         If you don't hear a question that I ask
20    or you don't understand it, please let me know, and
21    I'll do my best to either be more articulate or to
22    rephrase and clarify the question. And if at any
23    time you feel the need to take a break, please let
24    me know and we will certainly do whatever we need to

LEGALINK MANHATTAN (212) 557-7400

Page 137

1    Ralph W. Brenner, Esquire
2  to accommodate that.
3        Before we get into some of the more
4  substantive matters, I'd like to try to establish a
5  little more clearly the years of your service on the
6  AHERF board of trustees. I will represent to you
7  that our records seem to indicate, minutes that we
8  have looked at seem to indicate, that you went on
9  the board in June of 1992. Is that at all
10  consistent with your recollection?
11       MR. FRIESEN: Objection. Inconsistent
12  with our documents.
13       MS. MEADEN: Okay.
14  A.   I would have to rely on a consistency between
15  the two of you as to that.
16  Q.   Okay.
17  A.   My own recollection was it was like 1993, but
18  I could be wrong.
19  Q.   I think you testified earlier that you
20  resigned in October of 1998; is that correct?
21  A.   That's correct.
22  Q.   Was your resignation in connection with the
23  sale of some of the eastern hospitals to Tenet?
24  A.   No. It was -- that matter had not been
25  consummated at that time and I was resigning -- I

Page 138

1    Ralph W. Brenner, Esquire
2  stayed through the bankruptcy, not through the --
3  until actually the October date and I resigned
4  because, as I told you, I had had no communications
5  with other board members or officials of AHERF for
6  six months or so, a year, and I just felt that that
7  was very inconsistent to the position that I had to
8  maintain as a trustee, so I resigned from all
9  committees and including the chairmanship of St.
10  Christopher's Hospital for Children.
11  Q.   Did you tender that resignation in writing?
12  A.   I did.
13  Q.   Do you recall to whom you tendered it?
14  A.   Mr. Snyder.
15  Q.   Did you ever hear anything from Mr. Snyder in
16  response to your written resignation?
17  A.   Not in response to it, but I get a Christmas
18  card from him every year.
19  Q.   And, as best you recall, that was in October
20  of '98?
21  A.   Yes, October 20. I remember the date well.
22  Q.   I'm sorry. October 20?
23  A.   October 20. I remember the date well.
24  Q.   Do you recall when you -- the date on which
25  you went back to the St. Christopher's board?

Page 139

1    Ralph W. Brenner, Esquire
2  A.   After the Tenet acquisition arising out of
3  the bankruptcy, Calvin Bland, who was the executive
4  CEO of St. Christopher's prior to -- under my board
5  membership, had stayed on and was basically the man
6  in place at St. Christopher's at the time that Tenet
7  took control. He was asked by Tenet to formulate a
8  board of directors and I have to tell you it was not
9  an easy function to achieve. It is not fair to say,
10  but St. Christopher's did -- I did say it once and I
11  will say it again -- had an outstanding, outstanding
12  board membership when the company was going. Jack
13  Brennan, chairman of the board of Vanguard, not the
14  same Vanguard, Vanguard, the investment --
15  Q.   Financial Services?
16  A.   -- Raj Grupta, the chairman of the board of
17  Rohm & Haas. I can't remember them all, but they
18  were very, very distinguished individuals and proud
19  of it.
20       We had -- by that time, as I told you,
21  we had lost a substantial number of our physicians
22  because of the bankruptcy. They were scared, had
23  left. There were only two, I think, board members
24  from the old board who were prepared to return. By
25  the way, the ones who would not return, Jack

Page 140

1    Ralph W. Brenner, Esquire
2  Brennan, for instance, would not return because he
3  had bonds outstanding for United hospitals and
4  involved in the bankruptcy. Raj Grupta had
5  apparently some transactions going on with Tenet,
6  and so there were reasons why they couldn't return.
7  But they came to me and asked me if I would serve as
8  chairman.
9        I have to tell you, I really am not
10  always this dumb, but I put so many years into this
11  little institution and they were so great. Their
12  quality of -- I have to say it. The textbook, the
13  most significant book written by a pediatric
14  physician in the world was written by Dr. Waldo
15  Nelson, who was the founder of St. Christopher's and
16  who died maybe only five years ago, but if you go to
17  China, as I've done, Thailand, Vietnam and you go to
18  a medical school, you will see Dr. Waldo Nelson's
19  book as the teaching, and most significantly he
20  received the award from the most outstanding
21  children's hospital in the country, CHOP, Children's
22  Hospital of Philadelphia, No. 1 now, and they
23  recognized it, but my point is that there was such a
24  love and such a sense of feeling in that hospital
25  for the kids, the poor kids, that I said okay, and

35 (Pages 137 to 140)

# TAB 176

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS L.L.P.*

---

*J. DAVID BARNES*
*July 8, 2003*

---

# LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**BARNES, J. DAVID - Vol. 1**



**LEGALINK®**

A **WORDWAVE** COMPANY

J. DAVID BARNES

Page 117

1 read that right?
2 A   You read it right. I hope Carol wrote it
3 right.
4 Q   Does that sound to you like something that you
5 would have said in this time frame?
6 A   In general, yes.
7 Q   And when it says institution identified
8 strategy several years ago, what strategy is
9 meant there?
10 A   Mainly the acquisition of the Philadelphia
11 facilities, the implementation of computer and
12 accounting systems and so forth and so on that
13 would make it possible to reduce costs, and the
14 acquisition of patient care -- or the doctors'
15 system that would make it possible to improve
16 the occupancy rates.
17 Q   So is it your understanding in the fall of 1996
18 that in prior years, AHERF had adopted the
19 strategies that you just spoke of and was
20 continuing to implement them at this time?
21 A   Um-hum. Yes.
22 Q   And I take it you had an understanding that a
23 number of those strategies had high start-up
24 costs associated with them, right?
25 A   Yes.

Page 118

1 Q   And in your judgment, those strategies were
2 worth undertaking because of the expected
3 long-term benefits, right?
4 A   That's correct.
5 Q   Do you remember any member of the board of
6 trustees or any of its committees in this fall
7 of 1996 time frame expressing any contrary view
8 on that, that is, saying that the strategies
9 were costing too much money and weren't worth
10 it?
11 A   No.
12 Q   The last sentence there, keeping hospitals
13 full, is that a reference to the issues you've
14 already testified to regarding hospital
15 occupancy rates?
16 A   Well, you know, with all due respect, I think
17 secretaries don't always get every word you say
18 right. I don't think that sentence makes much
19 sense, and I think Carol sort of messed up when
20 she wrote it, but keeping hospitals full was an
21 important point.
22 Q   It was one that you focused on that you believe
23 other members of the board were also focusing
24 on?
25         MR. MCCLENAHAN: Objection. You keep

Page 119

1 asking whether he believes somebody else
2 believes something. If you know the answer to
3 that question, you can answer it, but do not
4 speculate on what other people might have
5 believed or on what you believed other people
6 might have believed.
7 A   Okay. The short answer is I don't know what
8 other people believed.
9 Q   Did you believe in the fall of 1996 that the
10 best way for AHERF to deal with the losses it
11 was experiencing was to continue to implement
12 these strategies we've spoken of that AHERF had
13 adopted a few years previously?
14         MR. MCCLENAHAN: Objection to form.
15         MR. WHITNEY: And I'll object to
16 foundation.
17         THE WITNESS: I feel helpless. What
18 do you want me to do? Just say nothing, I
19 guess.
20         MR. MCCLENAHAN: Well, if you can
21 answer -- the question assumes a fact that we
22 don't have in evidence yet, but if you can
23 answer it, you can.
24         MR. RYAN: Let me try to cure that
25 problem if I understand it.

Page 120

1 BY MR. RYAN:
2 Q   You've already mentioned, I believe, that there
3 were a number of strategies in place at this
4 time that had originally been adopted in prior
5 years, right?
6 A   Yes.
7 Q   And you knew in the fall of 1996 that the
8 previous year which was fiscal year 1996 had
9 been a tough year financially for AHERF, right?
10 A   Yes.
11 Q   Did you then believe in the fall of 1996 that
12 the best way for AHERF to address the financial
13. losses that it was experiencing was to continue
14 to implement these previously-adopted
15 strategies?
16         MR. MCCLENAHAN: Objection.
17         MR. WHITNEY: Objection to
18 foundation. Again, you've slipped the same
19 phrase in there, and there is no foundation for
20 the statement.
21         MR. MCCLENAHAN: To say it's a tough
22 year doesn't mean they've experienced any
23 losses.
24         MR. WHITNEY: Okay. That's my
25 problem.

J. DAVID BARNES

Page 121

1     MR. MCCLENAHAN: And to say it's a
2   tough year is only part of what he said.
3     MR. WHITNEY: Why don't you put the
4   financial statement in front of him.
5   BY MR. RYAN:
6   Q.   Let me withdraw the question and ask this: Did
7   you believe in the fall of 1996 that AHERF was
8   in a tough financial situation?
9   A.   No, I don't think so.
10  Q.   But you believed they had experienced a tough
11  year financially?
12  A.   I don't think I would have characterized it
13  that way.
14  Q.   How would you have characterized it?
15  A.   An improving year in a difficult environment.
16  Q.   While we were off the record at lunch, we
17  marked two new exhibits. Exhibit 1649 was the
18  document with Bates Nos. SEC 1000154855, and
19  Exhibit 1650 was the document with Bates Nos.
20  GOR 203 to 210. These are each documents that
21  appear to refer to a meeting of the finance
22  committee of AHERF held on Monday, December 2,
23  1996.
24      Please feel free to look at any
25  portion of these documents you like,

Page 122

1     Mr. Barnes. My questions are going to focus on
2   the bottom of page 1 of Exhibit 1650.
3     MR. MCCLENAHAN: I'm sorry. Which of
4   the two? Do you mean the --
5     MR. RYAN: No, I mean the shorthand
6   note transcription.
7     MR. MCCLENAHAN: All right. Got it.
8   Okay.
9   A.   Okay. I glanced at it, I guess. I didn't read
10  it all in great detail, but if that becomes
11  necessary, we'll do it -- I'll do it.
12  Q.   Please, if you want to look at any more detail
13  in the documents, just say so.
14  A.   No.
15  Q.   So you have in front of you Exhibit 1650?
16  A.   Um-hum.
17  Q.   Do you see down the last paragraph on the page,
18  there's some statements attributed to you
19  there?
20  A.   Um-hum.
21  Q.   Do you see the second sentence reads: Last
22  year was toughest year in this corporation
23  since World War II from bottom line?
24  A.   Um-hum.
25  Q.   Do you recall making that comment?

Page 123

1   A.   No, but it's a comment I've made a thousand
2   times to try and get the organization to be
3   more cost, more bottom-line conscious. It was
4   a broken record I used.
5   Q.   And bottom line is a reference to profit or
6   loss, is it not?
7   A.   Yes, net income.
8   Q.   You believe then in the fall of 1996 that
9   fiscal year 1996 was the toughest year for
10  AHERF since World War II from the bottom-line
11  perspective?
12      MR. WHITNEY: Objection. Foundation.
13  Q.   Go ahead.
14      MR. MCCLENAHAN: You want to -- could
15  you repeat the question?
16      MR. RYAN: Could you read the
17  question back, please?
18          - - - -
19  (The record was read back by the Reporter.)
20          - - - -
21      MR. WHITNEY: Objection. Foundation.
22      MR. MCCLENAHAN: You can answer.
23      THE WITNESS: Huh?
24      MR. MCCLENAHAN: You can answer.
25  A.   When do you mean by the fall? I think I used

Page 124

1   that same terminology at the October meeting,
2   if that's what you're talking about, that it
3   was a tough year. Is that what you mean?
4   Q.   Yes. Let me just try to make sure we have a
5   clear record.
6       In the October to December 1996 time
7   frame, did you believe then that fiscal year
8   1996 was the toughest year for AHERF since
9   World War II from the perspective of the bottom
10  line?
11      MR. WHITNEY: Objection. Foundation.
12  A.   I guess the best answer is I don't know.
13      In the job I had, to some extent you
14  had to function as a mouthpiece to try and
15  pound on the organization to be cost and profit
16  sensitive, and I used that a lot -- said that
17  lot. So I could have said it there or not, but
18  it's more a part of a preacher's sermon than it
19  is a carefully, factually-based, studied
20  observation.
21  Q.   Is it fair to say that even if you didn't go
22  back and review results for every single year
23  since World War II, you did believe in the
24  October to December 1996 time frame that fiscal
25  year 1996 had been a very tough year

J. DAVID BARNES

Page 125

1    financially for AHERF?
2        MR. WHITNEY: Objection. Foundation.
3  A    No, I don't think it was a "very tough year"
4      for the -- they have lost -- had reported
5      black -- or red ink for a while. They earned
6      six million bucks. It wasn't much, but I think
7      I was very pleased with the progress, because
8      it was a turn-around, and it was going in the
9      right direction.
10  Q    But you believed that what you said at the
11      meeting of a finance committee, and perhaps
12      earlier at the audit committee, was that it had
13      been the toughest year since World War II?
14        MR. WHITNEY: Objection. Foundation.
15  A    No. Does the minister believe everything he
16      says in church?
17        Some of this is preaching. When
18      you're chief financial officer, the chief
19      committee head and things aren't going as well
20      as it should, you've got to keep people pepped
21      up and on the -- continually reminded of the
22      bottom line and continually preached to, if
23      that's the right term, on getting the profits
24      up.
25        So $6 million, this is no big deal,

Page 126

1      but it was a damned sight better than the prior
2      year, but not anything like what I think the
3      ultimate -- the opportunity should have been.
4      So if you read the text, this paragraph
5      through, I'm just saying that, okay, we earned
6      $6 million -- last year we earned $6 million,
7      here we earned $3 million in the first quarter,
8      but that's not enough; it ought to be a good
9      deal more than that.
10  Q    Let me ask you about the next sentence. The
11      next sentence reads: Quantitatively earnings
12      were unimpressive. And my question to you is
13      do you know whether that should have been
14      qualitatively in the transcription?
15  A    Probably. If you want to be really technically
16      precise, it ought to have been both.
17  Q    All right. So you believed in the October to
18      December 1996 time frame that for fiscal year
19      1996, AHERF earnings had been unimpressive both
20      quantitatively and qualitatively?
21  A    The $6 million? Is that what you're talking
22      about now?
23  Q    AHERF's earnings for fiscal year 1996, yeah.
24  A    Yeah.
25  Q    Yes?

