TAB 193

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

   vs.                  Civil Action

PRICEWATERHOUSECOOPERS,     No. 00-684

LLP,

        Defendant.


       Videotaped Deposition of AMY

FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Tuesday, the 8th day of

June, 2004, at 9:00 a.m.

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1.888.391.3376 (DEPO)

Amy Frazier

---

Page 145

1 or make your deposition longer, but I think the
2 answer to my question is you don't recall
3 having a SUD with you and asking anyone at
4 AHERF or being in a conversation where someone
5 at C&L asked someone at AHERF to make a change   14:05:08
6 to their financial statements based on the SUD,
7 is that right?
8    A. I do recall of one situation which
9 was a report that was actually never issued in
10 which there -- I had -- I don't know if it was   14:05:47
11 actually the SUD document, but it was a summary
12 of adjustments that clearly indicated something
13 had to be resolved before we could issue the
14 financial statements.
15    Q. Let me come back to that.   14:05:59
16    Is the answer to my question -- my
17 earlier question, though, that you don't recall
18 having a SUD with you or being in a meeting
19 where a SUD was being discussed in which
20 someone from C&L asked someone at AHERF to make   14:06:10
21 a change?
22    MR. RYAN: Objection.
23    A. I mean, I think -- I'm actually
24 saying I have a situation that I recall. I
25 don't -- it didn't necessarily have to have the   14:06:20

---

Page 146

1 title SUD across the top. It represented an
2 accumulative list of adjustments in which we
3 said you need to make an adjustment before we
4 can issue the report.
5    Q. I understand that. I'm happy to   14:06:32
6 speak about that with you. I promise I'm going
7 to do it next.
8    But I would like to have an answer
9 to my question, which is, do you recall being
10 in a meeting or having a discussion in which   14:06:41
11 you were talking about the SUD specifically for
12 any fiscal year in which you or somebody at C&L
13 said, ladies and gentlemen at AHERF, please
14 make these changes or any of these changes?
15    A. Yes.   14:06:55
16    Q. With a SUD?
17    A. Again, my definition of a SUD is an
18 accumulation of a list of entries that need to
19 be considered in evaluating the overall
20 financial statements. And whether that's on an   14:07:07
21 Excel schedule that actually had the schedule
22 of summary of unadjusted differences was really
23 irrelevant. It was the total being used to
24 draw conclusions on whether or not we could
25 issue the financial statements.   14:07:21

---

Page 147

1    Q. Hold on for a second and humor me
2 about what is and what isn't relevant for a
3 moment.
4    I've seen lots of documents that
5 were called summary of unadjusted differences
6 for various fiscal years that look and smell a
7 lot like Exhibit 1339 in format.
8    We're going to come to what you
9 want to talk about. Now tell me, do you recall
10 sitting in a room or having a conversation   14:07:43
11 where this kind of a SUD, Exhibit 1339 or a
12 look alike, was being discussed and asking
13 someone at AHERF or hearing someone from C&L
14 ask someone at AHERF to make any change on the
15 SUD?   14:07:56
16    A. Yes.
17    MR. RYAN: Objection.
18    Q. So there was an exhibit that looked
19 just like 1339 in the room, a document?
20    MR. RYAN: Objection.   14:08:03
21    A. Your original question stated a
22 look-alike, and to me, you know, my
23 understanding of a look-alike was this summary
24 which included adjustments that were being
25 proposed as part of the audit process in   14:08:15

---

Page 148

1 relation to whether or not we can issue the
2 financial statements. It was the adjustments
3 that we as an engagement team had come together
4 and said these are the ones that we need to
5 resolve and aggregate and evaluate as part of   14:08:29
6 issuing the financial statements.
7    Q. But that's the only time you can
8 think of an example for this question as an
9 answer to this question, is that right?
10    A. That I currently recall, yes.   14:08:38
11    Q. Thank you.
12    When did that occur?
13    A. 1998.
14    Q. I had a premonition. Tell me, what   14:08:49
15 was the issue or the set of adjustments that
16 you were discussing with someone at AHERF?
17    A. It related to Rancocas Hospital and
18 the accounting for good will and
19 intercompanies. There was a series of items
20 that built up to the overall issue that needed   14:09:09
21 to be resolved.
22    Q. It was during the final or
23 preliminary audit work for fiscal year 1998?
24    MR. RYAN: Objection.
25    MR. JONES: I'm asking.   14:09:20

37 (Pages 145 to 148)

Page 149

1    Q.   Do you know when it was?
2    A.   It was in the spring of 1998;
3    however, that particular audit had a fiscal
4    year-end, I believe, of December 31st as
5    opposed to June 30th, 1997          14:09:36
6    Q.   The audit related to which
7    enterprise?
8    A.   I believe Rancocas.
9    Q.   It had a calendar year-end?
10   A.   Correct.          14:09:50
11   Q.   That was the New Jersey affiliate
12   of the Graduate Hospital group?
13   A.   Yes
14   Q.   That is then the lone example of a
15   discussion with AHERF personnel in which you    14:10:08
16   were a party regarding making changes on a
17   summary of unadjusted differences?
18        MR. RYAN: Objection  Earlier we
19   drew a distinction between having a summary
20   there while the discussion took place and      14:10:21
21   talking about individual items without having a
22   document there, which I thought was a critical
23   distinction in the early testimony.  So that
24   didn't make its way into your question, so I
25   object.          14:10:35

Page 150

1         MR. JONES: Thank you.  I'm not
2    sure it was critical.
3    Q.   But my question is still, can you
4    think of another example where you were
5    discussing a SUD, a piece of paper that was the    14:10:41
6    final SUD, as you understood it, and were
7    asking someone at AHERF to make changes in the
8    financial statements other than this Rancocas
9    fiscal year 1998 example?
10        MR. RYAN: Objection.          14:10:57
11   Q.   Was it a fiscal year 1998 example
12   or fiscal year 1997 example at Rancocas?
13   A.   It was the fiscal year 1997, which
14   was the calendar year 1997 for that entity.
15   Q.   Other than that example, can you    14:11:10
16   think of another one?
17   A.   Not that I recall as I sit here
18   today.
19   Q.   Who was involved in that meeting?
20   A.   Myself and Dan Cancelmi.          14:11:35
21   Q.   Anyone else?
22   A.   No
23   Q.   Do you recall anything more about
24   the conversation other than it involved
25   accounting for good will and certain    14:11:44

Page 151

1    intercompany accounts?
2    A.   The discussion was around how we
3    would -- in an effort to finalize the report
4    which had reporting deadlines, we had some
5    accounting discussion about possible approaches    14:12:06
6    that Mr. Cancelmi would recommend to address
7    the issue, but I simply communicated my
8    discussion that I had with Mr. Buettner
9    beforehand, which was until it's resolved, you
10   will not get your report.          14:12:22
11   Q.   Do you recall anything more about
12   the underlying accounting issues as we sit here
13   today?
14   A.   It related to whether or not the
15   good will will be realizable in the future, whether    14:12:33
16   or not it should be written down, and whether
17   or not the impact of a 50 million dollar
18   transfer of reserves in 1997 and that that
19   adjustment should be reversed and undone based
20   on a stand-alone report for the Rancocas          14:12:57
21   entity.
22   Q.   Some portion of the 50 million
23   dollars or all of it?
24   A.   A portion of it.
25   Q.   Is this the 50 million dollar set    14:13:08

Page 152

1    of reserve established in connection with the
2    purchase of the Graduate hospitals by AHERF and
3    later transferred to certain hospitals in what
4    was then known as the Delaware Valley Obligated
5    Group at AHERF?          14:13:25
6    A.   Yes.
7    Q.   Do you recall anything more about
8    the conversation with Mr. Cancelmi?
9    A.   He had proposed a method of
10   accounting for it would be to write it off to    14:13:44
11   net asset -- net assets.  And I told him that
12   that was not my understanding of how you could
13   account for it and I would discuss it further
14   with Bill, but that that would not be, in my
15   judgment, an appropriate resolution          14:14:01
16   Q.   Did you have an appropriate
17   resolution at the time that you shared with
18   him?
19   A.   Yes.
20   Q.   What was it?          14:14:07
21   A.   Reverse the 50 million dollar
22   entry.
23   Q.   With respect to Rancocas, it
24   wouldn't have been 50 million dollars, am I
25   right?          14:14:16

Page 153

1    A.    My point was to reverse it on all
2  of the entities.
3    Q.    Were you discussing all of the
4  other entities at the time, or was this
5  conversation strictly related to Rancocas, the    14:14:31
6  one that you're recalling now?
7    A.    As I recall, it was strictly
8  related to Rancocas and their desire to issue
9  that report.
10   Q.    You thought this took place in the    14:14:43
11 spring of '98, calendar year?
12   A.    Spring being very late spring
13 because I was on maternity leave again.
14   Q.    When were you on maternity leave in
15 '98?    14:14:59
16   A.    March. My son was born March 1st
17 of 1998, so basically six to eight weeks
18 following that.
19   Q.    So you're telling me it was
20 after --    14:15:12
21   A.    After.
22   Q.    -- you returned from maternity
23 leave --
24   A.    Correct.
25   Q.    -- that this conversation took    14:15:16

Page 154

1  place?
2    A.    Yes.
3    Q.    Let me ask you to turn to another
4  exhibit. This one is going to be previously
5  marked as Exhibit 1689. I'm going to ask you    14:15:36
6  to look at for me at the two-page document and
7  tell me if you've ever seen it before today.
8    A.    Yes.
9    Q.    When was the first time that you
10 saw this document?    14:15:58
11   A.    Last week.
12   Q.    You never saw it in connection with
13 your audit work at AHERF, is that right?
14   A.    No.
15   Q.    I think we have a double negative    14:16:14
16 and it's all my fault. So let me try it again.
17     Did you ever see it at any time
18 during your audit work at AHERF?
19   A.    No.
20   Q.    Did you ever see a document    14:16:23
21 similarly headed, that is, AHERF analysis of
22 reserves after proposed adjustments or AHERF
23 cushion analysis typed by AHERF personnel
24 during your audit work at AHERF?
25   A.    No.    14:16:41

Page 155

1    Q.    I'm going to ask you to look down
2  the first page and notice as you do at certain
3  of the various hospitals, there is a row
4  relating to PP&E reserve and amounts in the
5  column headed June 30, 1995 that tie to several    14:17:01
6  of the amounts on the AHERF PP&E score sheet
7  marked as Exhibit 4380. When you've had a
8  chance to do that, would you tell me?
9      In particular I'll direct your
10 attention to the S -- the St. Chris's category    14:17:30
11 of accounts and the PP&E reserve row there,
12 which is an amount of 1.133 million. Do you
13 see that?
14   A.    Yes.
15   Q.    That appears also on Exhibit 4380,    14:17:40
16 is that right, next to St. Chris?
17   A.    It appears on a rounded basis, yes.
18   Q.    Then again if you look later down
19 towards the bottom of the page to the Bucks
20 County amount for PP&E reserve, do you see    14:17:55
21 that?
22   A.    Yes.
23   Q.    That's 6-30-95, on Exhibit 1689,
24 the AHERF analysis of reserves, the amount is
25 1.493 million, and that ties -- is that right?    14:18:06

Page 156

1    A.    It appears as rounding.
2    Q.    It ties rounded, at least close
3  numbers, to the same amount on the schedule
4  previously marked as 4380, the score sheet, is
5  that right?    14:18:27
6    A.    Yes.
7    Q.    Do you know whether anyone at
8  Coopers & Lybrand had this analysis of
9  reserves, that is Exhibit 1689, in his or her
10 hand when the AHERF PP&E score sheet marked as    14:18:45
11 4380 was prepared?
12   A.    No, I don't know.
13   Q.    Did you ever learn that Coopers &
14 Lybrand auditors had been given reserve
15 analyses or what was sometimes I think referred    14:19:04
16 to as cushion analyses that looked like Exhibit
17 1689 during their audit work in connection with
18 AHERF?
19   A.    I'm sorry, can you repeat that?
20   Q.    Did you ever learn that anybody    14:19:17
21 else on the C&L -- on any C&L engagement team
22 ever received cushion or reserve analyses that
23 looked in format like Exhibit 1689?
24   A.    Not that I'm aware.
25   Q.    Did you ever learn during your    14:19:35

39 (Pages 153 to 156)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
   Plaintiff,
  vs.                     Civil Action
PRICEWATERHOUSECOOPERS,          No. 00-684
LLP,
   Defendant.

Continued Videotaped Deposition of

AMY FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Wednesday, the 9th day of

June, 2004, at 9:00 a.m.

