TAB 195

| Coopers &Lybrand | Coopers & Lybrand L.L.P.

a professional services firm | 600 Grant Street
35th Floor
Pittsburgh, Pennsylvania
15219-2709 | telephone (412) 355-6000

facsimile (412) 355-8089 |

September 22, 1997

To the Board of Trustees of
  Allegheny Health, Education and Research Foundation:

In planning and performing our audit of the financial statements of Allegheny Health, Education
and Research Foundation and affiliates (AHERF) for the year ended June 30, 1997, we
considered AHERF's internal control structure in order to determine our auditing procedures for
the purpose of expressing our opinion on the financial statements. Although our audit was not
designed to provide assurance on the internal control structure, we noted certain matters
involving the internal control structure and its operations, and are submitting for your
consideration related recommendations designed to help AHERF make improvements and achieve
operational efficiencies. Our comments reflect our desire to be of continuing assistance to
AHERF.

The accompanying comments and recommendations are intended solely for the information and
use of the Board of Trustees, management, and others within the organization and the
Department of Health and Human Services.

Very truly yours,

Coopers & Lybrand LLP



EXHIBIT
57(6
No. 8-19-02

CL 042203

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland

*Allegheny Health, Education and Research Foundation*
*Internal Control Observations*

## INDEX

|  | Pages |
|---|---|
| General Overview | 1-2 |
| Risk Contracting | 3-4 |
| Revenue and Accounts Receivable Observations | 5-6 |
| Human Resources/Payroll Observations | 7-8 |
| Purchasing System Observations | 9-10 |
| Off - Balance Sheet Commitments | 11 |
| Technology Related Observations | 12-15 |

CL 042204

*General Overview*

Fiscal year 1997 has proven to be another challenging year for the AHERF organization. Consistent with AHERF's desire to build a premier integrated healthcare delivery system, the organization continued to expand in 1997. Most notable was the acquisition of a majority of the Graduate Health System as well as the creation of Allegheny University Medical Centers (AUMC), which is now comprised of the newly acquired Forbes Health System, Allegheny Valley Health System and Canonsburg General Hospital. Additionally, AHERF continued to expand its physician network through the acquisition of physician practices including the addition of the physicians that were formerly members of the Penn Group Medical Associates. At June 30, 1997, the AHERF system had approximately 1,000 physicians affiliated through its AIHG subsidiary. Each of these affiliations and acquisitions have strengthened the AHERF system by enhancing its ability to serve its communities, but also, presents challenges relative to integrating operations and managing the financial performance of the system.

1997 was also a momentous year for AHERF with respect to entering the risk sharing arena through its contract with HealthAmerica in the Pittsburgh region. Essentially, beginning in April 1997, AHERF has assumed full financial risk for providing healthcare to approximately 260,000 lives. This contract coupled with the risk sharing contracts that previously existed with US Healthcare and other insurers has elevated the number of covered lives that AHERF is managing to over 500,000. Similar to the affiliations discussed above, entering into full risk contracts of the magnitude that AHERF has assumed presents challenges to the infrastructure of the organization.

The growth discussed above requires significant capital to be successful. This capital must either be provided through enhanced operations which provide for reduced costs to the system and increased revenue and cash collections or the acquisition of additional debt, essentially leveraging the organization's growth. At June 30, 1997, the AHERF system has outstanding debt, excluding recurring liabilities, of $1.05 billion and unrestricted net assets of approximately $570 million. Such leveraging has been necessitated because of increased costs in the management of the system, recurring investment in the physician network managed by AIHG, externally unfunded research initiatives, continuing issues with the billing and collection of revenue and funds required to support the infrastructure of the AHERF system hospitals. As a result of these issues, the management of cash in the AHERF system has been very demanding throughout the year.

As a result, AHERF has supported a portion of its infrastructure growth by entering into various operating lease commitments. While these commitments provide the necessary equipment to the organization and avoid the recognition of debt in the financial statements, they represent a cash commitment that must be managed by the system. At June 30, 1997, total lease commitments in the AHERF system were approximately $432 million versus $248 million at June 30, 1996, with an additional $100 million of commitments scheduled to close in mid-September through October 1997.

1

CL 042205

## General Overview (Cont'd)

Overall, AHERF has continued with its mission of building a healthcare system that will be a preeminent provider into the next century. The next year will be a critical year as the organization must begin to realize operational efficiencies as well as revenue enhancements from the affiliations that it has consummated in the past two years, in addition to the extensive physician network that has been assembled. Additionally, medical management processes will need to be enhanced as AHERF has potentially assumed significant risk through the full risk contracts with HealthAmerica and US Healthcare. Lastly, enhancements must continue to be made to the revenue and billing systems to improve the timeliness of cash collections in order for adequate amounts of cash to be available to fund operations, capital and debt obligations.

2

CL 042206

*Risk Contracting*

AHERF's focus on the development of a network provides challenges beyond the traditional healthcare provider's risks. These risks include, but are certainly not limited to, negotiation of contracts with third-party payors to share in the risks of reimbursement for delivery of care to patients. During fiscal year 1997, AHERF has made a significant investment in such arrangements by assuming the risk of managing care for approximately 285,000 lives, which results in the system's covered lives to being in excess of 500,000.

In connection with building such risk pools with third-party payors, AHERF has assumed a number of additional challenges which include:

- managing out-of-network care,
- creation and maintenance of adequate information systems to provide financial and operational management with timely and meaningful utilization data,
- negotiating premium levels and understanding marketing strategies,
- reducing costs through identification of operational efficiencies,
- development of medical management policies,
- obtaining appropriate levels of insurance coverage to limit exposure to catastrophic claims, and
- managing the relationships between AHERF and third-party partners such as HealthAmerica and US Healthcare.

Management of AHERF has designated individuals that are responsible for implementing policies and procedures and for building an appropriate monitoring system for these risk agreements. The monitoring system can be characterized as evolving throughout the fiscal year. Based on the results of our current audit procedures, we noted that exposure to significant liabilities over the term of the contracts may exist if they are not managed closely.

We recommend that management continue to allocate resources, both at a finance and operational level, to monitor risk agreements, with a particular focus on premium negotiations and marketing and monitoring of medical management cost to provide care to such patients. Management should also focus on the cost of providing care both inside and outside the network, since this is an area which can also expose the organization. Finally, consideration should be given to the establishment of action plans that provide targeted goals for the system to achieve and provide a baseline for evaluation of the success of the contracts. Targets could also provide comparative statistical information as a means for benchmarking AHERF to other systems that have entered into similar arrangements. Appropriate management tools are essential in order to achieve financial success in such complex agreements.

Management Response

AHERF recognizes that the success of an integrated delivery system depends not only on its ability to coordinate care, but also on its ability to utilize resources to proactively manage health. The goals of AHERF's integrated delivery system include the creation of a continuous

3

CL 042207

*Risk Contracting (Cont'd)*

improvement management process and the implementation of a care delivery model which produces the best return on investment, that is, the best health possible for the covered lives for which it is responsible.

The focus of initiatives underway include:

1)  The initial implementation of the integrated care management program;
2)  The ongoing assessment of the program's effectiveness in achieving targeted outcomes relative to patient quality of life, patient functional status, physician practice, and financial results;
3)  Collaboration with all of the components of AHERF to ensure the optimal management of patients within the Allegheny system;
4)  Coordination of the communication and education plans relative to the care management program; and
5)  The implementation of changes to continuously improve the effectiveness of the program.

AHERF further recognizes that in order to effectively manage the quality and cost of care for covered risk lives, the system must have access to timely, accurate, and meaningful data across the breadth and depth of the patient/provider/financial interface. The specific information services and financial reporting priorities are as follows:

a)  To ensure that timely and reliable data are available from each of the payors with whom AHERF has risk contracts;
b)  To provide comprehensive integrated financial and utilization analyses of the data from all risk contracts in addition to providing analyses of data from each individual payor;
c)  To identify and implement an appropriate risk stratification methodology so that clinically meaningful comparative data can be provided to individual practices/primary care physicians;
d)  To determine the level of automated support that can be provided to the concurrent care management functions in the short-term;
e)  To improve the efficiency of providing the data to the health plans which are necessary for monitoring the effectiveness of delegated medical management functions and for claims adjudication; and
f)  To define the long-term information management strategy for care management and develop the appropriate implementation plan.

4

CL 042208

## *Revenue and Accounts Receivable Observations*

During 1997, the AHERF system has faced constraints associated with reductions in reimbursement from third-party payors and reduced cash flows from these payors. As we reported to you during 1996, the system developed a strategy associated with the centralization of accounts receivable management. This was and continues to be impacted by complexities surrounding the registration, billing and collection processes. We further reported to you last year that we redesigned our audit approach to focus on these processes, and selected a sample of patient accounts and reviewed activity through the admission, billing and collection stages within the revenue cycle of the organization. We continued this same approach during the current year.

Significant improvements were noted in the areas of patient file documentation, more timely billing procedures and assessment of the net realizable value of patient accounts. The area of registration in the Delaware Valley, however, continues to provide the organization with inefficiencies in both the billing and collection process. As recommended in the past, particularly with the increasing volume of managed care agreements and risk sharing contracts, training and education and the possible redesign of the registration process is critical to the proper management of accounts receivable.

Further, it should be noted, that the system's third-party payors, particularly in the Delaware Valley Region, continue to delay the processing of claims for payment, contributing to cash flow issues and increased levels of bad debt reserves for collections.

Given the system affiliations and other influences that the complex healthcare environment imposes, management should continue to focus their attention on providing requisite levels of training to personnel, monitoring the collection process and continuing to make improvements in the areas discussed above.

## *Management Response:*

The improvement in the condition of patient accounts receivables during fiscal 1997 reflects the planned benefits derived from the consolidation of the billing and collection functions under a strong, central leadership.

The registration function in Pittsburgh has been under the coordinated direction of a senior director for over a year, whereas the DVR region has only recently been able to benefit from a more coordinated and focused leadership structure. Benefits derived from this structure, which are more fully realized in Pittsburgh but also underway in DVR, include:

1.    **Automation**

   - **Electronic Verification and Edit Approaches** - such as HDX, HDS, Combined Bill, and Filenet (for which applications to DVR registration are currently being explored)

CL 042209

*Revenue and Accounts Receivable Observations (Cont'd)*

- **Graphical User Interfaces** - roll out of ClientBuilder (AGH) and Windows-based registration for AIHG sites

2. **Process Improvement**

- **Express Registration**

- **Use of Rejected Bill Analyses** - to modify registration procedures

3. **Structural Initiatives**

- **Training and Education** – an aggressive training program has been developed around a standardized curriculum reflecting a coordinated patient access philosophy across both hospital and AIHG points of entry. Numerous classes of instruction have been held to standardize registration practices and also to provide updates relating to payor changes, new contracts, etc.

- **Expanded Financial Counseling** - In 1997, the financial counseling staff at AGH was expanded to handle processing of patient liabilities and issues at the point of service. This front end attention is particularly vital in intercepting problems associated with the complex nature inherent in many managed care arrangements.

With the full integration of a centralized leadership presence in the DVR, cohesive structure across the various AHERF affiliated institutions will exist.

6

CL 042210

### Human Resources/Payroll Observations

With increased affiliation activities during the past year, increased levels of human resources, multiple benefit plans and a variety of policies and procedures exist. As such, strains on the management of the flow of transactions in both the human resource and payroll departments can occur. The payroll department continues to focus on the consolidation of payroll systems while the human resource area has restructured to identify customer service areas for their employees.

Though there have been improvements in some areas, we have noted similar findings as in prior years. Management has recognized that such findings continue to expose the organization to increased costs due to delays in the processing of information. Quarterly audits have been instituted to identify those business units which have not attempted to institute procedures to reduce such processing delays.

As indicated above, our observations, which are similar to prior years, are straining the organization both from the use of resources and cost management. A summary of our findings include:

- Several hundred manual checks are processed each month as a result of delays in the processing of employee status changes, new hire information and various adjustments/corrections within the human resources/payroll systems. There are also delays in the timely transfer of information related to employee changes/corrections between the human resource and payroll departments,

- Time card information is not always verified by the person entering the data to ensure that the information is complete and signed for approval,

- Temporary employees are not consistently monitored for re-approval within defined policy periods, and

- Reconciliations of census data used for preparation of the benefit plan liability estimates do not always occur on a timely basis.

Recognizing that the growth of the system can result in a significant increase in the volume of transactions, management should institute action plans and appropriate follow-up procedures to address the improvement of processing transactions to ensure that items, as those indicated above, do not continue.

### Management's Response:

Management concurs with the recommendations.

Specifically, the Human Resources and Payroll departments will work in tandem to mitigate the delays in the processing of employees status changes. Improvements in the timeliness of processing these changes should dramatically reduce the level of manual checks prepared.

CL 042211

### *Human Resources/Payroll Observations (Cont'd)*

Given the volume of time cards processed (in excess of 300,000 time cards are processed on an annual basis), management believes that the present level of incomplete time card information is acceptable, manageable and does not subject the organization to undue financial risk. However, as management continues to migrate the disparate payroll functions of AHERF's recently acquired affiliates to the centralized payroll area in Pittsburgh, internal controls will be further tightened to reduce the level of time card exceptions.

The processing of paperwork related to the retention of employees temporarily added to the payroll system (e.g., interns) is certainly an area that can be enhanced. However, numerous compensating controls exist (e.g., cost center approval of time card information, workload planning and monitoring mechanisms, budget versus actual temporary employee expense analyses performed at the cost center, operating entity and corporate levels) to ensure that unnecessary temporary employee costs are not incurred. Nonetheless, the Payroll and Human Resources departments will work together with the respective operating units to develop more effective procedures to ensure that this paperwork is processed on a more timely basis.

A number of steps have been taken to ensure that census data used for the actuarial valuation is accurate. Beginning September 16, 1997, we will be sending the actuaries a file of demographic and payroll data on a weekly basis. These files will be extracted and produced by our Information Services department. AHERF's external actuary (Hewitt) will use internal systems to load and reconcile this data and will produce the annual actuarial valuation extract from their own system. This change has the following advantages:

1. Hewitt's data will be updated weekly and, therefore, kept current with changes within AHERF.
2. This eliminates the manual download/upload processes that were necessary, which caused some of the census problems in the past.
3. Edits, errors and warnings have been developed by Hewitt which will run each time a new file is loaded (weekly). This will address issues as they arise during the year rather than a once a year, single effort approach.
4. Hewitt will be interfacing with employees and providing customer services based on this data. Therefore, multiple databases (and the necessary corrections to those databases) are avoided.

CL 042212

### Purchasing System Observations

Transitioning of affiliated purchasing systems and improvements to the existing AHERF processes is an area that has received continued focus by AHERF management. Given that volume levels have increased tremendously and funding limitations exist, management continues to face challenges relative to the timely processing of data and monitoring of open purchase commitments and authorization levels. Such information is essential for the evaluation of cash management and preparation of internal reporting.

During our current year audit procedures, we evaluated past observations reported to you as well as updated our understanding of the internal control environment as a means for evaluating management's measures to improve the overall efficiency and control structure of the purchasing system. The following represents a summary of our observations, which are similar to those reported in prior years:

- Purchase orders are not consistently approved by authorized employees, particularly in those areas where signature approval forms have not been updated by the appropriate individuals,

- Though it does not appear unauthorized purchases are occurring, purchase orders designated for deletion are not being deleted from the purchasing system on a timely basis,

- Discrepancies between purchase requisitions, purchase orders, invoices and receipts are not resolved on a timely basis, our testing indicated that such discrepancies amounted to approximately $5.7 million, and

- Unmatched credits from vendors are not being resolved on a timely basis.

Management should evaluate current policies and procedures to ensure that unauthorized purchases do not occur within the system. Due to the dynamics of the organization, a periodic assessment, at least annually or semi-annually, of authorization levels should be performed. Additionally, timely resolution of open purchase orders, unmatched invoices and vendor credits is essential to ensure that commitments of the organization and cash requirements can be appropriately evaluated by management.

### Management's Response:

Management agrees with certain aspects of the comment and is taking the following action:

- Purchase order authorization has been an ongoing problem that has been identified for the last several years. Management has implemented new policies to address this matter and additional training and monitoring is required.

- Purchase orders designated for deletion have been brought current.

9

CL 042213

## *Purchasing System Observations (Cont'd)*

- Resolution of discrepancies continues to be a problem. The staffing levels of purchasing will soon be addressed to hopefully improve this.

- Unmatched credits is a problem that will require additional investigation. The centralization of the Accounts Payable function away from Purchasing has increased this problem and will need investigated.

10

CL 042214

## *Off - Balance Sheet Commitments*

As discussed earlier, AHERF has entered into significant levels of leasing arrangements in the past year. Although not recorded as debt in the financial statements, such arrangements represent substantial cash commitments into the future. It is essential that management establish a centralized monitoring mechanism over these commitments in order to ensure that they are being properly accounted for and included in required cash outlays in the cash budgets for the succeeding years. At present, management does not have a formalized process to follow when negotiating and finalizing leasing arrangements nor does management have a formalized tracking mechanism to monitor such commitments. It is our understanding that the Treasury Department is assessing the required enhancements to the existing control environment related to this issue.

## *Management's Response:*

Management will work to formalize processes for lease negotiations and the ongoing monitoring of executed leases. Such processes are expected to include, but will not be limited to, centrally instituted and controlled master lease facilities. Development and monitoring of such master lease arrangements will focus on operational work flow, which includes input from appropriate purchasing, administration, finance, legal and treasury personnel. These enhancements will greatly improve the monitoring of usage and compliance with facility guidelines along with operating lease provisions.

11

CL 042215

## Overview of AHERF Technology Systems

The Information Services department continues its efforts toward accomplishing goals defined by the Clinical Vision for Medical Management. Ultimately, the vision strives to achieve seamless systems integration and a computerized patient record, taking AHERF to the next level of healthcare computing that must be reached to allow AHERF to remain a competitive leader.

One of the key goals is to implement corporate-wide standard core transaction processing systems. By standardizing these systems across AHERF, the implementation of a computerized patient record becomes possible. As of May 1997, conversion to standard systems had been completed for five of the eight core systems identified. The Information Services department has also dedicated a significant amount of resources to the transition of the computer systems from Allegheny Valley, Forbes and Graduate.

Information Services has made progress with other key goals. These include, but are not limited to, the completion of the initial system design for creating a computerized patient record; defining business requirements for the integration of a medical knowledge bank, and supporting external connectivity with Managed Care Organizations and Pyramid Health.

Some of the systems in place throughout AHERF are supported and maintained outside of the Information Services department. These system are run by the users and are referred to as "client managed" systems.

## Technology Related Observations

As part of the fiscal year 1997 audit, we reviewed the controls surrounding the maintenance and processing of selected financial systems, principally patient accounting, professional fee billing, accounts payable, purchasing, fixed assets, admissions/discharges/transfers, order entry, payroll, flexible benefits, student billing and grant accounting. Six computers, located in Pittsburgh and the Delaware Valley, are used to process these systems. Our review focused on the control procedures in place relative to the following areas:

- **Software Maintenance** - controls designed to ensure that changes to applications and system software are appropriately authorized, tested, documented, and approved.
- **Computer Operations** - controls designed to ensure that authorized programs are appropriately executed; correct versions of data files are used during processing, and processing can be properly resumed in the event of computer processing failures.
- **Security** - controls designed to ensure that security exists over programs, data and other system resources, access to application functions are assigned based on job responsibilities, and computer hardware/media are secure from unauthorized access.
- **Implementation** - controls designed to ensure that new system implementation projects entail an appropriate level of management, testing, documentation and approvals, and include procedures to ensure data is accurately converted from the old system.

12

CL 042216

*Overview of AHERF Technology Systems (Cont'd)*

In addition to reviewing the Information Services' policies and procedures, we executed a security audit tool, called CA-Examine, on the Pittsburgh mainframe to identify potential security exposures. The findings resulting from the use of this tool, which were not significant in nature, have been provided to Information Services management.

The following observations were noted in conjunction with our procedural testing in the Information Services department:

Disaster Recovery Procedures

A disaster recovery plan documents the actions required if critical computer systems become inoperable and necessitate using an alternative computer. AHERF's current disaster recovery plan has some sections that are not current and not all aspects of the plan have been successfully tested. Furthermore, recovery procedures have not been documented for the Accounts Payable and Purchasing systems which are "client managed" (run by user departments). This may result in an unacceptable recovery period or inaccurate recovery of data for critical hospital systems should the computer system become inoperable.

AHERF should dedicate the time and resources to ensure that the recovery procedures are updated and kept current, especially given that AHERF's environment is constantly changing. The updated disaster recovery plan should be fully tested to ensure all aspects of the plan will operate accordingly. In addition, the user departments responsible for the "client managed" systems should document and test recovery procedures for their systems.

**Management Response (Information Services)**

Information Services (IS) has assigned a full time management level resource to be responsible for disaster recovery planning. The responsibilities of this person include ensuring that recovery procedures are updated and kept current.

On September 15-16, 1997 we completed a successful test of our mainframe recovery plan. Using our hot site we recovered all mainframe applications and successfully tested communications and critical applications because a number of systems are not managed by IS. To ensure that AHERF is prepared for any disaster, the owners of "client managed" systems must also develop recovery procedures. We will provide assistance to these owners to develop their plans.

We are now going to focus our business recovery efforts on non-mainframe applications managed by Information Services. These efforts, however, will not ensure that AHERF can successfully recovery all critical applications because a number of systems are not managed by IS. To ensure that AHERF is prepared for any disaster, the owners of "client managed" systems must also develop recovery procedures. We will provide assistance to these owners to develop their plans.

13

CL 042217

_Overview of AHERF Technology Systems (Cont'd)_

Year 2000 Strategy

The year 2000 will be the first century change ever encountered by an automated society. The vast majority of computer applications in use throughout the world today have date processing logic based on a two-digit year (e.g., "97" for 1997) When the year 2000 arrives and the two-digit year becomes "00", the computer application logic and/or the operating system software may produce erroneous results or fail to operate. The efforts and associated costs to address the year 2000 issue could be significant, as existing applications may need to be changed. The time required to research, change and test existing applications (or implement new applications) is typically extremely tight given that the year 2000 is an absolute deadline.

The Information Services (IS) department has formed a committee with representatives from various areas including facility, applications, end-user computing, networking, systems, security and Internal Audit. Sub-committees have been formed to define the date compliance standards, review and recommend software packages to aid in the management of the year 2000 project and develop a communication and awareness plan for the organization. These committees have identified over 300 software products/systems which need to be Year 2000 compliant.

Although progress has been made in assessing the implications of the year 2000 issue, an entity-wide strategy has not yet been developed and the initial assessments have not included all potential affected areas outside of IS, such as client managed systems and other equipment that utilizes a microprocessor.

We recommend that AHERF management develop and implement an entity-wide strategy to address the year 2000 issue. The year 2000 project should have clear sponsors from the IS and non-IS areas. For application software provided by vendors, management should gain written assurance from the vendor that the software is, or will soon be, year 2000 compliant.

**Management Response (Information Services)**

Information Services (IS) has recognized the criticality of the Year 2000 project and the importance of developing and implementing an enterprise strategy to address the Year 2000 issue. As such, we have created a Year 2000 Project Office and reassigned eight full time staff to focus on preparing AHERF for the Year 2000. This group is responsible for coordinating project activities across the entire enterprise and for ensuring the integrity of the overall century-compliance effort at AHERF.

14

CL 042218

## *Overview of AHERF Technology Systems (Cont'd)*

A management awareness campaign throughout the organization has been concluded. The Project Office staff is in the process of conducting a detailed assessment of all systems throughout the enterprise. This includes developing workshops to educate and access non-IS areas. Additionally, a member of the Project Office staff has been assigned full time to work with legal counsel to follow-up with vendors regarding compliance of packaged products (i.e. release number, ship date, compliance strategy, certification strategy).

The detailed assessment of all systems throughout AHERF will include systems managed by IS and "client managed" systems. It is the responsibility of the owners of the "client managed" systems to ensure that they are Year 2000 complaint. IS will assist in the effort and maintain an inventory of systems and their degree of Year 2000 compliance.

