TAB 182

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## RONALD DAVENPORT
*April 20, 2004*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue -- Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

DAVENPORT, RONALD - Vol.



LEGALINK
A WORDWAVE COMPANY

Page 85

```
1              MR. UNICE: Object to form.
2   A.   I have no idea.
3   Q.   And I take it you don't recall actually doing
4        that?
5   A.   No, no.
6              MR. UNICE: Object to form.
7   A.   That's correct.
8   Q.   Do you recall seeing this page at all?
9   A.   I do not.
10  Q.   Okay. You can put that document aside.
11            Do you recall that AHERF had outside
12       auditors during the time that you were on the
13       board?
14  A.   Yes.
15  Q.   And do you recall a Mr. Bill Buettner who was
16       one of those auditors?
17  A.   Not really, at least not by name.
18  Q.   Do you recall an auditor, an outside auditor, a
19       person from Coopers & Lybrand --
20  A.   Yes.
21  Q.   -- being at any of the AHERF trustee meetings?
22  A.   Vaguely, yes.
23  Q.   Did you ever have any discussions with any
24       Coopers & Lybrand people with respect to AHERF
25       outside of the context of one of these
```

Page 86

```
1        meetings?
2   A.   I did not.
3   Q.   And by one of these meetings, I meant the AHERF
4        board of trustees' meetings.
5   A.   Yes.
6   Q.   Let me just go back to Exhibit 1661, which are
7        the 1996 audited financials.
8   A.   Okay.
9   Q.   If you go to the page ending in 1606 --
10  A.   Okay.
11  Q.   -- it says, Report of independent accountants.
12  A.   Mm-hmm.
13  Q.   And there's a signature of Coopers & Lybrand at
14       the bottom. If you could just read this page
15       to yourself, and then I'll ask you a couple
16       questions about it.
17              - - - -
18            (The witness reviewed the Exhibit.)
19              - - - -
20  A.   Okay.
21  Q.   Is your understanding of the role of Coopers &
22       Lybrand in auditing the financial statements of
23       AHERF any different from what is written here
24       in this report of independent accountants?
25              MR. UNICE: Object to form.
```

Page 87

```
1   A.   My understanding -- I read this and
2        specifically the last sentence about
3        information as received. I would assume that
4        an auditor would -- would be able to pick up
5        any shell games, if there were, in fact, shell
6        games, but that's what I would assume. I
7        recognize the information is provided by the
8        principal.
9   Q.   Well, let me ask you this: If you go to the
10       second paragraph --
11  A.   Right.
12  Q.   -- it says, We conducted our audit in
13       accordance with generally accepted auditing
14       standards. Those standards require that we
15       plan and perform the audit to obtain reasonable
16       assurance about whether the financial
17       statements are free of material misstatement.
18  A.   Right.
19  Q.   Did you have any understanding of the role of
20       the outside auditor that differed from this
21       statement?
22  A.   No.
23  Q.   And generally do you think it's possible that
24       management could be doing shell games that an
25       auditor could not find?
```

Page 88

```
1              MR. UNICE: Object to form.
2              MR. McCLENAHAN: Do you think it's
3        possible is the question?
4              MR. FRIESEN: Yes.
5   A.   Not for long.
6   Q.   Do you think in hindsight that Mr. Abdelhak had
7        too much power?
8              MR. UNICE: Object to form.
9   A.   I don't think he had -- he had too much power.
10       I think the -- given the complicated nature of
11       the structure, it lent itself to independent
12       action. In other words, it was almost like our
13       intelligence system, there's so many players so
14       that information's not always shared.
15            For example, you asked me the
16       question about do I ever have -- do I know of
17       any trustees raising questions. Well, Vince
18       Sarni and I were very good friends. He played
19       a major role in Philadelphia. I never knew
20       that he resigned or why, because that would
21       have been very important to me.
22  Q.   And did that -- in your view, did the
23       supervision by the board, both the AHERF board
24       and the other connected and related boards, did
25       their supervision of management become more
```

22 (Pages 85 to 88)

Page 89

1    difficult as time progressed because of the
2    growing complexities of --
3  A.  Yes.
4  Q.  -- the organization?
5         MR. UNICE:  Object to form, lack of
6    foundation as to other boards he wasn't on.
7  Q.  Do you consider Mr. Abdelhak to be someone who
8    was open to other people's suggestions?
9  A.  Somewhat.  He was very opinionated, very strong
10   in his opinions.  He did not like dissent, but
11   he was solicitous of board members.
12 Q.  You can put that document aside.
13        Let's mark this exhibit as Exhibit
14   2553, and it's Bates numbered PR-PLD-020-02016
15   through 02021.
16                - - - -
17   (Exhibit 2553 marked for identification.)
18                - - - -
19 Q.  It says trustees' evaluation at the top.
20 A.  Okay.
21 Q.  And I'll represent to you that this came from a
22   stack of evaluations that were behind a tab
23   that said 1994 trustee evaluations, and this is
24   the only one I've seen that's actually typed
25   up, but is that your signature on the last

Page 90

1    page?
2  A.  That is my signature.
3  Q.  And do you recall typing or instructing someone
4    to type up a trustee evaluation?
5  A.  I do not recall, but that is my signature.
6  Q.  Do you remember receiving a trustee evaluation
7    at any time that was in this form?
8  A.  No.
9  Q.  But I take it that since you signed this, you
10   have no reason to dispute that you submitted
11   this at some point?
12 A.  I have no reason to dispute it.  That is my
13   signature, unless it was taken from some other
14   page.
15 Q.  Okay.  Let me show you another document then
16   which says -- well, this is Exhibit 2554.
17                - - - -
18   (Exhibit 2554 marked for identification.)
19                - - - -
20 A.  Okay.
21 Q.  This one says 1995, trustees' evaluation?
22 A.  Mm-hmm.
23 Q.  Now, your name is typed on this one at the end.
24 A.  Okay.
25 Q.  And do you recall --

Page 91

1  A.  No.
2  Q.  -- filling this one out?
3  A.  No, and I would -- I cannot imagine my having
4    my name typed.
5  Q.  Well, do you have any explanation for this
6    document then?
7  A.  None, but I can't imagine my name would be
8    typed.
9  Q.  Just for the record, why don't you read through
10   this document and let me know if there's
11   anything that you see --
12 A.  From 1995?
13 Q.  Yes.  If there's anything that you see that you
14   would not agree with, that stands out as
15   something that you would not have put down here.
16        MR. UNICE:  That he could look now
17   that he wouldn't have agreed with in 1995?
18        MR. FRIESEN:  That he now thinks that
19   he wouldn't have agreed with in 1995.
20 A.  As an example, there's a question mark under
21   the meetings.
22 Q.  Yes.
23 A.  I don't know why I would do that.
24 Q.  Okay.
25 A.  Another line says I would want more meetings.

Page 92

1    I know I wouldn't say that.
2  Q.  Okay.  Anything else?
3  A.  I would not have said that I would want fewer
4    meetings that lasted longer, no.  Site visits,
5    not necessarily.  The line which has No. 2 on
6    education is the same as what I said in 1994.
7    I see under (c) I put an X in both.
8  Q.  I'm sorry, say that again?
9  A.  Under No. 3 under education, there's an X in
10   both system-wide and individual, I would never
11   have done that, or every three to five years.
12   I would not put question marks by my time
13   commitments or question marks about the time I
14   spent is appropriate.  Okay.  That's about it.
15        MR. FRIESEN:  Okay.  Let me take a
16   break, and I might be done fairly soon, okay?
17        THE VIDEOGRAPHER:  We are going off
18   the record at 12:10.
19                - - - -
20   (There was a recess in the proceedings.)
21                - - - -
22        THE VIDEOGRAPHER:  We are back on the
23   record at 12:25.
24 BY MR. FRIESEN:
25 Q.   Mr. Davenport, have you met with anyone from

23 (Pages 89 to 92)

Page 93

1    Jones Day about this deposition?
2  A.   No.
3         MR. FRIESEN:  Okay.  I don't have any
4    further questions at this time.  I may have
5    some more after he's done with you.  Thank you
6    very much for coming in.
7              - - - -
8              EXAMINATION
9              - - - -
10  BY MR. UNICE:
11  Q.   Good afternoon, Mr. Davenport.  Again, my name
12    is John Unice.  I'm here for the Plaintiff, the
13    Official Committee of Unsecured Creditors of
14    AHERF.
15         Earlier on this morning you listed I
16    think to the best of your recollection some of
17    the other nonprofit boards on which you served,
18    and correct me if I'm wrong, but they are the
19    National Urban League, the National Chamber of
20    Commerce and the Heinz Historical Foundation?
21  A.   The list was in the '80s he asked me.
22  Q.   Okay.
23  A.   The '80s, the National Urban League, the U.S.
24    Chamber of Commerce, but not Heinz.  Heinz
25    History came in the '90s.

Page 94

1  Q.   Okay.  Besides those three, any other
2    involvement on your end in nonprofit boards
3    that you haven't told us today?
4  A.   The Committee on Economic Development, CED.
5    That's all I can think of.
6  Q.   What is the Committee on Economic Development?
7    Where is that located?
8  A.   It's a group of businessmen, 200 businessmen,
9    made up of corporate leaders from all over the
10    country.  It's located in New York.
11  Q.   What is the length of your tenure on that
12    board?
13  A.   Oh, since about 1978.
14  Q.   And you are currently a member, sir?
15  A.   Yes.
16  Q.   So aside from AHERF-related entities, there are
17    four other --
18  A.   That's right.
19  Q.   -- entities on which you served as a nonprofit
20    trustee.
21         I believe you shared with Mr. Friesen
22    earlier on your view that the role of a
23    nonprofit board member are mainly twofold:
24    One, to select the organization's chief
25    executive officer; correct?

Page 95

1  A.   Correct.
2  Q.   And the second would be to supervise his or her
3    work with the system?
4  A.   That's correct.
5  Q.   Let's talk for a little bit about the second
6    component of that role.  As a nonprofit board
7    member, can you tell me generally in your
8    experience the types of information from
9    management that you found useful in the
10    execution of your duties?
11  A.   Financial, personnel, and vision.
12  Q.   Vision being strategic thinking and so forth?
13  A.   That's correct.
14  Q.   Now, in the course of your responsibilities as
15    a nonprofit board member, have you from time to
16    time been assisted by external professionals
17    retained by management --
18  A.   Yes.
19  Q.   -- to engage in those duties?
20  A.   Yes, we have.
21  Q.   What kinds of professionals have helped you in
22    the course of your duties?
23  A.   With the vision particularly, sometimes we'd
24    search for personnel and sometimes with
25    financial expertise.

Page 96

1  Q.   Now, let's stick for a minute now just with
2    your AHERF experience.
3  A.   Okay.
4  Q.   Let me rephrase that, AHERF-related experience.
5    This will go back to AGH before AHERF was in
6    anybody's mind.
7         Were you aware that AHERF, for
8    financial assistance, hired outside -- an
9    outside auditing firm to audit the financial
10    statements presented by management on a yearly
11    basis?
12  A.   Yes.
13         MR. FRIESEN:  Objection to the term
14    financial assistance.
15  Q.   Who were those auditors?
16  A.   They were Coopers & Lybrand.
17  Q.   Were you aware that Coopers & Lybrand had
18    served as AGH's auditor for the better half of
19    a century?
20  A.   Not really.
21  Q.   Did you have any sense at all?
22         MR. McCLENAHAN:  You were with them a
23    long time, but not that long.
24  Q.   Did you have any sense at all as to how long
25    they had been serving as --

24 (Pages 93 to 96)

TAB 183

# In The Matter Of:

## *UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION v. PRICEWATERHOUSECOOPERS*

---

### *ROBERT L. FLETCHER*
*September 15, 2003*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*

*New York, NY 10170*

PH: 212-557-7400 / FAX: 212-692-9171

FLETCHER, ROBERT L. - Vol.



LEGALINK®

A WORDWAVE COMPANY

ROBERT L. FLETCHER

Page 117

1        MR. UNICE: Same objections.
2   Q.   Let me show you a document that's been marked
3        as Exhibit 1656. This is a very long, whopper
4        of a document.
5   A.   I had arrived at the same conclusion.
6   Q    It's a board book for an AHERF meeting of the
7        board of trustees. The meeting is dated
8        October 30th, 1997. You'll see on the second
9        page, Mr. Fletcher, your name is listed there
10       as a member of the -- of the board. Do you see
11       that?
12  A.   Mm-hmm.
13  Q.   Let me point you towards some specific pages,
14       and then I'll ask you if you remember receiving
15       them at or around this time, and, again, you
16       can look at as much of this document as you
17       want to.
18            If you would go to page 17, referring
19       to the large numbers at the top.
20  A.   Yes.
21  Q    It says Draft, and then it says, Consolidated
22       financial statements for the year ended June
23       30th, 1997.
24  A    Mm-hmm
25  Q.   And there are a number of pages that follow.

Page 118

1        Do you recall seeing the draft consolidated
2        financial statements for fiscal '97 at or
3        around October of 1997?
4   A.   Generally I would recall it.
5   Q.   Just to be clear, do you recall actually seeing
6        these particular financial statements?
7   A.   I was at the meeting. If -- if you say that
8        these were passed out at the meeting, if they
9        were passed out at the meeting, I was at the
10       meeting, I must have seen them.
11            MR. McCLENAHAN: If I can help. His
12       question is do you remember as you sit here
13       today in 2003, do you remember seeing these
14       financial statements at that meeting in October
15       of '97.
16            THE WITNESS: No.
17  Q.   Okay. These are actually part of the board
18       book that would be sent out prior to the
19       meeting; is that right?
20            MR. UNICE: Objection.
21  A.   Presumably.
22  Q.   And you recall being at the meeting; is that
23       right?
24  A.   Yeah.
25  Q.   I'm sorry?

