TAB 188

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

## *DOROTHY MCKENNA BROWN, ED.D.*
### *May 4, 2004*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

BROWN, ED.D., DOROTHY MCKENNA



LEGALINK'
A WORDWAVE COMPANY

Dorothy McKenna Brown, Ed.D.
1
2   A.   Management, yes.
3   Q.   And did they refer to -- management refer to
4   this as an integrated delivery system or IDS?
5   A.   I don't -- I'm not sure that I heard them say
6   that, but I would think that was the intention.
7   Q.   And who in particular -- do you know whose
8   idea it was to develop AHERF into an integrated
9   system?
10          MR. McCLENAHAN:  Object to form.
11          MS. MEADEN:  Objection.
12   A.   I don't know whose idea it was, but Sherif
13   articulated the vision.
14   Q.   And did the board of trustees agree with Mr.
15   Abdelhak's articulation of the need to develop an
16   integrated system for AHERF?
17          MS. MEADEN:  Objection.
18   A.   We agreed with his vision.
19   Q.   Do you remember any trustees -- just any
20   particular trustees voicing disagreement with the
21   vision, saying we should go another way instead?
22   A.   No.
23   Q.   Were there trustees who put questions to Mr.
24   Abdelhak about the vision that you recall?
25          MS. MEADEN:  Objection.  Foundation.

1          Dorothy McKenna Brown, Ed.D.
2   A.   Well, the vision was in place before
3   Hahnemann merged, so when I arrived on the board,
4   they were playing out the vision I guess.
5   Q.   Hahnemann acquisition was part of the vision?
6   A.   Was part of the vision and so, you know, each
7   step along the way trustees would ask questions
8   and -- but there was no antagonism or great
9   disagreement with him.
10   Q.   For subsequent acquisitions when you were on
11   the board after the Hahnemann acquisition, would Mr.
12   Abdelhak explain or present reasons why this
13   acquisition would make sense for AHERF and then they
14   would be approved by the board?
15   A.   Usually.
16   Q.   Are there any instances that come to mind
17   where that didn't happen?
18   A.   Yes.
19   Q.   And what was that or those?
20   A.   Well, the Graduate Hospital acquisition.  We
21   read about it in the papers.  And when I called Mr.
22   Abdelhak, he said that it had been approved by the
23   executive committee, and a number of us complained
24   about such a large undertaking not being vetted with
25   the whole board before it was done.

1          Dorothy McKenna Brown, Ed.D.
2   Q.   Do you remember which newspaper you read
3   about that?
4   A.   The Inquirer, Philadelphia Inquirer.
5   Q.   That's the major daily newspaper here in
6   Philadelphia?
7   A.   Yes.
8   Q.   What was your -- well, do you remember
9   reading the article at home or in your office?
10   A.   At home.
11   Q.   And does the paper come out in the mornings?
12   A.   Yes.
13   Q.   And do you recall what the article said?
14   A.   That Allegheny was -- I forget the word, and
15   it's probably -- it's an important distinction, but
16   that they were acquiring, I guess is the word, the
17   Graduate Health System.
18   Q.   Let me show you a document that has
19   previously been marked as Exhibit 579.
20          MR. McCLENAHAN:  Take a minute to read
21   it.
22   Q.   Yes, please read this entire article.  I will
23   tell you that Exhibit 579 is a copy of an article
24   that was printed off the Web site for the
25   Philadelphia Inquirer.  It was an article that

1          Dorothy McKenna Brown, Ed.D.
2   appeared on Page D-1 of the Philadelphia Inquirer on
3   August 11, 1996.  This isn't the actual photocopy
4   from the newspaper, but when you go onto the Web
5   site, you can print the stories that were in the
6   newspaper.  And I'll just give you time to read
7   this.
8          MS. MEADEN:  Jeff, do you know whose
9   underlinings these are?
10          MR. FRIESEN:  I don't know whose
11   underlinings they are.  I know they're not mine.
12   Q.   Oh, and, by the way, the headline of the
13   newspaper is "Absorbing Graduate Health Entails
14   Risk."
15          Do you think that this is the article --
16   A.   Yes.
17   Q.   -- that you were referring to?
18          And it looks like this was on the first
19   page of the business section?
20          MS. MEADEN:  Objection.
21          MR. McCLENAHAN:  Yeah, I mean --
22   A.   Somewhere in there.
23          MR. McCLENAHAN:  -- is that a question?
24   Q.   Now, had you never heard of AHERF potentially
25   acquiring the Graduate Hospital System until you

Dorothy McKenna Brown, Ed.D.
1
2 read this article?
3  A.  Correct.
4      MS. MEADEN:  Objection as to form.
5  Q.  And down near the bottom it says "Allegheny
6 spokesman Tom Chakurda said this was expected to
7 last about a year before consolidation is complete."
8      Did you know who Mr. Chakurda was?
9      MR. McCLENAHAN:  That is referring to
10 the paragraph immediately above it.
11     MR. FRIESEN:  Yes.  Let me back up.
12 Q.  It says, "For now, Allegheny has agreed only
13 to manage the hospitals for an undisclosed fee
14 without taking full financial control or
15 responsibility for debt.  Allegheny spokesman Tom
16 Chakurda said this was expected to last about a year
17 before consolidation is complete."
18     Did you know who Mr. Chakurda was?
19 A.  I think he was the PR person.
20 Q.  Do you see the first paragraph says, "The
21 Allegheny Health Education and Research Foundation
22 is about to take on a high-risk case in the Graduate
23 Health System according to the diagnosis of local
24 healthcare analysts"?
25 A.  (Witness shakes head in the affirmative.)

Dorothy McKenna Brown, Ed.D.
1
2 Q.  Can you remember any reaction that you had
3 when you read that?
4      MS. MEADEN:  Objection.
5 A.  Should I answer?
6      MS. MEADEN:  Go ahead.
7 Q.  Oh, yes.
8      MR. McCLENAHAN:  The question is do you
9 remember your reaction.
10 A.  Yes, I do remember my reaction.  As a
11 trustee, I didn't enjoy reading about a major change
12 in the newspaper, not knowing one thing about it,
13 and I called a variety of people -- I can't tell you
14 in what order, but the Philadelphia trustees, some
15 of them, Leslie Miller who was then chair of the
16 academic affairs committee, Claire Gargalli, Leon
17 Sunstein, Bob Palmer, Al Martinelli; and we had sort
18 of a back-and-forth conversation in different ways
19 about it.
20     I called Sherif and I asked him why he
21 had a board if he was going to have this kind of
22 activity without consulting with the full board, not
23 that I had a particular problem at that point with
24 the acquisition because it seemed to fit, as this
25 article goes on to relate, in with the vision, but

Dorothy McKenna Brown, Ed.D.
1
2 boards are for comment in that kind of a situation I
3 think.
4      He told me that he had the approval of
5 the executive committee and he got quite annoyed and
6 hung up.
7 Q.  He hung up on you?
8 A.  He hung up on me, called the next morning at
9 5 o'clock to apologize.
10     And then we had a subsequent meeting,
11 and I'm sure you have the minutes and whatever where
12 he outlined the deal and how it would be handled and
13 it would not jeopardize the AHERF financial
14 stricture.
15     And the one thing that this doesn't say
16 but I think was said somewhere in a meeting, that
17 also coming with it would have been the money from
18 the Graduate Foundation, which I think was close to
19 a hundred million dollars, and it never did.
20 Q.  It never did come?
21 A.  It never did come, and I don't know that it
22 was part of the official deal, but I just have a
23 recollection of that in a conversation.
24     MS. MEADEN:  I'm sorry.  I don't mean to
25 interrupt, but just to clarify, a recollection that

Dorothy McKenna Brown, Ed.D.
1
2 someone had told you that that money was going to
3 come --
4      THE WITNESS:  That that foundation would
5 also come with...
6 Q.  Okay.  Let me try and unpack a few of these.
7      The conversations with Miss Miller, Miss
8 Gargalli, Mr. Sunstein, Mr. Palmer and
9 Mr. Martinelli, these were all separate
10 conversations?
11 A.  Yes.
12 Q.  There were no conference calls with more than
13 one of them on the line?
14 A.  No.
15     And some of them wrote letters to
16 Sherif. I didn't.  I called him.  Some of them
17 called and wrote letters.
18 Q.  And you called each of those people:  Miller,
19 Gargalli, Sunstein, Palmer and Martinelli, before
20 you called Sherif?
21     MR. McCLENAHAN:  If you know.
22 A.  I don't remember.  I probably called one or
23 two to say -- you know, because I thought was I
24 asleep at the switch or at some meeting and I didn't
25 hear this, and, you know, I can't tell you in what

Dorothy McKenna Brown, Ed.D.

1
2  order I called, but none of those people had any
3  knowledge of it.
4    Q.  Let me just plumb your memory for a moment on
5  each of these conversations.  Maybe you don't
6  remember anything about them, but maybe you do.
7      Let's start with Leslie Ann Miller.  Do
8  you remember any of the details of that
9  conversation?
10   A.  No.  As I remember it now -- I don't know how
11  many years we are going back -- they were pretty
12  much the same.  There was just a general concern
13  that things of major importance were being
14  undertaken without discussing it with the full
15  board.
16   Q.  And each of those people had that --
17   A.  They had that same feeling.
18   Q.  -- agreed with you?
19   A.  You know, we didn't say, oh, it is going to
20  lose this much money or we are going to have to
21  spend or anything like that; it was really with
22  where the board fit in all of this activity.
23   Q.  Can you remember anything specifically about
24  your conversation with Miss Gargalli other than what
25  you have already said?

Dorothy McKenna Brown, Ed.D.

1
2   A.  No.
3   Q.  Mr. Sunstein?
4   A.  No; with none of them.
5      I just remember Leslie Miller saying,
6  "I'm writing a letter this afternoon and it's going
7  right over there."  That was...
8   Q.  Did Mr. Abdelhak during your first
9  conversation with him -- by the way, do you think
10  your call to Mr. Abdelhak was on the same day that
11  you read the newspaper article?
12   A.  I'm not certain, but very soon thereafter.
13   Q.  Did he have any explanation for not coming to
14  the board with this prior to the article being
15  published other than that the executive committee
16  had approved it?
17   A.  No.  Just that the board would have an
18  opportunity to review all the details at its
19  subsequent meeting and so on and so forth.
20   Q.  And did that satisfy you at the time?
21   A.  Well, not really.  I mean, I just -- it was
22  done, and so I was not aware that it had ever
23  happened before and I'm not aware that it ever
24  happened after that.
25   Q.  I'm sorry.  What do you mean "it was done"?

Dorothy McKenna Brown, Ed.D.

1
2   A.  The conversation and whatever had taken
3  place, and, you know, couldn't take it back.
4   Q.  I see.  His interview with the press --
5   A.  Or whoever.
6   Q.  -- Mr. Jacordis?
7   A.  The other thing that I have learned is that
8  when these things are reported, when anything is
9  reported, it's probably half true and half wishful
10  thinking, so, you know, how far along were they
11  really compared to what this article says, that's
12  questionable.
13   Q.  I take it people don't hang up on you very
14  often?
15   A.  I never had anyone hang up on me before
16  except my mother.
17      MR. McCLENAHAN:  That's allowed.
18   Q.  Do you remember where you were in the
19  conversation when he hung up on you?
20   A.  I said to him, "I don't know why you have a
21  board if you are going to operate like this," and
22  that's when he hung up.
23   Q.  Now, the next morning when he called to
24  apologize, what do you remember about that
25  conversation?

Dorothy McKenna Brown, Ed.D.

1
2   A.  I remember I was half asleep, but --
3   Q.  He called you at home at 5:00 a.m.?
4   A.  5:00, 5:30, something like that.  And he just
5  said he was sorry for any misunderstanding, that he
6  thought he had operated according to the guidelines
7  and the bylaws and so on and so forth.  And I said
8  "Well, fine."  I appreciated his call and we let it
9  be.
10   Q.  Did any of the other folks, Miller, Gargalli,
11  Sunstein, Palmer or Martinelli, talk to you
12  subsequently about any conversations that they had
13  with Mr. Abdelhak about this subject?
14   A.  No.  I know some of them said they called,
15  but they didn't talk about the details of the
16  conversation that I remember.
17   Q.  Did any of your friends or any other
18  colleagues in Philadelphia tell you that they read
19  the article and they knew you were on the board?
20   A.  No, I don't remember.
21   Q.  Now, did you ultimately attend the meeting
22  where the acquisition of Graduate Hospital System
23  was approved?
24   A.  Yes.
25      MS. MEADEN:  Objection.

