o

# TAB 192

1

IN THE UNITED STATES DISTRICT COURT

OF PENNSYLVANIA

WESTERN DIVISION


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

   Plaintiff,

    Vs.  Civil Action No. 00-684

PRICEWATERHOUSECOOPERS, LLP,

   Defendant.


  Videotaped deposition of WILLIAM F.

BUETTNER, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 500 Grant Street, Suite 3100,

Pittsburgh, Pennsylvania, on Tuesday, the 22nd

day of June, 2004, at 9:00 a.m.

    - - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE COMPANY

William F. Buettner                                                          Volume 1

Page 45

1    A.   Do you want me to -- I need a
2  little help in terms of your question. In
3  terms of what I knew at the time I wrote this
4  or what --
5    Q.   Yes.                    10:01:35
6    A.   -- I knew by the time I completed
7  the '96 audit?
8    Q.   No, what you knew when you wrote
9  this when addressing this to the audit
10  committee.                   10:01:44
11    A.   Well, the centralization process --
12  my recollection is in 1995 the process was
13  accelerated because information was released to
14  the staff in the eastern region prematurely.
15         As a result, the folks who were      10:02:05
16  processing the bills, if you will, in the
17  Philadelphia area realized that they were going
18  to lose their jobs. They began to leave, began
19  to look for other jobs.
20         It became very difficult then for      10:02:23
21  AHERF to get bills out the door without being
22  staffed up.
23         So the centralization process was
24  accelerated. AHERF didn't have the people in
25  Pittsburgh to take over that responsibility     10:02:40

Page 46

1  yet. Folks in Phili were leaving. They
2  brought in a firm to try to outsource, if you
3  will, that process, billing process.
4  Apparently that did not work very well.
5         During that period of time, they      10:02:58
6  were also going into the various hospitals
7  within the eastern region and planning on some
8  sort of systems conversion from various systems
9  to SMS or an upgrade to the SMS system.
10         So you had multiple factors that      10:03:14
11  were influencing the organization's ability to
12  get a bill out the door. That was my
13  understanding of the issues.
14    Q.   So this is your understanding going
15  into the '96 audit?               10:03:28
16    A.   Yes, yes.
17    Q.   Now, you said that it may have --
18  you may have had a different understanding
19  after the '96 audit was essentially completed.
20         What was that understanding of the      10:03:37
21  problems, if it's different?
22    A.   Well, after we completed our audit
23  in '96, it became clear to, at least from our
24  work, that while the system upgrades could
25  cause some consternation and obviously the lack   10:03:53

Page 47

1  of billers caused some problems, that there was
2  also some significant training issue needs that
3  had to be met in the east and that the
4  registration process within the east needed
5  some significant work, patient registration.    10:04:07
6    Q.   Mr. Buettner, could you turn with
7  me to the attachment which starts at the page
8  that has the ending Bates digits 239? Is this
9  attachment essentially what C&L folks referred
10  to? When I say C&L, I mean Coopers & Lybrand.    10:04:42
11  Do we understand each other there?
12    A.   Yes.
13    Q.   Referred to as an audit plan?
14    A.   Well, it's an audit plan to be
15  reviewed with the audit committee, yes.        10:04:55
16    Q.   I'm going to ask you to just tell
17  me what was meant by -- is this a document you
18  would have drafted or someone on your staff
19  would have drafted?
20    A.   The managers would have drafted      10:05:08
21  this document. I would have reviewed it, and
22  we would have reached some sort of conclusion
23  on the content after that review.
24    Q.   Is it the same drafting protocol
25  that would have been followed for the cover     10:05:20

Page 48

1  memo?
2    A.   Yes.
3    Q.   Do you have any idea today what is
4  meant by the second arrow on the second page
5  there which reads, "Provide management with      10:05:30
6  value-added services"? What were value-added
7  services in Coopers & Lybrand speak or at least
8  Coopers & Lybrand speak as it was intended to
9  be read by an audit committee?
10    A.   Well, the first item would be the      10:05:43
11  issuance of some sort of what we would call
12  management comment letter. In other words, it
13  would be suggestions or ideas where the
14  organization could improve its system of
15  internal controls or its processing of whatever   10:05:58
16  they were processing in a particular area.
17  That would be what we would view as a byproduct
18  of our audit procedures.
19    Q.   Anything else that that term means
20  to you, value-added services?              10:06:21
21    A.   Well, that could vary upon the
22  needs of a particular organization and the
23  resources that the firms would have. We would
24  be on the look-out to see if there were other
25  things that we could provide that would be      10:06:26

12 (Pages 45 to 48)

William F. Buettner

Volume 1

**Page 49**

1  meaningful to the organization.
2      Q.  It doesn't involve consulting
3  services?
4      A.  No, not from an auditing
5  perspective.          10:06:36
6      Q.  Let me ask you to flip to the page
7  that ends in the digits 241. Do you see the
8  patient receivables slash third-party is listed
9  under the category higher risk assessment?
10     A.  Yes.         10:06:58
11     Q.  Why would that be the case?
12     A.  Well, within a healthcare
13 organization, we viewed, as a matter of course,
14 billing systems as well as dealing with the
15 third parties to be an area of higher risk.    10:07:15
16 .    I think as you mentioned earlier in
17 your questioning of me, receivables were an
18 important area of a healthcare provider, and
19 certainly we reviewed it as being a very
20 important area.         10:07:32
21     Q.  I'm sorry, go ahead.
22     A.  And there are inherent issues in
23 that process. I'm not talking control issues
24 or things of that nature. Just that they --
25 the complexity of the area makes it just a    10:07:45

**Page 50**

1  difficult area for management to manage. So we
2  provided a higher risk assessment to that area.
3      Q.  When you say risk, what do you mean
4  by risk of what? What do you mean by that,
5  risk of what?         10:08:02
6      A.  In other words, there's a greater
7  risk of what we considered to be an error or a
8  material misstatement in that error because of
9  the complexity, because of the environment.
10     Q.  You've noted in handwriting -- I    10:08:19
11 believe the handwriting here is yours as well
12 on this page?
13     A.  Yes, I believe so.
14     Q.  Towards the bottom of the page on
15 the right-hand side, I think I read your    10:08:31
16 writing to say, "Increase A slash R, review
17 slash testing."
18     Have I done a capable job there?
19     A.  Yes.
20     Q.  What did you mean, if you can    10:08:43
21 recall, to convey by writing that note on the
22 document?
23     A.  I'm not sure I understand your
24 question, sir.
25     Q.  What did that mean -- what does    10:08:56

**Page 51**

1  that mean to you?
2      A.  We're going to increase the
3  accounts receivable review and testing. We're
4  going to do things in 1996 that we may not have
5  done in 1995 or we may not do normally.    10:09:10
6      Q.  When do you believe, if you have
7  any recall today, you put these notes on this
8  document, that is the notes on the memo and the
9  notes on the plan?
10     A.  I can't answer that specifically,    10:09:23
11 but I know some of the notes would have been
12 there to help me in my presentation or
13 discussion with the audit committee. I can't
14 tell you if all of them would have been there
15 at that point in time. I just can't remember.    10:09:39
16     Q.  I know there are several notes,
17 you'll note lots of figures in the latter few
18 pages of the document.
19     Are those figures in your
20 handwriting as well, which start at least on    10:09:49
21 page 255?
22     A.  Yes.
23     Q.  Do you have any doubt, though, that
24 these notes were written within a few days or a
25 week or two of April 8, 1996 on the memo and on    10:10:02

**Page 52**

1  the plan?
2      A.  They would have been written within
3  that time period. I can't tell you if it's a
4  week or a few days from April 8th, but within
5  that time period, yes.         10:10:21
6      Q.  Thank you.
7      Do you recall different things that
8  Coopers & Lybrand did or your engagement team
9  did in the area of testing accounts receivables
10 in '96 that had not been done in prior years?    10:10:30
11     A.  Yes.
12     Q.  What do you recall differently?
13 What do you recall that was different that had
14 been -- that was done in '96?
15     A.  Well, we brought in -- let me --    10:10:43
16 let me preface it by indicating I met with
17 management and indicated we wanted to do some
18 additional testing in certain areas. They
19 agreed.
20     Q.  Who at management?    10:11:00
21     A.  David McConnell.
22     Q.  What did you indicate to him that
23 you would do differently --
24     A.  Well, I --
25     Q.  -- if you told him?    10:11:15

13 (Pages 49 to 52)

William F. Buettner                                                                Volume 1

Page 53

1    A.   Pardon me, if I --
2    Q.   If you told him specifically what
3  you were planning to do differently.
4    A.   Yes, I told him what I wanted to
5  do. It was basically that I felt that a large    10:11:28
6  sample of review of a sample of bills is
7  necessary so that we could gain a better
8  understanding of why bills were not getting out
9  the door.
10   Q.   When you review a sample of bills,    10:11:39
11 what do you mean?
12   A.   Well, review bills from the time
13 that the patient registered in the facility to
14 the time that the bill went out and eventually
15 the money was collected by the organization.    10:11:50
16   Q.   Do you mean actually looking at
17 paper or electronic copies of bills or looking
18 at the billing process?
19   A.   The billing process.
20   Q.   Did you tell Mr. McConnell any    10:12:01
21 other new testing that you planned to do in the
22 accounts receivable area?
23   A.   We indicated we were going to bring
24 in specialists to perform that billing process
25 review.                                  10:12:18

Page 54

1    Q.   This was a billing process review
2  that was ultimately undertaken by a fellow
3  named Norb Kaliszewski?
4    A.   Yes, and these individuals within
5  in his group. They specialized in what I would    10:12:35
6  call back-office hospital operations. So
7  basically their work on a day in and day out
8  basis was to look at billing processes and to
9  determine if bills were getting out the door
10 right or what type of problems an organization    10:12:44
11 may be running into.
12   Q.   Did you tell Mr. McConnell any
13 other new testing was to be done?
14   A.   That was the primary area.
15   Q.   Can you think of anything else as    10:12:52
16 you sit here today?
17   A.   No, I cannot.
18   Q.   Can you think of anything else
19 different that you did in '96, whether or not
20 you told Mr. McConnell, as you sit here today?    10:12:58
21   A.   No. I believe that would be the
22 most significant change. I mean, there may
23 have been other minor modifications because
24 facts and circumstances would require it, but
25 that was the principal change.          10:13:19

Page 55

1       MR. JONES: Thank you.
2       Why don't we take our first break
3  today here. I think we're going to try to find
4  a conference room for you guys to chitchat in
5  if we can. I'll look into that if we haven't    10:13:29
6  already. Thank you.
7       THE VIDEOGRAPHER: We're going off
8  the record at 10:12.
9       (Recess had.)
10      THE VIDEOGRAPHER: We're back on    10:31:08
11 the record at 10:31.
12   Q.   Mr. Buettner, when we broke, we
13 were speaking of a contact or a meeting you had
14 with Mr. McConnell about 1996 audit matters
15 that were apparently on your mind.    10:31:18
16      Do you recall that's where we
17 broke, essentially?
18   A.   Yes.
19   Q.   My question is now a more general
20 one. Think about the time period, if you will,    10:31:29
21 between 1995 audit work and 1998 audit work
22 that I know was started and I understand was
23 not completed. But was Mr. McConnell your,
24 that is Bill Buettner's, primary contact at
25 AHERF during those times?           10:31:41

Page 56

1    A.   It would vary depending on the
2  agenda item, if you will. In terms of audit
3  work, I would say that he was not the primary
4  contact. That was his decision. He wanted us
5  to work either through -- if you're going to    10:32:06
6  cover the entire time period, I guess it would
7  be Spargo and Cancelmi, Dionisio or Adamczak.
8  Before that group there was a fellow by the
9  name of Joe Donnelly, but I think Joe was gone
10 by '95.                                 10:32:24
11   Q.   So in terms of your personal
12 interactions on audit matters, you would in the
13 first instance speak with either Mr. Spargo,
14 Mr. Adamczak, Mr. Cancelmi or Mr. Dionisio?
15   A.   Yes, depending on the item to be    10:32:36
16 discussed, yes.
17   Q.   Then in terms of any other, what
18 you referred to as agenda item, would Mr.
19 McConnell make the list?
20   A.   Yes, but --                   10:32:49
21   Q.   In what context?
22   A.   It would depend on, again, the
23 item.
24   Q.   Let's do it this way, which may
25 make it easier for both of us.       10:32:55

14 (Pages 53 to 56)

5f154c32-8158-45bb-ac86-8a0d33a5

William F. Buettner                                                                            Volume I

Page 57

1        For what matters did you consider
2   Mr. McConnell your primary contact?
3        A.   Well, general business matters,
4   items that I considered to be important enough,
5   even if from an audit context that I would want    10:33:11
6   to get his input or okay, or special projects
7   that we were brought in to assist AHERF
8   management. And if I felt that his input was
9   necessary, I would seek him out.
10       Q.   What do you mean to refer to when    10:33:33
11  you say general business matters?
12       A.   Well, just an understanding of the
13  direction of the organization. If the
14  organization's going through an acquisition,
15  for instance, we would want to -- I would want    10:33:50
16  to meet with him just to understand the
17  transaction, the steps that they were
18  undertaking to facilitate the transaction, the
19  acquisition.
20       Q.   Do you recall meeting with him on    10:34:05
21  those kinds of topics, hospital acquisitions or
22  physician practice acquisitions in particular?
23       A.   More or less a hospital
24  acquisition. I remember talking to him one
25  time about physician acquisitions, but    10:34:17

Page 58

1   generally it would be hospital acquisitions or
2   debt refinancings or things of that nature.
3        Q.   What, if anything, or any matter
4   would you consider Mr. Abdelhak to have been
5   during this same time period your primary    10:34:40
6   contact, and you understood Mr. Abdelhak,
7   Sherif I believe is his first name, to have
8   been the chief financial officer of AHERF, is
9   that right?
10       A.   Yes, that's correct.    10:34:49
11       Q.   Was there any matter that you
12  considered him to be the primary contact on
13  during this time period?
14       A.   Well, if there were critical
15  issues, business matters that we ran into, and    10:34:57
16  either I couldn't get in touch with Mr.
17  McConnell or Mr. McConnell would not take my
18  concerns seriously, let's say, I may go to
19  Sherif. Again, general -- what I would
20  consider to be general business matters and not    10:35:14
21  items of detailed audit testing or detailed
22  audit procedures.
23       Q.   How frequently did you meet with
24  either -- with Mr. McConnell during any audit
25  year '95 to '98, your best estimate? Was it a    10:35:27

Page 59

1   better of two or three meetings or were you
2   meeting throughout the year, or can you put an
3   estimate on it for me?
4        A.   We would meet throughout the year.
5   It would be luncheon meetings or breakfast    10:35:38
6   meetings, perhaps once every six weeks or
7   something along those lines. Sometimes he
8   would call the meeting or arrange for it.
9   Other times I would. There may be occasions
10  where the tax partner from Coopers & Lybrand, a    10:36:0[
11  fellow by the name of Larry Blair, felt it
12  would be worthwhile for him to meet with Mr.
13  McConnell or somebody over at AHERF for a
14  particular reason. So Larry would arrange the
15  meetings.                     10:36:11
16       Once every six weeks, once every
17  eight weeks, maybe once every four weeks
18  depending on the subject matter. But it would
19  be more than two or three. But that time
20  interval that I've given you is probably a fair    10:36:23
21  assessment of the number of times we met.
22       Q.   Did you meet with Mr. McConnell as
23  a matter of routine at the beginning and the
24  end of each audit cycle from the time -- from
25  the preliminary field work to the final work    10:36:36

Page 60

1   during this same '95 to '98 time period?
2        A.   Probably -- yes and no. I mean, at
3   the end we would attempt to meet with him or
4   have a conference call or go over what we
5   considered to be issues.              10:36:53
6        Planning was -- we attempted to
7   cover that, if you will, during these periodic
8   meetings that I just mentioned. I also believe
9   he would have gotten an advanced copy as well
10  as Mr. Abdelhak of our report that would go to    10:37:08
11  the audit committee so that they would be aware
12  of where we were coming from or areas of
13  concern.
14       Q.   Is it also true that he would
15  routinely during this '95 to '98 time period    10:37:20
16  join you at audit committee meetings when they
17  were held, Mr. McConnell, that is?
18       A.   Yes.
19       Q.   So you would have the opportunity
20  to chat with him shortly before, shortly after    10:37:30
21  those meetings?
22       A.   Yes, yes.
23       Q.   Do you recall how frequently, if it
24  was more than a time or two, that you met with
25  Mr. Abdelhak during the '95 to '98 time period?    10:37:40

5f154c32-8158-45bb-ac86-8a0d33a5131f

William F. Buettner                                                          Volume 1

Page 81

1   with McConnell, then I would -- and I couldn't
2   be there, then I would call McConnell, say I
3   can't be there, I'm going to send Mark Kirstein
4   over to go over this situation with you.
5          I'd be shocked if he says I          11:02:27
6   wouldn't meet with the person. He just didn't
7   strike me as that type of individual.
8       Q.   You never learned that, that he
9   said I won't meet with Mark Kirstein?
10      A.   I never had an instance where he       11:02:40
11  said he would not meet with anyone.
12      Q.   Did you believe Mr. McConnell to be
13  competent -- a competent CFO or chief financial
14  officer during the time you worked with him?
15          MR. RYAN: You're asking what he        11:02:53
16  felt back then?
17          MR. JONES: Yes.
18      Q.   Did you believe --
19      A.   At the time?
20      Q.   Let me try the question over again.    11:02:57
21          Did you believe during the time you
22  worked on AHERF audits that Mr. McConnell was a
23  competent CFO, chief financial officer?
24      A.   Yes, I felt that like everybody
25  else he had strengths and he had weaknesses.     11:03:09

Page 82

1   He was what people want to call a big picture
2   guy or global guy. I believe that was a
3   strength in a way.
4          He was not a detailed accountant,
5   so he placed reliance on people below him.       11:03:26
6   Historically I felt that he had the knack for
7   bringing people in who had -- who were able to
8   complement his weaknesses, if you will.
9       Q.   Those kinds of people were who?
10      A.   A Joe Donnelly or a Joe Dionisio, a   11:03:45
11  Mike Martin, things of that nature. He seemed
12  to surround himself with people who were fairly
13  bright people.
14      Q.   Did you have any reason to question
15  Mr. McConnell's integrity during the time you    11:04:00
16  worked on AHERF's audits?
17          MR. RYAN: You're asking him had
18  reason back then?
19          MR. JONES: During the time he
20  worked on AHERF audits.                          11:04:09
21      A.   At the time we worked on the audits
22  from '95 through '98, no, no.
23      Q.   Did you have -- go ahead.
24      A.   Things have changed since then.
25      Q.   Did you have any reason to doubt or     11:04:21

Page 83

1   question his integrity at any time before '95?
2       A.   Before '95?
3       Q.   Yes.
4       A.   No, sir.
5       Q.   Have you changed your view of Mr.       11:04:35
6   McConnell's competence since you stopped
7   working on AHERF matters?
8       A.   Yes. I'm not sure if it's his
9   competence or his ability to convince other
10  individuals within the organization that change   11:04:52
11  was needed. He appeared to understand the
12  issues that they were facing, but nothing got
13  done. So, you know, intellectually I think he
14  understood what had to be done, but somehow
15  things didn't seem to get done.                   11:05:09
16      Q.   Those things that you have
17  categorized I think in your answer as required
18  or needed change, what would they be?
19      A.   They would be items -- some of the
20  items we included in our management letter in     11:05:23
21  '97, cost containment, cost reduction, if you
22  will, some sort of revenue enhancement.
23  Smaller things such as the registration process
24  in the east was still undergoing reengineering
25  a year and a half after we brought it to his      11:05:44

Page 84

1   attention. Things of that nature.
2       Q.   I think you intimated in one of
3   your more recent responses that your view of
4   his integrity has changed since you left AHERF
5   audit work.                                       11:06:01
6          Is that the case?
7       A.   Yes, it is.
8       Q.   How has your view changed and why?
9       A.   There were certain pieces of
10  information that I believe he had. I can't        11:06:14
11  prove them for certain, but I believe he had
12  information that he didn't share with us. That
13  would have changed our judgments.
14      Q.   During your audit work?
15      A.   Yes. Yes, sir.                           11:06:25
16      Q.   What are those pieces of
17  information that you believe he may have had?
18      A.   Well, with regards to the
19  accounting for certain endowments, apparently
20  there was some sort of disagreement with the      11:06:36
21  people at Mellon Bank in terms of either the
22  actual interpretation of the trust indenture or
23  the existence of that indenture. We didn't
24  learn about that until I guess June of '98.
25          I don't know if he knew about it         11:06:57

Page 85

1   later, but apparently -- or earlier, I mean,
2   but apparently there was a letter written two
3   years earlier that no one ever shared with us.
4       Q.   How did -- strike that.
5       Any other piece of information that    11:07:09
6   you believe he may have had but did not share
7   with you in a timely way?
8       A.   There may have been some accounting
9   in the acquisition area that to this day I
10  still don't totally understand. I don't know    11:07:21
11  if he knew about it. But if he did, I wish he
12  would have told me.
13      Q.   The accounting in the acquisition
14  area, does this have to do with the certain
15  reserve transfers beyond the first 50 million    11:07:35
16  of reserve transfers that were moved from the
17  Graduate hospitals or the Graduate sets of
18  hospitals to the Delaware Valley Obligated
19  Group hospitals in 1997?
20      A.   Yes, it would be the transfers    11:07:48
21  beyond the 50 million dollars that they had
22  disclosed to us.
23      Q.   When I say the Graduate hospitals,
24  you know I mean more than one; it's the set of
25  hospitals from the former Graduate Health    11:08:03

Page 86

1   System that were acquired sometime in 1997 by
2   AHERF?
3       A.   Yes.
4       Q.   We understand each other when I
5   talk about that?                    11:08:06
6       A.   Yes.
7       Q.   When I say the Delaware Valley
8   Obligated Group hospitals, I'm referring to a
9   set of hospitals that AHERF had owned at least
10  the year before that were also in the Greater    11:08:14
11  Philadelphia region but had -- were reported in
12  different ways and were obligees or obligors or
13  at least had different debt instruments. You
14  understand that?
15      A.   Yes.                    11:08:28
16      Q.   Thank you. I'm glad.
17      Anything else that you believe he
18  may have not shared with you in a timely way
19  that has caused you now I understand to
20  question his integrity, is that what you mean    11:08:37
21  to say when you say your view has changed?
22      A.   Yes.
23      Q.   Is there anything else?
24      A.   Those are the two principal items.
25      Q.   Let me ask you, Mr. Buettner, now    11:08:59

Page 87

1   to think back with me about the 1996 audit work
2   in connection with perhaps Exhibit 4458.
3       Do you recall that the audit risk
4   assigned to accounts receivable by your
5   engagement team for the 1996 audit was below    11:09:16
6   max?
7       A.   You're talking about 1996, sir?
8       Q.   Yes.
9       A.   I can't remember that, but that's a
10  possibility.                    11:09:29
11      Q.   Do you recall being in any
12  conversations about what the audit risk ought
13  to be for '96 and a determination being made?
14      MR. RYAN:  You mean for the A/R?
15      Q.   Yes, for the A/R area.            11:09:46
16      A.   You're talking again for '96?
17      Q.   Yes.
18      A.   Yes, we would have meetings. I
19  would have meetings with the engagement team
20  during the planning process of the audit to    11:09:59
21  determine how we're going to approach our audit
22  work.
23      One item that we would have to
24  consider is the reliance we would place on
25  controls and the level of other testing we    11:10:10

Page 88

1   would do. So, yes, clearly we had those
2   discussions. I just don't recall any details
3   of the discussions.
4       Q.   Do you recall the audit risk
5   assigned to accounts receivable for AHERF    11:10:23
6   audits or any of its affiliates being at below
7   max in any fiscal year or for any fiscal year?
8       A.   I'm sure that there were some areas
9   that were either low and other areas that were
10  below max. That is a designation as to the    11:10:43
11  level of reliance we would place on controls.
12      If an area was identified as low,
13  that meant we would rely -- place significant
14  reliance on internal controls.
15      If it was below the max, we would    11:11:02
16  place some reliance on internal controls and
17  some on other areas of the testing, if you
18  will.
19      Q.   You just can't recall today whether
20  either the '96 audit or the '97 audit or    11:11:12
21  whether the risk assessment for A/R was below
22  max, is that fair?
23      A.   I cannot -- yes. And it's just not
24  A/R. It would be the revenue system that would
25  include A/R.                    11:11:23

22 (Pages 85 to 88)

5f154c32-8158-45bb-ac86-8a0d33a5

William F. Buettner                                                                    Volume 1

Page 89

```
 1      Q.   Thank you.
 2           I think we understand each other,
 3  but to make sure, when I use the term A/R or A
 4  slash R from time to time today, I have again
 5  gleaned that from work papers or from      11:11:31
 6  testimony. It's not something I typically used
 7  before in my conversation.
 8           But you understood -- understand me
 9  to mean accounts receivable when I say that?
10      A.   Yes.                    11:11:42
11      Q.   I'll understand you the same way.
12      A.   That's fine.
13      Q.   Thanks.
14           Let's ask you to look at another
15  exhibit for us. While we're pulling that,    11:11:51
16  would you tell me who you recall being involved
17  principally in the audit for accounts
18  receivable for the 1996 audit on your
19  engagement team, that is?
20      A.   I would imagine it would be      11:12:13
21  Kirstein, I guess Brian Christian. I'm not
22  sure if Amy Frazier had any involvement. I
23  just can't remember.
24           - - - - -
25      (Thereupon, Deposition
```

Page 90

```
 1      Exhibit 4459 was marked for
 2      purposes of identification.)
 3           - - - - -
 4      Q.   Mr. Buettner, I've now handed you
 5  Exhibit 4459. I'm going to ask you to take a    11:12:31
 6  look at this fairly brief two-page document and
 7  tell me if you recognize it and whether it
 8  bears your handwriting.
 9      A.   That's my handwriting. It looks
10  like it's some sort of agenda that the, I    11:12:50
11  believe the staff would have put together just
12  to update, give me an update on where they
13  stood on audit work.
14      Q.   It's headed with the words AHERF,
15  Accounts Receivable Update, August 8, 1996. Is   11:13:03
16  that right?
17      A.   Yes.
18      Q.   Is that a typical kind of document
19  by which you were updated by your staff, one
20  with that kind of a heading?             11:13:12
21      A.   No. It could vary depending on the
22  amount of time the staff had and the level of
23  detail they wanted to go into.
24           Sometimes an update would be
25  nothing more than two people sitting down and I   11:13:29
```

Page 91

```
 1  would grab a piece of paper and they would
 2  start going through their list, which was
 3  written on the back of a napkin and I would be
 4  taking notes.
 5      Q.   But you don't doubt this is the way   11:13:38
 6  information was conveyed to you in this
 7  instance, in a typewritten format like this?
 8      A.   In this particular instance,
 9  someone sat down and put together an outline of
10  where we stood on our work and the revenue      11:13:49
11  cycle.
12      Q.   Let me ask you to look midway down
13  the page for me under the heading Control and
14  Other Findings to Date. Do you see that
15  subheading?                    11:14:05
16      A.   Yes.
17      Q.   Which is the second on the
18  document?
19      A.   Yes, I do.
20      Q.   About midway down, maybe a little   11:14:07
21  greater than midway down, I see a reference
22  that reads, "Aging methodology has been changed
23  in 1996 based on final bill date for inpatient
24  and last pay date for outpatient."
25           I read that right? Did I read that   11:14:21
```

Page 92

```
 1  right?
 2      A.   Yes.
 3      Q.   You've written next to it, I
 4  believe in your handwriting, "measure
 5  difference." Did I also read that right?       11:14:31
 6      A.   Yes.
 7      Q.   Do you recall this announced or
 8  executed or implemented change in methodology?
 9      A.   Yes, I remember AHERF management
10  changing their methodology.         11:14:45
11      Q.   Do you recall that it had to do
12  with final bill date for inpatient and last
13  bill date for outpatient?
14      A.   Yes.
15      Q.   Do you recall what you meant when   11:14:55
16  you wrote the words measure difference?
17      A.   My recollection is I simply wanted
18  to know how much of a change that had on the
19  overall receivables.
20      Q.   Do you recall at any time       11:15:10
21  disapproving or taking exception to this
22  changed methodology to anyone at AHERF?
23      A.   No, no. These methods are
24  acceptable alternatives to what AHERF was --
25  had used previously.              11:15:28
```

23 (Pages 89 to 92)

