# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH
FOUNDATION,

                                        Plaintiff,

                    v.

PRICEWATERHOUSECOOPERS LLP,

                                        Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

## SUPPLEMENTAL APPENDIX TO STATEMENT OF UNDISPUTED AND MATERIAL FACTS PURSUANT TO RULE 56.1(D) IN FURTHER SUPPORT OF PRICEWATERHOUSECOOPERS LLP'S MOTION FOR SUMMARY JUDGMENT

### VOLUME II

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

August 19, 2005

TAB 197

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,

    vs.                     Civil Action

PRICEWATERHOUSECOOPERS,      No. 00-684

LLP,

        Defendant.


        Videotaped Deposition of MARK D.

KIRSTEIN, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 222 East 41st Street, Suite 400, New

York, New York, on Tuesday, the 11th day of

May, 2004, at 9:00 a.m.

_ _ _RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1.888.391.3376 (DEPO)

Page 33

1  determination in audit step A under obtainable
2  analysis of allowance for bad debt?
3      A.  Well, again, just judging off the
4  audit program I would suspect Craig Kocak did
5  the detailed work for accounts receivable.        09:33:50
6      So if your question is who do you
7  suspect did the detailed work, I would suspect
8  Craig Kocak thank you for that answer, and my
9  question was who was responsible for making the
10  determination that is referred to in paragraph     09:34:05
11  A under obtain analysis of allowance for bad
12  debt?
13      MR. RYAN:  Objection.
14      Q.  If you can recall.
15      A.  I think I've answered your question     09:34:16
16  as best as I can.  That determination could be
17  made by any member of the audit team as part of
18  the audit process.
19      Q.  There's nothing in the document
20  that can tell you as you look at it who     09:34:26
21  precisely that was, is that fair?
22      A.  Which document?
23      MR. RYAN:  Objection.
24      Q.  The obtain analysis of allowance
25  for bad debt page of the audit program.     09:34:34

Page 34

1      A.  I think that's a shortsighted view
2  of how the audit would work.  You're looking at
3  an audit program step.  I think this binder,
4  and it says one of, so there might even be
5  more, is really what our firm's work was on     09:34:47
6  accounts receivable.
7      Can I finish, please?
8      So when you're asking a step -- a
9  question about who determined that something
10  was done, you can't tell from this page, I can     09:34:56
11  tell you Craig Kocak appears to have signed off
12  on the detailed work.  But the work may exist
13  in multiple places throughout the binders.
14      Q.  I understand that you want to tell
15  me that.  But my question really was, from the     09:35:09
16  page we're looking at, you can't tell who made
17  the determination, is that fair to say?
18      A.  I don't think that's --
19      MR. RYAN:  Objection.
20      A.  I don't think that's the purpose of     09:35:17
21  this page.
22      Q.  I didn't ask you what the purpose
23  of the page was.
24      All I want to know is, if I'm
25  looking at Bates page 956, you've told me that     09:35:26

Page 35

1  it appears that Mr Kocak did the detailed
2  work.  And then the next question is, can you
3  tell me from looking at the page who ultimately
4  made the determination set forth in
5  subparagraph A?  That's all I want to know from     09:35:40
6  looking at the page
7      MR. RYAN:  Objection.
8      A.  I need more information to answer
9  that question, so --
10      Q.  So you can't tell from the page, is     09:35:51
11  that fair?
12      A.  That's fair.
13      Q.  Thank you.
14      Can you describe for me the
15  allowance for bad debt on the books and records     09:36:07
16  of a healthcare entity at this time, what that
17  account was supposed to reflect?
18      A.  What time period are you in?
19      Q.  Roughly 1995 here.
20      A.  Allowance for bad debts is          09:36:28
21  generally reserve for accounts receivable,
22  patient accounts receivable that may be
23  uncollectible.
24      Q.  How is it in this time frame that
25  Coopers & Lybrand would go about making the     09:36:48

Page 36

1  determination that the methodology and
2  assumptions used by the client to establish its
3  allowance for bad debt were reasonable or
4  consistent with the prior year?
5      A.  Let me hold that for a second, I'll     09:37:04
6  ask you to repeat it.  I just want to add to
7  the last question.  When I think of AHERF and
8  allowance for bad debts, and I don't remember
9  exactly, I said patient accounts.  They may
10  also have had an allowance for other     09:37:15
11  patient-related accounts like cost reports that
12  were in the account allowance for bad debts.  I
13  just don't recall.
14      So the broad accounts receivable
15  has patient accounts receivable and cost grade     09:37:31
16  adjustments.  They both may have been in
17  something called an allowance.  I just wanted
18  to clarify.
19      Q.  Or they may not have been.  You
20  just don't recall?          09:37:33
21      A.  I don't recall, but I also don't
22  want to leave it out so that later on we're not
23  passing each other in the night on questions.
24      Q.  I appreciate that
25      MR. JONES:  Can we have my other     09:37:41

9 (Pages 33 to 36)

Mark Kirstein

Page 37

1  question back?
2          (Record read.)
3      A.  I don't specifically recall 1995's
4  work program steps. I can go through the
5  binders if you would like me to do that.    09:38:16
6          Would you like me to do that?
7      Q.  We're going to go through pieces of
8  the binder, you bet you.
9          But my question is, do you recall
10  today generally how the process worked that   09:38:25
11  Coopers would become comfortable if the client
12  had enough bad debt reserves or enough in its
13  allowance for bad debt to reduce the
14  receivables on the balance sheet to net
15  realizable value as a process, the kinds of   09:38:41
16  things the auditors would do?
17      A.  I mean, in general -- I mean, I'm
18  not going to give you a litany of tests.
19  That's what the work papers are for.
20          But in general we would conduct --   09:38:57
21  we would do analytical analysis on the
22  balances, we would do high dollar account
23  testing, controls testing, and subsequent
24  receipt testing. There's probably ten more
25  things we do.                    09:39:17

Page 38

1          The other point that I would throw
2  in, because you asked a general question
3  basically about how do you audit the
4  allowances, is no one step -- no one test
5  stands alone. And you've got to take all the   09:39:28
6  tests that you conduct during an audit plus the
7  knowledge that you have from the client in
8  prior years, collectively take a look at that
9  at the end of an audit to make a determination
10  in your judgment as to whether the receivables   09:39:43
11  and the related reserves are at their net
12  realizable value.
13      Q.  When you said you did analytical
14  analysis, to what did you refer there?
15      A.  I didn't refer to anything         09:39:54
16  specifically. I was giving you general
17  recollection of auditing receivables.
18      Q.  Let me ask it differently. Do you
19  have any examples in mind of analytical
20  analyses?                        09:40:06
21      A.  Could be a fluctuation of dollar
22  value comparison from year to year. Could be a
23  percentage comparison. Bad debt reserve is a
24  percentage of A/R from year to year. You could
25  do it month to month, period to period.    09:40:20

Page 39

1          Could be an aging analysis, bucket
2  to bucket, payor to payor. There's lots of
3  other analytical analyses.
4          - - - - -
5          (Thereupon, Deposition Exhibit 4378
6          was marked for purposes of
7          identification.)
8          - - - - -
9      Q.  Mr. Kirstein, before we go to
10  Exhibit 4378, which the court reporter has    09:42:14
11  kindly marked and placed before you, are high
12  dollar testing, subsequent receipt testing, are
13  those analytics as well, analytical analyses as
14  well?
15      A.  They could be. You could do some    09:42:35
16  analytics from them.
17      Q.  Exhibit 4378 is headed, as its
18  contents, A/R, meaning accounts receivable,
19  inpatient slash outpatient bad debt reserve.
20          Is that right?              09:42:54
21      A.  Correct.
22      Q.  And you, again, are noted as the
23  manager, am I right?
24      A.  Down here? Correct.
25      Q.  Under C&L personnel.          09:43:02

Page 40

1          For year-end at 6-30-95, is that
2  right?
3      A.  Correct.
4      Q.  You've initialed it at the top of
5  the page under review completed. Is that    09:43:09
6  right?
7      A.  Yes.
8      Q.  I would like you to flip with me,
9  if you will, to the schedule that starts on
10  page 164 of the Bates range.            09:43:22
11      A.  Okay. This is not the entire
12  binder as it looked. I mean, just because it
13  jumps from Bates 092 to 164.
14      Q.  Yes. I should have told you --
15      A.  You've taken out whatever else was   09:43:34
16  in the note.
17      Q.  I should have told you, my notes
18  tell me to tell you that this is excerpted from
19  the binder and it is not the complete binder
20  and it is, as you can see, much skinnier than   09:43:43
21  the binder we handed you when we started the
22  deposition. So I apologize.
23      A.  Okay, I just wanted to make sure
24  that we were clear there could be other work
25  here.                            09:43:53

10 (Pages 37 to 40)

Page 41

1    Q.  I don't doubt that there are other
2  pages.
3        This schedule is headed Allegheny
4  General Hospital Allowance for Doubtful
5  Accounts Inpatient.  Is that correct?        09:44:03
6    A.  You're on 164?
7    Q.  Yes.
8    A.  That's correct.
9    Q.  And along the left-hand margin we
10  have a set of payor classifications.  Is that        09:44:08
11  right?
12    A.  Yes.
13    Q.  Then we have across -- columns
14  across the page which break down based on the
15  aging of an account, is that correct,        09:44:27
16  breakdowns based on aging or buckets as you may
17  have referred to them in an earlier answer?
18    A.  Probably a little too -- yes, let's
19  go with aging.  That's the appropriate term.
20    Q.  And this schedule provides the        09:44:49
21  client's assessment or amount of bad debt
22  reserves on the books for the Allegheny General
23  Hospital for fiscal year 1995 for inpatient and
24  outpatient accounts, is that correct?
25    A.  Well, 164 is purported to be on --        09:45:20

Page 42

1  I have a note on 165, the allowance for
2  doubtful accounts for inpatient A/R.
3        166 has a note that's on 167 that
4  says it's an allowance for outpatient A/R.
5    Q.  I'm sorry.  So we have the two        09:45:37
6  schedules, 164 and 166.
7        These are the amounts that the
8  client believed were necessary to be in the
9  allowance as of year-end, is that correct, and
10  the percentages from which those amounts were        09:45:47
11  generated?
12    A.  I don't know if I have enough
13  information to answer that.  I mean, I'm only
14  saying that in that I don't know what the
15  balance was.  I don't have the trial balance        09:45:58
16  and other things in front of me.  So these look
17  to be excerpted work papers that do say Craig
18  Kocak reviewed it for Jeff Womer.  They do say
19  this represents the allowance for doubtful
20  accounts for inpatients.  So, I mean, it        09:46:10
21  appears to be a work -- the work paper they did
22  some work on related to allowance for inpatient
23  and outpatient.  I don't know if all the
24  balances tie.
25    Q.  I understand you don't have a trial        09:46:18

Page 43

1  balance or general ledger to balance anything,
2  to tie off to, but it does appear to be the
3  work paper that would generate the appropriate
4  allowance from the percentages that the client
5  assigned; is that fair to say, it appears to be        09:46:30
6  in that format?
7    A.  It appears to be a work paper that
8  the client provided to us to assist auditing
9  the reserve.
10    Q.  The way it assisted is it showed        09:46:42
11  you percentages for different aging buckets
12  that generated an allowance for those aging
13  buckets that could then be totalled?
14    A.  Well, the work paper could have
15  assisted in many ways.  I don't know what Jeff        09:46:56
16  and Craig did with the work paper.  They could
17  have looked at it.  They could have talked to
18  the client.  They could have done other
19  analytics.  The content of the work paper seems
20  to be a balance of reserve and has a percentage
21  by aging category.
22    Q.  It's totalled for both inpatient
23  and outpatient at the bottom of the page?
24    A.  Correct.  Yes, it is.
25    Q.  And these are the kinds of        09:47:19

Page 44

1  schedules that in this fiscal year, and later
2  in your work or your experience with your work
3  at Coopers, that Coopers reviewed in connection
4  with auditing the allowance for doubtful
5  accounts.  Is that also fair?        09:47:32
6    A.  Yes, I don't specifically recall
7  '95, but subsequent years these appear
8  consistent in form.
9    Q.  I'm not asking you that you recall
10  this specific page in this specific fiscal        09:47:44
11  year.
12    A.  Okay.
13    Q.  In reviewing these kinds of
14  schedules, it is the percentages that generate
15  the reserve.  Is that right?        09:47:55
16        MR. RYAN:  Objection.
17    A.  What does that mean?
18    Q.  That applying the percentage to the
19  balance in the aging bucket generates the
20  amount of the reserve.  That's the way the math        09:48:06
21  works, am I right?
22    A.  Math -- let me just -- I'll
23  restate.
24        What you're saying is this line
25  item, allowance percentage, so in the zero to        09:48:22

11 (Pages 41 to 44)

Mark Kirstein

Page 45

1  30 category in self-pay one percent times the
2  two million looks like 086 equals 20,000, might
3  be 666.
4     Q.   What page are you on?
5     A.   164.                    09:48:34
6         Is that your question, is that how
7  the math works, takes the balance of two
8  million 088 times one percent, you get 20,666?
9     Q.   Right, yes.
10    A.   Yes.                      09:48:42
11    Q.   You're familiar with reserve
12  percentages applied to aging buckets like this
13  that generate an allowance in your work at
14  AHERF?
15        MR. RYAN:  Objection.        09:48:51
16    A.   Well, I'm familiar with schedules
17  in this form that assisted AHERF to estimate
18  what their reserves should be, recognizing that
19  a reserve is nothing but an estimate.
20    Q.   The schedules that you are familiar   09:49:01
21  with generate a reserve in this way, with
22  applying a percentage to an aging bucket to
23  come up with an allowance?
24    A.   AHERF used a methodology very
25  similar to this to estimate what they believed   09:49:14

Page 46

1  their reserves should be.
2     Q.   When you reviewed these
3  percentages, or those that reported to you, who
4  reported to you, reviewed these percentages on
5  these schedules, how is it that Coopers &     09:49:31
6  Lybrand in 1995, and subsequent years when you
7  were involved, became comfortable with the
8  reasonableness of the percentages?
9         MR. RYAN:  Objection.
10    Q.   Or attempted to.          09:49:45
11    A.   First, let me break that down.
12  You've got about three parts to that question.
13        You started with you.  Is the you
14  Mark Kirstein, or is the you C&L, because I
15  don't know if I reviewed this work paper in    09:49:56
16  1995.
17    Q.   Let me start over.  In your
18  experience at C&L in auditing the allowance for
19  doubtful accounts at AHERF, in the fiscal years
20  for which you were involved in that process,    09:50:05
21  whether they be 1995 or later.
22    A.   Okay.
23    Q.   How is it that you, to the extent
24  you were involved, became comfortable that the
25  percentages applied to the accounts receivable   09:50:13

Page 47

1  in the aging buckets at various AHERF hospitals
2  were appropriate?
3         MR. RYAN:  Objection.
4     A.   You're specifically asking about
5  these percentages on this schedule?     09:50:24
6     Q.   No, I said if you don't remember
7  this specific schedule, tell me generally how
8  you got comfortable with the reasonableness of
9  the percentages applied to aged receivable
10  buckets at AHERF hospitals during your work on   09:50:39
11  the AHERF audits?
12        MR. RYAN:  Objection.
13    A.   In general -- we can go through
14  whatever work papers you want to over the next
15  couple of days.  In general, the answer to   09:50:46
16  is that's our entire accounts receivable -- not
17  entire.  That's a significant piece of our
18  accounts receivable work  One element of
19  auditing a reserve, which is management's best
20  estimate of what they believe should be     09:51:02
21  reserved for potentially uncollectible
22  accounts, is considering the method that they
23  used to calculate that reserve
24        But you also could have other
25  information to audit the reasonableness of that   09:51:14

Page 48

1  because you're not really focused on
2  necessarily auditing every single percentage
3  line by line.
4         You're really focused on auditing
5  the overall reserve balance for receivables.     09:51:24
6         So I think the answer to your
7  question is I'm not sure I'll be able to show
8  you a step that says that's how we audited the
9  15 percent, the 20 percent, the 30 percent,
10  whatever, because that's really not the     09:51:37
11  objective of auditing the reserve.
12        The objective is auditing
13  management's total reserve of which this is one
14  factor.
15    Q.   Did you compare the percentages at   09:51:44
16  any given hospital with any baseline, any other
17  set of hospitals, either within the AHERF
18  system or without?
19    A.   Which percentages?  These
20  percentages?                    09:51:57
21    Q.   The percentages applied to the
22  aging buckets at AHERF hospitals.
23        MR. RYAN:  Objection.  I've gotten
24  confused in your question.
25    Q.   Let me try it again.          09:52:06

12 (Pages 45 to 48)

Mark Kirstein

Page 49

1    As a part of becoming comfortable
2  or becoming someone who was not comfortable
3  with the percentages applied to the aged
4  buckets of receivables at AHERF hospitals, did
5  you compare the percentages at AHERF hospitals    09:52:23
6  with any other set of hospitals outside of
7  AHERF first in your work as an auditor at C&L
8  from 1995 and forward?
9    A.  I don't recall doing that, but I
10  think I just want to restate what I said a    09:52:42
11  question ago maybe a little clearer.
12    The audit objective in auditing the
13  allowance for doubtful accounts is to audit the
14  allowance in an entity as a whole.  It is an
15  estimate.  It's management's estimate.  And we    09:52:58
16  as an auditor are auditing that estimate.
17    You have multiple ways you can
18  audit an estimate.  There's probably thousands
19  of ways you can audit an estimate, one of which
20  is to potentially reperform what management    09:53:08
21  did.  Another could be to come up with your own
22  best estimate.
23    So I can't tell you I recall
24  specifically comparing this to another
25  entity's.  But, in general, we may have    09:53:22

Page 50

1  compared, you know, allowance percentages on a
2  whole to what we're used to seeing in the
3  industry.  We may have, I just don't recall.
4    Q.  Do you recall becoming aware that
5  others made such a comparison of percentages to    09:53:33
6  other hospitals?
7    MR. RYAN:  Objection.
8    A.  I just don't recall.
9    Q.  Is that something you did at other
10  healthcare audits in the '95 and more current    09:53:43
11  time frame?
12    A.  Is what something?
13    Q.  That you looked at the reserve
14  percentages on the hospitals -- the reserve
15  percentages as a matter of the aging buckets as    09:53:55
16  applied to the aging buckets of the receivables
17  of other hospitals.
18    A.  Well, I think you're
19  oversimplifying.  Other hospitals don't even
20  necessarily have to have a schedule in that    09:54:06
21  form.
22    Q.  I'm just asking for your
23  recollection.  Do you recall doing that in your
24  audit work with respect to another hospital,
25  looking at the aging buckets perhaps back at    09:54:14

Page 51

1  AHERF hospitals and their reserve percentages?
2    A.  I just don't recall doing that.
3    Q.  Is it fair that -- as a part of
4  analyzing either the percentages themselves
5  applied to the aging buckets or, as you say,    09:55:11
6  the total allowance generated by those
7  percentages, during the 1995 and more recent
8  AHERF audits with which you were involved, do
9  you recall asking AHERF for actual collection
10  history to support the loss percentages?    09:55:27
11    A.  I do not recall asking to support
12  those loss percentages in a work paper.
13    As I said, we discussed that isn't
14  necessarily an objective of an audit test.  But
15  I do recall subsequent receipts testing.  I    09:55:49
16  believe we did that each year.  In fact,
17  subsequent receipts testing is a form of
18  collections testing.
19    Q.  Was there ever a template provided
20  to you by Coopers & Lybrand with proposed    09:56:21
21  appropriate percentages for your work in
22  healthcare auditing as that could or would be
23  applied to aged accounts receivable buckets?
24    A.  Not that I recall.
25    Q.  I'm going to ask you to flip back    09:56:40

Page 52

1  to 4077.  In particular, I think I'm going to
2  ask you to look at page 76.
3    MR. TORBORG:  1076.
4    Q.  I'm sorry, 1076.  Toward the back
5  half of the document.    09:57:06
6    A.  76.
7    Q.  Yes, 1076.  Should be headed
8  Hahnemann University Accounts Receivable
9  Aging-Inpatient.
10    A.  Yes, I got it.    09:57:32
11    Q.  I've read the heading for the
12  document correctly, am I right, Hahnemann
13  University Accounts Receivable Aging Dash
14  Inpatient?
15    A.  On 1076?    09:57:47
16    Q.  Yes.
17    A.  Correct.
18    Q.  It is dated as, again, as of June
19  30, 1995?
20    A.  Right.  Just give me a second, I    09:57:53
21  just want to -- this actually just in real life
22  would have been stapled to this work paper,
23  so --
24    Q.  Take your time.
25    A.  I'm sorry, I didn't know it's

13 (Pages 49 to 52)

Mark Kirstein

Page 53

1   attached --
2       MR. RYAN: You're talking about
3   1080?
4       A. Yes, 1080, in real life, this would
5   have been stapled to this work paper.      09:58:08
6       Q. I understand.
7       A. I would just like to read the note.
8       Okay. And the question was?
9       Q. I don't think there was one at that
10  moment.                                    09:58:27
11      A. Okay.
12      Q. If there is, I've forgotten it, so
13  we'll have to come back to it.
14      A. Okay.
15      Q. In real life, as you referred to     09:58:31
16  it, this page 80 with the handwritten note at
17  the base of the page would be on legal size
18  paper and the note would sort of extend at the
19  bottom of the page?
20      Do you recall that being the case      09:58:44
21  so that it could be read?
22      A. No, this would have been stapled
23  Landscape.
24      Q. I see. Thank you. Crosswise, if
25  you will, laterally?                        09:58:54

Page 54

1       A. Laterally Landscape, yes.
2       Q. Landscape is the computer speak, I
3   think.
4       A. It's 2004 now.
5       Q. It is, thank you.                    09:59:02
6       I'm going to ask you to look at the
7   note in the upper right-hand corner of this
8   schedule that does appear on page 1076 for
9   Hahnemann University, Accounts Receivable
10  Aging-Inpatient.                            09:59:18
11      A. No, I will not screw up your
12  pagination. I promise.
13      Q. I will try to monitor you.
14      A. All right.
15      Q. The upper right-hand corner has a    09:59:27
16  note that reads, "Patient liability not
17  reclassed." Is that right?
18      A. It says, "Net numbers, patient
19  liability not reclassed."
20      Q. Is that your handwriting?           09:59:39
21      A. No, it is not.
22      Q. Do you know what that refers to?
23      A. I do not, sir. No, sir.
24      Q. I'm going to ask you to flip back
25  to page 956 again real quickly.            10:00:15

