TAB 199



# AHERF

**Allegheny Health, Education and Research Foundation**

D L. Clark Building, 4th Floor
Pittsburgh, Pennsylvania 15212

## MEMORANDUM

DATE:        April 18, 1997

TO:          Distribution

FROM:        John T. Lydon
             Director, Accounting & Financial Reporting, Pittsburgh

             Chuck Lisman
             Director, Financial Services

SUBJECT:     **Coopers & Lybrand Audit Requests**

Attached you will find the Fiscal Year 1997 Coopers & Lybrand (C&L) Audit Schedule Request for Allegheny Health, Education and Research Foundation and affiliates. Please read through this request and prepare the appropriate schedules/analyses relative to your areas of responsibility. Note that there are two time frames outlined in this request, preliminary fieldwork scheduled to begin April 28, 1997 and year-end fieldwork scheduled to begin in late July or early August. Any schedules/analyses requested for preliminary fieldwork should be prepared as of March 31, 1997 and returned to Accounting by Tuesday, April 29, 1997. Year-end schedules/analyses should be prepared as of June 30, 1997 and returned by Thursday, July 31, 1997. The schedules/analyses prepared for the preliminary fieldwork should be "rolled forward" to account for the activity from April through June and available for review at year-end. As mentioned in the C&L request, they would like all schedules/analyses and any other supporting documentation to be supplied on disk in either Lotus 1-2-3 or Wordperfect format if possible. Please note that C&L will also be updating their understanding of our internal control environment during preliminary fieldwork, making it necessary for them to meet with a number of you in addition to any specific schedules/analyses that have been requested. If you have any questions on any matter related to this request please call Chuck Lisman at (412) 442-2153 for Delaware Valley entities or Jack Lydon at (412) 442-2194 for Pittsburgh entities. Thank you.

JTL.kw
s:\k\w\jtl\c&l97aud.wpd

Distribution:

| | | |
|---|---|---|
| Al Adamczak | Russ Laing | Nick Vidovich |
| Nick Borrelli | Ron Longobucco | Angie Yanez |
| Marcia Caliendo | Rich McKeown | |
| Dan Cancelmi | Chuck Morrison | |
| Dave Deasy | Mike Moyer | |
| Jeff Eberly | Jack Nelson | |
| Jack Ellsworth | Kristie Pippy | |
| Jim Fascetti | Bryan Randall | |
| Joe Gindhart | Keith Reabe | |
| Sue Gilbert | Susan Rutter | |
| Missy Hershberger | Kathleen Saunders | |
| Barb Johnson | Robin Schaffer | |
| Elaine Junio | Joe Scharf | |
| Bruce Kehr | Greg Snow | |
| Don Kline | Steve Spargo | |

CANDEP 01343



# Coopers &Lybrand

| Coopers & Lybrand L.L.P. | 600 Grant Street | telephone (412) 355-8000 |
| a professional services firm | 35th Floor<br>Pittsburgh, Pennsylvania<br>15219-2777 | facsimile  (412) 355 8089 |

April 15, 1997

Mr Jack Lydon
Director
Allegheny Health, Education
    and Research Foundation
503 Martindale Street
Fourth Floor
Pittsburgh, PA 15212

Dear Jack.

Enclosed please find a copy of our annual schedule request  The request has been prepared at an
AHERF level with a separate analysis of the recent affiliations and should be utilized as
considered applicable for each affiliate entity  If you have any questions please contact me at
355-7531, Christa Porter at 355-8029, Mark Kirstein at 355-7546 or Amy Frazier at 392-4933.
As originally discussed, we are expecting to perform preliminary fieldwork beginning April 28
through May 30, 1997

Sincerely.

Brian Christian

Brian Christian

Enclosure

cc:    A. Adamczak
       D. Cancelmi
       C. Lisman

CANDEP 01344

Coopers & Lybrand L L P  is a member of Coopers & Lybrand International  a limited liability association incorporated in Switzerland

# AHERF
## Fiscal Year 1997 Schedule Request
## Preliminary and Year End Fieldwork

The following document represents our annual schedule request which identifies the more significant schedules that we will need to complete the audit of AHERF and its affiliates. The schedules should be prepared for each entity as considered applicable. Consistent with previous years, **all schedules should be completed as of June 30,** however, in addition, certain schedules should also be provided at an interim date (i.e., March 31, 1997) to be used in completion of early substantive audit testing. Page two of this document includes a summary those areas that will be included in our early substantive audit testing procedures. This document is intended to be a guide, internal schedules which meet the same objective should be substituted in place of the requested schedule.

Consistent with the 1996 audit we will utilize the Coopers & Lybrand Audit Support System (CLASS) on the AHERF audits. CLASS is our Firm's version of a "paperless" audit. We are requesting that you provide us the schedules and any other supporting documentation on a disk in either LOTUS 1-2-3 or WordPerfect format. If there are items which are not available on disk, such as contracts, debt instruments or invoices, there is no need to create a file, we will simply use the hard copy evidence as we have done in the past.

Additionally, we will update our understanding and test the internal control environment during our preliminary audit phase. Our primary areas of focus include revenue, both the patient and professional fee cycles, payroll, purchasing, grant administration, student revenues, intercompany charges, fixed assets and treasury systems. Our procedures will involve meeting with operational personnel, documenting changes to the environment and selecting samples of transactions and specific controls for testing. We would appreciate your assistance in alerting these personnel that we will be in contact with them during our preliminary phase.

CANDEP 01345

# AHERF
## PRELIMINARY PHASE
## AUDIT AREAS

- Patient Accounts Receivable, including CRA's (*)
- Malpractice and Workers Compensation Accruals Testing (*)
- Property, Plant & Equipment (*)
- Other Assets (*)
- Other Liabilities (*)
- Review of all managed care contracts for the AHERF system. (*)
- Document controls of investment system and review supporting documentation for propriety of classifications.
- Document and test any significant system conversions.
- Review Board of Trustee minutes.
- Summary of all attorneys consulted during the fiscal year for preparation and mailing of legal letters.
- Fluctuation analysis for all entities & other analytical procedures.
- Audit of the AHERF, AVH, and Forbes defined benefit retirement plan and Zurbrugg's defined contribution retirement plans as of December 31, 1996. (See page 10 of this document for a detailed Schedule Request covering these procedures.)
- Opening balance sheet procedures, including purchase accounting adjustments for AVH, Forbes and Graduate entities
- Depreciation recapture calculation
- New lease transactions.

(*) For those accounts that we perform early substantive procedures as of the interim date of March 31, 1997, we will update the activity for these areas to year end and perform the appropriate audit tests, including comparative analyses as of June 30, 1997.

CANDEP 01346

## AHERF SCHEDULE REQUEST
## FISCAL YEAR 1997

### CASH

- Comparative schedule of cash balances at June 30. 1997
- Reconciliation of all accounts to bank statements and general ledgers
- Identify restrictions on cash accounts.
- Preparation of bank confirmations
- Analysis of intercompany transfers.

### INVESTMENTS (All Trustee Held, Board Designated, Endowment, Working Capital and Other Investments):

- Comparative schedule of investments. segregated by investment type. including a comparison to market value.
- Reconciliation of all accounts to the applicable trust statements
- Analysis of accrued interest receivable.
- Analysis of investment income
- Identify restrictions on accounts.
- Preparation of bank confirmations.
- Analysis of transfers to Mellon Master Trust.
- Reconciliation of system conversion.

### PATIENT ACCOUNTS RECEIVABLE (including CRA's) / PROFESSIONAL FEE REVENUE

The following list represents our request for both patient accounts receivable and professional fee revenue  Each bullet point may not be applicable to both areas.

- Provide a copy of management's statistical package at March 31, 1997 and June 30, 1997.
- Summarize accounts receivable, including in-house, DNFB and final billed, for inpatient and outpatient accounts as considered appropriate. Include reconciliations to the general ledger. (Including the number of patients and patient days (where applicable) for each category).
- Summarize number of patients and patient days (where applicable) for each category at March 31 and June 30  (category would be in-house, DNFB and Final billed on an inpatient and outpatient basis).
- Prepare a comparative aged A/R summary by significant payor type, based on date of service for outpatient and date of discharge for inpatient.
- Provide remittance advice summaries for the fiscal year.
- Summarize remittance advices subsequent to year end through August 29, 1997
- Provide analyses of contractual allowances for DNFB and in-house
- Provide a listing of all patient receivable balances greater than 90 days old in excess of $100.000 including documentation on the status of the account.
- Analyze the cash clearing accounts for inpatient/outpatient balances and provide a detailed listing of unposted cash at year end

3

CANDEP 01347

## AHERF SCHEDULE REQUEST
## FISCAL YEAR 1997

## PATIENT ACCOUNTS RECEIVABLE (Including CRA's) / PROFESSIONAL FEE REVENUE, continued

- Provide a listing of "credit balance accounts" for accounts greater than $25,000
- At year-end, provide a high dollar account analysis for patient account balances in excess of $200,000. The analysis should include payor, patient number, patient name, account balance, contractual allowance estimates recorded, net receivable, aging for final billed account and status of the account. This year-end analysis should be updated for subsequent receipts through August 22, 1997
- Analyze the allowance for doubtful accounts as of March 31 and June 30, 1997. Compare the estimate with prior year. Summarize account balance activity for the year to bad debt expense by payor. Additionally, any internal analyses of bad debt methodologies that provide consistency between entities should be provided.
- Summarize third party payor denials
- Summarize charity care, including charges foregone and expenses to administer the care
- Provide copies of the results of all KEPRO reviews at March 31, 1997 and updated through June 30, 1997
- Provide a summary of CRA activity at March 31, 1997 and updated through June 30, 1997 Summary should include beginning balances, cash receipts, cash payments, other activity and ending balances.
- Analyze ending CRA balances for all open years. This should include the current year estimate.
- Summarize cash correspondence for prior years CRA's and make available third party correspondence during the year.
- Provide a summary of PIP account activity at March 31, 1997 and updated through June 30, 1997.
- Analyze ending PIP balances for all open years.
- Make available third party correspondence related to CRA and PIP account activity during the current fiscal year.
- Preparation of KEPRO confirmations.

## STUDENT ACCOUNTS RECEIVABLE

- Comparative schedule of balances with prior year
- Analysis of allowance for doubtful accounts.
- Analysis of bad debt expense.
- Listing of all credit balances at June 30, 1997
- Statistical information (i.e., student enrollment by program and financial aid, rates, etc.)

CANDEP 01348

4

## AHERF SCHEDULE REQUEST
### FISCAL YEAR 1997

INTERCOMPANY ACCOUNTS

- Provide a detailed analysis of all intercompany accounts including reconciliation to the general ledger
- Assess collectibility of receivables
- Make available intercompany overhead charge model and policies
- Provide a summary of all G/L accounts that represent intercompany accounts

**OTHER RECEIVABLES** (including pledges and grants receivable)

- Comparative schedule of balances at March 31, 1997 and June 30, 1997
- Provide a summary of detail with reconciliation to the general ledger.
- Assess collectibility of receivables

INVENTORY

- Comparative schedule of balances with prior year.
- Provide an analysis of the inventory results (i.e., book to physical adjustments).

**OTHER ASSETS (including deferred financing costs, equity investments)**

- Comparative schedule of balances at March 31, 1997 and June 30, 1997.
- Summarize current year activity with a reconciliation to the general ledger.
- Available financial statements of equity investments, including an analysis of any loss commitments from those investments.

**PROPERTY, PLANT AND EQUIPMENT**

- Provide a summary of current year activity, (i.e., **beginning balance plus additions less disposals equals ending balance**) with a reconciliation of the subsidiary ledger to the general ledger. (This schedule should be available for year-end fieldwork only )
- Identify any non-cash transactions during the current year
- Analyze depreciation/amortization expense and reconcile to the income statement.
- Summarize significant gains/losses on retirements, if any.
- Provide a copy of the capital additions budget with a comparison of budget vs. actual and significant variances analyzed.
- Provide capitalized interest calculation at June 30, 1997.

CANDEP 01349

# AHERF SCHEDULE REQUEST
## FISCAL YEAR 1997

## LEASING

- Make available all new capital and operating lease documents.
- Prepare a five year payout schedule for both operating and capital lease arrangements at June 30, 1997
- Provide a detail of rent expense by entity
- SAS #13 analysis for all new leases
- Analysis of all sale / leaseback transactions
- Summary of open commitments

## ACCOUNTS PAYABLE

- Comparative schedule of balances with prior year.
- Provide reconciliation of the subsidiary ledger to the general ledger
- Make available check registers and subsidiary ledgers to perform a search for unrecorded liabilities.
- Provide a listing of open purchase orders at June 30, 1997

## ACCRUED EXPENSES

- Comparative schedule of balances at June 30, 1997.
- Provide supporting documentation for significant accruals (vacation, payroll, sick pay, student deposits and prepayments, etc.)

## LONG-TERM DEBT

- Summary of account balance and activity during the fiscal year and reconciliation to the general ledger at June 30, 1997.
- Provide quarterly covenant calculations for all debt agreements.
- Preparation of debt confirmations.

## PENSION COST

- Summarize current year activity and reconcile to the general ledger.
- Reconcile current year expense allocated to the respective entities and to the plan's actuary report.
- Summarize the status of plan transitions for those benefit plans merging into the AHERF system.

CANDEP 01350

## AHERF SCHEDULE REQUEST
### FISCAL YEAR 1997

### ADVANCES FROM THIRD-PARTY PAYORS

* Summarize activity of advance account during the year and reconcile schedule to the general ledger.
* Provide correspondence from the payor regarding changes in the authorized amount available
* Preparation of confirmations

### DEFERRED REVENUE

* Comparative schedule with prior year
* Evaluate the propriety of the amount recorded at June 30, 1997

### MALPRACTICE AND WORKERS' COMPENSATION ACCRUAL

* Comparative schedule with prior year. Analyze the balance in relation to recent history and timing of insurance coverage.
* Reconcile the current year activity of the accrual to the general ledger.
* Prepare a summary of AHSPIC and HAHN's funded status.
* Provide actuarial report supporting the accrual for malpractice claims
* Make available claims data for testing purposes.
* Provide actuarial report for self-insurance trust funds.
* Provide a detail of commercial policies purchased for run out at Graduate, Forbes and AVH.

### PHYSICIAN CONTRACTS / MANAGED CARE AGREEMENTS

* Provide a listing of all third party agreements.
* Provide a detail of physician contracts.
* Provide a summary of covered lives by third party agreement

### NET ASSETS

* Summarize the activity in the unrestricted, temporarily restricted and permanently restricted accounts, with a reconciliation to the general ledger.

### OPENING BALANCE SHEETS (AVH, Forbes and Graduate entities)

* Valuations for all property, plant and equipment at acquisition date (opening balance sheet dates).
* Bank statements confirming opening cash balances
* Accounts receivable analyses:
  1 Run out of opening accounts receivable balances.
  2 Remittance advice summaries for testing
  3 Subsequent receipts on outstanding patient accounts receivable

CANDEP 01351

**AHERF SCHEDULE REQUEST**
**FISCAL YEAR 1997**

OPENING BALANCE SHEETS (AVH, Forbes and Graduate entities). continued

- 4 Credit balances (i e , any large credit balances in account receivable that adjust purchase price).
- Policy analysis.
  - 1 Bad debt reserve using AHERF methodology vs. current methodology (i e , support for purchase accounting adjustment).
  - 2 Workers compensation / Malpractice reserve adjustments (i.e., purchase accounting for consistent policies).
  - 3 Other
- Supporting documentation for other receivables and assets, other liabilities and debt.
- Legal due diligence review
- Listing of employees covered under severance agreements and their related compensation
- Analysis of all restructuring charges by entity
- Detail of depreciation recapture calculation.
- Make available all affiliation agreements.
- Copies of C&L reviewed 1996 Graduate Deloitte and Touche working papers.

8

## AHERF SCHEDULE REQUEST
### FISCAL YEAR 1997

## OTHER SCHEDULES

- Final trial balances at March 31, 1997 and June 30, 1997, including a download into Lotus 1-2-3
- Make available final general ledger at March 31, 1997 and June 30, 1997
- Internal financial statements for March 31, 1997 and June 30, 1997
- Summarize significant related party transactions at June 30, 1997 for footnote disclosure.
- Provide supporting information for the financial statement preparation.
- Provide internal analysis, if any, of identified organizations that would be covered by SOP 94-3 "Reporting of Related Entities by Not-for-Profit Organizations".
- Provide supporting documentation for commitments and contingencies, including physician contracts and employment agreements.
- Reconciliation of all system conversions

9

CANDEP 01353

# AHERF RETIREMENT PLANS
## SCHEDULE REQUEST

As indicated above, during our preliminary phase of fieldwork, we will complete our procedures covering the AHERF, AVH, and Forbes defined benefit retirement plan and Zurbrugg's defined contribution retirement plans. Similar to the financial statement internal control documentation, we will need to be in contact with individuals within the human resource and payroll departments. We would appreciate your assistance in alerting them of our requirements. In connection with these procedures we will also need the following information.

## DEFINED BENEFIT PLANS

- Reconciliation of participant census data to payroll
- Copies of plan amendments, if any.
- Trust statements for the plan year ended December 31, 1996.
- List of active participants as of December 31, 1996
- List of new retirees during the plan year
- List of participants who have terminated during 1996 and are vested.
- List of participants receiving benefit payments.
- Actuarial valuation for the plan year ended December 31, 1996.
- Financial statements with supporting documentation for disclosure.

## DEFINED CONTRIBUTION PLANS

- Reconciliation of participant census data to payroll
- Copies of plan amendments, if any.
- Trust statements for the plan year ended December 31, 1996.
- List of active participants as of December 31, 1996.
- List of new retirees during the plan year.
- List of participants who have terminated during 1996 and are vested.
- List of participants receiving benefit payments.
- Financial statements with supporting documentation for disclosure.

CANDEP 01354

TAB 200

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION &

RESEARCH FOUNDATION,                    Civil Action

        Plaintiff,                     No. 00-684

    vs.

PRICEWATERHOUSECOOPERS, L.L.P.,

       Defendant.



     Videotape deposition of STEPHEN H.

SPARGO, called for examination under the statute,

taken before me, Jaci R. Traver, RPR, CRR, and

Notary Public in and for the State of Ohio, at

the offices of Jones Day, 500 Grant Street,

Pittsburgh, Pennsylvania, on Thursday, the 17th

day of July 2003 at 9:30 a.m.

