TAB 202

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA


THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

        Plaintiff,.

   vs.                   Civil Action

PRICEWATERHOUSECOOPERS,      No. 00-684

LLP,

        Defendant.


        Videotaped Deposition of ALBERT

ZWIRN, called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Jones Day, 500 Grant Street, Suite 3100,

Pittsburgh, Pennsylvania, on Thursday, the 20th

day of November, 2003, at 9:00 a.m.

        - - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza. Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Albert Zwirn

69

```
1        A.    No, I don't think I prepared it,
2   no, sir.
3        Q.    If you would go, please, to the
4   Bates page ending 4868.
5        A.    48 --
6        Q.    68.
7        MR. LUFT:  I don't think that's in
8   the copy that you gave us.
9        MR. THURMAN:  I don't have a 68.
10       MR. TORBORG:  I won't ask you about
11  that then unless I can find it here.  I don't
12  know why I don't have a copy of that.  Oh,
13  sure.
14           - - - - -
15       (Thereupon, Deposition Exhibit 2223
16       was marked for purposes of
17       identification.)
18           - - - - -
19       Q.    Mr. Zwirn, I'm going to be asking
20  you about some -- about the Bates pages that
21  end in 4868 through the remainder of the
22  document, Bates ending 4874.  If you would flip
23  through those.
24       A.    Yes, sir.
25       Q.    The Bates -- the page that has the
```

70

```
1   Bates number ending 68 is titled AHERF or
2   Allegheny Health, Education and Research
3   Foundation Endowment Classes.
4            Then it lists some endowments on
5   the left-hand corner which include the five
6   AHERF trusts that we've talked about today.
7        A.    M-hm.
8        Q.    As well -- and on the far
9   right-hand column there's a column called
10  Original Contribution.
11       A.    Yes, m-hm.
12       Q.    And then some attachments starting
13  at Bates ending 70 through 74 that -- do these
14  appear to provide support for the contribution
15  amounts that are listed in that column on Bates
16  ending 68?
17       MR. LUFT:  Objection.
18       A.    I'm sorry, on what page, sir?
19       Q.    Bates ending 68.
20            Does it appear --
21       A.    You mean backup like?
22       Q.    Yes.
23       A.    I -- I don't know.  This is not
24  familiar to me.
25       Q.    Okay.  So you don't recall being
```

71

```
1   involved in helping determine the original
2   contribution amount for the five AHERF trusts?
3        A.    I don't recall that specifically
4   It's possible, but I don't recall it
5   specifically.
6        Q.    Yeah.  I guess what I'm trying to
7   ask is whether you were involved in the --
8   strike that.
9            Do you recall being asked to
10  provide information from the trust documents so
11  that others could come up with the contribution
12  amounts, the original contribution amounts of
13  the five AHERF trusts?
14       A.    I don't recall that specifically.
15       Q.    Do you know -- and if you don't
16  know, that's fine -- do you know if anyone from
17  Coopers & Lybrand, who was AHERF's external
18  auditor throughout much of the time you were
19  there, whether they knew that you had a copy of
20  trust agreements in your files?
21       A.    I don't know that.
22       Q.    You don't know?
23       A.    No, sir.
24       Q.    Did you ever have any
25  correspondence with anyone at Coopers & Lybrand
```

72

```
1   throughout your entire time at AHERF?
2        A.    Not that I recall, no, sir.
3            You mean written correspondence,
4   that kind of thing?
5        Q.    No, just oral correspondence, any
6   discussions.
7        A.    Well, they used to come in, check
8   my work papers to make sure that the
9   endowment -- the principal agreed with the
10  trust statements and the income was the same.
11       Q.    Do you recall whether anyone from
12  Coopers & Lybrand ever asked to see your binder
13  of documents?
14       A.    I don't recall that.
15       Q.    Do you recall if anyone at Coopers
16  & Lybrand knew that you had a collection of
17  documents?
18       A.    I don't know that.
19       Q.    And when -- I'm sorry, so the
20  record is clear, when I say collection of
21  documents, I meant the --
22       A.    The binder.
23       Q.    The binder.
24       A.    I don't recall that.
25       Q.    Mr. Zwirn, do you have any contact
```

18 (Pages 69 to 72)

73

1   with the three Lockhart trusts today?
2          MR. LUFT: Objection.
3      A.   Today?
4      Q.   Yes.
5      A.   No. No, sir.
6      Q.   You're not involved in the
7   accounting for those today?
8      A.   No. That ended -- the three of the
9   five from those five that you originally talked
10  about? Yes. No. The accounting for that?
11     Q.   M-hm.
12     A.   I stopped that around the fall of
13  1990.
14         MR. TORBORG: Mr. Zwirn, I have no
15  further questions at this time. I appreciate
16  your time and patience.
17         EXAMINATION OF ALBERT ZWIRN
18  BY MR. LUFT:
19     Q.   Mr. Zwirn, if you would just give
20  me a brief second.
21     A.   Sure.
22     Q.   Stay on the record. I'll check if
23  I have anything I would like to ask you about.
24         Mr. Zwirn, you mentioned your black
25  binder. I believe Mr. Torborg asked you how it

74

1   was held together.
2      A.   Yes, sir.
3      Q.   I think you said some type of metal
4   fastener.
5      A.   Yes, sir.
6      Q.   Now, when you say, I'm just trying
7   to understand, is that the type of metal
8   fastener that you could stick through paper and
9   open up and close?
10     A.   Yes, sir.
11     Q.   So you could open it up, take
12  things out, close it?
13     A.   Yes, sir.
14     Q.   And just to be clear, I think
15  you've said a number of times this morning that
16  you stopped working on the accounting for the
17  Lockharts in the fall of 1990?
18     A.   Yes, sir.
19     Q.   I know you said you didn't recall
20  ever speaking to Coopers & Lybrand about the
21  Lockharts, but if, perhaps, you had a
22  conversation about work papers regarding
23  Lockhart, such as the time you mentioned about
24  Coopers & Lybrand, that would have been
25  sometime before the fall of 1990?

75

1      A.   Yes, sir.
2          MR. LUFT: I have no further
3   questions.
4          MR. TORBORG: I have no follow-up.
5   Thanks again.
6          THE VIDEOGRAPHER: Off the record
7   at 1:58.
8
9          (Deposition concluded.)
10         - - - - -
11
12                                    .
13
14
15
16
17
18
19
20
21
22
23
24
25

76

1              CERTIFICATE
2   The State of Ohio,  )
3                        SS:
4   County of Cuyahoga  )
5
6          I, Michele Eddy, a Notary Public
7   within and for the State of Ohio, duly
8   commissioned and qualified, do hereby certify
9   that the within named witness, ALBERT ZWIRN,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19         I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

19 (Pages 73 to 76)

Albert Zwirn

<div>

**77**

1　　　　I do further certify that I am not a
2　relative, counsel or attorney for either party,
3　or otherwise interested in the event of this
4　action.
5　　　　IN WITNESS WHEREOF, I have hereunto
6　set my hand and affixed my seal of office at
7　Cleveland, Ohio, on this　　　day of
8　　　　, 2003.
9
10
11
12
13
14　　　　Michele Eddy, Notary Public
15　　　　Within and for the State of Ohio
16
17　My commission expires May 22, 2005.
18
19
20
21
22
23
24
25

</div>

<div>

**79**

| 1 | objection | 29 | 9 |
| 2 | objection | 29 | 12 |
| 3 | objection | 30 | 8 |
| 4 | objection | 33 | 15 |
| 5 | objection | 33 | 18 |
| 6 | objection | 34 | 4 |
| 7 | objection | 35 | 23 |
| 8 | objection | 38 | 23 |
| 9 | objection | 41 | 21 |
| 10 | objection | 42 | 7 |
| 11 | objection | 45 | 15 |
| 12 | objection | 45 | 25 |
| 13 | objection | 47 | 21 |
| 14 | objection | 48 | 17 |
| 15 | objection | 48 | 21 |
| 16 | objection | 53 | 8 |
| 17 | objection | 54 | 6 |
| 18 | objection | 54 | 14 |
| 19 | objection | 54 | 23 |
| 20 | objection | 56 | 1 |
| 21 | objection | 57 | 12 |
| 22 | objection | 58 | 8 |
| 23 | objection | 59 | 16 |
| 24 | objection | 60 | 12 |
| 25 | objection | 60 | 19 |

</div>

<div>

**78**

1　　　　　I N D E X
2
3　EXAMINATION OF ALBERT ZWIRN　4　　24
4　BY MR. TORBORG
5　EXAMINATION OF ALBERT ZWIRN　73　　17
6　BY MR. LUFT
7
8　Exhibit 2221 was marked　　23　　22
9　Exhibit 2222 was marked　　66　　20
10　Exhibit 2223 was marked　　69　　15
11
12　　　　PREVIOUSLY MARKED EXHIBITS
13　Exhibit 4111　　　25　　24
14　134　　　　26　　3
15　Exhibit 4110　　　45　　6
16
17　objection　　　16　　23
18　objection　　　17　　13
19　objection　　　17　　15
20　objection　　　18　　2
21　objection　　　19　　11
22　objection　　　19　　17
23　objection　　　21　　6
24　objection　　　22　　3
25　objection　　　28　　19

</div>

<div>

**80**

| 1 | objection | 61 | 17 |
| 2 | objection | 63 | 21 |
| 3 | objection | 66 | 9 |
| 4 | objection | 70 | 17 |
| 5 | objection | 73 | 2 |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

</div>

20 (Pages 77 to 80)

TAB 203

# In The Matter Of:

## *AHERF v.*
## *PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *JOHN T. LYDON*
## *June 18, 2002*

---

### *MANHATTAN REPORTING CORP.*
### *420 LEXINGTON AVENUE*
### *NEW YORK, NY 10170*
### *(212) 557-7400    FAX: (212) 692-9171*

*Original File 061802JL.TXT, 224 Pages*
*Min-U-Script® File ID: 0554028219*

## **Word Index included with this Min-U-Script®**

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

JOHN T. LYDON
June 18, 2002

---

**1—10:58:47   25—10:59:56**                    Page 78

[1] — the Lockhart funds, I believe, if you
[2] look at the documentation, what our thought
[3] process was was that it could be used for the
[4] general purposes of the hospital, and it had
[5] never been pulled out of there to be used for
[6] the general purposes of the hospital.
[7]     So when FASB 117 came in, it forced
[8] us to go back and look at it. We looked at
[9] it and said these are all realized and
[10] unrealized gains.
[11]     We pulled them out and said they can
[12] now be used for the general purpose of the
[13] hospital. So I guess in absolute terms that,
[14] quote, unquote, it could be classified as a
[15] temporarily restricted fund.
[16]     My thought would have been that we've
[17] already satisfied the purpose of the funds,
[18] so we could pull that as income as we saw
[19] fit.
[20]     Q: Okay. When you said that AHERF had already
[21] satisfied the purpose of the funds, you're
[22] talking about by providing services to
[23] patients —
[24]     A: To patients throughout the history of the
[25] fund. That's correct.

---

**1—10:59:59   25—11:01:37**                    Page 79

[1]     Q: Over the many decades from when the fund was
[2] established until '96?
[3]     A: Yes. That's correct.
[4]     Q: When you say that then the amounts could be
[5] taken into income as needed, in your
[6] understanding did that have to be matched
[7] with any services that were being performed
[8] in the period in which the funds were taken
[9] in as income?
[10]     A: In that case the services performed had
[11] already happened over the decades. I guess
[12] going back to your original question about
[13] being a reserve, maybe that's, in fact, as we
[14] looked at it because the matching — those
[15] services were provided over fifty years or
[16] seventy years, whatever it was, so that event
[17] had already happened or those events had
[18] already happened.
[19]     Q: If you could look back, please, at
[20] Exhibit 19, which was the schedule we were
[21] looking at.
[22]     A: Okay.
[23]     Q: Do you see down toward the bottom there is a
[24] row called J. Lydon Entry?
[25]     A: Yes, I do see that.

---

**1—11:01:40   25—11:02:50**                    Page 80

[1]     Q: Do you have an understanding as to what that
[2] refers to?
[3]     A: I probably — not probably. I'm sure I made
[4] the entry when they — when they put this
[5] schedule together I had made the entries or a
[6] couple of entries that affected the balance
[7] of the account.
[8]     Q: Do you believe that this schedule in the
[9] first page of Exhibit 19 was created by
[10] someone who worked for you?
[11]     A: Good question. Yes. I would think so. I
[12] mean, it could have been created by me, but I
[13] don't recall that. Yes, I would think it
[14] would have come out of my department because
[15] basically what you're doing is roll
[16] forwarding the balance of the funds.
[17]     Q: All right. So you're rolling forward the
[18] balances from the original contributions to
[19] June 30, '95, and then from there to June 30,
[20] '96?
[21]     A: Yes, to show the activity. That's correct.
[22]     Q: Do you see now the next row again says J.
[23] Lydon Entry, and then it has an abbreviation
[24] after that?
[25]     A: Yes. I do see that.

---

**1—11:02:53   25—11:06:13**                    Page 81

[1]     Q: Is that supposed to refer to adjust endowment
[2] prior period?
[3]     A: That's what it looks like, yes.
[4]     Q: Do you recognize the handwritten numbers on
[5] this page, I mean, that is, whose handwriting
[6] that is?
[7]     A: Whose is it? Yes, because I was going to say
[8] I don't know what they mean. I think that's
[9] Al Adamczak's. I think.
[10]     Q: So that's where, for instance, it says
[11] $4,478,067?
[12]     A: Right.
[13]     MR. RYAN: Let me mark, please, as
[14] Exhibit 186 a document with Bates numbers
[15] CANDEP 02493 through 2494.
[16]
[17]     (Deposition Exhibit 186 marked for
[18] identification.)
[19]
[20]             BY MR. RYAN:
[21]     Q: Do you recognize Exhibit 186, Mr. Lydon?
[22]     A: Not specifically. I don't recall it, but it
[23] looks like from the fund documentation.
[24]     Q: All right. This looks like a legal document
[25] dated the 30th of December, 1915?

---

JOHN T. LYDON
June 18, 2002

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

---

1—11:06:16   25—11:07:32          Page 82

[1] **A:** Yes.
[2] **Q:** That has something to do with Edith Anne
[3] Oliver and Edith Oliver Rae?
[4] **A:** Yes.
[5] **Q:** On the second page you can see their
[6] signatures on the right, signatures of people
[7] named Edith A. Oliver and Edith Oliver Rae?
[8] **A:** That's correct.
[9] **Q:** Now, if you look at the bottom of the first
[10] page of this do you see this appears to be an
[11] incomplete sentence at the end there?
[12] **A:** Very end?
[13] **Q:** Very end of this page.
[14] **A:** Yes.
[15] **Q:** And then the next page is the start of a new
[16] paragraph; right?
[17] **A:** That's correct.
[18] **Q:** So these two pages don't look like they were
[19] consecutive to the original document, do
[20] they?
[21] **MR. JONES:** Object to foundation.
[22] **A:** That looks like it appears. They are missing
[23] some words.
[24] **Q:** Do you know whether there might be pages
[25] missing from here?

---

1—11:07:33   21—11:21:41          Page 83

[1] **A:** I would have no idea.
[2] **Q:** Do you know whether when you looked at the
[3] trust documentation as part of the FASB 117
[4] implementation project in '96 there were
[5] original trust documents where the pages
[6] didn't appear to go together?
[7] **A:** I don't recall.
[8] **MR. RYAN:** Why don't we break for
[9] just a moment to change the tape.
[10] **THE VIDEOGRAPHER:** We are now going
[11] off the record. The time on the screen is
[12] 11:08.
[13]
[14] (There was a recess in the proceedings.)
[15]
[16] **THE VIDEOGRAPHER:** We are now back on
[17] the record. The time on the screen is 11:21.
[18] **BY MR. RYAN:**
[19] **Q:** Let me mark, please, as Exhibit 187, a
[20] document with the Bates numbers CANDEP 02501
[21] through 02538.
[22]
[23] (Deposition Exhibit 187 marked for
[24] identification.)
[25]

---

1—11:22:03   25—11:23:34          Page 84

[1] **BY MR. RYAN:**
[2] **Q:** Now, do you see, Mr. Lydon, Exhibit 187 is a
[3] series of very-difficult-to-read legal
[4] documents that are in white text against a
[5] black background?
[6] **A:** Yes.
[7] **Q:** Do you recall seeing endowment documentation
[8] in this form of white text against the black
[9] background during the FASB 117 implementation
[10] project?
[11] **A:** Yes, I believe so.
[12] **Q:** Do you know whether this is a document
[13] printed off of microfiche?
[14] **MR. JONES:** Object to foundation.
[15] **A:** I don't know that for sure. Based on the way
[16] it looks, that would be my guess, but I can't
[17] say that conclusively.
[18] **Q:** Do you see at the top of the document there
[19] are two circular holes on either side at the
[20] top?
[21] **A:** Yes.
[22] **Q:** Then in the middle there are sort of two
[23] vertical lines?
[24] **A:** Yes.
[25] **Q:** That almost looks like the holes for a

---

1—11:23:38   25—11:25:29          Page 85

[1] fastening system with rods that kind of stick
[2] up and that you fold over?
[3] **A:** Yes.
[4] **Q:** Now, I know earlier you were talking about
[5] this binder of documents from the treasury
[6] department.
[7] **A:** Yes.
[8] **Q:** Does looking at Exhibit 187 help you to
[9] remember anything about how the fastening
[10] worked in that binder?
[11] **A:** No, not really. I think I recall it was
[12] black, but that's about all. I think it was
[13] black. I can't tell you whether it was three
[14] ring or the prongs or whatever it was.
[15] **Q:** But it was some type of binder where you
[16] could remove individual documents or
[17] individual pages, so it wasn't a permanently
[18] bound book or anything?
[19] **MR. JONES:** Object to form.
[20] **A:** That's my recollection, yes.
[21] **Q:** Now, if you could turn, please, to page 5 of
[22] this document with the Bates number at the
[23] bottom right corner ending in 2505.
[24] **A:** Okay.
[25] **Q:** I realize that it's very difficult to make

---

AHERF   v.
PRICEWATERHOUSECOOPERS, L.L.P.

