TAB 207

# AHERF

**Allegheny Health, Education and
Research Foundation**

*D.L. Clark Building, 4th Floor
Pittsburgh, Pennsylvania 15212*

### *Memorandum*

TO:        Charles P. Morrison
           Senior Vice President and CFO, Eastern Region

FROM:      Daniel J. Cancelmi
           Senior Director, Corporate Accounting and Financial Reporting

DATE:      March 23, 1998

SUBJECT:   **Transfer of Self Insurance and Pension Liabilities**

Several years ago, the various self insurance and pension liabilities of the hospitals were transferred from their respective balance sheets to AHERF's balance sheet since the accounting functions for these areas were centralized. When these liabilities were transferred to AHERF, they were transferred through the intercompany liability accounts. In short, the self insurance and pension liabilities on the hospitals' balance sheet were re-characterized as intercompany liabilities since these liabilities were moved to AHERF

Given the heightened awareness of the hospitals' intercompany balances in recent months, a determination was made in January 1998 to transfer the self insurance and pension liabilities back to the hospitals' balance sheet This transfer resulted in a reduction of the hospitals' intercompany liabilities

The following summarizes the self insurance and pension liabilities transferred back to the hospitals

### ($ in 000s)

| | Workers' Compensation | Malpractice | Pension | Total |
|---|---|---|---|---|
| Management Services | $    48 | $    --- | $   861 | $   909 |
| MCPH | 4,765 | 21,953 | 3,819 | 30,537 |
| Hahnemann | 5,116 | 13,587 | 5,943 | 24,646 |
| St. Christopher's | 1,419 | 4,411 | 3,227 | 9,057 |
| AUHS | 176 | --- | 11,052 | 11,228 |
| Bucks County | 467 | 1,945 | 1,094 | 3,506 |
| Elkins Park | 1,446 | 3,815 | 1,299 | 6,560 |
| Graduate | 2,525 | 6,188 | 3,032 | 11,745 |
| City Avenue | 1,721 | 1,173 | --- | 2,894 |
| Parkview | 702 | 1,206 | --- | 1,908 |
| Rancocas | --- | 401 | 1,744 | 2,145 |
| Mt. Sinai | 461 | 929 | 532 | 1,922 |
| Total | $18,846 | $55,608 | $32,603 | $107,057 |

DEPOSITION
EXHIBIT
11 30
2-7-63

PENGAD 800-631-6989

Charles P. Morrison
March 23, 1998
Page 2

Given the long-term nature of these liabilities, the tail period of these liabilities from a funding perspective is probably in the 5 to 10 year range.  Accordingly, the liabilities will not have to be fully liquidated in the near term.  Fiscal 1999 cash funding requirements for the liabilities will be determined when updated actuarial information is received

*If you have any questions or need additional information, please contact me at your convenience.*

DJC/jaf
s/acc/psfsd/wp/data/morrison/rfcf.lsb.mem

cc:     Al Adamczak
        Peter Keyes
        Chuck Lisman

DC8366 page 2 of 2

TAB 208

Dwight Kasperbauer

1              IN THE UNITED STATES DISTRICT COURT FOR THE     Page 1
                      WESTERN DISTRICT OF PENNSYLVANIA
2

3

4      THE OFFICIAL COMMITTEE OF        )
       UNSECURED CREDITORS OF           )
5      ALLEGHENY HEALTH,                )
       EDUCATION & RESEARCH             )
6      FOUNDATION,                      )
                                        )
7              Plaintiff,               )
                                        )    Civil Action
8          vs.                          )    Case No.  No. 00-684
                                        )
9      PRICEWATERHOUSECOOPERS,          )
       LLP,                             )
10                                      )
                                        )
               Defendant.               )
11

12

13

14     VIDEOTAPED DEPOSITION OF:   DWIGHT KASPERBAUER
15
       DATE:  March 5, 2004
16
       LOCATION:   Courtyard Marriott - Kansas City Airport
17                 7901 North Tiffany Springs,
                   Kansas City, Missouri  64153
18
       TAKEN BY:  Plaintiff
19
       REPORTED BY:  Sandra S. Sondag, CSR
20
       VIDEOGRAPHER:  Dave Perdaris, Legal Video
21

22

23

24

25

Dwight Kasperbauer

Page 90

1  A.  Approximately 1989, 1990.
2  Q.  Who was eligible to receive either a short-term or
3     long-term bonus under this program?
4  A.  The short-term bonus program went down to the vice
5     president level in the organization.  The Long-term
6     Plan was for a smaller group of people, the top six
7     or top eight people in the organization.
8  Q.  Who were those people?
9  A.  Would have been Sherif Abdelhak.  David McConnell,
10    Nancy Wynstra, Anthony Sanzo, myself, Doctor Ross.
11    There may have been others but I don't recall.
12 Q.  Doctor Kaye?
13 A.  Doctor Kaye, yeah.
14 Q.  How many people would have been eligible to receive
15    a short-term bonus if everyone at the VP level or
16    comparable level was included?
17 A.  In 1995, '6, '7, and probably, well, the academic
18    chairmen were included at that time, so it could
19    have been in the neighborhood of a hundred plus
20    people.
21 Q.  What was the purpose of the Incentive Program?
22 A.  It was to incend or motivate and reward for
23    attainment of goals and objectives.
24
25          (Document was marked Deposition

Page 91

1          Exhibit Number 2476 for identification.)
2
3  Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
4     what's been marked as Exhibit 2476.  Again, I'll
5     give you a chance to look at this.  My question is
6     going to be if you recognize this document?
7  A.  Yes, I recognize this document.
8  Q.  Okay.  What is this document?
9  A.  It is the -- it's the minutes of the AHERF
10    Compensation Committee held on March 7th, 1995.
11 Q.  Okay.  And were these minutes prepared in the
12    ordinary course of AHERF's business in its regular
13    practice?
14 A.  Yes.  Nancy Wynstra would have prepared the minutes
15    to the meeting.
16 Q.  And would you have reviewed these minutes as part
17    of your responsibilities as HR Vice President?
18 A.  Yes, I would usually do that.
19 Q.  And would you have kept a copy of these in your
20    file?
21 A.  Yes, probably.
22 Q.  Okay.  If you turn to the page, it's Page 3 of the
23    minutes, the top is a Paragraph C.  It says,
24    "Mr. Abdelhak's--" let me take us one step back.
25    You attended this meeting; right.

Page 92

1  A.  Yes, I did.
2  Q.  Okay.  Do you remember attending it?
3  A.  Not specifically.
4  Q.  Okay.
5  A.  No.
6  Q.  Page 3, it begins, "Mr. Abdelhak presented an
7     overview of the proposed revisions to the Annual
8     and Long-term Incentive Plans.
9        First of all, that is a reference to the
10    incentive plans you and I have just been
11    discussing; is that correct?
12 A.  Yes, correct.
13 Q.  The Annual Plan governed short-term bonuses; is
14    that right?
15 A.  Yes.
16 Q.  And the Long-term Incentive Plan obviously governed
17    long-term bonuses?
18 A.  Correct.
19 Q   The sentence continues with text, "Noting that
20    these proposed revisions have been developed as a
21    result of concerns expressed by the Committee that
22    the prior plans did not reflect an appropriate
23    balance last between the various mission elements
24    of the organization and the need for the
25    organization to retain financial strength."

Page 93

1  --   Do you remember that these incentive plans were
2     revised around March of 1995?
3  A.  I don't recall.
4  Q.  Let me -- I'm not trying to play hide the ball
5     here.  Let me refer you to the page that's labeled
6     2914 in the bottom right-hand corner.
7  A.  Okay.
8  Q.  Okay.  What is this document that begins on that
9     page?
10 A.  It's a plan summary for the Management Annual
11    Incentive Plan for AHERF for Administrative Guide.
12 Q.  So this is a plan governing the short-term bonuses?
13 A.  That's correct.
14 Q.  If you look at the last page of this summary, which
15    is Page 7, and is also Bates labeled 2920, under
16    Paragraph 20, "Effective Date", it says, "The Plan
17    is effective as of July 1, 1994 and shall remain in
18    effect until terminated by the Compensation
19    Committee."
20       Does this refresh your memory that this plan --
21    or this is the summary of the plan that was in
22    effect as of July 1, '94?
23 A.  That's correct, yes.
24 Q.  Are you aware of any provisions that governed the
25    plan other than these pages that we've just

24 (Pages 90 to 93)

Page 94

1    referred to here, 2914 through 2920?
2 A. Not that I'm aware of, no.
3 Q. So this is, more or less, the Plan?
4 A. Yes.
5 Q. Okay. If you turn to Page 2 of the Plan. It's on
6    2915.
7 A. (Witness complies).
8 Q. At the top it says, "Must Goals"?
9 A. Uh-huh, I see that.
10 Q. What's your understanding as to what the "Must
11    Goals" were of the plan?
12        MS. DeMASI: Objection to form.
13 A. I don't think I recall what they were.
14 Q. (BY MR. TAMBURRI) Who prepared this Plan? Who
15    would have prepared it?
16 A. I don't recognize the formatting as something that
17    would have come out of my office, so this might
18    have been prepared by MCG.
19 Q. If you look at Page 4 of the Plan, there's a table
20    in the middle of the page. Do you see this?
21 A. Uh-huh.
22 Q. What's your understanding as to what that table
23    depicts?
24 A. That would help determine the individual's bonus
25    award based upon the individual's performance and

Page 95

1    the organizational performance.
2 Q. So the calculation of an executive's bonus was
3    dependent on the success or lack thereof of his or
4    her business unit; right?
5 A. Right.
6 Q. But --
7 A. If it's business unit achieved expectations and the
8    individual achieved expectations, the target -- the
9    bonus would be 20 percent. It could be, I guess,
10    as low as 15 and as high as 25, according to this.
11 Q. Okay. Is it fair to say, looking at this table,
12    that if an executive was eligible for a bonus
13    ranging between 5 percent and 35 percent of his or
14    her salary, depending on how he or she performed
15    and how his or her business unit performed?
16 A. Yeah. And I would probably go on to say that
17    judgement could be applied, but it could go from
18    zero to 40 percent.
19 Q. Okay. And this just refers to the short-term
20    bonuses?
21 A. That's correct.
22 Q. Did you understand that some of the criteria for
23    determining whether any executive was eligible for
24    a short-term bonus was the financial performance of
25    AHERF?

Page 96

1        MS. DeMASI: Objection.
2 A. There were financial measures in the plans, yes.
3 Q. (BY MR. TAMBURRI) Okay.
4
5       (Document was marked Deposition
6       Exhibit Number 2477 for identification.)
7
8 Q. (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
9    what's been marked as Exhibit 2477. Do you
10    recognize this document?
11 A. Yes, I do. It appears to be a report that would
12    have been put together in preparation for
13    determining incentive compensation. Doesn't say
14    that but I think that was the purpose of it.
15 Q. Okay. Do you know who prepared this document?
16 A. Not for sure, no.
17 Q. Would you have received a copy of this document at
18    or around the time that it was prepared?
19 A. Most likely, yes.
20 Q. Would you have kept this in your files in the HR
21    Department?
22 A. Yes.
23 Q. Why would you have done that?
24 A. Well, this is, I guess, a part of the incentive
25    compensation, so I keep that as a file for

Page 97

1    documentation purposes.
2 Q. If you turn to the second page.
3 A. Uh-huh.
4 Q. And if you look at the footer, it says, "AA:kw"?
5 A. Uh-huh.
6 Q. Does that lead you to think that Al Adamczak
7    prepared this?
8 A. I would conclude that, yes.
9 Q. This document lists six performance measures. Do
10    you see them listed there?
11 A. Yes, I do.
12 Q. Is it your understanding that these are the six
13    performance measures that AHERF had to satisfy for
14    any executive to be eligible for either a
15    short-term or a long-term bonus under this
16    Incentive Plan?
17 A. I think so, without going back and seeing what
18    might have been set in the minutes at the beginning
19    of the fiscal year.
20 Q. Okay.
21 A. But I -- I would conclude that, yes.
22 Q. Okay. If we can look at these, could you tell me
23    what these performance measures, first of all, what
24    they were and what they were designed to measure?
25        MS. DeMASI: I'm sorry, do you want him

25 (Pages 94 to 97)

Dwight Kasperbauer

---

Page 98

1  to go by one by one or --
2         MR. TAMBURRI: Yeah.
3  Q. (BY MR. TAMBURRI) Do you mind going one by one?
4  A. No not at all. The first measure appears to be a
5     measure of the cost per adjusted discharge, a
6     measure of how much it costs for us to deliver
7     care. And it indicates that our decrease was 3 and
8     a half percent, while the medical component cost
9     index increased 4.7 percent. So our costs went --
10    our costs went down at a time when the Consumer
11    Price Index was going up.
12 Q. Can I ask you about this first -- I don't mean to
13    interrupt.
14 A. No.
15 Q. What was this designed -- what was the purpose of
16    this, of this Performance Measure, in layman's
17    terms?
18 A. To incend people to not be wasteful with expenses.
19 Q. Okay.
20 A. Operating results, as measured by the excess of
21    revenue over non-operating gains over expenses.
22       So that's, essentially, the margin, operating
23    margin of the company. And the comment is that the
24    excessive revenue, non operating gains over
25    expenses exceeded the target by $120,000.

