TAB 216

## Transcription of Shorthand Notes of Carol Gordon - AHERF Audit Committee, October 15, 1997

**Board Trustees present:** J. David Barnes, Ralph W. Brenner, Esq., Anthony M. Cook, Douglas D. Danforth, Richard H. Daniel, Harry R. Edelman III, Ira J. Gumberg, W. P. Snyder III, W. Bruce Thomas.

**Other Invitees present:** Sherif S. Abdelhak, William F. Buettner, Carol Gordon, Lynn R. Isaacs, Donald Kaye, M. D., David W. McConnell, Leonard L. Ross, Ph. D., Barry H. Roth, Anthony M. Sanzo, Diane K. Schrecengost, Nancy A. Wynstra, Esq.

Transcriptionist's note: Prior to the official opening of the meeting, Mr. Abdelhak said he had some comments to make to the Trustees which were not for the minutes, therefore, the following discussion did not appear in the official minutes of the meeting.

Abdelhak    Update to Trustees about what we are doing. Referred to audited statements, results from operations, significant deficit. Investment income has been helpful. Compounding problem in the Delaware Valley starting the last fiscal quarter with fair amount of reduction in revenue from Medicaid. We are trying to estimate what reduction in Medicaid reimbursement is -'estimated between $30-60 million, coupled with $2 million from Medicare as a result of the Balanced Budget Act. Results in the last quarter suggested we take aggressive action. When we looked at the numbers in the first two months, they appeared to represent a continuation from the last quarter, so I asked all of our people to effect some cost reductions. In the last two days, we have removed $130 million out of our expenses in the Delaware Valley. The bulk of those were personnel adjustments, 1800 jobs. Anticipate that we will need to do further reductions throughout the system because there doesn't appear to be an end to revenue rate reductions. It is my judgment we will need to focus our attention in Pittsburgh in the next month or so. Anticipate taking out another $25-$30 million from the Pittsburgh expenses. All of the fundamental revenue reductions have put an enormous stress on our cash flow. We are working diligently to fix that by fixing the operations, rather than borrow the way through it. At the last Finance Committee meeting, there was a discussion at my request to use some of the internal funds for a sale-leaseback arrangement we were contemplating for the Delaware Valley, and I think that has happened and we have used the funded depreciation at AGH to maintain Accounts Payable at a reasonable level. We are taking a beating in the papers in Philadelphia because of the magnitude of the adjustment and the impact on the economy, but I don't know that we could choose any other course. Anticipate that the University of Pittsburgh will have a similar action taken. Mr. Chairman, we are not about to give you a snapshot of the first three months. The numbers are preliminary, and we are working on the statements. Possibly (?)

- 1 -

AHERF LIT
USDC W D Pa
MISC No 00-40
16895
EXHIBIT NO



EXHIBIT

_1659_

DBR-CG-003447

Focused in the Delaware Valley. Two issues we were dealing with last year were the University and AIHG and fixing those. I think we have a fix for the University to have it break even, and I am confident we have a fix for AIHG to reduce the subsidy to half of what it was last year. The bulk of the adjustments we have made were in the hospitals. Some adjustments in corporate services here. No one has complained about the decrease in compensation. Need to improve in the Delaware Valley so that they can repay the advances from funded depreciation. Want to reduce the Accounts Payable to 60 days. I have asked to keep the small vendors paid. Reasons: (1) Medicare effect is roughly $30 million in the Delaware Valley; (2) Medicaid - state has removed $1 billion out of Medicaid payments in the Delaware Valley. State has increased our cost of insurance. Increased CAT fund premium by $20 million. Revenue has disappeared. There has not been a decrease in work, but there is no revenue. HMOs are the reason.

Danforth    I understand the Medicaid and Medicare funds come from federal government to state and the states disburse them.

Abdelhak.    Medicaid is paid through an intermediary and it is usually an insurance company. It was usually Blue Cross in Philadelphia. Now it is Blue Cross in Western Pennsylvania. No restrictions on how to use the federal money. Managed care was to be submitted by bids. Balanced Budget Act eliminated this requirement. They are probably spending about ½ as much as last year. Could be as much as $100 million less of reimbursement. We minimized the damage as much as we could.

Daniel    Why is it worse in the Delaware Valley?

Abdelhak    Competition; in Pittsburgh, there is only one Medicaid managed care company, and we own 1/3 of it. In Philadelphia, there are five. .....talked about all insurers in the Delaware Valley being way behind in payments. There is a tremendous backlog. Other measures: no capital acquisitions, no more leasing, have sold a lot of our assets and leased them back, have put an end to that. What is happening in the Delaware Valley will come to Pittsburgh.

Gumberg:    In terms of funded depreciation in AGH, do you think that the reimbursement and the pay back is within a relatively short time?

Abdelhak:    Any monies that are taken are being paid cash to AGH; investment income is not being used.

Sanzo:    Question: Will this current situation have a measurable impact on the Information Services initiative under way in AHERF?

- 2 -

DBR-CG-003448

| | |
|---|---|
| Abdelhak: | No, the responsibility of David, Nancy, Dwight Kasperbauer, Tom Chakurda, and the people in the support areas - the total budget is $120 million. $50 million of that is in IS, and David recommended, and I agreed, that we not touch that. We saved $26 million of the balance. There are a lot of people reporting administrative expenses at 24%. Ours are below 20%. |
| McConnell: | Ours are 12.25% of the total. |
| Abdelhak: | I cannot look at any of my people to say they didn't do something. If anyone didn't do something, it was me for not having a better handle on the extent of the damage in the Delaware Valley. Everyone has been responding as well as I could expect them to. |
| Barnes: | I have spent a lot of time with David and Sherif on this issue in the past couple of months. When it became apparent that the operating plan was way off track because of the revenue shortfalls in Philadelphia, they really got at it. I see this conversation as the opposite of a gloomy conversation. Over the past two years, the quality of our earnings was very poor. We tried to outgrow the issue by building utilization, etc., but it became apparent that we had to take some big bites, so this is good news. Bad news, however, is that although we would like to think that this is the end of the battle, and I am encouraging them to get this behind us by December 31, I am worried that this is not a trend that started in March of 1997 and will end in September, 1997. I believe it is a trend that may go on for several years until enough hospitals get squeezed out of business or the politicians reexamine what they are doing going forward. This is more likely a yearly thing rather than the end of this situation. |
| Abdelhak: | This is true. We are getting you some material to show you on an annual basis of the Balanced Budget Act. I have instructed some of our people to (1) close our clinics, both here and in Philadelphia. This is not reflected in the adjustments. In AGH, the clinics eat up $30 million. No announcements, quietly and quickly. 30/30. We cannot sustain them. How many people were served that way? 500,000. |
| Dan----: | Will affect the people who cannot afford it. |
| Edelman: | Will that over-use the ER? |
| Abdelhak. | State wants surplus in their budget at the expense of the institutions. |
| Edelman. | All medical systems are affected the same way? |
| Abdelhak | Yes, ask Bill. |

- 3 -

DBR-CG-003449

Buettner:    Agree. This is industry wide. It is in the Delaware Valley first, but it will move to Pittsburgh.

Abdelhak:    No one on my staff is responsible. The only thing we could have done if we had understood more fully the effect of the mandatory managed care is that we would have taken this action three months ago.

Barnes:    For years we have emphasized quality and were not hyper about costs, but now what is happening under the pressure of new legislation is that there are more fights for survival. Need to win the fight for survival. Also, very confident that with these actions we will restore our strength and increase our liquidity and increase our fundamentals as far as our financial position.

Edelman:    Why did we have to take the lead on the layoffs and clinics? Shouldn't we try to let someone else take the lead on the clinics?

Abdelhak:    Unfortunately, while we act and react quickly and make decisions quickly, there is no evidence that others will do the same, so as I said, for them we will have to bleed. It is a judgment.

Barnes:    Number-wise, we have to get at this. Last couple of years have not been as good as they could be. We don't have an option.

Edelman:    Both actions will be depicted properly?

Abdelhak    I know there is no possible way you could reconcile the gravity of the action. It will take us some time. They have historically been the places where we have let the residents practice. Now the state has published regulations that there must be a physician present and you would go to (....?...) otherwise. It won't give the residents the experience they need.

Transcriptionist's Note: At this point (12:50 p.m.), Mr. Barnes opened the meeting, declared there was a quorum present, the minutes were approved, etc. with no other comment.

Also please note: Other individuals generally spoke more quickly than Mr. Abdelhak during a presentation and it was often not possible to take word-for-word notes. In those cases, I usually made a note of the topic and filled in the detail later from agenda information when transcribing my notes What I have transcribed below in the following sections is what I wrote during the meeting

- 4 -

DBR-CG-003450

III. B.    Management Discussion and Report on Fiscal Year 1997 Audited Financial
Statements and Related Reports for AHERF

McConnell:    Have audited financial statements and appropriate debt compliance letters. Will
explain our format. (1) It has become clear over the years that as AHERF has
grown in size that in the external market we have the legal Obligated Group that
have asset pledges or debt pledges but the rating agencies look to the overall
organization. (2) Cost; used to provide different sets of audited financial
statements each year. Reduced audit fees substantially this year by going to one
audit report. As we were completing this issue, Bill Buettner had some concern
that the accounting profession considered our past as technically special reports.
Special purpose rendered them null and void, so we decided to go to one set of
statements. From a preparation standpoint, it seemed better. Reviewed the
mergers for Allegheny Valley and Graduate. Audit done quickly and cleanly. We
readjusted the balance sheets so we could gain Medicare recapture, and by doing
that with the mergers I could not give you a comparative balance sheet. These are
in draft form before final opinion. One large outstanding item: with respect to
Graduate merger into AHERF, we had certain costs in terms of debt compliance.
It is a legal, negotiating matter. I expect no problem other than working through
the ( ..?...) in the next couple of weeks. Can not have opinion filed until we
receive the waiver.

Buettner.    Referred to page 12 of the agenda. As David mentioned, the opinion is not
signed. We completed the work on September 4; waiting for the waiver from the
trustee and when we receive that, the note will be dated in October. We will issue
a clean opinion saying agree with Generally Accepted Accounting Principles and
agree with management's conclusion. Footnotes: David mentioned acquisitions.
To put acquisitions in perspective, size totaled $670 million of assets and
liabilities that are reflected in the financial statements that came in. Because of
the purchase accounting methodology that is used, the assets and liabilities come
on but the capital stays the same. So when you compare the position of the
organization, you are adding liabilities because of the acquisition but not adding
capital. Reason makes sense. Recapture is substantial but you have to follow this
type of accounting. David mentioned timing of these acquisitions were layered
throughout the year so if you look at page 14, income statement, you have the
(...?...) companies included but only few months of these (...?...) companies
reflected in the financial statements. Under purchase accounting method, you
start new when a new entity comes on board. He was going to bring up what he
already discussed: investment income $85 million. When you look at your overall
net income, that translates into a $60 million loss in operations. Consolidating
information in the back will provide with details.

Gumberg·    I noticed that on page 2 we have nominal working capital. Are you concerned

- 5 -

DBR-CG-003451

about only $8 million working capital, and I know we are working on paying payables quickly?

McConnell:  Obviously, we spend a lot of time managing that on a daily basis. $367 receivables, large number, have always talked about that to this committee in the past. If you look at that number and look at the annualized days and look at the last quarter's revenue (62 days in Accounts Receivable), our goal was to get it under 70. From a process standpoint, because the numbers are so large, we are attempting to negotiate special payment provisions with the payors, that is, Independence Blue Cross is probably one of the slowest payors we have. We told them they owed us $30 million more than we thought they did. So they said send us the claims. 150,000 outstanding claims. Collapsed their system. Trying to get half the money. We are trying to get predictability from cash flow. Computer systems of insurance companies aren't capable of what we are trying to do.

Snyder:  They were definitely trying to hold back.

McConnell·  . .talked about peculiarities of billing system and reasons for rejecting: name, birth date.

Abdelhak·  ·We are $60 million away from 60 days in Accounts Payable. We anticipate fundamental adjustments totaling $130 million will yield half of this this year. Plus, we need to catch up on a lot of this garbage. Combination is how to repay the funded depreciation and pay the Accounts Payable.

McConnell:  I think the downsizing of this week, in terms of cash, really won't materialize until January. So we need to do something in the meantime.

Cook  System wide, our days outstanding are in the low 60s and Shenf said we are $60 million away from 60 days.

McConnell:  From an Accounts Payable standpoint. From receivables, we are at 58 days.

Cook:  Where is the Delaware Valley?

McConnell:  AUH consolidated is at 66. St. Christopher's has been a large problem at 96. As of June, put them together. Delaware Valley consolidated is 73, which is as good as it has been in the last four to five years.

Dan----·  Asked about when the receivable hits the books.

McConnell.  . gave answer  Talked about giving the bill  Talked about difference in billing in Pittsburgh vs Delaware Valley, i e , Blue Cross problems. Blue Cross of

- 6 -

DBR-CG-003452

Western Pennsylvania does a better job.

Abdelhak:     What are the balances of the AGH funded depreciation on June 30 that was not used for payment of payables? .....little less than $50 million.

Buettner:     $58 million.

Abdelhak:     $58 million left behind.

McConnell:    We have continued to focus on bad debts. We have put a lot of emphasis on working these aggressively. Page 30, bad debt expense was $66.4 million. Have compared to other organizations in industry - compares bad debts to gross revenue and we are at 1.56 compared to gross. The national average is 5.8.

Edelman·      Asked where the $112 million shows up. On a consolidation statement, where does the intercompany $112 million show?

Buettner:     It will not show on a consolidated statement but it will be on the consolidating schedule; the number in the elimination column which reflects that AHERF has an obligation from one of its sister corporations.

McConnell:    We have certain audiences for the financial statements. (1) the Audit Committee, (2) Debt markets, and Bill has agreed that he needs to indicate that some of the money is in intercompany receivables. Resolution approved.

III  C     Fiscal Year 1997 Report on AHERF Internal Controls

Buettner·     Turn to Page 65. There is a short letter in draft form that deals with our report on internal controls. AHERF needs this for filing Medicare Cost Report. No material control weaknesses. Letter is similar to that in the past. Approved.

