TAB 224

COMPLIMENTARY READING
AND SIGNING COPY FOR
~~DEPONENT~~

1

2              IN THE UNITED STATES DISTRICT COURT

3          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

4                        - - -

5    SECURITIES AND EXCHANGE   :
     COMMISSION,               :
6                      Plaintiff :
                                :
7              vs.             :   CIVIL ACTION NO.
                                :   01-CV-3898
8    WILLIAM F. BUETTNER, MARK:
     D. KIRSTEIN and AMY S.    :
9    FRAZIER,                   :
                     Defendants:

10                       - - -

11
                  Philadelphia, Pennsylvania
12                 Monday, January 6, 2003

13                       - - -

14            Deposition of MARK D. KIRSTEIN, taken

15   pursuant to notice, at the offices of The

16   Securities and Exchange Commission, 601 Walnut

17   Street, Suite 1120E, on the above date,

18   beginning at approximately 9:55 a.m., before

19   Cynthia A. Whyte, Registered Professional

20   Reporter and Notary Public.

21                       - - -

22
                  V A R A L L O   Incorporated
23                Litigation Support Services
                      Eleven Penn Center
24                1835 Market Street, Suite 600
                   Philadelphia, PA 19103
25                (215) 561-2220  (215) 567-2670

1                       Mark D. Kirstein

2   agree before we start the remainder of the testimony

3   on the meanings that I will be intending when I use

4   certain terms.  So I would first refer or state to

5   you that in accordance with what is set forth on

6   Page 3 of this document, Bates-stamped JDP 45, when

7   I refer to AHERF in my questioning, I will be

8   referring to AHERF as it existed as of June 30, 1997

9   including the affiliates listed on Page 3 of this

10  document.  Do you understand that?

11    A.    Yes.

12    Q.    And to the extent that you use AHERF in any

13  other manner in answering my questions, would you

14  please specify any difference in your answers?

15  Otherwise, can we agree that you will do that;

16  otherwise, we will assume that we are using that

17  same meaning?  You can keep that document in front

18  of you throughout the testimony if that would be

19  helpful to you.

20             MR. ZABEL:  I think the witness can try

21  to do that.  We may have to see how it goes since

22  that is a definition you want to use today.  It is

23  not always the way that I will think of things, but

24  we'll try.

25    Q.    Do you not understand the information that

```
 1                    Mark D. Kirstein
 2   appears on here?
 3     A.    I understand that.  I have a hard time
 4   agreeing that every time I use the word "AHERF" that
 5   I'm referring to every single one of these things.
 6     Q.    That's not what I'm asking you to agree to.
 7   I'm asking you to agree if you use the term "AHERF"
 8   to mean something different than what is noted on
 9   this page that you will note that as part of your
10   answer and indicate what you are using the term to
11   mean.
12     A.    I'll try, but I think that is a heavy onus to
13   put on me.  I will try to answer every one of your
14   questions as best as I can and as thorough as I can.
15     Q.    Thank you.
16                  When I refer to DVOG or Delaware Valley
17   or Delaware Valley Obligated Group in my
18   questioning, I will be referring to the obligated
19   group as it existed as of June 30, 1997 including
20   the members that are listed on the third page of
21   what has been marked as Kirstein Exhibit 1 under
22   Delaware Valley Obligated Group.  Do you understand
23   that?
24     A.    Could you restate that again?
25     Q.    When I use either DVOG, D-V-O-G, or Delaware
```

VARALLO Incorporated

1                    Mark D. Kirstein

2  Valley or the term "Delaware Valley Obligated Group"

3  in my questioning, I will be referring to the

4  obligated group as it existed as of June 30, 1997

5  including the members that are listed on Page 3,

6  which this is the document that is in front of you,

7  of Kirstein Exhibit 1?

8                    MR. ZABEL:  Merri Jo, I'm going to make

9  a request that since we are using the terms on this

10  page and defined as DVOG, I'm going to ask you to

11  use DVOG and not use multiple terms.

12                    MS. GILLETTE:  That would be fine.  I

13  can do that.

14    Q.    Do you understand what I said to you, that

15  that will be what I will be referring to in my

16  questions as DVOG as indicated here on the third

17  page of Kirstein Exhibit 1?

18    A.    So if you are referring to DVOG, you will say

19  DVOG?

20    Q.    Yes.

21    A.    But your first question had Delaware Valley

22  in there.  That will not mean DVOG.  DVOG will mean

23  DVOG?

24    Q.    DVOG will mean DVOG as it is defined or set

25  out on Page 3 of Kirstein Exhibit 1.  Can we agree

```
1                         Mark D. Kirstein
2    on that?
3      A.    Yes.
4      Q.    And to the extent that you use DVOG in your
5    answers, that you will either use it to mean the
6    same thing as appears on Kirstein 1, Page 3, or you
7    will indicate that you intend a different meaning?
8      A.    Yes.
9      Q.    When I refer to Graduate in my questioning, I
10   will refer to the entities acquired by AHERF from
11   the Graduate Health System in 1997 and, accordingly,
12   those entities listed under Allegheny Hospitals,
13   Centennial Obligated Group, and Allegheny University
14   Hospitals, New Jersey.  These include City Avenue,
15   Graduate, Mt. Sinai, Parkview and Rancocas.  Do you
16   understand that?
17     A.    So it is the third one and the last one?
18     Q.    Yes.
19     A.    Yes.
20     Q.    And to the extent that you use Graduate in
21   your answers to my questions, can we agree that you
22   will use the same meaning or let me know if you are
23   using it to mean something different than that?
24     A.    I will do my best.
25     Q.    Thank you.
```

```
1                    Mark D. Kirstein

2              MR. ZABEL:  By the way, to make things

3    easier, we will agree to that and he will try to say

4    that.  That doesn't mean that he knew at the time

5    all of those entities were part of the definitions

6    that you are asking him to use today.

7    Q.    Mr. Kirstein, did you attend a luncheon with

8    certain AHERF employees on or about April 7, 1997 at

9    the Louis Tambellini Restaurant in Pittsburgh,

10   Pennsylvania?

11   A.    Yes.

12   Q.    What was the purpose of the luncheon?

13   A.    I don't recall.

14              MR. PERSCHETZ:  I need a clarification.

15   You are referring to AHERF as of June 30, 1997; is

16   that right?

17              MS. GILLETTE:  Yes.

18              MR. PERSCHETZ:  You just asked a

19   question about AHERF employees on April 7, 1997; is

20   that right?

21              MS. GILLETTE:  Yes.

22              MR. PERSCHETZ:  I object to the form of

23   the question.

24              (Kirstein Exhibit 2 was marked for

25   identification.)
```

VARALLO Incorporated

```
 1                    Mark D. Kirstein
 2     Q.   Mr. Kirstein, I have handed you what has been
 3  marked as Kirstein Exhibit No. 2.
 4     A.   Okay.
 5     Q.   Do you recognize what this is?
 6     A.   It appears to be in the -- a copy of an
 7  expense report that I would have filed.  I don't
 8  know if it's a complete copy.
 9     Q.   What documents would you need to look at to
10  determine whether this was a complete copy or not?
11     A.   I'm just hedging.  When you typically submit
12  an expense report, there would have been a time
13  report, a copy of the expense report and a copy of
14  receipts.  I'm not saying it is not a copy of the
15  expense report, but I'm not sure if it is everything
16  that I handed in on April 15, 1997.
17     Q.   I would like to first direct your attention
18  to the third line item entry if you go down the date
19  column on Page 1 in the far left-hand column of
20  Kirstein Exhibit 2 to the date 4/7/97 and ask you to
21  take a moment to read across that line entry.
22     A.   Okay.
23     Q.   Does this relate to the luncheon at
24  Tambellini's on April 7, 1997 that I just asked you
25  about?
```

**VARALLO Incorporated**

```
1                    Mark D. Kirstein

2     A.    I'm only aware of one luncheon that I had at

3  Tambellini's with those gentlemen.  It appears to,

4  yes.

5     Q.    And does reviewing this document refresh your

6  recollection as to what the purpose of the luncheon

7  was?

8     A.    No.

9     Q.    I direct your attention to the eighth column

10 over from the left which states "Business Purpose."

11 Is that your handwriting that appears in that column

12 on the line entry to the right of 4/7/97?

13    A.    Yes.

14    Q.    And what does it say?

15    A.    "Audit planning."

16    Q.    So can we agree that the business purpose of

17 this luncheon was audit planning?

18             MR. ZABEL:  Objection to the form.

19    Q.    What was the business purpose of this

20 luncheon, Mr. Kirstein?

21             MR. ZABEL:  Objection.  Asked and

22 answered.

23    A.    As I said, I don't recall.

24    Q.    Do you have any reason to believe that the

25 information that you wrote on this document at the
```

1                     Mark D. Kirstein

2    time that you created it was inaccurate when you

3    wrote it there?

4    A.    No.

5    Q.    I now direct your attention to the next

6    column to the right of the column which we were just

7    referring to.  That would be the ninth column on the

8    same line item entry and there appears to be some

9    handwritten notes in that block.  Is that your

10   handwriting?

11   A.    What's the title of the column?

12   Q.    "Guest/Business Affiliation."

13   A.    Yes, that's my handwriting.

14   Q.    And can you read into the record what it

15   says?

16   A.    Cancelmi, Adamczak, AHERF.

17   Q.    And what does that mean?

18            MR. ZABEL:  Objection to the form.

19   A.    When you fill out an expense report and had a

20   meal, you are required to write who was your guest

21   and what the business affiliation was.

