TAB 230

DEPOSITION
EXHIBIT
4444
6-10-01

# AHERF

Allegheny Health, Education and
Research Foundation

D.L. Clark Building, 4th F.
Pittsburgh, Pennsylvania 15

*Memorandum*

*[handwritten: No Severance Costs / Compliance Issues / Capitalization of Losses for MT / Signal for discontinued operation / intent - closure]*

TO          Charles P. Morrison
            Senior Vice President and CFO, Delaware Valley

FROM        Daniel J. Cancelmi
            Senior Director, Financial Services

DATE        June 20, 1997

SUBJECT     Intangible Assets on the Graduate Entities

As a result of the SDN/AHERF acquisition purchase price adjustments recorded on the various Graduate entities, significant intangible assets have been capitalized and reflected on the various Graduate balance sheets. These intangible assets, which amount to $191.0 million, will be amortized to expense over a 35 year period. Despite the fact that the ensuing amortization of these intangible assets will burden future earnings, several attractive features of capitalizing these intangibles are that (i) we have been afforded the opportunity to establish substantial amounts of reserves on the respective Graduate balance sheets and (ii) the unrestricted deficits of the Graduate entities were eliminated before the Graduate balance sheets came into the AHERF system on May 1, 1997. Accordingly, AHERF's unrestricted net equity has not been reduced by Graduate's net deficit balances.

Due to the unusual nature of these intangible assets, the following information summarizes the principal components of the intangible assets that have been capitalized.

(\$ in 000)

| | Graduate Hospital | Mt. Sinai Hospital | Rancocas Hospital | City Ave Hospital | Parkview Hospital | Total |
|---|---|---|---|---|---|---|
| Net unrestricted deficit as of SDN acquisition date | $ --- | $30,347 | $ --- | $12,548 | $8,365 | $51,260 |
| Bad debt reserves for DV A/R | 20,000 | 9,000 | 9,000 | 8,000 | 8,000 | 50,000 |
| Net unrestricted deficit as of AHERF system entry date (5/1/97) | 21,865 | 5,720 | 1,252 | 10,035 | 10,625 | 49,535 |
| Amount paid to acquire various HSI subsidiaries | 2,000 | --- | --- | --- | --- | 2,000 |
| Amount paid on 11/1/96 for HSI technology | 2,400 | --- | --- | --- | --- | 2,400 |
| Note payable for HSI technology | 9,600 | --- | --- | --- | --- | 9,600 |
| Estimated loss on disposal of Mt. Sinai | --- | 5,046 | --- | --- | --- | 5,046 |
| Estimated loss on disposal of Zurbrugg facility | --- | --- | 5,000 | --- | --- | 5,000 |
| Additional amounts payable reserves | 5,000 | 1,500 | 2,000 | --- | --- | 8,500 |
| SSMOB deficit | 1,896 | --- | --- | --- | --- | 1,896 |
| Mt. Sinai recapture gain payment | --- | 2,700 | --- | --- | --- | 2,700 |
| Discounting of $15 million note receivable from GHS | 1,758 | --- | --- | --- | --- | 1,758 |
| Additional workers' comp reserves | 1,300 | --- | --- | --- | --- | 1,300 |
| **Total** | **$55,819** | **$50,323** | **$17,282** | **$30,631** | **$26,990** | **$191,045** |

X 25984



Charles P Morrison
Page 2
June 20, 1997

The estimated annual amortization expense on a consolidated basis associated with the above intangible assets of $191.0 million approximate $5 5 million based on a 35 year life

If you have any questions or need additional information, please contact me at your convenience

DJC/jaf

cc     David McConnell
       Bob Mathews
       Al Adamczak
       Matt Dowling
       Anne Kelly
       Neil Luoarsky
       Joe Morkoski
       Chuck Lusman
       Jack Lydon

X 25985

AHERF affiliation analysis
June 30 1997

| | Graduate | Mt Sinai | Rancocas | City Ave | Parkview | Forbes | AVH | total | |
|---|---|---|---|---|---|---|---|---|---|
| Net unrestricted deficit as of SDN acquisition date | 0 | 30 347 | 0 | 12.548 | 8 365 | 0 | 0 | 51.260 | A |
| General reserves | 20 000 | 5 000 | 9 000 | 8.000 | 8 000 | 9 811 | 1 500 | 61,311 | B |
| Additional contingent liability reserves | 5 000 | 0 | 3 000 | 0 | 0 | 0 | 0 | 8,000 | C |
| Net unrestricted deficit as of AHERF system entry date (5/1/97) | 21,865 | 5.730 | 1.282 | 10 083 | 10 625 | 0 | 0 | 49,585 | D |
| Amount paid to acquire various HSI subsidiaries | 2 000 | 0 | 0 | 0 | 0 | 0 | 0 | 2 000 | E |
| Amount paid on 11/1/96 for HSI technology | 2,400 | 0 | 0 | 0 | 0 | 0 | 0 | 2 400 | F |
| Note payable for HSI technology | 9 600 | 0 | 0 | 0 | 0 | 0 | 0 | 9.600 | F |
| Estimated loss on disposal of Mt Sinai | 0 | 5 046 | 0 | 0 | 0 | 0 | 0 | 5.046 | G |
| Mt Sinai severance reserve | 0 | 5 000 | 0 | 0 | 0 | 0 | 0 | 5 000 | G |
| Estimated loss on disposal of Zurbrugg facility | 0 | 0 | 5 000 | 0 | 0 | 0 | 0 | 5 000 | H |
| Accounts payable reserves | 5 000 | 1 500 | 2 000 | 0 | 0 | 0 | 0 | 8 500 | I |
| S.SMOB deficit | 1 896 | 0 | 0 | 0 | 0 | 0 | 0 | 1.896 | J |
| Mt Sinai recapture gain payment | 0 | 2 700 | 0 | 0 | 0 | 0 | 0 | 2.700 | K |
| Discounting of $15 million note receivable from GHS | 1 758 | | | | | | | | |
| Workers Comp reserves | 1 300 | 0 | 0 | 0 | 0 | 4 000 | 1 025 | 6.325 | L |
| LIFO to FIFO policy change | 0 | 0 | 0 | 0 | 0 | 658 | 0 | 658 | M |
| Malpractice IBNR | 0 | 0 | 0 | 0 | 0 | 807 | 0 | 807 | N |
| Increase premium due to captive for retro prem adjustment due to adjustments to reserves | 0 | 0 | 0 | 0 | 0 | 900 | 0 | 900 | O |
| Additional CRA reserve | 0 | 0 | 0 | 0 | 0 | 0 | 1 000 | 1 000 | P |
| Impairments to other current assets | 0 | 0 | 0 | 0 | 0 | 67 | 356 | 423 | Q |
| Health insurance accrual | 0 | 0 | 0 | 0 | 0 | 0 | 102 | 102 | R |
| A/R reserve methodology change | 0 | 0 | 0 | 0 | 0 | 0 | 1,253 | 1,253 | S |
| Uncollectible Foundation Receivables | 0 | 0 | 0 | 0 | 0 | 0 | 438 | 438 | T |
| | 70 819 | 55 323 | 20 282 | 30 631 | 26 990 | 16 243 | 5 674 | 224 204 | |

GW per t/b  170 807

diff relates to entities w/ positive net assets for which PP&E and other non-current assets were written-off against  53,397

X 25986

A  amount traced to 10/31/96 internal trial balances
B  see cushion analysis *below*
C  amount relates to contingent liability reserves recorded during the affiliation related to potential liabilities that were identified during the due diligence process
D  represents principally $40.99 million of restructuring costs recorded while Graduate entities where apart of SDN prior to affiliation with AHERF (see attached analysis)
E  cost to purchase for-profit entities (ie., pmnl shop, Bala Imaging and Advanced Tech Mngmnt)
F  represents cash paid and note signed for technology purchased from HSI, AHERF has deemed this technology worthless and concludes that this amount s/b reflected as excess purchase price and no value s/b assigned to intangible asset of technology
G  amount represents reserves recorded for discontinued operations of Mt. Sinai, write-down of building and severance reserve for approx. 400 employees, noted May & June losses have been applied to reduce the reserves approx. $2.1 million, see discontinued issue for discussion on presentation
H  represents estimated loss for the facility and shutdown losses
I  represents estimate for unrecorded accounts payable amounts during the transition of purchasing/ap systems of approx. 2 to 3 months. amounts have been used for the 2 to 3 months during May and June
J  loss incurred related to the sale of the Church
K  recapture calculation resulted in an unfavorable adjustment for Mt Sinai, all others result in favorable contingent gains. see cushion/reserve/exposure analysis for C&L's position on $7 million of favorable adjustments recorded in 1997
L  reserve adjustments based on a review of the case reserves and adoption of AHERF actuarial assumptions
M  conforming policy change for Forbes to adopt AHERF inventory practices
N  IBNR reserve for Forbes based on review of case reserves and adoption of AHERF actuarial assumptions
O  premium adjustment to Caymen captive based on the results of the actuarial analysis
P  additional general CRA reserve
Q  various write-offs for impaired assets as identified during the due diligence process
R  unrecorded health insurance liability identified during the due diligence process
S  additional reserve required to adopt a balance sheet approach of assessing bad debt reserves consistent with AHERF methodolgies
T  reserve established for AVH Foundation receivables due potential collection issues since the Foundation was not acquired during the affiliation process and remains as a free-standing entity

*[Handwritten notes:]*

61,311

< 25,000> *established for Corp Compliance Reserves* @ the acquired entities

< 14,100> for PFMA see TM (M)

< 7,100 > Reserve for MC Recapture. maybe
15111    aggressive since payor has not certified the amount that such money is likely to be received (ie,

Excess undesignated FAS 5 (contingent gain)

*for value purchase*

Contingencies - I'll does not to take exception but will evaluate the reserve during FY 98 reversal

X 25987

Graduate System Restructuring

| Month | Description | Graduate | Mt. Sinai | Bancobas | City Line | Parkview | Total |
|-------|-------------|----------|-----------|----------|-----------|----------|-------|
| 09/96 | Write-off patient accts > 180 days | 3 000 000 | | | | | ~3 000 000 |
| 09/96 | Write-off physician receivables | 784.626 | | | 82.713 | | 867 339 |
| 09/96 | Write-off insurance receivables | 400.000 | | | | | 400 000 |
| 09/96 | Write-off Dr. MacVaugh receivables | 299.645 | | | | | 299 645 |
| 09/96 | Reserve for physician billing receivables | 234.255 | | | | | 234 255 |
| 09/96 | Cardiology residency billings | 118.643 | | | | | 118 643 |
| 09/96 | Write-off Blackwell Health Center A/R | 60,000 | | | | | 60,000 |
| 09/96 | NIH potential payback | 400.000 | | | | | 400.000 |
| 09/96 | Inventory reserve (10%) | 470.000 | | | | | 470.000 |
| 09/96 | Prudent Buyer/CRA reserve | 2,500.000 | | | | | 2 500 000 |
| 09/96 | Keystone withhold | | | | | 37,604 | 37,604 |
| 09/96 | HSI 10 year amortization | | | | 41,667 | 12,500 | 54,167 |
| 09/96 | Health Partners 1997 deficit | | | | 300,271 | 321,876 | 622 147 |
| 09/96 | Vanguard write-off | | | | | 11 669 | 11 669 |
| 09/96 | Write-off prepaids <$5,000 | | | | 32.533 | 24,722 | 57,255 |
| 09/96 | Organizational costs | | | | 163.889 | 109.259 | 273,148 |
| 09/96 | OHS receivable | | | | 150,000 | | 150,000 |
| 09/96 | Various account balances | | | | 87,094 | | 87,094 |
| 09/96 | College receivables | | | | 102,467 | | 102 467 |
| 12/96 | Write-up Zurbrugg facility | | | (3 273.220) | | | (3,273.220) |
| | | | | | | | 0 |
| | Total Pre-Acquisition Restructuring | 8 267 169 | 0 | (3 273 220) | 960 634 | 517 630 | 6 472,213 |
| | | | | | | | |
| 11/96 | Write-off physician receivables | 18.259 | | | | | 18,259 |
| 12/96 | Medicare billing reserve | | 450 000 | | | | 450.000 |
| 12/96 | Prudent Buyer/CRA reserve | 2 500 000 | | | | | 2 500.000 |
| 12/96 | Prudent Buyer/CRA ($167 x 3 mo ) (Apr-Jun) | 500 000 | | | | | 500 000 |
| 12/96 | Hill Burton reserve | 1 500 000 | | | | | 1 500 000 |
| 12/96 | PFMA (Police & Fire) 06/95 - 11/95 | 1 950 000 | | | | 1 950 000 | 3 900 000 |
| 12/96 | PFMA (Police & Fire) 12/95 - 05/96 | 1 600 000 | | | | 1 600 000 | 3 200 000 |
| 12/96 | PFMA (Police & Fire) 06/96 - 11/96 | 1 750 000 | | | | 1 750 000 | 3 500 000 |
| 12/96 | PFMA (Police & Fire) 12/96 - 06/97 est | 1 750 000 | | | | 1 750 000 | 3 500 000 |
| 12/96 | Pension plan (underfunded Graduate plan) | 1 000 000 | 300 000 | | | | 1,330.000 |
| 12/96 | Malpractice insurance | 1 000 000 | 1 100 000 | | 1,200.000 | 500 000 | 3,800.000 |
| 12/96 | NIH potential payback | 500.000 | | | | | 500 000 |
| 12/96 | Severance payments | 2 015.299 | | | | | 2 015 299 |
| 12/96 | Due diligence costs | 900 000 | 150,000 | 600 000 | 600,000 | 600 000 | 2,850.000 |
| 01/97 | Pension plan (underfunded Graduate plan) | | | | 1 000.000 | | 1,000.000 |
| 01/97 | Medicare billing reserve | | 75 000 | | | | 75 000 |
| 01/97 | Pension plan - AHERF | 1 100 000 | 200 000 | 900.000 | 400.000 | 500 000 | 3 100 000 |
| 01/97 | Write-off construction in progress balances | | | 479 012 | | | 479 012 |
| 02/97 | MA A/R reserve | 1 500 000 | 2 000 000 | | | | 3.500 000 |
| 02/97 | Proceeds from renovations | | | | 2 000.000 | | 2 000.000 |
| 04/97 | Duplicate resident counts | 1 000 000 | | | 153,000 | 153,000 | 1,306.000 |
| | Total Post-Acquisition Restructuring | 20 583 558 | 4 275 000 | 2 979 012 | 4 353 000 | 8,803 000 | 40.993.570 |
| | | | | | | | |
| | GRAND TOTAL | 28 850 727 | 4 275 000 | (294 208) | 5 313 634 | 9,320 630 | 47.465 783 |

X 25988

EXHIBIT (A) #3M ARCCT W/C OF PATIENT ACCOUNTS — amount is included
fully reserves accts > 180 days — in bad debt reserve

(B) Physician Receivables identified during the _____ _
due diligence process as potentially _____
uncollectible & deemed insufficiently __ _____
reserved for By D&T in PYs ____ ___ __ _____

(C) 400K Insurance Receivable — ____ _____
du balances that represented reserves that were
hung up on the balance sheet at time of ___
acquisition. _____ ___ __ _____ _
_____ ___; ____

(D) Represents estimated amount due based on
correspondence received from NIH RE:
misused grant funds

(E) Represents mngmn't's estimate for obsolete inventory
→   valuation reserve was revised during June _____ __

(F) Total 5.5 million recorded @ Graduate for ____
Prudent Buyer / CRA expenses. _____ __

(G) Represents Graduate's equity interest in the
losses of Health Partners treatment is ___
consistent w/ other AHERF entities
w/ an interest.

