TAB 240

**Judy G. Grastorf**

05/29/2001 04:51 PM
To:     Andrew Plunkett/US/OGC/PwC
cc:
Subject:  AHERF- Recent Discussions

----------------------- Forwarded by Judy G. Grastorf/US/ABAS/PwC on 05/29/2001 04:55 PM -------------------------

To:        Jay Brodish/ABS/Price Waterhouse@Price Waterhouse-US, Erica Baird/OGC/Price
           Waterhouse@Price Waterhouse-US, Ben Korbly/ABS/Price Waterhouse@Price
           Waterhouse-US, Mel Hope/ABS/Price Waterhouse@Price Waterhouse-US
cc:
From:      Jim Stalder
Date:      10/10/98 09:47:04 AM
Subject:   AHERF- Recent Discussions

For the record, the following meeting/ discussions have taken place over the past few days:

        1. On Thursday, Oct. 8,1998 Ben Korbly and I met with the following individuals over lunch at the Duquesne Club (in a private suite):

| | |
|---|---|
| *David Barnes | Chairman of Audit Committee |
| *Ira Gumberg | Member of Audit Committee |
| *Chuck Queenan | Kirkpatrick & Lockhart |
| *David Murdock | Kirkpatrick & Lockhart |
| *David McClenahan | Kirkpatrick & Lockhart |

In general, we set forth and discussed the agenda items which had been previously discussed with Barnes last Monday morning, placing significant emphasis on the SAS 82 communication requirements and the recent "findings" of fact from within the AHERF financial organization regarding the "reserve accounting". Considerable attention was also focused on the Mellon letter regarding the endowment accounting. We gave a copy of the Mellon letter as well as an excerpt from SAS 82 to the lawyers. Ben agreed to provide the lawyers with a copy of several requested items. The meeting concluded with our strong suggestion that the fact finding continue in earnest next week so as to permit us to be more responsive to the questions which must be answered. We made it clear that to accomplish this objective, we had to have the full cooperation of the key financial people. Ben and I exited to permit Barnes to discuss these matters with counsel.

        2. On Friday morning, I received a call from Barnes requesting that I summarize our "needs"(to proceed forward expeditiously) on a single piece of paper such that he could use it as a memory jogger for a meeting he was going to have at noon with Sanzo and Dionisio. I drafted such, cleared it with Ben and faxed it to Barnes in time for his meeting.

        3. Barnes called me around 2:00 to confirm that he had met with Tony and Joe and made it very clear to them that resolution of the open issues was a top priority. He instructed that we proceed full steam ahead with the objective of being ready for a meeting with the Audit Committee the week of Oct. 19. (We had suggested in our earlier note to him that he attempt to schedule the meeting as soon as possible to get it on everyone's calendar). Mel- David made it very clear that if we encounter any delay at all, we should contact him immediately and he will jump in and get things back on track.



CL 215770

4. Lee Powar (lead counsel to the bankrupt estate) called shortly after my discussion with Barnes. He explained that his office had just received "a very nasty call" from four SEC lawyers. He explained that he did not have his files with him and asked that I refresh his memory as to the four items that were on the table at the last Audit Committee meeting. He mentioned that he envisioned the need for a sit down, face to face, meeting with the SEC and suggested that Joe and I be present. I made it clear that (a) I was not the right guy (we agreed that it would probably be Ben) and (b) that any participation on our part would be with the advice and approval (and perhaps participation) of our counsel. I gave him the telephone numbers of Messrs. Barron and Korbly. I informed him of our meeting with Barnes and of fact that Mr. Barron was in discussions with the SEC.

5. While in an "update" discussion with Ben, I received a call from Frank Barron

# REDACTED

6. Joe Dionisio called and asked to confirm that the $28 M discussed with Barnes was the same $28 M that was on the table with the Audit Committee last month. I confirmed that, to our knowledge, it was but that it was the recent revelations as to the recording thereof that were most disconcerting. I also mentioned that it remained unclear how the $28 M related to the $14M which was on the "net effects" schedule at the time the accounts were cleared. We discussed the commitment that has been made regarding the "no holds barred" effort to be made next week in preparation for a meeting with the Audit Committee the following week. Like Barnes, he pledged his full support for the effort and instructed that we contact him immediately if the process gets delayed in any way.

7. Ben and I then discussed this matter with Rob Selpelic, the senior manager on the ground at AHERF to request that he make certain that the staffing is in place to get the job done next week, at least to the maximum degree possible given the volume of data to be reviewed. He will pursue this with Mel immediately. Ben agreed that he would stay on top of the process throughout the week.

Sorry for the length. Obviously, a lot happened yesterday.

CL 215771

TAB 241

## ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION
### FINANCE AND AUDIT COMMITTEE
#### Pittsburgh, Pennsylvania

A meeting of the Finance and Audit Committee of Allegheny Health, Education and Research Foundation was held on Wednesday, October 28, 1998, at 12:00 noon in the Board Room of Allegheny University Hospitals-Allegheny General, Pittsburgh, Pennsylvania. The meeting was called pursuant to notice duly given to each member of the Committee. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| Members Present | Other Invitees | Members Absent |
|---|---|---|
| J. David Barnes | Frank Barron | Harry Edelman, III |
| Douglas D. Danforth* | (Cravath, Swaine & Moore) | Paul D. Neuwirth |
| Ira J. Gumberg | Joseph D. Dionisio | |
| Robert B. Palmer* | Carol Gordon | |
| Randall L.C. Russell, Ph.D. | Mel Hope | Invitees Absent |
| | (PricewaterhouseCoopers) | |
| | Ben Korbly | Lee D. Powar, Esq. |
| | (PricewaterhouseCoopers) | |
| | David L. McClenahan, Esq. | |
| | (Kirkpatrick & Lockhart) | |
| | Charles P. Morrison | |
| | Charles J. Queenan, Esq. | |
| | (Kirkpatrick & Lockhart) | |
| | Anthony M. Sanzo | |
| | Wendy Smith, Esq. | |
| | (Kirkpatrick & Lockhart) | |
| | James C. Stalder | |
| | (PricewaterhouseCoopers) | |
| | Andrew E. Thurman, Esq. | |
| | W. P. Snyder III | |

\* Via Telephone Conference

I.    Opening of Meeting

The meeting was called to order by J. David Barnes, Chairman. Andrew E. Thurman, Esq. maintained the minutes. The Chairman declared that a quorum was present and the meeting was competent to proceed.

PGH:39573.1

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
October 28, 1998
Page 2


II.     Additions to the Agenda

        Mr. Barnes noted that there were no additions to the agenda.

III.    Approval Items

        A.     Minutes from AHERF Finance and Audit Committee Meeting Held on
               August 27, 1998

               Mr. Barnes noted that the minutes were presented for review by the Trustees and
               approval would be deferred until the next meeting.

        B.     Minutes from the AHERF Finance and Audit Committee Meeting Held on
               September 1, 1998

               Mr. Barnes noted that the minutes were presented for review by the Trustees and
               approval would be deferred until the next meeting.

IV.     Information and Discussion Items

        A.     Report from PricewaterhouseCoopers Regarding Fiscal Year 1997 Audited
               Financial Statements and Related Matters

               Mr. Barnes began the discussion with introductory comments regarding
               discussion items for the meeting, as follows:

               •     Restatement of the Fiscal Year 1997 financial statements, making possible
                     the A-133 filing requirements

               •     Discussion of the AHERF relationship with PricewaterhouseCoopers

               •     Review of events that led to the present situation

               Charles Queenan provided the framework for the discussions with
               PricewaterhouseCoopers ("PWC"), noting that discussions would be held with
               PWC and its attorneys in order that appropriate legal advice could be given to

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
October 28, 1998
Page 3

Allegheny Health, Education and Research Foundation ("AHERF") by Mr. Powar
and to individual AHERF trustees by Kirkpatrick & Lockhart. He further noted
that questions to AHERF legal counsel should be addressed during Executive
Session. Two specific points were noted in regard to PWC: (1) the firm is
possibly a target of the Securities & Exchange Commission (SEC) and possibly
of civil litigation, which puts them in a conflicted situation, and they would have
difficulty issuing a "clean" accounting report, and (2) if they have found
improprieties, they would have a difficult time relying on any certifications
AHERF personnel gave them. If they have any impropriety, they have an
obligation to report it to AHERF.

The representatives of PWC joined the meeting and were introduced to those
present.

A-133 Filing Requirements

Mr. Barnes noted that discussions with PWC in the September 1 meeting
emphasized the reissuance of the Fiscal Year 1997 financial statements in order
that the A-133 filing requirements could be fulfilled. Although it was hoped that
this could be concluded within one month's time, AHERF personnel have been
concentrating on matters relating to the sale of the Philadelphia hospitals and the
report has not yet been concluded. James Stalder noted that PWC has been
working to resolve the issues originally introduced during the meeting of
September 1.

Disclosure Requirements - SAS 82

Mr. Stalder discussed the disclosure requirements of SAS 82 and the obligation to
advise the Committee of the latest findings. He then updated the Committee of
the latest findings and thorough discussion followed.

Status of Restatement - Transfer of Reserves/Acquisition Accounting

Ben Korbly commenced discussion regarding reserves established in connection
with the Graduate acquisition of November 1996 as well as entries booked in
April and June 1997. Thorough discussion followed.

PGH: 39573.1

PR-1-001225

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
October 28, 1998
Page 4

### Status of Restatement - Rabbi Trusts

Mr. Korbly noted that trust assets (known as Rabbi Trusts) were established in
connection with unqualified retirement accounts and executive benefits. In June
1997, there was no requirement to show the Rabbit Trusts on the balance sheet.
A determination needs to be made as to whether the treatment of the Rabbi Trusts
on the accounting statements were appropriate.

### Status of Restatement - Endowment Funds

Mr. Korbly stated the matter of the Lockhart funds has been discussed and that a
final legal opinion has not yet been received. Mr. Dionisio reported that the
Committee reviewing this matter in the East has suspended their effort because
they have not received funding approval to engage a law firm or accounting firm
to review the matter, and that in the West, another Ad-Hoc Committee reviewing
endowment funds has chosen a law firm and an accounting firm, and is in the
initial stages of their review. A report will be issued on Western Region
endowments funds, and the Lockhart funds in particular.

### Status of Restatement - Intercompany Accounts

Mr. Korbly noted that intercompany accounts relates to supplementary financial
data rather than consolidated financial statements. Mr. Stalder noted that there
was no lack of integrity in this change and inasmuch as the bondholders knew of
the matter, it was not an issue.

### Status of Restatement - SDN Accounting

Mr. Korbly noted a review was made of the accounting in the SDN entity, and it
would appear that SDN is a holding company for acquisitions which were made
in a series of events. While there is a minimum amount of financial
documentation, it is believed that the financial records are adequate. Mr. Korbly
noted that while the SEC may decide to investigate SDN, PWC is satisfied with
the transactions that were processed through SDN. Mr. Sanzo asked legal counsel
whether the Finance and Audit Committee or any current officers of the
corporation have management responsibility for SDN. Mr. Thurman replied that

PR-1-001226

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
FINANCE AND AUDIT COMMITTEE
October 28, 1998
Page 5

the exact answer will require a further review, however, based on the review
made at this time, the board of AHERF, or its officers or management have no
responsibilities toward SDN.

Path Going Forward/Issues

Mr. Barnes noted that PWC has spent a lot of time reviewing events that led to
the issuing of the Fiscal Year 1997 financial statements, and that further
investigation was necessary. Mr. Queenan discussed the parameters of such an
investigation, and noted the investigation should be conducted by counsel to
AHERF.

Executive Session

The offer of Executive Session was made to the representative of
PricewaterhouseCoopers, and the offer was declined.

The offer of Executive Session was made to management, and the offer was accepted.
The representatives of PricewaterhouseCoopers were excused from the meeting.

V.    Adjournment

There being no further business, the meeting was adjourned at 2:55 p.m. as the Executive
Session began.

Respectfully submitted,

Andrew E. Thurman, Esq.

AET:cur

NOTED ATTACHMENTS: Notice of Meeting

FGH: 39573.1

PR-1-001227

TAB 242

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSE*

---

*THOMAS O'BRIEN*
*October 16, 2003*

---

# LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

O'BRIEN, THOMAS



LEGALINK®

A WORDWAVE COMPANY

Page 85

1    the board?
2  A.  Yes.
3  Q.  And I think you've told us that although you
4    can't recall specifically, maybe, the date or
5    the time of Exhibit 1661 and 1653
6    which contain the audited financial statements
7    for 1996 and 1997, you do believe that you
8    reviewed them when you received them?
9  A.  Yes.
10         MR. FRIESEN: Wait. Objection. 1653
11    contains --
12         MR. SHAPIRA: A draft.
13         MR. FRIESEN: -- a draft of the --
14         MR. JONES: I understand. I'll
15    change that.
16  BY MR. JONES:
17  Q.  You do recall that you received the audited
18    financial statements for fiscal year 1996 and
19    fiscal year 1997?
20  A.  As I said, I recall that I did. I can't say
21    that I recall that I did, other than I know
22    that if they were in the packet, I looked at
23    them.
24  Q.  You don't have any doubt that you got them, is
25    that fair to say?

Page 86

1  A.  Yes. I'd say that's a legitimate statement.
2  Q.  Okay. And it was your practice, and you don't
3    have any reason to believe you varied from it,
4    to review the audited financial statements when
5    you received them?
6  A.  That's correct.
7  Q.  And I understand that Exhibit 1653, for reasons
8    stated in the package, was a draft set of the
9    audited 1997 financial statements, but you
10    don't have any reason today to doubt that you
11    would have reviewed that draft when it was
12    forwarded to you?
13  A.  If it was forwarded to me, I'm sure I did.
14  Q.  And when you received those financial
15    statements and, in both instances, ultimately
16    the clean opinions the audit report contained
17    within them, what did you understand that to
18    mean?
19  A.  It means, as any clean opinion does, that, to
20    the best of their ability, the auditors have
21    reviewed the financial data for the period so
22    stated, reviewed the internal controls and the
23    integrity of them, and that, in their opinion,
24    those statements fairly present the financial
25    condition and the financial results of whatever

Page 87

1    period they chose to report on.
2  Q.  Did you at the time you received those clean
3    opinions believe them to be important to the
4    enterprise?
5  A.  Well, it was one of the most important things.
6    I mean, when you're on a board like that, you
7    look at a third-party provider of financial
8    information, in this case audited information,
9    and that gives you great comfort that a third
10    party has reviewed the financial data and
11    opined that it fairly presents the condition
12    and represents the operations of the stated
13    period.
14  Q.  Did you consider the third-party aspect of this
15    review a check on internal financial
16    management?
17         MR. FRIESEN: Objection.
18  A.  Well, as in any full audit, they clearly review
19    certain of the internal controls. There's no
20    question about that.
21  Q.  And in your everyday job, you knew -- or as a
22    consequence of your experience in your everyday
23    job, you knew that audited financial statements
24    were reviewed by people outside the
25    organization itself as well, is that fair to

Page 88

1    say?
2  A.  I'm not sure I follow what you mean.
3  Q.  That -- I think what I mean to say is that when
4    you were a member of the AHERF board, you
5    understood that the audited financial
6    statements that you received and reviewed were
7    also made available to parties outside of
8    AHERF, for instance, creditors?
9  A.  Oh, certainly. Yes.
10  Q.  And that they reviewed and relied upon those
11    statements as well?
12  A.  And bond agencies and, you know, investment
13    bankers and so forth and so on.
14  Q.  And those various parties you knew to receive
15    and review those financial statements and rely
16    upon them at the time they received them?
17  A.  Certainly.
18  Q.  So that the audited financial statements were
19    important internally for management purposes
20    and externally to others, at least as you
21    understood it at the time?
22  A.  That's correct.
23  Q.  Did you use the audited financial statements
24    that you reviewed for fiscal year 1996 and
25    fiscal year 1997 -- and for the latter, either

22 (Pages 85 to 88)

**Page 89**

1     in draft or final form -- to help you gauge the
2     performance of the enterprise?
3  A.  Yes. I'd say that's a legitimate question,
4     particularly the fiscal year 1997, seeing that
5     they were cash flowing at a meaningful rate
6     during that previous 12 months.
7  Q.  Let me ask you to flip quickly back to the 1996
8     audited financial statements, and page 3 at the
9     bottom of those which you'll find at Exhibit
10    1661.
11        MR. SHAPIRA: What's the page number?
12        MR. JONES: I'm sorry.
13        THE WITNESS: 1661.
14        MR. JONES: It's Exhibit 1661, page 3
15    at the bottom of the page.
16  BY MR. JONES:
17  Q.  That page presents the Consolidated Statement
18     of Operations, is that right?
19  A.  I have 1661 here which is also page 55.
20  Q.  No. I'm sorry. It was Exhibit 1661.
21        MR. SHAPIRA: You want him to look at
22    page 2, right?
23        MR. JONES: Page 3, the Statement of
24    Operations.
25        MR. SHAPIRA: Right at the beginning.

**Page 90**

1        THE WITNESS: Right at the beginning.
2        MR. SHAPIRA: Right.
3  BY MR. JONES:
4  Q.  And I think in response to questions by
5     Mr. Friesen, you indicated that you did look at
6     net income as a part of your review of the
7     financial statements, am I right?
8  A.  Um-hum.
9  Q.  Is that a yes?
10  A.  Let me -- I was reading. I didn't hear you.
11  Q.  I'm sorry. I think in response to questions
12     from Mr. Friesen, you said you paid particular
13     attention to the statement of operations and
14     the net income line, is that correct?
15  A.  Yeah. One of the things, yeah.
16  Q.  And here we see the net income line has a
17     figure of what? Before extraordinary item and
18     change in accounting principle, the figure is
19     six-and-a-half million dollars, roughly?
20  A.  That's correct.
21  Q.  And so in 1996, the audited financial
22     statements reflected net income before
23     extraordinary item and change in accounting
24     principle of $6.5 million, and I think that the
25     figure in 1997 you and Mr. Friesen discussed

**Page 91**

1     was a little over $20 million, is that fair to
2     say?
3  A.  That's correct.
4  Q.  So the trend is up at least at year end --
5     fiscal year end 1997?
6        MR. FRIESEN: Objection.
7  A.  That's correct.
8  Q.  When seeing these financial statements and
9     seeing the trend we just discussed, you used
10    the information in the statements to help you
11    gauge the financial performance of the
12    enterprise and the financial ability of
13    management to run the enterprise too, is that
14    fair to say?
15  A.  That's correct. Yes. Um-hum.
16  Q.  You also, I think, testified that you recalled
17    receiving at least quarterly internal financial
18    statements, is that right?
19  A.  To the best of my recollection, we got those.
20    There were interim statements. Quarterly, I
21    presumed, but there were interim statements,
22    most of which, as I say, I received and then
23    also got updates at the AUMC meetings.
24  Q.  And do you recall ever receiving a quarterly
25    internal financial statement -- strike that.

