TAB 247

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## RICHARD SHANNON, M.D.
### March 15, 2004

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-557-7400 / FAX: 212-692-9171*

**SHANNON, M.D., RICHARD - Vol. 1**



LEGALINK
A WORDWAVE COMPANY

RICHARD SHANNON, M.D.

Page 45

1  Q.  Do you recall when you first heard a concern
2     about the financial circumstances in the east?
3  A.  Again --
4        MS. MEADEN: I'm going to object to
5     the form.
6  A.  -- my recollection would be late 1997.
7  Q.  And would these concerns be something that you
8     learned about at AGH board meetings or
9     elsewhere?
10 A.  No, by late 1997 in the time period I'm
11    recalling, there were newspaper articles about
12    layoffs in hospitals in the east. It was
13    pretty public knowledge that operations in the
14    east were struggling.
15 Q.  And did you -- layoffs, for example, did you
16    learn about the layoffs from reading the
17    newspaper?
18 A.  I can't recall whether there was any other
19    source of that information. Certainly I knew
20    about it from the newspaper, but whether
21    someone else told me they were happening the
22    day before -- I also recall Mr. Abdelhak having
23    a meeting in which he announced the layoffs.
24 Q.  And who was at that -- that meeting?
25 A.  This was a public session, Mr. Abdelhak in

Page 46

1     front of an auditorium of lots of people in the
2     east, and it was televised back to the west.
3  Q.  And where were you when -- where was the venue
4     for watching it in the west?
5  A.  I can't recall. My guess is McGovern
6     Auditorium. There were a number of venues
7     where telecommunication hookups to the east
8     were available.
9  Q.  Do you recall when this -- this announcement
10    took place?
11 A.  No.
12 Q.  Did Mr. Abdelhak say why he had made the
13    decision to lay people off?
14 A.  Declining reimbursements and cuts in Medicare.
15 Q.  Do you remember anything else about -- anything
16    else stand out about what he said?
17 A.  No.
18 Q.  And was there any question and answer period or
19    other time for reaction after his address?
20 A.  Not that I can recall.
21 Q.  And did you have any kind of reaction or
22    thoughts after learning about these layoffs
23    with respect to the financial condition of
24    AHERF?
25 A.  My general impression was that financial

Page 47

1     circumstances in the east were very strapped
2  Q.  Okay. When you were on the AHERF board, as
3     part of the board materials that were sent to
4     you in advance of meetings, do you recall there
5     being any AHERF financial statements as part of
6     those materials?
7  A.  Yes
8  Q.  And would you spend any time reading, going
9     through those financial statements in advance
10    of the meetings?
11 A.  Yes.
12 Q.  And was there any particular part that you
13    would focus on, any particular line item or
14    section of the financial statements that you
15    would focus on when you were reading them?
16 A.  I suppose that my interests were principally
17    focused on -- in these complicated consolidated
18    financial statements -- on the western
19    entities, and I most distinctly recall seeing
20    operating statements, not balance sheets.
21 Q.  And just to be clear, I think you said this
22    earlier, but you don't recall seeing any
23    financial statements for AHERF as a whole
24    during calendar year 1997?
25 A.  Correct.

Page 48

1  Q.  Let me just show you a couple of documents
2     here. First one has been previously marked as
3     Exhibit 2101. This is AHERF consolidated
4     financial statements, September 30th, 1997, and
5     it's dated October 28th, 1997. Just take a
6     look through that, Dr. Shannon.
7        MR. McCLENAHAN: Is there anything in
8     particular you want him to look at?
9  Q.  Well, yes. I can tell you right now what my
10    question's going to be, which is have you ever
11    seen this before, but let me focus you on a
12    particular part that may or may not trigger a
13    reaction.
14       If you go to the second page of the
15    document, page 1a.
16       MR. McCLENAHAN: 791 at the bottom.
17       MR. FRIESEN: Right, 791 at the
18    bottom.
19 Q.  This is the AHERF consolidating statement of
20    operations for the three months ended September
21    30th, 1997, and on the left-hand column, a
22    little hard to read in places, but it says net
23    income/loss.
24 A.  Mm-hmm.
25 Q.  And then the far right under AHERF

RICHARD SHANNON, M.D

Page 49

1  consolidated, again, it's hard to read, but I
2  will tell you or I'll represent to you that it
3  says $42,571,000 net loss?
4  A.  Mm-hmm.
5  Q.  Have you ever seen this before?
6  A.  No, sir.
7  Q.  Okay.  You can put that aside.
8      I'll show you another document that's
9  Exhibit 1653.  These are the board materials
10  for a meeting of the audit committee of AHERF
11  for October 15th, 1997.  Now, I know you
12  weren't on the audit committee and you weren't
13  even on the board of AHERF as of this date
14  but --
15      MR McCLENAHAN:  But he's going to
16  ask you questions anyway.
17  Q.  -- but I'm going to ask you a question anyway.
18  Just give me one second.
19      If you turn to the page ending in
20  1967, we have the beginning of a draft of the
21  consolidated financial statements for the year
22  ended June 30th, 1997, and it goes on and on
23  and on, and, as you know, you can look at as much
24  of this as you want to, but my question, just
25  to be sure, is whether you've seen this before.

Page 50

1  A.  No, sir.
2      MS. MEADEN:  In draft form?
3      MR. FRIESEN:  Yes.
4  A.  No, sir, I have not seen this document before.
5  Q.  Okay.  You just saved yourself some time.
6      MR. McCLENAHAN:  I think he's getting
7  the drift of that.
8  Q.  Do you remember ever learning that in April of
9  1998 AHERF repaid a loan to Mellon Bank?
10  A.  Yes.
11  Q.  And when did you learn about that?
12  A.  The last week of April, 1998.
13  Q.  And how did -- how did you learn about that?
14  A.  I learned about that from Mr. Barry Roth and
15  Mr. Bob Fletcher.
16  Q.  And did they come to your office, or what kind
17  of meeting was this?
18  A.  No, we were at a meeting together outside of
19  the hospital.  Mr. Roth received a phone call
20  and then proceeded to tell Mr. Fletcher and me
21  about the loan repayment.
22  Q.  What was Mr. Roth's position at the time?
23  A.  He was -- well, Mr. Roth was probably still the
24  CEO of Forbes Regional Medical Center but was
25  made also the head of Allegheny University

Page 51

1  Hospitals West.  I can't recall, but he around
2  or about that time held those positions.
3  Q.  And Mr. Fletcher?
4  A.  Was the chairman of the board of Forbes
5  Regional Hospital.
6  Q.  And what exactly did Mr. Roth say other than it
7  was a loan that was repaid?
8  A.  I can't recall exactly.  I can tell you what I
9  remember.  Mr. Roth and Mr. Fletcher were both
10  upset that the Mellon note had been repaid
11  using funded depreciation from the Forbes
12  Regional and Allegheny Valley accounts.
13  Q.  And did this upset you as well?
14  A.  Yes.
15  Q.  At the time did anyone say whose decision it
16  was to make this repayment from those accounts?
17  A.  My recollection is it was Mr. Abdelhak's
18  decision.
19  Q.  And did you express any concern to anyone other
20  than Mr. Roth and Mr. Forbes about the Mellon
21  Bank loan repayment after it happened?
22  A.  It was Mr. Roth and Mr. Fletcher.
23  Q.  I'm sorry, Mr. Fletcher.
24  A.  And the -- it was the subject of further
25  discussion among myself, other members of the

Page 52

1  medical staff for the next couple of weeks.
2  Q.  And do you remember which other members of the
3  medical staff?
4  A.  The executive committee of the medical staff
5  president, the president of the AGH medical
6  staff.
7  Q.  Okay.  Now, the executive committee of the
8  medical staff, the president of the executive
9  committee --
10  A.  Yes.
11  Q.  -- was who?
12  A.  Dr. Heckler.
13  Q.  How do you spell that?
14  A.  H-e-c-k-l-e-r.
15  Q.  Okay.  And the other person?
16  A.  Dr. Ray.
17  Q.  R-a-y?
18  A.  Yes.
19  Q.  And what was --
20  A.  He was the president of the medical staff.
21  Q.  Okay.  Anyone else?
22  A.  There were certainly other members of the --
23  the chairman of other departments with whom
24  this was discussed, notably Dr. McGovern.
25  Q.  Which department was he the chair of?

RICHARD SHANNON, M.D.

Page 53

```
1    A.   Cardiothoracic surgery.
2    Q.   Anyone else?
3    A.   Those are the ones I specifically remember.
4    Q.   And what was the substance of your discussions
5         with Drs. Heckler and Ray? Or if they were
6         different discussions, let me know.
7    A.   Mr. Abdelhak's decision to take funded
8         depreciation without board approval was in
9         direct violation of a resolution that had been
10        passed by the boards that no money was to be
11        taken and upstreamed to AHERF without board
12        permission.
13   Q.   And the three of you agreed on that --
14   A.   Yes.
15   Q.   -- position? And did you have the same,
16        similar conversation with Dr. McGovern?
17   A.   Yes.
18   Q.   Were there any other subjects other than the
19        one that you just mentioned about the Mellon
20        Bank repayment that came up during those
21        conversations, any of those conversations?
22   A.   Yeah, the tenor of the discussion was more
23        about Mr. Abdelhak taking money without board
24        permission, prior board permission, less about
25        the Mellon Bank repayment, and growing concerns
```

Page 54

```
1         that Mr. Abdelhak was operating outside of what
2         we felt was -- should be his authority in this
3         regard given the circumstances in the
4         organizations at that time.
5    Q.   So would that concern then also include the
6         transfers that we talked about earlier --
7    A.   Yes.
8    Q.   -- from AGH to AHERF?
9    A.   Following the transfer of money from AGH to
10        AHERF, there were extensive discussions at the
11        AGH board and the requirement that Mr. Abdelhak
12        report to the boards before those moneys be
13        moved.
14            When he repaid the Mellon loan, by
15        doing -- by taking money from Forbes and
16        Allegheny Valley, as a board member and a
17        physician leader, I felt he was in violation of
18        that, and I shared that with the medical staff
19        leadership.
20   MS. MEADEN: And you shared that
21        with, I'm sorry?
22        THE WITNESS: With the medical staff
23        leadership, Dr. Ray, Dr. Heckler.
24   Q.   Did any other not -- did any nonphysician board
25        members express the same concern during this
```

