TAB 254

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## *DANIEL L. STICKLER*
*May 9, 2003*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

## STICKLER, DANIEL L.



**LEGALINK**®

A **WORDWAVE** COMPANY

DANIEL STICKLER

1
2 finished or came there afterwards. I don't
3 remember that.
4    Q.   So you are not sure who was the CEO
5 at the time you were performing the management
6 review?
7    A.   I don't recall, no.
8    Q.   Do you recall whether any of the
9 other members of AHERF management who you might
10 have dealt with at other hospitals were similarly
11 cooperative? Or maybe put differently, do you
12 recall any members of AHERF management who were
13 not cooperative in whatever management reviews
14 you performed?
15    A.   No.
16    Q.   Moving down one heading, do you see
17 where it says, in bold letters, "Declining
18 Revenue is the Root of the Problem: The patient
19 volumes are continuing to decline both in terms
20 of inpatient admissions and outpatient surgery.
21 It is this decline that is the root of the
22 continuing financial problems."
23    A.   I see that, yes.
24    Q.   Could you tell me what those lines
25 are about, if you recall?

DANIEL STICKLER

1
2    A.   I don't remember, I really don't.
3    Q.   Do you recall that there was a
4 declining revenue problem?
5    A.   I wouldn't have written that if I
6 didn't believe that to be the case.
7    Q.   Do you have any recollection about
8 declining revenues at Elkins Park, or in the
9 Delaware Valley in general in this period of
10 time?
11    A.   You have to understand that I've been
12 in I don't even know how many hospitals and
13 medical centers since that time period. To
14 remember which piece happened where is just
15 beyond a possibility, particularly on something
16 like this.
17    Q.   Do you recall any of the market
18 conditions in the Delaware Valley region in 1994?
19    A.   No.
20    Q.   As you may have studied them?
21    A.   No.
22    Q.   Focusing in then on the next set of
23 statements, do you see where it says "As was
24 stated in my earlier report on this hospital, it
25 will not be possible to cure this hospital's

DANIEL STICKLER

1
2 problems by cutting expenses. Such expense cuts
3 will temporarily solve the problem; however, the
4 patient revenue declines soon make another round
5 of expense reductions necessary."
6    A.   I see that, yes.
7    Q.   Do you recall having submitted an
8 earlier report on Elkins Park Hospital?
9    A.   I don't recall that, no.
10    Q.   Do you recall anything about your
11 recommendation or statement to Elkins Park
12 management that expense cuts would not solve any
13 of the problems, or the problem of the hospital
14 with respect to declining revenue?
15    A.   I don't recall, no.
16    Q.   I take it, but, as you said with
17 respect to the prior set of statements, that all
18 of the statements in this report you wouldn't
19 have written if you didn't believe it at the
20 time?
21    A.   I would not have written something in
22 the report that I didn't believe at the time.
23    Q.   Do you have any reason to believe
24 that this is not the report that you submitted to
25 AHERF management?

DANIEL STICKLER

1
2    A.   I don't have any reason to believe
3 that, no.
4    Q.   Turning to page 10 of 24, do you see
5 where there is a signature there of what appears
6 to be to me Daniel L. Stickler? Is that your
7 signature?
8    A.   It appears to be, yes.
9    Q.   Is this handwriting on this page,
10 other than the signature, your handwriting?
11    A.   No.
12    Q.   Do you recognize the handwriting at
13 all?
14    A.   No.
15    Q.   Turning ahead for the moment to page
16 7 of 24, do you see where at the top it says
17 "Overall expense reductions have been achieved:
18 The overall reductions in man-hours paid, that
19 was implemented in the spring of last year are
20 being sustained."
21    And then moving down, skipping over
22 some sentences, it says "Based on the overview of
23 the programs as I understand them, I commend the
24 staff for initiating them and cannot make
25 constructive suggestions for improving them."

13 (Pages 49 to 52)

DANIEL STICKLER

1
2     A.   I see that, yes.
3     Q.   Do you recall that that was your
4  final recommendation to AHERF management, even if
5  you don't remember the details of the market?
6         MR. WITTEN:   Objection.
7     A.   I was referring specifically to the
8  programs that they had underway to achieve
9  results in those specific areas, and I would not
10  have made that statement if I didn't believe it.
11  But I think you have to be sure you understand
12  that that relates to the entire paragraph and
13  those specific areas at that time.
14     Q.   Which programs are you referring to?
15     A.   The most significant of these are the
16  special surgical supplies and disposable patient
17  supply.  I understand from the staff interviews
18  that active programs are underway to bring these
19  areas under control.  Based on the overview of
20  programs as I understand them.  Those two
21  programs.
22     Q.   Do you recall any of the suggestions
23  you made at the time to AHERF management?
24     A.   No.
25     Q.   Would they have been contained in

DANIEL STICKLER

1
2  this report if --
3     A.   They would have been in the report,
4  whatever recommendations I had, yes.
5     Q.   Is there any particular section of
6  this report that contains your suggestions, or
7  are they just interspersed throughout?  Feel free
8  to, obviously, look through the report.
9     A.   The question was?
10     Q.   I was just wondering, is there a
11  particular section of this report that contains
12  your suggestions or are they just sort of
13  mentioned throughout, wherever you had them?
14     A.   They appear to be mentioned wherever
15  they occur here in the report.
16     Q.   Before leaving the report, let me
17  just confirm, you have no recollection at all
18  about the market conditions of the Delaware
19  Valley region in 1994?
20     A.   No, none at all.
21     Q.   Do you have any recollection, or did
22  you keep abreast of market conditions in the
23  Delaware Valley region over time prior to
24  arriving at AHERF in 1998?
25     A.   No.  Had no reason to.

DANIEL STICKLER

1
2     Q.   Do you recall, moving away from 1994,
3  what the market conditions were like in the
4  Delaware Valley region in 1998?
5     A.   I don't recall, no.
6     Q.   Did you perform any studies of the
7  market conditions at the time?
8     A.   I did not personally, no.
9     Q.   Did you speak with any members of
10  AHERF management about market conditions at the
11  time?
12     A.   I really don't recall.
13     Q.   Do you recall how you received any
14  information that you can recall about market
15  conditions at the time?
16     A.   I don't recall, no.
17     Q.   Do you at least recall receiving some
18  information about the market conditions at the
19  time?
20     A.   I don't recall, no.
21     Q.   In your practice of doing work in
22  consulting engagements, like the one you
23  performed for AHERF, or The Hunter Group
24  performed for AHERF, is it your normal practice
25  to study the market conditions?

DANIEL STICKLER

1
2     A.   This was a very untypical engagement
3  in that we came in to perform a performance
4  improvement program, develop a performance
5  improvement program, and that normally, in an
6  institution of that magnitude, would have taken
7  14 to 16 weeks.  Very soon after we got there it
8  became apparent that there was not enough cash to
9  sustain the organization through the development
10  of a turnaround plan and the implementation of a
11  turnaround plan, and so our focus changed
12  completely at that point in time.
13     Q.   Did you have a chance during that
14  time to, if you recall, speak with management
15  about what management was doing at the time to
16  deal with market conditions?
17     A.   I don't recall.  My memory of that
18  entire event is not very strong at this point,
19  this many years later, as you're seeing, I guess,
20  from my answers.
21     Q.   Do you recall that in 1997 -- let me
22  take a step back.  Do you recall where you were
23  in 1997, what engagement you might have been
24  working on in calendar year 1997 for The Hunter
25  Group?

DANIEL STICKLER

1
2    A.   No.  What year did you say this
3    engagement started?
4    Q.   Put differently, do you recall what
5    engagement you might have been working on one
6    year before the AHERF bankruptcy, or before the
7    AHERF bankruptcy?
8    A.   I don't recall specifically, no.
9    Q.   Do you recall that at some point in
10   time the Balanced Budget Act of 1997 was enacted?
11   A.   I recall it was enacted, yes.
12   Q.   And do you recall which hospital
13   system you were working for, what you were
14   working on at the time it was enacted?
15   A.   Not the specific time it was enacted.
16   Q.   Do you recall having any discussions
17   at The Hunter Group about the Balanced Budget Act
18   of 1997?
19   A.   I assume we did, but I don't recall
20   them.
21   Q.   Do you recall any discussions at The
22   Hunter Group about -- or what was your view of
23   the Balanced Budget Act of 1997, from the
24   perspective of someone who manages hospitals?
25   A.   It was going to increase the

DANIEL STICKLER

1
2    financial problems of the hospitals, because it
3    was going to reduce the cash flow to the
4    hospitals.
5    Q.   And how significant an impact did you
6    expect it would have on hospitals?
7    A.   I don't have an answer to that
8    today.  That would be highly dependent on their
9    patient mix, and that type of thing.  So it would
10   be different for every hospital.
11   Q.   Could you explain what you mean by it
12   would depend on the patient mix?  Do you mean it
13   would depend on what percentage of the patient
14   mix is Medicare patients?
15   A.   Yes.
16   Q.   So hospitals with more Medicare
17   patients as a percentage of the mix of total
18   patients would be more affected by the Balanced
19   Budget Act?
20   A.   They were more dependent on Medicare
21   payments, and when Medicare payments slowed down
22   the rate of increase, and weren't keeping up with
23   inflation, that had a bigger impact on them.
24   Q.   For hospitals with a significant
25   percentage of Medicare patients as a percentage

DANIEL STICKLER

1
2    of total patients, what was your view at the time
3    as to the impact of the Balanced Budget Act?
4    A.   I couldn't answer that question
5    today.
6    Q.   Do you recall working at any
7    hospitals during your time at The Hunter Group to
8    address the Balanced Budget Act of 1997 and its
9    impact?
10   A.   Not specifically.  Most of the
11   engagements I was involved in was in developing
12   the performance improvement program for the
13   hospital or academic medical center that was
14   involved, that in other terms would be thought of
15   as a turnaround plan.  So most of the clients
16   that I went into were having some financial
17   difficulty, and we were helping to put together a
18   turnaround plan for them.  I'm certain as we did
19   our projections we took into consideration our
20   projected impact of the Balanced Budget Act on
21   that individual hospital, each individual
22   hospital.  But I don't recall the numbers from
23   any of them.
24   Q.   And you don't have any sense as to
25   whether the Balanced Budget Act in its impact was

DANIEL STICKLER

1
2    more significant than any other impacts at the
3    time?
4    MR. WITTEN:  Objection.
5    A.   I couldn't answer that question.
6    Q.   Did you ever come to learn about any
7    cuts that had been made in Pennsylvania, in
8    particular in Philadelphia, for welfare benefits
9    and general assistance benefits that were
10   provided by the state to indigent persons?
11   A.   I can't answer that question.  I
12   don't have any recollection of that today.
13   Q.   Did you ever come to learn about the
14   implementation of a mandatory managed care
15   enrollment program for Medicare patients in
16   Philadelphia?
17   MR. WITTEN:  Objection.
18   A.   The question again?
19   Q.   Did you ever come to learn of a
20   mandatory managed care enrollment program for
21   Medicare patients in Philadelphia?
22   A.   I don't recall.
23   Q.   Did you ever learn about or come to
24   learn about the sunsetting of the Certificate of
25   Need requirement in Philadelphia?

15 (Pages 57 to 60)

Page 149

DANIEL STICKLER

1    DANIEL STICKLER
2  time, and drove back. There was another guy that
3  I think his residence was in Philadelphia, in the
4  Philadelphia area, who drove in and back.
5         I'm trying to think who else was
6  there. I don't even remember. Honan's residence
7  was in Florida at the time, I think.
8      Q.  Were there any individuals other than
9  yourself who had had management experience in
10  Pennsylvania in terms of running hospitals, who
11  were on the engagement team?
12     A.  Well, David Hunter, of course. Alan
13  Dzija was on the engagement team and had had
14  experience in the Philadelphia area. I don't
15  remember whether he had -- he worked for one of
16  the consulting firms. I don't know whether he
17  had direct hospital experience or not. I don't
18  recall others.
19     Q.  Was David Hunter actually on the
20  engagement team, or did he just arrange for the
21  engagement to occur and then left it to you?
22     A.  He spent some time there. I couldn't
23  tell you exactly how much. But he spent some
24  time there, and he also spent some time on the
25  phone with me relative to it. But my

Page 150

1    DANIEL STICKLER
2  recollection was he was much more present than
3  any other job I've ever been on.
4      Q.  In terms of what you did under this
5  engagement letter, in terms of just plugging the
6  hole, as you described it, left by Mr. Abdelhak
7  and Dr. Kaye, do you recall what you did when you
8  showed up to work on Monday in terms of your
9  responsibilities at that time?
10     A.  I think we went through all that
11  before. We put together -- we started to put
12  together a performance improvement program. Very
13  early on we shifted and put together this crash
14  program.
15     Q.  So that, what you described earlier
16  was part of this engagement, more or less?
17     A.  It's very hard to separate them. You
18  know, as the interim executive, I start
19  approving, putting out orders, and approving
20  requisitions, and cut expense, and reviewing
21  cost, and reviewing cost reports, and that kind
22  of thing.
23     MR. TERUYA: I don't think I will
24  spend very much time on these next few exhibits,
25  but I just wanted to show them to you.

Page 151

1    DANIEL STICKLER
2         The next one is number 1555, and it
3  is a one-page document with Bates number HUNT
4  4493, and it appears to be a supplemental
5  agreement between Kirkpatrick & Lockhart, or a
6  supplement to an agreement between Kirkpatrick &
7  Lockhart and AHERF, dated June 23, 1998.
8         (Deposition Exhibit 1555
9  for identification, document Bates stamped HUNT
10  4493.)
11     A.  Okay. I'm listening.
12     MR. TERUYA: While you have this
13  exhibit, let me mark another one that you might
14  need to look at simultaneously, as 1556, which
15  has Bates numbers HUNT 4547 through 4549, and it
16  appears to be a fax from William Cullen to Mr.
17  Huoy of The Hunter Group, dated June 25, 1998,
18  and it appears to be forwarding a signature page
19  of an agreement, and an exhibit to an agreement
20  as well, between Kirkpatrick & Lockhart and The
21  Hunter Group.
22         (Deposition Exhibit 1556
23  for identification, document Bates stamped HUNT
24  4547 through HUNT 4549.)
25     MR. D'ANGEL: Is that it, just two

Page 152

1    DANIEL STICKLER
2  pages behind the cover sheet?
3     MR. TERUYA: Yes, it is three pages
4  in total, a fax cover sheet, a signature page,
5  and an exhibit page of some sort.
6      A.  Okay.
7      Q.  I was just going to ask you, do you
8  recognize Exhibit 1555?
9      A.  No, I don't.
10     Q.  Do you recognize 1556?
11     A.  No.
12     Q.  Do you have any recollection of an
13  agreement entered into between The Hunter Group
14  and Kirkpatrick & Lockhart?
15     A.  I have a vague recollection that some
16  of our work was contracted with or through
17  Kirkpatrick Lockhart, for whatever reason I don't
18  know or recall.
19     Q.  Do you see on the third page of
20  Exhibit No. 1556 there is a document that says
21  Exhibit 1, and it's from The Hunter Group to
22  Kirkpatrick & Lockhart, dated, at least at the
23  top, June 16, 1998, and it says for assistance in
24  developing a near-term cash management and
25  conservation plan?

