TAB 262

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## KARLEEN CARLSON STRAYER
*October 8, 2003*

---

# SUPER CONFIDENTIAL
# LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**CARLSON STRAYER, KARLEEN**



LEGALINK®

A WORDWAVE COMPANY

KARLEEN CARLSON STRAYER          16:07:59

1    A.  Yes.                          16:08:00
2    Q.  What other factors, if any,       16:08:05
3  prompted your decision to downgrade the DVOG   16:08:07
4  entities?  I know we've talked about physician   16:08:12
5  practice, acquisition costs, I'm just trying   16:08:16
6  to gain a sense as to what else factored into   16:08:19
7  your decision, if anything.           16:08:21
8    A.  Well, we would have looked at the   16:08:24
9  overall financial health and the fact that   16:08:26
10  their balance sheet seems to have weakened.   16:08:28
11    Q.  What's your basis for that last   16:08:36
12  statement, that their balance sheet seems to   16:08:37
13  have weakened?                   16:08:40
14    A.  Just based on what Dick has   16:08:41
15  written here in terms of cash falling, cash   16:08:43
16  declining A/R days behind; that would have,   16:08:47
17  that alone would have been a reason for the   16:08:52
18  downgrade.  And the debt to cap jumped up.  So  16:08:54
19  those factors together would have also   16:09:00
20  influenced our decision to downgrade this.   16:09:04
21    Q.  Did you and Mr. Heberton, in   16:09:17
22  connection with this downgrade announcement,   16:09:20
23  discuss the possibility of bringing in a   16:09:23
24  consultant to take a look at the transfer   16:09:29

KARLEEN CARLSON STRAYER          16:09:29

1  payments that were being made from DVOG to   16:09:33
2  AIHG?                         16:09:37
3    A.  I don't recall.               16:09:39
4    Q.  If you had had such a conversation  16:09:51
5  with Mr. Heberton, would you expect that   16:09:53
6  conversation to be reflected in Exhibit 1887?  16:09:58
7    A.  Not necessarily.  Might have;   16:10:09
8  might not have.                  16:10:12
9    Q.  Is it more or less likely, one way  16:10:16
10  or the other, whether such a conversation   16:10:18
11  would be reflected in Exhibit 1887?   16:10:19
12    A.  Since this is simply an analysis   16:10:24
13  of the credit, it's -- it wouldn't surprise me  16:10:26
14  that it wasn't in this.  It would more likely  16:10:29
15  have appeared in the Alert Report because   16:10:32
16  that's where we typically mentioned what   16:10:35
17  specific actions we were taking.      16:10:40
18    Q.  Let me show you what I believe is  16:10:44
19  that Alert Report.                16:10:48
20      MR. KRUSKO: If we could mark that.  16:10:50
21      (Deposition Exhibit 2193 for   16:10:50
22  identification, Alert Report, production   16:11:40
23  numbers MBIA 029899.)              16:11:40
24      MR. KRUSKO: For the record, I   16:11:30

KARLEEN CARLSON STRAYER          16:11:30

1  would note that Exhibit 2193 is one-page that  16:11:31
2  bears the Bates number MBIA 029899.   16:11:38
3    Q.  Ms. Strayer, do you recognize this  16:11:56
4  as the Alert Report to which you were just   16:11:57
5  referencing?                    16:12:00
6    A.  Yes.                       16:12:01
7    Q.  Did you review this Alert Report   16:12:05
8  after Mr. Heberton had written it, but before  16:12:10
9  it went to distribution?            16:12:14
10    A.  Yes, I would have.             16:12:16
11    Q.  And I take it you would have   16:12:19
12  objected or otherwise stricken out any   16:12:20
13  statements that you disagreed with?   16:12:23
14    A.  Yes.                       16:12:34
15    Q.  Do you recall, in general terms,  16:12:34
16  who would have been included on this   16:12:35
17  distribution list?                16:12:36
18    A.  It's the list I mentioned earlier,  16:12:38
19  our senior management team would have been on  16:12:40
20  it, our healthcare new business people, all of  16:12:43
21  the insured portfolio management would have   16:12:47
22  been on it or at least the public finance   16:12:48
23  side, our reinsurance people, our attorneys,  16:12:51
24  potentially our auditors.            16:12:56

KARLEEN CARLSON STRAYER          16:12:56

1    Q.  Alert Reports were generated any   16:13:00
2  time credit was downgraded to the caution   16:13:04
3  list, meaning a rating of 6 or below?   16:13:13
4    A.  Yes.                       16:13:17
5      To clarify:  The caution list was   16:13:22
6  6 and there were different names for a 7 and   16:13:25
7  an 8 and a 9.                    16:13:27
8    Q.  And you just anticipated my next   16:13:30
9  question, which is something I feel   16:13:32
10  long-winded about:  So the caution list is   16:13:35
11  specific to just the numeric rating of 6?   16:13:38
12    A.  Yes, it was at that time; I   16:13:41
13  believe they changed the nomenclature today   16:13:43
14  but at that time, that's true.       16:13:46
15    Q.  And what would a numeric rating of  16:13:48
16  7 correspond to?                 16:13:50
17    A.  I believe that was called a credit  16:13:55
18  watch-list A.                    16:13:57
19    Q.  And a numeric rating of 8 would   16:14:00
20  corresponds to credit watch-list B?   16:14:02
21    A.  B.                        16:14:05
22    Q.  Rating 9, would that correspond to  16:14:06
23  anything?                      16:14:09
24    A.  That was called "classified."    16:14:09

53 (Pages 209 to 212)

Page 213

KARLEEN CARLSON STRAYER         16:14:09

1      Q. Did that label attach the sort of  16:14:16
2  layman's definition of "classified" to it; and  16:14:19
3  by that I mean, did that mean that only  16:14:22
4  certain individuals were permitted to see that  16:14:26
5  Alert Report or otherwise view files for that  16:14:27
6  credit?                           16:14:30
7      A. I, I don't know because it was  16:14:34
8  such a rare occurrence at MBIA that this was  16:14:36
9  not a regular ordinary course thing; it was  16:14:39
10 extremely rare, so I don't know.        16:14:42
11     I assume we have policy but I     16:14:44
12 don't know what it was.              16:14:47
13     Q. What person or what department was  16:14:50
14 responsible for enforcing that policy in the  16:14:54
15 1998 time frame?                    16:14:57
16     MR. WITTEN: Objection.          16:14:58
17     A. I don't even know what the policy  16:14:59
18 is so I don't, I don't know what department it  16:15:00
19 would have been.                   16:15:03
20     IPM would have still been        16:15:06
21 responsible for reporting on the credit; we  16:15:07
22 would have issued an Alert Report, but in  16:15:09
23 terms of, you know, at that point there's a  16:15:17
24 loss, the loss reserve committee has to  16:15:21

Page 214

KARLEEN CARLSON STRAYER         16:15:21

1  establish case loss reserves for that  16:15:24
2  particular credit and that's a senior  16:15:26
3  management committee that is specifically  16:15:28
4  assigned to do that and I'm not aware of what  16:15:32
5  all the policies were regarding that  16:15:35
6  committee.                        16:15:36
7      Q. Was the Delaware Valley Obligated  16:15:40
8  Group ever placed on that list?        16:15:42
9      A. Yes.                      16:15:44
10     Q. And did you participate in the  16:15:46
11 process after that point?            16:15:51
12     A. Yes.                      16:15:54
13     Q. And were you a member of this  16:15:55
14 committee that you just made reference to?  16:15:57
15     A. I was not a member of the  16:16:00
16 committee. The committee is basically our  16:16:01
17 senior management team.              16:16:03
18     Q. Okay. So in 1998, with respect to  16:16:04
19 DVOG, you weren't a member of whatever  16:16:06
20 committee reviewed the decision to put the  16:16:09
21 DVOG on the classified list?          16:16:13
22     A. Well, it was sorts of an -- it  16:16:19
23 wasn't a judgment call. It went on the  16:16:24
24 classified list once there was a bankruptcy  16:16:27

Page 215

KARLEEN CARLSON STRAYER         16:16:27

1  filing because we knew there would be a  16:16:29
2  payment default, so there wasn't any judgment  16:16:31
3  call about whether or not it should be on 9.  16:16:34
4      But my, my group downgraded it to  16:16:36
5  the 9 level and we would have provided reports  16:16:39
6  to the loss reserve committee; I, myself, was  16:16:43
7  not a member of the loss reserve committee.  16:16:45
8      Q. When you say "my group downgraded  16:16:53
9  it to the 9 level," did that occur on July  16:16:55
10 21st, 1998, or soon thereafter, if you recall? 16:16:59
11     A. Yes.                      16:17:02
12     Q. Reference is made in the opening  16:17:15
13 sentence of the Alert Report to "fierce  16:17:17
14 competition in the Philadelphia market"?  16:17:22
15     A. Yes                       16:17:25
16     Q. Is it your recollection that the  16:17:26
17 Philadelphia healthcare market, in this time  16:17:28
18 frame, March 1997, consisted of a number of  16:17:32
19 healthcare providers across the board in terms  16:17:39
20 of tertiary care hospitals, community  16:17:43
21 hospitals, teaching hospitals?        16:17:47
22     A. Yes.                      16:17:49
23     Q. And is it your recollection that  16:17:50
24 in this time frame, managed-care companies  16:17:52

Page 216

KARLEEN CARLSON STRAYER         16:17:52

1  were both consolidated and growing in power in 16:17:58
2  the Philadelphia area?               16:18:02
3      A. They were, they were very powerful  16:18:04
4  and very concentrated; so I was aware of that. 16:18:07
5  In terms of their growth, I can't speak,  16:18:10
6  specifically, but they were very powerful.  16:18:12
7      Q. Do you recall whether they were  16:18:16
8  becoming more powerful in this time frame?  16:18:18
9      A. They were negotiating very  16:18:22
10 aggressively; I do know that. But, you know,  16:18:23
11 "powerful" is sort of a judgmental -- judgment 16:18:27
12 call, so.                         16:18:33
13     Q. Is it your recollection that  16:18:35
14 reimbursement rates, generally speaking, were, 16:18:37
15 in general decline during this time frame?  16:18:40
16     A. They were -- yes             16:18:44
17     MS. HACKETT: Asked and answered,  16:18:46
18 but go ahead.                     16:18:46
19     Q. In addition to what we just  16:18:52
20 discussed, can you think of other factors that 16:18:53
21 went into Mr. Heberton's conclusion that there 16:18:56
22 was fierce competition in the Philadelphia  16:19:04
23 market at this time; again, this was a  16:19:08
24 conclusion that I believe you've testified  16:19:16

Page 217

```
1        KARLEEN CARLSON STRAYER      16:19:16
2    that you agreed with?                    16:19:16
3        A.   I guess the other thing would have  16:19:21
4    been simply that we have a number of credits  16:19:23
5    that we insure in that area, so we would have  16:19:26
6    had knowledge of those -- the performance of  16:19:32
7    those credits, and I am quite sure we heard  16:19:36
8    similar comments from a number of our credits  16:19:42
9        Q.   Was that true in March of 1996, as  16:19:48
10   well, in terms of the amount of business, the  16:19:48
11   volume of business that MBIA had in the    16:19:51
12   Philadelphia area market?               16:19:54
13       A.   Oh, in terms of the amount of    16:19:56
14   business we had? Yes. We would have had,   16:19:57
15   more or less, the same amount of business in  16:20:00
16   '96 and '97.                            16:20:02
17       Q.   So it was your understanding,    16:20:05
18   then, in this somewhat broad time frame,   16:20:06
19   '96/'97, that individuals in the Healthcare  16:20:09
20   Group on the new business side were familiar  16:20:15
21   with the Philadelphia area healthcare market?  16:20:17
22       MR. WITTEN: Objection.             16:20:21
23       A.   They would have done an analysis  16:20:26
24   of -- they would have reviewed the market  16:20:27
25   dynamics before insuring the transaction.  16:20:30
```

Page 218

```
1        KARLEEN CARLSON STRAYER      16:20:30
2        Q.   I guess, just to put a finer point  16:20:34
3    on it perhaps, where I'm going with this is  16:20:37
4    just to ask you whether you had an         16:20:40
5    understanding at the time, given the volume of  16:20:41
6    business that MBIA was doing in the       16:20:44
7    Philadelphia area market, whether analysts on  16:20:46
8    the new business side in the Healthcare Group  16:20:50
9    had a good understanding of the Philadelphia  16:20:53
10   healthcare market because of the level of side  16:20:55
11   that MBIA was doing?                    16:20:57
12       MR. WITTEN: Objection.             16:20:59
13       A.   Well, when I say we had other    16:21:00
14   credits in the Philadelphia marketplace that  16:21:02
15   we insured, it doesn't mean that we insured  16:21:04
16   them in 1996 and 1997.                  16:21:08
17       Most of our bond issues are          16:21:10
18   30-year transactions, so we would have insured  16:21:12
19   something in the early '80s and this would  16:21:15
20   have still been in place in '96 and '97. So I  16:21:17
21   don't recall specifically how much new     16:21:21
22   business we would have been booking around  16:21:22
23   that time in that market.               16:21:25
24       Q.   But the monitoring functions are  16:21:26
25   continuous --                          16:21:29
```

Page 219

```
1        KARLEEN CARLSON STRAYER      16:21:29
2        A.   Yes.                         16:21:30
3        Q.   -- during the term of the bond   16:21:31
4    insurance policy?                       16:21:32
5        A.   Yes.                         16:21:33
6        Q.   So it's fair to say that MBIA's  16:21:34
7    Surveillance Department of the Healthcare   16:21:37
8    Group was well familiar with the Philadelphia  16:21:41
9    area healthcare market in this time frame,  16:21:43
10   March 1997?                             16:21:46
11       A.   We were, we were familiar with   16:21:49
12   certain aspects of the market as they affected  16:21:50
13   the credits that we insured, yes.        16:21:54
14       Q.   Were you unfamiliar -- excuse me  16:21:55
15       Was the Healthcare Group in the      16:21:58
16   Surveillance Department unfamiliar with any  16:21:59
17   aspects of the Philadelphia healthcare market?  16:22:02
18       A.   Of course. I mean, it's a very  16:22:05
19   complex market.                         16:22:07
20       Q.   Okay.                        16:22:07
21       A.   So, you know, there were different  16:22:08
22   dynamics that would affect our credit      16:22:13
23   Specifically, we would have, we would have  16:22:17
24   understood but healthcare is just an extremely  16:22:19
25   complex business and there are many, many  16:22:21
```

Page 220

```
1        KARLEEN CARLSON STRAYER      16:22:21
2    things I'm sure we did not understand.     16:22:24
3        Q.   Okay. And with respect to the   16:22:26
4    complexity of the healthcare business, I take  16:22:29
5    it that's particularly true with respect to  16:22:32
6    the Philadelphia area healthcare market at  16:22:34
7    this time?                              16:22:37
8        A.   Philadelphia was one of the      16:22:37
9    markets that had very aggressive competition  16:22:40
10   in, in, you know, as you said, powerful    16:22:43
11   managed-care plans; so, it was one of the  16:22:48
12   markets that we would track, yes.        16:22:51
13       Q.   Can you identify anything about  16:22:55
14   the Philadelphia area market that you learned  16:22:58
15   in this general time frame; and again, I'm  16:23:01
16   speaking about you, personally, in March 1997,  16:23:04
17   that you didn't know beforehand?         16:23:07
18       A.   That I didn't know beforehand?   16:23:11
19       Q.   Yes.                         16:23:13
20       A.   It's hard for me to recall what  16:23:14
21   specifically I learned in '96, '97 versus   16:23:16
22   other years.                            16:23:19
23       Q.   I understand. I guess where I'm  16:23:20
24   going with this is you testified that there  16:23:22
25   were -- when I asked you whether there were  16:23:24
```

Page 221

KARLEEN CARLSON STRAYER                16:23:24
1
2  things that MBIA's Surveillance Department,    16:23:25
3  the Healthcare Group, was unfamiliar with    16:23:28
4  respect to the healthcare market, I believe    16:23:30
5  you testified "of course."                    16:23:32
6      A.  Um-hum.                    16:23:34
7      Q.  And I'm just trying to gain an    16:23:34
8  understanding as to what nuances or what    16:23:36
9  complexities in this market the Healthcare    16:23:38
10 Group in the Surveillance Department didn't    16:23:42
11 understand in this time frame, March 1997.    16:23:43
12     A.  What we didn't understand? I'm,    16:23:47
13 I'm not quite sure how to answer that    16:23:57
14 question. If we didn't understand it, I mean,    16:24:00
15 we maybe didn't know that we didn't understand    16:24:08
16 it.                    16:24:10
17         I'm not very clear on the    16:24:11
18 question. I'm sure there's a lot of things we    16:24:12
19 didn't understand.                    16:24:14
20     Q.  Right, but now you have the    16:24:15
21 benefit of hindsight, correct?    16:24:17
22     A.  Right.                    16:24:19
23     Q.  The DVOG entities filed for    16:24:19
24 bankruptcy in July of 1998, correct?    16:24:21
25     A.  Yes.                    16:24:24

Page 222

KARLEEN CARLSON STRAYER                16:24:24
1
2      Q.  And I assume some sort of review    16:24:26
3  was conducted by MBIA as a result of that    16:24:26
4  bankruptcy filing as to what had gone on with    16:24:29
5  respect to the monitoring efforts?    16:24:33
6      MR. WITTEN:  Objection    16:24:35
7      A.  I don't know that we did a    16:24:37
8  specific review. I mean, we certainly had    16:24:38
9  various constituents we had to report to in    16:24:50
10 terms of how we were handling the situation,    16:24:50
11 so we would have been doing reports to senior    16:24:50
12 management, to investors. It was a    16:24:50
13 high-profile case and we had a lot of    16:24:54
14 reporting we needed to do. So, yes, that is    16:24:56
15 something that, that we would have done.    16:24:58
16     Q.  I'm not trying to trick you, I'm    16:25:02
17 just saying I assume something of this    16:25:04
18 magnitude there would have been sort of a    16:25:07
19 lessons-learned review.                    16:25:07
20     A.  Oh, sure.                    16:25:10
21     Q.  Right, okay. And with the benefit    16:25:11
22 -- let me just ask you just to lay a    16:25:13
23 foundation: Did you participate in any way of    16:25:15
24 that review as manager of the Healthcare Group    16:25:18
25 in the Surveillance Department?    16:25:20

