TAB 271

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

## C. DAVID COOK
*November 25, 2003*

---

# LEGALINK MANHATTAN
# CONFIDENTIAL EXCERPTS EXTRACTED

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

COOK, C. DAVID - Vol. 2



LEGALINK
A WORDWAVE COMPANY

1      You may answer.

2  A.  Yeah, I think -- well, feels to me like I've

3     already answered that. No, I've had no

4     conversations with Coopers & Lybrand.

5  Q.  And am I correct that you received -- let me

6     rephrase this. Am I correct that your salary

7     and benefits are paid by PNC?

8  A.  You are correct.

9  Q.  And am I correct that PNC is a member of the

10    Plaintiff -- the Creditors Committee in a

11    lawsuit currently being brought against

12    PriceWaterhouseCoopers, LLP?

13  A.  You are giving me that information. I wasn't

14    formally aware of it before that.

15  Q.  Do you have any knowledge of what this lawsuit

16    is about that you are offering deposition

17    testimony in?

18        MS HACKETT: You should answer yes

19    or no to that question.

20  A.  Okay. The question is do I have any

21    knowledge --

22  Q.  Let me try to back up. Do you know whether PNC

23    is a member of the Plaintiff in this case, just

24    yes or no?

25  A.  I do because you told me. Prior to your

1     telling me I didn't know.

2  Q.  Okay. Do you personally know of any GAAP

3    violation in any financial statements of AHERF?

4  A.  No.

5  Q.  Do you personally know of any GAAP --

6        MR. COGAN: Wait a minute. Other

7    than the one that you've already brought to his

8    attention that was in the officer's

9    certificate --

10       THE WITNESS: Right.

11       MR. COGAN: -- that was discussed

12    earlier today?

13       MR. TERUYA: That's right, although

14    that was with respect to DVOG.

15       THE WITNESS: Well, but AHERF was

16    part of DVOG.

17  BY MR. TERUYA:

18  Q.  Okay. Other than the violation that was

19    disclosed in the officer's certificate authored

20    by Charles Morrison, are you aware of any GAAP

21    violation or do you personally know of any GAAP

22    violation in any financial statements of AHERF?

23  A.  And I would say no.

24  Q.  And other than that violation, do you know of

25    any GAAP violation in the DVOG, in any

1     financial statements of DVOG?

2  A.  At some point someone may have said to me,

3    because it's sticking in my mind, that the way

4    they treated the sale of a particular building

5    may not have been according to GAAP, but I

6    can't tell you who told me that and I can't

7    tell you when I learned it, and I don't even

8    know if it's true or not.

9  Q.  That's not based on your personal knowledge,

10    it's just based on what someone told you?

11  A.  Right, if your phrase -- and maybe that's

12    really useful. If you are using the word

13    "know" from my personal knowledge versus

14    secondhand, then I can easily say no to the

15    question.

16  Q.  Okay. Yeah, when I'm asking you about your

17    personal knowledge or what you personally know,

18    I mean to exclude hearsay --

19  A.  That's fine.

20  Q.  -- what you heard from people.

21  A.  That will help me.

22  Q.  Okay. Do you personally know of whether the

23    violation or alleged violation that Charles

24    Morrison wrote about in the officer's

25    certificate was, in fact, a GAAP violation?

1  A.  I do not.

2  Q.  Do you personally know of any material

3    misstatement in any financial statements of

4    AHERF?

5  A.  I do not.

6  Q.  Do you personally know of any material

7    misstatements in any financial statements of

8    DVOG?

9  A.  No.

10  Q.  Do you personally know of any audit failure by

11    Coopers & Lybrand?

12  A.  No.

13  Q.  Do you personally know of any failure by

14    Coopers & Lybrand to comply with GAAS,

15    generally accepted auditing standards?

16  A.  No. In fact, I've never -- I haven't heard

17    that phrase before. Always wondered if they

18    can -- well, I'll be quiet.

19  Q.  Do you personally know of any failure by

20    Coopers & Lybrand to comply with its contract

21    with AHERF and/or any of its affiliates?

22  A.  No. I said previously I'm unaware of the

23    extent of the contract.

24  Q.  Do you personally know of any failure by

25    Coopers & Lybrand to expose AHERF's

1  deteriorating financial condition, violations
2  of various debt covenants, deficient financial
3  controls and AHERF senior officials' financial
4  manipulations?
5  A.  No to all.
6  Q.  Do you personally know of which trustees, if
7  any, of AHERF were uninformed about the true
8  state of the financial condition of AHERF?
9  A.  The question causes me to want to believe that
10  some were informed and some weren't, and I
11  don't even have that knowledge. So I mean I --
12  I can only come in and say that I assume all
13  trustees had equal knowledge. If you are aware
14  of something else, then that's -- I'm not aware
15  of that.
16  Q.  Yeah, I'm not asking you to assume. I'm just
17  asking if you have any personal knowledge one
18  way or the other.
19  A.  But the wording of the question basically asks
20  me to tell you if I'm aware that some trustees
21  were uninformed, and that's a little bit like
22  when did you stop beating your wife.
23  Q.  I said do you personally know which trustees,
24  if any --
25  A.  I'm sorry, if any.

1  Q.  -- of AHERF were uninformed about the true
2  state of the financial condition of AHERF?
3  A.  No.
4  Q.  Do you know of what steps, if any, any trustees
5  of AHERF would, in fact, have taken if they had
6  had additional information about the financial
7  condition of AHERF at an earlier point in time?
8  A.  No.
9  Q.  Do you personally know of what, in fact, would
10  have been the effect, if any, of any steps that
11  any trustees of AHERF could have taken?
12  A.  No.
13  Q.  Do you personally know of any steps that any
14  trustees of AHERF could have taken that would,
15  in fact, have halted AHERF's financial demise?
16  A.  No.
17  Q.  Do you personally know what steps, if any, any
18  creditors of AHERF, including --
19  A.  Can we go back, can we go back to that one?
20  Q.  Oh, sure. Do you personally know of any steps
21  that any trustees of AHERF could have taken
22  that would, in fact, have halted AHERF's
23  financial demise?
24  A.  I suppose because we have just discussed the
25  letter and the proposal that PNC and MBI made,

1  and when we discussed that I told you that I
2  thought there was a fair chance that that
3  financing might have stabilized it, but I
4  really have to change the answer on that one
5  and say that if the trustees had accepted the
6  proposals from PNC and MBIA, that I believe it
7  might have given them a chance to stabilize the
8  organization.
9  Q.  Other than that are you aware of any steps that
10  trustees of AHERF could have taken that would
11  have halted AHERF's financial demise?
12  A.  No.
13  Q.  Do you personally of know what steps, if any,
14  any creditors of AHERF, including PNC, would,
15  in fact, have taken if they had had additional
16  information about the financial condition of
17  AHERF at an earlier point in time?
18  A.  No.
19  Q.  Do you personally know --
20  A.  I mean I think we would have done something,
21  but it's just speculative. As we said before,
22  I mean lending is an art, not a science.
23  Q.  So the answer to your last question just to be
24  clear is no, no personal knowledge?
25  MR COGAN:  Objection.

1  MS. HACKETT:  No, he answered the
2  question. He didn't answer no.
3  A.  My answer would be no, comma, but if we had --
4  if we had received different financial
5  information than we received and it was -- I'm
6  drawing the conclusion it was more negative --
7  if we had received it and it was more negative,
8  we would have had a chance to do something. I
9  can't tell you what we would have done, but the
10  earlier we had a chance to start dealing with
11  something, the better off, generally speaking,
12  you know, we are and the client is.
13  Q.  Okay. And based on what you talked about
14  before about the considerations, the many
15  considerations that go into choosing among many
16  options, you have no personal knowledge of what
17  particular steps, if any, any creditors of
18  AHERF would have taken if they had had
19  additional information about the financial
20  condition of AHERF at an earlier point in time?
21  A.  Good answer, I agree.
22  Q.  And do you personally know what, in fact, would
23  have been the effect, if any, of any steps that
24  could have been taken by any creditors of
25  AHERF, including PNC?

Page 575

1                    MR COGAN: Objection.
2    A.    It's too general for me to say, but the answer
3          is generally no.
4    Q.    Do you personally know of any steps that any
5          creditors of AHERF, including PNC, could have
6          taken that would, in fact, have halted AHERF's
7          financial demise?
8    A.    Could have halted, no. Might have halted, I'll
9          go back to the proposals that we were making,
10         the financing that we and MBIA as creditors
11         were making might have halted it, and what we
12         could have done was, I suppose, been more
13         successful at getting the board to accept them,
14         but other than that, no.
15   Q.    Do you personally know of any conduct of
16         Coopers & Lybrand that contributed to delays in
17         discovering the true financial state of affairs
18         in the AHERF system?
19   A.    I guess I have to say no.
20   Q.    Do you personally know of any conduct of
21         Coopers & Lybrand that aided in preventing the
22         immediate implementation of effective measures
23         in time to reverse the decline in the system's
24         financial condition?
25   A.    No, other than suggesting that whatever their

Page 576

1          normal processes and procedures were, they may
2          not have been as effective here as they would
3          have liked.
4    Q.    Do you have any personal knowledge as to
5          whether that's, in fact, true?
6    A.    No.
7    Q.    Do you have any personal knowledge of any
8          inaccuracies revealed in the AHERF system's
9          financial statements that had a material and
10         negative effect on the sale price of certain
11         AHERF affiliates?
12   A.    No.
13   Q.    Do you personally know whether if any creditors
14         of AHERF, including PNC, had had additional
15         information about the financial condition of
16         AHERF at an earlier point in time, the system,
17         in fact, would have been precluded from
18         incurring the obligations to creditors that
19         eventually forced its bankruptcy?
20                    MR COGAN: Objection.
21   A.    Yeah, I can surmise that that's true, but I
22         don't -- I don't really know specifically at
23         which point financial information may not have
24         been being accurately portrayed. So I can't,
25         without that knowledge, I can't exactly guess

Page 577

1          what steps might have, you know, might have
2          been about to take place or didn't take place.
3    Q.    And I don't mean to ask you to guess and let me
4          just ask you --
5    A.    I know, that's why I'm not guessing.
6    Q.    Okay. So just to be clear, you don't have any
7          personal knowledge of this issue, in fact?
8                    MS. HACKETT: Of this issue? I don't
9          know what --
10   Q.    Okay. Let me -- do you have any --
11   A.    I'm sorry, if you'll read it again, I'll try to
12         not equivocate. I wasn't trying to equivocate.
13   Q.    Okay. Do you have any personal knowledge of
14         whether if any creditors of AHERF, including
15         PNC, had had additional information about the
16         financial condition of AHERF at an earlier
17         point in time, the system would, in fact, have
18         precluded -- have been precluded from incurring
19         the obligations to creditors that eventually
20         forced its bankruptcy?
21                    MR COGAN: Objection.
22   A.    Yeah, and I guess I'd answer partly like I
23         answered above, and that really is that I don't
24         know what we would have done, but given
25         different financial information at an earlier

Page 578

1          time, we would have done something, and I go
2          back to my rumble strip. I don't know when I
3          hit the rumble strip what I'm going to do, but
4          if we had different financial information
5          sooner, we would have done something.
6    Q.    And do you know whether the effect of whatever
7          steps might have been taken would have been in
8          terms of precluding the system from incurring
9          the obligations that forced its bankruptcy?
10   A.    And that's why I was going back to timing.
11         Certainly some of the steps where they took on
12         additional debt might have taken place after,
13         we might have gotten different financial
14         information. There's a couple of speculations
15         in there. I don't like double "mights," but,
16         you know, if we -- if both of those had
17         occurred, yes, we might have precluded them
18         from making, you know, such acquisitions as the
19         Graduate acquisition.
20   Q.    But you don't know whether, you don't
21         personally know whether, in fact, that
22         acquisition or any others would have been
23         precluded; is that fair to say?
24                    MS. HACKETT: Objection, how can he
25         know about an event that didn't happen? How

60 (Pages 575 to 578)

Page 579

1  could he -- you are asking if you --
2      MR TERUYA: That's my point. If he
3  just says no, how can I know about an event
4  that didn't happen, that's fine.
5  A.  Great. I can't know about an event that didn't
6  happen, so I can't -- I can't presume to guess
7  what might have happened afterwards.
8  Q.  Okay. Do you personally know if any decrease
9  in AHERF's income or assets for fiscal '96 or
10  '97 in, fact, have caused bondholders,
11  credit enhancers or other creditors to have
12  acted any differently?
13  A.  And my generic answer has to be if we had
14  gotten different information, I'm sure we would
15  have acted differently, but I don't know the
16  extent to which we would have acted
17  differently.
18  Q.  How do you know that you, in fact, you would
19  have acted differently?
20  A.  I'm comfortable based on having been a banker
21  for a lot of years that a change -- you know,
22  any change in a set of information that you get
23  causes you to think about it differently. I
24  don't know exactly how I would have thought
25  about it; therefore, I don't know exactly what

Page 580

1  I would have done, but, you know, but any
2  changes, particularly those if they happen to
3  have been substantial would have caused us --
4  would have caused me and everyone else to react
5  differently in the bank.
6      I can't speak for the other
7  creditors. I can presume they would have done
8  the same thing.
9  Q.  Okay. And you mentioned that you would have at
10  least thought differently. Is it possible that
11  you might have nevertheless acted the same?
12      MR. COGAN: Objection.
13      MS. HACKETT: Come on, Kevin,
14  objection.
15  A.  Sure, in the third might, we might have gotten
16  different information at a different time, so
17  we might have -- we might have thought
18  differently but we might not have acted
19  differently, that's true. That's certainly a
20  possibility.
21  Q.  And would your answer be the same if I asked
22  you about any decrease in DVOG's income or
23  assets for fiscal '96 or '97?
24      MR. COGAN: Well, objection, I don't
25  know what you mean by the same.

