TAB 275

Special Meeting of the Board of Trustees of
Allegheny Health, Education and Research Foundation
Monday, September 16, 1996, 9:00 a.m.
AHERF Board Room
Fifth Avenue Place, Pittsburgh, Pennsylvania
and
Allegheny University of the Health Sciences
Center City President's Conference Room
Philadelphia, Pennsylvania

A special meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation was held on Monday, September 16, 1996 at 9:00 a.m. via videoconference from the AHERF Board Room, Fifth Avenue Place, Pittsburgh, Pennsylvania and the President's Conference Room at Allegheny University of the Health Sciences, Philadelphia, Pennsylvania. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| MEMBERS PRESENT | OTHER INVITEES | MEMBERS ABSENT |
|---|---|---|
| Sherif S. Abdelhak | Beth Boyer | Dorothy McKenna Brown, Ed.D. |
|  | Calvin Bland | Judith S. Eaton, Ph.D. |
| William F. Adam | Debra Caplan | Leonard T. Ebert |
| Henry G. Allyn, Jr. |  | William H. Genge |
| Barbara F. Atkinson, M.D. | Lynn R. Isaacs | Teresa Heinz |
| J. David Barnes | Donald Kaye, M.D. | Oksana Korzeniowski, M.D. |
| Iain F. S. Black, M.D. | William C Kennedy, Esq. | Stanley M. Marks, M.D. |
| Ralph W Brenner, Esq. | David W. McConnell | Joseph C. Maroon, M.D. |
| Douglas D Danforth | Jean Rocks | Leslie Anne Miller, Esq |
| Ronald R. Davenport | Leonard L. Ross, Ph.D. | Joseph Neubauer |
| Harry R. Edelman, III | Anthony M. Sanzo | Thomas H. O'Brien |
| Ira J. Gumberg | Cherry S White | Chryss O'Reilly |
| Robert M. Hernandez | Nancy A. Wynstra, Esq. | J. Brandon Snyder |
| Alfred W. Martinelli |  | Leon C. Sunstein, Jr. |
| Donna M. Murasko, Ph.D. |  | Mark Victor, M.D. |
| Francis B. Nimick, Jr. |  |  |
| Robert B. Palmer |  |  |
| David W. Sculley |  |  |
| W.P. Snyder III |  |  |
| Richard Spielvogel, M.D. |  |  |
| W. Bruce Thomas |  |  |
| Margaret Gray Wood, M.D. |  |  |

 DVR 51236 1


DEPOSITION EXHIBIT
829
AKF

PR-1-000910

:

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 2


I.    Opening of Meeting

The meeting was called to order by W.P. Snyder, III, Chairman. Nancy A. Wynstra, Esquire maintained the minutes  The Chairman declared that a quorum was present and the meeting was competent to proceed.  Mr Snyder noted that this was the first Board meeting to be held using our interactive video equipment

II    Additions to the Agenda

Mr. Snyder noted that the group had received an additional packet, containing material about several items on the agenda, which would be addressed at appropriate points during the meeting

III   Greene County Memorial Hospital Management Agreement

Mr. Sanzo discussed the proposed management agreement with Greene County Memorial Hospital ("GCMH")  He stated that it is a 102 bed hospital, which operates 40 beds at any given time.  He stressed that a linkage with GCMC has a strategic value as we position ourselves in the regional market  He noted that GCMH has a positive cash position.  He also advised the Board that we expect to enter into a separate management contract for the emergency room

Following discussion and upon motion duly made and seconded, the Board adopted the following resolution

**WHEREAS, Allegheny Health, Education and Research Foundation ("AHERF") owns and operates a diversified healthcare system ("AHERF System") located primarily in the cities of Philadelphia and Pittsburgh, Pennsylvania, which includes general and specialty hospitals, a network of ambulatory care providers, managed care components, and a health sciences university which includes a medical school; and**

**WHEREAS, Greene County Memorial Hospital ("GCMH") operates a hospital and related healthcare affiliates located in Waynesburg, Greene County, Pennsylvania; and**

**WHEREAS, discussions have been held between representatives of AHERF and GCMH about AHERF assuming the management of day-to-day operation of GCMH pursuant to the terms and conditions of a Management Agreement; and**

**WHEREAS, management believes that entering into a Management Agreement with GCMH will be beneficial to Allegheny General Hospital;**

**NOW THEREFORE, BE IT RESOLVED, by the Board of Trustees of AHERF that the proposed Management Agreement between AHERF and GCMH and its affiliates, in a form**

PR-1-000911

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 3

substantially equivalent to the existing AHERF management agreement with Ohio Valley Medical Center, is hereby approved to be effective October 1, 1996; and

FURTHER RESOLVED, that any inquiries or questions regarding this Management Agreement or any aspect thereof shall be referred to the President and Chief Executive Officers of GCMH and AHERF.

IV. Delaware Valley Medical Center Management Agreement

Dr Kaye gave a brief description of the Delaware Valley Medical Center to the Trustees. Delaware Valley Medical Center has been actively seeking a partner for some time and because of the number of primary care practices in their immediate vicinity owned by AIHG, this management contract is a good strategic move for AHERF Delaware Valley. He noted that the contract still needs approval by the Delaware Valley Medical Center System Board. This management contract is very similar to other contracts that AHERF has entered into whereby AHERF would hire their CEO and may or may not hire their CFO. Delaware Valley Medical center will pay a management fee of $1 million, plus expenses to AHERF.

Following discussion and upon motion duly made and seconded, the Board adopted the following resolution:

WHEREAS, Allegheny Health, Education and Research Foundation ("AHERF") owns and operates a diversified healthcare system ("AHERF System") located primarily in the cities of Philadelphia and Pittsburgh, Pennsylvania, which includes general and specialty hospitals, a network of ambulatory care providers, managed care components, and a health sciences university which includes a medical school; and

WHEREAS, Delaware Valley Medical Center ("DVMC") operates a hospital and related healthcare programs and facilities located in suburban Philadelphia in Langhorne, Pennsylvania; and

WHEREAS, discussions have been held between representatives of AHERF and DVMC regarding AHERF providing certain management and support services pursuant to the terms and conditions of a management agreement; and

WHEREAS, management believes that entering into a management contract with DVMC will be beneficial to the AHERF facilities and physicians in the Delaware Valley; and

NOW THEREFORE, BE IT RESOLVED, by the Board of Trustees of AHERF that the proposed Management Agreement between AHERF and DVMC and its affiliates, in

PR-1-000912

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 4

substantially the form of the current contract between AHERF and Ohio Valley Medical
Center, is hereby approved to be effective October 1, 1996 or at such other date as shall
be agreed upon between AHERF and DVMC; and

FURTHER RESOLVED, that the President and Chief Executive Officer of the
Corporation (or his designee) is hereby authorized and directed to negotiate and confirm
such final terms and conditions for such Management Agreement as such officer shall
deem reasonable and appropriate, and such terms and conditions are hereby ratified
and approved; and

FURTHER RESOLVED, that any officer of the Corporation is hereby authorized and
directed to do all such things and take all such actions as shall be necessary or
appropriate to execute and deliver the Management Agreement in the form approved
by the President and CEO, or his designee, and such actions are hereby ratified and
approved; and

FURTHER RESOLVED, that any inquiries or questions regarding this Management
Agreement or any aspect thereof shall be referred to the President and Chief Executive
Officer of AHERF, or his designee and the Chairman of the Partnering Committee of
the Board of DVMC.

V    Consolidation with Forbes Health System

Mr. Abdelhak briefed the Trustees on the consolidation with the Forbes Health System  He stated that
this is an important strategic move, and will allow for greater strength in negotiations with payors.
Mr. Abdelhak said that he and management have had repeated meetings with Forbes' management
and that he would be meeting with their Board on Tuesday, September 17, 1996. He also noted that
the Forbes special committee has recommended a consolidation with AHERF.

Mr. McConnell then reviewed issues relative to Medicare recapture and this transaction. He noted
that recapture is basically an acceleration of depreciation based on reevaluation of the life of the asset.
If the transaction occurs, over the next five years, we could record into income $7+ million. He also
noted that there are strict regulatory requirements which must be followed in order for an entity to
qualify for recapture and that this transaction is structured in a way which meets the requirements
Mr. Abdelhak stressed that the consolidation with Forbes, whether or not recapture occurs, is an
important strategic move on our part

Following a lengthy discussion and upon motion duly made and seconded, the Board adopted the
following resolution.

PR-1-000913

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 5

WHEREAS, Allegheny Health, Education and Research Foundation ("AHERF") owns and operates a diversified healthcare system ("AHERF System") located primarily in the cities of Philadelphia and Pittsburgh, Pennsylvania, which includes general and specialty hospitals, a network of ambulatory care providers, managed care components, and a health sciences university which includes a medical school; and

WHEREAS, Forbes Health System ("FHS") operates hospitals and related healthcare affiliates located in Allegheny County, Pennsylvania; and

WHEREAS, discussions have been held between representatives of FHS and AHERF about FHS becoming a member of the AHERF System pursuant to the general structure and parameters set forth herein; and

WHEREAS, FHS has independently concluded that substantial changes in circumstances applicable to healthcare systems and providers will result in significant shifts in demand for healthcare services, substantial reductions in payment for healthcare services, and shifts in the mechanisms for financing and delivery of healthcare services; and

WHEREAS, FHS has independently concluded that consolidation of healthcare resources and reductions in healthcare capacity will occur as a result of such changing circumstances; and

WHEREAS, FHS and AHERF have discussed consolidation and both FHS and AHERF have concluded that a consolidation between them would represent an appropriate response to the aforementioned changing circumstances and would be in the best interests of both organizations and the community; and

WHEREAS, AHERF is willing to embrace FHS' community mission and community providers and will commit itself to the advancement of both; and

WHEREAS, as part of the consolidation it is anticipated that FHS will, at a later date, merge into a corporation named Allegheny University Medical Centers ("AUMC"); and

WHEREAS, FHS and AHERF have discussed and conducted arm's length negotiations concerning the terms under which a consolidation between AHERF and FHS will occur, the details of which will be specifically set forth in a Consolidation Plan based on the following principles:

(a)     Any and all legal agreements entered into by and between FHS and any other party will be honored by AHERF;

PR-1-000914

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 6

(b)    A comprehensive assessment of administrative services will be conducted by the
       Chief Executive Officers of FHS and AHERF to identify the strongest, most
       efficient and effective administrative configuration for FHS and AUMC,
       including evaluation of the relative benefits of membership in the VHA or
       Premier alliance;

(c)    Programmatic clinical collaboration will be the responsibility of the Chief
       Executive Officer of FHS and related representatives of the medical staff and
       their counterparts at other AHERF entities;

(d)    All clinical services which can be effectively provided in the community hospital
       setting will continue to be maintained there and only those activities that the
       FHS physicians and management believe cannot be done effectively in the
       community based hospital will be encouraged to be delivered at Allegheny
       General Hospital (AGH);

(e)    All FHS physicians who have appropriate training and meet the established
       credentialing criteria will be welcome to join the medical staff of all other
       AHERF entities;

(f)    The current anesthesiology, emergency room, pathology and radiology contracts
       will be maintained to the extent consistent with quality patient care and cost
       efficiency;

(g)    AHERF's intent is to work with and not supplant the existing medical and
       surgical specialists of the FHS Medical Staff through its multiple programmatic
       and facility resources. Working through the established planning process, the
       FHS Medical Staff leadership will have the opportunity to identify gaps and
       levels of professional services appropriate for community facilities consistent
       with the adopted mission;

(h)    Determinations on referrals of patients shall be made exclusively by the patient's
       responsible physician and it is expected that the physician will do whatever
       he/she believes is in the best interests of the patient at all times. If referrals are
       made out of the System, the referring physician will be encouraged to provide
       an explanation to AHERF so that the System can determine how it can improve
       to earn the physician's referrals;

(i)    All FHS physicians will be encouraged, but not required, to participate in any
       and all offerings by AHERF including contracts with insurers and employers;

PR-1-000915

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 7

(j)    An appropriate assessment will take place regarding the effective operation of Forbes Metropolitan Hospital where it is anticipated that a preventative and rehabilitative outpatient service for geriatrics will be established and operated by the current FHS staff and it is anticipated that AGH and its staff will make referrals as appropriate for the services offered at that facility;

(k)    AHERF will, to the extent resources are available and community need is present, continue to equip and maintain the FHS facilities in a manner appropriate to community facilities of their size and type, and will allocate no greater amount of corporate overhead to Forbes Metropolitan Hospital, Forbes Regional Hospital, and Forbes Nursing Center than FHS currently allocates.

