TAB 279



# New Folder



DC8490 page 1 of 2

Ref 4

## PROPOSED RESOLUTIONS

BE IT RESOLVED, by the Board of Directors of SDN, Inc,. intending to be legally bound hereby and conditioned upon Graduate Health System ("GHS") taking the actions and satisfying the conditions set forth herein, that (i) the proposed reorganization of the GHS Subsidiaries (as defined herein) and SDN, Inc ("SDN") (ii) all actions, undertakings and transactions contemplated hereby, and as shall be reasonably required to effect and accomplish such reorganization, transactions and undertakings are hereby irrevocably approved; as used herein, the term "GHS Subsidiaries" shall mean the following subsidiary corporations (individually a " GHS Subsidiary") of which GHS is the sole member or shareholder (collectively the "GHS Subsidiaries"):

(1) The Graduate Hospital ("TGH"), which owns and operates The Graduate Hospital, located in Philadelphia PA;

(2) The Fifth and Reed Hospital ("FRH"), which owns and operates Mount Sinai Hospital, located in Philadelphia, PA;

(3) GHS-Osteopathic, Inc, ("GHO") which owns and operates both GHS City Avenue Hospital, located in Philadelphia, PA and GHS Parkview Hospital, located in Philadelphia, PA;

(4) Zurbrugg Hospital Foundation ("ZHF"), which through its subsidiary, Zurbrugg Memorial Hospital ("ZMH"), of which ZHF is the sole member, owns and operates both the facility formerly operated as Zurbrugg Hospital, located in Riverside, NJ and Rancocas Hospital, located in Willingboro, NJ,

(5) SSMOB, Inc, ("SSMOBI") which owns and operates various parcels of real property used in the operation and support of the Graduate System, including, without limitation, the corporate headquarters located at 22nd and Chestnut Streets, ,

(6) Founders Health Care, Inc., ("Founders") which operates various physicians' offices located in Pennsylvania, New Jersey, and Delaware, and engages in staffing arrangements for those offices through various contractual arrangements (the "Physician Staffing Contracts") with three professional corporations organized and operating respectively in Pennsylvania, New Jersey and Delaware (the "Founders Professional Corporations,"), and

(7) GS Re, Inc , which is an offshore insurance company chartered and operating in Bermuda and providing professional liability and related forms of insurance coverage for the health care components of the Graduate System,

FURTHER RESOLVED that SDN, in reliance upon the representation and warranty given by GHS for the reliance of SDN, does hereby acknowledge its understandings (A)

DVR 40641 1

DC8497 page 1 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 2

that, (with the exception of ZMH, of which ZHF is the sole member) GHS is the sole
member or shareholder, as the case may be, of each of the GHS Subsidiaries, and that
in such capacity, it possesses the sole and exclusive authority (1) to amend, alter or
restate the Articles of Incorporation (subject to recommendation of the Boards of each
GHS Subsidiary with respect to that subsidiary)and Bylaws of each GHS Subsidiary, and
(2) to appoint all of the Trustees or Directors, as the case may be. of each GHS
Subsidiary, (3) to remove all of the Trustees or Directors, as the case may be. of each
GHS Subsidiary, with or without cause, and (4) to appoint and remove. The President
and CEO of each GHS Subsidiary, (B) that by reason of the foregoing exclusive authority
of GHS with respect to each of the GHS Subsidiaries, GHS has the legal and actual
capacity and authority to cause each of the GHS Subsidiaries irrevocably to approve,
adopt and commit to be legally obligated to (i) the resolutions contained herein, (ii) the
reorganization and actions, undertakings and transactions contemplated hereby, and (iii)
all such actions on the part of each GHS Subsidiary as shall be reasonably required to
effect and accomplish such reorganization, transactions and undertakings, and (D) that
GHS, including through the exercise of its authority as sole member or shareholder, as
the case may be, of each GHS Subsidiary, shall cause each GHS Subsidiary irrevocably
to approve, adopt and commit to be legally obligated to (i) the resolutions contained
herein, (ii) the reorganization and actions, undertakings and transactions contemplated
hereby, and (iii) all such actions on the part of each GHS Subsidiary as shall be
reasonably required to effect and accomplish  such reorganization, transactions and
undertakings; and (E) that ZHF, as the sole member of ZMH, has authority with respect
to ZMH similar in all respects to the authority of GHS with respect to the other GHS
Subsidiaries and that GHS shall cause ZHF to cause ZMH irrevocably to approve, adopt
and commit to be legally obligated to (i) the resolutions contained herein, (ii) the
reorganization and actions, undertakings and transactions contemplated hereby, and (iii)
all such actions on the part of each GHS Subsidiary as shall be reasonably required to
effect and accomplish  such reorganization, transactions and undertakings,

FURTHER RESOLVED that, in passing this resolution, SDN has relied on the
representation and warranty of GHS that the Articles of Incorporation of each of the
GHS Subsidiaries have been amended to name and reflect  SDN as the sole Member of
each such GHS Subsidiary (except ZMH), or as the sole Shareholder with respect to the
stock-issuing subsidiaries, and the Bylaws of each of the Membership Subsidiaries shall
be amended and restated, to name and reflect SDN as the sole Member of each GHS
Subsidiary (except ZMH),  or as the sole Shareholder with respect to the stock-issuing
subsidiaries,  with the following reserved powers:

(a)     To appoint and remove the directors of such GHS Subsidiary, with or without
        cause;

(b)     To adopt amendments, alterations, or restatements of the Articles of
        Incorporation of such GHS Subsidiary,

DC8497 page 2 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 3

    (c)    To adopt Bylaws and to adopt alterations, amendments, restatements, or repealers of the Bylaws of such GHS Subsidiary;

FURTHER RESOLVED that the Bylaws of each of GHS Subsidiary (except ZMH), shall be amended, to specify that SDN, as the sole member of shareholder, as the case may be. shall possess the following reserved powers in addition to those specified in the Bylaws as amended and restated by GHS.

    (d)    To approve the appointment of and to remove the President and Chief Executive Officer of any such GHS Subsidiary and of any subsidiary of such GHS Subsidiary;(d) To approve annual capital and operating budgets for such GHS Subsidiary and for any subsidiary of such GHS Subsidiary including approval of individual line items of expense and income,

    (e)    To approve unbudgeted capital or operating expenditures to be undertaken individually or collectively by such GHS Subsidiary and for any subsidiary of such GHS Subsidiary where the cumulative amount of such unbudgeted expenditures is the greater of Two Million Dollars ($2,000.000) or ten percent (10%) in excess of the individual or combined approved budgets of GHS and its subsidiary corporations;

    (f)    To approve borrowing of funds by such GHS Subsidiary or any subsidiary of such GHS Subsidiary from an unrelated person, corporation, or other legal entity, or lending of funds by for such GHS Subsidiary or any subsidiary of such GHS Subsidiary to an unrelated person, corporation, or legal entity, including capital leases, where the term of the borrowing or lending exceeds one (1) year in duration and where the total amount of the borrowing or lending exceeds Five Hundred Thousand dollars ($500,000);

    (g)    To approve the creation of a mortgage, lien, or any other security interest in real property of such GHS Subsidiary and or in the real property of any subsidiary of such GHS Subsidiary;

    (h)    To approve the appointment of and to remove the President and Chief Executive Officer of any such GHS Subsidiary and of any subsidiary of such GHS Subsidiary;

    (i)    To appoint, and to have the authority to remove all officers of such GHS Subsidiary and of any subsidiary of such GHS Subsidiary,

    (j)    To determine how any and all excess cash generated by such GHS Subsidiary and by any subsidiary of such GHS Subsidiary is allocated within the SDN system in pursuit of the overall SDN mission, for purposes of this section. 'excess cash' shall mean the amount of cash added in prior periods as reflected in the audited statements of cash flows; SDN's allocation of such excess cash would occur only

DVR 40641 1    3

DC8497 page 3 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 4

    after ensuring compliance with any and all debt covenants; and

FURTHER RESOLVED that the Articles of Incorporation of ZMH shall be amended
to reflect SDN as the sole Class "A" Member and ZHF as the sole Class "B" member
of ZMH, and the Bylaws of ZMH shall be amended and restated, to name and reflect
SDN as the sole Class "A" Member and ZHF as the sole Class "B" member of ZMH
with the following reserved powers

Class A Member

(a)  To approve the appointment of directors of ZMH as submitted by the
    Class B Member;

(b)  To remove the directors of ZMH;

(c)  To adopt changes in the Articles of Incorporation of ZMH and these
    Bylaws; subject to receipt of recommendations of approval of such
    changes from the Class B Member,

(d)  To approve the appointment of the officers of ZMH and to remove the
    officers of ZMH;

(e)  To approve annual capital and operating budgets for ZMH, including
    approval of individual line items of expense and income, and for any
    other corporation in which ZMH possesses a sole, majority, or
    controlling voting or ownership interest (hereinafter referred to as
    "subsidiary corporation") including approval of individual line items of
    expense and income subject to receipt of recommendations of approval
    of such budgets from the Class "B" Member;

(e)  To approve unbudgeted capital or operating expenditures to be
    undertaken individually or collectively by ZMH or any subsidiary
    corporation of ZMH where the cumulative amount of such unbudgeted
    expenditures is the greater of Two Million Dollars ($2,000,000) or ten
    percent (10%) in excess of the individual or combined approved budgets
    of GHS and its subsidiary corporations;

(f)  To approve borrowing of funds by ZMH or by any subsidiary
    corporation of ZMH from an unrelated person, corporation, or other
    legal entity, or lending of funds ZMH or any subsidiary of ZMH to an
    unrelated person, corporation, or legal entity, including capital leases,
    where the term of the borrowing or lending exceeds one (1) year in
    duration and where the total amount of the borrowing or lending exceeds
    Five Hundred Thousand Dollars ($500,000),

DC8497 page 4 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 5

    (g)    To approve the creation of a mortgage, lien, or any other security interest in real property of ZMH or of any subsidiary corporation of ZMH;

    (h)    To determine how any and all excess cash generated by ZMH or any subsidiary corporation of ZMH is allocated within the SDN system in pursuit of the SDN mission; for purposes of this section, "excess cash" shall mean the amount of cash added in prior periods as reflected in the audited statements of cash flows; SDN's allocation of such excess cash would occur only after ensuring compliance with any and all debt covenants;

Class B Member

    (a)    To appoint the directors of ZMH, subject to approval of such appointments by the Class A Member;

    (b)    To recommend approval of amendments, alterations, or restatements of the Articles of Incorporation and these Bylaws, subject to adoption by the Class A Member;

    (c)    Subject to receipt of approval of such budgets from the Class "A" Member, to approve annual capital and operating budgets for ZMH and for any other corporation in which the corporation possesses a sole, majority, or controlling voting or ownership interest (hereinafter referred to as "subsidiary corporation") including approval of individual line items of expense and income;

    (d)    To approve unbudgeted capital or operating expenditures to be undertaken individually or collectively by ZMH and any subsidiary corporation where the cumulative amount of such unbudgeted expenditures is (i) Five Hundred Thousand Dollars ($500,000) or more in excess of individual or combined approved budgets (but less than Two Million Dollars more) or (ii) five percent (5%) or more (but less than ten percent (10 %) in excess of the individual or combined approved budgets of ZMH and its subsidiaries, whichever is less;

    (e)    To approve borrowing of funds by ZMH from an unrelated person, corporation, or other legal entity, or lending of funds by the ZMH to an unrelated person, corporation or legal entity, including capital leases, where the term of the borrowing or lending exceeds one (1) year in duration and where the total amount of the borrowing or lending exceeds Two Hundred Fifty Thousand Dollars ($250,000), but is less than Five

Resolutions of SDN Board of Directors
August 5, 1996
Page 6

Hundred Thousand Dollars ($500,000;

FURTHER RESOLVED that, upon the Effective Date, as defined herein, all of the
outstanding shares of stock held by GHS in any stock-issuing GHS Subsidiary shall be
transferred to SDN and such transfer shall be reflected on the books of such stock-
issuing GHS Subsidiary,

FURTHER RESOLVED, that SDN shall cause all approvals to be obtained which are
legally required to be obtained from any person or entity, whether governmental or
private, including, but not limited to any bond trustee, bond insurer, or court, in order
to effect the reorganization and the transactions contemplated hereby, provided that any
modifications or reconfigurations in the reorganization required to secure any such
approval shall be undertaken and are hereby approved, but further provided that the
reorganization shall be maintained in all such circumstances, and despite any such
structural modifications which may be required; and that GHS and/or any of the GHS
subsidiaries shall provide such assistance to SDN in securing such approvals as may be
requested by SDN;

