IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION AND RESEARCH
FOUNDATION,

                                Plaintiff,

                -against-

PRICEWATERHOUSECOOPERS LLP,

                                Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

REPLY MEMORANDUM IN SUPPORT OF PwC'S MOTION
TO PRECLUDE CERTAIN IRRELEVANT AND UNFOUNDED TESTIMONY
PROFFERED BY THE COMMITTEE'S CAUSATION EXPERTS

PricewaterhouseCoopers LLP ("PwC") submits this reply memorandum in

support of its motion to preclude certain testimony proffered by the causation experts of

the Official Committee of Unsecured Creditors of Allegheny Health, Education and

Research Foundation (the "Committee"): (1) James R. Schwartz; (2) Thomas W.

Singleton; (3) R. Bruce Den Uyl; and (4) Steven B. Kite.

**Preliminary Statement**

In its opening brief, PwC demonstrated that testimony from these four

expert witnesses as to how a "reasonable" board or "reasonable" creditors would be

expected or "required" to act, if confronted with the Committee's hypothetical

"corrected" financial statements, is not relevant to any issue in the case. Given the

AHERF Board's undisputed history of conduct far short of that expected of a reasonable

board, the only possible effect of testimony about an abstract "reasonable" board (or

"reasonable" creditors) would be confusion and prejudice. (*See* Memorandum in Support of PwC's Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by the Committee's Causation Experts at 11-12, hereinafter "PwC Br.")

In its opposition, the Committee offers no argument that such testimony would be relevant, or that it would not be confusing and prejudicial. Instead, the Committee mis-cites a handful of cases to urge that it is nevertheless allowed to offer such testimony. The Committee is wrong: the cases it cites do not support its position, and the cases do not in fact ignore the requirements of Fed. R. Evid. 702 and 403. (*See* Section I *infra*.)

In addition, despite the Committee's denials, it remains true that the Committee experts have proffered opinions as to what the actual AHERF Board or AHERF creditors would have done, without having performed the type of historical study of those specific organizations which is a necessary predicate for any such conclusions. All such testimony should be excluded. (*See* Section II *infra*.)

**Argument**

I.    **OPINION EVIDENCE AS TO WHAT AN IDEALIZED BOARD OR CREDITORS WOULD OR COULD HAVE DONE IS INADMISSIBLE.**

A.    The Proffered Testimony Does Not "Fit" the Issues to Be Decided by the Jury, as Required by Fed. R. Evid. 702.

The Committee does not deny that it intends to have each of Messrs. Schwartz, Singleton, Den Uyl and Kite testify as to what an abstract "reasonable board", or abstract "reasonable creditors", would have done in response to a hypothetical set of differently stated AHERF fiscal 1996 financial statements. (*See* The Committee's Brief in Opposition to PwC's Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by the Committee's Causation Experts at 4-9, hereinafter "Comm.

Br.") Instead, the Committee asserts that they may properly do so. The Committee is wrong on the law and the logic.

Certainly, expert testimony concerning the hypothetical actions of the "reasonable man" is admissible in some cases: for some claims, the conduct of the "reasonable man" is a necessary component of the analysis; in other cases, on the particular facts, the "reasonable man" may serve as a reasonable proxy for projecting the conduct of real actors in a but-for scenario. Here, however, it is undisputed that the AHERF Board was not the "informed and sophisticated" board about which Mr. Schwartz wishes to talk (*see* Comm. Br. at 5), but was instead far from acting "reasonably" or competently, and far from acting in accordance with its obligations. The Committee has not merely admitted this, but asserted it with great vigor. (*See* PwC Br. at 1-2.) Likewise, Messrs. Covintree and James have documented the consistent passivity and lack of care demonstrated by the two largest creditors, MBIA and PNC (*see* PwC Br. at 4 n.2), and the Committee's experts have proffered no contrary opinions regarding the historical patterns of conduct of these two organizations.

It is in this context that the Fed. R. Evid. 702 requirement of "fit" must be analyzed. In this context, there is no "fit" at all between the testimony that the Committee proposes concerning what an idealized board or creditors "would" or "could" have done, and any issue in this case. The Committee does not argue any such "fit" as a matter of logic; it merely asserts that the case law endorses such testimony. The Committee is wrong; what the cases illustrate is that courts carefully and logically decide the question of fit based on the intersection of the proffered testimony and the actual issues before the jury.

The Committee cites *Stelma v. Juguilon*, 597 N.E.2d 523 (Ohio Ct. App. 1992). In that case, expert testimony as to what a "reasonable person" would have decided was permitted because, as the court noted, "one of the essential elements" of that claim was whether a "<u>reasonable person</u> in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed". *Id.* at 528 (emphasis added). Here, quite to the contrary, the question is what the actual AHERF Board (or creditors) would have done. The hypothetical conduct of a (counterfactual) "reasonable board" is irrelevant.

