IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>　　　　　　　　　　　　　Defendant. | Civil Action No. 00-684<br><br>Judge David Stewart Cercone |

**REPLY MEMORANDUM IN SUPPORT OF PwC'S MOTION
TO EXCLUDE TESTIMONY CONCERNING CERTAIN DAMAGE THEORIES
PROFFERED BY R. BRUCE DEN UYL THAT DOES NOT COMPORT
WITH APPLICABLE LEGAL STANDARDS**

**Preliminary Statement**

The purpose of PwC's motion is clear and proper: to limit the damage theories that the Committee may present at trial through its expert Mr. Den Uyl to those permitted by law. *See Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, 102-03 (3d Cir. 1977) (testimony on aggregate dollar damages should not be presented to jury where such a measure was not permitted by law). The Committee, on the other hand, through Mr. Den Uyl, seeks to introduce extensive evidence of losses suffered by creditors or Non-Debtor Affiliates, but <u>not</u> by the Debtors—a measure of damages already rejected by this Court in its prior ruling.

## Argument

I. **"CREDITOR SHORTFALL" IS NOT A LEGITIMATE MEASURE OF INJURY TO THE DEBTORS.**

    A. <u>The "Creditor Shortfall" Calculation Is an Improper Attempt To Recover Creditor Losses from the Bankruptcy and Is Precluded by the Law of the Case.</u>

As PwC predicted (Memorandum in Support of PwC's Motion to Exclude Testimony Concerning Certain Damage Theories Proffered by R. Bruce Den Uyl that Does Not Comport with Applicable Legal Standards, hereinafter "PwC Br.", at 5), the Committee attempts to pass off Mr. Den Uyl's "creditor shortfall" theory as a species of the "deepening insolvency" claim authorized by the *Lafferty*[1] decision. (*See* Committee's Brief in Opposition to PwC's Motion to Exclude Testimony Concerning Certain Damage Theories Proffered by R. Bruce Den Uyl, hereinafter "Comm. Br.", at 7-8.) It is nothing of the kind, but is rather a blatant attempt to nullify Judge Ziegler's prior ruling in this case. (*See* PwC Br. at 3-4.)

The Committee incorrectly asserts that Judge Ziegler's ruling—prohibiting the Committee from asserting the claims of creditors—had nothing to do with the scope of recoverable damages. (Comm. Br. at 3.) Under its novel "creditor shortfall" theory, the Committee is once again seeking to recover every penny lost by creditors as a result of the AHERF bankruptcy. This is—to the penny—the measure of the claims that the Committee would have asserted on behalf of the creditors had Judge Ziegler not dismissed all such claims. This was the point of the motion and the Court's ruling; it was perfectly clear what was at stake. (*See* Jan. 28, 2002 Order ¶ 2 (granting summary

---

[1] *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001).

judgment "to the extent that plaintiff seeks to pursue claims on behalf of the creditors of AHERF").) If the Committee's present position were correct, then the briefing of PwC's Motion for Partial Summary Judgment at the beginning of discovery in this case was an idle exercise, and Judge Ziegler's consideration of and ruling on the point a nullity.

Moreover, the *Lafferty* opinion on which the Committee heavily relies (Comm. Br. at 4) made clear that the "deepening insolvency" damage theory that it authorized was <u>not</u> equivalent to the injury to creditors, stating that the damage measure was legitimate precisely because it focused on the impact on the value of the estate: there was "no indication that the Committee [was] attempting to recover for injuries to the creditors". *Lafferty*, 267 F.3d at 348-49.

Here the Committee is attempting exactly that.

