# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALLEGHENY
HEALTH, EDUCATION & RESEARCH
FOUNDATION,

Plaintiff,

v.

PRICEWATERHOUSECOOPERS LLP,

Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

---

## SUPPLEMENTAL APPENDIX TO MEMORANDUM IN SUPPORT OF PWC'S MOTION TO EXCLUDE TESTIMONY CONCERNING CERTAIN DAMAGES THEORIES PROFFERED BY R. BRUCE DEN UYL THAT DO NOT COMPORT WITH APPLICABLE LEGAL STANDARDS

Joseph F. McDonough
(Pa. I.D. # 19853)
MANION McDONOUGH & LUCAS, P.C.
USX Tower
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

Thomas G. Rafferty
Roger G. Brooks
Antony L. Ryan
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Attorneys for Defendant
PricewaterhouseCoopers LLP

TAB 30

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

## DANIEL L. STICKLER
*May 9, 2003*

---

# *LEGALINK MANHATTAN*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**STICKLER, DANIEL L.**



**LEGALINK®**

A **WORDWAVE** COMPANY

Page 61

DANIEL STICKLER

1          A.  I don't recall.
2          Q.  Did you ever come to learn about the
3   level of managed care penetration in
4   Philadelphia?
5          A.  I would assume I did, but I don't
6   recall.  You know, that would have to be included
7   in financial projections that were done.
8          Q.  Do you recall whether the market in
9   Philadelphia was a difficult one, even if you
10  don't recall any of the details of it?
11         A.  I don't recall, no.
12         Q.  And you said in the time that you had
13  been at AHERF, under the circumstances you didn't
14  have a chance to study the market, to the best of
15  your recollection, or to speak with management
16  about what it was doing, to the best of your
17  recollection, to deal with those problems?
18             MR. WITTEN:  Objection.
19         A.  I don't think I said I didn't have a
20  chance to speak with management.  I said I don't
21  recall having specific discussions with
22  management.
23             I do not recall us having done a
24  market analysis because, as I indicated, very
25

Page 62

DANIEL STICKLER

1   early on our emphasis was changed from a
2   turnaround to survival through this bankruptcy
3   process, which was much more short-term.
4          Q.  Did you perform any analysis of what
5   steps management had been taking over time in the
6   Delaware Valley region?
7          A.  No, I did not.  We made a conscious
8   decision that our job at that point in time was
9   looking forward, to deal with whatever we had to
10  deal with in the time period we were in, that if
11  somebody wanted to investigate or review the
12  past, that was a different job, and whoever was
13  responsible for it could do it.
14         Q.  Would looking at any documents about
15  the conditions in the Philadelphia region help to
16  refresh your memory or would I essentially just
17  be putting documents in front of you that
18  would --
19         A.  You would be wasting your time, I
20  think.
21         Q.  Is there anything you could think of,
22  perhaps documents The Hunter Group generated,
23  that I could show you that would help to jog your
24  memory about market conditions in Philadelphia?
25

Page 63

DANIEL STICKLER

1          A.  Not that I can think of, no.
2          Q.  You don't recall ever preparing any
3   reports, or anything like that, that described
4   the market conditions?
5          A.  I didn't prepare any, and I don't
6   believe our firm did prepare one during that time
7   period.
8          Q.  When you arrived at AHERF in 1998, do
9   you recall which hospital CEOs you might have had
10  any interactions with?
11         A.  All of them that were in place at the
12  time.  I was in a management role and all of them
13  that were in place at the time had direct
14  reporting relationships to me.  That would have
15  been Meg McGoldrick, Gebar.  Gee, I don't
16  remember the guy's name over at Graduate.
17         Q.  Is that Robert Matthews?
18         A.  Yes.  And I don't remember the names
19  at the other smaller hospitals, either.
20         Q.  Do you recall that Galvin Bland was
21  working at St. Christopher's Hospital for
22  Children?
23         A.  I recall him having been there while
24  I was there, and I think he was there at the time
25

Page 64

DANIEL STICKLER

1   I came.  I'm pretty certain he was.
2          Q.  Did you have any interactions with
3   the provost or dean of the university that AHERF
4   owned?
5          A.  Yes, both of them.
6          Q.  Do you recall the names of those
7   individuals?
8          A.  I don't recall the name of the
9   provost.  I recall the name of the dean was
10  Barbara Atkinson.
11         Q.  Do you recall that the provost was
12  Leonard Ross?
13         A.  I think you're right.  Well, wait a
14  minute.  Wait a minute.  I'm not certain whether
15  that's a name of the person that was there at the
16  time we came in or the name of the person that
17  was brought in after we left.  So I'm not certain
18  which one of those it was, to be honest.
19         Q.  Do you recall the names of any of the
20  other members of AHERF management that you might
21  have dealt with at the time you arrived in 1998?
22         A.  I dealt with all the department
23  chairmen of the school.  I don't recall the names
24  of the individuals.  I'm sorry, I don't recall
25

16 (Pages 61 to 64)

Page 65

DANIEL STICKLER
1 their names now.
2
3     Q.   By the time you arrived at AHERF in
4 1998, was Sherif Abdelhak no longer employed
5 there?
6     A.   Yes, he was gone.
7     Q.   And was David McConnell already gone?
8     A.   David was still there.
9     Q.   And Nancy Wynstra was still there?
10    A.   Was still there.
11    Q.   Did you have chances to interact with
12 the two of them?
13    A.   Limited chances to, yes. Not too
14 long after I was there the legal services for the
15 eastern operation was separated from the
16 corporate legal services, and they began
17 reporting to me instead of to Nancy. Not too
18 long after we got there, Dave McConnell
19 departed. And I don't remember much discussion
20 with him at all.
21    Q.   You said the eastern region legal
22 department was reporting to you after you got
23 there, after some time?
24    A.   Not too long after I got there, yes.
25 Because we were in the process of paring it down.

Page 66

DANIEL STICKLER
1
2     Q.   Paring down the legal department?
3     A.   Yes, as we were with all the expenses
4 we could pare down.
5     Q.   Do you recall that outside law firms
6 were brought in to assist AHERF with its legal
7 services at the time?
8     A.   I recall that they were using some
9 external legal counsel in addition to the paid
10 staff, yes.
11    Q.   Do the names of either Kirkpatrick &
12 Lockhart or Hahn Losier ring any bells as the
13 names of those firms?
14    A.   My recollection is that Hahn Losier,
15 if I'm not mistaken, was the bankruptcy counsel
16 that was brought in by corporate AHERF, and
17 Kirkpatrick & Lockhart I think was legal counsel
18 to corporate in Pittsburgh.
19    Q.   Does the name of the law firm Foley &
20 Lardner ring any bells as well?
21    A.   Yes.
22    Q.   Do you recall what their role was?
23    A.   They were assisting the eastern
24 operations relative to the -- there was in
25 process at the time, if I recall correctly, an

Page 67

DANIEL STICKLER
1
2 attempt to sell part of the hospitals in the
3 eastern operation, and they were assisting with
4 that transaction that was being dealt with by
5 investment bankers. And they had assisted with
6 some other work during that process, internal
7 corporate work, I would say, as opposed to
8 bankruptcy work.
9     Q.   Was the sale that you are referring
10 to the sale of the Philadelphia region hospitals
11 to Vanguard at the time that you arrived?
12    A.   There was a -- discussions were going
13 on about selling some portion of the Philadelphia
14 region hospitals to Vanguard at the time, yes.
15 It wasn't all the eastern hospitals, I don't
16 believe.
17    Q.   At the time you arrived, did you have
18 the sense that the hospital CEOs who you
19 interacted with were doing the best that they
20 could under the circumstances?
21    A.   I don't know that I was in a position
22 to make that call that quick. You know, we
23 thought we could put together a turnaround plan
24 that would help to improve the financial
25 situation if we had enough time to do it. There

