Exhibit A

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No.  05-2760

———————————

In Re:  CITX CORPORATION, INC.,
Debtor

GARY SEITZ, Chapter 7 Trustee
for CitX Corporation, Inc.,
Appellant

v.

DETWEILER, HERSHEY AND ASSOCIATES, P.C.;
ROBERT SCHOEN, C.P.A.

———————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 03-cv-06766)
District Judge: Honorable James T. Giles

———————————

Argued April 27, 2006

Before: AMBRO and FUENTES, Circuit Judges,
and IRENAS,[*] District Judge

(Opinion filed :  May 26, 2006)

Neal A. Jacobs, Esquire
Joshua A. Gelman, Esquire
Matthew I. Cohen, Esquire (Argued)
Jacobs Law Group
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA  19103-7405

      Counsel for Appellant

Jonathan K. Hollin, Esquire (Argued)
Powell, Trachtman, Logan, Carrle & Lombardo
475 Allendale Road, Suite 200
King of Prussia, PA  19406

      Counsel for Appellee

_____

OPINION  OF  THE  COURT

_____

_____

[*]Honorable Joseph E. Irenas, Senior District Judge for the District of New Jersey, sitting by designation.

2

AMBRO, <u>Circuit Judge</u>

An insolvent internet company involved in an illegal Ponzi scheme used its financial statements, compiled by its accounting firm, to attract investors. After the company spent the investors' money and incurred millions more in debt, it filed for bankruptcy. A bankruptcy trustee was appointed, and he sued the accounting firm, along with the partner responsible for compiling the financial statements, for, among other things, malpractice and "deepening insolvency." The District Court granted summary judgment for the defendants on both claims.

We affirm. The malpractice claim founders on two grounds: the company was not harmed by its accountants' actions, and in any event the affidavit submitted to support the claim was a sham. As for the deepening-insolvency claim, allegations of negligent conduct do not qualify for consideration.

## I.    Factual Background and Procedural History

### A. CitX becomes insolvent

Bernard Roemmele formed CitX Corporation, Inc. in 1996 as an internet company of sorts. Roemmele took immediate opportunity to pillage CitX; for starters, he used its money to license his own intellectual property, to cover one of

3

his debts, and to settle one of his lawsuits.[1]

In mid-1999, CitX linked up with Professional Resources Systems International, Inc. (PRSI), ostensibly to create an internet shopping mall for home-based merchants who would pay a fee to be featured. CitX used this PRSI relationship—with the help of a phenomenon called the Internet Bubble—to sell equity in itself. As it happened, PRSI was a fraudulent enterprise, and CitX's stock sales were illegal under federal and Pennsylvania law. PRSI scammed nearly $18,000,000 from would-be online merchants, and CitX received approximately $700,000 of this money. The Florida Attorney General shut down PRSI in January 2000, and a receiver was appointed for it.

PRSI was CitX's only significant client, and at the time PRSI was closed it owed CitX over $2,400,000. In CitX's compiled financials, this was all that was keeping the company theoretically in the black. Because CitX showed a positive balance sheet, it was able to sell more securities for over $1,000,000, which it proceeded to burn through in a year and a half. (CitX apparently spent much of the money in fruitless litigation against PRSI's receiver.)

---

[1] CitX was suspect from the start: one of the original members of CitX's board, Brian Roemmele, maintains that he was not involved in the company and that his signatures on corporate documents were forged.

4

In July 2001, CitX filed a Chapter 11 petition. The case was later converted to Chapter 7, and Gary Seitz was appointed as trustee.[2]

### B. Schoen and Detweiler compile the financials

The defendants–appellees in this case are Robert Schoen, a certified public accountant, and Detweiler, Hershey and Associates, P.C., Schoen's employer. In 1997, CitX retained Detweiler and Schoen to compile[3] its financial statements. Seitz

---

[2] For clarity, we will refer to the company as CitX and the plaintiff–appellant as Seitz, even though as trustee Seitz is standing in CitX's shoes for the purposes of this suit.

