**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE OFFICIAL COMMITTEE** | ) | |
| **OF UNSECURED CREDITORS OF** | ) | |
| **ALLEGHENY HEALTH, EDUCATION** | ) | |
| **AND RESEARCH FOUNDATION,** | ) | |
| | ) | 2:00cv684 |
| Plaintiff, | ) | **Electronic Filing** |
| | ) | |
| v. | ) | Judge David Stewart Cercone |
| | ) | Phase III |
| **PRICEWATERHOUSE COOPERS,** | ) | |
| **LLP**, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

January 17, 2007

**I.    INTRODUCTION**

In July of 1998, the Allegheny Health, Education & Research Foundation ("AHERF")
and certain of its affiliates filed for bankruptcy.  AHERF was a nonprofit Pennsylvania
corporation which was one of the largest nonprofit, integrated healthcare systems in the
country.  Prior to the bankruptcy, Coopers & Lybrand, L.L.P.("CL") audited the financial
statements of AHERF and its affiliates or their predecessors.  PricewaterhouseCoopers, L.L.P.
("PwC"), the successor to CL, was formed in July of 1998 from the merger of Price
Waterhouse L.L.P. and CL.

Plaintiff, the Official Committee of Unsecured Creditors of AHERF (the "Committee")
filed this action on behalf of the AHERF estates against PwC alleging professional negligence,
breach of contract, and aiding and abetting breaches of fiduciary duty committed by certain
members of AHERF's management.  These claims by the Committee are based upon CL's
audits of AHERF's financial statements for the fiscal years 1996 and 1997[1].  PwC has filed a
motion for summary judgment, the Committee has responded and, after argument in open

---

[1]    These fiscal years ended on June 30, 1996 and June 30, 1997, respectively.
Amended Complaint ¶ 31.

court, the motion is now before the Court.


II.    STATEMENT OF THE CASE

PwC is a limited liability partnership that provides accounting and auditing services.
PwC's Statement of Undisputed Material Facts ("PwC's SUMF") ¶ 1. PwC has an office in
Pittsburgh. *Id.* AHERF was a nonprofit Pennsylvania corporation, which, prior to filing
bankruptcy, operated as the parent company for a number of affiliates in the greater Pittsburgh
and Philadelphia areas. PwC's SUMF ¶¶ 3 & 4.

On July 21, 1998, AHERF filed for bankruptcy under Chapter 11 of the Bankruptcy
Code. PwC's SUMF ¶ 5. On that same day, the following AHERF affiliates also filed for
bankruptcy: (1) Allegheny University Hospitals, East ("AUH-East")[2]; (2) Allegheny University
Medical Practices ("AUMP")[3]; (3) Allegheny Hospitals, Centennial ("AH-Centennial")[4]; and
(4) Allegheny University of the Health Sciences ("AUHS")[5](collectively, including AHERF,
"Debtors"). *Id.* AHERF affiliates that did not file bankruptcy include: (1) Allegheny General

---

[2]    AUH-East operated five hospitals in the Philadelphia area: (1) Allegheny University
Hospitals, MCP (formerly known as the Medical College of Pennsylvania Hospital); (2)
Allegheny University Hospitals, Hahnemann (formerly known as Hahnemann University
Hospital); (3) Allegheny University Hospitals, Bucks County; (4) Allegheny University
Hospitals, Elkins Park; and (5) St. Christopher's Hospital for Children. PwC's SUMF ¶ 7.

[3]    AUMP owned and managed a number of physician practices in the greater Pittsburgh
and Philadelphia areas. PwC's SUMF ¶ 8.

[4]    AH-Centennial operated four hospitals in Philadelphia: (1) The Graduate Hospital;
(2) City Avenue Hospital; (3) Parkview Hospital; and (4) Mt. Sinai Hospital, which closed in
October of 1997. PwC's SUMF ¶ 9. The Centennial hospitals were part of the Graduate Health
System, Inc. ("GHS") until October 31, 1996, at which point the three GHS subsidiaries that
owned them were merged into SDN, Inc. Committee's Statement of Undisputed Material Facts
("Comm's SUMF") ¶ 17. On May 1, 1997, SDN, Inc. Changed its name to AH-Centennial. *Id.*

[5]    AUHS was an accredited university in Philadelphia that owned and operated the
MCP-Hahnemann School of Medicine. PwC's SUMF ¶ 10.

Hospital ("AGH"); (2) Allegheny University Medical Centers ("AUMC")[6]; and (3) Allegheny Hospitals, New Jersey("AH-NJ")(collectively the "Non-Debtor Affiliates"). PwC's SUMF ¶ 11. The Committee was appointed to represent the creditors of the Debtor and is comprised of: MBIA Insurance Co.; PNC Bank; the Bank of New York, as trustee for the Centennial bondholders; Aetna U. S. Healthcare, Inc.; and Coventry Corporation. PwC's SUMF ¶ 6.

Certain AHERF affiliates were members of obligated groups, on whose behalf state and local authorities issued municipal bonds. PwC's SUMF ¶ 18. As of June 30, 1996, AHERF had two obligated groups, the Allegheny General Hospital Obligated Group ("AGHOG") and the Delaware Valley Obligated Group ("DVOG"). PwC's SUMF ¶ 19. The DVOG included Debtors AUH-East and AUHS. PwC's SUMF ¶ 20. The DVOG bonds were issued in June of 1996, and all the bonds were either insured by MBIA, Inc., or secured by a stand-by letter of credit from PNC Bank. *Id.*

As of June 30, 1997, AHERF had five obligated groups: AGHOG; DVOG; the AUMC Obligated Group; the AG-Centennial Obligated Group; and AH-NJ Obligated Group. PwC's SUMF ¶ 21. The AUMC, the AG-Centennial, and AH-NJ Obligated Groups comprised affiliates that joined the AHERF system in the 1997 fiscal year and remained liable on bonds issued prior to their affiliation with AHERF. *Id.* All the bonds for the AHERF obligated groups were issued prior to June 30, 1996. PwC's SUMF ¶ 22.

