IN THE UNITED STATES DISTRICT COURT
OF WESTERN PENNSYLVANIA

THE OFFICIAL COMMITTEE OF          CIVIL   DIVISION
UNSECURED CREDITORS OF
ALLEGHENY HEALTH,                  No. 00-684
EDUCATION AND RESEARCH
FOUNDATION,

            Plaintiff,

      vs.

PRICEWATERHOUSE COOPERS,
LLP.,

            Defendant.
            _____

Transcript of SUMMARY JUDGMENT ARGUMENT
commencing on NOVEMBER 13, 2006
United States District Court, Pittsburgh, Pennsylvania
BEFORE:  HONORABLE DAVID S. CERCONE, DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            Richard Whitney, Esq.
                             Jones, Day, Reavis & Pogue
                             901 Lakeside Avenue
                             Cleveland, OH   44114

For the Defendant:           Thomas G. Rafferty, Esq.
                             Anthony L. Ryan, Esq.
                             Gregory Birkenstock, Esq.
                             Cravath, Swaine & Moore
                             825 Eighth Avenue
                             New York, NY   10019-7475

                             Joseph F. McDonough, Esq.
                             Manion, McDonough & Lucas
                             USX Tower, Suite 1414
                             Pittsburgh, PA   15219

Court Reporter:              Karen M. Earley, RDR-CRR
                             619 U.S. Courthouse
                             Pittsburgh, PA   15219
                             412-201-2660

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

1                         P R O C E E D I N G S

2        (November 13, 2006.   In open court.)

3                         THE COURT:   This is the time set for argument

4    on motions for summary judgment filed in the case of The

5    Official Committee of Unsecured Creditors of Allegheny

6    County Health, Education and Research Foundation,

7    plaintiff, versus PricewaterhouseCoopers, defendant.

8                         The Court's understanding is that Mr. Rafferty

9    is going to be arguing on behalf of the defendant.

10                        MR. RAFFERTY:   Yes, Your Honor.

11                        THE COURT:   Are you ready to proceed, sir?

12                        MR. RAFFERTY:   Thank you, Your Honor.

13                        Your Honor, before I start, let me say that if

14   I have to stop occasionally, it's because having young

15   children at home, they bring everything home with them.

16                        THE COURT:   I understand.

17                        MR. RAFFERTY:   Your Honor, I'd like to start

18   with a point that I think sometimes gets lost in this case,

19   and that is exactly who is who here.

20                        This is a case brought by the Committee, but

21   they are bringing it pursuant to 11 USC 541.   They, in

22   effect, stand in the shoes of AHERF.   As the Court in

23   Lafferty says, and as the statute itself says, they have

24   whatever rights AHERF had on the day AHERF filed for

25   bankruptcy vis-a-vis Coopers & Lybrand, now the successor

1    firm PricewaterhouseCoopers.  They don't have any more

2    rights than they had on that day.  They don't have any

3    less.

4              The corollary to that is that

5    PricewaterhouseCoopers has available to it every defense

6    that it could have raised had AHERF sued Coopers & Lybrand

7    on the day that it filed bankruptcy.

8              So the way Section 541 works is Mr. Whitney

9    and his clients are standing in the shoes of AHERF, and

10   they are subject to whatever defenses this defendant could

11   have raised against AHERF, and they cannot be in a better

12   position by virtue of the bankruptcy than they would have

13   been had AHERF survived and brought the lawsuit on its own.

14             Now, this has been a very long case.  The

15   bankruptcy was filed in July of 1998.  There were

16   disclosures given to the trustee in the bankruptcy

17   proceeding pursuant to Bankruptcy Rule 2004, including

18   things such as all the work papers of Coopers & Lybrand

19   relating to this audit.

20             This is a case where discovery effectively

21   started years and years ago.  There has been something on

22   the order of 200 depositions in this case, and discovery is

23   now over.  Now is the time if there are material facts in

24   dispute with respect to the issues raised in our motion,

25   it's incumbent upon the plaintiff to come forward with

1    them.

2              They don't get to say it's a complicated mess

3    and we don't have to point out the disputed material facts.

4    We can just say let's save it for a trial.

5              Now, our motion has effectively three major

6    components.  There are some smaller challenges to specific

7    claims as to the legal sufficiency of those claims, but

8    there are three principle issues that I think I'd like to

9    spend most of my time on today with the Court's indulgence

10   and patience.

11             The first is the audit interference of AHERF

12   which bars their claims.  When a client interferes with the

13   auditor's ability to perform its work, that raises a

14   defense of contributory negligence.  In this matter, Your

15   Honor, we're only talking about economic losses here, and

16   because of the economic losses being the only damages being

17   sought, if AHERF itself contributed to the audit failure by

18   interfering with the audit, their claims are barred.  They

19   are cut off.  It doesn't matter.  It's the Committee.

20             As I said when I started, they are standing in

21   AHERF's shoes, and they are subject to any defense we could

22   have raised against AHERF.

23             THE COURT:  I find it interesting in your

24   brief as I was reading it on the beach in Naples, Florida,

25   last week -- I hate to rub it in -- but I find it very

1  interesting your position is comparative negligence doesn't

2  apply to this case.

3                   MR. RAFFERTY:  That's right.  These are

4  economic losses, not personal injury property damage.

5                   THE COURT:  Common law contributory

6  negligence.

7                   MR. RAFFERTY:  There is an absolute bar to the

8  extent they interfered.  Now, in fairness, Your Honor, if

9  they were negligent and contributed to their own injury,

10  but the negligence was simply, for example, mismanaging the

11  business, that would not provide a contributory negligence

12  bar for an auditor.  There must be some nexus between the

13  conduct, the negligent conduct of the clients and the

14  audit.  It has to be interference with the audit.  The

15  Jewel court case makes that clear.

16                   But we have a somewhat different view on what

17  the interference has to be.  I mean it has to be a

18  substantial factor, indeed, but substantial factor simply

19  means there has to be a nexus.

20                   There could be other factors.  There could be

21  a hundred reasons why these debtors failed that are

22  separate and apart from the audit, but if the audit

23  interference was a substantial factor, then we're entitled

24  to the bar of contributory negligence.

25                   I'm going to come very briefly, Your Honor, to

1    the facts relating to that, and part of what I want to do

2    today is I want to describe to Your Honor this is not just

3    negligence on the part of AHERF.  AHERF intentionally,

4    intentionally and repeatedly interfered with the audit

5    performed by Coopers & Lybrand.

6              The second basis of our motion, Your Honor, is

7    the defense of in pari delicto, which flows from the Third

8    Circuit decisions in Lafferty and Cendant.  We believe the

9    Third Circuit decision in Lafferty, in particular, bars all

10   of the claims here and entitles PricewaterhouseCoopers to

11   judgment.

12             Now, those two motions were raised on our

13   initial briefing in this case, and following our initial

14   briefing in this case, the Third Circuit decided the CitX

15   case.  We believe that the CitX case provides an

16   independent basis, putting aside audit interference,

17   putting aside in pari delicto, putting aside other legal

18   challenges to the legal sufficiency of this case, the CitX

19   case bars these claims as a matter of law.

20             I'm prepared to proceed whichever way Your

21   Honor wants me to.  I can start with the CitX case or start

22   with the motion we filed, which is equally valid today as

23   the day we filed it.

24             THE COURT:  You may feel uncomfortable with

25   this, but let me ask you.  Which of the three arguments do

1    you believe is your strongest?

2              MR. RAFFERTY:  Your Honor, I believe the CitX

3    decision is the simplest.  It is the cleanest, and it is

4    far and away -- I don't have to wander through some of the

5    undisputed facts as I will have to do with audit

6    interference and as I will have to do with in pari delicto.

7              CitX, I can address my position on CitX in

8    basically five minutes.  If the Court is interested in

9    proceeding that way, I'm happy to turn to the back of my

10   book and --

11             THE COURT:  That's fine.  It really doesn't

12   matter.  Whatever is easiest for you.

13             MR. RAFFERTY:  I'm here to assist you.

14             THE COURT:  Then begin with the CitX case.

15             MR. RAFFERTY:  There are three causes of

16   action.  Count 1, professional negligence; Count 2 is

17   breach of contract; Count 3 is for aiding and abetting

18   breach of fiduciary duty by certain of the management of

19   AHERF.

20             All of the claims flow from the same factual

21   basis.  All of the claims in the complaint incorporate by

22   reference all of the paragraphs that previously came

23   before.  They all have the same theory of causation, Your

24   Honor.

25             The theory of causation, and I'm sure

1    Mr. Whitney will do this more eloquently than I can, as I

2    understand the theory of causation, if Coopers & Lybrand

3    had reached different conclusions about the financial

4    statements prepared by AHERF and its management in 1996 and

5    1997, they would have been obliged under the existing

6    standards to raise those issues with the audit committee,

7    and the audit committee and maybe the creditors if they had

8    been told that things weren't what they seemed, this was

9    not a healthy institution, that it was careening towards a

10   bankruptcy, that they would have taken some steps to turn

11   it around and fix the problem.

12            That is, as I understand it, their theory of

13   causation.  It is their theory of causation for all three

14   counts by failing to do that, Coopers engaged in

15   professional negligence; by failing to do that, Coopers

16   breached their contract; and by failing to do that, Coopers

17   aided and abetted the management of the company who had

18   fiduciary duties to AHERF and who, according to the

19   plaintiff, breached those duties.

20            Now, the interesting thing is not only did

21   they have the same factual basis, the same theory of

22   causation, but they seek precisely the same amount of

23   damages for each count, with one very minor exception.

24            What they seek, Your Honor, according to the

25   amended complaint, and this is at Paragraphs 49, 57, and

1    63, they seek the full extent of debtor's insolvency.

2    Now, with respect to the aiding and abetting

3    claim, they not only seek that in Paragraph 63, but they

4    added Paragraph 64 that says plus punitive damages on top.

5    They are asking for the full extent of the insolvency.

6    Every dollar that is owed to a creditor they don't have to

7    pay, they want PricewaterhouseCoopers to pay.

8    Now, their experts have come up with two

9    theories of damages that they've presented in this case,

10   and those motions aren't on today, but I'm just going to

11   briefly touch on them.  They have a big theory, a very,

12   very big theory of damages that they call the total

13   creditors' shortfall.  That's for some $557 million, and

14   then they have a subset of that which they refer to as the

15   avoidable losses, and that number is two hundred

16   sixty-seven and a half million dollars; and they're asking

17   for those numbers in the alternative.  As I understand it,

18   the 267 is a component of the bigger number.

19   Now, Your Honor, in my view, the second number

20   of avoidable loss is perfectly analogous to the deepening

21   insolvency theory of damages.  It is if you had done what

22   you were supposed to do, we would have fixed this, and we

23   wouldn't have gotten further.  We would have avoided those

24   other losses which we contend were avoidable.  There are

25   lots of fact questions as to whether they were avoidable.

1          That's not an issue we have to decide now.   If

2    we ever have a trial, they'll put on their evidence, and

3    we'll try to rebut it.   The bigger number is not only

4    deepening insolvency, it's the total insolvency.   It's the

5    total creditor shortfall.

6          Now, against that background, CitX has two

7    expressed holdings, and the plaintiff in its brief talks

8    about lots of things, but it tries to avoid the two

9    expressed holdings.

10          The two expressed holdings in CitX are as

11   follows:   The first is that deepening insolvency is not a

12   valid measure of damages for any claim, for any claim at

13   all.   The Third Circuit says that as loud and as clearly as

14   you can say it.   They say this requires us to decide

15   whether the deepening insolvency is a viable theory of

16   damages for negligence as opposed to whether it's a viable

17   cause of action, and they deal with that in their second

18   expressed holding.

19          They come up with saying that no one should

20   read Lafferty, the Third Circuit decision in Lafferty, no

21   one should read Lafferty as creating a novel theory of

22   damages for independent causes of action called deepening

23   insolvency.

