Attachment A

# In The Matter Of:

*AHERF v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

*ROBERT BERLINER*
*February 16, 2005*

---

# *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

BERLINER, ROBERT - Vol. 1



Page 9

Robert Berliner

1  
2  you reviewed and I can direct your attention to  
3  page 2.  
4      A.  Mr. Kite.  
5      Q.  Yes, Steven Kite?  
6      A.  Yes.  
7      Q.  Have you reviewed the expert report  
8  of Mr. Regan?  
9      A.  No, I have not.  
10     Q.  Do you know who Mr. Regan is?  
11     A.  Yes, I do.  
12     Q.  Were you aware that he was retained  
13 as an expert in this matter?  
14     A.  I was.  
15     Q.  By Jones Day?  
16     A.  Correct.  
17     Q.  What knowledge do you have about  
18 the opinions expressed by Mr. Regan?  
19     A.  None whatsoever.  
20     Q.  You don't know whether he agrees  
21 with you or disagrees with you?  
22     A.  I assume if he disagreed with me I  
23 would have heard about it, but I don't know for  
24 certain.  
25     Q.  Have you talked with lawyers from  

Page 10

Robert Berliner

1  
2  Jones Day about any opinions expressed by  
3  Mr. Regan?  
4      A.  No.  
5      Q.  Have you reviewed the expert report  
6  of Mr. Wallace, James Wallace?  
7      A.  No.  
8      Q.  Do you know who he is?  
9      A.  No, I don't.  
10     Q.  When were you first retained in  
11 this matter, Mr. Berliner?  
12     A.  I was retained in this matter in  
13 2000.  
14     Q.  So four years before you rendered  
15 your first expert report?  
16     A.  A little over four years, yes.  
17     Q.  You are being paid by the hour for  
18 your work on this case, is that right, sir?  
19     A.  That's correct.  
20     Q.  What is your hourly rate?  
21     A.  Mine?  
22     Q.  Yes.  
23     A.  675 an hour.  
24     Q.  Then I gather there's been a team  
25 of people who have worked with you who have also  

Page 11

Robert Berliner

1  
2  billed for their time, is that right?  
3      A.  Correct.  
4      Q.  Do you know what the total number  
5  of hours is that you've spent on this project,  
6  sir?  
7      A.  Yes, I do.  
8      Q.  How many hours is that?  
9      A.  Approximately 10,000.  
10     Q.  How many hours do you know have the  
11 people who have worked with you spent?  
12     A.  Yes, I do.  
13     Q.  How many hours is that?  
14     A.  Approximately 8800.  
15     Q.  You said just now that you believed  
16 you spent 10,000 hours, do you mean 1,000 or  
17 10,000?  
18     A.  I thought the question was how many  
19 hours of my team in total, 10,000.  
20     Q.  Of those hours, about how many  
21 hours did you personally spend on this project?  
22     A.  I spent approximately through the  
23 end of January, approximately 1200 hours.  
24         MR. RYAN:  Let me mark this please  
25 as Exhibit 2800.  

Page 12

Robert Berliner

1  
2         MR. JONES:  Before do you that, I  
3  was told that at the last deposition we were  
4  moving into the 6000s as a convention for  
5  experts and I was given the number that Ms.  
6  Meaden left off with if that's what you would  
7  prefer, if you don't prefer that that's fine.  I  
8  was told that she left off at 6008, that we were  
9  in expert exhibits at this point.  
10        MR. RYAN:  Sure, let me mark this  
11 as 6009.  
12        (Document, marked Exhibit 6009  
13    for identification.)  
14     Q.  Do you recognize Exhibit 6009,  
15 Mr. Berliner?  
16     A.  It appears to be a billings  
17 rendered in this case.  
18     Q.  Is it the case then that through  
19 January 12, 2005 your firm has billed  
20 $2,870,000?  
21     A.  That's correct.  
22     Q.  Who is paying your bill, sir?  
23        MR. JONES:  Object to foundation.  
24     A.  I assume the Unsecured Creditors  
25 Committee is paying the bills.

### Page 13

```
 1              Robert Berliner
 2      Q.   It comes out of the amount that
 3   otherwise would be distributed to creditors of
 4   AHERF to your understanding, is that right?
 5          MR. JONES:  Same objection.
 6      A.   That's right.
 7      Q.   I see toward the back of this
 8   exhibit about four pages from the end, three
 9   pages from the end, it seems that the first date
10   on which you billed time on this matter is in
11   August 2000?  I'm on the third to last page.
12      A.   I believe that's correct, but on my
13   copy that doesn't appear on the third from last
14   page.
15      Q.   I apologize.  That is consistent
16   with the time that you believe that you first
17   started to work on this matter?
18      A.   That's correct.
19      Q.   Who are the members of the team at
20   the Marks Paneth & Shron firm who worked with
21   you on this matter?
22      A.   The principal member of the team
23   was Stuart Zatkow who was assigned to this
24   engagement from the outset and the other senior
25   members of the team were Bill Holmes and to a
```

