**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLEGHENY HEALTH, EDUCATION & RESEARCH FOUNDATION,

Plaintiff,

v.

PRICEWATERHOUSECOOPERS, LLP,

Defendant.

Civil Action No. 00-684

Judge David Stewart Cercone

**THE COMMITTEE'S SUR-REPLY IN OPPOSITION TO PRICEWATERHOUSECOOPERS, LLP'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Beth Heifetz
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939

James M. Jones (PA #81295)
Laura A. Meaden (PA #52002)
JONES DAY
500 Grant Street, 45th Floor
Pittsburgh, PA 15219-2514
(412) 391-3939

J. Kevin Cogan
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215-2673
(614) 469-3939

Richard B. Whitney
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939

Attorneys for The Official Committee of Unsecured Creditors of AHERF

Dated: March 2, 2011

PwC contends that, for "over a decade," the Committee has "assert[ed] C&L's negligence," but "now" the Committee argues that "C&L knew all along . . . that AHERF was committing a financial fraud." Feb. 16, 2011 Reply in Supp. of Renewed Mot. for Summ. J. ("PwC Reply") at 1 (Docket No. 278). PwC charges that, only "at this late stage," does the Committee advance "brand-new contentions of material bad faith and secretive collusion." *Id.* at 11. But throughout the more-than-ten-year history of this case, the Committee has alleged and proffered evidence that C&L knew of, acquiesced in, and aided AHERF management's financial misdeeds.[1] The Third Circuit had no trouble understanding this. It certified questions to the Pennsylvania Supreme Court directed to the conduct of "non-innocent" and "conspir[ing]" auditors and noted that the Committee had alleged that C&L "knowingly assisted in the officers' misconduct," "knew" of their "fraud," and was a "co-conspirator." *See Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, No. 0701397, 2008 WL 3895559, at *2, 4, 6 (3d Cir. July 1, 2008).

The Committee's allegations here are not new; nor is the evidentiary record that supports them. Though PwC argues that "AHERF management excluded C&L from the tight-knit circle in on the fraud," *see* PwC Reply at 1, that record puts C&L at the center of the circle. For this reason, perhaps more than others, PwC's renewed summary judgment motion should be denied.

[1] *See*, *e.g.*, Compl. ¶¶ 4, 30, 40, 44 (Docket No. 1) (C&L had "actual knowledge" that management "manipulated operational results by portraying arbitrarily generated 'budgeted' numbers as actual operational results," "failed to expose" misconduct it detected, and issued clean opinions on financials it "knew" were "materially misstated"); First Am. Compl. ¶ 60 (Docket No. 12) (adding aiding and abetting breach of fiduciary duty claim; C&L "not only acquiesced in, but in fact helped to devise accounting manipulations"); Dec. 21, 2001 Br. in Opp'n to Mot. for Summ. J. at 3, 7-20, 38-40 (Docket No. 21) (cataloging evidence that C&L was "fully aware of, complicit with, and, in some cases, affirmatively involved in the misconduct at issue"); July 11, 2005 Br. in Opp'n to Mot. for Summ. J. ("2005 Comm. Opp'n") at 20 (Docket No. 124) (adding to that catalogue evidence that "Coopers knew about and was complicit in much of the management misconduct").

## I. The Threshold *In Pari Delicto* Inquiry Is About Good Faith.

### A. The Jury Must Decide Whether C&L Acted In Good Faith.

Imputation and *in pari delicto* are "unavailable" to "an auditor which has not dealt materially in good faith" with its client. *AHERF II*, 989 A.2d 313, 339 (Pa. 2010); *see also AHERF III*, 607 F.3d 346, 355 (3d Cir. 2010) (defense "conditioned on" good faith). And though PwC would have it otherwise, *see* PwC Reply at 2, the "threshold inquiry," regardless of the claim asserted, is the auditor's good faith. *Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 5 Civ. 9050 (LMM), 2010 WL 3452374, at *5 (S.D.N.Y. Sept. 1, 2010) (construing *AHERF II* and *III*); *see also AHERF II*, 989 A.2d at 335, 339; *AHERF III*, 607 F.3d at 355.