Page 127

1  A    Yes.
2  Q    And is it fair to say from what you were saying
3      earlier about preaching and so forth, that you
4      wanted to make sure that the other people in
5      attendance at these meetings were not
6      complacent about where AHERF stood financially?
7  A    Yes. What I said and said and said is that
8      AHERF should have a five percent profit margin.
9      That would have been $100 million of earnings.
10      So that was the target I set for them. That
11      isn't in the minutes here, but that's the
12      target they had.
13  Q    And AHERF didn't come close to meeting that
14      target in this time frame, correct?
15  A    Right.
16  Q    Did you consider in the October to December
17      1996 time frame any steps that you thought were
18      appropriate for AHERF in light of the
19      unimpressive earnings?
20  A    Well, bearing in mind we had a profit objective
21      for the next year of $20 million or something
22      like that, we had approved the budget, and they
23      had earned money in '96, they had begun to
24      develop some credibility of being able to
25      develop earnings. So other than pounding on

Page 128

1      profitability, pounding on costs, et cetera, et
2      cetera, I didn't have any new and unique ideas
3      in this time frame.
4  Q    Did you believe that the strategies that AHERF
5      was implementing, such as the doctors'
6      practices, acquiring the hospitals,
7      centralizing back office functions, would
8      improve AHERF's financial condition?
9  A    Yes.
10  Q    Do you recall anyone in this October to
11      December 1996 time frame blaming the strategies
12      that AHERF had in place already at that time
13      for the tough year that AHERF had experienced
14      financially?
15  A    I do not recollect that at all, no.
16  Q    Was it your sense of the feeling of the board
17      at this time that the steps that were already
18      being implemented were appropriate ones to deal
19      with the tough financial results?
20  A    Yes.
21  Q    Let me hand you, Mr. Barnes, what's previously
22      been marked as Exhibit 80.
23        MR. MCCLENAHAN: Is there something
24      in particular you want to call his attention
25      to?

32 (Pages 125 to 128)

J. DAVID BARNES

Page 129

1    MR. RYAN: Yeah.
2    BY MR. RYAN:
3    Q.   Do you see now, focusing on the second page of
4         Exhibit 80, this appears to be a letter from
5         Sherif Abdelhak to David Sculley dated
6         August 2, 1996?
7    A.   The letter to David Sculley?
8    Q.   Yes.
9    A.   Um-hum.
10   Q.   And do you recall that Mr. Sculley was a fellow
11        member of the executive committee of the AHERF
12        board of trustees?
13   A.   No, I don't. I don't specifically recall that.
14        I don't know. I do not recall he was or
15        was not a member of the executive committee.
16   Q.   Do you recall that he was on the board with
17        you?
18   A.   Yes, I believe so.
19   Q.   And you see the first page of the exhibit
20        there's a handwritten note sent to AHERF
21        executive CMT, and then a list of half a dozen
22        or so names that include yours?
23   A.   Um-hum.
24   Q.   Do you recall receiving this letter from
25        Mr. Abdelhak about acquisition of entities in

Page 130

1         the Graduate Health System?
2    A.   No, I do not.
3    Q.   Do you recall that in 1996 AHERF announced that
4         it was acquiring entities in the Graduate
5         Health System?
6    A.   No, I do not.
7    Q.   Do you remember, regardless of the time frame,
8         that at some point AHERF acquired entities in
9         the Graduate Health System?
10   A.   Yes.
11   Q.   How did you first learn about that?
12   A.   I don't recollect.
13   Q.   Do you know whether AHERF management consulted
14        you or any other members of the board of
15        trustees before deciding to make that
16        acquisition?
17   A.   I do not. No, I do not recollect. I can't
18        speak to other trustees. I don't recollect
19        them reviewing it with me.
20   Q.   Did you approve AHERF's acquisition of entities
21        from the Graduate Health System?
22   A.   I have no recollection.
23   Q.   Do you remember anything about a discussion
24        that may have taken place among members of the
25        board on that topic?

Page 131

1    A.   The only real discussion I recollect on the
2         subject was why the management wanted to do it,
3         and the management wanted to do it because they
4         had, if I remember correctly, an absolutely
5         terrific heart program at Graduate, and by
6         merging or acquiring Graduate, it would have
7         put that superb health -- or heart program into
8         Hahnemann which would have made Hahnemann a
9         much stronger medical school.
10   Q.   When you say that they had a terrific heart
11        program at Graduate, I've heard of the heart
12        program at Hahnemann but not at Graduate. So I
13        just want to be sure that we're talking about
14        the same acquisition.
15   A.   I'm quite sure I'm correct.
16   Q.   Okay.
17   A.   You might prove me wrong, but I'm quite sure
18        I'm correct.
19   Q.   And do you remember who in AHERF management
20        made those statements you're talking about
21        about the terrific heart program at Graduate?
22   A.   No, I do not.
23   Q.   Do you remember any review performed by the
24        AHERF board of trustees regarding possible
25        financial implications of acquiring entities in

Page 132

1         the Graduate Health System?
2    A.   I do not.
3    Q.   Do you recall giving any consideration to the
4         fact that the Graduate hospitals would come
5         with associated debt burden?
6    A.   Not -- no, I do not.
7    Q.   Did you learn anything at the time about the
8         pre-existing financial condition of the
9         Graduate Health System?
10   A.   I knew they were in -- I don't know at which
11        meeting I learned it, but I knew they were in
12        tough shape financially, but, as I told you,
13        the reason that was given for the acquisition
14        was not the financial plus, but the heart
15        program, and the intention was to close down at
16        least one of the hospitals which would have
17        helped the bottom line.
18   Q.   When you say that you knew that the Graduate
19        hospitals were in tough shape, can you remember
20        anything more specific about that?
21   A.   I do not.
22   Q.   Did you learn that various other institutions
23        that had looked into acquiring hospitals in the
24        Graduate Health System had backed away and
25        declined to do so?

33 (Pages 129 to 132)

J DAVID BARNES

Page 165

1     sense that, as I told you, I paid a lot of
2     attention to the total cash flow, and in this
3     year, if all the numbers had been rock solid
4     and so forth, we had a total cash flow of
5     something like $22 million plus $100 million.
6     So the cash flow in that year was -- the cash
7     flow in this year, as indicated by the
8     financial statement to which this was attached,
9     was something like 125 to 30 million dollars.
10    So although I heard people talking about cash,
11    on the other hand, I was thinking about, well,
12    if you're earning 100 -- generating that much
13    cash, life can't be that tough
14  Q.   Did you ask yourself why it was then that
15    Coopers & Lybrand was reporting that the
16    management of cash in the AHERF system had been
17    very demanding throughout the year?
18  A    Oh, I knew it was. I knew that cash was an
19    issue, and it had been a demanding challenge
20    for the finance department. I had no idea it
21    was as serious as it ultimately proved to be,
22    but, nonetheless, I knew it was an issue.
23  Q.   Certainly Coopers & Lybrand said it was
24    serious, right?
25  A.   That's correct.

Page 166

1   Q.   They said it was very demanding?
2   A.   That's correct.
3   Q.   On the top of the next page, page 71, do you
4     see the second sentence reads:  The next year
5     will be a critical year as the organization
6     must begin to realize operational efficiencies
7     as well as revenue enhancements from the
8     affiliations that it has consummated in the
9     past two years, in addition to the extensive
10    physician network that has been assembled?
11  A.   Um-hum.
12  Q.   That prediction certainly turned out to be
13    true, didn't it?
14  A.   It became true 15 days later
15  Q.   So already in October 1997, you knew that 1998
16    would be a critical year for AHERF?
17  A.   15 days later. That's right. The finance
18    committee met 15 days later on October 30 --
19  Q.   Right.
20  A.   -- when we saw first quarter earnings of a loss
21    of $42 million.
22  Q.   And you concluded then, by October 30, that
23    financial results were poor, right?
24  A.   For which period?
25  Q.   For the most recent period.

Page 167

1   A    For the --
2         MR. WHITNEY:  I have a feeling that
3     there's a little cat and mouse going on here.
4         MR. RYAN:  No  I'm not trying to
5     play cat and mouse
6         MR. WHITNEY:  For which period? For
7     the most recent period  It sounds like an
8     argument I have with my wife.
9   BY MR. RYAN:
10  Q.   Let me step back.
11        If I've understood you right, you
12    attended a meeting of the finance committee on
13    October 30, 1997 where you were presented,
14    among other things, with management's unaudited
15    results for the first quarter of fiscal year of
16    1998?
17  A.   That's correct.
18  Q.   That is the three months ending September 30,
19    1997?
20  A.   Um-hum.
21  Q.   And that was then the most recent period, was
22    it not?
23  A.   Um-hum.
24  Q.   And you concluded that the financial results
25    were very poor, didn't you?

Page 168

1   A    Yes  I'd phrase it more strongly, but, yes.
2   Q.   How would you phrase it?
3   A.   Dreadful.
4   Q.   Dreadful?
5   A.   Dreadful. Yeah
6   Q.   Do you know whether other people in attendance
7     at that meeting shared your view that these
8     were dreadful financial results?
9   A.   I don't know how anybody felt.
10  Q.   Well, did anybody express a view as to what
11    they thought?
12  A.   You mean in addition to me?
13  Q.   Yes.
14  A    I can't answer that question  I can't
15    recollect whether they did or they didn't, but
16    if they didn't, they must have been asleep,
17    because nobody that size can lose $42 million a
18    quarter and not have problems
19  Q    And as we now know with the benefit of
20    hindsight, 1998 was a critical year for AHERF,
21    was it not?
22  A.   Well, yes, it was, but I guess the question I'm
23    thinking about is whether it was a critical
24    period or the critical period.  I suppose I
25    think the critical period was the last half of

42 (Pages 165 to 168)

J. DAVID BARNES

Page 169

1    '97, the first two fiscal quarters of fiscal
2    '98.
3    Q.   And why do you believe that that was the
4    critical period at AHERF?
5         MR. MCCLENAHAN: Can you be more
6    clear on what period you're talking about,
7    again? In terms of calendar or fiscal years,
8    what months you're talking about?
9         THE WITNESS: Sure. Yes. I would --
10   what I said was I would guess that the most
11   critical period for AHERF had been the first
12   two fiscal quarters of fiscal '98.
13        MR. MCCLENAHAN: Are you talking
14   about July 1, '97 to December 31, '97?
15        THE WITNESS: Yes.
16        MR. MCCLENAHAN: Okay. Thank you.
17   BY MR. RYAN:
18   Q.   And why do you believe that that was the most
19   critical period for AHERF?
20   A.   Well, the first thing was an absolutely massive
21   storm warning signal which went up on
22   October 30 when we saw the first quarter
23   results which were, you know, just disastrous
24   to lose $42 million, and then the question is
25   that I told the finance committee and the board

Page 170

1    that we just had to get $168 million of costs
2    out that year, that fiscal year.
3    Q.   Which was 42 times four?
4    A.   Huh?
5    Q.   Which was 42 times four?
6    A.   That's correct. And I also asked the finance
7    department to do a more sophisticated analysis
8    of that issue, because 42 times 42 isn't the
9    most sophisticated job that could be done, and
10   report back, which they did, about year end,
11   and they said we needed to get $200 million
12   out. So we had to get somewhere in the order
13   of magnitude of $168 to $200 million in costs
14   out.
15        Abdelhak's solution to the problem
16   was to sell those two -- the two of the
17   Philadelphia operations, which I was willing to
18   give him all the moral support I could, but I
19   was very skeptical about whether they'd ever
20   get sold or sold for any meaningful amount of
21   money, because most of that $42 million loss
22   was Philadelphia, and I couldn't understand
23   why -- who you're going to find who's willing
24   to pay big money for something that's losing,
25   say, $40 million a quarter, and I felt that if

Page 171

1    there was a solution to the problem, we had to
2    get -- it had to be done by getting costs out
3    and promptly.
4         I said that to Sherif about every ten
5    days from then till the spring of '98, and he
6    kept -- I guess he was the same way I was
7    sympathetic to his thing, but not -- didn't
8    believe in it. He was, I guess, giving me the
9    reverse treatment, because he kept telling me
10   that costs were coming out, not to worry, and
11   finally got to the spring and they weren't
12   coming out -- and had not come out, put it that
13   way, and so I think that if there had been an
14   opportunity to solve -- to save AHERF, it was
15   in that time frame. If you had a tough enough
16   manager, maybe, but by the time you got to the
17   end of the year, it was over the hump. Now,
18   that's all hindsight. At the time I didn't
19   know that the thing was in as tough shape as it
20   actually was.
21   Q.   But at least by October 30 of 1997, you had
22   seen the massive storm warning signal?
23   A.   Right.
24   Q.   Just before we put this book aside, because I
25   want to follow up on some of these things you

Page 172

1    said, let me just ask you another question
2    about the book.
3         Do you see that beginning on page 10
4    there's a document called AHERF Consolidated
5    Financial Statements for the Year Ended June
6    30, 1997, and it's stamped in the upper right
7    draft?
8    A.   Um-hum.
9    Q.   And if you turn two pages to page 12, do you
10   see here a report of independent accountants
11   which is unsigned and for which the dating is
12   incomplete at the bottom and is again stamped
13   draft?
14   A.   Um-hum.
15   Q.   Do you recall that at this October 15, 1997
16   meeting of the audit committee of AHERF, you
17   did not receive, as was customary by this time
18   in prior fiscal years, final audited financial
19   statements from Coopers & Lybrand?
20   A.   Um-hum.
21   Q.   Yes?
22   A.   Do I recall it?
23   Q.   Yes.
24   A.   Yes, I do recall it. Yes.
25   Q.   Do you recall whether you ever received --