- - - - -

VOLUME II

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Page 385

1  of the Lockhart trusts, as we've now defined
2  the term, in connection with your '96 audit
3  work?
4      A.  I don't recall.
5      Q.  Do you recall ever learning from    13:31:46
6  Mr. Panucci or his colleague Patty that they
7  had reviewed the language of the Lockhart Trust
8  as we've now defined them themselves?
9      A.  I recall a discussion with Mark
10 Panucci about AHERF endowments, not necessarily   13:32:09
11 using the term Lockhart trusts as we've now
12 defined them.
13     Q.  What do you recall about that
14 conversation?
15     A.  It was initially a conversation    13:32:22
16 where he shared a view of AHERF management on
17 how to record the AHERF endowments and which
18 then followed with the conversation with Jack
19 Lyden to actually discuss what they were
20 proposing.                        13:32:46
21     Q.  We'll come back to that view
22 sharing. But my question is, do you ever
23 recall learning from Mr. Panucci that he had
24 reviewed each of the five Lockhart trusts in
25 connection with his '96 audit work?    13:32:57

Page 386

1      A.  I don't know if it was each of the
2  five trust documents, recognizing that he was
3  performing testing on their controls. But he
4  had documents or certain information available
5  during that discussion that he and I have had.   13:33:16
6  I just don't know which ones or all or whether
7  it was a representative part of the population.
8      Q.  I'm sorry, I interrupted you.
9      A.  Whether it represented the
10 population that he was reviewing.       13:33:29
11     Q.  Do you believe that he should have
12 reviewed each of the five Lockhart trusts as
13 we've defined them, in connection with his '96
14 audit work?
15         MR. RYAN:  Objection.        13:33:39
16     A.  No, given that he was performing a
17 test of controls of a process that AHERF
18 management had implemented.
19     Q.  Do you know what he means in his
20 note about principal when he says reviewed the   13:33:52
21 -- "C&L reviewed the endowment agreements and
22 noted the principal was permanently
23 restricted."
24         Do you know what principal is in
25 this schedule? And if it's something I need to   13:34:06

Page 387

1  ask him, you can tell me that.
2          MR. RYAN:  You're asking what the
3  word means or where in the schedule the numbers
4  can be found?  I'm confused.
5          MR. JONES:  If that's a part of her   13:34:20
6  answer, that's fine.  I asked her what the word
7  principal means to her.
8          MR. RYAN:  Okay.
9      A.  You're referring to tick mark A?
10     Q.  Yes, I am.                13:34:28
11     A.  I don't know obviously precisely
12 what he meant when he wrote it, but I have a
13 general understanding of that term in the
14 context of endowments.
15     Q.  What do you think it means in your   13:34:43
16 read of it now since you don't recall the
17 document from '96?
18     A.  The original corpus or -- the
19 original balance that was contributed by the
20 donor.                          13:34:56
21     Q.  So the amounts, perhaps, under the
22 column contribution on the far right-hand
23 margin of page one -- or page two of the
24 exhibit?
25     A.  Yes.                      13:35:12

Page 388

1      Q.  The black binders that you referred
2  to for the western region, recognizing that you include
3  within the western region AHERF the parent
4  company in your understanding of western
5  region?                         13:35:24
6      A.  Yes.
7      Q.  Do you recall ever learning from
8  whom or from what source Mr. Panucci or
9  Patty -- I've lost her last name --
10     A.  Francioni.                 13:35:35
11     Q.  -- Francioni received the black
12 binders?
13     A.  I don't remember who they had
14 gotten them from in the past.  I just don't
15 recall.                          13:35:53
16     Q.  Do you know what -- do you have any
17 recall from '96 about what Mr. Panucci meant
18 with the term income in tick mark A?  This is
19 recall from your work in '96.
20     A.  I don't have a recollection based   13:36:15
21 on this schedule and what he wrote here.
22     Q.  Reading the schedule today, do you
23 have an interpretation of what the word income
24 means?
25     A.  Without referring to the actual    13:36:46

32 (Pages 385 to 388)

Page 389

1  agreements or some other information at the
2  time, I'm not sure what -- it could mean
3  several components.
4      Q.  The next tick mark B reads, "C&L
5  reviewed the endowments."                13:37:13
6          It says again that C&L reviewed the
7  endowments, right?
8      A.  Yes.
9      Q.  And noted -- then it continues.
10  And noted there were general income        13:37:23
11  restrictions on the items. "Management took
12  the current income as unrestricted since the
13  amount would have been expensed in the current
14  year and any income from the prior years was
15  kept as temporary restricted."             13:37:42
16          Have I read the first sentence or
17  so accurately?
18      A.  Yes
19      Q.  Do you know what income means in
20  this tick mark?                            13:37:52
21      A.  Today or --
22      Q.  Yes.  First, do you have any
23  recollection from '96?
24      A.  I do not have a recollection from
25  '96.                                       13:38:05

Page 390

1      Q.  Do you have an interpretation of it
2  today?
3      A.  Not without the facts and
4  circumstances that existed at that time.  I
5  would need that information.               13:38:17
6      Q.  The next sentence reads -- the next
7  sentence from tick mark B, "The reason
8  management was being conservative and could not
9  take the approach, the entire amount has been
10  expensed.  C&L agrees with this treatment."  13:38:32
11          Do you see that?
12      A.  Yes
13      Q.  Do you recall C&L agreeing with the
14  treatment so described in 1996?
15      A.  Generally speaking, yes.          13:38:49
16      Q.  What do you recall about that?
17      A.  I recall that the interpretation of
18  the agreements were not clear as to whether or
19  not the income was available for operations.
20  It could be perceived that it would be and     13:39:16
21  that, as a result, they felt that it were more
22  conservative to classify items as temporarily
23  restricted than to interpret the agreement as
24  being fully unrestricted.
25          The word expensed, I'm not sure if   13:39:41

Page 391

1  that's necessarily the right -- the right term,
2  but the -- you know, just broadly speaking,
3  that they believed that had some
4  potential to be used for operations, but
5  because it was not clear in the agreement that  13:40:01
6  they should be conservative in how they treated
7  them.
8      Q.  Again, you didn't review the
9  agreements yourself to determine whether you
10  thought it was clear or not, is that right?   13:40:10
11      A.  I don't recall if I had the actual
12  agreements in my hand.  I recall this
13  discussion with Jack Lyden and even a follow-up
14  discussion, actually, with Al Adamczak to talk
15  about the language that was in the AHERF      13:40:29
16  agreements as I knew them.
17      Q.  Do you recall any of the language
18  to which you refer now?
19      A.  Just that income was not clear and
20  that the general purposes of the organization  13:40:49
21  was part of that terminology.
22      Q.  When you say income was not clear,
23  or restrictions on income was not clear, or the
24  interpretations related to income was not
25  clear, what do you mean by income?           13:41:05

Page 392

1      A.  The availability of unrestricted --
2  I'm sorry, unrealized, realized gains and
3  interest income, dividends and earnings.
4  Essentially the cumulative earnings was how --
5  was the context of the discussion that it was  13:41:28
6  everything in that pile.
7      Q.  So you are defining income in your
8  term to include anything that wasn't the
9  original contribution?
10      A.  In this particular situation.     13:41:39
11  Obviously there are others that it could have
12  been defined differently where it specifically
13  excluded something, but in this circumstance my
14  understanding of what was in question was
15  the --                                      13:41:52
16      Q.  In this circumstance the five
17  Lockhart trusts is what I'm referring to.
18      A.  Well, the trusts -- the majority of
19  the trusts on AHERF because I wasn't -- I was
20  not aware of them as the Lockhart trusts.     13:42:02
21      Q.  So there could have been others?
22      A.  It was those at AHERF, so to the
23  extent that this represented an entirety of
24  AHERF
25      Q.  I see.  The point you're making is  13:42:14

33 (Pages 389 to 392)

Amy Frazier                                                                 Volume 2

Page 393

1  those that were held at the books of AHERF, the
2  parent?
3      A    Correct.
4      Q    Whether or not it was justified
5  Lockhart trusts?              13:42:24
6      A    That's correct.
7      Q    If there were others, your
8  understanding of the term income applied to
9  those others as well, others besides the five
10  Lockhart trusts held on the accounts at AHERF,    13:42:32
11  the parent?
12      I withdraw the question. I think
13  we understand each other.
14      In any event, your definition of
15  income was everything but the original    13:42:50
16  contribution?
17      A    In the context of our discussions
18  on this, yes.
19      Q    You understood the point person at
20  AHERF who had been involved in the          13:43:15
21  classifications for the AHERF parent endowments
22  was Mr. Lyden?
23      A    Mr. Lyden and Mr. Adamczak.
24      Q    Was there any discussion about
25  whether the use of the classification    13:43:31

Page 394

1  temporarily restricted would create a cushion
2  to enhance earnings in future years?
3      MR. RYAN: Objection to form.
4      A    There was no discussion about that.
5      Q    Did you think that might be the    13:43:48
6  case?
7      A    Absolutely not.
8      Q    Did that turn out to be the case,
9  to your knowledge?
10      A    No.                      13:43:56
11      Q    Do you recall ever making an
12  inquiry of any financial institution about
13  receiving copies of endowment agreements which
14  endowments were held on the accounts of AHERF,
15  the parent?                    13:44:23
16      THE WITNESS: I'm sorry, can you
17  repeat that?
18      (Record read.)
19      A    No, because I believe they were --
20  they, AHERF, had been undergoing that process    13:44:43
21  themselves.
22      Q    Why did you believe that?
23      A    They had a number of steps that
24  they had been implementing throughout the
25  entire process of adopting the new accounting    13:44:55

Page 395

1  pronouncement, which included gathering all of
2  the documents, reviewing them with their legal
3  counsel in-house, and evaluating the impact of
4  the new standards  So it was a process that
5  they had undertaken            13:45:11
6      Q    Well, my question is, did you
7  actually hear from anybody that AHERF had gone
8  to financial institutions and requested copies
9  of underlying endowment agreements for the
10  endowments held at AHERF, the parent?        13:45:21
11      A    I believe your original question
12  was more directed to me, whether I personally
13  did
14      Q    It certainly was  You referred me
15  to AHERF personnel  That's why we're coming    13:45:29
16  back to that.
17      Do you ever recall hearing from
18  anybody that AHERF personnel were instructed or
19  had actually themselves gone out and asked for
20  copies of endowment agreements from financial    13:45:40
21  institutions in connection with this '96
22  endowment review?
23      A    I don't know if I -- I don't recall
24  if I knew that. I know they were gathering
25  documents  I'm not sure of all the sources    13:45:53

Page 396

1      Q    My question is now, back to you,
2  did you ever yourself make an inquiry, call,
3  visit a financial institution and ask for
4  copies of endowment agreements you believed to
5  be held by AHERF, the parent, in your '96 work?    13:46:06
6      A    I believe I said no because they
7  were doing it -- because they were taking their
8  own procedures to get the documents.
9      Q    My question now is did you instruct
10  Mr. Panucci or anybody else to do that?        13:46:22
11      A    No, I instructed him to review the
12  process of what management was undertaking.
13      Q    Did you ever learn from Mr. Lyden
14  or anybody else that AHERF or C&L had only
15  partial copies or believed they had only        13:46:56
16  partial copies of any of the five endowments
17  that we've now defined as the Lockhart trusts?
18      MR. RYAN: Could I get that read
19  back, please?
20      (Record read.)              13:47:31
21      A    I don't recall. I know there were
22  cases where they didn't have complete documents
23  or information was not available. I just don't
24  recall specifically related to those documents
25  at AHERF.                      13:47:48

34 (Pages 393 to 396)

Page 397

1    Q.  Who did you learn what you just
2  learned about some documents, perhaps, being
3  missing from?
4    A.  I don't recall if it was Carolyn
5  Cafaro or someone, that there were documents    13:48:09
6  that were very old that they were trying to
7  track down.
8    Q.  Well, they were old documents that
9  might have some missing portions or they were
10  just old documents?                            13:48:24
11    A.  Old documents that they may just
12  not even have because they never existed or --
13  period, or -- and I don't know if that was
14  parts, pieces.  It was just that they didn't --
15  it was quite an effort to gather materials      13:48:41
16  throughout the system
17    Q.  Miss Cafaro you understood to be
18  involved with endowment work related to the
19  eastern enterprises, is that right?
20    A.  Principally in 1996  But she         13:48:58
21  clearly was identified as the person who had
22  really spent a significant amount of time in
23  understanding the pronouncements and was
24  helping the others in the western region with
25  evaluating what they needed to do              13:49:10

Page 398

1    Q.  Do you know yourself whether she
2  was involved in any way in locating documents,
3  endowment documents for western enterprises, or
4  AHERF, the parent?
5    A.  I don't know.                          13:49:19
6    Q.  Tick mark C on the exhibit before
7  you reads, "C&L agreed the amounts to the
8  endowment agreements without exception."
9        Did I read that right?
10    A.  Yes.                                 13:49:39
11    Q.  Again, Mr. Panucci or his ghost
12  writer is referring to procedures that would
13  call for having the endowment agreements -- the
14  endowment agreements in hand, is that fair to
15  say?                                           13:49:55
16    A.  Certainly that would support that,
17  yes.  I don't know if it was the entire amount
18  or entire document, but whatever had been
19  provided
20    Q.  Does this schedule reflect in your   13:50:31
21  view today, since you don't recall it from the
22  '96 time frame, that the only amount classified
23  in the '96 financials -- that this schedule
24  would propose to be classified on the '96
25  financials in the permanently restricted       13:50:47

Page 399

1  category was the approximate 5 4 million in the
2  contribution column?
3    A.  I'm not sure without looking at all
4  the detail.
5    Q.  Is there anything else in this        13:51:28
6  schedule that suggests that any amount greater
7  than 5.4 million was to be permanently
8  restricted or reflected as permanently
9  restricted on the '96 financials?
10    A.  I just don't know without agreeing   13:51:58
11  these to the actual trial balances
12    Q.  Let's ask it this way  Do you
13  ever -- before I do that
14        Did you ever learn from any source
15  that Mellon Bank would not permit AHERF access  13:52:13
16  to any funds or sums held in the Lockhart
17  endowments, as we've described them, other than
18  interest and dividend income?
19        MR. RYAN:  This is at any point in
20  time?                                          13:52:34
21        MR JONES:  Yes
22    A.  Yes
23    Q.  When did you first learn that?
24    A.  1998
25    Q.  In fact, for a number of years,      13:52:40

Page 400

1  both before and after fiscal year 1996, the
2  income and dividend -- I'm sorry, the interest
3  and dividend income on the Lockhart trusts you
4  came to learn was shipped automatically to a
5  concentration account held by AHERF or AGH      13:52:58
6  before AHERF, is that fair to say?
7        MR RYAN:  Objection
8    A.  I don't recall
9    Q.  Did you ever learn that from any
10  source?                                        13:53:08
11    A.  I don't recall
12    Q.  When I say shipped to, I mean
13  siphoned off or periodically removed from the
14  trust balances at Mellon and given to other
15  accounts held in the name of AHERF or AGH, that  13:53:26
16  is the interest and dividend income?  Did you
17  ever learn that -- maybe I don't have the terms
18  exactly right -- but did you ever learn that as
19  a matter of principle had occurred?
20    A.  I know, generally speaking, there    13:53:38
21  were accounts that they had that amounts they
22  received might go into another account balance
23  I just don't know how the -- I can't recall if
24  it relates to these or others  I mean, I
25  remember the term concentration account also,   13:53:54

538

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
          Plaintiff,                    Civil Action
     vs.                                No. 00-684
PRICEWATERHOUSECOOPERS,
LLP,
          Defendant.


          Continued Videotaped Deposition of

AMY FRAZIER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Thursday, the 10th day of

June, 2004, at 9:00 a.m.