15

CL 042219

TAB  196

1

08:33:50

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                Civil Action

        Plaintiff,              No. 00-684

   vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

        Defendant.


     Videotape deposition of DANIEL CANCELMI,

called for examination under the statute, taken

before me, Jaci R. Traver, RPR, CRR, and Notary

Public in and for the State of Ohio, at the

offices of Jones Day, 500 Grant Street,

Pittsburgh, Pennsylvania, on Thursday, the 23rd

day of January 2003 at 9:00 a.m.

- - - - -

VOLUME 1

- - - - -



RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

Daniel Cancelmi

125

1    A.    Yes
2    Q.    One of them is what we talked about
3    earlier, before I was rudely interrupted, and
4    that was the notion that there may be a
5    arrangements with third party payors to charge
6    some discounted or usual fee as opposed to the
7    fee normally charged for the service by the
8    hospital.
9    A.    That can be one of the factors.
10    Q.    And that makes the collection of
11    the balance perhaps more difficult, right?
12    A.    It can.
13    Q.    There are, in addition to that,
14    government payors who have certain requirements
15    of their own as to what they will or will not
16    reimburse for and how much they will reimburse
17    for given items, right?
18    A.    Yes.
19    Q.    On the self-pay portion of
20    hospitals, a hospital is treating people who
21    are ill or in need of treatment, regardless of
22    their ability to pay. right?
23    A.    That happens, yes.
24    Q.    So in many cases you are dealing
25    with the unfortunate combination of large

126

1    hospital bills being rendered to people who do
2    not have any third party insurance for it,
3    right?
4    A.    That happens, yes.
5    Q.    And it is unusual in this
6    particular context, because someone can't
7    really avoid medical treatment if they need it,
8    right?
9    A.    I mean, yeah, that can happen. I
10    mean there's rules that hospitals follow and
11    there's certain, I believe, there's certain
12    laws and regulations in terms of what services
13    absolutely need to be provided to people,
14    regardless of their ability to pay.
15    Q.    But generally speaking, you're
16    dealing with sick people who don't have -- who
17    don't have the ability to decide whether or not
18    they need the service, and need the service
19    irrespective of their ability to pay, right?
20    A.    That happens, yes.
21    Q.    All of these things are components
22    that are built into the healthcare system,
23    right?
24    A.    Yes.
25    Q.    Okay. And the only source of -- or

127

1    the primary source of revenue that a hospital
2    has is its patient revenue, right?
3    A.    Generally speaking, depending --
4    you can have hospitals, if you have -- if
5    they're well endowed, that can generate vast
6    sums of revenues from other sources, endowment
7    investment income and stuff like that. But I
8    mean by and large a hospital's primary source
9    of revenues or cash receipts comes from
10    treating patients.
11    Q.    All right. That will exhaust that
12    area, I guess. Let me ask this question.
13    Was there any -- ever any
14    discussion at AHERF about deliberately
15    understating the allowances for doubtful
16    accounts?
17    A.    There was at times -- there was one
18    point where the company decided to record bad
19    debt expense based on budgetary levels, until
20    such time that they could get their arms around
21    and make a final determination of what the
22    problems were in the billing department.
23    And there was a lot of unusual
24    results coming out of the billing department.
25    There was a lot of different possible reasons

128

1    for those results. And there was a lot of
2    different people trying to evaluate what the
3    problems were.
4    And until there -- I don't remember
5    exactly what year, it may have been fiscal '97
6    when the company management decided that until
7    we sort this out and figure out and conclude
8    what's really wrong, we'll book to the budgeted
9    bad debt expense numbers.
10    Q.    This was in 1997?
11    A.    I think so.
12    Q.    Did Coopers know about that?
13    A.    I'm not sure if they did or not.
14    Q.    We'll return to that.
15    A.    But that was, just to clarify, that
16    was during the course of the year, and that
17    wouldn't have necessarily been the year end
18    numbers that Coopers would audit.
19    Q.    Now, when you were at Coopers
20    auditing AHERF year end 1994, do you recall
21    whether or not there was a discussion going
22    into the audit among the auditing personnel
23    about problems with AHERF's accounts
24    receivable?
25    A.    In 1994? Not that I remember.

32 (Pages 125 to 128)

Daniel Cancelmi

129

1    Q.   Do you have -- with respect to the
2  year end audit of 1996 or 1997, do you recall
3  having any awareness as to whether or not
4  Coopers was attaching special significance to
5  the area of accounts receivable in connection
6  with those audits?
7    A.   Yes
8    Q.   What was that understanding and for
9  what audit years?
10   A.   There was a lot of -- as I
11 mentioned before, there was a lot of concerns
12 within the organization as to some of the
13 problems in the billing department.  There
14 didn't seem to be the right level of cash being
15 collected.
16       And the time frame, you know,
17 whether it was fiscal '95 or fiscal '96, it
18 really started to really become more of an
19 issue being discussed   A lot of people within
20 the company looking at that area, trying to
21 figure out what's wrong.  And at certain
22 points, Coopers & Lybrand management advised
23 Coopers & Lybrand of some of the issues related
24 to that area
25       And I know at one point AHERF

130

1  management, I believe, engaged Coopers &
2  Lybrand to come in and do sort of, I'm not sure
3  what the right term would be, but some type of
4  special review or audit of some of the
5  potential problems related to the accounts
6  receivable area.  I don't exactly remember the
7  dates of that, but sometime in '96 or '97
8    Q.   With respect to the year end 1996
9  audit, do you know whether or not Coopers &
10 Lybrand was attaching any special focus or
11 significance on the account area of accounts
12 receivable in connection with the AHERF audit?
13   A.   I believe so, because, again, the
14 special review that I mentioned, that may have
15 been happening or occurring right before the
16 end of '96 or right after.
17       And then it seemed like during the
18 '96 audit, they were performing it seemed like
19 additional work than they would have in a
20 normal audit due to some of the issues that had
21 been occurring
22       And there would be, you know, if
23 you look at the management letter that would
24 have been issued by Coopers, there was, you
25 know, certainly a rather, you know, lengthy

131

1  conversation or discussion in '96 in the
2  management letter about some of the issues that
3  were challenging the Allegheny organization in
4  the patient billing area
5    Q.   You say if one looks in the
6  management letter of 1996, one will find
7  commentary about Coopers & Lybrand that
8  challenge the Allegheny organization?
9    A.   I'm not saying challenging, just
10 pointing out what some of their findings were
11 and some of the issues challenging or being
12 presented to the Allegheny organization.
13   Q.   All right  Now, I want to go back
14 to something you said in your last lengthy
15 answer, and that was it seemed like they were
16 doing additional work, more additional work
17 than they would have done in a normal audit
18 This is in 1996?
19   A.   Yes, I believe so
20   Q.   Okay  On what basis do you make
21 that statement?
22   A.   I thought that they were asking for
23 some more reports or data than they seemed to
24 have asked for in the past.
25   Q.   What sorts of reports and data, if

132

1  you recall?
2    A.   Just -- I don't remember
3  specifically.  Just accounts receivable type
4  information
5    Q.   What about -- do you remember who
6  it was that was doing the asking?
7    A.   There was probably a number of
8  different people.  It wasn't just one person.
9  I think they had -- Coopers would have, you
10 know, a number of different individuals looking
11 at accounts receivables, so you could have a
12 number of different people asking for data.
13       I think related to that special
14 review, they sent over like a request for
15 information from us of data that we would have
16 to pull together
17       And then I think they had people
18 other than auditors, they had this healthcare
19 consulting group.  They had some of those
20 people involved and went over and sat down and
21 reviewed data in the billing department area
22 and I guess spoke with people over there also.
23   Q.   Do you recall a conversation with
24 anybody from Coopers & Lybrand at or around the
25 time of the 1996 audit in which they told you

Daniel Cancelmi

133

1  specifically, we are really focused this year
2  on this accounts receivable?
3      A.   I can't remember a specific
4  conversation.
5      Q.   Was your impression that they were
6  doing additional work was simply that it seemed
7  like there was more activity from Coopers in
8  the area of accounts receivable?
9      A.   Yes
10     Q.   More requests for information?
11     A.   Yes.
12     Q.   All right. But nobody from Coopers
13 was specifically telling you, we're troubled
14 about accounts receivable, or we're locked in
15 on accounts receivable, anything like that?
16     A.   I mean I think it was a given that
17 given that, you know, that there had been
18 problems in that area that Allegheny management
19 had identified and had brought to, you know,
20 Coopers' attention and had asked them to come
21 in and do some additional work or review
22 procedures, whatever you want to call them.
23         So I mean certainly, you know, took
24 on maybe more heightened sense of awareness
25 than it would have if there hadn't been

134

1  problems or issues in that billing area.
2      Q.   But on the healthcare auditing
3  side, accounts receivable and the allowance for
4  doubtful accounts would always be a key
5  auditing area, right?
6          MR. RYAN: Objection.
7      A.   I believe that would be a fair
8  characterization that a lot of people would
9  conclude
10     Q.   Were you -- I asked you this
11 before, but I'm not sure that I remember what
12 the answer was
13         When you were at Coopers at year
14 end 1994, you had overall responsibility as
15 manager for items such as accounts receivable,
16 I think that was your testimony; is that right?
17     A.   Yes. When you're the overall
18 engagement manager in practice, you have
19 responsibility for making sure the entire
20 engagement is pulled together. You might have
21 other managers underneath you reviewing certain
22 areas and then you rely on, you know, the work
23 and the review procedures that they perform and
24 that the people underneath them perform
25     Q.   Do you remember whether or not your

135

1  work as manager at the year end 1994 audit
2  would specifically include inquiry into the
3  issue of bad debt, accounts receivable and bad
4  debt?
5      A.   I can't remember.
6      Q.   All right. The reason I ask the
7  question is because you said that many would
8  consider this to be a focal point of a
9  healthcare audit, right?
10     A.   Yes.
11     Q.   An important part of a healthcare
12 audit?
13     A.   Yes.
14     Q.   As opposed to tying off bonds or
15 something like that?
16     A.   Right
17     Q.   It involves in the bad debt area
18 that thorny issue of the auditing of estimates,
19 right?
20     A.   Yes.
21     Q.   And I'm wondering, in light of that
22 and in light of the fact that you were the lead
23 manager, if you will, on the AHERF audit, would
24 this not presuppose that you would be involved
25 in some direct way in the work and conclusions

136

1  being drawn by Coopers on accounts receivable
2  and bad debt?
3      A.   I would --
4          MR. RYAN: Objection.
5      A.   I would be involved. Whether I
6  performed the detailed nitty gritty review of
7  every single work paper and schedule that
8  supported those, I can't say that I would
9  have to go look at the work papers and see
10 which ones I reviewed and maybe had another
11 manager review them.
12         But they would have presumably kept
13 me apprised of what the issues were. And if
14 there was any problems, it would have been, you
15 know, brought to my attention and they would
16 have been, you know, obviously escalated to the
17 partner, if necessary
18     Q.   You talked about the fact that
19 Robin Schaffer would put together estimates
20 using matrixes of the kind and percentages that
21 we talked about earlier. Do you recall that
22 testimony?
23     A.   Yes.
24     Q.   And that this is an evaluation that
25 would go up the line at AHERF. People would

34 (Pages 133 to 136)

Daniel Cancelmi

137

1  look at the accounts receivable and the
2  estimates and they would look at the data and
3  sort of second guess, if you will, or add their
4  thoughts or concepts or judgments as it goes up
5  the line, right?
6      A.  Yes.
7      Q.  Now, when you were over at Coopers
8  & Lybrand, is there somebody over at Coopers &
9  Lybrand in connection with the auditing of that
10 column or that item that's doing essentially
11 the same thing, i.e., looking at the data that
12 is being relied on, looking at the numbers, and
13 making independent estimates?
14     MR. RYAN:  Objection.
15     Q.  Since I'm catching an objection, my
16 question is a broad one.
17     Based on your experience at Coopers
18 & Lybrand, how did you guys go about auditing
19 bad debt reserves at AHERF?
20     A.  I mean the firm has predefined
21 audit steps that are established at the start
22 of the auditing engagement that they set forth
23 and say, these are the steps or audit tests or
24 reviews that we will conduct to get comfortable
25 that the numbers are correct.

138

1      Those procedures start with lower
2  level people, the less experienced people.
3  Then that data is then reviewed by a more
4  experienced person.  Then it would then go up
5  to the manager left.  It would be reviewed at
6  the manager level.
7      If there were multiple managers, in
8  the '94 case there was multiple managers, that
9  manager's review would have, may have initially
10 been reviewed on a more cursory basis, from my
11 perspective, making sure numbers made sense
12 overall.  And then after the managers get done
13 with their review, the data is then submitted
14 to the partners, who then review the data on an
15 overall basis to make sure that the numbers
16 made sense.
17     And that type of audit of a
18 hospital, you know, the accounts receivable
19 area is certainly important.  So, you know,
20 there's a lot of attention.
21     Q.  My question relates, perhaps
22 imprecisely, my question relates to the fact
23 the allowance for accounts is an estimate.
24     A.  Uh-huh.
25     Q.  Necessarily it's an estimate.

139

1  Somebody is making a judgment call based upon
2  whatever data they're basing it on as to what
3  the number is going to be
4      In many accounts that are not
5  estimates, auditors have procedures that go
6  back, you know, generations of how you're going
7  to sample and test and determine whether or not
8  you're comfortable that the numbers are fairly
9  presented in the financial statement.  But with
10 an estimate, I'm trying to figure out how one
11 gets their arms around that
12     The company presents an estimate on
13 their financial statement for doubtful
14 accounts, an allowance for doubtful accounts.
15 Right so far?
16     A.  Yes
17     Q.  That's a significant item on a
18 healthcare company's financial -- or healthcare
19 provider's financial statement, right?
20     A.  Yes.
21     MR. RYAN:  Objection.
22     Q.  Well, whether --
23     MR. WHITNEY:  What's the objection?
24     MR. RYAN:  Significant to whom?
25     Q.  Is it a significant item on a

140

1  financial statement?
2      A.  It can be, yes.
3      Q.  It is -- it's a high risk area on
4  the financial statement, to utilize the
5  terminology you used earlier, right?
6      A.  It's an area, yeah, that oftentimes
7  is considered high risk and the auditors will
8  spend a lot of time making sure the numbers are
9  accurate.
10     Q.  Now, I'm familiar with the fact
11 that in other areas of auditing of other types
12 of companies involving estimates, one way they
13 approach it is they make, the auditing firm
14 makes its own estimates and then looks at its
15 estimates versus the company's estimates in
16 trying to assess whether the company's estimate
17 is a reasonable one
18     And my question to you is:  Is
19 that, in your experience, what Coopers did in
20 evaluating AHERF's estimate for doubtful
21 accounts?
22     MR. RYAN:  Which year are you
23 talking about, Dick?
24     MR. WHITNEY:  1994 to start.
25     A.  I don't remember every single audit

Just Launched    www.rennillo.com    Schedule Online
Cleveland (216) 523-1313                    Akron (330) 374-1313

Daniel Cancelmi

161

1  know, obviously a couple weeks or a month
2  after, you know, the end of a given month.
3      Q.   All right. Back to 1062 a second.
4  We have additional bad debt reserves. And the
5  next group here are a series of transfers
6  totaling 21,265,000. Do you see that?
7      A.   Yes.
8      Q.   This, again, are Graduate reserves
9  going to DVOG hospitals for the purpose of
10  increasing the allowance for bad debt, right?
11     A.   Yes.
12     Q.   And which Graduate entity
13  transferred them is also listed here, it's 10.6
14  from -- yeah, 10,600,000 from Graduate,
15  1,700,000 from Mount Sinai and so forth. Do
16  you see that?
17     A.   Yes.
18     Q.   There's handwriting down below that
19  looked to me to be, if I can skip about six
20  steps, general ledger references. Is that what
21  they are, or do you know?
22     A.   They're journal entry reference
23  numbers, I believe.
24     Q.   Journal entries in the general
25  ledger?

162

1      A.   Yes.
2      Q.   Whose handwriting is that?
3      A.   I believe that's Robin Schaffer's.
4      Q.   But it's not yours?
5      A.   No.
6      Q.   Do you know under what
7  circumstances Robin Schaffer came to record
8  these journal entries? I'm sorry. Yes. Yes.
9          Under what circumstances she
10  claimed or came to record these references to
11  journal entries?
12     A.   I believe this is in probably
13  sometime late summer of '98 when Coopers &
14  Lybrand, it may have been
15  PriceWaterhouseCoopers at that point, I'm not
16  sure what the exact merger date was, but when
17  they were reauditing or rereviewing, whatever
18  the word would be, these adjustments. And they
19  had asked questions as to the journal entries,
20  I believe, and the number of journal entries
21  that were made to record the transfers.
22     Q.   This is something that Coopers
23  raised in the summer of 1998?
24     A.   I believe so.
25     Q.   And Robin is -- Robin Schaffer is

163

1  providing this information ultimately for their
2  benefit?
3      A.   I believe so. I think a question
4  had come up as to how many journal entries had
5  been made to record these transfers; whether
6  there was, you know, a handful of entries or
7  hundreds of entries made to transfer these.
8          And what she's demonstrating is
9  really that there was only a handful of entries
10  or maybe one or two per hospital to record the
11  transfer.
12     Q.   All right. Where did -- the first
13  50 million, you indicated, came from debiting
14  goodwill on the Graduate hospitals' books, or
15  the books of the various Graduate hospitals,
16  before these entities were acquired by AHERF.
17         Do you know where or how the
18  reserves encompassed in this $21,265,000 slug,
19  where they come from or how they were created?
20     A.   They were also reserves on the
21  Graduate hospital. various Graduate hospitals'
22  books that had been created by, at that point,
23  recording expense on the Graduate hospitals'
24  books, I believe.
25     Q.   For what purpose had they been

164

1  created?
2      A.   They had been recorded for various
3  reserve issues.
4      Q.   Contingent liabilities?
5      A.   Contingent liabilities or just
6  certain obligations or things that were
7  potentially an exposure item relating to the
8  Graduate hospitals.
9      Q.   Once again, this would have been
10  before the Graduate hospitals were acquired by
11  AHERF?
12     A.   Yes.
13     Q.   These liabilities would have been
14  created by essentially taking an expense at
15  these various Graduate entities and using that
16  as the basis to create the reserve?
17     A.   Yes. They were either liabilities
18  or asset reserves, like contra-asset accounts.
19     Q.   I promise you we're going to look
20  at them in just a few minutes.
21         Finally, the last item in your
22  August 21, '98 memo is the sum of $28,300,000
23  in reserves used to reduce contractual
24  allowances. As someone once said, can you give
25  me five cents about what you mean by that?

41 (Pages 161 to 164)

Daniel Cancelmi

165

1       What is the purpose, what does it
2   mean to use reserves to reduce contractual
3   allowances?
4       A    Contractual allowance in the
5   hospital business is where, if you liken it to
6   a law firm, law firm's standard billing rate
7   for a partner may be $500 an hour, but you
8   agree to bill the client $200 an hour, so that
9   difference, the 500 less the 200, is $300.
10  It's like a discount you're giving your client.
11      It's similar to in the hospital
12  business. You may charge a thousand dollars to
13  perform some type of operation, but you agree
14  to take, say, $300 from an insurance company
15  So a thousand less 300, you have a $700
16  contractual allowance.
17      That's a contractual allowance in
18  the hospital world.
19      Q    We touched on this this morning, or
20  at least I did, and you at least grudgingly
21  agreed. There are circumstances in which the
22  hospital will bill an amount, but an insurance
23  company will only agree to pay a certain amount
24  for that procedure, right?
25      A    Yes.

166

1       Q    And in some, at least some of those
2   circumstances, the hospital agrees with the
3   insurer that they will not look to the patient
4   for the difference, right?
5       A    Yes.
6       Q    That spread between what you charge
7   and what they'll pay, that spread is a
8   contractual allowance?
9       A    Yes.
10      Q    Now, at AHERF, circa 1996, when you
11  bill a patient for an item that is payable by a
12  patient's insurance company for some discounted
13  amount, do you show the whole gross amount as a
14  receivable?
15      A    I believe so. I think you need
16  to -- you need to ask a billing person who does
17  that every day, but I believe the charges on a
18  bill, even the ones that go to the insurance
19  companies, show the gross charges. I think
20  that's a rule.
21      Like for example, when you bill
22  Medicare, even though you may not get paid your
23  gross charges, the charges -- you bill a gross
24  charge as to Medicare, but they reimburse you
25  based on whatever procedure is performed on

167

1   that patient
2       Q    Let me ask the question a different
3   way that's more addressable by you as an
4   accountant
5       From an accounting standpoint, how
6   do you deal with the contractual allowance? I
7   mean the contractual allowance is the spread
8   between what the company charges and what
9   they've agreed to take --
10      A    Right
11      Q    -- for the service. At AHERF did
12  they book the whole amount?
13      A    The contractual allowances would
14  either be calculated by the billing system
15  itself, and the billing system would
16  automatically -- let's go back to that example,
17  the thousand of charges and they get paid 300.
18  In a lot of cases the billing system would take
19  the $700,000 and record the contractual
20  allowance
21      In some cases if the billing system
22  for whatever reason wasn't calculating the
23  contractual allowance, you would have to make
24  an estimate of what the contractual allowance
25  was and record a journal entry for that.