Page 119

1   A.   I recall being at the meeting, yes.
2   Q.   How far in advance of the AHERF board meetings
3        would you usually get the board materials for
4        that meeting?
5   A.   I -- I really don't recall.
6   Q.   Now, if you go to page 21, again, referring to
7        the large numbers at the top, and this is part
8        of the financial statements that we were
9        talking about earlier, the draft financial
10       statements for fiscal year '97, do you see that
11       it says net income, 21,926,000?
12  A.   Yes.
13  Q.   Do you know from looking at this how you would
14       arrive at the operating income or operating
15       loss, which doesn't appear to be on here?
16            MR. UNICE: Objection, form and
17       foundation.
18  A.   No, I don't
19  Q.   Well, if you took out the investment income,
20       you see investment income near the top?
21  A.   Yes.
22  Q.   And net assets released from restrictions used
23       for operations, do you see that?
24  A.   Yes.
25  Q.   If you take those two numbers and you add them

Page 120

1        together and then you subtract them from the
2        net income, would that be an approximation of
3        the operating loss?
4            MR. UNICE: Objection, form and
5        foundation.
6   A.   I would assume that that's correct.
7   Q.   Do you -- let me ask you, do you recall seeing
8        this particular page?
9   A.   No.
10  Q.   Now, you said that you recall being at the
11       board meeting where these financial, draft
12       financial statements were presented. What do
13       you remember about that meeting, if anything?
14            MR. UNICE: Objection.
15  A.   Nothing specifically.
16            MR. McCLENAHAN: I think you already
17       went through an exhibit that reflected part of
18       what went on in this meeting, may have been
19       minutes of the meeting. I don't know.
20  Q.   Do you recall any discussion at the October 30,
21       1997 board meeting about the results for fiscal
22       year 1997?
23            MR. UNICE: Object to form.
24  A.   Specifically, no.
25  Q.   You can put this aside, and I'll show you

30 (Pages 117 to 120)

ROBERT L. FLETCHER

Page 121

1   another document that's previously been marked
2   Exhibit 1653.
3       Now, this is a board book or
4   committee book for the meeting of the audit
5   committee of AHERF for a meeting on October
6   15th, 1997. Now, we know that you were not on
7   the audit committee --
8   A.   Correct.
9   Q.   -- is that correct? I'd like to have you look
10      at page 70 -- actually page 68, again, the
11      large numbers at the top.
12  A.   Mm-hmm.
13  Q.   And if you'd actually flip to the previous
14      page, page 67, you'll see this is the beginning
15      of the Coopers & Lybrand management letter and
16      AHERF management response.
17          Even though you weren't on the audit
18      committee, did you ever see in -- well, did you
19      ever see at any time this Coopers & Lybrand
20      management letter and AHERF management
21      response?
22  A.   No.
23          MR. McCLENAHAN: You haven't even
24      shown him the letter yet.
25  Q.   Well, this is the beginning of the letter, and

Page 122

1   please feel free to -- to go through it.
2   A.   Well, I didn't see the letter so --
3   Q.   Just to be doubly sure, if you look at page 70
4       where the letter continues, it says General
5       Overview.
6   A.   All right.
7   Q.   This is all part of the letter, and I just
8       wanted to make sure if you look at this that
9       you can confirm that you haven't seen it or
10      maybe you have seen it?
11  A.   I have not seen it.
12  Q.   Okay. Good. You can put that aside.
13  A.   Just occurred to me if I stack this up in front
14      of me that reasonably soon I would no longer be
15      videotaped.
16  Q.   You can build an igloo.
17          While you were affiliated with AHERF,
18      what was your view of the integrity of
19      Mr. Abdelhak? And if it changed over time,
20      then let me know that.
21  A.   From my initial meeting with him until the time
22      he was no longer affiliated?
23  Q.   Correct.
24  A.   I would say I was impressed with his
25      credentials and his performance up until the

Page 123

1   time it appeared that things were not going
2   according to a plan that I had not seen in
3   detail.
4   Q.   And when roughly was that?
5   A.   I would say as a general point of demarcation
6       mid-'97.
7   Q.   Now, had you heard at any time prior to his
8       termination anyone else voice any concerns
9       about Mr. Abdelhak's integrity?
10  A.   No.
11  Q.   Did you consider Mr. Abdelhak to be someone who
12      was open to other people's suggestions?
13  A.   Yes, that's as opposed to no.
14  Q.   Do you need to explain that a little bit or --
15  A.   I -- I can't honestly answer yes without saying
16      that because I have no idea of how many
17      suggestions people have made to him that I saw
18      manifested eventually.
19  Q.   Okay. Well, speaking about your own personal
20      experience, did you feel comfortable making
21      suggestions to him?
22  A.   Yes.
23  Q.   Did you ever make a suggestion to him that you
24      thought was contrary to his own way of
25      thinking?

Page 124

1           MR. UNICE: Object to form.
2   A.   No.
3   Q.   What was your view of the integrity of
4       Mr. McConnell during the same time period,
5       while you were on the AHERF board until his
6       termination? And if it changed, then let me
7       know.
8   A.   Probably comparable.
9   Q.   Meaning that it changed for the worse at around
10      the same time that it did for Mr. Abdelhak?
11  A.   Yes.
12  Q.   Were you on the executive committee when
13      Mr. Abdelhak was terminated?
14  A.   Yes.
15  Q.   And why was he terminated?
16  A.   I would have to say in as few words as possible
17      a gross dissatisfaction with his -- his
18      performance.
19  Q.   Were you involved with the decision as to who
20      his replacement would be?
21  A.   Yes.
22  Q.   And he was replaced by Mr. Sanzo?
23  A.   Yes.
24  Q.   How was Mr. Sanzo chosen to -- to be the one
25      who would replace Mr. Abdelhak?

31 (Pages 121 to 124)

ROBERT L. FLETCHER

Page 125

1  A.  How was he chosen?
2  Q.  Right. Let me clarify that. Why Mr. Sanzo
3    instead of anyone else?
4  A.  Basically because of the need for someone to
5    step into that position very quickly and is
6    experienced with the components of the system.
7  Q.  At the time he was replacing Mr. Abdelhak, did
8    you have a view as to any -- any differences in
9    the way they thought the organization should be
10    run going forward between Mr. Abdelhak and
11    Mr. Sanzo?
12        MR. UNICE: Object to form.
13  A.  At the time that the decision was made to
14    select him as the replacement?
15  Q.  Right.
16  A.  No.
17  Q.  While you were on the AHERF board, did you have
18    any concerns about the number of members on the
19    board, meaning that there were too many or too
20    little?
21        MR. UNICE: Object to form.
22  A.  Yes.
23  Q.  And what were your concerns?
24  A.  Well, they -- they came from my experience with
25    a much more small board, much smaller board and

Page 126

1    a reasonable degree of participation by all the
2    members of the board.
3  Q.  That was your experience at Forbes?
4  A.  Yes, or they didn't serve on the board.
5  Q.  And was this always a concern of yours at
6    AHERF, or did it become a concern at some point
7    after you joined?
8        MR. UNICE: Object to form.
9  A.  Which? It was always or at some point?
10  Q.  Well, I guess that's my question to you. Was
11    this always a concern of yours?
12  A.  No.
13  Q.  So when did it become a concern?
14  A.  I can't specifically say when, but to me it was
15    a concern by the numbers.
16  Q.  And how did the large -- how did the fact that
17    there was a large number of people on the AHERF
18    board affect the meetings in your view? What
19    was it about it that concerned you?
20        MR. UNICE: Object to form.
21        MR. McCLENAHAN: Objection, he didn't
22    say that the meetings concerned him or that it
23    affected the meetings. Just no foundation.
24  Q.  Well, let me back up then. You said that one
25    of the things that you observed about the

Page 127

1    Forbes board was that the smaller group was
2    resultant in the reasonable degree of
3    participation among board members.
4        Did you feel that there was not a
5    reasonable degree of participation among the
6    board members of AHERF's board because there
7    were too many people on the board?
8        MR. UNICE: Object to form.
9  A.  I guess that is relevant.
10  Q.  I'm sorry, you guess that's relevant?
11  A.  I said I guess that was a relevant
12    consideration.
13  Q.  Did you believe at any time that there were too
14    many committees of the AHERF board?
15        MR. UNICE: Object to form
16  A.  No
17  Q  Did you believe that you received the materials
18    in advance of the board meetings in enough time
19    so you would have time to read through them?
20  A.  I'm a slow reader.
21  Q.  I don't know if that's a no or if it's just you
22    are a slow reader?
23  A.  Well, depends on the gross of the material. If
24    you've got this a day before (indicating), it's
25    probably not sufficient time.

Page 128

1  Q.  Right.
2  A.  If you got this much a day before (indicating),
3    you've got no excuse.
4  Q.  Did you get them a day before?
5  A.  Oh, I didn't say that.
6  Q.  Okay. You said you couldn't remember --
7  A.  I don't remember.
8  Q.  Do you remember ever feeling that you didn't
9    get it long enough before to read through the
10    whole thing?
11        MR. UNICE: Objection.
12  A.  Undoubtedly, yes.
13  Q.  Did you ever believe that sometimes the AHERF
14    board meetings didn't last long enough to get
15    through the entire agenda of all the materials?
16        MR. UNICE: Objection, form and
17    foundation.
18  A.  I have to -- I have to better understand the
19    question, being that you said in order to get
20    through all the material on the agenda, and I
21    would say to my recollection, we got through
22    the material on the agenda.
23  Q.  Did you feel that sometimes you got through the
24    material too quickly for your tastes?
25        MR. UNICE: Object to the form

32 (Pages 125 to 128)

TAB 184

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## DR. DONNA MARIE MURASKO
*April 8, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

MURASKO, DR. DONNA MARIE



LEGALINK
A WORDWAVE COMPANY

Page 161

Dr. Donna M. Murasko

1  tell you who asked the question or who
2  answered it.
3  Written in this format, it was
4  probably discussed.            02:59PM
5  Q.  And what did you write over on the
6  right on the bottom?
7  A.  It is a note, "Tony Cook did ask
8  about productivity of individuals. Len and
9  Sherif said we're fine."        02:59PM
10  Q.  And "Len" would be?
11  A.  Ross.
12  Q.  And who was he?
13  A.  He was the provost.
14  Q.  Now, do you have any idea what kind  03:00PM
15  of individuals is referred to here?
16  A.  A lot of the revenue in a medical
17  school is based on the billings of individual
18  faculty.
19  If you were reading the documents  03:00PM
20  that you have been giving me, there have been
21  comments about new hires not getting all their
22  revenue in on time because -- and in reading
23  it, I could tell you it is because of
24  credentialing in the hospital, and there is a  03:00PM

Page 162

Dr. Donna M. Murasko

1  payment delay.
2  That was a recurrent theme through
3  Board meetings, on whether or not we were
4  getting that money in quickly enough.     03:00PM
5  So this is consistent with that.
6  Q.  Do you know why Len and Sherif said
7  that, "we were fine"?
8  A.  Probably that the individuals are
9  now doing fine. Previous Board book said --  03:01PM
10  you have actually given me today said that
11  there are concerns with that. So their
12  comments were probably saying that that has
13  been addressed.
14  Q.  If you go to the next page, Delaware  03:01PM
15  Valley Obligated Group, Combining Statement of
16  Changes in Net Assets For the Year Ending June
17  30, 1997.
18  It says, "Bob Palmer," colon,
19  "realize conditions were difficult but did we  03:01PM
20  do the best we could. Sherif, I believe so.
21  Recruitment last year was needed, but we're
22  paying for it. Len, we've made some faculty
23  adjustments but," dot, dot, dot, takes --
24  sorry, "take one year to see change at      03:01PM

Page 163

Dr. Donna M. Murasko

1  minimum."
2  Q.  Do you know what that was about?
3  A.  It's consistent with what I just
4  said.                          03:01PM
5  If you hire new physicians, it takes
6  a year in order for their revenue to be
7  totally represented in the financials because
8  of the billing and the time that those
9  receivables come in.            03:02PM
10  Q.  Well, what do you think, "we're
11  paying for it," means?
12  A.  When you hire faculty, even though
13  you're not getting their revenue in, you have
14  to give them their monthly salary.      03:02PM
15  Q.  And then it says, "Potamkin," colon,
16  PR is management poor. Are losses real. Need
17  to know correct spin."
18  Do you know what that's all about?
19  MR. UNICE: Object to form.      03:02PM
20  A.  I don't know. I can't go back and
21  interpret that.
22  Q.  But this would be something that Mr.
23  Potamkin said?
24  A.  Not directly; it is obviously a      03:03PM

Page 164

Dr. Donna M. Murasko

1  paraphrase and a summary on my part. But I
2  can't decipher it at this point.
3  MR. FRIESEN: We need to change
4  the tape briefly.            03:03PM
5  VIDEO SPECIALIST: We are now
6  going off the video record. That
7  concludes Videotape No. 2. The time,
8  3:03.
9  (Short recess.)              03:03PM
10  VIDEO SPECIALIST: We are now
11  back on the videotape record. This
12  commences Videotape No. 3. The date,
13  April 8, 2004. The time, 3:13.
14  You may continue.          03:13PM
15  BY MR. FRIESEN:
16  Q.  Do you recall that Mr. Abdelhak was
17  terminated in June of 1998?
18  A.  Yes, I do.
19  Q.  And when was the first time that you  03:13PM
20  ever heard any discussion whatsoever about his
21  potential termination?
22  A.  I cannot recall the date. I...
23  Q.  Do you recall how much before the
24  actual termination it was?        03:14PM

41 (Pages 161 to 164)

Page 165

Dr. Donna M. Murasko

1
2    A.   No.
3    Q.   Whether it was a day or a week?
4    A.   I cannot.
5    Q.   Were you involved at all in the          03:14PM
6    decision to terminate him?
7    A.   I was not.
8    Q.   Do you recall how you learned that
9    he was terminated?
10   A.   I do not.                               03:14PM
11   Q.   Did you -- strike that.
12       Do you know when the first time was
13   that you heard that anyone had lost confidence
14   in Mr. Abdelhak?
15   A.   No.                                     03:14PM
16       MR. UNICE:  Object to form.
17   BY MR. FRIESEN:
18   Q.   Were you aware that, prior to his
19   termination, a group of AHERF doctors had lost
20   confidence in him?                           03:14PM
21   A.   I do not know that.  I do not
22   remember learning that.
23   Q.   And did you ever lose confidence in
24   Mr. Abdelhak prior to his termination?
25   A.   Confidence, no; concern, yes.          03:15PM

Page 166

Dr. Donna M. Murasko

1
2    Q.   And, again, do you know when that
3    concern started, whether it's in time or
4    related to particular events?
5    A.   I can't pinpoint it to anything        03:15PM
6    specific.
7    Q.   And what was your concern?
8    A.   Things were moving too quickly.
9    Q.   In a negative trajectory?
10   A.   No.                                     03:15PM
11   Q.   No?
12   A.   The growth that was occurring in the
13   system was too quick.  I am a fiscal
14   conservative.
15   Q.   And you don't know whether this was    03:16PM
16   in '96 or seven or eight?
17   A.   I can't put it in a time frame.
18   Q.   How about Mr. McConnell; do you
19   remember ever losing confidence in Mr.
20   McConnell prior to his termination?         03:16PM
21       MR. UNICE:  Object to form.
22   A.   I can't remember formulating an
23   opinion at that time.
24   Q.   Do you know why Mr. Abdelhak was
25   terminated?                                 03:16PM