11 (Pages 41 to 44)

Page 169

Dorothy McKenna Brown, Ed.D.

1
2  A.  No.
3  Q.  Now, if Coopers & Lybrand had brought such
4  matters to the attention of the audit committee,
5  would it -- would you have expected the audit
6  committee to conduct an investigation into those
7  issues raised by Coopers?
8      MR. FRIESEN:  Objection.
9  A.  Yes.
10 Q.  And is it your belief that the committee
11 would have conducted a thorough investigation of
12 such matters?
13     MR. FRIESEN:  Objection.
14 A.  Yes.
15 Q.  And based on some of your testimony earlier
16 today, I sensed that you were never hesitant, if
17 issues were presented to you that you were concerned
18 about, to inquire further and get answers to the
19 questions you had, correct?
20     MR. FRIESEN:  Objection.
21 A.  Yes.
22 Q.  That's a fair statement?
23 A.  Yes.  Why wouldn't I?
24 Q.  Right, right.
25     So if you had ever heard that these

Page 170

Dorothy McKenna Brown, Ed.D.

1
2  issues that I listed earlier had been raised by
3  AHERF's outside auditors and that came to your
4  attention, do you believe that you would have either
5  conducted an investigation on your own or gone to
6  people to insist that they conduct -- the
7  appropriate people to insist they conduct such an
8  investigation?
9      MR. FRIESEN:  Objection.  Calls for
10 speculation.
11 A.  Yes; not on my own, but I would have gone to
12 people that I thought were qualified to do such a
13 thing.
14 Q.  And that would have been members of the audit
15 committee?
16 A.  Right, or the resources.
17 Q.  Resource management committee, is that what
18 you meant?
19 A.  Committee.  I keep calling it a finance
20 committee in my head, but it was resources.
21 Q.  But that's what you were talking about?
22 A.  Yeah.
23 Q.  And you certainly would have wanted to know
24 what the results of that investigation were had one
25 been conducted, correct?

Page 171

Dorothy McKenna Brown, Ed.D.

1
2      MR. FRIESEN:  Objection.
3  A.  Yes.
4      Sorry.
5  Q.  Do you have any reason to believe that if
6  Coopers & Lybrand had ever raised any of these
7  issues with the audit committee that the
8  audit committee would not have conducted any
9  investigation into those allegations?
10     MR. FRIESEN:  Objection.
11 A.  No.
12 Q.  If the audit committee had heard such
13 allegations from Coopers & Lybrand and had conducted
14 such an investigation, it would have been your
15 expectation that they would then follow whatever
16 prudent course seemed dictated by the results of
17 that investigation, correct?
18     MR. FRIESEN:  Objection.
19 A.  Yes.
20 Q.  And if at the end of such an investigation
21 the audit committee had come to the board and made a
22 recommendation to the board about a course of action
23 to follow and had sufficiently satisfied any
24 questions that you may have had, would you believe
25 that you would have followed the recommendation of

Page 172

Dorothy McKenna Brown, Ed.D.

1
2  the audit committee in that regard?
3      MR. FRIESEN:  Objection.
4  A.  Yes.
5  Q.  Yes, you would have?
6  A.  I would, yeah.
7  Q.  Prior to the fall of 1998, did you ever have
8  any question as to the accuracy of AHERF's financial
9  statements?
10 A.  No.
11 Q.  Did you have any --
12     MR. FRIESEN:  I'm sorry.  Did you say
13 fall of 1998?
14     MS. MEADEN:  Yes.
15     MR. FRIESEN:  Objection.
16 Mischaracterizes the prior testimony.
17     MS. MEADEN:  I didn't characterize her
18 testimony.  I asked her a question if she had any.
19     MR. FRIESEN:  Okay.  Contradicts prior
20 testimony.
21     MS. MEADEN:  I don't think it does, but
22 all right.
23     THE WITNESS:  I don't think it does.
24     MR. McCLENAHAN:  Let's just go to the
25 next question.  We can have this debate later on.

Page 173

Dorothy McKenna Brown, Ed.D.

1
2  Q.  Did you make any observations as to -- strike
3  that.
4      Did you come to understand at some point
5  that Mr. McConnell had been terminated, his
6  employment had been terminated at AHERF?
7  A.  Yes.
8  Q.  Did you have any understanding as to why his
9  employment was terminated?
10  A.  No.
11  Q.  Were you involved in the decision to
12  terminate his employment?
13  A.  No.
14  Q.  Do you recall during the summer and fall of
15  1998, late summer, early fall of 1998, there was
16  some question as to whether AHERF's 1997 audited
17  financial statements could continue to be relied
18  upon?
19  A.  Yes.
20  Q.  Tell me how you first learned of that.
21  A.  I'm not sure.  I may have read it in the
22  newspaper.
23  Q.  Do you recall why it was that there was some
24  concern as to whether those financial statements
25  could continue to be relied upon?

Page 174

Dorothy McKenna Brown, Ed.D.

1
2  A.  No.
3  Q.  Do you recall that there was a public
4  announcement made, I think in September of 1998,
5  that those statements should no longer be relied
6  upon, the audited financial statements of AHERF for
7  fiscal year 1997?
8  A.  It's a bit of a blur, but I'm sure that I
9  knew it when it was announced.
10  Q.  Were you involved at all in the decision to
11  make that public announcement?
12  A.  No.
13  Q.  At some point in time did you come to
14  question the thoroughness or the competency of
15  Coopers & Lybrand's audit of AHERF's financial
16  statements?
17      MR. FRIESEN:  Objection.
18  A.  Only after that announcement that they had to
19  recast them or --
20  Q.  Do you recall specifically --
21  A.  That would be in that September time frame.
22  Q.  Do you recall having any discussions with
23  anyone on the AHERF board or within AHERF management
24  about that issue?
25  A.  No.

Page 175

Dorothy McKenna Brown, Ed.D.

1
2  Q.  During that same time period a decision was
3  made not to continue to retain
4  Pricewaterhousecoopers, which was the successor to
5  Coopers & Lybrand?
6  A.  Right.
7  Q.  Are you familiar with that decision?
8  A.  Yes.
9  Q.  Were you involved in that decision?
10  A.  No.
11  Q.  Did you have any understanding as to why that
12  decision was made?
13  A.  I guess because there was a lack of
14  satisfaction with the previous audit.
15  Q.  Did you have any conversations with anyone
16  about that --
17  A.  No.
18  Q.  -- topic?
19      At one point earlier today we were
20  looking at Book 3 for a board meeting of 12/16/1994,
21  and we don't need to refer to that, but I'm just
22  trying to put in context your testimony.  And I
23  think Mr. Friesen was asking you questions about the
24  physician practice acquisition, and I think your
25  testimony was that you raised a question at that

Page 176

Dorothy McKenna Brown, Ed.D.

1
2  point, do we have enough money to do all of these
3  things?
4  A.  Or sometime prior.  In that time frame.  I
5  don't know if it was at that heating or not.
6  Q.  And I think you said that someone answered
7  with a definitive yes?
8  A.  I think it was Sherif.
9  Q.  That was my question.  Do you recall who?
10  A.  Yes, I think it was Sherif, and I think he
11  said we have plenty of money.
12  Q.  And do you recall until the fall of 1997 Mr.
13  Abdelhak giving recurrent assurances to the board
14  that the system was financially strong enough to
15  absorb acquisitions of hospitals and acquisitions of
16  physician practices?
17  A.  I can't quote him the way I did in that
18  particular instance, but, yes, I have a sense that
19  we were regularly assured that while there was a lot
20  of work to be done, it could be done.
21  Q.  And, to be clear, you never heard from the
22  outside auditors --
23  A.  No.
24  Q.  -- that Mr. Abdelhak's assurances in that
25  regard were incorrect or inaccurate, correct?

44 (Pages 173 to 176)

Page 177

Dorothy McKenna Brown, Ed.D.

1
2   A.   No.
3         MR. FRIESEN:  Objection.
4   Q.   Earlier this afternoon Mr. Friesen also
5   showed you the 1996 audited financial statements,
6   and, again, there is no need to go back and look at
7   them. I'm just trying to put in context your
8   testimony. And he asked you if you reviewed the
9   financial statements as a practice when you got
10  them. And I believe your testimony was you
11  typically looked at the letter from the auditors and
12  the balance sheet and then perhaps looked at
13  footnotes if something caught your interest,
14  correct?
15  A.   Yes.
16  Q.   And I think you said you expected highly
17  unusual items to be pointed out by the finance
18  committee?
19  A.   Or the audit committee.
20  Q.   Or the audit committee?
21  A.   Or the audit committee.
22  Q.   And did you in that same vein expect highly
23  unusual items to be pointed out by the outside
24  auditors?
25  A.   I would assume they would have been

Page 178

Dorothy McKenna Brown, Ed.D.

1
2   pointed -- would have been pointed out to the audit
3   committee.
4   Q.   By the outside auditors?
5   A.   By the outside auditors.
6   Q.   And, again, you are not aware of Coopers &
7   Lybrand ever pointing --
8   A.   No.
9   Q.   -- out such highly unusual items to the audit
10  committee, correct?
11  A.   No.
12        MR. FRIESEN:  Objection.
13        MS. MEADEN:  Thank you for your
14  patience, Dr. Brown. I don't have any further
15  questions at this point. Mr. Friesen may.
16  BY MR. FRIESEN:
17  Q.   I just have a few.
18        I would like to clarify one thing, Dr.
19  Brown. In response to Miss Meaden's question, you
20  testified that prior to the fall of 1998 you
21  didn't -- I think you said you didn't believe that
22  any of AHERF's financial statements were inaccurate?
23  A.   No, I think she asked if Coopers' financial
24  statements were inaccurate.
25        MS. MEADEN:  The audited.

Page 179

Dorothy McKenna Brown, Ed.D.

1
2   A.   The audited.
3   Q.   Well, what she said was financial statements,
4   and I want to be clear what we are talking about
5   here.
6   A.   Okay.
7   Q.   Did you mean in your answer to talk about
8   audited financial statements?
9   A.   I meant audited financial statements. As I
10  indicated earlier, I had great concern when Sherif
11  said, quote, I don't have good numbers.
12  Q.   That's what I was getting at, and that was
13  the source of my confusion.
14        The second question I have is with
15  respect to the timing of the Graduate acquisition.
16  The testimony that you gave about believing that
17  there was a period of time within which the Graduate
18  entities could be given back to prior management, I
19  think you testified in response to Miss Meaden's
20  questions that that was during the due diligence or
21  trial period?
22  A.   Yes.
23  Q.   Now, did you approve of the acquisition
24  beyond the trial period, or did you think that
25  beyond the trial period you would have to approve it

Page 180

Dorothy McKenna Brown, Ed.D.

1
2   again?
3   A.   Well --
4         MS. MEADEN:  Objection. Vague.
5   Compound.
6         Go ahead.
7   A.   I think there is a -- something you showed me
8   here --
9   Q.   Right.
10  A.   -- minutes that talk about the final
11  presentation by Sherif, if I'm not mistaken.
12  Q.   Exhibit 832, which are the minutes of the
13  December 12, 1996.
14  A.   Yes.
15  Q.   Beginning on Page 743. That's right. Thank
16  you.
17        The paragraph on 743, the introduction
18  there says, "The president," meaning Mr. Abdelhak,
19  "reviewed the overall plans underway and steps taken
20  to date to accomplish the integration and
21  transaction of appropriate GHS activities to AHERF,
22  noting that final form of the reorganization will be
23  determined as current due diligence reviews and
24  other financial legal and operational analyses are
25  completed."