William F. Buettner

Volume 1

Page 93

1    Q.    Why do you -- why did you or do you
2    believe they were acceptable alternatives?
3    A.    Because I've seen them used
4    elsewhere with other clients or in the
5    industry.                              11:15:37
6    Q.    It was a part of your experience in
7    the industry?
8    A.    Yes.  Yes, sir.
9    Q.    In your A/R accounts receivable
10   audit work in the industry?          11:15:45
11   A.    Yes.
12   Q.    Did you understand at any point
13   during the '96 audit that this changed
14   methodology would make certain receivables at
15   certain AHERF hospitals seem younger, that is,  11:15:59
16   would reduce their aging in the schedules
17   prepared by the client?
18   A.    Yes.
19   Q.    Why did you think based on your
20   industry experience with A/R matters in the  11:16:15
21   healthcare field that this making younger of or
22   trimming the aging of receivables was
23   appropriate?
24         MR. RYAN:  Objection to form.
25   A.    It's not a question of whether I    11:16:33

Page 94

1    felt it was appropriate or not.  The client
2    adopted a methodology that we had seen
3    elsewhere with other clients.  As long as we
4    understood that methodology, then we could go
5    through our own assessment of the impact that  11:16:47
6    that would have.
7    Q.    So I think what you're telling me
8    is that you weren't saying grace over or
9    approving the methodology; you were only noting
10   that it was not, in your view, unheard of or   11:16:57
11   potentially uncommon?
12   A.    That's correct.
13   Q.    Did Coopers & Lybrand ask AHERF to
14   run two different versions of the aging for
15   these hospitals -- of the agings for these     11:17:13
16   hospitals that had employed this changed
17   methodology?
18   A.    We asked them for information to be
19   able to measure the difference, so I believe
20   that someone got that information because at   11:17:30
21   the end of the day I can remember being told
22   that the difference was not significant.
23   Q.    Who told you that?
24   A.    Someone on the staff.  That's my
25   recollection.  I can't tell you if it was Mark,  11:17:43

Page 95

1    if it was Brian, if it was Amy.  I just can't
2    remember.
3    Q.    Correct me if I'm wrong, but the
4    change that we're talking about, to be a little
5    more specific, that's in your recollection is   11:17:56
6    that the change at certain hospitals, at least,
7    inpatient billings were aged at final bill date
8    rather than discharged in this new methodology;
9    is that much right?
10   A.    That's correct.                   11:18:11
11   Q.    At certain hospitals, outpatient
12   billings were now going to be in, in 1996, aged
13   over again or the aging would restart with the
14   receipt of a payment and that the former
15   beginning point for those agings were at        11:18:26
16   registration?
17   A.    The date of service, yes.
18   Q.    For date of patient service?
19   A.    Yes.
20   Q.    Did C&L propose any adjustment in    11:18:36
21   any amount for this aging change in 1996 in its
22   audit work, an adjustment to the reserve for
23   accounts receivable at any AHERF hospitals?
24   A.    I think your question has two
25   questions in it or I'm not sure I understand,   11:19:01

Page 96

1    so I'm going to ask you to repeat, please.
2    Q.    Certainly.
3          Do you recall that Coopers &
4    Lybrand proposed any adjustment to the accounts
5    receivable -- or the allowance for doubtful     11:19:11
6    accounts, the reserve for bad debt, at any
7    AHERF hospital that was related to this aging
8    change?
9          MR. RYAN:  Objection.
10   A.    No.  I don't recall suggesting any   11:19:23
11   type of adjustment related to this aging
12   change.
13   Q.    Do you recall any discussions with
14   any member of the engagement team about placing
15   this aging change or any affect that may have   11:19:44
16   occurred because of it on the SUD, the
17   statement of unadjusted differences, from 1996?
18   A.    No.  You're talking solely for the
19   aging change?
20   Q.    Yes.                              11:20:03
21   A.    No.
22   Q.    Let me ask you this.  If I continue
23   to use the shortened form or the abbreviated
24   form of statement for unadjusted differences
25   and the phrase, therefore, would be SUD, S U D,  11:20:15

24 (Pages 93 to 96)

William F. Buettner                                                                 Volume 1

Page 113

1    second page of the report which has Bates
2    digits 428 as its ending Bates digits.
3          Do you see in the sentence that is
4    the second paragraph on this page a reference
5    to a first-run, "correct first-run percentage    11:55:26
6    of 60 percent," do you see that?
7       A.   Yes.
8       Q.   Is that the flip side of the 40
9    percent percentage you were referring to
10   earlier in your discussion about your          11:55:37
11   discussion with Mr. McConnell?
12      A.   Yes.
13      Q.   This is Kaliszewski's attempt to
14   capture for AHERF how many times it's getting
15   it right the first time in the hospitals at     11:55:49
16   least that he studied with respect to patient
17   billing?
18      A.   That's correct.
19      Q.   He apparently concludes that, of
20   the sample that he selected, they were getting  11:55:57
21   it right 60 percent of the time?
22      A.   Yes.
23      Q.   Did you have a view about how that
24   compared with other hospitals for whom you
25   performed audit services in the mid '90s in     11:56:09

Page 114

1    your industry experience?
2       A.   Yes.
3       Q.   What was that view?
4       A.   60 percent is low.
5       Q.   What was --                            11:56:19
6       A.   Was low.
7       Q.   What would have been a common or
8    more average, in your view, in your experience
9    from that time period, the mid 90s, percentage
10   of first-run correctness?                       11:56:30
11      A.   I can't put an exact figure on it,
12   but the 60s should have been 90, let's say, or
13   perhaps even higher.
14      Q.   Let me ask you to flip to page
15   three of the report, which is a page that ends  11:56:46
16   in 429 in the Bates numbering system.
17         Are you with me?
18      A.   Yes.
19      Q.   The chart here attempts to depict
20   what, as you understand it?                      11:57:08
21      A.   As indicated above the chart, I
22   mean, there are certain parameters or he calls
23   indicators, certain measurement parameters that
24   would highlight bills being sent out the door,
25   if you will, submitted to the insurers or being  11:57:26

Page 115

1    paid or how long it takes to get paid.  He's
2    trying to compare that to some sort of best
3    practices level that he includes on the bottom
4    of the chart.
5       Q.   In the sections or the columns,       11:57:42
6    rather, where he includes -- has the -- the
7    columns that he heads with the phrases bill to
8    pay and discharge to pay, do you see those two?
9       A.   Yes.
10      Q.   Do you know as you sit here today      11:57:54
11   if the figures set forth in those columns that
12   are so headed include only the accounts that
13   had been paid at the time he was doing his
14   study as opposed to accounts that were still
15   outstanding?                                    11:58:08
16      A.   My understanding would only be
17   those that have actually been paid.
18      Q.   Do you recall as you sit here today
19   confirming that with him one way or the
20   another?                                        11:58:19
21      A.   I may have.  Reading that, that's
22   my assumption.  We may have talked about it
23   because I looked at an earlier draft, but I
24   don't recall a specific discussion with him
25   about it.                                       11:58:30

Page 116

1       Q.   If it included accounts that were
2    still outstanding at the time he took his
3    measurement, Mr. Kaliszewski, that is, would
4    you have been as confident in the accuracy or
5    the importance of the outcome of the study?     11:58:44
6          MR. RYAN:  Objection.
7       A.   I'm not sure if I understand your
8    question.
9       Q.   Do you think if he had included in
10   his study in these two columns accounts that    11:58:57
11   were not yet paid but still outstanding at the
12   time, that would have skewed the result in any
13   way?
14         MR. RYAN:  Objection.
15      A.   Well, I -- I don't know.  I mean, I    11:59:07
16   would have to look at the level of deviation,
17   if you will, if that were the case.
18      Q.   Would that -- well, strike that.
19         If it had been that Mr. Kaliszewski
20   included in these two columns accounts that had  11:59:39
21   not been paid but were still outstanding at the
22   time he took his measurement, it's fair to say
23   that some of those accounts may never have been
24   paid, is that -- because in eventuality
25   sometimes accounts aren't paid?                 11:59:54

29 (Pages 113 to 116)

William F. Buettner                                                    Volume 1

Page 117

1          MR. RYAN: Objection.
2          A.   That's possible.
3          Q.   It wouldn't then have been a delay
4   in payment issue for those accounts, but it may
5   have just been simply a nonpayment issue that      12:00:04
6   was causing the data to come out the way it
7   came out?
8          MR. RYAN: Objection.
9          A.   Well, again, you would have to
10  determine why the payment was not made. Was      12:00:16
11  the payment not made because it was a self-pay
12  and there was true credit risk? Was a payment
13  not made because the registration process was
14  incorrect and as a result they were not able to
15  get the correct information?               12:00:29
16         I mean, you have nominal credit
17  risk when dealing with third-party insurers,
18  Medicare or Medicaid.
19         So the fact that you're not being
20  paid is either an eligibility issue or you      12:00:44
21  simply can't get it right. So we would have to
22  determine the reason for the nonpayment.
23         - - - - -
24         (Thereupon, Deposition.
25         Exhibit 4460 was marked for

Page 118

1          purposes of identification.)
2          - - - - -
3          Q.   Mr. Buettner, we've handed you a
4   new exhibit which is marked -- could you give
5   me -- the number for me?               12:01:23
6          A.   4460.
7          Q.   Thank you. 4460.
8          Do you recall seeing this document
9   before today?
10         A.   I recall seeing a document similar      12:01:35
11  to this. I don't know if it's the exact
12  document that I have in front of me, but I
13  remember seeing spreadsheets, if you will, that
14  look familiar to this -- or similar to this.
15         Q.   Do you know what this schedule      12:01:48
16  attempts to reflect?
17         A.   Well, I can only -- I can only
18  assume because it's really not dated. I mean,
19  Norb prepared schedules similar to this when
20  doing his study in both '96 and '97. I don't      12:02:15
21  know if this relates to '96 or '97. I'm not
22  sure if he prepared it or if somebody from
23  AHERF copied the format and did their own
24  study.
25         Q.   But you believe this to be a part      12:02:30

Page 119

1   of Norb's work product --
2          A.   No.
3          Q.   -- in any event?
4          A.   No, I said I believe he prepared --
5   he prepared schedules similar to this, but I'm      12:02:38
6   not sure these are his schedules or if somebody
7   from AHERF, for instance, did their own study
8   and used his format. I don't know.
9          Q.   Thank you.
10         You can put that one aside.            12:02:57
11         In performing your work in
12  connection with the '96 audit of accounts
13  receivable at AHERF, did you or those on your
14  engagement team review historical data,
15  historical collections data?               12:03:29
16         A.   Well, we, during our work in '95,
17  we would have looked at subsequent events. In
18  '96, we would have looked at subsequent events.
19  Subsequent events being defined as cash coming
20  in after the fact that would support the value      12:03:44
21  of the receivable at an earlier date.
22         Q.   Subsequent events in '95 would have
23  been some period of weeks or months post close
24  of the fiscal year '95, is that right?
25         A.   That's correct. Normally four to      12:04:04

Page 120

1   eight weeks, let's say.
2          Q.   That would be the same for '96?
3          A.   Yes.
4          Q.   So the historical collections data
5   that you would have referred to in connection      12:04:15
6   with your fiscal year '96 audit work, that is
7   historical from the perspective of the '96
8   fiscal year, would have been four to eight
9   weeks of subsequent events testing that took
10  place in connection with your '95 audit work,      12:04:28
11  is that fair?
12         MR. RYAN: Objection.
13         A.   Yes, yes.
14         Q.   Do you recall referring to
15  historical collections data for any prior time      12:04:36
16  period or anybody on your engagement team
17  having done so in connection with the '96
18  audit, that is before the four to six or eight
19  weeks after the close of the '95 fiscal year
20  data from any prior time period?            12:04:49
21         MR. RYAN: Objection.
22         A.   I'm totally confused here, sir.
23  I'm sorry.
24         Q.   That was long, so let me try it
25  again.                           12:04:58

30 (Pages 117 to 120)

William F. Buettner                                                                      Volume 1

---

Page 121

1    You told me that as a matter of
2  historical collections data, you believe in
3  connection with the '96 audit someone on your
4  engagement team would have looked at the '95
5  audit team's subsequent events testing. Is        12:05:08
6  that much right?
7      MR. RYAN: Objection.
8    A.  No, no, no. I'm sorry.
9    Q.  Then correct me, please.
10   A.  Let me -- if I misled you, I        12:05:16
11 apologize.
12   We'll do it -- we'll look at '96
13 and I'll put some dates as an example that may
14 not necessarily correlate to dates in our work
15 papers.              12:05:27
16   We're attempting to gain some sort
17 of comfort on the collectibility or what we
18 call the NRV, net realizable value, of patient
19 receivables as of June 30, '96.
20   Q.  This is as a part of your '96 audit    12:05:44
21 work?
22   A.  Yes, sir.
23   One thing that we would look at
24 then is we would look at collection activity in
25 July and August of '96.          12:05:54

Page 122

1    Q.  I understand.
2    A.  We would then evaluate the level of
3  cash that came in during those two months
4  related to the June '96 receivables to gain
5  some sort of comfort that they're collecting    12:06:07
6  those receivables.
7    We, likewise, would have done that
8  in 1995, the same scenario, June of '95, looked
9  at the July-August period of time, some period
10 of time.              12:06:23
11   So that was my answer to your
12 initial question when you asked for some sort
13 of historical evaluation.
14   Q.  I understand your answer now. I
15 appreciate the clarification.          12:06:33
16   My question then, as just a
17 follow-up, but I think I know the answer, is,
18 do you recall in connection with your '96 audit
19 work having anyone on your engagement team, or
20 yourself, look at collections data from prior    12:06:47
21 years, from prior periods, that is before the
22 fiscal year '96, doing it as a part of your '96
23 audit work?
24   A.  That was a factor that we
25 considered because we did look at cash        12:07:00

Page 123

1  collections that occurred during the year for
2  '96. And I believe we got that information
3  from patient accounting, I believe. They had
4  prepared schedules that would summarize cash
5  coming in the door for periods -- for a        12:07:19
6  particular month, if you will.
7    Q.  Particular months during fiscal
8  year '96?
9    A.  Yes, yes, yes. By payor, I
10 believe. I believe it was by payor.          12:07:29
11   Q.  Do you recall looking at any
12 schedules or any data like that for any period
13 before fiscal year 1996 in connection with your
14 '96 audit work?
15   A.  Yes, I think I just answered that,    12:07:40
16 I believe that was -- I can't remember now if
17 that was '96 or '97. I want to say it was for
18 '96, but I can't -- honestly can't remember.
19   Q.  I thought, though, what you said
20 was in connection with your '96 audit work, you    12:07:52
21 looked at data about collections in fiscal year
22 '96?
23   A.  Yes. And I believe that's the
24 case. I believe that's the case. There were
25 schedules put together. I believe that was    12:08:02

Page 124

1  '96. But, you know, it may have been '97. I
2  can't remember the time period, but we would
3  have looked at that, yes.
4    Q.  So you're not sure whether it was
5  '96 or '97 where you did that look?        12:08:17
6    A.  Yes.
7    Q.  My question is, in any -- in either
8  year -- I think this is where we're not maybe
9  understanding each other -- in either year --
10 year's audit work, the year's audit for fiscal    12:08:29
11 year '97 or the year's audit work for fiscal
12 year '96, do you recall looking at cash
13 collections that were brought in the door in
14 years before the audit year you were auditing,
15 so for '96 it would have been looking at        12:08:44
16 collections in '95 or for '97 it would have
17 been looking at collections in '96 or some
18 prior year? Do you recall doing that in
19 connection with your audit work in '96 or '97?
20   A.  I think I answered that. I mean,    12:08:57
21 I'm not trying to be difficult, but in '96
22 we're looking at cash collections at the
23 beginning of the next fiscal year that relate
24 to '96. I thought we looked at cash
25 collections that were summarized during the    12:09:17

William F. Buettner                                                                      Volume 1

Page 125

1   year by payor during '96, but, again, I can't
2   remember if it was '96 or '97.
3       Q.   But were those cash collections,
4   though, collections, if it was '96 or '97, that
5   came in the door during the fiscal year you        12:09:36
6   were auditing?
7       A.   Yes, they probably were. Some of
8   them may have related to the previous year.
9   There was no segregation on the schedule.
10      Q.   But it was clearly cash that came      12:09:45
11  in the door during the fiscal year you were
12  auditing?
13      A.   Yes. Yes, sir.
14      Q.   My question then is this, do you
15  recall in connection with either your '96 or       12:09:51
16  '97 work -- audit work looking at collections
17  data from any prior year that came in the door
18  during any prior fiscal year?
19      A.   In other words, cash that came in
20  the door that was segregated by the year that       12:10:03
21  the receivable related to?
22      Q.   Or that you knew otherwise to be
23  related?
24      A.   No, I don't remember looking at
25  that.                        12:10:11

Page 126

1       Q.   Do you recall ever asking for that
2   kind of data of your client, AHERF?
3           MR. RYAN:  Objection. You mean the
4   date of when the cash came in during the prior
5   year or the date of service was in the prior        12:10:28
6   year?
7           MR. JONES:  The prior year cash
8   collections.
9           MR. RYAN:  Because I'm not sure you
10  were clear.                    12:10:34
11      A.   Let me -- I'm really having a
12  difficult time here, so let me see if I can re
13  -- I don't want to do your job for you, but let
14  me try to just rehash the question so you can
15  agree that it's what you're looking for.        12:10:44
16          Cash comes in the door. The client
17  summarizes that cash by third-party, let's say
18  Blue Cross, Medicare, whatever.
19          That cash is obviously paying for
20  receivable. The cash comes in the door in       12:11:01
21  1996. You're asking if we evaluated whether
22  the cash that came in at that time in '96
23  related to a '96 receivable or a '95
24  receivable.
25      Q.   I'm not really asking that, but I'm    12:11:18

Page 127

1   presuming you're telling me you didn't do that?
2       A.   No. But that's the gist of what I
3   thought you were asking me.
4       Q.   Well, I think we're almost
5   understanding each other.              12:11:25
6           My question is, I think you've told
7   me now that in one of the two audit years --
8       A.   If not both.
9       Q.   If not both.
10      A.   I'm not sure.                12:11:33
11      Q.   Either '96 or '97, you looked at,
12  you believe, or someone on your team looked at,
13  you believe, collections during that audit year
14  that may have related to accounts that were
15  started in a prior audit year?            12:11:44
16      A.   Yes, may have, we're not sure.
17      Q.   My question is, do you recall doing
18  that exercise, that is looking at collection
19  activity, regardless of when the service dates
20  were or the discharge dates were for that cash    12:11:55
21  collection, but which cash came in the door in
22  a year prior to the year you were auditing?
23          MR. RYAN:  Objection.
24      A.   No, other than the subsequent
25  collection work that we just -- I just         12:12:07

Page 128

1   described to you in the July-August time frame.
2           We wouldn't be looking at that. I
3   mean, the client had systems in place where
4   they were aging receivables. So that type of
5   information in terms of what was paid and what    12:12:24
6   was unpaid would be coming out of their -- the
7   system, reports that were being generated
8   within the AHERF system.
9       Q.   How does subsequent receipts
10  testing provide comfort with respect to your      12:12:46
11  view of -- an auditor's view of, in this
12  particular case, your view, Mr. Buettner's view
13  of the suitability of the allowance for
14  doubtful accounts?
15      A.   Well, it's just one tool of many     12:13:00
16  tools that we have to evaluate the estimates
17  that management has established when they're
18  preparing the financial statements. So if at
19  the end of a specific year, I'll use June 30,
20  '96 as the example here, you have receivables    12:13:22
21  that are listed to be collected, and some
22  portion of them are collected in July or
23  August, that gives us comfort that obviously
24  those receivables are not uncollectible because
25  they've been collected.              12:13:40

32 (Pages 125 to 128)

Page 129

1   It also gives us comfort in the
2   fact that the client is going through a billing
3   process that the third parties are accepting to
4   a certain degree and that you have some sort of
5   evidence that services are being provided and      12:13:57
6   being paid for in the normal course of
7   business.
8       Q.   Let me ask you, as a part of your
9   '95, I'm flipping back a year on you now, at
10  least, '95 audit work, whether you became aware      12:14:12
11  that Coopers & Lybrand auditors were involved
12  in a process of looking at the affect of
13  applying the reserve allowance for doubtful
14  account reserving percentages from the
15  Allegheny General Hospital to the aging      12:14:29
16  receivable buckets at other hospitals within
17  the AHERF system in '95; do you recall that
18  that was done?
19      A.   Yes, I recall that.
20      Q.   Let me hand you what is Exhibit      12:14:47
21  1523.  You may take a moment to look at it.  I
22  only have a question about one of really the
23  notes on the second page of the document.
24      My question, after you've had a
25  chance to look at the note or as much of the      12:15:00

Page 130

1   document you would like, Mr. Buettner, is why
2   was that done in fiscal year '95 or in
3   connection with the fiscal year '95 audit?
4       A.   Well, there were a couple of
5   reasons why it was done.  As I had indicated      12:15:15
6   earlier, in 1995, AHERF experienced an increase
7   in their receivables in the east.  And that
8   based on management's assertions, as well as
9   items that we observed, that increase was due
10  in most part to some sort of billing issues,      12:15:46
11  centralization process that was I guess
12  publicly disclosed earlier than it should have
13  been.  They weren't getting bills out the door.
14      So the receivables grew.  Agings
15  deteriorated.  In other words, bills were being      12:16:07
16  generated or the wrong bills were being
17  generated or bills simply weren't getting out
18  the door, and the aging deteriorated.
19      So based on the assertions that
20  management told us, that we have this process      12:16:24
21  problem, this billing problem, you would expect
22  the receivables to age.  We looked at that
23  aging and we looked at the methodologies that
24  were being used by the organizations out in the
25  east.  I felt that I wanted to go through some      12:16:41

Page 131

1   sort of assessment in a manner differently than
2   what they did, which is something that the
3   auditing standards would suggest that an
4   auditor should do.
5       So I was familiar with the AGH      12:17:02
6   methodology and I asked my staff to overlay
7   that methodology over the results out in the
8   east, not to come up with an answer, but to
9   come up with some sort of framework as to how
10  large of a difference, if any, the allowance      12:17:21
11  would be between the two methodologies.
12      I believe that's what you see here
13  in this summary page.  The first three columns,
14  the per C&L, was really just the overlaying of
15  the AGH methodology with no factoring in of any      12:17:40
16  other items that we would have to consider to
17  reach a total assessment.  Then we compared
18  that to what the client booked and then there
19  were other items there that we felt were --
20  should be considered in coming up with whether      12:17:56
21  the reserves were adequate in the east or not
22  adequate or whether they should be strengthened
23  and things of that nature.
24      Q.   Can you show me on the document
25  where the difference is between what the client      12:18:06

Page 132

1   booked on the reserve and what would have been
2   booked had the AGH methodology been applied to
3   the hospitals listed here?
4       A.   You mean simply the math exercise?
5       Q.   Yes.  Is the difference reflected      12:18:19
6   here in a column or the result of a column?
7       A.   Yes, it would be the seventh column
8   over from the left called difference.
9       Q.   It's got a figure originally
10  apparently of 18.7 million dollars, roughly?      12:18:33
11      A.   I can't read it exactly, but it's
12  14.7.
13      Q.   14.7 is the handwritten edit to it?
14      A.   Yes.
15      Q.   I believe that my best read of that      12:18:45
16  is 18.7 million.  It looks like 4 million has
17  been -- or so has been deducted perhaps by
18  someone in handwriting.  Is that right?
19      A.   Yes.
20      Q.   Is the handwriting yours?      12:18:56
21      A.   No, it's not.
22      Q.   The note reads, "C&L assessed the
23  adequacy of each of AHERF's individual
24  hospitals, HUH, MCPH, SCHC, EPC and BCC, A
25  slash R reserves by applying AGH's reserve      12:19:15

William F. Buettner                                                        Volume 1

Page 133

1  percentage to each aging category of outpatient
2  and inpatient receivable." Is that at least
3  the first sentence?
4      A.  Yes.
5      Q.  Those other hospitals listed there,   12:19:25
6  did you understand them all to be Delaware
7  Valley Obligated Group hospitals?
8          MR. RYAN: Objection.
9      Q.  Or some other set of hospitals?
10     A.  I would call them the eastern       12:19:35
11 region hospitals.
12     Q.  At least as of the date of this
13 schedule, June 30, 1995?
14     A.  Yes, yes.
15     Q.  The Obligated Group was actually    12:19:43
16 formed later is your understanding?
17     A.  Yes.
18     Q.  In shorter form, at least in this
19 time period, this was the eastern area or
20 Philadelphia area hospitals?                 12:19:53
21     A.  For AHERF, that's correct.
22     Q.  Yes.
23         Did you consider the AGH
24 percentages to be at the time more appropriate
25 than the aging percentages that had been     12:20:04

Page 134

1  applied by the client at these hospitals, these
2  eastern area or Philadelphia area hospitals, in
3  your experience?
4          MR. RYAN: Objection.
5      A.  No, I did not. I mean, I wasn't    12:20:15
6  looking at the percentages, per se. I'm
7  looking at the methodology. There's a
8  difference between the methodology that AGH
9  followed and just applying percentages.
10     Q.  So you weren't looking at the      12:20:32
11 percentages?
12     A.  No. We applied what I would call
13 the AGH methodology, which -- which, by the
14 way, in this particular case, was -- we used
15 the AGH percentages because we were trying to 12:20:42
16 create parameters. But as I had indicated,
17 there are a wide variety of other items that
18 you would have to consider in making some sort
19 of assessment on the adequacy of the reserves
20 and so on. You just wouldn't attach numbers   12:20:56
21 into a formula.
22     Q.  But this schedule, that formula is
23 merely calculated by applying the AGH
24 percentages, is that right?
25     A.  Yes. The difference column that we  12:21:08

Page 135

1  talked about is simply the math.
2      Q.  Of taking percentages from AGH and
3  applying to the aged bucket receivables at
4  these eastern area hospitals?
5      A.  That's correct.                     12:21:20
6      Q.  Thank you.
7          Do you recall discussing this with
8  AHERF as a part of your '95 audit work, that
9  this calculation had been performed, this
10 application of percentage?                   12:21:34
11     A.  Yes.
12     Q.  With whom did you discuss it?
13     A.  It was the basis for the meeting
14 that I mentioned I had with McConnell, Mark and
15 I had with McConnell for '95.                12:21:44
16     Q.  Did you share with him that you had
17 actually done this math or did you just share
18 with him your comments about the status of the
19 receivable in a more general way?
20     A.  No, I think we gave him everything  12:21:55
21 that Mark prepared.
22     Q.  What do you mean by that?
23     A.  Well, there was this schedule and I
24 believe there were a few other schedules, if
25 this is the same schedule. I mean --         12:22:04

Page 136

1      Q.  In other words, you gave -- in any
2  event, though, you believe in that meeting you
3  gave Mr. McConnell a package of documents?
4      A.  Yes, documents or schedules, yes.
5      Q.  One of which may have been this     12:22:18
6  schedule?
7      A.  Yes.
8      Q.  But you can't tell me with
9  certainty that you gave him this document, is
10 that fair to say?                            12:22:27
11     A.  We're talking again this document
12 with the numbers written on it?
13     Q.  At least that much. I understand
14 there's also handwriting on it.
15     A.  I don't know if he ever saw this    12:22:39
16 document with the handwriting on it.
17     Q.  Separate and apart from the
18 handwriting?
19     A.  Yes, I'm sure -- I'm sure that we
20 discussed this with him and I believe he had a 12:22:49
21 copy of it.
22     Q.  Was there any reason you chose AGH
23 over any other hospital as the hospital whose
24 percentages would be applied?
25         MR. RYAN: Objection.               12:23:05

34 (Pages 133 to 136)

William F. Buettner                                                                                              Volume 1

Page 145

1     Another critical issue was the
2  environment in which the east was operating on
3  versus the west, if I can use those terms.
4     Q.   You mean the eastern --
5     A.   The east being the Hahnemanns,     12:50:31
6  MCP's where we're trying to access the reserve
7  adequacy versus the west, which is Allegheny.
8     The Allegheny processing of
9  receivables, while not perfect, was handled in
10  a much better format than the processing in the     12:50:54
11  east.
12     You did not have the people drain,
13  if you will, to staff reductions that occurred
14  in the east. That did not replicate itself in
15  the west due to the centralization.     12:51:11
16     Because the processing was so
17  difficult in the east, you had receivables
18  going out the door incorrectly, claims being
19  rejected, coming back to the organization for a
20  resubmission of a correct amount.     12:51:26
21     Well, when you think about the
22  methodology that we've talked about this
23  morning where you're applying some sort of
24  percentages to aging buckets, in Allegheny's
25  situation, you have a bill go out the door that     12:51:43