Page 55

1       A. Okay.
2       Q. Where the -- under, again, the
3   heading Obtain Analysis of Allowance for Bad
4   Debt
5       A. Yes.                                 10:00:43
6       Q. The subheading B reads, "Consider
7   the impact of co-insurance and deductibles that
8   have not been reclassed to self-pay or
9   commercial on the allowance for bad debt
10  calculation."                               10:00:54
11      Did I read that right?
12      A. Yes.
13      Q. Does that refresh your recollection
14  or provide you any other instruction about what
15  the note we just read referred to?         10:01:03
16      A. No, sir.
17      Q. What would be the difficulty with
18  respect to the accuracy of the allowance, at
19  least potential difficulty, if co-insurance and
20  deductibles had not been reclassed to self-pay  10:01:22
21  or commercial on the allowance for bad debt
22  calculation?
23      MR. RYAN: Objection.
24      A. You're asking hypothetically what's
25  the impact?                                 10:01:40

Page 56

1       Q. Yes.
2       A. I guess hypothetically if you were
3   reserving in making your estimate for what --
4   if management were estimating and making their
5   estimate for what they believe the reserve    10:01:52
6   should be for an amount Jim Jones owns yourself
7   but it's showing up in a Medicare category,
8   they may not reserve sufficient amount because
9   historically self-pay has a larger reserve,
10  tougher to get the money from people instead of  10:02:07
11  insurance companies.
12      So I guess theoretically if you had
13  a self-pay amount in the wrong category, you
14  could estimate low.
15      Q. The allowance could be estimated     10:02:17
16  low?
17      A. Theoretically, yes.
18      Q. Do you recall whether the Hahnemann
19  University had accounts receivable on their
20  books, their aging schedules for inpatient that  10:02:30
21  had not been -- the patient portion for which
22  had not been reclassed to self-pay?
23      MR. RYAN: Action 3095?
24      MR. JONES: Yes.
25      Q. In this time frame.                  10:02:44

14 (Pages 53 to 56)

Mark Kirstein

Page 161

1    Q. There's an entry there, looks to be
2  the second to the last of the current year
3  items which reads capitalized interest?
4    A. Correct.
5    Q. The amount under the -- that     13:40:47
6  relates to that entry appears to be 1.595 or
7  roughly 1.6 million dollars?
8    A. Yes.
9    Q. Do you recall what that entry
10  related to, what it reflected?     13:41:02
11    A. As I sit here today, I don't
12  specifically recall that entry. Generally I
13  recall capitalized interest that AHERF -- I
14  recall that AHERF had -- would not -- did not
15  record, keep in their books and records     13:41:23
16  capitalized interest, which is basically during
17  construction type projects, they would record
18  interest expense.
19      There was some element of GAAP that
20  allowed you to capitalize interest.     13:41:34
21      So as you see here is a SUD entry
22  that's basically reversing out the expense that
23  they would have recorded during the year and
24  recording an asset.
25    Q. What AHERF had done was expensed     13:41:49

Page 162

1  interest in the year they paid it?
2    A. I don't even know if it was paid.
3  Would GAAP, which is not -- somewhere in
4  GAAP -- I can't tell you which GAAP statement
5  allows you to capitalize interest -- allows you     13:42:15
6  on longer-term construction type projects to
7  capitalize interest. Basically while you're
8  building something, you don't have to expense
9  the interest. You can record it as part of the
10  cost basis of an asset. So I don't know that     13:42:17
11  they've paid it. It might not have been cash.
12  It may have just been a GAAP entry.
13    Q. Is it your understanding that GAAP
14  required capitalization of interest or allowed
15  it, or do you know?     13:42:29
16    MR. RYAN: Objection.
17    A. I don't know, sitting here today
18  I mean, GAAP is not something you just pull out
19  one thing and it tells you exactly what to do.
20  So you would have to know the facts and     13:42:43
21  circumstances to decide that.
22    Q. Do you recall whether you were
23  involved in the audit of CRA accounts in the --
24  for the AHERF engagement in any fiscal year?
25    A. I don't recall doing the detailed     13:43:30

Page 163

1  audit work of the CRA accounts in any of the
2  fiscal years. But as a manager, at least in
3  '96, accounts receivable and related items that I
4  reviewed, and CRA was a part of it that year.
5    Q. What does CRA stand for as you     13:43:46
6  recall it?
7    A. Cost rate adjustment.
8    Q. Is that essentially a liability
9  accrual?     13:43:54
10    MR. RYAN: Objection.
11    Q. Does it involve liability accruals?
12    A. I wouldn't phrase it that way.
13    Q. Phrase it for me.
14    A. I would say that it potentially     13:44:08
15  has -- it could result in a receivable which
16  could be a debit. It could result in a credit
17      Let me step back. It could be a
18  debit, could be a credit. Could be a
19  receivable, could be a payable.     13:44:23
20      Doesn't necessarily have to be a
21  liability. It actually could be recorded as a
22  contra asset, an offset of an accounts
23  receivable.
24    Q. Do you recall whether you were     13:44:34

Page 164

1  involved in CRA accounting -- accounting for
2  CRA accounts in 1995?
3    A. I don't recall, sir.
4    Q. Do you recall anyone who was?
5    A. I do not.     13:44:46
6    Q. Do you recall whether a specialist
7  from Coopers & Lybrand in CRA accounting was
8  brought in in that fiscal year to assist the
9  engagement team?
10    A. Which fiscal year?     13:44:57
11    Q. 1995 or 1996.
12    A. I can't speak to '95, although I
13  think he did play a role, but, in fairness, I
14  don't recall. But in 1996, Duane Girol was the
15  cost report specialist that we utilized to     13:45:14
16  assist us in completing the audit.
17    Q. I'm sorry, I missed part of that.
18  Do you know which fiscal year he was providing
19  that?
20    A. I can speak to '96. I do think he     13:45:21
21  was involved. But I don't have a recollection
22  of '95.
23    Q. What was his role in '95 or '96?
24    A. Duane would come in as a -- Duane
25  would come in as a specialist that understood     13:45:38

41 (Pages 161 to 164)

Mark Kirstein

Page 165

1  cost reports. Cost reports are very complex,
2  kind of like filing a tax return. There's
3  certain guys that understand tax returns.
4  There's certain guys that understand cost
5  reports.                          13:45:49
6        Duane would come in to assist the
7  audit team. Basically he would work with Joe
8  Scharf, who headed the cost reimbursement
9  department at Medicare -- at AHERF. Duane
10 would work with Joe Scharf and his staff to    13:46:02
11 understand the actual filings and
12 interpretations and rulings and whatever
13 related to cost reports.
14       He would interact with the audit
15 team so that we could assess what he thought   13:46:13
16 and make our judgments as part of the audit.
17       Q.  What do you recall him providing
18 you by way of information or data in connection
19 with his conversations with Mr. Scharf or
20 others, if anything?               13:46:27
21       A.  I believe, at least -- again, I'm
22 probably speaking more towards '96. I recall
23 Duane would have a binder. He would have a staff
24 person who would prepare some detail with them.
25 That would be someone would pull all the data   13:46:42

Page 166

1  from all the different accounting information
2  that management gave us. Duane would prepare a
3  binder that documented his work. And then we
4  would have discussions with Duane, you know,
5  sit-downs. Sometimes it was more than one, and  13:46:59
6  certainly he was available if we had questions
7  for phone calls and the like.
8        Q.  What do you recall learning at any
9  of those conversations, if anything?
10       A.  I don't recall the specifics       13:47:06
11 sitting here today.
12       Q.  Was he charged with determining the
13 appropriateness of any liability accruals --
14 liability accruals with respect to CRA accounts
15 that AHERF may or may not have had on its      13:47:27
16 books?
17       MR. RYAN:  Objection to form.
18       A.  What do you mean by liability
19 accrual?
20       Q.  An accrual on the books that would  13:47:35
21 suggest that a payable may have to be made by
22 AHERF.
23       A.  Okay. So then was he charged with
24 what?
25       Q.  Reviewing the appropriateness of    13:47:46

Page 167

1  any such accruals on AHERF's books.
2        A.  I would phrase it that Duane was
3  part of our audit team, so if AHERF had -- had
4  an accrual, had a reserve recorded, a
5  liability, or it might not show up in          13:48:03
6  liabilities, contra asset, for a cost rate,
7  Duane was part of our audit team. So Duane
8  would interact with Bill Buettner. Duane would
9  interact with me. Duane would interact with
10 our staff. And really we audited CRAs like     13:48:14
11 everything else as part of the team.
12       Q.  So the suitability of any such
13 reserve or accrual would be addressed with the
14 whole team, including Mr. Girol?
15       A.  I think that's reasonable, yes.      13:48:30
16       Q.  I'm handing you, Mr. Kirstein,
17 Exhibit 4054. This is a document on lined or
18 boxed paper and handwriting headed with the
19 letters A/P and the word score sheet. Is that
20 right?                             13:49:25
21       A.  That's what it says. Can you --
22 just for context, where did this come from? It
23 doesn't have a year or anything on it.
24       Q.  I will tell you that it came from
25 the fiscal year 1995 papers produced to us by   13:49:35

Page 168

1  counsel for PricewaterhouseCoopers in this
2  case. The C&L Bates range at the bottom
3  indicates Coopers & Lybrand document
4  production.
5        MR. RYAN:  It's a portion of a work      13:49:49
6  paper binder you're saying, Jim?
7        MR. JONES:  I believe that to be
8  the case.
9        Q.  That's right.
10       A.  It's a portion of a binder that      13:49:56
11 looks like this.
12       Q.  We believe so.
13       MR. TORBORG:  It could be less
14 pages; it could be more.
15       A.  I understand. I was just asking.    13:50:04
16       Q.  Have you ever seen this A/P score
17 sheet before, sir?
18       A.  Not that I recall sitting here
19 today.
20       Q.  Have you ever seen score sheets,    13:50:16
21 documents like this entitled score sheet as a
22 part of C&L's audit work in connection with
23 AHERF?
24       A.  I don't know if I remember in
25 connection with AHERF, but the term score       13:50:32

42 (Pages 165 to 168)

Mark Kirstein

Page 169

1  sheet, thinking back, especially preautomated
2  days, pre CLASS -- you talked earlier about the
3  CLASS system -- auditors would, and when I was
4  a staff, I would do the same thing, used to
5  keep track of potential -- potential, and I        13:50:48
6  highlight potential adjustments in the front of
7  a binder.
8          So sometimes this was just a tool
9  that people would just use to sort of track
10  where they are and they would stick it in the        13:51:00
11  front of the binder. That's why I asked where
12  this came from because I think -- I thought I
13  saw one earlier.
14    Q.  You may have.
15    A.  4077 has one called A/R score        13:51:09
16  sheet. So I think it was a tool or a trick
17  that people had used -- let me strike trick. I
18  don't mean that. A tool that people would use
19  to track potential adjustments as they
20  conducted their audit work.        13:51:25
21    Q.  Does this differentiate -- or tell
22  me the difference, rather, between the score
23  sheet and the SUD.
24    A.  Thinking back, the SUD is a formal
25  document that I believe C&L policy, you know,        13:51:35

Page 170

1  had said, you know, there should be a summary
2  of unadjusted differences.
3          The SUD should represent entries or
4  matters that as a result of the completion of
5  the audit work and everybody's input and        13:51:50
6  reviews truly represent misstatements in the
7  opinion of the audit team.
8          The score sheet I would say, first,
9  I don't think it's anything formal. It's not
10  mandated or dictated. And I would suspect it        13:52:03
11  is likely a tool that an auditor used to help
12  track potential areas. But they may not be
13  true misstatements. They may be things that
14  require additional follow-up. I just don't
15  know.        13:52:17
16    Q.  Was it your experience in your work
17  as an auditor at C&L on the AHERF engagement
18  that score sheets typically get prepared before
19  the final SUD is prepared and signed off on?
20  Is that what you're describing?        13:52:32
21    A.  I don't think I made a correlation
22  to the two. What I can tell you is my
23  experience is -- what I recall is that score
24  sheets were used as a means to track potential
25  adjustments in an audit binder. I don't recall        13:52:48

Page 171

1  seeing or hearing of score sheets really after
2  the CLASS system was implemented because it
3  kind of changed the way we did audits with an
4  automated system.
5          But before that, you sort of had        13:52:58
6  nowhere to put these things. So people would
7  put these in the front of a binder and call it
8  a score sheet.
9          To your second part on the SUD, you
10  might find some score sheet entries that may go        13:53:07
11  into the SUD, but that's back to my answer
12  earlier, the SUD is a formal document that
13  should reflect misstatements in the opinion of
14  the audit team after all audit work is
15  completed.        13:53:17
16    Q.  I'm going to ask you now to look
17  back at Exhibit 04054. At the bottom of the
18  page -- I'm sorry. 4054.
19    A.  Okay.
20    Q.  At the bottom of A/P score sheet --        13:53:31
21  well, before you get to the bottom, the top,
22  A/P refers to what?
23    A.  Usually accounts payable.
24    Q.  Do you know whose handwriting this
25  score sheet is prepared in?        13:53:46

Page 172

1    A.  I do not.
2    Q.  The last item reads, "AHERF," then
3  some numbers that I'm having difficulty seeing.
4    A.  71-12.
5    Q.  Thank you. Is that a corporate        13:53:57
6  number?
7    A.  No, that's a reference to a work
8  paper. So you should be able to go to work
9  paper 71-12 and see whatever they were talking
10  about.        13:54:06
11    Q.  I see.
12          We have, "The shortfall of
13  corporate service accrual," is that the way you
14  read the line next to that?
15    A.  Yes.        13:54:14
16    Q.  In the amount of about 6.6 million
17  dollars?
18    A.  Correct.
19    Q.  And then beneath that are the words
20  CRA liab, L.1 A B, or I assume that's short for        13:54:23
21  CRA liability, is that right; is that the way
22  you read it?
23    A.  Seems reasonable, yes.
24    Q.  Do you have any idea today what the
25  connection between those two accounts was?        13:54:37

43 (Pages 169 to 172)

Mark Kirstein

Page 173

1      MR. RYAN: Objection.
2      A.   Not sitting here. I would want to
3   refer to the AHERF work papers, work paper
4   71-12, to see what it says to potentially help
5   answer your question.                    13:54:50
6      Q.   Does this score sheet to you
7   reflect the moving of a dollar amount
8   previously in an accounts payable accrual to a
9   CRA account?
10      MR. RYAN: Objection.          13:55:02
11      A.   I don't think this entry reflects
12   anything other than someone wrote some words
13   and some numbers and letters on a page. I
14   would want to understand what they were
15   proposing and why they were proposing it.   13:55:18
16      Q.   So it means nothing to you?
17      MR. RYAN: Objection.
18      A.   Well, as I said, I don't know
19   exactly what they're proposing here. I mean,
20   it looks like -- I don't want to speculate. I   13:55:29
21   mean, somewhere in the work papers -- it looks
22   like there's a reference to a work paper as to
23   what this is. And before I would answer your
24   question, I would want to refer to that.
25      Q.   I understand your request. Mine is   13:55:39

Page 174

1   even simpler.
2      Looking at the two lines, you have
3   no idea what they mean put together like that
4   in those amounts from your experience as an
5   auditor and your experience with a score sheet?   13:55:51
6      MR. RYAN: Objection. I would note
7   the witness has said now twice that if you have
8   any more questions about this, he thinks the
9   place to go is work paper 71-12.
10      MR. JONES: I understand that he      13:56:01
11   wants to guide my examination. I choose to go
12   my own route.
13      Q.   My question is, looking at the
14   score sheet, you said you were familiar with
15   your work as an auditor at Coopers & Lybrand,   13:56:09
16   what do those two lines mean to you, if
17   anything? If they mean nothing, tell me that.
18      MR. RYAN: Objection.
19      A.   They look like account names that
20   AHERF had corporate service accruals and CRA   13:56:26
21   liabilities. Looks like somebody, whoever this
22   was, was potentially contemplating a
23   reclassification of one account that might have
24   been credited an accrual to another account
25   called a CRA liability. Beyond that, I would   13:56:41

Page 175

1   want to understand what they were doing and
2   what the detail was of the work papers.
3      Q.   Thank you.
4      Do you recall that there was a
5   corporate services accrual account at AHERF at   13:56:53
6   all? Do you know what it was for, what was in
7   it?
8      MR. RYAN: Objection.
9      A.   No, I don't.
10      Q.   Do you recall anyone ever referring   13:57:04
11   to the corporate services accrual account at
12   AHERF, the parent organization, as including
13   amounts that were cushions or potentially
14   unnecessary?
15      MR. RYAN: Objection.          13:57:15
16      THE WITNESS: Could you reread that
17   question, please, or rephrase, whichever you
18   prefer.
19      (Record read.)
20      A.   I don't sitting here today recall   13:57:38
21   discussions of the corporate service accrual
22   account.
23      Q.   You don't recall anyone ever
24   referring to amounts in a corporate services
25   accrual account for accounts payable that might   13:57:51

Page 176

1   include amounts that were unnecessary or
2   cushions?
3      MR. RYAN: Objection.
4      A.   I don't know what you mean by
5   unnecessary or cushions, first of all.   13:58:01
6      Q.   Picked amounts in there that might
7   refer to payables that may not ultimately need
8   to be paid.
9      A.   So your question is do I recall
10   hearing of corporate services accrual account   13:58:23
11   holding amounts that might be liabilities that
12   are not necessary?
13      Q.   Yes.
14      A.   I don't recall hearing that.
15      - - - - -
16      (Thereupon, Deposition Exhibit 4380
17      was marked for purposes of
18      identification.)
19      - - - - -
20      Q.   I've just handed you, Mr. Kirstein,   13:59:21
21   Exhibit 4380. Could you read the top of the
22   document and its title for us?
23      A.   AHERF PP&E, Score Sheet, June 30th,
24   1995.
25      Q.   Do you know whose initials are at   13:59:35

44 (Pages 173 to 176)

Mark Kirstein

Page 205

1    Q.   Right.
2    A.   I don't think right now -- it
3  doesn't appear I touched -- looked at this work
4  paper. I may have looked at this prior to
5  reviewing it, anyway.              14:51:24
6       This is provided by management,
7  this calculation, from treasury. You can see
8  the cite, the source down below. KKL, I
9  suspect, is Kelly Landy, who was an assistant
10 in the treasury department who worked for Sue   14:51:36
11 Gilbert or Sue Marie at the time.
12      They give C&L the calculation and
13 then you can see here it looks like Brian
14 and/or Frank Simpkins have cross-referenced the
15 numbers to various points, footnote 3, FS is    14:51:45
16 probably financial statement. You can ask
17 these guys where they got the specifics and
18 what they meant by their tick marks. But, in
19 general, that's what it appears they did.
20      Q.   Is it also in general the practice  14:51:58
21 to review the debt agreements to make sure that
22 what the client has provided you by way of the
23 calculation that is to be performed is
24 consistent with the terms of the debt
25 agreements?                        14:52:09

Page 206

1           MR. RYAN: Objection.
2    A.   I don't know if there is a standard
3  practice.
4    Q.   As you said before, you don't
5  recall whether you did that or not, is that    14:52:15
6  right?
7           MR. RYAN: Objection.
8    A.   I don't recall if I did that, and I
9  don't know if there is a standard practice. I
10 think that's really up to the auditor's        14:52:21
11 judgment as to what they needed to do to
12 understand the debt covenant requirements.
13      Q.   Do you recall that in 1995 the
14 Allegheny General Hospital Obligated Group
15 issued an additional 100 million dollars in    14:52:40
16 bonds?
17      A.   I do not recall that.
18      Q.   Do you recall that there was a
19 letter of credit provided by Morgan Guaranty of
20 New York on any portion of any new bond        14:52:50
21 issuance in 1995?
22      A.   I just don't recall that.
23      Q.   I'm going to ask you to flip to
24 CL 84938 in this same exhibit
25      A.   Okay.                     14:53:03

Page 207

1    Q.   Is that your handwriting, or is
2  that Mr. Simpkins' handwriting or someone
3  else's with the note just above item D on the
4  schedule?
5    A.   I think that's Frank Simpkins'.     14:53:22
6    Q.   Do you know what it says?
7    A.   Noted, then his initials.
8    Q.   And, again, it refers to
9  maintaining a consolidated unrestricted fund
10 balance of at least 200 million dollars, is    14:53:35
11 that right?
12           MR. RYAN: Objection.
13      A.   That's what it says, yes.
14      Q.   As of June 30, 1995?
15      A.   That's what the paper appears to   14:53:43
16 represent.
17      Q.   Here we have a calculation of
18 207,598,000 that appears to have a handwriting
19 edit next to it of 222,694,000 at the base of
20 the page next to item D; is that right?        14:54:03
21           MR. RYAN: Objection.
22      A    Yes.
23      Q.   Do you know why there was a change?
24           MR. RYAN: Objection.
25      Q.   Or why there was a handwritten note 14:54:15

Page 208

1  apparently making a change?
2           MR. RYAN: Objection.
3    A.   I do not.
4    Q.   Do you recall discussing a
5  potential change with respect to the way the   14:54:22
6  Morgan Guaranty Trust Company of New York
7  consolidated unrestricted fund balance would be
8  calculated?
9           MR. RYAN: Objection.
10      A.   Personally, no, I don't recall a   14:54:31
11 discussion related to the debt covenants or
12 that matter in 1995.
13      Q.   Do you recall ever reviewing the
14 underlying Morgan Guaranty debt instrument or
15 debt agreement yourself or any portion of it?  14:55:05
16      A.   I don't recall, no.
17      Q.   Do you recall any discussion of the
18 fact -- I'm sorry, do you recall any discussion
19 of any of the components of that unrestricted
20 fund balance calculation by anyone among your  14:55:29
21 C&L engagement team colleagues?
22      A.   No.
23      Q.   Do you recall any discussions with
24 anyone at AHERF about it or ever learning of
25 any discussions with anyone at AHERF about it,  14:55:39