         -  -  -  -  -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Frieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1-888-391-3376 (DEPO)

Stephen Spargo

93

1  reach some preliminary conclusions or decisions
2  as to whether they would be recorded or not.
3  And many times you couldn't finalize those
4  decisions until the audit was essentially
5  complete.
6      Q.   So you would put some things on
7  hold?
8      A.   Correct.
9      Q.   Or table them for a while?
10     A.   Correct. Correct.
11     Q.   And when the audit fieldwork was
12 complete, then you would make a final call on
13 the adjustment, one way, up or down?
14     A.   Correct.
15     Q.   If Coopers proposed adjustments,
16 how would they be addressed at these meetings,
17 or in the final meetings?
18     A.   Well, the manager, Mark or Amy or
19 the staff person responsible would discuss the
20 adjustment, why, you know, perhaps its
21 additions to PP&E that we made failed to record,
22 because of the invoice didn't come in until
23 August and we didn't know about it, but it
24 clearly was a purchase made before June 30th.
25         And they would say basically how

94

1  they arrived at their number that they're
2  proposing to adjust. And we would discuss it
3  until hopefully all of us have a consistent or
4  similar understanding.
5      Q.   So it was management by consensus
6  on these adjustment calls?
7      A.   Many times, yeah.
8      Q.   And ultimately, who had the final
9  say on whether an adjustment would be booked?
10     A.   Bill Buettner and I, I guess. But
11 it never really came to that.
12     Q.   You never had a disagreement with
13 him about any adjustment he proposed in the
14 end?
15     A.   In he end, no.
16     Q.   Did Mr. McConnell have say above
17 you?
18     A.   If we needed to go that route, but
19 no.
20     Q.   You don't remember it happening?
21     A.   No.
22     Q.   What was -- could you characterize
23 for me your relationship with Mr. Buettner in
24 the audit process while you were at AHERF?
25     A.   I think it was good. I think we

95

1  had a healthy respect for each other. I
2  thought he was one of the more reasonable audit
3  partners that I had run across in my years.
4      Q.   In terms of your working
5  relationship?
6      A.   Yes. And his abilities.
7      Q.   Do you recall any specific examples
8  of significant dollar amounts in adjustments
9  that Coopers proposed at year-end as a part of
10 their audit work that you had to address and
11 come to a determination on?
12     A.   The easiest one, the one you could
13 always count on was cost report. You know,
14 they would send their person in to evaluate all
15 open cost reports, Medicare, Medicaid. They
16 would never come to the same conclusion as Joe
17 Scharf. There would always be some
18 differences, plus or minus.
19         And they would propose adjustments
20 and we would have to decide whether, you know,
21 we agreed with how they reached their
22 conclusions and whether we wanted to book them
23 or not.
24         Patient accounts receivable was
25 always a big adjustment to the reserve for bad

96

1  debts or the contractual allowances within
2  accounts receivable.
3      Q.   Was the audit work -- there may
4  have been meetings going on afterwards, but the
5  actual review of financial data by Coopers &
6  Lybrand typically done by Labor Day?
7      A.   Typically, yes.
8      Q.   When would be a typical closing
9  meeting, as I understood took place, occur?
10     A.   Right around Labor Day, if we
11 could.
12     Q.   And what was the purpose,
13 generally, of the closing meeting?
14     A.   Pencils down, finalize the numbers,
15 start working on writing the footnotes, who was
16 going to do what, who was going to review them,
17 when would they be available for review. We
18 finalized numbers so we could move into the
19 footnote disclosures and some other areas.
20     Q.   So the figures at that point were
21 essentially fixed and now you're working on
22 narrative and presentation?
23     A.   Correct.
24     Q.   Do you remember any post closing
25 meetings financial adjustments, that is, number

24 (Pages 93 to 96)

Stephen Spargo

97

1 adjustments during the time you were at AHERF?
2     A.   After they were final?
3     Q.   After the closing meeting. Changes
4 to numbers.
5     A.   No.
6     Q.   None that you became aware of,
7 anyway?
8     A.   No.
9     Q.   Is that right?
10     A.   That's right.
11     Q.   Forgive my question. Did you have
12 any perception or impression of the
13 relationship Mr. McConnell shared with
14 Mr. Buettner?
15          MR. RYAN:  Objection.
16     Q.   Let me try that over.
17          You had from time to time had the
18 opportunity to perceive Mr. Buettner and Mr.
19 McConnell working together?
20     A.   I did.
21     Q.   Quite frequently?
22     A.   Quite frequently.
23     Q.   You knew that they met frequently?
24     A.   I did.
25     Q.   Throughout the year, not just the

98

1 audit year, but the calendar year?
2     A.   Correct.
3     Q.   And what, if any, impression did
4 you ever form about the nature of their
5 relationship?
6     A.   I guess the easiest way to describe
7 it is a lot of clients have asked me what I
8 learned from the AHERF debacle. And in
9 addition to achieving economies through
10 consolidation and integration, being methodical
11 about acquiring physician practices and
12 integrating them into a --
13     Q.   The need to do that.
14     A.   The need to do that. I've also
15 shared with them the need to maintain a healthy
16 distance with your auditors. Change auditors
17 every three years and don't allow CFOs and
18 audit partners to get too comfortable with each
19 other.
20     Q.   So am I right to take from that
21 answer your perception was Mr. McConnell and
22 Buettner became too tight with each other?
23          MR. RYAN:  Objection.
24     A.   Yes. That's correct.
25     Q.   Did I mischaracterize what you

99

1 meant?
2     A.   No, you did not.
3     Q.   And why is it -- strike that.
4          How is it that you came to that
5 conclusion?
6     A.   Because of the way certain issues
7 were addressed, particularly with accounts
8 receivable and the Graduate acquisition. But
9 also because of the huge amount of work that we
10 threw Coopers' way or held over their heads --
11 not held over their heads, but enticed them
12 with, special consulting work, where they made
13 the majority of their money from their service
14 to AHERF.
15     Q.   The A/R and Graduate acquisition
16 concerns you mentioned, the way Coopers dealt
17 with them?
18     A.   Yes.
19     Q.   What generally -- I believe with
20 fervor that we will address both of those later
21 today, but my question is:  Generally, what do
22 you refer to there?
23     A.   A/R had been a problem at Allegheny
24 and at AHERF for a long time. And those of us
25 who were fairly close to the numbers had very

100

1 little confidence in the numbers that came out
2 of the patient accounting function, and more
3 importantly, less confidence in their ability
4 to accurately submit claims and collect amounts
5 owed to Allegheny for services rendered, or
6 AHERF.
7          And the business office function
8 was in dire need of an overhaul; management,
9 staff, processes, systems, you name it. And in
10 discussions between Mr. Buettner and Mr.
11 McConnell, it was always my opinion that the
12 severity of that situation was always somehow
13 mitigated or not addressed as it should have
14 been.
15     Q.   Understated?
16     A.   Understated. Brushed off.
17 Adjustments not proposed, let alone made.
18 Allowances given for less than expected
19 performance within those functions.
20     Q.   What about the Graduate acquisition
21 did you refer to?
22     A.   The Graduate is a whole reserve
23 fiasco that --
24     Q.   The reserve establishment and
25 transfer?

25 (Pages 97 to 100)

Stephen Spargo

---

**101**

1    A.   Yes.
2    Q.   That occurred shortly before, if
3  not a little more than shortly before the time
4  you left the enterprise?
5    A.   Correct.
6    Q.   We will come back to both those
7  issues.
8    A.   I'm sure.
9    Q.   You also mentioned a huge amount of
10  work that was either thrown or was suggested to
11  Coopers & Lybrand might be thrown to them that
12  was not audit work specific.
13        To what did you refer there?
14    A.   Feasibility studies, accounts
15  receivable projects, working in the business
16  office. I mean there were -- in a system that
17  large, there were consulting opportunities that
18  came up constantly, not every week, but every
19  month or every so many months.
20        And if memory serves me correctly,
21  I think the audit fees for AHERF that Coopers
22  charged were in the neighborhood of
23  three-quarters of a million dollars, but I
24  believe their annual payments to Coopers &
25  Lybrand was more in the neighborhood of 2 to

---

**102**

1  3 million.
2    Q.   And did you hear Mr. McConnell from
3  time to time mention these non-audit
4  opportunities to Mr. Buettner?
5    A.   Whether I heard him mention them or
6  whether they were just afforded those non-audit
7  opportunities --
8    Q.   You became aware that they were so
9  afforded?
10    A.   Yes. Yes.
11    Q.   Was this breakdown of financial
12  remuneration from AHERF to Coopers & Lybrand
13  relatively consistent during the time you were
14  there, from year to year?
15        MR. RYAN: Objection.
16    A.   I believe so.
17    Q.   That's your best recollection?
18    A.   Yes. Yes.
19    Q.   Was Mr. McConnell a CPA?
20    A.   No.
21    Q.   Did you ever form a perception or
22  an understanding of his level of understanding
23  of accounting and finance reporting issues?
24    A.   Mr. McConnell was not real
25  technical, not detail-oriented.

---

**103**

1    Q.   He was, in your estimation, less
2  technical and detail oriented on accounting and
3  financial reporting issues than, perhaps, you
4  or Mr. Adamczak or Mr. Cancelmi?
5    A.   Definitely much less than Mr.
6  Adamczak and Cancelmi, and even less than me.
7    Q.   And you formed these impressions
8  from your meetings and discussions with him
9  about the financial statements as they were
10  prepared?
11    A.   Yes.
12    Q.   And other financial issues as they
13  arose?
14    A.   Yes. Yes.
15    Q.   Did you also from those
16  conversations and from your observation, Mr.
17  Buettner and Mr. McConnell in their
18  relationship, form an impression about whether
19  Mr. McConnell -- or a perception about whether
20  Mr. McConnell relied on Mr. Buettner or Coopers
21  & Lybrand to help him sort through financial
22  reporting and financial issues?
23        MR. RYAN: Objection.
24    A.   I think he relied on them a great
25  deal.

---

**104**

1    Q.   Why is it you say so?
2    A.   Because I know he would bounce
3  things off of Mr. Buettner at their monthly
4  Duquesne Club luncheons. That he and I would
5  talk about whatever technical issues there were
6  that lied before us, whether it's accounting
7  for the captive insurance company or merging
8  the Vermont captive into AHSPIC, or entries to
9  report goodwill on physician practices. But I
10  think things that caused David to stumble and
11  pause a little bit, he would put on his list to
12  discuss with Mr. Buettner.
13    Q.   Were you present at the meetings at
14  the Duquesne Club, or did you help Mr.
15  McConnell prepare for such meetings, or both?
16    A.   I attended a few over the course of
17  three years or so. And "a few" meaning five or
18  less.
19    Q.   Did these happen every month
20  throughout the year, as you understood it?
21    A.   I think they were intended to
22  happen every month, but I don't think schedules
23  allowed it.
24    Q.   And this was throughout the time
25  1993 to 1997?

---

26 (Pages 101 to 104)

Stephen Spargo

197

1    A.    Yes, it is.
2    Q.    June 30, 1996?
3    A.    Yes.  The bad debt reserve
4  handwriting is Dan Cancelmi's.
5    Q.    Right.  These are asset accounts
6  listed here; am I right?
7    A.    Yes.
8    Q.    Under the Hahnemann entries?
9    A.    Correct.  Correct.
10    Q.    Does it appear to you from this
11  schedule that for the 4 million related to
12  Hahnemann, and some of the 3 million related to
13  St. Chris Hospital, the reserves related to CRA
14  accounts, were, in fact, not credit balances
15  already in existence, but rather were new
16  receivables being established?
17    A.    That's correct.  Or it could have
18  been --
19        MR. RYAN:  I would like to object
20  to that question, please.
21    Q.    Go ahead.
22    A.    They're either newly-established
23  receivables or entries to reduce
24  previously-established credit balances.
25    Q.    Do you know who directed Mr. Scharf

198

1  to prepare these kinds of entries?
2    A.    I don't offhand, but as my memory
3  comes back, my guess is we told Mr. Scharf to
4  go find some reserves in his cost report
5  analyses, so that he wouldn't have done that
6  without my knowledge.
7    Q.    And his work in this effort to
8  identify new CRA reserves was something shared
9  with Coopers & Lybrand as well?
10    A.    Oh, I would imagine, yes.
11    Q.    Do you recall doing it?
12    A.    I don't.
13    Q.    If the CRA reserve came up as a --
14    A.    Has to be shared with Coopers &
15  Lybrand, they were all forwarded the CRA
16  balances from year to year, so the activity
17  recorded in those would beg the question, what
18  is it.
19    Q.    So it was shared in at least that
20  way?
21    A.    Absolutely.  It's impossible not
22  to.
23    Q.    Ask you to flip back to Exhibit 122
24  for a minute, which is the handwritten
25  Mr. Cancelmi schedule.

199

1    A.    Uh-huh.
2    Q.    Do you see that the capitalized
3  interest entries appear to relate to -- or some
4  organization portion of them relate to a prior
5  year?
6    A.    Yeah.  Yeah.
7    Q.    Do you recall any discussion of
8  that?
9    A.    Yeah, I think I do.
10    Q.    What do you recall about it?
11    A.    Yeah, that's a stretch.  I guess to
12  put it in context, up until 1996 what the
13  auditors would do would be to find some way to
14  get some comfort with our accounts receivable
15  balances, either through detailed calculations
16  or a combination of calculations and the SUD,
17  or the schedule of unadjusted differences.  So
18  that any deficiency or shortfall they might
19  compute would be offset by other offsetting
20  entries.  So that nothing would have to be
21  booked.
22        One of the offsetting entries in
23  1995 would be capitalized interest.  In 1996,
24  the difference that Coopers was able to
25  calculate wasn't quite small enough, so we had

200

1  to go reserve shopping and to book something so
2  that they could bring that difference between
3  their calculation and our numbers down to a
4  more manageable SUD-type level.
5        So that's why all of a sudden we
6  had to go find CRA reserves, PP&E reserves.
7  And one of the, obviously, the items here is
8  capitalized interest from a prior year, which
9  is not fair game.  That was used in 1995 to
10  negate the need to make a reserve adjustment at
11  that time.  You don't get to use it twice.
12    Q.    Otherwise, you have the phenomenon
13  of the reserve that keeps on giving?
14    A.    Yeah.
15        MR. RYAN:  Objection.
16    A.    Yeah.  Why not go to '94, '92.
17    Q.    That's what you meant when you said
18  a stretch earlier?
19    A.    Yes.
20    Q.    It's fair to say, sir, that --
21  strike that.
22        The problem you identify is one of
23  if you use a reserve to offset a bad debt
24  reserve shortfall in one fiscal year, or to get
25  comfortable about a bad debt reserve shortfall

50 (Pages 197 to 200)

201

1   that you will or will not recognize, that's one
2   use. And then if you take the reserve into
3   income in a later year, believing that it's no
4   longer necessary, that's yet again a second
5   use?
6       A.   Correct.
7           MR. RYAN:  Objection.
8       A.   Correct.
9       Q.   And that would be double use and,
10  therefore, improper?
11      A.   Right.
12          MR. RYAN:  Objection.
13      A.   There's no carry-over.
14      Q.   Do you recall Coopers & Lybrand, or
15  anyone at Coopers & Lybrand, in these weekly
16  update meetings or at any other time indicating
17  that use of the capitalized interest reserve or
18  any of these other reserves listed on Mr.
19  Cancelmi's schedule was in any way improper?
20      A.   I don't recall, no, sir.
21      Q.   That would have been something you
22  would have recalled, right?
23      A.   Probably.
24      Q.   Do you recall discussing the
25  carry-over or prior year use with folks at

202

1   Coopers & Lybrand?
2       A.   I don't actually recall it, but I
3   seem to recall laughing when it was suggested
4   that that's one of the items we could use in
5   '96.
6       Q.   Do you recall being surprised that
7   there was no disagreement from Coopers &
8   Lybrand on that front?
9       A.   I believe they suggested it.
10      Q.   Who?
11      A.   Coopers & Lybrand.
12      Q.   And who at Coopers & Lybrand?
13      A.   I don't know who specifically,
14  whether it was Bill or Mark or Amy. That's  .
15  another one of those gifts from above, just
16  kind of come down upon the masses.
17      Q.   Do you specifically recall
18  attending the 1996 closing meeting, fiscal year
19  1996 audit closing meeting?
20      A.   I don't specifically recall, no.
21      Q.   It would have been your practice to
22  attend such a meeting?
23      A.   Yes.
24      Q.   Those are pretty important
25  meetings?

203

1       A.   Yes.
2       Q.   Do you recall who else either
3   attended that meeting or -- start there. Do
4   you recall who else attended that meeting?
5       A.   I don't.
6       Q.   Do you recall who typically
7   attended those meetings?
8       A.   It was usually Dan and Al and I,
9   Jack, Chuck Lisman. Invitations were always
10  extended to McConnell, Dienisio, and Morrison.
11      Q.   Do you recall who from Coopers &
12  Lybrand attended the closing meeting in '96 or
13  any typical year?
14      A.   I don't. I don't. It would be a
15  partner or the manager and the in-charge, at
16  minimum.
17      Q.   And those, again, would have been
18  Mr. Buettner, Mr. Kirstein and Ms. Fraizer?
19      A.   That's correct.
20      Q.   What's the purpose of a closing
21  meeting?
22      A.   Pencils down, final adjustments,
23  make sure everybody is on the same page, no
24  open items, all work papers or schedules have
25  been prepared.

204

1       Q.   I would like to show you now what
2   has been marked as -- strike that. Let me
3   start this way.
4           Do you recall, as you sit here
5   today now, that at the fiscal year 1996 closing
6   meeting there was discussion with the Coopers &
7   Lybrand personnel and the AHERF personnel in
8   attendance that for fiscal year 1996 the A/R
9   reserve, or accounts receivable reserve, was at
10  least $30 million under-accrued, and
11  discussions to the effect that that figure
12  would need to be taken in over a period of
13  years, approximately three, in the future?
14          MR. RYAN:  Objection.
15      A.   I don't recall the specifics.
16      Q.   What do you recall, generally,
17  about that?
18      A.   I do recall everyone acknowledging
19  a deficiency that needed to be rectified
20  quickly.
21      Q.   An accounts receivable deficiency,
22  an accounts receivable reserve deficiency?
23      A.   Correct.
24      Q.   In a material or significant
25  number?

51 (Pages 201 to 204)

Stephen Spargo

205

1    A.   Correct.
2    Q.   I'm going to hand you now what has
3  been marked as Exhibit 1063 in this case.  It
4  is a set of notes entitled RJC Notes with a
5  Bates number that I think Mr. Ryan will either
6  tell us, or at least not disagree with me
7  indicates it was produced from the files of
8  Coopers & Lybrand.  I'm going to --
9        MR. RYAN:  From
10  PriceWaterhouseCoopers files.
11    Q.   I'm sorry, PriceWaterhouseCoopers
12  files.  And I'm going to ask you now to turn to
13  a Bates range page that is numbered CL147599.
14  The Bates page numbers, Mr. Ryan, on the
15  lower right-hand corner.
16    A.   Okay.  Okay.  Sorry.
17    Q.   I'm going to ask you to take a look
18  at these notes.  They are headed with a date
19  10/14/98.  Do you see that?
20    A.   I do.
21    Q.   They're handwritten.  And they have
22  the word "Al Adamczak" handwritten at the top
23  of the page.
24    A.   Right.
25    Q.   I'm going to ask you to do your

206

1  best to read these notes and tell me whether
2  you've seen these documents or these notes?
3    A.   "Indicated he did not take
4  responsibility" --
5    Q.   You don't need to read them out
6  loud.
7    A.   Don't you want type while I read?
8  I'll do it slow.
9    Q.   I guess I'm asking you to go ahead
10  and familiarize yourself with the page and the
11  document and then let me know if you think
12  you've ever seen it before.
13    A.   (Witness reviewing document.)
14        Hard to make out, but okay.
15    Q.   Do you think you've ever seen it
16  before?
17    A.   No.
18    Q.   Hasn't been shown to you either in
19  your work at AHERF or in any other testimony in
20  any other proceeding?
21    A.   No, it has not.
22    Q.   I'm going to direct your attention
23  primarily to the second and third paragraphs of
24  the handwritten notes.  I believe that the
25  second paragraph reads this way:

207

1        Indicated a decision was made at a
2  closing meeting that '96 A/R reserve was
3  30 million under-accrued -- or under-reserved,
4  rather.  30 million under-reserved.  And to
5  take it in over three years, done at a closing
6  meeting, all hands, including C & L.
7        Do you see those words?
8    A.   I do.
9    Q.   Does that, having seen it and had
10  it read to you now, refresh your recollection
11  that at the '96 closing meeting with Coopers &
12  Lybrand and AHERF personnel, there was a
13  discussion of and a determination made that the
14  '96 accounts receivable reserve as of 6/30/96
15  was under-reserved by $30 million and that it
16  would be taken in over time?
17    A.   Doesn't do anything for my memory,
18  no, I'm sorry.
19    Q.   Doesn't refresh your recollection?
20    A.   No.  No.
21    Q.   More than you've already testified?
22    A.   Right.  Correct, sir.
23    Q.   Then I think the next paragraph
24  says, indicated '96 shortfall was thought to be
25  30 million in '96.  Do you see that?