JOHN T. LYDON
June 18, 2002

1—11:25:32  25—11:27:01          Page 86

[1] out what it says here, but maybe you can
[2] consult at the same time Exhibit 20, which
[3] was the October 30, 1996 letter to
[4] Mr. Martin, which quotes certain excerpts
[5] from trust agreements.
[6]     A: Okay.
[7]     Q: Right.
[8]     A: Okay.
[9]     Q: Do you see down at the bottom of the first
[10] page of Exhibit 20 there is a quotation of
[11] language from documents for accounts 500-007
[12] Lockhart, J M ?
[13]     A: Okay.
[14]     Q: Do you see this document Exhibit 187, as
[15] written in the top 500-007 and refers in the
[16] second line to J. Marshall Lockhart?
[17]     A: Yes.
[18]     Q: Do you see then the language in paragraph H
[19] on page 5, which is very hard to read, looks
[20] like it may be the language here from down at
[21] the bottom of the first page of Exhibit 20?
[22]     MR. JONES: Object to foundation.
[23]     A: I can't. If you could maybe — this language
[24] here you're saying is contained here vice
[25] versa —

1—11:27:02  25—11:28:44          Page 87

[1]     Q: I'm talking about this paragraph begins on
[2] the second line
[3]     A: Okay
[4]     Q: It's a total of eight lines long.
[5]     A: Okay. I mean, it could be the same. It's
[6] very, very difficult to read.
[7]     Q: All right. Do you recall back at the time
[8] when you were doing the FASB 117
[9] classification project there were copies like
[10] what we have in Exhibit 187 that were very
[11] hard to make out what they said?
[12]     A: I don't recall, I don't recall.
[13]     Q: Okay. Referring then to the easier to read
[14] paragraph down at the bottom of Exhibit 20,
[15] do you see it ends with the same to be used
[16] for the furtherance of its charitable work?
[17]     A: Yes
[18]     Q: Is that the type of provision you were
[19] testifying about earlier?
[20]     MR. JONES: Object to form and
[21] foundation.
[22]     A: Yes I would assume so if that is a
[23] stipulation from the original fund agreement
[24] or original trust agreement.
[25]     Q: Do you see just above that there is a

1—11:28:46  25—11:30:34          Page 88

[1] sentence in Exhibit 20 which reads, Article 1
[2] defines income as rents, issues, interests,
[3] income and profits thereof?
[4]     A: Yes, I see that.
[5]     Q: Do you recall whether in the FASB 117
[6] classification project that you worked on you
[7] looked at how the trust agreements defined
[8] terms like income?
[9]     A: If it was in the agreement, I'm fairly
[10] certain I looked at the agreements, yes
[11]     Q: Let me ask you to turn to the second page,
[12] please, of Exhibit 20. Can you see the first
[13] sentence there reads, It is important to note
[14] that article 10 provides, quote, In the case
[15] of the sale of any securities of the trust
[16] fund at a premium or profit, such premium or
[17] profit shall become a part of the corpus and
[18] not income, closed quote?
[19]     A: Do I see that?
[20]     Q: Yes.
[21]     A: Yes
[22]     Q: Do you have an understanding as to what that
[23] means?
[24]     A: I guess what it's saying is if you're selling
[25] the security, the income — income should not

1—11:30:38  25—11:32:41          Page 89

[1] be — the profits should not be taken to
[2] income, should stay with the trust. I'm
[3] reading that. That's my understanding.
[4]     Q: Do you know whether a provision such as
[5] article 10 as is quoted here in the top of
[6] the second page of Exhibit 20 played any role
[7] in the FASB 117 classification project you
[8] worked on?
[9]     A: I'm not sure what you mean by played any
[10] role.
[11]     Q: Well, did a provision of that type affect how
[12] you classified some or all of the endowment
[13] funds?
[14]     A: I mean, we classified it based on what we
[15] read in the documentation, so if the
[16] provision — if I had seen the provision
[17] of — this particular provision, we would
[18] have acted accordingly to what we read in the
[19] documentation.
[20]     Q: Do you understand this provision to mean that
[21] capital appreciation on the endowment fund
[22] should be classified as restricted?
[23]     MR. JONES: Object to form and
[24] foundation
[25]     A: That's what this appears to say, yes.

TAB 204

1

1                UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                   - - -

4  THE OFFICIAL COMMITTEE OF THE    )
    UNSECURED CREDITORS OF ALLEGHENY  )
5  HEALTH, EDUCATION AND RESEARCH    )
    FOUNDATION,                    )
6                           )
             Plaintiff,        )
7                           )
        vs.                   ) Civil Action
8                           ) No. 00-684
    PRICEWATERHOUSECOOPERS, LLP,       )
9                           )
             Defendant.        )
10                    - - -

11      Videotaped Deposition of ALBERT ADAMCZAK

12         Thursday, June 19, 2003

13             Volume I

14                   - - -

15
        The videotaped deposition of ALBERT ADAMCZAK,
16  called as a witness by the Plaintiff, pursuant to
    notice and the Federal Rules of Civil Procedure
17  pertaining to the taking of depositions, taken before
    me, the undersigned, Teresa Constantini, a Notary
18  Public in and for the Commonwealth of Pennsylvania, at
    the law offices of Jones, Day, Reavis & Pogue, One
19  Mellon Bank Center, 500 Grant Street, 31st Floor,
    Pittsburgh, Pennsylvania 15219, commencing at
20  8:59 a.m. the day and date above set forth.

21                   - - -

22        COMPUTER-AIDED TRANSCRIPTION BY
         MORSE, GANTVERG & HODGE, INC.
23          PITTSBURGH, PENNSYLVANIA
             412-281-0189

24                 - - -

25

**54**

1    Q    What kind of information did you understand
2 from your role as -- your oversight role was provided
3 to them?
4    A    As a part of their -- of that planning
5 meeting, generally either at that meeting or
6 subsequent to it, they sent us what they called a list
7 of schedules and work papers that they would need to
8 do their year-end work, and it detailed exactly what
9 they needed.
10        And we generally provided everything that
11 was -- not generally. We always provided everything
12 that was on that list.
13        Now, based on them receiving the items
14 requested on that list, they might ask for more
15 information, and then that was prepared, and/or if we
16 had it on hand, it was provided to them.
17    Q    What kind of schedules would have been a
18 typical schedule that was requested?
19    A    Bank reconciliations for cash.
20        Detailed trial balances for accounts
21 receivable, along with aging analysis for accounts
22 receivable.
23        Bad debt reserve analysis, which showed the
24 calculations of the bad debt reserves that were
25 booked.

**55**

1        Roll forwards for property, plant and
2 equipment that showed the additions, disposals and
3 depreciation for the year.
4        Long term debt schedules that showed the
5 outstanding debt in a roll forward.
6        Any new borrowings.
7        Any payments during the year.
8        Schedules that rolled forward the other
9 assets, like goodwill or any of the other
10 intangibles.
11        Detailed trial balance for the accounts
12 payable.
13        Generally analytical schedules for all the
14 other miscellaneous receivables and other assets that
15 showed the balance in the previous year and the
16 balance in the current year, along with any
17 explanations for major changes between the two years.
18    Q    And this kind of information, these
19 schedules, were they provided during your time at
20 AHERF electronically, either by -- in disk or other
21 format, or were they provided in hard copy paper, or
22 both?
23    A    Generally hard copy paper.
24        There may have been some schedules given to
25 them electronically, but for the most part, they were

**56**

1 paper schedules.
2    Q    Did Coopers have access to the information
3 provided in the schedules electronically if they
4 wanted it?
5        MR. RYAN:  Objection.
6    A    I don't believe generally they did.
7        I don't think they had access to our
8 systems, if that's your question. I don't believe so.
9    Q    Do you know one way or the other?
10    A    I believe not.
11    Q    Okay.
12    A    But I don't know to sure.
13    Q    Do you recall ever receiving a request from
14 a Coopers & Lybrand auditor for access to electronic
15 systems, and then having to deal with that request?
16    A    I do not.
17    Q    Okay.
18        How would you characterize the relationship
19 with respect to information flow between AHERF finance
20 and the auditors during the time you were there?
21    A    I think it was a pretty free flow of
22 information.
23    Q    Were you ever told by anybody at Coopers
24 that they were dissatisfied with the flow of
25 information?

**57**

1    A    I was not.
2        And as a matter of fact, as a part of the
3 wrap-up meeting every year, where they met with
4 David McConnell, generally either a Joe Donnelly, a
5 Steve Spargo, whoever was there at the time,
6 Joe Dionisio, myself and Dan Cancelmi, they were
7 always asked that question by David McConnell, and
8 always answered that they were very happy with the
9 cooperation of the staff.
10    Q    At what point in the audit process did
11 Coopers & Lybrand typically present either you or
12 others in AHERF finance with any proposed adjustments
13 to the financial statements?
14    A    They might be discussed at these weekly
15 meetings as they came across them.
16    Q    Updates?
17    A    Yeah.
18        In other words, if they found a significant
19 item, they would bring it up for a number of reasons.
20        I think, one, they wanted to make sure that
21 they understood that they had -- in other words, if
22 thought they had an adjustment, might there be
23 something they weren't understanding that made their
24 conclusion not correct.
25        And, two, if it was of any material nature,

58

1  they wanted to have it discussed early on versus at
2  the end of the audit, so that it could be understood
3  and dealt with, for lack of a better word, early on.
4        I don't remember there being many, if any,
5  major adjustments that they ever brought to our
6  attention or talked about.
7     Q    In these updates meetings -- and this may
8  again be me mishearing you, and forgive me if that's
9  the case -- the update meetings took place during the
10  final audit process, that is, post July 15, or during
11  the preliminary audit process back in April typically?
12     A    No, the July 15th through the end of August
13  period.
14     Q    So it would have been -- if there were
15  proposed adjustments, they would likely be discussed
16  during the update meetings July 15th and after?
17     A    Correct.
18     Q    And were they then discussed at a close --
19  was there a closing meeting held?
20     A    Yes.
21        Then their final list of adjustments would
22  have been discussed at that point.
23        Now, they would not necessarily go through
24  every adjustment.
25        If there were some small adjustments, they

59

1  may say, "No, let's just talk about these major
2  adjustments."
3        And, again, I don't remember there being
4  any major adjustments.
5        Let me put it this way, there were no
6  adjustments that they insisted be made that weren't
7  made.
8        In other words, if they would find one and
9  bring it up at an interim period, and we all agreed,
10  "Hey, this is a material adjustment and it's a valid
11  adjustment," we would record it throughout that
12  process.
13     Q    So in any year you were with AHERF finance,
14  you cannot recall a time at which an adjustment that
15  was proposed by Coopers & Lybrand was not ultimately
16  made; is that right?
17        MR. RYAN:  Objection.
18     A    The only adjustment of any significance
19  that I remember was in '96 in the wrap-up meeting, and
20  it dealt with the Delaware Valley.
21        So, again, I'm not familiar with the
22  intimate detail, but there was something relative to a
23  potential shortfall in the bad debt reserve for
24  receivables on the Delaware Valley.
25        Now, that is an estimate, so it's not

60

1  something that you can sit there and point and say,
2  "It is this number," but the estimate, I think, was
3  rather large.
4        And at that wrap-up meeting,
5  David McConnell asked for more information to be able
6  to better understand what Coopers was talking about,
7  and they convened a separate meeting outside of that
8  meeting to discuss the details.
9     Q    All right.
10     A    But no adjustment was -- no adjustment was
11  booked as a result.
12     Q    We'll come back to that, that wrap-up
13  meeting.
14        That was for fiscal year '96?
15     A    Correct.
16     Q    But I guess the question that is remains:
17  I think your testimony is that you can't recall any
18  adjustment proposed by Coopers & Lybrand in any audit
19  year that the company refused to make; is that right?
20        MR. RYAN:  Objection.
21     A    That's correct.
22        As a matter of fact, I would -- I believe
23  that if there was a material adjustment and we refused
24  to book it, PWC would have some obligation relative to
25  their opinion.

61

1     Q    To disclose the refusal to book?
2     A    Yeah, or not to give the opinion.
3     Q    One or the other?
4     A    Right.
5        MR. JONES:  This is a good time for us to
6        take a quick break.  We've been at it for a
7        little over an hour.
8        THE VIDEOGRAPHER:  We're off the record.
9        The time is 10:06 a.m.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  Standby, please.
12        We're back on the record.  The time is
13        10:18 a.m.
14  BY MR. JONES:
15     Q    Mr. Adamczak, before we broke, we had
16  spoken briefly about some electronic accounting
17  information and systems in place at AHERF.
18        Do you recall that?
19     A    Yes.
20     Q    The schedules that AHERF accounting
21  personnel shared with Coopers & Lybrand during their
22  audit process were generated from what electronic data
23  system or source typically?
24     A    They would have generally been prepared on
25  some kind of a spreadsheet software, Excel or Lotus.

SHEET 9 PAGE 62

62

```
 1   Q    And the underlying data would have been
 2 retrieved from some other, I assume, system?
 3   A    Yes.
 4   Q    And what system would that have been?
 5   A    The McCormick and Dodge system.
 6   Q    And the McCormick and Dodge system was the
 7 system on which AHERF kept its general ledger?
 8   A    That's correct.
 9   Q    And was in place at the time you arrived at
10 AHERF and throughout the time you were there?
11   A    Yes.
12   Q    And that's an electronic general ledger
13 system?
14   A    Correct.
15   Q    Is it a common general ledger system, or
16 was it a common general ledger system in place in
17 health care enterprises during those years?
18   A    I don't know whether it's a common system
19 in health care enterprises.
20        I was told that it is a pretty common
21 system for big companies.
22   Q    Who told you that?
23   A    I just either read it or heard it through
24 conversation.
25   Q    What is the general purpose of a general
```

PAGE 63

63

```
 1 ledger, whether maintained electronic or otherwise?
 2   A    To track transactions and allow information
 3 to be summarized and reported, basically to show that
 4 the financial data for any -- any company or
 5 enterprise.
 6   Q    And ultimately is it a source document for
 7 the balance sheet and the statement of operations and
 8 other financial statements?
 9   A    Yes.
10   Q    Do all transactions go through the general
11 ledger at AHERF, or did they, rather, in the
12 relative -- the time period you were there?
13   A    I need you to clarify generally what --
14 generally -- generally anything that was in the
15 financial statements went through the general ledger
16 at some point.
17   Q    Do all journal entries made by department
18 personnel or department accounting personnel get --
19 find their way to the general ledger?
20   A    They are supposed to, and if they're in the
21 financial statements, yes.
22        In other words, somebody -- the exception
23 might be somebody may write up a journal entry and
24 write it up incorrectly, and upon looking at it, know
25 that it's wrong. That may not make its way.
```

PAGE 64

64

```
 1        But anything that is in the general ledger
 2 generally either gets there through a journal entry,
 3 or through a system that's set up, like a cash receipt
 4 or disbursement system, where information is keyed in,
 5 and the system then posts to the general ledger.
 6   Q    I see.
 7        So it short circuits the request for a
 8 journal entry in that case?
 9   A    Correct, because generally it's a high
10 volume of similar transactions.
11   Q    And the typical journal entry process while
12 you were at AHERF was a written request for a journal
13 entry that was then keyed after approval?
14   A    That's correct.
15   Q    And who gave the approvals?
16   A    Generally, it was the accounting director
17 or senior director, whatever you would call that role
18 on routine items, and as they became more major, they
19 were approved at higher levels in the organization.
20        Now, the approval did not always include a
21 sign off on a journal entry.
22        So by that I mean, if there was a large
23 item, David McConnell, who would most -- most
24 assuredly know about the entry, may not have signed
25 off on the physical journal entry.
```

PAGE 65

65

```
 1   Q    He may have signed off in some other way?
 2   A    Or verbally.
 3   Q    When you said that finance directors or
 4 senior finance directors, did you mean those with
 5 responsibility for a given hospital or enterprise
 6 within the system?
 7   A    Yes.
 8   Q    Through your contacts with
 9 Coopers & Lybrand during the audit process or
10 otherwise, did you understand that they had come to
11 understand what the general ledger system was?
12   A    Oh, I believe so, and I believe it's pretty
13 standard amongst all companies.
14   Q    Did you ever have a discussion with them
15 about the way the general ledger system worked and
16 operated?
17   A    No, no.
18   Q    Did they ever ask you for access to the
19 general ledger?
20   A    When you say "access," what do you mean?
21 To view the general ledger?
22   Q    Yes, either on screen, on line, or
23 otherwise.
24   A    Well, we often produce for them trial
25 balances and reports that came out of the system. So
```

**78**

1　Q　That's the patient financial services
2　group?
3　A　Services group, correct.
4　Q　And who actually set these percentages at
5　AHERF?
6　　　MR. RYAN: Objection.
7　BY MR. JONES:
8　Q　If you know.
9　　　Do you know who actually set the
10　percentages?
11　A　They are independently set for each
12　hospital.
13　　　In other words, based on the historical
14　collection experience, the percent on one hospital may
15　not be applicable to another hospital.
16　Q　And I guess that's where I was going next.
17　　　But where I was going first was: Which
18　group of AHERF employees had responsibility for fixing
19　these hospital specific aging percentages, or
20　percentages to be applied to the aging buckets?
21　　　Was it the patient financial services
22　group, or the finance department, or some other group?
23　A　That's a tough question, because I know
24　that patient financial service group reviewed the
25　percentages periodically and received this schedule,

**79**

1　and they were to initiate or to let us let the general
2　accounting area know if the percents looked wrong or
3　out of -- out of whack, but I don't know that there
4　was a formal process.
5　　　I know they got the schedules, and if they
6　saw something that didn't make sense, they were to
7　bring it to our attention, meaning general
8　accounting.
9　　　Likewise, if general accounting felt that
10　something didn't seem right as we looked at things, we
11　were -- we would get in contact with them and see
12　whether they should be changed.
13　　　So it was kind of a -- a back and forth
14　process versus somebody being responsible for setting
15　the percentages.
16　Q　I notice these are AGH schedules as we've
17　discussed; is that right?
18　A　That's correct.
19　Q　And that would have been the enterprise
20　which you would have had at least more historical
21　familiarity?
22　A　That's correct.
23　Q　And is there a reason that these schedules
24　do not have a column for accounts that were
25　outstanding more than 360 days?

**80**

1　A　The column that says to 211 to 360 is
2　anything beyond 211.
3　　　It's just the way the worksheet was set up
4　to title.
5　Q　So even if an account was more than
6　360 days old, it would be a part of that final
7　right-hand column just the left of the total?
8　A　That's correct.
9　　　And this schedule was to reflect all the
10　receivables that were patient related.
11　Q　There wasn't a protocol or a methodology in
12　place at AGH that anything over a year old was to be
13　written off entirely?
14　A　That was supposedly considered in the
15　development of this percent.
16　Q　Okay.
17　A　So where anything that old was at a
18　hundred, something less -- something in the 211 plus
19　may have been at 58 or something to derive an average
20　percent of 75.
21　　　So everything in that bucket, some items,
22　the older ones, were expected not to be collected.
23　　　Some of the newer ones in that bucket were
24　supposed to -- were supposedly to have a better
25　percentage than --

**81**

1　Q　And so the 75 percent which is applied to
2　both schedules to the accounts 211 to 360 days is an
3　amalgamation of your expectations regarding the
4　varying ages of the accounts within that bucket?
5　A　That's correct.
6　Q　Then I guess my question is still: Did
7　you, or do you know now, in your recollection, recall
8　that at AGH it was a hundred percent reserve that
9　would have been the figuring in the minds of those
10　arriving at the 75 percent that should be applied to
11　accounts over 360 days old?
12　　　MR. RYAN: Objection.
13　　　MR. JONES: Yes, I object to that question,
14　　too.
15　A　Yes, I can't say "yes" or "no."
16　Q　Even if I put a number of commas in there,
17　it would still be confusing.
18　　　My question is this: Is it your best
19　recollection today that at AGH, those that fixed the
20　percentages for the 211 to 360 day bucket really
21　applied a 100 percent reserve calculation to accounts
22　360 days or older?
23　　　MR. RYAN: Objection.
24　A　I don't know that I can answer that with a
25　"yes."