---

Page 99

1         So we were successful in generating a higher
2     operating margin than was anticipated.
3  Q. This second performance measure was designed,
4     essentially, to measure net income of AHERF; is
5     that a fair statement?
6         MS. DeMASI: Objection, form.
7  A. Yeah, I guess -- yeah, operating profit.
8  Q. (BY MR. TAMBURRI) Okay. How about the third
9     performance measure?
10 A. This is a measure of increase in net equity of the
11    organization or of value of the organization. And
12    it increased at a rate greater than the Consumer
13    Price Index, so the equity, the value of the
14    organization went up.
15 Q. This is a measure -- Performance Measure Number 3
16    is designed to measure the net worth of AHERF?
17 A. Yeah, that would be accurate.
18 Q. What about the fourth performance measure?
19 A. The fourth one deals with maintaining a level of
20    uncompensated care for patient services, and
21    uncompensated care is a percentage of net patient
22    revenue decreased. And as I recall, managing
23    uncompensated care was a measure of trying to
24    control bad debt.
25 Q. Okay.

---

Page 100

1  A. And managing appropriately other forms of
2     uncompensated care, charity care.
3  Q. Okay. What about the fifth performance measure?
4  A. This is an incentive to recognize increased volume
5     or business activity, occupancy rate measured by
6     admission. So it's designed to reflect reward for
7     growing the organization.
8  Q. How about the sixth performance measure?
9  A. That's a measure of research funding. The idea is
10    to attract more research funding to support
11    research within the organization.
12 Q. These six performance measures were all measures of
13    AHERF's performance during fiscal year '95 rather
14    than the performance of any of its subsidiaries; is
15    that --
16 A. Correct.
17 Q. Okay.
18 A. That's correct.
19 Q. And is it your understanding that all six of these
20    performance measures had to be satisfied for AHERF
21    executives to be eligible for bonuses?
22 A. I don't know if they all had to be satisfied. I
23    think these were the factors that the Compensation
24    Committee looked at when they evaluated
25    performance, but I don't know -- going back to what

---

Page 101

1     you said earlier about must goals --
2  Q. Okay.
3  A. -- I don't know if these were expressed as must
4     goals or not, I don't recall.
5  Q. Okay. If you look at the top of the document, it
6     says, "The following quantitative performance
7     measures, which are compiled primarily from
8     information contained within the audited financial
9     statements, where appropriate, and which have been
10    reviewed and verified by Coopers & Lybrand, are
11    intended to assist in the annual evaluation of
12    AHERF's performance and that of its key managers
13    and employees."
14       What was Coopers & Lybrand's role in this
15    incentive?
16 A. It's my understanding that they perform what's
17    called in the business as an agreed-upon procedures
18    audit, which is essentially a review and
19    affirmation that the information that's provided is
20    provided consistent with procedures and business
21    practices.
22 Q. Okay. After reviewing that first sentence, is it
23    your recollection that Coopers & Lybrand -- Coopers
24    & Lybrand evaluated whether AHERF -- let me take a
25    step -- I'm going to ask you that question in a

---

26 (Pages 98 to 101)

Page 102

1  second, let me just mark this, first.
2
3           (Document was marked Deposition
4           Exhibit Number 2478 for identification.)
5
6  Q.  (BY MR. TAMBURRI)  Let me show you what's been
7      marked as Exhibit 2478. I'll give you a chance to
8      look at this.
9  A.  Okay.
10 Q.  Do you recognize this document?
11 A.  Yes, I do.
12 Q.  What is that document?
13 A.  This is a letter back to me from Coopers & Lybrand
14     indicating that they have completed an agreed-upon
15     procedures review that I had requested of them in
16     connection with the incentive plans.
17 Q.  Did you -- would you have received this document in
18     your capacity as HR VP of AHERF?
19 A.  Yes, I would have.
20 Q.  Did you review it at the time you received it?
21 A.  I most certainly did.
22 Q.  Would you have kept it in your file?
23 A.  Yes.
24 Q.  If you'd turn to Page DBR-AA 22482.
25 A.  (Witness complies).

Page 103

1  Q.  Are these the agreed-upon procedures that you had
2      mentioned earlier that AHERF had with Coopers &
3      Lybrand for, or in connection with the fiscal year
4      '95 performance measures?
5  A.  Yes.
6  Q.  If you look down at "Excess Deficiency of Revenue";
7      do you see that?
8  A.  Yes, I do.
9  Q.  What's your understanding as to how AHERF -- I'm
10     sorry, how Coopers determined whether or not AHERF
11     had -- let me take a step back.
12     What's your understanding how this process
13     worked with Coopers' involvement? Did Coopers do
14     calculations for AHERF as it related to these
15     performance measures?
16         MS. DeMASI: Objection to form.
17 A.  I don't know.
18 Q.  (BY MR. TAMBURRI)  Okay. Let me ask you to turn to
19     the last page of the document. Or last two pages,
20     sorry.
21 A.  (Witness complies).
22 Q.  Do you see that these are calculations of the
23     performance measures for 1995?
24         MS. DeMASI: Objection to form.
25 A.  Yes, I do.

Page 104

1  Q.  (BY MR. TAMBURRI)  Okay  Do you know who prepared
2      this document?
3  A.  I would assume by the footer that it was Al
4      Adamczak is the initials that appear at the bottom
5      of the form.
6  Q.  Okay.  Does it refresh your recollection that AHERF
7      calculated these or performed these calculations
8      rather than Coopers & Lybrand?
9  A.  Yeah, it would appear that we, Al Adamczak
10     submitted these for consideration by Coopers &
11     Lybrand as part of the audit.
12 Q.  If that is what -- if that's how this occurred,
13     that Mr. Adamczak performed these calculations, and
14     these were submitted to Coopers, what was Coopers'
15     role once it received these calculations? What's
16     your understanding?
17 A.  That they would verify their accuracy.
18 Q.  How did Coopers do that?
19         MS. DeMASI: Objection to form.
20 A.  I don't know.
21 Q.  (BY MR. TAMBURRI)  Let me refer to you to Page 1,
22     which is 22482.
23         MS. DeMASI: Page 1 of Exhibit 1?
24         MR. TAMBURRI: Yeah.
25         MS. DeMASI: I think we're about to

Page 105

1      change the tape.
2         MR. TAMBURRI: Oh, okay.
3
4           (Brief Recess)
5
6  Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me ask you
7      about the agreed-upon procedures that start on
8      22482. How did these agreed-upon procedures come
9      about?
10         MS. DeMASI: Objection to form.
11 A.  I think as a part of the early communications or
12     discussions with the Compensation Committee, that
13     they wanted review of information that was
14     presented to them for validity and accuracy for
15     determining incentive compensation.
16 Q.  (BY MR. TAMBURRI)  Okay.
17 A.  So they wanted an outside, someone outside the HR
18     Department or Finance Department to validate the
19     information.
20 Q.  Were you involved in the preparation of these
21     agreed-upon procedures?
22 A.  I would say to some degree, I don't recall
23     specifically.
24 Q.  If you look down at "Excess Deficiency of Revenue";
25     do you see where that bullet point begins?

27 (Pages 102 to 105)

Dwight Kasperbauer

Page 106

1   A.  Yes, I do.
2   Q.  Underneath it says, "We agree the excess
3       (deficiency) of revenue and non-operating gains
4       over expenses to information contained in the
5       audited financial statements and to board budget
6       and management budget information provided by AHERF
7       management for the respective business units."
8   A.  I see that.
9   Q.  Do you -- was it your understanding that Coopers
10      was using audited financial statements to determine
11      whether AHERF properly calculated it's achieving or
12      lack thereof of the performance majors?
13          MS. DeMASI:  Objection to form.
14  A.  I would have to say so based upon what's stated
15      here.  That's the only knowledge that I would have.
16  Q.  (BY MR. TAMBURRI)  Okay.  Did you ever talk to
17      anyone at Coopers about how they were implementing
18      these agreed-upon procedures?
19  A.  No, not specifically.  And I think I sent them the
20      letter asking them to engage in these agreed-upon
21      procedures, and then this is the response that came
22      back.
23  Q.  As to the Net Assets, that bullet that begins "Net
24      Assets"?
25  A.  I see it.

Page 107

1   Q.  It says, "We agreed net asset balances to
2       information contained in the audited financial
3       statements for the respective business units."
4           Do you have any recollection as to whether
5       Coopers & Lybrand was using audited financial
6       statements of AHERF as part of these agreed-upon
7       procedures?
8   A.  I don't know for sure, I'd have to rely upon what's
9       stated here.
10  Q.  Do you have any reason to believe that Coopers was
11      not using the audited financial statements as part
12      of these agreed-upon procedures?
13  A.  No, I don't.
14
15          (Document was marked Deposition
16          Exhibit Number 2479 for identification.)
17
18  Q.  (BY MR. TAMBURRI)  Let me show you what's been
19      marked as Exhibit 2479.  Do you recognize this
20      document?
21  A.  These are the minutes from the October 3rd, 1995
22      AHERF Compensation Committee meeting.
23  Q.  Okay.  Did you attend this meeting?
24  A.  Yes, I did.
25  Q.  And you would have received these minutes as an

Page 108

1       invitee of that committee?
2   A.  Yes, I would.
3   Q.  Okay.  Did you maintain these minutes in your file?
4   A.  Yes, I would have.
5   Q.  Okay.  If you'd look at Page 4 of the minutes.
6   A.  (Witness complies).
7   Q.  Paragraph 8 is entitled "AHERF Incentive Plan Award
8       Performance Report."
9   A.  Yes.
10  Q.  It says that you presented an auditor's report on
11      the performance of the organization?  Do you
12      remember presenting that report?
13  A.  No, I don't but I'm sure I did.
14  Q.  Do you have -- do you believe that the auditor's
15      report that you presented is Exhibit 2478?
16  A.  It would appear to be that, yes.  Essentially the
17      same format.
18  Q.  Is it your understanding that Coopers & Lybrand,
19      the report prepared by Coopers & Lybrand indicated
20      that AHERF had attained the six performance
21      measures for fiscal year 1995 that we talked about
22      earlier?
23          MS. DeMASI:  Objection to form.
24  A.  Yes.
25  Q.  (BY MR. TAMBURRI)  If you'd turn to the next page,

Page 109

1       Page 5 of the minutes.
2   A.  (Witness complies).
3   Q.  Do you see the "Whereas" clause?  It says,
4       "Whereas, the performance threshold measures
5       adopted for Fiscal Year 1995 are:"  And then it
6       lists six of the performance measures?
7   A.  Uh-huh.
8   Q.  The six performance measures listed are the ones,
9       the six that you and I talked about earlier;
10      correct?
11  A.  Correct.
12  Q.  Does this refresh your recollection that these were
13      in fact, these six performance measures, adopted by
14      the Compensation Committee prior to beginning of
15      fiscal year '95?
16  A.  Yes.
17  Q.  Okay.  As a result of this meeting, did the
18      committee authorize AHERF to distribute Short-term
19      and Long-term Incentive Awards for 1995?
20  A.  Yes.
21  Q.  Were those incentive awards in fact distributed to
22      the eligible executives?
23  A.  Yes, they were.
24  Q.  Do you know who received short-term and long-term
25      bonuses for fiscal year 1995 performances?

www.rennillo.com

Cleveland (216) 523-1313                                    Akron (330) 374-1313

Dwight Kasperbauer

Page 110

1  A.  It would have been the top seven or eight people in
2      the organization in terms of the short and long
3      term, and then other vice president level people.
4  Q.  Okay.
5  A.  More than I can recall.
6  Q.  Okay. Is it your understanding that the committee
7      approved the award of -- the Compensation Committee
8      approved the award of those incentive bonuses
9      because these six performance measures were indeed
10     satisfied for 1995?
11 A.  Yes.
12 Q.  Do you have an understanding as to why the
13     agreed-upon procedures that Coopers & Lybrand
14     implemented in connection with these performance
15     measures included a review of the audited financial
16     statements by Coopers?
17         MS. DeMASI: Object to the form.
18 Q.  (BY MR. TAMBURRI) Do you know what I'm asking?
19     Do you understand?
20 A.  Not exactly, no
21 Q.  Why is it that -- what's you're -- why is it that
22     Coopers was asked to prepare AHERF's calculations,
23     audited financial statements?
24         MS. DeMASI: Objection to form.
25 A.  It's my understanding that those are the official

Page 111

1      results of the organization. They're attested to
2      by certified public accountants. And that's the
3      authority that you would go to for information.
4  Q.  (BY MR. TAMBURRI) Okay. Did you ever -- did you
5      believe that for purposes of calculating net income
6      as a performance measure, the audited financial
7      statements would be the best source of information?
8  A.  Yes.
9  Q.  Why do you say that?
10 A.  Because they're reviewed by, or analyzed by
11     professionals who are independent of the
12     organization. That's the role of the public
13     accountant, to review the work that's done by the
14     organization to attest to its accuracy.
15 Q.  And you held that belief in fiscal year '95?
16 A.  Yes, I did.
17 Q.  Did you believe, for purposes of fiscal year '95,
18     that the audited financial statements of AHERF were
19     the best indicator of AHERF's net worth for
20     purposes of determining whether AHERF satisfied
21     performance measures regarding its net worth?
22 A.  Yes.
23 Q.  Why do you say that?
24 A.  Again, it's an independent body that's reviewing
25     and attesting to the work that's prepared by the

Page 112

1      people in the organization. Outside the
2      organization reviewing the people that are inside
3      the organization.
4  Q.  Do you know if the performance measures, the six
5      performance measures that we talked about earlier
6      changed in any way between fiscal year 1995 and
7      1996?
8  A.  I think they did change from time to time
9  Q.  Okay. Do you remember what any of those changes
10     were?
11 A.  Not off the top of my head, no.
12 Q.  Okay.
13
14         (Document was marked Deposition
15         Exhibit Number 2480 for identification.)
16
17 Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, earlier you
18     expressed an interest in getting out of here, or
19     not getting out of here, but --
20 A.  Getting out of here.
21 Q.  -- finishing early.
22 A.  Yes.
23 Q.  I recognize that. If, however, you want to take a
24     break for lunch, just let me know. I'm happy to do
25     whatever you want to do, so it's up to you, really.