IV.  A.     Coopers & Lybrand Management Letter and AHERF Management Response

McConnell:    This is the detailed letter that is not required to be reported externally that we ask Coopers &Lybrand to share with the Audit Committee to give us areas of guidance to focus on. All CEOs and I have responsibility in various areas. Letter is here; management has been in agreement with the findings of Coopers & Lybrand. Bill agreed that Coopers is okay with our responsibilities. Questions? Philadelphia?

Cook.         Page 70 - in talking about the lease commitments Sherif commented on earlier.

- 7 -

DBR-CG-003453

|             |                                                                                                                                                                                                                                                                                                                                                                |
|-------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|             | $432 million on the books; additional $100 million in commitments - have they been executed?  What percentage of that $100 million falls into the lease commitment for this current fiscal year? |
| McConnell:  | $35 million pooled leasing program negotiated with General Electric.  That program is in place.  Available for our use.  Second piece is a $65 million lease program which is the energy plan for the Delaware Valley.  Project reduces cost greater than the level of the price of the program.  We are working on the lease transaction with the accounting rules.  In general, leases do support routine operations. |
| Edelman:    | There seems to be certain items that recur - Page 78 - purchasing systems observations.  Hard for me to understand why some of these things can't be taken care of. |
| Buettner:   | It has been an item for the past couple of years. |
| Edelman:    | Seems to me the answer is that we are still trying. |
| McConnell:  | Fair observation. |
| Dan----     | Page 74.  Revenue in Accounts Receivable - I have a feeling that herein might lie some other areas where cash is not coming in because we can't get the receivables properly managed.  And I am not sure the management response is really responsive to the issue. |
| Abdelhak·   | We will be taking care of some additional action.  The system that has been in place in Pittsburgh has worked very effectively in reducing their Accounts Receivable in a substantial way.  We are working diligently to get the same system implemented in the Delaware Valley.  Other change is that a couple of years ago I set the registration turned over to the Billing Department., and we will do the same thing in the Delaware Valley - we will turn over the front end to the Billing Department. |
| Dan----:    | How soon?  Today? |
| ?           | ....talked about seeing comments year after year. |
| McConnell·  | Going back to where our comments were last year on receivables, problems from the past have substantially improved. |
| Buettner·   | Agrees that significant improvements have been made.  From our perspective, positive steps have been taken.  The registration process of itself - I can't tell you |

- 8 -

DBR-CG-003454

if that would reduce your receivables, but clearly if you have a strong registration process it makes everyone's job easier. Principal difference is the quality of the input. Dramatic improvement.

Buettner:    System-wide, the best place for improvement is the registration process in the Delaware Valley. Also in the Delaware Valley, the third party payors have been very difficult to deal with.

Abdelhak:    Talk about purchasing system. First, there are no unauthorized purchases. They don't get paid. If anyone doesn't go through our purchasing system, they won't be paid. If you notice here the issues are: Are the right people approving the purchase before it is done? Procedural issue. We update our file of signers annually. Some departments didn't update them, hence there is a discrepancy. Procedural issue. Then, if you notice here, the fact that the credits are not handled and being resolved on a timely basis - it has to do with us having basically taken a function in the Purchasing Department because it was easier to do and use prudent judgment in separating responsibilities and have Accounts Payable handle so they don't have the same knowledge, they don't have the same flow of action. Finance has nothing to do with this. We are making a correction next year in the format to show who is the lead person to handle it.

Edelman:    Some of these look like fairly garbage items.

McConnell:    Yes, some of them are that, and if that is all they are finding, great. If that is the worst that they find in terms of an overall control environment, if this is where we are at, some people have done a good job.

Abdelhak    With all due respect to Mr. Edelman and to David, the one area which is new which is very important is the risk contracting, because there are big bucks involved. We have one million lives rather than 500,000, and that is a lot of money. I would not classify this as garbage.

Edelman:    Said some of these items are garbage. Would like to see them gotten rid of in one cycle. Some of them are very important.

Gumberg:    Regarding risk contracting - stop loss - is that a mathematical insurance to protect us?

Abdelhak:    Yes, and we have excellent rates. Rates were less than we could get from insurer. At the next meeting, let's try to devote some time to risk contracting issue.

Cook:    Are we on track with the implementation schedule for the HIMSYS for AHERF?

- 9 -

DBR-CG-003455

| | |
|---|---|
| Abdelhak: | We are six months behind because of the Year 2000. |
| Cook: | Does that impact all of the subsets? |
| Abdelhak: | Under the circumstances, with the staffing reductions in the Delaware Valley, one of the applications (inpatient nursing documentation) may be phased in in the Delaware Valley rather than implemented fully at Hahnemann. Principal problem is testing and training. Trying to find streamlined ways to get that done. Have developed computerized module that people can learn from and looking for people for testing to insure system is functional and meets specifications. |
| Dan----: | There was discussion in there about client managed systems. What about the risk if they don't get it done? |
| Abdelhak: | Ask Tony, Don Kaye, and Barry - they are at risk. |

IV. B     Coopers & Lybrand Required Communication to the Audit Committee

| | |
|---|---|
| Buettner: | If you have any questions; the letter is required to be issued by the firm every year. Eight or nine points we have to communicate to you. |

IV  C.     Report on Fiscal Year 1997 Audited Financial Statements - Canonsburg General Hospital and Subsidiaries

No questions.

IV  D     Coopers & Lybrand Management Letter and Canonsburg General Hospital Management Response

(Nothing was said.)

IV. E.     Review of Audit Services Activities from March, 1997 to Present (Pittsburgh and Delaware Valley)

| | |
|---|---|
| Schrecengost: | Summary of the work of the Audit Services Group. We have summarized individual reports and include Executive Summary. Any specific questions on any items—I will be happy to answer them or could provide copies of the reports. |
| Barnes | Anything of consequence? |

DBR-CG-003456

Schrecengost: We have been focusing on areas related to Compliance. We are under tremendous pressure from the government with their initiatives related to fraud and abuse. Articles on Columbia/HCA, and I think the work of the Audit Department regarding education and operational activity - we have encouraged people to be proactive in these terms and will not be reactive in terms of any letter that comes in from the government. Have a process for bad billing. We are self-disclosing and paying back things. See those as sensitive areas.

Snyder: How many in your department?

Schrecengost: 24 professionals across the state.

Snyder: You are fully staffed?

Schrecengost: Yes.

Edelman: How do you select risk assessment?

Schrecengost: That is discussed in the March meeting, and I will devote some time to that at the next meeting. Explained ways of risk assessment.

McConnell: Also leave time for the Committee to respond to any questions.

Barnes: Any more questions? Executive Session?

Buettner: No.

Barnes: Board?

No.

Barnes: Management?

Yes.

McConnell: We are recommending Coopers & Lybrand be reappointed as external auditors once again. From a quality and cost standpoint, they have done a good job. They have announced an international merger with Price Waterhouse. Price Waterhouse is out of that business on the East Coast. I do not know the direction the firm will take. Bill does not know who will be leading the office   Bill said it is the normal merging work.

Snyder: Diane, have you had the proper cooperation?

- 11 -

Schrecengost: I think we have the optimum audit coverage in terms of Internal Audit's ability to look a little bit deeper. I think we work very well together and I have no difficulty in terms of access. They are very involved in the Internal Audit activities. They rely on us on a control that they use to modify their work.

McConnell:    Doesn't mean we always agree with them.

Resolution approved. Meeting adjourned, 1:50 p.m.

cg 11091

- 12 -

DBR-CG-003458

TAB 217

## MEETING OF THE RESOURCE MANAGEMENT COMMITTEE
### ALLEGHENY GENERAL HOSPITAL
Pittsburgh, Pennsylvania

A meeting of the Resource Management Committee of Allegheny General Hospital was held on Wednesday, October 15, 1997, at 2:00 p.m. in the Snyder Auditorium of Allegheny General Hospital, Pittsburgh, Pennsylvania. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Committee. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Barbara Bensaia | William T. Duboc |
| William F. Adam | Debra L. Caplan | William H. Genge |
| David E. Barensfeld | Connie Cibrone | Frederick R. Heckler, M. D. |
| Christopher A. Bonnet, M. D. | John R. England | Robert M. Hernandez |
| R. Lee Bures | Joel H. Ettinger | Graemer K. Hilton |
| Richard H. Daniel | Dawn M. Gideon | Joseph C. Maroon, M. D. |
| Joseph D. Dionisio | Mary C. Goessler, M. D. | Thomas H. O'Brien |
| Harry R. Edelman, III | Carol Gordon | Randall L. C. Russell, Ph. D. |
| David P. Fowler, M. D. | Lynn R. Isaacs | Rolf Schapiro, M. D. |
| Ira J. Gumberg | Dwight Kasperbauer | David W. Sculley |
| Robert J. Hartsock, M. D. | Caryl M. Kline | Richard White, Ph. D. |
| Peter D. Kaplan, M. D. | Dana W. Ramish | |
| Douglas M. Landwehr, M. D. | Andrew Thurman, Esq. | |
| Stanley M. Marks, M. D. | Cherry S. White | |
| David W. McConnell | Nancy A. Wynstra, Esq. | |
| Veronica L. McDonough | | |
| James S. Moore | | |
| Michael W. Moyer | | |
| Francis B. Nimick, Jr. | | |
| Barry H. Roth | | |
| Anthony M. Sanzo | | |
| J. Brandon Snyder | | |
| W. P. Snyder III | | |
| William E. Walker | | |



AHERF LIT
USDC W.D. Pa.
MISC No 00-40
4266
EXHIB4266O.

DS 01785

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 2

I.    Opening of Meeting

The meeting was called to order by Sherif S. Abdelhak, Chairman. Nancy A. Wynstra, Esq. maintained the minutes. Mr. Abdelhak noted that the Committee on Trustees has been working to insure that the organization is streamlined and functioning in the most effective manner. Toward that end, there will be a single Western Region Resource Management Committee; its membership is being considered by the Committee on Trustees and will be announced soon. Other committees will also be reconstituted on a regional basis. In light of the fact that a Chair for the Regional Committee had not yet been appointed, Mr. Abdelhak chaired the meeting. The Chairman declared that a quorum was present and the meeting was competent to proceed.

II.   Additions to the Agenda

Mr. Abdelhak noted that there were no additions to the agenda.

III.  Review of Cardiovascular Services, AHERF Western Region

Mr. Abdelhak stated that the design of future meetings would be to report on a major clinical service, on a regional basis, at each Joint Conference and Planning Committee, focusing on quality issues, market share, medical developments, etc. At the Resource Management Committee, a review will be held of the same service, discussing all aspects of resources dedicated to that service, such as financial resources, system requirements, Human Resources, facilities, and resources required for an expanded market share.

Barry Roth stated that the purpose of the review of clinical services is to enable the Committee and the Board of Trustees to have an opportunity to develop regional strategies as well as evaluate and enhance the strengths of the organization. Mr. Roth defined the four categories of Cardiovascular Services as follows:

- Heart Transplants: Patients who had heart multitransplant surgery.
- Cardiac Surgery: Patients who had open heart surgery and/or pacemaker insertion;
- Invasive Cardiology: Patients who had cardiac catheterization and/or angioplasty;
- Clinical Cardiology: Patients admitted with a cardiac diagnosis who did not undergo any surgical or invasive procedure.

DS 01786

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 3

Mr. Roth provided a market overview and a review of market share. Mr. Sanzo continued the presentation with a discussion of the financial aspects of the Cardiology program, noting that the market is crowded, but Allegheny is a dominant player. Mr. Sanzo further stated that most of the strength of the AGH Cardiology program is outside of Allegheny County, and the greatest challenge is to capture the market in this county. Following a review of benchmark data quantifying the importance of the Cardiology service to the hospitals in the Western Region, Mr. Sanzo stated that moving forward with strategic initiatives is necessary to achieve the stated goals on increased market share while providing comprehensive Cardiology services at the lowest cost in Western Pennsylvania.

IV.   Approval Items

   A.   Governance Issues

      1.   Approval of Minutes

         The minutes from the meeting held on June 6, 1997, were presented. Upon motion duly made and seconded, the Resource Management Committee approved the following resolution:

               RESOLVED, that the Resource Management Committee of Allegheny General Hospital approves the Minutes from the meeting held on June 6, 1997, as presented.

   B.   Finance

      1.   AGH Financial Statements for the Year Ended June 30, 1997

         Sherif Abdelhak opened the discussion by asking the Trustees to turn to Page 5 of the June 30, 1997 Statement of Operations, Assets limited or Restricted as to Use. He noted that the $164,158,000 total in the line item "Unrestricted by Board of Trustees" is today closer to $58 million, in light of the fact that the Finance Committee approved the use of some of those funds to deal with working capital requirements in the Delaware Valley. Mr. Abdelhak further noted that the interest income is being

DS 01787

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 4

recorded to AGH on a current basis, with the intent for the principal to
be repaid within the next 12-24 months. He further noted on Page 7,
that a transfer of other assets from AIHG was reported in the amount of
$48,853,000. Mr. Abdelhak stated that tangible and intangible assets
were involved, although in many cases the assets were non-compete
agreements and goodwill, and returning the assets to AGH strengthens
the financial position.

Mr. Dionisio continued the presentation with a brief review of the
financial highlights for the Year Ended June 30, 1997. Inpatient revenue
produced a substantial positive variance from the amount budgeted due
to favorable variances in inpatient cases and revenue per case; outpatient
revenue had an increase over budget of 22%. These results, combined
with a favorable variance of $4 million in investment income, produced
income of approximately $21 million compared to the budgeted amount
of $9 million. Due to the January 1, 1997 transfer of ASRI to the
University, support which AGH provided to ASRI is now treated as an
expense item on the Statement of Operations. Reflecting that change
produced net income for the year of nearly $12 million. Following brief
discussion regarding the academic costs of the University now appearing
as an AGH expense item, it was noted that these expenses related to the
Pittsburgh-based University faculty only. Upon motion duly made and
seconded, the Resource Management Committee recommended that the
Allegheny General Hospital Board of Trustees approve the following
resolution:

> RESOLVED, that the Board of Trustees of Allegheny General
> Hospital approves the Financial Statements for the Year
> Ended June 30, 1997, as presented; and instructs the
> Secretary to append a copy of the approved Statements to the
> original minutes of the meeting.