22   Q.    So am I reading your entry correctly that the

23   guests were Mr. Cancelmi and Mr. Adamczak and the

24   business affiliation was AHERF, assuming that you

25   filled out the form accurately at the time that you

VARALLO Incorporated

```
1                    Mark D. Kirstein
2   filled it out?
3     A.    Yes, I would read that that Mr. Cancelmi and
4   Mr. Adamczak were my guests and that they were
5   employed at AHERF at the time.
6     Q.    And taking your attention over to the far
7   right-hand column under "Duration," what is the
8   handwritten entry in that box?
9     A.    The number 2.
10    Q.    And what does that mean?
11    A.    I don't recall writing this, but that column
12  when you fill out expense reports typically related
13  to the time that the lunch and/or the business meal
14  was.
15    Q.    And would that be two hours?
16    A.    Yes.
17    Q.    And I now direct your attention to Page 2 of
18  Kirstein Exhibit 2 to the signature line at the
19  bottom.  Is that your signature that appears there?
20    A.    Yes.
21    Q.    What was discussed at the luncheon at
22  Tambellini's with Mr. Adamczak and Mr. Cancelmi?
23              MR. ZABEL:  Objection.  Form.
24    A.    I don't recall the specifics of the lunch and
25  all the matters that were discussed.  I recall we
```

Mark D. Kirstein

1  discussed Dan playing golf with his son and we

2  discussed generally Al and his son played hockey and

3  I believe that there were some matters discussed

4  about the acquisitions that AHERF was undertaking at

5  the time in April.

7    Q.   Do you remember anything more specifically

8  about what was discussed about the matters relating

9  to the acquisitions that AHERF was undertaking?

10   A.   I do not, ma'am.

11         MR. ZABEL:  I would just note for the

12  record I'm not going to make objections to take up

13  time, but I think there, as Mr. Perschetz has

14  pointed out, AHERF must have been different than the

15  definition that you wanted us to agree to when you

16  are talking about this time period.  With that

17  understanding we will keep going.

18   Q.   Were reserves at either Graduate or DVOG

19  discussed during this luncheon?

20   A.   I don't know.

21         MR. PERSCHETZ:  I take it we can have a

22  standing objection as to form with regard to the use

23  of the term "AHERF" in connection with the question

24  relating to events that occurred before June 30,

25  1997?  Is that all right with you?

**VARALLO** Incorporated

1                      Mark D. Kirstein

2              MS. GILLETTE:  That's fine with me.

3              MR. PERSCHETZ:  Thank you.

4    Q.   Was there any discussion of the transfer

5  reserves during this luncheon?

6              MR. ZABEL:  Objection to form.

7    A.   What type of reserves?

8    Q.   Was there any discussion of any type,

9  relating to any type of transfer of any type of

10 reserve, during this luncheon?

11             MR. ZABEL:  Objection.  Form.

12   A.   What do you mean by reserve?

13   Q.   Do you have an understanding of what the term

14 "reserve" means?

15   A.   Reserve can mean a lot of things.

16   Q.   Do you have an understanding of what the term

17 "reserve" means to you?

18             MR. ZABEL:  Objection to form.  He said

19 it can have many meanings.

20   Q.   Please describe the meanings that you

21 understand the term to have.

22   A.   A reserve as I think of it is typically a

23 liability you set up for a potential either loss or

24 future event, but there could be many other meanings

25 to the word "reserve" that I'm not aware of.

**VARALLO Incorporated**

Mark D. Kirstein

1

2   Q.   But your understanding then, the

3 understanding you have or the definition that you

4 are aware of, is the one that you just gave; is that

5 correct?

6   A.   Sitting here today, that's the definition.

7   Q.   That is your definition?

8         MR. ZABEL: Objection. Form.

9   Q.   Is that your definition?

10         MR. ZABEL: Objection. Asked and

11 answered.

12   A.   I asked you for a clarification of reserve

13 and you asked me to clarify it.

14   Q.   Yes or no, Mr. Kirstein? Is that your

15 definition?

16         MR. ZABEL: Objection.

17         MR. PERSCHETZ: Objection.

18         MR. ZABEL: He is in the middle of his

19 answer. He is not going to interrupt you; please do

20 not interrupt him.

21   Q.   Were you done with your answer?

22   A.   I was not.

23   Q.   Please continue.

24   A.   All I said is I asked you for a clarification

25 of reserve and you asked me what I think it means.

TAB 225

Arbor
Oncology
Accoustments

O Thor

BSM—jo²²

PWCK2    42

DEPOSITION
EXHIBIT
4436
PENGAD 800 631 6989

EXH - SYSTOCENS
PRECITIEN
MOMES

PWCK2    43



4/21 Cont Ctrl

- $50 mm Add'l Reserves
- $44 mm Asset @ Mt. Sinai to Graduate
- Mt. Sinai to Be Sold for $16 mm.
- None until Future ?? Firm or Successor ??

- DSM Reserving
  - View as not under Mg
    1) GW
    2) Other Intangibles
    3) & in Goodwill.

Write Down
$50 mm (At 1/2
Amount A/R)

---

Summary [FFII] Conclusions

1) Reserve Generated By Purch Accr. To Amort
   Over 30 Yrs.
   - Will Occur @ Time To Amort

2) 25% of DSM Reserving Thru Income
   In '97.
   - Spango Says May Not Need DSM
     Reserving to At A's

3) Control Date of GHS
   - Debate 2/97 vs 5/97
   - SWD Perform Earlier for 3 Month Period

5) Will Reserve for Cost To Close &
   Losses @ Mt. Sinai From Sale Date To Close.

6) It's Purchase
   - To Add $44 mm Spent By Graduate
     & In Other Assets & GHS @ Accrd
   - $96 mm Was Rentals — Amort Will
     Gross up B/S & Asset As Intangibles.

Bad Assets
to Amort
from '97
to '97.

View
Consolidated
Ribs As
Acquisition

- Purchase Price of → Add To Purchase
  of Mt. Sinai &
  - Effective Date - 2/97    Purchase of At Accr Sale.
    for Ct.

7) FMV is BV of Debt — Asset is Current — S/O Diffs BV
8) Push Down Acct.

DAN C.     4/18          — BUETER / FRAZIER

— GOODWILL  @  MT. SINAI

— [illegible]  MT. SINAI  $ COST  [illegible]  $50 MM

— GRADUATE WILL [illegible] ASSUME PART OF $40 MM
    — IN ESCROW, [illegible] PURCHASE PRICE FOR GRADUATE

— CFL [illegible] PUT IN PP TE [illegible] RECOVER OVER OAM,
    — ATTORNEY WILL GO  30 - 35 YRS
    — CFL WILL ASSESS LIFE [illegible] SQD. DIFFERENCE.

---

$50 MM   RESERVES @ GRADUATE
    — WILL HAVE [illegible] MM [illegible] IN ON BY 5/30/93 (GROSS #)
                                                          ON A/R
                                                          OUTSTANDING

— PLACING RESERVES ON GRADUATE ENTITIES TO
    [illegible] USE FOR ON A/R @ Y/E

— DOES NOT BELIEVE THERE IS ANY GOODWILL
    RESERVES OTHER THAN $50 MM.

    — BECOMES PART OF PP&E / INTANGIBLE. AS PART OF
    PURCHASE ADJUSTMENT FROM [illegible] TO [illegible]
        — [illegible] A/R [illegible] [illegible].

- _DEM. REVENUE_
  - VIEWED AS PURCHASED NOL
    - OFFSET AGAINST GOODWILL WHEN UTILIZED
    - IF NO GOODWILL, OK TO GO THRU INCOME

  - OK IN '98 AS UNCERTAINTY IS REMOVED
    - _RESEARCH_

PWCK2    46

TAB 226



EXHIBIT 377

DEPOSITION
EXHIBIT

4403

Kirsten 5 13-04



Reporting
* Have trustees confirmed 1 report is acceptable?

Year End Timing

SFAS 124
* AHERF Restatement
* Acquired Subsidiaries

*Specific Purpose Report???*

*EM or Aux*

— Agreed upon procedures on debt compliance.

— GAs note receivable is bank discounted

— E Anthony change ==> Too Late @
   Policy & procedure manual
   On benefit software.

(handwritten notes — largely illegible)

PWCK2     36

_Airfare Issue_      8/10 /s

_Revenue_
- $50 mm Avt'l Reserve — $25 mm mm March
           $25 mm mm April
- $80 mm have dfs + after by $30 mm Reserve
  - New current vs plan year Breakout
- Minimizing HTS Impacts ⟹ out of Period Adjustments
                By Assumption
                ⟹ Prior/Prior acts booth
                    Plans
- Bad Debt Based to Bush
- Missed 1 Day Reserve in Policy.

_Profits_ — Charged Bad Debt to Poit d/p Invest
- Improve Physician Mix premiums
- Reserve is Conservative.

_Teams_ — Changed master for Airfare
_Status_ — NDCB Review
_+ Open_    • Curmus + Processes
       • Sample 80-10 Process Walk Thru.

TAB 227

**AHERF**
**06/30/97**

**Issue Topic:**          $50 Million Reserve Entry

**Issue Description:**   Per conversation with Robin Schafer, C&L notes that a total of $50
million was Intercompanied from the Graduate hospitals to the
Delaware Valley hospitals due to the DV bad debt reserve shortfalls.
A determination was made that $25 million of reserves would be
recorded in the DV hospitals in the March, 1997 financials and the
remaining $25 million would be recorded in April.

The allocation of the reserves was as follows:

|        | March, 1997 | April, 1997 | Total        |
|--------|-------------|-------------|--------------|
| Bucks  | $3 million   | $ 4 million  | $ 7 million   |
| Elkins | 3 million    | 5 million    | 8 million     |
| HUH    | 5 million    | 5 million    | 10 million    |
| MCP    | 8 million    | 7 million    | 15 million    |
| SCHC   | 6 million    | 4 million    | 10 million    |
|        |             |             | $25 million   |
| $25 million | $50 million |         |              |

The journal entry for the DV entitles was as follows:

Dr. Intercompany        xxx
   Cr.   I/P Reserve for Uncollectible Accounts   xxx

The journal entries for the Graduate Hospitals was as follows:

Dr. Intercompany     xxx
   Cr.  Other Assets - Purch Price Adj.  (intangible)   xxx

Dr. Accrued Liabilities - Other   xxx
   Cr.  Accrued Liabilities - Other       xxx

C&L notes that AHERF is amortizing the intangible over 35 years.
C&L does not take exception.