X 25989

(H) ORGANIZATIONAL COSTS
     amount represents current assets that did
     not have support & where deemed worthless by
     AHERF

(I) OHS RECEIVABLE
     amt deemed in uncollectible receivables
     based on review of the detail

(J) Represents a write-up of the Zurbrugg Facility
     based on AHERF's intent to continue to run
     the Facility   This was to ADJUST (reverse) a
     reserve that had been recorded m PYs
     A subsequent decision was made to
     sell the Facility & an addition reserve was recorded
     after Zurbrugg's entry into the AHERF system in May

(K) MC billing reserve
     subsequent billed as actual payback for
     incorrect billing

(L) Hill Burton Reserve recorded for patients that were
     qualifying however had not been placed through
     the application process – Accounts will be analyzed
     in connection w/ AHERF policy. Reserve remains
     @ 6/30/97 .

X 25990

(M) Represents loss reserves under the Police & Fire contract to fund losses. AHERF has subsequently concluded that the reserve is Not Necessary & the Graduate would not be obligated to Fund. C&L does not concur w/ the clients conclusion & believes a potential liability still exists. AHERF has removed the cushion from Graduate and transferred the cushion to other contingent liabilities. C&L will evaluate the appropriateness of the reserves ~~during~~ all reserve analysis.

*Included w/bad debt*

(N) AHERF elected to fully fund the Graduate DB plan given that they may/probably will elect to terminate the plan. The Funding was paid in 1997 & offset against the reserve.

(O) represent reserve adjustments for AHERF methodologies. case reserves were modified & actuarial analysis based on AHERF's actuaries

(P) Represents insurance reserves that were established and paid based on communicated terminations

X 25991

ⓐ Due diligence costs represents costs charges by AHERF to SAN for non recurring costs associated with the affiliation. Such costs were set up as a payable and have been settled through intercompany transactions

ⓑ AHERF pension plan
$2.7m, City Avenue funded benefits 1/1 for the move to Women's Hospitals C+L noted that this should have been accounted for prospectively significantly in the audited reserve analysis

ⓒ CIP & renovation disposals represent projects that were in process during the affiliation that AHERF has elected to terminate & accordingly w/o any costs capitalized to date.

X 25992

ⓓ The A/R Reserve represents reserves available due to difficulties in billing under new provider #'s for errors in accounts not billed w/in 180 days that would not be w/in statutory time frames. Amts are being collected due to correspondence w/ HMA that this was a unique circumstance & s/b collectible. Reserves recorded of remaining @ 6/30/97 represent undiscovered customs    Note "APPROX" $775K REMAINS @ 6/30 & being used ?

TAB 231

# In The Matter Of:

*OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF*
*ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *GREGORY SNOW*
*July 25, 2003*

---

# *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

SNOW, GREGORY



**LEGALINK®**

A WORDWAVE COMPANY

GREGORY SNOW

Page 21

1  specialized rather than being more generalists
2  in nature. Also, the result we were having was
3  not so much in the form of results but in the
4  form of perception.
5       When I say that, each hospital who
6  may have had their own patient accounting
7  functions prior to that time didn't have it any
8  longer. It was on a centralized corporate
9  basis. Therefore, they wanted to make sure
10  that they had the ability to reach out and
11  touch their patient accounting people, so
12  instead of going with the payor group concept,
13  we went more with a structure that was more
14  organized around specific hospitals or specific
15  entities.
16  BY MR. LUFT:
17  Q.  And again I believe you said this was at the
18  end of calendar year '95 which would have been
19  about midway through fiscal year '96.
20  A.  Yes.
21  Q.  Going back to your first answer, when I asked
22  the question, you said yes in terms of whether
23  it affected patient financial services group's
24  work, so I first want to ask you about the
25  question and ask you if you can expand for me

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 22

1  how it affected the patient financial services
2  group's work.
3  A.  The patient financial services group was
4  dealing with a lot of issues from the past.
5       The patient financial services group
6  inherited a lot of issues from acquisitions,
7  and we were trying to work through those, and
8  it was very difficult; so did we have an effect
9  or was there an effect on the results at the
10  time? I believe we had gone through and had
11  identified various accounts, various groupings
12  of accounts, that we felt were not viable or
13  could not be liquidated at that point in time,
14  and had presented them to senior management
15  earlier in calendar year 1995, and it was a
16  drag on the results but, at the same time, we
17  were told there was nothing we could do about
18  them.
19  Q.  And the question I asked, Mr. Snow, I asked
20  about how the lack of depth of the individuals
21  who you had working for the patient financial
22  services group affected the work PFSG was
23  doing. Could you speak directly to that
24  question?
25  A.  Sure. We had to overcompensate by hiring

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 23

1  additional individuals, by increasing our costs
2  to make up for certain deficiencies within the
3  organization.
4  Q.  I think you went on to discuss that as you got
5  to know your staff a little better, you sort of
6  adapted your approach to better fit their
7  abilities. Is that a fair statement?
8  A.  Yes.
9  Q.  Did you also bring in any new people you felt
10  would be better leaders for these people?
11  A.  Yes.
12  Q.  Who were those people?
13  A.  Russell Laing, who was the head of financial
14  reporting; Laura Franz, who was the head of, I
15  believe, head of inpatient collection, Dan
16  Theory for outpatient; a Maureen Slater for
17  billing; Linda Bond for customer service.
18       That's all I remember. I don't
19  remember any more.
20  Q.  Now, midway through fiscal year 1996 when you
21  sort of readapted your strategy to better suit
22  your personnel, did this new strategy lead to
23  an improvement on the problems caused by this
24  lack of depth?
25  A.  I believe it helped, but at the same time, I

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 24

1  don't believe we achieved the level of results
2  that we were ultimately looking for.
3  Q.  But from a personnel standpoint, this new
4  strategy was an improvement over what you had
5  initially implemented?
6  A.  Yes.
7  Q.  And with this improvement, did you expect the
8  results of the patient financial services group
9  to improve?
10  A.  Yes.
11  Q.  Now, I know as the head of the patient
12  financial services group that I assume everyone
13  reported to you at the end of the day.
14       How many people directly reported to
15  you, Mr. Snow?
16  A.  I don't remember the exact number, but it was
17  somewhere in the range of eight, eight or nine.
18  Q.  And who did you directly report to?
19  A.  Joe Dionisio.
20  Q.  Did you ever --
21       Were you ever charged with giving
22  reports to anyone besides Mr. Dionisio?
23  A.  I would copy various people on reports, but
24  everything went to Joe directly.
25  Q.  Let me move back to something which I just

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

Page 25

1    forgot to sort of tidy it up.
2         How long were you at AHERF?
3    A.   From May of 1995 through November of 1998.
4    Q.   And why did you leave AHERF in November of '98?
5    A.   I had received a call from my prior employer
6    who was asking if I was interested in
7    returning, and also AHERF was having economic
8    issues at the time, and it was a very good
9    opportunity that I could not pass up.
10   Q.   Okay. While you were at AHERF and in the
11   patient financial services group, who evaluated
12   your job performance?
13   A.   Joe Dionisio.
14   Q.   And how did Mr. Dionisio evaluate your
15   performance to the extent you're aware?
16   A.   I don't ever remember receiving a performance
17   review, but at the same time I was never
18   informed of any deficiencies in my performance.
19   Q.   Did you tend to get a sense of how Mr. Dionisio
20   felt the patient financial services group was
21   doing just based on oral conversations you had
22   with Mr. Dionisio?
23   A.   I believe that we thought it was performing as
24   well as it possibly could under some adverse
25   circumstances.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 26

1    Q.   Were there certain performance statistics or
2    measures which you or Mr. Dionisio would use to
3    evaluate the performance of the patient
4    financial services group?
5    A.   Yes.
6    Q.   What were some of those performance statistics?
7    A.   Total accounts receivable, total cash, cash
8    collected, days revenue outstanding, and then
9    we had a series of internal evaluations or
10   internal measurements that we had used as far
11   as internal productivity, internal measurements
12   that would mean something to us, but from --
13        It was as an indicator of
14   performance, but it was not something that
15   was -- it wasn't --
16        It was available, but it wasn't
17   widespread. It was more for internal use than
18   anything else.
19   Q.   What were some of those internal measures?
20   A.   How long did it take to get a bill out the
21   door, how long did it take for us to answer a
22   telephone call, what was the value of our daily
23   downloads. We had internal cash reports, we
24   had cash projection reports.
25        There's more, but, I'm sorry, I'm
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 27

1    drawing a blank.
2    Q.   That's fine. Now, how frequently did you
3    monitor these internal measures?
4    A.   Daily.
5    Q.   Daily? And how would you do so? Did you have
6    statistics constantly running tabulating the
7    prior day's figures?
8    A.   Yes, and also there were standardized system
9    reports that were produced by the various
10   billing systems that we would utilize.
11   Q.   And who was responsible for keeping track of
12   what were the numbers and information?
13   A.   I had a financial reporting department that
14   was -- the director in that area was Russell
15   Laing.
16   Q.   Now, the other measures you mentioned which
17   were not internal measures, how often did you
18   monitor those?
19   A.   Monthly.
20   Q.   How would you monitor them?
21   A.   There would be reports published by --
22        We would have --
23        Some of the reports would be
24   published internally and at the same time there
25   were other various reports that were published
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 28

1    by corporate finance.
2    Q.   Now, maybe you can just explain the distinction
3    of the corporate financial department at AHERF
4    and the financial services group at AHERF and
5    what the different responsibilities of the two
6    groups were.
7    A.   I'm sorry. Repeat the question please.
8    Q.   I'm going to break it into two parts. I
9    believe that was a little long.
10   A.   Okay.
11   Q.   First, could you explain the difference between
12   corporate finance at AHERF and the patient
13   financial services group at AHERF.
14   A.   The patient financial services group was the
15   billing and collection or had responsibilities
16   for the billing and collection for the various
17   entities.
18        Corporate finance, I believe it was
19   actually called at the time general accounting,
20   which was production of financial statements,
21   financial monitoring, financial analysis,
22   et cetera.
23   Q.   Now, you mentioned that certain reports were
24   produced by the patient financial services
25   group and certain reports were produced by the
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

7 (Pages 25 to 28)

GREGORY SNOW

Page 29

1    financial accounting office.
2   A.   Yes.
3   Q.   Were these same reports that dealt with a body
4        of information?
5   A.   Yes.
6   Q.   Were these reports overlapping in what they
7        were saying?
8   A.   They were overlapping from a billing and
9        collection perspective, but general accounting
10       produced many, many reports that had absolutely
11       nothing to do with patient financial services
12       group.
13  Q.   Okay. Did the general accounting office have
14       equal access to all the patient financial
15       services group's information that you had?
16  A.   Yes.
17  Q.   Who was the director of the general accounting
18       office while you were there?
19  A.   There were several. When I first started, it
20       was Stephen Spargo and I believe at a later
21       time it was Al Adamczyk.
22  Q.   Who in the general accounting office did you
23       most often deal with?
24  A.   It wasn't any one individual. There were
25       monthly meetings of which we would attend.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 30

1        Most of the direct interaction with the general
2        accounting office took place between Russ Laing
3        and the general accounting office.
4   Q.   Do you recall if you ever had interactions with
5        Mr. Daniel Cancelmi?
6   A.   Yes.
7   Q.   What was Mr. Cancelmi's position?
8   A.   I don't know what his exact title was, but I
9        believe he was like a regional corporate
10       finance --
11           He had a regional corporate finance
12       position. I believe he was responsible for the
13       Philadelphia hospitals from the financial
14       reporting point of view.
15  Q.   Do you recall if he ever produced any memos
16       concerning the billing collections work done by
17       the patient financial services group?
18  A.   Yes.
19  Q.   You mentioned a number of performance
20       statistics. Some of them are written down
21       here. The first one I think you said was total
22       AR.
23  A.   Yes.
24  Q.   Could you just describe what total accounts
25       receivable would constitute.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 31

1   A.   There's two forms of total AR. There is what I
2        would refer to as system AR, in other words,
3        what resides on the billing system itself, and
4        generally speaking, that will be a combination
5        of net and gross accounts receivable; and when
6        I say "gross," it's gross charges versus net
7        receivables being net of any contractual
8        allowances.
9            The systems were not always capable
10       of netting or taking contractuals at the time
11       of final billing for all accounts so,
12       therefore, it was a mixture of the two.
13           Total receivables from a corporate
14       finance or general accounting perspective would
15       be on a net basis, and it would also be net of
16       the reserve for bad debt analysis.
17  Q.   Now, what is a reserve for bad debt analysis?
18  A.   It's an estimation of how much of the
19       receivables that are outstanding that is
20       believed to be uncollectible.
21  Q.   And that was a reserve AHERF kept based on
22       estimations made by the patient financial
23       services group department or the general
24       accounting department office?
25  A.   General accounting.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 32

1   Q.   So the patient financial services group
2        department was not in charge of determining the
3        bad debt reserve for AHERF?
4   A.   No, sir.
5   Q.   Do you know who in the general accounting
6        office was tasked with the job of determining
7        the bad debt reserve for AHERF?
8   A.   I believe it was Mr. Cancelmi.
9   Q.   Okay. Did Mr. Cancelmi consult with you before
10       determining the bad debt reserve to the patient
11       financial services group?
12           MR. TORBORG: Object to the form.
13           THE WITNESS: There was a monthly
14       meeting in which various issues would be
15       discussed, and did we have any input? Again,
16       we would provide --
17           We would attempt to provide input as
18       far as saying yes, we think this is right, or
19       no, we think something is not correct, but the
20       final determination was a general accounting
21       function.
22  BY MR. LUFT:
23  Q.   The next measure you mentioned was total cash.
24       Can you describe what total cash --
25  A.   Total cash was cash collected during the end of

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

8 (Pages 29 to 32)

GREGORY SNOW

Page 33

1    the month.
2  Q.    And can you explain for me how total cash
3    relates to total accounts receivable?
4  A.    Cash collected is a subset of total
5    receivables. There is a time lag or time delay
6    from the time that an account is billed until
7    it's collected, and we had formulas that we
8    used to try to project cash and track income
9    cash, how much was deposited and how much was
10    posted on a daily basis.
11  Q.    Would it be fair to think of it as your
12    accounts receivables, sort of what you're owed,
13    and the cash is what you've already been paid?
14  A.    Cash is what -- the liquidation of AR.
15  Q.    Okay. Next thing you mentioned was days
16    revenue outstanding. Could you describe that
17    to me.
18  A.    It's a measurement to determine how long it
19    takes for a dollar to be collected.
20  Q.    How is that determined?
21  A.    There's various ways of determining it, but
22    typically the standard methodology is to take
23    three months' worth of revenue and divide it by
24    the number of days during that three-month
25    period of time, and whatever the result of that
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 34