**Page 92**

1        Do you recall ever receiving an
2    audited financial statement that caused you to
3    question the accuracy of an internal financial
4    statement?
5  A.  I don't believe so.
6  Q.  Did you use the audited financial statements as
7    a part of the tools available to you to monitor
8    performance of particular initiatives at AHERF,
9    for instance, the acquisition strategies that
10    we discussed earlier today?
11  A.  Well, I would say this: I would say that we
12    weren't divorced from the realities that
13    certain things were losing money and that there
14    were negative trends in certain things, but
15    when you looked at the audited financials and
16    saw that they were still cash flowing in a
17    meaningful way, that gave you comfort that
18    while things weren't wonderful, they were
19    clearly still operationally solid.
20        THE VIDEOGRAPHER: Excuse me. I have
21    to change tapes. We are now going off the
22    record. The time is 12:38 p.m.
23        - - - -
24    (There was a recess in the proceedings.)
25        - - - -

Page 93

1  THE VIDEOGRAPHER: We are now going
2  back on the record. The time is 12:39 p.m.
3  BY MR. JONES:
4  Q.  We're back on the record after a brief break,
5  Mr. O'Brien.
6  When you were a member of the AHERF
7  board, did you expect Coopers & Lybrand to
8  raise, either with the audit committee or with
9  the board itself, any material misstatements in
10  the financial statements presented for their
11  audit that they became aware of?
12  MR. FRIESEN: Objection.
13  A.  Well, I would say, again, generically, in any
14  board, I would expect the auditor to raise
15  those kinds of issues probably through the
16  audit committee, and then up to the full board.
17  Q.  Would you also expect Coopers & Lybrand during
18  this time period to have raised with the audit
19  committee or ultimately the full board any
20  intentionally misstatements they found in the
21  statements presented for their audit?
22  MR. FRIESEN: Objection.
23  A.  Without question.
24  Q.  Would you also expect Coopers & Lybrand, and
25  did you while you were a member of the board,

Page 94

1  to raise with the audit committee or the full
2  board any concerns that Coopers & Lybrand had
3  with the integrity or competence of financial
4  management?
5  MR. FRIESEN: Objection.
6  A.  Absolutely.
7  Q.  Why is that so important?
8  A.  Well, I think it's, again, just prima facie.
9  You know, it's obvious that's what the board
10  hires outside auditors to do is, you know,
11  fundamentally report on the integrity of the
12  financial data which includes the integrity of
13  the management that's preparing them.
14  Q.  Did you -- strike that.
15  Before the bankruptcy was
16  announced -- and I think we talked a little bit
17  about the fact that you learned about it
18  through means you don't recall, but it must
19  have been at or about the time of the
20  bankruptcy. When you learned of it, and at any
21  time before it, did you have any reason to
22  question the accuracy of the audited financial
23  statements presented to you?
24  A.  No. Really, no. None.
25  Q.  If Coopers & Lybrand had told you that the

Page 95

1  fiscal year 1996 or 1997 financial statements
2  presented for their audit were indeed
3  materially misstated and that they were,
4  therefore, going to issue an adverse opinion on
5  those statements, would that have caused you
6  concern?
7  MR. FRIESEN: Objection.
8  A.  Well, clearly.
9  Q.  And for the jury, why is that such a concerning
10  thing?
11  MR. FRIESEN: Objection.
12  A.  Well, you're obviously looking as, again, a
13  member of the board or any other constituency
14  where these things are used. You're looking to
15  make sure that they are high integrity, and you
16  base judgments on performance and risk, all
17  those things.
18  Q.  What kind of options does a board member and a
19  board have when faced with these kinds of
20  circumstances?
21  MR. FRIESEN: Objection.
22  A.  With what kinds of circumstances?
23  Q.  When an auditor comes to the board or the audit
24  committee and tells them that the financial
25  statements presented for their audit were

Page 96

1  indeed materially misstated and an adverse
2  opinion is to be issued?
3  MR. FRIESEN: Objection. Vague.
4  A.  Well, I mean, speaking again on a generic
5  basis, you would clearly -- the audit committee
6  would clearly probably establish or the board
7  would establish a special committee to review
8  those allegations and determine whether they
9  are correct or not and would get to the bottom
10  of whether or not they are, in fact, correct.
11  Q.  So you have the option of making inquiry?
12  A.  Certainly.
13  Q.  And indeed you also have the option of
14  recharging the auditors to expand their
15  procedures and scope, perhaps?
16  MR. FRIESEN: Objection.
17  A.  I mean, all of that would come from this
18  special committee or whatever you would set up
19  to look into those allegations by the auditor.
20  Q.  Is engagement of additional consultants a part
21  of the options that committee would have?
22  MR. FRIESEN: Objection.
23  A.  There would be all kinds of different options,
24  but that -- it would be a full inquiry into the
25  allegations. That's all I would say.

24 (Pages 93 to 96)

TAB 243

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
ALLEGHENY HEALTH, EDUCATION
AND RESEARCH FOUNDATION

Plaintiff,

Civil Action No. 00-684

v.

PRICEWATERHOUSECOOPERS, LLP

Defendants.

## EXPERT REPORT OF J. W. TILLETT, JR.

### NOVEMBER 12, 2004

_____
J. W. Tillett, Jr.

In connection with my work on this assignment, I have reviewed and/or considered the following:

- C&L working papers (including CLASS files and materials from certain desk files) related to the performance of the audit of the consolidated financial statements of AHERF for the year ended June 30, 1997
- C&L working papers (including CLASS files and materials from certain desk files) related to the performance of the audits of the financial statements of AHERF and its affiliates for the year ended June 30, 1996
- Various C&L working papers related to the performance of the audits of the financial statements of AHERF and its affiliates for the year ended June 30, 1995
- Fiscal years 1992 – 1997 AHERF audited consolidated financial statements and the financial statements of its affiliates
- Various pleadings and written discovery documents
- Depositions and related exhibits in this matter
- Deposition of Amy Frazier in the matter of the Securities Exchange Commission v. William F. Buettner, Mark D. Kirstein and Amy S. Frazier
- 1998 Not-For-Profit Health Care Medians, Moody's Investors Service, August 1998
- Copies of audited financial statements of certain Pennsylvania health care entities for the years 1996 and 1997, collectively "The Pennsylvania Data"[7]
- Copies of audited financial statements of various for-profit health care entities for the years ended 1996 and 1997.
- Technical Reference Materials, relevant at the time, including the following:
  - AICPA Professional Standards, Volumes 1 and 2, various editions
  - FASB Current Text, Volumes I and II, various editions
  - FASB Original Pronouncements, Volumes I and II, various editions
  - AICPA Audit and Accounting Guide, Health Care Organizations, various editions
  - AICPA, Audit Risk Alerts, Health Care Industry Developments
  - AICPA Audit and Accounting Guide, Not-For-Profit Organizations
  - AICPA, Consulting Services Special Report 03-1, Litigation Services and Applicable Professional Standards
  - AICPA Technical Practice Aids and Statement of Positions
  - FASB EITF Abstracts, various editions
  - 1997 SEC Guidelines, Rules and Regulations, (Warren, Gorham & Lamont)
  - Accounting for Business Combinations, Interpretations of APB Opinion Nos. 16 and 17, Eighth Edition
  - Montgomery's Auditing, Eleventh and Twelfth editions
- Expert Reports of Mr. Berliner dated September 3, 2004 and Mr. Regan dated September 2, 2004 and documents and materials referenced within

---

[7] Listing of Pennsylvania Hospitals considered [Tab 7].

- 1996 C&L Business Assurance Manual
- Various speeches by staff members of the Securities Exchange Commission

## V. Background

AHERF, as the parent company, was composed primarily of not-for-profit related entities. For external reasons regarding debt, many of these entities were structured as obligated groups. Pursuant to a letter of arrangement dated April 12, 1996, C&L was engaged to perform audits of the consolidated financial statements of AHERF and the financial statements of various subsidiaries as of and for the year ended June 30, 1996. The subsidiaries included Allegheny General Hospital Obligated Group (AGHOG) and the Delaware Valley Obligated Group (DVOG).

C&L was engaged to perform an audit of the consolidated financial statements of AHERF as of and for the year ended June 30, 1997 pursuant to a letter of arrangement dated April 25, 1997. It should be noted, C&L was not engaged to perform audits of the financial statements of any of the obligated groups as of and for the fiscal year ended June 30, 1997.

For both 1996 and 1997, C&L's engagement teams were comprised of numerous accounting professionals (many of whom were licensed Certified Public Accountants) who participated in planning and performing the audits in accordance with GAAS. The team for each year worked on the audit engagement for many months making inquiries of AHERF management, and analyzed thousands of pages of financial information provided by AHERF management and others in order to prepare its audit workpapers and reach its opinions on the financial statements they were engaged to audit. In addition, the team consulted with other C&L partners and professionals who were considered specialists in various health care and accounting matters to assist them in addressing many of the very complex and technical accounting matters.

## VI. Summary of Opinions

A. Fiscal Years 1996 and 1997 Financial Statements Audits

A.1     C&L planned and performed their audits of the fiscal year 1996 financial statements in accordance with GAAS for the following entities:

- the consolidated financial statements of AHERF,
- the consolidated financial statements of AGHOG,
- the combined financial statements of DVOG, and
- the financial statements of Allegheny Integrated Health Group (AIHG)

C&L's performance under these standards provided a reasonable basis for their opinions that the financial statements were fairly presented, in all material respects, in conformity with GAAP.

A.2     C&L planned and performed their audit of the fiscal year 1997 consolidated financial statements in accordance with GAAS. C&L's performance under these standards provided a reasonable basis for their opinion that the AHERF financial statements were fairly presented, in all material respects, in conformity with GAAP.

A.3     In my opinion, AHERF management failed to meet its obligation to C&L as set forth in the AICPA professional standards and in the letters of arrangement in connection with C&L's fiscal year 1996 and 1997 audits of the financial statements. As a result, C&L was precluded in its ability to detect material misstatements in connection with its audits.

A.4     C&L's consideration of materiality relative to unrestricted net assets, total net assets and the impact on debt covenants was appropriate. Furthermore, I believe the opinions expressed by Mr. Berliner and Mr. Regan on materiality judgments would be relevant for for-profit healthcare systems, but are not appropriate for materiality judgments for not-for-profit healthcare systems.

A.5     C&L's evaluations of the Summary of Unadjusted Differences (SUD) for each of the fiscal years 1995, 1996 and 1997 were reasonable and in accordance with GAAS.

A.6     C&L's communications with the Audit Committee and/or Board of Trustees was appropriate and in accordance with GAAS.

F. Debt

    F.1    C&L's audit procedures with respect to debt were performed in accordance with GAAS and together with other audit procedures, provided a reasonable basis for their conclusion that debt was presented, in all material respects, in accordance with GAAP, in relation to the financial statements taken as a whole. Furthermore, C&L complied with GAAS in connection with the special reports issued giving negative assurance relative to compliance with certain debt covenants.

G. Miscellaneous Allegations

    G.1    I disagree with Messrs. Berliner and Regan that C&L violated GAAS by failing to require AHERF to correct various GAAP violations and that these violations caused material misstatements to the financial statements being audited.

## VII. Bases for Opinions

A.1    C&L planned and performed their audits of the fiscal year 1996 financial statements in accordance with GAAS for the following entities:

- the consolidated financial statements of AHERF,
- the consolidated financial statements of AGHOG,
- the combined financial statements of DVOG, and
- the financial statements of AIHG

C&L's performance under these standards provided a reasonable basis for their opinions that the financial statements were fairly presented, in all material respects, in conformity with GAAP.

A.2    C&L planned and performed their audit of the fiscal year 1997 consolidated financial statements in accordance with GAAS. C&L's performance under these standards provided a reasonable basis for their opinion that the AHERF financial statements were fairly presented, in all material respects, in conformity with GAAP.

### Introduction

Before I begin addressing the specific issues in this report, it is important that I provide a framework for many of the concepts that I will discuss. Therefore, in the following paragraphs, I will provide some explanations from GAAS and other professional literature about the objectives of an audit and provide some background about the audit process. In addition, I will explain the purpose and scope the reports of independent accountants on audited financial statements, sometimes referred to as the auditor's opinion. Later in this report, I will explain the meaning and intent of the Report of Independent Accountants on consolidating and combining information that accountants may provide to report on supplemental information when it accompanies the audited financial statements. Also, throughout this report, I will explain why it is my opinion that C&L met their professional obligations under GAAS in planning and performing their audits of AHERF's consolidated financial statements as of and for the years ended June 30, 1996 and 1997 and of the audits of the financial statements for AGHOG, DVOG, and AIHG for the year ended June 30, 1996. In addition, I will discuss my bases for reaching these opinions and I will respond to the various allegations made by Mr. Berliner and Mr. Regan.

For fiscal years 1996 and 1997 C&L conducted their audits of the respective financial statements in accordance with GAAS. Their audits were conducted by a team of qualified professionals who planned and performed their procedures with due care and exhibited an independence in mental attitude. C&L's planning procedures appropriately included obtaining an understanding of the controls relevant to their audit of the financial statements. After obtaining this understanding C&L judgmentally determined which controls it would test and rely on in the performance of its audit.    Taking into

consideration these procedures, C&L performed its risk assessment, which determined the nature, timing and extent of the procedures performed. In performing these procedures, C&L obtained sufficient competent evidential matter that provided a reasonable basis for their opinions. As explained throughout this report, C&L audit team members obtained and assessed considerable information and documented their work and findings. Based on my review of the workpapers and reading depositions of C&L audit team members, I believe they demonstrated their expertise in accounting and auditing matters, their experience in the healthcare industry and their expertise in dealing with complex issues that were significant to AHERF.

**Objective of an Audit**

The purpose of an audit and the level of assurance provided by an auditor's opinion are often misunderstood. The objective of an audit of financial statements is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and cash flows in conformity with GAAP.[8] Since an audit opinion on financial statements is based on the concept of reasonable assurance, an audit is not intended to insure and an audit report does not constitute a guarantee.[9] In other words, an unqualified audit opinion does not provide assurance as to the financial health or future earnings of an entity. It provides only reasonable assurance on the fairness of the presentation of the financial statements in accordance with GAAP, in all material respects, and does not insure or guarantee sound financial condition, currently or in the future.

**Definition of an Audit**

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. Audit procedures are performed to obtain the competent evidential matter required to provide the auditor a reasonable basis for an opinion on financial statements. These procedures include: inspection, observation, inquiries, confirmations, and analytical procedures. An audit also includes assessing the accounting principles used and significant accounting estimates made by management, as well as evaluating the overall financial statement presentation.

An audit provides only reasonable assurance, and does not guarantee that all misstatements related to errors or irregularities will be detected because of such factors as (a) the use of professional judgment throughout the audit process, (b) the need for auditors to work within economic limits, (c) the use of selective testing in designing and performing audit procedures, (d) the inherent limitations of internal control, and (e) the fact that much of the evidence available to the auditor is persuasive rather than convincing in nature.

---

[8] June 1, 1997 AICPA Professional Standards, Volume 1, AU 110.01.
[9] June 1, 1997 AICPA Professional Standards, Volume 1, AU 316A.08.

During an audit, management makes many representations to the auditor, both written and oral, in response to specific inquiries or through the financial statements.[10] These representations are integral to conducting and audit and obtaining sufficient competent evidential matter. At the end of an audit, the auditor obtains written representations from management to complement and corroborate his audit procedures.

An audit of financial statements is typically conducted utilizing a team of qualified professionals comprised of associates, senior(s), manager(s) and partner(s). Audit teams are organized in a somewhat hierarchical manner. The nature of the team is dependent upon a number of factors, including the size and complexity of the audit client. The work performed is reviewed to determine whether it was adequately performed and to evaluate whether the results are consistent with the conclusions in the auditor's report.[11] The level of review and supervision depends on many factors, including the complexity of the subject matter, the qualifications of the persons performing the work and the judgment of the engagement team.[12]

As noted above, an auditor typically works within economic limits. As a result, the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost. The auditor must decide, again exercising professional judgment, whether the evidential matter available to him within the limits of time and cost is sufficient to justify expression of an opinion.[13] In other words, an audit is never performed with unlimited resources.

The auditor should prepare and maintain working papers, the form and content of which should be designed to meet the circumstances of a particular engagement. The information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions that he has reached concerning significant matters. The nature and type of workpapers that are maintained are subject to the auditor's judgment, and the auditor is not precluded from supporting his report by other means in addition to working papers.[14] Workpapers are records kept by the auditor of the procedures applied and tests performed and can include things such as company documents, analyses or schedules obtained or prepared by the auditor.[15]

---

[10] June 1, 1997 AICPA Professional Standards, Volume 1, AU 333.02.
[11] June 1, 1997 AICPA Professional Standards, Volume 1, AU 311.13.
[12] June 1, 1997 AICPA Professional Standards, Volume 1, AU 311.11.
[13] June 1, 1997 AICPA Professional Standards, Volume 1, AU 326.23.
[14] June 1, 1997 AICPA Professional Standards, Volume 1, AU 339.01, footnote 3.
[15] June 1, 1997 AICPA Professional Standards, Volume 1, AU 339.03.