Page 55

```
1         period of time?
2             MS. MEADEN: Objection, foundation.
3    A.   I remember a discussion in the middle of May
4         with Mr. Ira Gumberg in which myself,
5         Dr. McGovern, Dr. Jeff Cohen met with
6         Mr. Gumberg to express our concerns with
7         Mr. Abdelhak's behavior, in -- regarding the
8         repayment of the Mellon loan. Dr. Jeff Cohen
9         is the head of urology.
10   Q.   And what was the -- first of all, where was the
11        meeting with Mr. Gumberg?
12   A.   The meeting was in my office.
13   Q.   And it was just the four of you in the meeting?
14   A.   To the best of my recollection.
15   Q.   And what did you say and what did other people
16        say at the meeting, to the best of your
17        recollection?
18   A.   The focus of the meeting was, again, that we
19        could no longer tolerate Mr. Abdelhak's what
20        appeared to be disregard for board mandate and
21        that as physician leaders he had basically lost
22        the confidence to lead the organization, our
23        confidence to lead the organization.
24   Q.   Now, was there anything other than the Mellon
25        Bank loan and the taking the money from AGH and
```

Page 56

```
1         transferring it to AHERF that caused you to
2         lose confidence in Mr. Abdelhak at this time?
3    A.   I think the growing concerns about the
4         financial problems in the east and how they
5         were being managed.
6    Q.   Had Abdelhak said that he had some kind of plan
7         to fix the growing problems in the east?
8    A.   Yes.
9    Q.   And what was that plan to your understanding?
10   A.   My recollection is the plan involved selling
11        assets in the east to a for-profit company.
12   Q.   Was this the Vanguard entity?
13   A.   Yes.
14   Q.   And I take it that you didn't have much
15        confidence that this was going to happen, or
16        what was your concern about that?
17   A.   I think there were growing indications that the
18        deal was not going to happen.
19   Q.   Had you heard any concerns about vendors not
20        being paid?
21   A.   Not at that time. I don't --
22   Q.   Other than what you've already testified to,
23        were there any other issues that you remember
24        were on your mind when you decided that you had
25        lost confidence in Mr. Abdelhak?
```

14 (Pages 53 to 56)

RICHARD SHANNON, M.D.

Page 57

1   A.   No.
2   Q.   Did you give Mr. Gumberg some kind of advice as
3        to what he should do?
4   A.   In that meeting we used Mr. Gumberg as a
5        sounding board for what we felt needed to be
6        done. We felt Mr. Abdelhak needed to resign,
7        step down. We conveyed that to Mr. Gumberg at
8        that meeting, myself as one trustee to another.
9        We discussed ways in which that might happen.
10  Q.   What do you remember about those ways?
11  A.   Well, I only remember the way we ended up doing
12       it, I don't remember what the other options
13       were, which Mr. Gumberg agreed was the proper
14       approach, and that was to -- for senior leaders
15       of the medical staff to meet with Bill Snyder
16       and to ask him to seek Mr. Abdelhak's
17       resignation.
18  Q.   Why did you choose Mr. Gumberg of all of the
19       trustees to go to?
20  A.   I had worked with Mr. Gumberg on the AGH board
21       from the very beginning. I trusted
22       Mr. Gumberg. I think he had a very good
23       understanding of both physicians and what
24       physicians needed to be successful at AGH, and
25       I knew he was deeply engaged in what was going

Page 58

1        on.
2   Q.   How long did the meeting with Mr. Gumberg last?
3   A.   I don't recall. I would say not more than an
4        hour. This was not a lengthy discussion.
5   Q.   And what did Mr. Gumberg -- was it mostly you
6        doing the talking --
7   A.   Mm-hmm.
8   Q.   -- on the physician side?
9   A.   Yes.
10  Q.   Did any of the -- Dr. Cohen or Dr. McGovern say
11       anything?
12  A.   I'm sure they did, but I don't recall.
13  Q.   And what did Mr. Gumberg, what was his
14       reaction?
15  A.   I think Mr. Gumberg was concerned about the
16       state of the organization. He was I think
17       deeply concerned to hear that the physicians
18       had lost faith in Mr. Abdelhak and believed
19       that without the physicians' support,
20       Mr. Abdelhak could not continue to manage, and
21       as I said, we discussed several possible ways
22       to approach this. It was on Mr. Gumberg's
23       recommendation that we, the physician
24       leadership, meet with Mr. Snyder that we agreed
25       to proceed.

Page 59

1   Q.   Did you ever speak to -- strike that.
2            At some point you actually went and
3        spoke to Mr. Snyder?
4   A.   Yes, sir.
5   Q.   Okay. Before you spoke to Mr. Snyder, either
6        before or after you spoke to Mr. Gumberg, did
7        you speak to Mr. Frank Cahouet at all --
8   A.   No, sir.
9   Q.   -- about this issue?
10  A.   No, sir.
11  Q.   Did you ever go to Mr. Cahouet's home during
12       1998 before the bankruptcy?
13  A.   I can't recall.
14  Q.   Between the time that you had this conversation
15       with Mr. Gumberg in the middle of May and the
16       time that you spoke to Mr. Snyder -- which was
17       when approximately?
18  A.   Sunday of Memorial Day weekend 1998 at around
19       noon.
20  Q.   Okay. Between that time did you speak with any
21       other trustees or physicians with respect to
22       your loss of confidence in Mr. Abdelhak?
23  A.   I did speak with other physicians. We wanted
24       to make sure that we had the support of all of
25       the chairs of the departments at AGH.

Page 60

1   Q.   And did you have that support?
2   A.   Yes, sir, and I also spoke with the head of
3        the -- the president of the medical staff at
4        Hahnemann Hospital in Philadelphia.
5   Q.   And who was that?
6   A.   I can't recall his name. I can see his face,
7        but I can't recall his name.
8   Q.   And did you get that person's support too?
9   A.   Yes. With respect to your question about
10       trustees, I can't recall. The --
11       recollection I have most clear is the meeting
12       with Dr. Gumberg.
13  Q.   And how did you explain your concerns to the
14       chairs of the AGH departments, the ones other
15       than Dr. Cohen and Dr. McGovern, when you spoke
16       to them to get their support?
17           MR. McCLENAHAN:  You mean beyond what
18       he's already testified to you about?
19  A    I basically shared with them what I told you,
20       and that is that money had been upstreamed to
21       AHERF from AGH, that the board had passed a
22       resolution requiring Mr. Abdelhak to get board
23       approval before doing same, that he had gone
24       ahead and done so without board approval, and
25       that coupled with the failing circumstances in

15 (Pages 57 to 60)

RICHARD SHANNON, M.D.

Page 61

1     the east necessitated a change in leadership.
2  Q.  Prior to your meeting on Memorial Day weekend
3     1998 with Mr. Snyder, are you aware of any
4     other trustees, apart from your conversation
5     with Dr. Gumberg where you raised the issue,
6     discussing potentially terminating
7     Mr. Abdelhak?
8  A.  To the best of my recollection, it was just
9     Mr. Gumberg, but that's the best of my
10    recollection.
11 Q.  And when you say it was just Mr. Gumberg,
12    that's the conversation you referenced
13    earlier --
14 A.  Yes.
15 Q.  -- where you raised your concern? Prior to
16    learning of the Mellon Bank repayment from
17    Mr. Roth, did you have full confidence in
18    Mr. Abdelhak's ability to lead the organization
19    and make it successful?
20       MR. McCLENAHAN: Could you read back
21    that question, please?
22            - - - -
23    (The record was read back by the Reporter.)
24            - - - -
25 A.  I think I had growing concerns about

Page 62

1     Mr. Abdelhak.
2  Q.  And did those concerns start with learning at
3     the meeting on the last Friday in October with
4     Connie Cibrone about the -- what you learned
5     about the funded depreciation accounts being
6     transferred?
7  A.  Again, when I learned of that, Mr. Abdelhak's
8     response was that he would pay it back.
9     Mr. Abdelhak was attempting to sell assets in
10    the east to raise capital, and I presumed that
11    that was going to be a strategy that would
12    recover some of these assets.
13       Nonetheless, my faith in Mr. Abdelhak
14    was certainly shaken by the growing revelations
15    of problems in the east, and once it was clear
16    that the Vanguard deal was not going to happen,
17    there did not appear to be any other credible
18    plan in the works to recover those assets.
19       That, coupled with the fact, again,
20    that he had deliberately ignored a board
21    resolution requiring him to get permission
22    before taking money raised serious concerns, as
23    a board member and as a physician.
24 Q.  Did you ever hear any response from
25    Mr. Abdelhak about the Mellon Bank repayment

Page 63

1     and whether it was appropriate or inappropriate
2     to do it without board approval?
3  A.  Not that I recall.
4  Q.  Let's move on to the meeting that you had with
5     Mr. Snyder. You told me when it was, it was
6     Memorial Day weekend of 1998. Do you recall
7     where it was?
8  A.  In my home.
9  Q.  And how did you schedule the meeting?
10 A.  I called Bill Snyder on Saturday.
11 Q.  And what did you say to him?
12 A.  That Dr. McGovern, Dr. Cohen and I wanted to
13    meet with him to discuss him seeking
14    Mr. Abdelhak's resignation.
15 Q.  And during that phone conversation, what did he
16    say back to you?
17 A.  He was immediately responsive, said he would
18    make arrangements to meet with us on the
19    weekend.
20 Q.  How long did the telephone conversation last?
21 A.  Five minutes.
22 Q.  And did you explain during the telephone
23    conversation any more detail about why you
24    wanted to seek -- him to seek Mr. Abdelhak's
25    resignation?