38 (Pages 149 to 152)

DANIEL STICKLER

1
2  A.  Yes.
3  Q.  And then it has a task listing, with
4  a number of tasks, and individuals listed next to
5  it who appear to be Hunter Group members.
6  A.  Yes.
7  Q.  I was just wondering, do you have any
8  understanding of what this page at least is, the
9  Exhibit 1 page?
10  A.  Do I have any understanding of what
11  this page is?  I can do interpretation of it, I
12  guess.  But do I have a recollection of what it
13  was at the time, no.
14  Q.  Do you have a recollection of -- or
15  looking at this document, does this appear to
16  describe the plan you described, about trying to
17  formulate a turnaround plan of some sort, or the
18  efforts to formulate a turnaround plan?
19  A.  It appears that this describes it a
20  little bit differently than a turnaround plan
21  that I described earlier, and now it's making me
22  wonder about my recollection as to whether the
23  initial engagement of this group of people was,
24  quote, a near-term cash management conservation
25  plan or a full-blown turnaround plan.  But this

DANIEL STICKLER

1
2  list of individuals are the people that were the
3  team that was developing the plan, or working to
4  develop a plan.
5  Q.  So originally David Hunter and
6  yourself were hired to fill the hole left or the
7  void left by Mr. Abdelhak and Dr. Kaye?
8  A.  Yes.
9  Q.  And then this set of individuals,
10  David Hunter, Paul Long, Alan Dzija, Tom Honan,
11  Dean Kinsey, Jeff Gerew and Jack Julius, all came
12  on board to develop some kind of plan, but you
13  are not sure --
14  A.  To develop a plan to try to stop the
15  bleeding.
16  Q.  But you are not sure if it was a full
17  turnaround plan or some kind of near-term cash
18  management and conservation plan?
19  A.  Right.  I know that we ended up
20  working on the near-term short one as I told you,
21  the crisis one, instead of the long-term one, and
22  this is the people that came on board to work on
23  that.
24  Q.  But, again, you don't recognize
25  either of these documents or the signatures on

DANIEL STICKLER

1
2  them?
3  A.  I may have seen them, probably did
4  see them at some point, but I don't have a
5  specific recollection of that.
6  MR. TERUYA:  I am going to mark as
7  Exhibit 1557 a document with Bates numbers HUNT
8  4500 through 4501, and it appears to be an
9  engagement letter dated July 22, 1998, at the top
10  of it, between The Hunter Group and AHERF, signed
11  by, apparently, Larry Scanlan for The Hunter
12  Group and Anthony Sanzo for AHERF.
13  (Deposition Exhibit 1557
14  for identification, document bearing Bates stamps
15  HUNT 4500 and HUNT 4501.)
16  A.  Fire away.  I'll try to answer you.
17  Q.  Do you recognize this document?
18  A.  Not specifically, I don't, no.
19  Q.  Does this appear to be the engagement
20  letter between The Hunter Group and AHERF dated
21  July 22, 1998?
22  A.  That's what it appears to be.
23  Q.  Do you recognize David Hunter's
24  signature on the second page of the Exhibit 1557?
25  A.  His signature is not on there.  Larry

DANIEL STICKLER

1
2  Scanlan's is -- oh, yes, David Hunter's is, too,
3  I guess.  I don't recognize those signatures, but
4  I wouldn't, you know, necessarily recognize
5  them.  I don't have any reason to believe it's
6  not theirs.
7  Q.  Do you have any understanding of what
8  this document is about in terms of the scope of
9  The Hunter Group's engagement by AHERF?
10  A.  Some of the members of the team are
11  the same members that were described in the June
12  engagement letter, and so my -- and my
13  recollection is that this represents an involving
14  role on people's part.  And Bill Bricker was
15  added at that point in time as an additional
16  person.  Why it was cast in a new engagement
17  letter, I couldn't answer that specifically.
18  Q.  Is this letter --
19  A.  One of the reasons we added Bill
20  Bricker at that point in time was that we were
21  having difficulty meeting the, I won't say needs,
22  I'll say demands of all of the consultants to all
23  the parties, and all the potential purchasers,
24  for information, and running into some -- well,
25  we were having difficulty meeting those demands,

39 (Pages 153 to 156)

Page 157

DANIEL STICKLER

1
2  and we needed more help to do it, and that's what
3  Bricker was brought in to help do.
4      Q.  When you say all the parties, do you
5  mean consultants to the members of the Creditors
6  Committee, or who are you referring to?
7      A.  Consultants to the members of the
8  Creditors Committee.  I don't know, I think there
9  was somebody who was a consultant to the
10  Creditors Committee.  I think every health care
11  consultant in the country had some role in this
12  whole thing.  And they were struggling for access
13  to information that we were trying to make
14  available primarily to potential purchasers, and
15  at that time it hadn't been narrowed down to
16  two.  There were other organizations who were
17  looking at pieces of it.  And we were having
18  trouble trying to control the access to the
19  information to people who were supposed to get
20  it, and to get it to those who were supposed to
21  get it.
22      Q.  So in the June 16 engagement letter,
23  at first you and David Hunter were brought on
24  board, you as the interim chief operating officer
25  and him as the interim assistant to the CEO of

Page 158

DANIEL STICKLER

1
2  AHERF, is that right, and also as the engagement
3  director?
4      A.  Interim CEO -- I don't remember the
5  titles.  Whatever they are on there.  Engagement
6  director -- state the question again, please.
7      Q.  I was just saying, in the June 16,
8  1998 engagement letter, which I think is Exhibit
9  1554.
10      A.  Okay.
11      Q.  Do you recall that at that point you
12  and David Hunter were being called in, as you
13  said, to fill certain absences that had been left
14  by departures of AHERF management and that you
15  were going to be the interim chief operating
16  officer and David Hunter was going to be the
17  interim assistant to the CEO of AHERF, who was
18  then Tony Sanzo?
19      A.  Yes.
20      Q.  And then in the June 22, 1998 letter,
21  which is Exhibit 1557, at that point you expanded
22  the team?
23      MR. WITTEN:  Objection.
24      Q.  Is that correct?
25      A.  The team was restructured some, and

Page 159

DANIEL STICKLER

1
2  it was also made clear in that organization that
3  the consulting team would also report to me in my
4  role as interim COO, which is what the chart on
5  the second page was intended to do.
6      Q.  So Dean Kinsey, Bill Bricker, Tom
7  Honan, Alan Dzija and someone else were going to
8  all report to you?
9      A.  Yes.
10      Q.  And was there any reason -- you have
11  already explained why Bill Bricker was brought
12  into the picture.  Is there any reason that you
13  added on these other individuals?
14      A.  Those other individuals were on the
15  earlier engagement letter.  The team just
16  reassigned some of their responsibilities, but
17  they were already there.
18      Q.  Do you see the first line of Exhibit
19  1557 says "We are pleased to submit this proposed
20  addendum to the June 16, 1998 interim management
21  agreement"?
22      A.  Yes.
23      Q.  Is this agreement to add on Tom
24  Honan, Alan Dzija, Dean Kinsey and Bill Bricker,
25  and someone else, a supplement to the original

Page 160

DANIEL STICKLER

1
2  letter where just you and David Hunter are named,
3  Exhibit 1555?
4      A.  It's a little difficult for me to
5  figure out right now based on this as to what
6  role the June 23 addendum plays relative to that
7  and what role this other one plays relative to
8  that.
9      Q.  In terms of developing a near-term or
10  some kind of plan in the short run, was there a
11  reason to bring on individuals other than
12  yourself and David Hunter?
13      MR. WITTEN:  Objection.
14      Q.  From your perspective, from The
15  Hunter Group's perspective.
16      A.  Say that question again.
17      Q.  In other words, in connection with
18  developing a plan, whether it be a turnaround
19  plan or a cash conservation plan, was there any
20  reason that you brought on the particular
21  individuals you did to the AHERF engagement?
22      A.  Yes.  I mean, we needed help in
23  trying to figure out, put together that
24  30,000-foot level plan, as to where we thought we
25  could make cuts and how much it would take to

40 (Pages 157 to 160)

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## DANIEL L. STICKLER
### *May 28, 2003*

---

# *LEGALINK MANHATTAN*
## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

### STICKLER, DANIEL L.



LEGALINK®

A **WORDWAVE** COMPANY

Page 371

DANIEL L. STICKLER

1  a duty to understand it even before the audit was
2  done.
3      Q.    But had there been some kind of
4  discrepancy, then that would have triggered for
5  you the need to look into the situation?
6      A.    Absolutely, yes.
7      Q.    Was it your understanding -- I'm not
8  going to ask that.
9          When you were at AHERF as a
10 consultant to The Hunter Group, did any examples
11 of historic private inurement or potential
12 private inurement come to your attention?
13     A.    If you put into the category of
14 potential private inurement compensation levels
15 to some individuals that I would not have paid
16 myself and would not have considered reasonable,
17 I would say yes. But not being an attorney, I
18 don't know that I'm in a position to pass
19 judgment on those.
20     Q.    Was there any compensation that you
21 can recall right now that really seemed obscene
22 to you?
23     A.    There was a past chairman of
24 cardiovascular surgery, if I remember correctly,

Page 372

DANIEL L. STICKLER

1  that was still being paid a significant salary
2  sometime after he ceased serving that role, that
3  I would have had some serious concerns about had
4  I been the CEO.
5      Q.    What was that person's name?
6      A.    I knew you were going to ask me
7  that. I can't think of it. That's one example
8  that comes to my mind.
9      Q.    Was that person being paid while you
10 were there?
11     A.    Until we found it and stopped it,
12 yes.
13     Q.    Have you ever heard of the name Carol
14 Talbert?
15     A.    I have, yes.
16     Q.    And in what capacity have you heard
17 of the name Carol Talbert?
18     A.    She was on the corporate staff at one
19 point in time. I don't think she was still there
20 when I got there. She had -- I don't even
21 remember exactly what -- I can't think exactly
22 what her responsibilities were, whether it was
23 physician practice acquisition or management of
24 physician practices. I can't remember what her

Page 373

DANIEL L. STICKLER

1  responsibilities had been.
2      Q.    Did you ever hear anything about the
3  circumstances of her separation from AHERF?
4      A.    No, I don't recall having heard
5  that. I heard rumors surrounding her name, but
6  those were all very much hearsay and history, and
7  I don't think something that I could quote.
8      Q.    Did you ever hear that she received a
9  $1.6 million settlement to depart AHERF?
10     A.    I don't think I ever heard that, no.
11 I don't think so.
12     Q.    Did you ever hear that she got a
13 consulting contract that paid her $300,000, but
14 that she didn't provide any services in exchange
15 for that contract?
16     MR. TERUYA: Objection.
17     A.    I don't think so. I assume those
18 things all had happened prior to my arrival
19 there, and, to be honest with you, I wouldn't
20 have paid any attention to them if I had heard
21 them if they were history.
22     Q.    What were the rumors surrounding the
23 name Carol Talbert that you referred to a few
24 minutes ago?

Page 374

DANIEL L. STICKLER

1      A.    Relative to potential personal
2  relationships.
3      Q.    That she was having affairs? Did you
4  hear rumors that she was having an affair with
5  someone else within AHERF?
6      A.    I heard rumors that she had a close
7  personal relationship with someone else within
8  AHERF.
9      Q.    Okay, we will leave it at that. It's
10 already on the record.
11         Have you ever heard the name Iqbal
12 Paroo?
13     A.    I have, yes.
14     Q.    In what capacity?
15     A.    He was the president of AUHS prior to
16 AHERF acquiring -- he was president of Hahnemann,
17 I guess, prior to AHERF acquiring AUHS, and I
18 think he remained in that role for some time
19 period after they acquired it. I'm not certain.
20     Q.    Did you ever learn or hear anything
21 about the circumstances surrounding of Mr.
22 Paroo's departure from AHERF?
23     A.    No, I did not.
24     Q.    Did you ever hear that he was paid a

28 (Pages 371 to 374)

Page 375

DANIEL L. STICKLER

1
2 settlement payment for $3 million to release a
3 claim for intentional infliction emotional
4 distress?
5     A.   No, I did not.
6     Q.   Did you ever have any conversations
7 with trustees of AHERF where they indicated that
8 they had known all along that AHERF's financial
9 condition was far worse than the audited
10 financial statements indicated?
11     MR. TERUYA:  Objection.
12     A.   I don't think I did, no.
13     Q.   If you, meaning The Hunter Group, had
14 been on the scene 18 months earlier, say in
15 December of 1996, do you believe that you could
16 have implemented a turnaround plan and avoided
17 bankruptcy?
18     MR. TERUYA:  Objection.
19     A.   Yes, I believe we could have, yes.
20     Q.   And what do you base that belief on?
21     A.   I don't know that I could tie it to
22 specifics, other than my understanding of the
23 organization and the expense reductions that we
24 felt we could make when we put that 30,000-foot
25 plan together.  It would have required some

Page 376

DANIEL L. STICKLER

1
2 difficult decisions to be made, but I believe it
3 could have been done.
4     Q.   Is your belief also based in part on
5 your experience in the hospital field?
6     A.   Oh, obviously, yes.
7     Q.   And is your belief based in part on
8 other experience that you have had with other
9 turnarounds?
10     A.   Yes.
11     Q.   And is your belief based in part on
12 what experience that The Hunter Group, not just
13 you, has had in other hospital turnarounds?
14     A.   I guess to some extent.
15     MR. WITTEN:  Let's go off the record
16 for a minute and I will see if I have any more
17 questions.
18     THE VIDEOGRAPHER:  We will go off the
19 record.  It is 11:44.  And this is tape 5.
20     (A recess was taken.)
21     THE VIDEOGRAPHER:  Back on the
22 record.  It is 11:48, and this is tape 5.
23     BY MR. WITTEN:
24     Q.   Mr. Stickler, I don't have the Tenet
25 asset purchase agreement here, but I notice

Page 377

DANIEL L. STICKLER

1
2 there's a provision in that asset purchase
3 agreement relating to the fact that some of the
4 monies, some of the purchase price, is going to
5 be used to purchase malpractice insurance tails
6 for the hospitals or the physicians.  I don't,
7 frankly, recall which.  Do you remember anything
8 about the discussion about the purchase of
9 medical malpractice insurance tails?
10     A.   I recall that the absence of any
11 malpractice coverage was considered by Tenet to
12 be an obstacle to their acquisition, because they
13 were concerned that liability from previous cases
14 may end up accruing to them in the absence of any
15 insurance, and there would not have been any
16 insurance or any way to buy insurance had that
17 not been done.
18     Q.   Was there an absence of insurance
19 covering the AHERF eastern region or some of its
20 assets?
21     A.   My recollection is that there was an
22 offshore insurance company, that there was a
23 question about there being enough assets to cover
24 potential liabilities, and that's one of the
25 reasons why this tail purchase was considered to

Page 378

DANIEL L. STICKLER

1
2 be necessary.
3     Q.   This offshore is a subsidiary of
4 AHERF, the parent?
5     A.   That's my understanding, yes.
6     Q.   Did AHERF go out and purchase its own
7 insurance policies, or did that sub purchase
8 reinsurance?
9     A.   I couldn't answer that question for
10 you.
11     MR. WITTEN:  I don't have any other
12 questions.
13     MR. TERUYA:  I don't know what you
14 folks want to do in terms of scheduling.  I
15 probably have about maybe 45 minutes or so to an
16 hour of followup.  I don't know if you want to
17 take a quick lunch and come back.  It's up to
18 you.
19     THE WITNESS:  Let's do it and get it
20 over.
21     EXAMINATION BY MR. TERUYA:
22     Q.   Earlier this morning you were talking
23 about your experiences at Cedars Medical Center.
24 Do you recall that?
25     A.   Yes.