Page 223

KARLEEN CARLSON STRAYER                16:25:20
1
2      A.  Well, I wouldn't --    16:25:24
3  lessons-learned is sort of a theme that our    16:25:27
4  Surveillance Group had, so it would not have    16:25:32
5  been one specific thing that we did; it would    16:25:35
6  have been a broader-type of response.    16:25:38
7         So we would have had, we would    16:25:44
8  have tried to communicate to other people in    16:25:46
9  surveillance what we learned in doing the    16:25:48
10 AHERF remediation, that is true.    16:25:51
11     Q.  Right, right. And to communicate    16:25:53
12 what you learned because of the AHERF    16:25:56
13 remediation, you would have had to at some    16:25:58
14 point, after the bankruptcy, looked back and    16:26:01
15 conducted some sort of review of what happened    16:26:03
16 with respect to the remediation efforts?    16:26:07
17     A.  Yes.                    16:26:09
18     Q.  And I am simply asking, based    16:26:11
19 on that review you say you conducted, what you    16:26:15
20 learned during the course of the remediation    16:26:18
21 work that you did that you didn't know in    16:26:24
22 March of 1997?                    16:26:28
23     A.  Okay. I think -- probably the    16:26:33
24 major thing I would -- that in retrospect we    16:26:36
25 learned was that during this time period there    16:26:41

Page 224

KARLEEN CARLSON STRAYER                16:26:41
1
2  was a lot of merger activity going on in the    16:26:45
3  healthcare industry, in general, it was a very    16:26:49
4  common thing for entities to merge in response    16:26:50
5  to for-profit competition.                    16:26:53
6         And so, AHERF was an example of an    16:26:57
7  entity that looked to us like a combination    16:27:00
8  that would eventually become one, one group,    16:27:07
9  over time, as the East and the West came    16:27:11
10 together, and in fact there were    16:27:15
11 representations made that that was the plan    16:27:17
12 that management had at one time.    16:27:22
13         And we, we took some comfort from    16:27:25
14 the assurances that management made to us that    16:27:29
15 those were the plans.                    16:27:32
16         In retrospect, because of the    16:27:36
17 seriousness of the financial problems, those    16:27:38
18 plans never materialized, and so, something    16:27:41
19 that we had been, at least for some period of    16:27:43
20 time, counting on never transpired; so, that,    16:27:46
21 to some extent, was a lesson learned.    16:27:53
22         There are many other lessons we    16:27:56
23 learned and, as time goes on, those -- our    16:27:58
24 perspective on those issues evolve so I can't    16:28:02
25 -- you know, it depends on what year you ask    16:28:06

56 (Pages 221 to 224)

| | Page 257 |
|---|---|

KARLEEN CARLSON STRAYER    17:13:29

1
2    A.    Yes.    17:13:32
3    Q.    All of those scenarios have    17:13:35
4    financial impacts for MBIA, because MBIA had    17:13:38
5    provided bond insurance for the DVOG bonds and    17:13:42
6    for bonds issued on behalf of AGH, correct?    17:13:45
7    A.    Well, it would have a financial    17:13:49
8    impact for the entity that has the cash    17:13:50
9    flowing in and out. It wouldn't necessarily    17:13:55
10   have impact on MBIA unless, of course, we had    17:13:57
11   a bankruptcy or inability to make debt    17:14:00
12   service.    17:14:03
13   Q.    Or a bond covenant?    17:14:04
14   A.    Or a bond covenant default, yes.    17:14:06
15   Q.    At this point in time, the DVOG    17:14:09
16   was experiencing financial difficulties?    17:14:11
17   A.    Yes.    17:14:14
18   Q.    As reflected by the Alert Report    17:14:15
19   that we just saw?    17:14:18
20   A.    Yes.    17:14:21
21   Q.    What, if any, steps did you take    17:14:24
22   to get to the bottom of what's being described    17:14:26
23   here?    17:14:29
24   A.    We were, during this time period,    17:14:31
25   having very frequent conversations with Dave    17:14:33

| | Page 258 |
|---|---|

KARLEEN CARLSON STRAYER    17:14:33

1
2    McConnell and Mike Martin and, I believe,    17:14:36
3    other people at DVOG, primarily David,    17:14:40
4    Mr. McConnell and Mr. Martin.    17:14:46
5         We were asking for reports and,    17:14:51
6    again, I cannot specify the exact time frame    17:14:53
7    we were doing these things but we were having    17:14:57
8    more frequent meetings with them.    17:14:58
9         This was a very -- this was    17:15:09
10   becoming a very active remediation at this    17:15:09
11   point in time; there was a lot of activity    17:15:09
12   going on with this and a lot of many, many    17:15:09
13   conversations occurring.    17:15:11
14   Q.    These statements that are    17:15:13
15   contained in this passage, the last paragraph    17:15:14
16   on the first page of Exhibit 2194, have    17:15:17
17   serious ramifications for MBIA, correct?    17:15:21
18        MR. WITTEN: Objection.    17:15:25
19   A.    Could you clarify your question?    17:15:31
20   Q.    Okay. This transferring around of    17:15:33
21   funds from one obligated group to another    17:15:41
22   that's described here could have serious    17:15:43
23   ramifications for MBIA, given that MBIA,    17:15:46
24   again, had insured DVOG and AGH bonds?    17:15:50
25   A.    Well, you know, just given what    17:15:55

| | Page 259 |
|---|---|

KARLEEN CARLSON STRAYER    17:15:55

1
2    Dick and Chip are describing here, it's clear    17:15:58
3    they see this as sort of a double-edge sword    17:16:01
4    in that we did view at that time AGH as a    17:16:06
5    strong entity; and, so, the fact that they    17:16:09
6    were moving cash out of the West to support    17:16:12
7    the East, while we did not like the fact that    17:16:15
8    they were not -- they were sort of    17:16:18
9    disregarding the integrity of the obligated    17:16:19
10   group, if the cash transfers were going that    17:16:23
11   way, it did benefit us. So there was, there    17:16:24
12   was a positive to what they were doing.    17:16:29
13        Now, the risk, as you mentioned    17:16:31
14   earlier, is that the cash could go back out    17:16:33
15   and, in fact, that did eventually happen.    17:16:35
16   But, at this point in time, it appears that    17:16:37
17   they are supporting the East with the West and    17:16:41
18   that, that did give us a little bit of    17:16:44
19   comfort, I think.    17:16:46
20   Q.    Right. But additional money was    17:16:48
21   being taken out of DVOG to fund the physician    17:16:49
22   practice acquisition strategy that was being    17:16:52
23   pursued by AHERF at this point in time?    17:16:54
24        MS. HACKETT: Objection, asked and    17:16:56
25   answered.    17:16:57

| | Page 260 |
|---|---|

KARLEEN CARLSON STRAYER    17:16:57

1
2         You can answer.    17:16:59
3    A.    It's true, but those were -- I'm    17:17:02
4    sure that DVOG people would have called those    17:17:05
5    "investments," in that they -- you know, it    17:17:08
6    wasn't just cash being transferred out for no    17:17:11
7    reason, it was cash they were transferring    17:17:14
8    out, assuming that they would increase their    17:17:17
9    volume by doing so. So, you know, the    17:17:19
10   strategy ended up not being effective but that    17:17:22
11   was their plan and had their plan worked we    17:17:25
12   might not have been that troubled by those    17:17:28
13   transfers.    17:17:30
14   Q.    My understanding is that as    17:17:34
15   manager of the Healthcare Group in the    17:17:37
16   Surveillance Department, when you were    17:17:41
17   confronted with the remediation, you first    17:17:41
18   started your responsibility to have    17:17:47
19   discussions with the CFO, correct?    17:17:48
20   A.    We frequently did.    17:17:52
21   Q.    I'm talking about yourself,    17:17:53
22   though, as manager?    17:17:56
23   A.    As manager?    17:17:57
24   Q.    Yes.    17:17:58
25   A.    It would depend on the extent of    17:17:58

Page 261

KARLEEN CARLSON STRAYER          17:17:58

1  the people and the majority of the analyst   17:18:01
2  that was assigned to that particular credit.   17:18:03
3      Q.   Let me ask you this more          17:18:05
4  generally:  To the extent you received answers  17:18:06
5  from the CFO that you weren't happy with, was   17:18:08
6  it your practice, as manager of the Healthcare   17:18:11
7  Group in the Surveillance Department, to then   17:18:14
8  take the matter up with the entity's CEO?   17:18:15
9      A.   Yes; although, I would -- it      17:18:22
10 wasn't necessarily that we weren't happy with   17:18:25
11 the answers.  We, you know, as -- as we became   17:18:27
12 aware of more financial difficulty, it would   17:18:35
13 be neutral for us to sort of increase the      17:18:38
14 seniority of the individuals we were talking   17:18:40
15 with; so a next step would have been the CEO   17:18:42
16 after the CFO.                  17:18:46
17     Q.   Okay.  After you received this    17:18:47
18 Call Memorandum, Exhibit 2194, did you attempt  17:18:50
19 to contact Sherif Abdelhak, the CEO of AHERF?   17:18:54
20     A.   I believe that after this point we  17:19:01
21 did try to organize a meeting with him and   17:19:04
22 some others, and I cannot be specific on the   17:19:09
23 time frame, I'm not sure, but we did have a   17:19:12
24 meeting planned.                17:19:15

Page 262

KARLEEN CARLSON STRAYER          17:19:15

1      We flew out to -- first we met in   17:19:16
2  Philadelphia with some people and then we flew   17:19:20
3  out in Pittsburgh, and I believe it was in   17:19:23
4  Pittsburgh we were supposed to meet with      17:19:25
5  Sherif Abdelhak, and when we arrived we were   17:19:29
6  told that he had an emergency and could not   17:19:32
7  meet with us; so it was actually at a later   17:19:32
8  meeting that we ended up meeting him.      17:19:35
9      Q.   When was that first meeting      17:19:38
10 scheduled for, if you know?      17:19:41
11     A.   I don't recall exactly.  There's   17:19:42
12 probably a memo about it somewhere.      17:19:43
13     Q.   Do you recall the year?      17:19:46
14     A.   The first meeting?          17:19:47
15     Q.   No.  Just to be specific -- the   17:19:48
16 first meeting in terms of the one where you   17:19:51
17 flew out and Mr. Abdelhak said that he wasn't   17:19:53
18 available and you weren't able to meet with   17:19:57
19 him, was that '97 or '98?      17:19:59
20     A.   I think '97.          17:20:02
21     Q.   But you're not certain?      17:20:10
22     A.   I'm not certain.          17:20:11
23     Q.   Do you recall how much time      17:20:13
24 elapsed between your first attempt to meet   17:20:14

Page 263

KARLEEN CARLSON STRAYER          17:20:14

1  with Mr. Abdelhak and the second time?      17:20:16
2      A.   I'm not sure how much time there   17:20:21
3  was.  But I should point out during this time   17:20:23
4  we're having a lot of conversations with David  17:20:28
5  McConnell and Mike Martin, and they are      17:20:38
6  providing us with lots and lots of          17:20:38
7  information, we're getting a lot of          17:20:38
8  information from them.          17:20:40
9      Q.   Right.              17:20:41
10     A.   So I think our purpose in meeting   17:20:42
11 with Sherif was more to make a point than to   17:20:45
12 ask questions.  We weren't trying to get      17:20:49
13 necessarily more information from him; we were  17:20:52
14 trying to convey a message to him.      17:20:54
15     Q.   In terms of lots and lots of      17:20:56
16 information, I take it you mean lots and lots   17:20:58
17 of unaudited financial information?      17:21:01
18     A.   And a lot of phone calls.  So we   17:21:05
19 would, we were doing a lot of phone calls with  17:21:07
20 the financial folks at AHERF to understand the  17:21:09
21 numbers that we had and what was going on.   17:21:13
22     Q.   So possibly some projections?   17:21:15
23     A.   Possibly.              17:21:19
24     Q.   But no additional audited      17:21:21

Page 264

KARLEEN CARLSON STRAYER          17:21:21

1  financial information, because again, the DVOG  17:21:23
2  was on a June 30 fiscal year?      17:21:29
3      A.   Well, we eventually got the 1997   17:21:32
4  financials, audited financial statements, but,  17:21:38
5  yes, we only got the audits as they came due.   17:21:41
6      Q.   So in this time frame, April 1997,  17:21:43
7  the lots and lots of information you're      17:21:46
8  receiving is unaudited financial information,   17:21:49
9  amongst other information?      17:21:51
10     A.   Yes.              17:21:54
11     Q.   Earlier you testified that with   17:21:56
12 respect to Sacred Heart Hospital you      17:21:58
13 personally met on at least three occasions   17:21:59
14 with the Sacred Heart Hospital Executive   17:22:02
15 Committee, correct?          17:22:06
16     A.   Yes.              17:22:07
17     Q.   And the Executive Committee was   17:22:08
18 comprised of trustees for Sacred Heart      17:22:09
19 Hospital?              17:22:13
20     A.   Yes.              17:22:14
21     Q.   On receiving this memorandum, did  17:22:15
22 you make any attempt to meet with the AHERF   17:22:17
23 board to discuss this surreptitious moving of   17:22:21
24 funds as described here?          17:22:25

Page 265

```
                KARLEEN CARLSON STRAYER        17:22:25
1
2      A.  I don't believe so.        17:22:27
3      Q.  Why not?              17:22:27
4      A.  Because, for several reasons:    17:22:32
5   There -- I believe we had the view that the    17:22:36
6   problem was still controllable because some of  17:22:39
7   the, some of the things, for example, in the    17:22:44
8   prior memo, referred to the fact that the    17:22:46
9   physician -- the payments to the physicians    17:22:49
10  were yielding increased volume, we saw that as  17:22:51
11  a good sign.              17:22:55
12      I believe in this memo it says    17:22:56
13  that the physician acquisition strategy had    17:22:57
14  stopped. And so, we felt that some of the    17:23:01
15  things -- some of the negative financial    17:23:05
16  affects of their reorganization and physician  17:23:08
17  acquisition strategy were at an end and there  17:23:12
18  would, perhaps, be some stability in the    17:23:17
19  system                17:23:20
20      We were, in some sense, viewing    17:23:21
21  these cash transfers as a mitigant to us on    17:23:24
22  the DVOG side; so we wouldn't, we wouldn't at  17:23:27
23  this point have gone to the board to complain  17:23:31
24  about this because at this point the movement  17:23:34
25  of the funds was actually helping us; so we    17:23:36
```

Page 266

```
                KARLEEN CARLSON STRAYER        17:23:36
1
2   wouldn't go to the board to try to stop that    17:23:41
3   from happening.            17:23:42
4      Q.  Was there any guarantee at this    17:23:43
5   point in time that the movement of funds    17:23:45
6   described in Exhibit 2194 was going to    17:23:47
7   continue to help the DVOG?        17:23:50
8      A.  Well, there was no guarantee    17:24:00
9   There was a representation that, by the CFO    17:24:02
10  here, that he moved around funds as necessary,  17:24:06
11  but there were certainly no guarantee that he  17:24:09
12  was going to do that.        17:24:13
13      Q.  Did you attempt to get such a    17:24:14
14  guarantee from Mr. McConnell or anyone else at  17:24:16
15  AHERF?                17:24:21
16      A.  I don't know that, other than an    17:24:25
17  amendment to the bond documents, whether any  17:24:29
18  sort of guarantee would have been, would have  17:24:33
19  been something we could count on        17:24:41
20      I mean, we would have needed a    17:24:43
21  contractual obligation from them, so we would  17:24:45
22  have had to have them amend the bond documents  17:24:47
23  in some fashion, I assume, and no, that wasn't  17:24:50
24  anything we asked for specifically.    17:24:54
25      Q.  Did you or did anyone on your    17:24:57
```

Page 267

```
                KARLEEN CARLSON STRAYER        17:24:57
1
2   staff undertake any investigation to determine 17:25:01
3   whether the bond documents could be amended in 17:25:02
4   the way you're describing?        17:25:05
5      A.  No, we didn't        17:25:08
6      Q.  Why not?            17:25:09
7      A.  Because I think -- a lot depends    17:25:13
8   on what time period you're talking about    17:25:16
9      Q.  I'm talking about in the time    17:25:18
10  frame of this memorandum, April 30th, 1997.    17:25:19
11      A.  April. Well, I think it's    17:25:25
12  important to remember that our view at this    17:25:29
13  time, while we were very concerned with the    17:25:30
14  cash position, we -- our understanding was    17:25:33
15  that DVOG, DVOG in and of itself, entities    17:25:35
16  operating within that system, were profitable. 17:25:44
17  And that the problem was, the severity of the  17:25:46
18  problem was really caused by the physician    17:25:49
19  practice plan. And we viewed that as something 17:25:52
20  that could be controlled, to some extent    17:25:54
21      So it was -- you know, we did not  17:26:00
22  view this as the operating entities within    17:26:01
23  DVOG were bleeding and needed the West    17:26:03
24  support; we viewed this as a specific problem  17:26:06
25  caused by the physician acquisitions    17:26:09
```

Page 268

```
                KARLEEN CARLSON STRAYER        17:26:09
1
2      Q.  And again, you personally believed 17:26:12
3   that this was a controllable problem?    17:26:14
4      A.  We felt, at least as, you know, in 17:26:17
5   April 1997, that this was a situation that    17:26:22
6   AHERF management team could correct, yes.    17:26:27
7      Q.  I'm specifically asking you    17:26:32
8   whether you personally thought that MBIA could 17:26:33
9   "control" this problem?        17:26:39
10      A.  MBIA could control this moment.    17:26:41
11      Q.  Yes, you several times used the    17:26:51
12  phrase "controllable problem."    17:26:51
13      A.  No, MBIA had no control rights    17:26:51
14  whatsoever. We had no breach of a covenant.    17:26:51
15  We had -- you know, we never have the ability  17:26:53
16  to control management        17:26:54
17      Our rights and remedies always    17:26:55
18  come through the bond documents, through the  17:26:57
19  covenants and nothing had been breached.    17:26:59
20      Q.  So this --            17:27:01
21      A.  We had no rights.        17:27:02
22      Q.  So the surreptitious moving of    17:27:03
23  funds described here was a controllable    17:27:08
24  problem, "controllable" meaning on the part of 17:27:10
25  AHERF, AHERF could control this?    17:27:13
```

67 (Pages 265 to 268)

TAB 263

# In The Matter Of:

## *AHERF v.*
## *PRICEWATERHOUSECOOPERS, LLP*

---

## *RICHARD HEBERTON*
### *January 15, 2004*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

### HEBERTON, RICHARD



LEGALINK

A WORDWAVE COMPANY

RICHARD HEBERTON

Page 113

1
2    already made transfers equal to 32 million in the
3    first six months ending 12/31/96. " Do you see
4    that?
5        A.    Yes.
6        Q.    Basically you're analyzing the
7    transfers to be roughly 56 million --
8        A.    Correct.
9        Q.    Did you contact Mr. McConnell with
10    that discrepancy?
11        A.    I don't remember.
12        Q.    Were you concerned about that
13    discrepancy?
14        A.    Yes.
15        Q.    Did you act on that concern in any
16    way after this meeting, if you recall?
17        A.    Did I act on it.  No.  Not that I can
18    recall.  I'm not really sure if I know what you
19    mean by acting on it.
20        Q.    I'm just wondering if you acted on
21    that concern in any way.  In other words, do you
22    recall raising it with someone at AHERF or --
23        A.    Oh, at AHERF?  I don't know.  I
24    certainly was raising it internally at MBIA
25    through this document.