Page 581

1  Q.  Okay. Do you have any personal knowledge
2  whether -- or if any decrease in DVOG's income
3  and/or assets for fiscal '96 and/or '97 would,
4  in fact, have caused bondholders, credit
5  enhancers or other creditors to have acted any
6  differently?
7  A.  Yeah, and in similar vein, on the scale of
8  mights, and I understand that's perhaps not
9  where everybody would like me to be, but the
10  financial condition of DVOG was less strong
11  than the financial condition of AHERF. So if
12  there had been a negative change to some of the
13  numbers at DVOG, it is more likely we would
14  have not only thought differently, but acted
15  differently, but there wasn't as much cusion
16  there.
17  Q.  But you don't know in fact --
18  A.  But I do not know in fact, you are right.
19  Q.  -- whether you would have acted any
20  differently?
21  A.  Correct.
22  Q.  Do you know whether if any decrease in AHERF's
23  income or assets for fiscal years '96 or '97
24  would, in fact, have caused any covenant
25  violations?

Page 582

1  A.  Other than my previous comments, no.
2  Q.  What comments are those with respect to
3  covenant violations?
4  A.  Oh, I'm sorry, you just switched topics. No, I
5  do not.
6  Q.  Do you have any personal knowledge of any
7  decrease or do you personally know of any
8  decrease in DVOG's income or assets for fiscal
9  '96 or '97 would, in fact, have caused any
10  covenant violations?
11  A.  No, and I guess both of the questions depend on
12  the severity of the decrease.
13  Q.  Do you personally know what steps, if any, any
14  creditor of AHERF would, in fact, have taken in
15  response to learning of a covenant violation?
16  A.  No, but even more than what I said before, more
17  than just getting information and feeling
18  differently about it, a covenant violation says
19  we are definitely on the rumble strip, so we
20  would have done something different.
21  Q.  Do you personally know what particular steps,
22  if any, any creditor of AHERF, including PNC,
23  would, in fact, have taken in response to
24  learning of a covenant violation?
25      MS. HACKETT: Objection, other than

61 (Pages 579 to 582)

Page 583

1   what he's already testified to, that they --
2   extensively about what a bank might do in
3   response to a covenant violation?
4          MR. TERUYA: I'm asking whether he
5   personally knows what they would, in fact, do
6   in response to learning of a covenant
7   violation.
8   A.   I don't know what we would have done other than
9   we would have done something.
10  Q.   And do you personally know what steps, what
11  particular steps, if any, any creditor of
12  AHERF, including PNC, would, in fact, have taken
13  in response to learning of a GAAP violation?
14  A.   Would it -- would it help, because this is got
15  to be just as tough for you to read these as it
16  is for me to answer these, would it help for me
17  to agree that almost anyone involved, I don't
18  know what anyone would, in fact, have done
19  based on almost any scenario, because we are
20  talking about someone -- we are talking about,
21  you know, other creditors or other
22  organizations that I have no way to control. I
23  can't even control PNC.
24  Q.   Okay. I was going to say I'm almost -- I'm
25  close to the end, it's probably worth just

Page 584

1   finishing it out.
2   A.   Okay. Then you are having fun, go ahead.
3   Q.   Do you personally know what steps, if any, any
4   creditor of AHERF, including PNC, would, in
5   fact, have taken in response to learning of a
6   GAAP violation?
7   A.   I do not, but, again, a GAAP violation would be
8   like a double rumble strip, so we would have
9   done something.
10  Q.   But you don't know what that something is?
11  A.   But I do not know what we would have done.
12  Q.   Do you personally know what steps, if any, any
13  creditor of AHERF, including PNC, would, in
14  fact, have taken in response to learning of a
15  material misstatement in financial statements
16  of AHERF or its affiliates?
17  A.   No, similar to prior comments, no, I do not
18  know a specific step that we would have taken.
19  Q.   Do you personally know what steps, if any, any
20  creditor of AHERF, including PNC, would, in
21  fact, have taken if an event of default had
22  been declared?
23  A.   By whom?
24  Q.   By any creditor including PNC, with respect to
25  any credit that had been extended to AHERF.

Page 585

1   A.   No, I don't know what steps we would have taken
2   if someone else had declared an event of
3   default, but we would have quickly, you know,
4   gotten together to decide what our own possible
5   action steps were going to be.
6   Q.   And do you personally know what steps, if any,
7   PNC, would, in fact, have taken if an event of
8   default had been declared by PNC?
9   A.   If PNC had declared an event of default, you
10  are asking me what PNC would have done? After
11  PNC declared an event of default, it would have
12  continued negotiations with the borrower.
13  Q.   And beyond that, do you personally know what
14  steps PNC would have taken?
15  A.   No, lots of choices.
16  Q.   Do you personally know what steps, if any, any
17  creditor of AHERF would, in fact, have taken if
18  Coopers & Lybrand had issued an unqualified
19  opinion on any AHERF or DVOG financial
20  statements?
21  A.   Well, we wouldn't have done the DVOG financing.
22  We wouldn't have -- we wouldn't have done -- we
23  wouldn't have extended the AGH letter of
24  credit, and we wouldn't have done a lot of
25  things if it had been an unqualified debt. I'm

Page 586

1   sorry, you said unqualified and I leaped to
2   qualified.
3   Q.   I'm sorry, then I misspoke. Let me just ask
4   the question again.
5          What steps, do you personally know
6   what steps, if any, any creditor of AHERF,
7   including PNC, would, in fact, have taken if
8   PNC had issued a qualified opinion on any AHERF
9   or DVOG financial statements?
10  A.   Then my answer actually stands. We would not
11  have extended the DVOG financing, we would not
12  have extended the AGH letters of credit, we
13  would, in fact, have started to -- well, we
14  would have studied I suppose a full exit
15  scenario.
16  Q.   With respect to the DVOG bond issuance, I take
17  it your answer is true only if the qualified
18  opinion were with respect to some set of
19  financial statements that were issued before
20  the DVOG bond issuance?
21  A.   Right, if we got a qualified financial
22  statement after the bonds were outstanding,
23  then we would have pretty quickly entered into
24  some conversations with both AHERF and
25  probably, you know, well, certainly would have

62 (Pages 583 to 586)

TAB 272



Sherif S. Abdelhak
President and Chief Executive Officer

RECEIVED

AUG 1 3 1996

FRANK V. CAHOUET

Broad & Vine
Mail Stop 400
Philadelphia, PA 19102-119
215-762-8450
215-762-1754 Fax

320 East North Avenue
Pittsburgh PA 15212
412-359-6800
412-359-5192 Fax

ALLEGHENY
UNIVERSITY
OF THE HEALTH SCIENCES

August 8, 1996

Dear Members of the Allegheny Board of Trustees:

I would like to update you regarding the opportunity recently presented to AHERF by The Graduate Health System (GHS). The Graduate Health System, headquartered in Philadelphia, is a 501(c)(3) not-for-profit corporation that owns and operates a diversified healthcare system including general and specialty hospitals, a network of ambulatory care providers and managed care components. The Graduate Hospital serves as the cornerstone of the six hospital, 1440 bed system, which includes Graduate Hospital (330 beds), Mt. Sinai Hospital (230 beds), City Avenue Hospital (180 beds) and Parkview Hospital (195 beds) in Philadelphia; Rancocas Hospital (318 beds) in New Jersey; and Community General Hospital (188 beds) in Reading, Pennsylvania. The system also includes Founders Healthcare, Inc., which owns and manages physician practices in Pennsylvania, New Jersey and Delaware, GS RE, Inc. an off-shore Bermuda captive insurance company, two foundations and a management company.

The management of GHS had approached AHERF Management about certain of its hospitals and other organizations becoming part of AHERF. More specifically, under such proposal, all of the previously denoted GHS organizations, except for Community General Hospital in Reading (which is currently under sales contract) and the management company (which basically incurs cost for several executives and allocates them to the operating units), would be part of this transaction. Essentially, the entities to be transferred represent total assets of approximately $423 million with total revenues of approximately $381 million.

However, given that this is a large complicated organization, we believe it prudent to utilize an interim step in the acceptance process. Rather than AHERF, the immediate transaction would occur between GHS and SDN. SDN, Inc. [formerly United Hospitals, Inc.] is a 501(c)(3) not-for-profit corporation which is currently inactive and independent of AHERF, but which is managed by AHERF. In that SDN, Inc. is not a member of AHERF no prior approval by the AHERF Board of Trustees was necessary to approve this transaction. However, in the future, should SDN, Inc.'s management feel it appropriate to transfer one or more of the preceding entities into the AHERF System, after securing all the necessary legal and regulatory approvals and the completion of various due diligence reviews and resolution of resulting issues to the satisfaction of AHERF, the AHERF Board will then review and confirm the Executive Committee's actions. As you are aware, we have accepted this overture.

DVR 40997.1

FVC 01668

Allegheny Health Education and Research Foundation

...al Hospital • Allegheny Integrated Health Group • Allegheny University of the Health Sciences • Allegheny University Hospitals • St. Christopher's Hospital for Cl...

DEPOSITION
EXHIBIT
2385
ACF

Allegheny Boards of Trustees
August 8, 1996
Page 2


The AHERF Executive Committee members have given their concurrence and approval to move forward in the direction as outlined in this correspondence. If you have any questions please call me at 412-359-8800.

Sincerely,

Sherif S. Abdelhak

## DESCRIPTION OF PROPOSED REORGANIZATION

A.    Parties

 1. Graduate Health System ("GHS") and SDN, Inc. ("SDN"), a Pennsylvania non-profit corporation, both tax-exempt under Section 501(c)(3)

 2. GHS Subsidiaries

  (a) The Graduate Hospital
  (b) Mt. Sinai Hospital
  (c) GHS City Avenue Hospital and GHS Parkview Hospital
  (d) Zurbrugg Memorial Hospital and Rancocas Valley Hospital
  (e) Founder's Health Plan (including professional corporations)
  (f) GS Re, Inc. (captive insurance subsidiary)
  (g) At a future date, one or more of the entities providing outpatient and ancillary services previously owned and now owned by Health Systems International ("HSI") (including GHS Home Medical, Advanced Technology, Inc., Concorde Clinical Research, Bala Imaging, and Mid-Atlantic Stone Center).

B.    Proposed Transactions

 1. GHS transfers control of GHS Subsidiaries to SDN; SDN will have the power to amend Articles of Incorporation and Bylaws, to appoint and remove subsidiary directors, and to appoint and remove subsidiary Presidents/CEO's.

 2. SDN operates GHS Subsidiaries as parent holding company similar to GHS.

 3. GHS Subsidiaries retain current assets and liabilities.

C.    Financial

 1. GHS pays capital contribution to The Graduate Hospital; ($10 million on the effective date; $5 million each on first, second, and third anniversary dates totalling $25 million).

 2. GHS calculates inter-company liabilities between and among GHS and the GHS Subsidiaries; net amount owing to GHS of approximately $3,448,000 is forgiven.

 3. GHS transfers certain restricted funds, trusts and Board-designated assets to individual GHS Subsidiaries (including $6.2 million in restricted endowments and funds for Graduate Hospital,

Description of Proposed Reorganization
August 3, 1996
Page 2

4.    SDN will pay for the salary and certain benefits of Harold Cramer, Esq. through November 30, 1998 at the level specified in his present employment agreement; SDN will hire Robert Mathews as Chief Operating Officer of the GHS Subsidiaries for the remaining term of his employment agreement at his present salary; GHS will remain responsible for paying certain pension benefits payable to Harold Cramer, Esq. and Robert Mathews.

5.    SDN will provide severance benefits to employees of GHS Subsidiaries with two weeks of severance for each year of service up to a maximum of 26 weeks and healthcare vouchers to be used by displaced employees or their families at hospitals and physicians' offices designated by SDN.

6.    SDN, with necessary approvals, will assume responsibility for guarantees of GHS Subsidiary indebtedness, provided that GHS will be responsible for paying the difference between regular debt service and any payments accelerated as a result of the reorganization.

D.    Other Terms

1.    All GHS Subsidiaries will be released from the Management Agreement between GHS and HSI Management;

2.    GHS will negotiate with HSI for the transfer of the ancillary businesses; in turn, GHS will transfer to SDN any of the ancillary businesses transferred to GHS.

3.    GHS's interests in Founder's professional corporations in Pennsylvania, New Jersey, and Delaware will be assigned to SDN designee.

E.    Indemnities

1.    SDN will indemnify GHS and its directors/officers/employees/agents/representatives for acts or omissions of SDN in connection with the reorganization or from acts or omissions of SDN after the effective date of the reorganization.

2.    GHS will indemnify SDN and its directors/officers/employees/agents/representatives for acts or omissions of GHS in connection with the reorganization or from acts or omissions of GHS prior to the effective date of the reorganization.