(l)    The consolidation will be accomplished using all necessary steps to make the total transaction most beneficial to FHS and to AHERF and to ultimately achieve the desired configuration.

NOW THEREFORE, BE IT RESOLVED, by the Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF") that the invitation to FHS and affiliates to consolidate with AHERF is hereby ratified, and that the proposed consolidation of FHS and affiliates with AHERF is hereby approved upon adoption of a resolution by the FHS Board accepting the contents and spirit of this resolution and the notice set forth in the reserve powers section hereof; and

FURTHER RESOLVED, that the Board of Trustees of AHERF hereby requests that the Board of Trustees of FHS approve such a resolution and consolidation; and

FURTHER RESOLVED, that upon the approval by the FHS Board of such a resolution and consolidation, then effective immediately and automatically upon the notification by the CEO of FHS to the Chairman of the Board of AHERF of the occurrence of the last to occur of (i) the receipt of final approval of the proposed transaction by the Federal Trade Commission and the Department of Justice or upon the expiration of the required waiting period under the Hart-Scott-Rodino Act, (ii) the expiration of the required waiting period following formal required notification to the Pennsylvania Department of Health, for consummation of the consolidation contemplated by this resolution, and (iii) the completion of a due diligence process covering all information about FHS which AHERF deems relevant to this transaction with all issues identified resolved to AHERF's satisfaction, the Transaction and consolidation as herein described will occur.

FURTHER RESOLVED, that the structure of this Transaction will be in the form of either (1) a purchase of assets of FHS by Allegheny University Medical Centers ("AUMC") or another AHERF subsidiary, or (2) a statutory merger of FHS into AUMC or another AHERF

DVR 51236 1                          7

PR-1-000916

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 8

subsidiary, with the fair market value consideration for the Transaction being the assumption
by AUMC or another AHERF subsidiary of the outstanding liabilities of FHS and/or such other
consideration as shall be determined to be appropriate by AHERF and FHS.

FURTHER RESOLVED, that after either the purchase or merger, the Articles of Incorporation
of FHS shall be amended to either reflect AHERF as the sole Member of AUMC/FHS or to
reflect AHERF as the Class "A" Member of FHS and AUMC as the Class "B" Member.
Depending on the ultimate form of the Transaction, the Bylaws of AUMC/FHS shall be
amended and restated, to render AHERF as the Sole Member of AUMC/FHS with the following
reserve powers:

(a)     To appoint and remove, with or without cause, the trustees of the corporation;

(b)     To appoint and remove the Chair of the Board and other officers of the
        corporation or of any subsidiary corporation;

(c)     To approve the appointment of and to remove the president of the corporation
        or of any subsidiary corporations;

(d)     To adopt Bylaws and to effect or approve any amendments, alterations or
        restatements or other revision of the Articles of Incorporation of the corporation
        and these Bylaws;

(e)     To approve annual capital and operating budgets for the corporation and for
        any other corporation in which the corporation has a sole, majority, or
        controlling voting or ownership interest (hereinafter referred to as "subsidiary
        corporations"), including approval of individual line items of expense and
        income;

(f)     To approve unbudgeted capital or operating expenditures to be undertaken
        individually or collectively by the corporation and any subsidiary corporations
        where the cumulative amount of such unbudgeted expenditures is the lesser of
        two million dollars ($2,000,000) or ten percent (10%) in excess of the individual
        or combined approved budgets of the corporation and its subsidiaries;

(g)     To approve borrowing of funds by the corporation from an unrelated person,
        corporation, or other legal entity, or lending of funds by the corporation to an
        unrelated person, corporation or legal entity, including capital leases, where the
        term of the borrowing or lending exceeds one year in duration and where the
        total amount of the borrowing or lending exceeds One Hundred Thousand
        Dollars ($100,000).

PR-1-000917

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 9

    (h)    To approve the purchase or sale of any real property by the corporation or any subsidiary corporation, and to approve the creation of a mortgage, lien, or any other security interest in the real property of any subsidiary corporation;

    (i)    To determine how any and all excess cash generated by the corporation is allocated with the Allegheny System in pursuit of the overall Allegheny mission. For purposes of this section, "excess cash" shall mean the amount of cash added in prior periods as reflected in the audited statements of cash flows. The Member's allocation of such excess cash would occur only after insuring compliance with any and all debt covenants.

Depending on the ultimate form of the Transaction, the Bylaws of FHS shall be amended and restated, to render AHERF as the Class "A" Member and AUMC as the Class "B" Member with the reserve powers set forth above divided between them as is usual in the AHERF System.

FURTHER RESOLVED, that the Transaction and consolidation approved herein shall be accomplished in accordance with all applicable requirements of law and regulation, and in accordance with all contracts or other legal undertakings to which FHS or any of its current component entities is a party or by which it or they are bound, and that prior to implementation of the consolidation, all approvals shall be obtained which are legally required to be obtained from any person or entity, whether governmental or private, including, but not limited to, any bond trustee, bond insurer, or court, in order to effect the consolidation and the transactions contemplated hereby, provided that any modifications or reconfigurations in the consolidation required to secure any such approval shall be undertaken and are hereby approved, but further provided that the consolidation shall be maintained in all such circumstances, and despite any such structural modifications which may be required, provided, however, that consummation of the consolidation is contingent upon AHERF's completion of due diligence to its satisfaction; and

FURTHER RESOLVED, that, effective immediately upon adoption of this resolution, the Chief Executive Officer of AHERF will be given notice of any and all meetings of the Board of Trustees of FHS and will be invited to attend such meetings, either in person or through a designee, as a guest, provided, however, that such individual shall not attend any portion of said meetings at which competitively sensitive information is discussed; and

FURTHER RESOLVED, that the Chief Executive Officer of AHERF will nominate five (5) individuals who are currently members of the FHS Board to serve as members of the initial Board of Trustees of AUMC one of whom will be a member of the FHS Medical Staff, the remainder of the existing Trustees to become Life Emeritus Trustees of AUMC from which AHERF will fill vacancies that occur on the AUMC Board, and that the initial Board of Trustees

PR-1-000918

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 10

of AUMC will be responsible for developing and adopting the initial Bylaws of AUMC, subject to the reserve powers set forth hereof; and

FURTHER RESOLVED, that FHS' hospitals shall remain licensed as separate hospitals with separate and independent, self-governed Medical Staffs; and

FURTHER RESOLVED, that those assets accumulated by FHS prior to the date of the consolidation shall continue to be utilized exclusively to support the programs and facilities of FHS, unless AHERF and FHS, at the time the consolidation becomes effective, specifically agree otherwise; and

FURTHER RESOLVED, that since the consolidation will result in certain staff positions at FHS being eliminated, all existing policies in effect as of the beginning of the current fiscal year which relate to severance for individuals whose positions are eliminated, (or with respect to any individuals hired since the beginning of the fiscal year, in effect from the date of hire), shall be honored; and

FURTHER RESOLVED, that with regard to employees who do not have contracts governing their severance benefits, it is agreed that such employees shall be provided severance in accordance with the Income Continuation Plan adopted by the Board of Trustees of AHERF at its meeting of April 8, 1994;
in addition, these affected employees will be given vouchers to use for any health care they, or their families, may need during that period, provided they receive such care at any of the AHERF hospitals and clinics in the Pittsburgh area; and

FURTHER RESOLVED, that the Board further irrevocably approves, at such time as it deems appropriate, the purchase of the assets of FHS or the statutory merger of FHS into Allegheny University Medical Centers; and

FURTHER RESOLVED, that any of the Chairman, Vice-Chairman, President, Secretary, or Treasurer of AHERF is hereby authorized and directed to do all such things and take all such actions as such officer may deem to be reasonable and appropriate to provide for the implementation and effectuation of the Transaction and consolidation approved herein, including without limitation, by execution of contracts and other undertakings, delivery of instruments, securing of licenses, permits, and approvals, and making of filings and notifications, and all such actions are hereby approved; and

FURTHER RESOLVED, that the Chairman of the Board and the Chief Executive Officer of AHERF (the "Designated Officers"), are hereby authorized and directed to determine, on behalf of AHERF, how to proceed with the Transaction through negotiation and consultation with the Chairman of the Board and the Chief Executive Officer of FHS, (who shall be similarly

PR-1-000919

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 11

authorized and directed by FHS), and the Transaction, if any, and all determinations and decisions concerning the Transaction made by the Designated Officers, including, without limitation, with respect to the terms and/or form of such Transaction, or actions to effect such Transaction (including intermediate transactions) are hereby approved and ratified; and

FURTHER RESOLVED, that when the Designated Officers decide in which form to proceed with the Transaction, the Designated Officers are hereby authorized to do all such things and take all such actions on behalf of FHS as shall be necessary to effect and implement the Transaction as approved by the Designated Officers and to preserve the benefits of the Transaction to FHS and to AHERF, provided that the ultimate objective of consolidation of FHS into the AHERF system is achieved, (such actions to include, without limitation, the execution and delivery of instruments to implement a purchase and sale of assets, a statutory merger, or one or more intermediate transactions) and the authority to approve and effect all such actions on behalf of FHS is hereby delegated to the Designated Officers, and all such actions are hereby approved and ratified; and

FURTHER RESOLVED, that AHERF agrees to defend and indemnify any of the current directors of FHS in the event they are sued or subjected to any liability whatsoever as a result of their approval of this Transaction and consolidation; and

FURTHER RESOLVED, that any inquiries or questions regarding this consolidation or any aspect thereof shall be referred to the President and Chief Executive Officer of AHERF.

VI.    Consolidation with Graduate Health Systems Subsidiaries

Mr. Abdelhak gave an informational update to the Trustees regarding the Graduate Health Systems consolidation. He stated that we are not ready to advance the consolidation to the Trustees but that the Hart-Scott-Rodino filing was submitted at the beginning of September. If no communication is received with regard to the filings by the end of September, then the acquisition will be approved. If additional information is requested, there is a twenty (20) day waiting period. Mr. Abdelhak stated that the due diligence process has been started and management is actively collecting information. It is expected that the due diligence process will be completed in ninety (90) days from the date of the announcement. Mr. McConnell discussed recapture in the Graduate context. Mr. Abdelhak stated that he expects to bring a recommendation on the details of what components of Graduate will ultimately move into AHERF to the Board for approval in December. Mr. Abdelhak stated that he has not yet reached any conclusions but was sharing with the Trustees the options available. Mr. Abdelhak then briefly updated the Board on other on-going or planned system development activities. He noted that he is only willing to add additional entities if they have strong existing management which can assume on-going management responsibility.

PR-1-000920

Minutes of the Special Meeting of
The Board of Trustees of Allegheny
Health, Education and Research Foundation
September 16, 1996
Page 12

VII     Appointment of President of Allegheny University Medical Centers (AUMC)

Mr. Snyder announced that if Forbes decides to join AHERF, Barry Roth, President and CEO of
Forbes Health Systems would be named President and CEO of the new entity, Allegheny University
Medical Centers (AUMC). Mr. Abdelhak noted that this was contingent upon the outcome of the
meeting of the Board of Trustees of Forbes Health System, scheduled for the next day.

Thereafter, upon motion duly made and seconded, the Board adopted the following resolution:

**RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research
Foundation (AHERF), acting as the Member of Allegheny University Medical Centers
(AUMC), hereby approves the appointment of Barry Roth as President and Chief
Executive Officer of AUMC, contingent upon approval by the Board of Directors of
Forbes Health Systems.**

VIII.     Adjournment

Mr. Snyder asked if everyone was pleased with the format of using the interactive video equipment
for meeting purposes and everyone stated that they were very pleased

There being no further business, the meeting was adjourned

Respectfully submitted,

Nancy A. Wynstra

NAW:bb:24208

PR-1-000921

TAB 276

# In The Matter Of:

*AHERF   v.*
*PRICEWATERHOUSECOOPERS, L.L.P.*

---

*BERNARD J. KORMAN, ESQ.*
*August 28, 2002*

---

*MANHATTAN REPORTING CORP.*
*420 LEXINGTON AVENUE*
*NEW YORK, NY  10170*
*(212) 557-7400    FAX: (212) 692-9171*

*Original File 082802BK.TXT, 247 Pages*
*Min-U-Script® File ID: 0117903520*

**Word Index included with this Min-U-Script®**

---

1—11:59:09   25—12:01:00                    Page 115

[1] Q: Let me ask you to answer that question to the
[2] extent you have any understanding as a former Board
[3] member of the parent entity, GHS.
[4] A: I think the question is still the same, in
[5] whether there was any legal liability in that
[6] regard.
[7] And the answer is, I don't know
[8] whether there is any legal liability, if that's the
[9] question you are asking.
[10] Q: You mentioned that Coopers & Lybrand had had
[11] involvement in due diligence prior to the
[12] finalizing of the 1996 audited financials by
[13] Deloitte & Touche; correct?
[14] A: Yes.
[15] Q: Do you know whether Coopers & Lybrand had any
[16] control over the contents or form of the audited
[17] financials as finally issued by Deloitte & Touche?
[18] A: I know that they were directly involved with
[19] Deloitte & Touche, because Mr. Abdelhak asked that
[20] they be involved and asked our permission in that
[21] regard, which we gave.
[22] Q: Do you know what the nature of that
[23] involvement was?
[24] A: That was between Coopers and Deloitte and
[25] Allegheny.