FURTHER RESOLVED, that since the reorganization will result in certain staff positions
at GHS Subsidiaries being eliminated, SDN shall provide or shall cause the GHS
Subsidiaries to provide such employees two weeks of severance for each year of service
with a GHS Subsidiary, up to a maximum of 26 weeks (with the exception of the
following named individuals, who shall be entitled, if severed, to receive up to 52 weeks
of severance pay in accordance with the terms of their respective employment agreements
with GHS or any of the GHS Subsidiaries in effect as of June 30, 1996: Samuel
Steinberg; Melvin Smith, D.O.; Bernadette M.Mangan; Howard Peterson; Gary Scheib;
Stanley Goldfarb, M.D.; Caren Staskin; Lee Doty, Esq.; Alison Chmielewski; Joseph
Huber; John Schofield; and Neal Lubarsky); the total severance to which an individual
is entitled shall be set aside and used to pay supplemental unemployment compensation
to keep each individual whole for as long as he/she is entitled to unemployment
compensation under State law, and there are funds available in his/her severance pool,
up to a maximum of 52 weeks; in addition, such employees affected by severance will
be given vouchers to use for any health care they, or their families, may need during
such period, provided they receive such care at hospitals, clinics, physician's offices or
other healthcare facilities in the Delaware Valley designated by SDN;

FURTHER RESOLVED that inasmuch as GHS previously owned or controlled one or
more other membership or stock-issuing corporations or other entities (the "Ancillary
Entities") owning and operating all of the following activities and businesses, (including
all of the assets thereof) : GHS Home Medical; Advanced Technology, Inc ; Concorde
Clinical Research; Bala Imaging; and Mid-Atlantic Stone Center (collectively the
"Ancillary Businesses") and inasmuch as the Ancillary Businesses were transferred to the
control of Health Systems International, Inc ("HSI") in connection with certain other
transactions between HSI and GHS, and inasmuch as SDN has expressed its interest in

DVR 40641 1                                    6

Resolutions of SDN Board of Directors
August 5, 1996
Page 7

owning and operating the Ancillary Businesses, as soon as possible after the Effective
Date, GHS shall take the following actions with regard to the Ancillary Businesses: (1)
use its best efforts to cause HSI or any subsidiary of HSI to transfer ownership the stock
or ownership interests in the Ancillary Businesses (or any of them) to GHS on terms
approved by SDN; (2) if GHS reacquires all of the Ancillary Businesses (or any of
them), GHS shall transfer its stock or other ownership interests in such Ancillary
Businesses to SDN and shall cause the Articles of Incorporation and Bylaws of any
corporation owning and operating the Ancillary Businesses to be amended in the same
manner as specified above for the GHS Subsidiaries; and (3) upon amendment of the
Articles and Bylaws of any such company as specified herein, such company shall be
regarded for all purposes herein as a "GHS Subsidiary;"

FURTHER RESOLVED, that upon the Effective Date, in consideration of SDN
undertaking the plan of reorganization with the GHS Subsidiaries, GHS shall take the
following actions relating to the financial status of the GHS Subsidiaries:

(1) with regard to certain liabilities arising from prior transactions
between GHS and certain of the GHS Subsidiaries as reflected on the
financial records of GHS and the GHS Subsidiaries(collectively the
"Inter-Company Liabilities"), GHS shall (A) reconcile the Inter-Company
Liabilities owing respectively from the GHS Subsidiaries to GHS and
from GHS to the GHS Subsidiaries and owing between the GHS
Subsidiaries, or any of them; (B) provide to SDN appropriate financial
records, reconciliations, and information to substantiate such
reconciliations on or before the Effective Date (including, without
limitation, charts of accounts), which records, reconciliations and
information shall be incorporated herein and made a part hereof by
reference, and which shall include the following (i) balance sheets for
each of the GHS Subsidiaries calculated as of May 31, 1996 (the "May
31, 1996 Balance Sheets"), (2) the May 31, 1996 Balance Sheets
adjusted by inclusion of certain agreed upon pro forma adjustments
arising from the reorganization (the "Effective Date Pro Forma Balance
Sheets"); (ii) revenue and expense statements for each of the GHS
Subsidiaries portion of the relevant fiscal year ending May 31, 1996 (the
"FY 1996 Income Statements"); (iii) trial balances as of May 31, 1996
supporting the FY1996 Income Statements and May 31, 1996 Balance
Sheets; and (4) a certification of GHS in form reasonably satisfactory to
SDN as to the preparation of May 31, 1996 Income Statements and
Balance Sheets in accordance with GAAP and certifying no material
changes in financial condition between May 31, 1996 and the Effective
Date, except as otherwise disclosed by GHS to SDN, and (C) (i) forgive,
liquidate and irrevocably waive, as of the Effective Date, the net amount
of all GHS claims to the net amount of Inter-Company Liabilities owing
from the GHS Subsidiaries to GHS as of the Effective Date (estimated

DVR 40641 1                               7

Resolutions of SDN Board of Directors
August 5, 1996
Page 8

to be approximately $3,448,000 as of May 31, 1996). or (ii) pay to TGH, as of the Effective Date, in cash or readily available funds, the net amount of Inter-Company Liabilities owing from GHS to the GHS Subsidiaries as of the Effective Date, and

(2) as a capital contribution to TGH, GHS shall pay and irrevocably transfer to TGH, as of the Effective Date,   Ten Million Dollars ($10,000,000) and further, on each of the first, second and third anniversary dates of the Effective Date, GHS shall pay to TGH, on each such anniversary date, the amount of Five Million Dollars ($5,000,000) (cumulatively Fifteen Million Dollars ($15,000,000) on the three anniversary dates) which shall be paid in cash or readily available funds, and all of which such payments shall be paid into the funded depreciation accounts or funds of TGH; the deferred payment amounts totalling Fifteen Million Dollars ($15,000,000) shall, as of the Effective Date, be irrevocably transferred and paid into an escrow account to be maintained by a third party depository reasonably acceptable to SDN under terms reasonably acceptable to SDN, and such monies shall be irrevocably designated and earmarked for payment to TGH in three(3) equal installments on the first, second, and third anniversary dates of the Effective Date as provided above; provided that, not more frequently than annually, investment earnings on such escrow account may be paid to GHS to the extent that the balance in such escrow account exceeds 1.10 times the remaining balance of the amounts to be paid to TGH; and further that any amounts remaining in the escrow account after payment of the full amount owing to TGH may be paid to GHS;

(3) GHS shall pay and irrevocably transfer to TGH, as of the Effective Date, all of the assets, (including without limitation, cash or cash equivalents and investments) held by GHS in a Workers' Compensation self-insurance trust fund or account (such assets having an approximate value of $2,588,000 as of May 31, 1996);

(4) GHS shall pay and irrevocably transfer to ZMH the full amount of a trust designated or distributed  as of June 1996 to GHS Rancocas Hospital, which trust had an approximate value of $1,094,000 as of June, 1996, which transfer shall include all payments or distributions made from such trust to GHS between the date of such designation or distribution and the Effective Date;

(5) GHS shall pay and irrevocably transfer to TGH funds and accounts with a value of approximately $6,200,000 as of May 31, 1996, which funds represent restricted endowments and gifts made to and/or for the benefit of TGH, and

DC8497 page 8 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 9

(6) GHS shall pay and irrevocably transfer to any GHS Subsidiary any gifts, endowments, trusts, or other funds or assets held by GHS, which gifts. endowments, trusts, or other funds or assets were given, bequeathed, settled, or restricted for the benefit of any GHS Subsidiary or any employee of any GHS Subsidiary (including, without limitation, any pension and/or other employee benefit trusts); and

(7) (A) As soon as possible after the Effective Date, SDN shall assume, and GHS shall assist SDN in effecting the transfer from GHS to SDN of any guarantees of indebtedness on behalf of the GHS Subsidiaries in effect as of June 30, 1996 (the "Existing Guarantees), which assumptions and transfers shall be subject to any approvals of other parties required thereunder; (B) until the transfer of all Existing Guarantees from GHS to SDN is effected, GHS shall honor any Existing Guarantee not so transferred in the limited circumstances set forth herein (i) GHS shall pay, on behalf of any GHS Subsidiary, any portion or all of its obligations under such Existing Guarantee upon demand in accordance with the terms of any such guarantee to the extent that the obligations under the guarantees in question were accelerated in whole or in part or otherwise altered by reason of the consummation all or any portion of the reorganization approved herein; ii) to the extent that GHS is required to pay any amounts under any Existing Guarantee, SDN and the GHS Subsidiaries shall indemnify GHS for any such payments, provided that any such indemnification shall be made in accordance with the standard debt repayment schedule of the debt to which such guarantee pertains;.

FURTHER RESOLVED that GHS shall maintain and/or cause each of the GHS Subsidiaries to maintain in full force and effect, such policies of insurance as were in effect as of June 30, 1996 (including without limitation, policies relating to comprehensive general liability, directors and officers liability, property and casualty, auto, professional liability, criminal, Workers Compensation, unemployment insurance, employer's liability, criminal, and umbrella liability) and shall transfer all such policies in full force and effect as of the Effective Date with the GHS Subsidiaries; and further, that GHS shall transfer to SDN any such policies of insurance as were held by GHS in its name to the extent that such policies cover or pertain to one or more of the GHS Subsidiaries;

FURTHER RESOLVED that, on or before the Effective Date, GHS shall have caused the following agreements between GHS and HSI Management Co, Inc ("HSIM") , to be terminated from and after the Effective Date, with respect to any of the GHS Subsidiaries who are parties thereto or obligors thereunder, or to have HSIM agree irrevocably to waive and release all claims against any GHS Subsidiary under such agreements from and after the Effective Date, which terminations and/or releases shall be on terms acceptable to SDN . (A) the Management Agreement dated December 1,

DC8497 page 9 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 10

1995, by and between GHS (the "HSIM Management Agreement") and , (B) any Service Agreement between GHS and HSIM or between one or more GHS Subsidiaries and HSIM; further provided that GHS shall provide evidence to SDN on or before the Effective Date of such terminations /and/or releases,

FURTHER RESOLVED, at all times from and after the Effective Date, GHS shall indemnify and hold harmless SDN and the GHS Subsidiaries and the officers, directors, employees, agents or representatives of SDN and of each of the GHS Subsidiaries for all claims or damages of any kind or amount whatsoever caused by or arising from (1) any act or omission occurring on or prior to the Effective Date of GHS or of any of the respective officers, directors, employees, agents or representatives of GHS or (2) any act or omission of GHS occasioned by or in connection with the reorganization and actions, undertakings and transactions contemplated hereby or .

FURTHER PROVIDED, at all times from and after the Effective Date, SDN (and/or its successors, if any) shall indemnify and hold harmless GHS and the officers, directors, employees, agents or representatives of GHS and of each of the GHS Subsidiaries for all claims or damages of any kind or amount whatsoever caused by or arising from (1) any act or omission of SDN occasioned by or in connection with the reorganization and actions, undertakings and transactions contemplated hereby or (2) any act or omission of SDN occurring after the Effective Date of SDN, , or of any of the respective officers, directors, employees, agents or representatives of SDN ;

FURTHER RESOLVED that, from and after the Effective Date, SDN shall offer to employ, or cause one of the GHS Subsidiaries to offer to employ, Robert E. Mathews ("Mathews") as President and Chief Operating Officer of the GHS Subsidiaries as of the Effective Date for a term beginning on the Effective Date and ending on the date of termination of the Mathews Employment Agreement (as defined below) for salary and bonus terms equal to those in effect under the Mathews Employment Agreement (but not including stock options under Section 6 and or pension payments under Section 8) , provided that if Mathews accepts employment by SDN or any GHS Subsidiary on such terms, Mathews shall be released from the Employment Agreement between Mathews and HSIM dated December 1, 1995 (the "Mathews Employment Agreement") (including, without limitation, the restrictive covenant contained in Section 13 thereof) and the Agreement shall be terminated (except for the provisions of Section 8 thereof with regard to pension payments, which shall remain in effect) but provided that neither SDN nor any GHS Subsidiary shall be required to pay Mathews or reimburse any other party for the costs of any of the following: (1) stock option benefits under Section 6 of the Mathews Employment Agreement; (2) pension benefits payable under Section 8 thereof, (3) and/or the pension benefit portion under Section 8 of the termination payments under Section 11 thereof

FURTHER RESOLVED that, as of the Effective Date, SDN shall make a lump sum payment of $1,468,125 (minus required withholdings) (the gross amount being the sum

DVR 40641 1                    10

Resolutions of SDN Board of Directors
August 5, 1996
Page 11

of $978,750 in salary and $489,375 in bonus) to Harold Cramer, Esq. in cash or other readily available funds to pay and discharge salary and bonus payments under that certain Employment Agreement between Cramer and HSIM (the "Cramer Employment Agreement") dated December 1, 1995 for the period from the Effective Date through the end of the initial term of the Cramer Employment Agreement on November 30, 1996 and further that SDN shall pay, through November 30, 1996 for the other benefits provided to Cramer under the Cramer Employment Agreement except that neither SDN nor any GHS Subsidiary shall be required to pay or for any of the following (1) stock option benefits under Section 6 of the Cramer Employment Agreement; (2) pension benefits payable under Section 8 thereof; (3) and/or the pension benefit portion under Section 8 of the termination payments under Section 11 thereof