The case of *Salisbury v. Arthur Andersen & Co.*, 956 S.W.2d 601 (Tex. Ct. App. 1997), did not involve testimony about how an idealized board or creditors (or any idealized actors) would have acted in a hypothetical scenario. The expert in *Salisbury* offered precisely the type of <u>concrete</u> testimony the Committee now condemns, opining that "the company <u>would have run its business differently</u>" in the but-for world. *Id.* at 602-03 (emphasis added). What factual analysis underlay that opinion is not revealed; the admissibility of expert testimony of any type was not an issue on appeal in the reported opinion.[1]

The Committee's discussion of *In re Diet Drugs*, MDL No. 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001) (Comm. Br. at 10), is largely irrelevant to the present motion, arguing as it does against the admissibility of certain opinions reached by

---

[1] The case of *Comeau v. Rupp*, 810 F. Supp. 1127 (D. Kan. 1992), likewise did not address the admissibility of the referenced testimony. Nor does the one-line quotation to the effect that a certain hypothetical financial situation would "get management's attention" amount to expert testimony as to what actions an abstract management (or board, or creditors) would have <u>taken</u> once their "attention" had been gotten, as the Committee's experts here seek to offer.

PwC experts; these issues are adequately dealt with in the briefing on the Committee's *Daubert* motion, and will not be revisited here. What the *Diet Drugs* case does do, however, is teach that evidence of past conduct of a particular organization may lead to inferences by experts as to what that <u>same</u> organization would do or not do in the future. *Id.* at *17-18; *see also R.B. Ventures, Ltd. v. Shane*, No. 91 Civ. 5678 (CSH), 2000 WL 520615, at *5 (S.D.N.Y. May 1, 2000). That, of course, is a premise of the testimony of PwC's causation experts, which the Committee seeks to exclude. But it does <u>not</u> suggest that generalizations about what a "reasonable" organization would do can give an adequate basis for speculation as to what a <u>particular</u> and non-typical organization would do. Permitting a former FDA official to testify, based on his knowledge of the FDA and its past conduct, as to what action the FDA would likely have taken in a hypothetical circumstance, gives no support to the Committee's attempts to have experts with <u>no</u> prior knowledge of AHERF, its Board, or its creditors, and who have <u>not</u> made a study of the historical behavior of those organizations, testify as to what an abstract board (explicitly <u>not</u> the AHERF Board), or abstract creditors, would have done in a hypothetical world.

In short, the Committee has found <u>no</u> precedent for allowing testimony as to how an idealized "reasonable" board or "reasonable" creditors would have acted in a but-for world, when it is only the likely conduct of the real-world organizations, with all their real-world quirks and flaws, that is relevant. The Committee is equally unsuccessful at explaining any logical "fit" between the issues before the jury, and the proffered testimony.

Nor can the lack of "fit" be cured, as the Committee suggests, by PwC's cross-examination of its experts. The testimony of these experts, as proffered, is not merely incorrect, it is inadmissible. Cross-examination is not the appropriate recourse against inadmissible evidence; exclusion is.[2]

B.    The Proffered Testimony Would Be Confusing to the Jury and Highly Prejudicial, In Violation of Fed. R. Evid. 403.

PwC has explained the confusion and prejudice likely to result if the jury hears testimony as to how an abstract, idealized board or creditors might be expected to behave. (See PwC Br. at 11-12.) The Committee offers no counterargument whatsoever. The authority and logic already reviewed by PwC is further supported by the case of *R B Ventures, Ltd v. Shane*. The factual question there was whether the parties had entered into oral brokerage commission agreements. *Shane*, 2000 WL 520615, at *1. The plaintiff sought to call expert real estate brokers to offer the opinion that oral brokerage commission agreements are "consistent with industry practices" and are "not unusual". *Id* at *1-*2. After finding that no legitimate inference could be drawn from such opinions to the question actually to be decided—whether these parties in fact entered into a contract (*see id.* at *1-*4)—the court went on to warn of the likelihood that an improper and prejudicial inference would be drawn if such "industry practice" expert testimony were allowed:

> To be sure, the proffered opinions . . . do not state explicitly their opinion
> that Blitz and Shane entered into oral agreements for brokerage

---

[2] *See Stern v. Vic Snynder Inc.*, 473 A.2d 139, 145 (Pa. Super. Ct. 1984) (judgment vacated and remanded for new trial where prejudicial and irrelevant testimony was permitted, notwithstanding movant's opportunity to cross-examine during trial); *Rosenfeld v. Basquiat*, 78 F.3d 84 (3d Cir. 1996) (reversing and remanding for new trial where inadmissible testimony was allowed in by trial court, notwithstanding movant's opportunity to cross-examine).