B.  "Creditor Shortfall" Is Not a Legally Recognized Measure of Damages.

The problem, of course, is that in this case, the "creditor shortfall" bears no logical relationship to deepening insolvency. Possibly, there may be more than one legitimate way to attempt to measure deepening insolvency, but the Committee has not even tried. Unless, by remarkable coincidence, the net worth of the estate was an even zero in September of 1996 (the time of the first alleged "bad act"), then it is certain that the net indebtedness of the estate upon bankruptcy is <u>not</u> a measure of "deepening insolvency". In fact, since the Committee has offered no valuation of the estate as of September 1996, nor any estimate of <u>change</u> in valuation (*see* PwC Br. at 7-8), there cannot even be any inference that there <u>was</u> any deepening insolvency. At this stage in the case, this absence of proof alone should be fatal to any further proceeding under a "deepening insolvency" theory. *See Corporate Aviation Concepts, Inc. v. Multiservice Aviation Corp.*, Civ. A. No. 03-3020, 2004 WL 1900001, at *4 (E.D. Pa. Aug. 25, 2004)

(dismissing deepening insolvency theory where debt existed prior to the alleged fraud and the plaintiff "ha[d] not alleged that [the defendant] caused this debt to be increased"). Since all the bond debt was issued prior to the first alleged bad act,[2] it is entirely possible that AHERF was already deeply insolvent by September of 1996.

It also remains true that no case authorizes the pursuit of damages to an estate measured as the "creditor shortfall" rather than as the deepening insolvency. In *Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 U.S. Dist. Lexis 27238 (D.N.J. Aug. 25, 2004), given the court's interpretation of the particular allegations in that case, the net indebtedness served as an actual <u>measurement</u> of the deepening indebtedness. The plaintiff in that case alleged both that the accountant "knew or should have known the [corporation] was <u>at or near the point of insolvency</u> [*i.e.*, worth approximately zero] two years before that insolvency was revealed", and that had this insolvency been reported, state regulators would by law have intervened to ensure that no further insurance policies were written, *i.e.*, no further liabilities were incurred. *Id.* at *6, *25. Thus, in *Crowley*, on the plaintiff's theory the net indebtedness and the deepened insolvency were one and the same. Here, the Committee has not alleged or offered evidence of a "zero" baseline, and the equation does not work.

---

[2] The Committee argues that SDN "assumed" the bond debt of the Graduate Hospitals after fiscal 1996 (Comm. Br. at 7 n.2), but this misses the point. As detailed elsewhere (PwC Mem. Supp. Summ. J. at 53-55), the merger of Graduate into the empty SDN corporation made no change in the amount of Graduate debt, the identity of the creditors, or the identity and value of the assets and revenues available to pay that debt, and AHERF never assumed this debt, so the Graduate/SDN merger caused no "deepening" insolvency of anything. The Committee's reference to AHERF's payment of an $89 million bank loan (*id.*) is inexplicable, as repayment of a loan out of available cash has no effect one way or the other on the net indebtedness of an entity.

It is remarkable that the Committee cites the *Drabkin* case. While that court mentioned plaintiff's "rescue obstructed" theory, what it did was grant a j.n.o.v. against damages under that theory (and others) as irretrievably speculative. *See Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 455-58 (D.C. Cir. 1990). Because this claim failed on causation the Court never reached the issue of whether "rescue obstructed" was a valid measure of damages.

    C.    Mr. Den Uyl's "Creditor Shortfall" Measurement Is At Best a Highly Speculative Lost Profits Claim.

If "creditor shortfall" is not a measure of deepening insolvency, what is it? As the Committee essentially admits, it is a measure of lost hypothetical profits. No Committee expert opines that AHERF was solvent—able to meet its massive debt obligations—as of September 1996. And the Committee does not dispute that AHERF's financial performance leading up to the first alleged bad act was only degenerating. (*See* PwC Br. at 9 ("AHERF sustained operating losses of $8.2 million in 1993, $12.5 million in 1994, and $7.8 million in 1995, and reported operating losses of $86 million in 1996.").) Indeed, the Committee alleges that AHERF was bleeding money even faster than that. (*See* Comm. Br. at 8-9.) In other words, the premise of Mr. Den Uyl's "creditor shortfall" calculation—that in some alternative universe AHERF would have paid all its debts—is that AHERF would quickly have switched from large and growing losses to rich profits beyond anything it had ever achieved. This is entirely speculation with no factual basis and consequently is impermissible as a basis for a damage calculation. (*See* PwC Br. at 9.)