Page 68

DANIEL STICKLER
1
2 wasn't enough time to do it. We didn't get into
3 it very deeply.
4     Q.   So you didn't have enough time to put
5 together a turnaround plan?
6     A.   There wasn't enough money to operate
7 with to do it.
8     Q.   So you never, in fact, put together
9 even a plan?
10    A.   We put together a 30,000-foot level
11 estimate of what we thought we could do and how
12 long it would take to do it and how much money we
13 would need to operate in order to survive long
14 enough to do that. We did put that together.
15    Q.   But you never got a chance to test
16 out the plan or actually implement it?
17         MR. WITTEN: Objection.
18    A.   Never got any money from anybody to
19 carry through to do it.
20    Q.   So you can't say as you sit here
21 today whether the plan would have worked or not?
22    A.   We thought it would or we wouldn't
23 have proposed it, but we don't know unless it's
24 tested.
25    Q.   And you said your role was not to

17 (Pages 65 to 68)

Page 69

DANIEL STICKLER

1
2  evaluate what management had done in the past,
3  and the goal was just to look forward; is that
4  right?
5      A.   That's exactly right. And we made
6  that as a conscious decision, because we had a
7  very heavy full-time effort to try to lead that
8  organization through the process it was going
9  through, and we felt -- I felt very strongly that
10  it was not our responsibility and it would be a
11  distraction of management to spend our time
12  looking back trying to figure out what somebody
13  did right or wrong. It was immaterial to us at
14  that point.
15     Q.   Would part of putting together a
16  turnaround plan have entailed studying the market
17  conditions under which AHERF operated?
18     A.   It would have had we done the full
19  plan, yes.
20     Q.   And you said you didn't get a chance
21  to study the market conditions?
22     A.   No.
23     MR. WITTEN: Objection.
24     A.   We did not. In my recollection, we
25  did not.

Page 70

DANIEL STICKLER

1
2      Q.   And in your experience, does the
3  feasibility of a turnaround plan and what steps
4  you take in implementing a turnaround plan depend
5  upon the market conditions in which a hospital
6  operates, or a hospital system?
7      A.   As I indicated, we did a 30,000-foot
8  level look at what we thought we might be able to
9  do because we were working under a very short
10  time constraint, and we had to get money fast in
11  order to stay alive. And we did not have time to
12  do such an analysis. If we had done a full
13  14-week or 16-week performance improvement plan,
14  then we would have taken a look at the market
15  conditions and the strength of the organization
16  and projected what we thought they could do in
17  that market condition.
18     Q.   But you didn't have the chance to do
19  that under the circumstances?
20     A.   Right. We didn't even keep our
21  marketing person on the job.
22     Q.   Your person who conducted market
23  studies?
24     A.   Yes.
25     Q.   Do you know who that was at The

Page 71

DANIEL STICKLER

1
2  Hunter Group?
3      A.   I don't remember who was sent to the
4  project. As I said, we restructured the project
5  very rapidly very soon after we were there.
6      Q.   We will come to that, and I will show
7  you some documents with names of people.
8           Do you recall what were the
9  components of the 30,000-foot plan that you just
10  mentioned?
11     A.   I really don't.
12     Q.   Is that just an internal plan that
13  you had formulated that was thought about at The
14  Hunter Group?
15     A.   It was something that the members of
16  the team that we still had there at the time, and
17  the members of the management team that were
18  there in Philadelphia, i.e., the dean and the
19  provost and the hospital CEOs, put together based
20  on, as I said, a 30,000-foot level look on our
21  part, and then asking them what were the
22  opportunities for cost reductions.
23          And I don't want to overstate the
24  detail of that because, and I repeat, it was
25  looking at it on very rapidly the 30,000-foot

Page 72

DANIEL STICKLER

1
2  level.
3      Q.   And you said that this was a plan,
4  you know, at the 30,000-foot level, without
5  details, that you formulated in conjunction with
6  discussions with the hospital CEOs of AHERF?
7      A.   Yes.
8      Q.   Was Tony Sanzo involved in any of
9  those discussions?
10     A.   I'm certain that -- I don't know
11  whether he was involved in the process of putting
12  it together, but I'm rather certain that it was
13  reviewed and discussed with him once it was put
14  together.
15     Q.   And were any members of AHERF's board
16  involved in those discussions?
17     A.   No.
18     Q.   Either --
19     A.   No. Not with me, at least.
20     Q.   Backing up for a moment, in addition
21  to the various CEOs you have mentioned and Nancy
22  Wynstra and David McConnell, did you have a
23  chance to work with any AHERF board members
24  throughout your engagement with AHERF?
25     A.   There was one or two occasions in

18 (Pages 69 to 72)

**LEGALINK MANHATTAN  (212) 557-7400**

Page 77

DANIEL STICKLER

1
2 just trying to survive at the moment of the
3 bankruptcy, or when AHERF filed for bankruptcy?
4     A.   Yes, that's about when it happened.
5     Q.   And then during the course of the
6 bankruptcy process, at some point in time there
7 came a point where there was actual real thought
8 about developing a closedown plan or winddown
9 plan; is that right?
10     A.   There was a point at which we were at
11 risk of running out of cash completely and not
12 being able to make payroll, and I took it to the
13 Creditors Committee and presented to the
14 Creditors Committee a plan to -- a date by which
15 we felt a decision had to be made to either
16 provide more cash or to have a sale transaction,
17 or start implementing a five-day shutdown
18 period. And the plan was to at the end of five
19 days have a chain link fence up around all the
20 properties, and all the patients, all the
21 students and all the faculty and all the research
22 and everything gone.
23     Q.   Do you recall, was that discussion
24 before the bankruptcy or after the bankruptcy?
25     A.   Afterwards. Afterwards. It was as

Page 78

DANIEL STICKLER

1
2 we were coming toward the end of the debt
3 financing.
4     Q.   And at that point in time, do you
5 recall if there was an auction process going on
6 as to all the AHERF hospitals before the
7 Bankruptcy Court?
8     A.   I'm not familiar with the exact
9 definition of that, but I know that the
10 investment bankers were working at trying to get
11 competitive proposals for the sale of the
12 organizations, yes. We were working in support
13 of that.
14     Q.   So there were still sale processes
15 going on at that point?
16     A.   When?
17     Q.   I'm sorry, at the point in time where
18 you had your proposal about potentially shutting
19 down.
20     A.   Yes. That was -- either it had to be
21 sold or it had shut down or somebody had come up
22 with more money. Those were the only three
23 options.
24     Q.   In terms of the plan for shutdown,
25 would it have been a shutdown of all the AHERF

Page 79

DANIEL STICKLER

1
2 hospitals and the university or just some?
3     A.   Yes, it would have been a shutdown of
4 everything.
5     Q.   Do you recall what the reaction
6 was -- and you said this was a presentation to
7 the Creditors Committee?
8     A.   Yes.
9     Q.   Were any AHERF trustees present?
10     A.   I don't recall.
11     Q.   Do you recall what the reaction was
12 of the members of the Creditors Committee?
13     A.   I think we were all horrified at the
14 prospect of starting into that kind of a process.
15     Q.   And do you recall any other reaction
16 by the Creditors Committee?
17     A.   Not specifically, no.
18     Q.   And so at that point in time do you
19 recall what the decisions were that you were
20 choosing between, as opposed to shutting down
21 entirely?
22     A.   I wasn't making those decisions at
23 that point in time.
24     Q.   So you were proposing either sale or
25 shutdown?