[3] Compilations differ significantly from other forms of financial-statement preparation—reviews and audits. Among the three, compilations represent the "'lowest level of assurance.'" *Otto v. Pa. State Educ. Ass'n–NEA*, 330 F.3d 125, 133 (3d Cir. 2003); *see also Robert Wooler Co. v. Fid. Bank*, 479 A.2d 1027, 1030 (Pa. Super. Ct. 1984) (discussing the difference between audited and unaudited financials).

A compilation involves "[p]resenting in the form of financial statements information that is the representation of management (owners) *without undertaking to express any assurance on the statements*" by the accountant. Am. Inst. of Certified Pub. Accountants, AR § 100.04, at 3313, *available at* http://www.aicpa.org/download/members/div/auditstd/AR-00 100.PDF (2004) (emphasis added) (footnote omitted). This differs from a review, in which accountants give limited

5

alleges that Detweiler[4] went beyond its written engagement agreement and that it missed many "red flags" at CitX. These alleged red flags included that CitX's "bookkeeper" was actually Bernard Roemmele's girlfriend, and a high school dropout; CitX was bouncing checks; it was insolvent (*i.e.*, without the PRSI receivable, it had virtually no income); PRSI had been shut down; and yet CitX was selling stock to the public.

Detweiler prepared CitX's financial statements for the

---

assurance based on spot checks of financial information given to them. *See Otto*, 330 F.3d at 133. An audit gives the greatest assurance, as accountants performing one must verify the financial statements. *Id.*

Accountants "might consider it necessary to perform other accounting services to compile the financial statements." AR § 100.04, at 3313. For example, "the accountant should possess a general understanding of the nature of the entity's business transactions, the form of its accounting records, the stated qualifications of its accounting personnel, the accounting basis on which the financial statements are to be presented, and the form and content of the financial statements." *Id.* § 100.08, at 3315. But accountants doing a compilation are not under a duty to verify the information provided by the client; that is, they are not required to authenticate, or confirm the truth of, that information. *Otto*, 330 F.3d at 133–34.

[4] In this opinion, we refer to both appellees collectively as Detweiler.

6

period from July 1, 1997, through December 31, 1999. There were two sets of statements, both of which were compilations, as was made plain at the beginning of each statement. The first statement covered the fiscal years ending June 30, 1998, and June 30, 1999; the second covered the six-month period ending December 31, 1999. The second statement included the $2,400,000 PRSI receivable and was accompanied by a note that said in full:

> In January 2000, the Company, along with its largest customer and several individuals, were named as defendants and charged with certain security violations by the Attorney General's Office in Florida. As of the date of these financial statements, the Company is not sure what impact, if any, these charges will have on its financial position. As of December 31, 1999, the financial statements reflect accounts receivable in the amount of $2,403,122 from this customer and related deferred revenues in the amount of $960,000.[5]

---

[5] The second financial statement was even less detailed than the first, and its certification also added a paragraph that did not appear on the front of the two-year report and is not part of a standard compilation certification:

> Management has elected to omit substantially all of the disclosures ordinarily included in the financial statements prepared on

This second financial statement, from which stems this suit, was taken to a February 2000 CitX shareholder meeting. Even with its weakened financial condition and in suspect circumstances (at least one shareholder had by this time decided that the company was a Ponzi scheme), CitX was still able to raise more than $1,000,000 in equity. The company thereby prolonged its existence and went on to accrue millions of dollars in debt.

### C. Seitz sues Detweiler

Seitz sued Detweiler in July 2003. His complaint contained four causes of action: (1) malpractice; (2) "deepening insolvency";[6] (3) breach of fiduciary duty; and (4) negligent

---

the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, equity, revenue, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.