Sherif S. Abdelhak ("Abdelhak") was AHERF's President and Chief Executive Officer ("CEO") from 1986 until June 5, 1998. PwC's SUMF ¶ 23. As CEO, Abdelhak had overall executive responsibility for AHERF and its affiliates. *Id.* Abdelhak was also a member of the Boards of Trustees of AHERF, AUHS, AUH-East, AH-Centennial, AUMP, AGH and AUMC. *Id.* David W. McConnell ("McConnell") served as Executive Vice President and Chief

---

[6]    AUMC operated the following community hospitals in the Pittsburgh area: (1) Forbes Regional Hospital; (2) Forbes Metropolitan Hospital; (3) Forbes Nursing Center; (4) Forbes Hospice; (5) Allegheny Valley Hospital; and (6) Canonsburg General Hospital. PwC's SUMF ¶ 13.

Financial Officer ("CFO") of AHERF from November of 1991 until June of 1998. PwC's SUMF ¶ 24. McConnell also served as the Treasurer of AUHS, AH-Centennial and AUMC, and as Assistant Treasurer of AUH-East and AGH. *Id.* McConnell reported to Abdelhak. PwC's SUMF ¶ 32.

The Committee contends that in the late 1980's, Abdelhak, McConnell and others among the AHERF System's senior management ("senior management"), acting in concert with AHERF's Trustees, adopted the view that in order to prosper in a changing market for healthcare institutions, AHERF must grow by acquisition of hospitals, educational institutions, research facilities and medical practices. Amended Complaint ¶ 15. The theory underlying such growth was in part that healthcare providers needed to achieve economies of scale and an assured supply of patient revenue through the acquisition of geographically-proximate hospitals and physician practices. *Id.* The Committee avers that AHERF pursued this "economies of scale" strategy though a series of ill-advised and unjustifiable acquisitions, beginning in 1988 and continuing through the decade of the 1990's. *Id.* Further, AHERF never took the steps necessary to implement its "synergistic" strategy, as it failed to perform the proper due diligence, cut overhead costs or develop and employ the operational infrastructure essential to achieving the promised "economies of scale." *Id.*

The Committee directs this Court to various examples of AHERF's failed business strategies during the above-mentioned time period. In 1988, AHERF acquired MPC, which operated a medical school and associated hospital in Philadelphia. Amended Complaint ¶ 16. At the time of the acquisition, the Committee contends that MCP was in serious financial distress, and agreed to the acquisition only after AHERF pledged a capital infusion of $40-60 million into MCP over a five year period. *Id.*

Through the 1990's, senior management acting with the knowledge of and in concert with certain AHERF Trustees, continued to pursue similar acquisitions of failing institutions. Amended Complaint ¶ 18. In 1991, AHERF acquired the United Health System ("United"),

-4-

which operated St. Christopher's Hospital for Children in Philadelphia and three suburban hospitals. Amended Complaint ¶ 19. At that time, the Committee contends that the three hospitals were struggling financially, and United was headed for bankruptcy. *Id.* AHERF's Board approved the acquisition of the four hospitals. Amended Complaint ¶ 20. In so doing, AHERF assumed the hospitals' $137 million in long term debt. *Id.* Two years later, AHERF acquired Hahnemann University Medical School and its associated medical center, Hahnemann University Hospital. Amended Complaint ¶ 21.

In 1996, despite "already straining under the load of its debt-ridden and failing acquisitions," AHERF negotiated a plan to acquire six more hospitals in the Philadelphia area that were owned by the Graduate Health System ("GHS"). Amended Complaint ¶ 22. The Committee contends that the GHS hospitals were already losing millions of dollars every month. Amended Complaint ¶ 23. While pursuing the GHS hospitals, AHERF also acquired five hospitals in the Greater Pittsburgh market including four hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended Complaint ¶ 26. The acquisition of the GHS and Pittsburgh area hospitals added $282 million of under-secured bond debt to the AHERF System's consolidated balance sheet. Amended Complaint ¶¶ 25 & 26. The Committee also avers that AHERF, in the latter half of the 1990's, purchased the practices of hundreds of primary care physicians practicing in the Philadelphia and Pittsburgh markets which produced "staggering losses" to the AHERF System. Amended Complaint ¶ 21.

CL was retained by AHERF to audit AHERF's consolidated financial statement for the fiscal year 1996, and to audit the separate financial statements of AGHOG, DVOG and the Allegheny Integrated Health Group. PwC's SUMF ¶ 64. CL was also retained by AHERF to audit AHERF's consolidated financial statement for the fiscal year 1997, but not the separate financial statements of the obligated group affiliates. *Id.* CL was required to conduct the audits in accordance with generally accepted accounting standards ("GAAS") and other professional standards. Comm's SUMF ¶ 63.

The 1996 and 1997 engagement letters executed by CL and AHERF with regard to the audits provided, *inter alia*:

### REPRESENTATION FROM MANAGEMENT

>At the conclusion of the audits, AHERF management will provide to [CL] a representation letter for each respective report that . . . will confirm management's responsibility for the preparation of the financial statements in conformity with generally accepted accounting principles, the availability of financial records and related data, the completeness and availability of all minutes of the Board and committee meetings, management's responsibility for the entity's compliance with laws and regulations, the identification and disclosure to the auditor of all laws and regulations that have a direct and material effect on the determination of financial statement amounts and, to the best of their knowledge and belief, the absence of irregularities involving management or those employees who have significant roles in the control structure.

PwC's SUMF ¶ 66; PwC's Appendix at Tabs 51 & 52.