24          Interestingly enough, Your Honor, one of the

25   judges who was on the CitX panel is the author of the

1    Lafferty decision.  So this wasn't just a different panel

2    that went at it from a different direction --

3                    THE COURT:  Who was that?

4                    MR. RAFFERTY:  Judge Fuentes sat on both

5    panels and wrote the decision in Lafferty and joined in the

6    decision presumably here.

7                    Your Honor, now, the second expressed holding

8    in this decision, and they're pretty simple to find in the

9    case.  There are two clear holdings.  The first one says

10   it's not a theory of damages.  The second one says that

11   claims for deepening insolvency are claims that sound in

12   fraud.  They cannot be negligence claims.

13                   What they say is in Lafferty, Lafferty was a

14   situation in which a company was -- a series of companies

15   were created, and they were essentially shells, and they

16   were run to bilk investors.

17                   The question in Lafferty was whether extending

18   the corporate life of those entities by participating in

19   this fraud could create a theory of damages, and deepening

20   insolvency in Lafferty was viewed as a cause of action, and

21   that's what the CitX courts say.  The claim in Lafferty was

22   under Pennsylvania law a claim for deepening insolvency

23   which requires fraud.

24                   Now, in this case, Your Honor, there is no

25   fraud claim, and the reason I took Your Honor's time to go

1    through the three counts, at the front end, there is a

2    breach of contract, professional negligence, and anyone

3    aiding and abetting of breach of fiduciary duty not owed by

4    my client but by others.  We presumably, according to the

5    plaintiff, helped to breach their duty.

6              In fact, Your Honor, early in this case, very

7    early in this case, 2002, this plaintiff sought leave to

8    add a count for fraud.  Judge Ziegler denied that.

9              This is what Judge Ziegler said in his Order

10   of the 26th of August 2002.  He said it's hereby ordered

11   that plaintiff's motion is denied as untimely -- this is

12   2002.  The bankruptcy was filed in 1998 -- based on

13   previously known facts and prejudice to the defendant.

14             Well, Your Honor, I submit with due respect,

15   if it was prejudicial to the defendant in 2002 to allow

16   this plaintiff to add a fraud claim, it hasn't gotten any

17   less prejudicial four years later and 200 depositions into

18   it where we were focused on a case that dealt with three

19   counts, and none of which were fraud.

20             Now, in response to our brief, the plaintiff

21   has said, well, you know that's not consistent with our

22   theory of damages.  Well, it absolutely is our view on

23   CitX.  The creditor shortfall, the total creditor shortfall

24   is an illegitimate measure of damages either way because it

25   effectively makes the auditor the insurer for the entire

1   enterprise.  Every dollar the enterprise ends up short, the

2   auditor has to come up with.

3            Deepening insolvency itself, the claim in

4   Lafferty, never contemplated that.  It was the deepening

5   part of the insolvency, not the entire insolvency.

6            Our view is that within these numbers, they've

7   included elements that even if CitX had been decided the

8   other way, even if the Third Circuit had said this is a

9   valid theory of damages and you can proceed on it, even if

10  that happened, some of the numbers in there, their numbers

11  don't belong, but that's an issue for another day that we

12  may never have to get to.

13           Our position is a pretty simple one.  Two

14  holdings.  Not a theory of damages, and it's the only kind

15  of damages sought here; and secondly, to the extent that

16  there is such a cause of action under Pennsylvania law, and

17  that's what they decided in Lafferty, that the cause of

18  action requires fraud.  It is not negligence based, it's

19  not contract based, it's fraud based.

20           On that basis, Your Honor, we think that CitX

21  says these three claims seeking these damages on this

22  theory, this set of facts, this theory of causation ought

23  to be dismissed now.  They're simply not consistent with

24  the teaching of the Third Circuit in CitX, and unless Your

25  Honor has questions, that's really all I have to say about

1    CitX.

2              As I said, I think it's among the more

3    straightforward issues we have to deal with in these

4    motions.

5              THE COURT:  You can proceed.

6              MR. RAFFERTY:  Your Honor, I would like now to

7    jump back to the audit -- well, let me jump back to

8    something else.  There's two things I want to say that

9    cover everything that we moved on.

10             The first is that they all have something in

11   common, and that is they don't involve the issue as to

12   whether or not Coopers performed its 1996 and 1997 audits

13   in accordance with Generally Accepted Auditing Standards or

14   GAAS for short.  That's not a basis of our motion.

15             Those issues are complicated issues.  There

16   are lots of disputed material facts about those issues.  If

17   there ever were a trial, I think my opponent estimated he

18   would need more than a month to put on his case.  I'm sure

19   he'll refine that to some degree.

20             There are conflicting accounting issues that

21   would have to be resolved.  This motion does not involve

22   them.  You do not have to decide whether or not Coopers &

23   Lybrand in 1996 and 1997 performed their audits in

24   accordance with GAAS.  Nothing in these motions turn on

25   that.

1              I think this is a pretty critical issue

2   because my suspicion is that the plaintiff is going to take

3   the view that that's the central issue in this dispute and

4   that's what you should be resolving today.

5              We didn't move on that, Your Honor.  We try

6   not to make motions that simply are a waste of the Court's

7   time, and that's what that would have been because there

8   are too many material facts that there is conflicting

9   testimony on, and if there ever was going to be a

10  resolution of those issues, it would require a jury.  There

11  is no question about that, but that's not this motion.

12             Okay.  The second thing is this motion is

13  ripe.  It is very ripe right now.  There's been more than

14  extensive discovery.  There's been almost 200 depositions

15  in this case.  The case is now heading on to more than half

16  a decade since the case was filed.  We're finished with

17  discovery.

18             Now is the time where if there are material

19  facts that prevent the Court from granting judgment as a

20  matter of law to the defendant, the plaintiff has to come

21  forward with them.  They can't -- I will take a minute

22  later on, but in a lot of the findings of fact we put in,

23  their response to it is they don't dispute it now, but,

24  Your Honor, now is the time they have to dispute it.

25             If they don't dispute it, then it's

1    undisputed, and Your Honor is entitled to rely on those

2    facts to find for PricewaterhouseCoopers on summary

3    judgment.

4           The other thing that makes this ripe, Your

5    Honor, and there are many instances, and I'm not going to

6    pick them all out.  I don't want to spend a lot of time on

7    it, but where the plaintiff says, well, you know, this

8    needs to be decided at a trial, this needs to be decided at

9    a trial.

10          I want to take you back to the controlling

11   Third Circuit precedent here, which is Lafferty.

12   Lafferty's procedural posture was a judgment on the

13   pleadings, and what did Lafferty grant judgment on, the

14   pleadings.  Lafferty found in pari delicto and granted

15   judgment on the pleadings to the defendant, the one

16   remaining defendant in this case, third party professional

17   on claims of breach of contract, professional negligence,

18   and aiding and abetting breach of fiduciary duty, the same

19   three claims that are here.

20          It is perfectly clear that to the extent there

21   are undisputed material facts that support our motion, the

22   motion is ripe, and the Court is entitled to grant this

23   judgment, much as the Third Circuit affirmed the judgment

24   in Lafferty.

25          Now, having said that, let me start with audit

1    interference.  As I said, I'm not going to dispute that the

2    interference has to have been a substantial factor in the

3    auditor's failure.  One more thing I do want to say about

4    audit interference, Your Honor.  Going back to what I just

5    said about whether or not the audits were GAAS or not in

6    '96 or '97 is irrelevant to this motion.  In fact, in the

7    Jewel court case, the Court notes to the extent the jury

8    ultimately finds that the auditor did not engage in

9    negligent conduct, that the audits were not negligent, the

10    question of contributory negligence and audit interference

11    simply passes out of the case.

12         We all have had that experience.  If the jury

13    comes back and answers the question were they negligent and

14    answers no, then you never get to the question of

15    contributory negligence; but here the question of

16    contributory negligence is teed up.  There's not only

17    contributory negligence, there's intentional interference

18    with this audit.

19         Their arguments are this first one that I

20    tried to address, which is because Coopers in their view

21    was also negligent, that the negligence of AHERF should not

22    matter.  That's simply not the law as the Jewel court makes

23    clear.  In fact, it gets the law exactly reversed.

24         The second argument is their wrongdoing wasn't

25    substantial enough, and they also say it may have been

1    unintentional.  They also say the audit client didn't have

2    to be forthcoming with the auditor.  The auditor is

3    supposed to find it all automatic.  You got to assume your

4    client is lying to you.

5            That's neither the law nor what the accounting

6    standards require.  You're required to be skeptical, but

7    being skeptical doesn't mean you should assume your client

8    is lying to you about everything because if that were the

9    case, and this is in the auditing standards, if that were

10   the case, you would have to go back and verify every piece

11   of paper in the company, every book and record to make sure

12   they were genuine and not forgeries and haven't been

13   tampered with.  The world would grind to a halt if that was

14   the standard.

15           Let's go to the facts.  Your Honor, in these

16   companies, AHERF and Coopers & Lybrand, they have an

17   agreement, and if I might, Your Honor, if I may approach, I

18   got a book with the actual documents they're going to use

19   and one for your clerk, and I have given Mr. Whitney a

20   copy.

21           Your Honor, I'll try to move through this as

22   quickly as I can, but there was an engagement letter for

23   each of these two audits, and that is Exhibit 1 in your

24   book, which is the engagement letter for the '97 audit.

25   It's on the letterhead of Coopers & Lybrand, and at the end

1    of the letter, it is signed by Coopers & Lybrand, and it's

2    signed by Mr. McConnell, who is the chief financial officer

3    or was the chief financial officer there.

4                Now, Your Honor, let me take you to, and we

5    can put it up on the screen, a paragraph that deals with

6    the representations of management, and it's on Page 6, the

7    bottom of Page 6 in your exhibit.

8                What this letter says, Your Honor, the

9    agreement, and this, by the way, is the contract that we're

10   being sued on, this says that at the conclusion of the

11   audits, not at the beginning, at the conclusion of the

12   audits, AHERF management will provide to us, meaning

13   Coopers, a representation letter for each respective report

14   that, and then it goes on to say what is going to be in the

15   representation letter.  They're going to have to represent

16   that management was responsible for the preparation of the

17   financial statements in accordance with GAP, and there are

18   a variety of other issues that they are then supposed to

19   include in the letter.

20               Okay.  Now, this wasn't a kind of an off the

21   back of the envelope thought.  If you go down to the next

22   paragraph, what it says is that in the context of this

23   audit, if there has been -- if a member of AHERF management

24   makes a misrepresentation to Coopers, regardless of whether

25   such person was acting in AHERF's interest, Coopers will be

1    indemnified.

2           To be perfectly fair, Judge Ziegler has said

3    that paragraph doesn't prevent Coopers from being sued

4    itself for negligence, but when the parties signed this

5    agreement, they took these representations seriously.

6           There's a reason for that, Your Honor.  If I

7    could ask you to look at Exhibit 3 in your book.  We can

8    put it up on the screen as well.  This is the governing

9    auditing standards from the American Institute of Certified

10   Public Accountants that were in effect at the time, and

11   this covers these representation letters.

12          The first thing that is really important about

13   the representation letters is that they are absolutely

14   required -- this isn't sort of an afterthought -- the

15   standards say it is a requirement that the independent

16   auditor obtain written representations from management as a

17   part of an audit performed in accordance with Generally

18   Accepted Auditing Standards and provide guidance concerning

19   the representations to be obtained.

20          If you turn to the next page, there is a

21   laundry list that goes over onto the third page A through T

22   of the variety of subjects that if appropriate, need to be

23   included in the letter.

24          Now, I suspect Mr. Whitney is going to tell

25   you these letters were drafted by Coopers and given to

1  AHERF to sign.

2              That's true.  No dispute about that.  And the

3  reason for that, Your Honor, is that the auditor has to get

4  a letter that satisfies this standard.  It can't take the

5  chance that the client is going to write something that is

6  a little bit different or ambiguous.  It has to meet the

7  standard.