### Page 14

```
 1              Robert Berliner
 2   much lesser extent John Barron.
 3      Q.   What did Mr. Zatkow do to assist
 4   you in this engagement?
 5      A.   He reviewed documents, he helped
 6   draft the expert reports and he and I batted
 7   around issues and discussed the information that
 8   we came up with and debated those issues and
 9   reached consensuses and that kind of thing.
10      Q.   Are Mr. Zatkow's views also
11   included in your expert reports?
12      A.   No.  His views are communicated to
13   me orally and I took them into consideration in
14   forming my opinions.  I don't believe he would
15   disagree in any respect with any of the opinions
16   expressed in the report.
17      Q.   Did Bill Holmes and John Barron
18   play a similar role working with you on this
19   engagement, a similar role to Mr. Zatkow?
20      A.   No.
21      Q.   How would you describe the roles
22   that they played?
23      A.   They got involved much later on in
24   helping to draft the report.
25      Q.   Let me ask you about some other
```

### Page 15

```
 1              Robert Berliner
 2   members of your team whose names I saw in these
 3   documents, I apologize but all I have is their
 4   last names.  Who is Liz Atlas?
 5      A.   Atlas?
 6      Q.   Yes.
 7      A.   I don't know, she must be a very
 8   junior member who did some more routine tasks.
 9      Q.   How about Biddick?
10      A.   Biddick is a senior fellow but he
11   would have had very little input.  Probably in
12   the very early stages he helped reviewing some
13   of the SEC transcripts of depositions, I think
14   he reviewed three at the very outset.
15      Q.   How about Carson?
16      A.   Carson again would have been a very
17   junior person who I had no contact with.
18      Q.   How about Corchia?
19      A.   Corchia is my administrative
20   assistant.
21      Q.   How about Friedler?
22      A.   Friedler is a supervisor in our
23   litigation services department and we would have
24   assigned some specific task or tasks to him.
25      Q.   How about Goldberg?
```

### Page 16

```
 1              Robert Berliner
 2      A.   Again, I don't know that person, I
 3   had no contact with that person.  These three
 4   who I say I had no contact with are not members
 5   of our litigation services department, but would
 6   be audit staff people who we thought it would be
 7   efficient to assign some of the early digging at
 8   much lower billing rates.
 9      Q.   How about Henning?
10      A.   Henning is a very senior member of
11   the department who may have been involved in
12   some of the discussions of the GAAP matters.
13      Q.   Does he talk with you about what
14   was or wasn't GAAP?
15      A.   He served as a consultant, I ran by
16   some of the accounting issues with him and
17   wanted to see whether or not he concurred or
18   what views he had based upon the communication
19   made to him.  He was not involved at all in
20   reviewing any documents.
21      Q.   How about Hernandez?
22      A.   A person I don't know.  Again, he
23   probably came from the audit staff to do some
24   lower level work.
25      Q.   How about Lesser?
```

Page 17

Robert Berliner

2  A.  Lesser is a senior fellow who
3  worked with us in the debt compliance and the
4  CRA area.
5  Q.  CRA means what, sir?
6  A.  I believe it means cost rate
7  adjustments.
8  Q.  Did Mr. Lesser have any background
9  in that area of accounting, to your knowledge?
10  A.  I recall he had some experience in
11  health care, how extensive it is I don't recall.
12  Q.  Can you describe at all to me what
13  his background is?
14  A.  Yes, he was a senior partner in
15  Laventhall & Horwarth and currently had time
16  available. He had some kind of arrangement with
17  McGladrey here in New York where he was not
18  salaried and it was not taking much of his time
19  and I served with him on a state society
20  committee and had high regard for his ability
21  and asked him if he had any time to assist me on
22  a large engagement, he said he did, and I said I
23  had some discrete areas and I think I asked him
24  if he had any health care background and I think
25  he said he did. So he spent about a year

Page 18

Robert Berliner

2  working with us. He is not a member of Marks
3  Paneth & Shron in any way. You asked me if
4  everyone was a member of Marks Paneth & Shron, I
5  should have said he was an independent
6  contractor to us.
7  Q.  Do you know whether Mr. Lesser has
8  served as an engagement partner on a health care
9  audit previously in his career?
10  A.  I don't know.
11  Q.  Can you tell me anything more
12  specific about the nature of any previous health
13  care experience that Mr. Lesser may have?
14  A.  No, I can't.
15  Q.  Who is Mr. or Mrs. Littman?
16  A.  Sherry Littman is a junior member
17  of our department, she was a senior accountant
18  at Deloitte & Touche and had been with us, has
19  been with us now maybe a year or so.
20  Q.  How about Moskowitz?
21  A.  Moskowitz is no longer with the
22  firm. He was a senior accountant on the audit
23  staff that we deployed on the engagement in the
24  early going.
25  Q.  How about Mr. or Mrs. Paria? If

Page 19

Robert Berliner

2  that's how you pronounce it.
3  A.  Dicky Paria is an economist in our
4  litigation services department, he would have
5  had very little input to the engagement.
6  Q.  How about Rudsky?
7  A.  Lef Rudsky is a senior in the
8  litigation services department. Again, he would
9  have had very limited input to the engagement.
10  Q.  How about Sacks?
11  A.  Glenn Sacks is a senior member of
12  the department, has been with me for many years
13  and we may have asked him to assist in a
14  discrete area.
15  Q.  Is there any area that comes to
16  mind?
17  A.  No.
18  Q.  How about Schwitter?
19  A.  Frank Schwitter is a, like Elliott
20  Lesser, another independent contractor to us, he
21  is a retired Arthur Andersen partner. He
22  obviously was delegated some tasks but he had
23  very little input and did not expend any hours.
24  Q.  Do you know whether Mr. Schwitter
25  has any health care background?