Though PwC argues to the contrary, "actual collusion" is not the only form of good faith breach. PwC Reply at 5. The Pennsylvania Supreme Court instructed that to apply imputation where corporate officers "misrepresent[ed] corporate finances . . . with the auditors' knowledge and acquiescence" would be "ill advised, if not perverse." *AHERF II*, 989 A.2d at 336. And the only two cases to consider the issue since those words were written both reject the proposition that proof of "collusion" is required to establish a breach of good faith. *See Adelphia*, 2010 WL 3452374, at *5 (absence of "secretive, collusive dealings" does not preclude breach of good faith); *Bechtel v. Master, Sidlow & Assocs.*, Civ. A. No. 10-5195, 2011 WL 476535, at *7 (E.D. Pa. Feb. 8, 2011) ("we cannot presume good faith based solely on the lack of specific allegations of collusive activity").[2]

Knowledge and acquiescence bar the imputation-aided *in pari delicto* defense. But even if evidence of "actual collusion" were required, it pervades this record. *See* Jan. 18, 2011 Br. in

---

[2] The text of the Restatement provision cited by PwC at page 6 of its reply refers to "knowledge," not "collusion," when it discusses good faith breaches: "A third party . . . , knowing or having reason to know that the agent acts adversely . . . , does not deal in good faith." RESTATEMENT (THIRD) OF AGENCY § 5.04; *see also id.* cmt. c, illus. 5 (auditor does not act in good faith if it "knows or has reason to know" of inaccurate financial information).

Opp'n to Renewed Mot. for Summ. J. ("2011 Comm. Opp'n") at 8-17 (Docket No. 266). Though PwC now attempts to rebut that evidence with its own tick list of asserted facts, *see* PwC Reply at 9-10, the effort only underscores the number of factual disputes. And PwC's attempts to minimize C&L's guilty conduct aside, C&L knew of more than mere "accounting errors," *id.* at 7, what it knew was well beyond "material," *id.*, and materiality is for the jury to decide. The evidence of C&L's collusion, in significant measure, comes from its own auditors' files and its own auditors' depositions.[3] Just two examples make the point:

- C&L auditors and AHERF accountants, at the closing meeting for the 1996 audit, agreed to defer recognizing an existing $30 million "bad debt reserve shortfall" at the DVOG hospitals—a collusive fraud. *See* 2011 Comm. Opp'n at 13; 2005 Comm. Opp'n at 24-25.

- The next year, AHERF accountants—with C&L's knowledge and aid—deliberately created and then transferred $50 million worth of bogus reserves from the newly acquired Graduate hospitals to the referenced DVOG hospitals, all to further mask the ever-growing bad debt reserve shortfall there. *See* 2011 Comm. Opp'n at 14; 2005 Comm. Opp'n at 4-5, 26-27; Comm. SOF ¶¶ 94-95, 244-55.

None of this is new. None of it was reported to the Board. And all of it is collusion at its worst.[4]

**B. The Adverse-Interest Exception Also Precludes Summary Judgment.**

PwC says that "there is no evidence that C&L knew that any increases in [management] compensation were driven by fraud." PwC Reply at 3. But C&L knew the bonus compensation

---

[3] *See, e.g.*, July 11, 2005 Comm. SOF ("Comm. SOF") ¶¶ 34, 75, 85, 89, 94-95, 104, 108, 136, 242-58, 265-87, 293-97 (Docket No. 119); Jan. 18, 2011 Comm. Supp. SOF ("Comm. Supp. SOF") ¶¶ 4-5, 10-11, 15-16, 19-20, 38-42, 45, 48, 51, 65 (Docket No. 267).

[4] The testimony from the Committee's auditing expert about which PwC now complains merely reflects his independent (and candid) review and assessment of an audit record that revealed these frauds, other irregularities, and related audit misconduct. Mr. Berliner's testimony, in context, expresses no opinion about the "state of mind" of others, *see* PwC Reply at 8; rather he merely addresses what C&L's work papers and the audit record openly disclosed about AHERF's accounting and C&L's tracking of it, and testifies to what any reasonable auditor would or would not have concluded or known based on the audit evidence presented. PwC itself relies on Mr. Berliner's testimony regarding facts known by AHERF's management, PwC Reply at 9-11, and PwC's own auditing expert proffers opinions on what C&L "believed" and "understood," and what allegedly occurred "without C&L's knowledge." *See* March 2, 2011 Comm. Sur-Reply SOF ("Comm. Sur-Reply SOF") at 3 n.3. And, though PwC contends otherwise, "an expert witness may offer testimony concerning the ultimate issue in the case," *Forrest v. Beloit Corp.*, 424 F.3d 344, 353 (3d Cir. 2005), so long as he does not opine on the "governing law," *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).