J. DAVID BARNES

Page 173

1  A.  Yes.
2  Q.  -- final audited financial statements for
3     fiscal year 1997 with a report-- signed report
4     from Coopers & Lybrand?
5  A.  Yes.
6  Q.  When was that?
7  A.  January of next year, '98.
8  Q.  Is it possible it was in February or is there
9     something you specifically associate with
10    January?
11  A.  Well, I think --
12  Q.  I realize the importance of the January date,
13    but I'm asking you whether there's a specific
14    way you recall receiving them in January?
15  A.  Well, I had thought that the audited -- the
16    signed audited financial statements for
17    June 30, '97 were received in January of '98.
18    Now, maybe if you have something to
19    demonstrate, maybe it was February, but I
20    strongly remember they came in January.
21  Q.  Okay. In any event, by the time that you did
22    receive the signed Coopers & Lybrand report of
23    1997 -- fiscal year 1997 annual financial
24    statements, that was several months after the
25    massive storm warning signal from October,

Page 174

1    right?
2  A.  Um-hum. Are you finished with that exhibit?
3  Q.  I am. Yes, sir.
4       Let me mark, please, as Exhibit 1654
5    a four-page document with Bates Nos. JB 00469
6    through 472.
7         - - - -
8    (Exhibit 1654 marked for identification.)
9         - - - -
10  BY MR. RYAN:
11  Q.  Do you recognize the handwriting in Exhibit
12    1654, Mr. Barnes?
13  A.  Yes.
14  Q.  Whose is it?
15  A.  I did it.
16  Q.  And at some point in time did you send this to
17    Ira Gumberg?
18  A.  Probably, or handed it to him. Somehow. A
19    copy was intended for Ira in any case.
20  Q.  Do you recall why you prepared these notes?
21       MR. MCCLENAHAN: Why don't you take a
22    minute and read through the notes, Mr. Barnes.
23       THE WITNESS: Okay. Okay.
24  BY MR. RYAN:
25  Q.  Do you recall why you prepared these notes?

Page 175

1  A.  Yes. There was a meeting with MBIA, and
2    various people met with them. They had an
3    agenda. I can see it in my mind's eye, but I
4    can't tell you. AHERF -- or Sherif met with
5    them. Ira and I were asked to meet with them.
6    There must have been a couple other people,
7    because the agenda, which I can see in my
8    mind's eye, had three or four meetings, and the
9    question was what Ira and I -- what we should
10    talk about, and this was a shot at that.
11       MR. MCCLENAHAN: This was a shot did
12    you say?
13       THE WITNESS: This was a shot to Ira
14    about what we ought to talk about.
15  BY MR. RYAN:
16  Q.  Was this a meeting with MBIA in the spring of
17    1998?
18  A.  Yes.
19  Q.  Do you recall that it was a meeting in
20    connection with a proposed refinancing of
21    western region debt?
22  A.  No.
23  Q.  On the last page, page 4 --
24  A.  The last page?
25  Q.  Right.

Page 176

1  A.  Um-hum.
2  Q.  Could you read the last bullet point to us,
3    please? There's two sentences there after the
4    final bullet point.
5  A.  Did not forecast or plan 1997, 1998 revenue
6    decline, but did react quickly. In roughly six
7    months this board saw the first quarter
8    figures, much has been done.
9  Q.  And the much is underlined?
10  A.  Yeah.
11  Q.  And when you're referring there to the first
12    quarter figures, that's, again, the first
13    quarter of fiscal year 1998?
14  A.  Yes.
15  Q.  Can you explain what you meant when you wrote
16    that AHERF reacted quickly to the 1997 to '98
17    revenue decline?
18  A.  Well, at this point in time, I told you I was
19    talking endlessly with Sherif, and Sherif was
20    strongly -- I mean, he was very competitive or
21    very forceful in saying he was getting costs
22    out, and they had fired, I don't know, 1,800
23    people in Philadelphia or something like that
24    and they had done something else, and they were
25    really making progress in getting the costs

LEGALINK MANHATTAN (212) 557-7400

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## J. DAVID BARNES
*July 9, 2003*

---

# LEGALINK MANHATTAN

*420 Lexington Avenue – Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

BARNES, J. DAVID  - Vol. 2



**LEGALINK®**

A WORDWAVE COMPANY

J. DAVID BARNES

Page 265

1  A   Not that I recollect
2  Q   If you had heard that view expressed earlier,
3      do you know one way or the other how that would
4      have affected decisions taken by the AHERF
5      board of trustees?
6          MR. MCCLENAHAN:  Object to the form
7      of the question  It's hopelessly vague, but
8      you can answer it if you're able to
9  A   Well, this would, you know, sort of fly in the
10      face of the logic that had prevailed for a long
11      time  So whoever had this issue, they had the
12      burden of proof of getting people to accept it,
13      which, I guess, maybe you could
14          Then the second question is, okay,
15      this is the ones that don't have a medical
16      school affiliation  What's the other side of
17      the coin?  How many do?  That's all I can see
18      that's in this at earlier times  I don't know
19      what -- I have no idea what you'd have saw if
20      you asked the other side of the coin, which
21      hospitals do have a medical school affiliation?
22      You might have a list that's three times this
23      long  I don't know
24  Q   After you received this June 9, 1998 letter
25      from MBIA, did you do anything to follow up to

Page 266

1      learn any additional information on this topic?
2  A   No
3  Q   Let me mark, please, as Exhibit 1669 a one-page
4      letter dated -- Bates stamped, rather, TACO
5      52826
6          - - - -
7      (Exhibit 1669 marked for identification )
8          - - - -
9  BY MR RYAN:
10  Q   If you could let me know, Mr Barnes, when
11      you've had a chance to review the letter
12  A   I've read it
13  Q   This is a June 5, 1998 letter from W P Snyder,
14      III to Sherif Abdelhak?
15  A   That's correct
16  Q   Have you seen this letter before?
17  A   Yes
18  Q   This is the letter in which Mr Snyder informed
19      Mr Abdelhak that the executive committee was
20      removing him as president and chief executive
21      officer of AHERF?
22  A   That's correct
23  Q   And there's reference here to a meeting of the
24      executive committee duly called and held on
25      June 5, 1998  Do you recall that meeting?

Page 267

1  A   Yes
2  Q   And what do you remember about that meeting?
3  A   I recall the meeting  The issue --
4      was the termination or non-termination of
5      Mr Abdelhak  The committee decided in the
6      affirmative to terminate him, and that, of
7      course, was what precipitated this letter
8  Q   How long in advance of that meeting did you
9      learn that there was consideration being given
10      to terminating Mr Abdelhak?
11  A   I can't recollect a date -- a particular date
12      where that would have been -- have occurred,
13      put it that way
14  Q   But you heard about that at some point before
15      the actual meeting that day?
16  A   I didn't hear about it so much as, perhaps,
17      among others, but in any case, precipitated it
18  Q   But what role did you play in precipitating it?
19  A   Well, I ultimately lost confidence in Sherif,
20      and so -- and I didn't really know how you go
21      about removing somebody in that sort of a
22      circumstance, so I went to a lawyer who has
23      been a good friend and had some relationship
24      with AHERF, a very senior lawyer, and asked him
25      how one went about this, and as a consequence

Page 268

1      of that, I went and talked to Mr Snyder and
2      learned that other people had been talking with
3      Mr Snyder  So Mr Snyder then terminated --
4      or then agreed to have this committee
5      meeting -- or this executive committee meeting
6      which resulted in his termination
7  Q   Who was the lawyer whom you consulted?
8  A   Queenan  Chuck Queenan  C J Queenan
9  Q   He's a lawyer at the law firm of Kirkpatrick &
10      Lockhart?
11  A   Um-hum
12  Q   And you knew Mr Queenan, also, because he was
13      a member of the board of AHERF or one of its
14      affiliates?
15  A   No  He was not a member of the board of AHERF
16      I don't think he was a member of anything else
17  Q   Had you interacted with Mr Queenan on
18      AHERF-specific matters before?
19  A   Very little
20  Q   Did those matters involve your asking him for
21      legal advice?
22  A   No. I wasn't asking for legal advice, so the
23      answer is no, I guess
24  Q   What were those other matters where you spoke
25      with Mr Queenan about AHERF?

17 (Pages 265 to 268)

J. DAVID BARNES

Page 269

1    A    Sherif had mentioned some time in, I guess, the
2         May period of -- this is very foggy in my
3         mind -- of perhaps a substantial write-off in
4         the east or perhaps the accounting people in
5         the east had not done things appropriately, and
6         so I had talked about let's investigate and get
7         the facts, and I think Sherif and I had talked
8         with Queenan in the May time frame on that
9         issue, but I'm not really clear on the details
10        of that affair
11   Q    Was it your understanding that Mr Queenan was
12        to investigate this accounting issue?
13   A    I guess he was really -- our real consultation
14        was to ask him what we would do about it, and
15        if he volunteered to help us, then so be it
16   Q    Did you ever hear back from Mr Queenan about
17        what the results may have been of any
18        investigation?
19   A    I don't think he had time to do any work -- any
20        significant work until the termination of
21        Sherif
22   Q    Did you ever hear back from him at all about
23        any work he may have done?
24   A    No  He had done nothing that can I recollect
25   Q    So after you spoke with Mr. Queenan, you went

Page 270

1         to speak with the chairman of the board,
2         Mr Snyder, is that right?
3    A    That's correct  As I recollect, that's
4         correct
5    Q    And what did you tell Mr Snyder in that
6         meeting?
7    A    I told him that I had lost my confidence in
8         Abdelhak, and that I strongly urged that we
9         ought to terminate him and replace him with
10        someone else
11   Q    Did Mr Snyder say anything to you about who
12        else had approached him about terminating
13        Mr Abdelhak?
14   A    No, I can't -- he perhaps did, but I can't
15        recollect any comments of Snyder
16   Q    Did you speak to anybody else other than
17        Mr. Queenan and Mr. Snyder about whether
18        Mr Abdelhak should be terminated before this
19        executive committee meeting?
20   A    I can't recollect any
21   Q    Do you remember hearing something about a
22        petition among doctors at Allegheny General
23        Hospital to remove Mr. Abdelhak?
24   A    No
25   Q    Did you give any consideration as to whether

Page 271

1         the executive committee should remove
2         Mr Abdelhak or whether that was an issue for
3         the full board of trustees?
4    A    I did not, no
5    Q    Do you know whether any other members of the
6         board of trustees other than those on the
7         executive committee were consulted before this
8         meeting?
9    A    I do not know that
10   Q    What can you recall about the views that may
11        have been expressed by those who attended the
12        June 5, 1998 executive committee meeting?
13   A    I can't recollect the views of the
14        individual -- of the people that were there
15   Q    Do you remember whether you spoke out at that
16        meeting in favor of removing Mr. Abdelhak from
17        his position?
18   A    I do not recollect whether I did or did not
19   Q    Do you remember anybody expressing a contrary
20        view and urging that Mr. Abdelhak be retained?
21   A    No, I do not remember that either
22   Q    I believe you mentioned that when you spoke to
23        Mr Snyder prior to the June 5 meeting, he told
24        you that others had approached him about
25        terminating Mr. Abdelhak  Did he himself

Page 272

1         express any views to you at that meeting about
2         what he thought about whether Mr Abdelhak
3         should be terminated or not?
4    A    I don't recollect whether he did or didn't
5    Q    Who succeeded Mr Abdelhak as chief executive
6         officer of AHERF?
7    A    Mr Sanzo
8    Q    And how was Mr. Sanzo selected for that
9         position?
10   A    He was -- his name was put forth before a
11        committee, I presume the same committee, and it
12        was agreed that he would be, among the horses
13        we had, a good candidate
14   Q    Do you recall who nominated Mr. Sanzo for the
15        position?
16   A    I cannot recall that
17   Q    Do you recall whether there were any other
18        candidates considered to replace Mr Abdelhak
19        as CEO?
20   A    I do not recall any other candidates
21   Q    Did you give any consideration to bringing
22        anybody in from outside the organization to
23        provide fresh outside leadership?
24   A    Not in that time frame, no
25   Q    Was there any time frame in which you

18 (Pages 269 to 272)

J. DAVID BARNES

Page 273

1    considered that?
2  A.  No
3  Q.  Do you remember any other member of the board
4      of trustees suggesting that somebody be brought
5      in from the outside to be CEO?
6  A.  I do not remember anybody doing that
7  Q.  Do you recall that by this time, Dr. Kaye had
8      resigned from his position?
9  A.  No, I don't recall that
10 Q.  Did you ever learn why Dr. Kaye resigned?
11 A.  I don't remember -- I don't recollect knowing
12     why Kaye resigned other than the general broad
13     range of problems that we're all familiar with
14 Q.  I take it then that you never spoke to Dr. Kaye
15     about that matter?
16 A.  No, I don't recollect talking with Dr. Kaye
17     about that
18 Q.  What led you to -- well, strike that.
19     Did you believe in June 1998 that
20     Mr. Sanzo would be a good CEO for AHERF?
21 A.  Well, things were moving very rapidly then
22     You had to have a horse. I mean, we couldn't
23     necessarily worry about whether this is the
24     best horse. You had to have a horse. I
25     thought he was a good candidate for the job at

Page 274

1      the time involved. Now, if everything had gone
2      along superbly, would he have been a good
3      permanent horse? I don't know the answer to
4      that. That's a different question
5  Q.  What led you to believe that Mr. Sanzo would be
6      a good CEO at least at that time?
7  A.  Well, he had, I think, done a good job running
8      Allegheny General Hospital and was a
9      conscientious, hard-working fellow. So, I
10     think given the alternatives, he was a good
11     choice
12         MR MCCLENAHAN:  You know, Mr. Ryan,
13     I'm going to cut this off pretty soon. I've
14     read the complaint. I've read the answer. I
15     can't imagine how any of this relates to your
16     lawsuit. I just can't imagine how it could
17     lead to the discovery of admissible evidence
18     You know, whether Sanzo is the right horse or
19     the wrong horse is just not relevant, unless
20     you tell me it is
21         MR. RYAN:  I believe it to be highly
22     relevant
23         Let me mark, please, as Exhibit 1670
24     a document with Bates Nos. JB 00375 to 76
25         - - - -