          - - - - -

          VOLUME III

          - - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1 888.391.3376 (DEPO)

Amy Frazier                                                                 Volume 3

Page 582

1  the first meeting?
2      Q.   At any time up to and including the
3  conversation with him.
4      A.   I really had no understanding of
5  what it was to come to a conclusion. I needed    09:54:44
6  more facts.
7      Q.   Did you ever formulate a conclusion
8  or ever come to the view that this transaction
9  was consistent with GAAP?
10         MR. RYAN: Could I get that read    09:54:58
11  back, please?
12         (Record read.)
13     A.   Yes.
14     Q.   So you believed at some point that
15  it was okay under GAAP?    09:55:15
16         MR. RYAN: Objection. I don't
17  think that's what she just said.
18     Q.   So you formulated a conclusion at
19  some point that this was consistent with GAAP?
20     A.   You asked me if I developed a view.    09:55:23
21     Q.   Yes.
22     A.   If it was consistent. And I'm
23  saying, yes, I developed a view.
24     Q.   What was the view?
25     A.   That it was not consistent.    09:55:30

Page 583

1      Q.   Thank you.
2      A.   Not necessarily consistent with
3  GAAP.
4      Q.   When did you formulate that view,
5  that this set of entries regarding the 50    09:55:36
6  million dollar reserve transfers was not or
7  were not consistent with GAAP? The question is
8  when
9      A.   Sometime later in the audit as I
10  got more information, that if the adjustment,    09:55:52
11  at least as I was understanding it from their
12  perspective, would not be consistent with GAAP,
13  that it was a bookkeeping entry that I needed
14  to evaluate
15     Q.   Did you share your view with    09:56:08
16  anyone?
17     A.   Yes.
18     Q.   With whom?
19     A.   I discussed that with Mr. Buettner
20  and on other occasions with Mr. Cancelmi saying    09:56:15
21  why would you do something so stupid, reverse
22  it
23     Q.   So I understand that last piece of
24  the testimony, you told Mr. Cancelmi to
25  reserve -- to reverse this reserve transfer?    09:56:32

Page 584

1      A.   I just said it was unnecessary, you
2  don't need it, why are you doing it? You need
3  to have reserves at Graduate, keep them there.
4      Q.   My question was, did you tell him
5  to reverse it?    09:56:47
6      A.   Yes.
7      Q.   What did he say in this
8  conversation?
9      A.   I don't recall. I mean -- it had
10  been on two occasions at least that I had had    09:56:54
11  that discussion with him and -- and I just --  I
12  don't recall what he said. I do recall, back
13  again to that first conversation of it's what
14  they did, figure it out.
15     Q.   When did you first tell    09:57:14
16  Mr. Cancelmi that you thought he should reverse
17  the transaction or the entries or that they
18  were stupid?
19         MR. RYAN: Objection
20     Q.   Maybe it can help you by saying how    09:57:27
21  close in time after the first August meeting
22  with him?
23     A.   It was sometime during year-end
24  field work. It's a compressed period of a few
25  weeks. It really -- I don't know.    09:57:38

Page 585

1      Q.   Was it in August or September of
2  '97?
3      A.   It was probably later August or
4  early September. I just don't know.
5      Q.   Do you recall anything more about    09:57:52
6  the subsequent two conversations in which you
7  asked Mr. Cancelmi to -- or told Mr. Cancelmi
8  to reverse the entries than what you've just
9  told me as you sit here today?
10     A.   The one other was what we had    09:58:04
11  talked about yesterday relative to Rancocas,
12  which was obviously later.
13     Q.   We talked about that one yesterday.
14     A.   Yes.
15     Q.   Anything more?    09:58:13
16     A.   I mean, there were a number of
17  other just discussions that were taking place
18  throughout the course of the audit relative to
19  purchase accounting and related to Graduate.
20     Q.   No, let me help you limit the    09:58:33
21  question
22     A.   Okay.
23     Q.   I'm sorry to interrupt you.
24     A.   That's okay.
25     Q.   I really want to know anything more    09:58:39

12 (Pages 582 to 585)

Amy Frazier

Page 586

1   you recall, anything about the two
2   conversations in which you told Mr. Cancelmi to
3   reverse the two entries.
4        MR. RYAN: Other than what she's
5   already testified to.                    09:58:46
6        MR. JONES: Yes.
7        Q.   Which was, I think, he should
8   reverse them because they weren't necessary.
9        A.   Right.
10       Q.   Or that they were stupid.        09:58:52
11       MR. RYAN: We got a lot yesterday
12  about the second conversation.
13       Q.   I'm not asking about the Rancocas
14  conversation.
15       A.   Not as I sit here today, I don't   09:59:03
16  recall.
17       Q.   Do you recall him ever saying he
18  would or wouldn't do it, that is, reverse it?
19       A.   I don't recall, as I sit here
20  today.                                   09:59:19
21       Q.   Had you known Mr. Cancelmi in his
22  work at Coopers & Lybrand?
23       A.   Oh, yes.
24       Q.   Had you worked together on audits?
25       A.   Yes.                            09:59:25

Page 587

1        Q.   Which audits?
2        A.   AHERF. I don't recall if there
3   were others. There may have been something
4   else, but --
5        Q.   Did you consider him a good working  09:59:37
6   colleague in your times together at C&L?
7        A.   Yes. He was smart, technical,
8   fair. I thought we worked well together.
9        MR. RYAN: Would now be a good time
10  for a break, Jim?                         10:00:05
11       MR. JONES: Yes. I'm sorry.
12  That's just fine.
13       THE VIDEOGRAPHER: Off the record,
14  10:00.
15       (Recess had.)                        10:00:10
16       THE VIDEOGRAPHER: Back on the
17  record, 10:20.
18       Q.   Miss Frazier, how close in time was
19  your first conversation with Mr. Cancelmi at
20  which you discussed these transfers of reserves  10:19:42
21  from Graduate -- the Graduate hospitals to the
22  Delaware Valley Obligated Group hospitals and
23  your second conversation with Mr. Cancelmi at
24  which you told him he should reverse the
25  entries?                                  10:19:55

Page 588

1        A.   I don't recall. It was really
2   within those last few weeks of the audit, or at
3   least that main stage of the year-end field
4   work.
5        Q.   Was it more than a few days between  10:20:11
6   those two conversations?
7        A.   I really don't recall. It could
8   have spanned a weekend for all I know.
9        Q.   Do you recall working on or having
10  performed any analysis between the two        10:20:28
11  conversations that led you to conclude that the
12  Graduate hospitals needed the reserves and the
13  Delaware Valley Obligated Group did not?
14       A.   Yes.
15       MR. RYAN: Objection.                 10:20:40
16       Q.   So this was an analysis that you
17  could have completed over a weekend?
18       MR. RYAN: Objection.
19       A.   There was various things that were
20  occurring throughout the course of the audit,  10:20:51
21  end of the audit. So I don't remember when I
22  completed each of those pieces that kind of
23  mixed into that analysis.
24       Q.   But you had done some work between
25  the two conversations on the topic of who      10:21:07

Page 589

1   needed the reserves?
2        A.   Yes, including talking to
3   Mr. Buettner about it as well.
4        Q.   When you talked with Mr. Buettner
5   the first time, was that -- how many days or   10:21:16
6   was it after or was it the same day as the
7   first conversation with Mr. Cancelmi?
8        A.   I'm really not sure. It was fairly
9   close after. I just don't know if it was the
10  same day. I really don't know. It was -- it   10:21:28
11  seemed -- I just feel that it was pretty close
12  after. I just don't know if a night lapsed or
13  not.
14       Q.   So, again, within a day or two?
15       A.   Yes.                            10:21:44
16       Q.   What was Mr. Buettner's reaction?
17       A.   He wasn't aware of what it was, and
18  we talked about a series of steps that we would
19  like to take over the course of the audit to
20  understand what it related to, what the impact  10:21:58
21  was, what Graduate needed, what AHERF didn't
22  need, the DVOG hospitals, and to evaluate the
23  bad debt reserves at DVOG.
24       So we talked about a series of
25  things that we needed to do from a -- our audit  10:22:14

13 (Pages 586 to 589)

Page 590

1  procedures.
2      Q.  Do you recall anything more about
3  the conversation, anything he said or you said?
4      A.  We actually talked about the entire
5  memo and all of the things on the memo as part    10:22:27
6  of that conversation, so it was not just the 50
7  million.  I recall also just talking about an
8  update on the overall status of the audit.
9      Q.  Related to the Graduate reserve
10  transfers, though?                                10:22:45
11      MR. RYAN:  You're asking if there's
12  anything in this first meeting with
13  Mr. Buettner that she can remember?
14      MR. JONES:  Beyond what she's just
15  said about the Graduate reserve transfer issue.   10:22:52
16      A.  Just generally, we had some work to
17  do and needed to understand.
18      Q.  Had you -- did you tell
19  Mr. Buettner, in your first conversation with
20  him on the topic, that you had already told       10:23:02
21  Mr. Cancelmi to reverse the entries?
22      A.  No.  My recollection was that I was
23  still at the early stages of not really
24  understanding what exactly the transaction was,
25  so I couldn't formulate that type of an opinion   10:23:17

Page 591

1  at that point.
2      Q.  Can you recall today what it is you
3  had done between the first conversation with
4  Mr. Cancelmi about the topic and the
5  conversation during which you first told him to   10:23:28
6  reverse the entries by way of analysis?
7      A.  I'm sorry, with Mr. Cancelmi?
8      Q.  Yes.  As you sit here today.
9      A.  I just broadly recall knowing that
10  Graduate needed them for purposes at Graduate.    10:23:46
11  I don't recall generally what -- I don't recall
12  specifically what steps that included at that
13  point, but I at least had a view that Graduate
14  needed them.  I don't know if at that point I
15  was at the stage of knowing whether or not DVOG   10:24:04
16  didn't need reserves.
17      - - - - -
18      (Thereupon, Deposition Exhibit 4435
19      was marked for purposes of
20      identification.)
21      - - - - -
22      Q.  I'm going to hand you now what
23  we've marked as Exhibit 4435.
24      Can you identify this document for
25  me?                                               10:24:45

Page 592

1      A.  It's notes from a meeting that I
2  had with Dan Cancelmi on some early purchase
3  accounting adjustments that they had provided
4  to us.
5      Q.  That meeting occurred on the day of   10:25:02
6  the -- that your notes are dated, 7-16-97?
7      A.  I'm not sure if that was the actual
8  date, but it was probably approximately then.
9      Q.  Was your practice to, when you took
10  notes about meetings, to date them, the notes     10:25:18
11  on the day the meeting was held?
12      A.  Not always.
13      Q.  Why would you vary from that?
14      A.  I may not have dated it and the
15  next day when I went back to it dated it.  I       10:25:30
16  just -- it depended.  There was no consistency
17  necessarily.
18      Q.  Do you have any doubt that you met
19  with Dan Cancelmi and discussed these topics
20  within a few days of July 16, 1997?                10:25:42
21      A.  No.
22      Q.  In fact, you've written Dan C at
23  the top of the page and your initials, ASF, is
24  that right?
25      A.  That's correct.                           10:25:53

Page 593

1      Q.  The topic is Graduate purchase
2  adjustments?
3      A.  Yes.
4      Q.  I'm going to ask you to tell me if
5  you recall what you meant by amortization 35       10:26:06
6  years, item two.
7      A.  I don't recall the actual note, but
8  I recall generally speaking, that they wanted
9  to amortize the good will established, the
10  positive good will established for the Graduate    10:26:25
11  acquisition as over 35 years.
12      Q.  Did C&L ever take exception to this
13  treatment?
14      A.  I don't believe so, but I know that
15  there was some good will that did not -- that      10:26:37
16  went to PP&E, so, I mean, there was further
17  steps taken later that I would need to look at
18  that detail.
19      Q.  Would you flip to the second page
20  of your notes?  See at the bottom of the page      10:26:50
21  the number 50 and the letter M?  Do you know
22  why you wrote that note, 50 M?
23      A.  I believe it's in different -- I'm
24  not sure if that one is in different pen or
25  not, but it was, as I recall, a follow-up note     10:27:12

14 (Pages 590 to 593)

Page 610

1  Frazier, give you any reason to believe that
2  you knew about the 50 million dollar reserve
3  transfers of which we've been speaking in April
4  of '97?
5     A.  Absolutely not. I knew about it in    10:46:58
6  August or year-end field work of 1997.
7     Q.  Let's skip to the next page. It
8  says materiality, 15 million dollars, $500,000
9  SUD. Did I read that right?
10       MR. RYAN: I'm not sure it was 15.    10:47:16
11       MR. JONES: I said 15.
12       MR. RYAN: I'm not sure that's
13  15.
14     A.  I believe that's 1.5. There's a
15  faint dot there that maybe on the original is    10:47:23
16  more clear.
17     Q.  I apologize if I've misread it, but
18  I really can see no dot. So if that's your
19  best recollection -- you've seen the document a
20  number of times before, is that right?    10:47:34
21     A.  Yes. It's 1.5.
22     Q.  So the note reads, and it's in red,
23  materiality, 1.5 million dollars, $500,000 SUD,
24  is that right?
25     A.  Everything is in red. There wasn't    10:47:50

Page 611

1  anything unique about it being red.
2     Q.  I was just trying to time it so
3  that we knew when you took it.
4     A.  Yes.
5     Q.  Do you know what that means today?    10:47:57
6     A.  I was referring to some materiality
7  guidelines that we were contemplating as part
8  of planning for the audit.
9     Q.  What did the 1.5 million dollars
10  refer to?    10:48:12
11     A.  I would have to look back to our
12  actual planning information. I just don't
13  recall as I sit here today.
14     Q.  Do you know what the 500,000 K SUD
15  referred to?    10:48:27
16     A.  Based on that, it's an -- I don't
17  recall writing it, but, based on that, it
18  appears at least as an initial recommendation
19  of what we would include as possible
20  adjustments on the SUD.    10:48:37
21     Q.  But the -- you can't recall what
22  the 1.5 million dollars reserves to?
23       Is that overall materiality?
24       MR. RYAN: Objection.
25     A.  I can't recall. I need to go back    10:48:46

Page 612

1  into the planning work papers.
2     Q.  You can't recall?
3     A.  I can't, without looking at that.
4     Q.  It's been a number of years.
5     A.  Yes.    10:48:53
6     Q.  But you recall with clarity that
7  the 50 million dollar reserve location note of
8  a number of years ago did not refer to the
9  transfer of the reserves from the Graduate
10  hospitals to the Delaware Valley Obligated    10:49:19
11  Group hospitals, am I right?
12     A.  Absolutely, because that was a part
13  of a conference call. This, we wouldn't have
14  been talking about materiality with that call.
15     Q.  You think this note is unrelated,    10:49:22
16  the materiality note?
17     A.  It could have been or it's just a
18  follow-up discussion even after we got off the
19  phone, but I remember the call.
20     Q.  You can recall Mr. Cancelmi's words    10:49:33
21  precisely so that you can quote them, am I
22  right, today?
23       MR. RYAN: Objection
24     Q.  That the reserves were for Graduate
25  at Graduate in those words?    10:49:43