168

1       Q    How do you deal with the
2   contractual allowance on the financial
3   statements?
4       A    What do you mean deal with it?
5       Q    Well, you've got in your example a
6   thousand dollars gross and a $700 net for a
7   $300 contractual allowance, right?
8       A    No, other way. 700 contractual,
9   300 net.
10      Q    All right.
11      A    You reduce your revenue by the
12  $700
13      Q    You reduce -- you reduce the
14  revenue. Do you book the whole -- on the
15  income statement, do you show the whole amount
16  as revenue and then show the deduct as an
17  expense?
18      A    On the general ledger, it's both
19  the gross charge and the contractual allowances
20  is -- it's on there. But in usually the
21  external financial statements, the accounting
22  rules don't require you to disclose the
23  contractual allowance. You just show the net
24  number
25      Q    Well, all of this is prefatory to

42 (Pages 165 to 168)

Daniel Cancelmi

169

1  my question that when you're moving $28 million
2  of Graduate reserves from the Graduate over to
3  the DVOG hospitals to reduce contractual
4  allowances, where is it going? I can
5  understand --
6      A.  It's on the line that says net
7  patient revenue
8      Q.  What's it doing on that line?
9      A.  It's reducing -- it's increasing
10  the revenue on that line
11      Q.  All right  On the income
12  statement?
13      A.  Yes.
14      Q.  Okay  Now, where did these
15  reserves -- how were these reserves created?
16      A.  They were created on the various
17  Graduate hospitals, similar to the other set of
18  reserves we looked at
19      Q.  When you say, similar to the other
20  reserves we looked at --
21      A.  On the previous page
22      Q.  -- we're talking about the 21,265?
23      A.  That's correct
24      Q.  Again, these were reserves for some
25  sort of contingent liabilities or other

170

1  earmarked accounts at the Graduate, created at
2  the Graduate before they were sold to AHERF,
3  right?
4      A.  Yes
5      Q.  Okay. When was the $25,265,000 of
6  additional bad debt reserves transferred from
7  the Graduate to the DVOG hospitals?
8      A.  I think in May and June.
9      Q.  Of 1997?
10      A.  Of '97
11      Q.  Whose idea was it to transfer those
12  reserves?
13      A.  How those reserves were transferred
14  is after our department would have prepared the
15  financial statements for those months, those
16  financial statements would have been
17  distributed to management for their review.
18  And that would have been like Chuck Morrison
19  and David McConnell, et cetera
20          And after they had reviewed those
21  financial statements, they made the
22  determination that, indeed, we needed to
23  transfer additional reserves for the DVOG bad
24  debt reserves, and that the contractual
25  allowances on the DVOG hospitals for those

171

1  particular months needed to be adjusted.
2      Q.  Okay  1997, in March and April, in
3  each of those two months $25,000 -- $25 million
4  of Graduate reserves are transferred to the
5  DVOG hospitals and used to augment bad debt
6  And then at some point a determination is made
7  that you need more; is that right?
8      A.  Yes
9      Q.  And the decision is made to
10  transfer in May and June, in increments in both
11  May and June of 1997, $21 million more of
12  Graduate reserves, in this case created
13  through -- or created as contingent liability
14  reserves  The decision is made to transfer
15  them over, much like you would transfer the
16  first 50, right?
17          MR. RYAN: Objection
18      A.  Yes
19      Q.  Now, you say that the decision was
20  made by people like Morrison and McConnell; is
21  that right?
22      A.  Yes
23      Q.  Do you know whether or not Coopers
24  & Lybrand was involved in the decision?
25      A.  I don't know if they were involved

172

1  in the decision at that specific point in time
2  I couldn't say for sure
3      Q.  Do you know whether or not they
4  came to know about this transfer?
5      A.  Yes, I believe they did know about
6  it.
7      Q.  How do you know that?
8      A.  Well, there was -- we provided
9  various documentation to Coopers & Lybrand that
10  would have these transfers listed. these items
11  listed on there  And then there would have
12  been either through conversations directly with
13  them, documentation provided to them, or
14  documentation made available to them, that, you
15  know, these transactions had been recorded.
16      Q.  What documentation did you provide
17  to Coopers & Lybrand that would have had these
18  transfers listed?
19      A.  And I may not have provided the
20  documentation to them directly, but maybe it
21  was Robin or people in her department, as far
22  as the accounts receivable area  There is a
23  number of different audit schedules that they
24  request throughout the course of an audit, such
25  as the activity in the hospitals, bad debt

Daniel Cancelmi

253

1    A.    That arrow is pointing down to the
2   bottom of the page.
3    Q.    That would be this handwriting
4   below the typed text on page two?
5    A.    Yes.
6    Q.    All right. And this is the
7   handwriting of Amy Frazier?
8    A.    Yes.
9    Q.    She's got something going on there
10  that appears to be a breakdown or analysis of
11  the $61,311,000 that's on line item general
12  reserve?
13   A.    Yes.
14   Q.    And you see that the second line
15  item down below appears to include $14,100,000
16  for PFMA?
17   A.    Yes.
18   Q.    Do you recall ever having a
19  discussion with Amy Frazier in which she
20  claimed an understanding that the $61 million
21  of reserves that is referenced on the first
22  page of this document included the PFMA
23  reserves?
24   A.    No.
25   Q.    Do you ever recall any discussion

254

1   with Amy Frazier in which she told you she had
2   understood that the PFMA reserves were part of
3   the first 50 million?
4    A.    No.
5        MR. RYAN: Objection.
6    Q.    You never had such a conversation
7   with her?
8    A.    No.
9        MR. RYAN: Objection.
10       MR. WHITNEY: What's the objection?
11       MR. RYAN: If you're trying to tie
12  that question to this document, that's
13  completely misleading.
14   Q.    All right. But the $50 million did
15  not include in any way the PFMA reserves,
16  right?
17   A.    No.
18   Q.    It was never represented to Coopers
19  & Lybrand that they did, right?
20   A.    No.
21   Q.    Okay. In fact, the source of the
22  $50 million was made clear to Coopers & Lybrand
23  on at least two occasions, right?
24       MR. RYAN: Objection.
25   A.    Yes. It was clear what the

255

1   $50 million was for.
2    Q.    And the discussion of the
3   amortization of the offsetting entry over 35
4   years?
5    A.    Yes.
6    Q.    Let me show you a document that
7   we're going to be marking as 1069
8        - - - - -
9        (Thereupon, Deposition Exhibit 1069
10       was marked for purposes of
11       identification.)
12       - - - - -
13   Q.    Document produced by
14  PriceWaterhouseCoopers. Again, purports to be
15  a listing, AHERF update meeting June 20, 1997,
16  William Buettner, right? Is that Buettner's
17  handwriting?
18   A.    Yes.
19   Q.    All right. Do you remember
20  participating in an audit update -- an update,
21  AHERF update meeting on June 20, 1997?
22   A.    I can't remember specifically that
23  meeting, but I mean this is the agenda for that
24  meeting, so I assume I was there.
25   Q.    Why do you assume that?

256

1    A.    I generally attended these.
2    Q.    You're familiar with what an update
3   meeting was in the parlance of the relationship
4   with Coopers and AHERF in connection with the
5   1997 audit, right?
6    A.    Yes. Plus, I think I had a copy of
7   this same agenda in my files.
8    Q.    All right. Now, it says, accounts
9   receivable and revenue items. It says, impact
10  of Graduate reserve.
11       Down, about four bullets down under
12  accounts receivable and revenue items. Do you
13  recall the discussion of the impact of the
14  Graduate reserve on June 20, 1997?
15   A.    I don't remember the specific
16  discussion. I believe it related to the fact
17  that there were reserves established with
18  Graduate that were transferred to the Delaware
19  Valley Obligated Group, but I can't remember
20  exactly what we talked about.
21   Q.    There is a note, Pittsburgh levels
22  down, reserves appear adequate, DV levels flat.
23  Do you see that?
24   A.    Yes.
25   Q.    Do you know what that's a reference

64 (Pages 253 to 256)

Daniel Cancelmi

257

```
1   to?
2       A.  I guess he's referring to the bad
3   debt levels.  Or maybe -- it could be we're
4   talking about the patient receivable levels.
5   I'm not sure.
6       Q.  Do you recall anybody from Coopers
7   & Lybrand objecting to AHERF's transfer of the
8   first $50 million of reserves from Graduate to
9   DVOG?
10      A.  No.
11      Q.  If someone from Coopers & Lybrand
12  indicated that -- or if representatives of
13  Coopers & Lybrand were to take the position in
14  this litigation that they did not know about
15  the first $50 million in reserves until August
16  of 1997, would that be true?
17      A.  I don't believe so.  I think if you
18  look in their work papers, I think it would be
19  clearly evident that that wouldn't be the case.
20  Plus, the information that Allegheny provided
21  to them I don't think would support that, nor
22  would we just record transactions like that and
23  not advise them of those, the magnitude of
24  those transactions, with the hope that they
25  don't find that out at some point during the
```

258

```
1   audit.  Especially that particular audit area.
2       Q.  Do you recall sometime in the
3   summer of 1997, late summer, like August, Amy
4   Frazier coming into your office and saying to
5   you, what the hell is this all about?
6       A.  No.
7       Q.  Referring to these reserves.
8       A.  No.
9       Q.  Do you remember telling her, it's
10  your problem?
11      A.  I don't remember that.  I've heard
12  that -- I've heard that statement.  Again, I'll
13  go back to, you know, I was always under the
14  understanding and impression that Coopers was
15  aware of these transactions well before August
16  of '97.
17          To assume that in August of '97 was
18  when they first found out about it, I don't
19  think the documentation would support that.
20  And furthermore, if that was the case, I would
21  assume it would have been ratcheted up to all
22  kinds of levels within the organization.  And I
23  don't recall that ever occurring, whether my
24  supervisor or that person's supervisor came
25  back and said, hey, they don't agree with this
```

259

```
1   now.
2           There's protocol within the
3   auditing profession that if you would find an
4   adjustment of that magnitude that you didn't
5   agree with, that you would have to, you know,
6   document that and raise it with certain
7   individuals in senior management, let alone the
8   audit committee and those types of things.
9   It's just not my recollection.
10      Q.  Do you remember when Coopers &
11  Lybrand signed off on AHERF's 1997 audit?
12      A.  The time frame?
13      Q.  Yeah.
14      A.  I guess it was like probably
15  January or February of '98, I guess.  '98.
16      Q.  So it was sometime well after
17  August of 1997?
18      A.  Sure.  In fact, I mean one of the
19  big holdups in the release of the audit that
20  year was the Delaware Valley Obligated Group
21  was in violation of the debt convenance.  And
22  in addition, I guess Graduate, the Graduate
23  hospitals, either both of them or one of the
24  two.
25          And so there needed to be extra
```

260

```
1   work done to get comfortable as to whether
2   there would be some type of debt covenant
3   violation and what the impact would be.  And
4   that Allegheny management had to prepare
5   reports and present that information to some of
6   the bondholders.
7           And then subsequent to that, there
8   was a number of different months where
9   Allegheny continued to have accounts receivable
10  problems and there was still large amounts of
11  write-offs that occurred after June of '97.
12          And we had to advise Coopers &
13  Lybrand and there continued to be adjustments
14  and make sure they were comfortable with these
15  adjustments that happened after June of '97, to
16  make sure that they were still comfortable with
17  the June '97 numbers didn't need to be
18  adjusted.
19      Q.  If Amy Frazier or anyone else at
20  Coopers & Lybrand had come into your office and
21  told you, I didn't know about these
22  $50 million, reverse those entries, what would
23  you have done?
24      A.  I would have told my supervisor.
25      Q.  As a practical matter, what would
```

Just Launched    www.rennillo.com    Schedule Online
Cleveland (216) 523-1313                    Akron (330) 374-1313

Daniel Cancelmi

261

1  AHERF have done --
2       MR. RYAN: Objection.
3       Q.  -- if Coopers told them, we're not
4  going to sign off on these entries?
5       MR. RYAN: Objection.
6       A.  Well, if that type of issue had
7  arisen where they objected to numbers of that
8  magnitude, there would have been, I assume, a
9  number of different meetings and discussions
10  and dialogue as to what potentially the issue
11  is, what their position is, what Allegheny's
12  position would be. And to sort out the issue
13  and come to some resolution.
14      Q.  But as a practical matter, if
15  PriceWaterhouseCoopers in August of 1977 is
16  telling AHERF, we are not going to sign off on
17  $99 million of restructuring reserves being
18  transferred to the DVOG, what options does
19  AHERF have at that point?
20      MR. RYAN: Objection.
21      MR. TYCKO: You said 1977, but I
22  assume you mean 1997.
23      Q.  1997, I'm sorry.
24      A.  You know, the options would I guess
25  would be determine based on whatever the

262

1  dialogue was at that point between AHERF senior
2  management and Coopers & Lybrand as to what the
3  ultimate issue is.
4       With those type of numbers, if
5  Coopers said that they absolutely don't agree
6  with it, you'd have to make some adjustment.
7       Q.  You would have to -- you would
8  basically either have to reverse those entries
9  or you would have to issue your financial
10  statements with a qualified or adverse opinion,
11  right?
12      MR. RYAN: Objection.
13      A.  That's probably a good possibility.
14      Q.  My question to you, since I keep
15  catching these objections, based on your
16  experience on both the auditing side and the
17  client's side, if the auditor tells the client,
18  I'm not going to agree to transactions of that
19  magnitude, what are the company -- the company
20  basically has to go along with the auditor,
21  don't they?
22      MR. RYAN: Objection.
23      A.  Yeah, if you want an unqualified
24  opinion. I mean there's a number of different
25  things that have to happen, both from the

263

1  client's side and from auditor's side.
2       I mean there's representation
3  letters, there's required communications with
4  audit committees, there's management comment
5  letters, there's communications indicating
6  whether there's any disagreements with the
7  management and the accountants.
8       Whether the auditors have
9  identified any material adjustments that they
10  had -- that they disagreed with and had to
11  bring to management's attention. I mean
12  there's a -- I'm probably just -- that's tip of
13  the iceberg.
14      Q.  But in any event, at no time did
15  Coopers & Lybrand ever tell AHERF to reverse
16  any of these reserve transfers, right?
17      A.  Not that I'm aware of.
18      MR. RYAN: Objection.
19      Q.  Not that you're aware of. The
20  $50 million that was transferred from Graduate
21  to DVOG, the first 50, did DVOG need the money?
22      A.  Based on the calculations at that
23  point in time, that was the conclusion, that
24  they did need the reserves.
25      Q.  All right. Would you have

264

1  transferred these $50 million of reserves and
2  subsequently the other $21 million of reserves
3  to DVOG's allowance for bad debt if you did not
4  need the money?
5       A.  No, I don't believe so.
6       Q.  All right. Were there other
7  reserves available to apply to DVOG's bad debt
8  in March and April and May and June of 1997,
9  other than these Graduate reserves?
10      A.  Generally speaking, I mean I think
11  Allegheny's position was the answer was no by
12  and large. There may still have been
13  miscellaneous reserves out there, but I don't
14  think Allegheny management ever believed that
15  there was reserves of that magnitude that were
16  out there that would eliminate the need to make
17  those transfers.
18      Q.  You talked earlier about the
19  so-called X file, this circulated schedule of
20  reserves that was periodically circulated to
21  various representatives of AHERF, right?
22      A.  Yes.
23      Q.  Including you?
24      A.  Yes.
25      Q.  Okay. By virtue of that X file,

66 (Pages 261 to 264)

Daniel Cancelmi

265

1  you would know, would you not, if there were
2  available reserves, other than the Graduate
3  reserves, to apply to the DVOG bad debt?
4       MR. RYAN: Objection.
5    A.   Yeah, I mean that extra reserve
6  file or the X file, that was an attempt to
7  summarize at least some of the more noteworthy
8  reserves, excess or otherwise, on the financial
9  statements of the various Allegheny hospitals.
10   Q.   Do you remember whether or not
11 there was an excess contractual allowance
12 reserves of $9 million available as of year end
13 1997 to apply to these reserves -- or to the
14 DVOG bad debt?
15   A.   Not offhand.
16   Q.   Do you remember whether or not
17 there was a CRA reserve in the amount of
18 $10 million available to apply to the bad debt?
19   A.   I don't know. I don't remember
20 that, although that wasn't our department's
21 area. That was the cost reporting department,
22 government reimbursement department.
23   Q.   Let me show you a document here.
24       - - - - -
25       (Thereupon, Deposition Exhibit 1070

266

1       was marked for purposes of
2       identification.)
3       - - - - -
4    Q.   Let me show you a document that's
5  been marked as Deposition Exhibit 1070. And I
6  will represent to you that, while you're free
7  to look at anything you want to in respect of
8  these particular notes, my questions will be
9  with respect to the matter that is contained on
10 the document bearing Bates stamp number PWC
11 0036876.
12   A.   (Witness reviewing document.)
13   Q.   And the following page as well.
14   A.   I'm sorry, what page? 876?
15   Q.   876 and 87.
16   A.   Okay.
17   Q.   Do you recognize the handwriting?
18   A.   Yes.
19   Q.   Have you ever seen this document
20 before?
21   A.   Yes, the SEC staff showed this to
22 me.
23   Q.   Do you know whose handwriting it
24 is?
25   A.   Bill Buettner's.

267

1    Q.   Do you know what Mr. Buettner is
2  about trying to do here in these notes?
3    A.   I think what he's trying to do is
4  reconcile the bad debt reserves between the two
5  years.
6    Q.   Is he trying to determine whether
7  or not AHERF's reserves are sufficient without
8  the Graduate transfers, as far as you can see?
9       MR. RYAN: Objection.
10   A.   I would -- I can't -- I mean it
11 seems like that, but I think you need to ask
12 Bill.
13   Q.   Look at 877. You see he's got a
14 column beneath the needed 66.2.
15   A.   Uh-huh.
16   Q.   Well, let me go through this
17 calculation. Do you know what the old AHERF of
18 239.1 refers to?
19   A.   No.
20   Q.   Formula reserves 79.1 refers to?
21       MR. RYAN: Objection.
22   A.   I can't say for certain.
23   Q.   My question is whether or not you
24 recognize these numbers?
25   A.   No.

268

1    Q.   But down below in that there is,
2  below the 66, there are a series of entries
3  totaling 56.7. Do you see that?
4    A.   Yes.
5    Q.   One says, bad debt 35.2. Do you
6  know what that's a reference to?
7    A.   No.
8    Q.   One says, excess, appears to be,
9  CRA in the amount of $10 million. Do you know
10 what that's a reference to?
11   A.   I know what CRA means. I'm not
12 sure exactly what reserve he's talking about.
13   Q.   All right. Do you know what excess
14 contractual allowance of 9.8 refers to?
15   A.   That specific reserve that he's
16 indicating there, no.
17   Q.   How about legal reserve GL 1.7?
18   A.   No. I mean I've had questions on
19 I'm not sure this page, but I believe the
20 previous page. That legal reserve, I think
21 Allegheny had some reserves for some receivable
22 accounts that were sent out to collection and
23 attorneys were involved. I think that's what
24 he's referring to.
25   Q.   Well, my question is: As the

67 (Pages 265 to 268)

987

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action

        Plaintiff,                      No. 00-684

    vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

        Defendant.


      Continued videotaped deposition of

DANIEL CANCELMI, called for examination under the

statute, taken before me, Jaci R. Traver, RPR,

CRR, and Notary Public in and for the State of

Ohio, at the offices of Jones Day, 500 Grant

Street, Pittsburgh, Pennsylvania, on Friday, the

7th day of February 2003 at 9:00 a.m.

- - - - -

VOLUME 4

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Daniel Cancelmi                                                Volume 3

760

1         MR. TORBORG: I would like to move
2    to strike that response. It's not responsive
3    to your question.
4         Q.    Did you from time to time recommend
5    to your superiors that additional bad debt
6    expense be recorded on the books of the DVOG
7    hospitals?
8         A.    Based on the correspondence we sent
9    out, yeah, the calculations were suggesting
10   that additional bad debt reserves needed to be
11   recorded.
12        Q.    And you believed that the
13   organization should record the additional bad
14   debt expense, right?
15        A.    We believed that the bad debt
16   reserves, seemed like the bad debt reserves
17   need to be increased.
18        Q.    And did you believe that the proper
19   way to increase those bad debt reserves was by
20   booking a bad debt expense?
21        MR. TORBORG: Objection.
22        A.    That would be one way, you could
23   increase your bad debt reserves through
24   recording expense, but then there's other ways
25   bad debt reserves could have been increased.

761

1    Whether you collect monies on accounts that had
2    previously been written off, or if the
3    organization had reserves out there that could
4    be used for the bad debt reserves.
5         Q.    During this time frame, earlier in
6    fiscal year 1997, AHERF was booking monthly bad
7    debt expense on the internal monthly financial
8    statements of the DVOG hospitals to budget,
9    right?
10        A.    At this time frame?
11        Q.    In the time, in the months leading
12   up to the April 1997 memo.
13        A.    At some point in fiscal '97, that's
14   what we started doing.
15        Q.    And the booking to budget is a
16   large part of what caused the bad debt
17   allowance shortfall, right?
18        A.    No, there was -- I think there was
19   a shortfall at the time when they started
20   recording bad debt expense to budget.
21        Q.    A shortfall from the write-off of
22   the old patient accounts receivable, right?
23        A.    Yeah, write-offs of accounts. And
24   plus, the fact that accounts weren't being
25   collected and maybe hadn't necessarily been

762

1    written off yet. Because you get both. You
2    have accounts that get written off and then you
3    have accounts that aren't written off, but
4    they're getting older.
5         Q.    Do you agree, though, that
6    recording monthly bad debt expense to budget,
7    rather than actually what was called for by the
8    formula, was a factor in the growing bad debt
9    allowance shortfall that you believe existed at
10   the DVOG hospitals?
11        A.    I'm sure that was a part of it, but
12   I thought -- you would have to go back to the
13   correspondence. There was a shortfall, or at
14   least what the calculation would suggest was a
15   shortfall at some point in time.
16        But recording the bad debt expense
17   to budget, the background on that, I think I
18   testified a number of different times on that,
19   is there was unusually large activity of
20   write-offs occurring. And there was questions
21   going back and forth of were the write-offs
22   appropriate or not. And there was issues in
23   the billing department.
24        And what they -- what management
25   decided to do at that point, until they got

763

1    their arms around what was going on, was to
2    start recording bad debt expense at budget.
3         Q.    Did you at any time before writing
4    this April 14th, 1997 memo recommend to your
5    superiors that additional bad debt expense be
6    booked at the DVOG hospitals?
7         A.    Yeah, there's probably a lot of
8    correspondence out there on that. There's a
9    number of different memos, where based on the
10   reserve calculation, that there -- the bad debt
11   reserves would have to be increased.
12        Q.    And you believed at this time that
13   recording additional bad debt expense on the
14   books of the DVOG hospitals was the technically
15   proper way to increase the reserves, correct?
16        A.    That would be one way. Like I said
17   before, if there were -- if the organization
18   had other reserves that could be used for the
19   bad debt reserve account, that would be another
20   way.
21        Q.    Is one of the reasons that you
22   wrote the memo that we've marked as Exhibit 8
23   to make sure that Mr. Spargo and Mr. Adamczak
24   and Mr. Morrison and others were aware of the
25   issues surrounding the $50 million reserve

32 (Pages 760 to 763)

Daniel Cancelmi                                                    Volume 3

764
1  transfer?
2      A.   Yes.
3      Q.   Is it the case that you had some
4  concerns about the technical appropriateness of
5  this reserve transfer and wanted to make sure
6  that there was documentation that your
7  superiors were aware of it and approved it?
8      A.   Yeah.  And I say that in the memo
9  that it seems like first glance, based on, you
10  know, what I know, that, you know, this is sort
11  of unusual.  And I try to elaborate on that,
12  and so I documented that.
13      Q.   But you didn't create any kind of
14  documentation of that type about sending this
15  memo to Coopers & Lybrand, did you?
16      A.   I think Coopers & Lybrand got this
17  memo at some point.  I don't remember exactly
18  when.
19      Q.   Do you remember specifically ever
20  giving this memo we've marked as Exhibit 8 to
21  Coopers & Lybrand, yourself?
22      A.   Myself specifically, no, I did not.
23  I very well could have, but I couldn't point to
24  an exact date.  It's like six years ago.
25      Q.   You don't recall at any time, I'm

765
1  not talking about what the exact date was, you
2  don't recall at any time personally giving this
3  memo to Coopers & Lybrand, do you?
4      A.   Offhand, no.
5      Q.   And you don't know for a fact
6  whether anybody on your staff gave it to
7  Coopers & Lybrand, do you?
8      A.   It was my understanding they had
9  this.
10      Q.   But you don't know that for a fact,
11  do you?
12      A.   No, I don't.  I don't know -- I
13  couldn't -- I don't remember, hey, on, you
14  know, April 19th they have this memo.  I can't
15  point to a specific date.
16      Q.   And you don't know for a fact
17  whether Coopers & Lybrand had it at any time
18  during the 1997 audit, do you?
19      A.   I can't say specifically a day, but
20  my recollection was I thought they had it.
21      Q.   That's what you were told by
22  somebody, right?  'n fact, Robin Schaffer told
23  you that, hadn't she?
24      A.   Yeah, but I think other individuals
25  have told me that, too.

766
1      Q.   Apart from what you've heard from
2  other people, you have no personal knowledge
3  about whether Coopers & Lybrand had this memo
4  at any time during the 1997 audit, do you?
5      A.   I can't remember specifically if I
6  gave it to them.  No, I can't.  Can't point to
7  a day.
8      Q.   You have no other personal
9  knowledge from any source about whether Coopers
10  & Lybrand, in fact, had this memo during the
11  '97 audit, do you?
12      A.   I can't, again, I can't point to --
13  I thought they did, but I can't sit here and
14  tell you exactly why I thought they did.
15          But, you know, it's not -- I don't
16  know what else to say.
17      Q.   Your understanding that they did is
18  based on hearsay from what other people have
19  told you, right?
20      A.   Or but it could be based on what I
21  knew at the time, and I just don't remember,
22  you know, when it was, how they got it, et
23  cetera.
24      Q.   All right.  So you as you sit here
25  now, you can't say one way or the other whether

767
1  you ever had any personal knowledge, or whether
2  your understanding was based on hearsay; is
3  that fair?
4      A.   Yeah, I guess that's fair.
5      Q.   Let me hand you what's previously
6  been marked as Exhibit 203.
7          Do you recognize this exhibit,
8  Mr. Cancelmi?
9      A.   Yes.
10      Q.   What is it?
11      A.   It's a summary of the restructuring
12  reserves that were going to be transferred from
13  the Graduate hospitals to the DVOG bad debt
14  reserves.
15      Q.   It's a memo written by Al Adamczak
16  dated April 13th, 1997, correct?
17      A.   Correct.
18      Q.   And you received a copy of this
19  memo around that time, right?
20      A.   Yes.
21      Q.   And specifically what Mr. Adamczak
22  summarizes in this memo are the entries
23  necessary at AHERF, the parent corporation; is
24  that right?
25      A.   Yes.