Page 167

Dr. Donna M. Murasko

1
2    A.   I do not.
3    Q.   Prior to the time that you became
4    concerned about Mr. Abdelhak, what was your
5    general impression of him?                  03:17PM
6    A.   He was a man who had a defined
7    direction and had the energy to go in that
8    direction.
9    Q.   Did you consider him someone who was
10   open to other people's ideas?               03:17PM
11   A.   Anyone at the top has very defined
12   opinions.  I personally found him more willing
13   to listen than many people at the top.
14   Q.   Just to be clear, than you had
15   thought of many people at the top or that than 03:17PM
16   other people at the top had thought of him?  I
17   am just trying --
18       MR. KOLANKSY:  I --
19   A.   I don't understand your question.
20   Q.   Well, you said you found him more    03:17PM
21   willing to listen than other people at the
22   top.  And I just don't know if you meant other
23   people at the top thought differently or he
24   was different than other people at the top.
25   A.   Oh, probably neither.                   03:18PM

Page 168

Dr. Donna M. Murasko

1
2    Q.   Okay.
3    A.   It's people in a position of his
4    authority generally do not -- are not willing
5    to listen to people in the middle at all.  I  03:18PM
6    found him one who would listen.  So not just
7    in Allegheny, but generally people in power.
8    Q.   Now, by "in the middle," what do you
9    refer to?
10   A.   A department head.                     03:18PM
11   Q.   Because you are a Trustee, as well,
12   that's can what I am trying to get at.
13   A.   Key --
14   Q.   In your role as a Trustee, did you
15   consider him someone who was willing to listen 03:18PM
16   to Trustees?
17   A.   My -- you asked for my opinion in
18   general, and I have to do it based on my
19   personal interaction with him.
20       And, as I said before, it was a --     03:18PM
21   it was not just a Trustee; I was a faculty
22   member and a department head.  So I cannot
23   tell you whether or not my interaction with
24   him is universal with everybody.
25       I can't tell you specifically how he    03:19PM

42 (Pages 165 to 168)

Page 169

Dr. Donna M. Murasko

1    interacted with me, where he was willing to
2    listen to alternate points of view.
3        Q.   Well, when you were at these Board
4    meetings with other Trustees, and when you      03:19PM
5    wrote notes about this Trustee saying this and
6    that one shaking his head, et cetera, et
7    cetera, did you have a sense at those meetings
8    that Mr. Abdelhak was open to the suggestions
9    of other Trustees?                    03:19PM
10        A.   Yes.  He was listening to people and
11    seemed receptive.
12        MR. FRIESEN:  Let me mark
13    Exhibit 2528.
14        (Document marked for
15    identification as Exhibit 2528.)
16        MR. FRIESEN:  This is a
17    documents Bates numbered PR-PLD-066-00492
18    through 497.  And it says, "1995
19    Trustee's Evaluation."  It says,          03:20PM
20    "Murasko," at the top.  Then there is
21    some handwriting throughout and X's.
22    BY MR. FRIESEN:
23        Q.   Is this your handwriting in the
24    responses to this?                   03:20PM
25

Page 170

Dr. Donna M. Murasko

1        A.   Well, I have to get to that section.
2        Q.   Okay.
3        A.   Yes, that is my handwriting.
4        Q.   If you go to the page ending in 496.  03:21PM
5    At the bottom, No. 3, it says, "Do you have
6    any specific suggestions as to how your
7    functioning on the Board might be enhanced?"
8    And what did you write there?
9        A.   "It takes a while to become familiar  03:21PM
10    with the other Trustees.  Assigning a mentor
11    to a new Trustee.  Basically give the new
12    Trustee the name of an older, longer Trustee
13    who can be a resource would be helpful."
14        Q.   Do you know whether that suggestion   03:21PM
15    was put into action?
16        A.   To my knowledge, no.
17        Q.   Prior to coming to your deposition
18    here today, did you meet with or talk to
19    anyone from Jones, Day, which is Mr. Unice's  03:22PM
20    law firm?
21        A.   No, I did not.
22        MR. FRIESEN:  Those are all the
23    questions that I have at the moment.  And
24    I might have a few more once Mr. Unice is  03:22PM
25

Page 171

Dr. Donna M. Murasko

1    done with you.  But I want to thank you
2    very much for coming in.
3        VIDEO SPECIALIST:  We are now
4    going off the video.  The time, 3:22 and  03:22PM
5    38 seconds.
6        (Short recess.)
7        VIDEO SPECIALIST:  Back on.
8    The time, 3:27.
9    BY MR. UNICE:
10        Q.   Good afternoon, Dr. Murasko.  At
11    long last, my name is John Unice.  We met
12    earlier this morning.
13        I am here on behalf of the plaintiff
14    in this case, and I have some questions for   03:27PM
15    you about some of the matters you have already
16    discussed today.
17        Before I begin with my questions, I
18    want to make it clear, so you and I can talk
19    better with one other, that if you have a   03:28PM
20    question or concern about one of my questions,
21    that you ask me to rephrase it or repeat it,
22    and I will do that for you.  Okay?
23        A.   (Witness shakes head.)
24        Q.   All right?                     03:28PM
25

Page 172

Dr. Donna M. Murasko

1        A.   Fine.
2        Q.   Another big rule -- and you have
3    done a great job of this so far -- is to
4    answer verbally to my questions so that the   03:28PM
5    court reporter can transcribe your responses.
6    All right?
7        A.   Yes.
8        Q.   If at any time today you need to
9    take a break to talk to your attorney, let me  03:28PM
10    know, and we will do that.  All right?
11        A.   Yes.
12        Q.   And another one we are going to work
13    on together is to not speak over one another.
14    Do your best to wait until I finish my       03:28PM
15    questions, and I will do my best to let you
16    finish your response before my next question
17    comes out.  All right?
18        A.   Fine.
19        Q.   Earlier this morning you were asked  03:28PM
20    what your role was, or what you saw your role
21    to be, as a Trustee at AHERF.
22        And I believe you said that it was
23    to oversee and to assist management in the
24    oversight operations of the system.          03:29PM
25

43 (Pages 169 to 172)

TAB 185

000003

### MEETING OF THE BOARD OF DIRECTORS
### MEDICAL COLLEGE OF PENNSYLVANIA
### Philadelphia, Pennsylvania

A meeting of the Board of Directors of the Medical College of Pennsylvania was held on Wednesday, September 30, 1992 at 12:00 Noon in the Board Room at the College.  The following individuals were present:

| Members Present | Appointed Officers and Invited Guests | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Irene M. Cumming | Martin Beitler |
| Barbara F. Atkinson,M.D. | Leonard L. Ross, Ph.D. | Anthony M. Cook |
| Lee A. Barber, M.D. | Nancy A. Wynstra, Esq. | Douglas D. Danforth |
| Jules Blake, Ph.D. | | Ronald R. Davenport |
| Phyllis P. Bober, Ph.D. | | Charles M. Furr, M.D. |
| Sylvia M. Brasler | | Lillian Pardo, M.D. |
| William J. Brecht | | Ira J. Gumberg |
| Lorraine H. Brown, Ph.D. | | Caryl M. Kline |
| Pauline M. Chambers | | Marvin Lundy |
| Maurice C. Clifford, M.D. | | Elizabeth Pryor |
| Betsy Z. Cohen | | Barbara A. Schlager,M.D. |
| D. Walter Cohen, D.D.S. | | |
| Franklin E. Congdon, Jr. | | |
| Leonard T. Ebert | | |
| Harry R. Edelman, III | | |
| Claire W. Gargalli | | |
| Joseph H. Gillies | | |
| Richard G. Gilmore | | |
| Richard W. Goodby | | |
| Leonard S. Jacob, M.D. | | |
| Martha P. Jordan | | |
| Donald Kaye, M.D. | | |
| Walter E. Kemmerer | | |
| Julian Marsh, M.D. | | |
| David W. McConnell | | |
| Donald J. McGraw, M.D. | | |
| Susan V. McLeer, M.D. | | |
| Leslie Anne Miller | | |
| Donna Murasko, Ph.D. | | |
| Paul D. Neuwirth | | |
| William P. Snyder, III | | |
| Eric Vogel | | |
| Victoria Wilson | | |
| Margaret Gray Wood,MD | | |

PR-BO-063-02710

000004

MCP Board of Directors
September 30, 1992
Page 2

I.    **Opening of Meeting**

The meeting was called to order by Chairman H.R. Edelman, III who declared that a quorum was present and the meeting was competent to proceed. Nancy A. Wynstra maintained the minutes of the meeting.

II.    **Additions to the Agenda**

There were no additions to the agenda.

III.    **Current Issues**

A.    **Approval of Minutes**

The Minutes from the meeting held on June 17, 1992 were approved as presented.

B.    **Discussion and Actions re: Loss of $11 Million State Appropriation**

Mr. Edelman requested a re-ordering of the information to be presented under this agenda item, so that all aspects of the issue could be presented and thoroughly discussed before any matters were presented for action.

1.    **Presentation of actions and circumstances leading to management's decision.**

Dr. Cohen presented to the Board a review of the period from July 1, 1992 through August 1, 1992, when MCP learned that it had received no money in the state budget and considered how to meet the crisis which resulted. He noted that this was a very painful period but that it was necessary to take decisive action to reduce expenses and offset the loss of the $11 million in State appropriations so that MCP would be able to meet its obligations.

Dr. Cohen said that, before he requested the Board's ratification of those actions, he wanted the Board to be aware that certain members of the Faculty had expressed their concern about the actions taken and, for the reasons listed below, would like the Board to rescind or modify certain actions taken.

A.    Dr. Cohen said that the Faculty members who seek these actions believe that the two affected tenured Faculty should be reappointed because:

1.    MCP did not declare a state of financial exigency as they believe is required by the Faculty Bylaws.

000005

MCP Board of Directors
September 30, 1992
Page 3

    2.    MCP management did not consult with the Faculty before terminating
    tenured Faculty as required by the Faculty Bylaws.


    B.    More recently, those Faculty members have also claimed that MCP
management did not give the non-tenured Faculty the usual twelve months' notice and
have requested that such notice be provided as they believe to be required by the Faculty
Bylaws.

    Dr. Cohen noted that a copy of the relevant sections of the Faculty Bylaws had
been provided to the Board so they could confirm that the requirements of the Bylaws
were met. Specifically, he noted that:

    a)    The Bylaws require that a state of financial exigency exist before tenured
          faculty can be terminated. Nowhere is there a requirement that such a state
          be declared. In fact, a state of financial exigency did exist, given the relative
          size of the loss of funding, which is equal to 11 percent of the total college
          budget, and 29 percent of the funds available to the Dean for support of the
          Departments of the College. This has been confirmed by the Resource
          Management Committee of MCP.

    b)    MCP consulted with the Faculty through the various department chairmen
          and satisfied itself that the following solution constraints and criteria were
          valid and in the best interest of the College.

Dr. Cohen noted that the cost reduction steps taken were based on certain constraints and
criteria. Specifically,

    a)    The reductions made could not adversely affect the educational programs.
    b)    The reductions made could not further reduce the revenue of the College.
    c)    The reductions made could not jeopardize the accreditation of the schools.

    Cost reductions had to be implemented in the following order:

    a)    Non-personnel costs
    b)    Non-Faculty personnel
    c)    Non-tenured Faculty
    d)    Tenured Faculty

    Dr. Cohen noted that it is clear that those members of the Faculty who are
objecting to the actions taken believe that a much broader consultative process was
necessary. In that regard, he said, the individuals making the decisions must be
responsible for determining who to consult with, about what, and when. And, in making
that determination, he noted that the interest in consulting was balanced with the
necessity of maintaining confidentiality for the sake of the individuals affected and to avoid
creating a state of panic in the institution that would be counterproductive.

000006

MCP Board of Directors
September 30, 1992
Page 4

As to the notice requirement, Dr. Cohen stated that the Faculty Bylaws require "reasonable" notice and do not specify any specific period. While under normal circumstances we have given non-tenured Faculty a 12-month notice, these circumstances were anything but normal, and we gave what we believe is reasonable notice that ranged from 3-12 months, depending upon Faculty status and rank.

Dr. Cohen advised the Board that the College's legal counsel has verified management's adherence to the Bylaws.

Dr. Cohen assured the Board on behalf of Dean Ross, and all the Department Chairs of the College, that every action taken was in good faith with only one thing in mind--to save MCP. He requested that the Board consider all of the subsequent discussions with this in mind, and that the Board ratify all management action taken and thereby stand behind the people who undertook this most painful task on behalf of MCP.

2.    Revised budget resulting from management's decisions and actions.

Mr. Neuwirth presented the revised Medical College of Pennsylvania 1993 budget to the Board. He advised the Board that the revised budget reflects the adjustments necessary to respond to the loss of funding from the State of Pennsylvania. The revised budget anticipates a net excess of expenses over revenues of $3.114 million, which is the amount approved by the Board in June 1992 when it approved the original 1993 budget. The adjustments include a tuition increase, elimination of all salary increases and a 7% reduction in all college administrative and academic department budgets, and a $2.5 million reduction in support service expenses.

3.    Report from Resource Management Committee

Mr. Neuwirth then provided the report from the Resource Management Committee recommending that the Board concur in the decision of the Resource Management Committee that a clear state of financial exigency existed as of July 1, 1992 because of the State's failure to appropriate funds to MCP and further recommending that the Board approve the actions taken by management as a result of the state actions. He noted that the Committee had discussed extensively the financial and other issues raised by the failure to appropriate funds and concurred that the actions taken were necessary and appropriate under the circumstances. A lengthy discussion followed. During the discussion of the issues of financial exigency and the steps taken to deal with the financial emergency, there were inquiries about the cost of the adjustment applicable to tenured and non-tenured faculty. Mr. Abdelhak expressed his concern about the confidentiality of the individuals involved if this number were disclosed. It was noted during the discussion that what faced the College was a basic question of the ability to continue the various departments as functional entities and it was for this reason that it was necessary to take such a drastic step as termination of tenured or non-tenured faculty.

000007

MCP Board of Directors
September 30, 1992
Page 5

### 4.    Report from the Academic Affairs Committee

Leslie Miller then reported on the Academic Affairs Committee decision to appoint a Special Committee to consider various issues relative to tenure. She noted that the impetus for this Committee was the result of the difficult decision to terminate tenured faculty and the fact that the need to take this action in this instance has clarified the need for establishing clear standards and a process for the dismissal of tenured faculty. She noted that the focus of the Committee will be to consider the requirements for tenure and to consider the process for dismissal of tenured faculty. She noted that the intention in appointing the Committee is not to weaken but to strengthen the tenure system. Mr. Abdelhak noted management's understanding that there is a need to signal to the faculty the organization's strong commitment to the tenure process as well as the organization's commitment to the faculty. There was discussion of issues about tenure and the role of the Committee.

### 5.    Petition from Faculty Meeting

Dr. Ross then presented the petition which was passed at the faculty meeting held on September 21, 1992. He noted that the resolution, which calls for the Board of Directors to rescind the actions of administration with respect to the faculty and which calls upon the Special Committee of the Academic Affairs Committee to consult with the Executive Faculty prior to making its recommendations, was passed by a vote of 87 to 63, with 9 abstentions.