45 (Pages 177 to 180)

Page 181

Dorothy McKenna Brown, Ed.D.
1
2   A.   Yes.
3   Q.   And then the resolution goes on.
4   A.   For pages.
5   Q.   Yes.
6        And my question -- and I can point you
7   to specific paragraphs of the resolution if you
8   like, but before I do that, my question is:  Did you
9   understand that this resolution gave Mr. Abdelhak
10  the authority to finally fold the Graduate entities
11  into the AHERF system once due diligence was
12  complete?  And if you like, I can point to specific
13  paragraphs.
14        MR. McCLENAHAN:  If you have a current
15  recollection what this all meant in December of
16  1996 --
17        THE WITNESS:  I don't have a current
18  recollection.
19        MR. FRIESEN:  Well, it may help to look
20  at --
21        MR. McCLENAHAN:  Let me finish.
22        -- then you can answer that question.
23  But unless you have such a current recollection or
24  unless counsel can specifically refresh your memory,
25  you shouldn't speculate on what these pages of

Page 182

Dorothy McKenna Brown, Ed.D.
1
2   resolutions mean or say.
3   A.   I don't have a current recollection.
4   Q.   Let me try to refresh your recollection then.
5        If you go to Page 745, the middle
6   paragraph says --
7        MR. McCLENAHAN:  Why don't you start at
8   the top of that page if we are going to be referring
9   to it.
10  Q.   The middle paragraph says, "Whereas, although
11  due diligence reviews are continuing, AHERF
12  management has concluded that certain of the
13  operations and assets of the GHS subsidiaries should
14  be integrated into the AHERF system including,
15  without limitation, three of the adult community
16  hospitals (the Graduate Hospital, City Avenue
17  Hospital and Rancocas Hospital), the physician
18  satellite network, and the Bermuda offshore captive
19  insurance company, GHS Re, Inc."
20        And if you could read to yourself the
21  paragraphs on Page 746.
22        MR. McCLENAHAN:  Is there a question?
23        MR. FRIESEN:  Yes.
24  Q.   The question is:  Did you think at the time
25  during this meeting that you were approving simply a

Page 183

Dorothy McKenna Brown, Ed.D.
1
2   trial period wherein there would be due diligence
3   and AHERF would manage the Graduate entities for a
4   period of time, or did you think that you were
5   approving the ultimate acquisition if due diligence
6   turned out to be satisfactory?
7        MS. MEADEN:  Objection.
8        MR. McCLENAHAN:  Are you finished?
9        MR. FRIESEN:  Yes.
10        MR. McCLENAHAN:  Objection.  That
11  question is if you have a recollection.
12  A.   I truly don't remember.  If I voted for it, I
13  voted for it and I had read the material ahead of
14  time, but I don't remember.
15  Q.   Even apart from this document, since you
16  yourself have testified about this trial period, do
17  you recall believing when you approved the trial
18  period that management would have to come back to
19  the board for the final --
20  A.   Yes.
21  Q.   -- approval?
22  A.   Yes.
23  Q.   And do you recall that ever happening?
24  A.   No.
25  Q.   But recall at some point that Graduate

Page 184

Dorothy McKenna Brown, Ed.D.
1
2   was actually folded into AHERF?
3   A.   Yes.
4   Q.   And when you found out about that, did you
5   tell anyone that this should have been brought back
6   to the board again?
7        MS. MEADEN:  Objection.
8   A.   No.
9        MR. FRIESEN:  I don't have any further
10  questions.
11  BY MS. MEADEN:
12  Q.   I have a couple of followup questions.
13        When Mr. Abdelhak said in that meeting
14  in I think the May time period of 1998 that he
15  didn't have good numbers, was he specifically
16  referring to internal financial statements, or was
17  he looking at internal financial statements?
18  A.   I think that's what he was talking about
19  because the three more astute financial members on
20  that committee were asking him specific questions
21  about cash flow and a new word that I learned EB --
22        MR. McCLENAHAN:  EBITDA.
23  Q.   EBITDA.
24  A.   -- EBITDA, and I had to go home and look that
25  one up, and things like that.  And after some

46 (Pages 181 to 184)

# TAB 189

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE COOPERS, LLP.*

---

## *DONALD KAY, M.D.*
### *June 18, 2003*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### PH: 212-557-7400 / FAX: 212-692-9171

KAY, M.D., DONALD



**LEGALINK®**

A WORDWAVE COMPANY

DONALD KAYE, M.D.,

Page 374

1  acquisition.
2  BY MR. McDONOUGH:
3  Q.  Now, Dr. Kaye, even including the
4  benefits obtained as a result of the
5  efforts that you described, just
6  described, is it correct that AIHG
7  nonetheless continued to lose a very
8  substantial amount of money?
9  A.  Yes, it is. And a lot of the
10  reasons were that the critical mass, the
11  practices, had already been acquired and
12  others were coming on line that had been
13  already either purchased or fairly
14  binding agreements had been made. And
15  so, with the new practices, there were
16  more total losses.
17  Q.  And so the reasons for those
18  losses, as I understand your answer, is
19  that much of what was in AIHG was
20  already there and already the basis of
21  agreements at the time you arrived.
22  A.  That is correct. And there were
23  others that were committed to, which
24  then came on line and added to the
25  losses.

Page 375

1        MR. McDONOUGH: Mark this as
2  the next number, please.
3        MR. KRUSKO: It's 1514.
4        (Exhibit 1514 was marked for
5  identification.)
6  BY MR. McDONOUGH:
7  Q.  Dr. Kaye, I'm going to show you
8  what's been marked as Exhibit 1514. It
9  is, first of all, a fax cover page
10  indicating a delivery to you dated
11  October 1st of 1997, and attached to it
12  is something titled the AIHG Policy and
13  Performance.
14        Do you see that?
15  A.  Yes.
16  Q.  I'd like you to turn to the last
17  page of that exhibit. And in the last
18  paragraph, there is a sentence that
19  reads, In summary, our acquisition phase
20  is complete and our consolidation
21  integration phase is to begin.
22        Do you see that?
23  A.  Yes.
24  Q.  Dr. Kaye, at any point when you
25  were involved with AIHG as its

Page 376

1  president, do you recall any discussion
2  or reference to the fact of an
3  acquisition phase and then a
4  consolidation phase?
5  A.  No. But the termination or
6  slowing down of the acquisition phase is
7  clearly a reference to my intent and
8  efforts to slow it down.
9  Q.  How about the referenced term
10  here, "consolidation integration phase";
11  is that something that means anything to
12  you?
13  A.  No. That's his terminology.
14  This -- these were never formally
15  approved terms of anything, but I -- the
16  concept is that he is referring to a
17  need for consolidation, integration,
18  improvement, which I certainly can't
19  disagree with.
20  Q.  And in fact, is the process of
21  trying to take what you had at AIHG and
22  make it work in a more consolidated and
23  integrated fashion something you paid
24  attention to as well?
25  A.  Work better. I don't know really

Page 377

1  what's being consolidated or what's
2  being integrated. I'm -- my concern was
3  in terms of making it work better, and
4  that included disease management, more
5  medical direction, more oversight.
6  Q.  You can put that to the side.
7  Thank you.
8        Dr. Kaye, do you recall being
9  part of any discussions concerning a
10  proposed acquisition or a possible
11  acquisition of the Graduate Hospital
12  System?
13  A.  Yes. I was certainly present when
14  various discussions were held about the
15  Graduate System.
16  Q.  Okay. Well, my specific
17  reference, though, was to not any part
18  of the acquisition. I'm talking about
19  discussions about whether there should
20  be an acquisition of the Graduate
21  Hospital System.
22  A.  Yes. Again, there were multiple
23  such discussions along the line.
24  Q.  And with whom were those
25  discussions held?

24 (Pages 374 to 377)

DONALD KAYE, M.D.,

Page 378

1  A.  Primarily with Mr. Abdelhak. But
2  also, the various stages and
3  possibilities were discussed at a board
4  level. As a matter of fact, I can't
5  swear to this but I'm pretty sure that
6  the first I heard about the possibility
7  of a Graduate acquisition was at a board
8  meeting.
9  Q.  And taking first the discussions
10  with Mr. Abdelhak, can you recall for me
11  what was discussed as the pros and cons,
12  pros or cons of proceeding with the
13  Graduate Hospital Acquisition?
14  A.  Yes. I was asked my opinion. I
15  had the feeling that the basic decision
16  had already been made and, therefore,
17  what I did was gave the pros and the
18  cons as I saw them as opposed to saying
19  yes or no, which I didn't feel would
20  have been very helpful; as with the
21  Hahnemann acquisition, I gave what I
22  felt were the pros and cons.
23      I didn't come out for it, for
24  sure, and certainly didn't veto it
25  because I felt it would not have been a

Page 379

1  useful thing to do because it was going
2  to happen anyway.
3  Q.  And as best you can recollect,
4  what was the basis for your conclusion
5  that it was going to happen anyway?
6  A.  My feelings and my knowledge of
7  Mr. Abdelhak.
8  Q.  What were the pros and cons that
9  you recall discussing with Mr. Abdelhak?
10  A.  As I saw them, the pros were that
11  there was Graduate Hospital, which was a
12  highly-thought-of hospital with a
13  highly-thought-of staff in Philadelphia,
14  that they had a practice organization
15  which was much more efficient than
16  the -- than AHG. I believe they had --
17  whether they had taken more care in
18  selecting or whether their contracts
19  were different or whatever, they were
20  not losing large amounts of money.
21      The cons I felt were Graduate
22  Hospital, which was a tertiary care
23  hospital, which would be competing with
24  Hahnemann and MCP, both of which were
25  tertiary care hospitals; some very weak

Page 380

1  hospitals which were very poorly-
2  thought-of, such as the City Line Avenue
3  Hospital, Parkview Hospital, and Sinai,
4  which I saw no future for and I felt
5  basically it should be closed, with the
6  activity moved to our existing hospitals
7  should the acquisition go forward.
8      One other pro would be that
9  Graduate Hospital was in a part of the
10  city where we didn't have anything at
11  the time. So those were the pros and
12  the cons.
13  Q.  At the time the potential
14  acquisition was discussed with
15  Mr. Abdelhak, was it your understanding
16  that the Graduate system was losing
17  money?
18  A.  At -- we had these discussions at
19  various points in time. I don't think
20  there was one day where we sat down and
21  discussed everything about it, because
22  we had discussions and then there was
23  due diligence being done.
24      My understanding is that some
25  of the components were losing money and

Page 381

1  some of the components were making money
2  but that, as a whole, they weren't
3  doing -- as a whole, they were not
4  making money. But the thought was that
5  by efficiencies of management, by
6  downsizing their finance department,
7  personnel, all of the other support
8  areas, by extending hours, that there
9  would be efficiencies in the
10  consolidation.
11      I was not clearly in favor of
12  the acquisition but I clearly did not
13  veto it because I would -- really wasn't
14  in a position to veto it.
15  Q.  And I take it from that answer,
16  Dr. Kaye, that shifting to the
17  discussion of the Graduate acquisition
18  at the board level, you did not speak
19  against the possibility.
20  A.  No. At the board meeting -- the
21  AHERF board meeting anyway, where this
22  would have been primarily discussed --
23  it was a question of doing due diligence
24  and looking into it and making a
25  determination at a later time as to

25 (Pages 378 to 381)

DONALD KAYE, M.D,

Page 382

1  whether or not it would be taken into
2  AHERF, as the expression goes.
3  Q.  To your -- based on your
4  knowledge, Dr. Kaye, did any member of
5  the AHERF board, at the meeting you
6  reference or any other time in your
7  presence, vote or argue against the
8  Graduate acquisition?
9  A.  I believe there was general
10  skepticism from many of the board
11  members.  I don't specifically recall
12  any arguments or vetos, but I do recall
13  a general concern and skepticism about
14  the Graduate system.
15  Q.  Do you recall that any board
16  member voted against the concept of
17  acquisition?
18  A.  No, I don't really actually recall
19  a vote, per se, although I'm certain one
20  must have been taken.
21  Q.  Dr. Kaye, I'll show you what's
22  been marked as, previously marked as
23  Deposition Exhibit 751.  It is a copy of
24  a news release dated August 6th of 1996.
25       Do you see that?