Page 146

1  would be classified in the zero to 30 category
2  and then presumably by the time it hit 90 days
3  it would be collected, perhaps 120 days if it's
4  a stay.
5     In the east, because as we had --     12:52:01
6  because of the processing problems that we've
7  talked about and the rejections that occur, a
8  clean claim may not go out until the 90-day
9  time period, in effect.
10     So where Allegheny is billing     12:52:18
11  Medicare or Blue Cross or Medical Assistance or
12  some commercial insurer, hoping to collect
13  their money within 30, 45, 60 days, and
14  attempting to provide some sort of loss
15  parameter of what may be uncollectible on that     12:52:35
16  processing schedule, in the east, you're adding
17  probably 60 days before you're getting some
18  sort of clean claim being processed.
19     You have to take that into
20  consideration in terms of coming out with an     12:52:48
21  overall evaluation.
22     Q.   Which way did that mitigate?
23     A.   That would reduce the reserve
24  requirement as well.
25     Q.   Why is that?     12:53:01

Page 147

1     A.   Well, as I indicated, a receivable
2  sitting in the 60-day or 90-day category for
3  AGH would have different attributes than a
4  receivable that's sitting in a similar category
5  out east because a clean claim out east may not     12:53:18
6  have been generated until the 90-day mark.
7     An easy way of thinking about it is
8  if you take the Allegheny method and you just
9  overlay an additional 60 days or 75 days of
10  aging before clean claim comes off the     12:53:33
11  system -- now, that doesn't happen all the
12  time, obviously. But as a rule of thumb, there
13  were a higher level of rejects in the east
14  versus the west.
15     Q.   My question then is, isn't it also     12:53:45
16  the case, however, that this missed -- this
17  misphenomenon on first-runs or this ability to
18  get out clean claims first time and, therefore,
19  delay in getting out clean claims to the
20  payors, as you've described it, isn't it the     12:54:07
21  case that this delay might also itself lead to
22  ultimate uncollectibility?
23     A.   It may -- it may in terms of
24  self-pay, yes. And that's why when you look at
25  the overall reserve requirement versus the     12:54:20

Page 148

1  overall portfolio receivable requirements, you
2  would want to do a comparison to see how the
3  east is versus -- compares to the west.
4     Q.   Might it also cause consternation
5  with third-party payors and ultimately     12:54:31
6  uncollectibility with respect to them as well,
7  this delay?
8     MR. RYAN:   Objection.
9     A.   If you end up getting a clean claim
10  in, you should be paid. I mean, they may not     12:54:41
11  like the fact that they're rejecting the
12  claims, but if you ultimately get it right,
13  you're going to get collected within whatever
14  the timing requirements are for getting that
15  claim out.     12:55:03
16     Q.   Were there other factors besides
17  that and the AGH percentages?
18     A.   There was the PIP.
19     Q.   And the PIP, and the reserve total
20  to reserve -- or to receivable total. Others?     12:55:11
21     A.   The environment was -- the
22  processing environment was very important. The
23  PIP cash balances, if you will, were very
24  important in terms of whether you would use
25  this methodology -- you would have to adjust     12:55:24

37 (Pages 145 to 148)

William F. Buettner                                                          Volume 1

Page 149

1   the methodology. Those are the two primary
2   factors.
3            We would have looked at other items
4   such as subsequent collections, as I mentioned
5   before. We would look at the level of          12:55:35
6   third-party payors and self-payors. We would
7   look at the history of the reserve to total A/R
8   for the east versus the west in previous years.
9        Q.   Mr. Kirstein in the letter that you
10  recall reviewing himself, however, notes that    12:55:50
11  our basis for this conclusion, that is that the
12  accounts receivable reserve should be enhanced,
13  is rooted in the amount of A/R over 180 days
14  old coupled with the reduction of the reserve
15  as a percentage of A/R at several of the         12:56:07
16  hospitals.
17           I at least read the sentence right,
18  didn't I?
19       A.   Yes, and I think I've indicated,
20  that's what I testified to earlier.              12:56:16
21       Q.   But -- go ahead.
22       A.   The percentage of reserves to the
23  total A/R portfolio.
24       Q.   I'm focusing in on a different part
25  of the same sentence, that is, Mr. Kirstein      12:56:26

Page 150

1   appears to be noting a concern about A/R that
2   is over 180 days old and a concern there that
3   appears, to my eye, to be one about ultimate
4   collectibility.
5            Do you read it the same way, that       12:56:35
6   he has a concern that he's expressing about the
7   ultimate collectibility of A/R over 180 days
8   old?
9            MR. RYAN: Objection.
10       A.   Well, that he has a concern with       12:56:46
11  the collectibility of A/R over 180 days old.
12  That is one additional factor that we looked at
13  that led us to believe that the reserve --
14  reserve level should be enhanced.
15       Q.   Let me ask you to look at another      12:57:03
16  document for me. It's going to be Exhibit
17  4386.
18           Right before we broke for lunch, we
19  talked about whether you recalled proposing or
20  hearing about a proposal to apply the AGH        12:57:20
21  reserve percentages to aged buckets of
22  receivables at other AHERF hospitals in
23  connection with fiscal year '96 audit work. I
24  think you told me that you did not recall that
25  proposal.                                        12:57:31

Page 151

1        A.   I simply -- yeah, I don't recall
2   having the staff do that.
3        Q.   Let me ask you then to look at
4   Exhibit 4386 with me. It is an AHERF accounts
5   receivable procedures document, which is         12:57:46
6   apparently two pages in length, another one of
7   these accounts receivable typewritten
8   documents, not too dissimilar from the one we
9   saw before, am I right, in its format, anyway?
10       A.   It would be similar to what we         12:58:01
11  looked at before, yes.
12       Q.   About two-thirds of the way down
13  the first page of the document in one of the
14  bullet points on the left-hand margin I read
15  this phrase: "Prepare AGH model reserve for      12:58:13
16  all entities." Is that right?
17       A.   I see that, yes.
18       Q.   Do you recall being at a meeting or
19  reading a document like this at which this same
20  proposal is made or sentence was discussed?      12:58:30
21       A.   Well, I don't remember the meeting,
22  but, I mean, I believe I've seen this document
23  before. It was put together by the staff,
24  so --
25       Q.   When do you think you saw it?          12:58:37

Page 152

1        A.   Well, at some meeting. I mean, I
2   can see my handwriting over here in terms of
3   some comment on subsequent receipts testing and
4   so on.
5        Q.   So is it fair to say that your        12:58:48
6   recollection is refreshed that at some point
7   during the 1996 audit work there was a proposal
8   discussed to prepare AGH model reserve for all
9   entities?
10       A.   Well, that may have been other        12:59:03
11  people's suggestion, but it wasn't mine.
12       Q.   My question is, is your
13  recollection refreshed that the concept was
14  discussed, having seen the document?
15       A.   The concept may have been           12:59:15
16  discussed, yes, but I don't believe I was the
17  one that initiated the discussion of that
18  concept.
19       Q.   Just so we're clear, I understand
20  that you don't think you initiated it, and you
21  believe it may have been discussed, my question
22  is, is your recollection refreshed that it was
23  discussed?
24       A.   Yes, it probably was discussed at
25  the meeting. I don't have any specific reason    12:59:30

William F. Buettner                                                                    Volume 1

Page 153

1   to say that it wasn't.
2       Q.   Right.
3           Do you have a recollection that you
4   didn't want it to be done, that you didn't want
5   the AGH model reserve applied to all entities    12:59:37
6   in '96?
7       A.   Yes.
8           MR. RYAN:   Objection.
9       A.   I reached a conclusion that it was
10  not necessary.                                    12:59:46
11      Q.   When did you reach that conclusion?
12      A.   Probably sometime during the
13  beginning of year-end work. I just didn't feel
14  that it would accomplish anything. I can't
15  tell you the exact date or time frame.            13:00:00
16      Q.   Do you recall what you based your
17  conclusion on?
18      A.   On the processing errors that
19  continued to exist at the eastern hospital
20  operations and the fact that the agings would     13:00:11
21  not be as valuable a tool in assessing reserve
22  requirements as they had been in the past
23  because of the inability of the organization to
24  get clean claims out the door.
25      Q.   I'm handing you now, Mr. Buettner,        13:00:41

Page 154

1   what is marked as Exhibit 4387. I'm going to
2   ask you to take a look at that document with
3   me.
4           It is headed Working Paper for HUH
5   Center City, inpatient bad debt analysis,          13:01:01
6   6-30-96. Is that right?
7       A.   Yes.
8       Q.   HUH Center City was at that time a
9   DVOG hospital as you understood it?
10      A.   Yes.                                      13:01:11
11      Q.   This is a '96 work paper from the
12  CLASS system, or it appears so to you?
13      A.   Yes.
14      Q.   Apparently completed by
15  Mr. Christian and ultimately reviewed by           13:01:24
16  Mr. Kirstein in September of '96 or October of
17  '96, is that right?
18      A.   I don't know if it was completed by
19  Brian or not. I see the term. I haven't
20  looked at the rest of the document. I see the     13:01:31
21  term PBC there, which I believe stands for
22  prepared by client. It may, at least my
23  experience is that would tell you it's prepared
24  by client. So I'm not sure exactly what Brian
25  did to this schedule.                              13:01:45

Page 155

1       Q.   I understand.
2           He is at least listed as the
3   individual at C&L as completed by, his name
4   appears next to the words completed by?
5       A.   Yes.                                      13:01:54
6       Q.   Mr. Kirstein's appear next to the
7   words reviewed?
8       A.   Yes.
9       Q.   I think PBC, as you put it,
10  prepared by client, may be partially applicable    13:02:07
11  to this document, or it may not be. But in any
12  event, there are some footnotes that I think --
13  or tick mark notes that I think you will tell
14  me are Coopers & Lybrand's. If you look in
15  particular at page 1098.                           13:02:13
16      A.   M-hm.
17      Q.   Do you see the note there? The
18  note which reads note.
19      A.   Yes.
20      Q.   It goes on to read, "C&L does not        13:02:22
21  propose an entry for the difference between the
22  two reserve calculations because C&L has
23  prepared an additional analysis for the bad
24  debt reserve using AGH's reserve percentages
25  and the client has booked an additional            13:02:43

Page 156

1   reserve."
2           Do you see that?
3       A.   Yes.
4       Q.   Did I read that accurately?
5       A.   Yes.                                      13:02:48
6       Q.   Do you recall now that this
7   analysis was done and that an additional
8   reserve was booked?
9       A.   Yes, an additional reserve was
10  booked in '96.                                     13:03:03
11      Q.   Do you recall that the AGH reserve
12  percentage analysis was prepared?
13      A.   No, I don't recall that at all.
14      Q.   Would you have expected to have
15  been privy to that analysis had it been done as    13:03:13
16  a part of your audit responsibilities?
17      A.   Yes.
18          MR. RYAN:   Objection.
19      A.   I spent a significant period of
20  time with Brian and Mark going through portions    13:03:24
21  of the receivable work papers in '96, and I
22  would have expected to see that.
23      Q.   Did you ever learn that it had been
24  done and then discarded, the application of the
25  AGH percentages to the aged receivables at         13:03:39

39 (Pages 153 to 156)

William F. Buettner                                                                                          Volume 1

Page 157

1    other AHERF hospitals for fiscal year '96?
2          MR. RYAN: Objection.
3          A.   No.  We spent, if my memory serves
4    me correctly, we spent a lot of time looking at
5    agings and other receivable documentation for     13:03:50
6    the east and the west in '96.  And I recall
7    Brian putting out this information on rather
8    large spreadsheets because, quite frankly, the
9    computer printouts were small in terms of the
10   information and my ability to read them.  We       13:04:15
11   spent a lot of time looking at those agings.
12         But I do not recall any type of
13   exercise of going through and having -- at
14   least exercise that I went through with them
15   where we would look at the AGH methodology,        13:04:30
16   let's say, compared to what was going on in the
17   east in '96.
18         Q.   Do you ever recall hearing from
19   either one of them or from anyone else on the
20   engagement team that it had indeed been done,      13:04:39
21   whether or not it was presented to you or gone
22   over by you?
23         A.   No, I don't remember that at all.
24         Q.   Do you recall reading this note
25   before today?                                      13:05:03

Page 158

1          A.   No.
2          Q.   Do you recall ever learning, other
3    than through review of a schedule, that anyone
4    had made such a comparison and then described
5    those -- the comparison to you orally in a         13:05:20
6    conversation?
7          A.   No.  I mean, we had -- Mark, Brian
8    and I had numerous conversations about the
9    adequacy of reserves in '96.  We were all
10   throwing out various ideas and various ways of      13:05:35
11   looking at it, looking at the situation and the
12   reserve levels and what we felt would be
13   appropriate in terms of an enhancement to the
14   reserve levels.
15         I don't remember the content of all    13:05:48
16   of those discussions.  I can tell you we talked
17   about them.  I don't remember going through an
18   exercise similar to what we looked at in '95
19   where somebody sat down and showed me an
20   analysis of the AGH reserve percentages with       13:06:09
21   the client's receivables.  I just don't
22   remember seeing that.  I don't remember talking
23   to them about it.
24         Q.   Do you recall ever coming to a
25   conclusion during your '96 audit work that         13:06:18

Page 159

1    Delaware Valley Obligated Group hospital
2    reserve percentages, aging -- the percentages
3    applied to their aging receivable buckets are
4    low or too low in your estimation?
5          MR. RYAN: Could I have that read      13:07:01
6    back, please?
7          (Record read.)
8          Q.   Do you recall coming to that
9    conclusion?
10         A.   I do not recall concluding -- let     13:07:07
11   me put it to you this way.  My conclusion was
12   that I could not rely solely on looking at the
13   agings for the Delaware Valley to determine the
14   adequacy of the reserve for the client.
15         So I did not spend a great deal of     13:07:22
16   time making any type of assessment on the
17   percentages, loss percentages being applied,
18   for instance, to Hahnemann.
19         Q.   Do you recall becoming at all
20   concerned that these percentages were low on      13:07:35
21   their face --
22         MR. RYAN: Objection.
23         Q.   -- at DVOG hospitals?
24         A.   I'm not even sure what the DVOG
25   hospitals had adopted that the Hahnemann loss      13:07:43

Page 160

1    percentages for the rest of the operations,
2    number one.  I'm not sure.  I just don't know.
3    I think I just answered that I
4    didn't spend a great deal of time looking at
5    that assessment.  My assessment was geared in     13:07:54
6    another area.
7          So instead of reperforming what the
8    client had done, which is one option that an
9    auditor can follow in terms of assessing the
10   adequacy of an accounting estimate the client      13:08:13
11   develops, we decided -- I decided to look at
12   other areas and other factors to conclude on
13   whether those reserves and the estimates the
14   client made were reasonable or not.
15         Q.   The other factors were what?     13:08:26
16         A.   Well, the other -- overall growth
17   in the portfolio.  The makeup of that growth,
18   whether it was third parties, self-pay,
19   commercial insurers.  The level of cash coming
20   into the organization for the few months before   13:08:43
21   and immediately after year-end.  The level of
22   charge-offs that the client had recorded during
23   the year.  The level of reserves that existed
24   at the end of the year versus a comparison to
25   the total portfolio, if you will, of            13:09:03

40 (Pages 157 to 160)

William F. Buettner                                                                    Volume I

Page 213

1    I used the update to help with my
2    review of final audit issues with AHERF
3    management, McConnell or Spargo or whoever. It
4    was a memory jogger as well.
5    Q.   Do you know when in the audit        15:39:44
6    process this document would have been created
7    or prepared?
8    A.   Near the end of the audit. I can't
9    tell you exactly when, but they probably would
10   have, "they" being the C&L staff, would have   15:39:57
11   started on this sometime in maybe early
12   September as we were wrapping up the audit and
13   they were trying to put together a review of
14   financial statements and they were going
15   through disclosure reviews with the client and   15:40:11
16   so on.
17   Q.   Are the handwritten notes on this
18   document yours?
19   A.   Yes. Yes.
20   Q.   What did you mean by a top side       15:40:25
21   review of the financial statements?
22   A.   Under the auditing standards that
23   existed, at least at the time in '95, '96, '97,
24   the auditor had a responsibility to go through
25   some sort of top side review. In other words,   15:40:40

Page 214

1    review the financial statements and the
2    footnote disclosure, make some sort of
3    assessment on whether the disclosure was
4    reasonable and whether the financial
5    information included in the document made sense   15:40:52
6    vis-a-vis their understanding of the tests that
7    were performed and the conclusions that were
8    reached.
9    Q.   Is top side meant to be a term that
10   you use that is different from detailed review?   15:41:03
11   A.   Yes. I mean, it's -- I'm not sure
12   if the auditing standard calls it a top side
13   analytic or global analytic, but there's some
14   sort of terminology that would indicate that
15   you would want some sort of review on the        15:41:21
16   document going down as opposed to looking at
17   detailed records and working your way up.
18   Q.   Let me ask you just a few questions
19   then about the document itself
20        The first one is, to look at the, I   15:41:34
21   think the topic we were discussing just a few
22   moments ago, which I think is referred to under
23   the heading Patients Accounts Receivable on the
24   first page. Do you see that heading anyway?
25   A.   Yes.                          15:41:46

Page 215

1    Q.   The subtopic there that I want to
2    highlight for us is the allowance as a
3    percentage of accounts receivable. Do you see
4    that row?
5    A.   Yes.                          15:41:55
6    Q.   That row, I think, if I read the
7    table right, notes that the Delaware Valley
8    Obligated Group percentage -- allowance,
9    rather, as a percentage of accounts receivable
10   has increased between year-end '95 and year-end   15:42:10
11   '96; is that right?
12   A.   That's correct.
13   Q.   From 13 to 17 percent?
14   A.   Yes.
15   Q.   Did this figure mean anything to    15:42:22
16   you or this change in figures mean anything to
17   you in connection with your '96 audit work?
18   A.   Yes, that was an important measure
19   for us to evaluate in terms of the adequacy of
20   the reserve.                        15:42:35
21   Q.   Did the increase cause you to think
22   the reserve should be increased more than if
23   the percentage was not increasing?
24   MR. RYAN: Objection.
25   Q.   Let me try that again because it    15:42:48

Page 216

1    had too many uses of the word percentage.
2        Did this move of the percentage of
3    allowance as a -- I'll try it one more time.
4        Did this move from 13 percent and
5    17 percent from year-end '95 to year-end '96   15:43:07
6    cause you to think, all things else aside, that
7    the AHERF allowance for doubtful accounts
8    should be increased, decreased or stay the
9    same?
10       MR. RYAN: Objection.            15:43:18
11   A.   Based on this particular
12   evaluation -- we still concluded that the
13   reserve had to be increased, but it gave us
14   comfort because, in effect, management had
15   identified that the reserve level, if you will,   15:43:32
16   between '95 and '96 should increase. And they
17   did increase it.
18   Q.   So this move in percentages
19   mitigated towards increasing the reserve, in
20   your opinion?                      15:43:46
21       MR. RYAN: Objection to form.
22   A.   I'm not sure I understand your
23   question.
24   Q.   When you read this change --
25   A.   Yes.                          15:43:57

William F. Buettner                                                                    Volume 1

Page 217

1    Q.  -- the allowance as a percentage of
2  accounts receivable at DVOG hospitals is going
3  up between the two fiscal years, right?
4    A.  Yes.
5    Q.  That going up, did that lead you to        15:44:05
6  think, all things else the same or aside, that
7  there ought to be a modification of the reserve
8  that is positive, increasing the reserve, or
9  did it not have any affect at all?
10      MR. RYAN:  Objection.              15:44:24
11    A.  We reached the conclusion -- well,
12  I'm going to try to answer your question in two
13  parts.  If I'm not answering it, just interrupt
14  me.
15      This measure, this comparison of        15:44:44
16  the allowance to receivables at 17 percent and
17  the fact that it increased from 13 to 17
18  provided us with some comfort that management
19  was attempting to address their issue --
20  besides trying to fix the processing issue,        15:44:59
21  they were trying to go through some sort of
22  rational assessment of what the reserve level
23  should be.
24    Q.  That rational assessment led then
25  to actually increase the allowance as a percent   15:45:11

Page 218

1  of the outstanding receivable?
2    A.  Yes.  Now --
3    Q.  Please go ahead and finish.
4    A.  I'm not done yet.
5      As I recall, we wanted that        15:45:22
6  percentage to increase to a greater level.  It
7  was based on some other analytics that we
8  performed.
9    Q.  That was --
10    A.  When I say we, I'm talking Brian,        15:45:38
11  Mark and myself.
12    Q.  The percentage you refer to is the
13  '96 percentage?
14    A.  Yes, yes, yes, the 17 percent here,
15  we wanted it to be higher.  So, as a result, I        15:45:51
16  believe we suggested some sort of adjustment,
17  if you will, to increase the percentage.
18    Q.  Do you recall that you suggested an
19  adjustment in a particular amount to AHERF
20  management or that they suggested an adjustment   15:46:01
21  in a particular amount?
22    A.  No, we went to them and suggested
23  an increase of somewhere between 15 and 20
24  million dollars.
25    Q.  Who made that suggestion, the        15:46:13

Page 219

1  person?
2    A.  I made that suggestion.  The
3  suggestion wasn't made simply on the receivable
4  level.  It was made near the end of the audit.
5  And we had perhaps seven or ten items that we        15:46:28
6  were talking to management about that either
7  would have found their way on to our SUD or
8  items that we thought they should consider.
9  The item that we had we felt was the most
10  important was the increase in their receivable   15:46:45
11  reserve.
12    Q.  Who did you make the suggestion to?
13    A.  Spargo.  I believe that both
14  Cancelmi and Adamczak were in the meeting.
15  Mark and Amy were there.  I want to say Brian        15:46:59
16  was there, but I'm not certain.  And I'm not
17  sure if people stayed -- if all of those folks
18  were there for the entire meeting or session or
19  whatever you want to call it.  It wasn't a
20  formal meeting.  It was, quite frankly, a        15:47:12
21  discussion in an open area in the finance
22  department.  As I recall, the first meeting was
23  probably after 5:00.
24    Q.  Do you recall, it wasn't in a
25  conference room, it was just in a hallway?        15:47:26

Page 220

1    A.  No, not in a hallway.  They have --
2  they had back then what I would -- a cubicle
3  area and a couple conference rooms and bullpen
4  area, if you will, that were all
5  interconnected.  And it was somewhere in that        15:47:46
6  area there.
7    Q.  Do you recall roughly when this
8  meeting took place, or this conversation took
9  place?  Was it in August or September of '96?
10    A.  It was -- well, it was either late        15:47:54
11  August or September.  It was close to what I
12  would call the audit finalization or wrap-up
13  date.
14    Q.  Was Mr. McConnell a participant?
15    A.  No, I don't recall him being there        15:48:06
16  at all.
17    Q.  Do you recall any reaction that
18  anyone at AHERF had to the suggestion that you
19  made of upping the reserve for the allowance --
20  the allowance for doubtful accounts by 15 to 20   15:48:17
21  million dollars at AHERF hospitals?
22    A.  We didn't get an argument from
23  them, let's put it that way.  I mean, they
24  listened to us and understood where we were
25  coming from and indicated they would have to        15:48:29

55 (Pages 217 to 220)

William F. Buettner                                                                          Volume 1

Page 221

1  sit down and talk about it.
2      Q.  Do you recall any follow-up meeting
3  where, or conversation at which they told you
4  the results of that follow-up or conversation?
5      A.  Yes.  I can't tell you if it was      15:48:45
6  the next day or within two or three days, but
7  some short period of time thereafter they got
8  back to us with what I would call a proposal to
9  adjust for three or four of the items or five
10  of the items that we had on our list.  That      15:49:01
11  would include the receivables.
12      Q.  Did they give you an amount for the
13  allowance boost, the allowance for doubtful
14  accounts?
15      A.  They gave -- yes, they gave us a      15:49:14
16  summary of what they would be willing to post,
17  and I believe it was 17 million dollars.
18      Q.  I've seen a number 17.5 million
19  dollars in other depositions and other
20  documents.  Does that sound about right to you?      15:49:27
21      A.  That's probably right.
22      Q.  So the 15 to 20 range was yours and
23  the 17.5 was AHERF's as the way the
24  conversations played out?
25      A.  Yes.

Page 222

1      Q.  Thank you.
2          Who conveyed that and to whom was
3  it conveyed on the engagement team, the 17.5?
4      A.  Well, I recall being at the client
5  location when the decision was made.  I don't      15:49:50
6  know if Mark and Amy learned about it before I
7  did or not.
8      Q.  How did you learn of it then?
9      A.  That's what I'm saying, I can't
10  remember if they told me or Spargo told me.  I      15:50:01
11  don't know if Steve told me.  But they already
12  knew.  I just don't remember.
13      Q.  For the record, Steve is Mr.
14  Spargo's first name?
15      A.  Yes.                      15:50:10
16      Q.  You were comfortable and believed
17  that 17.5 was a figure that Coopers & Lybrand
18  would not take exception to, is that right?
19      A.  Yes, that's right.
20      Q.  Do you recall the other adjustments      15:50:30
21  as you sit here today that were being
22  discussed, the seven to ten other items, or
23  what might be six to nine other items?
24      A.  Well, there were items that we had
25  on our SUD or would be posting to our SUD.      15:50:5?