52 (Pages 205 to 208)

Mark Kirstein

Page 209

1  the components of the calculation?
2      A.  No.
3      Q.  Were you involved in the audit of
4  accounts receivable in the '96 audit?  I'm
5  going to have you flash forward a year for us.  14:56:46
6      A.  Okay.
7      Q.  Flash is probably a word that was
8  not particularly apt.  But let's move on to
9  1996 nonetheless.
10         Were you involved in the audit of  14:56:57
11  the accounts receivable for fiscal year '96 at
12  AHERF?
13      A.  Yes.
14      Q.  I'm handing you then, and I would
15  have handed you probably, regardless, Exhibit  14:57:08
16  4019.
17         Would you take a moment and review
18  the one-page document, Mr. Kirstein?  Then I'll
19  have a few questions for you.
20      A.  Okay.              14:57:32
21         Okay.
22      Q.  Do you recognize the document?
23      A.  Looks to be an agenda from a
24  planning meeting for the 1996 audit.
25      Q.  What does TEQ stand for at the top  14:58:18

Page 210

1  of the page?
2      A.  It's a reference to total
3  engagement quality.
4      Q.  That's a Coopers & Lybrand term?
5      A.  In 1996 I believe it was.  I don't  14:58:29
6  know if it still is.  I know it's not today.
7      Q.  What were total engagement quality
8  meetings?  What was the purpose of such
9  meetings?
10      A.  My recollection is they were  14:58:43
11  planning meetings, planning meetings for the
12  audit to discuss the business and how we would
13  approach the audit and any other matters.
14      Q.  Is the handwriting on this document
15  yours?              14:58:56
16      A.  No, it is not.
17      Q.  Do you recognize it?
18      A.  It looks like Amy Frazier's.
19      Q.  Under -- or as the second item
20  under the category business, the document  14:59:04
21  reads, 1996 audit items, and then next to that,
22  the term in handwriting appears below max.
23      A.  It says 1996 significant items.
24      Q.  I'm sorry, I misread it.  1996
25  significant items.  And then in handwriting the  14:59:21

Page 211

1  words below max.
2         What did below max mean in Coopers
3  & Lybrand audit language for fiscal year 1996?
4      A.  We spoke briefly earlier about
5  controls assessment.  You could be at low, you  14:59:36
6  could be at maximum.  Low being a reliance on
7  controls.  Maximum being basically no reliance
8  on controls.
9         The easiest way to define below
10  maximum is somewhere in the middle, some  14:59:50
11  reliance on controls, some reliance on what we
12  call substantive testing.  So it's a planning
13  term for how you plan to approach a specific
14  audit area.
15      Q.  Does it measure or at least attempt  15:00:02
16  to capture an assessment of the risk for
17  misstatement in the internal financial
18  statements presented for audit?
19         MR. RYAN:  Objection.
20      A.  I wouldn't characterize it that  15:00:15
21  way.
22      Q.  How many gradations are there
23  between the minimum and the maximum?
24      A.  I only recall low, maximum, below
25  maximum.              15:00:27

Page 212

1      Q.  You recall three?
2      A.  Yes.
3      Q.  This would have been C&L's -- let
4  me withdraw that.
5         Can you read the handwriting just  15:00:43
6  beneath the words below max?
7      A.  CA not sufficient, comma, WL,
8  probably write-off, policy question mark,
9  system problems, comma, management overrides
10  occurring.              15:00:57
11      Q.  What does CA mean to you?
12      A.  It's Amy's note.  So I don't know.
13  I wouldn't want to speculate.
14      Q.  It doesn't communicate anything to
15  you?  CA is not short for anything in  15:01:11
16  particular in your experience at Coopers &
17  Lybrand?
18      A.  Do you want me to speculate?
19      Q.  No, I want you to tell me from your
20  experience at Coopers & Lybrand whether the  15:01:18
21  abbreviation CA is typically used and, if so,
22  for what?
23      A.  I don't know.
24      Q.  Do you remember the meeting to
25  which this document apparently refers?  15:01:27

53 (Pages 209 to 212)

Mark Kirstein

Page 213

1    A. No, I do not.
2    Q. Do you remember yourself being
3  informed by Miss Frazier or anybody else or
4  learning that their A/R did not have a
5  sufficient write-off policy at AHERF?    15:01:41
6    MR. RYAN: Objection.
7    A. Are you reading that from here?
8    Q. I'm reading not sufficient
9  write-off policy as you just did.
10    A. No, I put a comma there because
11  there is one. It says CA not sufficient,
12  comma, write-off policy.
13    Q. Then it looks to be two question
14  marks after that?
15    A. Right.    15:01:59
16    Q. Do you recall any question about
17  the write-off policy at AHERF with respect to
18  accounts receivable in the 1996 audit year?
19    A. I do not, no.
20    Q. Do you recall any discussion or    15:02:09
21  knowledge of system problems at AHERF with
22  respect to accounts receivable in the 1996
23  audit?
24    MR. RYAN: Are we at this meeting
25  or any time in the audit?    15:02:19

Page 214

1    MR. JONES: Any time.
2    A. Yes, in 1996, what I recall about
3  receivables is that management had converted
4  systems -- Delaware Valley hospitals had
5  converted systems, the technology that they    15:02:32
6  used actually to bill patients.
7    Q. Was that a move from the PATCOM
8  system to the Envision system?
9    A. I believe that's right.
10    I also believe concurrently going    15:02:44
11  along with that was a movement in the finance
12  of the patient accounting function back to a
13  consolidated shared services unit back in
14  Pittsburgh. So all the billing and
15  transactions would be done out of Pittsburgh    15:02:58
16  for the Philadelphia hospitals.
17    As a result of the movement, plus
18  the system changes, that there were some
19  potential system issues, IT issues that had
20  arisen.    15:03:18
21    Q. Do you recall anything about the
22  meeting referred to in Exhibit 4019 in
23  specific?
24    A. No, I do not.
25    Q. I take it that the comments you    15:03:26

Page 215

1  just gave us, as Mr. Ryan I think indicated as
2  an edit to my question, were comments or
3  thoughts that come to you about the audit
4  generally, not about any particular meeting?
5    A. Correct, that's what you asked me,    15:03:39
6  if I ever learned of system problems in 1996.
7    Q. Exactly. I wanted to make sure we
8  were clear.
9    A. Okay.
10    Q. What did you learn, if anything,    15:03:47
11  during your audit work in connection with
12  fiscal year 1996 management overrides
13  occurring in the A/R area at AHERF?
14    A. I don't know what that means.
15    I don't recall hearing of    15:03:59
16  management overrides, but I don't know what
17  that means. You should ask Amy that.
18    Q. Without fail we will do that.
19    A. I suspected as much.
20    Q. Did you ever become concerned that    15:04:18
21  a management override or management overrides
22  were occurring at AHERF at any time during your
23  audit work there in any -- in connection with
24  any fiscal year?
25    A. What do you mean by management    15:04:40

Page 216

1  override?
2    Q. How was the term used at Coopers &
3  Lybrand in connection with your work at AHERF?
4    A. I don't know that it was a term
5  that's generally accepted, that's why I'm    15:04:50
6  asking what you meant
7    Q. All right. You never heard anybody
8  at Coopers & Lybrand use the term management
9  override?
10    A. Not that I recall.    15:04:56
11    Q. Do you recall the concept of
12  someone in financial management or executive
13  management instructing that normal controls
14  were to be overridden or not followed with
15  respect to financial reporting?    15:05:09
16    A. I can tell you I didn't -- I never
17  heard that on the AHERF audit.
18    Q. You never suspected that on the
19  AHERF audit?
20    A. I did not    15:05:18
21    Q. You never heard discussions about
22  it?
23    A. No, I did not
24    Q. Do you recall any discussions about
25  why Coopers & Lybrand had moved or was    15:05:34

54 (Pages 213 to 216)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
          Plaintiff,
     vs.                              Civil Action
PRICEWATERHOUSECOOPERS,               No. 00-684
LLP,
          Defendant.


          Continued Videotaped Deposition of

MARK D. KIRSTEIN, called for examination under

the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Jones Day, 222 East 41st Street,

Suite 400, New York, New York, on Wednesday,

the 12th day of May, 2004, at 9:00 a.m.

          - - - - -

          VOLUME II

          - - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Mark Kirstein                                                              Volume 2

Page 369

1    Q.  So it looks as if in July of 1996,
2  which would be the year after the close of the
3  fiscal year 1996, at Allegheny General
4  hospitals, they collected 29 million dollars of
5  their total A/R, which was 84.4 million        11:29:46
6  dollars, and that collection represented, in
7  July, 34.5 percent of the total?
8    A.  That's what this schedule says,
9  yes.
10    Q.  Then if we look at the same        11:29:58
11  percentages at AGH's sister hospitals, we see
12  that Center City has a percentage of 20.4
13  percent.  Is that right?
14    A.  Yes.
15    Q.  Skipping to the next page, 863, we   11:30:13
16  see that East Falls, or EPPI -- East Falls
17  slash EPPI has 13.9 percent?
18    A.  Yes.
19    Q.  That Bucks has 14.9 percent?
20    A.  Yes.                              11:30:26
21    Q.  And that Elkins has 14.5 percent?
22    A.  Correct.
23    Q.  St. Chris comes in at 13.1 percent.
24    A.  Correct.
25    Q.  Do you recall yourself coming to   11:30:41

Page 370

1  any conclusions in connection with your audit
2  work from subsequent receipts testing in 1996?
3    A.  I think subsequent receipts testing
4  was one of the tests that we considered along
5  with other accounts receivable tests that we've  11:31:04
6  discussed at earlier times, analytics, high
7  dollar account testing, reserve analysis.  So,
8  yes, subsequent receipt testing is one of the
9  items considered as we arrived at our
10  conclusion.                            11:31:20
11    Q.  My question was do you recall any
12  particular conclusions you arrived at, as you
13  sit here today, from the subsequent receipts
14  testing alone, whether or not this subsequent
15  receipts testing, that is contained in Exhibit  11:31:29
16  4024?
17    A.  No, but that's not how I -- that's
18  not how I view how we conducted the audit at
19  the time.  I mean, we conducted the audit
20  taking in all the information that we had to    11:31:44
21  make judgments about the accounts receivable
22  balance.  We looked at subsequent receipts
23  based on our expectations, what we knew about
24  the client, what we knew about their current
25  systems                                11:31:58

Page 371

1    Q.  Do you recall any specific
2  conversations you had with anyone on the
3  engagement team about the difference in the
4  subsequent receipts percentages for the month
5  of July among AHERF's hospitals?          11:32:07
6    A.  Do I recall discussions?
7    Q.  Yes.
8    A.  No, I do not.
9    Q.  Do you recall yourself being
10  concerned about the fact that AGH's cash     11:32:19
11  summary was a number of percentage points
12  higher than any of its sisters -- than that of
13  any of its sisters?
14    A.  No.  But I think that given that
15  one piece of data, that is potentially       11:32:37
16  consistent with what we knew about the systems
17  in 1996 and that they had converted systems,
18  they had moved people, had various agings,
19  accounts aging at Delaware Valley.
20    Q.  Do you recall coming to any        11:32:47
21  conclusions in connection with your AHERF 1996
22  audit work that the Delaware Valley Obligated
23  Group subsequent receipts testing came out
24  badly or suggested an adjustment should be made
25  to the reserve --                        11:33:00

Page 372

1       MR. RYAN:  Objection.
2    Q.  -- at those hospitals?
3    A.  I don't recall that.
4    Q.  You don't recall being concerned
5  about the subsequent receipts testing at the   11:33:09
6  Delaware Valley Obligated Group hospitals?
7    A.  No.
8    Q.  You recall no particular
9  conclusions that you drew from subsequent
10  receipts testing at any hospitals alone?    11:33:21
11       MR. RYAN:  Objection.
12    A.  Just based solely on that?
13    Q.  Yes.
14    A.  No.
15    Q.  Do you draw any conclusions from   11:33:37
16  this work paper today about the situation with
17  respect to subsequent receipts testing at the
18  Delaware Valley Obligated Group hospitals?
19    A.  I think I just said two questions
20  ago, I mean, I would have to put myself back at  11:33:45
21  the time when I had a whole lot more
22  information much fresher in my mind, but
23  sitting here today it does not seem
24  inconsistent that the percentages might be
25  lower in the Delaware Valley hospitals knowing  11:33:57

24 (Pages 369 to 372)

Page 373

1   what we knew related to their controls and
2   their system consolidation and other items
3   we've discussed earlier.
4       Q.   The fact that the percentages were
5   lower, does that lead you today to think that     11:34:06
6   an adjustment to the reserve at those hospitals
7   should be something to be considered?
8       MR. RYAN: Objection.
9       A.   No, not necessarily.  That would
10  just be one piece of data we would consider in    11:34:18
11  assessing the reasonableness of the accounts
12  receivable.
13      Q.   Mr. Kirstein, I've just handed you
14  Exhibit 4025, another work paper from Coopers &
15  Lybrand's 1996 audit system that appears to       11:34:59
16  have been marked as reviewed by you and last
17  modified by you for fiscal year 1996.  This one
18  headed with the phrase Asset -- or the word
19  Assets and the Patient Accounts Receivable,
20  Center City, Review High Dollar Accounts at       11:35:23
21  6-30-96.  Is that right?
22      A.   Yes.
23      Do you know there's like three more
24  work papers on this exhibit?
25      Q.   I was going to get to that.

Page 374

1       A.   Okay.
2       Q.   There are additional work papers
3   attached to this face page, is that right?
4       A.   Yes.
5       Would you like me to read through        11:35:42
6   these?
7       Q.   Yes.
8       I will note for you, Mr. Kirstein,
9   that they are consecutively numbered, so they
10  were probably produced from the file as we see    11:35:58
11  them here today in this order, in any event.
12      A.   Okay.
13      Okay.
14      Q.   Do you recall any review by Coopers
15  & Lybrand of account balances exceeding 200,000   11:36:46
16  on a test basis?
17      A.   I don't recall.  I mean, I didn't
18  recall this specific number of $200,000, but I
19  do recall high dollar testing was one of the
20  procedures that we included in our audit plan.    11:37:01
21      Q.   Why is it so included or was it so
22  included?
23      A.   There could be other objectives,
24  but one of the items we just wanted to focus on
25  related to receivables was the sample selection   11:37:22

Page 375

1   of larger dollar accounts to see if
2   management -- I would call it basically a
3   controls test  Let's put it -- let's step
4   back.  Let's call it a control test.  Select
5   high dollar accounts as part of our controls     11:37:36
6   testing to really assess if management has
7   controls in place to note those accounts in
8   their patient account system at the estimated
9   net realizable value for those accounts
10      Q.   I'm going to ask you to flip to       11:37:53
11  page 1124 with me.  In the step description it
12  reads, "Review client summary of accounts
13  greater than 90 days old with balances
14  exceeding $100,000.  Investigate Medicare slash
15  Medicaid balances greater than 120 days through   11:38:11
16  client inquiry to determine collectibility.
17      "Consider reclassifying old
18  Medicare slash Medicaid balances to self pay
19  and including in the bad debt reasonableness
20  test.  Consider collectible balances in           11:38:27
21  determining" -- I'm sorry, "consider
22  uncollectible balances in determining
23  reasonableness of overall accounts receivable
24  allowances."
25      Did I read that right?               11:38:37

Page 376

1       A.   Yes.
2       Q.   This was in the work paper marked
3   as reviewed by you and last modified by you?
4       A.   Yes.
5       Q.   The audit objective here is         11:38:44
6   valuation.  What does that mean to you?
7       A.   Is the account that you're auditing
8   here in this case, accounts receivable, valued
9   at net realizable value.
10      Q.   Do you recall the results of any     11:39:01
11  inquiry of the investigation of Medicare or
12  Medicaid balances over 120 days old?
13      A.   No, I do not.
14      Q.   Do you recall any discussions on
15  that topic, that topic of that inquiry?          11:39:16
16      A.   No, I don't.
17      Q.   Does the audit step suggestion of
18  reclassifying those amounts or considering
19  reclassifying those amounts to self pay suggest
20  a doubt about their collectibility?              11:39:33
21      MR. RYAN: Objection.
22      Q.   To you?
23      A.   No.  I think it's an audit -- as I
24  read this audit step today, it's just -- it's a
25  step that's basically saying if there are old    11:39:46

Page 377

1  accounts, consider whether they are
2  collectible.
3       If management believes they're not
4  collectible, management should consider
5  reclassifying them to self pay and then          11:39:55
6  appropriately consider that in making their
7  estimate for their bad debt reserve.
8       Q.  Do you recall seeing these audit
9  work papers before today?
10      A.  No, I do not.                    11:40:11
11      Q.  On the face page of Exhibit 4025,
12  there's a reference to item C, "Determine that
13  the appropriate" contractual allowance --
14  "contractual allowances have been taken against
15  these high dollar balance accounts."       11:40:31
16      Do you see that?
17      A.  Yes.
18      Q.  Do you recall there was a concern
19  that certain high dollar accounts may not have
20  been appropriately contractualized at AHERF     11:40:40
21  hospitals?
22      MR. RYAN:  Objection.
23      Q.  A concern on the part of you and
24  C&L auditors?
25      A.  Right, I don't recall that concern    11:40:51

Page 378

1       Q.  Mr. Kirstein, I've just handed you
2  Exhibit 4027, which is a group of work papers
3  with a face page that reads in handwriting,
4  "HUH, high dollar," I think, "A accounts and
5  credit balance testing."               11:41:42
6       Do you see that?
7       A.  Yes.
8       Q.  "As of 6-30-96."  Is that right?
9       A.  Yes, it is.
10      Q.  Do you know whose handwriting is on    11:41:49
11  the face of this page?
12      A.  I think this is Brian Christian.
13      Q.  Do you recall seeing this document
14  before today?  Please, take a few minutes.  I'm
15  not going to ask you many questions about it.    11:42:06
16  I know it's fairly dense.  But if you recall
17  seeing it before today and can tell me, that
18  would be great.
19      I will tell you that there are very
20  few lines of text on many of the pages.       11:42:17
21      A.  I recall seeing -- I can't say it's
22  identical, but in preparation for today's
23  deposition, I saw at least this cover page and
24  some of the items behind it, but I can't tell
25  you it was the same copies you made here.    11:42:33

Page 379

1       Q.  In fact, that would take a longer
2  comparison than we have time for.  Is that fair
3  to say?
4       A.  Yes, that's fair to say.
5       Q.  I'm going to ask you to turn to the    11:42:45
6  second page of the document with the Bates
7  label that ends 906.  About two or three lines
8  of text down in the computer printing it reads,
9  HUH fiscal year '96 report dash balances, and
10  then the greater than symbol.             11:43:02
11      A.  Okay.
12      Q.  200,000 contractual allowances.
13      Do you see that?
14      A.  Yes.
15      Q.  I'm going to ask you now to flip    11:43:15
16  to -- well, does that line and then your
17  familiarity with the document either based on
18  today's quick peek or your work with your
19  lawyers in preparation for the deposition, does
20  that allow you to tell me what kind of a       11:43:30
21  document this is?
22      MR. RYAN:  Objection to form and
23  foundation.
24      A.  I mean, this appears to be a
25  computer-generated report off of AHERF's       11:43:51

Page 380

1  systems.  This looks to me to be sort of the
2  code that they used to pick the report.
3       Q.  It shows high dollar accounts?
4       A.  Yes.  I don't recall this, but my
5  expectation or my best guess for you today    11:44:05
6  would be, you know, C&L wanted to perform one
7  of our controls test high dollar testing.  We
8  can only pick things that we know about, so we
9  went to management and said can you run us a
10  report out of your patient accounting system    11:44:18
11  out of, as it says, in step A, account balances
12  exceeding $200,000 in discharge -- in-house
13  D&FB and final billed.  That's what you see
14  here.  Balances greater than 200,000,
15  contractual allowances and aging inpatient    11:44:29
16  discharge not final billed.  So some -- I don't
17  know how we got this and who ran it, but it
18  looks like a system generated report.
19      Q.  In fact, the footer, if you will,
20  on many of the pages that I see has the phrase,    11:44:40
21  "Please deliver to Bill Gedman, third floor
22  Clark Building."  Did you know Bill Gedman?
23      A.  I don't know.  I don't recall.
24      Q.  Do you see the footer?
25      A.  Yes.                       11:44:52

26 (Pages 377 to 380)

Mark Kirstein

Volume 2

Page 381

1    Q.  The Clark Building was a building
2  in Pittsburgh that AHERF operated some of its
3  administrative departments out of.  Am I right?
4    A.  Correct.
5    Q.  I'm going to ask you to flip with    11:45:07
6  me now to page 928, ending 928.  That one
7  has --
8    A.  Do you know it skips from 916 to
9  928?  I'm not sure of the relevance, I'm just
10  telling you.                         11:45:24
11    Q.  I believe -- I see that, and I'm
12  not sure of it either.  But I only have
13  questions about the next couple of pages.
14    A.  Okay.
15    Q.  It reads HUH928 at the top --    11:45:33
16  toward the top of the page it reads, "HUH
17  fiscal year '96 report balances greater than
18  100,000, 90 days from final bill date,
19  inpatient accounts receivable."  Is that right?
20    A.  Correct.                        11:45:47
21    Q.  A slightly different parameter, but
22  another search that apparently somebody at
23  AHERF has done and then provided to the
24  auditors because it ends up in your folks' work
25  papers.                             11:45:58

Page 382

1    A.  Yes, my suspicion would be that's
2  in response to CL-1124.
3    Q.  I'm going to ask you to turn to the
4  next page, 929, where we list a series of
5  accounts even by patient name.  Is that fair to    11:46:14
6  say?
7    A.  Yes.
8    Q.  That fit the scope of the search
9  inquiry in that they have dollar balances at
10  the appropriate days out that met the    11:46:26
11  parameters of the search?
12    A.  You're asking me if they do meet
13  the parameters?  I don't know.
14    Q.  They appear to.
15       Let me give you a few examples.    11:46:36
16  Look at Miss Towns, Catherine Towns' account.
17    A.  M-hm.
18    Q.  The account balance is over
19  $100,000.  Am I right?
20    A.  Yes.                           11:46:45
21    Q.  Under final bill date is 10-18-93.
22  Is that right?
23    A.  Correct.
24    Q.  Miss Weber, four down, Ann Weber,
25  her final bill date is 12-1-94, her account    11:46:56