208

1    A.   I do.
2    Q.   Does that -- either of those
3  sentences help refresh your recollection about
4  the quantity of the shortfall you identified
5  had been discussed at the closing meeting?
6    A.   No, sir.
7    Q.   So your best recollection, as I
8  understand it, is that there was a discussion
9  at the closing meeting about a significant or
10  material dollar amount of A/R reserve shortfall
11  at year-end '96, but you don't remember this
12  particular figure of 30 million being
13  discussed?
14    A.   I do not.
15    Q.   But am I right in every other way?
16    A.   Yes, you are.  Yes, you are.
17        MR. JONES:  Let's take a break
18  here.
19        VIDEO TECHNICIAN:  Going off the
20  record at 3:13.
21        (Brief recess.)
22        VIDEO TECHNICIAN:  Going back on
23  the record at 3:28.
24    Q.   Mr. Spargo, at the closing meeting
25  we were just discussing, for the fiscal year

52 (Pages 205 to 208)

209

1  1996 audit, you do recall, or do you not,
2  discussions at the table among the auditors and
3  the AHERF personnel about the need to fix or
4  correct the accounts receivable shortfall that
5  had been determined over the next period of
6  years? I mean it had to be fixed; isn't that
7  right?
8        MR. RYAN: Objection.
9     A.  I do recall ending the audit with
10  an acknowledgment that we had --
11     Q.  We had a problem to fix?
12     A.  -- once and for all to put some
13  type of corrective measures in place.
14     Q.  Do you recall ever attending any
15  meetings after the closing meeting with
16  Mr. McConnell or any of the auditors about any
17  post closing meeting adjustments with respect
18  to the bad debt reserve that needed to be made?
19     A.  Yeah. I think we continued to
20  talk about the reserve for bad debts in David's
21  Friday meetings with his senior staff.
22     Q.  Do you recall whether any post
23  closing meeting adjustment to the bad debt
24  reserve at the Delaware Valley Obligated Group
25  Hospitals or any other said hospitals was

210

1  ultimately made, as you sit here today?
2     A.  I don't recall for certain, no.
3        - - - - -
4        (Thereupon, Deposition Exhibit 1683
5        was marked for purposes of
6        identification.)
7        - - - - -
8     Q.  Mr. Spargo, I've handed you now
9  what we've marked as Exhibit 1683 in this case.
10  It's apparently been marked as a different
11  exhibit number in another matter.
12        It is a memo from Mr. Cancelmi to
13  you dated September 20, 1996; am I right?
14     A.  Yes.
15     Q.  And do you recall -- it's got a re
16  line or subject line of Delaware Valley
17  accounts receivable aging.
18        Do you recall receiving this memo
19  about that time period?
20     A.  I don't recall receiving it, but
21  I'm sure I did.
22     Q.  You do, however, recall that even
23  after the close of the audit year for the --
24  for fiscal year 1996, needing to pay attention
25  to Delaware Valley accounts receivable aging?

211

1     A.  Oh, yeah.
2     Q.  That was a continuing problem?
3     A.  Yes.
4     Q.  How long had that been a problem
5  for --
6     A.  Delaware Valley accounts receivable
7  in the aging?
8     Q.  Yes.
9     A.  At least two, three years.
10     Q.  Do you recall that at about the
11  time of this memo the PATCOM accounts were no
12  longer being billed, or that is, PATCOM
13  accounts -- the PATCOM system was no longer
14  being used to bill accounts?
15     A.  I don't recall specifically, but
16  that could well have occurred around this time.
17     Q.  Do you recall if that ultimately
18  did occur?
19     A.  Yes.
20     Q.  And that this system was converted,
21  or the hospitals that had used the PATCOM
22  system were converted to the Invision system?
23     A.  That's correct. I think the actual
24  conversion happened during 1996.
25     Q.  I'm going to ask you to take a look

212

1  at Page 2 and 3 of the document. If you look
2  at the Elkins Park PATCOM system account
3  portion of the document, Page 2.
4     A.  Yes, sir.
5     Q.  Looking at those figures, the
6  difference between the 6/30/96 figures and the
7  8/31/96, does it appear to you that collections
8  are nominal?
9     A.  Yes.
10     Q.  And I would ask you to turn the
11  page, then, to Page 3 and look at the same
12  PATCOM account system accounts at St. Chris
13  Hospital and tell me whether your conclusion is
14  essentially the same?
15     A.  Yes. Collections are minimal.
16     Q.  I'm going to ask you to flip now to
17  the page which has Bates numbers 2333, ask you
18  if the handwriting on that page is yours, 2333?
19     A.  Yes, I believe it is.
20     Q.  Can you read the handwriting for
21  us?
22     A.  You had to ask.
23     Q.  I'm sorry.
24     A.  You mean scan it or read it out
25  loud?

Stephen Spargo

213

1    Q.    If you could read it out loud, it
2    would be helpful.
3    A.    Rats.
4    Q.    Slowly.  I apologize.
5    A.    Recommend offsetting the 360-plus
6    with reserve, which will leave a detailed A/R
7    balance of 233 million and a reserve of
8    approximately 27 million.  Utilizing the 17, I
9    assume, .5 year-end reserve in the Delaware
10   Valley and the 7.5 reserve for AGH.
11   Q.    Can I stop you there.  Do you know
12   what the 7.5 from AGH refers to?
13   A.    I don't, offhand.  I'm sure I'll be
14   reminded of it.
15   Q.    You can go ahead for the balance of
16   the three or four lines there.
17   A.    If accounts turned over to outside
18   party, any and all collections would serve to
19   increase the reserve.  Could also gradually
20   increase reserve on a monthly basis at 1 to
21   2 million a month.
22          That last little thing, estimate
23   year-end 6/30/97, I'm not sure what that has to
24   do with anything.
25   Q.    It is your handwriting.  Do you

214

1    remember writing this?
2    A.    I don't.
3    Q.    Do you remember what you were
4    trying to convey, generally, other than what
5    you just read to us?
6    A.    It appears what I was trying to
7    convey, I guess, are two things.  Number one,
8    let's fully reserve anything over a year old.
9    Let's get that crap off the books right now and
10   then deal with whatever reserve is appropriate
11   for the -- anything under a year old.
12          And then at the time I think they
13   were talking about turning over the PATCOM and
14   other old accounts to an outside party to
15   collect, even the ones greater than a year old.
16   And what I'm saying here is that's all well and
17   good, but whatever they collect we'll then
18   reinstate or put back into the reserve, if and
19   when they ever collect it.
20          As well as gradually increasing the
21   reserve 1 to $2 million a month through, I
22   assume, just accounting adjustments.
23   Q.    By taking bad debt expense charge?
24   A.    Yeah.
25   Q.    Fair to say that from this memo and

215

1    your recollection otherwise that even in late
2    September of '96 the accounts receivable
3    problem in the Delaware Valley wasn't getting
4    better?
5    A.    Correct.  Correct.
6    Q.    It was, indeed, something that was
7    still on your mind and how to handle it --
8    A.    Correct.
9    Q.    -- was something you had to deal
10   with?
11   A.    Correct.  The acknowledgment of a
12   $30 million shortfall and the parent agreement
13   to rectify it over time, although three years
14   is a long time, that was just a small step as
15   part of the solution.  I was not personally
16   satisfied with that.
17          But I was reminded that it was more
18   of an acknowledge than we've ever made in the
19   past.  This was no victory, nor was it
20   envisioned to be a solution.  Nowhere do you
21   hear anybody talk about the operations, why
22   can't we build accounts, why do we have such a
23   problem in the business office.
24          Once again, we sort of circumvented
25   the issue.  So this acknowledgment was no --

216

1    was not met with elation by myself or
2    Mr. Cancelmi or anyone else, I don't think.
3    Q.    And that acknowledgment was the
4    closing meeting acknowledgment we discussed
5    earlier?
6    A.    The fact everybody had
7    acknowledged, now we have a $30 million problem
8    we've got to fix.
9    Q.    Either before or at the closing
10   meeting?
11   A.    Right, any time.
12   Q.    Is it fair to say now that you do
13   recall that there was a discussion at the
14   closing meeting, or at some other time during
15   the audit process, that this $30 million
16   problem needed to be addressed over time?
17          MR. RYAN:  Objection.
18   Q.    Meaning years going forward.
19          MR. RYAN:  Objection.  Misstates
20   prior testimony.
21          MR. JONES:  I asked him if that's
22   his best recollection.
23   A.    I recall an outcome of the audit
24   being an acknowledgment of a $30 million
25   deficit, whether it was at a closing meeting or

54 (Pages 213 to 216)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
            Plaintiff,
      vs.                          Civil Action
PRICEWATERHOUSECOOPERS,           No. 00-684
LLP,
            Defendant.


            Continued Videotaped Deposition of

STEPHEN H. SPARGO, called for examination under

the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Manion McDonough, 600 Grant Street,

Suite 1400, Pittsburgh, Pennsylvania, Ohio, on

Tuesday, the 4th day of November, 2003, at 9:00

a.m.

            - - - - -


            VOLUME 3

            - - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1.888.391.3376 (DEPO)

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE COMPANY

Stephen Spargo                                                    Volume 2

494

1  was doubtful they would be achieved.
2      Q.   Did you have any sense that they
3  may be arbitrarily imposed?
4      A.   Oh, yeah.
5      Q.   And why so?
6      A.   Well, they normally came out of the
7  big office without any data going in first.
8      Q.   And the big office was
9  Mr. Abdelhak's?
10     A.   Mr. Abdelhak's, yes, yes.
11     Q.   Did you find that the budgets from
12  time to time were more optimistic than you
13  would have made them, the budget requirements?
14     A.   I can't say that. There was always
15  some glimmer of hope that there would have been
16  sufficient pressures placed on the operating
17  units to achieve some of those budgeted targets
18  and expectations.
19     Q.   Did you or anyone else at finance
20  though feel any amount of pressure to help
21  fulfill what might have been optimistic goals
22  from time to time, if you could, via accounting
23  treatments?
24     A.   Yeah, I think we recognize that we
25  wanted to try and hit our targets as best we

495

1  could.
2      Q.   Mr. Spargo, flipping back to
3  another category of questions for a second, if
4  C & L would have asked you, would you have told
5  them that the payments to Ms. Calvert and
6  Mr. Paroo were tort settlements?
7      A.   Sure I would have.
8          MR. RYAN:  Objection.
9      A.   Absolutely.
10     Q.   Or were for tort settlements?
11     A.   Yes, there's nothing to hide. The
12  disturbing part about those settlements, given
13  their timing, was that we were having cash, and
14  senior management somehow felt the need to pay
15  out $5 million to two bone heads.
16          You know, the accounting treatment,
17  I hate to say this, I could have cared less
18  about the accounting treatment. I had the
19  accountants responsible to me. I also had Dave
20  Deasy every day asking if he could pay Cardinal
21  Health or Baxter or -- and we're paying those
22  two people 5 million bucks.
23     Q.   You're aware that during your time
24  at AHERF, performance bonuses were paid to
25  management?

496

1      A.   Yes.
2      Q.   And it was a system designed to
3  reward executives in the event of achieving
4  certain benchmarks?
5      A.   Yes.
6      Q.   In a typical year, what did those
7  bonuses run for people at your level of
8  seniority and responsibility at the company?
9      A.   Ten to 30 percent.
10     Q.   Did you have a view about whether
11  those were middling or high in the industry?
12     A.   I thought they were high.
13     Q.   Was achievement of those bonuses by
14  management and people in the finance
15  department, like yourself, in part contingent
16  upon meeting certain financial goals?
17     A.   Yes.
18     Q.   And what were those goals?
19     A.   I don't recall, but I don't even
20  know if budget was one, something to do with
21  net equity, probably bond ratings, patient
22  satisfaction, quality. There was like four or
23  five indicators. Fairly standard in the
24  industry.
25     Q.   When you say budget was one, what

497

1  do you mean by budget?
2      A.   Whether we achieved our budget
3  targets or not.
4      Q.   In terms of net income?
5      A.   Net income, yeah, maybe revenues.
6      Q.   I'm sorry, you said something after
7  net income?
8      A.   Maybe revenues, whatever. No. No.
9  No. One of the big targets was cost per
10  adjusted discharge, CPAD, how could I forget.
11  Sherif would shoot me. That was a big deal
12  about whether we had achieved cost per adjusted
13  discharged targets.
14     Q.   What does that mean?
15     A.   That means you take your expenses
16  and go through some crazy gyration to equate it
17  to how much does it cost to treat a patient.
18  East, west, I don't know that we did a
19  consolidated, but probably in the regions where
20  they had hospitals.
21          - - - - -
22          (Thereupon, Deposition Exhibit 1700
23          was marked for purposes of
24          identification.)
25          - - - - -

54 (Pages 494 to 497)

Stephen Spargo                                                    Volume 2

498

1     Q.    Mr. Spargo, we just handed you
2   Exhibit 1700, which is a September 6, 1996 memo
3   from Dwight Kasperbauer to Mr. Buettner; is
4   that fair to say?
5     A.    Yes, sir.
6     Q.    With a copy to Al Adamczak?
7     A.    Yes, sir.
8     Q.    And in it Mr. Kasperbauer tells
9   Mr. Buettner that he is providing certain
10  information; is that right?
11    A.    Yes.
12    Q.    And part of that information is a
13  description of the criteria with respect to the
14  bonuses we've just been discussing; is that
15  right?
16    A.    That's correct.
17    Q.    And does that refresh your
18  recollection about the criteria involved?
19    A.    As soon as I go through them it
20  does.
21    Q.    And the categories briefly are
22  admissions, cost per adjusted discharge, which
23  you just mentioned?
24    A.    Correct.
25    Q.    Net income?

499

1     A.    Correct.
2     Q.    Net equity?
3     A.    Correct.
4     Q.    Uncompensated care?
5     A.    Correct.
6     Q.    And the level of external funds
7   secured for research?
8     A.    Yes.
9     Q.    In what connection was Mr.
10  Kasperbauer providing this information to
11  Mr. Buettner?
12    A.    He was asking Mr. Buettner to
13  review and verify the accuracy of the
14  underlying calculations.
15    Q.    This was a certain agreed upon
16  procedure project?
17    A.    Yes. Coopers would do that every
18  year. In fact, the first year I really got to
19  know Dan Cancelmi, he was the senior manager on
20  the AHERF job and he was tasked with doing
21  exactly what Mr. Buettner is doing here in this
22  calculation.
23    Q.    Do you recall ever being -- ever
24  having discussions with Coopers on these
25  engagements, on compensation?

500

1     A.    Not too much. No, because I
2   purposely dealt with Dwight.
3     Q.    And who was Mr. Kasperbauer, by
4   title?
5     A.    He was the executive vice president
6   and chief human resource officer.
7     Q.    Do you recall that any AHERF
8   executives received bonuses for acquisitions?
9     A.    Yes.
10    Q.    Who were they and do you recall?
11    A.    Yes. Mr. Abdelhak, Mr. McConnell,
12  Ms. Wynstra, of course, Dr. Kaye, Mr. Dienisio.
13  I don't know if Mr. Sanso. Mr. Sanso may have
14  as well.
15    Q.    It was based on hospital
16  acquisitions?
17    A.    I believe so, yes.
18    Q.    Were there any bonuses paid on
19  physician practice acquisitions?
20    A.    I think there may have been. Oh,
21  yes, there was. Yeah.
22    Q.    To whom?
23    A.    Whoever the guy was that cavorted
24  around with Carol.
25    A.    Harvey --

501

1     Q.    Leavy?
2     A.    Harvey Leavy, yeah. And probably
3   Carol as well.
4     Q.    How were you made aware of these
5   bonuses?
6     A.    Mr. Deasy.
7     Q.    Told you?
8     A.    Yes.
9     Q.    Do you recall bonuses being paid
10  for anything else?
11    A.    Yes.
12    Q.    What?
13    A.    Securing additional debt.
14    Q.    Who received those bonuses?
15    A.    Mr. Martin, Ms. Gilbert. I don't
16  know who else.
17    Q.    What were you -- do you have any
18  opinions on the appropriateness of the bonuses
19  we just discussed?
20    A.    Yeah.
21          MR. RYAN: Objection.
22    Q.    What about them?
23    A.    There was no need for it. You
24  don't give people bonuses to do their job. I
25  think the acquisitions used to piss me off, but

55 (Pages 498 to 501)

Stephen Spargo                                                          Volume 2

---

**502**

1 the debt really, like come on, but --
2    Q.   Was it your view that these were
3 unnecessary and excessive?
4         MR. RYAN:  Objection.
5    A.   Yes, it was, indeed.
6    Q.   Well, if I've overstated your
7 opinion, tell me.
8    A.   No.
9    Q.   How would you characterize --
10   A.   No, this was very excessive.
11 People should be fired, they shouldn't be
12 getting bonuses.
13   Q.   Do you recall the Exuplex program?
14   A.   Yes, I do, as a matter of fact.  It
15 was a creditor.
16   Q.   What was it?
17   A.   It was a basically an executive
18 perk package where we were allotted a certain
19 amount of money, and I don't recall exactly how
20 much, and with that money we could select
21 different types of benefits of short-term
22 disability, I think we had access to some
23 executive life insurance, and then there would
24 be a residual amount after we went benefit
25 shopping that we would keep for two years and

---

**503**

1 then have ready access to.
2    Q.   What was the quantum, if you can,
3 as a percentage of salary that you were
4 committed as an allotment to do this shopping?
5    A.   20 percent.
6    Q.   I think you testified earlier in
7 other litigation it was as much as 33 percent?
8    A.   Thirty-three.
9    Q.   Is that your best recollection?
10   A.   Yes.  Yes.  Thirty-three.  Yes.
11   Q.   Do you recall any other executive
12 benefits?
13   A.   Yes.  We got sort of like a car
14 allowance thrown into our salary.  And that was
15 intended, number one, for cars, so you didn't
16 have to submit the milage to and from the
17 airport and that crap.  It was also intended to
18 cover legal fees, financial advisors, tax
19 preparation fees, those kind of things.  That
20 was like $22,000 a year or something.
21   Q.   Do you recall that these benefits
22 that we've just discussed over the last few
23 minutes were benefits that were available to
24 not only persons of your position in the
25 company, but those above you like

---

**504**

1 Mr. McConnell, Ms. Wynstra and Mr. Abdelhak?
2    A.   Yes.
3    Q.   And were there levels of
4 individuals in the company beneath you who got
5 these benefits and bonuses?
6    A.   Perhaps.  Maybe down in the vice
7 president level.
8    Q.   But certainly above you the
9 benefits and bonuses that we've talked about
10 today applied?
11   A.   Oh, yeah, yeah, definitely.
12        MR. JONES:  Let's break here so
13 people can make their flights.  We will
14 obviously reconvene and maybe take a few
15 minutes to talk about when.  I will be, if not
16 done, and I may just say I'm done, very, very
17 close to done, on the order of a half hour to
18 an hour, but no more.  I appreciate everyone's
19 stamina.
20        VIDEO TECHNICIAN:  Going off the
21 record at 3:48.
22
23        (Deposition adjourned.)
24        - - - - -
25

---

**505**

1            CERTIFICATE
2 The State of Ohio,  )
3                     SS:
4 County of Cuyahoga.  )
5
6        I, Jaci R. Traver, RPR, CRR and
7 Notary Public, duly commissioned and qualified,
8 do hereby certify that the within named
9 witness, STEPHEN SPARGO, was by me first duly
10 sworn to testify the truth, the whole truth and
11 nothing but the truth in the cause aforesaid;
12 that the testimony then given by the
13 above-referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing
16 is a true and correct transcription of the
17 testimony so given by the above-referenced
18 witness.
19        I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

---

56 (Pages 502 to 505)

674
1  sheet right now and tell you if there's
2  reserves there on a CRA.
3      Q.   Right.  My point is, I guess, if
4  you look at a general ledger for Hahnemann
5  Hospital or MCP Hospital, there's no separate
6  general ledger account called excess CRA
7  reserves, right?
8      A.   No.  No.  No, no.
9      Q.   There might have been portions that
10 you thought were excess built into the
11 individual general ledger accounts for a
12 particular fiscal year and a particular payer,
13 but somebody just looking at a general ledger
14 print-out wouldn't be able to tell one way or
15 another whether there were excess CRA reserves
16 or not?
17         MR. JONES:  Objection.  Asked and
18 answered.
19     A.   Exactly.  Yes.
20         MR. JONES:  Object to form, too.
21     A.   One of the reasons for that, so you
22 know, as ludicrous as it sounds, the Federal
23 Government and the Office of Inspector General
24 has alleged in some cases that if you have a
25 liability on your books that suggests you owe