PAGE 82

82

1    I think my thought is that if you were to
2  take the receivables in that bucket in the case of the
3  self-pay, which is the top category on the 1997
4  analysis, that we would collect 75 percent of those
5  receivables.
6    Q    Let me see if I can put it even more
7  simply.
8    What is your recollection about what
9  percentage those responsible for AGH accounts
10  receivable reserving would have applied for any
11  particular payor, if you have any, with respect to an
12  account that was more than a year old?
13    A    Again, I don't know that it was looked at
14  that way.
15    I would -- my guess is, or my thought is,
16  that the possibility of collecting anything over a
17  year is very minimal.
18    Q    So --
19    A    But I don't know that we looked at it that
20  way.
21    I think we looked at it as that, that
22  bucket, anything over 211 in the self-pay category, we
23  would collect 25 percent of those receivables.
24    Whether we might collect one that's over a
25  year old, and not collect one that's less than a year

PAGE 83

83

1  old, I don't know that we sat in that detail.
2    Q    But I think what you're telling us is that
3  your expectation about the collectibility of -- your
4  expectation about the collectibility of any receivable
5  on the schedule in either year that was more than
6  360 days old was minimal?
7    A    I agree.
8    Q    Less than 10 percent?
9    A    Yes.
10    Q    Mr. Adamczak, we've handed you now
11  Exhibit 7 marked in an earlier deposition, which I
12  think you'll tell me is the October 16, 1995
13  management comment letter from Coopers & Lybrand, LLP
14  to the board of trustees at AHERF.
15    If you could take a few moments to tell me
16  if you think that's right, and then I will direct your
17  attention to just a few portions of the document.
18    A    I believe that's correct.
19    Q    And you, from time to time in your tenure
20  at AHERF, had available for your review, and took the
21  opportunity to review, the management comment letters
22  that Coopers & Lybrand would provide annually?
23    A    That's correct.
24    Q    And did you receive those management
25  comment letters annually?

PAGE 84

84

1    A    Yes.
2    Q    I'm going to refer you to the top of page 5
3  of this letter.
4    First of all, this is the letter that
5  applies to the fiscal year ending June 30th, 1995?
6    A    That's correct.
7    Q    And at the top of page 5 of the letter,
8  which is of course numbered a number of different ways
9  in this litigation, but it also bears a Bates number
10  of DC8221 page 7 of 22; is that right?
11    A    That's correct.
12    Q    The heading at the top of this page is
13  "Methodology for Establishing Bad Debt Reserves should
14  be Applied Consistently."
15    Did I read that right?
16    A    Yes.
17    Q    Do you recall that, upon receipt of this
18  management letter or before, you were apprised that
19  Coopers & Lybrand had at least some concern about the
20  consistency of bad debt reserves, or the application
21  thereof at these hospitals?
22    A    Yes, the methodology.
23    I don't know that they had a concern with
24  the overall -- the final result, i.e., whether the
25  reserve was adequate or not, but the thought was that

PAGE 85

85

1  they ought to be prepared in a consistent methodology.
2    Q    And what was generally the inconsistency,
3  as you understood it?
4    A    You know, because I didn't do the
5  Delaware Valley, I don't remember well enough what it
6  was, but I'm not so sure that they all used aging
7  buckets and percents to determine their bad debt
8  reserve.
9    Q    Did you disagree with the concern?
10    A    No.
11    Q    Do you recall any conversations with anyone
12  at Coopers & Lybrand about the consistency of
13  methodology?
14    A    Not a detailed discussion.
15    Q    Do you recall any conversation?
16    A    The only thing that I would remember is
17  that they -- that we should use a consistent
18  methodology.  No detailed --
19    Q    Do you recall -- I'm sorry.
20    A    No detailed discussions.
21    Q    Do you remember any communication with
22  anyone at Coopers about whether the concern went
23  beyond the consistency of the methodology to the
24  adequacy of the methodologies in place?
25    A    I do not.

86

1    Q    Do you recall any conversations or
2  communications with anyone at AHERF about that?
3    A    I do not know.
4    Q    I'm going to refer you now to the
5  second paragraph of the same page of Exhibit 7, where
6  the recommendation from Coopers & Lybrand is placed.
7         Do you see that?
8    A    Yes.
9    Q    Could you read those two sentences into the
10  record?
11    A    "Management should establish a system-wide
12  methodology for calculating the reserve for bad debts
13  using aging percentages by payor based on actual
14  historical data.  We believe that the current
15  methodology utilized by AGH should be considered for
16  application at all AHERF hospitals."
17    Q    And having read that now, do you recall
18  that Coopers & Lybrand was particularly comfortable
19  with the AGH methodology in this time period?
20    A    I believe that they were.
21    Q    Did they express it to you other than in
22  this recommendation in the management comment letter
23  marked as Exhibit 7?
24    A    In conversation, it may have come up that
25  the way that we had done it at Allegheny, they thought

87

1  it worked well and presented the analysis in a very
2  understandable format, and it was a -- a preferred
3  methodology.
4    Q    Was this something that was discussed at
5  wrap-up meetings which you attended?
6    A    It may have been discussed at a very
7  general level, meaning there are different reserve
8  methodologies at the hospitals, at the other
9  hospitals, and we prefer the one that Allegheny
10  uses, and I believe there was an initiative, or our
11  thought was to move toward the methodology --
12  methodology that Allegheny General Hospital had.
13         So I don't think there was any disagreement
14  in that being the way to go.
15    Q    And it was your recollection that in this
16  time period of '95 -- fiscal years '95 and '96, in any
17  event, that Coopers & Lybrand was on board with that
18  move?
19    A    Yes.  I think this statement --
20    Q    And in these closing meetings or wrap-up
21  meetings, the people who had expressed this similar
22  sentiment would have been whom on Coopers & Lybrand's
23  part?
24    A    Bill Buettner, the partner, and
25  Mark Kirstein, the manager.

88

1         (Thereupon, Deposition Exhibit No. 1522 was
2         marked for identification.)
3  BY MR. JONES:
4    Q    Mr. Spargo, we've handed you now what has
5  been marked as Exhibit 1522, which I think you will
6  tell me is a letter from Coopers & Lybrand to
7  Mr. Stephen Spargo at AHERF, dated April 15, 1992; is
8  that right?
9    A    That's correct.
10    Q    And it discusses the performance of certain
11  procedures with respect to the Allegheny General
12  Hospital's methodology for estimating the allowance
13  for doubtful patient accounts receivable; is that
14  right?
15    A    That's correct.
16    Q    Do you recall the performance of
17  procedures?
18    A    No.
19    Q    I'm sorry?
20    A    No, I don't.
21    Q    And I take it, then, that you don't know
22  who was involved at C&L in performing the procedures?
23    A    No, I don't.
24    Q    I'm going to refer you to page -- the Bates
25  range of 47674 of the document.

89

1    A    Which number was that?
2    Q    I'm sorry.  47674, which I think is an
3  April 19 -- or, I'm sorry, a March 19, 1992 memo from
4  you to Mr. Buettner.
5         Am I right?
6    A    That's correct.
7    Q    And that's your signature at the base of
8  the page?
9    A    Yes.
10    Q    And with it, you enclose an AGH account --
11  allowance for doubtful accounts analysis of the prior
12  month; is that right?
13    A    It's an analysis for the month ending
14  February 29th, 1992.
15    Q    Do you recall what prompted you to send him
16  this memo with this attachment?
17    A    No, I don't.
18         There must have been some discussion back
19  then relative to --
20    Q    In fact, this third line -- or, the
21  second and third line of the memo suggests you had a
22  meeting on March 9, 1992; is that right?
23    A    That's right.
24    Q    Having seen the memo, does this refresh
25  your recollection that you were involved, at least at

THE VIDEOGRAPHER: This concludes tape one of the deposition of Mr. Albert Adamczak. We're off the record. The time is 11:02 a.m.
(Recess taken.)
(Thereupon, Deposition Exhibit No. 1523 was marked for identification.)
THE VIDEOGRAPHER: Standby, please.
This begins tape two of the deposition of Mr. Albert Adamczak. We're back on the record. The time is 11:15 a.m.
BY MR. JONES:
Q Mr. Adamczak, we have marked during our break Exhibit 1523. I think you have a copy of it before you.
And it has a handwritten note at the top -- or, on the face page, with the words "Critical Matters."
Do you see that, in handwriting?
A Yes.
Q And the Bates number reflects to me, or tells me that it was produced from the files of Coopers & Lybrand.
I believe that to be the case, but you don't have to trust me.
My question really is: If you look at the

second page of the document, it appears to be a worksheet or spreadsheet of some form that deals with accounts receivable.
Am I right?
And reserve adjustments.
A I don't know about reserve adjustments, but it appears to be a reserve analysis.
Q Yeah. I'm looking at the column third from the right, "15 Percent Reserve Adjustment." That's where I got the word "adjustment."
Do you see that?
A Yes.
Q And the hospitals involved by abbreviation appear to be hospitals in what folks at AHERF often refer to as the Delaware Valley Obligated Group?
A Other than it looks like the very last hospital is AGH.
Q And you caught the difference I was hoping you would catch.
And if you look at the note, it says, "C&L assessed the adequacy of each of AHERF's individual hospitals," and then abbreviates the Delaware Valley hospitals; correct?
A Correct.
Q And then it says "A/R" -- and that meant --

means to you?
A Accounts receivable.
Q -- "reserves by applying AGH's reserve percentage to each aging category of outpatient and inpatient receivable."
Did I read that right, with your help?
A Yes.
Q Now, my question is, then: Do you recall that for the fiscal year 1995 audit, Coopers & Lybrand assessed DVOG's bad debt reserves by using an AGH methodology, or the AGH methodology?
A I don't remember.
Q Do you remember that coming up in any of the 1995, '96 or '97 meetings with Coopers & Lybrand?
A I don't.
Q Do you recall any discussions with anyone at AHERF about that?
A No.
Q Or Coopers?
A No.
Q Do you recall any specific discussions in 1995 about -- strike that.
Do you remember any specific discussions during the 1995 audit process about the weakness, or the relative weakness, of the DVOG methodologies or

percentages compared to AGH?
A Not in detail.
But I do remember that there was a discussion that the methodology wasn't consistent with Allegheny, and that if the Allegheny methodology was used, there might be different results.
Q And do you recall that the inconsistency was that the Allegheny methodology was more conservative, that is, applied higher percentages generally to the various aging buckets than the DVOG methodology?
A Yes.
Q And you recall that during the 19 -- those discussions occurring during the 1995 audit process?
A Yeah.
Q And do you recall that those discussions were had with or in the presence of Coopers & Lybrand?
A Yes.
Q And, generally, where would those discussions have been held?
A At that year end audit wrap-up meeting.
Q For the 1995 audit?
A Yes.
Q And who would have been in attendance?
A Bill Buettner.

PAGE 98

98

1    Mark Kirstein.
2    Q    Who on the part of AHERF?
3    A    Dave McConnell.
4    Steve Spargo.
5    Myself.
6    Dan Cancelmi.
7    And possibly Joe Dionisio.
8    Q    And it would have been held in roughly the
9    August 1995 or 1996 -- 1995 time frame?
10    Let me try that again.
11    The August 1995 time frame?
12    A    Yes.
13    Q    Handing you now, Mr. Adamczak, what has
14    been marked in an earlier deposition as Exhibit 22,
15    and I believe you'll tell me that it is a management
16    comment letter signed by Coopers & Lybrand, and
17    addressed to the board of trustees at AHERF, dated
18    September 23rd, 1996; is that right?
19    A    Yes.
20    Q    And, again, these were routinely
21    distributed to you and you reviewed them?
22    A    Yes.
23    Q    I'd like to just take you to the last
24    page -- I'm sorry, the second to last page of the
25    document, which is -- has Bates Nos. DC8230 page 15 of

PAGE 99

99

1    16 at the base of the page.
2    Are you with me?
3    A    Yes.
4    Q    And the heading there on that page is what?
5    A    "Status of Prior Year Observations."
6    Q    And what -- what typically followed in
7    Coopers & Lybrand's management comment letters the
8    heading "Status of Prior Year Observations"?
9    A    A follow up on their comment from the prior
10    year, whether progress had been made to implement the
11    items that management said they were going to
12    implement relative to the observations they had in
13    prior year, or generally what the status of prior year
14    items were that they noted.
15    Q    And this was a management comment letter
16    that applied to year end June 30, 1996; is that
17    correct?
18    A    Correct.
19    Q    So this would have been a -- the status of
20    prior year observations would have addressed things
21    that happened that were reported on in the year prior,
22    which would have been fiscal year 1995?
23    A    Yeah.
24    I think if you turn to the next page, right
25    at the top, it says, "The following summarizes the

PAGE 100

100

1    status of observations identified during the '95" --
2    "fiscal '95 audit."
3    Q    And I'm going to refer you to another
4    portion of the same page, which is the "Accounts
5    Receivable Observations."
6    Do you see that heading?
7    A    I do.
8    Q    And it says after that heading, "As
9    previously discussed, management recognizes the unique
10    issues surrounding AHERF's accounts receivable
11    management. Though the following observations have
12    not been addressed during 1996, appropriate follow-up
13    procedures are currently in the development stage."
14    Did I read that text right?
15    A    You did.
16    Q    And one of the bullet points beneath the
17    text is "Methodology for Establishing Bad Debt
18    Reserves should be Applied Consistently"; is that
19    right?
20    A    That's correct.
21    Q    And so reading that, what was your
22    observation about what was meant about what
23    Coopers & Lybrand was telling management?
24    A    That in 1995, they recommended that a
25    consistent methodology be applied, and that they

PAGE 101

101

1    recommended the Allegheny General Hospital methodology
2    as a preferred methodology.
3    And then when they came back in and did the
4    '96 audit and followed up on '95, that it -- there had
5    still not been a consistent methodology developed
6    amongst all hospitals.
7    Q    And is that consistent with your
8    recollection of the events?
9    A    Yes.
10    I believe that some of the hospitals may
11    have started to move that way, but by no means were
12    all the hospitals on that consistent methodology.
13    Q    By year end 1996, fiscal year 1996?
14    A    Correct.
15    Q    And do you recall discussions with AHERF or
16    anyone internally about moving to the AGH model during
17    fiscal year 1996 consistently?
18    A    I don't because, again, that was the
19    Delaware Valley, and I didn't have responsibility for
20    it.
21    Q    Do you know whether it was being considered
22    actively by those responsible for the Delaware Valley
23    in fiscal year 1996?
24    A    I thought it was, but I don't -- don't have
25    firsthand knowledge.

102

1   Q    And who would those folks have been;
2  Mr. Spargo and Mr. Cancelmi, or just Mr. Cancelmi?
3   A    Mr. Spargo and Mr. Cancelmi.
4   Q    Do you know whether or recall whether
5  Coopers & Lybrand assessed the adequacy of DVOG's bad
6  debt reserves, that is, the Delaware Valley Obligated
7  Group's bad debt reserves, using the AGH methodology
8  again in fiscal year 1996?
9   A    I don't know.
10  Q    Did you ever hear discussions about that?
11  A    I did not.
12  Q    With anyone at Coopers or otherwise?
13  A    No.
14  Q    Mr. Adamczak, I've handed you what has been
15 marked as Exhibit 110 in an earlier deposition, and
16 its first page has, at the upper left-hand corner, the
17 words "Bucks County Hospital," "Inpatient Bad Debt
18 Reserve Calculation."
19      Do you see that?
20  A    I do.
21  Q    And does this look to you like a schedule
22 that would have either been provided to
23 Coopers & Lybrand during the audit process, or created
24 by them during the audit process?
25  A    Yes.

103

1   Q    And do you have a -- from your experience,
2  can you choose between the two, that is, provided to
3  or generated by Coopers & Lybrand?
4   A    I would guess that it was prepared by AHERF
5  just because at the top underneath the date I see a
6  "PBC."
7   Q    Yes.
8   A    Which, from my old days in auditing,
9  generally meant "Prepared By Client."
10  Q    Okay.
11      And this Bucks County Hospital was a DVOG
12 hospital?
13  A    That's correct.
14  Q    And the fiscal year involved is 6/30/96?
15  A    Correct.
16  Q    That would be the year-end date for the
17 fiscal year, or the date of the year end?
18  A    Yes.
19  Q    And do you recall that some of the DVOG
20 entities switched patient billing systems some time
21 during that fiscal year 1996?
22  A    I know they switched.
23      I don't remember the dates or the
24 specifics.
25  Q    And do you know the name of the old system?

104

1   A    If you would give me a couple choices, I
2  think I could pick it, but --
3   Q    How about if I ask you if PATCOM refreshes
4  your recollection?
5   A    Yes.
6   Q    Was that the old system?
7   A    Yes.
8   Q    And the new system, the move was made to
9  this SMS Invision system?
10  A    Yes.
11  Q    And the hospitals involved, do these meet
12 with your recollection, Bucks, Elkins and
13 Saint Chris?
14  A    I'm not a good person to ask that, and I
15 don't remember the specific ones.
16  Q    You knew it was some Delaware Valley
17 hospitals, but which you can't --
18  A    Yeah.  There was a move from PATCOM to SMS.
19  Q    Do you see there, both on the first page of
20 the exhibit, and elsewhere, that the column of aged
21 receivables with days from billing that is the largest
22 is the 181 to 270 column that has any amounts in it?
23      MR. RYAN:  Objection.
24  A    Yes.
25      MR. RYAN:  I'm sorry.  You're on what page,

105

1  Jim?  I'm not sure I see that.
2      THE WITNESS:  All of them.
3      MR. JONES:  All of them.  I think I'm
4  right.
5      I can put the question differently.
6  BY MR. JONES:
7   Q    There are zeros in the column that is
8  headed 271 to 365 days from billing; is that right?
9   A    Yes.
10  Q    So all the accounts in these aging groups
11 are, at least if this schedule is accurate, 270 days
12 old or younger; is that fair to say?
13      MR. RYAN:  Objection.
14  A    No.
15  Q    And how is it -- why is it unfair to say?
16  A    I don't know.
17      I don't know whether the 281 to 270 is
18 similar to Allegheny, where that includes anything
19 older than 281, or whether this is after they moved
20 from one system to the new system, meaning that this
21 new system was only in place for a period of 270 or
22 less.
23      And so I don't -- I can't comment on this.
24  Q    Those are both good points, and my question
25 is that it may be that the system move occasioned the

**118**

1    A    No, but I'm aware that they knew of certain
2  reserves.
3    Q    And how are you aware of that?
4    A    Through discussions, and/or sometimes when
5  we looked at their year-end adjustments in our closing
6  meeting, as we discussed, some of these items would
7  come up in topics of discussion.
8    Q    So the content or the -- the amounts of
9  given reserves would be discussed openly in meetings
10  with the auditors?
11    A    Right.
12         MR. RYAN:  Objection.
13  BY MR. JONES:
14    Q    Is that what typically occurred?
15         MR. RYAN:  Objection.
16    A    Right.
17    Q    And those meetings would have included
18  Mr. Buettner and Mr. Kirstein, at least?
19    A    Yes.
20    Q    Ms. Frazier, perhaps?
21    A    Perhaps.
22    Q    Do you recall the use of the word "analysis
23  of reserves, or "schedule of reserves" coming up
24  during those meetings?
25    A    No.

**119**

1    Q    But like Mr. McConnell, it is your
2  testimony that the Coopers & Lybrand auditing
3  personnel had knowledge of the general content of
4  some, if not all, of these reserves during those
5  meetings?
6         MR. RYAN:  Objection.
7    A    I would say of some.
8         I can't say of all.
9    Q    And that would have happened in each of the
10  audit years, '95, '96, '97, during those audits?
11    A    Yes.
12    Q    Do you remember any in particular coming up
13  in any of those years that were discussed with -- in
14  those meetings with auditors?
15    A    No, but I know that every year, there
16  generally was some discussion relative to reserves in
17  the CRA accounts.
18         So CRA reserves would have been a routine
19  item of discussion.
20    Q    That was a recurring reserve on the table?
21    A    Yes.
22    Q    If Coopers & Lybrand had asked for a copy
23  of any of these analyses of reserves, or anybody from
24  Coopers & Lybrand had made such a request, would you
25  have given it to them?