Page 113

1  A.  I'm fine to continue.
2  Q.  That's fine with me. Okay.
3      Let me show you what's been marked as
4      Exhibit 2480. Do you recognize this document?
5  A.  This appears to be a report prepared by Al Adamczak
6      concerning the AHERF performance measures for
7      fiscal year 1996.
8  Q.  And those performance measures were the performance
9      measures established for determining whether or not
10     AHERF executives would receive bonuses under the
11     incentive program?
12 A.  That's correct.
13 Q.  Did you receive this document at or about the time
14     it was generated?
15 A.  Yes, I would have.
16 Q.  You would have kept it in your file?
17 A.  Yes, correct.
18 Q.  You would have received it because you were the HR
19     VP; is that right?
20 A.  That's correct.
21 Q.  Does this document accurately depict the six
22     performance measures that have been established for
23     fiscal year '96 for purposes of determining whether
24     AHERF executives would receive bonuses during, for
25     fiscal year '96?

29 (Pages 110 to 113)

Dwight Kasperbauer

Page 114

1  A.  I believe it to be accurate, yes.
2  Q.  Okay. If you look at Performance Measure Number 2,
3     it's listed as "Achieve favorable overall operating
4     results as measured by net income in excess of
5     established targets."
6        Net income, again, was a performance measure
7     for fiscal year '96?
8  A.  Correct.
9  Q.  Performance Measure Number 3. It says, "Achieve a
10     favorable trend in financial viability, as measured
11     by an increase in net equity, which is greater than
12     the change in the consumer price index."
13        Again, net worth was a performance measure for
14     fiscal year 1996?
15  A.  That's correct.
16  Q.  Is it your understanding that determination of
17     AHERF's net income for purposes of calculating --
18     let me take a step back.
19        Is it your understanding that AHERF's 1996
20     fiscal year audited financial statements were used
21     to determine whether AHERF satisfied the second
22     performance measure which dealt with net income?
23        MS. DeMASI: Objection to form.
24  A.  I believe that to be the case, yes.
25  Q.  (BY MR. TAMBURRI) And why do you say that?

Page 115

1  A.  As we discussed earlier, as a part of the
2     agreed-upon procedures, I guess I would expect that
3     the financial performance results would be tied
4     back to the audited financial statements.
5  Q.  Performance Measure Number 3 we discussed is a
6     measurement of AHERF's net worth?
7  A.  That's correct.
8  Q.  Is it your understanding that AHERF's net worth was
9     calculated for purposes of determining whether
10     AHERF satisfied Performance Measure Number 3 by
11     using the 1996 audited financial statements for
12     AHERF?
13  A.  Yes.
14  Q.  If you look back at the second performance measure
15     regarding net income. Was there anything other
16     than audited financial statements used to determine
17     whether AHERF satisfied that performance measure?
18  A.  No, this document would indicate that they would
19     use the audited financial statements.
20  Q.  And nothing else?
21  A.  And nothing else, yes.
22  Q.  Okay. Is it fair to say that the audited financial
23     statements were the only documents, or the only
24     information used to calculate or to determine
25     whether AHERF satisfied the performance measure

Page 116

1     regarding its net worth for fiscal year '96?
2        MS. DeMASI: Objection to form.
3  A.  As represented by this document, yes
4  Q.  (BY MR. TAMBURRI) Okay. Do you have any reason to
5     think that any other information was used other
6     than the audited financial statements?
7  A.  No.
8  Q.  Did anyone at Coopers ever tell you that
9     information other than the audited financial
10     statements were used to determine whether AHERF
11     satisfied Performance Measures Numbers 2 and 3
12     during fiscal year '96?
13  A.  No.
14  Q.  How about for 1995?
15  A.  No.
16
17        (Document was marked Deposition
18        Exhibit Number 2481 for identification.)
19
20  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
21     what's been marked as Exhibit 2481. Do you
22     recognize this document?
23  A.  Yes, I do. This is the -- these are the minutes
24     from the October 15th, 1996 AHERF Compensation
25     Committee meeting.

Page 117

1  Q.  Okay. And you attended this meeting?
2  A.  Yes, I did.
3  Q.  And you would have received these minutes as the VP
4     of HR and an invitee of the committee?
5  A.  Yes, I would have.
6  Q.  And you would have kept a copy of these in your
7     file?
8  A.  Yes, I would have.
9  Q.  If you'd turn to Page 4 of the minutes.
10  A.  (Witness complies).
11  Q.  First "Whereas" clause that you can see on the
12     page. It says, "Whereas, the performance measures
13     adopted for Fiscal Year 1996 and the results for
14     each of those goals are:" And it lists six
15     performance measures. Do you see that?
16  A.  I see them, yes.
17  Q.  Do these minutes accurately reflect what the
18     performance measures were for determining whether
19     incentive bonuses would be distributed for fiscal
20     year '96?
21  A.  Yes.
22  Q.  And they are the same six performance measures that
23     were listed in Exhibit 2480?
24  A.  Yes.
25  Q.  And the Compensation Committee approved the

30 (Pages 114 to 117)

Dwight Kasperbauer

Page 118

1    distribution of short-term and long-term bonuses at
2    this meeting because these six performance measures
3    had been satisfied by AHERF?
4  A.  Yes.
5  Q.  Who would have received short-term and long-term
6    bonuses accordingly?
7  A   They're listed starting on Page 6. Abdelhak,
8    Sherif Abdelhak, Calvin Bland, Walter Cohen, Tom
9    Galinski, myself, Doctor Kaye, David McConnell,
10    Leonard Ross, Anthony Sanzo, Nancy Wynstra. And
11    then there is a long list of other vice president
12    level people that would have received bonuses at
13    their level in the organization.
14  Q.  Okay. And those people are listed on Page 7 and 8?
15  A.  Yes.
16  Q   Of the minutes? Is it your understanding that the
17    committee approved, the Compensation Committee
18    approved the payment of these bonuses because these
19    six performance measures had, in fact, been
20    satisfied?
21  A.  Yes, that's my understanding.
22  Q.  If you'll look at Page 4 of the minutes.
23  A.  Yes.
24  Q.  The second performance measure says, "Achieve
25    favorable operating results, as measured by net

Page 119

1    income, in excess of established targets."
2      Is it your understanding that committee was
3    told that this performance measure was satisfied
4    because net income exceeded the established target
5    by $5,538 -- I'm sorry $5,538,000?
6      MS. DeMASI: Objection, form.
7  A.  Yes.
8  Q.  (BY MR. TAMBURRI) Okay. Is that because actual
9    fiscal year net income for 1996 was represented to
10    be $20,697,000?
11  A.  That's correct.
12  Q.  Do you know if that actually was fiscal year net
13    income for AHERF in 1996?
14  A.  I only know it because I see it here.
15  Q.  Okay. You don't have any reason to know it
16    otherwise?
17  A.  No.
18      MR. TAMBURRI: You know what, this has
19    previously been marked.
20      THE COURT REPORTER: Okay. Then I don't
21    need to mark it.
22  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, let me show you
23    what's been previously marked as Exhibit Number
24    1001. Do you recognize this document?
25  A.  This is a reproduction of the AHERF audited

Page 120

1    financial statements for fiscal year 1996
2  Q.  Would you have received a copy of this document at
3    the time it was prepared or shortly thereafter?
4  A.  Yes.
5  Q.  Why would you have received it?
6  A.  This, I believe, was a printed booklet, and it was
7    in general distribution of the employees of the
8    organization.
9  Q.  Okay. You would have received it in the normal
10    course of being an employee?
11  A.  (Witness nods head up and down.)
12  Q.  Did you keep a copy of it in your file?
13  A.  I don't know.
14      MS. DeMASI: Mark, again, just as to the
15    completeness of the document, is this intended to
16    be just Tab 1 of the Auditors Financial Statements
17    for Fiscal Year '96?
18      MR. TAMBURRI: Let me just double check
19    here.
20      MS. DeMASI: I don't think it contains
21    their main --
22      MR. TAMBURRI: I'm sorry?
23      MS. DeMASI: I don't think it contains
24    their main audit financial statements.
25      MR. TAMBURRI: Oh, just for AHERF, you

Page 121

1    mean?
2      MS. DeMASI: Uh-huh.
3      MR. TAMBURRI: Yeah, that's fine.
4  Q.  (BY MR. TAMBURRI) I'll just represent to you that
5    these are just the -- these are just the audited
6    financial statements for AHERF.
7  A.  Oh, okay.
8  Q.  And if you'll look at Page, the second page, you'll
9    see how they're --
10  A.  Yeah.
11  Q.  -- referenced to some of the other subsidiaries?
12  A.  Yeah. And I take this back. This probably wasn't
13    printed in broad distribution. There's a summary
14    financial statement, so this was probably just
15    distributed to management, upper management people
16    in the organization.
17  Q.  If you'll look at Page 3 of the exhibit.
18  A.  (Witness complies).
19  Q.  You see it's entitled, "Consolidated statement of
20    operations for the year end June 30, 1996."
21  A.  Uh-huh.
22  Q.  Do you see that?
23  A.  Yes, I do.
24  Q.  Is it your understanding that this is a reflection
25    of AHERF's income fiscal year 1996?

31 (Pages 118 to 121)

Dwight Kasperbauer

Page 122

1  A.  Yes.
2  Q.  Do you see that the audited financial statements on
3      Page, or Page 3 of AHERF's audit and financial
4      statements reflect AHERF had a net loss of 11.8
5      million for fiscal year '96?
6  A.  I see that.
7  Q.  Do you remember any discussion as to whether or not
8      the calculation of AHERF's net income for purposes
9      of Performance Measure Number 2 was properly
10     performed in 1996?
11 A.  No, I don't.
12 Q.  Did you ever talk to anyone at Coopers & Lybrand
13     about the calculation of net income?
14 A.  No
15 Q.  For fiscal year '96?
16 A.  No
17 Q.  Okay.
18
19         (Document was marked Deposition
20         Exhibit Number 2482 for identification.)
21
22 Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
23     what's been marked as Exhibit 2482.  Do you
24     recognize this document?
25 A.  Yes, I do

Page 123

1  Q.  What is this document?
2  A.  It's a letter from Coopers & Lybrand to the Board
3      of Trustees of AHERF, essentially, in response to
4      my letter asking Coopers & Lybrand to do
5      agreed-upon procedures, audit, review of our
6      performance measures.  So this is their official
7      letter back to the Board of Trustees.
8  Q.  And you would have received a copy of this in the
9      ordinary course of your business?
10 A.  Yes, I would have as HR Vice president.  Yes, I
11     would have.
12 Q.  And you would have kept a copy of this document in
13     your file as your practice?
14 A.  Yes, I would have.
15 Q.  If you'd turn to the second page of the exhibit.
16     It's entitled "Agreed-upon Procedures"; do you see
17     that?
18 A.  Exhibit 1?
19 Q.  Yeah.  Starts on Page 42226
20 A.  Yes, I have it.
21 Q.  Does Exhibit 1, which starts on 42226 and runs
22     through 42228 accurately reflect the agreed-upon
23     procedures for assessing performance measures of
24     fiscal year '96?
25 A.  Yes, to the best of my recollection.

Page 124

1  Q.  And you were involved in determining what those
2      agreed-upon procedures were for fiscal year '96?
3          MR. HENNING:  Objection to form.
4  A.  In the summary form I wouldn't say I got involved
5      in the details of what they would be, but as
6      accountants and auditors that they would apply
7      their judgment to those agreed-upon procedures.
8  Q.  (BY MR. TAMBURRI)  Okay.  So short-term bonuses
9      under the Incentive Program were distributed to all
10     eligible executives for fiscal year 1995?
11 A.  Yes, to the best of my recollection.
12 Q.  Long-term bonuses, the Compensation Committee
13     approved the accrual of the long-term bonus to all
14     eligible executives based upon fiscal year, AHERF's
15     attainment of fiscal year '95 performance measures?
16 A.  That's correct.
17 Q.  All eligible AHERF executives received short-term
18     bonuses under the Incentive Plan because AHERF
19     attained this fiscal '96 -- fiscal year '96
20     performance measures?
21 A.  Yes.
22 Q.  And all eligible AHERF executives received the
23     accrual of the long-term bonus because AHERF
24     achieved its performance measures for fiscal year
25     '96?

Page 125

1  A.  Yes.
2  Q.  Do you know if short-term bonuses were distributed
3      to eligible executives in 1997, for fiscal year
4      1997?
5  A.  Fiscal year '97 would have ended June of '97.  No,
6      I don't believe so.
7  Q.  Do you know why those bonuses were not distributed?
8  A.  I think at that time we were -- if I have my years
9      correct, we were in the midst of downsizing in
10     Philadelphia, and the Compensation Committee didn't
11     approve bonuses at that time.
12
13         (Document was marked Deposition
14         Exhibit Number 2483 for identification.)
15
16 Q.  (BY MR. TAMBURRI)  Mr. Kasperbauer, let me show you
17     what's been marked as Exhibit 2483.
18 A.  Yes, I recognize this
19 Q.  Okay.  Let me take one step back for a minute.  Can
20     you take a look at 2478 again.
21 A.  (Witness complies).
22 Q.  Can you turn to Pages DBR-AA 22482 through 22484.
23 A.  Okay
24 Q.  These are the agreed-upon procedures for fiscal
25     year 1995; is that right?