2.  Results of Operations and Financial Statements for the Period Ended
    September 30, 1997

    Mr. Abdelhak began the discussion by noting that, after preparation of
    the budget, an agreement was reached with Blue Cross representing an
    annualized reduction in revenue from Blue Cross amounting to $5
    million, retroactive to July 1, 1997.  Mr. Sanzo noted that the highlights

DS 01788

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 5

of the income statement showed that AGH was behind plan by $5 million
and recorded a loss of $3.5 million. He briefly reviewed admission
activity, acuity, and expense variances. Mr. Sanzo further stated that
certain physicians who had been employed were working under different
provider numbers, thus necessitating recredentialing before proper
billing could occur. Mr. McConnell estimated this situation accounted
for approximately $4 million in revenue due from Blue Cross.
Mr. Abdelhak provided an update on the Federal North project, stating
that initial plans were to create a 200,000 sq. foot research facility, thus
causing an $11 million carrying cost. He reported that the decision was
made not to develop the site for research but to use it for office space,
thus eliminating many of the office leases now in existence and reducing
the carrying costs of the project. Upon motion duly made and seconded,
the Resource Management Committee approved the following resolution:

> RESOLVED, that the Resource Management Committee of
> Allegheny General Hospital accepts the Financial Statements
> for the Period Ended September 30, 1997, as presented; and
> instructs the Secretary to append a copy of the accepted
> Statements to the original minutes of the meeting.

3.    Plan of Finance for AGH, AUMC and the Merger of
      AUMC/Canonsburg into AUMC

David McConnell noted that management is contemplating combining the
Western Region credit into one set of documents if better rates can be
achieved. A savings of approximately 4% Net Present Value is presently
projected. Based on prior approvals, an additional $50 million may be
obtained to replenish funds previously spent on capital improvements.
Mr. McConnell reported that covenants of existing tax exempt bond
financings or refinancings utilized by the Western Region entities as
stand-alone entities impose significant limitations on the ability of the
organization to streamline the corporate structure. As part of the
Western Region plan, AUMC/Canonsburg will be merged into AUMC
with AUMC as the surviving corporation, which will accomplish the
original intent of the merger of Canonsburg General Hospital into
AUMC. Upon motion duly made and seconded, the Resource
Management Committee recommended that the Allegheny General
Hospital Board of Trustees approve the following resolution:

DS 01789

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 6

WHEREAS, entities within the Allegheny Health Education
and Research Foundation (AHERF) system located in
Allegheny and Washington County ("the Western Region"),
Allegheny General Hospital ("AGH"), Allegheny University
Medical Centers ("AUMC") and AUMC/Canonsburg
(collectively "Corporations") have, at various times, financed
projects through the issuance of tax-exempt debt; and

WHEREAS, a review of the existing financings or refinancings
in the Western Region indicates that it is appropriate at this
time to refund or restructure the existing tax-exempt bonds,
and, at the same time, incur certain additional debt for current
and future expenditures, and merge AUMC/Canonsburg into
AUMC with AUMC as the surviving corporation.

WHEREAS, such refinancing may be done through a variety
of mechanisms, including the refunding and/or redemption, or
a tender and exchange for the outstanding tax exempt bonds,
the exchange of certain tax-exempt bonds from the proceeds of
tax exempt bonds, taxable notes of the Corporations and other
available moneys of the Corporations as more fully set out in
the "Plan of Finance and Summary of Certain Merger
Transactions" ("the Plan") which is attached hereto as Exhibit
"A" and made a part hereof.

NOW, THEREFORE, BE IT RESOLVED, that the Board of
Trustees of Allegheny General Hospital, hereby approves and
ratifies the transactions described in the "Plan of Finance and
Summary of Certain Merger Transactions ("the Plan"), as
identified on Exhibit "A" attached hereto; and

FURTHER RESOLVED, that, subject to parameters set forth
below, the conditions set forth herein, the incurrence of
indebtedness by the Corporations, and the expenditure of the
Corporations' own funds, for the Financing Purposes related
to the Corporations are hereby approved; and

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 7

FURTHER RESOLVED, that the transactions related to an
Obligated Group under a Master Indenture which are
described in the Plan are hereby approved; and

FURTHER RESOLVED, that the issuance and delivery of
Obligations by the Corporations and other Members of the
Obligated Group for the purposes described in the Plan are
hereby approved; and

FURTHER RESOLVED, that the execution, delivery, issuance
and approval, as the case may be, by the Corporations of the
Financing Documents, the Obligations and the Offering
Documents described in the Plan, in such forms and with such
provisions (including, if necessary, the funding of a debt
service reserve fund, the granting of a security interest in the
Corporations' accounts receivables and proceeds thereof, the
designation of a Bond Trustee, a Master Trustee, an Insurer
and one or more Financial Institutions, and the amount and
payment of the discounts and fees of the Underwriters) as shall
be approved by the Authorized Officers (as hereinafter
defined) executing and delivering the Financing Documents,
the Obligations and the Offering Documents to which the
Corporations are a party, and all such other documents,
certificates and instruments as may be necessary or desirable,
in the opinion of the Authorized Officers executing, delivering
and/or approving the same, in order to effectuate the
execution, delivery, issuance and approval of the Financing
Documents, the Obligations and the Offering Documents, are
hereby authorized and approved; provided, however, that the
conditions set forth in the next succeeding paragraph are
satisfied; and

FURTHER RESOLVED, that the aggregate principal amount
of indebtedness authorized to be incurred by the Corporations
pursuant to this resolution is limited to the amount necessary
to accomplish the Financing Purposes related to the
Corporations. The average rate of interest on the Fixed Rate
Bonds and any Direct Obligations bearing interest at a taxable
fixed rate, including the present value effect of any original

DS 01791

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 8

issue discount thereon, may not exceed the tax-exempt rates
and the taxable rates, respectively, borne by the fixed rate
indebtedness of comparable health care credits issued in a
comparable principal amount and with comparable maturities
as that of such Fixed Rate Bonds and Direct Obligations. The
total compensation paid to the Underwriters of the Bonds, may
not exceed 2.25% of the aggregate principal amount of the
Bonds. The total compensation paid to the Underwriters of the
Direct Obligations may not exceed 2.25% of the aggregate
principal amount of the Direct Obligations. The fixed rate of
interest paid by the Obligated Group under any Swap
Agreement or on any master note securing such payments may
not exceed the fixed rate of interest paid by comparable health
care credits to comparable counterparties under an interest
rate exchange agreement comparable to the Swap Agreement,
taking into account the notional principal amount thereunder
and the termination date thereof. The final maturity of any
indebtedness authorized to be incurred by the Corporations
and the other Members of the Obligated Group pursuant to
this resolution shall not be later than 40 years from the
respective dates of issuance of such indebtedness; and

FURTHER RESOLVED, that the Obligations, the Financing
Documents and the Offering Documents to which the
Corporations are a party may be executed and delivered by the
President and Chief Executive Officer, or his designee,
Secretary or Assistant Secretary, Treasurer or Assistant
Treasurer (the "Authorized Officers"). The execution and
delivery of such documents shall constitute evidence of the
satisfaction of the conditions described in the preceding
paragraph; and

FURTHER RESOLVED, that the merger of
AUMC/Canonsburg into Allegheny University Medical
Centers (AUMC), the transfer of all of AUMC/Canonsburg's
assets and liabilities to AUMC and the assumption by AUMC
thereof are hereby approved and ratified; and

DS 01792

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 9

FURTHER RESOLVED, that the transaction described in the Summary of Certain Merger Transactions, as identified on Exhibit "A" attached hereto, is hereby approved and ratified; and

FURTHER RESOLVED, that the Authorized Officers are hereby authorized and directed to take such other actions, including, without limitation, the execution and delivery of certificates and other documents, as may be necessary to effect the intent of this resolution; and

FURTHER RESOLVED, that the Secretary is directed to attach to the original minutes of this meeting the "Plan of Finance and Summary of Certain Merger Transactions" as presented at this meeting.

4.    Impact of Legislative Changes on AGH

Mr. Abdelhak noted that detailed information on the impact of recent legislative changes was provided.

V.    Written Reports Submitted for Information

A.    Primary Care Network Report
B.    Hospital Network Development
C.    AGH Annual Report on Capital Reimbursement Activity
D.    Review of Cash Disbursements
E.    AGH Human Resources Report

The above reports were presented for information, and there were no questions.

DS 01793

RESOURCE MANAGEMENT COMMITTEE
ALLEGHENY GENERAL HOSPITAL
October 15, 1997
Page 10

VI.    Adjournment

    There being no further business, the meeting was adjourned at 4:00 p.m.

Respectfully submitted,

Nancy A. Wynstra, Esq.
Secretary

NAW:cg

NOTED ATTACHMENTS: Notice of Meeting; AGH Financial Statements for the Year Ended June 30, 1997; AGH Results of Operations and Financial Statements for the Period Ended September 30, 1997; Plan of Finance and Summary of Certain Merger Transactions.

DS 01794

TAB  218

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*Ira Gumberg*
*October 3, 2003*

---

# LEGALINK MANHATTAN

*420 Lexington Avenue – Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

Gumberg, Ira - Vol. I



**LEGALINK**
A WORDWAVE COMPANY

IRA GUMBERG                                           Volume #2

Page 237

```
 1       IN THE UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF PENNSYLVANIA
 2
                        - - - -
 3
    THE OFFICIAL COMMITTEE OF    )
 4  UNSECURED CREDITORS OF       )
    ALLEGHENY HEALTH, EDUCATION & )
 5  RESEARCH FOUNDATION.         )
 6          Plaintiff,    )
                          )
 7          -vs-          )  Civil Action
                          )  No. 00-684
 8  PRICEWATERHOUSECOOPERS. L.L.P. )
                          )
 9          Defendant.   )
10
11                      - - - -
12      VIDEOTAPE DEPOSITION OF:  IRA GUMBERG
                  VOLUME II
13                      - - - -
14
15      DATE:  October 3, 2003
               Friday, 8:58 a.m.
16
17      LOCATION:  KIRKPATRICK & LOCKHART
                Oliver Building, 2nd Floor
18              535 Smithfield Street
                Pittsburgh, PA  15222
19
20      TAKEN BY:  Defendant
21
        REPORTED BY:  Heidi H. Willis, RPR. CRR.
22               Notary Public
                 AKF Reference No. HW77545
23
24
25
```

Page 239

```
 1                   * I N D E X *
 2  Examination by Mr. Brooks - - - - - - - - -  240
    Examination by Mr. Jones - - - - - - - - -  304
 3  Re-Examination by Mr. Brooks - - - - - - -  378
    Re-Examination by Mr. Jones - - - - - - - -  391
 4
    Certificate of Court Reporter - - - - - - -  394
 5  Errata Sheet - - - - - - - - - - - - - - - -  395
 6
 7         * INDEX OF EXHIBITS *
 8               REFERRED TO
 9  Deposition Exhibit 22 - - - -  328
    Deposition Exhibit 522 - - - -  357
10  Deposition Exhibit 832 - - - -  324
    Deposition Exhibit 1289 - - -  373. 375. 376
11  Deposition Exhibit 1659 - - -  247, 251
    Deposition Exhibit 1661 - - -  333, 335
12  Deposition Exhibit 1666 - - -  282
    Deposition Exhibit 1672 - - -  287
13  Deposition Exhibit 1939 - - -  325, 327, 380
    Deposition Exhibit 1994 - - -  321
14  Deposition Exhibit 2019 - - -  243
15
16            MARKED    REF'D
17  Deposition Exhibit 2051 - - - -  255
    Deposition Exhibit 2052 - - - -  266
18  Deposition Exhibit 2053 - - - -  273
    Deposition Exhibit 2054 - - - -  285
19  Deposition Exhibit 2055 - - -  293    294
    Deposition Exhibit 2056 - - - -  314
20  Deposition Exhibit 2057 - - -  316    317
    Deposition Exhibit 2058 - - - -  321    322
21  Deposition Exhibit 2059 - - - -  336    340
    Deposition Exhibit 2060 - - - -  370
22
23
24
25
```

Page 238

```
 1      VIDEOTAPE DEPOSITION OF IRA GUMBERG. VOLUME II.
    a witness, called by the Defendant for examination.
 2  in accordance with the Federal Rules of Civil
    Procedure, taken by and before Heidi H. Willis, RPR.
 3  CRR. a Court Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania, at the offices of
 4  Kirkpatrick & Lockhart, Oliver Building, 535
    Smithfield Street. Pittsburgh, PA 15222, on Friday.
 5  October 3. 2003. commencing at 8:58 a.m.
 6
                    - - - -
 7
 8  APPEARANCES:
 9      FOR THE PLAINTIFF:
        James M. Jones, Esq
10      JONES DAY
        One Mellon Bank Center
11      31st Floor
        Pittsburgh, PA  15219
12      412-258-2300
13
14      FOR THE DEFENDANT:
        Roger G. Brooks. Esq.
15      CRAVATH, SWAINE & MOORE
        Worldwide Plaza
16      825 Eighth Avenue
        New York, NY  10019
17      212-474-1986
18
19      FOR THE WITNESS:
        David McClenahan. Esq.
20      KIRKPATRICK & LOCKHART
        Oliver Building, Second Floor
21      535 Smithfield Street
        Pittsburgh, PA 15222
22      412-344-6500
23
24      ALSO PRESENT:
        Ken Ingersoll. Videographer
25
```

Page 240

```
 1                    - - - -
 2          P-R-O-C-E-E-D-I-N-G-S
 3                    - - - -
 4      THE VIDEOGRAPHER:  This is day two of
 5  the deposition of Ira Gumberg.  The witness is
 6  already sworn in.  We are now going back on the
 7  record.  The time is 8:58 a.m.
 8                    - - - -
 9          EXAMINATION (CONT'D)
10                    - - - -
11  BY MR. BROOKS:
12  Q.   Good morning, Mr. Gumberg.
13  A.   Good morning.
14  Q.   We spent some time yesterday looking at a
15  Coopers & Lybrand management or comment letter
16  I should say, and I want to ask a couple
17  follow-up questions about your experience with
18  Coopers & Lybrand.
19          Was Bill Buettner or any
20  representative of Coopers & Lybrand invited to
21  AHERF parent board meetings as a general
22  matter?
23          MR. JONES:  Object to foundation and
24  to form.
25  A.   I do not recall Bill at a parent board meeting.
```

Page 241

1  Q.  Was he invited to AGH board meetings?
2          MR. JONES:  Same objection.
3  A.  I do not recall him at an AGH board meeting.
4  Q.  Did he attend AGH resource management committee
5      meetings?
6          MR. JONES:  Same objection.
7  A.  The answer to that as well would be no, to the
8      best of my recollection, except for when I
9      asked for a special Saturday morning session,
10     which I might add was my first time meeting
11     Bill Buettner.
12 Q.  Okay.  And --
13 A.  Excuse me, that would have been the second time
14     I met Bill Buettner, the first time being at
15     the -- first time I attended an audit meeting
16     on October the 15th was my first time meeting
17     Bill Buettner.
18 Q.  And the second time was shortly thereafter at
19     this special meeting?
20 A.  I don't remember.  I think it was in -- I think
21     in -- correct, it may have been a couple months
22     later.
23 Q.  Okay.  Other than that special meeting, did you
24     ever attend any meeting of any AHERF board at
25     which Mr. Buettner was present?