**Link to Further Information:**  Audit Program Step  Audit program step

**Issue Type :**          No further action required

**Audit Area(s)**
**Affected  :**          Patient Accounts Receivable

**Client Site  :**        Delaware Valley, Graduate



DEPOSITION
EXHIBIT
4347

CONFIDENTIAL - COUNSEL ONLY          CL 232335

☐ Cleared

**Comments:**

**Created By:**      Kristen Heinlein      **Date:**   06/09/97 09.09.07 AM
**Last Modified By:** Kristen Heinlein      **Date:**   06/09/97 10.30:01 AM
**Cleared By:**                            **Date:**

☐ Reviewed

☐ Mark for Deletion

CONFIDENTIAL-COUNSEL ONLY         CL 232336

TAB 228

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF

UNSECURED CREDITORS OF

ALLEGHENY HEALTH, EDUCATION

& RESEARCH FOUNDATION,

      Plaintiff,.

  vs.                     Civil Action

PRICEWATERHOUSECOOPERS,     No. 00-684

LLP,

      Defendant.

Videotaped Deposition of KRISTEN

LEE HEINLEIN, CPA, called for examination under

the Applicable Rules of Federal Civil

Procedure, taken before me, Michele E. Eddy, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, pursuant

to notice and stipulations of counsel, at the

offices of Jones Day, 500 Grant Street, Suite

3100, Pittsburgh, Pennsylvania, on Tuesday, the

24th day of February, 2004, at 9:00 a.m.

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE



2500 Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

Kristen Heinlein, CPA

Page 109

1   information itself, I have printed off -- and
2   if you go back four pages from that --
3   actually, five pages where the box that says
4   document has a summary that says revisions.
5   Then toward the right it says field name.
6       A.   Okay.
7       Q.   Okay?
8           Then I've printed off the next five
9   pages, there's some overlap between, but the
10  dates -- some different pages that came under
11  that metadata.
12          Let me ask you, do you know what
13  that field means, revisions?
14      A.   No.
15      Q.   If I could ask you to flip with me,
16  and I realize it will take you a while maybe to
17  find it, but where the roll-forwards of the
18  schedules start.
19          Actually, let's make this a little
20  easier. Actually, if I can find it. Did you
21  find it?
22      A.   Inpatient?
23      Q.   Yes, inpatient, under Bucks County.
24      A.   Yes.
25      Q.   Right?

Page 110

1           And we see there, again, the -- in
2   the March row under the ATB column, there's,
3   again, a credit entry of $3,109,925, right?
4       A.   Yes.
5       Q.   But this one has a D footnote next
6   to it?
7       A.   Yes.
8       Q.   Which on the next page states,
9   "Represents the monthly entry to bad debt
10  expense, paren, AHERF is booking to budget, end
11  paren, plus the entry of 3 million dollars from
12  the Graduate hospitals, paren, refer to the
13  issue, end paren, period.
14          "Monthly bad debt expense agrees to
15  the I/S without exception."
16          Miss Heinlein, did you write that
17  footnote?
18      A.   I think so, yes.
19          - - - - -
20          (Thereupon, Deposition Exhibit 4297
21          was marked for purposes of
22          identification.)
23          - - - - -
24      Q.   For the record, what I've marked as
25  Exhibit 4297 is a document bearing the Bates

Page 111

1   number CL232335336. It's an issue topic titled
2   50 Million Dollar Reserve Entry that was
3   created by Kristen Heinlein on June 9th, 1997,
4   last modified by Kristen Heinlein on June 9th,
5   1996.
6           MR. McDONOUGH:  '97.
7       A.   '97.
8       Q.   I'm sorry, '97.
9           MR. McDONOUGH:  Viewed it and last
10  modified it on the same day.
11          MR. TORBORG:  Yes.
12      Q.   Miss Heinlein, if you would review
13  that document.
14      A.   Okay.
15      Q.   Miss Heinlein, do you recall this
16  document?
17      A.   Yes.
18      Q.   Is this -- earlier I had asked you
19  if there were any documents that you reviewed
20  in your preparatory session for your third day
21  of your SEC session?
22      A.   Yes.
23      Q.   I believe you referenced an issue
24  document?
25      A.   Yes.

Page 112

1       Q.   Is this that document?
2       A.   Yes.
3       Q.   Is this also the document that is
4   referenced in the bad debt roll-forward
5   schedule, Exhibit 4292, footnote D. It says,
6   "Refer to the issue"?
7       A.   Yes.
8       Q.   What is that note in Exhibit 4297
9   that says, "Represents the monthly entry to bad
10  debt expense, AHERF is booking to budget, plus
11  the entry of 3 million dollars for the Graduate
12  hospitals" mean?
13          MR. McDONOUGH:  For the record,
14  it's 4292 that that footnote appears in.
15          MR. TORBORG:  What did I say?
16          MR. McDONOUGH:  4297 is the issue.
17          MR. TORBORG:  Yes.
18      A.   I don't remember what specifically
19  I meant when I wrote it.
20      Q.   Does it have reference to the
21  transfer of reserves from the Graduate entities
22  to the Delaware Valley Obligated Group
23  entities?
24      A.   It appears so.
25      Q.   Do you recall that issue as you sit

28 (Pages 109 to 112)

Kristen Heinlein, CPA

Page 113

1  here today, the transfer of reserves from
2  Graduate to DVOG?
3        MR. McDONOUGH:  You know, just to
4  be precise --
5        MR. TORBORG:  The 50 million.
6        MR. McDONOUGH:  -- the issue to
7  mean the exhibit or the issue to mean --
8        MR. TORBORG:  The broader issue.
9        MR. McDONOUGH:  -- the broader
10  issue?
11        MR. TORBORG:  Yes, the broader
12  issue.
13        MR. McDONOUGH:  I have contended
14  throughout this case that they should have
15  thought of a different name --
16        MR. TORBORG:  Good point.
17        MR. McDONOUGH:  -- for the
18  document.
19        You're talking about the broader
20  issue with the small i, basically?
21        MR. TORBORG:  Thank you, yes.
22    A.   Yes.
23    Q.   To the best of your recollection,
24  when did you first learn that AHERF was
25  planning to transfer or had transferred

Page 114

1  reserves from the Graduate entities to the
2  Delaware Valley Obligated Group entities' bad
3  debt reserve accounts?
4    A.   I thought I learned about it during
5  our year-end procedures.
6    Q.   When was that phase of the audit?
7    A.   August, September time frame?
8    Q.   That's what you thought initially?
9    A.   Yes.
10    Q.   And then did reviewing the issue
11  document marked as 4297 refresh your
12  recollection of when you first learned about
13  it?
14    A.   No.
15    Q.   But it does cause you to believe
16  that you learned about it in the preliminary
17  phase of the audit?
18    A.   Yes.
19    Q.   By at least June 9th, 1997?
20    A.   Yes.
21    Q.   How did you come to learn about the
22  concept of -- notice I didn't use the word
23  issue --
24        MR. McDONOUGH:  I appreciate it.
25    Q.   -- the concept of transferring

Page 115

1  reserves from the Graduate entities to the
2  Delaware Valley Obligated Group entities?
3    A.   I'm not sure who told me about the
4  50 million dollar transfer.
5    Q.   Do you believe it's something that
6  someone told you or something that you learned
7  about from reviewing schedules like
8  roll-forward schedules?
9    A.   I think someone told me.
10    Q.   Do you recall who it was that told
11  you?
12    A.   No.
13    Q.   Do you recall if it was someone
14  either at AHERF, the client, or within Coopers?
15    A.   I don't know.
16    Q.   Do you recall testifying during
17  your first SEC deposition, the first day, that
18  it was your best recollection that you learned
19  about the concept of transferring 50 million of
20  reserves from Graduate to DVOG from Amy
21  Frazier?
22        MR. STEINBERG:  Objection. I think
23  if you're going to be referencing prior
24  testimony, you might want to put it --
25        MR. TORBORG:  That's what we're

Page 116

1  going to do.
2        MR. STEINBERG:  Put it in front of
3  her.
4        MR. TORBORG:  Since you invited
5  this.
6        MR. STEINBERG:  Didn't mean to
7  invite it, but I just think it's hard to deal
8  with the prior testimony and make
9  characterizations of it without the testimony
10  in front.
11        - - - - -
12        (Thereupon, Deposition Exhibit 4298
13        was marked for purposes of
14        identification.)
15
16    Q.   Miss Heinlein, if you could turn
17  to, and this is a miniscript version of your
18  testimony given on the first day of your SEC
19  deposition, March 1, 2000, to page 88 in the
20  little -- it has four pages on one page.
21        MR. McDONOUGH:  Just for
22  chronology, this is about four years ago?
23        MR. TORBORG:  Yes.  I don't know
24  that it was necessary to point that out on the
25  record, but, yes, 2000 was four years ago.

29 (Pages 113 to 116)

Kristen Heinlein, CPA

Page 117

1    Q.    Page 88 -- are you with me on page
2    88?
3    A.    Yes.
4    Q.    I'm going to read some testimony
5    into the record starting on line 17, okay?
6    A.    Yes.
7    Q.    Where there was a question, "And
8    with respect to that 50 million dollar
9    transfer, what did you do?
10    "We're talking from Graduate to
11    Delaware Valley, correct?"
12    Your answer, "Yes."
13    Question, "Okay."
14    Answer, "I received -- I learned
15    about the 50 million from Amy Frazier. I
16    inquired of management for journal entries and
17    the allocation between which hospital entities
18    it was going to and then I documented my
19    results of my findings."
20    Question, "What was the issue?"
21    Answer, "I put my information in an
22    issue to flag to Christa Porter and to Amy what
23    I found out. I didn't relate it. I didn't
24    categorize it as a critical matter. That was
25    my work in process issue."