1    is, divide that into the total -- into the
2    receivable number, and that will give you a
3    number of days that it takes to collect an
4    account.
5  Q.    And in what ways was the measure of days
6    revenue outstanding, in your opinion, a useful
7    measure of determining the patient financial
8    services group's performance?
9  A.    I don't think it is.
10  Q.    Okay.
11  A.    My bosses thought it was.
12  Q.    Mr. Dionisio?
13  A.    Mr. Dionisio and Mr. McConnell and other people
14    think it's a valid means, but I personally do
15    not, because I think it's a manipulative
16    number.
17  Q.    How so?
18  A.    Because --
19        Are you basing it on gross AR, or are
20    you basing it off of net AR? If you're basing
21    it off net, then who's making the determination
22    about the bad debt reserves? Bad debt reserves
23    is a subjective measurement.
24        Therefore, if I want to make the days
25    look --
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 35

1        If I want to make net days look
2    better, all I need to do is increase my
3    reserves. If I want to make the net days look
4    worse, then I'll decrease my bad debt reserves.
5  Q.    So am I correct then that what you're saying is
6    if you increase your bad debt reserves, you can
7    make this factor look better -- that is the
8    term you used, but --
9  A.    Yes.
10  Q.    And I assume that's better in the eyes of your
11    employers.
12  A.    Yes.
13  Q.    And similarly the opposite, that if you held
14    down your bad debt reserves, this measure would
15    look worse.
16  A.    Yes.
17  Q.    Did any of your superiors that you just
18    mentioned, Mr. McConnell, Mr. Dionisio, and I
19    don't know if you mentioned anyone else, ever
20    express to you why they felt days revenue
21    outstanding was a valid indicator of the
22    patient financial services group's performance?
23  A.    No, not to my knowledge.
24  Q.    Did you ever express to them that you did not
25    believe it was a good indication of the patient
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 36

1    financial services group's work?
2  A.    Yes.
3  Q.    What was their response?
4  A.    I don't remember the specific response, but I
5    believe I was probably summarily dismissed at
6    the time, so --
7        Sorry. I believe it was more duly
8    noted.
9  Q.    Do you recall, and you may have mentioned it
10    before, but do you recall if any other of these
11    performance measures were believed by your
12    superior, Mr. Dionisio or Mr. McConnell to be
13    particularly relevant in determining the
14    performance of the patient financial services
15    group?
16  A.    I cannot speak specifically to Mr. McConnell,
17    but Mr. Dionisio viewed all the measurements as
18    a means of trying to -- an attempt to evaluate
19    our performance from an overall perspective.
20  Q.    Do you know how often Mr. Dionisio reviewed
21    these performance measures?
22        Actually, strike that. Let me break
23    that up into two parts. You mentioned that you
24    reviewed the internal measures daily. Do you
25    know how often Mr. Dionisio reviewed the
MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 113

1  A.  Registration, the registration,
2     precertification, preauthorization. They were
3     very slow to adapt to changes within the
4     marketplace and with the contracts that they
5     had that had been signed for them.
6           There were administrative
7     requirements in those various contracts that
8     the hospitals were not responding to on a
9     timely basis, so, therefore, it affected our
10    ability to collect.
11 Q.  Now, you mentioned changes in the marketplace.
12    Do you recall if during this time period
13    managed care was growing, particularly in the
14    Delaware Valley?
15 A.  Yes. The feeling at that particular point in
16    time managed care markets were generally
17    described on a scale of one to four, one being
18    very little if any managed care penetration,
19    and four being ultimate managed care
20    penetration.
21          Pittsburgh at the time was viewed as
22    being maybe like a one or one and a half level,
23    where Philadelphia was more in the three to
24    three and a half range.
25 Q.  So there was significant managed care
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 114

1     penetration in the Delaware Valley?
2  A.  Very much so. Philadelphia at the time was
3     being compared to other marketplaces like
4     Minneapolis and California as far as the level
5     of managed care penetration.
6  Q.  And there was significant managed care
7     penetration in Minneapolis and California?
8  A.  They were leaders in the country as far as
9     managed care penetration was concerned.
10 Q.  And I think we discussed earlier where there is
11    managed care, you typically receive less
12    reimbursement for the same operation than you
13    would under an indemnification system. Right?
14 A.  You receive less reimbursement and also the
15    administrative liabilities concerned with those
16    contracts is much greater; so, therefore, it's
17    going to result in further reduced payments.
18 Q.  And I think we also discussed earlier that
19    these were the same managed care providers who
20    engaged in a payment slowdown in the Delaware
21    Valley --
22 A.  Yes.
23          MR. TORBORG: Object to the form.
24          THE WITNESS: Yes.
25 BY MR. LUFT:
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 115

1  Q.  Thank you.
2          Now, you also mentioned that you felt
3     that the hospitals were not doing a very good
4     job adapting to the growth in managed care in
5     the Philadelphia market. Is that correct?
6  A.  Yes.
7  Q.  In your opinion, what were they failing to do?
8  A.  They were failing to control the input or the
9     intake of patients and the administrative
10    duties that are associated with those various
11    contracts.
12 Q.  Now, is it your understanding that previously
13    these Delaware Valley hospitals had been
14    separate entities, had not been all one unit
15    when AHERF purchased them?
16          Let me strike that.
17          Each of the Delaware Valley hospitals
18    had been purchased by AHERF or one of its
19    predecessor organizations. Is that correct?
20 A.  That's my understanding.
21 Q.  Prior to purchase, they had separate CEOs,
22    separate staff, and separate contracts. Is
23    that correct?
24 A.  That's my understanding.
25 Q.  Do you believe the fact that there were all
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 116

1     these different systems prior to purchase by
2     AHERF led to the greater problems adapting to
3     the managed care?
4  A.  Define "systems."
5  Q.  I'm sorry?
6  A.  Define "systems."
7  Q.  Why don't I just try to ask the question again
8     so it's clear.
9  A.  Okay.
10 Q.  Were you ever of the belief that the fact that
11    each of these entities had previously been
12    independent and were not a consolidated group
13    prior to the purchase of AHERF led to greater
14    problems adapting to the rise of managed care
15    in Philadelphia?
16          MR. TORBORG: Object to the form.
17          THE WITNESS: I really don't have an
18    opinion. I don't know.
19 BY MR. LUFT:
20 Q.  Now, I asked you previously who you spoke with
21    at Coopers & Lybrand, and I believe you told me
22    about once a year would you speak to
23    Mr. Buettner.
24 A.  Yes.
25 Q.  You spoke with Mr. Kalisevsky at the same
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 117

1    meeting where would you speak to Mr. Buettner?
2    A.   Yes.
3    Q.   How often would you speak to Mr. Kalisevsky
4         aside from that meeting?
5    A.   Maybe two times a year.
6    Q.   And when would those times be?
7    A.   There would be an audit preconference.
8    Q.   That's the meeting where you were with
9         Mr. Buettner?
10   A.   There would be a preliminary finding of
11        results, and there would be a final
12        presentation of the results of the audit, and
13        there may have been some interaction in between
14        time as far as hallway conversation, as far as
15        a quick update as far as what they're finding,
16        but nothing --
17             Most of the workings or dealings with
18        Coopers in the department was between Russ
19        Laing and Coopers.
20   Q.   Did you ever speak with Amy Frazier?
21   A.   I don't know. I know the name. I don't
22        remember who she is.
23   Q.   Okay. Do you recall ever speaking with anyone
24        who was a manager at Coopers & Lybrand?
25   A.   I believe Nora was a manager.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 118

1    Q.   Do you recall ever speaking to the manager of
2         the AHERF -- the manager on the AHERF audit or
3         the managers on the AHERF audit?
4    A.   I thought it was Nora.
5    Q.   Do you recall ever speaking with Mr. Kirstein,
6         Mark Kirstein?
7    A.   Again, I know the name. I probably did, but I
8         don't remember the specifics or anything like
9         that.
10   Q.   So you have no specific recollections of any
11        conversations with either Mr. Kirstein or
12        Ms. Frasier?
13   A.   Other than --
14             No. The only time I can think that
15        we would have spoken would have been in these
16        various updates as far as the results, and I
17        don't have specific recollection of times,
18        dates, places, or basically the extent of the
19        conversations. Most of my interaction was with
20        Nora.
21   Q.   And, in fact, you don't even recall who
22        Mr. Kirstein and Ms. Frazier specifically are.
23        Correct?
24   A.   If they walked in the room right now, I
25        wouldn't know.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 119

1    Q.   Okay. Do you recall ever having any
2         conversations Christa Porter?
3    A.   I'm sorry. Who?
4    Q.   Christa Porter.
5    A.   I don't know what that is. No.
6    Q.   So you have no recollection of having --
7    A.   No.
8    Q.   Do you recall having any conversations with
9         Christa Heinlein?
10   A.   No. Again, I'm sorry. I don't have any
11        recollection.
12   Q.   Did you recall having any conversations with
13        Brian Christian?
14   A.   No, I'm sorry. I do not.
15   Q.   When you spoke with Mr. Buettner, what was the
16        purpose of those conversations?
17   A.   Coopers presented their audit plan for the year
18        and what documents they needed from us to be
19        able to perform their audit.
20   Q.   The audit plan they presented, was that for all
21        of AHERF or just specific to the patient --
22   A.   Specific to patient accounting.
23   Q.   Would you have input --
24             Would you give Mr. Buettner any input
25        at those meetings what you thought should be
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 120

1         looked at by Coopers & Lybrand?
2              MR. TORBORG: Object to the form.
3              THE WITNESS: No. The only time I
4         ever suggested anything to anyone, I believe it
5         was in the February, 1997, time frame, that
6         without coming out directly and saying
7         anything, you should just please be very
8         thorough in your audit.
9    BY MR. LUFT:
10   Q.   I believe you just said without saying anything
11        directly. Is that correct? Did I hear that
12        correctly?
13   A.   That's correct.
14   Q.   Why do you say without saying anything
15        directly?
16   A.   There were accounts in the active accounts
17        receivable that had been there since 1995 that
18        were uncollectible. If I had said anything
19        directly, I would have been terminated.
20   Q.   I'm going to come back to both parts of that.
21             When you say 1995, are you referring
22        to fiscal year 1995?
23   A.   Calendar year 1995.
24   Q.   So that would be fiscal year 1996?
25             MR. TORBORG: Object to the form.
     MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

Page 121

1    THE WITNESS: The conversation took
2  place --
3    MR. LUFT: Let me strike that.
4  BY MR. LUFT:
5  Q.  Do you know if those accounts were fiscal year
6    1996 or fiscal year 1995?
7  A.  These were accounts with dates of service prior
8    to June 30th, 1995.
9  Q.  Now, the second part, I believe, what you said
10    was if you said anything, you would have been
11    terminated.
12  A.  That's correct.
13  Q.  Who would have terminated you?
14  A.  Who would have directly terminated me would
15    have been Mr. Dionisio, and he would have been
16    told to terminate me by his bosses, and that's
17    my opinion. It's strictly an opinion.
18  Q.  Was it your understanding that if you told
19    Coopers & Lybrand certain information about
20    accounts receivable, you would be fired?
21    MR. TORBORG: Object to form.
22    THE WITNESS: Could you repeat the
23    question, please.
24  BY MR. LUFT:
25  Q.  Let me ask you this. You said that you believe
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 122

1    you would be fired.
2  A.  Yes.
3  Q.  What do you believe you would have had to have
4    done to precipitate your being fired?
5  A.  In September of 1995 -- excuse me.
6    In August and September of 1995, we,
7    as a patient accounting department, had
8    identified approximately $50 million of
9    accounts receivable that were uncollectible.
10    We had started attempting to write some of
11    those accounts off at that time. At a staff
12    meeting --
13    At Mr. McConnell's staff meeting in
14    the Clark Building in September of 1995, I was
15    told to stop the activity of writing those off,
16    and that they would be taken care of at a later
17    time.
18    Okay. Well, as of the first part of
19    1997, the accounts were still in the active
20    receivables.
21  Q.  And you believe if you told Coopers & Lybrand
22    about these accounts, you would be fired?
23  A.  Yes.
24  Q.  What was your belief that you would be fired
25    based on?
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 123

1  A.  The culture of the organization.
2  Q.  Could you expand on what you mean by the
3    "culture of the organization"?
4  A.  The organization was basically, in my opinion,
5    controlled by three people, and if you did
6    anything that was deemed to be detrimental or
7    outside of that -- if you did something, you
8    did that --
9    If you performed the function or did
10    something you weren't supposed to allegedly do,
11    that the ultimate result of that action would
12    be termination.
13  Q.  Do you know if anyone else at AHERF believed --
14    strike that.
15    Did you ever hear anyone else at
16    AHERF express the belief that if they did
17    something which was not deemed as correct by
18    those controlling AHERF, that they, too, would
19    be fired?
20  A.  Yes.
21  Q.  Who expressed that opinion to you?
22  A.  Let's just say it was numerous people, and it
23    was a common belief within the organization.
24  Q.  Do you recall anyone specifically?
25  A.  No.
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 124

1  Q.  In keeping with that belief, were you of the
2    opinion that you were not to share internal
3    information with anyone from the outside?
4    MR. TORBORG: Object to the form.
5    THE WITNESS: No. I --
6    No. If information was requested,
7    then I would provide it or attempt to get
8    clearance to provide it, but I was not going to
9    volunteer any information.
10  BY MR. LUFT:
11  Q.  Even if you believed that information to be
12    relevant?
13  A.  That's correct.
14  Q.  Did you ever seek clearance to give information
15    to Coopers & Lybrand but were told not to?
16  A.  I don't believe so.
17  Q.  And you would have sought clearance from
18    Mr. Dionisio?
19  A.  Yes.
20  Q.  Now, you said you wouldn't have volunteered
21    information to Coopers & Lybrand even if that
22    information was relevant to you. Right?
23  A.  Yes.
24  Q.  And that was based on your belief that
25    would lead to your termination?
    MANHATTAN REPORTING CORP., A LEGALINK COMPANY

31 (Pages 121 to 124)

Page 201

1  institution regarding alcohol or substance
2  abuse, do not state what is in those records,
3  and it's for another forum at another time for
4  those type of records to be produced.
5          THE WITNESS: Okay.
6  BY MR. LUFT:
7  Q.  Mr. Snow, when Mr. Laing was arrested -- strike
8  that.
9          Mr. Snow, do you recall that if when
10  Mr. Laing was arrested he was held for
11  psychiatric evaluation?
12  A.  I knew he was held. I didn't know why.
13  Q.  Thank you.
14          Mr. Snow, prior to today, have we
15  ever met?
16  A.  No.
17  Q.  Have you ever met with anyone representing
18  Coopers & Lybrand?
19  A.  I have had two telephone conversations with an
20  attorney from your firm, a Kevin --
21  Q.  Teryuya?
22  A.  Yes. Thank you.
23  Q.  Were those conversations to schedule your
24  deposition?
25  A.  To schedule the deposition, and he asked for a

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 202

1  copy of my resume.
2  Q.  Did you discuss the substance of your testimony
3  today with Mr. Teryuya?
4  A.  No.
5  Q.  Did you ever meet with anyone representing the
6  creditors' committee prior to your deposition
7  today?
8  A.  I don't believe so.
9  Q.  Have you ever had any conversations with anyone
10  from the creditors' committee prior to your
11  deposition today?
12  A.  I don't believe so.
13          MR. LUFT: Mr. Snow, I thank you for
14  your time, and I have no further questions at
15  this point.
16          I reserve the right to ask more
17  questions following Mr. Torborg's examination.
18          THE VIDEOGRAPHER: We are now going
19  off the record. The time on the screen is
20  3:20 P.M.
21          - - - -
22  (There was a recess in the proceedings.)
23          - - - -
24          THE VIDEOGRAPHER: We are now going
25  back on the record. The time is 3:34 P.M.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 203