**Generally Accepted Auditing Standards**

Statements on Auditing Standards are issued by the Auditing Standards Board, the senior technical body of the American Institute of Certified Public Accountants designated to issue pronouncements on auditing matters. These standards, referred to as GAAS, establish the quality of performance and the overall objectives to be achieved by the auditor in a financial statement audit. In the observance of GAAS, the auditor must exercise his judgment in determining which auditing procedures are necessary in the circumstances to afford a reasonable basis for the audit opinion. His judgment is required to be the informed judgment of a qualified professional person.[16]

**Generally Accepted Accounting Principles**

GAAP is a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations.[17]

The auditor's opinion that financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with GAAP should be based on his judgment as to whether:

- the accounting principles selected and applied have general acceptance;
- the accounting principles are appropriate in the circumstances;
- the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation;
- the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed; and,
- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.[18]

**Audit Risk**

Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his opinion on financial statements that are materially misstated.[19] The consideration of audit risk has an important bearing on the nature of the audit.[20] This risk is recognized by the

---

[16] June 1, 1997 AICPA Professional Standards, Volume 1, AU 110.04.
[17] June 1, 1997 AICPA Professional Standards, Volume 1, AU 411.02.
[18] June 1, 1997 AICPA Professional Standards, Volume 1, AU 411.04.
[19] June 1, 1997 AICPA Professional Standards, Volume 1, AU 312.02.
[20] June 1, 1997 AICPA Professional Standards, Volume 1, AU 150.05.

statement in the standard audit report that the auditor obtained "reasonable assurance" about whether the financial statements are free from material misstatement.[21]

In the course of preparing financial statements, management must make accounting estimates that affect the amounts reported in the financial statements. The risk of material misstatement of accounting estimates normally varies with the complexity and subjectivity associated with the process, the availability and reliability of relevant data, the number and significance of assumptions that are made, and the degree of uncertainty associated with the assumptions.[22]

## Accounting Estimates

Estimates used in accounting are necessary consequences of periodic presentations of financial statements and, as a result, preparing financial statements requires estimating the effects of future events.[23] Examples of items which are considered to be estimates are uncollectible receivables, inventory that is obsolete, and the service life of depreciable assets. In assessing an accounting estimate, the auditor is responsible for evaluating the reasonableness of the estimate made by management in the context of the financial statements taken as a whole.[24] In evaluating the reasonableness of an estimate, the auditor normally concentrates on key factors and assumptions that are (a) significant to the accounting estimate, (b) sensitive to variations, (c) deviations from historical patterns, and (d) subjective and susceptible to misstatement and bias. The auditor normally should consider the historical experience of the entity in making past estimates as well as the auditor's experience in the industry.[25] Further, the auditor obtains an understanding of how management developed the estimate and uses one or a combination of the following approaches to evaluate management's estimates:

- Review and test the process used by management to develop the estimate.
- Develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate.
- Review subsequent events or transactions occurring prior to completion of field work.[26]

Since no one accounting estimate can be considered accurate with certainty, the auditor recognizes that a difference between an estimated amount best supported by the audit evidence and the estimated amount included in the financial statements may be reasonable, and such difference would not be considered to be a likely misstatement.[27] In other words, an accounting estimate is correct as long as it is within a reasonable range.

---

[21] June 1, 1997 AICPA Professional Standards, Volume 1, AU 312.02.
[22] June 1, 1997 AICPA Professional Standards, Volume 1, AU 342.05.
[23] APB 20, paragraph 10.
[24] June 1, 1997 AICPA Professional Standards, Volume 1, AU 342.04.
[25] June 1, 1997 AICPA Professional Standards, Volume 1, AU 342.09.
[26] June 1, 1997 AICPA Professional Standards, Volume 1, AU 342.10.
[27] June 1, 1997 AICPA Professional Standards, Volume 1, AU 312.29.

TAB 244

# In The Matter Of:

## *In Re: AHERF*

---

## *Charles Queenan, Jr.*
## *Vol. 1, June 12, 2001*

---

*Morse, Gantverg & Hodge, Inc.*
*719 One Bigelow Square*
*Pittsburgh, PA  USA  15219*
*(412) 281-0189*

*Original File queenan.txt, 278 Pages*
*Min-U-Script® File ID: 1904231292*

# Word Index included with this Min-U-Script®

Page 53

[1] accounted for a variety of things in a proper fashion.
[2]     And why the surprise.
[3] And if there were errors, irregularities,
[4] who was responsible for the accounting entries or
[5] under whose direction were they made.
[6]     And if I may continue to understand what I
[7] just said, I assume you all do, you have to know the
[8] difference between an error and an irregularity.
[9]     These were developed back in statement and
[10] auditing standards 16 I think drafted by a former
[11] Pittsburgher by the name of Ken Johnson.
[12]     An error is an unintentional mistake.
[13] An irregularity is a purposeful
[14] falsification.
[15] Q: In terms of what is stated in Exhibit
[16] 1716A, besides Mr. Barnes and Mr. Abdelhak, did you
[17] discuss a net loss in operating results or any
[18] shortfall with anyone else at AHERF?
[19] A: I discussed the reasons for both the net
[20] losses and the pending writeoffs with those two
[21] gentlemen, but also with Mr. Adamczak and
[22] Mr. Dionisio, and in part with Ms. Wynstra.
[23] Q: Did you become aware that the information
[24] that we have been referring to in Exhibit 1716A was
[25] discussed at the March 11, '98 finance and audit

Page 54

[1] committee meeting?
[2] A: Only by reading the minutes.
[3] Q: And is it your understanding by reading the
[4] minutes that that was something discussed at the
[5] meeting?
[6] A: It so states.
[7] Q: Did you speak to anyone else that is
[8] indicated as present at this meeting besides the ones
[9] we just discussed regarding a net loss of 71.8 million
[10] or a shortfall of 57 million?
[11] A: Not to my recollection.
[12] Q: If you could look at Exhibit 1712A.
[13] A: I have it.
[14] Q: Can you identify that document?
[15] A: I can.
[16] This is a document that had been given to
[17] me by Mr. Adamczak.
[18] Q: Do you recall when it was given to you?
[19] A: I think in the early May period of 1998.
[20] Q: When was your meeting with Mr. Barnes and
[21] Mr. Abdelhak we just discussed?
[22] A: In the latter part of April of 1998.
[23] Q: What was the occasion for you receiving
[24] this document from Mr. Adamczak?
[25] A: I had asked Mr. Adamczak about a number of

Page 55

[1] accounting issues dealing with both the accounts
[2] receivable, the intercompany payable balances, the
[3] method of utilizing purchase accounting and the
[4] acquisition of the hospitals over in the eastern part
[5] of the Commonwealth of Pennsylvania.
[6]     And as well as I said intercompany entries
[7] with respect to reserves and balances.
[8]     And this was given to me I believe in
[9] response to that inquiry.
[10] Q: Do you know whether Mr. Adamczak had
[11] prepared this memorandum prior to your inquiry?
[12] A: I don't know.
[13] Because I forget just – I can't pin down
[14] the date that I asked him.
[15] Q: Do you remember him saying, "I will send
[16] you a memo on that" or "I will prepare a memo"?
[17] A: I don't recall.
[18] It could have been derived.
[19] I was asking these same things of
[20] Mr. Abdelhak. And during my meeting with him and
[21] Mr. Barnes to provide more detail, it could have been
[22] that Mr. Abdelhak asked Adamczak to do that.
[23]     And then I got it as a result thereof.
[24] Or it could have been where I asked him. I
[25] don't remember.

Page 56

[1] Q: I will refer you to the second full
[2] paragraph. "During the latter part of fiscal year
[3] 1997 approximately 99.6 million of reserves
[4] established as part of the Graduate acquisition and
[5] subsequently determined to be cushion from a Graduate
[6] perspective were transferred from the Graduate
[7] entities to other DV entities."
[8]     Were you aware of that 99 million dollar
[9] reserve transfer?
[10] A: Through this memo I was.
[11] Q: But not at the time it occurred?
[12] A: Not at the time it occurred, no.
[13] Q: This memo was your first information about
[14] the 99 million dollar transfer?
[15] A: It was.
[16] Q: Do you know what is meant by the word
[17] "cushion" in that sentence?
[18] A: I don't know exactly what is meant by that.
[19] The disturbing part to me was how the
[20] reserves were established in connection with the
[21] purchase accounting of a particular hospital. If you
[22] understand purchase accounting, you know you take the
[23] purchase price and the liabilities, and you allocate
[24] that among the various assets.
[25]     When you increase the liabilities by

Page 57

[1] putting a reserve on the right-hand side of the
[2] balance sheet, that requires a corresponding entry on
[3] the other side.
[4]     And that entry would be in the nature –
[5] may be of goodwill, which would be written off over a
[6] long time frame.
[7]     How you are doing it with one hospital,
[8] then transferring reserves that you establish for
[9] whatever reason, where future liabilities attributable
[10] to that hospital, how you then took those reserves and
[11] transferred them to another hospital was an answer I
[12] didn't know then and I don't know now.
[13] Q: Did you investigate the propriety of
[14] setting up those reserves at the Graduate originally?
[15] A: I was in process of doing that.
[16] But it was incomplete.
[17] Q: What did you learn?
[18] A: I didn't learn very much.
[19] I kept on asking the question.
[20] But I wasn't getting good information. I
[21] had a lot of material to review.
[22]     I had planned on taking these up with the
[23] outside accounting firm. Because it was my impression
[24] that they approved the purchase accounting.
[25]     So I had two issues.

Page 58

[1] The first issue was the purchase accounting
[2] entries at the outset appropriate. And what kind of
[3] valuations were made in terms of setting those up.
[4]     And once you had them established for a
[5] particular hospital how, even if you filed
[6] consolidated financials, how could you write
[7] liabilities attributable to another hospital off
[8] reserves from another hospital, I don't know the
[9] answer to that. Nor do I know the answer to the
[10] propriety of the purchase accounting.
[11]     Those were questions I was trying to scope
[12] out the answer of the inquiry.
[13] Q: That fact was disturbing to you when you
[14] learned of it in early May '98?
[15] A: Yes.
[16] Q: Who did you speak to about that issue?
[17] A: Remember I initially was in fact
[18] gathering. I know in human nature I won't be able to
[19] get much fact gathering, if I go out the initiative
[20] with an accusatory tone.
[21]     So I am not – one of the questions I asked
[22] was "What information do we have on that? How was
[23] this done? What is the background? Did the
[24] accountants – was there any memorandums issued on the
[25] subject? Was this commented on in the Coopers &

Page 59

[1] Lybrand management letter report?"
[2]     Those were the kind of inquiries I was
[3] making over the time frame.
[4] Q: Coopers & Lybrand was the accounting firm
[5] that you indicated you believed had approved the –
[6] A: They had given certified audited reports
[7] without qualification in 1997.
[8]     And that was a time frame in which
[9] hospitals were acquired.
[10]     So it would be very much a part of the
[11] nature of their audit to look at the way purchase
[12] accounting was utilized.
[13]     How it was set up.
[14] And what supporting documentation the
[15] entity had for setting up these reserves.
[16] Q: What did you learn about who was involved
[17] in the creation of the reserves?
[18] A: I never got an answer to that. So I didn't
[19] learn anything as to who set them up or who authorized
[20] them to be set up.
[21] Q: Did you learn anything about who
[22] transferred them or authorized them to be transferred?
[23] A: No.
[24] I had heard that it was done under the
[25] direction of Mr. McConnell, but I don't know whether

Page 60

[1] that was so or not so. Because I never had an
[2] opportunity to interview him nor to get corroboration.
[3] Q: Who did you hear that from?
[4] A: The inference I heard it from was
[5] Mr. Abdelhak.
[6] Q: When did you hear that?
[7] A: I think my first meeting with Barnes and
[8] Abdelhak.
[9] Q: Did Mr. Abdelhak express any concern about
[10] the propriety of the reserve transfer?
[11] A: I don't know that he expressed.
[12] He started to talk about reserves at that
[13] meeting.
[14]     I said, "How were they set up?"
[15] And I found after parsing through something
[16] less than a clear coherent explanation, I got some
[17] sense that it was set up incident to the purchase of
[18] the hospitals.
[19]     And then I got some sense that this would
[20] cover all of the writeoffs from the various hospitals.
[21]     I said, "How can you do that?"
[22] And I didn't get an answer.
[23] He said "McConnell must have done it" or
[24] something to that effect. That was the inference I
[25] got.

Page 61

[1]    To my recollection that is where I got it.
[2] Whether that was picked up in later
[3] conversations I had with Dionisio or Adamczak, I don't
[4] recall.
[5] Q: Did you discuss the Graduate reserve
[6] transfers with anyone else besides Mr. McConnell?
[7] A: Besides who?
[8] Q: With anyone besides Mr. McConnell?
[9] A: I never discussed it with Mr. McConnell.
[10] Q: I am sorry, with Mr. Abdelhak.
[11] A: I can't recall. I may have, as I just
[12] said, with Dionisio or Adamczak. But I don't recall.
[13] Q: Do you recall discussing the Graduate
[14] reserve transfer with any trustees, AHERF trustees?
[15] A: I don't.
[16] Q: Where was the meeting that you had with
[17] Mr. Barnes and Mr. Abdelhak in late April '98?
[18] A: In a room in the Duquesne Club in
[19] Pittsburgh.
[20] MR. DORMAN: I didn't hear that.
[21] A: A room in the Duquesne Club in Pittsburgh.
[22] Q: Do you recall how long that meeting lasted?
[23] A: I don't recall.
[24] My impression is an hour and a half to two
[25] hours.

Page 62

[1] Q: And there was no one else present besides
[2] the three of you?
[3] A: There was no one else present.
[4] Q: And how was that meeting arranged?
[5] A: It was arranged on a phone call that I had
[6] the day before from Mr. Abdelhak saying that he and
[7] Mr. Barnes wanted to meet with me on a matter related
[8] to AHERF.
[9]    And could I arrange my schedule to come.
[10] I think he called the day before.
[11] Could I arrange my schedule to come the
[12] following afternoon, I believe.
[13] Q: Was there some urgency to his request?
[14] A: To the extent he wanted to meet the next
[15] day there was, yes.
[16] Q: Do you know why that was?
[17] A: I have no idea.
[18] Q: Was Mr. Barnes – did Mr. Barnes
[19] participate in that phone call?
[20] A: No. Not to this recollection.
[21] Q: Did Mr. Barnes participate in the meeting
[22] in his capacity as chairman of the finance and audit
[23] committee?
[24] A: That was my impression.
[25] Q: Do you know whether the finance and audit

Page 63

[1] committee was aware of any of the issues that
[2] Mr. Barnes discussed with you at that meeting?
[3] A: I do not.
[4] Let me correct that.
[5] You have given me minutes of a prior
[6] meeting, which had some of these writeoffs reflected.
[7]    I did not know about that meeting at that
[8] time.
[9]    So you can say when you ask the question
[10] did the finance committee know about the writeoffs,
[11] they knew to the extent reflected in those minutes.
[12] Q: That you learned of in May of '98?
[13] A: That I learned later. That's right.
[14] Q: In May of '98?
[15] A: In May of '98. When I got a copy of the
[16] minutes.
[17] Q: Do you have any specific recollection of
[18] when you received that what you call the big chunk of
[19] documents from Wynstra in early May '98?
[20] A: I don't. It was some time in May. The
[21] date I have no idea.
[22] Q: Did you say early May?
[23] A: I know I was asking in early May. Just
[24] when I got them – because I know she had to collect
[25] some of them.

Page 64

[1]    But the exact dates which I got them, my
[2] guess is probably reasonably early May, maybe the
[3] second week or start of the second week.
[4]    But that is pure conjecture.
[5] Q: If I could refer you to Exhibit 1713A.
[6] Can you identify that document for me?
[7] A: Yes.
[8] This would be again one of the documents
[9] that was given to me by Mr. Adamczak incident to the
[10] inquiry I had been making.
[11] Q: The previous exhibit we looked at, 1712A,
[12] was dated May 1. This one is dated May 7.
[13] A: That's correct.
[14] Q: Are you aware of anything that led
[15] Mr. Adamczak to prepare this memorandum?
[16] A: I had met with him.
[17] And I was asking questions about the
[18] reserves, how they were established. And heard that
[19] they had moved between entities.
[20]    And I was wondering how that was done and
[21] under whose authority it was done.
[22]    And my sense was that this would be at
[23] least in part responsive to that.
[24] Q: Who was the first AHERF person that you met
[25] with after your meeting with Mr. Barnes and

Page 73

[1] function and accounting function had been outsourced.

[2]    This was background material he was saying,

[3] he was telling me about the reasons for a lot of the

[4] chargeoffs.

[5]    And the reasons for the continual aging of

[6] the accounts receivable.

[7] Q: Do I understand you correctly to say that

[8] there was a bigger problem with chargeoffs or

[9] writeoffs in the east because they were less

[10] conservative than the west?

[11] A: That is what I was told.

[12] Q: What did you discuss about the Graduate

[13] reserves with Mr. Dionisio?

[14] A: I can't recall. Except I believe I asked

[15] him how they were established and how the reserves

[16] were transferred among entities.

[17]    But I don't recall his answer.

[18] Q: You said inadvertent fax was sent. What

[19] was the inadvertent fax?

[20] A: The inadvertent fax was a fax sent I

[21] believe from the west to the eastern hospitals

[22] indicating that the accounts receivable function was

[23] to be consolidated.

[24]    This at that time was not known to the

[25] personnel in the east.

Page 74

[1] Q: When was the timing of that fax?

[2] A: I have no idea.

[3] Q: Was it in '98, do you know?

[4] A: I don't know.

[5] I would guess it would have been before

[6] that.

[7] Q: Before 1998?

[8] A: That would be my conjecture. But I don't

[9] know that.

[10] Q: Was there any resulting discourse between

[11] east management and west management as a result of

[12] that issue?

[13] A: I suspect there was.

[14] But I am unaware of any particular

[15] discourse.

[16]    There would have to be to consolidate

[17] things in Pittsburgh. "Send them here."

[18] Q: Are you aware of when they were

[19] consolidated?

[20] A: I am not aware.

[21] Q: Are you aware of whether they were

[22] consolidated?

[23] A: I am unaware.

[24] Q: Did you have any discussion regarding the

[25] Keysop plan or the loan program with Mr. Abdelhak or

Page 75

[1] Mr. Barnes at that initial meeting?

[2] A: No.

[3] Not that I recall.

[4] Q: Was that an issue that came up in your

[5] meetings with Mr. Dionisio or Adamczak?