Page 64

1  A.  I don't recall, but there were certainly
2     growing concerns throughout the hospital about
3     Mr. Abdelhak's ability to lead.
4  Q.  Right. I'm just trying to figure out if that's
5     something that you said on the phone to him or
6     not?
7  A.  No, but I assumed Mr. Snyder was aware of those
8     growing concerns, and by agreeing to meet with
9     us promptly, I assumed that he understood why.
10 Q.  Well --
11 A.  He didn't ask me, gee, Rick, why do you want to
12    do this. It was as if he understood that there
13    were these concerns.
14 Q.  And that's why you say you assume that he was
15    aware of it?
16 A.  Mm-hmm.
17 Q.  Because he wasn't surprised?
18 A.  Yeah.
19 Q.  So was it the next day that he came to your
20    home?
21 A.  Yes.
22 Q.  He came by himself?
23 A.  Yes.
24 Q.  And how long did the meeting take place, how
25    long did the meeting take?

16 (Pages 61 to 64)

RICHARD SHANNON, M.D.

Page 85

1  anything in these three points on the first
2  page that you would disagree with, even though
3  you don't remember whether Mr. Sanzo made the
4  points?
5        MS. MEADEN: Objection.
6  A.   As the person that led the effort to oust
7  Mr. Abdelhak as both a physician leader and a
8  member of the board of trustees, I clearly
9  understood that there was substantial issues
10 with the way in which the east had been
11 managed. That I would recount these as those
12 specific explanations, I can't say. It was
13 very clear that the east had been mismanaged,
14 and that was what, among those other things,
15 caused us to act.
16       MR. FRIESEN: Let me take a short
17 break, okay, and I may be able to wrap this up
18 relatively quickly.
19       THE VIDEOGRAPHER: We are going off
20 the record at 11:55.
21            - - - -
22 (There was a recess in the proceedings.)
23            - - - -
24       THE VIDEOGRAPHER: We are back on the
25 record at 12:02.

Page 86

1  BY MR. FRIESEN:
2  Q.   Dr. Shannon, while you were on the AHERF board,
3  what was your understanding of the role of the
4  AHERF board as opposed to AHERF management?
5  A.   The board had oversight over the AHERF
6  foundation and its management team.
7  Q.   And so what sorts of things would that entail,
8  that oversight?
9  A.   Well, again, I think it would include
10 financial, clinical and quality initiatives
11 which would be characteristics of most
12 healthcare institution boards.
13 Q.   Okay. Did you meet with any attorneys from the
14 law firm of Jones Day before today's deposition
15 in preparation --
16 A.   No, sir.
17 Q.   -- of the deposition?
18 A.   No, sir.
19 Q.   Did you speak with any of them on the phone?
20 A.   No, sir.
21       MR. FRIESEN: Okay. I don't have any
22 further questions at this time. I might have
23 some more once Ms. Meaden is through with you,
24 but we'll wait and see.
25       MS. MEADEN: Can I have five minutes

Page 87

1  to just gather up my documents and --
2        THE WITNESS: Sure.
3        MS. MEADEN: -- get ready and then
4  we'll start.
5        THE VIDEOGRAPHER: Going off the
6  record at 12:03.
7            - - - -
8  (There was a recess in the proceedings.)
9            - - - -
10       THE VIDEOGRAPHER: We are back on the
11 record at 12:10.
12            - - - -
13       EXAMINATION
14            - - - -
15 BY MS. MEADEN:
16 Q.   Good afternoon, Dr. Shannon. We met
17 previously. My name is Laura Meaden, and I'm
18 from the firm of Jones Day, and I represent the
19 Plaintiff in this action, The Official
20 Committee of Unsecured Creditors of AHERF, and
21 you will be happy to know that I have
22 considerably fewer questions for you this
23 afternoon than what Mr. Friesen did.
24       I think you testified earlier,
25 actually several times, that you viewed the

Page 88

1  role of the AGH board and your role as a board
2  member particularly as one of oversight of the
3  financial, clinical, and quality matters that
4  affected the hospital, namely AGH, and then the
5  same was true when you were serving as a member
6  of the board of AHERF; correct?
7  A.   Correct.
8  Q.   And did you understand in your role as a board
9  member of both AGH and AHERF that there were
10 outside professionals who were available to
11 advise the board on various matters?
12 A.   Yes.
13 Q.   In particular, financial matters?
14 A.   Yes.
15 Q.   And you understood that AHERF had retained an
16 outside auditing firm to review the financial
17 statements of AHERF and the entities within the
18 AHERF system?
19       MR. FRIESEN: Objection.
20 A.   Yes.
21 Q.   Did you understand that in the late -- or in
22 the 1997 time period when you believe you
23 joined those boards that the outside auditors
24 were the firm of Coopers & Lybrand?
25 A.   Yes.

22 (Pages 85 to 88)

RICHARD SHANNON, M.D.

Page 89

1  Q.  And you understood that Coopers & Lybrand was
2      an independent audit firm; correct?
3  A.  Yes.
4  Q.  Can you tell me what significance, if any, that
5      had to you, that Coopers & Lybrand was
6      independent from financial management of AHERF?
7  A.  At our board meetings we would receive what
8      were referred to as unaudited financials that
9      would include the operating performance and the
10     balance sheets of the respective entities and
11     specifically in this case AGH, and that at the
12     end of the fiscal year, those financials would
13     be audited by an outside firm that would attest
14     to the fact that the data that had been
15     presented was correct.
16 Q.  And did that give you any level of comfort with
17     respect to the matters within the financial
18     statements, that they were being reviewed by an
19     outside independent --
20 A.  Yes.
21 Q.  -- firm?
22 A.  Yes.
23 Q.  Again, can you explain for me why that was?
24 A.  Well, particularly as a physician, I think
25     knowing that the financial statements as they

Page 90

1      are presented are being reviewed by experts in
2      the field adds a great deal of confidence that
3      the complexities, nuances of financial
4      statements in the healthcare organization are
5      being validated.
6  Q.  And as a member of both the AHERF and the AGH
7      board then, did you rely on Coopers & Lybrand
8      to perform their duties in a competent way?
9  A.  Yes.
10 Q.  With respect -- and I'm talking about with
11     respect to the auditing --
12 A.  Yes.
13 Q.  -- of AHERF's --
14 A.  Yes.
15 Q.  -- financial statements?
16 A.  Yes.
17 Q.  And did you as a member of both the AHERF and
18     AGH board rely on Coopers & Lybrand to perform
19     the audit of AHERF and its affiliates, of those
20     financial statements with integrity?
21        MR. FRIESEN: Objection.
22 A.  Yes.
23 Q.  And as a member of the AHERF and AGH boards,
24     did you rely on Coopers & Lybrand to inform
25     either the board of AHERF or a committee of the

Page 91

1      board if Coopers & Lybrand had determined that
2      the financial information as presented on AHERF
3      and its affiliates' financial statements was in
4      some way not accurate?
5  A.  Yes.
6        MR. FRIESEN: Objection.
7  Q.  And at any time during your service on the AGH
8      board or the AHERF board, did you ever come to
9      learn that anyone from Coopers & Lybrand had
10     ever informed anyone on any of the AHERF boards
11     or committees that the audited financial
12     statements were in some way not accurate?
13 A.  I was never so informed, but I want to comment
14     that I did not see the audited financial
15     statements of either 1996 or 1997.
16 Q.  And you had never heard though from anyone else
17     who had seen the audited financial statements
18     for either fiscal year '96 or '97 that at any
19     time someone from Coopers & Lybrand had advised
20     the board or a committee of the board that
21     there were any misstatements or inaccuracies in
22     those financial statements?
23 A.  I was never made aware of any such disclosures.
24 Q.  Now, if at some point during your tenure on the
25     AGH or AHERF board you had come to learn that

Page 92

1      AHERF's outside auditors had called into
2      question the integrity of the financial
3      management of AHERF, would that have been
4      something that would have caused you some
5      concern?
6        MR. FRIESEN: Objection.
7  A.  Absolutely.
8  Q.  Can you explain to me why?
9  A.  Well, I think that particularly under the
10     circumstances I would have been deeply
11     concerned if someone had said there were
12     financial issues of any type knowing that we
13     were operating under, you know, strenuous
14     circumstances.
15 Q.  And if you had received such information from
16     the outside auditors, that there was some
17     question as to the integrity of the financial
18     management at AHERF, would you as a physician
19     leader and as a board member have sat back and
20     not requested an investigation into those
21     statements?
22        MR. FRIESEN: Objection.
23 A.  As a board member, I certainly would have
24     requested the finance committee of the board to
25     investigate these issues as the appropriate

RICHARD SHANNON, M.D.

Page 93

1    place and the committee on which the expertise
2    exists to do such a thing, yes. I would not
3    have considered myself the person to do that,
4    but I certainly would have expected and
5    instructed as capable the finance committee to
6    do so.
7    Q.   And you would have followed through to be sure
8        that the people with the appropriate expertise
9        were taking the steps you felt to be
10       necessary --
11   A.   Yes.
12   Q.   -- to investigate such --
13   A.   Yes.
14   Q.   -- statements; correct?
15           MR. FRIESEN:  Wait. I want to object
16       to the extent that there were three questions
17       and three yeses, I want to object to each of
18       the questions, and if it was just one question,
19       I want to object to that too.
20           MS. MEADEN:  It was intended as one
21       question but --
22           MR. FRIESEN:  Okay. If you could
23       just wait for a moment so I could get an
24       objection in.
25           THE WITNESS:  Sure.