29 (Pages 375 to 378)

Page 379

DANIEL L. STICKLER

1    DANIEL L. STICKLER
2    Q.    That's located down in Florida?
3    A.    Miami, Florida.
4    Q.    And did you previously mention that
5    one of the steps you take -- on day one of your
6    deposition did you mention that one of the steps
7    that you would take in trying to come up with a
8    turnaround plan and to judge its feasibility
9    would be to study the market conditions in which
10   a hospital operates, if you were going to try to
11   turn around a hospital?
12   A.    That would be one of the steps, yes.
13   Q.    And I take it you have never
14   performed any comparison of the market conditions
15   in Florida as they existed while you were in
16   charge of Cedars Medical Center and the market
17   conditions in Philadelphia at the time you were
18   there --
19   A.    We never did a comparison of that,
20   no.
21   Q.    And as you mentioned before, you
22   didn't perform any study of the market conditions
23   in Philadelphia because you didn't have time?
24   A.    That's right. There were reports of
25   a market analysis that had been done by AHERF

Page 380

1    DANIEL L. STICKLER
2    that we did review.
3    Q.    But you didn't have a chance to judge
4    whether those were accurate in your view?
5    A.    No.
6    Q.    And you didn't have a chance to use
7    those in formulating a turnaround plan based on
8    them?
9    A.    No. But in most instances, a
10   turnaround plan will -- about market analysis and
11   increased market share -- will in most instances
12   be less than 10 percent of the first three years'
13   turnaround expenses or where you are going to
14   have to do it.
15   Q.    In terms of revenue enhancement or
16   performance improvement in terms of revenue,
17   would that be something, a part of a turnaround
18   plan, that would depend upon an analysis of
19   market conditions, at least in part?
20   A.    Well, as I said, you know, you refer
21   to revenue enhancement. Revenue enhancement
22   involves a much greater piece than just getting
23   more market share. It involves your registration
24   process and your coding process and your billing
25   process, et cetera. And those clearly would

Page 381

1    DANIEL L. STICKLER
2    be -- and those can produce more of a short-term
3    effect in a turnaround than the increased market
4    share can.
5    Q.    Would part of what you view as
6    creating a turnaround plan for a hospital include
7    coming up with a business strategy for that
8    hospital going forward?
9    A.    Yes.
10   Q.    And would that include such things as
11   whether to acquire or divest hospitals in the
12   area of a hospital?
13   A.    The long-term business strategy plan
14   would have to include those, yes.
15   Q.    And in formulating a long-term
16   business plan like that, would that involve a
17   study of the market in which a hospital operated,
18   among other things?
19   A.    Yes, as I said previously, it would,
20   yes.
21   Q.    And you never had the chance to
22   perform any kinds of studies like that in
23   Philadelphia because there was no time?
24   A.    We did not. As I indicated, we
25   reviewed the work that had been done. If you

Page 382

1    DANIEL L. STICKLER
2    look at the, what was it, list of 87 items, or
3    whatever it was, that was in one of those
4    exhibits, you will notice that there were
5    recommendations to close two hospitals that were
6    part of that, those recommendations. Those were
7    based on current occupancy levels and on the
8    market analysis that had been done by AHERF.
9    Q.    Is your focus in formulating a
10   turnaround plan, at least for the short run, on
11   cost cutting rather than revenue enhancement?
12   A.    Usually about 90 percent of what you
13   can accomplish in a turnaround plan in the first
14   three years is on the cost side, and about 10
15   percent would be on the revenue side.
16   Q.    And, correspondingly, then, most of
17   the recommendations that you would come up with
18   in formulating a turnaround plan would relate to
19   cost cutting?
20   A.    Yes, sir.
21   Q.    Could you remind me what years you
22   were at Cedars Medical Center?
23   A.    '96 to '91 -- I mean '86 to '91.
24   Q.    Do you recall our discussion on the
25   first day of your deposition about the Balanced

30 (Pages 379 to 382)

TAB 255

Page 231

```
 1         IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2
                           - - - -
 3
      THE OFFICIAL COMMITTEE OF        )
 4    UNSECURED CREDITORS OF           )
      ALLEGHENY HEALTH, EDUCATION &    )
 5    RESEARCH FOUNDATION,             )
                                       )
 6                    Plaintiff,       )    Civil Action
                                       )    No. 00-684
 7                    -vs-             )
                                       )
 8    PRICEWATERHOUSECOOPERS, L.L.P.   )
                                       )
 9                    Defendant.       )

10

11                         - - - -

12       VIDEOTAPE DEPOSITION OF:  JAMES C. STALDER

13                    VOLUME II

14                         - - - -

15

16              DATE:    March 4, 2004
                         Thursday, 1:23 p.m.
17

18
                LOCATION:    JONES, DAY, REAVIS & POGUE
19                           500 Grant Street, 31st Floor
                             Pittsburgh, PA 15219
20

21
                TAKEN BY:    Plaintiff
22

23
                REPORTED BY:   Lissette Sprott
24                             Notary Public
                               AKF Reference No. LS79722
25
```

James C. Stalder                                                                    Volume

Page 344

1    was indeed some confusion, at least in
2    Dionisio's view, at the Kirkpatrick and
3    Lockhart firm about whether or not they were
4    supposed to be preparing an opinion on the
5    endowment issue?
6  A.  I suspect it was in response to having heard
7    from Cathy Hendrickson that she wasn't aware of
8    it, that we said: Joe, you guys have made a
9    representation that this is under way; she
10   doesn't know about it; that concerns us to make
11   sure it's being done.
12 Q.  The next set of notes, sort of the bottom
13   half -- or, roughly, the bottom half of this
14   last page are your comments to Mr. Dionisio?
15 A.  That's correct.
16 Q.  And they follow your initials; is that right?
17 A.  It says: JCS; Will we have an opportunity to
18   plead our case for retention? I'm asking Joe
19   that.
20 Q.  And he responds -- or you have written down
21   that he responded: Maybe; quite possible it
22   will come up; is that right?
23 A.  That's correct.
24 Q.  Can you read the rest of that note after the
25   word Joe?

Page 345

1  A.  Joe, he's saying: Maybe; it's quite possible
2    it will come up. You, Jim Stalder, might be
3    able to explain discussions you have had to
4    date with management with Lee Powar and the
5    reasons for retaining PwC emphasize -- parens,
6    emphasize the PW versus C&L role, close parens.
7    Must set forth the conditions agreed to.
8  Q.  Do you recall what those conditions were?
9  A.  I don't recall. I can only assume it's making
10   reference to the resolution of these issues.
11 Q.  Do you recall anymore about this conversation
12   with Mr. Dionisio today?
13 A.  I do not.
14                 - - - -
15   (Exhibit 4360 marked for identification.)
16                 - - - -
17 Q.  Mr. Stalder, I've just handed you Exhibit 4360.
18   Is this another set of notes in your hand, this
19   time of a conversation on August 24, 1998 with
20   Bill Buettner?
21 A.  It is, and I note you're now backtracking
22   again.
23 Q.  I know, I was about to confess to you that I've
24   got the dates out of order for the first time,
25   I think.

Page 346

1  A.  So it's the same day. I had talked to him
2    earlier, and -- well, I shouldn't say earlier.
3    I can't tell what time this is, but it's the
4    same day I talked to him.
5  Q.  And this, again, is a set of fee estimates; is
6    that right -- or your notes about fee
7    estimates?
8  A.  I'm not going to answer yes to estimates,
9    because I don't -- it might well be the
10   projected fee for the year then under
11   examination, the 1998 fiscal audit, rather than
12   a fee projected, but let's see.
13 Q.  And the only reason I use the word estimate --
14   well, at least one of the reasons was they
15   seem -- appear to be in round figures.
16 A.  I think he's talking about what was proposed.
17   And when he says in the audit committee book,
18   that would have been the fee proposed of
19   $700,000, which included 25,000 for work done
20   in Caymans, and included the A133, the pension
21   plans and so forth. Why it says six seventy
22   five down from seven hundred, I don't -- can't
23   explain that. And then he said: We progress
24   billed it. And he's giving me pieces, and
25   trying to tell us which were collected and

Page 347

1    which were not.
2  Q.  Is this information that you thought might be
3    handy to have with you in the upcoming audit
4    committee meeting? Is that why this was
5    assembled, to the best of your recollection?
6  A.  I have no recollection why we're doing that.
7    The only recollection I have about fees was the
8    one that we've talked before, and that was the
9    issue of conflict that presented if we --
10 Q.  Had outstanding fees going into bankruptcy?
11 A.  That's what I particularly --
12       MR. McDONOUGH: That were not waived.
13 A.  That's right, were not waived. So I don't
14   really know why in this point in time this was
15   coming up.
16 Q.  I take it then you don't recall, really,
17   anything about this conversation, other than
18   what might be reflected in the notes?
19 A.  That's correct.
20 Q.  I'm handing you, Mr. Stalder, a letter from you
21   to Mr. Dionisio dated August 26, 1998 that has
22   been previously marked as Exhibit 4146, and it
23   bears your signature; is that right?
24 A.  That's correct.
25 Q.  And this is a letter you would have sent on

30 (Pages 344 to 347)

Page 348

1     that day to Mr. Dionisio?
2   A.  It sure looks that way, yes.
3   Q.  And in it you tell me that you believe
      PricewaterhouseCoopers is uniquely positioned
      to assist the company in resolving what were
      called a set of immediate issues that appear on
7     the next page as expeditiously as possible?
8   A.  That's correct.
9   Q.  And were these issues that were prepared by you
10    or someone else at your direction, the next
11    page and the page that follows?  Looks like,
12    really, the issues are only on page two.
13  A.  I can assure you, although I don't recall, this
14    was the work of the team.  I wouldn't have
15    created this.  This would have been done by the
16    audit people helping with this work.
17  Q.  On the final page, it says -- there's a heading
18    that reads:  Why PricewaterhouseCoopers is
19    uniquely positioned to assist; is that right?
20  A.  That's correct.
21  Q.  And the last bullet point there under -- or
22    underneath that heading, reads:  If we are
23    approved to continue as your independent
24    accountants for fiscal 1998, we will agree to
25    waive all outstanding receivables from AHERF as

Page 349

1     of the date of filing; is that right?
2   A.  That's correct.
3   Q.  And that was an offer you recall making?
4   A.  It's here.  I mean, I remember -- you asked me
5    whether I remember sending the letter.  Yes.
6    Would I remember that particular offer that I
7    made?  That wouldn't have been something for me
8    to make.  That was the firm concluding that in
9    the process, that was required.
10  Q.  And you don't doubt that you attached the
11    attachment and made the offer; is that fair to
12    say?
13  A.  That's correct.
14  Q.  I'm handing you, Mr. Stalder, what has been
15    previously marked as Exhibit 2105 in this case,
16    which is a set of minutes from a meeting of the
17    finance and audit committee of Allegheny Health
18    Education and Research Foundation held on
19    Thursday, August 27, 1998 at eight a.m., and
20    they're marked draft, and they list you and
21    Mr. Korbly as invitees.
22        Have I identified the document right?
23  A.  That's correct, you have.
24  Q.  And do you recall attending such a meeting?
25  A.  I do.

Page 350

1   Q.  There are some handwritten notes that appear on
2    the second page of the document and the third
3    page.
4        Are those notes yours?
5  A.  They are not.
6  Q.  Do you recognize the handwriting?
7  A.  No, I could hardly read it.  I'm bad, but not
8    that bad.  I do recall that the draft was
9    terribly deficient, and my recollection is this
10    was -- we suggested significant modifications
11    to it; not just the few that I see here.
12  Q.  You recall that the draft of the minutes for
13    this meeting, in your view, were deficient?
14  A.  That's correct.
15  Q.  Did you see drafts before -- well,
16    apparently -- was that your view, or was that
17    the view of someone on the team?
18  A.  Someone on the team -- well, Korbly and I sat
19    there and heard -- sat there and participated
20    in the meeting, and we obviously were the
21    principal in saying:  That was not what
22    happened.
23  Q.  Do you recall today just what about the draft
24    minutes that you saw, whether they were these
25    or others, was deficient?

Page 351

1   A.  I'd have to study these notes and try to
2    remember, but no, I don't recall, no.
3   Q.  On the final page --
4   A.  Excuse me, I might point out, Jim, that you'll
5    note that Korbly's there, as well as Jim
6    Stalder, in spite of Joe Dionisio's request.
7    Because of the relative roles we were playing,
8    the firm would not permit me to go alone, even
9    though they wanted me to come alone, 'cause I'm
10    not an auditor.
11  Q.  Do you recall that there was indeed, as the
12    minutes here reflect, an executive session from
13    which you and Mr. Korbly were excused?  The
14    fact of your being excused is noted at the
15    bottom of page four of the draft minutes, and
16    then it appears that the finance and audit
17    committee went into executive session.
18        My only question is:  Do you recall
19    that there was a continuing portion of the
20    meeting after you left?
21  A.  Yes.
22  Q.  In that continuing portion, I'll just read for
23    you on page six of the minutes, the resolution
24    of the Committee was that it recommend to the
25    board of trustees that the firm

Page 352

1    PricewaterhouseCoopers LLP be replaced as
2    external auditors for AHERF and subsidiaries.
3          Do you recall that that was the
4    outcome of the meeting, that recommendation?
5    A.   I do.  We were waiting outside in the hall.
6    Q.   And how were you so informed?
7    A.   I believe David Barnes came out and told us
8    that.
9                - - - -
10   (Exhibit 4361 marked for identification.)
11               - - - -
12   Q.   Mr. Stalder, I've handed you now what I think
13   you'll tell me -- or you will tell me are your
14   notes of that 8-27-1998 AHERF audit committee
15   meeting; is that right?
16               MR. McDONOUGH:  4362?
17               MR. JONES:  4361, Exhibit 4361.
18               - - - -
19   (The witness reviewed the document.)
20               - - - -
21   BY MR. JONES:
22   A.   You're right that it looks like that, AHERF
23   audit committee meeting.  And then it starts
24   with:  Meeting next Thursday.  I'm not sure
25   that that makes any sense.  Lee in the margin.