Page 114

1
2        Q.    Do you recall any feedback from
3    Ms. Strayer or Mr. Mathis with respect to this
4    issue?
5        A.    No.
6        Q.    You and Mr. Reilly have written that
7    Mr. McConnell represented to you that the
8    physician acquisition program is now completed.
9    Do you see that?  It's the second line from the
10    bottom there.
11        A.    Yes.
12        Q.    If you'd turn with me to page 029902,
13    the last page of the document, do you see the
14    subheading "cap ex"?
15        A.    Yes.
16        Q.    Here you have written, "There are no
17    major acquisitions planned at this time.  They do
18    not want any more beds or buildings at this
19    time.  However, they continue to buy -- they
20    continue to look to buy practices." Do you see
21    that?
22        A.    Um-hum.
23        Q.    That last statement contradicts the
24    passage that we just read on the first page of
25    Exhibit 2194, correct?

Page 115

1
2        A.    Yes.
3        Q.    So I take it Exhibit 2194 reflects
4    the confusion that you spoke about earlier that
5    you had at this time in terms of whether AHERF
6    had in fact completed its physician practice
7    acquisition strategy or was continuing to buy
8    physician practices.
9            MR. WITTEN:  Objection to form.
10            MS. SPRINGER:  Objection.
11        A.    I don't know if that's what that's
12    saying.  That might just be a -- it could be
13    that's a typo.  I'm not sure what -- I don't
14    recall trying to imply something through those
15    two statements.
16        Q.    What could be a typo?
17        A.    Well, one says it's completed and one
18    says it's continuing to buy practices.  So I
19    don't remember why that's two different
20    statements.  My memory is that they were not
21    completed and that we were expecting additional
22    expenditures.  Maybe winding down, maybe that
23    would have been a better way of saying it.
24    That's obviously not what was said.
25        Q.    Do you recall more generally, though,

Page 116

1
2    being uncertain in this time frame as to where
3    exactly the physician practice acquisition
4    strategy stood?
5        A.    Yes.
6        Q.    Even if AHERF's physician practice
7    acquisitions were to stop this very day,
8    April 24th, 1997, did you understand at the time
9    that AHERF could call upon the DVOG at any time
10    to support the ongoing operations of practices it
11    already acquired?
12        A.    I don't recall if there was some sort
13    of legal requirement or not that the DVOG would
14    have to support the physician practices.  My
15    recollection is that the expense of supporting
16    the physician practices would drain money from
17    the DVOG.  But I can't remember whether it was a
18    legal requirement or not.
19        Q.    Perhaps the question was a little
20    unclear.  I wasn't trying to allude to any sort
21    of legal requirement.  I was simply asking you
22    whether you understood that AHERF, the parent
23    corporation, had the ability to use DVOG funds to
24    support practices that had already been acquired
25    by AHERF.

29 (Pages 113 to 116)

RICHARD HEBERTON

Page 117

1
2      A.   I think that was true.
3      Q.   Do you recall discussing that issue,
4  ongoing support for previously acquired
5  practices, with Mr. McConnell?
6      A.   Yes, I think so.
7      Q.   And did he indicate to you that the
8  DVOG would continue to support the previously
9  acquired physician practices?
10     A.   I can't remember exactly what he
11  said.
12     Q.   Did you ask him for any sort of
13  commitment that AHERF not take funds from DVOG to
14  support previously acquired physician practices
15  or limit the amount of money it would take from
16  the DVOG to support previously acquired physician
17  practices?
18     A.   I don't recall.
19     Q.   At this meeting Mr. McConnell
20  represented to those in attendance that AHERF
21  managed cash on a system-wide basis rather than
22  by hospital or obligated group as reflected here
23  on the first page at the bottom.
24     A.   Um-hum.
25     Q.   Then you and Mr. Reilly have written,

Page 118

1
2  "The CFO has described how he moved the funds
3  around the system as necessary.  He plans to
4  utilize the system's resources to support those
5  areas most in need.  He even indicated a
6  willingness to play with overhead charges to move
7  funds surreptitiously. While it is encouraging to
8  hear that the large resources available elsewhere
9  in the system may be available to ADVOG, the
10  CFO's disregard for the integrity of the
11  individual obligated group's financial statements
12  was disconcerting."
13     A.   Um-hum.
14     Q.   I take it you were very concerned
15  when you heard these statements from
16  Mr. McConnell.
17     A.   I think it led us to have some
18  concerns over the integrity of management.
19     Q.   Did you seek to have a meeting with
20  the CEO of AHERF, Sherif Abdelhak, in light of
21  Mr. McConnell's comments and your concern about
22  his integrity?
23     A.   I think I do remember us trying to
24  get meetings with the CEO just for all the issues
25  that we were concerned about.  I don't believe we

Page 119

1
2  ever did have a meeting with him, at least not
3  when I was working on the credit.
4      Q.   But is it your recollection that
5  these comments served as the impetus for a
6  request from MBIA that MBIA have a meeting with
7  Sherif Abdelhak?
8      A.   I don't remember.
9      Q.   Did you try to meet with the AHERF
10  board of trustees in light of your concern about
11  Mr. McConnell's integrity?
12     A.   No, I don't think we did at that
13  time.
14     Q.   Why not?
15     A.   I don't know if our concern had been
16  raised to that level yet.  Meeting with the board
17  was something that we did typically more with the
18  credits once they were on the 7 or 8 levels.
19  This one we were still trying to learn more about
20  as opposed to having made a decision that a loss
21  was potentially likely.
22     Q.   That's a little formalistic though,
23  right?
24     A.   What do you mean?
25     Q.   Well, adhering to a numeric rating.

Page 120

1
2      A.   No, the numeric rating implies the
3  immediacy of our concern.
4      Q.   Earlier you discussed conversations
5  you had with Ms. Strayer about downgrading the
6  DVOG to 7-B and not 6-B, correct?
7      A.   Um-hum.
8      Q.   So in light of these statements did
9  you believe that it would be prudent to downgrade
10  the DVOG to 7-B?
11     A.   I think we were still at this point
12  trying to learn more, trying to understand the
13  situation better.  Even though we were seeing
14  numerically some problems with the system we knew
15  all hospitals were having difficulties at that
16  time.  And we certainly still saw certain good
17  things about DVOG in terms of its size and
18  importance to the Philadelphia and Pennsylvania
19  markets.  And as we noted before, the fact that
20  they had a healthy parent, that weighed into how
21  we were approaching the remediation efforts at
22  that time.
23     Q.   Given your concerns about
24  Mr. McConnell's integrity, I take it you were
25  concerned that the F/Y '96 audited financial

30 (Pages 117 to 120)

RICHARD HEBERTON

Page 121

1
2  statements for the DVOG might not be accurate.
3      A.   I don't think I took it that far.
4  Maybe I should have.  But there's degrees -- I
5  mean, I don't think I left the meeting going I
6  can't trust this person at all, maybe this is
7  something to watch for as we continue to have
8  discussions.
9      Q.   Fair to say it was a red flag?
10     A.   That's a good way to put it.
11     Q.   Did you seek to meet with AHERF's
12 external auditors to, to use your phrase, learn
13 more and understand the situation better, given
14 the concerns you had about Mr. McConnell's
15 integrity?
16     A.   That sounds familiar.  I don't
17 specifically remember meeting with the auditors.
18 Maybe we had a conversation on the phone.  That
19 sounds familiar, but I don't remember
20 specifically.
21     Q.   But do you remember making that
22 request of AHERF, you personally?
23     A.   My recollection is quite -- is really
24 vague on that.  That sounds right.  I can't quite
25 picture a document or a call that included that,

Page 122

1
2  but I think that was what happened.  But I'm kind
3  of guessing.
4      Q.   You just don't know one way or the
5  other.
6      A.   Yes, I just don't remember.  It was a
7  long time ago.
8      Q.   Do you recall in this time frame who
9  AHERF's external auditors were?
10     A.   No.
11     Q.   A few moments ago you stated that
12 maybe you should have been more concerned about
13 Mr. McConnell's statements than you were.
14          MR. WITTEN:  Objection.
15     Q.   Why did you say that?
16          MR. WITTEN:  Excuse me, objection.
17     A.   Simply because the hospital system
18 eventually went bankrupt.
19     Q.   Is that something you wish you had
20 done, had been more concerned?
21     A.   I certainly wish we were more
22 concerned at an earlier stage.  It may have led
23 to a better outcome.
24     Q.   Do you recall whether Mr. McConnell
25 represented to you and others in attendance at

Page 123

1
2  this meeting that AHERF, the system, would
3  continue to support the DVOG with cash transfers
4  from other AHERF affiliates?
5      A.   Could you say that again?
6      Q.   Sure.
7      A.   Okay, say it again.
8      Q.   I take it the purpose of this
9  meeting, as you stated earlier, was to address
10 concerns you had about cash flow at the DVOG and
11 the transfers out of DVOG.
12     A.   Yes.
13     Q.   In connection with addressing those
14 concerns, did Mr. McConnell represent to those in
15 attendance that AHERF's other affiliates would
16 continue to support the DVOG and therefore there
17 was no real need to be concerned about short term
18 transfers out of the DVOG?
19     A.   I think it was more that there was
20 the potential for that to occur if it was
21 needed.  I don't think it was necessarily as
22 strong as like there was an assurance that that
23 would happen.  But that remained a possibility.
24     Q.   Represented more as a safety net?
25     A.   Yes.  Right, that they would not

Page 124

1
2  strictly follow the fact that the obligated group
3  was on its own and no help would come from the
4  rest of the system.  So some level of support may
5  be available but there wasn't a requirement for
6  it, nor was there a restriction against it.
7      Q.   Did you or did anyone at MBIA to the
8  best of your knowledge follow up with
9  Mr. McConnell to try to make that representation
10 more concrete in any way?
11     A.   I don't recall.
12     Q.   Do you recall anyone at MBIA
13 requesting that AHERF put that commitment in
14 writing?
15     A.   No, I don't remember that.
16          MR. KRUSKO:  Let's go off the
17 record.
18          THE VIDEOGRAPHER:  Going off the
19 record.  The time is 12:18 p.m.
20          (Luncheon Recess: 12:18 p.m.)
21
22
23
24
25

TAB 264

# In The Matter Of:

### *AHERF v.*
### *PRICEWATERHOUSECOOPERS, LLP*

---

### *CHARLES E. REILLY*
### *November 21, 2003*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

**REILLY, CHARLES E.**



LEGALINK
A WORDWAVE COMPANY

CHARLES E. REILLY

Page 77

1
2    Q.   Do you recall being concerned as a
3 result of this meeting that AHERF could be using
4 funds that would otherwise be used to support
5 AGH?
6    A.   Yes.
7    Q.   And why were you concerned about
8 that?
9    A.   Because we were concerned that they
10 were using the funds as if it was an easy
11 resource to take from one part of the system and
12 allocate to another and buy them time. And if
13 their strategy proved to be wrong, or to cause
14 losses, there would be less financial strength
15 from where the assets were transferred from.
16    We looked at DVOG, we looked at AGH
17 and we looked at AHERF and we watched the
18 transfers. And we were concerned about each
19 entity and we were concerned about the total
20 entity, and we were concerned about all the
21 transfers.
22    Q.   Did Mr. McConnell at this meeting
23 make any representations that asset transfers
24 generally could also benefit DVOG in that money
25 could be transferred into DVOG from other AHERF

Page 78

1
2 affiliates?
3    A.   Yes.
4    Q.   And did you take that as a positive?
5    A.   Yes. But there was no commitment.
6 So it's not something you can bank on.
7    Q.   Did you relay Mr. McConnell's
8 statements to Ms. Strayer?
9    A.   In the memo, yes.
10    Q.   Did Ms. Strayer contact you about
11 this memo?
12    A.   She was right next to me. Her office
13 is right next to me. So we discussed it.
14    Q.   And what did Ms. Strayer say to you
15 about this memorandum and the meeting more
16 generally?
17    A.   She acknowledged the memo, the
18 meeting and shared our concerns.
19    Q.   At this point in time did you believe
20 the general transferring of money across the
21 AHERF affiliates was going to benefit the DVOG in
22 the long-run, harm the DVOG in the long-run or
23 had you not formed an opinion one way or the
24 other?
25    MR. BROWN: Objection.

Page 79

1
2    A.   We had not formed an opinion. The
3 magnitude concerned us.
4    Q.   You and Mr. Heberton I believe have
5 used the word "surreptitiously." Why did you
6 choose that word? I don't want to turn this into
7 sort of a grammar test. I'm just trying to get a
8 sense as to what you were trying to convey to the
9 reader by discussing surreptitious transfers.
10    A.   We did not have a lot of comfort that
11 David was extremely disciplined about managing
12 each respective obligated group so that it would
13 support itself. Because that's the way these
14 things are built. They're supposed to support
15 themselves.
16    And by moving money around from one
17 obligated group to another is -- in one way there
18 might be business to conduct, but in one way you
19 could be damaging another entity. And we thought
20 that the way he characterized it was a little too
21 casual.
22    Q.   In light of your concerns about
23 Mr. McConnell, did you attempt to raise this
24 issue with Mr. Abdelhak, the CEO of AHERF?
25    A.   We did.

Page 80

1
2    Q.   And when did you do that, if you
3 recall?
4    A.   When we met with him.
5    Q.   Do you recall when you met with him?
6    A.   Not specifically. But it was after
7 this meeting. It was the same day we met with
8 the board members I believe.
9    Q.   Let me show you what we've previously
10 marked as Exhibit 1667.
11    A.   Okay.
12    Q.   Just for the record I would note that
13 this document, Exhibit 1667, is entitled "site
14 visit memo, May 4, 1998" to David Stevens and Pat
15 Mathis from you, Mr. Reilly, and Ms. Strayer, is
16 that correct?
17    A.   Right.
18    Q.   And in this memo, among other things
19 you and Ms. Strayer attempt to summarize the
20 meeting that you and others had with
21 Mr. Abdelhak, is that correct?
22    A.   Yes.
23    Q.   And this meeting occurred on May 4,
24 1998, is that correct?
25    MR. WITTEN: Objection.

CHARLES E. REILLY

Page 81

1
2         MR. BROWN:  Objection.
3    Q.    Withdrawn, I apologize.
4         This meeting occurred on the 29th of
5    May 1998, correct?
6    A.    Right.
7         MR. BROWN:  Objection.
8         MR. WITTEN:  Objection.
9         MR. BROWN:  You have the wrong
10   month.  April.
11        MR. KRUSKO:  I apologize.  I
12   apologize.
13   Q.    So if the record's clear, this document,
14   Exhibit 1667, is entitled "site visit memo, May
15   4, 1998," is that correct?
16   A.    Yes.
17   Q.    And this memo attempts to summarize a
18   meeting that you, Ms. Strayer and others had with
19   Mr. Abdelhak, among others, on April 29th, 1998,
20   is that correct?
21   A.    Yes.
22   Q.    Is this the meeting with Mr. Abdelhak
23   that you are recollecting?
24   A.    Yes.
25   Q.    Your meeting with Mr. McConnell

Page 82

1
2    occurred on April 24th, 1997.  And by that I mean
3    the meeting we were just discussing where
4    Mr. McConnell made some representations about
5    asset transfers, correct?
6    A.    Yes.
7    Q.    So if I understand you correctly,
8    over a year elapsed before you or anyone else at
9    MBIA, to the best of your knowledge, raised asset
10   transfer concerns with Mr. Abdelhak.
11        MR. BROWN:  Objection.  Lack of
12   foundation.
13   A.    I wouldn't say that's necessarily
14   true.
15   Q.    Do you recall personally raising
16   asset transfer concerns with Mr. Abdelhak any
17   time before April 29th, 1998?
18   A.    Not specifically.
19   Q.    Do you recall meeting with
20   Mr. Abdelhak or otherwise communicating with
21   Mr. Abdelhak at any point in time prior to
22   April 29th, 1998?
23   A.    Not specifically.
24   Q.    Do you know whether anyone in MBIA's
25   surveillance department spoke with Mr. Abdelhak

Page 83

1
2    about the asset transfer issues you and
3    Mr. Heberton raised in your memo prior to
4    April 29th, 1998?
5    A.    Not specifically.  No.
6    Q.    Why didn't you try to contact
7    Mr. Abdelhak if you didn't have any comfort about
8    Mr. McConnell's willingness to observe corporate
9    formalities in terms of asset transfers?
10        MR. WITTEN:  Objection.
11        MR. BROWN:  Objection as to lack of
12   foundation.
13   A.    We did try.  We were working with
14   both Mike Martin and Dave McConnell.  We would
15   have phone calls with them and we did request
16   meetings.
17   Q.    And your requests were turned down?
18   A.    Put off, delayed, excuses, meetings
19   scheduled, canceled.
20   Q.    Did you try to raise your concerns
21   with the AHERF board?
22   A.    Yes, at this meeting.
23   Q.    Did you try to raise your concerns
24   with the AHERF board at any time prior to
25   April 29th, 1998?

Page 84

1
2    A.    No.
3    Q.    And why did you not do that?
4    A.    It's appropriate to first meet with
5    the individual running the organization.  And if
6    you're not satisfied with the answers or the
7    meeting, then you would then go to the next level
8    of authority, which would be the board.
9         And because things were delayed, we
10   asked for meetings with the board the same day we
11   were asking for meetings with Sherif.  This would
12   not be typical, but because we were delayed and
13   we didn't have any leverage to require a meeting
14   and we got one as soon as we could, we wanted a
15   separate meeting with the board members.
16        You'll note that our meeting with
17   Barnes and Gumberg didn't include Sherif.  And
18   that's very deliberate.
19   Q.    Were you frustrated, were you
20   personally frustrated during this year lag time
21   between your meeting with Mr. McConnell and your
22   meeting with Mr. Abdelhak?
23   A.    Yes.
24   Q.    Did you act on that frustration in
25   any way?