F.    Process

1.    GHS approves resolutions.

2.    GHS certifies approval of resolutions and satisfaction of required conditions to SDN.

3.    SDN certifies approval of resolutions and satisfaction of required conditions to GHS.

4.    Resolutions and transactions take effect.

DVR 40896.1

PVC  01571

\

Description of Proposed Reorganization
August 3, 1996
Page 3

5.      After reorganization, SDN will undertake due diligence review, resolution of outstanding issues, and securing of necessary governmental and legal approvals.

6.      Upon completion of due diligence and approval processes satisfactory to AHERF, GHS Subsidiaries will become part of the AHERF System.

7.      If joinder of GHS Subsidiaries with AHERF System is not completed  within 24 months of the effective date of reorganization (unless reasons are beyond control of AHERF), GHS may recover the GHS Subsidiaries and reverse the reorganization.

DVR 40896.1

PVC 01572

TAB  273

# In The Matter Of:

## In Re:   AHERF

---

## Robert Zimmerman
## February 20, 2001

---

## Morse, Gantverg & Hodge, Inc.
## 719 One Bigelow Square
## Pittsburgh, PA   USA   15219
## (412) 281-0189

*Original File dle510.txt, 222 Pages*
*Min-U-Script® File ID: 3617826264*

# Word Index included with this Min-U-Script®

Page 12

[1] **Q:** What did you understand that to mean,
[2] the idea of acquiring the system outside of
[3] AHERF?
[4] **A:** Typically what occurred with –
[5] well, what had occurred with the immediate prior
[6] transaction, which was the acquisition of
[7] Hahnemann University, is that the, a company
[8] called SDN, Inc. could become the member or
[9] acquire the assets of the company and would then
[10] conduct its management review. And the board of
[11] AHERF at some point in that process, when I don't
[12] know, was asked to approve an affiliation with
[13] that organization that had become affiliated with
[14] SDN.
[15] **Q:** The testimony you just gave, was that
[16] with respect to the prior transaction, is that
[17] what you were talking about, the Hahnemann
[18] transaction?
[19] **A:** Correct.
[20] **Q:** When did that transaction occur?
[21] **A:** I want to say 1994.
[22] **Q:** And the Hahnemann entity or entities,
[23] where was it located?
[24] **A:** In downtown Philadelphia.
[25] **Q:** Same question about the Graduate Health

Page 13

[1] System, to your knowledge in July, in or about
[2] July of 1996, what comprised that system and
[3] where were those facilities located?
[4] **A:** Graduate Health System was the parent
[5] company. Its headquarters was in downtown
[6] Philadelphia in an old church building that had
[7] been renovated. Graduate Hospital was the
[8] flagship. It was sort of in center city area of
[9] Philadelphia.
[10]     Mount Sinai Hospital was some place in
[11] Philadelphia. Graduate Health System Osteopathic
[12] Hospital which I believe was on City Avenue in
[13] Philadelphia. Parkview Hospital some place in
[14] Philadelphia, and Rancocas Hospital and I believe
[15] at that time there were two campuses in the State
[16] of New Jersey.
[17]     Then there were, something called
[18] Founders that was a physician company, an
[19] offshore insurance captive and several
[20] subsidiaries and affiliates.
[21] **Q:** Now, referring back to Exhibit 7501,
[22] was that what Mr. McConnell is stating here about
[23] the nature of the transaction, was that
[24] consistent with your understanding from whatever
[25] other communications you had with him, that is an

Page 14

[1] acquisition of these entities outside of AHERF
[2] with a view to merging the physician group into
[3] AHERF and selling off the balance of the Graduate
[4] Health System?
[5] **A:** David's communication was initially the
[6] interest was in Founders, not in the rest of the
[7] system.
[8] **Q:** And did you understand why they had an
[9] interest in the Founders entity?
[10] **A:** Not really. Didn't discuss that with
[11] me.
[12] **Q:** Do you recall whether the first
[13] communication you received on this was Exhibit
[14] 7501 or it was something else, a phone call or a
[15] meeting?
[16] **A:** It would not have been a meeting. I
[17] don't recall whether there was a phone call.
[18] **Q:** It would not have been a meeting
[19] because you are in Chicago and he was in
[20] Pittsburgh?
[21] **A:** I would have remembered a meeting.
[22] **Q:** Now, you mentioned in your prior
[23] testimony an entity I believe you identified as
[24] SDN, is that correct?
[25] **A:** Correct.

Page 15

[1] **Q:** What was SDN in July of 1996?
[2] **A:** It was the Pennsylvania not for profit
[3] corporation, tax exempt under Section 501-C-3 of
[4] the Internal Revenue Code. It was the successor
[5] to a corporation that was originally called
[6] United Hospitals, Inc. It was one of the
[7] corporations that the AHERF organization became
[8] affiliated with in 1991 when it took over control
[9] of the United Hospital system. Sometime between
[10] 1991 and 1994 or whenever the Hahnemann
[11] acquisition occurred the name was changed to
[12] SDN.
[13] **Q:** Now, you say in 1991 AHERF became
[14] affiliated with the entity that became later
[15] known as SDN. What was the nature of the
[16] affiliation at that time?
[17] **A:** In 1991?
[18] **Q:** Yes, sir.
[19] **A:** AHERF became the member of United
[20] Hospitals, Inc., which itself owned and operated
[21] two or three hospitals, I don't recall, in
[22] Philadelphia. It also became a member of
[23] St. Christopher's Hospital for children, which at
[24] that time had just completed a new construction
[25] project and a new hospital. There may have been

Page 16

other corporations as part of that affiliation and I don't recall them.

Q: Did that affiliation ever change after 1991, that is, AHERF being the member of United Hospitals?

A: There were a series of corporate restructurings that had occurred. One of those hospitals I believe was closed. I think it was called Longdale. Two of the hospitals eventually became owned and operated by, I can't recall the name of the Philadelphia Acute Care Hospital Corporation, but that particular corporation, Allegheny University Medical Centers, I just don't remember what it was.

Q: An AHERF affiliate?

A: Yes. St. Christopher's stayed as a separate corporation but all the way through as an AHERF affiliate.

Q: Let me approach it differently. In July of 1996 the entity that had once been known as United Hospitals was then known as SDN, correct?

A: 19 when?

Q: In July of 1996.

A: Yes.

Page 17

Q: And just for the record do you know what the acronym SDN stood for?

A: Yes.

Q: What was that?

A: S was Sherif as Sherif Abdelhak the president of the organization.

Q: President of what organization?

A: AHERF. D, David McConnell, the CFO of AHERF, and Nancy Wynstra the EVP and general counsel of AHERF.

Q: At that time, July 1996, was there to your knowledge any legal affiliation between SDN and AHERF?

A: I understood that there was a management contract between AHERF and SDN. There was no direct membership relationship between AHERF and SDN. By that I mean that SDN didn't have as its member AHERF as, for example, St. Christopher did.

Q: To your understanding in July of 1996 then SDN was, there was this management contract you have testified to. Beyond that SDN was legally independent of AHERF, is that your understanding?

A: Yes.

Page 18

[1] Q: Now, by whom – well, strike that.
[2] After this contact from Mr. McConnell in July of
[3] 1996, was Foley & Lardner retained to do any work
[4] in connection with the GHS matter?
[5] A: Yes. We were retained for what
[6] management referred to as a management review.
[7] As lawyers we would think of it as similar to a
[8] due diligence review that would occur in any M&A
[9] transaction or financing transaction. The
[10] difference being is the due diligence review
[11] would occur prior to the consummation of the
[12] transaction. The management review was not
[13] intended to lead to the judgment of whether to
[14] consummate or not but rather to understand what
[15] SDN was going to be acquiring.
[16]     Our part of the management review, so
[17] to speak, was review of the debt, the corporate
[18] structure, the contracts, to a very limited
[19] extent the regulatory, some of the regulatory
[20] matters. Other firms were retained and involved.
[21] I don't recall the name of the firm in Detroit
[22] that did the insurance review. Drinker Biddle
[23] did the employee benefits review which may have
[24] been broader than that to include employee
[25] relations, I'm not sure. Coopers & Lybrand was

Page 19

[1] undertaken the finance review.
[2]     We were asked by Nancy to retain the
[3] firm of Blank Rome in Philadelphia for purposes
[4] of doing the real estate and environmental review
[5] which we otherwise would have done. So we did
[6] retain Blank Rome for that purpose. And a
[7] substantial amount of the regulatory and other
[8] matters that are not defined by those categories
[9] was retained by management and in-house legal
[10] staff.
[11] Q: So the principal thrust of your
[12] involvement was a review of the debt issues, is
[13] that fair?
[14] A: Debt and corporate.
[15] Q: Did you or Foley & Lardner have any –
[16] strike that. Was your law firm's retention, to
[17] your understanding, intended to cover a financial
[18] review of the transaction?
[19] A: No.
[20] Q: And was your law firm, to your
[21] understanding, retained to perform a review of
[22] the business advisability of the transaction?
[23] A: No.
[24] Q: By whom, and by this I mean what legal
[25] entity, by whom was Foley & Lardner retained in

Page 20

[1] connection, in or about July of 1996, in
[2] connection with GHS?
[3] A: SDN. Our bills were submitted, our
[4] invoices were submitted to SDN.
[5] Q: Did you – Through the time that you
[6] and your law firm worked the transaction
[7] involving GHS, did your client ever change from
[8] SDN to something else?
[9] A: At the moment when those affiliates,
[10] then affiliates of SDN became affiliates of
[11] AHERF, our work with SDN ceased and the work that
[12] we were undertaking then would have been for
[13] AHERF.
[14] Q: And do you recall when that occurred?
[15] A: I believe it was May of 1997, May 1,
[16] 1997.
[17] Q: Now, I think you indicated that the
[18] essential nature of the engagement was to perform
[19] a management review, is that correct?
[20] A: That's correct.
[21] Q: And did Foley & Lardner perform such a
[22] review?
[23] A: We did.
[24] Q: Had you performed and completed that
[25] review prior to May of 1997 when AHERF became

Page 21

[1] your client?
[2] A: What we had done was submitted to Nancy
[3] Wynstra a draft of the management report, which
[4] to the best of my knowledge was never completed.
[5] What we typically do in a due diligence review,
[6] or in this case a management review, is to submit
[7] a draft of that document, invite discussions with
[8] management over the points that are brought up in
[9] that document, particularly the significant
[10] issues that we put in an executive summary and
[11] then determine whether or not management wants us
[12] to probe any further into other areas. That did
[13] not occur. So to the best of my knowledge that
[14] report that was submitted is still and always has
[15] been a draft.
[16] Q: And when was that report submitted?
[17] First of all, I'm sorry, to whom was it
[18] submitted, this management review?
[19] A: To SDN through Nancy Wynstra. I
[20] believe in January of 1997.
[21] Q: Between January of 1997 and May of 1997
[22] did you, do you recall any further discussions
[23] with SDN or with the management of SDN regarding
[24] that review?
[25] A: Yes. There were a lot of things

Page 22

[1] brought up in that review that were being
[2] addressed and discussed by management, in some
[3] cases with us, from that moment forward. So the
[4] answer is yes.
[5] Q: But, well, let me ask the open-ended
[6] question. You say that it was then and is now a
[7] draft, it was never put into final form. Why was
[8] it not finalized, this management review report?
[9] A: We were never invited to a formal
[10] meeting or informal meeting to complete the
[11] report. The draft that we submitted we
[12] considered to be substantially final. The reason
[13] for leaving it open as a draft was to give
[14] management the opportunity to ask us to probe
[15] further, not because we believed that we had not
[16] completed certain parts of our original
[17] undertaking.
[18] Q: Foley & Lardner was satisfied with the
[19] completeness and the contents of the draft report
[20] at the time it submitted it, is that fair?
[21] A: That's fair.
[22] Q: And management, in your subsequent
[23] discussions with them concerning that report,
[24] never raised any issues with you that they
[25] thought that Foley & Lardner, from the report,

Page 23

[1] that Foley & Lardner needed to look at further,
[2] needed to do further work on in order to finalize
[3] the report, is that fair?
[4] A: That's fair.
[5] Q: Who, if you can recall today, who at
[6] Foley & Lardner – strike that. Once you were
[7] retained, were others besides yourself at Foley &
[8] Lardner assigned to work on the GHS matter for
[9] SDN?
[10] A: Yes.
[11] Q: And who comprised the team, if I can
[12] use that word?
[13] A: The team was led by one of my partners
[14] in our Washington, D.C. office. His name is Paul
[15] Cooney. He was the supervising attorney for the
[16] project. The reason I selected Paul is he is a
[17] health law attorney. I knew that the review was
[18] going to encompass a lot of things that were
[19] beyond my professional expertise, so he took
[20] control of the project. Helping in the debt side
[21] of it was Becky, her name is now is Brueckel,
[22] B-r-u-e-c-k-e-l, in the Chicago office. I don't
[23] recall the names of the various associates that
[24] also helped, but probably three or four others
[25] helped out, associates.

Page 24

Q: Before you move off Miss Brueckel, you say Mr. Cooney his expertise was in the area of health law?

A: Yes.

Q: How about Ms. Brueckel, what was her expertise?

A: She is a bond counsel.

Q: I think I might have interrupted your nswer and I apologize. Were there other members to the team that you can recall today?

A: Several associates and I don't recall whom.

Q: Any other partners?

A: Yes, actually.

Q: Who?

A: Mark Waxman was involved in looking at some of the issues. Mark was then a partner in the Washington, D.C. office. He was looking at the contracts that related to managed care.

Q: What was his area of expertise?