1—12:01:09   25—12:03:01                    Page 116

[1] Q: Do you know whether any changes to the
[2] substance or presentation of the audited financials
[3] were made at the request of Coopers & Lybrand?
[4] A: That's — if they were made, that was between
[5] those parties.
[6] Q: That is, you don't know?
[7] A: The answer is, I don't know.
[8] Q: Now, as you pointed out to me in the September
[9] 12 letter, which is Exhibit 251 —
[10] A: Yes.
[11] Q: — in addition to a representation on behalf
[12] of GHS, you stated that, quote, Should such change,
[13] that is, a transfer of control of assets, occur
[14] prior to June 30, 1997, SDN, Inc., will assume the
[15] current obligation of GHS to The Graduate Hospital.
[16] Do you see that?
[17] A: Yes.
[18] Q: Pardon me. It does say that, but that's not
[19] the language of interest.
[20] Let me take you to the sentence at
[21] the end of the paragraph about GHS Osteopathic, in
[22] which it says, quote, We have been assured that
[23] should such, that is, a transfer of control, occur
[24] prior to June 30, 1997, SDN, Inc., will provide the
[25] same assurance as GHS.

---

1—12:03:03   25—12:05:31                    Page 117

[1] And I understand that to be the
[2] assurance to GHS Osteopathic; is that correct?
[3] A: Yes, that is.
[4] Yes, that's the second letter that's
[5] attached hereto.
[6] Q: And was a letter in the form appearing at PH
[7] 16905 in fact signed and provided to you by a
[8] representative of AHERF?
[9] A: I believe so.
[10] MR. BROOKS: Let me mark as Exhibit
[11] 606, I believe, a letter on SDN letterhead, dated
[12] October 3, 1996, bearing Bates Nos. DC 0618, Pages
[13] 1 and 2, from Steve Spargo, to Bernard Korman.
[14] (Document marked for identification
[15] as Exhibit 606.)
[16] BY MR. BROOKS:
[17] Q: Mr. Korman, do you believe that you recall
[18] seeing this document before?
[19] A: I don't have an independent recollection of
[20] it, but it certainly does look familiar.
[21] Q: Does this letter appear to you to represent a
[22] guarantee from SDN to assume the GHS obligation to
[23] GHS Osteopathic that we have been discussing?
[24] MS. MEADEN: Objection as to form.
[25] A: If I read the second paragraph correctly, SDN

1—12:05:36   25—12:07:13                    Page 118

[1] guarantees both obligations, Paragraph 1 and
[2] Paragraph 2 of the letter which I sent to Deloitte.
[3] Q: Yes. But in particular —
[4] A: Yes. The answer is, yes.
[5] Q: And this letter identifies various sources of
[6] funding which SDN identifies as enabling it to
[7] stand behind such guarantees; correct?
[8] A: The letter speaks for itself.
[9] Q: Well, is that your understanding of what this
[10] letter — backing up.
[11] Mr. Korman, you were the recipient
[12] of this letter; is that correct?
[13] A: That is correct.
[14] Q: Were these guarantees important to you at the
[15] time?
[16] A: They were important to Deloitte at the time.
[17] Q: Did you understand this letter to identify
[18] various sources of funds which would enable SDN to
[19] stand behind the guarantees being made here?
[20] A: There are six sources that are identified in
[21] the letter; they are the six bullet points at the
[22] bottom of the letter.
[23] Yes. The answer is, yes.
[24] Q: SDN did not here identify any guarantee from
[25] AHERF as a source of funds enabling it to stand

1—12:07:17  25—12:09:31                Page 119

[1] behind its undertakings, did it?

[2]    **MS. MEADEN:** Objection.

[3]    **A:** This letter is a letter from SDN; it is not a

[4] letter from AHERF.

[5]    **MR. BROOKS:** Read back the question,

[6] please.

[7]    (The reporter read the record as

[8] requested.)

[9]    **A:** (Continued.) I don't know that that's the

[10] case.

[11]    If you look at the second bullet

[12] point, "Other sources of liquidity that may be

[13] available to SDN." I don't know what SDN's

[14] relationship was with AHERF.

[15]    **Q:** Let me direct you to your testimony, your

[16] previous testimony, at Page 416 of the Philadelphia

[17] Health Care Trust litigation deposition.

[18]    **A:** 416?

[19]    **Q:** Yes, sir.

[20]    **A:** Yes.

[21]    **Q:** And let me direct your attention particularly

[22] to the testimony going from Line 10 through Line

[23] 24. I am going to ask you to look at that.

[24]    **A:** Yes.

[25]    **Q:** Was it in fact your understanding at the time

1—12:09:34  25—12:11:09                Page 120

[1] of, say, September of 1996 that SDN itself did not

[2] have substantial assets?

[3]    **A:** So far as we knew, it didn't have any assets.

[4]    **Q:** And you understood, did you not, that the

[5] structure of the proposed merger was that, in the

[6] first instance, the Graduate entities would be

[7] merged into SDN, not into AHERF?

[8]    **A:** No. Our understanding was that there would be

[9] a two-step transaction; that first we would go into

[10] SDN, and then we would go into AHERF.

[11]    **Q:** Did you have any — did you receive any

[12] representations or assurances as to how long the

[13] period would be between the merger into SDN and the

[14] roll into AHERF?

[15]    **A:** Yes. I received assurances from Mr. Abdelhak

[16] that within a six-month period of time that would

[17] occur.

[18]    **Q:** He told you, did he not, that during that

[19] period of time, they would, among other things,

[20] conduct due diligence; correct?

[21]    **A:** That's correct.

[22]    **Q:** Did you and he discuss what would be done if,

[23] in the course of that due diligence, anything was

[24] discovered that made it, in the judgment of the

[25] AHERF Board, inappropriate to consolidate the

1—12:11:12  25—12:12:40                Page 121

[1] Graduate entities into AHERF?

[2]    **A:** I believe in the merger documents, that we had

[3] a provision that if it did not occur after a

[4] certain period of time, that the transaction would

[5] unravel.

[6]    **Q:** Would unwind?

[7]    **A:** Unwind. Excuse me, unwind.

[8]    **Q:** Let me ask you to turn to Page 414 of this

[9] same transcript.

[10]    **A:** Yes.

[11]    **Q:** And direct your attention to the testimony

[12] from Line 7 through Line 24.

[13]    **A:** Yes.

[14]    **Q:** And in one of your answers you refer to the

[15] fact that you were fine with the structure, the

[16] two-step structure, so long as you had, quote, the

[17] necessary assurances that ultimately we would have

[18] Allegheny behind this transaction and that they

[19] would be assuming full responsibility for this

[20] transaction?

[21]    **A:** Right.

[22]    **Q:** Can you explain to me what assurances you feel

[23] that you received from Mr. Abdelhak to that effect?

[24]    **A:** I received oral assurances and I received a

[25] letter from him to that effect, that that was his

1—12:12:44  25—12:14:33                Page 122

[1] intention.

[2]    **Q:** Can you tell me in any more detail what oral

[3] assurances you received from Mr. Abdelhak that

[4] AHERF would in fact complete the second step of the

[5] transaction?

[6]    **A:** Yes. It's referenced here, somewhat

[7] cryptically, on Page 414, referenced the United

[8] Hospital transaction, which was a transaction with

[9] which I was quite familiar. And that's exactly how

[10] they did that transaction, as well.

[11]    So I was familiar with the process,

[12] I was familiar with what he represented was his

[13] internal process. We were concerned about the

[14] external processes. And I was comfortable that

[15] that was his intent and relied upon those

[16] representations.

[17]    **Q:** Did Mr. Abdelhak ever tell you in words or

[18] substance that, notwithstanding the formalities of

[19] the SDN stage of the transaction, that you could be

[20] assured that AHERF would in fact assume ownership

[21] of the GHS entities?

[22]    **A:** The answer is yes.

[23]    But getting back to my previous

[24] answer on a previous question, we tried to tie up

[25] that gap, possible gap, by the language in the

August 28, 2002 Case 2:00-cv-00684-DSC   Document 191   Filed 08/19/2005   Page 19 of 56   AHERF   v.

PRICEWATERHOUSECOOPERS, L.L.P.

1—12:14:40   25—12:15:53                Page 123

[1] agreements, which provided for the unwinding of the
[2] situation if it did not occur.
[3]   Q: So on one hand he assured you it would occur,
[4] and on the other hand, in caution in the documents,
[5] you provided for the situation in which it didn't
[6] occur?
[7]   A: That was the attempt of our counsel, yes.
[8]   Q: Good counsel.
[9]   Do you recall any particular
[10] instances in which Mr. Abdelhak gave you any
[11] assurances that, leaving aside formalities, that
[12] AHERF would in fact assume control of the Graduate
[13] entities?
[14]   A: Yes; in our initial conversations, when we
[1] structured the transaction.
[16]   The intent always was for AHERF to
[17] do this. And there were reasons, external reasons,
[2] to go through the SDN situation, both on his side
[9] and our side.
[0]   Because timing was of the essence in
[1] this transaction so as to not have any instability
[2] operationally.
[3]   And I fully understood the process
[1] he had to go through with his Board, in terms of
[1] appropriate due diligence. And that's why the

1—12:15:57   25—12:17:54                Page 124

[1] transaction was structured the way it was.
[1]   But from day one it was the intent
[1] to do a two-step transaction.
[1]   Q: You mentioned, I believe, also that Mr.
Abdelhak sent you a letter confirming that the
second step of that transaction would in fact be
completed.
  Can you describe — do you recall
approximately when that letter was sent?
  A: The letter wasn't addressed just to the second
step of the transaction. It was prior to the
closing.
  I requested from him a written
communication that what he was representing to me,
on behalf of SDN, was also being represented as the
chief executive officer of AHERF.
  And he sent me such a letter. It
was a fairly short letter.
  Q: Looking again at Exhibit 251, Page 16904, and
the — pardon me, at Exhibit 251, which includes
the September 12 letter.
  A: I have it.
  Q: And the paragraph relating to The Graduate
Hospital, which I looked at in error last time
around.

1—12:17:56   25—12:19:18                Page 125

[1]   There is a reference in that
[2] paragraph in which it states that, quote, SDN,
[3] Inc., will assume the current obligation of GHS to
[4] The Graduate Hospital.
[5]   Do you see that?
[6]   A: Yes.
[7]   Q: Do you have any understanding of — well, let
[8] me rephrase that.
[9]   What obligation or obligations of
[10] GHS to The Graduate Hospital were you referring to
[11] there?
[12]   A: There was an intercompany debt outstanding
[13] between Graduate Hospital and Graduate Health
[14] System, and that's the obligation we are talking
[15] about.
[16]   MS. MEADEN: I'm sorry. Could you
[17] read the answer back, please.
[18]   (The reporter read the record as
[19] requested.)
[20]
[21]         BY MR. BROOKS:
[21]   Q: And looking at the next page of this
[22] collection.
[23]   A: Yes.
[24]   Q: The draft letter to yourself, from an unnamed
[25] person at AHERF.