FURTHER RESOLVED that GHS shall have caused each of the following to occur with respect to the Founder's Professional Corporations on or prior to the Effective Date: (A) any contracts or undertakings, and all rights and obligations hereunder, between each of the Founder's Professional Corporations and GHS, or any other entity within the Graduate System shall have been assigned to Founder's; (B) all shares and other voting rights or ownership interests in or pertaining to each of the Founder's Professional Corporations shall have been validly and duly assigned and transferred to Donald Kaye, M.D., President and CEO of SDN, ; (c) all of the directors of the Founder's Professional Corporations shall have resigned and Donald Kaye, M.D. shall have been appointed as a director of each such corporation required by law or by the Bylaws of such corporation; and (d) all of the officers of each of the Founder's Professional Corporations shall have resigned and Donald Kaye, M.D. (and/or such other person(s) as shall be designated by SDN) shall have been appointed to each office of each such corporation as shall be required by law or by the Bylaws of such corporation;

FURTHER RESOLVED (1) that Community General Hospital of Reading ("CGH"), which is another subsidiary of GHS, shall be excluded from the reorganization contemplated hereby and shall not be transferred to the control of SDN; (2) that CGH shall retain exclusive ownership of and responsibility for all of the assets owned by CGH or related to, associated with or arising from CGH (collectively the "CGH Assets"), and debts, liabilities and obligations incurred or accrued by CGH, or related to, associated with or arising from CGH (including, without limitation, any long-term indebtedness (collectively the "CGH Liabilities") shall not be transferred to SDN or transferred to or retained by any GHS Subsidiary ; (3) that CGH shall retain exclusive ownership of the CGH Assets and exclusive responsibility for the CGH Liabilities; and (4) that GHS and CGH shall indemnify SDN and the GHS Subsidiaries GHS shall indemnify and hold harmless SDN and the GHS Subsidiaries and the officers, directors, employees, agents or representatives of SDN and of each of the GHS Subsidiaries for all claims or damages of any kind or amount whatsoever caused by or arising from the CGH Liabilities;

FURTHER RESOLVED that the officers designated below as certifiers of these resolutions are authorized and directed to execute the certification set forth below at the

DC8497 page 11 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 12

end of these resolutions (the "SDN Certification") and to deliver the SDN Certification
to GHS on the date of adoption of these resolutions;

FURTHER RESOLVED  that the transactions and actions described herein shall be
effective  immediately and automatically upon the date (the "Effective Date") upon
which, following the delivery of the GHS Certification to SDN and acceptance of the
GHS Certification by SDN,  SDN shall deliver to GHS a certification (the "SDN
Certification") executed by two or more officers of SDN, certifying SDN's agreement
to and approval of the actions set forth herein, and certifying the satisfaction and/or
completion of any conditions or actions required to be satisfied or completed by SDN
prior to the effectiveness of the actions set forth herein;

FURTHER RESOLVED that the officers of SDN, or any of them,  are further authorized
and directed to take all such actions as shall be required to effect and implement these
resolutions and the actions, transactions and undertakings set forth herein prior to, on,
and/or after the Effective Date, including specifically but not by way of limitation, to
deliver all such other items or deliveries and take all such actions on the Effective Date
as shall be required hereunder or in connection with such actions and transactions and to
deliver to SDN, as of the Effective Date, such certificates and other undertakings or
documentation  as shall be reasonably required by SDN  to evidence the completion and
effectuation of all such actions, transactions and undertakings;

Resolutions of SDN Board of Directors
August 5, 1996
Page 13

FURTHER RESOLVED that SDN acknowledges that GHS further has expressly agreed that there shall be no commingling of the respective assets of GHS and SDN and that under no circumstances shall SDN serve as guarantor of any past, present, or future debt or obligation of GHS nor of any GHS Subsidiary nor assume responsibility for any past, present, or future. liability of GHS or of any GHS Subsidiary, except to the extent expressly·agreed by SDN.

FURTHER RESOLVED that SDN approves these resolutions and approves and authorizes the taking of such actions as shall be reasonably required to approve and effect the reorganization and actions. undertakings and transactions contemplated hereby and that, in doing so, SDN intends be legally bound by such resolutions and actions, provided that SDN's legal obligation hereunder shall be conditioned upon GHS and the GHS Subsidiaries taking the actions and satisfying the conditions set forth herein; and further provided that, if SDN shall not have provided the SDN Certification to GHS and taken legally binding and effective actions to approve and effect the reorganization and actions, undertakings and transactions contemplated hereby on or before a date not more than seven (7) days after the date of adoption of these resolutions, then the approval of these resolutions and of the reorganization and actions, undertakings and transactions contemplated hereby shall be withdrawn and shall be of no further force and effect;

FURTHER RESOLVED, that SDN shall operate, or cause to be operated, the GHS Subsidiaries in a commercially reasonable and businesslike manner, and that SDN shall not distribute or remove assets from the GHS Subsidiaries except for adequate consideration in the ordinary course of business and that the proceeds of any sale or distribution of a GHS Subsidiary or of any assets of GHS Subsidiaries shall be retained by the GHS Subsidiary in question or by the remaining GHS Subsidiaries;

FURTHER RESOLVED, that the reorganization and the actions, undertakings, and transactions contemplated hereby are being undertaken by GHS and SDN with the understanding that GHS Subsidiaries, at a future date, will become part of the integrated health system operated by Allegheny Health, Education and Research Foundation ("AHERF") and that, while a transfer of the GHS Subsidiaries to that system has been approved by AHERF, and the inclusion of the GHS Subsidiaries within the AHERF system will be consummated when certain conditions precedent have been accomplished, including the completion of various due diligence reviews and resolution of resulting issues to the satisfaction of AHERF and the securing of necessary legal and regulatory approvals; provided that, if, by a date twenty-four (24)·months after the Effective Date, the GHS Subsidiaries shall not have joined the AHERF System (except where the reasons for such delay are beyond the control of AHERF, in which such case, the 24-month time period shall be extended as shall be reasonably required to permit AHERF to resolve the reason for the delay), SDN shall notify GHS of that fact, and GHS may, for a period of ninety (90) days after such notice, direct SDN to reverse the reorganization and the actions, undertakings. and actions contemplated hereby and to return control of the GHS subsidiaries (including all of their respective assets and liabilities) to GHS and provided

DVR 40641 1                                    13

DC8497 page 13 of 15

Resolutions of SDN Board of Directors
August 5, 1996
Page 14

further that SDN, on receipt of such notice, promptly shall take all such actions as shall
be necessary to effect such reversal and such transfer of control with the reasonable
assistance of GHS;

FURTHER RESOLVED, that any of the officers of SDN are hereby authorized and
directed to do all such things and take all such actions as such officer may deem to be
reasonable and appropriate to provide for the implementation and effectuation of the
reorganization approved herein with respect to the entity to which their office pertains,
including without limitation, by execution of contracts and other undertakings, delivery
of instruments, securing of licenses, permits, and approvals, and making of filings and
notifications, and all such actions are hereby approved; and

FURTHER RESOLVED, that the number of directors of the Corporation shall be fixed
at four (4):

FURTHER RESOLVED, that the following named individual is hereby appointed to
serve as a director of SDN, effective as of the date hereof, to hold office until the next
annual meeting of the Board of Directors and until his successor is duly elected and
qualified:

Donald Kaye, M.D.

FURTHER RESOLVED, that the following persons are hereby elected to the SDN
offices shown opposite their names, to serve, at the pleasure of the Board, until their
respective successors shall have been duly elected and qualified:

| Name | Office |
| --- | --- |
| Sherif S. Abdelhak | Chairman |
| Donald Kaye, M.D. | Vice-Chairman and Chief Executive Officer |
| Robert Mathews | President and Chief Operating Officer |
| Nancy A. Wynstra, Esq. | Secretary and General Counsel |
| David W. McConnell | Treasurer |
| Joseph Huber | Chief Financial Officer |
| Robert M. McNair, Jr., Esq | Assistant Secretary |

DVR 40641 1                                        14

DC8497 page 14 of 15

*Resolutions of SDN Board of Directors*
August 5, 1996
Page 15

FURTHER RESOLVED. that any inquiries or questions regarding this reorganization shall be referred to Sherif S Abdelhak, Chairman of SDN.

CERTIFICATION

WE, THE UNDERSIGNED, do hereby certify that the attached resolutions were approved and adopted by the Board of Directors of SDN, Inc. on this 5th day of August, 1996.

SDN, INC.

By: _____
Donald Kaye, M.D
Vice-Chairman and Chief Executive Officer

By: _____
Robert M McNair, Jr., Esq.
Assistant Secretary

TAB 280

*Cnf. Hrg. 12/7/00 9:00 a.m.*

*#8406*
*NC/pla*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re: :
:
ALLEGHENY HEALTH, EDUCATION :
AND RESEARCH FOUNDATION, :
ALLEGHENY UNIVERSITY OF THE :
HEALTH SCIENCES, ALLEGHENY :
UNIVERSITY MEDICAL PRACTICES :
ALLEGHENY HOSPITALS :
CENTENNIAL AND ALLEGHENY :
UNIVERSITY HOSPITALS-EAST, :
:
         Debtors. :
:
:

Case Nos. 98-25773 MBM through
98-25777 MBM inclusive

Chapter 11

Consolidated for
Administration at 98-25773 MBM

---

## MEMORANDUM OF LAW IN SUPPORT OF
## CONFIRMATION OF DEBTORS' SECOND AMENDED
## CONSOLIDATED LIQUIDATING PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PROSKAUER ROSE LLP**
1585 Broadway
New York, New York 10036
(212) 969-3000
Alan B. Hyman
Jeffrey W. Levitan
Michael E. Foreman

**SABLE, PUSATERI, ROSEN,**
**  GORDON & ADAMS, LLC**
Frick Building, 7th Floor
Pittsburgh, PA 15219
(412) 471-4996
Robert G. Sable
Mark E. Freedlander

CO-COUNSEL TO WILLIAM J. SCHARFFENBERGER, THE CHAPTER 11 TRUSTEE

Dated:    Pittsburgh, Pennsylvania
          December 5, 2000

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 2

OVERVIEW OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

THE PLAN MEETS THE REQUIREMENTS FOR
CONFIRMATION UNDER SECTION 1129 OF THE
BANKRUPTCY CODE AND THEREFORE SHOULD
BE CONFIRMED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.     The Plan Meets the Requirements of Section 1129(a)(1)
           of the Bankruptcy Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           1.     The Plan Satisfies the Classification Requirements of
                  Section 1122 Because the Claims of Each Class Are
                  Substantially Similar to the Other Claims of that Class . . . . . . . . . . . 12

           2.     The Plan Meets the Requirements Set Forth
                  In Section 1123(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           3.     The Permissive Provisions Contained in the
                  Plan are Appropriate -- 11 U.S.C. § 1123(b) . . . . . . . . . . . . . . . . . . 17

      B.     The Plan Proponent Has Complied with the
           Provisions of Title 11 as Required by Section 1129(a)(2) . . . . . . . . . . . . . . . . . 24

      C.     The Plan Was Proposed in Good Faith -- 11 U.S.C. § 1129 (a)(3) . . . . . . . . . . 25

      D.     The Plan Provides for Court Approval of Payment
           for Services and Expenses -- 11 U.S.C. § 1129(a)(4) . . . . . . . . . . . . . . . . . . . 26

      E.     The Debtors Have Disclosed All Necessary Information
           Regarding Directors, Officers and Insiders -
           11 U.S.C. § 1129(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

F.   The Plan Does Not Contain Any Rate Changes Subject
     to the Jurisdiction of Any Governmental Regulatory Commission . . . . . . . . . . . 30

G.   The Plan is in the "Best Interest" of Creditors
     -- 11 U.S.C. § 1129(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

H.   All Impaired Classes of Claims Have Accepted the Plan
     -- 11 U.S.C. § 1129(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.   The Plan Provides for Payment in Full of All Allowed Priority
     Claims -- 11 U.S.C. § 1129(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

J.   The Plan has Been Accepted by Each Impaired Class that Was
     Entitled To Vote -- 11 U.S.C. § 1129(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

K.   The Plan is Not Likely to be Followed by Liquidation or the
     Need for Further Financial Reorganization
     -- 11 U.S.C. § 1129(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

L.   All Statutory Fees Will Be Paid -- 11 U.S.C. § 1129(a)(12) . . . . . . . . . . . . . . . 38

M.   The Plan Provides for the Continuance of Retiree Benefit
     Obligations -- 11 U.S.C. § 1129(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

N.   Cramdown Provisions are Inapplicable -- 11 U.S.C. § 1129(b) . . . . . . . . . . . . . 39

O.   Only One Plan is Being Confirmed -- 11 U.S.C. §1129(c) . . . . . . . . . . . . . . . . . 39

P.   The Principal Purpose of the Plan is not Tax Avoidance
     or Avoidance of Securities Laws
     -- 11 U.S.C. §1129(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF AUTHORITIES

## CASES

In re 11,111, Inc.,
  117 B.R. 471 (Bankr. D. Minn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Allegheny International, Inc.,
  118 B.R. 282 (Bankr. W.D. Pa. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

In re Apex Oil Co.,
  118 B.R. 683 (Bankr. E.D. Mo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Barnes v. Whelan (In re Barnes),
  689 F.2d 193 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.),
  201 B.R. 376 (Bankr. E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Century Glove, Inc.,
  No. 90-400-SLR, 1993 U.S. Dist. LEXIS 2286 (D. Del. Feb. 10, 1993) . . . . . . . . . . . . . . 25

Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman),
  585 F.2d 1171, 1179 (2nd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),
  767 F.2d 417 (8th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Corestates Bank, N.A. v. United Chemical Tech., Inc.,
  202 B.R. 33 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,36

In re Dilbert's Quality Supermarkets, Inc.,
  368 F.2d 922 (2d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Drexel Burnham Lambert Group, Inc.,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Findley v. Blinken (In re Joint Eastern & Southern Dist.'s Asbestos Litigation,
  120 B.R. 648 (E. & S.D.N.Y. 1991), rev'd, 995 F.2d 1274 (5th Cir. 1991),
  cert. denied, 506 U.S. 821 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Greystone III Joint Venture,
  102 B.R. 560 (Bankr. W.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Jersey City Medical Center,
    817 F.2d 1055 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part,
    78 B.R. 407 (Bankr. S.D.N.Y. 1987), aff'd sub nom.
    Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) . . . . . . . . . . . . . . . 11,24,27,37

In re Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 'ı. 22,30

In re Johns-Manville Corp.,
    97 B.R. 174 (Bankr. S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Mcorp Financial Inc.,
    137 B.R. 219 (Bankr. S.D. Tex.), appeal dismissed, 139 B.R. 820 (S.D. Tex. 1992) . . . . . 12

Menard-Sanford v. Mabey (In re A.H. Robins, Co.),
    880 F.2d 694 (4th Cir. 1989), cert. denied, 493 U.S. 959 (1989) . . . . . . . . . . . . . . . . . . . . 22

Official Unsecured Creditors' Committee of Erie Hilton Joint Venture v. Siskind (In re Erie
    Hilton Joint Venture),
    137 B.R. 165 (Bankr. W.D. Pa. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re PWS Holding Corp. Brunos, Inc.,
    No. 00-5042 and 00-5074,
    2000 U.S. App. LEXIS 23393 (3d Cir. Sept. 18, 2000) . . . . . . . . . . . . . . . . . . . . 11,22,23,26

S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),
    960 F.2d 285 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088 (1993) . . . . . . . . . . . . . . . . . 22

Sound Radio II,
    103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 264 (3d Cir. 1990) . . . . . . . . . . . . . . . . . 36,37

In re Sound Radio, Inc.,
    93 B.R. 849 (Bankr. D.N.J. 1988), aff'd in part, remanded in part,
    103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . 25

In re Sun Country Development, Inc.,
    764 F.2d 406, 408 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Teamsters National Freight Industrial Negotiating Committee v. U.S. Truck Co. (In re U.S.
    Truck Co. Inc.),
    800 F.2d 581 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Texaco Inc.,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988), appeal dismissed,
   92 B.R. 38 (Bankr. S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

In re Toy & Sports Warehouse, Inc.,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,24,30

In re U.S. Truck Co.,
   47 B.R. 932 (Bankr. E.D. Mich. 1985), aff'd,
   800 F.2d 581 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

In re Victory Construction Co., Inc.,
   42 B.R. 145 (Bankr. C.D. Cal. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## STATUTES

11 U.S.C. § 105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11 U.S.C. § 503(a)(3), (4), (5), (6) and (7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

11 U.S.C. § 524(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11 U.S.C. § 1122(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11 U.S.C. § 1123(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

11 U.S.C. §1129(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

11 U.S.C. § 1142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 U.S.C. §1930 (Section 1129(a)(12)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 11,24

S. Rep. No. 989, 95th Cong., 2nd Sess. 126 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,24

## MISCELLANEOUS

5 Collier on Bankruptcy ¶ 1122.03, at 1122-7 (15th ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 Collier on Bankruptcy ¶ 1129.02, at 1129-53 (15th ed. 1993) . . . . . . . . . . . . . . . . . . . . . . 36,37

**MEMORANDUM OF LAW IN SUPPORT OF
CONFIRMATION OF DEBTORS' SECOND AMENDED
CONSOLIDATED LIQUIDATING PLAN OF REORGANIZATION
<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

### PRELIMINARY STATEMENT[1]

This memorandum of law (the "Memorandum") is submitted on behalf of William

J. Scharffenberger, the Chapter 11 Trustee of Allegheny Health, Education and Research

Foundation ("AHERF"), Allegheny University Medical Practices ("AUMP"), Allegheny

Hospitals, Centennial ("Centennial"), Allegheny University of the Health Sciences ("AUHS")

and Allegheny University Hospital-East ("AUH-East," together with AHERF, AUMP,

Centennial and AUHS, collectively, the "Debtors"), in support of the entry of an order

confirming the Debtors' Second Amended Consolidated Liquidating Plan of Reorganization

dated December 5, 2000 (the "Plan").

As discussed below, the Plan has been overwhelmingly accepted by all impaired

classes of Claims that were entitled to vote thereon.  The Plan represents the final step in the

implementation of a consensual negotiated settlement and compromise of significant issues

regarding the treatment of Claims of creditors asserting security interests in and liens on certain

property of the Debtors' Estates, general unsecured creditors (including creditors holding

unsecured deficiency Claims) and creditors holding Claims against different estates, as reached

among the Chapter 11 Trustee, the official committee of unsecured creditors (the "Creditors'

Committee") and the three primary institutional creditors of the Debtors' Estates:  MBIA

Insurance Corporation ("MBIA"), PNC Bank, N.A. ("PNC") and Bank of New York, as

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed
to them in the Plan or the Disclosure Statement, as the case may be.

indenture trustee ("BNY") acting for and on behalf of bondholders holding Claims against

Centennial (collectively, the "Centennial Bondholders"). The Chapter 11 Trustee, the Creditors'

Committee, MBIA, PNC and BNY believe that the Plan should be confirmed because it

represents the best alternative available to all creditors.

As discussed below, and as will be demonstrated at the Confirmation Hearing, the

Plan satisfies all applicable provisions of the Bankruptcy Code in respect of confirmation. The

Plan furthers the objectives of the liquidating process, maximizes the value of the Debtors'

Estates and provides the best opportunity to distribute the Estates' Cash to creditors at the earliest

possible date. Accordingly, the Chapter 11 Trustee respectfully requests that this Court enter an

order confirming the Plan.

**FACTS**

The facts relevant to confirmation of the Plan are set forth in the Affidavit of

Charles P. Morrison, Chief Administrative Officer of the Debtors, sworn to on December 4,

2000, which has been filed with this Court and is incorporated by reference as if set forth fully

herein.

**PROCEDURAL HISTORY AND BACKGROUND**

On July 21, 1998 (the "Petition Date"), each of the Debtors filed their voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code. After the Petition Date, the

Debtors continued to operate their business and manage their properties as debtors-in-possession

pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Other for-profit and not-for-profit

affiliates of AHERF did not file petitions for relief under Chapter 11 but ceased substantially all operations.

On the Petition Date, the Bankruptcy Court approved the Debtors' $150 million debtor-in-possession revolving loan facility (the "DIP Facilitiy") with Madeleine L.L.C. ("Madeleine"), pursuant to which availability was determined based on an eligible accounts receivable borrowing base and included a $50 million letter of credit subfacility. The DIP Facility terminated in connection with the closing of the sale of the Philadelphia Operations to Tenet Healthcare Corporation and affiliated entities ("Tenet"). In addition, in order to attempt to stabilize the Debtors' day-to-day business operations, the Bankruptcy Court authorized, among other things, the Debtors to pay pre-petition amounts to employees and creditors in the ordinary course of business and continue, maintain and use their consolidated cash management system, existing bank accounts and existing business forms.

On July 30, 1998, the Office of the United States Trustee appointed the Creditors' Committee. After the commencement of the Chapter 11 Cases, the Bankruptcy Court approved a series of transactions, which closed on November 10, 1998, whereby Tenet acquired the Philadelphia-area assets and Drexel University assumed the management of the medical and health professional schools of the Debtors for $345 million gross consideration. On the same day, the Bankruptcy Court also approved the sale of the assets of the AHERF System's New Jersey operations and other hospital assets to Our Lady of Lourdes Healthcare Corporation.

On December 10, 1998, due to a loss of confidence in the Debtors' trustees and executive officers to make decisions that would maximize the value of the Estates for the benefit

of the creditors thereof, the Office of the United States Trustee appointed William J.

Scharffenberger to the position of Chapter 11 Trustee of AHERF. On August 18, 1999, the

Court entered an order expanding the appointment of the Chapter 11 Trustee to include the other

Debtors.

After several months of negotiations with the Non-Debtor Entities, Western

Pennsylvania Healthcare Corporation ("West Penn"), and the Commonwealth of Pennsylvania

the Chapter 11 Trustee and the Creditors' Committee consummated that certain global settlement

agreement dated June 30, 1999 (the "Global Settlement Agreement"). The Global Settlement

Agreement provided for a transfer of certain AHERF assets and the assignment of certain

executory contracts and unexpired leases to West Penn, AHERF's rejection of certain designated

executory contracts and unexpired leases, the release of inter-company and other claims by

parties to the Global Settlement Agreement, the Non-Debtor Entities' continued provision

administrative services to the Debtors during a transitional phase, the termination of the load

defined benefit plans and resolution of claims of the Pension Benefit Guaranty Corporation

("PBGC") in connection therewith, and the receipt of in excess of $26 million as a settlement

payment to the Debtors (the "West Penn Transaction"). On July 23, 1999, the Bankruptcy Court

entered an order approving the Global Settlement Agreement. The West Penn Transaction

closed on August 3, 1999.

The closing of the West Penn Transaction permitted the Chapter 11 Trustee to

turn his attention along with the Creditors' Committee to negotiate a consensual liquidating plan

among the major constituencies herein. On April 18, 2000, the Chapter 11 Trustee, members of

the Creditors' Committee and representatives of PNC, MBIA and BNY advised the Bankruptcy

Court of their progress in agreeing in principal to the terms and provisions of a liquidating plan. On June 13, 2000, the Chapter 11 Trustee filed a Disclosure Statement and Plan and on August 15, 2000, the Chapter 11 Trustee filed an Amended Disclosure Statement and Plan. On August 15, 2000 this Court approved the Disclosure Statement as containing "adequate information" respecting the Plan pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement Approval Order"), and authorized the solicitation of acceptances and rejections of the Plan from holders of impaired claims. The Disclosure Statement Approval Order also established October 18, 2000 at 5:00 p.m. (Pittsburgh time) as the Voting Deadline and the last date to file objections to confirmation of the Plan (the "Objection Deadline"). In addition, the Disclosure Statement Approval Order fixed the form, manner and time by which the Chapter 11 Trustee was required to serve notice of the Confirmation Hearing, the Voting Deadline and the Objection Deadline. As detailed below, in compliance with the Disclosure Statement Approval Order, actual and constructive notice of the Confirmation Hearing, the Voting Deadline and the Objection Deadline was duly provided.

The Chapter 11 Trustee received nine objections to confirmation of the Plan. Specifically, objections were filed by (1) the AHERF Lenders[2] (2) Sarah Lohwater, (3) Bell Atlantic, (4) Comprehensive Safety Compliance, Inc., (5) the Pension Benefit Guaranty Corporation, (6) InPhyNet Contracting Services, Inc., (7) certain breast implant litigants, (8) the

---

[2]    The AHERF Lenders include Mellon Bank, N.A., Toronto Dominion (New York), Inc., Bank One, National Association as successor in interest to Bank One, Akron, N.A., and Bank One, National Association formerly known as the First National Bank of Chicago (collectively, the "Lenders").

Attorney General of Pennsylvania, and (9) the United States Government, on behalf of the United

States Department of Heath and Human Services.

The process of soliciting votes on the Plan was duly conducted in accordance with

the solicitation procedures approved by the Court. The Chapter 11 Trustee served, inter alia, a

copy of the Disclosure Statement (including the Plan) and a notice of the Confirmation Hearing

(including the Objection Deadline) upon all of the Debtors' known impaired and unimpaired

creditors and all other parties designated in the Disclosure Statement Approval Order, including

holders of (1) Centennial Bonds, as determined by, among other things, the names (or the names

of whose nominees) appearing as of the Voting Record Date on the security holder lists

maintained by the Centennial Indenture Trustee, (2) MBIA/PNC Claims, (3) General Unsecured

Claims, (4) Centennial Unsecured Claims, (5) Convenience Claims and (6) Centennial

Convenience Claims. The Chapter 11 Trustee also published the Confirmation Hearing Notice

once in The Pittsburgh Post-Gazette, The Philadelphia Inquirer-Daily News, The Pittsburgh

Allegheny County Legal Journal, The New York Times (national edition) and The Wall Street

Journal (national edition) as required by the Disclosure Statement Approval Order.

Voting on the Plan was completed on October 18, 2000. As detailed in the Ballot

Certification, the Plan was overwhelmingly accepted by all voting classes of Claims entitled to

vote thereon. The following summarizes the voting results:

> --- 673 holders of Centennial Bondholder Claims in Class 3 with
> claims aggregating approximately $20.3 million (constituting over
> 96% in number and over 99% in dollar amount) voted to accept the
> Plan;

---    The two holders of MBIA/PNC Claims in Class 4 voted to accept the Plan;

---    788 holders of General Unsecured Claims in Class 5(A) aggregating approximately $405 million (constituting 87% in number and over 99% in amount) voted to accept the Plan[3];

---    752 holders of Centennial Unsecured Claims in Class 5(B) aggregating approximately $70.2 million (constituting over 98% in number and over 95% in amount) voted to accept the Plan;

---    935 holders of Convenience Claims in Class 6(A) aggregating approximately $691,000 (constituting over 95% in number and over 97% in amount) voted to accept the Plan; and

---    172 holders of Centennial Convenience Claims in Class 6(B) aggregating approximately $229,000 (constituting over 93% in number and over 91% in amount) voted to accept the Plan.