> commissions.  However, <u>the only apparent purpose for these opinions</u>
> <u>concerning industry practices is to lay a foundation for an inference</u>
> <u>counsel for plaintiff would ask the jury to draw that on the dates in</u>
> <u>question Blitz and Shane conducted themselves in a manner consistent</u>
> <u>with the practice.  This opinion testimony may not be used to accomplish</u>
> <u>indirectly what would be impermissible if attempted directly.</u>

*Id* at *4 (emphasis added).  That is exactly the case here:  the only apparent purpose for

expert testimony about actions that a "reasonable" board or creditor would or could have

done in the but-for world is to leave the jury with the impression that the expert has

opined that the AHERF Board and creditors would have undertaken those actions, or to

induce the jury to leap to that unwarranted inference.  Accordingly, such testimony

should be precluded by Rule 403.

## II.   TO THE EXTENT THE COMMITTEE'S EXPERTS PROFFER OPINION EVIDENCE AS TO WHAT THE ACTUAL AHERF BOARD OR ACTUAL AHERF CREDITORS WOULD HAVE DONE, THE OPINIONS LACK ANY SOUND BASIS AND SO ARE INADMISSIBLE.

The Committee's response on this topic is an odd mixture of denial,

defense, and changing the subject.

The Committee derides the possibility of "predict[ing] the behavior of

others" and asserts that its experts "offer no such 'opinions'" (Comm. Br. at 2), but later

in this same brief the Committee more accurately refers to "Mr. Singleton's proffered

expert testimony here concerning <u>how AHERF's business would have been run</u>

<u>differently</u>" in the but-for world, and asserts that such testimony "should be admitted".

(Comm. Br. at 9 (emphasis added).)  Similarly, Mr. Schwartz admitted at his deposition

that he was in fact opining not about what some "reasonable" board would have been

expected and required to do in the but-for world, but about the real "AHERF Board":

> "Q.     . . . And just so I understand the scope of your opinion, am I right
> that your opinion is about what the AHERF Board would have been

expected and required to do if the AHERF Board Members carried out
their fiduciary obligations?

"A.    I would phrase it a little differently.  I would phrase it that what my
report says is this—these are the steps that the AHERF Board would have
been expected and required to do.  Had they been advised by the
independent accountants of the gist of the conclusions reached by
Mr. Berliner and to some extent Mr. Kite, then they would have been
expected and required to take certain steps that I have laid out in the
report."

(Schwartz Dep. (App. tab 3) at 92-93.)

Thus, and as reviewed at more length in PwC's opening brief (PwC Br. at
4-9), the Committee's experts do proffer opinions which do and are intended to bleed
over from the abstract (and irrelevant) question of how idealized "reasonable"
organizations would have acted, into the question of how the real-world AHERF Board
and creditors would have acted.

As also previously documented by PwC (PwC Br. at 4-9), the
Committee's experts have completely failed to undertake the historical study of the
behavior of the AHERF Board and its creditors which could provide an adequate basis
for such opinions.  And here the Committee attempts to change the subject.  The
Committee extols the credentials of its experts (see Comm. Br. at 4-7), but PwC has not
criticized their credentials—only the inadequacy of their analysis.  The Committee cites a
case allowing testimony from percipient actors such as board members as to what they
"would have done" (Comm. Br. at 8), but this has no relevance to the present motion.
What PwC has noted is the inadequacy of the Committee's experts' attempts to justify
speculation as to what the 36-member AHERF board would have done by selectively
pointing to the testimony of fewer than a handful of trustees (see PwC Br. at 14)—even
though almost all trustees were deposed.

What the Committee never says is that its experts have taken into account the past behavior of the AHERF Board and AHERF creditors in forming opinions about what those organizations would have done in hypothetical circumstances. It does not say this because it cannot; its experts have too comprehensively denied performing any such analysis. (*See* PwC Br. at 4-5, 6, 7.) For this reason, and as more fully explained in PwC's opening memorandum, Messrs. Schwartz, Singleton, Den Uyl, and Kite should not be permitted to offer any opinions as to "how AHERF's business would have been run differently" (*see* Comm. Br. at 9), or as to any other aspect of how the AHERF Board or AHERF creditors would have acted in any hypothetical context.

## Conclusion

For the reasons stated above and in PwC's opening memorandum in support of this motion, PwC respectfully requests that the Court enter an order:

1.      Precluding any expert testimony about what a hypothetical board of trustees or a hypothetical creditor could or would have done in the Committee's "but for" world; and

2      Precluding any testimony from Messrs. Schwartz, Singleton, Den Uyl or Kite about what the AHERF Board of Trustees (or affiliated boards or committees), or creditors of AHERF or its affiliates, could or would have done in the Committee's "but for" world.

Dated:  August 19, 2005

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

by

Joseph F. McDonough
(Pa. I.D. # 19853)
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

CRAVATH, SWAINE & MOORE LLP

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August 2005, a true and correct copy of the foregoing Reply Memorandum in Support of Motion to Preclude Certain Irrelevant and Unfounded Testimony Proffered by Causation Experts was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

### *Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219

### *Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114