The Singleton turn-around "plan" on which Mr. Den Uyl rests his calculation is not merely speculative but also facially improbable; the Committee offers

no explanation or defense of Mr. Singleton's speculation that, under his hypothetical tutelage, <u>all</u> the AHERF hospitals would quickly have vaulted into the top quartile of performance and efficiency on various measures. (*See* PwC Br. at 10.) Apparently Mr. Singleton's hospitals, like Lake Wobegon's children, are all above average.

The Committee's complaint that PwC has not made a *Daubert* motion against Mr. Singleton's turn-around testimony (*see* Comm. Br. at 8) is irrelevant. PwC is not obliged to pursue all possible procedural paths, and in any case, even if Mr. Singleton may be generally qualified to testify regarding turn-around scenarios, it does not follow that his speculative turn-around scenario can satisfy the restriction under Pennsylvania law against speculation <u>in the particular context for which Mr. Den Uyl uses Mr. Singleton's scenario</u>. Specifically, as previously noted, lost profits damages may not be awarded unless the evidence establishes them with "reasonable certainty". *Delahanty v. First Penn. Bank*, 318 Pa. Super. 90, 120, 464 A.2d 1243, 1258 (1983); (*see also* PwC Br. at 9).

The Committee's attempt to justify Mr. Singleton's speculative turn-around plan for AHERF by pointing to Mr. Stickler's even more speculative turn-around "plan" (*see* Pl. Br. at 9) cannot fix the defect. As Mr. Stickler testified, his engagement (the month before AHERF's bankruptcy) did not produce "a real turnaround plan" but rather a "30,000 foot level estimate" of what it would take to avoid bankruptcy in June of 1998—not September of 1996. (Stickler Dep. Tr. (App. tab 30) at 68, 89, 97-98, 152-53.) Mr. Stickler did not "look back to try to figure out what happened" and, in any case, this "plan" was never implemented. (*Id.* at 68, 84.) Two speculations do not add up to a fact, and Mr. Stickler's 30,000 foot speculations cannot provide the factual context of

"profits made by others . . . where the facts were not greatly different", as required for a lost profits recovery. *See Advent Systems Ltd v. Unisys Corp.*, 925 F.2d 670, 681 (3d Cir. 1991). Where "evidence [falls] short of proving . . . lost income with reasonable certainty", expert testimony on those damages is properly limited. *Maher v. Continental Cas. Co.*, 76 F.3d 535, 541-42 (4th Cir. 1996).

The Committee's brief "explanation" of the inclusion of the losses of Graduate/Centennial creditors in Mr. Den Uyl's "creditor shortfall" figure (Comm. Br. at 10-11) is no explanation at all. (*See* PwC Br. at 11.) The Committee cites no evidence, and Mr. Den Uyl does not opine, that <u>these</u> creditors would not have "fallen" just as short in the but-for world in which Graduate was not merged into SDN. The Committee argues that this is immaterial, because "[t]hose hospitals could fail while part of the Graduate Health System, with no impact on AHERF". (Comm. Br. at 10-11.) But the Committee cites no evidence that the Graduate/SDN merger <u>had</u> any adverse impact on the "shortfall" suffered by non-Graduate AHERF creditors, and Mr. Den Uyl conceded at his deposition that the net effect of inclusion of the Graduate/Centennial hospitals in the consolidated estate may actually have been to <u>reduce</u> the shortfall of non-Graduate AHERF creditors after the consolidation in bankruptcy. (Den Uyl Dep. Tr. (App. tab 2) at 86.) In other words, any impact of the Graduate/SDN merger on the shortfall experienced by any creditors is purely speculative.

## II. MR. DEN UYL'S PURPORTED "AVOIDABLE COSTS" CALCULATION IMPROPERLY INCLUDES COMPONENTS THAT ARE NOT LOSSES TO THE DEBTORS.