Page 80

DANIEL STICKLER

1
2     A.   I was trying to -- I guess I was
3 trying to be certain everybody understood the
4 urgency of the situation and the terrible
5 consequences of one of the routes.
6     Q.   Did you have any sense of whether
7 shutdown was a real possibility in the sense of
8 was that --
9     A.   Oh, I was afraid it was. I mean, we
10 didn't put the plan together for a joke. We put
11 it together because we felt that it may very well
12 have to be done. And I even told them I was
13 going to wear a bulletproof vest if we started
14 through that process.
15     Q.   And I take it there was huge at that
16 time public concern, as far as you know, from the
17 press, or discussions?
18     A.   I don't know that the possible
19 shutdown plan ever got into the press. I don't
20 think it did. I don't recall.
21     Q.   Did you have interactions with either
22 the press at the time --
23     A.   No.
24     Q.   -- or with public community groups?
25     A.   No. Our Hunter Group position always

20 (Pages 77 to 80)

**LEGALINK MANHATTAN  (212) 557-7400**

Page 81

DANIEL STICKLER

1
2 is if the client is going to have interaction
3 with the press, then the client does it, we
4 don't.
5     Q.    Was the fact of The Hunter Group's,
6 you know, work at AHERF publicly known at the
7 time?
8     A.    Oh, yes. Oh, yes. That was well
9 known.
10     Q.    And do you know how it came to be
11 well known? I mean, did --
12     A.    I don't know.
13     Q.    Did AHERF release a press
14 announcement saying that?
15     A.    I don't remember.
16     Q.    Are engagements by The Hunter Group,
17 to the extent you know, ever kept secret in terms
18 of the work it does for various hospitals?
19     A.    Not that I know of. You can't keep
20 something like that secret.
21     Q.    You mentioned that you appeared at
22 various AHERF eastern region board meetings from
23 time to time.
24     A.    Yes.
25     Q.    Did you have discussions with the

Page 82

DANIEL STICKLER

1
2 AHERF eastern region board about the 30,000-foot
3 level plan you mentioned?
4     A.    My assumption is I did, but I don't
5 know specifically.
6     Q.    Do you recall any of the members of
7 the eastern region board who you dealt with
8 because perhaps you had more interaction with
9 them than others?
10     A.    Well, the chairman of that board's
11 last name was Palmer, if I'm not mistaken.
12 Dorothy Brown was a member of that board.
13     I can't think of any other names
14 right now.
15     Q.    Is there any reason that Dorothy
16 Brown's name and Mr. Palmer's name stick out more
17 than others in your mind?
18     A.    If I'm not mistaken, Mr. Palmer was
19 the chairman, and Dorothy Brown was assisting in
20 a role as the interim president of the university
21 during that bankruptcy process.
22     Q.    And did you have more occasion to
23 interact with Mr. Palmer because he was chairman?
24     A.    Yes. Yes.
25     Q.    And the same with Dorothy McKenna

Page 83

DANIEL STICKLER

1
2 Brown, because of her work as interim president?
3     A.    Because of her role as interim
4 president, yes.
5     Q.    Were there any members of AHERF's
6 Pittsburgh board, or the AHERF parent board, that
7 you had more occasion to interact with than
8 others?
9     A.    I don't recall. I don't even recall
10 whether there were members of the Pittsburgh
11 board on the eastern board or not. I don't
12 remember.
13     Q.    Do you recall ever having
14 interactions with William Snyder, III?
15     A.    I obviously know the name. As I
16 said, I attended one AHERF board meeting. I knew
17 the name from the years I had been in
18 Pittsburgh. So he wasn't a total stranger at
19 that point in time. I don't recall specific
20 interactions with him, no.
21     Q.    Do you recall at any point in time
22 ever hearing that AHERF had paid off an $89
23 million, or almost $90 million line of credit
24 that it had with the Mellon Bank?
25     A.    That was in the news and every place,

Page 84

DANIEL STICKLER

1
2 but that's about as much as I know about it, is
3 what was public again. I didn't choose to look
4 back and try to figure out what happened. And I
5 figured it was none of my business at that point.
6     Q.    Did you ever have occasion, even if
7 you didn't look into it on your own, to discuss
8 with either members of The Hunter Group or AHERF,
9 either trustees or management, the repayment of
10 the Mellon line of credit?
11     A.    It had been done by the time I became
12 aware of it, and I had no reason to spend my time
13 on it. That was a perfect example of the kind of
14 thing that I felt would be a deflection of our
15 attention, to put our attention to.
16     Q.    So you didn't have any discussions?
17     A.    No.
18     Q.    Do you know if anyone at The Hunter
19 Group was engaged in any discussions relating to
20 looking back at some of these events?
21     A.    No, I don't think so. I was the head
22 of the engagement team, and my direction was very
23 clear on that issue. I can't tell you that
24 somebody didn't out of curiosity go against my
25 direction, but...

21 (Pages 81 to 84)

**LEGALINK MANHATTAN  (212) 557-7400**



Page 85

DANIEL STICKLER

1
2     MR. WITTEN: Can we take a break,
3  Kevin?
4     MR. TERUYA: Sure. Off the record,
5  please.
6     THE VIDEOGRAPHER: Going off the
7  record. The time is 10:47 a.m.
8     (A recess was taken.)
9     THE VIDEOGRAPHER: Returning to the
10 record, the time is 10:59 a.m. This marks the
11 beginning of Tape No. 2.
12    MR. TERUYA: I would like to mark as
13 Exhibit 1552 a document bearing Bates numbers
14 PR-MM-06-1925 through 1932. And it appears to be
15 a fax dated July 8, 1998, from Kathleen
16 Hendrickson, to Mike Martin at AHERF, and it's
17 forwarding a letter that appears to be from
18 Thomas McCool of PNC Bank and David Stevens of
19 MBIA to members of the board of trustees of
20 AHERF, and it appears dated July 7, 1998, and it appears to copy
21 Anthony Sanzo, CEO, and David Hunter.
22    (Deposition Exhibit 1552
23 for identification, document Bates stamped
24 PR-MM-06-1925 through PR-MM-06-1932.)
25    BY MR. TERUYA:

Page 86

DANIEL STICKLER

1
2     Q.  Just let me know when you have had a
3  chance to look through it.
4     A.  I'm not going to read it all, so you
5  go ahead.
6     Q.  What I was going to ask you, do you
7  recognize this document at all?
8     A.  I don't recognize it specifically,
9  no. I think I recall hearing someplace that it
10 existed, but I don't recall having seen it.
11    Q.  Do you recall where you might have
12 heard about its existence from?
13    A.  No, I don't.
14    Q.  Did you talk with David Hunter at the
15 time about the AHERF engagement?
16    A.  I couldn't answer that question. I
17 really don't know.
18    Q.  Not about the letter, but I mean
19 during the course of the AHERF engagement, were
20 you having regular talks with him?
21    A.  Oh, yes. Yes, I had regular
22 conversations with him.
23    Q.  Do you recall what you might have
24 heard about the letter, other than the fact of
25 its existence?

Page 87

DANIEL STICKLER

1
2     A.  I heard that there was potentially
3  dollars available to carry through this time
4  period, but that it was contingent on the
5  relationship with the western operations, and
6  that that wasn't being receptive, or something of
7  that nature. I don't remember specifically.
8     Q.  When you say dollars available, do
9  you mean dollars available from any source, or
10 did you have some particular source in mind?
11    A.  I don't remember whether it was this
12 particular source or not.
13    Q.  Do you recall ever learning that --
14    A.  I think I remember in the Creditors
15 Committee at least one time PNC having referred
16 to AHERF rejecting that offer, or something of
17 that nature.
18    Q.  This is an offer for financing of
19 some sort from PNC to AHERF?
20    A.  Aren't they party to this one?
21    Q.  Oh, yes, they are. I just was seeing
22 what you remembered.
23    A.  So I don't know whether that was the
24 specific one he was referring to or not.
25    Q.  For the moment, setting aside the

Page 88

DANIEL STICKLER

1
2  letter, you recall that at some point in time
3  there was an offer from PNC to AHERF for
4  financing?
5     A.  It was hearsay information to me.
6  But I do recall having heard that, yes.
7     Q.  And what do you recall your reaction
8  was to hearing that, or what do you recall about
9  that?
10    A.  I guess my reaction was something
11 along the lines of focusing strictly on my
12 responsibility for that group of institutions,
13 that it was unfortunate that these two parties
14 didn't seem to be able to arrive at a conclusion
15 that would do what needed to be done for the
16 institutions. I didn't presume to pass judgment
17 on it. I figured that's not something I could do
18 anything about it, and I wasn't going to spend a
19 lot of time on sweating it out.
20    Q.  Do you recall when this was? Was
21 this in June of '98?
22    A.  I notice the date on this thing, but
23 I don't recall specifically when it was.
24    Q.  In relation to the bankruptcy, do you
25 recall if it was before the bankruptcy?