[6] We note in passing that, although Seitz was never able to make up his mind which section of the Bankruptcy Code purportedly allowed his claim—suggesting in his opening brief that he was proceeding under 11 U.S.C. § 544 and claiming at oral argument that he was not proceeding under § 544—we agree with the District Court for the District of Delaware that deepening insolvency is not a § 544 claim. *See Stanziale v.*

8

misrepresentation. The Bankruptcy Court dismissed Seitz's fiduciary duty claim. Later, after withdrawing the reference to the Bankruptcy Court of this adversary proceeding, the District Court granted summary judgment to Detweiler on the negligent misrepresentation claim. Finally, the District Court granted summary judgment to Detweiler on Seitz's malpractice and deepening-insolvency claims. Seitz appeals only the ruling on the latter two claims.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction over this case under 28 U.S.C. §§ 157 and 1334. We have jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final order.

We exercise plenary review of a District Court's grant of

---

*Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 548–89 (D. Del. 2005).

Because deepening-insolvency claims are brought on behalf of the debtor corporation, *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354, 356 (3d Cir. 2001), deepening insolvency can only be a claim under Bankruptcy Code § 541 (which deals with property of the debtor's estate). Section 544 implicates instead the trustee's powers to avoid, by stepping into the shoes of certain creditors and purchasers, prepetition transfers of property by the debtor. Therefore, as *Stanziale* held, § 544 does not authorize a deepening-insolvency tort claim. 335 B.R. at 548–49.

9

summary judgment. *Huu Nam Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005). In so doing, we apply the same test as the District Court: we therefore decide "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). We also view the facts "in the light most favorable to the party against whom summary judgment was entered." *Id.* (internal quotation marks omitted).

**III.    Discussion**

**A.    Was summary judgment correctly granted on the malpractice claim?**

To survive summary judgment on this claim, Seitz must present sufficient evidence to allow a reasonable jury to find in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); Fed. R. Civ. P. 56(e). Pennsylvania recognizes professional malpractice claims on a theory of negligence. *See Guy v. Liederbach*, 459 A.2d 744, 750 (Pa. 1983). Thus, Seitz must establish that (1) Detweiler owed a duty to CitX, (2) Detweiler breached that duty,[7] (3) CitX was actually harmed, and (4) Detweiler's breach caused that harm. *See Martin v.*

---

[7] Although Seitz argues that the District Court incorrectly found facts by ignoring his evidence that Detweiler breached its duty, we need not discuss that element or the duty element in light of our conclusions on the harm and causation elements.

10

*Evans*, 711 A.2d 458, 461 (Pa. 1998).

### 1.    *Harm*

Seitz must establish harm to CitX—"actual loss or damage"—to support a negligence action. *Id.* He alleges harm to it in the form of "deepening insolvency"—that Detweiler "dramatically deepened the insolvency of CitX, and wrongfully expanded the debt of CitX and waste of its illegally raised capital, by permitting CitX to incur additional debt by virtue of the compilation statements prepared and relied upon by third parties." Compl. ¶ 32.

This requires us to decide whether deepening insolvency is a viable theory of damages for negligence (as opposed to whether it is a viable cause of action—a topic dealt with in section B below). Our only opinion to address "deepening insolvency," *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001), defined it, in predicting Pennsylvania law, as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347. In that opinion, we concluded that deepening insolvency was a valid Pennsylvania cause of action. *Id.* at 344. Although we did describe deepening insolvency as a "type of injury," *id.* at 347, and a "theory of injury," *id.* at 349, we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-

11

insolvency *cause of action.* They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.[8]

Also, we note that Seitz did not provide sufficient evidence to allow a reasonable jury to find harm. Assuming for the sake of argument that Detweiler's financial statements allowed CitX to raise over one million dollars, that did nothing to "deepen" CitX's insolvency. Rather, it lessened CitX's insolvency. *Cf.* Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552–57 (2005) (discussing loans). Before the equity infusion, CitX was $2,000,000 in the red (using round numbers for ease of discussion). With the added $1,000,000 investment, it was thereby insolvent only $1,000,000. This hardly deepened insolvency. Any increase in insolvency (*i.e.*, the several million dollars of debt incurred after the $1,000,000 investment) was wrought by CitX's management, not by Detweiler.