The Committee contends that CL violated numerous core auditing standards which caused AHERF's statements of operations and balance sheets for fiscal years 1996 and 1997 to be materially misstated. Comm's SUMF ¶¶ 256 & 257. Specifically, the Committee claims that AHERF's audited statement of operations overstated net income by more than $90 million in 1996 and by more than $150 million in 1997, turning positive net income into losses of approximately $80 million in 1996 and $130 million in 1997. Comm's SUMF ¶ 257. Further, AHERF's balance sheet overstated unrestricted net assets by more than $80 million in 1996 and more than $240 million in 1997. *Id.*

PwC, however, contends that AHERF management knowingly misstated AHERF's financial statements in both 1996 and 1997, alleging that McConnell directed the improper accounting entries, and Abdelhak was aware of the misstatements. PwC's SUMF ¶¶ 31-35. Moreover, the Committee admits that the financial statements of AHERF and its affiliates for the fiscal years 1996 and 1997 were "materially misstated." Amended Complaint ¶ 36. It is further alleged that AHERF maintained internal schedules that showed two (2) sets of financial results, side by side: one side with the results provided to CL and reported externally; and the

other side showing the actual financial results. PwC's SUMF ¶ 113. These internal schedules showing different sets of financial results were provided to McConnell and Abdelhak by the AHERF financial department. PwC's SUMF ¶ 114. Members of AHERF management who were certified public accountants were required by AICPA standards to be candid and forthcoming with CL. PwC's SUMF ¶ 68. Members of AHERF's management who were CPAs included: Stephen Spargo[7] ("Spargo"), Senior Vice President, Corporate Support Services for AHERF; Albert Adamczak[8] ("Adamczak"), Senior Director of Finance at AGH; and Daniel Cancelmi. PwC's SUMF ¶¶ 29, 39 & 68; Comm's SUMF ¶ 68. Spargo and Adamczak reported to McConnell. PwC's SUMF ¶ 32.

CL, however, presented "clean opinions" of AHERF's audited financial statements for both fiscal-year 1996 and fiscal-year 1997, stating that the financial statements "present[ed] fairly, in all material respects, the consolidated financial position" of AHERF as of June 30, 1996 for fiscal-year 1996, and as of June 30, 1997 for fiscal-year 1997. Comm's SUMF ¶ 316. If, as part of its fiscal-year 1996 or 1997 audits, CL had accurately reported AHERF's financial condition and disclosed that the financial statements presented for audit were materially or intentionally misstated, or had it shared concerns over the competence and integrity of AHERF's financial management, the Committee contends that AHERF's Board of Directors (the "Board"), Audit Committee, and/or the "innocent, unaware and misinformed Trustees" would have acted to remedy AHERF's financial distress, which was nearly a decade in the making, and prevented AHERF's July 1998 bankruptcy. Comm's SUMF ¶ 146; Amended Complaint ¶ 41.

The audited financial statements failed to inform the Board that additional expansion activities could threaten AHERF's financial viability or that AHERF was in fact in financial

---

[7]    Spargo was responsible for overseeing AHERF's consolidated accounting functions and interacting with AHERF's outside auditors from CL. PwC's SUMF ¶ 31.

[8]    Adamczak's responsibilities included directing the accounting for AHERF and its western affiliates and interacting with AHERF's outside auditors from CL. PwC's SUMF ¶ 31.

distress.  Comm's SUMF ¶ 318.  Moreover, the Committee contends that CL's negligence

allowed the financial deterioration of AHERF to continue into insolvency, and prevented the

timely implementation of measures to reverse the decline of AHERF's financial condition.

Amended Complaint ¶¶ 47 & 48.  The Committee contends that AHERF was damaged by CL

to the "full extent of [the] insolvency, which amount is in excess of $1 billion." Amended

Complaint ¶ 49.


### III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no

genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of

law.  To support denial of summary judgment, an issue of fact in dispute must be both genuine

and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the

non-moving party and one which is essential to establishing the claim.  *Anderson v. Liberty

Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court

is not permitted to weigh the evidence or to make credibility determinations, but is limited to

deciding whether there are any disputed issues and, if there are, whether they are both genuine

and material. *Id*.  The court's consideration of the facts must be in the light most favorable to

the party opposing summary judgment and all reasonable inferences from the facts must be

drawn in favor of that party as well.  *Whiteland Woods, L.P. v.  Township of West Whiteland*,

193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d

Cir. 1987).

When the moving party has carried its burden under Rule 56(c),  its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts. *See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language

of the Rule, the nonmoving party must come forward with "specific facts showing that there is

a genuine issue for trial." FED. R. CIV. P 56(e).  Further, the nonmoving party cannot rely on

unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

## IV.    DISCUSSION

PwC contends that it is entitled to summary judgment on the Committee's claims based upon the following:

1.    The Court of Appeals for the Third Circuit in *In re CitX Corp.*, 448 F.3d 672 (3d Cir. 2006), found that a deepening insolvency theory of damages in invalid for a malpractice action, and that a claim of negligence cannot sustain a cause of action for deepening insolvency.  Because the Committee seeks to recover damages that are similar to a deepening insolvency measure of damages which are precluded under *CitX*, PwC is entitled to summary judgment;

2.    Senior management of AHERF, acting in the course of their employment, materially misstated AHERF's financial statements to its auditor, CL.  Standing in the shoes of AHERF, the Committee was *in pari delicto* with CL, and their claims are barred;

3.    AHERF interfered with CL's audits by withholding material information, as well by providing CL with misleading information;

4.    The Committee's sole contention of causation, which rests on the assertion that AHERF's Board, or its creditors, would have taken action to avoid bankruptcy if CL had done a proper audit, is entirely speculative;

5.    CL did not audit Centennial or any of the Graduate hospitals, and therefore owed no duty to Centennial;

6.    The Committee's breach of contract claim is duplicative of its professional negligence claims; and

7.    The Committee's claim for aiding and abetting breach of fiduciary duty is not a recognized cause of action in Pennsylvania.