8              There's a consequence if you can't get this

9  representation, and this is one of the things I'm going to

10  come back to, why what happened here is audit interference,

11  the likes of which I have never seen, and I have been doing

12  this for a while.

13              What happens if you don't get such a letter.

14  The standards tell you that, too, in Section 11 on scope

15  limitations.  The standards say that management's refusal

16  to furnish written representations constitute a limitation

17  on the scope of the audit sufficient to preclude an

18  unqualified opinion.

19              Put into my simple English, if you don't sign

20  such a letter and make those representations, AHERF, we,

21  the auditors, cannot give you a clean or unqualified audit

22  opinion on your financial statements.  Remember, this is at

23  the conclusion of the audit.  Management has to come in and

24  make these reps, otherwise, there is no opinion.

25              Your Honor, I submit to you that had there

1    been no unqualified audit opinion in '96 and '97, I

2    wouldn't be having this conversation with the Court today.

3    We wouldn't be here.

4             So what happened?  What happened, Your Honor,

5    is they lied to us.  They lied to us intentionally and

6    knowingly.

7             Now, Your Honor, this is probably the first

8    time in a summary judgment argument that I have ever used

9    video depositions.  I think it's kind of unusual, but this,

10   as I said, is the most --

11            THE COURT:  This is the first time I ever had

12   it presented in an oral argument.

13            MR. RAFFERTY:  It's a first for both of us,

14   and I struggled with this.  The reason for this is I want

15   you to see the words come out of the mouths of these

16   witnesses.

17            The witnesses you are going to see were senior

18   management at AHERF, among the signatories on the letter.

19   The letter is at Exhibit 2 for 1997, and the letter is

20   signed by Mr. Abdelhak, the chief executive officer; by

21   Mr. McConnell, chief financial officer; by Ms. Wynstra, who

22   was then the general counsel; and in '97 by Al Adamczak,

23   who was vice president in charge of corporate support

24   services, which effectively is like the controller.  The

25   four of them signed it, not just one of them.

```
1              We have a small problem in this case.
2   Unfortunately, Ms. Wynstra is deceased.  Mr. Abdelhak and
3   Mr. McConnell, they won't tell us anything.  They have both
4   taken the Fifth, and they are not answering the questions.
5              The reason I wanted you to see Mr. Adamczak
6   and even Mr. Cancelmi, they have testified.  They didn't
7   take the Fifth, and they both said that when they signed
8   the letter, they knew it wasn't true.
9              THE COURT:  What happened on the criminal
10  charges that were brought?
11             MR. RAFFERTY:  Some of them were dropped, and
12  some of them were resolved.
13             THE COURT:  I may have known at one time, but
14  were there convictions?
15             MR. RAFFERTY:  No, I don't believe there were
16  any convictions.
17             THE COURT:  Since we are talking about the
18  status of these individuals.
19             MR. McDONOUGH:  Ms. Wynstra passed away during
20  the course of the criminal proceedings, and Mr. McConnell
21  entered into a plea agreement that required some community
22  service with respect to a small fraction of the charges,
23  and Mr. Abdelhak entered into a plea agreement as well,
24  which included some halfway house or house arrest time, I
25  think, of a couple months, and that was the conclusion.
```

1    There were no trials.

2             THE COURT:  I didn't ask if there were trials.

3    There were convictions or they pled guilty or convictions

4    or they went through the ARD program.

5             MR. McDONOUGH:  I know Mr. McConnell went

6    through the ARD program, and I don't believe Mr. Abdelhak's

7    conviction was an eligible offense.  He served a little

8    time.

9             THE COURT:  Thank you.

10            MR. RAFFERTY:  Your Honor, going back to the

11   letter.  The reason for showing you some of this deposition

12   testimony is both these gentlemen say they signed the

13   letter, we knew it wasn't true, we signed it anyway.  We

14   gave it to you.

15            At the end of the audit, they signed a letter

16   that included representations about various things that are

17   actually at issue in this case, including the overall

18   thing, were the financial statements in accordance with GAP

19   when they knew they weren't.  They knew that Coopers &

20   Lybrand wasn't going to catch it now.  They hadn't caught

21   it before, and it was the end of the audit.

22            We are going to take a few minutes after this

23   to say how it is they managed to put this one past.  They

24   lied about this.  Let me show you what Mr. Adamczak said,

25   and, Your Honor, we have given you the written testimony at

1   Tab 4 of your book as well.

2              THE COURT:  I see it.

3              (Whereupon, an excerpt of the videotaped

4   deposition testimony of Mr. Al Adamczak was viewed by the

5   Court.)

6              MR. RAFFERTY:  Your Honor, he lied.  He signed

7   the letter, gave a rep. letter, and Mr. Adamczak and Spargo

8   and Mr. Cancelmi, the people's depositions which I might

9   get to today in brief snippets like this, were all

10  certified public accountants.  They understood what the

11  standard was.  He testified he knew Coopers was entitled to

12  rely on this letter, and he lied.

13             Now, I'm not going to keep playing it because

14  it will take too long.  In the excerpt I have given you

15  Page 908 of his transcript, which is at Tab 4, the question

16  was asked, and is it the case that you did not tell anyone

17  from Coopers & Lybrand that you believed any of the

18  statements in the representation letter marked as Exhibit

19  1626 were inaccurate, and the answer is that's true.

20             He didn't tell Coopers.  He gave us a

21  representation letter that he signed and that his senior

22  management signed, and he knew when he gave it to us it

23  wasn't true.

24             He also knew being a certified public

25  accountant, Your Honor, that if he had come to us, just

1    roll the clock back and imagine the hypothetical.  Suppose

2    he had said I'm not signing it.  If he hadn't signed it,

3    the auditing standards say we couldn't have given him an

4    unqualified auditing opinion.

5         He could have also said, you know, there are

6    things in here I'm not comfortable with.  We got to change

7    them.  Something else would have happened, but none of that

8    happened.  He simply signed it, handed it to us, didn't

9    tell us about it, and he lied.  That's audit interference.

10   That's not negligent audit interference.  That's

11   intentional conduct.

12        He testified that he knew totally that when he

13   signed the letter, that he was signing something that

14   wasn't true.  That's intentional interference with the

15   audit.  Because had he refused to sign it, there wouldn't

16   have been an unqualified opinion.

17        That is a substantial factor in the reasons

18   that we're here today in the injury to AHERF that they

19   allege came from not properly auditing the financial

20   statements.  He could have told us what was wrong.  He

21   knew, but he didn't, and instead he lied.

22        Now, Your Honor, we have exactly the same

23   language in the contract for 1996, which is at Exhibit 12.

24   The representation from management is the same.  The

25   indemnity is the same.  The same standards applied to the

1    '96 audit, and Exhibit 13 is a 1996 management

2    representation letter.  This one was not signed by

3    Mr. Adamczak.  It was signed instead by a gentleman named

4    Mr. Spargo.  I will show you a very brief clip of

5    Mr. Spargo because he, too, lied.

6              (Whereupon, an excerpt of the videotaped

7    deposition testimony of Mr. Spargo was viewed by the

8    Court.)

9              MR. RAFFERTY:  Your Honor, he signed the

10   letter, a rep. letter.  He is a certified -- he was a

11   certified public accountant.  He knew what the rep. letter

12   meant.  He knew without a rep. letter from management, at

13   the conclusion of the audit, there could be no unqualified

14   audit opinion.

15             He knew that the debt reserves, which are in

16   issue in this case -- if we ever had to try the negligence

17   part of this case, one of the issues is going to be the

18   reserves, one of the key issues, and the transfers of

19   reserves among various of these entities.

20             So there can't be, Your Honor, any clearer

21   indication of interference with an audit than affirmatively

22   misleading the auditors at the conclusion of the audit.

23             You know, he said the ball was in somebody

24   else's court.  He already knew they were at the end of the

25   audit.  This is essentially in the process of things among

1   the last steps.  That's what the standard says.  At the

2   conclusion of the audit.  That's what the agreement said.

3          So, Your Honor, I'm looking at the time, and

4   I'm not going to go through all of these.  I want to touch

5   on the highlights.  They had things called X files,

6   internal files that listed some of these reserves and

7   shortfalls that they never shared with Coopers.

8          What the plaintiff says in response to our

9   finding of fact is that they didn't provide the X files --

10  X files, Your Honor, was their name.  I was going to show

11  you testimony of one of their witnesses describing how he

12  recalled they came up with the name.  He didn't remember if

13  it was from the television show or meant excess.

14         They were effectively cushions they could move

15  around, which is not in accordance with GAP.  What they do

16  is they deny.  They say, Spargo, Mr. Spargo testified he

17  recalled sharing and discussing the X files, but he never

18  remembered -- he was never able to say who he gave them to,

19  when they were given to him, and Mr. Lisman, the man who

20  prepared the X files, testified that he never provided

21  them, that he didn't recall ever being asked to give them

22  to Coopers.

23         We can play Mr. Lisman's testimony.  He is one

24  of the creators of the X files.

25             (Whereupon, an excerpt of the videotaped

1    deposition testimony of Charles Lisman, Jr., was viewed by

2    the Court.)

3                    MR. RAFFERTY:  Your Honor, he doesn't recall

4    giving it to Coopers.  He doesn't recall giving it to

5    anybody but Mr. Cancelmi, who was a CPA that worked inside

6    of AHERF.

7                    The X files are at Tab 6 of your book.  There

8    are documents that are referred to as cheat sheets that

9    tracked reserves and cushions; and they did give us

10   documents that showed the reserves and cushions, but what

11   they did was before they gave them to Coopers, they took

12   the footnotes out, Your Honor, and the footnotes are what

13   showed you what the reserves and cushions actually were.

14                   At Tab 7 in your book is a document that shows

15   the revenue per admission track on a monthly basis.  This

16   is an internal AHERF document they didn't give to Coopers,

17   and there are footnotes in that, and you might be able to

18   see the footnotes better on the screen.  They are a little

19   bigger.

20                   For two of the months, they include

21   recognition of reserves from Graduate and a $10 million

22   reserve adjustment.

23                   Now, the important thing here, Your Honor,

24   when they track this, they are trying to see whether you

25   are making the same amount of money on admissions every

1   month.  It's a financial management tool.

2          When they turned this over to Coopers, they

3   didn't give it to them in the form that they had it

4   internally, which showed the impact of the reserves on the

5   numbers, because the two numbers in the column that those

6   footnotes come off are numbers that are very different than

7   the other monthly numbers.  One is 17 and one is 19, as

8   opposed to the others, which are all in the 10 to 13 range.

9   So what they did was they gave us instead Tab 8.

10          Tab 8, which is Exhibit 312.  If you turn to

11  the last page of Tab 8, they simply averaged it out for the

12  year.  They dropped the months out and dropped the

13  footnotes, and the testimony from the witnesses, which

14  we've included in Your Honor's book as well, indicate that

15  for Mr. Cancelmi -- his testimony is at Tab 9 -- before

16  they provided this schedule to Coopers in an electronic

17  form, they took the footnotes out.

18          Now, I want to make it clear, because

19  Mr. Whitney is going to do it if I don't do it, could

20  Coopers have found some of these things.

21          THE COURT:  I'm sorry.  You said could they

22  have --

23          MR. RAFFERTY:  Found out some of this.  The

24  answer to that is absolutely yes.  The truth is in the

25  world somewhere, the truth about the finances.  With enough

1    time, with enough money, with enough diligence, you might

2    have uncovered the fraud, the outside auditor.

3            The outside auditor here wasn't doing a fraud

4    audit.  They were doing the normal yearend audit.  These

5    people knew what they were doing.  They had X files they

6    didn't give us.  They had cheat sheets they gave us in a

7    stripped-out form.  They simply hid the information, and

8    then they got to the end of the year and the end of the

9    audit and they gave us rep.  letters that they now have

10   testified were knowingly false.  That's audit interference.