Page 20

Robert Berliner

2  A.  No, I don't.
3  Q.  How about Mr. or Ms. Smith?
4  A.  Stu Smith was a manager in our
5  litigation services department and he helped in
6  the review of documents and various other tasks.
7  Q.  How about Stocker?
8  A.  Bill Stocker is a senior technical
9  partner in the firm, not a member of the
10  litigation services department, and we ran a few
11  issues by him as well.
12  Q.  Are there any issues that you can
13  recall running by him?
14  A.  Yes, I ran by him the issue of the
15  appropriate reporting on consolidating
16  supplementary information, I recall
17  specifically, that's the only issue I recall
18  discussing with him.
19  Q.  Finally, how about Zaydenverg?
20  A.  Arcady Zaydenverg is a manager in
21  our litigation services department.
22  Q.  Overall you've had a team of about
23  20 people over the last four years who were
24  associated with Marks Paneth & Shron who
25  assisted you in preparing these reports?

Page 21

Robert Berliner

2 A. Yes. Well I wouldn't say all of
3 them assisted in the preparation of the report,
4 but they assisted in the various aspects of the
5 engagement leading up to the report.
6 Q. You said that you and your team
7 have spent to date approximately 10,000 hours on
8 this engagement. Do you know how many hours
9 Coopers & Lybrand spent each year in auditing
10 the financial statements of AHERF?
11 A. I don't recall the figure, but it
12 was considerably less than that.
13 Q. I believe you told us that you
14 billed so far about $2,870,000 on this
15 engagement, do you know how much Coopers &
16 Lybrand billed AHERF each year for the audit of
17 its financial statements?
18 A. I don't recall the figure, I think
19 it was substantially less.
20 Q. Could you turn please to your main
21 report. In the future when I refer to your
22 report I'm going to be referring to this large
23 document, the expert report of September 3.
24 Specifically to page 2 of the front part of the
25 report, does section C headed "Summary of

Page 22

Robert Berliner

2 Opinion" which goes from pages 2 to 4 set forth
3 a summary of the opinions that you are
4 expressing in this matter?
5 A. Yes, sir.
6 Q. Your first opinion which is called
7 "Violations of GAAP" at the bottom of page 2 you
8 state that "The consolidated AHERF financial
9 statements for 1996 and 1997 were materially
10 false and misleading", is that your opinion?
11 A. Yes.
12 Q. What do you mean by the term
13 materially false and misleading?
14 A. I mean that a reader of those
15 financial statements would get information that
16 would cause that reader to form an opinion as to
17 the financial position and results of operations
18 that would be different than the real opinion in
19 one way or another that that reader should form.
20 Q. Is that a term found in the
21 literature on generally accepted accounting
22 principles or GAAP?
23 A. As you know, the body of literature
24 that comprises GAAP is quite extensive and
25 whether or not those terms appear would require

Page 23

Robert Berliner

2 a careful review of thousands of pages, so I
3 can't tell you whether or not the term false or
4 the term misleading appears in the GAAP
5 literature.
6 Q. GAAP speaks, doesn't it, to whether
7 financial statements are presented fairly?
8 A. They do, in conformity with
9 generally accepted accounting principles.
10 Q. When you state that you formed the
11 opinion that the financial statements of AHERF
12 were materially false and misleading, do you
13 mean anything different by that than to say that
14 they were not presented fairly in your view in
15 accordance with generally accepted accounting
16 principles?
17 A. Yes, I do. There can be a
18 violation of generally accepted accounting
19 principles that may not have a material effect
20 on the financial statements. As you may notice
21 in the summary of opinions, I entitled the
22 opinions in this section as "Violations of
23 GAAP". In this opinion A I'm expressing the
24 view that those violations weren't material to
25 this '96 and '97 financial statements that

Page 24

Robert Berliner

2 caused those financial statements to be
3 materially false and misleading.
4 Q. Let me ask my question again with
5 the concept of materiality added to it. When
6 you say then in your opinion the financial
7 statements of AHERF were materially false and
8 misleading, do you mean to say by that anything
9 different from saying that they were not
10 presented fairly in all material respects in
11 accordance with generally accepted accounting
12 principles?
13 A. Yes, that opinion states that the
14 financial statements were not presented fairly
15 in all material respects in conformity with
16 generally accepted accounting principles.
17 Q. In opinion A or GAAP opinion A I
18 take it you are addressing the financial
19 statements of consolidated AHERF for those two
20 years, is that right?
21 A. That's correct.
22 Q. Have you formed any opinion as to
23 whether the audited financial statements of
24 AHERF as of June 30, 1995 and for the year then
25 ended were presented fairly in all material