targets and knew that the just-noted bad debt deferral schemes and other "cushion accounting" allowed management to hit those targets—and always just barely. *See* 2011 Comm. Opp'n at 19; Comm. SOF ¶¶ 227-29. A reasonable juror could fairly "charge [C&L] with notice" that management was "not acting with the principal's authority" when these manipulations were affected. *AHERF II*, 989 A.2d at 338. And in nearly ninety pages of briefing, PwC still cannot cite any evidence that AHERF benefited from the grossly misstated financials that its adversely interested accountants prepared and C&L blessed. There is none.[5]

**C. An Audit Firm Cannot Disown Its Partners' Malpractice.**

Citing Delaware business partnership law, PwC argues that it can disavow liability for collusive conduct on the part of C&L's engagement partner because collusion would be "plainly unauthorized." PwC Reply at 13. But Mr. Buettner was an auditor performing an audit, his misconduct occurred within the course of that audit, and nothing "plainly unauthorized" or otherwise untoward about his conduct came to the attention of AHERF's Board.[6]

Audit firms are not like other business partnerships. Auditors provide professional services and take on professional responsibilities. Indeed, they "assume[]" a "special—and crucial—role . . . as a check against potential management abuses." *AHERF II*, 989 A.2d at 332.

[5] AHERF's officers indeed were adversely interested. And AHERF's Board—were it accurately informed by C&L—could and would have stopped them. *See* Comm. SOF ¶¶ 326-39. Sheriff Abdelhak was no "sole actor" who "dominated" AHERF's Board. *See id*. ¶¶ 44-62, 147, 150-52, 326-43. PwC now finally concedes that the Board fired Mr. Abdelhak. *See* PwC Reply at 11-12. In April 1998, Board members hired outside counsel and commenced an inquiry into financial and accounting improprieties. By June 1998, the Board had removed both Mr. Abdelhak and CFO David McConnell. Comm. SOF ¶¶ 335-38. Board dissent from Mr. Abdelhak's failing strategic and operational initiatives would have come earlier had C&L discharged its duty and reported what it knew. The Board members testified that they relied on the (misstated) audited financial statements to evaluate strategy, operations, and management. *Id*. ¶¶ 317-330.

[6] "[F]raud committed within the apparent furtherance of the firm's business renders all partners liable." *In re Selheimer & Co*., 319 B.R. 395, 406 (Bankr. E.D. Pa. 2005) (construing substantively identical Pennsylvania partnership law and holding that securities firm "partnership is . . . liable for" its partner's securities fraud). Needless to say, those in AHERF management with whom Mr. Buettner colluded would not report the misconduct to the Board. For this reason, the Pennsylvania Supreme Court barred an auditing firm from invoking the *in pari delicto* defense where there is "collusion between officers and auditors." *AHERF II*, 989 A.2d at 339.

Auditors cannot walk away from the professional duties that come with this role merely by asserting that a partner's malpractice (or worse) simply was not authorized.[7]

Here, C&L (tactically and conditionally) argues that *if* Mr. Buettner, its partner, colluded with AHERF's management, then that collusion, of course, was "unauthorized." PwC Reply at 13. Again, "authorization" here is irrelevant. C&L had a professional (and contractual) duty to remain independent and never to engage in but rather to report the very collusion in which its auditors participated. It cannot escape liability for failing to discharge that duty—in the extreme. Were this not the rule, then auditing firms would never be liable for the most egregious audit misconduct (because audit firms would always contend that they would never "authorize" collusive fraud).[8]

## II. There Was No Audit Interference.

The audit interference defense "may be available to a negligent auditor," *AHERF II*, 989 A.2d at 335, but not a complicit one. PwC does not and cannot explain how AHERF management could have interfered with the work of C&L auditors who already knew of the "cushion" tracking and "reserve transfers" that two or three allegedly "hidden" documents reflected. PwC Reply at 9. C&L's files were full of documents confirming this misconduct, and

[7] *In re Summit Airlines, Inc.*, 160 B.R. 911, 917-21 (Bankr. E.D. Pa. 1993) (summary judgment granted in favor of unsecured creditors on law firm's liability in conversion for partner's embezzlement of client funds; partnership "equally liable" for "wrongful actions" of embezzling partner "irrespective of the apparent complete innocence of all of the other co-partners"; professional services firm's "plea that it never authorized" its partner to commit intentional bad acts is "irrelevant"); *see also Francis J. Bernhardt, III, P.C. v. Needleman,* 705 A.2d 875, 879 (Pa. Super. Ct. 1997) ("attorney's law firm can be vicariously liable for conversion").