Page 275

1        (Exhibit 1670 marked for identification.)
2         - - - -
3         MS. MEADEN:  This is Exhibit 1670?
4         MR. RYAN:  Yes
5  BY MR. RYAN:
6  Q.  Do you recognize Exhibit 1670, Mr. Barnes?
7  A.  Only by the fact that it looks like my
8      printing. Otherwise, I don't recollect it
9  Q.  All right. Based on how you date your notes,
10     do you believe these are handwritten notes you
11     made on or around June 4 of 1998?
12 A.  Um-hum
13 Q.  Do you see the third bullet point reads, if I'm
14     reading your handwriting right:  Keep $400 to
15     $60 deals together?
16 A.  I see that
17 Q.  Do you recall what that refers to?
18 A.  No, I do not
19 Q.  On the second page, do you see the fifth bullet
20     point appears to read:  Put someone interim or
21     otherwise in charge of Philadelphia hospitals,
22     and then there's the name Meg McGoldrick with a
23     question mark, and in the margin, there's the
24     name Harry Edelman?
25 A.  Um-hum

Page 276

1  Q.  Do you recall what those notes refer to?
2  A.  I do not
3  Q.  Who was Meg McGoldrick?
4  A.  She was a person in the Philadelphia scheme of
5      things, if you want to put it that way. I
6      don't recollect her, nor do I recollect what
7      her job was. The name is familiar to me, but
8      that's sort of it
9  Q.  Do you recall whether any consideration was
10     given to putting her in charge of the
11     Philadelphia hospitals?
12 A.  I do not recollect that.
13 Q.  Do you remember anything that Mr. Edelman may
14     have said about who he felt should be put in
15     charge of the Philadelphia hospitals?
16 A.  I do not
17 Q.  Do you recall that at some point after
18     Mr. Abdelhak was let go, David McConnell was
19     let go as chief financial officer of AHERF?
20 A.  Um-hum. Yes, I recall that.
21 Q.  Do you know how that decision was reached?
22 A.  I don't -- I didn't make it, so I don't recall
23     how that decision was reached
24 Q.  Do you know who did make that decision?
25 A.  No, I do not know.

19 (Pages 273 to 276)

J. DAVID BARNES

Page 289

1  Q.  Do you remember anything about a process in
2     which trustees evaluated AHERF's governance
3     system?
4  A.  I don't recollect -- I don't recollect that
5     with respect to AHERF.
6  Q.  Do you recall any comments that any other
7     trustees ever expressed to you about AHERF's
8     governance system?
9  A.  No, I don't recall any comments from anybody
10    else about the governance system.
11 Q.  Do you remember any trustee ever criticizing
12    how board meetings were run?
13 A.  Well, it depends on the time frame. In this
14    '95 time frame, no. Later on, as I told you
15    yesterday, as the mergers had taken place,
16    there were more and more trustees, more and
17    more meetings and so forth, there began to
18    develop a view that we ought to review the
19    management system to see if there's a better
20    way to do it, and that, as you know, was
21    commencing to be done when things fell apart.
22 Q.  Do you recall any comments that any particular
23    board member may have made during that time
24    about the need to restructure the board system?
25 A.  No, I do not.

Page 290

1         MR. RYAN: Okay. I think I may be
2  done. Why don't we, if it's agreeable to
3  everybody else, break for lunch, and I'll
4  review my notes and see whether I have anything
5  else. Is that fine with everybody else?
6         MR. WHITNEY: Well, I have only
7  between 15 minutes and 30 minutes of questions.
8  I'd leave it to all of you folks as to whether
9  or not you want to wait for him to review his
10 notes and do this without the need for the
11 intervention of lunch or whether you want to
12 have lunch. It's not my call. You all do what
13 you all want to do.
14        MR. RYAN: Why don't we just go off
15 the record and talk about the scheduling.
16        THE VIDEOGRAPHER: We're now going
17 off the record. The time on the screen is
18 12:06.
19         - - - -
20 (There was a recess in the proceedings.)
21         - - - -
22        THE VIDEOGRAPHER: We're now back on
23 the record. The time on the screen is 12:30.
24        MR. RYAN: Let me mark, please, as
25 Exhibit 1674 a document with Bates Nos.

Page 291

1     JB 02166 through 68.
2         - - - -
3     (Exhibit 1674 marked for identification.)
4         - - - -
5  BY MR. RYAN:
6  Q.  My question to you about this document,
7     Mr. Barnes, is simply this: You've mentioned,
8     I think, a number of times now that there was
9     at some point a board of trustees restructuring
10    instituted at AHERF, and does this November 6,
11    1997 letter reflect that restructuring that you
12    previously testified about?
13 A.  Okay.
14        MR. RYAN: Can you read the question,
15    please?
16         - - - -
17    (The record was read back by the Reporter.)
18         - - - -
19 A.  Yes, this letter reflects that restructuring
20    that we talked about.
21 Q.  Let me hand you now what's previously been
22    marked as Exhibit 1597, and my question,
23    Mr. Barnes, about this document is whether you
24    recall being shown some or all of the schedules
25    in this document before?

Page 292

1  A.  I don't recollect any familiarity with any of
2     these schedules.
3  Q.  All right. Next topic. Do you recall having
4     discussions in the summer or fall of 1998 with
5     Jim Stalder of PriceWaterhouseCoopers?
6  A.  Yes.
7  Q.  And what do you recall about those discussions?
8  A.  Somewhere in the time frame here, I guess it
9     must have been in the second quarter or
10    something of '98, Coopers & Lybrand merged with
11    PriceWaterhouse, and Stalder had been the local
12    manager for PriceWaterhouse, and he was a
13    friend of mine, a nice guy, and I was still
14    working then -- no, I wasn't. I had an office.
15    I guess he came to my office. So, in any case,
16    he came to my office once, and maybe a second
17    time. He came twice, and either or both times
18    or the second time, he had with him a guy by
19    the name of Corby, something like that.
20 Q.  Corby?
21 A.  Corby, I guess it was, and they came to talk
22    about the AHERF situation. That's what I
23    recollect in response to your question.
24 Q.  So this was one or two meetings at an office
25    that you maintained at Mellon Bank?

23 (Pages 289 to 292)

LEGALINK MANHATTAN (212) 557-7400

J. DAVID BARNES

Page 293

1  A.  Yes.
2  Q.  And what do you recall either Mr. Stalder or
3      Mr. Corbly saying about AHERF?
4  A.  I don't recall specifically what they were
5      saying.
6  Q.  Do you recall generally what the topic of the
7      conversation was?
8  A.  Well, they wanted to talk about -- this was
9      after the bankruptcy, and they wanted to talk
10     about the bankruptcy and the causes and the
11     this and the that, and I didn't really want to
12     get into that with them, so I told them if they
13     wanted to get involved, I'd shuck them off to
14     the lawyers who were then involved with the
15     thing, and that was sort of the end of my
16     contact with them.
17 Q.  Do you recall Mr. Stalder telling you that
18     PriceWaterhouse had discovered the possibility
19     of fraud by AHERF management causing a material
20     misstatement in AHERF's financial statements?
21 A.  No, I don't recollect that.
22 Q.  Are you saying that you recall that that didn't
23     happen or that you can't recall either way?
24 A.  I can't recall either way what was said.
25 Q.  I don't know whether we've had occasion in the

Page 294

1      last two days to mention an entity known as
2      AHSPIC, the Allegheny Health Services Provider
3      Insurance Company?
4  A.  To my knowledge, we have not.
5  Q.  Is that an entity with which you had
6      familiarity while you were on the AHERF board?
7  A.  Yes.
8  Q.  That was an insurance company?
9  A.  Yes.
10 Q.  Did you attend meetings related to AHSPIC?
11 A.  I attended their annual meeting.
12 Q.  And where was their annual meeting held?
13 A.  Grand Cayman.
14 Q.  That's in the Cayman Islands?
15 A.  Um-hum.
16 Q.  And was it typical for a number of members of
17     the board often accompanied by spouses to be on
18     this trip?
19         MR. MCCLENAHAN:  Objection to the
20     form.
21 A.  I really can't answer.  I can't answer that.  I
22     don't know about the spouse part of the issue.
23     Obviously, there were a number of people that
24     attended the meeting, yes.  The spouses, I
25     don't know.

Page 295

1  Q.  Okay.  Were there a number of other members of
2      the board of trustees of AHERF apart from you
3      present at these meetings in the Cayman
4      Islands?
5  A.  I can't answer that.  I don't know.  I think it
6      was -- my impression is it was AHERF -- I mean,
7      AHSPIC, whatever it is.  My impression is it
8      was trustees of the insurance company who were
9      there and not other people.
10 Q.  I see.  Did you think that there was anything
11     inappropriate about these meetings in the
12     Cayman Islands?
13 A.  No.  No.  As you probably know, they were very
14     common in the industry.  You would get off the
15     plane, and there would be the Pittsburgh people
16     and the University of Pennsylvania people or
17     somebody getting on the plane.
18 Q.  And in your understanding, this had to do with
19     rules governing offshore insurance companies
20     that the meetings had to be held out of the
21     country?
22 A.  That's correct.
23 Q.  Did you ever have occasion to discuss with
24     anyone at AHERF a concept known as the bad
25     bank?

Page 296

1  A.  No.
2  Q.  Is that a concept with which you are familiar?
3  A.  Yes.
4  Q.  From your time at Mellon Bank?
5  A.  My banking business, yeah.
6  Q.  Do you recall ever talking about that with Dave
7      McConnell?
8  A.  No.
9  Q.  Or any concept that was based on the bad bank
10     idea?
11 A.  No.
12         MR. RYAN:  That's all I have.  Thank
13     you very much for your patience and your time
14     over the last day-and-a-half, Mr. Barnes.
15         THE WITNESS:  Thank you.
16         - - - -
17         EXAMINATION
18         - - - -
19 BY MR. WHITNEY:
20 Q.  Mr. Barnes, my name is Richard Whitney.  I'm
21     representing the Creditors Committee in the
22     litigation against PriceWaterhouseCoopers.  I
23     have just a few questions to ask you
24         During the course of your deposition,
25     there has been reference to a concern that you

24 (Pages 293 to 296)

J. DAVID BARNES

Page 297

1    expressed at least once, and perhaps more than
2    once, at the AHERF board level which was about
3    the quantity and quality of earnings. What is
4    meant or what do you mean by quality of
5    earnings?
6   A.   That term was used in connection with the
7        quantity, it was the $22 million or the six,
8        whatever the number was, but what I was
9        concerned about in both years, but particularly
10       in the year that they were $22 million, was the
11       organization was too reliant on investment
12       income and needed to get things changed around
13       so their core earnings were more -- were really
14       doing the job rather than being reliant on
15       investment income.
16  Q.   Given the fact that AHERF was in the hospital
17       business, what would its core earnings be?
18  A.   Well --
19           MR. MCCLENAHAN:  Do you mean what
20       would the source of the earnings be?
21           MR. WHITNEY:  Yes.
22  A.   The source of the earnings -- the way AHERF was
23       constructed, the source of the earnings would
24       have been the top -- the revenue lines at the
25       top minus expenses.

Page 298

1   Q.   In that AHERF was in the hospital business, a
2        source of earnings would be patient revenue, is
3        that right?
4   A.   Yes.
5   Q.   Would patient revenue be a core earning that
6        you were concerned about in 1995, 1996 and
7        1997?
8   A.   Yes.
9   Q.   You've testified that in reviewing financial
10       statements -- I believe you testified to this,
11       and if I'm wrong, you can correct me, but I
12       believe you said that your focus was on the
13       income statement or the statement of operations
14       more than the balance sheet, is that right?
15  A.   That's correct.
16  Q.   Why would that be?
17  A.   Because I think that demonstrates what you're
18       earning from your efforts, and in the final
19       analysis, those earnings are what make it
20       possible for you to achieve your mission.
21  Q.   From the standpoint of AHERF, and I want to --
22       I'm going to be focusing my questions on that
23       10-15-96 audit committee meeting which was the
24       meeting which you testified yesterday was when
25       you were presented with the audited financial

Page 299

1    statement of AHERF for fiscal year 1996.
2    Focusing on 1996, was there anything about
3    AHERF that would cause you to be especially
4    interested in the statement of operations as
5    opposed to the balance sheet?
6        MR. RYAN:  Objection.
7   A.   Yes.  It was important to the organization to
8        develop a good, healthy cash flow.
9   Q.   You had testified yesterday, I believe, that
10       AHERF was pursuing strategies in the mid 1990's
11       that related to growth and incorporation of
12       hospitals and medical schools, physician
13       practices.  Do you recall that testimony?
14  A.   Yeah.
15  Q.   In light of those strategies, I believe --
16       strike that.  I believe you also said that
17       those strategies had caused some short-term
18       cost to the organization, is that right?
19  A.   That's correct.
20  Q.   In light of those strategies and those costs
21       and in assessing AHERF's performance on a
22       year-to-year basis, would the income statement
23       or the statement of operations be especially
24       meaningful to you in gauging those operations
25       and the success of the strategy?