Page 613

1       MR. RYAN: Objection
2     A.  In those words. I don't know if he
3  had ands and the's in between, but he said
4  they're for Graduate at Graduate for the types
5  of things that they need at Graduate    10:49:52
6     Q.  I just want to make sure you recall
7  that today.
8     A.  Absolutely.
9     Q.  Miss Frazier, I'm handing you what
10  we've marked as 4258. It's a working paper    10:50:34
11  named Hahnemann Trial Balance Review. Do you
12  see that?
13     A.  Yes.
14     Q.  This is a working paper, I believe,
15  that has been printed out in hard copy from a    10:50:46
16  version of the CLASS database that was not the
17  final version of the CLASS database for fiscal
18  year '97.
19       If you look about one, two, three,
20  four pages into the document, you'll see a    10:51:09
21  print of the screen that shows you as the
22  author. Is that right?
23     A.  That's what it states, yes.
24     Q.  Do you recall authoring this
25  document?    10:51:27

Page 614

1     A.  I don't recall the document
2  specifically, no
3     Q.  Do you have any doubt that you did?
4     A.  No, not based on this.  I'm not
5  sure -- I mean, I'm not sure about all of the        10:51:37
6  individual line items within it, but --
7     Q.  If you skip to the next page, the
8  print of that page indicates that you created
9  the document.  Is that right?
10    A.  Yes.                            10:51:51
11    Q.  Do you have any doubt that you did?
12    A.  No.
13    Q.  If you skip to the next page, that
14  screen print indicates that you created the
15  document on May 13, 1997 about 2:00 in the       10:52:02
16  afternoon.  Is that right?
17    A.  I'm sorry, I don't see my name.
18    Q.  Well, the document itself was
19  created.  I was carrying over the presumption
20  that you created it from the page prior         10:52:28
21    A.  Oh, I'm sorry.  That's what it
22  states, yes.
23    Q.  Can you look at the rest of the
24  screen prints and find for me -- I believe the
25  document indicates that it was last modified on  10:52:37

Page 615

1  May 22nd, 1997  Do you see that?
2     A.  I see date modified, 5-22-97.  I'm
3  not sure if that's last modified.
4     Q.  Does that list all of the dates of
5  the modification there?                 10:53:06
6     A.  I don't know  I'm not just that
7  familiar with that level of detail of CLASS to
8  know that.
9     Q.  Let me direct you back now to the
10  first page of the document.  You see about a    10:53:20
11  third of the way down on the face page of the
12  document that there is a line that reads, "How
13  is the first 25 of the 50 million distributed
14  to the entities, or did this occur in April."
15        Do you see that?                 10:53:39
16    A.  Yes.
17    Q.  Do you believe that you typed that
18  line or two lines?
19    A.  I don't have any reason to doubt
20  that I didn't                          10:53:47
21    Q.  As you sit here today, do you know
22  what that means?
23    A.  Generally speaking, yes.
24    Q.  What do you believe that it means?
25        Let me ask this.  Do you have any  10:54:00

Page 616

1  recall from 6-30-97's audit work about what
2  this means?
3     A.  Yes
4     Q.  What is your recall of what this
5  means?                              10:54:10
6     A.  That the DVOG hospitals were going
7  to be implementing their new bad debt
8  methodology and, once they did that, they
9  expected that they would need to record
10  additional bad debt reserves and they were     10:54:26
11  going to take it over two months of about 25
12  and 25 million each.
13    Q.  Where were they going to get those
14  reserve amounts, do you have any recollection
15  of that or knowing that at the time you typed   10:54:37
16  this document?
17        MR. RYAN:  Objection.
18    A.  I don't recall as far as typing the
19  document, but I recall generally in April
20  knowing that they were going to record it as    10:54:48
21  just normal bad debt reserves that you would do
22  on any type of bad debt reserve transaction.
23    Q.  Who did you learn that from?
24    A.  Dan Cancelmi
25    Q.  When you had those conversations --  10:55:02

Page 617

1  was this in a conversation?
2     A.  Yes
3     Q.  When you had those conversations,
4  did Mr. Cancelmi tell you anything about how he
5  anticipated that reserve increase was to be    10:55:19
6  recorded in specific?
7         MR. RYAN:  Objection.
8     A.  I just recall it being we're going
9  to record our bad debt reserve like we do, we
10  adopted the methodology, it's just normal      10:55:30
11  course of business that they've done in the
12  past.
13    Q.  When you say normal course of
14  business, how was it recorded at AHERF
15  hospitals?                           10:55:39
16    A.  In the past?
17        MR. RYAN:  You mean generally?
18    Q.  Yes, in your experience as of the
19  audit of 1997
20    A.  As bad debt expense.              10:55:46
21    Q.  So you increase bad debt expense on
22  the statement of operations and boost the
23  reserve by the same amount?
24    A.  That would be the offsetting entry,
25  yes.

20 (Pages 614 to 617)

Amy Frazier                                                                                    Volume 3

Page 618

1    Q.   You had no knowledge, as of the
2   date you authored Exhibit 4258, of a plan to or
3   the implementation of a plan to move 50 million
4   dollars of reserves established in connection
5   with the Graduate Hospital acquisition to the        10:56:15
6   Delaware Valley Obligated Group bad debt
7   reserves, is that right?
8    A.   Absolutely not.
9    Q.   Am I right?
10    A.   I had no knowledge of that.                   10:56:33
11    Q.   Why use the word distributed then
12   if you -- if they were going to do this in the
13   normal course, what does the word distributed
14   mean?
15    A.   I just didn't know how, on which             10:56:36
16   books it related to.  So I knew it broadly as
17   there was going to be 50 million on all the
18   DVOG entities.  I just didn't know which ones.
19    Q.   I'm handing you now, Miss Frazier,
20   Exhibit 4297.  I'll just have a few questions        10:57:14
21   for you.  It's a C&L work paper dated June 9,
22   1997 and apparently created and last modified
23   by Miss Heinlein.  Is that right?
24    A.   Yes, according to what it says.
25    Q.   It's an issue topic document, is             10:57:37

Page 619

1   that right?
2    A.   That's what it states, yes.
3    Q.   About the 50 million dollar reserve
4   entry, that's what it reads?
5    A.   Yes.                                           10:57:48
6    Q.   It then reads, "Per conversation
7   with Robin Schafer, C&L notes that a total of
8   50 million dollars was intercompanied" --
9   "intercompanied from the Graduate hospitals to
10   the Delaware Valley hospitals due to the DV bad     10:58:05
11   debt reserve short-falls.
12        "A determination was made that 25
13   million of reserves would be recorded in the DV
14   hospitals in the March 1997 financials and the
15   remaining 25 million dollars would be recorded      10:58:21
16   in April."
17        Do you see that?
18    A.   That's what it says, yes.
19    Q.   Then there's a schedule below that
20   reflects an allocation of those reserves, is        10:58:29
21   that right, to the various Delaware Valley
22   Obligated Group hospitals?
23    A.   Yes.
24    Q.   Which totals 50 million dollars?
25    A.   Looks like the totals are all off,            10:58:41

Page 620

1   but yes.
2    Q.   It ultimately then, in the same
3   issue description area, gives us the journal
4   entries or proposed journal entries that would
5   be involved.  Is that right?                         10:58:52
6    A.   There are journal entries listed
7   there, yes.
8    Q.   When did you first see this
9   document, if ever, before today?
10    A.   I don't recall if I've ever seen it          10:59:09
11   other than in deposition preparation.
12    Q.   You don't recall seeing it before
13   being prepared for lawyers to testify in the
14   SEC case, is that right?
15    A.   That's correct.                               10:59:23
16    Q.   When was your first preparation for
17   deposition in the SEC case at least by year?
18    A.   1998, maybe.  Nine?  I don't know.
19   Some --
20    Q.   Not earlier than 1998, is that              10:59:40
21   right?
22    A.   No.
23    Q.   It would not be earlier than that,
24   am I right?
25    A.   That's correct.                               10:59:46

Page 621

1    Q.   Do you see this document, it
2   appears to be created by Miss Heinlein and last
3   modified by Miss Heinlein on June 9, 1997?
4    A.   Yes.
5    Q.   If Miss Heinlein has testified that          11:00:13
6   it is her best recollection that she first
7   heard about the 50 million dollar Graduate
8   reserve entries to increase the bad debt
9   reserve at the Delaware Valley Obligated Group
10   hospitals, that she first learned of that set       11:00:29
11   of entries from you, would you disagree with
12   her today?
13        MR. RYAN:  Objection.
14    A.   I don't know.  It depends on the
15   timing.                                             11:00:42
16    Q.   Well, she's apparently
17   knowledgeable of it as of June 9, 1997, by at
18   least as far as you read this document, am I
19   right?
20    A.   That's what the document states.             11:00:55
21    Q.   So if she knew in June of '97 and
22   she says that she learned about it for the
23   first time from you, would you disagree with
24   her today on the record?
25        MR. RYAN:  Objection.                         11:01:07

21 (Pages 618 to 621)

Page 622

1    A.  I would need to break down elements
2  of that because I recall discussions with her
3  about 50 million dollars in reserves being
4  recorded at DVOG and then separately having
5  discussions with her regarding transfers as      11:01:19
6  part of the year-end field work. So in the
7  aggregate, there may be pieces of that I would
8  agree with, but --
9    Q.  Let's just -- let's put it real
10  bluntly. If she has testified or does testify      11:01:37
11  at trial that she knew about the reserve
12  transfers in June of '97, not whether there
13  might be some reserves established in one place
14  and whether there might be some additional
15  reserves needed someplace else, but that she      11:01:49
16  knew about the actual transfer of reserves from
17  the Graduate hospitals to the Delaware Valley
18  Obligated Group hospitals in June of '97 and
19  she first learned about it from you, do you
20  disagree with her?                                11:02:03
21    MR. RYAN: I'll object to that
22  because I think that mischaracterizes Miss
23  Heinlein's testimony.
24    MR. JONES: I posed a hypothetical.
25    Q.  Do you disagree with her?               11:02:12

Page 623

1    A.  Yes, if that's the hypothetical.
2    Q.  Handing you now what we've marked
3  as Exhibit 4264, Miss Frazier, I'm going to ask
4  you to take a moment to look at that document
5  which I believe has been derived from the final      11:03:01
6  CLASS database.
7    A.  Okay.
8    Q.  Have you seen this document before?
9    A.  Yes.
10    Q.  It reads, "This is not sufficient      11:03:34
11  documentation," is that right, as an on-line
12  summary?
13    A.  Yes.
14    Q.  It has a link to further
15  information line that reads, "Exclamation      11:03:44
16  point, 50 million dollar reserve entry." Is
17  that right?
18    A.  Yes.
19    Q.  It appears that you're the author
20  of this document, is that right, from the      11:04:01
21  screen prints and otherwise?
22    A.  Yes.
23    Q.  It has a date created of 8-7-97.
24  Is that right?
25    A.  Yes.                                    11:04:13

Page 624

1    Q.  Do you have any doubt that you
2  authored the document?
3    A.  No. I mean, obviously the response
4  piece I would not have necessarily authored,
5  but --                                          11:04:30
6    Q.  But the review comment you would
7  have authored?
8    A.  Likely, yes.
9    Q.  Here you're writing, "Assign a
10  basis for the need to account for this at      11:04:43
11  Graduate, i.e., why Graduate needs to establish
12  such reserves." Did you write that -- or did I
13  read that right? I'm sorry.
14    A.  Yes.
15    Q.  In the response it reads, "It was      11:05:03
16  concluded that we should keep these two issues
17  separate." Do you see that?
18    A.  Yes.
19    Q.  Do you know what that means, as you
20  sit here today?                                 11:05:14
21    A.  Generally speaking, yes.
22    Q.  What do you think it means?
23    A.  That the Graduate reserves and
24  whether or not Graduate needed reserves is one
25  topic and that whether or not DVOG was impacted  11:05:30

Page 625

1  by the transfer of reserves was another topic.
2    Q.  Do you know who wrote that?
3    A.  I do not.
4    Q.  Is this a comment on the issue
5  document marked as Exhibit 4302?               11:05:47
6    MR. RYAN: 4302?
7    Q.  I'm sorry, 4297, I apologize.
8    MR. RYAN: You mean on that
9  version?
10    MR. JONES: Or on any version       11:06:09
11    A.  I don't know without looking at the
12  electronic CLASS system, the source documents.
13    Q.  We've handed you just now, Miss
14  Frazier, what we've marked as Exhibit 4263.
15  This is a work paper headed Graduate Good Will      11:06:46
16  Entry completed by Kristen Heinlein and dated
17  8-21-97 and last modified by Miss Porter
18  apparently on 9-10-97.
19    Have you seen this before today?
20    A.  I don't recall.                          11:07:03
21    Q.  Do you recall having any
22  involvement in any of its text?
23    A.  No, I don't recall because my name
24  is not listed in the modification history.
25    Q.  Let me ask you to read to yourself  11:07:26

22 (Pages 622 to 625)

Amy Frazier                                                                    Volume 3

Page 630

1    A.   I don't recall.
2    Q.   Let me ask you to skip -- to flip
3   to the second page, in the box that reads
4   "purchase price adjustments."
5        Are you with me?              11:13:46
6    A.   Yes.
7    Q.   There's a note or a line that
8   reads, "Additional bad debt reserve for DVAR, 8
9   million dollars." Is that right?
10   A.   Yes.                          11:13:54
11   Q.   You knew City Avenue Hospital to be
12  a Graduate Obligated Group or a Graduate
13  Hospital, is that right?
14   A.   Graduate Hospital, yes.
15   Q.   Here we've got somebody saying in    11:14:04
16  their -- in the purchase price adjustments for
17  City Avenue, a Graduate Hospital, the words
18  "additional bad debt reserve for DV slash A/R,
19  8 million dollars." Am I right?
20   A.   That's what it says.          11:14:21
21   Q.   Can you put that to the side but
22  fold it over so that the second page stays in
23  the same place?
24        I'm now handing you what we've
25  marked as Exhibit 4123 on another day. Again,   11:14:37

Page 631

1   this is a C&L fiscal year '97 work paper?
2    A.   Yes.
3    Q.   For the City Avenue Hospital
4   opening balance sheet?
5    A.   Okay.                         11:14:57
6    Q.   Is that yes?
7    A.   Yes.
8    Q.   I would like you to skip to the
9   second page again and to the place where the
10  box reads, "Purchase price adjustments again."   11:15:07
11       Are you there?
12   A.   Yes.
13   Q.   I'm going to tell you what I think
14  to be true, that this is a version of the
15  document taken from whatever the final CLASS   11:15:21
16  database would have printed for us.
17   A.   M-hm.
18   Q.   Do you see there that the language
19  is different under the purchase price
20  adjustments for the 8 million dollar entry than   11:15:38
21  it is in Exhibit 4124?
22   A.   Yes, the words are different.
23   Q.   On 4124, from the draft version or
24  the earlier version of CLASS, the line reads,
25  "Additional bad debt reserve for DV A/R, 8   11:15:52