Just Launched    www.rennillo.com    Schedule Online
Cleveland (216) 523-1313                              Akron (330) 374-1313

768

1    Q.   And that's because Mr. Adamczak and
2    his staff had responsibility for the accounting
3    for the Pittsburgh-based entities, which
4    included AHERF, the parent corporation, right?
5    A.   Yeah, plus Al had responsibilities
6    for City Avenue and Parkview Hospital.
7    Q.   So two of the five Graduate
8    hospitals were also handled by Al Adamczak and
9    his staff, right?
10   A.   That's correct.
11   Q.   Is it the case then that
12   Mr. Adamczak was personally involved in
13   April 1997 in the journal entries to record the
14   $50 million reserve transfer?
15   A.   That's my recollection.
16   Q.   Let me mark, please, as
17   Exhibit 1092 a document with Bates numbers
18   DC0915 pages 31 to 37.
19           - - - - -
20       (Thereupon, Deposition Exhibit 1092
21       was marked for purposes of
22       identification.)
23           - - - - -
24   Q.   Mr. Cancelmi, is Exhibit 1092 a
25   summary of certain journal entries made to the

769

1    books of DVOG entities in March 1997?
2    A.   Yeah, that's what it looks like.
3    Q.   So we can see here, for instance,
4    on the first page a journal entry for
5    $8 million in Graduate reserves being
6    transferred to corporation 210, which was MCP
7    Hospital, right?
8    A.   I believe so, yes.
9    Q.   And that lines up with the dollar
10   amounts referred to in Exhibits 8 and 203, the
11   two exhibits we just previously looked at,
12   doesn't it?
13   A.   Yes.
14   Q.   And you can certainly -- you should
15   feel free to look at the pages for the other
16   DVOG hospitals. But do you agree that the
17   first half of the $50 million reserve transfer,
18   that is the half recorded as of March 1997, is
19   reflected here in Exhibit 1092?
20   A.   Yes.
21   Q.   What's shown here are journal
22   entries at the DVOG hospitals, not journal
23   entries at the Graduate hospitals or at AHERF,
24   the parent corporation; is that right?
25   A.   That's correct.

770

1    Q.   So, for instance, focusing here on
2    journal entry VO3017 at MCP Hospital, the
3    $8 million we were just talking about, the
4    journal entry shows an intercompany transfer
5    from AHERF, the parent corporation, right?
6    A.   I believe that's correct, yes.
7    Q.   And did Chuck Lisman give you a
8    copy of this document and write in the upper
9    right-hand corner, "DC, summary of your
10   entries"?
11   A.   Looks like it, yes.
12   Q.   And he underlined "your," right?
13   A.   Yes.
14   Q.   Just as Mr. Adamczak was the one
15   who had responsibility for the recording of
16   journal entries for the $50 million reserve
17   transfer on the books of AHERF, the parent
18   corporation, you had responsibility for
19   reporting the journal entries for the
20   $50 million reserve transfer on the books of
21   the DVOG Hospital, right?
22   A.   That's correct.
23   Q.   Let me hand you, Mr. Cancelmi, what
24   has previously been marked as Exhibit 37. Is
25   Exhibit 37 a memorandum that you sent to

771

1    Mr. Morrison dated May 1st, 1997?
2    A.   Yes.
3    Q.   And you discuss here at least three
4    sets of adjustments to the DVOG bad debt
5    reserve accounts that were processed in
6    May 1997, right?
7    A.   Yes. I guess they were recorded in
8    March.
9    Q.   At least as of March.
10   A.   Right.
11   Q.   Do you see that first sentence of
12   the memo reads, "in anticipation of year-end
13   reporting concerns related to the Delaware
14   Valley bad debt reserve shortfall position,
15   various adjustments to bad debt reserve
16   accounts were processed in March 1997 to
17   alleviate the shortfall."
18       Do you see that?
19   A.   Yes.
20   Q.   When you wrote, "in anticipation of
21   year-end reporting concerns," you were
22   referring to Coopers & Lybrand's upcoming
23   audit, right?
24   A.   Yeah, the year-end financial
25   statements, yes.

34 (Pages 768 to 771)

Daniel Cancelmi                                                                    Volume 4

---

1003

1 didn't have a full understanding of what all
2 the matters were. But I mean that was a
3 responsibility of other individuals.
4      Q.    Which items on this schedule did
5 you not have a full understanding of at the
6 time?
7      A.    I don't remember specifically every
8 single one of them. I mean some of them stand
9 out. Prudent Buyer reserve. Hill Burton
10 reserve, that could be one. I don't know, you
11 would have to say, I don't remember every single
12 one that I did and didn't.
13      Q.    But Prudent Buyer, Hill Burton are
14 ones that stand out to you as reserves that
15 weren't directly in your area; is that right?
16      A.    That's right.
17      Q.    Let me mark, please, as
18 Exhibit 1116 a document with Bates numbers
19 DC6585, pages 1 to 12.
20              - - - - -
21      (Thereupon, Exhibit 1116 was marked
22      for purposes of identification.)
23              - - - - -
24      Q.    Is this a memo, you wrote, Mr.
25 Cancelmi, about the PFMA contract?

---

1004

1      A.    Yes.
2      Q.    And PFMA was the Police and Fire
3 Medical Association?
4      A.    Yes.
5      Q.    And this memo is dated August 8th,
6 1997, right?
7      A.    Yes.
8      Q.    And that's after the time when
9 AHERF had closed the books for fiscal year
10 1997, but while Coopers & Lybrand was engaged
11 in doing the audit, right?
12      A.    I wouldn't say the books are
13 entirely closed, because Coopers & Lybrand was
14 still doing the audit.
15      Q.    If you could turn, please, to the
16 second page of this document. Do you see that
17 you list there what you refer to as two key
18 issues that need to be addressed?
19      A.    Yes.
20      Q.    Do you see number one states,
21 "given the ambiguities that exist as to whether
22 AHERF or GHS is legally obligated for the
23 deficits under this contract, the final
24 determination should be made as to our official
25 legal position on this matter."

---

1005

1              And GHS there is the Graduate
2 Health System. right?
3      A.    Yes.
4      Q.    Is it the case that the legal
5 advice that you received was that it was
6 ambiguous as to who was obligated on the
7 deficits for the PFMA contract?
8              MR. TORBORG:  Objection.
9      A.    Well, first of all, I don't think I
10 would have received legal advice. I don't --
11 Allegheny management, seemed like they were
12 pretty comfortable that that obligation didn't
13 exist. I think it was more of an issue how to
14 deal with GHS and some of the individuals at
15 GHS in terms of, you know, managing this
16 process out.
17              When you looked at the document, at
18 least my recollection, when you looked at the
19 documents, it wasn't an obligation that
20 Allegheny had assumed.
21      Q.    Let me ask you to turn to page 7 of
22 this exhibit. And do you see there an
23 April 8th, 1997 memo that you sent to
24 Mr. Spargo entitled PFMA Contract Financial
25 Responsibility?

---

1006

1      A.    Yes.
2      Q.    And then do you see in the fifth
3 paragraph there, the first sentence reads,
4 "this issue was discussed with Mark Waxman of
5 Foley Lardner who indicated that he did not
6 know if SDN assumed GHS' obligations under the
7 PFMA contract."
8      A.    Yes.
9      Q.    Was Foley Lardner outside legal
10 counsel to AHERF?
11      A.    Yes.
12      Q.    Did you discuss this matter with
13 Mr. Waxman?
14      A.    I don't know if I did or not. I'll
15 be honest, I don't even remember that name, to
16 be quite frank with you.
17      Q.    This memo you sent on April 8th,
18 1997 suggests that Mr. Waxman didn't know the
19 answer to the question as to who was obligated
20 on the PFMA contract, right?
21      A.    Yes.
22      Q.    Did you ever yourself review the
23 legal documents for the PFMA contract?
24      A.    I think so.
25      Q.    And did you discuss who was

---

5 (Pages 1003 to 1006)

Daniel Cancelmi                                                              Volume 4

---

1007

1  obligated under that contract with any in-house
2  lawyers at AHERF?
3      A.   Me personally?
4      Q    Yes
5      A    I probably did at some point.
6  Maybe in a meeting. And this issue came up a
7  number of different times, whether it was
8  Steve, Al. There was an Allegheny attorney --
9  there might have been one or two Allegheny
10  attorneys. Chuck Morrison. I think Dr. Kaye
11  got involved. McConnell was aware of it. I
12  don't remember everyone who was involved, to be
13  honest with you.
14     Q    If we look at the list of Graduate
15  system restructuring reserves, the attachment
16  to your May 22nd, 1997 memo, this indicates
17  that reserves were established for the PFMA
18  contract in December 1996; is that right?
19     A    Yes
20     Q    And it's about $7 million at the
21  Graduate Hospital and about $7 million more at
22  Parkview Hospital?
23     A    Yes
24     Q    And did AHERF conclude at some
25  point that it believed that it was not

---

1008

1  obligated on the PFMA contract after all?
2          MR. TORBORG: Objection. Asked and
3  answered.
4      A    Yeah, that was my recollection,
5  that Allegheny didn't think they were
6  obligated. You would have to look. I don't
7  know if there was legal files or anything on
8  that or not. That was my recollection.
9      Q    The fact that PFMA reserves were
10  established in December of 1996 indicates that
11  back at that date, someone at AHERF had assumed
12  or believed that AHERF was obligated on the
13  contract, right?
14         MR. TORBORG: Objection.
15     A    At that point in time, Allegheny
16  management thought they -- my understanding,
17  they thought they were obligated
18     Q    All right. So is what happened
19  basically that AHERF changed its mind as to the
20  better reading of the PFMA contract in terms of
21  who was obligated?
22         MR. TORBORG: Objection
23     A    I wouldn't say that, better
24  reading. I think, my recollection was there
25  was information that maybe had become available

---

1009

1  after the initial time when it was first
2  evaluated
3      Q    And that information was a copy of
4  the legal documents surrounding the PFMA
5  contract?
6          MR. TORBORG: Objection.
7      A    I couldn't say exactly what it was.
8  Further review, further analysis.
9      Q    So was the conclusion that AHERF
10  finally reached as to the PFMA contract that
11  the obligation under that contract had not been
12  assumed in the SDN merger, but had been left
13  behind with the Graduate Health system at that
14  time?
15     A    That was my recollection.
16     Q    And the SDN merger occurred as of
17  October 31st, 1996?
18         MR. TORBORG: Objection.
19     A    I think it was November 1st.
20     Q    So it's not the case that there was
21  any sort of additional contract or additional
22  legal event affecting the PFMA obligation that
23  occurred between May 1st and June 30th, 1997,
24  was there?
25         MR. TORBORG: Objection.

---

1010

1      A    I don't know. You would have to
2  ask an attorney, I believe.
3      Q    In your August 8th, 1997 memo that
4  we marked as Exhibit 1116, you suggest to the
5  distribution list that a final termination
6  should be made as to our official legal
7  position on this matter; is that right?
8      A    I believe that's what I said.
9      Q    And you sent this to Mr. McConnell
10  and Dr. Kaye and about half a dozen other
11  officers or employees of AHERF; is that right?
12         MR. TORBORG: Objection.
13     A    Yes
14     Q    Do you know who made a final
15  determination as to AHERF's official legal
16  position on this matter?
17     A    No.
18     Q    Do you know when that determination
19  was made?
20     A    No.
21     Q    Your August 8th memo suggests that
22  it hadn't been made as of that time, though; is
23  that right?
24         MR. TORBORG: Objection.
25     A    I mean that's -- yes, that's what

---

Just Launched    www.rennillo.com    Schedule Online
Cleveland (216) 523-1313                              Akron (330) 374-1313

Daniel Cancelmi                                                                                          Volume 4

1011

1   it says. Although, my recollection is that,
2   you know, management at that point I think
3   didn't believe that was their obligation.
4           Like I said, what stands out in my
5   mind, it was more of a political issue than
6   Korman, who was the old, I don't know what his
7   title is with the Graduate, and just a couple
8   of the other issues.
9           And I don't know, you would have
10  to -- I think Dr. Kaye would probably be a good
11  person to talk to, or Abdelhak, or even
12  McConnell, because there was -- I'm not sure it
13  was necessarily the legal position as more as
14  to maybe how they were going to deal with the
15  old Graduate people. But I don't know. And
16  that's maybe what I heard from Steve or Al.
17      Q.   The PFMA reserves were transferred
18  from Graduate to DVOG in the June 1997 close,
19  weren't they?
20      A.   Yes.
21      Q.   So that by the time you wrote this
22  August 8th memo, they were no longer on the
23  books at Graduate, right?
24      A.   That's correct.
25      Q.   And I think based on the discussion

1012

1   we had previously with reference to your
2   June 20th, 1997 memo about the intangible
3   assets on the Graduate entities, the
4   $14 million for the obligation under the PFMA
5   contract was capitalized as an intangible asset
6   at the Graduate entities, right?
7       A.   Yes.
8       Q.   When AHERF decided that it was no
9   longer obligated on the PFMA contract, wouldn't
10  the proper accounting have been to reverse the
11  $14 million reserve against goodwill at
12  Graduate?
13      A.   You'd probably have to ask someone
14  to come in and evaluate that. In this issue, I
15  mean we discussed this with Coopers & Lybrand.
16  This was specifically raised. Management, you
17  know, decided to transfer it, and the issue
18  came up with Coopers --
19      Q.   And Coopers & Lybrand --
20          MR. TORBORG: I think he was still
21  answering the question.
22      Q.   I'm sorry, I didn't mean to cut you
23  off.
24      A.   This issue was brought up with
25  Coopers & Lybrand. It was my recollection

1013

1   that, you know, they were aware that the
2   reserves had been transferred. And they asked
3   for documentation as to why we didn't think it
4   was -- it wasn't needed any more. And I
5   thought we had given them at least some
6   information on it, but I don't remember exactly
7   what.
8           Like this memo is probably an
9   example of something that may have been
10  provided to them.
11          MR. RYAN: I'll move to strike the
12  last portion of that response as not
13  responsive.
14          MR. TYCKO: Just for record, the
15  memo that Mr. Cancelmi was referring to is
16  Exhibit 1116.
17      Q.   Thank you. Coopers & Lybrand
18  suggested to you that the proper accounting
19  treatment for the PFMA contract, AHERF believed
20  that it was no longer liable on that contract,
21  would be to reverse the $14 million against
22  goodwill, didn't they?
23      A.   I don't remember that.
24      Q.   You're not saying that that didn't
25  happen, are you? You're just saying that you

1014

1   don't recall either way?
2       A.   That's correct.
3       Q.   And I take it that you remember
4   discussing with someone from Coopers & Lybrand
5   the question as to whether AHERF was obligated
6   on the PFMA contract or not; is that right?
7       A.   Yeah. Yeah, I mean generally
8   speaking, I remember that.
9       Q.   Do you remember with whom from
10  Coopers you discussed that?
11      A.   I thought I discussed it at one
12  point with Amy. But, you know, I know that was
13  on an audit agenda schedule that Coopers
14  provides. So there could have been others. I
15  can't say specifically everyone who I would
16  have discussed it with.
17      Q.   But the particular conversation
18  that you do recall is one with Amy Frazier,
19  right?
20      A.   It seems like that. But, again, I
21  couldn't say exactly when. I've testified to
22  that quite a number of times. And I thought it
23  was Amy, but it could have been others.
24      Q.   Was that part of a conversation
25  with Amy Frazier where you and she were going

Daniel Cancelmi                                                    Volume 4

**1015**

1 through this schedule of Graduate system
2 restructuring reserves attached to your
3 May 22nd, 1997 memo?
4      A.   I don't remember. Could have been,
5 but I don't remember specifically. If you're
6 asking this schedule, this May 22nd schedule,
7 it could have been -- the components on here
8 could have been discussed before they were
9 subsequently discussed again in connection with
10 this PFMA contract.
11         Because these issues here on the
12 May 22nd memo have been out there for months.
13 And, you know, I thought at certain times
14 Coopers was asking about, you know, some of the
15 restructuring reserves recorded on the Graduate
16 books.
17         So, you know, this schedule here
18 very well could have been discussed, you know,
19 before the follow-up issue was discussed
20 related specifically to the PFMA contract, but
21 I don't remember specifically.
22      Q.   And is it the case that in the
23 conversation that you had with Amy Frazier
24 about who was obligated on the PFMA contract
25 that you don't remember the details of what the

**1016**

1 two of you discussed in that conversation?
2         MR. TORBORG:  Objection.
3      A.   That would be fair. I don't
4 remember the specific conversation.
5      Q.   You can't testify, can you, that
6 you specifically used the words "transferred to
7 DVOG," can you?
8      A.   No, I can't. I can't say that
9 specific sentence I said from six days ago, let
10 alone six years ago. But it's my general
11 recollection that the transfer, the PFMA
12 reserve was discussed, but I can't sit there
13 and say, yeah, six years ago these are the
14 exact words I used.
15      Q.   Is it possible you used words like,
16 moved to bad debt?
17      A.   Like I said, I can't say exactly
18 what I said. I don't remember.
19      Q.   But that's one series of words that
20 you could have used to Amy, right?
21         MR. TORBORG:  Objection.
22      A.   I have no idea, to be honest with
23 you. I mean I don't remember the exact
24 sentences I used in that conversation.
25      Q.   And do you remember Amy Frazier at

**1017**

1 some point telling you that Coopers & Lybrand
2 believed that AHERF might still be liable on
3 the PFMA contract?
4      A.   I think probably when they first
5 looked at it, they, you know, they probably
6 said, well, we need to research it or look at
7 it ourselves. But, again, I don't remember
8 exactly what she said either.
9      Q.   I want to come back to this issue
10 about what the appropriate accounting treatment
11 would have been for the PFMA reserve, if AHERF
12 believed it wasn't liable on that obligation.
13         I think you testified previously in
14 purchase accounting there's a one-year
15 look-back period for the purchase price
16 allocation; is that right?
17      A.   For certain things.
18      Q.   And I think you drew a distinction
19 earlier between a change in the estimate of a
20 liability that should be on the books in
21 purchase accounting as a result of
22 circumstances that occurred between the opening
23 balance sheet and year end, on the one hand,
24 and on the other hand, a change in estimate as
25 to the liability that existed originally on the

**1018**

1 opening balance sheet date. Do you recall
2 that?
3      A.   Generally.
4      Q.   And in the case of the PFMA
5 obligation, we're talking about a change in the
6 estimate as to the liability that originally
7 existed as of the opening balance sheet date,
8 aren't we?
9      A.   I guess it's change in estimate or
10 change in facts and circumstances. Change in
11 management's assessment of the situation. I'm
12 not sure what you specifically characterize it
13 as.
14      Q.   Even if the change in management
15 assessment took place after May 1st, 1997, it
16 was an assessment of the situation already
17 existing as of the opening balance sheet date,
18 wasn't it?
19      A.   The matter existed as of the
20 opening balance sheet date.
21      Q.   And that situation, you're aware as
22 a CPA, who is experienced with purchase
23 accounting, that the appropriate accounting
24 treatment for a change in assessment of that
25 type would be to reverse the reserve against

8 (Pages 1015 to 1018)

Daniel Cancelmi                                                                Volume 4

1019

1  goodwill rather than release it afterwards,
2  right?
3       A.   Every situation is unique. I guess
4  you have to go back and analyze each situation
5  specifically, so I don't think you can make a
6  general characterization like that.
7       But I can tell you, you know, AHERF
8  management viewed it as based on the fact that,
9  you know, whatever you want to call it, change
10  in estimate, change in management assessment,
11  change in facts and circumstances, that, you
12  know, it was similar to the other reserves,
13  such as the 50 million that had been
14  established on the Graduate and then
15  transferred to DVOG for bad debt reserves.
16       Q.   When you say AHERF management
17  viewed it that way, who are you talking about?
18       A.   Well, I mean the people making the
19  decisions, McConnell, Morrison, Adamczak, I
20  guess at the time.
21       There's a number of people who were
22  involved in this. I mean you see the
23  distribution. Dr. Kaye got involved. I can't
24  remember, somehow he got involved. Bob
25  Matthews, obviously, had ties. He was an old

1020

1  Graduate person, so he obviously had ties.
2  McNair was legal guy. Harrington was the
3  managed care contract person. Matt Dowling was
4  the CFO of Graduate hospitals.
5       Q.   You're looking at the distribution
6  list to your August 8th memo marked as
7  Exhibit 1116, correct?
8       A.   Yes.
9       Q.   In that memo you don't state that
10  the PFMA reserve has been transferred to DVOG,
11  do you?
12       A.   I don't know if I do or not. No,
13  it doesn't look like it.
14       Q.   Even though the reserve had, in
15  fact, been transferred by that time, right?
16       A.   I believe it had been at that
17  point, yes. But most of those individuals on
18  that distribution list would have known at that
19  point that it had been transferred. I think we
20  looked at exhibits yesterday, like the
21  preliminary financial statements for Delaware
22  Valley that McConnell had seen, Dr. Kaye had
23  seen. Matt Dowling was the CFO. Al Adamczak,
24  obviously. Chuck Morrison.
25       As far as McNair and Judy, you

1021

1  know, I don't know if they knew or not.
2       Q.   Is there any reserve on this list
3  of Graduate system restructuring reserves
4  attached to your May 22nd, 1997 memo for which
5  you're aware of a change in circumstances
6  between May 1st and June 30th, 1997?
7       (Record repeated.)
8       A.   Any?
9       Q.   Yes.
10       A.   I wouldn't know specifically every
11  one. I mean --
12       MR. TORBORG: I'm going to have
13  to --
14       A.   Some of the things, I guess, that
15  may stand out would be, you know, it's like
16  write-off of maybe the patient receivables
17  greater than 180 days. Like I said, I think
18  the Prudent Buyer, there was some changes going
19  on there. Inventory, I thought there may have
20  been -- they may have done a physical by that
21  point.
22       NIH, I thought something in that
23  issue may have been resolved. I don't know
24  about the miscellaneous receivables, if
25  something was done on that.