### 6.    Communication From Departmental Chairs

Dr. Ross also presented a communication dated September 25, 1992 in which the Chairmen of the Academic Departments indicate their commitment to the preservation of tenure but note the need they faced during the financial emergency to balance that commitment against their responsibility to maintain MCP as a functioning entity. The Chairman noted that "we acted in good faith and did the best we could for MCP" and committed to strive for better communication and consultation among those concerned in the future.

### 7.    Statement on Behalf of AHERF

Mr. Snyder then made a statement on behalf of AHERF noting that management had agonized over the recommendations it would make to deal with the financial emergency resulting from the state's failure to appropriate funds and urging the MCP Board to act to support management in carrying out its responsibilities during this difficult period.

### 8.    Resource Management Resolutions:  re: Financial Exigency

Mr. Neuwirth then presented the Resource Management Committee's recommendations for consideration:

000008

MCP Board of Directors
September 30, 1992
Page 6

a.    Resolution, re: Financial Exigency

Following lengthy discussion and upon motion duly made and seconded, the Board of Directors of MCP approved the following resolution:

RESOLVED, that the Board of Directors ratify and affirm the administrative actions taken which were necessary to implement the adjustments caused by the financial emergency resulting in financial exigency and which alleviated this financial exigency which arose as a result of the significant reduction of the state appropriated funds for FY 1993, except for those actions relative to tenured faculty which will be handled separately.

Dr. Marsh abstained from voting on this matter.

b.    Resolution, re: Management's Actions and Adoption of Revised Budget

Following further lengthy discussion, and upon motion duly made and seconded, the Board approved the following resolution:

NOW THEREFORE BE IT RESOLVED, that the Board of Directors of the Medical College of Pennsylvania does hereby ratify and affirm the fact that, through the failure of the legislature to appropriate approximately $11 million for the College's fiscal year beginning on July 1, 1992, there was created for the College a financial emergency resulting in financial exigency; and

FURTHER RESOLVED that the Board of Directors of MCP does ratify and affirm the administrative actions taken by its authorized representatives, the College's administration, to make financial, administrative and programmatic changes because of the financial emergency caused by the State Legislature's actions and which did alleviate the financial exigency; and

FURTHER RESOLVED that the Board of Directors of MCP does hereby ratify and affirm the revised budget as recommended by the Resource Management Committee, which incorporates the financial adjustments necessary to alleviate the condition of financial exigency.

9.    Ratification of Action of Academic Affairs Committee

Leslie Miller then requested ratification of the action of the Academic Affairs Committee in appointing a Special Committee Concerning Tenure Policy. During the discussion it was suggested and agreed that the Chairman of the Faculty Bylaws Committee should be added as a member of the Special Committee. Upon motion duly made and seconded, the Board unanimously ratified the appointment of the Special Committee on Tenure Policy.

000009

MCP Board of Directors
September 30, 1992
Page 7

10.  Consideration of Petition From Faculty Meeting

Dean Ross then requested consideration of petition from the faculty.  The
resolutions requested by the faculty were:

>RESOLVED that the faculty of the Medical College of Pennsylvania
>respectfully requests the Board of Directors at its meeting on September 30
>to rescind the actions of the administration with regard to dismissal of non-
>tenured faculty with less than one year's notice and the non-reappointment
>of tenured faculty.

>BE IT FURTHER RESOLVED that the faculty also requests the select
>subcommittee of the Academic Affairs Committee of the Board of Directors
>to consult with the elected faculty representatives to the Executive Faculty
>prior to making its recommendations to the parent committee on
>December 2.

It was moved, seconded and unanimously approved that the two resolutions be
separated for action.  Dr. Marsh spoke from a prepared statement, in support of the first
resolution, indicating that if the Board approved the firing of tenured faculty, serious
consequences would ensue.  He expressed his concern that the Executive Faculty was not
consulted before this decision was made and noted that, although he had had an
opportunity for full discussion with the Chief Executive Officer, he did not agree with the
action taken.  He voiced the opinion that discussions with department chairmen
concerning budget cuts did not constitute consultation with the faculty as required under
the Bylaws.  He stated that if the action terminating the faculty is affirmed this will
undermine tenure at MCP and impair both recruitment and retention.  He also indicated
that he expected that the institution might be censured by the AAUP for failure to follow
the faculty bylaws.  Dr. Marsh stated that he did not agree that overturning the action
would be a vote of no confidence in management because he believes one of the roles of
the Board is to correct management mistakes if they are made, which he believes they
were in this instance.  He said that approval of the faculty resolution rescinding the
termination of tenured faculty would send a message to disaffected faculty, would
undercut claims that legal rights were violated, would begin the healing process between
faculty and management, and would avoid AAUP review.

Dr. Ross noted that throughout the process management had been in close
consultation with both the Human Resources and Legal Departments.  He noted that a
state of final emergency was announced on July 6, 1992 and indicated that, in an
academic medical center, the role of the Chairman is to serve as faculty leadership with a
key role in elaboration and implementation of policies and with full responsibility for
implementation of approved budgets.  He noted that, while termination of both non-
tenured and tenured faculty was extremely difficult, it was done to assure the survival of
MCP and that he did not believe this action should be undermined.  He also noted that

000010

MCP Board of Directors
September 30, 1992
Page 8

MCP was hit harder than any of the other medical schools by the failure of the State to appropriate the funds which were anticipated.

During the discussion which followed, it was noted that the faculty agreed that there was an emergency but felt that management had mis-interpreted the Bylaws and did not follow the spirit of the Bylaws, which has led to a strain between the faculty and the administration. It was also noted by management that the disagreement with the faculty over the interpretation of bylaws is a respectful disagreement and that management does recognize the importance of tenure and the need for clarity about termination of tenured faculty members. Ms. Miller noted that she had personally reviewed the applicable sections of the Faculty Bylaws and the entire situation and that she would vote against the faculty resolution. She said that she would vote against the faculty resolution to show her confidence in management to deal with the state of financial exigency. She also noted that, in her opinion, all requirements of the faculty bylaws were met. She noted that there clearly was and has been a state of financial exigency and that the minimum requirements of collaboration and discussion were met, although she noted that there may have been less than perfect communication between faculty and management. She noted that the decision was made in compliance with the Bylaws after consultation and that the decision, although very difficult, was justified by the financial crisis. She suggested that we should reflect on the need for a different process in the future but noted that to support the faculty resolution would further divide the organization when it needs to be united. She expressed her support for the actions taken by management and made a plea to the faculty to channel their energies into the work of the special committee on tenure.

Following discussion, it was moved and seconded that the Board accept the request of the faculty to rescind the actions of the administration with regard to the non-reappointment of tenured faculty. The motion was defeated with Dr. Murasko and Mr. Vogel abstaining.

On the second resolution, the Board agreed to take no action on the request of the faculty that the Subcommittee on Tenure of the Academic Affairs Committee consult with the elected faculty members prior to making its recommendations, because the Chairman of the Special Committee, Ms. Miller, committed to engage in such consultation.

11.    <u>Resolution, re: Non-reappointment of Tenured Faculty</u>

Mr. Abdelhak then moved that the action of the administration concerning the non-reappointment of tenured faculty be ratified and noted administration's pledge to the faculty to create and sustain a stable environment in which management and the faculty can work together in harmony. The motion was seconded and substantial discussion followed during which some members of the faculty suggested that the Board's adoption of this motion would have severe and negative consequences on the relationship with the faculty. Following the discussion and upon motion duly made and seconded, the motion

000011

**MCP Board of Directors**
**September 30, 1992**
**Page 9**

was passed with four abstentions, Mr. Neuwirth, Ms. Bober, Dr. Murasko and Mr. Congdon.


IV.   **Reports from MCP Committees**

A.   **Resource Management Committee**

Mr. Neuwirth presented the additional items recommended by the Resource Management Committee. He reported the results of operations and the unaudited financial statements for the fiscal year ended June 30, 1992. He noted that the Committee recommended the following actions:

1.   Approval of Results of Operations and Unaudited Financial Statements for FY Ended June 30, 1993.

Following discussion and upon motion duly made and seconded, the Board approved the following resolution:

> RESOLVED, that the Board of Directors of The Medical College of Pennsylvania accepts the year-end financial statements for the period ended June 30, 1992, contingent upon there being no material changes in the financial statements based upon the report of Coopers & Lybrand and acceptance by the AHERF Audit Committee.

2.   Approval of Lines of Credit

As a result of the Plan of Division of MCP creating Medical College Hospitals, existing lines of credit agreements with Philadelphia National Bank and Pittsburgh National Bank required modification for the banks to maintain the same credit and security that was in place prior to the Plan of Division. Upon motion duly made and seconded, the Board of Directors approved the following resolution:

**RESOLVED:**

1.   That the President, Vice-President, Treasurer, Assistant Treasurer, Secretary and Assistant Secretary of this Corporation, or any one or more of them, are hereby authorized in the name and on behalf of this Corporation from time to time (1) to borrow money and to obtain credit from The Philadelphia National Bank and to sell to or discount with said Bank any evidences of indebtedness and choses in action owned by this Corporation, on such terms as may be required by said Bank; (2) to authorize and cause the issuance of letters of credit and the purchase or sale of exchange for future delivery by said Bank for the account of this Corporation, on such terms as may be required by said Bank; (3) to give said Bank one or more mortgage or other liens on any

000012

MCP Board of Directors
September 30, 1992
Page 10

real property of this Corporation to secure the payment and performance of this Corporation's obligations and liabilities of any nature to said Bank; and (4) in connection with the foregoing, to execute and deliver any instruments

and/or agreements required by said Bank, including those authorizing confession of judgment.

2.    That the Secretary is hereby directed to file with said Bank a certified copy of this Resolution and a list of the persons, together with specimens of their signatures, who are the present holders of the said offices, and that said Bank shall be entitled as against this corporation to presume conclusively that the persons so certified as holding such offices continue respectively to hold the same until otherwise notified in writing by the Secretary.

3.    That this Resolution, insofar as said Bank is concerned, shall continue in full force and effect until receipt by said Bank of written notice from the Secretary of the changes, if any, therein.

RESOLVED:

1.    That the President, Vice-President, Treasurer, Assistant Treasurer, Secretary and Assistant Secretary of this Corporation, or any one or more of them, are hereby authorized in the name and on behalf of this Corporation from time to time (1) to borrow money and to obtain credit from The Pittsburgh National Bank and to sell to or discount with said Bank any evidences of indebtedness and choses in action owned by this Corporation, on such terms as may be required by said Bank:  (2) to authorize and cause the issuance of letters of credit and the purchase or sale of exchange for future delivery by said Bank for the account of this Corporation, on such terms as may be required by said Bank; (3) to give said Bank one or more mortgage or other liens on any real property of this Corporation or one or more liens on or security interess in any personal property of this Corporation to secure the payment and performance of this Corporation's obligations and liabilities of any nature to said Bank; and (4) in connection with the foregoing, to execute and deliver any instruments and/or agreements required by said Bank, including those authorizing confession of judgment.

2.    That the Secretary is hereby directed to file with said Bank a certified copy of this Resolution and a list of the persons, together with specimens of their signatures, who are the present holders of the said offices, and that said Bank shall be entitled as against this Corporation to presume conclusively that the persons so certified as holding such offices continue respectively to hold the same until otherwise notified in writing by the Secretary.

000013

MCP Board of Directors
September 30, 1992
Page 11

3.  That this Resolution, insofar as said Bank is concerned, shall continue in full
force and effect until receipt by said Bank of written notice from the
Secretary of the changes, if any, therein.

Mr. Neuwirth noted that the Report on Investments and the Information Systems
Report were included in the agenda for information and that he would be happy to answer
questions on either report.

B.    **Academic Affairs Committee**

Leslie Miller presented the Academic Affairs Committee's recommendations with
respect to tenure appointments. Following discussion, and upon motion duly made and
seconded, the Board approved the following resolution:

RESOLVED, that the Board of Directors of The Medical College of Pennsylvania,
acting on the recommendation of the Academic Affairs Committee, approves tenure
for the candidates listed below:

Bonita Falkner, M.D., Professor of Pediatrics
Anne Barnes, M.D., Professor of Anatomy and Neurology (Tenure of Title)

Ms. Miller then presented the Academic Affairs Committee's recommendations
concerning faculty changes. Following discussion, and upon motion duly made and
seconded, the Board approved the following resolution:

RESOLVED, that the Board of Directors of The Medical College of Pennsylvania,
acting on the recommendation of the Academic Affairs Committee, approves, the
following Faculty Changes:

**Emeritus:**

Doris Gallagher, M.D., from Associate Professor of Anesthesiology to Professor Emerita of
Anesthesiology, effective 07/01/92 (MC)

**Promotions:**

Linda J. Norderman, M.D., from Instructor in Emergency Medicine to Assistant Professor
of Emergency Medicine, effective 05/01/92 (AC)
Rebecca A. Seip, M.D., from Instructor in Emergency Medicine to Assistant Professor of
Emergency Medicine, effective 06/01/92 (AC)
Joan A. Lit, M.D., from Instructor in Medicine to Assistant Professor of Medicine, effective
07/01/92, MC
Sonia E. Hulman, M.D., from Assistant Professor of Pediatrics to Associate Professor of
Pediatrics, effective 07/01/92 (MC)

000014

MCP Board of Directors
September 30, 1992
Page 12

Charles D. Puglia, Ph.D., from Associate Professor of Pharmacology to Professor of Pharmarcology, effective 07/01/92 (MC)
H. Jordan Gerber, M.D., from Assistant Professor of Psychiatry to Associate Professor of Psychiatry, effective 07/01/92 (AC)
Eileen F. McGarvey, M.D., from Instructor in Radiologic Sciences to Assistant Professor of Radiologic Sciences, effective 07/01/92 (MC)
Seth Zwillenberg, M.D., from Clinical Assistant Professor of Surgery (Otolaryngology) to Clinical Associate Professor of Surgery (Otolaryngology), effective 06/01/92 (MC)

Appointments:

Jeffrey S. Deitch, Ph.D., Visiting Assistant Professor of Anatomy and Neurobiology, effective 07/01/92 (MC)
Yasunobu Itoh, M.D., Visiting Assistant Professor of Anatomy and Neurobiology, effective 07/01/92 (MC)
Denise R. Ferrier, Ph.D., Assistant Professor of Biochemistry, effective 07/01/92 (MC)
Bonnie B. O'Connor, Ph.D., Assistant Professor of Community and Preventive Medicine, effective 07/01/92 (MC)
Carol A. Hart, M.D., Instructor in Emergency Medicine, effective 07/01/92 (MC)
Loice A. Swisher, M.D., Instructor in Emergency Medicine, effective 07/01/92 (MC)
Patricia L. VanDevander, M.D., Instructor in Emergency Medicine, effective 07/01/92 (MC)
Steven L. Atlas, D.M.D., Clinical Instructor of Medicine (Dental Medicine), effective
Cheryl A. Collier-Brown, M.D., Clinical Instructor in Medicine, effective 07/01/92 (MC)
07/01/92, MC
Nadia Laniado, D.D.S., Clinical Instructor in Medicine (Dental Medicine), effective 05/06/92 (MC)
Christopher J. Larmour, D.M.D., Clinical Instructor in Medicine (Dental Medicine), effective 07/01/92 (MC)
Ronald S. Luber, D.O., Clinical Instructor in Medicine (Family Practice), effective 03/17/92 (MC)
Alan J. Miller, D.O., Clinical Instructor in Medicine (Family Practice), effective 07/01/92 (MC)
Susan P. Dias, M.D., Instructor in Medicine, effective 07/01/92 (MC)
Pamela B. French, M.D., Instructor in Medicine, effective 07/01/92 (MC)
John A. Getsy, D.O., Instructor of Medicine, effective 07/01/92, MC
David S. Kleinman, M.D., Instructor in Medicine, effective 07/01/92 (MC)
David S. Krause, M.D., Clinical Assistant Professor of Medicine, effective 08/01/92, MC
Elana N. Kripke, M.D., Clinical Instructor of Medicine, effective 07/01/92, MC
Larry L. Levin, M.D., Instructor in Medicine, effective 07/01/92 (MC)
Barbara J. Mroz, M.D., Instructor in Medicine, effective 07/01/92 (MC)
Sallie G. Stadlen, M.D., Assistant Professor of Medicine, effective 07/06/92, MC
George H. Steele, Jr., M.D., Assistant Professor of Medicine, effective 08/03/92, MC
Cyriac T. Thachet, M.D., Instructor in Medicine, effective 07/01/92 (MC)
Janin Rackowitz, M.D., Instructor in Medicine, effective 07/01/92 (MC)
Allison J. Batchelor, M.D., Clinical Assistant Professor of Medicine, effective 07/01/92 (MC)

000015

MCP Board of Directors
September 30, 1992
Page 13

Bethala (B.B.) Franklin, M.D., Clinical Assistant Professor of Medicine, effective 03/01/92 (MC)
Peter B. Frechie, D.O., Clinical Assistant Professor of Medicine, effective 06/01/92 (MC)
Joseph G. Lewis, M.D., Clinical Assistant Professor of Medicine, effective 07/01/92 (MC)
Usha S. Marfatia, M.D., Clinical Assistant Professor of Medicine, effective 07/01/92 (MC)
Michael J. Martinelli, M.D., Clinical Assistant Professor of Medicine, effective 07/01/92 (MC)
Varun Saxena, M.D., Clinical Assistant Professor of Medicine, effective 07/01/92 (MC)
Jeffrey H. Perlson, D.O., Clinical Assistant Professor of Medicine (Family Practice), effective 10/09/91 (MC)
Steven D. Feiner, D.O., Clinical Assistant Professor of Medicine, effective 07/01/92 (AC)
Lawrence M. Sigman, M.D., Clinical Assistant Professor of Medicine, effective 05/01/92 (MC)
Robert F. Boynton, M.D., Assistant Professor of Medicine, effective 07/01/92 (MC)
Barbara Carpenter, M.D., Assistant Professor of Medicine, effective 07/01/92 (AC)
John G. Ivanoff, M.D., Assistant Professor of Medicine, effective 07/01/92 (MC)
John T. Cinicola, M.D., Assistant Professor of Medicine, effective 07/01/92 (AC)
Ashok Chaddah, M.D., Assistant Professor of Medicine, effective 07/01/92 (AC)
Ruth M. Preisner, M.D., Assistant Professor of Medicine, effective 07/01/92 (AC)
Kumudini S. DeSilva, M.D., Assistant Professor of Medicine (Family Practice), effective 07/01/92 (AC)
Rosalind D. Kaplan, M.D., Assistant Professor of Medicine, effective 07/01/92 (MC)
Herbert A. Fischer, M.D., Associate Professor of Medicine, effective 05/01/92 (MC)
John H. Wertheimer, M.D., Clinical Associate Professor of Medicine, effective 07/01/92, MC
Thomas H. Swanson, M.D., Assistant Professor of Neurology, effective 07/13/92, MC
Gerald E. Beck, M.D., Clinical Instructor in Obstetrics and Gynecology, effective 05/01/92 (MC)
David W. Doupe, M.D., Clinical Assistant Professor of Obstetrics and Gynecology, effective 05/01/92 (MC)
Oluremi C. Adesida, M.D., Clinical Instructor of Pediatrics, effective 07/01/92, MC
Khudsiya S. Khan, M.D., Clinical Instructor in Pediatrics, effective 05/01/92 (MC)
David L. Snyder, Ph.D., Instructor in Pharmacology, effective 07/01/92 (MC)
Russell M. Farr, M.D., Assistant Professor of Psychiatry, effective 07/01/92, (AC)
Eric P. Fishman, Ph.D., Instructor in Psychiatry (Psychology), effective 04/06/92 (AC)
Linda J. Miller, Ph.D., Instructor in Psychiatry, effective 04/24/92 (AC)
Wendy Erslev, M.S.S., Clinical Assistant Instructor in Psychiatry (Social Services), effective 03/02/92 (MC)
Jack J. Blanchard, Ph.D., Assistant Professor of Psychiatry (Psychology), effective 07/01/92 (MC)
J. Faye Dixon, Ph.D., Assistant Professor of Psychiatry, effective 03/02/92 (MC)
Frank W. Kohler, Ph.D., Assistant Professor of Psychiatry, effective 04/24/92 (AC)
Kristin L. Crisci, M.D., Clinical Assistant Professor of Radiologic Sciences, effective 07/01/92, MC
Nicholas Flores, M.D., Instructor of Radiologic Sciences, effective 07/01/92, (AC)
Arnold C. Friedman, M.D., Professor of Radiologic Sciences, effective 08/17/92, MC—

000016

MCP Board of Directors
September 30, 1992
Page 14

Judith K. Weinstein, M.D., Assistant Professor of Radiologic Sciences, effective 07/01/92, MC

Alan Turtz, M.D., Instructor in Surgery, effective 07/01/92 (MC)

Anna Tyutyunikov, M.D., Ph.D., Research Assistant Professor of Surgery (Ophthalmology), effective 07/01/92 (AC)

Joint appointments:

Charles M. Koliner, M.D., Assistant Professor of Anesthesiology, effective 03/01/92 (AC)

Peter Kaplan, M.D., Associate Professor of Anesthesiology, effective 03/01/92 (AC)

Kathryn E. Vanderhei, M.D., Clinical Assistant Professor of Medicine, effective 05/01/92 (MC)

Bonita Falkner, M.D., Professor of Medicine, effective 07/01/92, MC

Judith L. Ross, M.D., Professor of Medicine, effective 07/01/92, MC

Benjamin F. Hammond, D.D.S., Ph.D., Professor of Microbiology and Immunology, effective 07/01/92 (MC)

Robert C. Rose, D.M.D., Assistant Professor of Surgery (Dental Medicine), effective 05/01/92 (MC)

Richard T. Cook, Jr., M.D., Assistant Professor of Emergency Medicine and Assistant Professor of Pediatrics, effective 07/01/92, MC

Brent R. King, M.D., Assistant Professor of Emergency Medicine and Assistant Professor of Pediatrics, effective 07/01/92, MC

John M. Loiselle, M.D., Assistant Professor of Emergency Medicine and Assistant Professor of Pediatrics, effective 07/01/92, MC

Richard J. Scarfone, M.D., Adjunct Assistant Professor of Emergency Medicine and Adjunct Assistant Professor of Pediatrics, effective 07/01/92, MC

Change of title:

Sharon F. Levy, M.D., from Assistant Professor of Medicine to Clinical Assistant Professor of Medicine, effective 05/01/92 (MC)

S. Bruce Greenberg, M.D., from Assistant Professor of Radiologic Sciences to Clinical Assistant Professor of Radiologic Sciences, effective 07/01/92, MC

Ms. Miller then presented the Academic Affairs Committee's recommendations concerning the appointment and reappointment of Academic Chairmen for the Academic Year 1992-1993. Upon motion duly made and seconded, the Board approved the following resolution:

000017

RESOLVED, that the Board of Directors of The Medical College of Pennsylvania, upon the recommendation of the Academic Affairs Committee approves the following academic Department Chairmen for appointment and reappointment for the academic year 1992-1993:

| | |
|---|---|
| Donald S. Faber, Ph.D. | Anatomy and Neurobiology |
| Alan Schwartz, M.D. | Anesthesiology |
| Michael C. Phillips, Ph.D. | Biochemistry |
| Eddy A. Bresnitz, M.D. (Acting) | Community and Preventive Medicine |
| David K. Wagner, M.D. | Emergency Medicine |
| Donald Kaye, M.D. | Medicine |
| Donna M. Murasko, Ph.D. (Acting) | Microbiology and Immunology |
| Rosalie Burns, M.D. | Obstetrics and Gynecology |
| Barbara F. Atkinson, M.D. | Pathology and Laboratory Medicine |
| Terrence L. Stull, M.D. (Acting) | Pediatrics |
| Jay Roberts, Ph.D. | Pharmacology |
| John M. Russell, Ph.D. | Physiology |
| Wagner H. Bridger, M.D. | Psychiatry |
| Mindy Horrow, M.D. (Acting) | Radiologic Sciences |
| Joel Roslyn, M.D. | Surgery |

C.    **Honorary Degrees Committee**

**Status Report**

Dr. Cohen recommended that an invitation to accept an Honorary Degree at the special convocation be extended to Lillian Paula Seitsive, M.D. Dr. Seitsive was in the first medical class to be educated on Henry Avenue. She is still in full-time practice of Family Medicine at age 86 and has an illustrious career. She has been one of our greatest supporters from a spiritual and a financial standpoint throughout the years. He also noted that approval had previously been given to grant Honorary Degrees to Louis W. Sullivan, M.D., Secretary, U.D. Department of Health and Human Services and Samuel O. Thier, M.D., President, Brandeis University at the special convocation. Following discussion and upon motion duly made and seconded, the Board of Directors approved the following resolution:

RESOLVED, that the Board of Directors authorize the President to invite Lillian Paula Seitsive, M.D., to accept an Honorary Degree to be conferred upon her by the Medical College of Pennsylvania at the Special Convocation.

000018

MCP Board of Directors
September 30, 1992
Page 16

V.     **Other Items**

    Mr. Edelman reported on the results of the balloting for the Nominating Committee. The following individuals are recommended to serve as members of the Nominating Committee for the coming year:

    **Maurice C. Clifford, M.D.**
    **Phyllis P. Bober, Ph.D.**
    **William J. Brecht**
    **Joseph H. Gillies**
    **Paul D. Neuwirth**

    Following discussion, and upon motion duly made and seconded, the Board approved designation of the indicated individuals as members of the Nominating Committee.

VI.    **Fund Development**

    Dr. Cohen highlighted the Fund Development Report.

VII.   **Management Report**

    Dr. Cohen and Dr. Ross presented a brief overview of the Management Report.

There being no further business, the meeting was adjourned at approximately 2:15 P.M. The next Board of Directors meeting is scheduled for Wednesday, December 16, 1992.

                                        _____
                                        Nancy A. Wynstra
                                        Secretary


NAW:bb:mcpbd

TAB 186

000002

**Annual Meeting of the Board of Trustees**
**Allegheny University of the Health Sciences**
**Philadelphia, Pennsylvania**

The annual meeting of the Board of Trustees of Allegheny University of the Health Sciences was held on Wednesday, December 4, 1996, at 10:00 A.M. in the Board Room of Allegheny University Hospitals, MCP. he meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting.

The following individuals were present:

| MEMBERS PRESENT | MEMBERS PRESENT | MEMBERS ABSENT |
|---|---|---|
| **Voting Trustees** | **Ex-Officio Trustees** | Barbara Atkinson, M.D |
| | | Jules Blake, Ph.D. |
| Sherif S. Abdelhak | Susan Brozena, M.D. | Calvin Bland. |
| E. Trent Andrews, M.D. | Yale Popowich | Betsy Z. Cohen, Esq. |
| Phyllis P. Bober, Ph.D. | | Douglas D. Danforth |
| William J. Brecht | **EMERITUS TRUSTEES** | Ronald R. Davenport |
| Dorothy McKenna Brown, Ed.D. | | Leonard T. Ebert |
| Stuart Caine | Richard W. Goodby | Claire W. Gargalli |
| Constance E. Clayton, Ed.D. | | Richard H. Glanton, Esq. |
| Maurice C. Clifford, M.D. | **OTHER INVITEES** | Willard P. Green, Ph.D. |
| Anthony M. Cook | | Christie Huddleston, M.D. |
| Gloria Donnelly, Ph.D., R.N. | D. Walter Cohen, D.D.S. | Joseph C. Maroon, M.D. |
| Harry R. Edelman, III | Lynn R. Isaacs | Alfred W. Martinelli |
| Risa Granick, Ed.D. | Dwight Kasperbauer | Dennis McWeeney |
| Leonard S. Jacob, M.D., Ph.D. | Charles P. Morrison | Donna M. Murasko, Ph.D. |
| Claude R. Joyner, M.D. | Jean Rocks | Joseph Neubauer |
| H. Lawrence Karasic, M.D. | Nancy A. Wynstra, Esq. | Susanne Palmer |
| Donald Kaye, M.D. | | Robert M. Potamkin, Esq. |
| Sandra Levison, M.D. | | Annette Marie Rizzo, Esq. |
| Paul D. Neuwirth | | Anthony M. Sanzo |
| Robert B. Palmer | | Manuel Stamatakis |
| Leonard L. Ross, Ph.D. | | William E. Welton |
| W. P. Snyder III, Chair | | |
| Leon C. Sunstein, Jr. | | |
| Margaret Gray Wood, M.D. | | |

000003

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 2

I.    OPENING OF THE MEETING

The meeting was called to order at 10:00 a.m. by W.P. Snyder, III, Chair, who declared that a quorum was present and the meeting was competent to proceed. Nancy A. Wynstra maintained the minutes of the meeting.

Mr. Snyder introduced and welcomed new members of the Board: Constance E. Clayton, Ed.D., Faculty Representative from the School of Public Health; Risa Granick, Ed.D., Faculty Representative from the School of Health Professions; Sandra Levison, M.D., Faculty Representative from the School of Medicine and Susanne Palmer, Faculty Representative from the School of Nursing.

II.   EDUCATIONAL PRESENTATION

Ms. Wynstra presented information on the Code of Ethics Education Program established at AHERF. This program has been developed for all AHERF employees and will become a part of employee orientation programs at all campuses. Ms. Wynstra noted that the Code has multiple purposes, including to reaffirm the commitment of AHERF to integrity and ethical conduct as a fundamental basis for functioning; to convey to the community AHERF's basic values and commitment to ethical conduct; and to provide a foundation for the conduct of any individual who acts on behalf of the institution.