Page 383

1  A.  Yes, I do.
2  Q.  And to put this in perspective,
3  Dr. Kaye, would that have been in the
4  first quarter of fiscal 1997 for the
5  AHERF eastern hospitals?
6  A.  Yes, it would have been.
7  Q.  Now, Dr. Kaye, does this assist in
8  refreshing your recollection that the
9  initial announcement of the Graduate
10  Health System occurred during the summer
11  of 1996 or during the early part of the
12  fiscal 1997 year?
13  A.  Yes.  I know the initial
14  discussions or planning occurred about
15  that time.  I am not specifically
16  familiar with this release.
17  Q.  This release, Dr. Kaye,
18  indicates -- this press release
19  indicates that the transfer will be
20  accomplished by transferring
21  subsidiaries of GHS, that's the Graduate
22  Health System, to a membership in SDN.
23       What was SDN?
24  A.  My best understanding of SDN, the
25  first contact I had in any way with SDN,

Page 384

1  was that SDN was the organization used
2  to acquire the United Hospitals, to
3  manage the United Hospitals while due
4  diligence was being done, and then to
5  transfer the hospitals or other assets
6  that were to be incorporated into
7  AHERF -- to AHERF, and then to sell,
8  close or discontinue other operations
9  that were part of the United Hospital
10  operations.
11       Specifically, I recall that
12  there was an ambulance company and there
13  were several other companies that were
14  either sold or discontinued by SDN.
15  Q.  Is it your recollection, Dr. Kaye,
16  that the AHERF board was aware that SDN
17  would be the initial vehicle utilized by
18  AHERF for acquisition of the Graduate
19  Health System?
20       MR. WHITNEY:  Objection to
21  form and foundation
22       THE WITNESS:  Of the Graduate
23  Health System?  Did I realize that --
24       I know that AHERF was aware
25  of SDN, and I know that the AHERF board

Page 385

1  was told that these hospitals would be
2  under the management of SDN while due
3  diligence was being done, and I know
4  that the AHERF board was told that they
5  would be appraised before -- or,
6  apprised of any further steps and would
7  have to agree to incorporate whatever
8  hospitals of the Graduate system were to
9  be incorporated at a later date.
10  BY MR. McDONOUGH:
11  Q.  Now, Dr. Kaye, is it your
12  recollection that due diligence or
13  financial analysis of the Graduate
14  Health System was, in fact, done by the
15  AHERF system?
16  A.  It was done by the AHERF finance
17  department.  Mr. McConnell was in
18  charge.  I reviewed the hospital
19  operations and what existing contracts
20  there were between the hospitals and
21  various physician groups and things like
22  that.
23  Q.  To your knowledge -- well, strike
24  that.
25       MR. McDONOUGH:  Why don't we

26 (Pages 382 to 385)

TAB 190

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## ROBERT BERLINER
### February 16, 2005

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

BERLINER, ROBERT - Vol. 1



Page 149

Robert Berliner
1
2 had many other brands.
3     Q.    Have you ever had in your career
4 any other experience like the one that you
5 described at American Beverage?
6     A.    Yes, I did.
7     Q.    What was that experience?
8     A.    It was with a company called
9 Nickelberry that had been a long-standing client
10 of our Chicago office where there was a
11 management change and the company relocated to
12 New York. The company took a position that they
13 had made a decision to dispose of a line of
14 business during the year and therefore in the
15 financial statements they wanted to release this
16 categorized the operations of this line of
17 business as a discontinued operation.
18     I'll never forget the situation, we
19 were working lengthy hours and one night about
20 8:30 I asked my team, I was the partner and I
21 asked my team look, I've got to leave now, is
22 there anything I can read on the train and the
23 answer was well, why don't you take the minutes
24 of the board of directors. So I took the
25 minutes of the board of directors meetings and

Page 150

Robert Berliner
1
2 I'm on the train reading these minutes and it
3 suddenly dawns on me that haven't I read this
4 part before, didn't I see this movie. I picked
5 up what I thought I had seen and there I had in
6 my hands two versions, two very different
7 versions of the same board meeting with respect
8 to this discontinuance of the business, and in
9 fact they had not made any decision to
10 discontinue the business.
11     I went back to the CEO and I said
12 to him as politely as I could how can you
13 account for the fact that what you told me --
14 which of these two board minutes is correct and
15 he blew it, he got all upset and everything and
16 lost his temper. Bottom line, we took the
17 discontinued operations, reflected them as
18 current operations, issued the financial
19 statements that way and two months later he
20 appeared in our office to speak to the managing
21 partner of the office to tell him we were being
22 fired and replaced as auditors because your
23 audit partner wouldn't let me put out the false
24 financial statements that I wanted to put out.
25     I'm use to dealing with managements

Page 151

Robert Berliner
1
2 that are not all that forthcoming and indeed
3 managements that lie. Whether they do or not
4 that does not absolve an auditor of his
5 responsibilities, otherwise where is the auditor
6 the watchdog for the public, readers of
7 financial statements count on the auditor to do
8 an audit.
9     That's why earlier in the day I
10 wanted to comment when you asked me about the
11 management representation letter being an
12 important procedure, of course it's an important
13 procedure but on the other hand what is it, of
14 course you have to get these representations
15 from management, but that is by no means the
16 corroboration or the end of what you're supposed
17 to do. I'm sorry for this prolonged answer, but
18 I couldn't resist given the question you asked.
19     Q.    I can see that. Have you had any
20 other experiences in your career like American
21 Beverage or Nickelberry?
22     A.    I did, but not all of them that I
23 can recollect or stand out at this time.
24     Q.    There aren't any others that come
25 to mind at this time?

Page 152

Robert Berliner
1
2     A.    Correct.
3     MR. JONES: Let's take a short
4 break.
5     THE VIDEOGRAPHER: This marks the
6 end of tape number 2 in the deposition of Robert
7 Berliner. We are going off the record, the time
8 is approximately 2:15 p.m.
9     (Short recess taken.)
10     THE VIDEOGRAPHER: We are back on
11 the record. Here marks the beginning of tape
12 number 3 in the deposition of Robert Berliner,
13 the time is 2:28 p.m.
14     A.    Mr. Ryan, may I add to the record
15 with respect to the Kite testimony?
16     Q.    Yes, please.
17     A.    I just checked with my colleague
18 Mr. Zatkow and it's his recollection that we
19 received the final report of Mr. Kite just prior
20 to issuing our report, which had been drafted
21 based upon the oral assurances that Mr. Kite
22 gave us as to what his opinions would say on the
23 management we were interested in.
24     Q.    As you understand it you didn't
25 receive the report from Mr. Kite until a matter

Page 153

Robert Berliner

1  of days before you submitted your report?
2      A.   That's correct.
3      Q.   You in fact had already drafted
4  what was in the report based on an oral
5  communication of Mr. Kite's views?
6
7      A.   That's correct.
8      Q.   Thank you. Is it your
9  understanding that in fiscal 1997 AHERF
10  management decided to engage Coopers & Lybrand
11  to perform only an audit of the consolidated
12  system rather than additionally perform separate
13  audits of certain affiliates or obligated
14  groups?
15      MR. JONES:  Object to form.
16      A.   I think I know where you're going
17  and the answer is basically yes, although I
18  would have used different words. It was to
19  report on, they couldn't audit the consolidated
20  without also auditing the consolidating, but the
21  report that I think you're talking about was an
22  audit opinion on the consolidated, as opposed to
23  1996 where they gave separate audit opinions on
24  the obligated groups.
25      Q.   That was a change in the scope of

Page 154

Robert Berliner

1
2  work for Coopers & Lybrand from one year to the
3  next, right?
4      A.   Again that needs commentary, it's
5  not an easy answer to that question. There is a
6  yes and a no. The no is that no, they still had
7  to audit the books and records of the various
8  components to be able to reach an opinion on the
9  consolidated financial statements, that's how
10  you audit, you audit the books of each of the
11  components in the consolidated financial
12  statements. The way the scope changes is that
13  the opinion that they would express on the
14  consolidating information would be in all
15  respects material to the consolidated.
16      As a result thereof, the audit
17  scope in terms of materiality, the materiality
18  threshold drops from what would be material to
19  the individual obligated groups -- I'm sorry, it
20  doesn't drop, it increases to the materiality on
21  the consolidated financials taken as a whole so
22  that less work would be required to give the
23  opinion that was given on the consolidating,
24  then if the audit firm had to report
25  individually on each of the obligated groups.

Page 155

Robert Berliner

1
2      Q.   So there was a more lenient
3  standard of materiality in 1997 than there had
4  been in the previous years?
5      A.   Yes.
6      MR. JONES:  Object to form.
7      Q.   Do you agree that because of this
8  change in reporting format, Coopers & Lybrand's
9  audit in fiscal year 1997 was conducted for the
10  purpose of forming an opinion on the
11  consolidated financial statements taken as a
12  whole?
13      MR. JONES:  Object to form.
14      A.   Again, my answer is yes and no.
15  Yes to the extent that that was the only audit
16  opinion expressed. No in that to be able to
17  express that opinion there had to be extensive
18  work on the various components, and particularly
19  to enable Coopers to be in a position to issue
20  its debt compliance letters in connection with
21  the various loan covenants. So there was a
22  modification, but it didn't go from auditing the
23  individual obligating groups to not auditing
24  them at all.
25      Q.   Do you agree that in fiscal year

Page 156

Robert Berliner

1
2  1997 Coopers & Lybrand was not required to
3  conduct an audit for the purpose of forming an
4  opinion on the financial statements of DVOG?
5      MR. JONES:  Object to form.
6      A.   Yes, there was no reason to express
7  an audit opinion on DVOG because a client didn't
8  request that opinion, but still with respect to
9  the debt compliance letters, the auditing work
10  that was done on DVOG and also the auditing work
11  on DVOG in order to form an opinion on the
12  consolidated financials taken in a whole
13  required extensive auditing procedures to be
14  applied to DVOG's books and records.
15      Q.   Do you agree that the supplementary
16  consolidating financial information for DVOG in
17  1997 was subjected to the auditing procedures
18  applied in the audit of the consolidated AHERF
19  financial statements?
20      A.   Yes, I do.
21      Q.   This change in the report that
22  Coopers & Lybrand was providing is something
23  that is apparent to any reader of the financial
24  statements, is it not?
25      MR. JONES:  Object to form and

Robert Berliner

1 foundation.
2     A.    What's apparent is they are not
3 getting a separate audit report on the
4 individual obligated groups, but they are
5 getting in lieu thereof a report on the
6 consolidating information.
7     Q.    This change in Coopers & Lybrand's
8 reporting obligation was apparent to the AHERF
9 board of trustees, right?
10     MR. JONES:  Object to foundation
11 and form.
12     A.    I guess so, I have no reason to
13 think otherwise. I don't know for sure to what
14 extent the board of trustees examined the
15 financial statements, I would think they would.
16     Q.    Do you agree that this change in
17 Coopers & Lybrand's, the reporting obligation
18 was also apparent to lenders?
19     MR. JONES:  Same objection,
20 foundation and form.
21     A.    I believe the quid pro quo here was
22 that in lieu of separate audit reports on the
23 individual obligated groups, the lenders would
24 receive a report on the consolidated and a

*(line numbers 1–25 for Page 157)*

Robert Berliner

1 report, separate report on the consolidating.
2 While a sophisticated lender would realize that
3 the report on the consolidating would give
4 somewhat less assurance let's say on the
5 fairness of presentation of the financial
6 statements of DVOG, the lender would also
7 realize that the report on the consolidating did
8 evidence the fact that auditing procedures were
9 applied on the individual components.
10     Just Mr. Ryan as you read to me for
11 the purpose of expressing an opinion on the
12 consolidated, so they would realize that they
13 were still getting audited financial statements
14 of the individual obligated groups -- sorry,
15 that they were not getting audited financial
16 statements of the individual obligated groups,
17 but they were getting an opinion on the
18 consolidating and that were there to be any
19 material departures from GAAP that were detected
20 in the audit of the consolidated financial
21 statements they would be brought to their
22 attention.
23     Q.    Are you aware that Foley & Lardner
24 provided a legal opinion saying that this change

*(line numbers 1–25 for Page 158)*

Robert Berliner

1 in reporting format complied with the obligated
2 group debt agreements?
3     A.    I am aware of that. I also want to
4 modify what I just said. The board of trustees
5 did review the financial statements and did
6 attach importance to the earnings that were
7 recorded therein.
8     Q.    Do you agree with me that as a
9 result of the change in reporting format, the
10 reader of the financial statements was no longer
11 informed of what the bad debt allowance was at
12 individual obligated groups?
13     A.    That's correct.
14     Q.    And was no longer informed of what
15 that debt expense was at different obligated
16 groups?
17     A.    That's correct.
18     Q.    And was no longer informed of
19 related party transactions, that is transactions
20 within the AHERF system?
21     A.    Correct.
22     Q.    Are these in your view then
23 significant reductions in the level of
24 information about DVOG that were provided in

*(line numbers 1–25 for Page 159)*

Robert Berliner

1 1997 as compared to 1996?
2     A.    They are reductions, yes.
3     Q.    Do you believe that they are
4 significant reductions?
5     MR. JONES:  Object to form.
6     A.    I believe they are significant
7 reductions.
8     Q.    And they are apparent to any reader
9 of the financial statements who cares to examine
10 them, right?
11     MR. JONES:  Objection to
12 foundation.
13     A.    The shear absence of footnotes on
14 the individual components is a significant
15 reduction of information.
16     Q.    Do you have any view one way or the
17 other as to whether the legal opinion from Foley
18 & Lardner was reasonable?
19     A.    No, I can't evaluate on a law
20 firm's opinion.
21     Q.    Nor would you have expected Coopers
22 & Lybrand to have been in a position to second
23 guess Foley & Lardner's opinion, would you?
24     MR. JONES:  Object to form.