Page 223

1  Capitalized interest on construction projects.
2  Self insurance reserve liabilities.  I would
3  have to go down the list.
4      Q.  That's fine.
5      A.  But it would be -- it was those      15:51:08
6  types of items.
7      Q.  But to you the most important one
8  was the boost that would be required to the
9  allowance for doubtful accounts?
10      A.  At that point in time, yes, in '96,      15:51:16
11  yes.
12      Q.  Your handwritten notes on Exhibit
13  4394, at the bottom of the page, you note
14  "Excess CRA, 10 to 20 million dollars."  Do you
15  know what that refers to today?      15:51:38
16      A.  Those are notes that I -- someone's
17  conveying information to me.  I can't tell you
18  if it's from the C&L team or if it's from
19  somebody at AHERF.
20      Q.  CRA is a cost rate adjustment      15:52:05
21  account?
22      A.  Yes.
23      Q.  I'm handing you now, Mr. Buettner,
24  Exhibit 4390.  Do you recall reviewing this
25  document at any point before today?  It's      15:52:54

Page 224

1  headed Delaware Valley inpatient days in A/R
2  analysis, 6-30-96, and it's a Coopers & Lybrand
3  work paper, I believe.
4      A.  No, I can't say that I've seen this
5  before.      15:53:12
6      Q.  Let me hand you one more and ask
7  you the same question.  It's Exhibit 4391
8  headed Delaware Valley outpatient days in A/R
9  6-30-96.  Have you seen this work paper before
10  today?      15:53:25
11      A.  No, I don't remember seeing it.
12      Q.  Do you recall asking anyone on your
13  engagement team or being aware that anyone on
14  your engagement team had calculated something
15  called days in accounts receivable?      15:53:42
16      A.  Well, yes.  I mean, I would expect
17  the -- well, I would expect the client to be
18  calculating this on an ongoing basis, and I
19  would expect my engagement team to either look
20  at their computation or go through their own      15:53:58
21  computation.
22      Q.  Do you recall the results of any
23  such analysis separate and apart from looking
24  at the documents?  And look at them if you
25  like.      15:54:08

56 (Pages 221 to 224)

William F. Buettner                                                                    Volume 1

Page 225

1        MR. RYAN: In 1996?
2        MR. JONES: Yes.
3     Q.   That is the results of days in
4  accounts receivable analysis.
5     A.   No. I mean, I remember it being a        15:54:21
6  discussion point of something that we would go
7  through and would be another item that we would
8  factor into in terms of our overall assessment
9  of the revenue function, the billing function
10  at the -- in the west and in the east and        15:54:36
11  reserve needs and things of that nature.
12     Q.   This may be a question you can't
13  answer, but would you look at Exhibit 4390 for
14  me and tell me if you, in your auditing
15  experience with respect to healthcare        15:54:48
16  enterprises, think that inpatient days in
17  A/R -- the inpatient days in A/R calculated on
18  Exhibit 4390 look high to you for the DVOG
19  hospitals?
20     A.   Yes, they do look high.        15:55:04
21     Q.   They look high compared to AGH as
22  well, is that right?
23     A.   That's correct.
24     Q.   What about outpatient on the next
25  exhibit?        15:55:12

Page 226

1     A.   Your question?
2     Q.   Do these DVOG hospitals appear to
3  have, in your view, as you sit here today, high
4  calculations as well for -- in this exhibit it
5  appears to be bad debt as a percent of net        15:55:39
6  patient service revenue?
7     A.   I'm sorry --
8        MR. RYAN: Objection.
9     A.   -- you've lost me there. A bad
10  debt or --        15:55:53
11     Q.   I'm sorry. You know what, I
12  skipped and I apologize. 4391. It's the same
13  question, days in A/R.
14        Do the DVOG hospitals days in A/R
15  look high to you in this exhibit as you sit        15:56:05
16  here?
17     A.   Yes, they do.
18     Q.   Did this concern you in connection
19  with your '96 audit work?
20        MR. RYAN: Objection.        15:56:18
21     A.   This particular measurement was an
22  item that we considered. First of all, we
23  expected that they -- this number to be high if
24  you can't get bills out correctly the first
25  time. So it was an item that we considered,        15:56:30

Page 227

1  yes.
2     Q.   You considered it, and I think what
3  you're telling me is that you understood, at
4  least in your view, that part of the
5  explanation for it was the less than stellar        15:56:51
6  first-run success rate --
7     A.   Yes.
8     Q.   -- at billing?
9     A.   Correct. Sorry for interrupting
10  your question.        15:57:04
11     Q.   That's okay.
12        Do you recall comparing these days
13  in A/R figures calculated for the Delaware
14  Valley Obligated Group hospitals to any other
15  set of hospitals, non AHERF hospitals in        15:57:17
16  connection with your '96 audit work
17  specifically?
18     A.   I would have done a general review,
19  yes, just to compare -- to try to gain some
20  sort of understanding or appreciation of what        15:57:36
21  the overall basis would be. I walked away from
22  that assessment or analysis with an
23  understanding that the parameter, if you will,
24  the days in A/R were high for the organizations
25  in the east        15:57:56

Page 228

1     Q.   Do you recall any specific
2  hospitals you compared them to?
3     A.   No. I compared -- there was a
4  database that the firm provided to the staff
5  that was available on Lotus notes. I believe        15:58:13
6  it was the CHIPS database. I would go in there
7  periodically and just, you know, run
8  comparisons, if you will, of days in A/R or
9  other measures. I would do that as part of
10  this analytic review or top side review when I        15:58:31
11  was going through the financial statements.
12     Q.   Was the CHIPS database available on
13  line to auditors at C&L at this period of time?
14     A.   Yes, yes. It would have been a
15  year or so old, obviously, in terms of the data        15:58:45
16  that you were comparing to, but, yes.
17     Q.   Now I want to turn to the bad debt
18  expense metric I tried to steer you to
19  prematurely a few moments ago.
20        - - - - -
21        (Thereupon, Deposition
22        Exhibit 4461 was marked for
23        purposes of identification.)
24        - - - - -
25     Q.   This is Exhibit 4461, Mr. Buettner.        15:59:17

57 (Pages 225 to 228)

William F. Buettner                                        Volume 1

Page 237

1    Q.    The typing apparently, or the font
2    apparently gets clear on later pages. But
3    there are payors listed on the left-hand
4    margin, is that fair to say, of the document?
5    A.    Yes.                    16:09:48
6    Q.    When do you recall seeing this
7    document before today?
8    A.    As I had indicated earlier, when
9    you provided me with some schedules that I
10   simply couldn't read, that I told Brian that he    16:10:01
11   was going to have to increase the font so that
12   I could sit down and perform some sort of
13   reasonable review with him.
14       He had put together some aging
15   schedules, and this is just a summary, I think,    16:10:15
16   of probably about 40 pages of printouts that he
17   generated of very long sheets that were, quite
18   frankly, in larger print than this. They were
19   eight and a half by 11.
20   Q.    Yes.                    16:10:31
21   A.    And we sat down and over, as I
22   indicated, over a couple day period, day and a
23   half, whatever, when I sat down and talked to
24   Mark and Brian, we were going through
25   receivables, we were trying to dissect exactly    16:10:4

Page 238

1    what was going on here, how it tied into other
2    items that we thought were occurring from a
3    processing perspective, what Norb was coming
4    down with, what was the client doing in terms
5    of increasing reserves, what the client's    16:10:58
6    assessment was in terms of collectibility, if
7    they had any specific reasons on why certain
8    items should be ignored, written off.
9        So it was basically my -- these
10   pages, plus a few other pages, were basically    16:11:18
11   my work pad, if you will, during that period of
12   time when we were going through the review.
13   Q.    This is the period of time during
14   which you came to the ultimate conclusion that
15   the reserve or the allowance -- the reserve or    16:11:31
16   the allowance for doubtful accounts needed to
17   be increased by 15 to 20 million dollars?
18   A.    Yes, yes.
19   Q.    These meetings were held primarily
20   with you and Mr. Kirstein and Mr. Christian    16:11:4
21   from time to time?
22   A.    Yes. I mean, it was within a two,
23   three-day period, rather intense. I spent a
24   lot of time over at the client location. I had
25   other client responsibilities. But I think for    16:11:57

Page 239

1    one day I was there probably all day. I felt
2    kind of bad for Brian because I had him running
3    around quite a bit getting information.
4    Q.    This would have been then, again,
5    in the late August, early September time frame    16:12:12
6    and shortly before the meeting with Mr. Spargo
7    and others about your suggestion to up the
8    reserve?
9    A.    Yes, yes. That all could have
10   occurred within a one-week period, let's say.    16:12:21
11   When I say one week, I don't mean Monday
12   through Friday, but within a five, six-day
13   period, yes.
14   Q.    On the first page of the schedule
15   which we've newly marked -- would you do me the    16:12:34
16   favor of repeating back for me the exhibit
17   number?
18   A.    4463.
19   Q.    On the first page of Exhibit 4463,
20   the lower right-hand corner of the document,    16:12:49
21   the figure appears at the very bottom under the
22   heading Total All Entries, Over 180 Days, and
23   the entry there is in a row for net A slash R;
24   is that right?
25   A.    Yes.                    16:13:05

Page 240

1    Q.    The entry used to read something
2    like 72 million dollars. It has a line through
3    it, and then your handwriting, 50 million
4    dollars beneath it. Is that right?
5    A.    50,000, but yes.            16:13:16
6    Q.    50,000. But this schedule would
7    refer to -- is it 50,000 or 50 million?
8    A.    I can't remember. I mean, as I
9    told you, we were going through a number of
10   assessments in terms of overall reserve    16:13:30
11   requirements and so on.
12   Q.    So let me make sure -- I think I
13   understand your testimony. I want to make sure
14   that the record is clear.
15       The figure that is typewritten on    16:13:38
16   this schedule for all entities under net A/R
17   over 180 days is 72 million dollars and change?
18   A.    Yes.
19   Q.    That much is right?
20   A.    Yes.                    16:13:49
21   Q.    What you've written in in
22   handwriting is the figure 50, five zero,
23   comma -- let me try that again. Five zero
24   comma, zero, zero, zero or 50,000, is that
25   right?                    16:14:00

William F. Buettner                                                                    Volume 1

Page 241

1    A.   Yes.
2    Q.   You don't know whether that meant
3  to relate to 50,000 or 50 million as you sit
4  here today?
5    A.   Yes.  In all probability it relates    16:14:06
6  to 50 million, but I honestly can't testify
7  today because I'm not sure how that number was
8  derived.
9    Q.   Do you recall considering whether
10  net A/R -- the net A/R figure calculated by    16:14:19
11  either the client or by C&L for all entities
12  which reflected A/R over 180 days should be
13  adjusted downward by any measure, by any sum in
14  these Christian/Kirstein/Buettner meetings?
15    A.   Well, yeah, I think we had reached    16:14:38
16  a conclusion that the reserve had to be
17  increased by 15 to 20 million dollars, yes,
18  sir.
19    Q.   So if having -- having given us the
20  benefit of that, net A/R in your view is A/R    16:14:50
21  after the allowance?
22    A.   Yes.
23    Q.   And, therefore, this roughly 22
24  million dollar difference, if we assume for a
25  minute that the 50,000 you wrote there meant 50    16:15:01

Page 242

1  million, would be in the ballpark of the
2  suggestion you were proposing, is that fair to
3  say?
4        MR. RYAN:  Objection.
5    A.   You could say that, but I'm not    16:15:11
6  sure that's what it meant.  I just don't know.
7    Q.   You just don't know?
8    A.   I cannot remember.
9    Q.   That's fine.  I'm going to ask you
10  skip to the next page.    16:15:21
11        Do you know what you're doing with
12  the handwritten figures that appear in the
13  first four columns with actual numbers in them
14  at the base of the page on page 35634 as you
15  sit here today?    16:15:35
16    A.   No, I can't remember.
17    Q.   Do you know why this second page
18  appears to -- strike that.
19        Do you know why -- what this second
20  schedule is doing as compared to the first    16:16:01
21  schedule as you sit here today?
22    A.   What page are you on?
23    Q.   I'm sorry, the second page of the
24  exhibit, 4463.  At your quick review here, can
25  you tell me why this schedule is different than    16:16:12

Page 243

1  the first one?
2        MR. RYAN:  Objection to form.
3    A.   I'm not sure -- I don't see the
4  difference.
5    Q.   Okay.  I think if you look to the    16:16:25
6  third page, maybe you'll see.
7        The third page gives a total
8  reserve figure of -- a total -- I'm sorry, net
9  A/R figure, total net A/R figure for all
10  entities at over 180 days at 92 million    16:16:38
11  dollars.
12    A.   M-hm.
13    Q.   Do you know why there would be two
14  different figures in these schedules?
15    A.   I don't know.    16:16:45
16        MR. RYAN:  Objection.
17    A.   I don't know.
18        MR. JONES:  Let's take our last
19  break of the day here.  If we take a quick one,
20  we may finish shortly after 5:00.    16:17:06
21        THE VIDEOGRAPHER:  Going off the
22  record at 4:17.
23        (Recess had.)
24        THE VIDEOGRAPHER:  We're back on
25  the record at 4:34.    16:34:01

Page 244

1    Q.   Mr. Buettner, could you look back
2  at Exhibit 4463 for me, the last series of
3  schedules we were reviewing at the time we
4  broke.  4463, the net A/R schedule.  Are you
5  with me?    16:34:19
6    A.   Yes.
7    Q.   Regardless of which figure we
8  choose, the roughly 72 million dollar figure
9  for net A/R, all entities over 180 days, or the
10  roughly 92 million dollar figure for net A/R    16:34:34
11  all entities over 180 days, the schedule
12  reflects that this amount is an amount
13  outstanding and presumably owed to AHERF
14  hospitals or other enterprises against which
15  there is no reserve.    16:35:00
16        Is that fair to say?
17        MR. RYAN:  Objection to form.
18    A.   Yes.  Yes.
19    Q.   Did that fact or knowing that fact
20  in connection with your '96 audit work cause    16:35:05
21  you concern about the reserve or the allowance
22  for doubtful accounts?
23        MR. RYAN:  Objection.
24    A.   As I stated previously, it would be
25  an item that we would consider in evaluating    16:35:21

61 (Pages 241 to 244)

William F. Buettner                                                              Volume 1

Page 245

1 the overall adequacy of the client's
2 established reserve.
3      Q.  Did you evaluate this item as one
4 that would suggest that an enhancement to the
5 reserve should be made or an increase in the      16:35:34
6 reserve should be?
7      A.  I would conclude that it would tell
8 us that we would want to take a look at an
9 increase in the reserve, not a decrease in the
10 reserve.                                          16:35:48
11     Q.  Thank you.  That's where I was
12 going with the question.
13          You have testified for us a little
14 while ago about the year-end adjustment to the
15 allowance suggested by you in the range of 15     16:36:02
16 to 20 million dollars.  I think I understand
17 from your testimony that that range of increase
18 came at the conclusion of a series of meetings
19 or a day or more of meetings with Mr. Christian
20 and Mr. Kirstein, is that right, that that's      16:36:22
21 when the suggestion crystallized in your mind?
22     A.  Yes, that's when we made -- we had
23 reached our conclusion that the reserves should
24 be enhanced.
25     Q.  And enhanced, in fact, in that            16:36:36

Page 246

1 amount, or is that an amount or a range,
2 rather, that you came up with separate and
3 apart from any conversations you had with these
4 two gentlemen?
5      A.  That I cannot remember.  There were       16:36:52
6 a whole -- there were a variety of factors, a
7 lot of conversation, a lot of data that was
8 shared.  The ultimate decision that was made
9 was my decision.
10          That decision was based on the           16:37:12
11 information I had seen, plus the information
12 that the staff had given me and what I also had
13 heard from the client.
14     Q.  Did you -- do you recall sharing
15 your 15 to 20 million dollar recommendation      16:37:22
16 with Mr. Christian or Mr. Kirstein before the
17 meeting with AHERF at which you shared this
18 suggestion?
19     A.  I think I did, but I can't remember
20 specifically.                                     16:37:35
21     Q.  Do you recall as you sit here today
22 any difference of opinion between the three of
23 you about the number or the range?
24     A.  No, I don't remember any comments,
25 adverse comments from their perspective in        16:37:49

Page 247

1 terms of the adequacy of that adjustment.
2      Q.  Do you recall either one of them or
3 anyone else on the engagement team indicating
4 to you that they thought the adjustment should
5 be more, higher, more than 17.5 -- or more than   16:37:59
6 15 to 20 million dollars?
7      A.  No, I don't remember any
8 conversations at all along those lines.
9      - - - - -
10          (Thereupon, Deposition
11          Exhibit 4464 was marked for
12          Purposes of identification.)
13      - - - - -
14     Q.  Mr. Buettner, do you recall
15 documenting anywhere in the work papers or        16:38:47
16 elsewhere, for that matter, the suggestion of
17 increasing the allowance for doubtful accounts
18 at AHERF hospitals by 15 to 20 million for
19 fiscal year '96?
20          MR. RYAN:  Could I get that read         16:39:02
21 back, please?
22          (Record read.)
23     A.  No, I don't, because I
24 believe the client ended up going
25 through that documentation process for            16:39:26

Page 248

1 us by booking the journal entry or by
2 increasing the reserves, let's say.
3      Q.  Do you recall posting the amount
4 of -- any amount to the SUD?
5      A.  After the client accepted the -- or       16:39:40
6 agreed to book the adjustment?  No.
7      Q.  Do you recall posting any amount
8 for an increase to the allowance for doubtful
9 accounts to the SUD at any time?
10     A.  In 1996?                                  16:39:54
11     Q.  Yes.
12     A.  No.
13     Q.  Is it your best recollection that
14 the suggestion of a 15 to 20 million dollar
15 increase in the allowance was not documented;     16:40:06
16 it was not written down in the work papers or
17 anywhere else?
18          MR. RYAN:  Objection.
19     A.  I believe it was written down to
20 the extent that the client had to book some       16:40:17
21 sort of adjustment to their financial
22 statements and on their general ledger, and the
23 staff reviewed that adjustment that was made,
24 and they documented the adjustment in the work
25 papers.                                           16:40:34

Page 249

1    Q.   Let me see if I can break that down
2  because I think we're speaking past each other,
3  perhaps.
4        And I understand that ultimately a
5  17.5 million dollar adjustment was made by      16:40:43
6  AHERF and that that may be reflected in some
7  internal AHERF schedules or on the general
8  ledger, or it may not.
9        My question is really, do you
10  recall yourself or any member of your      16:40:57
11  engagement team committing the 15 to 20 million
12  dollar range suggestion that you made to Mr.
13  Spargo and others at the meeting towards the
14  end of the audit work in fiscal 1996 to paper?
15    A.   No, not the range.  I don't think      16:41:15
16  we would do that because the client accepted
17  the proposal that we had made in terms of an
18  adjustment that should be booked.  So we
19  reflected the adjustment, not the proposed
20  adjustment.      16:41:33
21    Q.   They accepted -- the client
22  ultimately, apparently, accepted, in your
23  testimony, anyway, a number within the range.
24    A.   M-hm.
25    Q.   They didn't accept 20, right?      16:41:41

Page 250

1    A.   No.
2    Q.   But they did accept some number
3  between 15 and 20?
4    A.   Yes, yes, which under the
5  accounting rules is acceptable.      16:41:50
6    Q.   Let me ask you this.  Do you recall
7  creating documentation, ink or pencil on paper
8  or electronic documents, during your meetings
9  with Mr. Christian and Mr. Kirstein that
10  culminated in your recommendation of a 15      16:42:09
11  million to 20 million dollar reserve increase?
12    A.   No, I don't remember doing that.
13    Q.   Do you recall asking anyone -- let
14  me withdraw that.
15        Do you recall either of those      16:42:26
16  gentlemen creating documentation, that is
17  writing on paper or electronic documents or
18  other during this process?
19        MR. RYAN:  Objection.
20    Q.   Let me clear that up because it was      16:42:36
21  vague.
22        Do you recall Mr. Kirstein or
23  Mr. Christian writing down things on paper or
24  creating electronic documents that would
25  reflect the three of your conversations about      16:42:50

Page 251

1  this proposed adjustment?
2    A.   If they have, I haven't seen it.  I
3  wasn't aware of it, that they did that in
4  year-end '96.
5    Q.   You haven't seen it up to and      16:43:03
6  including today, is that fair to say?
7    A.   No, I've never seen a document of
8  that sort.
9    Q.   So what I said was right, you
10  haven't seen it, am I correct?      16:43:10
11    A.   Well, that's correct.  Yes, I'm not
12  aware that such a document exists.  I don't
13  know.
14    Q.   I don't mean to follow that
15  testimony with this set of documents to suggest      16:43:18
16  that this is it.  In fact, I have a different
17  question about this.  So I just want to be
18  clear.
19        This is Exhibit 4464, sir.  It is
20  what I understand to be a cover page that shows      16:43:32
21  a number of links within the CLASS system.
22  Then attached to it is a series of documents
23  that were produced to us in Bates order next to
24  these links that may or may not be reflected on
25  the face page.  I just don't know for sure.      16:43:52

Page 252

1        My question is based primarily on
2  testimony that we elicited from Mr. Kirstein
3  which he presented to you or Mr. Christian
4  presented to you, perhaps, in this meeting or
5  day or two of meetings that took place at      16:44:06
6  year-end of '96, a set of documents that
7  were -- that had been linked in the CLASS
8  system to review in connection with your
9  accounts receivable review at that point in
10  time.      16:44:19
11        Do you recall being provided with
12  something in that format?
13    A.   Yes, yes.  But there was some
14  information, as I had indicated earlier,
15  spreadsheets that were just very difficult to      16:44:26
16  review, too small, and I asked Brian to print a
17  vast majority of that information out.
18    Q.   I'm going to ask you to look at the
19  face page of Exhibit 4464 and tell me if that
20  refreshes any recollection about a set of      16:44:42
21  documents that you may have received either
22  printed out or in an electronic format from the
23  CLASS system, at least by the way they're
24  described there.
25        Does that appear to you to be      16:44:51

554

IN THE UNITED STATES DISTRICT

COURT OF PENNSYLVANIA

WESTERN DIVISION


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

        Vs.   Civil Action No. 00-684.

PRICEWATERHOUSECOOPERS, LLP,

        Defendant.


        Continued videotaped deposition of

WILLIAM F. BUETTNER, called for examination

under the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Jones Day, 500 Grant Street, Suite

3100, Pittsburgh, Pennsylvania, on Thursday,

the 24th day of June, 2004, at 9:00 a.m.

        VOLUME III

  - - _RENNILLO REPORTING SERVICES
        A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1.888.391.3376 (DEPO)

Page 598

1  "Problems, HU slash MCP," and then the last
2  bullet point, charged -- "charged off against
3  80 million," and then beneath that, "compare
4  '97 versus '96."
5      Did I read your handwriting right?    10:09:52
6  A.  Yes.
7  Q.  Do you recall discussing these
8  items in a meeting in the early June time
9  frame, '97?
10  A.  Yes.                          10:10:05
11  Q.  Who was in the meeting?
12  A.  Members of the C&L AHERF engagement
13  team.
14  Q.  Do you know who in particular or is
15  that something that would be too much of a    10:10:18
16  memory test?
17  A.  Well, I believe that Amy would be
18  there, perhaps Mark.
19      God bless you.
20      Perhaps Mark Kirstein, perhaps    10:10:31
21  Christa Porter.
22      Just looking at the notes, it
23  appears that they're giving me a run-down of
24  where we stood on the engagement after
25  performing our preliminary work, if you will,  10:10:49

Page 599

1  and things that we would have to get done,
2  either remaining work for preliminary or things
3  that we would have to look at for year-end.
4  Q.  What do you recall hearing about or
5  discussing with respect to the aging versus the  10:11:04
6  reserve, if anything, today?
7  A.  I don't recall anything -- anything
8  specific.
9  Q.  Do you recall anything about
10  revenue problems or bad debt -- rather, bad  10:11:18
11  debt problems at Hahnemann University Hospital
12  or MCP Hospital?
13  A.  I don't recall any specific
14  conversation.
15  Q.  What about the item under bad debt  10:11:29
16  which starts or reads, rather, "Charged off
17  against 80 million"? What do you recall about
18  conversations on that topic, if anything,
19  today?
20  A.  Nothing specific.          10:11:47
21  Q.  Do you recall -- I'm sorry, go
22  ahead.
23  A.  At some point in time, I believe
24  before this meeting, I learned the AHERF
25  management had charged off around 80 million  10:11:59

Page 600

1  dollars of receivables.
2  Q.  Charged off means written off the
3  books?
4  A.  Yes, written off of the, in effect,
5  written off of what I would call the A/R  10:12:11
6  subsidiary ledger.
7  Q.  Which subsidiaries did you
8  understand to be involved as of this time
9  period, June of '97?
10  A.  When I say subsidiary ledger, I'm  10:12:20
11  not talking about a company. I'm talking
12  about -- there's a term within the, let's say
13  the bookkeeping kingdom, if you will, that you
14  have a general ledger and then you have
15  subsidiary ledgers.              10:12:39
16      So in this particular case, the
17  accounts receivable detailed listing or
18  accounts receivable subsidiary ledger
19  charge-offs occurred so that the names of the
20  individuals whose accounts were being charged  10:12:51
21  off would be eliminated from those subsidiary
22  ledgers. That's what I meant.
23  Q.  Thank you. Thank you.
24      My question, then, I need to
25  rephrase.                      10:13:00

Page 601

1      Did you have an understanding in
2  June of '97 about which sets of hospitals,
3  which sets of AHERF hospitals were involved in
4  having 80 million dollars of accounts
5  receivable written off?          10:13:13
6  A.  I believe my understanding at the
7  time was that that was related to the eastern
8  operations, and that would include the
9  write-off of certain accounts, if you will,
10  that were maintained on old systems because of  10:13:31
11  systems conversion.
12  Q.  Was that the PATCOM system that
13  you're referring to there?
14  A.  Yes. I didn't write it here, but
15  that was my understanding, that that was a part  10:13:39
16  of the 80 million.
17  Q.  That PATCOM system was in place at
18  some point at hospitals that were members of
19  the Delaware Valley Obligated Group, is that
20  correct?                      10:13:52
21  A.  Yes, I believe that's the case.
22  Q.  When there is a charge-off or a
23  write-off of accounts receivable, what happens
24  with the bad debt reserve?
25  A.  Well, it would -- management can  10:14:05

William F. Buettner                                                                    Volume 3

Page 602

1  actually handle a charge-off in two different
2  ways. The first method is to write off the
3  account off of, again, the subsidiary accounts
4  receivable ledger. So you're eliminating
5  people's names in terms of potential debtors to    10:14:22
6  the organization.
7          When you write it off, you reflect
8  that write-off via a reduction of your
9  allowance for uncollectible accounts or bad
10 debt reserve.                    10:14:35
11         Another methodology that you could
12 follow is to write off the receivable in a
13 similar fashion but, instead of reducing the
14 reserve, simply charge it against the bad debt
15 expense of the organization for that particular    10:14:50
16 year.
17     Q.    The bad debt expense is reflected
18 on the income statement?
19     A.    Yes.
20     Q.    Do you have a recollection today as    10:14:56
21 to which of those options, if either, AHERF
22 employed?
23         MR. RYAN: For the 80 million?
24         MR. JONES: Yes.
25     A.    I can't tell you.               10:15:09

Page 603

1      Q.    Did a charge-off of that size cause
2  you some concern?
3      A.    No. The organization historically
4  charged off amounts. The amounts were, in
5  1997, the 80 million dollars was larger than    10:15:39
6  what you would have seen let's say in previous
7  years. But it wasn't an unusual activity.
8          Historically you would see
9  charge-offs in the 40, 50 million dollar range,
10 let's say. So it was larger. But it -- it did    10:16:04
11 not provide me with concern as you asked me as
12 an item we would consider in terms of our
13 additional audit work.
14         Quite frankly, I viewed it as an
15 action that in a way gave me some comfort that    10:16:21
16 management was attempting to address these
17 accounts receivable problems that were
18 lingering. So from an auditor's perspective,
19 it gave me comfort that they're attempting to
20 address this issue on a variety of fronts.       10:16:43
21     Q.    Do you recall the risk assessment
22 for accounts receivable in 1997 for your audit
23 work?
24     A.    In our planning document?
25     Q.    Yes.                        10:16:55

Page 604

1      A.    I'm not sure if it was low or below
2  the max. My -- I just can't remember.
3      Q.    Do you know as you sit here today
4  who took the lead at the managerial level on
5  the engagement team in accounts receivable for    10:17:14
6  fiscal year '97?
7      A.    I believe that was Amy Frazier.
8
9          (Thereupon, Deposition
10         Exhibit 4473 was marked for
11         purposes of identification.)
12         - - - - -
13     Q.    Mr. Buettner, I'm handing you
14 Exhibit 4473. I believe you've seen this
15 document before. But the first page of it is a    10:18:02
16 typewritten document headed Allegheny Health,
17 Education and Research Foundation, 1997 audit
18 update, October 1, 1997. And then there are a
19 series of pages that follow, some of them
20 typewritten and some of them are handwritten     10:18:22
21 schedules.
22         Could you do me the favor of
23 looking at the document, and take a few moments
24 if you need it, and let me know if the
25 handwriting you believe to be all yours.        10:18:34

Page 605

1      A.    Okay.
2      Q.    Do you believe the handwriting on
3  the document is all yours, sir?
4      A.    Yes, I do.
5      Q.    Was this handwriting placed on the    10:19:45
6  document all at one time or at different times?
7          MR. RYAN: You mean all of the
8  pages?
9          MR. JONES: Yes.
10     Q.    If you know.               10:19:55
11     A.    At different times.
12     Q.    Let me ask you then in particular,
13 do you know when you did the handwriting that
14 appears at pages 36437, 36438, and the pages
15 that follow through to 36443? So it's 437       10:20:17
16 through 443.
17     A.    These documents would have been
18 prepared at various times during what I would
19 call the wrap-up phase or the final review
20 phase of the AHERF engagement.               10:20:47
21         I can't put specific dates on them,
22 but some would be as, perhaps, as early as the
23 end of August and others would be sometime in
24 September or early October.
25     Q.    Of 1997?                    10:21:04

13 (Pages 602 to 605)

William F. Buettner                                                                 Volume 3

Page 606

1     A.   Yes. Yes.
2     Q.   The wrap-up you referred to was the
3  wrap-up of the '97 audit?
4     A.   Well, wrap-up of what I would call
5  a draft -- final draft report going to the        10:21:16
6  audit committee, yes.
7     Q.   That occurred in October?
8     A.   Yes.
9     Q.   Of '97?
10    A.   Yes, yes.                    10:21:24
11    Q.   So all of these notes on the pages
12  I just mentioned would have been penned before
13  the audit committee meeting?
14    A.   Yes. Yes. Well, I would say 99
15  percent of them. I can't speak to every --        10:21:38
16  every item because at the end of the
17  engagement, these things ended up in my notes
18  with the audit committee book as well. I
19  continued to use this document as we went
20  through subsequent events review and a final       10:21:5
21  disposition of various issues and eventual
22  release of the audit report after the holidays
23  in 1997.
24    Q.   Is there anything in the notes from
25  the beginning of the document to the end that      10:22:09