Page 383

1  balance is over $113,000.
2    A.  Yes.
3    Q.  Right?
4       If we look at others, you'll see I
5  think a similar pattern.             11:47:07
6    A.  M-hm.
7    Q.  My question is, do you recall
8  having Mr. Christian or someone else do an
9  analysis to determine the collectibility of any
10  of these accounts or any accounts of a similar    11:47:17
11  description as a part of your audit work for
12  fiscal year 1996?
13       MR. RYAN:  Objection.
14    A.  What I recall is that we -- Brian
15  Christian, performed as part of the audit the    11:47:39
16  tests that we've talked about, the high dollar
17  tests and the test of old account balances as
18  part of our controls testing and part of our
19  overall testing of accounts receivable.
20       I don't believe that he was, at    11:47:53
21  least I don't think he was necessarily looking
22  at every one of these accounts for a specific
23  account by account collectibility concern
24  because we're not auditing for necessarily
25  Catherine Towns' collectibility.  We're    11:48:07

Page 384

1  auditing for the account receivable balance for
2  DVOG as a whole.
3    Q.  What is involved in the high dollar
4  testing beyond asking the client to provide you
5  with the high dollar accounts, if anything, for    11:48:17
6  the fiscal year '96 audit at AHERF; what was
7  involved?
8    A.  I don't recall specifically.  I
9  mean, I would have expected Brian as the person
10  doing the work to apply, you know, his judgment    11:48:29
11  in the field.  And I think he cites that he
12  worked with Bill Gedman to accomplish the
13  objectives in the control test for high dollar
14  accounts.
15    Q.  My question is, in your experience    11:48:40
16  as a C&L auditor, both with AHERF and
17  otherwise, in 1996, what additional work was
18  available to an auditor to do once he got the
19  print-out from Mr. Gedman, or those like
20  Mr. Gedman, of high dollar accounts?    11:48:56
21       MR. RYAN:  Objection to form.
22    Q.  What further work could be done --
23  could have been done?
24       MR. RYAN:  Objection
25    A.  First, we haven't even talked what    11:49:09

27 (Pages 381 to 384)

TAB 198

# In The Matter Of:

*AHERF   v.*

*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*ROBIN R. SCHAFFER*

*June 4, 2002*

---

*MANHATTAN REPORTING CORP.*

*420 LEXINGTON AVENUE*

*NEW YORK, NY  10170*

*(212) 557-7400    FAX: (212) 692-9171*

Original File 060402RS.TXT, 293 Pages
Min-U-Script® File ID 0059175488

# Word Index included with this Min-U-Script®

Page 85

[1] were under Al Adamczak's group, and I believe
[2] Sam Yenez and Jack Nelson and that group
[3] handled that.
[4]    Q: Those are the same people that handled the
[5] accounting for patient revenue for the
[6] western operations; right?
[7]    A: Yes.
[8]    Q: Who was responsible for the accounting for
[9] revenue from the physician practices?
[10]    A: Me for part of it, and Al Adamczak's group
[11] had the western part of it. So I had the
[12] eastern profee or the professional fee
[13] revenue, and Al Adamczak's group would have
[14] had the western.
[15]    Q: And you also did the accounting for profee
[16] revenue from the University?
[17]    A: Yes.
[18]    Q: Which was part of the eastern region?
[19]    A: Yes.
[20]    Q: Do you see on the first page of your resume
[21] on Exhibit 99 the second bullet point says,
[22] Assisting the Senior Director in reporting
[23] and explaining monthly results to the Chief
[24] Executive Officers and Chief Operating
[25] Officers of the different individual

Page 86

[1] organizations?
[2]    A: Yes.
[3]    Q: Who was the senior director?
[4]    A: That was Dan Cancelmi.
[5]    Q: And who were the chief executive officers and
[6] chief operating officers of the individual
[7] organizations?
[8]    A: They varied for each of the hospitals. The
[9] hospitals all had their own chief executive
[10] officers and chief operating officers. I
[11] don't recall specific names of all of the
[12] people that we dealt with.
[13]    We had monthly meetings with those
[14] titled people, and we met with them and
[15] explained the results. I don't remember the
[16] names of everybody.
[17]    Q: When you say we had monthly meetings, who
[18] would actually go and meet with them?
[19]    A: Normally it would be Dan Cancelmi, myself,
[20] Jack Ellsworth and Chuck Lisman. That was
[21] the normal group.
[22]    Q: Did you go out to Philadelphia to do this?
[23]    A: Yes.
[24]    Q: Would Mr. Morrison or members of his staff
[25] also take part in these meetings?

Page 87

[1]    A: No.
[2]    Q: Were there separate monthly meetings for each
[3] of the DVOG hospitals?
[4]    A: Yes.
[5]    Q: So you went out to Philadelphia for a day or
[6] two and met with these various hospital
[7] executives?
[8]    A: Yes. Usually a couple of days it took us to
[9] go to each hospital and meet with them.
[10]    Q: Did you meet with Dr. Kaye?
[11]    A: No.
[12]    Q: He was one level above them?
[13]    A: Yes.
[14]    Q: Did you discuss issues like the bad debt
[15] allowance with the hospital executives?
[16]    A: The allowance not necessarily. Bad debt
[17] expense, yes. Most of the operations people
[18] wanted to understand the bad debt expense and
[19] the levels that we had been experiencing.
[20]    Q: Were they concerned about increasing bad debt
[21] expense?
[22]    A: Yes.
[23]    Q: Did you have an understanding as to why they
[24] were concerned about that?
[25]    A: My understanding was because it was

Page 88

[1] negatively impacting their operations, their
[2] results, that they had concerns as to what
[3] was going on and why it was happening.
[4]    Q: All right. Do you see the next to last
[5] bullet point under the heading of Primary
[6] Responsibilities says, Managing and preparing
[7] timely and accurate financial reports,
[8] including revenue by payor type, bad debt
[9] expense analyses, rate and volume analyses?
[10]    A: Yes.
[11]    Q: And do you believe that while you were at
[12] AHERF you, in fact, prepared accurate reports
[13] of revenue by payor type?
[14]    A: Yes
[15]    Q: And did you prepare accurate reports of bad
[16] debt expense analyses?
[17]    A: Yes.
[18]    Q: And did you prepare accurate reports of rate
[19] and volume analyses?
[20]    A: Yes.
[21]    Q: You see the next bullet point says Managing
[22] and coordinating the annual external audit of
[23] the account records and financial reports of
[24] the aforementioned organizations?
[25]    A: Yes.

Page 89

[1] Q: Which organizations are those?
[2] A: That would be for the eastern region
[3] hospitals and the university, the portions of
[4] the audit that I would be responsible for,
[5] meaning patient revenue and receivables.
[6] Q: What did you do in terms of coordinating the
[7] annual external audit?
[8] A: What I would do is we would get from
[9] Coopers — they would provide us with an
[10] audit request list, which was basically a
[11] list of this is what I want from you when I
[12] come in for the prelim audit and for the
[13] year-end audit.
[14] I would get a copy of that from Chuck
[15] Lisman or Dan Cancelmi and go through that
[16] with my staff to make sure that everything
[17] that Coopers needed was prepared and ready
[18] for them when they came in to do their audit.
[19] Q: Then when they actually came in, did you meet
[20] with people from Coopers then?
[21] A: Yes. And normally I met with whoever was in
[22] charge of the patients and accounts
[23] receivable portion of the audit, which was
[24] normally like a first or second-year auditor.
[25] Q: It would usually be a person each time?

Page 90

[1] A: Yes.
[2] Q: Now, see under Other Accomplishments the
[3] first bullet point says, Manage the
[4] consolidation and relocation of the
[5] aforementioned revenue reporting functions
[6] from Philadelphia to Pittsburgh?
[7] A: Yes.
[8] Q: Is that what you were talking about earlier,
[9] the consolidation that occurred in 1995?
[10] A: Yes.
[11] Q: Then you see the next bullet point, Directed
[12] the integration and consolidation of all
[13] financial accounting functions associated
[14] with the acquisition of the Graduate System
[15] hospitals?
[16] A: Yes.
[17] Q: What work did you do in that regard?
[18] A: Similar to what we did in 1995. For
[19] Graduate, Mt. Sinai and Rancocas I was
[20] responsible for going to Philadelphia,
[21] meeting at the individual hospitals with the
[22] accounting staff and going through what they
[23] did as far as recording entries and closing
[24] the books and had to learn it so that I could
[25] bring the responsibility back to Pittsburgh

Page 91

[1] and perform it there.
[2] Q: When was that accounting function brought
[3] back to Pittsburgh?
[4] A: I don't remember specifically. I don't
[5] remember exactly when that all happened.
[6] Q: Was the patient accounting for the
[7] Graduate hospitals also brought back to
[8] Pittsburgh?
[9] A: Patient accounting, no.
[10] Q: That stayed out in Philadelphia?
[11] A: Yes.
[12] Q: Is that under Ron Longabucco?
[13] A: Yes.
[14] Q: Did you deal directly with him?
[15] A: Yes.
[16] Q: Did you also deal directly with the staff
[17] that reported to Ron Longabucco?
[18] A: Yes.
[19] Q: Who was that?
[20] A: Mike. Of course I don't know the last name
[21] but Mike something. That was the main person
[22] that I worked without there that reported
[23] directly to Ron.
[24] Q: Now, I think you mentioned earlier that you
[25] did have interactions with Mr. Morrison's

Page 92

[1] staff?
[2] A: Yes.
[3] Q: That's primarily I think you indicated Kathy
[4] Stephans and Randy Jacobson?
[5] A: Correct.
[6] Q: What types of matters would you interact on
[7] with them?
[8] A: They would call and ask questions about
[9] financial statements, specific questions,
[10] what was going on, why was this the way it
[11] was.
[12] I also dealt a lot with Kathy and
[13] Randy on the receivable issues because once
[14] Chuck Morrison began being concerned about
[15] the negative results between bad debt and
[16] these missed contractuals, he asked Kathy and
[17] Randy to start looking at some of the
[18] detailed patient accounts just like I was in
[19] Pittsburgh to try to understand what was
[20] going on, what is happening.
[21] Q: Were there any accounting functions for which
[22] Mr. Morrison's staff had responsibility? I
[23] mean, accounting issues that they did and
[24] that you just then took their results?
[25] A: We did most — as far as like actually

Page 93

[1] recording journal entries and preparing
[2] financial statements, we in Pittsburgh were
[3] responsible for that.
[4]    I know that Kathy and Randy did their
[5] own analyses in their group based on the
[6] results, but they really didn't have any
[7] direct involvement in the monthly closing
[8] process.
[9]    Q: Do you see the next bullet point, the last
[10] one on the first page of your resume says,
[11] Managed the successful conversion of six
[12] hospital billing systems to SMS Invision?
[13]    A: Yes.
[14]    Q: I think we talked a little bit about that
[15] previously today. I'm wondering what the six
[16] hospital billing systems were that are
[17] mentioned there.
[18]    A: That would be MCP, EPPI, Elkins, Bucks, St.
[19] Chris and Hahnemann.
[20]    Q: I guess I get five.
[21]    A: EPPI is separate.
[22]    Q: I see. Okay. Got it. So those would be the
[23] DVOG hospitals?
[24]    A: Yes.
[25]    Q: Did you consider the conversion of those

Page 94

[1] hospital billing systems to SMS to be
[2] successful?
[3]    A: From an accounting perspective, yes. I
[4] wasn't impressed with the how the receivables
[5] ended up after they were on Invision. I
[6] mean, the collection wasn't what everybody
[7] had anticipated. The improvements from an
[8] operations — like a billing perspective
[9] weren't what everybody anticipated.
[10]    Q: Did you have any understanding as to why
[11] those improvements didn't come about?
[12]    A: Specifically no.
[13]    Q: Could you take us through what your job
[14] experience has been since you left AHERF?
[15]    A: Okay. After I left AHERF I started working
[16] for Tenet. That would have been November of
[17] 1998. I was hired by Tenet to be the
[18] controller for Hahnemann University Hospital
[19] out in Philadelphia.
[20]    I spent about, I guess, nine months
[21] out in Philadelphia. I think I left there in
[22] July. I guess it would have been July of
[23] '99. I left Tenet and came back to
[24] Pittsburgh to work again for the University
[25] of Pittsburgh Medical Center.

Page 95

[1]    I was hired there as the controller
[2] for the University Services Organization.
[3] Then in September of 1999 I decided to try to
[4] start my own accounting business, and
[5] currently since September of 1999 I've been
[6] trying to, one, start my own business and,
[7] two, I've been doing consulting work for the
[8] West Penn Allegheny Health System.
[9]    Q: Is the West Penn Allegheny Health System
[10] currently your primary client?
[11]    A: Yes.
[12]    Q: Do you work with any people in the West Penn
[13] Allegheny System who used to be colleagues of
[14] yours at AHERF?
[15]    A: Yes.
[16]    Q: Who are they?
[17]    A: Well, there were a lot there when I initially
[18] came that have since left. I don't know if
[19] you want me to name some of those.
[20]    Q: Please.
[21]    A: Sam Yenez was there when I first started. He
[22] left. Frank Insana was there. He left.
[23] Laura Ann Bliel — B-L-I-E-L, I think, is how
[24] you spell her name — she has since left.
[25] Dave Laffey — L-A-F-F-E-Y — he just

Page 96

[1] recently left. Sue Barch, she's still there.
[2]    Tracy Arovits came back and worked
[3] for me there. She's also still there. Brian
[4] Randall. I actually consult for him right
[5] now, but he's leaving. He just resigned
[6] yesterday, I believe.
[7]    I'm trying to think if there is
[8] anybody else there from the old AHERF days.
[9] Sue Kirsch was there when I first came back,
[10] and she has since left. Al Adamczak was
[11] there briefly when I first came back, but he
[12] has since left as well. That's probably —
[13] that's about it.
[14]    Q: Who was it — who initially at West Penn
[15] Allegheny hired you to do this consulting
[16] work?
[17]    A: It would have been — when I was working for
[18] the USO I worked for a gentleman named Ron
[19] Watezman. He was the chief financial officer
[20] at the USO at UPMC when I was there.
[21]    Q: USO is the United —
[22]    A: That's the University Services Organization.
[23] That's a physician group under the University
[24] of Pittsburgh Medical Center. He actually
[25] left UPMC and went to work for Dawn Javersack

ROBIN R. SCHAFFER
June 4, 2002

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

Page 153

[1]   A: Knowing Steve I can interpret he wasn't
[2] saying that he wasn't going to share it. He
[3] was saying until he received it and looked at
[4] it and we understood what its impact was,
[5] that it would not be shared with Coopers. I
[6] think that's why the immediately is in there.
[7]   Q: Do you see the last sentence of that first
[8] paragraph says, We may want to go so far as
[9] to specifically isolate these exposures
[10] within our accounting records so as to avoid
[11] the prior year confusion that has haunted us
[12] throughout 1996?
[13]   A: Yes.
[14]   Q: Do you know what Mr. Spargo meant when he
[15] referred to the prior year confusion that has
[16] haunted us throughout 1996?
[17]   A: Again, this is me just interpreting this
[18] today. I think all he's saying there is
[19] let's get our skeletons out of the closet,
[20] let's lay it out on the table what's here so
[21] that we are not stumbling on this stuff
[22] throughout '97 like we did in '96, whereas
[23] accounting was just trying to figure this
[24] stuff out and find it after it occurred.
[25] That's what I think he's saying.

Page 154

[1]   Q: And by skeletons in the closet, you're
[2] talking about undisclosed A/R issues that
[3] were in the accounting system at AHERF at
[4] June 30, '96?
[5]   A: Yes. When I say skeletons and undisclosed. I
[6] don't mean undisclosed to Coopers. I'm
[7] talking about where patient accounting hasn't
[8] disclosed them to accounting the issues that
[9] are out there, yes.
[10]   Q: If patient accounting hasn't told the general
[11] accounting department about those issues,
[12] then you couldn't tell Coopers about them;
[13] right?
[14]   A: That's correct.
[15]   Q: So those issues may have been hidden from
[16] Coopers' view; right?
[17]   MR. COGAN: Objection.
[18]   A: May have been, but I doubt it. A lot of this
[19] stuff that Greg Snow's group wasn't telling
[20] us we were finding out on our own, which is
[21] what caused the arguments between the two
[22] groups.
[23]   For example, the accounts at gross,
[24] we went to Amy during the '96 audit and
[25] presented all of that stuff to her directly

Page 155

[1] even though Greg Snow had not presented it to
[2] us. So I wouldn't say there were many issues
[3] that weren't disclosed to Coopers just
[4] because patient accounting didn't tell us
[5] about it.
[6]   Q: I think you indicated earlier this morning
[7] that the first time that you heard that there
[8] was a need to write off $80 million or so of
[9] patient accounts was in September of '96;
[10] right?
[11]   A: Yes. That would have been when I first heard
[12] the amount, that there was approximately $81
[13] million that needed to be written off, yes.
[14]   Q: Do you know whether people in the Patient
[15] Financial Services Group knew that before
[16] September '96?
[17]   A: I would imagine that they did, but I don't
[18] know that for sure.
[19]   Q: It's their whole job to track those numbers;
[20] right?
[21]   A: That is correct.
[22]   Q: So they certainly should have known about it?
[23]   A: I would think at a high level at a minimum
[24] they should have known they had some exposure
[25] as far as uncollected receivables, yes.

Page 156

[1]   Q: And they had all these data in a computer
[2] system so they could generate various types
[3] of printouts; correct?
[4]   A: Correct. They could have printed out various
[5] analyses to try to determine what was in the
[6] older aging categories and why it was
[7] uncollectible, yes
[8]   Q: And that could have enabled the patient
[9] accounting group to quantify what the amount
[10] of uncollectible patient accounts was; right?
[11]   A: Yes.
[12]   Q: Do you know whether the patient accounting
[13] group did that or not?
[14]   A: I know they eventually did it in 1997 when
[15] they started writing off the 81 million. I
[16] don't know if an analysis was done prior to
[17] that or not.
[18]   Q: At any rate, they didn't show you anything
[19] that they had done before September '96 in
[20] terms of quantifying the amount of
[21] uncollectible accounts; correct?
[22]   A: Correct.
[23]   Q: And so you didn't have anything that you
[24] could give to Coopers on that either?
[25]   A: On the June '96 audit?

AHERF v.                                                                    ROBIN R. SCHAFFER
PRICEWATERHOUSECOOPERS, L.L.P.                                               June 4, 2002

Page 157

[1]  Q: Yes
[2]  A: No
[3]  Q: Even if you didn't know about the specific
[4]  amount of uncollectible accounts, did you
[5]  know generally that there were accounts that
[6]  should have been written off that hadn't
[7]  been?
[8]  A: I would say yes, and I would say Coopers knew
[9]  that as well. Just looking at an aging of
[10] accounts receivable it was obvious that there
[11] were a lot of very old accounts at June 30,
[12] '96
[13] Q: Okay So Coopers would have had agings from
[14] which they could see that there were higher
[15] dollar amounts in the higher aged buckets;
[16] correct?
[17] A: Correct
[18] Q: And that would mean that those accounts would
[19] have a higher bad debt allowance associated
[20] with it; right?
[21] A: Yes
[22] Q: And it's different from an account which has
[23] been deemed to be uncollectible and which is
[24] then written off; right?
[25] A: Right. At 100 percent, right.