675
1  Medicare money, you're at fault if you don't
2  give them the money.
3         Well, if the liability is a
4  reserve, that's ludicrous to suggest that we're
5  going to issue a check for 7 million dollars to
6  Medicare for the hell of it.
7         So you don't -- you don't have
8  blatant reserves sitting out there, otherwise
9  the Brain Trust, DIG's going to come in and
10 say, well, if you think you owe them money, why
11 didn't you pay them?  We didn't really think we
12 owe them money.
13         So rather than getting into those
14 kind of conversations with unintelligible
15 types, you assign reserves to these respective
16 open fiscal years.
17         Now, I'm not talking about the
18 Department of Justice.
19     Q.   Now, I take it that you don't
20 recall ever going through an X file schedule
21 like this with anyone from Coopers & Lybrand?
22         MR. JONES:  Object to form.
23     A.   I don't recall, but it certainly
24 would have been available to them.  No new --
25 there's no news on it.  No secrets.  The word

676
1  Hammond is Hammond Hospital.  There's -- they
2  would have had access to this.
3      Q.   Do you know one way or the other
4  whether the Coopers & Lybrand auditors knew
5  that AHERF kept X file schedules like this?
6         MR. JONES:  Object as asked and
7  answered.
8      A.   I'm sure they did.  I'm sure they
9  did.
10     Q.   You don't recall yourself ever
11 telling them that, do you?
12     A.   That we have our own tally of
13 reserves?
14     Q.   Right.
15     A.   Yes.  Yes.  If there's an audit
16 team in the world that has never sat down with
17 their auditors and said what kind of reserves
18 do you have available, they're liars.  There's
19 not a company in the world.  They don't even
20 have to go after the Healthsouths and the real
21 obvious bad guys.  Everybody.
22         I mean, that's a natural
23 conversation, what kind of reserves do you have
24 available, are you skinny or are you heavy, are
25 they light?  What have you taken in income this

677
1  year?  What else is there?
2         How much tolerance is there in
3  certain accounts?  Are the CRAs, you know,
4  loaded up or are they thin?
5         Absolutely.  And my clients had
6  conversations with me when I was a Coopers &
7  Lybrand auditor.
8         So the Medical Center of Beaver
9  County, by god we sat down and talked about
10 reserves real early on because I wasn't going
11 to sit there and say I'm going to adjust
12 $40,000 here and wait until the end and then
13 come back and say you can stick that where the
14 -sun doesn't shine because we have reserves out
15 the whazoo.
16         So there's no -- there's no doubt.
17         And if they didn't ask and didn't
18 try to understand, then shame, shame, shame.  I
19 mean, that's just the way it works.  It worked
20 at Edgewater Steel and at Bounty Oil & Gas.
21 It's not just healthcare.  There's no -- they
22 don't have a monopoly on reserves.
23     Q.   Coopers & Lybrand would sometimes
24 during the audit reach their own judgments as
25 to whether they thought a reserve was needed or

40 (Pages 674 to 677)

Stephen Spargo                                                    Volume 3

---

678

1  not, right?
2      A.   Oh, yeah, sure. Sure.
3      Q.   One of the types of documents that
4  was provided to Coopers when they came in to
5  begin their audit was a print-out of a general
6  ledger, right?
7      A.   Yes, sir. Yes. Yes.
8      Q.   So that Coopers & Lybrand could see
9  the reserves that were on the books?
10     A.   Correct.
11     Q.   But Coopers & Lybrand wouldn't
12  necessarily know which reserves you thought
13  were excess or not unless you told them, right?
14         MR. JONES:  Object to form and
15  foundation.
16     A.   Yeah, or we made them look. You
17  know, you can find an inventory reserve when
18  you find that the count is different than the
19  general ledger balance.
20         Or you can send Duane Girol up to
21  squeeze it out of Scharf, how much reserve is
22  there.
23         Or you can sit down and say what
24  are your reserve positions in your CRAs. I
25  mean, just about every item on here they could

---

679

1  have found. The PP&E schedule tie-in.
2         I mean, those are all natural audit
3  steps so you can sit back and wait for them to
4  say, why is there a difference? Well, it's a
5  part of the reserves.
6         Or you can just tell them upfront
7  or show it as a reconciling item on the
8  schedules.
9         I mean, there are ways to find out
10  without having to be verbally, you know,
11  directed right to it.
12         But in all fairness to them and in
13  the interest of time and efficiency, there's no
14  point --
15         MR. JONES:  No point in what?
16     A.   No point in not showing them or
17  telling them, really.
18     Q.   During the 1996 audit, the last
19  audit while you were at AHERF, was there
20  somebody at AHERF who was, in effect, the lead
21  person who directed interactions with the
22  accountants for Cooper?
23     A.   Who directed the interactions?
24     Q.   Right.
25     A.   No.

---

680

1      Q.   Somebody who was a point person or
2  a point of contact with Coopers & Lybrand.
3      A.   Dan had his organizations. Al had
4  his. Dan would give a lot of responsibility to
5  Chuck Lisbon for some of those hospitals, as Al
6  would give to Dan Cancelmi. The people at
7  Coopers knew all of the people at Allegheny, so
8  there was no controlled access, no controlled
9  conversation. If the lowly staff B wanted to
10  talk to Carolyn Karfaro about why the
11  investment confirms don't tie in, they'd go
12  right to her. Dan may not even know they went
13  right into there.
14         I sure as hell wouldn't know. It
15  didn't really matter. I mean, they all knew
16  each other. They used to work together, half
17  of them.
18     Q.   How much interaction did you
19  especially have with the auditors from Coopers
20  & Lybrand during the audit?
21         MR. JONES:  Object as asked and
22  answered.
23     A.   Minimal. Minimal. Friday mornings
24  for the most part I tried to make those
25  meetings.

---

681

1      Q.   Audit update meetings?
2      A.   Yes, sir. Yes, sir.
3      Q.   Did you personally provide Coopers
4  & Lybrand with any documents or schedules, so
5  forth, or is that something that you expected
6  your staff to do?
7         MR. JONES:  Object to form.
8      A.   I can't -- certainly my staff. I
9  can't think of a thing that would have had to
10  come out of my office that would have
11  substantiated a balance or an account.
12     Q.   You weren't collecting up papers --
13     A.   No.
14     Q.   -- to give to Coopers when they
15  came in for their audit?
16     A.   No, not at all, no schedule
17  requests would come to me. No. It's almost as
18  bad as asking McConnell.
19     Q.   Other than these Friday update
20  meetings, how much interaction did you have
21  during the 1996 audit with Bill Buettner, the
22  Coopers' partner?
23     A.   I think that would be about it,
24  really. I don't think that he was on site a
25  heck of a lot. He left a lot to Kerstein. I

---

41 (Pages 678 to 681)

Stephen Spargo                                                    Volume 3

682

1  don't know. I don't even -- I don't know if we
2  went to the Clark Bar at all in the evenings,
3  whether it be a Friday after work or even a
4  weekday. It wouldn't be unusual to go
5  downstairs sometimes. Whether we did with the
6  auditors that year, I don't recall.
7       I did stay away to maybe some
8  extent, I don't know if this really influenced
9  it, but my baby sitter was hired by Coopers &
10 Lybrand, so I stayed away because I didn't want
11 her thinking I was over there looking at her
12 over her shoulder and had anything to do with
13 her getting a job because I didn't -- it wasn't
14 fair to her. So -- and it's, you know, with
15 all the accounting that went on over there,
16 there's no need for Mr. Big to come strolling
17 around the cubicles, certainly who would make
18 people feel uncomfortable for any reason, which
19 they shouldn't, but --
20      Q.   So you don't have any type of
21 process where you would meet weekly with Bill
22 Buettner?
23      A.   No. No.
24      Q.   How about Mark Kerstein and Amy
25 Frazier?

683

1       A.   No. I hope they would tell you
2  that I was accessible to them if they needed me
3  for anything or needed to talk about anything.
4  No.
5       Q.   So that was mainly -- that is the
6  sort of interaction with Mark Kerstein, Amy
7  Frazier was in your understanding handled
8  mainly by Al and Dan?
9       A.   Yes, sure. They were like equals.
10 They talked the same language. Al and Dan had
11 worked their way up through the ranks at the
12 same levels that Mark and Amy were at. So --
13      Q.   Is it the case that you don't know
14 for a fact whether Al Adamczak or Dan Cancelmi
15 provided Coopers & Lybrand with any of these X
16 file schedules?
17      MR. JONES: Object to form and
18 asked and answered.
19      A.   Not for a fact, no, sir.
20      Q.   Let me hand you what's been
21 previously marked as 1351.
22      MR. JONES: Object to the document
23 in that the exhibit sticker appears to be
24 upside down.
25      MR. RYAN: Objection noted.

684

1       Q.   Do you recognize Exhibit 1351, Mr.
2  Spargo?
3       A.   I recognize it as a SUD for 1996.
4  I don't know that I've seen it before.
5       Q.   When you and the auditors from
6  Coopers & Lybrand discussed the SUDs, did you
7  do that in a way where they went through their
8  SUD entries orally or did they give you a copy
9  of the SUD for you to look at while you went
10 through it with them? How did that work?
11      MR. JONES: Object to form and
12 foundation. Presumes there was such a
13 conversation.
14      A.   I think for the most part it was
15 orally, at least for my purposes, and would be
16 not every item, probably the more material or
17 more significant items. So --
18      Q.   And just due to the objection that
19 was just lodged, is it, in fact, the case that
20 at the end of each audit there would be a
21 meeting where Coopers & Lybrand people would go
22 through at least the more significant SUD
23 entries?
24      A.   Yes. But not at the end. As the
25 entries were identified. Purpose number two of

685

1  these meetings was to discuss the files.
2       Q.   Got it.
3           Now, we were looking previously at
4  the 1995 SUD. Let me try to dig that out here.
5           Do you have Exhibit 1339 in that
6  stack there?
7       A.   From this morning?
8       Q.   Yes.
9       A.   Yes, sir.
10      Q.   Could you turn to the page with
11 Bates number 57337?
12      A.   Yes, sir.
13      Q.   This appears to be the Allegheny
14 General Hospital SUD?
15      A.   Yes, it does.
16      Q.   Do you see an entry for
17 capitalized interest?
18      A.   Yes, I do.
19      Q.   In the amount of $1,595,000?
20      A.   Yes, yes, I do.
21      Q.   Do you recall that Coopers &
22 Lybrand urged AHERF to capitalize interest?
23      A.   No. No. I don't know about the
24 urge word. I know we used to let them come in
25 and calculate it for themselves because we knew

42 (Pages 682 to 685)

746

1    A.   We did. We did.
2    Q.   To whom did you go with those
3  doubts, concerns about Mr. Snow's performance?
4    A.   Dionisio, Morrison, McConnell, once
5  to Sherif, Buettner, Kerstein, Jeff Walmer.
6    Q.   Can you tell me about the one time
7  you recall going to Sherif Abdelhak?
8    A.   Yes. Yeah. It was when McConnell
9  was away racing and something came to his
10  attention to suggest that the level of bad
11  debts at AGH had grown to large numbers without
12  his knowledge.
13       So he had asked for some
14  explanation. And the explanation had to do
15  primarily with shoddy practices within the
16  business office. This really wasn't any
17  revelation. It was only a revelation to him.
18    Q.   This was a question he asked of
19  you?
20    A.   He asked a specific question
21  because he had seen some financial data that
22  prompted that question related specifically to
23  A/R bad debts and write-offs. So I answered
24  him honestly.
25    Q.   You told him you thought the reason

747

1  was shoddy practices in the business office?
2    A.   Pretty much, that this is not an
3  isolated event, this has been building over
4  time and here -- here's the rest of that story.
5    Q.   What reaction did he have at that
6  time?
7    A.   He was looking for somebody's head
8  until David returned on Monday or Tuesday or
9  whatever, calmed him down and god knows what he
10  told him. That was the end of the interaction
11  with Sherif on accounts receivable matters.
12  This was never discussed.
13       So I don't know what he said,
14  whether he discredited me or my analysis or
15  whatever. And I rode on the plane with Sherif
16  all the time. So if he wanted private time to
17  say what is the real story, this is what David
18  told me, nothing, zippo. I said okay, that's
19  fine.
20    Q.   So you didn't ever have a follow-up
21  conversation with Sherif Abdelhak?
22    A.   No. That was it. Once is plenty.
23  Mr. McConnell made it clear not to have any
24  further discussions like that with Sherif.
25    Q.   Did he tell you that expressly?

748

1    A.   Oh, yeah, yeah. Yeah. It was
2  questionable whether I was going to be employed
3  there much longer for awhile, but, you know, it
4  was a mistake in judgment, so be it. That's
5  how we learn. I think that's how he eventually
6  came around to see it, so I said, you know,
7  fine.
8    Q.   Do you know around when in time
9  this conversation that you had with Sherif
10  Abdelhak was?
11    A.   I don't. I don't.
12    Q.   Was that right before you left?
13    A.   No.
14    Q.   Or was it before that?
15    A.   My guess would be a couple years
16  before I left. So I wasn't ready to pack it
17  in. Had I been, it might have been a little
18  bit of a different outcome, different
19  conversations. But, no, I was nowhere close to
20  thinking about going somewhere else to work.
21    Q.   Were you concerned about the affect
22  that the problems in the patient collections
23  office, that is the PFSG group at AHERF, might
24  have on the organization as a whole?
25    A.   I knew -- I knew the affect it was

749

1  having on it currently. Other than
2  Mr. McConnell and myself, we were probably the
3  only two people that really got to appreciate
4  the difficulties from the financial statements
5  and also having to do with the cash flow
6  implications.
7       No one else really wore hats that
8  crossed both sides. Treasury was all cash.
9  Dionisio was all A/R and AGH.
10       So no one really got to appreciate
11  struggling through the financial analyses with
12  crappy information, Snowbird and company
13  throwing up road blocks and making sure we
14 · don't get the information we need. And also
15  having to go answer to Dave Deci every day
16  about pay Cardinal Health and don't pay anybody
17  else, sorry. David said if a vendor calls,
18  tell them to call David's office. Yeah, right,
19  like that phone's going to get answered.
20       So, yeah, it's -- it was a problem
21  on a daily basis.
22    Q.   Did you ever consider going
23  directly to the Board of Trustees to let them
24  know about these problems?
25    A.   No, I never did. No.

Stephen Spargo                                            Volume 3

750
1    Q.   Did you ever consider trying to
2  approach Sherif Abdelhak again despite what
3  David McConnell told you?
4    A.   No.
5    Q.   You were concerned that you would
6  be fired?
7    A    No. I was -- you know, I guess I
8  was convinced that we had to work through the
9  players that existed because changes weren't
10 going to be made and, you know, just keep
11 harping away, maybe with a little bit less vim
12 and vigor.
13       I didn't get a lot of help. Al and
14 Dan certainly saw it firsthand. It wasn't all
15 personalities. Snowbird treated his people
16 like crap and I had no respect for him because
17 of that. They were out of their league.
18 Sometimes you got to know when to fold and move
19 on. They weren't being well served.
20    Q.   Just so we have a clear record,
21 Snowbird is Greg Snow?
22    A.   Greg Snow. I'm sorry.
23    Q.   Mr. Snow's predecessor, I believe
24 you mentioned the first day of your deposition,
25 was a gentleman named Roger Hoxindale?

751
1    A.   Yes, yes.
2    Q.   Did you have an opinion as to how
3  he was doing in bill collection?
4    A.   Well, I -- my opinion in retrospect
5  was that it was -- it got a little beyond him
6  as well. We were biting off more than we could
7  chew. It's one thing to march out there once a
8  month and say from now on you're only closing
9  the books under my tutelage, and that's only
10 going to last about ten minutes because I'm
11 going to bring Dan Cancelmi in a heartbeat, so
12 you do whatever you want for 29 days, but on
13 the 30th day when it's journal entry time, this
14 is the drummer that you're going to be dancing
15 to or marching to.
16       The business office, they do
17 substantive tasks every day. And you can't
18 just say, hey, you know, there's a new sheriff
19 in town. We're going to do it differently and,
20 guess what, we're moving you back to
21 Pittsburgh. That's rather disruptive.
22       You need a very, very stable
23 environment before you start making those
24 decisions. We had systems that were awry and
25 PATCOM crap and we couldn't even get Medicaid

752
1  bills out the door.
2        It just wasn't reasonable to expect
3  the patient accounting could do what we were
4  about to do with payroll and accounts payable.
5  It's a different -- you pay people in Alaska
6  and they wouldn't know the damn difference.
7  Not so with the business offices.
8    Q.   It was helpful to be more on the
9  ground?
10   A.   I think. I think. You need to --
11 you need to make sure you know what you're
12 moving and you have proper controls in place
13 before you just start dabbling with it.
14   Q.   Am I understanding you right that
15 in hindsight you think the move to patient
16 billing back to Pittsburgh was a mistake?
17   A.   Ill conceived and ill orchestrated,
18 yes, I do.
19   Q.   Who conceived that consolidation of
20 patient billing?
21   A.   I don't know. David and Sherif
22 would be my guess.
23   Q.   Who orchestrated that?
24   A.   David and Dionisio, and Roger was
25 sent out there initially, but, you know, his

753
1  opportunity presented itself in Children's
2  Hospital, so Greg Snow was charged with that
3  task.
4    Q.   When you had responsibilities for
5  patient billing, that was only at AGH?
6    A.   Only at AGH, yes. Yes. Okay, I
7  fibbed. No, I didn't.
8    Q.   So you didn't have to deal with the
9  issues of all the different hospitals and all
10 the different systems halfway across the state?
11   A.   No. No. Thank goodness.
12   Q.   I take it that you felt that you
13 and your colleagues in general accounting had
14 difficulty in getting access to information
15 from Greg Snow and his people?
16   A.   We did.
17   Q.   What types of difficulties did you
18 encounter?
19   A.   I guess schedules weren't made
20 available or, you know, there was always a
21 question of doing the allowance calculations at
22 the end of the month and verifying that the
23 percentages and ratios being used were correct.
24       I think you even alluded to earlier
25 that when it comes to collecting patient

59 (Pages 750 to 753)

Stephen Spargo                                                    Volume 3

754

1   accounts receivable you can always look back
2   and see what you really did collect to make an
3   estimate as to what you did collect. Well, you
4   can't. It's not that easy
5         Someone doesn't give you the
6   information about this was the gross amount
7   billed, this was the net that we wrote it down
8   to and here is what we already collected, plus
9   the patient co-pay -- it is complicated, I'll
10  give them that
11        It's way beyond what I could do.
12  But there are experts out there to do it. But,
13  you know, we asked for analyses or, you know,
14  asked for information and they'd say no, we'll
15  do it, we'll get Russ Laing to do it.
16        Other people would be assigned
17  tasks and out comes garbage. It's like, well,
18  not only did we not accomplish what we wanted
19  to accomplish, but time was wasted waiting for
20  what we had no reason to believe was going to
21  be meaningful information anyway. So it was a
22  struggle
23        Q.   Who was Russ Laing?
24        A.   One of Greg Snow's staff. I don't
25  know if he reported directly to Greg or two

755

1   steps removed. But he was somebody that came
2   over to AHERF from UPMC, kind of a new addition
3   charged with helping us get our hands around
4   business office issues.
5         Q.   Did you and your colleagues in
6   general accounting specifically have
7   difficulties getting information from Mr.
8   Laing?
9         A.   Yes. Oh, yeah. Or Robin. I think
10  that's what I usually heard is Robin, we would
11  send her down.
12        Q.   Robin Schaffer?
13        A.   Robin Schaffer, which is I guess
14  kind of in retrospect foolish. You go
15  downstairs and get it She would come back
16  empty-handed. They'd send her on some wild
17  goose chase and she'd either tell Chuck or Dan
18  directly.
19        Q.   Were there occasions where you felt
20  that Mr. Laing had, in fact, provided
21  misinformation?
22        MR. JONES: Object to form.
23        A.   I don't know. I don't know
24  about -- purposely misinformation or was it
25  analyses that reflected his ineptitude perhaps

756

1   more so. Not -- inability to get his hands
2   around the issue. I used to work with Russ at
3   Coopers & Lybrand. I don't want to speak
4   poorly of him, but he wasn't the right man for
5   that job either. I hope he didn't give
6   purposely misinformation to send us off too far
7   down a different path.
8         Q.   I think you previously stated in
9   one of the various testimonial sessions you've
10  had that you felt that Mr. Laing was part of a
11  smoke screen.
12        A.   Yes.
13        Q.   Can you explain that?
14        A.   Well, yeah, I think --
15        MR. JONES: Object to form.
16        A.   -- Russ and I think at the time
17  they shared some documents with me that would
18  show some of the results of Russ's efforts that
19  tried to show that these numbers were right and
20  the problem wasn't this big. And it was a
21  bunch of mumbo jumbo that if you took the time
22  or wasted the time to get through the logic of
23  his analyses, you would eventually find the
24  Achilles' heel where, you know, assumption
25  number four is totally false, so that means

757

1   five through 94 have no merit and you just
2   wasted two hours of our time trying to figure
3   out what the hell you just did.
4         So, you know, sometimes it was
5   simple stuff, calculating days of revenue
6   receivables. Other things were, you know,
7   trying to get a handle on what was our current
8   A/R balance and what were the accounting
9   entries that needed to be made. So --
10        Q.   Do you have any knowledge about the
11  quantity or quality of the information that
12  Greg Snow and Russ Laing and others provided to
13  Coopers & Lybrand?
14        MR. JONES: Object to foundation.
15        A.   No, I don't know that I ever heard
16  Coopers' staff complain or heard complaints
17  through my staff about that. It was a struggle
18  down there. And I think they, Jeff Walmer and
19  others, Brian I think was one of the guys who
20  was assigned to that, they appreciated how
21  difficult it was to get -- get schedules to tie
22  and things that foot and cross foot, two
23  schedules add up to the trial balance amount.
24  I mean, it was a -- it was a complex
25  environment.