**120**

1    A    I can't say.  I don't know.
2    Q    Question never came up?
3    A    No.
4    Q    Did anybody tell you not to give it to
5  them?
6    A    No.
7    Q    And you never refused them any other data?
8    A    No.
9    Q    Is that right?
10    A    Correct.
11    Q    I'm going to ask you to turn to page -- to
12  the last page of the analysis.  It's headed "Potential
13  Adjustments."
14    A    Yes.
15    Q    And I'm going to ask you to look down in
16  the lower right-hand corner of the document -- well,
17  before you do that, the "Potential Adjustments," is
18  this a page that often occurred, or often was attached
19  to analyses of reserves?
20    A    I don't know that it was often, but it --
21  it wasn't so infrequent that it was rare.
22         In other words, it did happen.
23    Q    And this -- this potential -- this last
24  page also had potential expense items.
25         Is this the exposure kinds of items you

**121**

1  were referring to earlier?
2    A    Yes, yes.
3    Q    I note that one of these potential
4  exposures or expense items parenthetically is
5  $25,000 -- I'm sorry, is that -- are those in
6  thousands or --
7    A    Thousands.
8    Q    So it would be $25 million --
9    A    Correct.
10    Q    -- entry that occurs in the lower
11  right-hand corner for uncollectible PATCOM accounts.
12         Do you see that?
13    A    I do.
14    Q    Do you recall any discussion of that?
15    A    I don't.
16         I assume it relates to the moving from the
17  old patient accounting system to the new one.
18         A lot of times when you do that, do a
19  conversion like that, at some point you abandon the
20  old system and don't pursue collection, and everything
21  in it becomes uncollectible just because of the cost
22  to maintain two systems and two sets of collection
23  efforts, and so forth.
24         So that may -- may have been an estimate of
25  that.

122

1    Q    Do you recall this PATCOM $25 million
2    exposure or anything approximating that coming up in
3    the wrap-up meeting for the audit at year-end fiscal
4    year 1996?
5    A    Again, I know there was an issue that came
6    up, but David McConnell asked to have the details to
7    hold a discussion that was related to the Delaware
8    Valley receivables.
9        It may very well have been this.
10       The meeting was convened at another time
11   with Coopers & Lybrand, David McConnell, and I don't
12   know whether Steve or Dan were there, where it was
13   further discussed.
14   Q    An item like $25 million would have been a
15   large item that would have been on the order of
16   largeness that you referred to earlier in your
17   testimony today?
18   A    Yes, absolutely.
19   Q    Do you ever recall hearing, again with
20   respect to Delaware Valley and its bad debt reserve
21   calculations, that MCPH/EPPI, that hospital was only
22   reserving on self-pay, on the self-pay portion of
23   insurance receivables, or on the self-pay portion of
24   insurance receivables?
25   A    I don't specifically remember that.

124

1        Am I right?
2    A    Yes.
3    Q    And the heading on the face page, of which
4    appears to be generated by the Coopers & Lybrand work
5    paper system, says "MCPH East Falls Inpatient Bad Debt
6    Analysis 6/30/96 Using HUH Methodology"; is that
7    right?
8    A    Yes.
9    Q    And "HUH" refers to the Hahnemann
10   University Hospital?
11   A    Right.
12   Q    And that's another DVOG hospital?
13   A    Correct.
14   Q    Do you recall learning that Coopers
15   performed an analysis of MCPH's bad debt reserves
16   using the HUH methodology?
17   A    No.
18       MR. RYAN:  Objection.
19   BY MR. JONES:
20   Q    And you don't recall, then, any discussions
21   with anyone on that topic?
22   A    No.
23       MR. JONES:  As it's about time for a break,
24   let's take one.
25       THE VIDEOGRAPHER:  We're off the record.

123

1        I may have.
2        To me, the Delaware Valley, I would often
3    hear conversations relative to it.
4        Since they didn't concern me, I didn't
5    necessarily pay -- pay attention to it.
6    Q    Given your experience, if that was the only
7    reserve that was being used at that hospital, you
8    think that would be an appropriate way to calculate
9    the appropriate reserve?
10       MR. RYAN:  Objection.
11   A    No.
12   Q    And why is that?
13   A    Because obviously you have other payors, or
14   I believe they had other payors, and I would have to
15   think that you're not going to collect a hundred
16   percent of every other payor.
17       So in my mind, some reserve for the other
18   payors other than self-pay would have been required.
19   Q    And, in fact, every other hospital with
20   which you had familiarity in the AHERF system had such
21   reserves for other payors?
22   A    I believe so.
23   Q    Mr. Adamczak, I've handed you now a series
24   of schedules under the Bates -- under the Deposition
25   Exhibit No. 1075.

125

1        The time is 11:56 a.m.
2        - - -
3        (Thereupon, from 11:56 a.m. to 12:58 p.m.,
4    a luncheon recess was taken.)
5        - - -

**126**

1    A-F-T-E-R-N-O-O-N  P-R-O-C-E-E-D-I-N-G-S
2        THE VIDEOGRAPHER:  Standby, please.
3        We are back on the record.  The time is
4    12:58 p.m.
5    BY MR. JONES:
6    Q    Mr. Adamczak, when we broke, we were
7    discussing accounts receivable issues related to the
8    fiscal year 1996 audit at AHERF, and my question to
9    you now is:  Heading into the audit year for 1996, for
10   fiscal year 1996, was there a particular area of focus
11   that you understood Coopers to be engaged in or
12   centered on in their audit?
13   A    Well, I know that they had identified
14   accounts receivable as a -- what they called a high
15   risk area, or something where they would spend more
16   attention than on some of the other areas.
17       And I believe they were to -- or, they had
18   mentioned that they were going to do more elaborate
19   testing in that area than they did the previous years,
20   and in our other areas.
21       So it was an area of their focus.
22   Q    And how is it that you came to learn of
23   that focus?
24   A    I thought it was discussed in the
25   preliminary planning meeting, and there may have even

**127**

1    been a request from David McConnell to them to take a
2    good, hard look at the receivables.
3    Q    And the preliminary planning meeting would
4    have involved who from Coopers?
5    A    Bill Buettner.
6        Mark Kirstein.
7        Possibly Amy Frazier.
8    Q    And you were involved?  You were at the
9    meeting yourself?
10   A    Yes.
11   Q    Okay.
12       And why was this to be a focus area,
13   accounts receivable?
14   A    I think one of the reasons was that you
15   had, you know, a multitude of hospitals, the disparity
16   in the bad debt reserve calculations, that kind of
17   thing, and just a little bit of an uneasy feeling.
18   Q    On the part of the auditors?
19   A    On the part of the auditors, and I think
20   management had a little bit of an uneasy feeling, too.
21   Q    And was the focus on A/R, or accounts
22   receivable, to be primarily centered on the eastern
23   hospitals, or was it both sides of the AHERF
24   organization?
25   A    I think it was primarily on the eastern

**128**

1    hospitals.
2        If I remember back then, there was an
3    initiative to consolidate the billing offices, meaning
4    that the Delaware Valley used to have one or several
5    billing offices.
6        Several may have been one for each
7    hospital, or one for two hospitals, but there were
8    more than one.
9        And there was an initiative to consolidate
10   the billing function into one office all out of
11   Pittsburgh.
12       And I think based on that consolidation,
13   there was a request from AHERF management, along with
14   an understanding from Coopers, of the need to do a
15   more stringent audit, since you were consolidating a
16   number of offices, to make sure nothing fell through
17   the cracks, or that there wasn't -- there weren't any
18   problems caused by the consolidation, or that were out
19   there that maybe now came to light as a result of the
20   consolidation.
21   Q    And did that consolidation involve all of
22   the patient financial services group personnel?
23   A    When you say that, I don't believe that the
24   people in the Delaware Valley relocated to Pittsburgh.
25       I think Pittsburgh hired new staff, in

**129**

1    essence, to replace the Delaware Valley staff that was
2    let go, in theory.
3    Q    I understand that.
4        So there was another challenge for accounts
5    receivable in that fiscal year of 1996, was new
6    personnel?
7    A    Correct.
8    Q    Was there a challenge posed by any change
9    in the payor environment, or the paying practices of
10   the payor environment in Philadelphia?
11   A    I believe there -- there constantly were
12   those types of challenges.
13       I seem to remember there being a couple big
14   issues.
15       I don't remember the specifics relative to
16   the Medicare or Medicare in the Delaware Valley at
17   that time.
18       And I think Blue Cross had slowed down
19   payments for some reason out there, also.
20   Q    Do you recall that finance department
21   personnel, including yourself, in this time period
22   leading up to the fiscal year 1996 audit, or around
23   that time, were informing Mr. McConnell of challenges
24   in the accounts receivable accounting and function in
25   the eastern hospital?

PAGE 138

138

1    Q    And as you sit here today, can you recall
2 whether it, in time, was performed before or after the
3 Coopers & Lybrand interim project that is evidenced in
4 Exhibit 1525?
5    A    I can't, but I thought it was after, but --
6 and I seem to remember Coopers & Lybrand also, I think
7 you would call it, increasing your scope, meaning
8 testing -- doing more detailed testing in the
9 receivables, and telling us they were going to.
10       In essence, if they generally picked a
11 sample of so many patients, to go back and track
12 through the records, and let's say that the normal
13 sample would be 25, I think they were going to
14 increase it and do 60 or 50, or something like that,
15 to give themselves some more comfort with the
16 receivables.
17    Q    And that was as a matter of the regular
18 audit in '96?
19    A    Yes.
20    Q    For fiscal year '96?
21    A    Yes.
22    Q    Mr. Adamczak, I'm handing you now what
23 we've marked in an earlier deposition as Exhibit 122.
24       Do you recognize that handwriting?
25    A    It looks to me to be that of Dan Cancelmi.

PAGE 139

139

1    Q    And have you ever seen this document
2 before?
3    A    I don't know that I ever remember seeing
4 this document, but I seem to have seen a calculation
5 like this in a memo that Dan may have done at some
6 later point.
7    Q    A typewritten memo?
8    A    Yes.
9    Q    Okay.
10       And the -- the document you have before you
11 as Exhibit 122 has a heading that says "Year End
12 A/R" -- then I'm having trouble reading it --
13 "Adjustment."
14       Do you see that?
15    A    Yes.
16    Q    It may be "Receivable Adjustment"?
17    A    Yeah. I can't make out that word, either.
18    Q    And at the base of the page, it looks like
19 it totals an adjustment of $17.5 million; is that
20 right?
21    A    That's correct.
22    Q    And it appears to apply to DVOG, Delaware
23 Valley Obligated Group hospitals; is that right?
24    A    Yes.
25    Q    In that the $17.5 million total adjustment

PAGE 140

140

1 is spread among several Delaware Valley Obligated
2 Group hospitals?
3    A    Yes.
4    Q    It may be "Reserve Adjustment" at the top
5 of the page.
6       Does that look more like it to you?
7    A    Yes.
8    Q    So the title of the document, if we are
9 reading the handwriting correctly, is "Year End A/R
10 Reserve Adjustment"?
11    A    That's what it appears to be, yeah.
12    Q    So it looks, from the handwritten schedule
13 to you, that -- that the A/R reserve has been adjusted
14 in the total figure of $17.5 million, in that it has
15 been increased by that amount; is that right?
16    A    I don't know that it looks like it -- it
17 shows an unadjusted reserve balance of 50 million, an
18 adjustment to come to final numbers, but I don't know
19 whether it was ever booked, not booked.
20       I don't even know which year. This is year
21 end, but I don't which year end.
22    Q    I understand.
23       I'm asking, the schedule itself, though,
24 shows, because the unadjusted balance is roughly
25 50 million, and the final reserve balance is roughly

PAGE 141

141

1 68 million, that the adjustment was positive, if it
2 was made?
3    A    Correct.
4       It was an increase to the unadjusted
5 balance.
6    Q    And it also seem to have at the lower half
7 of the schedule -- well, it doesn't seem to have, it
8 has a phrase that says, "Adjustments consist of the
9 following," and then it lists line items thereafter;
10 correct?
11    A    That's correct.
12    Q    What do you interpret these entries to
13 mean?
14    A    A detail -- a detail of the 17-5.
15       It may not necessarily agree to the 17-5
16 above it by hospital, but it's a way of coming up with
17 17-5.
18    Q    Does it look to you to be the source of the
19 17-5 adjustment dollars?
20    A    Yes.
21    Q    And it refers to specific accounts and
22 specific hospitals; does it? It does; doesn't it?
23    A    Correct.
24    Q    And those hospitals are Saint Chris CRA
25 amount, and HUH CRA amount, and East Falls property

142

1 plant and equipment reserve, and then a similar
2 reserve at the University Hospital and HUH, a
3 capitalized interest amount in both fiscal year '96
4 and '95; is that right?
5     MR. RYAN:  Objection.
6   A   That's correct.
7   Q   Are there any other line items?
8   A   No.
9   Q   Do you recall, Mr. Adamczak, that after
10 year end and in conjunction with Coopers' '96 -- audit
11 of the '96 fiscal year at AHERF, that there was an
12 increase in reserves -- made to reserves for bad debts
13 for various DVOG hospitals in this amount,
14 17.5 million?
15  A   I don't remember specifically.
16  Q   Do you remember that there was an increase,
17 and it was generally in this dollar amount range?
18  A   I received -- I remember seeing memos much
19 after the fact that led me to believe that that was
20 the case.
21  Q   Okay.
22      You weren't involved in making the entries,
23 yourself?
24  A   No.
25  Q   Did you discuss it with anyone at -- during

143

1 the audit year 1996?
2   A   No.
3       Again, I wouldn't have had responsibility
4 for the Delaware Valley.
5   Q   And you would not have been involved in the
6 decision whether or not to make the adjustment?
7   A   No.
8   Q   Do you know whether -- whose idea it was to
9 create capitalized interest reserves in this fiscal
10 year?
11     MR. RYAN:  Objection.
12  A   No.
13      I know there was an issue relative to
14 capitalized interest.
15  Q   What do you know about it?
16  A   That generally under accounting guidance,
17 if you have major construction initiatives, you can
18 take part of your interest expense and capitalize it
19 as part of the asset under the theory that it's a
20 capital cost, that it's part of the asset, and getting
21 the asset ready to use, and so forth.
22      And that in 1995 and 1996, there were some
23 major construction and progress projects, meaning
24 projects that spanned big lengths of time and that
25 qualified for the capitalized -- to have the interest

144

1 capitalized, and that interest was not capitalized, it
2 was, in fact, expensed, and that a decision was made
3 to go back and to capitalize that interest in 1996 or
4 1997.
5   Q   Do you know who made that decision?
6   A   Ultimately, it would have been
7 David McConnell, I assume.
8   Q   Do you know who was involved in making the
9 decision, or discussing it, and were you?
10  A   Steve Spargo most likely would have
11 discussed it with David McConnell.
12      Because I believe these are Allegheny
13 General items, this capitalized interest, I know
14 Allegheny General had this issue, and I assume that's
15 where these two numbers came from.
16      My staff would have prepared the analysis
17 to support the number.
18  Q   Do you know whether there was a similar
19 capitalized interest issue in any of the Delaware
20 Valley hospitals for either fiscal year '95, '96 or
21 '97?
22  A   I don't, and I believe the auditors --
23 well, I don't believe.
24      They were aware of this issue, and that we
25 did not capitalize it in the prior years, meaning '95

145

1 and prior, and that we should have.
2       I thought they had it included on their
3 adjustment listing in '95.
4   Q   Okay.
5       Let me ask you this since you're talking
6 about prior years:  Looking at the source of the
7 adjustments in the second half of the page of
8 Exhibit 122, if any of these amounts related to prior
9 year activity, would it have been appropriate to use
10 them in '96 as a source for the adjustment reflected
11 in the schedule?
12     MR. RYAN:  Objection.
13  A   It generally is never appropriate to use a
14 prior reserve for a current year item, unless that
15 reserve was established specifically for that item.
16  Q   And so if it -- it's fair to say, then, for
17 instance, the capitalized interest notation or line
18 item for fiscal year '95 may well have related to a
19 prior year and, therefore, been inappropriate for use
20 in '96?
21     MR. RYAN:  Objection.
22  A   Yes.
23      And generally it's not appropriate to use a
24 reserve from one hospital on another legal entity,
25 either.

PAGE 146

146

1  Q   If that what's this -- these two entries
2  reflect?
3  A   That's right.
4  Q   And, similarly, PPE can be an item that
5  relates the prior years, is that right, property plant
6  equipment?
7  A   It could.
8  Q   And same with the CRA reserve?
9  A   It may. It may not. I don't know the
10  history or the detail.
11  Q   And why is it inappropriate to move these
12  amounts from one accounting period to another, from
13  one fiscal year to another --
14      MR. RYAN: Objection.
15  BY MR. JONES:
16  Q   -- if it, in fact, were done?
17  A   Because it has the effect to, in theory,
18  smooth out earnings, or to not properly reflect the
19  operations of that entity within that year.
20      You take -- you take, in theory, a year
21  that has good results, and hold some of it back to use
22  in years that have not so good results, and present a
23  picture that's not reflective of the operations in
24  this period.
25  Q   And people reviewing the financial

PAGE 147

147

1  statements are there -- to that extent, not reviewing
2  the actual performance of the enterprise in the period
3  reflected?
4  A   Correct.
5  Q   And those could be board members, third
6  parties and others?
7      MR. RYAN: Objection.
8  A   Could be.
9      (Thereupon, Deposition Exhibit No. 1526 was
10      marked for identification.)
11  BY MR. JONES:
12  Q   Mr. Adamczak, I've just handed you what's
13  marked as Exhibit 1526.
14      Again, it appears to have been produced
15  from your files, at least by way of Bates number, and
16  it is a September 24, 1996 memo with the subject line,
17  "Delaware Valley Accounts Receivable Reserves"; is
18  that right?
19  A   That's correct.
20  Q   It appears to have been prepared by
21  Mr. Cancelmi and addressed to Mr. Spargo; is that
22  right?
23  A   That's correct.
24  Q   I'm going to give you a few moments to
25  refamiliarize yourself with this document.

PAGE 148

148

1      Do you recall receiving this memo around
2  the time that it appears to have been dated?
3  A   I don't.
4  Q   Okay.
5  A   I think I had -- had come to receive this
6  memo at some later date.
7  Q   And do you recall the circumstances of how
8  it is you came to receive it?
9  A   Yeah.
10      I think at some point the accounts
11  receivable write offs and so forth became an issue
12  before the bankruptcy around, and I asked for any
13  memos that Dan or others might have related to any of
14  the bad debt issues, and tried to, in my mind,
15  understand the history of what went on in Delaware
16  Valley, and I think that's when I came upon this.
17  Q   And do you recall that taking place before
18  or after bankruptcy was declared?
19  A   I don't remember specifically.
20  Q   Do you recall -- but you do --
21  A   If it was before, it was not far before.
22      So somewhere right in the time of the end
23  of the fiscal year of '97, and somewhere around April
24  through August or so of '97
25  Q   The memo discusses what Mr. Cancelmi calls

PAGE 149

149

1  aging categories that continue to deteriorate at the
2  Delaware Valley; is that right?
3  A   He does.
4  Q   And those are aging categories of
5  receivables; is that right?
6  A   That's correct.
7  Q   And he notes that -- and he believes it's
8  fair to state that there's a pool of old receivables
9  that we will not be able to collect.
10      Am I right?
11  A   That's what I read, yes.
12  Q   And then he represents a table of
13  information about proposed write offs using amounts
14  that were dated as of August 31st, 1996, and that
15  table appears on the second page of the exhibit; is
16  that right?
17  A   That's correct.
18  Q   And as a part of -- it looks to be
19  two halves of the table, he notes certain existing
20  reserves that could be used to cover the write offs?
21  A   Yeah.
22      I believe those are the bad debt reserves
23  that each Delaware Valley hospital had at that point
24  in time.
25  Q   And then there's some other reserves,

158

1    A    I think it's consistent with this memo that
2  we looked at.
3         I think it's all part of that type of a
4  discussion.
5    Q    Do you recall discussing -- I'm sorry.
6         So that would have been consistent with
7  your recollection that this transfer was discussed
8  with the auditors as -- in connection with their work
9  on the fiscal year '96 audit?
10        MR. RYAN:  Objection, misstates the prior
11   testimony and this document.
12   A    Yeah, I don't know that.
13   Q    Okay.  You don't whether it was discussed
14  with them or not?
15   A    That's correct.
16   Q    Whom do you recall discussing it with?
17   A    Steve Spargo through this memo.
18   Q    Anybody else?
19   A    No.
20   Q    You did, however, I think, testify that the
21  AGH capitalized interest reserve, and its potential
22  for use to cover bad debt write offs in the east, was
23  a part of schedules that related to the closing of the
24  fiscal year audit work?
25   A    Yes.