32 (Pages 122 to 125)

Dwight Kasperbauer

Page 126

1   A.  Correct.
2   Q.  Did these pages accurately reflect those
3       agreed-upon procedures?
4   A.  Yes, to the best of my knowledge.
5   Q.  Okay.  Exhibit 2483, what is this document?
6   A.  This is a spreadsheet maintained or created by Dave
7       Deasy in the Payroll Department to track, on the
8       first page, Sherif Abdelhak's long-term incentive
9       accrual and subsequent distributions.
10  Q.  Okay.  And did you receive a copy of this document
11      at the time that it was prepared?
12  A.  Yes
13  Q.  Why did you receive it?
14  A.  This would have been input information to the
15      Compensation Committee regarding incentive bonuses
16      to be awarded.
17  Q.  And you would have received it because you were the
18      head of HR at the time that you did receive it?
19  A.  Yes, I administered that plan
20  Q.  Okay.  And would you have kept this in your file as
21      a business practice of yours?
22  A.  Yes, I would have.
23  Q.  Okay  Sherif Abdelhak received a long-term
24      incentive award for every year between 1988 and
25      1997; is that correct?

Page 128

1   A.  That's correct.
2   Q.  And the total accrued balance of his awards as of
3       April 30th, '98, was $383,395?
4   A.  That's correct.
5   Q.  David McConnell received a long-term incentive
6       award for every year between 1998 (sic) through
7       1997?
8   A.  That's correct.
9   Q.  And the amount of his awards range from $36,000 to
10      $110,000?
11  A.  That is also correct.
12  Q.  The accrued balance of his awards totaled $391,207
13      as of April 30th, 1998?
14  A.  That's correct.
15  Q.  Mr. Sanzo received an award under the Long-term
16      Incentive Plan every year from 1998 (sic) through
17      1997 -- 1988 through 1997?
18  A.  That's correct.
19  Q.  And the range of his awards totaled $30,000 -- or
20      ranged from $30,000 to $100,000?
21  A.  Correct.
22  Q.  The total accrued balance of his awards was
23      $352,152?
24  A.  That's correct
25  Q.  And that's as of April 30th, '98?

Page 127

1   A.  That's correct.
2   Q.  And the amount of his awards ranged, during those
3       years, between $65,000 and $185,000?
4   A.  That's correct.
5   Q.  And the total accrued balance of his awards as of
6       April 30th, 1998, was $651,357?
7   A.  Yes, correct.
8   Q.  Turn to the next page.
9   A.  (Witness complies).
10  Q.  You received a long-term incentive award for every
11      year from 1988 through 1997?
12  A.  That's correct.
13  Q.  And the amount of your awards during those years
14      ranged from $21,000 to $78,000?
15  A.  That's correct.
16  Q.  And the total accrued balance of your awards as of
17      April 30th, '98, was $280,848?
18  A.  Yes.
19  Q.  Turn to the next page.
20  A.  (Witness complies).
21  Q.  Doctor Kaye, he received a long-term incentive
22      award for every year between 1991 and 1997?
23  A.  That's correct.
24  Q.  And the total -- or the amount of his awards ranged
25      from $31,500 to $110,000?

Page 129

1   A.  That's correct.
2   Q.  Now, there were other executives that received
3       long-term awards other than the individuals listed
4       on this exhibit; right?
5   A.  Yes.
6   Q.  Some of those individuals were Nancy Wynstra --
7   A.  Possibly Doctor Ross.
8   Q.  Okay.  Joe Dionisio?
9   A.  I believe so.
10  Q.  Okay.  Did you ever meet with representatives of
11      Coopers & Lybrand during the course of their annual
12      audit?
13          MS. DeMASI:  Objection to form.  The
14      audit of the financial statements?
15          MR. TAMBURRI:  Yeah, I'm sorry, audit of
16      financial statements.
17  A.  No, not that I recall.
18  Q.  (BY MR. TAMBURRI)  Were you ever asked to provide
19      information to anyone from Coopers & Lybrand in
20      connection with its audit of the AHERF financial
21      statements?
22  A.  Only to the extent that I would have been asked for
23      retirement plan information.
24  Q.  And to the extent that you were asked for
25      information, did you provide information?

33 (Pages 126 to 129)

Dwight Kasperbauer

Page 178

1  circumstances that indicate management might under
2  certain conditions, override the Internal control
3  structure or Intentionally misstate the
4  enterprise's financial statements."
5      And the column to the right in the second
6  paragraph, the paragraph reads, "Management of
7  AHERF receives very healthy bonuses based on the
8  results of the operations. This is also a factor
9  that we consider in reviewing the results of the
10 organization."
11     Did you ever have any communications with
12 anyone at Coopers & Lybrand about the bonuses that
13 AHERF management received?
14 A.  Not that I recall.
15 Q.  Okay. Aside from the information that you provided
16 to Coopers in connection with the performance
17 measures, did you provide any other information to
18 Coopers about executive compensation?
19 A.  Not that I recall.
20 Q.  Okay.
21     MR. TAMBURRI: If you'd give me
22 five minutes to look at my notes, I think I'm done.
23 I just want to check my notes.
24     THE WITNESS: Okay.
25

Page 179

1      (Brief Recess)
2
3  Q.  (BY MR. TAMBURRI) Mr. Kasperbauer, did you -- were
4  you involved in any way in any payments made by
5  AHERF to any sporting teams in the Pennsylvania --
6  in Pennsylvania?
7  A.  No.
8  Q.  To the extent those payments were made, who would
9  have been responsible for those?
10 A.  I heard after the fact or when the public knew
11 about an arrangement that had been made with David
12 McConnell to reimburse David McConnell to get a box
13 or something at the Steelers Three River Stadium.
14 Q.  Okay. The first time you learned about that was
15 after the bankruptcy?
16 A.  Yes.
17 Q.  Earlier I showed you an exhibit in which you had
18 provided information about Mr. Abdelhak's income to
19 an insurance company?
20 A.  Yes.
21 Q.  Why were you involved in providing that information
22 to the insurance company?
23 A.  He had asked me to work through the Exec-U-Flex
24 program to try and secure additional, I think it
25 was disability insurance beyond what was available

Page 180

1  under the straight Exec-U-Flex program.
2  Q.  All right. Other than the incentive program,
3  Incentive Award Program, KEYSOP, the Executive Loan
4  Program, were there any other benefits that were
5  awarded to the senior executives that you could
6  think of?
7  A.  Nothing other than the arrangement that
8  Mr. Abdelhak had with regard with his house.
9  Q.  Okay. And that was that AHERF bought his house and
10 leased it back, or rented it back to him?
11 A.  I believe that was the arrangement, yes.
12 Q.  Were you involved in that --
13 A.  No.
14 Q.  -- in any way?
15     MR. TAMBURRI: Okay. I know it's been a
16 long day, but I appreciate your time, and I don't
17 have any more questions for you at this time.
18     THE WITNESS: Okay.
19
20     CROSS-EXAMINATION
21 BY MS. DeMASI:
22 Q.  Good afternoon, Mr. Kasperbauer.
23 A.  Good afternoon.
24 Q.  Let me just reintroduce myself, my name is Karin
25 DeMasi and I am here representing

Page 181

1  PricewaterhouseCoopers, which is the defendant in
2  this litigation. I just have a few follow-up
3  questions per the questions you were asked today.
4      First of all, I just want to understand what
5  your role is versus the Compensation Committee a
6  bit better. You weren't actually a member of the
7  Compensation Committee; is that right?
8  A.  That's correct, I was not.
9  Q.  Okay. The members of the Compensation Committee
10 were a subset of the Board members?
11 A.  That's correct, all external Board members.
12 Q.  All external Board members.
13 A.  Yes.
14 Q.  Okay. And in your capacity as the head of Human
15 Resources, you would make recommendations to the
16 Compensation Committee; is that correct?
17 A.  I would bring information to them or make
18 recommendations, yes.
19 Q.  Okay. And some of the information that you would
20 bring to them was brought by information you
21 obtained from the outside compensation consultant
22 that you referred to this morning; is that right?
23 A.  That's correct.
24 Q.  And then in all instances was it your understanding,
25 that any salary increases or benefits would have to

46 (Pages 178 to 181)

Dwight Kasperbauer

Page 182

1     be approved by the Compensation Committee?
2     A.   That was my understanding, yes.
3     Q.   You were not authorized to make those yourself, in
4         other words; is that right?
5     A.   That's correct, I was not.
6     Q.   Those were made by the outside Board members who
7         comprised the Compensation Committee?
8     A.   Yes.
9     Q.   And that was true both for executive salaries as
10        well as benefits; is that right?
11    A.   That's correct, yes.
12    Q.   And the outside consultant that I just referred to
13        that you were discussing this morning with
14        Mr. Tamburri, that's MCG; right?
15    A.   Yes.
16    Q.   And we saw some of their documents this morning,
17        right?
18    A.   Yes.
19    Q.   I believe you said this morning that MCG had
20        performed a couple of studies for AHERF at your
21        direction; is that right?
22    A.   Over the course of that ten-year period of time,
23        yes, uh-huh.
24    Q.   Okay.
25

Page 183

1         (Document was marked Deposition
2          Exhibit Number 2501 for identification.)
3
4     Q.   (BY MS. DeMASI)  For the record I've handed you
5         what's been marked as Exhibit 2501.  Just take a
6         second to look through that, Mr. Kasperbauer.
7     A.   This is a copy of a letter from David Bjork with
8         MCG to me dated March 30th, 1995.
9     Q.   Okay.  And around the time of 1995, had you asked
10        Mr. Bjork or MCG to review the compensation
11        letters -- to review the compensation levels for
12        AHERF executives?
13    A.   Yes.
14    Q.   And is this the report that they gave you as a
15        result of that?
16    A.   Yes, it is.
17    Q.   And if you turn to the last page of Exhibit 2501,
18        the last paragraph states, "On the basis of this
19        analysis," that's contained in Exhibit 2501, "we
20        conclude that the total value of compensation and
21        benefits paid and reported for the Chief Executive
22        Officer and Chief Financial Officer of AGH for
23        fiscal year 1993 were reasonable and consistent
24        with the policy established by AHERF's and AGH's
25        Board of Directors."  Do you see that?

Page 184

1     A.   Yes, I do.
2     Q.   And was it your understanding that they reached
3         that conclusion based on a study that they had
4         conducted?
5     A.   Yes, I would assume so, uh-huh.
6     Q.   Okay.  And did you rely on that conclusion in
7         making recommendations to the Compensation
8         Committee?
9     A.   Yes, I would have.
10    Q.   And based on the information that you received from
11        MCG, did you agree with that conclusion?
12    A.   Without going back through all the details, yes, I
13        assume so.
14    Q.   Did you belive at the time that the compensation
15        levels for the CEO and the CFO were reasonable and
16        consistent with the policies established at AHERF
17        and AGH?
18    A.   Yes.
19            MR. TAMBURRI:  I'm sorry, I didn't mean
20        to interrupt.  Were you asking at the time that you
21        received this study?
22    Q.   (BY MS. DeMASI)  Did you believe that at the time
23        you received this study?
24    A.   Yes.
25    Q.   And did you believe that at all times that the

Page 185

1         levels of compensation were reasonable and
2         consistent?
3     A.   Based upon the recommendations of the consultants,
4         yes.
5     Q.   And would that be true for all executive
6         management, did you believe that the compensation
7         levels of executive management were reasonable and
8         fair?
9            MR. TAMBURRI:  Object to the form.
10    A.   Yes.
11    Q.   (BY MS. DeMASI)  And is the same true of the
12        benefit packages that were provided to executive
13        management?
14    A.   Yes.
15            MR. TAMBURRI:  Same objection.
16    Q.   (BY MS. DeMASI)  You believe that those were
17        reasonable and fair?
18    A.   Yes.
19    Q.   And I take it you wouldn't have recommended the
20        benefit packages or the compensation if you didn't
21        believe that?
22    A.   Right.  And as we found out today, there are
23        certain things that I didn't know about that go
24        beyond the scope of what was recommended.
25    Q.   But in terms of what you recommended and what the

47 (Pages 182 to 185)

Dwight Kasperbauer

Page 186

1  Board approved?
2  A. Yes.
3  Q. You believed that that was all reasonable and fair?
4  A. Yes.
5  Q. And did you belive that the levels of compensation
6     being provided, of which you were aware, and the
7     benefits being provided were comparable to similar
8     organizations?
9        MR. TAMBURRI: Object to the form.
10 A. Yes.
11 Q. (BY MS. DeMASI) And again, that was based on the
12    work done by MCG?
13 A. MCG, yes.
14 Q. Did you form an opinion as to competence of MCG as
15    a compensation consultant?
16 A. Yes, I felt they were real good, very knowledgeable
17    of the industry.
18 Q. And they had particular expertise in health care as
19    well?
20 A. Yes. They, they were engaged by many, many large
21    healthcare firms.
22 Q. And their experience and specialization in
23    healthcare was one of the reasons that you decided
24    to retain MCG; is that correct?
25 A. That's correct.

Page 187

1  Q. Let me ask you to look back in your pile, if you
2     will --
3  A. Sure.
4  Q. -- to Exhibit 2464.
5  A. (Witness complies).
6  Q. I'll just ask you one other question before we turn
7     to that exhibit, Mr. Kasperbauer. Did you believe
8     that MCG was a disinterested consultant?
9  A. Yes.
10       MR. TAMBURRI: Object to the form.
11 Q. (BY MS. DeMASI) And, again, that's one of the
12    reasons that you hired MCG?
13 A. Yes.
14 Q. Do you have Exhibit 2464 in front of you?
15 A. Yes, I do.
16 Q. And this, the exhibit that Mr. Tamburri asked you
17    questions about earlier, in the second paragraph of
18    this exhibit it states, "In response to a request
19    from the Compensation Committee, MCG conducted a
20    thorough market review and advanced a letter to WP
21    Snyder III on October 4th, 1996." Do you see that?
22 A. Yes, I do.
23 Q. Who is Mr. Snyder?
24 A. Mr. Snyder is the Chairman of the Board of AHERF.
25 Q. And he was also a member of a Compensation

Page 188

1  Committee; is that right?
2  A. That's correct.
3  Q. And in that capacity he had the authorization to
4     approve levels of compensation and/or benefits?
5  A. He did, yes.
6        MS. DeMASI: Just keep that in front of
7     you for one moment,
8
9        (Document was marked Deposition
10       Exhibit Number 2502 for identification.)
11
12 Q. (BY MS. DeMASI) Have you had a chance to review
13    Exhibit 2502, Mr. Kasperbauer?
14 A. Yes, I have.
15 Q. And is this the market review that's referred to in
16    your memorandum that's Exhibit 2464?
17 A. Yes, it is.
18 Q. Is it the -- this Exhibit 2502 is the document that
19    you referred to as market review done by MCG?
20 A. That's correct.
21 Q. And did you rely on this document and on MCG -- let
22    me start again.
23    Did you rely on Exhibit 2502 created by MCG in
24    making recommendations for the Compensation
25    Committee?