Page 242

1  A.  I don't believe so.
2  Q.  And let me correct my question.  Other than
3      that special meeting and the audit committee
4      meeting that you referred to, did you ever
5      attend any AHERF board or committee meeting at
6      which Mr. Buettner was present?
7  A.  I do not believe so.
8  Q.  At either of those two meetings you did attend
9      at which Mr. Buettner was present, did you ask
10     Mr. Buettner any questions?
11 A.  At the audit --
12 Q.  Sorry, why don't we hold until he gets that,
13     and we'll read back the question.
14         MR. McCLENAHAN:  Sorry.
15         MR. BROOKS:  Why don't you read back
16     the question, if you would.
17              - - - -
18     (The record was read back by the Reporter.)
19              - - - -
20 A.  I do not believe that I asked Mr. Buettner
21     questions at the October 15th audit meeting,
22     but I cannot say for sure.  I think -- I think
23     I may not have.
24         I did, because I chaired the meeting,
25     the Saturday morning session, so there would

Page 243

1      have been a number of questions I would have --
2      I would have asked of him.
3  Q.  Okay.  Let me hand you minutes of that October
4      15th, 1997 audit committee meeting which had
5      been be previously marked as Exhibit 2019 in
6      this litigation.
7          And, Mr. Gumberg, do these appear to
8      be the minutes of the meeting you were
9      referring -- of the audit committee meeting you
10     were referring to?
11 A.  It appears to be.
12 Q.  And this meeting was the first time you met
13     Mr. Buettner in any context?
14 A.  Yes.
15 Q.  If you would turn in this document into page 4,
16     Bates No. ending in 814, and three sentences in
17     at the top of that page you'll see a sentence
18     that reads, quote, Following discussion
19     regarding the outstanding balances in accounts
20     payable and expected adjustments which are
21     intended to be paid to AGH funded depreciation
22     account, and then it continues.
23         At that audit committee meeting on
24     October 15, 1997, was there a discussion of the
25     fact that large loans had been made from the

Page 244

1      AGH funded depreciation account to the Delaware
2      Valley entities?
3  A.  Yes, sir.
4  Q.  And --
5          MR. McCLENAHAN:  Mr. Gumberg, I think
6      it might be helpful if you at least skimmed the
7      section beginning with B over to page 4 where
8      Mr. Brooks is asking questions so you get --
9          THE WITNESS:  Okay.
10         MR. McCLENAHAN:  -- a sense of the
11     context of the question.
12              - - - -
13     (The witness reviewed the Exhibit.)
14              - - - -
15         THE WITNESS:  Okay.  I think you
16     asked a question if there had been discussion
17     about transfers.
18 BY MR. BROOKS:
19 Q.  And I think you answered that question.  I
20     think there's no question pending.
21         My question now is:  When did you
22     personally first become aware that substantial
23     loans may have been made from the funded
24     depreciation accounts of Allegheny General to
25     DVOG entities?

2 (Pages 241 to 244)

Page 245

1   A.   A few days -- a day before this meeting, which
2        would have been I believe on the 14th.
3   Q.   Okay.
4   A.   I came in for a pre-meeting, which would have
5        been a standard, a routine with me where any
6        type of a resource management committee meeting
7        that I would be participating in or chairing,
8        that there would be a pre-meeting, and that at
9        two o'clock this same day there was a resource
10       management meeting. So that was the reason for
11       my being there the day earlier was for that
12       preparatory session.
13            The presenters that would be
14       presenting at that meeting were all in
15       attendance, and then they excused themselves or
16       Tony Sanzo I should say excused everybody
17       except himself and Joe Dionisio, and then Joe
18       Dionisio and Tony advised me that in their
19       opinion there were substantial transfers that
20       had been taking place and that they may not be
21       presented on the balance sheet as -- as
22       transfers due from the east back to the west,
23       but instead I believe were labeled as
24       investments.
25            I had a -- I then excused Joe

Page 246

1        Dionisio and only spoke one-on-one with Tony
2        Sanzo. I told Tony that I wanted to get to the
3        bottom of this immediately, and he said that
4        that was the reason why he came to me, that he
5        thought that I would be the personality, the
6        individual that would deal with this, and I
7        asked him if he would call Sherif and tell
8        Sherif that I'm aware and tell Sherif I'd like
9        to see him.
10            I received a call back at my office
11       sometime that afternoon asking if I could meet
12       Sherif at 11:30 this same day at Sherif's
13       office at the AGH enterprise.
14            MR. McCLENAHAN: The same day now
15       meaning the 15th?
16   A.   The next day, the 15th, the audit committee
17       meeting, the 15th, and then I met with Sherif
18       that morning, or at that 11:30 meeting.
19   Q.   And what was the substance of your conversation
20       with Mr. Abdelhak?
21   A.   Substance -- substance of that was that I
22       discussed with Sherif rather directly what I
23       had learned. He at first told me he thought
24       that I was incorrect in terms of the way it was
25       presented in the balance sheet. The meeting

Page 247

1        became a little bit heated from his perspective
2        in the sense that he thought I didn't
3        understand and that I was completely off base
4        in terms of the accounting of this.
5             I told him that I might be, an
6        accountant I'm not, but that I do know as a
7        trustee to me investments to me meant General
8        Motors, 3M, IBM, it didn't mean invested in our
9        own shop, particularly on the other side,
10       meaning the east side of our enterprise, and I
11       thought that most board members would feel the
12       same way.
13            He then said that he understood, and
14       I recommended to him that I thought the -- that
15       he should come before his board at this twelve
16       o'clock meaning and discuss it.
17   Q.   And that is then what happened at that meeting?
18   A.   And that is then what happened at that meeting.
19   Q.   Let me also put in front of you what's been
20       previously marked, in fact, you probably have
21       it in your stack somewhere, this is the --
22       Ms. Gordon's shorthand, the transcription of
23       Ms. Gordon's shorthand notes of the October 15,
24       1997 meeting which is labeled as Exhibit 1659.
25       I'll save time by handing you --

Page 248

1   A.   Thank you.
2   Q.   -- another copy I have one more here.
3            MR. McCLENAHAN: I got it.
4   Q.   And, again, you can decide how much context you
5        want to look at. I'm going to direct your
6        attention to some of the discussion that is
7        approximately recorded towards the top of page
8        7.
9   A.   I'm just going to ask for your help for page 7.
10            MR. McCLENAHAN: This is Western
11       Pennsylvania does a better job?
12            MR. BROOKS: That is the page and
13       then the discussion that follows underneath
14       that.
15            MR. McCLENAHAN: Well, help us out
16       here. Are you going to be talking about the
17       funded depreciation issue or the issue that
18       precedes it on --
19            MR. BROOKS: The funded depreciation
20       issue.
21            MR. McCLENAHAN: Okay. Ira, why
22       don't you start then at the top of page 7 and
23       read down until Roman numeral III C.
24            - - - -
25            (The witness reviewed the Exhibit.)

3 (Pages 245 to 248)

IRA GUMBERG                                   Volume #2

Page 249

1            - - - -
2   BY MR. BROOKS:
3   Q.   Okay. My first question is at this meeting was
4        it primarily Mr. Abdelhak or Mr. Buettner who
5        explained to the AHERF audit committee the
6        nature of these loans and how they were
7        accounted for?
8   A.   As I recall, I think Sherif set the -- set the
9        foundation for the discussion, the fact that
10       there had been these loans and transfers, and I
11       recall as well some specifics from Dave
12       McConnell that was also explained.
13              And the open question in my mind
14       after hearing all dialogue was when will they
15       be paid back, and I recall asking that
16       question, and I believe the answer that was
17       given to me was going to be within 12 to 18
18       months.
19   Q.  I take it from these notes that Mr. Buettner
20       either spoke or responded to questions in the
21       course of this discussion. Can you describe for
22       me what his role in this discussion was?
23   A.   I can't recall.
24   Q.   Okay. All right. In the course of this
25       meeting, do you believe that the AHERF audit

Page 250

1        committee was accurately advised as to the
2        amount of loans that had been made from AGH,
3        from the AGH funded depreciation accounts?
4              MR. JONES: Object to foundation and
5        form.
6   A.   I'm not sure, reading -- reading the page you
7        asked me to read, I'm not sure I even
8        understand when the -- the balances of AGH
9        funded depreciation June 30 was not used for
10       payments of payables less than 50 million,
11       Buettner responds 58 million left behind.
12              I don't know how that ties in. I do
13       know that at a later date, I don't recall when,
14       the amount of transfers, as I remember, was
15       larger.
16   Q.   Larger than?
17   A.   Than what was I believe explained at that
18       meeting. I think, as I recall, the number that
19       was transferred turned out to be something in
20       the 90 million-ish range.
21   Q.   Do you recall what the relationship between
22       that and the reference to an intercompany 112
23       million by Mr. Edelman in these notes was or
24       might be?
25   A.   I don't. I do actually remember Harry asking

Page 251

1        the question where it showed up, and I do
2        remember an answer being given that it was in
3        the elimination column.
4   Q.   And --
5   A.   That's all I can recall.
6   Q.   -- at that meeting was it explained
7        sufficiently to your satisfaction?
8   A.   At the time I would have thought that I
9        understood, and I might add that following that
10       meeting thereafter, the balance sheets
11       reflected differently. They reflected the fact
12       that there had been transfers to the east, and
13       I'm not sure, I think they were maybe footnoted
14       sizably on the balance sheet.
15   Q.   There is a note on this page in Exhibit 1659 by
16       Mr. McConnell's name that reads, quote, Bill
17       has agreed that he needs to indicate that some
18       of the money is in intercompany receivables.
19              Do you recall any comments from
20       Mr. Buettner to the effect that the accounting
21       for some of these transfers needed to be
22       changed?
23   A.   I do not. I don't wish to editorialize, but
24       Bill Buettner came across to me as a rather
25       meek individual. I don't recall much dialogue.

Page 252

1   Q.   There is in this half page we've looked at,
2        there are two comments noted by Mr. Buettner's
3        name. Do you have any recollection that he
4        declined to answer any questions that anybody
5        asked him?
6   A.   No, I don't recall a decline.
7   Q.   Do you believe that he was not forthcoming in
8        answering questions that anybody asked him?
9              MR. JONES: Object to foundation.
10  A.   I also could not say that he was not
11       forthcoming.
12  Q.   About the time of the October 15 AHERF audit
13       committee meeting, did anybody bring this same
14       issue to the attention of the AGH board?
15  A.   Well, the --
16              MR. JONES: Object to foundation.
17  A.   -- yes, because at the two o'clock meeting
18       Sherif spoke again and addressed a huge
19       auditorium, because it was the consolidated --
20       yes, it was the -- it was a consolidation of
21       resource management committees across the whole
22       global system that had been invited in to the
23       auditorium, not because of the subject, but
24       whatever the agenda was that they were -- we
25       were discussing.

4 (Pages 249 to 252)

IRA GUMBERG                                    Volume #2

Page 253

1    And he took the first 10 or so
2    minutes of that meeting and spoke, and I might
3    add I recall him speaking rather articulately
4    about the subject, and board members were
5    there, physician members who were members of
6    committees were there, and it would have been
7    the first time that physician members would
8    have heard this, and there was a great deal of
9    surprise.
10   Q.  And at that large meeting Mr. Abdelhak laid out
11       the nature and size of these transfers clearly?
12   A.  He did.
13   Q.  Was your judgment at the time that anything
14       about how these transfers had been done was
15       improper on the part of management?
16       MR. JONES: Object to form.
17       MR. McCLENAHAN: How they had been
18       done or -- is that your question?
19       MR. BROOKS: Let me reask it.
20   Q.  Was your judgment at the time that management
21       had acted improperly in making these loans from
22       the funded depreciation to the DVOG entities?
23       MR. JONES: Same objection.
24   A.  Is my attorney -- am I okay to answer?
25       MR. McCLENAHAN: Yes.