Page 118

1    MR. STEINBERG: Just to clarify, I
2    don't think it says Christa Porter. It just
3    said Christa.
4    MR. TORBORG: Christa, thank you.
5    Why can't I read documents?
6    Q.    Do you recall giving this testimony
7    after having a chance to read through it with
8    me?
9    A.    I guess.
10    Q.    Do you believe that testimony was
11    truthful when you gave it in March of 2000?
12    A.    Yes.
13    Q.    If you would flip with me, please,
14    to page 219 of this transcript. I'm going to
15    do this same drill here, starting with line
16    five of page 219. Are you with me?
17    A.    Yes.
18    Q.    Question, "Did you ever have any
19    discussion with any members of the audit team
20    that indicated they were aware of the recording
21    of bad debt allowance is of these magnitudes,
22    20 million at Graduate, 9 million at Rancocas,
23    5 million at Mt. Sinai; were they aware of
24    that? Was this news or information to Miss
25    Frazier?"

Page 119

1    Mr. Barron interjected. "At what
2    point in time," question. Then Mr. DeLacy
3    interjected, "At any point in time during the
4    audit after you were charged with the -- with
5    investigation of this 50 million dollar
6    transfer."
7    Your answer, "Amy Frazier knew
8    about it and Christa Porter knew about it. I
9    knew that."
10    Then a question by Mr. DeLacy, but
11    did -- "But did, though, know about the amounts
12    coming at the various hospitals, coming in
13    those amounts, were they familiar with that,
14    too?"
15    Mr. Barron interjected. "Prior to
16    that point in time when she did her research?"
17    Mr. DeLacy, "Correct." Mr. Barron, "Is that
18    what you're asking?" Mr. DeLacy, "Yes."
19    Your answer, "I think so. I think
20    Christa also knew."
21    Question, "Christa Porter and Amy
22    both knew?"
23    Answer, "I think so, yes."
24    Mr. Weiser interjected, "Just to clarify, they
25    knew about the amounts coming from Graduate or

Page 120

1    where they went on the DVOG entities, if you
2    remember, or if you don't remember."
3    Your answer, "I know they told me
4    about a transfer from Graduate to DVOG, 50
5    million dollars."
6    Mr. Weiser then asked, "Do you
7    remember whether they told you or not that they
8    went into specific months and the amounts that
9    they went into -- they went in specific
10    months?"
11    The witness, "They told me March
12    and April. I don't know if they told me
13    amounts."
14    Question by Miss Pappas, "In your
15    first conversation with Amy and Christa
16    sometime in August of 1997, why don't you tell
17    us, because we've gone a little bit further
18    here, tell us what they told you. We
19    understand from what you've told us already
20    that during that first conversation -- first of
21    all, both were present at the time?"
22    Answer, "I think so."
23    Question, "Okay, and you recalled
24    them both telling you about this issue, the 50
25    million dollars?"

30 (Pages 117 to 120)

Kristen Heinlein, CPA

Page 137

1  reallocation of these reserves in the Graduate
2  hospitals to the other Delaware Valley
3  Hospitals is not the most technically
4  appropriate resting place, however, since only
5  one audited set of financial statements will be
6  prepared at a consolidated AHERF level, the
7  precise placement of the reserves on the
8  individual hospital's financial statements
9  becomes less critical."
10      My question for you, Miss Heinlein,
11 is do you recall any discussion at any time
12 during the 1997 audit about the fact that there
13 would be only one set of consolidated financial
14 statements in context with the reserve
15 transfers?
16     A.  Not in context with the reserve
17 transfers.  I just knew there that there was
18 going to be one set of financials instead of
19 multiple perennity.
20     Q.  So you don't recall any connection
21 between the two?
22     A.  No.
23     Q.  At any time during the 1997 audit,
24 do you recall ever hearing about Coopers
25 requesting AHERF to reverse the transfers?

Page 138

1      A.  No.
2      Q.  Now, unlike some of the -- I want
3  to -- sorry, flip back to 4297.  That was your
4  issue document.
5      A.  Okay.
6      Q.  Now, unlike some of the other
7  documents we've seen today, this one is an
8  issue topic document and not a work paper, is
9  that right?
10     A.  Yes.
11     Q.  Is there a distinction between the
12 two types of documents?
13     A.  Yes.
14     Q.  To the best of your understanding,
15 what was the difference between an issue
16 document and a regular work paper?
17     A.  Work paper normally included
18 information that the client had given to the
19 auditors and then, you know, we, as the
20 auditors, put our tick marks on it or our
21 follow-up questions.  An issue was to bring
22 attention to something that we had found when
23 we were auditing our audit areas.
24     Q.  If I could ask you to flip out --
25 get out Exhibit 4001.  It was a document

Page 139

1  produced earlier today that has a cover page
2  that had the business assurance manual on it.
3  The first page will be a black document.
4      Again, Exhibit 4001 has a cover
5  page, which is the cover page for the business
6  assurance manual, assurance services, 1996
7  edition, as well as a particular section within
8  that manual, Section 620, Consideration of
9  Documentation of Issues.
10     Did you review this last time and
11 tell me if you recall whether or not you
12 remember this document?
13     A.  I remember the manual.  I'm not
14 specifically sure of Section 620.
15     Q.  Do you think you did look at it
16 during the -- at all during the AHERF audit?
17     A.  I don't know.
18     MR. STEINBERG:  Section 620?
19     MR. TORBORG:  Section 620, yes.
20     A.  I don't know.
21     Q.  Section .3 on Bates 256 states, "An
22 issue is a matter that we identify that is
23 relevant and requires a response in the audit
24 from either a technical project management or
25 client's service or any other point of view."

Page 140

1      Issue matter -- "Issues may be
2  matters from the previous year that were
3  appropriate to be readdressed in the current
4  audit, risks identified during the client
5  acceptance or continuance review, risks
6  identified at the planning stage, exceptions
7  arising from our work or other matters
8  warranting further attention.
9      "Critical matters are those issues
10 deemed of such importance that they require
11 partner clearance.  This section outlines how
12 we should consider documenting issues,
13 including critical matters."
14     Does my reading that language in
15 the record refresh your recollection at all
16 about whether you read this language before?
17     A.  No.
18     Q.  Does this comport with your
19 recollection about what an issue was?
20     A.  Yes.
21     Q.  Under .4(a) under subsection under
22 identification of issues, it states, "Members
23 of the engagement team should identify issues
24 as early as possible."
25     Do you remember that being

35 (Pages 137 to 140)

Kristen Heinlein, CPA

Page 141

1  something that was stressed during the AHERF
2  audit, to identify issues as early as possible?
3      A.  Yes.
4      Q.  And then (c) stated, "Issues should
5  be analyzed by the member of the engagement
6  team with the appropriate experience, skills,
7  and judgment who should be satisfied that the
8  record of the issue is sufficient to identify
9  the audit engagements."
10         Do you recall that being something
11  that was stressed during the audit of AHERF,
12  1997 audit of AHERF?
13     A.  Yes.
14     Q.  Now, the issue document that we saw
15  in Exhibit 4297, the 50 million reserve entry,
16  the one created on June 9th -- June 9, 1997,
17  you have typed -- you have typed it issue type,
18  no further action required?
19     A.  Yes.
20     Q.  Do you recall that within the CLASS
21  system you could identify an issue type?
22     A.  Yes, I could.
23     Q.  And do you know why you typed this
24  one no further action required?
25     A.  Yes, because I only used this issue

Page 142

1  as a place where I kept my notes throughout the
2  audit.
3         MR. STEINBERG:  Are we done with
4  4001?
5         MR. TORBORG:  Yes.
6         - - - - -
7         (Thereupon, Deposition Exhibit 4302
8         was marked for purposes of
9         identification.)
10        - - - - -
11     Q.  For the record, what I've marked as
12  Exhibit 4302 is an issue topic titled 50
13  Million Reserve Entry.  Again, this one has a
14  created by date of June 9th, 1997; but this one
15  has a last modified by date of August 13, 1997.
16     Right?
17     A.  Yes.
18     Q.  Have you had a chance to look
19  through this document or do you need a second?
20     A.  I'm fine, go ahead.
21     Q.  Do you recall this document?
22     A.  Yes.
23     Q.  Now, this one has some changes from
24  the previous version, correct?
25     A.  Yes.

Page 143

1      Q.  One of the changes was that the
2  issue type was changed from no further action
3  required to audit implications?
4      A.  Yes.
5      Q.  Do you know why that was changed?
6         MR. STEINBERG:  You're comparing to
7  4297?
8         MR. TORBORG:  Yes.
9      A.  I don't know, I changed it.  I
10  don't know why.
11     Q.  What did the term audit
12  implications mean?
13     A.  Something that would impact the
14  audit and needed to be looked at by someone
15  higher than myself.
16     Q.  In addition, this version of the
17  work paper, the journal entries that are listed
18  on Exhibit 4297, the earlier version of the
19  issue document, the journal entries are not on
20  this version?
21     A.  Correct.
22     Q.  Do you know why not?
23     A.  I'm not sure why I deleted them.
24     Q.  And then in this version, the issue
25  description, you have, "Per conversation with

Page 144

1  Robin Schaffer, C&L notes that a total of 50
2  million was intercompanied from the Graduate
3  hospitals to the Delaware Valley Hospitals to
4  help, quote, support, unquote these entities
5  due to bad debt reserve shortfalls."
6         In the earlier version of this work
7  paper, you didn't have the language "to help
8  support," right?
9      A.  Yes.
10     Q.  Do you know why you added that
11  language?
12     A.  No.
13     Q.  Do you know what you meant when you
14  said "to support"?
15     A.  I don't know what I thought at that
16  time.
17     Q.  Do you know why you put it in
18  quotes?
19     A.  No.
20     Q.  Based on your practices at the
21  time, would that be, putting in quotes, would
22  that be something intended to suggest sarcasm?
23        MR. STEINBERG:  Objection.  Vague,
24  lack of foundation and calls for speculation.
25     A.  I have no idea why I put that in

36 (Pages 141 to 144)