1          MR. TORBORG: Good afternoon,
2  Mr. Snow.
3          THE WITNESS: Hello.
4          MR. De MONACO: Before you begin your
5  questioning, I just want to state on the record
6  that I would request counsel in this matter to
7  treat the questions and answers that Mr. Snow
8  gave regarding Russell Laing as confidential
9  pursuant to whatever provision in the Case
10  Management Order may speak to confidentiality.
11          Certainly anything that Mr. Snow
12  knows or stated regarding Mr. Laing, that
13  Mr. Laing would have said to him as his
14  superior, would be confidential.
15          Certainly anything in his business
16  records, in the personnel file, would be
17  confidential; and I believe that Mr. Laing's
18  already testified that he may have waived it,
19  but I would just ask that those portions of the
20  transcript that speak to that subject matter be
21  deemed confidential, and then it will be up to
22  counsel and the Court to decide what, if any,
23  use can be made consistent with Pennsylvania
24  law; and I'm not a party to this action, but
25  I'm simply making a request as an officer of

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 204

1  the court that we would just consider the
2  Pennsylvania law as it relates to
3  confidentiality, and specifically as it relates
4  to alcohol treatment and psychiatric treatment.
5          MR. LUFT: I understand your request.
6  I should note that there is a parallel action
7  going on at this time brought by the SEC
8  against three of the auditors from
9  Coopers & Lybrand.
10          I know PriceWaterhouseCoopers has
11  been subpoenaed for documents, including
12  deposition testimony, in this case. I don't
13  know if the creditors' committee has also been
14  asked for information, but to the extent that
15  those Subpoenas are out there and this
16  information comes in, I can't represent to you
17  one way or the other right now as to whether
18  this information can be kept confidential from
19  those requests for information.
20          MR. DeMONACO: I guess all I'm
21  requesting is that you simply as counsel
22  designate those portions of this transcript as
23  confidential and be treated as such and then
24  whoever gets the transcript will know that
25  there's this issue regarding Pennsylvania law

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

51 (Pages 201 to 204)

GREGORY SNOW

Page 205

1  present, and they'll act accordingly as well,
2  I'm sure, consistent with Pennsylvania law.
3          That's the only reason, to just sort
4  of make this a heightened awareness that this
5  is a sensitive issue in Pennsylvania regarding
6  Pennsylvania law, and I just want to make sure
7  it's treated appropriately.
8          MR. TORBORG: I would request that
9  Mr. Luft or Cravath handle that, because they
10 are the ones that asked these questions and may
11 want to use them.
12         MR. LUFT: Fine.
13         - - - -
14         EXAMINATION
15         - - - -
16 BY MR. TORBORG:
17 Q.  Good afternoon, Mr. Snow.
18 A.  Hello.
19 Q.  When Mr. Luft left his questions, as we just
20 discussed again, we were talking about
21 Mr. Laing, and I'm not going to ask any of the
22 troublesome questions we asked about already,
23 but can you explain briefly what Mr. Laing's
24 role was at AHERF?
25 A.  He was the director of financial reporting for

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 206

1  patient financial services.
2  Q.  And what job duties did Mr. Laing have in that
3  role as the director of financial reporting
4  within the patient financial services group?
5  A.  We published a series of daily, weekly, and
6  monthly reports as far as various indicators of
7  collection activity, et cetera, for the
8  hospitals that we were performing the service
9  for, and it was Mr. Laing's department which
10 had maybe five or six people in it in total to
11 be able to provide this information.
12 Q.  Do you recall when Mr. Laing started at AHERF?
13 A.  I believe it was in either May or June,
14 probably June of 1995.
15 Q.  Do you recall who recruited Mr. Laing to AHERF?
16 A.  We ran an ad in the paper, a classified ad, I
17 believe, in the Post-Gazette, I believe,
18 advertising for the position; and at that
19 particular point in time he was with UPMC, and
20 he responded to the ad.
21         He went through an interview process
22 just like every other viable candidate, and he
23 was the one who was selected for a position.
24 Q.  Did you make the decision to hire Mr. Laing?
25 A.  Yes.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 207

1  Q.  Did you have an understanding that Mr. Laing
2  had an extensive background in accounts
3  receivable and patient revenue issues when you
4  hired him?
5  A.  Yes.
6  Q.  Why did you go about hiring someone like
7  Mr. Laing to work under you at PFSG?
8          MR. LUFT: Objection.
9          THE WITNESS: Because I wanted to
10 make sure that we had accurate -- bad choice of
11 words -- that we had information available to
12 us on a daily basis from an internal
13 perspective again such as cash reports,
14 productivity measurements, various AR reports.
15         We were being asked to perform
16 analysis on various swings or -- "swings" is,
17 again, probably not a good choice of words, but
18 various activities or flows within the accounts
19 receivable on a month-to-month basis, and I
20 needed some assistance in providing that
21 analysis.
22 BY MR. TORBORG:
23 Q.  You needed someone with a stronger accounting
24 background than yourself?
25 A.  Not only a stronger accounting background, but

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 208

1  more someone who had more of a
2  financial/analytical background to help assist
3  in this area.
4  Q.  Specifically relating to the areas of accounts
5  receivable and patient revenue and other issues
6  particular to health care receivables?
7  A.  Yes.
8  Q.  Did you understand that Mr. Laing was
9  particularly experienced in those areas?
10         MR. LUFT: Objection.
11         THE WITNESS: Yes.
12 BY MR. TORBORG:
13 Q.  Now, you've worked at several different patient
14 financial groups at health care systems.
15 A.  Yes.
16 Q.  You've worked at Cleveland Clinic twice and now
17 Duke.
18 A.  Yes.
19 Q.  Is it typical for the patient financial
20 services or the billing office to have someone
21 in Mr. Laing's role?
22 A.  I don't know if it's typical in the industry,
23 but it's something I have always insisted on
24 everywhere I've worked.
25 Q.  Let me back up. At the other places you've

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

GREGORY SNOW

Page 209

1    worked, have you had occasion to interact with
2    auditors, the outside auditors of the entity?
3    A.   Yes.
4    Q.   What has been the nature of those interactions?
5    A.   Very much similar to what we had at AHERF.  The
6        auditors would come in annually and do an
7        audit, have a preaudit conference.
8            We'd be given a list of documents we
9        needed to supply, plus our annual reports,
10       would be asked to provide a status on the
11       various accounts that were selected at random,
12       and we'd provide that information to the
13       auditors and answer any questions and any audit
14       comments that would come back.
15   Q.   During your time at AHERF, do you believe that
16       Mr. Laing was a particularly fertile source of
17       information regarding financial reporting
18       issues in the accounts receivable and patient
19       revenue areas?
20           MR. LUFT:  Objection.
21           THE WITNESS:  Yes.
22   BY MR. TORBORG:
23   Q.   Would you have expected the outside auditors to
24       ask Mr. Laing any questions, should they have
25       any questions?
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 210

1    A.   I believe so, yes.
2    Q.   Why do you say that?
3    A.   Well, every time that we had the preconference
4        audits, Russell was designated as the point
5        person from a patient accounting perspective to
6        interact with the auditors.
7            If they needed anything, they would
8        go to Russell.  If they needed additional
9        reports, Russell was to be the liaison with the
10       audit fund.
11   Q.   What is the extent of your knowledge about what
12       reports the patient financial services group
13       gave to Coopers & Lybrand during
14       Coopers & Lybrand's audits or other engagements
15       of AHERF's receivables?
16   A.   We gave whatever we were asked for.
17   Q.   It wasn't just information relating to 25 or 30
18       samples, was it?
19   A.   I believe --
20           MR. LUFT:  Objection.
21           THE WITNESS:  I believe there was a
22       letter put out.  I believe it's called a
23       preaudit letter.  I'm not sure of the exact
24       title, but there was a letter produced for
25       AHERF at the time, AHERF as a whole.
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 211

1            I believe it was being managed from a
2        general accounting perspective through a
3        gentleman by the name of Jack London -- or
4        Lydon, excuse me -- and of the documents that
5        were provided, a subset of the data that was
6        necessary came from -- was to come from patient
7        and financial services.
8            MR. TORBORG:  Mr. Snow, I'd like to
9        show you what has been previously marked as
10       Exhibit 1312, and I think you'll tell me that
11       this is the type of -- the type of a request
12       that you were just referring to.
13                   - - - -
14       (Deposition Exhibit No. 1312
15       previously marked for identification.)
16                   - - - -
17           THE WITNESS:  Yes.
18   BY MR. TORBORG:
19   Q.   And I'd like to specifically ask that you turn
20       to the page that ends with the Bates number
21       01347 in the bottom right-hand corner.
22   A    Yes.
23   Q.   Just for the record, I know that Exhibit 1312
24       is an April 18, 1997, memo from John Lydon for
25       distribution and includes, among others,
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 212

1        Mr. Snow; and if you go on Page 47 to about the
2        middle of the page where it says patient
3        accounts receivable, have you had a chance to
4        review the items that on that page that go
5        to -- over to Page 48 until the subheading
6        student accounts receivable?
7    A.   Yes.
8    Q.   How much involvement did you have personally in
9        collecting this documentation and providing it
10       to Coopers & Lybrand?
11   A.   Basically none.  This would have been Russell
12       and Bill Gedman's responsibility to provide
13       this information.
14   Q.   Would some of the information listed on here
15       also possibly come from the general accounting
16       office, as well?
17   A.   Yes.
18           MR. LUFT:  Objection.
19           Mr. Snow, I'll ask the same thing
20       that Mr. Torborg asked of you.  Give me time.
21           THE WITNESS:  Yes
22           MR. LUFT:  Thank you.
23           THE WITNESS:  No problem.
24   BY MR. TORBORG:
25   Q.   Is it fair to say you're not particularly
        MANHATTAN REPORTING CORP., A LEGALINK COMPANY

53 (Pages 209 to 212)

TAB  232

### Allegheny Health, Education and Research Foundation
### MEMORANDUM

Date: June 10, 1996                    **CONFIDENTIAL**

To:      **Greg Snow**
         **Vice President, PFSG**

From:    **Russell G. Laing**
         **Director of Financial Reporting**

Subject:    **Coopers & Lybrand - Receivables Audit Issues**

Having noted that C&L has selected approximately 300 individual patient registrations (inpatient and outpatient) for testing, I conference-called both Norb Shevelesky and Mark Kirstein today to discuss their fye 1996 audit approach to receivables; a summary follows:

- C&L has increased their risk assessment (either "Low", "Below Maximum" or "Maximum") from Low (in fye 1995 audit) to Below Maximum (in fye 1996 audit)

    - The reason for the perception of increased risk fye 1996 by C&L was explained as due to changes in personnel and organizational structure, along with concerns over the accounts receivable aging

    - As a result of the higher fye 1996 perceived risk, the sample/selection size was dramatically increased over what was used fye 1995 (by way of comparison, Mark mentioned that at the highest level of risk: "Maximum", a sample/selection would have run into "thousands of accounts" - and would have required an extensive time/effort to complete)

- C&L is auditing the receivable balance as of 3/31/96; they hope to be able to discuss higher level reserve issues with us in mid/late July, and then apply a higher level analytic review of receivable balances as of 6/30/96 (probably similar to the due diligence/keeping current type reviews that C&L would perform in connection with a bond offering)

- The testing of the 300 sampled items will be performed by Norb Shevelsky's staff: Health Care Regulatory group, and will include:

    - Detail review of coding/diagnosis-assignment (C&L: "If you billed the wrong code, the money may not belong to you even though it was paid")

    - Review of billing history including notes/comments from follow up personnel (C&L: looking for: "anything that would indicate a delay in collection")

In view of the foregoing, I would make several observations:

PR-LAING 00086

- Expectations: Given the just the level of corrections and adjustments with receivables in the current fiscal year, (including the period: April - May, 1996), as well as outstanding prior year(s) issues, there is a strong likelihood that such an extended detailed audit of receivables will disclose issues that:

  - Might be noted within the Management Letter (on operational/internal control deficiencies)

  - Could potentially result in a decision by C&L to resort to more extensive detailed year-end audit procedures with respect to balances as of 6/30/96, in addition to the extensive effort invested during the preliminary phase of their audit

- Timing:

  - Medical Records/Coding/Registration: Per Linda Bond, C&L could probably commence review of the medical record files next week for inpatient, she is checking on department availability of outpatient files)

  - Billing files (eg screen prints of account-billing-payment activity) will probably require a minimum of several weeks to obtain

  - C&L originally wanted to have all the requested information for their review by the end of June, but in our conversation today indicated that they were now looking at mid-July

  - A significant component towards facilitating the audit process will be the level of cooperation and assistance from DVR medical records personnel

I would recommend that all interested parties be apprised of the expectations as noted above, before proceeding to make the requested information available to C&L. I do not take any exception to what they have proposed to do by way of their audit approach, but merely note that under the circumstances it may not be an effective use of their (or our own) time given the expected results.


Cc    Al Adamczak
      Dan Cancelmi


PR-LAING 00087

# TAB 233

✓ C/L fil

**Coopers &Lybrand**

a professional services firm

Coopers & Lybrand L.L.P.

600 Grant Street
35th Floor
Pittsburgh, Pennsylvania
15219-2777

telephone (412) 355-8000

facsimile  (412) 355-8089

September 23, 1996

To the Board of Trustees of
  Allegheny Health, Education and Research Foundation:

In planning and performing our audits of the financial statements of Allegheny Health, Education
and Research Foundation and its affiliates; Allegheny General Hospital, the Delaware Valley
Obligated Group and Allegheny Integrated Health Group (AHERF and affiliates) for the year
ended June 30, 1996, we considered AHERF's internal control structure in order to determine our
auditing procedures for the purpose of expressing our opinion on the financial statements.
Although our audits were not designed to provide assurance on the internal control structure, we
noted certain matters involving the internal control structure and its operations, and are
submitting for your consideration related recommendations designed to help AHERF to make
improvements and to achieve operational efficiencies.  Our comments reflect our desire to be of
continuing assistance to AHERF.

The accompanying comments and recommendations are intended solely for the information and
use of the Board of Trustees, management, others within the organization and the Department of
Health and Human Services.

Very truly yours,

Coopers + Lybrand L.L.P.

22
C. Lisman
5/23/02

Coopers & Lybrand L.L.P. is a member of Coopers & Lybrand International, a limited liability association incorporated in Switzerland

X

*Allegheny Health, Education and Research Foundation*
*Internal Control Observations*

**INDEX**

|  | **Pages** |
|---|---|
| Accounts Receivable Observations | *1-2* |
| Information System Observations | *3-5* |
| Other General Observations | *6-9* |
| Status of Prior Year Observations | *10* |

DC8230 page 2 of 16

*Accounts Receivable Observations*

### General Overview

Fiscal year 1996 has proven to be yet another landmark year for AHERF with respect to its various consolidation and centralization projects. Most notably was the Delaware Valley debt refinancing, which was finalized during June of 1996. This refinancing will provide the AHERF system with less burdensome reporting requirements, in addition to eliminating various restrictions on funds that were previously reserved for repayment of debt obligations. During fiscal year 1997, the AHERF system will move ahead with centralizing other functions, including the organization's investments into a master trust arrangement. As we have noted in the past, we believe the AHERF system and management have benefited from the reorganization and consolidation projects that have been ongoing within the organization.