[6] A: I don't recall they were.

[7] Q: Or Ms. Wynstra?

[8] A: I don't recall they were.

[9] Q: Were you aware at the time you were doing

[10] your investigation that there was Keysop distribution

[11] that was made in 1998 to certain executives?

[12] A: I was unaware of that at that time.

[13] Q: Did you become aware of it at some time

[14] during your work for AHERF?

[15] A: I may have later incident to the analysis

[16] of an appropriate termination of Mr. Abdelhak.

[17]    Just when I learned about it, I am not

[18] quite sure.

[19]    I think I learned about it – I am sure it

[20] was after May.

[21]    I don't think I even heard the word

[22] "Keysop."

[23] Q: It was after Mr. Abdelhak's termination as

[24] best you recall?

[25] A: That is to the best of my recollection,

Page 76

[1] yes.

[2] Q: That was on June 5th, 1998?

[3] A: I think that was the date of the

[4] termination.

[5]    I think there was a process that started

[6] before that leading up to a final decision to

[7] terminate and how one would go about approaching the

[8] resolution of appropriate severance arrangement for it.

[9] Q: What did you learn about the Keysop

[10] distributions that were made?

[11] A: I don't recall other than I think there was

[12] some memo indicating that some had been made earlier.

[13]    But right now I have no recollection of it.

[14] I do recall the Keysop issue incident to an

[15] analysis of the severance arrangement for Mr. Abdelhak.

[16] Q: Was there any discussion or investigation

[17] in to the propriety of the Keysop distributions that

[18] were made in 1998?

[19] A: Not to my recollection.

[20] Q: When you learned of the Keysop

[21] distributions in or after June 1998, were you aware –

[22] A: What was the date of the Keysop

[23] distributions?

[24] Q: I don't have that in front of me right

[25] now. I am sorry.

Page 77

[1]    Do you recall –
[2] A: There was, as you know, Keysop distribution
[3] made much later incident to a payment of indebtedness
[4] to Pittsburgh National Bank.
[5]    Is that what you are talking about?
[6] Q: Yes.
[7] A: I didn't learn about that until soon before
[8] it was made.
[9] Q: In the July '98 time frame?
[10] A: Yes.
[11] Much later.
[12] Close to when they were made.
[13] Q: Do you know how much – how much in
[14] distributions there was done?
[15] A: I don't recall, no.
[16] But I do know they were used to pay off the
[17] indebtedness to PNB.
[18] Q: What Keysop distribution that you learned
[19] of in June of '98 were you referring to earlier?
[20] A: I had thought you were talking about the
[21] way in which the Keysop had been set up –
[22] Q: For Mr. Abdelhak.
[23] A: For a group of employees.
[24] A group of officers.
[25] Moneys otherwise that were part of

Page 78

[1] different plans were distributed and put in to that
[2] Keysop.
[3]    That is what I thought you were talking
[4] about.
[5]    The initial setup of the Keysop.
[6] I learned about that in terms of the way it
[7] was set up earlier incident to an analysis of what is
[8] the package in terms of appropriate severance was
[9] Sherif Abdelhak entitled to and under what bases.
[10]    And that is what I thought you were talking
[11] about.
[12]    Again, I didn't learn that until after the
[13] June time frame.
[14]    That is what I thought you were talking
[15] about.
[16] MR. PIETRAGALLO: Would you excuse us one
[17] second?
[18] MR. SPITALETTO: Sure.
[19] THE VIDEOGRAPHER: This concludes tape 1 of
[20] the deposition of Mr. Charles Queenan. We are
[21] off the record. The time is 11:21 a.m.
[22]    (Discussion off the record.)
[23] THE VIDEOGRAPHER: This begins tape 2 of
[24] the deposition of Mr. Charles Queenan. We are
[25] back on the record. The time is 11:23 a.m.

Page 79

[1]    BY MR. SPITALETTO:
[2] Q: Upon the advice of your counsel,
[3] Mr. Queenan, I am going to ask you generally what the
[4] scope of the work that you performed for AHERF in 1998
[5] was?
[6] A: Yes.
[7] I think it is best understood that it was
[8] three discrete assignments.
[9]    The first assignment, which was denominated
[10] on our records as special project, started with the
[11] meeting with Mr. Abdelhak and Mr. Barnes.
[12]    And it looked in to an investigation of the
[13] accounting entries used particular in '97 and early
[14] '98.
[15]    And whether those accounting entries were
[16] appropriate or inappropriate.
[17]    And the reason for that investigation, as I
[18] understood it, was the surprise that came to
[19] Mr. Barnes when he learned that the order of magnitude
[20] of the writeoffs over and above those that had already
[21] happened were in the 200 to 300 million dollar range.
[22]    That was an investigation that started in
[23] late April and terminated some time, I believe, in the
[24] third week in May.
[25]    Where the second of the discrete

Page 80

[1] assignments happened. This occurred as a result of a
[2] phone call I received from Mr. Danforth saying that
[3] over the phone that the decision had been made to
[4] consider the termination of Mr. Abdelhak, that he
[5] wanted me and our firm to engage in an analysis of
[6] what an appropriate severance arrangement would be
[7] under the employment contract that Mr. Abdelhak had
[8] with AHERF. And would I meet with Mr. Kasperbauer as
[9] soon as possible.
[10]    So the second of the discrete assignments
[11] related to an analysis of the employment contract, the
[12] compensation package that Mr. Abdelhak had. His
[13] employment contract. And an appropriate severance
[14] arrangement.
[15]    The third discrete involvement, and on my
[16] part this became less and less of an involvement was
[17] in my mind crisis management.
[18]    And it started in the latter part of June,
[19] and in part overwhelmed and enveloped the severance
[20] arrangement for Mr. Abdelhak.
[21]    And it was the result of information coming
[22] to the attention of the directors by reason of the
[23] change from personnel, the CEO from Mr. Abdelhak to
[24] Mr. Sanzo, wherein information started to be brought
[25] of the deteriorating nature of the financial affairs

Page 81

[1] of the institution.

[2]    It was crisis management which involved a
[3] close look at a variety of options.

[4]    These options included combinations with
[5] other entities.

[6]    They included refinancing.

[7] They included looking to obtain help at
[8] both the federal and the state level from the
[9] standpoint of financial help.

[10]    It included an analysis of whether a
[11] bankruptcy was an appropriate option.

[12]    That was the third.

[13] And I describe that crisis management.

[14] The second I described as severance
[15] arrangements for Abdelhak.

[16]    And the first I described as accounting
[17] investigation.

[18] MR. DORMAN: Did you say the third was
[19] accounting investigation?

[20] A: That was the first. The second, severance
[21] arrangements. The third, crisis management.

[22] Q: In conjunction with the first assignment,
[23] was there any consideration or review of endowment
[24] documents or restricted funds?

[25] A: I don't recall that I got to that at that

Page 82

[1] time.

[2]    I don't believe I did.

[3] Q: Was it an issue that was raised?

[4] A: I don't recall it was an issue raised then.

[5] Q: If you could look at Exhibit 1694A.

[6] MR. PIETRAGALLO: Can you tell me what I am

[7] looking for?

[8] Q: Can you identify that document?

[9] A: I can not.

[10] Q: You have never seen it before preparation

[11] for your deposition or today?

[12] A: I never saw it, I am not even sure I saw

[13] this during preparation.

[14] Q: For the record, it appears to be a May 13,

[15] 1998 letter to Rob Byer at Kirkpatrick & Lockhart from

[16] Nancy Wynstra.

[17]    I will direct you to the first sentence,

[18] Mr. Queenan, "Enclosed are the documents relative to

[19] the various endowments at the former Graduate

[20] hospitals, which you have requested."

[21]    Are you aware of whether or not Mr. Byer

[22] was conducting some examination of the endowment

[23] documents?

[24] A: I was not aware.

[25] Q: Who is Mr. Byer?

Page 83

[1] A: He is a partner in the firm of Kirkpatrick

[2] & Lockhart.

[3] Q: Did you ever work with him in regard to

[4] AHERF?

[5] A: No.

[6] Q: What is his practice area?

[7] A: He has a wide variety. Certainly

[8] litigation would be one.

[9]    He also is involved in business affairs.

[10] But heavily involved in procedural aspects

[11] of litigation.

[12]    A former judge, as you know.

[13] Q: Are you aware of what work he was doing for

[14] AHERF or any of its subsidiaries?

[15] A: No.

[16] Let me correct that.

[17] I certainly was not aware of anything

[18] reflected in the May 13th letter.

[19]    In the crisis management or the third

[20] phase, I do recall that he was trying to be helpful

[21] with I believe people at the state level to see in

[22] terms of one of the options of state and federal

[23] levels that he was involved in trying to ascertain

[24] what the possibility would be to get some support from

[25] state government to tie this thing over until we had

Page 84

[1] refinancing.

[2] Q: Are you aware of whether or not in

[3] connection with what you are referring to as the

[4] crisis management assignment any consideration or

[5] evaluation was done of endowments or restricted funds?

[6] A: That was an issue that had come up. In

[7] terms of just the relevance and how it came up in

[8] terms of the crisis management, I don't know.

[9]    I was not personally involved in it.

[10] Q: Who was involved?

[11] A: Other lawyers in the firm. Just which

[12] ones, I don't know.

[13] Q: Did you do any work in connection with the

[14] potential Vanguard agreement or acquisition of some

[15] AHERF entities?

[16] A: Other than reading it, reading a draft of

[17] one of the acquisition agreements, I did not.

[18] Q: Are you aware of whether Vanguard did due

[19] diligence in connection with their consideration of

[20] purchasing AHERF entities?

[21] A: I am not aware. I assume they did. But I

[22] am not aware.

[23] Q: If I could refer you to Exhibit 1714A.

[24] Can you identify that document?

[25] A: I can.

TAB 245

Intentionally Left Blank

TAB 246

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *WILLIAM SNYDER, III*
### *July 15, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

## SNYDER, III, WILLIAM



**LEGALINK®**

A WORDWAVE COMPANY

WILLIAM SNYDER, III

Page 37

09:54:27  1    St. Christopher's?
09:54:27  2   A.  I've been going through that since you've been
09:54:31  3        talking trying to remember whether -- I know we
09:54:33  4        talked about it. Whether it was completed or
09:54:35  5        not, I don't remember.
09:54:43  6   Q.  Do you recall that thereafter AHERF acquired
09:54:56  7        Hahnemann University?
09:54:56  8   A.  Hahnemann?
09:54:58  9   Q.  Yes.
09:54:59 10   A.  Right.
09:55:01 11   Q.  And what was the reason why AHERF acquired
09:55:07 12        Hahnemann?
09:55:07 13   A.  Well, it was a leading hospital -- one of the
09:55:18 14        leading hospitals in Philadelphia and would be,
09:55:31 15        again, a facility that would be a good thing
09:55:38 16        for us to own. That's as much as I can say
09:55:41 17        about it. I was not against it.
09:55:43 18   Q.  Do you recall that there was also a medical
09:55:47 19        school that was part of Hahnemann?
09:55:49 20   A.  Yes.
09:55:49 21   Q.  And did you think it was a good idea for AHERF
09:55:58 22        to acquire a second medical school?
09:56:00 23   A.  Well, I think they were -- I don't remember,
09:56:03 24        but I think they were joined together, so there
09:56:08 25        was one, and they flew under the MCP flag. I

Page 38

09:56:14  1        don't remember the size of the Hahnemann
09:56:16  2        Medical School.
09:56:24  3   Q.  And what information did you have as a member
09:56:27  4        of the board about the consolidation of these
09:56:30  5        two medical schools?
09:56:35  6            MR. WHITNEY: Objection. Vague.
09:56:39  7            MR. MCCLENAHAN: You may answer if
09:56:41  8        you recall.
09:56:46  9   A.  I don't think there was any objection to
09:56:49 10        putting them together, no. As a matter of
09:56:52 11        fact, I think everybody thought it was a good
09:56:55 12        idea.
09:56:55 13   Q.  Do you recall there being any sorts of problems
09:56:58 14        arising in the consolidation process?
09:57:01 15   A.  Personnel problems, yes.
09:57:03 16   Q.  Personnel problems meaning faculty or --
09:57:07 17   A.  Yes, faculty.
09:57:08 18   Q.  Do you know what the financial condition of
09:57:27 19        Hahnemann University Hospital was at the time
09:57:28 20        that AHERF acquired it?
09:57:30 21   A.  Well, I know university hospitals were having
09:57:41 22        trouble financially, and I think, I recall,
09:57:43 23        that Hahnemann also was having some financial
09:57:48 24        troubles, but it was within our ability to
09:57:49 25        handle it at the time.

Page 39

09:57:51  1   Q.  And was it your understanding that adding
09:58:00  2        Hahnemann to AHERF's network of hospitals in
09:58:03  3        Philadelphia would increase the strength of
09:58:06  4        AHERF's hospitals overall?
09:58:08  5   A.  Oh, certainly.
09:58:09  6   Q.  By the ability to refer patients?
09:58:15  7   A.  Right.
09:58:15  8   Q.  And to achieve --
09:58:16  9   A.  That was the main reason for all of them, the
09:58:21 10        ability to refer patients.
09:58:22 11   Q.  Do you recall there being any consideration
09:58:24 12        about the ability to achieve efficiencies from
09:58:28 13        having more hospitals?
09:58:30 14   A.  Well, there was supposed to be synergies in
09:58:34 15        that, yes.
09:58:34 16   Q.  Do you recall what those were?
09:58:35 17   A.  Well, economy of size.
09:58:46 18   Q.  And do you know whether AHERF then did realize
09:58:53 19        an economy of size?
09:58:56 20   A.  Well, I remember that they certainly strove to
09:59:00 21        have that -- to accomplish that, and to what
09:59:04 22        degree it was accomplished, I'm not in a
09:59:06 23        position to say.
09:59:07 24   Q.  Do you remember a discussion about how being
09:59:13 25        larger would help AHERF in negotiating with

Page 40

09:59:17  1        insurance companies?
09:59:18  2   A.  With what?
09:59:19  3   Q.  Insurance companies.
09:59:21  4   A.  Oh, with insurance companies. Sure.
09:59:24  5        Certainly.
09:59:24  6   Q.  And what do you recall about that?
09:59:26  7   A.  Well, I recall that if we had -- would have had
09:59:31  8        or did have a big enough slice of the insurance
09:59:34  9        market, that we could call some of the shots
09:59:39 10   Q.  So that by having hospitals like Hahnemann and
09:59:43 11        St. Christopher's in the system that were seen
09:59:46 12        as clinically good hospitals, AHERF would be
09:59:49 13        able to get rates from the insurance companies
09:59:51 14        that would be higher?
09:59:52 15   A.  That was one of the ideas, yes.
09:59:54 16   Q.  And do you know if that goal was accomplished
10:00:01 17        by AHERF?
10:00:03 18   A.  No, I don't know that.
10:00:04 19   Q.  Do you remember anyone in management at AHERF
10:00:13 20        or on the board of trustees speaking out
10:00:16 21        against the acquisition of Hahnemann?
10:00:20 22   A.  I don't recall.
10:00:20 23   Q.  You testified earlier a little bit about
10:00:42 24        AHERF's acquisition of physician practices, is
10:00:45 25        that right?

10 (Pages 37 to 40)

WILLIAM SNYDER, III

**Page 41**

| | | |
|---|---|---|
| :00:45 | 1 | A. Yes. |
| 10:00:46 | 2 | Q. And a principal purpose of those acquisitions |
| 10:00:57 | 3 | was to increase the number of patients at the |
| 10:01:00 | 4 | hospitals, is that right? |
| 10:01:01 | 5 | A. Right. |
| 10:01:01 | 6 | Q. Do you recall that the practices themselves |
| 10:01:11 | 7 | were losing a considerable amount of money? |
| 10:01:14 | 8 | A. Are you talking about before or after |
| 10:01:17 | 9 | acquisition? |
| 10:01:17 | 10 | Q. After acquisition. |
| 10:01:18 | 11 | A. Yes. They were losing a considerable amount of |
| 10:01:22 | 12 | money after acquisition as a whole. |
| 10:01:24 | 13 | Q. Yes. |
| 10:01:25 | 14 | A. Yes. |
| 10:01:25 | 15 | Q. And was that a concern to you? |
| 10:01:27 | 16 | A. Yes, it was. |
| 10:01:28 | 17 | Q. And what types of discussions do you recall |
| 10:01:34 | 18 | about that concern? |
| 10:01:34 | 19 | A. I recall discussions about the amount of money |
| 10:01:45 | 20 | we were expending to purchase them and when we |
| 10:01:49 | 21 | were going to see some return on that. It was |
| 10:01:55 | 22 | a difficult thing to see a return, because you |
| 10:01:57 | 23 | had to wait till the hospitals got the |
| 10:01:59 | 24 | additional patients, and that, of course, took |
| 10:02:01 | 25 | time to do that. So it was difficult to |

**Page 42**

| | | |
|---|---|---|
| 10:02:05 | 1 | dollarize anything there. |
| 10:02:07 | 2 | Q. Was it your understanding that this was a |
| 10:02:11 | 3 | strategy that had considerable short-term |
| 10:02:14 | 4 | costs, but that hopefully would have |
| 10:02:18 | 5 | considerable long-term benefits? |
| 10:02:20 | 6 | A. Long-term gains, right. |
| 10:02:22 | 7 | Q. And was that something that was in these board |
| 10:02:26 | 8 | meetings talked about, this issue of short-term |
| 10:02:30 | 9 | cost versus long-term gain? |
| 10:02:32 | 10 | A. I'm sure that Sherif explained that, and that |
| 10:02:36 | 11 | was the understanding of everybody, that it |
| 10:02:38 | 12 | would take some time, as I had just stated. |
| 10:02:41 | 13 | Q. Were there any members of the board of trustees |
| 10:02:54 | 14 | who you recall speaking out against this |
| 10:02:57 | 15 | strategy of acquiring physician practices? |
| 10:03:05 | 16 | A. No, sir, I can't remember that, but I can |
| 10:03:07 | 17 | remember that there was lively discussion about |
| 10:03:11 | 18 | it, because nobody understood -- some people |
| 10:03:14 | 19 | did not understand it too well, and it had to |
| 10:03:17 | 20 | be explained to them in detail. |
| 10:03:19 | 21 | Q. Do you know whether AHERF management was taking |
| 10:03:26 | 22 | any steps to try to deal with these losses at |
| :0:03:31 | 23 | the practices after acquisition? |
| :03:33 | 24 | A. No, I don't remember what they tried to do. |
| 10:03:41 | 25 | Q. Was it your understanding, though, that there |