Page 94

1           MR. FRIESEN:  Thanks.
2    BY MS. MEADEN:
3    Q.   I think you testified earlier, Dr. Shannon,
4        that in the late October 1997 time period is
5        when the -- was the first time that you had
6        learned of significant transfers from Allegheny
7        General Hospital being made to AHERF; correct?
8    A.   That's correct.
9    Q.   And I think you also testified that shortly
10       thereafter you had heard a response from
11       Mr. Abdelhak as to how those moneys were going
12       to be paid back; correct?
13   A.   That's correct.
14   Q.   Do you recall approximately the time period
15       between the last Friday in October and when you
16       heard a response from Mr. Abdelhak in '97?
17   A.   I do not recall the time frame.
18   Q.   Was it a matter of weeks or months? Days? Can
19       you be more specific?
20   A.   I'm sure it was a matter, as best I can recall,
21       a matter of weeks to months.
22   Q.   And as I understood your earlier testimony --
23       and please correct me if I'm wrong, I'm not
24       attempting to mischaracterize it -- you were at
25       least initially satisfied with Mr. Abdelhak's

Page 95

1    response as to how those moneys were going to
2    be repaid to Allegheny General; correct?
3    A.   Yes.
4    Q.   And I think you had testified that he had
5        assured at least some group of physicians and
6        other AGH board members that the moneys would,
7        in fact, be paid; correct?
8           MR. FRIESEN:  Objection.
9    A.   Yes.
10   Q.   Did he give any time period within which that
11       repayment was going to be made?
12   A.   Not that I recall.
13   Q.   And he -- I believe you testified that he said
14       there was an IOU or someone said there was an
15       IOU from AHERF to AGH for those -- those
16       amounts; correct?
17   A.   Yes.
18   Q.   And what significance, if any, did that, the
19       existence of such an IOU make to you in your
20       level of concern at that point?
21   A.   I was concerned the transfer had occurred. The
22       fact that the parent said it would repay the
23       money I understood and took at face value as
24       true, and when over a period of the next months
25       there appeared to be no mechanism, no credible

Page 96

1    mechanism whereby the repayment could occur, I
2    became more and more concerned.
3    Q.   But at least initially the existence of such an
4        IOU gave you some level of reassurance that the
5        moneys may, in fact, be repaid down the road?
6           MR. FRIESEN:  Objection.
7    A.   Yes, I took that at face value.
8    Q.   And I think you also testified that around that
9        same time there was discussion of selling some
10       of the eastern assets; correct?
11   A.   That's correct.
12   Q.   And what significance, if any, did that have
13       for you in your level of concern with respect
14       to whether the funds would ultimately be repaid
15       to AGH?
16   A.   I understood that to be a mechanism whereby
17       cash could be raised that would allow the IOU
18       to be addressed and for additional capital to
19       be generated to run the eastern entities.
20   Q.   So it was at least your understanding that if
21       the eastern assets were sold, some of the funds
22       raised from that sale would be used to repay
23       Allegheny General Hospital?
24   A.   That's correct.
25   Q.   Okay. And in that October time period then,

TAB 248



**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

William P. Snyder III
Chairman

Fifth Avenue Place
120 Fifth Avenue Suite 2900
Pittsburgh PA 15222-3009
412-359-8590

June 5, 1998

Received
PRESIDENT & CEO

Mr. Sherif S. Abdelhak
President and Chief Executive Officer
Allegheny Health, Education and Research
    Foundation
Fifth Avenue Place
120 Fifth Avenue, Suite 2900
Pittsburgh, PA  15222-3009

CHIEF
EXECUTIVE OFFICES

Dear Mr. Abdelhak:

    Please be advised that at a meeting of the Executive Committee duly called and held on
June 5, 1998, the Executive Committee, exercising the power conferred on the Executive
Committee under Section 9.3 of the Bylaws of the Allegheny Health, Education and Research
Foundation (the "Foundation") took actions removing you as President and Chief Executive
Foundation, removing you from each other office with the Foundation and each subsidiary and
affiliate of the Foundation you may have held and from membership on the Board of Trustees, in
each case effective as of 9:30 AM, EDT, on Friday, June 5, 1998.  You should also be aware that,
to the extent not already provided in the Bylaws of the Foundation, the Executive Committee
authorized and directed the Compensation Committee of the Board of the Foundation to resolve
any issues which may arise under or in connection with that certain Employment Agreement
between the Foundation and you dated October 30, 1991.  You should anticipate that the
Compensation Committee or its representative will contact your attorney, Julia Martin, in due
course with a proposal.  You should also be aware that the Compensation Committee has been
directed to consider a number of factors which, of course, include the Foundation's obligations
under that Employment Agreement as well as the Foundation's obligations to its various
constituents and its own interest in preserving its tax exempt status.

    Very truly yours,

W. P. Snyder, III

DEPOSITION
EXHIBIT
1677
AKF

TACO52826

Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences
Allegheny University Hospitals • Allegheny University Medical Centers • St. Christopher's Hospital for Children

TAB 249

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## *ROBERT PALMER*
### *August 8, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**PALMER, ROBERT**



**LEGALINK®**

A **WORDWAVE** COMPANY

ROBERT PALMER

Page 149

1   Q.   If you could just state your answer again just
2        so the record's clear?
3   A.   Ask the question again.
4   Q.   Okay.
5   A.   Please.
6   Q.   The potential sale of some of AHERF's eastern
7        hospitals to the Vanguard Health System, the
8        proposed layoffs of around 1,000 to 1,200
9        people in the eastern region of Pennsylvania,
10       and the cost-cutting measures that Mr. Abdelhak
11       and members of management brought to the
12       board's attention, were these all actions taken
13       based on concern about AHERF's financial health
14       in the first quarter of fiscal year 1998 and
15       going forward to the rest of fiscal year --
16  A.   They were reaction both current operating
17       results and changing views on strategic
18       decisions.
19  Q.   Do you recall if there were any other actions
20       which were contemplated for a means of helping
21       AHERF's financial condition going forward at
22       this time?
23  A.   I don't recollect at this moment.
24  Q.   Do you recall if you believed at the time that
25       the potential sale of hospitals, the layoff of

Page 150

1        individuals and cost-cutting measures were
2        appropriate actions to take in light of AHERF's
3        current financial position?
4   A.   Well, everything subject to the terms. The
5        concept I thought might well have merit.
6   Q.   Do you recall if anyone ever suggested seeking
7        outside consultation with an expert in the
8        field of hospital healthcare finances in order
9        to proceed based on AHERF's current financial
10       condition?
11  A.   I don't recall that being put on the table at
12       that period back at that time. You are talking
13       now about late 1997, early 1998, about the time
14       that the exploratory talks. If that's the
15       period, I don't recall.
16  Q.   Okay. Mr. Palmer, do you recall that AHERF had
17       attained $100 million line of credit from the
18       Mellon Bank group which was made up of Mellon
19       Bank, First Chicago, Toronto Dominion, and Bank
20       One?
21  A.   Yes, I do recall.
22  Q.   And do you recall that by late fiscal year 1997
23       AHERF's financial performance had declined to
24       the point there were issues of whether AHERF
25       was going to be in noncompliance with some of

Page 151

1        its covenants in the line of credit?
2   A.   Yes, I do recall in light of particularly
3        discussions having to do with the year-end
4        audit for June 30, '97, and then the
5        renegotiation of that line of credit was
6        another occasion for technical default issues
7        coming up.
8   Q.   Do you recall that on or about April 27th,
9        1998, AHERF had repaid the Mellon Bank group?
10            MR. McCLENAHAN: The date again?
11            MR. LUFT: April 27th, 1998.
12  A.   Yes, I do.
13  Q.   Do you recall if the board was ever consulted
14       as to whether AHERF should repay the Mellon
15       Bank group for that line of credit?
16  A.   I do not recall my being consulted.
17  Q.   Do you recall ever hearing from any other
18       members of the board of trustees that they had
19       been consulted about whether AHERF should repay
20       the Mellon Bank group for a line of credit?
21  A.   No, I don't recall.
22  Q.   Is it your understanding that AHERF used up a
23       significant amount of liquidity to pay off the
24       Mellon Bank group in April of 1998?
25            MR. JONES: Object to form.

Page 152

1   A.   Yes, the $100 million was -- was a sizable
2        amount in relation to the available cash.
3   Q.   And at the time --
4   A.   I believe the amount, by the way, was a little
5        less than $100 million. I think the actual
6        loan I think you'll find was in the 90-ish
7        area.
8   Q.   Okay. And was it your understanding that around
9        April of 1998 that AHERF's financial condition
10       had continued to deteriorate from the results
11       we looked at as of first quarter fiscal year
12       1998?
13  A.   So you are saying the first quarter of fiscal
14       or calendar when you say April?
15  Q.   Let me ask the question again, because I think
16       it's unclear.
17            Did you have an understanding at the
18       time as to AHERF's financial condition in April
19       of '98 in comparison to what it was at the end
20       of the first quarter of fiscal year 1998, which
21       I believe would have been September 30th, 1997?
22  A.   And did I have a sense in April of '98 that the
23       condition --
24            MR. McCLENAHAN: Was worsened.
25  A.   -- was worsened?

38 (Pages 149 to 152)

ROBERT PALMER

Page 153

1  Q.  Yes.
2  A.  Yes.
3  Q.  And it had worsened, to your --
4  A.  Yes, it had.
5  Q.  Mr. Palmer, do you recall that Sherif Abdelhak,
6      the CEO of AHERF, was fired in June of 1998?
7  A.  He was fired in either the very late days of
8      May or the very early days of June.
9  Q.  Do you know when Mr. Abdelhak was fired?
10 A.  I don't recall now the date.
11 Q.  Do you know the reason that Mr. Abdelhak was
12     fired?
13         MR. JONES: Object to foundation.
14 A.  I was informed that a -- that a group of
15     trustees most closely involved with the work --
16     in the relationship, governance relationship
17     with Mr. Abdelhak had lost confidence in his
18     ability to properly conduct the affairs.
19 Q.  Do you recall who those trustees were?
20 A.  I don't know all of them. Obviously Bill
21     Snyder was one.
22 Q.  Was the decision as to whether to fire
23     Mr. Abdelhak ever brought before the whole
24     AHERF board?
25 A.  Not before it was done.