Page 353

1    I'm not sure what this tells me, Jim, to be
2    honest with you.  I'd have to really study this
3    in the context of the other notes.
4    Q.   Well, let me just ask this question:  They are
5    indeed the notes -- Exhibit 4361 are notes in
6    your hand?
7    A.   They are in my hand, yes.
8    Q.   And they are dated 8-27-98, and headed with the
9    phrase:  AHERF audit committee meeting?
10   A.   They are.
11   Q.   Okay.  They do refer to what folks you knew to
12   be involved with the AHERF audit committee,
13   like Ira Gumberg and someone named Palmer; is
14   that right?
15   A.   Palmer I recall -- I believe was one of the
16   board members from the Philadelphia end of
17   the --
18   Q.   And he appears to be present at the meeting by
19   video conference?
20   A.   No one -- I don't recall video.  I think it was
21   just telephone conference.
22   Q.   All I'm doing is referring to the draft
23   minutes, which reflect a double-asterisked
24   footnote --
25   A.   Then he was.

Page 354

1    Q.   -- to that effect.
2    A.   Not my recollection, but he must have been.
3    Q.   On the next page, the note on the upper
4    right-hand margin, can you read that for me?
5    A.   Obviously, I passed a note to -- this says:
6    Note passed to David Barnes as a reminder
7    during the audit committee meeting.  I must
8    have slipped him this note that says:  A133
9    issue, question.  I suspect he didn't recall
10   that he didn't raise it, and I was obviously
11   suggesting he should raise it, because they had
12   in jeopardy the grant moneys that Dr. McMaster
13   was worried about.
14   Q.   Mr. Stalder, can you read for me the portion of
15   the minutes that apply to the time period in
16   which you were purportedly in attendance, which
17   I think are on page one, two and three.  And
18   then -- with an eye toward what you tell me you
19   can now recall being anything that is deficient
20   about those minutes?
21   A.   Jim, we could try that, but what I'm recalling
22   is an extensively re-drafted set of these
23   things, which we sent back to them and said:
24   There's -- you know, a lot of corrections have
25   to be made.  Will I remember them now is

Page 355

1    dangerous for me to even try.
2    Q.   Well, I don't know that it is, but what I would
3    like is your best recollection.  I do have a
4    set of edits to certain minutes, I'm not sure
5    it's this meeting, that I will share with you
6    shortly, I believe.  I've seen them, and I
7    don't want to characterize them, but I wouldn't
8    call them extensively re-writing anything.
9          So if you could just do me the favor,
10   it's really only, essentially, two pages of
11   text, and then let me know if there's anything
12   major that comes to your mind, or substantive,
13   by way of deficiency, I'd like to know it.
14               MR. McDONOUGH:  Well, I object to
15   this exercise, and to the form of a question to
16   read something from five years ago, but if
17   that's how you want to spend your time, go
18   ahead, Mr. Stalder.
19               MR. JONES:  Well, the question is
20   only posed in response to the answer I was
21   given to a prior question.
22               MR. McDONOUGH:  I understand the
23   answer, but it's the follow-up question that
24   doesn't make sense.
25               - - - -

Page 356

(The witness reviewed the document.)

- - - -

A.   I can't even tell what the suggested insert is, for example, on page three, what the -- it says: They are in a general agreement that the financial statements should not be relied upon. I can't even see what that insert is. The whole tone of this was inconsistent with the facts. The whole tone was -- it was Dionisio covering his position. And that's what I know we had -- I had a concern with. The tone was that it was his idea that it had to be restated and so forth and so on. And that's where I know we had -- I had heartburn. What happened with it, I honestly don't recall.

Q.   Thank you. And the tone problem for you was that it really wasn't Mr. Dionisio's idea that the 1997 financial statements needed to be restated, but somebody else's?

A.   No, no, no. No, the tone -- the key thing that -- from the day I got exercised, was we had been lied to. We, the firm of Coopers & Lybrand had been lied to, and they had covered up the existence of a key document. Joe was choosing -- electing not to disclose that, and

Page 357

I wasn't comfortable with that. I know that fact.

Q.   Okay. And the document you referred to, just for clarity, is the Mellon letter we've discussed?

A.   That's correct, and the action behind it. You know, not only the existence of it, but the fact that we discovered that there was efforts on the part of AHERF people to prevent him from being seen, and then even after the fact, they were making notes on it. I recall that. They exercised from it. That's the tone that was being lost -- or that reality was being lost, and I felt it was a critically important omission.

Q.   Let me ask you this: The first full paragraph on page -- what is page four of the minutes. Are you with me? The four is in the upper right-hand corner.

A.   Okay.

Q.   Reads -- starts with the words Mr. Dionisio, and it includes a sentence that Mr. Dionisio noted that after extensive consultation with Jim Stalder of PricewaterhouseCoopers --

A.   Excuse me, wait a minute, page four?

Page 358

MR. McDONOUGH: It would be page four numbered at the top, so it would be this one.

THE WITNESS: That's page three of the notes.

MR. JONES: I apologize. I --

MR. McDONOUGH: These -- through the various markings, some of these pages wind up with six different page numbers.

THE WITNESS: It's page three of the minutes is what you're --

MR. McDONOUGH: It's CL150835 on the bottom.

MR. JONES: In the lower right-hand corner.

THE WITNESS: I'm there.

BY MR. JONES:

Q.   In the sentence in the middle of that first paragraph, which reads: Mr. Dionisio noted that after extensive consultation with Jim Stalder of PricewaterhouseCoopers, they are in general agreement that the financial statements should not be relied upon. It then continues: Mr. Stalder and Mr. Korbly concurred with Mr. Dionisio's report and with the recommendation that users of the financial

Page 359

statements be notified.

Did I read that right?

A.   Yes.

Q.   And do you agree that that was conveyed by Mr. Dionisio in the meeting?

A.   Yes.

Q.   Okay. And did you disagree with any of that, those two sentences, when he so conveyed it?

A.   What I'm disagreeing with is his careful omission of why.

Q.   No, I understand, but you don't disagree with the statement itself; is that fair?

A.   No, I do not.

Q.   And the why is -- refers to your earlier testimony about the Mellon letter and the background for it?

A.   And the related activities of the client, yes. I also recall, now that I look at it, that we had the same kind of concern evolved with the recognition of income from the reserves. He conveniently doesn't disclose that either.

Q.   Did you share with Mr. Dionisio what he didn't, in your view, share with the Committee?

A.   Yes.

Q.   And was this in a subsequent conversation?

33 (Pages 356 to 359)

TAB  256



Anthony M. Sanzo
President and Chief Executive Officer
Allegheny Health Education and
Research Foundation

**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

320 E. North Avenue
Pittsburgh PA 15212-4772
412 359-3008
412 359-3558 Fax

TO:     AHERF Executive Staff
        Hospital Vice Presidents
        University Leadership
        Faculty
        Provost's Staff
        Medical Staff

FROM:   Anthony M. Sanzo          III A
                                  Martin, Michael P.
                                  Sr. Vice President
SUBJ:   Media Release             Treasury Operations

DATE:   September 2, 1998

The attached media release announcing the possible restatement of our consolidated financial statements will be issued late today and we expect that it will garner significant media attention.

It is important to understand that these matters relate to the entity known as AHERF and certain Eastern Region affiliates.

This latest announcement is in keeping with our stated intent to proactively announce developments within the Allegheny organization and to remain diligent in our examination of our financial situation.

*Anthony M. Sanzo*

Anthony M. Sanzo

AMS slk

Attachment

DBR-SG
05008

Allegheny Health  Education and Research Foundation
Allegheny University of the Health Sciences • Allegheny University Hospitals • Allegheny University Medical Practices • St. Christopher's Hospital for Children



DEPOSITION
EXHIBIT
1289
NS    1-30-03

# NEWS



**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

For Immediate Release
Contact:     Thomas G. Chakurda
             (412) 359-6896

### AHERF CONSIDERS RESTATEMENT
### OF CONSOLIDATED FINANCIAL STATEMENTS

Pittsburgh, PA — September 2, 1998 — The Finance and Audit Committee of the Board of
Trustees of Allegheny Health, Education and Research Foundation (AHERF), together with the
new senior management of AHERF and PriceWaterhouseCoopers LLP, are reviewing certain
accounting and reporting issues related to the June 30, 1997 consolidated financial statements of
AHERF and its affiliates, which they believe may require revision. Accordingly, pending
completion of their review, no further reliance should be placed on the financial statements or the
Coopers & Lybrand report thereon. Included among the issues being reviewed are:

♦ a portion of the liability reserves related to the acquisition of the Graduate Hospitals were
   incorrectly reversed to income, thus, impacting intercompany accounts and net patient
   revenues; and

♦ earnings and trading gains from certain restricted funds may have been incorrectly
   reported as "Net Assets Released From Restrictions" and "Investment Income."

According to the Finance and Audit Committee of AHERF's Board, the latest findings are part of
the ongoing process to examine all financial aspects of the Allegheny organization. They
reinforced that if further matters surface, they will be addressed on a timely basis.

-30-

DBR-SG
06009

Allegheny Health, Education and Research Foundation
Allegheny University of the Health Sciences • Allegheny University Hospitals • Allegheny University Medical Practices • St. Christopher's Hospital for Children

TAB 257

# A Review of the Financial Performance of the Allegheny Health Education and Research Foundation 1994 – 1997



**November 5, 2004**

*Prepared by*

William O. Cleverley, Ph.D.

President

Cleverley & Associates

Suite 204

438 East Wilson Bridge Road

Worthington OH 43085-2382

888-779-5663

www.cleverleyassociates.com

Allegheny Health Education
and Research Foundation

Review of Financial Performance
November 5, 2004

3. *Increasing balances of net income attributed to net assets released from restrictions* With the absence of sufficient underlying unrestricted tangible assets to satisfy creditors in the event of default, increased attention would be devoted to income and cash-flow prospects. We have already observed that AHERF has generated negative values of free-operating cash flow since 1995 (Figure 5). This is a direct result of poor margins from operations.

Reviewing income statements for AHERF from 1994 to 1997 shows increasing amounts of net income being derived from the transfer of restricted net assets:

|      | Transfers from Restricted Assets to Income (millions) |
|------|:---:|
| 1994 | 3.5 |
| 1995 | 5.1 |
| 1996 | 18.9 |
| 1997 | 47.2 |

Without these transfers, net income and cash flows for AHERF would have been substantially worse. This should cause an analyst to review the sustainability of these transfers in future years.

Table 4 shows changes in temporary restricted net assets for AHERF during 1996 and 1997. Temporary restricted net assets provide the source for most transfers to income. The data in Table 4 show that AHERF's ability to subsidize operations at levels experienced in 1996 and 1997 is very doubtful.

**Table 4. Changes in Temporary Restricted Net Assets AHERF (data in millions)**

|                                            | 1996 | 1997 |
|--------------------------------------------|------:|------:|
| Beginning temporary restricted net assets  | $101.3 | $109.0 |
| Adj from change in accounting principles   | 18.0 | --- |
| Contributions                              | 7.0 | 12.1 |
| Investment income                          | 8.4 | 22.0 |
| Net assets released                        | (29.3) | (46.9) |
| Unrealized appreciation                    | 4.2 | (6.0) |
| Transfer to other net assets               | (0.6) | 2.5 |
| Acquisition of affiliates                  | --- | 18.0 |
| Change                                     | $7.7 | $1.8 |
| *Ending temporary restricted net assets*   | **$109.0** | **$110.8** |

Without a one-time revaluation of the portfolio in 1996 ($18.0 million) and the acquisition of an affiliate in 1997 ($18.0 million), the balance in this fund would have shown a sharp decrease. AHERF cannot depend on these events in the future and would likely be forced to reduce transfers. This would have a negative effect on income and cash-flow levels that are already inadequate.

Allegheny Health Education
and Research Foundation

Review of Financial Performance
November 5, 2004

4. *Increasing balances of operating lease commitments.* Organizations can also create large balances of future obligations by utilizing operating leases. Operating leases are not capitalized, but their future obligations are shown in footnote disclosure. Table 5 below shows future "Total Minimum Payments" for non-cancelable operating leases, as shown in the AHERF audited financial statements.

Table 5. Non-cancelable Operating Lease Minimum Payment
AHERF (000)

|  | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|
| Total minimum payments | $61,761 | $78,479 | $247,540 | $431,676 |
| Long-term debt – net of current position | 520,893 | 608,190 | 663,971 | 960,273 |
| Operating lease payment to long-term debt % | 11.9% | 12.9% | 37.3% | 45.0% |

The data in Table 5 show an alarming increase in obligated payments through operating leases. Credit analysis should have incorporated this factor into the assessment of the financial position of AHERF.

5. *Unfunded pension liability.* Footnote disclosure in AHERF's audited financial statements also disclosed a significant decrease in the funded status of its pension plans. In 1994, AHERF had $22.7 million in pension funds in excess of its projected benefits obligations. By 1997, this position had reversed, and AHERF was now underfunded by $22.5 million. This underfunded status would create an additional financial obligation for AHERF.

## Conclusion

I believe from my review of the audited financial statements of AHERF and its affiliate DVOG that clear signs of future financial problems were visible in the 1994-to-1997 period. This conclusion is based upon the following points:

1. Neither AHERF nor DVOG experienced levels of profitability that were adequate when compared to any reasonable benchmark of industry performance.

2. Neither AHERF nor DVOG generated positive levels of free-operating cash flow in 1995, 1996, and 1997.

3. Both AHERF and DVOG experienced dramatic declines in liquidity. Values for total days cash on hand were declining throughout the period and were well below expected levels for hospitals rated BBB.

Cleverley & Associates

4. Increases in current liabilities in relation to current assets further weakened short-term liquidity positions. Much of the problem started in 1996 with the line of credit increase to $40 million. AHERF and DVOG were starving for cash flow that was not being provided from operations.

5. Levels of debt or financial leverage were extremely high at AHERF and DVOG when compared to any reasonable industry benchmark. These levels were even higher when the large values of restricted net assets and intangible assets were factored into the anlaysis.

6. The sustainability of the past inadequate profit and cash-flow levels was questionable. AHERF was realizing income from inflated levels of transferred restricted net assets that would not likely be sustainable in future years.

The bottom line is simple and obvious. AHERF and its affiliate DVOG were not generating adequate cash flow, they had enormous levels of both short- and long-term debt, and their access to liquid assets had been eroded. I do not understand why any analyst would have concluded this was a reasonably safe investment.