CHARLES E REILLY

Page 85

1
2      A.    Yes.
3      Q.    How did you act on it?
4      A.    Repeated calls, getting updates,
5  requesting meetings. Getting the attention of
6  the most senior people.
7      Q.    I believe you've testified that you
8  got excuses from Mr. Abdelhak in terms of why he
9  wasn't able to meet with MBIA.
10     A.    Perhaps not from him but maybe from
11 Mike Martin who was really our primary contact
12 who would seek to set up meetings with McConnell
13 and Sherif and the board members.
14     Q.    But that frustration never reached
15 the point of you attempting to contact any member
16 of the AHERF board, the parent board.
17         MR. BROWN:  Objection.
18     A.    That's right.
19     Q.    After the meeting on the 24th of
20 April with Mr. McConnell, did you recommend to
21 Ms. Strayer or to Mr. Mathis that MBIA seek some
22 sort of binding guarantee that asset transfers
23 out of the DVOG would stop at a certain point in
24 time?
25         MR. WITTEN:  Objection.

Page 86

1
2          MR. BROWN:  Objection.
3      A.    No.
4      Q.    And why did you not do that?
5      A.    We didn't have any leverage to do
6  so.
7      Q.    Is it fair to say you thought it was
8  a lost cause?
9          MR. BROWN:  Objection.
10     A.    No.
11     Q.    Did you try -- did MBIA try?
12     A.    No.
13     Q.    And you didn't try simply because you
14 felt that you didn't have any leverage.
15         MR. BROWN:  Objection.
16         MR. WITTEN:  Objection.
17     A.    We didn't have leverage to require a
18 change. When you have -- you're starting to
19 interface with the management team in April of
20 '97, you create a relationship and you form an
21 opinion over time on their results and their
22 actions. It would have been premature to require
23 that then and there. And that's an opinion.
24 Some people may say yes, we should have done that
25 right away, and some people would say that would

Page 87

1
2  be a lost cause. But I think that something in
3  the middle is more appropriate, which is exactly
4  what we did. We did what a typical workout
5  officer would do.
6      Q.    What's your basis for that statement
7  in terms of what a typical workout officer would
8  do?
9      A.    15 years of experience in lending and
10 credit, new business and workouts as well. Spent
11 two years at the Japanese bank doing real estate
12 workouts. It's very good, hard core experience.
13     Q.    At this April 24th meeting did
14 Mr. McConnell make any representations, if you
15 recall, as to whether physician practice
16 acquisitions would continue in the future?
17     A.    I can't say specifically. You're
18 talking about the '97 or are you talking about
19 '98?
20     Q.    Yes, I'm sorry if that wasn't clear.
21 April 24th, 1997 as discussed in Exhibit 1895.
22 And if I could perhaps help you, if I could
23 direct your attention to the very last few lines
24 of the first page 030220, there's a statement
25 here, "Also encouraging was his statement that he

Page 88

1
2  projects that cash transfers will be reduced to
3  $50 million in fiscal 1997 and will continue to
4  decline since the physician acquisition program
5  is now completed." Do you see that?
6      A.    Yes.
7      Q.    It says, "However, this number seems
8  low as ADVOG had already made transfers equal to
9  $32 million through the first six months ending
10 12/31/96." Do you see that statement?
11     A.    Yes.
12     Q.    And if you were to annualize that,
13 that's roughly 64 million in transfers in fiscal
14 year 1997, is that correct?
15     A.    That's right.
16     Q.    And do these sentences reflect your
17 skepticism with respect to Mr. McConnell's
18 representation?
19     A.    Yes.
20     Q.    So here's another example of a
21 statement by Mr. McConnell that failed to give
22 you comfort?
23         MR. WITTEN:  Objection.
24         MR. BROWN:  Objection.
25     A.    I would say yes.

22 (Pages 85 to 88)

TAB 265

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## RICHARD WEILL
*June 15, 2004*

---

# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

WEILL, RICHARD



LEGALINK
A WORDWAVE COMPANY

Page 217

RICHARD WEILL

1
2  know what it is now that I see it date.
3      Q.   Birthday?
4      A.   Wife and husband's anniversary.  I
5  know exactly what I was doing.
6      Q.   We will be sure to send a copy of this
7  to Mrs. Weill who will be pleased to see --
8      A.   Forty year marriage.
9      Q.   Congratulations on taking a day off on
10 your fortieth anniversary.
11     A.   Actually I probably didn't take a day
12 off.  This letter was sent out at the end of the
13 day and I left to take her to the city, but I
14 know I didn't take the day off.  That wasn't my
15 nature.
16     Q.   I take it you directed Mr. Mathis to
17 send this letter to all of the AHERF board
18 because of the gravity of the situation?
19     A.   Actually I suspect that we only sent
20 it to Tony.  If you will look, it was care of in
21 the address above.  We may not have had the
22 addresses of the board members, so I think we
23 sent this to Tony for his circulation to the
24 board.
25     Q.   Okay.  It was your understanding that

Page 218

RICHARD WEILL

1
2  Mr. Sanza who was then president and CEO of
3  AHERF would circulate it to the AHERF board?
4      A.   That was what we were hoping for, yes.
5      Q.   Hoping for or was that your
6  understanding, sir?
7      A.   Understanding.  I would have no way of
8  knowing what he would do.  We hoped that he
9  would -- when you send a letter like this to an
10 officer, you don't know for sure that he will
11 circulate it.  Our hope was that he would
12 circulate it, but we had no other way -- this is
13 the way to contact him.
14     Q.   So why didn't MBIA take whatever steps
15 necessary to contact each AHERF board member
16 with this proposal?
17     A.   I suspect that we wanted to get this
18 letter out quickly.  I suspect that Tony may
19 have told us that he was going to circulate it
20 for us to the board.  All those things were
21 probably in the suspect, but I can't tell you
22 with certainty that it was circulated to the
23 AHERF board.  It wasn't sent to him, it was sent
24 care of.
25     Q.   Do you recall whether prior to this

Page 219

RICHARD WEILL

1
2  point in time July 11, 1998, MBIA had sent any
3  other appeal or correspondence to the AHERF
4  board?
5      A.   It says that we sent one right here on
6  July 7.  You just showed it to me.
7      Q.   The David Cook letter?
8      A.   Right.
9      Q.   Signed by Mr. Stevens?
10     A.   Yes.
11     Q.   Yes.  I apologize.  In addition to
12 that piece of correspondence do you recall --
13     A.   I don't recall any other.
14     Q.   You don't recall you personally
15 sending any correspondence to the AHERF board?
16     A.   I do not recall.
17     Q.   By this point in time had MBIA
18 retained Goldman Sachs to assist it in --
19     A.   It is my recollection that we had.
20     Q.   Third paragraph, the opening sentence,
21 appears the statement:  "Our advisors indicate
22 that the sale of the entire system would very
23 likely yield a purchase price well in excess of
24 all debt."
25          Do you see that statement?

Page 220

RICHARD WEILL

1
2      A.   Yes, I do.
3      Q.   Is that based on advice from the
4  investment banking firm Goldman Sachs?
5      A.   I can't say that with certainty but I
6  sure think that's what it means, yes.
7      Q.   I take it you believed that at the
8  time?
9      A.   Absolutely.
10     Q.   I take it you wanted to send this
11 letter to the board to build pressure on the
12 board to keep AHERF and the DVOG out of
13 bankruptcy?
14     A.   Absolutely.
15     Q.   Did you ever learn that a subcommittee
16 of the AHERF parent board met at some point in
17 time to consider this proposal?
18     A.   I don't -- no, I do not know that.
19     Q.   Do you recall that the AHERF board
20 rejected this proposal?
21     A.   I don't recall that either.
22     Q.   Do you recall that the AHERF board
23 failed to act on this proposal?
24     A.   That's a certainty, yes, I mean that's
25 just a fact.

55 (Pages 217 to 220)

Page 221

RICHARD WEILL

1
2    Q.    Were you disappointed by that?
3    A.    Yes.
4    Q.    I take it you were disappointed by
5    that because you felt that selling the entire
6    system would avoid the need for a bankruptcy
7    filing?
8    A.    You know, that's exactly how I felt on
9    that day, that is exactly correct.
10    Q.    Do you recall at a later point in time
11    making another offer of financial assistance to
12    AHERF?
13    A.    Yes.
14    Q.    Do you recall roughly what was
15    entailed with that offer?
16    A.    I couldn't do it from memory, no, but
17    I do know we made another offer.  Or they asked
18    us -- they asked us for an offer and we must
19    have made a counteroffer is my recollection.  It
20    had to do with liquidity rather than this kind
21    of letter.  It was a different proposal.
22    Q.    So in other words, it was a proposal
23    for financial assistance as opposed to a
24    proposal to sell --
25    A.    My recollection, that's my

Page 222

RICHARD WEILL

1
2    recollection.
3    Q.    If I can show you what we previously
4    marked as Exhibit 1243?
5    A.    July 13.  Okay.
6    Q.    Mr. Weill, does Exhibit 1243 embody
7    the liquidity proposal that you had in mind?  Or
8    does it reflect --
9    A.    You know, it is interesting.  That
10    isn't my -- I am sure that it does, but I don't
11    recall it at thirty -- it must be.  My
12    recollection was that it was a smaller amount.
13    I could be wrong.  Remember, I didn't go back
14    and look at anything so I can't help you
15    exactly, but that's -- you know, this is the
16    letter that was sent.  It says that MBIA is
17    involved in this offer so this must be the offer
18    that we made on July 13.
19    Q.    This joint offer contains no
20    requirement for a pledge of assets held by
21    AHERF's western affiliates, correct?
22    A.    I don't know.  I would have to read it
23    because I don't know the offer.
24    Q.    Okay.
25    A.    So the answer is I don't know.

Page 223

RICHARD WEILL

1
2    Q.    More generally, do you recall whether
3    in this timeframe MBIA was willing to lend the
4    DVOG a small amount of money without requiring a
5    pledge of assets from AHERF's western entities?
6    A.    Yes, it is my recollection that we
7    were willing.  One of the problems that I have
8    not repeated every single time because I am
9    trying to be a gentleman about this whole thing,
10    is that people were working from information
11    that turned out to be totally faulty.
12         Everybody was working from financial
13    statements that turned out not to represent -- I
14    am not calling them fraudulent, but I am calling
15    them inaccurate.  So all the information that
16    everybody is working on at this time, all of
17    this may have been a waste because in fact we
18    didn't have the correct information as to the
19    financial situation of any of these
20    institutions.  We may have been throwing money
21    down a rat hole at this point.
22         So these were honest attempts by us to
23    try to -- to help the situation.  Yes is the
24    answer to your question.
25    Q.    Is it also correct that you don't

Page 224

RICHARD WEILL

1
2    recall reviewing or relying on the audited
3    fiscal year 1997 financial statements for AHERF?
4    A.    They weren't available on July -- for
5    '97?  The '96s come out in June of -- well, of
6    course we would have relied on financial
7    statements.  We looked at this credit and we
8    looked at the financial statements that were
9    delivered to us.
10    Q.    Did you personally to the best of your
11    recollection review the audited FY '97 financial
12    statements --
13    A.    I did not.
14    Q.    -- for AHERF or any of its affiliates?
15    A.    I did not.
16    Q.    And you don't recall, then, relying on
17    those statements for making any decision?
18    A.    Yes.  Implicit in all of the
19    discussions that we had at MBIA was a belief
20    that the information that we were receiving was
21    accurate and correct, that there weren't any
22    misstatements in it.  It is how you make
23    decisions.  You don't go around and say I am
24    assuming the accuracy of these financial
25    statements that are delivered to me.

56 (Pages 221 to 224)

Page 225

RICHARD WEILL

1   RICHARD WEILL
2      What you do is, in the real world, is
3   you take a statement that's delivered to you,
4   you read it and you believe it. Then you say --
5   you prepare a report like Dick Heberton's report
6   that describes what was in the income statement
7   that was delivered to you.
8      Just putting it in perspective, the
9   board didn't have the information either when
10  they rejected these offers.
11  Q.   How do you know that, sir?
12  A.   Because the statements subsequently
13  were restated by the auditors.
14  Q.   So by the information, what do you
15  mean the information?
16  A.   Correct financial information was not
17  available. I am assuming that no auditing firm
18  restates financial statements if they were
19  correct when issued. You only restate financial
20  statements when they are incorrect.
21  Q.   Do you have any basis for concluding
22  that the AHERF board would have done anything
23  different?
24  A.   No basis.
25  Q.   Had --

Page 226

RICHARD WEILL

1   RICHARD WEILL
2   A.   I have no basis for knowing that.
3   However, let's be fair. Having correct
4   information makes decisions more -- correct
5   decisions to be made easier to make. No one
6   tries to make decisions from false information,
7   from fraudulent information.
8      And I haven't done this for every
9   question because I didn't think it was fair to
10  you, but inherent in this is that the financial
11  statements were restated.
12  Q.   Okay. So why are they fraudulent?
13  MR. WITTEN: Let him finish if he is
14  answering a question.
15  A.   I didn't say they were fraudulent, I
16  don't know that.
17  Q.   Just to be clear, you have no basis
18  for saying that the audited fiscal year 1997
19  consolidated statements for AHERF and its
20  affiliates are in any way fraudulent?
21  A.   I didn't say that any of them were
22  fraudulent. I said that a number of them were
23  restated which means that they were incorrect when
24  delivered. I don't know if they were
25  fraudulent. That's a legal issue.

Page 227

RICHARD WEILL

1   RICHARD WEILL
2   MR. WITTEN: Why don't we go off the
3   record.
4   THE VIDEOGRAPHER: Going off the
5   record at 2:08 p.m.
6      (Recess)
7   THE VIDEOGRAPHER: Returning to the
8   record at 2:22 from 2:08.
9      (Exhibit 2626, Document Bates Stamped
10  MBIA 030141 through 030142, marked for
11  identification)
12  BY MR. KRUSKO:
13  Q.   Welcome back. Let me show you what we
14  just marked as Exhibit 2626.
15  A.   Why didn't we date anything in those
16  days?
17     (Pause)
18  A.   Okay.
19  Q.   Do you recognize Exhibit 2626, Mr.
20  Weill?
21  A.   No.
22  Q.   I should back up one second.
23     For the record, Exhibit 2626 is Bates
24  numbered MBIA 030141 through 030142.
25     Is it your belief that Mr. Stevens has

Page 228

RICHARD WEILL

1   RICHARD WEILL
2   prepared this document for you to use in
3   addressing a letter to the MBIA board concerning
4   AHERF and/or the DVOG?
5   A.   I don't know what the purpose of this
6   memorandum was, I'm sorry. I don't remember.
7   Q.   Did Mr. Stevens at any point in time
8   draft information for you to include in a letter
9   that you in turn submitted to the MBIA board?
10  A.   Not within my recollection, I'm sorry.
11  I don't recall sending a letter to the board.
12  But it says if you would -- says board letter
13  paragraphs for DVOG.
14  Q.   Right?
15  A.   But I don't recall it.
16  Q.   Okay.
17  A.   By the way, it may not have been sent,
18  too. I may have asked for information for a
19  letter. I may have even drafted the letter and
20  may have concluded at some point to do it orally
21  or to do it differently. But clearly this was
22  done, at least he thought he was writing a
23  letter for the board.
24  Q.   In your capacity as president, do you
25  recall instances in which you submitted a letter

57 (Pages 225 to 228)

RICHARD WEILL

1    RICHARD WEILL
2    adequate information upon which to oversight the
3    hospital's operations.
4          The information they had was wrong.
5    It was faulty. I am not saying it is fraudulent
6    because I don't know that. But I do know that
7    PricewaterhouseCoopers determined that it was
8    wrong and faulty and issued new statements.
9      Q.   Move to strike.
10         What other leverage did MBIA have
11   other than the threat of acceleration?
12         MR. WITTEN: Objection. We have been
13   through this for hours.
14         MS. SPRINGER: Asked and answered.
15         MR. WITTEN: But go ahead, answer it
16   again.
17     A.   I will answer. We could have gone to
18   the newspapers which we have done in other
19   circumstances. We could have gone to the
20   governor. We could have -- we could have done
21   lots of things that we have done in other
22   situations.
23     Q.   Okay. With respect to going to the
24   newspapers, isn't it the case that your letter
25   was released by MBIA to newspapers to in part

1    RICHARD WEILL
2    apply pressure to the AHERF board?
3      A.   Yes.
4      Q.   So that a bankruptcy filing could be
5    avoided?
6      A.   Absolutely. The problem was -- what
7    was the date of that letter? Let's examine that
8    for a second. It is my recollection that that
9    date is June of 1998. If the information that I
10   am talking about had been available in February
11   of 1997, the situation would have been totally
12   different. You would not have been that close
13   to bankruptcy then.
14         The events that occurred between the
15   misstatements and June of 1998 could have been
16   alleviated, could have been ameliorated by
17   events that could have taken place.
18     Q.   February 1997 is in what was AHERF's
19   fiscal year 1997, correct?
20     A.   I think it is -- aren't those the
21   '96 -- weren't the '97 financials delivered --
22   '96 financials delivered in '97?
23     Q.   I can actually represent to you that
24   they weren't delivered in calendar '97. The
25   audited fiscal year 1996 statements for AHERF

1    RICHARD WEILL
2    were not delivered to MBIA in calendar '97.
3          MR. WITTEN: Well, we have seen a
4    document already that shows that the '96s were
5    delivered in November of 1997.
6          MR. KRUSKO: Correct.
7          MR. WITTEN: To MBIA.
8          MR. KRUSKO: Yes.
9          MR. WITTEN: Okay.
10         MR. KRUSKO: That's all I wanted to
11   establish.
12     Q.   I just wanted to establish that it
13   seems to me you are talking about two different
14   fiscal years. In other words --
15     A.   I am talking about two different
16   fiscal years, you are absolutely correct. You
17   are absolutely correct.
18     Q.   That's important because there are
19   different allegations about each fiscal year?
20     A.   Fine, that's fair.
21     Q.   With respect to going to the
22   government, meaning the mayor of Philadelphia
23   and/or the government of Pennsylvania that's
24   something that MBIA did as well, correct?
25     A.   No, we didn't -- well, we did it but

1    RICHARD WEILL
2    it was way too late. But let me tell you what
3    we did in other circumstances so you can
4    understand what you really can do in the real
5    world.
6          If we had known about this in a timely
7    fashion, in other situations we were able to get
8    statutes passed in Congress that allowed people
9    to get a tax ruling that they needed. We
10   lobbied state senators to change the
11   reimbursement program -- excuse me, yes, United
12   States senators to reimburse -- for
13   reimbursement programs.
14         And I am not saying that any of these
15   things would necessarily have been done in this
16   setting, but they were all cut off. All those
17   alternatives were cut off because the
18   information wasn't available.
19     Q.   The information wasn't available even
20   though the DVOG was an 8B credit as of February
21   1998?
22     A.   It defaulted in June of 1998.
23     Q.   Correct. But if I am understanding
24   your testimony correctly, you are saying in
25   February 1998 when it was an 8B credit, MBIA

73 (Pages 289 to 292)

RICHARD WEILL

1  didn't have enough information to act upon?
2      A.   That's correct.  It didn't even know
3  it had a default, and I am not convinced that we
4  didn't have a default sooner than that.  I don't
5  know that.  I mean, your point is well taken, I
6  don't know what -- I would have to study the
7  financial statements and allegations and the
8  restated financial statements.  But certainly
9  the restated financial statements would have
10 been delivered in a more -- if they had been
11 delivered in a timely fashion correctly -- the
12 '96 financial statements were for the period
13 that ended June 30, 1996, is that correct?
14     Q.   Correct.
15     A.   I just heard that they were delivered
16 in November of 1997.
17          MR. WITTEN:  1996.
18     A.   In November of 1996.  If -- I'm sorry,
19 that's what I thought.  I'm sorry.  The reason
20 February was when we wrote -- we downgraded,
21 that's what I thought.  Thank you.  I knew the
22 facts were wrong.  I knew you stated it wrong.
23          MR. WITTEN:  I meant to say earlier
24 November of '96.