A: He was a health attorney, health care lawyer.

Q: Any other partners you can recall who worked on the matter?

A: I cannot.

Page 25

Q: Was anyone from your – in 1996 did your firm have an office in Los Angeles?

A: Oh, thank you. We did have an office in Los Angeles.

Q: You are quite welcome. I didn't have anything to do with creating that office, but –

A: Actually there was another gentleman involved. Not as part of the report and this is something for which we weren't directly retained. It wasn't part of the management review, but it was part of the advice that I was giving the client.

Q: Before you get then to that, in terms of the team that was responsible for preparing the management, doing the management review and preparing the report, have you exhausted your recollection of the members of that team?

A: Yes.

Q: Okay. And then who else not on that aspect of the engagement, but who else at Foley & Lardner worked on matters related to GHS in the 1996, 1997 timeframe?

A: Bob Klein from our Los Angeles office. Bob is a Medicare expert, third party payor expert. What I had noticed when the transaction

Page 26

[1] was originally structured – if I may talk about
[2] why Bob was involved?
[3] Q: Yes, please. Let me ask the question.
[4] Why was Bob involved?
[5] A: Originally SDN was going to become the
[6] member, and I'll focus on just one Graduate
[7] Hospital Corporation. I will focus on just one
[8] of them, Graduate Hospital Corporation. As I
[9] understood the Medicare rules and regulations at
[10] that time when one acquired a membership interest
[11] in a corporation and the ownership of the
[12] hospital, the provider, didn't change, you didn't
[13] have what's called a change in ownership. So far
[14] as the Medicare regulations were concerned, it
[15] was the same provider that existed prior to the
[16] assumption of membership by the new company.
[17] Q: Let me just interrupt you there. What
[18] would the legal structure as you understand it be
[19] that would lead to that result?
[20] A: Again, we are focusing for discussion
[21] on Graduate Hospital, that corporation –
[22] Q: Yes, sir.
[23] A: – would amend its by laws creating a
[24] member and designating, in this case, SDN, to be
[25] that member.

Page 27

[1] Q: And prior to that happening – well,
[2] who was the member, say in June of 1996?
[3] A: I don't recall whether it was a
[4] membership corporation prior to that time.
[5] Q: Assuming it was?
[6] A: It would have been members of the
[7] community.
[8] Q: I see.
[9] A: Oh, actually it would have been
[10] Graduate Health System.
[11] Q: The parent?
[12] A: It would have been the parent.
[13] Q: And the structure that you were just
[14] describing assumes that someone, in this instance
[15] SDN, would be by resolution substituted for
[16] Graduate Health System as the member of Graduate
[17] University Hospital or whatever the entity was?
[18] A: Graduate Hospital Corporation, correct.
[19] Q: Okay. Go on with your explanation of
[20] Mr. Klein's role.
[21] A: All right. Again, the regs as I
[22] understood them, the regulations as I understood
[23] them then is that if you had a change in
[24] ownership which could be accomplished by a
[25] purchase of the hospital, the bricks and mortar

TAB  274

Coopers
&Lybrand

oopers & Lybrand L.L.P.
a professional services firm

Financial Advisory Services

PR-BONDH-000298

THE GRADUATE HOSPITAL

MT. SINAI HOSPITAL

CITY AVENUE/PARKVIEW HOSPITALS

ZURBRUGG MEMORIAL HOSPITAL

DUE DILIGENCE REPORT

December 13, 1996

PR-BONDH-000299

# Coopers &Lybrand

**Coopers & Lybrand L.L.P.**

a professional services firm

2400 Eleven Penn Center
Philadelphia Pennsylvania
19103 2962

telephone (215) 963-8000

facsimile (215) 963-8700

**CONFIDENTIAL**

December 13, 1996

Mr. David W. McConnell
Executive Vice President and CFO
SDN, Inc.
Fifth Avenue Place
120 Fifth Avenue, Suite 2900
Pittsburgh, PA 15222

Dear Mr. McConnell:

Pursuant to our engagement letter dated August 26, 1996 and the due diligence checklist attached thereto, we have analyzed certain financial, lease, contract and other data of Graduate Hospital, Mt. Sinai Hospital, Parkview/City Avenue Hospitals, Zurbrugg Memorial Hospital and Founders Health Care (collectively, "Graduate") and identified herein various significant items noted during our analysis. Our analysis was undertaken solely to assist you in your evaluation of the transaction with Graduate. The scope of our work included:

- Visiting various Graduate entities;

- Holding discussions with various key management executives of Graduate regarding financial, contract, lease, disbursement, and physician acquisition due diligence and valuation matters;

- Reading and analyzing audited financial statements for the prior three fiscal years of Graduate;

- Analyzing certain significant contracts for the sale, lease or acquisition of capital assets;

- Analyzing physician acquisition due diligence and valuation reports;

- Analyzing Graduate disbursement records for the period July 1, 1995 through June 30, 1996 for payments to certain officers and directors of Graduate; and

- Reading the working papers of Deloitte & Touche and Ernst & Young and interviewing certain of their personnel regarding the audit performed by these firms for the last three fiscal years of Graduate.

We believe you understand that the scope of our engagement and our procedures described above do not constitute an attest service as the term is defined by the American Institute of Certified

PR-BONDH-000300

Mr. David W. McConnell
December 13, 1996
Page 2

Public Accountants ("AICPA"). Accordingly, we are unable to express any assurance on any of the financial statements or other data included in the accompanying report. We also make no representation as to the adequacy of our procedures for your purposes.

This report is solely for your information and the management of SDN and its advisors in connection with the proposed acquisition of Graduate and should not be referred to or distributed for any purposes to any other parties. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

After you and your colleagues have had an opportunity to review this report, we will be pleased to answer any questions.

Very truly yours,

*Coopers - Lybrand L.L.P.*

TABLE OF CONTENTS

|       |                                          | Page |
|-------|------------------------------------------|------|
| I.    | Significant Capital Asset Transactions   | 1    |
| II.   | Physician Practice Transactions          | 4    |
| III.  | Financial Reporting                      | 9    |
| IV.   | Payments to Related Parties              | 31   |
| V.    | Government Actions                       | 33   |

| Exhibit A | Physician Practice Acquisition Summary |
|-----------|----------------------------------------|
| Exhibit B | Summary of Disbursements to Certain Identified Related Parties |

PR-BONDH-000302

# I. SIGNIFICANT CAPITAL ASSET TRANSACTIONS

<u>The Omega Sale/Leaseback Transaction</u>

In October 1993, Graduate Health System, Inc. ("GHS"), The Graduate Hospital and 17th and South Parking Corp. sold four properties to Omega Healthcare Investors, a real estate investment trust, for a total of $29,725,000. Omega agreed to lease the properties back to the sellers. The following properties were involved in the sale/leaseback:

| Entity | Property | Primary Use | Sale Price | Monthly Lease Payment |
|---|---|---|---|---|
| GHS | 1740 South St. | Medical Office Bldg. | $ 6,775,000 | $66,400 |
| GHS | 520 So. 19th St. | Medical Office Bldg. | 1,275,000 | 12,500 |
| Graduate Hospital | 19th & Lombard St. (Pepper Pavilion) | Medical Office Bldg. | 15,300,000 | 150,000 |
| 17th & S. Parking Corp. | 1700 South Street | Parking Garage | 6,375,000 | 62,500 |
| (Conveyed to Hospital by Phila. Industrial Development Authority) | | | | Indexed to CPI |
| | | | $29,725,000 | |

Under the terms of the "operating lease," the initial lease term on all properties is 17 years. The GHS and 17th & South Parking Corp. leases have options to renew for eight years followed by an option to renew for an additional two years thereafter. The Pepper Pavilion lease has an option to renew for eight years followed by an option for an additional four years.

Under the "ground lease" ownership of all properties, except the Pepper Pavilion property, revert back to their respective entities after 27 years. The Pepper property reverts back to Graduate Hospital after 29 years.

PR-BONDH-000303

The transaction enabled GHS to pay off $5,609,325 in lease and sublease obligations to the Quakertown General Authority. 17th and South Parking Corp. retired all of its long term debt when it paid off a $3,891,976 loan from the Philadelphia Authority for Industrial Development (PAID). To a lesser degree, Graduate Hospital reduced its long term debt by paying off the remaining $349,998 on a note to the University of Pennsylvania.

The lease was classified as an operating lease. We understand the lessee's incremental borrowing rate assumption approximated 11%. Graduate Hospital recorded a gain on this transaction of $5,949,178. This gain, recorded as deferred revenue, is being amortized into other operating revenue notably over 17 years (the initial term of the lease). We have requested D & T's analysis of this transaction and the operating vs. capital lease accounting treatment analysis. To date this has not been received. GHS has not been able to locate the operating vs. capital lease calculations. **Given the significance of this complicated transaction and its potential impact on debt covenants, we recommend that a formal review of the proper accounting treatment be undertaken.**

The Osteopathic Acquisition

On July 13, 1993, GHS acquired City Avenue Hospital and Parkview Hospital, affiliates of the Philadelphia College of Osteopathic Medicine (PCOM). This transaction was effective July 1, 1993. Pursuant to the acquisition agreement dated March 17, 1993, the newly formed entity, GHS Osteopathic, Inc. paid $18.9 million in cash, assumed liabilities of approximately $29 million, and issued three non-interest bearing subordinated notes to PCOM.

The following is a summary of the transaction:

| | |
|---|---|
| Cash portion | $ 18,900,000 |
| Cash flow note | 12,000,000 |
| Short term note | 2,100,000 |
| Short term note | 4,200,000 |

PR-BONDH-000304

The $12 million cash flow note is subordinated to all other debt including capital leases. Minimum annual payments begin at the end of the sixth fiscal year. According to the acquisition agreement, the payments will be the greater of: a) $125,000 or b) 100% of the cash flow of the acquired hospitals for the preceding fiscal year or $500,000 whichever is less. For the purposes of this note, "cash flow" means: revenue less a) expenses before depreciation, amortization and inter-affiliate payables; and b) principal payments on all other long term debt.

The discounted value of the $12 million cash flow note net of payments appears on Parkview/City Avenue's balance sheet. The present value calculation assumed a discount rate of 6% and minimum payments of $500,000. The entire unpaid principal balance of this note is due and payable July 13, 2023.

The note for $2.1 million represented prepaid rent due to PCOM. The first installment of $850,000 was paid in December 1993. The remainder was paid in 1994. It appears that the rent was related to an operating lease for Parkview's medical office building. Along with capital leases, GHS Osteopathic also assumed the operating lease obligations of the two hospitals.

The note for $4.2 million was intended to cover unpaid expenses and was paid at closing.

PR-BONDH-000305

## II. PHYSICIAN PRACTICE TRANSACTIONS

Founders Health Care, Inc. ("FHC") and related entities (Founders Medical Group ("FMG") P.C., FMG Central PA, P.C., FMG NJ, P.C., and FMG Delaware, P.A.) have acquired various physician practices since 1994. Attached as Exhibit A is a schedule of practices acquired, the related purchase price, cash paid at closing and the payment dates for promissory notes delivered as part of the transactions.

Note Guarantees

GHS guaranteed the following FHC notes due to physicians groups:

- Burlington County Internal Medicine Associates;
- Callowhill Medical Associates;
- Cinnaminson Pediatrics;
- Fleetwood Medical Associates;
- Grossman & Levine Associates; and
- Mt. Laurel Family Physicians.

**Given the SDN transaction, SDN's legal counsel should assess the impact of the transaction on the above loans' guarantee status.**

GHS also guaranteed the following lease and note from FHC:

- Copelco Capital Inc. - Equipment lease (multiple items) to FHC guaranteed by GHS commencing in February 1996 for a term of 60 months at $5,845 per month; and

- CoreStates, Inc. - Loan to FHC guaranteed up to $4 million by GHS dated March 1995. Under this agreement, GHS must maintain its corporate existence and shall

PR-BONDH-000306

not dissolve or otherwise dispose of all, or substantially all of its assets, or consolidate with, or merge into another corporation. GHS must also maintain at all times investments with a fair market value of not less than $10 million. **Given the SDN transaction, SDN's legal counsel should assess whether there has been a default under this loan.**

Due Diligence/Valuations

There were no individual due diligence reports for the FHC physician practice acquisitions. Information obtained during the FHC's diligence process was included in the valuation information. **No significant due diligence issues were identified in the FHC valuation information.**

We analyzed the valuation methodologies employed by FHC in its determination of the fair market value of the physician practice acquisitions. In addition, we attempted to reconcile specific revenue, compensation, and synergistic assumptions inherent in the valuations to a board approved business plan. As part of this process, we attempted to identify areas which do not appear to comply with regulatory guidelines.

The IRS indicates that the valuation of a business interest is generally based on the determination of the entity's Business Enterprise Value ("BEV"). BEV is defined as invested capital which is equivalent to the fair market value of the equity plus interest bearing debt.

In determining the BEV the IRS' CPE Manual states:

"A valuation appraisal should include all recognized approaches for estimating BEV, including the market approach, cost approach, and income approach. The income approach is generally employed in IDS (integrated delivery system) cases, because it includes the excess earnings method described in Rev. Rule 68-609, 1968-2 C.B. 327, and approved for the valuation of intangible assets acquired by exempt organizations in

PR-BONDH-000307

Rev. Rule 76-91, 1976-1 C.B. 149. Valuation analysts generally favor the income approach in appraising physician practices...