1—12:19:23   25—12:22:05                Page 126

[1]   It is your testimony that you
[2] received a signed version of this letter?
[3]   A: Yes.
[4]   Q: Do you recall who it was signed by?
[5]   A: I thought it was signed by Mr. Abdelhak.
[6]   As a matter of fact, again, calling
[7] upon memory, this may be the letter that I was
[8] referring to where he gave me the assurances that
[9] AHERF was going to support the transaction.
[10]   Q: I want to ask you a few more questions about
[11] the purpose of the use of the SDN two-step
[12] structure. And in that context I will direct you
[13] to your testimony at Page 412 of your prior
[14] deposition.
[15]   And it is a topic that I can't tell
[16] you precisely starts or ends at one place, but I
[17] think you will find relevant testimony there.
[18]   In particular, on Page 412, let me
[19] ask you to review your answer from Lines 10 to
[20] Lines 22.
[21]   A: Yes.
[22]   Q: Pardon me. You said there, you pointed there
[23] to, various external players, such as government
[24] agencies and labor unions.
[25]   Can you explain to me how the use of

1—16:17:49  25—16:18:52          Page 207

[1] me.The control of the hospitals.

[2]    **Q:** Okay.

[3]    **A:** Control of the hospitals. Right.

[4]    **Q:** All right. And that was, as I understand it,

[5] then, SDN was substituted, you are saying, as the

[6] single shareholder member of the hospitals?

[7]    **A:** Exactly.

[8]    **Q:** In place of GHS; correct?

[9]    **A:** Exactly.

[10]    **Q:** My question now is, if you know, was there

[11] some reason that that change of control could not

[12] be effected in that way with AHERF becoming the

[13] single shareholder member of the hospitals

[14] initially, as opposed to having SDN come in

[15] initially and then transfer to AHERF?

[16]    **A:** No. If the party — if AHERF had wanted to do

[17] the transaction that way, they could have done it

[18] that way.

[19]    **Q:** Was this two-step process something that was

[20] suggested by AHERF?

[21]    **A:** Yes.

[22]    **Q:** Were you ever given any explanation as to why

[23] they wished to structure it in this two-step

[24] process?

[25]    **A:** No.

---

1—16:19:19  25—16:20:28          Page 208

[1]    **Q:** I think you testified earlier that Mr.

[2] Abdelrah had asked you to allow Coopers & Lybrand

[3] to participate with Deloitte & Touche in closing

[4] out the '96 books; is that correct?

[5]    **A:** That is correct.

[6]    **Q:** All right. And did you in fact permit Coopers

[7] & Lybrand to participate with Deloitte & Touche in

[8] that process?

[9]    **A:** I notified Deloitte that I had agreed to that.

[10]    **Q:** Did you instruct Deloitte then to cooperate

[11] fully with Coopers & Lybrand in that process?

[12]    **A:** Absolutely.

[13]    **Q:** Do you recall who at Deloitte you notified?

[14]    **A:** The partner in charge, who was Ray Cisneros.

[15]    **Q:** Do you have any reason to believe that

[16] Deloitte & Touche did not cooperate fully with

[17] Coopers & Lybrand in that process?

[18]    **A:** I have every reason to believe that they did

[19] cooperate.

[20]    **Q:** And what is the basis for your belief in that

[21] regard?

[22]    **A:** The billing that we received in that regard.

[23]    **Q:** Could you be more specific?

[24]    **A:** Yes.They charged us for the time involved in

[25] working with Coopers and with AHERF, which was over

---

1—16:20:31  25—16:21:41          Page 209

[1] and above the audit-fee structure that was

[2] involved.

[3]    **Q:** You are talking —

[4]    **A:** That we had contracted for.

[5]    **Q:** You are talking about Deloitte & Touche

[6] charged you for that time?

[7]    **A:** Yes; yes.Yes. It was specific billing with

[8] specific hours and specific work.

[9]    **Q:** Did you ever notify anyone within the

[10] management ranks of the hospitals that they were to

[11] cooperate and provide information to Coopers &

[12] Lybrand in connection with closing out the '96

[13] books?

[14]    **A:** No. I did not work with the hospital people;

[15] I worked with the CFO of the system.

[16]    And the CFOs at the hospital and the

[17] controllers of the hospital reported to him, so he

[18] handled that process.

[19]    **Q:** Who was that person?

[20]    **A:** My memory is not clear whether Mr. Durishan

[21] was the CFO at that time. I think he was. If not,

[22] it was Joe Huber. I believe it was Mr. Durishan.

[23] I am not clear as to whether it was Mr. Durishan.

[24]    **Q:** It was one of those two?

[25]    **A:** It was one of those two.And if I reflect on

---

1—16:21:41  25—16:22:44          Page 210

[1] it more properly, more likely Mr. Huber.

[2]    **Q:** Do you recall whether or not you had ever

[3] informed either Mr. Durishan or Mr. Huber, whoever

[4] was in that position at that time, that they were

[5] to then notify the controllers and CFOs of the

[6] hospitals that Coopers & Lybrand was going to be

[7] involved in the process?

[8]    **A:** I would not have had that kind of

[9] conversation.They would have — either one of

[10] those would have known how to manage the process

[11] once they understood what the process was.

[12]    **Q:** Is it your belief that Mr. Huber or Mr.

[13] Durishan, again, whoever held that position, was

[14] aware that Coopers & Lybrand was to be given full

[15] access to information with respect to the closing

[16] out of the '96 books?

[17]    **A:** Not only were they aware of it, they

[18] interacted with them because they were involved in

[19] the process.

[20]    **Q:** Did you ever receive any sort of information

[21] that Coopers & Lybrand was dissatisfied with the

[22] access it was given to financial information or any

[23] information that it wanted to review in connection

[24] with closing out the '96 books?

[25]    **A:** I never received any information like that.

1—16:22:47   25—16:24:01                    Page 211

[1] Q: Are you aware of anyone within the GHS system
[2] who did receive any such notification?
[3] A: No.
[4]    On the contrary, my belief is that
[5] everything went quite well and that we were able to
[6] keep to a time schedule and get things done.
[7]    If anything, the Coopers involvement
[8] extended the audit period.
[9] Q: Why do you say that?
[10] A: Because of their interaction with Deloitte. I
[11] mean, the additional hours that were spent in this
[12] process until we closed out the audit.
[13] Q: Was it your understanding that Coopers &
[14] Lybrand had also been retained by AHERF to
[15] participate in the due diligence review of the
[16] acquisition of the hospitals?
[17] A: Yes; yes.
[18] Q: And how is it that you had that understanding?
[19] A: I was told specifically that — and our
[20] people, I know, worked with them and interacted
[21] with them, the AHERF staff as well as the Coopers
[22] staff.
[23] Q: When you say, "AHERF staff," are we talking
[24] about employees of AHERF that were involved?
    A: Yes; yes. I am talking about Mr. McConnell

1—16:24:04   25—16:26:07                    Page 212

[1] and his folks.
[2] Q: Are you aware of whether the management of the
[3] hospitals were instructed by anyone to cooperate
[4] fully with Coopers & Lybrand and AHERF in their due
[5] diligence review?
[6] A: I believe that Mr. Matthews, to whom the
[7] hospital executives reported, operating executives
[8] reported, passed that information on to them.
[9] Q: Did you receive any notification at any time
[10] that either AHERF or Coopers was dissatisfied with
[11] the access they were given to information that they
[12] needed to complete their due diligence review?
[13] A: No.
[14] Q: Are you aware of anyone within the GHS system
[15] or the hospital who had heard complaints from
[16] either AHERF or Coopers about the access they were
[17] given to information that they needed to complete
[18] their due diligence review?
[19] A: No.
[20] Q: Do you have any reason to believe that
[21] information was withheld from AHERF or Coopers &
[22] Lybrand by anyone from either the hospitals or GHS
[23] in connection with the due diligence review?
[24] A: No.
[25] MR. BROOKS: Objection. Lack of

1—16:26:07   25—16:27:36                    Page 213

[1] foundation.
[2]            BY MS. MEADEN:
[3] Q: Do you have any reason to believe that any
[4] information was withheld from Coopers & Lybrand or
[5] AHERF in connection with closing out the '96 books
[6] of the hospitals?
[7] MR. BROOKS: Same objection.
[8] A: No.
[9] Q: I think you had testified earlier that there
[10] was a mechanism within the documentation for the
[11] SDN transaction that provided that if AHERF chose
[12] not to absorb the hospitals into its system, that
[13] the transaction would be unwound?
[14] A: I don't believe the documents reference AHERF
[15] choosing. If for any reason, by a certain date, I
[16] believe some time in '97, it did not occur, then
[17] the transaction was to be unwound.
[18] Q: Had there been discussion within DHS as to
[19] what it would do with the hospitals if, for
[20] whatever reason, the transaction with AHERF was not
[21] consummated?
[22] A: No.
[23] Q: Was there any thought on your part as to what
[24] GHS would do with those hospitals if AHERF did not
[25] ultimately absorb the hospitals?

1—16:27:38   25—16:28:51                    Page 214

[1] A: I had no reason to believe that the
[2] transaction would not occur.
[3] Q: I understand that.
[4] A: After October 31.
[5] Q: All right. Well, let's talk about, then,
[6] prior to October 31.
[7]    If for some reason SDN, the first
[8] step of the process, was not completed, had there
[9] been discussions within the GHS system, either the
[10] Board or among others that you were involved in, as
[11] to what the next step would be from your
[12] perspective as to what you would do at the
[13] hospitals?
[14] A: No. We reached by, I guess, the middle of
[15] August, we had an understanding as to a
[16] transaction, and we closed by October 31.
[17]    There was no reason to contemplate,
[18] or we had no cause for even considering that
[19] because everything was moving along as the parties
[20] seemed to intend it to happen.
[21]    And there was nothing in the due
[22] diligence process which gave us any pause.
[23] Q: Those talks with AHERF commenced, I think you
[24] said, in June or July?
[25] A: June or July.

1—16:28:52  25—16:29:57                                    Page 215

[1]  **Q:** Of '96; correct?

[2]  **A:** Yes; yes.

[3]  **Q:** Again, let's step back prior to those

[4]  discussions.

[5]      Had you had any contemplation or

[6]  discussion among the members of the Board or

[7]  management of the hospitals, if AHERF weren't

[8]  interested when you approached them about these

[9]  hospitals, what you were going to do with them?

[10]  **A:** No. That was not the sequence of events.

[11]  **Q:** Why don't you explain to me, then, what the

[12]  sequence of events was.

[13]  **A:** The sequence of events was that we had had

[14]  discussions, as I stated previously, with Blue

[15]  Cross.

[16]  **Q:** Uh-huh.

[17]  **A:** And then when they fell through, and we

[18]  entered into the transaction with HSI, we thought

[19]  everything was moving along appropriately.

[20]      When we determined that that was not

[21]  working as we had thought it would work, we had

[22]  discussions with other hospitals and hospital

[23]  systems. And in my previous depositions I have

[24]  outlined those discussions. There was reference to

[25]  some of them today.

1—16:29:59  25—16:31:08                                    Page 216

[1]      And AHERF was at the end of the line

[2]  in those discussions. So it really was a

[3]  culmination of those discussions. AHERF was a

[4]  culmination of those discussions.

[5]      And, as I said, we had those

[6]  discussions in June, July, we reached agreement in

[7]  August, and we closed in October.

[8]      So that time line really did not —

[9]  and there was nothing in that period of time which

[10]  would indicate that we were not on a course to

[11]  successfully conclude that which we had planned.

[12]  **Q:** With AHERF being at the end of the line?

[13]  **A:** AHERF —

[14]  **Q:** That was your phrase.

[15]  **A:** AHERF was the successful acquirer.

[16]  **Q:** And I guess my question really goes to whether

[17]  or not you had thought beyond AHERF.

[18]      Whether there were any other

[19]  potential either merger partners or acquiring

[20]  entities that you had considered or were thinking

[21]  about if, for whatever reason, the AHERF deal

[22]  didn't happen?

[23]  **A:** We thought we found heaven with AHERF.

[24]  **Q:** Was there ever any discussion or contemplation

[25]  by the Board of closing any of the four hospitals

1—16:31:10  25—16:32:03                                    Page 217

[1]  that were ultimately transferred to AHERF, prior to

[2]  that transaction?

[3]  **A:** Four?

[4]  **Q:** Four? How many were there at Graduate?

[5]  **A:** There was Graduate, there was Mt. Sinai,

[6]  Parkview —

[7]  **Q:** City Avenue?

[8]  **A:** — City Avenue, Rancocas, and Zurbrugg.

[9]  **Q:** You're right. I'm sorry. Six. I always

[10]  forget Rancocas.

[11]      Is that five or six?

[12]  **A:** Rancocas and Zurbrugg would be considered one,

[13]  they were combined.

[14]      The one that was left out was

[15]  Reading, which was outside the AHERF transaction.

[16]  **Q:** I'm sorry. Getting back to the correct

[17]  number, let's say we had five, then.