Given the overwhelming acceptance and support for the Plan, and because as demonstrated below, the Plan satisfies all of the requirements for confirmation, this Court should enter an order confirming the Plan.

## OVERVIEW OF THE PLAN

The Plan is the product of months of negotiations among the Chapter 11 Trustee, the Creditors' Committee, MBIA, PNC and BNY. In general, the Plan classifies all Claims against the Debtors into ten separate Classes and subclasses. Pursuant to the Plan, upon the occurrence of the Effective Date of the Plan, (i) holders of Priority Claims will be paid in full, (ii) holders of General Secured Claims will be paid in full or otherwise rendered unimpaired, (iii) holders of Secured Claims of Centennial Bondholder Claims will be paid $20.5 million of their

---

[3]    The Plan would have been accepted even if Mellon Bank had been permitted to vote as a holder of a General Unsecured Claim in the amount of $89 million.

aggregate Allowed Secured Claim of $33 million and be granted an entitlement to recover

remaining portions of the Allowed Secured Claim upon the first distribution by Liquidating

AHERF, as well as an Allowed Centennial Unsecured Claim of $105.6 million, (iv) holders of

Secured Claims of MBIA/PNC Claims will be paid $10 million of their aggregate Allowed

Secured Claim of $50 million and be granted an entitlement to recover the remaining portion of

such secured claim upon subsequent distributions by Liquidating AHERF in accordance with the

Plan as well as an Allowed Unsecured Claim of $340.3 million, (v) holders of General

Unsecured Claims will be paid 5% of their Allowed Unsecured Claim in Cash and entitled to

subsequent distributions by Liquidating AHERF in accordance with the Plan based on a

participation equal to the amount of their Allowed Claim, (vi) holders of Centennial Unsecured

Claims will be paid 1.5% of their Allowed Unsecured Claim in Cash and entitled to recover

subsequent distributions by Liquidating AHERF in accordance with the Plan based on a

participation equal to 30% of their Allowed Claim, (vii) holders of Allowed Convenience Claims

will be paid 10% of their Allowed Unsecured Claim in Cash, (viii) holders of Allowed

Centennial Convenience Claims will be paid 3% of their Allowed Unsecured Claim in Cash,

(ix) holders of Insurance Claims will retain proceeds from any applicable Insurance Policy, and

(x) holders of Allowed Membership Interests will retain 100% of their Membership Interests.

The Plan effectuates a distribution of Cash currently held in the Debtors' Estates

and continues the liquidation of the non-Cash assets of the Estates remaining as of the Effective

Date through a continuing post-confirmation vehicle, defined in the Plan as Liquidating AHERF.

Any net litigation recoveries ultimately realized by Liquidating AHERF will be paid to secured

and unsecured creditors in accordance with the distribution scheme and adjustments embodied in

the Plan at certain defined intervals. At the time the Chapter 11 Trustee, at the direction of the

Creditors' Committee, determines to make a distribution of the first $50 million of net litigation

recoveries, holders of MBIA/PNC Claims will receive $15 million, holders of Centennial

Bondholders Claims will receive $12.5 million and holders of Allowed Unsecured Claims will

receive their Pro Rata share of the remaining $22.5 million. At the time the Chapter 11 Trustee,

at the direction of the Creditors' Committee, determines to make a distribution of the second $50

million of net litigation recoveries, holders of MBIA/PNC Claims will receive $15 million with

the remaining $35 million being distributed Pro Rata to holders of Allowed Unsecured Claims.

At the time the Chapter 11 Trustee, at the direction of the Creditors' Committee, determines to

make any subsequent distributions after the first $100 million has been recovered, holders of

MBIA/PNC Claims will receive 20% of all such distributions until such holders have been paid

$10 million and the remaining amounts will be distributed Pro Rata to holders of Allowed

Unsecured Claims.

## ARGUMENT
### THE PLAN MEETS THE REQUIREMENTS FOR
### CONFIRMATION UNDER SECTION 1129 OF THE
### BANKRUPTCY CODE AND THEREFORE SHOULD BE CONFIRMED

Section 1129 of the Bankruptcy Code sets forth the requirements for consolidation

of a plan of reorganization. Pursuant to Section 1129(a) of the Bankruptcy Code, a plan of

reorganization should be confirmed if:

> A. The plan complies with the applicable provisions of Title 11
> (Section 1129(a)(1));

B.  The plan proponents have complied with the applicable provisions of Title 11 (Section 1129(a)(2));

C.  The plan has been proposed in good faith and not by any means forbidden by law (Section 1129(a)(3));

D.  The plan proponents have disclosed to the court any expenses incurred in connection with the plan and such payments have been approved by, or are subject to the approval of, the court as reasonable (Section 1129(a)(4));

E.  The plan proponents have disclosed the identity, affiliations and compensation of individuals proposed to serve as officers and directors of the debtor after confirmation and the continuance in such offices by such individuals is consistent with the interests of creditors and equity interest holders and with public policy (Section 1129(a)(5));

F.  To the extent that the debtor is subject to the jurisdiction of any regulatory commission, any rate change provided in the plan has been approved by or is subject to the approval of such regulatory commission (Section 1129(a)(6));

G.  Each holder of a claim or interest in an impaired class has either accepted the plan or will receive or retain under the plan on account of such claim or interest property of value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 (Section 1129(a)(7));

H.  Each class of claims or interests has either accepted the plan or is not impaired under the plan (Section 1129(a)(8));

I.  The treatment of administrative expense and priority claims under the plan complies with the provisions of Section 1129(a)(9);

J.  If a class of claims is impaired under the plan, at lease one impaired class of claims has accepted the plan, determined without including the acceptances by any insiders holding claims in such class (Section 1129(a)(10));

K.  Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor (Section 1129(a)(11));

L.  The plan provides for payment on the effective date of all fees payable under 28 U.S.C. §1930 (Section 1129(a)(12)); and

M.  The plan provides for the continued payment of certain retiree benefits for the duration of the period that the debtor has obligated itself to provide such benefits (Section 1129(a)(13)).

11 U.S.C. §1129(a). As set forth below, the Plan complies fully with the requirements of Section 1129(a) of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

### A.    The Plan Meets the Requirements of Section 1129(a)(1) of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the "applicable provisions" of the Bankruptcy Code. The legislative history to Section 1129(a)(1) explains that this provision embodies and incorporates the requirements of Sections 1122 and 1123 of the Bankruptcy Code, governing the classification of claims and the contents of the plan, respectively. H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 126 (1978); see In re PWS Holding Corp. Brunos, Inc., Case No. 00-5042 and 00-5074, 2000 U.S. App. LEXIS 23393, at *52-53 (3d Cir. Sept. 18, 2000) ([t]his requires that the plan conform to the applicable provisions of Title 11); In re Johns-Manville Corp., 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), aff'd in part, 78 B.R. 407 (Bankr. S.D.N.Y. 1987), aff'd sub nom. Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Apex Oil Co., 118 B.R. 683, 700 (Bankr. E.D. Mo. 1990); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). As demonstrated below, the Plan complies fully with the requirements of both Sections 1122 and 1123 of the Bankruptcy Code, and therefore, satisfies Section 1129(a)(1) of the Bankruptcy Code.

1.    The Plan Satisfies the Classification Requirements of
Section 1122 Because the Claims of Each Class Are
Substantially Similar to the Other Claims of that Class

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim in

a particular class if such claim is substantially similar to the other claims of such class. 11

U.S.C. § 1122(a). Although the Bankruptcy Code does not define "substantially similar," these

words have generally been interpreted to mean similar in legal character to other claims against a

debtor's assets or to other interests in the debtor. See 5 Collier on Bankruptcy ¶ 1122.03, at

1122-7 (15th ed. 1993); In re Mcorp Financial Inc., 137 B.R. 219, 226 (Bankr. S.D. Tex.), appeal

dismissed, 139 B.R. 820 (S.D. Tex. 1992). Section 1122(a) does not require that all substantially

similar claims be placed in the same class, but rather that all claims within a class be

substantially similar to one another. See In re Jersey City Medical Center, 817 F.2d 1055, 1060-

61 (3d. Cir. 1987); Barnes v. Whelan (In re Barnes), 689 F.2d 193, 201 (D.C. Cir. 1982); In re

11,111, Inc., 117 B.R. 471 (Bankr. D. Minn. 1990); In re Greystone III Joint Venture, 102 B.R.

560 (Bankr. W.D. Tex. 1989). Courts are also afforded broad discretion in approving a plan

proponent's classification scheme, and may properly consider the specific facts of each case

when making such determination. See In re Jersey City Medical Center, 817 F.2d at 1060-61

("Congress intended to afford bankruptcy judges broad discretion [under Section 1122] to decide

the propriety of plans in light of the facts of each case"); Teamsters Nat'l Freight Indus.

Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 586 (6th Cir. 1986)

(noting "broad discretion" courts are given to determine proper classifications).

In the present case, the Plan's classification structure is proper and in accordance

with Section 1122(a) of the Bankruptcy Code. As provided in Section 1123(a)(1) of the

Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors

are not classified for the purposes of voting on or receiving distributions under the Plan. All such

claims are instead treated separately upon the terms set forth in Article 3 of the Plan. The Plan

segregates the various Claims against the Debtors into the following Classes: (1) a Class of

Priority Claims (Class 1); (2) a Class of General Secured Claims (Class 2); (3) a Class of Secured

Claims of holders of Centennial Bondholders Claims (Class 3); (4) a Class of Secured Claims of

holders of MBIA/PNC Claims (Class 4); (5) a Class of General Unsecured Claims (Class 5(A));

(6) a Class of Centennial Unsecured Claims (Class 5(B)); (7) a Class of Allowed Convenience

Claims (Class 6(A)); (8) a Class of Allowed Centennial Convenience Claims (Class 6(B)); (9) a

Class of Insurance Claims (Class 7); and (10) a Class of Allowed Membership Interests (Class

8). Under the Plan, Claims in Classes 1, 2, and 8 are unimpaired, and Claims in Classes 3, 4,

5(A), 5(B), 6(A), 6(B) and 7 are impaired.

This classification structure is proper as each Class under the Plan differs in legal

character or nature.[4] Furthermore, all Claims within each Class are substantially similar to the

other Claims in that Class. As set forth above, the Plan designates ten classes and subclasses of

Claims that provide for different treatment of the Claims. Claims within a class are treated

equally. Accordingly, the classification structure set forth in the Plan is proper, thereby satisfying

the requirements of Section 1122 of the Bankruptcy Code.

---

[4]    The Chapter 11 Trustee has filed a response to the objection of InPhyNet Contracting
Services, Inc., addressing the Plan's classification scheme in greater detail. That response
is incorporated in this Memorandum as if fully set forth herein.

2.    The Plan Meets the Requirements Set Forth In Section 1123(a)

Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements with which every Chapter 11 plan must comply. 11 U.S.C. § 1123(a)(1)-(7). As set forth in sequence below, the Plan complies fully with each such requirement.

a.    The Plan Designates Classes of Claims -- 11 U.S.C. § 1123(a)(1)

Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims, other than claims of a kind specified in Section 507(a)(1) (administrative expense claims), Section 507(a)(2) (claims arising during the 'gap' period in an involuntary case), and Section 507(a)(8) (tax claims). See 11 U.S.C. § 1123 (a)(1). Article 4 of the Plan designates ten Classes of Claims, other than the Administrative Priority and Priority Tax Claims specified in Sections 507(a)(1), (2), and (8) of the Bankruptcy Code which are classified under Article 3 of the Plan. The Plan therefore complies with Section 1123(a)(1) of the Bankruptcy Code.

b.    The Plan Specifies Unimpaired Classes -- 11 U.S.C. § 1123(a)(2)

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Here, the Chapter 11 Trustee has satisfied this requirement because Article 4 of the Plan specifies whether each Class of Claims is impaired or unimpaired under the Plan.

    c.    The Plan Adequately Specifies the Treatment
        of Impaired Classes -- 11 U.S.C. § 1123(a)(3)

Section 1123(a)(3) of the Bankruptcy Code requires that a Plan "specify the treatment of any class of claims or interests that is impaired under the Plan." 11 U.S.C. § 1123(a)(3). Here, the Chapter 11 Trustee has satisfied this requirement because Article 5 of the Plan specifies the treatment afforded to all Classes of Claims.

    d.    The Plan Provides for the Same Treatment of Claims
        Within the Same Class -- 11 U.S.C. §1123(a)(4)

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Article 5 of the Plan satisfies this requirement in that all holders of Claims within a particular class are receiving identical treatment under the Plan.

    e.    The Plan Provides Adequate Means for Its
        Implementation -- 11 U.S.C. § 1123(a)(5)

Section 1123(a)(5) of the Bankruptcy Code requires that a plan of reorganization "provide adequate means for its implementation" and lists certain examples, such as retention by the debtor of all or any part of the property of the estate; transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan; merger or consolidation of the debtor with one or more persons; amendment of debtor's charter; or cancellation or modification of any indenture or similar instrument. See 11 U.S.C. § 1123(a)(5). Articles 6 and 7 and the other provisions of the Plan provide adequate means for

its implementation. They include: (a) establishing Liquidating AHERF as a post-confirmation

vehicle to continue liquidating the non-Cash assets of the Estates remaining as of the Effective

Date, including the liquidation of significant pending Recovery Actions being pursued, and

resolving and administering Claims; (b) transferring all rights, titles, and interests to all Estate

Assets of the Debtors to Liquidating AHERF; (c) canceling the promissory notes, share

certificates, bonds and other instruments evidencing Claims against the Debtors, and

(d) discharging and releasing the obligations of the Debtors under any promissory notes, share

certificates, bonds and other instruments evidencing any Claim.