A moment's contemplation of the meaning of "avoidable costs" highlights the legally impermissible ways in which Mr. Den Uyl has padded his estimate: what is to be measured are the net costs <u>suffered by the plaintiff</u> but avoidable in the hypothetical

-7-

but-for world. Or, in common-sense terms, "How much did the estates lose as a result of the alleged wrong?" Mr. Den Uyl improperly adds outflows without crediting counterbalancing and linked inflows, and overtly measures the "avoidable loss <u>to the AHERF System</u>" (Den Uyl Rpt. (App. tab 1) at 24 (emphasis added)), rather than to the Debtors. These are legal, not factual errors, and opinions premised on these errors should not be permitted in evidence. *See New Mexico v. General Electric Co.*, 335 F. Supp. 2d 1266, 1276 (D.N.M. 2004) (where plaintiff has "no cognizable claim for loss", expert testimony concerning that loss is not relevant and should be excluded).

    A.    <u>Expenditures on Western Region Physician Practice Acquisitions Had No "But For" Impact on Any Debtor Entity.</u>

The fact is that western region (Pittsburgh area) <u>Non-Debtor</u> Affiliates made huge cash transfers to the Debtor Allegheny University Medical Practices ("AUMP") (in this time period known as Allegheny Integrated Health Group ("AIHG")) for the express purpose of covering the cost of physician practice acquisitions by AUMP in the western region, and covering the operating losses of those practices once acquired. In other words, in the Committee's "but for" world in which the practice acquisitions did not happen, neither would AUMP have received the benefit of these cash transfers; the two are inextricably linked, and must be offset. (*See* PwC Br. at 15-16.)

The Committee tries to pretend that there is a factual dispute here, and fantasizes a world in which the western region Non-Debtor AHERF Affiliates would transfer tens of millions of dollars to AUMP for no reason whatsoever, even though no physician practices in their area were being purchased. (Comm. Br. at 12-13.) But there is no factual dispute. The purpose of these transfers to AUMP was well documented. For example, the fiscal 1996 financial statements for AGH clearly state: "During fiscal

-8-

year 1996, AGH [a Non-Debtor], through AHERF, transferred $10,376[,000] to AIHG <u>to support its acquisition and operation of physician practices</u>." (Ex. 1228 (App. tab 4) at TN CBC43B 01620) (emphasis added).) Likewise the fiscal 1997 unaudited financial statements for the AHERF parent organization contain line items clearly identifying transfers labeled "Support from AGH" for "AIHG Operations", "AIHG Capital" and for the "PGMA purchase".[3] (DB-CM-18-01302–07 (App. tab 31) at DB-CM-18-01306.)

       There is no contrary evidence. There is neither factual testimony nor expert opinion that the western entities would have given this money to AUMP had the practice acquisitions not occurred. One cannot create a "factual dispute" by opposing pure speculation against facts. *See Jersey Central Power & Light Co v. Township of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985).

       The Committee's argument that it is free to hypothesize <u>unconditional</u> cash transfers to AUMP in its "but for" scenario because "[m]oney is fungible and AHERF controlled the money of its subsidiaries since it was their sole member" (Comm. Br. at 13) is a blatant invitation to disregard the line between Debtor and Non-Debtor entities, and is absurd. On the hypothesis, AHERF could have transferred twice (or ten times) as much from Non-Debtor to Debtor entities in the "but for" world (once the rationale for the transfer is removed, one amount is as sensible as the next), no doubt to the great benefit of the estates. But such absolutely baseless hypotheticals cannot provide a basis for a legally permissible damages calculation.

---

[3] In April of 1997, using funds from non-Debtor AGH, AHERF purchased a large group of physician practices in the Pittsburgh area known as Penn Group Medical Associates ("PGMA"), and assigned their practices to Debtor AUMP. (*See* Den Uyl Rpt. (App. tab 1) at 34.)

In sum, to the extent the capital costs and operating losses of physician practices acquired by the Debtor AUMP were funded by special-purpose cash transfers from Non-Debtor Affiliates, those acquisitions caused no avoidable costs to the Debtors, and as a matter of law should not be permitted to be included in any "avoidable cost" damage calculation offered by the Committee.