22 (Pages 85 to 88)

Page 89

DANIEL STICKLER

1
2    A    I thought it was before. My
3  recollection is it was before the bankruptcy.
4    Q.    And it was obviously at some point
5  after your arrival, which was, as you said, a
6  couple of months in front of the bankruptcy, or a
7  month or so in front of the bankruptcy?
8    A.    I don't remember exactly, but I don't
9  think it was very long before the bankruptcy.
10    Q.    In your view, could acceptance or
11  agreement between AHERF and PNC as to some kind
12  of financing arrangement have helped AHERF's
13  financial condition in '98?
14    MR. WITTEN: Objection.
15    A.    I said earlier we had put together a
16  30,000-foot plan as to what we thought we had to
17  have to get it to the point of avoiding
18  bankruptcy. And I don't remember whether this
19  number was consistent with that plan or not, to
20  be honest with you.
21    Q.    When you said that there was some
22  condition upon the financing that related to the
23  involvement of the west, what did you mean by
24  that?
25    A.    My recollection was that -- and this

Page 90

DANIEL STICKLER

1
2  refreshed my memory when I looked at it, to be
3  honest with you -- that there was a condition
4  that the assets of the west had to be pledged in
5  order to achieve the financing. And my
6  recollection was that that was a stumbling point.
7    Q.    That AHERF was, for whatever reason,
8  unwilling to accept that condition?
9    A.    Or PNC was, for whatever reason,
10  insisting on it.
11    Q.    And you said it was unfortunate. I
12  take it that's just because of the obvious point
13  that whatever money was available could have
14  helped the situation?
15    A.    Yes. My focus was on that group of
16  organizations, and...
17    Q.    Do you recall if the dollar amounts
18  were significant that were involved?
19    A.    I just saw one in here, a number of
20  160 million, didn't I, when I looked at this? Or
21  did I not?
22    Q.    There is a reference of a maximum of
23  up to 160 million, and I don't know what
24  recollection you might have about the amounts.
25    A.    Only what I saw when I saw this. I

Page 91

DANIEL STICKLER

1
2  didn't have a recollection before that.
3    Q.    Is it consistent with your
4  recollection that we are talking about a
5  significant amount of money?
6    A.    Yes.
7    Q.    Do you see the reference down on the
8  page with the number ending in 1926 on the bottom
9  right? It's the first page of the letter, the
10  July 7 letter. Do you see the paragraph that
11  starts out "Moreover" down at the bottom, and
12  continues on to the next page?
13    A.    Yes.
14    Q.    I'm sorry, it's all on this page. Do
15  you see it says, "Moreover, at a time when the
16  AHERF system had already manifested serious
17  financial problems, the board nonetheless allowed
18  the withdrawal from the AHERF system in April
19  1998 of almost $90 million to repay, and thereby
20  prefer as to all other creditors, Mellon Bank, an
21  action which drained the AHERF system of
22  desperately needed liquidity at a critical
23  juncture."
24    A.    I see that, yes.
25    Q.    Do you recall ever hearing anything

Page 92

DANIEL STICKLER

1
2  along those lines?
3    A.    We talked about that earlier and, as
4  I said, it was in the newspaper. It was
5  everyplace. And so I don't know where I heard
6  it, but I became aware of it, yes, of that
7  dispute.
8    Q.    Did you have any view as to whether
9  that repayment was something that hurt the AHERF
10  system?
11    A.    That was history that I couldn't
12  change, and I didn't spend any time thinking
13  about it.
14    Q.    Would you have made that same
15  decision to repay?
16    A.    I don't know the situation. I
17  couldn't decide on that.
18    Q.    Would an additional $90 million in
19  money at the time have helped the situation, in
20  your view?
21    A.    I don't remember the amount of
22  dollars we felt we needed in the turnaround. I
23  don't remember when this happened, or how much of
24  it may have been, pardon the expression, pissed
25  away if they hadn't done that and still not been

23 (Pages 89 to 92)

DANIEL STICKLER

1
2  available. I don't have any way of knowing.
3      Q.  I take it at the time you would have
4  at least wanted 90 more million dollars? That
5  would be something that was useful?
6      A.  There was a number we felt we had to
7  have, and anything less than that we weren't
8  willing to tackle it on. And I don't remember
9  what that number was.
10     Q.  $90 million in combination with other
11  sources of financing collectively might have
12  gotten you to that number?
13     A.  Let's go back and look at what the
14  number was, and that's the answer to the
15  question.
16     Q.  So 90 million would have at least --
17     A.  You're trying to put words in my
18  mouth now.
19     Q.  I'm just asking you --
20     A.  I mean, if grandmother had 150
21  million, that would have helped. You know,
22  anything would have helped if you had been able
23  to assemble the total amount necessary to work
24  through that turnaround plan.
25     Q.  So any significant amount of money

DANIEL STICKLER

1
2  would have helped if in combination it added up
3  to whatever was the figure you came out with?
4      A.  Yes.
5      Q.  Going back to the 30,000-foot
6  turnaround plan you mentioned, you mentioned that
7  the goal was in the short term to come up with
8  various kinds of cost reduction. What was the
9  sort of purpose for reducing costs in the short
10  term? What would that have allowed AHERF to do?
11  Just to avoid bankruptcy?
12     A.  The original goal was to do a
13  long-term turnaround plan. Then it changed very
14  rapidly into a plan -- get enough money and
15  implement enough cost reduction steps to be able
16  to avoid the cash flow crisis and bankruptcy,
17  yes.
18     Q.  And once costs had been reduced to a
19  certain level to avoid bankruptcy, what would the
20  goal then be, if you were able to obtain that
21  goal?
22     A.  Then it would have been to put
23  together a long-term turnaround plan, or at least
24  I assume that would be
25     Q.  So the goal would have switched back

DANIEL STICKLER

1
2  to trying to come up with a turnaround plan?
3      A.  Yes.
4      Q.  And would part of that turnaround
5  plan have been trying to find ways to enhance
6  revenues as well as reduce costs?
7      A.  I'm sure it would have been, yes.
8      Q.  In order to come up with that plan,
9  that's where you said you would perform an
10  evaluation of the market?
11     A.  Yes.
12     Q.  Was there anything else you would do
13  in addition to performing the evaluation of the
14  market?
15     A.  We would have done our total --
16  assuming the client was willing, we would have
17  done our total performance improvement program,
18  and that looks at every aspect of the
19  organization, from top to bottom, productivity,
20  supplies, market analysis, contracting, you know.
21     Q.  Would you look at what strategies
22  management and the board had pursued in the past?
23     A.  No. Only to the extent that
24  something jumped out as having been an obstacle
25  to the future.

DANIEL STICKLER

1
2      Q.  Would you look at what was the
3  performance of whatever strategy management and
4  the board had pursued in the past?
5      A.  Only to the extent that it jumped out
6  as a potential obstacle to the future. I mean,
7  it would not have been a retrospective study as
8  to who screwed up or who didn't.
9      Q.  I mean, would you look at what
10  challenges the board and management had faced in
11  the past in assessing what to do going forward?
12     A.  Probably not. Again, it's
13  forward-looking. It's where are you today, what
14  can you do today to be better tomorrow. And
15  whether you got here because of this or this or
16  this is immaterial as far as we were concerned.
17     Q.  And that's the standard practice that
18  you employed in engagements at the time?
19     A.  Yes.
20     Q.  In terms of that standard practice
21  you employed, when you say you would have studied
22  the market, would you have studied the
23  performance of certain kinds of strategies in
24  that market? In other words, would you have
25  tried to judge what a given strategy in the

24 (Pages 93 to 96)