The crux, then, is the claim that the $1,000,000 equity investment allowed CitX to exist long enough for its management to incur millions more in debt. But that looks at the issue backward. As noted, the equity investment was hardly harmful to CitX. Its management surely misused the

---

[8] By this we do not mean to imply that deepening insolvency would be a valid theory of damages for any other cause of action, such as fraud, and *Lafferty* did not so hold.

12

opportunity created by that investment; that was unfortunate. But they could have instead used that opportunity to turn the company around and transform it into a profitable business. They did not, and therein lies the harm to CitX.  Put another way, "[t]he deepening of a firm's insolvency is not an independent form of corporate damage.  Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation."  *Id.* at 575.[9]

## 2.    *Causation*

Even if CitX's insolvency deepened between when it issued financial statements in January 2000 and when it filed for Chapter 11 protection 18 months later, Seitz must establish that Detweiler's actions caused that condition (which for the sake of argument we assume to be a harm).  *See Martin*, 711 A.2d at 461.  Seitz's complaint alleges that—by failing to investigate CitX's problems, determine that the financial statements were wrong, and tell CitX's board of directors about those issues—Detweiler did not give the board the chance to

---

[9] In any event, even Seitz's counsel acknowledged that deepening insolvency as a measure of damages merely replicates malpractice damages.  In a letter to counsel for Detweiler that Seitz's counsel wrote in January 2005, he concedes that "the damages analyses under the deepening insolvency theory and under the malpractice theory are identical."

13

"safeguard the remaining assets of CitX." Compl. ¶ 33. Thus, whatever harm occurred to CitX was "[a]s a result of the damage caused by [Detweiler]." Compl. ¶ 34.

Seitz provides as support for these allegations an affidavit given by Richard Marks, CitX's Chief Operating Officer and a former member of the CitX board. This affidavit suggests, among other things, that Marks was misled by the Detweiler-compiled financial statements and that, had he known that the statements were incorrect, he would not have pursued investor capital, would have started CitX's dissolution, would have taken steps to avoid further losses, and would have prompted investigations to protect CitX's assets.

The District Court found Marks's affidavit ineffective in creating a genuine issue of material fact, for Marks in a subsequent deposition virtually disavowed the affidavit. Contrary to the suggestion in his affidavit, Marks testified that he continued to solicit investor funds. He pursued investor funds even into 2001, which was well after PRSI's problems became apparent. He also admitted that he "absolutely knew for a fact that PRSI was shut down before the shareholders meetings. No question in my mind."

Apparently Marks gave his affidavit as part of a deal to get a suit against him dropped. The affidavit was purely hypothetical; Marks described his intent in signing it as "if, back then, you were told this, or, if, back then, you were apprised of

14

that, could you have, would you have. And . . . my affidavit pretty much says, I may have, based on that—those facts. There's no absolute." And even Marks's hypothetical answers were armchair theory, because, as he said, "the may or may not . . . could also be academic because, if the truth be told, Mr. Roemmele really is the one who influenced and determined what or what did not occur in the CitX Corporation, not the board members, not any officers . . . ."

In signing his affidavit, Marks relied on but a couple hours' study of CitX's corporate minutes from its 2000 shareholder meeting, its financial statements, and two expert opinions pointing out to him the problems in those financial statements. So Marks—disclaiming his own knowledge of any inaccuracies in CitX's financials—took the expert opinions as fact in his affidavit.[10]  Most damaging to the credibility of

---

[10] It is characterized by statements like "I now understand that collection of the PRSI receivable was highly doubtful at best and should have been backed out of the financial statements." Marks explained in his deposition, however, "I said, you know, based on what you're showing me now, and I'm reading these . . . expert witness opinions on the financial statements, they have a lot more expertise in these matters than I do, I was relying on what they showed me. So it was my understanding at the time that they showed me those ex[p]ert opinions, at that time that we were sitting in that room, and that's what the 'I now understand'—'now' refers to sitting in that room at that time."