In its oral argument before the Court, PwC indicated that its strongest argument for summary judgment was based upon the Third Circuit's opinion in *CitX*. Because of this perceived importance, the Court has analyzed the parties contentions below. However, because this Court finds that the wrongdoing of AHERF's senior management must be imputed to AHERF, and that the doctrine of *in pari delicto* applies to bar the Committee's claims, the remaining arguments in favor of summary judgment need not be addressed at this time.

A.    Effect of *In re CitX Corp.*

In *CitX*, an insolvent internet company involved in an illegal Ponzi scheme used its financial statements, compiled by its accounting firm, to attract investors. *In re CitX Corp.*, 448 F.3d at 674. The company spent the investors' money and incurred millions more in debt, then filed for bankruptcy. *Id.* The trustee in bankruptcy filed an action against the accounting firm responsible for compiling[9] the financial statements alleging, among other things, malpractice and "deepening insolvency." *Id.* In affirming the district court's grant of summary judgment to the accountants, the Third Circuit found that the trustee's evidence was insufficient show both harm and causation, based largely upon a "sham" affidavit given by the debtor's Chief Operating Officer. In its analysis, the court stated that deepening insolvency was not "a valid theory of damages for an independent cause of action." *In re CitX Corp.*, 448 F.3d at 677. The court also concluded that "a claim of negligence cannot sustain a deepening [] insolvency cause of action." *Id.* at 681.

---

[9]    Though it has no effect upon the Court's analysis in this instance, it should be noted that in the instant action, CL was engaged to audit the financial statements of AHERF, not to merely compile such information. The principal difference between the two is the degree and amount of responsibility undertaken by the accountant. In both types of engagements the accountant agrees to prepare financial statements. In an audited engagement, the accountant assumes responsibility for the accuracy of the figures appearing thereon. In effect, he warrants the reliability of the report which he prepares. In an unaudited engagement, the accountant does not warrant and is not responsible for the ultimate accuracy of the report if the figures supplied by the client are erroneous. *See Robert Wooler Co. v. Fid. Bank*, 479 A.2d 1027, 1030 (Pa. Super. 1984).

PwC argues here that because the Committee seeks to recover damages that are similar to a deepening insolvency measure of damages precluded by *CitX*, PwC is entitled to summary judgment. The Court, however, finds that PwC's argument fails because: (1) the Committee has not claimed a cause of action based upon a deepening insolvency theory; (2) PwC did not move for summary judgment on the grounds that the Committee failed to offer sufficient proof of harm or damages[10]; and, (3) under a narrow reading of *CitX*, the damages alleged by the Committee in this action are not precluded.

In determining whether deepening insolvency was a viable theory of damages for negligence, in light of its opinion in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001), the Third Circuit stated:

> in predicting Pennsylvania law, [we defined "deepening insolvency"] as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Lafferty*, 267 F.3d at 347. In that opinion, we concluded that deepening insolvency was a valid Pennsylvania cause of action. *Id.* at 344. Although we [described] deepening insolvency as a "type of injury," *id.* at 347, and a "theory of injury," *id.* at 349, we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening - insolvency cause of action. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.

*In re CitX Corp.*, 448 F.3d at 677. Notwithstanding the court's finding that "[t]he deepening of a firm's insolvency is not an independent form of corporate damage," it further stated "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation." *In re Citx Corp.*, 448 F.3d at 678 (quoting Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 575 (2005)).

In the instant action, the Committee alleges "independent caus[es] of action" in the

---

[10]    It must be noted that, in a separate motion, PwC did seek to exclude certain damage testimony proffered by the Committee's expert. Though this Court has serious concerns regarding the Committee's measure of damages, the issue of harm to AHERF and the proper measure of damages, if any, shall be left for another day.

-11-

form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a "remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits."  Therefore, PwC is not entitled to summary judgment based upon the holding in *CitX*.

      B.      Equitable Doctrine of *In Pari Delicto*

It is undisputed that the Committee stands in the shoes of the bankruptcy trustee and is authorized to prosecute any claims or causes of action that the debtor, AHERF, has against CL. *See* Opinion, Ziegler, J., January 28, 2002 at p.6.  Understanding the dynamics of the action then, the Committee essentially claims that AHERF followed a fatally flawed business plan for nearly a decade[11], resulting in its "woeful and deteriorating" financial condition, and despite the fact AHERF knowingly supplied  its independent auditors with materially misleading financial statements for the fiscal years 1996 and 1997, the auditors failed to save AHERF from its internally orchestrated, and Board approved, demise.

PwC argues that the Committee's claims are barred as a matter of law because the Committee, standing in the shoes of AHERF, was *in pari delicto* with the defendant. The common law doctrine of *in pari delicto*, literally meaning "in equal fault,"  provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim. *See Pinter v. Dahl*, 486 U.S. 622, 632 (1988); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001)(citing *Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot*, 458 A.2d 545, 548-549 (Pa. Super. 1983).  It is derived from the maxim *in pari delicto potior est conditio defendentis* meaning: "in a case of equal or mutual fault ... the position of the defending party ... is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)).  Therefore, the defense is "limited to situations where the plaintiff bore at least

---

[11]    Over such period, AHERF's long-term debt increased from $70 million in 1987 to approximately $1.1 billion in 1997.  Amended Complaint ¶ 29.

substantially equal responsibility for his injury, and where the parties' culpability arose out of the same illegal act." *Pinter v. Dahl*, 486 U.S. at 632. Under both Pennsylvania and federal law, *in pari delicto* is a doctrine of equity.  *Lafferty*, 267 F.3d at 354; *Peyton v. Margiotti*, 156 A.2d 865, 868 (Pa. 1959).