11           Your Honor, I think I need to move quickly

12   onto the issue of in pari delicto.  I just want to say in

13   pari delicto is a theory that requires, unlike audit

14   interference, the imputation of the wrongdoing of AHERF's

15   management to AHERF itself.  That's the first step.  You

16   have to impute it.

17           This flows out of the just old standard agency

18   rules we all learned in law school, I'm acting in the scope

19   of my agency, then what I do is attributable to the person

20   for whom I'm acting as agent.  It's perfectly clear that in

21   the rep. letters, those people were the agents of AHERF.

22   They were the CEO, CFO, general counsel, and effectively

23   the controller.

24           As to show what does plaintiff say in response

25   to this.  Plaintiff says, well, they were acting aversely

1    to the interest of AHERF because they wanted to preserve

2    their salaries, emoluments, the luxury lifestyle.  They got

3    used to the corporate jet retreats.

4              I don't think under the Cendent decision that

5    those issues get plaintiff to a finding as a matter of law

6    of an adverse interest.  I don't believe that it's enough.

7              There is an earlier decision by Judge Ziegler

8    in that he denied summary judgment in another case in which

9    he was moved by some of those same facts, but I think the

10   Third Circuit has made pretty clear in Cendent, it doesn't

11   really matter if the wrongdoers are feathering their nest

12   at the same time they're acting within the apparent and

13   actual scope of their authority on behalf of the company.

14             But even if that were the case, Your Honor,

15   even if the adverse interest doctrine were to apply here,

16   there is yet an exception to that which is called the sole

17   actor exception to the adverse interest rule.  That is when

18   someone so dominates or some group so dominates the company

19   that they control it, that what they do or don't do is

20   imputed to the company because they're the ones who are

21   dominating the company.  That's precisely what we have

22   here, Your Honor.

23             You know you don't really have to take my word

24   for it because in a separate case, this same plaintiff

25   brought a lawsuit against some of the officers and

1    directors of this company, and what they said in that case

2    was that this management thoroughly dominated this

3    corporation.  The management ran roughshod over AHERF,

4    particularly Mr. Abdelhak.

5                THE COURT:  You don't think there's a material

6    issue of fact on that point?

7                MR. RAFFERTY:  No, I don't think so, Your

8    Honor, because if you -- let me go through the testimony

9    very quickly.  There's lots of findings in fact in which

10   the plaintiff said we don't dispute.  You quoted the

11   testimony right.  We don't think you should get the

12   inference from it.  Many of the trustees, Mr. Abdelhak ran

13   this company as a fiefdom.

14               THE COURT:  I read those.

15               MR. RAFFERTY:  In their complaint against,

16   among others, Mr. Abdelhak, they said things -- why don't

17   we put up Paragraph 46.

18               This is a complaint filed by this plaintiff

19   against, among others, Mr. Abdelhak.  One of the things

20   they say in the complaint they filed in court, that

21   Abdelhak was able to cause his managers to allocate

22   expenses and revenues among the various entities in the

23   system simply on the basis of how he wants the entity to

24   look.

25               Those aren't my words.  Those are words this

1  plaintiff put into a court file.

2          Now, go back to Paragraph 44.  They also said

3  in that same complaint, the lax internal control

4  environment was underscored by the nature of AHERF board

5  meetings, which were short in duration, thoroughly scripted

6  by the office of defendants, with the cooperation and

7  acquiescence of key trustee departments and intentionally

8  designed and conducted so as to discourage meaningful

9  scrutiny by the other members of AHERF's board.

10          In other words, Your Honor, this plaintiff

11  said these officers, defendants, dominated this company.

12          Now, there's more than that, Your Honor.

13  There is a very full record at our Finding of Fact 49.  We

14  say that there is not a single instance recorded in any of

15  the minutes of the AHERF board of trustees of any trustee

16  dissenting from an action taken by the board.

17          What does the committee say in response?  They

18  say that's right.  The available board minutes don't

19  reflect any trustee dissent.

20          We have Paragraph 44 of our findings.  We

21  quote from the testimony of Richard Daniel, the former vice

22  chair and chair credit officer of Mellon Bank.  He says

23  Abdelhak was a dominant CEO to the extreme.  So he was

24  dominating the board.

25          Answer:  He was dominating every meeting that

1    I was involved in.

2              The Committee doesn't dispute this.  They say,

3    again, that we accurately quoted from the testimony.

4              There's more.  There's Henry Allen, the

5    retired president and CEO of the Pittsburgh and Lake Erie

6    Railroad, also on the board.  He said Mr. Abdelhak ruled

7    with an iron fist and demanded, and in most cases, received

8    from any subboards absolute adherence.  We quoted them in

9    the brief.

10             There is more than ample evidence that

11   Mr. Abdelhak and his inner circle dominated this company

12   and their wrongful conduct.  Remember, in this complaint

13   that we went through, this plaintiff filed against

14   Mr. Abdelhak, the complaint said that the action of

15   Mr. Abdelhak and the other defendants in that case caused

16   the downfall of AHERF.

17             Now, they're not bound by -- you can have many

18   causes for a downfall.  I don't dispute that, but they

19   understood that Mr. Abdelhak dominated this company.  The

20   evidence is irrefutable saying that we quoted it

21   accurately.  You shouldn't draw an inference from it that

22   there was domination.

23             That's all there is.  There is nothing to try

24   here.  We're not going to have to sit for months on that

25   question and have these people parade in front of a jury

1    and say the same thing they said under oath in a

2    deposition.  They don't have any facts to the contrary.

3    They don't have a single board minute that reflects a

4    dissenting view taken by a trustee.

5              There is more than ample evidence that the

6    wrongful conduct of Mr. Abdelhak and Mr. McConnell and

7    others is imputable and should be imputed to AHERF, much

8    like the Third Circuit did in Lafferty; and once that

9    conduct is imputed, Your Honor, the claims here fall away.

10             I want to go back to where I started on this.

11   Remember this isn't -- the plaintiff here is only nominally

12   the creditors' committee.  The plaintiff, the actual

13   plaintiff here, the person or the entity whose rights are

14   being enforced against Coopers and PwC as successor is

15   AHERF.  It's AHERF.  They're standing in AHERF's shoes.

16             The Third Circuit, the arguments that they

17   make in response to in pari delicto and imputation are all

18   equitable arguments.  They were innocent trustees.  The

19   Third Circuit rejected that.  They were innocent board of

20   directors in Lafferty as well.  The Third Circuit said

21   that's not meaningful.  You're bound by 541 to the rights

22   that the debtor has of the bankruptcy, and you're subject

23   to whatever defenses a defendant has against that debtor;

24   and for that reason, the in pari delicto defense is an

25   absolute bar.

1         I'll also go back.  In Lafferty, the same

2  three causes of action were barred by in pari delicto.

3  Breach of contract, aiding and abetting breach of fiduciary

4  duty, and professional negligence, among some others, but

5  those three were also in the mix.

6         You said an hour, and I'm almost there.  If I

7  could very quickly, there are some discrete issues.  There

8  is a claim that is not a small claim.  It's for a hundred

9  million dollars or so involving the Centennial entities

10  which were in a post-petition consolidation in the

11  bankruptcy and put into this estate for the benefit of

12  creditors, and they're claiming that they're going to

13  recover this money on behalf of them, notwithstanding the

14  fact it's a post petition.

15         Your Honor, it's really a simple answer.

16  Section 541, 11 USC 541 says you got whatever rights and

17  causes of action the debtor has on the day the bankruptcy

18  was filed.  The filing was July 21, 1998.  Consolidation

19  was December 14, 2000.  There is no Centennial claim in

20  this case.  There can't be.  Section 541 bars that.

21         There is also a breach of contract claim that

22  is, very quickly, when we had previously moved against this

23  claim in front of Judge Ziegler, we thought it was entirely

24  duplicative of the professional negligence claim.

25         At that time the plaintiff said no, there may

1    well be specific contract provisions that were breached in

2    addition to simply not meeting the standards required of

3    you, and Judge Ziegler declined to dismiss it at that

4    stage.  He did say you need to come out with a claim that's

5    based on something other than they breached the same

6    standard that applies to their professional negligence

7    claim.

8           And we have now gotten to the end of the day.

9    They don't have any such claim.  The claim they have is by

10   not doing a GAAS audit in '96 and '97, they breached the

11   contract.  Judge Ziegler already decided that.  That was

12   back in January of 2003.  It's law of the case here.

13          They haven't got any other facts, material or

14   otherwise, to suggest that there are other breaches, and so

15   the contract claim ought to be dismissed.  The contract

16   claim, in any event, would be barred by both the audit

17   interference and by the in pari delicto, but standing

18   alone, it ought to go as well.

19          Finally, Your Honor, there are two other

20   issues.  There is an issue of causation.  Their whole

21   theory of causation is if we had done a different job, if

22   we would have raised the flag, they would have done

23   something.  Maybe and ultimately that something would have

24   succeeded.  That's one too many jumps in the causal chain.

25   That's a shoulda, woulda, coulda theories of damages, and

1    there are no shoulda, woulda, coulda.  It can't be by

2    becoming the outside auditor of a company, you become the

3    insurer, and whatever happens to them, you're responsible

4    for.

5              There is an aiding and abetting breach of

6    fiduciary claim.  There are cases all over the lot.  The

7    Supreme Court of Pennsylvania has not said there is such a

8    claim under Pennsylvania law.  Some federal courts have

9    said well, I think they would, and some federal courts have

10   said I don't think they would.

11             Some federal courts have said until they do,

12   I'm not going to do anything.  We don't think you ought to

13   be in the business of making new law.  In any event, the

14   audit interference in pari delicto bars that claim.  You

15   may never have to get there.  If you do, there is a

16   question as to whether it is, as a matter of law, whatever

17   the facts are, a valid claim or not.

18             I apologize.  I have gone almost an hour.  If

19   you have any questions, I will try to answer them quickly.

20             THE COURT:  On the in pari delicto argument,

21   can you elaborate a little bit more on your position with

22   regard to the adverse interest exception to the imputation?

23             What was the motivation that you think the

24   record supports?

25             MR. RAFFERTY:  I think the records show

1    Mr. Abdelhak, who dominated this company, thought that

2    bigger was better.  He thought that he could buy bankrupt

3    entities or entities that were teetering on the verge of

4    bankruptcy and through better management and some chicanery

5    we didn't know about at the time, he could turn them around

6    and make them profitable.

7            He thought at the end of the day, the world

8    would come his way and that bigger would be better.  He

9    would be positioned in both ends of Pennsylvania, not just

10   in one, and that would be a good thing, and they were in

11   effect buying --

12           THE COURT:  A good thing for AHERF?

13           MR. RAFFERTY:  A very good thing for AHERF.

14   If they had managed to survive, it might well have been a

15   very good thing.  They were taking a chance.

16           Mr. Abdelhak was, if nothing else, apparently

17   a risk taker.  He appears to have been taking a risk here.

18   He was betting on his own judgment that bigger was better

19   and that he could turn things around that other people had

20   failed at.

21           Ultimately, that didn't come to pass.  He ran

22   out of time, he ran out of cash, and he couldn't do it; but

23   I don't believe that he was acting adverse to AHERF's

24   interests as he perceived his interest.

25           That is the difficult issue in this.  In

1    hindsight, you could say, well, sure, if he hadn't bought

2    that and if he hadn't bought that or assigned that debt,

3    the entity itself would have been in a much better place.

4    That's Monday morning quarterbacking.  That's very easy.

5            Mr. Abdelhak and others were on the ground

6    making decisions on the fly.

7            THE COURT:  What if the facts in the case show

8    a little bit of each, a little bit of the actions taken,

9    the disingenuous actions taken were to expand AHERF, to

10   make it into a real powerhouse and also to personally

11   benefit the alleged wrongdoers?