[8] Avoiding this absurd result, the Restatement bars auditors from invoking imputation in the first instance. *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt. b. Moreover, PwC's for-the-papers "authorization" rejoinder contradicts a decade's worth of factual and legal submissions to this Court and should not be countenanced. After PwC's own investigative team interviewed witnesses and reviewed audit records as the bankruptcy unfolded, throughout the more than ten years of litigation that followed, and in every sworn testimonial session and expert report that went with it, PwC has always "owned" what Mr. Buettner and his audit team did and steadfastly contended that no audit misconduct occurred. Were C&L permitted to recant years of record ratification of Mr. Buettner's deeds and argue now that he somehow "went rogue," that challenge to its own partner's authorization would present only fact questions for jury resolution. And it strains credulity to believe that a jury will ever hear from PwC the following contradiction at trial: "Mr. Buettner did nothing wrong, but if he did, then he was an unauthorized fraud feasor."

C&L did not need and did not ask for these few more. Comm. Supp. SOF ¶¶ 39-42, 65; Comm. Sur-Reply SOF ¶¶ 39-42, 65.

**III. Causation Is A Factual Determination.**

The Committee's causation evidence is precisely the kind that courts routinely credit in audit-failure cases. PwC argues that those cases "involve a situation in which a government regulator or board of directors necessarily would have taken a predetermined action to cut losses." PwC Reply at 18. PwC is wrong.

- In *Crowley v. Chait*, No. 85-2441 (HAA), 2004 WL 5434953, at *8 (D.N.J. Aug. 25, 2004), *aff'd sub nom. Thabault v. Chait*, 541 F.3d 512 (3d. Cir. 2008), employees of the Vermont Insurance Commissioner testified to "options" they would have taken had an accurate audit taken place. No action was preordained (and PwC's challenge to the causation evidence there—the same one it makes here—was dismissed as "more argumentative than real argument").

- In *Bd. of Trs. of Cmty. Coll. Dist. No. 508 v. Coopers & Lybrand*, 775 N.E.2d 55, 61-62 (Ill. Ct. App. 2002), *aff'd in part, rev'd in part*, 803 N.E.2d 460 (Ill. 2003), board members testified that, if informed of the improper investments, they "would have made whatever changes" were "recommended"; that they "would not have tolerated it and . . . would have 'cleared up' the situation"; and that they "would have pursued any information that indicated improper investment . . . ." Again, no pre-set, definitive plan was a part of the record.

- In *Comeau v. Rupp*, 810 F. Supp. 1127, 1143-44 (D. Kan. 1992), board members testified "that they would have taken corrective action if they had been informed of the serious problems," and an expert testified that an accurate depiction of the company's financial condition could "reasonably be expected to 'get management's attention very quickly.'" No prescribed, defined plan here either.

AHERF's Board members testified that they would have followed the same kinds of reasonable courses of action had C&L provided accurate audit reporting. Comm. SOF ¶ 147. And when those Board members eventually learned, from other sources, only a little of what C&L knew all along, they undertook just those actions—retaining financial consultants, launching law firm-

guided internal inquiries, and firing Messrs. Abdelhak and McConnell. *Id*. ¶¶ 335-42. This is causation evidence–plus.[9]

## IV. PwC's Challenges To Damages Present More Factual Disputes.

### A. The Committee's "Creditor Shortfall" Measure Is Appropriate.

Save for *Kirschner v. K&L Gates LLP*, No. GD09-015557, 2010 WL 5504811 (Ct. Com. Pl. Allegheny County Dec. 28, 2010), PwC offers nothing new on damages. The Common Pleas Court's holding there—that a "corporation that is already too insolvent to survive at the time of the malpractice" cannot be "harmed by becoming more insolvent"—is both at odds with long-standing appellate precedent and has nothing to say about the Committee's damage measures here.[10] The Committee's "creditor shortfall" damage measure is premised on evidence that AHERF indeed was solvent before C&L's audit misconduct drove it into bankruptcy.[11]

An inability to fulfill obligations to third parties is corporate harm, *see Thabault*, 541 F.3d at 523, and a reference to "creditors" does not mean that the harm was suffered solely by creditors. Where, as here, "the injury alleged by the plaintiffs is 'primarily to the corporation, and is an injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt, then the suit is for a tort suffered by the