Page 300

1        MR. RYAN:  Objection.
2   A.   We were, as you know, basically trying to build
3        a viable medical system in the Philadelphia
4        market, the purpose of which was to really fund
5        a top quality medical school in Philadelphia,
6        and probably as good a measure of what kind of
7        progress we were making was the P&L.
8   Q.   All right.  When AHERF acquired these eastern
9        hospitals, was it your recollection that they
10       were profitable entities before AHERF acquired
11       them?
12  A.   No, it was not.
13  Q.   All right.  Is it your recollection that at
14       least Mr. Abdelhak's suggestion was that
15       although not profitable, they could become
16       profitable under the AHERF umbrella because of
17       efficiencies in the consolidation of the
18       consolidation of operations?
19  A.   That's correct.
20  Q.   Would a tracking of the statement of operations
21       from year to year to year provide you and other
22       members of the board, in your opinion, with
23       guidance as to whether or not that statement
24       was proven out?
25           MR. RYAN:  Objection.  Lack of

25 (Pages 297 to 300)

TAB  177

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## RICHARD L. SPIELVOGEL, M.D.,
*May 19, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

SPIELVOGEL, M.D., RICHARD L.



LEGALINK
A WORDWAVE COMPANY

Richard L. Spielvogel, M.D.
1
2  academic medical doctor who'd been in the
3  process of discussing things and coming to
4  conclusions to take it more direct. Now,
5  initially I took the attitude when I was on
6  his bandwagon that this was what we needed, we
7  had had too many wishy-washy people that
8  hadn't made decisions and because of that we'd
9  been failing. Both of these schools were
10  failing at the time they were acquired, so I
11  had hoped that it would turn it around.
12     Q. Now, when he made this comment
13  about, you know, he will he carry you on his
14  back or do you in, this was at an auditorium
15  in Hahnemann?
16     A. Yeah. It's in the new college
17  building on the first floor. I can't remember
18  the name of the auditorium.
19     Q. And who was the audience?
20     A. The audience was all of the faculty
21  at Hahnemann at the Center City campus.
22     Q. Do you recall any reaction when he
23  said that? Did people look around the room or
24  what do you remember about that?
25     A. Well, I remember Arthur Patchefsky,

Richard L. Spielvogel, M.D.
1
2  who is a well-known pathologist and in my
3  opinion one of the best surgical pathologists
4  who was in the department of pathology, saying
5  he won't need to carry me on my back -- he
6  said you won't need to carry me on your back
7  because I won't be here, and he did quit
8  shortly thereafter. That's a paraphrase of
9  what he said. I've always respected him.
10  He's head of pathology at Fox Chase now. I
11  always respected that he didn't like that type
12  of talk at that point in time when it was a
13  brand-new acquisition and, you know, stood up
14  for it.
15     Q. Now, the conversation that you had
16  with Mr. Abdelhak where he wanted to have
17  these meetings with the various Philadelphia
18  trustees and where you told him that you
19  thought the meetings were choreographed and
20  that kind of thing --
21     A. I said that -- well, I don't know if
22  I used those words. I said that I felt that I
23  wasn't really involved very much with the
24  meeting, that the role that the faculty
25  thought I had didn't exist, and, you know,

Richard L. Spielvogel, M.D.
1
2  could I be on some committee or could there be
3  some mechanism where I could better represent
4  these people because I felt that I was
5  appointed to the trustees -- I realize there
6  are different responsibilities of a trustee
7  and so forth, but I thought that the reason
8  for having a faculty trustee was to represent
9  and convey the concerns of the faculty, you
10  know, versus the banks or the other hospitals
11  in the system or something of that nature.
12     Q. In terms of the timing of that
13  meeting -- you may have answered this already
14  but just for the record -- that would have
15  been in late '95, you think?
16     A. Late '95 or early '96. And it was
17  sometime -- I had been to several meetings
18  before that happened.
19     Q. And you said that he didn't get back
20  to you. Did you raise any of your concerns
21  about your role within the governance system
22  with Mr. Abdelhak after that?
23     A. No. I never had another direct
24  one-on-one meeting with him.
25     Q. And did you ever -- did anything

Richard L. Spielvogel, M.D.
1
2  happen after that meeting that made you change
3  your mind about the fact that you thought that
4  the meetings were choreographed, et cetera?
5     A. Well, that was -- we alluded to this
6  in a previous question. That along with my
7  feel that the system wasn't really doing what
8  it had hoped to do began to change my
9  enthusiasm for the project. And I at least
10  internally became less a supporter of what was
11  going on in general. Naturally, I was happy I
12  was earning a good salary, the dermatology was
13  going well, children in high school. I
14  thought about leaving again at that point and
15  decided not to.
16     Q. You said internally you became less
17  of a supporter. Was there anything external
18  that you did to show a lack of support for
19  Mr. Abdelhak's strategies?
20     A. No, no. I mean, I would comment at,
21  say, the Hahnemann Hospital executive
22  committee meeting or the dean's meetings and
23  so forth. I would point out how we're not
24  integrating the system at all in my opinion.
25  The goals when I go to these meetings and read

## Page 53

Richard L. Spielvogel, M.D.

1  
2  these executive journals or papers or articles
3  that would come out, the goals of the
4  integrated system really weren't occurring.
5  The management in my opinion was poor up and
6  down the line. And the point that I came into
7  greatest conflict with it was for the billing
8  for the professional services. I did play a
9  role in selecting a new billing manager from
10 University of Pennsylvania who came over and
11 then left about a year later, but the changes
12 to integrate the practice simply weren't
13 happening.
14     Q. Tell me about the billing problem
15 and then the changes that you tried to --
16     A. Well, the billing problem -- and I'm
17 not an expert on billing, but in that role I
18 did meet with the billing people every other
19 week. And in a simplistic view, if you take
20 your gross bills minus what you've agreed not
21 to accept, you come to a net figure, and that
22 we were only collecting about 50 percent of
23 that. And when I would go to meetings such as
24 the one in Washington but another one called
25 the Association of American Medical Colleges

## Page 54

Richard L. Spielvogel, M.D.

1  
2  had a subgroup called the clinical practice
3  group where individuals in positions like mine
4  would meet, and I would go and hear lectures
5  on billing where the top ones were University
6  of Colorado and University of Connecticut.
7  They would give these -- they claimed they
8  were collecting 85, 90 percent. Michigan was
9  another one. And we were sitting down at 50,
10 60 percent, and there seemed to be no interest
11 in collecting this money or bringing in the
12 type of people who could do it and straighten
13 it out. It seemed to me like the efforts were
14 all involved in growth, rapid expansion --
15 this is again my personal thoughts -- and
16 instead of the day-to-day grind of making the
17 system work.
18     Q. And you thought this back in 1995?
19     A. I think I began to -- you know,
20 initially I had a euphoria for it, but I think
21 in that late '95-early '96 time period when I
22 realized that these folks did not seem
23 interested in gutting out the day-to-day work
24 it takes to make a system work smoothly with
25 what they had, they seemed more interested in

## Page 55

Richard L. Spielvogel, M.D.

1  
2  acquiring a large system not necessarily for
3  sale like you would taking something public
4  but in order maybe to control the price or be
5  the largest in town or something of that
6  nature. And it was broken at the base level
7  from the clinician viewpoint, the portion that
8  I saw, and I said the assumption that the same
9  thing was happening in the hospitals because
10 the billing for them was right next to us.
11     Q. The concerns you had about the role
12 of the board and the meetings being
13 choreographed, are those things that you
14 understood other trustees also had concerns
15 about?
16     A. I had little contact with other
17 trustees. I would fly -- they had a corporate
18 plane that we would usually go to Pittsburgh.
19 Towards the end, they had one of -- maybe one
20 or two meetings here. We didn't discuss -- I
21 would fly out with a fellow named Leon
22 Sunstein and Bob Palmer and there wasn't a lot
23 of discussion. I would receive that booklet
24 that you said we might see some of those again
25 the earliest would be 48 hours prior to the

## Page 56

Richard L. Spielvogel, M.D.

1  
2  meeting and the latest I think was at the
3  meeting once, but, if not, just a short time
4  before in the midst of a busy schedule. So
5  we'd look it over. And it was a very thick
6  booklet if you think of it and the portion of
7  the meeting devoted to -- when you had lunch
8  and you had quite often a medical speaker,
9  something new in the system or something like
10 this, came down to a very short time, let's
11 say 30 to 60 minutes we actually did the
12 business. And it seemed to me there were 15
13 or 20 motions, most of them perfunctory, just
14 approving things that were already done that
15 had to legally be approved by the board for
16 some rule or bylaws or something like that.
17     Q. Did you ever suggest to Mr. Abdelhak
18 other than the suggestion or the request that
19 you go on to one of the committees, did you
20 ever suggest any changes in the format of the
21 boards or of the format of the materials that
22 were provided to board members?
23     A. No. That was the only really
24 meeting that we discussed it. And I just
25 simply said I'd like to be more involved in

Page 57

1  Richard L. Spielvogel, M.D.
2 something with a little more meat that I could
3 take back to the faculty that I'm doing
4 something for them or representing them.
5  Q.  Would you try to read the booklet
6 even though it came --
7  A.  I read it.
8  Q.  -- pretty close to the meeting?
9  A.  Except perhaps the one time I got it
10 at the meeting, I read it cover to cover in a
11 perusal way.  I usually knew -- because in
12 there -- in there were little tidbits.  I
13 believe they had at that single meeting we
14 approved the minutes of something like eight
15 boards or six other boards, you know, the
16 practice group entity, the hospital's entity,
17 the medical school's entity, and so forth.  So
18 there was a lot of material.  Then I would
19 look over the finances.  I had very little
20 training other than that one course I told you
21 about in North Carolina, but tried to look
22 at -- I believe there was a profit and loss
23 and then there was a cash flow and a couple
24 other things like that.  I would look over
25 them to just basically go to the bottom line

Page 58

1  Richard L. Spielvogel, M.D.
2 and see what that was.
3  Q.  When you say there were little
4 tidbits, are you thinking of anything in
5 particular that you were --
6  A.  Oh, I just remember that the jets
7 were in a for-profit corporation or the planes
8 or something like that.  There would be -- no,
9 I don't, just things that were written down
10 that had already happened that were there that
11 hadn't been publicly discussed.
12  Q.  What did you think of -- were you
13 surprised by the fact that a not-for-profit
14 organization would have a corporate jet?
15  A.  Well, I was surprised, but that was
16 discussed at a meeting.  And I have no
17 recollection which meeting or who asked the
18 question or if there was a question.  And it
19 was explained to me in a way you would expect
20 it that if I were the executive who owned it
21 that because of a monopoly of US Air -- and
22 it's absolutely true.  One time I did have to
23 go to Pittsburgh on one day's notice.  It was
24 something like 3 or 4 hundred dollars round
25 trip to Pittsburgh.  I know that sounds

Page 59

1  Richard L. Spielvogel, M.D.
2 outrageous, but it actually was.  It was a
3 very high price.  So they had come up with an
4 equation of how many AHERF trips per week or
5 day or something that needed to be made
6 between the two and multiplied it out times
7 this high number and came out with a relative
8 justification of the money.
9  Q.  Are you saying that they said that a
10 private jet was cheaper than US Air?
11  A.  I don't want to overplay this --
12  MR. UNICE:  I don't doubt it.
13  Q.  Because let me know because I use US
14 Air all the time.
15  A.  I don't think they said it like
16 that.  They came up with a formula to justify
17 the usage of the plane being that the
18 executives need to go back and forth so many
19 trips per week on short notice that if you
20 bought a full fare ticket at some very high
21 price, I'm just making up $400, but that was
22 something close to what it was.  I have a home
23 up in Maine and occasionally at the last
24 moment I think of flying up to Portland or
25 Bangor sometimes and it's about $700 round

Page 60

1  Richard L. Spielvogel, M.D.
2 trip.  And that's how they justified it and
3 that was simply explained.  And I accepted it
4 as part of this jet-setting type of expansion
5 that we were into becoming one of the biggest
6 health care systems in Pennsylvania and the
7 east.
8  Q.  Literally jet setting?
9  A.  Literally.
10  Q.  One of the things that you mentioned
11 a few answers back was that in the call that
12 Mr. Paroo had with you where he told you about
13 the acquisition by AHERF --
14  A.  Yes.
15  Q.  -- he mentioned that you would be
16 having this prestigious job; right?  And I
17 think that's referring to the chairman of the
18 department of dermatology?
19  A.  Well, he -- one of the agreements --
20  Q.  Just to finish the record.  Then you
21 said we can talk about that later and I guess
22 I'd like to talk about that now.  What
23 happened?
24  A.  No, I think I misled you there or
25 there's been a -- when he called, he said that

Page 61

Richard L. Spielvogel, M.D.

1 thank you very much for, you know, this time I
2 had done in medicine and he thought I had done
3 a very good job and thank you for considering
4 taking this dean's position, but that that had
5 all been shelved and he apologized for taking
6 the time -- taking so long to get back to me.
7 And he explained it there was going to be this
8 merger. And he said as a reward -- I don't
9 know if he used those exact words, but as
10 thanks for this, you're going to have your own
11 separate department of dermatology, which had
12 been one of my requests when I took medicine,
13 in this new combined university, and that I
14 would have a very important role as one of the
15 I think he said two but subsequently I think
16 there were four faculty representatives on
17 what he called the big board, the board in
18 Pittsburgh. And I -- he didn't elaborate on
19 it. I think I thought in my mind that that
20 would involve more of my time and being a
21 position that I would have more influence in
22 in helping to develop this new combined school
23 and the quality of practice and those types of
24 things.

Page 62

Richard L. Spielvogel, M.D.

1 Q. Was there ever any discussion among
2 the trustees of AHERF about terminating
3 Mr. Abdelhak?
4 A. No, not until -- I think my last
5 board meeting was in the fall of '97. And
6 then I was informed I believe via a letter
7 that they were downsizing the board or
8 something like that. We may have actually --
9 in fact, we may have actually voted. In any
10 case, being taken off the board, which I
11 believe was in early '98. You would have
12 those records probably. There was never any
13 discussion. The chairman of the board would
14 usually finish the meeting initially by saying
15 what a great quarter we had or half year and
16 then later by saying, you know, despite the
17 very difficult health care environment in
18 Philadelphia, we're fortunate to have such a
19 strong leader and so forth. I never heard any
20 discussion of removing him.
21 Q. And you never thought of getting --
22 trying to -- initiating action with other
23 trustees to get together to remove
24 Mr. Abdelhak?