Page 632

1   million dollars," right?
2    A.   Yes.
3    Q.   On the final version of the CLASS
4   print, Exhibit 4123, the line now reads,
5   "Additional bad debt reserve, 8 million   11:16:07
6   dollars," is that right?
7    A.   Yes.
8    Q.   So what is different is the words
9   or phrase for DV A/R. Is that right?
10   A.   Yes.                          11:16:21
11   Q.   Do you know why it's been deleted,
12  those --
13       MR. RYAN: Objection.
14   Q.   -- three words, "for DV slash A/R"?
15   A.   I don't know why they modified the   11:16:34
16  work paper specifically.
17   Q.   Did you ask someone to do that?
18       MR. RYAN: Objection.
19   A.   I don't recall the work paper. I
20  recall generally us talking about how we needed   11:16:47
21  to document our understanding of the two
22  reserves. I don't know what that played out,
23  though, to the individual work papers.
24   Q.   Did you ask someone, Miss Frazier,
25  to take the words "for DV A/R" out of this work   11:16:59

Page 633

1   paper?
2    A.   No.
3    Q.   Do you know if someone else did?
4        MR. RYAN: Objection.
5    A.   There's different -- what, take --   11:17:12
6        MR. RYAN: Are you asking whether
7   somebody directed it to happen or that somebody
8   removed the words? It's ambiguity, your
9   question.
10       MR. JONES: I'm sorry, I don't   11:17:22
11  think there's any ambiguity because I think
12  clearly there's words that have been removed.
13  We've established that.
14   Q.   The words have been removed, am I
15  right?                             11:17:29
16   A.   Yes, they are removed.
17   Q.   My question is, did you ever learn
18  from any source that someone on the C&L
19  engagement team told somebody else on the C&L
20  engagement team to take out those words, "for   11:17:38
21  DV A/R" in the final CLASS database?
22   A.   I don't recall. I just recall the
23  general conversation of understanding
24  everywhere we had documented what those
25  reserves represented.                  11:17:57

24 (Pages 630 to 633)

Amy Frazier

Volume 3

Page 634

1    Q.  Your testimony is you don't recall
2  ever knowing that someone gave that
3  instruction, is that right?
4    A.  That's correct.
5    Q.  Do you know who took the words out,    11:18:07
6  as you sit here today?
7    A.  No.
8    Q.  To your knowledge, did anyone at
9  C&L ever tell anyone on the Board of Trustees
10  of AHERF, the Audit Committee members or    11:18:37
11  anybody else, about the Graduate reserve
12  transfers, as we've discussed them so far this
13  morning, during fiscal year 1997 audit work or
14  at the end of the fiscal year 1997 audit work?
15    MR. RYAN:  Objection.    11:18:57
16    THE WITNESS:  I'm sorry, can you
17  repeat or reread?
18    Q.  Let me try to get rid of one of the
19  objections, I believe
20    Did you ever learn that anybody at    11:19:23
21  C&L ever told anybody on the AHERF Board of
22  Trustees about the 50 million dollars of
23  reserve transfers we've been discussing this
24  morning from Graduate to the Delaware Valley
25  Obligated Group before the financial statements    11:19:37

Page 635

1  for fiscal year '97 were finalized?
2    A.  I don't recall
3    Q.  That may have happened, you just
4  don't recall it?
5    A.  Yeah, I just don't recall if I had    11:19:48
6  a discussion with anyone to know if it did or
7  didn't.
8    Q.  Do you recall any discussions with
9  anyone on the C&L engagement team about whether
10  the fact of those reserve transfers should be    11:19:57
11  disclosed to anyone on the AHERF Board of
12  Trustees?
13    A.  I don't recall
14    Q.  Do you recall any discussions with
15  anyone at AHERF about whether the fact of those    11:20:14
16  reserve transfers should be disclosed to anyone
17  on the Board of Trustees?
18    A.  I don't recall.
19    Q.  Do you recall whether any
20  discussions with anyone about whether the fact    11:20:33
21  of those reserve transfers should be included
22  in the required communications letter for
23  fiscal year 1997?
24    A.  Yes
25    Q.  What do you recall about that?    11:20:46

Page 636

1    A.  I recall generally the preparation
2  of the required communications letter and
3  whether or not there are any matters for the
4  work that we had done throughout the course of
5  the audit or possible adjustments of whether or    11:21:05
6  not we should include anything in that letter
7  in my discussions with Mr. Buettner.
8    Q.  My question is a little more
9  specific.  Maybe you've answered it, but I want
10  to make sure because it sounds like you've    11:21:19
11  qualified it a little.
12    Do you recall discussing with
13  Mr. Buettner then the 50 million dollar reserve
14  transfers in connection with whether they
15  should be included in the required    11:21:31
16  communications letter to the board?
17    A.  I recall it as a broad discussion,
18  which included a number of topics.  I don't
19  recall any of the topics individually.
20    Q.  You don't recall then discussing    11:21:44
21  the 50 million dollar reserve transfers with
22  Mr. Buettner as a proposed item to be included
23  in the required communication letter?
24    A.  I don't recall.
25    Q.  Do you recall any discussions with    11:22:08

Page 637

1  anyone at AHERF -- I'm sorry, that was too fast
2  and the wrong words.
3    Do you recall any discussions with
4  anyone on the C&L engagement team about
5  including the 50 million dollar reserve    11:22:20
6  transfers on the C&L SUD for fiscal year 1997?
7    A.  Yes.
8    Q.  With whom did you have those
9  discussions?
10    A.  Mr. Buettner, at least.  I don't    11:22:30
11  know if there were others.
12    Q.  We'll come back and talk about that
13  after we change tapes.
14    THE VIDEOGRAPHER:  Off the record
15  at 11:23.    11:22:40
16    (Recess had.)
17    - - - - -
18    (Thereupon, Deposition Exhibit 4438
19    was marked for purposes of
20    identification.)
21    - - - - -
22    THE VIDEOGRAPHER:  Back on the
23  record, 11:40
24    Q.  Miss Frazier, I'm handing you what
25  we've marked as Exhibit 4438, a document we    11:39:39

25 (Pages 634 to 637)

Cleveland (216) 523-1313                    Akron (330) 374-1313

Page 638

1  referred to shortly before we broke and a
2  document about which I will have a few
3  questions for you now.
4         Do you recognize this as the
5  September 22nd, 1997 required communications    11:39:52
6  letter from Coopers & Lybrand to the board of
7  trustees of AHERF?
8     A.  I don't dispute the date. I recall
9  it as the required communications letter, yes,
10  for the 1997 audit.              11:40:13
11    Q.  The date is on the upper right-hand
12  corner of the first page, is that right?
13    A.  Correct.
14    Q.  I read the date right?
15    A.  Correct.                 11:40:20
16    Q.  Did you draft this letter?
17    A.  I don't recall.
18    Q.  If I told you that we have been
19  produced -- or that a draft of this letter has
20  been produced to us with a designation from    11:40:40
21  counsel that it came from your computer files,
22  would that refresh your recollection that you
23  drafted this letter?
24    A.  No.
25    Q.  Do you recall drafting required    11:40:53

Page 639

1  communications letters from Coopers & Lybrand
2  to the AHERF Board of Trustees in any fiscal
3  year or for any fiscal year?
4     A.  Yes.
5     Q.  Was that your routine when you    11:41:06
6  became a manager, to draft the required
7  communications letters?
8     A.  Not necessarily since there were
9  two managers on the account.
10    Q.  Do you recall any fiscal year for    11:41:16
11  which you did not draft the required
12  communications letter --
13         MR. RYAN:  Objection.
14    Q.  -- once you had become a manager?
15    A.  No, I don't recall one way or    11:41:28
16  another.
17    Q.  I'm going to ask you to turn to the
18  second page of the document. Do you see the
19  heading Significant Audit Adjustments?
20    A.  Yes.                 11:41:40
21    Q.  The phrasing beneath that which
22  reads, "We did not discover adjustments during
23  the course of our audit which individually or
24  in the aggregate would have a significant
25  affect on AHERF's financial statements nor    11:41:52

Page 640

1  represent weaknesses in AHERF's" -- "AHERF's
2  financial reporting process which could
3  materially misstate future financial
4  statements."
5         Did I read that accurately?    11:42:04
6     A.  Yes.
7     Q.  Having had a chance to look at that
8  with me, does that refresh your recollection
9  about whether you and Mr. Buettner, or anyone
10  else on the C&L engagement team, talked about    11:42:14
11  whether or not to include the Graduate reserve
12  transfer entries we've been discussing this
13  morning in this letter?
14    A.  No.
15    Q.  Do you see the next portion of the    11:42:26
16  document, it's headed Disagreements With
17  Management? Do you see that?
18    A.  Yes.
19    Q.  It says, beneath it -- it says
20  beneath it, "No disagreements with management    11:42:37
21  arose during the audit with respect to: One,
22  the application of accounting principles to
23  specific transactions; two, judgments related
24  to accounting estimates; three, scope of the
25  audit; four, disclosures to be included in the    11:42:58

Page 641

1  financial statements or; five, the wording of
2  our report."
3         Do you see that?
4     A.  Yes.
5     Q.  Reading that now, does that refresh    11:43:07
6  your recollection about whether you and
7  Mr. Buettner or anybody else on the engagement
8  team, talked about whether or not to disclose
9  the Graduate reserve transfers in the amount of
10  50 million dollars in this letter?    11:43:19
11    A.  No.
12    Q.  Did you indeed have a disagreement
13  with Mr. Cancelmi about whether the entries
14  should be reversed?
15         MR. RYAN:  Objection to form    11:43:40
16    A.  I'm sorry, can you repeat that?
17    Q.  We can have that one read back.
18  It's not very long.
19         (Record read.)
20    A.  I don't know that, if it was a    11:43:54
21  disagreement. Obviously they didn't reverse
22  the entries, and we felt that there was better
23  bookkeeping that could have been done.
24    Q.  Not only did they not reverse them,
25  but let's try this in order.    11:44:06

26 (Pages 638 to 641)

Amy Frazier                                                          Volume 3

Page 638

1   referred to shortly before we broke and a
2   document about which I will have a few
3   questions for you now.
4        Do you recognize this as the
5   September 22nd, 1997 required communications   11:39:52
6   letter from Coopers & Lybrand to the board of
7   trustees of AHERF?
8        A.   I don't dispute the date. I recall
9   it as the required communications letter, yes,
10  for the 1997 audit.                            11:40:13
11       Q.   The date is on the upper right-hand
12  corner of the first page, is that right?
13       A.   Correct.
14       Q.   I read the date right?
15       A.   Correct.                             11:40:20
16       Q.   Did you draft this letter?
17       A.   I don't recall.
18       Q.   If I told you that we have been
19  produced -- or that a draft of this letter has
20  been produced to us with a designation from    11:40:40
21  counsel that it came from your computer files,
22  would that refresh your recollection that you
23  drafted this letter?
24       A.   No.
25       Q.   Do you recall drafting required      11:40:53

Page 639

1   communications letters from Coopers & Lybrand
2   to the AHERF Board of Trustees in any fiscal
3   year or for any fiscal year?
4        A.   Yes.
5        Q.   Was that your routine when you       11:41:06
6   became a manager, to draft the required
7   communications letters?
8        A.   Not necessarily since there were
9   two managers on the account.
10       Q.   Do you recall any fiscal year for    11:41:16
11  which you did not draft the required
12  communications letter --
13       MR. RYAN:  Objection.
14       Q.   -- once you had become a manager?
15       A.   No, I don't recall one way or        11:41:28
16  another.
17       Q.   I'm going to ask you to turn to the
18  second page of the document. Do you see the
19  heading Significant Audit Adjustments?
20       A.   Yes.                                 11:41:40
21       Q.   The phrasing beneath that which
22  reads, "We did not discover adjustments during
23  the course of our audit which individually or
24  in the aggregate would have a significant
25  affect on AHERF's financial statements nor      11:41:52

Page 640

1   represent weaknesses in AHERF's" -- "AHERF's
2   financial reporting process which could
3   materially misstate future financial
4   statements."
5        Did I read that accurately?              11:42:04
6        A.   Yes.
7        Q.   Having had a chance to look at that
8   with me, does that refresh your recollection
9   about whether you and Mr. Buettner, or anyone
10  else on the C&L engagement team, talked about  11:42:14
11  whether or not to include the Graduate reserve
12  transfer entries we've been discussing this
13  morning in this letter?
14       A.   No.
15       Q.   Do you see the next portion of the   11:42:26
16  document, it's headed Disagreements With
17  Management? Do you see that?
18       A.   Yes.
19       Q.   It says, beneath it -- it says
20  beneath it, "No disagreements with management  11:42:37
21  arose during the audit with respect to: One,
22  the application of accounting principles to
23  specific transactions; two, judgments related
24  to accounting estimates; three, scope of the
25  audit; four, disclosures to be included in the 11:42:58

Page 641

1   financial statements or; five, the wording of
2   our report."
3        Do you see that?
4        A.   Yes.
5        Q.   Reading that now, does that refresh  11:43:07
6   your recollection about whether you and
7   Mr. Buettner or anybody else on the engagement
8   team, talked about whether or not to disclose
9   the Graduate reserve transfers in the amount of
10  50 million dollars in this letter?             11:43:19
11       A.   No.
12       Q.   Did you indeed have a disagreement
13  with Mr. Cancelmi about whether the entries
14  should be reversed?
15       MR. RYAN:  Objection to form.            11:43:40
16       A.   I'm sorry, can you repeat that?
17       Q.   We can have that one read back.
18  It's not very long.
19       (Record read.)
20       A.   I don't know that, if it was a       11:43:54
21  disagreement. Obviously they didn't reverse
22  the entries, and we felt that there was better
23  bookkeeping that could have been done.
24       Q.   Not only did they not reverse them,
25  but let's try this in order.                   11:44:06

26 (Pages 638 to 641)