1022

1       Again, at the bottom there's
2  Prudent Buyer again, Hill Burton. I thought
3  that was resolved. That had been resolved.
4  PFMA, just talked about.
5       Malpractice, I thought there was --
6  based on the June 30th, you know, reserve
7  position that they hadn't necessarily been
8  neither or some of it. And we've talked about
9  the MA reserve. I don't know, it's some of the
10  ones that stand out.
11       Q.   With respect to the Prudent Buyer
12  reserve, is the change in circumstance that
13  you're referring to what you testified about
14  earlier that the Prudent Buyer provision was
15  removed from Independence Blue Cross contracts
16  in the Philadelphia area?
17       A.   I don't know if it was removed,
18  or -- you need to talk to Steve or maybe Joe or
19  Chuck Morrison about the reimbursement.
20       Q.   All right.
21       A.   Something was going on. Something
22  happened there.
23       Q.   All right. But the issue that
24  leads to the change is something about the
25  Prudent Buyer clause in the Independence Blue

9 (Pages 1019 to 1022)

Daniel Cancelmi                                                                    Volume 4

1023

1  Cross contracts?
2      A.    That could be one of the issues.
3  Then there could be just an issue just based
4  on, you know, subsequent analysis of -- I don't
5  know, the activity, maybe, after a certain
6  point in time something changed. I don't know.
7  I'm not the person to ask.
8      Q.    Is Mr. Spargo the person to ask?
9      A.    I think Steve would be a good
10 person to talk to. Maybe Joe Scharf could
11 help.
12     Q.    Now, Mr. Spargo wasn't at AHERF for
13 all of the period from May 1st to June 30th,
14 1997, was he?
15     A.    No, he wasn't. He has a pretty
16 good understanding of what the issues were
17 related to Prudent Buyer.
18     Q.    Isn't it a fact, Mr. Cancelmi, that
19 the change in the Prudent Buyer provision
20 occurred before May 1st, 1997?
21     A.    I don't know if it did or not.
22     Q.    That would affect the accounting
23 treatment, wouldn't it?
24     A.    I don't know if it would or not.
25     Q.    You know that whether it occurred

1024

1  before or after May 1st, 1997 would affect the
2  need for the reserve as of the opening balance
3  sheet date for the entry into the AHERF system,
4  right?
5      A.    Depends what the issue was and why
6  it changed.
7      Q.    What change in circumstance between
8  May 1st and June 30th, 1997 did you have in
9  mind for the write-off of patient accounts
10 greater than 180 days?
11     A.    Could be something as simple as
12 when you're looking at the status of the
13 receivables, the aging categories. After a
14 certain point in time, if there hasn't been a
15 significant deterioration, that could be one,
16 one example.
17          And my recollection was Graduate
18 wasn't having -- their billing department, I
19 think at that point, was separate from the
20 billing department that was in Pittsburgh. And
21 their billing department wasn't having the type
22 of issues that the Pittsburgh billing
23 department was having.
24     Q.    Do you recall specifically any
25 change at the Graduate Hospital in the need to

1025

1  write off patient accounts that occurred
2  between May 1st and June 30th, 1997?
3      A.    Specifically, no. Just what I
4  said, I think based on you keep looking at the
5  status of the receivables.
6      Q.    We saw from the X files that we
7  looked at yesterday that you and Mr. Adamczak
8  were the ones who were going through the lists
9  of reserves on the Graduate entities to
10 identify ones that could be transferred to
11 DVOG, right?
12     A.    We were, I guess, one of others.
13 Those issues on those lists were widely known
14 by a number of different people.
15     Q.    All right. But the only people's
16 handwriting we saw on the X files we looked at
17 yesterday were yours and Mr. Adamczak's, right?
18     A.    Yes, because he probably pulled it
19 from either Al's file or my files. Those
20 documents are distributed to a lot of other
21 individuals, too. If you pulled their files,
22 you might see their handwriting on it, too.
23     Q.    All right. And you're talking
24 about other individuals within AHERF, right?
25     A.    Yes

1026

1      Q.    Let me hand you, Mr. Cancelmi, a
2  copy of the transcript from day two of this
3  deposition. Could you turn, please, to
4  page 321
5      A.    Yes
6      Q.    Now, I would like to read to you
7  the question and answer that begins on line
8  five
9          Question: "How about prior to
10 Coopers & Lybrand signing off on the 1997
11 audit? And by signing off, I mean the issuing
12 of their opinion to the 1997 audit."
13          Answer: "My recollection is that
14 certain of the reserves that were included in
15 the $28 million transfer, the questions had
16 come up to as to where those reserves had gone
17 And the ones that come to mind are like maybe
18 the PFMA reserve, I think the MA, there was an
19 MR reserve or a Hill-Burton reserve.
20          "I can't say specifically exactly
21 which reserves may have been discussed  But
22 there was certainly a number of reserves that
23 were out there on the Graduate books. But then
24 on June 30th, they weren't there anymore,
25 because they had been transferred and were

10 (Pages 1023 to 1026)

Daniel Cancelmi                                                    Volume 4

1027

1    included as part of the 28."
2         Did I read that transcript right?
3         A.   Yes  I think there's an error on
4    line 14.
5         Q.   That was exactly what I was going
6    to ask you about first  There's a reference
7    there to an MR reserve.  Do you know what you
8    said there?
9         A.   I think I meant to say MA, or maybe
10   it was I did say MA, just wasn't typed.
11        Q.   All right  So the three reserves
12   that you mentioned there in your answer were
13   the PFMA reserve, the MA reserve and the Hill
14   Burton reserve, right?
15        A.   Yes.
16             MR. TORBORG: I'm going to object.
17        Q.   Let me ask that question.
18        The three reserves that you
19   mentioned in the sentence on lines 12 to 15 are
20   the PFMA reserve, the MA reserve and the Hill
21   Burton reserve, right?
22        A.   Yes.
23             MR. TORBORG: Objection.
24             MR. RYAN: Can you tell me what
25   your objection is?

1028

1             MR. TORBORG: Since I can't
2    remember exactly what he says, it's possible
3    the MR could have been something like AR
4    reserve.
5             THE WITNESS: Good point.
6             MR. TORBORG: I'm reserving the
7    objection.  He may have identified four and the
8    record is not reflecting all four because MR is
9    not one we've familiar with.  It may have been
10   a transcription error.
11        Q.   Thank you.  But you believe that MR
12   was just MA, right?
13             MR. TORBORG: Objection.
14        A.   That was initially what came to my
15   mind.  The AR reserve, that may have come up.
16   I can't remember.  I don't remember
17   specifically.
18        Q.   Have you discussed the PFMA
19   reserve, the MA reserve and the Hill Burton
20   reserve with Robin Schaffer since the
21   bankruptcy?
22        A.   Sure
23        Q.   And she's told you that she
24   believes that those three reserves were brought
25   up with Coopers & Lybrand, right?

1029

1         A.   She -- I mean she's indicated that
2    PFMA that came into ask her about it, but she
3    said something, I don't know anything about it,
4    you've got to talk to Dan.  The MA reserve, I
5    can't remember if she said she talked to them
6    about that or not.[1]  And the Hill Burton could
7    be the same as the PFMA.  I don't know whether
8    she had documentation on it or not.
9         Q.   But all three of these reserves are
10   accounts receivable reserves, patient accounts
11   receivable reserves that were within Robin
12   Schaffer's area, right?
13        A.   Yes.
14        Q.   And since all these investigations
15   and lawsuits began, you and Ms. Schaffer have
16   had occasion to discuss these three reserves;
17   is that right?
18        A.   Yes.  Well, specifically those
19   three reserves?  Sure, they've come up, but
20   those aren't the only three reserves that have
21   ever been discussed.
22        Q.   You don't have a specific
23   recollection of you personally discussing the
24   Hill Burton reserve with anyone from Coopers &
25   Lybrand, do you?

1030

1             MR. TORBORG: Objection.
2         A.   Specifically, no.  I think I've
3    said that.  I think I've said from back in 1998
4    or 1999 that, generally speaking, I remember
5    that there were certain reserves that had been
6    discussed, but couldn't say specifically a
7    hundred percent certainty that every single
8    component had been.
9         And that was the basis for that one
10   schedule that summarized the 21 and the 7,
11   which equalled the 28  And we provided that to
12   PWC, Mel or Rob or whoever else was there.
13        So that was my general recollection
14   from way back then  And that's what I've
15   indicated throughout the next four or five
16   years.  Then I've subsequently seen at least
17   some correspondence in Coopers & Lybrand's firm
18   work papers that would, I think, support that
19             MR. RYAN: I move to strike the
20   last portion of that response.
21             MR. TORBORG: I object to the
22   motion.
23        Q.   And just so we're clear, you don't
24   specifically recall you personally discussing
25   the Medicaid reserve with Coopers & Lybrand

11 (Pages 1027 to 1030)

Daniel Cancelmi                                                    Volume 4

---

**1031**

1   either, do you?
2       A   I can't remember a specific
3   conversation, but I thought that had come up,
4   because we had received some correspondence and
5   we had started to be paid on those Medicaid
6   accounts.
7           And I think Ron Longabucco, who
8   used to run the billing department, either had
9   conversations with us, or we advised Coopers &
10  Lybrand to call Ron Longabucco, because they
11  knew Ron Longabucco  And we, either myself or
12  Robin or maybe someone else may have tried to
13  explain that situation.
14          Joe Scharf was involved with those
15  MA reserves, too  And eventually, we had
16  received it in correspondence or discussed it
17  with Ron Longabucco that this matter had been
18  resolved
19          And we — now that I think about
20  it, it comes to mind, I think we — I may have
21  told a Coopers & Lybrand representative to
22  maybe call Mr  Longabucco if they needed more
23  information related to the MA reserve  But I
24  can't say specifically with a hundred percent
25  certainty  But that seems to be, generally

---

**1032**

1   that just popped in my mind.
2       Q.   That has nothing to do with the
3   transfer. That's just for need of the reserve?
4       A.   No  This would have been after the
5   reserve had been transferred, why it wasn't
6   needed anymore. I wouldn't have had them call
7   Ron Longabucco in the summer of '97 as to why
8   it initially had been recorded, because I
9   believe Coopers & Lybrand, this issue had
10  come — this is one of the first issues that
11  came up during the due diligence process, that
12  Coopers & Lybrand was actively involved in that
13  due diligence process.
14          In fact, maybe, if you speak with
15  Mr. Scharf, there could have been Coopers &
16  Lybrand reimbursement people that got involved
17  in assessing the situation, but I couldn't say
18  that for certain.
19          MR. RYAN: Why don't we go off the
20  record to change the tape.
21          VIDEO TECHNICIAN: We're at the end
22  of tape four of deposition of Daniel Cancelmi,
23  February 7, 2003  We'll resume with tape five.
24  The time is 10:09
25          (Brief recess )

---

**1033**

1           VIDEO TECHNICIAN: We are resuming
2   the tape five of the deposition of Daniel
3   Cancelmi on February 7th, 2003  The time is
4   10:31 a m.
5           MR. TYCKO: Just before you go to
6   your next question, before the break you were
7   asking Mr. Cancelmi some questions about the
8   three or maybe four reserves that he had
9   mentioned on page 321 of his January 4
10  deposition. Just one thing that he wanted to
11  add on that point before you move to your next
12  question  Why don't you go ahead
13          THE WITNESS: I think before the
14  break we were talking at some point about some
15  of the reserves that that were issues that were
16  changed or what have you
17          One of the things I think we talked
18  about was Prudent Buyer  And what just what I
19  remembered was that that contract with
20  Independence Blue Cross I'm pretty certain
21  included a clause that the company's management
22  had to engage their external auditors to
23  perform some type of review over the Prudent
24  Buyer information.
25          And it was, I believe, there had to

---

**1034**

1   be a separate opinion issued by Coopers &
2   Lybrand evaluating the Prudent Buyer
3   information.
4           And I know that Coopers was
5   involved and had been performing work in
6   connection with that separate audit
7   requirement  But I think Steve Spargo or Joe
8   Scharf probably could provide more information
9   on all the work that Coopers & Lybrand was
10  being required to do on that, as part of that
11  requirement of that Blue Cross contract
12          MR. TYCKO: And I apologize, my
13  introduction to that was confusing.  That
14  actually doesn't relate to questions you were
15  asking about the transcript.  It relates to the
16  questions you were asking him about the
17  schedule attached to Exhibit 154.
18      Q.   Thank you.  It is the case, isn't
19  it, that the first period in which Coopers &
20  Lybrand performed agreed upon procedures
21  relating to Prudent Buyer obligations at
22  Graduate was for fiscal year 1997, right?
23      A    I don't remember.  You need to talk
24  to Steve or Joe.
25      Q    And isn't it the case that Coopers

---

12 (Pages 1031 to 1034)

Daniel Cancelmi

Volume 4

1035

1  & Lybrand was not retained to do that agreed
2  upon procedures work until early in calendar
3  1998?
4        MR. TORBORG: Objection.
5     A.  Well, I don't know exactly when
6  they were retained, but they -- Coopers would
7  have been aware, because I believe they had
8  been performing Prudent Buyer agreed upon
9  procedures work or whatever type of work they
10  were performing before fiscal '97 time period.
11  But I don't know the exact dates.
12     Q.  Isn't it the case, though, Mr.
13  Cancelmi, that other independent accounting
14  firms, not Coopers & Lybrand, were performing
15  agreed upon procedures relating to Prudent
16  Buyer obligations at Graduate in 1996 and prior
17  years?
18     A.  They were, yeah, Deloitte & Touche
19  was Graduate's auditors up until the time of
20  the merger.
21     Q.  Now, I believe you testified
22  yesterday that you made or directed others to
23  make the journal entries for the $28 million
24  transfer of reserves from the Graduate
25  hospitals to the DVOG hospitals; is that right?

1036

1     A.  Yes.
2     Q.  And when you made those journal
3  entries, or directed others to make them, what
4  basis did you have in Generally Accepted
5  Accounting Principles for that transfer?
6     A.  That was based on, you know,
7  Allegheny management had determined that those
8  reserves would be transferred, should be
9  transferred. And it seemed to be consistent
10  with the methodology that had been used for the
11  50 million and the 21 million.
12     Q.  Isn't it the case, though, that you
13  were responsible for the timely and accurate
14  preparation of the financial statements in
15  accordance with GAAP?
16        MR. TORBORG: Objection.
17     A.  Yes. We went through this
18  yesterday. To the extent I could at my level,
19  yes.
20     Q.  It's also the case that you were
21  not permitted to subordinate your judgment to
22  that of others, right?
23        MR. TORBORG: Objection.
24     A.  Yes.
25     Q.  So when you made or directed others

1037

1  to make those journal entries, you must have
2  formed a view as to whether they were in
3  accordance with GAAP, right?
4     A.  I don't know if I specifically -- I
5  think my recollection is, based on the
6  information that was available to me, and the
7  rationale seemed to be consistent with how
8  other reserves had been handled, that it didn't
9  seem to be a problem.
10     Q.  The $28 million reserve transfer
11  was different from the other reserve transfers
12  in that the transfer went into an income
13  statement account at the DVOG hospitals, right?
14     A.  Yeah, but that's just -- that's
15  really semantics, because the 50 and the 21,
16  those could have been -- those accounts, they
17  were transferred over for. They could have
18  just as easily been written off to the income
19  statement and the reserve transferred over, and
20  then the impact of the write-offs to the
21  account handled in the same manner as the 28.
22  I've testified to that before.
23        It's just a little bit different on
24  how the patient billing department handles
25  certain of the write-offs versus others.

1038

1     Q.  That doesn't make any sense to me.
2  The $71 million reserve was transferred to a
3  balance sheet account, right?
4     A.  That's because when they wrote off
5  the accounts, they wrote off the accounts to
6  the balance sheet account, as opposed to the
7  28 million, the accounts were being written off
8  to the income statement account.
9        But if the other $71 million of
10  accounts had been written off to the income
11  statement, it would have been handled in the
12  same manner. You would have reversed the
13  expense of an impact, just like the 28.
14     Q.  I'm not talking about the write-off
15  of accounts. I'm talking about the transfer of
16  reserves. The way the reserves were
17  transferred was different, wasn't it?
18        MR. TORBORG: Objection.
19     A.  Certain of the entries were
20  different, but as far as the overall logic or
21  rationale, it's the same thing.
22     Q.  With respect to the $28 million
23  reserve transfer, what write-offs are you
24  talking about?
25     A.  There was write-offs, you know, in

13 (Pages 1035 to 1038)

Daniel Cancelmi                                                      Volume 4

1039

1   the patient revenue system.
2       Q.   What write-offs in the patient
3   revenue system?
4       A.   I don't know how to answer that.
5   Accounts that had been written off in the
6   patient revenue system.
7       Q.   You testified yesterday, didn't
8   you, that the reason for the $28 million
9   reserve transfer was that your superiors in
10  AHERF management were dissatisfied with the
11  preliminary financial results and directed the
12  reserve transfers to improve the bottom line.
13  Didn't you testify that way?
14      A.   You also showed me an exhibit, or
15  at least a number of exhibits that indicated
16  that the explanation for those unsatisfactory
17  results were as a result of write-offs to the
18  patient billing system.
19           And I think if you go to a memo
20  that was written from Adamczak to McConnell,
21  there's blatant explanations that the
22  unsatisfactory results is due to the write-off
23  of accounts.
24      Q.   Are you referring to what were
25  known at AHERF as out-of-period adjustments?

1040

1       A.   That could be part of them.
2       Q.   Could I ask you, Mr. Cancelmi,
3   please, to refer back to Exhibit 1097.
4       A.   Okay.
5       Q.   Is the memo from Mr. Adamczak you
6   were just now referring to obtained in this
7   exhibit?
8       A.   Yes.
9       Q.   Which memo is that?
10      A.   July 18th memo from Adamczak to
11  McConnell.
12      Q.   So that's on pages 65 and 66, using
13  the Bates pages in the right-hand corner?
14      A.   Yes.
15      Q.   And Mr. Adamczak reports there that
16  inpatient service revenue to DVOG hospitals was
17  $15.7 million below budget for the month of
18  June, right?  On Bates page 65.
19      A.   Yes.
20      Q.   And that's before the adjustments
21  that included the larger portion of the $28
22  million reserve transfer, right?
23      A.   I believe that's correct.
24      Q.   On the next page, Bates page 66,
25  Mr. Adamczak reports that $8.2 million was the

1041

1   result of volume variances, right?
2       A.   Yes.
3       Q.   And then Mr. Adamczak reports that
4   at MCP Hospital there was $1 million of
5   contractual adjustments posted in the SMS
6   system in June which were in final billed in
7   the previous month and should have already been
8   at net.  Do you see that?
9       A.   Yes.
10      Q.   Do you have an understanding as to
11  what that means?
12      A.   Yes.
13      Q.   Could you explain that for us,
14  please?
15      A.   Just what it says.
16      Q.   What was the SMS system?
17      A.   Billing -- patient billing system.
18      Q.   Contractual adjustments refers to a
19  contra revenue item?
20      A.   Yes.
21      Q.   So Mr. Adamczak stating here that
22  $1 million of contractual adjustments were
23  taken at MCP Hospital in June when the gross
24  revenue relating to those accounts was
25  recognized in May or another prior month?

1042

1       A.   Yes.
2       Q.   Now, ideally, in a hospital
3   accounting system, the gross revenue and the
4   associated contractual adjustment would be
5   recognized in the same period, right?
6       A.   That's correct.
7           MR. TORBORG:  Objection to the
8   question.
9       Q.   And there are numerous
10  complications that sometimes make that
11  difficult to achieve; is that right?
12      A.   Yes.
13      Q.   Is it your understanding that other
14  hospital systems besides AHERF also deal with
15  this problem with out-of-period contractual
16  adjustments?
17          MR. TORBORG:  Objection.
18      A.   Yes.
19      Q.   AHERF isn't unique in this regard,
20  is it?
21          MR. TORBORG:  Objection.
22      A.   In dealing with this issue?
23      Q.   In having an issue of out-of-period
24  contractual adjustments?
25      A.   No, they're not necessarily unique

14 (Pages 1039 to 1042)

Daniel Cancelmi                                                    Volume 4

1063

1    Q.    So you read through APB-16 as an
2    aid in making the purchase accounting
3    decisions, right?
4    A.    I'm sure I did at some point. I
5    don't know about every single paragraph.
6    Q.    And there's nothing in APB-16 that
7    would permit the transfer of purchase
8    accounting reserves to an income statement
9    account at an existing affiliate, is there?
10   A.    There's a lot of things that aren't
11   in APB-16 related to purchase accounting. The
12   standards don't list every single possibility
13   for a purchase accounting item. So you can't
14   just make an overall characterization that
15   because a single issue is identified in an
16   accounting standard, that it's not appropriate.
17   In fact, a lot people would
18   suggest, in fact, the profession I think would
19   like the accounting standards to become even
20   more specific, because they're too textbook.
21   So there's a lot of, you look at all kind of
22   accounting standards, every single possibility
23   is not always specifically addressed in
24   accounting standards, and that's intentional.
25   And you can't foresee every single

1064

1    situation for every company in this country,
2    otherwise, you would have accounting standards
3    that would be -- every single one of them would
4    be a telephone book. And then you still
5    wouldn't be able to get every situation in
6    there.
7    Q.    Did you look in APB-16 to see
8    whether it provided any support for the
9    $28 million reserve transfer?
10   A.    I don't remember if I did or not.
11   Q.    For lots of other accounting issues
12   that arose at AHERF, you did consult the
13   relevant accounting standards, didn't you?
14   A.    Depends on what the issues were.
15   Q.    We've looked at memos you wrote on
16   sale/leasebacks where you went and consulted
17   the relevant accounting standards, right?
18   A.    Yes.
19   Q.    We've seen that you consulted
20   APB-16 itself in making the purchase price
21   allocation decisions, right?
22   A.    Certain of them.
23   Q.    And this $28 million reserve
24   transfer was an accounting transaction of a
25   type that you had never seen before; isn't that

1065

1    right?
2    A.    I guess so. Oh, I had. I saw it
3    before, a couple months earlier, with the
4    50 million.
5    Q.    But that was, different because
6    that --
7    A.    No, it wasn't.
8    Q.    -- a transfer into a balance sheet
9    account, right?
10   A.    No, it wasn't.
11   MR. TORBORG: Objection.
12   A.    Same logic. Just a manner of how
13   the patient billing department handled a
14   write-off of the account, that's the only
15   difference.
16   Q.    But you can't identify any
17   $28 million of accounts that were written off,
18   can you?
19   A.    I think --
20   MR. TORBORG: Objection.
21   A.    -- if you hired someone to go in
22   and conduct an audit of the thousands of
23   transactions processed within the billing
24   system in AHERF in fiscal '97, you could easily
25   find $28.3 million of adjustments. But I would

1066

1    let someone else embark on that endeavor.
2    Q.    I'm not interested in hiring
3    anybody after the fact. I'm interested in what
4    you knew back in the summer of 1997. You
5    didn't know of any $28 million in patient
6    account write-offs that were being covered by
7    the reserve transfer from Graduate, did you?
8    MR. TORBORG: Objection.
9    A.    I wouldn't necessarily say that.
10   Q.    You can't point to any document
11   that lists 28 million dollars in such
12   write-offs, can you?
13   MR. TORBORG: Objection. This has
14   been asked and answered more than once.
15   A.    I think if you go back through
16   documents every month, you could find
17   $28.3 million, but I mean I think you need to
18   ask the people in the patient billing
19   department to identify those.
20   Q.    Let me hand you, Mr. Cancelmi,
21   what's previously been marked as Exhibit 321.
22   I think you testified a little bit about
23   Exhibit 321 previously.
24   This is a packet that you provided
25   to individuals from PriceWaterhouse in the

20 (Pages 1063 to 1066)

Daniel Cancelmi

Volume 4

---

**1067**

1  summer or fall of 1998, right?
2      A.  Yes.
3      Q.  And the first page of this exhibit,
4  that is, the schedule on the cover page, is
5  something that you and your staff prepared
6  especially for that purpose, right?
7      A.  Yes.
8      Q.  This schedule didn't exist back
9  during the 1997 audit, did it?
10     A.  That's correct.
11     Q.  If you could turn, please, to the
12 next page.  Second page of the exhibit.  Is
13 this page a page from what is known as a trial
14 balance?
15     A.  Yes.
16     Q.  And a trial balance is a printout
17 off the general ledger system of a company that
18 shows the current balance in the accounts; is
19 that right?
20     A.  Yes.
21     Q.  And a printout of -- strike that.
22         Each AHERF hospital was a separate
23 corporation in the accounting system, right?
24     A.  No.
25     Q.  The AHERF hospitals, at least

---

**1068**

1  generally, each had separate general ledger
2  systems; is that right?
3      A.  There were certain exceptions to
4  that, such as MCP.  MCP was one hospital
5  physically separated from EPPI, Eastern
6  Psychiatric Institute.  Those two were
7  combined.
8      Q.  The only point I'm trying to
9  establish is it's not as though there were one
10 consolidated AHERF general ledger.  There was a
11 whole array of general ledgers, generally
12 speaking, one for each hospital?
13     A.  Yes.
14     Q.  And is it the case that a printout
15 of all the trial balances at any given point in
16 time for all the AHERF entities would be many
17 hundreds of pages?
18         MR. TORBORG:  Objection.
19     A.  These particular trial balances
20 were, I don't know, maybe, I don't know, 25, 50
21 pages.  Depends.  The balance sheet was, I
22 don't know, maybe 10 pages.  Income statement
23 may have been maybe 10, 15, something like
24 that.  Just depends how much activity that
25 hospital had.