III.  ADDITIONS TO THE AGENDA

There was one addition to the agenda. Dr. McKenna Brown announced that a resolution regarding Authorization to Confer an Honorary Degree would be presented by Dr. Ross under the Report from the Academic Affairs Committee.

IV.   GOVERNANCE ISSUES

A.    Minutes from the Meeting held on June 20, 1996

Mr. Snyder presented for consideration the Minutes of the meeting of the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University held on June 20, 1996. Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences hereby approves the Minutes from the meeting held on June 20, 1996, as presented.

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 3

### B.    Delaware Valley Board Retreat

Mr. Edelman reported that a Delaware Valley Board Retreat was being planned for March 20, 1997. The topic will be "Emphasis on Quality as a Competitive Edge". The meeting format will include a presentation by Mr. James Orlikoff, a nationally known speaker and author, followed by panel discussions addressing quality issues related to research, education, ambulatory and in-hospital care.

## V.    REPORT FROM THE ACADEMIC AFFAIRS COMMITTEE

Dr. McKenna Brown presented the Report of the Academic Affairs Committee meetings held on September 24 and November 15, 1996 and introduced the items set forth below which were advanced to the Board for consideration.  Dr. McKenna Brown reported that there was one addition to the report: a proposed resolution regarding the awarding of an Honorary Degree at Commencement Exercises.  She noted that the item would be presented by Dr. Ross.

### A.    Authorization to Confer an Honorary Degree

Dr. Ross recommended that an invitation to accept an Honorary Degree at Commencement Exercises on May 23, 1997 be extended to C. Everett Koop, M.D., Sc.D.  Dr. Koop is an outstanding Pediatric Surgeon with an international reputation and he has agreed to be the Commencement Speaker for the School of Medicine.

Upon motion duly made and seconded, the Board adopted the following resolution:

> RESOLVED, that the Board of Trustees authorizes the President to invite C. Everett Koop, M.D., Sc.D. to accept an Honorary Degree to be conferred upon him by Allegheny University of the Health Sciences at Commencement Exercises on May 23, 1997.

### B.    Faculty Tenure

Upon recommendation of the Academic Affairs Committee, Dr. McKenna Brown presented for consideration the names of the candidates listed below who were proposed for tenure awards.

Upon motion duly made and seconded, the Board adopted the following resolution:

> RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences, upon the recommendation of the Academic Affairs Committee, approves tenure for the candidates listed below:

DVR:51867.1

PR-BO-040-01832

000005

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 4

                      Sarah S. Garber, Ph.D., Associate Professor of Physiology
                      Jeffrey L. Glassroth, M.D., Professor of Medicine
                      Dennis R. Grayson, Ph.D., Professor of Psychiatry (AC)
                      Robert J. Schwartzman, M.D., Professor of Neurology
                      Fong Y. Tsai, M.D., Professor of Radiologic Sciences
                      Paul E. Pepe, M.D., Professor of Emergency Medicine (AC)

C.    **Authorization for Allegheny University of the Health Sciences to Confer Degrees**

Upon recommendation of the Academic Affairs Committee, Dr. McKenna Brown presented for ratification the names of the recipients of degrees that were granted on August 31, 1996 from the programs in the School of Health Professions and the School of Nursing. In addition, she requested approval of a list of proposed candidates to be granted degrees in December noting that the list is tentative at this time.

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

    **RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences ratifies the conferring of degrees, upon such of those students recommended by the Deans and the Faculty of the School of Health Professions and the School of Nursing, and listed in Appendix "A" of this Resolution; and**

    **FURTHER RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences empowers the President to confer degrees, upon such of those students recommended by the Deans and the Faculty of the School of Health Professions and the School of Nursing, and listed in Appendix "B" of this Resolution, who have successfully completed all requirements for the relevant degree; and**

    **FURTHER RESOLVED, that the Board directs the Secretary to append a copy of the final list of students in each of the above mentioned schools to whom degrees are granted to the original minutes of this meeting.**

D.    **Faculty Bylaw Amendments for the School of Public Health**

Upon recommendation of the Academic Affairs Committee, Dr. McKenna Brown presented for consideration the proposed amendments to the Bylaws of the School of Public Health.

PR-BO-040-01833

DVR:51867.1

000006

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 5

Upon motion duly made and seconded, the Board adopted the following resolution:

> **RESOLVED,** that the Board of Trustees of Allegheny University of the Health Sciences hereby approves the amendments to the School of Public Health Bylaws, as presented; and

> **FURTHER RESOLVED,** that the Secretary of the Corporation is hereby directed to append a copy of the approved amendments to the Allegheny University of the Health Sciences School of Public Health Bylaws to the original minutes of this meeting.

E.    **Transfer of Research Grants from ASRI to the University**

Upon recommendation of the Academic Affairs Committee, Dr. McKenna Brown presented a resolution seeking authorization to accept transfers from Allegheny-Singer Research Institute (ASRI) to Allegheny University of the Health Sciences (the "University") of selected grant and contract responsibilities and the corresponding research administrative support.

Discussion followed. Mr. Abdelhak emphasized that by consolidating the research efforts from all campuses within the University, the research accomplishments of the faculty as a whole would be clarified.

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

> WHEREAS, Allegheny General Hospital ("AGH") is a nonprofit corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with Allegheny Health, Education and Research Foundation ("AHERF") its sole Member; and

> WHEREAS, Allegheny-Singer Research Institute ("ASRI") is a nonprofit corporation duly organized under the laws of the Commonwealth of Pennsylvania with AHERF as its Class A Member and AGH as its Class B Member; and

> WHEREAS, Allegheny University of the Health Sciences (the "University") is a nonprofit corporation and institution of higher learning duly organized and existing under the laws of the Commonwealth of Pennsylvania with AHERF as its sole Member; and

DVR:51867.1                                                    PR-BO-040-01834

000007

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 6

WHEREAS, ASRI seeks to transfer grants and contracts identified in Exhibit "A" to this Resolution and corresponding research administration support to the University and to make the University responsible and accountable for these grants, contracts and the grant and contract supported projects and activities;

NOW, THEREFORE, THE BOARD OF TRUSTEES OF ALLEGHENY UNIVERSITY OF THE HEALTH SCIENCES HEREBY RESOLVES AS FOLLOWS:

RESOLVED, that the University hereby accepts the transfer of ASRI grants and contracts as identified in Exhibit A and the corresponding research administration support to the University;

FURTHER RESOLVED, that the University agrees that the NIH Grants set forth on Exhibit A and incorporated herein by reference will be transferred on the grant anniversary date to the University as the Successor In Interest for purposes of these transfers from ASRI and that Subagreements be amended after Notice of Award is received, effective on their renewal dates; and

FURTHER RESOLVED, that the University agrees that the NIH Contracts set forth on Exhibit A and incorporated herein by reference will be transferred through the execution of a Novation Agreement by ASRI as the original contractor to the University; and

FURTHER RESOLVED, that the University agrees that after the University is approved by NIH as the Successor in Interest to ASRI for purposes of the transfer of all NIH Subagreements set forth on Exhibit A incorporated herein by reference shall be transferred to the University by means of the contract amendment process. Letters shall be sent to the prime grantees along with a sample amendment and revised Face Page and Checklist of subcontracting site to begin the amendment process; and

FURTHER RESOLVED, that the University agrees that the Department of Education Grants set forth on Exhibit A and incorporated herein by reference will be transferred by ASRI to the University in accordance with the standard guidelines of the Department of Education for transferring grants; and

FURTHER RESOLVED, that ASRI agrees that Federal grants in their last year of funding will not be transferred to the University but will remain in ASRI; and

FURTHER RESOLVED, that ASRI agrees that all non-federal grants set forth on Exhibit A will be transferred by letter sent to each sponsor requesting change effective January 1, 1997; and

DVR:51867.1

PR-BO-040-01835

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 7

> **FURTHER RESOLVED,** that ASRI agrees that non-federal grants ending prior to January 1, 1997, will not be transferred to the University but will remain in ASRI; and
>
> **FURTHER RESOLVED,** that ASRI agrees that all Pending Applications for federal and non-federal grants submitted prior to the date of final approval of the transactions will be transferred from ASRI to the University after indication that the application is in competitive range for funding and before a Notice Of Award is issued; and
>
> **FURTHER RESOLVED,** that the University agrees that all submissions for federal and non-federal grants dated on or after the date of final approval of the transactions, shall be submitted under the name of the University; and
>
> **FURTHER RESOLVED,** that the University hereby authorizes and directs such University officers and officials as may be necessary to do all such things and take all such actions as may be necessary to carry out the intent of this resolution, contingent upon the approval of the actions described in this Resolution by ASRI, AGH and AHERF.

F.  **Summary of Actions Taken at the Meeting Held on November 15, 1996**

Dr. McKenna Brown summarized the actions taken by the Academic Affairs Committee at their meeting held on November 15, which included the Appointment of two Academic Department Chairs for the School of Medicine and Faculty Changes for the School of Medicine, School of Health Professions, School of Public Health and the School of Nursing.

VI. **RECOMMENDATIONS FROM THE RESOURCE MANAGEMENT COMMITTEE**

President Abdelhak presented the report of the Resource Management Committee meeting held on November 15, 1996 and introduced the items set forth below which were advanced to the Board for consideration.

A.  **Audited Financial Statements for the Fiscal Year Ended June 30, 1996**

Upon recommendation of the Resource Management Committee, President Abdelhak presented for consideration the Audited Financial Statements for the Fiscal Year Ended June 30, 1996 noting that the financial statements reflect the results of operations and financial position for the Delaware Valley Obligated Group (the Obligated Group), which was created as a result of the recent financing of debt. The Obligated Group is comprised of Allegheny University of the Health Sciences, Allegheny University Hospitals, and St. Christopher's Hospital for Children. The financial statements include suppplementary combining information on the components of the Obligated Group.

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 8

Upon motion duly made and seconded, the Board adopted the following resolution:

> RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences approves the Audited Financial Statements for the Fiscal Year ended June 30, 1996, as presented; and directs the Secretary to append a copy of the approved Statements to the original minutes of this meeting.

**B.**    **Coopers & Lybrand's No Material Weakness Observations and Internal Control Observations from FY 1996 Audit**

Upon recommendation of the Resource Management Committee, President Abdelhak presented the Coopers & Lybrand letter on No Material Weakness Observations and the "Management Letter" for the Delaware Valley Obligated Group, noting that the Auditors have not identified any material weaknesses in the internal control structure for Allegheny University of the Health Sciences.

Upon motion duly made and seconded, the Board adopted the following resolution:

> RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences accepts the Coopers & Lybrand's letter on No Material Weakness Observations, as presented; and instructs the Secretary to append a copy of the accepted letter to the original minutes of this meeting.

**C.**    **Summary of Actions Taken at the Meeting Held on November 15, 1996**

President Abdelhak summarized the actions taken by the Resource Management Committee at their meeting held on November 15, which included acceptance of the Financial Statements for the three months ended September 30, 1996. He noted that days of revenue in patient accounts receivable decreased during the first quarter and are expected to continue decreasing throughout the fiscal year. The long-term debt ratio increased. The physician services revenue is under budget mainly due to volume levels that are below expectations and rate deterioration due to managed care.

**VII.**    **MANAGEMENT REPORT**

Report of the Provost

Dr. Ross highlighted items of significant interest at the University level including status reports on activities with regard to the School of Medicine, School of Health Professions, School of Nursing and the School of Public Health. The Provost also discussed the status of the Commonwealth's appropriation to the University for its educational programs for the next fiscal year and the self study process required for continued accreditation of the University by the Middle States Association of Colleges and Schools.

000010

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 9

Discussion followed regarding efforts in process to encourage underrepresented minorities to enter the health professions. It was noted that there were fewer minorities enrolled in medical schools nationally in the last year and Allegheny is well ahead of the national percentages. Mr. Abdelhak reaffirmed AHERF's commitment to minorities and women. It was requested that a report be presented on minority affairs within the University at a future Board meeting.

Mr. Abdelhak highlighted additional management issues. He stated that upon its receipt, the Board would receive a copy of the final written report from the Institutional Review that was held in the fall, and time would be allocated at a future meeting to discuss the suggestions relative to research and education strategies.

Mr. Abdelhak announced the resignation of long-time Board member Leslie Anne Miller and noted her many accomplishments and contributions to the Allegheny system. He reported that AHERF Management was working to resolve the issues with Allegheny College with respect to similarities in nomenclature, and the Board would be apprised of future developments.

Mr. Abdelhak also announced that the Deans were designing a model for the "practitioner of the future". In order to assess AHERF's ability to maintain its leadership position in the future, a model is needed to ascertain the qualities that will be needed in future medical school applicants. There was discussion regarding the increasing influence of economics on the students' ability to apply to such institutions. Mr. Abdelhak stated that it was his hope that an endowment fund be established to increase available funding for scholarships.

VIII.   **EXECUTIVE SESSION**

The Board moved into Executive Session.

A.   **Goals and Objectives for Fiscal Year 1997**

Upon recommendation of the Compensation Committee, President Abdelhak and Dr. Ross presented for consideration the proposed Goals and Objectives for Fiscal Year 1997 for Allegheny University of the Health Sciences.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny University of the Health Sciences approves the Goals and Objectives for Fiscal Year 1997, as presented; and directs the Secretary to append a copy of the approved Goals and Objectives to the original minutes of this meeting.

DVR:51867.1

PR-BO-040-01838

000011

Allegheny University of the Health Sciences
Meeting of the Board of Trustees
December 4, 1996
Page 10

    **B.**   **Annual Review of Management**

        As mandated by the corporate bylaws, the external trustees met in Executive Session with President Abdelhak to review the performance of management.

**ADJOURNMENT**

There being no further business, the meeting was adjourned at 12:20 p.m.

                  Respectfully submitted,

                  _____

                  Nancy A. Wynstra, Esq.
                  Secretary

Noted Attachments:   Meeting Notice; List of Students granted degrees from the School of Health Professions and the School of Nursing, Amendments to the School of Public Health Bylaws, Audited Financial Statements for Fiscal Year ended June 30, 1996, Coopers & Lybrand's letter on No Material Weakness, Goals and Objectives for Fiscal Year 1997.

/jmm

PR-BO-040-01840

PR-BO-040-01841

TAB 187

**000042**

**Meeting of the Board of Trustees**
**Medical College of Pennsylvania and Hahnemann University Hospital System**
**Philadelphia, Pennsylvania**

A meeting of the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System (MCPHUHS) was held on Thursday, June 20, 1996 at the Medical College of Pennsylvania and Hahnemann University, Center City Campus Board Room. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board. A copy of the notice is appended to the original minutes of this meeting.