*(line numbers 1–25 for Page 160)*

Page 233

Robert Berliner

1    Robert Berliner
2    appropriate procedure, and so they gave
3    assurance to someone that nothing came to their
4    attention in the performance of their work on
5    this procedure to indicate that the account was
6    overstated, that conveys false assurance to the
7    recipient of that letter, but it's attributable
8    to the audit failure as opposed to a false
9    communication, an intentionally false
10   communication.
11       Q.    Have you learned that AHERF
12   management and the law firm of Foley & Lardner
13   discovered the error in calculating the Morgan
14   Guarantee Trust consolidated unrestricted fund
15   balance covenant before the release of the
16   fiscal 1997 audited financial statements?
17       A.    I don't recall.
18       Q.    Have you heard of the law firm of
19   Foley & Lardner?
20       A.    Yes.
21       Q.    It is a reputable law firm?
22       A.    As far as I know.
23       Q.    If you were an auditor would you be
24   upset if you learned that your client had a
25   reputable law firm like Foley & Lardner that

Page 234

1    Robert Berliner
2    knew of debt covenant noncompliance and didn't
3    take any action to have their client tell you,
4    the auditor, about it?
5        MR. JONES:  Object to the
6    hypothetical.
7        A.    I would be upset.
8        MR. RYAN:  We need to change the
9    tape.
10       THE VIDEOGRAPHER:  This marks the
11   end of tape number 3 in the deposition of Robert
12   Berliner.  We are going off the record, the time
13   is approximately 4:33 p.m.
14       (Short recess taken.)
15       THE VIDEOGRAPHER:  We are back on
16   the record.  Here marks the beginning of tape
17   number 4 in the deposition of Robert Berliner,
18   the time is approximately 4:46 p.m., you can
19   begin.
20       Q.    Mr. Berliner, do you agree that an
21   audit is designed to provide only reasonable
22   assurance of discovering material in the state
23   that they exist?
24       A.    I do.
25       Q.    An audit is not designed too

Page 235

1    Robert Berliner
2    provide absolute assurance, is it?
3        A.    It is not.
4        Q.    An audit is not a guarantee, is it?
5        A.    It is not.
6        Q.    An auditor is not an insurer, is
7    he?
8        A.    He is not.
9        Q.    Do you agree that the subsequent
10   discovery that a material misstatement exists in
11   the financial statements does not in and of
12   itself evidence inadequate planning, performance
13   or judgment on the part of the auditor?
14       MR. JONES:  Object to form.
15       A.    I agree.
16       Q.    Do you agree that there are certain
17   inherent limitations of an audit?
18       A.    I agree.
19       Q.    For instance, auditors only come in
20   for a short period of time to conduct their
21   audit testing?
22       A.    Relatively speaking, yes.
23       Q.    Do you agree that an auditor cannot
24   test 100 percent of the transactions of a
25   company, right?

Page 236

1    Robert Berliner
2        A.    Well, it's not practical for the
3    auditor to do so.
4        Q.    That's part of the inherent
5    limitations to an audit to which we were
6    referring to?
7        A.    Yes.
8        Q.    As a result of that fact, is the
9    concept of selective testing generally accepted
10   as a valid and sufficient basis for the auditor
11   to base his opinion on?
12       A.    It is.
13       Q.    Selective testing is also referred
14   to sometimes as sampling, right?
15       A.    Yes.
16       Q.    So that an auditor may in
17   conducting his audit conduct procedures only on
18   a sample of the accounts or on a sample of
19   transactions, right?
20       A.    Yes.
21       Q.    That is in accordance with GAAS,
22   right?
23       A.    It is.
24       Q.    Now if an auditor complies with
25   GAAS and does not find material misstatement,

Page 237

Robert Berliner

1
2 that doesn't necessarily mean he didn't do his
3 job properly, does it?
4     A.    That's right.
5     Q.    Do you have a sense of how many
6 entries there would be in a given year to the
7 contractual allowance accounts at AHERF?
8     A.    Thousands.
9     Q.    Of which $28 million transferred
10 from Graduate to the contractual allowance
11 accounts at DVOG would be only a handful, right?
12     A.    Yes.
13     Q.    Do you agree that if an auditor
14 were auditing the contractual allowance account
15 which included thousands of journal entries, an
16 auditor would not test each of the thousands of
17 journal entries recorded throughout the year in
18 the general ledger?
19     A.    I agree.
20     Q.    Would it be fair to say that an
21 auditor is not responsible for recording entries
22 into the books and records of the company?
23     A.    That's correct.
24     Q.    That's the job of the company and
25 its personnel, right?

Page 238

Robert Berliner

1
2     A.    That correct.
3     Q.    As part of the concept I think we
4 mentioned before that the financial statements
5 are the responsibilities of management?
6     A.    That's correct.
7     Q.    Would you agree that the auditor's
8 primary concern is not with individual
9 transactions or individual journal entries, but
10 with the financial statements taken as a whole?
11     MR. JONES:  Object form.
12     A.    That is the auditors primary
13 concern, yes.
14     Q.    Would you agree that an audit
15 performed in accordance with GAAS is not
16 designed to provide an opinion on the
17 effectiveness of internal controls?
18     MR. JONES:  Object to form.
19     A.    Yes, I do.
20     Q.    Do you agree that an audit
21 performed in accordance with GAAS is also not
22 designed to provide an opinion on the
23 qualifications or effectiveness of company
24 personnel?
25     A.    Yes.

Page 239

Robert Berliner

1
2     Q.    Do you agree that an audit
3 performed in accordance with GAAS is also not
4 designed to provide an opinion on company
5 business strategies?
6     A.    Yes.
7     Q.    Do you agree that an auditor has to
8 rely on his professional judgment in carrying
9 out his audit?
10     A.    I agree.
11     Q.    Do you agree that judgment is
12 pervasive throughout every aspect of an audit?
13     A.    I agree.
14     Q.    There are literally hundreds of
15 judgments that are made by an auditor in the
16 course of even the most straightforward audit,
17 isn't that right?
18     MR. JONES:  Object to form.
19     A.    Hundreds of judgments?
20     Q.    Yes.
21     A.    It depends upon the entity I guess.
22     Q.    For an entity as large as AHERF,
23 the whole AHERF system, there would be hundreds
24 of judgments that would be made during the
25 course of the audit?

Page 240

Robert Berliner

1
2     A.    Yes, I agree.
3     Q.    Generally there is no right or
4 wrong answer to any of these matters, right?
5     MR. JONES:  Object to form and
6 foundation.
7     A.    Any of what matters?
8     Q.    The matters on which an auditor
9 exercises judgment.
10     MR. JONES:  Object to form and
11 foundation.
12     A.    There is no single right answer.
13 There may be an array of different right answers
14 might be a better way of putting it, is that a
15 fair way of saying it?
16     MR. JONES:  Same objection.
17     A.    I'm not sure of that.  I can
18 envision circumstances where there would be a
19 right answer.
20     Q.    And others in which there might be
21 a range of right answers?
22     A.    Correct.
23     Q.    Would you agree that management
24 possesses knowledge about his business that
25 generally is substantially greater than that of

Page 241

Robert Berliner

1
2  the outside auditors?
3      A.   I agree.
4      Q.   That's because the transactions of
5  the entity and its related assets and
6  liabilities are within the direct knowledge and
7  control of management, isn't it?
8      A.   Yes, it is.
9          MR. JONES:  Objection to form and
10  foundation.
11      Q.   The auditor's knowledge of these
12  matters is limited to that acquired through the
13  audit, isn't it?
14      A.   That is correct.
15          MR. JONES:  Same objection.
16      Q.   When we say that the financial
17  statements are the responsibility of management,
18  does that also mean that management is
19  responsible for preparing the financial
20  statements in accordance with GAAP?
21      A.   That's correct.
22      Q.   Is management responsible for
23  adopting sound accounting policies?
24      A.   It is.
25      Q.   Is management responsible for

Page 242

Robert Berliner

1
2  maintaining the accounting records?
3      A.   Yes.
4      Q.   And for recording its transactions
5  throughout the year?
6      A.   Yes.
7      Q.   Is establishing and maintaining an
8  internal control structure also an important
9  management responsibility?
10      A.   It is.
11      Q.   What are the reasons that
12  management establishes internal controls?
13      A.   There are many reasons.  With
14  respect to the financial statements it's to
15  assure that they are able to prepare financial
16  statements that fairly present in accordance
17  with GAAP and to assure against the
18  misappropriation of their assets.
19      Q.   You agree that no internal control
20  system can provide absolute assurance that the
21  financial statements will be prepared in
22  accordance with GAAP?
23      A.   I agree.
24      Q.   If that happens, that is that the
25  financial statements are not prepared in

Page 243

Robert Berliner

1
2  accordance with GAAP, do you agree that that
3  does not mean that the internal control system
4  in place is necessarily deficient?
5      A.   Yes.
6      Q.   Do you agree that it's probably
7  very difficult, if not impossible, to design an
8  internal control system that would catch even
9  immaterial errors?
10          MR. JONES:  Object to form.
11      A.   Yes.
12      Q.   You agree that the auditors do not
13  play a role in the day-to-day monitoring of the
14  internal control system?
15      A.   Yes.
16      Q.   Do you agree with me that
17  management has various obligations to the
18  auditor, including that management is supposed
19  to be responsive to the auditor's inquiries?
20      A.   Yes.
21      Q.   Do you agree with me that
22  management is supposed to furnish the auditor
23  with assistance in locating documents?
24      A.   Yes.
25      Q.   Do you agree that management is

Page 244

Robert Berliner

1
2  supposed to produce evidence that the auditor
3  asks to see?
4      A.   Yes.
5      Q.   Do you agree with me that
6  frequently auditors ask the management to have
7  client's personnel prepare certain schedules
8  that the auditor incorporates in his working
9  papers?
10      A.   Yes.
11      Q.   Do you believe that management has
12  an obligation to cooperate with the auditor in
13  terms of those requests?
14      A.   Yes.
15      Q.   Do you agree with me that
16  management is obligated to tell the auditors the
17  truth?
18          MR. JONES:  Object to form and
19  foundation.
20      A.   Yes.
21      Q.   Do you agree with me that
22  management is obligated not to withhold any
23  material information?
24      A.   Yes.
25          MR. JONES:  Object to form and

Page 245

Robert Berliner

1  foundation.
2      Q.    Do you agree with me that if
3  management lies to an auditor or withholds
4  pertinent information from an auditor,
5  management has breached its obligations to the
6  auditor?
7          MR. JONES:  Objection to form and
8  foundation.
9      A.    Yes.
10      Q.    Do you agree with me that the
11  position of trust between the auditor and the
12  client lies at the very heart of the audit
13  process?
14      A.    Yes.
15      Q.    Do you agree with me that the
16  auditor has to be in a position where the
17  auditor can rely on the honesty and truthfulness
18  of what the auditor is told by his clients?
19          MR. JONES:  Objection to form and
20  foundation.
21      A.    Yes.
22      Q.    Do you agree with me that during
23  audits management is responsible for disclosing
24  to the independent auditors sufficient and

Page 246

Robert Berliner

1  relevant information so they may conduct their
2  audits?
3          MR. JONES:  Object to form.
4      A.    Could you repeat that, please.
5          (Question read.)
6          MR. JONES:  Object to form.
7      A.    I really don't know how to answer
8  that question, the auditor should know how to
9  conduct his audit.  So while management should
10  be responsive to the auditor's inquiries, I
11  don't believe management has a responsibility to
12  hold the auditors hand and lead him through the
13  audit, as is implied by this particular
14  question.
15      Q.    Let me ask it again to make sure
16  we're on the same page, Mr. Berliner.  Do you
17  disagree with the proposition that during audits
18  management is responsible for disclosing to the
19  independent auditors sufficient and relevant
20  information so they may conduct their audits?
21          MR. JONES:  Same objection, asked
22  and answered.
23      A.    Again, I think the auditor has an
24  obligation to make inquiries of management and I

Page 247

Robert Berliner

1  believe management has an obligation to be
2  responsive to those inquiries.  There is certain
3  information I believe that management, as we've
4  been discussing, should divulge to their
5  auditors, but the question is so general it
6  really confuses I think the respective roles of
7  management and the auditor in terms of who's
8  responsible for the audit.  I'm very sensitive
9  to this question because of the positions taken
10  by Mr. Tillett that I vehemently disagree with
11  and I think this is striking right in the face
12  of that and is trying to articulate his
13  viewpoint with which I disagree.
14      Q.    Are you able to tell me sir whether
15  or not you disagree with the proposition that
16  during audits management is responsible for
17  disclosing to the independent auditors
18  sufficient and relevant information so they may
19  conduct their audits?
20          MR. JONES:  Same objection; asked
21  and answered.
22      A.    I disagree.
23      Q.    Do you agree that members of
24  management who are certified public accountants

Page 248

Robert Berliner

1  must comply with the AICPA's professional code
2  of conduct and not knowingly fail to disclose
3  material facts?
4      A.    I agree.
5      Q.    Do you agree that if the management
6  of an audit client puts its mind to it, the
7  management of an audit client can obstruct the
8  efforts by the auditing firm?
9      A.    I agree.
10          MR. JONES:  Object to form.
11      Q.    And that that can obstruct the
12  efforts of the auditing firm to conduct an audit
13  in accordance with GAAS?
14      A.    Yes.
15          MR. JONES:  Same objection.
16      Q.    Let me ask you a question about the
17  nature of audit evidence.  Do you agree that an
18  auditor finds it necessary when conducting an
19  audit to rely on evidence that is persuasive
20  rather than convincing?
21      A.    Yes.
22      Q.    This is a respect in which audit
23  evidence differs, for example, from legal
24  evidence which is circumscribed by rigid rules?