Page 607

1  you now see and recall as being penned after
2  October of -- after the audit committee meeting
3  in October of 1997?
4     A.   Well, for instance, on page 433.
5     Q.   Do you believe that to have been       10:22:28
6  penned after the October audit committee
7  meeting?
8     A.   No, no. But there are two or three
9  numbers that are scratched out and then numbers
10  circled. I believe I got that information at a    10:22:36
11  later date. All I did was just update the
12  schedule here because I was using this as --
13  this information, if you will, during some
14  subsequent events work as well.
15    Q.   Any other set of handwriting that     10:22:50
16  you believe was added after October -- the
17  October audit committee meeting?
18    A.   I can't remember specifically, no.
19    Q.   Let me ask you to look in
20  particular now at pages 438 and 439. Do you       10:23:03
21  know if these were penned in August of 1997?
22    A.   Probably a little later as I was
23  going through some sort of what I would call
24  top side review of financial statements.
25    Q.   When you say a little later, does      10:23:26

Page 608

1  that mean early September 1997?
2     A.   No. Well, sometime in September or
3  early October.
4     Q.   Is that your best approximation?
5     A.   Yes, yes.                    10:23:39
6     Q.   That's of 1997?
7     A.   Yes.
8     Q.   Thank you.
9          Was this typewritten portion of the
10  document, which apparently has one, two, three,   10:23:59
11  forgive me here, four, five, six pages, and
12  they're not all in order in the exhibit, but
13  six pages of typewritten text, was it prepared
14  for a meeting?
15    A.   Yes. Well, yes, it was prepared       10:24:18
16  for a meeting and also to assist the managers
17  and partners in performing, again, what I would
18  call this top side review of the financial
19  statements. We prepared a similar document in
20  '96.                              10:24:37
21          The engagement team would prepare
22  this. I don't know if this is the final
23  draft -- final copy of the document. There
24  were various drafts. I believe I was given an
25  earlier draft and I was using it as I was        10:24:46

Page 609

1  trying to put together some additional analysis
2  for the audit committee meeting in performing
3  my review of the financials.
4     Q.   So you were using the typewritten
5  version that does -- the typewritten pages that    10:24:56
6  do appear in Exhibit 4473 in connection with
7  your review of the draft financial statements
8  and to prepare for the audit committee meeting?
9     A.   Yes, yes.
10    Q.   Thank you.                   10:25:09
11          I'm going to ask -- going to ask
12  you to look at page 431 for a minute.
13          Do you see about midway down the
14  page there's a bullet point that reads, "Also
15  during 1997, the AHERF system adopted a uniform    10:25:26
16  bad debt reserve methodology." Then it
17  continues. Do you see that?
18    A.   Yes.
19    Q.   Do you recall that being the case?
20    A.   Yes, they, "they" being AHERF       10:25:41
21  management, attempted to implement the comment
22  that we had given to them I guess in 1995
23  originally.
24    Q.   Do you recall that the new
25  methodology involved the application of new       10:25:54

14 (Pages 606 to 609)

Page 614

1    A.   My engagement team informed me of
2    the fact that they had discovered these
3    transfers or were told about these transfers.
4        Q.   Who on the engagement team told
5    you?                              10:31:01
6    A.   Amy Frazier.
7        Q.   Do you recall where you were when
8    she told you?
9        A.   I think it was during a visit
10   over -- a visit of mine over at the work site   10:31:13
11   over at the AHERF finance area. And the
12   engagement team was over there working and I
13   had come in to see how the year-end had started
14   and what type of progress we were making,
15   things of that nature.               10:31:26
16       Q.   Do you recall what she said when
17   she told you? Let me ask you to hold that
18   thought for a minute because I want to ask one
19   question first.
20          Do you recall whether anyone else    10:31:45
21   was present?
22       A.   No. It was -- we were in a working
23   space cubicle area where Coopers' folks were,
24   in effect, stationed. I'm not sure if there
25   were other people from C&L around or not when   10:31:56

Page 615

1    we had this conversation. I simply can't
2    remember.
3        Q.   What is it now that you do recall
4    her telling you?
5        A.   She was going through her          10:32:08
6    assessment, if you will, preliminary assessment
7    of some of the purchase adjustments, I guess.
8    We were trying to get information on the
9    purchase adjustments for Graduate.
10          That was an item that was an         10:32:22
11   important item for us and an item that had
12   been -- that we had been asking the client for
13   since probably May or June or -- and we were
14   just starting to get some information.
15          I guess through that initial         10:32:42
16   investigation, she became aware of this 50
17   million dollar reserve that had been created as
18   part of the Graduate purchase adjustments.
19          The intent to, I believe, based on
20   the document she showed me, to be transferred   10:33:02
21   to DV A/R, I believe, was that what the
22   document said, or something to that effect.
23       Q.   She showed you a document?
24       A.   There was a memo, I believe, from
25   an AHERF -- an AHERF memo and she was sort of   10:33:19

Page 616

1    using that memo to -- as a focal point in terms
2    of providing -- or performing her purchase
3    adjustment work, if you will. That's the
4    document that she showed me.
5        Q.   This was a memo from Mr. Cancelmi    10:33:35
6    dated roughly June of 1997?
7        A.   I can't remember what the date of
8    the memo was.
9        Q.   Do you recall it was a memo from
10   Mr. Cancelmi?                       10:33:46
11       A.   I think it was, yes.
12       Q.   Did you -- did she tell you how she
13   came to have the memo in this first
14   conversation?
15       A.   I don't remember.             10:33:59
16       Q.   What did you say, if anything, in
17   response to her telling you this?
18       A.   I basically told her that they
19   couldn't do that. I mean, just from a -- they
20   couldn't move a purchase transaction over and    10:34:15
21   use it for bad debt reserve at Delaware Valley.
22       Q.   Did you give her any instructions
23   after telling her that?
24       A.   I told her to talk to Dan about it
25   and tell her -- tell him that we wouldn't        10:34:25

Page 617

1    accept the reserves over the Delaware Valley.
2        Q.   Do you remember any more -- do you
3    remember anything more about that conversation?
4           MR. RYAN: The one he had with Amy?
5           MR. JONES: Yes.              10:34:44
6        A.   We talked about a variety of other
7    items.
8        Q.   I'm sorry, let me give you a little
9    more focus.
10       A.   Okay.                      10:34:54
11       Q.   Do you remember any more
12   discussions that you had about this reserve
13   transfer issue with Amy during this first
14   conversation?
15       A.   No, no.                    10:35:01
16       Q.   Was your initial reaction that
17   these transfers were violations of GAAP or
18   would have violated GAAP?
19       A.   Well, my initial reaction was to
20   provide or to get additional information so I    10:35:21
21   could provide some sort of guidance to my staff
22   and reach a conclusion.
23       Q.   But you just said you told Amy to
24   tell Dan that we wouldn't accept it. So your
25   initial reaction was that there was at least a   10:35:33

16 (Pages 614 to 617)

William F. Buettner                                                                          Volume 3

Page 618

1   problem here?
2        A.   Well, my initial reaction, as I
3   said, is that we would not accept the use of
4   those reserves in evaluating the Delaware
5   Valley accounts receivable.          10:35:45
6        Q.   Do you believe that the entries or
7   the series of accounting transactions violated
8   GAAP today?
9        A.   Oh, yes, yes.
10       Q.   You believed it at the conclusion      10:35:58
11  of your '97 audit work, is that fair to say?
12       A.   Yes, I believe that the transfers
13  in and of themselves were a departure from
14  GAAP.
15       Q.   Did you ever tell anyone at AHERF      10:36:12
16  that you believed that they were a departure
17  from GAAP?
18       A.   Yes, we told people at AHERF.
19       Q.   Did you?
20       A.   No.  I mean, Amy had, my              10:36:25
21  understanding, numerous conversations with
22  Cancelmi.  I'm not sure if anyone else was in
23  the room with them when they went through that
24  discussion.  But it was -- they were well aware
25  that we would not accept the premise that they     10:36:42

Page 619

1   could use those reserves to support the bad
2   debt reserves at the Delaware Valley.
3        Q.   They were well aware, if they were
4   well aware, from conversations with Amy as far
5   as you know?                        10:36:58
6        A.   Yes.
7        Q.   Did you ever tell anyone at AHERF
8   that you were aware of the reserve transfers?
9             MR. RYAN:  This one that we --
10            MR. JONES:  The 50 million dollars    10:37:11
11  that we've just been speaking of.
12       A.   I can't recall discussing it with
13  anyone else.
14       Q.   Do you recall discussing with
15  anyone on the audit committee or any member of    10:37:17
16  the Board of Trustees at AHERF?
17       A.   At what point in time?
18       Q.   Through June -- June of '98.
19            Let's make that May of '98 because
20  I see where you're thinking.          10:37:36
21       A.   Yes.  Yes.
22       Q.   Did you ever discuss the fact that
23  the reserve transfers in the 50 million dollar
24  amount we've been discussing occurred with
25  anyone on the audit committee or the Board of     10:37:45

Page 620

1   Trustees at AHERF before June of '98?
2        A.   No.
3             During our audit committee meetings
4   in October of '97, for instance, I was aware of
5   the transfer.  But by then I had completed       10:38:03
6   sufficient audit work and had concluded that
7   the transfers were not material and did not
8   warrant disclosure to the audit committee.
9        Q.   Did you share your discovery from
10  Miss Frazier about these 50 million dollars of    10:38:52
11  reserve transfers with the concurring partner
12  on the engagement at any time during the '97
13  audit work?
14       A.   I did not.  It's my understanding
15  that Amy discussed the purchase transactions      10:38:57
16  for Graduate, Forbes and Allegheny Valley with
17  the concurring partner and that that would have
18  been included in those discussions.
19       Q.   How did you come to that
20  understanding?                      10:39:10
21       A.   Just based on my discussions with
22  Amy.  I mean, I -- what had happened is we had
23  a meeting set up where the three of us would
24  get together to go through a preliminary
25  review.  The three of us being the concurring     10:39:23

Page 621

1   partner, myself and Amy.
2             We were going to attempt to do that
3   over at the AHERF financial department, if you
4   will, while the staff was still trying to wrap
5   up some work.  Unfortunately I guess another     10:39:36
6   client matter pulled Mr. Hoover away, couldn't
7   make that commitment, so Amy met with
8   Mr. Hoover at a later date.
9        Q.   Did you discuss the fact of these
10  50 million dollars of reserve transfers with      10:39:49
11  anyone else on the engagement team other than
12  Miss Frazier during the '97 audit work?
13       A.   I simply can't -- I don't know.  I
14  can't remember.
15       Q.   Do you recall a meeting in early      10:40:32
16  April of 1997, within the first two weeks of
17  April of 1997, with Mr. McConnell and Mr.
18  Spargo at which the topic of potential
19  transfers of reserves established in connection
20  with the Graduate acquisition -- let me try      10:40:54
21  that question again.
22            Do you recall being in a meeting
23  with Mr. McConnell and Mr. Spargo within the
24  first two weeks of April 1997 at which the
25  topic of reserve transfers of any kind from the   10:41:10

17 (Pages 618 to 621)

Cleveland (216) 523-1313                                              Akron (330) 374-1313

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0d

Page 622

1  Graduate hospitals to the Delaware Valley
2  Obligated Group hospitals was raised?
3      A.  I do not recall such a meeting.
4      Q.  Do you recall ever hearing from Mr.
5  Kirstein in April or May of 1997 that he had      10:41:25
6  been approached by any member of AHERF
7  financial -- AHERF financial's department or
8  AHERF management about such a proposal?
9      A.  No, I don't remember talking to
10  Mark about that.                10:41:43
11     Q.  Do you ever recall discussing with
12  Mr. McConnell or Mr. Spargo at any time that
13  the Graduate acquisition afforded AHERF an
14  opportunity to remedy its bad debt reserve
15  issues in the Delaware Valley Obligated Group?    10:42:11
16     A.  No.
17     Q.  Or words to that effect?
18     A.  No.  I had discussions with Mr.
19  McConnell at some point in time.  I can't place
20  it in April.  And I also had discussions with      10:42:25
21  Mr. Spargo and Cancelmi at a much earlier date
22  about the possibility of going through a
23  restructuring at Graduate so that once the
24  Graduate organization was merged into AHERF,
25  that it would be accretive to the operations of   10:42:47

Page 623

1  AHERF going forward and, in effect, help AHERF
2  meet whatever financial objectives they would
3  have.
4      Q.  What does the word accretive mean
5  to you?                  10:43:03
6      A.  That means it would help -- it
7  would be increasing net unrestricted assets, if
8  you will, or a change in net unrestricted
9  assets for the AHERF system.
10        MR. JONES:  Let's take a quick      10:43:21
11  break here because we have to change tapes.
12        THE VIDEOGRAPHER:  We're going off
13  the record at 10:43.
14        - - - - -
15     (Thereupon, Deposition
16     Exhibit 4474 was marked for
17     purposes of identification.)
18        - - - - -
19     (Discussion off the record.)
20        THE VIDEOGRAPHER:  We are back on   10:45:42
21  the record at 10:45.
22     Q.  Mr. Buettner, I'm going to hand you
23  what we just marked as Exhibit 4474.  Do you
24  recognize this as an excerpt from your calendar
25  for the months of March and April 1997?  I      10:45:57

Page 624

1  understand the copy is difficult, but it was
2  the best one we were supplied.
3      A.  Yes.
4      Q.  Thank you, sir.
5        Do you write your own -- in this      10:46:28
6  time period and on this document, did you write your
7  original of this document, did you write your
8  own notes about appointments and the like?
9      A.  Yes.  My secretary, if she made an
10  appointment, I would jot it down here so I      10:46:49
11  would try to control my own calendar within
12  that perspective.  But she may make an
13  appointment for me absent the information I put
14  in this booklet.
15     Q.  Did you make a habit of writing      10:47:03
16  through in squiggly lines when an appointment
17  had been passed or a date had been passed,
18  anyway?
19     A.  Yes, either I went to the
20  appointment, I made the phone call, or      10:47:16
21  something got changed and it was no longer
22  relevant.  So the fact that it's crossed out
23  doesn't necessarily mean the event occurred.
24  It just means that it was rescheduled or
25  cancelled.                10:47:29

Page 625

1      Q.  But the fact that it's crossed out
2  does make it tougher to read, right?
3      A.  Yes, yes, that's my way of managing
4  open commitments, if you will.
5      Q.  I understand.            10:47:40
6        Let me ask you to help me just a
7  little bit.  On March 6th, the entry for March
8  6th, a Thursday, the upper right-hand corner of
9  the first page of the document?
10     A.  Yes.                10:47:49
11     Q.  Does that appear to be AHERF that
12  is written below the scribble, the word AHERF
13  in your hand?
14     A.  On March 6th, Thursday the 6th,
15  sir?                  10:48:00
16     Q.  Yes.
17     A.  Yes.
18     Q.  When you wrote a meeting with AHERF
19  management or AHERF finance department
20  personnel down, did you typically list AHERF in   10:48:06
21  the entry in this time period?
22        MR. RYAN:  You mean the word AHERF?
23        MR. JONES:  Yes, the word AHERF.
24     A.  I may have.  It would depend -- it
25  would depend on who I was meeting.  I wasn't      10:48:22

18 (Pages 622 to 625)

William F. Buettner                                                                                    Volume 3

Page 626

1  trying to create a record, if you will. I was
2  just trying to provide me with information in
3  terms of a memory jogger.
4      Q.  Let me ask you to look at the entry
5  for Wednesday, March 19th. Do you see that          10:48:34
6  entry?
7      A.  Yes.
8      Q.  Is that David McConnell in your
9  handwriting or an abbreviation for his name at
10 the bottom entry?                                   10:48:49
11     A.  Yes, AHERF, 7:30 a.m., breakfast,
12 Duquesne Club, David McConnell dash LS Blair.
13 That would be Larry Blair.
14     Q.  Did you frequently dine with Mr.
15 McConnell at the Duquesne Club?                     10:49:03
16     A.  No. As I testified to yesterday or
17 perhaps it was the first day of testimony, I
18 would meet with Mr. McConnell periodically,
19 once every four weeks, once every six weeks,
20 once every eight weeks, based on his either         10:49:22
21 desire to get together or my desire to get
22 together or, in this particular case, I think
23 it was Mr. Blair's desire to get together.
24     Q.  My question is, were these meetings
25 from time to time at least at the Duquesne Club     10:49:34

Page 627

1  with Mr. McConnell?
2      A.  Some of them would have been at the
3  Duquesne Club, yes.
4      Q.  Let me ask you to look at April for
5  just a moment. Can you read what's under          10:49:44
6  Monday, April 7th?
7      A.  "Partners meeting, 8:00." I think
8  that's what it says.
9      Q.  Can you read for me what's under
10 Wednesday, April 9th? Does that say Spargo?        10:50:01
11     A.  With the lunch or --
12     Q.  Way down is all I can see.
13     A.  Yes, there's Spargo there.
14     Q.  Do you recall meeting with him on
15 that day?                                           10:50:17
16     A.  I don't.
17     Q.  How about Friday, April 11, does it
18 say AHERF on the right-hand corner of the page
19 at 10:00 a.m.?
20     A.  Yes.                                        10:50:25
21     Q.  Can you read anything beneath that?
22     A.  Yes, "A-133 review, Graduate
23 pension, Amy Frazier." So taken from that, I
24 was apparently reviewing the A-133 report for
25 perhaps June of '96, or it may have been           10:50:43

Page 628

1  planning for 1997. I'm not sure.
2      Q.  Let me ask you to go back to March
3  25, a Tuesday, as a part of our calendar
4  review, and I hope the end of it.
5          Do you see a reference to Mr.              10:51:02
6  McConnell there?
7      A.  Yes.
8      Q.  Can you read what is beneath the
9  scribble under DMC?
10     A.  It looks like 2:00 or 3:00 and then        10:51:10
11 I wrote down 3:00.
12     Q.  On the very next day, we have a
13 Wednesday, March 26th, entry for AHERF with at
14 least Mr. Steve Spargo's name there?
15     A.  Yes.                         10:51:27
16     Q.  Can you read anything else that's
17 beneath the scribble?
18     A.  It says, "Financial statement
19 audit."
20     Q.  Do you recall meeting with Mr.             10:51:32
21 McConnell on the 25th, Tuesday?
22     A.  I may have. I don't recall
23 specifically.
24     Q.  Do you recall meeting with Mr.
25 Spargo on the 26th?                     10:51:42

Page 629

1      A.  I may have. Again, I can't
2  remember.
3      Q.  Do you recall meeting with Mr.
4  Spargo on either Wednesday, April 9, or Friday,
5  April 11?                             10:51:53
6      A.  I can't remember if I met with him
7  on the 9th. I have it listed down here. On
8  the 11th there's nothing here that indicates
9  that I would have met with him. I may have. I
10 don't know.                            10:52:12
11     Q.  What about Mr. McConnell on either
12 day?
13     A.  Well, looking at this document, I
14 can't tell if I met with him on either day. I
15 have -- well, if I can --           10:52:22
16     Q.  Sure.
17     A.  It looks like on the 11th at some
18 point in the day I'm in Johnstown, Pennsylvania
19 because it indicates BT tax trip. BT was a
20 banking client, financial institution client of   10:52:40
21 mine located in Johnstown, Pennsylvania. So at
22 some point in time after, presumably after
23 10:00 in the morning I was in Johnstown, but
24 I -- I'm assuming that's what happened,
25 although it could have changed, again.             10:52:55

19 (Pages 626 to 629)

Page 630

1    Q.   Let me show you, Mr. Buettner, a
2  new exhibit, 4436, actually new to this
3  deposition, not new to the case.
4       These are a set of handwritten
5  notes I believe Mr. Kirstein has told us were    10:53:12
6  written in his hand. I have a particular
7  interest in asking you a question on the page
8  that ends with the Bates digit 45.
9       At the top of the page, Mr.
10 Kirstein has apparently written Dan C period    10:53:33
11 4-18, 4 slash 18, in a form that indicated to
12 him, I believe in his testimony, that that was
13 a date -- month and a day of the year. And
14 then next to that he has written Buettner slash
15 Frazier.                10:53:53
16      Do you see those, that line,
17 anyway, of text?
18     A.   Yes, I do.
19     Q.   Do you recall being in a meeting
20 with Mr. Kirstein and Mr. Cancelmi and Miss    10:54:02
21 Frazier on this date at which the Graduate
22 reserve transfers, as we've described them
23 today, were discussed?
24     A.   No, I don't.
25     Q.   Do you recall being a member or a    10:54:15

Page 631

1  party to a conference call on that date with
2  these individuals at which the Graduate reserve
3  transfers, as we've described them, or a
4  proposal relating to the Graduate reserve
5  transfers were discussed?        10:54:29
6     A.   No, I don't.
7     Q.   Do you recall discussing reserve
8  transfers of any kind with -- related to the
9  Graduate hospitals and the Delaware Valley
10 Obligated Group hospitals or a proposal to make    10:54:47
11 same with Mr. Cancelmi, Miss Frazier, or Mr.
12 Kirstein at any time in April of 1997?
13    A.   I have no memory at all of talking
14 to them about such a transaction. Would we
15 have met during that time period? It's very    10:55:02
16 possible. But I just can't remember ever
17 discussing this issue with them at that point
18 in time.
19    Q.   Do you see just below the halfway
20 portion of the page where the note reads, "50    10:55:26
21 million dollars reserves at Graduate, will have
22 80 million C/O in DV by 6-30-97"?
23    A.   Yes, I see that.
24    Q.   Do you recall discussing anything
25 related to that topic with these people or any    10:55:44

Page 632

1  one of them in April of '97?
2     A.   I just can't remember, no, I don't.
3     Q.   Do you ever recall at any time
4  before late July or early August or early
5  August of 1997 connecting the establishment of    10:56:01
6  50 million dollars of reserves at the Graduate
7  hospitals with the 80 million charge-off you
8  knew to have occurred at the Delaware Valley
9  Obligated Group hospitals?
10    A.   No, no. To this day I don't think    10:56:15
11 I've made a connection between the two, to be
12 honest with you.
13    Q.   Do you see the next bullet point
14 there reads, "Placing reserves on Graduate
15 entities to be used for DV A slash R at Y slash    10:56:26
16 E or year-end"?
17    A.   Yes, I -- I can't read his scribble
18 very well, but I think that's a fair depiction
19 of what he's trying to put down.
20    Q.   Do you recall discussing that topic    10:56:47
21 with Mr. Cancelmi, Mr. Buettner, Mr. Frazier --
22 you're Mr. Buettner -- Mr. Cancelmi, Miss
23 Frazier or Mr. Kirstein at any time before late
24 July or early August of 1997?
25    A.   No, I don't.            10:56:59

Page 633

1     Q.   Mr. Buettner, this is Exhibit 4258.
2  It's a fairly short work paper with some
3  Metadata, at least as we understand it, from
4  the CLASS system attached to it.
5       Do you recall ever seeing this    10:57:27
6  document before today?
7     A.   No.
8     Q.   Do you see on the first page, the
9  line about a third of the way down that reads,
10 "How was the first 25 of the 50 million    10:57:59
11 distributed to the entities, or did this occur
12 in April?"
13      Do you see that?
14    A.   Yes, I do.
15    Q.   Do you recall any discussions with    10:58:08
16 anyone on the engagement team or anyone at
17 AHERF regarding distributing 50 million dollars
18 to various entities in any context before July
19 or late July, early August of 1997?
20    A.   No, I do not.            10:58:26
21    Q.   Do you have an understanding or
22 have you learned from any source why the author
23 of this work paper or the authors would have
24 been writing about this in May of '97?
25    A.   No, I haven't spoken to anyone    10:58:44

20 (Pages 630 to 633)

William F. Buettner                                                                              Volume 3

Page 634

1   regarding this matter, so I have no idea.
2        - - - -
3        (Thereupon, Deposition
4        Exhibit 4475 was marked for
5        purposes of identification.)
6        - - - -
7        Q.   Mr. Buettner, I'm handing you now
8   Exhibit 4475. I apologize, it slipped out of
9   my hand.
10       A.   That's okay.              10:59:32
11       Q.   Is the handwriting on this AHERF
12  update meeting dated June 20, 1997 yours?
13       A.   Yes.
14       Q.   Do you believe that you put the
15  handwriting on this document around that date,    10:59:46
16  that is, close in time to June 20, 1997?
17       A.   Yes.
18       Q.   Thank you, sir.
19       Is this a format as we've seen
20  before that was typically used when the           11:00:02
21  engagement team got together and met as an
22  agenda?
23       A.   Yes, the engagement team put
24  together information in terms of the overall
25  status of the engagement and where we stood as    11:00:14

Page 635

1   of the end of preliminary and would prepare
2   this outline, if you will, of items to discuss.
3        Q.   Do you know who was in attendance
4   at this June 20, 1997 AHERF audit update
5   meeting?                        11:00:30
6        A.   No, I do not.
7        Q.   Do you know if it took place on
8   that day?
9        A.   No, I do not.
10       Q.   Do you know if any member of AHERF    11:00:37
11  management or its finance department was in
12  attendance?
13       A.   I am not certain. My best
14  recollection is that some folks would be
15  available from AHERF at this meeting, but I       11:00:51
16  simply can't remember.
17       Q.   Do you see under the heading
18  Accounts Receivable and Revenue Items you have
19  written the words or abbreviations for the
20  words Pittsburgh or PGH?              11:01:02
21       A.   Yes.
22       Q.   Levels down, "Reserves appear
23  adequate"?
24       A.   Yes.
25       Q.   Is that a reference to that bad    11:01:09

Page 636

1   debt reserves in Pittsburgh or for
2   Pittsburgh-based hospitals appeared adequate?
3        A.   No, I don't think that would be
4   reflective of only bad debt reserves. It would
5   be the reserves for receivables that would also    11:01:25
6   include CRAs, contractuals, things of that
7   nature.
8        Q.   Do you have a recollection of what
9   you meant by the phrase "DV levels flat"?
10       A.   Well, DV would be the eastern part    11:01:37
11  of the operations. I guess someone told me
12  that based on our assessment to date or what
13  we've seen the A/R levels were flat.
14       Q.   Did you use DV for a short form for
15  the Delaware Valley Obligated Group?              11:01:54
16       MR. RYAN: You mean here in this
17  document?
18       Q.   Here and elsewhere during your work
19  on AHERF audits.
20       MR. RYAN: Objection.              11:02:01
21       A.   Well, I would use east versus west,
22  DV, AGH, DVOG.
23       In my day-to-day observations or
24  communications with folks, I would not use the
25  formal name for a number of these              11:02:19

Page 637

1   organizations. I mean, I normally would refer
2   to things as east and west, but sometimes I
3   would use the word Delaware Valley.
4        Q.   You would use the word Delaware
5   Valley or DV?                        11:02:30
6        A.   Or the term Delaware Valley, I'm
7   sorry.
8        Q.   Yes, use the term Delaware Valley
9   or the initials DV for the Delaware Valley
10  Obligated Group from time to time?              11:02:37
11       A.   Well, no. Delaware Valley would be
12  a term for the east. It may or may not be
13  Delaware Valley Obligated Group. It would be
14  based on the conversation we're having and what
15  specific items we would be talking about.         11:02:53
16       Q.   Here we have the phrase typed next
17  to DV levels flat, "Impact of Graduate
18  Reserve."
19       Do you have any recollection of
20  what that -- what the discussions were on that    11:03:07
21  topic during this meeting as you sit here
22  today?
23       A.   You mean the typed comment on the
24  left-hand side?
25       Q.   Yes.                        11:03:16

21 (Pages 634 to 637)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0d

William F. Buettner    Volume 3

Page 638

1    A.  No, I don't.
2    Q.  Pardon the pause, Mr. Buettner, but
3  we're trying to make the day shorter.
4       MR. RYAN:  We will not object to
5  that.            11:04:20
6       MR. STROUP:  Stipulated.
7    Q.  I'm handing you, Mr. Buettner, what
8  we marked as Exhibit 4438.  Is this the
9  required communications letter from Coopers &
10  Lybrand to the Board of Trustees at AHERF dated   11:04:45
11  September 22nd, 1997?
12    A.  Yes.
13    Q.  Does this letter bear the Coopers &
14  Lybrand signature penned by you?
15    A.  Yes.          11:05:01
16    Q.  Which I think you told us means
17  that you read and approved it before it was
18  sent?
19    A.  Yes.
20    Q.  Do you see under the heading    11:05:09
21  Significant Audit Adjustments and Disagreements
22  With Management, which appears at the second
23  page of the letter, do you see those topics?
24    A.  Yes, yes.
25    Q.  Why is it today that you did not   11:05:25