Page 158

[1]  Q: But that would in effect be a reserve of 100
[2]  percent?
[3]  A: Correct
[4]  Q: Did you ever tell Coopers & Lybrand during
[5]  the '96 audit that there were accounts that
[6]  should have been written off but hadn't been?
[7]  A: Specifically, no. But we had general
[8]  conversations about the aging and the fact
[9]  that it had continued to deteriorate
[10] Q: All right And the particular question I
[11] guess that I'm asking now is whether you can
[12] remember anything about talking with Coopers
[13] during the '96 audit about accounts that
[14] should have been written off but hasn't been?
[15] A: No
[16] Q: Is that something that you even knew about at
[17] that time?
[18] A: Specific accounts, no
[19] Q: Did you have any general knowledge that there
[20] were accounts out there that shouldn't have
[21] been written off but hadn't?
[22] A: General knowledge, no  General inclination
[23] based on the agings, yes
[24] Q: So that was in effect your guess?
[25] A: Exactly

Page 159

[1]  Q: A suspicion you had?
[2]  A: Yes
[3]  Q: But you didn't know for sure?
[4]  A: Correct
[5]  Q: So you didn't tell Coopers about the fact
[6]  that you thought that there were accounts
[7]  that should have been written off but hadn't
[8]  been?
[9]  A: Correct
[10] Q: You were just speaking more generally about
[11] how the accounts had aged?
[12] A: Yes
[13] MR. RYAN: Why don't we take the
[14] lunch break
[15] THE VIDEOGRAPHER: We are now going
[16] off the record The time on the screen is
[17] 12:27
[18]
[19]   (There was a luncheon recess in the
[20] proceedings at 12:27 p.m )
[21]
[22] THE VIDEOGRAPHER: We are now back on
[23] the record. The time on the screen is 1:36
[24]
[25]         EXAMINATION CONTINUED

Page 160

[1]
[2]         BY MR. RYAN:
[3]  Q: Good afternoon, Ms. Schaffer
[4]  A: Good afternoon
[5]  Q: Now, I think I asked you this morning whether
[6]  you had spoken to anyone from a government
[7]  agency about AHERF; right?
[8]  A: Yes
[9]  Q: Apart from people who used to represent you
[10] at Drinker, Biddle & Reathe, have you ever
[11] spoken to any other attorneys about the AHERF
[12] matter?
[13] A: Any other attorneys? No
[14] Q: Have you ever, for instance, spoken to
[15] anybody from the law firm of Jones Day?
[16] A: No
[17] Q: Have you spoken to anyone who you thought
[18] represented the creditors committee?
[19] A: Chuck Morrison is the only person I've talked
[20] to that I know worked with the creditors, and
[21] he isn't an attorney, so I would say no
[22] Q: What kind of conversations did you have with
[23] Mr. Morrison about AHERF?
[24] A: I had to call him on a couple of occasions to
[25] find some documents related to my current

Page 161

[1] consulting at West Penn Allegheny, and I also
[2] contacted Chuck when I heard that you wanted
[3] to talk to me to find out if there was
[4] anything in the settlement that would cover
[5] my attorney fees. I knew the answer to that,
[6] but I wanted to ask anyways, and so I talked
[7] to him pretty recently.
[8]     Q: Apart from this issue of attorney's fees,
[9] have you spoken at all to Mr. Morrison about
[10] any of the AHERF lawsuits or investigations?
[11]    A: No
[12]    Q: Apart from Mr. Morrison, have you spoken to
[13] anyone else associated with the AHERF
[14] bankruptcy trustee's office?
[15]    A: I've talked to Mike Martin about work-related
[16] issues but not about the bankruptcy
[17]    Q: And also not about any lawsuits or
[18] investigations?
[19]    A: Correct.
[20]    MR. RYAN: Now, let me mark these as
[21] Exhibit 105, two documents which may or may
[22] not belong together with Bates Nos TN RC013
[23] 0001 to 12
[24]
[25]    (Deposition Exhibit 105 marked for

Page 162

[1] identification.)
[2]
[3]             BY MR. RYAN:
[4]    Q: Now, the first page of Exhibit 105 is, I
[5] think, the same as Exhibit 104; right?
[6]    A: Yes
[7]    Q: Do you recognize the second page of Exhibit
[8] 105?
[9]    A: It looks vaguely familiar, yes
[10]    Q: Do you know whether you prepared the
[11] schedule?
[12]    A: I would have to say I did I don't recall
[13] preparing it, but these is the types of
[14] schedules I would prepare for Dan for whoever
[15] requested them So I would have to say
[16] probably
[17]    Q: Do you know whether this schedule, the second
[18] page of Exhibit 105, originally went with the
[19] first page? I'm asking just so you
[20] understand these two pages were next to each
[21] other the way we got them. I'm just trying
[22] to understand whether you know whether they
[23] originally went together
[24]    A: I don't know if they did or not for sure. I
[25] don't think they did, but I don't know for

Page 163

[1] sure
[2]    Q: Now, the second page of Exhibit 105 deals
[3] with commercial accounts; is that correct?
[4]    A: Yes
[5]    Q: Do you recall that AHERF had a 20 percent
[6] contractual allowance for commercial accounts
[7] receivable?
[8]    A: Yes That was the standard reserve
[9] percentage we used for commercial when I
[10] first started
[11]    Q: Do you know what that 20 percent contractual
[12] allowance percentage was based on?
[13]    A: Historical collection data.
[14]    Q: Now, do you see on this schedule there is a
[15] column, the second from the right that says
[16] ADDL percentage?
[17]    A: Yes
[18]    Q: Is it your understanding that that refers to
[19] an additional 17 percentage points?
[20]    A: Yes
[21]    Q: Do you have any understanding as to what that
[22] represents?
[23]    A: Yes. From what I can recall today there was
[24] an issue with the commercial collection being
[25] less than 80 percent, which was what was

Page 164

[1] originally assumed based on historical
[2] percentages.
[3]     Patient accounting actually came up
[4] with some estimates of what they thought we
[5] were really collecting on commercial, and as
[6] a result of that it was determined we needed
[7] at least another 17 percent reserve on
[8] commercial accounts
[9]    Q: So that would be saying that AHERF was
[10] collecting only 63 percent instead of 80
[11] percent?
[12]    A: Correct.
[13]    Q: And all this has to do with a contractual
[14] allowance, not with a bad debt allowance?
[15]    A: That's correct.
[16]    Q: Bad debt allowance would be a later step?
[17]    A: Yes.
[18]    Q: Was the contractual allowance percentage for
[19] commercial accounts at DVOG hospitals
[20] increased from 20 percent to 37 percent
[21] indicated on the schedule?
[22]    A: I believe it was, yes
[23]    Q: Do you know when that occurred?
[24]    A: No.
[25]    Q: Do you recall that for some time after AHERF

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN R. SCHAFFER
June 4, 2002

---

Page 165

[1] first realized that the actual collection
[2] percentage for commercial accounts was less
[3] than 80 percent, that the 80 percent figure
[4] continued to be used on the books?
[5]    A: There would have most likely been a period of
[6] time after we realized we needed to increase
[7] the percentage before we actually implemented
[8] it because normally these types of changes
[9] had to be approved by levels above Dan and
[10] myself to make a change like this.
[11]    Q: Do you recall telling anyone from Coopers &
[12] Lybrand about your belief that the
[13] contractual allowance issue had to be
[14] increased before AHERF officially made that
[15] change?
[16]    A: I don't recall specifically, but most likely
[17] when I became aware that it needed to be
[18] increased, I would have involved Coopers if
[19] they were in at the time. Like for the audit
[20] I would have let them know that. I don't
[21] recall specifically, though.
[22]    Q: Is it possible that you didn't tell Coopers
[23] about it until the change officially took
[24] place?
[25]    A: That is possible.

Page 166

[1]    MR. COGAN: Objection.
[2]    A: But with my history of how I interacted with
[3] them, unlikely.
[4]    MR. RYAN: Let me mark, please, as
[5] Exhibit 106 a document with the Bates Nos.
[6] DBR-AA 52610 through 13.
[7]
[8]    (Deposition Exhibit 106 marked for
[9] identification.)
[10]
[11]                BY MR. RYAN:
[12]    Q: Do you recognize Exhibit 106, Ms. Schaffer?
[13]    A: I don't recall or recollect getting this
[14] specifically at the time. I know that I did
[15] receive correspondence like this. Dan was
[16] pretty good or AI in this case copying me on
[17] anything that related to our area. But today
[18] I don't really recall seeing it.
[19]    Q: Do you recall that at some point in time
[20] there were meetings between the accounting
[21] department and the Patient Financial Services
[22] Group known as joint finance communications
[23] meetings?
[24]    A: I am aware that there were meetings that
[25] started in fiscal '96, I believe, that we in

Page 167

[1] accounting sort of requested to have occur.
[2]    I don't know — I don't remember them
[3] being called joint finance communication
[4] meetings, but yes, there were meetings that I
[5] remember.
[6]    Q: All right. So if they began in fiscal 1996,
[7] that would be consistent with these minutes
[8] which are from August 29, '95?
[9]    A: That's correct.
[10]    Q: Do you know if you regularly received minutes
[11] from these meetings between the Patient
[12] Financial Services —
[13]    A: Regularly I would have to say no.
[14]    Q: On this list of attendees, Mr. Adamczak,
[15] Mr. Cancelmi, Mr. Scharf and Mr. Snow all
[16] worked in the general accounting department;
[17] right?
[18]    A: Greg Snow, no.
[19]    Q: I'm sorry. Mr. Spargo.
[20]    A: That's correct.
[21]    Q: So that would be Adamczak, Cancelmi, Scharf
[22] and Spargo?
[23]    A: Correct.
[24]    Q: Did the other four people listed here as
[25] being in attendance at this meeting all work

Page 168

[1] in the Patient Financial Services Group?
[2]    A: Yes.
[3]    Q: Now, if we could turn, please, to the second
[4] page, you see that the third item in bold is
[5] called Aging Criteria?
[6]    A: Yes.
[7]    Q: Do you see it says, Currently Pittsburgh
[8] bases its aging criteria on the date of
[9] billed and Philadelphia bases theirs on the
[10] date of discharge?
[11]    A: Yes.
[12]    Q: Do you have an understanding as to what that
[13] represents?
[14]    A: Yes. The way agings are produced from the
[15] patient accounting system can be defined
[16] differently. For Pittsburgh an account did
[17] not start aging until after it was billed,
[18] which on the contrary for the Philadelphia
[19] hospitals it was date of discharge.
[20]    Between the two, if there is a delay
[21] between discharge date and when an account is
[22] billed, the Philadelphia hospitals would have
[23] been penalized, so to speak. Their agings
[24] would have looked worse because they were
[25] under a different aging methodology.

---

ROBIN R. SCHAFFER
June 4, 2002

AHERF v.
PRICEWATERHOUSECOOPERS, L.L.P.

Page 169

[1] Q: So that the date of billing usually takes
[2] place after the date of discharge?
[3] A: That is correct
[4] Q: So that using the date of discharge, in
[5] effect, artificially accelerated the aging
[6] process?
[7] A: Yes
[8] Q: Now, the next sentence says, This discrepancy
[9] will be coordinated by the end of August?
[10] A: Yes
[11] Q: Do you recall whether this was coordinated at
[12] some point?
[13] A: I can't say that it was definitely the end of
[14] August, but, yes, we did change the way we
[15] aged our accounts receivable to be consistent
[16] with the AGH hospitals
[17] Q: So that the aging began on the date of
[18] billing?
[19] A: Yes
[20] Q: At the DVOG hospitals?
[21] A: Yes
[22] Q: In fiscal '96?
[23] A: I don't remember exactly when, but it
[24] probably was shortly after this meeting
[25] Q: Do you know why that change was made?

Page 170

[1] A: This is a pure assumption on my part. I
[2] don't have any recollection at the time why
[3] it was done, but I think because Greg Snow
[4] would be questioned as to why the accounts
[5] receivables were aging
[6] It would be of benefit to him if it
[7] was based on date of bill versus a date of
[8] discharge, so I am assuming maybe Greg Snow
[9] requested that change
[10] Q: Did you at the time believe there was
[11] anything inappropriate about making that
[12] change?
[13] A: No
[14] Q: If you could turn, please, to the last page
[15] of the exhibit, page 4 Do you see under the
[16] heading Future Issues for Discussion the
[17] second item starts with Bad Debt?
[18] A: Yes
[19] Q: Do you have an understanding as to what is
[20] meant by managing a process versus managing
[21] to a number?
[22] MR. COGAN: Objection
[23] A: If I would say what I thought that meant, I
[24] would truly be guessing
[25] Q: Okay That's fine That wasn't something

Page 171

[1] that you heard talked about at AHERF?
[2] A: No
[3] MR. RYAN: Let me mark, please, as
[4] Exhibit 107 the document with the Bates Nos
[5] TN C1C 00062 through 63
[6]
[7] (Deposition Exhibit 107 marked for
[8] identification )
[9]
[10] BY MR. RYAN:
[11] Q: Do you recognize Exhibit 107, Ms Schaffer?
[12] A: Again, it's something I know that I received
[13] because I'm cc'd on it, but today looking at
[14] this, I don't really recall seeing it at the
[15] time
[16] Q: Do you see the first item on the list is
[17] called Bill Production?
[18] A: Yes
[19] Q: Who at AHERF was responsible for producing
[20] the bills?
[21] A: That would be the Patient Financial Services
[22] Group under Greg Snow
[23] Q: Do you see the second item says Standardize
[24] front-end practices?
[25] A: Yes

Page 172

[1] Q: Do you have an understanding as to what
[2] front-end practices are?
[3] A: I believe that would mean the registration
[4] process
[5] Q: Was that also something that was handled by
[6] the Patient Financial Services Group?
[7] A: Indirectly yes, but that would be more a
[8] function of what's going on in the hospital
[9] itself, which would have been under Chuck
[10] Morrison's direction
[11] Q: At least for the DVOG hospitals?
[12] A: That is correct
[13] Q: Do you know what's meant by the third item,
[14] Improve access to and integrity of data?
[15] A: Again, my assumption there would just be from
[16] a system perspective having better access to
[17] information and having better information in
[18] the system if you improve like registration
[19] processes and so forth
[20] Q: Did you ever hear that the Patient Financial
[21] Services Group was complaining about access
[22] to or integrity of data?
[23] A: Not that I recall
[24] Q: If you could turn, please, to the second
[25] page Do you see item No 9 which says

AHERF  v.
PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN R. SCHAFFER
June 4, 2002

Page 173

[1] Enhance recoveries on accounts assigned to
[2] bad debt?
[3]     A: Yes
[4]     Q: The item A says Form/Purchase AHERF-owned
[5] collection agency?
[6]     A: Yes
[7]     Q: Did you ever hear of any proposals to form or
[8] purchase an AHERF-owned collection agency?
[9]     A: Not that I recall.
[10]    Q: You see item B says Installation of
[11] predictive dialer?
[12]    A: Yes
[13]    Q: Do you know what a predictive dialer is?
[14]    A: No, I don't.
[15]    Q: Finally do you see No. C says Increase
[16] internal staffing or outsourcing to respond
[17] to change in dunning cycles/automatic bad
[18] debt turnover? Do you have an understanding
[19] as to what's referred to there?
[20]    A: No, I don't
[21]    Q: So you were generally working on accounting
[22] for bad debts, you didn't work at all on
[23] actually collecting the bad debts?
[24]    A: Correct
[25]    Q: That would be the Patient Financial Services

Page 174

[1] Group?
[2]     A: Yes
[3]     MR. RYAN: Let me mark, please, as
[4] Exhibit 108 a two-page document with Bates
[5] Nos. CL 001018 through 107.
[6]
[7]     (Deposition Exhibit 108 marked for
[8] identification.)
[9]
[10]         BY MR. RYAN:
[11]    Q: Now, I understand that there are various
[12] items that have been added here, but do you
[13] recognize the basic schedules in Exhibit 108,
[14] Ms Schaffer?
[15]    A: Yes, I do
[16]    Q: Can you tell us what they are, please?
[17]    A: Yes These were what we called our bad debt
[18] roll forward schedules This is a specific
[19] schedule that Coopers would request as part
[20] of their audit request schedules.
[21]    What this does is it takes the
[22] balance sheet bad debt allowance account, and
[23] it rolls it forward from the beginning of the
[24] year throughout the year and shows basically
[25] the types of entries that hit that particular

Page 175

[1] account.
[2]     Q: And is the schedule on the first page for the
[3] inpatient bad debt allowance account at Bucks
[4] County?
[5]     A: Yes
[6]     Q: And the schedule on the second page is for
[7] the outpatient bad debt allowance account at
[8] Bucks County?
[9]     A: Yes
[10]    Q: Each of the DVOG hospitals had those two
[11] separate bad debt allowance accounts?
[12]    A: Yes
[13]    Q: What was the inpatient bad debt allowance at
[14] Bucks County at June 30, '95?
[15]    A: That should be at the very top of the
[16] schedule, the 887,806.
[17]    Q: What was the corresponding amount at June 30,
[18] 1996?
[19]    A: That would be the 2,647,782.
[20]    Q: So June 30, 1996, Bucks County had three
[21] times as much bad debt allowance for
[22] inpatient accounts according to this schedule
[23] as of June 30, 1995?
[24]    A: That's correct.
[25]    Q: Now, if you look on the next page for the

Page 176

[1] outpatient account, what was the balance of
[2] June 30, '95?
[3]     A: It would be 302,535
[4]     Q: What was the bad debt allowance for Bucks
[5] County outpatient accounts of June 30, 1996?
[6]     A: 880,141
[7]     Q: So here again we have an increase of almost
[8] threefold; correct?
[9]     A: Correct.
[10]    Q: Now, do you see down toward the bottom of the
[11] first page there is a paragraph that begins
[12] Per discussion with Robin Schaffer?
[13]    A: Yes
[14]    Q: I take it that paragraph wasn't there when
[15] you provided schedules to Coopers & Lybrand;
[16] right?
[17]    A: That is correct.
[18]    Q: Did you tell Coopers & Lybrand that the
[19] increase in age of accounts receivables had
[20] occurred because of problems with collections
[21] and increased volume within patient
[22] accounting during the fiscal year?
[23]    A: I'm sure I did
[24]    Q: Can you explain what increased volume within
[25] patient accounting refers to?

1—10:22:11  25—10:24:00                              Page 339

[1]   Q: Mr. Cancelmi knew about that issue?
[2]   A: Yes
[3]   Q: And Mr Adamczak knew about it?
[4]   A: Yes
[5]   Q: Do you know whether Mr McConnell knew about
[6] that issue?
[7]   A: I would have to say yes because of all the
[8] correspondence and stuff that Dan Cancelmi was
[9] known for providing.
[10]   Q: Now, I take it that AHERF's May and June 1997
[11] results in the Delaware Valley Obligated Group
[12] were below budget, right?
[13]   A: Before the adjustments, yes
[14]   Q: Do you recall any discussions about that?
[15]   A: Not specifically
[16]   Q: But that was the reason why AHERF made the
[17] $28 million reserve transfer, right, to bring
[18] the actual results up to approximate budgeted
[19] results?
[20]   MR. COGAN: Objection
[21]   A: Yes and no. Budget was always the driver for
[22] what we thought a given month should look like,
[23] but we did also consider the volume for that
[24] month, and if volume was down, then we didn't
[25] adjust the volume. That's not something that

1—10:24:03  25—10:25:41                              Page 340

[1] we would want to mess with This was more to
[2] cover what we thought were rate issues that
[3] didn't relate to the actual operations for the
[4] months of May and June
[5]   Q: Was any attempt made to quantify this
[6] unexplained rate variance?
[7]   A: To my knowledge, no
[8]   Q: So there was no basis for the approximately
[9] $28 million amount in reserves that were
[10] transferred from Graduate to DVOG, right?
[11]   A: I don't want to say no basis I regularly did
[12] prepare reports trying to summarize the
[13] out-of-periods for a given month I don't know
[14] if those out-of-period reports were used in
[15] making the determination whether or not we
[16] should book the $28 million or not
[17]   Q: Who came up with the $28 million amount?
[18]   A: It's my understanding that that came from
[19] someone above Dan Cancelmi and Al Adamczak
[20]   Q: And the person above Dan Cancelmi and Al
[21] Adamczak was Mr. McConnell, right?
[22]   A: Right
[23]   Q: And the only person above Mr. McConnell was
[24] Mr Abdelhak, right?
[25]   A: Right

1—10:25:42  25—10:26:58                              Page 341

[1]   Q: Can you explain to us why it was your
[2] understanding that the $28 million adjustment
[3] came from someone above Mr. Cancelmi and
[4] Mr Adamczak?
[5]   A: Yes The normal process was that we would
[6] produce the financial statements based on what
[7] had actually happened in a given month  Dan
[8] would review the financial statements to make
[9] sure that they were accurate, making sure that
[10] everything footed and that the numbers were
[11] accurate in comparison to the actual general
[12] ledger, then the statements would then be given
[13] to Chuck Morrison, David McConnell, I don't
[14] know who else. These types of adjustments,
[15] including the $28 million, came after the
[16] initial financial statements were prepared
[17]   Q: All right When you say the financial
[18] statements were distributed to Chuck Morrison,
[19] you're talking now about the DVOG financial
[20] statements?
[21]   A: Yes I don't know if he saw the western region
[22] or not
[23]   Q: And Mr McConnell and Mr. Morrison got the
[24] Delaware Valley financial statements at the
[25] same time?

1—10:26:59  25—10:29:02                              Page 342

[1]   A: I don't know that.
[2]   Q: Was Mr. Spargo, and then after he left,
[3] Mr Adamczak, who was promoted to take
[4] Mr Spargo's place, on the same level in
[5] AHERF's corporate structure as Mr Morrison?
[6]   A: I think on paper, yes, but I don't know if
[7] that's really how things worked or not On
[8] paper, I'd have to say yes
[9]   Q: Did you have a sense as to who had more clout
[10] in the real world?
[11]   A: Probably Chuck Morrison
[12]   Q: Were you concerned in May and June of 1997 that
[13] AHERF was making these adjustments to net
[14] income without any quantitative basis for them?
[15]   A: To a degree, yes, but because the out-of-period
[16] problem had existed and was normally the reason
[17] for the variances, I wasn't very uncomfortable
[18] with it Just slightly
[19]   Q: Did you discuss your slight discomfort with
[20] Mr Cancelmi?
[21]   A: I probably did I was pretty open about what I
[22] thought
[23]   Q: Do you remember anything about those
[24] conversations?
[25]   A: No

ROBIN SCHAFFER
June 6, 2002

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—10:29:02   25—10:30:42    Page 343

[1] Q: Do you know anything about what Mr. Cancelmi
[2] thought at the time about that $28 million
[3] adjustment to net income?
[4] A: No
[5] Q: Have you ever spoken to Mr. Cancelmi since
[6] about that $28 million adjustment to net
[7] income?
[8] A: The only conversations we had about that was I
[9] believe something came up in his conversations
[10] with the SEC about my saying that we basically
[11] recorded that to budget or something, and Dan
[12] just said that — I don't know what his exact
[13] words were, but that that wasn't the only
[14] reason the adjustment was booked, that by me
[15] saying that we just booked up to budget may not
[16] have been the most proper thing to answer.
[17] That was the extent of it
[18] Q: Did Mr. Cancelmi, in that conversation, tell
[19] you what any other reason may have been for
[20] that adjustment?
[21] A: No We tried not to alter each other's
[22] thoughts about this whole process by talking
[23] about it. We talked about it as little as
[24] possible.
[25] Q: Did you ever talk to anyone besides

---

1—10:30:58   25—10:32:35    Page 344

[1] Mr Cancelmi about the $28 million adjustment
[2] to net income?
[3] A: No.
[4] Q: So you never told anyone from Coopers & Lybrand
[5] about that?
[6] A: Directly, no, but indirectly by questions
[7] coming up as to why the reserves were gone, I
[8] would say yes. But directly, no.
[9] Q: And the questions about why the reserves were
[10] gone, you're referring to the questions Amy
[11] Frazier asked you about revenue reserves at
[12] Graduate, right?
[13] A: Yes
[14] Q: So you never had any discussions with anyone
[15] from Coopers & Lybrand about the DVOG side of
[16] those entries, did you?
[17] A: No.
[18] Q: And none of the schedules in the accounts
[19] receivable area that you provided to Coopers &
[20] Lybrand in any way identified that $28 million
[21] adjustment, right?
[22] A: My Lotus schedules, no The general ledger, of
[23] course, itself would show that, which they
[24] received a copy of, because the reserve would
[25] go from $5,050,000 to zero. It would be gone.