60 (Pages 754 to 757)

Stephen Spargo                                                    Volume 3

---

758

1    Q.   Given the experience that you had
2  dealing with Greg Snow, is it possible that
3  there was information in PFSG that would have
4  reflected poorly on how Greg Snow and his staff
5  were performing that they didn't give to
6  Coopers & Lybrand?
7            MR. JONES:  Object to form and
8  foundation.
9    A.   Well, is there a chance of that?
10  Yeah.
11           Is there a chance it reflected
12  poorly on information they were trying to give
13  Dan Cancelmi and his staff?  Yeah.
14           But as a backdrop to all of this,
15  if nothing else, you had a very outspoken, very
16  opinionated me sitting there saying this is
17  wrong.  This is -- this is crap going on down
18  there.  Our reserves are for shit.  We can't
19  get any good information.  We need to fix this.
20           So if they suspected that the
21  information may not have footed and tied in,
22  their suspicions could have been confirmed by
23  just mine and other people's statements saying
24  this needs attention.  We're asking you, get in
25  there, get your hands dirty.

---

759

1    Q.   Did you ever form any views as to
2  why it was that Greg Snow and his staff were
3  doing poorly collecting patient accounts?
4            MR. JONES:  Object to form.
5    A.   My own views is the task was too
6  big for him and his staff.  You know, it's I
7  guess I'm a perfect example of you can be a
8  numbnut and surround yourself with good people
9  and do your job, or make it look like your
10  job's getting done.  And you're only as good as
11  the people you surround yourself with.
12           It wasn't all him.  He did not
13  necessarily have the right caliber of talent
14  around with him.  But you also have to be an
15  effective leader.  You can't treat people like
16  crap.  You can't swear at them at meetings,
17  make derogatory comments while others are there
18  to witness it or you'll never have good people
19  around you.
20           So, he would never have the right
21  staff.  And you have to attribute that to the
22  top, to the leader.  It was too bad.
23    Q.   You heard of occasions where people
24  in PFSG felt that they were being treated
25  poorly, sworn at?

---

760

1    A.   Oh, yeah.
2    Q.   Derogatory words used to them?
3    A.   You bet.
4            MR. JONES:  Object to form.
5    Q.   And they, therefore, left the
6  organization due to the treatment they were
7  getting from Greg Snow?
8    A.   Yes, yes.
9    Q.   Let me hand you what's previously
10  been marked as Exhibit 104.
11           This is a memo from you to Mr. Snow
12  dated July 15th, 1996.  Right?
13    A.   Yes.
14    Q.   And I see that you are copying on
15  the bottom David McConnell and Joe Dionisio,
16  right?
17    A.   Yes, sir.
18    Q.   And were you purposefully doing
19  that so that those individuals would see the
20  written efforts you were making to get
21  information from Mr. Snow?
22    A.   Yes.  Yes.  That would be my guess.
23  Well, and, likewise, it's a courtesy, David's
24  my boss, Joe's Greg Snow's boss.
25    Q.   Do you see the first sentence of

---

761

1  the memo reads, "In reviewing the various A/R
2  and net revenue adjustments that have been
3  reported in our June close, it occurred to me
4  that we may want to spend some extra time
5  analyzing our June 30th A/R balances in an
6  effort to identify all potential exposures
7  included therein"?
8    A.   M-hm.
9    Q.   Do you recall what the various A/R
10  and net revenue adjustments were that you were
11  referring to there?
12    A.   I don't offhand.  But I assume it's
13  contractual allowances, bad debt reserves, the
14  usual menu of revenue and A/R adjustments.
15    Q.   Do you recall whether you ever
16  received from Greg Snow or his staff the type
17  of analysis that you were asking for here in
18  this memo?
19    A.   No, I don't think I did, to be
20  honest with you.  That's more from prior
21  testimony than anything else.
22    Q.   The second sentence reads,
23  "Although I would not envision immediately
24  sharing such an analysis with our auditors, I
25  do believe they should be assessed in

---

61 (Pages 758 to 761)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION,
         Plaintiff,
    vs.                 Civil Action
PRICEWATERHOUSECOOPERS,     No. 00-684
LLP,
         Defendant.


Continued Videotaped Deposition of
STEPHEN H. SPARGO, called for examination under
the Applicable Rules of Federal Civil
Procedure, taken before me, Michele E. Eddy, a
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant
to notice and stipulations of counsel, at the
offices of Manion McDonough, 600 Grant Street,
Suite 1414, Pittsburgh, Pennsylvania, Ohio, on
Wednesday, the 5th day of November, 2003, at
10:00 a.m.

- - - - -

VOLUME 4

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216 523 1313 fax 216 263 7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330 374 1313 fax 330 374 9689
1.888.391.3376 (DEPO)

806

1  foundation.
2      A.  Yes.  Yes.
3      Q.  So that, for instance, at Hahnemann
4  University Hospital, if the contractual
5  allowance on average for that 9 million dollars
6  in accounts, if they really were accounts at
7  gross, if the contractual allowance for those
8  accounts were 33 percent or one-third, then the
9  accounts should have been carried at 6 million
10  rather than 9 million, the potential adjustment
11  would be 3 million, right?
12      MR. JONES:  Object to form.
13      A.  Yes.  Yeah.
14      Q.  Now, the potential adjustment we've
15  been talking about so far is an adjustment to
16  the accounts at gross balance on the balance
17  sheet, right?
18      A.  Yes.  I believe these are all on
19  the balance sheet, hopefully, or in the A/R
20  detail that added up to what was on the balance
21  sheet.  One never knew with patient accounting.
22      Q.  Now, when AHERF, while you were
23  there, recognized that there were accounts at
24  gross on the books and adjusted those balances
25  to their net carrying basis, that resulted in

807

1  what was known as an out-of-period adjustment,
2  didn't it?
3      MR. JONES:  Object to form and
4  foundation.
5      A.  Yeah, that -- yes, that was the
6  term that was often used, yes.
7      Q.  All right.  So -- and out-of-period
8  adjustment meant that, say, in a given month
9  there was a contractual adjustment posted,
10  whereas the gross revenue amount had been
11  recognized in a previous month?
12      MR. JONES:  Object to form.
13      A.  Yes.
14      Q.  Now, to the extent that the amount
15  of accounts at gross at a particular hospital
16  remained relatively constant over time, in any
17  given month, not only would there be
18  contractual adjustments taken where the gross
19  revenue for that particular account had been
20  recognized in an earlier month, but also in the
21  month we're talking about there would be gross
22  revenue recognized for some other account
23  without the contractual adjustment being taken
24  to offset it, right?
25      MR. JONES:  Object to form and

808

1  foundation.
2      A.  That's kind of a run-on sentence,
3  but, yeah, I think.  Yeah, if I'm with you.
4  Yeah.
5      Q.  And the question that I'm trying to
6  get to is, am I right that to the extent that
7  the accounts at gross problem remain constant
8  in a given fiscal year, say, there would be no
9  net affect upon the income statement in that
10  year because there would be contractual
11  adjustments taken in that year where the gross
12  revenue had been recognized in the previous
13  year but there would also be gross revenue
14  taken in that year where the contractual
15  adjustment wouldn't be taken until the
16  following year?
17      MR. JONES:  Same objection.
18      A.  Yeah, conceivably, if the activity
19  from year to year is level and that the
20  accounts are identified on a semi timely basis,
21  yes.  Yes.  No single year could be -- would be
22  distorted by that.  It might -- go ahead.
23      MR. JONES:  You can finish your
24  answer.
25      A.  It might be helpful to know that

809

1  this whole concept of out-of-period adjustments
2  was another smoke screen thrown up by the PFS&G
3  group as we were trying to identify unusual
4  variances in net revenues, which we attributed
5  to their lack-luster-crappy performance, they
6  attributed to all this bunk.
7      So the out-of-period adjustments
8  were caused by a number of factors, one of
9  which is these accounts at gross, which, to be
10  honest with you, and excuse my french, I didn't
11  give a crap about.  I really -- there's
12  probably accounts at gross all the time.
13  There's probably accounts sitting at a thousand
14  dollars that technically we were going to be
15  paid 5,000 and we should write up to its net
16  realizable value.
17      We latched onto these accounts at
18  gross, and you'll see copies to Morrison and
19  Snow and everybody else, to highlight once
20  again that somebody downstairs didn't have a
21  damn clue what they're doing, that we have
22  $300,000 from 1994 that they're saying is
23  sitting at gross.
24      I don't care what it's sitting at.
25  Who's the payer?  Send them the damn bill and

Stephen Spargo                                                      Volume 4

---

810

1   get the cash in. I really don't give a rats
2   you-know-what if you take the allowance now, in
3   '95, in '94. You shouldn't have an account
4   sitting there two years old that you don't even
5   know what the net amount is.
6        So my whole -- this was one more
7   opportunity to say we got a bunch of bone-heads
8   down here. I don't really care -- this account
9   at gross crap I don't care about. This
10  out-of-period adjustment or allowance, that
11  happens all the time.
12       But, you know, once again, we got
13  distracted into putting little detailed
14  analyses together that all of a sudden now say,
15  oh, is this an exposure item? The exposure is
16  they're not doing their job. If it's exposure
17  here, it's much, much less than the fact that
18  they're not doing their job and they're not
19  collecting cash.
20  Q.    So you were concerned about the
21  accounts gross issue for what it's
22  operationally about patient billing?
23  A.    That's absolutely right.
24  Q.    But you didn't think it was a big
25  problem from an accounting point?

---

811

1   A.    I didn't. I didn't. Because, to
2   be honest with you, if it's sitting there gross
3   since 1994, we don't really know who the payer
4   is. There's a good chance if it's Medicaid,
5   even though we might have it in some other
6   class, we're not going to get zip for it.
7        Maybe it's all patient liability
8   we're going to get a hundred percent for. I'm
9   not -- that didn't trouble me. You know, it
10  was another distraction that we tried, number
11  one, to work around and, number two, to use
12  against them, say, okay, you know, you want to
13  play this out-of-period adjustment game, we'll
14  play it. But, you know, all for not again,
15  so --
16  Q.    Let me just ask you another -- a
17  question or two about one that I was asking
18  about.
19       We discussed that to the extent
20  that accounts at gross remained constant in a
21  given year should have no net affect on the
22  income statement, right?
23       MR. JONES: Object to form.
24  A.    That's correct.
25  Q.    To the extent that in a given year

---

812

1   the balance of accounts at gross was worked
2   down so that there were fewer accounts at gross
3   at year-end than there had been at the
4   beginning of the year, then that would tend to
5   have a somewhat depressing affect upon income
6   in that year, right?
7        MR. JONES: Object to form and
8   foundation.
9   A.    Yes.
10  Q.    Do you recall during your last year
11  or two at AHERF whether the accounts at gross
12  problem was remaining constant, increasing,
13  decreasing?
14       MR. JONES: Same objection.
15  A.    I don't recall that we ever
16  wrestled with it over a multi-year period.
17  There were multi-year balances as this schedule
18  demonstrates. But I honestly don't recall
19  saying, oh, this sounds bad, but it's a hell of
20  a lot better than last year. Or this is worse,
21  we're on an upward trend. I really -- this was
22  a temporary smoke screen, as I mentioned, that
23  we were trying to work with and around. So I
24  don't recall, sir.
25  Q.    Let me hand you another exhibit

---

813

1   that I believe you were shown at the previous
2   session of your deposition as well. It's
3   Exhibit 122.
4   A.    Thank you.
5   Q.    Now, this is Mr. Cancelmi's
6   handwritten schedule identifying a year-end A/R
7   reserve adjustment in the amount of 17 and a
8   half million dollars. Is that right?
9   A.    Yes, sir.
10  Q.    And you recall that at the end of
11  the Coopers & Lybrand fiscal year 1996 audit,
12  there was an adjustment made to bad debt in the
13  Delaware Valley in the amount of 17 and a half
14  million dollars, right?
15  A.    1996?
16  Q.    Fiscal 1996.
17  A.    Did we talk about that yesterday?
18  Q.    I don't think so, no.
19  A.    No, then I don't, because I don't
20  recall. But I'm sure you have something to
21  help me.
22  Q.    All right. Let me hand you an
23  exhibit marked in the previous session of your
24  deposition, Exhibit 1683.
25  A.    Thank you.

---

6 (Pages 810 to 813)

Stephen Spargo                                                    Volume 4

814

1    Q.    You see that Exhibit 1683 appears
2  to contain two versions back-to-back of
3  Mr. Cancelmi's September 20th, 1996 memo to you
4  on Delaware Valley accounts receivable aging
5  with attachments, the first copy beginning at
6  Bates page DC 2135 and the second copy
7  beginning at DC 2329.
8    A.    I see that, yes.
9    Q.    If we could focus on the second
10  copy of the memo contained in Exhibit 1683.
11    A.    Must we?  Okay.
12    Q.    This is I believe your handwriting?
13    A.    I believe --
14    Q.    That we see on this page?
15    A.    Yes, it is.
16    Q.    And then also at the end of the
17  memo before the attachments on page DC 2333?
18    A.    Yes.
19    Q.    Could you just read the first
20  paragraph of your handwriting there, please?
21    A.    Yikes.  I'll try.  You can help me
22  if you'd like.
23          "Recommend offsetting the 360 plus
24  something reserve."
25    Q.    With reserve?

815

1    A.    What's that?
2    Q.    With reserve, perhaps?
3    A.    With -- yeah, with reserve, which
4  will leave -- bad English -- and a detailed A/R
5  balance of 203 million or 233 or -- and a
6  reserve of approximately 27 million, parens,
7  utilizing the 17.5 year-end reserve in the
8  Delaware Valley and the 7.5 reserve from AGH.
9    Q.    Thank you.
10    A.    You're welcome.
11    Q.    So there's a reference here in your
12  handwritten notes to a 17.5 year-end reserve in
13  the Delaware Valley, right?
14    A.    Yes.
15    Q.    Let's add to that another document,
16  Exhibit 1450.  This is a memo from Mr. Cancelmi
17  to you dated four days later, September 24th,
18  1996, right?
19    A.    That's correct.
20    Q.    And I think at the last session of
21  your deposition we looked at your handwritten
22  note on the first page to David McConnell?
23    A.    Yes, I believe we did.
24    Q.    If I could direct your attention,
25  please, to the second page.

816

1    A.    Yes, sir.
2    Q.    And do you see down there toward
3  the bottom under the heading existing reserves
4  to be used to cover write-offs after a breakout
5  of bad debt reserves at the five Delaware
6  Valley hospitals totaling $53,867,000, there's
7  a row called other reserves segregated for bad
8  debts at 6-30-96 in the amount of $17,500,000.
9    A.    Yes.
10    Q.    Does looking at these exhibits,
11  1683 and 1450, help refresh your recollection
12  that there were 17 and a half million dollars
13  in reserves that were identified at the end of
14  the Coopers & Lybrand fiscal year 1996 audit
15  and set aside for bad debts in the Delaware
16  Valley?
17          MR. JONES:  Object to form.
18    A.    It appears that's -- it appears
19  that's what has happened.
20    Q.    Exhibit 122 that we started off
21  this line of questioning with is a schedule
22  that lists one, two, three, four, five, six,
23  seven groups of reserves that total 17 and a
24  half million dollars in amount?
25    A.    That's correct.

817

1    Q.    Now, I think you've testified
2  previously that you remember there was a
3  discussion at the end of Coopers & Lybrand's
4  fiscal year 1996 audit that they believed that
5  the bad debt reserves in the Delaware Valley
6  needed to be enhanced, is that right?
7          MR. JONES:  Object to form.
8    A.    That's correct.
9    Q.    And I know that, you know, over the
10  years as you've been deposed a number of times,
11  various people have asked you questions about
12  what the amount of that shortfall that was
13  identified for June 30th, 1996 may have been.
14          But is it correct that you do not
15  have a recollection as to what the amount of
16  that shortfall that Coopers & Lybrand
17  calculated was?
18          MR. JONES:  Object to form in that
19  it misstates his prior testimony.
20    A.    The question is do I have a
21  recollection of the shortfall that Coopers
22  calculated?
23    Q.    Yes, sir.
24    A.    No, I don't.
25    Q.    Do you know, for instance, one way

7 (Pages 814 to 817)

818

1  or the other whether Coopers & Lybrand believed
2  that the amount of shortfall was in the 15 to
3  20 million dollar range around this 17 and a
4  half million dollar adjustment?
5      MR. JONES: Same objection.
6      A.   They may have, if their calculators
7  weren't working.
8      Q.   Mr. Cancelmi started sending you a
9  series of memos starting on September 20th,
10 1996 about the bad debt reserve shortfall,
11 right?
12     A.   Yes, he did.
13     Q.   That was a shortfall that he was
14 calculating after a proposed write-off of about
15 80 million dollars in accounts in the Delaware
16 Valley, right?
17     A.   That's correct.
18     Q.   Before Mr. Cancelmi started sending
19 you this series of memos beginning about
20 September 20th, 1996, had you performed any
21 sort of calculation of what you believed the
22 bad debt reserve shortfall at June 30th, 1996
23 might be?
24     A.   I don't know that I would have, no.
25 That would be uncharacteristic of me to do it.

819

1      Q.   Had anybody else performed for you
2  a calculation of a bad debt reserve shortfall
3  at June 30th, 1996?
4      MR. JONES: Object to form.
5      A.   Before these memos?
6      Q.   Yes, sir.
7      A.   I would imagine so. Yeah.
8      Q.   Do you remember anything about
9  that? Do you remember who did that or what the
10 amount was?
11     A.   My guess is it would be Dan and his
12 staff or Al and his staff or AGH.
13          I would not have waited for Dan's
14 typed memo to have this reveal anything to me
15 other than maybe this will be a starting point
16 to get this mess cleaned up in fiscal '97.
17          We lost in '96. We didn't get the
18 attention we wanted. So we gave up and said,
19 okay, let's -- it's a new year, it's a new day,
20 let's try something new. How about writing off
21 every account over 270 days old and all that
22 PATCOM crap and past statute, let's go naked on
23 our reserves and let's see if Mr. Snow likes
24 standing in front of the mirror naked. That's
25 what this was all about.