159

1         I thought I had seen it on the
2  Coopers & Lybrand year-end adjustment list as a
3  reserve.
4         I don't know where they used it to offset,
5  whether they offset bad debt shortfalls on the
6  Delaware Valley, or other adjustments that they had
7  proposed.
8    Q    Okay.
9         So its establishment, the fact of its
10  existence, you recall the auditors knowing about?
11   A    I believe so.
12   Q    What happened to it you don't remember
13  discussing with the auditors?
14   A    Right, or how they used it to offset other
15  adjustments, or how they concluded on it, I wasn't
16  aware.
17   Q    Okay.
18        I'm going to hand you now what we marked as
19  Exhibit 143 at some prior time, and I think you will
20  tell me that it's a memo from you with your initials,
21  or at least your first name written on it, to
22  Jack Nelson, dated February 13, 1997?
23   A    That's correct.
24   Q    And that's your handwriting?
25   A    The signature?

160

1    Q    Yes.
2    A    Yes.
3    Q    Is any of the other handwriting yours?
4    A    No.
5    Q    And the memo, in its first sentence, says
6  that, "Steve Spargo has asked that 7.1 million of AGH
7  reserves be transferred to the Delaware Valley in our
8  January close," and then it gives some entries to
9  accomplish that.
10        Am I right?
11   A    Yes.
12        I think it's consistent with the previous
13  memo we looked at.
14   Q    And, in fact, at this point, the memo
15  reflects that the $7.1 million figure is, as you put
16  it, housed in a CRA Medicare fiscal year '96 account?
17   A    Correct.
18   Q    Okay.
19        And do you know whether the transfer was
20  ever effected?  E-f-f-e-c-t-e-d.
21   A    I believe that if it was, it was reversed
22  very quickly.
23        I don't remember whether there was an
24  actual entry made, and I don't know what this -- the
25  word next to my name that's handwritten says.

161

1    Q    It could say "reversed"?
2    A    Yeah, it could, and that's -- that could
3  tell me that it was booked and then reversed, but I
4  know if it was booked and reversed, it happened very
5  quickly.
6    Q    And why do you know that?
7    A    Because I remember Steve giving me and
8  discussing this memo with me, asking that the entry be
9  made.
10        I would have cord -- coordinated the entry
11  from the Allegheny General side, which is what you see
12  here.
13        Dan Cancelmi would have booked a
14  corresponding entry on the Delaware Valley hospitals.
15        And then I remember Steve fairly quickly,
16  in a day or two, a couple days, coming back and saying
17  that David McConnell changed his mind and does not
18  want that money from the west to the east.
19   Q    Do you know who was involved in that
20  decision to either reverse the transfer, or stop it
21  before it was made?
22   A    I assume David McConnell and Steve Spargo.
23   Q    Do you know if Coopers was involved, or
24  anyone from Coopers?
25   A    I don't know that.

PAGE 162

162

1        MR. JONES: Let's take a quick break here.
2        THE VIDEOGRAPHER: This concludes tape two
3    of the deposition of Mr. Adamczak. We're off
4    the record. The time is 1:42 p.m.
5        (Recess taken.)
6        THE VIDEOGRAPHER: Standby, please.
7        This begins tape three of the deposition of
8    Mr. Albert Adamczak. We are back on the record.
9    The time is 1:48 p.m.
10   BY MR. JONES:
11   Q    Mr. Adamczak, at the outset of your
12   deposition then, or recently just before our break, we
13   talked about the wrap-up or closing meeting for the
14   '96 audit work done by Coopers & Lybrand.
15       You believe that to have taken place in
16   roughly the August 1996 time frame?
17   A    Yes.
18   Q    And you were in attendance.
19       Do you recall who else was in attendance?
20   A    I believe David McConnell, Joe Dionisio,
21   Steve Spargo, myself, Dan Cancelmi, Bill Buettner,
22   Mark Kirstein, and I don't know whether Amy Frazier
23   was there or not, but she very well may have been.
24   Q    Okay.
25       Where do you think -- believe that that

PAGE 163

163

1    meeting was held?
2    A    David McConnell's office.
3    Q    Does he have a big conference table?
4    A    Yes.
5    Q    What are closing meetings generally about?
6    A    It's generally a chance for
7    Pricewaterhouse -- or, PricewaterhouseCoopers to
8    highlight any significant items from their audit, how
9    the audit went, did it go smoothly, were there
10   problems that they encountered, to review the
11   management letter comments, at least the significant
12   ones, with David McConnell, to review the significant
13   adjustments that they might have found, or even the
14   insignificant ones that they thought needed to be
15   discussed, to comment on how, we as a finance group,
16   performed during the audit, i.e., did our records seem
17   to be in shape, did it seem like we generally had an
18   organized approach to our bookkeeping, that kinds of
19   thing.
20       To kind of give the top finance guy from
21   AHERF an overview of their process, their findings,
22   and the state of what they thought the finance shop
23   was in.
24   Q    You mentioned that one topic of
25   conversation in the fiscal year '96 wrap-up or closing

PAGE 164

164

1    meeting was what I think you termed as a Delaware
2    Valley bad debt reserve shortfall that was large, and
3    that there was a -- you think a separate meeting after
4    the wrap-up meeting held between Mr. McConnell and at
5    least Mr. Buettner; is that right?
6    A    What I remember was that there was some
7    issue brought up by Coopers & Lybrand relative to the
8    adequacy of the bad debt reserve on the Delaware
9    Valley, and that their feeling was that it might not
10   be adequate.
11       I don't remember the numbers as to how
12   significant it was or wasn't.
13       But based on the fact that it came up for
14   discussion tells me it was at least of some
15   significance, that they thought it important enough to
16   bring it up as a topic of discussion.
17       And David McConnell asked them and
18   Dan Cancelmi and Steve if they had any supporting
19   documentation that he could look at and see what kind
20   of numbers they were talking about it, and where these
21   conclusions and -- may have come from.
22       And no one had any supportive stuff with
23   them at the meeting.
24       So he asked if -- if basically he and Bill
25   and Steve, if needed, could get together outside of

PAGE 165

165

1    that meeting in another meeting in the next day or two
2    to continue the discussion on that one issue.
3    Q    And that was a meeting that you did not
4    attend?
5    A    That's correct.
6    Q    Did you provide any information for that
7    meeting?
8    A    No.
9        The Delaware Valley accounting group
10   would.
11       The only feedback that I ever received or
12   heard relative to that meeting was that there was a
13   decision made to write some number off, which I assume
14   was the inadequacy of that reserve over some ensuing
15   years, over the next couple -- two or three years, to
16   get it back into line.
17   Q    Do you recall other topics of discussion or
18   concern that Coopers & Lybrand raised in that '96
19   closing meeting?
20   A    I don't.
21   Q    I'm going hand to you now, Mr. Adamczak,
22   what has been marked in a prior deposition as
23   Exhibit 1063.
24       It's, I believe, produced from the files of
25   Coopers & Lybrand, and bears the Bates label on the

**166**

1 first page of CL14754, and concludes with page 147613.
2     It also has on the first page the initials
3 "RJC" and the word "Notes"; is that right?
4     A   Yes.
5     Q   I'm going to ask you to flip to Bates
6 page CL147599, and the heading on that page is
7 "10/14/98 Al Adamczak"; is that right?
8     A   It is.
9     Q   And it's a handwritten set of notes; is
10 that right?
11    A   Yes.
12    Q   Do you recall, in the October '98 time
13 period, being interviewed from anyone at either
14 Coopers & Lybrand, or what may have been then
15 PricewaterhouseCoopers, about the fiscal year '96
16 audit?
17    A   I remember being interviewed by a guy for a
18 very short period of time.
19    Q   Do you recall his name to have been
20 Robert Cepielik?
21    A   I don't -- that could have very well have
22 been.
23        I know he was not involved in the audit,
24 and I didn't get the impression he was from their
25 legal office.

**167**

1     Q   But you had the impression that he was from
2 either Coopers & Lybrand or PricewaterhouseCoopers?
3     A   I had that knowledge, yeah.
4     Q   As he identified himself --
5     A   Correct.
6     Q   -- in that way?
7         Is that "yes"?
8     A   Yes.
9     Q   I'm going to ask you roughly, how long do
10 you think you spoke with the gentleman?
11    A   I'd say no more than two hours, but I think
12 it was less than that.
13    Q   And do you remember him taking notes of the
14 conversation?
15    A   Yes.
16    Q   And do you recall where the interview took
17 place?
18    A   In my office.
19    Q   Did he ask -- did he tell you why he was
20 interviewing you?
21    A   I don't remember specifically.
22        He may have said at the request of the
23 board or of PW -- something with the board.
24    Q   And you told him everything you could
25 about -- in answer to his questions to the best of

**168**

1 your ability at the time?
2     A   At that time.
3     Q   And to the best of your recollection at
4 that time?
5     A   Uh-huh, yes.
6     Q   You didn't hold anything back from the
7 interview?
8     A   No.
9     Q   I'm going to ask you to take a look at the
10 notes, and in particular, given our most recent set of
11 questions, what I look -- what looks to be the
12 second paragraph, in which it says, I think,
13 "Indicated a decision was made at the closing meeting
14 that '96 A/R reserve was 30 million under reserved,
15 and to take it in over three years," period.  "Done at
16 closing meeting," comma, "all hands including C&L."
17        Do you see that?
18    A   Yes.
19    Q   Does that, as you sit here today, refresh
20 your recollection about the closing meeting and the
21 discussion of the '96 A/R reserve at -- in the
22 Delaware Valley?
23    A   I think that's consistent with what we've
24 talked about.
25        It fills in that it may have been as much

**169**

1 as 30 million, and that I think it was talked about
2 taking it in over three years, and that McConnell
3 again asked for the detail to better understand where
4 this number came from.
5     Q   And does that -- does the note, at least
6 the part we've just read, fairly characterize your
7 statement to Mr. Cepielik or the
8 PricewaterhouseCoopers representative at the time?
9     A   Yeah.
10        Although, I clarify that where it says the
11 reserve was 30 million under reserve, that I don't
12 know that a definitive -- that everybody necessarily
13 said, "Hey, it's 30 million."
14        I think it was, "It could be as much as
15 30 million."
16    Q   That was a range that was used?
17    A   Yeah, I think that --
18        MR. RYAN:  Objection.
19    A   I think that's why the subsequent meeting
20 was to be held, to better look at the details, and
21 determine what they thought the real amount was.
22    Q   Is it -- did you have any reason to suspect
23 at the time or since that Mr. Cepielik mistranscribed
24 your comments during his interview?
25    A   I had no reason to believe that, no.

262

1  Q  Do you recall -- strike that.
2     Do you recall whether the flagpole language
3 was yours in your talk with the fellow from
4 PricewaterhouseCoopers in October '98?
5  A  I don't remember.
6  Q  Is that a phrase you used?
7  A  Periodically.
8  Q  But if you had used it, it would have
9 referred to what or whom?
10  A  In discussion with Bill Buettner.
11  Q  We've already shown you today,
12 Mr. Adamczak, Exhibit 1 -- No. 154, and I'm going to
13 ask you to turn back to it for a minute.
14  Q  154?
15  Q  Yes.
16     It's a May 22nd, 1997 memo to -- from
17 Mr. Cancelmi to distribution. It had the restruct --
18 "Graduate System Restructure Reserves" as its final
19 page.
20  A  Okay.
21  Q  I'm going to ask you to skip to the
22 second page of the document, Mr. Adamczak.
23     At the top, it refers to the recording of
24 certain reserves at the Graduate hospitals as part of
25 purchase price allocation, and then underlines a

263

1 phrase which reads, "which are not reflected on the
2 income statement."
3     Do you see that?
4  A  I do.
5  Q  And then it says, "Rather," comma, "these
6 reserves have been capitalized on the balance sheet as
7 an intangible asset which will be amortized over
8 35 years."
9     Do you see that?
10  A  I do.
11  Q  "This accounting treatment," it continues,
12 "has been discussed with Coopers & Lybrand who agrees
13 with this approach as these reserves are viewed as
14 unrecorded preacquisition contingencies."
15     Did I read that right, as well?
16  A  You did.
17  Q  And you are noted at the distribution line
18 at the bottom of the page?
19  A  I am.
20  Q  I think, then, the table that follows the
21 text I just read has a row that lists "Delaware Valley
22 hospital bad debt reserves," and amounts of the
23 50 million -- that total 50 million that would be
24 accrued there.
25     Do you see that?

264

1  A  I do.
2  Q  So does it refresh your recollection now
3 that it was most likely in May of 1997 that you heard
4 about approval of the $50 million Graduate reserve
5 transfer by Coopers & Lybrand for the first time?
6  A  Yes, yes.
7     MR. RYAN:  Objection, misstates the
8     document.
9 BY MR. JONES:
10  Q  Did you ever discuss with Dan Cancelmi or
11 anybody else on what basis he included the statement
12 in this memo about the accounting treatment having
13 been discussed with Coopers & Lybrand who agreed with
14 the approach?
15  A  I did not.
16  Q  Did you ever talk with Dan or Steve or
17 Mr. McConnell at any time about any approval from
18 Coopers & Lybrand for the $50 million Graduate
19 transfer?
20  A  We talked about $99 million being the total
21 reserve.
22     After this 50 million was moved, subsequent
23 analysis that Dan Cancelmi prepared showed that there
24 was another shortage of some 20 million -- 20 plus
25 million dollars.

265

1     And at that point, I took it to
2 David McConnell and said, "There's still a shortage of
3 $20 million."
4     And his comment was that, "We had discussed
5 cleaning this up once and for all with" -- not "we,"
6 that he had discussed with Coopers once and for all
7 cleaning this up.
8     They were aware of it, they had approved
9 the $50 million being moved, and that they would be
10 fine with moving additional reserves to get the bad
11 debt reserves where it needed to be.
12     In other words, "There's an issue, we're
13 going to clean it up, and we're going to do what needs
14 to be done to get it cleaned up by the end of this
15 year."
16  Q  And the "this year" in that sentence was
17 fiscal year '97?
18  A  Correct.
19  Q  Did that -- do you recall approximately at
20 what point in time you had that conversation with
21 Mr. McConnell?
22  A  I don't remember specifically, but I know
23 it was after Steve left. So it would have been after
24 May 30th.
25  Q  Was it after year end?

PAGE 266

266

1    A    I think it was when we were doing the May
2  financial statements, because then again when June
3  rolled around, we were another 20 short that no one
4  suspected, because it -- because the direction had
5  been given to the patient accounting people to clean
6  up their patient records.
7        So no one really knew what the magnitude of
8  the final write off was going to be.
9        They thought it was 50. Then in May, it
10 ended up 20 short. So they thought it was 70, and
11 more clean up occurred.
12       As you remember, I told you the patient
13 accounting records, there's a great volume.
14       So until they're cleaned up, no one knew
15 what the final outcome was going to be, and they
16 couldn't clean it up immediately. It took time.
17       So as of May, it was 21 additionally short,
18 and then in June, it became another 20 some million
19 additionally short, and that's when I went back to
20 David McConnell again, and he said, "Talk to Dan and
21 see whether there are any more reserves on the
22 Graduate hospitals or elsewhere to cover that 28,
23 because we are to clean it up by the end of the year."
24       Dan identified additional reserves for that
25 20 plus million and the reserves.

PAGE 267

267

1        David approved it, and the write off
2  occurred.
3    Q    And that last slug was the 28 million that
4  is referred to in the August 21, 1998 memo?
5    A    Yes.
6        It comes to 99 point --
7    Q    The last piece --
8    A    -- 565 million.
9    Q    The last piece of the 99 million total?
10   A    That's correct.
11   Q    So you had two subsequent conversations
12 with Mr. McConnell?
13   A    That's correct.
14   Q    And in the second one, was
15 Coopers & Lybrand's review or approval of the ongoing
16 transfer subject brought up again?
17       MR. RYAN: Objection.
18   A    Yes.
19       Although, he -- I don't know that he went
20 to them specifically and said, "I'm going to write 21,
21 I'm going to write 28."
22       It was more like, "This issue was discussed
23 with Coopers. They know we're cleaning it up. They
24 know we're moving reserves to clean it up. They'll be
25 okay with it."

PAGE 268

268

1    Q    And your direction from him was to take
2  it -- get rid of it this year?
3    A    Correct.
4    Q    Mr. Adamczak, we are handing you now what
5  has been marked as Exhibit 8 early on in the
6  deposition proceedings in this case apparently, which
7  is a memo dated April 14, 1997, apparently shortly
8  after your Tambellini's lunch, to Mr. Spargo from
9  Mr. Cancelmi, with a heading "Restructuring Charges
10 Earmarked for Bad Debt Reserves."
11       Have I described the memo accurately?
12       MR. RYAN: Objection.
13   A    You have.
14       MR. JONES: What's the basis for that
15 objection?
16       MR. RYAN: That there's any connection
17 between this memo and the Tambellini's lunch.
18 It's the inference that you were packing into
19 that.
20       MR. JONES: I think -- I was only
21 indicating a time relationship.
22 BY MR. JONES:
23   Q    But in any event, you are copied on the
24 memo; is that right, sir?
25   A    That's true.

PAGE 269

269

1    Q    In the first sentence, it says, "In an
2  effort to alleviate the Delaware Valley patient
3  accounts receivable estimated bad debt reserve
4  shortfall, a decision has recently been made to record
5  approximately 50 million of restructuring reserves on
6  the various Graduate Hospitals."
7        Did I read the first sentence right?
8    A    I believe so.
9    Q    And so if -- if this memo was received by
10 you on or after April 14, 1997, you were aware that
11 the transfer was to go through, whether or not having
12 been approved by Coopers, at least by April 14, 1997;
13 is that right?
14   A    Correct.
15   Q    Does this refresh your recollection, this
16 first sentence, that the reserves were actually
17 recorded in the first instance for the purposes of
18 alleviating the bad debt reserve shortfall at DVOG?
19   A    It appears that's why they were recorded,
20 yes.
21       I think the -- the one memo we looked at,
22 No. 154, dated May 22nd, identifies on the second page
23 accruals for the existing AHERF Delaware Valley
24 hospital bad debt reserves of 50 million.
25   Q    Does the language also indicate to you, and

**270**

1  did you so read it at the time, that the reserves were
2  not yet booked at Graduate, if you go back to the
3  first sentence of the April 14 memo?
4      A    It appears that to be the case, that they
5  were not reserved -- were not recorded, or are being
6  recorded as a part of this initiative.
7      Q    Either they were not yet recorded, or were
8  recorded contemporaneous with the memo?
9      A    Correct.
10     Q    The second sentence of the memo says, "In
11 turn," comma, "these reserves will be transferred over
12 to AHERF Delaware Valley hospitals via intercompany
13 account transfers, which will serve to increase the
14 hospitals' bad debt reserve balances."
15         Is that right?
16     A    That's correct.
17     Q    And that was consistent with what you
18 understood was the proposal raised at the Tambellini's
19 lunch in your presence?
20     A    The only -- yes, but only thing that I was
21 not sure of at the Tambellini's lunch is whether
22 reserves would be created and moved, or whether they
23 would be existing reserves that would be moved.
24         But the concept of moving the reserves from
25 Graduate to Delaware Valley is consistent.