Page 189

1  A. Yes.
2  Q. And did you receive a copy of Exhibit 2502?
3  A. Yes, I believe I did.
4  Q. And you received it on or around October of 1996?
5  A. Yes.
6  Q. And would you have kept Exhibit 2502 in your files
7     in the ordinary course of your business?
8  A. Yes, I would.
9  Q. And let me just ask you that same question with
10    respect to Exhibit 2501, which you reviewed a
11    moment ago, the March 30, 1995 analysis by MCG.
12 A. Yes, I would have kept that in my files.
13 Q. In your files in the ordinary course of your
14    business? And you received that on or about
15    March 30th, 1995?
16 A. Yes.
17 Q. Thank you.
18
19       (Document was marked Deposition
20       Exhibit Number 2503 for identification.)
21
22 Q. (BY MS. DeMASI) I've handed you what we've marked
23    as Exhibit 2503 and just ask you to review that.
24    Do you recognize Exhibit 2503?
25 A. Yes, I do.

48 (Pages 186 to 189)

Dwight Kasperbauer

Page 190

1  Q. And what is this Exhibit?
2  A. This is a letter addressed to me from MCG, I
3     believe David Bjork signed the letter, David Bjork,
4     a partner with MCG. It's dated September 24th,
5     1996, and it is essentially a proposal to assist
6     the Compensation Committee in the review of
7     competitiveness, reasonableness and appropriateness
8     of executive compensation.
9  Q. And would you have received this document on
10    September of 1996?
11 A. That's correct.
12 Q. And you would have kept it in your files in the
13    ordinary course of your business?
14 A. Yes, I would have.
15 Q. And had you requested MCG to prepare a proposal to
16    assist the Compensation Committee?
17 A. Yes, we did.
18 Q. And did AHERF retain MCG to perform that analysis?
19 A. Yes, we did.
20 Q. And did you rely on that analysis in making
21    recommendations to the Compensation Committee?
22 A. Yes, we did.
23 Q. If you'd turn to Page 5 of Exhibit 2503.
24 A. (Witness complies).
25 Q. Is that section entitled "MCG's Capabilities"; do

Page 191

1     you see that?
2  A. Yes.
3  Q. It says, "MCG/Healthcare is the largest executive
4     compensation firm in the world focused exclusively
5     on health care and is widely recognized as the
6     leading authority on executive compensation for
7     health care organization."
8        Mr. Kasperbauer, in the 1995, 1996, 1997 time
9     frame, did you consider MCG to be a leading
10    authority on executive compensation for health care
11    organizations?
12 A. Yes.
13       MR. TAMBURRI: Object to the form.
14 A. Yes, I did.
15 Q. (BY MS. DeMASI) Put that aside.
16       Mr. Kasperbauer, let me ask you to find in your
17    big stack there Exhibit 2478 and 2482.
18 A. (Witness complies). You said 2482?
19 Q. I did. Do you recall earlier today Mr. Tamburri
20    asking you some questions about agreed-upon
21    procedures performed by Coopers & Lybrand?
22 A. Yes.
23 Q. Okay. I just want to ask you a couple follow-up
24    questions about that. First, if you'd look at
25    Exhibit 2478, there's an agreed-upon procedures

Page 192

1     performed in 1995; is that right?
2  A. That's correct.
3  Q. If you'll look at the first paragraph of the
4     letter, the September 20th letter that's at the
5     front of this exhibit. It states, "In response to
6     your letter dated December 8th, 1995"; was that
7     your letter to Coopers & Lybrand asking Coopers &
8     Lybrand to perform these procedures?
9  A. That's correct.
10 Q. And is that essentially an engagement letter for
11    these procedures?
12 A. Yes.
13 Q. And does that engagement letter set forth the scope
14    of the engagement?
15 A. Yes.
16 Q. And then the last sentence of that paragraph says,
17    "A copy of your letter"; does that mean -- does
18    that refer to your letter of September 8th?
19 A. I'm sorry, where are you?
20 Q. The last sentence of the first paragraph. The
21    parenthetical.
22 A. Oh. "A copy of your letter has been included with
23    attachments to this letter." Yes, that would be
24    referring to my letter.
25 Q. Okay. It says, "Copy of your letter and

Page 193

1     Attachments A and B have been included as Exhibit 2
2     of this letter." Do you see a copy of your letter
3     attached to this document?
4  A. No, I do not.
5  Q. Do you see Attachment B included in this document,
6     included in this exhibit?
7  A. No, I do not.
8  Q. Does that indicate to you that this exhibit is
9     incomplete, at least with respect to the letter and
10    to Attachment B?
11 A. Yes.
12 Q. Okay. You would have received those two
13    attachments at the time?
14 A. Yes.
15 Q. And you received this. Now, I think you referred
16    earlier to the agreed-upon procedure as an audit;
17    do you recall that?
18 A. Yes.
19 Q. Okay. Did you understand, in fact, that the
20    agreed-upon procedures were not an audit?
21 A. What I understand agreed-upon procedure to be is,
22    is that a professional engages in a review of steps
23    in a process. That's my understanding of
24    agreed-upon procedures. Did we follow the
25    procedures that were mapped out.

49 (Pages 190 to 193)

TAB 209

## ALLEGHENY HEALTH, EDUCATION &RESEARCH FOUNDATION (AHERF)
## PERFORMANCE MEASURES
## FISCAL YEAR 1996

The following quantitative performance measures, which are compiled primarily from information contained within the audited financial statements, where appropriate, and which have been reviewed and verified by Coopers & Lybrand, are intended to assist in the annual evaluation of AHERF's performance and that of its key managers and employees. These performance measures, which are consistent amongst all AHERF business units, will be used in conjunction with Mr. Abdelhak's formal assessment of AHERF's operating results to assess overall performance during fiscal year 1996. Mr. Abdelhak will be present at the meeting to discuss his formal assessment of operating results along with any other relevant aspects of AHERF's overall performance.

1.  Achieve a rate of increase in the cost of health care services provided, as measured by the cost per adjusted discharge, which is lower than the change in the medical component of the consumer price index.

| | FY 96 Actual | FY 95 Actual | Decrease | Percent Decrease |
|---|---|---|---|---|
| Cost per adjusted discharge | $ 6,717 | $ 6,880 | ($ 163) | (2.4%) |

The cost per adjusted discharge decreased 2.4%, while the medical component of the consumer price index increased 4.6%.

2.  Achieve favorable overall operating results, as measured by net income, in excess of established targets.

| | FY 96 Actual | FY 96 Target | Surplus |
|---|---|---|---|
| Net income exclusive of extraordinary loss on debt refinancing | $ 20,697,000 | $ 15,159,000 | $ 5,538,000 |

Net income exceeded the target by $5,538,000.

3.  Achieve a favorable trend in financial viability, as measured by an increase in net equity, which is greater than the change in the consumer price index.

| | June 30, 1996 | June 30, 1995 | Increase | Percent Increase |
|---|---|---|---|---|
| Net equity exclusive of unusual items | $ 728,813,000 | $ 711,732,000 | $ 17,081,000 | 2.4% |

Net equity increased 2.4%, while the consumer price index increased 2.6%.

The lower than expected increase in net equity (2.4% vs. a 2.6% increase in the consumer index) is due largely to AIHG's financial results, which are significantly influenced by the start-up operations of the expanding physician network.

DEPOSITION
EXHIBIT
2480
3-5-04   SSS
FRN/GD-Bennett, N J

DBR-AA
22680

**ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION (AHERF)**
**PERFORMANCE MEASURES**
**FISCAL YEAR 1996**
**Page 2**

4. Maintain or enhance levels of uncompensated care as a percent of patient service revenue.

|  | FY 96 Actual | FY 95 Actual |
|---|---|---|
| Uncompensated care as a percent of net patient service revenue | 6.0% | 5.2% |

Uncompensated care as a percent of net patient service revenue increased from 5.2% to 6.0%.

5. Maintain or increase occupancy as measured by admissions.

|  | FY 96 Actual | FY 95 Actual | Increase |
|---|---|---|---|
| Admissions | 91,133 | 88,375 | 2,758 |

Admissions increased 2,758 or 3.1%.

6. Maintain or enhance the level of external funds used for research.

|  | FY 96 Actual | FY 95 Actual | Increase |
|---|---|---|---|
| Level of external funds used for research | $ 57,079,000 | $ 45,589,000 | $ 11,490,000 |

Levels of external funds used for research increased $11,490,000.

AA:kw
\96perfmeas.ahf

DBR-AA
22681

TAB 210

**ALLEGHENY
HEALTH,
EDUCATION AND
RESEARCH
FOUNDATION**

Dwight Kasperbauer
Executive Vice President and
Chief Human Resources Officer

Fifth Avenue Place, Suite 2900
120 Fifth Avenue
Pittsburgh, PA 15222-3009
Telephone (412) 359-3137

Broad & Vine Streets
Mail Stop 490
Philadelphia, PA 19102-1192
Telephone (215) 762-3060

September 6, 1996

William Buettner
Partner
Coopers & Lybrand
600 Grant Street - 35th Floor
Pittsburgh, PA 15219

Dear Mr Buettner

Coopers & Lybrand has been asked to perform certain agreed-upon procedures pertaining to the performance measures used by the AHERF and subsidiary Compensation Committees to evaluate management's performance and determine management incentive payments  Specifically, we are requesting that Coopers & Lybrand confirm, through agreement to underlying source documents, the performance measures as provided on Attachment A  In addition, we are requesting that you verify through recalculation and agreement to source documents the participant incentive plan compensation as provided on Attachment B

The source documents for the quantitative performance measures are available from Al Adamczak in Corporate Finance  The source documents for the calculation of participants' payments are maintained in the Corporate Payroll Department.

I look forward to receiving your report and will include it with the full report to the various Compensation Committees at their upcoming meetings

Sincerely,

Dwight Kasperbauer

DK kss
Attachments
cc:  Al Adamczak

DEPOSITION
EXHIBIT
1700
Spiro 7-18-03

DBR-AA
22694

# ALLEGHENY HEALTH EDUCATION & RESEARCH FOUNDATION
## MEMORANDUM

**FINAL**

DATE: September 20, 1996

TO　　Dwight Kasperbauer &
　　　Executive Vice President &
　　　Chief Human Resource Officer

FROM: Al Adamczak
　　　Senior Director, Accounting & Financial Reporting
　　　Pittsburgh and AHERF

RE　　FY96 Business Unit Performance Indicators

Following are the FY96 performance targets that are of a financial nature as compiled and reviewed by the AHERF Finance Department. It should be noted that information for OVHS&E is calendar year 1995 and 1996 which corresponds to their official year end

| | ADMISSIONS (PATIENT VOLUME/UTILIZATION) | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
| FY96 Actual | 30,302 | 50,362 | 10,469 | - | - | 91,133 | 10,846 |
| FY95 Actual | 30,551 | 47,795 | 10,029 | - | - | 88,375 | 11,297 |
| Increase/(Decrease) | (249) | 2,567 | 440 | - | - | 2,758 | (451) |
| % Increase/(Decrease) | (0 82%) | 5 37% | 4 39% | - | - | 3 12% | (3 99%) |

| | COST PER ADJUSTED DISCHARGE (CPAD) (Cost Control) | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
| FY96 Actual | $5,896 | $7,005 | $8,846 | - | - | $6,717 | $4,700 |
| FY95 Actual | 6,111 | 7,151 | 8,764 | - | - | 6,880 | 4,912 |
| Increase/(Decrease) | ($215) | ($146) | $82 | - | - | ($163) | ($212) |
| % Increase/(Decrease) | (3 52%) | (2 04%) | 0 94% | - | - | (2 37%) | (4 32%) |
| Medical Mkt CPI Inc | 4 60% | 4 60% | 4 60% | | | 4 60% | 4 60% |

| | NET INCOME (OPERATING PERFORMANCE) | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AIHG | Total AHERF | OVHS&E |
| FY96 Actual | $6,321,000 | $17,604,000 | $15,433,000 | ($1,794,000) | ($40,875,000) | $20,697,000 | ($1,460,000) |
| FY96 Projection | 2,859,000 | 16,776,000 | 14,729,000 | (2,800,000) | (37,930,000) | 15,159,000 | 135,000 |
| Favorable/(Unfavorable) Variance | $3,462,000 | $828,000 | $704,000 | $1,006,000 | ($2,945,000) | $5,538,000 | ($1,595,000) |