Page 254

1    A.  I don't believe that I would have viewed --
2        that I viewed them as improper. I think the
3        only part that was of concern to me was the
4        labeling on the balance sheet and the fact that
5        I learned about it kind of last minute, and as
6        you know, I learned about it through a prep
7        session.
8    Q.  Did the fact that you only learned about it at
9        the last minute raise concerns in your mind
10       about whether you could trust top management?
11   A.  That's a -- that's a fair question. My
12       judgment at the time was that I watched Sherif
13       come before his board, respond appropriately.
14       If he had not at the time, I would have had
15       great concern, but I thought he had cleared
16       himself appropriately, and I felt that maybe
17       all I was able to do in the process as being
18       one of his board members was just help him do
19       the right thing by his institution.
20   Q.  Did the fact of these transfers and the way
21       that you learned about them and the way they
22       had been recorded on the book cause you to
23       consider whether top management of AHERF should
24       be changed?
25   A.  It did not reach that level in my mind at that

Page 255

1        time.
2    Q.  What action, if any, did the AHERF audit
3        committee take in connection with this issue
4        once it was informed about it at the October 15
5        meeting?
6    A.  Roger, I don't recall exactly the action taken,
7        but there was more proactive action taken at a
8        meeting of the AHERF finance committee a few
9        weeks later.
10       MR. BROOKS: Let me mark as Exhibit
11       2051 a one-page document bearing the Bates No.
12       HE 1373 titled Report From the Special Task
13       Force Reviewing Intercompany Loans.
14            - - - -
15       (Exhibit 2051 marked for identification.)
16            - - - -
17   BY MR. BROOKS:
18   Q.  And let me ask you first, Mr. Gumberg, if you
19       recognize this document.
20            - - - -
21       (The witness reviewed the Exhibit.)
22            - - - -
23   A.  I believe I -- I believe I did.
24   Q.  Did you write this report?
25   A.  I don't recall.

Page 256

1    Q.  This report appears to refer to a meeting of a
2        special task force of resource management
3        committee on April 18, 1998, of which you were
4        chair.
5            Can you describe for me what that
6        special committee -- special task force was and
7        how it came into existence?
8    A.  Yes, be happy to, but I need to take you back a
9        little bit.
10   Q.  Okay.
11   A.  Two weeks after the audit meeting, which I
12       believe was October 15th, there was a finance
13       meeting of the AHERF -- AHERF finance board.
14       MR. McCLENAHAN: Committee.
15   A.  Committee, thank you. And there at that
16       meeting I believe that was when a resolution
17       was being asked to be approved that would
18       have -- that would have approved an
19       intercompany transfer as high as $150 million.
20            And having heard this at the meeting,
21       I thought it was appropriate that I speak out,
22       and I did, and I -- I'm trying to go back in
23       life now, but I believe that I spoke about the
24       fact that in that two-week period that I had
25       felt a we/they issue had developed between our

IRA GUMBERG                                             Volume #2

Page 261

1   Q.  Did you find him -- the information that
2       Mr. Buettner gave at that meeting to be
3       accurate?
4   A.  I believe so, yes.
5   Q.  And have you ever learned anything to the
6       contrary?
7   A.  I have not.
8   Q.  Did you find him willing to answer whatever
9       questions the committee members had?
10  A.  Yes.
11  Q.  The last paragraph of this report begins,
12      quote, The task force was generally satisfied
13      with the explanations, but nonetheless agreed
14      to continue to monitor these transactions in
15      the future, and it continues
16          Is that an accurate summary of your
17      own state of mind after this meeting on April
18      18th?
19  A.  Yes, and subsequently I reported this to both
20      my committee and I believe to the board.
21          MR. JONES:  I'm sorry, which board?
22          THE WITNESS:  That would have been
23      the west board, Jim.
24          MR. JONES:  Thank you.
25  Q.  And you described earlier the we/they mind-set

Page 262

1       that you observed on the part of some of the
2       doctors.  Was it your view that significant
3       intercompany loans were consistent with the
4       integrated system strategy that AHERF was
5       pursuing?
6           MR. JONES:  Object to form.
7   A.  I think the answer to that question is yes to a
8       certain point.
9   Q.  Did you ever come to a particular conclusion
10      about what that point was?
11  A.  I think that I did.
12  Q.  And what was your conclusion?
13  A.  That if we were going to exceed this $150
14      million range, that we needed to circumscribe
15      funds and stop allowing any future transfers,
16      and, in fact, I spoke up.  I had our resource
17      management committee authorize a resolution to
18      do just that, and then I took it to the board
19      of directors, and I asked the board of
20      directors to do the same, which it also was
21      moved by me and I believe seconded by Sherif
22      Again, the board being the western board.
23  Q.  The AGH board?
24  A.  Yes.
25  Q.  So I'm clear on the chronology, at the October

Page 263

1       15th AHERF audit committee meeting,
2       Mr. Abdelhak and Mr. Buettner explained to the
3       committee intercompany --
4   A.  And the financial officer.
5   Q.  Mr. McConnell?
6   A.  Right.
7   Q.  -- explained to the committee the intercompany
8       transfers that had happened during fiscal 1987;
9       correct?
10          MR. JONES:  '97.
11  A.  I'd like to -- I'd like to just maybe cast that
12      a little differently.
13  Q.  Okay.
14  A.  I believe Sherif presented it.  I believe
15      McConnell added to the presentation, and I
16      believe, as I recall at least, that Buettner
17      answered questions.
18  Q.  The focus of that discussion and explanation
19      was on transfers that had happened during
20      fiscal 1997; correct?
21  A.  Transfers that had happened.
22  Q.  That had happened, and then following that, the
23      AHERF board approved up to an additional $150
24      million worth of --
25  A.  No, inclusive of  150 I believe was -- the

Page 264

1       difference of whatever it was and 150, it was
2       not to go over 150.
3   Q.  So it was functionally something like a credit
4       line that was not to exceed --
5   A.  Correct, intercompany credit loan of 150.
6   Q.  Okay.
7           MR. JONES:  In total.
8           THE WITNESS:  In total.
9   Q.  Mr. Gumberg, how did you learn of the decision
10      that AHERF would acquire The Graduate
11      Hospitals?
12  A.  I attended a meeting in December of '96.  I
13      believe that was when I concede that I was on
14      the AHERF board.  They presented as part of an
15      agenda the fact that they had already an
16      agreement -- I can't remember if it was they
17      had acquired or if they had an agreement to
18      acquire The Graduate Hospital system, and I
19      remember some initials.  It wasn't called
20      Graduate, it was an entity called SD something.
21  Q.  SDN?
22  A.  Okay, SDN, and that was my first -- my first
23      knowledge.
24  Q.  Well, let me ask you this:  Back in August this
25      acquisition had been discussed in news articles

TAB 219

1

1       IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF PENNSYLVANIA

2

3

4     THE OFFICIAL COMMITTEE OF UNSECURED
      CREDITORS OF ALLEGHENY HEALTH,

5     EDUCATION & RESEARCH FOUNDATION,

6            Plaintiff,

7     vs.                          No. 00-684

8     PRICEWATERHOUSECOOPERS, L.L.P.,

9            Defendant.

       _____

10

11

12

13       VIDEOTAPED DEPOSITION OF RICHARD H. DANIEL

14          Taken on behalf of the Defendant

15              October 10, 2003

16

17                  - - -

18

19        BE IT REMEMBERED THAT, pursuant to the Federal Rules

20    of Civil Procedure, the deposition of RICHARD H. DANIEL

21    was taken before Tim Bellisario, a Certified Court

22    Reporter and a Notary Public for the State of Washington,

23    on October 10, 2003, commencing at the hour of 9:13 a.m.,

24    the proceedings being reported at 601 Union Street, Suite

25    1624, Seattle, Washington.

hard Daniel

---

134

A. I see it.

Q. It says: "Sherif Abdelhak opened the discussion by asking the Trustees to turn to page 5 of the June 30th, 1997 statement of operations  Assets limited . . . to use. He noted that $164,158,000 total in the line item unrestricted by Board of Trustees is today closer to $58 million in light of the fact that the finance committee approved the use of some of those funds to deal with working capital requirements in the Delaware Valley."

Did I read that correctly?

A. Yes, you did.

Q. Do you recall Mr. Abdelhak informing the Board that in fact the assets -- the assets unrestricted by the Board of Trustees was in fact closer to $58 million, even though the line item reflected a little bit in excess of $164 million?

A. I wouldn't know.  I wasn't at the Board meeting.

Q. Well, okay.  I believe it says you were a member present at this meeting?

A. This was a committee, not the Board.

MR. UNICE: You asked him Board of Trustees, I think.

MR. LUFT:  Okay.  Let me ask this:  Do you recall Mr. Abdelhak stating at this meeting of the AGH resource management committee --

---

135

THE WITNESS: Making that statement?

MR. LUFT: Yes.

THE WITNESS: No.

Q. No, you don't recall?

A. I now do, as he said.

Q. You now see that its here  My question is: Do you now recall or do you still have no recollection of whether he said it or not?

A. I see it here.

Q. But you don't recall whether he said it?

A. (Witness nods head from side to side.)

Q. Okay.  I just want to keep the record clean.

A. Good.  So do I.

Q. I'm going to ask you to keep that page --

A. I'm aware that it happened, yes.

Q. You're aware that what happened?

A. That the money was used for the purpose stated.

Q. Were you aware at that time, October 15th, 199 --

A. Apparently, I was made aware of it on October 15th.

Q. And in fact, if I can ask you to keep that document open and also turn to look at Exhibit 1659.

A. (The Witness complied.)

Q. Which is the Carol Gordon notes of the October 15th, 1997 audit committee meeting of AHERF.

---

136

1  A. Got it.  What page?

2  Q. The page ending 3453.

3  A. Okay.

4  Q. I'm going to have you look at that.  Let me

5  first also ask you to find, so we can look at them all

6  together, Exhibit 2019, which is the October 15th, '97 audit

7  committee minutes.

8  A. Yep.  What page?

9  Q. 55814. Well, first look at now -- because you

10  said you knew of it, and I just want to show you some

11  various places, at 55814 -- the top paragraph on that page,

12  there's a line that says: "Following discussion regarding

13  the outstanding balances and accounts payable" --

14  Do you see where I am?

15  A. Uh-hum (affirmative).

16  Q. -- "an expected adjustments which are intended to

17  pay the AGH funded depreciation amount."

18  MR. UNICE: Objection, it doesn't say

19  that. Avi

20  MR. LUFT: Excuse me. you are correct.

21  It says "which are intended to repay the AGM funded

22  depreciation account."  Thank you, John.

23  So we'll just have that there.  And

24  then, if we can turn to Exhibit 1659, which is the notes,

25  which are the Carol Gordon transcription notes from that

---

137

1  same meeting.

2  If we look under Abdelhak's statement on

3  the top of the page, "What are the balances of the AGH

4  funded depreciation on June 30th that was not used for

5  payment of payables . . . not less than $50 million;

6  Buettner, $58 million; Abdelhak $58 million left behind."

7  And then McConnell states: "We have continued to focus on

8  bad debts  We have put a lot of emphasis on working these

9  aggressively  Page 30, Bad Debt Expense was $66.4 million.

10  Have compared to other organizations in industry; compares

11  bad debt to gross revenue, and we are at 1.56 compared to

12  gross; the national average is 5.8."

13  Then, Mr. Edelman comes back to this

14  topic and says, asks where the $112 million shows up on a

15  consolidation statement. where did the intercompany $112

16  million show  Mr. Buettner states: "It will not show on

17  consolidated statement. but it will be on the consolidating

18  schedule. The number of the in the elimination column,

19  which reflects that AHERF has an obligation from one of its

20  sister corporations."

21  Now, having seen the statements in the

22  minutes and in the transcription -- Carol Gordon's

23  transcription of the October 15th, 1997 audit committee

24  meeting -- does this refresh your recollection about whether

25  the knowledge you had about the movement of the intercompany

---

35 (Pages 134 to 137)

Richard Daniel

---

138

1  funds came from your attendance at the AHERF audit committee
2  meeting?
3      A.  Probably.
4      Q.  So you don't recall specifically, but you
5  definitely recall that you were aware of the use of
6  AGH-funded depreciations to pay for —
7      A.  I think this is the first time I heard about it.
8      Q.  Do you believe you would have heard about it in
9  the context of being a member of either the AGH resource
10  management committee or the AHERF audit committee?
11     A.  Not necessarily.
12     Q.  In what other context could you have envisioned
13  learning of this, Mr. Daniel?
14     A.  Only if someone else told me. I don't know how
15  I would have none. Sooner or later it was going to come
16  out. I mean, it was too important a transaction to lie
17  there and not have somebody be made aware of it. This was
18  being made aware of.
19     Q.  Do you have any reason to believe that this
20  information was only imparted to you to the exclusion of any
21  other members of the AHERF audit committee, the AHERF parent
22  board or the AGH resource management committee?
23          MR. UNICE: Objection, lack of
24  foundation.
25     A.  No.

---

139

1      Q.  So it's your understanding that the other members
2  of the audit committee and the AGM resource management
3  committee were aware of this transfer as well?
4      A.  Yes.
5          MR. UNICE: Do you mean is that what
6  the minutes say, was that your question, Avi?
7          MR. LUFT: I think he answered my
8  question.
9          THE WITNESS: If I knew it, they knew
10  it.
11     Q.  Did you ever have any personal conversations with
12  Mr. Abdelhak?
13     A.  Yes.
14     Q.  About how many times do you believe you just
15  spoke to Mr. Abdelhak, just the two of you?
16     A.  Two or three times.
17     Q.  Were those before the acquisition of Forbes or
18  after the acquisition of Forbes, or a combination?
19     A.  I don't remember.
20     Q.  Do you recall if you had a view of Mr. Abdelhak's
21  capabilities as a CEO when you were a member of the AHERF
22  audit committee?
23     A.  I was developing one, yes.
24     Q.  And what view were you developing of Mr. Abdelhak?
25     A.  That he was a very controlling CEO.

---

140

1      Q.  Do you recall if that manifested itself in how he
2  acted?
3      A.  Yes.
4      Q.  How so?
5      A.  He dominated virtually every meeting he was at.
6      Q.  Including the audit committee meetings you
7  attended?
8      A.  Yes.
9      Q.  Do you recall if Mr. Abdelhak was responsive to
10  other people's ideas?
11     A.  I would have no way of knowing.
12     Q.  Do you recall ever being in a situation where
13  people raised suggestions other than what Mr. Abdelhak was
14  advocating?
15     A.  No.
16     Q.  Do you recall ever hearing any members of the
17  Board of Trustees or one of the committees of the Board of
18  Trustees ever criticize Mr. Abdelhak in public?
19          THE WITNESS: In public?
20          MR. LUFT: Yes.
21     A.  No.
22     Q.  Do you recall ever hearing one of the members of
23  the audit committee or a member of the Board of Trustees
24  ever raising questions in public about how Mr. Abdelhak was
25  handling a matter relevant to AHERF?