Kristen Heinlein, CPA

Page 145

1  quotations.
2      Q.   I'm asking based on your practice
3  of when you drafted work papers or issue
4  topics, if you put something in quotes, like
5  you put in "to help support," would that be
6  something that based on your practice would
7  indicate hinting at sarcasm?
8      A.   No.
9      MR. STEINBERG:  Same objection.
10     Q.   For the record, I've shown the
11  witness or asked the witness to review Exhibit
12  4260, which is an April 7th, 1997 interoffice
13  correspondence from Christa Porter to the AHERF
14  engagement team that is a three-page document.
15  Miss Heinlein is shown on the distribution on
16  the third page of the document.
17     Miss Heinlein, if you would take a
18  look at that to the extent you think it's
19  necessary to tell me whether or not you recall
20  it, then I'll ask some specific questions.
21     A.   Yes, I recall it.
22     Q.   You do recall the document?
23     A.   Yes.
24     Q.   The fourth bullet on the second
25  page Bates ending 220 -- let me first read the

Page 146

1  first paragraph of that page.  It says, "The
2  following is a list of CLASS tips for the AHERF
3  engagements.  This list was generated from
4  prior experience in CLASS best practices.
5      "If you have any suggestions for
6  additional points or criticisms for those made,
7  please let me know."
8      Then the fourth bullet down reads,
9  "Prior to including an issue in the audit file,
10  the issue must be discussed with a senior
11  assigned to review the audit area for
12  concurrence."
13     Miss Heinlein, do you recall that
14  there was a guideline to discuss the creation
15  of an issue with a senior prior to including it
16  in the audit file?
17     MR. STEINBERG:  Objection.  Vague.
18  Sorry.
19     A.   I don't remember, no.
20     Q.   Do you recall whether it was your
21  practice to discuss issue documents with a
22  senior before putting it in the audit file?
23     A.   No.
24     Q.   Five bullets down from that is a
25  bullet that says, "A replication schedule will

Page 147

1  be developed for both prelim and year-end field
2  work.  Please stick to the replication
3  schedule.  This is important due to the size of
4  the engagement team."
5      Do you have an understanding of
6  what that means?
7      A.   Yes.
8      Q.   What is your understanding?
9      A.   There was a main database held on a
10  server, so everybody who had done work on this
11  database needed to transfer the information
12  from that day to the overall database on the
13  server, so we would replicate our databases.
14     Q.   Every member of the audit team
15  would replicate the databases?
16     A.   Yes.
17     Q.   To the best of your knowledge?
18     A.   Yes.
19     Q.   To the best of your knowledge, did
20  people stick with the replication schedule?
21     A.   I don't remember.
22     Q.   I asked you earlier if you recalled
23  whether or not you discussed -- when you first
24  created the issue document related to the 50
25  million, Exhibit 4297, whether you discussed it

Page 148

1  with anyone else.  I think you said you don't
2  recall today if you did.
3      A.   Correct.
4      Q.   Based on your practices at the
5  time, would you have created an issue document
6  relating to the 50 million dollar transfers
7  without discussing it with someone above you?
8      MR. STEINBERG:  Objection.  Vague.
9  Lack of foundation.  Calls for speculation.
10     A.   Quite possibly, yes.
11     Q.   Quite possibly you may have done
12  that?
13     A.   Yes.
14     Q.   Why do you say that?
15     A.   If I couldn't find my senior, if
16  the person wasn't there for the day, I would
17  create an issue and then eventually follow up
18  with the person.
19     4303 marked.
20     Q.   For the record, what we've marked
21  as Exhibit 4303 is a work paper for the 1996
22  audit, working paper name, 50 million dollar
23  reserve; 50 million dollar bad debt reserve
24  entry.  The working paper reference number
25  0053-75.  Completed by Kristen Heinlein on

37 (Pages 145 to 148)

TAB 229

ALLEGHENY HEALTH EDUCATION...     Multi-Page™     KRISTEN LEE HEINLEIN

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     )  File No. P-259
ALLEGHENY HEALTH EDUCATION           )
AND RESEARCH FOUNDATION              )

WITNESS: Kristen Lee Heinlein

PAGES:  1 through 300

PLACE:  U.S. Securities & Exchange Commission
        Philadelphia District Office
        The Curtis Center
        Staff Conference Room
        601 Walnut Street, Suite 1120E
        Philadelphia, Pennsylvania 19106

DATE:   Wednesday, March 1, 2000

        The above-entitled matter came on for hearing, pursuant
to notice, at 9:20 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

        CATHI PAPPAS, ESQ.
        PAUL BOEGGEMAN, Branch Chief, Accounting
        KEVIN deLACY, Staff Accountant
        Securities and Exchange Commission
        601 Walnut Street, Suite 1005E
        Philadelphia, Pennsylvania  19106-3322
        (215) 597-3100

On behalf of the Witness:

        FRANCIS P. BARRON, ESQ.
        STEVEN E. WEISER, ESQ.
        Cravath, Swaine & Moore. Esq
        Worldwide Plaza
        825 Eighth Avenue
        New York, New York  10019-7475
        (212) 474-1506

        JOSEPH F. McDONOUGH, ESQ.
        Manion, McDonough & Lucas, P C
        600 Grant Street, Suite 882
        Pittsburgh, Pennsylvania  15219-2702
        (412) 232-0200

CONFIDENTIAL

Page 3

C O N T E N T S

WITNESSES:                                          EXAMINATION

Kristen Lee Heinlein                                     8

EXHIBITS:      DESCRIPTION                          IDENTIFIED

442            3/18/99 SEC letter to Kristen
               Lee Heinlein                             8

443            Resume of Kristen Lee Heinlein          41

444            Two-page document: Coopers &
               Liebrand file tips                       76

445            Two-page document: Bates 499-500       161

446            Multi-page document: Bates PUC 9482
               through PUC 9500                        197

447            Multi-page document: Bates PUC 9795
               through PUC 9810                        273

448            Multi-page document: Bates PUC 132251
               through PUC 132253                      280

Page 2

A P P E A R A N C E S   (Continued)

JEFFREY L. CLOSE

Price Waterhouse Coopers. L L.P.

1301 Avenue of the Americas

New York, New York  10019-6013

(212) 707-6709

EXHIBIT
HEINLEIN 1
GW 2/11/03

Page 4

P R O C E E D I N G S

1     MS. PAPPAS: On the record at 9:20 a.m. on March 1.
2  2000. Ms. Heinlein. my name is Cathi Pappas.  I'm an
3  attorney with the Securities & Exchange Commission in
4  Philadelphia
5           With me today is Kevin deLacy. who is an accountant
6  with this office.  Also joining us at intermittent times
7  today will be Barry Isenman.  He is a branch chief in this
8  office. and also an attorney. and Paul Boeggeman.  He is an
9  accountant and a branch chief of this office
10          When I ask you questions, if you don't understand a
11 question. say so. and I will repeat or rephrase it
12 accordingly.  If you answer a question. we will presume you
13 both heard and understood the question.  Do you understand
14 that?
15          MS. HEINLEIN: Yes.
16          MS. PAPPAS: Are you on medication today or
17 anything else that would affect your recollection and/or
18 prevent you from testifying truthfully today?
19          THE WITNESS: No.
20          MS. PAPPAS: Why don't you raise your right hand
21 Whereupon.
22
23                    KRISTEN LEE HEINLEIN
24 was called as a witness and. having been first duly sworn.
25 was examined and testified as follows:

Page 1 - Page 4

**Page 81**

1    Q  If we were to find an AmiPro documents attached to
2  the work papers, would that mean it had, in fact, been
3  presented to the client?
4    A  Not necessarily
5    Q  How would you tell?
6    A  It wouldn't be able to tell
7       BY MS PAPPAS:
8    Q  In terms of this instruction you are not supposed
9  to link them if you're not going to show them to the client,
10  did you follow this instruction, or am I misinterpreting it?
11  Do you interpret it the same way?
12    A  I'm not quite sure how I should interpret it. My
13  understanding – from reading this, it looks like we should
14  not have used AmiPro documents unless they were supposed to
15  be formal documents. Do I know if every followed that? I
16  don't know.
17    Q  Did you follow it?
18    A  I don't know. I don't remember.
19    Q  So you might have attached an AmiPro document which
20  was not to be distributed?
21    A  Yes.
22    Q  Going down to the fourth bullet point, "Pop-up
23  boxes should be utilized for all flux," f-l-u-x
24  "explanations, this can be accomplished by utilizing tables
25  and notes for pasting lead schedules into the document and

**Page 82**

1  placing the flux tick mark next to the particular account
2  being analyzed."
3       What does that mean?
4       MR. BARRON: Well, just so we're absolutely clear,
5  you're asking for her understanding, right?
6       MS. PAPPAS: That's what I'm asking for.
7       THE WITNESS: My understanding was in a Lotus Notes
8  document included in the database, in the Lotus Note work
9  paper, we would make a table, put our lead schedule in the
10  table and create a pop-up box for us to put in our
11  explanations
12       BY MS. PAPPAS:
13    Q  And do those pop-up boxes print out on the hard
14  copy, or are they only visible while you're looking at the
15  system?
16    A  I don't know if they can be printed out. They are
17  visible in the system.
18    Q  So it's a possibility that if we have hard copy of
19  the Class system it may not show pop-up boxes?
20    A  It's possible.
21    Q  And what you put in pop-up boxes were explanations?
22    A  Yes.
23    Q  Okay. For the table, for –
24    A  Yes
25    Q  – data and the table?