### Revenue and Accounts Receivable Overview

Centralization projects and system conversions have continued to provide a challenging environment for the AHERF system's accounts receivable management. In addition to these projects, complexities surrounding the registration, billing and collection processes for managed care insurers and other third party payors have resulted in the growth of the system's accounts receivable balances over the past two years, with fiscal year 1996 exhibiting an increase of approximately $64 million over the previous year. As a result, our 1996 audit approach was modified to consider operational issues specific to the accounts receivable area.

Our procedures included documenting and testing various aspects of the revenue system's internal control environment, with particular attention directed to the registration, billing, collection and reserve analysis processes. Furthermore, we selected a sample of patient accounts covering a one year period and performed an evaluation of the revenue/billing process, whereby we obtained an understanding of the patient account history from the date of registration to the date of collection. We designed our procedures to consider the implications that managed care contracts and other changes in third-party reimbursements could have on the processes that AHERF must complete to be properly reimbursed by third-party payors.

As a result of our procedures, we have concluded that the controls over the establishment and monitoring of accounts receivable reserves are designed appropriately and are operating effectively so as to properly adjust accounts receivable balances to their estimated net realizable value.

With regard to the process of registering patients, billing the appropriate third-party payors and collecting amounts owed, we would recommend that management focus its attention on two items; (1) training appropriate personnel in the registration and billing of patient accounts with attention directed to the implications that managed care contracts have on these processes; and (2) establishing standardized account follow-up procedures to be deployed during the collection process.

*l*

DC8230 page 4 of 16

### <u>Revenue and Accounts Receivable Overview</u> (continued)

From the perspective of personnel training, we believe that AHERF should consider enhanced education and training of the registration staff, specifically focusing on the gathering of complete and accurate insurance and demographic data. In addition, we believe that training should be provided to all registration and billing personnel on the inter-workings of the individual managed care contracts that AHERF has negotiated. Improvements in the registration area, coupled with a better understanding of the managed care contracts, will allow management to submit accurate claims in a more efficient manner, as well as improve the timeliness of third-party claims payments.

With regard to the establishment of standardized account follow-up procedures, we noted that certain methodologies utilized by the customer service representatives are inconsistent which results in inefficiencies and delays in the processing and collection of patient claims. We recommend that a standardized account follow-up process be implemented that would entail standard note taking procedures and message recording, as well as the specific identification and review of accounts by payor, amount and aging category, which will assist in the determination of specific actions steps required for collection of the outstanding accounts.

DC8230 page 5 of 16

*Information System Observations*

### Information Services Overview

The AHERF computer environment is complex, with financial and patient care applications processed on a variety of geographically-dispersed computer systems. The Pittsburgh data center is the heart of the processing environment and it is electronically linked via AHERF's state-wide computer network to peripheral computer sites throughout the AHERF system.

During fiscal year 1996, the Information Services department completed a number of significant initiatives related to standardizing the financial and patient care applications, including:

- Migrating the patient accounting/billing and patient management systems for Allegheny University Hospitals (Elkins Park and Bucks County) and St. Christopher's Hospital for Children to the SMS Invision system,

- Implementing a common fixed asset system on the Pittsburgh mainframe for all AHERF entities, and

- Converting the materials management system for Allegheny University Hospitals (East Falls, Elkins Park and Bucks County) and St. Christopher's Hospital for Children to the main Delaware Valley local area network (LAN) system.

As part of the fiscal year 1996 audit, we reviewed the controls surrounding the maintenance and processing of selected financial systems; principally patient accounting, professional fee billing, accounts payable, purchasing, fixed assets, admissions/discharges/transfers, order entry, payroll, flexible benefits, student billing and grant accounting. Our review focused on the control procedures in place relative to the following areas:

- **Software Maintenance** - controls designed to ensure that changes to application and system software are appropriately authorized, tested, documented, and approved.

- **Computer Operations** - controls designed to ensure that authorized programs are appropriately executed, correct versions of data files are used during processing, and processing can be properly resumed in the event of computer processing failures.

- **Security** - controls designed to ensure that security exists over programs, data and other system resources, access to application functions are assigned based on job responsibilities, and computer hardware/media are secure from unauthorized access.

- **Implementation** - controls designed to ensure that new system implementation projects entail an appropriate level of management, testing, documentation and approval, and include procedures to ensure that data is accurately converted from the former systems.

DCB230 page 7 of 16

**Information Services Overview** (continued)

In addition to reviewing the Information Services' policies and procedures, we executed a security audit tool, called CA-Examine, on the Pittsburgh mainframe to identify potential security exposures. The findings resulting from the use of this tool, which were not significant in nature, have been provided to Information Services' management.

Information Services continues to make progress in strengthening the control environment for Pittsburgh and the Delaware Valley. During fiscal year 1996, the Information Services department completed a number of significant initiatives related to strengthening controls, including:

- Implementing the RACF security package for the Pittsburgh mainframe (this included configuring RACF and developing the associated security procedures),
- Improving the software maintenance procedures through the use of the Change Man software package,
- Consolidating the mainframe computer operations procedures to the Pittsburgh region,
- Implementing a process whereby a periodic technical security review is performed over the LANs (using a security tool called the KANE Security Analyzer), and
- Addressing the four findings that we reported in fiscal year 1995.

**Information Services Observation**

The following observation was noted in conjunction with our procedural testing in the Information Services department:

- The disaster recovery plan, which documents the required actions to be taken if critical computer systems become inoperable and necessitate the use of an alternative computer system, contain some sections which are not current or have limited detail, and not all critical aspects of the plan have been recently tested. In addition, the plan does not address the LAN systems supported by Information Services. This may result in an unacceptable recovery period, especially for critical AHERF systems, or inaccurate recovery of data, should the computer system become inoperable.

*4*

DC8230 page 8 of 16

## Recommendation

We understand that a project is currently underway to update the disaster recovery plan. We recommend that management assign a priority to completing this project and ensure that the updated plan reflects the current environment and is expanded to include an appropriate level of detail and recovery procedures for the LAN systems supported by Information Services. Also, the updated disaster recovery plan should be fully tested to ensure that all aspects of the plan will operate as designed.

## Management's Response

The project to update the Disaster Recovery Plan is currently in its final phase. A walk-through test of the plan is scheduled for October 31 and November 1, 1996. This updated plan will include all appropriate procedures for the recovery of mainframe and PC file server systems within the responsibilities of Information Services.

DC8230 page 9 of 16

*Other General Observations*

Our testing procedures extend to various other operational areas within the organization, including general accounting, purchasing, payroll and benefits administration. Understanding the internal control environment of the organization and designing appropriate tests of the various controls represents the basis of our audit approach. The following observations were identified during our testing procedures.

**General Accounting Observations**

As discussed earlier, the AHERF system has experienced numerous transitions during the reorganization process. In addition, AHERF was faced with the adoption of Statement of Financial Accounting Standard (SFAS) No. 116, "Accounting for Contributions Received and Contributions Made," SFAS No. 117, "Financial Statements of Not-for-Profit Organizations" and SFAS No. 124, "Accounting for Certain Investments Held by Not-for-Profit Organizations."

As part of the current year audit, our procedures included discussions with various members of finance management and the testing of controls over general ledger maintenance, internal interim reporting and the interface of operational systems with the general ledger.

In summary, our testing results indicated that the reporting packages are prepared in a consistent and accurate manner and thereby enable executives and senior management to monitor the financial condition and results of operations of the AHERF system.

**Human Resources and Payroll Observations**

Our procedural testing of the payroll internal control environment, including discussions with various individuals in the human resources and payroll departments, resulted in the following observations:

- Approximately 300 manual payroll checks are processed monthly as the result of delays in the processing of employee status changes within the human resources/payroll systems, delays in the processing of new hire information and various adjustments/corrections,
- Temporary employees are not consistently monitored for reapproval within defined policy periods,
- Certain records are not readily available due to the corporate restructuring and consolidation of the payroll and human resources departments, and
- Edit reports are not reviewed for changes to standing data.

Furthermore, it should be noted that approximately 37% of the employment documentation for new hires is processed subsequent to their first qualifying pay period and approximately 42% of employee status changes are not processed timely and/or accurately.

DC8230 page 11 of 16

## Recommendation

Management should implement policies and procedures over the processing of certain personnel and payroll information to enhance the overall internal control environment. These policies and procedures should include, but should not be limited to, improving the overall processing of employee status changes and new hire information, recommunicating existing policies regarding temporary employee approvals, and utilization of edit reports to monitor changes to standing data within the human resources/payroll systems. Implementation of such procedures should assist in an overall reduction in the processing of manual checks.

## Management's Response

Management concurs with the above recommendation and will strive to improve the timeliness of processing personnel information, to the extent practical, which should serve to reduce the number of manual checks.

## Purchasing System Observations

The following observations were noted in conjunction with our testing of the purchasing internal control environment:

- Discrepancies between purchase requisitions, purchase orders, invoices and receipts, which resulted in more than $4 million of problem invoices at fiscal year-end, are not resolved within a timely basis,
- Purchase orders are not consistently approved by authorized employees within the AHERF system, and
- Employee authorization records have not been updated to reflect employee status changes.

## Recommendation

Management should implement policies and procedures to improve the overall processing of purchasing information. These polices and procedures should include, but should not be limited to, establishing guidelines for clearing discrepancies within the purchasing system and performing an evaluation of employee authorization records to ensure that they have been properly updated.

## Management's Response

Management agrees with certain aspects of the observations and has taken or will take the following corrective action.

- As of August 25, 1996, when this issue was first brought to management's attention by C&L, the total invoices on hold due to discrepancies was $3.3 million which represents less than 2.5% of the total annual dollars processed by the Pittsburgh Purchasing Department. In addition, less than one third of this total ($996,563) represented past due dollars. Approximately 50% of the problem invoices were related to one distributor of medical products who implemented invalid price increases with no notification to Allegheny General Hospital. Management has received appropriate information from the medical products distributor to resolve their discrepancies. As of September 19, 1996, the total invoices on hold due to discrepancies was $2.1 million and the amount past due has decreased by one-third to $616,798. Purchasing management will continue to monitor the invoices on hold and focus on decreasing the past due amount to zero.

- Purchasing will implement formal policies and procedures to enforce compliance with the organizational policies that address purchasing authorization by October 15, 1996.

- Due to a hardware and software upgrade to the computer used to maintain the purchasing authorization database, we were unable to update this information for at least two months. The computer problem has since been corrected and the database is currently being updated based on add/delete/change forms received during that period.

8

DC8230 page 13 of 16

## Retirement Plan Observations

In order to design our tests of the pension system, we obtained an understanding of the internal control system and tested its operation through various inquiries and sampling applications. Generally, the control system appears to be operating effectively; however, certain matters were identified during the course of our audit which should be considered by management. These are summarized below along with our recommendations.

### Findings

C&L identified various discrepancies in the census data provided to Hewitt & Associates, the actuary for the AHERF Retirement Plan (the Plan). Such items, which appear to be primarily the result of delays in the processing of information, include the following:

- New hires from January through July of 1996 were incorrectly included in the December 31, 1995 census data,
- Employees transferring among affiliates within the AHERF system were often listed twice in the census data,
- Certain terminated employees were not properly designated as such in the census data,
- Pittsburgh region census data pension hours were frequently added to payroll hours, resulting in an improper doubling of qualifying pension hours, and
- Leave pay and service were not properly credited to participants.

It should be further noted that a significant amount of reliance is placed on the actuary to identify inconsistencies within the annual and historical census data.

### Recommendation

While we understand that we were provided interim data as a basis of our testing, management should implement policies and procedures to address the various discrepancies identified to ensure that the Plan is in compliance with ERISA regulations. Such procedures should include, but should not be limited to, the utilization of in-house edit reports for preparation of the census data, reconciliation of census data submitted to the actuary to the data used in the valuation, improvements in processing of relevant employee status changes and an overall evaluation of the internal control environment in the benefits department.

### Management's Response

Reconciliations performed to identify discrepancies such as the ones listed in the findings are performed on a routine basis. However, this normal reconciliation process was delayed this year due to other priorities identified relative to the 403(b) plan. As a result, C&L was reviewing interim data rather than data in final form. The reconciliation process is currently being completed. C&L's concurrence will be obtained regarding finalization of the data and procedures which will be formalized during the next two months.

9

DC8230 page 14 of 16

*Status of Prior Year Observations*

The following summarizes the status of observations identified during the fiscal year 1995 audit.

Comments which have been appropriately addressed during fiscal year 1996:

- Periodic Interim Payment (PIP) Accounts should be Reconciled and Differences Resolved on a Periodic Basis
- Development of Expanded Accounts Payable Reports should be Considered
- Implementation of an In-House Fixed Asset System should be Considered
- Property and Equipment Disposal Procedures should be Enhanced
- Consideration should be Given to the Performance of a Property and Equipment Physical Inventory Count
- Segregation of Duties over the Allegheny University East Falls Hospital's (formerly the Medical College of Pennsylvania Hospital) Patient Care System should be Improved
- Security over the Allegheny University Center City Hospital's (formerly Hahnemann University Hospital) Patient Accounting/Care Systems could be Strengthened
- Security over the Delaware Valley Purchasing/Payable Systems should be Strengthened
- User Access Rights for Allegheny General Hospital's Patient Care Systems should be Periodically Reviewed

Comments which are still applicable for fiscal year 1996:

**Accounts Receivable Observations**

As previously discussed, management recognizes the unique issues surrounding AHERF's accounts receivable management. Though the following observations have not been addressed during 1996, appropriate follow-up procedures are currently in the development stage.

- Deterioration of Accounts Receivable Aging
- Methodology for Establishing Bad Debt Reserves should be Applied Consistently
- Patient Liability Amounts should be Reclassified to Self-Pay
- Procedures to Identify Charity Care should be Enhanced in the Delaware Valley

**Other General Observations**

Although the following observation has not been addressed during 1996, purchasing and accounts payable management are currently in the process of evaluating the potential operational efficiencies of implementing appropriate policies and procedures to address the following recommendation.

- Security and Recovery Procedures for the Pittsburgh Materials Management/Accounts Payable Systems Should be Strengthened

*10*

DC8230 page 16 of 16

TAB  234

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
& RESEARCH FOUNDATION
              Plaintiff,
      vs.                          Civil Action
PRICEWATERHOUSECOOPERS,           No. 00-684
LLP,
              Defendant.

- - - - -

          Videotaped Deposition of JOSEPH W.

TILLETT, JR., called for examination under the

Applicable Rules of Federal Civil Procedure,

taken before me, Michele E. Eddy, a Registered

Professional Reporter and Notary Public in and

for the State of Ohio, pursuant to notice and

stipulations of counsel, at the offices of

Cravath, Swaine & Moore, 825 Eighth Street,

Worldwide Plaza, New York, New York, on

Wednesday, the 2nd day of March, 2005, at 9:00

a.m.