**Page 43**

| | | |
|---|---|---|
| 10:03:49 | 1 | were some measures in place to attempt to |
| 10:03:52 | 2 | reduce the losses? |
| 10:03:52 | 3 | A. Yes. Yes. There was always an attempt to |
| 10:04:00 | 4 | contain costs wherever possible. |
| 10:04:02 | 5 | Q. That was something that Sherif Abdelhak told |
| 10:04:05 | 6 | the board? |
| 10:04:06 | 7 | A. Yes. He preached that. |
| 10:04:08 | 8 | Q. Let me turn now, if I could, to these meetings |
| 10:04:23 | 9 | that I think you mentioned that you would have |
| 10:04:25 | 10 | with Sherif Abdelhak. |
| | 11 | A. Sure. |
| 10:04:28 | 12 | Q. Were these generally in person or by telephone |
| 10:04:32 | 13 | or how did you communicate? |
| 10:04:33 | 14 | A. Mostly in person, because I was just a floor |
| 10:04:37 | 15 | below him, and I would walk upstairs or he'd |
| 10:04:40 | 16 | come down to see me. |
| 10:04:42 | 17 | Q. I see. So you had an office in Fifth Avenue |
| 10:04:45 | 18 | Place? |
| 10:04:46 | 19 | A. Yes, I did. |
| 10:04:46 | 20 | Q. And that was an AHERF office? |
| 10:04:50 | 21 | A. Well, it was three offices and a meeting room. |
| 10:04:55 | 22 | The meeting room was used exclusively by AHERF. |
| 10:05:00 | 23 | My office was paid for by AHERF, and I had two |
| 10:05:04 | 24 | other offices. I had a secretary and an |
| 10:05:07 | 25 | accountant, and their space I paid for by |

**Page 44**

| | | |
|---|---|---|
| 10:05:10 | 1 | returning money to AHERF. So, ostensibly, they |
| 10:05:15 | 2 | just paid for my office. |
| 10:05:16 | 3 | Q. Understood. |
| 10:05:28 | 4 | And would Sherif Abdelhak bring |
| 10:05:32 | 5 | questions or concerns to you or was it you |
| 10:05:36 | 6 | raising questions with him or did it go both |
| 10:05:39 | 7 | ways? |
| 10:05:39 | 8 | A. Both ways, yes. |
| 10:05:40 | 9 | Q. What types of questions would you raise with |
| 10:05:45 | 10 | Mr. Abdelhak? |
| 10:05:45 | 11 | A. I raised questions constantly about we were |
| 10:05:58 | 12 | going pretty fast in this whole thing, and we |
| 10:06:02 | 13 | better assimilate some of the things before we |
| 10:06:05 | 14 | went into others. |
| 10:06:07 | 15 | Q. And when you say that you were going pretty |
| 10:06:10 | 16 | fast, you mean AHERF's pace of acquisitions? |
| 10:06:12 | 17 | A. Yes. |
| 10:06:13 | 18 | Q. And what did Mr. Abdelhak say about that? |
| 10:06:17 | 19 | A. I don't know what he said about that. |
| 10:06:22 | 20 | Q. I mean, did he express to you a confidence that |
| 10:06:28 | 21 | he had everything under control? |
| 10:06:30 | 22 | A. Sherif Abdelhak had a confidence -- |
| 10:06:34 | 23 | self-confidence in everything, everything |
| 10:06:39 | 24 | There was very few things that he couldn't |
| 10:06:46 | 25 | accomplish. |

11 (Pages 41 to 44)

WILLIAM SNYDER, III

Page 45

10:06:46 1   Q.   Did you considerate at all trying to implement
10:07:02 2      some type of benchmarks to determine how AHERF
10:07:07 3      was doing in terms of assimilating
10:07:11 4      newly-acquired entities?
10:07:13 5   A.   No. I don't think it was possible at the time.
10:07:18 6      They were going too fast.
10:07:19 7   Q.   Did you suggest to Mr. Abdelhak that the
10:07:26 8      organization ought to slow down on the pace of
10:07:28 9      acquisitions?
10:07:29 10  A.   Yes.
10:07:29 11  Q.   In the end, though, the acquisitions continued,
10:07:41 12     didn't they?
10:07:41 13  A.   I don't know what time frame you're talking
10:07:45 14     about that I said that, but in the end, they
10:07:47 15     certainly did continue.
10:07:48 16  Q.   Well, during what time period were you raising,
10:07:56 17     you know, a suggestion that the organization
10:07:59 18     ought to slow down in the acquisition pace?
10:08:00 19  A.   At what period?
10:08:02 20  Q.   Yes.
10:08:02 21     Did you say that? Oh, I don't remember. I
10:08:06 22     suppose halfway along the Philadelphia
10:08:09 23     acquisition path.
10:08:12 24  Q.   And did Mr. Abdelhak have arguments as to why
10:08:19 25     AHERF should continue making the acquisitions?

Page 46

10:08:21 1   A.   Convincing arguments.
10:08:23 2   Q.   And I take it that he ended up convincing you
10:08:28 3     and other members of the board?
10:08:30 4          MR. WHITNEY: Objection. Foundation.
10:08:31 5          MR. RYAN: All right. Well, let me
10:08:31 6     just start with the simple question.
10:08:33 7  BY MR. RYAN:
10:08:33 8   Q.   I take it that he ended up -- that he ended up
10:08:38 9     convincing you?
10:08:41 10  A.   Yes.
10:08:41 11  Q.   Did any other trustees raise any concern with
10:08:52 12     you in private outside board meetings about the
10:08:57 13     pace of AHERF's acquisitions?
10:08:58 14  A.   I believe they did, but I can't tell
10:09:04 15     specifically who they were. There was a lot of
10:09:11 16     talk about it, and yet there was a lot of pride
10:09:19 17     in what we were doing
10:09:23 18          MR. MCCLENAHAN: At some point when
10:09:26 19     it's convenient, I think we should take a
10:09:30 20     ten-minute recess.
10:09:32 21          MR. RYAN: Sure. Now is fine to take
10:09:35 22     a short break --
        23          THE WITNESS: Okay.
10:09:35 24          MR. RYAN: -- if that's convenient to
10:09:38 25     you.

Page 47

10:09:38 1          THE VIDEOGRAPHER: We're now going
10:09:40 2     off the record. The time on the screen is
10:09:42 3     10:09.
        4         - - - -
        5     (There was a recess in the proceedings.)
        6         - - - -
10:23:30 7          THE VIDEOGRAPHER: We're now back on
10:24:28 8     the record. The time on the screen is 10:24.
10:24:31 9  BY MR. RYAN:
10:24:31 10  Q.   We've been talking a little bit, Mr. Snyder,
10:24:35 11     about a series of acquisitions that AHERF made.
10:24:43 12     What role, in your understanding, did the board
10:24:45 13     of trustees play in reviewing or approving
10:24:50 14     those acquisitions?
10:24:55 15  A.   Well, they did just that, they reviewed them
10:24:58 16     and approved them after discussion.
10:25:02 17  Q.   And at least speaking for you personally, what
10:25:10 18     type of review did you undertake of these
10:25:14 19     proposed acquisitions?
10:25:15 20  A.   I normally talked to Abdelhak about each one
10:25:23 21     prior to the time it was brought to the board.
10:25:26 22  Q.   And what types of questions would you ask about
10:25:31 23     a proposed acquisition?
10:25:32 24  A.   What the acquisition is going to bring to our
10:25:38 25     overall strategy, and questions as to the

Page 48

10:25:47 1     financial implications.
10:25:53 2   Q.   And I take it that in each case, the answers
10:26:02 3     that Mr. Abdelhak gave you you thought were of
10:26:05 4     a satisfactory nature?
10:26:06 5  A.   I did.
10:26:07 6  Q.   Were there any other board members who were
10:26:12 7     involved in sort of pre-discussions about
10:26:17 8     acquisitions before the formal board meeting?
10:26:21 9  A.   I don't know that.
10:26:22 10  Q.   Were there other board members with whom you
10:26:25 11     had a practice of consulting in advance of
10:26:29 12     board meetings?
10:26:31 13  A.   No, I didn't have a practice of doing that, no.
10:26:36 14     I did it possibly occasionally, but I didn't
10:26:39 15     make a general practice of it.
10:26:40 16  Q.   And I take it then that at the regular board of
10:26:50 17     trustees meetings, there would be discussion of
10:26:55 18     at least the two aspects of proposed
10:26:58 19     acquisitions that you mentioned, that is, what
10:27:01 20     the proposed acquisition would bring to the
10:27:04 21     overall strategy and financial implications of
10:27:06 22     the acquisition?
10:27:07 23  A.   Yes, and what it would mean, in some cases, to
10:27:15 24     Allegheny General because of the implication of
10:27:17 25     teaching.

12 (Pages 45 to 48)

WILLIAM SNYDER, III

Page 85

| | |
|---|---|
| 11:27:15 1 | MR. WHITNEY: Objection. Vague. |
| 11:27:15 2 | THE WITNESS: What are we doing here? |
| 11:27:18 3 | MR. MCCLENAHAN: Also, I have the |
| 11:27:19 4 | same objection. Do you want him to answer the |
| 11:27:24 5 | question that you posed? |
| 11:27:26 6 | MR. RYAN: Could you read it back, |
| 11:27:27 7 | please, while I listen to the question? |
| 8 | - - - - |
| 9 | (The record was read back by the Reporter.) |
| 10 | - - - - |
| 11:27:49 11 | MR. RYAN: All right. Let me ask, |
| 11:27:51 12 | maybe, a better question. |
| 13 | BY MR. RYAN: |
| 11:27:55 14 | Q. Did you have an understanding as to what |
| 11:28:00 15 | financial measure in particular Mr. Barnes was |
| 11:28:03 16 | concerned about? |
| 11:28:04 17 | MR. MCCLENAHAN: You mean on |
| 11:28:04 18 | December 2, 1996, because that's the document |
| 11:28:09 19 | we've been talking about? |
| 11:28:13 20 | MR. RYAN: Well, I wasn't trying to |
| 11:28:16 21 | limit it. Let me step back one step again. |
| 11:28:19 22 | BY MR. RYAN: |
| 11:28:19 23 | Q. If I understood you right, you can recall there |
| 11:28:23 24 | being concern on the part of Mr. Barnes about |
| 11:28:26 25 | the fiscal year 1996 results? |

Page 86

| | |
|---|---|
| 11:28:28 1 | A. Correct. |
| 11:28:29 2 | Q. And he expressed that concern at some board |
| 11:28:34 3 | meeting or meetings that you attended? |
| 11:28:36 4 | A. Yes. |
| 11:28:36 5 | Q. And did you have an understanding at that time |
| 11:28:41 6 | about which measure on financial statements |
| 11:28:44 7 | Mr. Barnes was particularly concerned about? |
| 11:28:47 8 | A. No. All I say is he was concerned about the |
| 11:28:51 9 | lack of profitability and the lack of cash on |
| 11:28:55 10 | hand. |
| 11:28:55 11 | Q. And did you share Mr. Barnes' concerns? |
| 11:29:01 12 | A. At that time, yes. |
| 11:29:03 13 | Q. Do you know whether any other members of the |
| 11:29:09 14 | AHERF board did or did not share those |
| 11:29:10 15 | concerns? |
| 11:29:12 16 | A. No, I don't. |
| 11:29:13 17 | Q. From talking to Sherif Abdelhak, do you know |
| 11:29:19 18 | whether he shared those concerns, or did he |
| 11:29:21 19 | have a different view from Mr. Barnes, if you |
| 11:29:27 20 | know? |
| 11:29:27 21 | A. I don't know. Whatever I say would be |
| 11:29:31 22 | speculation. I don't know. |
| 11:29:36 23 | Q. Do you see that the comments attributed to |
| 11:29:40 24 | Mr. Barnes go on to say: Quantitatively, |
| 11:29:44 25 | earnings were unimpressive. Management has |

Page 87

| | |
|---|---|
| 11:29:48 1 | been working very hard. We have to get the |
| 11:29:50 2 | earnings up in this corporation? |
| 11:29:52 3 | A. Yes. |
| 11:29:53 4 | Q. Do you recall Mr. Barnes making comments of |
| 11:29:58 5 | that type? |
| 11:29:58 6 | A. No. |
| 11:29:59 7 | Q. Did you hold the view that earnings at AHERF in |
| 11:30:09 8 | fiscal year 1996 were unimpressive? |
| 11:30:11 9 | A. Yes. |
| 11:30:12 10 | Q. And was it your view at the time that |
| 11:30:15 11 | management had been working very hard and that |
| 11:30:18 12 | the organization had to get the earnings up? |
| 11:30:20 13 | A. Yes. |
| 11:30:20 14 | Q. Do you see the next sentence reads: There |
| 11:30:25 15 | tends to be a casual atmosphere on this issue? |
| 11:30:31 16 | A. Yes, I see that. |
| 11:30:32 17 | Q. Do you have any understanding as to what that |
| 11:30:35 18 | might refer to? |
| 11:30:36 19 | MR. MCCLENAHAN: You mean what |
| 11:30:37 20 | Mr. Barnes meant? |
| 11:30:38 21 | MR. RYAN: Yes. |
| 11:30:39 22 | A. Yes. I thought Mr. Barnes felt that way. |
| 11:30:42 23 | Q. Do you know what he meant by that? A casual |
| 11:30:46 24 | atmosphere on whose part? |
| 11:30:50 25 | A. No, I don't know what he meant by it. |

Page 88

| | |
|---|---|
| 11:30:53 1 | Q. Was it your understanding at the time that |
| 11:31:19 2 | AHERF management believed that the strategies |
| 11:31:22 3 | it had put in place of acquiring hospitals and |
| 11:31:27 4 | physician practices would help to improve the |
| 11:31:30 5 | earnings going forward? |
| 11:31:31 6 | A. Yes. |
| 11:31:32 7 | Q. And how did you believe that that would happen? |
| 11:31:41 8 | Through increased patient referrals or -- |
| 11:31:45 9 | A. Yes. |
| 11:31:46 10 | Q. Do you recall there being at AHERF at some |
| 11:32:14 11 | point in time a centralization of certain |
| 11:32:20 12 | support functions to Pittsburgh? |
| 11:32:21 13 | A. Yes. |
| 11:32:21 14 | Q. And what do you recall about that |
| 11:32:28 15 | centralization project? |
| 11:32:32 16 | A. Well, I recall that Sherif felt that we should |
| 11:32:39 17 | centralize a lot of the operations and |
| 11:32:43 18 | decisions in Pittsburgh as the -- to get a |
| 11:32:50 19 | better focus on what was going on in the |
| 11:32:52 20 | overall picture. |
| 11:32:54 21 | Q. Was the hope, in your understanding, to have |
| 11:33:02 22 | economies of scale? |
| 11:33:03 23 | A. Oh, absolutely. |
| 11:33:04 24 | Q. And was it your understanding that among the |
| 11:33:10 25 | functions that were being consolidated back to |

22 (Pages 85 to 88)

WILLIAM SNYDER, III

Page 89

11:33:13 1    Pittsburgh was the collection of patient bills?
11:33:18 2  A.  Patient bills?
11:33:19 3  A.  Yes.
11:33:19 4  A.  Yes. Yes.
11:33:21 5  Q.  Did you come to learn how that project of
11:33:31 6    centralizing patient billing had gone?
11:33:36 7  A.  I don't know what you mean had gone. Do you
11:33:39 8    mean whether it improved the situation?
11:33:41 9  Q.  Whether it had worked out or not, yes.
11:33:45 10 A.  I don't recall.
11:33:45 11 Q.  Let me hand you, Mr. Snyder, what's previously
11:34:32 12   been marked as Exhibit 80, and if you could
11:34:58 13   just take a moment to review at least the cover
11:35:00 14   letter.
11:35:27 15 A.  All right.
11:35:28 16 Q.  Do you recall receiving a copy of this letter
11:35:35 17   from Mr. Abdelhak dated August 2, 1996
11:35:40 18   regarding the acquisition of the Graduate
11:35:42 19   Health System?
11:35:43 20 A.  No. No, I don't recall.
11:35:46 21 Q.  Do you recall that at some point in time AHERF
11:35:49 22   did acquire hospitals in the Graduate Health
11:35:51 23   System?
11:35:51 24 A.  Oh, yes.
11:35:52 25 Q.  And what do you recall about why AHERF made

Page 90

11:35:58 1    that acquisition?
11:36:02 2  A.  I don't know. I'd have to go back and read a
11:36:15 3    lot more about it before I could tell you why
11:36:18 4    we tried to acquire Graduate.
11:36:19 5  Q.  Do you see here in Exhibit 80, in
11:36:45 6    Mr. Abdelhak's letter, the third sentence
11:36:48 7    reads: I consulted extensively with Bill
11:36:53 8    Snyder, and he is in full agreement with the
11:36:55 9    proposed action?
11:36:56 10 A.  Yes.
11:36:56 11 Q.  Do you remember anything about Mr. Abdelhak
11:37:03 12   consulting with you?
11:37:06 13        MR. WHITNEY: About Graduate?
11:37:07 14        MR. RYAN: Yes.
11:37:10 15 A.  All I can remember is that he consulted with me
11:37:14 16   about that and all the rest of the hospitals.
11:37:20 17   He says in here, the -- extensively is the word
11:37:31 18   he uses, so I assume that he talked to me a lot
11:37:34 19   about it.
11:37:35 20 Q.  Why don't -- if you would, why don't you take a
11:37:38 21   moment to review the next two pages --
11:37:39 22 A.  All right.
11:37:40 23 Q.  -- which are entitled Overview of Proposal for
11:37:44 24   Certain Graduate Health System Entities to
11:37:45 25   Become Part of SDN, Inc.