Page 154

1  Q.  So Mr. Abdelhak was fired, and then the whole
2      parent board was told that Mr. Abdelhak had
3      been fired?
4  A.  Yes.
5  Q.  Do you recall that Anthony Sanzo was chosen to
6      replace Mr. Abdelhak?
7  A.  Yes.
8  Q.  Do you recall if the whole parent board was
9      ever asked to meet to decide who should succeed
10     Mr. Abdelhak as CEO of AHERF?
11 A.  I recall that the executive committee met to
12     make that decision. I don't recall that the
13     full board was.
14 Q.  And was it your understanding that the
15     executive committee believed that Mr. Sanzo was
16     the best person to lead AHERF at the time they
17     appointed him?
18 A.  I recollect that the executive committee did
19     feel that.
20 Q.  Do you know why the executive committee felt
21     that Mr. Sanzo was the best person to succeed
22     Mr. Abdelhak as CEO of AHERF?
23 A.  It was felt that if --
24         MR. JONES: Object to foundation.
25 A.  It's a hard question to answer why Sanzo was

Page 155

1      the best. I'll just say a couple criteria. I
2      was in those discussions. I was part of that
3      meeting, and I can tell you especially about my
4      thinking, less so about other people's.
5          It was my feeling, and I believe
6      others, that, if possible, it would be highly
7      desirable to fill that position from the
8      inside. Time was of the essence, and current
9      knowledge, trust, and working relationships
10     with others in the organization, suppliers and
11     others who dealt with the organization, it
12     would be best if we had the right person to do
13     it from within, and Anthony Sanzo had a good
14     range of experience. He enjoyed the trust
15     of -- of myself and I believe others. We had
16     decided that he was the best option that we had
17     at the time in the circumstances in which we
18     were operating.
19 Q.  Do you recall if any people outside of AHERF
20     were seriously considered for the role of CEO
21     of AHERF to succeed Mr. Abdelhak?
22 A.  I don't recall specific names. There was good
23     discussion about the pros and cons of staying
24     in, going out, and if we would go out, we would
25     try to find someone who had great capability,

Page 156

1      but I was party to and agreed with a decision
2      that Anthony Sanzo would be the best.
3  Q.  Do you recall that in June of 1998
4      Mr. McConnell, the CFO of AHERF, was fired?
5  A.  Yes.
6  Q.  Do you have an understanding of why
7      Mr. McConnell was fired?
8  A.  Yes.
9  Q.  And what is your understanding?
10 A.  That he did not enjoy the confidence of either
11     the new management or the board.
12 Q.  Do you recall if the entire AHERF board of
13     trustees was consulted as to whether to fire
14     Mr. McConnell?
15 A.  I don't recall that the entire board was, but I
16     do recall that the executive committee was.
17         MR. JONES: Note my objection to
18     foundation.
19 Q.  I'd like to show you what was previously marked
20     as Exhibit 1672. Specifically I'm going to ask
21     you about pages Bates stamped PR-PLD 0050-3109
22     through 110.
23 A.  Would you repeat --
24 Q.  Sure.
25 A.  I'm looking at the title, and I'm trying to get

39 (Pages 153 to 156)

ROBERT PALMER

Page 157

1    in my mind, you know, what's going on at the
2    time. I'm trying to understand what I'm about
3    to read. Okay. Could you tell me the
4    specific --
5  Q.  I'm sorry.
6  A.  No, that's all right.
7  Q.  The final Bates numbers are 3109 through 3110.
8        MR. McCLENAHAN: I was just going to
9    suggest to you to page through that exhibit and
10    make sure you have a sense of what it is.
11  Q.  Absolutely.
12  A.  Okay. It's executive committee of -- I am not
13    in attendance, but it says -- these are
14    minutes, but it says there are no draft or
15    final minutes of this meeting. Are these draft
16    minutes or what, or are these just documents
17    that were put on the table?
18  Q.  The document I wish to ask you about --
19        MR. McCLENAHAN: He's asking you
20    about the exhibit, not -- I want him to get
21    familiar with the exhibit.
22        MR. LUFT: And I'm trying to give him
23    that answer.
24        MR. McCLENAHAN: Okay.
25        MR. LUFT: Okay? This is a document

Page 158

1    which came from the files, it's my
2    understanding that it was put together this
3    way. I mean I can't represent to you whether
4    this was minutes with attachments or just
5    documents that someone has clipped together at
6    a later point.
7        The document that I wanted to ask you
8    about I believe is a complete letter, and I
9    just want to ask you about that, but I cannot
10    represent to you one way or the other whether
11    this was a document at the point or whether
12    this is somewhat later.
13        MR. JONES: I will note that the
14    third page in doesn't note the witness'
15    attendance at whatever meeting these documents
16    may or may not refer to.
17        MR. LUFT: I believe the witness has
18    already pointed that out. Thank you.
19        MR. JONES: I'm sorry, I couldn't
20    hear it, as I have trouble with --
21        THE WITNESS: I'm sorry, yes, I did.
22    Oh, now, just a minute. Just a minute.
23    Telephone conference participants, look toward
24    the bottom of the page.
25        MR. JONES: I see your name now,

Page 159

1    Robert Palmer.
2        THE WITNESS: Yeah, apparently I was
3    on the telephone.
4  BY MR. LUFT:
5  Q.  Okay.
6  A.  Whether I was able to look at any of these
7    documents, I probably was not, I was not by a
8    fax machine, but I may have been present for
9    discussion around some of them as best I could
10    deal with them.
11  Q.  Okay. The document I'm asking about purports
12    to be a July 7, 1998 letter from PNC Bank,
13    National Association, MBIA Insurance
14    Corporation, to the members of the board of
15    trustees of AHERF.
16        Do you recall if you ever received a
17    copy of this letter, Mr. Palmer?
18  A.  I don't recall.
19  Q.  The letter discusses the potential for a bridge
20    loan for AHERF. Do you recall if you ever were
21    aware that MBIA and PNC offered to make a
22    bridge loan to AHERF?
23  A.  I recall being in discussion on this subject.
24    I don't recall whether I actually looked at
25    this letter.

Page 160

1        MR. McCLENAHAN: Why don't you take a
2    minute to read the letter.
3        THE WITNESS: Okay.
4        - - - -
5    (The witness reviewed the Exhibit.)
6        - - - -
7  A.  Okay.
8  Q.  Do you recall that MBIA and PNC offered to give
9    AHERF a bridge loan so that AHERF could avoid
10    filing bankruptcy?
11        MR. JONES: Object to form.
12  A.  I recall that they offered a bridge loan. I
13    can't be sure of exactly what their purpose of
14    doing it was, but I recall that they offered to
15    make such a bridge loan.
16  Q.  Do you recall if AHERF accepted their offer for
17    the bridge loan?
18  A.  My recollection is that AHERF did not accept.
19  Q.  Do you recall why AHERF rejected MBIA and PNC's
20    offer?
21        MR. JONES: Object to foundation.
22  A.  Yes, I do. That it seemed to us, this may or
23    may not have been what they were -- it seemed
24    to us that this was an attempt on behalf of
25    this already engaged creditors to improve its

LEGALINK MANHATTAN  (212) 557-7400

TAB 250

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## ALFRED W. MARTINELLI
*May 5, 2004*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

MARTINELLI, ALFRED W.



LEGALINK
A WORDWAVE COMPANY

Alfred W. Martinelli

1
2 the trustees  Do you remember her at all?
3    A   From the medical school?  The name
4 is familiar.  I'm having trouble placing it,
5 putting a familiar face on it.
6    Q   Now, this document doesn't have a
7 date on it and it doesn't say on it what
8 meeting it's from if it's from a meeting.
9 There's a name on here Danforth.  Do you
10 remember a Mr. Danforth as a trustee at AHERF?
11    A   Was Danforth a consultant?  I
12 thought he might have been a consultant.
13    Q   Well, you recall a Douglas Danforth
14 who was a trustee?
15    A   I don't.
16        MS. MEADEN:  I'm sorry?  Is
17    that a no?  No, you don't recall?
18        THE WITNESS:  I don't recall
19    the names.
20 BY MR. FRIESEN:
21    Q   Under Danforth, it says:  "We must
22 not let the organization or outside world
23 think we will fail; it's a hard time, but
24 we'll make it."
25        Do you remember being at a meeting

Alfred W. Martinelli

1
2 where either Mr. Danforth or another trustee
3 said words to that effect?
4        MS. MEADEN:  I'm going to
5    object to the form.
6    A   One of the doctors, and I can't
7 recall what meeting, the meeting that was --
8 when the Vanguard was being presented to us
9 and we were told that there was no other
10 alternatives, and then we were further told
11 that there was a technical default in our
12 debt, and I raised the question that perhaps
13 we needed to think about bankruptcy as
14 protection having been through the Penn
15 Central situation.
16        Several of the board members,
17 including one of the doctors, and I don't know
18 whether that was Danforth or not, raised that
19 question.  He said we cannot do that.  He said
20 if we do that, we'll lose all of our patients,
21 nobody will come to us and nobody ever will
22 want to come to a bankrupt school or bankrupt
23 hospital.  I said that's not the case.
24 Bankruptcy actually gives you protection.  You
25 can operate under that bankruptcy protection.

Alfred W. Martinelli

1
2 And we can kind of restructure this whole
3 situation.  Most of the people there were very
4 much upset about the word "bankruptcy" and
5 they were very much upset by it.  Who said
6 what, I do remember one of the physicians made
7 it very clear that we cannot put out that
8 we're going to close -- not close, that we're
9 going to go bankrupt.
10    Q   And this was a physician from one of
11 the Philadelphia entities?
12    A   I remember it was one of the
13 physicians that said that.
14    Q   And this person was from
15 Philadelphia?
16    A   Yes.
17    Q   Do you remember who it was?
18    A   I don't know.
19    Q   Okay.  You can put that document
20 aside.  I'm going to show you another one
21 that's been marked as Exhibit 2524.
22        MR. McCLENAHAN:  Let me take
23    just a second with Mr. Martinelli.
24        THE VIDEOGRAPHER:  We are now
25    going off the video record.  The time is

Alfred W. Martinelli

1
2    2:06.
3        (Discussion off the record.)
4        THE VIDEOGRAPHER:  We are now
5    back on the video record.  The time is
6    2:10 p.m.  We are now ending the second
7    tape.  The time is 2:10 p.m.
8        (Short recess.)
9        THE VIDEOGRAPHER:  This is
10    Videotape 3.  The date is May 5, 2004.
11    The time is 2:20 p.m.  The deposition of
12    Alfred Martinelli.
13 BY MR. FRIESEN:
14    Q   Mr. Martinelli, you have Exhibit
15 2524 in front of you?
16    A   Yes.
17    Q   Have you had a chance to look
18 through it?
19    A   Yes.
20    Q   Again, this comes from the files of
21 Ms. or Dr. Murasko.  The second page of the
22 document says Joint Meeting of the Board of
23 Trustees and Resource Management Committee
24 Allegheny University of the Health Sciences.
25 And do you see you're listed there as one of