I believe that credit analysts should have perceived from the audited DVOG 1996 statements that a DVOG bankruptcy was a very real possibility within the next several years. DVOG had virtually no available unrestricted cash (20 8 days). It had experienced negative values for free-operating cash flow in both 1995 and 1996. Present levels of short-term and long-term debt were extremely high relative to industry standards. Seventy-two percent of its total assets in 1996 were financed with debt. If restricted funds and non-tangible assets are excluded, the percentage of debt-to-tangible assets increases to 84.4%. In short, DVOG had no cash, no operating cash flow, and enormous levels of debt. While hindsight is perfect, I still believe credit analysts should have seen that DVOG was in a precarious financial position.

TAB 258

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 00-684<br>)<br>)<br>)<br>)<br>) |

## EXPERT REPORT OF ROBERT P. MITCHELL, ESQ.

I, Robert P. Mitchell, Esq., am submitting this expert report in the above-captioned case.

### I.    QUALIFICATIONS

I am a lawyer and partner with Sherman & Howard L.L.C., Denver, Colorado. I received a Bachelor of Arts degree (with honors) from Eastern Montana College in 1970. I received my Juris Doctor degree (with honors) from University of Texas Law School in 1973. I have been admitted to practice in the States of New York (1974) and Colorado (1976).

My practice has concentrated in public finance since 1975, with a particular emphasis on healthcare and public power. I have acted as bond counsel, disclosure counsel, underwriter's counsel, and borrower's counsel in connection with public finance transactions, as well as occasionally as trustee and issuer's counsel.

I have been a member of the National Association of Bond Lawyers since its founding and have served as a panelist on various bond financing matters for the annual Bond Attorneys Workshop. My resume appears at *Tab 1*.

Master Indenture. In my opinion Foley & Lardner was correct in each case. (Mr. Kite ignored the differences in the wording of the two rate covenants in concluding that Foley & Lardner was correct in 1991 and wrong in 1997.) In my opinion, if the 1996 financial reports had shown that DVOG failed to maintain a debt service coverage ratio of 110% (even if such ratio were less than 100%) such a report would not have constituted an incurable Event of Default, and would have been subject to the notice provisions of Section 7.1 and the requirement that a Consultant be retained.

Mr. Kite cites the fact that Foley & Lardner apparently advised AHERF to obtain a waiver from MBIA in connection with the 1994 acquisition of the Hahnemann University Hospital as evidence of an inconsistent opinion. (The Hahnemann Master Trust Indenture rate covenant is worded substantially identical to that in the DVOG Master Indenture.) However, the wording of the September 25, 1994 "Waiver and Direction to Bond Trustee" (Deposition Exhibit 338) does not support Mr. Kite's reading; indeed, it is consistent with the 1997 Foley & Lardner opinion under the identically worded DVOG Master Indenture provisions. The waiver recites that Hahnemann, based on "preliminary interim" financial statements for its June 30, 1994 fiscal year, expects that its Historical Debt Service Coverage Ratio is less that 1.0 to 1.0. In Section 1(a) of the waiver, MBIA waives the requirement of Section 6.3 of the Master Indenture (and an analogous section of the Loan Agreement) that Hahnemann retain a Consultant. In Section 1(b), MBIA directs the Master Trustee "not to deliver a written notice of <u>default</u> pursuant to Section 7.1(a)(ii) of the Master Indenture and will waive <u>any default that may give rise</u> to an Event of Default thereunder as a consequence of the failure to achieve a Historical Debt Service Coverage Ratio of at least 1.0 to 1.0. (Emphasis added)" The wording of the waiver demonstrates clearly that neither MBIA nor Hahnemann is treating the failure to achieve 1.0 to 1.0 historic coverage

-10-

as an immediate incurable Event of Default. Instead, it is treated as a circumstance requiring retention of a Consultant and potentially permitting the Master Trustee to give notice, at most a "default that may give rise to an Event of Default." If any of MBIA, Hahnemann, AHERF or Foley & Lardner believed that an incurable Event of Default would exist under the Hahnemann Master Indenture, the wording of the waiver would have reflected that belief. In my experience, sophisticated commercial parties would not proceed in the face of an Event of Default without insisting on a clear and unambiguous waiver of that Event of Default. The wording of the 1994 Hahnemann waiver is consistent, not in conflict, with the 1997 Foley & Lardner opinion construing identical language in the DVOG Master Indenture.

        3.     *Legal Consequences of DVOG's Failure to Provide Financial Statements prepared in Accordance with GAAP.*

Mr. Kite states that "Sections 1.4 and 6.6 of the DVOG Master Indenture together require that DVOG's financial statements be prepared in accordance with GAAP." However, he quotes no textual support for this assertion. Neither Section 1.4 nor Section 6.6 impose any affirmative covenant to prepare financial statements in accordance with GAAP, in contrast to other AHERF master indentures; nor does the definition of Audited Financial Statements in Section 1.1 of the DVOG Master Indenture. Section 1.4 provides that computations under the Master Indenture are generally to be performed in accordance with GAAP, and allows an election of new GAAP principles. However, the section also makes clear that the "requirements set forth herein [i.e., in the Master Indenture] shall prevail if inconsistent with generally accepted accounting principles." Section 6.6 simply requires the Obligated Group to file its audited financial statements annually with the Master Trustee. Where parties intend to impose an affirmative covenant that an Obligated Group prepare its financial statements in accordance with GAAP, with potential Event of Default consequences, such a covenant is expressly included; the second sentence of Section

-11-

5.11(a) of the AGHOG Master Indenture which states "such Audited Financial Statements shall be prepared in accordance with generally accepted accounting principles" is an example of such an express covenant. There is no such express covenant in the DVOG Master Indenture. Thus, even if the DVOG Master Trustee believed DVOG's fiscal year 1996 financial statements were not prepared according to GAAP, in my opinion, that in and of itself would not have permitted the DVOG Master Trustee to declare an "Event of Default" under the DVOG Master Indenture.

> 4.    *Legal Consequences of AGHOG's Failure to Properly Calculate its Consolidated Fund Balance Covenant.*

Mr. Kite notes that as of September 1996, the Morgan Guaranty Reimbursement Agreement contained a covenant that required AGHOG's Consolidated Unrestricted Fund Balances to be at least $200,000,000 at all times. He alleges that "the covenant was breached in fiscal year 1996 because Consolidated Unrestricted Fund Balances had declined to $184.5 million;" and under cross default provisions, "the entire AGHOG financing structure could have collapsed in 1996 had Morgan Guaranty and MBIA been aware of AGHOG's breach of the Consolidated Unrestricted Fund Balance covenant." This analysis ignores two real world considerations. First, the default provision in Section 8 of the Morgan Guaranty Reimbursement Agreement makes clear that Morgan Guaranty's rights only existed if "an Event of Default has occurred and is continuing." Thus, if AGHOG had been made aware of the default, it is my understanding that AHERF in 1996 had the ability to cure the shortfall through transfer of funds which could have repaid the Affiliate loans owed to AGHOG. If so, this would have allowed AGHOG to avoid the default (prior to release of the June 30, 1996 financials) or to cure it after such release and report the default to Morgan Guaranty and the fact that it had been cured. In this case, Morgan Guaranty could not have had the ability to declare an Event of Default, with the cascading cross default consequences, since the default disclosed would not be continuing.

-12-

Secondly, the reality of letter of credit backed bond financings is that there are significant costs to a bank's pulling the trigger on an covenant default, since that results in the publicly held bond program collapsing, i.e., being tendered to the bank. In my experience, a letter of credit bank would be loathe to allow such a collapse unless the covenant default is a signal of imminent financial failure of the underlying credit group. Here, I understand, the only problem in AGHOG's case was that its sound financial condition had allowed it to make the loans to affiliates outside the credit group. Particularly given that the shortfall in 1996 was less than 10% of the covenant level, it is not credible to assume that Morgan Guaranty would have risked triggering the collapse of the underlying bond program (since it would have had to fund the purchase of the bonds under its letter of credit) for such a level of non-compliance.

5.    *Legal Consequences of AGHOG's Alleged Failure to Prepare Financial Statements in Accordance with GAAP*

Plaintiff's expert alleges a breach of AGHOG's obligation to provide properly audited financial statements under the AGHOG Master Indenture for 1996. As I mentioned above, unlike the DVOG Master Indenture, the AGHOG Master Indenture did contain an affirmative covenant to prepare financial statements in accordance with GAAP. However, under Section 6.01 of the AGHOG Master Indenture, such a covenant breach only becomes an "Event of Default" if the Obligated Group fails to remedy it for 30 days after written notice of the breach is given by the Master Trustee or holders of a requisite percentage of notes. In this case, it seems obvious the Obligated Group would be able to cure the default by issuing revised financial statements in such time frame. In my opinion, if the Master Trustee were provided with revised audited financial statements including an unqualified auditor's opinion within the 30 day cure period, the Master Trustee could not declare an "Event of Default," even if the time period specified in Section 5.11(a) for delivery of such financial statements had expired.

Foley & Lardner also delivered a December 22, 1997 opinion letter (Deposition Exhibit 976) addressed to Coopers & Lybrand as to the consequences of the possible failure of DVOG to comply with the rate covenant for fiscal year 1998 under the DVOG Master Indenture. As discussed above, the Foley opinion noted that the rate covenant does not dictate whether or not any failure by the DVOG to maintain a coverage ratio of not less than 1.0 will result in an "Event of Default" and thus referred to the 30 day notice and cure provision under Section 7.1. As my analysis above makes clear, I agree with the conclusions expressed in this Foley opinion letter. Certainly it is my opinion that Coopers & Lybrand was justified in relying on this opinion letter in releasing its audit letter on the 1997 financial statements of AHERF.

Foley & Lardner advised AHERF in a November 3, 1997 Memorandum (Deposition Exhibit 378) that it interpreted the Centennial Master Indenture (Deposition Exhibit 334) rate covenant similarly, i.e., that retention of a Consultant and undertaking recommended curative actions would preclude the Master Trustee from declaring an Event of Default even if the coverage ratio were below 1.0. (Zimmerman Deposition at 77-78; Brueckel Deposition at 162-63.) The memorandum states specifically that "With AHC having taken such action, thereby precluding the default from becoming an Event of Default, the accountants should be able to release their unqualified audit report." In addition, Mr. Zimmerman acknowledged discussing the approach AHERF was taking to the Centennial rate covenant issue (based on Foley & Lardner's analysis) with Mr. Buettner of Coopers & Lybrand. (Zimmerman Deposition 105-07; 125-27.) In my opinion, Coopers & Lybrand was also justified in relying on this advice in releasing their audit letter on the 1997 financial statements of AHERF.

In addition, Foley & Lardner advised AHERF in January 1998 that its secondary market disclosure report ("SMDR") relating to the fiscal year ending June 30, 1997 need not include

-19-

additional disclosure of the matters in the communication from First Union National Bank's attorney to Foley & Lardner (Deposition Exhibits 389 and 390; Zimmerman Deposition 100-102; Brueckel Deposition 200-206.) First Union acted as trustee under the Centennial Master Indenture and related bond issues; in a telephone message its attorney, Mr. Houston, raised three matters: (i) the failure to timely deliver the June 30, 1997 fiscal year financial statements; (ii) whether AHERF constituted an appropriate Consultant and (iii) that one of the 1991 bondholders had asked First Union to give formal notice of default. It was apparently the view of Foley's attorneys that the filing of the audited financial statements and the AHERF report with First Union would preclude it from proceeding with a formal notice of default, and that thus any further disclosure of these matters in the SMDR was not necessary as being material. (Deposition Exhibit 390.) In my experience, these are matters on which corporations and issuers rely on lawyers, rather than accountants, in determining their duties under federal disclosure laws. This is particularly the case where the issues at the heart of the matter involve construing the provisions of the indentures and other financing documents governing what constitutes compliance, a default, an Event of Default, and the rights of trustees. Corporations and issuers turn to their lawyers for guidance in such matters, as AHERF did here.

        9.     *Would Foley & Lardner's Advice to AHERF Regarding Rate Covenant Compliance have been the same in 1996?*

Regarding the legal consequences of the DVOG failure to meet debt service coverage ratio alleged by Plaintiff in 1996, based on the legal opinion letter Foley & Lardner provided in December 22, 1997, it is my opinion that Foley & Lardner would have advised AHERF management in 1996 that, under both the operative covenants and Section 7.1 of the DVOG Master Indenture, no Event of Default would occur as long as DVOG after notice, retained a Consultant and was diligently pursuing curative actions as prescribed under the DVOG Master

-20-

Indenture. Even assuming that Foley & Lardner and AHERF believed that the DVOG 1996 fiscal year financials would demonstrate that historical debt service coverage was less than 110%, based on the wording of the covenant, I can only conclude that they would have advised DVOG to retain a Consultant prior to delivering the 1996 fiscal year financials to the master trustee. Based on their 1997 opinion letter analysis, this would have prevented the master trustee and MBIA from declaring an Event of Default under the DVOG Master Indenture.

> 10.    *Should Foley & Lardner have advised AHERF to disclose Financial Covenant Violations to Coopers & Lybrand prior to release of the 1997 SMDR and Audit?*

From the testimony of the two Foley & Lardner lawyers principally involved in counseling AHERF and it affiliates on debt compliance and disclosure, it appears that they were aware of at least two defaults at the time the 1997 financial statements and annual continuing disclosure statements were being finalized and released. By late January, 1998, Ms. Brueckel became aware that there was a substantial amount due to AGHOG from intercompany loans to DVOG, which were required to be deducted in determining compliance with AGHOG's fund balance covenant under the Morgan Guaranty Reimbursement Agreement. (Brueckel Deposition at 215; Deposition Exhibit 345.) Mr. Zimmerman also was aware of this default. (Zimmerman Deposition at 117.) Yet neither Mr. Zimmerman nor Ms. Brueckel advised AHERF to include notice of such default in the Secondary Market Disclosure Report mailed on February 6, 1998. (Zimmerman Deposition at 118; Brueckel Deposition at 187-88.) Similarly, neither of them advised AHERF to discuss the implications of this default with Cooper & Lybrand prior to releasing the fiscal year 1997 audited financial statements. (Brueckel Deposition at 231; Zimmerman Deposition at 121-122.) This default was a material event requiring disclosure under Securities and Exchange Commission Exchange Act Rule 15c2-12. Foley & Lardner was the primary counsel on whom AHERF was relying for advice on disclosure matters relating to

covenant compliance generally, and in connection with the preparation of the annual Secondary Market Disclosure Report for fiscal year 1997. (Brueckel Deposition at 34-36.) In my opinion, Foley & Lardner should have advised AHERF to include disclosure of this default in the 1997 Secondary Market Disclosure Report which was sent out on February 6, 1998. In addition, in my opinion, Foley & Lardner should have advised AHERF to inform Coopers & Lybrand about this default and its implications for the fiscal year 1997 financial report. An uncured default would have required consideration of whether the amounts outstanding under the Morgan Guaranty Reimbursement Agreement should be treated as current liabilities, as well as footnote discussion.