RICHARD WEILL

1          MR. KRUSKO:  I thought he did,
2  actually, but be that as it may.
3          MS. SPRINGER:  I think it was
4  confusing between what you said and --
5      A.   The fact is, if that information had
6  been available to us and was correct in '97,
7  whether it was late '96 or early 1997, and we
8  knew that we had a more difficult problem or
9  even a breach, lots of things could have
10 happened before money was expended.
11     Q.   So, for example, if the DVOG had
12 violated the asset transfer test in fiscal year
13 1996, MBIA would have had certain rights and
14 responsibilities that you are saying it would
15 have pursued to the fullest degree?
16     A.   I am going to sound weak.  Pursued to
17 the fullest degree, we would have pursued.  I
18 don't know what the fullest degree means.  I am
19 not going to pretend that I know what the
20 fullest degree means.  We would have pursued.
21          If the debt coverage test had broken
22 one, we knew about it in '97, we would have had
23 more power, more ability to cause the board to
24 look at costs, to cause Hunter to be inserted,

RICHARD WEILL

1  to do all kinds of things, obviously always with
2  the threat of causing there to be an
3  acceleration.
4          But that's exactly what happens in the
5  real world in these situations, is that you
6  don't go to the -- to use your word, to the
7  absolute extent that you could go to.  You don't
8  do that.  That isn't how this works.  You work
9  with people, but you have to have the right to
10 assert things, and we didn't know we had the
11 right, because the financial statements that
12 were given to us turned out to be, at least
13 according to Coopers & Lybrand, incorrect
14 because they restated them.
15     Q.   Has anyone at MBIA ever communicated
16 to you that had the asset transfer test met
17 MBIA's standard underwriting guideline, that the
18 DVOG would have violated the test in fiscal year
19 1996?
20     A.   I can only look at the documents
21 themselves.  I'm sorry, are you asking if they
22 had violated the test that was in DVOG?
23     Q.   Correct.
24     A.   I don't know -- we would have pursued

RICHARD WEILL

1  it, yes.
2      Q.   Perhaps just a little unclear.  What I
3  am asking is whether anyone at MBIA has ever
4  represented to you that had MBIA's standard
5  asset transfer test been adopted, that DVOG
6  would have violated the test in fiscal year
7  1996?
8      A.   I don't know what you are talking
9  about when you say standard.  You mean put in
10 the documents when originally done?
11     Q.   Yes.
12     A.   I'm sorry.  We never look at things
13 that way.  The answer is I don't know what we
14 would have done.  I am only arguing, just so you
15 understand my point -- I got to repeat my point.
16         The only thing that you worry about
17 after the deal is done is what the deal itself
18 says.  There is no value in anyone spending
19 time, although I am sure they do, worrying about
20 a provision that you wish you would have had.
21         I am not saying you can't find someone
22 who said that.  You probably can.  But it is
23 useless.
24     Q.   Do you know what MBIA would have done

Page 297

RICHARD WEILL

1  had the DVOG violated the asset transfer test in
2  fiscal year 1996?
3  A.   The one that was in the documents?
4  Q.   Yes.
5  A.   I do not know exactly what we would
6  have done, but we would have asserted that they
7  shouldn't do it any more. We would have worked
8  our darn heart out to get them to make the
9  changes in their administration of that hospital
10  so that they weren't wasting money. We would
11  have argued that Hunter should have been brought
12  in. We would have argued a hundred things. We
13  didn't have the power to do that because we
14  didn't have the information. By the way, the
15  board didn't have it either.
16  Q.   You keep saying that the board didn't
17  have it. Have you ever untaken any review of
18  what information was available to the AHERF
19  board at specific points in time?
20  A.   No. But I do know that a board has
21  available to it financial statements that are
22  delivered to it by an auditing firm. That's
23  what it has available to it, and they didn't
24  have correct financial statements, it turned

Page 298

RICHARD WEILL

1  out. I didn't say they had incorrect financial
2  statements. It turned out that Coopers &
3  Lybrand said they had incorrect financial
4  statements, not me.
5  Q.   Okay. Separate and apart from that,
6  are you aware of any information that was
7  available to the AHERF board?
8  A.   No.
9  Q.   Aside from the fiscal year 1996
10  audited financial statements and aside from the
11  fiscal year 1997 audited financial statements?
12  A.   The answer is no.
13  Q.   Do you have any personal knowledge of
14  any steps that any creditors of AHERF and or its
15  affiliates could have taken that would have in
16  fact have altered AHERF's financial demise?
17  MR. WITTEN:  Objection. We have been
18  through this for a long time.
19  You can answer that if you wish.
20  A.   I don't -- do I know actual steps they
21  would have taken?  No. I can only say what we
22  would have tried to do under the circumstances
23  and I have done that already.
24  Q.   I think I am done for now, thank you.

Page 299

RICHARD WEILL

1  A.   Thank you.
2  MR. WITTEN:  You guys want to take a
3  break?
4  (Pause)
5  EXAMINATION
6  BY MR. WITTEN:
7  Q.   Mr. Weill, you will remember my name
8  is Jesse Witten and I am an attorney for the
9  plaintiff Official Committee of Unsecured
10  Creditors of AHERF?
11  A.   Yes.
12  Q.   Is there a committee within MBIA
13  called the executive policy committee?
14  A.   There is today.
15  Q.   When did that committee come into
16  being approximately?
17  A.   Sometime after January 1, 1999.
18  Q.   After January 1, 1999?
19  A.   Right. Before that there were
20  committees, but I don't think they had that
21  name. Maybe they did.
22  Q.   In 1998 was there a particular
23  committee that David Stevens sought to get
24  himself appointed to?

Page 300

RICHARD WEILL

1  A.   Yes.
2  Q.   What was that committee?
3  A.   Well, I think "committee" is the wrong
4  word. There was a senior management group that
5  was kind of an executive policy group. I'm not
6  sure it was a committee in the traditional sense
7  of the word. It met with David Elliott
8  periodically. It was considered the senior
9  management team.
10  Q.   What should we call this grouping of
11  people?
12  A.   I would call it the senior management
13  team.
14  Q.   David Elliott, again, at the time was
15  the chief executive officer of MBIA?
16  A.   That's correct.
17  Q.   In 1998, is it the case that David
18  Stevens sought to get himself appointed to the
19  senior management team as you have described it?
20  A.   Yes. He probably did in 1997, too.
21  Q.   How did you learn that he tried to get
22  himself appointed to that group?
23  A.   He asked me.
24  Q.   What did he say to you?

Page 301

RICHARD WEILL

1
2     A.    He said I want -- I think that I
3  should be on the senior management team on a
4  number of occasions.  I mean, we are talking
5  every single morning, and during his -- we do
6  reviews at MBIA twice a year and he certainly in
7  his review said that he wanted to be on the
8  senior management team.
9     Q.    Who appointed people to the senior
10  management team?
11     A.    David Elliott.
12     Q.    Aside from telling you that he wanted
13  to be appointed to the senior management team,
14  are you aware of anything else that David
15  Stevens did to try and get himself appointed?
16     A.    Sure.  He talked to other people that
17  were on the senior management team and asked
18  them to assert on his behalf, and he lived a few
19  doors away from David Elliott, and David Elliott
20  knew him and respected him.  He obviously asked
21  David Elliott
22     Q.    In 1998 did Mr. Stevens say to you
23  whether it was important to him to be appointed
24  to the senior management team?
25     A.    Yes.

Page 302

RICHARD WEILL

1
2     Q.    What did you say?
3     A.    He said it was important to him to be
4  important to the senior management team.  He
5  wanted to be on the senior management team.
6     MR. KRUSKO:  I think we have
7  established that.
8     MR. WITTEN:  Let him answer, please.
9     A.    He wanted to be on the senior
10  management team and he was clear about it.
11     Q.    Did he say that often to you?
12     A.    Yes.
13     Q.    What ultimately did Mr. Elliott decide
14  in 1998 about appointing Mr. Stevens to the
15  senior management steam?
16     A.    He decided not to appoint Mr. Stevens
17  to the senior management team.
18     Q.    Do you know how Mr. Stevens was
19  informed of Mr. Elliott's decision to pass him
20  over for appointment to the senior management
21  team?
22     A.    I told him.
23     Q.    When did you tell him?
24     A.    I told him during his review, midyear
25  review.

Page 303

RICHARD WEILL

1
2     Q.    Midyear in 1998?
3     A.    Yes.
4     Q.    How did you tell Mr. Stevens that he
5  would not be appointed to the senior management
6  team?
7     A.    Carefully.  Mr. Stevens, David Stevens
8  is excellent at many, many, many things.  I
9  respected David Stevens.  I trusted David
10  Stevens.  He was as close a colleague as one
11  might have.
12     He, however, was prickly, abrupt,
13  difficult to deal with, particularly opinionated
14  after the fact, and David Elliott did not think
15  within the team concept of MBIA that it would
16  work out with him on the senior management team.
17     He had a very poor relationship with
18  Jan Christensen.  He had a very poor
19  relationship with Neil Budnick.  He had a great
20  relationship with me.  I used -- as you can see,
21  the MBIA method, as so well proven by 2631,
22  document exhibit 2631, is to write down key
23  points that you are going to make in a
24  conversation.
25     And in a conversation that I had with

Page 304

RICHARD WEILL

1
2  him during his review, I made the key points
3  that David Elliott asked me to make to him which
4  were:  One, you are great, we want you to stay,
5  we will pay you well, we love you, but, two,
6  unfortunately, just don't feel like you would be
7  someone that's going to fit on the senior
8  management team in the style that you seem to
9  want to operate.
10     Q.    Was there any particular word used by
11  Mr. Elliott or by you in this meeting to
12  describe Mr. Stevens to him?
13     A.    We carefully picked a word that we
14  thought wasn't emotional.  We said he was
15  prickly, to be exact.
16     Q.    What did Mr. Stevens say to you at
17  this midyear 1998 review when you told him he
18  was not going to be appointed to the senior
19  management team?
20     A.    He was outraged.  And my style still
21  is and was then and still is is to let people,
22  when they get bad news, vent any way and as long
23  as they want.  And he vented that day and the
24  next day and maybe didn't show up for work for a
25  day.

TAB 266

DEPOSITION
EXHIBIT
2201
10/9/03

INSURED PORTFOLIO MANAGEMENT ALERT REPORT
February 3, 1998
***DOWNGRADE TO CREDIT WATCH LIST B***

TO          Distribution

FROM.       Chip Reilly, Alyssa Park

RE          Allegheny Delaware Valley Obligated Group

CONCERN     Recent Rating Downgrades, Limited Liquidity, and Poor Operating Performance

ACTION      Downgrade to Credit Watch List B

| Bond Type: | 19 | | Gross Par Value: | $298,625,000 | | |
|---|---|---|---|---|---|---|
| Policy #: | 212710 | 212720 | Net Par Value: | $256,294,907 | | |
| | 212730 | 212740 | Net Debt Service: | $447,628,356 | | |
| Credit #: | PA0543 | | Next DS Pmt: | $7,064,238 | Date Due: | 5/01/98 |
| | | | MADS: | $21,913,745 | Year: | 2013 |
| Rating: | MBIA: | 8B | AADS: | $14,828,794 | | |
| | Downgraded From  7B | | | | | |
| | Moody's | *Ba2 (11/97) | Final Maturity: | 11/15/2021 | | |
| *Unpublished | S&P. | *BBB (8/97) | Last Approval: | 6/19/96 | | |

Allegheny Delaware Valley Obligated Group (DVOG) is being downgraded to 8B due to concerns over recent rating downgrades for affiliated organizations, an extremely weak liquidity position, and anemic operating margins in part due to managed care pressures in an over-bedded market DVOG is the eastern arm of Allegheny Health and Educational Research Facilities (AHERF) and consists of six hospitals in the Philadelphia area AHERF acquired the Graduate Hospital System and Zurbrugg Memorial Hospitals (Allegheny Hospitals, New Jersey) in 1997, but both are outside of DVOG

DVOG has weak liquidity and high leverage Available cash was $78MM in FY97 (26 days) and dropped during the first quarter of FY98 (9/30) to $65MM (19 days) Debt to capitalization is high at 67% for FY97. Moreover, DVOG's operating performance continues to slide The operating income was -$1 1MM for FY97, but there was a positive bottom line of $24 5MM In the first quarter of FY98, DVOG has already posted an operating deficit of -$26 3MM and a bottom line of -$21 4MM DVOG also plans to post an additional $84MM loss beginning in the second quarter of FY98 as a result of layoffs Demands for cash within DVOG are high because in addition to severance costs, there is also internal reorganization charges and physician contract buy-outs As of the first quarter of FY98, DVOG has drawn $87 3MM from several lines of credit. On a more positive note, as a system, AHERF has better liquidity with $442MM (83 days) of available cash, and has a history of freely transferring cash between its subsidiaries

The competitive Philadelphia market has affected more than just DVOG, many entities within AHERF have been the subject of recent downgrades Moody's just downgraded Graduate to B2 from a Ba2 Moody's also downgraded Zurbrugg to Ba3 from Baa3 Recently, the eastern division of AHERF has been supported by cash flows from the stronger, western division which is based in Pittsburgh However, these drains on cash have begun to take their toll. Allegheny General Hospital, rated an Aa in 1992, was recently downgraded to A3 from A2 despite their solid position in the Pittsburgh market

The greater Philadelphia market is one of the most difficult healthcare markets due to intense managed care pressures and an extremely competitive and over-bedded marketplace Although DVOG is the largest player in the Philadelphia market, it still only has a 15% market share Pittsburgh, while not as competitive as Philadelphia, is subject to the near monopoly of Blue Cross of Western Pennsylvania, and may be subjected to greater volatility and uncertainty in the future

MBIA        007499

TAB 267



**ALLEGHENY**
HEALTH, EDUCATION AND
RESEARCH FOUNDATION

320 East Ninth Avenue
Pittsburgh PA 15222 County

*via facsimile (412) 762-2784*

Tuesday, December 23, 1997

Mr Frank Taucher
Vice President
PNC Bank, N A
One PNC Plaza, 5th Floor
249 Fifth Avenue
Pittsburgh, PA 15222-2707

RE:     Delaware Valley Obligated Group (DVOG) Series 1996 Letter of Credit, Reimbursement and
        Security Agreements
        [1) Series 1996-D tax exempt variable;  2) Series 1996-E taxable commercial paper]

Dear Frank

Per my conversation with you of the other week, enclosed please find the following information

  ✓ DVOG internal financial statements for the 4-months ended Oct-31-97
  ✓ Drawdown schedule of board-designated assets, since Oct-31-97
  ✓ Oct-31-97 Liquidity Ratio calculation (actual)
  ✓ Oct-31-97 Liquidity Ratio calculation (adjusted by drawdowns through present)


We regret to inform you that DVOG is not in compliance with the Liquidity Ratio requirement of 2 00 to 1 00 as of the
present time   It is not anticipated that DVOG will meet this Liquidity Ratio requirement for the balance of fiscal year
1998  Therefore, please accept this formal request from AHERF to extend a waiver pursuant to Section 6 10 (Financial
Covenants) of the Letter of Credit, Reimbursement and Security Agreements through June 30, 1998

Thank you for your consideration and we look forward to hearing from and working with you to resolve this issue in a
timely manner

Sincerely,

Michael P Martin
Senior Vice President, Treasury

enclosures
S \WP\MURRAY\TAUC1223 WPD
cc      Susan M Gilbert
        Angela B Maher
        David W McConnell   ✓
        Richard J Mckeown
        Kelly L Metz
        Becky Serafin

AHERF LIT
USDC W.D. Pa.
MISC No 00-40
23992
EXHIBIT NO

**RECEIVED**

DEC 29 1997

Executive Vice President &
Chief Financial Officer

Allegheny Health, Education and Research Foundation
Allegheny General Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences
• Allegheny University Hospitals • Allegheny University Medical Centers • St Christopher's Hospital for Cr

JD-DMC-0011250



DEPOSITION
EXHIBIT
*1788*
AKF

TAB 268

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## BRIAN CAMP
*June 28, 2004*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

CAMP, BRIAN - Vol. 1



LEGALINK
A WORDWAVE COMPANY

BRIAN CAMP

1    document more so than I actually remember her
2    being previously on it.
3 Q.    So you don't know you took it over from?
4 A.    I don't recall.
5 Q.    Okay. You said you don't recall when you
6    started doing the AHERF analyses. Do you
7    recall generally when it would have been?
8 A.    No, I don't. I don't think it was the first
9    thing I worked on when I joined the group, but
10    I think it was within, maybe, the first six
11    months or a year that I was there.
12 Q.    Okay. And just if we look at Exhibit 1785,
13    which is the big one we've been looking at most
14    of the day, if we look at the Credit
15    Information Sheet, which is the first page of
16    that exhibit, underneath the line that says
17    Credit Underwriting by Brian Camp, there's a
18    line that says, Approval Date: 12-22-97, and
19    we also looked at your underwriting document
20    earlier which had a December 22, '97 date.
21        Does that help you set in time that
22    it was some time before December of '97 that
23    you took over the analysis of the AHERF credit?
24 A.    Yes. Yes, you could say that.
25 Q.    If you could turn the page to 30886 on Exhibit

1    1785.
2 A.    Okay.
3 Q.    And, again, we're looking at Section 1 which
4    includes the most significant issues with
5    respect to the credit addressed in this credit
6    review, is that right?
7 A.    Yes.
8 Q.    And if we look at the third bullet point from
9    the end under that section, that paragraph
10    begins -- you've written, The individual
11    hospitals of the Delaware Valley group are
12    currently experiencing staff reductions to
13    offset an AHERF reported $6 million decrease in
14    reimbursement. Overcapacity can also be
15    singled out for the current market situation.
16    Did I read that correctly?
17 A.    Yes.
18 Q.    If we flip to page 891 -- with the Bates ending
19    891, if you look at the second bullet point on
20    that page, which is, again, a continuation
21    under the heading Operating Performance --
22 A.    Okay.
23 Q.    -- it again says, The individual hospitals of
24    the Delaware Valley group are currently
25    experiencing staff reductions to offset an

1    AHERF reported $6 million decrease in
2    reimbursement. And then it says, Also
3    contributing to this reduction was
4    overcapacity.
5 A.    Okay.
6 Q.    Is that correct?
7 A.    Yes. That's what I see.
8 Q.    Do you recall in this time frame that AHERF's
9    Delaware Valley group affiliates were
10    experiencing layoffs?
11 A.    No, I don't. Before I came here and read this,
12    I really didn't remember what the Delaware
13    Valley group was. So, no, all I can really say
14    is what I'm reading.
15 Q.    I'm sorry. I didn't mean to interrupt you.
16 A.    That's okay.
17        I was just saying all I can really
18    remember about the Delaware Valley group is
19    what I'm reading actually right here.
20 Q.    Do you recall that AHERF had affiliates in the
21    Delaware Valley?
22 A.    In reading this, I can see that. Before, I
23    couldn't have told you what the Delaware Valley
24    was, but in reading this, clearly, the Delaware
25    Valley has affiliate hospitals, it appears.