While BEV may appropriately be measured using the income approach, it is important to note that the approach (which includes a number of different methodologies) frequently depends on assumptions made about future events; information upon which the assumptions are based is under the control of the parties - who may not be dealing at arm's-length and is often difficult to verify. Different assumptions can result in different values. Thus, the factual assumptions upon which such valuation is based should be reviewed carefully to ensure that they are realistic."

Each approach utilizes various methods depending on the situation. The Discounted Cash Flow (Income) Approach is based on the generally accepted principle that the fair market value of an entity may be measured by the present value of its future cash flows. This approach is preferred by the IRS for physician practice valuations. The Market Approach is based on either transactions involving similar entities or similar operational characteristics. The Underlying Asset Approach requires the determination of the aggregate fair market value of the assets and liabilities of the entity. Under this approach, stockholder's equity is adjusted to fair market value.

We analyzed twenty-nine valuation reports prepared internally by FHC and related financial information and made inquiries with management. Our observations are:

- The historical financial and operational detail included in the valuations differed by practice. While many (i.e. Theodore Bear, G.P., Ltd.) practices included historical financial statements, five year projections and various valuation methodologies others were limited to brief description of the practice's historical operational statistics;

PR-BONDH-000308

- **In general, the valuation methodologies (where present) were not consistent with IRS guidelines and approaches.** For those with a completed valuation analysis, the following methodologies were performed:

    ** FHC presented a market approach based on a goodwill estimate. Practice gross revenues were multiplied by a weighted multiple and averaged. This methodology is problematic in that there was no underlying support for the determination of the multiples;

    ** The second valuation methodology is based on a discounted cash flow (DCF) approach of adjusted weighted net cash flows. The net cash flows were then averaged. Inconsistencies inherent in the model include: 1) The present value of cash flows is based on three year historical "normalized cash flows" instead of reasonable projections (the IRS has established a five year projection period) and excluded a residual value estimate; 2) By using Medical Group Management Association data to adjust historical physician compensation, cash flows and therefore value were not based on actual physician compensation to be paid by FHC, and 3) cash flows appear to be based on adjusted *pre-tax* income; and

    ** The third valuation approach is an attempt at the IRS' CPE Manual's underlying asset approach. The approach presents the net value of practice assets which included equipment and furnishings, medical and office supplies and existing patient charts and records.

- **Contrary to the IRS' recommended valuation guidelines, the practice valuations were internally prepared as compared to having them prepared by an independent third party.**

During our analysis, we were unable to identify specific assumptions (i.e. revenue, operations and synergies) utilized in the valuations as to the anticipated future course of action to be taken.

PR-BONDH-000309

Furthermore, without appropriate assumptions, we were not able to correlate management's commitment to the general assumptions included in the *revised* October, 1995 Business Plan. Although the existing FHC Business Plan may effectively be utilized by its board of directors in the exercise of its fiduciary responsibility, it could not be used to evaluate FHC's decision to purchase a practice and evaluate the performance of the acquisitions at appropriate future intervals. The IRS has announced that it views the existence of a detailed business plan in general, and in a situation such as physician practice acquisitions to be an important part of the hospital's decision making process. It is for this reason, in addition to the potential for abuse in the lack of detailed assumptions, that the IRS has placed emphasis on detailed assumptions being included in an overall business plan to explain how the expansion is expected to occur.

In conclusion, if the IRS were to audit the practice acquisitions, it may be necessary to reperform the valuations utilizing methodologies recommended by the IRS. Additionally, the supporting assumptions for the valuation conclusions would need to be documented.

PR-BONDH-000310

## III. FINANCIAL REPORTING

Audited financial statements and the related workpapers for the following entities have been made available for the periods indicated:

| Entity | Fiscal Year Ending | Auditor |
|---|---|---|
| The Graduate Hospital | 06/30/96<br>06/30/95<br>06/30/94 | Deloitte & Touche ("D&T") |
| Mt. Sinai Hospital | 06/30/96<br>06/30/95<br>06/30/94 | Deloitte & Touche |
| Parkview Hospital/<br>City Avenue Hospital | 06/30/96  (*)<br>06/30/95<br>06/30/94 | Deloitte & Touche |
| Zurbrugg Memorial Hospital | 12/31/95<br>12/31/94<br>12/31/93 | Ernst & Young ("E&Y") |

(*)  The financial statements and all workpapers related to the fiscal year ending June 30, 1996 for the Parkview/City Avenue hospitals were not complete for certain audit areas as a result of open audit adjustments that were not yet finalized at the time of issuance of this report.

This section contains a summary of significant observations noted in our analysis of the financial statements and the respective external auditors workpapers:

PR-BONDH-000311

The Graduate Hospital

Unapplied Patient Accounts Receivable Cash Account:

The workpapers for both fiscal 1995 and 1994 indicated that there is a general cushion in the unapplied cash account of approximately $300,000. This amount was not highlighted in the 1996 workpapers. However, based on our analysis of the workpapers, we did note that amounts within this unapplied cash account are allocated to each payor based on a weighted average approach using gross accounts receivable outstanding at month end as the factor in determining the weighted average. The amounts are not allocated to each payor based on known collections. **The balance in this account at June 30, 1996 was approximately $996,000 of unapplied credits.**

Bad Debt Reserve and other Patient Accounts Receivable:

D&T performs three approaches to the bad debt reserve analysis for patient accounts receivable at each entity. The income statement methods (i.e. historical write-off and historical provision) have generally indicated that the overall reserve is insufficient. However, the balance sheet method which assigns collection percentages by payor has been comparable to Graduate Hospital's methodology of applying reserve percentages by payor. Graduate Hospital has historically assigned reserve percentages from 65% to 100% of accounts greater than 180 days for all payors. D&T's analysis resulted in proposed adjustments for additional reserves, e.g. $683,000 in fiscal 1995. However, the 1996 analysis indicated that Graduate Hospital's methodology, which is consistent with previous years, was approximately $1 million greater than the D&T balance sheet analysis. No adjustment was proposed by D&T to reduce the reserve. Furthermore, it should be noted that during fiscal 1996, Graduate Hospital's provision was not sufficient to cover current year write-offs. This, supported by improved aging of the accounts, indicates that an increase in the reserve was not considered necessary for future write-offs.

---

PR-BONDH-000312

Lastly, we noted that several of the affiliates within the Graduate Health System participate in a capitated fee arrangement with Wise Choice. Documentation throughout the workpapers indicates that management receives reimbursement at approximately 15% of established rates. **Based on our analysis of the other liabilities area, we noted that under the Wise Choice arrangement, Graduate Hospital recorded a liability of approximately $335,000 related to an overpayment received for patient referrals outside of the network which are not covered by the program.**

Assets Limited or Restricted As to Use:

As noted in our analysis of each years' workpapers, Graduate Hospital includes in this category an investment with Omega Healthcare Investors which is in the form of a note receivable with a fixed interest rate of 7%. It appears the carrying value of the receivable has been concluded to approximate fair value for disclosure purposes. Also noted in our analysis of the 1996 financial statements and workpapers was the sale transaction of Greater Atlantic by Graduate Health System to Health Systems International, Inc. **As a result of the Greater Atlantic/Health Systems transaction, the Graduate Hospital received a $10 million lump sum payment as a guarantee payment to provide service for the subscribers of the health plan in the future. The payment has been invested in various investment security vehicles and has been included as a component of the Assets Limited or Restricted as to Use Board Designated Funds at June 30, 1996.**

Inventory:

Graduate Hospital maintains inventory annual policies and procedures. It was noted in the workpapers that no inventory of the operating room had been conducted internally or externally. This area has not historically carried material book to physical adjustments. Though not a material area, (i.e.., balance of approximately $462,000 at June 30, 1996), the assets have not been properly captured in the annual inventory process established by the Graduate Hospital's established policies and procedures.

PR-BONDH-000313

Research Grants Observations:

In fiscal 1995, Graduate Hospital received approximately $2,900,000 in research grants from the Department of Health and Human Services ("DHHS"). **Management concluded that reporting under the requirements of OMB Circular A-133 were not applicable.** This conclusion was reached based upon the specific exclusion clause for hospital organizations from the definition of a not-for-profit organization contained in the circular. However, it appears that there is a contractual affiliation relationship with the University of Pennsylvania since Graduate Hospital's separation. **This relationship and resulting reporting requirements, should be further analyzed based upon the clarification of an affiliation issued by DHHS in the March 1, 1991 Federal Register.** D&T has concurred with management's conclusions and have not issued a report on Graduate Hospital's compliance in accordance with OMB Circular A-133. **It should be further noted, based on the revised requirements of OMB Circular A-133 which were issued in the April 30, 1996 Federal Register, entities which are defined as hospital organizations that receive a minimum of $300,000 of federally funded dollars, excluding Medicare and Medicaid programs, will now be required to comply with the provisions by providing an organizational-wide audit.**

Also, for grant funding, Graduate Hospital defers recognition until the cash is received. All expenses are accumulated on the balance sheet as a grant receivable and recognized as revenue and expense when the funds are received. This treatment should only result in a gross-up of the income statement accounts with no impact on excess of revenues and gains over expenses. At June 30, 1995, there was approximately $824,000 in the ending receivable. Reference to this accounting treatment was not made in the 1996 workpapers, however, the balance in the ending receivable was approximately $531,000.

In our analysis of other liabilities, we noted that during fiscal 1996 a National Institutes of Health (NIH) dispute arose. NIH, a significant federal government funding source to the Graduate Hospital has raised questions related to the treatment of FICA costs for reimbursement. Currently, the Graduate Hospital is appealing NIH's proposed settlement. However, at June 30,

PR-BONDH-000314

1996 an accrual exists for $470,000 of the approximate $800,000 of questioned costs. No further details of the makeup of the questioned costs, NIH's position or detail on management's estimates of the amount were noted based on our analysis of the workpapers. We were advised that, subsequent to June 30, 1996, a reserve for the entire amount of questioned costs was established.

Physician Loans and other Physician Transactions:

At Graduate Hospital, there are loans to physicians with a balance of $3,380,000. There is a general reserve against these loans of $2,300,000. The following table summarizes these loans:

| Physician | Balance at 10/31/96 | Explanation |
|---|---|---|
| Horace MacVaugh | $ 300,000 | Physician in bankruptcy with little collateral |
| Charles Wolferth | $1,259,000 | Loan for surgery/practice development. Physician no longer making payments. However, Graduate Hospital is transferring funds from the surgery endowment fund to make payments on the loan. |
| Thomas Sedlacek | $1,821,000 | Loan for gynecology practice development. Physician no longer making payments. Settlement negotiations are in progress. Graduate Hospital's management believes but is not certain, that funds advanced to this practice were included in the practice's income. |

To date no tax Form 1099s have been issued in connection with these loans. **Additionally, SDN's legal counsel should investigate the appropriateness of utilizing surgery endowment funds to make payments on the Wolferth loan.**

PR-BONDH-000315

For the June 30, 1995 and 1996 audits, D & T indicated that loans to physicians represented a riskier audit area due to the weak payment histories of the accounts. D&T proposed adjustments to increase the reserves on the loans to the entire outstanding balances in both fiscal years. It also recommended improving the controls over the accounts. This should be a continuing area of focus due to the tax ramifications to the physicians of writing off the loans.

Additionally, it should be noted that Graduate Hospital has various receivables with physicians for rental income for practice offices. At June 30, 1996, approximately $371,000 of the outstanding receivable is greater than 90 days old with no reserve assigned to the balances. D&T did not propose an adjustment for the aged accounts, however, a recommendation was made to management to consider establishing such reserves for accounts greater than 90 days old. Also included in the amount receivable for rental income was approximately $157,000 to be received from Founders Health Care, a related party.

Property and Equipment:

During 1994, Graduate Hospital engaged Valuation Counselors to perform a property and equipment inventory. The study indicated that certain assets had been over depreciated in prior years resulting in $4,400,000 of excess accumulated depreciation. This was viewed as an opportunity by Graduate Hospital to improve recordkeeping over the fixed asset system. As a result, $4.0 million of the $4.4 million general reserves were utilized in fiscal 1994 for the following:

PR-BONDH-000316

| | |
|---|---|
| Reclassification to CRA's for depreciation errors in filed cost reports | $2.0 million |
| Write-off of reconciling differences between the fixed asset detail and the results of the inventory | 1.3 million |
| Reduction to current year depreciation | .6 million |
| Valuation Counselors fees | .06 million |
| Other | .04 million |
| Total | $4.00 million |

A general depreciation reserve remained at June 30, 1995 in the amount of $400,000. The workpapers for fiscal 1996 did not address the issue. Additionally, the property and equipment inventory resulted in approximately $9.2 million of fully depreciated assets being removed from the fixed asset subsidiary ledger since the items either were not located or were no longer in service.

D&T recommended that Graduate Hospital consider obtaining a new property accounting system. The existing system did not provide management with adequate tools to utilize property subledger information. Graduate Hospital management agreed with the recommendation and it was going to evaluate various systems. During fiscal 1996, various systems were evaluated and a system from Best was chosen. However, given the transaction with SDN, Graduate Hospital is awaiting a decision as to whether to convert to the Best system or to SDN's system.