[18]      Was there ever any discussion or

[19]  contemplation of closing any of those hospitals

[20]  prior to the discussions with AHERF?

[21]  **A:** No.

[22]  **Q:** Was there ever any contemplation or discussion

[23]  of filing for bankruptcy on behalf of any one of

[24]  those hospitals?

[25]  **A:** Pardon me?

1—16:32:04  25—16:33:28                                    Page 218

[1]  **Q:** Was there ever any — I think you heard me. I

[2]  think you were offended. If you need me to repeat

[3]  the question, I will do that.

[4]  **A:** No; no.

[5]      We had no plans for any form of

[6]  reorganization. Much better term than

[7]  "bankruptcy."

[8]  **Q:** We looked at financial statements earlier that

[9]  we have marked as an exhibit. And I want to ask

[10]  you about the preparation of financial statements,

[11]  or the audited financial statements in general.

[12]      Deloitte & Touche was the outside

[13]  auditor for the hospitals within the GHS system;

[14]  correct?

[15]  **A:** That is correct.

[16]  **Q:** And as I understand your prior testimony here

[17]  today, Deloitte & Touche — neither Deloitte &

[18]  Touche nor any other public accounting firm ever

[19]  audited the financial statements for GHS; correct?

[20]  **A:** They did not have a formal independent audit

[21]  for GHS, that's correct.

[22]  **Q:** With respect to the audited financial

[23]  statements for the individual hospitals within the

[24]  system, those were audited on an annual basis; is

[25]  that correct?

TAB 277

GRADUATE HEALTH SYSTEM, INC.

AUGUST 5, 1996

<u>SPECIAL MEETING OF BOARD OF DIRECTORS</u>

A special meeting of the Board of Directors of Graduate
Health System, Inc. convened at the offices of the corporation at
22nd and Chestnut Streets, Philadelphia, Pennsylvania on Sunday,
August 5, 1996. Present were all of the members of the Board of
Directors and, by invitation, Marc S. Cornblatt, legal counsel
and Secretary of the corporation, Joseph Huber, Jo Surpin, Lee
Doty, Esquire, Harold Cramer, Esquire and Robert Mathews.

In addition, present by invitation of the Board as repre-
sentatives of Allegheny Health, Education and Research Foundation
were Sherif S. Abdelhak, President and Chief Executive Officer,
Donald Kaye, M.D., Chief Operating Officer, Delaware Valley,
David W. McConnell, Executive Vice President and Chief Financial
Officer, Myles G. Turtz, M.D., Executive Vice President of System
Development, and Robert M. McNair, Jr., Esquire, Senior Counsel,
Delaware Valley.

All of the members of the Board being present, notice of the
meeting was waived and there was a quorum for the conduct of
business. Bernard Korman, Esquire, Chairman of the corporation,
served as Chairman, and Marc Cornblatt as Secretary, of the
meeting.

Mr. Korman called the meeting to order and stated that the
purpose of the meeting was to continue consideration and to vote
on the resolutions proposed for the establishment of SDN, Inc. as



EXHIBIT
244
CW  7/9/62

PH5100

the sole member and shareholder of the corporation's subsidiaries for the eventual transfer of the subsidiaries to AHERF as part of the AHERF System and certain related transactions, all as specifically set forth in the resolutions, which are attached to these minutes.

At Mr. Korman's request, Mr. Abdelhak made a presentation concerning the AHERF System and expressed his view that the proposed transaction would strengthen both the AHERF and Graduate Systems, improve and be of great long term value to the health care delivery system in the region and greatly benefit the community.

After discussion among those present, Mr. Korman thanked Mr. Abdelhak for his comments. The AHERF representatives left the meeting to permit the Board to consider the proposed resolutions and transaction.

Mr. Carlino asked about the financial terms of the proposal and its impact on the corporation after the transaction and transfers are completed. Joseph Huber, Treasurer of the corporation, reviewed the financial issues and, with Mr. Korman and Mr. Cramer, discussed expected developments as the reorganization contemplated by the transaction proceeded.

The directors reviewed the discussion at the special meeting held the previous day and reconfirmed their conclusion that, based on extensive evaluation and investigation, the transaction was in the best interests of the corporation and the community served by its System and the best mechanism to assure the con-

- 2 -

DS1-332563


PH5101

tinuation of the mission of the corporation and the System and would be of significant long term value to their constituencies and the community.

A motion was made that the proposed resolutions in the form attached to these minutes be approved and adopted as resolutions of the Board of Directors of this corporation, which motion was duly seconded and unanimously adopted.

The AHERF representatives returned to the meeting and were advised of the adoption of the resolutions. Mr. Cramer expressed his satisfaction and excitement at the prospect of the arrangements between the Graduate and AHERF Systems and the prospects for the future. He also stated his mixed personal feelings about his retirement and his conclusion of 20 years of service to the corporation and its health care system. Mr. Abdelhak congratulated Mr. Cramer on his long service to The Graduate System, the community, and the interests of health care in the region and stated that his legacy would always be a matter of great importance.

The business of the meeting having been concluded, the meeting was adjourned.

_____
Secretary

- 3 -

DS1-332563

PH5102

TAB 278

ANNUAL MEETING OF THE BOARD OF TRUSTEES
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
Via Videoconference
AHERF, Fifth Avenue Place Conference Room, Pittsburgh
and
Allegheny University Hospitals, MCP Board Room, Philadelphia

The annual meeting of the Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF"), was held on Thursday, December 12, 1996, via videoconference, in the AHERF Fifth Avenue Place Conference Room, Pittsburgh and the Allegheny University Hospitals, MCP Board Room, Philadelphia. The meeting was called pursuant to notice duly given in accordance with the Bylaws to each member of the Board of Trustees. A copy of the notice is appended to the original minutes of this meeting. The following individuals were present:

| **Members Present** | **Other Invitees** | **Members Absent** |
|---|---|---|
| Sherif S. Abdelhak | Calvin Bland | Leonard T. Ebert |
| William F. Adam | Robert L. Fletcher | William H. Genge |
| Henry G. Allyn, Jr. | Thomas Galinski | Teresa Heinz |
| Barbara F. Atkinson, M.D. | Lynn R. Isaacs | Robert M. Hernandez |
| J. David Barnes | Dwight Kasperbauer | Joseph C. Maroon, M.D. |
| Iain F. S. Black, M.D. | Donald Kaye, M.D. | Alfred W. Martinelli |
| Ralph W. Brenner, Esq. | David W. McConnell | Joseph Neubauer |
| Dorothy McKenna Brown, Ed D | James H. McMaster, M.D. | Chryss O'Reilly |
| Douglas D. Danforth | Leonard L. Ross, Ph.D. | David W. Sculley |
| Ronald R. Davenport | Barry H. Roth | J. Brandon Snyder |
| Harry R. Edelman, III | Anthony M. Sanzo | W. Bruce Thomas |
| Ira J. Gumberg | Nancy A. Wynstra, Esq. | |
| Oksana Korzeniowski, M.D. | | |
| Stanley M. Marks, M.D. | | |
| Donna M. Murasko, Ph.D. | | |
| Francis B. Nimick, Jr. | | |
| Thomas H. O'Brien | | |
| Robert B. Palmer | | |
| W. P. Snyder III | | |
| Richard Spielvogel, M.D. | | |
| Leon C. Sunstein, Jr. | | |
| Mark Victor, M.D. | | |
| Margaret Gray Wood, M D | | |



DEPOSITION EXHIBIT
235
ACF

PR-1-000740

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 2

I.    **Opening of the Meeting**

The meeting was called to order at 12:20 p m by W.P Snyder III, Chairman   Nancy A
Wynstra, Esq. maintained the minutes   The Chairman declared that a quorum was present
and the meeting was competent to proceed

Mr Snyder introduced and welcomed a new trustee - Thomas O'Brien, Chairman and CEO,
PNC Bank, and two guests - Barry Roth, President and CEO, Forbes Health System, and
Robert L Fletcher, Chairman of the Board of Forbes Health System.

II.    **Educational Presentation**

Ms Wynstra presented information on the Code of Ethics Education Program established at
AHERF   This program has been developed for all AHERF employees and will become a part
of employee orientation programs at all campuses   Ms Wynstra noted that the Code has
multiple purposes, including to reaffirm the commitment of AHERF to integrity and ethical
conduct as a fundamental basis for the functioning of the organization; to convey to the
internal and external community AHERF's basic values and commitment to ethical conduct,
and to provide a foundation for the conduct of any  individual who acts on behalf of the
organization.

III.    **Additions to the Agenda**

There were no additions to the agenda

Mr Snyder noted that a proposed resolution for the approval of the merger of Allegheny
Valley Hospital into Allegheny University Medical Centers had been distributed and would
be presented by Mr Abdelhak under Consolidation Matters in Section II, Tab 7 of the
agenda

IV.    **AHERF Governance Issues**

A    Minutes from the Meeting Held on June 21, 1996

Mr Snyder presented for consideration the Minutes from the meeting of the Board
of Trustees of Allegheny Health, Education and Research Foundation held on June
21, 1996  Upon motion duly made and seconded, the Board approved the following
resolution

PR-J-000741

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 3

> **RESOLVED, that the Board of Trustees of Allegheny Health, Education
> and Research Foundation approves the Minutes from the meeting held
> on June 21, 1996, as presented.**

B.    Minutes from the Special Meeting Held on September 16, 1996

Mr. Snyder presented for consideration the Minutes from the Special Meeting of the
Board of Trustees of Allegheny Health, Education and Research Foundation held on
September 16, 1996. Upon motion duly made and seconded, the Board approved the
following resolution:

> **RESOLVED, that the Board of Trustees of Allegheny Health, Education
> and Research Foundation approves the Minutes from the Special
> Meeting held on September 16, 1996, as presented.**

C.    AHERF Executive Committee Unanimous Consent in Lieu of Meeting

Mr. Snyder presented background information on the Unanimous Consent in Lieu of
Meeting dated October 22, 1996, relative to the sale of certain properties owned by
various entities within the system, that was distributed and signed by all members of
the AHERF Executive Committee. The Board approved the resolutions as agreed to
by the Executive Committee and directed that a copy of the Unanimous Consent be
attached to the original minutes of this meeting

V.    **Report from the Committee on Trustees**

Mr. Nimick presented the Report from the Committee on Trustees meeting held on November
19, 1996 and introduced the items set forth below which were advanced to the Board for
consideration

A.    Consolidation Matters

1.    Corporate Structure

Mr Abdelhak presented an organizational chart depicting the proposed
corporate structure for Allegheny Health, Education and Research Foundation
and its subsidiaries as recommended by the AHERF Committee on Trustees
He explained how the proposed new structure differs from the current
structure    Discussion followed regarding the need for increased
communication between various subsidiary Boards at AHERF    It was

PGH 24869 1

PR-1-000742

recommended that a management group including the various Board and
Committee Chairs and the members of senior management, convene twice a
year to collectively discuss current significant issues throughout the
organization

The resolution delegates to the CEO of AHERF the authority to make final
decisions concerning precisely when and how various GHS entities and
employees will be integrated into AHERF. Among other things this
delegation is intended to include the authority to amend the AHERF
Retirement Account Plan (and other AHERF benefit plans) to adopt such
provisions regarding employees of GHS entities as the AHERF President and
Chief Executive Officer, and any other officers designated by him, may deem
to be reasonable and appropriate.

Upon motion duly made and seconded, the Board approved the following
resolution.