> f.    The Plan Provides for Required Charter
>        Provisions -- 11 U.S.C. § 1123(a)(6)

        With respect to corporate debtors, Section 1123(a)(6) of the Bankruptcy Code

requires that the Plan provide for the inclusion of provisions in the debtor's charter prohibiting

the issuance of certain nonvoting securities and the establishment of an appropriate distribution

of voting power as to the several classes of securities. See 11 U.S.C. § 1123(a)(6). This section

is inapplicable to the Plan because the Plan contemplates the liquidation of the Estates and it

does not provide for the issuance of any securities.

> g.    The Plan Contains Appropriate Provisions for the
>        Selection of Officers and Directors -- 11 U.S.C. § 1123(a)(7)

        Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain only

provisions that are consistent with the interests of creditors and with public policy with respect to

the manner of selection of any officer, director, or trustee. 11 U.S.C. §1123(a)(7). Here, the Plan

meets this requirement. Specifically, as of and following the Effective Date of the Plan, the

initial Bankruptcy Officers shall consist of the following for AHERF: (i) William J.
Scharffenberger - Sole Trustee and Chief Liquidating Officer and (ii) Charles P. Morrison -
Liquidation Officer and Secretary. The initial Bankruptcy Officers for AUHS, AUMP,
Centennial and AUH-East are: (i) Fred Chbosky - Sole Trustee and (ii) Charles P. Morrison -
Liquidation Officer and Secretary. The initial Bankruptcy Officer for Allegheny Health Services
Providers Insurance Company is Fred Chbosky, as Sole Director. The Bankruptcy Officers shall
also include Messrs. Scharffenberger, Morrison and Chbosky in their capacity as trustee, director
or officer of any directly or indirectly wholly owned subsidiary of AHERF as of and following
the Effective Date.

Thus, the provisions of the Plan respecting the election of officers and directors
(and any successors thereto) are consistent with the interests of creditors and public policy.
Thus, the Plan satisfies Section 1129(a)(7).

\* \* \*

In sum, as discussed seriatim above, the Plan satisfies all of the seven mandatory
plan requirements contained in Section 1123(a) of the Bankruptcy Code.

3.    The Permissive Provisions Contained in the
       Plan are Appropriate -- 11 U.S.C. § 1123(b)

       a.    General

Section 1123(b) of the Bankruptcy Code specifies certain permissive provisions
that can be included in a Chapter 11 plan. In this respect, the Plan contains certain of the
provisions specifically contemplated by Section 1123(b), including, among others, the

impairment and unimpairment of classes of allowed claims (Section 1123(b)(1)), and the

assumption or rejection of certain executory contracts and unexpired leases (Section 1123(b)(2)).

Other provisions of the Plan are permissible pursuant to Section 1123(b)(6) of the Bankruptcy

Code which permits a plan to include other provisions not inconsistent with the applicable

provisions of Title 11. These include the Bankruptcy Court's retention of jurisdiction as to

specified issues by the Court administering the Chapter 11 Cases, the substantive consolidation

of the Debtors' Estates, and certain discharge and exculpation provisions that are consistent with

the Bankruptcy Code. Set forth below is a description of certain permissive provisions of the

Plan.

      b.     Impairment or Unimpairment of Claims

      Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class

of claims, secured or unsecured, or interests." 11 U.S.C. § 1123(b)(1). As discussed above,

Articles 4 and 5 of the Plan designate certain classes as impaired and leave certain classes

unimpaired.

      c.     Executory Contracts and Unexpired Leases

      Section 1123(b)(2) permits a plan to "provide for the assumption, rejection or

assignment of any executory contract or unexpired lease of the debtor not previously rejected."

11 U.S.C. § 1123(b)(2). Article 9 of the Plan provides for the rejection on the Confirmation Date

of any executory contracts or unexpired leases (other than Insurance Policies) which (1) have not

expired by their own terms on or prior to the Confirmation Date, (2) have not been assumed and

assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation

Date, or (3) are not subject of a motion to assume or reject the same which is pending at the time

of the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall

constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy

Code. Therefore, the Plan complies with Section 1123(b)(2).

        d.      Compliance with Section 1123(b)(5)

           (i)      Retention of Jurisdiction Post-Confirmation

Pursuant to Article 12 of the Plan, this Court shall have exclusive jurisdiction of

all matters arising out of, and related to, the Chapter 11 Cases, the Plan and Liquidating AHERF

pursuant to, and for the purpose of, Sections 105(a) and 1142 of the Bankruptcy Code.[5]

---

[5]    Such jurisdiction is retained as is legally permissible, including, but not limited to, the following purposes:

    (a)    to hear and determine the Recovery Actions or matters related thereunder to enable the Chapter 11 Trustee and the Creditors' Committee to prosecute the Recovery Actions;

    (b)    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims or to liquidate or estimate any Disputed Claim, provided that only the Chapter 11 Trustee, and the Creditors' Committee may file objections to Claims;

    (c)    to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses, pursuant to Section 3.2(b) hereof;

    (d)    to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

    (e)    to enforce the provisions of the Plan subject to the terms thereof;

    (f)    to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, Plan Documents or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

    (g)    to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

(continued...)

The retention of jurisdiction contained in the Plan is consistent with the Bankruptcy Code. See e.g., 11 U.S.C. § 1142; In re Dilbert's Quality Supermarkets, Inc., 368 F.2d 922, 924 (2d Cir. 1966) (Act case) ("The contention that adoption of the reorganization plan ousted the court of jurisdiction must be rejected. The reorganization Court may retain jurisdiction of the debtor until the final decree."); Official Unsecured Creditors' Committee of Erie Hilton Joint Venture v. Siskind (In re Erie Hilton Joint Venture), 137 B.R. 165, 170 (Bankr. W.D. Pa. 1992) ("The mere fact that a Chapter 11 Plan has been confirmed is not sufficient to divest us of jurisdiction."); Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.), 201 B.R. 376, 378 (Bankr. E.D. Pa. 1996) ("§ 1142(b) specifically confers subject matter jurisdiction on bankruptcy courts to resolve postconfirmation issues necessary to execute the confirmation plan."); Findley v. Blinken (In re Joint Eastern & Southern Dist.'s Asbestos Litig., 120 B.R. 648, 657 (E. & S.D.N.Y. 1991) (The Second Circuit has rejected the "contention that the adoption of [a] reorganization plan oust[s] [bankruptcy] court of jurisdiction.") (citation omitted); In re Johns-Manville Corp., 97 B.R. 174, 180 (Bankr. S.D.N.Y. 1989) ("Courts have relied on § 1142(b) to supply a basis for general post-confirmation jurisdiction."). Accordingly, the continuing jurisdiction of the Bankruptcy Court contemplated in Article 12 of the Plan is appropriate and complies with applicable law.

---

[5](...continued)

  (h)  to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and

  (i)  to determine such other matters as may be provided for in the Confirmation Order.

(ii)    Substantive Consolidation

The AHERF Lenders objected to confirmation of the Plan primarily on the ground that the substantive consolidation of the Debtors' Estates is unwarranted in these Chapter 11 Cases. The Chapter 11 Trustee has filed a separate response to the AHERF Lenders' objection, and such response is incorporated in this Memorandum as if fully set forth herein.

e.    Injunction and Exculpation Provisions

An integral provision of the Plan is the injunction and exculpation provisions contained in Article 10 and Section 14.2 of the Plan. Generally, except as otherwise provided in the Plan, the Plan provides that all Persons are permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively, or otherwise against the Debtors, their Estates or the Chapter 11 Trustee, on account of or representing any Claims, debts, rights, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan. Specifically, the injunction is an integral part of the transactions implemented under the Plan and is given in consideration for and in connection with the treatment afforded to creditors. Further, in Section 14.2 of the Plan, neither the Debtors, the Chapter 11 Trustee, the Creditors' Committee (including its individual members), the Bankruptcy Officers or their advisors, agents or Professionals shall have or incur any liability to any holder of a claim or any fiduciary for such holder for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful

misconduct or gross negligence, and, in all respects, the Debtors, the Chapter 11 Trustee, or

Creditors' Committee and each of their respective members, officers, directors, employees,

advisors, agents and Professionals shall be entitled to rely upon the advice of counsel with

respect to their duties and responsibilities under the Plan; provided, however, that nothing in the

Plan shall, or shall be deemed to, release or exculpate such parties with respect to their respective

obligations or covenants arising pursuant to this Plan. The Court's granting of injunctions and

exculpations are appropriate under such circumstances.

Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). Bankruptcy courts are empowered under Section 105(a) of the

Bankruptcy Code to issue permanent injunctions in favor of non-debtors in a variety of contexts.

See S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),

960 F.2d 285, 293 (2d Cir. 1992) cert. dismissed, 506 U.S. 1088 (1993) (bankruptcy court has

jurisdiction to approve the release and injunction provisions of the plan); In re Johns-Manville

Corp., 843 F.2d at 636; see also Menard-Sanford v. Mabey (In re A.H. Robins, Co.), 880 F.2d

694, 701-02 (4th Cir. 1989) (release and permanent injunction in favor of insurance company,

executives and law firms), cert. denied, 493 U.S. 959 (1989).

The Third Circuit has adopted these principles by analyzing Section 524(e) of the

Bankruptcy Code. Section 524(e) provides that "[e]xcept as provided in subsection (a)(3) of this

section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the

property of any other entity for, such debt." 11 U.S.C. § 524(e). In PWS Holding Corporation

Brunos, Inc., the Third Circuit held that a release, identical to Section 14.2 of the Plan, which

released official members of the official committee of unsecured creditors and professionals who

provided services after the petition date from certain liability for their work in the reorganization

did not violate Section 524(e) of the Bankruptcy Code. See PWS Holding Corp. Brunos, Inc.,

Nos. 00-5042 and 00-5074, 2000 U.S. App. LEXIS 23393, at *23 (3d Cir. Mar. 10, 2000). The

court stated that this provision, which is common in Chapter 11 plans, did not affect the liability

of these parties but rather expressed the standard of liability for such persons and entities under

the Bankruptcy Code. See id. at *58. The court reasoned that Section 524(e), "by its terms, only

provides that a discharge of the debtor does not affect the liability of non-debtors on claims by

third parties against them for the debt discharged in bankruptcy." Id. at *60. However, the

provision did not affect the liability of third parties because members of the committee and

professionals who provided services to the Debtors remained liable for willful misconduct or

gross negligence. Id. at 61. The court stated that this is the appropriate standard for liability

under Section 1103(c)[6] which applies to actions against committee members and professionals

that provided services to the committee if they were sued for their participation in the

reorganization. See id. at *63. Therefore, this release clause did not affect the liability of

another entity on a debt of the debtor within the meaning of Section 524(e) and, therefore, was

appropriate.

　　　　Similarly, the exculpation clause contained in Section 14.2 of the Plan sets forth

the appropriate standard of liability for the Debtors, the Chapter 11 Trustee, the Creditors'

---

[6]     Section 1103(c) of the Bankruptcy Code has been interpreted to imply both a fiduciary
duty to committee constituents and a limited grant of immunity to committee members.
See PWS Holding Corp. Bruno's Inc., 2000 U.S. App. LEXIS, at *62. This immunity
covers actions within the scope of the committee members' duties, but limits liability of a
committee for willful or ultra vires misconduct. See id. at *63.

Committee (including its individual members), the Bankruptcy Officers, and their advisors,

agents and Professionals under the Bankruptcy Code. Therefore, the exculpation provision is

appropriate. Accordingly, the injunction and exculpation provisions contained in Article 10 and

Section 14.2 of the Plan should be approved.

### B.     The Plan Proponent Has Complied with the Provisions of Title 11 as Required by Section 1129(a)(2)

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent

"compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). The legislative

history of Section 1129(a)(2) of the Bankruptcy Code explains that this provision embodies the

disclosure and solicitation requirements set forth under the Bankruptcy Code and Bankruptcy

Rules. H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d

Sess. 126 (1978); Johns-Manville Corp., 68 B.R. at 630; Toy & Sports Warehouse, 37 B.R. at

149.