B.  Disallowed Claims Are Not Damages to the Debtors.

PwC has argued that, as a matter of law and logic, disallowed claims, not being obligations of the Debtors, cannot comprise part of a measure of "avoidable costs" damage to the estates. (PwC Br. at 17-19.) By way of example PwC pointed to a large volume of disallowed claims against the Centennial estate. (*Id.*) The Committee's response is to argue that various fractions of the gap between the allowed claims and Mr. Den Uyl's "remaining liabilities" figure do not represent "disallowed claims". Many of the Committee's factual assertions in this regard are both intricate and mistaken, but this is a sideshow. All PwC's motion seeks in this regard, at this point, is a ruling that as a matter of law, disallowed claims cannot be included in any calculation of "avoidable costs" damages. Factual disputes as to the amount of such disallowed claims at the margin will necessarily be resolved at a later date. (The legal question is of great import under either party's mathematics; it is undisputed that many millions of dollars of claims were disallowed for the Centennial estate alone.[4])

---

[4] Of the $93 million difference between Mr. Den Uyl's calculation of "remaining liabilities" at Centennial ($262 million) and the allowed claims against Centennial ($169 million) the Committee points to only $39 million that it asserts is "easily explained" by factors other than disallowance of claims. (*See* Comm. Br. at 15.)

-10-

Once we focus specifically on disallowed claims, the Committee has little to say. As noted previously, the theoretical definition of an "avoidable cost" claim is the measure of the debts owed by the debtor estate (on whose behalf the claim is being brought) that would have been "avoided" in the hypothetical "but for" world. (*See* PwC Br. at 12.) Mr. Den Uyl and the Committee disparage the bankruptcy process and accuse it of disallowing legitimate debt obligations (Comm. Br. at 16-17), and attempt to portray this as a fact or "credibility" issue (Comm. Br. at 17). But Mr. Den Uyl's credibility and the justice of the bankruptcy claims allowance process are both irrelevant. The point is that, <u>on the motion of the Chapter 11 Trustee</u>[5] (in whose shoes the Committee stands for purposes of this lawsuit (*see* Jan. 28, 2002 Op. at 6)), these claims have in fact been disallowed, and as a result <u>are not debts of the estate</u>. The Committee, asserting the claims of the Chapter 11 Trustee, cannot now switch positions and argue that those claims <u>are</u> enforceable and constitute damage to the estate. Disallowed claims are not debts of the estate[6] in the real world; the Committee hypothesizes that they would not have been debts in the "but for" world: they thus have no role in the "avoidable costs" analysis.

In ignoring this, the Committee is abandoning a legally legitimate "avoidable costs" analysis, and is comparing one hypothetical "but for" world against

---

[5] *See, e.g.*, Ex. 2793 (App. tab 21); Order, Bankr. Ct. Docket No. 9727, dated Dec. 23, 2002 (App. tab 22).

[6] *See* Jan. 28, 2002 Op. at 6 (The Committee is only "'authori[zed] to prosecute any claims and causes of action against Coopers possessed by the <u>Debtors' estates</u>'" (quoting Bankr. Consent Order at 2 ¶ 1) (emphasis in original).).

another (one in which the losses were suffered but there was no bankruptcy), instead of against the real world—and the real "costs". (*See* PwC Br. at 18-19.)

The Committee's reason for ignoring the real world is obvious, but improper: what the disallowance of a claim does is allocate a loss to the creditor <u>rather than</u> to the debtor. The Committee here continues its dogged determination to pursue every penny lost <u>by a creditor</u> as a result of the AHERF bankruptcy. However, it is not permitted to do so.

    C. <u>Neither Merger Into a Shell Corporation Nor the Post-Bankruptcy Consolidation Can Transform the Pre-Existing Debts and Ongoing Losses of Centennial Into "Avoidable Losses" of Any Debtor.</u>

As reviewed in PwC's opening memorandum in support of this motion (PwC Br. at 19-20) and set out more fully in PwC's memorandum in support of its motion for summary judgment (PwC Mem. Supp. Summ. J. at 46, 51-54), the merger of the Graduate hospitals into the otherwise empty SDN entity made no change at all to the scale of the debts or losses of those hospitals, or to the identity of their creditors, nor did it impose any liability on any other Debtor.

The Committee attempts to hang some significance on the bare fact of the merger with SDN (Comm. Br. at 18), but this was in substance nothing more than a name change (as AHERF acquired thereby neither ownership nor liability), and negates none of the facts PwC has previously reviewed.