DANIEL STICKLER

1
2  abstract, how it does in a given market, given
3  the market conditions?
4      A.   We would have looked at what their
5  market share was today, who their competitors
6  were, what their strengths and weaknesses are,
7  what our strengths and weaknesses were, and
8  drawing on our knowledge of strategies that
9  potentially might work, we would bring that to
10 bear, too, yes.
11     Q.   Would you look at how the strategies
12 that had been pursued by competitors and by your
13 client itself had fared in the given market?
14     A.   Probably not in that regard, no.
15     Q.   Do you recall any engagements --
16 actually let me strike that.
17          And you have said that you didn't
18 have time to do any of that, look at the market
19 conditions or to form any kind of turnaround plan
20 in your time at AHERF because you didn't have the
21 time to do it; is that right?
22     A.   Well, you just said any kind of
23 turnaround plan, and that cost reduction plan to
24 get through to positive cash flow was, in fact, a
25 bit of a turnaround plan. It wasn't what we

DANIEL STICKLER

1
2  would consider a real turnaround plan. It was
3  what would meet the needs of the organization at
4  that point in the crisis. We did do that, yes.
5  We did it at the 30,000-foot level. We didn't
6  have time to do it any further than that.
7      Q.   But you didn't perform any analysis
8  of the market and competitors and the like that
9  you said you would need to formulate a plan?
10     A.   As I said before, no, we did not.
11     Q.   I guess, referring for a moment back
12 to Exhibit 1552, do you see the line in it, the
13 third paragraph, that says, "We have heard that
14 the AHERF board has recently expressed strong
15 reservations with respect to making the credit of
16 the west available to support the east. The
17 board's current position is inconsistent with its
18 actions in the past and is particularly
19 unfortunate in view of the system-wide need for
20 financing. Until now, the board has had no
21 reservation about attempting to adjust
22 intercompany obligations or about using very
23 substantial sums over an extended period of time
24 for loans, advances and repayments within the
25 AHERF system, as documented by the books and

DANIEL STICKLER

1
2  records of the various members of the AHERF
3  system."
4          Had you ever heard anything about any
5  kinds of loans or other kinds of arrangements
6  between the west and east at AHERF at any time?
7      A.   I'd hear hearsay conversations, but
8  nothing that I, you know -- you've got to be a
9  better source of information than me for those
10 kinds of things.
11     Q.   Do you recall what you heard, just at
12 a general level?
13     A.   That money from the west -- or the
14 east had been used to support some of the
15 activities in the west. I heard that in general
16 conversation. Whether it's true or not, I
17 couldn't support it. And, again, it was
18 immaterial to me at that point in time.
19     Q.   Did you recall hearing at the time
20 that the west, or the AHERF board, had decided
21 that the west funds would no longer be used to
22 subsidize the operations of the east?
23     A.   I think I told you a few minutes ago
24 that I heard that they had said that they would
25 not guarantee the debt. That's all I recall

DANIEL STICKLER

1
2  having heard.
3      Q.   In terms of searching for additional
4  financing that could help the situation at AHERF,
5  was that at all part of your responsibilities?
6      A.   I guess to the extent that I provided
7  supporting information to try to convince
8  somebody that it would be a good investment on
9  their part, particularly if they were a creditor,
10 to put some more money forward to try to preserve
11 their earlier debt, yes.
12     Q.   Do you recall what sources of
13 financing you contacted at the time?
14     A.   I was not the primary contact. I was
15 in a supporting role during that time period. I
16 recall having -- being in a supporting role in
17 discussions with MBIA. That's the only one I can
18 recall specifically, and I recall that because we
19 flew up there on Sunday night.
20     Q.   That's flying up to Armonk?
21     A.   Yes.
22     Q.   Do you recall what the purpose of
23 that conversation was?
24     A.   Tried to convince them to loan us
25 money.

25 (Pages 97 to 100)

**LEGALINK MANHATTAN  (212) 557-7400**

Page 101

DANIEL STICKLER

1
2    Q.    Do you recall when that was?
3    A.    If I'm not mistaken, it was a day or
4    two before bankruptcy, sort of a last-ditch
5    effort.
6    Q.    Who went up with you on that?
7    A.    Sanzo and Hunter and I, and I don't
8    remember whether there was anybody else or not.
9    Q.    And do you recall who the MBIA people
10   were that you met with?
11   A.    I don't remember the names, no.
12   Q.    Do you recall what their positions
13   was?
14   A.    There was the big muckety-muck that
15   we met with that night, and two or three
16   supporting people, but I don't remember the names
17   at this point.
18   Q.    So some high-level person at MBIA?
19   A.    Yes.
20   Q.    And do you recall what kind of
21   financing arrangement you were looking for was,
22   or were you just looking for whatever kind of
23   money was available?
24   A.    We were asking for credit to be given
25   to AHERF at that point in time, a loan to be made

Page 102

DANIEL STICKLER

1
2    to AHERF to carry us through that period we were
3    talking about.
4    Q.    Do you recall having any discussion
5    at that point about whether the assets of the
6    west would be needed to be pledged?
7    A.    I don't recall any discussion on
8    that, and I didn't consider myself a party to
9    that question, to be honest with you. Whatever
10   the board decided, they decided, and they didn't,
11   you know..
12   Q.    Do you recall what MBIA's response
13   was at the time to your request?
14   A.    I recall we didn't get the money. I
15   remember that.
16   Q.    Do you recall why you didn't get the
17   money?
18   A.    I specifically don't recall why. I
19   recall we were greatly disappointed, and that was
20   sort of our last-ditch effort.
21   Q.    What was the aversion to filing for
22   bankruptcy, or why did you have that aversion?
23   A.    You mean why did we not want to do
24   it?
25   Q.    At that point in time.

Page 103

DANIEL STICKLER

1
2    A.    Well, I guess we felt we had a
3    responsibility to the creditors. I think we had
4    responsibility to the corporation. You know, we
5    ran a high risk of throwing the hospitals and the
6    health care organizations into a deep downward
7    spiral. You know, if you don't make payroll in a
8    hospital and the ICU nurses don't show up
9    tomorrow, you've got a pretty big problem. And
10   we were trying to avoid those kinds of problems.
11   And as the -- you know, we had a
12   difficult struggle to keep the public confidence
13   in the organization so that the patient volumes
14   and the revenues stayed relatively constant
15   during that time period, to keep the Joint
16   Commission from jerking accreditation away from
17   us, to keep the medical school accrediting party
18   from jerking accreditation away from us. There
19   were a lot of reasons.
20   Q.    So just the mere fact of filing for
21   bankruptcy can make that kind of difference?
22   A.    Oh, yes, I think it potentially could
23   have. We worked very hard with those
24   organizations and with the public media and the
25   employees and the medical staff and everybody to

Page 104

DANIEL STICKLER

1
2    convince them that, you know, as Churchill said,
3    that we will get through this and we will
4    prevail.
5    Q.    So just the mere fact of filing for
6    bankruptcy can jeopardize, or you thought at the
7    time could jeopardize AHERF's accreditation of
8    the hospitals and the medical school?
9    A.    The individual hospitals are
10   accreditated and the medical school is
11   accreditated, you know, individually. And it
12   obviously did. I mean, they were out there, to
13   talk at it and look at it immediately, within
14   days.
15   Q.    In addition to that, you said that
16   there would be public concern about the situation
17   if AHERF filed for bankruptcy?
18   A.    Yes. You know, you don't want to go
19   in and have your back operated on tomorrow if you
20   don't know whether the nurses are going to show
21   up for work or not.
22   Q.    Let me try to separate two things
23   out. I mean, if we separate out on the one hand
24   the factors that lead an institution to file for
25   bankruptcy, namely, you know, it doesn't have

26 (Pages 101 to 104)

Page 145

DANIEL STICKLER

1
2    A.   It appears to be the engagement
3 letter between The Hunter Group and AHERF
4 relative to the interim management services. I
5 think I stated to you earlier that there was
6 performance improvement planning responsibility.
7 I had thought that was all in one engagement
8 letter. There must have been separate engagement
9 letters, is all I can conclude, because I don't
10 see it mentioned here.
11    Q.   I will just mention, I have a series
12 of engagement letters, and I was just trying to
13 understand the differences between them. So I am
14 taking out new ones, and if you are wondering
15 what I am doing.
16       So does this appear to be the initial
17 engagement letter between AHERF and The Hunter
18 Group?
19    A.   It appears to be, yes.
20    Q.   Do you see the signature on page 4 of
21 the document of Larry Scanlan?
22    A.   Yes.
23    Q.   Was he the president of The Hunter
24 Group at the time?
25    A.   Yes.