15

Mark's affidavit is the following exchange in his deposition:

> Q:          Okay. Now, the affidavit that you
> signed that we went through, is
> there anything in there that's
> untrue?
>
> [Marks]:    You know, I'm going to—how do
> I say this? I don't want to answer
> this with a simple yes or no answer,
> because there are issues here, if you
> can appreciate, which impact me
> and I feel uncomfortable making
> that answer—
>
> Q:          Okay.
>
> [Marks]:    —without the advice of legal
> counsel.

This non-affirming affirmance seems to say that Marks's affidavit was a scheme to provide sufficient "facts" to survive a summary judgment motion. The District Court properly disregarded it under the principles of the "sham affidavit" doctrine.

That doctrine generally "refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in

16

opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (internal quotation marks omitted). As this quote suggests, the doctrine typically applies when the deposition precedes the affidavit. *See also Martin v. Merrell Dow Pharms., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988) (noting that the doctrine applies to contradictions of *"prior* testimony" (emphasis added)); *Black's Law Dictionary* 63 (Bryan A. Garner ed., 8th ed. 2004) ("[A sham affidavit is a]n affidavit that contradicts clear testimony *previously given* by the same witness, usu. used in an attempt to create an issue of fact in response to a motion for summary judgment." (emphasis added)). That is, the affidavit comes in later to explain away or patch up an earlier deposition in an attempt to create a genuine issue of material fact. In this case, however, the affidavit came first, and only later did the deposition uncover the untruths in the affidavit.

We perceive no principle that cabins sham affidavits to a particular sequence. *Cf. Shearer v. Homestake Mining Co.*, 557 F. Supp. 549, 558 n.5 (D.S.D. 1983) ("When a witness has given testimony both by affidavit and by deposition, the two forms should be considered on a motion for summary judgment, but greater reliability is usually attributed to the deposition. Summary judgment may be granted based upon the deposition testimony if the court is satisfied that the issue potentially created by the affidavit is not genuine." (citations omitted)), *aff'd*, 727 F.2d 707, 709 & n.3 (8th Cir. 1984). Indeed, cross-

17

examining the affiant in a later deposition seems the better way to find the flaws in a bogus affidavit. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 334–35 (3d ed. 1998) ("[A] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier *or later* deposition, despite the greater reliability usually attributed to the deposition. The court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from being entered." (emphasis added) (footnotes omitted)); *see also* 10A *id.* § 2722, at 373, 379 (noting that depositions are "one of the best forms of evidence for supporting or opposing a summary-judgment motion," and that affidavits, not being subject to cross-examination, "are likely to be scrutinized carefully by the court to evaluate their probative value").

We hold that the District Court properly discounted Marks's affidavit in light of his deposition testimony. Because, without Marks's affidavit, there is nothing in the record to support a finding that anyone extended credit to CitX in reliance on the financial statements compiled by Detweiler, Seitz cannot establish that Detweiler caused any harm to CitX.

**B.    Was summary judgment correctly granted on the deepening-insolvency cause of action?**

Seitz alleges that Detweiler should have known about the errors in the financial statements that (he further alleges)

18

eventually caused the harm to CitX. His complaint barely makes out, and his evidence completely fails to support, any allegation of fraudulent conduct on Detweiler's part. Without fraud, Seitz must fall back on his allegation that Detweiler negligently deepened CitX's insolvency. Therefore, we must decide whether an allegation of negligence can support a claim of deepening insolvency. As opposed to our discussion above about deepening insolvency as a theory of damages, we deal with it here as a cause of action, which *Lafferty* held it to be under Pennsylvania law. *Lafferty*, 267 F.3d at 344, 351.[11]