In *Lafferty*, the Third Circuit found that the analysis of the *in pari delicto* doctrine was the same under various causes of action, and determined that a court may speak of one doctrine though it may  involve a number of different defenses depending on whether a contract, tort, or other claim is asserted. *See Lafferty*, 267 F.3d at 354-355. In so finding, the court quoted the Seventh Circuit Court of Appeals in *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982) in which Judge Posner stated:

> . . . the question [is] whether Seidman was entitled to use the wrongdoing of Cenco's managers as a defense against the charges of breach of contract, negligence, and fraud [which] when committed by auditors, are a single form of wrongdoing under different names. . . . Because these theories of auditors' misconduct are so alike, the defenses based on misconduct of the audited firm or its employees are also alike, though verbalized differently. A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract. The corresponding defense in the case of negligence is, of course, contributory negligence. . . . [And, in the fraud context, a] participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud.

*Cenco, Inc. v. Seidman & Seidman*, 686 F.2d at 453-554 (citation omitted). Therefore, if the conduct of AHERF's management can be imputed[12] to AHERF, and therefore, to the Committee,  then the *in pari delicto* doctrine may bar the entire suit. *See Lafferty*, 267 F.3d at 355.

We look to state law to ascertain when wrongful conduct should be imputed to a corporation. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84 (1994)(holding, in the FDIC

---

[12]     Imputation refers to the attribution of one person's wrongdoing to another person. *Lafferty*, 267 F.3d at 355.

receivership context, that, without an "explicit federal statutory provision" or special federal interest, state law "governs the imputation of knowledge to corporate victims of alleged negligence").  PwC seeks to impute the conduct of AHERF's senior management, including *inter alia* Abdelhak, McConnell, Spargo and Adamczak,[13] who knowingly misstated AHERF's financial statements in both 1996 and 1997. PwC's SUMF ¶¶ 29-35.  Moreover, despite representations to the contrary, AHERF knew at the time the financial statements were presented to CL that the statements were materially false. PwC's SUMF ¶¶ 33-34.  Spargo and Adamczak also testified that McConnell directed the improper accounting entries, and that Abdelhak was aware of the entries. PwC's SUMF ¶ 35.

In applying the law of imputation in *Lafferty*, the Third Circuit applied a two-part test under which the fraud of an officer is imputed to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Lafferty*, 267 F.3d at 358-359 (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975). The Third Circuit in *Rochez Bros.* further stated "[t]his is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions. The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d at 884[14].

The record clearly establishes, and the Committee does not contest, that the senior management of AHERF were acting in the course of their employment when the materially

---

[13]    Both Spargo and Adamczak had job responsibilities which included the preparation of AHERF's financial statements and interacting with AHERF's auditors at CL.  PwC's SUMF ¶ 31.

[14]    It should be noted that *Rochez* was decided before *O'Melveny & Myers v. FDIC*, which held that the issue of imputation is determined by state law, and while the *Rochez* court did not rely upon Pennsylvania case law for its summary of agency law, the court's summary was certainly consistent with Pennsylvania agency law.

false financial statements for the fiscal years 1996 and 1997 were prepared and presented to CL for audit. The first prong of the imputation test, therefore, is satisfied.

Under the second prong of the imputation test, regarding whether the conduct of AHERF's management was committed for the benefit of the corporation, the conduct will not be imputed if the officers' interests were adverse to the corporation and "not for the benefit of the corporation." *Lafferty*, 267 F.3d at 359, *see also Solomon v. Gibson*, 615 A.2d 367 (Pa. Super. 1992). This is known as the "adverse interest exception."

PwC argues that the conduct of AHERF management must be imputed to AHERF because there is no evidence that AHERF's interests were totally abandoned, and that Abdelhak and McConnell acted entirely for their own benefit. The Committee, however, contends that inquiry into the application of the adverse interest is fact intensive, and is properly a question for the jury. Further, the Committee argues that PwC's assertion that the adverse interest exception applies only if Abdelhak and McConnell acted "entirely" in their own interest, and "totally abandoned" the interests of AHERF is not the proper standard under Pennsylvania law. Citing *In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. 784 (W.D. Pa. 1995), the Committee argues that summary judgment is improper here because a trier of fact could reasonably conclude that Abdelhak and McConnell acted, not with the intent to benefit AHERF, but to preserve their own "employment, salaries, emoluments and reputations . . ." *See In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. at 786-787.

The Third Circuit's rulings in *Lafferty* do not aid the Court in resolving the issue. *Lafferty* arose out of the bankruptcy of two lease financing companies that were allegedly involved in a "Ponzi" scheme. The Official Committee of Unsecured Creditors brought suit on behalf of the debtor corporations against, *inter alia*, the corporations' counsel, accountant, and underwriters (one of which was Lafferty), claiming that these third parties had fraudulently induced the corporations to issue debt securities, thereby deepening their insolvency and forcing them into bankruptcy. The District Court held that the suit against the third parties was

barred by the doctrine of *in pari delicto*. In affirming the dismissal of the lawsuit, the Third

Circuit had no need to apply the adverse interest exception to imputation as it relied upon an

exception to the exception, known as the "sole actor[15]" exception. *Lafferty*, 267 F.3d at 359.

The exception states that:

> If an agent is the sole representative of a principal, then that
> agent's fraudulent conduct is imputable to the principal
> regardless of whether the agent's conduct was adverse to the
> principal's interests. The rationale for this rule is that the sole
> agent has no one to whom he can impart his knowledge, or from
> whom he can conceal it, and that the corporation must bear the
> responsibility for allowing an agent to act without accountability.

*Id.*

After a careful examination of applicable Pennsylvania law, as well as a review of

similar cases in other circuits, the Court finds that the Committee's adverse interest argument

fails. It has been long held under Pennsylvania law that a corporation or principal, is liable for

the acts of its agents, officers or directors only when the agent, officer or director is acting

within the express or implied or apparent scope of his authority or employment, or where the

principal, with full knowledge of the material facts, ratifies the unauthorized acts. *Todd v.

Skelly*, 120 A.2d 906, 909 (Pa. 1956)(citations omitted). However, where the

> agent acts in his own interest which is antagonistic to that of his
> principal, or commits a fraud for **his own benefit** in a matter
> which is beyond the scope of his actual or apparent authority or
> employment, the principal **who has received no benefit**
> therefrom will not be liable for the agent's tortious act.