12           MR. RAFFERTY:  Then you go back to Cendent.

13   Cendent says if they're acting in the scope of their

14   authority, it doesn't matter if they are also feathering

15   their own nest.

16           I have a really simple mind, but if your

17   salary, if the benefits you get from your job, if the

18   lifestyle you get from going to work and getting a paycheck

19   were sufficient to put you adverse to your employer, then

20   every one of us would in some way be adverse to our

21   employers.

22           This was not the only company in the United

23   States that had a corporate jet that went on retreats, that

24   paid executives better than maybe they would have been at

25   some other public institutions.  It can't be those facts

1    alone.

2            They don't have any facts that say, for

3    example, that they took on -- they went out and raised

4    money and they deposited it themselves.

5            There's an argument at the end of the day they

6    moved some of the retirement funds on the way out the door

7    as they knew the end was coming, that Mr. Abdelhak and

8    others managed to get out of the building with their

9    retirement funds, but at the time that they were making

10   these decisions, I think it's implausible to conclude they

11   were simply thinking this is all a ruse, it's not in

12   AHERF's interest.  The whole thing is going to collapse.

13           I think they sincerely believed bigger is

14   better, and they could turn these things around, and at the

15   end of the day, they would be heroes.  Unfortunately, life

16   doesn't work out that way for us.  Sometimes you make a

17   bet, and it doesn't come home.

18           That's what happened here.  If you say okay,

19   they were acting adversely, the domination that this

20   gentleman and his cronies had over this company is an

21   exception to that rule.  It is the same exception that was

22   applied in Lafferty.

23           In Lafferty, the Court concluded that they

24   weren't acting in the interest of the companies because the

25   companies were actually shells that were just pass-throughs

1    to get money.

2            The Walnut and Creek Lifting Company I think

3    was the name of it, where the Court nonetheless concluded

4    because the Shapiro family dominated that company, their

5    conduct had to be imputed to it.

6            Either way, I think you can go either way

7    here.  You can simply say they don't have enough facts to

8    demonstrate adverse interest, but even if they did, there

9    is more than adequate domination to invoke the sole actor

10   exception to the adverse interest rule.  On either basis,

11   the in pari delicto defense would bar this entire case.

12            THE COURT:  Thank you.

13            MR. RAFFERTY:  Thank you very much, Your

14   Honor.

15            THE COURT:  You're welcome.  Mr. Whitney.

16            MR. WHITNEY:  Good morning, Your Honor.

17            THE COURT:  Good morning, Mr. Whitney.

18            MR. WHITNEY:  I'm Dick Whitney.  I represent

19   AHERF in this case.

20            I was thinking of some pithy introduction to

21   my argument that I could give the Court, and I kept coming

22   back to something that is not a particularly pithy

23   introduction, but it wouldn't go away, and that is when one

24   considers the couple or several trans files that were

25   shipped over here by the parties in connection with this

1    motion for summary judgment, and on the basis of my, what

2    is it now, 33 years of experience, something just tells me

3    this is not a summary judgment motion.

4              What I thought I'd do is I'd suggest to the

5    Court that as the Court knows, this seems to be something

6    that lawyers do nowadays is file these motions for summary

7    judgment in which they're just inviting submissions of all

8    of this testimony, and here's why they do it; but after 33

9    years, I must confess to you, I don't know why someone does

10   this.

11             There's no rule of law in Rule 56 that says

12   that if you need a mid-sized pickup truck to bring the

13   entire record over that the Court is supposed to be looking

14   through in support of the notion that there's no genuine

15   dispute of material fact, because that's what all these

16   documents are there to do, there's no rule that says that a

17   mid-sized pickup or higher is a fortiori denial of motion.

18             As I said, something keeps telling me that,

19   and the more I thought about it and the more I felt like as

20   I'm reading these briefs, and they are really kind of

21   fascinating briefs, it came to me that those trans files

22   aren't indicative of what this thing is really about.

23             The arguments and counter arguments that are

24   made in these briefs are not arguments in support of a

25   motion for summary judgment.  They constitute closing

1   arguments to the jury on three issues that are by every

2   court that decides them factually intensive issues that

3   raise jury questions.

4          The reason why they are jury questions is not

5   just because there's inevitably a factual controversy with

6   respect to them, but because if you're talking about in

7   pari delicto or audit interference or proximate causation,

8   sooner or later somebody's got to draw an inference from

9   all of these facts because it isn't as though there is

10  going to be direct testimony that takes you right to it.

11         That inference is supposed to be drawn by

12  juries, and that is, in essence, what these arguments pro

13  and con are about; and in order to make it appear as though

14  it's a summary judgment case, in each of those three

15  settings, in pari delicto, audit interference, proximate

16  causation, what Coopers does is they articulated at the

17  outset a rule of law that they say is the applicable rule

18  that the Court is to be guided by, that is a rule of law

19  that is so strict that not for nothing, no plaintiff could

20  probably meet it.

21         And then they argue that, in fact, we didn't

22  meet it, and they state some facts in their favor that they

23  say we didn't dispute and, therefore, voila, one has a

24  summary judgment.

25         The fact of the matter is in each one of those

1  cases, the rule of law that they are citing is not correct,

2  and that the case law that does inform these issues

3  invariably says that what we're dealing with here is an

4  issue of fact.

5          Now, I will get to the CitX case in a little

6  while.  I wanted to talk first, though, about in pari

7  delicto, audit interference, and proximate causation,

8  because unlike the holding in CitX, those are the issues

9  that they filed a motion for summary judgment on.

10          CitX informs a rather different motion that

11  they filed, which they allude to in a footnote of their

12  supplemental brief, which has nothing to do with any of the

13  grounds in their motion for summary judgment, and I'll get

14  to that, if I may -- well, I'll say a minute, but it will

15  be probably more than that.

16          With regard to imputation and this whole

17  question of adverse interest, the rule of law they come up

18  with is that in order to sustain a claim that AHERF's

19  management was acting with adverse interest, we must show

20  that they totally abandoned AHERF's interests.  They acted

21  totally in their own interests.  There's something that

22  they inject in their reply brief about the need for the

23  motives to be secret, and mixed motives are not sufficient.

24          Their undisputed evidence is that we cannot

25  establish this adverse interest comes in the form of

1    comments like Abdelhak cared deeply about AHERF.  Abdelhak

2    and McConnell always acted in the best interest of AHERF.

3    The problem is that those comments don't have anything to

4    do with the management wrongdoing that they are trying to

5    impute onto AHERF; and moreover, the rule of law that

6    they're citing, which is the supposed adverse interest, is

7    not, in fact, the rule of law.

8            The misconduct they want to impute is stated

9    in their brief.  It is undisputed that AHERF's management

10   deliberately recorded the entries that caused the alleged

11   misstatements in AHERF's financial statements, which they

12   prepared.  Thus, if the Court imputes the conduct of

13   AHERF's management to AHERF, the committee action fails as

14   a matter of law.

15           Now, I for one was really impressed with

16   Mr. Rafferty's Kumbaya comments about why Mr. Abdelhak

17   believed in his heart of hearts that the worm would turn

18   and the company would turn around and so forth; but in

19   connection with the in pari delicto argument, he is arguing

20   they cooked the books, and that's what he says, and that's

21   what he did.

22           Not for nothing the evidence in this case is

23   Coopers was right in there cooking the books with them.

24   Make no mistake about it, this is going to be a fun trial

25   because Coopers & Lybrand is not some lanny-pie (phonetic)

1  here that was somehow interfered with in their best efforts

2  to uncover the truth.

3           They were people who absolutely knew every

4  essential element of these book cookings, and that is

5  scattered throughout our statements of fact, but I will

6  allude to some of that today.

7           With regard to what the standard is, the

8  standard I submit is Judge Ziegler's opinion in the

9  Phar-Mor case.  The reason it is is because here you have

10  an effort to try to wrestle with a doctrine of imputation

11  in the context of what we are talking about here, which is

12  a business failure case involving a litigation against the

13  outside auditor and the issue of whether or not a

14  management's wrongdoing or fraud is to be imputed so as to

15  defeat the action.

16           And what Judge Ziegler had to say there was

17  that we hold that genuine issues of material fact preclude

18  the entry of summary judgment.  From the evidence of

19  record, we cannot conclude, as a matter of law, that the

20  fraudulent acts of Monus, Finn, and others were intended to

21  benefit Phar-Mor.

22           While we recognize Finn, Walley, and

23  Cherelstein have all said that the motivation behind the

24  fraud and the resultant cover-up was to provide time for

25  management to resolve Phar-Mor's underlying business

1    problems, such a motivation does not, in our judgment,

2    necessarily equate to a finding that fraudulent actors

3    intended to benefit Phar-Mor.

4         Rather or indeed, a reasonable trier of fact

5    could conclude that the true motive of the wrongdoing was

6    the preservation of their employment, salaries, emoluments

7    and representations, as well as their liberty at the

8    expense of Phar-Mor's corporate well-being.

9         In other words, the fact that somebody may

10   suggest that there is something out there that might have

11   benefited AHERF, Phar-Mor in that case, the fact that the

12   jury could conclude, that the jury could draw an inference

13   from all of the evidence, theirs and ours, that the true

14   motive was feathering their own nest.

15        And that is exactly what we have in AHERF.  As

16   a matter of fact, AHERF is probably a stronger case than

17   Phar-Mor for the propositions that Judge Ziegler is sitting

18   here.  No. 1, Mickey Monus and his friends were saying in

19   Phar-Mor we did it all for the good of the corporation.

20   These guys are pleading the Fifth Amendment.

21        I mean that is not exactly something that

22   lends itself to an inference that they were doing something

23   for the good of their principle under the doctrine of

24   imputation.

25        Secondly, this case is more about preservation

1  of salary and emoluments and jet planes.  We're talking

2  here about compensation packages for Abdelhak and McConnell

3  that were substantial and substantially driven by bonuses

4  and incentive compensation packages tracking directly to

5  the company's financial statements and their well-being.

6              In fact, in our statements of fact, we point

7  out that in several years, the financial statements

8  happened to track almost exactly the targets in those

9  financial packages.

10             We submit under the doctrine or under the case

11  law of Phar-Mor or under the standard that is set by

12  Phar-Mor, we are dealing here with a jury question that

13  goes exactly to that point.

14             Let me say a couple other things.  One is

15  while the jury is parsing this out, another fact that they

16  could infer motive from or whether benefit derives from

17  this action is that this supposedly dominated board, these

18  lapdogs of Mr. Abdelhak, when they found out about the

19  financial misstatements, they fired him shortly after they

20  fired Coopers & Lybrand.  So that the board by its own

21  actions demonstrates exactly what good all of this

22  misbehavior had to AHERF.

23             In response to that, when we get to the reply

24  brief, we hear, as we heard today, Cendant.  The Third

25  Circuit decision in Cendant apparently before Lafferty, the

1    Third Circuit hasn't decided another case, and in their

2    reply brief they suggest that Cendant effectively rejects

3    this notion of salaries and emoluments and mixed motives

4    and that Phar-Mor is not good law in light of Cendant.

5            When Mr. Rafferty was talking about a prior

6    summary judgment opinion of Judge Ziegler, I was thinking

7    he might be talking about his prior summary judgment

8    opinion in this case, because apropos of the issue or

9    doctrine of law of the case, Judge Ziegler in his January

10   2002 summary judgment opinion specifically said that

11   Cendant doesn't change Pennsylvania law on imputation

12   because this very argument about Cendant that pops up in

13   the reply brief is an argument that they already made and

14   lost to Judge Ziegler in connection with the motion decided

15   in January of 2002.

16           So what starts out as an alleged absence of

17   material dispute of fact in pari delicto, not mentioning

18   and discussing at all Phar-Mor, becomes a reversion back to

19   well, Phar-Mor is not good law.  It's all about Cendant.

20   You can't have mixed motive.  It has to be a sole motive

21   and so forth.