[9] PwC argues that AHERF's "testimony that a variety of options was available is not evidence that a *particular* option would have been exercised." PwC Reply at 16 (emphasis in original). Citing *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453 (D.C. Cir. 1990), and *Devaney v. Cheser*, No. 83-8455, 1989 WL 52375 (S.D.N.Y. May 10, 1989), PwC says that this "option" evidence is somehow inadmissible. Neither case supports the proposition. In both cases, audit failures aside, the directors had full knowledge of the financial condition of the companies and took no remedial action. *Devaney*, 1989 WL 52375, at *5; *Drabkin*, 905 F.2d at 455-56. Here, there is no evidence that AHERF's Board members were aware of the devastating financial losses that accurate audit reporting would have revealed, much less the fraud that concealed those losses.

[10] *See*, *e.g.*, *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983) (rejecting auditor's argument that once an entity's net worth dipped below zero, it could not be damaged further).

[11] Mr. Berliner's restated financials for the enterprise reflect a positive net worth of over $700 million at the time C&L should have reported what it knew. *See* Comm. Sur-Reply SOF ¶ 106. C&L's wrongdoing did not cause AHERF to become "more insolvent," it prevented AHERF from taking corrective action that would have averted insolvency. The detail and outcome of the intervention are the subject of the opinion and testimony of Thomas Singleton, the Committee's healthcare turnaround expert. Comm. SOF ¶¶ 150-51, 153-54.

corporation, and properly brought by the trustee.'" *The Univ. of Md. at Balt. v. Peat Marwick Main & Co.*, 923 F.2d 265, 273 (3d Cir. 1991) (citation omitted).[12]

**B. PwC's Challenge To "Avoidable Costs" Raises Only Fact Questions.**

Before bankruptcy—when AHERF incurred the "avoidable costs"—AHERF operated, in the words of C&L's engagement partner, "as a system . . . as opposed to the eastern region or the west." Comm. Supp. SOF ¶ 117; *see also id.* ¶¶ 111-13, 115-19. The particular "avoidable cost" challenged by PwC relates to "excess cash" within that AHERF "system"—cash that was wasted through acquiring and operating money-losing physician practices; cash that could and would have been better used (or conserved entirely) had C&L informed the Board of AHERF's true financial condition. While AHERF's hospital affiliates controlled some funds (like cash necessary to remain in compliance with debt covenants), they did not control "excess cash." The AHERF parent controlled those funds through corporate bylaws, and the loss of those funds was a loss to AHERF (a debtor) and to AUMP (the operator of the physician practices and itself a debtor). *See* 2011 Comm. Opp'n at 45-46; Comm. Supp. SOF ¶¶ 111-12; Comm. Sur-Reply SOF ¶¶ 54, 110, 141-43. Who controlled the funds, how and through which enterprises the funds flowed, and whether the outflow harmed the debtors are all factual questions.

**V. Centennial's Losses Are Its Own And AHERF's, Too.**

**A. PwC Is Liable To Centennial Directly For Centennial's Losses.**

PwC does not dispute that privity is not required for the Committee's aiding and abetting breach of fiduciary duty claim. Nor does PwC dispute the existence of privity between C&L and Centennial on the 1997 audit. And for the 1996 audit, PwC concedes that privity can exist

[12] *See also Cedarbrook Plaza, Inc. v. Gottfried*, No. Civ. A. 97-1560, 1997 WL 330390, at *10 (E.D. Pa. June 6, 1997); *In re Precept Bus. Servs., Inc.*, No. 01-31351-SAF-7, 2004 WL 2074169 (Bankr. N.D. Tex. Aug. 23, 2004) (although "a Chapter 7 trustee rather instinctively couches his statement of damages in terms of the impact on creditors[,] . . . that does not negate the summary judgment evidence suggesting damages to the [corporation]").

between an auditor and someone other than its client, such as a third-party beneficiary. *See* PwC Reply at 25-26.[13] PwC claims, nevertheless, that "[t]here is no evidence whatsoever that SDN was in privity with C&L on the 1996 AHERF audit." *Id*. at 26. The Committee, however, cited ample evidence of privity based on the SDN-AHERF relationship and C&L's simultaneous, related, and overlapping engagements for SDN and AHERF—evidence that would support privity with SDN directly, through C&L's expressly assumed professional relationships, as a third-party beneficiary of the AHERF-C&L audit relationship, or otherwise. *See* 2011 Comm. Opp'n at 48-52.