Page 63

Richard L. Spielvogel, M.D.

1 A. No.
2 Q. Let me show you another document.
3 This document doesn't have a sticker on it
4 because it's been marked recently, but it's
5 been marked as Exhibit 2561. And, again, this
6 is just for timing. It's a copy of the
7 minutes of the January 5, 1998, AHERF board
8 meeting. And you'll see that you're listed
9 here as attending by telephone?
10 A. Yes.
11 Q. So you were at least still on the
12 board and attending a meeting by telephone as
13 of January 5, 1998?
14 A. Yes.
15 Q. Is that consistent with your memory?
16 The AHERF board meetings, I think you said
17 that some of them were in Pittsburgh and some
18 were in Philadelphia?
19 A. Yes. Almost all of them were in
20 Pittsburgh, maybe one in the summer one year
21 or possibly two years there was one meeting in
22 Philadelphia.
23 Q. The ones in Pittsburgh, would all
24 the trustees get together in one room?

Page 64

Richard L. Spielvogel, M.D.

1 A. Yes.
2 Q. And would they all sit around a
3 table?
4 A. Yes. It was a large conference
5 table. We would have -- I believe you would
6 fly out there in the morning, get down to the
7 hospital. There would be a lunch. Usually,
8 there would be a medical presentation,
9 although not always, about some new system or
10 department or research that was going on in
11 the system. And then there was the business
12 meeting.
13 Q. And did Mr. Abdelhak have a usual
14 chair in the room or would he move around?
15 A. No. To my memory, he always sat at
16 the head of this very long conference table.
17 Q. And the chairman of the board,
18 Mr. Snyder, where would he sit?
19 A. He would sit right up there also. I
20 think actually the chairman sat in the very
21 middle and Mr. Abdelhak would sit to his side.
22 Q. And what was your impression at the
23 time when you went to these meetings of the
24 interaction or relationship between Mr. Snyder

TAB 178

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## MARK VICTOR, M.D.
*June 17, 2004*

---

# *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

VICTOR, M.D., MARK - Vol.



LEGALINK
A WORDWAVE COMPANY

Mark Victor, M.D.

you to do is to read through the introductory paragraph and tell me if it jars your memory at all about any other discussion apart from what you've already testified about related to the Graduate acquisition from this board meeting.

MR. GOODKIND: So just the paragraph on 743?

MR. FRIESEN: Right.

BY MR. FRIESEN:

Q. I mean, feel free to read the whole resolution if you want. It may be helpful for you to do that.

A. I don't think I've ever heard the term "SDN" before today, which is a little scary.

I mean, I'm lost so -- okay. I read it. I don't know what you want me to say.

Q. Well, I'm just trying to find out if it jars your memory at all about anything else that happened at this meeting that you haven't already testified about.

A. Not really. I mean, I probably felt at that moment as bewildered as I am now



Mark Victor, M.D.

trying to read through all this legalese. I don't really know what the point of it is. And I do remember now SDN I believe was Sherif, Dan McConnell, and Nancy Wynstra. I think that was their little company, right, SDN? It just hit me. I mean, I think what it's saying over these five pages is that they're suggesting that this be approved, but it certainly seems long-winded.

MR. FRIESEN: All right. Why don't we take a break. I'm about to switch topics.

THE VIDEOGRAPHER: It's 2:23. We'll now go off the video record.

(Short recess.)

(Documents entitled "AHERF Physician Risk/Reward Sharing Project" marked Exhibits 2706 and 2707.)

THE VIDEOGRAPHER: It is now 2:34. We'll now go back on the video record.

BY MR. FRIESEN:

Q. Dr. Victor, before you you've got Exhibit 2706, which is a document that your



Mark Victor, M.D.

counsel has produced in this case. And I understand that it's from your file; is that correct?

A. I believe so.

Q. It says "AHERF Physician Risk/Reward Sharing Project."

A. Uh-huh, yes.

Q. Can you tell me what this document is?

A. I think we covered a little of this earlier. This was part of a smaller group that I was a part of to evaluate the benefits of the risk pool that we had discussed earlier today of acquiring patients and putting them into a risk management pool with U.S. Healthcare. And there were some outside consultants from Milliman & Robertson who came and gave most of this data, which was for the most part, as I recall, strongly favorable in terms of getting very involved in a risk sharing model.

Q. Do you recall when the work on this project started?

A. No.



Mark Victor, M.D.

Q. And what was the conclusion -- was there a conclusion to the project?

A. I believe they were very excited about it and continued to get into a risk sharing model.

Q. And I've also shown you another document, Exhibit 2707, which has the same title and it's another document. Is that also related to the project that you were just testifying to?

A. I believe it's the same document only this one has my additional handwriting notes on on the side.

MR. FRIESEN: Okay. You can put those documents aside.

Just for the record, this morning I marked Exhibit 2705. And Mr. Unice tells me that that document has previously been marked as Exhibit 2045 and 2056. I don't know whether that's right or not, but that's what Mr. Unice says so...

BY MR. FRIESEN:

Q. Do you recall going to a Board of

Page 61

Mark Victor, M.D.

1        Mark Victor, M.D.
2 Trustees retreat in Pittsburgh at the Duquesne
3 Club?
4        A.   Vividly.
5        Q.   What do you remember about that?
6        A.   My first and only time on a private
7 jet. It was pretty cool.
8        Q.   So you were flown from Philadelphia
9 to Pittsburgh on a private jet?
10       A.   Uh-huh.
11       Q.   Whose jet was it?
12       A.   I don't know. I believe it was
13 either Allegheny's -- which at the time I
14 believe they owned and operated two or three
15 private jets for shuttling back and forth
16 between Pittsburgh and Philly, but there were
17 way more than three so they may have hired,
18 rented, you know, leased others.
19       Q.   I'm sorry. There were way more than
20 three jets?
21       A.   Yes.
22       Q.   Did all the trustees go to the
23 airport at the same time and get on separate
24 jets and go off to Pittsburgh?
25           MR. UNICE:  I object to form.

Page 62

Mark Victor, M.D.

1        Mark Victor, M.D.
2        A.   I believe we did.
3        Q.   Do you know how many trustees there
4 were per jet?
5        A.   I think six or eight was ours. They
6 were, you know, small private planes, jets.
7        Q.   Was there food on them?
8        A.   I don't think so. I think there was
9 sodas as I recall because it's only about an
10 hour flight, maybe less.
11       Q.   And then did somebody pick you up at
12 the airport in Pittsburgh?
13       A.   Yes.
14       Q.   What kind of a car was that, dare I
15 ask?
16       A.   I think it was a limo. And we were
17 taken to the Duquesne Club, which was kind of
18 an old, you know, moneyed club from the old
19 days in Pittsburgh. And there was a luncheon.
20 There was a large number of people. I mean,
21 all the different boards were there. As I
22 said, there were many, many different boards,
23 many, many different sort of companies within
24 the overhanging name of AHERF. And, again,
25 some of them were foundation and some of them

Page 63

Mark Victor, M.D.

1        Mark Victor, M.D.
2 was the physician practice acquisition group.
3 And there was something I remember called
4 Integrated Health maybe or something like
5 that. And there were a variety of
6 presentations. And, you know, it was just a
7 nice day and then we went back to the airport
8 and back in the planes and went home.
9        Q.   Back in the limo?
10       A.   I think so. It was pretty -- it was
11 an impressive day. And my overwhelming sense
12 was, what am I doing here?
13       Q.   I was going to ask you what your
14 reaction was with the limos and the planes.
15       A.   It was probably as intended, I mean,
16 a bit overwhelmed.
17       Q.   Now, did all these people at the
18 Duquesne Club, were they all in one room or
19 what?
20       A.   Yes, I mean, for the luncheon and
21 the presentation. The day may have started
22 long before we got there because a lot of the
23 members were from, in fact, Pittsburgh. So
24 the Philadelphia contingent plus wherever else
25 people came from may have gotten there at

Page 64

Mark Victor, M.D.

1        Mark Victor, M.D.
2 different times because there was also some
3 deals that Allegheny had in and around
4 Pittsburgh, some other health care systems. I
5 don't remember their names or specifics, but I
6 remember there were other groups they were
7 managing and other hospital systems they were
8 trying to do business with. It may have even
9 been other states. I'm not sure. But, in any
10 event, the luncheon and the presentations and
11 sort of the very, very optimistic and rosy
12 future of the organization were the mainstay
13 of the presentations.
14       Q.   Did Mr. McConnell give a
15 presentation?
16       A.   I believe he did.
17       Q.   And did Mr. Abdelhak give a
18 presentation?
19       A.   Always.
20       Q.   And did they both speak of this very
21 optimistic rosy future?
22       A.   Yes.
23       Q.   Do you remember anything else about
24 those presentations in terms of details of the
25 future?

16 (Pages 61 to 64)

Page 65

Mark Victor, M.D.

1      A.   There were a lot of slides.  It was
2  sort of on a large screen presentation.  I
3  can't give you any specifics of numbers, but
4  some of the data, some of the risk pools were
5  projected into the billions of dollars of
6  total revenue stream.  I don't remember how
7  many, but it was, you know, sort of a
8  five-year projection.  It was way beyond my
9  context of understanding numbers.
10     Q.   Was there a discussion among the
11 trustees during the presentations or
12 logistically how would it work?  Would the
13 presenter give a slide show and then have
14 questions at the end or would it be
15 interactive or no questions or what?
16     A.   No.  I think it was what you
17 suggested, but I don't recall much discussion.
18 It was more of a show.
19     Q.   Do you recall hearing any comments
20 of any trustees either at the meeting or in
21 the limo or on the plane coming home where
22 they had a reaction to the presentations?
23     A.   A few of the people that I sat next
24 to on the plane home had similar feelings that

Page 66

Mark Victor, M.D.

1  I did that it was all a bit overwhelming,
2  that, you know, my God, what did this day
3  cost, the numbers seemed unreal, things of
4  that sort.
5      Q.   And by numbers, you mean the
6  projections?
7      A.   The projections.  But, again, I
8  don't think any one of us was in any position
9  to do justice a critique of any of it.
10     Q.   And why was that?
11     A.   Because it's not any of -- the
12 physicians that I was with, it's none of our
13 field of expertise to talk about, you know,
14 five-year projected earnings from a risk
15 management pool.
16     Q.   Let me show you a document that's
17 been marked as 522, Exhibit 522.  And it's
18 dated April 10, 1997.  The cover page is
19 addressed to the Board of Trustees of AHERF
20 from Mr. McConnell, subject management
21 presentation.  And it attaches what it says
22 are copies of the entire slide presentation of
23 the management team from the April 5 AHERF
24 board retreat.

Page 67

Mark Victor, M.D.

1      A.   Okay, if you say so.
2      Q.   And just to be doubly sure, let me
3  also show you 521, which says AHERF Board of
4  Trustees retreat April 5, 1997, Duquesne Club.
5  And you'll see that you're listed here as an
6  Allegheny trustee in attendance from
7  Philadelphia.
8      A.   I was.
9      Q.   Are these, Exhibit 522, as best as
10 you can recall, are those the slides that were
11 shown?
12         MR. GOODKIND:  Just an offhand
13     question, 521 is marked a draft.  Is
14     there a reason for that?
15         MR. FRIESEN:  521 is marked
16     draft?
17         MR. GOODKIND:  The pages inside
18     are all marked draft pages.  It's not
19     necessarily the final document obviously.
20         MR. FRIESEN:  Oh, I see what
21     you mean.  It appears that one of the
22     attachments is -- from 2708 to 2716 is
23     marked draft.  The only reason I'm
24     showing him this -- showing you this,

Page 68

Mark Victor, M.D.

1  Dr. Victor, is to nail down the date of
2  the Duquesne Club retreat.
3          THE WITNESS:  If that's what
4  the date is, I don't -- as vividly as I
5  remember the experience, I can't tell you
6  I would be able to tell you the date, but
7  this all looks, you know, vaguely
8  familiar and these certainly seem like
9  the projections that we saw.  And it was
10 at the Duquesne Club and it was the only
11 time I've ever been there in my life, so
12 I would have to say this was the date.
13 BY MR. FRIESEN:
14     Q.   What was the lunch like?
15     A.   It was nice, not as impressive as
16 the plane.
17     Q.   Okay.  You can put those aside.  The
18 next one is Exhibit 1655.  These are the
19 minutes of an October 30, 1997, AHERF Board of
20 Trustees meeting.
21     A.   Okay.
22     Q.   And you'll see that you are listed
23 here as a member present.  It says at the top
24 via videoconference.

17 (Pages 65 to 68)

TAB 179

# In The Matter Of:

*AHERF   v.*

*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*WILLIAM C. KENNEDY*

*August 15, 2002*

---

*MANHATTAN REPORTING CORP.*

*420 Lexington Avenue*

*New York, NY  10170*

*(212) 557-7400    FAX: (212) 692-9171*

Original File 081502WK.TXT, 274 Pages
Min-U-Script® File ID 2367678085

# Word Index included with this Min-U-Script®

AHERF  v.

PRICEWATERHOUSECOOPERS, L.L.P.

WILLIAM C. KENNEDY

August 15, 2002

---

2—15:56:34  25—15:57:52                    Page 225

**WILLIAM C. KENNEDY**

[1]

[2] know I'm not supposed to ask questions.

[3]     Q: You're allowed. I can't tell you.

[4]     A: With Kirkpatrick & Lockhart?

[5] The reason I'm struggling with this is I

[6] wouldn't even know who at Kirkpatrick & Lockhart —

[7] one we would ordinarily have asked this question of.

[8] That's what I'm struggling — who would it have been

[9] with? I mean, I just don't think this is a David

[10] McClenahan issue.

[11]     Q: Let me say that I'm not attempting to

[12] represent to you by looking at this piece of paper in

[13] front of me that someone says you were at a

[14] conference call. What I will tell you is some

[15] testimony that's been given regarding this is unclear

[16] to me.