Amy Frazier

Volume 3

Page 642

1     You told them to reverse it. You
2 told them they were stupid and they didn't
3 reverse them. Do you believe that that
4 constitutes a disagreement?
5     MR. RYAN: Objection        11:44:18
6     A. It constitutes that we have a
7 difference of opinion, it's bad bookkeeping,
8 bookkeeping entries.
9     Q. Do you recall any discussions with
10 Mr. Buettner, or anyone else on the engagement    11:44:36
11 team, for fiscal year 1997 about whether or not
12 the Graduate reserve transfers in the 50
13 million dollar amount, that you tell us you
14 were knowledgeable of, should be disclosed to
15 the Audit Committee or the AHERF Board of        11:44:55
16 Trustees in some way other than through the
17 required communications letter?
18     A. I don't recall.
19     Q. Did you ever become concerned
20 yourself personally that such a disclosure      11:45:15
21 should have been made either in the required
22 communications letter, orally, or in some other
23 fashion?
24     A. I'm not sure, again, to your
25 reference to concerned.        11:45:19

Page 643

1     I'm not aware of anything that at
2 the end of the day that I thought wasn't
3 disclosed that should have been
4     Q. Did you ever -- do you have reason
5 to believe that the board ever learned about    11:45:31
6 the Graduate reserve transfers in the amount of
7 50 million dollars in connection with your '97
8 audit work?
9     A. I don't know if they were or not.
10     Q. What discussions do you recall      11:45:54
11 occurring and with whom did you have them about
12 whether to include the reserve transfers in the
13 amount of 50 million dollars in the -- on the
14 SUD for '97?
15     A. At least Mr. Buettner. I don't    11:46:05
16 recall if there were others.
17     Q. What do you recall about those
18 conversations?
19     A. We had a discussion generally that
20 such amount would not need to be included on    11:46:20
21 the SUD since it was a balance sheet
22 transaction and that, at the end of the day,
23 Graduate had on its books an amount that it
24 needed and we were reporting on the
25 consolidated financial statements.      11:46:41

Page 644

1     Q. Do you recall anything more about
2 the communication between you and Mr. Buettner
3 on this topic?
4     A. Not really. I mean, obviously it's
5 been a while.        11:46:59
6     Q. Did you agree -- did the two of you
7 agree with that conclusion?
8     A. Yes.
9     Q. So you and Mr. Buettner agreed that
10 we would not -- or that C&L would not put on    11:47:12
11 the SUD the 50 million dollar reserve
12 transfers, is that right?
13     A. We discussed that it was not
14 necessary to include it.
15     Q. I know that. I know you've said    11:47:23
16 that. My question is, did you have any
17 difference of opinion with Mr. Buettner on the
18 topic?
19     A. No. It was kind of a collaborative
20 discussion to understand what the impact was to    11:47:36
21 the financial statements and whether or not it
22 needed to be included.
23     Q. Did you ever talk with anybody
24 besides Mr. Buettner about whether that was the
25 right judgment, to exclude the transfers from    11:47:47

Page 645

1 the SUD or to exclude the mention of the
2 transfers from the SUD?
3     MR. RYAN: Objection.
4     A. I don't recall in the context of
5 the SUD those discussions.        11:48:02
6     Q. Do you recall some other context in
7 which excluding mention of the transfers was
8 part of a communication between you and anyone?
9     MR. RYAN: Objection.
10     A. I said in the context of the SUD.    11:48:13
11 I mean, I certainly had discussions with people
12 about the -- others on the C&L team about the
13 50 million dollars. I just don't remember in
14 the context on the SUD.
15     Q. We misunderstood each other.    11:48:22
16     My question is, do you recall
17 discussing with anyone the general topic of
18 failure to disclose the reserve transfers
19 either on the SUD or to the board, anyone in
20 life, not just members of the engagement team,    11:48:39
21 at any time?
22     MR. RYAN: Objection.
23     A. I'm sorry, can you repeat that?
24     Q. I can.
25     A. It changed.        11:48:48

27 (Pages 642 to 645)

Amy Frazier                                                                          Volume 3

Page 642

1    You told them to reverse it. You
2  told them they were stupid and they didn't
3  reverse them. Do you believe that that
4  constitutes a disagreement?
5       MR. RYAN: Objection.                    11:44:18
6    A. It constitutes that we have a
7  difference of opinion, it's bad bookkeeping,
8  bookkeeping entries.
9    Q. Do you recall any discussions with
10  Mr. Buettner, or anyone else on the engagement    11:44:36
11  team, for fiscal year 1997 about whether or not
12  the Graduate reserve transfers in the 50
13  million dollar amount, that you tell us you
14  were knowledgeable of, should be disclosed to
15  the Audit Committee or the AHERF Board of       11:44:55
16  Trustees in some way other than through the
17  required communications letter?
18    A. I don't recall.
19    Q. Did you ever become concerned
20  yourself personally that such a disclosure      11:45:15
21  should have been made either in the required
22  communications letter, orally, or in some other
23  fashion?
24    A. I'm not sure, again, to your
25  reference to concerned.                        11:45:19

Page 643

1    I'm not aware of anything that at
2  the end of the day that I thought wasn't
3  disclosed that should have been.
4    Q. Did you ever -- do you have reason
5  to believe that the board ever learned about    11:45:31
6  the Graduate reserve transfers in the amount of
7  50 million dollars in connection with your '97
8  audit work?
9    A. I don't know if they were or not.
10    Q. What discussions do you recall     11:45:54
11  occurring and with whom did you have them about
12  whether to include the reserve transfers in the
13  amount of 50 million dollars in the -- on the
14  SUD for '97?
15    A. At least Mr. Buettner. I don't     11:46:05
16  recall if there were others.
17    Q. What do you recall about those
18  conversations?
19    A. We had a discussion generally that
20  such amount would not need to be included on     11:46:20
21  the SUD since it was a balance sheet
22  transaction and that, at the end of the day,
23  Graduate had on its books an amount that it
24  needed and we were reporting on the
25  consolidated financial statements.              11:46:41

Page 644

1    Q. Do you recall anything more about
2  the communication between you and Mr. Buettner
3  on this topic?
4    A. Not really. I mean, obviously it's
5  been a while.                                    11:46:59
6    Q. Did you agree -- did the two of you
7  agree with that conclusion?
8    A. Yes.
9    Q. So you and Mr. Buettner agreed that
10  we would not -- or that C&L would not put on    11:47:12
11  the SUD the 50 million dollar reserve
12  transfers, is that right?
13    A. We discussed that it was not
14  necessary to include it.
15    Q. I know that. I know you've said    11:47:23
16  that. My question is, did you have any
17  difference of opinion with Mr. Buettner on the
18  topic?
19    A. No. It was kind of a collaborative
20  discussion to understand what the impact was to  11:47:36
21  the financial statements and whether or not it
22  needed to be included.
23    Q. Did you ever talk with anybody
24  besides Mr. Buettner about whether that was the
25  right judgment, to exclude the transfers from    11:47:47

Page 645

1  the SUD or to exclude the mention of the
2  transfers from the SUD?
3       MR. RYAN: Objection.
4    A. I don't recall in the context of
5  the SUD those discussions.                       11:48:02
6    Q. Do you recall some other context in
7  which excluding mention of the transfers was
8  part of a communication between you and anyone?
9       MR. RYAN: Objection.
10    A. I said in the context of the SUD.    11:48:13
11  I mean, I certainly had discussions with people
12  about the -- others on the C&L team about the
13  50 million dollars. I just don't remember in
14  the context on the SUD.
15    Q. We misunderstood each other.        11:48:22
16    My question is, do you recall
17  discussing with anyone the general topic of
18  failure to disclose the reserve transfers
19  either on the SUD or to the board, anyone in
20  life, not just members of the engagement team,   11:48:39
21  at any time?
22       MR. RYAN: Objection.
23    A. I'm sorry, can you repeat that?
24    Q. I can.
25    A. It changed.                          11:48:48

27 (Pages 642 to 645)

Amy Frazier                                                                    Volume 3

Page 646

1    Q.   I can.
2        I want to know if you recall
3    discussing Coopers & Lybrand's failure to
4    disclose to the AHERF board the 50 million
5    dollar reserve transfers at any time?        11:49:00
6        MR. RYAN:  Objection.
7    A.   You're assuming there's a failure
8    in needing to disclose them.
9    Q.   What I'm assuming isn't relevant to
10   my question.                                 11:49:12
11       What I want to know is, did you
12   ever discuss that with anyone?
13   A.   I guess I'm struggling with your
14   question because you're assuming that there's a
15   failure. I'm saying I don't recall whether or  11:49:22
16   not I discussed it with, who I discussed or if
17   we discussed it, but I'm not agreeing that it's
18   a failure.
19   Q.   Do you recall discussing with
20   anyone, whether a personal friend, a spouse, or  11:49:36
21   anyone, your discomfort or any discomfort you
22   had about not disclosing the Graduate reserve
23   transfers to the AHERF board?
24       MR. RYAN:  Objection.
25   A.   First of all, I don't know if they    11:49:52

Page 647

1    weren't disclosed.
2    Q.   I want you to assume they were not
3    until at least 1998.
4        MR. RYAN:  You're asking her to
5    testify as to what she remembers actually    11:50:03
6    feeling something about a fact you're asking
7    her to assume?
8        MR. JONES:  No, that's not what I'm
9    asking her at all.
10       MR. RYAN:  I'm confused.           11:50:09
11       MR. JONES:  I'm sorry you're
12   confused. My question was, does she recall
13   having a conversation with anyone, a personal
14   friend, anyone, about discomfort over, personal
15   discomfort over not disclosing the Graduate   11:50:19
16   reserve transfers to the AHERF board.
17       MR. RYAN:  Objection
18   A.   I guess two points. I don't know
19   that they weren't disclosed.
20   Q.   I've asked you to assume that they   11:50:30
21   were not.
22   A.   And, secondly, I don't talk about
23   client matters to friends.
24   Q.   So you don't recall such a
25   conversation?                                11:50:41

Page 648

1    A.   I never had a conversation with
2    friends or spouse or other family members.
3    Q.   That's fine.
4        Do you recall discussing with
5    anyone discomfort over the fact that the      11:50:49
6    Graduate reserve transfers were not placed on
7    C&L's SUD for fiscal year '97?
8    A.   I'm not sure I know what you mean
9    by discomfort. I never had discomfort because
10   I think I've testified that Mr. Buettner and I  11:51:02
11   talked about whether or not it was necessary to
12   include them.
13   Q.   I mean other than Mr. Buettner.
14       MR. RYAN:  Objection
15   A.   I also said I don't recall if I had  11:51:22
16   other discussions regarding the SUD on that
17   particular item.
18   Q.   Do you recall ever seeing a draft
19   version of the SUD in which the 50 million
20   dollar reserve transfers were mentioned -- on  11:52:00
21   which the 50 million dollar reserve transfers
22   were mentioned?
23   A.   I don't recall there being one.
24       - - - - -
25       (Thereupon, Deposition Exhibit 4439

Page 649

1        was marked for purposes of
2        identification.)
3        - - - - -
4    Q.   We've just marked, Miss Frazier,
5    Exhibit 4439. I'm going to ask you to take a   11:52:42
6    few moments to take a look at the exhibit and
7    ask -- then I'll ask you if you've ever seen it
8    before.
9    A.   I don't recall in this sequential
10   order. I recall some of them in a subsequent   11:53:23
11   event binder.
12   Q.   Which pages do you recall appearing
13   in a subsequent event binder?
14   A.   Just generally the format and
15   putting the subsequent event binder together   11:53:31
16   and that there was an index in the front of the
17   sections.
18   Q.   So some of these documents may have
19   appeared there, it is your view?
20   A.   Yes.                              11:53:45
21   Q.   I'm going to ask you to look now at
22   the -- the subsequent events binder to which
23   you refer was for the '97 audit?
24   A.   Yes.
25   Q.   I'm going to ask you to look now at  11:53:57

28 (Pages 646 to 649)

Amy Frazier                                                                    Volume 3

Page 674

1   on page 87?
2       A.  Sometime during year-end field work
3   for 1997.
4       Q.  Do you know with any more precision
5   than that?                                    13:15:47
6       A.  No.
7       Q.  Do you know when you wrote the
8   handwritten notes in the -- during -- that
9   appear through the balance of the document?
10      A.  I would say sometime during       13:16:05
11  year-end field work of 1997.
12      Q.  Did you create those notes close in
13  time with the schedule and the handwritten
14  notes on 25987?
15      A.  I recall the majority of them being   13:16:19
16  before, but close in time.
17      Q.  The majority of the notes that
18  appear at pages 25989, 25989 through 92 were
19  prepared shortly before this schedule on 25986
20  and 87, is that right?                        13:16:41
21      A.  Correct.
22      Q.  Does this spreadsheet and its tick
23  mark notes, that is the 25986 and 25987 pages
24  of Exhibit 4444, reflect an attempt on your
25  part to determine whether the 50 million dollar   13:17:10

Page 675

1   reserve entries that we've been discussing
2   today resulted in a material misstatement of
3   the AHERF consolidated financial statements?
4       MR. RYAN:  Objection.
5       A.  Not just that.  I mean, there was a   13:17:29
6   lot of effort and a lot of reasons for
7   preparing this.
8       Q.  Does it serve that purpose, though,
9   among others?
10      MR. RYAN:  Objection.                  13:17:39
11      A.  Does this analysis -- it serves
12  part of that purpose in providing some
13  information in making that assessment.
14      Q.  Did you share this analysis with
15  anyone?                                       13:17:53
16      MR. RYAN:  The actual document or
17  the content of the analysis?
18      MR. JONES:  The document.
19      A.  I don't recall.  It was available
20  in the work papers.                           13:18:06
21      Q.  Do you recall presenting this
22  analysis to Mr. Buettner and discussing it with
23  him?
24      A.  Yes.
25      Q.  So he reviewed it at some time in   13:18:14

Page 676

1   the '97 field work?
2       A.  I don't know if he reviewed the
3   pages, but we talked about the content during
4   the 1997 field work.
5       Q.  Did you give him the pages so that   13:18:22
6   he could read them if he chose to?
7       A.  I don't recall.
8       Q.  So you don't know whether he laid
9   eyes on these pages or not, is that fair to
10  say?                                          13:18:31
11      A.  I just don't recall.
12      Q.  Did you use Mr. Cancelmi's memo to
13  help prepare the analysis?
14      A.  I just want to back up.  As I was
15  looking, when you were referencing before as   13:18:51
16  far as your question with Mr. Buettner, were
17  you referring to just -- can we clarify if it
18  was just these two pages?
19      Q.  I meant just those two pages.
20      A.  Okay.                                13:19:00
21      MR. RYAN:  86 and 87?
22      MR. JONES:  Yes.
23      A.  Okay.
24      Q.  Did you share some other portion of
25  the document with him, though?                13:19:07