---

**1069**

1      Q.  But overall, if you were to print
2  out a trial balance for any given date for all
3  the AHERF hospitals, you would have many
4  hundreds of pieces of paper, correct?
5      A.  It depends what level of detail
6  it's printed out.  There's detailed transaction
7  trial balances that look to be hundreds.  These
8  trial balances were more summarized and they
9  wouldn't have been necessarily that voluminous.
10         As an example, I think I used to
11 fit all my Delaware Valley trial balances into
12 a binder, might have been a couple inches
13 thick.  Pittsburgh, maybe even same size, maybe
14 a little smaller.
15         So, you know, normal, like a binder
16 like you see at the end of the table there,
17 that would fit all the trial balances for DVOG,
18 and you'd need another one for the Pittsburgh
19 side.
20     Q.  When you're talking about fitting
21 all the trial balances, you're talking about
22 this high-level type of trial balance that we
23 see in the second page of Exhibit 321, right?
24     A.  Yes.  And I had -- I had those
25 monthly binders in my office, but they were

---

**1070**

1  about the size there.
2      Q.  All right.  So if we're talking
3  about a printout of the high-level trial
4  balance for all of the AHERF entities, we are
5  talking about hundreds of pages, right?
6          MR. TORBORG:  Objection.
7      A.  Could be.  You have to add them up,
8  I guess, but.
9      Q.  On any given page of this trial
10 balance printout, there are several dozen
11 accounts listed, right?
12     A.  Yes.
13     Q.  So overall, we're talking about
14 thousands of accounts in the AHERF system,
15 right?
16     A.  No, I wouldn't say that, because
17 they -- we tried to have standardized chart of
18 account.  But you could have a couple hundred
19 that would sort of apply to all the facilities.
20 Several hundred.  I never counted them.
21     Q.  When you're talking about standard
22 chart of accounts, you're talking about, for
23 example, that general ledger account number
24 1001100 might mean the cash concentration
25 account at each AHERF entity?

---

Daniel Cancelmi                                                    Volume 4

---

1071

1      A    Right, then you go to 1201902,
2  other reserves, FFMA, that might have only been
3  on a handful of hospitals.
4      Q.   But the way that the general
5  ledgers were maintained, there's a separate
6  general ledger account for the cash
7  concentration account for each hospital, right?
8      A    Yes.
9      Q.   So that overall, treating the
10  accounts at the different hospitals separately,
11  as they were on the AHERF general ledger
12  system, there were thousands of general ledger
13  accounts in the entire system, right?
14      A    I guess if you add them all up.
15  Each one of them could have had, say, 200
16  accounts. And if you have 10 entities, if
17  someone -- I would argue you have 200 accounts,
18  but when you sum them all up, if you count
19  every single general ledger. you have 200 times
20  10.
21      Q.   And there are five DVOG hospitals,
22  right?
23      A    Yes.
24      Q.   University, in addition?
25      A    Yes. Six, actually

---

1072

1      Q.   But there are five Graduate
2  hospitals, right?
3      A    I guess.
4      Q.   There's AGH, right?
5      A    Yes
6      Q.   AHERF the parent corporation?
7      A    Yes
8      Q.   Other Pittsburgh-based entities?
9      A    Yes
10      Q.   The Forbes Hospitals had several
11  different general ledgers, didn't they?
12      A    Yes, they did.
13      Q.   And there's Allegheny Valley in
14  addition?
15      A    Yes
16      Q.   A couple there, probably?
17      A    Yes
18      Q.   So overall, we're talking about
19  maybe 20 different general ledger systems by
20  the end of fiscal year 1997, right?
21      A    It could have been -- there's -- I
22  think there was more than that.
23      Q.   All right. More than 20 general
24  ledgers and there are a couple hundred accounts
25  in each. right?

---

1073

1      A    Uh-huh.
2      Q.   So overall we're talking about
3  thousands of different accounts in the AHERF
4  general ledger system?
5      A    Yeah, if you add them up
6  collectively
7      Q.   And many of these accounts would
8  have numerous transactions during the course of
9  a given year, right?
10      A    Yes.
11      Q.   Let's take, as an example, a
12  contractual allowance account. An account like
13  that would have many hundreds of transactions
14  in a year, right?
15      A    Yes, it could
16      Q.   And there would be many hundreds of
17  entries to that account right?
18      A    It could. I mean generally
19  speaking, I think you had, you know, you had a
20  standardized computer system interface that
21  went in each month, where the billing system
22  interfaced into the general ledger system. And
23  then you had manual adjustments that were made
24      Q.   So there would be certain entries
25  into the general ledger system that would be

---

1074

1  made through a computer interface system, and
2  then there would be others that would be made
3  manually, right.
4      A.   Yes
5      Q.   And overall, in any year for the
6  AHERF system, we're talking about at least
7  hundreds of thousands of entries against the
8  general ledger system, right?
9      A.   It's a lot. I have no idea how
10  much it is.
11      Q.   Millions, maybe?
12      A.   I have no idea.
13      Q.   And certainly when you were an
14  auditor, you never reviewed millions of entries
15  in your client's general ledger system, did
16  you?
17      A.   No. You didn't have to review
18  millions of journal entries. There was
19  sometimes you looked for large entries, flip
20  through journal entry books. I think there was
21  audit program steps, you would do that for
22  manual journal entries
23      Q.   And you --
24      A.   But every single journal entry
25  wouldn't have been examined.

---

22 (Pages 1071 to 1074)

1235

1  difference that you report here doesn't include
2  any amount for MCP, right?
3      A.   That's correct.
4      Q.   And because of the particular bad
5  debt reserve methodology used by MCP Hospital
6  in fiscal year 1996 and prior years, there may
7  well have been a significant difference between
8  the new methodology and the old methodology in
9  terms of what the formula reserve was; is that
10 right?
11     A.   There could be, yes.
12     Q.   Then Bucks County, Elkins Park and
13 St. Christopher's Hospitals, as of June 30th,
14 1996, were using two separate reserve methods;
15 one for the Patcom accounts and one for the
16 Envision accounts; is that right?
17     A.   I believe that's correct.
18     Q.   Is it the case that in this memo
19 that you sent on February 28th, 1997, you're
20 already assuming the Patcom write-offs have
21 taken place, so that the comparison is simply
22 to the Envision old method at those three
23 United Hospitals?
24     A.   I don't know.
25     Q.   Let me see if I can help you with

1236

1  that. First of all, in the first page, do you
2  see the estimated shortfall using the new
3  method as $53,668,000?
4      A.   Yes.
5      Q.   Then do you see on Bates page 271,
6  there's a February 7th, 1997 memo from you to
7  Mr. Morrison that reports that the bad debt
8  reserve shortfall after the projected future
9  write-offs are extracted from the agings is
10 $53,668,000?
11     A.   Yes.
12     Q.   So that this calculation that
13 you're performing is assuming that the entire
14 past statute and Patcom write-off has occurred,
15 right?
16     A.   Yes.
17     Q.   If one were to perform a
18 calculation of the effect of the new bad debt
19 reserve methodology that included the Patcom
20 accounts and the bad debt reserve method that
21 was used there, one would get a different
22 result for the different -- the new and old
23 methods than the one that you reported using a
24 different method in your February 28th memo,
25 right?

1237

1      A.   Yes.
2      Q.   Let me hand you, Mr. Cancelmi, what
3  was previously been marked as Exhibit 319.
4          Is this a memorandum that Robin
5  Schaffer sent to you dated August 11th, 1998?
6      A.   Yes.
7      Q.   And it relates to June bad debt
8  expense levels?
9      A.   June bad debt information.
10     Q.   And the schedule on the second page
11 of the document contains month-to-date
12 information, as well as year-to-date
13 information, correct?
14     A.   Yes.
15     Q.   And referring you to the column
16 actual per FS in the year-to-date section of
17 the schedule, is it the case that the actual
18 bad debt expense at the DVOG hospitals in
19 fiscal year 1998 was the 38,390,000 at AUH,
20 plus the 7,138,000 at St. Christopher's?
21     A.   Yes.
22     Q.   So it's a total of about $45 and a
23 half million?
24     A.   Yes.
25     Q.   And that was an amount fairly

1238

1  significantly below budget, right?
2      A.   The budget numbers were about 64 in
3  total, something like that. 64 million.
4      Q.   So that the actual bad debt expense
5  was about $20 million below budget?
6      A.   Looks like about 19.
7      Q.   And do you recall that the bad debt
8  allowance of the DVOG hospitals at June 30th,
9  1997 was about $65 million?
10     A.   The bad debt what?
11     Q.   Bad debt allowance.
12     A.   On the balance sheet?
13     Q.   Right.
14     A.   I don't remember offhand.
15     Q.   Assuming for the moment that that
16 $65 million figure is correct, do these 1998
17 results suggest to you that the bad debt
18 allowance as of June 30th, 1997 at the DVOG
19 hospitals may have been on the conservative
20 side?
21         MR. TORBORG:  Objection.
22     A.   Not necessarily.
23     Q.   That's one inference that one could
24 draw from that, though, right?
25         MR. TORBORG:  Objection.

Just Launched    www.rennillo.com    Schedule Online
Cleveland (216) 523-1313                        Akron (330) 374-1313

1239

1    A.   Yeah, that could be one of many
2    others.
3    Q.   Let me hand you, Mr. Cancelmi,
4    what's previously been marked as Exhibit 70.
5         Is Exhibit 70 a March 16th, 1998
6    memo that you wrote to Mr. Dionisio about a
7    Coopers & Lybrand letter on intercompany
8    transactions?
9    A.   Yes.
10   Q.   And this letter, which is attached,
11   is what's sometimes known as an agreed upon
12   procedures report?
13   A.   Yes.
14   Q.   Do you see there you state in your
15   second sentence, "essentially, C&L performed
16   limited agreed-upon procedures, which primarily
17   consisted of agreeing the intercompany
18   transactions to the general ledger and
19   verifying the mathematical accuracy of the
20   activity."
21   A.   Yes.
22   Q.   And it's correct that Coopers &
23   Lybrand performed limited agreed-upon
24   procedures, isn't it?
25        MR. TORBORG:  Objection.

1240

1    A.   Yeah, I think that's fair to say.
2    Q.   Do you know of anything inaccurate
3    in the agreed-upon procedures report?
4    A.   Not that I was aware of.
5    Q.   And the scope of the agreed-upon
6    procedures that Coopers & Lybrand was to
7    perform would be found in the engagement
8    letter, correct?
9    A.   Yes.
10   Q.   This may be a document you were
11   referring to before.
12        Let me mark as Exhibit 1129 a
13   document with Bates number DC8368, page 6.
14        - - - - -
15        (Thereupon, Exhibit 1129 was marked
16        for purposes of identification.)
17        - - - - -
18   Q.   Do you recognize Exhibit 1129, Mr.
19   Cancelmi?
20   A.   Yes.
21   Q.   What is it?
22   A.   It's a representation letter.
23   Q.   It's the representation letter
24   relating to the agreed-upon procedures report
25   for the intercompany account balances that we

1241

1    looked at in the last exhibit?
2    A.   Yeah, for intercompany agreed-upon
3    procedures that Coopers & Lybrand performed.
4    Q.   And is that your signature there?
5    A.   Yes.
6    Q.   And were the representations that
7    you made in this letter to Coopers & Lybrand
8    accurate and truthful?
9    A.   Yes.
10        MR. TYCKO:  Mr. Ryan, we would like
11   to stop relatively soon, so whenever you get to
12   a logical breaking point in your questioning,
13   just let us know.
14        MR. RYAN:  I'll do that.
15   Q.   Let me mark, please, as
16   Exhibit 1130 a document with Bates numbers
17   DC8366, pages 1 to 2.
18        - - - - -
19        (Thereupon, Exhibit 1130 was marked
20        for purposes of identification.)
21        - - - - -
22   Q.   Is this a memo that you sent to
23   Mr. Morrison dated March 23rd, 1998?
24   A.   Yes.
25   Q.   And it's entitled Transfer of Self

1242

1    Insurance and Pension Liabilities?
2    A.   Yes.
3    Q.   Do you see the second paragraph
4    there, the first sentence reads, "given the
5    heightened awareness of the hospitals'
6    intercompany balances in recent months, a
7    determination was made in January 1998 to
8    transfer the self insurance and pension
9    liabilities back to the hospitals' balance
10   sheet."
11   A.   Yes.
12   Q.   Could you explain to us what the
13   heightened awareness of the hospitals'
14   intercompany balances was that you're referring
15   to there?
16   A.   AGH had an intercompany receivable
17   from the Delaware Valley hospitals, or AHERF,
18   and there was questions whether AGH was going
19   to be repaid.
20   Q.   All right.  Are the transactions
21   that you are discussing here in your
22   March 23rd, 1998 memo the transfer of certain
23   assets held at the AHERF parent corporation to
24   the individual hospitals?
25   A.   Yeah.  Certain liabilities, yes.

64 (Pages 1239 to 1242)

1243

1  Q.  And that affected the intercompany
2  account balances of the hospitals?
3  A.  Yes.
4  Q.  Was the timing of the transfer in
5  January 1998 related to the fact that Coopers &
6  Lybrand was going to issue an agreed-upon
7  procedures report on the intercompany account
8  balances as of January 31st, 1998?
9  MR. TORBORG:  Objection.
10  A.  I don't know if it was or not.  I
11  know what they wanted to do, my recollection
12  was they wanted to, instead of having all
13  certain items up at the parent level, they
14  wanted to move them back to the individual
15  hospital levels.
16  Q.  When you say, they, who was that?
17  A.  My understanding, management.  I
18  would have understood that from Al.
19  Q.  Did Mr. Adamczak tell you who in
20  management wanted to do that?
21  A.  I thought McConnell and Abdelhak.
22  I thought Abdelhak wanted to do that.
23  Q.  Wasn't the purpose of this
24  intercompany transfer to reduce the hospitals'
25  intercompany balances that would be reported in

1244

1  the agreed-upon procedures report?
2  MR. TORBORG:  Objection.
3  A.  I don't know about that.  No.  I
4  mean I guess, moving back, it would reduce the
5  intercompany balances.
6  Q.  And you're saying it's a
7  coincidence that that occurred during the same
8  month as the intercompany agreed-upon
9  procedures report was going to be issued?
10  A.  I don't know if it was coincident
11  or not.  I mean that issue had been -- AHERF
12  management, that's what they decided to do, to
13  transfer the liability balances back.
14  MR. RYAN:  All right.  This is a
15  logical breaking point for the day.
16  MR. TYCKO:  Before we go off the
17  record, maybe we should just talk about where
18  we go from here at this point.
19  I understand from my off-the-record
20  discussions with Mr. Ryan that he is not going
21  to be able to finish his questioning tonight,
22  even if we stayed a little bit longer.  So
23  given that it's a Friday, 5:15, and Mr.
24  Cancelmi has been going for three days, it
25  seems like an appropriate stopping place.

1245

1  Do you have any suggestions, or
2  Mr. Torborg have any suggestions for the
3  appropriate way to bring this issue before the
4  court?
5  MR. RYAN:  Well, I mean I'm hopeful
6  that we don't need to bring the issue before
7  the court and that we can, I'm hoping, all
8  agree that an additional day would provide me
9  with the time necessary to complete my
10  cross-examination and any time that Jones Day
11  might need for the -- for any redirect
12  questions that they might have.
13  MR. TYCKO:  Well, I mean as we may
14  have made clear on numerous occasions to you,
15  we're not willing voluntarily, absent a court
16  order, to go forward for another day.  We think
17  that would be beyond the obligations of Mr.
18  Cancelmi under Rule 45, and would be an
19  unreasonable burden upon him under these
20  circumstances, given that this is now the
21  completion of his tenth day of deposition
22  testimony on these issues.
23  So I think the matter is going to
24  have to get brought before the court.  I mean
25  are you able to make some sort of

1246

1  representation right now as to how much
2  additional time you would need to complete your
3  examination?
4  MR. RYAN:  Subject to looking over
5  my notes and the transcript so far, I believe
6  that my additional examination would be between
7  half a day and a day.
8  MR. TYCKO:  Okay.  Well --
9  MR. TORBORG:  I was just going to
10  ask if there's -- if it makes any difference,
11  if we attempted to do this in sort of a
12  different fashion than we're down now, either
13  that being doing it in Dallas where's Mr.
14  Cancelmi is located, or doing it maybe by video
15  deposition, which is kind of a new technology.
16  MR. TYCKO:  I don't think location
17  is really the issue.  I mean Mr. Cancelmi came
18  to Pittsburgh voluntarily.  He wasn't compelled
19  to come here.  So it isn't so much the location
20  of the deposition that is really the issue for
21  us.
22  I think it's really just the time
23  that it takes to do the actual deposition and
24  the burdensomeness of that at this point.
25  So I mean I appreciate that

1247

1 suggestion, but it seems to me that that doesn't
2 really answer the objection on our part.
3         MR. TORBORG: To the extent that it
4 matters, since you were asking how much time he
5 had left, I would envision I would have -- we
6 would have very little time, thus far,
7 depending on what else he gets into. It's
8 always hard for me to guess exactly, but very
9 little time left, I mean, for re-questioning
10 after him. But that could change based upon
11 what he gets into.
12         MR. TYCKO: I don't have any
13 problem with continuing this discussion off the
14 record in terms of trying to work things out.
15         But assuming that doesn't happen
16 and, again, working on the assumption that we
17 would be the ones filing the motion, does
18 anybody have any objection if we file that on
19 or before the 28th of February? It's three
20 weeks from now. Are you guys up against any
21 sort of deadlines in terms of getting this
22 issue resolved?
23         MR. RYAN: No, I don't have any
24 objection to that. Let me just state that I
25 reserve all of our rights to continue this

1248

1 examination at this time. I'm hopeful that we
2 can continue an off-the-record discussion and
3 hopefully resolve it that way.
4         VIDEO TECHNICIAN: Being there are
5 no further questions at this time, we are going
6 off the record. The time is 5:27.
7
8         (Deposition adjourned.)
9         - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1249

1               CERTIFICATE
2   The State of Ohio, )
3               SS:
4   County of Cuyahoga. )
5
6         I, Jaci R. Traver, RPR, CRR and
7   Notary Public, duly commissioned and qualified,
8   do hereby certify that the within named
9   witness, DANIEL CANCELMI, was by me first duly
10  sworn to testify the truth, the whole truth and
11  nothing but the truth in the cause aforesaid;
12  that the testimony then given by the
13  above-referenced witness was by me reduced to
14  stenotypy in the presence of said witness;
15  afterwards transcribed, and that the foregoing
16  is a true and correct transcription of the
17  testimony so given by the above-referenced
18  witness.
19        I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

1250

1         I do further certify that I am not
2   a relative, counsel or attorney for either
3   party, or otherwise interested in the event of
4   this action.
5         IN WITNESS WHEREOF, I have hereunto
6   set my hand and affixed my seal of office at
7   Cleveland, Ohio, on this      day of
8         , 2003.
9
10
11
12
13
14         Jaci R. Traver, Notary Public
15         within and for the State of Ohio
16
17  My commission expires July 15, 2003.
18
19
20
21
22
23
24
25

66 (Pages 1247 to 1250)

Page 1260

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF PENNSYLVANIA

 3

 4    THE OFFICIAL COMMITTEE OF

 5    UNSECURED CREDITORS OF

 6    ALLEGHENY HEALTH, EDUCATION &

 7    RESEARCH FOUNDATION,              Civil Action

 8             Plaintiff,               No. 00-684

 9    vs.

10    PRICEWATERHOUSECOOPERS, L.L.P.,

11             Defendant.

12

13              Continued videotaped deposition of

14    DANIEL CANCELMI, called for examination under the

15    statute, taken before me, Michael E. Miller, CSR,

16    RPR, CRR in and for the State of Texas, at the

17    offices of Gibson, Dunn & Crutcher, 2100 McKinney

18    Avenue, Suite 1100, Dallas, Texas, on Monday, the

19    24th day of November, 2003 at 9:08 a.m.