The following individuals were present:

| MEMBERS PRESENT | OTHER INVITEES | MEMBERS ABSENT |
|---|---|---|
| Sherif S. Abdelhak | Barbara Atkinson, M.D. | Leonard T. Ebert |
| George Amrom, M.D. | Lisa Bembenick | Richard Gilmore |
| William J. Brecht | Beverly Callahan | Robert M. Potamkin, Esq. |
| Jonathan Butcher | Mary Ann Darragh | Lynn Seltzer Shecter |
| William T. Duboc | Doreen Denega, Esq. | |
| Harry R. Edelman, III | Glenda Donoghue, M.D. | |
| Claire W. Gargalli | Shelley Gebar | |
| Joseph H. Gillies | Lynn R. Isaacs | |
| Richard H. Gwinn | Dwight Kasperbauer | |
| Marvin T. Hunter, M.D. | Christopher Kowalsky | |
| Donald Kaye, M.D. | David W. McConnell | |
| Oksana Korzeniowski, M.D. | Meg McGoldrick | |
| Joseph D. Little, Jr. | Joan M. Mitchell | |
| Paul D. Neuwirth | Charles P. Morrison | |
| Leonard L. Ross, Ph.D. | Michael O'Mahoney | |
| W.P. Snyder, III. | Jean Rocks | |
| Leon C. Sunstein, Jr. | Anthony M. Sanzo | |
| Mark Tanker, D.O. | Nancy A. Wynstra, Esq. | |
| Margaret Gray Wood, M.D. | | |

## I.     OPENING OF THE MEETING

The meeting was called to order at 10:05 a.m. by Mr. Edelman who declared that a quorum was present and the meeting was competent to proceed. Nancy A. Wynstra, Esq. maintained the minutes of the meeting.

Mr. Edelman introduced Mary Anne Darragh, Vice President, Allegheny General Hospital; Glenda Donaghue, M.D., Executive Vice Provost, MCPHU; Christopher Kowalsky, Vice President, Information Services, AIHG; and Anthony Sanzo, President and CEO, Allegheny General Hospital.

000043

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 2

## II.    EDUCATIONAL PRESENTATION

Ms. Wynstra presented information on the Code of Ethics Education Program established at AHERF. This program has been developed for all members of the AHERF family and will become a part of employee orientation programs at all campuses. She noted that the Code has multiple purposes, including to reaffirm the commitment of AHERF to integrity and ethical conduct as a fundamental basis for our functioning; to convey to our community AHERF's basic values and commitment to ethical conduct; and to provide a foundation for the conduct of any individual who acts on behalf of the organization.

## III.    ADDITIONS TO THE AGENDA

There were no additions to the agenda.

## IV.    APPROVAL ITEMS

### A.    Governance Issues

1.    Minutes from the meeting held on December 14, 1995

Mr. Edelman presented the minutes from the meeting held on December 14, 1995.

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

> **RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System hereby approves the minutes from the meeting held on December 14, 1995, as presented.**

2.    MCPHUHS Bylaw Amendments

Ms. Wynstra noted that the Corporate Bylaws of the Allegheny System are reviewed each year. Changes are made as appropriate to maintain consistency throughout the orgranization and to reflect changes in the organization. The most significant changes in the proposed Amendments pertain to delegating more authority to the various committees of the Boards; changing the number of required meetings of the Boards; clarifying that the purchase or sale of real estate must be approved by the Boards and by the Member; clarifying that the "Purposes" of each corporation are as stated in its Articles of Incorporation or any Amendments thereto; and delineating approvals for the appointment and removal of the President and Chief Executive Officer of each corporation.

DVR:46073.1

**000044**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 3

Discussion followed regarding delegating certain authority to the Joint Conference and Planning Committee and the Resource Management Committee and certain changes to their designated responsibilities were agreed upon.

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

> RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System (MCPHUHS), subject to the approval of Allegheny Health, Education and Research Foundation (AHERF), the Member, hereby adopts amendments to the Bylaws of MCPHUHS, as modified at this meeting, effective upon approval by the Member; and

> FURTHER RESOLVED, that the Secretary is authorized and directed to modify the order of the Bylaws as necessary for consistency throughout the organization; and

> FURTHER RESOLVED, that the Secretary is directed to append a copy of the Bylaw amendments, as adopted, to the original minutes of the meeting and to restate the Bylaws of the corporation.

B.    Recommendations from the Joint Conference and Planning Committee

Ms. Gargalli presented the report from the Joint Conference and Planning Committee meetings held on March 20, 1996 and June 5, 1996, and introduced the items set forth below which were advanced to the Board of Trustees for consideration:

1.    Medical Staff Development Plans

    a.    Clinical Service of Obstetrics/Gynecology

Ms. Gargalli provided an overview of the proposed Plan for the Clinical Service of Obstetrics and Gynecology at the Medical College of Pennsylvania Hospital. It is recommended that the Clinical Service of Obstetrics and Gynecology at the Medical College of Pennsylvania Hospital be open to qualified general practitioners and midwives. With respect to the subspecialties of Gynecological Oncology, Reproductive Endocrinology/Infertility and Maternal Fetal Medicine, it is recommended that these services be limited to physicians salaried by MCPHU.

**000045**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 4

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

RESOLVED, that the Obstetrics/Gynecology Clinical Service for general practitioners and midwives be OPEN; and

FURTHER RESOLVED, that the Obstetrics/Gynecology Clinical Service in the subspecialty areas of Gynecologic-Oncology, Reproductive Endocrinology/Infertility, and Maternal Fetal Medicine be LIMITED to physicians salaried by MCPHU; and

FURTHER RESOLVED, that the ability to assure adequate volumes for subspecialists in order to maintain the highest levels of clinical competency and provide sufficient volume for teaching and the ability to coordinate scheduling and coverage will be optimized within a single, salaried physician group; and

FURTHER RESOLVED, that candidates are required to be Board Certified or active candidates for their Boards, who will concentrate their practice at MCPH and/or other AHERF hospitals in the Delaware Valley, and who will be committed to the research and/or educational programs of MCPHU.

b.    Clinical Service of Allergy/Immunology

Ms. Gargalli provided an overview of the proposed Plan for the Clinical Service of Allergy/Immunology at the Medical College of Pennsylvania Hospital. It is recommended that the Clinical Service of Allergy/Immunology at the Medical College of Pennsylvania Hospital be limited to physicians salaried by MCPHU.

Upon motion duly made and seconded, the Board of Trustees adopted the following resolution:

RESOLVED, that the Allergy/Immunology Clinical Service be LIMITED to physicians salaried by MCPHU; and

PR-BO-089-01234

DVR-46073.1

000046

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 5

FURTHER RESOLVED, that recruitment will be undertaken only if it can be demonstrated that the ratio between patients and medical staff is sufficient so that each member can maintain the volume of activity necessary to assure an acceptable level of clinical competency and expertise and meet the educational needs of students and residents; and

FURTHER RESOLVED, that candidates are required to be Board Certified or active candidates for their Boards, who will concentrate their practice at MCPH and/or other AHERF hospitals in the Delaware Valley.

c.    Clinical Service of Rheumatology

Ms. Gargalli provided an overview of the proposed Plan for the Clinical Service of Rheumatology at the Medical College of Pennsylvania Hospital.    It is recommended that the Clinical Service of Rheumatology at the Medical College of Pennsylvania Hospital be limited to physicians salaried by MCPHU.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Rheumatology Clinical Service be LIMITED to physicians salaried by MCPHU; and

FURTHER RESOLVED, that recruitment will be undertaken only if it can be demonstrated that the ratio between patients and medical staff is sufficient so that each member can maintain the volume of activity necessary to assure an acceptable level of clinical competency and expertise and meet the educational needs of students and residents; and

FURTHER RESOLVED, that candidates are required to be Board Certified or active candidates for their Boards, who will concentrate their practice at MCPH and/or other AHERF hospitals in the Delaware Valley.

PR-BO-089-01235

**000047**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 6

    d.   Clinical Services of Obstetrics/Gynecology, Allergy/Immunology and Rheumatology

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

> **RESOLVED, that practitioners who currently hold clinical privileges in the Obstetrics/Gynecology Clinical Service, the Allergy/Immunology Clinical Service and the Rheumatology Clinical Service at MCPH shall continue to exercise those privileges to the extent that each practitioner maintains compliance with appropriate professional standards for continuation of such privileges; and**

> **FURTHER RESOLVED, that the Medical Staff Development Plans hereinabove shall be subject to review in June, 1998 or sooner if warranted.**

2.   Report of the Executive Medical Board

    a.   Medical Staff Credentialling Items

Ms. Gargalli presented the reports of the Executive Medical Board from the Joint Conference and Planning Committee meetings held on March 20, 1996 and June 5, 1996 and recommended for approval the following medical staff credentialling items relative to certain members of the Medical Staff of the Medical College of Pennsylvania Hospital, as well as recommendations for privileges for Allied Health Practitioners.

Upon motion duly made and seconded, the Board of Trustees approved the following resolutions:

**APPOINTMENT TO PROVISIONAL STAFF:**

> **RESOLVED, that the Board of Trustees of Medical College of Pennsylvania and Hahnemann University Hospital System approves the appointment of the following individuals as members of Medical College of Pennsylvania Hospital Medical Staff in provisional status with clinical privileges as recommended:**

DVR:46073.1

PR-BO-089-01236

000048

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 7

| Name of Practitioner | Clinical Service/Division | Staff Category |
| --- | --- | --- |
| Paul C. Anisman, MD | Pediatrics/Cardiology | Active |
| S. Ausim Azizi, MD | Neurology | Active |
| Mary Anne Delaney, MD | Psychiatry | Active |
| Pataleone DeMasi, MD | Medicine/General Medicine | Active |
| Carol Fleischman, MD | Medicine/General Medicine | Active |
| Paul Grena, DO | Medicine/Cardiology | Active |
| Daniel Guilfoil, MD | OB/Gyn | Active |
| Althea Hankins, MD | Medicine/General Medicine | Active |
| Johannes Jones, MD | OB/Gyn | Active |
| Lewis J. Kaplan, MD | Surgery/General | Active |
| Harminder Kaur, MD | Medicine/General Medicine | Active |
| Bruce Kornberg, DO | Medicine/Cardiology | Active |
| Rosemary Kozar, MD | Surgery/General | Active |
| Russell Maulitz, MD | Medicine/General Medicine | Active |
| Robert Mermer, DDS | Dental Medicine/Surgery | Active |
| Bizhan Micaily, MD | Radiation Oncology | Active |
| Parvaneh Ravandoost, MD | Medicine/General Medicine | Active |
| Bradley Robinson, MD | Pediatrics/Cardiology | Active |
| Bradley Schwartz, MD | Ophthalmology | Active |
| Barry Singer, MD | Medicine/Hematology-Oncology | Active |
| Antonio Sison, MD | OB/Gyn | Active |
| Brian Steele, DO | Medicine/General Medicine | Active |
| Gail Sullivan, MD | OB/Gyn | Active |
| Richard Watson, DO | Medicine/General Medicine | Active |

PR-BO-089-01237

DVR:46073.1

000049

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 8

## TRANSFER FROM PROVISIONAL STATUS:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System approves the
transfer of the following practitioner, who has successfully completed
the provisional period, to regular appointment on the Medical College
of Pennsylvania Hospital Medical Staff in the staff category indicated
with clinical privileges as recommended:

| Practitioner | Clinical Service/Division | Staff Category |
|---|---|---|
| Michael Hicks, MD | Emergency Medicine | Active |

## TRANSFER IN STAFF STATUS:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System approves
transfer in staff status for the following practitioners as indicated on
the Medical College of Pennsylvania Hospital Medical Staff:

| Name of Practitioner | Clinical Service/Division | Staff Category |
|---|---|---|
| Rosalinda DiRenso, MD | Emergency Medicine | Active to Affiliated |
| Joel Kramer, MD | OB/Gyn | Affiliated to Active |
| George Simpson, MD | Psychiatry | Active (resignation rescinded) |

## REAPPOINTMENTS:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System approves
reappointment of the following practitioner with clinical privileges as
delineated:

| Name of Practitioner | Clinical Service/Division | Staff Category |
|---|---|---|
| Arnold Weisgold, MD | Dental Medicine | Affiliated |

DVR:46073.1

MCC 089-01238

000050

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 9

OTHER HEALTH PROFESSIONALS:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System grants
permission for the following Other Health Professionals to provide
patient care services as delineated:

| Name of Practitioner | Clinical Service | Category |
|---|---|---|
| Deborah Appleyard, CNM | OB/Gyn | Nurse Midwife |
| Katy Dawley, CNM | OB/Gyn | Nurse Midwife |
| Jane Greene, CNM | OB/Gyn | Nurse Midwife |
| Paul Logan, MSN,RN,CS,CRNP | Medicine/Cardiology | Nurse Practitioner |
| Melissa Sapiro, CNM | OB/Gyn | Nurse Midwife |

Upon motion duly made and seconded, the Board of Trustees approved the
following resolutions:

APPOINTMENT TO PROVISIONAL STAFF:

RESOLVED, that the Board of Trustees of Medical College of
Pennsylvania and Hahnemann University Hospital System approves the
appointment of the following individuals as members of Medical
College of Pennsylvania Hospital Medical Staff in provisional status
with clinical privileges as recommended:

| Name of Practitioner | Clinical Service/Division | Staff Category |
|---|---|---|
| Endla Anday, MD | Pediatrics | Active |
| Carol Andersen, MD | Pediatrics | Active |
| Diane Barsky, MD | Pediatrics | Active |
| Kenneth Casey, MD | Neurosurgery | Active |
| Christine Chung, MD | Ophthalmology | Active |
| Mara J. Crans, MD | Pediatrics | Active |
| Josepha Devaro, MD | Dermatology | Active |
| Jan Gopelrud, MD | Pediatrics | Active |
| Jan Horrow, MD | Anesthesiology | Active |
| Ami Iskandrian, MD | Medicine/Cardiology | Active |
| Andrew Jasek, MD | Medicine/Geriatrics | Active |
| Kevin Kelly, MD | Pediatrics | Active |
| Bradford Lin, MD | Medicine/Cardiology | Active |

**000051**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 10

## APPOINTMENT TO PROVISIONAL STAFF (Cont'd):

| Name of Practitioner | Clinical Service/Division | Staff Category |
|---|---|---|
| Michael Loftus, DDS | Surgery/Oral & Maxillofacial | Active |
| Patricia Loudis, MD | Neurology | Active |
| Daniel J. McCormick, MD | Medicine/Cardiology | Active |
| Powers Peterson, MD | Pathology | Active |
| Jeffrey Rosensweig, MD | Pediatrics | Active |
| Howard Rosner, MD | Medicine/Cardiology | Active |
| Michael Spence, MD | Obstetrics & Gynecology Community & Preventive Medicine | Active |
| Robert Schwartzman, MD | Neurology | Active |
| Fong T. Tsai, MD | Radiologic Sciences | Active |

## ALLIED HEALTH PRACTITIONERS:

RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System grants permission for the following Allied Health Practitioners to provide patient care services as delineated:

| Name of Practitioner | Clinical Service | Category | Supervision |
|---|---|---|---|
| Janet M. Kaye, Ph.D. | Family Medicine | Psychologist | |
| Sara E. Lodge, CNM | OB/Gyn | Nurse | |
| Katherine McCluskey, PAC | Neurosurgery | Physician Assistant | Kenneth Casey, MD |
| Adelle O'Neill, CNM | OB/Gyn | Nurse Midwife | |
| Kenneth Podell, Ph.D. | Psychiatry | Psychologist | |
| Laurie Roselli, CRNP | Pediatrics | Nurse Practitioner | |
| Kenneth Stein, DPM | Orthopedic | Podiatrist | |

PR-BO-003 ᴗ⁻⁻¹²

DVR:46073.1

000052

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 11

b.    Amendments to Medical/Dental Staff Bylaws

Ms. Gargalli presented the proposed amendments to the Medical/Dental Staff
Bylaws and Rules and Regulations.