# TAB 191

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP.*

---

*D. PAUL  REGAN*
*March 4, 2005*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

REGAN, D. PAUL  - Vol. 1



D. PAUL REGAN

Page 161

BY MR. ROSENTHAL:

1    Q    And if you don't have an opinion with
2 respect to that, feel free to say so.
3    A    It doesn't appear that it was. It had a
4 net loss, it had a net loss in 1996, of June 30,
5 1996 of $12 million, and that was after
6 considering investment income of $74,075,000. So
7 there was a substantial loss from the fees that it
8 charged. The fees that it charged were less than
9 its expenses.
10    Q    In fact, AHERF financed its operating
11 needs largely from private philanthropy and
12 government grants in addition to its fees; is that
13 right? Do you know?
14    A    Well, looking at the June 30, 1996
15 financial statements, it indicates that of the
16 $1,607,000, net patient service revenue was
17 $1,352,000, which -- I have to get a calculator.
18    Q    That's all right, I'll withdraw the
19 question, Mr. Regan. I don't want to slow us
20 down.
21    A    That's okay. If you ask me another
22 question that involves, I'll have the calculator
23 out.

Page 162

1    Q    Okay, I would like you to take a look at
2 page 9 of your report, Paragraph F(i). Now, in
3 this paragraph, you begin with the statement,
4 "This statement focuses on organizations that have
5 predominantly non-business characteristics that
6 heavily influence the operations of the
7 organization."
8        Do you see that?
9    A    I do.
10    Q    Is that a quotation? I realize there are
11 no quotation marks here, but is that language a
12 direct quotation from some accounting source?
13    A    It is taken from FASB, Statement of
14 Financial Accounting Concepts, Number 4,
15 Paragraph 7, and it's not a direct quotation --
16 well, hang on, let me see
17        It looks like through the word different,
18 it's taken from paragraph 7.
19    Q    That's not quite right though, is it,
20 sir? Through the word "organization," it's taken
21 from paragraph 7, and then there are two
22 paragraphs in between.
23    A    Well, I just read the first statement,
24 the first sentence, which brings me to the word

Page 163

1 "organization." And then after the first
2 sentence, it starts with the word "The," and so
3 does my paragraph. And in that sentence, the line
4 between "Non-business organizations and business
5 enterprises is not always sharp," which is a
6 quote, and then "Since the incidence and relative
7 importance of those characteristics, in any
8 organization, are different," yes. Through the
9 word "different," it's the same as paragraph 7.
10    Q    There is nothing intervening between the
11 first sentence and the second sentence of your
12 paragraph that's in Con 4?
13    A    No.
14    Q    Is there any reason why you did not use
15 quotation marks around this language, which is
16 directly quoted from FASB Concept Number 4?
17    A    No. I could have, and then put an
18 ellipse after the word "different," and then put a
19 quote after the ellipse.
20    Q    Now, in F(iii) at the bottom of page 9,
21 you say that, "It appears that the readers of
22 AHERF's financial statements were focused on the
23 financial performance of AHERF."
24        Who were the readers of AHERF's financial

Page 164

1 statements that you refer to in that sentence?
2    A    What I'm referring to are management and
3 members of the board.
4    Q    And management was responsible for
5 preparing the financial statements; is that
6 correct?
7    A    Yes.
8    Q    Now, on what information, that is,
9 documents or testimony, did you base your
10 conclusion that it appears that the readers of
11 AHERF's financial statements were focused on the
12 financial performance of AHERF?
13    A    With respect to management, what I see is
14 a number of comments by C&L and its analysis of
15 the control environment, where there are a number
16 of comments as to management being aggressive,
17 management being very mindful of making budget,
18 management being focused on achieving earnings
19 expectations, management expressing the opinion
20 that they can't afford to write off certain
21 assets, because of the impact on budget or the
22 bottom line.
23        There are a number of references in the
24 Coopers & Lybrand working papers, which are driven

D. PAUL REGAN

Page 165

1  from results of operations, targets and
2  achievement. I don't see, for example, ever any
3  discussion of, this is going to hurt our net
4  assets. It's, It's going to hurt our operations.
5       With respect to the board of directors in
6  looking at their deposition testimony, and in
7  reading the minutes, the transcripts of Audit
8  Committee meetings, I see an emphasis on, for
9  example, a chair, Mr. Barnes, he is driven by and
10 very interested in operations.
11     Q   Cash flow from operations, isn't that
12 right, Mr. Barnes?
13     MR. TORBORG: I object to form.
14 BY MR. ROSENTHAL:
15     Q   Doesn't the statement that you quote from
16 Mr. Barnes in your report say that he tended to
17 emphasize cash flow from operations; is that
18 correct?
19     MR. TORBORG: I object to form.
20     A   The first item of cash flow from
21 operations is the bottom line of your statement of
22 operations.
23 BY MR. ROSENTHAL:
24     Q   I want to continue to ask you some

Page 166

1  questions about management and Mr. Barnes, but
2  since you mentioned the term "bottom line," can I
3  ask you, what is the bottom line on AHERF's
4  financial statements, the actual bottom line on
5  the statement of operations?
6     A   Well, I always equate bottom line with
7  the words "net income," which is on the statement
8  of operations of AHERF.
9        If you look at the AHERF financial
10 statements, say, of June 30, 1996, my
11 interpretation of the bottom line is the net loss
12 of $11,837,000. There's three other numbers that
13 fall below it to have a modest impact, and brings
14 that number down to a loss of, or a decrease in
15 unrestricted net assets of $8,007,000.
16     Q   I apologize for asking a simplistic
17 question, but my question is not how do you
18 interpret the phrase "bottom line." I'm asking
19 you, what is the actual last line on the bottom of
20 the page of the AHERF statement of operations?
21     A   The company notes are an integral part of
22 the consolidated financial statements.
23     Q   The last line, not the note.
24     A   Oh, a number, the last line with a

Page 167

1  number? Decrease in unrestricted net assets.
2     Q   Whereas if you were to look at the
3  financial statements of a for-profit company, the
4  last line, the bottom line would be income,
5  correct?
6     A   It would probably be fully diluted
7  earnings per share.
8     Q   Well, there is an earnings per share
9  calculation that's below the income statement --
10     A   Yes, the bottom line you're just talking
11 about. So your bottom line is different than the
12 bottom line we're talking -- (indicating)
13     Q   Where is the income line?
14     A   Do I go to the bottom line that says,
15 Fully diluted earnings per share?
16     Q   Where does the income line occur in the
17 bottom of a statement of income for a for-profit
18 organization?
19     MR. TORBORG: I object to form,
20 foundation.
21     THE WITNESS: Can I hear that question
22 again?
23     (Question read)
24     A   I don't understand your question, now

Page 168

1  that you've confused me about this bottom line
2  process. Because on a for-profit, the bottom line
3  is typically, fully diluted earnings per share.
4  BY MR. ROSENTHAL:
5     Q   If you were confused by my question, I
6  apologize. We will leave it at that.
7        What is the title of the statement which
8  contains revenue, expenses, et cetera, for AHERF?
9     A   In 1996, it's called a Statement of
10 Operations.
11     Q   And in your experience with a for-profit
12 corporation, are they generally called a statement
13 of income for operations?
14     A   A lot of times they're called statement
15 of operations.
16     Q   Now, a short while ago, you had referred
17 to evidence that you had seen in the Coopers &
18 Lybrand work papers of a management interest in
19 maximizing income.
20        Some of the examples that you cited,
21 could they be information that you saw, not in the
22 Coopers & Lybrand work papers, but in the numerous
23 examples of internal AHERF management documents
24 that you cite in your report?

D. PAUL REGAN

Page 169

1    A   I would expect that there are some
2    documents, or AHERF documents that make that
3    statement. For example, the statement that "We
4    can't afford to write off these assets," or "We
5    can't afford to establish an appropriate bad debt
6    reserves," that's a statement that I recall as an
7    AHERF management document.
8    Q   That's the one I was thinking of, thank
9    you.
10       Now, you also, did you read Mr. Barnes'
11   entire deposition or just portions of it?
12   A   My expectation is that I read portions of
13   that deposition.
14   Q   Do you recall whether the portions of the
15   deposition in the portions of the deposition that
16   you read, Mr. Barnes testified that he did his own
17   calculation of cash flow from the AHERF financial
18   statements?
19   A   That's consistent with my recollection,
20   yes.
21   Q   And that he didn't put a lot of stock in
22   the net income number?
23       MR. TORBORG: I object to form.
24

Page 170

1    BY MR. ROSENTHAL:
2    Q   Do you recall reading that in Mr. Barnes'
3    deposition?
4        MR. TORBORG: I object to form.
5    A   I'd need to see that testimony.
6    BY MR. ROSENTHAL:
7    Q   Do you recall in reading the deposition
8    testimony, Mr. Barnes' deposition testimony,
9    whether he made the statement that he thought the
10   quality of earnings for AHERF for 1996 were very
11   poor?
12   A   I don't have a specific recollection of
13   reading that.
14   Q   We talked earlier about your credentials
15   as a certified fraud examiner. Did you bring any
16   of those credentials to bear in examining the
17   conduct of management, AHERF management in this
18   case?
19   A   No, I didn't look at my role or my scope
20   of my work as being a fraud examiner.
21   Q   Did you look to see if there were
22   instances where AHERF management withheld
23   information from the Coopers & Lybrand auditors
24   that would have been significant to the conduct of

Page 171

1    the audit?
2        THE WITNESS: Can I hear that question
3    again, please.
4        (Question read)
5    A   I don't know that I'd phrase it that
6    way. I was looking to whether or not the working
7    papers of Coopers & Lybrand indicated to me that
8    Coopers & Lybrand knew or would have known that
9    there were GAAP failures, had Coopers & Lybrand
10   chosen to look at the relevant records or
11   sufficient competent records which would have been
12   made available to them if asked, or they would
13   have seen if they looked.
14   BY MR. ROSENTHAL:
15   Q   I understand that's the way you would put
16   your opinion. I'm asking you a question, however,
17   and my question is did you look to see if there
18   were instances where AHERF management withheld
19   information from the Coopers & Lybrand auditors
20   that would have been significant to the audits?
21   A   I did not focus on that issue.
22   Q   You didn't look for it --
23       MR. TORBORG: I object to form.
24

Page 172

1    BY MR. ROSENTHAL:
2    Q   -- to see whether there were such
3    instances?
4    A   No, I looked to whether or not the
5    information that was collected by Coopers &
6    Lybrand and the kind of records that were made
7    available to it, when married to the type of GAAP
8    failures that were identified, would have provided
9    C&L with the information that there was a
10   misstatement, or it would have alerted C&L to the
11   need for reviewing the books of the original entry
12   and other available documents to cure whatever
13   deficiencies in a sufficient competent evidential
14   manner existed in connection with an analysis of
15   an account or accounts.
16   Q   So is it possible, sir, that there were
17   instances where AHERF management withheld
18   information from Coopers & Lybrand that would have
19   been significant to the audits, but you did not
20   look for them?
21       MR. TORBORG: I object to form.
22   A   That's not something that I did. But it
23   became, I think, clear to me that the failings of
24   GAAP resided within the financial statements, in

D. PAUL REGAN

Page 173

1  the accounting records; and that Coopers & Lybrand
2  was aware or would have been aware of those
3  failings had they looked at the appropriate
4  records, which I have every reason to believe were
5  made available to it.
6  BY MR. ROSENTHAL:
7     Q   Which appropriate records are you
8  referring to and why do you believe they were made
9  available?
10       MR. TORBORG:  I object to form.
11    Compound.
12    A    Journal entries, general ledgers, agings
13  of accounts payable and application of percentages
14  of reserves for bad debts on those percentages,
15  and the depositions of AHERF persons who indicate
16  that when they were asked for records by Coopers &
17  Lybrand, they made those records available; and
18  when they were asked questions by Coopers &
19  Lybrand, they answered the questions that were
20  asked.
21  BY MR. ROSENTHAL:
22    Q   Are you aware of whether there were
23  internal schedules used by AHERF management that
24  contained notes which detailed some of the matters