Page 639

1  disclose the Graduate reserve transfers that
2  you became aware of in late July or early
3  August 1997 to the board in this letter under
4  either of these headings?
5    A.  Well --          11:05:45
6    Q.  Let me withdraw the question for a
7  minute.  Strike the today.
8       What I mean to ask is why is it
9  that you did not disclose to the board under
10  either of these headings or in any other way   11:05:55
11  the Graduate reserve transfers that you became
12  aware of in July, late July or early August of
13  1997?
14    A.  The disclosure requirements that
15  are summarized, if you will, in this letter are   11:06:16
16  presented in the auditing standards
17  publications for the AICPA.
18       When you go through this process of
19  providing the board with specific information
20  within the context of required communications   11:06:37
21  with the audit committee, the items that you
22  made reference to, significant audit
23  adjustments and disagreements with management,
24  relate to items that we would deem to be
25  significant or material.      11:06:55

Page 640

1       The 50 million dollar transfer, as
2  I testified to a little earlier today, in my
3  opinion was not material.  It had no impact on
4  the consolidated financial statements of AHERF,
5  and this letter refers to our audit of the   11:07:23
6  consolidated statements of AHERF.  No impact on
7  key parameters or measurements within the AHERF
8  system when you measure materiality.  No impact
9  on net unrestricted assets.  No impact on
10  working capital.  No impact on total assets.   11:07:47
11       I viewed the transfer as nothing
12  more than a related party transaction that
13  eliminated in consolidation.
14    Q.  You didn't -- let me try that one
15  again.          11:08:04
16       A couple headings up there's a
17  section called errors, fraud or illegal act.
18       Did you consider the transfer an
19  error, these 50 million dollars' worth of
20  transfers, an error, a fraud or an illegal act?   11:08:15
21       MR. RYAN:  Objection, compound.
22    A.  No.
23    Q.  Did you consider it an error?
24       I apologize, sir, your counsel has
25  made an objection, so I'm trying to make it   11:08:28

Page 641

1  clear.
2       Did you consider the 50 million
3  dollars of reserve transfers an error?
4    A.  I considered it a departure from
5  GAAP which was immaterial to the -- to the   11:08:36
6  consolidated financial statements of AHERF and
7  did not view the transfer as an error as
8  outlined within the statement and auditing
9  standards definitions, if you will.
10    Q.  It was a departure from GAAP but   11:08:55
11  not an error in your view?
12    A.  A material error.
13    Q.  Did you consider it fraud?
14    A.  No.
15    Q.  Did you consider it illegal or an   11:09:09
16  illegal act?
17    A.  No.
18    Q.  Did you have a disagreement with
19  management, in your view, over the propriety of
20  the application of an accounting principle to   11:09:23
21  the transaction, the transfers being the
22  transaction?
23       MR. STROUP:  I'm sorry, could you
24  repeat that question?
25    A.  Yes, you've got to help me on the   11:09:32

22 (Pages 638 to 641)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0d

Page 642

1  question.
2      Q.   Let me help you by -- in this way.
3  I think I'll address Steve's issue as well.
4          I'm looking down with the
5  disagreements with management -- to the          11:09:40
6  disagreements with management portion of the
7  letter.
8          Are you with me?
9      A.   Yes.
10     Q.   It reads, "No disagreements with          11:09:49
11 management arose during the audit with respect
12 to the application of accounting principles to
13 specific transactions."
14         Do you see that language?
15     A.   Yes.                    11:10:00
16     Q.   Did you believe that you had a
17 disagreement with AHERF management about an
18 application of an accounting principle to a
19 specific transaction in light of the Graduate
20 reserve transfers?                 11:10:12
21     A.   Yes, but, if I can complete my --
22     Q.   Yes.
23     A.   The disagreements with management
24 section here deals with material items. Every
25 item that we would list on our SUD, if you          11:10:29

Page 643

1  will, the summary of unadjusted differences,
2  would meet the definition of some sort of
3  disagreement with management concerning the
4  application of an accounting principle or to a
5  specific transaction.              11:10:50
6          The disclosure requirements for the
7  audit committee relates only to those items
8  that are deemed to be significant or material.
9          As I testified earlier, the
10 transfers had no impact on the consolidated          11:11:06
11 financial statements for AHERF.
12     Q.   Did the transfers have an impact on
13 the consolidating information for the Delaware
14 Valley Obligated Group hospitals?
15         MR. RYAN: We're still talking          11:11:21
16 about the 50 million dollars?
17         MR. JONES: Yes.
18     A.   You had a related party transaction
19 that was reflected on the consolidating balance
20 sheet. I can't think of any impact it would          11:11:35
21 have on the other statements.
22     Q.   Did it have an impact on the income
23 statement or the statement of operations for
24 the Delaware Valley Obligated Group hospitals,
25 the 50 million dollars of reserve transfers?          11:11:46

Page 644

1          MR. RYAN: Objection.
2      A.   In my judgment, no.
3      Q.   No impact whatsoever?
4      A.   No.
5      Q.   Why is that?                11:11:55
6      A.   We reached the conclusion -- I
7  reached the conclusion that the 50 million
8  dollars that they had transferred was not
9  needed in any way, shape or form at the
10 Delaware Valley Obligated Group to support any          11:12:15
11 type of reserve needs, whether for bad debt or
12 whatever else.
13     Q.   The presentation, however, of the
14 financial information on the Delaware Valley
15 Obligated Group financial statements would have          11:12:29
16 been different had the reserve transfers not
17 taken place. Am I right?
18         MR. RYAN: Objection.
19     A.   The presentation on the balance
20 sheet would be slightly different if the          11:12:45
21 transactions had not taken place.
22     Q.   Would the income statement or the
23 statement of operations, the presentation of
24 the numbers there have been different?
25     A.   No, not in my opinion.          11:12:56

Page 645

1      Q.   Was the numbers that were different
2  on the balance sheet for DVOG, or that would
3  have been different had the transfers not
4  occurred, numbers related to accounts
5  receivable on the balance sheet --          11:13:32
6          MR. RYAN: I'm sorry.
7      Q.   -- in his testimony?
8          MR. RYAN: I'm not sure I followed
9  that, so can I get that read back?
10
11         (Record read.)
12     Q.   I meant to say were at the
13 beginning of that sentence.
14         MR. RYAN: I'm not sure I
15 understand it, so I'll still object.          11:13:56
16     A.   Well, I'm not sure I understand it
17 as well.
18         We in terms of measuring the
19 materiality would have looked at let's say
20 working capital as a measure, and I don't          11:14:08
21 believe the related party activity impacted
22 working capital at all.
23         Clearly there were certain items,
24 numbers on the consolidating schedule that are
25 different because the transfer was booked. But          11:14:19

23 (Pages 642 to 645)

William F. Buettner                                                    Volume 3

Page 646

1  in my judgment, those differences were not
2  material and would not be misleading to a
3  person who's a reasonable reader, let's say, of
4  the financial statements.
5       Q.   Was A/R, accounts receivable, for      11:14:33
6  DVOG, for the Delaware Valley Obligated Group,
7  so our abbreviations are understood, on the
8  consolidating balance sheet for DVOG -- or in
9  the consolidating balance sheet information for
10 DVOG understated by 50 million dollars in 1997?   11:14:53
11      A.   I simply don't remember. You would
12 have to look at the statement. But the
13 consolidating statements I do not remember.
14      But my judgments were based on the
15 impact on net working capital and on the      11:15:07
16 overall presentation of the consolidating
17 financial information and whether there was a
18 material distortion of the consolidating
19 information. I arrived at a conclusion that it
20 did not knowing that it's consolidating      11:15:23
21 financial information without the benefit of
22 footnote disclosure and so on.
23      Q.   How did you learn that AHERF would
24 not reverse the entries that you had taken
25 exception with through Miss Frazier?      11:15:46

Page 647

1       A.   I believe Amy told me.
2       Q.   How is it -- how did she describe
3  that to you?
4       A.   She indicated to me she had a
5  number of meetings with Dan and -- Dan      11:16:02
6  Cancelmi -- and that they simply did not want
7  to reverse the transfer.
8       Q.   Did she give you any explanation as
9  to why?
10      A.   I can't recall specific      11:16:17
11 discussions. We had discussions on whether it
12 would be needed and so on.
13      During that period of time, we
14 agreed that we would go through an assessment
15 or we were going through an assessment of the      11:16:28
16 Delaware Valley or the AHERF consolidated bad
17 debt reserve calculation without the 50 million
18 dollars.
19      I told her I was going to go
20 through that assessment on my own, as well, so      11:16:43
21 that I could reach some sort of conclusion. It
22 was an item that we talked about through the
23 course of the audit with an understanding that
24 management didn't want to reverse this transfer
25 of related party transaction.      11:17:00

Page 648

1       Q.   Did you understand that there
2  was -- let me withdraw that.
3       Did you post the 50 million dollar
4  reserve transfers that we've been discussing to
5  the SUD, the summary of unadjusted differences,      11:17:16
6  for 1997?
7       A.   No.
8       Q.   Or did anyone?
9       A.   No, I have no idea what we would
10 post to the SUD.      11:17:22
11      Q.   Why do you say that, sir?
12      A.   Because the consolidated financial
13 statements reflect a consolidated position of
14 AHERF. This is a related party transaction
15 between two of the organizations within the      11:17:37
16 AHERF system.
17      As management prepared the
18 consolidated financial statements, the 50
19 million dollars would be eliminated in the
20 consolidation process just like every other      11:17:51
21 related party transaction between the
22 organizations would be related -- would be
23 eliminated in consolidation.
24      Q.   You did have a difference with
25 management, though, about the appropriate      11:18:04

Page 649

1  accounting for these reserve transfers, am I
2  right?
3       A.   We had a difference in terms of the
4  transfer or the presentation of the reserves,
5  yes, on the consolidating schedule.      11:18:14
6       MR. JONES: Let's take our next
7  break here.
8       THE VIDEOGRAPHER: Going off the
9  record at 11:18.
10      (Recess had.)
11      - - - - -
12      (Thereupon, Deposition
13      Exhibit 4476 was marked for
14      purposes of identification.)
15      - - - - -          11:27:11
16      THE VIDEOGRAPHER: We're back on
17 the record, 11:34.
18      Q.   Mr. Buettner, I'm handing you what
19 has been marked as Exhibit -- well, I handed
20 that to you before I wrote it down. Would you      11:34:56
21 tell me the number, sir?
22      A.   4476.
23      Q.   Thank you, 4476.
24      MR. RYAN: I'm sorry, I'm not sure
25 I've got the same thing. I've just got a      11:35:05

24 (Pages 646 to 649)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0d

Page 650

1    version without an exhibit number.
2         MR. TORBORG: Without a Bates
3    number?
4         MR. RYAN: No, without an exhibit
5    number. I'm sorry, I didn't realize it was --    11:35:16
6    I apologize.
7         Q.   Would you take a look at this 1997
8    work paper, Mr. Buettner, and I have a question
9    on it for you, which relates only to the last
10   few lines of the second page.            11:35:26
11        A.   Sure.
12        Okay.
13        Q.   Have you seen this work paper
14   before, sir?
15        A.   Yes. Obviously I reviewed it at    11:36:11
16   some point in time.
17        Q.   It indicates that you were -- your
18   review would have taken place at least by July
19   25, 1997?
20        A.   Yes.                   11:36:25
21        Q.   It is a work paper from the '97
22   audit system that reads, General and
23   Administrative Data as a section heading and
24   Planning and Control as a file section name?
25        A.   Yes.                   11:36:44

Page 651

1         Q.   Toward the bottom of the page I
2    read a couple entries, and they are, I think
3    they're the last two, and I think they're the
4    last two on the document. The words read,
5    "Materiality threshold for T slash B accounts,    11:36:56
6    colon, 1.5 million dollars," and then "SUD
7    threshold, colon, $500,000."
8         Did I read them right?
9         A.   Yes.
10        Q.   This document, if its creation    11:37:09
11   history, which appears at the bottom of the
12   second page, is accurate, was apparently
13   completed by a Miss Porter on your engagement
14   team on April 8, 1997?
15        A.   Yes.                   11:37:24
16        Q.   Is this the document, Mr. Buettner,
17   that we referred to or you referred to, rather,
18   yesterday in which initial materiality numbers
19   or percentages were recorded for the 1997
20   audit?                      11:37:38
21        A.   Yes.
22        Q.   What does it mean, the phrase
23   "Materiality threshold for T slash B accounts,
24   1.5 million dollars"?
25        A.   Well, T slash B stands for trial    11:37:50

Page 652

1    balance which is a document that, in this
2    particular case, the AHERF management team,
3    finance team would maintain.
4         It's a level of detail on a summary
5    of accounts above the general ledger, if you    11:38:09
6    will, summarized a little bit more than the
7    general ledger but in more detail than what you
8    would see on the financial statements.
9         What we mean here by materiality
10   threshold for trial balance accounts is that    11:38:27
11   any account below the 1.5 million dollars, the
12   engagement team would not necessarily have
13   performed what we would call substantive audit
14   work. They may perform a flux review or they
15   may not look at the account at all based on the    11:38:40
16   professional judgment that we would expect them
17   to exercise, but that accounts above a million
18   and a half dollars would be subject to some
19   sort of review, whether it's control testing or
20   some sort of combination of control testing and    11:38:58
21   substantiation work being done.
22        Q.   When you say accounts, do you mean
23   account balances?
24        A.   Yes, trial balance accounts, yes.
25        Q.   So if there were trial balance    11:39:12

Page 653

1    accounts that had sums in them of more than 1.5
2    million dollars, they may be subject to a
3    different level of scrutiny or testing than
4    trial balance accounts with sums that had less
5    than 1.5 million dollars in them. Is that    11:39:30
6    fair?
7         A.   Yes.
8         MR. RYAN: Objection.
9         Q.   What about -- what does the phrase
10   SUD threshold 500,000 mean?            11:39:37
11        A.   S U D stands for summary of
12   unadjusted differences, or as we've been
13   talking about in the last three days during
14   this deposition, SUD.
15        And the initial assessment for the    11:39:52
16   engagement team was that any item above
17   $500,000 should be included on the SUD with an
18   understanding that that may change during the
19   course of the audit, but that that was the
20   initial threshold provided for the aggregation    11:40:10
21   of what we view to be misstatements or
22   potential misstatements.
23        Q.   So then other than this document,
24   the materiality thresholds or standards applied
25   by Coopers & Lybrand to its audit work at AHERF    11:40:20

25 (Pages 650 to 653)

William F. Buettner

Volume 3

Page 666

```
1    A.   No.
2    Q.   Have you ever heard of a gentleman
3  named Hipkiss as a member -- that may have been
4  a member of your engagement team, sir, or a
5  woman named Hipkiss, for that matter?
6    A.   Tom Hipkiss, perhaps. I'm not sure       11:55:20
7  if he was a member of the AHERF engagement
8  team, but he worked at Coopers, I believe, at
9  some point during '97, '98.
10   Q.   Do you know if he's still with
11 Coopers?                                         11:55:35
12   A.   No, I don't know.
13   Q.   Let me show you two exhibits, I
14 think, in an order that may be counter
15 intuitive. Exhibits 4124 and Exhibits 4123.      11:55:47
16         Exhibit 4124, sir, I will tell you
17 is, as I understand its production history, is
18 a print-out from the CLASS -- the CLASS
19 database before it went final for the year
20 1997.                                            11:56:10
21         It may have been maintained on
22 Mr. Hipkiss's computers or somebody else. But
23 it is, as I understand it, a prefinal version
24 from which this document was printed.
25         I say that to you in the interest        11:56:23
```

Page 667

```
1  of fairness so that you know at least what
2  little bit I know about the document.
3         It has to do with the City Avenue
4  Hospital.
5         Do you know in which Obligated            11:56:34
6  Group the City Avenue Hospital existed at AHERF
7  in fiscal year 1997?
8    A.   No, I would have to go back and
9  look at my notes to give you a definite answer.
10 I simply can't remember.                         11:56:49
11   Q.   Let me ask you to assume that it
12 was a Graduate hospital, one of the Graduate
13 hospitals as we've defined them.
14   A.   That's fine.
15   Q.   I think another word for those            11:57:04
16 hospitals that some people have used at AHERF
17 and in other places was the Centennial
18 Obligated Group. Do you remember that --
19   A.   Yes.
20   Q.   -- that term Centennial being used        11:57:14
21 to refer to the former Graduate hospitals?
22        MR. RYAN: Objection.
23   A.   For a certain group of the Graduate
24 hospitals, yes.
25   Q.   Yes.                                      11:57:22
```

Page 668

```
1         Which -- there was a hospital that
2  was in New Jersey that was not a part of the
3  Centennial Obligated Group?
4    A.   I'm not sure if -- Rancocas was in
5  New Jersey. I'm not certain if it was a part   11:57:32
6  of the Obligated Group or not part of the
7  Obligated Group.
8    Q.   Let me ask you to assume with me
9  that the City Avenue Hospital was at least one
10 of the former Graduate hospitals.               11:57:41
11        I'm going to ask you to look at the
12 second page of the document briefly.
13        Do you see there that someone has
14 typed into the work paper under Purchase Price
15 Adjustments as a header the phrase, "Additional 11:57:59
16 bad debt reserve for DV A slash R, 8 million
17 dollars," or 8 comma, 000, at least on this
18 document. Do you see that?
19   A.   Yes, I do.
20   Q.   The phrase, again, is additional
21 bad debt reserve for DV A slash R, is that      11:58:16
22 right?
23   A.   Well, additional is misspelled, but
24 I think that's the point they're trying to
25 make.                                           11:58:28
```

Page 669

```
1    Q.   You know, I've read that a few
2  times and I just see it now. Thank you.
3         Would you now look at the next
4  exhibit that I gave you, which I believe is
5  4123; is that right?                            11:58:39
6    A.   Okay.
7    Q.   This, again, is a working paper
8  from the '97 audit relating to City Avenue, at
9  least by its header, is that right?
10   A.   Yes.                                      11:58:49
11   Q.   Now I would like you to look at the
12 second page of the document. Do you see under
13 Purchase Price Adjustments the document now
14 reads, "Additional bad debt reserve, 8 million
15 dollars"?                                        11:59:00
16   A.   Yes.
17   Q.   And that there may be other
18 changes, but at least that the document has
19 changed in one way, and that is the phrase for
20 DV A slash R has been removed?                   11:59:15
21   A.   Okay.
22   Q.   Between the two exhibits?
23   A.   Okay.
24   Q.   Do you see that?
25   A.   Yes, I do.                                11:59:22
```

29 (Pages 666 to 669)

680a3ea2-1869-4c88-9ad7-eb2c771c5bce

William F. Buettner                                                    Volume 3

---

Page 670

1    Q.   In fact, the spelling error carried
2  over, didn't it, into the second document?
3    A.   Yes, it did.
4    Q.   Sir, the first document, 4124, is
5  apparently dated as last modified August 13,    11:59:36
6  1997 by Mr. Carrabba. Is that accurate?
7    A.   That's what this document
8  indicates, yes.
9    Q.   And then this second document from
10 which the phrase for DV A/R has been erased    11:59:52
11 reads that it was last modified by Miss Porter
12 on 9-10-97, is that right?
13   A.   Well, yes, it indicates that it was
14 completed by Tony Carrabba on 8-21-97 and last
15 modified by Christa on 9-10.    12:00:21
16   Q.   Thank you.
17   A.   So both of them apparently did
18 something to this document during that period
19 of time.
20   Q.   Thank you.    12:00:29
21        Mr. Buettner, did you ever learn
22 that anyone on your engagement team had been
23 instructed to remove the language "for DV A/R"
24 from this work paper at any point in time?
25   A.   No.    12:00:42

---

Page 671

1    Q.   Did you ever yourself, sir, ask
2  anyone to remove this phrase from this work
3  paper?
4    A.   No.
5    Q.   Do you recall at any time during    12:00:48
6  1997 ever learning that anyone on your
7  engagement team had removed language from work
8  papers that might have revealed knowledge of
9  the transfer of reserves -- the transfer of
10 reserves from the Graduate hospitals or the    12:01:03
11 former Graduate hospitals to the DVOG
12 hospitals?
13   A.   No, that transfer was documented in
14 numerous places within the work papers.
15   Q.   Did you ever learn that anyone on    12:01:13
16 your engagement team had removed language to
17 hide the timing of knowledge of those reserve
18 transfers?
19   A.   No.
20   Q.   Did you ever learn that anyone gave    12:01:24
21 such an instruction?
22   A.   No.
23   Q.   I take it that you never did, sir?
24   A.   No, I did not.
25   Q.   I'm handing you, Mr. Buettner, a    12:01:46

---

Page 672

1  memo from Miss Frazier to Mr. Elek dated
2  November 12, 1996 and marked as Exhibit 4440.
3        Have you seen this document before
4  today?
5    A.   I do not recall seeing this    12:02:07
6  document before, no, sir.
7    Q.   You do recall Mr. Elek being
8  involved with you in AHERF due diligence work
9  in connection with the Graduate hospitals?
10   A.   Yes, as I testified yesterday,    12:02:21
11 Mr. Elek was the partner on the Graduate due
12 diligence. I was the, I guess, the concurring
13 partner.
14   Q.   Do you recall Mr. Elek or yourself
15 ever coming to the conclusion, during the due    12:02:33
16 diligence work on the Graduate hospitals, that
17 the Graduate hospitals had a need for
18 additional accounts receivable related
19 reserves?
20   A.   I don't recall a discussion with    12:02:50
21 Mr. Elek regarding that.
22   Q.   Do you recall concluding that
23 yourself during your Graduate due diligence
24 work?
25   A.   My review of the Graduate due    12:03:07

---

Page 673

1  diligence work would have been limited to
2  review of the documents prepared by the
3  engagement team, Mr. Elek's engagement team.
4        I don't remember reaching that
5  conclusion at all, and I did not perform    12:03:20
6  detailed steps in the due diligence area.
7    Q.   Mr. Buettner, I'm going to hand you
8  now what was marked in an earlier deposition,
9  which is a large set of documents, but I really
10 only have a question about a few of them. It    12:04:16
11 is Exhibit 4248. If you could maybe take the
12 rubber band off of the document and put it to
13 the side, I'll try to work quickly through the
14 document before we break for lunch with you.
15        I will tell you, sir, that I    12:04:39
16 understand these to be a collection of accounts
17 receivable related work papers for the '97
18 audit from the files of Coopers & Lybrand. I
19 would like you to turn first with me to page
20 PwC 10307. It's toward the back of the    12:04:53
21 document, I'm led to believe. I have confirmed
22 that it is.
23        Are you with me?
24   A.   Yes.
25   Q.   This is a work paper regarding the    12:05:20

---

30 (Pages 670 to 673)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0

William F. Buettner

Volume 3

Page 674

1  Parkview Hospital, is that right?
2      MR. RYAN: I'm sorry, I'm not sure
3  the witness is ready.
4      Q.   10307?
5      A.   I'm sorry, 103 has several --    12:05:28
6  please bear with me.  306.A, B, C, D -- we've
7  gone through the entire alphabet, folks.
8      MR. RYAN: It's after L.
9      MR. JONES: I should have described
10  it that way, the page after 306L.    12:05:52
11     Q.   Are you with me?
12     A.   Yes, I am.
13     Q.   This should be a face page that
14  says Parkview bad debt reserves at 6-30-97?
15     A.   Yes.    12:06:02
16     Q.   I ask you to turn to the very next
17  page, sir, which has a schedule regarding A/R
18  reserves for the Parkview Hospital?
19     A.   Okay.
20     Q.   Do you see that?    12:06:13
21     A.   Yes.
22     Q.   Do you see towards the bottom or
23  the mid portion, rather, of the page that this
24  hospital, a member of the former Graduate
25  hospitals, has a note in the work paper that    12:06:24

Page 675

1  reads, "These percentages are still being used
2  because they are considered to be
3  conservative."
4      Do you see that?
5      A.   Yes.    12:06:35
6      Q.   "And that C&L does not take
7  exception."
8      A.   Okay.
9      Q.   Did I read it right?
10     A.   Yes, that's part of that note, yes.    12:06:44
11     Q.   Would you flip with me to page 310
12  of the document, the digits that end 310.
13     A.   Okay.
14     Q.   This is, again, another Graduate
15  Hospital City Avenue's bad debt reserve    12:07:03
16  schedule for 6-30-97, at least by title.
17     A.   Yes.
18     Q.   If you'll flip the page, we have
19  the same note which appears at the mid portion
20  of the page regarding A/R reserves at City    12:07:15
21  Avenue, am I right, at least in the portion of
22  the note that reads, "These percentages are
23  still being used because they are considered to
24  be conservative, C&L does not take exception"?
25     A.   Yes.    12:07:32

Page 676

1      Q.   Would you look at the last -- I'm
2  sorry, page 312, which I think is the last page
3  of the City Avenue schedules. Do you see there
4  that tick mark A reads in its last sentence,
5  "The hospital is as conservative as possible in    12:07:49
6  booking the reserve for bad debts"?
7      A.   Yes.
8      Q.   Do you recall that your engagement
9  team had these views at any time during the '97
10  audit work about the bad debt reserves or the    12:08:07
11  suitability of the bad debt reserves at
12  Graduate hospitals?
13     A.   Well, I recall discussing the bad
14  debt reserves, if you will, for the acquired
15  entities, all of them. That would include    12:08:22
16  Graduate, Allegheny and Forbes, and the
17  engagement team telling me that they thought
18  that the reserves were conservative, reasonable
19  but conservative.
20     Q.   Did you ever -- the notes I think    12:08:36
21  reflect that Deloitte & Touche -- you can
22  reassemble the document, if you would like.
23     A.   Okay.
24     Q.   I should ask you the favor to
25  reassemble the document.    12:08:46

Page 677

1      Do you -- the notes I think reflect
2  that Deloitte & Touche was involved in
3  establishing the percentages for the Graduate
4  hospitals.
5      Did you ever come to understand    12:08:56
6  that as a part of your due diligence or audit
7  work?
8      MR. RYAN: Objection.
9      A.   No.
10     Q.   Did you ever, as a C&L auditor,    12:09:03
11  become involved in establishing bad debt
12  reserve percentages or methodologies for
13  clients?
14     A.   No.
15     Q.   I presume this will be our last    12:09:31
16  exhibit before lunch, he said at 12:10.
17     4263 is the one I'm handing you
18  now, Mr. Buettner.
19     This is a schedule headed Graduate
20  Good Will Entry, which I think has been located    12:09:51
21  among the '97 work papers at Coopers & Lybrand.
22     I really only have a question about
23  the page of the document which has the
24  description for tick mark B, which I think
25  you'll find because it was produced from the    12:10:13

31 (Pages 674 to 677)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b0d

Page 678

1  final CLASS database and not as a hard paper
2  document at page four of the document.
3      A.   Okay.
4      Q.   Are you with me?
5      A.   I think I am.              12:10:23
6      Q.   The tick mark starts with the
7  phrase anyway, "Prior experience with the
8  Delaware Valley entities led to the 50 million
9  dollar reserve for bad debts.
10         "AHERF management believed that   12:10:36
11  when the DV entities were brought into the
12  AHERF system, the entities did not have
13  sufficient reserves on their books for bad
14  debts.
15         "Therefore, management wanted to   12:10:49
16  have sufficient reserve for the Graduate
17  hospitals when they were brought into AHERF.
18         "AHERF management discussed the
19  decision with C&L partner" -- "with C&L
20  partner, who agreed that a reserve should be   12:11:05
21  established."
22         Do you see that?
23      A.   Yes, I do.
24      Q.   Have you seen this work paper
25  before today?                    12:11:12

Page 679

1      A.   I did not see this work paper
2  during the 1997 audit.
3      Q.   Did you see it before today?
4      A.   Yes, I believe counsel may have
5  provided me with a copy of it back in 2001.   12:11:22
6      Q.   Do you know who wrote this work
7  paper?
8      A.   No, I don't.
9      Q.   Do you know who wrote this tick
10  mark?                          12:11:33
11      A.   No, I don't.
12      Q.   Is the tick mark true?
13         MR. RYAN:  Objection.
14      A.   No, I don't believe it's true.  I
15  don't believe it's accurate.          12:11:41
16      Q.   What's wrong with it?
17      A.   Well, I'm not sure if the -- if the
18  claim that the DV entities were brought into
19  AHERF did not have sufficient reserves on the
20  books is totally accurate.  I don't believe   12:11:56
21  that.
22         The fact that AHERF management was
23  trying to use that as a reason to have
24  sufficient reserves for the Graduate hospitals
25  I believe is really irrelevant.       12:12:13