---

1—10:32:40   25—10:34:01    Page 345

[1] Q: Right I'm trying to ask you not about the
[2] Graduate side of those entries, but about the
[3] DVOG side where $28 million went into the
[4] contractual allowance contra-revenue account,
[5] right?
[6] A: Okay Um-hum
[7] Q: So none of the schedules that you provided to
[8] Coopers identified that $28 million on the DVOG
[9] side, right?
[10] A: Again, no schedules, yes, but if they looked at
[11] a general ledger on the DVOG side, I believe
[12] those contractuals were booked in a separate
[13] account on the income statement on the general
[14] ledger
[15] Q: Now, you and Mr. Cancelmi had a particular kind
[16] of periodic schedule that you referred to as
[17] the cheat sheet, right?
[18] A: Yes
[19] Q: Could you explain, please, what the cheat sheet
[20] was?
[21] A: Yes. The cheat sheet was just a summary of the
[22] results for the month and the prior months in
[23] the fiscal year It showed the total days
[24] actual versus budget It would calculate gross
[25] revenue and net revenue per day and per case, I

---

1—10:34:05   25—10:35:44    Page 346

[1] believe, for each month of the fiscal year It
[2] would show total gross revenue actual to
[3] budget, total net revenue actual to budget and
[4] the variance So it was a highlight of some of
[5] the key results for a given month related to
[6] revenue
[7] Q: What did you use the cheat sheet for?
[8] A: That was used — I prepared it so that Dan
[9] would have an understanding of the revenue
[10] results in a given month in a more summary
[11] format, and we also used that to help explain
[12] revenue to operations people or anybody else
[13] that would ask questions Chuck Morrison.
[14] Q: Did you use the cheat sheet as part of your
[15] work in determining volume and rate variance?
[16] A: That was a separate analysis, because that was
[17] more detailed by payor, whereas the cheat
[18] sheets were in total
[19] Q: Did you provide Coopers & Lybrand each year
[20] with the June version of the cheat sheet?
[21] A: I know I did in probably fiscals '95 and '96
[22] I don't know if they asked for that in '97. It
[23] wasn't a request on their normal audit request
[24] sheet It was just something that they would
[25] ask for sometimes to explain — do

---

AHERF  v.

PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN SCHAFFER
June 6, 2002

---

1—10:35:47  25—10:50:23                     Page 347

[1] analytical-type auditing work.

[2]   Q: The cheat sheet showed results for the given

[3] month and also year-to-date, right?

[4]   A: Yes.

[5]   Q: So that the June 1997 cheat sheet would show

[6] results for all of fiscal year 1997?

[7]   A: Yes.

[8]   Q: Now, you said that you didn't remember the kind

[9] of conversations that existed about the

[10] $50 million with respect to the $21 million

[11] because that wasn't as open or as big of an

[12] issue, right?

[13]   A: Correct.

[14]   Q: Is that also true for the $28 million, that

[15] that wasn't as open or as big of an issue?

[16]   A: Yes.

[17]   MR. RYAN: Why don't we take a brief

[18] break.

[19]   THE VIDEOGRAPHER: We're now going

[20] off the record. The time on the screen is

[21] 10:37.

[22]

[23]   (There was a recess in the proceedings.)

[24]

[25]   THE VIDEOGRAPHER: We are now back on

---

1—10:50:36  25—10:52:07                     Page 348

[1] the record. The time on the screen is 10:50

[2]   BY MR. RYAN:

[3]   Q: Now, you testified, Ms. Schaffer, that it was

[4] your understanding that the $49 million in

[5] reserves were initially established in purchase

[6] accounting for legitimate purposes at Graduate,

[7] right?

[8]   A: Not part of purchase accounting, but they were

[9] established as legitimate reserves on Graduate,

[10] yes, the 49

[11]   Q: Do you have an understanding as to how they

[12] were established at Graduate?

[13]   A: I believe it was an increase to restructuring

[14] expense, and then a liability was set up on

[15] Graduate's books in various different accounts.

[16]   Q: Have you heard it suggested that the initial

[17] $50 million was also originally earmarked for

[18] use at Graduate?

[19]   A: The only time I ever heard that referenced was

[20] that in that April 14 memo. I think the

[21] wording in there was such that it said

[22] earmarked for Graduate.

[23]   Q: And you're talking about Mr. Cancelmi's

[24] April 14 memo?

[25]   A: Yes.

---

1—10:52:08  25—10:53:40                     Page 349

[1]   Q: Which is the first written document that you're

[2] aware of about the $50 million?

[3]   A: Yes.

[4]   Q: Do you know whether that statement in

[5] Mr. Cancelmi's memo is correct, that is, that

[6] the $50 million was originally earmarked for

[7] use at Graduate?

[8]   A: I don't think that was the correct wording. I

[9] don't think that's what was meant by that

[10] wording.

[11]   Q: Why not?

[12]   A: I was never under the impression that that 50

[13] was set up for anything specific on Graduate,

[14] and, to my knowledge, Dan Cancelmi didn't

[15] believe that either.

[16]   Q: And what do you base your belief as to

[17] Mr. Cancelmi's mindset on?

[18]   A: Conversations with Dan Cancelmi.

[19]   Q: Conversations when?

[20]   A: At the time either during or after the time the

[21] memo was written.

[22]   Q: So in April 1997 or later that same year?

[23]   A: Yes.

[24]   Q: And he indicated to you that the only reason

[25] the $50 million was established at the Graduate

---

1—10:53:43  25—10:55:15                     Page 350

[1] hospitals was to be transferred over to the

[2] DVOG hospitals?

[3]   A: Yes.

[4]   Q: Do you know what Mr. Cancelmi may have told

[5] Coopers & Lybrand about the originally intended

[6] use of the $50 million in reserves?

[7]   A: I don't.

[8]   Q: Now, with respect to the $49 million in

[9] reserves, I think you testified that between

[10] the time that they were established at Graduate

[11] and the end of the fiscal year, it was your

[12] understanding that AHERF determined that those

[13] reserves were no longer needed at Graduate,

[14] right?

[15]   A: Yes.

[16]   Q: Did you consider at the time whether the proper

[17] accounting might be simply to reverse the

[18] establishment of those reserves rather than to

[19] take them into income or make them available

[20] for use elsewhere?

[21]   A: I didn't even think about that at the time

[22]   Q: Have you thought about that since then?

[23]   A: Not really.

[24]   Q: As you sit here today, do you have any view on

[25] that?

---

ROBIN SCHAFFER
June 6, 2002

AHERF v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—10:55:15  25—10:57:07                    Page 351

[1]    MR. COGAN: Objection.
[2]    A: My only view today, again, would be looking at
[3] it not from a bond perspective, but from a
[4] consolidated perspective, that these reserves
[5] were expensed on the Graduate hospitals and
[6] used on the DVOG hospitals. So from a
[7] consolidation standpoint, it wouldn't have a
[8] total bottom-line effect.
[9]    Q: And did you know at the time whether those
[10] restructuring expenses at Graduate were
[11] included in AHERF's consolidated audited
[12] financial statements for fiscal year 1997?
[13]    A: At the time I thought they were, yes.
[14]    Q: Do you know now that they, in fact, were not?
[15]    A: Based on my deposition with the SEC, that's my
[16] impression, they were not.
[17]    Q: Do you know what the basis was for your
[18] impression at the time that they were included
[19] as expenses in the consolidated financial
[20] statements for AHERF?
[21]    A: Just simply my lack of knowledge with how SDN
[22] was consolidated and how that all worked.
[23]    Q: Did you know anything more about how these
[24] reserves were established at Graduate other
[25] than that they were established through

---

1—10:57:08  25—10:58:07                    Page 352

[1] restructuring expense?
[2]    A: Not really.
[3]    Q: Can you think of anything else that you knew
[4] about how they were established?
[5]    A: Meaning the method of how we came up with the
[6] numbers or just the journal entries themselves?
[7]    Q: Either. Either one.
[8]    A: I mean, I know like we had talked about with
[9] the MA reserve, I mean, there was a thought
[10] process behind that, that there was a billing
[11] issue. PFMA, I know there was some issue. I
[12] just can't recall what it was today.
[13] Inventory, I think there was an inventory
[14] reserve. That was basically because we were
[15] anticipating the results of a physical
[16] inventory, and the fact that maybe our
[17] inventory balances were over or understated, I
[18] can't think right now which way it would go,
[19] but we needed a reserve to cover that issue.
[20] So, again, the thought process behind
[21] developing them, I know, was a thought-out
[22] process by various individuals within the
[23] organization.
[24]    Q: Meaning people at AHERF?
[25]    A: Yes.

---

1—10:58:08  25—10:59:44                    Page 353

[1]    Q: All right. Now, if you wouldn't mind just
[2] locating in that stack of exhibits an exhibit
[3] we discussed on Tuesday which was Exhibit 7,
[4] the October 16, 1995 Coopers management comment
[5] letter.
[6]    A: Okay.
[7]    Q: Now, let me mark, please, as Exhibit 131 — no.
[8] Strike that. It's already been marked as
[9] Exhibit 22, so let me just hand out what's
[10] already been marked as Exhibit 22.
[11]    Do you recognize Exhibit 22,
[12] Ms. Schaffer?
[13]    A: Yes, I do.
[14]    Q: What is it?
[15]    A: Again, this would be the management comments —
[16] I guess that's what this is called — for
[17] fiscal 1996, I'm gathering, since this was
[18] dated September 23, 1996.
[19]    Q: All right. So this is a similar document to
[20] Exhibit 7, except it comes a year later and has
[21] other comments in it?
[22]    A: Correct.
[23]    Q: But the general format and purpose of the
[24] letter is similar?
[25]    A: Yes.

---

1—10:59:45  25—11:01:21                    Page 354

[1]    Q: Now, if you could turn, please, to the last
[2] page of Exhibit 22 which was originally page 10
[3] of Bates 16, do you see there's a bold heading
[4] Accounts Receivable Observations?
[5]    A: Yes.
[6]    Q: And then you see it says, Though the following
[7] observations have not been addressed during
[8] 1996, appropriate follow-up procedures are
[9] currently in the development stage, and then
[10] there are four bullet points?
[11]    A: Yes.
[12]    Q: Now, if you could keep that open and then look
[13] at the Exhibit 7 and turn, please, to what was
[14] originally page 3, Bates page 5, and do you see
[15] there the heading Deterioration of Accounts
[16] Receivable Aging?
[17]    A: Yes.
[18]    Q: And we looked at this on Tuesday, right?
[19]    A: Yes.
[20]    Q: Do you agree with the statement in Exhibit 22,
[21] the 1996 management comment letter, that AHERF
[22] management did not solve the problem of
[23] deterioration of accounts receivable aging
[24] during fiscal year 1996?
[25]    A: Yes.

---

ROBIN SCHAFFER
June 6, 2002

AHERF v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—16:10:23 25—16:11:30  Page 511

[1] Q: And that would show different amounts from the
[2] internal schedule, right?
[3]  A: I'm surprised the amounts would be different,
[4] but that is what this is saying. Normally, the
[5] presentation may be different.
[6]  Q: All right. But what's being discussed here in
[7] Exhibit 153 is that even the amounts on the
[8] schedules provided to Coopers & Lybrand would
[9] be different from the ones for internal use,
[10] right?
[11]  A: It almost from this, yes, looks like that our
[12] internal ones wouldn't tie to our GL which was
[13] odd.
[14]  Q: And the ones that would be provided to
[15] Coopers & Lybrand would tie to the general
[16] ledger so that they wouldn't be able to detect
[17] that anything unusual was going on, right?
[18]  A: Correct.
[19]  Q: Now, this isn't an idea that you would have
[20] come up with on your own, is it?
[21]  A: No.
[22]  Q: Do you know who directed you to prepare or to
[23] ask your staff to prepare two separate sets of
[24] schedules, one for internal use and one for the
[25] auditors?

1—16:11:31 25—16:12:51  Page 512

[1]  A: No. I don't remember why I did this.
[2]  Q: Do you think Mr Cancelmi asked you to do this?
[3]  A: No.
[4]  Q: Why not?
[5]  A: It doesn't make any sense that he would,
[6] because what would be given to the auditors
[7] would tie to the GL and would have the entries
[8] on them, they just wouldn't have been readily
[9] identified on the schedules, which later that
[10] changed and everything was actually footnoted.
[11] So it wouldn't make sense that Dan would ask me
[12] to do this.
[13]  Q: Okay. But the way it's being contemplated here
[14] in Exhibit 153 is that Coopers & Lybrand would
[15] be provided with schedules from which they
[16] wouldn't have been able to determine that this
[17] reclassification of favorable revenue
[18] adjustments took place, right?
[19]  A: Not easily. They would have still been able
[20] to, but it wouldn't have been as easily
[21] identified.
[22]  Q: Now, if you could look at the second page of
[23] Exhibit 153, can you read what you've written
[24] there between the two sets of three asterisks
[25] up at the top of the page?

---

1—16:12:52 25—16:14:08  Page 513

[1]  A: Yes. Do not use as JE, which means journal
[2] entry, backup.
[3]  Q: So you were directing your accounting staff not
[4] to include these sheets that you were writing
[5] out with the journal entries, right?
[6]  A: Yes.
[7]  Q: Do you remember why you directed your staff to
[8] do that?
[9]  A: No, because this would be what the journal
[10] entry would look like, so I don't know why it
[11] would have mattered if they attached it or not.
[12]  Q: Well, on the third page of Exhibit 153, which
[13] also says at the top do not use as journal
[14] entry backup, there's a reference to how you're
[15] going to have the two sets of schedules, the
[16] internal schedules and the schedules for
[17] Coopers & Lybrand, right?
[18]  A: Yes.
[19]  Q: Is that perhaps why the idea was not to use
[20] these schedules as journal entry backups?
[21]  A: Perhaps I don't recall. I mean, I don't —
[22] I'm not saying that because I know that for
[23] sure, but that's perhaps why I'm not sure why
[24] I didn't want them to attach it.
[25]  MR. RYAN: Let me mark, please, as

1—16:14:13 25—16:15:57  Page 514

[1] Exhibit 154, the document with Bates Nos
[2] DBR-RS-0286 through 88.
[3]
[4]  (Deposition Exhibit 154 marked for
[5] identification.)
[6]
[7]    BY MR. RYAN:
[8]  Q: Do you recognize Exhibit 154, Ms. Schaffer?
[9]  A: Yes.
[10]  Q: What is it?
[11]  A: This is a memo from Dan Cancelmi to various
[12] individuals on the distribution dated May 22,
[13] 1997 regarding Graduate system restructuring
[14] reserves.
[15]  Q: Now, if you could turn, please, to the second
[16] page. Now, the memo discusses here the issue
[17] of whether the $50 million in reserves that
[18] ended up being transferred to DVOG would be
[19] established at the Graduate hospitals by means
[20] of restructuring expense or as purchase price
[21] adjustments, right?
[22]  A: Yes.
[23]  Q: And is it the case that initially the idea was
[24] to establish the $50 million in reserves as
[25] restructuring expense?

---

1—16:15:59   25—16:17:16                     Page 515

[1]   A: That was, from Dan's April 14 memo, how it
[2] appeared we initially planned to do it, yes
[3]   Q: At some point between April 14 and May 21,
[4] 1997, that changed to a purchase price
[5] allocation, right?
[6]   A: Yes.
[7]   Q: Do you recall why that change was made?
[8]   A: Yes I was told at the time that the change
[9] was actually a result of Bill Buettner coming
[10] up with a different way of booking the 50
[11]   Q: Who told you that?
[12]   A: Dan.
[13]   Q: Did you ever talk with anyone from Coopers &
[14] Lybrand about these two different methods that
[15] were being discussed for establishing the
[16] $50 million in reserves?
[17]   A: No
[18]   Q: Now, do you see the third sentence on the top
[19] of page two states, This accounting treatment
[20] has been discussed with Coopers & Lybrand, who
[21] agrees with this approach, as these reserves
[22] are viewed as unrecorded pre-acquisition
[23] contingencies?
[24]   A: Yes
[25]   Q: And did you understand that sentence to mean

1—16:17:22   25—16:18:34                     Page 516

[1] that what Coopers & Lybrand was agreeing with
[2] was the approach of establishing the $50
[3] million in reserves at Graduate by means of
[4] purchase price adjustments rather than as
[5] restructuring expense?
[6]   A: Yes.
[7]   Q: If you could turn, please, to the last page of
[8] Exhibit 154, this is a schedule headed Graduate
[9] System Restructuring, right?
[10]   A: Yes.
[11]   Q: Did you play any role in AHERF's decision to
[12] take any of the restructuring costs listed on
[13] this attachment?
[14]   A: To actually book the entries or determining
[15] that they were no longer needed?
[16]   Q: Let me ask first about booking the entries
[17] initially?
[18]   A: Yes
[19]   Q: Which ones?
[20]   A: I don't — the ones that would have related to
[21] my area, of course, the patient revenue ones, I
[22] would have known about, but let me just say
[23] that sometimes Chuck Lisman booked stuff
[24] through an upload and it didn't actually get
[25] recorded as a V entry by my group. but I would

1—16:18:37   25—16:19:30                     Page 517

[1] have been aware of it.
[2]   Q: All right. So a V entry is a journal entry
[3] that begins with the letter V?
[4]   A: Yes.
[5]   Q: And that's how you and your staff recorded
[6] journal entries?
[7]   A: Correct.
[8]   Q: And I'm not sure whether we've covered yet what
[9] an upload is, so could you just define for the
[10] record, please?
[11]   A: Yes. An upload is just taking information and
[12] putting it into a Lotus or Excel format that,
[13] instead of having to be keyed by somebody into
[14] the ledger, it can be almost interfaced — it
[15] can be interfaced into the ledger so it saves
[16] time.
[17]   Q: Did you also refer to uploads as on-line posts?
[18]   A: On-line posts were different.
[19]   Q: Okay.
[20]   A: An on-line post is when you could actually key
[21] a journal entry, and instead of waiting for a
[22] post to run overnight, you could actually post
[23] it immediately on-line
[24]   Uploads, you actually had to take the
[25] system down, I believe, to run them, so they

1—16:19:32   25—16:20:56                     Page 518

[1] posted automatically.
[2]   Q: Why were journal entries sometimes made in the
[3] form of uploads and sometimes through paper
[4] journal entries?
[5]   A: Normally, an upload was used when there were
[6] numerous entries to be posted and you wanted to
[7] save time keeping an entry.
[8]   Q: Why were journal entries sometimes recorded as
[9] on-line posts rather than by either of the two
[10] other methods?
[11]   A: Normally, if we were trying to produce
[12] financial statements and didn't want to wait
[13] overnight for new system reports, we would
[14] on-line post and run the reports immediately
[15]   Q: All right. So going back to this attachment
[16] here to Exhibit 154, are there any particular
[17] reserves that you can remember being involved
[18] in the decision to establish on books of one of
[19] the Graduate hospitals?
[20]   A: Item number 1, writing off patient accounts
[21] greater than 180 days, I'm sure that I pulled
[22] that number off of an aging report
[23] Determining why we would want to write off
[24] every account over 180 days, I wasn't part of
[25] that decision I don't know if that came from

ROBIN SCHAFFER
June 6, 2002

AHERF  v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—16:20:58  25—16:22:20    Page 519

[1] Ron Longabucco or not

[2]   Q: Okay. So you're saying that you were perhaps

[3] involved in quantifying the actual amounts or

[4] providing information about that, but that you

[5] wouldn't have been a decision maker of whether

[6] to write off patient accounts over 180 days at

[7] the Graduate hospitals?

[8]   A: Correct.

[9]   Q: Okay.

[10]   A: The prudent buyer/CRA reserve of $2 and a half

[11] million, I would have been aware of that, but I

[12] believe that Joe Scharf actually would have

[13] came up with that amount.

[14]     The Medicare billing reserve, the

[15] $450,000 under Mt. Sinai, again, I probably was

[16] aware of because it was an A/R issue, but,

[17] again, I didn't actually help develop the

[18] number.

[19]     There's more prudent buyer. Same

[20] issue.

[21]     The Hill-Burton reserve of a million

[22] five, again, I would have been knowledgeable of

[23] it. That related to our Hill-Burton charity

[24] care policy, but, again, I wasn't the one that

[25] came up with the actual million five.

---

1—16:22:23  25—16:23:39    Page 520

[1]   Q: Hill-Burton refers to a federal statute, the

[2] Hill-Burton Act?

[3]   A: I believe it does, yes.

[4]   Q: Who at AHERF was responsible for Hill-Burton

[5] issues?

[6]   A: Probably, for the Graduate hospitals, Ron

[7] Longabucco would have been.

[8]     Police and fire, again, I'm aware of

[9] the issue, but I wasn't the one that calculated

[10] the potential reserve that we needed. It would

[11] have either been maybe Joe Scharf, Ron

[12] Longabucco or Dan or somebody like that.

[13]     The MA reserve we've talked about. I

[14] wasn't, again, responsible for developing the

[15] number; Ron Longabucco was, but I was aware of

[16] it. I think that's it.

[17]   Q: Now, you were speaking before about a $1 and a

[18] half million MA reserve, and, according to this

[19] schedule, that was the reserve at The Graduate

[20] Hospital, and then there was an additional

[21] $2 million MA reserve at Mt. Sinai Hospital?

[22]   A: Right. I was talking — I was talking

[23] about the million five, I was specifically

[24] talking about Graduate, because I also said the

[25] $5,050,000 which was PFMA. I had forgot about

---

1—16:23:44  25—16:24:54    Page 521

[1] the 42 million on Mt. Sinai.

[2]   Q: Okay. So the MA reserve that you remember

[3] discussing with Ms. Schaffer — excuse me, with

[4] Ms. Frazier, was the $1 and a half million

[5] reserve at The Graduate Hospital, correct?

[6]   A: That's correct.

[7]   Q: All right. Let me ask you now whether you were

[8] involved in the decision that any of the

[9] reserves on this attachment to Exhibit 154 were

[10] no longer needed?