820

1      This wasn't to say 17 and a half
2  was bad or, look, we're moving AGH's
3  capitalized interest over. We were looking for
4  a brand-new day. Because I knew he would be
5  exposed someday, and I hadn't been successful
6  at this point, so let's try this.
7      Q.   So the question that I guess I'm
8  trying to ask is, did you have in mind before
9  you started receiving this series of memos from
10 Mr. Cancelmi beginning on September 20th that
11 there was a particular amount of bad debt
12 shortfall in the Delaware Valley?
13     MR. JONES: Object as asked and
14 answered and form.
15     A.   I don't recall having any amount in
16 mind. My recollection of the circumstances is
17 it wouldn't have mattered. It didn't matter to
18 me if it was a million dollar shortfall or 101
19 million dollar shortfall. We weren't bringing
20 cash in the door and we needed that to be
21 acknowledged.
22          So the magnitude of the shortfall
23 was irrelevant. Coopers was comfortable with
24 the '96 audit. We got through that day. Let's
25 move on to the next. So --

821

1      Q.   Before Coopers & Lybrand came in to
2  do the fiscal year 1996 audit, you and your
3  staff in the general accounting department at
4  AHERF prepared a set of financial statements
5  for fiscal year 1996, right?
6      A.   We probably would have. For June
7  30th?
8      Q.   Yeah.
9      A.   I think that was our practice. We
10 definitely closed the books and I assume we
11 distributed preliminary draft statements in
12 June, which most hospitals do, recognizing that
13 the year-end close is a whole new ballgame.
14          So we definitely send reports out
15 to the presidents and their department, cost
16 center managers, so they can look at variances
17 and assess their activities within their
18 departments.
19          I can't recall if at Allegheny our
20 practice was to do a full set of financials,
21 but we could have.
22     Q.   In any event, you and your staff
23 are the ones who determined the amount of bad
24 debt allowance that was on the books at June
25 30th, 1996 and that was provided to Coopers &

8 (Pages 818 to 821)

Stephen Spargo                                                    Volume 4

822

1  Lybrand for them to audit, right?
2      A.  I believe, since I don't think we
3  historically adjusted the reserves for bad debt
4  on a monthly recurring basis, that we closed
5  the books in June like we did in other years
6  with whatever balance was there with the
7  complete understanding and expectation that our
8  friends from Coopers & Lybrand would come in
9  and assess the -- help us assess or we'd help
10  them assess the adequacy of the reserves.
11      I'd be surprised if at the June
12  close you saw any adjustments to the reserve up
13  or down other than the direct write-off method
14  that Mr. Snow was utilizing.
15      Q.  We saw in the exhibit we looked at
16  earlier today, Exhibit 117, that AHERF was
17  preparing calculations of the bad debt reserve
18  using a bad debt reserving formula for the
19  Delaware Valley hospitals and providing that to
20  Coopers & Lybrand to audit for the June 30th,
21  1996 audit, right?
22      MR. JONES:  Object to form.
23  Misstates testimony.  Misstates the document.
24      A.  Mr. Ryan, was this document
25  prepared by Coopers or by AHERF?

823

1      Q.  Are you familiar with the
2  abbreviation used by auditors PBC to mean
3  prepared by client?
4      A.  Oh, no.  But, yes, I've heard that.
5  Yes, I'm familiar with that.
6      Q.  Are you familiar with what the bad
7  debt reserve spreadsheets that your staff
8  prepared for the Delaware Valley hospitals at
9  June 30th, 1996 looked like?
10      A.  I believe I am now.  I think I'm
11  looking at one.
12      Q.  So assuming that Exhibit 117 is a
13  set of schedules prepared by the accounting
14  department at AHERF, as prior witnesses have
15  testified they are, you would agree, would you
16  not, that the general accounting department at
17  AHERF was calculating a bad debt allowance for
18  the Delaware Valley hospitals at June 30th,
19  1996 using a bad debt reserving formula, right?
20      MR. JONES:  Object to form and
21  foundation.
22      A.  I would agree that the PBC initials
23  suggest that someone on my staff or -- at
24  AHERF -- could have been done by Snow's
25  staff -- did a bad debt reserve -- did two bad

824

1  debt reserve calculations for Hahnemann
2  University for at least the purpose of
3  demonstrating that the difference between using
4  the bill date and the discharge date is
5  immaterial.
6      This schedule doesn't tell me that
7  anyone said the reserves are adequate.  It
8  doesn't tell me that anyone said 50 percent
9  write-off for the 181 category is appropriate.
10      It just tells me that let's not
11  split hairs over bill date versus discharge
12  date because, quite frankly, Snow's staff can't
13  do that.
14      I get the sense you're about to
15  educate me.
16      Q.  Let me hand you, Mr. Spargo, what's
17  previously been marked as Exhibit 116.
18      A.  Thank you.
19      I see it says PBC.
20      Q.  This exhibit also says PBC, doesn't
21  it?
22      A.  It does.
23      Q.  Do you recognize this as a type of
24  schedule known as a bad debt reserve
25  roll-forward?

825

1      A.  I guess -- yeah, I guess that's
2  what we could call this.
3      MR. JONES:  Object to foundation.
4      Q.  This first page is headed Center
5  City, Formerly Hahnemann University Hospital,
6  Inpatient Summary of Reserves for Bad Debt,
7  right?
8      A.  It is.
9      Q.  You see there the adjusted ending
10  balance in the amount of $15,058,248, right?
11      A.  I do.
12      Q.  Do you see that amount ties to the
13  formula bad debt reserve calculation based on
14  the age by final bill date methodology in
15  Exhibit 117?
16      A.  It certainly does.
17      Q.  Do you see there the year-to-date
18  adjustment to calculation booked at year-end in
19  the amount of $3,082,598 to bring the bad debt
20  reserve for inpatient accounts at Hahnemann
21  Hospital up to the formula amount at June 30th,
22  1996?
23      A.  Yes, I sure do.
24      Wait, say that again.
25      MR. RYAN:  Could you read that

9 (Pages 822 to 825)

826

1  back, please?
2      A.   Oh, no -- no, that's the subtotal.
3  That's not a year-end adjustment.
4          That's the subtotal of all 12
5  monthly entries, is it not? Because it happens
6  to equal the total. That's taken July plus --
7      Q.   All right, thank you.
8      A.   Right?
9      Q.   So the $3,082,598 figure is the
10  total for the entire fiscal year in the column
11  of provisions on the adjusted trial balance,
12  right?
13     A.   I believe so.
14     Q.   So the year-to-date adjustment
15  calculation is zero, right?
16     A.   Year-to-date adjustment
17  calculation.
18         That line shows zero, yes. I don't
19  know what that really means, but yes.
20     Q.   At any event, at year-end, the
21  ending balance in the general ledger account
22  for inpatient bad debt reserves at Hahnemann
23  University Hospital as shown in Exhibit 116
24  ties to the amount as calculated by the bad
25  debt reserving formula contained in Exhibit

827

1  117, right?
2      A.   That is correct. You're right.
3      Q.   Does reviewing Exhibits 116 and 117
4  refresh your recollection that, in fact, the
5  general accounting department at AHERF did
6  calculate and book a bad debt allowance at the
7  Delaware Valley hospitals at year-end fiscal
8  year 1996 based on bad debt formula reserving
9  methodology?
10         MR. JONES: Object to form and
11  foundation.
12     A.   That certainly appears that's what
13  has happened, yes.
14     Q.   And then provided those amounts to
15  Coopers & Lybrand to audit, right?
16         MR. JONES: Same objection.
17     A.   Yes, it appears so.
18     Q.   Do you recall ever telling Bill
19  Buettner or anybody else at Coopers & Lybrand
20  that you believed that the bad debt allowances
21  at the Delaware Valley hospitals, that the
22  general accounting department at AHERF had
23  provided Coopers & Lybrand to audit, were
24  understated?
25         MR. JONES: Object to form and

828

1  foundation.
2      A.   No, I don't recall those -- those
3  exact words, no.
4      Q.   You had conversations, I gather,
5  with Coopers & Lybrand where you told them that
6  you had concerns about how the patient billing
7  department was doing and you felt they weren't
8  collecting cash well, right?
9      A.   I did have those, yes.
10     Q.   But you can't recall conversations
11  where you said to anybody from Coopers &
12  Lybrand I think the bad debt reserve is wrong,
13  I think the financial statements are misstated
14  or anything like that, right?
15         MR. JONES: Object to form.
16     A.   I did not say it like that, no.
17     Q.   You can't recall saying it in any
18  other way that would have conveyed that
19  message, can you?
20         MR. JONES: Object to form.
21     A.   Yeah. Our A/R includes junk. I
22  don't know how you're going to get satisfied
23  with it this year. But I know you do your own
24  little testing. We have past statute accounts.
25  We have PATCOM crap that we've inherited. We

829

1  need help more than sending Norb in from
2  Harrisonburg or wherever he came from. We've
3  got some serious problems here.
4      Q.   Do you have any reason to believe
5  that the 17 and a half million dollar
6  adjustment made as a result of the Coopers &
7  Lybrand fiscal year 1996 audit was not an
8  adjustment sufficient to state the bad debt
9  allowances at the Delaware Valley hospitals
10  fairly at fiscal year-end?
11         MR. JONES: Object to form.
12     A.   Do I believe it was not sufficient?
13     Q.   Do you have any reason to
14  believe -- do you have any reason as you sit
15  here today to believe that that adjustment was
16  insufficient?
17         MR. JONES: Same objection.
18     A.   Yes.
19     Q.   What reason is that?
20     A.   Dan Cancelmi's September 20th memo
21  to me and the September 24th memo and my
22  handwritten note to David McConnell.
23     Q.   Before you received Mr. Cancelmi's
24  September 20th, 1996 memo, and perhaps
25  conversations with Dan in the days leading up

10 (Pages 826 to 829)

830

1   to that memo, did you have any reason to
2   believe that the bad debt reserve at the
3   Delaware Valley hospitals with the 17 and a
4   half million year-end adjustment was
5   insufficient?
6        MR. JONES: Same object as asked
7   and answered.
8        A.   Yes.
9        Q.   What reason is that?
10       A.   None of this was a new problem. We
11  knew we had issues in accounts receivable that
12  predate September 20th.
13       I don't want to keep harping on
14  past statute and PATCOM and accounts at gross
15  and different issues, but we knew they were
16  there.
17       How much? It was secondary to we
18  weren't doing a good job at billing and
19  collecting cash.
20       So the 17 million or 17 and a half,
21  or whatever adjustments were posed, were
22  adequate for Mr. Buettner to get comfortable.
23  If he could recharacterize the CRA reserve to a
24  bad debt reserve to help ensure that the
25  reserve was more reasonably stated, fine.

831

1   That's okay.
2        My issue wasn't with the adequacy
3   of the reserves other than the fact that
4   that -- that might allow us to heighten the
5   ineptitude of our PFS&G group because, as I
6   said yesterday, I had the dubious distinction
7   of dealing with Mr. Deci and cash. Cash is
8   king. Today, too, in both of our lives and at
9   work, so --
10       Q.   Now, Bill Buettner isn't shown as
11  being copied on Mr. Cancelmi's September 20th,
12  1996 memo marked as Exhibit 1683, right?
13       A.   I don't believe he is.
14       Q.   Nor is anyone else from Coopers &
15  Lybrand shown as getting copies, right?
16       A.   I assume not. I can look at that
17  page.
18       No, sir, just Mr. Morrison, Snow
19  and Robin Schaffer.
20       Q.   Who are all AHERF people?
21       A.   Correct.
22       Q.   The same is true of Mr.
23  Mr. Cancelmi's memo dated September 24th, 1996
24  marked as Exhibit 1450, again, neither Mr.
25  Buettner nor anybody else from Coopers &

832

1   Lybrand is shown as being copied, right?
2        A.   Correct.
3        Q.   Do you recall providing
4   Mr. Buettner a copy of Mr. Cancelmi's September
5   20th memo?
6        A.   No, I don't recall.
7        Q.   Do you recall providing a copy of
8   that memo to anyone at Coopers & Lybrand?
9        A.   No.
10       Q.   Do you recall providing
11  Mr. Buettner a copy of Mr. Cancelmi's September
12  24th memo?
13       A.   No.
14       Q.   Do you recall providing that memo
15  to anyone at Coopers & Lybrand?
16       A.   No.
17       Q.   I think we saw yesterday that the
18  management representation letter that you and
19  others in management at AHERF signed and
20  returned to Coopers & Lybrand was dated
21  September 20th, 1996, right?
22       A.   Correct.
23       Q.   When you signed that management
24  representation letter and provided it to
25  Coopers & Lybrand, did you tell Coopers &

833

1   Lybrand about this series of memos from
2   Mr. Cancelmi?
3        A.   No, not that I recall.
4        Q.   Even though you felt in your mind
5   that the series of memos from Dan Cancelmi cast
6   doubt on the adequacy of the bad debt reserves
7   at June 30th, 1996?
8        A.   Yes.
9        MR. RYAN: Why don't we take a
10  break.
11       THE VIDEOGRAPHER: Going off the
12  record at 11:22.
13       (Recess had.)
14       THE VIDEOGRAPHER: Going back on
15  the record at 11:32.
16       Q.   Mr. Spargo, if you wouldn't mind
17  keeping out Exhibit 122, which was the
18  handwritten schedule, 17 and a half million
19  dollars in adjustments.
20       A.   Okay.
21       Q.   And looking at that in conjunction
22  with some pages from Exhibit 10.
23       A.   Okay.
24       Q.   If we could start with the page
25  with the Bates number ending in 1363.

11 (Pages 830 to 833)