**271**

1      Q    In here, it's made clear to you that it was
2  creation, as well?
3      A    Yes.
4      Q    Who would have actually ultimately recorded
5  the reserves; do you know?
6      A    The accounting staff for the Delaware
7  Valley.
8      Q    And who would have done the entries to
9  accomplish the transfer?
10     A    The accounting staffs for the Delaware
11 Valley hospitals.
12     Q    And you would not have been involved?
13     A    In the actual writing of journal entries
14 and putting them into the system?
15     Q    Or approving them.
16     A    No.
17     Q    You would not have?
18     A    I think this memo would have done it.
19         I may have -- I don't think I did in this
20 instance, but I may have authored a memo consistent
21 with this to the accounting staff that said, "Based on
22 this memo, record these entries."
23     Q    You just don't recall doing it?
24     A    Not on this issue, no.
25     Q    Do you know if Coopers ever received a copy

**272**

1  of this memo, Exhibit 8?
2      A    I do not.
3      Q    If they would have asked you for it, would
4  you have given it to them?
5      A    I assume so, but I don't know for sure.
6      Q    Would you have -- pardon my stuttering.
7          Did you ever receive any instruction not to
8  give this memo to anyone?
9      A    I did not.
10     Q    Did you ever give such an instruction?
11     A    I did not.
12     Q    I'm handing you or passing now,
13 Mr. Adamczak, what we've marked as Exhibit 203, and
14 it's a memo from you to Nick Vidovich dated April 17,
15 1997, three days later.
16         Is that right?
17     A    That's correct.
18     Q    And in it, you write under the subject
19 line, "Restructuring Reserves," "Fifty million of
20 reserves will be recorded on the Graduate Hospitals
21 and subsequently moved to DV hospitals via AHERF as
22 follows."
23         It, again, speaks of the recording process
24 to be in the future; is that right?
25     A    Correct.

**273**

1      Q    And "DV" refers to Delaware Valley?
2      A    That's correct.
3      Q    And these, in fact, the entries that are
4  noted below that phrase, are, in fact, the way the
5  accounting treatment worked with AHERF as the
6  intermediary in the transaction; is that right?
7      A    Yes and no.
8          AHERF, the parent company, was not really
9  the intermediary, other than the fact that all banking
10 was settled through the parent company.
11         You only had a payable or receivable to the
12 parent, not to any other entity.
13     Q    You didn't have a direct payable or
14 receivable to sister enterprises?
15     A    Correct.
16         It was either a payable or a receivable
17 position with the parent company.
18         As a result of moving these reserves from
19 one hospital to another, there had to be a
20 corresponding entry on this parent relative to that
21 receivable or payable position.
22     Q    And this -- these entries accomplished the
23 task --
24     A    Correct.
25     Q    -- for the reserve transfers?

**PAGE 274**

274

1  A   That's correct.
2  Q   For the first 50 million anyway?
3  A   Yes.
4  Q   50 million, was that a significant sum in
5  magnitude?
6  A   I believe so.
7  Q   And was it significant enough that this --
8  you believe that this kind of transfer would have been
9  discussed with the auditors?
10  A   I would believe --
11  MR. RYAN:  Objection.
12  A   I would believe it was, and I would also
13  believe that they would have seen it in their auditing
14  work, and should have asked about it.
15  Q   Were you generally proactive in your
16  discussions with Coopers & Lybrand's about
17  transaction -- Coopers & Lybrand about transactions or
18  entries of this magnitude?
19  A   I don't know if we were or weren't, to be
20  honest.
21  Q   I believe you testified and used the word
22  "proactive" before when it came to recording something
23  like these kinds of transactions.
24      Do you have a reason to think otherwise
25  now?

**PAGE 275**

275

1  A   No, no.
2      And based on, you know, my recollection of
3  Dan bringing it up at the restaurant, and his memos,
4  where he says Coopers & Lybrand approved it, I have no
5  reason to believe that it wasn't discussed with them
6  proactively.
7  Q   And my question is:  With items of this
8  magnitude, 50 million -- in the $50 million range,
9  were you proactive in discussing generally these
10  matters with Coopers & Lybrand to avoid reversals
11  later?
12  A   Generally, yes.
13  MR. JONES:  Let's take a quick break here.
14  THE VIDEOGRAPHER:  We're off the record.
15  The time is 4:47 p.m.
16  (Recess taken.)
17  THE VIDEOGRAPHER:  Standby, please.
18  We're back on the record.  The time is
19  4:49 p.m.
20  BY MR. JONES:
21  Q   I'm going to ask you to flip back to
22  Exhibit 154.
23      It looks like, based on the language we
24  read on the second page of this exhibit together,
25  Mr. Adamczak, that at some point a decision was made

**PAGE 276**

276

1  to create the $50 million worth of reserves through
2  purchase accounting and not the restructuring costs.
3      Is that consistent with your recollection?
4  A   Yes.
5  Q   And do you know why that decision was made?
6  A   To record it as a purchase price versus an
7  income item?
8  Q   A restructuring income item.
9  A   No.
10  Q   Do you know who was involved?
11  A   No.
12      Although, it says that it was discussed
13  with Coopers & Lybrand.
14      I was told at one point that they had
15  suggested it.
16  Q   Did Mr. Cancelmi and you ever discuss this?
17  A   Dan had mentioned to me that
18  Coopers & Lybrand -- that this is the issue where I
19  think I had mentioned that I thought originally this
20  might have been booked as an expense, and then moved
21  to the balance sheet as goodwill.
22  Q   I understand.
23  A   Or part of that issue, that certain items
24  were originally shown as restructuring and later
25  reclassified to goodwill.

**PAGE 277**

277

1  Q   So when you say that -- was it Dan that
2  told you that Coopers was involved in changing the
3  initial treatment from restructuring cost charges to
4  the income statement, to a balance sheet item in
5  purchase price accounting?
6  A   Yes, that they were involved in that
7  suggestion or decision.
8  Q   Okay.
9      And do you recall roughly when he told you
10  that?
11  A   No.
12  Q   Do you recall the context of the meeting,
13  or the conversation?
14  A   Yeah.
15      I had asked him -- again, I had seen
16  financial statements for one month that had
17  restructuring expenses of a certain number, and then I
18  got the next month Delaware Valley statements, and
19  their restructuring number was much smaller on the
20  balance sheet increase.
21      So there was an adjustment to the prior
22  period, and I had asked Dan why that occurred.
23      And he told me that there was a discussion
24  with Coopers, and they suggested that certain of those
25  expenses should be shown as goodwill instead of as a

SHEET 1  PAGE 1

734

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                    - - -

4   THE OFFICIAL COMMITTEE OF UNSECURED )
    CREDITORS OF ALLEGHENY HEALTH,      )
5   EDUCATION and RESEARCH FOUNDATION,  )
                                        )
6            Plaintiff,                 )
                                        )
7        vs.                            ) No. 00-684
                                        )
8   PRICEWATERHOUSECOOPERS, LLP,        )
                                        )
9            Defendant.                 )

10                   - - -

11   Continued videotape deposition of ALBERT ADAMCZAK

12              Friday, June 27, 2003

13                  Volume IV

14                   - - -

15       The continued videotape deposition of ALBERT
     ADAMCZAK, previously called as a witness by the
16   plaintiff, pursuant to notice and the Federal Rules of
     Civil Procedure pertaining to the taking of
17   depositions, taken before me, the undersigned,
     Lance E. Hannaford, a Notary Public in and for the
18   Commonwealth of Pennsylvania, at the offices of Jones,
     Day, Reavis & Pogue, 31st Floor, One Mellon Bank
19   Center, Pittsburgh, Pennsylvania  15219, commencing at
     8:09 o'clock a.m., the day and date above set forth.

20                   - - -

21        COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
22           PITTSBURGH, PENNSYLVANIA
                 412-281-0189
23                   - - -

24

25

PAGE 90

823

1 And I think generally they reviewed them
2 with David McConnell.
3 And upon their determination, they were
4 satisfied with the presentation and had no other items
5 of adjustment or items to be analyzed to determine
6 whether additional adjustments were made.
7 They would give their approval or determine
8 the adjustments that they wanted booked.
9 This appears to be the draft that was sent
10 to Joe Dionisio at the start of that process or once
11 we had preliminary numbers for the month for Allegheny
12 General Hospital for April 30th, 1996.
13 Q And on the second page of the exhibit,
14 again, there is a reference to the 40 million dollars
15 that is expected to be repaid upon completion of the
16 DVR bond refinancing?
17 A Correct.
18 Q And then the next sentence states,
19 "Additionally, 32 million dollars is reflected as a
20 receivable from affiliates."
21 A Yes.
22 Q Let me mark, please, as Exhibit 1618 a
23 document with Bates Nos. DBRAA88004 through 88025.
24 (Thereupon, Exhibit No. 1618 was marked for
25 identification.)

PAGE 91

824

1 Q Is Exhibit 1618 a copy of the Allegheny
2 General Hospital internal unaudited financial
3 statements for April 1996?
4 A Appears to be.
5 Q And if you look at the balance sheet on
6 Bates page 88008, do you see a receivable from
7 affiliates in the amount of 31,930,000 dollars?
8 A I do.
9 Q That would then appear to be the same thing
10 as the -- as what Mr. Nelson in Exhibit 1617 referred
11 to as 32 million dollars?
12 A That's correct.
13 Q If I could call your attention to one other
14 item on the balance sheet here, do you see a payable
15 to affiliates in the amount of 9,400,000 dollars?
16 A I do.
17 Q So that as of April 30th, 1996, the net
18 receivable or payable status for AGH would be the
19 31,930,000 dollars less the 9,400,000 dollars?
20 A Correct.
21 Q And they are each shown here separately
22 because at that time one was classified as current,
23 the other as noncurrent.
24 Right?
25 A Correct.

PAGE 92

825

1 Q Let me mark, please, as Exhibit 1619 a
2 document with Bates Nos. DBRAA87994 through 97.
3 (Thereupon, Exhibit No. 1619 was marked for
4 identification.)
5 Q Is Exhibit 1619 a copy of the financial
6 statement highlights for Allegheny General Hospital
7 for May 1996?
8 A Correct.
9 Q Again, there is a reference to the 40
10 million dollars expected to be repaid upon completion
11 of the DVR bond refinancing?
12 A Yes.
13 Q Then it states additionally, 27 million
14 dollars is reflected as a receivable from affiliates?
15 A Correct.
16 Q Let me mark please exhibit -- let me hand
17 you what has previously been marked Exhibit 602.
18 Is Exhibit 602 a copy of the internal
19 unaudited Allegheny General Hospital financial
20 statements for May 1996?
21 A I believe so.
22 Q Turn, please, to the balance sheet that
23 bears Bates No. 87946. Do you see there receivable
24 from affiliates in the amount of 27,211,000 dollars?
25 A I do.

PAGE 93

826

1 Q Which appears to be the same 27 million
2 dollar amount referred to in Exhibit 1619?
3 A It does.
4 Q And then as we saw in the previous month,
5 in April 1996, there is an offsetting payable to
6 affiliates in the amount of 9,400,000 dollars, right?
7 A Correct.
8 Q Let me hand you now what has previously
9 been marked Exhibit 536.
10 This is a document we looked at last time.
11 It is the financial statement highlights for AGH for
12 June 1996. Right?
13 A Yes.
14 Q And there is a reference there, I am
15 looking at the table in the middle of the first page
16 to a repayment from the DVR 1996 bond proceeds in the
17 amount of 49,844,000 dollars. Right?
18 A Yes.
19 Q So that in the end, Allegheny General
20 Hospital got repaid from the DVOG bond financing even
21 something more than the 40 million dollars that for
22 the previous three months it had expected to be paid?
23 A That is what it appears.
24 MR. JONES: Object to foundation.
25 Q Do you see that here the unpaid DVR

SHEET 13  PAGE 94

827

1 transfers are shown as 35,052,000 dollars?
2    A   Yes.
3    Q   If I could hand you what was previously
4 marked Exhibit 539, which we also looked at last time.
5       This is a copy of the Allegheny General
6 Hospital internal unaudited financial statements for
7 the month of June 1996.
8    A   Yes.
9    Q   If you could turn to the balance sheet on
10 Bates page 87745.
11      Do you see a due from affiliates figure
12 there for June 30th, 1996 in the amount of 25,128,000
13 dollars?
14   A   I do.
15   Q   Do you see over in liabilities that the
16 payables to affiliates have been reduced to zero?
17   A   I do.
18   Q   And the due from affiliates rather than
19 being up in the current assets, as it was in the
20 previous month, is now in the noncurrent assets?
21   A   Yes.
22   Q   Does it appear to you, then, that in June
23 1996 the 9,400,000 dollars of payables to affiliates
24 was netted against the due from affiliates?
25   A   That is what it appears.

PAGE 95

828

1    Q   You could just keep that open, please.
2       Let me hand you what was previously marked
3 Exhibit 538.
4       If you could just take a moment to review
5 that document, please.
6    A   I have reviewed it.
7    Q   Do you recognize exhibit -- strike that.
8       Do you recognize Exhibit 538 as a copy of a
9 bank account statement from Mellon Bank?
10   A   Of a trust account statement, yes.
11   Q   And is it a statement for the Allegheny
12 General Hospital funded depreciation account?
13      MR. JONES: Object to foundation.
14   A   I don't see where it says that.
15      But I believe that it is.
16   Q   Let me just ask you a couple of questions
17 about that, which may help to confirm that.
18      In Exhibit 536, the financial statement
19 highlights, we saw a repayment of DVR 1996 bond
20 proceeds in the amount of 49,844,000 dollars?
21   A   Yes.
22   Q   And do you see here toward the top of the
23 first page of Exhibit 538 a transfer in to the account
24 in the amount of approximately 49,844,000 dollars?
25   A   Yes.

PAGE 96

829

1    Q   Do you see on the second page of Exhibit
2 538 the very last row is called net assets at market
3 end of period?
4    A   Yes.
5    Q   And the amount shown is 151,298,000 dollars
6 and change?
7    A   Yes.
8    Q   And if we look back at the AGH balance
9 sheet marked as Exhibit 539 for June 30th, 1996,
10 unrestricted assets -- let me start over. The line
11 assets limited or restricted to use, unrestricted
12 by board of trustees as of June 30th, 1996 at AGH is
13 shown as 151,298,000 dollars. Right?
14   A   Correct.
15   Q   And that figure ties to the amount in the
16 bank account for which we have the Mellon Bank trust
17 statement marked Exhibit 538. Right?
18   A   Correct.
19   Q   Is it your belief, then, that as of June
20 30th, 1996, the financial statements at AGH showed in
21 assets limited or restricted as to use by board of
22 trustees only moneys actually in the bank account at
23 Mellon Bank?
24   A   Yes.
25      MR. JONES: Object to foundation.

PAGE 97

830

1    Q   Unlike in the prior three months that we
2 saw, there was no longer any receivable from the
3 Delaware Valley region carried in the assets limited
4 or restricted as to use line item on the balance sheet
5 at AGH.
6       Right?
7    A   Correct.
8       MR. JONES: Object to form and foundation.
9       MR. RYAN: Let's take a quick break here.
10      THE VIDEOGRAPHER: We are off the record.
11 The time is 11:31 a.m.
12      (Recess taken.)
13      THE VIDEOGRAPHER: We are back on the
14 record. The time is 11:46 a.m.
15 BY MR. RYAN:
16   Q   Do you have a copy, Mr. Adamczak, of
17 Exhibit 58, the 1997 audited consolidated AHERF
18 financial statements?
19   A   I do.
20   Q   If you could turn to the consolidated
21 balance sheet, do you see that assets limited were
22 restricted as to use net of current portion for all of
23 AHERF is given as 780,821,000 dollars?
24   A   Yes.
25   Q   If you could turn to note 3, beginning of

831

1 the bottom of page 12, continuing on to page 13.
2       Do you see there a table that shows the
3 breakdown of the 780,821,000 dollars in assets limited
4 or restricted as to use net of current portion?
5    A    I do.
6    Q    The first item listed there is called
7 unrestricted by board of trustees, future additions or
8 replacement of property and equipment. Right?
9    A    Correct.
10   Q    And is that what we have been referring to
11 as funded depreciation?
12   A    Yes.
13   Q    And that is the amount of 215,711,000
14 dollars?
15   A    Correct.
16   Q    That is a figure for all of AHERF at June
17 30th, 1997, correct?
18   A    That's correct.
19   Q    Am I right that the 1997 audited financial
20 statements do not include figures for funded
21 depreciation at any of the AHERF affiliates?
22   A    Not in the main part of the statements. In
23 the ancillary schedules, that information is included.
24   Q    Let's turn to one of the ancillary
25 schedules. The consolidating balance sheet on page

832

1 27.
2       There is a row there, assets limited or
3 restricted as to use net of current portion, right?
4    A    Yes.
5    Q    And the far right column, consolidated
6 AHERF is 780,821,000 dollars?
7    A    Correct.
8    Q    So this is in effect a makeup by affiliate
9 of the amount shown on the consolidated AHERF balance
10 sheet. Right?
11   A    Correct.
12   Q    But there is no information provided, is
13 there, that would show a makeup by AHERF affiliate of
14 the 215,711,000 dollars in funded depreciation as
15 disclosed in note 3?
16   A    There is not.
17   Q    And the reason for that is that when AHERF
18 moved to a consolidated audit only format, there were
19 no footnotes about the individual AHERF affiliates,
20 right?
21       MR. JONES: Object to foundation.
22   A    Correct.
23   Q    So information that in a prior year, for
24 example, would have been disclosed in the footnotes to
25 the separately audited AGH statements were no longer

833

1 provided in 1997?
2    A    Correct.
3    Q    Let me hand you what was previously marked
4 Exhibit 60.
5       Do you recall that in fiscal year 1997,
6 Chuck Lisman was in charge of coordinating changes to
7 drafts of the financial statements?
8    A    Yes.
9    Q    And were you aware of the fact that he
10 maintained report makeup papers?
11   A    I was not.
12   Q    Have you seen some or all of the schedules
13 contained in Exhibit 60 before?
14       MR. JONES: Object to form.
15   A    I don't believe so.
16   Q    If you could turn, please, to the third
17 page of the exhibit, Bates page 423.
18       Do you see there in the middle of the page
19 there is again a breakdown by AHERF affiliate of the
20 780,821,000 dollars of assets limited or restricted as
21 to use net of current portion?
22   A    Yes.
23   Q    And then up on the very first row of this
24 page is a breakdown of funded depreciation by AHERF
25 affiliate. Right?