DBR-AA
22695

MEMO RE: FY96 BUSINESS UNIT PERFORMANCE INDICATORS  (9/20/96)
PAGE 2

| | NET EQUITY (Financial Viability) | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AHIG | Total AHERF | OVHS&E |
| FY96 Actual* | $254,577,000 | $157,020,000 | $99,393,000 | $90,769,000 | ($29,722,000) | $728,813,000 | $44,217,000 |
| FY95 Actual | 252,931,000 | 140,231,000 | 87,251,000 | 83,560,000 | 11,163,000 | $711,732,000 | 45,203,000 |
| Increase/(Decrease) | 1,646,000 | 16,789,000 | 12,142,000 | 7,209,000 | (40,885,000) | 17,081,000 | (986,000) |
| % Increase/(Decrease) | 0.65% | 11.97% | 13.92% | 8.63% | (366.25%) | 2.40% | (2.18%) |
| CPI Inc | 2.70% | 2.50% | 2.50% | 2.50% | 2.60% | 2.60% | 2.60% |

| | UNCOMPENSATED CARE | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AHIG | Total AHERF | OVHS&E |
| FY96 Actual | | | | | | | |
| Net Patient Service Revenue | $394,561,000 | $618,214,000 | $134,149,000 | $131,453,000 | $74,097,000 | 1,352,474,000 | $93,920,000 |
| Uncompensated Care | 20,489,000 | 41,677,000 | 6,777,000 | 11,025,000 | 1,137,000 | 81,105,000 | 7,186,000 |
| Percentage | 5.19% | 6.74% | 5.05% | 8.39% | 1.53% | 6.00% | 7.65% |
| FY95 Actual | | | | | | | |
| Net Patient Service Revenue | 405,427,000 | 584,808,000 | 127,317,000 | 105,282,000 | 23,172,000 | 1,246,006,000 | 97,717,000 |
| Uncompensated Care | 21,708,000 | 26,638,000 | 7,206,000 | 9,109,000 | 150,000 | 64,811,000 | 10,305,000 |
| Percentage | 5.35% | 4.55% | 5.66% | 8.65% | 0.65% | 5.20% | 10.55% |

| | LEVEL OF EXTERNAL FUNDS SECURED FOR RESEARCH | | | | | | |
|---|---|---|---|---|---|---|---|
| | AGH | Allegheny University Hospitals | SCHC | Allegheny University | AHIG | Total AHERF | OVHS&E |
| FY96 Actual | $8,789,000 | - | - | $43,347,000 | - | $57,079,000 | N/A |
| FY95 Actual | $11,678,000 | - | - | $33,911,000 | - | $45,589,000 | N/A |

*FY 96 actual net equity is exclusive of transfers to affiliates, unusual items and cummulative efforts of new FASB adoptions

Should you have any questions or comments relative to the preceding, please feel free to contact me at your convenience.
Thank you

AA:kw
s:\kim\123\96perf\grt

cc    Steve Spargo

DBR-AA
22696

TAB 211

MINUTES OF THE COMPENSATION COMMITTEE MEETING OF
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Tuesday, March 7, 1995 - 9:30 A.M. - ALLEGHENY GENERAL HOSPITAL

A meeting of the Allegheny Health, Education and Research Foundation Compensation Committee
was held on Tuesday, March 7, 1995 at 9:30 A.M. in the Kent Room at Allegheny General
Hospital.

| Members Present: | Invited Guests: | Members Absent: |
| --- | --- | --- |
| J. David Barnes | Sherif S. Abdelhak | Graemer K. Hilton |
| Douglas D. Danforth | Dwight Kasperbauer | Francis B. Nimick, Jr. |
| W.P. Snyder III | David W. McConnell | |
| | Nancy A. Wynstra | |

I.    Opening of the Meeting

The meeting was called to order by Chairman, W.P. Snyder III, who declared that a
quorum was present and the meeting was competent to proceed. Nancy Wynstra
maintained the minutes of the meeting.

II.    Approval Items

A.    Minutes

The minutes from the October 3, 1994 meeting of the Compensation Committee
were approved as presented.

B.    Long-Term Incentive Plan Award Distribution

Mr. Abdelhak presented to the Committee a report on the performance of the
organization for Fiscal Years 1991 to 1995. The report is presented to assist the
Committee in evaluating whether or not the long-term award accruals approved in
Fiscal Year 1991 should be distributed to the involved executives at this time,
which, pursuant to the terms of the Long-Term Incentive Plan, is five years after
the initial accrual.

Following discussion and upon motion duly made and seconded the Committee
approved the following resolution.

WHEREAS, The Compensation Committee adopted a Key Management Long-
Term Incentive Plan to encourage and reward senior managers for the



DEPOSITION
EXHIBIT
2476
3-5-04 SS

JD-HL 0020906

Minutes of the AHERF Compensation Committee
Tuesday, March 7, 1995 - 9:30 a.m.
Page 2

attainment of established long-term objectives; and,

WHEREAS, The organization has received a favorable ruling from the IRS concerning such Plan; and,

WHEREAS, The Plan provides for the distribution of accrued incentive awards subject to the Compensation Committee's determination of management performance; and,

WHEREAS, An assessment of progress concerning quality of care, level of charity care, excellence in educational and research programs and financial viability indicates that the system has been and continues to be effectively managed in the long-term best interests of patients, students and staff.

NOW, THEREFORE, BE IT RESOLVED, That the Compensation Committee authorizes the distribution of accrued long-term incentive awards for Fiscal Year 1991 plus accrued in' rest to the following individuals:

NAME

Sherif S. Abdelhak
D. Walter Cohen, D.D.S.
Thomas P. Galinski
Dwight Kasperbauer
Donald Kaye, M.D.
David W. McConnell
Leonard L. Ross, Ph.D.
Anthony M. Sanzo
Nancy A. Wynstra

FURTHER RESOLVED, That the Committee authorizes distribution of 100% of the deferred award amount, based on its evaluation of management's progress and performance each year for the prior five years; and

FURTHER RESOLVED, That the Committee directs that the list of individuals and the specific awards authorized be appended in a sealed envelope to the original minutes of this meeting.

JD-HL 0020907

Minutes of the AHERF Compensation Committee
Tuesday, March 7, 1995 - 9:30 a.m.
Page 3

C.  Mr. Abdelhak presented an overview of the proposed revisions to the Annual and
Long-Term Incentive Plans, noting that these proposed revisions have been
developed as a result of concerns expressed by the Committee that the prior plans
did not reflect an appropriate balance between the various mission elements of the
organization and the need for the organization to retain financial strength. Mr.
Abdelhak noted that the trigger for the free care related objective had been changed
from a specific number to a requirement that no person is refused service because
of inability to pay. Mr. Abdelhak then reviewed with the group the financial
guidelines which he has given to the organization's executives and indicated that
he is, through management, assuring an appropriate balance between the various
incentive award objectives. He also noted that, in order to maintain Internal
Revenue Service approval of the Plan, it is important that the commitment to
quality and to significant amounts of charitable care be appropriately reflected in
the Plan.

The Committee requested that different terminology than Meets Expectations and
Exceeds Expectations be used to reflect perf :mance. The Committee accepts and
hereby approves revisions of the Management Incentive Plan as presented at this
meeting.

Following discussion, and upon motion duly made and seconded, the Committee
approved the following resolution.

RESOLVED, that the AHERF Compensation Committee accepts and
hereby approves the revisions to the Management Annual Incentive
Plan and the Management Long-Term Incentive Plan as presented at
this meeting, contingent upon the substitution of other terms for the
terms "acceptable progress," "achieved expectations" and "exceeded
expectations" as set forth in the draft plan; and

FURTHER RESOLVED, that the Secretary is directed to attached a
copy of the approved Plans to the minutes of this meeting.

D.  Executive Compensation Cost of Living Adjustment

Mr. Kasperbauer noted that the Committee had agreed that, until such time as a
new market study to measure the competitive position of AHERF's senior
management salaries is conducted, which will not occur any earlier than January,

JD-HL 0020908

Minutes of the AHERF Compensation Committee
Tuesday, March 7, 1995 - 9:30 a.m.
Page 4

1997, salary increases for senior management are limited to cost of living adjustments.  He indicated that a 3.25% cost of living adjustment was recommended for eligible individuals, to be effective on their anniversary date.

Following discussion and upon motion duly made and seconded the Committee approved cost of living adjustments of 3.25% for Sherif S. Abdelhak, D. Walter Cohen, D.D.S., Thomas P. Galinski, Dwight Kasperbauer, Donald Kaye, M.D., Iqbal F. Paroo, Leonard L. Ross, Ph.D., Anthony M. Sanzo, Nancy A. Wynstra, with such adjustment to be effective on the individual's anniversary date. The Committee agreed that this approach to compensation adjustments would be continued for one additional year but requested that a comparative compensation study be commenced at that time.

E.    Human Virology Institute Recruitment

Mr. Abdelhak presented information with respect to the potential recruitment of three senior researchers in the area of Human Virology  He noted that, in order to provide security to the individuals involved, it would be necessary to offer them five-year continuing contracts.  In addition, a special laboratory would need to be constructed for conducting the research involved and a number of people who currently work with these researchers would need to be recruited to the organization. Mr. Abdelhak noted that, while this recruitment would be expensive, it would significantly enhance the organization's reputation and lead to receipt of substantial research funding.

Following discussion and upon motion duly made and seconded the Committee approved offering five-year continuing contracts to Robert C. Gallo, M.D., Robert R. Redfield, M.D., and William A. Blattner, M.D.

F.    Information Items

A.    Non-Compete Plan Investment Report

As requested by the Committee, Mr. Kasperbauer presented a report on the investment performance of the funds invested in the Non-Compete Plan account for Messrs. Abdelhak and Kasperbauer and Ms. Wynstra.

JD-HL 0020909

Minutes of the AHERF Compensation Committee
Tuesday, March 7, 1995 - 9:30 a.m.
Page 5

B.    Review of AHERF and Subsidiary Meeting Dates and Activities

Mr. Kasperbauer briefly reviewed the calendar of Compensation Committee
meetings for 1995 and called the attention of the Committee to the draft
minutes of the subsidiary compensation committees.

At approximately 10:20 a.m., the Committee went into Executive Session and all
management staff other than Mr. Abdelhak were excused.

The meeting was adjourned at approximately 11:20 a.m.

Respectfully submitted,

Nancy A. Wynstra, Esquire

NAW:ss
Enclosures
3-10-95

JD-HL 0020910

# *A  H  E  R  F*

*Allegheny Health, Education*
*and Research Foundation*

120 Fifth Avenue Place
Suite 2900
Pittsburgh, PA  15222-3009

---

PERSONAL AND CONFIDENTIAL

TO:             David M. Deasy
                Director, Corporate Payroll

FROM:           Dwight Kasperbauer
                Executive Vice President
                  and Chief Human Resources Officer

SUBJECT:        Key Management Long-Term Incentive Plan - Fiscal Year 1991

DATE:           March 7, 1995

The amounts on the attached document have been approved by the AHERF Compensation Committee for distribution.

Please forward the checks to my attention on or about July 3, 1995.

Thank you in advance.

DK:tst
Attachment

---

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

### Key Management Long-Term Incentive Plan - Fiscal Year 1991

| Executive Name | Accrued Award |
|---|---|
| Sherif S. Abdelhak | $116,479 |
| D. Walter Cohen, D.D.S. | $ 41,617 |
| Thomas P. Galinski | $ 32,817 |
| Dwight Kasperbauer | $ 60,856 |
| Donald Kaye, M.D. | $ 65,367 |
| David W. McConnell | $ 77,624 |
| Leonard L. Ross, Ph.D. | $ 56,471 |
| Anthony M. Sanzo | $ 69,916 |
| Nancy A. Wynstra | $ 63,498 |
| TOTAL | $584,645 |

Percent accrued award authorized for distribution _100_ %

W.P. Snyder III
Chairman, Compensation Committee

_Mar. 7, 1995_
Date

Members:

J. David Barnes

_3.7.95_
Date

Douglas D. Danforth

_3.7.95_
Date

Graemer K. Hilton

Date

Francis B. Nimick, Jr.

Date

DK les Keymgmt 2-21 96

JD-HL 0020912

JD-HL 0020913

*ALLEGHENY HEALTH, EDUCATION AND
*RESEARCH FOUNDATION

*KEY MANAGEMENT LONG TERM
*INCENTIVE PLAN

| Executive | FY 1991 award | Value 2 6-30-95 FY 1992 award | FY 1993 award | FY 1994 | Total | AWARD 2 6-30-95 |
|---|---|---|---|---|---|---|
| Abdelhak | $104,691 | $117,638 | $110,979 | $132,600 | $465,915 | $116,479 |
| McConnell | $76,935 | $71,902 | $78,780 | $82,500 | $310,498 | $77,624 |
| Santo | $58,432 | $60,262 | $71,199 | $79,772 | $229,664 | $49,916 |
| Galinski | $30,536 | $45,508 | $47,225 | $0 | $131,269 | $32,817 |
| McMaster | $47,644 | $39,196 | $42,009 | $40,549 | $169,400 | $42,350 |
| Wynstra | $57,702 | $56,657 | $85,042 | $74,592 | $253,992 | $83,498 |
| Kasperbauer | $50,804 | $59,160 | $83,968 | $69,412 | $243,423 | $60,656 |
| Cohen | $53,527 | $59,160 | $0 | $53,872 | $166,469 | $41,617 |
| Ross | $44,264 | $59,160 | $55,611 | $44,646 | $225,864 | $59,471 |
| Helton | $42,038 | $43,915 | $21,543 | $41,590 | $149,086 | $37,272 |
| Cumming | $0 | | $0 | $0 | $0 | $0 |
| Dionisio | $53,563 | $51,196 | $48,290 | $44,620 | $199,677 | $49,919 |
| Rewson | $33,656 | $32,538 | $32,199 | $31,080 | $139,473 | $32,368 |
| Kaye | $38,344 | $172,313 | $71,696 | $76,114 | $165,470 | $43,367 |
| Bland | N/A | $42,915 | $44,664 | $49,728 | $150,507 | $0 |
| McNair | N/A | N/A | $42,932 | $41,140 | $84,372 | $0 |
| Total | $702,132 | $821,520 | $798,545 | $886,903 | $3,209,100 | $746,555 |

MANAGEMENT ANNUAL INCENTIVE PLAN
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
ADMINISTRATIVE GUIDE

1.    PURPOSE

The AHERF Management Annual Incentive Plan is intended to enhance the Organization's ability to achieve its mission and charitable purpose of promoting the general health of both present and future generations of the communities it serves.   Specific Plan objectives are to:

- Reinforce the Organization's commitment to excellence in all of its patient care, education and research activities;

- Focus the attention of senior management on maintaining financial viability and achieving Organizational outcomes necessary to support the Organization's mission;

- Encourage teamwork and personal achievement; and,

- Enhance the Organization's ability to attract and retain high quality executive talent by providing Award opportunities commensurate with the Organization's management challenge and performance.