---

141

1      A.  No.
2      Q.  Do you recall if you ever found that odd, that no
3  one was ever raising any questions about any of the
4  decisions that Mr. Abdelhak was making?
5          MR. UNICE: Objection, mischaracterized
6  his prior testimony.
7      A.  I didn't find it odd.
8      Q.  Why not?
9      A.  He wouldn't allow it.
10     Q.  What do you mean, "he wouldn't allow it"?
11     A.  People would not do it in public. You said
12  "public" in each one of these questions.
13     Q.  Yes.
14     A.  And people working for Mr. Abdelhak, I figured
15  out. would not criticize him in public.
16     Q.  When you say people working for him, you're
17  referring to AHERF management?
18     A.  Yes.
19     Q.  They wouldn't question him in public?
20     A.  Yes.
21     Q.  How about members of the audit committee, would
22  they be willing to question Mr. Abdelhak in public?
23          MR. UNICE: Objection, lack of
24  foundation.
25          THE WITNESS: In public?

---

36 (Pages 138 to 141)

hard Daniel

---

**142**

MR. LUFT: Yes.

A. Not to my knowledge.

Q. Do you know of any reason why independent members of the audit committee wouldn't want to — would feel that they couldn't question Mr. Abdelhak in public?

A. It's not the role of a committee member.

Q. You don't believe it to be the role of a committee member if they have a different opinion than the CEO. to question the CEO?

A. They do it in the context of the corporation, not in public.

Q. And by "public," I mean public meetings.

A. So do I.

Q. So it is your opinion that it is not the role of a member of a committee of a board to raise disagreements they have with the CEO at meetings of that committee?

A. Oh. I've been referring to AHERF. The answer to that question is yes.

Q. Okay. So in general you believe it's the role, but at AHERF. there wasn't the role of the committee members.

A. That's correct.

Q. Now, in your opinion --

A. From what I saw.

Q. Obviously   I'm only asking about your opinion and

---

**143**

your understanding.

A. Okay.

Q. And from your perspective. what accounted for that difference between what you would expect to be right at other corporations. and what in fact was happening at AHERF?

A. A term I used before. Abdelhak was a dominant CEO, to the extreme.

Q. So he was dominating the Board?

MR. UNICE: Objection, lack of foundation.

A. He was dominating every meeting that I was involved in.

Q. Do you recall ever talking to any other members of the AHERF Board of Trustees or the AHERF audit committee about Mr. Abdelhak's dominating personality and domination of meetings he attended?

A. Yes.

Q. Who did you speak to about this?

A. Ira.

Q. That would be Ira Gumberg?

A. That would be.

Q. Do you recall what Mr. Gumberg said in response?

A. Yes.

Q. What did Mr. Gumberg say?

A. He shared my concern.

---

**144**

1    Q. He also feared that Mr. Abdelhak was dominating
2   the meetings he attended?
3      A. That's correct.
4      Q. Do you know if Mr. Gumberg indicated to you that
5   he had ever spoken to anyone else about his concern about
6   Mr. Abdelhak's domination?
7      A. I don't recall that he did.
8      Q. Do you recall if Mr. Gumberg ever took any action
9   in response to his belief that Mr. Abdelhak was dominating
10  the meeting that he was in attendance at?
11     A. No.
12     Q. Did you ever take any action in response to Mr.
13  Abdelhak's domination of meetings?
14     A. No.
15     Q. Was that partially because you were off the audit
16  committee before you had ever had an opportunity to take any
17  action?
18          MR. UNICE: Object to form.
19          THE WITNESS: Well. you're asking the
20  question now at a time in which I'm no longer affiliated
21  with AHERF.
22          MR. LUFT: What I'm asking is: Do you
23  believe that if you had not been excused from your duties
24  on the audit committee so quickly, you may have chosen to
25  take action in the future against this problem that you

---

**145**

1   perceived?
2          MR. UNICE: Object to form.
3      A. I don't know. Probable, but I wouldn't know.
4   because that time hadn't come.
5      Q. Do you believe that your removal from the AHERF
6   audit committee was in fact partially motivated by a concern
7   that you felt that there was a problem with Mr. Abdelhak's
8   domination of the meetings he was in attendance at?
9          MR. UNICE: Object to form; lack of
10  foundation.
11     A. That's not the conclusion I came to.
12     Q. The conclusion you came to was that you were
13  asking too many questions?
14     A. That's correct
15     Q. At the audit committee meetings at which you were
16  in attendance, would you say they were characterized by more
17  or less discussion amongst the committee members than there
18  was at the finance committee at Forbes?
19          MR. UNICE: Objection, vague.
20          THE WITNESS: I don't know what the
21  real question is.
22          MR. LUFT: Well, then, let me ask it
23  again.
24          THE WITNESS: Change it so that I can
25  understand it.

---

37 (Pages 142 to 145)

TAB 220

**AHERF**
**Mellon Bank**
Wire Transfer – Current Day Outgoing Wire Report

| Transfer Payment Amount | Mellon Reference Number | RRN | Wire Network | Network Reference Number | Time Processed | Value Date | Init ID | Auth ID |
|---|---|---|---|---|---|---|---|---|
| BANK:  Mellon Pittsburgh | | BANK # | 100 | | | BRANCH: PG | | |

ACCOUNT #: 937768

**DRAWDOWN**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $6,000,000.00 | 4812 | 201 | Drawdown | 775 | 10:28 | 04/27/98 | VCM | |

RCV=043000096PNCBANK PITT*FNC=DRCBNF=D0937768*ALLEG HEALTH EDUC & RES FD*DBT=D10694245*ALLEGHENY HEALTH EDUC & RESEARCH FD*ORG=D937768*ALLEGHENY HEALTH EDUCATION &*RESEARCH FOUNDATION*320 E NORTH AVE*PITTSBURGH PA 15212-4756*CDT=043000261BBI=REF CONCEN OF FUNDS*

Total Wire Drawdowns for Account 937768:       $6,000,000.00
Total Drawdown Payments for Account 937768:       1

**DEBITS**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $3,500,000.00 | 4808 | 551 | Fed Wire | 774 | 10:28 | 04/27/98 | VCM | |

RCV=031000053PNCBANK PHIL*FNC=CTRBNF=D8529992181*MUTUAL FUNDS GROUP*ORG=D937768*ALLEGHENY HEALTH EDUCATION &*RESEARCH FOUNDATION*320 E NORTH AVE*PITTSBURGH PA 15212-4756*OBI=TEMP FUND, ACCOUNT NO. 19999,*ALLEGHENY HEALTH. EDUCATION AND*RESEARCH FOUNDATION*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $42,412.65 | 4813 | 353 | Fed Wire | 776 | 10:28 | 04/27/98 | VCM | |

RCV=043000096PNCBANK PITT*FNC=CTRBNF=D2443526*TRANS GENERAL SERVICES CO., INC*ORG=D937768*ALLEGHENY HEALTH EDUCATION &*RESEARCH FOUNDATION*320 E NORTH AVE*PITTSBURGH PA 15212-4756*BNA=PHNDIANE STONER, (412) 762 24*23*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $89,457,722.18 | 24555 | 535 | Book Tmf | 0 | 17:48 | 04/27/98 | VCM | |

RCV=043000261MELLON PIT/*FNC=CTRBNF=D00000990873800*LOANS MELLON BANK 7380*ORG=D937768*ALLEGHENY HEALTH EDUCATION &*RESEARCH FOUNDATION*320 E NORTH AVE*PITTSBURGH PA 15212-4756*OBI=REF:  AHERF, ATTENTION: LOAN ADMIN*ISTRATION*

Total Wire Debits for Account 937768:       $93,000,134.83
Total Debit Payments for Account 937768:       3



003447

MM2945 Page 2 of 3

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
### REQUEST FOR ELECTRONIC FUNDS TRANSFER

**Pay From:**

| | |
|---|---|
| Bank Name, City & State | Mellon Bank, Pittsburgh, PA |
| ABA Routing No. | 043000261 |
| Account Number | 093-7768 |
| Account Title | AHERF Concentration |

003448

Amount $    89,457,722.18          Repetitive EFT No.    535

Due Date          04/27/98

**Pay to:**

| | |
|---|---|
| Bank Name, City & State | Mellon Bank, Pittsburgh, PA |
| ABA Routing No. | 043000261 |
| Account Number | 990873800 |
| Account Title | Credit Loan Administration |
| Reference (Optional) | AHERF Line of Credit |

**Description**

Payoff of Line of Credit  Principal, Interest and Fees

| Company No. | G/L Acct No. | Cost Center | Subledger | Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | Total |

| Requested by | Approved by |
|---|---|
| Date | Date |

**For Treasury Use Only**

EFT Initiated by          Date  4-27-98

Approved by          Date

**Authorization For Repetitive**

Officer's Signature          Date



MM2945 Page 3 of 3

TAB 221

APR-22-98 WED 18:38    AHERF FINANCE ADMIN    FAX NO. 4123593365    P. 02

# AHERF

**Allegheny Health, Education**
**and Research Foundation**

*Fifth Avenue Place, Suite 2900*
*120 Fifth Avenue*
*Pittsburgh, Pennsylvania 15222-3009*

## MEMORANDUM

TO:     David W. McConnell

FROM:   Sherif S. Abdelhak   *[signature] Abdelhak  4/22/98*

DATE:   April 22, 1998

RE:     Repayment to Mellon Bank

Pursuant to the demands placed upon the organization by Mellon Bank on behalf of itself and the consortium of banks with respect to the current $90,000,000 debt obligation, I am directing you to take the following steps: liquidate sufficient funds from the AUMC Funded Depreciation account and other AHERF Unrestricted Funds as necessary to provide sufficient liquidity to pay the loan in full as of this Friday, April 24, 1998.

You are to take this action if you are unable to negotiate another appropriate alternative or extension of time for such repayment with Mellon Bank to your satisfaction. Any funds taken from non-AHERF accounts are to be swapped with AHERF endowments or other funds as you deem appropriate so that the total investments on the subsidiary's books are not materially affected in amount, recognizing that there may be some adjustment necessary within categories to accomplish this task.

If any Board approval or other items are subsequently deemed necessary, we will deal with them in the next round of regularly scheduled board meetings, as appropriate; however, given the timeframe placed upon us, you are authorized to proceed prior to that approval.

If you have any questions, do not hesitate to call.

SSA:cg

04222

*Copy Al Adamczak*  } *Personal and Confidential*
*Mike Martin*

AHERF LIT
USDC W.D. Pa
MISC No. 00-40
12797
EXHIBIT NO.

DEPOSITION
EXHIBIT
*1930*
*AKF 8/22/07*

DBR-RJM-00148

TAB 222

2

## MEETING OF THE RESOURCE MANAGEMENT COMMITTEE
## ALLEGHENY GENERAL HOSPITAL
## ALLEGHENY UNIVERSITY MEDICAL CENTERS
## ALLEGHENY UNIVERSITY MEDICAL CENTERS/CANONSBURG
### Pittsburgh, Pennsylvania

A meeting of the Resource Management Committee of Allegheny General Hospital, Allegheny University Medical Centers and Allegheny University Medical Centers/Canonsburg was held on Tuesday, February 10, 1998, in the Board Room of Allegheny University Hospitals, Allegheny General. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Committee. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| **Members Present** | **Other Invitees** | **Members Absent** |
|---|---|---|
| William F. Adam | Barbara Bensaia | Robert M. Hernandez, Vice Chair |
| David E. Barensfeld | Debra Caplan | Veronica L. McDonough |
| William Burt | Connie Cibrone | Michael Miller, M.D. |
| Jeffrey Cohen, M.D. | Joseph Dionisio | Lyle L. Shumaker |
| Steve Elliott | John England | |
| Robert L. Fletcher | Joel Ettinger | |
| David Fowler, M.D. | Dawn Gideon | |
| Ira J. Gumberg, Chair | Lynn Isaacs | |
| Daniel Heilman, M.D. | Dwight Kasperbauer | |
| Shalom Kalnicki, M.D. | Christine Mamone | |
| Charles LaBelle | Michael Moyer | |
| David W. McConnell | Dana Ramish | |
| James S. Moore | Barry Roth | |
| Randall L. C. Russell, M.D. | Joseph Sanfilippo, M.D. | |
| Anthony M. Sanzo | Andrew Thurman, Esq. | |
| Richard P. Shannon, M.D. | Cherry S. White | |
| William E. Walker | | |

### I.    Opening of the Meeting

The meeting was called to order at 9:00 a.m. by Ira J. Gumberg, Chairman. Andrew Thurman, Esq., kept the minutes.

### II.    Additions to Agenda

Mr. Gumberg noted that there were no additions to the agenda.

GOV 29560



**MEETING OF THE RESOURCE MANAGEMENT COMMITTEE**
Allegheny General Hospital, Allegheny University Medical Centers, Allegheny University Medical Centers/Canonsburg

February 10, 1998                    Page ~ 2 ~

III.   Approval Items

    A.  Governance Issues

        1.  Approval of Minutes

            The minutes from the Allegheny General Hospital, Allegheny University Medical Centers and Allegheny University Medical Centers/Canonsburg Resource Management Committee meeting which was held on October 15, 1997, were presented.

            Upon motion duly made and seconded, the Resource Management Committee approved the following resolution:

                **RESOLVED, that the Resource Management Committee approves the Minutes from the Allegheny General Hospital, Allegheny University Medical Centers and Allegheny University Medical Centers/Canonsburg Resource Management Committee meeting held on October 15, 1997, as presented.**

    B.  Finance

    1.  AUH-West Financial Statements for the Period Ended December 31, 1997

        Mr. Anthony Sanzo reviewed the Financial Statements for the Period Ended December 31, 1997. Operating performance and cash flow fell short of expectations for Allegheny University Hospitals-Western Region (AUH-West). While most of the pressure rests within Allegheny General Hospital (AGH), Allegheny University Medical Centers' Forbes Regional, experienced volume and revenue declines. Revenue from patient services approximated budget at $352 million, however, volume and rates fluctuated throughout the region. The unanticipated revenue reductions in fiscal year 1998 relate primarily to the new Blue Cross contract (retroactive July 1, 1997), the Medicare Balanced Budget Act of 1997 (effective October 1, 1997) and reductions in rates of reimbursement for managed care patients and an escalating shift from indemnity cases to managed care. While AGH admissions exceeded plan by 330 cases, AUMC admissions fell short by 646. More importantly, rates of payment fell below budgeted levels in all organizations, most notably at AGH.