**Page 83**

1    A  Yes.
2    Q  Have you ever seen any printouts for pop-up boxes?
3    A  No.
4    Q  Looking at the next one, "Prior to including an
5  issue attached to a particular work paper the issue must be
6  discussed with the senior assigned to review the audit area
7  for concurrence," in your understanding, what does that mean?
8    A  An associate should have talked with a senior to
9  tell them that they were creating an issue.
10    Q  What is an issue?
11    A  An issue is something that an associate wants to
12  flag to the senior.
13    Q  Why?  Why does an associate want to flag the issue
14  to the senior?
15    A  It could be something that is – I don't know how
16  to say it – of significance, that it's something that's
17  significant during the audit.
18    Q  How about giving me an example?
19    A  If I found a – during 1996 in accounts payable, if
20  I would have found an invoice that was not recorded
21  correctly, I would propose an issue for it to flag it to my
22  senior.
23    Q  In accounts payable that was not paid correctly?
24  I'm sorry.
25    A  That was not recorded as a payable.

**Page 84**

1    Q  Was there a materiality threshold, or any accounts
2  payable?
3    A  There was a materiality threshold
4    Q  So if it was within the materiality threshold and
5  it wasn't invoiced – not recorded properly, you would pass
6  that on to your senior?
7    A  Yes
8    Q  How would you pass it on to your senior?
9    A  I could have spoke with the senior directly, or I
10  could have created an issue. and he would have seen that when
11  he was reviewing my work.
12    Q  If you speak with the senior directly, is there any
13  record of the issue?
14    A  No.
15    Q  So you could have found an issue and not recorded
16  it, just spoke to the senior about it informally?
17    A  Yes.
18    Q  Are there any issues which must be recorded?
19    A  What we consider critical matters
20    Q  What are critical matters?
21    A  Again, something of significance that the manager
22  should review
23    Q  So if there's an issue that you and your senior do
24  not resolve, it is recorded as critical matter?
25    A  It's documented as a critical matter, yes.

KRISTEN LEE HEINLEIN         Multi-Page™  ALLEGHENY HEALTH EDUCATION...

Page 85

1    Q  Do you ever informally talk with a manager about an
2  issue and not record it?
3    A  Yes.
4    Q  When do you do that?
5    A  During audit procedures.
6    Q  Why would that not be considered critical matter as
7  you just described it?
8    A  Manager may not think it's a critical matter.
9    Q  So a manager tells you whether or not something is
10  a critical matter?
11    A  Yes. Yes.
12    Q  Okay. I'm a little bit lost in the procedure,
13  then. I got the understanding that if you and your senior do
14  not -- are not able to resolve an issue and you're taking it
15  to the manager, at that point, it is recorded. And I think
16  what you just told me was different.
17        So why don't you tell me what the procedure is if
18  you and your manager cannot or do not resolve an issue.
19    A  My manager and I or my senior and I?
20    Q  You and your senior. Did I misspeak? I'm sorry.
21    A  We could discuss it with the manager first before
22  creating a critical matter, or we could create a critical
23  matter in the system.
24    Q  Typically, what did you do? Which order did you
25  do?

Page 86

1    A  I don't remember.
2    Q  With respect to the AHERF engagement 1996 and 1997,
3  and distinguish if your procedures changed, what were your
4  procedures with respect to issues, presenting them to seniors
5  and then presenting them to managers. Take me through the
6  process specific to AHERF, specific to Fiscal '96 and '97.
7        MR. BARRON: The problem with that question is it
8  assumes that there was a process.
9        BY MS. PAPPAS:
10    Q  What was your practice?
11        MR. BARRON: Well, that assumes that there was a
12  practice, too. I'm not certain that that assumption is
13  warranted by what she has told you already.
14        MS. PAPPAS: This witness is articulate. She'll
15  tell me that.
16        THE WITNESS: I really don't have a practice. I
17  think it depended upon the situation.
18        BY MS. PAPPAS:
19    Q  Okay. Under what circumstances would you do what?
20  Give me your examples?
21    A  If it was a search item, as I mentioned before, I
22  would pass to the senior, and we would not deem that a
23  critical matter. We probably did not talk to the manager
24  about it first. We may have put it as a critical matter in
25  the database. And all that depended on the situation.

Page 87

1    Q  What's a search item?
2    A  Something that I found that was not accrued for,
3  recorded as a payable.
4        BY MR. deLACY:
5    Q  That was the example you used before, correct?
6    A  Yes. Correct.
7        BY MS. PAPPAS:
8    Q  So you take it to your senior. If the senior and
9  you could not resolve it, what would you do? AHERF 1996-1997
10  fiscal.
11    A  I don't remember. We could have spoken to the
12  manager informally. We could have put it in an issue. It
13  would not have been a critical matter issue, though.
14    Q  Not until the manager said it was a critical
15  matter?
16    A  Correct.
17    Q  Okay. Let's take 1997. In 1997, did you work on
18  accounts receivable --
19    A  Yes
20    Q  -- for AHERF?
21    A  Yes.
22    Q  And that was for all AHERF entities, correct?
23    A  Yes.
24    Q  With respect to issues in accounts receivable at
25  AHERF in 1997, who was your senior?

Page 88

1    A  Christa Porter.
2    Q  Who was the manager to whom you take this up with?
3    A  Amy Frazier.
4    Q  In view of your relationship at the time with
5  Christa Porter and with Amy Frazier, if you found what you
6  considered -- what would you consider, first of all, to be an
7  issue in accounts receivable in Fiscal '97 with respect to
8  AHERF?
9    A  Something that was significant that I found during
10  my auditing procedures or was brought to my attention.
11    Q  And what would be significant with respect to
12  accounts receivable? And if you have a specific example of
13  what you thought was an issue in 1997, go ahead and tell me?
14    A  A $50 million transfer.
15    Q  That you considered to be an issue?
16    A  Yes
17    Q  And with respect to that $50 million transfer, what
18  did you do? We're talking from Graduate to Delaware Valley,
19  correct?
20    A  Yes
21    Q  Okay.
22    A  I received -- I learned about the 50 million from
23  Amy Frazier. I inquired of management for journal entries
24  and the allocation between which hospital entities it was
25  going to, and then I documented my results of my findings.

Page 89

1    Q  What was the issue?
2    A  I put my information in an issue to flag to Christa
3  and to Amy what I had found out.  I didn't relate it -- I
4  didn't categorize it as a critical matter.  That was my work-
5  in-process issue.
6    Q  I'm sorry.  I don't understand the last part.  I
7  think you said you did not categorize it as a critical issue
8  but rather as a work-in-process issue?
9    MR. McDONOUGH:  Critical matter.
10    MS. PAPPAS:  I'm sorry.
11    BY MS. PAPPAS:
12    Q  Critical matter, but rather as a work-in-process
13  issue?
14    A  Yes.
15    Q  Explain that, please.
16    A  When I was researching the $50 million, I put
17  everything in an issue so I had it in one place in the
18  database.  And we can -- our issues, we can categorize them
19  as critical matters, point forwards.  We can give a
20  description of the issue.
21    So there can be different issues for different type
22  of situations, a critical matter, an undetected error, a
23  point forward, for example.
24    Q  A point --
25    A  Point forward for next year.  A point forward,

Page 90

1  something that we learned during this audit that's going to
2  relate to next year's audit.
3    Q  Okay.  So you characterize something as an issue
4  within the Class database?
5    A  Yes.
6    Q  And it's actually something you click on, or
7  something, saying "issue"?
8    A  Yes.
9    Q  Okay.  And then they ask you what category of
10  issue?
11    A  Yes.
12    Q  And your categories of issues would include point
13  forward, critical matter -- you said another one.  I'm sorry.
14    A  Undetected error.
15    Q  Undetected error.  Did you also say work-in-
16  progress?
17    A  I didn't categorize my issue.  I left it blank when
18  I created my issue.
19    Q  All the time or just this particular time with 50
20  million?
21    A  This particular time.
22    Q  How come you didn't characterize it?
23    A  It was my work-in-process.  I was just putting
24  information in that issue.
25    Q  Okay.  So Amy tells you about $50 million.  You

Page 91

1  then put it into an issue?
2    A  Yes.
3    Q  How soon after you spoke to Amy?
4    A  I don't know how soon after.  It was during year-
5  end field work.
6    Q  Did Amy tell you to put it into an issue?
7    A  No.
8    Q  Did you talk it over with your senior?
9    A  Not that I remember.
10    Q  Did you discuss it with Amy?
11    MR. BARRON:  What's the "it" --
12    MS. PAPPAS:  The $50 million and the fact that they
13  were putting into issue.
14    THE WITNESS:  I don't think so.
15    BY MS. PAPPAS:
16    Q  Did Amy or anybody instruct you on how to
17  categorize it as an issue?
18    A  No.
19    Q  Staying with issues and what is done with issues
20  and staying with the $50 million, what then happened to it
21  after you put it into an issue?  Do you know?  Did Amy
22  instruct you to make it a critical matter?
23    A  I don't remember.
24    Q  You don't recall?
25    A  I don't recall.

Page 92

1    Q  What do you recall about what happened to that
2  issue after you put it into the database?
3    A  I put it into the database, included the
4  information that I found, and that's the way I left it.
5    Q  Now, you've described a process with respect to
6  issues by which you'd take it and either informally present
7  it to your senior or formally present it to your senior.  Was
8  this a formal presentation to your senior by putting it into
9  the database?
10    A  No.  It was informal.
11    Q  Informal.  Okay.  How was it presented to your
12  senior?  You said you didn't talk to Christa about it.  What,
13  if anything, was her notification of this issue?
14    A  When she reviewed my work papers, she would have
15  seen the issue.
16    Q  You didn't bring it up with her?
17    A  I don't remember if I specifically told her I
18  created an issue or not.
19    Q  Whether or not you told her you created an issue,
20  do you recall discussing the issue?  Whether identified as an
21  issue or not, do you recall discussing the issue that you
22  created with respect to $50 million with Christa?
23    A  I discussed $50 million with Christa.  I don't know
24  if I discussed it as an issue.
25    Q  Did you and Christa come to any resolution with

Page 89 - Page 92



KRISTEN LEE HEINLEIN               Multi-Page™  ALLEGHENY HEALTH EDUCATION...