- - - - -

RENNILLO REPORTING SERVICES
A LEGALINK AFFILIATE

2500 Erieview Tower. 1301 East Ninth Street, Cleveland, Ohio, 44114 tel 216.523.1313 fax 216.263.7070
One Cascade Plaza, Suite 1950, Akron, Ohio, 44308 tel 330.374.1313 fax 330.374.9689
1.888.391.3376 (DEPO)

J. William Tillett, CPA

Page 181

1   are new and don't have the vast industry
2   experience, nor will you ever accept -- expect
3   everybody to have that type of experience. But
4   I think I just mentioned a lengthy list of
5   industry specialists that had a considerable      13:57:48
6   amount of experience in conducting those types
7   of audits.
8       Q.   Who did you identify as being
9   inexperienced members of the engagement team,
10  if anyone?                                         13:58:05
11      A.   You know, I didn't -- I don't
12  recall. I do know that I looked at the staff
13  people and had read some of their depositions
14  and from their answers could probably -- if
15  asked that question at that time, may have said    13:58:22
16  this person doesn't have a lot of experience.
17  But I don't recall who that would be.
18      Q.   Let me throw a few names at you and
19  see if we can agree with him. How about
20  Mr. Christian?                                     13:58:37
21          MR. RYAN: I'm sorry, you're asking
22  what about Mr. Christian?
23      Q.   Was he in your view inexperienced
24  for the work he undertook?
25          MR. RYAN: Objection.                       13:58:42

Page 182

1       A.   No.
2       Q.   Was Mr. Panucci inexperienced for
3   the work he undertook?
4       A.   He was a younger staff accountant,
5   a very bright individual. I would probably        13:58:50
6   feel fortunate to have somebody like that on my
7   engagements. I think he, I don't recall, I
8   think this is from depositions, but like the
9   highest grade on the CPA exam and that kind of
10  thing.                                             13:59:06
11      Q.   Did you consider him to be
12  inexperienced, though, is my question.
13      A.   He had -- I wouldn't say
14  inexperienced. He was a staff level person and
15  obviously he would have much less experience      13:59:17
16  than Miss Frazier or Mr. Kirstein or
17  Mr. Buettner, and he would have the same level
18  of experience the other staff accountants would
19  have.
20      Q.   Did you believe Mr. Kirstein and         13:59:29
21  Miss Frazier had appropriate experience for the
22  staffing roles they filled?
23      A.   Yes, I think I just testified to
24  that.
25      Q.   Did you explore Mr. Kirstein or          13:59:40

Page 183

1   Miss Frazier's background other than by reading
2   their transcripts?
3       A.   The transcripts of their
4   depositions?
5       Q.   Yes, in either this matter or the        13:59:55
6   SEC matter.
7       A.   When you say explore, what -- can
8   you help me --
9       Q.   Did you ask questions of anyone,
10  undertake any other independent work to try to    14:00:07
11  arrive at their experience base with earlier
12  clients?
13      A.   I may have discussed with
14  Mr. Crouse and Mr. Carlson his experience as I
15  -- my understanding of his experience as a        14:00:33
16  result of reading the transcripts of his
17  deposition to see if they knew of anything else
18  or that -- I don't recall any specific
19  conversations, but that could have occurred.
20      Q.   Do you recall agreeing with any of       14:00:47
21  the opinions expressed by Mr. Wallace in his
22  rebuttal report?
23          MR. RYAN: Objection.
24      A.   I don't recall. By the nature of
25  his report, it was just a rebuttal of mine, so    14:01:02

Page 184

1   pretty much by definition I can safely say I
2   didn't agree with any of his opinions.
3       Q.   You mentioned that Mr. Buettner had
4   some experience with the client?
5       A.   Yes, sir.                                14:01:17
6       Q.   Do you know today how long that
7   experience ran?
8       A.   Several years. I don't have a -- I
9   don't remember the exact number of years.
10      Q.   Is experience with a client always       14:01:26
11  a benefit to an auditor?
12      A.   There are certainly benefits.
13      Q.   Is it always a benefit?
14      A.   In some people's mind, maybe not.
15  Others usually it is. Maybe it's mostly good,     14:01:38
16  a little bad, you know. People have opinions
17  on that.
18      Q.   Do you have an opinion on it?
19      A.   Yes, I do.
20      Q.   What is that?                             14:01:48
21      A.   I think experience with a client is
22  very good.
23      Q.   What are the opinions -- it's fair
24  to say that there has been some public debate
25  about whether long-time experience or long-term   14:01:59

46 (Pages 181 to 184)

J. William Tillett, CPA

Page 185

1 experience is beneficial, is that fair to say?
2    A.    That is very fair to say.
3    Q.    Reported in the media and other
4 places?
5    A.    Yes, sir.                    14:02:07
6    Q.    And the criticism, in summary form,
7 has been that long-time experience with the
8 same audit client can impair one's
9 independence; is that an accurate statement?
10    A.    I have heard that.          14:02:20
11    Q.    You don't agree with that?
12    A.    I don't disagree that it might
13 occur. It's been my experience in 36 years
14 that I have never observed an impairment of
15 independence as a result of the partner serving  14:02:33
16 the account for a long period of years.
17    Q.    Have you ever observed an
18 impairment of independence as a result of the
19 significance of the revenue stream generated by
20 the client for a given partner?    14:02:49
21    A.    I've heard those allegations or
22 allegations of that.
23    Q.    Have you ever observed it yourself?
24    A.    No.
25    Q.    I just want to ask you to flip to    14:02:58

Page 186

1 page 11 of your report. Towards the bottom of
2 the page, in the final paragraph that appears
3 there, you write, "The information contained in
4 working papers constitutes the principal record
5 of the work that the auditor has done and the    14:03:38
6 conclusions that he has reached concerning
7 significant matters."
8        Is that right?
9    A.    That's right.
10    Q.    You believe that to be true?    14:03:47
11    A.    Yes.
12    Q.    Was the amount of the 17.5 million
13 dollar adjustment to the allowance for doubtful
14 accounts at DVOG in fiscal year 1996 a
15 significant matter?                14:04:02
16    A.    Was the amount?
17        MR. RYAN: Objection.
18    Q.    Yes.
19    A.    I haven't formed an opinion on
20 that.                            14:04:12
21    Q.    Have you formed an opinion about
22 whether the audit team's acceptance of the
23 amount should have been reflected in the work
24 papers for the '96 audit of the DVOG hospitals,
25 Delaware Valley Obligated Group hospitals?    14:04:27

Page 187

1        MR. RYAN: Objection.
2    A.    That the amount?
3    Q.    Should have been somewhere
4 reflected in the work papers and the C&L's team
5 acceptance of that amount.          14:04:38
6        MR. RYAN: Same objection.
7    A.    I think it was reflected.
8    Q.    How do you come to that conclusion?
9    A.    Through review of the work papers.
10    Q.    Do you recall a work paper in which    14:04:47
11 anyone at C&L said 17.5 million dollars will be
12 the adjustment and we approve so, or words to
13 that effect?
14        MR. RYAN: Objection.
15    A.    No, I don't -- I don't think that    14:04:56
16 was stated as such in the working papers.
17    Q.    Then what do you refer to in the
18 working papers?
19    A.    The adjustment itself.
20    Q.    The entries?              14:05:07
21    A.    The entries itself.
22    Q.    The journal entries?
23    A.    The journal entries, right, that
24 are summarized in the C&L work papers.
25    Q.    Do you see in the work papers for    14:05:15

Page 188

1 the '96 audit of the Delaware Valley Obligated
2 Group hospitals any mention of the clients or,
3 rather, C&L's 15 to 20 million dollar range for
4 the suitable amount of an adjustment to the
5 allowance for doubtful accounts as testified to    14:05:33
6 by Mr. Buettner?
7    A.    I don't see that number or range
8 documented in the work papers.
9    Q.    Would you expect, consistent with
10 your statement on page 11 of your report, that    14:05:43
11 that range should have been documented in the
12 work papers?
13    A.    Not necessarily.
14        MR. RYAN: Objection.
15    Q.    You don't have an opinion one way    14:05:49
16 or the other?
17        MR. RYAN: Objection.
18    A.    I would not be surprised to see it.
19 I would not be surprised not to see it.
20    Q.    Did you when, in your experience,    14:05:59
21 counsel for an adjustment to the allowance of
22 doubtful accounts at a not-for-profit hospital
23 reflect the suitable range or the acceptable
24 range for which you had counseled in your work
25 papers?                          14:06:16

47 (Pages 185 to 188)

J. William Tillett, CPA

1     THE WITNESS: Can you read that
2 back?
3     (Record read.)
4     A. I think I understand that.
5     The audit process -- it's been my   14:06:45
6 experience that the audit process is just that,
7 a process. And the -- through the deposition
8 testimony I find both from AHERF individuals
9 and from C&L individuals to be quite
10 consistent.     14:07:09
11     What they are describing in that
12 process I find to be very common in a very
13 usual or normal process that would be
14 occurring.
15     Often in my career -- I hope this   14:07:20
16 is responsive -- we would form a preliminary
17 opinion that an allowance for doubtful account
18 should be increased and discuss it with clients
19 in a very similar fashion as Mr. Buettner and
20 Mr. Cancelmi I believe described whereby the   14:07:48
21 auditors say we think you should increase the
22 allowance. The client may say, well, how much
23 do you think. The auditor may say 15, 20
24 million dollars might be the number we would
25 feel better with, and then the client comes   14:08:03

1 forth and makes an adjustment.
2     What's important is the adjustment
3 is made and it's dealt with. If it had not
4 been dealt with, I think had Mr. Buettner would
5 have posted it to a SUD along with some of the   14:08:23
6 other items involved in the journal entries and
7 had to, at that time, would have had to make a
8 determination whether the '96 SUD was -- the
9 items on the SUD, either as individual items or
10 in the aggregate, had a material impact on the   14:08:44
11 financial statements and would have had to
12 complete that process.
13     Under the facts, as I understand
14 them, where the adjustment was made, the 17.5
15 never got posted to the SUD and, in fact, items   14:09:00
16 that were on the SUD already, the preliminary
17 SUD got taken off the SUD. So I think in his
18 words they got several things on the balance
19 sheet cleaned up at the same time.
20     Q. My question, however, remains, in   14:09:15
21 your experience, when you counsel clients to
22 adjust the allowance for doubtful accounts in
23 an upward fashion, to increase it, did you put
24 the amount of the proposed adjustment in your
25 work papers, or any suitable range?   14:09:28

1     MR. RYAN: Objection.
2     A. I may have. It may have occurred
3 just as I tried to describe it. It could have
4 been a preliminary judgment or assessment and
5 it -- the act that -- how it was proposed is,   14:09:43
6 of course, I can understand a great importance
7 to you right now, but at the time of the audit
8 and in conducting an audit, who proposed it or
9 whatever is not as relevant as at the end of
10 the day, the allowance was a reasonable amount   14:10:05
11 in the eyes of the auditor.
12     Q. I don't want to dicker with you
13 about order of importance of items, but my
14 question is, can you think of an instance where
15 you proposed for one of your not-for-profit   14:10:15
16 hospital's clients that the allowance for
17 doubtful accounts be enhanced or increased at
18 year-end where you didn't document the amount
19 that would be suitable to you?
20     A. I'm sure --   14:10:27
21     MR. RYAN: You mean an actual
22 client, is that what you're asking?
23     Q. No, can you think of an instance,
24 first?
25     A. I'm sure there are. I'm just   14:10:33

1 telling you the process as I gained to
2 understand as a result of mainly from the
3 depositions reap along with the working papers
4 how all this happened, I find it not unusual
5 and something that I could put myself in I   14:10:52
6 think this has happened this way to me before.
7     Q. Okay.
8     A. Whether it's a specific hospital, I
9 wouldn't be able to recollect that.
10     Q. Is it, in your view, the better   14:11:01
11 practice to document a suitable range or a
12 suitable amount --
13     MR. RYAN: Objection.
14     Q. -- in the work papers?
15     A. It becomes important, particularly   14:11:07
16 if the client doesn't make the entry because
17 then you have to have an amount on the SUD that
18 supports it. The fact that the adjustment is
19 made is not concerning to me. It makes the
20 issue of having the documentation of less --   14:11:30
21 much less concern.
22     Q. My question stands. Do you believe
23 it to be a better practice to document such a
24 range or such an amount in the work papers?
25     MR. RYAN: Objection.   14:11:40

48 (Pages 189 to 192)

J. William Tillett, CPA

Page 193

1    A.   Documentation, more is better, if I
2  can make that general comment and particularly
3  in situations like we have at hand here.  So I
4  guess I would give you generally speaking that
5  would be                                14:12:02
6       Q.   That would be your view?
7       A.   Yes.
8       Q.   Is that a yes?
9       A.   Yes  I'm sorry.
10      Q.   Was the transfer of the 50 million    14:12:06
11  dollars of reserves that we discussed earlier
12  today from the Graduate hospitals or reserves
13  established in connection with the acquisition
14  of the Graduate hospitals to the Delaware
15  Valley Obligated Group hospitals' bad debt    14:12:23
16  reserves a significant matter, the existence of
17  which or the fact of which should have been
18  recorded in the work papers?
19            MR. RYAN:  Are you talking about
20  the 50?                                14:12:33
21            MR. JONES:  The 50  The big 50.
22      A.   The 50
23            MR. RYAN:  Objection.
24      A.   I think it was recorded in the work
25  papers.                                14:12:41

Page 194

1       Q.   Describe for me how.
2       A.   The adjustments made by the client
3  are summarized in the C&L work papers, the
4  March 25 million and the April 25 million.
5       Q.   Did you see any work papers,    14:13:02
6  though, that described the work done or any
7  audit conclusion reached in connection with
8  whether the transfer of the 50 million dollars
9  of reserves that we've just discussed complied
10  with GAAP?                             14:13:23
11      A.   I saw Mr. Buettner's analysis where
12  he considered the effects of the 50 million
13  dollar transfer on the audited financial
14  statements.
15      Q.   Did that analysis expressly refer    14:13:38
16  to GAAP compliance or compliance with GAAP?
17            MR. RYAN:  Objection.
18      A.   I don't believe very many audit
19  schedules specifically make those kinds of
20  statements.                            14:13:55
21      Q.   I understand that.  I'm really only
22  talking about one.
23            Did his analysis refer to GAAP?
24      A.   No, nor did I expect it to.
25      Q.   My question, did his analysis refer    14:14:07

Page 195

1  to GAAP?
2       A.   I don't recall that it did.
3       Q.   I'm going to hand it to you now or
4  at least a set of documents that included, I
5  believe, from his deposition, and they were    14:14:15
6  marked as Exhibit 4473 to that deposition.  If
7  you will quickly just confirm to me that the
8  analysis by which you just referred by
9  Mr. Buettner is included in Exhibit 4473, that
10  would be great.                        14:14:30
11      A.   Yes, sir.
12      Q.   In particular, which pages do you
13  refer to?
14      A.   They're all -- all these are
15  somewhat related, but I think the principal    14:14:58
16  schedules would be CL 036438 and CL 036439.
17      Q.   Are you aware of any other work
18  papers, to the extent these can be so
19  considered, but any work papers, besides these
20  pages you just referred to, that address the    14:15:27
21  materiality of the 50 million dollars in
22  reserve transfers?
23            MR. RYAN:  Objection.
24      A.   I think his schedule is doing more
25  than just addressing the materiality, but I do    14:15:41