Page 91

11:40:09 1  A.  Okay.
11:40:10 2  Q.  Has this helped at all to bring back two
11:40:16 3    reasons why AHERF was acquiring Graduate?
11:40:18 4  A.  Yes. Yes.
11:40:19 5  Q.  All right. And what reasons are those?
11:40:21 6  A.  What's your question?
11:40:22 7  Q.  Based on having now reviewed this overview,
11:40:29 8    what reasons do you recall AHERF having for
11:40:34 9    making the Graduate acquisition?
11:40:37 10 A.  There again, I believe for the same reason, to
11:41:00 11   provide more patients for all the hospitals.
11:41:13 12 Q.  So that the idea was that by increasing in
11:41:17 13   size, the acquisition would improve the overall
11:41:21 14   financial strength of the eastern region?
11:41:24 15 A.  More economies of scale.
11:41:26 16 Q.  Okay. Economies of scale with the Graduate
11:41:29 17   hospitals and the existing hospitals in the
11:41:31 18   eastern region?
11:41:32 19 A.  That's correct. Just in the east.
11:41:36 20 Q.  So that would be the hospitals we've talked
11:41:38 21   about, MCP, United and Hahnemann?
11:41:40 22 A.  Hahnemann, yes.
11:41:41 23 Q.  Do you recall that AHERF was making the
11:41:50 24   Graduate acquisition through a corporation
11:41:55 25   called SDN, Inc.?

Page 92

11:41:58 1  A.  Yes.
11:41:59 2        MR. WHITNEY: Objection. Foundation.
11:42:00 3  Q.  And what do you recall about that?
11:42:03 4  A.  I recall, as far as I can remember, was that it
11:42:15 5    was an effort to not put more debt on the AHERF
11:42:20 6    balance sheet and to have it over to the side,
11:42:25 7    but reserving the right to put that hospital
11:42:27 8    into the AHERF family when the time seemed
11:42:32 9    appropriate.
11:42:32 10 Q.  And you didn't believe, did you, that there was
11:42:36 11   anything improper about the use of SDN, Inc.?
11:42:41 12 A.  It worried me, but I asked Nancy, and she said
11:42:46 13   she thought it was perfectly legal.
11:42:47 14 Q.  When you say that it worried you, what worried
11:42:50 15   you about it?
11:42:50 16 A.  Well, just from what you said. Why are we
11:42:53 17   doing things off to the side? I'm always leery
11:42:58 18   of off-balance sheet things, and this was an
11:43:05 19   idea that -- I don't know who hatched this
11:43:07 20   idea, whether it was Sherif or Nancy or who it
11:43:10 21   was, but --
11:43:11 22 Q.  All right. So you consulted with Ms. Wynstra
11:43:14 23   about it?
11:43:14 24 A.  Yes, in conjunction with Sherif.
11:43:17 25 Q.  And she told you that this was a perfectly

23 (Pages 89 to 92)

WILLIAM SNYDER, III

| | | |
|---|---|---|
| 11:43:22 | 1 | legal mechanism? |
| 11:43:23 | 2 | A.  Yes. |
| 11:43:23 | 3 | Q.  Do you recall anything else that she may have |
| 11:43:25 | 4 | told you about SDN? |
| 11:43:28 | 5 | A.  No. |
| 11:43:29 | 6 | Q.  Did you consult at all with Coopers & Lybrand |
| 11:43:34 | 7 | about SDN? |
| 11:43:36 | 8 | A.  No. |
| 11:43:36 | 9 | Q.  Did you consult with Coopers & Lybrand about |
| 11:43:43 | 10 | the Graduate acquisition in general? |
| 11:43:47 | 11 | A.  No. |
| 11:43:47 | 12 | Q.  If you take a look, please, it's the page with |
| 11:44:01 | 13 | number -- the number ending in 2668, using |
| 11:44:05 | 14 | these little numbers in the bottom right, these |
| 11:44:08 | 15 | Bates numbers. |
| 11:44:10 | 16 | A.  2668.  I've got it. |
| 11:44:12 | 17 | Q.  Are you with me on a schedule called Actual |
| 11:44:16 | 18 | Statement of Revenue and Expenses 11 Months |
| 11:44:19 | 19 | Ended May 31, 1996? |
| 11:44:21 | 20 | A.  Yes, sir. |
| 11:44:21 | 21 | Q.  Do you know whether you reviewed this kind of |
| 11:44:25 | 22 | financial information for the Graduate |
| 11:44:26 | 23 | hospitals prior to the acquisition? |
| 11:44:29 | 24 | MR. MCCLENAHAN:  Objection to the |
| 11:44:30 | 25 | form.  What do you mean by this kind of |

| | | |
|---|---|---|
| 11:44:34 | 1 | financial information?  You mean did he review |
| 11:44:35 | 2 | this particular sheet? |
| 11:44:39 | 3 | Q.  Do you know whether you reviewed an income |
| 11:44:43 | 4 | statement, whether it was this schedule or |
| 11:44:47 | 5 | another income statement schedule, for the |
| 11:44:49 | 6 | Graduate hospitals before the acquisition? |
| 11:44:51 | 7 | A.  I don't recall. |
| 11:45:00 | 8 | Q.  And this schedule appears to show a net loss |
| 11:45:10 | 9 | for this 11-month period of $9,697,000? |
| 11:45:17 | 10 | A.  That's what it shows. |
| 11:45:19 | 11 | Q.  And two rows up, a loss from operations of |
| 11:45:23 | 12 | $20,124,000? |
| 11:45:26 | 13 | A.  Yes. |
| 11:45:27 | 14 | Q.  Do you recall a discussion at the board of |
| 11:45:34 | 15 | trustees about how the Graduate hospitals were |
| 11:45:37 | 16 | doing in terms of their financial condition? |
| 11:45:41 | 17 | A.  No.  I don't remember that discussed. |
| 11:45:45 | 18 | Q.  I think you mentioned in the context of SDN |
| 11:45:51 | 19 | that you do recall that there was a possibility |
| 11:45:55 | 20 | that only certain of the Graduate hospitals and |
| 11:45:58 | 21 | not all of them would be integrated into AHERF, |
| 11:46:02 | 22 | is that right? |
| 11:46:06 | 23 | A.  That isn't what we were talking about.  We were |
| 11:46:09 | 24 | talking about, I said, it was possible in the |
| 11:46:11 | 25 | future that the hospitals could be integrated |

| | | |
|---|---|---|
| 11:46:15 | 1 | into AHERF. |
| 11:46:15 | 2 | Q.  Oh, I see. |
| 11:46:17 | 3 | A.  I mean, that was left open. |
| 11:46:21 | 4 | Q.  Was there a discussion of whether it would be |
| 11:46:28 | 5 | all of the Graduate hospitals or none or if |
| 11:46:32 | 6 | some hospitals might be selected to be |
| 11:46:35 | 7 | integrated into the system? |
| 11:46:35 | 8 | A.  Yes, there was discussion of what entities we |
| 11:46:40 | 9 | should acquire. |
| 11:46:41 | 10 | Q.  And what do you recall about that? |
| 11:46:43 | 11 | A.  I don't remember what they were, but I remember |
| 11:46:45 | 12 | there was people talking about one and the |
| 11:46:48 | 13 | other. |
| 11:46:48 | 14 | Q.  There was a view that certain hospitals might |
| 11:46:50 | 15 | not be as desirable as other hospitals? |
| 11:46:53 | 16 | A.  Right.  Right. |
| 11:46:53 | 17 | Q.  Who then was going to decide which of the |
| 11:47:05 | 18 | Graduate hospitals would be integrated into |
| 11:47:09 | 19 | AHERF? |
| 11:47:09 | 20 | A.  I would assume Sherif.  Assume.  I say it was |
| 11:47:19 | 21 | Sherif that would decide that. |
| 11:47:20 | 22 | Q.  And do you recall that the board of trustees |
| 11:47:22 | 23 | gave him authority to make that decision? |
| 11:47:24 | 24 | A.  No, I don't recall that. |
| 11:47:25 | 25 | Q.  Let me hand you, Mr. Snyder, what's previously |

| | | |
|---|---|---|
| 11:47:52 | 1 | been marked as Exhibit 832, and let me just ask |
| 11:48:15 | 2 | you first does this appear to be a copy of the |
| 11:48:17 | 3 | minutes of what's referred to as the Annual |
| 11:48:21 | 4 | Meeting of the Board of Trustees of AHERF held |
| 11:48:23 | 5 | on Thursday, December 12, 1996? |
| 11:48:25 | 6 | A.  It does. |
| 11:48:27 | 7 | Q.  And what I'd like to call your attention to, if |
| 11:48:33 | 8 | I could, is beginning on page 4, the section |
| 11:48:39 | 9 | headed Reorganization of Certain Graduate |
| 11:48:42 | 10 | Health System Entities, and then there are a |
| 11:48:46 | 11 | number of resolutions that continue on to |
| 11:48:49 | 12 | page 10. |
| 11:50:13 | 13 | A.  Yeah.  Okay. |
| 11:50:14 | 14 | Q.  Let me ask you first, since I don't have the |
| 11:50:18 | 15 | benefit for this meeting of the type of |
| 11:50:22 | 16 | transcription of shorthand notes that we saw |
| 11:50:24 | 17 | earlier, does a review of the minutes here that |
| 11:50:30 | 18 | you've just looked at help you to recall what |
| 11:50:33 | 19 | was said at this meeting about the Graduate |
| 11:50:37 | 20 | acquisition? |
| 11:50:38 | 21 | A.  Not too much, no. |
| 11:50:40 | 22 | Q.  Do you recall any member of the board of |
| 11:50:46 | 23 | trustees speaking against the Graduate |
| 11:50:50 | 24 | acquisition? |
| 11:50:58 | 25 | A.  No, I don't recall that.  I'd like to help |

24 (Pages 93 to 96)

WILLIAM SNYDER, III

Page 97

11:51:03  1    there, but I don't recall that.
11:51:04  2  Q.  Do you recall any member of the board raising
11:51:10  3    any questions or concerns about the acquisition
11:51:14  4    even if it didn't rise to the level of speaking
11:51:17  5    against it, to speak?
11:51:24  6  A.  Well, there's a difference between recalling
11:51:26  7    exactly what we're talking about and the
11:51:32  8    impression left in my mind about these
11:51:36  9    acquisitions. That's all I can say. There's a
11:51:39  10    difference there, but since I can't be
11:51:41  11    specific, I can't answer that.
11:51:45  12  Q.  Do you remember any trustee raising with you
11:51:57  13    the issue of the fact that AHERF management had
11:52:02  14    announced the acquisition of the Graduate
11:52:04  15    hospitals before consulting with the full
11:52:16  16    board?
11:52:16  17  A.  No.
11:52:17  18  Q.  And you're shown as being present at this
11:52:36  19    meeting of the board, right?
11:52:37  20  A.  I was there, yes.
11:52:38  21  Q.  And I assume that you voted in favor of the
11:52:44  22    resolutions --
11:52:45  23  A.  Yes.
11:52:45  24  Q.  -- relating to the Graduate acquisition?
11:52:50  25  A.  Well, I guess I did if the minutes show it.

Page 98

11:52:56  1    There was no objection on my part.
11:53:01  2      You have to understand that these
11:53:10  3    video conferences were tough. You couldn't see
11:53:12  4    the people on the other side, on the
11:53:14  5    Philadelphia side, and it made it very hard, I
11:53:19  6    thought, to conduct a proper meeting, but
11:53:22  7    that's what we did.
11:53:22  8  Q.  Okay. So let me make sure that I understand
11:53:25  9    this. There were certain trustees present in a
11:53:28  10    conference room in Pittsburgh and others
11:53:30  11    present in a conference room in Philadelphia?
11:53:32  12  A.  Correct.
11:53:32  13  Q.  And then there was some sort of video
11:53:35  14    conferencing technology used so that you
11:53:41  15    sitting in Pittsburgh could, in effect, see the
11:53:43  16    trustees in Philadelphia on a T.V. screen
11:53:45  17    basically?
11:53:45  18  A.  On a T.V. screen, right. It was the Sony
11:53:49  19    system, and it was in the early stages, and it
11:53:51  20    was only fairly good in my opinion.
11:54:03  21  Q.  I assume that Mr. Abdelhak would have been in
11:54:07  22    Pittsburgh, at least generally, at these board
11:54:10  23    meetings, right?
11:54:11  24  A.  Yes. I don't know whether he was in this one
11:54:14  25    or not, but he generally was in Pittsburgh,

Page 99

11:54:17  1    yes. Well, you can't tell from this.
11:54:20  2  Q.  Right. I don't believe that it indicates who
11:54:23  3    was where.
11:54:25  4  A.  What do those check marks mean?
11:54:28  5  Q.  I don't know. That I cannot tell you.
11:54:33  6  A.  I'll tell you what I think they mean, that the
11:54:37  7    check marks were in Pittsburgh, and the ones
11:54:41  8    that are unchecked were in Philadelphia.
11:54:42  9    That's just a guess, but it looks like
11:54:44  10    it, because -- no, that wouldn't be right
11:54:46  11    either, because I was in Pittsburgh. So I
11:54:48  12    don't know what they are.
11:54:49  13  Q.  This is just a copy how we found it in AHERF's
11:54:54  14    files.
11:54:54  15  A.  Um-hum.
11:54:56  16  Q.  Do you remember any trustee asking any
11:55:12  17    questions about whether AHERF's financial
11:55:16  18    condition was such that the organization could
11:55:18  19    afford to make the Graduate acquisition?
11:55:21  20  A.  No.
11:55:23  21  Q.  Do you know what any other members of AHERF
11:55:32  22    management, apart from Sherif Abdelhak, may
11:55:35  23    have thought about the Graduate acquisition?
11:55:37  24  A.  No.
11:55:39  25  Q.  I think you mentioned that you recall speaking

Page 100

11:55:43  1    to Ms. Wynstra at least about the SDN matter?
11:55:47  2  A.  SDN, yes. Yes.
11:55:48  3  Q.  Did you talk with her about the Graduate
11:55:50  4    acquisition generally?
11:55:51  5  A.  No. No, no.
11:55:57  6  Q.  Did you have a practice at all of consulting
11:56:04  7    with Dr. Kaye about acquisitions in the eastern
11:56:08  8    region?
11:56:08  9  A.  No. The only thing I did with Dr. Kaye is he
11:56:17  10    cured me of malaria. If it hadn't been for
11:56:21  11    Dr. Kaye, I would not be sitting here today.
11:56:24  12  Q.  Well, that's certainly a testament to his
11:56:29  13    medical skill.
11:56:31  14      Do you recall -- and if I asked you
11:56:40  15    this morning, please forgive me. Do you
11:56:42  16    recall if there was an executive committee of
11:56:45  17    the board?
11:56:45  18  A.  Executive committee report on this?
11:56:49  19  Q.  Executive committee of the board?
11:56:51  20  A.  Oh, yes, yes. Yeah.
11:56:53  21  Q.  How was that committee formed?
11:56:56  22  A.  I don't know. I'd like to see a copy of the
11:57:03  23    members, because I've even forgotten that.
11:57:03  24  Q.  I'll hand that to you just now.
11:57:11  25  A.  Now, you haven't brought up any minutes of

25 (Pages 97 to 100)

WILLIAM SNYDER, III

Page 141

14:26:59 1    Q.    And the idea was that AHERF would sell those
14:27:02 2          assets, lease them back so it could continue to
14:27:05 3          use them, and --
14:27:06 4    A.    Get the cash and continue to use the facility.
14:27:11 5    Q.    Right. Do you know why that sale/leaseback
14:27:14 6          ended up falling through?
14:27:14 7    A.    Ended up how?
14:27:16 8    Q.    Falling through.
14:27:27 9    A.    No, I don't. I do recall that one of the
14:27:32 10         trustees was very much against it, because they
14:27:36 11         felt it was short-term versus long-term, and
14:27:44 12         that we'd lose out in the end.
14:27:46 13   Q.    Do you recall who that trustee was?
14:27:48 14   A.    No, I don't. No.
14:28:04 15   Q.    Do you know ultimately, though, why that
14:28:08 16         sale/leaseback didn't end up going through?
14:28:10 17   A.    Why it didn't go through?
14:28:12 18   Q.    Right.
14:28:14 19         MR. MCCLENAHAN: He just testified
14:28:15 20   that he didn't know.
14:28:16 21         MR. RYAN: Oh, I'm sorry.
14:28:17 22   A.    No, I didn't know. I don't remember, no
14:28:20 23   Q.    Do you recall that another measure AHERF
14:28:24 24         management was engaged in to try to raise cash
14:28:26 25         was to sell accounts receivable?