Page 165

Alfred W. Martinelli
1       Alfred W. Martinelli
2  the members?
3    A   Yes.
4    Q   Now, three pages after that, the
5  page ending in 7593 -- two pages after, there
6  are notes of an April 21, 1998, meeting of the
7  AUHS board. Now, I don't know whether you
8  were at this meeting or not, but I want to ask
9  you a couple questions to see if it refreshes
10 your recollection. And I'd like you to go to
11 the last page of the exhibit, 7596. Do you
12 see it says "Concerns of Board"?
13   A   Yes.
14   Q   And it says "Sherif" and it talks
15 about Vanguard and says "feel comfortable it
16 will close but...there is a back up plan that
17 (doesn't want to share)."
18       Do you recall ever being at a
19 meeting where Mr. Abdelhak said in substance
20 that he was comfortable that the Vanguard deal
21 would close but there was a backup plan that
22 he didn't want to share?
23   A   I can't recall that. Looking at the
24 dates, the month of April is generally when
25 I'm still in Florida and I don't come up and I

Page 166

Alfred W. Martinelli
1       Alfred W. Martinelli
2  don't remember coming up specifically for a
3  meeting. And I don't recall attending this by
4  telephone so I'm not quite sure whether I was
5  here or not. I can't answer that
6  specifically.
7    Q   Well, that's a good point. Let me
8  follow up on that. During 1997 and 1998, what
9  months would you be at your home in Florida?
10   A   Generally speaking, we go down in
11 the beginning of November to open up the
12 house, come back for Thanksgiving and stay
13 through Christmas, and go back down the 27th
14 of December and then come back sometime after
15 Easter, probably at the end of April or the
16 beginning of May. It varies a little bit
17 about when Easter falls.
18   Q   And do you recall ever coming back
19 to Philadelphia or Pittsburgh while you were
20 in Florida to attend an AHERF or
21 AHERF-affiliated entity meeting?
22   A   No.
23   Q   You can put that document aside.
24       Do you have any recollection that in
25 April of 1998 AHERF repaid a loan to the

Page 167

Alfred W. Martinelli
1       Alfred W. Martinelli
2  Mellon Bank?
3    A   I do not.
4    Q   Were you involved at all in the
5  decision to terminate Mr. Abdelhak?
6    A   No.
7    Q   Do you recall how you found out that
8  Mr. Abdelhak had been terminated?
9    A   I don't recall specifically how it
10 came about, but I don't -- you know, did not
11 participate in it and probably heard it
12 through someone from Hahnemann.
13   Q   And did anyone ever explain to you
14 why Mr. Abdelhak was terminated?
15   A   Not specifically.
16   Q   Do you have any idea even today why
17 he was terminated?
18   A   My guess is that he was the author
19 of a failed strategy. And he did a lot of
20 things to try to make that work. And my guess
21 is that from hindsight, knowing the things he
22 did, everything he did was to try to obtain
23 the capital necessary. I think he invaded
24 some of the endowment funds but he did so by
25 putting a note back in and then getting

Page 168

Alfred W. Martinelli
1       Alfred W. Martinelli
2  approval by the executive committee to do
3  that. Those are hindsight observations. And
4  so everything he did was to try to make that
5  strategy work. And, unfortunately, the cash
6  was flowing out too quickly and there wasn't
7  sufficient time to bring that around.
8    Q   Were you involved with the AHERF
9  board when the decision -- the AHERF parent
10 board when the decision to file for bankruptcy
11 was made?
12   A   No.
13   Q   Do you have any knowledge of
14 proposals for interim financing that were made
15 to AHERF just prior to the filing of the
16 bankruptcy?
17   A   No, I do not.
18   Q   Earlier in the deposition, you
19 talked about your feeling that the Pittsburgh
20 trustees I think you used the word
21 "sacrificed" the eastern entities. Did you
22 express your feelings about that either to
23 Mr. Abdelhak or to any of the Pittsburgh
24 trustees?
25   A   When I came to that conclusion, they

42 (Pages 165 to 168)

Page 169
1        Alfred W. Martinelli
2   were gone. I mean, that was after the
3   Vanguard situation had taken place and shortly
4   thereafter when it went bankrupt. Then it
5   became clear what the objective was.
6        Q. Oh, I see. You had these feelings
7   after the bankruptcy filing?
8        A. That's right. And it was clear when
9   they tried to -- they brought some consultant
10  in to try to turn the Philadelphia thing
11  around and it was clear that they were sort of
12  disassociating themselves from what was going
13  on in Philadelphia.
14       Q. And was that after the bankruptcy?
15       A. After the bankruptcy.
16       Q. Did you hear about the decision to
17  file for bankruptcy before it happened or
18  after it happened, meaning before the decision
19  was taken or after?
20       A. Say again.
21          MR. FRIESEN: If we could just
22  have the question read back.
23          (The court reporter read the
24  preceding question.)
25          THE WITNESS: My recollection

Page 170
1        Alfred W. Martinelli
2   is after.
3   BY MR. FRIESEN:
4        Q. You weren't consulted before?
5        A. No.
6        Q. Let me show you a document that's
7   previously been marked Exhibit 1661. These
8   are the fiscal year 1996 audited financial
9   statements for AHERF. Do you recall seeing
10  these audited financial statements,
11  Mr. Martinelli?
12       A. I'm sure I did. I can't recall
13  specifically, you know, when and where and all
14  the rest, but I'm sure I saw these.
15       Q. When you were actively participating
16  in the AHERF Board of Trustees, would you
17  review any audited financial statements that
18  were provided to you?
19       A. Whatever was presented, I would
20  review.
21       Q. And is there any particular part or
22  line item of audited financial statements for
23  AHERF that you would focus on when you
24  received them?
25       A. It's hard for me to say. While the

Page 171
1        Alfred W. Martinelli
2   results from operations show a decrease,
3   again, there is $95 million in depreciation so
4   that from a cash point of view, that should be
5   a cash positive result to the operation.
6        Q. Right. I don't mean to interrupt
7   you, but what I'd like to know is, typically
8   when you would receive audited financial
9   statements, is there a particular part that
10  you would in your practice focus on when you
11  got them? I'm not necessarily talking about
12  these ones in particular.
13       A. Okay. Generally, I would look at
14  the notes and I would look at the cash flow
15  statements. Those are the things that would
16  concern me the most.
17       Q. Okay. And why is that?
18       A. Again, the notes understand --
19          MR. McCLENAHAN: Excuse me. Do
20  you mean in addition to what he already
21  testified to for 20 minutes earlier in
22  the deposition about why the cash flow
23  statements are much more important than
24  the balance sheet or the income
25  statement? Do you mean in addition to

Page 172
1        Alfred W. Martinelli
2   what he's already said? Because there's
3   no reason for him to repeat it at this
4   hour.
5          MR. FRIESEN: If he wants to
6   refer back to his testimony, then that's
7   fine.
8          THE WITNESS: Well, again, I've
9   covered why I thought cash flow was the
10  important thing for a nonprofit
11  corporation and the footnotes to the
12  financials contain the understanding of
13  the numbers and what's in them. And
14  anything that was amiss or anything else
15  should have been in the footnotes.
16  BY MR. FRIESEN:
17       Q. Let me show you another document
18  that's been marked as Exhibit 1656. Now, this
19  is the board book for the October 30, 1997,
20  meeting that you may recall you did not attend
21  back from the minutes. And I just want to see
22  if you go to the page starting at 827 at the
23  bottom, it says Draft at the top and it says
24  Consolidated Financial Statements for the year
25  ended June 30, 1997. Even though you were not

43 (Pages 169 to 172)

TAB 251

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *BARBARA ATKINSON, M.D.*
*May 12, 2004*

---

## *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**ATKINSON, M.D., BARBARA - Vol. 1**



LEGALINK
A WORDWAVE COMPANY

BARBARA ATKINSON, M.D.

Page 93

1   A.  No.
2   Q.  (BY MR. FRIESEN) Is this something that you would
3       think that Mr. Abdelhak wouldn't be in his nature
4       to say?
5   A.  This doesn't sound like him either. But, I won't
6       say he didn't say this one. But I don't know. You
7       know, newspaper reporters take things totally out
8       of context.
9   Q.  And I take it at that time you had full confidence
10      that Mr. Abdelhak had the ability and whatever he
11      needed to right the ship, as it were?
12  A.  Yes.
13  Q.  Do you recall around this time, in October of 1997,
14      any of the other trustees disagreeing with Mr.
15      Abdelhak's corrective strategy, meaning the layoffs
16      and other cost containment measures while
17      continuing on with the Integrated Delivery System
18      strategy?
19          MR. UNICE: Object to form.
20  A.  I don't recall any specifics. I think people
21      thought the layoff, as painful as they were, were
22      what needed to happen.
23  Q.  (BY MR. FRIESEN) They thought that -- or you
24      thought that AHERF was already doing all that it
25      could to solve problems it had?

Page 94

1           MR. UNICE: Object to form.
2   A.  I guess.
3   Q.  (BY MR. FRIESEN) By the way, the article mentions
4       picketers that were -- that the newspaper at least
5       said were going to march in Philadelphia to protest
6       the layoffs; do you remember any protests?
7   A.  I don't remember.
8   Q.  Do you recall having a conversation with Doctor
9       Donna Murasko where you discussed the University
10      not spending any more money on faculty or equipment
11      and basically cutting costs pretty drastically?
12          MR. UNICE: Object to form with the time
13      frame.
14  A.  I don't know.
15          MR. FRIESEN: I don't know. Donna
16      Murasko didn't know, and that's why I'm asking
17      Doctor Atkinson.
18  A.  Okay. I don't remember. I had lots of
19      conversations with -- Donna was another faculty
20      member, and we certainly -- and she was another
21      faculty representative on the Board, the basic
22      science representative, so I know we talked in a
23      variety of occasions about a lot of things.
24  Q.  (BY MR. FRIESEN) Did you ever receive any phone
25      calls or communications from any vendors of any of

Page 95

1       the AHERF entities complaining that they hadn't
2       been paid?
3   A.  I remember that those started, and they probably
4       started sometime after October, but it really got
5       significant again in the wintertime. So I remember
6       it more, it became more of a crises in the winter
7       and spring. I don't remember if I got any specific
8       ones in the fall.
9   Q.  And did you do anything to follow-up with -- let me
10      just withdraw that.
11          Did vendors call you or did you get reports
12      from faculty members of vendors calling, or how did
13      you find out about that?
14  A.  Yeah, they didn't call me. I think I got reports
15      from faculty of issues with vendors. I think it
16      was really in response to newspaper articles.
17  Q.  And did you pass along those concerns to the board?
18  A.  I probably passed them along to Sherif Abdelhak;
19      I'm not sure if I passed it to the board or not.
20  Q.  Do you remember what his response was?
21  A.  No.
22  Q.  Do you recall there came a point in time in 1998,
23      prior to the bankruptcy, when AHERF tried to sell
24      some of its hospitals to the Vanguard organization?
25  A.  Yes.