In addition, it is also clear that by October, 1997 Mr. Zimmerman and Ms. Brueckel were aware that a default had occurred under AHERF's Credit Agreement with Mellon Bank, as a result of DVOG's failure to meet the requirements of its liquidity covenant as of September 30, 1997. (Deposition Exhibit No. 964.) In an opinion letter of April 29, 1998 (Deposition Exhibit No. 970, Mr. Zimmerman characterized the liquidity noncompliance as an immediate Event of Default under Section 7.01(d) of the Mellon Credit Agreement. Although AHERF disclosed an event of noncompliance in connection with such liquidity covenant, Foley & Lardner did not advise AHERF to disclose in the SMDR that an Event of Default had (or might have) occurred. (Zimmerman Deposition at 118.) Such disclosure is required by SEC Rule 15c2-12. In addition, Foley & Lardner did not advise AHERF to discuss the implications of such an Event of Default with Coopers & Lybrand, notwithstanding that they were aware of its implications for treatment of the debt as current. (Zimmerman Depositon at 158-59; Brueckel Deposition at 282-284.) In my opinion, the failure of DVOG to meet the liquidity requirements of the Mellon Credit Agreement was an Event of Default under Section 7.01(d), which should have been disclosed as

-22-

TAB 259

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP<br><br>Defendant. | Civil Action No. 00-684<br>Judge David Stewart Cercone |

# EXPERT REPORT OF
# PROFESSOR CHRISTOPHER M. JAMES

November 12, 2004

deteriorating financial situation sooner, steps would have been taken to address the situation."[123]  The only PNC witness he cites is Ralph "Mike" Michael, the CEO of PNC's corporate bank.  Read in its entirety, Mr. Michael's deposition testimony does not indicate that PNC would have halted AHERF's financial demise.  Rather, Mr. Michael testified that there were no established practices or procedures at PNC regarding how to respond to covenant non-compliance in connection with debt obligations.[124]  He did not say exactly what PNC would have done, but he indicated that they would have worked with the borrower to improve operations and cash flows.[125]  He also states that he does not know what the outcome of any such steps would have been.[126]  Thus, the Den Uyl Report does not provide any additional insight into the steps that the Plaintiff's would have taken in the event of a hypothetical covenant violation.[127]

90.    The Kite and Den Uyl Reports do not specify what specific actions the banks would have taken in response to the hypothetical covenant violations.  They merely speculate that the banks would have taken actions, but do not outline the specific steps the banks would have taken.  Given the wide range of potential responses to covenant non-compliance, it is essential to analyze the response of the lenders to actual covenant violations to determine the likely response to a hypothetical covenant violation.  It is unlikely that the banks would have taken a course substantially different from what they actually followed when certain covenant violations were detected.

---

[123] Report of Bruce Den Uyl, p. 21.

[124] Deposition of Ralph S. Michael, p. 151.

[125] Deposition of Ralph S. Michael, p. 166.

[126] Deposition of Ralph S. Michael, p. 168.  "Q: And do you know what in fact would have been the outcome of any such steps in this instance with respect to AHERF?"  "A: I don't know because again we didn't have the opportunity to do that."

[127] One of the possible steps that Mr. Michael identifies is the introduction of a crisis manager, but he repeatedly says that Tom McCool, the head of PNC's workout group, was in charge of that decision. However, Mr. McCool was asked in his deposition "Q: Do you know personally what steps, if any, any creditor of AHERF or it's affiliates would, in fact, have taken if an event of default had been declared on any of the letters of credit or any other?"  Mr. McCool responded, "No."  Deposition of Thomas McCool, p. 267-268.  He was also asked if he knew what steps, if any, would be taken regarding GAAP violations or material misstatements or if Coopers & Lybrand had issued a qualified opinion.  Again, he answered "No." Deposition of Thomas McCool, p. 267.  Thus it is pure speculation that a crisis manager would have been brought into the AHERF situation by PNC.

## VIII. Bank Actions When Covenants Were Violated

*PNC Bank*

91. Based on the Berliner Report, the Kite Report asserts that the DVOG debt service coverage covenant would have been breached at fiscal year-end 1996 and 1997.[128] Mr. Kite argues that had this breach been known, PNC would have been in a position to "pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system."[129] Mr. Kite further asserts that the actions taken by PNC "could have either avoided bankruptcy or mitigated its effects."[130] Based on my review of PNC's actual response to covenant violations by AHERF and its affiliates, and my experience in the commercial banking industry, it is unlikely that, in response to the covenant violations alleged by the Plaintiff's experts, PNC would have taken a course substantially different from the one actually followed.

92. On December 23, 1997, DVOG informed PNC that it was out of compliance with its liquidity ratio covenant requirement of 2.00 to 1.00 for the 1996 DVOG Letter of Credit. Further, DVOG indicated that it did not anticipate meeting this requirement for the balance of fiscal year 1998.[131] As discussed in Section VII, the occurrence of a covenant violation created a wealth of possible responses from PNC ranging from granting DVOG a waiver to declaring an Event of Default. PNC's inaction in responding to this actual DVOG covenant violation is informative in regards to how PNC may have responded to the Plaintiff's alleged covenant violation at fiscal year-end 1996.

93. Following its receipt of the notice of the covenant violation, PNC had to decide whether to renew the 1993 AGH Letter of Credit that expired in approximately

---

[128] I have been advised that there is a legal issue regarding whether there would have been an incurable "Event of Default" under the DVOG Master Indenture or First Supplement thereto if DVOG had failed to maintain an annual debt service coverage ratio of 1.00. I understand that Robert P. Mitchell opines in his expert report that there would not have been.

[129] Report of Steven B. Kite, p. 6.

[130] Report of Steven B. Kite, p. 5.

[131] Exhibit 1788.

one month on January 28, 1998. The timing of this renewal provided PNC with considerable leverage to exact concessions from AHERF. In the Credit Information Sheet that was prepared in support of the renewal of the credit, PNC notes the numerous operating and liquidity problems at DVOG. Specifically, DVOG was experiencing considerable losses, its physician practices would potentially take years to turn around and its liquidity was constrained. In short, PNC was aware that DVOG's financial condition and outlook were poor. Despite this negative outlook, the Credit Information Sheet indicated that PNC intended to pursue additional business with AHERF and its affiliates, including treasury management, capital markets and asset management business.[132]

94. PNC was also aware that AHERF had historically transferred funds from its stronger Obligated Groups to support the operations of the weaker ones and to fund AHERF's physician acquisition strategy. As one of AHERF's stronger Obligated Groups, AGHOG had helped fund AHERF's expansion plans. Given the weakness of DVOG and AHERF's historical penchant of transferring funds among its Obligated Groups, PNC should have been aware that the DVOG's weakness could have a direct impact on AGH.

95. Despite the knowledge of DVOG's financial condition and covenant violation, PNC renewed the 1993 AGH Letter of Credit with only one modification to the existing terms: an increase in pricing from 35 basis points to 55 basis points due to a Moody's downgrade of AGH's bond rating.[133] Despite the DVOG covenant violation, the renewed 1993 AGH Letter of Credit contained no additional substantive amendments.

96. Following PNC's decision to renew the 1993 AGH Letter of Credit in January 1998, PNC continued to take limited action with respect to the DVOG covenant violation. On February 26, 1998, more than two months after receiving notice from AHERF, PNC was still uncertain of how to respond. In her quarterly credit summary, the acting PNC RM, Paula Mammarella, indicated that "[s]ignificant

---

[132] Exhibit 1785.
[133] The renewal included a revised fee of 55 basis points with a provision to increase the fee to 65 basis points or 75 basis points in the event of further declines in AGH's credit rating.

112.  Mellon was informed of a DVOG liquidity ratio covenant violation related to the 1997 AHERF Line of Credit in October 1997.[159] The obligated group liquidity ratio covenant in the Credit Agreement mandated that DVOG maintain a liquidity ratio of 1.60 to 1.00. DVOG's reported liquidity ratio was 1.31 to 1.00 as of September 30, 1997 and the group's financial performance was rapidly deteriorating.[160] In an e-mail dated October 28, 1997, Richard Arrington, head of Mellon's Healthcare Banking Group, outlined Mellon's concerns:

> "In summary, [AHERF's] consolidated net loss for the quarter is $42.5mm versus a profit in the prior year period of $3.4mm. We are concerned not only by the level of performance but also by the speed of the deterioration."[161]

Nonetheless, Mellon's Credit Group decided to waive the covenant until the end of calendar year 1997 rather than calling the loan, and did not even further investigate AHERF's liquidity levels by demanding additional financial information or reviewing readily available information.

113.  Ultimately, in late-April 1998, at the insistence of certain members of the Mellon Bank Group – specifically TD – AHERF repaid the $89 million that had been borrowed under the 1997 AHERF Line of Credit. This request by the Mellon Bank Group did not benefit the other creditors of the borrower or the borrower itself. Rather, this specific set of creditors benefited at the expense of the other parties. In addition, it is notable that TD, a lender with a limited banking relationship with AHERF pushed aggressively to call the loan, while Mellon, a lender with a broad and profitable relationship with AHERF, was reluctant to call the loan.

---

[159] Had the liquidity ratio covenant violation been reported at fiscal year-end 1997, Mellon would have likely been notified of the covenant violation in September 1997, one month prior to when Mellon was actually notified.

[160] Exhibit 2346.

[161] Exhibit 2345.

*The DVOG Lines of Credit*

114. The Kite Report asserts that approximately $57 million in outstanding lines of credit to DVOG entities (the "DVOG Lines of Credit") "would also have been subject to renegotiation" in the event of a breach in the debt service covenant associated with the 1996 DVOG Letter of Credit or in the event that Mellon did not enter into the 1997 AHERF Line of Credit.[162] These outstanding Lines of Credit included $7.5 million between Hahnemann University Hospital and First Union Bank ("First Union Line of Credit"),[163] $33 million across two Lines of Credit between various DVOG entities and PNC ("PNC Line of Credit"), and $16.5 million across two Lines of Credit between Medical College of Pennsylvania and Hahnemann University entities and CoreStates Bank ("CoreStates Line of Credit"). In the event of a covenant violation, small participants without a strong banking relationship with AHERF may have had a desire to exit the credit; however, there is no evidence to indicate that either new or existing lenders would not have replaced them.

115. As discussed earlier, PNC had an extensive banking relationship with AHERF and its affiliates, including its role as the primary credit bank. The credit relationship between PNC and AHERF totaled $144 million in direct exposure as of August 1996 and $140 million as of January 1998. Further, as detailed in this section, PNC's response to actual AHERF covenant violations was typically accommodative. Given PNC's longstanding and profitable relationship with AHERF, as well as its actual response to AHERF covenant violations, I conclude that it is unlikely that PNC would have altered the PNC Line of Credit in the event of a hypothetical DVOG covenant violation at fiscal year-end 1996.

116. CoreStates had a longstanding relationship with both Hahnemann and Medical College of Pennsylvania, and it hoped to leverage its existing Lines of Credit to develop a more substantial relationship with AHERF and its affiliates.[164] In addition, CoreStates had previously extended the Hahnemann Line of Credit

---

[162] Report of Steven B. Kite, p. 18
[163] Formerly First Fidelity Bank.
[164] See, for example, Deposition of Gary Seybold, p. 21-24.

despite the poor fiscal year 1994 financial performance of Hahnemann. When discussing this extension, Gary Seybold, the CoreStates RM at the time, stated "[t]he approval process...is not black and white, and there are a lot of factors that you take into consideration."[165] He also indicated that "...you don't make a decision just off of the financial statements."[166] In addition, the Master Note Agreements governing the CoreStates Line of Credit did not have financial covenants and therefore a hypothetical DVOG covenant violation would not have required action by CoreStates. Furthermore, Mr. Seybold testified that he had never been involved in a credit relationship "where CoreStates demanded repayment of a Line of Credit" nor was he aware of a situation where CoreStates had ever "requested collateral or otherwise restructured a deal" due to a borrower's financial performance.[167] Mr. Seybold's testimony is consistent with my experience in the banking industry that radical actions are rarely taken in situations such as the hypothetical DVOG covenant violation. Finally, CoreStates was one of four banks that bid on the 1997 AHERF Line of Credit. Given my review of responses to covenant violations and my experience in the banking industry, it is unlikely that CoreStates would have taken any radical actions in response to a hypothetical DVOG covenant violation. Further, it is my opinion that if CoreStates decided to exit its Line of Credit, it is likely that another bank would have stepped in and offered a similar Line of Credit in its stead.

117.  First Union was one of four banks to bid on the 1997 AHERF Line of Credit. Given my review of responses to covenant violations and my experience in the banking industry, it is unlikely that First Union would have taken any radical actions in response to a hypothetical DVOG covenant violation. Indeed, Thomas Woodward, the First Union Vice President responsible for managing the First Union Line of Credit, testified that he cannot say, "with any degree of certainty" how First Union would have responded in the event of a hypothetical 1996 DVOG covenant violation.[168] Further, it is my opinion that if First Union decided

---

[165] Deposition of Gary Seybold, p. 55.
[166] Deposition of Gary Seybold, p. 55-56.
[167] Deposition of Gary Seybold, p. 83-84.
[168] Deposition of Thomas C. Woodward, p. 94-96.

to exit its Line of Credit, it is likely that another bank would have stepped in and offered a similar line of credit in its stead.

*Morgan Guaranty Trust*

118. Based on the Berliner Report, the Kite Report asserts that the AGHOG consolidated unrestricted fund balance covenant contained in the Reimbursement and Security Agreement with MGT was breached both at fiscal year-ends 1996 and 1997.[169] He argues that had this breach been discovered at fiscal year-end 1996, MGT would have been in a position to "pursue courses of action to preserve their ability to be repaid and to encourage AHERF, its affiliates and their fiduciaries to pursue strategic business plans to improve the operations of the AHERF system."[170] He further asserts that the actions taken by MGT, among others, "could have either avoided bankruptcy or mitigated its effects."[171] Based on my review of MGT's response to this covenant violation in early- and mid-1998, and my experience in the commercial banking industry, it is my conclusion that in response to the covenant violations alleged by Plaintiff's experts, it is unlikely that MGT would have taken a course substantially different from what it actually followed.