1 Q.    Having looked at this, you know that AHERF had
2    affiliates in the Delaware Valley, is that
3    correct?
4 A.    Yes. That's what this says.
5 Q.    Flip back to page 30891.
6 A.    Okay.
7 Q.    This is the portion of the document with
8    Ms. Mammarella's signature at the end, correct?
9 A.    30891?
10 Q.    I may have a pagination problem here.
11 A.    Okay.
12 Q.    Sorry. I directed to you the wrong page.
13    30839 --
14 A.    839.
15 Q.    -- is the page that we need.
16        MR. UNICE: 839?
17        MR. SMITH: Yes.
18 A.    Okay.
19 Q.    And this is the section of the document that I
20    believe was authored by Ms. Mammarella, is that
21    correct?
22 A.    Yeah, I'm not sure, but her name is at the end
23    of the section, so I believe it was.
24 Q.    In the paragraph at the top of that page, it
25    says, While cost savings of approximately $40

BRIAN CAMP

Page 129

1  to $50 million through headcount cuts have been
2  achieved so far, (specifically a six percent
3  reduction in the work force, or 1,200 jobs,
4  primarily in Philadelphia), such expenses still
5  have negatively impacted the organization's
6  operating results as much more restructuring is
7  needed. Did I read that correctly?
8  A.  Yes.
9  Q.  And the next sentence says, AHERF management
10  initially stated that the staffing cuts and a
11  20 percent pay cut imposed upon executives
12  throughout its system were due to the state's
13  mandatory shift of Philadelphia's Medicaid
14  patients into managed care and on the federal
15  government's attempts to rein in on Medicare
16  spending. Did I read that one correctly?
17  A.  Yes. That's what I see.
18  Q.  Do you recall any discussions with anyone in
19  the Health Care Lending Group with respect to
20  layoffs by AHERF of 1,200 employees amounting
21  to a six percent reduction in the work force?
22  A.  No. I remember no layoff talks.
23  Q.  Do you know whether those layoffs referenced at
24  page 30839 are the same staff reductions that
25  you were referring to at pages 30886 and 30891,

Page 130

1  the two paragraphs that we read from your
2  section immediately preceding?
3  A.  No, I don't recall. I can read. I don't
4  recall explicitly. In reading it, it looks
5  like they may be referring to the same thing,
6  but I'm not sure, because I don't use the same
7  language that's used here.
8  What was the second page that you're
9  referring me to?
10  Q.  Of your section?
11  A.  Yeah, my document.
12  Q.  30891.
13  A.  891.
14  Q.  And the section we're looking at is the second
15  bullet point.
16  A.  Okay. I don't remember, but it appears to be
17  talking about the same thing.
18  Q.  I'm going to hand you what's previously been
19  marked as Exhibit 1776, which is a reprint of
20  an article from The Philadelphia Inquirer dated
21  October 18, 1997 entitled Explaining Why The
22  Ax Fell For 1,200.
23  As part of your responsibilities in
24  monitoring health care credits, would you keep
25  apprised for press reports addressing the

Page 131

1  entities for which you did credit analyses?
2  A.  In general, I wouldn't say I read all the
3  papers from the different cities, like, I don't
4  remember this article, but I would say I would
5  have attempted to stay as apprised as I could.
6  Q.  Did you say you would have attempted to stay as
7  apprised as you could?
8  A.  Yeah, I would have sought out whatever I could
9  have found, but I don't recall reading this.
10  Q.  This particular newspaper article?
11  A.  Yeah.
12  Q.  Do you see underneath the headline, Explaining
13  Why The Ax Fell For 1,200, the sub-heading
14  there says, Allegheny Hospital's chief
15  executive calls the layoffs unavoidable. He
16  disputes a view that faults the company's
17  aggressive acquisitions and spending. Did I
18  read that correctly?
19  A.  Yeah. That's what I see.
20  Q.  I know you said you don't recall this article
21  specifically.
22  A.  Yeah.
23  Q.  Do you recall seeing any other press accounts
24  that faulted AHERF's aggressive acquisitions
25  and spending for the layoff of 1,200 employees

Page 132

1  that's being reported here?
2  A.  No. I know from the sentences in the
3  paragraphs you read me out of here, that the
4  Delaware Valley group is referring to a group
5  of hospitals in Philadelphia, which I didn't
6  quite remember before I came here, and this is
7  also referring to, it looks like, job cuts in
8  that group of hospitals in Philadelphia, but I
9  don't really recall. That's pretty much what I
10  basically recall about it. I really didn't
11  remember the Delaware Valley group until we
12  just read about it.
13  Q.  Do you remember the Allegheny General Hospital
14  Obligated Group?
15  A.  Yes, I remember Allegheny General Hospital.
16  Q.  Okay. And what do you remember about that
17  obligated group?
18  MS. WYRICK: About that what?
19  MR. SMITH: Obligated group. I'm
20  sorry.
21  A.  Oh, obligated group?
22  Q.  Yeah.
23  A.  No, I remember --
24  MR. UNICE: Object to form.
25  A.  I remember doing -- I remember the hospital. I

23 (Pages 129 to 132)

BRIAN CAMP

Page 133

1  couldn't tell you what was in the obligated
2  group.
3  Q.  Okay.
4  A.  Okay?
5  Q.  And what do you remember about Allegheny
6  General Hospital?
7  A.  Just, in and of itself, that I believe I did a
8  credit report on Allegheny General Hospital.
9  Q.  Okay.  And just to make it clear, because I
10  think my first question we might have passed
11  each other a little bit, do you remember the
12  Allegheny General Hospital Obligated Group?
13  A.  No, I remember the hospital.
14  Q.  And why do you think you remember the hospital?
15  A.  Because I --
16        MS. WYRICK:  Object to that.
17  A.  I guess my general -- since it's been so long,
18  I tend to remember the bigger -- the actual
19  company underlying.  I don't remember, like,
20  how it was structured, an obligated group, and
21  Delaware Valley is just groupings of company.
22  I don't remember how they were grouped, but I
23  generally remember the hospital.
24  Q.  Do you remember Elkins Park Hospital?
25  A.  No, not at all.

Page 134

1  Q.  Bucks County Hospital?
2  A.  No.  I know Bucks County is in Philadelphia,
3  but, no, I don't remember Bucks County
4  Hospital.
5  Q.  St. Christopher's Hospital for Children?
6  A.  That one seems familiar, although I don't
7  recall actually writing a credit or writing a
8  review up on that at all, but that name seems
9  familiar.
10  Q.  Going back to the newspaper article that you
11  were looking at --
12  A.  Okay.
13  Q.  -- I know it's a tough copy to read, but let me
14  see if I can read some of it.
15        Beginning underneath the byline
16  there, it says, He says he had no other choice.
17  Battered by cutbacks in government funding and
18  facing a shortfall of revenues, Sherif
19  Abdelhak, chief executive of the region's
20  largest hospital network, says he was forced to
21  take drastic action.  Just how drastic became
22  apparent last Monday when Allegheny slashed its
23  payroll by 1,200 employees, or six percent of
24  the entire work force at its ten area
25  hospitals.

Page 135

1        Nobody looked forward to doing
2  something that was the antithesis of what we
3  stand for, Abdelhak said, in his first
4  interview about the downsizing, but we were
5  forced.
6  A.  Okay.
7  Q.  Do you recall that Sherif Abdelhak was the
8  chief executive officer of AHERF?
9  A.  Now that I see the name, I remember the name
10  from some of the Pittsburgh articles that were
11  in the news that was going on at the time.  I
12  remember the Sherif.  I don't remember his last
13  name.
14  Q.  And do you recall that AHERF was -- I think you
15  referred to it earlier as the holding company
16  with which Allegheny General Hospital was
17  affiliated, is that correct?
18  A.  Yes.  That's how I remember it.
19  Q.  And now having heard the names of some of the
20  Delaware Valley entities, including
21  St. Christopher's, which I think you said you
22  remember --
23  A.  Yes.
24  Q.  -- does that refresh your recollection that
25  those hospitals were also affiliated with

Page 136

1  AHERF, the holding company?
2  A.  I can say that now I understand that they're
3  part of the thing you've been calling the
4  Delaware Valley group, and I understand that's
5  part of -- or was something underneath of
6  AHERF.
7  Q.  Okay.
8  A.  That's what I remember.
9  Q.  And we saw that in that organization chart that
10  we looked at earlier, is that right?
11  A.  Yeah.  Um-hum.
12  Q.  Moving on to the paragraph next to the picture
13  of Mr. Abdelhak that's down the bottom left
14  corner of that picture, it says, But to some of
15  the fired employees and other local industry
16  observers, the Columbus Day Massacre isn't so
17  easily explained.  Do you see that?
18  A.  Yes.
19  Q.  Do you recall at any time hearing of layoffs at
20  any of the AHERF entities referred to as the
21  Columbus Day Massacre?
22  A.  No.  Again, for whatever reason, the whole
23  Philadelphia Delaware group just doesn't really
24  ring a bell to me.  Like, this seems to be
25  talking, again, about that half of the state.

24 (Pages 133 to 136)

TAB 269

# In The Matter Of:

*AHERF v.*
PRICEWATERHOUSECOOPERS, LLP

---

## RALPH S.   MICHAEL
*March 11, 2004*

---

# *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

MICHAEL, RALPH S.



LEGALINK
A WORDWAVE COMPANY

RALPH S. MICHAEL

1          MR. TERUYA:  Counsel's eyes only or
2    confidential?
3          MS. HACKETT:  I want it counsel's eyes
4    only.  Now, I -- sitting here I'm not sure if the
5    case management order would permit that, but I would
6    ask your stipulation that it would only be reviewed
7    by counsel and not disclosed beyond counsel in this
8    case if you're going to ask him for that type of
9    extremely personal information.
10         MR. TERUYA:  Well, let me think about that
11   question and I'll come back to it.
12         MS. HACKETT:  Okay.
13         MR. TERUYA:  Why don't we take a quick
14   break.
15         MS. HACKETT:  Sure.
16         THE WITNESS:  Thank you.
17         MR. TERUYA:  Sure.
18         THE VIDEOGRAPHER:  The time is 2:53 p.m.
19   We're off the record.
20         (Whereupon a break was taken.)
21         THE VIDEOGRAPHER:  The time is 3:00 p.m.
22   We're on the record.  This is tape No. 3 of the
23   deposition of Ralph S. Michael, III.  We're on the
24   record.
25   BY MR. TERUYA:

1          Q.   Were there any types of written practice or
2    procedure or policy documents that you referred to
3    from time to time in your work as CEO of the
4    corporate banking area?
5          A.   Not typically, no.
6          Q.   Were there on specific occasions any types
7    of documentation you relied on or referred to?
8          MS. HACKETT:  Can I stop you for a minute?
9    I don't understand.
10         Is there a particular subject matter for
11   which he would have referred to the written
12   documentation?  Am I missing something in this?
13         MR. TERUYA:  With respect to healthcare
14   matters.
15         THE WITNESS:  There were healthcare credit
16   policies, but I typ- --- of which I had a general
17   understanding but not a specific understanding.
18   BY MR. TERUYA:
19         Q.   Other than the healthcare policies, perhaps
20   examples of which we've seen today, were there any
21   other types of documents you would have referred to
22   from time to time in making credit-type decisions
23   with respect to healthcare?
24         A.   No, other than borrower-specific
25   information.

1          Q.   Okay.  When you say borrower-specific
2    information, do you mean offerings or other types of
3    documents --
4          A.   Financial or -- financial statements, et
5    cetera.
6          Q.   Okay.
7          Do you know if there was any established
8    practice or procedure at PNC in how to respond to
9    noncompliance or defaults with debt agreement
10   obligations?
11         A.   Every situation is different, you know, so
12   there are no established, "if this, then that," no.
13         Q.   Do you personally know as you sit here
14   today of any GAP violations in any AHERF or DVOG
15   financial statements?  And when I say "personally
16   know," I mean not from news articles or people
17   telling you things, but just from your own personal
18   knowledge.
19         A.   It's been so long that I believe I do, but
20   I can't cite what they are, so -- I believe I had
21   knowledge of them at one point, but I honestly can't
22   remember what they are.
23         Q.   Do you know what your knowledge was based
24   on at some point even if you can't recall particular
25   examples?

1          A.   Yeah.  My understanding of the financial
2    statements and of GAP.
3          Q.   As a non-C.P.A.?
4          A.   As a non-C.P.A., correct.
5          Q.   And was that belief or knowledge formed
6    just on your own personal review without assistance
7    from others of the financial statements?
8          A.   I don't recall.
9          Q.   And even if you don't recall the particular
10   items, do you recall anything about even what areas
11   those violations might have related to?
12         A.   No.
13         Q.   Do you recall who you might have had any
14   discussions with about such violations?
15         A.   No.  Most of -- most of the -- as I stated
16   earlier, most of the energy that I put toward this at
17   the time was really prospective.  How do we keep this
18   thing from -- on the rail, so to speak.  There isn't
19   a lot -- when you're in a crisis mode like this,
20   there isn't a lot of, gee, how did we get here?
21   There is, you know, typically forensic accounting
22   work done, you know.  But the first thrust of that is
23   to find out what's real in the balance sheet and
24   among the cash flows, not so much of who shot John.
25         Q.   Do you personally know of any audit failure

RALPH S. MICHAEL

Page 153

1   by Coopers & Lybrand?
2      A.  Not personally, no.
3      Q.  Do you personally know of any failure by
4   Coopers & Lybrand to comply with generally-accepted
5   auditing standards?
6      A.  I don't.
7      Q.  Do you personally know of any failure of
8   Coopers & Lybrand to comply with the contract with
9   AHERF and/or its affiliates?
10     A.  Wouldn't know what that contract is, so I
11  would have no way of knowing.
12     Q.  Okay.
13        Do you personally know of any failure by
14  Coopers & Lybrand to expose AHERF's deteriorating
15  financial condition, violations of areas that
16  covenants, deficient financial controls and/or AHERF
17  senior officials' financial manipulations?
18     A.  I don't know specifically.
19     Q.  Do you have any general knowledge of that
20  topic?
21     A.  No.  None that bears mention.  Speculation.
22     Q.  Okay.
23        Do you personally know which trustees, if
24  any, of AHERF or its affiliates were uniformed about
25  the true state of AHERF's financial condition?