PR-BONDH-000317

Due from Affiliates:

The $53.9 million balance at June 30, 1996 principally consists of a $50 million receivable from Graduate Health System. The remainder of this balance represents various other transactions with the foundation and other members within Graduate Health System offset by a reserve of $5.5 million. It should be noted that an analysis of the collectibility is performed at the parent level and that as a result of the analysis during fiscal 1996, approximately $2 million of the reserve was reversed to income. **Furthermore, it should be noted that a receivable of approximately $766,000 from Bala Imaging, of which $242,000 is included in Due from Affiliates, is included in the June 30, 1996 financial statements. Our analysis of D&T workpapers indicates that the collectibility of this receivable has been guaranteed by Health Systems International, Inc. and Graduate Health System.** It is unclear in the workpapers if the guarantee is for the full amount outstanding or if it excludes the $242,000 included in the Due from Affiliates financial statement classification.

Patient Accounting System:

The patient accounting system provides a one day time lag between the transfer of accounts from discharged not final billed and final billed status. As a result, management continues to assess an estimated contractual allowance for those accounts included in the lag account at the end of each month until the amounts net at the time of transfer to final billed status.

Benefit Programs:

As indicated in the notes of the financial statements, Graduate Hospital terminated its noncontributory defined benefit pension plan in 1992. An adjustment continues to be recorded for the current expense related to the unfunded obligation which is recorded in the financial statements. D&T's actuarial analysis of the unfunded obligation made a recommendation to increase the discount rate used in determining the obligation from 6.75% to 7.50%. They further recommended that the rate of return on plan assets be decreased from 9% to 8%. It is unclear

PR-BONDH-000318

based on our analysis of the workpapers and the disclosure included in the Notes of the financial statements as to management's conclusions on the assumptions used.

Deferred Revenue Observations:

As disclosed in the notes of the financial statements, deferred revenue consists principally of the deferred gain on the sale-leaseback transaction with Omega Healthcare Investors discussed in Section I of this report and the unamortized portion of deferred revenue received from the sale of Greater Atlantic Health Services as discussed earlier in this section of the report. Based on our analysis of the documentation included in D&T's workpapers, the amount is being amortized over 10 years into income. Note 13 of the financial statements does not provide for a definitive time frame. Such amortization should be monitored based on expected patient levels and the requirements of the sale agreement.

CRA Observations:

Based on our analysis of the D&T workpapers, little to no adjustments were suggested as a result of their procedures in this area. We did note however, that D&T believes that there may be exposure related to the "72 Hour Rule". Additionally, it was noted that D&T does not agree with management's treatment of recording a contingent gain related to a 1991 Medicare appeal. Offsetting these amounts, the workpapers did indicate that there are potential favorable adjustments related to the 1995 filed cost report for IME and DSH. In summary, though there are variances in the individual assessment of the open cost reporting years, in the aggregate, D&T did not propose an adjustment to the recorded amounts.

Due to the various factors discussed in Note 19 of the financial statements, Graduate Hospital has recorded a liability of approximately $2.8 million related to Independence Blue Cross's Prudent Buyer clause. **At the time of our analysis of D&T's workpapers, the analysis of Prudent Buyer exposure had not been finalized. No Prudent Buyer obligations had been recorded for the 1995 or 1994 fiscal years.**

PR-BONDH-000319

Unrecorded Liabilities:

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

Mt. Sinai Hospital

Assets Limited or Restricted as to Use:

As described in the Graduate Hospital section of this report, Mt. Sinai Hospital received approximately $883,000 from the sale transaction involving Greater Atlantic Health Services during fiscal 1996.

CRA:

In prior years, an adjustment was proposed by D&T to CRA for $150,000 of cushion. It was unclear, however, which payor or year this cushion related to. An adjustment was not recorded. In fiscal 1996, no mention was made of this cushion.

Outpatient Ancillary Charges:

Outpatient ancillary charges are included in accounts receivable at gross charges due to the overall immateriality of the amounts. The growth in these charges should be monitored by management to ensure that this methodology is appropriate. It should be noted that all other charges are netted at the time of billing.

HDS and SMS System Interface:

D&T noted that as a result of inaccurate links between the HDS and SMS systems, several procedures were inaccurately billed resulting, in some cases, in lost revenue. It was recommended that the controls over the HDS/SMS interface could be enhanced through

PR-BONDH-000320

implementation of basic review and monitoring procedures such as: review of data prior to transmission to SMS for reasonableness; daily review of the exception reports produced by SMS which lists errors; and for procedures which were not billed, a monthly recommendation of the Rev3 report to the HDS printouts and a monthly analytical review of the revenue by each department head to assess the consistency of the revenue with the level of activity within the department.

Mt. Sinai Hospital management indicated that the Finance Department performs an analysis of data parity between HDS and SMS on a monthly basis for ancillary departments to test revenue produced.

Bad Debt Reserve:

During fiscal 1995, Mt. Sinai management reversed approximately $680,000 of bad debt reserves. The results of their balance sheet analysis indicated that the excess reserves were not necessary. Consequently, fiscal 1995 operating results were increased due to the reversal of this excess reserve. During fiscal 1996 procedures, D&T concluded that the reserves were understated and proposed an adjustment to increase the reserves by $500,000 and reduce excess CRA reserves. This adjustment was made and resulted in no net impact to the 1996 operating results.

D&T also indicated that Mt. Sinai management continues to record reserves necessary for patient receivable bad debts using general reserve percentages. It was recommended that this methodology be revaluated and to provide for specific reserves by payor type. This recommendation was based in part on the shift taking place in the health care industry towards outpatient services and the new implementation of Mt. Sinai's Partial Program. By determining specific reserves, a more reflective allowance would be determined and it would help identify any significant uncollectible accounts and unfavorable trends in third-party payments or billing errors.

PR-BONDH-000321

Mt. Sinai management indicated that it now tests general reserves used for accounts receivable utilizing the analytical review process developed by D&T and updated by Mt. Sinai. Adjustments to the general reserves, if needed, are done on a monthly basis.

Joint Venture Interest:

Mt. Sinai has a 50% equity interest in MSH/US Regional Occupational Sport Medicine, Inc. which began operations in January 1995. Mt. Sinai has approximately $200,000 invested in the joint venture consisting of equity contributions and a demand note receivable. It does not appear that the operating losses from this venture are properly recorded under the equity method of accounting. However, these amounts were immaterial in fiscal 1995 (approximately $13,000). Management should continue to monitor these results in the event they become more material in future years.

Unrecorded Liabilities:

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

Parkview Hospital/City Avenue Hospital

Cash:

**At June 30, 1996 and 1995, approximately $6.6 million and $2.4 million, respectively of negative cash was reclassified as accounts payable.**

Bad Debt Reserve and Other Patient Accounts Receivable:

As indicated in the Graduate Hospital section of this report, D&T evaluates the adequacy of the allowance for uncollectible accounts based on a three method approach. No adjustments were

PR-BONDH-000322

identified in this area based on the procedures. It was noted that during fiscal 1996, the aging analysis by payor for assignment of allowance was discontinued. However, the new methodology was reasonable based on D&T's procedures.

It was also noted that no formal charity care policy has been established for Parkview/City Avenue Hospitals.

Parkview/City Avenue are participants in the Wise Choice fee capitation arrangement. A liability of approximately $700,000 was recorded related to these payments, however, it was unclear if this amount represents unapplied cash or amounts owed related to referral outside of the network.

Assets Limited or Restricted as to Use:

**As discussed earlier in the Graduate Hospital section of this report, Parkview/City Avenue Hospitals have recorded approximately $1.6 million of deferred revenue related to the Greater Atlantic Health Services sale. According to the documentation included in the workpapers, this amount is being amortized into income over a three year period which is inconsistent with the amortization period for Graduate Hospital's portion of the proceeds.**

CRA:

D&T noted that due to the large number of managed care contracts and the limited number of pay classes within the billing system, Parkview/City Avenue Hospitals use an estimated overall percentage to calculate contractual allowances for certain outpatient receivables. It was recommended that system enhancements be investigated to improve managed care reporting and estimation of contractual allowances. According to Parkview/City Avenue management, the required enhancements were completed.

PR-BONDH-000323

D&T also noted that the SMS generated inpatient Medicare contractual allowance was overstated. As a result, the IME and Capital portions of the Medicare receivable balance appear to be understated at the time of final billing but are subsequently adjusted at the point of payment. D&T recommended that management work with SMS to perfect the system generated contractual allowance at the point of final billing and eliminate the need for recurring manual adjustment at the time of payment.

Management agreed with D&T's observation. However, it believed that the components which are incorrectly valued represented minor differences from the final payment that is received from Medicare and are adjusted to actual at the time of payment. Management was taking steps to resolve the incorrect values.

Property and Equipment:

It was noted by D&T that a physical inventory of fixed assets had not been performed for several years. Also, Parkview/City Avenue Hospitals do not physically label their property and equipment with an identifying number. Management had received a proposal from an independent valuation firm to perform the inventory but the cost was too prohibitive. However, management was going to use internal resources to inventory its fixed assets. To date, this inventory has not been done. However, management plans on doing the fixed asset inventory in fiscal 1997. It was also noted in the detail of a repairs and maintenance expense analysis that a service contract with GHS Technology Management, Inc. is in place to monitor biomedical equipment. The monthly contract fee for the agreement is $57,025 for fiscal 1996 and $25,075 for fiscal 1995.

PR-BONDH-000324

Legal and Other Reserves:

There were approximately $70,000 of legal reserves at June 30, 1995. However, there was no discussion of the need for such reserves. The fiscal 1996 workpapers did not provide details for these reserves.

There also appear to be various general reserves/cushion available as of June 30, 1995. These include a settlement on a contract with a physician that appears to have been paid but for which a reserve of $124,100 exists, accruals for personal time (not eligible to be carried forward per the time-off policy) included in the vacation accrual of $275,000, and an accrued pension cushion of $65,800 related to fiscal 1995 contributions. There were not significant variations in the make-up of these accounts in fiscal 1996.

Unrecorded Liabilities:

No adjustments were identified as a result of D&T's search for unrecorded liabilities.

Areas Impacting Graduate Hospital, Mt. Sinai Hospital and Parkview Hospital/City Avenue Hospital

Workers' Compensation:

It was noted based on our analysis of the workpapers, that during fiscal 1996, a decision was made to "push down" all workers compensation liabilities from the parent level (i.e., Graduate Health System) to the affiliate level. At June 30, 1996, the related restricted assets had not been transferred to the affiliates and remained at the parent level. However, a due from Graduate Health System was recorded for a like amount. **The analysis of the June 30, 1996 workers' compensation liability utilizes a 7.5% discount rate which varies from the AHERF discount rate, should these entities join the AHERF system and adopt similar accounting policies.**

PR-BONDH-000325

Malpractice:

**During fiscal 1996, the discount rate used in determining the reserves for professional liability claims was increased to 6% from the 5% used in 1995. It should be noted that the 6% discount varies from the AHERF discount rate should these entities join the AHERF system and adopt similar accounting policies.**

Other Observations:

The following represents a summary of other miscellaneous observations noted based on our analysis of D&T's workpapers:

- Graduate Hospital is required to provide the City of Philadelphia an audit in accordance with Government Audit Standards and the City of Philadelphia Subrecipient Audit Guide for the Ryan White program funding. This audit report was prepared for the program period ending April 3, 1996 and will be eligible for incorporation into an organizational-wide as previously discussed.

Zurbrugg Memorial Hospital

Accounts Receivable Credit Balances:

At December 31, 1995, there were $1,783,234 of credit balances in the inpatient patient accounts receivable accounts of which $1,641,685 were aged over 120 days. In the over 120 day category $1,182,968 were related to U.S. Healthcare with 93% of this amount representing PIP receipts. The PIP receipts are zeroed out as USHC vouchers are received and payments are applied to patient accounts. The balance of the credit balances in the over 120 day category of $458,717 represent credit balances ranging from $27,000 to $70,000 in the commercial, New Jersey Blue Cross, self-pay, Pru-Care and Champus payor categories. Zurbrugg considered the credit balance

PR-BONDH-000326

accounts valid and the patient accounting staff periodically works the accounts. It was noted that the overall credit balances were consistent with the prior year.

**At December 31, 1995, there were credit balances in the outpatient patient accounts receivable of $767,461 of which $733,798 were over 120 days.** In the over 120 day category is an amount due Medicaid of $260,150. The payment creating this credit balance was received on December 6, 1995 relating to services provided on July 27, 1995. Medicaid was overpaid due to a keying error that was corrected on July 31, 1995. The credit balance was to be repaid to Medicaid through the voucher take-backs. **Most of the balance in the over 120 day category ($316,816) consists of miscellaneous accounts. A high priority is not placed on resolving the balances due to the high volume of accounts. Consequently, the potential need exists to use cash to refund the balances to the patients or make a payment to New Jersey under any escheat laws.**

Riverside Facility Exposure:

**In September 1995, Zurbrugg consolidated its Riverside Division with the Rancocas Division. Management intends to sell the Riverside facility. At December 31, 1995, the Riverside facility is included as "other current assets" in the amount of $1,000,000.** An appraisal was completed by Valuation Counselors on May 31, 1995 which indicated a value in the range of $800,000 to $1,000,000. The highest and best use was indicated as "partial demolition and conversion to an assisted living facility. **To the extent a sale of this facility is expected at less than $1,000,000, there will be a loss incurred on the disposal.**

Prudent Buyer:

**At December 31, 1995, the due to third parties account included amounts for New Jersey Blue Cross ("NJBC") prudent buyer of $569,000 for 1993, $766,000 for 1994 and $751,000 for 1995. To our knowledge, NJBC hasn't performed any audits or collected any monies under the prudent buyer provision in its contracts. Consequently, there are potential**

PR-BONDH-000327

excess third party reserves of $2,086,000. The prudent buyer clause appears to have been negotiated out of Zurbrugg's current agreement. This should be verified by SDN's legal counsel. There was no revocation of the prudent buyer provisions for the contracts covering years 1993 through 1995, however. **One word of caution, however. We understand that Anthem Blue Cross Blue Shield of Ohio, which is in the process of acquiring NJBC, is beginning to pursue collection in Ohio under its prudent buyer contract language. Anthem had not previously enforced this provision even though it had been in its contracts for several years.**

Medical Malpractice:

**At December 31, 1995, the medical malpractice IBNR reserve was $925,500.** E&Y estimated that this account had an excess reserve of approximately **$475,000.** However, E&Y passed on making an adjustment for the difference due to the uncertainty of malpractice claims.