> **RESOLVED, that the Board of Trustees of Allegheny Health,
> Education and Research Foundation approves the AHERF
> Corporate Structure substantially as presented; and directs the
> Secretary to append a copy of the approved Structure to the
> original minutes of this meeting.**

2    <u>Reorganization of Certain Graduate Health System Entities</u>

Mr Abdelhak presented for consideration proposed resolutions regarding the
reorganization of certain Graduate Health System ("GHS") entities from SDN
and/or GHS into the AHERF System. The President reviewed the overall
plans underway and the steps taken to date to accomplish the integration and
transaction of appropriate GHS activities to AHERF, noting that final form
of the reorganization will be determined as current due diligence reviews and
other financial, legal and operational analyses are completed. Mr. Abdelhak
noted, in response to questions, that any GHS, Forbes, or AVHS debt
currently outstanding will remain separate and will not be combined with the
debt of any of the obligated groups currently within AHERF He also
reiterated AHERF's commitment, as demonstrated during the United
Hospitals consolidation, to handle such transactions in a way which gives
maximum protection to bondholders, both of AHERF system entity bonds and
of the bonds of any entity being acquired

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 5

Following discussion and upon motion duly made and seconded, the Board adopted the following resolution

WHEREAS, Allegheny Health, Education and Research Foundation ("AHERF") operates a diversified health system (the "AHERF System") providing education, research, clinical and preventive health and health-related services in Western Pennsylvania and in the Delaware Valley, including through tertiary, specialty, and community hospitals, a health sciences university, a physician satellite network, and related activities; and

WHEREAS, Graduate Health System ("GHS"), a Pennsylvania non-profit tax-exempt corporation, historically has operated a diversified health services system within the Delaware Valley (the "GHS System") offering clinical, preventive, and related health services, including through five (5) adult community hospitals, a physician satellite network, and various other entities providing and supporting the provision of health and health-related services; (such entities collectively referred to herein as the "GHS Subsidiaries"); and

WHEREAS, GHS determined, after lengthy evaluation and analysis of alternatives, that the best interests of the GHS Subsidiaries and the GHS System would be best served by a reorganization that would allow some or all of the GHS Subsidiaries to become associated with another health services system; and

WHEREAS, after arm's-length negotiations, GHS entered into an agreement with SDN, Inc. ("SDN"), a Pennsylvania non-profit, tax-exempt corporation (which formerly operated United Hospitals, Inc.), to undertake a series of transactions (the "GHS-SDN Transactions") in which the GHS Subsidiaries would be transferred into SDN or to the control of SDN for various purposes, including without limitation, the evaluation of the possible reorganization of some or all of the GHS Subsidiaries into the AHERF System; and

PGH 24869 1

PR-1-000744

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 6

WHEREAS, the GHS-SDN Transactions were concluded and became effective on November 1, 1996, at which time the GHS Subsidiaries were merged into SDN or transferred to the control of SDN; and

WHEREAS, AHERF provides management services to SDN under a management arrangement in effect since July 1, 1991, and, in conjunction with such management arrangement, has initiated various operational, financial, and legal due diligence analyses and investigations of the GHS Subsidiaries for the purpose of determining the appropriate future methods and locations of operation of the GHS Subsidiaries, including within the AHERF System; and

WHEREAS, although due diligence reviews are continuing, AHERF management has concluded that certain of the operations and assets of the GHS Subsidiaries should be integrated into the AHERF System, including, without limitation, three (3) of the adult community hospitals (the Graduate Hospital, City Avenue Hospital, and Rancocas Hospital), the physician satellite network, and the Bermuda offshore captive insurance company, GHS Re, Inc.; and

WHEREAS, as a result of ongoing due diligence reviews, AHERF management may determine that certain other operations and assets of the GHS Subsidiaries should be integrated into the AHERF System; and

WHEREAS, because of various operational, financial, legal, and regulatory considerations, certain operations and assets of the GHS Subsidiaries, such as the physician satellite network, already are being integrated into the AHERF System, while other components of the GHS Subsidiaries will enter the AHERF System at various times, depending on the completion of ongoing analyses and the resolution of certain operational, financial, legal, and/or regulatory factors; and

PGH 24869 1

PR-1-000745

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 7

WHEREAS, AHERF management wishes to seek conceptual approval by the AHERF Board of Trustees of various activities and undertakings conducted to date by AHERF in connection with the GHS-SDN Transactions, and further to seek conceptual approval of the possible reorganization of various components of the GHS Subsidiaries into the AHERF System, as well as securing the approvals and authority reasonably necessary to accomplish such transaction;

NOW, THEREFORE, BE IT RESOLVED by the Board of Trustees ("Board") of AHERF, that the GHS-SDN Transactions are hereby acknowledged, and recognized to the extent relating to the possible reorganization of the GHS Subsidiaries into the AHERF System, including without limitation, the condition that GHS be permitted to recover control of the GHS Subsidiaries for a period of ninety (90) days if such reorganization shall not have occurred on or before October 31, 1998; and

FURTHER RESOLVED, that the proposed reorganization into the AHERF System of two (2) community hospitals previously operated as GHS Subsidiaries, The Graduate Hospital and City Avenue Hospital respectively, together with relevant operations, assets, and liabilities respectively pertaining thereto or associated therewith, is hereby approved and ratified, with the understanding that such hospitals shall be operated as part of a non-profit tax-exempt subsidiary of AHERF to be referred to as "Allegheny University Hospitals, Centennial"; and

FURTHER RESOLVED, that the proposed reorganization into the AHERF System of one (1) community hospital previously operated as a GHS Subsidiary, the Rancocas Hospital (operating under the corporate name "Zurbrugg Memorial Hospital") together with relevant operations, assets, and liabilities pertaining thereto or associated therewith, is hereby approved and ratified, with the understanding that such hospital shall be operated as part of a non-profit tax-exempt subsidiary of AHERF to be referred to as "Allegheny University Hospitals, New Jersey"; and

PGH 24R69 1

FURTHER RESOLVED, that the reorganization into the AHERF System of the physician satellite network, Founders Health Plan, together with the professional corporations, operations, assets, and liabilities pertaining thereto or associated therewith, through a merger or other appropriate method, is hereby ratified and approved, and that the components of such physician satellite network shall be operated as part of Allegheny Integrated Health Group; and

FURTHER RESOLVED, that the AHERF President and Chief Executive Officer is hereby authorized and directed to make and approve such determination(s) regarding the reorganization of additional GHS Subsidiaries (or component(s) thereof) into the AHERF System, together with such operations, assets, and liabilities as may be associated therewith, to the extent that the AHERF President and Chief Executive Officer determines that the reorganization of such GHS Subsidiaries (or components thereof) into the AHERF System is reasonable and appropriate to advance and/or protect the best interests of the AHERF System and the reorganization into the AHERF System of such additional GHS Subsidiaries as shall be determined and approved by the AHERF President and Chief Executive Officer is hereby ratified and approved; and

FURTHER RESOLVED, that the extension of the Management Agreement between SDN, Inc. and Allegheny Health, Education and Research Foundation dated July 1, 1991 (the "Management Agreement"), any actions or undertakings by AHERF with respect to SDN or the GHS Subsidiaries under the Management Agreement, and the continued provision of management and support services by AHERF to SDN and its subsidiaries, including, without limitation, the GHS Subsidiaries, under the terms of the Management Agreement are hereby approved and ratified collectively and individually; and

FURTHER RESOLVED, that the ratification and approval by the Board of the reorganization of certain of the GHS Subsidiaries into the AHERF System shall be conditioned upon the agreement of SDN to transfer to AHERF or to a designated AHERF subsidiary promptly upon the receipt thereof, any proceeds in any form whatsoever received by SDN or any GHS

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 9

Subsidiary controlled by SDN and remaining after providing for payment of any liabilities incurred in the ordinary course of business in the operation of SDN or any such GHS Subsidiary to the extent that such proceeds arise or result from the operation, purchase (or other acquisition in whole or in part), sale (or other disposition in whole or in part), closure, abandonment, or other transaction or activity of, or relating to, any such GHS Subsidiary (or any asset or component part thereof), provided that any such proceeds received by AHERF or any AHERF subsidiary shall be restricted and used exclusively to support the operation and/or carry out business purposes of one or more of the GHS Subsidiaries reorganized into the AHERF System (or component part(s) thereof); and

FURTHER RESOLVED, that the reorganizations of the GHS Subsidiaries into the AHERF System that are contemplated and approved hereby shall be completed on or before July 1, 1997, at such specific date and time as shall be deemed appropriate by the AHERF President and Chief Executive Officer, except to the extent that any such reorganization is delayed due to the necessity to secure any approval of such reorganization required from any governmental or private party or entity, in which case the effective date for such reorganization may be deferred by direction of the AHERF President and Chief Executive Officer until such approval has been obtained; and

FURTHER RESOLVED, that the transactions contemplated and approved hereby shall be conditioned upon the obtaining of all approvals which are legally required to be obtained from any person or entity, whether governmental or private, including, without limitation, any bond trustees, bond insurer, or court in order to effect the reorganizations and the transactions contemplated hereby, provided that any terms, conditions, and/or reconfigurations in the reorganizations required to secure any such approval shall be undertaken and are hereby approved and ratified subject to the requirement that SDN and/or any of the GHS Subsidiaries shall provide such assistance as may be reasonably required in securing any such approval; and

PGH 24869 1

PR-1-000748

FURTHER RESOLVED, that the AHERF President and Chief Executive Officer, and any other officer(s) designated by the AHERF President and Chief Executive Officer are hereby authorized and directed to do all such things and take all such actions as such officer(s) may deem to be reasonable and appropriate with respect to the entity to which their office pertains to provide for the implementation and effectuation of the reorganizations of such of the GHS Subsidiaries (or any component(s) thereof) as shall be reorganized into the AHERF System as approved herein, including without limitation, by negotiation of terms and conditions and execution of contracts and other undertakings, delivery of instruments, securing of licenses, permits, and approvals, and making of filings and notifications, and all such actions are hereby approved and ratified.

3.    Consolidation of Forbes Health System

Mr Abdelhak presented to the Board an analysis projecting the financial condition and operating performance of Forbes Health System following the effective date of the merger

4    Allegheny Valley Hospital

Mr Abdelhak presented the proposed recommendation for Allegheny Valley Health System (AVHS) and its affiliates to merge with Allegheny University Medical Centers (AUMC). Mr. Abdelhak and Mr McConnell provided background information on the merger. They reviewed AHERF and Allegheny Valley Health System (AVHS) combined financial statements and other selected information for Fiscal Year 1996 to depict the financial condition and operating performance of AVHS along with the impact of the proposed acquisition on AHERF's consolidated totals. It was also noted that AVHS has a strong management team in place. As proposed, AVHS will become part of AUMC which is a direct subsidiary of AHERF equivalent to Allegheny General Hospital, St Christopher's Hospital for Children, Allegheny University Hospitals and Allegheny University of the Health Sciences AUMC will serve as the company for all Pittsburgh based community hospitals that affiliate with the AHERF system  Following discussion and upon motion duly made and seconded, the Board approved the following resolution

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 11

WHEREAS, Allegheny Health, Education and Research Foundation ("AHERF") owns and operates a diversified healthcare system ("AHERF System") located primarily in the cities of Philadelphia and Pittsburgh, Pennsylvania, which includes general and specialty hospitals, a network of ambulatory care providers, managed care components, and a health sciences university which includes a medical school; and

WHEREAS, Allegheny Valley Health System ("AVHS") operates a hospital and related healthcare affiliates located in Natrona Heights, Pennsylvania; and

WHEREAS, AHERF owns and operates as part of its diversified healthcare system a community hospital network in Western Pennsylvania known as Allegheny University Medical Centers ("AUMC"); and

WHEREAS, discussions have been held between representatives of AVHS and AHERF about AVHS becoming a member of AUMC pursuant to the general structure and parameters set forth herein; and

WHEREAS, AVHS has independently concluded that substantial changes in circumstances applicable to healthcare systems and providers will result in significant shifts in demand for healthcare services, substantial reductions in payment for healthcare services, and shifts in the mechanisms for financing and delivery of healthcare services; and

WHEREAS, AVHS has independently concluded that consolidation of healthcare resources and reductions in healthcare capacity will occur as a result of such changing circumstances; and

WHEREAS, AHERF and AVHS have discussed merger and both AHERF and AVHS have concluded that a merger between them would represent an appropriate response to the aforementioned changing circumstances and would be in the best interests of both organizations and their respective communities; and

PR-1-000750

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 12

WHEREAS, AHERF is willing to commit to AVHS's community mission and community providers and will commit itself to the advancement of both; and

WHEREAS, it is anticipated that AVHS will, at a later date, merge into Allegheny University Medical Centers ("AUMC"); and

WHEREAS, AHERF and AVHS have discussed and conducted arm's length negotiations concerning the terms under which a merger between AUMC and AVHS will occur, the details of which will be specifically set forth in a Plan of Merger based on the following principles:

(a)    Any and all legal agreements entered into by and between AVHS and any other party will be honored by AUMC and AHERF;

(b)    A comprehensive assessment of administrative services will be conducted by the Chief Executive Officers of AVHS and AUMC to identify the strongest, most efficient and effective administrative configuration for AVHS and AUMC;

(c)    Programmatic clinical collaboration will be the responsibility of the Chief Executive Officer of AVHS and related representatives of the medical staff and AUMC in consultation with the AUMC/AVHS Community Advisory Board and other AHERF entities;

(d)    All clinical services which can be effectively provided in the community hospital setting will continue to be maintained at AVHS and only those activities that the AVHS physicians and management believe cannot be offered effectively in the community hospital setting will be encouraged to be delivered at Allegheny General Hospital (AGH) or other AUMC hospitals;

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 13

    (e)    All AVHS physicians who have appropriate training and meet the established credentialing criteria will be welcome to apply for membership on the medical staffs of all other AHERF entities;

    (f)    AHERF's intent is to work with and not supplant the existing medical and surgical specialists of the AVHS Medical Staff through its multiple programmatic and facility resources. Working through its established institutional planning process, the AVHS Medical Staff leadership will have the opportunity to identify deficiencies in and approve levels of professional services appropriate for community facilities consistent with it's adopted mission;

    (g)    Determinations on referrals of patients shall be made exclusively by the patient's responsible physician and it is expected that the physician will do whatever he/she believes is in the best interests of the patient at all times. If referrals are made out of the System, the referring physician will be encouraged to provide an explanation to AUMC so that the other providers within the AHERF System can determine improvements needed to earn the physician's referrals;

    (h)    All AVHS physicians will be encouraged, but not required, to participate in any and all offerings by AHERF including contracts with insurers and employers;

    (i)    AHERF will, to the extent resources are available and community need is present, continue to equip and maintain the AVHS facilities in a manner appropriate to acute care community facilities of their size.