As set forth above, the Chapter 11 Trustee has fully complied with the provisions

of Sections 1125 and 1126 of the Bankruptcy Code and with Bankruptcy Rules 3017 and 3018

regarding disclosure and notice. In particular, on August 15, 2000, this Court entered the

Disclosure Statement Approval Order, specifically finding, after a duly noticed hearing, that the

Disclosure Statement contained "adequate information" within the meaning of Section

1125(a)(1) of the Bankruptcy Code. Indeed, the information contained in the Disclosure

Statement was the subject of extensive negotiation among the various constituencies herein,

including the Chapter 11 Trustee, the Creditors' Committee, PNC, MBIA and BNY.

Moreover, pursuant to the Disclosure Statement Approval Order, the Disclosure Statement with all exhibits annexed thereto, the Plan, appropriate ballots, and the Confirmation Hearing Notice were timely distributed to all parties designated therein. The Confirmation Hearing Notice (including the Voting and Objection Deadlines) was timely published in The Pittsburgh Post-Gazette, The Philadelphia Inquirer-Daily News, The Pittsburgh Allegheny County Legal Journal, The New York Times (national edition) and The Wall Street Journal (national edition). Thus, the Chapter 11 Trustee has complied with the provisions of Title 11, and in particular the provisions of Sections 1125 and 1126. Accordingly, the Chapter 11 Trustee has satisfied the requirements of Section 1129(a)(2) of the Bankruptcy Code.

### C.    The Plan Was Proposed in Good Faith -- 11 U.S.C. § 1129 (a)(3)

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." See 11 U.S.C. § 1129(a)(3). Although not defined in the Bankruptcy Code, courts have held that the good faith requirement of Section 1129(a)(3) is satisfied when "the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success." Corestates Bank, N.A. v. United Chemical Tech., Inc., 202 B.R. 33, 57 (E.D. Pa. 1996); In re Century Glove, Inc., No. 90-400-SLR, 1993 U.S. Dist. LEXIS 2286, *15 (D. Del. Feb. 10, 1993) (citing In re Sun Country Development, Inc., 764 F.2d 406, 408 (5th Cir. 1985). In Century Glove, supra, the United States District Court for the District of Delaware also noted that the "requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start." Id. See also In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) ("Sound Radio I"),

aff'd in part, remanded in part, 103 B.R. 521 (D.N.J. 1989) ("Sound Radio II"), aff'd, 908 F.2d

964 (3d Cir. 1990) ; In re PWS Holding Corp. Bruno's Inc., 2000 U.S. App. LEXIS, at *50

("[f]or purposes of determining good faith under section 1129(a)(3). . . the important point of

inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy Code.").

Here, the Chapter 11 Trustee's good faith in proposing this Plan is apparent.  The

Plan has been proposed with the honest intent to liquidate the remaining assets of the Debtors'

Estates, distribute the Estate Assets and resolve and administer Claims to augment the potential

recovery of creditors and is likely to achieve that goal.  The Plan also sets aside sufficient funds

in connection with the creation of Liquidating AHERF as a post-Effective Date vehicle to pursue

lawsuits already commenced, or to be commenced, against those responsible for AHERF's

demise.  Thus, it is likely that recoveries made, whether through a negotiated settlement or

judgement, can be distributed at intervals to secured and unsecured creditors after the initial

distribution on the Effective Date.  Thus, the Plan satisfies the "good faith" requirement of

Section 1129(a)(3) of the Bankruptcy Code.

### D.    The Plan Provides for Court Approval of Payment for Services and Expenses -- 11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services
> or for costs and expenses in or in connection with the case, or in
> connection with the plan and incident to the case, has been approved by, or
> is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). This section has been construed to require that all payments of professional fees which are made from estate assets be subject to bankruptcy court review and approval as to their reasonableness. See In re Johns-Manville Corp., 68 B.R. at 632.

In the instant case, any agreement by the Debtors to retain professional persons to provide services to the Debtors in or in connection with their Chapter 11 cases has been disclosed to the Court in the Disclosure Statement or in applications to employ such professionals. The Creditors' Committee retained Jones, Day, Reavis & Pogue as counsel, Campbell & Levine, LLC as Pittsburgh co-counsel and Zolfo Cooper LLC as financial consultants. The Chapter 11 Trustee retained Mr. Fred Chbosky, an experienced senior financial executive with bankruptcy and turnaround experience, Proskauer Rose LLP, as legal counsel, and the Pittsburgh firm of Sable, Pusateri, Rosen, Gordon & Adams, LLC. Subsequently, the Chapter 11 Trustee retained Donlin, Recano & Company, Inc. as claims reconciliation consultant and voting agent and DRX Distribution Management, Inc. as disbursing agent. As provided for in the Retention Orders, all fees and expenses incurred by these professionals are to be compensated, without further order, upon the submission of reasonably detailed invoices to the Debtors, which will be subject to final approval by this Court under Section 330 of the Bankruptcy Code.

Pursuant to Section 3.2 of the Plan, all entities, including, without limitation, the individual members of the Creditors' Committee, seeking an award by the Bankruptcy Court of professional fees, including the fees of the Chapter 11 Trustee, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date (a) shall file their respective final applications for allowances of compensation for services

rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Chapter 11 Trustee and the Creditors' Committee. All fees and expenses of professionals for services rendered in connection with the Chapter 11 Cases and Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by the Chapter 11 Trustee from the assets of Liquidating AHERF upon receipt of reasonably detailed invoices therefor by the Chapter 11 Trustee and Creditors' Committee, for such amounts and on such terms as such professional and the Chapter 11 Trustee with the consent of the Creditors' Committee, may agree to, without the need for the Bankruptcy Court authorization or entry of a Final Order. Pursuant to Section 12.1 of the Plan, this Court will retain jurisdiction to hear and determine any and all applications by professionals for compensation and reimbursement of expenses incurred through and including the Confirmation Date.

The foregoing procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Chapter 11 Trustee satisfies the objectives of Section 1129(a)(4) of the Bankruptcy Code. Accordingly, the Plan complies with the requirements of Section 1129(a)(4) of the Bankruptcy Code.

E.    **The Debtors Have Disclosed All Necessary Information**
      **Regarding Directors, Officers and Insiders - 11 U.S.C. § 1129(a)(5)**

Section 1129(a)(5) of the Bankruptcy Code requires that the Debtors disclose the

identity and affiliations of the proposed officers and directors of the Reorganized Debtors, that

the appointment or continuance of such officers and directors be consistent with the interests of

the creditors and that there be disclosure of the identity and compensation of any insiders to be

retained or employed by the reorganized Debtors. See 11 U.S.C. § 1129(a)(5). Here, the Plan

satisfies this requirement. On October 11, 2000, the Chapter 11 Trustee filed, among other

things, the Designation of Bankruptcy Officers, which provided that, as of and following the

Effective Date of the Plan, the initial Bankruptcy Officers shall consist of the following for

AHERF: (i) William J. Scharffenberger - Sole Trustee and Chief Liquidating Officer and

(ii) Charles P. Morrison - Liquidation Officer and Secretary. The initial Bankruptcy Officers for

AUHS, AUMP, Centennial and AUH-East are: (i) Fred Chbosky - Sole Trustee and (ii) Charles

P. Morrison - Liquidation Officer and Secretary. The initial Bankruptcy Officer for Allegheny

Health Services Providers Insurance Company is Fred Chbosky, as Sole Director. The

Bankruptcy Officers shall also include Messrs. Scharffenberger, Morrison and Chbosky in their

capacity as trustee, director or officer of any directly or indirectly wholly owned subsidiary of

AHERF as of and following the Effective Date. Accordingly, the requirements of Section

1129(a)(5) of the Bankruptcy Code are satisfied.

**F.    The Plan Does Not Contain Any Rate**
**Changes Subject to the Jurisdiction of**
**Any Governmental Regulatory Commission**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the Reorganized Debtors in the operation of their business approve any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval. See 11 U.S.C. § 1129(a)(6). Section 1129(a)(6), however, is inapplicable to these Chapter 11 Cases, as the Debtors have no rates subject to the jurisdiction of any regulatory commission. Accordingly, the requirement of Section 1129(a)(6) is satisfied.

**G.    The Plan is in the "Best Interest" of**
**Creditors -- 11 U.S.C. § 1129(a)(7)**

Section 1129(a)(7) of the Bankruptcy Code, the so-called "best interest" test, requires that any holder of a claim that is impaired by the plan and that has not accepted the plan:

> receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A)(ii).

The best interest test focuses on individual dissenting creditors rather than classes of claims. See In re Toy & Sports Warehouse, Inc., 37 B.R. at 150. Under the best interest test, the Court must find that each dissenting creditor will receive or retain value that is not less than the amount such holder would receive if the debtor was liquidated. See In re Johns-Manville Corp., 843 F.2d at 649 (presentation of liquidation analysis showing lesser probable recovery in

Chapter 7 satisfies Section 1129(a)(7)); In re Drexel Burnham Lambert Group, Inc., 138 B.R. at

761; In re Victory Constr. Co., Inc., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984). In essence, the

best interest test contemplates a comparison of distributions under a proposed plan with those

that would be realized in a hypothetical Chapter 7 liquidation. See e.g., In re Allegheny Int'l,

Inc., 118 B.R. 282, 317 (Bankr. W.D. Pa. 1990).

    The Plan is the best plan that can be proposed and serves the best interest of the

Debtors' creditors and other parties-in-interests. If a Chapter 7 conversion resulted in individual

Chapter 7 cases for each Debtor, the unsecured creditors of each Debtor would not receive any

payment whatsoever until all amounts due to more senior classes, including the following, were

paid in full: (a) secured creditors (to the extent of the value of their collateral), (b) Chapter 7

administrative expense creditors, (c) Chapter 11 administrative expense creditors and (d) all

other priority creditors.

    A Chapter 7 liquidation would result in substantially reduced recoveries -- at a

much later point in time -- than the recoveries creditors are expected to receive pursuant to the

Plan. Substantial administrative expenses would result from the appointment of a Chapter 7

trustee or trustees and additional professionals. Additional expenses and Claims, some of which

would be entitled to priority, would be generated in connection with a resolution of all

outstanding Claims, issues and matters that will be addressed during the Case and are resolved

under the Plan. The Chapter 7 trustee or trustees might be required to determine, or to seek a

determination, as to each Debtors' allocable interest in assets and liabilities in the Estates. The

pre-petition inter-company claims that would likely be asserted by each Estate against the others

would likely be substantial. Furthermore, it would be inefficient for a Chapter 7 trustee to begin

pursuing the Recovery Actions at this time after the Chapter 11 Trustee and the Creditors'

Committee have expended considerable resources conducting discovery and filing lawsuits

against such persons responsible for AHERF's financial demise.

Thus, the Plan satisfies the "best interest" test contained in Section 1129(a)(7) of

the Bankruptcy Code.

### H.     All Impaired Classes of Claims Have Accepted the Plan -- 11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires, with respect to each class of

claims or interests, that (a) such class has accepted the Plan, or (b) such class is not impaired

under the Plan. See 11 U.S.C. §1129(a)(8). Pursuant to the provisions of the Bankruptcy Code,

only holders of allowed claims or in classes of claims that are impaired and retain or receive

property under the Plan are entitled to vote to accept or reject a proposed Chapter 11 plan. Under

the Bankruptcy Code, a class is "impaired" unless the legal, equitable and contractual rights to

which the holders of claims in such class are entitled are not modified. Classes of claims in

which the holders of claims are unimpaired under a Chapter 11 plan are deemed to have accepted

the plan and are not entitled to vote to accept or reject the plan. Classes of claims that are not

entitled to receive or retain any property under a plan on account of such claim are deemed to

have rejected the plan and need not vote.

Under the Plan, Classes 1, 2, and 8 are unimpaired, and are thus conclusively

deemed to have accepted the Plan. Furthermore, as set forth in the Ballot Declaration, all

impaired classes under the Plan -- Classes 3, 4, 5(A), 5(B), 6(A), and 6(B) -- have voted

overwhelmingly to accept the Plan. Holders of Insurance Claims (Class 7) do not receive or retain any property under the Plan, and, therefore, are deemed to reject the Plan. As detailed below, the Plan does not discriminate unfairly and is fair and equitable with respect to holders of Insurance Claims. Accordingly, the Plan meets the requirements of Section 1129(a)(8) and 1129(b).

### I.     The Plan Provides for Payment in Full of All Allowed Priority Claims -- 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) of the Bankruptcy Code generally requires that persons holding claims entitled to priority under Section 507(a) of the Bankruptcy Code receive specified cash payments under a plan unless the holder of a particular claim agrees to a different treatment thereof. Specifically, Section 1129(a)(9) of the Bankruptcy Code provides that:

1. holders of claims under Section 507(a)(1) or 507(a)(2)[7] must receive cash on the effective date of the plan equal to the allowed amount of such claim;

2. holders of such claims entitled to priority under Sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) must receive cash on the effective date of the plan equal to the allowed amount of such claim or deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim;[8]

---

[7]    Claims having priority under Section 507(a)(1) of the Bankruptcy Code are administrative expenses allowed under Section 503(b) of the Bankruptcy Code. Claims having priority under Section 507(a)(2) of the Bankruptcy Code are certain unsecured claims arising in an involuntary case, and therefore, do not exist in Chapter 11 cases. 11 U.S.C. §§ 507(a)(1) and (2).