The Committee also asserts that the post-bankruptcy consolidation of the several Debtor estates transferred the Graduate/Centennial liability to all the Debtors, and so increased their injury and PwC's liability. (*See* Comm. Br. at 18-19.) As PwC has reviewed above in connection with Mr. Den Uyl's "creditor shortfall" theory (*supra* at 5-7), there is no evidence that the consolidation increased the damages of any Debtor as a

-12-

matter of fact. As PwC demonstrates elsewhere, and incorporates here by reference, the post-bankruptcy consolidation cannot give rise to otherwise non-existent claims as a matter of law. (*See* PwC SJ Rep. Mem. at Part IV.C.)

In sum, the Committee, through Mr. Den Uyl, is attempting to relabel pre-existing, non-avoidable debts of Graduate/Centennial as "avoidable costs", by means of legally invalid theories. The transformation should be rejected, and no evidence of such debts should be permitted in any presentation of "avoidable costs" damages.

> D.   Losses to the Creditor HealthAmerica as a Result of the HealthAmerica Risk Contract Are Not Damages to the Debtors.

The entire difference between Mr. Den Uyl's calculation of AHERF's damages relating to the HealthAmerica contract ($27.7 million), and PwC's figure ($5.1 million) (*see* PwC Br. at 22), is Mr. Den Uyl's failure to offset the $22.6 million payment from HealthAmerica to AHERF, which even the Committee agrees was an "unmerited cash advance" (Comm. Br. at 20). The Declaration of Mr. Guarneschelli which accompanies the Committee's brief supports PwC's position and confirms that there are no undisputed facts.

In the Committee's "but for" world, in which the HealthAmerica contract was never entered into, AHERF could not possibly have received this $22.6 million cash advance from HealthAmerica. In the real world, AHERF did receive it (increasing the assets of the estate), but owed it back (increasing the liabilities of the estate by an equal amount). The net effect on the value of the estate is zero, so there can be no "but for" "avoidable cost" relating to this $22.6 million cash advance, or the obligation to repay that advance. The Court should rule now that, as a matter of law, it is impermissible to include the obligation to repay the $22.6 million as an "avoidable cost" without offsetting

against it the inescapably linked "avoidable benefit" to the Debtor of receiving that amount as a cash advance in the first place.

"Equating AHERF's liability to HealthAmerica [$27.7 million] with avoidable costs", as Mr. Den Uyl does in his calculation (*see* Comm. Br. at 20), without offsetting the $22.6 million cash advance received from HealthAmerica and kept by AHERF, simply does not "measure[ ] the loss that AHERF incurred due to a risk contract it would not have entered into" (Comm. Br. at 20). The only thing that the Committee's calculation measures is the loss to HealthAmerica. This is yet another attempt to ignore Judge Ziegler's prior ruling in this case.

## Conclusion

For the reasons set forth above, and in PwC's opening memorandum in support of this motion, PwC respectfully requests that the Court issue an order:

    1.    Precluding testimony from Mr. Den Uyl (or any other witness) concerning or in support of Mr. Den Uyl's so called "creditor shortfall" measure of damages; and

    2.    Precluding testimony from Mr. Den Uyl (or any other witness) including or supporting the inclusion in an "avoidable costs" measure of damages, of any costs borne by creditors or Non-Debtor Affiliates.

Dated: August 19, 2005

Respectfully submitted,

MANION McDONOUGH & LUCAS, P.C.

by _____
Joseph F. McDonough
(Pa. I.D. # 19853)

USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

CRAVATH, SWAINE & MOORE LLP

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August 2005, a true and correct copy of the foregoing Reply Memorandum in Support of Motion to Exclude Testimony Concerning Certain Damage Theories Proffered by R. Bruce Den Uyl and Supplemental Appendix thereto was served upon counsel of record by either hand delivery and/or overnight delivery, addressed as follows:

*Via Hand Delivery:*

James Jones, Esquire
JONES DAY
One Mellon Bank Center
500 Grant Street, Suite 3100
Pittsburgh, PA 15219

*Via Federal Express - Overnight*

Richard B. Whitney, Esquire
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114