Page 146

DANIEL STICKLER

1
2    Q.   Is he still the president of The
3 Hunter Group, to the extent there is one, at
4 present?
5    A.   I don't know what his exact title is
6 now.
7       MR. D'ANGEL: He's a managing
8 director at Navigant. He's a Navigant employee
9 now.
10    Q.   Back at the time in 1998, did Larry
11 Scanlan have any kinds of involvement in the
12 AHERF engagement, other than signing off the
13 engagement letter, to your knowledge?
14    A.   Not to my knowledge. He may have had
15 in relationship to David Hunter, but I don't
16 recall in relationship with me.
17    Q.   And do you recognize this to be his
18 handwriting on page 4?
19    A.   No.
20    Q.   You don't know?
21    A.   No.
22    Q.   But you don't have any reason to
23 believe that this is not the engagement letter?
24    A.   No.
25    Q.   And at this point in time, is it

Page 147

DANIEL STICKLER

1
2 correct that this was an engagement letter just
3 for services by you and David Hunter in terms of
4 providing interim management services?
5    A.   That's what I see here, yes.
6    Q.   And at the time do you know why or
7 what was the objective in terms of obtaining
8 interim management services from The Hunter
9 Group, if you know?
10    A.   If I'm not mistaken, this was within
11 days after the departure of Sherif and Donald
12 Kaye, the eastern regional executive, and they
13 were trying to plug a hole, I think.
14    Q.   Do you remember who contacted whom?
15 Did AHERF contact The Hunter Group, or vice
16 versa?
17    A.   I don't know. I was riding down the
18 Coraner Turnpike in Ohio with my wife when I got
19 a call on my cell phone that said can you be in
20 Philadelphia Monday morning.
21    Q.   That was on a Friday, you said, they
22 gave you a call, and said be at work on Monday?
23    A.   Friday or Saturday.
24    Q.   And you were in Ohio, you said, at
25 the time?

Page 148

DANIEL STICKLER

1
2    A.   Yes.
3    Q.   Was that on a different engagement?
4    A.   No, I was visiting my in-laws.
5    Q.   At that time you were still residing
6 down in Florida?
7    A.   Yes.
8    Q.   Did you have to move up to
9 Pennsylvania for the AHERF engagements?
10    A.   No. I got a corporate apartment
11 there in town, and used that, and went home on
12 weekends when I could.
13    Q.   Were most of the members of the
14 engagement team from The Hunter Group who worked
15 at AHERF residents of Pennsylvania?
16    A.   I couldn't even --
17    Q.   Or put differently, were there a lot
18 of people who were in the same boat as you,
19 coming from Florida to Pennsylvania, or were
20 there lots of people who were from Pennsylvania?
21    A.   Our people are scattered to live all
22 over the country, and live wherever they want to,
23 and fly to work Monday morning. And one guy on
24 the engagement was from New Jersey, and he drove
25 in. I think he drove in every day most of the

37 (Pages 145 to 148)

Page 149

DANIEL STICKLER

1  time, and drove back. There was another guy that
2  I think his residence was in Philadelphia, in the
3  Philadelphia area, who drove in and back
4          I'm trying to think who else was
5  there. I don't even remember. Honan's residence
6  was in Florida at the time, I think.
7      Q.   Were there any individuals other than
8  yourself who had had management experience in
9  Pennsylvania in terms of running hospitals, who
10  were on the engagement team?
11      A.   Well, David Hunter, of course. Alan
12  Dzija was on the engagement team and had had
13  experience in the Philadelphia area. I don't
14  remember whether he had -- he worked for one of
15  the consulting firms. I don't know whether he
16  had direct hospital experience or not. I don't
17  recall others.
18      Q.   Was David Hunter actually on the
19  engagement team, or did he just arrange for the
20  engagement to occur and then left it to you?
21      A.   He spent some time there. I couldn't
22  tell you exactly how much. But he spent some
23  time there, and he also spent some time on the
24  phone with me relative to it. But my

Page 150

DANIEL STICKLER

1  recollection was he was much more present than
2  any other job I've ever been on.
3      Q.   In terms of what you did under this
4  engagement letter, in terms of just plugging the
5  hole, as you described it, left by Mr. Abdelhak
6  and Dr. Kaye, do you recall what you did when you
7  showed up to work on Monday in terms of your
8  responsibilities at that time?
9      A.   I think we went through all that
10  before. We put together -- we started to put
11  together a performance improvement program. Very
12  early on we shifted and put together this crash
13  program.
14      Q.   So that, what you described earlier
15  was part of this engagement, more or less?
16      A.   It's very hard to separate them. You
17  know, as the interim executive, I start
18  approving, putting out orders, and approving
19  requisitions, and cut expense, and reviewing
20  cost, and reviewing cost reports, and that kind
21  of thing.
22          MR. TERUYA: I don't think I will
23  spend very much time on these next few exhibits,
24  but I just wanted to show them to you.

Page 151

DANIEL STICKLER

1      The next one is number 1555, and it
2  is a one-page document with Bates number HUNT
3  4493, and it appears to be a supplemental
4  agreement between Kirkpatrick & Lockhart, or a
5  supplement to an agreement between Kirkpatrick &
6  Lockhart and AHERF, dated June 23, 1998.
7          (Deposition Exhibit 1555
8  for identification, document Bates stamped HUNT
9  4493.)
10      A.   Okay. I'm listening.
11      MR. TERUYA: While you have this
12  exhibit, let me mark another one that you might
13  need to look at simultaneously, as 1556, which
14  has Bates numbers HUNT 4547 through 4549, and it
15  appears to be a fax from William Cullen to Mr.
16  Huoy of The Hunter Group, dated June 25, 1998,
17  and it appears to be forwarding a signature page
18  of an agreement, and an exhibit to an agreement
19  as well, between Kirkpatrick & Lockhart and The
20  Hunter Group.
21          (Deposition Exhibit 1556
22  for identification, document Bates stamped HUNT
23  4547 through HUNT 4549.)
24      MR. D'ANGEL: Is that it, just two

Page 152

DANIEL STICKLER

1  pages behind the cover sheet?
2      MR. TERUYA: Yes, it is three pages
3  in total, a fax cover sheet, a signature page,
4  and an exhibit page of some sort.
5      A.   Okay.
6      Q.   I was just going to ask you, do you
7  recognize Exhibit 1555?
8      A.   No, I don't.
9      Q.   Do you recognize 1556?
10      A.   No.
11      Q.   Do you have any recollection of an
12  agreement entered into between The Hunter Group
13  and Kirkpatrick & Lockhart?
14      A.   I have a vague recollection that some
15  of our work was contracted with or through
16  Kirkpatrick Lockhart, for whatever reason I don't
17  know or recall.
18      Q.   Do you see on the third page of
19  Exhibit No. 1556 there is a document that says
20  Exhibit 1, and it's from The Hunter Group to
21  Kirkpatrick & Lockhart, dated, at least at the
22  top, June 16, 1998, and it says for assistance in
23  developing a near-term cash management and
24  conservation plan?