Seitz's contention that negligence can suffice for

---

[11] Though *Lafferty* and the economic tort it interpreted Pennsylvania law as approving for fraudulent conduct have provoked much comment, *see, e.g.*, William Bates III, *Deepening Insolvency: Into the Void*, Am. Bankr. Inst. J., Mar. 2005, at 1; J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (2005); Willett, *supra*, that issue is not before us. Even if it were, we cannot revisit the correctness of that interpretation of Pennsylvania law. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005) (noting that only the Court *en banc* can overrule a precedential decision). Although some courts in this Circuit have extended *Lafferty*'s reasoning to other states, *see, e.g.*, *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, Nos. 02-13396 & 04-57060, 2006 WL 864843, at *16–17 (Bankr. D. Del. Mar. 31, 2006) (holding that Delaware, New York, and North Carolina would recognize the cause of action), nothing we said in *Lafferty* compels any extension of the doctrine beyond Pennsylvania.

19

deepening insolvency has some support. For example, the Ninth
Circuit Court of Appeals recently suggested that deepening
insolvency does not require intentional conduct. *See Smith v.
Arthur Andersen LLP*, 421 F.3d 989, 995 (9th Cir. 2005)
(recognizing deepening insolvency when the allegations were
that the defendants "misrepresent[ed] (not necessarily
intentionally) the firm's financial condition to its outside
directors and investors"); *see also Bondi v. Bank of Am. Corp.
(In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d 587, 601 (S.D.N.Y.
2005). Indeed, *Lafferty* relied, in a string cite of five cases, on
one case suggesting that negligence would suffice. 267 F.3d at
350–51 (citing *Gouiran Holdings, Inc. v. DeSantis, Prinzi,
Springer, Keifer & Shall (In re Gouiran Holdings, Inc.)*, 165
B.R. 104, 107 (E.D.N.Y. 1994)).

In addressing this question, we note that *Lafferty* holds
only that fraudulent conduct will suffice to support a deepening-
insolvency claim under Pennsylvania law. *See id.* at 347
(defining the injury as a "fraudulent expansion of corporate debt
and prolongation of corporate life"); *id.* at 349 (referring to the
"fraudulent and concealed incurrence of debt"); *see also
Corporate Aviation Concepts, Inc. v. Multi-Serv. Aviation Corp.*,
No. Civ.A. 03-3020, 2004 WL 1900001, at *4 (E.D. Pa. Aug.
25, 2004) (holding that only fraudulent conduct will suffice for
a deepening-insolvency claim); *OHC Liquidation Trust v. Credit
Suisse First Boston (In re Oakwood Homes Corp.)*, Nos. 02-
13396 & 04-57060, 2006 WL 864843, at *20 (Bankr. D. Del.
Mar. 31, 2006) (same). We know no reason to extend the scope

of deepening insolvency beyond *Lafferty*'s limited holding. To that end, we hold that a claim of negligence cannot sustain a deepening-insolvency cause of action.[12]

## IV.  Conclusion

Seitz's malpractice claim fails because he cannot establish harm or causation. He could not establish harm because deepening insolvency is not a valid theory of damages for negligence. And the affidavit that purported to create a genuine issue of fact on the causation issue should be discarded in favor of that affiant's later, conflicting deposition testimony.

Seitz's deepening-insolvency claim fails because he cannot establish a genuine factual issue to support the allegation that Detweiler engaged in fraudulent conduct. Negligence cannot support such a claim.[13]

_____

[12] Therefore, we need not address the parties' arguments about the application of *in pari delicto* (which simply means that a plaintiff wrongdoer cannot recover from a defendant wrongdoer).

[13] Moreover, even were negligence capable of supporting a deepening-insolvency claim, we have already noted the lack of evidence to support a causal connection between the worsening of CitX's financial condition and the issuance by Detweiler of the compiled financial statements in January 2000.

21

We therefore affirm the District Court's grant of
summary judgment in favor of Detweiler.