*Id.* (Emphasis added).

Because the misrepresentations made by AHERF management in the financial

statements occurred within the scope of their employment and authority, the adverse interest

exception prevents imputation only if AHERF "received no benefit" from the improper

conduct of its managers and directors. Consistent with the law of Pennsylvania, Judge Ziegler

---

[15]     PwC also argues that the sole actor exception is applicable here as well. Because
the Court finds that the adverse interest exception does not bar imputation in this instance, there
is no need to address the argument.

specifically stated in *Phar-Mor* that "[a] corporation is not imputed with the 'knowledge of an agent in a transaction in which the agent secretly is acting adversely to the [corporation] and **entirely** for his own or another's purposes.'" *In re Phar-Mor, Inc. Securities Litigation*, 900 F. Supp. at 786(citations omitted)(quoting RESTATEMENT (SECOND) OF AGENCY § 282(1)(1957))(emphasis added).

The focus, therefore, is not whether Abdelhak, McConnell and other senior management responsible for the ill-fated financial statements benefitted in some way, or whether such benefits outweighed the benefits to AHERF, but the question is a relatively simple one -- whether **any** benefit accrued to AHERF. The Court finds the rationale advanced by the Court of Appeals for the First Circuit in the factually similar *Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006) to be both applicable and persuasive here.

In *Baena*, a Belgian company with headquarters in Massachusetts, took on massive new debt in connection with the acquisitions of two U. S. companies. *Baena v. KPMG LLP*, 453 at 3. It was later discovered that the company had greatly overstated its revenues and profits,[16] and certain top officers and directors were ultimately implicated in the apparent fraud. *Id.* The company filed for bankruptcy, and the bankruptcy court approved a plan of liquidation, giving authority to prosecute claims on behalf of the company to the trustee. *Id.* The trustee brought an action[17] against the accountants, charging that the accounting firms, as claimed by the

---

[16]     The accounting devices allegedly employed by the company in overstating the revenues and profits included recording revenue from contracts not yet executed, booking revenue in a lump sum where the amount should have been amortized across several years, and recording revenue from clients who did not exist or who had not made payments or commitments that could properly be recorded. *Id.* at 3.

[17]     The complaint set forth a claim for unfair or deceptive trade practices under Massachusetts state law, Mass. Gen. Laws ch. 93A §§ 1-11 (2002), and two (2) tort violations, aiding and abetting the breach of a fiduciary duty and accounting malpractice. *Id.* The district court dismissed the two tort claims as barred by the statute of limitations and no appeal was taken as to those claims. The only claim pertinent to the appeal was the unfair trade practice claim. *Id.*

Committee in the instant action, knowingly tolerated patently improper accounting practices by the company in order to retain a lucrative client. *Id.* at 4. The district court held that *in pari dilecto* barred the claim, and dismissed the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.*

Similar to the arguments made by the Committee, the trustee in *Baena* argued on appeal that the "adverse interest" exception prevented application of the imputation doctrine, and that the doctrine should not apply where "innocent decision-makers" could have prevented the harm. *Id.* at 7. Applying the law of Massachusetts, the First Circuit found that imputation may be avoided where the wrongdoing was done primarily for personal benefit of the officer and was in fact "adverse" to the interest of the company, *e.g.* if the salesman uses the company car in a bank robbery, the company is not normally liable. *Id.* (citing PROSSER AND KEETON ON TORTS § 70, at 503-505 (5th ed. 1984)). In this case, however, the approval and oversight of the financial statements was a function of management, was carried out on the company's behalf, and therefore, was enough to attribute management's conduct to the company. *Baena v. KPMG LLP*, 453 F.3d at 7, *see also* RESTATEMENT (SECOND) OF AGENCY § 257 (1958); *Lafferty*, 267 F.3d at 358-59; *Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997).

The First Circuit specifically found that "[a] fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable . . .. [n]or does it matter that the implicated managers also may have seen benefits to themselves--that alone does not make their interests adverse." *Baena v. KPMG LLP*, 453 F.3d at 7-8; *see, e.g., Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998)(finding adverse interest exception inapplicable because accountant's malpractice brought plaintiff some short-term benefit. "Florida law requires that a corporate officer's interest be entirely adverse for the exception to apply (*i.e.*, his actions must neither be intended to benefit the corporation nor actually cause short- or long-term benefit to the corporation)); *FDIC v.*

-18-

*Shrader & York*, 991 F.2d 216, 223-24 (5th Cir. 1993), *cert. denied*, 512 U.S. 1219 (1994)(an agent's knowledge falls within the adverse interest exception only if the agent acts "entirely for his own or another's purposes . . . the knowledge is imputed in a case of 'joint' interests even though the agent's primary interest is inimical to that of the principal); *see also* RESTATEMENT (SECOND) OF AGENCY § 282(1). Affirming the district court's decision to dismiss the action, the First Circuit held that nothing in the complaint suggested that senior management was acting solely out of self-interest or otherwise attempting primarily to benefit anyone other than the company through their behavior. *Id.* at 7-8.

Notably, the *Baena* case was resolved on a motion to dismiss despite the trustee's contention that the adverse interest exception was an issue of fact not proper for resolution at such an early stage of the litigation. Here, the Committee also vehemently argues that the adverse interest exception is an issue of fact that must be resolved by a jury. The Court certainly agrees that in the thousands of pages submitted by the parties in support of their positions, there are many factual issues that are disputed. Regarding the issues related to the imputation issue, however, it is clear to this Court that AHERF management was acting within the scope of their employment in submitting the financial statements and that such misconduct enabled further acquisitions that, in the short term, was a benefit to AHERF.