22           Judge Ziegler even quotes that argument of

23   theirs in his summary judgment opinion.  It is exactly the

24   way it appears in the reply brief down to the inner

25   delineation of the applicable word.  I'm looking for the

1   quote here.  While we recognize that Finn, Walley, and

2   Cherelstein have all testified of the motivation behind the

3   fraud and resultant cover-up, the creditors quoting

4   defendant argues that the fraud was committed during the

5   course of senior management's employment.

6         The second prong of the imputation test is

7   also satisfied because the creditors committee does not

8   even allege that AHERF senior officers were acting

9   entirely, underlined, for their own benefit in committing

10  the fraud.

11        Judge Ziegler already decided this issue.  He

12  already decided specifically the question of whether or not

13  Cendant even addressed the Phar-Mor decision because as we

14  point out in a rejoinder brief, it didn't.

15        Not for nothing I suppose that Cendant was

16  interpreting New Jersey law on imputation, and the New

17  Jersey Supreme Court ruled, I guess, just a couple of

18  months ago, that the doctrine of imputation has no

19  application, or in pari delicto has no application in a

20  case involving auditor malpractice.  That case is called

21  NCP Litigation Trust versus KPMG, 901 A.2d 871.

22        They have a different interpretation of it,

23  I'm sure, but I don't believe the case would support a

24  differing interpretation.

25        They then argue that even if there is an

1   adverse interest, this case is subject to the sole actor

2   exception of Lafferty or the sole actor's exception to the

3   adverse interest rule is designed to address a person or

4   small group of people who hold the shares of the company

5   and can effectively control the board and management.

6          The rationale, as Lafferty puts it, is no one

7   to whom -- that particular agent has no one to whom he can

8   impart his knowledge or from whom he can conceal it.

9          That book cooking that was going on in AHERF,

10  there weren't any shareholders here.  It is a nonprofit

11  company.  The people -- the consumers of the cooked books,

12  the patrons in this restaurant is the board of trustees.

13  Those are the people that they were taking all this effort

14  to cook the books for.

15         To conceal what was going on and to preserve

16  their salaries, their compensation packages, et cetera,

17  because not coincidentally the book cooking went

18  specifically to what Mr. Rafferty was talking about, this

19  whole business about Abdelhak believed that by acquiring

20  companies and through synergies of scale can turn losing

21  hospitals and health care facilities and medical schools

22  into winners.

23         The book cooking was designed to hide the fact

24  that the first set of acquisitions he made were not turning

25  around, and the turnaround was the justification for the

1    next set and the next set and the next set.  From the

2    standpoint of what could have been a benefit to AHERF, the

3    answer is nothing.

4          There are some cases out there that talk about

5    the fact well, even if ultimately it led to a corporate's

6    demise, they obtained some kind of short-term benefit out

7    of the misconduct of management.  Here there aren't any

8    short-term benefit.  All they did was load on more losing

9    companies along the way and paid salaries and target-based

10   incentives to these guys.  They got nothing.  AHERF itself,

11   the entity got nothing out of this except more losing

12   entities and a larger bankruptcy.

13         With regard to the whole business of the sole

14   actor exception, it's a large reach to suggest that the

15   factual situation discussed in Lafferty reaches the AHERF

16   situation.  This dominated board of lapdogs consisting of

17   CEOs, of places like Mellon Bank, the CFO of USX, these

18   guys are not on the board.  They are the audit committee,

19   and the idea these guys are lapdogs is counterintuitive at

20   best; but if there's any question about that, one need only

21   look at their work papers, which are written by people

22   other than the people who are writing about sole actor

23   domination, and what Coopers & Lybrand in its work papers

24   and characterize that the client has to say is this about

25   the lapdogs.

1          C&L's experience with the individual boards is

2    that they are generally independent of management,

3    extremely qualified and diligent in completing their

4    responsibilities and are cognizant of their actions and the

5    associated impact on the organization's employees,

6    patients, local communities, and society at large.

7          The audit committee at AHERF is very active

8    and has significant influence in the operations of the

9    organization.  They meet with C&L at least two times a year

10   to discuss the audit plan and the audit results.  They

11   review the internal audit plan each year and review any

12   significant findings that may arise from their work.

13         They are recording in their work papers that

14   these guys are to be taken seriously by them, the auditors.

15   They have to answer to them.  That's not exactly a

16   dominated group of people.

17         Lastly, as we say in our brief or talk about

18   in our brief, there is case law that makes clear that

19   imputation doesn't get you all the way there, that actually

20   dismissing Coopers & Lybrand on the basis of imputation

21   requires application of the doctrine of in pari delicto.

22         In that regard, there is case law that

23   suggests as that NCP case sort of or the result -- the NCP

24   case from New Jersey would recognize, that when a third

25   party has colluded with a corporate agent in the

1    wrongdoing, they're not entitled to invoke the doctrine of

2    in pari delicto.

3              There is also case law that we cite that deal

4    with the presence of innocent decision makers as blocking

5    or barring the doctrine of in pari delicto.

6              Now, in a bout of candor, I'm going to tell

7    you from looking at all this imputation law, I'm having

8    difficulty trying to square all of the cases in all the

9    different ways these courts analyze them.  I have

10    difficulty with the idea there is an exception to the rule

11    and then an exception to the exception; but in addition to

12    that, you've got laid on top of that in pari delicto, laid

13    on top of that collusion, innocent decision makers, and I

14    believe fairly what these cases all come down to is

15    essentially this.

16              If by not invoking the doctrine of imputation,

17    the only benefit is going to go to the very wrongdoers who

18    created the harm, which is the Lafferty situation, then you

19    impute the conduct.

20              If, however, by invoking imputation, you are

21    either working a harm on innocence or providing an out to

22    someone who was an active participant in the wrongdoing,

23    you don't invoke the doctrine of imputation.

24              I believe that all of these cases more or less

25    turn on that, and all of these analyses are directed toward

1    trying to find the answers to those questions.

2            An adverse interest exception, sole actor

3    rule, the application of in pari delicto, the question of

4    innocent decision makers, which is another side of the

5    adverse interest exception, they are all the same, and

6    ultimately, they are issues for the jury to decide.

7            The two sides in their brief are not hunting

8    and fishing for undisputed facts.  They are giving the

9    Court their position as to the evidence that they call to

10    the fore to prove what they want to prove with regard to

11    the in pari delicto doctrine, and it is ultimately for the

12    jury to decide whether or not that doctrine should apply

13    based upon instructions given by the Court.

14            The same approach attaches to their audit

15    interference argument.  They begin by stating as a rule,

16    the defense has established if the client is not open and

17    forthcoming in respect to the audit, and failure to provide

18    the auditor with pertinent information in the client's

19    possession can itself constitute contributory negligence.

20            Failure to provide the auditor with pertinent

21    information in the client's possession can itself

22    constitute contributory negligence.

23            That's kind of a tall order to hear from one

24    of the four largest auditing firms in the country.  There's

25    audit interference if the client is not open and

1    forthcoming, and failure to provide the auditor with

2    pertinent information can constitute contributory

3    negligence.

4              Now, they don't cite any cases in support of

5    that proposition of law, and that probably ought not to be

6    very surprising because it rather flies in the face of what

7    an auditor is supposed to be doing.  Auditors are supposed

8    to be an independent set of eyes on a financial statement.

9              One of their roles, for example, is to detect

10   fraud.  Yet, it becomes an immediate defense to a

11   malpractice case if they can show that there was something

12   that somebody didn't tell them in the course of the audit.

13             You know, today, they show you the rep.

14   letter, as it's called, I guess the management rep. letter,

15   and Mr. Rafferty confirmed the fact they get them at every

16   audit as a precondition of signing that little clean

17   statement at the end of the financial statement.  No rep.

18   letter, no audit.

19             So if the rep. letter -- if they can prove the

20   rep. letter is wrong, they take a pass on a bad audit.

21             That's not what the case law says, and as a

22   matter of fact, one of the cases that we cite to the Court

23   dealt specifically with the question of rep. letters.

24             It was the lower court case in Cendant where

25   the Court said this Court does not agree that CUC's alleged

1    failure to provide accurate information to Ernst & Young

2    relieved Ernst & Young of its responsibilities under its

3    contract.  By the way, this is an indication that other

4    courts have seen this argument before.

5              I don't do a lot of this work, but I have done

6    some, and a lot of these arguments are pretty familiar to

7    me, too, not only with regard to audit interference, with

8    trotting out the Drabkin case from the DC circuit and so

9    forth.

10             These arguments move from court to court, and

11   this court is dealing specifically with what we heard this

12   morning.  The very duty, and that would be E&Y undertook

13   was to exercise due care and disclose any acts of fraud it

14   uncovered.

15             Such a promise necessarily requires that it

16   anticipate the possibility that it would receive inaccurate

17   financial information from CUC.  In fact, one purpose of

18   the independent audit is to protect a company and its

19   investors from fraud.

20             Similarly, in the WorldCom case we cite, the

21   auditor must employ professional skepticism and should not

22   be satisfied with less than persuasive evidence because of

23   a belief that management is honest.

24             Of course, that makes perfect sense.  Most of

25   the auditing standards are about the acts and the steps

1    that one has to take to determine as an independent set of

2    eyes whether or not the representations of management in a

3    financial statement is true, and that's what is said in the

4    audit opinion.  In our opinion, these financial statements

5    fairly represent the financial condition of the company.

6           If you get an automatic pass when somebody

7    does something that is -- when you can find something after

8    the fact that you didn't know about in the course of the

9    audit, that can't be a standard for contributory

10   negligence, and it's not.

11          The standard is it has to be a -- it has to

12   make a substantial contribution, and in the context of

13   audit interference, that means it has to have a substantial

14   impact on the ability of the auditor to perform the audit.

15          Because if it's about whether or not

16   management was just contributory negligent in a vacuum,

17   that's just revisiting imputation again.  We already know

18   because they told us in connection with the imputation

19   argument Sherif Abdelhak was a fraudfeasor and so was David

20   McConnell.

21          Everybody who reads the Pittsburgh

22   Post-Gazette, I guess, knows that; but the point is whether

23   or not the things that they're pointing to interfered with

24   their ability to perform the audit.

25          They aren't just saying in their papers and

1  can't, well, you know, we got this rep. letter, and listen

2  to what Adamczak says on the television and Spargo says on

3  the television.  They were wrong.  They also say Coopers

4  knew those rep. letters were wrong.

5           Let me back up and say audit interference, in

6  any event, is more properly directed to a situation in

7  which the negligence that is being claimed against the

8  auditing firm are acts of omission, which is what I think

9  Mr. Rafferty was suggesting we have here.

10          That is the idea, and frankly, it's an idea

11 that probably is visited on auditing firms too often, that

12 something bad happens to a company, it goes under, and

13 creators, and in the list of defendants comes the auditor,

14 and the argument that is made is these people did a bad

15 thing, and Abdelhak and AHERF did a bad thing, and while

16 you didn't know about it, you should have designed your

17 audit in such a way you should have uncovered it.  You

18 should have caught it as it went by the door.

19          An audit interference in that context would

20 have relevance if, in fact, you say their inability to

21 uncover it had an impact or was impacted by what management

22 didn't tell them; but when you look at the areas of the

23 audit in their papers in support of this motion they filed,

24 these are not issues that they did not know about or issues

25 where they were materially hampered from finding out about

1    on their own.

2            All of these issues are issues where the

3    auditing misconduct of Coopers & Lybrand, alleged by the

4    plaintiff, lacked more of comission than omission, and the

5    notion of audit interference is almost a non sequitur.

6            THE COURT:  Mr. Whitney, you mentioned at the

7    very beginning of your argument that the record shows that

8    C&L knew that AHERF was, I think your words were, cooking

9    the books.

10           MR. WHITNEY:  Yes.

11           THE COURT:  Point me to a few --

12           MR. WHITNEY:  I'm about to do that in

13   connection with audit interference, because these are the

14   things they point out in their brief.  These are where

15   they're planting their flags.