PwC then argues that the merger of the Graduate hospitals into SDN did not harm SDN (later renamed "Centennial") because the Bankruptcy Court ruled that bankruptcy claims of the Graduate hospitals' creditors are deemed to have arisen prior to the date of the merger. PwC Reply at 26-27. But the point is that SDN did not have Graduate's liabilities before the merger. Had C&L reported what it knew, the merger would not have occurred, *and SDN-Centennial never would have been saddled with Graduate's liabilities*.

**B. PwC Is Liable To The Other AHERF Estates For Centennial's Losses.**

PwC makes no privity arguments regarding C&L's relationship with the other AHERF debtors, and the Bankruptcy Court's order substantively consolidating the AHERF estates for all purposes confirmed the various estates' cross-liability for Centennial's debts and losses. PwC seeks to avoid this, arguing that *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), prohibits the "offensive" use of substantive consolidation. PwC Reply at 27-28. But *Owens Corning* itself confirms that substantive consolidation "'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities.'" 419 F.3d at 205 (citation

[13] Contrary to PwC's suggestion, PwC Reply at 26 n.19, *In re Phar-Mor, Inc. Sec. Litig*., 892 F. Supp. 676 (W.D. Pa. 1995) applied the same strict privity standard to claims for both professional negligence and negligent misrepresentation.

omitted). AHERF and all of the other debtors, therefore, were left with Centennial's inherited Graduate liabilities.[14] PwC's Section 541(a)(1) argument fails because the AHERF estates' claims against PwC existed as of the date of bankruptcy, and substantive consolidation merely recognized that the already "scrambled" AHERF estates were cross-responsible for each other's liabilities.[15] And whether or not Judge McCullough used the phrase *nunc pro tunc*, his order specified that the AHERF debtors would be treated as a single entity in all "Recovery Actions" (including this one). *See* Comm. Supp. SOF ¶ 139.

## VI. C&L Breached Its Own Duties And Aided And Abetted The Breaches Of Others.

The highest Pennsylvania appellate courts to reach the issues and the better reasoned federal opinions recognize the Committee's breach of contract and aiding and abetting breach of fiduciary duty claims. The Pennsylvania Supreme Court went out of its way to note that "[u]nder present Pennsylvania law," the latter claim "is a recognized cause of action." *AHERF II*, 989 A.2d at 327.[16]

Respectfully submitted,

/s/ *James M. Jones*
James M. Jones (PA #81295)
JONES DAY
500 Grant Street, 45th Floor
Pittsburgh, PA 15219-2514
(412) 391-3939

Dated: March 2, 2011

Attorneys for The Official Committee of Unsecured Creditors of AHERF

[14] *Owens Corning* addressed whether a district court's "deemed" consolidation, solely for bankruptcy plan purposes (and in contrast to the full substantive consolidation and attendant merger of assets and liabilities ordered by Judge McCullough here), should stand where that "deemed" consolidation's primary purpose was a "ploy to deprive one group of creditors of their rights while providing a windfall to other creditors." *Owens Corning*, 419 F.3d at 200. AHERF's substantive consolidation was not "deemed" and had no such nefarious purpose or effect.

[15] *See*, *e.g.*, *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 86 (3d Cir. 2003) (in substantively consolidating, "the question is whether the 'eggs'—consisting of the ostensibly separate companies—are so scrambled that we decline to unscramble them"); *In re MacDonald*, 326 B.R. 6, 12-13 (Bankr. D. Mass. 2005) (post-petition damages resulting from pre-petition injury were property of the estate).

[16] PwC also argues that the Committee "does not point to any evidence" that "C&L knew that AHERF management's conduct was a breach of fiduciary duty." PwC Reply at 30. This, despite pages of citations to such evidence previously provided. *See*, *e.g.*, Comm. SOF ¶¶ 63-136, 222, 243-301; Comm. Supp. SOF ¶¶ 3-24, 34, 38-42, 61-67.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2011, I electronically filed the foregoing Sur-Reply in Opposition to PricewaterhouseCoopers, LLP's Renewed Motion for Summary Judgment with the Clerk of the Court using CM/ECF, causing same to be served on all counsel of record via ECF filing notice.

/s/ *James M. Jones*
One of the attorneys for The Official Committee of Unsecured Creditors of AHERF