[17]     A: Okay.

[18]     Q: I'm trying to determine if — whether you

[19] did attend or hear about it.

[20]     A: To the best of my recollection, I was never

[21] involved in anything having to do with this, other

[22] than what I've already testified to, this one little

[23] piece of time where I did what I've said I did and I

[24] made these notations and sent it back to Mike. I

[25] don't recall any follow-up on this. I don't recall

---

2—15:57:55  25—15:59:33                    Page 226

**WILLIAM C. KENNEDY**

[1]

[2] Mike ever calling me asking me questions about what I

[3] might have meant or not meant. And I — Mike and I

[4] worked very well together, so I — you know, I

[5] just — if I were involved in a call with Mike, I

[6] would remember it, and I just — I don't remember

[7] one.

[8]     Q: Okay. Is it your opinion that any realized

[9] or unrealized gains that were had on the Lockhart

[10] fund — and I'm referring specifically to the three

[11] accounts that are actually titled Lockhart and have

[12] all the same language in the case of a security, that

[13] language — is it your belief that any gain on that

[14] sale or any value appreciation on those funds other

[15] than unspent income is part of principal?

[16]     MR. RYAN: Objection.

[17]     THE WITNESS: I think any monies that are

[18] made on the sale of the securities would be

[19] considered a premium or profit and that would be

[20] corpus. If you're getting a dividend — you're

[21] holding on to the stock and you're receiving

[22] dividends, it would seem to me that in that instance

[23] you're probably talking about income.

[24]     BY MR. TORBORG:

[25]     Q: Okay. Now, when you — you said that you

---

2—15:59:38  25—16:00:33                    Page 227

**WILLIAM C. KENNEDY**

[1]

[2] weren't concentrating on Barbara Robinson's first two

[3] paragraphs when you looked at this?

[4]     A: Right.

[5]     Q: You were simply looking at the language

[6] itself?

[7]     A: Yes.

[8]     Q: Were you able to make the determination you

[9] just made for me without looking at her first two

[10] paragraphs?

[11]     MR. RYAN: Objection.

[12]     THE WITNESS: I hadn't thought of it that

[13] way. I was really responding specifically to the

[14] questions that you've posed and trying to clarify my

[15] answer.

[16]     BY MR. TORBORG:

[17]     Q: My question is simply this.

[18]     A: Reading the language, yeah.

[19]     Q: Do you need this letter to determine

[20] whether or not any gains on the sale that are not

[21] attributable to interest income or dividend income

[22] are permanently restricted and part of principal?

[23]     MR. RYAN: Objection.

[24]     THE WITNESS: That's an interesting

[25] question.

---

2—16:00:49  25—16:01:54                    Page 228

**WILLIAM C. KENNEDY**

[1]

[2]     This goes back to the question of there not

[3] being a provision in the document for the use of

[4] principal.

[5]     MR. TORBORG: Well —

[6]     THE WITNESS: And whether this — we just

[7] got done talking about premiums being income as

[8] opposed to being principal. So not having the

[9] language in front of me, is it fair for me to

[10] conclude that realized or unrealized gains could be

[11] used is the question?

[12]     BY MR. TORBORG:

[13]     Q: If the — let me ask it a different way:

[14] If there were language in the trust agreement that

[15] said principal is permanently restricted or corpus is

[16] permanently restricted —

[17]     A: Uh-huh.

[18]     Q: — would you need the Barbara Robinson

[19] letter to determine the availability of capital

[20] appreciation on the trust?

[21]     MR. RYAN: Objection.

[22]     THE WITNESS: I think I would, but I

[23] respect that someone that's much more knowledgeable

[24] with regard to the way trusts function and work and

[25] perhaps who are more familiar with the specific —

---

WILLIAM C. KENNEDY
August 15, 2002

AHERF v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

2—16:01:58  25—16:03:11                     Page 229

WILLIAM C. KENNEDY

[1]
[2] even these specific instruments might not have needed
[3] it. I think that my approach to this would be to go
[4] back to the document, even if I had a gut feeling one
[5] way or the other.
[6]                    BY MR. TORBORG:
[7]    Q: But you would rely on that underlying
[8] document?
[9]    MR. RYAN: Objection.
[10]    THE WITNESS: I would rely on the
[11] underlying document.
[12]    MR. TORBORG: Okay I think we can put
[13] this aside.
[14]    THE WITNESS: Good.
[15]                    BY MR. TORBORG:
[16]    Q: You talked earlier about a severance
[17] agreement that you prepared for Carol Calvert
[18]    A: Yes.
[19]    Q: What do you remember about the
[20] circumstances leading to that severance agreement?
[21]    A: I was told that she was being let go by
[22] David McConnell. My conversations were all with
[23] David, not with Mr. Abdelhak. David came to me —
[24] and again, this is at a time Nancy's not there — we
[25] need a severance agreement for Carol, basically what

---

2—16:03:18  25—16:04:32                     Page 230

WILLIAM C. KENNEDY

[1]
[2] I would term a standard severance agreement in terms
[3] of the format and the construct of it. And I was
[4] told that the amount was $1.2 million, which gave me
[5] a little pause.
[6]    Q: Why?
[7]    A: That's a lot of money, but — it's a lot of
[8] money, but it's also not out of the realm of
[9] possibility at AHERF.
[10]    Q: At AHERF?
[11]    A: At AHERF.
[12]    Q: But not generally?
[13]    A: Because it could —
[14]    MR. RYAN: Objection.
[15]    THE WITNESS: — conceivably represent
[16] multi-year — it's probably a number derived from
[17] salary times a number of years of potential service.
[18] I had no idea what Carol made, still don't.
[19] What I — when I questioned the number with David, I
[20] was basically told the number's resolved, Sherif has
[21] said it's 1.2, just do the agreement.
[22]                    BY MR. TORBORG:
[23]    Q: Do you know why —
[24]    A: I prepared the agreement.
[25]    Q: Do you have any insight as to why Carol

---

2—16:04:34  25—16:06:23                     Page 231

WILLIAM C. KENNEDY

[1]
[2] Calvert was let go?
[3]    A: There was a lot of speculation, internal
[4] office, good internal office speculation.
[5]    Q: Such as?
[6]    A: Well, it ran the gamut from simply not
[7] being satisfied with performance, which would be a
[8] legitimate rationale for asking someone to leave,
[9] versus having a personal affair with someone and then
[10] the affair ending and someone being asked to no
[11] longer be in my presence, that kind of thing. Do I
[12] know specifically where in that — where in the gamut
[13] lies the truth? I do not, no.
[14]    Q: Was the speculation about an affair — did
[15] that involve a member of AHERF senior management?
[16]    A: It involved Mr. Abdelhak. I don't know
[17] whether it's true nor did I try to find out.
[18]    Q: When we were off line — I think Anthony
[19] was in the room — we were discussing some personal
[20] travel that Ms. Wynstra took —
[21]    A: Yes.
[22]    Q: — while she was at AHERF. What can you
[23] remember about that?
[24]    A: I can remember that there was a lot of it.
[25] I can remember that most — most of it was associated

---

2—16:06:27  25—16:08:00                     Page 232

WILLIAM C. KENNEDY

[1]
[2] with AHSPIC and with the activities of the insurance
[3] company.
[4]    Ms. Wynstra took the position that all the
[5] business to be conducted by AHSPIC was required under
[6] Cayman law to be outside the Continental United
[7] States; that you could not even convene a complaint
[8] committee meeting to review the status of litigation
[9] in this country, that those meetings had to be
[10] outside of the United States.
[11]    And as a consequence, four times a year,
[12] meetings of the claims committee — complaint, I said
[13] complaint, but I meant claims — claims committee,
[14] were held outside of the United States. There was
[15] usually — every January, the meeting was in the
[16] Cayman. There was usually at least one meeting in
[17] Canada, and then there was usually a meeting in
[18] Europe, and the fourth meeting could be anywhere.
[19]    Q: Where in Europe would it typically be?
[20]    A: In Europe, they were usually in some very
[21] nice old world city like Copenhagen and Amsterdam and
[22] Paris, Rome, somewhere near Baden-Baden, Germany,
[23] Stockholm, London.
[24]    Nancy would go to London periodically
[25] because some of the excess coverage, layers of

---

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

WILLIAM C. KENNEDY
August 15, 2002

---

2—16:08:07   25—16:09:41                    Page 233

[1]                   *WILLIAM C. KENNEDY*
[2] coverage, the excess layers, were through Lloyd's
[3] So she would be over there to meet with
[4] representatives of Lloyd's and discuss that
[5]       You know, the board meetings for AHSPIC
[6] were overseas. There was — I think the last year I
[7] was there, the AHSPIC board meeting was in Scotland,
[8] and I remember her coming back from Scotland being
[9] very enamored of the place that they had stayed. And
[10] not long after, I was told that she and her husband
[11] had either invested in property or had bought some
[12] property over there while they were there.
[13]       I always knew that there was no such thing
[14] as having to do all of that business outside of the
[15] United States. And this became very public after the
[16] bankruptcy because there had been an expose in The
[17] Philadelphia Inquirer about comparing the expenses
[18] that AHERF incurred running its captive insurance
[19] company versus Jefferson and the University of
[20] Pennsylvania. And Jefferson's is a Cayman captive as
[21] well, and they certainly did business in the United
[22] States. They didn't go — they didn't take all the
[23] business out of the country like she was professing
[24] was necessary.
[25]       This was not just Nancy travel. When we

---

2—16:09:44   25—16:11:10                    Page 234

[1]                   *WILLIAM C. KENNEDY*
[2] talk about a claims committee meeting, we're talking
[3] about probably 60 odd people traveling to these
[4] cities, round-trip fair, often with spouses. You're
[5] talking about five-star hotels, the best restaurants
[6] in the city.
[7]       You're also talking about an extraordinary
[8] amount of time planning these trips and the costs
[9] associated with that. There was a travel agent in
[10] Pittsburgh who regularly met with Nancy and planned
[11] these trips years in advance. He would come in.
[12] They would spend hours in the afternoons planning
[13] these trips.
[14]       The person that would know the most about
[15] this is Nancy's assistant, Michelle Zatezalo,
[16] Z-a-t-e-z-a-l-o. That was Michelle's principal
[17] responsibility, planning these trips. Nancy would go
[18] before the planned trip. She would stay beyond the
[19] trip. Many of the people that would go over could
[20] conceivably be — many of the members of the claims
[21] committee were physicians and they would go with
[22] their wives and they would have extended periods of
[23] time afterwards where they would stay wherever.
[24]       Nancy would often shop. She was a great
[25] antiquer, and she would often have lots of things

---

2—16:11:12   25—16:12:42                    Page 235

[1]                   *WILLIAM C. KENNEDY*
[2] shipped back from wherever they had been. I remember
[3] one instance where Michelle had to go down to the
[4] wharf in Pittsburgh to pick up two armoires that had
[5] been shipped over from Stockholm, and I was puzzled
[6] as to why Michelle was going to pick them up for
[7] starters during the workday.
[8]       And you couldn't help but sit back and
[9] wonder who was paying for the armoires and who paid
[10] for the shipping and all those wonderful things that
[11] pass through your mind when you realize that this
[12] person is doing this so often, so visibly in front of
[13] all the rest of the staff. She got away with it.
[14]       And, you know, I mean, Sherif and his wife
[15] were on these trips. The people — you know,
[16] McConnell did not go on these trips. He went to the
[17] Caymans every year, but he didn't go to the claims
[18] committee meetings. Sanzo was on these committee
[19] meetings. He would go.
[20]       The president, the chairman of the claims
[21] committee, was Nancy's husband who was a physician,
[22] Dr. Berg. He was the chairman of the claims
[23] committee, and obviously, then they were both — they
[24] both got over there and back by virtue of their roles
[25] relative to the committees. So she essentially had

---

2—16:12:44   25—16:14:03                    Page 236

[1]                   *WILLIAM C. KENNEDY*
[2] Allegheny paying the travel for both of them back and
[3] forth to these incredible venues.
[4]   Q: In addition to these kind of expenses, can
[5] you recall any other type of — I don't want to use a
[6] vague word which he'll object to — exorbitant
[7] expenses?
[8]   A: Exorbitant. That's a relative term working
[9] for Allegheny because you have to understand
[10] Allegheny owned two jets. We jetted back and forth
[11] between Philadelphia and Pittsburgh practically every
[12] day. You would get — you know, if you had to have a
[13] meeting — if I needed to meet with the three doctors
[14] that I talked about earlier, the three Bs, I would
[15] take the jet to Philadelphia. I'd get on the
[16] schedule, and I would be able to fly in the morning
[17] from Pittsburgh to Philadelphia. I'd have my meeting
[18] with them, and I'd go back to the Philadelphia
[19] airport and I was home in Pittsburgh again that
[20] evening.
[21]       That plane — the planes were eight- and
[22] 12-seat planes, so, you know, depending on who was
[23] booked, you could get bumped. You know, you might be
[24] scheduled to go and Mr. Abdelhak needed the seat or
[25] whatever and then you flew commercial.