Page 677

1       A.  I recall providing him 88, the
2   information, the schedule in the meeting.
3       Q.  When did you provide him page
4   25988?
5       A.  Sometime during the year-end field   13:19:18
6   work, shortly after I received it.  I just
7   don't know when exactly.
8       Q.  Do you know when you received it?
9       A.  Sometime during August of '97.
10      Q.  My question then -- thank you.      13:19:30
11      A.  I'm sorry.
12      Q.  That's fine.
13      My question was, did you refer to
14  or use Mr. Cancelmi's June 20, 1997 memo, which
15  is the first two pages of our exhibit, in   13:19:41
16  preparing your affiliation analysis, which are
17  the following two pages of the exhibit?
18      A.  That was one source of information
19  that was used, yes.
20      Q.  Do you recall the other -- any     13:19:52
21  other sources?
22      A.  The following work paper Bates
23  numbered 25988 was also a source, as well as
24  really through the end of the document.  And
25  then I know there were other sources that I   13:20:17

35 (Pages 674 to 677)

Amy Frazier                                                                                    Volume 3

Page 678

1   looked to for Forbes and AVH related to their
2   acquisition work papers, which are not related
3   to that first two pages or the latter part of
4   this document.
5        I referred to the trial balance for    13:20:35
6   good will, something, AHERF financial something
7   to get that number.
8        Q.   I notice that Mr. Cancelmi has the
9   line item in his memo of June 20 that caused
10  you to question him about, in your field work.    13:20:52
11  The line reads, "Bad debt reserves for DV A/R"
12  and the total of 50 million. We saw that a few
13  moments ago.
14       A.   Yes.
15       Q.   And then on your -- then on your    13:21:05
16  schedule, you have written the word "general
17  reserves" with some of the same dollar entries,
18  at least the same constituent dollar entries.
19  Is that fair?
20       MR. RYAN: Objection.    13:21:24
21       A.   There are dollar amounts that agree
22  at least for those entities that correspond
23  with that on his memo, but there are obviously
24  others on that line item as well.
25       Q.   Right, there is the Forbes and AVH    13:21:38

Page 679

1   entries, right?
2        A.   Correct.
3        Q.   But the Graduate entries are the
4   same, are they not?
5        A.   Assuming that that was a five on    13:21:50
6   the first page of his memo. I just can't tell
7   on this copy, but yes.
8        Q.   Why did you retitle the row?
9        A.   Because we did not agree that the
10  reserve was for DV A/R and that an assessment    13:22:05
11  of whether or not those reserves were needed at
12  Graduate was, in part, the purpose of this work
13  paper. So they really were, at least
14  initially, general reserves that needed to be
15  evaluated.    13:22:28
16       Q.   Didn't Mr. Cancelmi tell you in his
17  memo what the reserves were for?
18       MR. RYAN: Objection.
19       Q.   He says, "Bad debt reserves for DV
20  A/R."    13:22:30
21       MR. RYAN: Objection.
22       A.   There's a purpose that appears to
23  be identified on that memo, but obviously is
24  not in our work performing an independent
25  assessment of what we believe those reserves    13:22:42

Page 680

1   might be for.
2        Q.   Might be used for?
3        A.   Or needed for.
4        Q.   Which part of this analysis served
5   the purpose of providing you, or any member of    13:22:57
6   the engagement team, comfort about whether or
7   not the Graduate reserve transfers resulted in
8   a material misstatement of the balance sheet at
9   AHERF for fiscal year '97?
10       A.   I'm sorry, can that be read back?    13:23:12
11       Q.   Sure.
12          (Record read.)
13       A.   I don't know that it's referring to
14  the actual transfer, but it's evaluating
15  whether or not the purpose of the 50 million    13:23:39
16  being established at Graduate was needed, and
17  that was being done through the analysis on
18  25987.
19       Q.   That's the handwritten analysis at
20  the base of the page?    13:23:55
21       A.   That's part of it, yes.
22       Q.   That handwritten analysis relates
23  to the line that we were just discussing on
24  25986 headed with the words Graduate -- general
25  reserves. Is that right?    13:24:08

Page 681

1        A.   It relates to the total on that
2   line, yes.
3        Q.   The total on that line is
4   $61,311,000, is that right?
5        A.   That's correct    13:24:19
6        Q.   Which is the 50 million
7   attributable to the Graduate hospitals plus the
8   balance you've got there attributable to the
9   Forbes and the AVH hospitals, is that right?
10       A.   Correct    13:24:31
11       Q.   And that 61 million, therefore, has
12  a tick mark -- 61 plus million has a tick mark
13  B, which on page 25987 is described with these
14  words, "See cushion analysis below." Is that
15  right?    13:24:46
16       A.   Yes.
17       Q.   And the "below" is written in your
18  handwriting?
19       A.   Yes
20       Q.   "See cushion analysis" is typed.    13:24:53
21       A.   Yes.
22       Q.   And then beneath that, can you tell
23  me what your figures and notes are meant to
24  reflect?
25       MR. RYAN: It looks like you might    13:25:06

36 (Pages 678 to 681)

Amy Frazier                                                                    Volume 3

Page 682

1   have a last line of this cut off of this copy.
2           MR. JONES: I apologize if I do.
3           MR. RYAN: I'm just saying.
4       A.  There's definitely a piece of this
5   that's not clear.                    13:25:15
6       Q.  Can you tell me generally what the
7   analysis is meant to reflect?
8       A.  It was to take the general reserve
9   amount established during all of the
10  acquisitions and evaluate whether or not there   13:25:26
11  were purposes that should be considered as to
12  whether or not it was reasonable for AHERF to
13  establish that reserve during the acquisitions.
14      Q.  Did Mr. Cancelmi or anybody at
15  AHERF tell you that they had established the      13:25:40
16  reserve for any purpose other than transfer to
17  the Graduate -- to the Delaware Valley
18  Obligated Group hospitals?
19          MR. RYAN: Could I have that read
20  back, please?                        13:25:48
21          (Record read.)
22      A.  Yes.
23      Q.  Who told you that?
24      A.  Mr. Cancelmi.
25      Q.  What did he say?               13:26:04

Page 683

1       A.  Back in the planning field work,
2   during our preliminary phase, that their intent
3   was to establish a reserve for things like
4   compliance matters and accounts payable and
5   physician contracts, essentially manpower or     13:26:23
6   people-related issues during an acquisition.
7   There were a number of things. I don't recall
8   them, as I sit here today, that related to
9   that, but that there was, at least for Graduate
10  at the time, a need for such reserves.           13:26:41
11      Q.  He told you that sometime in the
12  spring of the year 1997, that they were
13  contemplating establishing reserves for those
14  purposes at Graduate?
15      A.  Yes.                            13:26:56
16      Q.  What does the entry immediately
17  below the entry 61,311,000 on page 25987 read?
18      A.  The 25 million in brackets.
19      Q.  Yes.
20          Can you read the text next to that    13:27:19
21  as well?
22      A.  "Established for corporate
23  compliance reserves at acquired entities."
24      Q.  Yes.
25          Is that what it says?             13:27:29

Page 684

1       A.  Yes.
2       Q.  And what do you mean to refer to
3   when you write 25 million dollars in brackets
4   and follow it with those words? Or what did
5   you mean to refer to, I should say.              13:27:41
6       A.  Well, the starting point is the 61
7   million, which would have been a reserve or a
8   credit balance. It was to identify items.
9           The reason that there are brackets
10  on the 25 million is to work through the 61       13:27:55
11  million down to what might be a remaining
12  excess number. So the description generally
13  relates to corporate compliance issues that
14  were existing in healthcare providers
15  particularly in the Philadelphia marketplace     13:28:17
16  and investigations by the government and that
17  an assessment needed to be made as to whether
18  or not these acquired hospitals would have such
19  compliance matters.
20      Q.  Where did you get the 25 million       13:28:30
21  dollar figure?
22      A.  It was an estimate that I had
23  discussed with Mr. Buettner.
24      Q.  So he gave it to you?
25          MR. RYAN: Objection.                13:28:39

Page 685

1       A.  He didn't physically give it to me.
2   He discussed it and shared it as a possible
3   amount to consider in light of other situations
4   that had been settling for comparable amounts.
5       Q.  So who arrived at the figure? Did     13:28:58
6   you supply it to him or did he supply it to you
7   or was it a collaborative process?
8       A.  I don't know if -- it was certainly
9   collaborative, our discussion. I believe he
10  suggested that it could be as much as 25          13:29:22
11  million.
12      Q.  Did you bring documents to him to
13  talk about the topic of the amount of this 25
14  million dollar sum, or this corporate
15  compliance reserve, rather?                      13:29:33
16      A.  Not in that particular discussion.
17      Q.  Did you look at documents in
18  connection with your discussions with him
19  regarding how much the corporate clients'
20  compliance reserve might or should be?            13:29:45
21      A.  Yes.
22      Q.  What documents did you look at?
23      A.  Just results of due diligence
24  procedures and press -- just general knowledge
25  in the press about the government               13:30:00

37 (Pages 682 to 685)

Amy Frazier                                                                                    Volume 3

Page 686

1  investigations that were taking place at that
2  time.
3      Q.  Do you remember any documents in
4  particular on that latter point, government
5  investigations, that you looked at?        13:30:12
6      A.  Just -- it was more of what had
7  been published, I believe, in newspapers and
8  what we were aware of happening in the
9  marketplace.
10     Q.  It was -- strike that        13:30:21
11         When you wrote the acquired
12 entities, did you mean to include entities
13 other than the Graduate hospitals?
14     A.  No.  Well, no, I don't recall -- I
15 don't recall, I guess, as it related to the        13:30:38
16 western region because the assessment here is
17 being made at the 61 million dollar level, so I
18 just don't recall.
19     Q.  Do you remember anything more you
20 did to substantiate the need for the 25 million        13:30:53
21 dollar reserve?
22         MR. RYAN:  Objection.
23     A.  I don't recall anything further
24 than those discussions, recognizing that
25 ongoing assessments would be made in the future        13:31:07

Page 687

1  year under purchase accounting.
2      Q.  Did you ever do anything to
3  determine whether or not the Delaware Valley
4  Obligated Group had hospitals -- pardon me.
5         Did you do anything to determine        13:31:18
6  whether the Delaware Valley Obligated Group
7  hospitals had a reserve for the same kinds of
8  matters in 1997, corporate compliance issues?
9      A.  As I recall, there were separate
10 procedures that were done in evaluating the        13:31:35
11 control environment and work that internal
12 audit was doing over the compliance area.  I
13 don't recall if there were any specific
14 reserves or not identified, but I do remember
15 generally the control process.        13:31:51
16     Q.  The Delaware Valley Obligated Group
17 hospitals are in greater Philadelphia, and you
18 knew that in 1997, is that right?
19     A.  Yes.
20     Q.  The Graduate hospitals were in        13:32:03
21 greater Philadelphia, if you include Rancocas,
22 New Jersey; and you knew that in 1997, is that
23 right?
24     A.  Yes.
25     Q.  Did you have any reason to believe        13:32:12

Page 688

1  in 1997 that the general published reports
2  about corporate compliance would cause a
3  variance in the need for a corporate compliance
4  reserve at these two different sets of
5  hospitals?        13:32:22
6         MR. RYAN:  Objection.  Asked and
7  answered.
8      A.  I certainly had an understanding
9  that there could be differences between the two
10 organizations knowing that hospitals a part of        13:32:32
11 AHERF were existing within AHERF and they had
12 an internal audit function in place.
13     Q.  Let me ask you to look at the next
14 line item, the 14.1 million dollars that you
15 have there in brackets for PFMA.  Do you see        13:32:49
16 that?
17     A.  Yes.
18     Q.  You've got a see tick mark M.
19         Could you take me in the analysis
20 where I'm supposed to go with that?  Is that up        13:33:00
21 at the top half of the page?
22     A.  No, I believe that's referring to
23 the handwritten notes on --
24     Q.  Page 91?
25     A.  Yes.        13:33:15

Page 689

1      Q.  That reads that -- the 14.1 million
2  dollar PFMA entry in your schedule represents,
3  I'm quoting now, "Represents lost reserves
4  under the police and fire contract to fund
5  losses.        13:33:33
6         "AHERF has subsequently concluded
7  that the reserve is not necessary and the
8  Graduate would not be obligated to fund.
9         "C&L does not concur with the
10 client's conclusion and believes a potential        13:33:44
11 liability still exists.
12         "AHERF has removed the cushion from
13 Graduate and transfers the cushion to other
14 contingent liabilities.
15         "C&L will evaluate the        13:33:58
16 appropriateness of the reserve.  See reserve
17 analysis."
18         Is that right?
19     A.  That's what it states.  But it's
20 also obviously off to the left included in bad        13:34:08
21 debt next to that tick mark.
22     Q.  I see that.
23         Do you know why today that C&L did
24 not concur in the client's determination that
25 the Graduate hospitals as acquired would not be        13:34:21

38 (Pages 686 to 689)

Page 742

1   added this separate set of handwritten notes on
2   this reserve schedule for settled years, CRA
3   accounts for settled years at AHERF?
4       A.  I don't recall.
5       Q.  Do you see you did that at least on    14:53:02
6   the first page?
7       A.  Yes.
8       Q.  You see Mr. Girol has put his
9   initials next to the date 8-21-97. Am I right?
10      A.  Yes.                        14:53:14
11      Q.  Your initials don't appear on the
12  document, do they?
13      A.  No.
14      Q.  Is there a reason why when you
15  added your information you didn't date it and    14:53:22
16  initial it?
17      A.  No. I mean, it was not uncommon.
18  I was just kind of reviewing just by those
19  little squiggly lines, reviewing the
20  information he had and whether -- that was just   14:53:33
21  kind of normal practice for me.
22      MR. RYAN:  If we're going to get
23  into any substantive questions about this page,
24  there are much more legible portions, I would
25  like another copy produced.          14:53:52

Page 743

1       MR. JONES:  I'll try not to have my
2   feelings hurt about whether my questions were
3   substantive to this point. We may ask a few
4   more questions. I don't think the reading of
5   the notes is going to be important to them.    14:53:57
6       Q.  Do you see a couple different times
7   you've written the words "designated or
8   designated tentative settlement" on the
9   schedule?
10      A.  If that's what that says.        14:54:40
11      Q.  Let me represent to you that my
12  copy may be a little better, it does read to me
13  "designated tent settlement" like in the
14  right-hand margin under MCPH; do you see that?
15      A.  Yes.                        14:54:54
16      Q.  Do you see it there twice, one time
17  tentative is spelled out, the other time it's
18  just abbreviated tent?
19      A.  Yes, but I'm not sure about that
20  one tentative.                     14:55:08
21      Q.  That's all right. My question is
22  really this. What does the word designated
23  mean to you in connection with CRA's in
24  connection with your AHERF audit work?
25      A.  I don't recall.              14:55:26