20

21                     - - - - -

22                   VOLUME 5

23                     - - - - -

24

25
```

Daniel Cancelmi                                                                     Volume 5

Page 1429

1  could have months in that -- within the same
2  month where you have things going the other way.
3      Q.   And people were, in effect, doing
4  analyses just to find one side of the entry, and
5  they weren't trying to track down all the        02:36PM
6  offsetting items that went the other way?
7          MR. TORBORG: Object to foundation.
8      A.   I didn't say that, no. I didn't say
9  that.
10     Q.   (BY MR. RYAN) Okay. Were people      02:36PM
11 doing types of analyses to try to find the
12 offsetting items that went the other way?
13     A.   Yes. Yes
14     Q.   Well, let me ask this, now: Are you
15 able to say one way or the other whether these    02:37PM
16 issues of accounts at gross and out-of-period
17 adjustments served to increase or decrease DVOG's
18 income during fiscal year 1997?
19     A.   I can't answer that specifically; but
20 you've got to keep in mind, accounts at gross can 02:37PM
21 be a different issue than out-of-period
22 adjustments because you can have out-of-period
23 adjustments related to accounts that were not at
24 gross.
25     Q.   If the accounts were adjusted, say,    02:37PM

Page 1430

1  from one payor category to another or what? I
2  mean, what kinds of out-of-period adjustments did
3  you observe that weren't associated with accounts
4  at gross?
5      A.   All of them. You could have countless 02:38PM
6  different situations where you have out-of-period
7  adjustment.
8      Q.   Can you give me one that isn't
9  connected to accounts at gross?
10     A.   Yeah. You could have an account, the  02:38PM
11 gross charges are $1,000, the account gets
12 contractualized down to, say, $400, meaning
13 there's a $600 contractual allowance, it's on the
14 books at $400 and, for whatever reason, that $400
15 a year later, six months later, 18 months later,  02:38PM
16 gets written off. That $400 would be an
17 out-of-period adjustment.
18     Q.   Why wouldn't you just call that a
19 write-off of the uncollectible account?
20     A.   Out of period. Write-off out of       02:38PM
21 period. That's just using terminology that's
22 often used in the business.
23     Q.   Isn't every write-off of an account
24 from a previous month?
25     A.   Not necessarily. If you collected     02:39PM

Page 1431

1  that $400, you wouldn't have an adjustment.
2      Q.   I understand that. It's not very
3  common to write off an account as uncollectible
4  in the same month in which it's established,
5  right?                                          02:39PM
6      A.   I don't know about that either.
7      Q.   Would you agree that many accounts
8  that are written off relate to services provided
9  in prior months?
10     A.   Yes.                                   02:39PM
11     Q.   At all healthcare organizations?
12     A.   Yes.
13     Q.   That's how write-offs generally work,
14 that you determine after some period of time that
15 the account's uncollectible?                    02:39PM
16     A.   Yes.
17     Q.   And you would refer to any account
18 write-off as an out-of-period adjustment?
19     A.   Some of them. There's a difference
20 between a bad debt write-off and an out-of-period 02:39PM
21 adjustment write-off.
22     Q.   Can you explain the difference?
23     A.   I mean, I can't. There's thousands of
24 examples. I just went through one. You have a
25 $1,000 account, you contractualize it down to    02:40PM

Page 1432

1  $400 and for whatever reason, the insurance
2  company notifies you that they're not going to
3  pay it for -- could be countless reasons, the
4  $400 could get adjusted as a write-off against
5  revenue, and it's -- a lot of people view that as 02:40PM
6  an out-of-period adjustment.
7      Q.   Do you? Do you view that as an
8  out-of-period adjustment?
9      A.   Yeah.
10     Q.   So you wouldn't consider that to be a  02:40PM
11 bad debt write-off?
12     A.   Not necessarily. It depends on the
13 fact pattern. If you didn't bill the insurance
14 company appropriately, it's contractual
15 allowance. It's not a bad debt.                 02:40PM
16     Q.   For the reasons we're talking about
17 earlier, that it's not really a credit quality
18 issue, it's a billing process issue?
19     A.   Correct.
20         MR. TORBORG: Object to form.           02:40PM
21     Q.   (BY MR. RYAN) And you would expect an
22 allowance to be taken for that kind of issue in
23 the contractual allowance rather than the bad
24 debt allowance?
25         MR. TORBORG: Object to form and        02:41PM

44 (Pages 1429 to 1432)

Daniel Cancelmi                                                                                    Volume 5

Page 1433

1  foundation.
2      A.   Could be, depending on the fact
3  pattern.
4          MR. RYAN: Okay. We need to take a
5  break for switching the tape.          02:41PM
6          THE VIDEOGRAPHER: We're off the
7  record at 2:41 p.m. This concludes Tape 2.
8          (Recess taken.)
9          THE VIDEOGRAPHER: We're back on the
10 record at 2:58 p.m. This is the beginning of   02:58PM
11 Tape 3.
12     Q.   (BY MR. RYAN) Let me hand you,
13 Mr. Cancelmi, what's previously been marked as
14 Exhibit 148. And if you could just take a moment
15 to review this, let me just explain I guess why   02:59PM
16 I'm showing this to you. Your name is not on
17 this as author or recipient or copyee or
18 anything, but there is a reference in the middle
19 of the document to a meeting with Chuck Morrison
20 and Dan Cancelmi on February 21st, 1997. So if   02:59PM
21 you could just take a moment to review that and
22 let me know when you're finished.
23         MR. TORBORG: Are you having him
24 read the entire document, or just that
25 paragraph?                          03:00PM

Page 1434

1          MR. RYAN: Just this first page, I
2  guess.
3      Q.   Okay.
4      Q.   (BY MR. RYAN) Do you remember
5  anything about this meeting that apparently    03:01PM
6  occurred between Mr. Laing, Chuck Morrison and
7  you about an alternative net realizable valuation
8  approach developed by PFSG?
9      A.   No.
10     Q.   I've got one other document that I    03:01PM
11 think deals with a related topic, so let me show
12 that to you. It's Exhibit 1258.
13         Now, this document states in the
14 middle of the page, the sort of double-indented
15 paragraph, "I provided a draft of the PFSG    03:02PM
16 valuation to NRV," which I take it is net
17 realizable value, "to Robin Schaffer in our
18 meeting of May 5th, 1997; she indicated she would
19 review and comment." And then there are two
20 pages attached, and I think the second      03:02PM
21 attachment, Bates page 166, is the PFSG valuation
22 to NRV.
23         Are these schedules at all familiar to
24 you, Mr. Cancelmi?
25     A.   No, not offhand.            03:02PM

Page 1435

1      Q.   Do you remember anything about Russ
2  Laing in the spring of 1997 coming up with an
3  alternative bad debt reserving methodology?
4          MR. TORBORG: Object to form.
5      A.   I really don't. I don't remember    03:03PM
6  specifically. I know they were doing analyses,
7  but I just -- I don't remember specifically this
8  specific example.
9      Q.   (BY MR. RYAN) Now, Russ Laing worked
10 in the Patient Financial Services Group; that is,  03:03PM
11 in the patient billing and collections
12 department, right?
13     A.   Yes.
14     Q.   And it was you and others in the
15 general accounting department who had       03:03PM
16 responsibility for calculating and accounting for
17 the bad debt allowance, right?
18     A.   Yes.
19     Q.   Did you have an understanding at the
20 time as to why Mr. Laing was performing this    03:03PM
21 alternative calculation of something that would
22 appear to be within your responsibilities?
23         MR. TORBORG: Object to form.
24     A.   I don't remember specifically. I know
25 they were doing analyses because they would    03:04PM

Page 1436

1  get -- you know, they would get asked to, you
2  know, look into -- when questions would arise,
3  they would be asked to, you know, look into, you
4  know, what was going on.
5      Q.   (BY MR. RYAN) Did you have an opinion  03:04PM
6  at the time of Mr. Laing's accounting abilities?
7      A.   Of his what?
8      Q.   Accounting abilities.
9          MR. TORBORG: Object to form.
10     A.   He didn't work for me.         03:04PM
11     Q.   (BY MR. RYAN) You had occasion,
12 though, to interact with him, right?
13     A.   Yes.
14     Q.   And in the interactions that you had
15 with him, whether in person or in memos that you  03:04PM
16 exchanged with him, did you have occasion to form
17 an opinion as to his abilities as an accountant?
18         MR. TORBORG: Object to form and
19 foundation.
20     A.   Not necessarily. The only thing I    03:04PM
21 said earlier, that, you know, sometimes they
22 would draw conclusions that, you know, we would
23 scratch our head at, but I didn't supervise him,
24 so I couldn't draw a specific whether he was, you
25 know, the best accountant or the worst accountant  03:05PM

45 (Pages 1433 to 1436)

www.rennillo.com
Cleveland (216) 523-1313                                          Akron (330) 374-1313
98aa6344-d0d3-4e9a-b40c-883b01ff1081

Daniel Cancelmi                                                    Volume 5

Page 1437

1  or middle of the road.
2      Q.   (BY MR. RYAN) Did you believe at the
3  time that Mr. Laing was approaching some of these
4  issues with a view toward making the performance
5  of new management in the Patient Financial    03:05PM
6  Services Group look good?
7          MR. TORBORG: Object to form.
8      A.   I wouldn't say that. The -- you know,
9  a lot of people's sense was that, you know, they
10  believed that some of the problems related to the  03:05PM
11  fact that, you know, the billing departments had
12  been transferred over from the Delaware Valley,
13  and, you know, that they were trying to, you
14  know, clean up past problems.
15      Q.   (BY MR. RYAN) Did you and others in  03:05PM
16  your group find Mr. Laing a difficult person to
17  work with?
18          MR. TORBORG: Object to form and
19  foundation.
20      A.   Yeah, sometimes he was. He had his  03:06PM
21  point of view and we had ours.
22      Q.   (BY MR. RYAN) Do you know whether
23  there were periods of time when Mr. Laing was
24  absent from his work at AHERF for reasons to do
25  with his personal life?              03:06PM

Page 1438

1          MR. TORBORG: Object to form and
2  foundation.
3      A.   I think I remember hearing something
4  about that.
5      Q.   (BY MR. RYAN) That there were times  03:06PM
6  when he wasn't able to come to work?
7          MR. TORBORG: Object to form and
8  foundation.
9      A.   I don't know specifically. I vaguely
10  remember hearing certain things, but I can't  03:06PM
11  comment about that stuff.
12      Q.   (BY MR. RYAN) All right. I mean, I'm
13  not trying to -- you know, to get you to tell me
14  whether rumors were true or not. I'm just trying
15  to establish that you did hear at the time that  03:07PM
16  there were going on in Russ Laing's life that
17  from time to time that prevented him from coming
18  to work; is that right?
19          MR. TORBORG: Object to form,
20  foundation.              03:07PM
21      A.   Mr. Ryan, I know Russ; I worked with
22  him a little bit. Anything I heard about his
23  personal life would have been second, third,
24  fourth, who knows how many hands down the road,
25  so, you know, I don't know what was going on in  03:07PM

Page 1439

1  his personal life. And whether that was the
2  reason he may have been at work -- I don't even
3  remember the exact time frame when he may or may
4  not have been at work.
5      Q.   (BY MR. RYAN) Okay. All right. So I  03:08PM
6  take it, looking at these two exhibits, 148 and
7  1258, hasn't helped to refresh your recollection
8  as to any work that Mr. Laing or others may have
9  been doing on an alternative bad debt reserving
10  methodology?              03:08PM
11      A.   I mean, I knew they were doing, you
12  know analyses. I just -- I don't remember
13  specifically these, but you just -- you know,
14  just interacting here that, you know, they're
15  doing -- they're looking at some things, and I  03:08PM
16  have schedules in my files for some things they'd
17  put together on how they analyzed things. In
18  fact, we looked at one not too -- you know, a few
19  minutes ago. So they -- you know, they would
20  analyze information. I mean, that was -- I  03:08PM
21  believe that was his job.
22      Q.   All right. When you said we looked at
23  one, you meant some of these accounts at gross
24  schedules we looked at?
25      A.   Yes.              03:08PM

Page 1440

1      Q.   Well, let me ask you this, which is
2  really what I'm trying to get at, I guess.
3          Did you ever review loss percentages
4  or bad debt reserving methodologies that
5  Mr. Laing generated in this 1997 time frame?  03:09PM
6      A.   I'm sure I did.
7      Q.   Okay.
8      A.   He used to -- because one of these has
9  arrows pointing or something. Yeah. He put
10  together schedules like that periodically. I  03:09PM
11  don't remember every single one of them, but
12  that's -- I recognized that when I saw that
13  because he did that on a lot of his schedules.
14      Q.   Did you form any views at the time as
15  to whether the bad debt reserve methodologies  03:09PM
16  that Mr. Laing was generating were reasonable or
17  not?
18          MR. TORBORG: Object to form and
19  foundation.
20      A.   I don't remember specific ones. I  03:09PM
21  know I would have looked at some things and, you
22  know, I'd have comments on some things, but I
23  don't remember the specific calculations. I --
24  my recollection was more in putting together
25  analyses on the accounts at gross. Those seemed  03:10PM

46 (Pages 1437 to 1440)

Daniel Cancelmi                                                                                    Volume 5

Page 1441

1  to be the more frequent ones, but then I know he
2  did do other things. He used to put together
3  analyses periodically for -- I don't know if it
4  was for Dionisio or Greg Snow.
5     Q.  (BY MR. RYAN) All right. Let me          03:10PM
6  switch gears here a little bit and hand you a
7  document that's previously been marked as
8  Exhibit 60.
9        And maybe it would be helpful to look
10  at this in conjunction with the consolidated      03:11PM
11  audited financial statements of AHERF for fiscal
12  year 1997, which is Exhibit 58; so let me hand
13  you that too.
14        Do you recognize Exhibit 60,
15  Mr. Cancelmi?                                    03:12PM
16     A.  Yeah, vaguely.
17     Q.  Do you recall that Chuck Lisman
18  maintained report makeup binders for the fiscal
19  year 1997 financial statements?
20     A.  Yeah.                                     03:12PM
21     Q.  And for those of us who aren't
22  accountants, a report makeup binder is basically
23  a backup for the statements; is that right?
24     A.  It summarizes how certain of the
25  numbers are sum-- -- are prepared or added up to    03:12PM

Page 1442

1  get to the numbers that are in the financial
2  statement.
3     Q.  All right. So, I mean, does this
4  Exhibit 60 look to you like a copy of a portion
5  of Mr. Lisman's report makeup binder?             03:13PM
6     A.  Yes.
7     Q.  If we look here on the first
8  substantive page of Exhibit 60, and it's Bates
9  page 422, you see there the first line shows the
10  makeup of a supplemental disclosure on the        03:13PM
11  balance sheet, the allowance for uncollectible
12  accounts?
13     A.  Yes.
14     Q.  And it totals there $127,424,000?
15     A.  Yes.                                       03:13PM
16     Q.  And if we look in Exhibit 58, the
17  audited 1997 financial statements, we can see the
18  same allowance for uncollectible accounts in that
19  amount, $127,424,000, shown on the balance sheet
20  on Bates page 896, right?                         03:14PM
21     A.  Yes.
22     Q.  Now, if we look in the consolidating
23  schedules in Exhibit 58, such as the
24  consolidating balance sheet information on Bates
25  page 921 --                                       03:14PM

Page 1443

1     A.  921.
2     Q.  Page 27.
3     A.  Oh.
4     Q.  Sorry. In Exhibit 58 in the audited
5  financial statements, these are the consolidating    03:14PM
6  schedules attached to the audited financial
7  statements.
8     A.  Okay.
9     Q.  -- we see there there's a makeup of
10  the net patient accounts receivable for AHERF in    03:14PM
11  the amount of $367,061,000, right?
12     A.  Yes.
13     Q.  But just the way that the
14  consolidating balance sheet schedule is
15  presented, there's no makeup information for the    03:15PM
16  allowance for uncollectible accounts or bad debt
17  reserve, there's no breakdown of how the
18  $127 million figure relates to different AHERF
19  entities, right?
20     A.  Correct.                                   03:15PM
21     Q.  And that's what's shown here in the
22  report makeup binder in Exhibit 60; is that
23  right?
24     A.  Yes.
25     Q.  So we can see here, for example, that    03:15PM

Page 1444

1  of the $127 million, 68 million and change was at
2  the Delaware Valley, right?
3     A.  At DVOG.
4     Q.  At DVOG, yes.
5     A.  Yes.                                       03:15PM
6     Q.  And that was then the figure that was
7  calculated by the AHERF finance department as the
8  bad debt allowance at DVOG and presented to
9  Coopers & Lybrand to audit, right?
10     A.  I assume it ties to the general         03:16PM
11  ledger.
12     Q.  Now, the next page, Bates page 23,
13  page 423 of Exhibit 60, there's a breakdown of
14  the assets limited or restricted as to use
15  components by AHERF entity, right?              03:17PM
16     A.  Yes.
17     Q.  The first row is unrestricted by
18  boards of trustees, future addition or
19  replacement of property and equipment.
20        Is that what is generally referred to    03:17PM
21  as funded depreciation?
22     A.  Yes, or board-designated.
23     Q.  And we see there the total for
24  consolidated AHERF is $215,211,000, right?
25     A.  Yes.                                       03:17PM

47 (Pages 1441 to 1444)

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF PENNSYLVANIA
 3
 4    THE OFFICIAL COMMITTEE OF
 5    UNSECURED CREDITORS OF
 6    ALLEGHENY HEALTH, EDUCATION &
 7    RESEARCH FOUNDATION,              Civil Action
 8            Plaintiff,               No. 00-684
 9    vs.
10    PRICEWATERHOUSECOOPERS, L.L.P.,
11            Defendant.
12
13            Continued videotaped deposition of
14    DANIEL CANCELMI, called for examination under the
15    statute, taken before me, Michael E. Miller, CSR,
16    RPR, CRR in and for the State of Texas, at the
17    offices of Gibson, Dunn & Crutcher, 2100 McKinney
18    Avenue, Suite 1100, Dallas, Texas, on Tuesday,
19    the 25th day of November, 2003 at 9:03 a.m.
20
21                    - - - - -
22                   VOLUME 6
23                    - - - - -
24
25
```

Daniel Cancelmi                                                                                    Volume 6

Page 1630

1    do need to go through all those procedures.
2          And then one of the -- as I mentioned,
3    one of the steps is then to look at the slope and
4    how the accounts are reserved throughout the
5    aging categories and the reserve percentages.    11:18AM
6        Q.   (BY MR. TORBORG) In fact, looking at
7    the reserve percentages is one of the principal
8    things one does as an auditor when they try to
9    assess the adequacy of the bad debt reserves?
10         MR. RYAN: Objection.              11:18AM
11       A.   Yeah, sure, they look at the reserve
12   percentages.
13       Q.   (BY MR. TORBORG) I mean, you don't
14   have the opportunity as the auditor to review
15   every single account to see whether it's truly    11:18AM
16   collectible or not, right?
17       A.   No.
18       Q.   So you have to rely on some sort of --
19   some sort of other mechanism to determine whether
20   or not the allowance appears reasonable, right?    11:18AM
21       A.   Yes.
22       Q.   When you say "slope of bad debt
23   reserve percentages across the agings," what does
24   that mean?
25       A.   Let me think of an example. You could    11:19AM

Page 1631

1    have -- say you think you're going to collect --
2    say you have a $100 account and your history may
3    suggest that, okay, the $100 account, depending
4    on when the person makes payments on the account,
5    whether it's a person or an insurance company,    11:19AM
6    the farther out or the older the account gets,
7    the slope, the incline, gets steeper. In other
8    words, the reserve percentage can go up based on
9    how old the account is. So a lot of
10   organization -- as the account gets older, the    11:19AM
11   reserve percentages increase.
12       Q.   Just as the proposal you implemented
13   during your time at AHERF, starting in September
14   of '96 did, right?
15       A.   Yes. There was a slope element for    11:20AM
16   most of them -- yeah, actually, I guess all of
17   them.
18       Q.   Because it's pretty common knowledge
19   that the older the -- generally speaking, the
20   older the account is, the less likely it is    11:20AM
21   collectible?
22       A.   Generally speaking.
23       Q.   When you were an auditor at Coopers &
24   Lybrand auditing the various healthcare
25   receivables for various clients, did you have    11:20AM

Page 1632

1    occasion to review, in order to assess the
2    reasonableness of a particular client's bad debt
3    reserves, the reserve methodologies that were
4    used by others in the industry?
5        A.   Hmm. I mean, I guess you draw upon    11:21AM
6    your knowledge from your other audit clients.
7    I'm not sure that the firm had some type of
8    central repository where, you know, these are
9    what the top hundred hospitals, this is how they
10   reserve receivables. I don't remember anything    11:21AM
11   like that, but just based on your different audit
12   clients, you may -- "Okay. I know they do it
13   like this, the other one does it like this." So
14   that's sort of where you get your knowledge base
15   from.                                11:21AM
16       Q.   And that, in fact, is something that
17   accounting standards suggest that one might --
18   suggest the auditor might do in order to gain
19   comfort on the reasonableness of an estimate,
20   right?                               11:21AM
21       A.   Yes, that would be one way to do it.
22       Q.   Okay. So, for example, if you were
23   auditing two different hospital systems in the
24   same market, say Pittsburgh, and one client had
25   reserve percentages for Blue Cross of -- going    11:22AM

Page 1633

1    across the table, 10%, 10%, 10%, 10%, 10%, and
2    the other one had receivables in the same payor
3    class of 10%, 20%, 30%, 40%, 50%, 60%, you might
4    take a look at the differences there in
5    evaluating the reasonableness of either one of    11:22AM
6    those hospitals, right?
7          MR. RYAN: Objection.
8        A.   Yes.
9        Q.   (BY MR. TORBORG) That's something
10   that auditors do, right?                 11:22AM
11         MR. RYAN: Objection
12       A.   They can. Sure.
13       Q.   (BY MR. TORBORG) And did you view
14   that as something Coopers & Lybrand did when it
15   audited healthcare receivables?           11:22AM
16         MR. RYAN: Objection.
17       A.   Yes. I mean, then -- you know, we
18   would try to look at, you know, the bad debt
19   reserve calculations to -- in a number of
20   different -- in performing a number of different    11:22AM
21   steps to try to get comfortable with, you know,
22   the bad debt reserving practices for a particular
23   hospital, taking into consideration, obviously,
24   these facts unique to a particular hospital.
25       Q.   (BY MR. TORBORG) Now, another test    11:23AM

24 (Pages 1630 to 1633)

Cleveland (216) 523-1313                                              Akron (330) 374-1313

Page 1634

1  that you indicated you might use in auditing the
2  allowance for bad debts to determine its
3  reasonableness was subsequent receipts testing?
4      A.  Yes.
5      Q.  Can you explain what subsequent          11:23AM
6  receipts testing is and how it would be used as a
7  tool to evaluate the reasonableness of the
8  allowance?
9      A.  Say you have a June 30th year-end, so
10  you're auditing the June 30th receivables.  So     11:23AM
11  what you would do is you'd look for cash payments
12  received in, say, the month of July, August,
13  September, October, et cetera, to see how much of
14  that June A/R balance had been collected after
15  year-end.                                         11:23AM
16      Q.  And the -- I take it, then, that the
17  less percentage of the balance collected might
18  account for a higher reserve?
19      A.  It could.
20      Q.  Was that something -- and I'm          11:24AM
21  referring to subsequent receipts testing --
22  something that was readily done by Coopers &
23  Lybrand when you were there to evaluate the
24  adequacy of a healthcare client's allowance for
25  bad debts?                                        11:24AM

Page 1635

1      MR. RYAN:  Objection to form.
2      A.  It was done on certain clients; other
3  clients, it was not done.  And a lot of it had to
4  do with timing of the audit.
5      Q.  (BY MR. TORBORG)  Did it also have to    11:24AM
6  do with the relative concerns that Coopers may
7  have had regarding the adequacy of the allowance?
8      MR. RYAN:  Objection.
9      A.  Whether they went to subsequent
10  receipts testing, if they had concerns?           11:24AM
11      Q.  (BY MR. TORBORG)  Uh-huh.
12      A.  That would be one factor.
13      Q.  I believe you also indicated that as
14  an auditor, you may have spoken with individuals
15  within the billing department in evaluating the   11:25AM
16  adequacy of the bad debt?
17      A.  Yes.
18      Q.  Okay.  And why would you do that?
19      A.  Well, I mean, that's the department
20  responsible for billing and collecting the        11:25AM
21  receivables for a hospital.
22      Q.  Okay.  And why does that fact make
23  them a source to look at when evaluating the
24  adequacy of receivables, the adequacy of the
25  allowance for bad debts?                           11:25AM

Page 1636

1      A.  Because they're -- I mean, they're
2  accountable and they're responsible for
3  collecting those receivables, and then they work
4  those accounts on a daily basis, so they would
5  have insight on some of the specific accounts     11:25AM
6  and/or trends, overall trends for particular
7  payors that may prove useful.
8      Q.  And I think yesterday we looked at,
9  briefly, an alternative net realizable value
10  approach developed by Mr. Laing who worked in     11:25AM
11  AHERF's billing office, right?
12      A.  Yes.
13      Q.  Okay.  And I believe you said you
14  didn't recall reviewing that at the time?
15      A.  I don't remember the -- like I said, I  11:26AM
16  think I testified I remember schedules similar to
17  that, but I don't remember if that was the exact
18  one I would have looked at.
19      Q.  Okay.  Now, given the reasons you've
20  stated as to why the auditor may go to the        11:26AM
21  billing department in evaluating the adequacy of
22  the allowance, such as their ability to trace
23  payment histories, the day-to-day contact with
24  accounts, wouldn't an alternative net realizable
25  value approach developed by someone within that   11:26AM

Page 1637

1  department be a useful tool?
2      MR. RYAN:  Objection.
3      A.  Could be.
4      Q.  (BY MR. TORBORG)  Particularly if it
5  was based on some sort of analysis of past        11:26AM
6  payment history?
7      MR. RYAN:  Objection.
8      A.  It could be.
9      Q.  (BY MR. TORBORG)  Now, how -- what was
10  the last year you were on the Coopers & Lybrand   11:27AM
11  audit team at AHERF?  Was it 1994?
12      A.  Yeah, June '94 audit.
13      Q.  Okay.  Given your experience with --
14  both at Coopers & Lybrand and at AHERF, if
15  Coopers & Lybrand had come to AHERF at the end of  11:27AM
16  the 1996 audit and said, "AHERF, your bad debt
17  reserving methodologies are inadequate and do not
18  make sense and we will not sign the audit opinion
19  unless you revise them," what do you think would
20  have happened at that point?                       11:27AM
21      MR. RYAN:  Objection.
22      A.  I think it sort of did happen.  I
23  mean, we had to book an adjustment.  But you have
24  to -- when an accounting firm does that, you have
25  to understand where -- what the basis for that    11:28AM

544f55cc-e6e9-4cad-97b2-c616aa088c75

Page 1638

1  conclusion is and get an understanding of, you
2  know, what they're -- where they're coming from
3  to make sure that, you know, their conclusions
4  are appropriate.
5      Q.   (BY MR. TORBORG) Now, at some point,   11:28AM
6  I believe at least as early as September, you
7  developed with the assistance of perhaps others,
8  a new bad debt reserving methodology for the
9  Delaware Valley hospitals, right?
10     A.   Yes.                    11:28AM
11     Q.   Right.
12        Now, if Coopers & Lybrand had
13 indicated in their 1996 audit that the existing
14 bad debt reserve methodologies were inadequate
15 and unreasonable, do you believe that you would   11:28AM
16 have created that methodology earlier and then
17 tried to apply it to the balances that existed at
18 the end of fiscal year '96?
19        MR. RYAN: Objection.
20     A.   We may have.               11:29AM
21     Q.   (BY MR. TORBORG) So it's possible,
22 then, that -- well, strike that.
23        Mr. Ryan also asked you some questions
24 about the methodology used by MCP Hospital and
25 EPPI for reserving bad debts?         11:29AM

Page 1639

1      A.   Yes.
2      Q.   And the process, again, I believe was
3  to reserve for self-pay balances in the patient
4  portion of insurance receivables, right?
5      A.   Yes.                    11:29AM
6      Q.   Okay. And I believe he asked you
7  whether or not you believed that it was a
8  reasonable methodology, right?
9      A.   Yes.
10     Q.   Okay. Now, when he asked you that   11:29AM
11 question, did you have in front of you the
12 information you believed would be necessary to
13 make an assessment about whether or not it was
14 reasonable?
15        MR. RYAN: Objection.        11:30AM
16     A.   No. I -- if I remember what the
17 question was, I think I responded this was -- the
18 bad debt reserve was calculated in accordance
19 with the company's policy for that particular
20 facility at that particular point in time.   11:30AM
21     Q.   (BY MR. TORBORG) Okay. So you don't
22 believe that you responded that you felt it was a
23 reasonable methodology?
24        MR. RYAN: Objection.
25     A.   I -- I can't -- I don't remember for   11:30AM