Upon motion duly made and seconded, the Board of Trustees approved the
following resolution:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System hereby
approves the revised and restated Medical/Dental Staff Bylaws and
Rules/Regulations of the Medical College of Pennsylvania Hospital
Medical/Dental Staff; and

FURTHER RESOLVED, that the Secretary of the corporation is
hereby directed to append a copy of the approved amendments to the
Medical College of Pennsylvania Hospital Medical/Dental Staff Bylaws
to the original minutes of this meeting.

3.    Quality Assessment

a.    Quality Assessment Quarterly Report for the Period January through March,
1996

Ms. Gargalli presented the Medical College of Pennsylvania Hospital Quality
Assessment Quarterly Report for the period January through March, 1996.
Upon motion duly made and seconded, the Board of Trustees approved the
following resolution:

RESOLVED, that the Board of Trustees of the Medical College of
Pennsylvania and Hahnemann University Hospital System approves the
Medical College of Pennsylvania Hospital Quality Assessment Quarterly
Report for the period January through March, 1996, as presented; and
directs the Secretary to append a copy of the approved report to the
original minutes of this meeting.

b.    Annual Review of the Quality Improvement Program Plan

Ms. Gargalli presented the Quality Improvement Program Plan for the Medical
College of Pennsylvania Hospital.

PR-BO-089-01241

**000053**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 12

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

> RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves the Quality Improvement Program Plan for the Medical College of Pennsylvania Hospital, as presented; and directs the Secretary to append a copy of the approved Plan to the original minutes of this meeting.

4. Utilization Management

   Annual Review of the Utilization Management Plan

   Ms. Gargalli presented the Utilization Management Plan for the Medical College of Pennsylvania Hospital.

   Upon motion duly made and seconded, the Board of Trustees approved the following resolutions.

   > RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves the Utilization Management Plan for the Medical College of Pennsylvania Hospital as presented; and directs the Secretary to append a copy of the approved Plan to the original minutes of this meeting.

5. Safety Management

   a. Annual Report on the Safety Management Program and 1996 Objectives

      Ms. Gargalli presented the Annual Report on the Safety Management Program and 1996 Objectives for the Medical College of Pennsylvania Hospital.

000054

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 13

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves the annual evaluation of the past year's safety management efforts at the Medical College of Pennsylvania Hospital, including the quarterly statistics for the period October through December, 1995, and the 1996 Objectives, as presented in the Annual Report on the Safety Management Program; and directs the Secretary to append a copy of the approved report to the original minutes of this meeting.

b.    Quarterly Safety Report for the Period January through March, 1996

Ms. Gargalli presented the Medical College of Pennsylvania Hospital Quarterly Safety Report for the period January through March, 1996.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System approves the Medical College of Pennsylvania Hospital Quarterly Safety Report for the period January through March, 1996, as presented; and directs the Secretary to append a copy of the approved report to the original minutes of this meeting.

6.    Appointment of Hospital System Chiefs

Ms. Gargalli presented the list of individuals recommended for appointment as Hospital System Chiefs for the individual clinical services within the hospital system for a period of one year, with all appointments taking effect July 1, 1996.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System ("MCPHUHS") approves the individuals recommended by the President and Chief Executive Officer of MCPHUHS for the position of Hospital System Chief for the academic year beginning July 1, 1996; and

PR-BO-089-01243

000055

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 14

>       FURTHER RESOLVED, that the Board directs the Secretary to append the
>       names of the individuals so approved, to the original minutes of this
>       meeting.

7.   Appointment of Clinical Service Chiefs

Ms. Gargalli presented for consideration the list of individuals recommended for
appointment as Clinical Service Chiefs for the individual clinical departments at the
Medical College of Pennsylvania Hospital, for a period of one year, with all
appointments taking effect July 1, 1996.

Upon motion duly made and seconded, the Board of Trustees approved the following
resolution:

>       WHEREAS, the Board of Trustees of the Medical College of Pennsylvania
>       and Hahnemann University Hospital System ("MCPHUHS") is responsible
>       for overseeing the administration and management of clinical services at the
>       Medical College of Pennsylvania Hospital ("MCPH"); and

>       WHEREAS, the Board is required to appoint service chiefs periodically to
>       oversee and coordinate the activities of the clinical services of MCPH;

>       NOW THEREFORE, BE IT RESOLVED, that the Board of Trustees of the
>       Medical College of Pennsylvania and Hahnemann University Hospital
>       System hereby approves the appointment of those persons named on Exhibit
>       "A" which is attached hereto and incorporated herein by reference, as chiefs
>       of the services at MCPH specified in Exhibit "A" for a one (1) year term
>       beginning on July 1, 1996; and

>       FURTHER RESOLVED, that the Secretary is hereby directed to append a
>       copy of Exhibit "A" attached hereto and incorporated herein by reference
>       to the original minutes of this meeting.

C.   Finance

1.   Results of Operations and Financial Statements for the Nine Months Ended March 31,
     1996

Dr. Kaye presented the results of operations and the financial statements for the nine
months ended March 31, 1996.  He reviewed the year-to-date admissions, patient days
and average length of stay for the hospital system.  Mr. Morrison reviewed the

DVR:46073.1

PR-BO-089-01244

000056

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 15

consolidated balance sheet and highlighted information on accounts receivable, funded depreciation and line of credit borrowings. Mr. Abdelhak discussed the impact of the AIHG physician practices, the CAT fund surcharge and the reduction in Medicaid reimbursement on the hospital system budget.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

> RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System accepts the financial statements for the nine months ended March 31, 1996, as presented; and instructs the Secretary to append a copy of the accepted Statements to the original minutes of the meeting.

2.    Fiscal Year 1997 Operating and Capital Budgets

Mr. Morrison reviewed the FY 1997 Operating and Capital Budgets. He reviewed the consolidated statement of financial position as of June 30, 1996 which included both the projected outcome for FY 96 and the proposed budget for FY 97. He discussed the impact on growth of activity and programs in a cost control environment.

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

> RESOLVED, that the Board of Trustees of the Medical College of Pennsylvania and Hahnemann University Hospital System contingent upon approval by the Member, approves the proposed Operating and Capital Budget for Fiscal Year 1997, as presented; and directs the Secretary to append a copy of the approved Budget to the original minutes of this meeting.

3.    Enhancement of Physical Therapy and Rehabilitation Services

Ms. McGoldrick discussed the recent completion of negotiations with HealthSouth Corporation regarding the management of inpatient and outpatient rehabilitation services at the Medical College of Pennsylvania Hospital. Dr. Kaye discussed the benefits and reasons for the transactions, noting that Management has determined that the sale of certain off-campus units to HealthSouth would be in the best interests of the Allegheny health care system and the patients who utilize these services. The sale will be at a fair market value.

DVR:46073.1

**000057**

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 16

Upon motion duly made and seconded, the Board of Trustees approved the following resolution:

WHEREAS, Medical College of Pennsylvania and Hahnemann University Hospital System ("MCPHUHS")and Hahnemann University Hospital own certain off-campus physical therapy centers in Philadelphia, known as the Hahnemann Outpatient Physical Therapy Department, the Joe Torg Center for Sports Medicine and Athletic Rehabilitation Center, and the Delaware Valley Sports Medicine Center (the "Centers"), and Allegheny United Hospitals, Inc. operates two inpatient rehabilitation units and two outpatient physical therapy centers, located at Bucks County Hospital and Elkins Park Hospital (the "On-Campus Units");

WHEREAS, management has determined that it is, in the best interest for the Centers to be sold to HealthSouth and the On-Campus Units to be managed by HealthSouth, and acting on behalf of MCPHUHS and the other respective corporations, the respective officers have executed an Agreement of Sale, a Management Agreement and certain other documents effectuating the HealthSouth Transactions (the "HealthSouth Documents"), subject to the subsequent approval by the Board of Trustees of MCPHUHS and the other respective corporations;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Trustees of MCPHUHS hereby approves, confirms, and ratifies the HealthSouth Transactions and the execution of the HealthSouth Documents;

FURTHER RESOLVED, that the Board hereby authorizes and directs management of MCPHUHS to take all such actions as shall be necessary to effectuate the terms of the HealthSouth Transactions and to satisfy any conditions that management may determine are reasonably required to permit confirmation, consummation, and ratification of the HealthSouth Transactions pursuant to the HealthSouth Documents;

FURTHER RESOLVED, that the officers of MCPHUHS are hereby authorized and directed to do all such things and take all such actions as shall be reasonably necessary to consummate and accomplish the HealthSouth Transactions, including without limitation, the execution and delivery of such other instruments as shall be necessary.

000058

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 17

## IV.    INFORMATIONAL ITEMS

### A.    Finance

#### 1.    Annual Report on Capital Reimbursement Activity

Mr. Morrison presented the capital reimbursement activity for FY 1996. This
information is provided to the Board of Trustees to assure that decisions made by
management about the use of tax exempt debt are made in a responsible manner and
follow U.S. Treasury regulations.

#### 2.    Accounts Receivable Report

Mr. Morrison provided information regarding the consolidation of the accounts
receivable and patient accounting departments for AHERF and in particular the
Delaware Valley region.

### B.    Human Resources

Climate Report

Mr. Kasperbauer provided information on the human resources trends and issues affecting
AHERF's adult hospital system in the Delaware Valley. Based on the statistics and
information reported, the educational initiatives planned seem appropriate to meet the needs
identified.

### C.    Information Services

#### 1.    Annual Report on Information Services

Mr. Kowalsky provided a report on the information services activities for Fiscal Year
1996.

#### 2.    Academic and Clinical Informatic Plans

Ms. Darragh provided an overview of the academic and clinical informatics plans for
AHERF. She stated that the overall benefits of this project are to enhance the
patient's experience; to provide the ability to obtain all patient information from any
computer terminal/site within the hospital setting; to assess efficiency and effectiveness
of the healthcare delivery system; and, to develop a data repository for clinicians.

ENR:46073.1

000059

Medical College of Pennsylvania and Hahnemann University Hospital System
Meeting of the Board of Trustees
June 20, 1996
Page 18

This project will take approximately 4 years to complete and will cost approximately $6 million.

### D.    Fund Development

Mr. O'Mahoney provided a status report on fund development through April 30, 1996. The report included information on cash flow, fund raising projections for FY 1997 and a calendar of upcoming fund development events of interest to Board members.

## V.    MANAGEMENT REPORTS

### Report from the President and CEO

Dr. Kaye presented his report to the Board of Trustees regarding activities within the Medical College of Pennsylvania and Hahnemann University Hospital System. He stated there would be a meeting in the near future with representatives of Forbes Health System regarding a possible consolidation with AHERF and requested participation from the hospital system trustees in addressing any questions or concerns from the Forbes Board members at this meeting.

### ADJOURNMENT

There being no further business, the meeting was adjourned at 12:05 p.m.

Respectfully submitted,

_____
Nancy A. Wynstra, Esq.
Secretary

Noted Attachments: MCPHUHS Bylaw Amendments; Medical College of Pennsylvania Hospital Medical Staff Development Plans; Medical College of Pennsylvania Hospital Amendments to Medical/Dental Staff Bylaws; Medical College of Pennsylvania Hospital Quality Assessment Quarterly Report; Medical College of Pennsylvania Hospital Quality Improvement Program Plan; Medical College of Pennsylvania Hospital Utilization Management Plan; Medical College of Pennsylvania Hospital Annual Report on Safety Management Program; Medical College of Pennsylvania Hospital Quarterly Safety Report; MCPHUHS Hospital System Chief Appointment List; Medical College of Pennsylvania Hospital Clinical Service Chief Appointment List; Results of Operations and Financial Statements for the Nine Months Ended March 31, 1996; Operating and Capital Budgets for Fiscal Year 1997.

:be

DVR:46073.1

# Common Pleas Subpoena

X 120-30                COMMONWEALTH OF PENNSYLVANIA

                           COUNTY OF BLAIR


—————————————————————,
              VS        Plaintiff                        NO._____ of 20_____

—————————————————————,
              Defendant

To  _____
        Name(s) of Witness(es)

   1.  You are ordered by the Court to come to  _____
                                                (Specify Courtroom or other place)

at  _____ Pennsylvania, on _____ at _____ o'clock___.m., to

testify on behalf of _____ in the above case, and to remain
until excused.

   2.  And bring with you the following:  _____

——————————————————————————————————————————————————

If you fail to attend or to produce the documents or things required by this

subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the

Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney

fees and imprisonment.

Issued by:_____
          (State attorney's name, address, telephone no., & identification no.)


                          BY THE COURT,

Date:_____         By: _Carol A Newman_____
Seal of the Court

Offical Note:  This form of subpoena shall be used whenever a subpoena is issuable,
including hearings in connection with depositions and before arbitrators, masters,
commissioners, etc.

If a subpoena for production of documents, records or things is desired, complete
paragraph 2.

# Common Pleas Subpoena

X 120-30                         COMMONWEALTH OF PENNSYLVANIA

                                      COUNTY OF BLAIR


————————————————————,
                    VS        Plaintiff                        NO._____ of 20_____

————————————————————,
                              Defendant

To _____
        Name(s) of Witness(es)

  1.  You are ordered by the Court to come to _____
                                              (Specify Courtroom or other place)

at _____ Pennsylvania, on _____ at _____ o'clock___.m., to

testify on behalf of _____ in the above case, and to remain
until excused.

  2.  And bring with you the following: _____

_____

If you fail to attend or to produce the documents or things required by this

subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the

Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney

fees and imprisonment.

Issued by:_____
            (State attorney's name, address, telephone no., & identification no.)


                              BY THE COURT,

                                            *Carol A. Newman*
Date:_____      By:_____
Seal of the Court

Offical Note:  This form of subpoena shall be used whenever a subpoena is issuable,
including hearings in connection with depositions and before arbitrators, masters,
commissioners, etc.

If a subpoena for production of documents, records or things is desired, complete
paragraph 2.