Page 174

1  that you have concluded were accounting
2  irregularities, and yet when those, when similar
3  schedules were provided to Coopers, some of those
4  notes were removed?  Are you aware of that fact?
5     A   I'm aware, for example, that Coopers was
6  given schedules which did not have all of the
7  words which are on other schedules.  Whether, when
8  Coopers was given those schedules, they were
9  removed, I don't know the answer to that question.
10  It could be that they were merely given schedules
11  which did not contain notes that were made by
12  others or at a later time.
13    Q   And would you agree that all of the words
14  in your last answer were significant words that
15  would have alerted the auditors to the potential
16  existence of accounting irregularities?
17    A   I would agree that in the example I'm
18  thinking of, those words are yet one way in which
19  it would have led C&L to have a better
20  understanding of the transactions, but that that
21  was only one of the ways in which Coopers would
22  have found out; and that the better records are in
23  fact the journal entries themselves, the books of
24  original entry of AHERF, and they certainly were

Page 175

1  on those books of original entry rather than the
2  spreadsheets you're talking about.
3     Q   Sir, is it the case that auditors in the
4  course of performing a GAAS audit don't audit all
5  of the general ledger and journal entries of the
6  company, as a general matter?
7     A   As a general matter, they select entries
8  of interest based upon risk assessment and
9  knowledge of the facts and circumstances they gain
10  as a result of their audit or audit plan.
11    Q   And might an auditor choose to select
12  certain journal entries for examination, if
13  presented with a schedule that had such a footnote
14  as we've been discussing?  Might that direct the
15  auditor to examine the journal entries that you're
16  describing?
17    A   If there is such a footnote, I think it
18  might make the task a bit easier.  However, in
19  this circumstance, I think the auditor, there is
20  overwhelming reason for the auditor to examine the
21  entries which were listed on that page, given the
22  size of the entries, the effect of the entries on
23  DVOG, and the probability of where those entries
24  were coming from.

Page 176

1     Q   But you agree that the presence of the
2  footnote would certainly be likely to cause the
3  auditor to check, a reasonable auditor to check
4  the underlying journal entries?
5       MR. TORBORG:  I object to form.
6     A   I think the auditor is going to be doing
7  that anyway, given the nature of the analysis.  He
8  doesn't need to be grabbed by the nose and pushed
9  into the garbage.  I mean, he's going to look at
10  those entries anyway, or she.
11  BY MR. ROSENTHAL:
12    Q   Are you aware, sir, that the person
13  principally responsible for making the journal
14  entries in this area of DVOG's books has testified
15  in this case that she knew Coopers did not
16  generally audit those journal entries?
17       MR. TORBORG:  I object to form and
18    misstates prior testimony.
19       MR. ROSENTHAL:  To hell it does.
20       MR. TORBORG:  Okay.
21       MR. WHITNEY:  I move to strike that.
22    A   That would strike me as disingenuous,
23  because there hadn't been such entries in the
24  past.  There hadn't been entries where

D. PAUL REGAN

1 BY MR. ROSENTHAL:
2     Q   My question is a little different than
3 the one you're answering, sir. My question is not
4 whether or not withstanding any efforts by
5 management to conceal information, Coopers &
6 Lybrand could have nonetheless detected it.
7         I'm simply asking whether you saw any
8 evidence during the 15,000-plus hours that your
9 team worked on this matter over four years' time
10 of management concealing information from
11 Coopers & Lybrand?
12         MR. TORBORG: I object to form.
13     A   For example, I noted the document that
14 you describe with respect to the notes, but I
15 don't consider that evidence of a concealment.
16 It's evidence that there is another version of a
17 document that doesn't have as many notes as
18 another version of a document. To me, that didn't
19 matter.
20         These are entries in an area of high risk
21 and entries in an area where the entries, the
22 books of original records that are under
23 examination need to be reviewed. Evidence needs
24 to be gathered about those journal entries, not

1 spreadsheets. Just look at the journal entries,
2 that's what you're auditing. That's what's
3 important to me.
4     Q   Did you identify in the 15,000 plus hours
5 that your team worked on this matter over four
6 years' time, any evidence of management
7 withholding information from Coopers & Lybrand?
8         MR. TORBORG: I object to form.
9     A   I didn't identify any meaningful behavior
10 which I would describe in that way. Certainly I
11 read the testimony you described, where the
12 interviewee was to answer the questions asked. It
13 is not uncommon, it is not surprising, and I don't
14 view that as significant to my findings, because
15 of the other facts and circumstances that were in
16 place, the other information that was available
17 that is more competent and more appropriate to be
18 reviewed.
19 BY MR. ROSENTHAL:
20     Q   Sir, you understand I'm not asking you
21 whether these facts would be significant to your
22 findings. I'm just asking whether you identified
23 such facts. Do you understand that that's my
24 question?

1         MR. TORBORG: I object to the instruction
2 and I object to form.
3         MR. ROSENTHAL: It's not an instruction.
4 I'm seeking to determine whether the witness
5 understands my question, since each time I ask
6 him, he answers by answering a question I did
7 not ask.
8         MR. TORBORG: I object to the
9 introduction, and I object to the form.
10         MR. ROSENTHAL: And I object to the
11 speaking objections.
12     A   Is there a question?
13 BY MR. ROSENTHAL:
14     Q   Do you understand that my questions are
15 not about whether or not such facts, if you
16 discovered them, would have been significant to
17 your findings.
18         I'm simply asking whether you came across
19 facts in the course of four plus years' work on
20 this matter, where you saw evidence of management
21 concealing information, management withholding
22 information, and I have a few other in the same
23 vein, but do you understand that my questions are
24 not about whether they go to your opinion about

1 the adequacy of the audit?
2         MR. TORBORG: Objection. That question
3 has been asked and answered at least four
4 times in this deposition.
5         MR. ROSENTHAL: It's been asked, it
6 hasn't been answered.
7         MR. TORBORG: It has been answered. It's
8 because you have an idea of what you believe
9 the word "withholding" means and what you
10 believe the word "concealment" means --
11         MR. ROSENTHAL: This is so beyond the
12 bounds of acceptable objections. This gives
13 new meaning to speaking objections.
14         MR. TORBORG: You are berating our
15 witness for not answering questions and he has
16 answered questions.
17         MR. ROSENTHAL: The witness has
18 considerably more experience answering
19 questions than I have asking them. I think he
20 can handle himself.
21         Now, sir --
22         MR. WHITNEY: He answered the question
23 you're fighting with him about. If you go
24 back and ask the reporter the original

D. PAUL REGAN

Page 189

1 question you asked him about concealing
2 information, listen to his answer, he answered
3 the question, and then he gave a further
4 statement. And you and he are talking about
5 that further statement, but the question was
6 answered.
7 BY MR. ROSENTHAL:
8    Q  Okay, but do you understand, sir, that
9 I'm not asking you a question that relates to the
10 further statement? I'm asking you simply about
11 whether you uncovered such evidence in the course
12 of your review.
13       MR. TORBORG: And which evidence is that?
14       MR. ROSENTHAL: The prior two questions
15    about concealing information, withholding
16 .  information. I just want to understand if the
17    witness understands my question.
18       MR. TORBORG: Objection, compound.
19    A  I did not -- first of all, I'm looking
20 and I'm trying to retain things that I think are
21 significant. If I encounter something that I
22 viewed as insignificant or inconsequential, I
23 don't try to retain it. So I didn't bring
24 anything with me today in my head that struck me

Page 190

1 as important, along the lines of your question.
2 So I don't have anything in my head that relates
3 to that particular question.
4 BY MR. ROSENTHAL:
5    Q  In the four plus years of work done by
6 you and your team on this matter, did you note any
7 evidence of collusion within the company or with
8 third parties with respect to information that was
9 not provided to Coopers & Lybrand?
10       MR. TORBORG: I object to form.
11    A  No, I'm of the opinion that Coopers &
12 Lybrand had what it needed.
13 BY MR. ROSENTHAL:
14    Q  Again, sir, my question is, did you see
15 any evidence of collusion to withhold information?
16       MR. TORBORG: Asked and answered.
17    A  And your last words were not provided to
18 Coopers & Lybrand, and I think that Coopers &
19 Lybrand was provided with sufficient matters on
20 the issues that are in play in this case.
21 BY MR. ROSENTHAL:
22    Q  Given that qualification in your answer,
23 is it the case that you saw evidence of collusion
24 that didn't matter to Coopers & Lybrand, because

Page 191

1 they had sufficient information?
2       MR. TORBORG: I object to form.
3    A  No.
4 BY MR. ROSENTHAL:
5    Q  Did management, in your opinion, AHERF
6 management commit intentional fraud?
7       MR. TORBORG: I object to form.
8    A  I haven't been asked to attempt to make
9 that determination, and as a result, I don't have
10 an opinion with respect to that issue.
11 BY MR. ROSENTHAL:
12    Q  So you don't have an opinion as to
13 whether or not management intentionally misstated
14 the financial statements?
15    A  That's not something that I've been asked
16 to opine on, and as a result, I haven't focused
17 and structured my work to lead me to be able to
18 give an opinion in that area and be able to
19 provide an appropriate basis for it.
20    Q  Do you agree, sir, that because the
21 characteristics of irregularities, a properly
22 designed and executed audit may not detect a
23 material irregularity?
24    A  I recognize that that's a possibility in

Page 192

1 an audit.
2    Q  Do you agree that audit procedures that
3 are effective for detecting a misstatement that is
4 unintentional may be ineffective for detecting a
5 misstatement that is intentional?
6    A  I can envision facts and circumstances
7 where that could occur.
8    Q  Were there some members of AHERF
9 management who were certified public accountants?
10    A  It's my recollection, yes.
11    Q  And do certified public accountants have
12 obligations, professional obligations beyond those
13 of ordinary employees who are not CPAs?
14    A  I believe so. I think that's been
15 discussed in my rebuttal report.
16    Q  And what are the nature of the additional
17 responsibilities, professional responsibilities
18 that certified public accountants have, beyond
19 those of ordinary employees?
20       MR. TORBORG: I object to form.
21    A  My recollection is that, in my rebuttal
22 report, what I commented on was the auditor's
23 responsibility. I think Mr. Tillett discussed the
24 responsibilities and included that in his report.

D. PAUL REGAN

Page 193

1  If you have a copy of those pages, I'd be happy to
2  look at them and see to the extent I agree.
3  BY MR. ROSENTHAL:
4      Q   Well, we will return to this subject.
5          Do you agree that the auditor's opinion
6  on the financial statements is based, in the
7  context of a GAAS audit, is based on the concept
8  of reasonable assurance?
9      A   Yes.
10     Q   And do you agree that because the
11 auditor's opinion on the financial statements is
12 based on the concept of reasonable assurance, the
13 auditor is not an insurer of the financial
14 statements?
15     A   I agree with that.
16 ·   Q   Do you agree that the auditor is not a
17 guarantor --
18     A   I agree with that.
19     Q   -- of the financial statements?
20     A   Yes.
21     Q   Do you also agree that the subsequent
22 discovery that a material misstatement exists in
23 the financial statements for a given period, does
24 not in and of itself evidence inadequate planning,

Page 194

1  performance or judgment on the part of the
2  auditor?
3      A   Yes.
4      Q   I'm going to hand you what has previously
5  been marked as Exhibit 435, there are a few
6  versions of this floating around. You may have
7  seen one that has a different number on it.
8          But do you recognize the document that
9  has been marked as Exhibit 435?
10     A   Yes.
11     Q   And Exhibit 435 is a document, a letter,
12 addressed to a Mr. Mike Martin, vice president and
13 treasurer of AHERF from Barbara K. Robinson, Vice
14 President of the Mellon Bank, and then it has
15 handwriting on it. Is that right?
16     A   It does, yes.
17     Q   Do you know whether the Mellon Bank was
18 the trustee for a number of trusts that existed on
19 behalf of AHERF?
20     A   I believe it was.
21     Q   Now, have you read the letter that is the
22 underlying document in Exhibit 435?
23     A   Yes.
24     Q   Does Ms. Gordon set out in Exhibit 435