Page 680

1         The Graduate Hospital reserve
2  requirements should stand on their own.  The
3  fact that there was some sort of restructuring
4  where reserves were booked, if you will, to get
5  them up to levels that people were comfortable   12:12:30
6  with did occur.  I agreed with that, but I did
7  not agree with what's been outlined here.
8      Q.   What part of this did you not agree
9  with?
10      A.   I think I indicated I didn't agree   12:12:41
11  with the very first premise that the DV
12  entities were brought into the system with
13  insufficient bad debt reserves.  And I
14  disagreed with the fact that I agreed on a 50
15  million dollar reserve at Graduate for bad   12:12:55
16  debts.
17      Q.   In fact, it is your testimony
18  today, sir, that you never agreed with that, is
19  that right?
20      A.   That's correct.          12:13:03
21         MR. JONES:  Let's break here for
22  lunch.
23         THE VIDEOGRAPHER:  We're going off
24  the record at 12:13.
25

Page 681

1         (Lunch recess.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 678 to 681)

Page 682

1    AFTERNOON SESSION commencing at 1:13 p.m.
2         THE VIDEOGRAPHER: We're back on
3    the record at 1:09.
4    FURTHER EXAMINATION OF WILLIAM F. BUETTNER
5    BY MR. JONES:                    13:09:13
6         Q.   Mr. Buettner, could I ask you to
7    refer back to an exhibit we marked earlier
8    today, 4473. The exhibit started with
9    typewritten material as an October 1, 1997
10   audit update and contained a number of your    13:09:27
11   handwritten notes. Exhibit 4473.
12        Do you have that before you, sir?
13   A.   Yes, I do.
14   Q.   Could you turn with me to page
15   36438 and 36439? Have you those two pages     13:09:49
16   before you, sir?
17   A.   Yes, I do.
18   Q.   Can you tell me what these notes
19   comprise, what are they?
20   A.   These two pages summarize my           13:10:05
21   assessment of the AHERF bad debt reserve
22   assessment, my assessment for the year-ending
23   June 30, 1997 with an emphasis on what I would
24   call old AHERF.
25        What I mean by old AHERF would be       13:10:28

Page 683

1    the entities that existed within the AHERF
2    system as of July 1, 1996.
3         Q.   Those would have been the AHERF
4    entities or enterprises save and except for
5    Allegheny Valley, Forbes and the Graduate     13:10:51
6    hospitals?
7    A.   Yes. For the most part, yes, sir.
8    Q.   Any other exceptions that you can
9    think of?
10   A.   No, that's the primary group that     13:11:01
11   you would exclude, yes.
12   Q.   You said this summarized your
13   assessment. Is your assessment written in any
14   form anywhere else?
15   A.   No, this is a summary of my          13:11:14
16   assessment.
17   Q.   There isn't another document that
18   this -- these two pages summarize, is that fair
19   to say?
20   A.   That's correct.                 13:11:23
21   Q.   Why was it that you were focusing
22   on old AHERF as you have just defined it?
23   A.   Well, for two reasons. One is you
24   had a significant amount of activity in 1997 in
25   terms of charge-offs.              13:11:43

Page 684

1         We had spent time in 1996 in terms
2    of looking at this receivable buildup. We were
3    getting information -- I was getting
4    information from my engagement team in terms of
5    overall status of billing process for these --  13:12:00
6    this old AHERF organization in 1997 that I
7    wanted to try to incorporate to get an
8    understanding of the reserve requirements.
9         And lastly, management had made
10   this -- taken this position of transferring, as   13:12:17
11   we had discussed earlier, this 50 million
12   dollars, from one entity to the other with the
13   intended purpose of using the 50 million
14   dollars to, if you will, support or enhance the
15   reserve, bad debt reserve, if you will, for      13:12:39
16   some old AHERF entities.
17        Obviously a question that we had at
18   the time we learned of the transfer is the 50
19   million needed at what it called old AHERF. So
20   I went through this assessment to determine in   13:12:56
21   my own mind if the 50 million dollars was
22   needed.
23   Q.   Did you understand that the
24   charge-offs or the vast majority of them that
25   occurred during the fiscal year 1997 occurred   13:13:09

Page 685

1    at the DVOG hospitals?
2    A.   Yes.
3    Q.   At the time that you were preparing
4    this two-page handwritten schedule?
5    A.   Yes.                          13:13:18
6    Q.   Did you understand that the
7    transfers had gone from former Graduate
8    hospitals to the Delaware Valley Obligated
9    Group hospitals?
10   A.   Yes.                          13:13:25
11   Q.   And to their bad debt reserve,
12   those Allegheny -- those Delaware Valley
13   Obligated Group hospitals?
14   A.   Yes.
15   Q.   Why then were you focusing on       13:13:34
16   something greater than the Delaware Valley
17   Obligated Group hospitals?
18   A.   We were performing a consolidated
19   audit of AHERF, and I wanted to gain comfort,
20   not only of the reserve adequacy for the        13:13:48
21   Delaware Valley, which I'm not opining on, but
22   on old AHERF with an understanding that the
23   other organizations that were coming in
24   throughout the year would have their own
25   reserves and the staff was looking at those     13:14:02

33 (Pages 682 to 685)

William F. Buettner                                                                                     Volume 3

Page 686

1   reserves.
2           I wasn't aware of billing issues at
3   any of those three organizations. I had gained
4   some sort of comfort, based on discussions with
5   the engagement team, that the reserve          13:14:13
6   requirements for those three organizations were
7   met and that the reserves were reasonable,
8   conservative.
9           So I wanted to spend my time with
10  old AHERF because, quite frankly, there was a    13:14:26
11  history there of need to either enhance the
12  reserves or need to evaluate the reserves
13  vis-a-vis a rather sporadic billing process
14  that existed.
15      Q.  But did that sporadic billing          13:14:44
16  process apply to Allegheny General Hospital in
17  your view at this time?
18      A.  No, no.
19      Q.  It really applied to the Delaware
20  Valley Obligated Group hospitals, is that       13:14:56
21  right?
22      A.  That's correct.
23      Q.  Then why, again, focus on more than
24  the Delaware Valley Obligated Group hospitals?
25          MR. RYAN: Objection.                    13:15:04

Page 687

1       A.  Well, because, I indicated earlier,
2   I'm doing -- my audit opinion is geared towards
3   a consolidated AHERF report. And a
4   consolidated AHERF report would include both
5   Allegheny General as well as the eastern        13:15:21
6   hospitals or the Delaware Valley hospitals,
7   however you want to define them.
8       Q.  You said you wanted to determine,
9   at least in part, whether the old -- whether
10  old AHERF needed the 50 million dollar reserve   13:15:33
11  boost.
12      A.  Yes.
13      Q.  Why isn't it -- why isn't it that
14  your inquiry was whether or not the Delaware
15  Valley Obligated Group hospitals needed the 50   13:15:45
16  million dollar reserve boost as it is the case
17  that that's where the reserve boost occurred?
18          MR. RYAN: Objection.
19      A.  Because I'm performing an audit on
20  the consolidated financials. I'm looking at      13:15:56
21  the financials on a global basis.
22      Q.  Did it have anything to do with the
23  fact that -- let me withdraw that.
24          Why is it that you did not trust or
25  believe management in their view, at least,      13:16:11

Page 688

1   that Delaware Valley -- the Delaware Valley
2   Obligated Group hospitals needed the reserve
3   boost that the Graduate reserve transfers
4   permitted?
5       A.  Well, the process of an audit is to   13:16:27
6   evaluate or test management assertions, whether
7   it deals with the 50 million dollars, whether
8   it deals with the booking of receivables, the
9   booking of revenues, the booking of any other
10  reserve balances. I mean, the audit process      13:16:46
11  deals with evaluating the position that
12  management takes in terms of the preparation of
13  their financial statements.
14          This was an item, an unusual
15  assertion that they were making. We had an       13:17:00
16  obligation to go through and assess whether it
17  made sense or not.
18      Q.  I'll use your word, it was indeed
19  an unusual set of entries, the 50 million
20  dollar reserve transfers?                        13:17:15
21      A.  I'm not talking about the entries.
22  I'm talking about the assertion.
23      Q.  What assertion?
24      A.  The assertion that the bad debt
25  reserve in the east for old AHERF was            13:17:24

Page 689

1   understated by 50 million dollars. That
2   simply, based on my experience with the
3   organization and the activities that they had
4   taken, it just seemed unusual.
5       Q.  We can agree, though, that you        13:17:40
6   believed in, at the time period you created
7   these two schedules, that the transfers to
8   boost the Delaware Valley Obligated Group
9   receivables were a departure from GAAP?
10          MR. RYAN: I'm sorry, can or can't?    13:17:50
11      Q.  We can agree on that?
12      A.  We can agree that the transfers
13  were a departure from GAAP?
14      Q.  Yes.
15      A.  Yes.                                    13:17:59
16      Q.  So in a factual circumstance where
17  a client has departed from GAAP and has
18  departed from GAAP after members of your
19  engagement team have told them that they, in
20  your view, should not so depart and continues    13:18:15
21  to insist on the need for these -- this 50
22  million dollars in the bad debt reserve at the
23  Delaware Valley Obligated Group hospitals, why is it that
24  you did not believe that assertion, that there
25  was indeed a need?                               13:18:36

34 (Pages 686 to 689)

1    MR. RYAN: Objection.
2         A.   Because part of our audit step is
3    to test client assertions, as I had indicated
4    earlier.
5         Q.   Let me ask --            13:18:48
6         A.   You know, at the end of every
7    fiscal year, the client prepares financial
8    statements. They make judgments in terms of
9    booking of estimates for reserves and booking
10   of assets, booking of transactions. We      13:19:02
11   evaluate those or test those.
12        The fact that the transfer was non
13   GAAP in no way, shape or form influenced the
14   decision on whether the reserve was necessary.
15   That's a separate decision.      13:19:21
16        Q.   Mr. Buettner, did you yourself ever
17   talk with anyone at AHERF about whether or not
18   the Delaware Valley Obligated Group hospitals
19   needed a bad debt reserve boost at year-end
20   1997 of 50 million dollars?      13:19:37
21        A.   I believe that during the what I
22   would call audit closing meeting or the prep
23   meeting for the audit committee, I told Mr.
24   McConnell I was comfortable with the reserves,
25   the bad debt reserves, period. I told him that   13:19:57

1    I had some issues with some purchase
2    adjustments which would have included the 50
3    million dollars, but that I thought that those
4    items could be worked out over the next 12
5    months under the accounting rules.      13:20:14
6         Q.   But you didn't discuss with him the
7    reserve transfers themselves, is that fair?
8         A.   No, I didn't get into the details
9    of, as he would call, bean counter type
10   activity.      13:20:25
11        Q.   So did you ever talk with anyone
12   other than Mr. McConnell at AHERF about whether
13   or not they believed that the Delaware Valley
14   Obligated Group hospitals needed the 50 million
15   dollar boost in their bad debt reserves that   13:20:38
16   the transfers permitted?
17        A.   No, no.
18        Q.   Thank you.
19        Let me ask you now to look at 36438
20   and 36439 with me. Neither one of these pages   13:20:50
21   are dated, are they?
22        A.   That's correct.
23        Q.   Did you typically date your work
24   papers?
25        A.   In some cases, yes.      13:20:58

1         Q.   Did you ever date -- refuse to date
2    a work paper for a reason?
3         A.   No.
4         Q.   Did you decline to date these work
5    papers for a reason?      13:21:10
6         MR. RYAN: Objection.
7         A.   No.
8         Q.   Is it just a matter of you just not
9    getting around to putting a date on it?
10        A.   Yes.      13:21:16
11        Q.   All right. Are these work
12   papers -- were these work papers prepared in a
13   meeting, or was this something you were doing
14   by yourself?
15        A.   These documents were prepared in      13:21:34
16   probably two or three sittings, one of which I
17   would classify as a meeting. Maybe two. I
18   can't recall.
19        Q.   I'm sorry, go ahead.
20        A.   In my office, as I was attempting      13:21:54
21   to summarize what I considered to be key
22   information for the AHERF audit committee
23   meeting, as well as attempting to gain some
24   sort of understanding of the global financial
25   issues outlined in the audited financial      13:22:10

1    statements.
2         Q.   Who was it --
3         MR. RYAN: Hold on, I'm not sure
4    he's finished.
5         Q.   I'm sorry, I wasn't looking at you   13:22:16
6    when you answered. I was taking a note,
7    Mr. Buettner. Please continue.
8         A.   I was also attempting to complete
9    what I would call my global review of the
10   financial statements for AHERF, as well.      13:22:27
11        Q.   Who was it then that might have
12   been in attendance with you at any time while
13   you were taking these notes?
14        A.   Amy Frazier was involved at some
15   point in time with helping me collect some of   13:22:44
16   this information.
17        Q.   Anyone else?
18        A.   I don't recall if other folks were
19   involved or not.
20        Q.   The schedule that appears -- or the   13:23:00
21   handwritten schedule that appears at 36438 has,
22   at least towards the top portion of the
23   document, two columns. Is that right?
24        A.   Yes.
25        Q.   One is headed 1997 and the other   13:23:10

William F. Buettner                                                                    Volume 3

Page 694

1   1996?
2       A.   Yes.
3       Q.   The row -- the first row is headed
4   with the handwritten term reserve. What does
5   that row and the numbers in the '97 and '96        13:23:22
6   column reflect?
7       A.   That would be the bad debt reserve
8   for what I would call the old AHERF hospitals
9   at the end of June 30, '97 or June 30, '96.
10      Q.   Thank you.                                 13:23:40
11           If I read at any time now this
12  afternoon your handwriting wrong on these
13  documents, will you tell me? I want to try to
14  move this along. If I've got the handwriting
15  wrong, just want you to speak up and tell me.       13:23:50
16      A.   Yes.
17      Q.   The next row I believe reads
18  expense, is that right?
19      A.   Yes.
20      Q.   I guess I didn't need to ask you           13:24:04
21  that one given the predicate there, but I did.
22           Those two entries for '97 and '96
23  have 66.4 million dollars, and is it 67.5
24  million dollars?
25      A.   Yes.                                       13:24:09

Page 695

1       Q.   Respectively.
2            What do those reflect?
3       A.   That would be the bad debt expense
4   that's reflected on the financial statements.
5       Q.   For?                                       13:24:21
6       A.   For AHERF for June 30th, 1997 and
7   June 30th, 1996.
8       Q.   Was that for the bad debt expense
9   for all of AHERF?
10      A.   Yes.                                       13:24:32
11      Q.   Both old and new, if you will?
12      A.   Yes, although my position is new
13  would have been nominal because the
14  organizations were only in the system for two
15  or three months for the most part.                 13:24:42
16      Q.   What have you done to arrive at the
17  figure that appears just below the expense row
18  for both 1997 and 1996, the figures 130.2
19  million and 109.3 million respectively?
20      A.   That's simply a subtotal of the two       13:25:02
21  numbers above. So that would be, for 1997, for
22  instance, the total reserve and total expense
23  during the year would result in 130 million
24  dollars of potential reserve, if you will, to
25  be utilized during the period 1997.                13:25:20

Page 696

1       Q.   So the justification for using, in
2   your mind, expense for all of AHERF was that it
3   would have been nominal, or the portion related
4   to the Graduate hospitals, the Allegheny Valley
5   Hospital, the Forbes Medical Center would have     13:25:42
6   been nominal?
7       A.   Yes, yes.
8       Q.   Why not just use the amount of bad
9   debt expense for the old AHERF organizations
10  and be more precise?                               13:25:53
11      A.   Well, for a couple of reasons, one
12  is it's a top side review, so I don't have --
13  I'm not going to try to tie this down to exact
14  dollars. I had at least a draft of the
15  financials in front of me.                         13:26:05
16           My conclusion was that the
17  organizations you just mentioned were in the
18  system for only a short period of time and the
19  level of bad debt expense would be nominal
20  because they were only included in the AHERF       13:26:25
21  system, in the case of Graduate, for two
22  months, in the case of Forbes, six months, in
23  the case of Allegheny Valley, I believe three
24  months. So it was readily available.
25           I had my staff, in this case, Amy,        13:26:41

Page 697

1   trying to collect other information for me for
2   the analysis. If the number was 65 million
3   versus 66 million, it certainly wasn't going to
4   change my conclusion.
5       Q.   Let me ask you to read for me or,         13:26:57
6   if you would, because I find it difficult, the
7   next row of the schedule. I think, at least
8   read it with me, I think it reads, "Charge-off,
9   semicolon, DVOG, 80.4 million dollars"?
10      A.   That's a fair interpretation. I           13:27:14
11  would agree with that, yes, sir.
12      Q.   That entry was meant to reflect the
13  80 million dollars of charge-offs at DVOG
14  hospitals that we referred to earlier today?
15      A.   Yes.                                       13:27:26
16      Q.   And then beneath that, I think
17  you've written in parentheses the term west, W
18  E S T. Am I right there?
19      A.   Yes, that's probably west.
20      Q.   The figure associated --                   13:27:37
21      A.   I'm not sure if that's west or
22  rest, but -- I honestly can't make it out
23  today.
24      Q.   Do you have a recall about what the
25  14.6 million dollar figure next to either the      13:27:50

36 (Pages 694 to 697)

William F. Buettner

Volume 3

Page 698

1  word west or rest was meant to convey?
2      A.    That would be the charge-off
3  information for the remainder of the old AHERF
4  system for '97.
5      Q.    So either west or rest would be        13:28:05
6  reflective of that concept?
7      A.    For the most part, yes, sir.
8      Q.    You summed those two or added those
9  two figures together and arrived at a sum of
10  approximately 95 million dollars and that        13:28:16
11  figure appears just below the 14.6 million
12  dollars?
13      A.    Yes.
14      Q.    Then under the '96 column, you have
15  a figure of 45.5 million dollars on the same        13:28:25
16  row. Is that right?
17      A.    Yes.
18      Q.    What is that meant to reflect?
19      A.    Charge-offs for old AHERF, if you
20  will, for 1996.        13:28:37
21      Q.    Was old AHERF all of AHERF in 1996?
22      A.    Yes, yes.
23      Q.    Then the next row down reads,
24  "Reserve dash old"?
25      A.    Yes.        13:28:53

Page 699

1      Q.    The sums here are 35.2 million
2  dollars for 1997?
3      A.    Yes.
4      Q.    And 63.8 million dollars for 1996?
5      A.    Yes.        13:29:02
6      Q.    So the reserve is significantly
7  smaller in '97 as you have calculated it?
8      A.    Yes.
9      Q.    The next -- do you know where you
10  got that number?        13:29:12
11      A.    Which number, sir?
12      Q.    The 35.2 million dollar number.
13      A.    That's the result of subtracting
14  the 95 million of charge-offs from the 130.2
15  million dollars mentioned above, which was the        13:29:27
16  combination of the beginning reserve plus
17  expense for the year.
18      Q.    Skipping back up to the top of the
19  schedule for a moment, the '97 reserve figure
20  that we started at, or started off with for old        13:29:40
21  AHERF, the 63.8 million dollars, what was that
22  derived from, as a source, if you know?
23      A.    It probably came from the June
24  30th, 1996 financial statements of AHERF.
25      Q.    The acquired reserve row, which is        13:29:58

Page 700

1  about halfway down the page, do you see that?
2      A.    Yes.
3      Q.    The 40 million dollars that appears
4  to have been placed there originally, what was
5  that meant to reflect?        13:30:10
6      A.    The bad debt reserve for the
7  acquired entities, Forbes, Allegheny Valley and
8  Graduate.
9      Q.    It has a line through it?
10      A.    Yes.        13:30:20
11      Q.    Why is that, if you know today?
12      A.    Because at some point in time after
13  I did the original computation, I learned that
14  it was really 41.5.
15      Q.    You added the 41.5 next to the 40        13:30:30
16  at some subsequent time?
17      A.    Yes.
18      Q.    Do you know when in time you added
19  it?
20      A.    September, October of '97. I can't        13:30:39
21  tell you specifically.
22      Q.    Then the next row reads,
23  "Graduate." You have 50 million dollars there.
24      A.    Yes.
25      Q.    What is the 50 million dollars        13:30:51

Page 701

1  there meant to convey?
2      A.    That's the 50 million dollars of
3  transfers that we've been talking about for the
4  last hour or so.
5      Q.    Then you've summed the three        13:31:01
6  reserve figures, 35.2, 40 and 50 to come up
7  with 125.2?
8      A.    125.2, yes, sir.
9      Q.    Then what does that 125.2 then
10  reflect other than the sum I just indicated it        13:31:20
11  reflects?
12      A.    What I was trying to do is
13  determine if I had all of the key elements, if
14  you will, of the reserve number reflected on
15  the June 30th, 1997 AHERF consolidated balance        13:31:31
16  sheet. And that number is right below, 127.4.
17      So I was trying to determine the
18  makeup of the 127.4 without going back and just
19  looking at the client's trial balance or
20  general ledger so that if I had a question, for        13:31:53
21  instance, at the audit committee, I could
22  explain what the makeup of the 127.4 was in
23  global terms that an audit committee member,
24  for instance, would be interested in hearing
25  and not by entity or things of that nature.        13:32:08

37 (Pages 698 to 701)

Page 702

1    Q.   Then you've got a section of the
2  schedule towards the bottom of the page headed
3  makeup.
4    A.   Yes.
5    Q.   Do you see that?                13:32:18
6    A.   Yes.
7    Q.   What were you doing in the makeup
8  section of the schedule?
9    A.   What I was attempting to do is
10  evaluate, was evaluate what, absent the 50      13:32:30
11  million dollar transfer, what number I would
12  expect to see on the caption Allowance for
13  Uncollectibility Accounts.
14    Q.   For what enterprise or set of
15  enterprises?                            13:32:43
16.    A.   For AHERF, consolidated AHERF for
17  June 30, 1997.
18    Q.   You've written beneath makeup the
19  words, "Acquired Forbes"?
20    A.   Yes.                            13:32:55
21    Q.   "2.9"?
22    A.   Yes.
23    Q.   What does that reflect?
24    A.   My understanding, that was a bad
25  debt reserve for Forbes as of June 30, 1997.   13:33:01

Page 703

1    Q.   Where did you get that figure?
2    A.   Amy Frazier would have given me
3  that number.
4    Q.   The next row reads, "AVH 1.1."
5  What does that reflect?                  13:33:13
6    A.   The same descriptor as with Forbes,
7  the bad debt reserve for AVH as of June 30,
8  1997.
9    Q.   Again, Amy was the source?
10    A.   Yes.                            13:33:24
11    Q.   And then it says, "Grad 36
12  million"?
13    A.   Yes.
14    Q.   What does that figure represent?
15    A.   The same as the other two, that's   13:33:30
16  the bad debt reserve for Graduate as of June
17  30th, 1997.
18    Q.   The source is the same?
19    A.   Yes.
20    Q.   You have summed them to roughly 40   13:33:38
21  million dollars?
22    A.   Yes.
23    Q.   That's the next row?
24    A.   Yes.
25    Q.   Beneath that you have written the   13:33:44

Page 704

1  words, "Old AHERF dash G slash L," and the
2  number "35.2." What does that entry mean?
3    A.   Well, that's the 35 million dollars
4  that I calculated above.
5    Q.   It's a bring-down, if you will?      13:34:00
6    A.   Yes, yes. I've never heard that
7  term, but, yes, I would agree with that.
8    Q.   I may have just coined it.
9         MR. RYAN: I like it.
10    A.   By the way, the 40 is a bring-down,   13:34:10
11  if you will, from up above.
12    Q.   I guess it is. Thank you.
13        The row next or just below old
14  AHERF G slash L reads, "Other reserves, 22.5."
15  What does that reflect?                  13:34:25
16    A.   That's a number that I calculated
17  based on discussions with Amy. I believe the
18  detail of that would sit on the next page,
19  which is Bates 36439.
20    Q.   Which part of the next page is the   13:34:42
21  detail found -- on which part of the next page
22  is the detail found?
23    A.   About halfway -- a little more than
24  halfway down the page you'll see a caption
25  called Bad Debt and then -- do you see that?   13:34:53

Page 705

1    Q.   Yes, I do.
2    A.   Right below that there are three --
3  three lines, then a subtotal, then a fourth
4  line.
5    Q.   Yes.                            13:35:03
6    A.   So it's a combination of the excess
7  CRA of ten, excess C/A of 9.8, legal reserves,
8  1.7, and SCHC collection of one. I believe if
9  you add those up, you'll come close to 22.503.
10    Q.   You received these figures that     13:35:29
11  you've just read to us as excess CRAs -- excess
12  C/A's --
13    A.   Yes.
14    Q.   -- legal reserves and SCHC
15  collection figures from Miss Frazier?     13:35:41
16    A.   Yes, for the most part, yes.
17    Q.   Do you recall receiving that
18  information from any other source?
19    A.   The legal reserve I may have gotten
20  off of the general ledger when I was doing my   13:35:53
21  review out in the field. I can't remember if
22  Amy gave me that or if I had that from other
23  notes.
24    Q.   Do you recall any communications
25  with Miss Frazier about why she believed that   13:36:02

680a3ea2-1869-4c88-9ad7-eb2c77fa5b

William F. Buettner

Volume 3

Page 706

1   any of these CRAs or C/A amounts were excess?
2       A.   It was based on our assessment,
3   apparently, of the review that we had performed
4   in that area.
5           As we have discussed over the last     13:36:22
6   couple of days, it wasn't unusual for the
7   organization to have reserves sitting in the
8   receivable area for contractuals or CRAs that
9   at some point in time they no longer needed.
10          When I met with her during the      13:36:40
11  year-end phase of our engagement, she informed
12  me of the existence of these accounts or these
13  amounts.
14      Q.   Did she tell you why she thought
15  they were excess?                          13:36:51
16      A.   We may have had some general
17  discussion about it, but I don't recall right
18  now.
19      Q.   Next to the line excess CRA and the
20  10 million dollar figure that appears next to   13:37:02
21  it, you've got DVOG in parentheses with a
22  question mark. Am I right?
23      A.   Well, I have DVOG. I'm not sure if
24  that's a question mark or not, but --
25      Q.   Do you know what you meant to       13:37:15

Page 707

1   convey by DVOG and whatever mark appears next
2   to it?
3       A.   Well, my understanding is that the
4   majority of the CRA -- the excess CRA sat in
5   the Delaware Valley and the amount -- that    13:37:26
6   there was a nominal amount at AGH.
7       Q.   Beneath that parenthetical there's
8   another parenthetical on the same row as the
9   phrase, "Excess C slash A, 9.8 million." Am I
10  right?                                     13:37:44
11      A.   Yes.
12      Q.   C slash A to you means contractual
13  allowance?
14      A.   Yes.
15      Q.   What does it mean -- what did you   13:37:53
16  mean when you wrote .8 million dollars AGH and
17  9 million dollars DVOG in that parenthetical?
18      A.   That was my understanding as the
19  source of those two -- of the 9.8. 800,000
20  came from AGH. 9.0 came from the Delaware   13:38:13
21  Valley.
22      Q.   This was an understanding derived
23  from a conversation with Miss Frazier?
24      A.   Yes, an earlier conversation during
25  the course of the audit.                   13:38:24

Page 708

1       Q.   Let me ask you now to flip back
2   with me to the prior page, which ends in the
3   Bates digits 438.
4           How, again, did you derive the 97.7
5   million dollar figure which appears just below  13:38:43
6   the figure for other reserves that we've been
7   discussing of 22.5 million dollars?
8       A.   You're asking on the 97.7 million?
9       Q.   Yes, how is that figure arrived at?
10      A.   That's the summation of the 40, the  13:38:56
11  75 and the 22.
12      Q.   The 40, the 75 and the 22?
13      A.   I'm sorry, I'm adding it as I'm
14  going. The 40 -- the 35 and the 22.
15      Q.   What import did that figure have    13:39:18
16  for you, if any, at the time?
17      A.   Well, the number on the financial
18  statements that the client had prepared was 127
19  million, the number for allowance for
20  uncollectible accounts.                    13:39:33
21          As part of my assessment, I wanted
22  to evaluate if that number should change. So I
23  went ahead and went through my own evaluation
24  or assessment as to exactly what was, in my
25  opinion, sitting in bad debt reserve absent the  13:39:54