[11]   A: Again, I wasn't the one who determined they

[12] were not needed, but, as with the MA reserve

[13] example, I actually had a conversation with Ron

[14] Longabucco and knew that that one wasn't needed

[15] specifically.

[16]   Q: Okay. Are there any others that you can

[17] remember anything about the decision that the

[18] reserve was no longer needed at Graduate?

[19]   A: Police and fire is the only other one where I

[20] remember Dan saying he had documentation that

[21] stated we no longer needed it and why I don't

[22] know what that documentation was.

[23]   Q: Okay

[24]   A: That's probably all I can remember today

[25] specifically.

---

1—16:24:56  25—16:26:31    Page 522

[1]   MR. RYAN: Let me mark, please, as

[2] Exhibit 155, a set of schedules with the Bates

[3] Nos. DBR-RS-0307 through 13.

[4]

[5]     (Deposition Exhibit 155 marked for

[6] identification.)

[7]

[8]     BY MR. RYAN:

[9]   Q: Do you recognize Exhibit 155, Ms. Schaffer?

[10]   A: Yes.

[11]   Q: What is it?

[12]   A: This is a Chuck Lisman schedule. It's

[13] basically summarizing journal entries that had

[14] been recorded or were to be recorded, I'm not

[15] sure, related to some of these reserves that we

[16] have talked about. It is by corp I.D., which

[17] is either a Hahnemann, MCP, so forth, and it

[18] also at the top — across the top is saying

[19] where the reserve or excess reserve was going

[20] to come from.

[21]   Q: All right. So the computer file name in the

[22] top left-hand corner indicates to you that

[23] Mr. Lisman prepared this schedule at the

[24] direction of Mr. Cancelmi, right?

[25]   A: Probably, yes.

---

1—16:26:34  25—16:27:46　　　　Page 523

[1] Q: Is that your handwriting in the middle of the
[2] top of the first page?
[3] A: Yes.
[4] Q: Where it says 3-97, $25 million?
[5] A: Yes.
[6] Q: And did you make that note indicating that this
[7] schedule shows the initial $25 million out of
[8] the $50 million that was recorded in the March
[9] '97 close?
[10] A: I believe I did that. Yes.
[11] Q: Do you know when you made that handwritten
[12] notation?
[13] A: That was probably made when Coopers came back
[14] with — PricewaterhouseCoopers and wanted to
[15] audit the entries where we had reversed all
[16] this stuff, the restatement entries.
[17] Q: All right. So you're talking about the fall of
[18] 1998 after the bankruptcy?
[19] A: Yes.
[20] Q: Now, Corporation 210 was MCP Hospital, right?
[21] A: Correct.
[22] Q: So this journal entry V-0307 shows the first
[23] $8 million in reserves coming in from the
[24] Graduate hospitals to MCP, right?
[25] A: Correct.

1—16:27:47  25—16:28:50　　　　Page 524

[1] Q: And 1204100 was the general ledger account
[2] number for the inpatient bad debt allowance
[3] account, right?
[4] A: That's correct.
[5] Q: The outpatient account was 1204200, right?
[6] A: Correct.
[7] Q: And 1420140 was a general ledger account number
[8] for intercompany account with the AHERF parent
[9] corporation, right?
[10] A: Yes
[11] Q: The AHERF parent corporation was Corporation
[12] No. 140?
[13] A: Yes
[14] Q: So apart from the description field here,
[15] there's nothing that would indicate, just from
[16] the general ledger numbers used in the journal
[17] entry, that the reserves were being transferred
[18] from Graduate, is there?
[19] A: Oh, except for the description column you said,
[20] no
[21] Q: Right. If you could turn, please, to the
[22] second page of Exhibit 155, Corporation 211 is
[23] Elkins Park, right?
[24] A: Yes
[25] Q: So journal entry V-0310 is showing the initial

1—16:28:56  25—16:30:00　　　　Page 525

[1] $3 million in reserves that were transferred
[2] from Graduate hospitals to Elkins Park?
[3] A: Correct.
[4] Q: And that was, again, into the inpatient bad
[5] debt allowance account?
[6] A: Yes.
[7] Q: And does the fact that these journal entries
[8] began with V indicate that your group was
[9] responsible for recording them?
[10] A: Yes
[11] Q: If you could turn, please, to the next page,
[12] Corporation 212 was Bucks County, right?
[13] A: Yes
[14] Q: So journal entry V-0310 on this page shows the
[15] initial $3 million going into the inpatient bad
[16] debt allowance account at Bucks County, right?
[17] A: Yes
[18] Q: If you could go to the next page, please,
[19] Corporation 220 was St. Christopher's Hospital?
[20] A: Yes
[21] Q: So journal entry V-0311 shows $6 million in
[22] reserves coming from Graduate and going into
[23] the inpatient bad debt allowance account at St
[24] Christopher's?
[25] A: Yes.

1—16:30:01  25—16:31:18　　　　Page 526

[1] Q: And, finally, if you turn to the next page,
[2] Corporation 230 was Hahnemann?
[3] A: Yes.
[4] Q: So journal entry V-0311 shows $5 million coming
[5] from Graduate and going to the inpatient bad
[6] debt allowance account at Hahnemann University
[7] Hospital, right?
[8] A: Yes.
[9] Q: So that's covered now the entire $25 million
[10] that was recorded in the March close, right?
[11] A: Yes
[12] Q: And that was all done by people in your group?
[13] A: Yes.
[14] MR. RYAN: Let me mark, please, as
[15] Exhibit 156, three pages without Bates numbers
[16] that I obtained from a box in the bankruptcy
[17] trustee's off-site storage facility designated
[18] Schaffer C-028 and with bar code K-85205.
[19]
[20] (Deposition Exhibit 156 marked for
[21] identification.)
[22]
[23] BY MR. RYAN:
[24] Q: Do you recognize Exhibit 156, Ms Schaffer?
[25] A: Yes.

1—17:02:53  25—17:04:47                    Page 551

[1] A: Yes Yes Yes

[2] MR. RYAN: Let me mark, please, as

[3] Exhibit 164, the document at Bates Nos

[4] DBR-RS-0290 through 98.

[5]

[6] (Deposition Exhibit 164 marked for

[7] identification.)

[8]

[9]         BY MR. RYAN:

[10] Q: Do you recognize Exhibit 164, Ms Schaffer?

[11] A: Yes.

[12] Q: What is it?

[13] A: This is a memo from Dan Cancelmi to Al Adamczak

[14] dated July 3, 1997 regarding the Delaware

[15] Valley bad debt reserves.

[16] Q: Now, Attachment A and B to this memo are

[17] previous Dan Cancelmi memos that we've looked

[18] at earlier today, right?

[19] A: Yes.

[20] Q: Do you recognize Attachment C which is on Bates

[21] page 297?

[22] A: Yes

[23] Q: Do you know who prepared this?

[24] A: I probably did. That would be my guess.

[25] Q: Now, column G shows the $50 million in reserve

1—17:04:54  25—17:05:57                    Page 552

[1] transferred from Graduate, right?

[2] A: Yes

[3] Q: Column H is called General Accounting Revenue

[4] Adjustments, and it totals $10,752,000, right?

[5] A: Yes.

[6] Q: And if you look back on page 2 of

[7] Mr. Cancelmi's memo, right down toward the

[8] bottom there's a row for general accounting

[9] reserve adjustments $10,752,000, right?

[10] A: Yes

[11] Q: Now, do you see the bullet point — the last of

[12] the three bullet points in the middle of that

[13] page which reads, Unsubstantiated patient

[14] reserve adjustments of $10.8 million were

[15] recorded by general accounting personnel in

[16] September 1996 to enhance operating results

[17] When these adjustments could not be

[18] substantiated, general accounting covered these

[19] adjustments with bad debt reserves?

[20] A: Yes

[21] Q: Is that the reclassification we've been talking

[22] about?

[23] A: Yes.

[24] Q: Do you agree with Mr. Cancelmi that these

[25] adjustments could not be substantiated?

1—17:06:00  25—17:09:08                    Page 553

[1] A: Yes, but, as I always have a but, I think

[2] unsubstantiated meant that we had hoped that,

[3] again, like I said, that something would turn

[4] around to offset these adjustments so that we

[5] could get rid of them by the end of the year,

[6] which never happened.

[7] Q: Now, the adjusted shortfall listed down here at

[8] the bottom of page 2 is $28,361,000?

[9] A: Yes

[10] Q: That appears to be based on Attachment C?

[11] A: Yes.

[12] Q: Do you know why that figure differs slightly

[13] from the $25,083,000 shortfall as of May 31,

[14] 1997 shown in Exhibit 41?

[15] A: Give me one second to look at it. It looks

[16] like the difference is in the MCP required

[17] reserve amount. If you compare — which

[18] exhibit am I on — Exhibit 164, page 297, the

[19] required reserve column E, back to the

[20] Exhibit 41 column required bad debt reserve at

[21] May 31, '97, you can see that Hahnemann's

[22] 32,533 ties between the two. Elkins Park, I

[23] thought, tied. Oh, it's the two that's

[24] asterisk'd. It looks like Bucks County ties,

[25] the $4,592,000, and St. Christopher's, the

1—17:09:13  25—17:10:48                    Page 554

[1] $9,899,000 tied, but it's MCP and Elkins that

[2] are different, and I believe it's bulleted here

[3] as to why it's different.

[4] Q: I see. So the calculation on Attachment C to

[5] Exhibit 164 takes into account the anticipated

[6] Past Statute and Pat Com write-offs to occur in

[7] June 1997?

[8] A: Yes

[9] Q: And it appears that those may not have been

[10] considered in the calculation in Exhibit 41?

[11] A: That's correct.

[12] Q: All right. Let me show you one last document,

[13] and then we'll wrap up for the day here. This

[14] has previously been marked as Exhibit 43

[15] Do you recognize Exhibit 43,

[16] Ms. Schaffer?

[17] A: I do, but, again, I don't know if I'm

[18] recognizing it because I saw it in '97 or if

[19] it's because I've seen it since then in the

[20] deposition with the SEC.

[21] Q: All right. Is it your understanding that this

[22] memo and its attachments set forth a use of

[23] reserves to cover the bad debt reserves

[24] shortfall at DVOG and to cover issues related

[25] to Health Partners?

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN SCHAFFER
June 6, 2002

1—17:10:49  20—17:11:44                     Page 555

[1]    MR. COGAN: Objection.

[2]    A: Yes.

[3]    Q: And this includes the $21 million transfer from

[4] Graduate to DVOG, right?

[5]    A: Correct.

[6]    Q: So since you don't recall whether you had

[7] Exhibit 43 back in 1997, I take it you never

[8] provided Exhibit 43 to Coopers & Lybrand?

[9]    A: To my knowledge, no, but I can't recall one way

[10] or the other.

[11]    Q: And you don't recall, do you, ever providing

[12] Exhibit 164, the other July 3, 1997 memo, to

[13] Coopers & Lybrand, do you?

[14]    A: I don't recall doing that, no.

[15]    MR. RYAN: Why don't we break for the

[16] day.

[17]    THE WITNESS: Okay.

[18]    THE VIDEOGRAPHER: We're now going

[19] off the record. The time on the screen is

[20] 5:11.

[21]

[22]    (The proceedings were temporarily

[23] adjourned at 5:11 p.m.)

[24]

[25]

---

Page 556

[1] COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE

[2] COUNTY OF ALLEGHENY          )    SS:

[3]    I, JoAnn M. Brown, RMR, a Court Reporter and

[4] Notary Public in and for the Commonwealth of

[5] Pennsylvania, do hereby certify that the foregoing

[6] deposition of ROBIN R. SCHAFFER was taken at the time

[7] and place stated herein; and that the said deposition

[8] was recorded stenographically by me and then reduced

[9] to printing under my direction, and constitutes a

[10] true record of the testimony given by said witness.

[11]    I further certify that I am not a relative or

[12] employee of any of the parties, or a relative or

[13] employee of either counsel, and that I am in no way

[14] interested directly or indirectly in this action.

[15]    IN WITNESS WHEREOF, I have hereunto set my hand

[16] and affixed my seal of office this 10th day of June,

[17] 2002

[18]

[19]

[20]

[21]                    Notary Public

[22]

[23]

[24]

[25]

---

Page 557

[1] COMMONWEALTH OF PENNSYLVANIA )    E R R A T A
COUNTY OF ALLEGHENY          )    S H E E T

[2]

      I, ROBIN R. SCHAFFER, have read the foregoing

[3] pages of my deposition given on Thursday, June 6,
2002, and wish to make the following, if any,

[4] amendments, additions, deletions or corrections:

[5] Page/Line  Should Read        Reason for Change

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

      In all other respects, the transcript is true and

[20] correct

[21]

                ROBIN R. SCHAFFER

[22]

      Subscribed and sworn to before me this

[23] _____ day of _____, 2002

[24]

         Notary Public

[25]    AKF Reference No. JB70547

---

# In The Matter Of:

*AHERF   v.*

*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*ROBIN R. SCHAFFER*

*July 23, 2002*

---

*MANHATTAN REPORTING CORP.*

*420 Lexington Avenue*

*New York, NY  10170*

*(212) 557-7400     FAX: (212) 692-9171*

Original File 072302RS.TXT, 190 Pages
Min-U-Script® File ID 3041804375

**Word Index included with this Min-U-Script®**

ROBIN R. SCHAFFER
July 23, 2002

AHERF　v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—10:31:02　25—10:32:05　　Page 606

[1] **Q:** Are there any amounts on the schedule that,
[2] in fact, were reserves transferred from
[3] Graduate even though they are not identified
[4] as such?
[5] **A:** Yes.
[6] **Q:** What amount is that?
[7] **A:** The 1.5 million that's labeled Account
[8] Shortfall Adjustment.
[9] **Q:** That's in note H?
[10] **A:** Yes.
[11] **Q:** For June 1997?
[12] **A:** Yes.
[13] **Q:** And if we look now again at attachment A to
[14] Exhibit 43, we can see that same $1,500,000
[15] amount in reserve transferred from the
[16] Graduate Hospital; right?
[17] **A:** Yes.
[18] **Q:** And we know from the other documents that
[19] we've looked at today that that amount was
[20] not expensed at Bucks County; right?
[21] **A:** Correct.
[22] **Q:** But there is no way to tell from the
[23] outpatient bad debt roll forward provided to
[24] Coopers & Lybrand that the $1,500,000
[25] shortfall adjustment involved transfer of

---

1—10:32:07　25—10:33:44　　Page 607

[1] reserves from Graduate; is there?
[2] **A:** Correct, no.
[3] **Q:** And there is no way to tell that that amount
[4] was not expensed as opposed to the shortfall
[5] adjustment in the inpatient account which, in
[6] fact, was expensed; correct?
[7] **A:** Correct.
[8] **MR. RYAN:** Let me mark, please, as
[9] Exhibit 290 a set of schedules with Bates
[10] numbers CL013556 A through M.
[11]
[12] (Deposition Exhibit 290 marked for
[13] identification.)
[14]
[15] **BY MR. RYAN:**
[16] **Q:** Do you recognize the schedule in Exhibit 290,
[17] Ms. Schaffer?
[18] **A:** Yes.
[19] **Q:** What are they?
[20] **A:** These are the same schedules we just looked
[21] at before in Exhibit 289, but they are for
[22] Elkins Park and not Bucks County, as we
[23] looked at before.
[24] **Q:** So these are again schedules that you or your
[25] staff prepared and that you reviewed as part

---

1—10:33:49　25—10:34:56　　Page 608

[1] of your calculation of the bad debt allowance
[2] required for Elkins Park on June 30, '97?
[3] **A:** Yes.
[4] **Q:** And you then provided these schedules to
[5] Coopers & Lybrand for their audit?
[6] **A:** Yes.
[7] **Q:** Do you see on the very first page here there
[8] is a tick mark B by an entry for 20 percent?
[9] **A:** Yes.
[10] **Q:** And that relates to contractual allowance on
[11] so-called commercial accounts; is that right?
[12] **A:** Yes.
[13] **Q:** And do you see then tick mark B reads Based
[14] upon historical data from patient accounting?
[15] **A:** Yes.
[16] **Q:** Is that tick mark B something that was
[17] already on the schedule when you provided it
[18] to Coopers?
[19] **A:** I don't think it was.
[20] **Q:** All right. Do you believe that you told
[21] someone from Coopers & Lybrand that the 20
[22] percent contractual allowance for commercial
[23] accounts was based upon historical data from
[24] patient accounting?
[25] **A:** No, only because we always just used an 80-20

---

1—10:35:02　25—10:36:16　　Page 609

[1] split not based on any actual data. It was
[2] just we knew we weren't going to get 100
[3] percent of charges, so we tended to assume 80
[4] percent. So I don't believe I would have
[5] said that it was historical data from patient
[6] accounting.
[7] **Q:** You don't recall telling anyone from Coopers
[8] & Lybrand, do you, that you had any
[9] historical data that was inconsistent with
[10] the 80-20 split?
[11] **A:** No.
[12] **Q:** If you could turn, please, to the Elkins Park
[13] inpatient bad debt roll forward on Bates page
[14] L. Now, this schedule shows a $3 million
[15] transfer from Graduate in note G for March.
[16] 1997; right?
[17] **A:** Yes.
[18] **Q:** And then a $5 million transfer from Graduate
[19] in note H for April 1997?
[20] **A:** Correct.
[21] **Q:** That $8 million amount is the only amount
[22] that's identified on the schedule as a
[23] transfer from Graduate; right?
[24] **A:** Yes.
[25] **Q:** And the next page, Bates page M, which is the

---

1—10:36:21  25—10:37:32                Page 610

[1] outpatient bad debt roll forward for Elkins
[2] Park, there are no amounts that are
[3] identified as transfers from Graduate, are
[4] there?
[5]     A: No.
[6]     Q: And on each of the schedules in inpatient and
[7] outpatient, the note for the other amount for
[8] June includes a shortfall adjustment; right?
[9]     A: Yes
[10]    Q: $24,000 for inpatient and $2,700,000 for
[11] outpatient?
[12]    A: Yes
[13]    Q: And there is no way to tell from these
[14] schedules how much of that amount involved
[15] the transfer of reserves from Graduate, is
[16] there?
[17]    A: No
[18]    Q: And there is no way to tell from these
[19] schedules which portion of the so-called
[20] shortfall adjustment was expensed and which
[21] portion was not expensed; right?
[22]    A: Correct
[23]    MR. RYAN: Can we mark, please, as
[24] Exhibit 291 a set of schedules with Bates
[25] numbers CL013568 A through N as in Nancy.

5—10:37:38  25—10:39:03                Page 611

[1]
[2]     (Deposition Exhibit 291 marked for
[3] identification.)
[4]
[5]              BY MR. RYAN:
[6]     Q: Do you recognize the schedules in Exhibit
[7] 291, Ms Schaffer?
[8]     A: Yes
[9]     Q: What are they?
[10]    A: Again, these are similar to Exhibits 289 and
[11] 290, except they are for Hahnemann Hospital,
[12] and they are the in and outpatient bad debt
[13] reserve calculations and the in and
[14] outpatient bad debt roll forward analyses
[15]    Q: As with the previous two exhibits, these are
[16] schedules that you or your staff prepared and
[17] that you reviewed as part of your calculation
[18] of the bad debt allowances for the DVOG
[19] hospitals at June 30, '97?
[20]    A: Yes
[21]    Q: And you then provided the schedules to
[22] Coopers & Lybrand as part of their audit?
[23]    A: Yes
[24]    Q: Now, if you could look, please, at the
[25] inpatient bad debt roll forward on Bates page

1—10:39:05  25—10:40:08                Page 612

[1] M as in Mary, do you see note E states
[2] Transfer of reserves from Graduate?
[3]     A: Yes
[4]     Q: And that refers to a $5 million amount in
[5] March and a $5 million amount in April?
[6]     A: Yes
[7]     Q: For a total of $10 million?
[8]     A: Yes
[9]     Q: And in your understanding is that Hahnemann
[10] University Hospital's portion of the $50
[11] million reserve transfer?
[12]    A: Yes.
[13]    Q: Are there any other amounts either on the
[14] inpatient or outpatient bad debt roll forward
[15] that are identified as reserves transferred
[16] from Graduate?
[17]    A: No
[18]    Q: Do you believe that there are additional
[19] amounts that, in fact, were reserves
[20] transferred from Graduate?
[21]    A: Yes
[22]    Q: And where are those identified?
[23]    A: In footnote F on schedule M and footnote D on
[24] schedule N
[25]    Q: And those are notes that in each case just

1—10:40:11  22—10:41:30                Page 613

[1] read bad debt shortfall adjustments; right?
[2]     A: Correct.
[3]     Q: Is there any way that you can tell from
[4] looking at these schedules how much of the
[5] $691,047, amount in the other column for the
[6] inpatient bad debt allowance for June was a
[7] transfer of reserves from Graduate?
[8]     A: No.
[9]     Q: And is there any way that you can tell from
[10] looking at these schedules that you provided
[11] to Coopers & Lybrand how much of the
[12] $10,638,000 amount in the other column of the
[13] outpatient bad debt roll forward for June was
[14] reserves transferred from Graduate?
[15]    A: No
[16]    Q: Is there any way you can tell on either of
[17] these schedules how much of the shortfall
[18] adjustments were expense?
[19]    A: No.
[20]    MR. RYAN: Let me mark, please, as
[21] Exhibit 292 a set of schedules with Bates
[22] numbers CL013580 A through G
[23]
[24]    (Deposition Exhibit 292 marked for
[25] identification.)