# TAB 201

Marc A. Panucci

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   WESTERN DISTRICT OF PENNSYLVANIA
 4   - - - - - - - - - - - - - - - - - - - -x
 5   THE OFFICIAL COMMITTEEE OF UNSECURED
     CREDITORS OF ALLEGHENY HEALTH, EDUCATION
 6   & RESEARCH FOUNDATION,
 7                        Plaintiff,
 8           -against-
 9   PRICEWATERHOUSECOOPERS, LLP,
10                        Defendant.
11   - - - - - - - - - - - - - - - - - - - -x
12                        825 Eighth Avenue
                          New York, New York
13
                          November 18, 2003
14                        9:07 a.m.
15
16           DEPOSITION of MARC A. PANUCCI, a
17   witness in the above-entitled action, held
18   at the above time and place, taken before
19   Barbara P. Goldsmith, a Shorthand Reporter
20   and Notary Public of the State of New
21   York, pursuant to Subpoena, the provisions
22   of the Federal Rules of Civil Procedure,
23   and stipulations between Counsel.
24
25
```

Marc A. Panucci

Page 122

1  of this audit step to identify and
2  document the client's approach for
3  adopting the new standard, receiving
4  information from someone at AHERF other
5  than Ms. Cafarro?
6     A.   Are we talking specifically
7  about the Delaware Valley entities or are
8  we talking about all of AHERF?
9     Q.   Well, at first I'd like to talk
10 about whether you received written
11 information from someone other than
12 Ms. Cafarro about the East, the Delaware
13 Valley enterprises, if you can recall
14 today.
15    A.   I do recall Carolyn directing me
16 to other places for additional
17 information.
18    Q.   Do you recall what those other
19 places were or by whom they were peopled?
20    A.   I do not recall.
21    Q.   Do you recall receiving anything
22 from any other places other than
23 Ms. Cafarro with respect to the Delaware
24 Valley endowments and investments?
25    A.   Yes.

Page 123

1     Q.   From whom?
2     A.   I do not recall.
3     Q.   What do you recall receiving?
4     A.   I just remember there was
5  conversations going through our audit and,
6  you know, I said Carolyn, I don't -- I
7  don't see the support in the binder for
8  it. And she directed me to other places.
9  To who, I don't know.
10    Q.   Do you recall speaking with
11 people in the treasury department of AHERF
12 in Pittsburgh?
13    A.   I do not recall if it was in
14 treasury or not.
15    Q.   Do you recall speaking with
16 people in the development department of
17 the eastern hospitals, or departments?
18    A.   Again, I don't recall if it was
19 the specific development departments or
20 not.
21    Q.   Do you recall receiving anything
22 in hard copy, electronic or other tangible
23 readable format from, anyone other than
24 Ms. Cafarro, regarding the eastern owned
25 endowments?

Page 124

1     A.   I remember a request to other
2  individuals and receiving something, yes.
3     Q.   Do you recall what it was?
4     A.   I do not recall what it was.
5     Q.   Is it fair to say that to the
6  extent you thought information that you
7  received important in your analysis in
8  your work, you mention it in your work
9  papers?
10       MR. LUFT:  Objection.
11    A.   Again, I can't speak for what's
12 in the work papers back in '96.
13    Q.   I'm not asking you to memorize
14 or to have memorized work papers and
15 regurgitate them for me. What I'm asking
16 is, was it your practice, in or about the
17 time of this audit, to record in the work
18 papers your receipt or your failure to
19 find important documentation?
20    A.   In the work papers would provide
21 information of where we would receive
22 something and the support for our
23 conclusions. But being it's the company's
24 adoption, I don't know if all the
25 information -- you know, all the

Page 125

1  information we received from them would
2  not be included in the work papers.
3     Q.   You don't know if it would?
4     A.   I don't know if it would or not.
5     Q.   If there was a lack of
6  documentation that made it impossible for
7  you, in your judgment, to accurately
8  determine the appropriateness of the
9  company's work with respect to the
10 adoption of these new FASBs, would you
11 have noted that in your work papers, that
12 you completed?
13    A.   I don't remember any discussion
14 of a lack of documentation that was needed
15 from the company on the adoption of the
16 new standards.
17    Q.   You don't recall that being a
18 fact; is that fair to say, that there was
19 a lack of documentation? You don't recall
20 that being a fact?
21       MR. LUFT:  Objection.
22    A.   What I remember is the company
23 adopted 116, 117, that they had enough
24 support to give their conclusion of the
25 classifications for 116, 117. And we were

32 (Pages 122 to 125)

Marc A. Panucci

Page 126

1  able to do an independent review of that
2  support, but it was mentioned because
3  you're talking about old endowments that,
4  you know, the documentation might not be
5  complete, but there was enough information
6  contained within there to make that
7  assessment.
8      Q.   To make your assessment?
9      A.   No. To make the company's
10  assessment, and we did our independent
11  review of that assessment.
12     Q.   Right. And you do not recall,
13  as you sit here today, putting in a work
14  paper that you did not have enough
15  information to make your own independent
16  assessment; is that right?
17     A.   I don't recall anything saying
18  that, no.
19     Q.   No. And you don't recall
20  concluding that; is that right?
21     A.   Correct.
22     Q.   Who was it, then, from whom you
23  received any of the same kinds of
24  documentation, what you called the
25  underlying work papers and support for the

Page 127

1  adoption of SFAS 116 and 117 for
2  enterprises other than the eastern
3  Delaware Valley enterprises, that is, the
4  western enterprises, or AHERF, the parent
5  enterprise?
6      A.   I remember an individual by the
7  name of Al Zworn providing information.
8      Q.   And I only correct this to the
9  extent it is a correction because I've
10  seen his name recently on a subpoena, but
11  I believe the gentleman that worked at
12  AHERF was named Al Zwirn, and maybe we're
13  saying the same word, but I think his name
14  is spelled Z-w-i-r-n. Does that sound
15  right to you?
16     A.   That name sounds familiar. The
17  correction of the spelling I do not know.
18     Q.   You were saying Z-w-o-r-n, at
19  least in your own mind and voice, correct?
20     A.   Correct, and I thought that was
21  the spelling of that name.
22     Q.   That's fine, and I want your
23  testimony, not mine. But by prompting you
24  that I have seen the name Z-w-i-r-n, I'm
25  curious if that refreshed your

Page 128

1  recollection and I think you were telling
2  me it did not.
3      A.   Correct.
4      Q.   Do you recall receiving any
5  written information from anyone else
6  besides Mr. Al Zwirn/Zworn with respect to
7  the western enterprises or AHERF, the
8  parent?
9      A.   There was -- I know Carolyn was
10  not primarily responsible, but I don't
11  know who my primary contact was as it
12  related to the western side or AHERF, the
13  parent.
14     Q.   I will show you a work paper
15  shortly and will tell you now, just
16  because it will save me the time reaching
17  around and potentially bumping the court
18  reporter again, that a name appeared in
19  the work papers, that is, Jack Lydon. Me
20  having given voice to that name, does that
21  refresh your recollection that he might
22  have been your contact for other
23  documentation besides Mr. Zwirn?
24     A.   I remember the name, Jack Lydon.
25  I don't recall if that was the specific

Page 129

1  audit area I was working with Jack on.
2      Q.   What do you recall receiving
3  from either Mr. Zwirn or Mr. Lydon?
4      A.   Similar information I received
5  from the Delaware Valley entities, but it
6  was -- the initial part of it was not as
7  one neat place binder as the Delaware
8  Valley's. But there was a, you know, a
9  schedule that the client prepared. It
10  shows here's what our classifications are
11  and then another set of binders that had
12  the supporting documentation for the
13  company's classification of those
14  endowments.
15     Q.   Do you recall that the schedule
16  was in a binder or separately supplied?
17     A.   Separately supplied.
18     Q.   And the schedule was generally
19  in what kind of a format?
20     A.   I remember it was an Excel
21  spreadsheet that had the classification.
22     Q.   It wasn't parchment or slate, it
23  was an Excel spreadsheet?
24     A.   Correct.
25     Q.   And it was a multipage document

33 (Pages 126 to 129)

Marc A. Panucci

1  or a single page document?
2      A.   I do not recall.
3      Q.   Do you recall, then, that you
4  received from Mr. Zwirn or Mr. Lydon --
5  and I'm going to use both names unless you
6  tell me you're certain it was Mr. Zwirn an
7  not Mr. Lydon. Can you tell me that with
8  certainty, that you received documentation
9  from only one of them and not either of
10  them?
11     A.   Mr. Zwirn was the one who
12  provided the binder to have the supporting
13  documentation for it.
14     Q.   And he may or may not have
15  provided the schedule. Is that what you
16  are intimating?
17     A.   He did not provide the schedule.
18  I don't know if it was Mr. Lydon who
19  provided the schedule or not, but it was
20  somebody else.
21     Q.   That's helpful and I appreciate
22  your offering that for me.
23         The question now is, do you
24  recall receiving from Mr. Zwirn, then, two
25  binders, three binders, one binder, or do

1  you today really recall whether the
2  support information was all in one binder
3  or not?
4      A.   I do not recall if it was
5  multiple binders.
6      Q.   It could have been one, it could
7  have been more than one. Is that
8  accurate?
9      A.   It was at least one.
10     Q.   But I'm also right, it could
11  have been more than one?
12     A.   Correct.
13     Q.   Do you recall whether you
14  received this information all in one
15  installment or whether you got any
16  information in hard copy over time as you
17  sit here today?
18     A.   I can't recall.
19     Q.   When did you get the information
20  from Mr. Zwirn? The reason I ask it is
21  you mentioned that you got sort of at the
22  outset of your work on endowments and
23  investments, which you believe, I think,
24  to be in the final audit phase as opposed
25  to prelim from Ms. Cafarro. Did you get

1  this documentation from Mr. Zwirn on
2  western enterprises and AHERF, the parent,
3  at the same time period, at the outset of
4  your work?
5      A.   For the AHERF parent, we did not
6  receive any information until the year end
7  work and it was after the Delaware Valley
8  entity information was received. The
9  reason was they were not ready to hand
10  over the adoption for 116, 117 at the
11  outset of our audit.
12     Q.   At the outset of?
13     A.   Our year end procedures.
14     Q.   Thank you. That helps me get,
15  also in my mind, to the right time period.
16         When you say AHERF, the parent,
17  do you also include in that any other
18  western enterprise like Allegheny General
19  Hospital?
20     A.   Yes.
21     Q.   So any western or parent level
22  endowment/investment support
23  documentation, whether by way of schedule,
24  three-ring binder, you got after the
25  eastern support data?

1      A.   Correct.
2      Q.   And not quite at the outset of
3  your investment work as a part of your
4  year end audit work, but later in time
5  because the client was not ready yet to
6  give you the information?
7      A.   Correct.
8      Q.   And why is it that you
9  understood that the client was not ready
10  yet to give you the information?
11     A.   My understanding, the company
12  was still completing their analysis of the
13  adoption of 116, 117 as it related to the
14  western hospitals.
15     Q.   And from whom did you gain this
16  understanding?
17     A.   I could not recall who that
18  individual was.
19     Q.   Was it Mr. Zwirn?
20     A.   It was not Mr. Zwirn.
21     Q.   After that, do you have any idea
22  who it was?
23     A.   I do not know.
24     Q.   What did you understand
25  Mr. Zwirn's role at AHERF to be?

34 (Pages 130 to 133)

Marc A. Panucci

Page 134

1    A.   I do not know.
2    Q.   You understood Mr. Lydon to be a
3  part of the finance department, however?
4    A.   Yes.
5    Q.   Meaning the accounting
6  department, in general terms?
7    A.   Yes.
8    Q.   The process that you've just
9  described for us is really the same one
10  for both FASBs 116 and 117. Is that fair
11  to say? The process of understanding and
12  learning the client's approach for
13  adoption. You don't, in your mind, have
14  two sets of data retrieval in mind is what
15  I'm asking?
16    A.   No. And principally because
17  116 -- most of the information we talked
18  about was really the 116 adoption because
19  that deals with classifying the
20  investments. The 117 part really deals
21  with the financial statement presentation.
22    Q.   So this is all part and parcel
23  of the same process?
24    A.   Correct.
25    Q.   And the classification process,

Page 135

1  as you understood it, from reading the
2  FASBs, the relevant literature, and
3  discussing the topic with Ms. Frazier, was
4  what; what was the client supposed to do
5  as a matter of this new classification
6  protocol set forth in FASB 116 or 117?
7    A.   The company had to make a
8  determination based upon donor intent if
9  their investment should be classified as
10  unrestricted, temporarily restricted, or
11  permanently restricted.
12    Q.   And those were net asset
13  categories?
14    A.   I'm sorry. What do you mean?
15    Q.   When displayed on actual
16  financial statements, those categories of
17  assets were on the net asset side of the
18  balance sheet?
19    A.   They were on the asset side of
20  the balance sheet. They were investments.
21    Q.   And describe for me your
22  understanding of the categories. What
23  qualified investment amounts or endowment
24  amounts for classification in each of the
25  categories when you were performing your

Page 136

1  audit work?
2    A.   My understanding back in the '96
3  audit or my understanding today?
4    Q.   Well, if you have a recollection
5  of your understanding then, share it with
6  me.
7    A.   I don't think I'd have a
8  recollection as of '96 of what that was.
9  But as of today, and it's not worked in
10  the investment area in sometime now, as
11  far as not for the profit, but it's based
12  upon you have to look at the donor.
13    Q.   Let's stop for a second. And I
14  don't mean to interrupt, only that I think
15  it will be clearer this way.
16        As you sit here today, you don't
17  recall anything about what you understood
18  to be the distinction between the asset or
19  net asset classifications we just
20  discussed; is that right?
21    A.   Yeah. I don't think -- back in
22  '96, I cannot recall, you know, what my
23  understanding of those classifications
24  would be just because we are talking about
25  '96.

Page 137

1    Q.   No, and I don't mean to make
2  this more of a memory test than it is. I
3  only want to know if you can tell me one
4  way or the other whether you have any
5  independent recollection, of any kind, of
6  what you understood to be the distinction
7  between the categories or classifications
8  when you were doing the work in fiscal
9  year '96. If you've got some
10  understanding of it, I want you to share
11  it with me.
12    A.   Okay, fair. That understanding
13  was certainly it was going to be based
14  upon donor intention.
15    Q.   Right.
16    A.   That you no longer could have a
17  board designated fund be considered
18  temporarily or permanently restricted, so.
19    Q.   They would be considered
20  unrestricted?
21    A.   It would be considered
22  unrestricted.
23    Q.   Anything else?
24    A.   So then you would look at the
25  donor's intention, and based upon the

35 (Pages 134 to 137)

Marc A. Panucci

Page 234

1 twice.
2     A.    That's okay.
3         Nothing, to my knowledge, would
4 refresh my recollection.
5     Q.    There was no particularly
6 strange piece of paper or anything else
7 that stands out in your mind in that
8 notebook that, if you saw it again today,
9 you think would trigger a memory that, oh,
10 yes, this is more than likely a copy of
11 the notebook; is that right?
12     A.    The only thing I can remember or
13 one of the things I can remember, that
14 being some of the paper, and it was old.
15 It was yellow and tainted and, you know,
16 entailed at least partial endowment
17 agreements.
18     Q.    Do you recall, as you sit here
19 today, testifying in the SEC deposition
20 with any more certainty than you've
21 testified today about what you reviewed
22 that was received from Mr. Zwirn by way of
23 endowment documentation?
24     A.    Nothing that I can recall.
25     Q.    How long did you -- how much

Page 235

1 time do you recall spending looking at the
2 endowment documents that you received from
3 Mr. Zwirn, or can you estimate it today?
4     A.    I cannot estimate it today
5 because I, mean, it was part of the
6 endowment testing for all of the AHERF and
7 subsidiaries. So it would be difficult to
8 allocate what portion was to this entity
9 compared to another entity.
10     Q.    So if I asked you to give me
11 your best estimate, you could come up with
12 no set of hours?
13     A.    No.
14     Q.    Was it more than an hour?
15     A.    To be honest, I could not answer
16 you one way or the other.
17     Q.    It could be less than an hour?
18         MR. LUFT: Objection. He told
19     you he couldn't answer you one way or
20     the other.
21         MR. JONES: This is the last
22     question in the series.
23     Q.    It could be less than an hour
24 then?
25     A.    I would have no way of saying

Page 236

1 less, more. No way of knowing.
2     Q.    Do you recall anyone else being
3 involved in the review of the notebook
4 that Mr. Zwirn gave you or the notebook
5 that Ms. Cafarro gave you from C&L?
6     A.    Not that I can recall.
7     Q.    Do you recall providing access
8 to anyone else at C&L with access to,
9 rather, the notebook that Mr. Zwirn or
10 Ms. Cafarro gave you?
11     A.    Not that I can recall.
12         MR. JONES: I think I only have
13     two of these. So I'm going to ask you
14     to share it with the witness briefly.
15     I'm not going to ask him very many
16     questions about it and I'm going to
17     ask the court reporter to mark it as
18     our exhibit next in order.
19         (SEC exhibit was marked Exhibit
20     4111 for identification, as of this
21     date.)
22     Q.    I apologize in advance,
23 Mr. Panucci, for the heft of Exhibit 4111.
24 It is another document marked in the SEC
25 proceeding as Exhibit 134. Does anything

Page 237

1 from the outward appearance of this large
2 document refresh your recollection that it
3 was -- that it is, rather, a copy of the
4 notebook that you reviewed?
5         MR. JONES: I will note for the
6     record that it has a torn label on the
7     face of the notebook which reads,
8     "Allegheny General Hospital
9     endowments, trusts, agency and other
10     accounts."
11     A.    Nothing that would refresh my
12 recollection.
13     Q.    At a next break, we'll ask you
14 to review it briefly and its contents. It
15 has a table of contents as well, as you
16 can see from the second page of the
17 document, and does that refresh your
18 recollection?
19     A.    No.
20     Q.    You can put that large one aside
21 or ask Mr. Luft to handle it for you.
22         I'm going to ask you to turn to
23 a couple of Bates pages in Exhibit 4110,
24 Mr. Panucci. The first one is ED 50, E-D
25 as in ED 50. And it is a face page for --

3c1c9fed-8243-4bb3-97af-4175b3c8472a

Marc A. Panucci

Page 238

1  that bears the title, rather, "Allegheny
2  General Hospital endowments and trusts
3  investment fund, John Marshall Lockhart
4  fund, Mellon trust number 500-O07 in
5  barely legible print. Is that right?
6      A.  Yes.
7      Q.  And it notes at the base of the
8  page that the type of restrictions on the
9  trust, at least by the author's account,
10 were "principal restricted and income
11 apparently unrestricted." Is that right,
12 by Xes, although it looks to me --
13     A.  There's a mark on the restricted
14 part for income that I don't know what
15 that is or what it means.
16     Q.  And the clearer X is with
17 unrestricted; is that right?
18     A.  Yes. As it relates to income,
19 yes.
20     Q.  In any event, this document is
21 not a Coopers & Lybrand generated
22 document, to your knowledge; am I right?
23     A.  That is correct.
24     Q.  It appears to you to be a client
25 generated document?

Page 239

1      A.  Yes.
2      Q.  And do you recall reviewing this
3  document during your '96 audit work?
4      A.  I do not recall reviewing this
5  document.
6      Q.  And you see that it reads,
7  "Special provisions: Income in the amount
8  of $250 per month is paid to the sole
9  survivor of the 12 original annuitants,"
10 and continues from there?
11     A.  Yes.
12     Q.  I'm going to ask you to look
13 further back into this set of documents
14 into the microfiche portion of the John
15 Marshall Lockhart endowment documents
16 which have 500, the number 500-O07 at the
17 top of the page. Are you with me?
18     A.  Yes.
19     Q.  And that's Bates page ED 53.
20     A.  Yes.
21     Q.  If you look at ED 53 -- in these
22 and the pages that follow for several are
23 black microfiche, hard copies of
24 microfiche that are black in background
25 with white print; am I right?

Page 240

1      A.  That's what it appears to be.
2      Q.  Do you recall reviewing copies
3  like this in the endowment document you
4  received or notebook you received from
5  Mr. Zwirn?
6      A.  I remember microfiche pages
7  included in the binder.
8      Q.  Microfiche copied like this?
9      A.  Yes.
10     Q.  Do you recall reviewing the John
11 Marshall Lockhart endowment documents that
12 started ED 53 and followed?
13     A.  Do you know where it ends in
14 this document?
15     Q.  I believe it ends with
16 amendments, certainly no later than ED 90.
17     A.  I do not recall specifically
18 reviewing the Lockhart agreement that
19 we're specifically looking at. I know
20 there's more than one.
21     Q.  Let me ask you to look at the
22 page Bates labeled ED 54. Do you see
23 under Article I the definition of "income
24 as rents, issues, interests, income, and
25 profits thereof, hereinafter called

Page 241

1  income"?
2      A.  Can you give me a paragraph
3  reference, please?
4      Q.  It's Article I, about halfway
5  through the first sentence.
6      A.  I'm sorry. Yes. Yes.
7      Q.  You recall reading that kind of
8  language or that language in the endowment
9  documents provided to you by Mr. Zwirn, as
10 you sit here today?
11     A.  I do not recall.
12     Q.  I'm going to ask you to skip to
13 page ED 62. And there I'm going to ask
14 you to look at article -- the top of the
15 page which is the end of the Article X
16 where it says, "In case of the sale of any
17 securities of the trust fund at a premium
18 or profit, such premium or profit shall
19 become a part of the corpus and not
20 income."
21         Do you see that?
22     A.  Yes.
23     Q.  Do you recall reading that
24 language or language to that effect in the
25 endowments provided to you by Mr. Zwirn or

61 (Pages 238 to 241)

Marc A. Panucci

Page 242

1    anybody else at AHERF in the fiscal year
2    1996 audit?
3        A.   I do not recall.
4        Q.   As you read that language today
5    with the familiarity of the
6    classifications called for by the FASBs
7    116, 117 and 124 that we've been
8    discussing, do you recall making any
9    determination about the propriety of how
10   the sums set forth -- described in that
11   sentence should be characterized or
12   classified?
13       MR. LUFT:  Objection.  Are you
14   asking about what he was reading today
15   or asking back then?
16       MR. JONES:  I asked him about
17   what he's reading today and if he had
18   any recall.
19       MR. LUFT:  I'm still unclear.
20       Q.   We just read a sentence.
21       A.   Yes.
22       Q.   About the event of the sale of
23   securities of the trust at a premium or a
24   profit, correct?
25       A.   Yes.

Page 243

1        Q.   Do you recall anything about how
2    you would have determined the propriety of
3    the classification of sums that were
4    reflected by the sale of securities of the
5    trust at a premium or a profit, at a
6    premium or profit during the 1996 audit
7    work?
8        A.   I do not recall.
9        Q.   You don't know how you passed on
10   their classification one way or the other?
11       A.   I mean, we would have --
12   management would have had their
13   classification and we would have done our
14   independent review.  But, you know, I
15   don't recall any specific discussions
16   around this area or this sentence.
17       Q.   Do you recall -- or language
18   like this?
19       A.   Yes, correct.
20       Q.   Do you recall what management's,
21   that is, AHERF's classification of sums
22   that were derived from the sale of trust
23   securities at a premium or a profit was?
24       MR. LUFT:  Objection.  Are you
25   talking in general all endowments he

Page 244

1    looked at or are you referring to a
2    specific one?
3        MR. JONES:  I'm speaking of any
4    endowment that he can recall.
5        A.   I do not recall.
6        Q.   Do you recall specifically for
7    the Lockhart trust we're reviewing now how
8    management classified sums that would be
9    derived from the sale of securities of the
10   fund at a premium or profit?
11       A.   I do not recall.
12       Q.   As you read the language today,
13   and if you were called upon to make the
14   determination about the propriety of the
15   classification of sums derived from the
16   sale of securities of the trust fund at a
17   premium or a profit and the rest of the
18   language that describes them here by
19   instructing that such premium and profit
20   shall become a part of the corpus and not
21   income, what classification would you
22   apply to those sums?
23       MR. LUFT:  You're asking him to
24   make a determination today based on
25   this one sentence?

Page 245

1        MR. JONES:  Yes, on this
2    sentence.
3        A.   Based upon today, I think I
4    would still want more information to get
5    clarification of what is meant by this
6    sentence.  You know, talking to engagement
7    teams, talking to the client, and the
8    review of 116, 117.
9        Q.   What information would you need
10   from the client or the engagement team?
11       A.   Well, I think I would want to
12   try and get some understanding because
13   these agreements were written well before
14   FAS 116 or 117 was written.  I'm trying to
15   obtain some understanding of what their
16   determination was, what their
17   classification was.  And you know, based
18   upon that, whether we could agree to that
19   or not based upon 116, 117.
20       Q.   I understand.  And if their
21   determination was either temporary or
22   unrestricted for these sums derived from
23   the sale of securities, would you agree
24   with it as you read it today?
25       MR. LUFT:  Reading this

62 (Pages 242 to 245)

Marc A. Panucci

Page 246

1  sentence?
2      MR. JONES: Yes.
3      MR. LUFT: And only this
4  sentence?
5      MR. JONES: I haven't asked him
6  to read any other recently.
7      A.  In reading this sentence, and
8  based upon today, I would say with the
9  classification has to go with where the
10  corpus is.
11     Q.  And if the corpus was
12  permanently restricted, then the sale of
13  the securities would be similarly
14  permanently restricted, in your view?
15     A.  Based upon this limited
16  information, yes.
17     Q.  I'm going to ask you to skip to
18  ED 91. Do you recall reviewing this face
19  page for the John Marshall Lockhart No. 1
20  Mellon trust number 500-017?
21     A.  I do not recall.
22     Q.  I'm going to ask you to refer to
23  Article IX, which is at page 101, ED 101.
24  It has the same language at the end of the
25  article. "In case of the sale of any

Page 247

1  securities of the trust fund at a premium
2  or profit, such premium or profit shall
3  become a part of the corpus and not
4  income."
5      Do you see that?
6      A.  Yes.
7      Q.  And your conclusion about an
8  appropriate classification in a FASB 116
9  or 117, given this text and nothing else,
10  as you sit here today, would be the same?
11     A.  As of today and given this text,
12  yes, the classification would be the same
13  as the corpus.
14     Q.  And do you recall coming to the
15  conclusion on any of the Lockhart
16  endowments that were listed in the prior
17  schedules we looked at earlier today that
18  AHERF's classifications were in any way in
19  error?
20     A.  Not that I can recall.
21     Q.  Do you recall having questions
22  about language like this with respect to
23  gains on the sale of securities that you
24  raised with anyone at AHERF?
25     A.  Not that I --

Page 248

1      MR. LUFT: He says he doesn't
2  recall the Lockhart trust.
3      MR. JONES: I'm talking about
4  the language.
5      Q.  Do you recall raising questions
6  about language like this with respect to
7  gains in the sale of securities with
8  anyone at AHERF?
9      A.  Not that I can recall.
10     Q.  Do you recall raising questions
11  about the language or language like it
12  that we just discussed with anyone at
13  PriceWaterhouseCoopers?
14     A.  Not that I can recall.
15     Q.  Do you recall discussing it with
16  Ms. Frazier or language like this or this
17  language?
18     A.  Again, not that I can recall.
19     Q.  If you had a difference of
20  opinion with the client about the
21  appropriateness of the classification that
22  would apply to sums described by this
23  language, would that disagreement or
24  difference of opinion have been reflected
25  in your work papers?

Page 249

1      A.  Well, it would go through a
2  series of discussions beforehand.
3      Q.  But ultimately if Coopers &
4  Lybrand as an enterprise had a difference
5  of opinion, it would be reflected in the
6  work papers somewhere?
7      A.  Yes.
8      MR. LUFT: Objection.
9      Q.  And how would it be so
10  reflected, in your experience?
11     A.  In my understanding, it could
12  be -- it would be reflected in the work
13  papers. Depending on the nature of the
14  item, it could be recorded on our sub. It
15  all depends.
16     Q.  But it would be somewhere in the
17  work papers?
18     A.  Yes.
19     Q.  And as you sit here today, you
20  don't recall yourself having a difference
21  of opinion with respect to the way gains
22  in the sale of securities were classified;
23  is that right?
24     A.  Not that I can recall.
25     Q.  Do you recall having a

63 (Pages 246 to 249)

Marc A. Panucci

Page 250

1  disagreement with the client or a
2  difference of opinion with the client in
3  the way that it had classified unrealized
4  gains over time?
5      A.   Not that I can recall.
6      Q.   Do you recall having a
7  disagreement with the client or difference
8  of opinion with the client with respect to
9  any of its classifications under FASB 116
10 and 117?
11     A.   Well, as of today, I think we
12 reviewed one of those in the documents.
13     Q.   We saw one note, you're right.
14 Save and except for that, do you recall
15 any other disagreements?
16     A.   Not that I can recall.
17     Q.   In the language that we just
18 reviewed regarding gains on the sale of
19 securities, do you see any time
20 restriction?
21         MR. LUFT:  You just want him to
22     review the language, just that
23     sentence, not the whole?
24         MR. JONES:  Yes.
25     A.   Just that sentence?

Page 251

1      Q.   Yes.
2      A.   I do not see any time
3  restrictions in that sentence.
4      Q.   Do you see any restriction that
5  would be lifted with the occurrence of an
6  event?
7      A.   Not in that sentence, no.
8      Q.   Or the happening of a condition?
9      A.   Not in that sentence, no.
10     Q.   I think you told us that you do
11 not recall conversations with AHERF
12 personnel or PriceWaterhouseCoopers
13 personnel about the classifications or
14 your concerns about the classifications or
15 any concerns about the classifications on
16 endowments and investments that AHERF had
17 arrived at?  Am I right?  That's
18 consistent with your recollection?
19     A.   Can you repeat that again?
20     Q.   Yes, I can.  That was a hard one
21 and I'm just trying to understand it.  I
22 think where we are, so that we don't have
23 to backtrack, is that, as you sit here
24 today, you cannot recall any disagreements
25 with the client regarding the

Page 252

1  classifications they made in compliance
2  with FASB 116 and 117 on their endowments
3  and investments in fiscal year '96 save
4  for the footnote we just discussed; is
5  that right?
6      A.   Not that I can recall, no.  No
7  final disagreements, no.
8      Q.   You can't recall any today,
9  correct?
10     A.   Right.
11     Q.   And then my question next is, do
12 you recall having any concerns -- do you
13 recall any intermediary concerns or
14 disagreements with the client on their
15 classifications, as you sit here today?
16     A.   Well, I mean, as part of the
17 audit process, there's the ongoing
18 dialogue of questions, issues, concerns,
19 as you go back and forth.  But in a final
20 determination, final conclusion, based
21 upon our independent review, I do not
22 recall any disagreements with the
23 classifications.
24     Q.   I understand.  And my question
25 is, do you recall any of those discussions

Page 253

1  or back and forth in which you were
2  voicing some concern about the propriety
3  of the classifications, as you sit here
4  today?
5      A.   Not that I can specifically
6  recall, no.
7      Q.   Do you recall anything in a
8  general way?
9      A.   Not that I could recall.
10     Q.   All right.  And then my next
11 question was, do you recall having any
12 concerns yourself about missing
13 documentation for the endowments and
14 investments that you were asked to review?
15         MR. LUFT:  Objection.
16     A.   Can you repeat that one more
17 time?  I'm sorry.
18     Q.   Let me break it down.  Do you
19 recall that in the binders that you were
20 given to review, AHERF investments and
21 endowments, whether by Ms. Cafarro or
22 Mr. Zwirn or anyone else, that there was
23 any missing documentation, in your view?
24     A.   Well, the representation we got
25 from management was here's the information

64 (Pages 250 to 253)

Marc A. Panucci

Page 254

1  that we have. It was -- it could be
2  partial or full agreements, but there was
3  enough information for us to determine, as
4  management, the classification of the
5  endowments. And when we did our
6  independent review, we did not take
7  exception that there was enough
8  information to determine those
9  classifications.
10     Q.   So what you are telling me is
11  that there may have been some missing
12  documentation, but in your view, or in
13  C&L's view, it wasn't sufficient to cause
14  you to take exception with the
15  classifications of the client?
16        MR. LUFT:  Objection.
17     A.   Management made a determination
18  there was enough information to classify
19  the investments. And based upon our
20  independent review, there was nothing that
21  came to our attention that there needed to
22  be additional information to classify the
23  investments.
24     Q.   All right. And then my
25  follow-up question is, did you,

Page 255

1  personally, ever have a concern about
2  missing documentation with respect to any
3  endowment or investment that you were
4  charged with reviewing?
5        MR. LUFT:  Objection.
6     A.   Not that I can recall.
7     Q.   Do you recall taking any steps
8  to secure additional documentation or what
9  was believed to be missing documentation
10  with respect to any of the endowments or
11  investments you were charged with
12  reviewing or auditing?
13     A.   Only in what we talked about
14  earlier today. If it was not included in
15  the binder management, you know, sent me
16  to other people within the organization to
17  obtain that information.
18     Q.   Do you recall receiving any
19  documentation from anyone else, though, as
20  you sit here today? I know you might have
21  had discussions, but the question I have
22  is, do you recall receiving anything
23  tangible in hard copy or electronic format
24  form?
25     A.   Not that I can recall.

Page 256

1     Q.   Do you recall going to any third
2  parties or requesting of any third parties
3  any additional documentation with respect
4  to any endowment or investment during your
5  fiscal year '96 audit work?
6     A.   Do you mean -- can you repeat
7  that?
8     Q.   Yes. Do you recall going to or
9  inquiring of any third party regarding an
10  effort to get your hands on additional
11  endowment or trust or investment
12  documentation that might have been missing
13  in the material that the client had given
14  you during your fiscal year '96 audit
15  work?
16     A.   I do not recall specifically
17  trying to get third party information as
18  it related to documentation that was not
19  included in the binder. But there is
20  third party information you receive on the
21  investments, i.e., the trustee statements.
22     Q.   You did some tying work where
23  you got written documentation to help you
24  with the tying?
25     A.   Correct.

Page 257

1     Q.   Among other things, perhaps?
2     A.   Correct.
3     Q.   But you don't recall trying to
4  find underlying endowment documentation or
5  investment vehicle documentation from
6  third parties; is that right?
7     A.   As it relates to the
8  classification of the investments, no, I
9  don't recall.
10     Q.   Do you recall trying to get that
11  underlying endowment or investment vehicle
12  documentation for any other purpose?
13     A.   Again, just what we talked
14  about, the confirmation process and the
15  trustee statement process.
16     Q.   Well, that is isn't an
17  underlying documentation, though. That's
18  a statement of account balances; am I
19  right?
20     A.   Well, I would still define that
21  as underlying documentation for support of
22  the accounts.
23     Q.   I hear you and what I meant to
24  mean by underlaying documentation and what
25  I meant to say is the fundamental trust

65 (Pages 254 to 257)

Cleveland (216) 523-1313                                    Akron (330) 374-1313

3c1c9fed-8243-4bb3-97af-4175b3c8472a

Marc A. Panucci

Page 258

1 documents or investment vehicle documents.
2 You don't recall trying to get those for
3 any purpose; am I right?
4     A.  I don't recall, no.
5     Q.  I am right that you don't recall
6 trying to get them; is that right?
7     A.  That's correct.
8     Q.  You weren't on the phone with
9 Mellon Bank or any Mellon financial
10 institution or any other financial
11 institution asking for the fundamental
12 trust documents from any earlier point in
13 time; is that right?
14     A.  That is right.
15     Q.  And you do recall some of these
16 trust documents or endowment documents to
17 be old?
18     A.  Yes.
19     Q.  If you had made such a contact
20 with a third party to get additional
21 underlying trust or endowment
22 documentation, would that be reflected in
23 your work papers?
24     MR. LUFT:  Objection.
25     A.  Are you asking me as of today or

Page 259

1 in the fiscal year '96?
2     Q.  What you recall of your
3 practices in fiscal year '96.
4     A.  I do not recall any situation on
5 the entities I've audited and as it
6 relates to hospitals or not-for-profits
7 needing to go to third party confirmations
8 as it relates to endowment agreements, so.
9     Q.  So you don't really have a
10 practice?
11     A.  I don't have, right, I don't
12 have a standard to answer that question
13 upon.
14     Q.  Do you recall discussing with
15 anyone at PriceWaterhouseCoopers the
16 unavailability of any underlying trust or
17 endowment documentation?
18     A.  Not that I can recall, but I
19 know others were aware of it.  I don't
20 know if it was me telling them or not,
21 but --
22     Q.  How was it --
23     A.  -- I know Amy Frazier was aware
24 that there was a representation of, you
25 know, partial or incomplete

Page 260

1 documentations.
2     Q.  And how is it that you know that
3 Amy was aware of such a representation?
4     A.  Because Amy and I talked about
5 it.
6     Q.  And the conversation was
7 essentially that she was told the same
8 thing you were told?
9     A.  Yeah.  I don't know how the
10 context was.  I don't know if Amy was told
11 from the client, Amy told me or vice
12 versa.  I don't know the nature of how it
13 was told to us.
14     Q.  But you and she both understood
15 from the client, it is your belief, that
16 certain underlying trust documentation was
17 not at least in the client's files?
18     A.  Yes.
19     Q.  Do you recall discussing with
20 her, then, any efforts to get it from some
21 other source?
22     A.  Not that I can recall.
23     Q.  Do you recall discussing with
24 anyone at PriceWaterhouseCoopers such an
25 effort?

Page 261

1     A.  Not that I can recall.
2     Q.  Do you recall seeking out the
3 input of specialists or lawyers at
4 PriceWaterhouseCoopers with respect to
5 your classification audit work?
6     MR. LUFT:  Objection.
7     Q.  Other than Mr. Thomas.
8     A.  Except for Mr. Thomas, I can't
9 recall anybody else.
10     Q.  Do you recall discussing whether
11 a specialist in endowment or investment
12 auditing should -- or a lawyer should be
13 consulted as a part of your classification
14 work?
15     A.  Not that I can recall.
16     Q.  Do you recall ever yourself
17 coming to the conclusion that the trust or
18 endowment language that you reviewed
19 called for you to seek legal advice?
20     A.  Not that I can recall.
21     MR. JONES:  We'll break here and
22 we will shortly thereafter conclude.
23     (A recess was taken at 4:08 p.m.
24 and the Deposition continued at 4:19
25 p.m.)

www.rennillo.com

Cleveland (216) 523-1313                                    Akron (330) 374-1313

3c1c9fed-8243-4bb3-97af-4175b3c8472a

Marc A. Panucci

Page 262