834

1    A    Yes.
2    Q    And that is the type of breakdown you can
3 see on this schedule that is not contained in the
4 consolidated audit only format of the 1997 audited
5 financial statements. Right?
6    A    Correct.
7    Q    And this shows Allegheny General Hospital
8 with 58,600,000 dollars of assets limited or
9 restricted as to use net of current portion?
10   A    Correct.
11   Q    Of which 50,244,000 dollars was funded
12 depreciation, right?
13   A    Correct.
14   Q    If you could look at Exhibit 1564 from last
15 time.
16       This is draft No. 7. Exhibit 1563, I
17 apologize.
18       This is draft No. 7 of the 1997 AHERF
19 audited financial statements. Right?
20   A    Correct.
21   Q    And if we turn to the consolidating balance
22 sheet on page 27. We see assets limited or restricted
23 as to use net of current portion of 58,600,000 dollars
24 at Allegheny General Hospital.
25       Right?

SHEET 23  PAGE 174

907

1    Q    Then on page 6, do you see paragraph 27
2  reads, "Other than those events described in note 16
3  and 17 to the financial statement, no events have
4  occurred subsequent to June 30th, 1997, that would
5  require adjustment to or disclosure in the financial
6  statements."
7        Right?
8    A    Yes.
9    Q    At the time you signed this letter for
10 Coopers & Lybrand, did you believe that that was a
11 correct representation?
12   A    The only item that I had apprehension was
13 relative to the writeoffs early in '98, that I believe
14 Coopers came in and rereviewed that and determined
15 they were properly written off in '98. And that '97
16 statements did not need to be adjusted.
17   Q    That is a reference to the 23 million
18 dollars that was recorded as a valuation adjustment?
19   A    Yes.
20   Q    That was an item that Coopers & Lybrand
21 told you that couldn't remain booked that way at year
22 end 1998, right?
23   A    The booking of that was not my concern.
24        My concern was did that writeoff belong in
25 1997.

PAGE 175

908

1        They said '98 was proper. It is just the
2  way it was reflected in the '98 statements.
3    Q    Is it, though, the case that Coopers &
4  Lybrand told you that they would not allow AHERF to
5  carry that adjustment in the way that it had been
6  booked at year end 1998?
7    A    Yes.
8        But they did not insist that it be pushed
9  back in to '97.
10   Q    And is it the case that you did not tell
11 anybody from Coopers & Lybrand that you believe any of
12 the statements in the representation letter marked as
13 Exhibit 1626 were inaccurate?
14   A    That's true.
15   Q    Let me mark, please, Exhibit 1627 a
16 document with Bates Nos. SEC D414 through 421.
17        (Thereupon, Exhibit No. 1627 was marked for
18 identification.)
19   Q    If you turn to the second page of the
20 exhibit, do you see this is a document entitled "offer
21 of settlement of Albert Adamczak"?
22   A    I do.
23   Q    Could you explain what this document is?
24   A    It is an agreement that I entered in to
25 with the SEC, whereby I neither -- where certain

PAGE 176

909

1  allegations were made by the SEC against me relative
2  to the AHERF audited financial statements, whereby I
3  neither admitted guilt nor was convicted of any of the
4  allegations. But agreed basically in settlement not
5  to represent clients before the SEC for a three year
6  period that expired in beginning of May of 2003, which
7  I hadn't done in many years before this and have not
8  done in the three years that this was in effect.
9    Q    And as a result of this offer of settlement
10 with the Security and Exchange Commission, did you
11 have your license as a certified public accountant
12 suspended?
13   A    I did.
14        My understanding is the rules that the
15 certified public accounting profession follows is that
16 if you enter in to a sanction agreement for any period
17 of time with any other body that they follow suit and
18 don't even investigate the allegations.
19   Q    And is that your signature on the last page
20 of the document?
21   A    It is.
22   Q    If I could call your attention on page 3,
23 Bates No. 417, to paragraph 10, do you see that reads
24 "AHERF's audited consolidated financial statements
25 with consolidating schedules for the year ended June

PAGE 177

910

1  30th, 1997 purportedly prepared in accordance with
2  GAAP, were materially false and misleading and failed
3  to comply with GAAP in that A, they materially
4  overstated AHERF's 1997 consolidated net income, and
5  B, they materially overstated Delaware Valley's 1997
6  net income"?
7    A    I see that.
8    Q    Do you believe that that is a true
9  statement?
10   A    I do.
11   Q    And did you tell anybody at Coopers &
12 Lybrand about that during the 1997 audit?
13   A    I did not.
14        MR. RYAN: No further questions at this
15 time. I thank you very much for your patience
16 and your time, Mr. Adamczak.
17        EXAMINATION
18 BY MR. JONES:
19   Q    Mr. Adamczak, Jim Jones again. I will ask
20 you I hope a relatively few questions by way of
21 followup.
22        Let's start where we left off with Exhibit
23 1627. Unless anybody needs a break.
24   A    No.
25   Q    I think you tried to tell Mr. Ryan moments

911

1 ago that the offer of settlement you provided the SEC
2 contained a provision, or at least as you understood
3 it, it contained a provision that you did not agree to
4 all of the findings that the SEC may have proposed
5 against you.
6        Is that correct?
7    A   I believe I didn't -- in this settlement, I
8 didn't agree to any of them.
9    Q   I will direct your attention to
10 paragraph -- rather, page 2 of the settlement
11 agreement.
12       Paragraph A.
13       Can you read that sentence for us?
14   A   Under section A?
15   Q   Yes.
16   A   "Contents solely" --
17   Q   The word is "Consents". You should read
18 the clause that starts just before paragraph A.
19   A   "On the basis of the foregoing, Adamczak
20 hereby: Consents solely for the purpose of these
21 proceedings and any other proceedings brought or on
22 behalf of the Commission or in which the Commission is
23 a party, and without admitting or denying the findings
24 contained in the order, except for those set forth in
25 paragraph A1 below", which are factual in nature,

912

1 "Which are admitted to the entry of the order of the
2 Commission making the following findings."
3    Q   And paragraph A1 refers to your background
4 and time of employment at AHERF in a general way; is
5 that right?
6    A   That's correct.
7    Q   Mr. Adamczak, do you know whether the CPA
8 licensing body, as licensing body for certified public
9 accountants, did any investigation in connection with
10 your suspension?
11   A   I know they did not.
12   Q   How is it you know that?
13   A   Through discussion with them and the letter
14 where my in essence CPA license was suspended, it says
15 we basically follow -- under X rule we follow certain
16 guidance. It says, "If your license is suspended, we
17 automatically suspend it for the same time."
18   Q   I will flip you back now to Exhibit 1626,
19 which is the representation letter that Mr. Ryan gave
20 to you just before he gave to you the settlement
21 agreement offer. Do you have that in front of you?
22   A   I do.
23   Q   You just told us that you had I think the
24 words were apprehensions, when you signed this January
25 12th, 1998 letter; is that right?

913

1    A   That's correct.
2        MR. RYAN: Objection.
3    Q   And the basis of your apprehensions were
4 what in a general way?
5    A   Many of the items that we discussed here.
6        The IBM -- recording the sale on gain of
7 the IBM building.
8        The recording of income on the Lockhart
9 funds.
10       The funded depreciation classification
11 as -- excuse me, the intercompany receivable
12 classification as funded depreciation.
13       The transfer of the reserves from Graduate
14 to AHERF.
15       The initial allowance that the Graduate
16 entities be put in to SDN, whose board members were I
17 believe Nancy Wynstra, David McConnell and Sherif
18 Abdelhak.
19       My belief was that because of that board
20 representation, that it in essence was -- that company
21 was part of AHERF and should have been consolidated
22 from day one instead of several months where those
23 entities were left in SDN.
24   Q   For accounting purposes?
25   A   For accounting purposes.

914

1    Q   This is some of the things? Were there
2 others that come to mind that caused you apprehension?
3    A   The bad debt reserves shortfall from '96
4 that there was a subsequent meeting held on.
5        It appears there may have been some
6 adjustment, 17 million of the 30. But the other 30 I
7 never saw resolved.
8        Those types of items.
9        The fact that we continued to bring issues
10 related to the receivables to Coopers & Lybrand's
11 attention and never saw adequate resolution to those
12 items.
13   Q   As part of the comfort you took in
14 resolving the apprehension -- let me rephrase. Is
15 part of any resolution of the apprehension you felt
16 that occurred caused by comfort you took from
17 Coopers & Lybrand's work in the audit process?
18       MR. RYAN: Objection.
19   A   Absolutely.
20   Q   Could you explain that for me?
21   A   I knew they had reviewed the IBM
22 transaction in detail. Because I believe they were
23 engaged directly to review that.
24       I knew the question relative to the
25 Graduate entities going in to SDN before they came in

SHEET 24   PAGE 182

915

1 to AHERF was looked at vigorously by Coopers &
2 Lybrand, because at one point they were pushing that
3 it be consolidated, and then at some later date it
4 ended up not to be consolidated.
5        The 50 million dollar reserve transaction,
6 it was my understanding that they knew about it.
7 Looked at it. And had even requested that it be moved
8 from restructuring costs to goodwill. Representations
9 in memos that I saw from Dan Cancelmi and others that
10 led me to believe that Coopers was aware of all of the
11 reserves being moved.
12        Even though agreed upon procedures were
13 done on such things as the intercompany accounts, I
14 relied on Coopers, that they didn't see anything.
15        I didn't put as much credence on that as an
16 audit that they went and dug and looked at everything.
17        But that based on their limited procedures,
18 that nothing came to sight, because I would expect
19 even if you are ticking and tying balances, that you
20 would at least read the schedule. And if it doesn't
21 make sense or something looks out of whack, you bring
22 that to attention of management.
23        The fact that in these followup meetings,
24 the audit meetings, the ones I went to, issues did not
25 come up that caused me any concern.

PAGE 183

916

1        Relative to these big items.
2        I know that when I was in auditing,
3 generally one of the procedures was when the auditors
4 came in, they received a trial balance and asked for
5 any subsequent entries to be given to them.
6        I know a lot of these items we talked about
7 happened late in July or middle July.
8        I would have expected by then they were in
9 with their trial balance and should have been
10 reviewing any entries made from that time on.
11        Also, the magnitude of these adjustments
12 were in my mind very big.
13        And as we looked at many sheets that had
14 journal entries with millions of dollars on them,
15 although I didn't review them, because it wasn't part
16 of my process at the time to look at the detail, and I
17 do acknowledge that I know these transfers happened.
18        I would have expected Coopers to see these
19 numbers either through journal entry review, there is
20 usually a large and unusual journal entry review or
21 procedures they did.
22        And last but not least, I would have hoped
23 that as part of the audit, they would have spent some
24 time with me as an executive of that organization just
25 to ask me some questions or my thoughts.

PAGE 184

917

1        I don't know that there was more than two
2 or three times they stopped by during the audit. And
3 it was generally to express pleasantries, and that was
4 it.
5    Q    Did you ever tell them anything untrue?
6    A    I did not.
7    Q    At any time?
8    A    No.
9    Q    That is Coopers & Lybrand?
10   A    That's correct.
11   Q    Is it fair to say, sir, that -- strike
12 that.
13        The question better put is what did you
14 think about Coopers, what did you think and believe
15 about Coopers' state of knowledge with respect to the
16 items you just mentioned gave you apprehension or were
17 perhaps inaccurate in the representation letter?
18        MR. RYAN:  Objection.
19   A    My thought is based on my history and my
20 training were that the recording of these or the
21 handling was incorrect.
22   Q    What did you think about Coopers' knowledge
23 about those facts?
24        MR. RYAN:  Objection.
25   A    My thought is that they had every fact that

PAGE 185

918

1 I did other than my opinion.
2    Q    So telling them that you thought things
3 were inaccurate, or that you had apprehension about
4 them --
5    A    Were my opinion.
6    Q    And wouldn't, in your view, have been news
7 to them; is that right?
8        MR. RYAN:  Objection.
9    A    I don't know that I would say that.
10       But I know that in the past, when I have
11 expressed contrary opinions, it didn't resolve in any
12 differences.
13       As a matter of fact, senior management
14 generally took the position that Coopers & Lybrand
15 were the experts, and when I had a contrary view, it
16 was kind of thanks for your advice, but they are the
17 experts we have hired. And we will take their advice.
18   Q    If you had spoken up at the time someone
19 asked you to -- I assume someone asked you to sign the
20 representation letter? Or it was put in front of you
21 in some way?
22   A    It was more or less sent to me.
23   Q    By whom?
24   A    There was no discussion.
25   Q    Who sent it to you?

PAGE 186

919

```
 1    A    I believe Coopers & Lybrand sent it or
 2  someone internally.
 3    Q    If either -- strike that.
 4         If at the time this representation letter
 5  marked as Exhibit 1626 hit your desk, you had spoken
 6  up and said "I don't think I will sign it" for the
 7  reasons you just expressd on the record here today
 8  among others, what do you think the reaction from the
 9  auditors would have been based on your experience over
10  the years with them, especially in the '96 audit work?
11         MR. RYAN: Objection.
12    A    Similar to the funded depreciation
13  reclass. I think there would have been an explanation
14  given to me as it was right or okay.
15         And internally, I think I would have been
16  outcast by management.
17    Q    Do you think any expression of your
18  apprehensions or belief in the inaccuracies of any
19  particular paragraph in the representation letter
20  would have been ultimately futile?
21    A    Yes.
22         MR. RYAN: Objection.
23    A    Absolutely.
24    Q    I will ask you to look at a couple other
25  things Mr. Ryan showed you. In particular Exhibit
```

PAGE 187

920

```
 1  320. Just because it is closer to the top. Let's
 2  look at the second page.
 3         We looked at these notes. We looked at
 4  them last week. We looked at them again today. I
 5  don't want to belabor the point.
 6         But Mr. Ryan asked you a series of
 7  questions. I think he got you to say that yes,
 8  footnote F is the only footnote on that page, the
 9  second page of Exhibit 16 -- Exhibit 320 that has the
10  word "Graduate" on it, isn't that right?
11    A    That's correct.
12    Q    However, the very next footnote, right
13  below F, and alphabetically consecutive, footnote G
14  has an entry called with the footnote language rather
15  year end shortfall adjustment in an amount of 5.6
16  million dollars nearly.
17         Right?
18    A    That's correct. Then it says something at
19  the end about an EPPI bad debt transfer 5.28 million.
20    Q    Those are big numbers?
21    A    I would assume so.
22    Q    If you would have seen a footnote F -- and
23  you were an auditor for a long time at Ernst &
24  Whinney; is that correct?
25    A    That's correct.
```

PAGE 188

921

```
 1    Q    If in your experience as an auditor you
 2  would have seen a footnote F that said Graduate
 3  transfer with a big number like 15 million in one
 4  footnote, and the footnote right below it said 5.6
 5  million dollar year end shortfall adjustment, would
 6  you have asked more questions?
 7         MR. RYAN: Objection.
 8    A    Most definitely including the fact that at
 9  the end it says EPPI bad debt transfer 5.28. I might
10  have concluded that was a 10 or 11 million dollar
11  issue.
12    Q    And you would have wanted to talk to people
13  inside the accounting information about what not only
14  the Graduate reserve entry was about, but about these
15  other entries as well?
16         MR. RYAN: Objection.
17    A    Most definitely.
18    Q    That goes for every other footnote
19  essentially that Mr. Ryan just showed you in that even
20  when there was a Graduate entry, there may also have
21  been a shortfall adjustment in a similarly big number;
22  is that right?
23         MR. RYAN: Objection.
24    A    That's right.
25    Q    We could look through these pages and do it
```

PAGE 189

922

```
 1  again. But each time he omitted to note the other
 2  shortfall adjustments in the same string of
 3  footnotes. Am I right?
 4    A    That's correct.
 5    Q    And you would have asked questions about
 6  all of those footnotes, wouldn't you?
 7    A    I believe so.
 8    Q    And you think a reasonably prudent auditor
 9  doing his job would have done the same thing, am I
10  right?
11         MR. RYAN: Objection.
12    A    Yes.
13    Q    Look at 1549. This is the 28 million
14  dollar schedule. Am I right?
15    A    It is.
16    Q    It includes a cover page and some roll
17  forwards; is that right?
18         MR. RYAN: Objection.
19    A    Cover page --
20    Q    And excerpts from roll forwards?
21    A    From trial balances that give trial
22  balances in two points of time.
23    Q    I apologize. Trial balances. And some
24  other memos in there, is that right?
25    A    That's correct.
```

TAB 205

:a6530 002:PF)

MASTER TRUST INDENTURE

By and Among

ALLEGHENY UNIVERSITY HOSPITALS
(formerly The Medical College of Pennsylvania and
Hahnemann University Hospital System)

HAHNEMANN UNIVERSITY HOSPITAL

ALLEGHENY UNITED HOSPITALS, INC.

ALLEGHENY UNIVERSITY FOR HEALTH SCIENCES
(formerly The Medical College of Pennsylvania and Hahnemann
University)

ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN

HORIZON MEDICAL CORPORATION

AND SUCH OTHER PERSONS AS MAY BECOME
MEMBERS OF THE OBLIGATED GROUP

And

NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,
as Master Trustee

Dated as of May 15, 1996

This instrument was prepared
by:

Foley & Lardner
One IBM Plaza
Suite 3300
330 N. Wabash Avenue
Chicago, Illinois  60611

DEPOSITION
EXHIBIT
330
AKF

AHERF LIT
USDC W.D. Pa.
MISC No 00-40
24021
EXHIBIT NO.

K&L/DAK 00003

b     Long-Term Indebtedness as to which, when issued, 25% or more of the principal thereof is due in a single year, or

(c)   Long-Term Indebtedness as to which, when issued, 25% or more of the original principal amount thereof may, at the option of the holder or registered owner thereof, be redeemed or repurchased at one time, which portion of the principal is not required by the documents pursuant to which such Indebtedness is issued to be amortized by redemption prior to such date.

"Bond Index" shall mean (i) in respect of any outstanding Indebtedness, the average interest rate on such Indebtedness for the twelve (12) months immediately preceding the month prior to such calculation, or if such Indebtedness shall have a variable rate for less than a twelve (12) month period, the average interest rate for such lesser period; and (ii) in respect of any proposed Indebtedness, at the option of the Obligated Group Agent, the initial rate established for such Indebtedness, as determined by an Officer's Certificate.

"Book Value," when used in connection with Property of any Member of the Obligated Group, shall mean the cost of such Property, net of accumulated depreciation, calculated in conformity with generally accepted accounting principles, and when used in connection with Property of the Obligated Group, means the aggregate of the values so determined with respect to such Property of all Members of the Obligated Group determined in such a manner that no portion of such value of Property of any Member of the Obligated Group is included more than once.

"Capitalization" shall mean the principal amount of all outstanding Long-Term Indebtedness of the Obligated Group, plus the equity accounts of the Obligated Group (i.e., unrestricted fund balances, including any shareholder equity).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor thereto.

"Commitment Indebtedness" means the obligation of any Person to repay amounts disbursed pursuant to a Credit Facility to pay when due such Person's obligations with respect to Indebtedness.