The Plan is designed to provide guidance to the various constituent components of AHERF.  In application, it is subject to interpretation by the Business Unit Compensation Committees; however, final determination of any matters of interpretation rest with the AHERF Compensation Committee.

2.    DEFINITIONS

"AHERF Compensation Committee" refers to the Compensation Committee of the Board of Trustees of the Organization, a committee made up of outside directors who receive no compensation from the Organization.

"Award" refers to the calculated incentive amount earned by and paid to a Participant under the terms and provisions of this Plan.

"Base Salary" refers to annualized base rate in effect at the close of the fiscal year, exclusive of the value of any basic or supplemental employee benefits, but inclusive of any base earnings deferred to a subsequent year in accordance with any Organization-sponsored qualified tax deferred Plan(s).
"Business Unit"  refers to any component of AHERF recognized as a distinct operating unit for purposes of this Plan.

"Business Unit Compensation Committee" refers to the Committee of external trustees selected to oversee executive compensation within the relevant business unit of AHERF.

"Goal Weight" refers to a weight assigned to reflect the impact and degree of importance attached to a goal:  (1) moderate, (2) high, and (3) essential.

"Mission Objectives" refer to the broad based mission oriented categories within which specific annual performance Goals are developed by each Business Unit

JD-HL 0020914

"Must Goals" refers to Business Unit and/or Organizational Performance Goals which must be fully achieved in order for the appropriate unit to qualify for any Award.

"Organization" refers to AHERF and its subsidiaries.

"Organization Appraisal" refers to the annual review of performance to Plans/Goals which occur at the subsidiary and AHERF level.

"Organizational Performance Goals" or "Goals" refer to the specific performance measurement criteria approved by the Committee at the start of the fiscal year for purposes of Award determination under this Plan.

"Participant" refers to an employee of the Organization designated by the Committee to participate in the Plan.

"Performance Appraisal" refers to the Participant's annual review, conducted by his or her immediate superior, for the purpose of assessing performance with respect to his or her total job responsibilities.

"Plan" refers to the AHERF Management Annual Incentive Plan as described in this document.

"Plan Year" refers to the Organization's Fiscal Year.

"Planning Calendar" refers to the schedule of events in the planning, performance evaluation and incentive determination cycle (Appendix A).

"Work Unit" refers to a single entity or multiple entities which when combined, represents organization(s) upon which the individual participant's performance is measured. For example, a Department Chair's Work Unit may be 75% the department and 25% the school. A hospital system executive's Work Unit may be 100% the hospital.

3.    ELIGIBILITY

Plan eligibility is extended to employees of the Organization (or any of its subsidiaries) who, in the opinion of the Business Unit, have the opportunity to significantly impact the accomplishment of the Organization's mission. In general, the eligible group includes Academic/Clinical Chairs and employees in executive salary grades 4 and above or other designated key employees who play crucial roles in the attainment of the Organization's Goals.

It is the intent that each Participant be notified in writing of his or her eligibility, Award opportunity and all relevant Business Unit performance goals within 60 days of the start of the Plan Year.

4.    MISSION OBJECTIVES

Awards may be paid to the Participants provided the AHERF Compensation Committee determines that the Organization is satisfying its Mission Objectives. Mission performance will be evaluated in light of the following:

- No patient will be refused service because of the inability to pay

- Quality of care is maintained or enhanced as measured by

2                                        JD-HL 0020915

- Patient/client satisfaction indices;

- Full accreditation by the Joint Commission on Accreditation of Healthcare Organizations and other relevant Organizations;

- Institutional quality scores (e.g., mortality, nosocomial infections, unplanned re-admissions, drug reactions) at satisfactory levels as determined by appropriate business unit Quality Assurance Committees.

● The commitment to research and teaching is maintained or enhanced;

● Long-term Organizational viability as measured by financial indicators is maintained or enhanced.

The committee(s) will annually review the performance of the Business Units and its senior officers to make a determination if the mission requirements have been met and that Goals specified in the annual performance Plan have been achieved. If so, the committee(s) will authorize calculation of Awards pursuant to the methods described in the Plan.

5.    **PERFORMANCE PLANNING AND MEASUREMENT**

Each CEO, in concert with the System CEO, will develop Organizational Goals for his or her Business Unit consistent with the System Mission Objectives and assign weights, i.e., 1) moderate, 2) high, 3) essential, indicating the impact of the goal on the organization's mission. The Goals of each Business Unit will be the measure upon which the individual CEO's performance will be evaluated. (See Appendix B for format). Each participant throughout the System will likewise develop goals and objectives in concert with his or her supervisor.

The System CEO will annually evaluate the results of each Business Unit and arrive at unit performance score considering both the weight of the goal and achievement. Each goal will be assigned one of the following scores.

    o - Unacceptable Performance
    1 - Acceptable Progress
    2 - Achieved Expectations
    3 - Exceeded Expectations

A weighted average score will determine the Work Unit Score category. The Business Unit Compensation Committee will validate the performance evaluations conducted by the CEO. The AHERF Board Chairman will evaluate and the AHERF Compensation Committee will validate the System CEO's performance.

6.    **ORGANIZATION PERFORMANCE THRESHOLDS: MUST GOALS**

Notwithstanding the calculations described in Section 8, no Awards will be payable under the Plan if the Organization or Business Units fail to achieve any Board of Trustee-determined Must Goals. For example, if the Organization fails to provide care to any individual because of his/her ability to pay or fails to maintain hospital or academic accreditation, no awards will be authorized within that Business Unit.

JD-HL 0020916

7.    INDIVIDUAL PERFORMANCE THRESHOLD

Regardless of the level of performance achieved against overall Organization and Business Unit objectives, no Award will be paid to a Participant who fails to achieve at least an "Acceptable Progress" rating on his/her individual Performance Appraisal for the year. Such Performance Appraisal shall include consideration of both achievement against the Participant's objective performance Goals, as well as subjective factors.

8.    TARGET AWARD LEVELS

The table below establishes the range of Awards to be available to individuals dependent upon Work Unit performance. Business Unit performance will be used to determine the Award range for participants who function primarily within the Business Unit. Participant's performance which may materially impact or influence other entities will have Work Unit accountabilities adjusted to reflect the relationship (See Appendix C). Individual evaluations will be based on achievement of specific individual objectives established at the start of the fiscal year, as well as a subjective year-end assessment of the Participant's overall performance during the year.

Incentive Awards for CEOs and senior AHERF executives will be apportioned by the allocation of responsibility and interdependence among the units. For example, a portion of the hospital CEO's Award is dependent on the success of the university (see Appendix C for format). The relative weight to be assigned to each Organization may differ by CEO, based upon the specific role and responsibilities of each individual within the Organization.

TABLE 1 *

| WORK UNIT EVALUATIONS | INDIVIDUAL EVALUATION | | |
|---|---|---|---|
| | ACCEPTABLE PROGRESS | ACHIEVED EXPECTATIONS | EXCEEDED EXPECTATIONS |
| Acceptable Progress 1.0 - 1.66 + | 5% 0% - 10% | 10% 5% - 15% | 15% 10% - 20% |
| Achieved Expectations 1.67 - 2.33 + | 15% 10% - 20% | 20% 15% - 25% | 25% 20% - 30% |
| Exceeded Expectations 2.34 - 3.0 + | 25% 20% - 30% | 30% 25% - 35% | 35% 30% - 40% |

\*    *Percents indicate percent of base salary.*

+    *Final weighted score from evaluation of performance goals.*

The System CEO, subject to approval by the Compensation Committee, may adjust the Business Unit's CEO's incentive Award to reflect the individual CEO's personal performance in achieving Business Unit results. The Business Unit CEO, subject to the approval of the committee may adjust the Award to the Participant giving consideration to factors including total annual compensation or other relevant factors.

JD-HL 0020917

9.    MAXIMUM AWARD

Each Participant may be eligible to achieve an Award pursuant to the categories and ranges on Table 1, Page 4; however, in no case may the combination of base pay and annual incentive Award exceed 1.5 times the 75th percentile (market price) for the position. The AHERF Compensation Committee may elect to revise the maximum Award, as changing business conditions warrant. Further, the Committee may determine, in its sole discretion, if Awards in excess of the maximum are appropriate for any Participant as a reward for Organization and/or individual performance in any year.

10.    PLAN FUNDING

Estimated Awards under the Plan will be accrued monthly and charged as an expense against the income statement of the Organization and the applicable business unit. Accruals of Awards will not imply vesting of any individual Awards to Participants. Vesting occurs only upon completion of the fiscal year, following the Compensation Committee's review of the extent to which performance objectives have been met, and their decisions regarding individual Awards to be paid.

11.    AWARD PAYMENT

If the Compensation Committee determines that Awards should be made, earned Awards will be paid in cash within 150 days following the end of the fiscal year, unless payments are deferred under an Organization-sponsored deferral Plan.

12.    NEW HIRES AND PROMOTIONS

Individuals hired or promoted into positions that would qualify for Plan participation will be added to the Plan, subject to the a ,roval of the Committee. Internal promotions will be considered a Participant for the entire yea, and new hires will participate on a prorated basis according to the months employed in the fiscal/Plan year.

13.    TERMINATION OF EMPLOYMENT

If termination of a Participant's employment occurs during the fiscal year by reason of death, disability, or normal retirement (consistent with the Organization's then current provisions for disability and normal retirement), the Participant (or the Participant's beneficiary or estate in the event of death) will be eligible to receive a prorata Award for the year based on time employed and objectives accomplished during the year.

A Participant who terminates employment with the Organization prior to the end of the fiscal year for any other reason (whether voluntarily or involuntarily) will forfeit the opportunity to earn an Award under the Plan for that year. Participants who terminate after the close of the fiscal/Plan year but before approval of Award will be eligible for payment based upon fiscal/Plan Year performance.

Notwithstanding any other provision of the Plan, the Committee may. in its sole discretion, permit continued participation, proration or early distribution (or a combination thereof) of Awards which would otherwise be forfeited.

5

JD-HL 0020918

14.    ADJUSTMENTS

If an extraordinary event occurs during a fiscal year which significantly alters the basis upon which the Organization or Business Unit performance levels were established for the year, the AHERF Compensation Committee, in its sole discretion, may make adjustments in such performance levels to the extent it deems appropriate (whether before or after the end of the fiscal year). Such adjustments shall be conclusive and binding upon all parties concerned. Such events may include, without limitation, changes in accounting rules or regulations, changes in regulatory rulings affecting the business of the Organization, and significant unexpected changes in economic conditions affecting the Organization. Certain events, such as loss of hospital or medical school certification, insolvency of the Organization or any subsidiary, or the loss of tax-exempt status of the Organization or any of its tax exempt subsidiaries, may result in the termination of the Plan at any time, at the discretion of the AHERF Compensation Committee.

15.    PLAN ADMINISTRATION

All decisions concerning the determination of Awards under this Plan will be subject to final approval of the AHERF Compensation Committee. In addition, the Committee will have the authority to interpret the provisions of the Plan and to make any final decisions necessary to administer the Plan, including but not limited to:

- Approval of Plan Participants;

- Apportionment of accountability;

- Establishment of maximum Awards;

- Approval of performance objectives

- Weighting of objectives (Organization vs. Business Unit vs. individual);

- Certification of performance against objectives established for the Plan;

- Adjustment of objectives due to extraordinary events; and approval of individual Awards to be paid.

The Committees, in making any determinations under the Plan, shall be entitled to rely on opinions, reports, or statements of officers of the Organization, and of legal counsel, public accountants, and other experts or third parties.

16.    ASSIGNMENT AND EMPLOYEE RIGHTS

A Participant may not assign or transfer his or her rights under the Plan, and any attempt to do so will invalidate those rights.

No employee has any claim or right to be a Participant in the Plan nor to be granted an Award under the Plan, nor is there an obligation for uniformity of treatment of eligible employees or Participants under the Plan. Participation in the Plan does not give an employee the right to be retained in the employment of the Organization. Moreover, the decision about whether or not Awards should be paid under the Plan, in total or with respect to any Participant, is entirely within the discretion of the Business Unit Compensation Committee or AHERF Committee as may be appropriate.

JD-HL 0020919

17.    DESIGNATION OF BENEFICIARIES

A Participant may designate a beneficiary or beneficiaries to receive, in the event of the Participant's death, all or part of the amounts to be distributed to the Participant under the Plan. A designation of beneficiary may be replaced by a new designation or may be revoked by the Participant at any time. In the event the participant fails to designate a beneficiary, the beneficiary designated for the Supplemental Survivor Life Insurance policy, provided by the organization, will be used. A designation or revocation shall be on a form to be provided for such purpose and shall be signed by the Participant and delivered to the Organization prior to the Participant's death. Any amount that is payable to a Participant upon death and is not subject to such a designation shall be distributed to the Participant's estate.

18.    AMENDMENT OR TERMINATION

This Plan may be amended, suspended, or revoked at any time and without notice. In the case of termination of the Plan, the AHERF Compensation Committee, if it determines in its sole discretion that it is necessary or advisable under the circumstances, may authorize the proration or early distribution, or a combination thereof, of Awards earned under the Plan.

19.    WITHHOLDING TAX

The Organization will deduct from all Awards paid under the Plan any taxes required by law to be withheld.