        Since 1989, Allegheny General has experienced a 31% decline in average payment per case. Since 1994, the average payment per case declined 16½% which represents approximately $40 million annually. The above and other factors clearly point to the need for accelerated, increased emphasis on cost reduction initiatives -- 1.) an immediate reduction of $20 million, and 2.) an $80 million reduction over the next 30 month period. Mr. Barry Roth and

                                                    **GOV 29561**

Ms. Connie Cibrone were then called upon to discuss specific initiatives at the respective institutions

### _Allegheny University Medical Centers Update_

Mr. Roth opened his presentation by stating that for the first six months of FY'98 Allegheny University Medical Centers (AUMC) experienced net income of $13.6 million which was $4.1 million ahead of budget. This favorable variance was generated by investment earnings and the accrual of benefits from depreciation recapture. Net patient revenue was impacted by a 4% shortfall in inpatient admissions across AUMC facilities, especially at Forbes Regional.

AUMC experienced negative cash flow for the first six months, as cash from the Medicare recapture has not yet been received.

Mr. Roth continued his discussion presenting an action plan intended to decrease expenses and enhance revenues. This plan targets review and reduction of administrative and non-clinical services, and actions currently underway to deal directly with volume declines and additional inpatient admissions. In addition, a very select group of primary care physicians, employed by one of our competitors, is being recruited to provide increased services in our region. Penn Group Medical Associates are also being persuaded to provide increased services in our region. Outpatient programs are being implemented to enhance volume and positive outcomes are expected as a result of several ambulatory sites opening.

Considerable discussion ensued regarding the less-than-expected inpatient volumes, the rationale as to why physicians may be referring outside the Allegheny network and the $8.2 million subsidy anticipated to support Allegheny University Medical Practices (AUMP). It was suggested that value and efficiency of each AUMP practice be reviewed.

Mr. David McConnell explained the process of securing practice offices and the goal of redefining our network. AUMP is currently in the process of attempting to reshape current contracts. Approximately 20% of private practice offices should not have been acquired due to their geographical inability to serve AUH-West facilities. In addition, we have about 85 physicians who are experiencing problems getting credentialed with Highmark. We anticipate the credentialing process to be complete by April 1, 1998. Committee members requested that Mr. McConnell address and stay close to the financial situation and in the future, provide an outline of supporting key elements.

**5MEETING OF THE RESOURCE MANAGEMENT COMMITTEE**

Allegheny General Hospital, Allegheny University Medical Centers, Allegheny University Medical Centers/Canonsburg

February 10, 1998                                                                    Page ~ 4 ~

### *Allegheny General Hospital Update*

Ms. Cibrone provided a status report relative to expense reductions at AGH. AUH-West has engaged McKinsey and Company to assist with improving the productivity of the non-patient care workforce by a reduction in costs of $40 million over the next two years. This reduction will encompass non-patient care labor to include the entire workforce less bedside nurses. The outcome of the study is to eliminate non-value added activities, and to identify more efficient and effective ways to conduct necessary activities. Concurrent with this study, we have asked McKinsey to assess the three remaining drivers of costs: resource utilization, purchasing management, and capacity configuration. This assessment will enable us to determine, with some degree of certainty, the magnitude of future savings opportunities.

Ms. Cibrone continued her presentation reporting on revenue enhancement. She stated that AGH's operating rooms are at capacity. As a result, AGH clinicians are forced to take patients to competing organizations for care. To alleviate this situation, AGH is converting its MRT suite to an O/R which will be ready for occupancy within the next six weeks. Other options to expand O/R capacity are under investigation to include the construction of two outpatient O/Rs, the use of modular O/Rs and possible expansion of elective O/R time on the weekends.

Mr. Joseph Dionisio highlighted components of Management's Analysis and Discussion of the Financial Statements for the six months ended December 31, 1997. During the first half of fiscal year 1998, AUH-West reported net income of $6 million which was approximately $6 million less than budget. Although total revenues, gains and other support exceeded expectations by $9 million, mostly attributable to outpatient revenue, total expenses exceeded budget by nearly $15 million, thus resulting in the less-than-expected net income for the period. Volume exceeded budget at AGH-AG by approximately 300 cases, but AUMC experienced a nearly 600 case negative volume variance. Net revenue per case declined by nearly $160 during the period, primarily the result of new contractual arrangements previously discussed. Outpatient revenue exceeded budget by $7 million. Investment income of $23 million was nearly $11 million greater than budget, primarily the result of favorable market trends and trading gains. Expenses were $375 million or $15 million greater than budget. The major component of this difference was attributable to unfavorable AUHS purchased services variances of $6 million. Also contributing to the overall unfavorable expense variance was patient care supplies, bad debts and salaries, wages and fees.

Considerable discussion occurred with respect to balance sheet accounts. Patient accounts receivable increased $24 million since June 30, 1997, primarily related to various medical records issues at AGH, and the accounting for the benefits of depreciation recapture at AUMC. Amounts due from affiliates decreased $23

million from prior year end to a balance of $104 million as of December 31, 1997.
Accounts payable and accrued expenses decreased $2.4 million since
June 30, 1997, reflecting efforts to reduce AUH-West payables. Subsequent to
December 31, 1997, the aging of trade payables has deteriorated substantially
such that approximately $15 million of trade payables are over sixty days.

Significant time and emphasis were placed on the Statement of Cash Flows for the
period. Operating activities required cash of $9 million, primarily because of the
substantial increases in accounts receivable and the pay down of accounts payable
during the first six months. Approximately $18 million of property, plant and
equipment was acquired during the first six months, somewhat at a greater rate of
acquisition than budgeted. Long term debt of approximately $9 million was paid
off. Net transfers to affiliates of approximately $10 million, most of which went
to AUMP, were unbudgeted and unplanned for. The above cash outflows of $46
million were met in part by a repayment of $23 million on the intercompany loans.
The balance of the cash needs necessitated a draw down of funded depreciation.

Upon motion duly made and seconded, the Resource Management Committee
approved the following resolution:

> **RESOLVED, that the Resource Management Committee of Allegheny
> General Hospital, Allegheny University Medical Centers and Allegheny
> University Medical Centers/Canonsburg accepts the Financial
> Statements for the Period Ended December 31, 1997, as presented; and
> instructs the Secretary to append a copy of the accepted Statements to
> the original minutes of this meeting.**

2.  Outlook for Fiscal Year 1998

The Committee was clear in expressing its concern over the continued reduction
in cash reserves, which lead to the following discussion focusing on cash
projections for the balance of the fiscal year.

Because operations are expected to improve the last six months of the year, it is
anticipated that there will be positive cash flow generated during the period
January through June 1998 sufficient that the negative cash flow of $19 million
experienced during the first six months of the year will be reduced to something
closer to $15 million by the end of the year.

Noteworthy projected sources and uses of cash for the six months ended June 30,
1998, include positive cash flow provided by operating activities primarily the
result of improved operations and the collection of a substantial portion of the
prior increase in accounts receivable. Property, plant and equipment additions
have been conservatively estimated at $13 million. There will also be repayment
of additional long-term debt of $4 million and potential additional cash transfers

to affiliates of $12 million, again, a large portion potentially going to AUMP, although it was indicated this amount might, in the final analysis, be somewhat less.

It was assumed in compiling the Cash Flow Forecast for the balance of the fiscal year that accounts payable would be maintained at the December 31, 1997, level which, as previously indicated, has recently deteriorated. Also, it was assumed that there would be no further payments on the intercompany accounts for the balance of the year.

As previously noted, the Committee directed management to reduce accounts payable. Management was also asked to re-evaluate the capital needs and minimize capital investments over the remaining balance of the fiscal year as appropriate. It was further requested that AUH-West management work with AUMP management to minimize AUMP's need for operating subsidies.

Subsequent to the discussion of the Outlook for Fiscal Year 1998 it was decided to reconvene in late March or early April to further address the Outlook, address the outflow of cash requirements and intercompany transfers to affiliates.

3. Status of Intercompany Loans

Mr. Dionisio provided a brief overview on the Status of Intercompany Loans.

Mr. Sanzo had previously announced the inception of the AHERF Internal Loan Committee which consists of four external trustees and one internal Committee member. He also advised all transfers of funds between affiliates over $10 million be reviewed and approved by this committee. Any loans are to be repaid complete with interest, and the lending entity's CEO must preapprove such transfers. He further stated it was his strong recommendation AUH-West not make additional transfers to AUH-East until AUH-West could rebuild its own cash reserves.

After a lengthy discussion regarding intercompany loans and the creation of the Internal Loan Committee, the Resource Management Committee of AUH-West adopted a resolution requiring it be informed of any future intercompany advances.

Upon motion duly made and seconded, the Resource Management Committee approved the following resolution:

**RESOLVED, that the Allegheny General Hospital, Allegheny University Medical Centers and Allegheny University Medical Centers/Canonsburg Resource Management Committee directs that the detail of any proposed loan between Allegheny Health, Education and Research**

Foundation and affiliated corporations and AUH-West institutions, such detail to include the amount, the purpose, the repayment schedule and the interest rate of the contemplated loan, be provided to this Committee.

4.  Allegheny University Medical Centers and Allegheny University Medical Centers/Canonsburg Disposition of Gifts - Real and Personal

Mr. Dionisio briefly reviewed the objective to facilitate the receipt and disposition of non-cash gifts. To that end, he explained the intent to allow management to dispose of stock, bonds and other negotiable securities as well as real estate and other non-cash gifts without seeking Board approval each time.

Upon motion duly made and seconded, the Resource Management Committee approved the following resolution:

WHEREAS, from time to time various individuals have indicated their interest in donating stocks, bonds, or other negotiable securities, as well as non-cash gifts of real estate, jewelry, paintings and other items; and

WHEREAS, brokers representing those individuals donating securities have indicated that there will be negative tax consequences for the donor unless the sale of such items is in the name of someone other than the donor; and

WHEREAS, Allegheny University Medical Centers (AUMC) and Allegheny University Medical Centers/Canonsburg (AUMC/C) wish to facilitate the receipt and disposition of non-cash gifts; and

WHEREAS, donated non-cash gifts of real estate, jewelry, paintings, etc. are converted to cash whenever possible.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Trustees of AUMC and the Board of Directors of AUMC/C direct that any and all donated stocks, bonds or other negotiable securities and non-cash gifts, including but not limited to, jewelry, real estate, paintings, etc. donated to AUMC or AUMC/C, respectively, unless otherwise restricted by the donor, may be disposed of for cash when deemed appropriate by management; and

FURTHER RESOLVED, that the cash realized from the disposition of such gifts shall be utilized by management in a manner which is beneficial to the charitable purposes of AUMC or AUMC/C, is in accordance with the charitable intent of the donor, and is in compliance with any applicable policy or directive adopted by these Boards and;

GOV 29566

**MEETING OF THE RESOURCE MANAGEMENT COMMITTEE**
Allegheny General Hospital, Allegheny University Medical Centers, Allegheny University Medical Centers/Canonsburg
February 10, 1998                                                    Page ~ 8 ~

> FURTHER RESOLVED, that the incumbents of any of the positions listed are hereby authorized to approve such action or actions as may be necessary or desirable to sell, assign or transfer said non-cash gifts, or the proceeds of the sale thereof, and to approve the execution of any or all instruments necessary, proper, or desirable for the purpose of expediting the receipt and transfer of such non-cash gifts to cash:
>
> Chairman
> Vice Chairman
> President and Chief Executive Officer
> Treasurer or Assistant Treasurer
> Secretary or Assistant Secretary; and
>
> FURTHER RESOLVED, that the Secretary or Assistant Secretary is hereby authorized to provide a list of the names of the current incumbents of these positions to any transfer agent, broker, brokerage house or other entity or individual as is deemed necessary to accomplish the intent of this resolution; and
>
> FURTHER RESOLVED, that the Boards hereby direct that the transfer to cash non-cash gifts shall be implemented by the Allegheny Health Education and Research Foundation Treasury Department; and
>
> FURTHER RESOLVED, that management is directed to report annually to the Board of Trustees of AUMC or the Board of Directors of AUMC/C on the receipt and disposition of all non-cash gifts.

IV.   Review of Maternal/Child Services

Mr. Sanzo highlighted components of the Maternal/Child Services Review. These are services in which there exists a distinct market leader outside the Allegheny system. In the case of obstetrics/gynecology it is Magee Women's Hospital; in the case of pediatrics, it is Children's Hospital of Pittsburgh. Allegheny University Hospitals are second in position to both services, respectively.

The Allegheny University Hospitals which offer obstetrics services include Allegheny General Hospital, Forbes Regional and Allegheny Valley. The combined subsidy for obstetrics services for fiscal year 1997 was $6 million. Although no Allegheny University Hospital is generating income from said services, the community hospitals are more efficient in providing obstetrics services than is AGH. Of the factors influencing income, rate of payment is the most important. These payment rates have been low given current market competition. Most notably, AGH is paid 60% of the Medicaid rate for obstetrics care, Forbes Regional is paid 73% of the Medicaid rate and Allegheny Valley is paid 86% of the Medicaid rate.

GOV 29567

MEETING OF THE RESOURCE MANAGEMENT COMMITTEE                              **10**

Allegheny General Hospital, Allegheny University Medical Centers, Allegheny University Medical Centers/Canonsburg

Management recommends a number of strategies be implemented to increase market share by adding cases over the next three years. Supporting this recommendation is the important role obstetrics plays within the overall spectrum of hospital care. It is the single largest reason people are admitted. It is management's and the medical staff leadership's belief that degradation in obstetrics care or its elimination would have a negative impact on general surgery, general medicine and other core programs at the hospitals, but further recognize that growth cannot continue to increase subsidies. Therefore, it is proposed that it increase market share while reducing principal costs by 12% at AGH and 4% at the community hospitals.