Page 93

1  respect to the $50 million?
2      A  No.
3      Q  What happened then?  Did you and Christa take it to
4  Amy?  What happened?
5      A  Amy was involved in the process of me learning
6  about the $50 million.  I shared the information with Christa
7  and with Amy that was in my issue, but after that I'm not
8  sure what transpired with the $50 million.
9      Q  Do you know how the issue -- if the issue was
10  resolved and how?
11      A  I don't know.
12      Q  What was the $50 million issue?
13          MR. BARRON:  Are you asking about what the document
14  that she put into the system was?
15          MS. PAPPAS:  No.  I'm asking her what was the
16  issue.
17          MR. McDONOUGH:  Yeah.
18          MR. BARRON:  But that's what's confusing.
19          MR. McDONOUGH:  We got to use "issue" the right
20  way, then. because you're using it generically.  I appreciate
21  that, but it has also got a definition here  So when you
22  say, "What was the $50 million issue?" we would like you to
23  distinguish between "issue" meaning what was the deal, what
24  was the subject versus what was the "issue" meaning the
25  created document by Christa.

Page 94

1          BY MS. PAPPAS:
2      Q  What's your definition of "issue"?  What
3  constitutes an issue that you would either record or discuss
4  informally?
5      A  Something that was significant occurring within the
6  entity.
7      Q  What was significant with respect to the $50
8  million?
9      A  Fifty million dollars.  It was a large, significant
10  transaction within AHERF.
11      Q  Why was it a large significant transaction with
12  respect to AHERF?
13      A  It was brought to my attention by Amy to research
14  the transaction.
15      Q  Okay.  And my question was why was it a significant
16  transaction?  You said, "It was brought to my attention by
17  Amy to research the transaction."  I'm not sure that's
18  responsive.  Is it?  And if so, how?  Does it become
19  significant because Amy brought it to your attention to
20  research?
21      A  Yes.
22      Q  Okay.  So Amy bringing it to your attention to
23  research was the flag by which you classified it as an issue?
24      A  As to created a document or whether I thought it
25  was a significant transaction?

Page 95

1      Q  Correct.  The latter.
2      A  Because Amy brought it to my attention.
3      Q  Did Amy tell you to make it an issue?
4      A  She told me to research the $50 million.
5      Q  When did Amy first bring this to your attention?
6      A  During year-end field work, which would have been
7  August.
8      Q  August of '97?
9      A  Yes.
10      Q  Now, August of '97 is the first time you ever heard
11  of the 50 million or any component of it?
12      A  Yes.
13      Q  With respect to issues other than the $50 million,
14  were you typically involved in the resolution?
15      A  No.
16      Q  Okay.  So you would bring issues -- typically, you
17  would bring issues to the attention of your senior, and if
18  you and the senior could not resolve it, it would be brought
19  to the attention of the manager; is that correct?  We're now
20  talking about issues typically.
21          MR. BARRON:  Here's the problem with this word
22  "issue" -- and it's coming back again and again in the
23  questioning -- is that "issue" has two different meanings.
24          There is "issue" meaning something needing to be
25  resolved, and there is an "issue" meaning a document as

Page 96

1  defined in the Class system that is put into the system.
2          An "issue" in the second definition; that is, a
3  document reflecting her research on the $50 million matter
4  that went into the system does not necessarily present an
5  issue as we more generally understand it for resolution.  It
6  may be just information
7          BY MS. PAPPAS:
8      Q  "Issues" as used on the fifth bullet point on
9  Exhibit 444, I believe, is that being used -- given Frank's
10  distinction between "issue," what is the definition as it is
11  being used there?
12      A  Here?
13      Q  Yes, the fifth bullet point.
14      A  My understanding of this fifth issue is that it
15  would have been something that I would have discussed with
16  the senior.  We did a formal issue, written document, that we
17  would present to the manager.
18          BY MR. deLACY:
19      Q  And it would be included in the Class system?
20      A  Yes.
21      Q  As an issue within the Class system meaning of
22  "issues," correct?
23      A  Yes.
24          MR. BARRON:  A document.
25          THE WITNESS:  A document.

Page 93 - Page 96

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                        )
                                         )
ALLEGHENY HEALTH EDUCATION               )
AND RESEARCH FOUNDATION                  )  File No P-259

WITNESS:  Kristen Lee Heinlein

PAGES:   1 through 290

PLACE:   United States Attorney's Office
         United States Post Office and Courthouse
         Seventh and Grant Street
         Pittsburgh, Pennsylvania

DATE:    Friday, September 15, 2000

     The above-entitled matter came on for hearing at 9:26
a.m., pursuant to notice

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     CATHERINE PAPPAS, ESQ.
     KEVIN deLACY, ACCOUNTANT
     Securities and Exchange Commission
     Philadelphia District Office
     601 Walnut Street, Suite 1005E
     Philadelphia, PA  19106-3322
     (215) 597-3100

On behalf of the Witness:

     DAVID M  HOWARD, ESQ.
     MATTHEW S. MINER, ESQ.
     Deckert, Price & Rhoads
     4000 Bell Atlantic Tower
     1717 Arch Street
     Philadelphia, PA  19123
     (215) 994-2218
     (215) 994-2222

---

Page 3

C O N T E N T S  (Continued)    :

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 615 | Multi-page document, Bates CHP 112 to 116 | 252 |
| 616 | Multi-page document, Bates PMC 11837 to PMC 11855 | 266 |

---

Page 2

C O N T E N T S

| WITNESS: | | EXAMINATION |
|---|---|---|
| Kristen Lee Heinlein | | 4 |
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 601 | Business card | 5 |
| 602 | Multi-page document | 34 |
| 603 | Multi-page document, Bates PMC 33000 through PMC 3300 | 67 |
| 604 | Multi-page document, Bates CHP 1 through CHP 7 | 36 |
| 605 | Multi-page document, Bates PMC 33010 to PMC 33013 | 73 |
| 606 | Review comment, Bates CHP 28 | 99 |
| 607 | Multi-page document, Bates CHP 66 through CHP 72 | 131 |
| 608 | Multi-page document, Bates CHP 73 to CHP 77 | 142 |
| 609 | Multi-page document, Bates CHP 92 to CHP 86 | 151 |
| 610 | Multi-page document, Bates CHP 78 through CHP 81 | 157 |
| 611 | Single-page document, Bates TEN 544 | 198 |
| 612 | Two-page document, Bates DBRRS 61 and 62 | 202 |
| 613 | Multi-page document, Bates PMC 12235 to 12237 | 205 |
| 614 | Single-page document, Bates PMC 12234 | 212 |

---

Page 4

1          P R O C E E D I N G S
2       MS. PAPPAS:  Ms Heinlein, my name is Cathi Pappas
3   I'm an attorney with the Securities and Exchange Commission
4   With me today is Kevin deLacy  He is an accountant with the
5   Securities and Exchange Commission
6       Are you on any medications or anything else that
7   would affect your truthful testimony today?
8       THE WITNESS:  No.
9   Whereupon,
10          KRISTEN LEE HEINLEIN
11  was called as a witness and, having been first duly sworn,
12  was examined and testified as follows:
13      MS. PAPPAS:  All your answers must be verbal, as
14  you know.  To the extent if you don't understand a question,
15  say so, and we will repeat it or rephrase it accordingly.
16      If you answer a question, we will both presume
17  you've heard it and understood it.  Do you understand that?
18      THE WITNESS:  Yes.
19          EXAMINATION
20  BY MS. PAPPAS:
21  Q  Your name, for the record?
22  A  Kristen Lee Heinlein.
23  Q  Is your present address still 108 Williams Street?
24  A  Yes.
25  Q  You've given me -- when we marked this as Exhibit

---

Page 5

1  601 -- your new business card with Himark Life and Casualty
2  Group. That is your new place of employment?
3      A. Yes.
4              (SEC Exhibit No. 601 was marked for
5          identification.)
6      BY MS. PAPPAS:
7      Q. Why did you leave Coopers?
8      A. I wanted a change.
9      Q. Was there any disciplinary reason for you leaving?
10      A. No.
11      Q. And were you asked to leave?
12      A. No.
13      Q. What do you do at Himark?
14      A. Manager in the Finance Department. I'm the manager
15  of cash management.
16      Q. You said manager?
17      A. Yes.
18      Q. Okay. And what did you do in that position?
19      A. I manage seven people. I manage the cash in-flows
20  and out-flows as well as the investment activity.
21      Q. Investment in what?
22      A. Stocks, bonds, equities.
23      Q. Are you doing the accounting for the cash flow?
24      A. Yes
25      Q. Okay. Are you doing the accounting for the

Page 6

1  investments?
2      A. Yes.
3      Q. Do you do any other accounting activities?
4      A. We are a third-party processor, so I bill our
5  customers.
6      Q. You also doing the billing, then -- the accounting
7  in accounts receivables?
8      A. Yes.
9      Q. Okay. And are you doing the accounting for the
10  accounts receivables?
11      A. Yes.
12      Q. And you're the head of the group that is doing
13  these things?
14      A. I'm the manager. I have a director above me.
15      Q. Okay. And the director is responsible for several
16  different groups, not just yours, correct?
17      A. Correct.
18      Q. Okay. Any other areas that you are in charge of
19  other than third-party -- below your director, obviously,
20  other than the third-party billing, cash and the investment
21  areas?
22      A. No.
23      Q. And how long have you been there? When did you
24  start there?
25      A. I started May 22nd.

Page 7

1      Q. Of 2000, correct?
2      A. Yes.
3      Q. Are you still in contact with anybody from Coopers?
4      A. Yes.
5      Q. With whom? Is it a short list?
6      A. Pretty short.
7      Q. Okay. Who are you in contact with?
8      A. Dione Graswick, Debby Wisniewski, Jim McIntire,
9  Barb Toy, Pam Bowser.
10      Q. Okay. The first name you gave --
11          MR. HOWARD: Wait a second. Is that it?
12          MS. PAPPAS: I'm sorry.
13          THE WITNESS: Yes.
14          MS. PAPPAS: I assumed when you paused --
15          MR. HOWARD: Okay. She was still looking.
16          MS. PAPPAS: My fault.
17          BY MS. PAPPAS:
18      Q. Wisniewski. Can you spell the last name?
19      A. W-i-s- --
20      Q. n-e-w?
21      A. n-i-e-w-k-s-i.
22      Q. Okay. And the first name you gave us?
23      A. Debby.
24      Q. No. I'm sorry. The first -- before Debby you gave
25  us a name.