Page 196

1  believe that it is addressing materiality.
2            I'm not -- I am not aware if there
3  is other work papers that specifically address
4  the materiality of the 50 million dollar
5  transfer.                              14:15:57
6       Q.   Do you consider these handwritten
7  notes -- they are handwritten notes, is that
8  right?
9            MR. RYAN:  Just these two pages?
10      A.   The two pages                  14:16:03
11      Q.   The pages you just referred to.
12      A.   That's right  Many of the
13  attachments or accompanying schedules and data
14  are not handwritten, but you could tell it's
15  his -- it appears to be his handwriting from    14:16:15
16  them that he's using to work on this analysis.
17      Q.   But nonetheless, the handwritten
18  notes to which you just referred, do you
19  consider them to be work papers for the '97
20  audit?                                 14:16:28
21      A.   Yes
22      Q.   You understand they were maintained
23  in separate files from the rest of the work
24  papers?
25      A.   Yes  And specifically the auditing    14:16:32

49 (Pages 193 to 196)

TAB 235

# In The Matter Of:

## AHERF   v.
## PRICEWATERHOUSECOOPERS, L.L.P.

---

### CHARLES W. LISMAN, JR.
### May 22, 2002

---

### MANHATTAN REPORTING CORP.
### 420 LEXINGTON AVENUE
### NEW YORK, NY  10170
### (212) 557-7400    FAX: (212) 692-9171

Original File 052202CL.TXT, 249 Pages
Min-U-Script® File ID: 1799883967

## Word Index included with this Min-U-Script®

Page 3

[1]                * INDEX *
[2] Examination by Mr. Ryan - - - - - - - - - - - 5
[3] Certificate of Court Reporter - - - - - - - - - 247
    Errata Sheet - - - - - - - - - - - - - - - - - 248
[4] Notice of Non-Waiver of Signature - - - - - - - 249
[5]
[6]
[7]
[8]
[9]           * INDEX OF EXHIBITS *
[10] Deposition Exhibit 1 - - - - - - - - - - - - - - 6
     Deposition Exhibit 2 - - - - - - - - - - - - - 38
[11] Deposition Exhibit 3 - - - - - - - - - - - - - 77
     Deposition Exhibit 4 - - - - - - - - - - - - - 83
[12] Deposition Exhibit 5 - - - - - - - - - - - - - 96
     Deposition Exhibit 6 - - - - - - - - - - - - - 99
[13] Deposition Exhibit 7 - - - - - - - - - - - - - 110
     Deposition Exhibit 8 - - - - - - - - - - - - - 129
[14] Deposition Exhibit 9 - - - - - - - - - - - - - 131
     Deposition Exhibit 10 - - - - - - - - - - - - 165
[15] Deposition Exhibit 11 - - - - - - - - - - - - 175
     Deposition Exhibit 12 - - - - - - - - - - - - 176
[16] Deposition Exhibit 13 - - - - - - - - - - - - 232
     Deposition Exhibit 14 - - - - - - - - - - - - 235
[17] Deposition Exhibit 15 - - - - - - - - - - - - 236
     Deposition Exhibit 16 - - - - - - - - - - - - 242
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]
[2]           P-R-O-C-E-E-D-I-N-G-S
[3]
[4]    THE VIDEOGRAPHER: Good morning. I'm
[5] the video operator, Jake Mercatoris, of
[6] Manhattan Reporters, New York, New York. Today
[7] is May 22, 2002, and the time is 9:00. We are
[8] at the offices of Manion, McDonough & Lucas to
[9] take the videotape deposition of Charles Lisman
[10] in the matter of The Official Committee of
[11] Unsecured Creditors of Allegheny Health,
[12] Education & Research Foundation versus
[13] PricewaterhouseCoopers in the United States
[14] District Court for the Western District of
[15] Pennsylvania.
[16]    Will counsel please introduce
[17] themselves?
[18]    MR. RYAN: Antony Ryan from Cravath
[19] Swaine & Moore for defendant
[20] PricewaterhouseCoopers, and with me is
[21] Alexandra Rigney, a legal assistant at Cravath,
[22] and Joe McDonough from Manion, McDonough also
[23] representing PricewaterhouseCoopers.
[24]    MR. JONES: Jim Jones with Jones,
[25] Day, Reavis & Pogue on behalf of The Official

Page 5

[1] Committee of Unsecured Creditors for AHERF.
[2] With me is Peter Kyviakidis of Zolfo Cooper.
[3]    THE VIDEOGRAPHER: Will the Court
[4] Reporter please swear in the witness?
[5]
[6]    CHARLES W. LISMAN, JR.
[7] being first duly sworn,
[8] was examined and testified as follows:
[9]
[10]           EXAMINATION
[11]
[12]    THE VIDEOGRAPHER: We may begin.
[13]           BY MR. RYAN:
[14]    Q: Good morning, Mr. Lisman.
[15]    A: Good morning.
[16]    Q: Could you give us your full name for the
[17] record, please?
[18]    A: Charles Walter Lisman, Jr.
[19]    Q: And what's your home address?
[20]    A: 681 Valencia Road, Mars, Pennsylvania 16046
[21]    Q: By whom are you currently employed?
[22]    A: By Hussey Copper, Limited.
[23]    Q: Have you been deposed before, Mr. Lisman?
[24]    A: Correct.
[25]    Q: How many times?

Page 6

[1]    A: It was with the SEC, but I don't recall how
[2] many days exactly I was there.
[3]    Q: Was that a deposition dealing with AHERF?
[4]    A: Correct.
[5]    Q: How long were you employed by AHERF?
[6]    A: I believe it was March of '95 through November
[7] of '98, if my memory serves me.
[8]    Q: And was AHERF the term that you usually used to
[9] refer to your employer?
[10]    A: Correct.
[11]    MR. RYAN: Let me ask the Court
[12] Reporter to mark, please, as Exhibit 1, a
[13] document with the Bates No. DBR-CL 0016.
[14]
[15]    (Deposition Exhibit 1 marked for
[16] identification.)
[17]
[18]           BY MR. RYAN:
[19]    Q: Do you recognize Exhibit 1, Mr. Lisman?
[20]    A: Yes.
[21]    Q: Is this a copy of your resume?
[22]    A: This is a copy of my old resume, yes.
[23]    Q: So this shows you still being at AHERF, right?
[24]    A: Correct.
[25]    Q: So this would be from 1998 or earlier, is that

Page 7

[1] right?

[2] A: This would have been prepared probably while I

[3] was at Tenet.

[4] Q: How long were you at Tenet?

[5] A: November of '98 through May of '99, I believe.

[6] Q: Is Exhibit 1 accurate for your work experience

[7] and education as of 1998?

[8] A: It looks like my resume, yes.

[9] Q: If you look down under AHERF, you've got a

[10] listing there of what you did at your job

[11] there, is that right?

[12] A: Okay.

[13] Q: The first bullet point says, Review and analyze

[14] the monthly financial results of AHERF

[15] consolidation, the University, and the

[16] for-profit corporations?

[17] A: Correct.

[18] Q: Could you describe for us what was involved in

[19] reviewing and analyzing the monthly financial

[20] results of AHERF consolidation?

[21] A: Reviewing AHERF consolidation, which was the

[22] latter part of my time at AHERF, was making

[23] sure that all of the hospital results made it

[24] into the AHERF consolidated and that

[25] eliminating entries eliminated the appropriate

Page 8

[1] intercompany accounts, and the University was

[2] bringing in the University, and the for-profits

[3] were the for-profit corporations that were

[4] acquired during that time frame.

[5] Q: Did each of AHERF's individual hospitals have

[6] its own general ledger?

[7] MR. JONES: Object to form as vague

[8] and unclear as to time frame.

[9] Q: You can go ahead and answer anyway.

[10] A: I believe every hospital had its own general

[11] ledger, yes.

[12] Q: And at least during the latter time that you

[13] were at AHERF, were you the person who made the

[14] consolidating entries for AHERF's consolidated

[15] financial statements?

[16] A: The entries. When you say entries, what are

[17] you speaking of?

[18] Q: Were you the one who drew up the journal

[19] entries?

[20] A: At consolidation, all you're doing is bringing

[21] together all the individual hospitals, then

[22] there are consolidating entries. No, I would

[23] not have drawn up the consolidating entries.

[24] Q: Who is it who drew up the consolidating journal

[25] entries?

Page 9

[1] A: That would have probably been Nick Vidovich or

[2] Frank Insana. Probably Frank.

[3] MR. JONES: Could you spell Frank's

[4] last name for us or try?

[5] THE WITNESS: I'll try. I believe

[6] it's I-N-S-A-N-A.

[7] BY MR. RYAN:

[8] Q: So when you reviewed the monthly financial

[9] results of AHERF consolidation —

[10] A: Okay.

[11] Q: — what types of duties did that encompass?

[12] A: That would include making sure that, within the

[13] AHERF consolidation, there were separate

[14] hospital statements that would come in or

[15] separate operating units. You would make sure

[16] that the numbers that are getting into the

[17] AHERF consolidated agrees to the individual

[18] hospital's statements or the individual

[19] reporting entity's statements.

[20] Q: Now, you see the next item on your resume says,

[21] Transition the general ledger accounting from

[22] the various Philadelphia sites to the

[23] Pittsburgh office?

[24] A: Correct.

[25] Q: Could you describe for us, please, what was

Page 10

[1] involved with that?

[2] A: When AHERF acquired the Delaware Valley

[3] hospitals — Delaware Valley being the

[4] Philadelphia region hospitals — all of the

[5] accounting was done in Philadelphia at each of

[6] those hospitals. The intent of AHERF was to

[7] centralize accounting, i.e., bring the

[8] accounting back to Pittsburgh, so we had to go

[9] and learn the monthly accounting at each of the

[10] hospitals or from the group that did the

[11] accounting in Philadelphia to be able to then

[12] transfer that data into the McCormick & Dodge

[13] system which was used in Pittsburgh.

[14] Q: And is that something that was occurring around

[15] the time when you began at AHERF?

[16] A: Yes.

[17] Q: When was that process completed?

[18] A: It was in various phases. When I had started

[19] AHERF, the Delaware Valley Obligated Group, as

[20] it was called, was acquired. That would have

[21] been MCP, Elkins, Bucks, Hahnemann, St.

[22] Christopher's, the University. So that would

[23] have gone for — I don't know how long it took

[24] us to transfer that back to Pittsburgh. Then

[25] later on, they acquired the Graduate hospitals

Page 11

[1] and the for-profits, so there was a time
[2] difference. There was one set of accounting
[3] general ledgers that got brought back, then
[4] there was time in Pittsburgh, then there was
[5] the acquisition of the Graduate group which the
[6] whole process started again. So it started in
[7] '95, and it ended — I don't recall. Rancocas
[8] would have been the last one that got brought
[9] back from the Philadelphia region.
[10]    Q: And that would have been in '97?
[11]    A: I don't know that without looking back at the
[12] actual dates.
[13]    Q: When you refer to the for-profit corporations,
[14] what corporations are those?
[15]    A: Graduate had under I believe it was the Shell
[16] Company Graduate Health Systems was the name of
[17] it. There was Bala Imaging, which was an MRI
[18] for-profit company, and there was a Home
[19] Infusion Company, and there was a Home Service
[20] Company, I believe it was, and there were Reed,
[21] I want to say, parking garage, and there were
[22] three or four others, but I don't recall the
[23] names of them.
[24]    Q: Were there any for-profit corporations
[25] associated with the Delaware Valley hospitals

Page 12

[1] that AHERF already owned in 1995?
[2]    MR. JONES: Object to form.
[3]    Q: Go ahead.
[4]    A: I'm not positive, but Horizon parking garage
[5] might have been a for-profit. I don't know off
[6] the top of my head.
[7]    Q: That was associated with St. Christopher's
[8] hospital?
[9]    A: Correct.
[10]    Q: Are there any others that you can think of?
[11]    A: I don't know if SDN was or not. I didn't do
[12] much with SDN. That was a Pittsburgh-based
[13] group that did that.
[14]    Q: At AHERF, when used the term the Delaware
[15] Valley —
[16]    A: Correct.
[17]    Q: — did you use that term to refer to all of
[18] AHERF's operations in the Philadelphia area?
[19]    A: I don't know that for a fact. I would probably
[20] say just the original Delaware Valley Group,
[21] and then the other would be the Graduate
[22] hospitals.
[23]    Q: Now, the next item on your resume says, Review
[24] the annual consolidated financial statements,
[25] ($4 billion in revenue) and act as liaison with

Page 13

[1] the independent auditors, right?
[2]    A: Correct.
[3]    Q: In what ways did you act as liaison with the
[4] independent auditors?
[5]    A: I would provide them data. They would come in
[6] and be auditing a specific area. Who do I need
[7] to talk to? Go talk to so and so, or, here, I
[8] have that information. Here's your general
[9] ledgers that you're going to need or you're
[10] going to need to see Dan on that. You need to
[11] see whomever on whatever various areas. Or if
[12] they had difficulties in obtaining data from
[13] various people, I would try to obtain that data
[14] for them or get that person to contact them so
[15] that they could get whatever it was they
[16] needed.
[17]    Q: When you say Dan, is that Dan Cancelmi?
[18]    A: Correct.
[19]    Q: And were AHERF's independent auditors from
[20] Coopers & Lybrand?
[21]    A: Correct.
[22]    Q: So you were, in effect, the first person who
[23] people from Coopers came to to get information?
[24]    A: No. I did not — I dealt with most of the
[25] staff people, the field in-charge and below

Page 14

[1] usually. Usually the managers and the partners
[2] would talk with Dan or Steve or Al as far as
[3] the planning and things like that.
[4]    Q: And is Steve Steve Spargo?
[5]    A: Correct.
[6]    Q: And Al is Al Adamczak?
[7]    A: Correct.
[8]    Q: Who do you recall dealing with from Coopers &
[9] Lybrand on the AHERF engagement?
[10]    A: When you mean dealing with, what are you
[11] asking?
[12]    Q: Yeah. When the auditors from Coopers came in
[13] to audit AHERF, who do you remember interacting
[14] with as part of their audit?
[15]    A: It was various people in the various years. It
[16] would have been Brian Christian, Marc Panucci,
[17] Kristen Heinlein, or something on that order,
[18] Christa Porter. Early years, it would have
[19] been Amy Frazier potentially. There were other
[20] staff people, but I can't think of their names.
[21]    Q: Did you interact with Mark Kirstein?
[22]    A: Usually not. I knew Mark, and we would talk,
[23] but never sit down and talk about — other than
[24] the periodic meetings we would have during the
[25] audit for audit updates.