Page 142

14:28:35 1    A.    I remember there was a discussion of it. I
14:28:37 2          don't remember whether we did it or not.
14:28:39 3    Q.    And was it your understanding, there again,
14:28:42 4          that the idea would be to get cash in the
14:28:45 5          short-term?
14:28:46 6    A.    Right.
14:28:48 7    Q.    Was it your feeling at this time in the fall of
14:28:56 8          1997 into the spring of 1998 that AHERF
14:29:01 9          management was undertaking a number of
14:29:05 10         proactive measures to try to improve the
14:29:08 11         organization's condition?
14:29:13 12   A.    Absolutely.
14:29:14 13   Q.    And did you approve of the measures that they
14:29:18 14         were undertaking?
14:29:20 15   A.    Did I personally approve of them?
14:29:22 16   Q.    Yes, sir.
14:29:23 17         MR. MCCLENAHAN: I mean, I will
14:29:25 18   object to the question as vague. You've listed
14:29:28 19   a number of such measures. There may be other
14:29:33 20   measures, and I'm not sure whether he would
14:29:36 21   give the same answer as to each and every one.
14:29:38 22   A.    Yes, that's very true. I approved of the
14:29:42 23         leaseback sale, and what other ones are you
14:29:46 24         referring to? Accounts receivable?
14:29:52 25   Q.    Yes. The layoffs, the closing of Mt. Sinai

Page 143

14:29:57 1          Hospital, the other cost reductions --
14:29:58 2    A.    I approved of those, yes.
14:30:01 3    Q.    -- and the sale of the eastern hospitals to
14:30:03 4          Vanguard?
14:30:04 5    A.    Yes.
14:30:05 6    Q.    Do you recall that in April 1998, AHERF repaid
14:30:14 7          a loan from the Mellon Bank?
14:30:15 8    A.    Yes, I do
14:30:16 9    Q.    And what do you recall about that?
14:30:18 10   A.    All I could tell you about that is that Sherif
14:30:23 11         came to see me one morning early in my office
14:30:28 12         and said he was forced to pay the Mellon Bank
14:30:31 13         off. I don't remember the figure, but it sort
14:30:33 14         of runs in my mind it was $98 million. I may
14:30:38 15         be wrong on that by now, but that's a figure
14:30:42 16         that's in the back of my head, and that he had
14:30:44 17         to do it or the Mellon Bank was going to
14:30:46 18         foreclose. That's all I can remember. And I
14:30:49 19         said to him, I think you should have taken that
14:30:53 20         to the board before you took such drastic
14:30:55 21         action. He said he didn't have time.
14:30:56 22   Q.    Why did you consider that to be drastic action?
14:31:00 23   A.    Well, we had all kinds of other debts, and just
14:31:04 24         to single out one creditor and pay them back
14:31:07 25         didn't seem right without full authority

Page 144

14:31:14 1    Q.    And when you made this point to him, his
14:31:21 2          response was that he hadn't had time?
14:31:23 3    A.    He had no time. He said he was given an hour
14:31:27 4          or something like that to make up his mind.
14:31:30 5    Q.    Did you then talk about this Mellon Bank
14:31:35 6          repayment with anyone else besides
14:31:37 7          Mr. Abdelhak?
14:31:40 8    A.    Well, it became a matter of general discussion
14:31:43 9          immediately among -- at all the meetings, but I
14:31:49 10         don't think that I specifically called anybody
14:31:51 11         and said, hey, we just paid the Mellon Bank
14:31:54 12         back.
14:31:54 13   Q.    And when you say at meetings, you're talking
14:31:57 14         about meetings of the board or or committees of
14:32:01 15         the board?
14:32:01 16   A.    Yes. Right
14:32:02 17   Q.    And what was the nature of that discussion?
14:32:04 18   A.    Well, the propriety of doing it and how much
14:32:17 19         time did we really have? Did the Mellon Bank
14:32:20 20         really put the squeeze on us? That's about it.
14:32:23 21   Q.    And were there trustees who expressed the view
14:32:28 22         that Mr. Abdelhak should not have repaid the
14:32:31 23         loan?
14:32:33 24   A.    I don't remember if there was anybody that said
14:32:37 25         they disapproved of it. I think they

36 (Pages 141 to 144)

WILLIAM SNYDER, III

Page 145

14:32:40 1    disapproved of the manner in which it was done
14:32:43 2    so quickly.
14:32:43 3    Q.  Without consulting the board?
14:32:45 4    A.  Without consulting the proper authorities.  It
14:32:51 5        was a lot of money.
14:32:52 6    Q.  And did you also personally believe that
14:33:00 7        Mr. Abdelhak should have consulted the board?
14:33:01 8    A.  Yes.
14:33:02 9    Q.  Did Mr. Abdelhak's handling of the Mellon Bank
14:33:14 10       repayment play a role in his being replaced as
14:33:20 11       chief executive officer of AHERF?
14:33:22 12   A.  The answer is that, among others.
14:33:32 13   Q.  What were the other factors as you understood
14:33:36 14       them?
14:33:36 15   A.  Well, the condition of the corporation as a
14:33:43 16       whole and his handling of it.  Where are we now
14:33:51 17       in the time frame?  When was bankruptcy?  What
14:33:55 18       was the end date?
14:33:56 19   Q.  The bankruptcy, I think I can tell you, was
14:34:00 20       filed on July 21, 1998.
14:34:02 21   A.  So what we're talking about is how many months
14:34:04 22       before then?
14:34:06 23   Q.  The Mellon Bank repayment?
14:34:09 24   A.  Yeah
14:34:10 25   Q.  I think it was three months before that.

Page 146

14:34:12 1    A.  Three months.  Okay.  I just want to get the
14:34:14 2        time frame in my head.
14:34:15 3    Q.  So you've mentioned, I think, as factors for
14:34:18 4        why Mr. Abdelhak was replaced, his handling of
14:34:21 5        the repayment of the Mellon Bank loan, and then
14:34:23 6        the condition of the corporation as a whole and
14:34:25 7        his handling of that?
14:34:28 8    A.  The condition of the whole situation.  We were
14:34:32 9        in dire straits.
14:34:36 10   Q.  Who decided to replace Mr. Abdelhak as CEO?
14:34:42 11   A.  I did, with consultation with some of the
14:34:46 12       senior board members.
14:34:48 13       I had a meeting with three other
14:34:51 14       senior doctors on a Sunday afternoon, and they
14:34:57 15       said that they were going to leave and pull a
14:34:59 16       lot of the doctors out of Allegheny with them
14:35:02 17       if Abdelhak didn't go.  It was about a
14:35:05 18       three-hour meeting.  Then when I got back from
14:35:08 19       that meeting, I called a number of the leading
14:35:12 20       trustees and asked them what they thought, and
14:35:14 21       they all said we think he should go.  So I
14:35:20 22       didn't see him on Monday because of some
14:35:24 23       reason, I don't know whether his or mine, but,
14:35:26 24       anyway, I called him down to the office on
14:35:28 25       Tuesday and fired him.

Page 147

14:35:35 1    Q.  So the first event in the sequence of events,
14:35:41 2        as you recall, was this meeting that you had
14:35:43 3        with three Allegheny General Hospital doctors?
14:35:43 4    A.  This was the first what?
14:35:47 5        MR. MCCLENAHAN:  That would depend on
14:35:48 6        when you begin the sequence
14:35:52 7    Q.  The first event in the series of events that
14:35:56 8        led to Mr. Abdelhak being fired was a meeting
14:35:58 9        you had with three Allegheny General doctors?
14:36:00 10   A.  Yes, that was the first.  Yes.
14:36:02 11   Q.  Who were those doctors?
14:36:04 12   A.  Dr. McGovern, Jr., Dr. Shannon, Richard
14:36:11 13       Shannon, and Dr. Jeffrey Cohen.
14:36:15 14   Q.  Could you spell that last one, please?
14:36:18 15   A.  C-O-H-E-N.  He's chief of urology.  Still is.
14:36:25 16   Q.  And where did this meeting with the doctors
14:36:31 17       take place?
14:36:31 18   A.  At Dr. Shannon's house in Sewickley.
14:36:34 19   Q.  And who called the meeting, so to speak?
14:36:44 20   A.  It was Dr. Shannon called me, I believe, on
14:36:47 21       Saturday and asked if I could meet tomorrow
14:36:50 22       afternoon, and I said certainly.
14:36:52 23   Q.  And the meeting lasted --
14:36:56 24   A.  For three hours
14:36:57 25   Q.  And what issues did the three doctors raise

Page 148

14:37:03 1        with you in the meeting?
14:37:05 2    A.  Well, they mostly said the damage that happened
14:37:11 3        to Allegheny General, that was their main beef,
14:37:15 4        because they were all Allegheny General
14:37:17 5        Hospital, and they thought that the hospital
14:37:19 6        was being put in a very -- had been put in an
14:37:23 7        extremely bad position, and it was getting
14:37:25 8        worse every day, and that they weren't going to
14:37:28 9        stay if he stayed
14:37:30 10   Q.  Dr. Cohen, I think you mentioned, was the chief
14:37:35 11       of urology?
14:37:36 12   A.  Yes.  Dr. Shannon is chief of medicine.
14:37:40 13   Q.  And Dr. McGovern is a heart doctor?
14:37:42 14   A.  He's a thoracic surgeon.
14:37:46 15   Q.  And I take it that these were all three very
14:37:53 16       eminent medical doctors?
14:37:55 17   A.  Yes, and all reasonably young.  Not real young,
14:38:02 18       but reasonably young.
14:38:02 19   Q.  And they told you that if Mr. Abdelhak wasn't
14:38:10 20       fired, they would leave Allegheny General?
14:38:12 21   A.  If he wasn't what?
14:38:13 22   Q.  That if Mr. Abdelhak wasn't fired, they would
14:38:17 23       leave Allegheny General Hospital?
14:38:17 24   A.  Yes, and take as many others with them as they
14:38:20 25       could

37 (Pages 145 to 148)

WILLIAM SNYDER, III

Page 149

14:38:20 1 Q. At this meeting that you had at Dr. Shannon's
14:38:27 2 house on Sunday afternoon, did you attempt to
14:38:30 3 argue with them or --
14:38:31 4 A. No. No. I just let them talk and explain why
14:38:36 5 they felt that way and why others felt that
14:38:42 6 way.
14:38:42 7 Q. And I take it after that meeting, you then met
14:38:48 8 or called up some other board members?
14:38:50 9 A. Yes, I did.
14:38:51 10 Q. Who were they?
14:38:52 11 A. I called them on the phone.
14:38:54 12 Q. Who were they?
14:38:55 13 A. I know Barnes was one, and I think I talked to
14:39:09 14 Nimick and --
14:39:13 15 Q. Francis Nimick?
14:39:14 16 A. Yes. I don't recall all who I called, I really
14:39:23 17 don't, but I called four or five of them.
14:39:25 18 Q. If we just look back at the minutes of the
14:39:32 19 executive committee, would that -- would that
14:39:33 20 at all help you to refresh your recollection as
14:39:35 21 to which trustees you may have called.
14:39:38 22 A. Well, is that important to you to know which
14:39:40 23 ones?
14:39:40 24 Q. It is, yes. Yes, it is
14:39:43 25 A. I'll do my best

Page 150

14:39:44 1 Q. It's Exhibit 1651 just a few exhibits ago
14:39:57 2 A. Danforth. Douglas Danforth. I know I called
14:40:02 3 him. I'm pretty sure I called Sculley. He's
14:40:19 4 my neighbor, and I trusted him a lot, but I
14:40:22 5 can't be certain, but I'm pretty sure I would
14:40:25 6 have called him. I don't know about Edelman.
14:40:28 7 I did not call Brenner, because he's in
14:40:30 8 Philadelphia. I'd say I called Barnes and
14:40:33 9 Danforth, Sculley, and maybe Edelman.
14:40:43 10 Q. And Mr. Nimick as well?
14:40:45 11 A. I think I called Nimick. I'm not positive of
14:40:49 12 that, but I think I did. He's an old -- very
14:40:55 13 old hand -- old head.
14:40:58 14 Q. And when you called these other board members,
14:41:07 15 I take it that you started off by explaining to
14:41:09 16 them what Dr. Shannon and the other doctors had
14:41:11 17 told you?
14:41:12 18 A. I opened the meeting -- the conversation with
14:41:17 19 my meeting with those four doctors and
14:41:21 20 explained what they said and how they felt, and
14:41:24 21 that I could heartily agree that it was time to
14:41:26 22 pull the plug on him.
14:41:29 23 Q. I'm sorry. I didn't quite hear that.
14:41:31 24 A. It wa. time for him to go.
14:41:32 25 Q. All right. So that was a view that you

Page 151

14:41:35 1 expressed when you called up these other board
14:41:37 2 members?
14:41:38 3 A. Yes, yes, yes.
14:41:38 4 Q. Do you recall what views, if any, they
14:41:42 5 expressed in these telephone calls with you?
14:41:43 6 A. Well, they all agreed. I do remember that. I
14:41:49 7 don't know what views they expressed, but they
14:41:51 8 agreed in one form or another.
14:41:53 9 Q. Do you remember any trustee coming to you
14:41:59 10 before this Sunday afternoon meeting at
14:42:03 11 Dr. Shannon's house --
14:42:05 12 A. That's a very good question.
14:42:05 13 Q. -- to suggest that Mr. Abdelhak should be
14:42:07 14 replaced?
14:42:07 15 A. I can't give you a name, but it runs in the
14:42:20 16 back of my head that somebody did come to me
14:42:22 17 about that. I don't remember who it was,
14:42:24 18 though, and it certainly was in my mind too.
14:42:52 19 Q. Do you recall whether the topic of the
14:42:55 20 repayment of the Mellon Bank loan was part of
14:42:59 21 the conversation at Dr. Shannon's house?
14:43:02 22 A. I can't recall whether it was or not. That's a
14:43:13 23 good point, though. I just don't remember.
14:43:14 24 Q. And so then on Tuesday, you called Mr. Abdelhak
14:43:49 25 into your office and fired him?

Page 152

14:43:51 1 A. Yes.
14:43:51 2 Q. And what did he say in this meeting?
14:43:57 3 A. You don't want to put that in the minutes.
14:44:00 4 Q. He was upset?
14:44:02 5 A. Oh, that's putting it very mildly. The main
14:44:07 6 thing he said to me was that I was making the
14:44:09 7 biggest mistake of my entire life, and he was
14:44:13 8 raving, climbing the walls, so to speak.
14:44:19 9 Q. Had you ever given any previous warning to him
14:44:27 10 that his job was in jeopardy?
14:44:31 11 A. No. No.
14:44:32 12 Q. Well, I think I may have marked this last week,
14:45:08 13 but I don't have the marked version here, so
14:45:13 14 I'll mark as Exhibit 1677 a one-page document
14:45:15 15 with Bates No. TACO 52826.
16 - - - -
17 (Exhibit 1677 marked for identification.)
18 - - - -
14:45:34 19 BY MR. RYAN:
14:45:34 20 Q. And if you could just take a moment to review
14:45:43 21 that, please, Mr. Snyder.
14:46:23 22 A. Yes, sir.
14:46:23 23 Q. And is this a letter that you sent to
14:46:34 24 Mr. Abdelhak dated June 5, 1998?
14:46:37 25 A. Yes.

LEGALINK MANHATTAN (212) 557-7400

WILLIAM SNYDER, III

Page 153

| 14:46:37 | 1 | Q. | And I take it then this letter you more |
| 14:46:43 | 2 | | formally, in writing, advised him of a decision |
| 14:46:47 | 3 | | you had already told him about already? |
| 14:46:49 | 4 | A. | That's what it was for. |
| 14:46:50 | 5 | Q. | And do you recall that before you sent this |
| 14:46:55 | 6 | | letter, there was a meeting of the executive |
| 14:46:57 | 7 | | committee of the board to discuss it? |
| 14:47:00 | 8 | A. | Yes. |
| 14:47:00 | 9 | Q. | And what do you recall about that meeting? |
| 14:47:03 | 10 | A. | Nothing, except that, as far as I know, it was |
| 14:47:10 | 11 | | unanimous to go through with this. |
| 14:47:14 | 12 | Q. | And whom -- well, strike that. |
| 14:47:21 | 13 | | Who was selected to replace |
| 14:47:24 | 14 | | Mr. Abdelhak? |
| 14:47:26 | 15 | A. | Anthony Sanzo. |
| 14:47:28 | 16 | Q. | And who made that decision? |
| 14:47:29 | 17 | A. | Well, we had a meeting, a discussion about it, |
| 14:47:41 | 18 | | and I don't know whether it was in executive |
| 14:47:42 | 19 | | committee or what it was, but there were a |
| 14:47:44 | 20 | | number of people, trustees that were in on |
| 14:47:48 | 21 | | that. It was also my recommendation. |
| 14:47:51 | 22 | Q. | And why was Mr. Sanzo your -- |
| 14:47:57 | 23 | A. | Well, he had all kinds of experience in this |
| 14:48:04 | 24 | | field, and he was known by all the trustees. |
| 14:48:06 | 25 | | He reported at nearly all the board meetings. |

Page 154

| 14:48:11 | 1 | | They knew what he was about, what his mind was |
| 14:48:14 | 2 | | like, and he had done a very good job with |
| 14:48:18 | 3 | | Allegheny General, and in my opinion, he was |
| 14:48:21 | 4 | | the obvious choice. |
| 14:48:24 | 5 | Q. | Do you remember whether there were any trustees |
| 14:48:28 | 6 | | present at the meeting you're talking about |
| 14:48:30 | 7 | | who -- |
| 14:48:31 | 8 | A. | Dissented? |
| 14:48:32 | 9 | Q. | Well, who suggested other candidates? |
| 14:48:34 | 10 | A. | No. |
| 14:48:35 | 11 | Q. | First of all? |
| 14:48:37 | 12 | A. | No |
| 14:48:37 | 13 | Q. | And I take it that you don't recall any trustee |
| 14:48:40 | 14 | | voting against the appointment of Mr. Sanzo? |
| 14:48:42 | 15 | A. | No, sir |
| 14:48:42 | 16 | Q. | Then I take it some time later, Mr. McConnell |
| 14:48:51 | 17 | | was removed as AHERF's chief financial officer? |
| 14:48:55 | 18 | A. | Yes, and I went over that. David wanted to |
| 14:49:01 | 19 | | know what I knew about that, and I don't recall |
| 14:49:03 | 20 | | it at all. I don't know who fired him or how |
| 14:49:06 | 21 | | that came about. I don't know why I don't. I |
| 14:49:09 | 22 | | just don't. |
| 14:49:09 | 23 | Q. | Okay. |
| 4:49:11 | 24 | A. | When did he depart? Some months later, I |
| 14:49:19 | 25 | | think. |

Page 155

| 14:49:19 | 1 | Q. | The documents I have suggest later in June. |
| | 2 | | I'm not sure. |
| 14:49:23 | 3 | A. | Early June? |
| 14:49:24 | 4 | Q. | Later in June. I'm not sure of the exact date |
| 14:49:27 | 5 | | myself. |
| 14:49:27 | 6 | A. | All right. |
| 14:49:28 | 7 | Q. | Does looking at this letter, Exhibit 1676, |
| 14:49:35 | 8 | | dated June 5 help you to place in time when |
| 14:49:42 | 9 | | this Sunday meeting took place at Dr. Shannon's |
| 14:49:57 | 10 | | house? |
| 14:49:57 | 11 | A. | No, but I would -- several weeks before, but I |
| 14:50:01 | 12 | | can't give you the specific date. |
| 14:50:03 | 13 | Q. | Okay. I'm just asking for some general idea? |
| 14:50:06 | 14 | A. | Yeah. It was several weeks before this. |
| 14:50:10 | 15 | | Actually, I'm trying to figure out who wrote |
| 14:50:12 | 16 | | this letter, I mean, actually constructed it, |
| 14:50:17 | 17 | | because everything is in here. I just don't |
| 14:50:24 | 18 | | know who constructed the letter. |
| 14:50:25 | 19 | Q. | But you actually signed the letter? |
| 14:50:27 | 20 | A. | Well, I agreed with everything it said, but I |
| 14:50:30 | 21 | | might have forgotten some of the things that we |
| 14:50:32 | 22 | | were obligated to do had I not had some advice, |
| 14:50:39 | 23 | | which is only normal. I mean, I -- |
| 14:50:40 | 24 | Q. | Sure. Sure. It looks like it's a lawyer -- it |
| 14:50:45 | 25 | | uses the sort of legalese-type expression like |