Page 96

1   Q.  And do you know why they wanted to do that, why
2       AHERF wanted to try and make that deal?
3   A.  I assumed it was for cash.
4   Q.  Did you have a sense of what would happen if the
5       transaction didn't close?
6           MR. UNICE: Object to form.
7   A.  No.
8   Q.  (BY MR. FRIESEN) Did you ever hear Mr. Abdelhak
9       saying how confident or unconfident he was that the
10      deal would close?
11  A.  I can't remember.
12  Q.  I'm going to show you a document that's been marked
13      as 2524.
14  A.  Okay.
15  Q.  Now, this document is from the files of Doctor
16      Murasko. And if you go to the second page, it
17      says, "Joint meeting of the Board of Trustees and
18      Resource Management Committee, Allegheny University
19      of the Health Sciences" April 21st, 1998, and
20      you're listed there with a tick mark next to your
21      name as an other invitee?
22  A.  Yes.
23  Q.  Then, if you go to the page ending in 7593, these
24      are Doctor Murasko's notes, and at the top it says,
25      April 21st, 1998, a UHS Board.

24 (Pages 93 to 96)

BARBARA ATKINSON, M.D.

Page 97

1    A.  Okay.
2    Q.  And I'd like to ask you about the last page of the
3        document.  You can read as much of it as you
4        want to, please.
5    A.  Okay.
6    Q.  Now, on the last page it says, Sherif, and one of
7        the things that it says there is, "Vanguard feel
8        comfortable it will close but dot, dot, dot, there
9        is a backup plan, paren, doesn't want to share,
10       close paren"?
11   A.  Uh-huh.
12   Q.  Do you recall being at a meeting where Mr. Abdelhak
13       said that he was comfortable that the Vanguard deal
14       would close, but if it didn't close there was a
15       backup plan but he didn't want to share the backup
16       plan?
17   A.  I don't remember that, but if she took these notes
18       I assume it's correct.
19   Q.  Do you recall being -- strike that
20          You can put that document aside.
21          Do you recall anything about a loan to AHERF
22       from Mellon Bank being repaid in April of 1998?
23   A.  I recall the issues about it from later.  I don't
24       know that I recall it at the time, but I recall
25       hearing about it during the bankruptcy as one of

Page 98

1        the issues later on.
2    Q.  What do you recall learning?
3    A.  Well, some of the implications of the, of that,
4        that there were members of the board from the
5        Mellon Bank.
6    Q.  Can you explain a little bit more what you mean by
7        that?
8    A.  Well, just that it was -- that they had called in
9        the loan, I guess, and I don't know if it's true or
10       not, that they did it based on the fact that they
11       were on the board, but that that was at least an
12       allegation during the bankruptcy that that
13       happened.
14   Q.  Do you know who made that allegation?
15   A.  I don't.  And I don't even know who the appropriate
16       board members were.
17   Q.  But at the time that it happened, at the time back
18       in April of 1998, when Mellon Bank loan was repaid,
19       did you have any knowledge of it?
20   A.  It was probably something that was passed at a
21       board meeting, but it didn't -- it wasn't with
22       any -- it didn't seem unusual, or with any reason
23       to make it seem as if anything other than an
24       ordinary transaction.
25   Q.  Do you remember any concerns being raised at any

Page 99

1        board meetings related to transfers or loans from
2        the Pittsburgh area AHERF entities to support the
3        Philadelphia area AHERF entities?
4    A.  Yes.  I know that several of the Pittsburgh board
5        members raised those issues on several occasions.
6    Q.  And what do you remember about the issues that they
7        raised?
8    A.  I don't really remember that much, although I
9        remember that the Philadelphia entities didn't
10       actually -- well, thought at some level it was
11       probably not true or not to the extent that the
12       Pittsburgh people thought it was true.
13          So I know that there was some dispute about
14       what actually happened.  That some of the financial
15       management was happening out of Pittsburgh, so it
16       wasn't entirely clear how some of the -- how some
17       of those transactions actually happened.
18   Q.  Do you recall any of the Philadelphia trustees,
19       including yourself, ever saying that they thought
20       that the Pittsburgh trustees were the people who
21       were -- or the Pittsburgh people were the people
22       who were running the show at AHERF and not the
23       Philadelphia people?
24          MR. UNICE:  Object to form.
25   A.  I don't remember anything about that.

Page 100

1    Q.  (BY MR. FRIESEN) Do you remember ever feeling that
2        way?
3          MR. UNICE:  Same objection.
4    A.  I don't actually understand what you mean.
5    Q.  (BY MR. FRIESEN) Do you remember any friction
6        between the Philadelphia trustees and the
7        Pittsburgh trustees?
8          MR. UNICE:  Object to form.
9    A.  I don't remember anything that was friction.
10   Q.  (BY MR. FRIESEN) Do you recall feeling that you
11       were left out, to some extent, because you were
12       from Philadelphia and not one of the people from
13       Pittsburgh?
14   A.  I didn't feel that I was left out, but I'm, as I
15       said, I was an academic representative, and so from
16       that standpoint -- in fact, I probably wasn't -- I
17       was responsible for the academics there, too, so I
18       did not feel that.  But I was not the finance
19       person.
20   Q.  Did you have any involvement at all in the
21       termination of Mr. Abdelhak?
22   A.  No.
23   Q.  You weren't consulted at all?
24   A.  I don't believe so.
25   Q.  When was the first time, whether in terms of an

25 (Pages 97 to 100)

BARBARA ATKINSON, M.D.

Page 101

1   event or in terms of, you know, a time, that you
2   heard anyone discuss the possibility of Mr.
3   Abdelhak either resigning or being terminated?
4   A   I'm not really sure. I was surprised when it
5       happened. I'm not -- I think I probably heard
6       about it afterwards, and I don't know that I
7       heard -- that I even heard talk about it happening
8       beforehand at all.
9   Q   And why were you surprised?
10  A   Well, I guess I still didn't realize that there was
11      as much trouble as there was.
12  Q   Did you ever learn why Mr. Abdelhak was terminated,
13      exactly?
14  A   I don't know that I had any specific -- no, I guess
15      not, not what the specific causes were, no.
16  Q   Did you ever hear of any physicians either from
17      Pittsburgh or Philadelphia asking any board members
18      to terminate Mr. Abdelhak?
19  A   I actually, I didn't know that, if they did.
20  Q   You didn't know that until just now?
21  A   Yeah, I think so, yeah.
22  Q   Okay. And you don't recall any discussions among
23      physicians or faculty members or anyone, to your
24      knowledge, prior to your finding out that Mr.
25      Abdelhak had been terminated about his potential

Page 102

1   termination?
2   A   Yeah, I think people were beginning to have
3       questions about what was all happening. People, I
4       think most people still even through till he was
5       terminated didn't recognize what the level of the
6       problem was.
7          The person I worked with most closely through
8       that whole spell was Don Kaye, who was the
9       president of the university then, from January on,
10      and so I'm not sure what discussions we had, but
11      certainly it wasn't about terminating Sherif.
12  Q   Up until the time he was terminated, did you ever
13      have any concerns about Mr. Abdelhak's competence
14      or integrity?
15  A   Well, I don't know. I guess that the integrity
16      piece I started wondering about, and that
17      particularly grew across that January on time
18      frame. Competence, I still assumed he was right
19      till I saw how, what happened afterwards.
20  Q   And what it that made you question his integrity?
21  A   Well, I just didn't know how truthful he was being
22      about some of the, discussing the issues, and I'm
23      not even sure at what point I began to have those
24      concerns and whether it was the comparing the
25      aftermath to the beforehand. He was a very -- he

Page 103

1   was very powerful, believable person when he was in
2   power, I guess. Much less believable when you saw
3   the aftermath.
4   Q   Do you recall any specific things that he said that
5       you questioned when you heard them?
6   A   I can't recall.
7   Q   If you had heard that Mr. Abdelhak had hung up the
8       phone on another trustee during a phone call, would
9       that have caused you to question whether he was the
10      right person to be CEO?
11          MR. UNICE: Object to form.
12  A   I can't answer that. I did not know that.
13  Q   (BY MR. FRIESEN) I understand.
14  A   Okay.
15  Q   But if you'd heard it, you don't know what you'd
16      think?
17  A   Yeah.
18  Q   Does that sound like something he would do, or is
19      that something that surprises you?
20          MR. UNICE: Object to form, lack of
21      foundation.
22  A   He had a temper. It depends on what somebody said,
23      so I'd have to know who it was and under what
24      circumstances. I would assume he might do it under
25      some circumstance.