119. On April 1, 1995, MGT entered into a Reimbursement and Security Agreement with AGHOG in relation to a Letter of Credit backing a $50 million bond issuance. The agreement included, among others, a covenant mandating that AGHOG should maintain a consolidated unrestricted fund balance of at least $200 million at all times. Such a covenant prevented the excessive transfer of funds from AGHOG to elsewhere in the AHERF system, as had occurred in 1993

---

[169] I understand that Robert P. Mitchell opines in his expert report that, had this covenant breach been discovered, assuming AHERF had cured the breach at or before the time it notified MGT, an "Event of Default" could not have resulted from such breach.
[170] Report of Steven B. Kite, p. 6.
[171] Report of Steven B. Kite, p. 5.

and 1994.[172] MGT wanted to ensure that its obligation would not be "weakened by net outflows to the advantage of other parts of the system."[173]

120. At the end of fiscal year-end 1996, the consolidated unrestricted fund balance was calculated incorrectly: the reported balance was approximately $211 million, while the actual balance was approximately $185 million. MGT had explicitly negotiated this covenant into the agreement, and the calculation was relatively simple to verify, thus it is surprising that MGT did not detect the incorrect calculation.[174] Further, if the covenant had been properly calculated and AGHOG were in violation, it appears that the violation would have been easily cured via an inter-organization transfer from AHERF, as AHERF had more than sufficient liquidity to push the balance above the $200 million threshold.

121. On January 1, 1997, AHERF transferred most of ASRI's operations out of AGHOG, resulting in a $20 million reduction in the consolidated unrestricted fund balance. In response, AHERF requested that MGT reduce the covenant level to $160 million, in exchange for the tightening of two other financial covenants.[175] In May 1997, the parties signed an amendment to the Reimbursement and Security Agreement. The consolidated unrestricted fund balance covenant was reduced to $160 million from $200 million, while the debt service covenant was increased to 1.30 to 1.00 from 1.20 to 1.00 and the debt-to-capitalization ratio was tightened to 63% from 66 2/3%.[176] MGT's willingness to renegotiate these covenants indicates that it was flexible in its management of

---

[172] Exhibit 934.

[173] Exhibit DX-2638.

[174] The AGHOG Balance Sheet at fiscal year-end 1996 specified general net assets of approximately $228 million and receivables from affiliates of $26 million. Once the general net assets were adjusted to account for certain contractual adjustments, the fund balance was $211 million; however, this adjustment failed to subtract the receivables from affiliates of $26 million. Therefore, the actual consolidated unrestricted fund balance at fiscal year-end was approximately $185 million, below the required threshold of $200 million. The materials necessary to make this calculation were received by MGT. Further, since receivables from affiliates had to be subtracted from the general net assets in the calculation of the covenant, it should have been immediately clear to MGT that the covenant was calculated incorrectly. See Exhibits DX-2641 and DX-2642; the Deposition of Susan A. Flanagan, p. 16-18, 130; and the Deposition of Kelly Mertz, p. 296-299.

[175] Exhibit DX-2645.

[176] Exhibit 347.

covenant violations. In this case, MGT traded the loosening of one covenant for the tightening of two others.

122.   In January 1998, Foley & Lardner ("F&L"), AHERF's counsel, discovered that AHERF was incorrectly calculating the consolidated unrestricted fund balance covenant related to the 1995 AGHOG Letter of Credit.[177] Upon discovering this issue, F&L failed to prompt AHERF to notify Coopers, failed to cause AHERF to include the corrected calculation in the February 6, 1998 Market Disclosure Report, and failed to promptly disclose the covenant non-compliance to MGT.

123.   In March 1998, MGT was finally informed that AGHOG was in violation of the consolidated unrestricted fund balance covenant at fiscal year-end 1997, as well as at September 30, 1997 and December 31, 1997.[178] AGHOG's consolidated unrestricted fund balance as of June 30, 1997 stood at $78 million, significantly out of compliance with the terms of the Amended Reimbursement and Security Agreement related to the 1995 AGHOG Letter of Credit.[179] In a letter to MGT, AHERF outlined the covenant violation and requested that MGT renew the 1995 AGHOG Letter of Credit, which was set to expire on April 13, 1998.[180]

124.   The day after receiving the letter indicating that AGHOG was not in compliance with the fund balance covenant, MGT approved a one-year extension of the 1995 AGHOG Letter of Credit.[181] This intention to extend the credit was formalized in a letter dated April 2, 1998. Similar to the extension of the 1993 AGH Letter of Credit granted by PNC, the only significant modification to the terms of the letter of credit was an increase in the fee to 50 basis points from 27.5 basis points. MGT also requested that AGHOG provide it with monthly financial statements beginning with April 1998. This letter also granted AGHOG a waiver of its covenant non-compliance until May 31, 1998.[182]

---

[177] Exhibit 345.
[178] Exhibit 359.
[179] Exhibit 360.
[180] Exhibit 359.
[181] Exhibit 669.
[182] Exhibit DX-2637.

TAB 260

OFFICIAL STATEMENT DATED JUNE 13, 1996

NEW ISSUE — BOOK-ENTRY ONLY

Expected Ratings: (See

*TREASURY*
*DEPT*
*COPY*

*In the opinion of Bond Counsel, assuming compliance by the Authority and the Members of the Obligated Group with certain covenants, interest on the 1996D Bonds is excludable from gross income for purposes of federal income tax... the 1996D Bonds is not an item of tax preference for either individual or corporate alternative minimum tax... 1996D Bonds may be indirectly subject to corporate alternative minimum tax and certain other taxes imposed on... described under the caption TAX EXEMPTION herein. In the opinion of Bond Counsel under the laws of the Commonwealth... described and construed the 1996D Bonds are exempt from personal property taxes in Pennsylvania and the interest on the Pennsylvania personal income and corporate net income tax. See TAX EXEMPTION herein.*

## $50,000,000

## Pennsylvania Higher Educational Facilities Authority
### (Commonwealth of Pennsylvania)
### Health Services Revenue Bonds
### (Allegheny Delaware Valley Obligated Group Project)
### Series D of 1996

Dated: Date of Delivery                                             Due: November 15, 2035

The 1996D Bonds of the series described above (collectively the 1996D Bonds) will be issued by the Pennsylvania Higher Educational Facilities Authority the Authority pursuant to a Trust Indenture dated as of June 1, 1996, the Bond Indenture, between the Authority and Norwest Bank Minnesota, National Association, as trustee (paying agent and bond registrar in such capacities the Bond Trustee). The proceeds from the sale of the 1996D Bonds will be used to: finance a pooled loan program, the Program, and will pay certain costs of issuing the 1996D Bonds. Under the Program, certain amounts will be made from time to time to one or more of The Medical College of Pennsylvania and Hahnemann University, The Medical College of Pennsylvania and Hahnemann University Hospital System, Hahnemann University Hospital, Allegheny United Hospitals, Inc., St. Christopher's Hospital for Children and Hector Medical Corporation (each hereinafter called an Initial Participant, and together with their affiliates which may become participants in accordance with the Bond Indenture the Participants), pursuant to loan agreements (each a Loan Agreement) entered into from time to time among the Authority, the Program Administrator herein defined and each Participant. Pursuant to the Program funds will be disbursed to a Participant to finance reimburse or reimburse the cost of capital assets. The 1996D Bonds will be payable from and secured by a pledge of certain funds held by the Bond Trustee under the Bond Indenture and from payments to the Bond Trustee as assignee of the Authority under the Loan Agreements. In addition the 1996D Bonds will be payable from amounts payable to the Bond Trustee on the Series D Master Note described herein, and issued by the Initial Participants as the initial Members of the Obligated Group under the Master Trust Indenture described herein among the Members of the Obligated Group and Norwest Bank Minnesota, National Association, as trustee in such capacity the Master Trustee. The Series D Master Note constitutes the joint and several obligation of the Members of the Obligated Group under the Master Indenture and is secured thereunder by a pledge and assignment in favor of the Master Trustee of the Gross Revenues of the Obligated Group

The 1996D Bonds will be issued as fully registered bonds and when issued, will be registered in the name of and held by Cede & Co. as nominee of The Depository Trust Company (DTC). New York, New York. DTC will act as securities depository for the 1996D Bonds. Purchases of the 1996D Bonds will be made only in book-entry form in denominations of $100,000 and integral multiples thereof (except as provided herein) and purchasers will not receive certificates representing their interests in the 1996D Bonds. So long as DTC or its nominee Cede & Co. is the registered owner of the 1996D Bonds, payments of the principal of, redemption premium, if any, and interest on the 1996D Bonds will be made by the Bond Trustee directly to Cede & Co. or its nominee. Disbursement of such payments to the Direct Participants is the responsibility of DTC and disbursement of such payments to Beneficial Owners of the 1996D Bonds is the responsibility of the Direct Participants and the Indirect Participants. So long as the 1996D Bonds are held in DTC or its nominee's name, all references herein to the Registered Owners or Owners of the 1996D Bonds or to the Bondholders shall mean only DTC or its nominee. See BOOK-ENTRY ONLY SYSTEM herein.

The 1996D Bonds initially shall be in the Weekly Mode bearing interest at a variable rate per annum determined on a weekly basis as described herein by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, as Remarketing Agent. Interest on the 1996D Bonds is payable on the first Business Day of each month commencing July 1, 1996, so long as the 1996D Bonds are in the Weekly Mode.

The 1996D Bonds are required to be purchased on demand in compliance with the terms stated in each 1996D Bond at the registered owner thereof upon notice and expense of the 1996D Bonds to the Bond Trustee as tender agent in such capacity the Tender Agent from and for the extent of the sources described herein at a price the Purchase Price equal to 100% of the principal amount thereof plus accrued interest as hereinafter described. Prior to conversion the Weekly Mode to another Interest Mode as described herein and under certain other circumstances described herein the Owners of the 1996D Bonds will be required to tender their 1996D Bonds to the Tender Agent for purchase as described herein.

THE 1996D BONDS ARE SUBJECT TO REDEMPTION PRIOR TO MATURITY AS DESCRIBED HEREIN

From the date of delivery until June 10, 1999 (unless earlier terminated or extended as described herein), payment of the principal of the 1996D Bonds and up to 34 days interest on the 1996D Bonds (calculated at the maximum rate of 12%) when and as the same shall be due and payable and payment of the Purchase Price of 1996D Bonds tendered for purchase as described herein, will be funded by amounts available under an irrevocable letter of credit issued by

## PNC Bank, National Association

The 1996D Bonds are limited obligations of the Authority payable only out of the revenues derived by the Authority under the Bond Indenture from the Loan Agreements and the Series D Master Note pledged thereunder and do not constitute a debt or liability of the Commonwealth of Pennsylvania or any political subdivision, agency or instrumentality thereof. Neither the general credit of the Authority nor the credit or taxing power of the Commonwealth of Pennsylvania or any political subdivision, agency or instrumentality thereof is pledged for the payment of the principal of or redemption premium, if any, or interest on the 1996D Bonds. The Authority has no taxing power.

The 1996D Bonds are offered when, as and if issued by the Authority and accepted by the Underwriters, subject to prior sale or withdrawal or modification of the offer without notice, and subject to receipt of the approving legal opinion of Ballard Spahr Andrews & Ingersoll, Philadelphia, Pennsylvania, Bond Counsel. Certain legal matters will be passed upon for the Initial Participants and Members of the Obligated Group by their special counsel, Fineis Lardner Weissipurg & Aronson, Chicago, Illinois, and by Nancy A. Wynstra, Esquire, Executive Vice President and General Counsel of Allegheny Health Education and Research Foundation, for the Authority by its counsel, Klett Lieber Rooney & Schorling, a Professional Corporation, Harrisburg/Pittsburgh, Pennsylvania, for the Bank by its counsel Cohen & Grigsby, P.C., Pittsburgh, Pennsylvania and for the Underwriters by their counsel Drinker Biddle & Reath, Philadelphia, Pennsylvania. It is expected that the 1996D Bonds in definitive form will be available for delivery to DTC in New York, New York, on or about June 19, 1996.

This cover page contains certain information for quick reference only. It is not a summary of the issue. Prospective purchasers (including Beneficial Owners) of the 1996D Bonds should read the entire Official Statement to obtain information essential to the making of an informed investment decision.

## Merrill Lynch & Co.                    Goldman, Sachs & Co.
### PNC Securities

DEPOSITION
EXHIBIT
407
ACF

GOV 18633

APPENDIX A


THE OBLIGATED GROUP


The information contained in this Appendix A to the
Official Statement has been obtained from
The Medical College of Pennsylvania and Hahnemann University Hospital System,
Hahnemann University Hospital, Allegheny United Hospitals, Inc.,
St. Christopher's Hospital for Children, Horizon Medical Corporation and
The Medical College of Pennsylvania and Hahnemann University

GOV 18691

**Summary of Revenue and Expenses**

The following table sets forth a summary of revenue and expenses of operations of the Obligated Group for each of the fiscal years ended June 30, 1994 and 1995 and for the ten-month periods ended April 30, 1995 and 1996. Such summary has been prepared on the assumptions that the Obligated Group was constituted on July 1, 1993 and that during the period commencing on such date, the Obligated Group had been in place and had consisted of each of the proposed Members.

The information for the two-year period ended June 30, 1995 has been derived from the combined financial statements of the Obligated Group, audited by Coopers & Lybrand L.L.P., independent public accountants (the "Audited Financial Statements"). The information for the ten-month periods ended April 30, 1995 and 1996 has been derived from the unaudited combined financial statements of the Obligated Group which were prepared in accordance with generally accepted accounting principles applied on a basis consistent with the Audited Financial Statements (except for the change in accounting treatment of support to AIHG) and which reflect all adjustments necessary, in the opinion of management, for a fair presentation of the results of operations for the interim period (the "Unaudited Financial Statements"). The results of operations for the ten months ended April 30, 1996 are not necessarily reflective of the results which may be achieved for the full fiscal year ended June 30, 1996. All of the summary financial information provided below for the two-year period ended June 30, 1995 should be read in conjunction with the Audited Financial Statements and related notes which are included in Appendix B to the Official Statement.

GOV 18704

## SUMMARY OF REVENUE AND EXPENSES
### (Dollars in Thousands)

|  | Fiscal Year Ended June 30. | | Ten Months Ended April 30, (Unaudited) | |
|---|---|---|---|---|
|  | 1994 | 1995 | 1995 | 1996 |
| **Revenue** |  |  |  |  |
| Net patient service revenue | $756.046 | $817.407 | $661.743 | $734.014 |
| Academic activities | 56,400 | 57.605 | 48.847 | 52.339 |
| Research and training support | 46.511 | 50,784 | 34.047 | 36.242 |
| Other | 51.970 | 57,448 | 54,906 | 49.673 |
| Total revenue | 910.927 | 983.244 | 799.543 | 872.268 |
| **Expenses** |  |  |  |  |
| Salaries, wages, and fringe benefits | 554.773 | 550,761 | 455,211 | 493.719 |
| Materials, supplies and services | 292.971 | 328.846 | 261.140 | 296.580 |
| Depreciation and amortization | 45.182 | 51.324 | 43.033 | 44,167 |
| Interest | 29,814 | 28,621 | 23.889 | 24.616 |
| Total expenses | 922,740 | 959,552 | 783,273 | 859,082 |
| Income (loss) from operations | (11.813) | 23.692 | 16.270 | 13.186 |
| Nonoperating gains, net | 13,444 | 11,902 | 8,895 | 12,832[2] |
| Excess of revenue and net gains over expenses before restructuring costs and change in accounting principle | 1,631 | 35.594 | 25,165 | 26.018 |
| Restructuring costs | 38,670[1] | 4,645 | — | — |
| Excess (deficiency) of revenue and net gains over expenses before change in accounting principle | (37,039) | 30,949 | 25.165 | 26.018 |
| Income from change in accounting principle | — | — | — | 4,363[2] |
| Excess (deficiency) of revenue and net gains over expenses | ($ 37,039) | $ 30,949 | $ 25,165 | $ 30,381 |

(1)  Associated primarily with the affiliation of Hahnemann University and AHERF in November 1993 and consist of write-offs of inventory, property and equipment, and good will; management, legal and accounting costs, fringe benefit costs; professional liability costs, and expenses associated with the termination of certain faculty and other employees.