Page 154

1      A.  No.
2      Q.  Do you personally know of what steps, if
3   any, trustees of AHERF or its affiliates would in
4   fact have taken if they had had additional
5   information about AHERF's financial condition at an
6   earlier point in time?
7      A.  No.
8      Q.  Do you personally know of what in fact
9   would have been the effect, if any, of any steps that
10  trustees of AHERF might have taken?
11     A.  No.  Because I don't know what those steps
12  were, it's hard to know what the effect would have
13  been.
14     Q.  Do you personally know of any steps that
15  any trustees of AHERF or its affiliates could have
16  taken that would have in fact halted AHERF's
17  financial demise?
18     A.  No.
19     Q.  Do you personally know of any steps that
20  anyone could have taken that would in fact have
21  halted AHERF's financial demise?
22     A.  No.
23     Q.  Do you personally know what steps, if any,
24  any creditors of AHERF or its affiliates, including
25  PNC, would in fact have taken if they had had

Page 155

1   additional financial information about AHERF's
2   financial condition or its affiliate's financial
3   condition at an earlier point in time?
4      A.  I think safe to say that had we known this
5   earlier, you know, the -- there would have been, you
6   know, very active discussion around either
7   restructuring the debt in some form or fashion or
8   accelerating repayment.  The timeliness of
9   information here is of real import to a creditor.
10     Q.  Do you know what would have been the
11  outcome of those discussions in fact?
12     A.  I don't know because we didn't have the
13  information at that time.
14     Q.  So sitting here today it's impossible to
15  speculate or it would be just speculation --
16        MR. COGAN:  Objection.
17  BY MR. TERUYA:
18     Q.  -- as to what would have happened?
19        MS. HACKETT:  It would be speculation as to
20  what would happen?  I don't understand the question.
21        THE WITNESS:  Yeah.
22        MS. HACKETT:  What are you asking him?
23  BY MR. TERUYA:
24     Q.  You said you couldn't say today what would
25  have been the outcome of the discussions, and what

Page 156

1   I'm trying to ask is, you know, why is it that you
2   can't say sitting here today what would the outcome
3   have been?
4      A.  Well, if the outcome is in terms of would
5   AHERF ultimately file bankruptcy -- this is the way I
6   interpreted it -- would they ultimately file
7   bankruptcy or not, you know, I don't know that.
8         You know, Would it be likely that we would
9   have done something -- we, PNC, I can't speak for
10  other creditors -- but that we PNC would have done
11  something along the lines of accelerating the debt,
12  you know, I think it's very likely.
13     Q.  So you think --
14     A.  Declaring a default and/or when I say
15  accelerating the debt, that's kind of the end
16  statement.  But, you know, threatening to declare a
17  default, you know, and, for instance, causing the $90
18  million not to be paid to Mellon Bank.
19     Q.  Let me ask you in steps.
20        Do you think that declaring a default and
21  actually accelerating rather than threatening to
22  accelerate the debt would have been the outcome?
23     A.  I think that threatening a default, you
24  know, probably would have, you know, caused a
25  different outcome.  Declaring a default and

RALPH S. MICHAEL

Page 157

1  accelerating the debt definitely would have brought
2  about a different outcome for the secured creditors.
3      Q.  Okay.  Let me back this up.
4          Do you know what PNC in fact would have
5  done as between restructuring the debt, accelerating
6  the debt, or something else?
7      A.  No because we didn't have the information
8  at that time, and I can't put myself back to the
9  point in time where I would have the information,
10  so --
11      Q.  Okay.
12          And in terms of declaring a default, do you
13  know in fact what would have been the effect if PNC
14  had declared a default in terms of how things would
15  have unfolded at AHERF?
16      A.  No.  And I think that was the question I
17  tried to answer earlier.
18          MS. HACKETT:  Uh-huh.
19          THE WITNESS:  No.  I can't say that we know
20  that specifically.
21  BY MR. TERUYA:
22      Q.  And likewise, do you know in fact what
23  would have been the effect if PNC had declared a
24  default and then accelerated the debt?
25      A.  Ask that again.  For some reason I got

Page 158

1  distracted.
2      Q.  I said, likewise, do you know what would
3  have been the effect in fact if PNC had declared a
4  default and then accelerated the debt in terms of how
5  things would have unfolded?
6      A.  No.  I don't know, you know.
7      Q.  And earlier you mentioned the possibility
8  of stopping the repayment to Mellon Bank.
9      A.  Just as one potential outcome.
10      Q.  How would that have been effectuated?
11      A.  Well, the -- by -- you know, by -- and
12  again, this is a -- just simply an example, you know,
13  but by notifying the management and potentially the
14  Board that an event of default existed and would not
15  be waived, the management of the Board would have
16  been crazy to pay $90 million to yet another creditor
17  when the gun is held to your head by one creditor.
18      So I suspect what would have happened there
19  is that Mellon and PNC would have threatened default,
20  and everyone would have come to the table together as
21  a workout.
22      Q.  Do you know when is the earliest date that
23  PNC could have declared an effect of default with
24  respect to the DVOG letters of credit?
25      A.  I don't.

Page 159

1          MR. COGAN:  Objection.  That's okay.  I
2  protected the record.
3          MR. TERUYA:  What was the objection about
4  that question, just out of curiosity, to make sure I
5  didn't misstate something?
6          MR. COGAN:  I'm objecting to the form of it
7  and the foundation of it.
8          MR. TERUYA:  Okay.
9          MR. COGAN:  And more particularly, he's
10  never read the credit instruments.  You're asking him
11  for a legal conclusion as to when they could have
12  first declared a default.  He doesn't know the
13  underlying documentation, so I don't know how he can
14  make that determination, and do when you can first
15  declare a default in my view does -- at least the way
16  you asked it -- calls for a legal conclusion.  I hope
17  that helps.
18          MR. TERUYA:  Okay.
19          MR. COGAN:  Since you asked,
20          MR. TERUYA:  I did ask.
21      Q.  Did anyone -- did you have any
22  understanding of your own as to when PNC could
23  declare an event of default?
24      A.  No.  Does that tell you -- from the vantage
25  point that -- I had never read the legal agreement.

Page 160

1      Q.  Okay.  Do you know -- I think we covered
2  this with respect to particular examples, but do you
3  know what in fact would have been the effect, if any,
4  of any steps that any creditors of AHERF's affiliates
5  could have taken?
6          MS. HACKETT:  Other than what he's already
7  testified to?
8          MR. TERUYA:  Yeah.
9      Q.  Other than what you've already talked
10  about?
11      A.  No, I don't.
12      Q.  Do you personally know of any steps that
13  any creditors of AHERF or its affiliates, including
14  PNC, could have taken that would in fact have halted
15  AHERF's financial demise?
16      A.  It's been so long, I can't recall the --
17  what the remedies might have been.  The proposed
18  remedies might have been at that point.
19      Q.  So given the passage of time --
20      A.  Yeah.
21      Q.  -- you don't have knowledge today as you
22  sit here?
23      A.  I don't.  I don't.
24      Q.  Do you personally know of any conduct by
25  Coopers & Lybrand that contributed to delays in

40 (Pages 157 to 160)

Page 161

1  discovering the true financial statement of affairs
2  in the AHERF system?
3       A.  I don't.
4       Q.  Do you have any personal knowledge of any
5  conduct of Coopers & Lybrand that aided in preventing
6  the immediate implementation of effective measures in
7  time to reverse the decline in AHERF's financial
8  condition?
9       A.  I don't.
10       Q.  Do you know personally of any inaccuracies
11  revealed in AHERF's financial statements that had a
12  material and negative effect on the sale price of
13  certain AHERF affiliates?
14       A.  I don't, but I'm not sure I would have been
15  close enough to it to know.  But I don't know.
16       Q.  Okay.
17           Do you know whether -- personally know
18  whether if any creditors of AHERF or its affiliates,
19  including PNC, had had additional information about
20  AHERF's financial condition -- I'm sorry.  Let me
21  start over, then.
22           Do you personally know whether any
23  creditors of AHERF or its affiliates, including PNC,
24  had had additional information about AHERF's or its
25  affiliates' financial condition at an earlier point

Page 162

1  in time, the AHERF system would in fact have been
2  precluded from incurring the obligations that
3  eventually forced its bankruptcy?
4           MR. COGAN:  Objection.
5           MS. HACKETT:  Did AHERF -- you're asking
6  him that AHERF would have been prevented from
7  incurring the obligations?
8           THE WITNESS:  I --
9           MR. TERUYA:  Yes.
10           MS. HACKETT:  Object.  Lack of foundation.
11       But you may answer if you understand it.
12           THE WITNESS:  I would say simply that I
13  don't -- it's not clear to me what financial
14  obligations that specifically caused the bankruptcy,
15  so I guess I can't answer the question.
16           MR. TERUYA:  Okay.
17           THE WITNESS:  It's a lack of understanding
18  on my part.
19           MR. TERUYA:  Okay.
20       Q.  Do you personally know if any decrease in
21  AHERF's income or assets for fiscal years '96 or '97
22  would in fact have caused bond holders, credit
23  enhancers or other creditors to have acted any
24  differently?
25       A.  I have a strong belief that had the, you

Page 163

1  know, financial results been reported at that point
2  in time that the debt ratings would not have remained
3  at the level that they were, and I think that would
4  have had an impact on all of the above.
5       Q.  Do you know whether in fact the debt rating
6  would have been affected?
7       A.  I don't know it for a hard fact because I'm
8  not Moody's or Standard and Poors, but I'm very
9  confident that it would have been.
10       Q.  And what would in fact have been the effect
11  in any change of the debt rating?
12       A.  Depending on the time, I know certainly had
13  it been -- had it occurred prior to our approval, had
14  the debt been noninvestment grade, you know, it's
15  possible that we wouldn't have approved, you know,
16  that credit.  It is likely that we wouldn't have
17  approved it in that size, you know.
18       Q.  Do you have any recollection as you sit
19  here today of the chronology of the approval of the
20  DVOG letters of credit versus the issuance of the
21  fiscal year '96 financial statement?
22       A.  I don't recall.
23       Q.  Okay.
24           In addition or other than or setting aside
25  the possible ramifications with respect to the

Page 164

1  approval decision, what other effects, if any, would
2  be -- any change in the financial statements in fact
3  have caused among creditors?
4       A.  Including PNC or --
5       Q.  Including PNC.
6       A.  Yeah.  The -- the -- it's entirely likely
7  that that would have made the, you know -- any
8  covenant violation, any waiver discussions, you know,
9  much more difficult for the company.  You know, that
10  there would have been, you know, far stronger
11  pressure to restructure, you know; far stronger
12  pressure to limit expenses and to really right the
13  ship from an operating perspective.
14           We had a misconception of what the hospital
15  looked like from an operating perspective.
16       Q.  And do you know what particular steps PNC
17  would have taken?
18       A.  I don't really know because we weren't
19  confronted with that issue.
20       Q.  Okay.
21           Do you know what effect in fact a
22  restructuring would have had if it had occurred at an
23  earlier point in time?
24       A.  Well, I don't know in fact, but I would
25  observe that it -- it probably would have improved

RALPH S. MICHAEL

Page 165

1  the operating cash flow of the organization.
2      Q.  Did you ever perform any retrospective
3  study of any of these issues of what, you know, could
4  have been different in terms of the operations at
5  AHERF --
6      A.  I did not.
7      Q.  -- if different steps had been taken?
8      A.  I did not, no.
9      Q.  Do you personally know of or would your
10  answer be the same to the question do you personally
11  know if any decrease in DVOG's income or assets for
12  for fiscal years '96 or '97 would in fact have caused
13  bond holders, credit enhancers, or other creditors to
14  have acted any differently?
15      A.  Same answer.
16      Q.  Do you personally know if any decreases in
17  AHERF's or DVOG's income or assets for fiscal years
18  '96 or '97 would in fact have caused any covenant
19  violations?
20      A.  I don't know.
21      Q.  Do you personally know what steps, if any,
22  any creditor of AHERF or its affiliates would in fact
23  have taken in response to learning of a covenant
24  violation?
25      A.  I don't know.  If you're talking about

Page 166

1  creditors including PNC, I, again, go back to my
2  earlier comment of much more difficult and attentive,
3  you know, discussion around waivers.
4      Q.  Would your answer still be that you can't
5  say what specific actions PNC would in fact have
6  taken?
7      A.  Only by virtue of the fact that it -- since
8  it didn't happen, I can't tell you exactly what we
9  would have done.  I can tell you that in a general
10  sense we would have gone in and worked very closely,
11  you know, with the company to shore up their
12  operating cash flow which could have included the
13  introduction of a crisis manager, for instance, as a
14  mechanism to try and preserve and ultimately build --
15  preserve cash in and ultimately build the cash flow
16  of, you know, the AHERF entity.
17      Q.  What's a crisis manager?
18      A.  Crisis manager would be a consultant
19  experienced in turnarounds.
20      Q.  Was any recommendation ever made with
21  respect to AHERF as things actually unfolded in terms
22  of appointing a turnaround expert or consultant of
23  some sort?
24      A.  That's really a question for Tom Mc Cool.
25      Q.  Have you ever had any role or involvement

Page 167

1  or did you ever have any role or involvement as CEO
2  of the corporate banking area in appointing a
3  turnaround expert or consultant?
4      A.  Yes.  We -- that's -- and actually Tom Mc
5  Cool does that, but that's a fairly standard
6  practice, you know, within the commercial banking
7  industry and introducing crisis managers hired by the
8  company, you know, for -- to -- to work -- to bring
9  about financial resolution.
10      Q.  Once as you mentioned some of the problems
11  at AHERF became apparent to people at PNC, do you
12  know if in fact someone was hired as a turnaround
13  consultant?
14      MS. HACKETT:  I believe you asked him that.
15      MR. TERUYA:  I asked if there was any
16  consideration of it, and he said Tom Mc --
17      MS. HACKETT:  Yeah.  Okay.
18      THE WITNESS:  And same answer.  I just
19  don't know whether it happened or not.
20      MR. TERUYA:  Okay.
21      Q.  In addition to the possibility of hiring a
22  crisis manager, are there any other specific steps
23  that you know PNC would in fact have taken or might
24  have taken?
25      A.  Well, there are a whole host of steps that

Page 168

1  are really driven by the particular circumstances at
2  the time.
3      Q.  Can you say what the effects in fact would
4  have been of any of those particular steps?
5      A.  Historically, you know, those are very
6  successful at preserving cash in the estate,
7  enhancing the liquidity of the enterprise and, in
8  many cases, averting bankruptcy.
9      For instance, to -- and we talked earlier
10  about, you know, money that in hindsight looks silly,
11  corporate boxes at stadiums, et cetera.  A crisis
12  manager would come in, identify that and eliminate
13  it, and that cash, therefore, never gets spent.  So
14  that's the sort of thing that can occur.
15      Q.  And do you know what in fact would have
16  been the outcome of any such steps in this instance
17  with respect to AHERF?
18      A.  I don't know because again we didn't have
19  the opportunity to do that.
20      Q.  Who are the crisis managers, if you know,
21  that PNC deals with?
22      A.  Again, I'd refer you to Tom Mc Cool because
23  he's the actual party in charge there.
24      Q.  Do you personally know what steps, if any,
25  any creditor of AHERF or its affiliates, including

42 (Pages 165 to 168)

RALPH S. MICHAEL

Page 169

1   PNC, would in fact have taken in the event that a
2   default would have been declared?
3       A.   Again, I don't know with absolute
4   certainty, but it would run the range, you know,
5   from -- if an event of default had been declared, my
6   guess is it would be acceleration.
7       Now, if an event had been -- had been
8   threatened but not declared, it might be different.
9       Q.   Are you equating the event of default being
10  declared or an event of default being declared an
11  indecision to accelerate?
12      A.   Well, the -- if you think through the chain
13  of events, a situation occurs, a default occurs which
14  can go, you know, one of three ways:  It can be
15  cured; it can be waived, or it can be declared.  I
16  took your question from the very narrowest sense
17  because once declared, it means, typically, that you
18  and the borrower have acknowledged that you're going
19  to disagree, and, you know, that you're not willing
20  to work together and in a high percentage of declared
21  defaults, you know, there is an acceleration.  So it
22  may simply be the form of the question that you
23  asked.  If the -- and again, I go back to that event
24  of default which can be dealt with in one of three
25  ways.

Page 170

1       Q.   Okay.  So like a lower case e, lower case
2   d, event of default, it could be dealt with in three
3   possible ways?
4       A.   Yes.
5       Q.   One of which is to declare a formal capital
6   E, capital D event of default?
7       A.   Correct.
8       Q.   And then likely to accelerate?
9       A.   Right.
10      Q.   Do you know if there are possible remedies
11  or steps that PNC could take, competing steps PNC
12  could take once a formal event of default is
13  declared?
14      A.   There are, but they're relatively limited,
15  you know.  That's -- the declaration of a formal
16  event of default is a very serious issue.
17      Q.   Do you know whether during calendar '98
18  before the bankruptcy any other creditors of AHERF or
19  its affiliates declared a formal event of default?
20      A.   I don't know.
21      Q.   Do you know what steps, if any, PNC would
22  in fact have taken if another entity creditor had
23  declared a formal event of default?
24      A.   I don't know because I don't know the
25  answer to the first question, so that's --

Page 171

1       Q.   Okay.
2       Do you personally know what steps, if any,
3   any creditor of AHERF or its affiliates would in fact
4   have taken if Coopers & Lybrand had issued an
5   unqualified opinion on any AHERF or DVOG financial
6   statements?
7       A.   An unqualified opinion?
8       Q.   I'm sorry.  A qualified opinion.
9       A.   I thought so, because I didn't --
10      Q.   I'm sorry.
11      A.   Yes.  At that point that is a severe red
12  flag, you know.  It is -- I can't recall in my
13  career, you know, where I have made a loan or
14  approved a loan to an entity -- a new loan.  And
15  sometimes you have to renew loans that are
16  outstanding, but a new loan to an entity that has a
17  qualified opinion.
18      The -- we would have immediately, had we
19  even considered -- continued to consider extending
20  credit, you know, we would have immediately contacted
21  with the company's approval Coopers and tried to get
22  to the very bottom of what it was, you know, that
23  caused them to issue that qualified opinion, you
24  know.
25      It's -- it's challenging to me to think

Page 172

1   that there would have been an outcome there that
2   would have -- that we would have continued to pursue.
3       Now, concurrently, had there been a
4   qualified opinion, the credit never would have gotten
5   investment grade status from Moody's and Standard &
6   Poors, and that -- if you think back to my earlier
7   comments, the two of the necessary conditions for me
8   to sign approving this, one was an investment-grade
9   status, and the other was an unqualified opinion.
10  The absence of one brings about the absence of the
11  other in that order.  I'm sorry.  In that reverse
12  order.
13      The absence of the unqualified opinion
14  brings about the absence of the investment-grade
15  rating, and it's a nonstarter.
16      Q.   Do you have any understanding of what was
17  the chronological relationship between Coopers &
18  Lybrand's issuance of an audit opinion on the fiscal
19  year '96 financial statements of AHERF and its
20  affiliates with respect to the approval decision?
21      A.   No.  That -- I think that was asked
22  previously, and I do not.
23      Q.   Do you personally know what the effects of
24  any steps that any creditor of AHERF or its
25  affiliates could have taken in response to a -- to

Page 173

1 learning of a GAP violation would have been?
2     A.  It would be speculative on my part.
3     Q.  Do you personally know what would the
4 effect have been of any steps of any creditor of
5 AHERF or its affiliates could have taken in response
6 to learning of any material misstatement in the
7 financial statements of AHERF or any of its
8 affiliates?
9     A.  Well, the -- let me ask, are you including
10 any creditor, including PNC?
11     Q.  Yes.
12     A.  You've asked that in some questions and not
13 others.
14         The -- then let me amend that because
15 either a GAP violation or, you know, a material
16 misstatement would likely be a violation of the
17 covenants which again, as you know, I'm no expert in
18 the documentation of this particular transaction, but
19 as part of boilerplate, you know, you would have
20 material misstatement and GAP violations, typically,
21 you know, and that would have led to a covenant
22 default, you know, and -- or the existence of an
23 event of default that could have been declared a
24 capital letters event of default and with the
25 potential for acceleration thereafter.