Lease Payment Disclosures:

There is no disclosure of future minimum payments under operating leases. E&Y passed on disclosure since the total amounts are immaterial (less than $50,000) and most leases are year-to-year.

NJHCFFA Revenue Bond Compliance:

**Zurbrugg was not in compliance with the Debt Service Coverage Ratio of at least 1.10 for the year ended December 31, 1995.** As required by the terms of the loan agreement, a consultant (E &Y) was hired to prepare a report setting forth the reasons for the noncompliance and making recommendations with respect to the operations and management of the hospital which will enable the hospital to comply with the Debt Service Coverage Ratio requirement at the earliest practical time. E&Y's report was issued on July 3, 1996.

PR-BONDH-000328

E&Y's report indicated Zurbrugg's inability to comply with the rate covenant requirement in 1995 was due primarily to the significant operating losses incurred by the Riverside Division and costs incurred to transition all Riverside acute care services to the Rancocas Division. The acute care services at Riverside Division were closed to ensure the long term viability of Zurbrugg and to help bring Zurbrugg back into ratio covenant compliance.

The following were identified as management's plans to cure ratio noncompliance:

- Consolidation of acute care services and the Riverside facility disposition.; This has been completed;

- Development of a physician network in Zurbrugg's primary service area, which is in process;

- Continued development of managed care contracts. As of June 1, 1996, Zurbrugg became part of the Aetna provider network and management anticipates an increase in inpatient and outpatient volume. Zurbrugg also entered an agreement with CIGNA recently

The following were E&Y's recommendations to management to assist in correcting the ratio coverage noncompliance:

- Considering unbudgeted reduction in state charity care funding, E&Y believed that it was critical for Zurbrugg to continue monitoring volume, length of stay, staffing, payer mix, case mix, overtime, the use of temporary help and other information compared to budget. This initiative is in process;

- E&Y believed Zurbrugg must lower its cost structure and suggested the following initiatives, all of which are in process:

PR-BONDH-000329

- Further consolidate services with GHS such as laboratory, contract negotiation, and certain administrative services;

- Outsource certain services including dietary management which is being evaluated;

- Process improvement and reengineering initiatives to enhance staff efficiency and reduce staffing needs, including a systematic review of all operational expense categories to identify short-term and long-term opportunities for cost reduction;

- Review its organizational structure and wherever opportunity exists, expand spans of control and reduce levels of management;

- Develop case management protocols to reduce unnecessary utilization of services and shorten the length of stay; and

- Assess the extent to which it uses available information technology to streamline work processes and improve efficiency.

- E&Y suggested that management prepare a cost/benefit analysis for the disposition of the Riverside facility including the potential Medicare depreciation recapture, and options for relocating the services and programs from the Riverside facility to the Rancocas facility or other sites. This initiative has been completed;

- Zurbrugg should continue to maximize the opportunities offered through its relationship with GHS including service/administrative consolidation, managed care contracting, and other economies of scale. This was in process and will continue under SDN's control;

- Zurbrugg needs to develop a capital financing plan to maintain the facility at the levels needed to meet regulatory requirements as well as to remain competitive. This initiative is in process;

- E&Y suggested that the current marketing plan should be expanded to provide a cohesive strategic plan which clearly establishes a vision and overall financial, operational and organizational direction for Zurbrugg over the next three to five years to better position

PR-BONDH-000330

the hospital in an increasingly competitive, managed care-driven marketplace. This initiative is in process;

- Management should develop a comprehensive methodology to evaluate product/service line and payer profitability on a routine basis which would enable it to more effectively negotiate managed care contracts and focus efforts on marginal programs. This recommendation was implemented.

Based on its review and recommendations, and, if the recommended planning and monitoring processes were in place, E&Y concluded that Zurbrugg should be able to achieve the profitability required to attain compliance with the required ratio covenant.

CoreStates Bank Loan Compliance:

**For the year ended December 31, 1995, Zurbrugg was <u>not</u> in compliance with the Debt Service Coverage Ratio of at least 1.25. A waiver was received by management for this covenant as a result of amendment of the loan agreement dated December 8, 1995.**

Board Minutes:

It was noted that a $5 million discrimination suit filed by a lab employee. This suit was noted in the February 27, 1996 Board minutes. SDN legal counsel should follow-up on the merits and status of this suit.

**Also, in the March 28, 1995 Board minutes, it was indicated that Zurbrugg would receive a 1995 charity care subsidy of $1,800,000 as a result of proposed legislation. The amount actually received in 1995 was $1,828,000. No charity care subsidy was received in 1994 and $3,800,000 was received in 1993.**

PR-BONDH-000331

Finally, the December 11, 1995 Board minutes indicated that a third party lawsuit was filed by S.C. Holding Inc. in connection with an environmental clean-up claim. Zurbrugg and other parties are being sued to clean-up a site. The minutes indicated that any exposure should be minimal due to the number of parties involved. SDN's environmental consultants should evaluate any potential financial exposure.

PR-BONDH-000332

## IV. PAYMENTS TO RELATED PARTIES

We read the conflict of interest statements for the years 1993 through 1996 submitted by the various officers and directors of Graduate Health System, Zurbrugg Memorial Hospital, The Graduate Hospital, Mt. Sinai Hospital and City Avenue/Parkview Hospitals. For entities identified in the statements we conducted a search for any payments made to the entities from July 1, 1995 through June 30, 1996 from Zurbrugg Memorial Hospital, The Graduate Hospital. Mt. Sinai Hospital and City Avenue/Parkview Hospitals. **The following material payments were identified:**

| Name | Title | Relationship | Payments 7/1/95 to 6/30/96 |
|------|-------|--------------|---------------------------|
| Peter D. Carlino | Director, GHS | Son-in-law, Jay Irwin is EVP of Flanigan, O'Hara, Gentry & Associates which provides insurance brokerage services to Graduate Hospital | S 198,152 |
| Bernard Korman | Director, GHS | Former President, CEO and Director of Mediq, Inc., parent corporation of Medifac/ Granary, Mediq Management Services Inc., Mediq/PRN Life Support Services Inc. and Mediq Consulting Group and a director of Omega | $4,050,145* |
| David M. Eveland | Director, GHS | Director of SJ X-Ray | $1,956,921 |
| Barry Fabius | President, BF Health Care Inc. | President, BF Health Care Inc. | S 812,358 |
| Kenneth Brait | Chairman, Dept. Neurological Sciences at Rancocas | Brait, Parton and Margolia | $ 96,000 |

PR-BONDH-000333

| Name | Title | Relationship | Payments 7/1/95 to 6/30/96 |
|---|---|---|---|
| Charles Goldstein | Formerly Pres. of Zurbrugg Med. Staff, Director, and Attending Radiologist | ZMH Cat Scan, ZMH Outpatient Radiology and Med. Staff | $   73,169 |

\*    Additionally, at SDN's request we conducted a search for payments to Omega Healthcare for fiscal 1994 and fiscal 1995. It was noted that for the period November 1993 through June 1995, payments totaled $5,848,398.

Attached as Exhibit B is a schedule which identifies the entities from which the payments identified above were made.

PR-BONDH-000334

## V. GOVERNMENT ACTIONS

On April 3, 1996, Graduate Hospital entered into a settlement with the federal government for alleged violations of Title XVIII of Social Security Act with respect to Medicare billing for nonphysician outpatient services provided in conjunction with inpatient admissions (Graduate Hospital did not admit to any liability or wrongdoing).

Graduate Hospital agreed to pay the federal government the sum of $163,370 for claims filed from October 1987 to December 31, 1991 and $148,205 for all erroneous claims submitted and paid on or after January 1, 1992 (up to December 31, 1995).

PR-BONDH-000335

EXHIBIT A

PHYSICIAN PRACTICE ACQUISITION SUMMARY

PR-BONDH-000336

Founders Health Care, Inc. (Promissory notes due next four years)
Practice Acquisitions

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Utilizsysd | Scheduled Payment Dates | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Amounts due by calendar year | | | |
| 4/29/94 | Roxborough Family Practice | $348,420 | $198,420 | $75,000 $75,000 $0 | 4/29/95 plus accrued interest or prime payable annually 4/29/96 | | | | |
| | Roxborough Family Practice | $282,876 | $282,876 | N/A | N/A | | | | |
| 8/1/94 | Bucks-Phila Medical Center | $300,000 | $150,000 | $150,000 | 7/31/98 plus accrued interest @ prime | | $150,000 | | |
| 9/29/94 | Haileysville Med Assoc, PC | $665,000 | $365,000 | $100,000 $200,000 | 11/1/95 plus accrued interest @ prime 11/1/98 plus accrued interest @ prime | | $200,000 | | |
| 2/1/95 | Blatt & Assoc. Internal Medicine (Stock Purchase Agreement) | $800,525 | $400,263 | $98,064 $98,064 $102,067 $102,067 | 2/28/97 plus accrued interest @ prime 2/28/98 plus accrued interest @ prime 2/28/97 plus accrued interest @ prime 2/28/98 plus accrued interest @ prime | $98,064 $102,067 | $98,064 $102,067 | | |
| 4/7/95 | Leppan & Buckley | $28,971 | $28,971 | $0 | N/A | | | | |
| | FMG-NE (No Acquisition Costs) | $0 | $0 | $0 | N/A | | | | |
| 7/1/8/94 | Family Physicians of Cinnaminson | $175,000 | $100,000 | $75,000 | monthly *   * payable in equal monthly installments, commencing first day of the month following the last day of employment of Dr. Muraiz, and ending the first day of the month following one year from the date of Closing. | | | | |
| 12/1/94 | Singer, Cook & Greenwood | $723,850 | $236,350 | $81,250 $81,250 $81,250 $81,250 $81,250 $81,250 | 6/1/95 11/1/95 6/1/96 11/1/96 6/1/97 11/1/97 plus accrued interest at 8.5% compounded annually and payable on Final Maturity Date | $81,250 $81,250 | | | |
| 2/3/95 | Burlington Co. Internal Med Assoc (Stock Purchase Agreement) | $1,994,568 | $494,568 | $500,000 $500,000 $500,000 | 2/29/96 plus accrued interest at 8.5% payable with each payment 2/28/97 plus accrued interest at 8.5% payable with each payment 2/28/98 plus accrued interest at 8.5% payable with each payment | $500,000 | $500,000 | | |

PR-BONDH-000337

Founders Health Care, Inc.
Practice Acquisitions

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Delivered | Scheduled Payment Dates | Amounts due by calendar year | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1997 | 1998 | 1999 | 2000 |
| 1/2/95 | Grossman-Levine Associates (Stock Purchase Agreement) | $2,300,000 | $1,150,000 | $287,500 $287,500 $575,000 | 2/29/96 plus accrued interest @ prime rate 2/28/97 plus accrued interest @ prime rate 1/31/98 plus accrued interest @ prime rate | $287,500 | $575,000 | | |
| 3/8/95 | Robert Siedman, D O | $159,835 | $82,335 | $77,500 | 4/7/99 plus accrued interest @ 9% | | | $77,500 | |
| 11/2/94 | Callowhill Medical Associates, P.C. | $250,000 | $150,000 | $100,000 | 10/31/98 plus accrued interest @ prime rate | | $100,000 | | |
| 11/2/94 | Fleetwood Medical Associates | $500,000 | $250,000 | $250,000 | 10/31/98 plus accrued interest @ prime rate | | $250,000 | | |
| 8/1/94 | Mid-Cny Family Practice | $122,309 | $107,309 | $15,000 | 2/1/95 plus accrued interest @ prime rate | | | | |
| 1/3/95 | Barry Bub, M D | $191,026 | $155,026 | $36,000 | 1/1/99 plus accrued interest @ 5½% per annum compounded annually | | | $36,000 | |
| 7/27/95 | Exeter Pediatrics | $350,000 | $175,000 | $175,000 | 7/1/99 plus accrued interest @ prime rate | | | $175,000 | |
| 5/1/95 | Sandhya Bach | $180,000 | $100,000 | $80,000 | 4/30/98 plus accrued interest @ prime rate | | $80,000 | | |
| 1/18/95 | David Estock, M.D | $455,648 | $355,648 | $100,000 | 2/1/99 plus accrued interest @ prime rate | | | $100,000 | |
| 2/27/95 | Bernard King, D.O. Wyomissing Medical Associates | $314,345 Start-up Practice | $314,345 | $0 | N/A | | | | |
| 1/3/96 | Northeast Family Practice Associates | $117,628 | $117,628 | $0 | N/A | | | | |
| 9/1/95 | Cursona Family Practice | $38,000 | $38,000 | $0 | N/A | | | | |
| 10/27/95 | Robert J. Kaplan, D.O. | $170,000 | $100,000 | $70,000 | 10/27/99 plus accrued interest @ prime | | | $70,000 | |
| 10/27/95 | Donald Baseman, D O | $318,672 | $75,000 | $91,772 $151,900 | 1/2/96 plus accrued interest @ prime 10/27/99 plus accrued interest @ prime | | | $151,900 | |
| 12/6/95 | Frank Gunn, D O | $170,000 | $170,000 | $0 | | | | | |