    (j)    The merger will be accomplished using all necessary steps to make the entire transaction most beneficial to AVHS and to AUMC.

PGH 24869 1

PR-1-000752

(k)    The AUMC Board will conduct a planning process and recommend to AHERF the ultimate number of institutions that should be consolidated into AUMC.

NOW THEREFORE, BE IT RESOLVED, by the Board of Trustees of Allegheny Health, Education and Research Foundation ("AHERF") that the invitation to AVHS and its affiliates to merge with AUMC is hereby irrevocably ratified, and that there is an irrevocable commitment by the Board of Trustees of AHERF, that upon the adoption of this resolution by AVHS, AUMC and AHERF, it shall participate in the development and execution of a Plan of Merger of AVHS and affiliates with AUMC and other documents necessary to implement the intent of these resolutions, such as Articles, Bylaws, and other documents of AUMC, as may be determined to be appropriate and subject to satisfactory completion of such due diligence as is determined by AHERF, AUMC and AVHS to be appropriate; and

FURTHER RESOLVED, that the Board of Trustees of AHERF hereby acknowledges that the Board of Trustees of AVHS has approved such a resolution and Plan of Merger and the Board of AHERF, acting as the Member of AUMC hereby approves adoption of such a resolution and Plan of Merger by the Board of Trustees of AUMC; and

FURTHER RESOLVED, that upon the approval by the AHERF Board of such a resolution and Plan of Merger, then upon the notification by the CEO of AVHS to the President and CEO of AUMC of the occurrence of the last to occur of (i) the receipt of final approval of the proposed transaction by the Federal Trade Commission and the Department of Justice or upon the expiration of the required waiting period under the Hart-Scott-Rodino Act, and (ii) the completion of a due diligence process covering all information about AVHS which AUMC and AHERF deem relevant to this transaction with all issues identified being resolved to AUMC's and AHERF's satisfaction, the AUMC Board shall direct that such merger be effective as of the date of the filing with the Pennsylvania Corporation Bureau, or such later date as shall be mutually agreed between AVHS and AUMC (the "Effective Date"); and

PGH 24R69 1

FURTHER RESOLVED, that, upon the Effective Date, AVHS shall merge into AUMC, and shall transfer, by operation of law, ownership of and responsibility for the assets and liabilities of AVHS in existence as of the date upon which such merger takes effect to AUMC and that the consideration to be paid by AUMC to AVHS for the transfer of such assets pursuant to such merger shall be the assumption of such outstanding liabilities of AVHS by AUMC, as well as such other consideration as shall be provided by AUMC and/or AHERF to AVHS in exchange for such transfer of assets and liabilities, and that such consideration has been reviewed by AUMC and AVHS and has been determined to be fair market value for the assets transferred by such merger; and

FURTHER RESOLVED, that after the merger the Board of Trustees of AUMC shall have and exercise direction and control of AUMC, except that, AHERF, as the sole Member of AUMC, shall have the following reserve powers:

(a)     To approve the appointment of Trustees of AUMC and upon vote of at least two thirds of the Trustees of AHERF to remove the Trustees of the Corporation;

(b)     To approve the election of the Chair of the Board of AUMC and other officers of AUMC or of any subsidiary corporations to AUMC, and to remove the Chairman or other officers as set forth in (a) above;

(c)     To approve the appointment of the President of AUMC, or of any subsidiary corporations;

(d)     To approve Bylaws adopted by AUMC and to effect or approve any amendment, alteration, or restatement or other revision of the Articles of Incorporation of the Corporation and these Bylaws;

(e)     To approve the purchase or sale of any real property by AUMC or any subsidiary corporation, and to approve creation of a mortgage, lien, or any other security interest in the real property of the corporation or in the real property of any subsidiary corporation, and to approve borrowing of funds by the corporation from an unrelated

person, corporation, or other legal entity, or lending of funds by the corporation to an unrelated person, corporation or legal entity, including capital leases, where the term of the borrowing or lending exceeds one year in duration and where the total amount of the borrowing or lending exceeds One Hundred Thousand Dollars ($100,000.00); and

(f)     To approve annual capital and operating budgets for the corporation and for any other corporation in which AUMC has a sole, majority, or controlling voting or ownership interest (hereinafter referred to as "subsidiary corporations"), and to approve unbudgeted capital or operating expenditures to be undertaken individually or collectively by AUMC and any subsidiary corporation where the cumulative amount of such unbudgeted expenditures is the lesser of two million dollars ($2,000,000) or ten percent (10%) in excess of the individual or combined approved budgets of AUMC and its subsidiaries;

(g)     To determine how any and all excess cash generated by AUMC is allocated within the AHERF System in pursuit of the overall AHERF mission; for purposes of this section, "excess cash" shall mean the amount of cash added in prior periods as reflected in the audited statements of cash flows; AHERF's allocation of such excess cash would occur only after ensuring compliance with any and all debt covenants, with excess cash allocation among AUMC institutions to be determined by AUMC; and

FURTHER RESOLVED, that the Transaction and merger approved herein shall be accomplished in accordance with all applicable requirements of law and regulation, and in accordance with all contracts or other legal undertakings to which AVHS or any of its current component entities is a party or by which it or they are bound, and that all approvals shall be obtained which are legally required to be obtained from any person or entity, whether governmental or private, including, but not

PGH 24869 1

limited to, any bond trustee, bond insurer, or court, in order to effect the merger and the transactions contemplated hereby, provided that any modification or reconfigurations which do not materially change the terms of this resolution in the merger required to secure any such approval shall be undertaken and are hereby approved, but further provided that the merger shall be maintained in all such circumstances, and despite any such structural modifications which may be required, provided, however, that consummation of the merger is contingent upon AHERF's and AUMC's completion of due diligence to their satisfaction; and

FURTHER RESOLVED, that, effective immediately upon adoption of this resolution, the Chief Executive Officer of AHERF will be given notice of any and all meetings of the Board of Trustees of AVHS and will be invited to attend such meetings, either in person or through a designee, as a guest, provided, however, that such individual shall not attend any portion of said meetings at which competitively sensitive information is discussed; and

FURTHER RESOLVED, that the Chairman of the Board of AVHS will appoint, subject to the reserve powers as set forth in paragraph 15 hereof, four (4) individuals who are currently members of the AVHS Board to serve as members of the initial Board of Trustees of AUMC (one of whom will be appointed by AHERF to the AHERF Board of Trustees and AVHS will always have a representative on the AHERF Board of Trustees), and the President of the Medical Staff of AVHS will serve as a member of the Board of AUMC ex-officio with vote; the remainder of the existing Trustees will become Life Trustees and members of an AVHS Community Advisory Board ("CAB") of AUMC from which AUMC, subject to the reserve powers as set forth in paragraph 15 hereof, will fill any vacancies among the four (4) lay AVHS appointees that occur on the AUMC Board, and that the initial Board of Trustees of AUMC will be responsible for developing and adopting the initial Bylaws of AUMC, subject to the reserve powers set forth herein;

FURTHER RESOLVED, that the CAB will advise AHERF and AUMC on institutional and AUMC planning matters and on other matters of significance to the AVHS community, nominate replacement appointees to the AUMC Board, work with the AVHS Auxiliary, monitor and report on the health status of the community, monitor and report on health care legislation matters, provide community education, address other issues delegated by AUMC, and elect additional members from time to time; and

FURTHER RESOLVED, that the Allegheny Valley Hospital Foundation shall remain as an independent and separate entity by modifying its corporate documents to reflect that it will be a supporting organization of AUMC, cognizant of and supportive of the AUMC mission within the AVHS service area, which will raise funds for AUMC activities at AVHS, said funds and other assets of the Foundation to be used exclusively in support of activities of AVHS.

FURTHER RESOLVED, that AVHS's hospital shall remain licensed as a separate hospital with a separate and independent, self-governed Medical Staff; and

FURTHER RESOLVED, that all assets accumulated by AVHS set forth on it's consolidated balance sheet as of the date of the Transaction, shall continue to be utilized exclusively to support the programs and facilities of AVHS, unless AHERF, AUMC and AVHS, at the time the merger becomes effective, specifically agree unanimously otherwise; and

FURTHER RESOLVED, that in the event AHERF or AUMC, changes ownership or closes AVHS as an acute care hospital without the concurrence of the AUMC/AVHS CAB, then AHERF will return AVHS and all restricted assets as defined in the foregoing paragraph to the AUMC/AVHS CAB, if the CAB, by duly adopted resolution, so elects; and

FURTHER RESOLVED, that since the merger may result in certain staff positions at AVHS being eliminated, all existing policies approved prior to the date of merger which relate to severance for individuals whose positions are eliminated, (or with respect to any individuals hired since the beginning of the fiscal year, in effect from the date of hire), shall be honored; and

FURTHER RESOLVED, that with regard to employees who are not covered by severance policies described in the above-referenced paragraph, it is agreed that such employees shall be provided severance in accordance with the Income Continuation Plan adopted by the Board of Trustees of AHERF at its meeting of April 8, 1994; in addition, these affected employees will be given vouchers to use for any health care they, or their families, may need during that period, provided they receive such care at any of the AHERF hospitals and clinics in the Pittsburgh area; and

FURTHER RESOLVED, that any of the Chairman, Vice-Chairman, President, Secretary, or Treasurer of AHERF and AUMC are hereby authorized and directed to do all such things and take all such actions as such officer may deem to be reasonable and appropriate to provide for the implementation and effectuation of the Transaction and merger approved herein, including without limitation, by execution of contracts and other undertakings, delivery of instruments, securing of licenses, permits, and approvals, and making of filings and notifications, and all such actions are hereby approved; and

FURTHER RESOLVED, that the Chairman of the Board and the Chief Executive Officer of AUMC (the "Designated Officers"), are hereby authorized and directed to determine on behalf of AHERF, how to proceed with the Transaction through negotiation and consultation with the Chairman of the Board and the Chief Executive Officer of AVHS, (who have been similarly authorized and directed by AVHS), and the Transaction, if any, and all determinations and decisions

concerning the Transaction made by the Designated Officers, including, without limitation, with respect to the terms and/or form of such Transaction, or actions to effect such Transaction (including intermediate transactions) are hereby approved and ratified; and

FURTHER RESOLVED, that when the Designated Officers decide in which form to proceed with the Transaction, the Designated Officers are hereby authorized to do all such things and take all such actions on behalf of AUMC and AHERF as shall be necessary to effect and implement the Transaction as approved by the Designated Officers and to preserve the benefits of the Transaction to AVHS and to AHERF and AUMC, provided that the ultimate objective of the merger of AVHS into AUMC is achieved, (such actions to include, without limitation, the execution and delivery of instruments to implement a statutory merger or one or more intermediate transactions) and the authority to approve and effect all such actions on behalf of AUMC and AHERF is hereby delegated to the Designated Officers, and all such actions are hereby approved and ratified; and

FURTHER RESOLVED, that AHERF agrees to defend and indemnify any of the current directors of AVHS in the event they are sued or subjected to any liability of their approval of this Transaction and merger; and

FURTHER RESOLVED, that any inquiries or questions regarding this merger or any aspect thereof shall be referred to the President and Chief Executive Officer of AHERF.