[8]    Claims entitled to priority under Section 507(a)(3) of the Bankruptcy Code are certain claims for wages, salaries, and commissions earned within ninety (90) days of the filing of the petition, to the extent of $4,300 per claimant. Claims entitled to priority under Section 507(a)(4) of the Bankruptcy Code are certain claims for contributions to

(continued...)

3.  holders of tax claims entitled to priority under 507(a)(8) must receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claims.[9]

11 U.S.C. §1129(a)(9).

In accordance with Section 1129(a)(9) of the Bankruptcy Code, Section 3.2 of the Plan provides that, subject to certain additional requirements for professionals and certain other entities set forth below, the Chapter 11 Trustee shall pay to each holder of an Allowed Administrative Expense Claim, on account of its Administrative Claim in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors pursuant to the normal business terms between the parties, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the holder of such Administrative Expense Claim and the Chapter 11 Trustee and the Creditors' Committee. Such Administrative Expense Claims shall include undisputed costs incurred in the operation of the Debtors' business after the Petition Date and fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

---

[8](...continued)
employee benefits plans arising from services rendered within one hundred eighty (180) days of the filing of the petition within specified dollar limitations. Claims entitled to priority under Section 507(a)(5) of the Bankruptcy Code are certain claims for deposits on consumer goods. Claims entitled to priority under Section 507(a)(7) of the Bankruptcy Code are claims of a spouse, former spouse or child of a debtor for alimony or child support and do not apply to the Plan. 11 U.S.C. § 503(a)(3), (4), (5), (6) and (7).

[9]  Claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code are certain tax claims of governmental units.

The Plan also satisfies the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of tax claims having priority under Section 507(a)(8) of the Bankruptcy Code. Under Section 3.3 of the Plan, each holder of an Allowed Priority Tax Claim shall be paid (a) in full, in Cash, on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced or (b) upon such other terms as may be agreed to between the Chapter 11 Trustee and any holder of an Allowed Priority Tax Claim.

In accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, Section 5.1 of the Plan provides that each holder of an Allowed Priority Claim (i.e., claims entitled to priority under Sections 507(a)(2) - (a)(7)) shall be entitled to receive Cash in an amount equal to such Allowed Priority Claim on the later of the Effective date and the date such Priority Claim becomes an Allowed Priority Claim, or as soon thereafter is practicable, unless the holder of an Allowed Priority Claim and the Chapter 11 Trustee with the consent of the Creditors' Committee, agree to a different treatment thereof.

Based on the foregoing, the Plan complies with the requirements of Section 1129(a)(9) of the Bankruptcy Code.

J.    **The Plan has Been Accepted by Each Impaired Class that Was Entitled To Vote -- 11 U.S.C. § 1129(a)(10)**

Section 1129(a)(10) of the Bankruptcy Code requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." In the instant

case, as detailed in the Ballot Declaration, all impaired Classes of Claims entitled to vote voted

to accept the Plan, without including any acceptance of the Plan by any insiders. Accordingly,

Section 1129(a)(10) of the Bankruptcy Code is satisfied.

### K.    The Plan is Not Likely to be Followed by Liquidation or the Need for Further Financial Reorganization -- 11 U.S.C. § 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code requires the Court to find that the

Plan is "feasible" as a condition precedent to confirmation. Specifically, the Court must

determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). As demonstrated below, the Plan is feasible within the meaning of

Section 1129(a)(11).

The feasibility test requires the court to determine whether a plan is workable and

has a reasonable likelihood of success. See Texaco, 84 B.R. at 910 (citing In re Johns-Manville

Corp., 68 B.R. at 635). To establish that a plan is feasible, it is not necessary that success be

guaranteed. Rather, it need only be shown that there is a "reasonable assurance that the Debtors

will remain commercially viable for a reasonable time." Sound Radio II, 103 B.R. 521, 523

(D.N.J. 1989); see also Corestates Bank, N.A. v. United Chemical Tech., Inc., 202 B.R. 33, 45

(E.D. Pa. 1996), citing, 5 Collier on Bankruptcy, 1129.02, at 1129-53 (15th ed. 1993) ("It is not

necessary that success be guaranteed, but only that the plan present a workable scheme,

organization, and operation from which there may be a reasonable expectation of success").

Courts have held that "[u]nder § 1129(a)(11), all that is required is a 'reasonable' prospect for financial stability and success." Sound Radio, II., 103 B.R. at 524; Kane v. Johns-Manville Corp., 843 F.2d at 649 ("As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

A key element of feasibility is whether there exists the reasonable probability that the provisions of the plan can be performed. Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson), 767 F.2d 417, 420 (8th Cir. 1985) ("the feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . . The test is whether the things which are to be done after Confirmation can be done as a practical matter. . . ." (citing Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman), 585 F.2d 1171, 1179 (2d Cir. 1978)). The purpose of the feasibility test is to protect against wholly speculative plans:

> The purpose of Section 1129(a)(11) is to prevent Confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after Confirmation.

5 Collier on Bankruptcy, 1129.02[11], at 1129-61 (15th ed. 1995). Just as speculative prospects of success, however, cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat consummation on feasibility grounds because a guarantee of the future is not required. See U.S. Truck Co., 47 B.R. at 944.

In the present case, the Plan satisfies the applicable standards of feasibility. The Chief Administrative Officer has analyzed AHERF's ability to meet its obligations under the Plan and estimates that approximately $100 million of Cash will be available for distribution to secured and unsecured creditors upon the occurrence of the Effective Date after payment or

satisfaction of all Administrative Expense, Priority Tax and Priority Claims. The Debtors have

obtained Cash from various sources during the pendency of these Chapter 11 Cases, including

proceeds from the sale of the Philadelphia-area assets to Tenet and the West Penn Transaction,

collection of accounts receivable, recovery of life insurance premiums paid on behalf of

executives, the settlement of various preference causes of actions against vendors, the liquidation

of the rabbi trust plan, and the Tenet cure reserve escrow. This amount is projected to be

sufficient to meet all Effective Date Cash funding obligations under Articles 3 and 5 and Section

6.9 of the Plan. In addition, the Debtors expect to receive proceeds from the settlement with

participants of the Aetna Deferred Compensation Plan, the settlement with the Philadelphia

Healthcare Trust and other transactions that will provide additional funding for the Liquidation

Expense Reserve Account. Accordingly, the Plan is feasible under Section 1129(a)(11) of the

Bankruptcy Code.

### L.    All Statutory Fees Will Be Paid -- 11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) of the Code requires the payment of all fees payable under 28

U.S.C. § 1930. See 11 U.S.C. § 1129(a)(12). Section 14.13 of the Plan requires that Liquidating

AHERF shall be responsible for the payment of any post-confirmation fees due pursuant to 28

U.S.C. § 1930(a)(6). Thus, the Plan satisfies the requirements of Section 1129(a)(12).

### M.    The Plan Provides for the Continuance of
### Retiree Benefit Obligations -- 11 U.S.C. § 1129(a)(13)

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation of retiree benefits at levels established pursuant to Section 1114 of the Bankruptcy

Code. Section 9.4 of the Plan provides that payment of any Retiree Benefits shall be continued solely to the extent, if any, and for the duration of the period the Debtors are contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtors under applicable law. Accordingly, Section 1129(a)(13) of the Bankruptcy Code is therefore satisfied.

### N.    Cramdown Provisions are Inapplicable -- 11 U.S.C. § 1129(b)

Section 1129(b) of the Bankruptcy Code, the so-called "cramdown" provisions, allow for non-consensual confirmation of a plan in circumstances where there is a rejecting class of claims. In the instant case, holders of Insurance Claims (Class 7) do not receive or retain any property on their claims and, therefore, are deemed to reject the Plan. The Plan is fair and equitable and does not discriminate unfairly against holders of Insurance Claims. Each holder of an Insurance Claim shall retain all proceeds derived from any applicable Insurance Policy, and to the extent that a Claim that has been identified by the Chapter 11 Trustee as an Insurance Claim is not covered in whole or in part by insurance, it will be treated as an Allowed General Unsecured Claim or an Allowed Centennial Unsecured Claim, as the case may be. Therefore, the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Insurance Claims (Class 7).

### O.    Only One Plan is Being Confirmed -- 11 U.S.C. §1129(c)

Section 1129(c) of the Bankruptcy Code provides that a court may confirm only one plan. See 11 U.S.C. § 1129(c). In the instant case, the Plan is the only plan that has been proposed. Accordingly, Section 1129(c) is satisfied.

P.    **The Principal Purpose of the Plan is not Tax Avoidance
or Avoidance of Securities Laws -- 11 U.S.C. §1129(d)**

Section 1129(d) of the Bankruptcy Code provides that the court may not confirm a plan if the principle purpose of the plan is the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933. U.S.C. § 1129(d). As noted above, the Plan has been proposed with the honest intent to liquidate the remaining assets of the Debtors Estates, distribute the Estate Assets and resolve and administer Claims to augment the potential recovery of creditors. Moreover, no party-in-interest that is a governmental unit has requested that the Plan not be confirmed on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. Accordingly, Section 1129(d) of the Bankruptcy Code is satisfied.

* * *

Having satisfied all of the applicable requirements for confirmation under Section 1129(a) of the Bankruptcy Code, the Chapter 11 Trustee respectfully submits that the Plan should be confirmed in all respects.

## CONCLUSION

For the reasons, and based on the authorities and evidence presented above, and as will be further demonstrated at the Confirmation Hearing, the Chapter 11 Trustee submits that the Plan satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed. Accordingly, the Chapter 11 Trustee respectfully requests that the Court enter an order (a) confirming the Plan, and (b) granting the Chapter 11 Trustee such other and further relief as is just and appropriate.

Dated: Pittsburgh, Pennsylvania
     December 5, 2000

                  PROSKAUER ROSE LLP

                  By: _____
                     Alan B. Hyman (AH 6655)
                     Jeffrey W. Levitan (JL 6155)
                     Michael Foreman (MF 5802)
                     1585 Broadway
                     New York, New York  10036
                     (212) 969-3000

                     -and-

                  **SABLE, PUSATERI, ROSEN, GORDON & ADAMS, LLC**

                     Robert G. Sable, Esq. (PA I.D. No. 00964)
                     Mark E. Freedlander, Esq. (PA I.D. No. 70593)
                     Frick Building, 7th Floor
                     Pittsburgh, PA  15219
                     (412) 471-4996

                     Attorneys for the Chapter 11 Trustee

TAB 281

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:
ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,
    Case No. 98-25773
ALLEGHENY UNIVERSITY MEDICAL PRACTICES
    Case No. 98-25774
ALLEGHENY HOSPITALS, CENTENNIAL
    Case No. 98-25775
ALLEGHENY UNIVERSITY HOSPITAL-EAST
    Case No. 98-25776
ALLEGHENY UNIVERSITY OF THE HEALTH SCIENCES
    Case No. 98-25777

Case Nos. 98-25773 MBM through
98-25777 MBM inclusive

Chapter 11

Consolidated for Administration at
98-25773 MBM

```
9825773 0051051-00    J0133A01    S#0001559
MBIA INSURANCE CORP
ATTN: KARLEEN STRAYER
HEALTHCARE AND POOL UNIT
113 KING ST
ARMONK          NY 10504
```

## NOTICE OF CONFIRMATION AND EFFECTIVENESS OF PLAN

PLEASE TAKE NOTICE, that on December 14, 2000, the United States Bankruptcy Court for the Western District of Pennsylvania entered an order (the "Confirmation Order") confirming the Debtors' Second Amended Consolidated Liquidating Plan of Reorganization dated December 5, 2000 (the "Plan") of the above-captioned debtors (collectively, the "Debtors")

PLEASE TAKE FURTHER NOTICE, that the Effective Date of the Plan, as defined therein, occurred on December 26, 2000

PLEASE TAKE FURTHER NOTICE, that the Confirmation Order is available for inspection in the Office of the Clerk of the United States Bankruptcy Court located at the United States Bankruptcy Court for the Western District of Pennsylvania, 600 Grant Street, Pittsburgh, Pennsylvania 15222

PLEASE TAKE FURTHER NOTICE, that pursuant to the Plan, the automatic stay provided for in the Debtors' Chapter 11 cases under Section 362 of the Bankruptcy Code and in existence on the date of the confirmation of the Plan is dissolved as of the Effective Date The injunction imposed pursuant to the Bankruptcy Court's March 31, 1999 order staying all actions against non-debtors and actions that may implicate the Debtors' Executive Protection Policies (as defined in the Disclosure Statement) shall remain in effect

Dated: January 12, 2001

PROSKAUER ROSE LLP

By: /s/ Alan B. Hyman
Alan B. Hyman                    - and -
Jeffrey W. Levitan
Michael E Foreman
1585 Broadway
New York, New York 10036
(212) 969-3000

MCGUIRE WOODS LLP

Robert G. Sable
Mark E Freedlander
Frick Building 7th Floor
Pittsburgh, PA 15219
(412) 471-4996

Attorneys for the Chapter 11 Trustee

Form F0281

MBIA          029771