38 (Pages 149 to 152)

Page 153

DANIEL STICKLER

1
2    A.    Yes.
3    Q.    And then it has a task listing, with
4  a number of tasks, and individuals listed next to
5  it who appear to be Hunter Group members.
6    A.    Yes.
7    Q.    I was just wondering, do you have any
8  understanding of what this page at least is, the
9  Exhibit 1 page?
10    A.    Do I have any understanding of what
11  this page is? I can do interpretation of it, I
12  guess. But do I have a recollection of what it
13  was at the time, no.
14    Q.    Do you have a recollection of -- or
15  looking at this document, does this appear to
16  describe the plan you described, about trying to
17  formulate a turnaround plan of some sort, or the
18  efforts to formulate a turnaround plan?
19    A.    It appears that this describes it a
20  little bit differently than a turnaround plan
21  that I described earlier, and now it's making me
22  wonder about my recollection as to whether the
23  initial engagement of this group of people was,
24  quote, a near-term cash management conservation
25  plan or a full-blown turnaround plan. But this

Page 154

DANIEL STICKLER

1
2  list of individuals are the people that were the
3  team that was developing the plan, or working to
4  develop a plan.
5    Q.    So originally David Hunter and
6  yourself were hired to fill the hole left or the
7  void left by Mr. Abdelhak and Dr. Kaye?
8    A.    Yes.
9    Q.    And then this set of individuals,
10  David Hunter, Paul Long, Alan Dzija, Tom Honan,
11  Dean Kinsey, Jeff Gerew and Jack Julius, all came
12  on board to develop some kind of plan, but you
13  are not sure --
14    A.    To develop a plan to try to stop the
15  bleeding.
16    Q.    But you are not sure if it was a full
17  turnaround plan or some kind of near-term cash
18  management and conservation plan?
19    A.    Right. I know that we ended up
20  working on the near-term short one as I told you,
21  the crisis one, instead of the long-term one, and
22  this is the people that came on board to work on
23  that.
24    Q.    But, again, you don't recognize
25  either of these documents or the signatures on

Page 155

DANIEL STICKLER

1
2  them?
3    A.    I may have seen them, probably did
4  see them at some point, but I don't have a
5  specific recollection of that.
6    MR. TERUYA:    I am going to mark as
7  Exhibit 1557 a document with Bates numbers HUNT
8  4500 through 4501, and it appears to be an
9  engagement letter dated July 22, 1998, at the top
10  of it, between The Hunter Group and AHERF, signed
11  by, apparently, Larry Scanlan for The Hunter
12  Group and Anthony Sanzo for AHERF.
13    (Deposition Exhibit 1557
14  for identification, document bearing Bates stamps
15  HUNT 4500 and HUNT 4501.)
16    A.    Fire away. I'll try to answer you.
17    Q.    Do you recognize this document?
18    A.    Not specifically, I don't, no.
19    Q.    Does this appear to be the engagement
20  letter between The Hunter Group and AHERF dated
21  July 22, 1998?
22    A.    That's what it appears to be.
23    Q.    Do you recognize David Hunter's
24  signature on the second page of the Exhibit 1557?
25    A.    His signature is not on there. Larry

Page 156

DANIEL STICKLER

1
2  Scanlan's is -- oh, yes, David Hunter's is, too,
3  I guess. I don't recognize those signatures, but
4  I wouldn't, you know, necessarily recognize
5  them. I don't have any reason to believe it's
6  not theirs.
7    Q.    Do you have any understanding of what
8  this document is about in terms of the scope of
9  The Hunter Group's engagement by AHERF?
10    A.    Some of the members of the team are
11  the same members that were described in the June
12  engagement letter, and so my -- and my
13  recollection is that this represents an involving
14  role on people's part. And Bill Bricker was
15  added at that point in time as an additional
16  person. Why it was cast in a new engagement
17  letter, I couldn't answer that specifically.
18    Q.    Is this letter --
19    A.    One of the reasons we added Bill
20  Bricker at that point in time was that we were
21  having difficulty meeting the, I won't say needs,
22  I'll say demands of all of the consultants to all
23  the parties, and all the potential purchasers,
24  for information, and running into some -- well,
25  we were having difficulty meeting those demands,

Page 157

DANIEL STICKLER

1  and we needed more help to do it, and that's what
2  Bricker was brought in to help do.
3
4      Q.    When you say all the parties, do you
5  mean consultants to the members of the Creditors
6  Committee, or who are you referring to?
7      A.    Consultants to the members of the
8  Creditors Committee. I don't know, I think there
9  was somebody who was a consultant to the
10  Creditors Committee. I think every health care
11  consultant in the country had some role in this
12  whole thing. And they were struggling for access
13  to information that we were trying to make
14  available primarily to potential purchasers, and
15  at that time it hadn't been narrowed down to
16  two. There were other organizations who were
17  looking at pieces of it. And we were having
18  trouble trying to control the access to the
19  information to people who were supposed to get
20  it, and to get it to those who were supposed to
21  get it.
22      Q.    So in the June 16 engagement letter,
23  at first you and David Hunter were brought on
24  board, you as the interim chief operating officer
25  and him as the interim assistant to the CEO of

Page 158

DANIEL STICKLER

1
2  AHERF, is that right, and also as the engagement
3  director?
4      A.    Interim CEO -- I don't remember the
5  titles. Whatever they are on there. Engagement
6  director -- state the question again, please.
7      Q.    I was just saying, in the June 16,
8  1998 engagement letter, which I think is Exhibit
9  1554.
10      A.    Okay.
11      Q.    Do you recall that at that point you
12  and David Hunter were being called in, as you
13  said, to fill certain absences that had been left
14  by departures of AHERF management and that you
15  were going to be the interim chief operating
16  officer and David Hunter was going to be the
17  interim assistant to the CEO of AHERF, who was
18  then Tony Sanzo?
19      A.    Yes.
20      Q.    And then in the June 22, 1998 letter,
21  which is Exhibit 1557, at that point you expanded
22  the team?
23          MR. WITTEN: Objection.
24      Q.    Is that correct?
25      A.    The team was restructured some, and

Page 159

DANIEL STICKLER

1  it was also made clear in that organization that
2  the consulting team would also report to me in my
3  role as interim COO, which is what the chart on
4  the second page was intended to do.
5      Q.    So Dean Kinsey, Bill Bricker, Tom
6  Honan, Alan Dzija and someone else were going to
7  all report to you?
8      A.    Yes.
9      Q.    And was there any reason -- you have
10  already explained why Bill Bricker was brought
11  into the picture. Is there any reason that you
12  added on these other individuals?
13      A.    Those other individuals were on the
14  earlier engagement letter. The team just
15  reassigned some of their responsibilities, but
16  they were already there.
17      Q.    Do you see the first line of Exhibit
18  1557 says "We are pleased to submit this proposed
19  addendum to the June 16, 1998 interim management
20  agreement"?
21      A.    Yes.
22      Q.    Is this agreement to add on Tom
23  Honan, Alan Dzija, Dean Kinsey and Bill Bricker,
24  and someone else, a supplement to the original

Page 160

DANIEL STICKLER

1
2  letter where just you and David Hunter are named,
3  Exhibit 1555?
4      A.    It's a little difficult for me to
5  figure out right now based on this as to what
6  role the June 23 addendum plays relative to that
7  and what role this other one plays relative to
8  that.
9      Q.    In terms of developing a near-term or
10  some kind of plan in the short run, was there a
11  reason to bring on individuals other than
12  yourself and David Hunter?
13          MR. WITTEN: Objection.
14      Q.    From your perspective, from The
15  Hunter Group's perspective.
16      A.    Say that question again.
17      Q.    In other words, in connection with
18  developing a plan, whether it be a turnaround
19  plan or a cash conservation plan, was there any
20  reason that you brought on the particular
21  individuals you did to the AHERF engagement?
22      A.    Yes. I mean, we needed help in
23  trying to figure out, put together that
24  30,000-foot level plan, as to where we thought we
25  could make cuts and how much it would take to

40 (Pages 157 to 160)

TAB 31

DB-CM-18-01302

# ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION

## FINANCIAL STATEMENTS

### JUNE 30, 1997

10/29/97
03:45 PM

# ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
## INDEX
### JUNE 30, 1997

Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statements of Operations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Changes in Net Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

DB-CM-18-01303

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
### BALANCE SHEETS
#### June 30, 1997
(Dollars in thousands)