The Committee admits that in both fiscal-years 1996 and 1997, AHERF managers directed accounting entries that caused the financial statements to be "materially misstated." Amended Complaint ¶ 36. Further, the Committee admits that AHERF maintained internal schedules that showed two (2) sets of financial results, side by side: one side with the results provided to CL and reported externally; and the other side showing the actual financial results. PwC's SUMF ¶ 113; Comm's SUMF ¶¶ 113, 229. These internal schedules showing different sets of financial results were provided to McConnell and Abdelhak by the AHERF financial department. PwC's SUMF ¶ 114; Comm's SUMF ¶ 114. Moreover, there is no dispute that the AHERF managers and directors were acting within the scope of their employment in the

preparation of the offending financial statements.  The question, therefore, is whether AHERF management acted solely for their own personal interests, AHERF deriving no benefit from the misconduct.

The Court agrees with PwC that there is no evidence in the record showing that AHERF's interests were totally abandoned, and that Abdelhak and McConnell acted entirely for their own benefit.  Futher, the record is replete with testimony that, had certain AHERF trustees and/or members of AHERF's Audit Committee been aware that the 1996 and 1997 financial statements materially misstated AHERF's financial conditions, they would have taken immediate action including changing AHERF's business strategy by ceasing all further hospital and physician-practice acquisitions.  *See, e.g.* Comm's SUMF ¶¶ 147-152(citing to depositions of AHERF trustees and/or members of AHERF's Audit Committee).  Clearly, if during the periods relevant to the misstated financial statements, AHERF made acquisitions of other hospitals, physician practices and/or educational facilities, then over the immediate short term AHERF did indeed benefit.  The benefits to AHERF  from such acquisitions include an increase of its assets and the addition of income streams.

It is undisputed that in August of 1996, AHERF acquired six (6) hospitals in the Philadelphia area that were owned by the Graduate Health System ("GHS"). Amended Complaint ¶ 22; Report of R. Bruce Den Uyl, Comm. Appendix, Tab 3, p. 4 (hereinafter ("Den Uyl Report").  In the same time period, AHERF also acquired five hospitals in the Greater Pittsburgh market including four hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended Complaint ¶ 26; Den Uyl Report, p. 6.  On July 1, 1997, AHERF purchased Canonsburg Hospital. Den Uyl Report, p. 6.  Further, in the latter half of the 1990's, AHERF purchased the practices of  "hundreds" of primary care physicians in the Pittsburgh and Philadelphia markets. Amended Complaint ¶ 27. Specifically, AHERF purchased the primary physician practices organized under Allegheny University Medical Practices, formerly known as Allegheny Integrated Health Group. Den Uyl Report, p. 6-7.

-20-

AHERF's largest acquisition of physician practices became effective in April of 1997, when it acquired the practices of more than one hundred (100) physicians including approximately eighty (80) primary care physicians of the Penn Group Medical Associates. Den Uyl Report, p. 7.   Management's scheme to misrepresent the financial condition of the company in this instance permitted AHERF to grow as a company, which was a benefit to AHERF. *See In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 522 (W.D. Pa. 2002).

Further, the Committee's contention that imputation is improper where the jury could infer that management acted to preserve their own "employment, salaries, emoluments and reputations . . ." is illogical as it would discharge corporations from liability for the misdeeds of its officers or directors in almost every instance.  That members of AHERF management may have seen benefits to themselves here, does not by itself render their interests adverse.[18]  As further evidence of self-interest, the Committee asserts that on the "eve of bankruptcy"certain senior executives, including Abdelhak and McConnell, withdrew nearly $6 million in benefits held in a KESOP executive-benefit program, even though some portion of those benefits had not yet vested and even though funding the KESOP program would endanger AHERF's ability to meet payroll.  Comm's SUMF ¶ 38.  This alleged misconduct, however, occurred more than one (1) year after the conclusion of  AHERF's 1997 fiscal year, and has no relevance to whether management's motive for misstating the financial statements for the 1996 and 1997 fiscal years was entirely for personal interests.

Based on the above, the Court finds there are no facts in dispute that warrant application of the adverse interest exception to bar imputation.  There is also no dispute that AHERF's senior management team created the fraudulent financial statements, and therefore,

---

[18]     The adverse interest exception might apply under circumstances in which the corporate officers loot the corporation of all its assets, thereby depriving the corporation of any benefit from the fraud perpetrated against innocent investors.  *See Baena v. KPMG LLP*, 453 F.3d at 7-8; *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*, 2006 Bankr. LEXIS 2419, 111-110 (Bankr. D.D.C. 2006).  There is no evidence of such circumstances here.

was a primary wrong-doer. CL's alleged misdeeds are based, *inter alia*, upon its failure to detect the material misstatements in the financial statements and advise AHERF of the accounting violations and the actual financial condition of the company. AHERF bears at least substantially equal responsibility for the injury it seeks to remedy, and barring an equitable determination to the contrary, the *in pari delicto* doctrine bars AHERF's, and thus the Committee's, claims against PwC.

The Committee argues that two (2) equitable factors preclude application of the *in pari delicto* doctrine: (1) CL's improper conduct; and (2) the presence the AHERF Board members who were innocent, independent actors who could have stopped the wrongdoing had CL conducted proper audits. The Committee's first contention is without merit. The *in pari delicto* doctrine contemplates "mutual fault" on the part of both plaintiff and defendant. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. at 306. As previously stated, the application of the doctrine is "limited to situations where the plaintiff bore at least substantially equal responsibility for his injury, and where the parties' culpability arose out of the same illegal act." *Pinter v. Dahl*, 486 U.S. at 632. In both *Lafferty* and *Baena v. KPMG*, the courts applied the *in pari delicto* doctrine to bar the claims of the plaintiffs notwithstanding the assumptions made by the courts that the defendant professionals were complicit in the alleged corporate wrong-doing. *See Lafferty*, 267 F.3d at 345; *Baena v. KPMG LLP*, 453 F.3d at 4.