16           It's not as the argument today suggests -- I

17   grant Mr. Rafferty we're talking about a lot of paper here

18   and one hour of argument, but it's not generalized argument

19   about being mislead.  It's in specific areas of the audit

20   they are being mislead.

21           The first of them is, the first one is the bad

22   debt shortfall at the eastern hospitals.  Let me lay this

23   out for you.

24           What I've come to learn from the AHERF case,

25   one of the most significant items on a financial statement

1   of a hospital are its accounts receivables.

2           This stuff is always a little dry, but every

3   now and then you find a kernel of something interesting.

4   Hospitals get their money from patient revenue.  There's

5   three kinds of payers.  There's the self-insureds or people

6   who don't have insurance, there are people with private

7   insurance, and then there are people with Medicare and

8   Medicaid.

9           Because of those differences, how much people

10  pay and how much insurance companies pay have a significant

11  impact on whether or not those accounts receivables will

12  ultimately materialize into cash; and for that reason, an

13  enormous red flag on a health care financial statement is

14  the reserve for bad debt, because that is the allowance for

15  how much of that you're not going to collect.

16          Now, to prove that I'm the dumbest person in

17  the room, when I took accounting for lawyers, you see that

18  number up there in the balance sheet and it's in

19  parentheses, you say okay, I understand that.  What I never

20  really understood is you got to get it there, which is to

21  say when you are putting -- I'm smiling.  I didn't know

22  this -- when you are putting in your annual statement of

23  operations what your income is in terms of your patient

24  revenues, you got to charge an expense for bad debt off

25  that revenue.

1          The revenue goes up into accounts receivable.

2    The bad debt expense you take goes up into the allowance

3    for doubtful accounts in the balance sheet.  This becomes

4    like really important because this is an area that is a red

5    flag area.  It's an area where because bad debt write-offs

6    or bad debt expense is an estimation like most estimations,

7    the accounting industry recognizes the possibility of

8    misstatement is high, and, therefore, it's an area where

9    somebody seeking to improve the appearance of the financial

10   statement can get some sort of short-term leap by basically

11   underestimating for bad debt; but sooner or later, the

12   piper has to get paid, because sooner or later, you got to

13   decide what you're going to do about that accounts

14   receivable.

15          Because once it gets to be about 12 or 14

16   months old or 24 months old, it starts to smell a little

17   bit like three-day old fish in a grocery bag, and you got

18   to kill the metaphor fish or cut bait.  You got to write it

19   off.

20          When you write it off, you got to charge it

21   off to bad debt.  If you want to write off $10 million of

22   accounts receivable, you got to write off $10 million of

23   that reserve you created by bad debt expense to do it.

24          This is what AHERF's problem was in 1996,

25   which is the primary audit under review here, and that is

1    they had been under reserving for bad debt.  They had been

2    under expensing in the financial statements for bad debt.

3            Coopers & Lybrand said there is audit

4    interference here because they found a memo from an

5    in-house accounting guy, a CPA they point out, that notes

6    in September of 1996, after the close of their fiscal 1996

7    audit year, which ends at the end of June, and the audit

8    ends in September or the audit report is typically due at

9    the end of September, they found out that he is recognizing

10    in this memo, and you heard it also in the video played,

11    they knew that they were under reserved for bad debt.

12            The only way you can fix that, at least the

13    only valid way you can fix that is to take a substantial

14    bad debt write-off, but what AHERF also did, and it's

15    apropos of these X files, is they used to engage in

16    something else that is not in accordance with general

17    accepted accounting principles, and that is they would

18    create what were called cushion reserves.

19            In good years, they would set aside contingent

20    liabilities and keep those liabilities in a rainy day slush

21    fund, and that's what these X files were.

22            At the end of 1996, they had a significant bad

23    debt shortfall, and what they did is they applied about

24    seventeen and a half million dollars of cushion to the

25    problem.  They simply used these contingent liabilities,

1    wrote off account receivables against them, the bad debt,

2    says where it is, and there is no need to expense any bad

3    debt, and they don't have to show an enormous operational

4    loss on the financial statement.

5            Now, they say we didn't know about this, but

6    the problem is -- they didn't know about this memo, but the

7    problem is, No. 1, there's nothing about that memo that

8    kept them from doing an audit.

9            More generally, as we point out in our papers,

10   our forensic auditing experts have opined in this case that

11   nothing AHERF's management did or did not do impaired

12   Coopers & Lybrand from either detecting the misstatements

13   or performing a GAAS, Generally Accepted Auditing

14   Standards, sufficient audit.

15           As we say in our brief, that really is the end

16   of the analysis because it means there is a jury question,

17   therefore, as to whether or not there truly was the kind of

18   audit interference they're talking about.

19           But the point is they knew that AHERF's

20   eastern operations were badly under reserved for bad debt.

21   The audit work papers show, as we point out in the

22   statement of facts and in our brief, truncated audit

23   procedures by them, what one of our experts refers to as a

24   hot stove.  They would do various independent tests to

25   determine the reasonableness of the reserves and then those

1    tests would stop.

2         The audit engagement partner ultimately says

3    we came to the conclusion they were $15 to $20 million

4    short on their bad debt reserve in the eastern hospitals,

5    what are called DV or Delaware Valley, and told them so.

6         We thought they were short about $15 to $20

7    million.  There is no work paper evidence about this $15 to

8    $20 million.  There is no indication anywhere where he came

9    up with those numbers.

10        However, these people who were talking on the

11   television screen, Mr. Adamczak and Mr. Spargo, indicate,

12   and so told Coopers when they came in after the fall, or

13   PricewaterhouseCoopers when they came in after the fall of

14   AHERF to try to resurrect what had happened here, is that

15   everybody knew, including Coopers & Lybrand, that even

16   after that $15 to $20 million shortfall was taken care of,

17   there was still $30 million short in DV, and Coopers notes

18   of those interviews, indicates this is per Mr. Adamczak,

19   indicated a decision was made at a closing meeting that '96

20   AR reserve was $30 million under reserved, and to take it

21   in over three years.  Done at a closed meeting, all hands,

22   including C&L.

23        Now, that's a violation of Generally Accepted

24   Accounting Principles.  Our experts have testified they

25   won't dispute that you're not allowed to fix bad debt in

1    little drips and drabs and to leak it into the financial

2    statement over three years.

3                So when they say that Mr. Cancelmi's

4    recognition in memos they were under reserved for bad debt

5    constitutes audit interference, there is a jury question

6    here about whether or not the failure to impart that memo

7    materially interfered with their audit.

8                In addition to that and apropos of the Court's

9    question, we have the question of the Graduate reserve

10   transfers.

11               I mentioned this whole concept of these

12   cushion reserves and what AHERF did is in connection with

13   the acquisition of some hospitals in late '96, ultimately

14   folded into AHERF in May of 1997.  What they did is they

15   created a whole variety of purchase accounting reserves

16   under principles of purchase accounting for liabilities

17   that they might have to face at the Graduate Hospitals,

18   which were the hospitals they were acquiring over the short

19   term.

20               Now, under purchase accounting they have to

21   resolve the issues of these contingent liabilities in a

22   short period of time.  They're not allowed to just leave

23   them there forever, but that wasn't a problem to AHERF

24   because as their in-house folks testified to, they were

25   creating those reserves in large part or if not created in

1  large part, quickly became seen as a vehicle to address an

2  even worsening situation with Delaware Valley, bad debt

3  reserves, and by the end of 1997, they had transferred $99

4  million of these reserves to the Graduate to address their

5  bad debt problems primarily.

6          Now, Coopers & Lybrand's argument about audit

7  interference is they knew about the first $50 million and

8  they knew that it was, as they say in their brief, a

9  departure from GAP.  That means they knew in connection

10 with the 1997 audit, they transferred $50 million of these

11 reserves from the Graduate over to DV, and they knew it was

12 a violation of GAP, but they claim in the briefs to the

13 Court, and it's a big argument they had, we didn't know

14 about the other $49 million, that makes up the total of $99

15 million.

16          Now, the significance of this is because in

17 connection with the $50 million of reserves that they knew

18 about and knew were a quote, unquote, departure from GAP,

19 they claim through a series of convoluted reasoning they

20 don't bore the Court with in their summary judgment brief,

21 they claim it did not somehow result in a material

22 misstatement of AHERF's financial statements, never mind

23 the Generally Accepted Audit Standards and Accounting

24 Procedures require them to inform the board of so-called

25 reportable conditions relating to the integrity or honesty

1    of AHERF's management.

2           This management that they say lied to them,

3    they lied to them.  They knew he transferred $50 million of

4    reserves.  They knew it was a violation of GAP, and they

5    nonetheless claim they had no obligation with regard to

6    that because it did not result, they say, in a material

7    misstatement of the 1997 financial statement; but once you

8    get another $49 million lopped on to that, now you're going

9    to have a lot of trouble selling that one.

10          So their basic argument is they didn't know

11   about the other $49 million of reserves.  In their brief to

12   the Court, they cite these various bullet points of the

13   things that supposedly AHERF did to conceal from them the

14   fact of the $49 million of reserves, but, in fact, there is

15   a memo in their file dealing with one of those reserves of

16   the $49 million.  In fact, it represented about 30 percent

17   of that number, $14 million.

18          It's on the Court's screen, and it is showing

19   there as a PFMA contract.  Now, this is a memo of

20   Pricewaterhouse.  It's got their Bates number on it, and

21   discovery establishes that the handwriting we're looking at

22   here is the handwriting of one of the audit managers in the

23   case, Mark Kirskein.

24          Now, they would probably argue I'm putting

25   this up here because I love this memo, and I would answer

1    you're right, I do like this memo because it tells you a

2    lot about how much of a group of lanny-pies (phonetic)

3    these Coopers & Lybrand auditors were and how much they

4    were really taken in by this supposed audit interference.

5            This was part of the $49 million they didn't

6    know about.  The note to the immediate right says where did

7    it go, and then over, attached over to an arrow, not

8    through income moved to DV reserves for AR.  Moved to

9    Delaware Valley reserves for accounts receivable.

10           The same meeting was attended by another audit

11   manager of Coopers, one Amy Frazier.  There is the same

12   memo.  Here are her notes.  Reserves reported in SDN legal

13   documentation indicates that GMS is obligated.  That is on

14   that contract, the entity that acquired the Graduate

15   Hospitals is obligated on that PFMA contract.  Transferred

16   reserves of the books to DV, Delaware Valley.  This is $15

17   million of the $49 million they now claim they didn't know

18   about, and those memos indicate nothing other than the fact

19   they absolutely did know about it.

20           They were looking for it in the course of

21   their audit.  Where is the PFMA contract, and they were

22   being told where it was.

23           These are examples of the evidence we put

24   before the jury in response to their little bullet point

25   arguments about whether or not these guys knew about this

1    other $49 million of reserves, or whether or not anything

2    we did materially interfered with their ability to find out

3    whether we did or we did not.

4              As I said at the outset, this is not the kind

5    of case where audit interference really has a role.  Once,

6    again, whether it does or it does not is a jury question.

7              The last thing I wanted to talk to you about

8    as it relates to their summary judgment is the issue of

9    proximate causation.

10             Now, in their brief, and this is an argument I

11   have seen before, they characterize proximate causation is

12   woulda, coulda, shoulda testimony, and they also speak in

13   terms of the idea that our causation case is this carefully

14   constructed series of things that the Court has to find in

15   order to find that there was a causal link between the

16   negligence and the damage.

17             This is all it comes down to.  Coopers &

18   Lybrand knew or should have known at the time they issued a

19   clean opinion on the 1996 AHERF financial statements that

20   they were materially misstated and not by a little bit.

21             They were off by a cool $90 million here in

22   1996.  Instead of showing an excess of revenue of profits

23   of something under $10 million, they actually should have

24   shown a loss of close to $80 million, and that's all coming

25   from the Delaware Valley primarily, and that matters.