TAB 180

# In The Matter Of:

*AHERF   v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*DIANE SCHRECENGOST*
*November 7, 2002*

---

*MANHATTAN REPORTING CORP.*
*420 LEXINGTON AVENUE*
*NEW YORK, NY  10170*
*(212) 557-7400    FAX: (212) 692-9171*

*Original File 110702DS.TXT, 211 Pages*
*Min-U-Script® File ID: 3641525120*

# Word Index included with this Min-U-Script®

1—14:57:46  25—14:58:44          Page 175

[1] A: My conclusions don't indicate that there was
[2] anything inappropriate.
[3] Q: And if you had thought there was anything
[4] inappropriate, you would have included it in
[5] the report, right?
[6] A: I reported our testing exceptions.
[7] Q: So the answer to that is yes, right?
[8] A: Rephrase your question. I don't want you to
[9] make a blanket statement if that's not what I
[10] said.
[11] Q: If you had found anything with respect to
[12] executive management business expenses that you
[13] felt was inappropriate, you would have included
[14] it in your report, right?
[15] A: I reported on what we found. I don't know why
[16] you're trying to say it differently. I
[17] reported what we found.
[18] Q: And you found nothing inappropriate?
[19] A: I found items that I've noted here, yes.
[20] Q: All right. You found the items that you've
[21] listed. Other than the items you listed, you
[22] did not find any inappropriate items, is that
[23] right?
[24] A: That's not true. It says, We noted minor
[25] discrepancies on an infrequent basis, and those

1—14:58:48  25—15:08:06          Page 176

[1] instances were not considered significant. And
[2] then there are three exceptions that are noted
[3] in a little more detail.
[4] Q: Thank you.
[5] So is it right that you did not find
[6] any significant improprieties with respect to
[7] executive management business expenses other
[8] than the ones that you list here?
[9] A: In this fiscal year for the testing that we
[10] did, yes.
[11] Q: I'm not trying to ask a hard question. I'm
[12] just asking you didn't hold anything back; you
[13] put down what you found, right?
[14] A: Oh, yes.
[15] MR. JONES: We've been at it another
[16] hour and 20. Can we have a short break here?
[17] MR. RYAN: Sure.
[18] THE VIDEOGRAPHER: We're now going
[19] off the record. The time on the screen is
[20] 2:59.
[21]
[22] (There was a recess in the proceedings.)
[23]
[24] THE VIDEOGRAPHER: We are now back on
[25] the record. The time on the screen is 3:08.

1—15:08:10  25—15:09:47          Page 177

[1] MR. RYAN: Let me mark, please, as
[2] Exhibit 802 a document with Bates Nos. DBR DKS
[3] 22686 to 91.
[4]
[5] (Deposition Exhibit 802 marked for
[6] identification.)
[7]
[8]          BY MR. RYAN:
[9] Q: Do you recognize Exhibit 802,
[10] Mrs. Schrecengost?
[11] A: It's a similar report on executive management
[12] business expenses one year later.
[13] Q: The report for fiscal year 1995?
[14] A: Yes.
[15] Q: And is that your signature on the third page?
[16] A: Yes.
[17] Q: And the report is addressed to the audit
[18] committee of the AHERF board?
[19] A: Yes.
[20] Q: And you and your staff tested a sample of
[21] executive expense reports for the executives
[22] listed there in the middle of the first page?
[23] A: Yes.
[24] Q: And did you find any significant improprieties
[25] that you did not include in your report?

1—15:09:52  25—15:11:19          Page 178

[1] A: I only know — I can only tell what's included
[2] in the report. I wouldn't have held anything
[3] back.
[4] Q: And you don't recall Coopers & Lybrand playing
[5] any role in this review, do you?
[6] A: I haven't mentioned them, but I don't know
[7] whether that means they weren't involved or I
[8] just didn't mention them. I can't tell.
[9] MR. RYAN: Let me mark, please, as
[10] Exhibit 803 a two-page document with Bates Nos.
[11] DBR DKS 22684 to 85.
[12]
[13] (Deposition Exhibit 803 marked for
[14] identification.)
[15]
[16]          BY MR. RYAN:
[17] Q: Do you recognize Exhibit 803,
[18] Mrs. Schrecengost?
[19] A: It appears to be the same kind of executive
[20] management business expense report now for
[21] fiscal 1996.
[22] Q: And is that your signature on the second page?
[23] A: Yes.
[24] Q: And the report is addressed to the audit
[25] committee of the AHERF board?

1—15:11:21   25—15:12:57                    Page 179

[1]  **A:** Yes.

[2]  **Q:** And, once again, you and your staff found a

[3] high level of compliance?

[4]  **A:** Yes.

[5]  **Q:** And you don't recall any significant

[6] improprieties that you did not include in your

[7] report, do you?

[8]  **MR. JONES:** Object to form.

[9]  **A:** The word improprieties is — I didn't have any

[10] significant findings that I didn't include in

[11] the report.

[12]  **Q:** And you don't recall Coopers & Lybrand being

[13] involved in this review, do you?

[14]  **A:** I don't recall that they were or they weren't.

[15]  **Q:** They're not mentioned in the letter as being

[16] involved, are they?

[17]  **A:** Scanning quickly, I don't see them mentioned in

[18] here.

[19]  **Q:** In the 1997 time frame, was it generally known

[20] that certain senior members of AHERF management

[21] were very well compensated?

[22]  **MR. JONES:** Object to foundation.

[23]  **A:** I don't know what — I don't know what they

[24] made.

[25]  **Q:** Did any member of the AHERF board ever ask you

1—15:13:05   25—15:14:30                    Page 180

[1] to do any internal audit work with respect to

[2] executive compensation?

[3]  **A:** There was a compensation committee of the

[4] board. I would assume that would be the place

[5] where those reviews or requests would be

[6] directed.

[7]  **Q:** And did you or your staff play any role in

[8] that?

[9]  **A:** No, we did not.

[10]  **Q:** Are you familiar with an AHERF affiliate called

[11] Jellico?

[12]  **A:** Yes.

[13]  **Q:** What was Jellico?

[14]  **A:** I only know of it as it relates to the

[15] bankruptcy.

[16]  **MR. CROUCH:** My concern is whether or

[17] not we'll be entering into any privileged

[18] communication, so if you could be just cautious

[19] in developing an appropriate foundation so I

[20] can determine whether or not a privilege issue

[21] is present.

[22]  **MR. RYAN:** Okay.

[23]                 **BY MR. RYAN:**

[24]  **Q:** Before the AHERF bankruptcy, did you have any

[25] familiarity with an AHERF affiliate named

1—15:14:34   25—15:16:39                    Page 181

[1] Jellico?

[2]  **A:** I don't think so.

[3]  **Q:** Did you do any work before the bankruptcy in

[4] connection with arrangements under which AHERF

[5] bought a house for Mr. Abdelhak?

[6]  **A:** No.

[7]  **Q:** Are you familiar with an AHERF affiliate called

[8] AHSPIC?

[9]  **A:** Yes.

[10]  **Q:** What was AHSPIC?

[11]  **A:** The acronym stands for something similar to

[12] Allegheny Health Services Provider Insurance

[13] Corporation. That's my best guess. It was a

[14] captive insurance company.

[15]  **Q:** It provided malpractice coverage for AHERF

[16] doctors?

[17]  **A:** I think so.

[18]  **Q:** And were you aware that certain meetings of the

[19] AHSPIC board were held in the Cayman Islands?

[20]  **A:** Yes.

[21]  **Q:** And at other overseas locations?

[22]  **A:** Yes. I think they had to be.

[23]  **Q:** It was your understanding at the time this was

[24] done pursuant to legal requirements, is that

[25] right?

1—15:16:39   25—15:18:01                    Page 182

[1]  **A:** Yes.

[2]  **Q:** You didn't think that there was anything wrong

[3] with that in any way, did you?

[4]  **A:** No.

[5]  **MR. JONES:** Object to form.

[6]  **Q:** Did you ever travel on a corporate jet owned by

[7] AHERF?

[8]  **A:** Yes.

[9]  **Q:** Was that jet used for travel back and forth

[10] between Pittsburgh and Philadelphia?

[11]  **A:** Yes.

[12]  **Q:** Were there controls in place at AHERF to make

[13] sure that the corporate jet was not used

[14] improperly?

[15]  **MR. JONES:** Object to foundation.

[16]  **A:** Management — certain management people had the

[17] authority to use the jet. I don't know about

[18] proper or improper. It was generally used to

[19] go back and forth to Philadelphia.

[20]  **Q:** In your understanding, the corporate jet was

[21] used for legitimate business reasons, right?

[22]  **A:** I believe there were certain executives who

[23] could charter it, if you will, for personal use

[24] and pay the organization back.

[25]  **Q:** So that they weren't getting a free use of the

1—15:18:03  25—15:20:44                           Page 183

[1] jet; they would have to pay for it?

[2]  **A:** I believe so.

[3]  **Q:** Did you or your staff ever uncover any misuse

[4] of funds by a member of AHERF management?

[5]  **MR. JONES:** Object to form.

[6]  **A:** I don't think so.

[7]  **Q:** Was there an incident at one point regarding

[8] Super Bowl tickets?

[9]  **A:** I think there was, but I don't have a clear

[10] recollection of what the issue was.

[11]  **Q:** Did AHERF have in place a code of ethics?

[12]  **A:** When?

[13]  **Q:** In the mid 1990's.

[14]  **A:** I have a recollection at some point they were

[15] developing one, but timing, I don't recall, or

[16] whether or not it had actually been finalized.

[17] I think they were developing one or were

[18] attempting to communicate one.

[19]  **Q:** Did anything ever come to your attention as

[20] director of internal audit to suggest that any

[21] of your colleagues in AHERF management were in

[22] any way dishonest or unethical?

[23]  **A:** No.

[24]  **MR. JONES:** Object to form and

[25] foundation.

1—15:21:11  25—15:23:07                           Page 184

[1]  **Q:** Do you recall in 1992 there was an incident of

[2] fraud in the St. Christopher's Hospital payroll

[3] department?

[4]  **A:** Yes.

[5]  **Q:** What do you remember about that?

[6]  **A:** We had only become associated with St.

[7] Christopher's right around that same time. I

[8] think the fraud predated the acquisition of

[9] AHERF — by AHERF of St. Chris.

[10]  A payroll supervisor or manager had

[11] created checks — inappropriate payroll checks

[12] and was cashing them herself.

[13]  **Q:** How was that fraud detected?

[14]  **A:** It was brought to the attention of my staff by

[15] the management at St. Chris who had been

[16] approached by an employee who thought there was

[17] something amiss, and we were asked to look into

[18] it.

[19]  **Q:** And what was the result of the investigation?

[20]  **A:** There was — there had been a substantial

[21] dollar value of inappropriate payroll checks

[22] created and taken by this payroll manager, and

[23] we documented it in such a way that Allegheny

[24] recovered a substantial portion of that loss

[25] from its insurance carrier.

1—15:23:21  25—15:24:46                           Page 185

[1]  **Q:** And were internal controls put in place to try

[2] to reduce the risk of something like that

[3] happening in the future?

[4]  **A:** It had resulted from the fact that St.

[5] Christopher's did not have good segregation of

[6] duties within that function and they were using

[7] an outside payroll service, both of which

[8] changed after they became part of the Allegheny

[9] system.

[10]  **Q:** So that you and your colleagues at AHERF

[11] improved the internal controls at St.

[12] Christopher's?

[13]  **A:** The payroll became an in-house function that

[14] had segregation of duties so that same scenario

[15] couldn't occur.

[16]  **Q:** And segregation of duties is a classic example

[17] of an internal control, right?

[18]  **A:** Yes.

[19]  **Q:** After the incident at St. Christopher's in

[20] 1992, did you ever discover anything like that

[21] in the AHERF system again?

[22]  **MR. JONES:** Object to form.

[23]  **A:** A payroll issue like that? I don't think so.

[24]  **Q:** How about any issue more generally where an

[25] employee defrauded the organization of a

1—15:24:50  25—15:27:23                           Page 186

[1] substantial amount of money?

[2]  **A:** There were — yeah, there were reviews or

[3] investigations that were done. I can't recall

[4] any specifically right now. That was not the

[5] only time an employee tried to rip us off.

[6]  **Q:** Were there ever any instances where an employee

[7] succeeded in defrauding the organization of a

[8] substantial amount of money?

[9]  **A:** Nothing approaching the dollars involved in

[10] that St. Chris payroll fraud. Certainly

[11] nothing we ever caught.

[12]  **Q:** Do you remember a doctor in the AHERF system

[13] named Charles Bolno?

[14]  **A:** Yes.

[15]  **Q:** What do you remember about him?

[16]  **A:** There was some problem with — something about

[17] him, whether it was billing or documentation.

[18] I believe he was terminated. I believe

[19] Mr. King did a lot of the work involved in

[20] whatever it was we had done to investigate the

[21] matter of Dr. Bolno. I don't remember the

[22] details.

[23]  **Q:** Let me hand you what's previously been marked

[24] as Exhibit 177. Do you believe you've seen

[25] this memorandum before, Mrs. Schrecengost?

TAB 181

**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

William P. Snyder III
Chairman

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
Telephone (412) 359-8590

September 5, 1996

TO:      David M. Deasy

FROM:    W. P. Snyder III

Consistent with past practice at AHERF in recognizing extraordinary effort and contributions
made to the organization through the acquisition of The Graduate Hospitals, please prepare
bonus checks as follows, to be issued this week. If any of the individuals has any special
requirements for income tax handling, he will so advise you.

| | |
|---|---|
| Sherif S. Abdelhak | $ 150,000 |
| David W. McConnell | 112,500 per o~~ |
| Myles G. Turtz, M. D. | 75,000 |

If you have any questions, please do not hesitate to contact my office directly.

WPS:cg   W P Sun

CC:    Sherif S. Abdelhak
       David W. McConnell
       Myles G. Turtz, M. D.

AMS6 000230

Members of the Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences •
Allegheny University Hospitals • St. Christopher's Hospital for Children

DEPOSITION
EXHIBIT
2488
3-5-04   SSS

**A L L E G H E N Y**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

William P. Snyder III
Chairman

September 5, 1996

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
Telephone (412) 359-8590

TO:        David M. Deasy

FROM:      W. P. Snyder III

Consistent with past practice at AHERF in recognizing extraordinary effort and contributions
made to the organization through the acquisition of Forbes Health System, please prepare
bonus checks as follows, to be issued on September 20, 1996. If either of the individuals has
any special requirements for income tax handling, he will so advise you.

|                     |           |
|---------------------|-----------|
| Sherif S. Abdelhak  | $ 100,000 |
| David W. McConnell  | 75,000    |

If you have any questions, please do not hesitate to contact my office directly.

WPS:cg

CC:    Sherif S. Abdelhak
       David W. McConnell



AMS6  000231

Members of the Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences •
Allegheny University Hospitals • St. Christopher's Hospital for Children