Page 744

1       Q.  Does it mean that it was for a
2   specific purpose?
3       A.  No.
4       Q.  Or specific account for a specific
5   year?                           14:55:32
6       A.  No. I mean, especially with
7   tentative, the word -- to me that was more of a
8   final -- it represented something was --
9   anything with the term settlement was at least
10  an indication of it being a little more final.    14:55:47
11      I don't know what it meant in
12  relation to the word designated. So the fact
13  that those words are altogether I can't just
14  pick on designated.
15      Q.  You wrote the words that I just    14:55:58
16  read, though, is that right?
17      A.  Well, I --
18      MR. RYAN:  To the extent you can
19  read them.
20      A.  Yeah, I'm just not sure about that    14:56:04
21  one that has -- or what -- I really can't tell
22  over here
23      Q.  I'm sorry, at least once you've
24  written the word designated -- the words
25  designated tentative settlement, am I right?    14:56:26

Page 745

1       A.  It appears.
2       Q.  Yes.
3       Does that indicate to you that the
4   amounts in that category would not be cushion
5   or excess?                        14:56:30
6       MR. RYAN:  Objection.
7       A.  I don't recall the papers or what
8   information I knew at the time to even infer
9   what I meant at the time, so I don't even know
10  as I sit here today.                 14:56:46
11      Q.  You have no recollection of what
12  designated meant and whether or not it would
13  mean to you the opposite of excess?
14      A.  Not without having more information
15  and recreating kind of that historical    14:57:02
16  information.
17      Q.  You see you've written designated
18  again next to Elkins, M/C '96 designated,
19  $83,000 perhaps is the figure?
20      MR. RYAN:  Where is that?          14:57:16
21      MR. JONES:  Middle of the page.
22      MR. RYAN:  I don't even see it.
23      A.  I mean, I see where there might be
24  another word that says designated. I just, I
25  don't recall.                     14:57:32

52 (Pages 742 to 745)

Page 746

```
 1      Q.   I will represent to you that that's
 2   what it says.
 3           Do you recall ever learning or ever
 4   being interested in a designated settlement for
 5   CRA's at Elkins that did not have the word      14:57:40
 6   tentative for Medicare 1996?
 7           MR. RYAN:  Objection.
 8      A.   Again, I don't recall -- I need
 9   more information.
10      Q.   You can put that aside.           14:58:11
11           - - - -
12           (Thereupon, Deposition Exhibit 4445
13           was marked for purposes of
14           identification.)
15           - - - - -              14:58:25
16      Q.   I'm handing you Exhibit 4445.  Can
17   you identify this document for me?
18      A.   I don't recall it, in the context
19   of the 1997 audit.
20      Q.   It has been identified to us by     14:58:44
21   your counsel as coming from your computer
22   files.  Do you believe that you prepared it?
23      A.   I don't recall it, but if it came
24   from my PC, it's possible.
25      Q.   You see it's called a reserve      14:58:57
```

Page 747

```
 1   analysis?
 2      A.   Yes.
 3      Q.   Then it lists at least under one
 4   subheading CRA -- CRA's undesignated in various
 5   amounts at various hospitals?       14:59:09
 6      A.   Yes.
 7      Q.   Do you know when you prepared this?
 8           First of all, do you know if you
 9   prepared this and then do you know when?
10      A.   As I said, I don't recall it and so   14:59:22
11   I don't recall when I prepared it.
12      Q.   Do you have any doubt if it came
13   from your computer files that you prepared it?
14      A.   If it was saved on my hard drive        .
15   Obviously someone else can prepare it and I can  14:59:40
16   download it, but I just don't know.  I don't
17   recall it.
18      Q.   Let me hand you really quickly what
19   we've marked as Exhibit 4122 called CRA Review
20   Comments.  It's a work paper apparently   15:00:18
21   prepared at least in connection with the '97
22   audit, although it appears to have come from
23   its labeling at the lower right-hand corner
24   from an early and not, therefore, final version
25   of the CLASS system.            15:00:32
```

Page 748

```
 1           I would ask you to look at the
 2   second page.  It says at the top, "CRA
 3   questions," does it not?
 4      A.   That's what it says.
 5      Q.   Then it says reserve --        15:00:57
 6   "reservers," and perhaps that's a typo, "per
 7   Joe."  Do you see that?
 8      A.   Yes.
 9      Q.   Do you know who Joe is?
10           MR. RYAN:  Objection.        15:01:13
11      A.   I don't know.  I don't --
12      Q.   Have you ever seen this document
13   before?
14      A.   I don't recall seeing it.
15      Q.   You can put that one aside.      15:01:50
16           Look back to Exhibit 1070 for a
17   moment for me, which is an exhibit that
18   included Mr. Buettner's two-page schedule that
19   we were discussing a moment ago.
20      A.   Yes.                15:02:25
21      Q.   Do you see the line item for excess
22   C slash A?  Do you have any understanding of
23   what excess C slash A means?
24           MR. RYAN:  On 877?
25           MR. JONES:  Yes, 877.          15:02:43
```

Page 749

```
 1      A.   I obviously didn't write it.
 2      Q.   Do you know what C slash A is short
 3   for either in Mr. Buettner's parlance or yours?
 4      A.   From my perspective, C slash A in
 5   the context of a healthcare audit was        15:03:00
 6   contractual allowance.
 7      Q.   Did you ever come to the conclusion
 8   in your fiscal year '97 audit work that there
 9   were excess contractual allowances in the
10   amount of 9.8 million dollars at AHERF?     15:03:16
11           MR. RYAN:  Objection.
12      Q.   Or at old AHERF, for that matter?
13      A.   I'm sorry, can you repeat that?
14      Q.   Yes.
15           Did you ever yourself come to the    15:03:26
16   conclusion that there were 9.8 million dollars
17   of excess contractual allowance reserves at old
18   AHERF as you've defined it this afternoon --
19           MR. RYAN:  Objection.
20      Q.   -- for fiscal year '97?        15:03:41
21      A.   I recall having knowledge that
22   there were excess contractual allowances.  I
23   don't recall the exact amount, but I remember
24   them being in the neighborhood of 10 million
25   dollars.                15:03:54
```

Amy Frazier                                                                 Volume 3

Page 750

```
 1      Q.  Did you come to that conclusion
 2   yourself, or was that a conclusion that was
 3   shared with you by Mr. Buettner or someone
 4   else?
 5      A.  I recall knowing that myself as    15:04:04
 6   part of my review of the receivable work
 7   papers.
 8      Q.  Do you think you shared that number
 9   with Mr. Buettner?
10      A.  Yes.                               15:04:14
11      Q.  The round 10 million dollar number?
12      A.  Yes, I recall sharing it with him.
13      Q.  When you shared it with him, what
14   did you say was the basis for your review?
15      A.  I recall advising him that when I   15:04:26
16   was reviewing the detailed work papers, there
17   were differences between what was needed in
18   their calculations versus what was recorded on
19   the actual trial balances and summing them up
20   across the entities.                      15:04:40
21      Q.  That was work you had performed?
22      A.  Yes.
23      Q.  Did you give him a piece of paper
24   to reflect that work or did you just share it
25   with him orally?                          15:04:49
```

Page 751

```
 1      A.  I remember a piece of paper that I
 2   had captured it on.  I don't remember if I
 3   showed him the paper or that I just told him
 4   because I knew it, but -- and I remember him at
 5   some point writing it down           15:05:01
 6      Q.  Have you seen that piece of paper
 7   since your audit work in '97?
 8      A.  That he wrote it down on?
 9      Q.  No, that you wrote it down on.
10      A.  I don't recall seeing it since    15:05:09
11   then
12      Q.  Do you recall making it a part of
13   the work papers for the '97 audit?
14      A.  I don't recall if it was in my
15   notes or not.  It was kind of an eight and a  15:05:19
16   half by 11 sheet of paper.
17      Q.  In all the depositions and sworn
18   testimony you gave to the SEC and in preparing
19   for those and in preparing for today, you
20   haven't seen that document?            15:05:33
21      A.  Not that I recall.
22      Q.  That, therefore, is another
23   document from the '97 work that you did that is
24   lost as far as you know, is that right?
25          MR. RYAN:  Objection            15:05:41
```

Page 752

```
 1      A.  I'm not sure if it's lost.  It's
 2   just I don't recall seeing it or whether or not
 3   it's available because it was a part of my
 4   notes that I was tracking things on to review
 5   throughout the course of the audit.       15:05:56
 6      Q.  As far as you know, it doesn't
 7   exist anymore, am I right?
 8      A.  Not that I've seen it.
 9      Q.  I may have a couple nots in there
10   that we shouldn't have.                  15:06:08
11          As far as you know, it doesn't
12   exist anymore, am I right?
13      A.  I don't know.  I have not seen it.
14      Q.  Do you have any reason to believe
15   that it exists?                          15:06:17
16      A.  Not based on the things that I've
17   seen, no.
18      Q.  Again, don't be frightened, we're
19   not going to look at many pages of this
20   exhibit  It has, however, been marked as  15:06:42
21   Exhibit 4322.
22          The pages I would like to discuss
23   with you, Miss Frazier, are at 10482 and
24   following.  10482.  They start with a face page
25   that indicates to me that this is a set of work  15:07:20
```

Page 753

```
 1   papers from the '97 C&L audit files relating to
 2   assets, and in particular, patient accounts
 3   receivable  Is that right?
 4      A.  Yes.
 5      Q.  They appear to have been completed   15:07:36
 6   by Miss Heinlein and last modified by Miss
 7   Porter.  Is that right?
 8      A.  Yes.
 9      Q.  Could you look at the schedules
10   that follow, tell me if these schedules to you   15:07:52
11   appear to relate to Coopers & Lybrand's
12   assessment of contractual allowances at the
13   five DVOG hospitals as of 6-30-97?
14      A.  Are you referring to where it
15   starts with 484?                          15:08:21
16      Q.  Let me make sure  I think it
17   starts with 483 with the face page Bucks
18   contractual allowance.
19      A.  Okay.  I can't read the headers.
20   These appear to be schedules that are prepared  15:08:36
21   by AHERF for their assessment of contractual
22   allowances that we obtained.
23      Q.  Then have been themselves imported
24   through the magic of electronic data to your
25   work papers, is that correct?             15:08:52
```

54 (Pages 750 to 753)

Amy Frazier                                                                          Volume 3

Page 754

1    A.   Correct.
2    Q.   Do you recall reviewing these
3  contractual allowance work papers in connection
4  with your work in the '97 or for the '97 audit?
5         MR. RYAN:  The ones that start at    15:09:05
6  483?
7         MR. JONES:  Yes, or at least the
8  schedules that follow there.
9    A.   I don't recall these schedules
10 specifically.  I recall at various points    15:09:13
11 having printed copies of contractual allowance
12 information, but I don't recall these
13 specifically.
14   Q.   You don't recall reviewing them
15 on-line either because don't I see your name    15:09:25
16 popping up on the reviewed portion of the CLASS
17 prints, is that fair to say?
18        MR. RYAN:  Objection.
19   A.   I mean, I don't know.  Just because
20 my name's not in the field doesn't mean I    15:09:43
21 couldn't have opened up the file and looked at
22 it.
23   Q.   Do you recall that you looked at
24 hard copies as you suggested or electronic
25 screens?                                    15:09:54

Page 755

1    A.   I recall both, generally.  I mean,
2  I had printed copies of things that weren't
3  easy to read and looking at things on the
4  screen where I needed to
5    Q.   Were these the kinds of schedules    15:10:05
6  that you would have referred to or were these
7  these schedules that you referred to in coming
8  up with an impression that roughly 10 million
9  dollars existed in excess -- as excess
10 contractual allowances at AHERF in your    15:10:20
11 conversations with Mr. Buettner that led to,
12 you believe, or perhaps ended up in his
13 two-page schedule as a part of Exhibit 1070?
14        MR. RYAN:  Objection.
15   A.   I don't recall what schedules I had    15:10:38
16 to derive that number from.  I just recall them
17 relating to contractual allowances
18        MR. JONES:  Why don't we break here
19 and, if we do a quick one, I think we may
20 actually be on schedule                      15:10:52
21        MR. RYAN:  Super.
22        THE VIDEOGRAPHER:  Off the record,
23 3:11.
24        (Recess had.)
25        THE VIDEOGRAPHER:  Back on the    15:27:35

Page 756

1  record, 3:27.
2    Q.   Miss Frazier, I'm asking you now,
3  I've asked you just at the break to get ready
4  to talk with us again, at least briefly, about
5  Exhibit 4332, and, in particular, the    15:27:45
6  contractual allowance schedules, or the reserve
7  for contractual allowance schedules which start
8  at page 488.
9         Are you with me?
10   A.   Yes.                             15:28:04
11   Q.   The schedule there relates to the
12 Bucks County Hospital?
13   A.   That's what it says, yes.
14   Q.   It is towards the bottom of the
15 page we have what is called the reserve for    15:28:11
16 allowance balances, inpatient.  Is that right?
17   A.   One side is inpatient; one side is
18 outpatient it looks like.
19   Q.   Let's focus on the inpatient side
20 for now.                                    15:28:24
21   A.   Okay.
22   Q.   In connection with your audit work
23 in fiscal year 1997, did you have any reason to
24 believe that the balances in the column beneath
25 the header we just read, the 6-30-97 column,    15:28:36

Page 757

1  were in any way excess?
2    A.   I don't recall the detail of the
3  schedule from 1997
4    Q.   As you sit here today, you don't
5  know whether those balances were excess, is    15:28:55
6  that fair to say?
7    A.   I don't recall without looking at
8  more detail
9    Q.   What else would you want to look
10 at?                                        15:29:06
11   A.   I would need to understand what the
12 words say because I can't really read them.
13 And I'd just have to look through other work
14 papers that related to the area
15   Q.   Do you know whether any specific    15:29:22
16 balance listed there, where there is a balance,
17 is excess?
18        Do you have any recollection of any
19 specific balance that is listed as excess or
20 has an excess component to it?              15:29:34
21        MR. RYAN:  I'll object because the
22 witness can't read what the words say, I'm not
23 sure she can give you a different answer to
24 your question
25        MR. JONES:  I don't really want to    15:29:44

Cleveland (216) 523-1313                  www.rennillo.com                  Akron (330) 374-1313