Page 1640

1  certain, but I think I indicated something to the
2  effect that I wasn't issuing opinions on the
3  reasonableness of the specific accounts or
4  specific methodologies. It was just this was the
5  methodology that we used as an organization that   11:30AM
6  was, you know, subject to review and, ultimately,
7  audit on an annual basis.
8      Q.   (BY MR. TORBORG) And in order to
9  assess the reasonableness of that calculation,
10 you might want some information such as how many   11:30AM
11 insurance receivables were over a year old -- a
12 year old, say, that had no bad debt reserves?
13        MR. RYAN: Objection.
14     A.   That would be one -- sure, one of many
15 things you'd look at.            11:31AM
16     Q.   (BY MR. TORBORG) Okay. And then I
17 think that also Mr. Ryan alluded to the
18 possibility that there might be additional
19 contractual allowance reserves on those insurance
20 receivables, right?              11:31AM
21     A.   I don't remember exactly what he said,
22 but there could be.
23     Q.   Okay. But you don't know whether or
24 not, in fact, there were additional bad debt --
25 additional contractual allowance reserves other   11:31AM

Page 1641

1  than those reserves necessary to bring it down to
2  the contractually agreed-upon value of the
3  account?
4        MR. RYAN: Objection.
5      A.   I don't -- my recollection is that   11:31AM
6  there was contractual allowance reserves to
7  adjust the accounts to what the expected amount
8  that would be collected under the contract.
9      Q.   (BY MR. TORBORG) Okay. Mr. Ryan also
10 asked you some questions yesterday about the bad   11:32AM
11 debt reserving methodologies, such as what was in
12 place at MCP and EPPI, of reserving only on
13 payors that may have a suspect credit quality?
14     A.   Yes.
15     Q.   But there are a lot of reasons why   11:32AM
16 even a third-party payor such as Medicare, Blue
17 Cross, creditworthy payors might reject a
18 receivable, right?
19     A.   Yes.
20     Q.   If you would turn to Exhibit 32. It   11:32AM
21 should be in your stack there. Specifically at
22 Bates page ending 275.
23        MR. TYCKO: 275, you said?
24        MR. TORBORG: 275, yes.
25     Q.   (BY MR. TORBORG) And does this appear   11:33AM

26 (Pages 1638 to 1641)

544f55cc-e6e9-4cad-97b2-c616aa088c75

Daniel Cancelmi                                                                    Volume 6

Page 1642

1  to be a discussion relating specifically to the
2  adult Delaware Valley Obligated Group hospitals?
3      A.   Page 28 -- 275?
4      Q.   275. If you look at page ending 286,
5  I think you'll see a separate discussion for     11:33AM
6  St. Chris.
7      A.   Oh. Okay.
8      Q.   Right.
9          Now, that section starts off by
10 saying, "Allegheny University Hospitals' billing  11:33AM
11 and accounts receivable performance indicators
12 have been substantially impacted by changes in
13 AUH's business environment and AHERF's
14 consolidation and relocation of Patient Financial
15 Services to Pittsburgh in 1995. AUH's payor mix   11:34AM
16 has evolved to where 45% of its revenue is
17 derived from Medicaid and Managed Care, the most
18 difficult third-party payors," right?
19     A.   Yes.
20     Q.   And then if you would flip with me to   11:34AM
21 two more pages in to Bates ending 277, under the
22 section "Payor Mix," this narrative states,
23 "AUH's payor mix is generally less favorable than
24 the comparison group primarily because of its
25 concentration among managed care which has grown  11:34AM

Page 1643

1  substantially in recent years. Perhaps no other
2  single factor, with the possible exception of
3  denial rates, influences accounts receivable more
4  so than payor mix," right?
5      A.   Yes.                                11:35AM
6      Q.   And then if you would flip with me to
7  one more section, Bates ending 278, the next
8  page, the last sentence of that page states,
9  "While many of the reasons for being denied
10 payment are intercepted through prebilling edits, 11:35AM
11 other reasons for denial include," and then the
12 next page provides a number of reasons why a bill
13 might be rejected, right?
14     A.   Uh-huh.
15     Q.   Such as, "services provided out of    11:35AM
16 network, services not authorized or lacking
17 authorization numbers, patient's not eligible,"
18 and it goes on, right?
19     A.   Yes.
20     Q.   And then the last -- and then that    11:35AM
21 paragraph below it concludes, "Many third-party
22 payors, particularly managed care companies, are
23 increasingly resorting to the practice of denials
24 under complex contractual arrangements in order
25 to deny financial responsibility for payment     11:36AM

Page 1644

1  altogether or to shift some portion of the claim
2  to another insurance carrier or the patient,"
3  right?
4      A.   Yes.
5      Q.   Now, these factors that we've just   11:36AM
6  read all deal with primarily third-party payors
7  other than self-pay, right?
8      A.   Yes.
9      Q.   So is it fair to say that the change
10 in the payor mix at the Allegheny University     11:36AM
11 Hospitals impacted -- would have an impact on the
12 reasonableness of management's estimate for bad
13 debt reserves?
14         MR. RYAN: Objection.
15     A.   That's what many people believed.    11:36AM
16     Q.   (BY MR. TORBORG) Do you recall
17 whether AHERF ever tried to analyze what impact
18 this change in payor environment might have on
19 the allowance for uncollectible accounts?
20     A.   I'm sure there was analyses done,     11:37AM
21 probably countless analyses, but I think
22 globally, a lot of people believed that because
23 the Philadelphia market had such a concentration
24 of managed care insurance companies that it was
25 more difficult to bill and collect your          11:37AM

Page 1645

1  receivables as opposed to some other cities where
2  managed care hadn't necessarily gained as strong
3  a foothold; and Pittsburgh was an example where
4  managed care hadn't necessarily gained as strong
5  a foothold yet.                               11:37AM
6      Q.   Do you recall whether you ever
7  discussed with anyone at Coopers & Lybrand the
8  possible impact on the change in the payor mix
9  and the increased denial rates on the allowance
10 for uncollectible accounts?                     11:38AM
11         MR. RYAN: Objection.
12     A.   I'm sure that was discussed. You
13 know, it probably came up -- I mean, it was
14 pretty evident from the numbers, but then also
15 when there was this debate that we've talked     11:38AM
16 about before about using the AGH methodology,
17 there was one of the -- I think one of the
18 discussion points would have been, you know, the
19 Pittsburgh market's a little different than the
20 Philadelphia market, so you couldn't necessarily 11:38AM
21 just, you know, utilize the AGH methodology out
22 in the Philadelphia market without looking at it,
23 because the market conditions could be different.
24     Q.   (BY MR. TORBORG) And, in fact,
25 because of the more difficult market conditions  11:38AM

27 (Pages 1642 to 1645)

544f55cc-e6e9-4cad-97b2-c616aa088c75

Daniel Cancelmi                                                                                    Volume 6

Page 1786

1    A.   Okay.
2    Q.   This is an analysis of reserves, in
3  the left column, revised 6/30/95; in the right
4  column it's January 31st, 1996, right?
5    A.   Yes.                            04:28PM
6    Q.   And there's the fiscal year '96
7  revenue adjustment shown as a negative number, a
8  number in parentheses, and so that's a potential
9  exposure item, right?
10       MR. TORBORG: Excuse me. Could I      04:29PM
11  have that one read back?
12       (The following portion of the record
13  was read.)
14       "QUESTION: And there's the fiscal
15  year '96 revenue adjustment shown as a negative
16  number, a number in parentheses, so that's a
17  potential exposure item, right?"
18       MR. TORBORG: Object to form.
19    A.   Well, I don't know if it's a potential
20  exposure item or it was segregated, because I    04:29PM
21  think most of that adjustment came out of the CRA
22  accounts which is listed above, like the
23  11 million-five.
24    Q.   (BY MR. RYAN) That's exactly where
25  I'm going with this, actually.            04:29PM

Page 1787

1    A.   Oh. Okay.
2    Q.   So if you could turn back four pages
3  in Exhibit 2294 to DC4588, page 1 of 8.
4    A.   Okay.
5    Q.   All right. This is another version of   04:30PM
6  "AHERF Analysis of Reserves," again showing
7  6/30/95 in the left column and January 31st, 1996
8  in the right column, right?
9    A.   Uh-huh.
10    Q.   Is that your handwriting in the upper   04:30PM
11  right corner?
12    A.   Yes.
13    Q.   Could you read that, please?
14    A.   "Summarized version."
15    Q.   Okay. Do you see under "Hahnemann    04:30PM
16  University Hospital, Prior Year CRA" at June 30th
17  of 1995 of $19,500,000?
18    A.   Yes.
19    Q.   And if you compare this schedule with
20  the earlier version of the schedule we were    04:30PM
21  looking at Bates number DC4588, page 5 of 8,
22  that's the sum of fiscal year '95 and prior year
23  CRA totalling $19-1/2 million, right?
24    A.   That's what it looks like.
25    Q.   And so the balance in those two rows   04:30PM

Page 1788

1  on DC4588, page 5 of 8, at January 31st, 1996 is
2  $14 million, right?
3    A.   Yes.
4    Q.   And then on the page we were just
5  looking at, DC4588, page 1 of 8, the balance is   04:31PM
6  $1-1/2 million, right?
7    A.   Right.
8    Q.   So the decrease is $12-1/2 million?
9    A.   Right.
10    Q.   And as you were indicating, I think,   04:31PM
11  that you recalled that offsets the fiscal year
12  1996 revenue adjustment of $12-1/2 million,
13  right?
14    A.   Yes.
15    Q.   Do you recall, then, that the fiscal    04:31PM
16  year 1996 revenue adjustments were reversed and
17  excess CRA reserves were released into income in
18  a similar amount; namely, $12-1/2 million?
19       MR. TORBORG: Object to form and
20  foundation.                         04:31PM
21    A.   I don't know if the actual entries
22  were reversed, but I think it was just viewed
23  that the revenue adjustments that were made were
24  considered to be cost report adjustments.
25    Q.   (BY MR. RYAN) And you referred      04:32PM

Page 1789

1  earlier to a disclosure in the AHERF financial
2  statements, and I just want to make sure we're
3  talking about the same thing. So --
4    A.   You just had them.
5    Q.   Well, let's look in 1996, since that's   04:32PM
6  the fiscal year we're in, Exhibit 1228. In the
7  consolidated AHERF financial statements that are
8  included in this package, it's on page 10. It's
9  a part of note 2, the accounting policies note.
10       MR. TYCKO: Do you have a Bates     04:32PM
11  number?
12       MR. RYAN: Yeah. Bates number 1586.
13    A.   Okay.
14    Q.   (BY MR. RYAN) The last sentence
15  reads, "Retroactive adjustments are accrued on an  04:33PM
16  estimated basis in the period the related
17  services are rendered and adjusted in future
18  periods as final settlements are determined,"
19  right?
20    A.   Uh-huh.                        04:33PM
21    Q.   And that's telling the reader that, as
22  of the balance -- as of any given balance sheet
23  date, a reserve is established for the estimated
24  CRA liability, and if that estimate is then too
25  high or too low, as it turns out in a subsequent   04:33PM

63 (Pages 1786 to 1789)

Daniel Cancelmi                                                                              Volume 6

Page 1790

1  period, the difference is booked to income in the
2  subsequent period, right?
3      A.   Yes.
4          MR. TORBORG:  Object to form.
5      Q.   (BY MR. RYAN)  There's no -- there's    04:33PM
6  no prior period adjustment made.  Rather, AHERF
7  was following an accounting treatment of
8  recording the difference between the original CRA
9  reserve and the final amount as income in the
10 current period, right?              04:34PM
11         MR. TORBORG:  Object to form.
12     A.   Yes.
13     Q.   (BY MR. RYAN)  And that's what AHERF
14 did in fiscal year 1996 with the $12-1/2 million
15 of excess CRA reserves at Hahnemann University    04:34PM
16 Hospital; that is, reverse the $12-1/2 million of
17 excess CRA reserves into income in that fiscal
18 year, right?
19         MR. TORBORG:  Object to form and
20 foundation.                      04:34PM
21     A.   Yes.
22     Q.   (BY MR. RYAN)  And in your view,
23 that's consistent with AHERF's accounting
24 policies as disclosed in note 2 to the
25 consolidated AHERF audited financial statements,  04:34PM

Page 1791

1  isn't it?
2          MR. TORBORG:  Object to form and
3  foundation.
4      A.   Yes.
5      Q.   (BY MR. RYAN)  And just to make sure    04:34PM
6  we have a clear record, the revenue adjustments
7  we're talking about that became income from
8  excess CRA reserves properly released into income
9  are the ones that Mr. Torborg showed you in
10 Exhibit 1692, right?              04:35PM
11         MR. TORBORG:  Object to form.
12     A.   You lost me there.
13         MR. RYAN:  Could you read that back,
14 please?
15         (The following portion of the record    04:35PM
16 was read.)
17         "QUESTION:  And just to make sure we
18 have a clear record, the revenue adjustments
19 we're talking about that became income from
20 excess CRA reserves properly reversed into
21 income are the ones that Mr. Torborg showed you
22 in Exhibit 1692, right?"
23         MR. TORBORG:  Object to form.
24     A.   The revenue adjustments -- how can I
25 explain?  The revenue adjustments that were made,  04:35PM

Page 1792

1  I guess, earlier in the year, at the end of the
2  year, like I said, I don't know if those actual
3  entries were reversed and then the cost report
4  adjustments were made, or that they were just
5  viewed as those adjustments that were made were    04:35PM
6  the cost report adjustments that would have been
7  made at the end of the year.
8      Q.   (BY MR. RYAN)  All right.  Let me move
9  to my third topic, which is which is bad debt
10 allowance as of June 30th, 1996.  So if you could  04:36PM
11 try to find -- Mr. Torborg went over these
12 exhibits with you earlier -- Exhibit 10, which
13 was Mr. Lisman's fiscal year 1996 year-end
14 adjustments file, and Exhibit 136, which looks
15 like this.                       04:36PM
16     A.   Okay.
17     Q.   And I have what I think will be very
18 few questions about this.
19         Exhibit 136 is undated, right?
20     A.   Yes.                    04:36PM
21     Q.   And is it the case that you don't
22 recall when in time, exactly, you prepared these
23 analyses?
24     A.   That's correct.
25     Q.   If you look at Exhibit 10, Bates       04:37PM

Page 1793

1  page 1363, Mr. Torborg asked you, I think, a
2  number of questions suggesting that the figure of
3  41 0, handwritten figure in the middle of the
4  page there, might be the same as the typed
5  $41,635,000 figure on the first page of          04:37PM
6  Exhibit 136.
7          And my question is:  Is it the case
8  that you don't know one way or the other whether
9  those figures have any relation to each other or
10 not?                           04:37PM
11     A.   I can't say with 100% certainty, no.
12     Q.   And then, Mr. Torborg asked you a
13 number of questions suggesting that at the time
14 you and others at AHERF met with representatives
15 from Coopers & Lybrand and discussed increasing    04:38PM
16 the DVOG bad debt allowance at June 30th, 1996,
17 what ended up being a $17-1/2 million adjustment,
18 Mr. Torborg suggested that you believed at the
19 time, perhaps, that there needed to be even more
20 of an increase.                   04:38PM
21     Q.   And my question to you is:  Is it the
22 case, as you testified yesterday, that it was
23 your understanding at the end of those sessions,
24 based on the analysis Coopers & Lybrand had done,
25 that the $17-1/2 million adjustment was           04:38PM

64 (Pages 1790 to 1793)

544f55cc-e6e9-4cad-97b2-c616aa088c75

Daniel Cancelmi                                                                    Volume 6

Page 1794

1  sufficient to bring the DVOG bad debt allowance
2  at June 30th, 1996 up to an amount that was in a
3  reasonable range?
4        MR. TORBORG: Object to form.
5     A.  It was my recollection that after the    04:39PM
6  $17-1/2 million adjustment was made, that that
7  would take the bad debt reserve up to a
8  sufficient level to enable Coopers & Lybrand to
9  sign off.
10    Q.  (BY MR. RYAN) All right. And we've    04:39PM
11 talked before about how a bad debt allowance is
12 an estimate and there can be a range of
13 reasonable bad debt allowances to have, right?
14    A.  Yes.
15    Q.  And you're familiar, I take it, with    04:39PM
16 the principal of FAS 5 that talks about booking
17 reserves at the low end of a range if no figure
18 within the range is more probable than any other,
19 right?
20    A.  Yes.                                  04:40PM
21       MR. TORBORG: Object to form.
22    Q.  (BY MR. RYAN) And have you
23 conducted -- well, strike that.
24       Did you conduct in 1996 any analysis
25 designed to suggest where in a reasonable range    04:40PM

Page 1795

1  of bad debt allowances the four scenarios you set
2  forth in Exhibit 136 might fall?
3        MR. TORBORG: Object to form.
4     A.  I don't remember.
5     Q.  (BY MR. RYAN) Did you perform any    04:40PM
6  type of analysis designed to determine what the
7  low end of a reasonable range of bad debt
8  allowances might be?
9        MR. TORBORG: Object to form.
10    A.  I don't remember.                      04:40PM
11    Q.  (BY MR. RYAN) Let me turn to my last
12 topic, which is the $23 million valuation
13 allowance in the first quarter of fiscal year
14 1998. So if you could try to find, please,
15 Mr. Cancelmi, Exhibit 316 as well as    04:41PM
16 Exhibit 4039, the Coopers & Lybrand work paper.
17    A.  Okay. 4039?
18    Q.  Yes. It looks like this.
19    A.  (Nods head.)
20    Q.  If you could turn, please, to the    04:41PM
21 second page of Exhibit 4039. You'll see that
22 there are listings -- and let's start with the
23 first hospital, which is Elkins Park. Do you see
24 that there are listing of out-of-period
25 adjustments for the months of July through    04:42PM

Page 1796

1  September 1997 by payor class?
2     A.  Yes.
3     Q.  And then there's a total amount in the
4  fourth column, which for Elkins Park is $251,000.
5  Do you see that?                             04:42PM
6     A.  Yes.
7     Q.  And do you see that that total amount
8  does not include the medical assistance
9  out-of-period adjustments?
10    A.  Okay. Yes, I see that.                 04:42PM
11    Q.  And the way that the table is set up
12 is, perhaps, a little bit confusing, but do you
13 see that, in fact, the totals for the individual
14 months, July, August and September, because they
15 all sum to the total for the quarter, those    04:43PM
16 monthly totals don't include the medical
17 assistance out-of-period adjustments either?
18    A.  If you float them down?
19    Q.  Yes.
20    A.  I don't know if they do or not. You'd    04:43PM
21 have to add them.
22    Q.  But you can see, for example, in
23 August, there's such a large amount of
24 positive --
25    A.  Oh, yeah.                             04:43PM

Page 1797

1     Q.  -- medical assistance adjustments, you
2  really couldn't include those in the total,
3  right?
4     A.  Okay. Yeah.
5     Q.  And are you aware of reasons why one    04:43PM
6  might want to analyze medical assistance
7  out-of-period adjustments separately from other
8  out-of-period adjustments?
9     A.  It has tick mark A.
10    Q.  Yeah. I'm not sure that goes to that    04:44PM
11 question. I think it might go to the 100%
12 figure.
13    A.  I'm not sure why they put it together
14 like that.
15       MR. RYAN: All right. Let me mark a    04:44PM
16 new exhibit that might shed some light on this.
17 This can be the next exhibit number.
18       THE REPORTER: David, do you have
19 the exhibit stickers?
20       MR. TORBORG: I'm sorry. Yes.
21 Let's go off the record.
22       THE VIDEOGRAPHER: We're off the
23 record at 4:45 p.m.
24       (Discussion off the record.)
25       THE VIDEOGRAPHER: We're back on the    04:45PM

65 (Pages 1794 to 1797)

Daniel Cancelmi                                                    Volume 6

Page 1798

1    record at 4:46 p.m.
2         MR. RYAN:  Let me mark, please, as
3    Exhibit 2298, the document with Bates
4    numbers DBR-AA 74499 through 74505.
5         (Exhibit 2298 marked.)          04:45PM
6         MR. TORBORG:  2298?
7         MR. RYAN:  Yes.
8    Q.   (BY MR. RYAN)  Do you see this is a
9    memo from Robin Schaffer to you, dated
10   October 15th, 1997, on the subject of Delaware  04:45PM
11   Valley revenue analyses?
12   A.   Okay.
13   Q.   And if you could look, please, at the
14   third page of the exhibit, Bates page 501, do you
15   see there's a table of contractual          04:46PM
16   adjustments posted in the first quarter of fiscal
17   year 1998 with a final bill date of June 30th or
18   prior?
19   A.   Yes.
20   Q.   Total is $10,849,000?          04:46PM
21   A.   Uh-huh.
22   Q.   That's the same $10,849,000 we see in
23   Exhibit 316, the inpatient component of the
24   valuation adjustment, right?  Right?
25   A.   Hold on.          04:46PM

Page 1799

1    Q.   Okay.  Sorry.  I didn't mean to rush
2    you.
3    A.   Yes.
4    Q.   All right.  And then Robin has in the
5    column on the right a medical assistance column  04:46PM
6    that totals $4,112,000?
7    A.   Uh-huh.
8    Q.   Is it your understanding that that is
9    a component of the $10,849,000?
10   A.   Yes.          04:47PM
11   Q.   And then there's a little asterisk
12   that reads, "Medical Assistance contractual
13   allowances may not have a bottom line impact if
14   the accounts receivable resided in an MA
15   Applicant financial class."          04:47PM
16   A.   Uh-huh.
17   Q.   Do you have an understanding of what
18   that means?
19   A.   Yeah.
20   Q.   Could you explain that to us, please?  04:47PM
21   A.   It means that there's basically a
22   manual reserve recorded separately.
23   Q.   All right.  So it would make sense to
24   deduct the $4.1 million of medical assistance
25   contractual allowances from the $10.8 million  04:47PM

Page 1800

1    total?
2    A.   Not in -- it could be.  Depends if
3    it's an MA -- if it was classified as MA-App; and
4    therefore, if there was a reserve out there, then
5    you would deduct it.  If there wasn't, then you  04:47PM
6    would not.
7    Q.   All right.  Now, if there were some
8    amount of contractual allowances on inpatient
9    accounts taken during the first quarter of fiscal
10   year 1998, whether it's the $6.7 million or the  04:48PM
11   full $10.8 million, where the gross revenue was
12   booked before June 30th, 1997 -- are you with
13   me --
14   A.   Uh-huh.
15   Q.   -- so far?          04:48PM
16        -- it's also quite possible that there
17   was gross revenue booked during the first quarter
18   of fiscal year 1998 where the associated
19   contractual adjustment hadn't yet been taken as
20   of September 30th, 1997, right?          04:49PM
21   A.   Could be.
22   Q.   Do you know whether that amount was
23   greater or less than the 6.7 or 10.8 million?
24   A.   Whether what amount was?
25   Q.   Whether the amount --          04:49PM

Page 1801

1    A.   If you're asking how much of the 10.8
2    was -- relates to revenue booked after June '97,
3    is that your question?
4    Q.   No.  Let me try to ask the question in
5    a better way.  I'm not doing a good job asking  04:49PM
6    this question.
7         Given how AHERF's billing systems
8    worked, for the same reason that there were these
9    out-of-period contractual adjustments being
10   recorded in the first quarter of fiscal year  04:49PM
11   1998, there likely was gross revenue being booked
12   in that same quarter where the amount booked
13   wasn't just the net amount, but it was the total
14   gross amount; that is, the net plus what should
15   have been taken as a contractual adjustment but  04:50PM
16   wasn't, right?
17   A.   Not necessarily.
18   Q.   That happened frequently from month to
19   month in the AHERF hospitals, didn't it?
20   A.   Yeah, but then your scenario is it  04:50PM
21   would have been recorded in some other payor
22   class at June, and then it flipped to medical
23   assistance in, say, August of '97, and then you'd
24   have negative, say, Blue Cross revenue, you'd
25   have gross revenue, you'd have positive MA  04:50PM

66 (Pages 1798 to 1801)