Page 195

1  her view on behalf of Mellon Bank that a number of
2  the Lockhart trusts are restricted trusts within
3  the meaning of, she doesn't use the accounting
4  terms, but her description is such that it
5  qualifies as restricted within the meaning of
6  FAS 116 and 117 and 124; is that right?
7          MR. TORBORG: I object to form. I think
8  you misspoke.
9          THE WITNESS: You said Ms. Gordon.
10         MR. ROSENTHAL: I'm sorry, Ms. Robinson.
11         MR. TORBORG: I have a further objection
12 to form as well.
13         MR. ROSENTHAL: Well, let me withdraw
14 that.
15     Q   Why don't you read the document and then
16 I will have some questions.
17     A   Okay, I looked at the document.
18     Q   Now, you understand, sir, that these
19 trusts had a principal also known as a corpus, and
20 generated interest, correct?
21     A   Yes.
22     Q   And that there was language in the trust
23 agreements that refer to what counted as income
24 and what counted as part of the corpus or

Page 196

1  principal of the trust, right?
2      A   Yes.
3      Q   And that one issue with respect to
4  classification of the trusts on the financial
5  statements of AHERF, was whether gains from
6  appreciation and value, or from, at point of sale,
7  on part of corpus, counted as income or was to be
8  put back to the corpus? Do you understand that?
9      A   I do.
10     Q   And does Ms. Robinson express the view on
11 behalf of Mellon Bank, the trustee of these
12 trusts, that for most of these trusts, the gains
13 from any disposition or sale of part of the trust,
14 the corpus, was to be put back to the corpus?
15         MR. TORBORG: I object to form.
16 BY MR. ROSENTHAL:
17     Q   That is, it was not part of income within
18 the meaning of the trust agreements?
19         MR. TORBORG: I object to form.
20     A   Yes, her second paragraph indicates, or
21 she states that, (Reading) My review indicates a
22 mixed response. Several of the trusts are quite
23 explicit, that only income is available.
24

D. PAUL REGAN

Page 209

1  of entries, journal entries, relating to
2  contractual allowances, you would not expect the
3  auditor to examine each of those journal entries,
4  correct?
5      A   No.
6      Q   And that approach of selective testing
7  and audit sampling is used in audits and generally
8  accepted as a standard audit approach, is it not?
9      A   Yes, you need to do risk assessment, and
10 based upon the risk assessment, you design at
11 first the depth and breadth of audit procedures
12 that are appropriate, given the facts and
13 circumstances and the findings, that are learned
14 by the auditor during the planning process, during
15 its prior relationship with the client, and during
16 the course of the current engagement.
17         It's a constant assessment made by the
18 auditor of risks of misstatement and need for
19 sampling and analysis.
20         MR. ROSENTHAL:  I'm told there is five
21 minutes left on the tape, so why don't we
22 switch tapes.
23         THE VIDEOGRAPHER:  This marks the end of
24 Tape Number 3 in the deposition of Paul Regan.

Page 210

1  We are going off the record at 3:27.
2         (Whereupon a recess was taken, after
3         which the following proceedings
4         were held:)
5         THE VIDEOGRAPHER:  Here begins Tape
6  Number 4 in the deposition of Paul Regan.
7  We're going back on the record at 3:31.
8  BY MR. ROSENTHAL:
9      Q   Mr. Regan, you offer an opinion that
10 AHERF calculated compliance with the Morgan
11 Guarantee Trust, consolidated unrestricted fund
12 balance portion of an indenture agreement between
13 AHERF and Morgan Guarantee Trust, correct?
14     A   Yes.
15     Q   Have you learned that AHERF management
16 obtained a letter from Foley & Lardner, a law
17 firm, offering its opinion that management had
18 incorrectly calculated the unrestricted fund
19 balance?
20     A   I believe I've heard that.
21     Q   So you're aware that management had a
22 letter from Foley & Lardner, the conclusion of
23 which was that there was noncompliance with the
24 debt covenant?

Page 211

1      A   I believe I've heard that statement.  I
2  don't recall when they received such a letter.
3      Q   Well, if you were the auditor of AHERF
4  and you were to subsequently learn after the
5  issuance of the fiscal 1997 audit financial
6  statements, that management had such a letter
7  prior to the issuance of those financial
8  statements, would it upset you, as the auditor,
9  that they had such a letter and hadn't provided it
10 to you?
11     A   I certainly would want to know what their
12 bases for not concurring with the letter and
13 acting accordingly, you know, what was the other
14 information which the company or management,
15 certain persons within management relied upon,
16 rather than the letter.  And based upon that
17 answer, based upon that answer, that would
18 influence my reaction.
19     Q   And you wouldn't be in a position to ask
20 those questions about what did you rely on rather
21 than the letter, if you didn't know about the
22 letter, correct?
23     A   That's correct.
24     Q   Would you agree that auditors have as

Page 212

1  their primary concern, not individual
2  transactions, but the financial statements taken
3  as a whole?
4      A   As a general rule, yes.  But when they're
5  actually doing the audit and they become aware of
6  individual transactions, they can become very
7  concerned about those transactions.
8      Q   Does knowledge that an auditor gains in
9  its prior audits accumulate and contribute to
10 their ensuing audits?
11     A   Yes.
12     Q   Would you agree that not all of that
13 accumulated knowledge needs to be, or even
14 practically, could be documented?
15         MR. WHITNEY:  I'll object as compound.
16     A   I agree that not all cumulative knowledge
17 can be documented, but significant findings,
18 conclusions, concerns, should be documented.
19 BY MR. ROSENTHAL:
20     Q   Would you agree that management possesses
21 a knowledge about its business that is
22 substantially greater than its outside auditors?
23     A   I would agree that it is generally the
24 case, that's the expected case.  I don't know that

D. PAUL REGAN

Page 213

1  it's always true, but it's the expected case.
2      Q    Would you agree that management is
3  responsible for the performance of the company and
4  not its auditors?
5      A    Generally I agree that that as a general
6  statement is correct. There certainly will be
7  certain aspects of a company that may be the
8  responsibility of the auditors.
9      Q    Would you agree that management is
10 responsible for preparing the company's financial
11 statements?
12     A    Generally, that's the expectation. The
13 reality is sometimes the auditor does that.
14     Q    In the case of AHERF, did management
15 prepare the financial statements?
16     A    That's my expectation, that management
17 prepared the financial statements.
18     Q    Would you agree that the accounting
19 estimates that are reflected or incorporated in a
20 company's financial statements are management's
21 estimates?
22     A    They should be.
23     Q    And the auditor's role is limited to
24 assessing the reasonableness of management's

Page 214

1  estimates, is that true?
2      MR. WHITNEY: Objection, foundation.
3      A    That's the way it often works. Sometimes
4  in a particular account, a warranty reserve or a
5  bad debt reserve, the auditors will make a
6  determination and there will be a discussion and
7  consultation, and then it might be recorded to the
8  amount that's done by the auditor. But generally,
9  you expect management to do that. You certainly
10 want management to do that.
11 BY MR. ROSENTHAL:
12     Q    Are all accounting entries that violate
13 accounting rules material to the financial
14 statements taken as a whole?
15     A    That would not be what my expectation is.
16 I would think that there are some that are not.
17     Q    Would you take a look at page 15 of your
18 report, Paragraph 14(A).
19     A    Page 15, paragraph?
20     Q    14(A) -- I'm sorry, not 14, 4.
21     A    4(A)?
22     Q    Yes, 4(A). And specifically, actually,
23 subparagraph 2, you have a quote here. Can you
24 read that quote for me, please?

Page 215

1      A    (Reading) The concept of materiality
2  recognizes that some matters, either individually
3  or in the aggregate, are important for a fair
4  presentation of financial statements in conformity
5  with generally accepted accounting principles.
6      Q    And then there are three dots. That's an
7  ellipses, right?
8      A    Yes.
9      Q    That indicates that material has been
10 omitted?
11     A    Correct.
12     Q    What words were omitted from AU 312.03
13 that follow the word "principles"?
14     A    "While other matters are not important."
15     Q    Why did you leave those words out from
16 your description of the concept of materiality,
17 the quote that you have here?
18     A    The statement that is quoted is that the
19 concept of materiality recognizes that some
20 matters, either individually or in the aggregate,
21 are important. That certainly implies that some
22 are not. I think that kind of, that's really
23 not necessary. I wanted to focus on the fact
24 that some matters are important individually or

Page 216

1  in the aggregate.
2      What we're here to talk about and address
3  in this report are those matters that are
4  important. I think that the part quoted implies
5  that the other words, and the other words are not
6  important. We're not talking about matters that
7  are not material.
8      Q    I'm a bit confused by your answer. I'm
9  not sure, are you saying that these words are --
10 you omitted the words "while other matters are not
11 important," because that's clear and implied from
12 what is there? Or are you saying, you omitted
13 them because that's a part of the concept that you
14 were not trying to address here?
15     A    I think both. Also, this paragraph goes
16 on after that and --
17     Q    But the sentence ends with those words,
18 right?
19     A    The sentence ends with the words --
20     Q    "While other matters are" --
21     A    "while other matters are not important."
22     MR. WHITNEY: Let's all talk separately
23 here, guys.
24     A    The sentence ends with the words, "while

D. PAUL REGAN

Page 217

1  other matters are not important."
2  BY MR. ROSENTHAL:
3    Q   Now, if you look at 4(A)(i), you begin
4  that passage with an ellipse. What is left out
5  here?
6    A   There is a prior sentence that says, the
7  existence of audit risk is recognized by the
8  statement in the auditor's report that the auditor
9  obtain reasonable assurance about whether the
10  financial statements are free of material
11  misstatement.
12    Q   And why did you leave that statement out
13  of Paragraph 4(A)(i)?
14    A   Because I think that the second sentence
15  is the sentence which is particularly important to
16  understanding my report and what audit risk is.
17       Audit risk is the risk that the auditor
18  may unknowingly fail to appropriately modify his
19  opinion on the financial statements that are
20  materially misstated. That's what I wanted to
21  drive home. That's what audit risk is. Her
22  sentence doesn't, doesn't really tell that story.
23    Q   Now, sir, if you will take a look at (v)
24  at the top of page 16, you have a quote from

Page 218

1  AU 312.07, "As a result of the interaction of
2  quantitative and qualitative considerations in
3  materiality judgments, misstatements of relatively
4  small amounts that come to the auditors' attention
5  could have a material effect on the financial
6  statements."
7       Do you see that?
8    A   Yes.
9    Q   Does AU 312.07 continue with a
10  one-sentence example of what it means by the
11  second sentence that you quoted?
12    A   Yes.
13    Q   And what is the example?
14    A   For example, an illegal payment of an
15  otherwise immaterial amount could be material if
16  there is a reasonable possibility that it could
17  lead to a material contingent liability or a
18  material loss of revenue.
19    Q   Why did you leave that example out of
20  your Paragraph 5?
21    A   I think the first sentence sets the pace,
22  sets the standard, this is one example. There is
23  lots of examples.
24       When you write a report like this, you

Page 219

1  got to make judgments as to, well, what are the
2  important aspects that you're trying to
3  communicate? Because I can't insert this book and
4  all the FASs that it relates to. I've got to pick
5  those items, which I think are relevant and
6  reliable to my opinion.
7    Q   So that example was not relevant to
8  illustrate what that statement from AU 312 was
9  describing?
10       MR. WHITNEY: Objection, asked and
11  answered.
12    A   I don't think so. I don't think it is
13  relevant to the case. I mean, we don't have an
14  illegal payment that I'm aware of.
15  BY MR. ROSENTHAL:
16    Q   Precisely.
17       Now, on page 7 to 8 of your report, you
18  have a listing of the hierarchy of GAAP, generally
19  accepted accounting principles; is that right?
20    A   7 and 8 is a discussion of generally, the
21  nature of generally accepted accounting
22  principles, and I described the sources of
23  established accounting principles. My reference
24  to, in Footnote 10, to SAS-69, which, as we've

Page 220

1  discussed previously today, really lays out all of
2  the various pieces of GAAP and its hierarchy.
3    Q   Now, in Item C on page 8, Item C on
4  page 8, you say, "For entities such as AHERF and
5  its obligated groups which issued municipal
6  securities, rules and interpretive releases of the
7  SEC have the highest authority similar to Category
8  1." Do you see that?
9    A   I do.
10    Q   Are staff accounting bulletins
11  interpretive releases of the SEC or rules of the
12  SEC?
13    A   Did you finish?
14    Q   Yes.
15       THE WITNESS: Can I hear the question?
16       (Question read)
17    A   I look at them as practices followed by
18  the SEC staff in administering SEC disclosures, so
19  they don't -- I don't view them as part of
20  Category 1.
21  BY MR. ROSENTHAL:
22    Q   Is it possible that a non-professional
23  and non-technically informed reader of your
24  Paragraph C could get the impression that you