Page 709

1   50 million dollars. I came up with roughly 98
2   million.
3           Then I sat down and I said, okay,
4   what other items of import relate to some sort
5   of either patient receivable or CRA or other   13:40:09
6   third-party issues.
7           You can see that there were three
8   items listed there which got me to 130 million.
9   I'm sitting here saying it's in the ballpark,
10  so I would not necessarily have a problem with  13:40:28
11  the number 127 being presented on the balance
12  sheet.
13      Q.   The reserves listed below 97.7 have
14  these descriptors, am I right, "Graduate,
15  deferred rev"?                             13:40:46
16      A.   Yes.
17      Q.   "14 million dollars"?
18      A.   Yes.
19      Q.   Then you've written in the
20  corner -- or next to that, rather, in        13:40:49
21  parentheses, "QualMed dash DMC, close paren"?
22      A.   Yes.
23      Q.   What does that mean, that row?
24      A.   Well, the deferred revenue on
25  Graduate related to a QualMed contract. The   13:41:06

39 (Pages 706 to 709)

William F. Buettner

Volume 3

Page 710

1  client decided to write the deferred revenue
2  off into income. We disagreed with that
3  treatment. We believed that it belonged on the
4  balance sheet.
5      I believe my staff placed that 14  13:41:23
6  million on the SUD for evaluation as a
7  misapplication or a misstatement, if you will.
8  And the deferred revenue, other people were
9  calling it QualMed within the organization, so
10 I just wrote that down and I wanted to remind  13:41:45
11 myself that this is something I wanted to talk
12 to McConnell about.
13     Q.  Did you?
14     A.  Yes, I had a brief conversation. I
15 can't say it lasted more than 15 seconds,  13:41:55
16 though, to be honest with you.
17     Q.  What did you -- what was said in
18 those very few seconds?
19     A.  That basically the QualMed deferred
20 revenue was written off and we didn't think it  13:42:08
21 should be written off.
22     Q.  What did he say, if anything?
23     A.  I think I also told him we put it
24 on our SUD and he said fine.
25     Q.  What do you recall about why you,  13:42:21

Page 711

1  C&L, thought the liability should be
2  reinstated, if you recall anything today?
3      MR. RYAN: Objection.
4      A.  My general recollection is that
5  this liability was booked or recorded on the  13:42:36
6  financials at Graduate as of June of '96. As
7  we went through due diligence, management
8  looked at it and continued to believe that the
9  liability should stay on the Graduate's
10 financial statements.  13:42:51
11     Then very late in the game, the
12 folks from AHERF management decided to write it
13 off.
14     Our position was twofold. One, if
15 the liability truly did not exist, then it  13:43:08
16 should not go through income, but should be
17 reflected as an element of purchase accounting,
18 so it should not go through the income
19 statement. As a result, we had it on the SUD.
20     Secondly, we were not comfortable  13:43:26
21 that it should be written off because I don't
22 believe we ever -- we were ever given any sort
23 of documentation or what I considered to be a
24 justifiable -- what Amy considered to be a
25 justifiable reason for writing it off.  13:43:41

Page 712

1      Q.  Do you recall what the obligation
2  was as you sit here today?
3      A.  It related to providing services to
4  QualMed on an as needed basis from QualMed, as
5  I recall.  13:43:55
6      The deferred revenue was basically
7  monies paid in advance. I can't remember
8  anything else.
9      Q.  The police -- the next row on the
10 schedule that ends with the Bates digits 438  13:44:06
11 says, "police slash fire, 14 million"?
12     A.  Yes.
13     Q.  That related to the PFMA contract
14 that the Graduate hospitals had entered into?
15     A.  Yes.  13:44:20
16     God bless you.
17     Q.  How did you learn of that figure or
18 that potential reserve?
19     A.  I don't understand your question,
20 sir.  13:44:33
21     Q.  How did you get the entry, "police
22 slash fire," from what source?
23     A.  Based on discussions with Amy.
24     Q.  Did she give you both the topic for
25 the entry and the amount of the entry?  13:44:43

Page 713

1      A.  No. We had discussions in terms of
2  the fact that the contract -- originally the
3  client had booked an accrual for the contract
4  and then they changed their mind and reversed
5  it. Again, we weren't comfortable that the  13:44:56
6  reversal made sense. So I felt that it was
7  necessary to reflect the liability, if you
8  will, on the financial statements.
9      Q.  Did you talk with anyone at AHERF
10 yourself about that reversal?  13:45:16
11     A.  I don't recall, no, I don't.
12     Q.  Did you talk with anyone but Mr.
13 McConnell for 15 seconds about the Graduate
14 deferred revenue reversal?
15     A.  No.  13:45:30
16     Q.  The next item is listed as prudent
17 buyer, 5.1 million dollars?
18     A.  Yes.
19     Q.  Next to it you've written in
20 parentheses, "Is this needed, question mark"?  13:45:40
21     A.  Yes.
22     Q.  Who is the source for that entry
23 and figure?
24     A.  Based on discussions I had with Amy
25 Frazier.  13:45:51

William F. Buettner                                                                          Volume 3

Page 722

1    A.    Yes.
2    Q.    What is the figure next to that?
3    A.    I believe it's 77.1.
4    Q.    It looks to me as if that figure
5  has been altered, at least in my copy, to read      13:54:32
6  something that looks closer to 79.1.
7    A.    That's correct.
8        MR. RYAN: Objection.
9    A.    It could be 77 or 79. My
10  recollection is 77, but when I originally wrote    13:54:43
11  it I obviously changed it at that time.
12    Q.    Do you recall changing it to 79.1?
13    A.    Today I can't remember, but I
14  believe it was 77 because that's the math. I
15  believe if it's 77, you get down to the 66, but    13:55:03
16  --.
17    Q.    Let me ask it this way. Do you
18  have any doubt that you were the person that
19  changed it to 79 at some point?
20    A.    Oh, no, I'm the person that made    13:55:15
21  the change.
22    Q.    Do you recall why you made the
23  change?
24    A.    Because I think I made, dare I say,
25  a typo.                                          13:55:24

Page 723

1    Q.    A hando, perhaps?
2    A.    Yes.
3    Q.    What is the formula reserve figure,
4  where did you derive it from?
5    A.    As I indicated, when I was out in    13:55:36
6  the field in late August with the engagement
7  team, I wanted to go through my own assessment
8  of the reserve needs for what I considered to
9  be old AHERF and also so that I could
10  understand the impact that the client actions    13:55:49
11  had on -- numerous client actions and
12  receivables on the agings and things of that
13  nature.
14        So basically I sat down in the
15  cubicle and I guess similar to 1997, although    13:56:01
16  not as bad, I had them provide me with
17  information similar to what Brian had provided
18  me in '96.
19        I went through my own review of the
20  old AHERF aging and basically put together a    13:56:17
21  consolidated aging schedule on a sheet of paper
22  similar to the tablet you're writing on right
23  now, Mr. Jones.
24    Q.    All right.
25    A.    Broke it out by                13:56:36

Page 724

1  inpatient/outpatient. Went through age
2  buckets, 0 to 30, 30 to 60, similar to what you
3  would see on an aging schedule.
4        Then went through a calculation of
5  what I felt the reserve requirements would be    13:56:50
6  by basically using what I would call AGH loss
7  percentages or percentages that AGH had used in
8  their methodology in previous years or averages
9  if those percentages were detailed -- so
10  detailed because I didn't have the level of    13:57:08
11  detail that the AGH method had. And I came up
12  with a number. And that number, I believe, was
13  77, but it could have been 79. I can't
14  remember. So I had these sheets. I held on to
15  those sheets. At the end -- and went through    13:57:24
16  this type of exercise out in the field with the
17  staff on 439.
18        As I left that day, I told Amy that
19  I was comfortable with the level of bad debt
20  reserve that existed at old AHERF.    13:57:46
21    Q.    When you left what day, sir?
22    A.    The day I performed this formula
23  review, if you will, on my own.
24    Q.    Which wasn't the same day as you
25  prepared this schedule marked as a part of    13:57:54

Page 725

1  Exhibit 4473?
2    A.    Yes, I think I've testified to
3  that, yes.
4    Q.    It was the same day?
5    A.    It was not the same day.    13:58:01
6    Q.    All right, thank you, go ahead.
7        How far in advance?
8    A.    It could have been three weeks to a
9  month.
10        So I told Amy that I had reached a    13:58:14
11  conclusion that the reserves for old AHERF
12  based on my assessment, the reserves were
13  adequate, and that the 50 million dollar issue
14  was really a transfer of reserve issue problem
15  and not an issue of reserve and adequacy at old    13:58:32
16  AHERF, if you will, or something that could
17  impact the income statement.
18        And I took -- I had the underlying
19  information, my notes, if you will, in my
20  folder, AHERF folder. And when it came time    13:58:51
21  for me to prepare for the audit committee
22  meeting and collect vital information or
23  information I felt was vital in case of
24  questions from the audit committee, I took that
25  information, sat down and attempted to    13:59:05

43 (Pages 722 to 725)

Page 726

1  summarize it. I summarized it basically on
2  this sheet of paper that you see here.
3      Q.  Which is page 439?
4      A.  439.
5          So the formula reserve is really      13:59:15
6  one number that is -- that would summarize
7  probably five, six, seven detailed pages of
8  work that I had done in terms of just looking
9  at aging schedules and things of that nature.
10     Q.  Do you have those sheets or pages      13:59:33
11 anymore, sir?
12     A.  No, I do not.
13     Q.  Do you know whether they have ever
14 been made available to either my law firm or
15 the SEC?                                       13:59:44
16         MR. RYAN: Objection.
17     A.  No. I know they have not because
18 I, quite frankly, I pitched them once I
19 prepared this schedule. I felt that I never
20 had a need for them.                           13:59:53
21     Q.  Let me ask you to tell me, if I'm
22 right, in the way that I read the next row on
23 this schedule. It says, "IBC slash Oxford."
24 Then I can't read the next word.
25     A.  "HMO."                                 14:00:09

Page 727

1      Q.  Then beneath that, "cash flow"?
2      A.  Yes.
3      Q.  And then the figure 9.0 million
4  dollars in brackets?
5      A.  Yes                                    14:00:18
6      Q.  What does that entry refer to?
7      A.  Well, based on my discussions with
8  AHERF management, specifically McConnell, I
9  guess, I had heard comments periodically that
10 both IBC, Independence Blue Cross, as well as  14:00:36
11 Oxford Health, which is an HMO, were being
12 difficult in terms of reimbursement of AHERF
13 claims in the eastern portion of the state and
14 that it was his sense that they were using
15 AHERF as a means of improving their own cash   14:00:58
16 flow, simply slowing down payment.
17     Q.  Did you -- I'm sorry, did you hear
18 this from any other source besides Mr.
19 McConnell?
20     A.  Well, that's what I was going to      14:01:09
21 get to.
22     Q.  Okay. Then go ahead.
23     A.  So what I did at some point during
24 the later phases of the '97 audit, I remember
25 running into a healthcare partner in the       14:01:22

Page 728

1  Philadelphia office by the name of Glenn
2  Schively. And I asked Mr. Schively if he had
3  heard any stories about either Independence
4  Blue Cross or Oxford being very slow to pay in
5  terms of patient claims with healthcare        14:01:38
6  providers. He told me that he had, that it was
7  apparently a comment that a number of his -- a
8  number of his Philadelphia clients had.
9          Mr. McConnell also told me at
10 another meeting that AHERF management was       14:01:51
11 considering some sort of global settlement, if
12 they could reach one, with either Oxford or
13 Independence Blue Cross. I believe his
14 comments were geared more towards Oxford than
15 IBC, but that's my recollection today.         14:02:09
16         Basically that they were going to
17 go to the third-party payors and say, look, you
18 owe us a certain sum of money. We're running
19 into a lot of problems with detailed claims.
20 Why don't we try to negotiate some sort of     14:02:23
21 overall settlement on those detailed claims to
22 arrive at an amount that we could be paid and
23 basically we would provide some sort of
24 discount.
25         So based on that information, I       14:02:35

Page 729

1  took a look at the aging, if you will,
2  schedules that I had put together, tried to
3  pull out Independence, Blue Cross and Oxford.
4  And based on the agings that I had seen, a lot
5  of receivables were being reserved at 75       14:02:53
6  percent.
7          So I basically said, well, if
8  they're going to go through this global
9  settlement and we know that they're slow in
10 terms of their overall pay, reserving them at  14:03:04
11 75 percent really doesn't make sense, in my
12 formula, so I'm going to reduce that to 30
13 percent. And that's the impact of that change
14 in loss reserve, if you will, is the 9 million
15 dollars.                                       14:03:18
16     Q.  That's reflected, at least in part,
17 on the same row where you've written 30 percent
18 versus 75 percent?
19     A.  Yes. Yes.
20     Q.  The next row is unapplied -- do       14:03:27
21 these conversations with Mr. McConnell and
22 Mr. Schively all predate your writing these
23 notes on page 439?
24     A.  Yes.
25         The conversations with McConnell on   14:03:41

680a3ea2-1869-4c88-9ad7-eb2c77fa5b

William F. Buettner

Volume 3

Page 730

1  the Oxford Health would be both before and
2  after my preparation of this document.
3      Q.   All right.
4      A.   Because I believe that topic also
5  came up at the October audit committee meeting.   14:03:53
6      Q.   On unapplied cash, you have a
7  figure of 1.9 million dollars in brackets and a
8  parenthetical next to it of 3.8 million at 50
9  percent?
10     A.   Yes.                    14:04:07
11     Q.   What does that entry mean?
12     A.   The unapplied cash that existed
13  within the old AHERF system at the end of 1997
14  was about 3.8 million dollars. So I simply
15  provided -- took a 50 percent factor and said   14:04:22
16  that some portion of this unapplied cash
17  relates to receivables that I'm establishing a
18  reserve on and those receivables have already
19  been paid, so it's inappropriate to establish a
20  reserve on paid receivables.          14:04:37
21        So I reduced my reserve projection
22  or requirement by 1.9 million dollars.
23     Q.   So the 9 million and the 1.9
24  million both act to reduce the reserve
25  projection you had calculated?        14:04:51

Page 731

1      A.   Yes.
2      Q.   That left you with the next row,
3  which reads, "Needed, 66.2 million dollars"?
4      A.   Yes.
5      Q.   That's just a mathematical    14:04:58
6  difference?
7      A.   Correct.
8      Q.   We've talked about the middle
9  portion of the page, I believe, a few moments
10  ago. Am I right?                14:05:08
11     A.   Yes.
12     Q.   The bottom portion of the page is
13  another schedule that starts with the line --
14  or the row, rather, "Old slash A slash R, 239.1
15  million dollars." Is that right?      14:05:27
16     A.   Correct.
17     Q.   That's a bring-down from the top of
18  the page as we've defined it today?
19     A.   Yes.
20     Q.   Then it says, "Collections, 150.8   14:05:31
21  million."
22     A.   Yes.
23     Q.   What does that line represent?
24     A.   Subsequent collections as of a
25  specific date that the staff -- the staff had   14:05:41

Page 732

1  given me a number.
2      Q.   The staff person here is Miss
3  Frazier?
4      A.   It probably was Amy. I can't
5  remember exactly.              14:05:48
6      Q.   So that leaves you with a
7  difference there of 88.3 million dollars, which
8  is the next figure?
9      A.   Yes.
10     Q.   And then you've got a reserve item   14:05:56
11  of 58.0 million dollars, which appears just
12  below the 88.3 million?
13     A.   Yes.
14     Q.   What does that -- what is that
15  intended to reflect?            14:06:07
16     A.   That's my assessment of the
17  reserves for bad debt, reserves sitting on the
18  balance sheet designated for bad debt. And the
19  makeup of that is right above. It's the 57.7
20  that we had talked about earlier.     14:06:23
21     Q.   Which enterprises is that reserve
22  drawn from?
23     A.   Old AHERF.
24     Q.   Then you've got a net of 30.3
25  million dollars?                14:06:29

Page 733

1      A.   Yes.
2      Q.   Then it says, "To be collected
3  SEPT"?
4      A.   Yes.
5      Q.   What does that mean?        14:06:36
6      A.   To be collected dash September. I
7  don't know exactly why I wrote that there, but
8  it's there.
9      Q.   Did you ever come to learn that you
10  made a mistake by listing the 58 million dollar   14:06:47
11  reserve there where it is listed on the page?
12     A.   The calculation is wrong. It's a
13  mistake.
14     Q.   Why is it?
15     A.   Well, the old AHERF number of 239   14:07:02
16  is net of the bad debt reserve, so I'm
17  basically taking a reserve out twice. So it's
18  just wrong.
19     Q.   What should be the figure that you
20  arrive at, the accurate figure?       14:07:15
21     A.   It would be closer to 90 million
22  dollars. Or somewhere around there. I'm
23  just --
24     Q.   What --
25     A.   I'm just estimating. But somewhere   14:07:24

45 (Pages 730 to 733)

William F. Buettner                                                    Volume 3

1    Q.  Do you recall that attached -- as
2  an attachment to this cover e-mail was a
3  schedule that follows in the exhibit?
4    A.  I believe that was the case.
5    Q.  So is it your best testimony then    15:22:22
6  today that the first time you saw both the
7  cover e-mail and its accompanying three-page
8  schedule was on July 3rd, 1998, the day before
9  Independence Day?
10    A.  At 6:33 in the morning.    15:22:38
11    Yes.  I don't remember exactly when
12  I saw it, but if she sent it on the 3rd, I
13  probably would have gotten it on the 3rd or at
14  some point in time closely thereafter, yes.
15    Q.  You would have looked at it within    15:22:56
16  a day or two of having received it is your best
17  recollection?
18    A.  Yes, yes.
19    Q.  Mr. Buettner, she has written,
20  "Attached is the A slash R reserve    15:23:09
21  reconciliation that we walked through the other
22  day."
23    A.  M-hm.
24    Q.  I read that sentence accurately?
25    A.  Yes.    15:23:18

1    Q.  Is this something -- did you have
2  the actual typed schedule that is a part of
3  Exhibit 1078 with you in a meeting with Miss
4  Frazier before July 3rd, 1998, or is her
5  reference to a walk-through a reference to    15:23:33
6  something else in your view?
7    A.  I cannot remember.  As I recall, I
8  asked Amy to go through and go through some
9  sort of herself -- go through an assessment on
10  her own of reserve adequacy for old AHERF as of    15:23:48
11  June 30, 1997 based on her knowledge of the
12  organization and the fact that she had overseen
13  receivables and if she could go through an
14  assessment in the same format, if you will, as
15  the one I had prepared.  As you recall, I had    15:24:13
16  testified that I had shown her generally how my
17  assessment worked.
18    So I don't know if she's making
19  reference to the reconciliation that we walked
20  through the other day, if that's the case where    15:24:26
21  I prepared and we were just sitting down and
22  saying, look, I would like you to go through
23  this.  I want you to go through your own
24  assessment.  I'm not going to give you a copy
25  of it.  Go ahead out and take a look at the    15:24:37

1  work papers, let me know and tell me where I
2  screwed up.
3    I don't know if that's what she's
4  making reference to or if we looked at this
5  thing and then she went back and was continuing    15:24:48
6  on her work.  I just can't remember.
7    Q.  Do you recall, though, having the
8  conversation to the effect of go forward from
9  here and tell me where I screwed up with her at
10  some point?    15:25:01
11    A.  Oh, yes.
12    MR. RYAN:  Objection.
13    A.  Clearly.  Clearly I had a
14  conversation with her.  She did not do this all
15  on her own.  She did this at my request.    15:25:07
16    Q.  That request was borne of some sort
17  of discussion you had with other individuals
18  before the time Miss Frazier was so tasked?
19    MR. RYAN:  Objection.
20    Q.  Let me withdraw it because --    15:25:28
21    A.  Yes.
22    Q.  -- although I think it's phrased
23  appropriately, it may be confusing, so let me
24  try again.
25    A.  Sure.    15:25:34

1    Q.  Why is it that you tasked Miss
2  Frazier as you just mentioned?
3    A.  Well, at -- I believe I testified
4  to this already.  There was an audit committee
5  meeting in June that I attended.  I believe    15:25:47
6  Mr. Testoni attended that meeting with me.
7    While at that meeting, there was a
8  question that came up concerning the existence
9  of 99 million dollars of reserves that had been
10  transferred or utilized in the calculation of    15:26:08
11  bad debt reserves for old AHERF, as I recall.
12    Someone on the audit committee
13  asked me if I knew anything about it or what I
14  knew about it.
15    Q.  Who was that person on the audit    15:26:25
16  committee?
17    A.  I can't remember who it was.  It
18  might have been Harry Edleman, but I just can't
19  remember at this point in time.
20    Q.  The meeting again was in June of    15:26:37
21  '98?
22    A.  Yes, sir.
23    Q.  Can you fix it any more precisely
24  in time?
25    A.  Well, we had a report that we    15:26:42

57 (Pages 778 to 781)

William F. Buettner                                                                    Volume 3

Page 782

1  delivered to the audit committee. So it would
2  have been whatever date the report specified
3  would have been the date of the meeting.
4      Q.   Did you try to date your report the
5  date of the meeting?                    15:26:56
6      A.   In that particular case, yes, we
7  did. It may have been the 12th or thereabouts.
8      Q.   That is roughly consistent with
9  some recollection I'm having, so Mr. Torborg is
10 helping us find a document that may be helpful   15:27:09
11 to us, hence the rattle and hum.
12     A.   But if I can continue.
13     So we had the meeting. I got this
14 question. I didn't know anything about it. At
15 the end of the meeting, I believe I ran into   15:27:24
16 Adamczak in the hallway.
17     Q.   Mr. Al Adamczak?
18     A.   Yes. And I believe McConnell and
19 Dionisio was there as well. I asked a
20 straight-forward question of what were they   15:27:41
21 talking about. Adamczak said I'll fax you
22 something this afternoon or tomorrow morning.
23     Q.   Can I ask you just to back up with
24 me and then we'll come back for a moment?
25     A.   Yes.                         15:27:54

Page 783

1      Q.   Was there any more conversation at
2  the audit committee meeting about this reserve
3  transfer issue other than an inquiry from
4  Mr. Edleman in roughly the way you phrased it?
5      A.   Not while I was in the room or   15:28:06
6  Mr. Testoni was in the room, I don't believe
7  so. I don't recall.
8      Q.   What was your response when you
9  were queried the way you've just mentioned?
10     A.   I told him I didn't know what he   15:28:14
11 was asking -- what he was talking about, what
12 he was asking me to opine on. I simply didn't
13 know what he was talking about.
14     Q.   Did you share with him and the rest
15 of the audit committee then that you were aware   15:28:26
16 of 50 million dollars of reserve transfers?
17     A.   No, because there were a variety of
18 questions being asked at that meeting by the
19 audit committee members of us, us being
20 Mr. Testoni and myself, as well as AHERF   15:28:43
21 management.
22     We had prepared a report that we
23 were trying to review with the members of the
24 Committee.
25     The key points in that report were   15:28:56

Page 784

1  our concern over -- our concern over the
2  financial stability of the AHERF system and the
3  possibility that we may have to give a going
4  concern for the 1998 audit, as well as the fact
5  that there were a number of initiatives that   15:29:16
6  were underway that we had been asked to review
7  by the AHERF audit committee and we hadn't
8  received the information from management.
9      MR. JONES: Deferentially, I move
10 to strike the balance of the answer after the   15:29:32
11 word no.
12     Q.   Mr. Buettner, let me take you now
13 to the conversation you started to tell me
14 about with Mr. Adamczak.
15     At that point, could you tell me   15:29:43
16 what he said to you?
17     A.   I think I told you already, he said
18 he would fax me something or send it to me that
19 night or the next morning.
20     Q.   And did you have any more   15:29:56
21 conversation with him or Mr. McConnell at that
22 point on the topic?
23     A.   No.
24     Q.   Any more conversation with any
25 audit committee member leaving the meeting at   15:30:05

Page 785

1  that point?
2      A.   No, the meeting was ongoing when
3  Mr. Testoni and I left.
4      Q.   Did you receive anything by way of
5  fax?                                   15:30:16
6      A.   Yes, he sent a two or three-page
7  fax to me.
8      Q.   What did that contain, if you
9  recall today?
10     A.   I believe it was a memo to Sherif   15:30:26
11 Abdelhak just outlining 99 million dollars of
12 reserves that were transferred from various
13 Graduate entities to the Delaware Valley.
14     Q.   Do you recall whether it was dated
15 close in time to this June 12, 1998 meeting?   15:30:49
16     A.   I can't remember. I can't
17 remember.
18     Q.   Is that then what prompted you to
19 ask Miss Frazier to undertake the analysis or
20 the reconciliation that is reflected in Exhibit   15:31:07
21 1078?
22     A.   Yes.
23     Q.   This two or three-page memo
24 revealed to you that there were, or at least
25 the memo depicted reserve transfers beyond the   15:31:28

58 (Pages 782 to 785)

680a3ea2-1869-4c88-9ad7-eb2c77fa5b

William F. Buettner                                                          Volume 3

Page 786

1    50 million of which you were already aware?
2        A.   Well, that was the -- one of the
3    questions we had.  We couldn't tell if this was
4    inclusive of the 50, exclusive of the 50.
5            The way Mr. Adamczak described it,    15:31:40
6    we were confused as to exactly what this
7    information meant.
8        Q.   In any event, you knew from the
9    memo that somebody believed some amount of
10   reserve transfers had gone from the Graduate    15:31:55
11   hospitals to the Delaware Valley obligated
12   hospitals in an amount in excess of 50 million.
13   Is that fair to say?
14       A.   Yes, yes.
15           MR. JONES:  Let's take our break    15:32:07
16   here.
17       Q.   Before we do that, before we go off
18   the record, was that the first time you were
19   made aware of the potential that reserve
20   transfers in excess of the 50 million of which    15:32:17
21   you were aware in late July or early August
22   1997 had taken place?
23       A.   You're going to have to repeat
24   that.  I'm sorry.
25       Q.   We can have it read back.    15:32:32

Page 787

1            THE WITNESS:  Could you read it
2    back, please?
3
4            (Record read.)
5        A.   Yes, that's the first time that I    15:32:53
6    was aware of something greater than 50 million
7    dollars.
8            MR. JONES:  Let's take a break
9    here.
10           THE VIDEOGRAPHER:  Going off the    15:32:59
11   record at 3:33.
12           (Recess had.)
13           THE VIDEOGRAPHER:  We're back on
14   the record at 3:48.
15       Q.   Mr. Buettner, did you, upon receipt    15:48:13
16   of Miss Frazier's e-mail and its attached
17   schedule, which have been marked now in this
18   case as Exhibit 1078, meet with her about her
19   schedule or talk with her about the contents of
20   her schedule?    15:48:36
21       A.   Yes, I did.
22       Q.   How shortly after July 3rd do you
23   think that occurred, or do you know that it
24   occurred on July 3rd?
25       A.   I don't remember.  I remember    15:48:47

Page 788

1    sitting down and talking to her and before
2    talking to her just going through her overall
3    assessment and then sitting down and evaluating
4    that versus my own assessment and concluding
5    that my original assessment was, in my opinion,    15:49:06
6    reasonable.  And that her work basically
7    confirmed the fact that what I had done, based
8    on the information given to me, was a
9    reasonable analysis.
10       Q.   Do you recall coming to any    15:49:27
11   different conclusion after talking with her?
12       A.   No.
13       Q.   When you say you reviewed her
14   assessment, you mean you reviewed the schedules
15   that are a part of Exhibit 1078?    15:49:34
16       A.   Yes, yes.  I spoke to her about her
17   approach and obviously there were differences
18   in her computation versus mine, but I would
19   expect that.  But at the end of the day, the
20   overall needs analysis I felt was pretty    15:49:51
21   consistent.
22       Q.   Did you talk about any -- with her
23   about any particular differences that you
24   wanted to understand?
25       A.   No, I didn't go down item by item    15:50:02

Page 789

1    or look at certain areas that she might have,
2    you know, different theories on.
3            I was looking for some sort of
4    either confirmation or disagreement over what
5    would be the overall required reserve, or    15:50:26
6    suggested reserve elements at AHERF, old AHERF,
7    as of June of '97.
8            The analysis ended up with some
9    sort of comparable conclusion.  I mean, they
10   weren't exactly the same numbers.  I wouldn't    15:50:45
11   expect that.  But I sat here and I clearly, by
12   looking at her assessment and looking at my
13   assessment, it didn't give the answer or any
14   type of insight into why I asked her to do this
15   original project, which was the discussion or    15:51:03
16   the question and this memo from Mr. Adamczak on
17   the 99 million dollars.
18       Q.   Did you ever come to the conclusion
19   that any portion of Miss Frazier's analysis was
20   wrong?    15:51:21
21       A.   No, I didn't spend a great deal of
22   time auditing it, if you will.  I looked at it.
23   I gained an understanding based on my
24   discussions with her and concluded that it was
25   close enough or approximated -- her conclusions    15:51:37

59 (Pages 786 to 789)