---

2—10:41:35  25—10:42:52                    Page 614

[1]
[2]            **BY MR. RYAN:**
[3]    **Q:** I apologize for the small type on some of the
[4] pages. Do you recognize the schedule in
[5] Exhibit 292, Ms. Schaffer?
[6]    **A:** Yes.
[7]    **Q:** What are they?
[8]    **A:** These are the same schedules we have just
[9] looked at in the previous three exhibits for
[10] MCC and EPPI. It's the bad debt reserve
[11] calculation and the roll forwards for in and
[12] outpatient.
[13]    **Q:** MCC was the main clinical campus of the
[14] Medical College of Pennsylvania Hospital;
[15] right?
[16]    **A:** Correct
[17]    **Q:** Also known as MCP?
[18]    **A:** Yes
[19]    **Q:** So Bates page F shows on the top the bad debt
[20] roll forward for EPPI; right?
[21]    **A:** Yes
[22]    **Q:** The Eastern Pennsylvania Psychiatric
[23] Institute?
[24]    **A:** Yes
[25]    **Q:** And the bottom of Bates page F shows the bad

---

1—10:42:55  25—10:44:12                    Page 615

[1] debt roll forwards for MCP inpatient?
[2]    **A:** Yes
[3]    **Q:** And Bates page G shows the bad debt roll
[4] forward for MCP outpatient; right?
[5]    **A:** Yes
[6]    **Q:** And now is it your understanding that as of
[7] June 30, '97, the EPPI bad debt allowance
[8] account was closed out and combined with the
[9] MCP inpatient account?
[10]    **A:** Yes.
[11]    **Q:** And that's why the ending balance for the bad
[12] debt allowance account at EPPI is zero?
[13]    **A:** Yes
[14]    **Q:** And the balance in the account was then
[15] transferred to the MCP inpatient account;
[16] right?
[17]    **A:** Correct
[18]    **Q:** And the required bad debt allowance of MCP
[19] inpatient that you calculated then was the
[20] required amount for the inpatient accounts
[21] receivable at MCP plus the required amount
[22] for the accounts receivable at EPPI?
[23]    **A:** Yes
[24]    **Q:** Now, the only amounts that are identified on
[25] any of these three bad debt roll forwards for

---

1—10:44:16  24—10:45:31                    Page 616

[1] MCP Hospital and EPPI as being the transfer
[2] of reserves from Graduate is $15 million in
[3] note F on the MCP inpatient bad debt roll
[4] forward; correct?
[5]    **A:** Correct
[6]    **Q:** And now again note G at MCP inpatient and
[7] note D on MCP outpatient refer to a YE
[8] shortfall adjust or adjustment; right?
[9]    **A:** Yes
[10]    **Q:** Is it your understanding that those so-called
[11] shortfall adjustments included the transfer
[12] of reserves from Graduate?
[13]    **A:** Yes
[14]    **Q:** But there is no way to tell from these roll
[15] forward schedules how much of that shortfall
[16] adjustment involved transfer of reserves from
[17] Graduate, is there?
[18]    **A:** No.
[19]    **Q:** There is no way to tell how much of the
[20] shortfall adjustment was expensed; right?
[21]    **A:** No.
[22]    **MR. RYAN:** Let me mark, please, as
[23] Exhibit 293 a schedule with Bates number
[24] CL13584 A through M
[25]

---

4—10:45:35  25—10:46:49                    Page 617

[1]    (Deposition Exhibit 293 marked for
[2] identification.)
[3]
[4]            **BY MR. RYAN:**
[5]    **Q:** Do you recognize the schedules in Exhibit
[6] 293, Ms. Schaffer?
[7]    **A:** Yes
[8]    **Q:** What are they?
[9]    **A:** Again, this is the same type of schedules we
[10] were looking at in the previous four
[11] exhibits, but this one is for St
[12] Christopher's Hospital. It's the bad debt
[13] reserve calculations and the corresponding in
[14] and outpatient bad debt reserve roll
[15] forwards.
[16]    **Q:** These schedules, as with the schedules in the
[17] previous four exhibits, were prepared by you
[18] or your staff and were reviewed by you as
[19] part of your calculation of the bad debt
[20] allowances at the DVOG hospitals at June 30,
[21] 1997; right?
[22]    **A:** Yes
[23]    **Q:** And you then provided these schedules to
[24] Coopers & Lybrand for their audit?
[25]    **A:** Yes

---

# In The Matter Of:

*AHERF   v.*

*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*ROBIN R. SCHAFFER*

*Vol. 4, October 3, 2002*

---

*MANHATTAN REPORTING CORP.*

*420 LEXINGTON AVENUE*

*NEW YORK, NY  10170*

*(212) 557-7400     FAX: (212) 692-9171*

*Original File 100302RS.TXT, 243 Pages*
*Min-U-Script® File ID: 0505685479*

# Word Index included with this Min-U-Script®

AHERF  v.

PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN R. SCHAFFER

Vol. 4, October 3, 2002

---

1—14:22:52  25—14:24:04                    Page 938

[1] write-off?

[2]  A: Yes To cover this portion of the receivables,

[3] yes

[4]  Q: When you say this portion of the receivables,

[5] you're referring to the entirety of the past

[6] statute write-offs performed during fiscal year

[7] 1997, right?

[8]  A: Right

[9]  Q: Which in gross amount were $80 million, but had

[10] a net effect before the associated bad debt

[11] allowance of $60,456,000?

[12]  A: Right. Yes

[13]  Q: And I believe you testified that during fiscal

[14] year 1998, Mr Cancelmi wanted to establish a

[15] reserve on AHERF's books for the

[16] accounts-at-gross problem, is that right?

[17]  A: Yes

[18]  Q: And I think, in your words, that reserve was

[19] nixed by someone higher than Dan?

[20]  A: Yes

[21]  Q: Do you have any information as to who that may

[22] have been who nixed the reserve?

[23]  A: Not for sure  I know that it was communicated

[24] to Dan through Chuck Morrison  I don't know

[25] whether Chuck made the decision or somebody

---

1—14:24:06  25—14:25:45                    Page 939

[1] above him Actually, Dan wanted to book the

[2] accounts at gross prior to '98 also, not just

[3] in '98 the reserves

[4]  Q: Now, do you recall you testified that back in

[5] 1997, you believe that Bill Buettner may have

[6] played some role in coming up with the idea for

[7] the $50 million reserve transfer?

[8]  A: Yes

[9]  Q: Were conversations that you had with Dan

[10] Cancelmi the only source for that belief?

[11]  A: Yes, and the only other thing I'm trying to

[12] recollect is when price came back with Bill

[13] Buettner — after the bankruptcy, when they

[14] came back in the summer of '98, there was some

[15] dialogue going back and forth between Dan and

[16] Bill at that time, and I don't remember

[17] specifically if something then may have been

[18] said that would lead me to believe that Bill

[19] was only knowledgeable of the 50 or part of its

[20] creation. I have like a vague thought in my

[21] mind that there was something said during that

[22] meeting that may also lead me to believe that

[23] Bill Buettner had more than just a knowledge of

[24] it

[25]  Q: Something said by Mr Cancelmi at that meeting?

---

1—14:25:48  25—14:26:55                    Page 940

[1]  A: Said by Mr Cancelmi to Bill Buettner

[2]  Q: You don't recall Mr Buettner saying anything

[3] that would lead you to believe that he was

[4] admitting that he played a role in coming up

[5] with the $50 million reserve transfer?

[6]  A: No

[7]  Q: This is just based on statements from

[8] Mr Cancelmi?

[9]  A: Statements from Mr Cancelmi and statements —

[10] dialogue in that particular meeting, yes.

[11]  Q: And you've never seen any documents which

[12] suggest that Coopers & Lybrand participated in

[13] coming up with the idea for the $50 million

[14] reserve transfer have you?

[15]  A: No.

[16]  Q: You've never spoken to anyone else who has

[17] suggested that Coopers & Lybrand played a role

[18] in coming up with the $50 million reserve

[19] transfer, right?

[20]  A: Right.

[21]  Q: Your knowledge is just hearsay from Dan

[22] Cancelmi, right?

[23]  A: Hearsay again, and, yes, there's something that

[24] was said in that meeting that leads me to

[25] believe that I got the impression not just from

---

1—14:26:58  25—14:28:28                    Page 941

[1] hearing it from Dan, but from dialogue that Dan

[2] had with Bill Buettner during that meeting.

[3]  Q: So that Dan said this to you in 1997, and then

[4] again said it in 1998 in a meeting which Bill

[5] Buettner was present, is that right?

[6]  A: I don't know exactly — I don't recall exactly

[7] what Dan said in the meeting, but something was

[8] said during that meeting that leads me to

[9] believe today that he played — it was more

[10] than just him knowing about it

[11]  Q: And just, again, just to be certain we've got a

[12] clear record, Bill Buettner didn't say anything

[13] in your presence indicating that he agreed with

[14] that in any way, did he?

[15]  A: He did not

[16]  Q: Now, you also testified that at the time you

[17] were going through the bad debt roll-forwards

[18] with Kristen Heinlein during the interim field

[19] work, you were under the impression that Amy

[20] Frazier already knew about the $50 million

[21] reserve transfer, right?

[22]  A: Yes

[23]  Q: And was your source for that understanding that

[24] you had at the time also Dan Cancelmi?

[25]  A: Yes

---

Case 2:00-cv-00684-DSC     Document 184     Filed 08/19/2005     Page 62 of 64

ROBIN R. SCHAFFER                                                    AHERF   v.
Vol. 4, October 3, 2002                         PRICEWATERHOUSECOOPERS, L.L.P.

---

1—14:28:28   25—14:30:05                               Page 942

[1]   Q: You didn't participate in any conversations
[2] with Amy Frazier at or before that time about
[3] the $50 million reserve transfer, right?
[4]   A: No, not specifically with Amy.
[5]   Q: So, again, the impression that you were under
[6] in the interim field work in 1997 that Amy
[7] Frazier already knew about the $50 million
[8] reserve transfer is hearsay from Dan Cancelmi,
[9] right?
[10]   A: Yes.
[11]   Q: Now, I think you testified about the PFMA
[12] reserve that was transferred from The Graduate
[13] Hospital to one or more DVOG hospitals, right?
[14]   A: Yes.
[15]   Q: And you testified that based on schedules that
[16] you provided to Coopers & Lybrand, they could
[17] have determined on the Graduate side that that
[18] reserve was no longer on the books at June 30,
[19] 1997, right?
[20]   A: Yes.
[21]   Q: But you did not provide them with any schedules
[22] that would have disclosed that what happened to
[23] the PFMA reserve was that it was transferred to
[24] DVOG, right?
[25]   A: Well, part of it was on the bad debt

---

1—14:30:09   25—14:31:30                               Page 943

[1] roll-forward; part of the PFMA reserve was used
[2] to cover the $75 million total shortfall. So,
[3] I guess, indirectly, by giving them the
[4] roll-forward, a piece of it was there.
[5]   Q: The bad debt roll-forward doesn't say the word
[6] PFMA or those four letters, does it?
[7]   A: No.
[8]   Q: It just says shortfall adjustment, right?
[9]   A: Right.
[10]   Q: You know that the shortfall adjustment
[11] included, among many other things, the PFMA
[12] reserve, right?
[13]   A: Right.
[14]   Q: But there's no way to tell that from looking at
[15] the schedules, is there?
[16]   A: No.
[17]   Q: To the best of your knowledge, did Amy Frazier
[18] have any information from which she could have
[19] told that the PFMA reserve from The Graduate
[20] Hospital ended up being used at DVOG?
[21]   A: She had access to the journal entries which
[22] would have given her that information. Whether
[23] or not she looked at them, I don't know.
[24]   Q: By access to the journal entries, you mean that
[25] she could have asked you or one of your

---

1—14:31:34   25—14:32:56                               Page 944

[1] colleagues in the accounting department at
[2] AHERF to see the sheet with the particular
[3] information for that journal entry, is that
[4] right?
[5]   A: Yes. Yes.
[6]   Q: You knew at the time that it was not part of
[7] Coopers & Lybrand's normal audit procedure to
[8] review all the journal entries that AHERF
[9] booked throughout the year, right?
[10]   A: All, no. Significant, yes.
[11]   Q: And Amy Frazier did raise the issue of the PFMA
[12] reserve with you, right, asking you why it was
[13] no longer on the books, right?
[14]   A: Asking me to clarify if Graduate no longer
[15] needed it. Yes.
[16]   Q: All right. And that suggested to you that she
[17] knew it was no longer on the books of The
[18] Graduate Hospital, is that right?
[19]   A: Yes.
[20]   Q: And in that conversation, you did not tell Amy
[21] Frazier that the PFMA reserve had been used at
[22] DVOG, right?
[23]   A: No.
[24]   Q: And you didn't tell her that at any other time,
[25] did you?

---

1—14:32:56   25—14:34:25                               Page 945

[1]   A: Not that I'm aware of.
[2]   Q: You didn't tell anybody else from Coopers that
[3] at any time, did you?
[4]   A: No.
[5]   Q: Did you ever tell anybody from Coopers &
[6] Lybrand there's some unusual journal entries in
[7] June 1997 that you might want to take a look
[8] at?
[9]   A: I think by presenting the roll-forward in the
[10] manner that I did to them was telling them
[11] something.
[12]   Q: And when you say presenting the roll-forward,
[13] you just mean the way that you prepared the
[14] schedule the way it appeared on the page,
[15] right?
[16]   A: Yes. I made very easy for them to specifically
[17] see that there were unusual transactions at
[18] specific dollar amounts that had gone on in
[19] fiscal '97.
[20]   Q: When you gave Coopers & Lybrand the June 1997
[21] bad debt roll-forwards, you didn't say to them,
[22] hey, there's some unusual journal entries here
[23] in June that you might want to take a look at?
[24]   A: That's not really the process of how things
[25] work, so, no

---

AHERF v.
PRICEWATERHOUSECOOPERS, L.L.P.

ROBIN R. SCHAFFER
Vol. 4, October 3, 2002

---

1—14:34:26  25—14:36:14                           Page 946

[1]   **Q:** Did you believe at the time that there were
[2]   unusual journal entries?
[3]   **A:** Yes.
[4]   **Q:** If you had been conducting an independent audit
[5]   of the AHERF consolidated financial statements
[6]   in 1997, would you have wanted to examine those
[7]   journal entries?
[8]   **A:** Yes.
[9]   **Q:** And you generally had a good working
[10]  relationship with Amy Frazier, right?
[11]  **A:** Yes.
[12]  **Q:** But it didn't occur to you to tell Amy about
[13]  these journal entries that you knew Amy would
[14]  want to know about?
[15]  **A:** I feel like I did tell her on the roll-forward
[16]  schedules.
[17]  **Q:** You felt that you told Amy Frazier about the
[18]  unusual journal entries by handing the piece of
[19]  paper which said shortfall adjustment to
[20]  Kristen Heinlein?
[21]  **A:** Yes.
[22]  **Q:** Apart from handing the piece of paper which
[23]  said shortfall adjustment to Kristen Heinlein,
[24]  is there anything else that you did to tell Amy
[25]  Frazier that there were these unusual journal

---

1—14:36:17  25—14:37:24                           Page 947

[1]   entries in June of 1997 that she should look
[2]   at?
[3]   **A:** No.
[4]   **Q:** Looking back at it years later, do you wish
[5]   that you had told Amy Frazier?
[6]   **A:** No, I don't — I still think I gave her the
[7]   information she asked for and needed.
[8]   **Q:** You don't think that if you had gone to Amy
[9]   Frazier and told her, Amy, there are these
[10]  journal entries in June 1997, we've never done
[11]  anything like this before, it's pretty unusual,
[12]  maybe you want to check it out, you don't think
[13]  that we could have perhaps avoided a lot of
[14]  what's going on now?
[15]  **MR. COGAN:** Objection
[16]  **A:** A lot of that stuff was discussed at the prelim
[17]  audit. I gave her memos. I gave them copies
[18]  of all the past statute write-offs. The only
[19]  thing I did not do is, when I give them the
[20]  June schedules, walk in there and say, I'm
[21]  going to audit this for you; this is what you
[22]  need to know. I gave them the information.
[23]  They did not ask me any questions.
[24]  **Q:** And during the preliminary field work, the only
[25]  reserve transfers that had been made at that

---

1—14:37:26  25—14:39:18                           Page 948

[1]   time or even thought of by that time was the
[2]   $50 million transfer, right?
[3]   **A:** Yes.
[4]   **Q:** And all the different pieces of the $21 million
[5]   reserve transfer, of the $28 million reserve
[6]   transfer were all done after the preliminary
[7]   field work?
[8]   **A:** Yes.
[9]   **Q:** I think you've testified before that no one at
[10]  AHERF at the time, to your knowledge, ever
[11]  added up the different amounts in the way that
[12]  we have today to arrive at a $99 million total,
[13]  is that right?
[14]  **A:** Yeah. I testified that no one at AHERF had
[15]  done it, nor had anyone at Coopers ever done
[16]  that until things blew up.
[17]  **Q:** We've discussed before how most of the DVOG
[18]  hospitals on a monthly basis determined their
[19]  bad debt expense using the income statement
[20]  method, right?
[21]  **A:** Yes.
[22]  **Q:** And then at year's end, the balance sheet
[23]  method which involved the buckets with the
[24]  different payor categories and the aging
[25]  category would be applied, right?

---

1—14:39:19  25—14:41:11                           Page 949

[1]   **A:** Yes. They were applied before year end, but
[2]   they had to be trued up at year end.
[3]   **Q:** Right. Okay.
[4]       So that it would be typical for this
[5]   truing up process to occur in June, right?
[6]   **A:** Yes.
[7]   **Q:** And if there was a bad debt reserve shortfall,
[8]   based on the use of the income statement method
[9]   throughout the year, then a shortfall
[10]  adjustment would be made in June in order to
[11]  true up the reserve to the amount required by
[12]  application of the balance sheet method, right?
[13]  **A:** Yes. The entry is normally a provision entry.
[14]  It was part of the normal booking of the bad
[15]  debt expense. It wasn't an unusual item. Yes.
[16]  **Q:** And when you say it was normally a provision
[17]  entry, you mean that there was a debit to bad
[18]  debt expense?
[19]  **A:** Yes
[20]  **Q:** For that shortfall adjustment in truing up from
[21]  the income statement method to the balance
[22]  sheet method?
[23]  **A:** Yes.
[24]  **Q:** And for that reason, it's quite possible, isn't
[25]  it, that when Coopers & Lybrand looked at the

---

ROBIN R. SCHAFFER
Vol. 4, October 3, 2002

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

1—14:41:14   25—14:42:31                    Page 950

[1] bad debt roll-forwards and saw a June entry for
[2] shortfall adjustments, they thought that what
[3] was going on was that you were booking a debit
[4] to bad debt expense to true up from the income
[5] statement method to the balance sheet method?
[6]    MR. COGAN: Objection
[7]    A: It wouldn't work for Hahnemann, because they
[8] were on the balance sheet method, so that sort
[9] of hurts that right there, but those
[10] adjustments were never presented as shortfall
[11] adjustments before. They were just part of the
[12] normal provision entry. It's just unusual that
[13] it was in an other column and footnoted on any
[14] of the hospitals for June
[15]    Q: And Kristen Heinlein had never worked on
[16] accounts receivable for prior years' audits, so
[17] she wouldn't know what the schedules looked
[18] like at June 1996 or June 1995?
[19]    A: No The schedule, though, in the March looked
[20] like all the previous ones I didn't do the
[21] footnoting until June of fiscal '97
[22]    Q: For the four DVOG hospitals that were on the
[23] income statement method, does it make sense to
[24] you that somebody would think a shortfall
[25] adjustment in June related to a debit to bad

1—14:42:38   25—14:43:49                    Page 951

[1] debt expense to true up from the income
[2] statement method to the balance sheet method?
[3]    MR. COGAN: Objection
[4]    A: They should have asked, but they might have
[5] thought that
[6]    Q: Now, Mr. Cogan asked you about the $28 million
[7] reserve transfer which went to the contractual
[8] allowance accounts at the DVOG hospitals,
[9] right?
[10]    A: Yes
[11]    Q: And I believe you testified that you tried to
[12] put the $28 million in reserves into particular
[13] accounts in the trial balance, is that right?
[14]    A: They were booked to the other contractual
[15] allowance account which normally doesn't have
[16] significant dollars in it Our contractual
[17] allowance accounts are set up by payor So
[18] there's Medicare, Medical Assistance, Blue
[19] Cross and so forth, and then there's an other
[20]    Q: All right And the other contractual allowance
[21] account was an already existing account, right?
[22]    A: Yes
[23]    Q: And do you believe that the name of the account
[24] was other?
[25]    A: Yes It was called inpatient contractual

1—14:43:53   25—14:45:30                    Page 952

[1] other, outpatient contractual other
[2]    Q: The account wasn't called Graduate reserve
[3] transfer?
[4]    A: No
[5]    Q: So that somebody looking at this trial balance
[6] wouldn't have been able to tell from the trial
[7] balance that these amounts had been transferred
[8] from Graduate, right?
[9]    A: No
[10]    Q: And there were some additional amounts in the
[11] other contractual allowance accounts, right?
[12]    A: Yes. Insignificant amounts, but there were
[13] amounts in there, yeah
[14]    Q: It did not purely contain the $28 million
[15] reserve transfer?
[16]    A: It did not
[17]    Q: Now, could you take a look at another exhibit
[18] Mr Cogan showed you which was Exhibit 321
[19] It's a packet of schedules It has a lead
[20] schedule headed Graduate System Reserves FY End
[21] of June 30, 1997
[22]    A: I saw that one
[23]    MR. COGAN: While the witness is
[24] looking for the exhibit, how much longer are
[25] you going to be?

1—14:45:31   25—14:46:49                    Page 953

[1]    MR. RYAN: Very little This may be
[2] the last document I'll just look at my notes
[3] then So far as I know right now, this is the
[4] last one I have
[5]    A: I found it
[6]    Q: All right Now, this is a packet of schedules
[7] that you and Mr Cancelmi and Mr. Lisman
[8] prepared after the bankruptcy, is that right,
[9] or a packet that you collected and prepared a
[10] cover sheet for at that time?
[11]    A: Yes
[12]    Q: The actual schedules that are attached are
[13] pre-existing schedules?
[14]    A: Yes
[15]    Q: Was the purpose of preparing this packet of
[16] schedules to try to get the best evidence that
[17] you could that Coopers & Lybrand knew about the
[18] $28 million reserve transfer?
[19]    A: Yes
[20]    Q: Now, you looked with Mr Cogan, I think, at the
[21] third page of the exhibit, Bates page 74?
[22]    A: Yes
[23]    Q: This is the agenda for a meeting on August 22,
[24] 1997?
[25]    A: Yes