```
1    Q.   Mr. Panucci, thank you for your
2    diligence in hanging with us this
3    afternoon but we're nearly concluding.
4         I'm going to ask you to refer
5    quickly back to Exhibit 4110 which you
6    have before you, I believe.
7    A.   Yes.
8    Q.   To Bates page ED 141. This is
9    on sort of the left-hand portion of the
10   document. And actually I lied. Could you
11   look a few pages prior to that, to ED 149.
12   A.   Okay.
13   Q.   And do you see that that is
14   another face page for another trust, this
15   one entitled the Edith Ann Oliver and
16   Edith Oliver Rea trust?
17   A.   Yes.
18   Q.   With Mellon trust number
19   510-OOO?
20   A.   Yes.
21   Q.   Do you recall reviewing this
22   page or this trust during your audit work
23   in 1996?
24   A.   I do not recall.
25   Q.   I'm going to ask you to skip a
```

Page 263

```
1    couple of pages to ED 141 now, which I
2    think you'll tell me is a page that looks
3    to be the beginning of the trust document
4    and has the words, "this agreement" at the
5    top of it.
6    A.   Yes.
7    Q.   It appears to be a document
8    dated AD 1915; is that right?
9    A.   Yes.
10   Q.   Do you recall reviewing
11   documents that old in your endowment and
12   investment work at AHERF in fiscal year
13   1996 or for fiscal year 1996?
14   A.   I know some of the endowments
15   were old. I do not know the specific
16   years they were originated in.
17   Q.   This page has some language
18   describing income and proceeds of the sale
19   of securities. I'm going to ask you to
20   look at and then tell me whether you
21   recall reviewing it or language to its
22   effect.
23        In the first whereas clause, it
24   reads, the document reads, "Whereas the
25   said parties of the first part desire to
```

Page 264

```
1    establish a trust fund, the income from
2    which shall be expended for the
3    maintenance of the Allegheny General
4    Hospital in the north side Pittsburgh,
5    Pennsylvania."
6         Do you see that?
7    A.   Yes.
8    Q.   Do you recall reviewing that
9    language?
10   A.   I do not recall.
11   Q.   And then in the next paragraph,
12   which reads, "now" or starts, rather,
13   "Now, therefore, this agreement," and goes
14   on from there. Do you see that beginning
15   phrase?
16   A.   Yes.
17   Q.   It describes in the sentence
18   that follows or the phrase that follows,
19   the handing over of certain sum of money.
20   Do you see that, or stock, rather?
21        MR. RYAN: Stock, I think.
22   Q.   Let me read it. It reads,
23   "External loan bonds." Do you see that?
24   "The parties of the first part do hereby
25   assign, transfer, set over and deliver to
```

Page 265

```
1    the party of the second part $260,000 par
2    value of Anglo French five year five
3    percent external loan bonds."
4         Have I read that right?
5    A.   I couldn't tell if it was 250 or
6    two -- okay. It's 260 in the words, yes.
7    Q.   And then the next phrase says,
8    "To have and to hold the said securities
9    and the proceeds of the sale or conversion
10   of the same to said party of the second
11   part, its successors and assigns in trust
12   nevertheless for the following uses and
13   purposes."
14        Do you recall reading that
15   language during your audit effort?
16   A.   I do not recall.
17   Q.   You have had a chance during our
18   last break to review briefly Exhibit 4111
19   marked previously in the SEC proceedings
20   as Exhibit 134. Am I right?
21   A.   Yes, briefly, briefly review it.
22   Q.   Is there anything that arose
23   from that review that indicates to you
24   that Exhibit 4111 is, indeed, a copy of
25   the notebook or that you received from
```

67 (Pages 262 to 265)

Marc A. Panucci

Page 266

1   either Mr. Zwirn or Ms. Cafarro in your --
2   as a part of your work, rather, on the
3   fiscal year 1996 audit?
4       A.   Nothing that I could recall that
5   that would be the binder.
6       Q.   Having now the two before you
7   and hands folded over one, do you have any
8   basis for telling us that you believe one
9   or the other is more likely a copy of the
10  volume or the notebook you received from
11  Mr. Zwirn, more likely to be the copy of
12  the volume or notebook you received from
13  Mr. Zwirn?
14          MR. LUFT:  Objection.
15      A.   The only thing, as I sit here
16  today, would be the size of the binder
17  given to me is similar to Exhibit 4110,
18  but that's all I could tell you is the
19  size would approximate that.
20      Q.   And is it fair to say that you
21  are not telling us under oath that Exhibit
22  4110 is not the binder Mr. Zwirn gave you.
23  Is that accurate?
24      A.   Can you repeat that one more
25  time.

Page 267

1       Q.   Yes, that had too many negatives.
2   I think we could parse it out, but it had
3   too many negatives.  Let me try it again.
4           Can you testify with certainty
5   today that Exhibit 4110 is not a copy of
6   the binder that Mr. Zwirn gave you?
7       A.   I cannot one way or the
8   other if this is the full binder that was
9   given to me or not.
10      Q.   So the short answer is you can't
11  say with certainty that it's not the
12  binder or a copy of the binder; is that
13  right?
14      A.   In certainty whether it's not or
15  it is, yes.
16      Q.   Have you ever seen Exhibit 4110
17  or Exhibit 4111 before today in perhaps
18  your preparations -- strike the question.
19          Do you recall reviewing
20  yesterday in your preparation session
21  Exhibit 4110 or 4111?
22      A.   Can you repeat that?
23      Q.   Yes.  Do you recall reviewing
24  yesterday Exhibit 4110 or 4111 or at any
25  other time in preparation for this

Page 268

1   deposition?
2       A.   I can't recall any other time
3   but yesterday, parts of 4110 were either
4   shown to me or read to me.
5       Q.   And why do you think that?
6       A.   Well, based upon meeting with
7   counsel yesterday.
8       Q.   I'm saying, slightly different
9   thing.  Did you see this exhibit on the
10  table and that's why you think that parts
11  of it were read to you or shown to you?
12      A.   Well, I just can't say for
13  certainty whether it was that exact
14  exhibit that were being shown to me.
15      Q.   But language like I read to you
16  today was read to you yesterday?
17      A.   Yes.
18      Q.   From a document that looked a
19  lot like Exhibit 4110?
20      A.   Yes.
21      Q.   And that was done by counsel?
22      A.   Yes.
23      Q.   Do you recall contacting any
24  third party about endowment or investment
25  work you were doing other than the tying

Page 269

1   of sums for any reason?
2       A.   The only other contact that I
3   would know of is we also got SAS 70
4   reports from third parties.
5       Q.   What are SAS 70 reports?
6       A.   They are reports done by the
7   financial institution or third party's
8   independent accountants on the internal
9   control environment at that third party
10  site.
11      Q.   So they have to do with internal
12  controls at the financial institutions,
13  for example, in place there?
14      A.   Correct.
15      Q.   Did you ever learn, as a part of
16  your audit work, or after, that AHERF
17  stripped the dividend or interest income
18  from the Lockhart trust accounts and moved
19  it to a separate concentration or other
20  account at one of the Mellon
21  institutions --
22          MR. LUFT:  Objection.
23      Q.   -- on a monthly or other
24  periodic basis?
25      A.   Can you repeat that again?  I'm

68 (Pages 266 to 269)