"Completion Indebtedness" shall mean any Long-Term Indebtedness (i) incurred by any Person for the purpose of financing the completion of constructing or equipping Facilities with respect to which Long-Term Indebtedness was theretofore incurred in accordance with the provisions hereof, and (ii) with a principal amount not in excess of the amount required (a) to provide a completed and equipped Facility of substantially the type and scope contemplated at the time such prior Long-Term Indebtedness was originally incurred, (b) to provide for capitalized interest during the construction period and the period during which such Facilities are placed in service, (c) to capitalize a reserve with respect to such Completion Indebtedness

3

K&L/DAK 00010

and d to pay the costs and expenses of issuing such Completion Indebtedness

"Construction Index" shall mean the health care component of the implicit price deflator for the gross national product as most recently reported prior to the date in question by the United States Department of Commerce or its successor agency, or, if such index is no longer published, such other index which is certified to be comparable and appropriate by the Obligated Group Agent in an Officer's Certificate delivered to the Master Trustee.

"Consultant" shall mean a Person who r which is appointed by any Member of the Obligated Group for the purpose of passing on questions relating to the financial affairs, management or operations of one or more Members of the Obligated Group or the entire Obligated Group and has a favorable reputation for skill and experience in performing similar services in respect of entities engaged in reasonably comparable endeavors. If any Consultant's report or opinion is required to be given with respect to matters partly within and partly without the expertise of any Consultant, such Consultant may rely upon the report or opinion of another Consultant possessing the necessary expertise.

"Counsel" shall mean an attorney-at-law or law firm (which may include Counsel to a Member of the Obligated Group, including inside Counsel retained by a Member of the Obligated Group or AHERF as an employee).

"Credit Facility" means any letter of credit, line of credit, insurance policy, guaranty or other agreement constituting a credit enhancement or liquidity facility which is issued by a bank, trust company, savings and loan association or other institutional lender, insurance company, financial institution or surety company.

"Debt Service Requirement" of any Person shall mean, for any period of time, the amounts payable or the payments required to be made by such Person in respect of principal and interest on Outstanding Long-Term Indebtedness during such period (including, with respect to Short-Term Indebtedness incurred pursuant to Section 4.1(c) hereof, the actual amount of interest paid thereon during such period and the principal due thereon during such period, calculated in accordance with Section 4.4 hereof), calculated in such a manner that no portion of Long-Term Indebtedness is included more than once and, taking into account (for purposes of calculating the Debt Service Requirements for any future period) that (i) the principal amount and any payments made in respect of any Indebtedness represented by a Guaranty shall be determined in accordance with Section 4.3 hereof, (ii) any payments to be made in respect of Balloon Indebtedness and Variable Rate Indebtedness shall be calculated in accordance with the provisions of Section 4.4 hereof, (iii) with respect to Indebtedness refunded or refinanced during such period, the amount of principal taken into account during such period shall be assumed to equal only the principal not payable from the proceeds of Indebtedness, and (iv) any amounts payable from funds available under an Escrow Deposit

4

other than amounts so payable solely by reason of the obligor's failure to make payments from other sources) or funded from the proceeds of such Long-Term Indebtedness (i.e., accrued and capitalized interest) shall be excluded from the determination of the Debt Service Requirement.

"Escrow Deposit" shall mean a segregated escrow fund or other similar fund, account or deposit in trust of cash in an amount (and/or Investment Securities the principal of and interest on which will be in an amount), and under terms, sufficient to pay all or a portion of the principal of, premium, if any, and interest on Indebtedness as the same shall become due or payable upon redemption.

"Event of Default" shall mean any Event of Default under this Master Indenture, as provided in Article Seven hereof.

"Facilities" shall mean all land, leasehold interests and buildings and all fixtures and equipment of a Person.

"Financial Advisor" shall mean an investment banking or financial advisory firm, commercial bank or any other qualified Person who or which is appointed by any Member of the Obligated Group for the purpose of passing on questions relating to the availability and terms of specified types of Indebtedness for any Member of the Obligated Group and is actively engaged in and has a favorable reputation for skill and experience in underwriting or providing financial advisory services in respect of similar types of Indebtedness incurred by entities engaged in reasonably comparable endeavors.

"First Supplemental Indenture" shall mean the First Supplemental Master Trust Indenture dated as of May 15, 1996 to be executed and delivered by the Members of the Obligated Group and the Master Trustee concurrently with the execution and delivery of the Original Master Indenture, which First Supplemental Indenture supplements and amends the Original Master Indenture, provides for the issuance, authentication and delivery of the 1996 Notes under and pursuant to the Original Master Indenture, as so supplemented and amended and makes certain amendments to the Original Master Indenture solely for the benefit of the Bond Insurer (as defined therein).

"Fiscal Year" shall mean a period of twelve consecutive months ending on June 30 or on such other date as may be specified in an Officer's Certificate of the Obligated Group Agent executed and delivered to the Master Trustee.

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees, or other board, committee or group of individuals in which the powers of a board of directors or board of trustees is vested generally or for the specific matters under consideration.

K&L/DAK 00012

TAB 206

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *FRANK V. CAHOUET*
### *March 5, 2004*

---

# *LEGALINK MANHATTAN*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

CAHOUET, FRANK V.



LEGALINK®
A WORDWAVE COMPANY

FRANK V. CAHOUET

Page 41

1   Q.   If you look on the front page, your handwriting
2        is there?
3   A.   Yeah.
4   Q.   So I assume that means that you got this
5        document at some point.
6   A.   Yes.
7   Q.   Okay.
8   A.   I assume I did.
9   Q.   Okay. It says it's for a meeting -- enclosed
10       is information for a meeting of the joint
11       conference and planning committee, the resource
12       management committee, and the integrated health
13       care services board.
14  A.   Uh-huh.
15  Q.   On January 9th, 1995. I take it that you were
16       on one or more of those committees or boards.
17       Do you remember?
18  A.   No. I don't remember.
19  Q.   But in your handwriting it says you're sorry to
20       miss the meeting. Right?
21  A.   Yeah. I read that.
22  Q.   Okay. If you turn to Page 15 -- let's assume
23       it's a five, okay, 1511, it says vision
24       statement. On the top it says southwest
25       integrated delivery network, and it says vision

Page 42

1        statement. Health care in western Pennsylvania
2        is entering a new and challenging era. An
3        important element of the evolving health care
4        environment is the development of
5        community-based delivery systems with
6        physicians, hospitals, and other health care
7        providers.
8            Then it goes on in the top of the
9        second paragraph, in order to respond to the
10       dynamic health care environment, and then it
11       goes on again.
12           My only real point with this page is
13       to ask you whether this refreshes your
14       recollection that you knew at the time that
15       there were changes in the health care industry
16       that AGH was planning to react to.
17  A.   No, it doesn't.
18  Q.   Let me try one more time with 1517 where it
19       says market assessment.
20  A.   Yeah.
21  Q.   And then it talks about managed care increasing
22       and projection that over 50 percent of
23       southwest Pennsylvania market will be enrolled
24       in capitated managed care plans by the year
25       2000.

Page 43

1            Does any of that ring a bell?
2   A.   No.
3   Q.   You can put that document aside.
4            When you were on the AGH board but
5        before January 5th, 1998, did you have
6        knowledge of whatever business plans that AHERF
7        had overall?
8            MR. COGAN: Objection.
9            THE WITNESS: Can you repeat --
10           Can she repeat that?
11           MR. FRIESEN: Absolutely. Anytime.
12           - - - -
13       (The record was read back by the reporter.)
14           - - - -
15           THE WITNESS: Boy, I can't recall
16       that. Throughout that whole period?
17  BY MR. FRIESEN:
18  Q.   Let me try to be a little more to the point.
19           Do you recall that AHERF had a plan
20       to become an integrated delivery system,
21       something called an integrated delivery system,
22       during the mid 1990s but before you were on the
23       AHERF board? So I'm not saying that you knew
24       this or you didn't know this. I'm just trying
25       to find out --

Page 44

1   A.   I don't recall.
2   Q.   Let me ask you to look at that account plan one
3        more time, which is 2383.
4   A.   Oh, you took it back.
5            MR. RESTIVO: No, no. You have it.
6   BY MR. FRIESEN:
7   Q.   This, again, is from September of 1995.
8   A.   Beg your pardon. Yes. Go ahead. What page?
9   Q.   The page ending in 275.
10  A.   Yes.
11  Q.   Now, you see at the top it says client
12       strategy?
13  A.   Yes.
14  Q.   And 1.0 says enhanced position is premier
15       statewide academic health care provider through
16       a corporatewide commitment to superior
17       technology, professionals and facilities, and
18       the first bullet point says utilize strategic
19       acquisitions to enhance role as nationally
20       recognized research and academic institution
21       and to strengthen market position.
22           I'm sorry. I'll go slower.
23           Do you recall knowing in the 1995
24       time period that AHERF was planning as part of
25       its strategy to use strategic acquisitions to

11 (Pages 41 to 44)

FRANK V. CAHOUET

Page 45

1    enhance itself?
2  A.    Future strategic acquisitions?
3  Q.    Right.
4  A.    No. I don't recall.
5  Q.    You are aware or were you aware it had acquired
6    other hospitals in the past?
7  A.    That's why I said future.
8  Q.    Right. Do you recall anything about AHERF's
9    acquisition of Forbes Hospital system? Do you
10    remember anything about that?
11  A.    No. I don't think I was on the board at that
12    time.
13  Q.    You were not on the AHERF board. Is that
14    correct?
15  A.    Was I on the AGH board at the time it was
16    acquired?
17  Q.    Right.
18  A.    When was it acquired?
19  Q.    I think it was in 1996.
20  A.    No. I don't recall.
21  Q.    Were you aware that in the mid 1990s, and,
22    again, this is before January 5th, 1998, AHERF
23    had a strategy to acquire physician practices?
24  A.    Before I went on the AHERF board?
25  Q.    Right.

Page 46

1  A.    I'm trying to be specific. I can't say that I
2    specifically knew that they had a strategy of
3    acquiring physician practices.
4  Q.    Do you recall anyone saying that AGH would get
5    more patients because AHERF was acquiring
6    physician practices and the physicians would
7    then refer more patients to AGH?
8  A.    I understand the concept, but I don't recall
9    any specific conversations like that, no.
10  Q.    Do you recall prior to January 5th, 1998, AHERF
11    having a plan to enter into something called
12    risk contracts?
13        - - - -
14    (There was a discussion off the record.)
15        - - - -
16        THE WITNESS: Risk contracts?
17  BY MR. FRIESEN:
18  Q.    Right.
19  A.    No.
20  Q.    That word's not --
21  A.    I don't understand the term.
22  Q.    Do you recall that at some point in time, and
23    again this is before you were on the AHERF
24    board, that AHERF acquired hospitals in the
25    Graduate Health System? Do you remember

Page 47

1    anything about that?
2  A.    Are you talking about Hahnemann?
3  Q.    No, Graduate. Hahnemann was in 1993, and
4    Graduate was in 1996, if that's helpful.
5        MR. COGAN: Objection.
6        THE WITNESS: No.
7        MR. RESTIVO: When you get to a
8    natural break, let's take a five-minute break.
9        MR. FRIESEN: Okay. Let me sort of
10    ask you a few questions about Hahnemann since
11    you've brought it up, and then we can take our
12    break.
13        What do you remember, if anything,
14    about the acquisition of Hahnemann?
15        THE WITNESS: I don't remember.
16        MR. FRIESEN: All right. Why don't
17    we take a break.
18        THE VIDEOGRAPHER: We are going off
19    the record at 10:44.
20        - - - -
21    (There was a recess in the proceedings.)
22        - - - -
23        THE VIDEOGRAPHER: We are back on the
24    record at 10:53.
25  BY MR. FRIESEN:

Page 48

1  Q.    Mr. Cahouet, do you remember at any time before
2    or after the bankruptcy discussing the Graduate
3    acquisition with anyone related to AHERF?
4  A.    No.
5  Q.    Let me show you a document that I'm going to
6    mark as Exhibit 2385.
7        - - - -
8        (Deposition Exhibit No. 2385 marked
9    for identification.)
10        - - - -
11        MR. FRIESEN: This is a document
12    Bates numbered FVC 01568 through 72, and it's a
13    letter from Sherif Abdelhak to the members of
14    the Allegheny boards of trustees dated
15    August 8th, 1996.
16        Just take your time to read through
17    this document, if you will.
18        - - - -
19    (The witness reviewed the document.)
20        - - - -
21        THE WITNESS: Go ahead.
22  BY MR. FRIESEN:
23  Q.    This has one of those stamps again that says
24    received with your name?
25  A.    Yes.

12 (Pages 45 to 48)

FRANK V. CAHOUET

Page 49

1  Q.  Do you recall receiving this?
2  A.  No. I don't recall receiving it. I'm not
3      saying I didn't, but I don't recall receiving
4      it.
5  Q.  Is this file handwriting, is that your
6      handwriting?
7  A.  Yeah. That looks like it.
8  Q.  Do you thing that the underlining would be
9      yours?
10 A.  I think so.
11 Q.  And is it your practice when you receive a
12     document that you sometimes underline things in
13     the document when you read them?
14 A.  Sometimes.
15 Q.  Now, in 1996 when you were chairman, president,
16     and CEO of Mellon Bank, I take it that there
17     would be a lot of documents that come over your
18     desk every day. Is that fair to say?
19 A.  Not really, not a lot of documents.
20         Documents. Describe a document just
21     so --
22 Q.  Well, letters, memos, correspondence, things
23     like this.
24 A.  Yes.
25 Q.  I mean, would it be in the hundreds or --

Page 50

1  A.  No.
2  Q.  Dozens or --
3  A.  A dozen.
4  Q.  Seeing this document today, does this refresh
5      your recollection that you knew something about
6      the potential acquisition of Graduate back in
7      August of 1996?
8  A.  Not really.
9  Q.  While you were on the board of AGH but before
10     you were on the AHERF board, would you from
11     time to time speak with Mr. Abdelhak on the
12     phone or in person outside the context of
13     actual formal board meetings?
14 A.  I would have to say yes. I can't recount
15     the --
16         You know, I can't remember specific
17     conversations, but I'd have to say yes.
18 Q.  Could you tell me basically what kinds of
19     things you would talk to him about?
20 A.  The hospital.
21 Q.  Do you recall the first time you met
22     Mr. Abdelhak?
23 A.  No.
24 Q.  Did you know him prior to your becoming a board
25     member on AGH's board?

Page 51

1  A.  Not really. There may have been some time gap
2      there, but I didn't have a social relationship
3      with him.
4  Q.  You can put that aside. Let me show you a
5      document that has previously been marked as
6      Exhibit 2101.
7          - - - -
8          (Deposition Exhibit No. 2101
9      previously marked for identification.)
10         - - - -
11         MR. FRIESEN: This is a document with
12     the date October 28th, 1997, and it says AHERF
13     consolidated financial statements,
14     September 30th, 1997.
15         MR. RESTIVO: And again, in fairness,
16     in completeness to the witness, would you tell
17     him the source of this document or what the
18     Bates stamp means.
19         MR. FRIESEN: The source of this
20     document is not the files of Mr. Cahouet.
21     That's all I can tell you right now.
22         MR. RESTIVO: And it does not appear
23     to be the files based on a prior document or
24     anything that Mellon Bank produced?
25         MR. FRIESEN: That is correct.

Page 52

1          MR. RESTIVO: Thank you.
2          MR. FRIESEN: In fact, my first
3      question would be, once Mr. Cahouet has had a
4      chance to look at the document, whether he
5      recalls ever seeing it before.
6          - - - -
7          (The witness reviewed the document.)
8          - - - -
9          THE WITNESS: No, I don't recall.
10 BY MR. FRIESEN:
11 Q.  If you could go to the second page of the
12     document, JB 00791 --
13 A.  Yes.
14 Q.  -- at the top it says AHERF consolidating
15     statement of operations for the three months
16     ended September 30th, 1997.
17 A.  Uh-huh.
18 Q.  And some of this is hard to read, but I'll tell
19     you what it says.
20         About halfway down it says, net
21     incomes/loss on the left.
22 A.  Uh-huh.
23 Q.  And then on the right that number, I will tell
24     you, is $42,571,000 for a net loss for that
25     three months.

13 (Pages 49 to 52)

FRANK V. CAHOUET

Page 53

1  A.  Uh-huh.
2  Q.  Does that bring it --
3       MR. COGAN:  That's the number on the
4  far right?
5       MR. FRIESEN:  Right.
6       MR. COGAN:  What was it, 42,971?
7       MR. FRIESEN:  571.
8  BY MR. FRIESEN:
9  Q.   I'm not saying you knew this or got this
10      document or anything else, but I would just
11      like to know whether you recall knowing in
12      October of 1997 that there was such a net loss
13      for AHERF as a whole.
14 A.   No, I don't recall.  I'm at a little bit of a
15      disadvantage, because I can't read your
16      headings here.
17 Q.   Which headings?
18 A.   Well, western region --
19 Q.   Right.
20 A.   Eastern region?
21 Q.   Right.
22 A.   What's this next one?
23 Q.   Those are various SCHC --
24      Those are various subsidiaries or
25      entities within AHERF, and the one I was

Page 54

1  pointing to was the one at the end which was
2  the AHERF consolidated.
3       MR. RESTIVO:  With all due respect,
4  Mr. Cahouet, you've already testified you
5  haven't seen the document before and you didn't
6  know what he asked you, and I don't think you
7  should waste the examiner's time having him
8  explain to you what entries are on a document
9  you haven't seen before.
10      THE WITNESS:  Okay.  That's fine with
11 me.
12 BY MR. FRIESEN:
13 Q.   Let me just ask you another set of questions
14      here if you go to JB 00794, the
15      second-to-the-last page.
16 A.   Sure.
17 Q.   And under current assets, top left, it says as
18      of September 30th, 1997, cash and cash
19      equivalents is zero dollars?
20 A.   Yes.
21 Q.   Do you recall knowing in October of 1997 that
22      AHERF had zero dollars in cash and cash
23      equivalents as of September 30th, 1997?
24 A.   No, I don't recall.
25 Q.   Okay.  You can put --

Page 55

1  A.   If I make the point to you, though, that
2       doesn't necessarily mean anything particularly.
3       It may be just a running account at zero.
4  Q.   But you don't really know what it means.
5       Right?
6  A.   No.
7  Q.   Okay.  You can put that document aside.
8       I'm going to show you a document that
9       has previously been marked as Exhibit 1661.
10                    - - - -
11      (Deposition Exhibit No. 1661
12      previously marked for identification.)
13                    - - - -
14      MR. RESTIVO:  Counselor, I take it
15      that to the extent you're showing Mr. Cahouet a
16      document that was a deposition exhibit in
17      another deposition, you're not remarking it
18      here.
19      MR. FRIESEN:  That's right.
20 BY MR. FRIESEN:
21 Q.   This Exhibit 1661 is a copy of the audited
22      financial statements for the fiscal year 1996
23      of AHERF.
24      You can look through as much of it as
25      you want to, but my question, first one at

Page 56

1  least, is going to be whether you've ever seen
2  this before.
3  A.   I don't recall.
4  Q.   Okay.  You can put it aside.  We'll try one
5       more.  You never know.  This one's been marked
6       as Exhibit 1653.
7                    - - - -
8       (Deposition Exhibit No. 1653
9       previously marked for identification.)
10                    - - - -
11      (The witness reviewed the document.)
12                    - - - -
13 BY MR. FRIESEN:
14 Q.   Now, let me tell you something about this, and
15      then I'll ask you some questions.
16      These are materials for a meeting of
17      the audit committee of AHERF held on
18      October 15th, 1997.
19      Now, I know you were neither on the
20      audit committee of AHERF nor on the AHERF board
21      at that time, and you may well have never seen
22      any of this, but I want to know specifically if
23      you go to the page ending with the Bates number
24      1967, it says draft at the top.
25 A.   Yeah.

14 (Pages 53 to 56)