20.    EFFECTIVE DATE

The Plan is effective as of July 1, 1994 and shall remain in effect until terminated by the AHERF Compensation Committee.

21.    VALIDITY

In the event any provision of the Plan is held invalid, void, or unenforceable, the same shall not affect, in any respect whatsoever, the validity of any other provision of the Plan.

22.    APPLICABLE LAW

The Plan shall be governed by and construed in accordance with the laws of the state of Pennsylvania.

3-01 95 KEYAHS D

7

JD-HL 0020920

# APPENDIX A

## AHERF INCENTIVE PLAN PROCESS AND TIME LINE

*Contingent on dates of Compensation Committee and Board of Trustees meetings.*

*Business Unit compensation committees meet prior to AHERF Compensation Committee to certify and advance to AHERF business unit performance.*

**Not Later Than**

| | |
|---|---|
| March 31 | Organization goals and budget assumptions for coming fiscal year approved by Trustees. |
| June 30 | CEO presents annual operating plan and budget to Trustees for approval. |
| June 30 | Incentive plan participants' personal goals for the coming fiscal year approved by each supervisor. |
| August 30 | Incentive plan participants' personal evaluations against prior year's goals completed by supervisor. |
| September 30 | Prior fiscal year performance report against plan presented by business unit CEO to System CEO for evaluation. Coopers & Lybrand will complete review of Business Unit and System performance measures. |
| October 30 | Business Unit and AHERF Compensation Committee meetings to review and validate performance against Trustee-approved plans, review CEO's report on individual performance against goals and authorize incentive awards as may be appropriate. |

DK lss 1-18-95

JD-HL 0020921

**APPENDIX B**
**FISCAL YEAR 1996**

**PLAN AND EVALUATION FORMAT**

I.   AHERF ORGANIZATIONAL GOALS

| PLAN/GOALS | RESULTS | PRIORITY WEIGHT 1-2-3 (Must) | EVALUATION Raw Score | EVALUATION Weighted Score | COMMITTEE VERIFICATION |
|---|---|---|---|---|---|
| Maintain or enhance uncompensated care as a percent of revenue compared to prior fiscal year levels. (Correct for changed poverty levels.) | | | | | |
| Maintain or enhance patient satisfaction, program accreditation and clinical care quality indicators compared to prior fiscal year levels. | | | | | |
| Maintain or increase the level of external funding for research | | | | | |
| All undergraduate and graduate educational programs sponsored by AHERF shall be fully accredited | | | | | |
| Achieve a favorable change in net equity equal to or better than the change in CPI | | | | | |
| The rate of increase in the cost of health care services provided as measured by the cost per adjusted discharge, shall be lower than the rate of increase in the medical component of the consumer price index. | | | | | |

JD-HL 0020922

APPENDIX B
FISCAL YEAR 1996

PLAN AND EVALUATION FORMAT

II.  BUSINESS UNIT MEASURES

| PLAN/GOALS | RESULTS | PRIORITY WEIGHT 1-2-3 (MUST) | EVALUATION Raw Score 0-1-2-3 | EVALUATION Weighted Score | COMMITTEE VERIFICATION |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

JD-HL 0020923

| PLAN/GOALS | RESULTS | PRIORITY WEIGHT 1-2-3 (MUST) | EVALUATION Raw Score · Weighted Score 0-1-2-3 | | COMMITTEE VERIFICATION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

\* Priority weight to be determined.

Final Weighted Score:

| Summary Evaluation | Exceeded Expectations Achieved Expectations Acceptable Progress Unacceptable Performance |
|---|---|
| Committee Verification | |

JD-HL 0020924

APPENDIX C

WORK UNIT ILLUSTRATIONS BASED ON
ALLOCATION OF RESPONSIBILITY AND INTERDEPENDENCE

| EXECUTIVE NAME | AHERF | AGH | AIHG | MCP/HU | MCPHUHS | SCHC |
|---|---|---|---|---|---|---|
| CEO Hospital | 5% | | 5% | 15% | 25% | 50% |
| CEO AIHG | 5% | 15% | 50% | | 15% | 15% |
| EVP Corporate Staff | 50% | 10% | 10% | 10% | 10% | 10% |
| CEO Hospital System | 5% | | 15% | 20% | 50% | 10% |
| EVP Finance | 50% | 10% | 10% | 10% | 10% | 10% |
| Provost | 5% | 15% | 5% | 50% | 15% | 10% |
| CEO Hospital | 5% | 60% | 15% | 20% | | |
| EVP Legal Services | 50% | 10% | 10% | 10% | 10% | 10% |

Dean                               School 75%          University 25%
Academic Department Chairs  Department 75%     School 25%
Hospital Vice President        Hospital 100%

For illustration only · Percentage allocations do not reflect discussion, agreement or approval
of the nature of the distribution.

JD-HL 0020925

## INCENTIVE CALCULATION ILLUSTRATION

ASSUME:        Corporate Staff Executive
               Base Salary $100,000
               Individual Evaluation:  Achieved Expectations

| Work Unit Responsibility Allocation | Unit Evaluation | Score |
|---|---|---|
| AHERF    50% | Achieved Expectations | 2 |
| AGH      10% | Achieved Expectations | 2 |
| AIHG     10% | Exceeded Expectations | 3 |
| MCPHU    10% | Acceptable Progress | 1 |
| MCPHUHS 10% | Achieved Expectations | 2 |
| SCHC     10% | Acceptable Progress | 1 |

Weighted Average                                        1.9

Work Unit Summary Evaluation:  Achieved Expectations

From Table 1, Page 4, incentive award to be $20,000.
(Work Unit achieved expectations and individual evaluation achieved expectations.)

ASSUME:        Department Chair
               Base Salary $100,000
               Individual Evaluation:  Exceeded Expectations

| Work Unit Responsibility Allocation | Unit Evaluation | Score |
|---|---|---|
| School      25% | Acceptable Progress | 1 |
| Department  75% | Exceeded Expectations | 3 |

Weighted Average                                        2.5

Work Unit Summary Evaluation:  Exceeded Expectations

From Table 1, Page 4, incentive award to be $35,000.
(Work Unit exceeded expectations and individual evaluation exceeded expectations.)

JD-HL 0020926

MANAGEMENT LONG-TERM INCENTIVE PLAN
AHERF Administrative Guide
Addendum to Annual Incentive Plan

1.    PURPOSE

AHERF has established a management annual incentive plan to enhance the
organization's ability to achieve the mission and goals. In furtherance of this purpose
and in recognition of the long range impact and effect of certain managerial decisions,
AHERF also maintains the Management Long-Term Incentive Plan to promote and
reward actions which are in the long-term best interests of AHERF.

2.    ELIGIBILITY

Plan eligibility is extended to full time employees of AHERF or any of its subsidiaries
who qualify for participation in the Management Annual Incentive Plan and who are
Department Chairs or are in executive salary grades 12 or above. Other individuals who
play crucial roles in the attainment of organizational objectives as determined by the
AHERF Compensation Committee may also be included.

3.    GENERAL PLAN DESCRIPTION

Long-term plan accruals are predicated upon the determination of an annual award under
the Management Annual Incentive Plan. Pursuant to the granting of an annual award,
eligible participants may be awarded a deferred incentive grant equal to the annual award
up to an amount not to exceed 20% of base salary. The award will be deferred to the
fifth fiscal year following the year for which it has been earned and distributed at the
discretion of the compensation committee. During the deferral period, deferred incentive
balances will be credited interest at the AHERF Time Value of Money Rate established
annually for the Execu-FLEX Benefit Program.

4.    LONG-TERM PERFORMANCE MEASUREMENT

Payment of deposits and accrued interest thereon will be subject to an adjustment,
determined at the sole discretion of the AHERF Compensation Committee, based on the
Committee's assessment of the extent to which the Organization has attained its long-term
objectives over the five-year period following the date of the initial deposit.    This
assessment will include both qualitative and quantitative considerations deemed relevant
by the Committee, including, without limitation, measures of quality of care, level of
charity care provided, excellence of educational and research programs, and financial
viability.

Actual awards to be paid under the Plan may vary from 0 percent to 100 percent of the
total deposit and accrued interest, at the discretion of the AHERF Compensation
Committee. Any reduction to the total deposit and accrued interest for a given year shall

JD-HL 0020927

apply in equal proportion (as a percent of total deposit and accrued interest) to the deposits and accrued interest of all participants for the year.

5.    PLAN FUNDING AND VESTING OF ACTUAL AWARDS

Deposits under the Plan, and interest thereon, will be accrued monthly and charged as an expense against the income statement of the Organization and the applicable subsidiary. Accruals of deposits and interest will not imply vesting of any actual awards to participants.

Vesting of each actual award (following any reduction deemed appropriate by the AHERF Compensation Committee as discussed in paragraph 11 above) will occur five years following the completion of the fiscal year for which the deposit was earned, subject to the participant's continued employment with the Organization during the five-year period.

6.    TERMINATION OF EMPLOYMENT

If termination of a participant's employment occurs during the fiscal year by reason of death, disability, or normal retirement (consistent with the Organization's then current provisions for disability and normal retirement), the Participant (or the participant's beneficiary or estate in the event of death) will be eligible to receive a prorata deposit for the year based on time employed and objectives accomplished during the year. Fur- ·.ier, the total value of a participant's earned but unvested deposits and interest accrued thereon will vest immediately upon death, disability, or normal retirement, subject to a reduction by the AHERF Compensation Committee for Organization performance against its long-term goals over the preceding five-year period.

A participant who terminates employment with the Organization prior to the end of the fiscal year for any other reason (whether voluntarily or involuntarily) will forfeit the op-portunity to earn a deposit under the Plan for that year. Further, the total value of a participant's earned but unvested deposits and interest accrued thereon will be forfeited upon termination of his/her employment with the Organization for any reason (whether voluntarily or involuntarily), other than for reasons of death, disability, or normal retire-ment, as discussed above.

Notwithstanding any other provision of the Plan, the Committee may, in its sole discretion, permit continued participation, proration or early distribution (or a combination thereof) of deposits and interest which would otherwise be forfeited.

7.    NEW HIRES AND PROMOTIONS

Individuals hired or promoted into positions that would qualify for Plan participation will be added to the Plan, subject to the approval of the Committee. Such participants who have been in the qualifying position long enough to have had an impact during the fiscal year (minimum of three months as Plan participant) will be eligible to receive a prorated

deposit based on time employed as a participant during the year.

8. ADJUSTMENTS

If an extraordinary event occurs during a fiscal year which significantly alters the basis upon which the organization or business unit performance levels were established for the year, the Committee, in its sole discretion, may make adjustments in such performance levels to the extent it deems appropriate (whether before or after the end of the fiscal year). Such adjustments shall be conclusive and binding upon all parties concerned. Such events may include, without limitation, changes in accounting rules or regulations, changes in regulatory rulings affecting the business of the Organization, and significant unexpected changes in economic conditions affecting the Organization.

9. PLAN ADMINISTRATION

All decisions concerning the determination of deposits and actual awards under this Plan will be subject to final approval of the Committee. In addition, the Committee will have the authority to interpret the provisions of the Plan and to make any decisions necessary to administer the Plan, including but not limited to:

- Approval of plan participants;
- Establishment of maximum deposits;
- Establishment of performance objectives;
- Weighi.g of objectives (organization vs. business unit vs. individual);
- Certification of performance against objectives established for the Plan;
- Adjustment of objectives due to extraordinary events; approval of individual deposits; and
- Approval of actual awards to be paid upon completion of the five-year vesting period.

The Committee, in making any determinations under the Plan, shall be entitled to rely on opinions, reports, or statements of officers of the Organization, and of counsel, public accountants, and other experts or third parties.

10. ASSIGNMENT AND EMPLOYEE RIGHTS

A participant may not assign or transfer his or her rights under the Plan, and any attempt to do so will invalidate those rights.

No employee has any claim or right to be a participant in the Plan nor to be granted a deposit or actual award under the Plan, nor is there an obligation for uniformity of treatment of eligible employees or participants under the Plan. Participation in the Plan does not give an employee the right to be retained in the employment of the Organization. Moreover, the decision about whether or not actual awards should be paid under the Plan, in total or with respect to any participant, is entirely within the discretion f the AHERF Compensation Committee.

11.   DESIGNATION OF BENEFICIARIES

A participant may designate a beneficiary or beneficiaries to receive, in the event of the participant's death, all or part of the amounts to be distributed to the participant under the Plan. A designation of beneficiary may be replaced by a new designation or may be revoked by the participant at any time.   A designation or revocation shall be on a form to be provided for such purpose and shall be signed by the participant and delivered to the Organization prior to the participant's death. Any amount that is distributable to a participant upon death and is not subject to such a designation shall be distributed to the participant's estate. If there shall be any question as to the legal right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the participant, in which event the Organization shall have no further liability to any one with respect to such amount.

12.   AMENDMENT OR TERMINATION

This Plan may be amended, suspended, or revoked at any time and without notice. In the case of termination of the Plan, the Committee, if it determines in its sole discretion that it is necessary or advisable under the circumstances, may authorize the proration or early distribution, or a combination thereof, of deposits earned under the Plan.

13.   WITHHOLDING TAX

The Organization will dedu . from all actual awards paid under the Plan any taxes required by law to be withheld.

14.   EFFECTIVE DATE

The Plan is effective as of July 1, 1994 and shall remain in effect until terminated by the Committee.

15.   VALIDITY

In the event any provision of the Plan held invalid, void, or unenforceable, the same shall not affect, in any respect whatsoever, the validity of any other provision of the Plan.

16.   APPLICABLE LAW

The Plan shall be governed by and construed in accordance with the laws of the state of Pennsylvania.

DK\ 1\1 1 30-95 \\LT\P

JD-HL 0020930