Annual subsidies for pediatrics services approximated $5.5 million in fiscal year 1997. Management understands the need to significantly reduce the subsidy for pediatric services and recommends the most productive way of accomplishing this is to collaborate with one of the other existing pediatric services offered by either Children's Hospital of Pittsburgh, Mercy Hospital or West Penn Hospital. Because of Children's market dominance, it is further recommended that we work diligently, confidentially and expeditiously with representatives from Children's to see if the interest in collaboration is mutual. In the event this collaboration does not occur, we will work with Mercy and West Penn to rationalize investments and provide services at a lower cost.

V.  Written Reports Submitted for Information

    A.  Hospital Network Development
    B.  AUH-West Investment Report
    C.  Government Audits of Physicians at Teaching Hospitals
    D.  Review of Cash Disbursements
    E.  AUH-West Human Resources Report
    F.  AUH-West Proposed Calendar of Discussion Items for Resource Management
        Committee Meetings

GOV 29568

JD0006 Page 14 of 171

# 11

MEETING OF THE RESOURCE MANAGEMENT COMMITTEE

Allegheny General Hospital, Allegheny University Medical Centers, Allegheny University Medical Centers/Canonsburg

February 10, 1998                                                                 Page ~ 10 ~

VI.   Adjournment

There being no further business, the meeting was adjourned at 11:55 a.m.

Respectfully submitted,

Cherry S. White
Secretary

/cem

Noted Attachments:   Notice of Meeting
AUH-West Financial Statements for the Period Ended December 31, 1997

CEM:P:\WP\RMC\AUHWMIN.210

GOV 29569

TAB 223

1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF PENNSYLVANIA
 2

                          - - - -
 3
    SECURITIES AND EXCHANGE        )
 4  COMMISSION,                    )
                                   )
 5                                 )
                                   )
 6          Plaintiff,             )
                                   )
 7            -vs-                 )    Civil Action
                                   )    No. 01-CV-3898
 8  WILLIAM F. BUETTNER, MARK D.   )
    KIRSTEIN, and AMY S. FRAZIER,  )
 9                                 )
                                   )
10                                 )
            Defendants.            )
11
12                      - - - -
13      VIDEOTAPE DEPOSITION OF:  DAN CANCELMI
14                      - - - -
15
                   DATE:    February 5, 2003
16                          Wednesday, 9:37 a.m.
17
                   LOCATION:  BUCHANAN INGERSOLL
18                            One Oxford Centre,
                              20th Floor
19                            301 Grant Street
                              Pittsburgh, PA  15219-1410
20                            412-562-8800
21
                   TAKEN BY:  Defendant
22
23                 REPORTED BY:  Claire Gross, CRR, RDR
                                 Notary Public
24
25          VIDEOTAPE DEPOSITION OF DAN CANCELMI,
```

18

1     My memory was it was some type of
2   healthcare consulting group, and that he was
3   going to eventually migrate over and work in
4   there full time.
5   Q.   Do you recall that was a movement over to the
6   healthcare regulatory group?  Does that sound
7   consistent?
8   A.   Yes.
9   Q.   So Mr. Kirstein had discussed that with you
10   during '97 that he was moving over to the
11   healthcare group?
12   A.   I think so. I remember that issue. I can't
13   say 100 percent if it's certainly Mark told
14   me about it. Maybe somebody else told me
15   about it, but I was aware of that.
16   Q.   Now, I think you've testified to this.
17   You're familiar with people referring to an
18   Eastern and a Western Region of AHERF; isn't
19   that correct?
20   A.   Yes.
21   Q.   After '96 the Eastern entities included what
22   was known as the Delaware Valley Obligated
23   Group; correct?
24   A.   Yes
25   Q.   And the Eastern Region was also referred to

19

1   sometimes as the Delaware Valley; is that
2   correct?
3   A.   Yes.
4   Q.   And once the Graduate Hospitals were acquired
5   they became part of the Eastern Region of
6   AHERF; right?
7   A.   They were physically located in the Eastern
8   Region of the State of Pennsylvania, and then
9   there was obviously some facilities and
10   physician practices in New Jersey.
11     From a legal standpoint, from a legal
12   structured standpoint, I don't remember them
13   ever being all under the same legal corporate
14   umbrella.
15   Q.   I didn't ask you whether they were part of a
16   legal structure. I just asked you whether
17   they considered within AHERF to be part of
18   the Eastern Region. They weren't considered,
19   for instance, to be part of the Pittsburgh
20   region?
21     MS. COLLIERS:  Objection to form.
22   A.   No.
23   Q.   They were considered to be part of the
24   Eastern Region?
25   A.   Yes.

20

1   Q.   And referred to in that sense being among the
2   Eastern entities?
3   A.   Yes.
4     MS. COLLIERS:  Objection.
5   Q.   The eastern entities were sometimes known as
6   the Delaware Valley, so the Graduate
7   Hospitals would be considered part of the
8   Delaware as well?
9     MS. COLLIERS:  Objection.
10   A.   Yes.
11   Q.   Correct?
12   A.   Geographically, yes.
13   Q.   And do you remember at some point there were
14   discussions at AHERF about consolidating
15   DVOG — you know what I mean by DVOG —
16   A.   Yes.
17   Q.   — and the Graduate Hospitals into a legal
18   entity?
19   A.   I remember there was discussions about that.
20   There was also discussions about that on the
21   Pittsburgh side. Like I think I testified
22   earlier, I thought — my recollection was the
23   conversation or the communications or the
24   considerations of that was more further along
25   on the Pittsburgh side, but I couldn't — I

21

1   can't say that for 100 percent sure. It just
2   seemed to be my sense of it. But, yes, there
3   were discussions.
4   Q.   About consolidating DVOG and the Graduate
5   Hospitals?
6   A.   Yes
7   Q.   Into a legal entity?
8     MS. COLLIERS:  Objection to form.
9   A.   I don't know if it would have been a legal
10   entity. It was more of a reporting type of a
11   format maybe so maybe try to streamline some
12   administrative functions of the Allegheny
13   system.
14   Q.   But as far as you know, it also could have
15   been that it was being discussed to
16   consolidate them into a legal entity;
17   correct?
18     MS. COLLIERS:  Objection.
19   A.   It could have been.
20   Q.   Now, to save a little time, I want to mark
21   some exhibits as D-1 through D-7. That's how
22   we are going to refer to ours.
23           - - - -
24   (Exhibits D-1 through D-7 marked for identification.)
25           - - - -

6 (Pages 18 to 21)

22

1  Q.  I'm going to hand them to you one at a time.
2      These are all transcripts, Mr. Cancelmi, just
3      so you know. I think you've seen them just
4      with different stickers.
5          Now, Mr. Cancelmi, on January 23,
6      2003 do you recall being asked questions by
7      Richard Whitney, a lawyer for the Unsecured
8      Creditors Committee of AHERF?
9  A.  Yes.
10 Q.  You were testifying under oath that day;
11     correct --
12 A.  Yes.
13 Q.  -- as you have many times before now?
14 A.  Yes.
15 Q.  Now, I'd like to turn your attention toward
16     D-2, which is the transcript of January 23,
17     2003. If you go to page 200 and line 7, I'm
18     going to read you some of the questions and
19     answers; okay?
20 A.  Okay.
21 Q.      "Question: Okay. Do you remember
22     discussing with Mark Kirstein the subject of
23     the $50 million reserves under circumstances
24     where he said he would take it back to people
25     at Coopers?

23

1          MS. COLLIERS: Counsel --
2          MR. PERSCHETZ: That's not what I
3      have on that page on D-2.
4          MS. COLLIERS: That's not what I have
5      on D-2 either.
6          MR. TYCKO: I do.
7          MR. ZABEL: It's the January 23
8      transcript.
9          MR. PERSCHETZ: Page 200. Sorry.
10         MS. COLLIERS: I'm sorry. June 28?
11         MR. ZABEL: 23rd.
12         MS. COLLIERS: My page -- my 200
13     there isn't a question.
14         MR. DeLEO: Like mine.
15         MR. ZABEL: Page number is right at
16     the bottom. It's a strange numbering system.
17         MR. PERSCHETZ: That's what confused
18     my.
19         MS. COLLIERS: Okay.
20         MR. ZABEL: You have it?
21         MS. COLLIERS: Yes.
22         MR. ZABEL: Everyone has a correct
23     transcript?
24 BY MR. ZABEL:
25 Q.  I'm going to start over, I think,

24

1      Mr. Cancelmi.
2  A.  Okay.
3  Q.  On page 200, line 7, the question put to you
4      by Mr. Whitney:
5          "Question: Okay, do you remember
6      discussing with Mark Kirstein the subject of
7      the 50 million reserves under circumstances
8      where he said he would take it back to people
9      at Koppers?
10         "Answer: I really don't remember
11     that.
12         "Question: All right. You don't
13     remember any conversation which Kirstein
14     would have said I'll take that up, I'll run
15     it up the flagpole?
16         "Answer: No. I really don't
17     remember. I think they are referring to that
18     luncheon at Tambellini's, and my
19     recollection -- I mean, this is my
20     recollection. Whether it's right or not, I
21     don't remember us going to that lunch
22     thinking, hey, we got this brainstorm of an
23     idea, we'll run it by Mark and then see if he
24     thinks it's okay, and then he'll run it by
25     Buettner. I just -- that wasn't my

25

1      recollection of it.
2          "Question: If Adamczak's
3      recollection is different -- and I don't know
4      if it is or it isn't, but if Adamczak's
5      recollection is essentially as stated in
6      these notes, would you dispute that?
7          "Answer: Yes. I mean that just -- I
8      don't remember it being like that. I just
9      don't remember me around Al going to a lunch
10     meeting like that thinking, hey, we'll try
11     this out on Kirstein and, if he buys off on
12     it, hopefully he'll take it up to Buettner.
13     I mean, that's not what I remember.
14         Now, that testimony is truthful and
15     accurate; correct?
16 A.  Yes.
17 Q.  You don't remember raising the $50 million
18     reserve transfer issue with Mark Kirstein at
19     Tambellini's, do you?
20         MS. COLLIERS: Objection to form.
21 A.  I don't remember that.
22         ----
23     (Exhibit D-8 marked for identification.)
24         ----
25 Q.  You can put the transcript aside for now.

7 (Pages 22 to 25)

26

1    Mr. Cancelmi, I'm handing you what has been
2    marked as Exhibit D-8. Do you recognize
3    that; correct?
4  A.  Yes.
5  Q.  As you testified, this is a resume? D-8 is a
6    resume you created; right?
7  A.  Yes.
8  Q.  You created it at the request of the SEC that
9    was relayed through your lawyer; correct?
10  A.  Yes.
11  Q.  You created it, in fact, as you testified the
12    day before, your testimony approximately a
13    week before?
14  A.  Yes.
15        MR. TYCKO: Just so the record is
16    clear, the SEC did not ask me to ask Dan to
17    create a resume. I was asked by Cathy Pappas
18    if we could provide a resume on the
19    assumption that would streamline the
20    deposition, and as a result of that Dan
21    created the resume.
22  Q.  You created the resume the day before your
23    testimony?
24  A.  Yes. I think it was the day before.
25  Q.  And you didn't have a resume available to

27

1    provide to the SEC at that time?
2  A.  I probably could have found one. I mean,
3    I've had a number of different resumes
4    through the years, like most people do.
5  Q.  But you weren't able to find one so you
6    created a new one?
7        MS. COLLIERS: Objection to form.
8  A.  I had one. The address needed to be changed.
9    This needed to be updated.
10  Q.  Did you have the resume on a computer?
11  A.  Yes.
12  Q.  I want to show you what's been marked as
13    Exhibit D-8-A.
14        - - - -
15    (Exhibit D-8-A marked for identification.)
16        - - - -
17  Q.  Now, you recognize that as another resume of
18    yours, don't you, Mr. Cancelmi?
19        MS. COLLIERS: Objection.
20  A.  Yes.
21  Q.  And you used D-8-A to create, to work off of
22    to create D-8; didn't you?
23        MS. COLLIERS: Objection.
24  A.  I don't think so. I've had a number of
25    different versions of resumes through the

28

1    years.
2  Q.  Well, let's look at both resumes, D-7 and
3    D-8-A. Both of them bring up to the time if
4    you look at the top of your employment at the
5    Tenet Health System or Tenet Healthcare
6    Corporation; correct?
7  A.  Yes.
8  Q.  Now, Exhibit D-8 includes your position from
9    September '99 to the present as
10    vice-president assistant controller at Tenet
11    Healthcare Corporation; right?
12  A.  Yes.
13  Q.  D-8-A does not have that position at the
14    type; isn't that right?
15  A.  That's correct.
16  Q.  That's because D-8-A was created before
17    September 1999 when you got that position?
18  A.  I believe so.
19  Q.  Well, you wouldn't have left that position
20    off of it, would you?
21  A.  No.
22  Q.  Now, D-8-A was created, sometime, though
23    after November of '98? You would agree with
24    me, wouldn't you, because it lists your
25    position from November '98 to present?

29

1  A.  Yes.
2        MS. COLLIERS: Objection to form.
3  Q.  That's where it lists you as a chief
4    financial officer of Hahnemann University
5    Hospital; right?
6  A.  Yes.
7  Q.  When was D-8-A created?
8  A.  I have no idea.
9  Q.  Did you produce D-8-A to the SEC?
10  A.  I don't know if I did or not.
11  Q.  Well, you've produced a lot of documents to
12    the SEC; correct?
13  A.  Yes.
14  Q.  You don't recall whether you produced this?
15  A.  Offhand, no.
16        MS. COLLIERS: Objection.
17  Q.  Now, D-8-A was created, though, you would
18    agree with me, based on the date before there
19    were any proceedings in this case?
20        MS. COLLIERS: Objection.
21  A.  No, not necessarily.
22        MR. TYCKO: Before there were any
23    proceedings in which case?
24        MR. ZABEL: In this AHERF matter, the
25    SEC matter.

8 (Pages 26 to 29)