Page 8

1      A. Dione.
2      Q. What was the last name?
3      A. Graswick.
4      Q. That's it.
5      A. G-r-a-s-w-i-c-k.
6      Q. Okay. Jim McIntire, M-c-I-n-t-y-r-e?
7      A. t-i-r-e.
8      Q. Toy was the next one, someone Toy?
9      A. Barbara.
10      Q. T-o-y?
11      A. Mm-hum.
12      Q. Okay. Is that a "Yes"?
13      A. Yes.
14      Q. And the last one was Bowser?
15      A. Pamela Bowser.
16      Q. B-a-u-s-e-r?
17      A. B-o-u.
18      Q. Okay. B-o-w. I'm sorry. B-o-w-s-e-r.
19      Q. My fault. Of all those, was Jim McIntire the only
20  one with a connection to AHERF?
21      A. Yes.
22      Q. Have you spoken with Jim McIntire about the --
23  aside from what you told us in previous testimony have you
24  spoken with Jim McIntire with respect to AHERF and/or the
25  1997 audit?

Page 9

1    A   He was asking me if I was going to testify again.

2    Q   Okay. And what did you tell him?

3    A   Eventually.

4    Q   Okay. Did you talk about the substance of your

5    testimony?

6    A   No.

7    Q   Okay. Anything else about AHERF with him?

8    A   No.

9    Q   Since your last testimony have you spoken with,

10   aside from counsel, anybody concerning the AHERF matter?

11   A   No.

12   Q   Okay. Any conversations with Amy Frazier or Bill

13   Buettner?

14   A   I saw Bill before I left PWC and told him that I

15   was leaving to pursue a different career path.

16   Q   Did you speak with AHERF at all?

17   A   No.

18   Q   Did you speak about your testimony before the staff

19   at all?

20   A   No.

21   Q   Did you speak about your -- I'm sorry. Have you

22   seen Amy Frazier since your last testimony?

23   A   No.

24   Q   How about Christa Porter?

25   A   No.

Page 10

1    Q   And have you spoken with Christa Porter about AHERF

2    since your last testimony?

3    A   No.

4    Q   Mark Kirstein. Same question. Have you seen or

5    spoken -- seen Mark Kirstein or spoken with Mark Kirstein

6    since your last testimony?

7    A   No.

8    Q   Is there anything from your last testimony, given

9    the intervening time, your new counsel and/or anything that

10   you've remembered that you'd like to restate or change since

11   your last testimony?

12   A   I've reviewed new documents, and I've realized that

13   I knew about the $50 million before August. So my chronology

14   was incorrect. And by reviewing this document, I now realize

15   that I deleted the issue.

16   Q   Meaning hard delete, as we used before, or soft

17   delete, meaning marked for deletion?

18   A   Both. You have to mark a deletion before you can

19   hard delete.

20   Q   Okay. And you actually did the hard delete, is

21   your recollection?

22   A   Yes.

23   Q   And we are talking about the $50 million issue?

24   A   Yes.

25   Q   Okay. Is there any other documents that you

Page 11

1    reviewed that helped you refresh your recollection?

2    A   No.

3    Q   What is it that makes you --

4    MR. HOWARD:  Wait a second. That assumes that her

5    recollection has been refreshed, and I don't think she said

6    that her recollection has been refreshed on both of those

7    issues -- on both of those matters, I should say.

8    MS. PAPPAS:  Okay.

9    BY MS. PAPPAS:

10   Q   What has been changed since your last testimony?

11   A   I've seen the issue document.

12   Q   And that issue document caused what? Seeing the

13   issue document caused what?

14   A   Me to know that I knew about the 50 million before

15   August and that I hard deleted the document.

16   Q   Okay. So on both those matters, the hard delete

17   and knowing about it in June of 1997 you have -- it has

18   refreshed your recollection, correct?

19   A   On those two points.

20   Q   Okay. I'm not sure where I went wrong on that, but

21   on those -- what was it with respect to the issue document

22   that refreshed your recollection with respect to the hard

23   delete?

24   A   I remember Christa Porter talking to me about my

25   issue document, saying that I should put the information into,

Page 12

1    a work paper and that I no longer needed the issue document,

2    that Amy Frazier would deal with the rest of the information.

3    Q   Okay. Why don't you take me through the steps that

4    you took to change -- well, and you're saying "hard delete,"

5    but I'm thinking maybe what you're -- how are you making an

6    issue a work paper? Is that, essentially, what you did?

7    A   Yes. I copied and paste my information on the

8    issue --

9    Q   Into a new work paper?

10   A   Into a work paper.

11   Q   Okay. So you've created a work paper at this

12   point?

13   A   Yes.

14   Q   And then what did you do with the -- you cut/paste,

15   as you would in WordPerfect or Word, correct?

16   A   Yes.

17   Q   Okay. And what, then, happened to the issue?

18   A   I deleted it.

19   Q   Were you an owner of the database?

20   A   No.

21   Q   How did you delete it?

22   A   I marked it for deletion -- I now remember

23   that -- in CLASS, you can hard delete your own documents.

24   Q   Okay. So whether you're an owner or not, you

25   can -- owner of the database, as we discussed before, you can

**Page 13**

1  hard delete from the database documents that you created?
2     A  That I created only
3     Q  And what is it between then or your earlier
4  testimony and now that refreshed your recollection that you
5  deleted it?
6     A  Just by seeing the document and going through in my
7  mind what happened.
8     Q  Have you spoken to anybody from Coopers or
9  PriceWaterhouse on this point?
10     A  No.
11     Q  What was the key function, if you recall, to delete
12  your own document when you're not an owner?  Do you remember?
13     A  I know that there's a mark for deletion.
14     Q  Right.  Box?
15     A  A Box.  And then I -- again, I would be speculating.
16  I don't remember what my keystrokes were to delete it.
17     Q  But you could actually type something in, and it's
18  gone from the database is your recollection?
19     A  If I type it into a document, I could back space
20  and delete something.  Is that what you mean?
21     Q  I'm sorry.  Bad question.  I meant the document
22  itself, the issue itself.  It is your recollection that you
23  could actually do something on your keyboard, and as long as
24  you created the document it would be gone from the database?
25     A  Yes.

**Page 14**

1     Q  Okay.  And if you did not create it, you would not
2  be able to do that?
3     A  Not that I remember, no.
4     Q  Do you know whether you did that to any other
5  documents, other than review comments, perhaps, that you
6  created during the -- that you created during the 1997 audit?
7     A  I don't remember.
8     Q  Okay.  You don't remember doing it, or you don't
9  remember either way?
10     A  I don't remember either way.
11     Q  Do you recall whether -- now, I did limit it from
12  review comments.  Do you know whether you ever deleted, hard
13  deleted, review comments?
14     A  Not that I remember, no.
15     Q  Now, I asked you did you speak to anybody from
16  PriceWaterhouse or Coopers, and your response was no on this
17  point.  Let me ask that a little bit broader.  Other than
18  your counsel, aside from your counsel, have you spoken to
19  anybody that helped refresh your recollection on that hard
20  delete point?
21     A  No.
22     MS. PAPPAS:  Okay.  Why don't we proceed.  Kevin is
23  going to be asking most of these questions, and I'll fill in
24  as needed.
25     BY MS. PAPPAS:

**Page 15**

1     Q  Last testimony you identified or you stated that
2  you gave a group of documents to your recollection I believe
3  was Christa and/or Amy, and it was for a meeting that you
4  thought was to be with Hoover, Kirstein, Buetner -- Hoover,
5  Buetner, Kirstein and Frazier.  Is that in accordance with
6  your recollection?
7     A  Yes.
8     MS. PAPPAS:  Let me show what you has been marked
9  as Exhibit 519.  Look at this packet of documents.  To the
10  extent it matters, we found this group of documents in what
11  was identified as Hoover's personal files.  I believe they
12  were consecutive in numbering.  I believe there may have been
13  a rubber band around them, though I'm not absolutely certain
14  on that point.
15     BY MS. PAPPAS:
16     Q  Is this the packet of documents that you provided
17  for the meeting?
18     MR. HOWARD:  Are these Bates-numbered
19  consecutively?
20     MS. PAPPAS:  I think they are.  I didn't re-check
21  them this morning, but my recollection is they are.
22     MR. HOWARD:  So it's PWC 0153209 --
23     MS. PAPPAS:  Correct.
24     MR. HOWARD:  -- through 153265?
25     MS. PAPPAS:  Yeah.  Kevin, would you just double

**Page 16**

1  check that as she's looking in terms of consecutive?  It
2  looks like they are, and that's my recollection.
3     (The witness examined the document.)
4     THE WITNESS:  I think I did -- I think this was my
5  packet, yeah.  I don't remember the fund report.
6     MS. PAPPAS:  Okay.  Use Bates numbers, if you will,
7  when you don't remember something, meaning the bottom right.
8     THE WITNESS:  PWC?
9     MS. PAPPAS:  Yeah.
10     THE WITNESS:  0153252.
11     BY MS. PAPPAS:
12     Q  You don't remember including that in a packet, or
13  you don't remember --
14     A  I don't remember if I did this.
15     Q  Okay.  And the items you provided were things you
16  did?
17     A  That I gathered the information for.
18     Q  What I'm trying to understand is are you saying
19  you're not sure whether the packet included in 153252 to
20  153258 you're not sure of?
21     MR. HOWARD:  Can I just suggest that it might be a
22  good idea, just because I think the record is already
23  confused, to break it down per page?
24     MS. PAPPAS:  Well, okay.  I think this is a group
25  of documents that you provided.  But if you want to go by

Page 13 - Page 16