## In The Matter Of:

*AHERF   v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*CHARLES W. LISMAN, JR.*
*May 23, 2002*

---

*MANHATTAN REPORTING CORP.*
*420 LEXINGTON AVENUE*
*NEW YORK, NY  10170*
*(212) 557-7400    FAX: (212) 692-9171*

*Original File 052302CL.TXT, 243 Pages*
*Min-U-Script® File ID: 1807000367*

## Word Index included with this Min-U-Script®

---

Page 451

[1] had made over $100 million in adjustments
[1] that fiscal year; right?
[3]    A: Compared to the schedule, yes, I would have
[1] known that.
[1]    Q: Did you consider that to be significant at
[1] the time?
[1]    A: Yes. Looking at it now, it's still
[1] significant.
[1]    Q: Do you infer from this schedule that AHERF
[1] may, in fact, have earned less in fiscal year
[1] 1997 than it reported on its income
[1] statement?
[1]    A: Without —
[1]    MR. JONES: Object to form.
[1]    A: Without looking at each component of this, a
[1] lot of the adjustments could have been prior
[1] expenses taken on the hospital and were valid
[1] reversal of those expenses.
[1]    Q: Did you ever tell anyone about the use of
[1] over $100 million in adjustments at AHERF for
[1] fiscal year 1997?
[2]    A: Would I have told anyone at AHERF?
[3]    Q: Anyone at all.
[4]    A: I would have given this to Dan at his request
[5] to prepare this. That's who I reported to

Page 452

[1] was Dan.
[2]    Q: Okay. So you prepared the second page of
[3] Defendant's Exhibit 50 at the direction of
[4] Mr. Cancelmi?
[5]    A: It looks like one of my schedules, yes.
[6]    Q: The third column here is headed Without
[7] Cushion Net Income/(Loss) Year to Date;
[8] right?
[9]    A: Yes.
[10]    Q: What did you understand the term cushion to
[11] mean at the time?
[12]    A: The term cushion?
[13]    Q: Yes.
[14]    A: Cushion would be reserve excess, not
[15] necessary.
[16]    Q: Now, $84,959,000 of these adjustments are
[17] indicated as having taken place at DVOG;
[18] right?
[19]    A: Correct.
[20]    Q: And an additional $17,400,000 took place at
[21] former Graduate Health System hospitals for
[22] which you had accounting responsibility;
[23] right?
[24]    A: What was that last part again?
[25]    Q: $17,400,000 of adjustments took place at

Page 453

[1] former Graduate Health System entities for
[2] which you had accounting responsibility;
[3] right?
[4]    A: Yes. And I just want to — Rancocas or AH,
[5] New Jersey wasn't a part of the Centennial
[6] group of hospitals. It was always referred
[7] to as part of the Graduate acquisition, but
[8] they were a separate reporting entity on
[9] their own. They were not a part of
[10] Centennial, as you can see here.
[11]    Q: All right. So AHERF put the four
[12] Pennsylvania hospitals that it required from
[13] Graduate Health Systems into a bond obligated
[14] group known as Centennial; right?
[15]    A: I think that's how they had their own
[16] obligating group also. I don't think
[17] Rancocas was a part of the Graduate, per se,
[18] group because it was a New Jersey hospital.
[19]    Q: Okay. In any event, the four hospitals in
[20] Centennial Obligated Group were the four
[21] Pennsylvania-based hospitals that AHERF
[22] required for the Graduate Health System?
[23]    A: Yes, the SDN required from the Graduate
[24] Health System.
[25]    Q: And the AHERF that are acquired from SDN?

Page 454

[1]    A: Yes.
[2]    Q: And the Rancocas Hospital was on its own in
[3] the Obligated Group Allegheny Hospital, New
[4] Jersey?
[5]    A: Yes.
[6]    Q: AHERF ever made adjustments of this magnitude
[7] at hospitals which you had accounting
[8] responsibility in previous fiscal years?
[9]    A: I thought we saw adjustments in 1996 on one
[10] of the schedules. Maybe not a hundred
[11] million, but I thought we saw adjustments in
[12] 1996.
[13]    Q: Right. Those were adjustments in
[14] substantially lower amounts; right?
[15]    A: Lower than 107, yes.
[16]    Q: Significantly lower; right?
[17]    A: I don't know without looking back, but okay.
[18]    Q: Did you have a view about these adjustments
[19] at the time?
[20]    A: Did I have a view? I don't recall having any
[21] view. I would have probably discussed them
[22] with Dan, but I don't recall what the final
[23] outcome of those discussions were.
[24]    Q: Do you remember whether you had any concerns
[25] that some or all of these adjustments might

Page 455

[1] not be proper?

[2] A: Without looking as to the makeup, as this —
[3] in order to get to this kind of number there
[4] had to be some makeup what those of
[5] adjustments were, some coming out of reserve
[6] of the analysis of reserves, which meant that
[7] they were at some point expensed in the past.

[8] So that was a timing issue as they
[9] were expensed prior. Now you're just
[10] bringing income for them. I don't know what
[11] the makeup of the 107 is.

[12] Q: The purchase accounting reserves at the
[13] Graduate hospitals had not been expensed in
[14] the past, had they?

[15] MR. JONES: Object to form.

[16] A: I don't know if they had or hadn't. I
[17] thought we saw a schedule that was pre and
[18] post, and part of them did hit the profit and
[19] loss and part didn't.

[20] Q: You were aware at the time that many of the
[21] purchase accounting adjustments at the
[22] Graduate hospitals were established by AHERF
[23] in purchase accounting?

[24] A: A lot of the account 402501 were a part of
[25] purchasing accounting, yes.

Page 456

[1] Q: And various other contingent liabilities that
[2] were created on the Graduate Hospital's
[3] balance sheets were also created in purchase
[4] accounting?

[5] A: Some were and some probably would have been
[6] on the books already, yes.

[7] Q: And the ones that were created in purchase
[8] accounting were going to be amortized over
[9] time; correct?

[10] A: The asset would have been, yes.

[11] Q: So you are aware at this time in the summer
[12] of 1997 that AHERF had taken very little
[13] expense related to those reserve accounts;
[14] right?

[15] A: I would need to see the makeup of the 107 to
[16] determine how much was expensed on each of
[17] the hospital's books at any point in time.

[18] Q: I understand. I'm not asking you now about
[19] particular amounts. I'm just asking whether
[20] you knew in the summer of 1997 that a portion
[21] of these adjustments represented reserve
[22] amounts that had not been expensed at AHERF?

[23] A: A portion of them could have been. I'm
[24] saying I don't know without seeing the
[25] specific pieces. But a portion of them could

Page 457

[1] have been, yes. I don't know how much of a
[2] portion without seeing the actual makeup of
[3] the 107.

[4] Q: Did the use of those purchase accounting
[5] reserves as income statement adjustments in
[6] fiscal year 1997 raise any concerns in your
[7] mind?

[8] A: It could have at that point in time, and I
[9] would have talked to Dan about them. I don't
[10] recall sitting here today looking back
[11] saying, oh, yes, I questioned this, that and
[12] the other. I don't remember specifically
[13] questioning those transactions.

[14] Q: And you can't recall bringing any of those
[15] transactions to the attention of Coopers &
[16] Lybrand, can you?

[17] MR. JONES: Object to form,
[18] foundation.

[19] A: Not that I recall.

[20] MR. RYAN: Let me mark this as
[21] Defendant's Exhibit 51, a one-page document
[22] with Bates No. CLIS 0211.

[23]

[24] (Deposition Exhibit 51 marked for
[25] identification.)

Page 458

[1]    - - - -
[2]    BY MR. RYAN:

[3] Q: Do you recognize Defendant's Exhibit 51,
[4] Mr. Lisman?

[5] A: Yes.

[6] Q: What is it?

[7] A: It is a schedule proposed adjustments that I
[8] would have gotten from Dan.

[9] Q: Is that Mr. Cancelmi's handwriting?

[10] A: With the exception of the 6 of 1997 circled
[11] and the general account ledger account
[12] numbers, the five digit numbers.

[13] Q: Do you think that you used Mr. Cancelmi's
[14] handwritten schedule to prepare journal
[15] entries for adjustments in June 1997?

[16] A: That's what it appears to be, yes, but I
[17] don't know that for sure.

[18] Q: Now, the first row says MCP-IP; right?

[19] A: Yes.

[20] Q: Does that mean MCP Hospital inpatient?

[21] A: Yes.

[22] Q: There are various entries for inpatient and
[23] out-patient accounts at the DVOG hospitals;
[24] right?

[25] A: Right. And Graduate and Rancocas, yes.

Case 2:00-cv-00684-DSC    Document 187-2    Filed 08/19/2005    Page 64 of 65

CHARLES W. LISMAN, JR.                                              AHERF  v.
May 23, 2002                            PRICEWATERHOUSECOOPERS, L.L.P.

Page 459

[1] Q: That's the same 6,500,000 at Graduate and
[2] Rancocas you've seen before?
[3] A: Yes.
[4] Q: The entries at the top of the page reflect
[5] the recognition of income at DVOG hospitals
[6] from reserves transferred there from Graduate
[7] hospitals; right?
[8] A: Right.
[9] Q: Did you ever provide Defendant's Exhibit 51
[10] to Coopers & Lybrand?
[11] A: Not that I recall specifically, but if they
[12] would have asked for the intercompany makeup,
[13] they would have needed something like this,
[14] that why MCP had a payable to Graduate and
[15] vice versa. Maybe not this format, but some
[16] makeup as to what's in the intercompanies.
[17] But I don't know if I got that question or
[18] not.
[19] Q: Okay. When you say you don't recall
[20] specifically, do you have any recollection of
[21] that?
[22] A: No. But if you're looking at the
[23] intercompany balances, the question would be
[24] raised why would MCP have an intercompany
[25] balance with Graduate would be the logical

Page 460

[1] question. But I don't know one way or
[2] another or if they would have dealt with
[3] someone else on staff as to what was the
[4] makeup in the intercompany balances.
[5] Q: You don't recall anyone from Coopers asking
[6] you that question, do you?
[7] A: No.
[8] Q: You didn't volunteer to Coopers & Lybrand
[9] that these entries existed, did you?
[10] MR. JONES: Object to form.
[11] A: No. I would have answered the questions that
[12] were asked of me.
[13] MR. RYAN: Why don't we take our last
[14] break of the day.
[15]
[16] (There was a recess in the proceedings.)
[17]
[18] BY MR. RYAN:
[19] Q: Let me mark these as Defendant's Exhibit 52,
[20] a two-page document with Bates numbers
[21] DC3723, page 5 through page 6
[22]
[23] (Deposition Exhibit 52 marked for
[24] identification.)
[25]

Page 461

[1] BY MR. RYAN:
[2] Q: Do you recognize Defendant's Exhibit 52,
[3] Mr. Lisman?
[4] A: Yes.
[5] Q: What is it?
[6] A: It's a memo from Dan Cancelmi to Al Adamczak,
[7] Subject: Justification for Preparing One Set
[8] of Consolidated Statements.
[9] Q: Did you receive a copy of this memo at the
[10] time?
[11] A: Yes.
[12] Q: Do you recall then in fiscal year 1997 AHERF
[13] prepared only consolidated financial
[14] statements?
[15] A: When you say consolidated financial
[16] statements, what do you mean by that?
[17] Q: In years before fiscal year 1997 AHERF issued
[18] separate sets of audited financial statements
[19] for various hospitals or obligated groups
[20] within its system; right?
[21] A: Okay.
[22] Q: Do you recall that in fiscal year 1997 AHERF
[23] no longer did that but only issued
[24] consolidated financial statements?
[25] A: I don't recall that, but — was it one

Page 462

[1] consolidated statement or was it one-year
[2] statements?
[3] Q: I'm talking about a single consolidated
[4] financial statement as opposed to having
[5] separately issued and audited financial
[6] statements for the various entries that made
[7] up the AHERF system.
[8] A: But there were consolidating schedules
[9] contained therein.
[10] Q: There were attachments, consolidating
[11] schedules?
[12] A: Within the financial statements. That's
[13] possible. I would have to see the annual
[14] report, but, yes, that's possible.
[15] Q: In this memorandum, Defendant's Exhibit 52,
[16] Mr. Cancelmi sets forth reasons for why AHERF
[17] did that; right?
[18] A: Yes.
[19] Q: To the best of your knowledge, are the
[20] reasons that Mr. Cancelmi gives here in this
[21] memo the reasons that actually motivated
[22] AHERF to prepare only consolidated financial
[23] statements?
[24] MR. JONES: Object to foundation.
[25] A: I don't know if that was AHERF's motive to do

Page 463

[1] that or not. I don't know if this memo
[2] caused that or if this was just one Dan
[3] trying to explain — Al probably asked Dan
[4] what would be the justification for one set,
[5] and Dan researched and gave him these
[6] justifications. Whether that was the
[7] deciding factor, I do not know.
[8]     Q: Do you recall any discussion at AHERF about
[9] issuing only consolidated financial
[10] statements in fiscal year 1997?
[11]     A: At that point in time we probably did discuss
[12] it, but I don't recall at this point.
[13]     MR. RYAN: Let me mark, please, as
[14] Defendant's Exhibit 53 a two-page document
[15] with Bates numbers DC8421, page 1 through
[16] page 2.
[17]
[18]     (Deposition Exhibit 53 marked for
[19] identification.)
[20]
[21]     BY MR. RYAN:
[22]     Q: Do you recognize Defendant's Exhibit 53,
[23] Mr. Lisman?
[24]     A: Specifically this document off the top of my
[25] head, no. This is the general format that

Page 464

[1] Coopers would put together when we would have
[2] update meetings. This particular meeting on
[3] June 20, 1997, no, that doesn't stick out as
[4] a particular date to me.
[5]     Q: All right. If you wouldn't mind just looking
[6] through the bullet points on this exhibit and
[7] letting me know whether any of them refresh
[8] your recollection as to whether you attended
[9] the June 20, 1997 AHERF update meeting.
[10]     A: (Witness reviews document.)
[11]     Not necessarily because the one thing
[12] that potentially would is Graduate closing
[13] date March 1 versus May 1. An item could
[14] appear on numerous update meetings.
[15]     It could be on a June 20 one, it
[16] could be on a July 5 one if it still hasn't
[17] been resolved. No particular point leads me
[18] to say, yes, I was there.
[19]     If I was at the meeting and I
[20] retained my copy of the outline, I would
[21] indicate who from Coopers' side and from
[22] AHERF's side was in attendance if I would
[23] have retained my copy.
[24]     Q: Do you recall what the issue was with
[25] Graduate closing date March 1 versus May 1?

Page 465

[1]     MR. JONES: Object to foundation. Do
[2] you mean at the meeting he now says he
[3] doesn't know if he attended?
[4]     MR. RYAN: No.
[5]     BY MR. RYAN:
[6]     Q: Do you know what the item Graduate closing
[7] date March versus May 1 on Defendant's
[8] Exhibit 53 represents?
[9]     A: From what I recall today, not necessarily.
[10] Specifically what it related to back then, it
[11] had —
[12]     MR. JONES: Let me interrupt. My
[13] objection is still foundation.
[14]     MR. RYAN: Please don't interrupt the
[15] witness.
[16]     MR. JONES: I'm allowed to make my
[17] objection before he answers, if I possibly
[18] can. Go ahead. I met no offense. When you
[19] start to answer before I have an opportunity,
[20] I have to, Mr. Lisman, just for your benefit,
[21] try to get it in before you answer. I
[22] apologize. I was not trying to be rude. I
[23] was trying to preserve my objection. Go
[24] ahead.
[25]     A: That's fine. There was some question

Page 466

[1] surrounding the Graduate acquisition by SDN
[2] versus AHERF is how I recall it. That may
[3] not be necessarily true.
[4]     And I don't know if that's what that
[5] bullet point relates to or not because I do
[6] not know if I was at this meeting or not. I
[7] can't say that for sure.
[8]     Q: Do you remember being at an update meeting
[9] with Coopers & Lybrand at which this topic
[10] was discussed?
[11]     A: There was a question about the purchase —
[12] the Graduate purchase accounting or the
[13] timing of it, yes. There was some audit
[14] meeting that had that in it.
[15]     I don't remember if it was one
[16] meeting. I don't remember if it was at every
[17] meeting we continued to talk about the
[18] Graduate acquisition. I don't remember.
[19]     Q: All right. But you do remember that you were
[20] present at at least one update meeting at
[21] Coopers at which this topic came up?
[22]     A: That a topic related to the Graduate purchase
[23] came up. Maybe not this particular bullet
[24] point, but a question relative to the
[25] Graduate purchase accounting and the timing