Page 156

| 14:50:49 | 1 | | a lawyer in the letter. |
| 14:50:49 | 2 | A. | Well, that's what I think. I think a lawyer |
| 14:50:50 | 3 | | wrote it. |
| 14:50:52 | 4 | Q. | Let me hand you, Mr. Snyder, what's previously |
| 14:51:18 | 5 | | been marked as Exhibit 1672, and there are a |
| 14:52:08 | 6 | | number of documents here, I believe, all from, |
| 14:52:12 | 7 | | roughly, the July 1998 time frame. I wanted to |
| 14:52:18 | 8 | | ask you, first, about the document beginning on |
| 14:52:24 | 9 | | page 3109, using the numbers in the bottom |
| 14:52:30 | 10 | | right corner |
| 14:52:38 | 11 | A. | Yes, sir |
| 14:52:38 | 12 | Q. | Which is a July 7, 1998 letter to the members |
| 14:52:43 | 13 | | of the board of trustees of AHERF. |
| 14:52:47 | 14 | A. | Yes. |
| 14:52:49 | 15 | Q. | And it appears on the next page to be signed by |
| 14:52:51 | 16 | | representatives of PNC Bank National |
| 14:52:56 | 17 | | Association and of MBIA Insurance Corporation |
| 14:52:59 | 18 | A. | Okay |
| 14:53:00 | 19 | Q. | If you wouldn't mind just reading this |
| 14:53:04 | 20 | | page-and-a-half-long letter, please. |
| 14:54:58 | 21 | A. | Okay. |
| 14:54:58 | 22 | Q. | Do you recall that in July 1998, two of AHERF's |
| 14:55:09 | 23 | | creditors, namely PNC and MBIA, offered to |
| 14:55:15 | 24 | | provide financing to AHERF? |
| 14:55:16 | 25 | A. | Yes |

39 (Pages 153 to 156)

WILLIAM SNYDER, III

Page 157

14:55:17  1   Q.   And what do you recall about that?
14:55:19  2   A.   Well, I recall that nobody wanted to put the
14:55:29  3        western hospitals in jeopardy in this loan,
14:55:33  4        which, of course, is what it called for.
14:55:35  5   Q.   When you say no one, you mean no one on the
14:55:44  6        board?
14:55:44  7   A.   Generally speaking, the trustees did not like
14:55:48  8        the idea of putting the western hospitals up as
14:55:54  9        collateral.
14:55:54 10   Q.   And that appears to be what PNC and MBIA are
14:56:09 11        referring to in the third paragraph when they
         12        state --
14:56:11 13   A.   Yes, it does.  Yes.
14:56:12 14   Q.   -- we have heard that the AHERF board has
14:56:15 15        recently expressed strong reservations with
14:56:17 16        respect to making the credit of the west
14:56:19 17        available to support the east?
14:56:20 18   A    Yes
14:56:21 19   Q.   They go on to state in this letter:  The
14:56:24 20        board's current position is inconsistent with
14:56:27 21        its actions in the past and is particularly
14:56:31 22        unfortunate in view of the system-wide need for
14:56:33 23        financing.
         24   A    Yeah.
14:56:36 25   Q.   Did you have a view at the time about this view

Page 158

14:56:40  1        that PNC and MBIA were expressing?
14:56:46  2   A.   Well, I thought it was unfortunate we'd have to
14:56:50  3        do that, but that's where we were.
14:56:54  4   Q.   What view did you have as to whether the board
14:57:03  5        should make the credit of the west available
14:57:06  6        for the east?
14:57:08  7   A.   Well, I don't remember how I felt at the time,
14:57:19  8        but I sort of remember that I was not in favor
14:57:23  9        of it.
14:57:26 10   Q.   Why not?
14:57:27 11   A.   Well, for the same reason.  I wanted to
14:57:31 12        preserve the Allegheny General, not see it go
14:57:37 13        belly up along with all the rest.  By that
14:57:44 14        time, it was sort of a foregone conclusion in
14:57:50 15        my mind that the ones in the east were in
14:57:51 16        terrible, terrible trouble and probably
14:57:54 17        couldn't be saved.
14:57:59 18   Q.   Did you meet or talk by phone with
14:58:10 19        representatives of PNC Bank or MBIA in the July
14:58:16 20        1998 time frame?
14:58:17 21   A.   I personally did not.  I think most of those
14:58:21 22        negotiations were done through David.
14:58:23 23   Q.   David Barnes?
14:58:25 24   A    McConnell
14:58:26 25   Q    Oh, I see.  McConnell.

Page 159

14:58:41  1        Your view, in effect, was you didn't
14:58:42  2        want to throw good money after bad?
14:58:46  3        MR. MCCLENAHAN:  Well, objection.
14:58:47  4        That's your characterization, and I think
14:58:49  5        that's putting words into the witness' mouth.
14:58:51  6        He explained what his concerns were.
14:58:53  7   A.   I told you what my concerns were, and it was
14:58:56  8        just that I wanted to save this one hospital.
14:58:59  9   Q.   Allegheny General?
14:59:00 10   A.   I wasn't sure, yes, how long it could last,
14:59:07 11        but --
14:59:09 12   Q.   Let me ask you about another letter from MBIA
14:59:12 13        which is a few pages before that in this
14:59:15 14        exhibit.  It's at the page ending in 3102.
14:59:21 15   A.   102?
14:59:22 16   Q.   Yes, sir.
14:59:28 17   A.   Okay.
14:59:30 18   Q.   And if you could just take a moment to review
14:59:34 19        this letter from Richard Weill of MBIA.
15:00:56 20   A.   All right.
15:00:59 21   Q.   What I wanted to ask you about particularly is
15:01:04 22        the third paragraph where Mr. Weill writes:
15:01:09 23        Our advisors indicate that the sale of the
15:01:11 24        entire system would very likely yield a
15:01:15 25        purchase price well in excess of all the debt.

Page 160

15:01:18  1        Do you recall that?
15:01:20  2   A.   I don't remember that statement.
15:01:22  3   Q.   Do you recall more generally MBIA stating that
15:01:27  4        they thought the need for a bankruptcy filing
15:01:31  5        could be obviated or avoided by sale of the
15:01:34  6        entire system?
15:01:35  7   A.   No, I don't remember that.
15:01:36  8   Q.   Do you recall that ultimately the bankruptcy
15:01:59  9        filing was made for AHERF and certain of its
15:02:05 10        affiliates, but that the western hospitals were
15:02:06 11        kept out of bankruptcy?
15:02:08 12   A.   Yes.
15:02:08 13   Q.   And did you agree with that way of structuring
15:02:15 14        the bankruptcy filing?
15:02:16 15   A.   Yes.
15:02:16 16   Q.   And why did you think that that was
15:02:19 17        appropriate?
15:02:19 18   A.   Well, for the same reason I gave you on others,
15:02:25 19        that we were able to preserve Allegheny
15:02:27 20        General.
15:02:27 21   Q.   Did you have a view at the time as to what had
15:02:45 22        created the need for AHERF to file for
15:02:48 23        bankruptcy?
15:02:51 24   A.   The numbers.  They were bleak.  There wasn't
15:02:59 25        much left.

40 (Pages 157 to 160)

WILLIAM SNYDER, III

Page 161

15:03:00  1   Q.   And did you have a view as to what factor or
15:03:04  2        factors had caused that condition at AHERF?
15:03:08  3   A.   There were so many of them that I couldn't sit
15:03:14  4        and list them.  There were a number of factors
15:03:21  5        that, over a period of three years, arrive at
15:03:24  6        this converging point.
15:03:26  7             MR. MCCLENAHAN:  We just spent five
15:03:29  8        hours working through those factors.
           9             THE WITNESS:  Yeah.
15:03:31 10             MR. MCCLENAHAN:  I mean, if you
15:03:31 11        really expect the witness to answer that
15:03:35 12        question after all this time, it seems to me we
15:03:38 13        should go back over what we just spent the rest
15:03:42 14        of the day working through.
15:03:44 15   A.   I can't give you all the reasons, but they were
15:03:47 16        all written right in front of us.  They're in
15:03:48 17        that pile there.
15:03:49 18   Q.   The reasons are, generally speaking, the market
15:03:52 19        factors and how AHERF acted in response to
15:04:01 20        those factors?
15:04:01 21   A.   Yes.
15:04:22 22             MR. MCCLENAHAN:  Are you finished
15:04:23 23        with this?
15:04:24 24             MR. RYAN:  Yes, I am.
15:04:25 25   BY MR. RYAN:

Page 162

15:04:25  1   Q.   Did you remain on the AHERF board after the
15:04:33  2        bankruptcy filing?
15:04:36  3   A.   I don't know when I got off.
15:04:39  4   Q.   Was there a time when you left the board?
15:04:42  5   A.   Oh, sure, but I don't know exactly when it was.
15:04:47  6        Does it show?  I can't tell you.
15:04:48  7   Q.   I can't either.
15:04:50  8   A.   Really?
15:04:51  9   Q.   Yes.
15:04:52 10             MR. MCCLENAHAN:  That's enough.  If
15:04:54 11        you don't remember, all you need to do is say
15:04:56 12        so, and then he'll ask you another question.
15:04:58 13   A.   I don't remember when I got off the board of
15:05:01 14        AHERF.
15:05:01 15   Q.   Do you recall why you got off the board of
15:05:06 16        AHERF?
15:05:06 17   A.   Yes, because I was no longer wanted or needed.
15:05:25 18   Q.   And was that a conclusion you reached or is
15:05:29 19        that something that you were told by somebody?
15:05:32 20   A.   I don't believe so.  I think I came to that
15:05:37 21        myself.  It was time to go.
15:05:47 22   Q.   Let me shift topics, if I could, and ask some
15:06:06 23        questions about the board meetings.  Did you
15:06:25 24        have concern in the 1990's with the number of
15:06:29 25        members on AHERF's board?

Page 163

15:06:32  1   A.   Yes, I was concerned with that.
15:06:35  2   Q.   Did you think that there were too many members?
15:06:38  3   A.   Too many.  Too many, yes.
15:06:41  4   Q.   How did you feel that that affected the board
15:06:49  5        meetings?
15:06:49  6   A.   Well, I felt it made the board unwieldy, and we
15:06:54  7        had so many people that we hardly had enough
15:07:00  8        chairs, and I didn't think it was necessary to
15:07:02  9        have all those people, but when you have that,
15:07:07 10        you always worry about you're going to hurt
15:07:10 11        somebody's feelings when you -- somebody that's
15:07:16 12        important to you down the road, but you have to
15:07:18 13        do it sometimes.
15:07:19 14   Q.   I think you mentioned previously that sometimes
15:07:28 15        you thought that the volume of materials sent
15:07:32 16        to board members prior to meetings was quite
15:07:35 17        voluminous?
15:07:36 18   A.   Yes, sir.
15:07:36 19   Q.   Did board members make comments about couldn't
15:07:43 20        we cut down on the volume of material?
15:07:45 21   A.   Always.  Always.  Many times.
15:07:48 22   Q.   And did that happen?
15:07:50 23   A.   Well, I think attempts were made.  I don't
15:07:58 24        think it happened very materially.
15:08:01 25   Q.   How far in advance of board meetings would you

Page 164

15:08:11  1        receive board materials?
15:08:12  2   A.   Several days.
15:08:14  3   Q.   Did you feel that that was a long enough time
15:08:19  4        in order to review those materials?
15:08:20  5   A.   At times, I thought so.  Other times I didn't,
15:08:30  6        depending on how important the subjects were
15:08:33  7        under consideration.
15:08:33  8   Q.   Did you talk to anybody at AHERF about sending
15:08:43  9        out materials farther in advance of meetings?
15:08:43 10   A.   I don't believe so.
15:08:44 11   Q.   Do you recall any board members raising that as
15:08:49 12        a concern to you, the length of time they had
15:08:53 13        to consider the materials?
15:08:54 14   A.   I believe I remember one or two saying that at
15:09:04 15        times.
15:09:10 16   Q.   Did you believe that sometimes the AHERF board
15:09:18 17        meetings didn't last as long as might have been
15:09:22 18        helpful to get through all the material?
15:09:31 19   A.   Well, I think there were times it was cut
15:09:34 20        short, but most of the time we covered the
15:09:36 21        entire agenda.
15:09:38 22             Remember, these people not only had
15:09:39 23        these board meetings, but all of them were on
15:09:42 24        committees, and they all had voluminous minutes
15:09:45 25        to go through.  So it was quite a bunch of

41 (Pages 161 to 164)

WILLIAM SNYDER, III

Page 165

15:09:50 1     paper.
15:09:51 2   Q.   Trust me, I've seen the bunch of paper.
15:09:57 3        Were there efforts undertaken to try
15:09:59 4   to reduce the number of boards and committees
15:10:03 5   at AHERF?
15:10:13 6   A.   I don't remember. I think we made an attempt
15:10:18 7   at that some time along the line.
15:10:23 8   Q.   Let me mark a new document as Exhibit 1678. It
15:10:36 9   bears Bates Nos. PRPLD 02002244 through 49.
          10       - - - -
          11   (Exhibit 1678 marked for identification.)
          12       - - - -
15:11:10 13   A.   Oh, I forgot about this.
15:12:20 14        Number 4 under meetings was something
15:12:22 15   that I tried to promote all the time, but
15:12:25 16   didn't have too much luck.
15:12:30 17   Q.   Oh, you're talking about short site visits?
15:12:33 18   A.   Yes. Sometimes you could get a few to come,
15:12:38 19   but -- because I made site visits all the time,
15:12:42 20   and I thought others should too.
15:13:05 21        MR. MCCLENAHAN: Are there specific
15:13:06 22   questions about this document?
15:13:07 23        MR. RYAN: Yeah. I'm just -- I think
15:13:09 24   the witness is almost through looking through
15:13:10 25   it. I do have a number of specific questions.

Page 166

15:13:36 1        THE WITNESS: Okay.
          2   BY MR. RYAN:
15:13:37 3   Q.   All right. Let me ask, first of all, is this a
15:13:41 4   trustee evaluation form that you filled out and
15:13:43 5   signed?
15:13:43 6   A.   Yes, it is.
15:13:49 7   Q.   Do you see down the bottom of the first page,
15:13:52 8   Board Materials, question 5 reads: If you
15:13:56 9   believe that you need additional information in
15:13:59 10   order to make informed decisions on particular
15:14:01 11   issues which come before the board, is it clear
15:14:05 12   to you how to go about seeking that additional
15:14:10 13   information? You checked no.
15:14:12 14   A.   Right.
15:14:13 15   Q.   Were there occasions where you wanted to get
15:14:17 16   additional information from AHERF management?
15:14:18 17   A.   I'd say more concise rather than additional.
15:14:24 18   Q.   And who did you go to to try to get more
15:14:31 19   concise information?
15:14:34 20   A.   Well, I went to Sherif, or if it was
15:14:37 21   appropriate, I would go see Nancy or David
15:14:42 22   McConnell or maybe one or two others.
15:14:52 23   Q.   Then on the second page under Meetings,
15:15:02 24   question 1 reads: The current board schedule
15:15:05 25   calls for four meetings per year of most boards

Page 167

15:15:08 1   and board committees with each meeting
15:15:11 2   generally scheduled to last approximately two
15:15:14 3   hours. Are the meeting schedules and the
15:15:16 4   number and length of meetings currently
15:15:18 5   appropriate in light of the time needed to
15:15:19 6   conduct the business which is the
15:15:21 7   responsibility of the board? And you answered,
15:15:23 8   Yes, just barely. Is that right?
15:15:26 9   A.   Well, we talked about that before.
15:15:27 10   Q.   So that you thought that either there should be
15:15:31 11   more meetings or the meetings ought to last
15:15:35 12   longer?
15:15:35 13   A.   For my purpose, it was very difficult to hold
15:15:47 14   meetings longer than two hours, you couldn't
15:15:49 15   keep the trustees any longer than that, and if
15:15:51 16   you just had this to deal with and not the
15:15:54 17   committee meetings, then we should have had
15:15:56 18   more board meetings, but you had the committees
15:15:58 19   also. So you were putting a big burden on
15:16:00 20   people of their free time. That's why I put
15:16:05 21   just barely.
15:16:06 22   Q.   Let me ask you about the section headed Time
15:16:22 23   Commitment on the fourth page.
15:16:27 24   A.   Where are you?
15:16:28 25   Q.   The page ending in 2247 in the bottom right

Page 168

15:16:33 1   corner.
15:16:33 2   A.   Oh, okay. I've got you. Go ahead.
15:16:35 3   Q.   Time commitment?
15:16:36 4   A.   Yes.
15:16:36 5   Q.   Question 1 reads: Approximately how much time
15:16:40 6   per month do you spend in carrying out your
15:16:44 7   trustee responsibilities? And your answer was:
15:16:47 8   One to two hours per day. Right?
15:16:49 9   A.   Yeah.
15:16:50 10   Q.   I take it that due to the fact that you were
15:16:53 11   chairman of the board and served on, as we've
15:16:56 12   seen, many different committees and boards, it
15:16:58 13   was your feeling you spent a substantial amount
15:17:00 14   of your time on board activities?
15:17:02 15   A.   Well, I was right in the building, and I was --
15:17:07 16   the company was paying for my office, so I
15:17:09 17   tried to do it.
15:17:10 18        When I said one to two hours a day,
15:17:12 19   that wouldn't be every day, meaning some day
15:17:15 20   you might spend more than two or three hours,
15:17:17 21   and sometimes you might spend less.
15:17:19 22   Q.   Understood.
15:17:19 23   A.   Yes.
15:17:20 24   Q.   And I take it that due to your role on the
15:17:28 25   board, you weren't expecting other trustees to

42 (Pages 165 to 168)