Page 104

1   Q   (BY MR. FRIESEN) You said that he had a temper,
2       can you recall any specific instances of his temper
3       being exercised?
4   A   I can't recall but there were instances. I mean,
5       it's not at board meetings, he usually was pretty
6       calm and collected at board meetings, but usually
7       if there were -- but if there was really some bad
8       news in terms of something, he got angry.
9   Q   At the time that the bankruptcy -- withdrawn.
10          At the time you found out about the bankruptcy
11      filing, what was your view as to what had caused
12      the problems that lead to the bankruptcy?
13          MR. UNICE: Object to form, lack of
14      foundation.
15  A   Well, I'm not sure exactly what you mean. You want
16      to know why I thought we were in bankruptcy?
17  Q   (BY MR. FRIESEN) Yes.
18  A   Well I guess I didn't realize that there were the
19      financial problems there were until the Hunter
20      Group was brought in, and even at the beginning of
21      that I thought it was a cash flow problem but not
22      a, not a major bankruptcy problem.
23          Once -- I think it took awhile even into the
24      bankruptcy to begin to start thinking about and
25      understanding where the troubles came from, but I

26 (Pages 101 to 104)

TAB 252

**14**

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Pittsburgh, Pennsylvania

A special meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation
was held on Monday, January 5, 1998 at 10:30 a.m. via videoconference between the AHERF Fifth
Avenue Place Conference Room, Pittsburgh, Pennsylvania and the Hahnemann President's
Conference Room, Philadelphia, Pennsylvania and via teleconference.

| Members Present | Invited Guests Present | Members Absent |
|---|---|---|
| Sherif S. Abdelhak | Donald Kaye, M.D. | Leonard T. Ebert |
| William F. Adam* | Dwight Kasperbauer | Robert L. Fletcher |
| Henry G. Allyn, Jr.* | David W. McConnell | Teresa Heinz |
| Barbara F. Atkinson, M.D.* | Anthony M. Sanzo | Alfred W. Martinelli |
| J. David Barnes* | Nancy A. Wynstra, Esq. | Joseph Neubauer |
| Iain F.S. Black, M.D.* | | Thomas H. O'Brien |
| Ralph W. Brenner, Esq.* | | Chryss O'Reilly |
| Dorothy McKenna Brown, Ed.D.* | | David W. Sculley |
| Douglas D. Danforth | | |
| Ronald R. Davenport* | | |
| Harry R. Edelman III* | | |
| William H. Genge* | | |
| Ira J. Gumberg | | |
| Robert M. Hernandez* | | |
| Joseph C. Maroon, M.D.* | | |
| Donna M. Murasko, Ph.D*. | | |
| Francis B. Nimick, Jr. | | |
| Robert B. Palmer | | |
| Richard L. Ray, M.D.* | | |
| J. Brandon Snyder* | | |
| W.P. Snyder III | | |
| Richard Spielvogel, M.D.* | | |
| Leon C. Sunstein, Jr.* | | |
| W. Bruce Thomas* | | |
| Stanley Trooskin, M.D.* | | |
| Mark Victor, M.D.* | | |
| Walter L. Williamson* | | |
| Margaret Gray Wood* | | |

\*      Attendance via telephone conference

DVR: 75561.1

GOV 71639

**15**

Special Meeting of the AHERF Board
January 5, 1998
Page 2

## I.   OPENING OF THE MEETING

The meeting was called to order at 10:30 a.m. by W.P. Snyder, III, who declared that a quorum was present and the meeting was competent to proceed. Mr. Snyder indicated that the complete report from the Committee on Trustees would be presented and discussed, with action being taken on the full report following a complete discussion. Nancy A. Wynstra, Esq. maintained the minutes of the meeting.

## II.   ADDITIONS TO THE AGENDA

Mr. Abdelhak indicated that a status report on the financial condition of the organization would be provided following action on the Report from the Committee on Trustees.

## III.   REPORT FROM COMMITTEE ON TRUSTEES

### A.   Proposed Governance Structure [Exhibit 1]

Mr. Nimick presented for consideration a proposed governance structure.  Mr. Abdelhak explained that the changes in the current structure were being recommended to assure that trustee time is being effectively used, that there is a minimum of duplication in material presented to Boards and Committees, and that the corporate structure facilitates trustee involvement in strategic planning and decision making. Additionally, one of the goals of the governance restructuring is to create Boards and Committees of a size to permit meaningful discussion and dialogue.  Mr. Abdelhak noted that over time the Corporate structure will be made as consistent as possible with the governance structure, consistent with various legal requirements, including requirements of existing bond financings. The proposed structure differs from the structure recommended in October, in that at that time it was proposed that Allegheny General Hospital (AGH) and Allegheny University Medical Centers (AUMC) would be merged with a new AUH - West. For the time being, it is now recommended that AGH and AUMC will retain separate Boards, with Allegheny University Hospitals - West serving as the Executive Committee for those entities and providing oversight. Numerous questions about the proposed governance structure were raised, with specific questions about the role of the regional Committee and the Executive Committee, and a lengthy discussion ensued.

DVR: 75561.1

**16**

Special Meeting of the AHERF Board
January 5, 1998
Page 3

B.   Amendments to Articles of Incorporation and Bylaws [Exhibit 2]

Mr. Nimick presented for consideration conceptual changes to the organization's Bylaws and some of the Articles of Incorporation set forth in Exhibit 2, which would be necessary to compliment the proposed governance restructuring.  Ms. Wynstra summarized the areas of the Bylaws and Articles of Incorporation which will require amendment to implement the proposed governance structure.  Ms. Wynstra noted that changes in the legal structure will be implemented over time so that the legal structure mirrors the governance structure.   Several questions about the proposed Bylaw changes were raised and addressed.

C.   Recommendations for Board and Committee Membership and Allegheny Officers for Calendar Year 1998 [Exhibit 3]

Mr. Nimick presented for consideration recommendations for Board and Committee membership, Board and Committee Chairs and Allegheny Officers for Calendar Year 1998 as set forth in Exhibit 3.

Following discussion and upon motion duly made and seconded, the Board of Trustees approved the following resolution:

RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation (AHERF), and of AHERF, acting as the Member of Allegheny General Hospital, Allegheny University Medical Centers, Allegheny-Singer Research Institute, Allegheny Integrated Health Group, Allegheny University of the Health Sciences, St. Christopher's Hospital for Children, and Allegheny University Hospitals, hereby adopts, in concept, the governance structure as outlined on Exhibit 1; and

FURTHER RESOLVED, that the Board hereby adopts, in concept, amendments to the Bylaws and the Articles of Incorporation as outlined in Exhibit 2; and

DVR: 75561.1

**17**

Special Meeting of the AHERF Board
January 5, 1998
Page 4

FURTHER RESOLVED, that the General Counsel is directed to fully develop the necessary changes to the corporate Bylaws of Allegheny General Hospital, Allegheny University Medical Centers, Allegheny-Singer Research Institute, Allegheny Integrated Health Group, Allegheny University of the Health Sciences, St. Christopher's Hospital for Children, and Allegheny University Hospitals, and Articles of Incorporation of the relevant entities as outlined in Exhibit 2 and return the detailed Bylaw amendments to the Board for final approval; and

FURTHER RESOLVED, that the Board approves the appointment of Board and Committee Members, the appointment of Board and Committee Chairs, and the election of Officers as set forth in Exhibit 3; and

FURTHER RESOLVED, that the General Counsel is directed to take such action as may be necessary, including the preparation and filing of any and all documents necessary to carry out the intent of this resolution; and

FURTHER RESOLVED, that the Secretary is directed to append to the original minutes of this meeting a copy of Exhibits 1, 2, and 3.

D.    **Status Report on Financial Condition**

Mr. Abdelhak provided a status report on the current financial condition of the organization noting that declining revenues continue to result in lower payments than the actual cost per case, although the cost per case has been substantially reduced. He noted that we must evaluate everything we are currently doing and that, in his view, every program and activity, except our mission, our vision of excellence and our commitment to personal service, being up for reevaluation. He noted that we are in an industry where we must offer services on a personal service basis but be paid as a commodity and that we must look at other industries which have faced similar problems and see what has worked for them. Ultimately he said we will need to make very difficult decisions about what to continue and what to discontinue. He noted that among the factors to be considered in making this decision are which programs are or can be made to be programs of distinction and high quality with a significant

DVR: 75561.1

**18**

Special Meeting of the AHERF Board
January 5, 1998
Page 5

market position and low costs. He noted that two top level management teams, one in the East and one in the West, are currently reviewing everything in order to make recommendations as to what should be discontinued. A fundamental fact, he said, is that we cannot continue to subsidize as many programs as we currently subsidize. During the discussion the Trustees emphasized that we must never think of ourselves as a commodity and that we should seek to better educate the public as to the real cost of the level and quality of service that they want. It was also noted that we need to see how we can improve our information systems so that management has better and more current information upon which to make its evaluation.

Mr. Abdelhak also noted that some portion of our unrestricted assets have been liquidated in order to significantly reduce the level of payables in both Pittsburgh and Philadelphia and that he has instructed that the level of payables must be maintained on a much more current level than has been the case over the past year. He also noted that we are looking into the possibility of leveraging our receivables.

IV.    ADJOURNMENT

There being no further business, the meeting was adjourned.

Respectfully submitted,

_____
Nancy A. Wynstra, Esq.
Secretary

Noted Attachments: Meeting Notice, Exhibits 1, 2 and 3.

DVR: 75561 1

GOV 71643

TAB 253



Anthony M. Sanzo
President and
Chief Executive Officer

**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

320 East North Avenue
Pittsburgh, PA 15212-4772
412-359-3005
412-359-3888 Fax

Broad & Vine Streets
Mail Stop 400
Philadelphia, PA 19102-1192
215-762-7765
215-762-1754 Fax

June 26, 1998

David W. McConnell
Senior Vice President and CFO
Allegheny Health, Education and
    Research Foundation
120 Fifth Avenue Place
Pittsburgh, PA 15222

Dear Mr. McConnell:

Please be advised that effective June 26, 1998, your employment with Allegheny Health, Education and Research Foundation (the "Foundation") is terminated. In addition, you have been removed as an officer of the Foundation effective June 26, 1998. You should know that the Executive Committee has also directed the officers of the Foundation to use the Foundation's membership rights under the respective bylaws of the Foundation's subsidiaries and affiliates to remove you as an officer or member of the Board of Trustees of any affiliate or subsidiary. Accordingly, you will have no relationship with the Foundation and/or any of its affiliates or subsidiaries after today.

I have been instructed to review this matter with counsel before discussing resolution of your employment agreement with you. I will do so promptly and direct counsel to contact you. If you retain counsel, please advise.

No public announcement has been made, but the Foundation believes that an announcement should be made within the next 48 hours. The Foundation would like to work with you to determine if a mutually satisfactory public announcement can be prepared. Please let me know today if you would like to work with us in this regard.

Sincerely,



Anthony M. Sanzo

AMS:dls

AMS4 02157