(2)  See the subcaption, "General Adoption of SFAS Nos. 117 and 124" above for information relating to a change in accounting principle with respect to the treatment of investment appreciation.

A-11

GOV 18705

**Balance Sheet**

     The following table sets forth the balance sheet for the Obligated Group as of June 30, 1994 and 1995, which has been derived from the Audited Financial Statements, and as of April 30, 1996, which has been derived from the Unaudited Financial Statements. The balance sheet information as of June 30, 1994 and 1995 should be read in conjunction with the Audited Financial Statements and related notes which are included in Appendix B to the Official Statement.

A-12

GOV 18706

## BALANCE SHEET
### (Dollars in thousands)

| | June 30, | | April 30, (Unaudited) |
|---|---|---|---|
| | 1994 | 1995 | 1996 |
| **Current assets** | | | |
| Cash and short-term investments | $ 60,513 | $ 30,528 | $ 53,807 |
| Receivables: | | | |
| Patient accounts, less allowance for doubtful accounts of $25,420 at June, 1994, $36,460 at June, 1995, and $53,840 at April, 1996 | 118,612 | 180,340 | 262,029 |
| Affiliates | 11,435 | 0 | 0 |
| Other | 12,724 | 22,169 | 31,239 |
| Inventories | 11,080 | 11,863 | 12,571 |
| Prepaid expenses | 8,478 | 8,516 | 4,135 |
| Total current assets | 222,842 | 253,416 | 363,781 |
| Investments limited or restricted as to use, net of amount to meet current obligations | 182,742 | 174,770 | 172,429 |
| Property and equipment, net | 409,509 | 397,190 | 403,593 |
| Other assets | 11,870 | 10,157 | 15,904 |
| Total assets | 826,963 | 835,533 | 955,707 |
| **Current liabilities:** | | | |
| Accounts payable | 34,258 | 28,283 | 39,686 |
| Accrued expenses | 78,772 | 59,297 | 50,993 |
| Line of credit borrowings | 12,800 | 6,000 | 56,300 |
| Payables to affiliates | 0 | 4,964 | 87,953 |
| Deferred revenue | 7,683 | 11,230 | 18,376 |
| Current portion of self-insurance liabilities | 9,477 | 5,821 | 4,043 |
| Current portion of long-term debt | 6,907 | 7,083 | 7,116 |
| Total current liabilities | 149,897 | 122,678 | 264,467 |
| Long-term debt | 345,060 | 339,452 | 331,838 |
| Student loans | 16,520 | 17,375 | 18,501 |
| Payable to affiliates | 4,582 | 22,895 | 18,862 |
| Self-insurance liabilities | 19,451 | 12,429 | 11,116 |
| Other noncurrent liabilities | 20,522 | 9,662 | 9,576 |
| Total liabilities | 556,032 | 524,491 | 654,360 |
| **Net Assets:** | | | |
| General | 191,871 | 220,204 | 194,015 |
| Restricted: | | | |
| Specific purposes | 14,012 | 16,432 | 23,978 |
| Endowments | 65,048 | 74,406 | 83,354 |
| Total net assets | 270,931 | 311,042 | 301,347 |
| Total liabilities and net assets | $ 826,963 | $ 835,533 | $ 955,707 |

GGU 18707

TAB 261

EXHIBIT

1887

8-6-03

## MBIA Insured Portfolio Management Department
### Hospital Unit Rating & Review Form

| | | | |
|---|---|---|---|
| To: | File *(Filename Pa0543c doc)* | Rating Date: | 2/28/97 |
| Analyst: | Dick Heberton | Rating: | 6B |
| Obligor: | AHERF Delaware Valley Obligated Group | Policy Numbers: | 212700, 212720, 212740 |
| Net Outst. Par: | $262,753,238 as of // | Credit Number: | PA0543 |
| Final Maturity | 2021 | Pool Parent: | N/A |

### I. MBIA Rating Assignment, Change or Confirmation

| | New Rating | Previous Rating (Date) |
|---|---|---|
| Standalone Rating | 6B | 4B (5/23/96) |
| LOC Bank Rating (Pool Borrowers) | | |

LOC Bank Name     N/A
FIAD Rating
Expiration of LOC
Renewal of LOC in question? Why?

### II. Rating Agency Rating

| | New Rating | As of date | Previous Rating |
|---|---|---|---|
| Moody's | | 5/23/96 | Baa |
| S&P | | 5/23/96 | BBB |

### III. Rating Type

| | |
|---|---|
| X | Surveillance "20/20" Rating (Audits Spread, Analysis Below) |
| | Surveillance "SU" Rating (Alert/ACRS Report) |
| | Surveillance Review (Audits spread, no write-up) |
| | Rating Agency Report Reviewed (Full report only - attach) |

### IV. Contacts

| | Hospital/Obligor | Other |
|---|---|---|
| Name of Entity | AHERF | |
| Contact Name | Mike Martin | |
| Title | CFO | |
| Phone No | 412-442-2219 (secretary Addie) | |
| Date of Contact | 2/26/97 | |

MBIA     029893

## Hospital Analysis

The 1.533-bed Allegheny Health. Education and Research Foundation (AHERF) Delaware Valley Obligated Group is a new legal entity formed in 1996. Previously, this credit number had consisted of our exposure to Hahnemann University Hospital. The new Obligated Group consists of Hahnemann and all of its fellow AHERF affiliates in the Philadelphia area. The Group members are all controlled affiliates of AHERF and are part of the Allegheny System. The Allegheny System is the largest in Pennsylvania with over 2.600 licensed beds and 3,177 students. AHERF is also the parent of the strong 728-bed Allegheny General Hospital in Pittsburgh (PA0325. 2B), Allegheny Integrated Health Group (AIHG, physician practices and ambulatory services) and many others

The Obligated Group members are:
- Allegheny University Hospitals
- Allegheny University of the Health Sciences
- St. Christopher's Hospital for Children

Allegheny University Hospitals consists of two Philadelphia tertiary hospitals.
1   Allegheny Center City Hospital - 558 beds (formerly Hahnemann University Hospital) and
2   Allegheny East Falls Hospital - 444 beds (formerly the Medical College of Pennsylvania Hospital).
and two suburban community care hospitals:
1   Allegheny Bucks County Hospital - 176 beds and
2   Allegheny Elkins Park Hospital - 175 beds
It also operates an inpatient psychiatric facility (Eastern Pennsylvania Psychiatric Institute) on behalf of the State

Allegheny University of the Health Sciences consists of the former Medical College of Pennsylvania and the academic segment of Hahnemann University Hospital System which were merged on 12/31/94 following the affiliation of Hahnemann with AHERF. Initially it was known as MCP-Hahnemann School of Medicine. It also includes the Schools of Nursing and Public Health

St. Christopher's Hospital for Children is an 180-bed acute care children's hospital and regional referral center in Philadelphia. SCHC assumed the assets of a prior Group member. Honzon Medical Corp. which owned and managed SCHC's parking garage. Horizon withdrew from the Group following its merger with Zurbrugg Hospital

This Obligated Group was brought together by AHERF to create a strong integrated delivery system in the Philadelphia area in order to gain a competitive advantage in negotiating for managed care contracts. The consolidation of the Group has been going on for the past three years and has involved many mergers, restructurings. layoffs and associated write-offs. Most the of members were rather lackluster performers prior to their affiliation with AHERF with fairly weak balance sheets

The combined entity shows the scars of those weak balance sheets which were further harmed by $43MM in restructuring write-offs in 1994 and 1995, a large $33MM extraordinary loss due to the refinancing in 1996 and net transfers to other affiliates of $74MM in 1996 and $17MM in the first quarter of fiscal 1997. As a result of these charges, the Group's unrestricted fund balance dropped from $220MM in 1995 to $150MM in 1996 and $134MM as of 9/30/96. With debt of $464MM (including a $58MM line of credit) the Group is woefully undercapitalized. Debt/cap jumped from an already high 61% in 1995 to a staggering 77 5% at 9/30/96.

Cash fell sharply in 1995 from 59 to 33 days due to management's decision to reduce current liabilities. Cash fell further in 1996 to 27 days ($76MM) as A/R days soared to 104 days due to the difficulties of converting the members' A/R systems to the AHERF system. This was anticipated by management and has been partially funded with borrowings under its line of credit. The Group also has $123MM of restricted cash. This includes $60MM in temporarily restricted endowments, donations and student loans and $63MM in permanently restricted endowments and trusts. The AHERF System has about another $200MM in unrestricted cash. mostly at Allegheny General

MBIA        029894

Good profitability in the last two years appears to partially mitigate this very weak balance sheet, but it depends how you interpret the income statement. The spreads show bottom line profits of $1.6MM in 1994, $36MM in 1995, $27MM in 1996 and $9.4MM in the first quarter 1997. But 1994's result excludes a $39MM restructuring charge, 1995's excludes a $4MM restructuring charge and 1996's excludes a $74MM transfer of net assets to affiliates. Of those transfers, $51MM went to support the acquisition (10%) and operation (90%) of physician practices by AIHG. Such support of physician practices had previously been accounted for mostly as an expense. For example, in 1995 the Group recorded an expense of $8MM and a net asset transfer of $5MM to AIHG. If all of this $51MM had been treated as an expense in 1996, the Group would have recorded <u>a loss of over $24MM</u> instead of a $27MM profit! These transfers continued in the first quarter of 1997 at $17.4MM and, according to CFO Martin, will continue at this pace indefinitely. The CFO indicated that they were now accounting for these expenses as transfers because AIHG is a separate corporation and because of the need to not appear to be buying referrals. 1996's profit was also boosted by a $8.6MM investment gain relating to the adoption of FAS 124.

AHERF is investing heavily in physician recruitment to help build revenues in the long-run. Average acquisition costs are about $150,000 for a primary care practice of 1.5 doctors. AHERF initially projected having 500 physicians (90% primary) and one million covered lives under contract by 6/30/98, but they have about 400 physicians now (including Graduate acquisition) and are comfortable staying at that level. The buildup of its primary care network and specialty recruitments are already having an impact as shown by the 8% rise in revenues in 1996. Utilization levels are also rising. All hospitals showed an increase in admissions (averaging 5%). Outpatient visits have gone up sharply in the last two years from 339,936 to 661,251. Rising managed care penetration reduced reimbursements which partially offset the benefit of these increases. Managed care now accounts for 32.6% of revenues.

The tertiary hospitals and St. Christopher's are the money makers in the Group as the medical school generates losses ($5MM in 1996) and the community hospitals have historically posted poor results. Losses at the medical schools are projected to decline as AHERF moves to reduce their size and consolidate operations. To improve profitability systemwide, AHERF has restructured operations to reduce costs. These actions included a reduction of FTEs at each facility.

Applications at the medical schools have fallen sharply from the peak year of 1994 due to the merger of MCP and Hahnemann in January 1995. After rising from 12,200 in 1992 to 19,695 in 1994, applications fell sharply in 1995 to 13,602 and to 12,528 in 1996. Matriculatants also were cut after the merger from 302 in 1994 to 240 in 1995. In 1996, 246 students matriculated. Total enrollment declined from 1,212 in 1994 to 1,121 in 1996 as a result. Applications at the Nursing and Public Health schools declined less severely and total enrollment has actually grown since the merger (2,116 in 1996 vs. 1,920 in 1994).

The Obligated Group's primary service area consists of most of Philadelphia County, along with a portion of surrounding counties in PA and NJ. The Group is the market leader in its service area with a 7.6% share (9% in Philadelphia). This market is very overbedded and is experiencing rapid managed care penetration. Recent consolidations have produced strong competitors to the Allegheny System. Competitors include 623-bed Thomas Jefferson (merged with Main Line HS), 703-bed University of Pennsylvania, 445-bed Temple, 524-bed Albert Einstein and the preeminent 301-bed Philadelphia Children's Hospital.

A related, but unaffiliated organization, SDN Inc., is in the process of acquiring Graduate Health System, which has six hospitals in the Philadelphia area. SDN has several AHERF executives on its board, but it is not legally part of AHERF. However, Martin indicated that SDN would eventually become part of the Allegheny System, although not part of the DVOG, at least initially. Including the Graduate acquisition, AHERF will have a 15% market share in the Delaware Valley.

Almost all current senior managers in the Group (except at St. Christopher's) have been appointed by AHERF since its affiliation. Recent news articles have reported that AHERF's managers are some of the highest paid in the industry including the CEO, Sherif Abdelhak, who earned $1.2MM in 1995. UC members who met with management describe them as very competent and confident with good turnaround experience.

MBIA    029895

## Hospital Legal Structure

Is the Borrower an Obligated Or Restricted Group?    YES    x    NO

List Members    | see wnteup |

| | | | System Name |
|---|---|---|---|
| Borrower Type | Single Hospital | | |
| | Two-Three Hospital System | x | Allegheny |
| | Large, Multi-State System | | |

| Type of Exposure | New Issue | _____ | UIT/Secondary | _____ | BIG | _____ |
|---|---|---|---|---|---|---|
| (check all that apply) | Pool (non HBCS) | _____ | HBCS Pool | _____ | MBIA | x |

Support
(check all that apply)

- Gross receipts or A/R pledge
- Mortgage
- Negative Mortgage Pledge
- Guarantee
- Name of Guarantor
- Other Support (Explain)

Debt Service Reserve Fund

- Funded at inception at MADS
- Funded at inception at less than MADS
- Funded due to springing reserve at
- Not funded - springing reserve at
- Surety
- No existing or springing DSRF

Is the borrower in compliance with all covenants?    YES _____    NO _____

List major covenants and describe any compliance exceptions

| Covenant | Section/Doc | Required | Actual | Comments |
|---|---|---|---|---|
| Rate Covenant | § / | | | |
| Cushion Ratio Covenant | § / | | | |
| Additional Bonds Test | § / | | | |
| Limits on Asset Transfers | § / | | | |
| Other | § / | | | |

Does the borrower have variable rate debt?    YES _____    NO _____
If yes, what is date of Purchase Period expiration?
Is the debt backed by a LOC? Which Bank?
If MBIA insured, review document summaries and show next date of liquidity facility renewal _____

Other
Is MBIA's exposure related to a crossover refunding?    YES _____    NO _____

Comments:

MBIA    029896