Page 174

1     Q.  Do you know what would in fact have been
2 the particular steps PNC or other creditors would
3 have taken in response to learning of GAP violations
4 or material misstatements?
5     A.  I can't --
6         MS. HACKETT:  Other than what he's already
7 testified to?
8         THE WITNESS:  Yeah.  That's really kind of
9 the same thing I just said, you know.  The -- there
10 would have been a very intensive, you know,
11 discussion with the company and with Coopers &
12 Lybrand, you know, the -- you know, the
13 potential, you know, for the declaration of an event
14 of default, you know, out of -- capital letters event
15 of default out of that condition of default.
16 BY MR. TERUYA:
17     Q.  Do you know what the effect would have been
18 of any steps that could have been taken?
19     A.  The -- I don't know specifically, but, you
20 know, again, probably a restructuring of the credit,
21 the hiring of a crisis manager, potentially, you
22 know.  A step along those lines.
23     Q.  Do you know whether a crisis manager in
24 fact would have been able to successfully avert
25 AHERF's bankruptcy?

Page 175

1     A.  I don't know whether a crisis manager would
2 have been able to avert the bankruptcy, but I'm
3 highly confident a crisis manager would have caused
4 the creditors to result in a higher realization on
5 their claims.  That -- of that I have a very, very
6 high degree of confidence.
7     Q.  What's the basis for your belief?
8     A.  His -- just seeing countless situations of
9 similar nature.  Professional experience.
10     Q.  What -- do you have any sense of what the
11 quantitative effects would have been in terms of
12 realization by creditors?
13     A.  I'm not close enough to it to know.
14     Q.  Do you personally know what would have been
15 the quantitative effect of any steps that PNC or
16 other creditors could have taken in response to
17 learning of material misstatements or GAP violations?
18     A.  It would be speculation on my part.
19     Q.  Did you ever perform any studies or do you
20 know of anyone performing any studies of what
21 creditors' recovery could have been under different
22 scenarios as things unfolded at AHERF?
23     A.  I'm not aware of any.  Doesn't mean they
24 don't exist.
25     Q.  Do you personally know what the particular

Page 176

1 consequence is -- actually, let me strike that.
2         Do you personally know whether the term
3 "unrestricted fund balance" in any letter of credit
4 agreement between PNC and AHERF in fact excludes
5 intercompany loans?
6         MS. HACKETT:  Can I have that back, please?
7 BY MR. TERUYA:
8     Q.  Do you personally know whether the term
9 "unrestricted fund balance" in any letter of credit
10 agreement between PNC and AHERF in fact excludes
11 intercompany loans?
12         MS. HACKETT:  Objection.  Lack of
13 foundation.  He has to look at the documents to know
14 that.
15         THE WITNESS:  You took the words out of my
16 mouth.
17         MS. HACKETT:  There you go.
18         THE WITNESS:  I would not have used
19 "objection" and "foundation," but I am not familiar
20 with the letter of credit documents.
21 BY MR. TERUYA:
22     Q.  And therefore you don't know?
23     A.  Therefore I don't know.
24     Q.  Do you personally know the present extent
25 of the bankrupt AHERF's estate's net in solvency?

44 (Pages 173 to 176)

RALPH S. MICHAEL

Page 177

1    A.  No,
2    Q.  Do you know who was charged, if anyone,
3 with monitoring that -- the present extent of the
4 bankrupt estate's net in solvency?
5    A.  No.
6        MS. HACKETT:  I was going to say you mean
7 PNC or beyond that, but I don't think he knows either
8 way.
9        MR. TERUYA:  I just meant PNC.
10        THE WITNESS:  No.
11 BY MR. TERUYA:
12    Q.  Have you had any conversations with any
13 lawyers with Jones Day before this deposition?
14    A.  No.
15        MS. HACKETT:  Relating to the deposition;
16 correct?
17        MR. TERUYA:  Yeah.  In relating to the
18 deposition.
19        THE WITNESS:  No.  I was going to say I had
20 a conversation with Mickey Pohl, I think, back in
21 1994, but it wasn't about AHERF.
22 BY MR. TERUYA:
23    Q.  Did you have any conversations with anyone
24 else about this deposition before the deposition?
25    A.  No.

Page 178

1        MS. HACKETT:  Other than me.
2        THE WITNESS:  I'm sorry.  Exactly.  That's
3 right.
4        MS. HACKETT:  Other than me.
5        THE WITNESS:  I'm sorry.
6 BY MR. TERUYA:
7    Q.  Did you meet with anyone from Reed Smith in
8 preparation for this deposition?
9    A.  Yes.  I met with Mary yesterday for an hour
10 or less.
11    Q.  Anyone else?
12    A.  No.
13    Q.  And other than your meeting for an hour or
14 less, did you have any other conversations with
15 anyone from Reed Smith?
16    A.  No.
17    Q.  Do you have any present plan to testify at
18 any trial in this case?
19    A.  I sure hope not.
20    Q.  Are you involved in this litigation in any
21 way other than testifying at this deposition?
22    A.  No.
23    Q.  Have you ever had any discussions with
24 anyone about this litigation?  Just "yes" or "no."
25    A.  No.

Page 179

1    Q.  And do you know if your -- going back to
2 that question I asked you earlier.  Do you know if
3 your stock holdings were ever publicly-disclosed in
4 any of PNC's public filings?
5    A.  They're -- I know that they are disclosed
6 and vastly overstated, you know.  And when I say
7 this, because you'll find it anyway, if you go to
8 Yahoo, for instance, you'll find a form 4 filing that
9 they pick up that includes, you know, some restricted
10 stock that by virtue of leaving PNC I did not
11 collect.  So, you know, I think that's still out in
12 the public domain, and it's not correct.  I wish it
13 was.  Man, do I wish that.
14    Q.  You told me --
15        MR. TERUYA:  Actually, can we take a quick
16 break?  I just want to look at my notes.  I think
17 we're done.
18        MS. HACKETT:  Sure.  Sure.
19        THE WITNESS:  Yes.
20        THE VIDEOGRAPHER:  The time is 3:35 p.m.
21 We're off the record.
22        (Whereupon a break was taken.)
23        THE VIDEOGRAPHER:  Time is 3:43 p.m.  We're
24 back on the record.
25 BY MR. TERUYA:

Page 180

1    Q.  I want to just ask a few -- a couple more
2 questions that I skipped over.
3        Do you personally know the effect of any
4 steps that any creditor of AHERF or its affiliates,
5 including PNC, could have taken in response to
6 learning of covenant noncompliance by AHERF or its
7 affiliates?
8        MS. HACKETT:  Objection.  Wasn't that asked
9 and answered --
10        MR. TERUYA:  I asked about GAP violations
11 and material misstatements.
12    Q.  If you're answer would be the same --
13    A.  Yeah.
14    Q.  Do you personally know the effect of any
15 steps that any creditor of AHERF or its affiliates,
16 including PNC, could have taken if any event of
17 default had been declared?
18        MS. HACKETT:  Objection.  Asked and
19 answered.
20 BY MR. TERUYA:
21    Q.  Same answer?
22    A.  Yeah.  Same answer.
23    Q.  Can you tell me what were the circumstances
24 of your departure from PNC?
25    A.  The -- a relatively complex set of

45 (Pages 177 to 180)

TAB 270

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS*

---

## *THOMAS MCCOOL*
*October 28, 2003*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**MCCOOL, THOMAS - Vol. I**



LEGALINK
A WORDWAVE COMPANY

it was going to be a, you know, real problem.
Q. What were MBIA's stated concerns about a bankruptcy filing?
A. That the company was going to sell. If it sold, it would only sell in the east and would leave them in the west, and they weren't going to get very much money out of the east.
Q. Was there any concern that was stated to you by MBIA about just the fact of a bankruptcy filing occurring?
A. I think they're generally scared to death of them; but, you know, they seemed to act as if they would do almost anything to avoid a bankruptcy.
Q. Did anyone from MBIA ever express to you any views on why representatives of MBIA wanted to avoid a bankruptcy?
A. Not specifically. It was certainly part of the discussions we had at the various meetings we had with the company.
Q. With MBIA?
A. And MBIA. But they're an insurance company; we're a bank. We're different.
Q. Did you have any involvement with operations at AHERF after the time of its bankruptcy?

A. No. You mean in terms of day-to-day operations?
Q. Overseeing its day-to-day operations and what it was doing?
A. No.
Q. Did anyone at PNC, to your knowledge?
A. Not -- except through the committee, to the extent the committee was involved, the unsecured committee.
Q. Do you know if any representatives of the committee or PNC observed what operations were going on at AHERF after the bankruptcy?
A. You're going to have to define "operations" for me.
Q. I just mean like in terms of how the hospitals were doing and what kinds of management decisions were being made to preserve value.
A. You mean financial reports or cash flow reports or --
Q. No, I mean actual operations of the hospitals like how the sale process was going, how, you know, the doctor and patient situation that you described was being handled, how the faculty situation was being handled, et cetera.
A. Did we oversee it?

Q. Are you aware of anyone at PNC --
A. Are you talking about overseeing in terms of managing? That's what an overseer is. What do you mean?
Q. Did anyone monitor, anyone at PNC or any members of the creditors' committee, monitor the operations of the AHERF hospitals?
A. Generally we had regular meetings with our advisors and accountants, we met with the company's advisors and accountants, and we met with the company on a regular basis.
Q. Do you recall ever learning of any problems that AHERF was facing in terms of attempting to sell the eastern region hospitals after the bankruptcy?
A. Yeah, a whole series of them. It's almost impossible to enumerate all of them.
Q. Do you recall ever hearing that there was any problem in terms of managing the due diligence process with respect to the hospitals?
A. That was one of them.
Q. Do you recall ever hearing that --
A. I actually caused a good bit of that, thank you.
Q. You how was that?

A. Because I know what a due diligence process is supposed to entail. In large part, it's an establishment of a data center and a data room, whether it's at one of the hospitals or one room at all of the hospitals. These guys didn't have anything like that.
Q. AHERF management did not?
A. No.
Q. Who was running the due diligence process at AHERF?
A. In large part it was Tony and Joe Dionisio, I think, and they may have designated other people, but we thought they were generally responsible for it.
Whether they had the Hunter Group --
I think they confined the Hunter Group, as I recall, to more or less the day-to-day hospital operations, and they were going to take care of the sale themselves; but I remember specifically asking them to take me to the data room.
Q. Did you view it as a mistake that prior to that time AHERF management had not created a data room where all the documents were kept?
A. It may or may not be characterized as a

Page 237

1  mistake, but I'm unaware of any corporate sale
2  that has ever taken place without one.
3  Q.   Do you recall having any concerns about any of
4  management's conduct in running the sale
5  process and due diligence process with respect
6  to the eastern regional hospitals after the
7  bankruptcy other than what you just mentioned?
8  A.   I just thought from the committee's standpoint,
9  this was not a well-oiled machine --
10  Q.   What do you mean by that?
11  A.   -- in any sense
12      They simply didn't approach the tasks
13  they were charged with as professionally -- or
14  with professional advice.
15      Whatever they did, they didn't seem
16  to do very well.
17  Q.   Did you think there was any problem with the
18  fact that AHERF had not approached other
19  potential buyers other than Vanguard and Tenet
20  prior to the bankruptcy?
21      MR. COGAN: Objection.
22      THE WITNESS: I don't know whether
23  that may or may not have been a root cause of
24  the basic problem. I don't think limiting it
25  to two --

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 238

1      They could have had ten.
2  BY MR. TERUYA:
3  Q.   They just weren't handling the process well?
4  A.   I didn't think so.
5  Q.   Did you or any other representatives of MBIA or
6  the committee ever take any steps to intervene
7  in terms of management's conduct in running the
8  sale and due diligence process other than what
9  you said about asking that a data room be
10  created?
11  A.   I think we made suggestions and comments, but
12  as creditors and ultimately even as members of
13  the unsecured creditors' committee, this isn't
14  a process where you can simply step in ala the
15  European process, damn it, step in and just
16  take over and do it yourselves.
17      This arrangement and this legal
18  system simply doesn't permit that to occur. We
19  can have opinions; we can even express those
20  opinions, but whether they have effect on the
21  parties to whom we're expressing them, though,
22  is a different story.
23      Here, they apparently had little
24  effect.
25  Q.   If an event of formal default had been declared

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 239

1  by PNC, could PNC then have forced management
2  to make certain decisions with respect to the
3  sale process?
4  A    To the extent that it would have caused them to
5  end up in the bankruptcy sooner, I don't think
6  it would have had substantial effect, because
7  they still would have been in place. They
8  still would have been the same people.
9  Q.   After PNC declares an event of default in terms
10  of the available remedies that PNC has, can PNC
11  force management of a borrower to make certain
12  decisions at that point?
13  A.   We can negotiate it for that.
14  Q.   I'm sorry?
15  A    We can negotiate for that outcome; but in terms
16  of forcing it as if forcing it will lead to its
17  implementation, no, that's not how it works.
18  Q    Can PNC ever force management to make certain
19  decisions in terms of the rights it has
20  available to it under the letters of credit
21  agreement?
22  A    We have made it a --
23      We have done it in the past where we
24  requested or required that for, say, new money
25  advances that the company would alter

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 240

1  management, change management, hire a crisis
2  manager, take steps like that; and sometimes we
3  get what we want, and sometimes we don't.
4  Q.   It's still a negotiated process even in
5  instances like that?
6  A    Unfortunately, given the U.S. legal system,
7  it's still a negotiated process, yes.
8      It's one of the flaws here, that and
9  the elimination of debtors' prison, but that's
10  just me.
11  Q    I'm sorry. That and what?
12  A    The elimination of debtors' prisons, but that's
13  just me.
14  Q    Do you have any understanding of whether there
15  was a refinancing of AHERF's -- or AGH's bonds
16  at some point in time after the bankruptcy
17  filing by AHERF?
18  A    No, there was a refinancing of the West Penn
19  bonds and then a refinancing -- or reissuance
20  of certain of the AGH bonds as part of the West
21  Penn transaction.
22  Q    So is it your understanding that the AGH bonds
23  were defeased using the proceeds of the West
24  Penn bond offer?
25  A    No.

MANHATTAN REPORTING CORP., A LEGALINK COMPANY

60 (Pages 237 to 240)

THOMAS McCOOL

Page 241

1  Q.  That's not your understanding?
2  A.  No.
3  Q.  Do you have any understanding of whether AGH
4      bondholders have been repaid?
5  A.  I believe they have.
6  Q.  Did PNC suffer any losses with respect to the
7      AGH Obligated Group letters of credit?
8  A.  Yes, we did.
9  Q.  What losses were suffered?
10 A.  In rough terms, I'm trying to recall, but it
11     would have been somewhere on the order of
12     $13 million to $14 million.
13 Q.  And what constituted those losses?
14 A.  The repayment of the bondholders under our
15     letter of credit, and the refinance -- the
16     purchase combination of West Penn and AGH and
17     the amount of money we actually received in
18     that transaction.
19 Q.  So even after the West Penn bond offering, AGH
20     Obligated Group still didn't have enough money
21     to repay the bondholders.  Is that what you're
22     saying?
23 A.  That's right.
24 Q.  Was the AGH Obligated Group able to repay the
25     bondholders to some extent?
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 242

1  A.  The bondholders were paid in full.  They had
2      an LC.
3  Q.  A letter of credit?
4  A.  We, as the letter of credit holder, were not
5      paid in full, because we paid the bondholders;
6      but AGH did not pay us the full amount.
7  Q.  Okay.  So the total magnitude of the AGH
8      letters of credit, as we've seen, was far in
9      excess of $13 million.  Right?
10 A.  Our share of that was roughly $44 million.
11 Q.  $44 million.  Okay.
12 A.  Yes.
13 Q.  And you, PNC, recovered the amount of the
14     letters of credit except for $13 million to
15     $14 million.  Correct?
16 A.  The way the deal was structured in the West
17     Penn transaction is we received two-thirds in
18     cash, and we received one-third in a very soft,
19     very subordinated note, which we value at zero.
20 Q.  And what is the purpose of that note?
21 A.  Actually, you'd have to ask Morgan.  They
22     wanted it more than I did.
23 Q.  Do you know if that note is supposed to --
24     Well, let me rephrase that.  Who
25     still owes PNC the $13 million to $14 million?
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 243

1  A.  West Penn/Allegheny Health System.
2  Q.  And what are the terms of that -- or what is
3      the nature of that obligation of West Penn to
4      PNC?
5         MS. HACKETT:  What do you mean
6      "nature"?
7         MR. TERUYA:  How is it that West
8      Penn --
9         MR. COGAN:  A subordinated note.
10        THE WITNESS:  Yes.  It's a very
11     subordinated note.
12        MR. TERUYA:  So West Penn currently
13     doesn't have enough money to pay PNC.  Is
14     that --
15        MS. HACKETT:  Currently?  You mean as
16     of today?
17        MR. TERUYA:  Well, at the time
18     whenever this occurred, whenever the bond
19     offering occurred and PNC ended up being owed
20     $13 million to $14 million.  I'm just trying to
21     understand why is it --
22        THE WITNESS:  I would have to go
23     through the whole structure of the West
24     Penn/Allegheny merger, but in summary form,
25     Highmark advanced $125 million to West Penn in
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

Page 244

1  the form of bridge financing to assure the
2  liquidity of the overall system which is first
3  as to priority in payment of West
4  Penn/Allegheny Health System, which is the
5  combined entity.
6     The next is the refinanced MBIA
7  bonds, as well as additional amounts that were
8  issued in order to make a cash payment to PNC,
9  Sumitomo, and Morgan, all of whom received
10 roughly two-thirds of their obligation in cash
11 and the other one third in junior notes that
12 are subordinated first to the $125 million in
13 Highmark debt and next to the $300 million or
14 $400 million of MBIA, slash, bondholder debt;
15 and then there's about $43 million in total of
16 these what are called -- I forget.  I think the
17 name we came up with actually were FRRCs,
18 floating rate restructuring certificates.
19 BY MR. TERUYA:
20 Q.  So currently right now the sum of that is that
21     PNC is owed $13 million to $14 million from
22     West Penn and --
23 A.  West Penn/Allegheny Health System.
24 Q.  And a note has been tendered or provided by
25     that system to PNC?
       MANHATTAN REPORTING CORP., A LEGALINK COMPANY

61 (Pages 241 to 244)