PR-BONDH-000338

Founders Health Care, Inc.
Practice Acquisitions

| Closing Date | Practice Name | Total Purchase Price | Cash Paid at Closing | Promissory Notes Delivered | Scheduled Payment Dates | Amounts due by calendar year | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1997 | 1998 | 1999 | 2000 |
| 12/1/95 | Mt. Laurel Family Physicians (Stock Purchase Agreement) | $1,550,352 | $500,352 | $0 * | 12/1/96 *Accrued interest @ prime only to be paid | | | | |
| | | | | $350,000 | 12/1/97 plus accrued interest @ prime | $350,000 | | | |
| | | | | $350,000 | 12/1/98 plus accrued interest @ prime | | $350,000 | | |
| | | | | $350,000 | 12/1/99 plus accrued interest @ prime | | | $350,000 | |
| 2/1/96 | Paul Kaplan, M.D. | $311,000 | $211,000 | $100,000 | 2/1/00 plus accrued interest @ prime | | | | $100,000 |
| 3/1/96 | Cinnaminson Pediatric Associates (Stock Purchase Agreement) | $1,198,374 | $710,874 | $243,750 | 3/1/99 plus accrued interest @ prime | | $243,750 | | |
| | | | | $243,750 | 3/1/00 plus accrued interest @ prime | | | | $243,750 |
| 4/16/96 | Drs. Formica & Strauss | $325,000 | $325,000 | $0 | N/A | | | | |
| 7/1/96 | Douglas F. Smith, M.D. | Start-up Practice | | | | | | | |
| | Totals | $14,341,399 | $7,343,965 | $6,997,434 | | $1,500,131 | $2,648,881 | $960,400 | $343,750 |

PR-BONDH-000339

**EXHIBIT B**

**SUMMARY OF DISBURSEMENTS
TO CERTAIN IDENTIFIED RELATED PARTIES**

PR-BONDH-000340

**Exhibit B**

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | Harold Cramer | CEO | 1995/1996 1993 | • Director of **Bio / Data Corp.** He indicated that no compensation was received for his services.<br>• Director of Phila Aids Coalition.<br>• Director & VP of JPS.<br>• Trustee of Fed Jewish Amenities.<br>• Chairman of the Board for Jewish Newspapers | $0 |
| GHS | Peter D. Carlino | Director | 1996 | • Peter's son-in-law, Jay Irwin, is the Executive V.P. of **Flanigan, O'Hara, Gentry & Associates.** FOG&A provides insurance broker services to the GHS. | $198,152 |
| GHS | Russell J. Kunkel | Director | 1995/1994 1993 | • Employee - **Meridian Bancorp, Inc.**(95')<br>• President & CEO **Meridian Mortgage Corporation (94', 93').**<br>• Vice Chairman-**Meridian Banc Corp., Inc.**<br>• Vice Chairman-**Meridian Bank.** | $9,595<br><br>Note: payments do not include payments related to the bond issuance. |
| GHS | Janice L. Richter | Director | 1996 | • Member, Board of Trustees. **Coriell Institute,** Camden, NJ.<br>• Related to owner, **Hill International, Inc.** **Willingboro, NJ.**<br>• Trustee, **Trenton State College Foundation,** Trenton NJ. | $0 |

PR-BONDH-000341

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | Janice L. Richter | Director | 1993/1994 | • Married to owner of Hill International, Inc. who has a subsidiary the environmental consulting firm of Kaselaan & D'Angelo, which has provided certain services to GHS or its members in the past. | $0 |
| GHS | Marc S. Cornblatt | Secretary | 1996 | Legal counsel for: • (i) Charles C. Wolferth, Jr., MD, and Graduate Surgical Associates, P.C. • (ii) Nicholas L. Depace, MD and Philadelphia Health Group, P.C. | $88,756 |
| GHS | Joseph M. Huber | Treasurer and Assistant Secretary | 1996 | • Non-voting shareholder of Cope Care Inc. • Shareholder of Venture Control Enterprises inc. | $0 |
| GHS | Bernard J. Korman | Director | 1993/1994 | • President, CEO, Director of Mediq Incorporated, Parent corporation of Medifac, Inc. / Granary. • Mediq Management Services, Inc. • Mediq / PRN Life Support Services, Inc. • Mediq Consulting Group. • Director of Omega Health care. | Mediq- $513,770 Omg- $3,536,375 (Note: total payments to Omega for the period 11/93-6/95 were $5,848,398) |
| GHS | Robert E. Mathews | President | 1993 | • Shareholder-Mediq Inc. | $513,770 |

PR-BONDH-000342

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | Paul A. Dandridge | Director | 1993 | • Consultant with Birch & Davis. B&D proposed to the Health Choices RFP. Greater Atlantic is also responding to this RFP. | $0 |
| The Graduate Hospital | Mary Ann Lenzi | VP of Finance | 1994 | • Member BOD TGH Physician Hospital Organization. • Treasurer Vice President Graduate Campus Condominium Association. • Delaware Valley Hospital | $38,390 |
| Zurbrugg | Bernadette M. Mangan | President, Zurbrugg, Riverside | 1992 | • PTT &S Delran -Board Member (Physical Therapy and Sports Services) | $0 |
| GHS | Michael Margolin, MD | Board member | 1996/1992 | • Brait Parton Margolin has agreements with the hospital to perform testing (EEG, EMC, Evoked Responses) • His group competes with the Hospitals for CT scanner. • Additionally, the group performs MRI's for the Hospital. | $96,000 |

PR-BONDH-000343

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| GHS | David M. Eveland | Director | 1996/1995 1994 | • <u>SJ X-Ray</u>, Director / Executive Director, "I am involved in the overall management of the company, but have individual sales representatives who call at the hospital. I am not a shareholder in the corporation." | $1,956,921 |
| GHS | Gregory A. Gast | Vice President, Human Resources | 1996 | • Small shareholder of <u>Smith Klein Beecham, Inc.</u> | $458,707 |
| Zurbrugg | Jeffrey Kossow | Chairman, QA | 1994 | • Contract with Hospital for PA activities, additional QA activity. Paid stipend by <u>Med staff</u> for chairmanship of QA. | $4,889 |
| Zurbrugg | Kenneth Brait | Chrmn, Dept Neurological Sciences | 1994 | • <u>Brait Parton Margolin</u> has agreements with the hospital to perform testing (EEG, EMC, Evoked Responses)<br>• His group competes with the Hospitals for CT scanner. | $96,000 |
| Zurbrugg | Charles Goldstein, MD | President of Med Staff, Board Member, Attending Rad | 1994 | • Contract with the Hospital to provide CT Services:<br>  - <u>ZMH Cat Scan</u><br>  - <u>ZMH Outpatient Radiology</u><br>• <u>Med Staff</u> | $67,175<br>$1,105<br>$4,889 |

PR-BONDH-000344

Exhibit B

SUMMARY OF DISBURSEMENTS
TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|---|---|---|---|---|---|
| Mt. Sinai | Richard T. Cohen | Board Member | 1995 | • **Philadelphia Health Mgmt Corp.** Pres and CEO;<br>• **The Bridge**-Board Member -sec/tres; Interim House-Board Member;<br>• **NET/LKEs**-Board Member;<br>• **JFK; JJPI.** | $0 |
| Mt. Sinai | Richard J. Cohen | Board Member | 1993 | • **Phila Health mgmt Corp.** - Sale of health care related date and / or drug & alcohol treatment services. | $0 |
| Mt. Sinai | Barry Fabius, MD | President, BF Health Care Inc. / Medical Director | 1995/1992 | • President, **BF Health Care Inc.** | $812,358 |
| Mt. Sinai | Thomas J. Kelly Jr. | Board Member | 1993 | • Thomas's wife, Frances R. Delly is an employee of **Pro-Cor Ambulance Co.** a provider of ambulance services to Mt.Sinai. | $0 |
| Mt. Sinai | Frances J. Bonner | Director of PM&R | 1992 | • Chairman Dept of **PM&R** Graduate Hospital | $0 |
| GHS-Ost eopathic, Inc. | Lee W. Dorty, Esq | Director, Secretary | 1996 | • Employed by **HSI Management Co Inc.**(HSI is a managed care company.)<br>• General council and vice President of GHS | N/A |

PR-BONDH-000345

Exhibit B

## SUMMARY OF DISBURSEMENTS
## TO CERTAIN IDENTIFIED RELATED PARTIES

| ENTITY | NAME | TITLE | YEAR | RELATIONSHIP | PAYMENTS TO RELATED PARTIES (7/1/95-6/30/96) |
|--------|------|-------|------|--------------|---------------------------------------------|
| GHS-Osteopathic | Stanley Goldfarb, M.D. | None Indicated | 1994/1995 · | VP of Patient Care Education & Research. | N/A |

South Jersey X-ray is the distributor of choice for Dupont's film products. The hospitals receive a 1% vendor discount for film product purchases made from South Jersey X-ray. Capital equipment purchases are also made through South Jersey X-ray.

PR-BONDH-000346

Exhibit B

## SUMMARY OF DISBURSEMENTS
### For The Period Ended (7/0/95- 6/30/96)

| | Parkview AMS | Single Disbursements | Ctry Ave/Parkview SMS | City Ave AMS | Single Disbursements | Rancocas / Zubrogg | Graduate | Single Disbursements | Mt. Sinai | Single Disbursements | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BF Health Care Inc. | $0 | $0 | $0 | $0 | $0 | $404,420 | $22,528 | | $385,410 | | $812,359 |
| Bio Data Inc. | | | | | | | | | | | $0 |
| Bio / Data Corp. | | | | | | | | | | | $0 |
| Birch Dave | | | | | | | | | | | $0 |
| Basil Patron Margolin | | | | | | | | | | | $0 |
| Communities General Hospital | | | | | | 96,000 | | | | | $96,000 |
| Core Care Inc. | | | | | | | | | | | $0 |
| Corbell Institute of Camden | | | | | | | | | | | $0 |
| Delaware Valley Hospital Counsel | | | | | | | | | | | $0 |
| Department of PM & R (Graduate Hospital) | | | 265 | 215 | | | 1,379 | 25,765 | 10,576 | 170 | $38,390 |
| Flanigan O'Hara, Gentry & Associates | | | | | | | | | | | $0 |
| Graduate Campus Condominium Association | 9,994 | | 53,545 | 11,874 | | | 87,315 | | 35,425 | | $198,152 |
| Gary Ramisher (contract with Zubrugg) | | | | | | | | | | | $0 |
| Health Management Corp | | | | | | 68,260 | | | | | $68,260 |
| Hill International Inc. | | | | | | | | | | | $0 |
| Interim / House | | | | | | | | | | | $0 |
| JFK | | | | | | | | | | | $0 |
| JJPI | | | | | | | | | | | $0 |
| Karassan & Diangelo | | | | | | | | | | | $0 |
| Medilec Inc. / Granary Assoc. | 8,044 | | 107,487 | 27,365 | | 72,205 | 196,573 | | | | $411,673 |
| Mediq | | | | | | | 0 | | | | $0 |
| Mediq Consulting Group | | | | | | 2,607 | 11,902 | | | | $14,509 |
| Mediq Management Services, Inc. | 5,050 | | 17,971 | 8,181 | | 7,782 | 35,653 | | 8,344 | | $82,981 |
| Mediq / PRN Life Support Services, Inc. | | | | | | | | | | | $0 |
| Mediutil | | | | | | 4,889 | | | | | $4,889 |
| Masrov, Gelman Jaffe, | 8,002 | | 17,862 | 8,845 | | | 52,743 | | 1,300 | | $88,752 |
| Net / Likas | | | | | | | | | | | $0 |
| Omega Healthcare | | | | | | | | | | | $0 |
| Paypel Hamilton | | | | | | | 3,536,375 | | | | $3,536,375 |
| Philadelphia Health Management Corp. | | | | | | | | | | | $0 |
| Procor Amublance Co. (Careline of Delaware Valley) | | | | | | | | | | | $0 |
| PTT & S | | | | | | | | | | | $0 |
| SJ McRay | | | | | | 229,350 | | | | | $229,350 |
| Smith Klein Beecham, Inc. | 211,349 | | 153,081 | 204,700 | | 427,959 | 948,579 | | 11,253 | | $1,956,921 |
| TGH Physician Hospital Organization | 21,025 | | 82,214 | 24,511 | | 194,344 | 82,953 | 48,231 | 5,424 | | $458,702 |
| The Bridge | | | | | | | | | | | $0 |
| Trenton State College Foundation | | | | | | | | | | | $0 |
| Venture Control Enterprises | | | | | | | | | | | $0 |
| | $263,464 | $0 | $432,445 | $285,690 | $0 | $1,507,635 | $4,975,999 | $73,996 | $457,735 | $170 | $7,997,336 |

PR-BONDH-000347

Note: Information obtained from AMS and SMS Accounts Payable Systems