B.     Recommendations for AHERF Board Membership

1     Appointment of Trustee

Mr Nimick presented the Committee on Trustees recommendation for appointment of an Allegheny Health, Education and Research Foundation

Trustee    Upon motion duly made and seconded, the Board adopted the following resolution

**RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation appoints the following to serve as a Trustee of Allegheny Health, Education and Research Foundation, in such class and for such term as indicated:**

### Class II - Expiring Annual Meeting 1999

**Robert L. Fletcher**

2.    Reappointment of Trustees

Mr Nimick presented the Committee on Trustees recommendations for reappointment of AHERF Trustees.  Upon motion duly made and seconded, the Board adopted the following resolution:

**RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation reappoints the following to serve as Trustees of Allegheny Health, Education and Research Foundation, in such class and for such term as indicated:**

### Class II - Term Expiring Annual Meeting 1999

**Dorothy McKenna Brown, Ed.D.**
**Leonard T. Ebert**
**Alfred Martinelli**
**Joseph Neubauer**
**Robert B. Palmer**
**Richard Spielvogel, M.D.**
**Leon C. Sunstein, Jr.**

C.    Nominations for AHERF Officers for Calendar Year 1997

Mr. Nimick presented the Committee on Trustees recommendation for a slate of officers for Allegheny Health, Education and Research Foundation  Upon motion duly made and seconded, the Board adopted the following resolution.

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 22

RESOLVED, that the Board of Trustees of Allegheny Health, Education
and Research Foundation appoints the following individuals as officers
to serve at the pleasure of the Board for the ensuing year.

Chair – William P. Snyder III
Vice Chair – Douglas D. Danforth

*Executive Vice President – Calvin Bland
*Executive Vice President – Dwight Kasperbauer
*Executive Vice President – Donald Kaye, M.D.
*Executive Vice President – David W. McConnell
*Executive Vice President – Leonard L. Ross, Ph.D.
*Executive Vice President – Anthony M. Sanzo
*Executive Vice President – Nancy A. Wynstra. Esq.

*Secretary – Nancy A. Wynstra, Esq.
*Treasurer – David W. McConnell
*Assistant Secretary – William C. Kennedy, Esq.
*Assistant Secretary – Lynn R. Isaacs
*Assistant Secretary – Cherry S. White
*Assistant Treasurer – Michael P. Martin

*    Appointed Officer without vote

D    Conflict of Interest Policy and Bylaw Amendments

Ms Wynstra presented a proposed policy and relevant Bylaw amendment language
relative to the Conflict of Interest Policy. She advised that the granting of tax-exempt
status to Allegheny Integrated Health Group (AIHG) is contingent upon AIHG's
adoption of the IRS's new form of conflict of interest policy.  That policy is not
inconsistent with the policies previously adopted by Allegheny Health, Education and
Research Foundation and the other entities in the AHERF health care system,
including AIHG.  To enable AIHG and other new entities to obtain federal tax-exempt
status and to ensure continued uniformity among AHERF and the other entities in the
AHERF system, it is recommended that the corporate Bylaws of each Allegheny
entity be amended, and that the suggested form of conflict of interest policy be
adopted by AHERF as the policy for it and its subsidiaries

Upon motion duly made and seconded, the Board adopted the following resolution

PGH 24869 1

WHEREAS, the Internal Revenue Service has recently issued a suggested form for conflict of interest policies for tax-exempt organizations; and

WHEREAS, Allegheny Health, Education and Research Foundation (AHERF) has a systemwide Code of Ethics program, which includes a Conflict of Interest program; and

WHEREAS, obtaining and maintaining tax-exempt status will be simplified by amending AHERF's current conflict of interest program to include certain specific language suggested by the IRS.

NOW THEREFORE, BE IT RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, for itself and each of its subsidiaries, hereby approves the amendments to its Bylaws and the Bylaws of each Allegheny entity in the form attached hereto as Exhibit "A"; and

FURTHER RESOLVED, that the Board adopts the Conflict of Interest Policy, in substantially the form attached hereto as Exhibit "C", as the policy for AHERF and its subsidiaries; and

FURTHER RESOLVED, that the Secretary is directed to attach to the minutes of this meeting a copy of the Bylaw amendments and Conflict of Interest Policy as presented to this meeting.

## VI.    Report from the Audit Committee

Mr. Barnes presented the Report from the Audit Committee meeting held on October 15, 1996 and introduced the items set forth below which were advanced to the Board for consideration.

### A.    Report on FY 1996 Audited Financial Statements and Related Reports for AHERF and Subsidiaries

Mr. Barnes presented the Audited Financial Statements for Fiscal Year 1996 for AHERF and its Subsidiaries. The report included the related debt compliance letters for AHERF, the Allegheny General Hospital Obligated Group and the Delaware Valley Obligated Group. Following discussion and upon motion duly made and seconded, the Board adopted the following resolution

PGH 24869 1

PR-1-000762

> **RESOLVED, that the Allegheny Health, Education and Research Foundation Board of Trustees approves the Audited Financial Statements and the related debt compliance letters for Fiscal Year 1996; and**
>
> **FURTHER RESOLVED, that the Board instructs the Secretary to append copies of the approved Fiscal Year Audited 1996 Financial Statements and related debt compliance letters to the original minutes of this meeting.**

B    Fiscal Year 1996 Report on AHERF Internal Controls

Mr Barnes reported that Coopers & Lybrand had reviewed internal controls within AHERF and its Obligated Group entities and stated that there were no matters noted during the audits that would be considered to be material weaknesses  Upon motion duly made and seconded, the Board adopted the following resolution

> **RESOLVED, that the Allegheny Health, Education and Research Foundation Board of Trustees accepts the Coopers & Lybrand Report on Allegheny Health, Education and Research Foundation Internal Controls as presented; and**
>
> **FURTHER RESOLVED, that the Board instructs the Secretary to attach a copy of the approved Report to the original minutes of the meeting.**

C    Recommendation of Appointment of External Auditors

Mr Barnes presented the Audit Committee's recommendation that Coopers & Lybrand (C&L) be reappointed to serve as external auditors for AHERF and its subsidiary organizations for Fiscal Year 1997  Discussion followed regarding the proposed appointment and whether or not a change would be appropriate at this time, and it was agreed to review the matter  It was noted that we do not use C&L for consultation except on matters directly related to the audit or in due diligence. Following discussion, and upon motion duly made and seconded, the Board adopted the following resolution:

> **RESOLVED, that the Allegheny Health, Education and Research Foundation Board of Trustees reappoints Coopers & Lybrand as independent auditors of Allegheny Health, Education and Research Foundation and its subsidiary organizations for Fiscal Year 1997.**

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 25

VII     **Report from the Finance Committee**

Mr. Barnes presented the Report from the Finance Committee meeting held on December 2, 1996 and introduced the items set forth below which were advanced to the Board for consideration.

A.     Results of AHERF Operations and Financials for the Period Ended September 30, 1996

Mr. Barnes presented the results of the AHERF Operations and Financials for the period ended September 30, 1996 noting that the results are slightly better than budget. The increase in admission figures to date is primarily responsible for the results achieved so far this year that were better than budgeted  Mr. Barnes emphasized the importance of increasing the earnings in order to provide enough cash flow in the corporation to provide for equipment and plant modernization and for the provision of new technology. Discussion followed regarding the continuing decrease in Accounts Receivable after the negative interim impact experienced with the move of receivables management from Philadelphia to Pittsburgh.   Additionally, a suggestion was made that the Finance Committee examine the debt structure and determine its effect on AHERF's long term financial capabilities. Upon motion duly made and seconded, the Board adopted the following resolution

> **RESOLVED, that the Board of Trustees of Allegheny Health, Education and Research Foundation, accepts the results of the AHERF Operations and Financials for the period ended September 30, 1996, and directs the Secretary to attach a copy of the accepted Financial Statements to the original minutes of this meeting.**

B.     Authorization of AHERF Lines of Credit

Mr. Barnes reported  that the Treasury Department has devised a plan to consolidate the several lines of credit that AHERF maintains for working capital purposes.  He noted that such consolidation, using a single bank, will save AHERF an estimated $400,000 per year in bank fees  Any borrowing by an operating unit would be treated on the financial statements as a borrowing by that individual unit and not of AHERF

PGH 24869 1

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 26

Upon motion duly made and seconded, the Board adopted the following resolution

WHEREAS, Certain affiliates (the "Affiliates") of Allegheny Health, Education and Research Foundation ("AHERF") currently maintain one or more lines of credit for working capital and general corporate purposes; and

WHEREAS, AHERF desires to reduce the associated direct and indirect expenses incurred by the Affiliates by establishing a line of credit with a bank or banks (the "Bank"), the proceeds of which will be used immediately to refinance its Affiliates' lines of credit; and

WHEREAS, Each of the Affiliates have agreed to guaranty its indebtedness and obligations and to issue and deliver to AHERF for the benefit of the Bank a Master note guaranteeing the obligations under the guaranty or an obligation in the form of a guaranty, all under and pursuant to each of the Affiliate's respective Master Indenture;

NOW, THEREFORE, BE IT RESOLVED, That the Board of Trustees of AHERF hereby approves and authorizes the use of a line of credit to be secured through a bank or banks with an amount not to exceed $100 million and a term not to exceed three (3) years; and

FURTHER RESOLVED, That the officers of AHERF, each severally, are authorized and directed to execute and deliver on behalf of and in the name of AHERF any and all instruments, agreements or documents that may be required by the bank or banks in order to effect the intent of these Resolutions.

VIII.   **Information Items**

A.   Management of Human Resources at AHERF

Mr Kasperbauer presented the report on the Management of Human Resources at AHERF, as information

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 27

B        Allegheny Health, Education and Research Foundation Management Report

The Annual Report to the Board of Trustees was presented at the meeting. Mr. Abdelhak discussed his intent to schedule an AHERF Board meeting in the spring with an expanded format to appropriately address system-wide strategies and discuss modifications to those strategies to support AHERF's Mission and Vision. Mr. Abdelhak stated that he envisioned an open format which would allow for feedback from every Trustee. The possibility of holding the meeting on a Saturday was suggested.

C        Reports From Supported Organizations

1        Allegheny General Hospital

Mr. Sanzo presented the Report from the President and CEO of Allegheny General Hospital for the First Quarter, Fiscal Year 1997, to the Board as information. He noted that AGH is currently ahead of plan

2.        Allegheny Integrated Health Group

Dr. Kaye presented the Report from the President and CEO of Allegheny Integrated Health Group as information. He emphasized the significant growth that has taken place. He noted that the revenue realized per physician annually is currently $3 million and is expected to reach $6 million per physician in Philadelphia

3        Allegheny-Singer Research Institute

Dr. McMaster presented the Allegheny-Singer Research Institute Report as information. He noted that Stephen Vatner, M.D has been appointed Director of the Institute for Cardiovascular Research for the University.

4        Allegheny University Hospitals

Dr. Kaye presented the Report from the President and CEO of Allegheny University Hospitals to the Board as information, emphasizing that operational activity has dramatically increased over the past year

PGH. 24869 1

Annual Meeting of the Board of Trustees of AHERF
December 12, 1996
Page 28

5.   Allegheny University of the Health Sciences

Dr Ross presented the Report of the Provost of Allegheny University of the
Health Sciences as information. He reported on the continued advancement
of the quality of educational programs and the move to full integration of
relevant programs Research initiatives have experienced exponential growth
A major goal is the assurance of full interaction between researchers from the
Philadelphia and Allegheny campuses

6   St Christopher's Hospital for Children

Mr. Bland presented the Report of the President and CEO of St
Christopher's Hospital for Children as information He noted a downturn in
pediatric activity throughout the Delaware Valley and discussed the
development of our SCHC pediatric program at Allegheny General Hospital

D    Management Report from Managed Organization

Ohio Valley Health Services Educational Corporation

Mr. Galinski presented the President's Report of Ohio Valley Health Services
Educational Corporation as information, noting that OVHSEC is making money

IX.   **Adjournment**

There being no further business, the meeting was adjourned.

Respectfully submitted,

Nancy A Wynstra, Esq
Secretary

NOTED ATTACHMENTS. Meeting Notice, Unanimous Consent, Bylaw Amendments, Conflict of
Interest Policy, Fiscal Year Audited 1996 Financial Statements, Fiscal Year 1996 Report on AHERF
Internal Controls; Operations and Financials for the Period Ended September 30, 1996

PGH 24869 1