### ASSETS

| | June 30, 1997 | June 30, 1996 |
|---|---|---|
| Cash and short-term investments | $0 | $0 |
| Assets limited as to use | 7,480 | 3,050 |
| Other receivables | 15,659 | 0 |
| Receivable from affiliates | 0 | 34,860 |
| Prepaid expenses | 10,000 | 7,722 |
| **Current assets** | 33,139 | 45,632 |
| Assets limited or restricted as to use: | | |
| Unrestricted: | | |
| By board of trustees | 69,193 | 56,688 |
| Endowments | 86,288 | 29,130 |
| Temporarily restricted by donor | 12,079 | 52,788 |
| Permanently restricted: | | |
| Endowments | 5,387 | 5,387 |
| Participating trusts | 45,141 | 38,409 |
| | 218,088 | 182,402 |
| Investments | 370 | 370 |
| Property and equipment, net | 34,050 | 50,902 |
| Noncurrent receivable from affiliates | 43,146 | 35,667 |
| Other assets | 105,674 | 33,970 |
| **Total assets** | $434,467 | $348,943 |

### LIABILITIES AND NET ASSETS

| | June 30, 1997 | June 30, 1996 |
|---|---|---|
| Accounts payable | $39,799 | $16,283 |
| Book overdraft | 17,817 | 28,834 |
| Self-insurance liabilities | 18,321 | 9,400 |
| Accrued expenses | 102,268 | 30,504 |
| **Current liabilities** | 178,205 | 85,021 |
| Self-insurance liabilities | 16,647 | 9,284 |
| Other noncurrent liabilities | 78,604 | 37,521 |
| | 273,456 | 131,826 |
| Net assets: | | |
| Unrestricted | 98,404 | 120,533 |
| Restricted - Temporarily | 12,079 | 52,788 |
| - Permanently | 50,528 | 43,796 |
| | 161,011 | 217,117 |
| **Total liabilities and net assets** | $434,467 | $348,943 |

DB-CM-18-01304

Page 2

ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
STATEMENTS OF OPERATIONS
for the twelve months ended June 30, 1997
(Dollars in thousands)

| | CURRENT MONTH | | | | CURRENT YEAR TO DATE | | | PRIOR YEAR |
| | ACTUAL | BUDGET | VARIANCE | | ACTUAL | BUDGET | VARIANCE | ACTUAL |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Centralized service | $1,162 | $1,162 | $0 | | $13,938 | $13,938 | $0 | $14,541 |
| Investment income | 5,448 | 687 | 4,761 | | 41,281 | 8,250 | 33,031 | 35,620 |
| Net assets released from restrictions | 19,442 | 1,669 | 17,773 | | 36,663 | 19,027 | 17,636 | 0 |
| Other revenue | 371 | 104 | 267 | | 14,150 | 1,251 | 12,899 | 917 |
| Total revenue | 26,423 | 3,622 | 22,801 | | 106,032 | 42,466 | 63,566 | 51,078 |
| **Expenses** | | | | | | | | |
| Salaries, wages, and fees | 10,457 | 5,860 | (4,597) | | 93,754 | 71,727 | (22,027) | 67,474 |
| Fringe benefits | 1,616 | 595 | (1,021) | | 11,860 | 6,104 | (5,756) | 5,366 |
| Purchased services | 9,146 | (6,623) | (15,769) | | (52,761) | (79,345) | (26,584) | (62,722) |
| Administrative and general | 2,571 | 1,237 | (1,334) | | 19,497 | 13,015 | (6,482) | 8,057 |
| Depreciation and amortization | 306 | 683 | 377 | | 8,828 | 8,200 | (628) | 6,599 |
| Unusual item - reduction in workforce cost | 0 | 0 | 0 | | 0 | 0 | 0 | 2,388 |
| Total expenses | 24,096 | 1,752 | (22,344) | | 81,178 | 19,701 | (61,477) | 27,162 |
| Net income | $2,327 | $1,870 | $457 | | $24,854 | $22,765 | $2,089 | $23,916 |

DB-CM-18-01305

DB-CM-18-01306

Page 3

**ALLEGHENY HEALTH, EDUCATION AND RESEARCH F... ...ION**
**STATEMENT OF CHANGES IN NET ASSETS**
for the twelve months ended June 30, 1997
(Dollars in thousands)

| | Unrestricted | Temporarily Restricted | Permanently Restricted |
|---|---|---|---|
| Balance, June 30, 1996 | $120,533 | $52,788 | $43,796 |
| Net income | 24,854 | 0 | 0 |
| Unrealized appreciation/(depreciation) of investments | (3,955) | (4,046) | 6,732 |
| **Support from AGH for:** | | | |
| AHIG Operations | 10,981 | 0 | 0 |
| AHIG Capital | 6,308 | 0 | 0 |
| AUHS - Dean's office | 250 | 0 | 0 |
| Allegheny Institute for Cellular Therapy | 500 | 0 | 0 |
| AHERF | 552 | 0 | 0 |
| PGMA Purchase | 18,000 | 0 | 0 |
| **Support from DV for:** | | | |
| AHIG Operations | 39,827 | 0 | 0 |
| AHIG Capital | 6,168 | 0 | 0 |
| AHEFC | 5,082 | 0 | 0 |
| Tresdner Expansion | 125 | 0 | 0 |
| **Support from AUMC for:** | | | |
| Tresdner Expansion | 101 | 0 | 0 |
| AHIG Operations | 2,328 | 0 | 0 |
| PGMA Purchase | 2,000 | 0 | 0 |
| **Support to AHIG for:** | | | |
| Capital | (12,416) | 0 | 0 |
| Operations | (31,316) | 0 | 0 |
| PGMA Purchase | (20,091) | 0 | 0 |
| **Support to AGH for:** | | | |
| Telecommunication grant | (913) | 0 | 0 |
| **Support to AUHS for:** | | | |
| Dean's office | (687) | 0 | 0 |
| Allegheny Institute for Cellular Therapy | (375) | 0 | 0 |
| PHI Development | (184) | 0 | 0 |
| **Capital Project Transfers to:** | | | |
| AGH | (13,800) | 0 | 0 |
| MCPH | (6,390) | 0 | 0 |
| EPH | (2,131) | 0 | 0 |
| BGH | (2,133) | 0 | 0 |
| SGHC | (8,523) | 0 | 0 |
| HUH | (6,472) | 0 | 0 |
| AUHS | (4,624) | 0 | 0 |
| Pittsburgh Free Dispensary | 115 | 0 | 0 |
| Endowment matching | (4,110) | 0 | 0 |
| Net assets released from restrictions | 0 | (34,663) | 0 |
| Increase in DHO Investment | 127 | 0 | 0 |
| **Balance, June 30, 1997** | $239,404 | $13,079 | $50,528 |



Page 4

## ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION
### STATEMENT OF CASH FLOWS
for the twelve months ended June 30, 1997
(Dollars in thousands)

**Cash flows from operating activities:**

| | |
|---|---:|
| Net income | $24,854 |
| Adjustments to reconcile net income | |
| to net cash provided by operating activities: | |
| Depreciation and amortization | 8,828 |
| Increase/(decrease) in cash and short-term investments from changes in: | |
| Other receivables | (15,659) |
| Prepaid expenses | (2,278) |
| Other assets | (71,704) |
| Accounts payable | 23,516 |
| Self-insurance liabilities - current | 8,921 |
| Accrued expenses | 71,764 |
| Self-insurance liabilities | 7,363 |
| Other noncurrent liabilities | 41,083 |
| | |
| Net cash provided by operating activities | 96,688 |

**Cash flows from investing activities:**

| | |
|---|---:|
| Increase in assets limited or restricted as to use | (77,488) |
| Purchases of property and equipment, net | (36,054) |
| Endowment matches | (4,110) |
| Pittsburgh Free Dispensary | 115 |
| Other | 127 |
| | |
| Net cash used by investing activities | (117,410) |

**Cash flows from financing activities**

| | |
|---|---:|
| Book overdraft | (11,017) |
| Net change in intercompany accounts | 27,381 |
| Net transfers from affiliates | 4,358 |
| | |
| Net cash provided by financing activities | 20,722 |
| | |
| Net increase in cash and short-term investments | 0 |
| | |
| Cash and short-term investments at beginning of year | 0 |
| | |
| Cash and short-term investments at June 30, 1997 | $0 |

DB-CM-18-01307