The Court is also not moved by the Committee's argument regarding the "innocent and independent" Board members who could have, if so informed, stopped the wrong-doing and reversed a decade of mismanagement. This type of innocent and independent "decision-maker" limitation has been adopted by some courts to bar *in pari delicto* defenses against a bankruptcy trustee seeking to recover against outside professionals. *See e.g. In re Sharp Int'l Corp.*, 278 B.R. 28, 36 (Bankr. E.D.N.Y. 2002); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997). The Court was unable to find

support for the innocent decision-maker limitation to imputation and/or *in pari delicto* in either Pennsylvania or Third Circuit decisions.  Moreover, this limitation clearly deviates from traditional agency doctrine, as well as Pennsylvania agency law. Indeed, the Pennsylvania Supreme Court has long held a corporate principal liable "for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of [its] agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment." *Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 287 (Pa.1985)(citing *Bachman v. Monte*, 326 Pa. 289, 192 A. 485 (1937); *Freedman v. Providence Washington Ins. Co.*, 182 Pa. 64, 37 A. 909 (1897); *DeTurck v. Matz*, 180 Pa. 347, 36 A. 861 (1897); *McNeile v. Cridland*, 168 Pa. 16, 31 A. 939 (1895); *Independent Bldg. & Loan Assn. v. Real  Estate Title Ins. & Trust Co.*, 156 Pa. 181, 27 A. 62 (1893); *Griswold v. Gebbie*, 126 Pa. 353, 17 A. 673 (1889); *Brooke v. New York, L.E. & W.R.R.*, 108 Pa. 529, 1 A. 206 (1885); *Erie City Iron Works v. Barber and Co.*, 106 Pa. 125 (1884); *Custar v. Titusville Gas & Water Co.*, 63 Pa. 381 (1869); *Shelhamer v. Thomas*, 7 Serg. & R 106 (1821); *Phoenix Insurance Co. v. Pratt*, 2 Binn. 308 (1810)).  A company president, therefore, who engages in price-fixing leaves his corporation liable even if the board of directors, had it known, would have stopped him. *E.g. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 570-74 (1982)(finding principal was subject to civil liability under the antitrust laws for acts of its agents performed with apparent authority).

By the Committee's own admission, the AHERF Board members during the relevant period were themselves CEOs, CFOs and members of Boards of the leading and largest Pennsylvania-based corporations.  Brief of Committee, pp. 18-19. Yet these Board members allowed AHERF to pursue a business strategy, proffered by AHERF senior management and certain Trustees acting in concert, that implemented a series of ill-advised and unjustifiable acquisitions beginning in 1988 and continuing through the decade of the 1990's. Amended

Complaint ¶¶ 15-18. Specifically, in January of 1991, the Board approved the acquisition of

four (4) hospitals making up the United Health System ("United") knowing that three of the

hospitals were struggling financially and that United was headed toward bankruptcy. Amended

Complaint ¶¶ 15-18. In August of 1996, during the time period relevant to the misstated

financial documents, the Board approved a plan to acquire six GHS hospitals despite clear

indication these hospitals were losing millions of dollars every month. Amended Complaint ¶¶

22 & 23. The Committee admits that the financial distress of the GHS hospitals was "widely

reported by the media." Amended Complaint ¶ 22. During this same time period, the Board

approved the acquisition of five hospitals in the Greater Pittsburgh market including four

hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended

Complaint ¶ 26. The acquisition of the GHS and Pittsburgh area hospitals added $282 million

of under-secured bond debt to the AHERF System's consolidated balance sheet. Amended

Complaint ¶¶ 25 & 26. There was no outcry from the innocent and independent Board

members or Trustees. Moreover, during this period of acquisition and expansion, and with the

approval of AHERF's Board, AHERF's debt increased from approximately $70 million in

1987 to approximately $1.1 billion in 1997. *See* Amended Complaint ¶ 29.

     Despite the averments of the Committee regarding the decade long business strategy

consisting of ill-conceived, ill-advised mergers and acquisitions, and despite the intentional

accounting misstatements by AHERF management, the Committee lays AHERF's entire

bankruptcy at the feet of its outside auditors. The very harm allegedly suffered at the hands of

PwC, however, presupposes the Board approved business strategy, as well as the imputable

wrongdoing of AHERF's management. The Court, therefore, finds no equitable bar to either

the imputation of the misdeeds of AHERF management to AHERF or to the application of the

doctrine of *in pari delicto*.

V.    CONCLUSION

The Court finds no material issue of fact that excepts the wrongdoing of AHERF's senior management from imputation to AHERF.  The Court further finds no factual or equitable bar to application of the doctrine of *in pari delicto* which shall bar all the Committee's claims in this matter.  PwC's motion for summary judgment shall be granted.  An appropriate order will follow.


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    James Jones, Esquire
    Laura E. Ellsworth, Esquire
    Laura A. Meaden, Esquire
    John G. Unice, Esquire
    Jones Day Reavis & Pogue
    One Mellon Center, 31st Floor
    Pittsburgh, PA 15219

    Douglas A. Campbell, Esquire
    Stanley E. Levine, Esquire
    Campbell & Levine
    1700 Grant Building
    Pittsburgh, PA 15219

    Richard B. Whitney, Esquire
    J. Kevin Cogan, Esquire
    Jones Day Reavis & Pogue
    North Point
    901 Lakeside Avenue
    Cleveland, OH 44114

    David S. Torborg, Esquire
    Jones Day Reavis & Pogue
    51 Louisiana Avenue, NW
    Metropolitan Square
    Washington, DC 20001

    Joseph F. McDonough, Esquire
    Robert D. Finkel, Esquire
    James R. Walker, Esquire
    Manion, McDonough & Lucas
    600 Grant Street, Suite 1414
    Pittsburgh, PA 15219

Francis P. Barron, Esquire
Roger G. Brooks, Esquire
Antony L. Ryan, Esquire
Cravath, Swaine & Moore
825 8th Avenue
New York, NY 10019-7475