1          It matters to the overall story because as I

2   said earlier, the Delaware Valley supposed success, you

3   know, their ability to take these losers and turn them into

4   winners through synergy was what was fueling their

5   acquisition program and also helping out a lot with the

6   incentive compensation packages, that's what it should have

7   said.

8          Coopers & Lybrand should have issued not a

9   clean opinion but an adverse opinion on their financial

10  statements saying the financial statements showing that

11  this company has an excess of revenue over expense does not

12  fairly present the financial statements in accordance with

13  GAP.

14         Now, no one has ever seen adverse financial

15  statements, and the reason is anybody who needs one can't

16  suffer an adverse audit opinion, and, therefore,

17  ultimately, what it does is it gives AHERF or Coopers

18  ultimate leverage to force this management to accurately

19  record what the financial statement position of the company

20  was or inform the board what the evidence was or what the

21  actual financial position was.

22         We have presented testimony of board members

23  that if this kind of disclosure had been made, it would

24  have had an impact.  They would have had to have explored

25  options available to them, including such things as hiring

1  a consultant, firing management, considering whether or not

2  to stop the acquisition program, deciding at that point in

3  time not to buy the Philadelphia hospitals then under

4  scrutiny, undertaking a turnaround program.

5             All of those things were what members of the

6  audit committee have testified to, and that is in our

7  statement of facts.

8             Now, our position is if that kind of

9  intervention had occurred, we have testimony that says that

10  if the things they said they would have explored and would

11  have been forced to do in that situation had been done,

12  AHERF would not have suffered an ultimate loss to its

13  creditors, and AHERF, therefore, could have either stayed

14  in business but would not have had a creditor loss.

15             Now, their argument is it's hypothetical, it's

16  hypothetical, it's hypothetical because it didn't happen.

17  The answer is yeah, I know it didn't happen.

18             A lot of times tort laws, proximate cause is

19  about things that didn't happen, and the Courts have

20  recognized that that kind of testimony passes muster in a

21  circumstance like this to prove intervention; and in fact,

22  one of the cases that we cite to you speaks in terms of the

23  fact that the very fact that it is hypothetical in

24  nature --

25             THE COURT:  I think a better word than

1    hypothetical is they're saying it was speculative.

2             MR. WHITNEY:  I'm not drawing lines.  I have

3    proven these cases one or the other.  The bottom line is it

4    passes muster.

5             By urging the Court to refuse consideration of

6    this deposition testimony, this is Commeau versus Rupp, the

7    accountants failed to recognize the plaintiff's proof of

8    causation in this case is rendered more difficult by the

9    very nature of the claims.

10            Negligent omissions on the part of defendants

11   that in turn caused inaction on the part of the RCSA board,

12   because this necessarily poses the causation question of

13   what would have happened if the accountants had adequately

14   fulfilled their duties.

15            It is difficult to understand how the FDIC

16   could prove its case without at least some of the testimony

17   that the accountants derided as self-serving and

18   speculative.  To accept the accountant's argument would

19   allow them to profit from an uncertainty of their own

20   creation, notwithstanding the elementary conceptions of

21   justice and public policy require that the wrongdoer shall

22   bear the risk of the uncertainty which his own wrong has

23   created.

24            They talk about options they would have been

25   forced in that situation to perform.  One of the things

1  that cases look at that is pretty important here, whether

2  one calls it hypothetical or speculative, what happened

3  when the truth came out because what happened in the summer

4  of 1996 almost immediately after the board finally heard

5  about the Graduate reserve transfers, these are the things

6  that Mr. Butner, the partner in charge, said 50 million of

7  it was a departure of GAP.

8           He said I advised my manager to tell them to

9  reverse those entries.  That statement is not in the audit

10  work papers, and he signed the financial statement, even

11  though the reserve transfers were not reversed.

12          What is significant, the board asked him in a

13  June 1998 meeting, Coopers engagement partner, the audit

14  committee asks him what's going on with these $99 million

15  of reserves being transferred.  His answer, forthcoming as

16  it was, is I don't know what you're talking about.  I don't

17  know what you're talking about.

18          When they found out what they were talking

19  about, they fired him almost immediately.  They fired

20  Abdelhak, they fired McConnell.  They hired a turnaround

21  expert.  That turnaround expert indicated by that time it

22  was too late.  He also indicated, as had ours, that if this

23  had occurred at an earlier point in time, year end 1996,

24  the company could have been saved.

25          That testimony adds to this supposed woulda,

1  coulda, shoulda testimony.  It also answers this case they

2  like so much from the D.C. Circuit called Drabkin

3  versus -- I have forgotten what the name of the defendant

4  is.  I've forgotten.

5          There the Circuit Court of Appeals set aside a

6  jury verdict based upon the fact that the weight of the

7  evidence indicated that the causation case advanced by the

8  plaintiffs was not sufficient.

9          They pointed out there that for two years

10  prior to the supposed misstatements and the supposed

11  hypothetical intervention, the company had received from

12  the auditors going concerns, opinions, expressions by the

13  auditor as part of their opinion they had doubts as to the

14  ability of the company to continue as a going concern,

15  which they ignored.

16          That circumstantial evidence drove the D.C.

17  Circuit to say this causation case doesn't pass muster, and

18  I don't have a problem with that case at all.

19          As a matter of fact, I take comfort from a

20  case like that because what that is showing is even in this

21  Drabkin case that they like so much, there is a recognition

22  that an auditor's opinion can and in the appropriate case

23  should be held to call for an intervention, and there the

24  intervention or the information the accountant gave was

25  information that absolutely if they're not going to

1    intervene, they never would, but that's not the evidence in

2    AHERF.

3              By the way, in Drabkin, they claim -- I don't

4    know why they claim this -- that Drabkin stands for the

5    proposition this woulda, shoulda, coulda testimony has to

6    come from the majority of the board, 35 or more on AHERF

7    board, including Teresa Heinz Kerry was on the board but

8    not deposed in this case.  There is nothing in Drabkin

9    about that.

10             The plaintiff's evidence was characterized by

11   the Court of Appeals as having been a sound bite from one

12   director suggesting that if disclosures had been made, they

13   would have done something.  The Drabkin case does not

14   undercut our position.  Proximate causation is a question

15   of fact.

16             I'm just about at the end, so let me speak

17   briefly about the CitX case.  First of all, there's a

18   holding in CitX that says something like negligence alone

19   will not support a cause of action for deepening

20   insolvency.  I was a little surprised to hear the

21   discussion of that holding today.

22             We didn't bring a cause of action for

23   deepening insolvency.  I don't know what a cause of action

24   for deepening insolvency is.  I don't know what it looks

25   like, and I also know not for nothing Judge Fuentes was to

1    the contrary notwithstanding that Lafferty intended to

2    create a cause of action, at least as the term has been

3    used, by practicing members of the bankruptcy Bar in the

4    Third Circuit.

5             What Lafferty was dealing with, which is

6    relevant, I guess to the question of CitX, is Lafferty was

7    dealing with an adage that the accounting firms have raised

8    in the past going back to a 7th Circuit case in the 1980s,

9    which we cite in our brief, called Shock against Brown.

10            Creditors have very limited standing to sue

11   auditing firms of a debtor.  Generally speaking, if the

12   debtor or the auditing firm does not essentially

13   specifically intend to extend the representations of their

14   audit to an individual creditor, that creditor doesn't have

15   individual standing.

16            The argument was made by Coopers & Lybrand in

17   this Shock against Brown case, which dealt with the

18   insolvency of the American Reserve Insurance Company that

19   because of that fact, once a company becomes insolvent, the

20   corporation no longer suffers any injury because once it

21   hits a net worth of zero and goes below that, you're

22   talking about only a creditor injury, and the Seventh

23   Circuit said in Shock that's not true.

24            The deepening insolvency of a corporation is

25   also stating a corporate harm.  What Lafferty is doing in

1    part is following Shock in the Third Circuit in this

2    opinion, but I guess because Shock against Brown was an

3    insurance liquidation and not a bankruptcy and, therefore,

4    had a smaller audience, nobody thought to create or try to

5    argue that Lafferty created or Shock created a cause of

6    action; but in the wake of Lafferty, there is all kind of

7    case law out there, guys running around bringing causes of

8    actions against management and auditing firms for deepening

9    insolvency, without even any kind of traditional

10   allegations of wrongdoing.

11              Our case pleads negligence.  It is a state law

12   tort claim, and we allege that they were negligent, we

13   allege proximate cause, and we allege alternative theories

14   of damage.

15              I was interested to hear Mr. Rafferty indicate

16   that one of those theories of damage was just knocked down.

17   What CitX says is invalid because it couldn't be more

18   unlike CitX.

19              When they filed a motion for summary judgment

20   here, they also filed a motion to strike our damages, which

21   were, one, creditor shortfall predicated on the evidence

22   that, one, if they had discharged their duty as auditors,

23   there would have been an intervention, and we can prove by

24   a preponderance of the evidence that that intervention

25   would have saved this company from loss, so the unpaid

1    obligations to creditors, which is an injury under Shock

2    against Brown and Lafferty, is on them.

3            Alternatively, they should be at least liable

4    for what are the avoidable losses.  These are specific

5    transactions you can point to that wouldn't have happened

6    if there had been an accurate disclosure of their financial

7    statements and there had been the consequent intervention.

8            Proof by a preponderance of the evidence of

9    identifiable transactions that would not have happened.

10   Those were our theories of damage, and the motion they

11   filed was those theories of damage are invalid because they

12   don't measure a deepening insolvency.  The suggestion that

13   was made was the only damages you can get are damages that

14   are allowed under Lafferty, and our response was huh.

15           This is a state law tort action with state law

16   proof of proximate cause and state law proof of damage

17   because in Pennsylvania, as everywhere else, that law is

18   damages are intended to be put down and a plaintiff is

19   entitled to recover damages that would put them in the

20   position they would have been in were it not for the

21   defendant's wrongdoing, and that's what our damages were.

22   They said that was illegal because they weren't deepening

23   insolvency damages.

24           If you look at the motions they filed at that

25   time, they argued that we didn't even prepare balance

1   sheets comparing --

2              THE COURT:  To be fair to Mr. Rafferty, you

3   have to wrap up.

4              MR. WHITNEY:  The bottom line is where they

5   come out on CitX is this.  They are not suggesting that our

6   damages are like those in CitX.  They are saying CitX bars

7   deepening insolvency-like damages, and CitX specifically

8   does not say that.

9              What CitX says, and this is the critical

10  language of the opinion, if I can put my hands on it, where

11  an independent cause of action gives a firm a remedy for

12  the increase in its liability, the decrease in fair asset

13  value or its lost profits, then the firm may recover

14  without reference to the incidental impact upon the

15  solvency calculation.

16             In other words, don't come into court claiming

17  I had my insolvency wrongfully deepened.  Don't come into

18  court proving the very damage measure that they claimed is

19  the only damage measure available.

20             Look at our balance sheet here, look at our

21  balance sheet there, because a lot of things can cause a

22  change in that balance sheet; but if you have common law

23  tort claims and common law tort damages, you can recover

24  them notwithstanding the incidental impact on the solvency

25  calculation because we, the Third Circuit, sitting in

1   diversity, they don't say this, but it's a fact you can't

2   be rewriting Pennsylvania tort law.

3              Thank you, Your Honor.  I appreciate your

4   patience.

5              THE COURT:  Thank you, Counsel.

6              MR. RAFFERTY:  Thank you, Your Honor.

7              THE COURT:  I'll be in touch.

8              (Whereupon, the above argument was concluded.)

9                        -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I hereby certify by my original signature herein that the

2    foregoing is a correct transcript from the record of

3    proceedings in the above-entitled matter.

4

5

6                    S/ Karen M. Earley

7                       Karen M. Earley, RDR-CRR

8                       Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25